225

Ch.                    **In re Paramount Airways Ltd. (C.A.)**

A    The following additional cases were cited in argument:

*Anglo-African Steamship Co., In re* (1886) 32 Ch.D. 348, C.A.
*Attock Cement Co. Ltd. v. Romanian Bank for Foreign Trade* [1989]
     1 W.L.R. 1147; [1989] 1 All E.R. 1189, C.A.
*Bishopsgate Investment Management Ltd. v. Maxwell* [1993] Ch. 1; [1992]
     2 W.L.R. 991; [1992] 2 All E.R. 856, C.A.
*Clark v. Oceanic Contractors Inc.* [1981] 1 W.L.R. 59
B    *Cooke v. Charles A. Vogeler Co.* [1901] A.C. 102, H.L.(E.)
*Mackinnon v. Donaldson, Lufkin and Jenrette Securities Corporation* [1986]
     Ch. 482; [1986] 2 W.L.R. 453; [1986] 1 All E.R. 653
*Seagull Manufacturing Co. Ltd., In re* [1992] Ch. 128; [1991] 3 W.L.R. 307;
     [1991] 4 All E.R. 257
*Shilena Hosiery Co. Ltd., In re* [1980] Ch. 219; [1979] 3 W.L.R. 332; [1979]
     2 All E.R. 6
C    *Spiliada Maritime Corporation v. Cansulex Ltd.* [1987] A.C. 460; [1986]
     3 W.L.R. 972; [1986] 3 All E.R. 843, H.L.(E.)
*Theophile v. Solicitor-General* [1950] A.C. 186; [1950] 1 All E.R. 405,
     H.L.(E.)
*Tracomin S.A. v. Sudan Oil Seeds Co. Ltd. (Nos. 1 and 2)* [1983] 1 W.L.R.
     1026; [1983] 3 All E.R. 137, C.A.

D    The following cases, although not cited, were referred to in the skeleton
arguments:

*Air-India v. Wiggins* [1980] 1 W.L.R. 815; [1980] 2 All E.R. 593, H.L.(E.)
*Ashtiani v. Kashi* [1987] Q.B. 888; [1986] 3 W.L.R. 647; [1986] 2 All E.R.
     970, C.A.
*Attorney-General for Alberta v. Huggard Assets Ltd.* [1953] A.C. 420; [1953]
E    2 W.L.R. 768; [1953] 2 All E.R. 951, P.C.
*Babanaft International Co. S.A. v. Bassatne* [1990] Ch. 13; [1989] 2 W.L.R.
     232; [1989] 1 All E.R. 433, C.A.
*Banque des Marchands de Moscou (Koupetschesky) v. Kindersley* [1951] Ch.
     112; [1952] 1 All E.R. 1269, C.A.
*Compania Merabello San Nicholas S.A., In re* [1973] Ch. 75; [1972]
     3 W.L.R. 471; [1972] 3 All E.R. 448
F    *Derby & Co. Ltd. v. Weldon (No. 6)* [1990] 1 W.L.R. 1139; [1990] 3 All
     E.R. 263, C.A.
*Draper (C. E. B.) & Son Ltd. v. Edward Turner & Son Ltd.* [1965] 1 Q.B.
     424; [1964] 3 W.L.R. 783; [1964] 3 All E.R. 148, C.A.
*Dulles' Settlement, In re* [1951] Ch. 265; [1950] 2 All E.R. 1013, C.A.
*English, Scottish and Australian Chartered Bank, In re* [1893] 3 Ch. 385,
     C.A.
G    *Farrell v. Alexander* [1977] A.C. 59; [1976] 3 W.L.R. 145; [1976] 2 All E.R.
     721, H.L.(E.)
*Gold Star Publications Ltd. v. Commissioner of Police of the Metropolis*
     [1981] 1 W.L.R. 732; [1981] 2 All E.R. 257, H.L.(E.)
*Haiti (Republic of) v. Duvalier* [1990] 1 Q.B. 202; [1989] 2 W.L.R. 261;
     [1989] 1 All E.R. 456, C.A.
*Holmes v. Bangladesh Biman Corporation* [1989] A.C. 1112; [1989] 2 W.L.R.
H    481; [1989] 1 All E.R. 852, H.L.(E.)
*Macleod v. Attorney-General for New South Wales* [1891] A.C. 455, P.C.
*Reg. v. West Yorkshire Coroner, Ex parte Smith* [1983] Q.B. 335; [1982]
     3 W.L.R. 920; [1982] 3 All E.R. 1098, C.A.
*Whitney v. Inland Revenue Commissioners* [1926] A.C. 37, H.L.(E.)

226

APPEAL from Mervyn Davies J.                                                    A

On 29 November 1990 the joint administrators of Paramount Airways
Ltd., Roger Arthur Powdrill and Joseph Beaumont Atkinson, issued an
originating application against the respondent, Hambros Bank (Jersey)
Ltd., seeking, inter alia, (1) a declaration that the payment of £346,800
made on or about 31 July 1989 into the account of Anser General
Investments S.A. held with the bank, effectively reducing the
indebtedness of Anser General Investments S.A. to the bank, constituted    B
a transaction at an undervalue within section 238 of the Insolvency Act
1986; (2) an order that the bank pay to the administrators the sum of
£346,800; (3) a declaration that the payment of £1,300,000 made on or
about 4 July 1989 into the account of Anser General Investments S.A.
with the bank, effectively reducing the indebtedness of Anser General
Investments S.A. to the bank, constituted a transaction at an undervalue   C
within section 238 of the Act of 1986; and (4) an order that the bank
pay to the administrators the sum of £1,300,000.

On 30 November 1990 Mr. Registrar Buckley made an order granting
the administrators liberty to serve the originating application by post
upon the bank at 13, Broad Street, St. Helier, Channel Islands. On
19 June 1991 Mervyn Davies J. set aside the registrar's order on the
ground that section 238 of the Act of 1986 did not have extraterritorial   D
effect so as to apply to a foreign bank incorporated and resident abroad
having no place of business in the United Kingdom, with the consequence
that the court had no jurisdiction to make an order under the section
against the bank.

By a notice of appeal dated 22 July 1991 the administrators appealed
on the grounds, inter alia, that (1) the judge had erred in law in holding  E
that the court had no jurisdiction to make any order under section 238
of the Act of 1986 against the bank; (2) the judge should have held that
the words "any person" in section 238 meant (in the case of a company)
any company, whether or not registered in England and Wales, or
having a place of business in England and Wales, or carrying on
business in England and Wales at the time of the transaction complained
of; alternatively, that those words (in the case of a company) meant any   F
company with a sufficient connection with England and Wales: and that,
on the facts of the case, there was a sufficient connection; and in either
case the court accordingly had jurisdiction to entertain the originating
application against the bank, and to grant leave under rule 12.12 of the
Insolvency Rules 1986 to serve the bank in Jersey; and (3) in construing
section 238 of the Act of 1986 the judge had erred in failing (i) to hold   G
that the bank, even though a Jersey company, was within the class of
persons with respect to whom Parliament was to be presumed to be
legislating in section 238; (ii) to give sufficient weight to the mischief
which the section was intended to remedy, and/or to the disastrous
practical consequences for all insolvencies with any international element
if the operation of the section were limited to those within England and
Wales at the time of the transaction complained of; (iii) to give sufficient  H
weight to the legislative context of the section and related sections; and
(iv) to give sufficient weight to the fact that the transactions dealt with
by the sections necessarily had a connection with England and Wales in

1

227

Ch.                    In re Paramount Airways Ltd. (C.A.)

A    that they involved a disposition of the property of a person or company
the subject of insolvency proceedings before the courts of England and
Wales.

By a respondent's notice the bank notified its intention of contending
that the judge's decision should be affirmed on the additional ground
that he should in any event have exercised his discretion under rule
12.12 and set aside the registrar's order on the ground that it was not a
B    proper case for service of the originating application out of the
jurisdiction; and in particular because (i) the bank had at all relevant
times no presence in, and/or sufficient connection with, England and
Wales; and/or (ii) the judge should have applied and/or had regard to
the provisions of R.S.C., Ord. 11 and, had he done so, should have
concluded that the claims raised did not fall within the ambit of the
C    order and that leave to serve out should thus be refused.

The facts are stated in the judgment of Sir Donald Nicholls V.-C.


*Nicholas Merriman Q.C.* and *Richard Salter* for the administrators.
On its true construction section 238 of the Insolvency Act 1986 gives the
court jurisdiction to make orders against "any person" provided that the
criteria laid down in sections 238 and 241 are satisfied. The "territorial
D    principle" in *Ex parte Blain; In re Sawers* (1879) 12 Ch.D. 522 is not an
invariable rule of law but a rebuttable presumption used to construe
statutes expressed in general terms: see *Clark v. Oceanic Contractors
Inc.* [1983] 2 A.C. 130, 145, 152. The court should treat the presumption
simply as one of the factors to be taken into account.

The wording, structure, subject matter, scheme and legislative history
E    of the Act show that Parliament intended that the provisions of the Act
should apply to offshore companies as well as persons in England and
Wales. Difficulties of enforcement can be dealt with on a practical basis:
either the administrator will not bring proceedings or leave to serve out
can be refused under rule 12.12 of the Insolvency Rules 1986. Moreover,
comity does not require an implied territorial limitation. Decisions on
F    predecessor provisions have been concerned with the construction of the
rules governing leave to serve proceedings out of the jurisdiction, not
with any implied territorial limitation: see *Rousou's Trustee v. Rousou*
[1955] 1 W.L.R. 545; [1955] 3 All E.R. 486.

There has been a shift in the law's attitude to assertion of jurisdiction
over foreigners: see *Tracomin S.A. v. Sudan Oil Seeds Co. Ltd. (Nos.
G    1 and 2)* [1983] 1 W.L.R. 1026 and *In re Vocalion (Foreign) Ltd.* [1932]
2 Ch. 196. The *Ex parte Blain* presumption is weak where the English
courts are already seised of the primary subject matter and the conduct
which Parliament is regulating has an English connection and effects
within England. Since section 238 contains an express definition of the
classes of person to whom it applies, no additional limitations on those
classes should be implied. *In re Tucker (R.C.) (A Bankrupt), Ex parte
H    Tucker (K.R.)* [1990] Ch. 148 is distinguishable since it was concerned
with the special case of the power to summon witnesses on a private
examination in bankruptcy. [Reference was also made to *In re Seagull
Manufacturing Co. Ltd.* [1992] Ch. 128.]

1

228

Prior to 1962 there was no statutory power, corresponding to R.S.C., Ord. 11, authorising the Bankruptcy Court to assert extraterritorial jurisdiction against persons other than the debtor. This deficiency was remedied by the Bankruptcy (Amendment) Rules 1962 (S.I. 1962 No. 295 (L. 3)): see *In re Jogia (A Bankrupt)* [1988] 1 W.L.R. 484. Rule 12.12 of the Insolvency Rules 1986 expressly dissociated jurisdiction to grant leave for service out of the jurisdiction in insolvency proceedings from Order 11: see *In re Tucker (A Bankrupt)* [1988] 1 W.L.R. 497. It is improbable that Parliament intended by the Act of 1986 to reduce the court's jurisdiction and, in particular, to restrict the remedies available to the trustee in bankruptcy formerly conferred by section 42 of the Bankruptcy Act 1914 and section 172 of the Law of Property Act 1925. [Reference was made to *Bishopsgate Investment Management Ltd. v. Maxwell* [1993] Ch. 1.]

The Act of 1986 contains no limitation on those companies which may be made the subject of the primary jurisdiction similar to the conditions which have to be satisfied in respect of a debtor before a bankruptcy petition can be presented. Under Part V of the Act the court has jurisdiction to wind up "any unregistered company," which includes overseas companies: see section 220. The courts have developed a flexible test for assuming this jurisdiction: see *In re A Company (No. 00359 of 1987)* [1988] Ch. 210. Although there are no limitations on the phrase "any person" the courts should, when deciding whether to make an order, take into account (a) the closeness of connection between the transaction in question and this country and (b) the likelihood of benefit accruing to the creditors.

It is necessary, in order to obtain leave under rule 12.12 of the Rules of 1986, to satisfy the court that the case is a proper one for leave to be granted in the exercise of the court's discretion. [Reference was made to *Spiliada Maritime Corporation v. Cansulex Ltd.* [1987] A.C. 460.]

*Nigel Davis* for the bank. Section 238 should be construed in conformity with the principle in *Ex parte Blain; In re Sawers*, 12 Ch.D. 522, 526, that English legislation, unless the contrary is expressly enacted or plainly to be implied, is presumed to be applicable only to British subjects or to foreigners abroad who have come to this country and made themselves subject to the jurisdiction: see *In re Tucker (R.C.) (A Bankrupt), Ex parte Tucker (K.R.)* [1990] Ch. 148. [Reference was made to *Cooke v. Charles A. Vogeler Co.* [1901] A.C. 102.] The making of an order under the section against a foreigner depends on establishing his presence in the jurisdiction at the time of the transaction. The *Ex parte Blain* principle is not merely a factor to be taken into consideration but involves an initial presumption that Parliament does not intend to legislate extraterritorially: see *Clark v. Oceanic Contractors Inc.* [1983] 2 A.C. 130. [Reference was made to *Mackinnon v. Donaldson, Lufkin and Jenrette Securities Corporation* [1986] Ch. 482.] Thus the administrators have to establish that the section by express words or necessary implication has extraterritorial effect. Section 426 of the Act of 1986 illustrates the limited jurisdictional approach contemplated by Parliament.

1

A    *Rousou's Trustee v. Rousou* [1955] 1 W.L.R. 545 does not support
the administrators' case. It would be surprising if the Act of 1986 were
to extend to money received in a foreign country. On the administrators'
argument an innocent foreign recipient of property transferred abroad
under a transaction valid under local law could fall within the section.
That would be repugnant to international law. [Reference was made to
*Cheshire & North's Private International Law*, 11th ed. (1987), p. 911;

B    *Dicey & Morris, The Conflict of Laws*, 11th ed. (1987), vol. 2, pp. 1110–
1112; *Sill v. Worswick* (1791) 1 H.Bl. 665; *Galbraith v. Grimshaw* [1910]
A.C. 508 and *In re Vocalion (Foreign) Ltd.* [1932] 2 Ch. 196.] The
*Ex parte Blain* principle is neither outdated (see *Clark v. Oceanic
Contractors Inc.* [1983] 2 A.C. 130) nor superseded: see *In re Seagull
Manufacturing Co. Ltd.* [1992] Ch. 128 and *Theophile v. Solicitor-

C    General* [1950] A.C. 186.
    Section 238 is not aimed primarily at wrongdoing, but at the fair
distribution of assets among creditors. Even if it is aimed at wrongdoing,
it does not follow that it should be construed liberally. In any event,
some limitation should be implied by analogy with R.S.C., Ord. 11. It is
unlikely that Parliament intended to enlarge the jurisdiction of the court
by the insolvency rules. As to the exercise of discretion, this was not a

D    proper case for granting leave to serve out of the jurisdiction since the
discretion ought to be exercised by analogy with Order 11 and the
claims do not fall within any of the paragraphs of Ord. 11, r. 1(1).
    *Merriman Q.C.* in reply. *In re Jogia (A Bankrupt)* [1988] 1 W.L.R.
484; *In re Shilena Hosiery Co. Ltd.* [1980] Ch. 219; *In re Tucker
(A Bankrupt)* [1988] 1 W.L.R. 497 and *Rousou's Trustee v. Rousou*

E    [1955] 1 W.L.R. 545 show that sections 42 and 44 of the Bankruptcy
Act 1914, section 172 of the Law of Property Act 1925 and section 320
of the Companies Act 1985 were all treated as applying to foreign
recipients of property. It was against that background that the Act of
1986 was passed. Section 426(4), which empowers English courts to
assist foreign courts exercising insolvency jurisdiction, is plainly based
on the expectation that foreign courts will make extraterritorial orders

F    affecting persons or property within the jurisdiction of the English
courts, and that English courts will act similarly.
    As to the relationship between exercise of discretion and assumption
of jurisdiction, see *Attock Cement Co. Ltd. v. Romanian Bank for
Foreign Trade* [1989] 1 W.L.R. 1147. Where the jurisdiction under
section 238 is unlimited and unfettered the exercise of jurisdiction
extraterritorially must be based on demonstration of a sufficient

G    connection with this country. As to connecting factors, see *Clark v.
Oceanic Contractors Inc.* [1981] 1 W.L.R. 59, 65. As to the need for a
statutory authority to serve out of the jurisdiction, see *In re Anglo-
African Steamship Co.* (1886) 32 Ch.D. 348.

*Cur. adv. vult.*

H    27 February.    The following judgments were handed down.

    SIR DONALD NICHOLLS V.-C.    All legal systems have to deal with the
situation which arises where a debtor is unable to pay his debts. Under

1

230

Sir Donald
Nicholls V.-C.                In re Paramount Airways Ltd. (C.A.)                [1993]

English law, where the debtor is a corporate body, its assets are sold,    A
the proceeds distributed among its creditors, and then the debtor ceases
to exist, i.e., it is dissolved. The law is more merciful to an individual.
His property is sold and the proceeds distributed among his creditors.
Thereafter, in due course, he is discharged from bankruptcy and is
permitted to resume a normal life, freed from the burden of his past
debts.

    This simple scheme has to be buttressed by statutory provisions    B
concerned to prevent abuse by debtors and to achieve a fair distribution
of a debtor's property among his creditors. In some circumstances it
would not be reasonable that a disposition of property made by an
individual before his bankruptcy, or by a company before being wound
up, should be allowed to stand. This may be because of the purpose for
which the disposition was made, or because of the time at which it was    C
made. One instance is where a debtor, anticipating insolvency, seeks to
discharge one of his debts in priority to the others. For example, a
company may pay off its bank overdraft ahead of its other liabilities
because the directors have given personal guarantees to the bank. The
directors are anxious to relieve themselves of their personal liability, so
they decide to use what money is available in repaying the bank and to
leave those who have supplied goods to the company to whistle for their    D
money. Another instance is when an individual, anxious about the
consequences of his insolvency, gives away his property shortly before
he becomes bankrupt. For example, he transfers his share of his house
to his wife. Fairness to his creditors demands that he should not be able
to deplete his assets in this way in a deliberate attempt to put them
beyond the reach of his creditors.                                        E

    Successive statutes, principally the Bankruptcy Acts and the
Companies Acts, contained provisions regulating this subject matter.
They were something of a hotchpot. The provisions are to be found now
in the Insolvency Act 1986. They comprise a coherent, modernised and
expanded code. Section 238 enables the court, in prescribed circum-
stances, to make orders restoring the original position where a company
has made gifts or entered into other transactions at an undervalue.    F
Section 239 gives the court a like power in respect of a transaction by a
company which has put a creditor or guarantor into a better position in
the event of the company going into insolvent liquidation than otherwise
would have been the case. Sections 339 and 340 contain similar, although
not identical, provisions where an individual is adjudged bankrupt. The
question raised by this appeal concerns the territorial scope of these    G
provisions and, in particular, of the phrase "any person" in section
238(2). The applicants, who are the administrators of an English
company, Paramount Airways Ltd., claim that the words mean exactly
what they say: any person. Hence the expression is apt to include the
respondent bank, Hambros Bank (Jersey) Ltd. ("Hambros Jersey").
The contrary argument is that Hambros Jersey is outside the ambit of
the section, because the apparent width of the phrase is subject to an    H
implied limitation that the expression applies only to (1) British subjects
and (2) all persons present in England and Wales at the time of the
impugned transaction. Hambros Jersey does not fall within either of

1

231

Ch.                    In re Paramount Airways Ltd. (C.A.)          Sir Donald
                                                                  Nicholls V.-C.

A   these heads. Hambros Jersey is part of the Hambros Bank Group, but it
    is a Jersey company. It carries on business in Jersey, and does not carry
    on business in England and Wales. Mervyn Davies J. [1992] Ch. 160
    upheld this argument and implied a limitation, although in not precisely
    these terms. He held that section 238 applies to British subjects,
    companies registered in England, foreigners present in England and,
    possibly, foreign companies carrying on business in England. The
B   administrators have appealed from that decision.

    *The facts*

        Before turning to the precise terms of the statutory provisions I must
    set the scene by referring to the facts. For the purposes of this appeal
    the barest outline is sufficient. Paramount Airways Ltd. ("the company")
C   is a company which carries on business as a charter airline. On 7 August
    1989 an administration order was made in respect of the company. In
    the present proceedings the joint administrators are alleging that in July
    1989 the company had £1·3m. standing to the credit of its bank account
    in England. The company is also said to have been the beneficial owner
    of £346,800 held by solicitors in London. These two sums of money
D   were then transferred from England to Jersey by being paid, on the
    instructions of Mr. Ferriday, a director and chairman of the company, to
    the credit of a bank account held by Ryco Trust Ltd., a Jersey company,
    with Hambros Jersey. Ryco is a company administration agent which is
    said to have managed Anser General Investments S.A., a Panamanian
    company, on behalf of Mr. Ferriday. Anser is alleged to be owned or
    controlled by Mr. Ferriday. On the instructions of Ryco the money was
E   then transferred to Anser and paid into an account which Anser
    maintained in Jersey with Hambros Jersey. The payments were in
    reduction of Anser's overdraft. The administrators are alleging that the
    company's money was misappropriated and paid away for no benefit to
    the company. They assert that the payments to Anser were transactions
    at an undervalue made at a time when the company was unable to pay
F   its debts and within the relevant period of time stipulated in section 240.
    They seek an order that Hambros Jersey restore the money to the
    company. They are alleging that the benefit Hambros Jersey received
    from partial repayment of the overdraft was not acquired in good faith
    and for value and without notice of the relevant circumstances.
        Hambros Jersey has denied this claim, but it admits, for the purposes
    only of this appeal, that (subject to the jurisdiction point) the
G   administrators have an arguable case against the bank under section 238.
    An originating application was issued by the administrators on
    23 November 1990, and on 30 November 1990 the registrar gave leave
    to serve these proceedings out of the jurisdiction. Hambros Jersey
    applied to set aside that order, and it is against the judge's decision of
    14 June 1991 acceding to that application that this appeal was brought.
        The company, acting by the administrators, also commenced actions
H   against Mr. Ferriday and others in England and Jersey in respect of
    these transactions. The primary claim against Hambros Jersey is that it
    is liable to the company as constructive trustee for the sums of £1·3m.
    and £346,800. Hambros Jersey has submitted to the jurisdiction of the

232

English court in respect of the claims in the English action, and the A
Jersey action has been stayed. Subject to one argument to which I shall
come, concerning the proper application of the relevant insolvency rule,
Hambros Jersey does not challenge the judge's view that, if the court
has jurisdiction to grant leave to serve these section 238 proceedings on
Hambros Jersey out of the jurisdiction, this was a proper case for the
court to exercise its discretion in favour of granting leave.

B

### An aid to construction

Next I must refer to an established principle of statutory construction
which looms large on this appeal. The principle was stated by James L.J.
in *Ex parte Blain; In re Sawers* (1879) 12 Ch.D. 522, 526, in a much
quoted passage:

> "It appears to me that the whole question is governed by the broad, C
> general, universal principle that English legislation, unless the
> contrary is expressly enacted or so plainly implied as to make it the
> duty of an English court to give effect to an English statute, is
> applicable only to English subjects or to foreigners who by coming
> into this country, whether for a long or a short time, have made
> themselves during that time subject to English jurisdiction."

D

Brett and Cotton L.JJ. gave judgments to the like effect. That
decision concerned the scope of the expression "the debtor" in the
Bankruptcy Act 1869 (32 & 33 Vict. c. 71). The court held that, despite
its literal width, the expression did not embrace two Chileans resident in
Chile who had never been to England, although they were partners with
persons in England carrying on a business here.          E

The principle was the subject of authoritative exegesis by the House
of Lords recently in the tax case of *Clark v. Oceanic Contractors Inc.*
[1983] 2 A.C. 130. I need refer only to passages in the speeches of Lord
Scarman and Lord Wilberforce. Commenting on the judgments in *Ex
parte Blain*, 12 Ch.D. 522, Lord Scarman said [1983] 2 A.C. 130, 145:

> "Put into the language of today, the general principle being there F
> stated is simply that, unless the contrary is expressly enacted or so
> plainly implied that the courts must give effect to it, United
> Kingdom legislation is applicable only to British subjects or to
> foreigners who by coming to the United Kingdom, whether for a
> short or a long time, have made themselves subject to British
> jurisdiction. Two points would seem to be clear: first, that the
> principle is a rule of construction only, and secondly, that it G
> contemplates mere presence within the jurisdiction as sufficient to
> attract the application of British legislation. Certainly there is no
> general principle that the legislation of the United Kingdom is
> applicable only to British subjects or persons resident here. Merely
> to state such a proposition is to manifest its absurdity. Presence, not
> residence, is the test."

H

Lord Wilberforce said, regarding the "territorial principle," at p. 152:

> "That principle, which is really a rule of construction of statutes
> expressed in general terms, and which as James L.J. said a 'broad

Ch.                In re Paramount Airways Ltd. (C.A.)                Sir Donald
Nicholls V.-C.

A    principle,' requires an inquiry to be made as to the person with
     respect to whom Parliament is presumed, in the particular case, to
     be legislating. Who, it is to be asked, is within the legislative grasp,
     or intendment, of the statute under consideration? The contention
     being that, as regards companies, the statute cannot have been
     intended to apply to them if they are non-resident, one asks
     immediately—why not?"

B
     From these observations the task before the court on this appeal can
     be distilled in this form: the court is concerned to inquire as to the
     persons with respect to whom Parliament is presumed to have been
     legislating when using the expression, "any person," and in making that
     inquiry Parliament is to be taken to have been legislating only for
     British subjects or foreigners coming to the United Kingdom, unless the
C    contrary is expressed (which it is not here) or is plainly implicit.

     *The sections*

     In summary form, the provisions of the relevant sections are as
     follows. Section 238 applies in the case of a company in respect of which
     an administration order has been made or which has gone into
D    liquidation. "Company" means, in short, a company registered under
     the Companies Acts: see sections 251 and 735(1) of the Companies Act
     1985. Section 238(2) and (3) provides:

          "(2) Where the company has at a relevant time . . . entered into a
          transaction *with any person* at an undervalue, the [administrator or
          liquidator] may apply to the court for an order under this section.
E         (3) . . . the court shall, on such an application, make such order as
          it thinks fit for restoring the position to what it would have been if
          the company had not entered into that transaction." (My emphasis.)

     In short, a transaction at an undervalue means a gift or a transaction for
     a consideration which is significantly less in value than the consideration
     provided by the company: subsection (4). An order is not to be made
F    under the section if the company entered into the transaction in good
     faith and for the purpose of carrying on its business and at the time
     there were reasonable grounds for believing the transaction would
     benefit the company: subsection (5).
     Section 239, concerned with preferences, applies in the same
     circumstances as section 238. Subsections (2) and (3) provide:

G         "(2) Where the company has at a relevant time . . . given a
          preference *to any person*, the [administrator or liquidator] may
          apply to the court for an order under this section. (3) . . . the court
          shall, on such an application, make such order as it thinks fit for
          restoring the position to what it would have been if the company
          had not given that preference." (My emphasis.)

H    Giving a "preference" means doing anything which has the effect of
     putting one of the company's creditors, or a guarantor for any of the
     company's debts, into a better position in the event of the company
     going into liquidation than otherwise would have been the case:

234

Sir Donald
Nicholls V.-C.                 In re Paramount Airways Ltd. (C.A.)                    [1993]

subsection (4). An order is not to be made under the section unless, in    A
deciding to give the preference, the company was influenced by a desire
to produce that effect: subsection (5). Where a preference is given to a
person "connected with the company," the court is to presume that the
company was so influenced unless the contrary is shown: subsection (6).

   Sections 240 and 241 contain ancillary provisions. Section 240 sets
out an elaborate definition of the expression "relevant time." For
present purposes it is sufficient to note that the expression embraces the    B
period of two years prior to the onset of insolvency in the case of
transactions at an undervalue and of preferences given to a person
connected with the company, provided that at the time of the transaction
the company was unable to pay its debts or it became unable to pay its
debts by reason of the transaction. In the case of other preferences the
period is six months. Section 241 lists some of the types of orders the    C
court may make under section 238 or section 239. The court may
require any property transferred as part of the transaction to be vested
in the company, release any security given by the company, require
"any person" to make payments to the administrator or liquidator in
respect of benefits received by him from the company, provide for a
guarantor whose obligations have been discharged to be under revived
obligations, provide for security to be given for the discharge of    D
obligations imposed by the order and for the priority which such security
shall have, and provide for the extent to which persons may be able to
prove in the winding up. Subsection (2) is in wide terms, enabling the
court to make an order against a person even though he was not a party
to the transaction with the company:

      "(2) An order under section 238 or 239 may affect the property    E
   of, or impose any obligation on, *any person* whether or not he is
   the person with whom the company in question entered into
   the transaction or . . . the person to whom the preference was
   given; . . ." (My emphasis.)

There is a saving in respect of interests which were acquired, for value
and in good faith and without notice of the relevant circumstances, from    F
a person other than the company.

   Sections 238 and 239 are matched by comparable provisions, in
sections 339 to 342, regarding individuals who are adjudged bankrupt.
Section 339, concerning transactions at an undervalue, provides:

      "(1) . . . where an individual is adjudged bankrupt and he has at a
   relevant time . . . entered into a transaction *with any person* at an    G
   undervalue, the trustee of the bankrupt's estate may apply to the
   court for an order under this section. (2) The court shall, on such
   an application, make such order as it thinks fit for restoring the
   position to what it would have been if that individual had not
   entered into that transaction." (My emphasis.)

Section 340 makes corresponding provision for an application to the    H
court, and for the court making an order, where an individual has given
a preference "to any person." "Relevant time" is defined in similar
terms to those applicable to companies so far as preferences are

1

235

Ch.                       In re Paramount Airways Ltd. (C.A.)           Sir Donald
                                                                      Nicholls V.-C.

A    concerned, but a more extended period, of five years, is provided for
     transactions at an undervalue. The need for insolvency at the relevant
     time does not apply to transactions at an undervalue entered into less
     than two years before the individual is adjudged bankrupt. Section 342,
     regarding the orders which the court may make, is in similar terms to
     section 241.

B        Finally, section 423, coupled with sections 424 and 425, makes
     provision regarding "transactions defrauding creditors." This section
     applies whether or not insolvency proceedings of any kind have been
     taken, and it applies however long before the application to the court
     the transaction being impugned was entered into. Where the debtor has
     been adjudged bankrupt or is a company which is being wound up or in
     relation to which an administration order is in force, the application can
C    only be made by the official receiver, the trustee of the bankrupt's
     estate, the liquidator or the administrator or, with the leave of the
     court, by a victim of the transaction. In other circumstances an
     application may be made by a victim of the transaction, viz., a person
     who is, or is capable of being, prejudiced by the transaction. Shortly
     stated, the section applies to transactions "with another person" entered
     into by way of a gift, or in consideration of marriage or for a
D    consideration significantly less in value than the consideration provided
     by the debtor: subsection (1). The court has power to make such order
     as it thinks fit for restoring the position to what it would have been if
     the transaction had not been entered into and also, in this case, for
     protecting the interests of persons who are the victims of the transaction:
     subsection (2). A prerequisite to making such an order is that the court
E    is satisfied that the transaction was entered into by the debtor for the
     purpose either of putting assets beyond the reach of a person who is
     making, or may at some time make, a claim against him, or of otherwise
     prejudicing the interests of such a person in relation to such a claim:
     subsection (3).

*The persons in respect of whom Parliament was legislating*

F        It will have been seen from the above summary that, on its face, the
     legislation is of unlimited territorial scope. To be within the sections a
     transaction must possess certain features. For instance, it must be at an
     undervalue and made at a time when the company was unable to pay its
     debts, the company must be in the course of being wound up in England
     or subject to an administration order, and so on. If a transaction
G    satisfies these requirements, the section applies, irrespective of the
     situation of the property, irrespective of the nationality or residence of
     the other party, and irrespective of the law which governs the transaction.
     In this respect the sections purport to be of universal application. The
     expression "with any person" merely serves to underline this universality.
     It is, indeed, this generality which gives rise to the problem.

H        In these circumstances one is predisposed to seek for a limitation
     which can fairly be read as implicit in the scheme of the legislation.
     Parliament may have been intending to legislate in such all-embracing
     terms. Parliament may have intended that the English court could and
     should bring before it, and make orders against, a person who has no

Sir Donald
Nicholls V.-C.                In re Paramount Airways Ltd. (C.A.)                    [1993]

connection whatever with England save that he entered into a transaction,    A
maybe abroad and in respect of foreign property and in the utmost good
faith, with a person who is subject to the insolvency jurisdiction of the
English court. Indeed, he might be within the sections and subject to
orders even though he had not entered into a transaction with the
company or debtor at all. Such an intention by Parliament is possible.
But self-evidently in some instances such a jurisdiction, or the exercise
of such a jurisdiction, would be truly extraordinary.                             B

The difficulty lies in finding an acceptable implied limitation. Let me
say at once that there are formidable, and in my view insuperable,
objections to a limitation closely modelled on the formula enunciated in
*Ex parte Blain*, 12 Ch.D. 522 as explained by Lord Scarman in *Clark v.
Oceanic Contractors Inc.* [1983] 2 A.C. 130, 145. The implied limitation
for which Hambros Jersey contended is riddled with such serious,            C
glaring anomalies that Parliament cannot be presumed to have intended
to legislate in such terms.

In the first place, to treat presence of the other party within England
and Wales as the factor which determines whether a transaction is
within the ambit of the sections would be to adopt a criterion which
would be capricious in the extreme. A transaction with a foreigner who
is resident here would be outside the embrace of the legislation if he      D
happened to be abroad, or chose to be abroad, at the time the
transaction was effected. Conversely, a foreign national resident abroad
would find that the transaction with him was within the Act if, but only
if, he was physically present in this country at the time of the transaction.
Secondly, this criterion would leave outside the scope of the legislation a
transaction by a debtor with an overseas company wholly controlled by      E
him. Siphoning money abroad in this way is a typical case to which the
new legislation must have been intended to apply. Thirdly, this test
would draw a distinction between the position of British subjects and
others on a matter of substantive law affecting property transactions. It
would be surprising if Parliament had such an intention today. Fourthly,
this test would mean that there was no remedy under the Act in respect
of a transaction with an overseas company, or a foreigner living here but   F
abroad at the crucial moment, even if the subject matter was English
land. Mr. Davis felt constrained to accept that such a case might be
within the purview of the legislation. This concession betrays the
weakness of Hambros Jersey's argument. If a transaction relating to
English land is within the legislation regardless of the identity or
whereabouts of the other party to the transaction, why should not this      G
equally be so with regard to a transaction relating to shares in an
English company? Or United Kingdom Government stocks? Or money
in an English bank account? What this shows is that the physical
absence or presence of the other party at the time of the transaction by
itself bears no necessary relationship to the appropriateness of the
transaction being investigated and made the subject of an order by an
English court. As a sole touchstone it is useless.                          H

The oddities do not end there. Hambros Jersey's contention, if
correct, would mean that the jurisdiction of the English court under the
sections would be much more restricted than the circumstances in which

237

Ch.                    In re Paramount Airways Ltd. (C.A.)          Sir Donald
Nicholls V.-C.

A   an individual may be adjudged bankrupt or a company may be wound
up by the English court. Under section 265 the English court has
jurisdiction, for example, over a debtor who is a foreign national who
has never lived or been here so long as, at a time within the last three
years, he was a member of a firm which carried on business in this
country. As to companies, under section 221 the court has jurisdiction
to wind up overseas companies, a subject to which I shall return. Given

B   the width of the ambit of these basic provisions, it would be surprising if
Parliament is to be taken to have intended to limit the sections now
under consideration as Hambros Jersey contended. Particularly, perhaps,
since English law provides for the distribution of the assets of the
insolvent among all the creditors worldwide. English law does not erect
a "ring fence" to exclude creditors living abroad.

C   For completeness I mention one further small pointer in the same
direction, if one be needed. It is of a linguistic nature. As already seen,
the sections make special provision for transactions with persons who
are connected with the company or are associates of the debtor. For
example, a company which has given a preference to a person connected
with the company is rebuttably presumed to have been influenced by a
desire to prefer that person. Under the statutory definitions one of the

D   circumstances in which a person is connected with a company is where
the person is a company which is under common control: see sections
249 and 435(6). Section 435(11) provides that for this purpose "company"
includes any body corporate, whether incorporated in England or
elsewhere. These provisions do not sit happily with the implied limitation
for which Hambros Jersey contended.

E   For these reasons Parliament cannot be taken to have been legislating
only for transactions with the two classes of persons within Hambros
Jersey's suggested limitation. So I cast around to see whether there is
some other limitation implicit in the legislation: is there some other class
with respect to whom Parliament is to be presumed to have been
legislating? For example, in *In re Tucker (R. C.) (A Bankrupt), Ex parte
Tucker (K. R.)* [1990] Ch. 148, where the application of the *Ex parte*

F   *Blain*, 12 Ch.D. 522 principle was urged, this court declined to construe
the words "any person" in section 25 of the Bankruptcy Act 1914 as
embracing British subjects wherever they might be, and held that the
power given to the court by that section to summon persons before it
was even more limited and extended only to persons who were available
to be served in England.

G   In the end I am unable to discern any satisfactory limitation. I am
unable to identify some other class. The case for some limitation is
powerful, but there is no single, simple formula which is compelling,
save for one expressed in wide and loose terms (e.g., that the person, or
the transaction, has a "sufficient connection" with England) that would
hardly be distinguishable from the ambit of the sections being unlimited
territorially and the court being left to display a judicial restraint in the

H   exercise of the jurisdiction. I mention, to dismiss, some examples of
unacceptable simple tests. One possibility might be that the section
applies only to transactions with persons who are available to be served
with process in England and Wales. Such a limitation would have similar

238

defects to those discussed above. Another possibility is that the   A
transactions are confined to those governed by English law. But the
remedies given by the sections include personal remedies, such as an
order that the recipient of property transfer it back to the company, or
an order that the other party to a transaction pay a sum of money to the
trustee of the bankrupt's estate. It would be odd if a transaction were
outside the section in all circumstances solely because it was governed
by a foreign law even though, for instance, all the parties were in this   B
country at all times. The same objection applies to a third possibility,
namely, that the sections apply only to dealings with property, immovable
or movable, situate in England and Wales at the relevant time.

Authority does not provide any guidance. Surprisingly, the court
seems never to have decided this "territoriality" question in relation to
the predecessor sections in the earlier Acts, such as sections 42 and 44   C
of the Bankruptcy Act 1914, section 320 of the Companies Act 1948 and
section 172 of the Law of Property Act 1925. The questions which arose
turned on the construction of the then rules concerning leave to serve
proceedings out of the jurisdiction: *Rousou's Trustee v. Rousou* [1955] 1
W.L.R. 545 and, later, [1955] 3 All E.R. 486; *In re Jogia (A Bankrupt)*
[1988] 1 W.L.R. 484; and *In re Tucker (A Bankrupt)* [1988] 1 W.L.R.
497. One analogy prayed in aid in the course of argument on the   D
present appeal was the "relation back" doctrine applied in English
insolvency. This still exists in a limited form in relation both to
companies and to individuals, in that where a person is adjudged
bankrupt or a company is wound up by the court, dispositions of
property made by the debtor or the company after a prescribed date,
usually the date of the presentation of the petition for a bankruptcy   E
order or a winding up order, are void unless the court otherwise orders:
sections 127 and 284. There is some authority that, although under
English law the assignment of a bankrupt's property to the trustee in
bankruptcy operates as a worldwide assignment of all his property
wherever situated (sections 283, 306 and 436), the relation back principle
applies only to property situated in England: *Galbraith v. Grimshaw*
[1910] A.C. 508, especially *per* Lord Dunedin, at p. 513.   F

Given that the remedies under consideration in the present case are
primarily of an in personam character, perhaps a closer analogy is to
cases concerned with the circumstances in which English courts have
granted or refused injunctions to restrain creditors, who have not proved
in an English bankruptcy, from taking proceedings abroad or compelling
them to refund property obtained abroad. The decided cases are few   G
and mostly not of recent date. Residence in England was used as the
test in some cases such as *Sill v. Worswick* (1791) 1 H.Bl. 665 and *Ex
parte Ormiston; In re Distin* (1871) 24 L.T. 197. Likewise, in relation to
companies Maugham J. in *In re Vocalion (Foreign) Ltd.* [1932] 2 Ch.
196 held that it would be more conducive to substantial justice to permit
foreign proceedings, brought by a creditor domiciled overseas, to
proceed. In *Dicey & Morris, The Conflict of Laws*, 11th ed. (1987), vol.   H
2, pp. 1110–1111, the test propounded is of residence at the time the
other party received the payment. A different view is espoused in
*Cheshire & North's Private International Law*, 11th ed. (1987), p. 914.

1

239

Ch.                    In re Paramount Airways Ltd. (C.A.)                    Sir Donald
                                                                              Nicholls V.-C.

A   The suggestion made there is that it is only equitable that the jurisdiction cannot be exercised against a creditor unless the same conditions are applicable to him at the time he receives the payment as are applicable to jurisdiction over the debtor. This would be a wider test than residence.

There are areas of doubt and real difficulty here. There are unresolved conflict of laws problems. There is a crying need for an

B   international insolvency convention. As it is, the Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters 1968 does not apply to bankruptcy, winding up and analogous proceedings. Section 426(4) of the Act of 1986 envisages co-operation between United Kingdom courts and the insolvency courts of other countries, but the only order made so far is of limited application: see

C   the Co-operation of Insolvency Courts (Designation of Relevant Countries and Territories) Order 1986 (S.I. 1986 No. 2123).

In my view the solution to the question of statutory interpretation raised by this appeal does not lie in retreating to a rigid and indefensible line. Trade takes place increasingly on an international basis. So does fraud. Money is transferred quickly and easily. To meet these changing conditions English courts are more prepared than formerly to grant

D   injunctions in suitable cases against non-residents or foreign nationals in respect of overseas activities. As I see it, the considerations set out above and taken as a whole lead irresistibly to the conclusion that, when considering the expression "any person" in the sections, it is impossible to identify any particular limitation which can be said, with any degree of confidence, to represent the presumed intention of Parliament. What can be seen is that Parliament cannot have intended an implied limitation

E   along the lines of *Ex parte Blain*, 12 Ch.D. 522. The expression therefore must be left to bear its literal, and natural, meaning: any person.

*The court's discretion: a sufficient connection with England*

This conclusion is not so unsatisfactory as it might appear at first

F   sight. The matter does not rest there. Parliament is to be taken to have intended that the difficulties such a wide ambit may create will be sufficiently overcome by two safeguards built into the statutory scheme. The first lies in the discretion the court has under the sections as to the order it will make. Section 423(2) provides that the court "may" make such order as it thinks fit for restoring the position and protecting

G   victims of transactions intended to defraud creditors. Sections 238, 239, 339 and 340 provide that the court "shall," on an application under those sections, make such order as it thinks fit for restoring the position. Despite the use of the verb "shall," the phrase "such order as it thinks fit" is apt to confer on the court an overall discretion. The discretion is wide enough to enable the court, if justice so requires, to make no order against the other party to the transaction or the person to whom

H   the preference was given. In particular, if a foreign element is involved the court will need to be satisfied that, in respect of the relief sought against him, the defendant is sufficiently connected with England for it to be just and proper to make the order against him despite the foreign

240

Sir Donald
Nicholls V.-C.                In re Paramount Airways Ltd. (C.A.)                [1993]

element. This connection might be sufficiently shown by the residence of    A
the defendant. If he is resident in England, or the defendant is an
English company, the fact that the transaction concerned movable or
even immovable property abroad would *by itself* be unlikely to carry
much weight. Likewise if the defendant carries on business here and the
transaction related to that business. Or the connection might be shown
by the situation of the property, such as land, in this country. In such a
case, the foreign nationality or residence of the defendant would not *by*    B
*itself* normally be a weighty factor against the court exercising its
jurisdiction under the sections. Conversely, the presence of the defendant
in this country, either at the time of the transaction or when proceedings
were initiated, will not necessarily mean that he has a sufficient
connection with this country in respect of the relief sought against him.
His presence might be coincidental and unrelated to the transaction. Or    C
the defendant may be a multinational bank, carrying on business here,
but all the dealings in question may have taken place at an overseas
branch.

Thus in considering whether there is a sufficient connection with this
country the court will look at all the circumstances, including the
residence and place of business of the defendant, his connection with
the insolvent, the nature and purpose of the transaction being impugned,    D
the nature and locality of the property involved, the circumstances in
which the defendant became involved in the transaction or received a
benefit from it or acquired the property in question, whether the
defendant acted in good faith, and whether under any relevant foreign
law the defendant acquired an unimpeachable title free from any claims
even if the insolvent had been adjudged bankrupt or wound up locally.    E
The importance to be attached to these factors will vary from case to
case. By taking into account and weighing these and any other relevant
circumstances, the court will ensure that it does not seek to exercise
oppressively or unreasonably the very wide jurisdiction conferred by the
sections.

I pause to observe that this would not be the first time that, in this
field, Parliament has conferred on the English court a jurisdiction of    F
unlimited territorial application. Section 221 provides that an unregistered
company may be wound up under the Act. This embraces all overseas
companies, but in practice this has not given rise to difficulties. Despite
the width of the statutory provision, the English court does not exercise
its jurisdiction to wind up a foreign company unless a sufficient
connection with England and Wales is shown and there is a reasonable
possibility of benefit for the creditors from the winding up: see the    G
review of the authorities by Peter Gibson J. in *In re A Company*
*(No. 00359 of 1987)* [1988] Ch. 210.

*The court's discretion: leave to serve abroad*

The other safeguard arises at an earlier stage of the proceedings, and
provides an additional protection for persons who are abroad and not    H
able to be served with proceedings in this country in the usual way.
They are not to be brought here unless the court first grants leave for
the proceedings to be served on them abroad. In this regard the

Ch.                    In re Paramount Airways Ltd. (C.A.)

A    difficulties of interpretation which existed under the old bankruptcy
rules have been cured by the unambiguous terms of rule 12.12 of the
Insolvency Rules 1986:

"(1) Order 11 of the Rules of the Supreme Court, and the
corresponding County Court Rules, do not apply in insolvency
proceedings. (2) A bankruptcy petition may, with the leave of the

B    court, be served outside England and Wales in such manner as the
court may direct. (3) Where for the purposes of insolvency
proceedings any process or order of the court, or other document,
is required to be served on a person who is not in England and
Wales, the court may order service to be effected within such time,
on such person, at such place and in such manner as it thinks fit,
and may also require such proof of service as it thinks fit. (4) An

C    application under this rule shall be supported by an affidavit
stating—(a) the grounds ᵒn which the application is made, and
(b) in what place or country the person to be served is, or probably
may be found."

Applications under the sections with which this appeal are concerned
are "insolvency proceedings:" rule 13.7.

D    Hambros Jersey contended that the jurisdiction conferred by this
rule can only properly be exercised by analogy to R.S.C., Ord. 11, so
that leave should not be granted unless the case falls within one of the
paragraphs of Ord. 11, r. 1(1). This is not a tenable interpretation of
rule 12.12 of the Rules of 1986, given the clear language of paragraph
(1) of the rule and given also that by their nature proceedings under the

E    Insolvency Act 1986 cannot be expected to be addressed by Ord. 11,
r. 1.

Thus the second safeguard is that he who wishes to serve the
proceedings abroad must first obtain an exercise by the court of its
discretion in his favour. In deciding whether the case is a proper one for
service out of the jurisdiction, one of the circumstances the court will
take into account is the strength or weakness of the plaintiff's claim in

F    the proceedings. There must be a real issue, between the plaintiff and
the defendant, which the plaintiff may reasonably ask the court to try.
As Millett J. observed in *In re Tucker (A Bankrupt)* [1988] 1 W.L.R.
497, 502ʙ, the plaintiff must make out a sufficiently strong case to justify
his being given leave. How strong that case should be depends on the
circumstances of the particular case. Where a foreign element is involved

G    one of the factors which the court will consider is the apparent strength
or weakness of the plaintiff's claim that the defendant has a sufficient
connection with England, in respect of the relief sought in the
proceedings.

*Conclusion*

H    For these reasons I am not able to accept Hambros Jersey's
submissions on the proper interpretation of section 238(2). The judge
was persuaded into error on this point. It is not necessary to consider
the facts further in this case, since Hambros Jersey does not challenge

1

242

Sir Donald
Nicholls V.-C.                In re Paramount Airways Ltd. (C.A.)                [1993]

the judge's view on the way the court's discretion under rule 12.12    A
should be exercised (save on the one point I have rejected).

I would therefore allow this appeal, set aside the judge's order and
restore the order of the registrar. These proceedings should be permitted
to proceed in England, hand-in-hand with the action in respect of which
the bank has submitted to the jurisdiction of the English court. When
the judge hears these proceedings he will have further evidence before    B
him and he will make findings of fact on disputed issues such as whether
Hambros Jersey had notice of the alleged misappropriation of some
£1·65m of the company's money. It will be for him to decide, in the
light of all the evidence, whether in respect of the relief claimed
Hambros Jersey has a sufficient connection with England for it to be
just for the English court to grant such relief. The grant of leave to
serve Hambros Jersey abroad does not preclude the bank from raising    C
this issue as a defence at the trial.

TAYLOR L.J.   I agree.

FARQUHARSON L.J.   I also agree.

                              *Appeal allowed with costs in*    D
                                *Court of Appeal and below.*
                                *Leave to appeal refused.*

*Solicitors: Norton Rose; Wilde Sapte.*

[Reported by CHRISTOPHER CHAMPNESS ESQ., Barrister]    E

F

G

H

# TAB 70

**A.C.**        AND PRIVY COUNCIL.        235

In their Lordships' opinion, the misdirection upon the law of provocation could not have caused any miscarriage of justice because there was no sufficient material on this issue to go to the jury. Accordingly, and for this reason, they have humbly advised Her Majesty to dismiss the appeal.

P. C.

1962

LEE
CHUN-CHUEN
*v.*
THE QUEEN.

Solicitors: *T. L. Wilson & Co.; Charles Russell & Co.*

C. C.

---

[HOUSE OF LORDS.]

WINTER AND OTHERS    .    .    .    .    .    APPELLANTS;
(EXECUTORS OF SIR ARTHUR MUNRO SUTHERLAND.
BART., DECD.)
. AND
INLAND REVENUE COMMISSIONERS    .    RESPONDENTS.

H. L. (E.)*

1961
*June* 29;
*July* 3;
*Oct.* 26.

[APPEAL IN *In re* SUTHERLAND, DECD.]

*Revenue—Estate duty—Valuation—Shares—" Contingent liabilities "—Control of company by deceased—Company in receipt of capital allowance in respect of assets leaving expenditure unallowed—Sale by company of assets after death of deceased giving rise to balancing charges—Balancing charges resulting in additional assessments to income tax and profits tax—Whether additional assessments " contingent liabilities "—Finance Act, 1894 (57 & 58 Vict. c. 30), s. 7 (5)—Finance Act, 1940 (3 & 4 Geo. 6, c. 29), ss. 50 (1), 55 (1) (2) (as amended by Finance Act, 1946 (9 & 10 Geo. 6, c. 64), s. 47, Sch. II, Pt. I)—Income Tax Act, 1952 (15 & 16 Geo. 6 & 1 Eliz. 2, c. 10), ss. 292 (1), 297.*

*Revenue—Estate duty—Valuation—Test of price if sold—Whether actual sale to be assumed—Finance Act, 1894, s. 7 (5).*

*Statute—Construction—Scottish and English Act—Scottish concept incorporated into English law—" Contingent liability "—Meaning—Finance Act, 1940, s. 50 (1).*

The deceased had "control" of a company within the meaning of section 55 of the Finance Act, 1940, during the five years ending with his death on March 29, 1953, so that the shares which he held in the company fell to be valued for estate duty purposes by reference to the net value of the company's assets pursuant to sections 50 and 55 of the Act of 1940. The assets of the company

---

* *Present*: LORD REID, LORD TUCKER, LORD BIRKETT, LORD HODSON and LORD GUEST.

236                    HOUSE OF LORDS          **[1963]**

H. L. (E.)

1961

SUTHERLAND,
DECD., *In re.*

included five ships for which, at the deceased's death, the company had received capital allowances under Part X of the Income Tax Act, 1952, leaving a sum as "expenditure unallowed" as defined by section 297 of the Act of 1952. The ships were sold during the period November, 1953, to February, 1954, for a sum greater than the expenditure unallowed, and this gave rise to balancing charges under section 292 of the Act of 1952, resulting in additional income tax and profits tax assessments at the current rates. On a summons to determine whether under section 50 (1) of the Finance Act, 1940,[1] as applied by section 55 (2) (*a*) of that Act, any allowance could be made for the balancing charge that would have been due at the date of death (giving rise to income tax and profits tax) in valuing the shares of the company for estate duty purposes at the deceased's death on the ground that such charge had been a "contingent liability" at that date: —

*Held* (Lord Tucker and Lord Hodson dissenting), that a "contingent liability" was a liability which, by reason of something done by the person bound, would necessarily arise or come into being upon an event or events which might or might not happen (post, pp. 249, 262), and that an existing legal liability was

---

[1] Finance Act, 1894, s. 7 (5): "The principal value of any property "shall be estimated to be the price "which, in the opinion of the Com-"missioners, such property would "fetch if sold in the open market "at the time of the death of the "deceased."

Finance Act, 1940, s. 50: "(1) In "determining the value of the estate "for the purpose of estate duty the "provisions of subsection (1) of sec-"tion seven of the Finance Act, 1894, "as to making allowance for debts "and incumbrances shall not have "effect as respects any debt or in-"cumbrance to which assets of the "company passing on the death by "virtue of section forty-six of this "Act were liable, but the Commis-"sioners shall make an allowance "from the principal value of those "assets for all liabilities of the com-"pany (computed, as regards liabili-"ties which have not matured at the "date of the death, by reference to "the value thereof at that date, and, "as regards contingent liabilities, by "reference to such estimation as "appears to the Commissioners to be "reasonable) . . ."

S. 55 (as amended): "(1) Where "for the purposes of estate duty there "pass, on the death of a person dying

"after the commencement of this Act, "shares in or debentures of a com-"pany to which this section applies, "then if—(*a*) the deceased had the "control of the company at any time "during the five years ending with "his death; . . . the principal value "of the shares or debentures, in lieu "of being estimated in accordance "with the provisions of subsection (5) "of section seven of the Finance Act, "1894, shall be estimated by reference "to the net value of the assets of the "company in accordance with the "provisions of the next succeeding "subsection. (2) For the purposes of "such ascertainment as aforesaid— "(*a*) the net value of the assets of "the company shall be taken to be "the principal value thereof estimated "in accordance with the said sub-"section (5), less the like allowance "for liabilities of the company as is "provided by subsection (1) of section "fifty of this Act in relation to the "assets of a company passing on a "death by virtue of section forty-"six of this Act, but subject to the "modification that allowance shall be "made for such a liability as is men-"tioned in paragraph (*b*) of that sub-"section unless it also falls within "paragraph (*a*) thereof . . ."

**A.C.**                    AND PRIVY COUNCIL.                    237

not essential to its creation (post, pp. 251, 253, 263); and that
since at the date of the deceased's death, the company by applying
for and accepting allowances in respect of the ships in question, had
become bound by statute to pay tax under a balancing charge when
it ceased to use the ships in its trade, if the moneys which it
received for them exceeded any expenditure on them which was still
unallowed, such liability was a "contingent liability" within
section 50 (1) of the Act of 1940; and that, accordingly, the Com-
missioners of Inland Revenue were required pursuant to the pro-
visions of that section to make an estimate of such contingent
liability as appeared to them to be reasonable.

Observations of Lord Greene M.R. as to the meaning of
"contingent liabilities" in *In re Duffy* [1949] Ch. 28, 37, 38; 64
T.L.R. 545; [1948] 2 All E.R. 756, C.A. questioned.

Decision of the Court of Appeal sub nom. *In re Sutherland, decd.*
[1960] Ch. 611; [1960] 3 W.L.R. 491; [1960] 3 All E.R. 270, C.A.
(affirming Danckwerts J. [1960] Ch. 134; [1959] 3 W.L.R. 543;
[1959] 2 All E.R. 682) reversed.

H. L. (E.)

1961

SUTHERLAND,
DECD., *In re.*

APPEAL from the Court of Appeal (Lord Evershed M.R.,
Willmer and Upjohn L.JJ.).

This was an appeal from an order of the Court of Appeal dated
July 22, 1960, dismissing the appeal of the appellants, the execu-
tors of the will of Sir Arthur Munro Sutherland, Bart., deceased,
from an order of the Chancery Division (Danckwerts J.) dated
June 19, 1959, whereby it was declared that no allowance fell to
be made in valuing for estate duty the shares of B. J. Suther-
land & Co. Ltd., on the basis of the net value of the assets of the
company by taking into account balancing charges (giving rise to
income tax and profits tax) attaching to a sale of ships belonging
to the company by reason of and up to the amount of capital
allowances previously received in respect of the said ships.

The facts were as follows: At his death on March 29, 1953,
the deceased, Sir Arthur Munro Sutherland, was the owner of
98,700 £1 shares in the capital of B. J. Sutherland & Co. Ltd.,
of which company he had had control during the five years ending
with his death. Consequently, for purposes of estate duty, the
shares had to be valued by reference to the net value of the assets
of the company, in accordance with the provisions of sections 50
and 55 of the Finance Act, 1940, instead of by reference to the
then open market value of the shares pursuant to section 7 (5) of
the Finance Act, 1894.

The assets of the company at the date of the deceased's death
included five ships, the value of which at that date had been
agreed with the Estate Duty Office to be £1,150,000. The cost
of these ships to the company for income tax purposes had been

238                        HOUSE OF LORDS                    **[1963]**

agreed to be £847,907, and at the date of the deceased's death
the company had received capital allowances under the provisions
of Part X of the Income Tax Act, 1952, leaving "expenditure
"unallowed" (as defined by section 297 of, the same Act) of
£290,749. In the event of a sale of the ships for a sum in excess
of the amount of such expenditure unallowed, under section 292 of
the Income Tax Act, 1952, a balancing charge would be imposed
of an amount equal to such excess, resulting in an assessment to
income tax and profits tax at the rate appropriate to the year
in respect of which such assessment was made.

The ships were in fact sold between November, 1953, and
February, 1954, for sums amounting in the aggregate to
£1,070,505. This gave rise to balancing charges of £548,318,
resulting in an additional income tax assessment on the company
for the year 1953–54 at 9s. in the pound, amounting to
£246,743 2s., and an additional profits tax assessment at the rate
of 22½ per cent. for the chargeable accounting period ending on
March 31, 1954, amounting to £123,371 11s. The aggregate of
this additional tax liability was £370,114 13s.

The executors of the deceased took out a summons to deter-
mine whether, on the true construction of section 50 (1) of the
Finance Act, 1940, as applied by section 55 (2) (a), any allowance
should be made in valuing for estate duty at the deceased's death
the shares on the basis of the net value of the assets of the
company by taking into account balancing charges (giving rise to
income tax and profits tax) attaching to a sale of the ships by
reason of and up to the amount of the capital allowances received
by the company.

Danckwerts J. held that the balancing charge was not a
"contingent liability" within section 50 (1) of the Finance Act,
1940, and no allowance could be made for it. The Court of Appeal
affirmed that decision.

*Sir John Senter Q.C.* and *Roderick A. Watson* for the appel-
lants. For estate duty purposes the relevant date is that of the
death of the deceased and, accordingly, the question at issue
does not relate to the balancing charge in fact levied on the
actual sale of the ships after the death of the deceased but to
the agreed sum, £270,000, the amount of the balancing charge
which would have been paid if the ships had been sold at the
moment of death. The issue in this appeal is whether, as the
appellants contend, this latter balancing charge is a "contingent
"liability" within section 50 (1) of the Finance Act, 1940.

**A.C.**          AND PRIVY COUNCIL.                    239

H. L. (E.)

1961

SUTHERLAND,
DECD., *In re.*

Danckwerts J. and the Court of Appeal held that *In re Duffy*[2] is a complete bar to that contention. That decision, however, is irrelevant in this case and, further, it is submitted that in relation to the construction placed on the words " contingent " liability " it was wrongly decided having regard to subsequent authorities. It is irrelevant because it was concerned with income tax on profits and gains for the purposes of Schedule D and not with balancing charges. Further, the question there at issue would be decided differently if it arose for decision today since the reasoning of the Court of Appeal in that case[2] as to income tax as an existing liability is inconsistent with that of this House in *British Transport Commission* v. *Gourley*.[3]

It is plain that but for *In re Duffy*[4] Danckwerts J.[5] would have found in the appellant's favour; his view that in *Duffy's* case[6] the words " contingent liability " were given too narrow a meaning is adopted. The appellants adhere to their proposition, which was rejected by the Court of Appeal,[7] that the sole and express statutory hypothesis on which the valuation falls to be made under section 55 and section 50 of the Finance Act, 1940, is a notional sale of the assets at their open market price at the time of the death, making allowance for liabilities, including those attaching or crystallising, as a matter of law, on the sale. Since it is at the option of the taxpayer whether he takes a wear and tear allowance one looks at the state of the account between the trader and the Revenue at the moment of death and ascertains whether on the written down value and the market value of the assets there is a contingent liability.

Reliance is placed on *Inland Revenue Commissioners* v. *Wood Brothers (Birkenhead) Ltd.*[8] as showing that the ordinary provisions of Case I of Schedule D (the subject-matter of *In re Duffy*[9]) are distinct from the provisions relating to balancing charges. In relation to a balancing charge the relevant provision is section 292 of the Income Tax Act, 1952, the effect of which is definitely, on the happening of the relevant event, to create a liability. This is quite distinct from the case of a charge for income tax under Schedule D which is governed by section 1 of the Income Tax Act, 1952. Where there is a liability

2 [1949] Ch. 28; 64 T.L.R. 545;
[1948] 2 All E.R. 756, C.A.
3 [1956] A.C. 185; [1956] 2
W.L.R. 41; [1955] 3 All E.R. 796,
H.L.
4 [1949] Ch. 28.
5 [1960] Ch. 134, 142, 143.

6 [1949] Ch. 28.
7 [1960] Ch. 611, 622.
8 [1959] A.C. 487; [1959] 2
W.L.R. 47; [1959] 1 All E.R. 53;
38 T.C. 275, H.L.
9 [1949] Ch. 28.

240                              HOUSE OF LORDS                    **[1963]**

H. L. (E.)

1961

SUTHERLAND,
DECD., *In re.*

for income tax under Schedule D then maybe it cannot be said that the liability exists, that the charge has arisen, until the passing of the subsequent Finance Act which prescribes that for the year of assessment there shall be income tax at a given rate. But with a balancing charge, the language of section 292 shows that the charge definitely attaches upon the happening of the event and the liability exists, even though its final *quantification* may depend on a subsequent Finance Act: see *Inland Revenue Commissioners* v. *Wood Brothers (Birkenhead) Ltd.*[10]; *Kirkness* v. *John Hudson & Co.*[11]; *Whitney* v. *Inland Revenue Commissioners.*[12] The fact that the charging provision in relation to this balancing charge was in existence at the date of the deceased's death and that liability did not depend upon anything which might appear in a subsequent Finance Act is the vital distinction between the present case and *In re Duffy.*[13]

As to profits tax, a similar argument applies. The charging section imposing liability for profits tax remains section 19 of the Finance Act, 1937: see section 31 (1) (*a*) of the Finance Act, 1947. The charge there imposed does not require any further Act to perfect it. Subsequent Finance Acts only prescribe the *rate* of tax payable for the relevant year. Balancing charges in relation to profits tax are dealt with by paragraph 2 of the Eighth Schedule to the Act of 1947. [Reference was also made to section 7 (5) of the Finance Act, 1894, sections 122, 280 and 323 of the Income Tax Act, 1952, and section 13 of the Finance Act, 1953.]

*Watson* following. On analysis it will be seen that the true certainty here is that once a trading company has elected to take the benefit of a capital allowance there will ultimately be a reckoning between the trader and the Revenue. This machinery is designed to adjust any over or under allowance of capital allowances. The set of circumstances which attract the reckoning in section 292 is well-nigh exhaustive. The only possibility which is not provided for is that the whole tax machinery falls to the ground and that, therefore, there will be no liability. Furthermore, there are all the elements of a running account between the taxpayer and the Revenue since the allowance given at any given date is a known fact. On the assumption that the event happens one can strike a figure at which the fiscal allowance

[10] [1959] A.C. 487.
[11] [1955] A.C. 696, 729; [1955] 2 W.L.R. 1135; [1955] 2 All E.R. 345; 36 T.C. 28, H.L.
[12] [1926] A.C. 37, 52; 42 T.L.R. 58; 10 T.C. 88, H.L.
[13] [1949] Ch. 28.

**A.C.**          AND PRIVY COUNCIL.                    241

may be made. What may not be known is the rate of tax. That
is the outstanding uncertainty apart from the fact that there may
turn out to be no tax liability in the ensuing year.

The Crown's case here is an objection to liability at all whether
or not the ships had been sold. The difference between the
present case and *In re Duffy* [13] is that in that case the taxpayer
was endeavouring to obtain an allowance for a liability which was
both contingent and continuing. There appear to be no
authorities which bear on the meaning of " contingent liability,"
in English law. It is true that section 30 of the Bankruptcy
Act, 1914, allows for the inclusion of " contingent liabilities "
but there is no definition of those words in that context. A
" contingent liability " in section 50 of the Finance Act, 1940,
differs from a future liability in that the structure for bringing
the liability into existence is already present and all that is neces-
sary to make the liability a present liability is the happening of
an event or events.

*B. L. Bathurst Q.C. (Viscount Bledisloe)* and *E. B.
Stamp* for the Commissioners of Inland Revenue. There are two
questions for consideration. (1) The first is whether as a matter
of construction of section 50 (1) of the Finance Act, 1940, there
must be a legal liability existing at the date of death. It is
necessary first to find a liability. There are three kinds of liability
in contemplation in this connection: (i) present liabilities;
(ii) liabilities which have not matured at the date of death, for
example, where the time for payment has not arrived; (iii) con-
tingent liabilities, which comprise liabilities under an existing legal
obligation under which any payment will become due in con-
sequence of the happening of a future uncertain event or events.
The distinction between category (ii) and (iii) is that the
" material " of (ii) is certain while the " material " of (iii) is
uncertain for the event may never occur.

If no legal liability exists at the relevant date—the death—
then there is no contingent liability, there is simply the future
possibility of a liability which is not included in section 50 at
all. If the expression " contingent liabilities " is to be construed
as widely as the appellants contend the question arises, where
does one draw the line? Presumably it includes every probable
liability. It is submitted that section 50 is aimed primarily at
the contractual obligations of the company and not at obligations
arising under a statute. On the true construction of section 50

[13] [1949] Ch. 28.

H. L. (E.)
1961

SUTHERLAND,
DECD., *In re.*

there must be a legal liability existing at the date of death. At the time of the deceased's death no one could foretell whether the ships would be sold then or whether the business would be continued for a considerable time and the ships then sold at a time when their sale would give rise not to a balancing charge but to a balancing allowance. The commissioners are not bound to assume that the ships would be sold shortly after the death.

It is conceded that as soon as an allowance is accepted there arises an obligation to pay in certain circumstances, but whether the sum in question is *ever payable* depends on the volition, and is under the control, of the company as to when it sells the assets. It is this factor of volition which impressed Roxburgh J. who determined *In re Duffy* at first instance,[14] for in his judgment a state of affairs which could be terminated by a person's own choice without the intervention of anyone or anything could not properly be described as a liability. Contra the case where X covenants to pay £1,000 to B if B survives A. In this example X is under a contingent liability to pay B. The argument presented to the Court of Appeal by Mr. Pennycuick Q.C. for the Crown in *In re Duffy* [15] is adopted. The question here is whether the expression " contingent liabilities " in section 50 (1) covers a hypothetical balancing charge, a prospective liability based on next year's income.

The question at issue can be clarified by considering the normal life insurance policy. The insurance company is plainly under a contingent liability to pay the sum assured on the assured's death contingently on the assured paying the premiums. The assured is under no liability contingent or otherwise to pay the premiums. If he does not then, of course, no sum is payable by the insurance company on his death. This is comparable to the present case. At the date of the deceased's death there was a mere possibility of a future liability which crystallised when the company by its own voluntary act sold the ships.

*The nature of a balancing charge.*

It is plain from section 292 and from the definition of " year " of assessment " in section 526 of the Income Tax Act, 1952, that a balancing charge is subject to income tax and that balancing charges are made and made only for the year of assessment, and, therefore, that it is made for the tax year following the death. The machinery for creating a balancing charge is under section

---

[14] Unreported, but see extract from         [15] [1949] Ch. 28, 31.
the judgment, post, p. 259.

**A.C.**　　AND PRIVY COUNCIL.　　243

292, but it depends on a subsequent Finance Act for its validity. Accordingly, no liability for a balancing charge arises unless (i) one or other of the events set out in section 292 occurs, and (ii) a Finance Act is passed imposing income tax. In those circumstances, therefore, there was no liability at all at the date of the death contingent or otherwise.

(2) The second question relates to section 7 (5) of the Finance Act, 1894. It is submitted that the valuation required by section 7 (5) does not involve a notional sale of the assets. All that is required is that the commissioners express an opinion as to what the assets would be likely to fetch if sold in the open market: see *per* Lord Evershed M.R.[16] and Upjohn L.J.[17] Section 7 (5) is concerned with the market value of the assets and not with the net amount that comes into the hands of the vendor. Contrast section 9 of the Finance Act, 1912, which concerns estate duty on timber where the valuation is related to the net moneys, after deducting all necessary outgoings. See also *Tyser* v. *Attorney-General*,[18] where Simonds J. construed the expression " proceeds " of sale " in section 40 (2) of the Finance Act, 1930, as meaning " net proceeds of sale."

As to the authorities, *British Transport Commission* v. *Gourley* [19] has no relevance here for it concerned damages for loss of earnings actual and prospective and the prospective liability to tax on such prospective earnings. Lord Dunedin's dictum in *Whitney* v. *Inland Revenue Commissioners* [20] does not assist the appellants for he assumes the existence of income tax in the relevant year. There cannot be a charge to tax until the tax is in existence and a rate in respect thereof prescribed. The appellants are wrong in contending that section 292 of the Income Tax Act, 1952, prescribes the charge. It is merely the machinery for the charge—a skeleton waiting for blood to be infused into it by the next Finance Act. *Kirkness* v. *John Hudson & Co. Ltd.*[21] is relied on to show that section 17 of the Income Tax Act, 1945 (the predecessor of section 292), was a charging section. *Inland Revenue Commissioners* v. *Wood Brothers (Birkenhead) Ltd.*[22] is in favour of the commissioners. The only question at issue there was whether the £18,675 was income. [Reference was also made to *Commissioner of Stamp Duties* v. *New Zealand*

H. L. (E.)
1961
SUTHERLAND,
DECD., *In re.*

---

16 [1960] Ch. 611, 624.
17 Ibid. 628, 629.
18 [1938] Ch. 426; 54 T.L.R. 481; [1938] 1 All E.R. 657.
19 [1956] A.C. 185.
20 [1926] A.C. 37, 52.
21 [1955] A.C. 696, 729.
22 [1959] A.C. 487, 510, 511, 515.

244                      HOUSE OF LORDS           **[1963]**

H. L. (E.)    *Insurance Co. Ltd.*[23]]   In *Southern Railway of Peru Ltd.* v.

1961          *Owen (Inspector of Taxes)*[24] Lord Oaksey observed that there
              was a fundamental distinction between a contingent liability and
SUTHERLAND,
DECD., *In re.*  a payment dependent upon a contingency, for when a debt was
              not paid at the time it was incurred its payment was, of course,
              contingent upon the solvency of the debtor, but the liability was
              not contingent. Thus, in the present case, the payment of the
              balancing charge was contingent in one sense but the liability was
              not contingent. For present purposes the obligation must be a
              legal obligation existing at the date of death.

                  As to profits tax, it is necessary to have an annual imposition
              for profits tax as for income tax. Further, the existence of this
              charge depends on the charge to income tax. [Reference was
              made to paragraph 2 of the Eighth Schedule to the Finance Act,
              1947.]

                  To summarise: (1) Before section 50 (1) of the Finance Act,
              1940, can come into operation there must be a liability existing
              at the date of death. (2) There was no such liability here but
              merely the future possibility of liability. The appellants are con-
              fusing a hypothetical liability with a contingent liability under
              section 50. Once one departs from the above approach there is
              no criterion to assist in determining the nature of a contingent
              liability—does it include all probable or all possible liabilities?
              [Reference was also made to section 30 of the Bankruptcy Act,
              1914, and to *Asher* v. *Seaford Court Estates Ltd.*[25]]

                  *Stamp* following. In English law the word " liable " means
              bound or obliged by law or equity: see the Oxford Dictionary.
              The word " liability " has a corresponding meaning. Was this
              company at the date of the deceased's death under an obligation
              in law or in equity in respect of the payment of a balancing
              charge? That is the question. Was the company under a
              liability? That is the question which section 55 of the Act of
              1940 poses, and then one turns to section 50 to see how that is
              quantified. The fact that section 50 uses the word " contingent "
              cannot give a different colour and meaning to the word
              " liabilities " as understood in English law. By a " contingent
              " liability " in English law is meant a legal liability which will
              only be performed or be required to be performed in certain

[23] [1956] A.C. 284, 296; [1956] 2       [24] [1957] A.C. 334, 344; [1956] 3
W.L.R. 571; [1956] 1 All E.R. 598,        W.L.R. 389; [1956] 2 All E.R. 728;
P.C.                                       36 T.C. 634, H.L.
                                          [25] [1950] A.C. 508; 66 T.L.R. (Pt.
                                          1) 945; [1950] 1 All E.R. 1018, H.L.

**A.C.**       AND PRIVY COUNCIL.                    245

circumstances. There is no necessity to extend the meaning of
" liabilities " in section 55 in order to cover " contingent
" liabilities " in section 50 (1).                                    1961

It matters not for present purposes that the performance of    SUTHERLAND,
the liability is prospective, provided that at the basis of the    DECD., *In re.*
liability there is an existing binding obligation in law or equity
arising from contract or statute in existence at the material date.
Thus it cannot be said today that a barrister in practice is under
a contingent liability to pay next year's income tax although it is
as certain as anything can be that it will become payable in law at
a future date, namely, on the passing of the relevant Finance Act.

*Sir John Senter Q.C.* in reply. Where there has been an
initial allowance the moment that the market value exceeds the
written-down value of the asset there is a contingent liability on
the trader to return the excess. The Crown's argument gives a
very limited meaning to " contingent liabilities." *In re Duffy* [26]
is distinguishable. [Reference was also made to section 7 (5) of
the Finance Act, 1894, and to *Kirkness* v. *John Hudson & Co.
Ltd.*[27]]

Their Lordships took time for consideration.

October 26, 1961. LORD REID. My Lords, the appellants are
the executors of the deceased, Sir A. M. Sutherland, who died
on March 29, 1953. He owned 98,700 shares in B. J. Sutherland
& Co., and he controlled that company. Accordingly, these shares
had to be valued for estate duty purposes by reference to the
value of the assets of the company and not by reference to
the market value of the shares at the date of his death. The
company owned five ships, of which the value at that date is
agreed to have been £1,150,000. The cost of these ships had been
considerably less and the company had received large capital and
annual allowances so that the expenditure unallowed within the
meaning of section 297 of the Income Tax Act, 1952, was only
£290,749. Accordingly, if these ships had been sold when the
deceased died there would have been a balancing charge which
would have given rise to liabilities for income tax and profits tax
amounting to £270,079. In fact, the ships were sold somewhat
later and then the balancing charge gave rise to a liability of
£370,000 for income tax and profits tax.

The question in this case is whether any account has to be
taken of the fact that if these ships were sold for a price exceeding

[26] [1949] Ch. 28.              [27] [1955] A.C. 696, 716.

246                          HOUSE OF LORDS                **[1963]**

the unallowed expenditure the excess would be subject to a
balancing charge. I need not consider profits tax because the
argument is the same as for income tax with a minor difference
which, in my view, is not material in this case. The question
depends ultimately on the proper construction of the words
" contingent liabilities " in section 50 (1) of the Finance Act,
1940, but before coming to that subsection I must briefly refer to
certain other provisions.

Section 55 of that Act provides that, where there pass shares
of a company of which the deceased had control, the principal
value of the shares " . . . shall be estimated by reference to the
" net value of the assets of the company in accordance with
" the provisions of the next succeeding subsection. (2) For the
" purposes of such ascertainment as aforesaid—(*a*) the net value
" of the assets of the company shall be taken to be the principal
" value thereof estimated in accordance with the said subsection
" (5), less the like allowance for liabilities of the company as is
" provided by subsection (1) of section fifty of this Act in relation
" to the assets of a company passing on a death by virtue of
" section forty-six of this Act, but subject to the modification that
" allowance shall be made for such a liability as is mentioned in
" paragraph (*b*) of that subsection unless it also falls within
" paragraph (*a*) thereof; . . ."

Section 50 (1) provides: " In determining the value of the
" estate for the purpose of estate duty the provisions of sub-
" section (1) of section seven of the Finance Act, 1894, as to
" making allowance for debts and incumbrances shall not have
" effect as respects any debt or incumbrance to which assets of
" the company passing on the death by virtue of section forty-six
" of this Act were liable, but the Commissioners shall make an
" allowance from the principal value of those assets for all liabili-
" ties of the company (computed, as regards liabilities which have
" not matured at the date of the death, by reference to the value
" thereof at that date, and, as regards contingent liabilities, by
" reference to such estimation as appears to the Commissioners
" to be reasonable) other than—(*a*) liabilities in respect of shares
" in or debentures of the company; and (*b*) liabilities incurred
" otherwise than for the purposes of the business of the company
" wholly and exclusively."

I need not set out the section of the Income Tax dealing
with balancing charges because there was no dispute about their
nature. If a trader claims and receives an initial allowance or
annual allowances in respect of anything which he uses in his

**A.C.**          AND PRIVY COUNCIL.                    247

trade there must be a reckoning with the Revenue when for any    H. L. (E.)
reason he ceases to use it in his trade. He may sell or scrap it:      1961
it may perish: or he may cease to carry on his trade. In any of    ———
these events the expenditure unallowed must be compared with    SUTHERLAND,
any " sale, insurance, salvage or compensation moneys " received.    DECD., *In re.*
If the latter exceed the former that shows that he has been      ———
allowed too much and a balancing charge will be made. If the    Lord Reid.
former exceeds the latter he has been allowed too little and he    ——
will get a balancing allowance.

So the position of the company at the date of the deceased's
death was that, by applying for and accepting allowances in
respect of these ships, it had become bound by the statute to pay
tax under a balancing charge when it ceased to use these ships in
its trade, if the moneys which it received for them exceeded any
expenditure on them which was still unallowed. And I should
add, because importance was attached to this in argument, the
company would only have to pay tax if the law had not been
altered, and if when the question arose there was in existence a
Finance Act determining the rate of income tax. So there were
two contingencies which had to be fulfilled or conditions which
had to be purified before tax could be demanded from the com-
pany: the sums received for the ships must exceed the unallowed
expenditure, and there must be no relevant change in the law and
no failure to enact a Finance Act. The question is whether in
these circumstances there was a contingent liability of the com-
pany to pay tax.

No doubt the words " liability " and " contingent liability "
are more often used in connection with obligations arising from
contract than with statutory obligations. But I cannot doubt
that if a statute says that a person who has done something
must pay tax, that tax is a " liability " of that person. If the
amount of tax has been ascertained and it is immediately payable
it is clearly a liability; if it is only payable on a certain future
date it must be a liability which has " not matured at the date of
" death " within the meaning of section 50 (1). If it is not yet
certain whether or when tax will be payable, or how much will be
payable, why should it not be a contingent liability under the
same section?

It is said that where there is a contract there is an existing
obligation even if you must await events to see if anything
ever becomes payable, but that there is no comparable obligation
in a case like the present. But there appears to me to be a close
similarity. To take the first stage, if I see a watch in a shop

H. L. (E.)
1961
———
SUTHERLAND,
DECD., *In re.*
———
Lord Reid.
———

window and think of buying it, I am not under a contingent liability to pay the price: similarly, if an Act says I must pay tax if I trade and make a profit, I am not before I begin trading under a contingent liability to pay tax in the event of my starting trading. In neither case have I committed myself to anything. But if I agree by contract to accept allowances on the footing that I will pay a sum if I later sell something above a certain price I have committed myself and I come under a contingent liability to pay in that event. This company did precisely that, but its obligation to pay arose not from contract but from statute. I find it difficult to see why that should make all the difference.

It would seem that the phrase " contingent liability " may have no settled meaning in English law because, in this case, Danckwerts J. thought it necessary to resort to a dictionary, and in *In re Duffy* [1] (a case much relied on by the respondents) the Court of Appeal regarded its meaning as an open question. But the Finance Acts are United Kingdom Acts, and there is at least a strong presumption that they mean the same in Scotland as in England. A case precisely similar to this case could have come from Scotland and your Lordships would then have considered the meaning of this phrase in Scots law. So I need make no apology for reminding your Lordships of its meaning there. Perhaps the clearest statement of the Law of Scotland is in Erskine's Institute, 3rd ed., vol. 2, Book III, Title 1, section 6, p. 586, when he says: " Obligations are either pure, or to a cer-" tain day, or conditional. . . . Obligations in diem . . . are those " in which the performance is referred to a determinate day. In "'this kind . . . a debt becomes properly due from the very date " of the obligation, because it is certain that the day will exist; " but its effect or execution is suspended till the day be elapsed. " A conditional obligation, or an obligation granted under a con-" dition, the existence of which is uncertain, has no obligatory " force till the condition be purified; because it is in that event " only that the party declares his intention to be bound, and " consequently no proper debt arises against him till it actually " exists; so that the condition of an uncertain event suspends not " only the execution of the obligation but the obligation itself. . . . " Such obligation is therefore said in the Roman law to create " only the hope of a debt. Yet the granter is so far obliged, that

[1] [1949] Ch. 28; 64 T.L.R. 545; [1948] 2 All E.R. 756, C.A.

**A.C.**  AND PRIVY COUNCIL.  249

"he hath no right to revoke or withdraw that hope from the
"creditor which he had once given him."

So far as I am aware that statement has never been questioned
during the two centuries since it was written, and later authorities
make it clear that conditional obligation and contingent liability
have no different significance. I would, therefore, find it impos-
sible to hold that in Scots law a contingent liability is merely a
species of existing liability. It is a liability which, by reason of
something done by the person bound, will necessarily arise or
come into being if one or more of certain events occur or do not
occur. If English law is different—as to which I express no
opinion—the difference is probably more in terminology than in
substance.

I must now turn back to the provisions of section 50 (1) of the
Finance Act, 1940. It directs the commissioners to make an
allowance for (or deduction in respect of) all liabilities of the com-
pany, and it divides liabilities, as one might expect, into three
classes. First, where the liability is a sum immediately payable
there is no need for computation and the whole is deducted.
Secondly, the liability may be one which has not matured: that
would include a sum payable at a definite future date or a sum
payable on an event which must occur some time, for example,
the death of A. There the commissioners are to take the present
value of the debt. The third class is "contingent liabilities,"
which must mean sums, payment of which depends on a contin-
gency, that is, sums which will only become payable if certain
things happen, and which otherwise will never become payable.
There calculation is impossible, so the commissioners are to make
such estimation as appears to be reasonable.

The last class appears to me to cover exactly the conditional
obligation dealt with by Erskine in the passage I have quoted.
I agree with the respondents' argument to this extent, that this
class can only include liabilities which in law must arise if one or
more things happen, and cannot be extended to include everything
that a prudent business man would think it proper to provide
against. That is the distinction which I have already tried to
explain. But I cannot agree with the respondents' further argu-
ment that there must be an existing obligation because that would
exclude at least all Scottish conditional obligations.

This argument was based on certain observations in the Court
of Appeal in *In re Duffy,*[2] so I must now examine that case, as to

[2] [1949] Ch. 28.

H. L. (E.)

1961
_____
SUTHERLAND,
DECD., *In re.*
_____
Lord Reid.
_____

which I may say at once that I am satisfied that the decision was right, although I cannot accept all the reasons given. There, as in this case, section 50 of the Act of 1940 had to be applied. Duffy died on June 24, 1942, and therefore his company's assets had to be valued at that date. But instead of doing that the parties adopted the convenient course of valuing those assets at the end of the financial year of the company on January 31, 1942, and adding a proportion of the company's profits for the year 1942–43. This artificial method of valuation led to trouble. The taxpayer sought to bring in as a contingent liability of the company a proportion of its income tax for the year 1943–44, because the earning of profits during the year 1942–43 had engendered a contingent liability for tax for 1943–44. As pointed out by Roxburgh J. in a judgment [3] which I find convincing, it had done nothing of the kind. Whether the company would have to pay tax for the year 1943–44 depended entirely on whether they chose to carry on trade during that year and the profits for 1942–43 were merely the measure of their tax liability if they chose to do so. I doubt if the taxpayer could even have stated a plausible case if the old three years' average rule had still applied. It seems to me to be verging on the absurd to say that a trader had, in June, 1942, incurred a contingent liability to pay tax for a year which only began nine months later.

But the importance of *Duffy's* case [4] to the respondents lies in certain general observations of Lord Greene M.R. in the Court of Appeal. Dealing with section 50 (1) he said [5]: " The words in " brackets deal with two subclasses of liabilities. Neither of " those subclasses can go beyond the head class of liabilities," and then he went on to consider the " natural and ordinary " meaning " of the words apparently on the assumption that " contingent liabilities " is not a phrase of known meaning in the law of England. Then he went on to say, [6] " taking the con- " struction of these words, I find it impossible to give them a " meaning extending beyond what is always perfectly ascertain- " able without any doubt whatsoever, namely, an existing legal " liability, actually existing in law at the relevant date. The " words cannot be stretched so as to cover something which in a " business sense is morally certain and for which every business " man ought to make provision but which in law does not become " a liability until a subsequent date."

[3] Unreported.                          [5] Ibid. 36.
[4] [1949] Ch. 28.                       [6] Ibid. 37, 38.

**A.C.** AND PRIVY COUNCIL. 251

I agree with the last sentence of this quotation and it applied to the facts of *Duffy's* case.[7] The taxpayer had already been allowed to deduct tax for 1942–43 and he sought in addition a deduction of something which was only "morally certain" to become the measure of taxation in the next year—if, indeed, it could be said to be morally certain that the company would continue trading. But as a general statement of the law I think that the passage is inadequate because it appears to me to deprive the category of contingent liabilities of all content. That this category is in a special position is made clear by the Act which, in contrast to the provision for computing other kinds of liability, only requires for a contingent liability "such estimation as "appears to the commissioners to be reasonable." I cannot reconcile this with a requirement that such a liability must always be perfectly ascertainable as a legal liability actually existing in law at the relevant date. The essence of a contingent liability must surely be that it may never become an existing legal liability because the event on which it depends may never happen.

There appears to me to be no further difficulty and therefore I am not bound to hold that no deduction can be made in respect of the company's contingent liability to pay tax under a balancing charge, and not bound to hold that estate duty has to be paid on a fictitious sum. I say a fictitious sum because in fact it was impossible for the company to realise the value of the ships without having immediately to pay away as tax a large proportion of what it received. So it would be a fiction to say that the full value of the ships could be regarded as swelling the assets of the company.

But the deduction will not be the sum of £270,079 which would have been payable in tax if the ships had been sold at the date of the death of the deceased. I agree with your Lordships and the Court of Appeal in rejecting the appellants' argument for this. In my view, the case must go to the commissioners in order that they may make the estimation required by section 50 (1) on the footing that, at the date of death, liability to pay under a balancing charge was a contingent liability which would become an immediate liability of the company if they sold or otherwise ceased to trade with the ships and received sums exceeding the expenditure still unallowed. It would not be right for me to suggest to the commissioners how they should carry out their task: they will no doubt have regard to all relevant facts. In my

H. L. (E.)

1961

SUTHERLAND,
DECD., *In re.*

Lord Reid.

[7] [1949] Ch. 28.

252                          **HOUSE OF LORDS**          **[1963]**

judgment, this appeal should be allowed and the case remitted to a judge of the Chancery Division to proceed as accords.

LORD TUCKER. My Lords, I have had the advantage of reading in print the speech which is to be delivered by my noble and learned friend, Lord Hodson. I am in complete agreement with the conclusion he has reached that this appeal should be dismissed, and the reasoning by which he has arrived at that result. In particular I would wish to emphasise and adopt what he says with regard to the meaning of the words " contingent liabilities " in section 50 (1) of the Finance Act, 1940. To construe these words as wide enough to include a prospective or foreseeable liability, there being at the material date no contract or statute in existence under which such liability could or would in certain contingences arise, cannot, in my opinion, be justified and would be contrary to Lord Greene's reasoning in *In re Duffy* [8] which should, I think, be applied in the present case.

I would dismiss this appeal.

LORD BIRKETT. My Lords, I have had the opportunity of reading and considering the speeches of my noble and learned friend upon the Woolsack, Lord Reid, and of my noble and learned friend, Lord Guest. I agree with their conclusions and would allow the appeal and remit the case to the commissioners to make the estimation referred to in section 50 (1) of the Finance Act, 1940. The facts of the case and the relevant sections of the various statutes have been so fully set out in the speech of my noble and learned friend, Lord Reid, that there is no necessity to repeat them, and I can confine myself to stating quite briefly the reasons which have led me to the conclusion that the appeal ought to be allowed.

The decisive question is whether in the circumstances of this case there was a " contingent liability " within the meaning of section 50 (1) of the Finance Act, 1940. When Sir Arthur Sutherland died in March of 1953 he had controlled the company of B. J. Sutherland for some years and owned 98,700 shares in the company. To ascertain the value of these shares for estate duty purposes it was necessary, first of all, to ascertain the net value of the assets of the company at the date of his death, in accordance with the provisions of section 55 (1) and (2) of the Finance Act, 1940. Section 55 (2) of the Act of 1940 expressly

[8] [1949] Ch. 28.

**A.C.**                    AND PRIVY COUNCIL.                    253

provides that in estimating the value of the assets, the allowance
for the liabilities referred to in section 50 (1) of the Finance Act,
1940, must be taken into account. Those liabilities include con-
tingent liabilities which are to be computed by the commissioners
on a reasonable estimation.

It is clear that these contingent liabilities are of a very special
kind, which are not capable of precise ascertainment, but are
capable of reasonable estimation. The contingent liability for
which the appellants contend in this case arises in this way. At
the date of Sir Arthur Sutherland's death the assets of the com-
pany which fell to be valued included five ships which had cost
the company £847,907 but were now worth over a million pounds.
The company had received capital allowances under the provisions
of the Income Tax Act, 1952, and the amount of the capital
expenditure still unallowed was £290,749. In the light of the
provisions of section 292 of the Act of 1952 it was clear that if
the ships were sold for anything like their true value, a balancing
charge would be imposed, and a liability for income tax and profits
tax would follow as a matter of course. The ships were not sold
at the date of the death of Sir Arthur but were sold some months
later. A balancing charge was imposed with the result that an
assessment was made for income tax and profits tax amounting to
£370,114 13s. The question is: Was this liability to pay tax
arising out of the balancing charge a contingent liability within
the meaning of section 50 (1) of the Finance Act, 1940? It was
clearly in accordance with the provisions of the Income Tax, 1952,
and I am of opinion that it was a contingent liability within the
meaning of section 50 (1) of the Finance Act, 1940, and that
the commissioners should have made the reasonable estimation
authorised by the Act. It was argued that an existing legal
liability was essential to the creation of a contingent liability, and
that no such legal liability existed in this case at the date of
Sir Arthur's death. In my view this is to take too narrow a view
of the true meaning of contingent liability. It must have been
apparent to everybody concerned with the calculation of estate
duty in this case that on the sale of the ships a balancing charge
was certain to arise and that additional duty would have to be
paid. The appellants had raised the question with the commis-
sioners before any legal proceedings were begun, for it was clear
to them that on the happening of a certain event, that is, the sale
of the ships, the provisions of the Act of 1952 would come into
operation as the event later proved. They never doubted the
existence of a liability but it was a contingent liability. It was

H. L. (E.)

1961

SUTHERLAND,
DECD., In re.

Lord Birkett.

no less a contingent liability because the sale of the ships might not take place. The true legal position was that from the moment the appellants accepted capital allowances they were at once under a liability to pay tax in the circumstances provided for in the Income Tax Act, 1952. That liability was a contingent liability and was within the meaning of those words in section 50 (1) of the Finance Act, 1940. I am confirmed in this view by the citations from the law of Scotland made by my noble and learned friends, Lord Reid and Lord Guest. I also agree with their observations on the case of *In re Duffy,*[9] and I would allow the appeal.

LORD HODSON. My Lords, at his death on March 29, 1953, the deceased, Sir Arthur Munro Sutherland, was the owner of 98,700 £1 shares in the capital of B. J. Sutherland & Co. Ltd., of which company he had had control during the five years ending with his death. Consequently, for purposes of estate duty, the shares had to be valued by reference to the net value of the assets of the company in accordance with the provisions of sections 50 and 55 of the Finance Act, 1940, instead of by reference to the then open market value of the shares pursuant to section 7 (5) of the Finance Act, 1894.

The assets of the company at the date of the deceased's death included five ships, the value of which at that date had been agreed with the Estate Duty Office to be £1,150,000. The cost of these ships to the company for income tax purposes had been agreed to be £847,907, and at the date of the deceased's death the company had received capital allowances under the provisions of Part X of the Income Tax Act, 1952, leaving " expenditure " unallowed " (as defined by section 297 of the same Act) of £290,749. In the event of a sale of the ships for a sum in excess of the amount of such expenditure unallowed, under section 292 of the Income Tax Act, 1952, a *balancing charge would be imposed* of an amount equal to such excess, resulting in an assessment to income tax and profits tax at the rates appropriate to the year in respect of which such assessment was made.

The ships were in fact sold between November, 1953, and February, 1954, for sums amounting in the aggregate to £1,070,505. This gave rise to balancing charges of £548,318, resulting in an additional income tax assessment on the company for the year 1953–54 at 9s. in the pound, amounting to

[9] [1949] Ch. 28.

**A.C.**        AND PRIVY COUNCIL.                                255 .

£246,743 2s., and an additional profits tax assessment at the rate
of 22½ per cent. for the chargeable accounting period amounting
to £123,371 11s. The aggregate of this additional tax liability was
£370,114 13s.

The question for decision is whether in valuing the assets of
the company at the date of the deceased's death any deduction
ought to be made in respect of a claim for additional income tax
and profits tax which might arise upon a sale of the ships for an
amount in excess of the expenditure unallowed having regard to
the manner in which this event afterwards happened.

The following statutory provisions are material:

<div align="right">

H. L. (E.)

1961

SUTHERLAND,
DECD., *In re.*

Lord Hodson.

</div>

### Finance Act, 1894.

Section 7: " (5) The principal value of any property shall be
" estimated to be the price which, in the opinion of the Commis-
" sioners, such property would fetch if sold in the open market at
" the time of the death of the deceased: Provided that, in the
" case of any agricultural property . . ."

### Finance Act, 1940.

Section 55: " (1) Where for the purposes of estate duty there
" pass, on the death of a person dying after the commencement of
" this Act, shares in or debentures of a company to which this
" section applies, then if—(a) the deceased had the control of the
" company at any time during the [five years] ending with his
" death; or (b) . . . ; or (c) . . . the principal value of the shares
" or debentures, in lieu of being estimated in accordance with the
" provisions of subsection (5) of section seven of the Finance Act,
" 1894, shall be estimated by reference to the net value of the
" assets of the company in accordance with the provisions of
" the next succeeding subsection.

" (2) For the purposes of such ascertainment as aforesaid—
" (a) the net value of the assets of the company shall be taken to
" be the principal value thereof estimated in accordance with the
" said subsection (5), less the like allowance for liabilities of
" the company as is provided by subsection (1) of section fifty of
" this Act in relation to the assets of a company passing on a
" death by virtue of section forty-six of this Act, but subject to
" the modification that allowance shall be made for such a liability
" as is mentioned in paragraph (b) of that subsection unless it
" also falls within paragraph (a) thereof; (b) the aggregate value
" of all the shares and debentures of the company issued and
" outstanding at the death of the deceased shall be taken to be

256           HOUSE OF LORDS        **[1963]**

H. L. (E.)

1961

———

SUTHERLAND,
DECD., *In re.*

———

Lord Hodson.

———

" the same as the net value of the assets of the company; (c) . . .
" (d) the value of any share, or of any debenture, or of a share or
" debenture of any class, shall be a rateable proportion, ascer-
" tained by reference to nominal amount, of the net value of the
" assets of the company as determined under paragraph (a) of this
" subsection, . . . as the case may be."

     Section 50: " (1) In determining the value of the estate for
" the purpose of estate duty the provisions of subsection (1) of
" section seven of the Finance Act, 1894, as to making allowance
" for debts and incumbrances shall not have effect as respects
" any debt or incumbrance to which assets of the company passing
" on the death by virtue of section forty-six of this Act were
" liable, but the Commissioners shall make an allowance from the
" principal value of those assets for all liabilities of the company
" (computed, as regards liabilities which have not matured at the
" date of the death, by reference to the value thereof at that date,
" and, as regards contingent liabilities, by reference to such
" estimation as appears to the Commissioners to be reasonable)
" other than—(a) liabilities in respect of shares in or debentures
" of the company; and (b) liabilities incurred otherwise than for
" the purposes of the business of the company wholly and
" exclusively."

     The appellants claim that they are entitled to make a deduc-
tion in respect of " balancing charges " as being " contingent
" liabilities " within section 50 (1) of the Finance Act, 1940. Their
claim does not relate to the balancing charges which were levied
on the sale of the ships after the death of the deceased but to a
sum of £270,000, which is an agreed figure representing the
balancing charges which would have been paid if the ships had
been sold at the time of the death.

     The time of the death is the relevant moment and the appel-
lants have contended that when the statute directs property to be
valued at the price which it would fetch if sold in the open market,
a sale at the moment of death should be assumed.

     On this hypothesis of a notional sale they argue that the
liability to a balancing charge was contingent on the sale because
at the date of the death the ships were worth much more than
their written down value.

     The answer to this argument is that to apply the statutory
test of value it is necessary to ascertain what the property would
fetch at the time of death on a sale, not on a sale by a particular
individual. Section 7 (5) of the 1894 Act does not put the appel-
lants in the same position as they would have been if the ships

**A.C.**    AND PRIVY COUNCIL.    257

had been sold at the death. The ships were not sold and there
is nothing in the section to introduce the artificial conception
that they must be deemed to have been sold. I agree, therefore,
with the judgments delivered in the Court of Appeal that the
appellants' case fails in limine since the whole basis of the argu-
ment is a notional or hypothetical sale bringing in its train a
contingent liability.

The appellants have, however, maintained in this House, as
I understand their argument, that even if they cannot succeed in
upholding their hypothesis of a sale they are entitled to make the
deductions claimed as " contingent liabilities " having regard to
the wide meaning which can be given to these words. It is true
that, from the accountancy point of view, any provisions which
the directors of a company as business men think it prudent to
make for something which may not happen can be entered in
a balance-sheet as a liability. In ordinary speech no doubt one
often uses the words " contingent liabilities " in this sense. I do
not think in their context these words can have such an extended
meaning nor indeed do the appellants contend that they should,
for they expressly disclaimed that they would seek to take into
account liabilities which may exist in the future, but they have
endeavoured to say that there is, as it were, " in gremio " a
liability which was contingent since once the voluntary allow-
ances have been accepted the acceptor runs the risk of attracting
liability to refund the allowances.

This is no doubt true, but in my judgment the risk of attracting
liability is not enough and the argument involves a misconception
of what is meant by " contingent liabilities " in their context.

There may be no day of reckoning; the ships may never be
sold; if there is a sale there may be a balancing allowance not a
balancing charge. It is only when section 292 of the Income Tax
Act, which provides for balancing charges and balancing allow-
ances, comes into operation that any question can arise.

One must start with the word " liability " which prima facie
connotes a legal liability. When one adds to it the adjective
" contingent " one is not entitled to sail into an uncharted sea
and to take into account not only contingent liabilities but all
other kinds of liabilities which may be prospective or foreseeable
as likely to be incurred.

There can be no true contingent liability unless there is an
existing legal obligation under which a payment will become due
on the happening of a future unascertained event or events. There
must always be an underlying obligation. It does not matter

H. L. (E.)

1961

SUTHERLAND,
DECD., *In re.*

Lord Hodson.

H. L. (E.)
1961

SUTHERLAND,
DECD., *In re.*

Lord Hodson.

whether one regards the obligation as suspended pending the arising of the contingency or whether one regards the performance of the obligation as suspended. The result to my mind is the same. In the ordinary case no doubt the contingent liability is imposed by contract. A common example is a contract of insurance when the insurance company promises to make a payment to the assured on the happening of a contingency. A car owner may have an accident and be liable to meet an award of damages. If he is insured the contingency is provided for. In some cases the contingent liability may be imposed by statute. An illustration is to be found in the case of *Southern Railway of Peru Ltd.* v. *Owen (Inspector of Taxes).*[10]    No doubt other examples can be found.

The distinction between a future liability which has not yet matured and a contingent liability is marked in section 50 (1) itself. Those which have not matured are certain as to maturity whereas those which are contingent are uncertain as to maturity. The value of each is capable of estimation by the commissioners as the statute directs.

The case of *In re Duffy*[11] is authority for the proposition that the words " contingent liabilities " in section 50 mean legal liabilities actually existing in law at the relevant date and cannot be stretched so as to cover something which in a business sense is morally certain and for which every business man ought to make provision but which in law does not become a liability until a subsequent date. That also was an estate duty case. It concerned the basis of valuation of the shares of a company on the death of the deceased Joseph Duffy. The shares had to be valued for the purpose of calculating duty in the manner laid down in section 55 of the Finance Act, 1940. The executors sought to deduct as a contingent liability a sum equivalent to income tax on the proportion of the profits of the company applicable to that part of the company's financial year which preceded the death of the deceased. Two points were taken by the Crown, first that the tax was imposed annually, secondly that the trader is only liable if he carries on his trade into the next year. The tax not having been imposed, although admittedly there was a moral certainty that it would be, there was no liability and the Court of Appeal decided the case on this ground. Roxburgh J. in his judgment,[12] which the Court of Appeal upheld, based himself

---

[10] [1957] A.C. 334; [1956] 3 W.L.R. 389; [1956] 2 All E.R. 728; 36 T.C. 634, H.L.

[11] [1949] Ch. 28.

[12] Unreported.

**A.C.**   AND PRIVY COUNCIL.   259

on the second point taken by the Crown. He put the matter in
this way:

   " Mr. Stamp gave a graphic illustration which really seems to
" me to illuminate the problem. It was this. The fact that you
" have got a live dog on December 31, 1947, does not make you
" liable, contingently or otherwise, to pay for a dog licence in
" 1948. Of course, the probability is very great that you will not
" kill your dog overnight. Likewise, the probability was very
" great that this company would not go out of business immedi-
" ately after the testator's death. But the fact that you are
" unlikely to kill your dog before January 1 cannot convert into
" a liability that which otherwise is not a liability, and it is quite
" plain that if you did kill your dog before January 1, 1948, you
" would not be liable for a dog licence for the year 1948.

   " It seems to me that that was just the position of this com-
" pany with regard to the financial year beginning April 6, 1943.
" It was unlikely that it would not carry on business, but there
" was nothing to compel it to do so. It was unlikely that income
" tax would be abolished, but there was nothing to prevent
" Parliament from abolishing it. But, to my mind, it is impossible
" to believe that a state of affairs which you can terminate if
" you like by your own choice and without the intervention of
" anybody or anything, can properly be described as a liability.
" If you can go out of business and, thereby, escape from any
" liability to tax, then in my judgment, you are not under a
" liability for the tax in question."

   In my opinion the reasoning of these judgments is sound.
True that to treat the passing of the next Income Tax Act as the
crucial moment when liability attaches is to rest on rather an
artificial basis since it is as certain as can be that year by year
income tax will be imposed. This criticism cannot, however, be
levelled against the ground upon which Roxburgh J. decided the
case. There, as here, the liability could have been avoided at the
volition of the company. Money for duty had to be raised but
not necessarily by the sale of the ships, though no doubt this was
the convenient course to follow and a decision was taken to sell
the ships rather than shares of the company. I agree with Rox-
burgh J. in regarding a state of affairs which can be terminated
of one's own choice without outside intervention as being incon-
sistent with the imposition of a liability contingent or otherwise.

   I see no room for an intermediate kind of liability between
the contingent liability which I have tried to describe and the
prospective liability which may or may not come into existence

260                              HOUSE OF LORDS              **[1963]**

H. L. (E.)      and which is admittedly outside the scope of a contingent liability
1961            for the purposes of the section; and I find it impossible to define
─────           or limit the scope of a liability such as is contended for by the
SUTHERLAND,     appellants. They have established vulnerability, no doubt, but
DECD., *In re.* not contingent liability.
Lord Hodson.

I will not deal at length with the subsidiary arguments presented on behalf of the appellants. Accepting the distinction between liability and assessment drawn by Lord Dunedin in *Whitney* v. *Inland Revenue Commissioners* [13] I see no distinction between sections 1 and 292 of the Act of 1952 which enables the appellants to say that here there was a liability existing at the date of death. Further, I think that mutatis mutandis the same arguments apply to profits tax and there is no distinction to be drawn between profits tax and income tax. Annual imposition is necessary for both. Reliance was also placed on the case of *British Transport Commission* v. *Gourley* [14] which shows that a prospective tax burden should be taken into account in assessing damages in an action of tort. No assistance can be gained from the speeches delivered in that case which had to do with prospective earnings and not with liabilities, actual or contingent.

I would dismiss the appeal.

LORD GUEST. My Lords, upon the death of Sir Arthur Sutherland on March 29, 1953, the property passing for the purposes of estate duty included 98,700 shares of £1 each in B. J. Sutherland & Co. Ltd. The deceased had control of the company during the five years ending with his death and the principal value of the shares had therefore to be valued according to the provisions of section 55 (1) of the Finance Act, 1940, by reference to the net value of the assets of the company. Section 55 (2) of the Act of 1940 provides that the value of the assets is to be taken to be the principal value estimated in accordance with section 7 (5) of the Finance Act, 1894, less the allowance for liabilities provided for by section 50 (1) of the Act of 1940.

Section 50 (1) is in the following terms: " 50.—(1) In deter-
" mining the value of the estate for the purpose of estate duty
" the provisions of subsection (1) of section seven of the Finance
" Act, 1894, as to making allowance for debts and incumbrances
" shall not have effect as respects any debt or incumbrance to

[13] [1926] A.C. 37, 52; 42 T.L.R.    [14] [1956]  A.C.  185;  [1956]  2
58; 10 T.C. 88, H.L.                  W.L.R. 41; [1955] 3 All E.R. 796,
                                      H.L.

**A.C.**    AND PRIVY COUNCIL.    261

" which assets of the company passing on the death by virtue of
" section forty-six of this Act were liable, but the Commissioners
" shall make an allowance from the principal value of those assets
" for all liabilities of the company (computed, as regards liabilities
" which have not matured at the date of the death, by reference
" to the value thereof at that date, and, as regards contingent
" liabilities, by reference to such estimation as appears to the
" Commissioners to be reasonable) other than—(*a*) liabilities in
" respect of shares in or debentures of the company; and (*b*)
" liabilities incurred otherwise than for the purposes of the
" business of the company wholly and exclusively."

At the date of Sir Arthur's death the assets of the company
included five ships. At this date the company had received in
respect of these ships, which cost the company £847,907, capital
allowances under Chapter 2 of Part X of the Income Tax Act,
1952, to the amount of £557,158. The ships had at the deceased's
death a greatly increased value, and if they had been sold then, the
company would have sustained a balancing charge under section
292 of the Income Tax Act, 1952, giving rise to additional income
tax and profits tax liability. The five ships were in fact sold
during the year of assessment 1953–54 for £1,070,505 and a
balancing charge arose on the sum of £548,318 giving rise to
additional income tax liability and profits tax liability respectively
of £246,743 and £123,371.

The appellants claimed that in arriving at the value for estate
duty purposes of the shares, they were entitled to receive an
allowance under section 50 (1) of the Finance Act, 1940, by taking
into account the balancing charges attaching to the sale of the
ships.

In the courts below the appellants' claim has been refused,
but it is not unfair to say, at any rate so far as Danckwerts J.
is concerned, that, if they had not considered themselves bound
by authority to decide otherwise, they might have decided in the
appellants' favour.

The argument presented by the appellants was presented from
two angles. First, it was argued that section 7 (5) of the Finance
Act, 1894, envisaged a notional sale of the ships as at the date of
the deceased's death and that from the price in the open market
as provided for in section 7 (5) the balancing charges must be
deducted. The second aspect of the argument was that the
liability for balancing charges was a " contingent liability " within
the meaning of section 50 (1) of the Finance Act, 1940, and that

H. L. (E.)
1961

SUTHERLAND,
DECD., *In re.*

Lord Guest.

the commissioners must make an allowance for the balancing charges from the principal value of the assets.

The first argument was, in my opinion, rightly rejected by the Court of Appeal. The purpose of section 7 (5) of the Finance Act, 1894, is to value the property. "It does not," as the Master of the Rolls (Lord Evershed) said,[15] "require you to "assume that the sale . . . has occurred." It simply prescribes as the criterion for value price in the open market as between a willing seller and a willing buyer, which is a familiar basis of valuation. I therefore agree with all that fell from the Master of the Rolls and Upjohn L.J. upon this aspect of the matter. But both these learned judges appeared to think that this concluded the case in favour of the Revenue and that if you did not assume a notional sale under section 7 (5) of the 1894 Act, there was no room for the operation of section 50 (1) of the Finance Act, 1940. With great respect to these learned judges this seems to me to fail to appreciate the second limb of the appellants' argument. By section 55 (2) of the Act of 1940 you are directed to section 7 (5) of the Act of 1894 for the method of valuation of the assets of the company, but in calculating the allowance for liabilities of the company you are directed to section 50 (1). And among the allowances which the commissioners are directed to make are " contingent liabilities." Contingent liabilities, therefore, remain as deductions from the open market value of the assets of the company.

If this be the correct interpretation of these sections, the only question is whether the liability to pay balancing charges was a " contingent liability " under section 50 (1). If the question were untrammelled by authority I should have little difficulty in holding that the liability for these balancing charges was a contingent liability. It is plain from the terms of section 50 (1) that the liability contemplated is different from a debt or incumbrance, because the ordinary provisions of section 7 (1) of the Act of 1894 regarding debts and incumbrances are not to apply. Section 50 (1) refers both to liabilities which have not matured at the date of death and to contingent liabilities. Contingent liabilities must, therefore, be something different from future liabilities which are binding on the company, but are not payable until a future date. I should define a contingency as an event which may or may not occur and a contingent liability as a liability which depends for its existence upon an event which may or may not happen. A contingent obligation has in Scots law a

[15] [1960] Ch. 611, 624.

**A.C.**  AND PRIVY COUNCIL.  263

perfectly well-known meaning. I quote from Erskine's Institute of The Law of Scotland, 3rd ed., vol. 2, Book III, Title 1, section 6, p. 587: " A conditional obligation, or an obligation granted " under a condition, the existence of which is uncertain, has no " obligatory force till the condition be purified; because it is in " that event only that the party declares his intention to be bound, " and consequently no proper debt arises against him till it " actually exists; so that the condition of an uncertain event " suspends not only the execution of the obligation but the " obligation itself."

In Gloag on Contract, 2nd ed., pp. 271–272, future obligations are contrasted with contingent obligations. An obligation is future when though not presently exigible it is dependent on no other condition than the arrival of the day of payment. An obligation is contingent " if its enforceability is dependent on an " event which may or may not happen." I see no reason why these principles should not be applicable to a United Kingdom statute and no authority was quoted to show that English law differed in any way.

The Crown argued that the case of *In re Duffy* [16] was a barrier to the appellants' success and the learned judges of the Court of Appeal considered themselves bound by that decision. In particular, reliance was placed on the construction placed by Lord Greene M.R. on the words " contingent liabilities " when he said [17]: " But, quite apart from all these considerations, taking " the construction of these words, I find it impossible to give them " a meaning extending beyond what is always perfectly ascertain- " able without any doubt whatsoever, namely, an existing legal " liability, actually existing in law at the relevant date. The " words cannot be stretched so as to cover something which in a " business sense is morally certain and for which every business- " man ought to make provision but which in law does not become " a liability until a subsequent date."

With great respect to Lord Greene, if a liability must be an existing legal liability to comply with section 50 (1), that would appear to give no content to the adjective " contingent." The liability is not a legal liability until the contingency has arrived and the section cannot therefore be restricted to " existing legal " liabilities." *In re Duffy* [18] concerned the point whether income tax payable at the standard rate for the financial year 1943–44, assessed by reference to the profits of the year 1942–43 during

[16] [1949] Ch. 28.          [18] Ibid. 28.
[17] Ibid. 37, 38.

264                     HOUSE OF LORDS            **[1963]**

H. L. (E.)
1961

SUTHERLAND,
DECD:, *In re.*

Lord Guest.

which the deceased died on June 24, 1942, was a contingent
liability of the company for the purposes of sections 50 and 55 of
the Finance Act, 1940. The Court of Appeal decided that it was
not a contingent liability upon the view that there was no
present liability for income tax and that it was not certain that
income tax would be imposed in the Finance Act for the next
year. Roxburgh J., whose judgment was affirmed by the Court of
Appeal, approached the matter from a slightly different angle.
He held that as the company was free not to carry on business in
the relevant year and that as the company could terminate its
liability to income tax by its own voluntary act by not trading,
it could not be described as a liability. It is not necessary to
come to a conclusion as to whether *In re Duffy* [19] was rightly
decided. The facts of the present case are different and more
favourable to the taxpayer than they were in *Duffy.* [20] The
claim for initial allowances for what has been described as deprecia-
tion is the voluntary choice of the taxpayer, but, once he has
obtained such allowances, he is automatically involved by the
operation of law in the payment of balancing charges, if the assets
are parted with at a price greater than the written down value in
the circumstances defined in section 292 of the Income Tax
Act, 1952. In the present case as at the date of the deceased's
death the ships in question had a value on the open market
considerably in excess of that written down value. The liability
for such a balancing charge was, in my view, a " contingent
" liability " within the meaning of section 50 (1) of the Act of
1940, the liability being contingent upon the ships being sold at
a price in excess of their written down value. The courts below
have, in my opinion, put too narrow a construction on the words
" contingent liabilities."

The commissioners will, under section 50 (1), require to make
an estimation of the contingent liabilities as appears to them to
be reasonable. The allowances to be made will not be the full
extent of the balancing charges.

I therefore agree that the appeal should be allowed and the
case dealt with in the way in which my noble and learned friend
on the Woolsack proposes.

*Appeal allowed.*

Solicitors: *Hyde, Mahon & Pascall for Keenlyside & Forster,
Newcastle-upon-Tyne; Solicitor of Inland Revenue.*

**J. A. G.**

[19] [1949] Ch. 28.                    [20] Ibid.

# TAB 71

**In Matter of T&N Limited and Others v.
In the Matter of the Insolvency Act 1986**
Case No: 5798 (and others) of 2001
High Court of Justice Chancery
Division Companies Court
14 December 2005

**[2005] EWHC 2870 (Ch)**

**2005 WL 3498927**

Before: Mr Justice David Richards
Date: 14/12/2005, Hearing dates: 11,
12,13, 14, 25 and 26 October 2005

**Analysis**

**Representation**

• Richard Snowden QC and Peter Arden (instructed by Denton Wilde Sapte ) for the Administrators of T&N Ltd.
• Richard Sheldon QC , Monica Carss-Frisk QC , Jane Mulcahy and Daniel Bayfield (instructed by Lovells and Herbert Smith ) for the Official Committee of Asbestos Creditors and the Future Claimants' Representative.
• Robin Dicker QC and Richard Fisher (instructed by Sidley Austen Brown and Wood ) for Federal Mogul Corporation and its affiliates as debtors in possession in the proceedings under Chapter 11 of the US Bankruptcy Code , the Official Committees of Unsecured Creditors and of Equity Security Holders and JP Morgan Chase Bank as Administrative Agent for the holders of pre-petition bank debts.
• William Trower QC and Stephen Robins (instructed by DLA Piper Rudnick Gray Cary (UK) LLP ) for Lloyd's Syndicate 45/177.
• David Allan QC and Hugo Groves (instructed by John Pickering and Partners ) for the Representative UK Asbestos Claimants.
• Simon Mortimore QC , James Eadie and Blair Leahy (instructed by Allen & Overy ) for the Trustees of the T&N Retirement Benefits Scheme (1989).

**Approved Judgment**
Mr Justice David Richards:

**Introduction**

1    This is an application by the administrators of T&N Limited and other companies in the T&N group, by which they seek the determination of certain legal issues which are central to the future conduct of the administrations. The directions sought by the administrators and the issues raised by this application are set out in paragraphs 12–18 below. It is convenient first to give the necessary background information.

2    In a judgment given in October 2004, Re T&N Ltd [2004] EWHC 2361 (Ch), [2005] 2 BCLC 488 , I set out in paragraphs 6–44 the background to the administrations and the problems confronting the companies. The brief summary which follows and which brings the information up to date is sufficient for present purposes.

3    The T&N group was for many years engaged on a large scale in the mining of asbestos and in the manufacture and distribution of asbestos products. More recently it diversified into other product areas not necessarily involving asbestos, particularly the manufacture of parts for use in the automotive industry. The UK holding company was listed on the London Stock Exchange until 1998 when it was taken over by Federal Mogul Corporation Inc (FMC).

4    By then the hazardous nature of asbestos was well known and there had for some years been a rising number of claims against asbestos producers, such as T&N, by employees and former employees and members of their families, by third parties who had worked with asbestos products in, for example, the shipbuilding industry and by others who had been exposed to asbestos dust. These were in the main personal injury claims, but there have also been property damage claims and contribution claims by other asbestos producers.

5    The volume and scale of asbestos-related claims, particularly in the United States, continued to grow to the point in 2001 that the management of the Federal Mogul group, including the management of the

T&N sub-group, concluded that the affected companies should seek the protection of appropriate insolvency proceedings. On 1 October 2001, administration orders were made in England in respect of T&N and 132 other English companies in the Federal Mogul group. At the same time, those companies and 23 US companies in the Federal Mogul group filed for protection under Chapter 11 of the US Bankruptcy Code .

6    The relevant companies face liabilities on a massive scale. There are great difficulties in attaching figures to the companies' asbestos-related liabilities, particularly as some asbestos-related conditions do not manifest symptoms, or even start, for many years after exposure to asbestos dust. Evidence previously filed on applications in the administrations has provided a range of figures for current values of present and future claims of approximately £250 million for the United Kingdom and a range of about $2.7 billion to $10.5 billion for the United States. Proceedings were held earlier this year in the US District Court to estimate the value of all "pending" and "future" asbestos claims against the T&N companies for the purposes of a proposed plan of reorganisation of the companies. Written and oral expert evidence was submitted to the court. In its judgment on 19 August 2005, the US District Court estimated the current discounted value of total US claims, both pending and future, at $9 billion. For these purposes, claims were pending if they had been made by 1 October 2001, the date of the petitions under Chapter 11 , and all remaining claims were future. Although the figure of $9 billion was not apportioned between the two categories, it is accepted by all parties that the future claims represent a very significant majority of the total figure. Future claims for these purposes include both claims made since the petition date and an estimate of claims which may be made in the future. Again there is no apportionment of the figure between these two elements, but it is accepted that the estimate for claims not yet made represents a significant majority of that category.

7 Evidence was also placed before the US District Court as to the value to be attributed to UK asbestos claims. This evidence was not challenged and the relevant figures were adopted by the court in its judgment. Pending claims were valued at £14 million and future claims at £229 million.

8    As well as asbestos liabilities, T&N and 13 other companies in administration have very substantial liabilities to the trustees of the T&N Retirement Benefit Scheme (1989) (the T&N pension scheme). Actuaries instructed by the trustees have valued the claim against the companies as at March 2004 at £1.8 billion, making the trustees the largest single creditor by a wide margin. In addition, the trustees have claims under section 75 of the Pension Act 1995 . The Pension Protection Fund (the PPF) was established under the Pensions Act 2004 . Its function is to assume responsibility for, and to provide compensation to members of, eligible pension schemes, when there is a qualifying insolvency event in relation to the employer and there are insufficient assets in the pension scheme to provide for the level of protected liabilities. It became operational on 6 April 2005. It is anticipated, and it is critical to the success of proposals for the future conduct of the administrations, that the T&N pension scheme will be taken into the PPF. The "assessment period" during which the PPF must determine whether it would be appropriate to take the scheme into the PPF will start when the administrators send out notices to creditors convening meetings to consider proposals for company voluntary arrangements (CVAs) under Part I of the Insolvency Act 1986 .

9 Since the administration and Chapter 11 proceedings started in October 2001, there has been agreement in principle among the administrators, the debtor-in-possession management and the major creditor groups and representatives that, if possible, a means should be found to avoid a liquidation of the relevant US and UK companies. Some of the companies have businesses which are considered to be viable, and the problems associated with the long-term profile of the asbestos claims make highly desirable a solution other than liquidation. The solution would, if possible, involve a plan of reorganisation approved under the procedures contained in Chapter 11 of the US Bankruptcy Code and schemes of arrangements or CVAs in the UK. There have, however, been great difficulties in reaching agreement between the various groups as to the appropriate terms of these proposals. I outlined some of the issues in my judgment given on 21 October 2004: see paras 45–57 and 83–120.

10    More recently, progress has been made and on 26 September 2005 a number of parties entered

T&N Ltd, Re, 2005 WL 3498927 (2005)

into a settlement agreement. The parties are the
administrators, FMC and T&N (acting by their debtor
in possession management), the US Plan Proponents,
the PPF and High River Limited Partnership, the
most substantial holder of bonds issued by FMC. It
represents a settlement which is acceptable to the largest
creditors or creditor groups of the UK companies,
that is, the trustees of the T&N pension scheme, in
so far as it leads to entry into the PPF, and the
Official Committee of US Asbestos Claimants. It has
been approved by a resolution of the T&N creditors'
committee, with two abstentions. The unequivocal view
of the administrators is that it embodies a sensible
solution which treats all creditors fairly. It will enable
the companies to come out of administration and
Chapter 11 proceedings.

11  The settlement Agreement involves the promotion of
CVAs or schemes of arrangement which will provide for
the payment of specific amounts to certain creditors and
for the establishment of trusts and reserves from which
dividends will be paid to relevant groups of creditors.
The Plan Proponents agreed to make an application
to the US Court for an Order that CVAs or schemes
can be promoted before a Plan of Reorganisation
is approved by the US Court. Since the hearing of
this application, an order has been made by the
US Court in terms which permit the promotion of
CVAs or schemes. Certain creditor groups (notably US
and Canadian asbestos personal injury claimants and
the overwhelming majority of inter-company claims)
are excluded from the UK asset distribution process,
although US asbestos claimants will receive a very
substantial share of collections under the Hercules
insurance policy (as to which see Freakley v Centre
Reinsurance International Co [2004] EWHC 2740 (Ch),
[2005] 2 BCLC 530 ). Those creditors will (except in
relation to the Hercules insurance policy) rely entirely
upon the treatment they are to receive under the
eventual Plan of Reorganisation to be confirmed in
the US. Relevant participating creditors in the UK will
(with the exception of the claim of the T&N pension
scheme against T&N) have to establish their claims for
dividend purposes in accordance with English legal and
procedural requirements. The payments to creditors
and the establishment of the necessary trusts and
reserves will be funded from the cash already held by the
Administrators and the sale proceeds of certain assets.

**Issues**

12  It is an essential feature of the proposals that
not only those persons who have already made or
are entitled to make asbestos-related claims, but
also all future claimants, should be bound by the
schemes or CVAs. As will appear, this involves no
jurisdictional difficulty as regards future claimants who
were employees and therefore have contractual claims,
or claimants who have accrued causes of action in
tort. The issue requiring resolution is whether future
claimants who were not employees and who do not
have accrued causes of action in tort can be parties to
a scheme of arrangement or a CVA and bound by it.
I should mention that there have been no submissions
directed to statutory claims of former employees or
their dependants. So far as US claims are concerned,
they are or will be principally product liability claims
and are maintainable, if at all, in tort.

13  A further issue which has been raised for decision
is whether, on the hypothesis of a winding-up, persons
with potential tort claims but without an accrued cause
of action at the date on which the company goes into
liquidation (the liquidation date) would have admissible
claims for the purposes of proof in a winding-up. This
in turn requires consideration of, first, claimants who
do not have an accrued cause of action when they seek
to prove, and, secondly, claimants who have a cause
of action which accrues after the liquidation date. A
very large proportion of persons who have been exposed
to asbestos dust will never suffer any injury and will
therefore never have a cause of action in tort. It is
not however possible to predict whether any particular
individual will or will not develop an asbestos disease.

14  This second issue is not raised because liquidations
are anticipated, although they cannot be ruled out
as a possible outcome. It is raised because, if these
potential claimants are not entitled to prove and receive
a distribution in a winding-up, issues may arise as to
fairness and as to the proper constitution of classes for
voting purposes in a scheme. I say that it may raise such
issues, because it is not accepted by the administrators
and other parties that it necessarily will do so. I have
not heard submissions as to these consequential issues.
Plainly, however, any problem is avoided if the proper
conclusion is that such claimants are entitled to prove
in a liquidation.

15   A third issue has arisen, if the answer to the second issue is that, applying the usual principles of statutory construction, the potential claimants cannot prove in a liquidation. It is then contended by the US Asbestos Creditors Committee and other parties that this would breach the claimants' rights under the European Convention for the Protection of Human Rights and Fundamental Freedoms (the Convention) and the First Protocol.

16   There are, as it appears to me, two principal reasons for the importance of these issues in this case, which also explain why they have not previously arisen. First, the particular nature of asbestos-related diseases is, as I have mentioned, such that there may be a very long period between the exposure to asbestos and the start, let alone the appearance of symptoms, of the resulting disease. The second reason is the scale of the potential liabilities, particularly in the United States, and the inadequacy of available insurance cover. Asbestos-related diseases are not unique in having so long a period of development (see Cartledge v E Jopling & Sons Ltd [1963] AC 758 ) but it may be that previously there has been adequate insurance to meet the problem.

**Administrators' application**

17   The administrators' application, as amended, contains definitions in paragraph 2:

> "For the purposes of this Application
>
> (1)  "future asbestos claim" means any personal injury claim against a UK Debtor where:
>
> (a)   the claimant was exposed to asbestos which could cause an asbestos-related disease or diseases, and
>
> (b)  the relevant UK Debtor would be liable in respect of that exposure and any such disease or diseases, and

> (c)  all of the exposure to asbestos occurred prior to the relevant date or the liquidation date (as the case may be), but
>
> (d)  the claimant's cause of action, if any, against the relevant UK Debtor will accrue after the relevant date (in the case of paragraph 2 below) or the liquidation date (in the case of paragraph 3 below).
>
> (2)  "relevant date" means a date on which the Administrators propose in respect of the relevant UK Debtor a scheme of arrangement pursuant to section 425 of the Companies Act 1985 (the 1985 Act), and/or a company voluntary arrangement pursuant to the provisions of Part I of the Insolvency Act 1986 (the 1986 Act).
>
> (3)  "liquidation date" means a date on which the relevant UK Debtor goes into liquidation pursuant to the provisions of Part IV of the 1986 Act."

18   The substantive relief sought by the administrators is in paragraphs 3 and 4:

> "3.   That it may be determined and declared whether a claimant in respect of a future asbestos claim against a UK Debtor would be a "creditor" of the UK Debtor so as to be capable of being bound by any compromise or arrangement sanctioned by the Court pursuant to section 425 of the 1985 Act and/or by any company voluntary arrangement approved pursuant to the provisions of Part I of the 1986 Act.

WESTLAW   © 2017 Thomson Reuters.

4. That it may be determined and declared whether a claimant in respect of a future asbestos claim against a UK Debtor would be entitled to prove for a debt in the liquidation of that UK Debtor pursuant to the provisions of Part IV of the 1986 Act and/or Part 4 of the Insolvency Rules 1986 ."

**Representation and the parties' positions**

19   The application is for directions to enable the administrators to pursue and fulfil the purposes of the administrations. They do not seek declarations which would be binding or create issue estoppels as regards individual claimants. One reason for this is that it is of vital importance not to take any steps which might infringe the claims-handling rights of insurers and reinsurers under the Hercules insurance arrangements. No representation orders have therefore been sought or made.

20   The applications were provided to a number of interested parties. In addition to the administrators, for whom Mr Snowden QC and Mr Arden appeared, six groups of interested parties have been represented on the applications. Mr Sheldon QC and Mr Bayfield appeared for the Official Committee of Asbestos Creditors and for the Future Claimants' Representative appointed in each case by the Office of the United States Trustee for the purposes of the Chapter 11 proceedings. They are among the proponents of, or they support, the Plan of Reorganisation being promoted in the Chapter 11 proceedings. Mr Dicker QC and Mr Fisher appeared for certain of the Plan Proponents, namely Federal Mogul Corporation and its affiliates as debtors in possession in the Chapter 11 proceedings, the Official Committees of Unsecured Creditors and of Equity Security Holders and JP Morgan Chase Bank as administrative agent for the holders of pre-petition bank claims. Mr Trower QC and Mr Robins appeared for Syndicate 45/177 at Lloyd's, which is one of T&N's employer's liability insurers, covering a period

from 1977 to 1995. There has been litigation between T&N and the syndicate but they have reached outline terms of settlement, one of the conditions of which is that future asbestos claimants must be bound by the terms of any final settlement, whether effected by scheme of arrangement or CVA. The representatives of UK asbestos claimants appointed by Lindsay J on 27 May 2004 were represented by David Allan QC and Hugo Groves. While supporting the administrators, they did not advance separate submissions on any of the issues. All these parties supported the position of the administrators that future asbestos creditors could be bound by a scheme of arrangement or CVA and that their potential claims were admissible to proof in a liquidation. There was a unanimity of approach to the first of those issues but, as will be seen, on the second issue, their submissions differed and in some respects conflicted. Nonetheless they were agreed as to the outcome.

21   The T&N pension trustees were represented by Mr Mortimore QC and Miss Leahy. The trustees do not have a position on the first issue and therefore neither support nor oppose the declaration on that issue sought by the administrators. Their primary concern is that the T&N pension scheme should enter the PPF. The PPF, not the trustees, is a party to the settlement agreement and has indicated its support for CVAs embodying its terms. Under the terms of the settlement agreement the trustees would receive payments totalling about £250 million and, if the pension scheme enters the PPF, these payments will be for the benefit of the PPF. At meetings to consider CVAs and schemes, the PPF, not the trustees, will be entitled to vote on behalf of the pension scheme. For these reasons, the trustees make no submissions on the first issue.

22   The trustees do, however, oppose the administrators' position on the second issue and submit that without an accrued cause of action as at the liquidation date, a potential tort claim is not admissible to proof, nor is an actual claim in tort where a cause of action has in fact accrued but only after the liquidation date. As a very substantial creditor, the trustees and the many thousands of present and former employees who are beneficiaries under the scheme have a direct interest in this issue, if it proves impossible to give effect to the settlement agreement. Accordingly, Mr Mortimore assumed the burden of advancing submissions in

opposition to the four separate sets of submissions made on this issue by Mr Snowden, Mr Sheldon, Mr Dicker and Mr Trower.

23  Very shortly before the start of the hearing, the administrators' counsel lodged a supplemental skeleton argument, raising for the first time submissions that if the relevant statutory provisions were construed so as to prevent tort claimants without a cause of action accrued as at the liquidation date from proving in a liquidation, such a result would be incompatible with the Convention and the First Protocol. If that were right, the Court was bound by the Human Rights Act 1998 to construe the provisions in a way which was compatible with the Convention or, if that was impossible, the court should at least indicate the incompatibility, whether or not formal declarations were sought. At my request, the administrators' solicitors notified the Department of Trade and Industry, which is the government department responsible for insolvency legislation, of these submissions. The Insolvency Service, which is the relevant agency of the Department, replied in writing that it did not wish to participate in the application and it has not made any submissions on this issue. Separate argument was addressed to me at a subsequent hearing by Miss Carss-Frisk QC on behalf of the Asbestos Creditors' Committee and the Future Claimants' Representative and by Mr Eadie on behalf of the trustees of the T&N pension scheme. I am very grateful to them, as I am to all counsel, for the great assistance which they gave on this application. The submissions of Miss Carss-Frisk were adopted without further argument by all parties, except of course, the pension scheme trustees.

**Development of asbestos-related diseases**

24  It is appropriate to give a very brief summary of the development of these diseases, to give some sense of their scale and nature. This is an area of developing scientific knowledge. There are helpful statements of current medical opinion in a number of authorities, including Fairchild v Glenhaven Funeral Services Limited [2003] 1 AC 32 and Grieves v F. T. Everard & Sons [2005] EWHC 88 (now on appeal). The following summary is taken from the administrators' skeleton argument. It is agreed by all counsel appearing on this application, including David Allan QC who

has great experience in this area. The stages of the development of asbestos-related diseases, so far as known, is as follows:

• (1)  The inhalation of asbestos fibres. Following inhalation, a proportion of the fibres never reach the lungs. Some are caught in the nasal passage; others are trapped in the mucus which lines the body's airways and are eventually swallowed or expectorated.

• (2)  Deposit of fibres into lungs. When fibres are deposited in the lungs, the body's natural defences (scavenger cells known as "macrophages" and dissolution in tissue fluids) succeed in clearing some of the fibres or (by a coating process) operate so as to neutralise them. However, a substantial proportion survives these processes.

• (3)  The by-products of the body's natural defences and the bio-persistence of asbestos fibres are the cause of asbestosis. Failed macrophages die and they, and the surviving asbestos fibres, produce a chemical reaction. This reaction in turn produces an inflammation of the lung which, if sufficiently serious and prolonged, can cause fibrosis — asbestosis — to develop. It does not usually become apparent or detectable until after 20 years from first exposure.

• (4)  The presence of asbestos fibres in the lung increases the likelihood of the development of lung cancer, with the fibres acting in relation to at least some of the genetic mutations which result in the first malignant cell. Asbestosis is a sufficient, but probably not a necessary, condition for the development of cancer of the lung. With the other asbestos-related diseases, it shares a long latency period. However, and as with mesothelioma (as to which further below), the first malignant cell may develop some considerable time before the cancer actually becomes manifest. Once manifest, the disease is almost always fatal and death occurs within a very short period of between 12 and 18 months.

• (5)  Asbestos fibres can pass from the lungs and penetrate the pleura. The precise route is as yet unclear.

• (6)  The presence of asbestos fibres commonly causes pleural plaques to develop. These are localised areas of pleural thickening, consisting of bland fibrous tissue. The cause is not

absolutely clear, although it appears to be similar to asbestosis; that is, an inflammation caused by a chemical reaction produced by pleural macrophages and the presence of asbestos fibres. As with asbestosis, pleural plaque rarely becomes apparent or detectable until after 20 years from first exposure.
• (7)   Pleural thickening is pleural fibrosis, extending continuously over a variable proportion of the thoracic cavity, usually involving the visceral pleura. The cause, development and latency period are similar to pleural plaques. However, unlike pleural plaques, the disease may manifest itself in the form of physical symptoms.
• (8)   Mesothelioma is a malignant tumour arising from mesothelial cells and is found most commonly in the pleura, and sometimes in the peritoneum. Asbestos fibres in the pleura increase the likelihood of the development of the requisite malignant cell, although it is not clear precisely at which stages of mutation the fibre operates or what precise form that development takes. The mean latency period is 40 years, although (if the end of that period is taken to be the first manifestation of symptoms) the appearance of the first malignant cell takes place within that period — about 10 years prior to the first manifestation of symptoms. The disease is fatal, death usually occurring within about 12 months after the onset of symptoms.

It is therefore not just the symptoms, but the condition itself, which may not start to develop for many years after exposure.

**Accrual of causes of action**

25   Damage is a necessary element of a cause of action in the tort of negligence. Unless and until the claimant suffers a loss which is recognised in law as compensatable by an award of damages, the claimant has no claim in negligence. This is not a technical requirement. It goes to the foundation of the law of negligence and many other torts. The obligation which the law imposes in appropriate circumstances (where the legal decision is that there exists a duty of care to avoid loss of the type in question), and which a claimant may enforce by legal proceedings, is an obligation to compensate the claimant against loss which was a reasonably foreseeable consequence of his carelessness. There is no free-standing obligation

or duty of care. This was clearly stated by Viscount Simonds in Overseas Tankship (UK) Limited v Morts Dock and Engineering Co Ltd (The Wagon Mound) [1961] AC 388 at 425:

> "It is, no doubt, proper when considering tortious liability for negligence to analyse its elements and to say that the plaintiff must prove a duty owed to him by the defendant, a breach of that duty by the defendant, and consequent damage. But there can be no liability until the damage has been done. It is not the act but the consequences on which tortious liability is founded. Just as (as it has been said) there is no such thing as negligence in the air, so there is no such thing as liability in the air. Suppose an action brought by A for damage caused by the carelessness (a neutral word) of B, for example, a fire caused by the careless spillage of oil. It may, of course, become relevant to know what duty B owed to A, but the only liability that is in question is the liability for damage by fire. It is vain to isolate the liability from its context and to say that B is or is not liable, and then to ask for what damage he is liable. For his liability is in respect of that damage and no other. If, as admittedly it is, B's liability (culpability) depends on the reasonable foreseeability of the consequent damage, how is that to be determined except by the foreseeability of the damage which in fact happened — the damage in suit? And, if that damage is unforeseeable so as to displace liability at large, how can the liability be restored so as to make compensation payable?"

26 A cause of action in negligence can therefore accrue only if and when compensatable loss is suffered. The same is not true of a cause of action for breach of contract. By making the contract, a party assumes a legally recognised and enforceable obligation to perform it. A breach of contract is therefore without more a breach of legal obligation and a cause of action has accrued, even though substantial loss has not yet been suffered and may never be suffered.

27 These differences between liability in contract and in tort play an important part in the present application, for at least two reasons. First, the way in which the relevant provisions in the Insolvency Act 1986 and the Insolvency Rules are drafted focus attention on these issues. Secondly, the differences may produce surprisingly different results depending on whether a claim can be brought in contract or in negligence.

28 The accrual of causes of action in relation to asbestos-related claims raises acute difficulties, because of the long period which may elapse between exposure to asbestos and the onset of any medical consequences which can be recognised as damage, and because of the difficulties, often amounting to impossibility, of ascertaining the time at which those consequences started.

29 The issue of what constitutes compensatable loss is itself controversial. There is, of course, no difficulty with conditions such as mesothelioma, lung cancer or asbestosis. These are comparatively rare developments on a statistical basis, although still representing a very serious problem. The difficulty arises in relation to the much more common, asymptomatic development of pleural plaques. In Grieves v F. T. Everard & Sons , Holland J held that permanent penetration by asbestos fibres, with only the potential for harmful physiological changes, did not constitute compensatable loss. He further held that pleural plaques were not of themselves sufficient for this purpose. However, pleural plaques providing a catalyst for future symptomatic diseases and amounting to physiological damage, when combined with resulting anxiety, was sufficient to amount to a compensatable loss and was therefore sufficient to give rise to a cause of action. On that basis, a claimant can elect for either a final award of damages or a provisional award. A final award will compensate not only for the damage

presently suffered (e.g. anxiety) but also for all damage which might be suffered in the future, such as the development of mesothelioma, provided that it is not too speculative. A provisional award will compensate the claimant for his present loss, but also enable the claimant to apply for further damages in the event that a serious condition specified in the order later develops.

30 The power to award provisional damages is conferred by section 32A of the Supreme Court Act 1981 which enables the award to be made:

> "for damages for personal injuries in which there is proved or admitted to be a chance that at some definite or indefinite time in the future the injured person will, as a result of the act or omission which gave rise to the cause of action, develop some serious disease or suffer some serious deterioration in his physical or mental condition."

31 Its application to asbestos cases was described as follows by Holland J in Grieves (para 88a):

> "This type of award has to be compensation for a penetration of the body by asbestos fibres, which penetration is permanent and of sufficient extent and maturity as to give rise to pleural plaques and to the fact of a lifetime risk of the onset of a symptomatic condition, with concomitant 'suffering' or loss of amenity in terms of anxiety. It does not have to compensate for the onset of any such conditions in terms of general damages or prospective financial loss. I reject a Defendants' submission that the fact of an award presently predicated on the basis that no such condition will in fact arise somehow adversely affects so much of the claim as invokes anxiety. Whether or not

T&N Ltd, Re, 2005 WL 3498927 (2005)

there is an immediate award that reflects the onset of such a condition and its consequences, the threat of such remains and is a potential source of anxiety."

At para 90B, Holland J, explained the approach to a final award and the submissions made on it:

"Granted that the final award has from the onset been pitched at a level higher than that for a provisional award, what is it that commands greater compensation? The only apparent factor is the actual assessed risk of the future onset of an asbestos related symptomatic, possibly terminal condition. I consider each of the three presently claimed full awards separately in due course — it is convenient presently to take Mr. Grieves as an example. In his case (as a 64 year old) that which arguably justifies a general damages award higher than that appropriate on a provisional basis are 2% risks of the future onset of diffuse pleural thickening, further or alternatively asbestosis; and 5% risks of the future development of a mesothelioma, further or alternatively lung cancer. It is the potential for the onset of one or more of these conditions that is said to merit an enhanced award. Essentially, proof on balance of probabilities that there are these risks justifies, so it is submitted, substantially higher compensation in terms of general damages."

Holland J held that Mr Grieves could not recover damages based on the possibility of an asbestos-related condition developing because it was too speculative.

## Are Future Asbestos Claimants "creditors" for the purposes of schemes of arrangement and CVAs?

32   Section 425 of the Companies Act 1985 makes provision for "a compromise or arrangement … proposed between a company and its creditors, or any class of them" to become binding on the company and the creditors, by a process involving a meeting or meetings of the creditors or classes of creditors concerned and subsequent sanction by the court. There is no definition of "creditors" for this or any other purpose in the Companies Act .

33   Part 1 of the Insolvency Act 1986 makes provision for the directors, administrator or liquidator of a company to "make a proposal under this Part to the company and to its creditors for a composition in satisfaction of its debts or a scheme of arrangement of its affairs", called a voluntary arrangement ( section 1(1) ). Section 3 provides for a meeting of creditors and a meeting of members of the company to consider the proposal. If approved at both meetings, the CVA binds every creditor entitled to vote at the meeting of creditors, whether or not he in fact voted or was present or had notice of the meeting, as if he were a party to the arrangement ( section 5(2) ). The same is true if the proposal was approved only at the meeting of creditors, subject to the court's powers under section 4A(6) . There is no definition of "creditor" for the purposes of Part 1 of the Insolvency Act 1986 , or indeed for the purposes of other provisions of the Act relating to companies.

34   Provision for schemes of arrangement was first made by the Joint Stock Companies Act 1870 . It was more limited in scope than the later provisions now re-enacted as section 425 . It applied only to schemes of arrangement between a company in liquidation and its creditors. The meaning of "creditors" was considered in Re Midland Coal, Coke and Iron Co [1895] 1 Ch 267 which concerned a scheme under that Act. The lessee of mines had assigned his leases to the company which covenanted to indemnify him against liability under the leases. The company went into liquidation and a scheme was approved, under which a new company took over the assets and liabilities of the company and agreed to pay or satisfy the unsecured creditors within three months of approval of the scheme. The lessee applied in the liquidation of the company to have a sum provided to meet his contingent liability for rent, royalties and

breaches of covenant. In considering whether he was bound by the scheme and thereby precluded from lodging a proof in the liquidation of the old company, there was consideration of the meaning of "creditor" for the purposes of the 1870 Act. Wright J said at p 271:

> "It is difficult to put a meaning on sec.2 of the Joint Stock Companies Arrangement Act, 1870 , and the case is complicated by the scheme. But, on the whole, I may take it that sec.2 is intended to apply to everybody who can be treated as a creditor of any sort, whether actual or contingent. Craig, being some sort of a creditor, within the meaning of the Act, so that he could be bound by meetings of creditors, either was bound by some order of the Court, or he had it in his power to get himself protected, and must be treated as if he were a party represented by some particular class of creditors. As one of the creditors, or of a class of creditors, he was a party to and bound by the scheme."

35   On appeal it was argued by Mr Buckley QC for the lessee that the word "creditor" in the 1870 Act did not include every person who has a contingent claim against the company, whatever may be the nature of his claim. Lindley LJ, giving the judgment of the Court of Appeal, agreed with Wright J's approach to the meaning of "creditor":

> "Considering that that Act was passed in order to enlarge the powers conferred by sect. 159 of the Companies Act, 1862 , we agree with Mr Justice Wright in thinking that the word "creditor" is used in the Act of 1870 in the widest sense, and that it includes all persons having any pecuniary claims against the company. Any other construction

would render the Act practically useless" (p. 277).

36   Mr Snowden relied on this decision as support for an interpretation of "creditors" which would include future asbestos claimants. The decision dispels any notion that "creditors" are restricted to those with debts which are presently payable or certain to be payable in the future. However, it would not itself justify reading "creditors" in this context as having a wider meaning than creditors with a provable claim in the winding-up to meet their claim: see Lindley LJ at pp 275–277. Since schemes of arrangement under the 1870 Act could only be proposed between a company in liquidation and its creditors, it is to be expected that there should be an alignment between the meaning of "creditors" under the 1870 Act and "creditors" in a liquidation.

37   The power to promote schemes of arrangement was extended to all companies, not just those in liquidation, by the Companies Act 1907 . Since then there has been no necessary link with the law relating to liquidations, and since 1986 the provisions governing liquidations have been contained in a different statute from those dealing with schemes of arrangements. While those treated as having provable debts in liquidation are "creditors" for the purposes of section 425 , it does not follow that "creditors" need be restricted to such persons.

38   This was the conclusion reached by the Supreme Court of New South Wales in Re R. L. Child & Co Pty Ltd (1986) 4 ACLC 312 . It was an application to convene a meeting of creditors to consider a scheme of arrangement with creditors who were defined as:

> "any person who [has] or claims to have any claim against the company arising out of or having its origin in any matter occurring on or prior to 14 February 1986 or arising out of any transaction, act or omission of the company or any person on or before 14 February 1986, whether the claim be present, future or contingent or whether

liquidated sounding only in damages and whether in contract or in tort howsoever arising …"

The company was insolvent, but not in liquidation, and, under the applicable insolvency rules, a person with an unliquidated claim in tort was excluded from proof in the winding-up of an insolvent company, whether his cause of action accrued before or after the liquidation date. McLelland J saw no warrant for introducing this exclusion into the meaning of "creditors" in section 315 of the Companies Code , which governed schemes of arrangements in terms similar to section 425. In reaching this conclusion, he referred to the fact that such claims were provable in the winding-up of a solvent company and observed:

> "It is highly unlikely that the legislature would have intended the ambit of that expression to vary depending upon whether the company was solvent or insolvent, and to exclude persons having liquidated claims in tort from the scope of sec. 315 would make little commercial sense."

39    The class of creditors entitled to prove in a solvent liquidation was widely drawn to include all contingent liabilities and did not exclude unliquidated claims in tort. McLelland J treated that provision as a "convenient guide" to the meaning of creditors in section 315 . This decision was followed by Anderson J in Bond Corporation Holdings Ltd v State Western Australia (1992) 7 WAR 61 (although the decision was disapproved on other grounds by the Privy Council in Kempe v Ambassador Insurance [1998] 1 WLR 271 ). It is to be observed that the definition of creditors in the scheme was wide enough to include not only tort claimants with an accrued cause of action, but also those with claims "arising out of or having its origin in any matter occurring on or prior to 14 February 1986 or arising out of any transaction, act or omission of the company" on or before the same date. That formulation

was clearly wide enough to include persons who had as yet suffered no loss from the "matter occurring" or the act or omission of the company, and who would therefore not have an accrued cause of action in tort.

40    In my judgment, "creditors" in section 425 is not limited to those persons who would have a provable claim in the winding-up of the company, although it clearly includes all those who would have such a claim. As was submitted by Mr Snowden and other counsel, one of the recognised purposes of section 425 is to encourage arrangements with creditors which avoid liquidation and facilitate the financial rehabilitation of the company: see, for example, Sea Assets Ltd v PT Garuda Indonesia [2001] EWCA Civ 1696 at para 2. This suggests that as wide a meaning as possible should be given to "creditors" in the section. Having said that, it is important to bear in mind that section 425 is designed as a mechanism whereby an arrangement may be imposed on dissenting or non-participating members of the class and such a power is not to be construed as extending so as to bind persons who cannot properly be described as "creditors".

41    The provisions for CVAs are much more recent than those for schemes of arrangements. They were first introduced by the Insolvency Act 1985 and came into effect as Part 1 of the Insolvency Act 1986 , a consolidating statute. They are based on recommendations contained in the report of the Review Committee on Insolvency Law and Practice (Cmnd 8558, 1982) (the Cork Report).

42    Although contained in the Insolvency Act and although envisaged as a mechanism for a company in financial difficulties, there is no clear requirement that creditors for the purposes of CVAs should be restricted to persons with provable debts. As a mechanism which is intended as an alternative to schemes of arrangement, there is every reason for concluding that "creditors" should have as wide a meaning in Part 1 of the Insolvency Act as in section 425 .

43    The meaning of "creditors" in this context was considered by Knox J in Re Cancol Ltd [1996] 1 All ER 37 . A landlord contended that future rent under a lease was not affected by a voluntary arrangement approved in relation to the tenant company. Knox J rejected the argument that "creditors" were restricted to those with

presently enforceable claims, and did not include those with future or contingent claims, a reading which would of course have provided a much narrower class even than persons with provable claims. Knox J relied in part on the analogy with schemes of arrangement and on the meaning given to "creditors" by the Court of Appeal in Re Midland Coal, Coke and Iron Co . He observed at p 44:

> "it would, in my view, be highly anomalous if company voluntary arrangements under the 1986 Act, which are intended to be an alternative to liquidation, and s.425 compromises or arrangements did not have the same potential ambit."

Knox J therefore applied by analogy the decision of the Court of Appeal in Re Midland Coal, Coke and Iron Co that "creditors" include all persons having any pecuniary claims against the company, including those whose claims are future or contingent.

44  The claim for future rent in Re Cancol Ltd would be a provable debt in a liquidation, and the decision is not therefore authority for the proposition that the meaning of creditors in relation to CVAs goes wider than those with provable debts. However, some persons who do not have provable debts are clearly creditors: see rule 12.3(2) of the Insolvency Rules 1986 . Thus, a person with the benefit of a costs order made in family proceedings was a creditor for the purposes of serving a statutory demand and presenting a bankruptcy petition, even though the debt was not provable: Levy v Legal Services Commission [2001] 1 FLR 435 (CA) . See also Re a Debtor; JP v A Debtor [1999] BPIR 206 .

45  Every creditor who has notice of the meeting convened to consider a CVA is entitled to vote at it. Rules 1.17(2) and 1.17(3) provide for the value to be attributed to the votes of creditors:

> (2)  [Calculation of votes] Votes are calculated according to the amount of the creditor's debt as at the date of the meeting or, where the company is being wound up or is

in administration, the date of its going into liquidation or (as the case may be) when the company entered administration.

> 1.17(3)  [Limitation on voting] A creditor may vote in respect of a debt for an unliquidated amount or any debt whose value is not ascertained and for the purposes of voting (but not otherwise) his debt shall be valued at £1 unless the chairman agrees to put a higher value on it."

The word "debt" is not defined for the purposes of this rule. While it might not obviously suggest a wholly contingent liability, it is clear from Re Cancol Ltd that it does so.

46  The present state of the authorities therefore shows that (i) the holder of a contingent claim is a creditor for the purposes of the provisions governing both schemes of arrangement and CVAs and (ii) the claim need not be a provable debt. The nature of contingent claims is such that a creditor for these purposes need not have an accrued cause of action. To take the simple example of an uncalled guarantee, the person with the benefit of the guarantee will be a "creditor" of the guarantor, even though there has not been, and may never be, any default on the principal debt or any call on the guarantee.

47  Nonetheless it is a significant step to go from saying that a person with a contingent claim on the basis of an existing contractual obligation is a "creditor" to saying that a person who has suffered no loss and who therefore has no claim in tort is a "creditor" because he may in the future suffer loss, giving him then a cause of action in tort. There is no authority, except possibly the New South Wales case of Re RL Child & Co Pty Ltd , which establishes this proposition. Nor, however, does any authority reject it.

48  It becomes necessary to look closely at the nature of a contingent liability. The most illuminating authority, on which Mr Snowden and other counsel heavily relied,

is the decision of the House of Lords by a majority of three to two in In re Sutherland, decd, Winter v IRC [1963] AC 235 . It concerned the incidence of estate duty in circumstances where the deceased had "control" of a company, as defined in the Finance Act 1940 , during the five years ending with his death. In such circumstances, his shares fell to be valued by reference to the net value of the company's assets, pursuant to sections 50 and 55 of the 1940 Act. At the date of death the assets included five ships for which the company had received capital allowances under the Income Tax Act 1952 , leaving a sum as "expenditure unallowed" as defined in the 1952 Act. If, as happened after his death, the ships were sold at a price greater than the expenditure unallowed, the company became subject to balancing charges resulting in a tax liability.

49   For the purposes of valuing the net assets of the company, allowance had to be made under section 50 of the Finance Act 1940 for:

> "all liabilities of the company (computed, as regards liabilities which have not matured at the death, by reference to the value thereof at that date, and, as regards contingent liabilities, by reference to such estimation as appears to the Commissioners to be reasonable) …"

The issue was whether the balancing charges payable on a sale of the ships was for these purposes "contingent liabilities" of the company at the date of the deceased's death.

50   It was submitted for the Inland Revenue that contingent liabilities referred to an existing legal obligation under which any payment would become due in consequence of the happening of a future uncertain event or events. No legal obligation existed at the date of death, not only because it was uncertain whether the ships would ever be sold, but also because any sale, and therefore the liability to pay a balancing charge, depended on the volition of the company. The contingency was under its control. While it was conceded that as soon as a capital allowance

was accepted there arose an obligation to pay in certain circumstances, it was the element of volition which meant that there was no contingent liability. Additionally, it was submitted that section 50 was not aimed at obligations arising under a statute, and was aimed primarily at contractual obligations.

51   Lord Reid, giving the leading majority speech, rejected the notion that a contingent liability could arise under a contract, but not under statute: pp 247–248. As to the meaning of contingent liability, he held that in Scots law and in section 50 of the Finance Act 1940 , it was:

> "a liability which, by reason of something done by the person bound, will necessarily arise or come into being if one or more certain events occur or do not occur." (p 249.)

Although Lord Reid formally expressed no final view as to the meaning of contingent liability as a matter of English law, this was an English appeal on the construction of a United Kingdom statute, and there is no good basis for suggesting that it generally has a different meaning in English law.

52   While contingent liabilities in section 50 meant "sums, payment of which depends on a contingency, that is, sums which will only become payable if certain things happen, and which otherwise will never become payable", he agreed with the Commissioners:

> "to this extent, that this class can only include liabilities which in law must arise if one or more things happen and cannot be extended to include everything that a prudent businessman would think it proper to provide against." (p 249)

The difference here was that by accepting the capital allowances, the company came under a statutory obligation to pay balancing charges if the ships were

later sold at more than a certain amount, and it did not matter that it was a matter of choice for the company whether it sold the ships.

53 Lord Birkett and Lord Guest agreed with Lord Reid. Lord Birkett said at pp 253–254 of the obligation to pay the balancing charges:

> "It was no less a contingent liability because the sale of the ships might not take place. The true legal position was that from the moment the appellants accepted capital allowances they were at once under a liability to pay tax in the circumstances provided for in the Income Tax Act, 1952 ."

At p. 264, Lord Guest said, in terms which are particularly in point to the present case:

> "The claim for initial allowances for what has been described as depreciation is the voluntary choice of the taxpayer, but, once he has obtained such allowances, he is automatically involved by the operation of law in the payment of balancing charges, if the assets are parted with at a price greater than the written down value in the circumstances defined in section 292 of the Income Tax Act, 1952 ."

54 It appears from Lord Hodson's minority speech, with which Lord Tucker agreed, that the critical feature was that the contingency depended on the volition of the company: see p 259. In those circumstances, it could not properly be said that there was an underlying obligation. He did however accept that a contingent liability could arise under a statute, as much as by contract.

55 The analysis of contingent liability contained in the majority speeches in Re Sutherland has been applied in the context of insolvency: see Re SBA Properties Ltd [1967] 1 WLR 799 (no contingent liability because the company had done nothing which could result in it being subject to the alleged liability) and Community Development Pty Ltd v Engwirda Construction Co [1969] HCA 47, (1969) 120 CLR 455 (High Court of Australia) per Owen J (employer under a construction contract is contingently liable to pay "extras" although their determination is subject to arbitration under the contract: this would, I think, be a contingent liability under the minority, as well as the majority, view in Re Sutherland ). See also Re Gasbourne Pty Ltd [1984] VR 801 .

56 In Secretary of State for Trade and Industry v Frid [2004] 2 AC 506, the House of Lords held that there could be set-off under rule 4.90 of the Insolvency Rules between an obligation which was contingent at the liquidation date to reimburse the Secretary of State for payments made under statute to former employees and a VAT credit in the company's favour at the liquidation date. One issue was whether, for the purposes of rule 4.90 with its reference to "mutual credits, mutual debts or other mutual dealings", a contingent liability arising as a result of a statute, rather than under a contract, was capable of set-off. The House of Lords held that it was.

57 The contingent liability arose in this way. The company was liable for compensatory notice pay and redundancy payments to nine employees under sections 88 and 135 of the Employment Rights Act 1996 . As the company did not make the payments, the Secretary of State was liable to do so under sections 166 and 167 of the Act. On making payment, section 167(3) provided that all the rights and remedies of the employees against the company vested in the Secretary of State.

58 It was submitted for the liquidator that at the liquidation date there was no debt arising under section 167(3) , only a possibility that such a debt would later come into existence. As to this, Lord Hoffmann, giving the leading speech, said:

> "9 It is not however necessary for the purposes of rule 4.90(2) that the debt should have been due and payable before the insolvency date.

It is sufficient that there should have been an obligation arising out of the terms of a contract or statute by which a debt sounding in money would become payable upon the occurrence of some future event or events. The principle has typically been applied to claims for breach of contract where the contract was made before the insolvency date but the breach occurred afterwards ( In re Asphaltic Wood Pavement Co (1885) 30 Ch D 216 ) or claims for indemnity by a guarantor where the guarantee was given before the insolvency date but the guarantor was called upon and paid afterwards: Jones v Mossop (1844) 3 Hare 568 ; In re Moseley-Green Coal and Coke Co Ltd, Ex p Barrett (1865) 12 LT (NS) 193 .

10 The effect of these and similar cases was summed up by Millett J in In re Charge Card Services Ltd [1987] Ch 150 , 182:

> "By the turn of the [20th] century, therefore, the authorities showed that debts whose existence and amount were alike contingent at the date of the receiving order, and claims to damages for future breaches of contracts existing at that date, were

capable of proof and, being capable of proof, could be set off under the section provided that they arose from mutual credits or mutual dealings. The only requirement was that they must in fact have resulted in quantified money claims by the time the claim to set off was made.""

He held that the apparent reasoning of the Court of Appeal in Re A Debtor (No 66 of 1955) ex p. The Debtor v Waite's Trustee [1956] 1 WLR 480 , that a surety under a pre-insolvency guarantee is not entitled to set-off unless he has paid the debt before the insolvency date, was wrong and continued:

> "17 This means that if the Secretary of State had agreed by contract before the insolvency date to guarantee any future liability of the company to pay compensatory notice pay or make redundancy payments to employees under the 1996 Act, the contract of guarantee would have created a contingent liability on the part of the company to reimburse the Secretary of State which was a "debt" at the insolvency date and became capable of set-off when the employees were afterwards

paid. The next question is whether it makes a difference that the contingent liability existed by virtue of a statute rather than a contract and, not being consensual, that it involved no direct contract or other relationship with the employees or the company.

18 …

19 If a statutory origin does not prevent set-off in the case of debts due and payable at the insolvency date, I do not see why it should make any difference that the statute creates a contingent liability which exists before the insolvency date but falls due for payment and is paid afterwards. The term "mutual debts" does not in itself require anything more than commensurable cross-obligations between the same people in the same capacity. How those debts arose—whether by contract, statute or tort, voluntarily or by compulsion—is not material."

59 It seems to me that even if section 167(3) had not expressly conferred on the Secretary of State the rights and remedies of the employees of the company, the result would have been the same. The primary liability to make the payments rested with the company. The statute imposed an obligation on the Secretary of State to make the payments, if the company failed to do so. If the Secretary of State did so, she would have an enforceable right of reimbursement against the company. The analogy with a contractual guarantee was exact: see Lord Hoffmann at para 20. If a third party makes under legal compulsion a payment which is primarily due from a debtor, the third party has a common law right of reimbursement against the debtor. The liability of the company to the Secretary of State

in Frid would not then strictly be created by the statute but it would arise by operation of law.

60 If the principles established by Re Sutherland and Frid are applied to this case, it is right in my judgment to conclude that T&N is subject to contingent liabilities to pay damages to those who have already been carelessly exposed to asbestos by the actions of T&N and who later suffer compensatable loss, resulting in claims for damages in negligence against T&N. The creditors in respect of those contingent liabilities are the persons who have been carelessly exposed to asbestos and who will have claims in negligence if they suffer loss as a result. Reverting to Lord Reid's speech, the contingent liability to pay damages is a liability which, by reason of something done by the person (i.e. the use or distribution by T&N of asbestos or asbestos products) will necessarily arise or come into being if one or more certain events occur (i.e. the onset of asbestos-related conditions in persons previously exposed to asbestos by T&N). Lord Guest referred specifically to the contingent debtor being "automatically involved by the operation of law in the payment" of the debt once the contingency occurred. That precisely describes the situation here. The careless exposure of persons to asbestos by T&N will automatically by the operation of the law of negligence lead to the liability to pay damages, assuming the existence of the other necessary elements of a claim in negligence.

61 This is in one important respect a stronger case than Re Sutherland . As already noted, the majority did not regard as decisive that the liability to pay the balancing charges would arise only as a result of the company's own choice to sell the ships. In this case there is no question of volition. There is nothing which T&N can do to incur or avoid the liability. There is no medical intervention which can prevent the development of the asbestos-related conditions in those who have been exposed to asbestos. Nature will take its course.

62 If a valuation to be performed under provisions identical to the Finance Act 1940 was of a controlling shareholding in an asbestos producer, rather than a shipping company, the existing exposure of the company to asbestos-related personal injuries claims in the future would, in my view, have constituted contingent liabilities. They go beyond something which

"in a business sense is morally certain and for which every businessman ought to make provision."

63   In my judgment, it makes no difference that the source of the liability is the common law of negligence, rather than a contract or a statute. There is no logical reason why it should make a difference. Lord Guest in Re Sutherland did not limit the source to contract or statute but referred to the operation of law. Lord Hoffmann in Frid did not limit it, but said in terms:

> "How those debts arose — whether by contract, statute or tort, voluntarily or by compulsion — is not material."

The example of a liability arising by application of the principle of reimbursement is likewise "by operation of law". The liability in tort which Lord Hoffmann may have had particularly in mind is illustrated by the Australian case of Gye v McIntyre 171 CLR 609 , to which he referred in the context of "mutual dealings". The High Court held that a claim for damages for fraudulently inducing the insolvent company to make a contract with a third party could be set off against a liability on a loan. The loss caused by the fraud had been suffered before the liquidation date, so that there was at that date a complete cause of action in tort. This does not however mean that Lord Hoffmann's reference to tort in the passage cited above should be confined to completed causes of action.

64   I was referred, by way of comparison, to cases where the liability, although arising from events prior to the liquidation date, is created by the subsequent exercise of a judicial discretion. In Glenister v Rowe [2000] Ch 76 the Court of Appeal held that a party to litigation against a bankrupt could not prove for costs incurred in the litigation prior to the bankruptcy but not covered by a costs order made before the bankruptcy, because the bankrupt would be liable only if and when the court in its discretion made a costs order. It was not therefore a contingent liability at the date of bankruptcy. (I comment in passing that, while producing a just result on the facts of the case, the decision is likely to produce an unjust result when applied to the similar provisions governing proof in

the winding-up of a company.) Likewise, there are a number of Australian decisions concerning statutory provisions whereby personal liability for the debts of an insolvent company can be imposed on a director, if he has been convicted of a relevant offence. In such a case, the liability is imposed by the civil court in the exercise of its discretion. These provisions have been held not to create a contingent liability of the director at the time of his bankruptcy because any liability is dependent on a subsequent exercise of judicial discretion: see, for example, Corporate Affairs Commissioner v Karounos (1985) 3 ACLC 40 .

65   I accept the submission that these cases are not in point to the issue as regards future asbestos claims. There is no element of discretion as regards such claims. If the ingredients of the tort of negligence, including compensatable loss, are established, the claimants are entitled to damages. They do not depend on an exercise of discretion by the court.

66   I conclude therefore that T&N is subject to contingent liabilities in respect of future asbestos claims, as defined in the administrators' application and that the future asbestos claimants, being those persons who have been exposed to asbestos and who will have claims in negligence against T&N if they develop asbestos-related diseases, are "creditors" of T&N for the purposes of section 425 of the Companies Act 1985 and Part I of the Insolvency Act 1986 dealing with CVAs.

67   In reaching this conclusion, I emphasise that I do so on the basis of the facts relevant to asbestos claims, principally that the relevant acts or omissions of T&N are complete, the potential claimants have been exposed to asbestos and the existence of a claim in tort depends solely on whether a relevant asbestos condition develops. I have not considered circumstances where all the relevant events excluding damage have not occurred, as, for example, where a company has negligently made a product but the putative claimant has not acquired it or used it. By way of extreme example, if aero-engines are negligently manufactured and are in use but have not (yet) caused an air crash, it could hardly be supposed that there exists a contingent liability to the victims of a possible future crash: for facts of this sort, see Re R-R Realisations Ltd [1980] 1 WLR 805 .

68  As I have mentioned, no party represented on this hearing advanced submissions against the proposition that future asbestos claimants were creditors for these purposes. However, Mr Snowden and other counsel readily accepted that it was their duty to put before the court all counter-arguments which occurred to them. They conscientiously did so and after the hearing Mr Arden supplied me with a summary of the counter arguments. I believe therefore that my decision is reached after a full consideration of the relevant issues.

**Are future asbestos claims provable debts in a winding-up of T&N?**

69    It does not necessarily follow from the characterisation of future asbestos claimants as creditors for the purposes of a scheme of arrangement or a CVA that their claims are provable in a winding-up of T&N if it goes into liquidation before they have suffered any compensable loss. This issue turns on the relevant provisions of the Insolvency Rules .

70  The insolvency regime, dealing with the insolvency of both individuals and companies, is contained in the Insolvency Act 1986 and the Insolvency Rules 1986 (in both cases, as amended from time to time). They contain a substantial degree of reform of the pre-existing law, which had been contained as regards individuals in the Bankruptcy Act 1914 and the Bankruptcy Rules and as regards companies in the Companies Act 1948 (and then, briefly the Companies Act 1985 ) and the Companies (Winding Up) Rules 1949 . Under the previous regime, significant portions of the Bankruptcy Act and Rules were made applicable in the winding-up of insolvent companies. The new regime implemented many of the recommendations for reform made by the Cork Report. However, not all its recommendations were accepted, including in particular in relation to dealing with unliquidated tort claims. The reforms were introduced in the first instance by the Insolvency Act 1985 which was for the most part not brought into effect, but was consolidated with other provisions in the Insolvency Act 1986 .

71  It is a striking feature of the present insolvency regime that while there is an almost complete correspondence between the provisions governing provable debts, the mechanics of proof and the

distribution of assets in bankruptcy and in winding-up, many of the bankruptcy provisions are contained in primary legislation, while the equivalent winding-up provisions are contained in the Insolvency Rules 1986 . It would appear that the draftsman of the Rules used the bankruptcy provisions in the Insolvency Act as a template. Where the corresponding provisions are largely identical, it must be taken that the Rules are intended to achieve the same result for a winding-up as applies under the Act (or equivalent Rules) in a bankruptcy. It would be very odd to construe them in different ways. Nonetheless, provisions which made good sense in a bankruptcy context may be regarded differently in the context of a winding-up.

72  The principal provisions as regards provable debts are Rule 12.3 , which applies to bankruptcy and winding-up, Rule 13.12 , which applies only to winding-up, and section 382 , which applies only to bankruptcy. The relevant rule-making powers are contained in the Insolvency Act 1986 : section 411 and schedule 8 (para 12) (winding-up) and section 412 and schedule 9 (para 17) (bankruptcy).

73  Rule 12.3(1) provides:

> "[What is provable] Subject as follows, in administration, winding up and bankruptcy, all claims by creditors are provable as debts against the company or, as the case may be, the bankrupt, whether they are present or future, certain or contingent, ascertained or sounding only in damages."

Rule 12.3(2) ("What is not provable") specifies very limited categories of claims which are not provable; it does not include contingent claims in tort.

74  Rule 13.12 is one of the interpretation provisions contained in Part 13 of the Rules and provides:

> (1)    [Definition]  "Debt", in relation to the winding up of a company, means (subject to the next paragraph) any of the following—

(a) any debt or liability to which the company is subject at the date on which it goes into liquidation;

(b) any debt or liability to which the company may become subject after that date by reason of any obligation incurred before that date; and

(c) any interest provable as mentioned in Rule 4.93(1).

13.12(2) [Liability in tort] In determining for the purposes of any provision of the Act or the Rules about winding up, whether any liability in tort is a debt provable in the winding up, the company is deemed to become subject to that liability by reason of an obligation incurred at the time when the cause of action accrued.

13.12(3) [Debt or liability] For the purposes of references in any provision of the Act or the Rules about winding up to a debt or liability, it is immaterial whether the debt or liability is present or future, whether it is certain or contingent, or whether its amount is fixed or liquidated, or is capable of being ascertained by fixed rules or as a matter of opinion; and references in any such provision to owing a debt are to be read accordingly.

13.12(4) ["Liability"] In any provision of the Act or the Rules about winding up, except in so far as the context otherwise requires, "liability" means (subject to paragraph (3) above) a liability to pay money or money's worth, including any liability under an enactment, any liability for breach of trust, any liability in contract, tort or bailment, and any liability

arising out of an obligation to make restitution."

75 The bankruptcy provision which is equivalent to Rule 13.12 is section 382 of the Insolvency Act 1986 . It defines "bankruptcy debt":

"(1) [Bankruptcy debt"] "Bankruptcy debt", in relation to a bankrupt, means (subject to the next subsection) any of the following—

(a) any debt or liability to which he is subject at the commencement of the bankruptcy,

(b) any debt or liability to which he may become subject after the commencement of the bankruptcy (including after his discharge from bankruptcy) by reason of any obligation incurred before the commencement of the bankruptcy,

[(c) …]

(d) any interest provable as mentioned in section 322(2) in Chapter IV of Part IX.

(2) [Liability in tort] In determining for the purposes of any provision in this Group of Parts whether any liability in tort is a bankruptcy debt, the bankrupt is deemed to become subject to that liability by reason of an obligation incurred at the time when the cause of action accrued.

(3) [References to debt or liability] For the purposes of references in this Group of Parts to a debt or liability, it is immaterial whether the debt or liability is present or future,

whether it is certain or contingent or whether its amount is fixed or liquidated, or is capable of being ascertained by fixed rules or as a matter of opinion; and references in this Group of Parts to owing a debt are to be read accordingly.

(4) ["Liability"] In this Group of Parts, except in so far as the context otherwise requires, "liability" means (subject to subsection (3) above) a liability to pay money or money's worth, including any liability under an enactment, any liability for breach of trust, any liability in contract, tort or bailment and any liability arising out of an obligation to make restitution."

Just as Rule 13.12 defines "debts" for the purposes of proof in a winding-up, section 382 defines debts for the purposes of proof and distribution in bankruptcy: see sections 322 and 324 of the Insolvency Act 1986 .

76  Historically the development of rules for proving debts began with individual bankruptcy. As an individual will survive bankruptcy, it was not a necessity to include all or most debts and liabilities of the bankrupt as provable debts. If a particular debt was not provable, it would not be extinguished by the bankruptcy and could be enforced against the bankrupt and his after-acquired property. There was a balance between sharing in the distribution of the bankrupt's property which came at the price of not being able to pursue the bankrupt in any other way, and being free to pursue the bankrupt but at the price of not sharing in a distribution of his assets on bankruptcy. This was not a matter of choice for the creditor but turned on the definition of provable debts.

77  Until the early 19th century, the prevailing legal policy was that debts should not be provable either if they were difficult to quantify or if they resulted from the personal wrongdoing of the bankrupt. Claims for unliquidated damages in tort showed both

characteristics, but other claims such as unliquidated claims for breach of contract or contingent claims were excluded on the basis of the first ground.

78  A succession of Bankruptcy Acts culminating in the Bankruptcy Act 1869 revolutionised the approach to provable claims. With a few exceptions, all claims were to be provable and it was no longer regarded as a sound basis for exclusion that the claim was difficult to quantify.

79  In Hardy v Fothergill (1888) 13 App Cas 351 at 355, Lord Halsbury L.C gave some account of the developments before 1869:

"My Lords, the question in this case seems to me to depend entirely upon the true construction of the 31st section of the Bankruptcy Act of 1869 , but before proceeding to discuss the particular words now under construction it is not unimportant to notice the gradual steps taken by the legislature to extend the application of the bankruptcy law to future and contingent debts. Mr. Eden in a treatise published in 1826 points out that one of the most important and valuable alterations effected by the 6 Geo. 4 c. 16 was the provision which it contained with respect to proof of contingent debts. Prior to that Act contingent demands could not be proved under a commission taken out before the contingencies upon which they were made payable had taken effect. Nearly eighty years before that time Lord Hardwicke expressed a wish in which Lord Eldon afterwards concurred "that some gentleman might think of a clause which might remedy and settle the matter for the future." My Lords, from that time till the year 1869 I think the legislature has been engaged in the effort to exhaust every conceivable possibility of liability under which

a bankrupt might be, to make it provable in bankruptcy against his estate and relieve the bankrupt for the future from any liability in respect thereof."

80  In Re Hide, ex p Llynvi Coal and Iron Co (1871) 7 Ch App 28 at 31 James LJ described the changes made by the Bankruptcy Act 1869 :

"Upon the question of the right of proof I am satisfied that there can be no real question as to the intention of the Legislature. A great number of cases occurred, before the passing of the late Act, in which the bankrupt was left liable to several claims of various kinds, and the persons who had those claims were entirely excluded from any participation in the general division of the assets. Then came the Act of Parliament, which — dealing in express terms with almost every one of the cases which had ever previously occurred, and excluding nothing but demands for damages for personal torts — provided that there should be nothing whatever for which a right to proof should not be given. Every possible demand, every possible claim, every possible liability, except for personal torts, is to be the subject of proof in bankruptcy, and to be ascertained either by the Court itself or with the aid of a jury. The broad purview of this Act is, that the bankrupt is to be a freed man — freed not only from debts, but from contracts, liabilities, engagements, and contingencies of every kind. On the other hand, all the persons from whose claims, and from liability to whom he is so freed are to come in with the

other creditors and share in the distribution of the assets."

81  In Flint v Barnard (1888) 22 QBD 90 at 92, concerning the Bankruptcy Act 1883 , Lord Esher MR derived from Hardy v Fothergill the correct approach for the courts to the construction of these provisions:

"It seems to me that the House of Lords, in Hardy v. Fothergill , has laid down a rule of interpretation, or rather a rule of conduct, for the Court where it has to construe the Bankruptcy Act . It is true that the remarks of the Lord Chancellor relate to the Bankruptcy Act, 1869 , but they are equally applicable to the later Act [ Bankruptcy Act 1883 ], and may be paraphrased by saying that since the statute 6 Geo. 4, c. 16, till the year 1883, the legislature has been engaged in the effort to exhaust every conceivable possibility of liability under which a bankrupt might be, to make it provable in bankruptcy against his estate and relieve the bankrupt for the future from any liability in respect thereof."

82  Thus a wide range of contingent or unliquidated claims become provable, with a just estimate being made of the value of the claim. Proofs of debt were therefore admissible for unliquidated damages for breach of contract ( Re Sneezum, ex p Davis (1876) 3 Ch D 463 ), for a contingent claim in respect of a repairing covenant in a lease ( Hardy v Fothergill ), for a contingent claim under a guarantee ( Wolmershausen v Gullick [1893] 2 Ch 514 ), and for an annuity payable during joint lives and for so long as the recipient should lead a chaste life ( Ex p Neal, In re Batey (1880) 14 Ch D 579 ). The provisions for valuing such claims for the

purposes of proof are now contained in section 322 (3) and (4) (bankruptcy) and Rule 4.86 (winding-up).

83   The same inclusive approach was adopted with regard to provable debts in a winding-up. Section 158 of the Companies Act 1862 provided in language that has changed little in subsequent provisions:

> "In the event of any company being would up under this Act, all debts payable on a contingency, and all claims against the company, present or future, certain or contingent, ascertained or sounding only in damages, shall be admissible to proof against the company, a just estimate being made, so far as is possible, of the value of all such debts or claims as may be subject to any contingency or sound only in damages, or for some other reason do not bear a certain value."

84  The Cork Report noted at para 1289:

> "It is a basic principle of the law that every debt or liability capable of being expressed in money terms should be eligible for proof in the insolvency proceedings, so that the insolvency administration should deal comprehensively with, and in one way or another, discharge, all such debts and liabilities."

A similar statement of principle was contained in a report of the Australian Law Reform Commission: General Insolvency Inquiry (1988):

> **"A comprehensive system**
> A basic aim of insolvency law is to deal comprehensively with all of the debts and liabilities of

the insolvent. In the case of an individual insolvent, the aim is to have all claims to which the insolvent was subject at the time of the commencement of the formal administration resolved so that the insolvent can make a fresh start. This reflects the rehabilitative aim of insolvency law. In the case of a company, the aim is to deal with all the claims against a company so that its affairs can be fully would up or so that it can resume trading."

85   Notwithstanding this inclusive policy, English insolvency law has experienced particular difficulty in dealing with unliquidated claims in tort. Until the reforms consolidated in the Insolvency Act 1986 , such claims were not provable at all in bankruptcy or in the winding-up of an insolvent company. It was widely understood that only claims for sums liquidated by judgment or agreement before the bankruptcy or winding-up could be the subject of proof.

86   Provable debts in bankruptcy were governed by section 30 of the Bankruptcy Act 1914 :

> "(1)     Demands    in    nature of unliquidated damages arising otherwise than by reason of a contract, promise, or breach of trust shall not be provable in bankruptcy.
>
> …
>
> (3)   Save as aforesaid, all debts and liabilities, present or future, certain or contingent, to which the debtor is subject at the date of the receiving order, or to which he may become subject before his discharge by reason of any obligation incurred before the date of the receiving order, shall be deemed to be debts provable in bankruptcy.

T&N Ltd, Re, 2005 WL 3498927 (2005)

(4) An estimate shall be made by the trustee of the value of any debt or liability provable as aforesaid, which by reason of its being subject to any contingency or contingencies, or for any other reason, does not bear a certain value.

…

(6) If, in the opinion of the court, the value of the debt or liability is incapable of being fairly estimated, the court may make an order to that effect, and thereupon the debt or liability shall, for the purposes of this Act, be deemed to be a debt not provable in bankruptcy.

(7) If, in the opinion of the court, the value of the debt or liability is capable of being fairly estimated, the court may direct the value to be assessed before the court … and the amount of the value when assessed shall be deemed to be a debt provable in bankruptcy.

(8) "Liability" shall, for the purposes of this Act, include

(a) any compensation for work or labour done;

(b) any obligation or possibility of an obligation to pay money or money's worth on the breach of any express or implied covenant, contract, agreement, or undertaking, whether the breach does or does not occur, or is or is not likely to occur or capable of occurring, before the discharge of the debtor;

(c) generally, any express or implied engagement, agreement, or undertaking, to pay, or capable of resulting in the payment of,

money or money's worth; whether the payment is, as respects amount, fixed or unliquidated; as respects time, present or future, certain or dependent on one contingency or on two or more contingencies; as to mode of valuation, capable of being ascertained by fixed rules or as a matter of opinion."

The effect of section 30(1) was to exclude from proof unliquidated damages in tort. Such claims therefore survived a bankruptcy and could be pursued against a former bankrupt and his after-acquired property.

87 By section 317 of the Companies Act 1948 , and its predecessor sections, the provisions of bankruptcy law as to "debts provable and to the valuation of annuities and future contingent liabilities" were made applicable in the winding-up of an insolvent company. If the company were solvent, or became solvent in the course of the winding-up (as for example, in Re Rolls-Royce Ltd [1974] 3 All ER 646 ), the bankruptcy provisions did not apply or ceased to apply, and provable debts were governed exclusively by section 316 :

"In every winding up (subject, in the case of insolvent companies, to the application in accordance with the provisions of this Act of the law bankruptcy) all debts payable on a contingency, and all claims against the company, present or future, certain or contingent, ascertained or sounding only in damages, shall be admissible to proof against the company, a just estimate being made, so far as possible, of the value of such debts or claims as may be subject to any contingency or sound only in damages, or for some other reason do not bear a certain value."

Accordingly, unliquidated claims in tort could be proved in the winding-up of a solvent company. If, however, the company were insolvent they could not be the subject of proof and, in the absence of joint tortfeasors or insurance available to the claimant under the Third Parties (Rights against Insurers) Act 1930 , the claim would remain entirely unpaid. This represents an important difference between insolvent companies and individuals. The winding-up of an insolvent company leads almost inevitably to its dissolution and there is no equivalent to proceeding against the bankrupt after his discharge.

88    Shortly before the reforms were enacted in the Insolvency Act 1985 , the problems posed by the exclusion of unliquidated claims in tort were considered in two decisions at first instance. In Re Berkeley Securities (Property) Ltd [1980] 1 WLR 1589 , Vinelott J considered the position where tort damages became liquidated by judgment or agreement during the winding-up. He held that in those circumstances the bankruptcy rules imported by section 317 required modification to fit into the scheme of the winding-up of an insolvent company and did not preclude the admission of the claim for the liquidated sum. The claimant would not be entitled to disturb prior distributions to creditors but would be able, in effect, to catch up with prior distributions out of assets remaining with the liquidator and to participate pari passu in any future distributions.

89    Vinelott J did not regard it as sensible that an unliquidated claim for damages in tort should be excluded from proof in bankruptcy, although, as he acknowledged, that clearly was the legal position. He regarded it as anomalous, given that an unliquidated claim for damages for breach of contract was admissible to proof but may be just as difficult to ascertain and evaluate. He pointed to the facts of Re Great Orme Tramways Co (1934) 50 TLR 450 , which concerned a claim in respect of personal injuries sustained by a passenger when a tram ran out of control. A claim for the same amount for the same injuries could be made in contract or in tort. The unliquidated claim in contract was provable, but not the unliquidated claim in tort. He drew the anomaly to the attention of the Cork Committee.

90    In a subsequent case, Re Islington Metal & Plating Works Ltd [1984] 1 WLR 14 , Harman J disagreed with the decision of Vinelott J. He held that, on the relevant provisions, a tort claim could be proved in a bankruptcy or an insolvent liquidation only if liquidated by judgment or agreement before the bankruptcy or winding-up. He founded this on the principle that the liquidation of an insolvent company and the distribution of its assets were to be treated as notionally simultaneous and all debts were to be computed at the liquidation date (subject to the application of the hindsight principle to contingent claims, which enables the court to take account of later events in evaluating such claims). If, however, all provable debts and liquidation expenses were paid in full, Harman J held that the bankruptcy rules would cease to apply and, under section 316 , unliquidated tort claims would be admitted to proof even if the claims might exceed the assets then available.

91    The Cork Report considered the admissibility of tort claims to proof and recommended a change in the law. It stated at para 1318:

> "It has been put to us that, having regard to the elaborate rules which exist for dealing with contingent liabilities, such as annuities, it is unacceptable that tort claims should be left outside the category of provable debts. We agree. We recommend that the present rule in bankruptcy be reversed, and that all claims for damages, whether in contract or in tort, be admissible to proof in liquidation of assets, bankruptcy or winding up, *provided only that the claim is liquidated by agreement or judgment before it becomes proved* ." (Emphasis added)

It can be seen that the Cork Report did not recommend that unliquidated claims in tort should as such be provable, which would seem to have been the solution favoured by Vinelott J in Re Berkeley Securities Ltd (Property) Ltd at pp 1611–1612 but was not open to him on the statutory provisions as they then stood. Instead,

the Cork Report adopted as its recommendations the route adopted by Vinelott J as his decision, that tort claims should be admissible to proof but only after they had been liquidated by judgment or agreement.

92   It is unclear from the Cork Report whether its recommendation was premised on the assumption that the cause of action in tort would be complete by the liquidation date, although not then quantified. This was not a point which had arisen or been discussed in Re Berkeley Securities Ltd (Property) or Re Islington Metal and Plating Works Ltd or, so far as I am aware, in any other English decision or commentary. It is, however, a point which has been addressed in legislation elsewhere. The Report refers to section 61(1) of the Civil Liability Act 1961 of Ireland, which amended Irish bankruptcy law to provide:

> "Notwithstanding any other enactment or any rule of law, a claim for damages or contribution in respect of a wrong shall be provable in bankruptcy where the wrong out of which the liability to damages or the right to contribution arose was committed before the time of bankruptcy."

The Cork Committee obviously considered that solution, but did not recommend its adoption. If it had been included in the Insolvency Act or Rules , there would be no doubt that future asbestos claims would be provable. Under the Irish provision, the date of accrual of the cause of action is irrelevant and all that is necessary is that a liability to damages should arise out of a wrong committed before the time of bankruptcy.

93   The solution adopted in the Insolvency Act and Insolvency Rules did not follow the recommendation of the Cork Report, as is apparent from the terms of section 382 and rule 13.12 . It is not necessary that tort damages should be liquidated by judgment or agreement before they can be the subject of proof, but section 382(2) and rule 13.12(2) introduces special provision for tort claims and it is their proper construction which is at the heart of this issue. The Cork Report had also addressed the discharge of

the bankrupt from provable tort and other claims and recommended that the bankrupt should be released from all claims admissible to proof. This recommendation was not adopted as regards claims for personal injuries: section 281(5) . The position in bankruptcy with respect to a personal injury claim is therefore that, whether or not it is provable, the bankrupt does not obtain a release from it by his discharge from bankruptcy, except to such extent and on such conditions as the court may direct.

94   Although rule 13.12(2) , as the provision expressly dealing with tort claims in the winding-up of companies, is substantially the same as section 382(2) which applies in bankruptcy, there cannot, of course, be any provisions equivalent to those which enable either personal injury claims, or claims incapable of proof, to survive the discharge of a bankrupt. In the vast majority of cases, the winding-up of a company leads to its dissolution, whereby it ceases to exist.

95   It is against this background that the precise meaning and effect of rules 12.3 and 13.12 , and section 382 , as regards tort claims arises for consideration. The fundamental issue for present purposes is whether the cause of action in tort must be complete by the liquidation date.

96   Sir Donald Nicholls V-C thought that this was the effect of the relevant provisions. In Re Kentish Homes Ltd [1993] 1 BCLC 1375 , the only authority in which this question has been considered, albeit obiter, he said at p 1382:

> "The cut-off provisions may, in general, work reasonably satisfactorily in respect of claims based on contract. Claims arising under contractual obligations incurred before the date on which the company went into liquidation are provable. As to payments under contracts made with a company after it has gone into liquidation, for example, if goods are supplied to a company pursuant to arrangements negotiated with the liquidator, in general such payments will rank for preferential treatment as

expenses incurred in the winding up. Unquantified claims for damages in tort are not so favourably treated. In the past, if a company went into liquidation before a claimant had been able to quantify his claim by judgment or agreement he was left out in the cold. In Re Berkeley Securities (Property) Ltd [1980] 3 All ER 513, [1980] 1 WLR 1589 the court struggled hard to avoid this injustice. Vinelott J held that a claim for damages in tort is excluded from proof only if it has not been liquidated at the time the claimant comes in to prove. He is not entitled to disturb prior distributions to other creditors but, as regards undistributed assets, he is entitled to a dividend enabling him to 'catch up' with distributions already made to other creditors. In Re Islington Metal & Plating Works Ltd [1983] 3 All ER 218, [1984] 1 WLR 14 , Harman J pointed out the difficulties with this solution having regard to the then statutory provisions and an established line of authority. The particular problem raised in those two cases has now been addressed by winding-up rule 13.12(2):

'In determining for the purposes of any provision of the Act or the Rules about winding up, whether any liability in tort is a debt provable in the winding up, the company is deemed to become

subject to that liability by reason of an obligation incurred at the time when the cause of action accrued.'

So far as it enables some liabilities in tort to be proved, this provision ensures justice to tort claimants. However, it still leaves a tort claimant without any remedy if his cause of action arose after the date when the company went into liquidation. In some instances it will be a matter of chance whether a cause of action in tort accrues before or after the date of the commencement of the liquidation. If a company sells and supplies dangerous goods, it will be a matter of chance whether they cause injury and damage pre- or post-liquidation, and it is only when the damage is sustained that the cause of action in tort accrues."

97  The decision in Re Kentish Homes Ltd , which concerned the company's liability to the community charge arising after the liquidation date and its status as a liquidation expense, was overruled by the House of Lords in Re Toshoku Finance UK Ltd plc [2002] 1 WLR 671 . However, the passage cited above, which is not part of the reasoning for the decision, was not commented upon and is not in my view affected by the overruling of the decision.

98  Sir Donald Nicholls V-C's reading of the relevant provision as regards tort claims is a natural reading and, as it seems to me, the most obvious. It was not, however, an issue in the case before him and he did not have the benefit of the detailed submissions which were addressed to me.

99  The same approach is taken in *Muir Hunter on Personal Insolvency* at 3–2699, in its commentary on section 382(2) of the Insolvency Act 1986 :

> "… if after the bankruptcy order, a person suffers damage caused by the bankrupt's negligence before his bankruptcy, the injured person's claim, in so far as it is a claim in tort, will not be a bankruptcy debt."

100  Sir Donald Nicholls V-C was clearly conscious of the anomalies and even injustice which could arise if a claim in tort was provable only if the cause of action had accrued by the liquidation date. Before looking at the detailed arguments on construction, it is worth identifying the consequences in relation to asbestos claims. These claims present particularly acute difficulties because of the very long periods which may pass between exposure to asbestos and the onset of any disease or compensatable condition, and because of the impossibility of identifying the time at which the disease or condition can be said to start.

101  The first consequence is that if the cause of action must accrue before the liquidation date, it must be established that material injury had been suffered by that date. The start of an asbestos disease or condition does not coincide with the development of symptoms but occurs much earlier. It is impossible to identify even in the most approximate way the time when it started. In Keenan v Miller Insulation & Engineering Ltd (8 December 1987 unreported , Piers Ashworth QC sitting as a deputy High Court Judge), in which the claimant suffered from asbestosis, the evidence of one of the leading medical experts in this field was that the material injury could have occurred anywhere between 10 and 20 years after the first exposure. In cases of mesothelioma, material injury occurs with the development of the first malignant cell, but the first symptoms may not appear for many years. The evidence in Bolton Metropolitan Borough Council v Municipal Mutual Insurance Ltd (28 May 2005, unreported , Judge Kershaw QC) established that the symptoms in that particular case first appeared in January 1991, but

the first malignant cell developed at some point in the three years 1979 to 1981.

102  In general, the courts do not have to grapple with this issue. Since the Limitation Act 1963 , the important question for limitation purposes has been the claimant's knowledge of his condition. Although the effect of the decision in the House of Lords in Arnold v Central Electricity Generating Board [1988] 1 AC 228 was that any action time-barred before 4 June 1954 remained time-barred, the date of first damage does not, on the medical evidence before the courts in the cases after Arnold to which I was referred, appear to have caused great difficulty; certainly not the difficulty which could arise in a liquidation of T&N in determining whether damage first occurred before or after the liquidation date. More difficult problems could arise in deciding, for the purposes of insurance cover, the year in which damage first occurred, although on the medical evidence before the court in Bolton Metropolitan BC v Municipal Mutual Insurance Ltd , the case in this category to which I was referred, it was not a major problem.

103  Secondly, assuming that the start of the relevant condition can be determined, the entitlement to prove a claim in tort and therefore the prospects of any recovery will depend on an accident of timing. Whenever a line is drawn it is inevitable that some people will be on the wrong side of it, but the consequences here are very serious. They will cause a well-grounded sense of injustice.

104  Thirdly, precisely the same facts may give rise to a provable claim for breach of contract but not in tort. A former employee of T&N who was exposed to asbestos during his employment and who develops a compensatable disease or condition after the liquidation date will unquestionably be entitled to prove for an unliquidated claim for his loss on the basis of a breach of contractual duty owed to him by T&N. He could not make the same claim in tort, only because his cause of action in tort had not accrued by the liquidation.

105  Where the claimant in contract and in tort is the same person, that consequence is an anomaly but not an injustice. The fourth consequence arises where the claimants are different. There are a number of

cases involving family members of former employees. Typically an employee's wife would wash his work clothes which had asbestos dust on them. Both develop asbestos-related conditions after the liquidation date of the employer. The employee has a claim for breach of contract. Assuming that the state of knowledge about the risks passed by asbestos was sufficient at the time of exposure to give rise to a duty of care, the wife has a claim in negligence. The employee's claim could be proved in the liquidation of the employer but not his wife's claim.

106    I was pressed with a fifth consequence. It was submitted that if all provable debts and liquidation expenses were paid in full, the balance of assets would be distributed among shareholders and no payment or provision would be made for non-provable claims, such as claims in tort accruing after the liquidation date. It was submitted that this resulted from, first, the liquidator's statutory duty to distribute the assets in accordance with section 107 of the Insolvency Act 1986 (voluntary winding-up) and sections 148(1) and 154 and rule 4.181 of the Insolvency Rules (compulsory winding-up), and secondly, the changes made by the Insolvency Act 1986 and the Insolvency Rules 1986 which meant that there was no longer any mechanism for proving such tort claims even in a solvent liquidation.

107    It would indeed be extraordinary if a company's assets could be, and were required to be, distributed to shareholders without paying tort claims which had accrued since the liquidation date, or other claims not provable in a liquidation, such as costs incurred in litigation against the company before the liquidation date but not then the subject of an order. In my judgment, this is not the position. The statutory duties of liquidators are part of, and subject to, all the provisions of the Insolvency Act and the Insolvency Rules . The voluntary liquidation of a company does not operate as an automatic stay of proceedings or the enforcement of judgments. The court may stay or restrain proceedings against the company by exercise of its powers under section 112 of the Insolvency Act 1986 . This power will generally be exercised to prevent a creditor obtaining by execution an advantage over other creditors. However, where all provable debts have been paid in full and there is a surplus otherwise available for shareholders, I can see no reason why the court would

restrain a tort claimant from obtaining or executing a judgment. In the case of a compulsory liquidation, section 128(1) of the Insolvency Act 1986 provides that any execution put in force after the commencement of the winding-up is void. However, it is well established that the court may exercise powers under section 130(2) to permit execution to proceed: see The Constellation [1966] 1 WLR 272 and the authorities there cited. Again, if there is a surplus which would otherwise be distributed to shareholders, I see no reason why the court would not give leave to a tort claimant to obtain or execute a judgment. This deals with the point put to me, but in a case where there was a surplus but it was insufficient to pay all tort claims in full, the court would face a major issue as to how best to deal with this situation in a fair and sensible manner. It is not an issue for this case, where there is no realistic prospect of a surplus.

108    In approaching the construction of the relevant provisions, I was referred to a number of authorities which make clear that Parliament is presumed not to have intended unreasonable, unjust or absurd results. So, for example, in Coutts & Co v IRC [1953] AC 267 at 281 Lord Reid said:

> "In general, if it is alleged that a statutory provision brings about a result which is so startling, one looks for some other possible meaning of the statute which will avoid such a result, because there is some presumption that Parliament does not intend its legislation to produce highly inequitable results."

In IRC v Hinchy [1960] AC 748 at 768, Lord Reid said:

> "One is entitled and indeed bound to assume that Parliament intends to act reasonably, and therefore to prefer a reasonable interpretation of a statutory provision if there is any choice."

In Mangin v IRC [1971] AC 739 at 746, Lord Donovan said:

> "the object of the construction of a statute being to ascertain the will of the legislature it may be presumed that neither injustice nor absurdity was intended. If therefore a literal interpretation would produce such a result, and the language admits of an interpretation which would avoid it, then such an interpretation may be adopted."

In R (on the application of Edison First Power Ltd) v Central Valuation Officer [2003] 4 All ER 209 concerning, in effect, double taxation, Lord Millett said at paras 116–117:

> "The courts will presume that Parliament did not intend a statute to have consequences which are objectionable or undesirable; or absurd; or unworkable or impracticable; or merely inconvenient; or anomalous or illogical; or futile or pointless. But the strength of these presumptions depends on the degree to which a particular construction produces an unreasonable result."

In the same case, Lord Hoffmann said at para 25 that the strength of presumptions against unreasonable consequences:

> "depends upon the degree to which the consequences are unreasonable, the general scheme of the legislation and the background against which it was enacted."

109  I turn now to the detailed issues of construction.

110  All counsel arguing that future asbestos claims are provable debts (the proponents) start their submissions with rule 12.3 , stressing three features. First, it is the substantive provision which determines the claims which are provable by creditors in both corporate and personal insolvency proceedings. Secondly, rule 12.3(1) is cast in very wide terms which, read on their own, are apt to include claimants in the position of future asbestos claimants. Not only the proponents, but also Mr Mortimore, made this submission. Thirdly, if any categories of claims which would otherwise fall within the wide terms of rule 12.3(1) are to be excluded, it would be reasonable to expect the exclusion to be set out in this rule, and not for example in an interpretation provision. This is demonstrated by rule 12.3(2), 12.3(2A) and 12.3(3) which contain particular exclusions or qualifications to the generality of rule 12.3(1) .

111  I agree that rule 12.3(1) is cast in wide terms. I also agree that, read on its own, it includes contingent claims such as those of the future asbestos claimants. My reasons for this view are the same as those for concluding that they are creditors within the meaning of section 425 : T&N is exposed to contingent liabilities to them, as analysed in Re Sutherland .

112  However, it is not possible to read rule 12.3(1) on its own. The broad range of claims to which it refers are provable "as debts". Necessarily this brings in the definition of "debt" in rule 13.12 , for the purposes of a winding-up: see Re Toshoku Finance UK plc per Lord Hoffmann at para 24. It is only if claims fall within that definition that they are provable. It is by no means unusual for interpretation provisions to have a substantive effect. It does not follow from the presence of exclusions in Rule 12.3 that the definition of "debt" will not also contain restrictions. The specific exclusions and qualifications contained in rule 12.3 all relate to debts which fall within the definition in rule 13.12 and it is, I think, for this reason that they are dealt by exclusion in rule 12.3 .

113  Although in terms an interpretative provision, rule 13.12 contains provisions with a major impact on the process of winding-up, just as its equivalent, section 382

of the Insolvency Act 1986 , does in bankruptcy. Rule 13.12(1) defines "debt" by reference to time and thereby restricts the class of debts which may be proved in a winding-up. A "debt" is a debt or liability to which the company either (a) is subject at the date on which it goes into liquidation or (b) may become subject after that date by reason of any obligation incurred before that date. This gives effect to the principle of a pari passu distribution of assets, by identifying the relevant date for determining provable debts as the date on which the company goes into liquidation: see Wight v Eckhardt Marine GmbH [2004] 1 AC 147 (PC) per Lord Hoffmann at paras 28–33. Either they exist at that date or, if they are contingent at that date, they must arise by reason of an obligation incurred before that date.

114 All counsel are agreed, as is obvious, that the claims of future asbestos claimants are at best contingent at the liquidation date. By definition, they have suffered no injury at that date and may never do so. Most of the submissions made by the proponents adopted the approach that future asbestos claims fell within rule 13.12(1)(b) . The exception was a submission by Mr Snowden, on behalf of the administrators, that these claims fell within rule 13.12(1)(a) . He relied on rule 13.12(3) , providing that, for the purposes of references in any provision of the Rules to a debt or liability, it is immaterial whether the debt or liability is present or future, or certain or contingent. Rule 13.12(3) therefore applies to rule 13.12(1)(a) as much as to any other provision in the Rules, so that it encompasses contingent as well as other debts to which the company is subject at the liquidation date. As to rules 13.12(1)(b) and 13.12(2) , Mr Snowden submitted that they enabled a tort claimant to prove for liabilities which accrued after the liquidation date. He gave two examples. The first is a claim which is quantified by judgment or agreement after the liquidation date. The second is a claim for damages in respect of loss after the liquidation date, such as a claim in respect of a nuisance continuing after that date (as discussed by Harman J in Re Islington Metal & Plating Works Ltd ).

115 This submission cannot stand with the terms of rule 13.12(1) . The contrast between paragraph (a) , which refers to any debt or liability "to which the company is subject at the date on which it goes into liquidation" and, paragraph (b) , which refers to any debts or liability "to which the company may become

subject after that date by reason of any obligation incurred before that date", makes clear in my view that liabilities which are contingent at the liquidation date are addressed in paragraph (b) , not paragraph (a) . Such liabilities clearly include those for which the future asbestos claimants would seek to prove. I agree with Mr Snowden that a post-liquidation judgment or agreement of a provable contingent claim would fall within rule 13.12(1)(b) , in accordance with the hindsight principle explained by Lord Hoffmann in Wight v Eckhardt Marine GmbH . But it would make no sense for the contingent claim to be within (a), but the liquidated amount to be within (b). As to post-liquidation loss in respect of a cause of action which arose before the liquidation, I again agree that it falls within paragraph (b) . If such loss is within paragraph (b) where there is already a cause of action, all the more must contingent loss where there is no cause of action falling (if at all) within paragraph (b) .

116    Another issue raised on rule 13.12(1)(a) was whether claims for unliquidated damages existing at the liquidation date fell within it. So, for example, if a breach of contract had occurred before the liquidation date or if there were an accrued cause of action in tort, would any claim which could be made for unliquidated damages at that date be within paragraph (a) , rather than paragraph (b) . Most submissions, including those of Mr Mortimore, were made on the basis that they were within paragraph (a) . However, Mr Trower submitted that paragraph (a) was limited in its scope to debts and liabilities which were ascertained at the liquidation date and payable then or at a certain date in the future. He contrasted the language of paragraph (a) ("is subject at the liquidation date") with paragraph (b) ("may become subject after that date"). This contrast suggested that paragraph (a) was restricted to those debts and liabilities which were unquestionably payable by the company. That would extend to debts which were definitely payable at a future date, because the uncertain language of paragraph (b) ("may become subject") would not be applicable to them. However, he submitted, nothing was payable in respect of an existing claim for unliquidated damages until judgment or agreement and it might be that nothing would be found to be payable.

117    As a matter of impression from the terms of rule 13.12(1) there is force in this submission. It

gains support from a consideration of the way express provision has been made for liabilities in tort in rule 13.12(2) . Mr Snowden in his skeleton argument made the point that the draftsman appears to have assumed that unliquidated claims in tort, whether the cause in action had accrued or not, fell within rule 13.12(1)(b) . However, I would conclude that an existing but unliquidated claim for damages comes within rule 13.12(1)(a) . Referring to rule 13.12(3) , it is immaterial whether the amount of debt or liability is "fixed or liquidated, or is capable of being ascertained by fixed rules or as a matter of opinion". A debtor can properly be said to be "subject to" an existing but unliquidated liability even though it is not payable until liquidated by judgment or agreement. Unlike a contingent liability, it is not a liability to which the company only "may become subject".

118  All the proponents, including Mr Trower, submit that rule 13.12(1)(b) is wide enough to encompass future asbestos claims. They submit that it is immaterial that, because no compensatable loss has been suffered at the liquidation date, no cause of action has accrued at that date. The claims represent debts or liabilities to which the company will become subject if compensatable loss is suffered, and therefore they are debts or liabilities to which the company may become subject after the liquidation date.

119  This leads to the central issues as to (a) what is meant in rule 13.12(1)(b) by the phrase "by reason of any obligation incurred before" the liquidation date in the context of tort claims and (b) the effect of rule 13.12(2) . There is no difficulty in applying rule 13.12(1)(b) to a liability arising by reason of a contract made before the liquidation date. The company thereby incurs an obligation to perform its terms and any claim under the contract which does not come within paragraph (a) will be within paragraph (b) . The same is true of a statutory obligation which has been incurred before the liquidation date (for an example, see R (on the application of Steele) v Birmingham City Council [2005] EWHC 783 ) or, picking up on other examples in rule 13.12(4) , a bailment which has occurred before the liquidation date or an obligation to make restitution incurred before that date.

120  The approach adopted by each of the proponents, including Mr Snowden in an alternative submission,

was for the most part similar. First, rule 13.12(1)(a) is directed at present or accrued claims, including claims for unliquidated damages in tort where the cause of action has accrued at the liquidation date; as noted above, only Mr Trower took a different line on this point. Secondly, the words "any obligation incurred" in rule 13.12(1)(b) are apt to include those torts which are based on a wrongful act or omission which may occur before any damage is caused. In the context of negligence, they cover the duty of care owed by the company to claimant, or alternatively the duty and its breach. By being subject to a duty of care, the company thereby incurs an obligation to compensate the claimant for foreseeable loss caused by a breach of the duty. The effect was to produce a similar approach to claims in contract and in tort. The duty of care, or its breach, prior to the liquidation date is analogous to the contract made before that date. Any damage resulting from breach of the duty of care or breach of the contract will be provable, whenever it occurs, and a contingent claim can be made in the meantime. Thirdly, the terms of rule 13.12(2) show that it is intended to inform or qualify rule 13.12(1)(b) . Fourthly, it follows from the fact that a claim for unliquidated damages in tort falls within rule 13.12(1)(a) , that it cannot be the legislative intention of rule 13.12(2) to confine claims in tort under rule 13.12(1)(b) to those which have accrued at the liquidation date. There are no discernible policy reasons for doing so and reliance is placed on the consequences outlined above which flow from excluding tort claims which accrue after the liquidation date. Fifthly, rule 13.12(2) is intended to expand, not restrict, rule 13.12(1)(b) in its application to tort claims. It is expressed as a deeming provision, and the normal function of a deeming provision is to include something which would otherwise be excluded.

121  Sixthly, the particular purpose of rule 13.12(2) is to clarify and extend rule 13.12(1)(b) for those torts where it cannot otherwise be said that the company has "incurred an obligation" before the cause of action accrues. Mr Trower and Mr Dicker submitted that its effect is to create a statutory fiction that a company is deemed to become subject to any liability in tort *which does not arise by reason of an obligation already incurred* as if it had become subject to that liability "by reason of an obligation incurred at the time when the cause of action accrued". It is designed to fit certain tort claims into a structure which pre-supposes that the liability is

based on an obligation incurred. Those are the torts which do not involve any "obligation incurred" prior to the accrual of the cause of action, such as conversion, defamation and trespass to land. For claims of this sort, rule 13.12(2) deems the obligation to have been incurred when the cause of action accrues. Applied in that way, the cause of action would have to accrue before the liquidation date. But Mr Trower and Mr Dicker submit further that rule 13.12(2) should be read as if the words "by reason of an obligation incurred" were in parenthesis, so that the operative part of the sub-rule reads "the company is deemed to become subject to that liability … at the time when the cause of action accrued". In this way, any cause of action in tort arising after the liquidation date, which was not already within rule 13.12(1)(b) , would be provable when the cause of action accrued.

122    Mr Sheldon made substantially the same submission in a slightly different way. He submitted that the effect of the deeming provision of Rule 13.12(2) is to substitute the following for 13.12(1)(b) in the case of contingent tort claims:

> "(b) any debt or liability to which the company may become subject after that date by reason of an obligation incurred at the time the cause of action accrued."

So read, rule 13.12(1)(b) would permit any possible future tort claim to be proved, even if all the elements of the tort occurred after the liquidation date. Mr Sheldon accepted that this construction was not free from difficulty and submitted that it should be read subject to an implied limitation that the company's tortious acts were committed prior to the liquidation date. There would have to be a solid basis for the possibility of a future claim before any value could be placed on a proof submitted in the liquidation.

123    By way of explanation, Mr Dicker submitted that the purpose of Rule 13.12(2) was to dispel any residual doubt as to the issue which had arisen under the previous provisions. Both Vinelott J in Re Berkeley Securities (Property) Ltd and Harman J in Re Islington

Metal & Plating Works Ltd had treated a judgment or agreement as a necessary pre-condition to a proof for damages in tort, but had disagreed as to the time when it was required, before the date of proof (Vinelott J) or before the liquidation date (Harman J). The purpose of rule 13.12(2) is to reverse that requirement and make clear that the liability arises at the time of the cause of action. On that basis, rule 13.12(1) can apply in the same way as claims in contracts, with existing liabilities (i.e. an accrued cause of action) dealt with under paragraph (a) and contingent liabilities (where the cause of action has yet to accrue) under paragraph (b) .

124    The proponents emphasised that if rule 13.12(2) was intended to exclude unliquidated damages in tort unless the cause of action had accrued at the liquidation date, it would have clearly so provided. There was no need for it if it was construed as providing for the purposes of rule 13.12(1) that a liability in tort arose when the cause of action accrued: this was the case without the need for a deeming provision. And if the cause of action had to have accrued before the liquidation date, rule 13.12(1)(b) would have no role in relation to tort claims, because such claims are within rule 13.12(1)(a) .

125    As all counsel agreed, it is an important starting point in the construction of rule 13.12 , and section 382 , that they were for the first time permitting unliquidated claims in tort to be provable in winding-up and bankruptcy. Further, because the drafting of those provisions was closely modelled on provisions in earlier legislation ( section 30(1) and (8)(c) of the Bankruptcy Act 1914 ) it was necessary, as a matter of drafting, to fit any special provision as to tort claims within that framework.

126    The decision to make unliquidated tort claims provable was a policy choice, and the extent to which tort claims should be provable involved policy choices. There were a number of clear possibilities. First, there was the solution, adopted under the previous insolvency regime by Vinelott J in Re Berkeley Securities (Property Ltd) and recommended in the Cork Report, of providing that tort claims would be admissible once they were liquidated by judgment or agreement. This was not adopted. Secondly, there was the solution adopted in Ireland, under which tort claims were provable "where the wrong out of which the

liability to damages ... arose was committed before the time of bankruptcy". If it was intended to adopt that solution, the Irish section provided a ready precedent, but no language of that sort was used in the new provisions. A third solution was that unliquidated tort claims should be provable provided that the cause of action had accrued by the liquidation date. A fourth solution would be to provide that all unliquidated tort claims should be provable whether the wrongful acts or omissions occurred before or after the liquidation date.

127   A general principle that tort claims are to be provable is achieved by the reference to them in rule 13.12(4) and section 382(4) , but it is rule 13.12(1) and section 382(1) which govern the timing requirements for provable claims. As Mr Mortimore stressed, the entirety of rule 13.12(1) is qualified by rule 13.12(2) . This slight indication that rule 13.12(2) is intended to be a complete code of the circumstances in which tort claims are to be provable is given substantial support by its opening words:

> "In determining for the purposes of any provision of the Act or the Rules about winding up, whether any liability in tort is a debt provable in the winding up ..."

This language is more obviously consistent with a provision which will define the circumstances in which a liability in tort will be admissible to proof, rather than with a provision which will do no more than extend the meaning of another provision.

128   The language of rule 13.12(2) is, as all counsel agreed, most obviously linked to rule 13.12(1)(b) . As I have already held, unliquidated claims in tort for loss already incurred at the liquidation date are probably covered by paragraph (a) . Once it is accepted that unliquidated tort claims are to be provable at all, there is no difficulty in saying that claims for loss already incurred at the liquidation date are admissible to proof. The difficulty arises in relation to loss which has not then been incurred but may be incurred at a later date. Contingent claims are the subject of paragraph (b) . All contingent claims are admissible to proof provided only

that they arise "by reason of any obligation incurred" before the liquidation date.

129   The question requiring a clear answer is how those words are to be applied, for the first time, to tort claims. The purpose of rule 13.12(2) is to provide the answer. The obligation is incurred "when the cause of action accrued". That provision can then be applied to answer the question posed by rule 13.12(1)(b) : was the obligation incurred before the liquidation date? The result is that contingent tort claims are provable, provided that the cause of action accrued before the liquidation date.

130   I do not consider sustainable the submissions that rule 13.12(2) is to be read as if the words "by reason of an obligation" were in parenthesis or even were omitted entirely. On the contrary, as a matter of both context and grammar, it seems to me clear that the words "at the time when the cause of action accrued" qualify "by reason of an obligation incurred" rather than "became subject to that liability".

131   This approach does not deprive rule 13.12(2) of purpose. First, it has the general purpose of making clear that tort claims are provable provided that the cause of action has accrued by the liquidation date. Secondly, it clarifies the position as regards claims for losses which have not occurred at the liquidation date, and may never be incurred. An example would be personal injury cases where provisional damages have been awarded or are claimed, and where the claimant has a right to apply for a further award if, but only if, he develops new diseases or conditions. Another example would be the claim for further loss from a continuing nuisance, to which Mr Snowden referred. Without a statement of the applicable principle provided by rule 13.12(2) , there could be real uncertainty as to what was meant by "any obligation incurred" in this context. As was said in a different context, in the Canadian case of Smith v Canadian Broadcasting Corporation [1953] 1 DLR 510 , to which Mr Mortimore referred, ""[a]ny obligation incurred" may not be very apt language to describe a liability in tort".

132   The question is fairly asked by the proponents as to why rule 13.12(2) does not simply provide that a liability in tort is a "debt" only if it arises out of a cause of action which had accrued at the liquidation date. The answer,

as it seems to me, is that having decided to adopt the phraseology of section 30(3) of the Bankruptcy Act 1914 for rule 13.12(1) (and section 382 (1) ), rule 13.12(2) (and section 382(2) ) were drafted so as to fit in with it. It may also be fairly said against the proponents that, if the intention had been to incorporate the Irish provision, why did it not use language along the lines of that provision. In fact the proponents go further and submit that the effect of rule 13.12(2) is to permit tort claims to be proved not only in cases in which the cause of action accrued after the liquidation date, but also in cases where there has been no wrongful act or omission until after the liquidation date. I find it impossible to find that meaning in the sub-rule.

133    The proponents rely heavily on the use of the word "deemed" in rule 13.12(2) . Deeming provisions are frequently, perhaps usually, used to extend the natural meaning of a provision or even to create a statutory fiction. A good example of the latter is a provision in the legal aid regulations considered by the Court of Appeal in DEG — Deutsche Investitions und Entwicklungsgesellschaft mbH v Koshy [2001] 3 All ER 878 , on which Mr Trower in particular relied. A person whose legal aid certificate was revoked was deemed never to have been an assisted person. Robert Walker LJ, with whom Aldous LJ agreed, endorsed at p 882 the approach which required the court to have regard to the legislative purpose underlying a deeming provision which introduced a statutory fiction and not to extend its effect further than was necessary to achieve that purpose.

134  Deeming provisions do not necessarily extend the natural meaning of a provision or create a fiction. Their purpose may be to define or clarify the circumstances relevant to the main provision. In St Aubyn v Attorney-General (No 2) [1952] AC 15 at 53, Lord Radcliffe said:

> "The word "deemed" is used a great deal in modern legislation. Sometimes it is used to impose for the purposes of a statute an artificial construction of a word or phrase that would not otherwise prevail. Sometimes it is used to put beyond doubt a particular construction that might otherwise be uncertain. Sometimes it is used

to give a comprehensive description that includes what is obvious, what is uncertain and what is, in the ordinary sense, impossible."

In the decision of the High Court of Australia in Hunter Douglas Australia Pty Ltd v Perma Blinds (1969–1970) 122 CLR 49 Windeyer J said at p 65:

> "the verb "deem", or derivatives of it, can be used in statutory definitions to extend the denotation of the defined term to things it would not in ordinary parlance denote. This is often a convenient device for reducing the verbiage of an enactment. But that the word can be used in that way and for that purpose does not mean that whenever it is used it has that effect. After all, to deem means simply to judge or reach a conclusion about something … The words "deem" or "deemed" when used in a statute thus simply state the effect or meaning which some matter or thing has — the way in which it is to be adjudged. This need not import artificiality or fiction. It may be simply the statement of an indisputable conclusion, as if for example one were to say that on attaining the age of twenty-one years a man is deemed to be of full age and no longer an infant. Hundreds of examples of this usage of the word appear in the statute books."

At p 67 he said:

> "There is no presumption, still less any rule, that wherever the word "deemed" appears in a statute it demonstrates a "fiction" or some abnormality of terminology.

Sometimes it does. Often it does not. Much depends upon the context in which the word appears …"

135  In my view rule 13.12(2) falls into the second of Lord Radcliffe's categories. It is designed to provide the certainty which, for the reasons already given, was required.

136  The submission on which the proponents most strongly relied was that this construction produced a result which was unjust and absurd and which cannot have been intended. While I am sure that the framers of the legislation did not intend to produce injustice, I consider that a deliberate policy choice was made to use the liquidation date as the cut-off point for causes of action in tort. There are reasons for this choice. It will generally produce greater certainty, it may permit a liquidation to be brought to an earlier conclusion and it may be regarded as consistent with the principle that all claims are to be identified and valued as at the liquidation date.

137  Whether, in the light of circumstances disclosed by this case, it was the right policy choice is another matter. Where the pre-liquidation activities of the company lead to post-liquidation losses recoverable in tort, particularly where as here it is a question only of waiting to see if the loss occurs, very serious questions arise as to whether the claimants should be excluded from all participation with other creditors in a distribution of the company's assets. It is not, however, so obvious as to how participation would best be achieved.

138  A system which allows all individuals who have been exposed to asbestos to claim against the contingency that they will develop compensatable injury will favour those who in fact never develop any injury against those who do so. It would result in very small amounts being paid to a very large number of people, rather than targeting the available resources to those who develop serious conditions and need and deserve substantial sums. That may not be thought to be an attractive policy choice. Some might regard it as unreasonable or even absurd. An alternative approach would be to calculate on a statistical and actuarial basis

the sum needed to meet future claims and allow a proof for that total sum, thereby creating a reserve which can be applied in paying a dividend to those who in fact develop compensatable conditions.

139  This does no more than illustrate that the right answer in policy terms to the issues raised by this case requires careful consideration and is not necessarily to be found in the Insolvency Act and the Insolvency Rules as they presently stand.

140  In this connection, the difference between the bankruptcy and winding-up regimes is important. I have already made the point, as did counsel, that a claim which cannot be proved in a bankruptcy can be pursued against the bankrupt after his discharge. An exclusion from proof for causes of action in tort accruing after the commencement of the bankruptcy will not necessarily produce an injustice and may be beneficial to the claimant, depending on the debtor's financial position after his discharge. This may strike a fair balance, provided that the debtor does emerge from bankruptcy, except to such extent and on such conditions as the court may direct. Further, in the case of personal injuries claims, Parliament provided that, even if provable, they were not released by the debtor's discharge from bankruptcy, except to such extent and on such conditions as the court may direct. In choosing to apply the bankruptcy template of section 382 to the rules governing the winding-up of companies, an approach has been adopted which leaves no room for these mitigating factors. This does not however enable the court to construe the substantially identical terms of section 382 and rule 13.12 in radically different ways.

141  In the result, therefore, I conclude that future asbestos claims (as defined) are not provable debts for the purposes of winding-up and I agree with the construction of the rules reached by Sir Donald Nicholls V-C.

142  The proponents' submissions also relied on a reading of "obligation incurred" in rule 13.12(1)(b) to include the situation where a duty of care in tort was engaged or broken before the liquidation date but no injury was caused until after that date, if at all. In my judgment, the words "obligation incurred" are not apt to describe the duty of care or its breach. An analysis of the tort of negligence, such as that

given by Viscount Simonds in The Wagon Mound , is important. It is not just the liability in damages, but also the underlying obligation, which is incurred when damage is suffered and a cause of action accrues. The obligation in negligence is to compensate for loss caused by the defendant's careless act or omission. While the act or omission will, if followed by material loss, lead to an obligation to compensate the victim, it is not in my view correct to say that by the careless act or omission alone the company incurs an obligation. This is not, in my view, inconsistent with my conclusion that potential tort claimants are creditors for the purposes of section 425 . All that is required in that context is that there should exist "contingent liabilities" in the sense described by the majority in Re Sutherland . Unlike rule 13.12(1) , it does not require that the company should already have "incurred an obligation". As shown by the authorities to which I have referred and on which all the proponents relied, a person may be a "creditor" for the purposes of section 425 without having a provable debt as defined in the insolvency legislation.

**Human Rights**

143  My conclusion on the proper construction of rule 13.12 makes it necessary to consider the submissions that this construction renders the legislation in breach of the Convention. Specifically, it is submitted that it would involve a violation of article 1 of the First Protocol to the Convention either on its own or taken in conjunction with article 14 of the Convention.

144  By section 3 of the Human Rights Act 1998 :

> "So far as it is possible to do so, primary legislation and subordinate legislation must be read and given effect in a way which is compatible with Convention rights."

The duty imposed on the court by this section requires the court to reach, if possible, a construction of legislation which is compatible with Convention rights, although it may not be justified by the usual principles of statutory construction. But it is engaged only where the construction arrived at by the application of those

principles produces a result which is not compatible with Convention rights. The court must therefore first, as I have done, reach its conclusion without recourse to section 3 . It must then decide whether that construction is incompatible with Convention rights. Only if it decides that it is incompatible, does section 3 apply. See Poplar Housing Association v Donoghue [2002] QB 48 per Lord Woolf LCJ at para 75.

145  Article 1 of the First Protocol (A1P1) provides:

> "Every natural or legal person is entitled to the peaceful enjoyment of his possessions. No one shall be deprived of his possessions except in the public interest and subject to the conditions provided for by the law and by the general principles of international law.
>
> The preceding provisions shall not, however, in any way impair the right of a State to enforce such laws as it deems necessary to control the use of property in accordance with the general interest or to secure the payment of taxes or other contributions of penalties."

The proponents submit that the potential tort claims of the future asbestos claimants are "possessions" for the purposes of A1P1 and that the effect of rule 13.12 , as I have construed it, violates A1P1 , not in the sense that the claimants are deprived of their potential claims altogether but in the sense that there is an interference with their enjoyment of them. Alternatively, if potential tort claims are not "possessions" for these purposes, it is submitted that asbestos claims arising from accrued causes of action are possessions and that, in the case of those accruing after the liquidation date, the inadmissibility of such claims to proof involves an interference with the enjoyment of such claims. It is in each case an interference, not a deprivation of the claimants' rights: it is only a right to prove in a winding-up and to participate with other creditors in a distribution which is denied to them. Their claims

are not extinguished and in all other respects are enforceable. However, the practical effect is likely to be substantial because, except to the extent of any available insurance cover (which in this case will be inadequate) or claims against other producers or distributors of asbestos products, they will in practice recover nothing.

**Future asbestos claims: A1P1**

146  I consider first whether the potential tort claims (the future asbestos claims as defined) are "possessions" within the meaning of A1P1 . If they are not possessions, then there can be no breach of the article in respect of them. The definition of future asbestos claims assumes that the claimant was before the liquidation date exposed to asbestos which could cause an asbestos-related condition for which T&N would be liable in damages. Equally, however, it assumes that no such condition has started before the liquidation date and it may never start. In any individual case, the prospects of developing a compensatable condition are likely to be very low. Unless and until such condition does start, the future asbestos claimants have no cause of action in English law and any proceedings would be struck out as disclosing no cause of action.

147  In a number of decisions, the European Court of Human Rights has considered the status of claims as "possessions". In Pressos Compania Naviera SA v Belgium (1996) 21 EHRR 301 , the court held that an accrued cause of action in tort was a possession. Damage was an essential element in the cause of action under Belgium law. Damage had occurred and under Belgium law the causes of action had accrued prior to the passing of retrospective legislation which deprived the claimants of their claims for compensation. On the basis that the cause of action had accrued, the claimants had a "possession" and therefore had a legitimate expectation that their claims would be determined in accordance with the general law of tort: see para 31 of the judgment. It was common ground between Miss Carss-Frisk and Mr Eadie that the test of legitimate expectation is not material to the determination of whether a claim constitutes a possession. It is the status of a particular claim as a possession which creates the legitimate expectation that it will be dealt with in accordance with domestic law.

148  In Kopecky v Slovakia (no 44912/98, 28 September 2004) , the Grand Chamber considered the elements necessary for a claim to constitute a possession for the purposes of A1P1 . In paragraph 35 of the judgment a number of relevant principles established by the practice of the Convention institutions under A1P1 are set out, including:

> "(c)    An applicant can allege a violation of Art.1 of Protocol No.1 only in so far as the impugned decisions related to his "possessions" within the meaning of this provision. "Possessions" can be either "existing possessions" or assets, including claims, in respect of which the applicant can argue that he or she has at least a "legitimate expectation" of obtaining effective enjoyment of a property right. By way of contrast, the hope of recognition of a property right which it has been impossible to exercise effectively cannot be considered a "possession" within the meaning of Art.1 of Protocol No.1, nor can a conditional claim which lapses as a result of the non-fulfilment of the condition. (see Prince Hans-Adam II of Lichtenstein v Germany [GC], no 42527/98 , §§ 82 and 83, ECHR 2001-VIII and Gratzinger and Gratizingerova v The Czech Republic (dec) [GC], no 39794/98 , § 69, ECHR 2002-VII)."

149    The Grand Chamber held that the alleged possession was not an "existing possession" and turned therefore to consider whether the "claim constituted an "asset", that is whether it was sufficiently established to attract the guarantees of Article 1 Protocol No 1 " (para 42). The judgment considers the role of "legitimate expectation" in this context and stated in paragraphs 48–49:

"48 … The "legitimate expectation" identified in Pressos Compania Naviera SA was not in itself constitutive of a proprietary interest; it related to the way in which the claim qualifying as an "asset" would be treated under domestic law and in particular to reliance on the fact that the established case law of the national courts would continue to be applied in respect of damage which had already occurred.

49   In a line of cases the Court has found that the applicants did not have a "legitimate expectation" where it could not be said that they had a currently enforceable claim that was sufficiently established …"

The judgment concludes on this aspect at paragraph 52:

"52   In the light of the foregoing it can be concluded that the Court's case law does not contemplate the existence of a "genuine dispute" or an "arguable claim" as a criterion for determining whether there is a "legitimate expectation" protected by Art.1 of Protocol No.1. The Court is therefore unable to follow the reasoning of the Chamber's majority on this point. On the contrary, the Court takes the view that where the proprietary interest is in the nature of a claim it may be regarded as an "asset" only where it has a sufficient basis in national law, for example where there is settled case law of the domestic courts confirming it."

The principal question for the court was therefore "whether there was a sufficient basis in domestic law, as interpreted by the domestic courts, for the applicant's claim to qualify as an "asset" for the purposes of Article 1 of Protocol No 1 ". As Mr Eadie submitted, it is difficult to see how a claim can constitute a possession within the meaning of A1P1 if under the relevant domestic law the claim is not maintainable. There is a clear link in this context with rights of access to the courts under article 6 , but the criterion for a possession under A1P1 may be expected to be stricter than for a right of access under article 6 .

150   The earlier judgment of the Grand Chamber in Gratzinger v Czech Republic (no 39794/98, 10 July 2002) , referred to in the judgment in Kopecky , concerned a claim for recovery of property confiscated under the former communist regime. The applicants had no claim under Czech law because under the terms of the Extrajudicial Rehabilitation Act of 1991 they did not satisfy one of the pre-conditions to an application, namely Czech nationality (although they had been Czech nationals at the date of confiscation). The Grand Chamber held that their claim was not a "possession" within the meaning of A1P1 because under Czech law it was not sufficiently established to be enforceable.

151   The Grand Chamber has again considered the relevant principles in two recent decisions. Draon v France (no 1513/03, 6 October 2005) concerned a claim for compensation in respect of the birth of a child with a disability, which was negligently not detected during pregnancy. During the course of proceedings the action was barred by new legislation applicable to pending cases. Paragraph 65 of the judgment reads:

"65   The Court reiterates that, according to its case-law, an applicant can allege a violation of Article 1 of Protocol 1 to the Convention only in so far as the impugned decisions relate to his "possessions" within the meaning of that provision. "Possessions" can be "existing possessions" or assets, including, in certain well-defined situations, claims. For a claim to be capable of being considered an "asset" falling within the scope of

Article 1 of Protocol No 1, the claimant must establish that it has a sufficient basis in national law, for example where there is settled case-law of the domestic courts confirming it. Where that has been done, the concept of "legitimate expectation" can come into play."

It was accepted that the claim was sufficiently established under French law to constitute a "possession" and that there had been an interference with the right to peaceful enjoyment of it. It was held that the interference was not justified and that there had been a breach of A1P1 .

152    Roche v The United Kingdom (no 32555/96, 19 October 2005) concerned a claim for damages for personal injury alleged to arise from the claimant's exposure to toxic chemicals during tests carried out on him while serving in the army. His claim under English law was barred by a certificate issued under section 10 of the Crown Proceedings Act 1947 . He contended that this violated a number of Convention rights, including those under articles 6 and 14 and under A1P1 . The central issue as regards those provisions was whether the certificate represented a substantive or procedural bar. The Grand Chamber, reaching the same conclusion as the House of Lords in Matthews v Ministry of Defence [2003] 1 AC 1163 , held that the certificate was part of a system which precluded a claim in tort as a matter of substantive law. There was accordingly no violation of articles 6 or 14 or A1P1 . In dealing with the alleged violation of A1P1 the Grand Chamber again reiterated the basic principle as regards the status of claims as possessions:

"The Court recalls that a proprietary interest in the nature of a claim can only be regarded as a possession where it has a sufficient basis in national law, including settled case-law of the domestic courts confirming it." (para 129)

153    In the light of the principles established by these cases, the issue is whether future asbestos claims (as defined) have a sufficient basis in national law to constitute possessions for the purposes of A1P1 . It is clear, in my judgment, they do not. Material damage is an essential element of a cause of action in negligence under English law. By definition, future asbestos claimants have not, as yet, suffered any material damage. Any claim form issued by them seeking damages in negligence would be struck out as disclosing no cause of action. Accordingly their "claims" are not possessions for the purposes of A1P1 . It follows that a construction of the Insolvency Rules which does not permit future asbestos claims to be admitted to proof involves no violation of A1P1 .

154    In his submissions, Mr Eadie suggested that the decisions of the ECtHR showed that to be recognised as a possession a claim must be both significantly established under domestic law and currently enforceable. In Kopecky and Draon , for example, both expressions may be found. Whatever the relevance of the distinction between them in other cases, it is not, I consider, a distinction which arises in this case. To say that a future asbestos claimant does not have a currently enforceable claim is literally true, but it suggests that he will have an enforceable claim in the future. That is not true, as regards many of the future asbestos claimants. They will have claims if, but only if, they develop compensatable conditions. Unless and until they do so, they have no sustainable claim in English law.

155    Miss Carss-Frisk relied on Ambruosi v Italy (no 31227/96, 19 October 2000) , a decision of the Second Section of the Court, as showing that a claim may be a "possession", even where an enforceable claim does not yet exist if, as she submitted, in some sense payment has been earned or an obligation of some kind has been incurred to the claimant. The applicant was a lawyer who had acted for a number of pensioners with restitution claims in respect of overpaid tax. The Italian government decided that restitution should be made. It did so and enacted a decree which extinguished the pending cases. An effect of this was to deprive the applicant of her right, if the cases had proceeded and been successful, to apply to the court for payment of her costs directly by the defendant, in view of

her clients' impecuniosity. She had already carried out work on the cases and incurred costs. The court held that the decree involved a breach of A1P1 as regards the applicant's right to claim her costs against the defendant. The precise nature of the applicant's rights under Italian law is not clear from the judgment and there is no substantial discussion in the judgment as to the grounds for the conclusion that the claim for fees was a possession, although it is noted (para 20) that future income constitutes a possession within A1P1 "only if it has been earned or where an enforceable claim exists".

156   I do not consider that it is possible to derive any principle from Ambruosi v Italy which could assist in establishing that future asbestos claims are possessions. In any event, the applicable principles have been established by the later decisions of the Grand Chamber to which I have referred.

**Future asbestos claims: A1P1 and article 14**

157   Alternatively, as regards future asbestos claims the proponents rely on article 14 of the Convention in conjunction with A1P1 . Article 14 provides:

> "The enjoyment of the rights and freedoms set forth in this Convention shall be secured without discrimination on any ground such as sex, race, colour, language, religion, political or other opinion, national or social origin, association with a national minority, property, birth or other status."

Article 14 does not create autonomous rights, but rather a principle of non-discrimination in the enjoyment of Convention rights and in the enjoyment of additional rights, falling within the general scope of Convention rights, which the State has voluntarily decided to provide. This does not diminish its importance, as it is fundamental to the values which the Convention is intended to protect: A and X v Secretary of State for the Home Department [2004] QB 335 per Lord Woolf LCJ at para 8. The application of article 14 does

not necessarily require the violation of a Convention right. It is necessary, but also sufficient, for the facts of the case to fall "within the ambit" of one or more Convention articles: Stec v United Kingdom (Grand Chamber decision as to the admissibility of applications 65731/01 and 65900/01, 6 July 2005).

158   Miss Carss-Frisk submitted that the facts of this case are sufficiently linked to A1P1 to come within the ambit of article 14 . The complaint is that rule 13.12 operates so as to prevent creditors from submitting claims in a liquidation in respect of a "contingent tort claim", whereas other contingent personal injury claims, such as those based on breach of contract, can be proved.

159   The State has chosen to allow contingent claims, in principle, to be proved in a liquidation. Having chosen to do so in relation to contractual claims, and thereby created for them legal rights sufficiently well-established in domestic law to be possessions within A1P1 , it is discriminatory not to extend the same right to contingent tort claims, such as future asbestos claims. For these purposes it is not necessary to establish that future asbestos claims are possessions within the meaning of A1P1 .

160   Miss Carss-Frisk submits that asbestos personal injury claimants with contingent claims in contract and those with such claims in tort are in an analogous or comparable situation for the purposes of article 14 . First, both categories are concerned to obtain compensation for the same kind of loss, based on exposure to asbestos. Secondly, persons in neither category have at the liquidation date suffered loss, and may never do so. Thirdly, the only difference is the legal basis for the claim.

161   Miss Carss-Frisk relied in particular on two decisions of the ECtHR concerning rights to social security benefits. In Willis v United Kingdom (2002) 35 EHRR 21 , the applicant successfully argued that the refusal to pay him a widowed mother's allowance and a widow's payment, to which he would have been entitled if he were a woman, constituted discrimination against him on grounds of sex. The court held that the right to these benefits was a pecuniary right which constituted a possession and that the applicant was denied the right on account of his sex, contrary to article 14 . In Stec v

T&N Ltd, Re, 2005 WL 3498927 (2005)

United Kingdom , an assertable right under domestic law to a welfare benefit was held to be a possession within A1P1 ; the importance of the decision lay in its application to non-contributory benefits. Article 14 was held to be applicable, on the basis of the relevant test as stated in para 55:

> "In cases, such as the present, concerning a complaint under Article 14 in conjunction with Article 1 of Protocol 1 that the applicant has been denied all or part of a particular benefit on a discriminatory ground covered by Article 14, the relevant test is whether, but for the condition of entitlement about which the applicant complains, he or she would have had a right, enforceable under domestic law, to receive the benefit in question."

162  Even if it is right to apply the principles in these decisions to claims to be pursued in litigation, I do not think that they lead to the conclusion for which Miss Carss-Frisk contends. Her submissions proceed on the basis that through the insolvency legislation the State has chosen to protect contingent claims, but has denied that protection to contingent tort claims. But it is only by choosing a broad class of claims that a distinction can be argued to arise. If the particular class of claim is looked at, namely "contingent tort claims", it can be seen that there is no discrimination: no such "claims" may be proved by anyone. The test set out in Stec involves examining "a particular benefit" and determining whether the applicant had been denied it on a discriminatory ground. I accept the force of what Miss Carss-Frisk submits as to the common features of those who may suffer personal injury in the future, but the legal differences are not matters of mere labels. As a matter of English law, claims in tort are essentially different in a number of fundamental respects from claims in contract. In particular, in the case of employees and others with relevant contractual rights, they already have at the liquidation date an accrued cause of action for breach of contract. Claims

in contract and claims in tort are no more to be taken together for these purposes than different benefits under the social security system.

163  In any event, and this was Mr Eadie's submission on this point, it seems clear from the Strasbourg case-law that article 14 is inapplicable in relation to a claim, as opposed to other possessions, unless the claim has a sufficient basis in domestic law to constitute a possession within A1P1 .

164  The application in Gratzinger v Czech Republic was made on the basis of A1P1 taken in conjunction with article 14 . I have referred above to the Grand Chamber's decision that the claim for recovery of property was not a "possession" within the meaning of A1P1 . It was submitted that the pre-condition of Czech nationality to the right to make the claim was discriminatory within article 14 . The Grand Chamber rejected the application under article 14 on the grounds that the "claim" was not a possession within A1P1 and article 14 was not autonomous: see paras 74 and 76. The case was not therefore within the ambit of A1P1 . The case made under article 14 in conjunction with A1P1 was rejected by the Grand Chamber on the same ground in Roche v United Kingdom : para 133. The decisions in Gratzinger and Roche are all the stronger because in both cases all the facts required to constitute the claims had occurred and it was only because of particular features of the claimants (nationality and employment in the armed forces) that their "claims" had an insufficient basis in domestic law to constitute possessions. By contrast, in this case, future asbestos claims do not constitute possessions because the essential element of loss is missing.

165  Accordingly I reject the submission that rule 13.12 , as it applies to future asbestos claims, violates A1P1 taken in conjunction with article 14 . I have not here dealt with the further issue as to whether, if such claims were within the ambit of A1P1 , there would be discrimination on a ground falling within article 14 . I shall have to return to article 14 when dealing with the position of causes of action in tort which accrue after the liquidation date and deal there with the issue of discrimination.

**Asbestos claims accrued after the liquidation date: A1P1**

166  If, as I hold, there is no violation of A1P1 , either on its own or in conjunction with article 14 , involved in a construction of the Insolvency Rules which precludes future asbestos claims from being treated as provable debts, the proponents submit that there is a violation of those provisions in relation to the treatment of tort claims which in fact accrue after the liquidation date. The effect of rule 13.12 is to prevent any proof in respect of tort claims where the cause of action accrues after the liquidation date. Once compensatable loss has occurred and the cause of action has accrued, it is clear that a personal injuries claim in tort is a possession within the meaning of A1P1 , assuming a relevant duty of care and breach. It is submitted that, by precluding such claims from being provable debts, rule 13.12 interferes with the enjoyment of the possession in breach of A1P1 or, alternatively, there is discrimination in breach of A1P1 read in conjunction with article 14 .

167  Mr Eadie accepts that, once the cause of action has accrued, a personal injuries claim in tort with a substantial basis in fact and law is a possession within A1P1 . He accepts also that the effect of rule 13.12 prevents full enjoyment of the possession. However, he submits that there would be no violation of A1P1 . He submits that, as I have already mentioned, the existence of a claim as a possession gives rise to a legitimate expectation that the claim will be determined and treated in accordance with the settled principles of domestic law and that the State will not then interfere with those settled principles. He further submits that rule 13.12 is part of the applicable domestic law and, unless changed, will be part of such law when a relevant cause of action accrues after the liquidation date. There is therefore no interference, in breach of A1P1 , with the enjoyment of the claim as a possession. A1P1 protects claims against retrospective interference.

168  The cases of Pressos and Draon provide clear examples of retrospective interference with settled principles of domestic law which deprived the applicants of their legitimate expectation to have their claims, which were sufficiently established as a matter of domestic law to constitute possessions, determined in accordance with the existing domestic law. Neither Miss Carss-Frisk nor Mr Eadie are aware of any case in which it has been suggested or held that the principles of domestic law applying prior to the existence of a claim, or a change in those principles prior to the existence of

a claim, constituted an interference with the claim as a possession for the purposes of A1P1 . However, Miss Carss-Frisk submitted that it is not right that there can only be an interference with a possession if there is a change in the law after the applicant has acquired the possession. She relied on the speech of Lord Nicholls of Birkenhead in Wilson v First County Trust Ltd (No 2) [2004] 1 AC 816 . The case concerned not a claim but contractual rights under a loan agreement which was subject to regulations made under the Consumer Credit Act 1974 . The rights could not be enforced because, in breach of the regulations, the contract failed correctly to state the amount of credit. The Court of Appeal held that there was an interference with the contractual rights in breach of A1P1 , notwithstanding that the regulations pre-dated both the loan agreement and the coming into force of the Human Rights Act 1998 . The House of Lords reversed the decision, but on a number of different grounds.

169  It was submitted in the House of Lords that there was no interference, in breach of A1P1 , with the creditor's contractual rights because the regulations pre-dated the agreement and the rights were, therefore, from inception subject to the limitations under the regulations. Miss Carss-Frisk relied on the rejection of this submission by Lord Nicholls at paras 38–45. However, as she acknowledged, this was a minority view. Lord Hope of Craighead at paras 106–109 disagreed. He said at paras 106–107:

> "106  Article 1 of the First Protocol has a similar character. It does not confer a right of property as such nor does it guarantee the content of any rights in property. What it does instead is to guarantee the peaceful enjoyment of the possessions that a person already owns, of which a person cannot be deprived except in the public interest and subject to the conditions provided for by law: Marckx v Belgium (1979) 2 EHRR 330 , 350, para 50. Here too it is a matter for domestic law to define the nature and extent of any rights which a party acquires from time to time as a result of the transactions which he or she enters into. One

must, of course, distinguish carefully
between cases where the effect of the
relevant law is to deprive a person of
something that he already owns and
those where its effect is to subject
his right from the outset to the
reservation or qualification which
is now being enforced against him.
The making of a compulsory order
or of an order for the division of
property on divorce are examples of
the former category. In those cases
it is the making of the order, not
the existence of the law under which
the order is made, that interrupts
the peaceful enjoyment by the owner
of his property. The fact that the
relevant law was already in force
when the right of property was
acquired is immaterial, if it did not
have the effect of qualifying the
right from the moment when it was
acquired.

107 The rights of property which are
in issue in this case are those set in
an agreement which is regulated by
the 1974 Act. The Act subjects the
rights of the creditor to restrictions
in some circumstances. Section 65
declares that a regulated agreement
which is improperly executed cannot
be enforced by the creditor except by
means of an order of the court, and
section 127(3) declares that it is not
to be enforceable at all except upon
the condition which it lays down.
The agreement which was entered
into in this case was from the outset
an agreement which was improperly
executed. So it was always subject
to the restrictions on its execution
which sections 65(1) and 127(3) of
the 1974 Act set out. I would hold
that FCT's Convention rights under
article 1 of the First Protocol are not
engaged in these circumstances."

Lord Scott of Foscote was of the same view:

> "168    First, article 1 of the First
> Protocol is directed to interference
> with existing possessions or property
> rights. FCT never had, at any
> stage in the history of the loan
> agreement, the right to enforce
> against Mrs Wilson the repayment
> of the £5,000. Neither the 1974
> Act as a whole nor section
> 127(3) in particular constituted an
> interference with a pre-existing right
> of FCT to enforce repayment by
> Mrs Wilson of the £5,000. The
> Act, and section 127(3) prevented
> FCT from ever possessing that right.
> No authority has been cited to
> your Lordships for the proposition
> that a statutory provision which
> prevents a transaction from having
> the quality of legal enforceability
> can be regarded as an interference
> for article 1 purposes with the
> possessions of the party who would
> have benefited if the transaction had
> had that quality. In my opinion, the
> proposition should be rejected."

170  Lord Hobhouse of Woodborough considered the
matter in a rather different way, his answer depending
on whether on the facts the lender had possession of the
pledged car or was only seeking to enforce a contractual
right. Lord Rodger of Earlsferry at para 178 agreed
with Lord Nicholls as to the disposal of all the grounds
of appeal, without further comment on this particular
issue.

171  In the judgment of a Chamber of the ECtHR in J A
Pye (Oxford) Ltd v United Kingdom (no 44302/02, 15
November 2005) , it was held by a 4 to 3 majority that
the application of the English law of adverse possession
to deprive the applicant of its registered title to land
violated A1P1 . It was argued by the UK Government

T&N Ltd, Re, 2005 WL 3498927 (2005)

that there was no breach because the relevant law existed at the time of the acquisition of the property. This was rejected at para 51 of the judgment:

> "51    The Court does not share the Government's view that the operation of the legislation is to be regarded as an incident of, or limitation on, the applicants' property right at the time of its acquisition, such that Article 1 ceased to be engaged when the relevant provisions took effect and the property right was lost after 12 years of adverse possession. It is true that the relevant provisions of the legislation existed at the time the property was acquired by the applicants and that the consequences for the applicants' title to the land of 12 years adverse possession were known. However, Article 1 does not cease to be engaged merely because a person acquires property subject to the provisions of the general law, the effect of which is in certain specified events to bring the property right to an end, and because those events have in fact occurred. Whether it does so will depend on whether the law in question is properly to be seen as qualifying or limiting the property right at the moment of acquisition or, whether it is rather to be seen as depriving the owner of an existing right at the point when the events occur and the law takes effect. It is only in the former case that Article 1 may be held to have no application."

But the court goes on to say at para 52:

> "The provisions are also different from those examined in the House of Lords in Wilson v. The First County Trust Ltd [2003]

UKHL 40 — also invoked by the Government — in which the majority held that the relevant legislation regulating the enforceability of loan agreements "bit" at the moment the transaction was concluded and that the lender accordingly had no right to enforce repayment of the loan of which he could be deprived under Article 1. By contrast, the 1925 and 1980 Acts are in the view of the Court to be seen as "biting" on the applicants' property rights only at the point at which the Grahams had completed 12 years' adverse possession of the applicants' land and not as delimiting the right at the moment of its acquisition. Accordingly, the Court rejects the Government's argument that, on this ground, Article 1 was not engaged in the present case."

This passage involves no criticism of the majority view in Wilson v First County Trust Ltd , but appears to endorse it.

172    In applying the principles to be deduced from these cases, it follows in my judgment that rule 13.12 , in precluding a tort claim which accrues after the liquidation date from being treated as a provable debt, involves no relevant interference with the enjoyment of the claim as a possession in breach of A1P1 . Unlike the law of adverse possession, it does not have the effect of depriving the claimant of an existing claim nor does it interfere with the exercise of any existing rights. At no time will the claimant have had a right to prove in respect of his post-liquidation tort claim.

173    In Pennycook v Shaws (EAL) Ltd [2004] Ch 309 , on which Miss Carss-Frisk also relied, the Court of Appeal considered the application of A1P1 to the statutory rights of business tenants under Part II of the Landlord and Tenant Act 1954 . Arden LJ, with whom the other members of the Court agreed, observed that there were important differences between the

statutory provisions under consideration in Wilson and the statutory rights of a tenant to a continuation of his tenancy or to a new tenancy, subject to the provisions of Part II of the 1954 Act. She cited the passages to which I have referred from the speeches of Lord Nicholls and Lord Hope and, referring to Lord Nicholls' speech, she said at para 35:

> "On this analysis the court must look at the substance of the claimed right to see whether the bar in this case to the exercise of the tenant's right is a delimitation of the right or whether it represents a deprivation of rights."

Applying that test to the business tenant's statutory rights, Arden LJ held that the relevant provision in that case was more accurately analysed as a deprivation of a right rather than a delimitation.

174  I do not consider that Pennycook v Shaws (EAL) Ltd supports Miss Carss-Frisk's submission. Applying the distinction between the deprivation of a right or its delimitation to post-liquidation tort claims, the effect of rule 13.12 is in my judgment to delimit them, for the reasons already given. The tort claimant has no right of which he is deprived.

175  It is in any event important, as Mr Eadie stressed, to focus on the nature of the possession in this case and the consequences under A1P1 . The post-liquidation tort claims are possessions because they are sufficiently established under the applicable principles of English law. The consequence under A1P1 is a legitimate expectation that English law will not be altered after the claims come into existence in a way which deprives the claimants of their claims or adversely interferes with them. This is the principle applicable to claims which has been established by Kopecky v Slovakia and other decisions of the ECtHR . Kopecky was decided after Wilson v First County Trust and Pennycook v Shaws (EAL) Ltd but there is in any case nothing said in those cases, or in the recent decision in J A Pye (Oxford) Ltd v United Kingdom , which qualifies or casts doubt on the principle of legitimate expectation as it applies to claims. On that basis, rule 13.12 involves no breach

of A1P1 as it applies to tort claims which accrue after the liquidation date, because it is part of domestic law before any such claims exist.

176  My conclusion is therefore that rule 13.12 does not violate A1P1 as regards tort claims which accrue after the liquidation date.

### Asbestos claims accrued after the liquidation date: A1P1 and article 14

177  Finally, in the alternative, the proponents submit that rule 13.12 violates A1P1 taken in conjunction with article 14 . First, they submit that the exclusion from proof of post-liquidation tort claims is within the ambit of A1P1 , because these claims will exist as otherwise enforceable claims and will constitute possessions for the purposes of A1P1 . Secondly, the treatment of tort claimants is discriminatory when compared with the treatment of creditors with claims for breach of contract.

178  Mr Eadie submits that this submission fails, on grounds both of ambit and of the absence of any relevant discrimination.

179  As to ambit, Mr Eadie submits that, although the post-liquidation tort claims are capable of being possessions within A1P1 , there is still no breach of the legitimate expectation that such claims will be treated in accordance with the principles of domestic law. The decisions of the ECtHR in Gratzinger v Czech Republic and Roche v United Kingdom support this submission in its application to claims. I admit to some misgivings in its rigid application to a case where there is clear discrimination. Suppose that domestic law provided that only men could bring personal injury claims in tort, notwithstanding that in all other aspects a woman's claim satisfied the criteria established by domestic law. It seems surprising that article 14 would not provide protection on the sole ground that this bar had existed at the time that her cause of action would otherwise have accrued.

180  As to discrimination, article 14 may apply only if there is "discrimination on any ground such as sex, race, colour, language, religion, political or other opinion, national or social origin, association with a national minority, property, birth or other status". Miss

Carss-Frisk submits that the difference in treatment of personal injury claims in tort and similar claims in contract constitutes discrimination on grounds of "other status". She submits that this is a broad concept which should not be given a restricted meaning and that it is apt to describe the status of a person who has suffered injury as a result of a breach of a tortious duty of care. It defines their status as a victim of a particular type of legal wrong. Moreover, tort claimants are as between themselves subject to discrimination depending on whether their cause of action accrued before or after the liquidation date.

181 Miss Carss-Frisk further characterised the status in a different, but associated, way. Most of the personal injury claimants with contractual claims were employees of T&N. The distinction, and the discrimination, was between employees on the one hand and those who had not been employed by T&N on the other hand.

182 Miss Carss-Frisk relied on the judgment of the ECtHR in National & Provincial Building Society v United Kingdom (1998) 25 EHRR 127 . Regulations imposing a tax charge on interest earned on building society accounts during a transitional period had been declared invalid in proceedings brought by Woolwich Building Society. Woolwich Building Society succeeded in a restitutionary claim for the repayment of the relevant tax. Retrospective legislation was enacted to validate the regulations, but it included an exemption in respect of proceedings for restitution commenced before 18 July 1986. This provision, on the facts, applied only to Woolwich Building Society. The applicant building societies complained that the legislation breached their Convention rights on grounds, amongst others, that it violated A1P1 taken in conjunction with article 14 . They contended that they were in a materially identical situation to that of Woolwich Building Society, enjoying the same restitutionary rights, and that by not including them within the exemption there was discrimination on grounds falling within article 14 . The court rejected the contention. Its judgment at para 88 states:

> "not every difference in treatment will amount to a violation of this Article. Instead, it must be established that other persons

in an analogous or relevantly similar situation enjoy preferential treatment, and that there is no reasonable or objective justification for this distinction."

The court accepted that the applicant building societies were in an analogous if not identical situation as Woolwich Building Society with respect to the tax regulations but, because only Woolwich Building Society had taken proceedings, it rejected the contention that they were in fact in a relatively similar situation to Woolwich Building Society.

183 Miss Carss-Frisk submitted that the approach of the court in the National & Provincial case shows that the ECtHR is prepared to proceed on the basis that it is not particularly important to identify a relevant ground of discrimination. Rather, the court asks whether the comparator groups are in an analogous situation and, if so, can the discrimination be justified. Miss Carss-Frisk submitted that personal injuries claimants are in an analogous position, whether their accrued causes of action are in tort or in contract. Both have claims for damages, well-established as a matter of the applicable principles of English law, and both may obtain judgments quantifying their damages.

184 Miss Carss-Frisk accepted that some attention has to be paid to whether the alleged discrimination is on a ground to which article 14 applies. Mr Eadie submitted that recent decisions of the House of Lords, as well as Strasbourg decisions, had underlined the importance of this part of the analysis and had shown that, for article 14 to be engaged in any particular case, the discrimination must be on a ground falling within article 14 . In Kjeldsen v Denmark (1976) 1 EHRR 711, at para 56, the ECtHR stated:

> "The court first points out that Article 14 prohibits, within the ambit of the rights and freedoms guaranteed, discriminatory treatment having as its basis or reason a personal characteristic ('status') by which

persons or groups of persons are distinguishable from each other."

185   The test of personal characteristic was adopted and applied by the House of Lords in R (S) v Chief Constable of South Yorkshire Police [2004] 1 WLR 2196 . Lord Steyn, with whom all other members of the House agreed on this point, said at paras 46–49:

"46   This question is important because if the different treatment is not on a relevant ground for the purposes of article 14, then this article is not applicable. In any event, identification of the ground for different treatment is material to the question of justification.

47 The different treatment afforded to the appellants and comparators was on the ground that the former had already provided samples and fingerprints to the police in a criminal investigation while the comparators had never been required to do so.

48   The list of grounds in article 14 is not exhaustive, and necessarily includes each of the specifically proscribed grounds as well as "other status". The European Court of Human Rights has interpreted "other status" as meaning a personal characteristic: Kjeldsen , Busk Madsen and Pedersen v Denmark (1976) 1 EHRR 711 , 732–733, para 56. I do not understand Lord Woolf CJ [2002] 1 Wlr 3223 , 3238 to have expressed a different view in paragraph 47 of his judgment. On the other hand, the proscribed grounds in article 14 cannot be unlimited, otherwise

the wording of article 14 referring to "other status" beyond the well-established proscribed grounds, including things such as sex, race or colour, would be unnecessary. It would then preclude discrimination on any ground. That is plainly not the meaning of article 14.

49   It is, therefore, necessary to examine whether the ground for different treatment in this case amounts to a status in the sense of a personal characteristic within the meaning of article 14."

186   Lord Steyn concluded that the difference in treatment was not analogous to any of the expressly proscribed grounds such as sex, race or religion and that the provision of fingerprints and DNA samples to the police did not constitute a "status" within article 14 (para 51). In R (Hooper) v Secretary of State for Work and Pensions [2005] 1 WLR 1681, the House of Lords applied the same approach and held that discrimination by reference to whether or not a person had started legal proceedings was not a "status" within article 14 : Lord Hoffmann at para 65.

187   In R (Carson) v Secretary of State for Work and Pensions [2005] 2 WLR 1369, the House of Lords again looked at this question. The claimant was a British citizen who had spent most of her working life in Britain and had a full record of national insurance contributions. At the date of her retirement, she was resident in South Africa. Because she was resident in South Africa, and because the United Kingdom had no relevant reciprocal agreement with South Africa, she was not entitled to annual cost of living increases in her state pension. She argued that this constituted discrimination under article 14 in the enjoyment of a possession under A1P1 , on the grounds of her status, namely residence in South Africa. Lord Hoffmann referred to the need to show discrimination on the basis of a "personal characteristic", as set out in Kjeldsen v Denmark and R (S) v Chief Constable of the South

Yorkshire Police , and was content to assume that residence in South Africa was a personal characteristic: para 13. Likewise, in the conjoined appeal of *Reynolds* , age was treated as at least capable of following within article 14 . Lord Walker of Gestingthorpe said at paras 52–54:

"52   It will be apparent that the grounds of discrimination prohibited by article 14 extend a good way beyond sex and race. Its enumeration of grounds does not in terms include residence (the ground of complaint in Mrs Carson's case) or age (the ground of complaint in Ms Reynolds' case). The residual group, "or other status" (in the French text, *toute autre situation*), is far from precise. The respondent Secretary of State does not contend that the grounds of residence and age cannot be included within the scope of article 14. But it is clear from the jurisprudence of the Strasbourg court that the possible grounds of discrimination under article 14 are not wholly unlimited; nor are all possible grounds of equal efficacy in establishing unlawful discrimination. These points call for some explanation, since they are relevant to these appeals.

53   In Kjeldsen , Busk Madsen and Pedersen v Denmark (1976) 1 EHRR 711 , an early Strasbourg decision concerned with compulsory sex education in state primary schools, the court, at pp 732–733, para 56, interpreted "status" in article 14 as "a personal characteristic … by which persons or groups of persons are distinguishable from each other". The fact that a number of parents objected to their children receiving sex education at school was not accepted as equivalent to

a religious belief so as to make the complainants a group for the purposes of a claim under article 14 taken together with article 2 of the First Protocol.

54   It was suggested in argument that the Kjeldsen test of looking for a personal characteristic is no longer part of the Strasbourg jurisprudence. But it has recently been followed by the Fourth Section of the European Court of Human Rights in two admissibility decisions, Budak v Turkey (Application No 57345/00) (unreported) 7 September 2004 and Beale v United Kingdom (Application No 16743/03) (unreported) 12 October 2004 . In Budak the only relevant difference was in the criminal procedure adopted for two different types of offence. In Beale it was the different investigatory procedures appropriate for the police (on the one hand) and trading standards officers (on the other hand). In neither case was there any personal characteristic of the claimant which could be a ground for discrimination contrary to article 14. Moreover this House has recently applied Kjeldsen in R (S) v Chief Constable of the South Yorkshire Police [2004] 1 WLR 2196 , 2213, para 48, per Lord Steyn."

188   It is clear from these authorities that it is an essential element of a complaint of discrimination contrary to article 14 that the ground of discrimination should be a personal characteristic. The extensive list of specific grounds of discrimination in article 14 both led to the interpretation of "other status" as personal

characteristics and has given some guidance as to the underlying nature of those characteristics.

189   In my judgment, tort claimants do not as such possess any personal characteristics which distinguish them from other personal injuries claimants. Their distinctive features for present purposes are (i) they have been negligently exposed to asbestos by T&N, (ii) they have as a result suffered injury and (iii) the only legal basis on which they can make a claim is in negligence. It is the third feature which distinguishes them. But the nature of the legal redress available to them under the general law is not in my view to be regarded as a personal characteristic within article 14 , and it certainly bears no relation to any of the characteristics specified in article 14 . In my view, it is no more a personal characteristic than commencing proceedings before or after a particular date ( R (Hooper) v Secretary of State for Work and Pensions ) or committing or being charged with one offence rather than another ( Budak v Turkey, no 57345/00, 7 September 2004 ).

190   As I have mentioned, Miss Carss-Frisk also submitted that the distinction was between employees, who have claims for breach of contract and therefore have provable claims, and other claimants. However, I do not consider that that demonstrates a personal characteristic shared by the other claimants. They are an extremely disparate group, including, by way of example only, workers "loaned" to T&N by other T&N companies, wives of T&N workers, workers in other industries such as shipbuilding and construction, children living near T&N plants, people exposed to asbestos because of temporary building works at their work-place, and consumers using products incorporating asbestos. Their exposure has been in many different countries, notably the United States as well as the United Kingdom, and they are of many different nationalities. The absence of a contract of employment with T&N cannot in my view be regarded as a shared personal characteristic. It is a fact which defines a very broad category of persons, and affects their legal rights, but it is not a personal characteristic. Miss Carss-Frisk relied on Lord Hoffmann's inclusion of a person's occupation as a personal characteristic ( Carson , para 16) but a particular occupation is not analogous to the fact of not being employed by T&N.

191   I conclude therefore that article 13.12 , as it applies to tort claims accruing after the liquidation date, does not breach article 14 taken in conjunction with A1P1 .

192   My reasons for concluding that none of the challenges to rule 13.12 on the basis of Convention rights succeeds makes it unnecessary to consider whether the differences in treatment under the rule can be justified, whether under A1P1 or under article 14 .

### Conclusion

193   My overall conclusions are therefore, first, that future asbestos claimants (as defined) are creditors for the purposes of a scheme of arrangement under section 425 of the Companies Act 1985 and a CVA under Part I of the Insolvency Act 1986 . Secondly, future asbestos claims are not provable debts in a liquidation. Thirdly, this second conclusion involves no breach of Convention rights under article 1 of the First Protocol whether taken on its own or in conjunction with article 14 of the Convention.

Crown copyright

© 2017 Sweet & Maxwell

2005 WL 3498927

© 2017 Thomson Reuters.

# TAB 72

*a*   # Re Thoars (decd), Reid v Ramlort Ltd

[2002] EWHC 2416 (Ch)

CHANCERY DIVISION
SIR ANDREW MORRITT V-C
*b*   7, 15 NOVEMBER 2002

*Winding up – Transactions at an undervalue – Value of consideration
provided by bankrupt – Preliminary issue as to whether and to what extent
value should be assessed taking into account subsequent events – Whether
preliminary issue susceptible of just determination – Insolvency Act 1986,*
*c*   *s 339.*

On 1 February 1994, T took out a unit-linked life insurance policy with
Skandia Life. On 1 February 1996 the annual premium, which was variable,
was £1,176 for a sum payable on death then amounting to £185,568. On
*d*   19 July 1996, T, who was suffering from cirrhosis of the liver, was put on
the active list for a liver transplant. On 26 July 1996 T assigned the benefit
of the policy to the defendant (Ramlort) by means of a written declaration of
trust which was not expressed to be made for any consideration. On
18 September 1996 T underwent a liver transplant. The following day he
died both intestate and insolvent. The claimant (R) was appointed the
*e*   judicial factor of T's insolvent estate in 1997. In 1999 R commenced
proceedings seeking to set aside the assignment of the policy under s 339 of
the Insolvency Act 1986 on the grounds that it was a transaction at an
undervalue, made at a relevant time under s 341, by reference to the sum
payable on death as at 1 February 1996, namely £185,598. Ramlort
*f*   contended that when assigned the policy had no value or none exceeding its
surrender value of £71.96. In addition it asserted that it gave good
consideration for the declaration of trust by reimbursing the deceased for the
premium due on 1 February 1996, agreeing to pay the remaining premiums
as and when they fell due and paying the deceased £1,900. The registrar
adjourned the application to the judge for the determination of a preliminary
*g*   issue. The issue was to what extent (if at all) the value of the consideration
provided by T to Ramlort by the declaration of trust should be assessed in
the knowledge of and/or taking into account the fact that T underwent a liver
transplant operation on 18 September 1996 and died the following day.

**Held** – (1) The court might in appropriate circumstances have regard to
*h*   subsequent events in assessing the value of consideration in money or
money's worth as required by s 339(3)(c). Reality should be given precedence
over speculation. The same valuation principles should be applied to both the
consideration received by the insolvent and the consideration disposed of by
the insolvent. If subsequent events were admissible because they resolved
*i*   previous uncertainties there was no logical basis for limiting their effect so as
to exclude increases in value. The value of the consideration in money or
money's worth was to be assessed as at the date of the transaction, and if at
that date value was dependent on the occurrence or non-occurrence of some

event and that event occurred before the assessment of value had been
completed then the valuer might have regard to it, but the valuer was entitled
and bound to take account of all other matters relevant to the determination
of value as at the date of the transaction. Subsequent events, though
admissible, were only evidence on which the valuer might rely. The actual
value remained a question of fact for his determination on all the evidence.

*Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] 1 BCLC 145 applied.

(2) The preliminary issue was not susceptible of just determination in
accordance with its terms. The preliminary issue was inappropriate because
the value of the policy as at 26 July 1996 was a question of fact for the
determination of the court on all the evidence. It would depend on the court's
evaluation of the expert valuation evidence. That might, in turn, depend on
the court's evaluation of medical evidence as to the cause of death because
the deceased died of cardiac arrest, not from cirrhosis of the liver, and
whereas death caused by the latter was more or less expected depending on
whether or not the deceased had a liver transplant, it remained to be decided
whether there was any expectation of death from the former and if so to what
extent.

### Cases referred to in judgment

*Bwllfa and Merthyr Dare Steam Collieries (1891) Ltd v Pontypridd
    Waterworks Co* [1903] AC 426, HL.
*Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] UKHL 2, [2001] 1 BCLC
    145, [2001] 1 WLR 143, HL.

### Preliminary issue

Mr Reid as the judicial factor of the insolvent estate of Mr Allan McLean
Thoars (deceased) applied to set aside the assignment by Mr Thoars to the
defendant company, Ramlort Ltd, of a life assurance policy as a transaction
at an undervalue under s 339 of the Insolvency Act 1986 and the registrar
adjourned the application to the judge for the determination of a preliminary
issue as to the extent to which the value of the consideration provided by Mr
Thoars to Ramlort Ltd by the declaration of trust made on 26 July 1996
should be assessed in the knowledge of and/or taking into account the fact
that Mr Thoars underwent a liver transplant operation on 18 September
1996 and died the following day. The facts are set out in the judgment of Sir
Andrew Morritt V-C.

*Stephen Davies QC* (instructed by *Peterkins*) for the applicant.
*Guy Newey QC* (instructed by *Clintons*) for the respondent.

*Cur adv vult*

15 November 2002. The following judgment was delivered.

### SIR ANDREW MORRITT V-C.

[1] On 1 February 1994 Allan McLean Thoars (the deceased) took out a
unit-linked life insurance policy with Skandia Life Assurance Co Ltd (the
policy). On 1 February 1996 the annual premium, which was variable, was
£1,176 for a sum payable on death then amounting to £185,568. On 19 July
1996 the deceased, who was suffering from cirrhosis of the liver, was put on

*a* the active list for a liver transplant. On 26 July 1996 the deceased assigned the benefit of the policy to the defendant (Ramlort) by means of a written declaration of trust which was not expressed to be made for any consideration. On 18 September 1996 the deceased underwent a liver transplant. The following day he died both intestate and insolvent.

*b* [2] The claimant (Mr Reid) is the judicial factor of the deceased's insolvent estate, having been so appointed by the sheriff for the area in which the deceased lived, namely Grampian, Highlands and Islands, on 16 September 1997. On 12 March 1999 he commenced these proceedings. He seeks an order to set aside the assignment of the policy under s 339 of the Insolvency Act 1986 on the grounds that it was a transaction at an undervalue.

*c* [3] Section 339 provides:

'(1) Subject as follows in this section and sections 341 and 342, where an individual is adjudged bankrupt and he has at a relevant time (defined in section 341) entered into a transaction with any person at an undervalue, the trustee of the bankrupt's estate may apply to the court for an order under this section.

*d* (2) The court shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if that individual had not entered into that transaction.

(3) For the purposes of this section and sections 341 and 342, an individual enters into a transaction with a person at an undervalue if—
*e* (a) he makes a gift to that person or he otherwise enters into a transaction with that person on terms that provide for him to receive no consideration, (b) he enters into a transaction with that person in consideration of marriage, or (c) he enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the individual.'
*f*

*g* [4] Section 341(1)(a) prescribes the relevant time for the purposes of s 339 as a time within five years prior to the presentation of the petition on which the individual was adjudicated a bankrupt. But, by virtue of s 341(2), a time not within the last two years of that period is not relevant unless the individual was insolvent at that time or became insolvent in consequence of the transaction. In the case of a transaction between that individual and an associate of his it is presumed that those conditions are satisfied unless the individual establishes the contrary.

*h* [5] It is not in dispute that the declaration of trust was executed by the deceased at a relevant time. Mr Reid relies on the sum payable on death as at 1 February 1996, namely £185,598, and contends that his claim comes within each of the grounds set out in s 339(3). This is disputed by Ramlort. It contends that the policy had no value or none exceeding its surrender value of £71.96. In addition it asserts that it gave good consideration for the *i* declaration of trust by reimbursing the deceased for the premium due on 1 February 1996, agreeing to pay the remaining premiums as and when they fell due and paying the deceased £1,900.

[2003] 1 BCLC 499

[6] The parties have given disclosure and exchanged the reports of experts on the valuation of the policy. They have not exchanged witness statements or the reports of medical experts. On 27 November 2001 Mr Registrar Jaques adjourned the application to the judge for the determination of a preliminary issue in the following terms:

'To what extent (if at all) the value of the consideration provided by Mr Thoars to Ramlort Ltd by the declaration of trust made on 26th July 1996 should be assessed in the knowledge of and/or taking into account the fact that he underwent a liver transplant operation on 19th September 1996 and died during surgery on that date.'

The formulation of the preliminary issue misstates the facts because the transplant was carried out on 18 September and the deceased died, not during surgery on that day, but on the following day, 19 September, when in intensive care after the operation had been completed.

[7] I did not understand that order to have been made by consent but neither side appealed. For reasons I will explain later I do not consider such a preliminary issue to be susceptible of just determination in accordance with its terms. But in view of the delays which have already occurred in the resolution of this dispute I should give such guidance as I properly can in advance of findings of relevant facts.

[8] The essential point is the extent, if any, to which subsequent events may be regarded in assessing the value of consideration in money or money's worth as required by s 339(3)(c). That the court may in appropriate circumstances have regard to subsequent events in assessing values is not in doubt. In *Bwllfa and Merthyr Dare Steam Collieries (1891) Ltd v Pontypridd Waterworks Co* [1903] AC 426, 431 Lord Macnaghten said:

'If the question goes to arbitration, the arbitrator's duty is to determine the amount of compensation payable. In order to enable him to come to a just and true conclusion it is his duty, I think, to avail himself of all information at hand at the time of making his award which may be laid before him. Why should he listen to conjecture on a matter which has become an accomplished fact? Why should he guess when he can calculate? With the light before him, why should he shut his eyes and grope in the dark?'

[9] In *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] UKHL 2, [2001] 1 BCLC 145, [2001] 1 WLR 143 the House of Lords considered the entitlement of a court to have regard to subsequent events in ascertaining the value of the consideration in money or money's worth received by an insolvent company. The question arose under s 238(4)(c) which is in substantially the same terms as s 339(3)(c).

[10] The facts of that case were complicated. In essence an insolvent company, AJB, transferred its stockbroking business to a subsidiary of PCG and received in exchange the benefit of a covenant by PCG to pay an annual rent of £312,500 for four years contained in an agreement for the subletting

by AJB to PCG of certain computer equipment which AJB held under a head lease. It was necessary to value the benefit of that covenant and compare it with the value of the business being sold, namely £1.25m.

*a*

[11] The date of the transaction was 10 November 1989. As at that date the headlease was terminable at the will of the headlessor because the sub-lease was in breach of an absolute covenant against assigning or sub-letting. Repossession of the equipment would terminate the sub-lease. As Lord Scott of Foscote, with whom the other members of the appellate committee agreed, said (para 23):

*b*

> 'So, what was the value, in money or money's worth, of a covenant by PCG that was so precarious?'

*c*

He then referred to a number of events occurring between 10 November 1989 and 23 February 1990 and concluded (para 25) that:

> 'PCG's covenant, which had been precarious at the outset, had become worthless by 23 February 1990 at the latest.'

*d*

[12] Lord Scott of Foscote referred to the submission of counsel for PCG that such ex post facto events should not be taken into account in valuing PCG's covenant as at 10 November 1989 and continued, in para 26:

*e*

> 'I do not agree. In valuing the covenant as at that date, the critical uncertainty is whether the sublease would survive for the four years necessary to enable all the four £312,500 payments to fall due, or would survive long enough to enable some of them to fall due, or would come to an end before any had fallen due. Where the events, or some of them, on which the uncertainties depend have actually happened, it seems to me unsatisfactory and unnecessary for the court to wear blinkers and pretend that it does not know what has happened. Problems of a comparable sort may arise for judicial determination in many different areas of the law. The answers may not be uniform but may depend upon the particular context in which the problem arises. For the purposes of s 238(4), however, and the valuation of the consideration for which a company has entered into a transaction, reality should, in my opinion, be given precedence over speculation. I would hold, taking account of the events that took place in the early months of 1990, that the value of PCG's covenant in the sublease [as] of 10 November 1989 was nil. After all, if, following the signing of the sublease, AJB had taken the sublease to a bank or finance house and had tried to raise money on the security of the covenant, I do not believe that the bank or finance house, with knowledge about the circumstances surrounding the sublease, would have attributed any value at all to the sublease covenant.

*f*

*g*

*h*

> [27] Where the value of the consideration for which a company enters into a s 238 transaction is as speculative as is the case here, it is, in my judgment, for the party who relies on that consideration to establish its value. PCG and Brewin Dolphin are, in the present case, unable to do so.'

*i*

[2003] 1 BCLC 499

[**13**] Counsel for Ramlort submitted that *Phillips* was distinguishable on any one of four grounds. First, the relevant valuation in that case was the consideration received by the insolvent whereas this case concerns the consideration disposed of by the insolvent. It was suggested that this distinction had a real difference because though an insolvent should be discouraged from selling his assets for a speculative consideration he should not be impeded in selling assets of a speculative value for tangible consideration. I am unable to accept this distinction. It is not warranted by the terms of the subsection nor by the mischief against which it is aimed, namely a reduction in the net assets of the insolvent. Such a reduction is achieved by a mismatch between that which is disposed of and that which is received. The same valuation principles should be applied to both elements.

[**14**] Second, it is suggested that Lord Scott of Foscote based his conclusion on the inability of the defendants to establish the value of the covenant. By contrast, in this case each party has produced the report of an expert on the valuation of the policy. This submission relates to para 27 of the speech of Lord Scott of Foscote. I do not read that paragraph as qualifying in any way what is said in para 26. On the contrary it is the consequence of applying the principles set out in para 26 which leads to the conclusion in para 27 that PCG had failed to discharge the onus of establishing the [face] value of the covenant.

[**15**] Third, counsel for Ramlort points out that in *Phillips* subsequent events were relied on as confirmation that the asset of precarious value in fact had none whereas in this case Mr Reid seeks to rely on subsequent events to increase the value of the policy. It is true that such a distinction may be drawn but I do not see why it should lead to any difference. If subsequent events are admissible because they resolve previous uncertainties then I can see no logical basis for limiting their effect so as to exclude increases in value.

[**16**] Finally, counsel for Ramlort submitted that the use of the subsequent events in *Phillips* to confirm a nil value accorded with common sense, but their use in this case to give to the policy any value beyond the nominal would not. This is not a ground for distinguishing *Phillips*, though it may be good reason for scrutinising its application with care.

[**17**] For all these reasons I reject the contention of counsel for Ramlort that I am not bound by the ratio decidendi of *Phillips*. I take that ratio to be that (1) the value of the consideration in money or money's worth is to be assessed as at the date of the transaction, (2) if at that date value is dependent on the occurrence or non-occurrence of some event and that event occurs before the assessment of value has been completed then the valuer may have regard to it, but (3) the valuer is entitled, indeed bound, to take account of all other matters relevant to the determination of value as at the date of the transaction. The first proposition appears from the second sentence of the passage in para 26 I have quoted in para 12 above. The second proposition is reflected in the third sentence of that quotation. In my view the third proposition is inherent in the last two sentences of para 26 and the first sentence of para 27 of the speech of Lord Scott of Foscote.

[**18**] Counsel for Ramlort submitted that on the facts of this case it would be wrong to assess the value of the policy as at 26 July 1996 by reference to the death of the deceased on 19 September 1996. He pointed to absurdities which would arise in comparable cases, for example, the accidental and

premature death of a young and healthy life assured, the sale of a lottery ticket at cost, the purchase or sale of quoted shares before the disclosure of market sensitive information, the sale of land with hope value which is subsequently realised or the sale of residential property the value of which goes up in line with the market. In all these cases, he submitted, the use of subsequent events to increase the value would be unjust.

[19] Counsel for Mr Reid recognised the force of these submissions. In his reply he accepted that subsequent events should not be taken into account unless and to the extent that they were both relevant and foreseeable at the time the transaction was entered into.

[20] In my view the examples of absurdity given by counsel for Ramlort cannot be so easily disposed of. In each case the subsequent event is foreseeable though its likelihood ranges from the remote (the lottery ticket), through the possible (sale of land with hope value) to the probable (the sale of residential property). The solution in my view lies in the third proposition to which I have referred. Subsequent events, though admissible, are only evidence on which the valuer may rely. The actual value remains a question of fact for his determination on all the evidence. In the same way that Lord Scott of Foscote referred in para 26 to the likelihood of AJB raising money on the security of the covenant so the valuer is entitled to consider the likelihood of a lottery ticket being sold for more than the value of the stake before the draw has been carried out, notwithstanding that he knows that thereafter it entitled the holder to £5m.

[21] This conclusion demonstrates the inappropriateness of the preliminary issue in this case. The value of the policy as at 26 July 1996 is a question of fact for the determination of the court on all the evidence. It will depend on the court's evaluation of the expert valuation evidence. That may, in turn, depend on the court's evaluation of medical evidence as to the cause of death because the deceased died of cardiac arrest, not from cirrhosis of the liver. Death caused by the latter was more or less expected depending on whether or not the deceased had a liver transplant; but was there any expectation of death from the former and if so to what extent? It is not for me, on the trial of this or any other preliminary issue, to express any view as to how the judge at the trial should resolve the issues of fact. The decision of the House of Lords in *Phillips* shows that evidence as to when the deceased died and why is admissible but it is for the judge at trial to determine what, if any, effect on the value of the policy as at 26 July 1996 those facts may have.

[22] In these circumstances I do not consider that it would be appropriate to give an answer to the preliminary issue. Not only is it factually inaccurate but any answer may appear to limit the scope of the fact-finding exercise to be conducted by the judge at trial. In my view the sooner that exercise is completed the better. I will invite counsel to formulate directions designed to ensure that the trial of the application takes place as soon as possible.

*Order accordingly.*

Celia Fox　　Barrister.

# TAB 73

**1 Ch.**          CHANCERY DIVISION.                    221

*In re* WARING. WESTMINSTER BANK *v.* BURTON-    JENKINS
          BUTLER.                                                    J.

                                                                      1948
*Will—Annuities given " free of income tax "—Will dated before*     ―――――
*September* 3, 1939—*Testator dies after that date—Court of Appeal*  *Jan.* 21.
*holds s. 25 of the Finance Act,* 1941 *applies—House of Lords subse-*  ―――――
*quently in another case holds that decision wrong—Rights of annui-*
*tants—Res judicata—Finance Act,* 1941 (4 & 5 *Geo.* 6, *c.* 30), *s.* 25
*—Finance (No.* 2) *Act,* 1945 (9 & 10 *Geo.* 6, *c.* 13), *s.* 20.

By his will dated February 11, 1939 the testator bequeathed
annuities to L. B. and H. B. payable free of income tax. By a
codicil the testator authorized his trustees to set up an annuity
fund sufficient to pay the annuities. The testator died in 1940.
The trustees took out a summons asking whether in setting aside
a fund to answer the tax-free annuities they ought to provide for
these annuities at their face value or whether the provisions of
s. 25 of the Finance Act, 1941 were applicable. Farwell J. held
in *In re Waring* [1942] Ch. 309, that s. 25 did not apply. His
decision was reversed by the Court of Appeal who held ([1942]
Ch. 426) that s. 25 did apply and that the trustees ought to
appropriate a fund the income of which at the date of appropriation
would be sufficient to pay twenty twenty-ninths of the gross
amount of the tax-free annuities. Only one of the two tax-free
annuitants H. B. was a party of that application. The Court of
Appeal refused to make a representation order so that the proceed-
ings should bind L. B. who was abroad. After the decision of the
House of Lords in *Berkeley* v. *Berkeley* [1946] A. C. 555 it became
clear that the decision of the Court of Appeal in *In re Waring*
(supra) was wrong and the trustees now asked whether having
regard to the provisions of s. 20 of the Finance (No. 2) Act, 1945
and to the decision in *Berkeley* v. *Berkeley* (supra) the two tax-
free annuities ought to be paid in full.

*Held* that in the case of the annuitant who was a party to the
previous proceedings the principle of res judicata applied and he
was bound by the decision of the Court of Appeal that s. 25 of the
Finance Act, 1941 applied to reduce his tax-free annuity to the
appropriate fraction of the full amount. The matter could not be
dealt with de novo by reason of the amendment of s. 25 by s. 20 of
the Finance (No. 2) Act, 1945. The second annuitant however, who
had not been a party to the previous decision, was not bound by
the order of the Court of Appeal and was entitled to claim retro-
spectively the full amount of her annuity.

ADJOURNED SUMMONS.

The following statement of facts is taken substantially from
his Lordship's judgment : The testator John Arkle Waring,
made a will dated February 11, 1939, a first codicil dated
March 8, 1939, and a second codicil dated January 27, 1940, and
died on August 3, 1940. His will and his first codicil were both

222                          CHANCERY DIVISION.                **[1948]**

JENKINS
J.

1948

WARING,
*In re.*

WEST-
MINSTER
BANK
*v.*
BURTON-
BUTLER.

dated before the beginning of the late war : on the other hand,
he died after the outbreak of the late war, that is to say, after
September 3, 1939.   The testator by his will gave a large
number of annuities, of which fifteen were given without any
direction as to freedom from income tax, while two were given
by cl. 7 in the following terms : " I bequeath the following
" annuities free of income tax and free of legacy and all other
" (if any), duties payable upon or by reason of my death :
" (1.) to Mrs. Louie Burton-Butler of Ostend 100*l*. per annum.
" (2.) To Howard Bertram Burton-Butler of the United States
" of America 100*l*. per annum.   And I direct that the said
" annuities shall be paid free of all deductions whatsoever by
" equal quarterly payments the first whereof shall be made
" three months after my death."   The testator directed that
the ultimate residue of his estate should be divided into shares,
one of which was given absolutely to the defendant Sir George
Henry Gater.

By cl. 3 of his first codicil the testator empowered his trustees
to set up an annuity fund in these terms : " I empower my
" trustees to set apart as soon as conveniently may be and
" invest in their names in any of the investments in which my
" residuary estate is authorized to be invested with power to
" vary investments a sum the income whereof when invested
" shall be sufficient at the time of investment to pay the annui-
" ties bequeathed by my said will and by this my codicil or
" any other codicil thereto and to pay the same accordingly
" with power to resort to the capital of the appropriated fund
" whenever the income shall be insufficient and until such sum
" shall be so appropriated I charge my residuary personal estate
" with the said annuities but after appropriation my residuary
" estate shall thereby be discharged from the said annuities."

The question with which the trustees of the will were con-
fronted was whether s. 25 of the Finance Act, 1941 (1) applied

(1) The Finance Act, 1941 :
section 25 (1.) " Subject to the
" provisions of this section, any
" provision, however worded, for
" the payment, whether period-
" ically or otherwise, of a
" stated amount free of income
" tax, or free of income tax other
" than sur-tax, being a provision
" which—(*a*) is contained in any
" deed or other instrument, in
" any will or codicil . . . . and

" (*b*) was made before the third day
." of September, 1939 ; and (*c*) has
" not been varied on or after that
" date, shall, as respects pay-
" ments falling to be made during
" any year of assessment, the
" standard rate of income tax for
" which is ten shillings in the
" pound, have effect as if for the
" stated amount there were sub-
" stituted an amount equal to
" twenty twenty-ninths thereof."

**1 Ch.**          CHANCERY DIVISION.                    223

to the tax-free annuities and whether they ought, in setting
up the annuity fund, to provide for those annuities at their face
value or only at twenty twenty-ninths of that amount.
A summons was issued to resolve this and other questions and
the form in which this matter was raised by that summons was
this : " Whether in appropriating a fund sufficient by its
" income to satisfy such annuities "—those were the annuities
given free of tax—" . . . . (ii.) Having regard to s. 25 of the
Finance Act, 1941 such income " (that is to say, the income of
the appropriated fund) " should be sufficient to pay twenty
" twenty-ninths of the gross amount of the annuity ; income
" tax being taken into account at 10s. in the pound or at some
" other and if so what rate."

JENKINS
J.

1948
———
WARING,
*In re.*
WEST-
MINSTER
BANK
*v.*
BURTON-
BUTLER.
———

   Only one of the two tax-free annuitants, namely the
defendant, Howard Bertram Burton-Butler, was a party to that
application to the court. It was asked in those proceedings that
a representation order should be made so as to bind the second
tax-free annuitant Mrs. Louie Burton-Butler but such order
was refused. Mrs. Louie Burton-Butler was then abroad in
an enemy occupied country and could not be made a party.

   The matter came before Farwell J. in *In re Waring* (1) and
he decided, for the purposes of s. 25 of the Finance Act, 1941,
that a provision contained in a will for the payment of an
annuity was only made when it came into operation. On
April 15, 1942, he delivered judgment and said : " The question
" for my determination is whether or not s. 25 of the Finance
" Act, 1941, applies to a will made before September 3, 1939,
" by a testator who died after that date. It is not until the
" death of a testator that provisions contained in the will take
" effect, and, therefore, in my judgment, the provision with
" which I am concerned here was not ' made ' until after
" September 3, 1939. Until the death of the testator the will
" was a document bearing date before September 3, 1939,
" but it had no effect. Section 25 of the Finance Act, 1941,
" therefore does not apply."

   That decision was appealed from by Sir George Henry Gater
as representing the residuary legatees. On July 16, 1942,
the Court of Appeal (2) reversed the decision of Farwell J.
on this point, taking the view that a provision in a will for this
purpose was made, in effect, as soon as it was executed : so
that the position was that if a testator made a will before
September 3, 1939, leaving a tax-free annuity, and died after

(1) [1942] Ch. 309.          (2) [1942] Ch. 426.

                    *T* 2                              1

224                    CHANCERY DIVISION.          **[1948]**

<div style="float:left">

JENKINS
J.

1948

WARING,
*In re.*

WEST-
MINSTER
BANK
*v.*
BURTON-
BUTLER.

</div>

that date s. 25 of the Finance Act, 1941, would be applicable
provided that in the meantime the provision had not been
varied within the meaning of the section.   The order made by
the Court of Appeal was in these terms : " Upon motion by way
" of appeal this day made unto this court by counsel for the
" defendant Sir George Henry Gater from so much of the order
" dated April 15, 1942, as declared that s. 25 of the Finance
" Act, 1941, had no application to the annuities bequeathed
" free of tax by the will of the above named testator John Arkle
" Waring and accordingly that in appropriating a fund for
" the provisions of cl. 3 of the first codicil to the said will for
" the purpose of answering such annuities the plaintiffs ought
" to approriate a fund the income of which at the date of
" appropriation was sufficient to pay the whole gross amount of
" such annuities income tax being taken into account at the
" standard rate in force at the date of such appropriation . . . .
" This court doth order that the said order dated April 15,
" 1942, be varied so far as it declares as aforesaid. And in lieu
" thereof this court doth declare that s. 25 of the Finance Act,
" 1941, applies to the said annuities and accordingly that in
" appropriating a fund under the provisions of cl. 3 of the first
" codicil to the said will for the purpose of answering such
" annuities the plaintiffs ought to appropriate a fund the income
" of which at the date of appropriation is sufficient to pay
" twenty twenty-ninths of the gross amount of such annuities
" income tax being taken into account at Ten Shillings in the
" Pound " ;   and it was ordered that with that variation
Farwell J.'s order should be affirmed.   Leave to appeal to the
House of Lords was refused.

The question with regard to the annuities having been thus
determined by the Court of Appeal, the trustees appropriated
a fund to answer the annuities pursuant to cl. 3 of the first
codicil treating the two tax-free annuities as being each of
twenty twenty-ninths of their gross amount.   The pro-
visions of s. 25 of the Finance Act, 1941, were limited so as to
apply only so long as tax was at 10s. in the pound.   The
Finance (No. 2) Act, 1945, reduced the tax to 9s. in the pound ;
so that it no provisions had been made for the continuance of
s. 25 of the Act of 1941 it would have ceased to have effect.
But uno flatu with the reduction in the rate of tax the Finance
(No. 2) Act, 1945 enacted by s. 20, sub-s. 1, that : s. 25 of the
Finance Act, 1941, should have effect in all years of assessment
for which the standard rate of income tax was over five

**1 Ch.**            CHANCERY DIVISION.                    225

shillings and sixpence in the pound in the manner therein set out.

The matter standing thus, another case concerning tax-free annuities, namely *In re Berkeley* (1), went to the Court of Appeal and thence to the House of Lords where it is reported under the title of *Berkeley* v. *Berkeley* (2). In that case the Court of Appeal on the point now in question followed their own decision in the matter of the present testator's estate. In the House of Lords the decision of the Court of Appeal in *In re Berkeley* (2) was reversed and the decision of the Court of Appeal in the present case was overruled.

This summons was taken out by the trustees of the testator's will asking whether having regard : (*a*) to the order dated July 16, 1942 of the Court of Appeal in *In re Waring* (3), (*b*) to the provisions of s. 20 of the Finance (No. 2) Act, 1945 (4), (*c*) to the decision of the House of Lords in *Berkeley* v. *Berkeley* (2) the tax free annuities ought to be paid in full or subject to the deduction provided by the section. The defendants to the summons were the two tax-free annuitants, Rose Emily Postlethwaite who was given an annuity subject to tax and Sir George Henry Gater who took a share of residue.

JENKINS J.

1948

WARING, *In re.* WEST- MINSTER BANK *v.* BURTON- BUTLER.

---

(1) [1945] Ch. 107.
(2) [1946] A. C. 555.
(3) [1942] Ch. 426.
(4) The Finance (No. 2) Act, 1945 : Section 20 " (1.) The " amendments of s. 25 of the " Finance Act, 1941, specified " in this section shall have effect " for the purpose of rendering the " said s. 25 (which provides for a " reduction of tax-free annuities, " etc., in years of assessment " where the standard rate of in- " come tax is ten shillings in the " pound) applicable with modi- " fications to all years of assess- " ment for which the standard rate " of income tax is over five " shillings and sixpence in the " pound. (2.) In sub-s. (1.) of " the said s. 25, for the words " ' is ten shillings ' there shall be " substituted the words ' exceeds

" ' five-shillings and six pence '. " (3.) For the words ' twenty " ' twenty-ninths wherever they " occur in the said s. 25 there shall " be substituted the words ' the " appropriate fraction ' ; and at " the end of the said s. 25 there " shall be inserted the following " sub-section—' (6.) In this section " ' the expression " the appro- " ' " priate fraction " means, in " ' relation to any year of assess- " ' ment, the fraction the denomi- " ' nator of which is twenty-nine " ' and the numerator of which is " ' twenty-nine decreased by one " ' for every complete sixpence in " ' the pound by which the " ' standard rate of income tax " ' for the year exceeds five " ' shillings and sixpence in the " ' pound '."

226                          CHANCERY DIVISION.            **[1948]**

<div style="float:left">

JENKINS
J.

1948

WARING,
*In re.*

WEST-
MINSTER
BANK
*v.*
BURTON-
BUTLER.

</div>

*J. A. Wolfe* for the plaintiff.

*Cozens-Hardy Horne* for Mr. and Mrs. Burton-Butler the tax-free annuitants. This matter turns on the operation of s. 25 of the Finance Act, 1941 and of s. 20 of the Finance (No. 2) Act, 1945. When tax ceased to be 10s. in the pound s. 25 of the 1941 Act ceased to operate. The question is not res judicata. That rule only applies where the same parties re-open the same matter which could have been brought forward at the time : *Henderson* v. *Henderson* (1). Here the fact that s. 25 has been extended entitles the parties to apply again to the court. A different section has now to be construed. It would not be right to hold that Mr. Burton-Butler was bound by the previous order of the Court of Appeal and Mrs. Burton-Butler was not bound. This would be to create a third category of annuitants. The testator intended the tax-free annuitants to be in the same position. The doctrine of estoppel cannot be made to extend to issues in a second action which cannot be asserted beyond all possible doubt to be identical with those raised in a previous action : *New Brunswick Ry. Company* v. *British and French Trust Corporation, Ld.* (2) per Lord Maugham L.C.

*Milner Holland* for an annuitant who took subject to tax. Section 20 of the Finance (No. 2) Act, 1945 merely altered the figures in s. 25 of the 1941 Act. A new section was not substituted for s. 25. It is essential that there should be finality in judicial proceedings. The fact that one of the tax-free annuitants was not before the Court of Appeal is no reason for treating that order as not binding.

*J. V. Nesbitt* for Sir George Henry Gater, one of the residuary legatees. With regard to Mrs. Burton-Butler she was not a party to the proceedings before the Court of Appeal and she cannot be debarred from claiming. Mr. Burton-Butler who was a party to these proceedings is however bound by them. The principle of res judicata applies.

JENKINS J., after stating the facts set out above, continued : The result clearly is that if the question had to be decided de novo either here or in the the Court of Appeal both courts would be constrained, in view of the decision of the House of Lords in *Berkeley* v. *Berkeley* (3) to hold that this provision for the payment of two tax-free annuities was made on August 3, 1940, when the testator died and not before, with the result that

(1) (1843) 3 Hare 100, 115.          (3) [1946] A. C. 555.
(2) [1939] A. C. 1, 19.

**1 Ch.**                CHANCERY DIVISION.                    227

s. 25 of the Finance Act, 1941 does not apply and both annuities
must be paid and provided for at their full amount.   There is no
doubt but that that is the law as it stands to-day.   But the
question before me is not merely how the matter ought to be
dealt with if it could be dealt with de novo but the extent to
which it can be dealt with de novo having regard to the judgment
of the Court of Appeal applicable to this very estate.  Two people
are concerned, the two tax-free annuitants, of whom only one
was before the court on the previous occasion, namely,
Mr. Burton-Butler.   Notwithstanding the attractive argument
to the contrary presented to me by Mr. Cozens-Hardy Horne, it
seems to me really clear beyond argument that on the well-
recognized principle of res judicata he is bound by the previous
decision.   The decision was a decision in terms that s. 25 of the
Finance Act, 1941, applied to the two tax-free annuities—
that is, a decision that those annuities must be provided for
as annuities of twenty twenty-ninths of the full amount
thereof so long as tax continued at 10s. in the pound.   It has
been overruled, or in other words has been held by a higher
tribunal to be wrong in law and not to be followed in other cases,
but it is nevertheless a subsisting order which is binding on the
parties to the proceedings in which it was made.

I was invited to say that the matter could be dealt with de
novo as a question arising under s. 25 of the Finance Act,
1941, as amended by s. 20 of the Finance (No. 2) Act, 1945.
Notwithstanding the sympathy I cannot help feeling for
Mr. Burton-Butler I am unable to see my way to holding that
that amendment (which, after all, is an amendment providing
for the continued existence of s. 25) has the result of destroying
the effect of the Court of Appeal's decision as a decision
regarding the quantum of his annuity.   I think that decision
as to the applicability of s. 25 is a decision as to the applica-
bility of that section not only in its original form but also in
its amended form.   I am, accordingly, constrained to hold that
so far as Mr. Burton-Butler is concerned the quantum of his
annuity must be treated as irretrievably fixed by the decision
of the Court of Appeal.

The second defendant, Mrs. Burton-Butler, is in a different
position.   She was not a party to the previous proceedings and
no representation order was made so as to bind her.   In my
judgment, therefore, the order made by the Court of Appeal
on July 16, 1942, cannot affect her rights in any way, and she is
entitled to claim retrospectively the full amount of her annuity

JENKINS
J.

1948
———
WARING,
*In re.*
WEST-
MINSTER
BANK
*v.*
BURTON-
BUTLER.
———

JENKINS
J.

1948

WARING,
*In re.*

WEST-
MINSTER
BANK
*v.*
BURTON-
BUTLER.

calculated in accordance with the law as it is now known to be
having regard to the decision of the House of Lords in the
*Berkeley* case (1).

For these reasons (anomalous as the result may appear to be)
I think it necessarily follows that question 1 must be answered
in the sense that the tax-free annuity bequeathed by cl. 7
of the testator's will to Mr. Burton-Butler ought to be paid
subject to such reduction as is provided for by the section and
the tax-free annuity payable to Mrs. Burton-Butler ought to
be paid in full.

*Declaration accordingly.*

Solicitors : *Ouvry & Co. ; Lee & Pembertons.*

(1) [1946] A. C. 555.

B. A. B.

---

JENKINS
J.

1948

*Jan.* 12.

## *In re* STRATHBLAINE ESTATES, LIMITED.

*Company — Winding-up — Legal estate in freeholds held by company
as trustee at date of dissolution—Application by beneficiaries for
vesting order—Form of order—Trustee Act, 1925 (15 Geo. 5, c. 19),
s. 44, sub-s. 2—Law of Property Act, 1925 (15 Geo. 5, c. 20), ss. 53,
181—Companies Act, 1929 (19 & 20 Geo. 5, c. 23), s. 296—R. S. C.
Or., 53B, r. 5.*

A company, which had agreed with its shareholders to dis-
tribute among them in specie certain properties which it owned,
was dissolved without having executed the necessary conveyances.
On an application by the shareholders for a vesting order :—

*Held,* that as the company had been a trustee of the properties
for the shareholders, a vesting order should be made under the
provisions of s. 44, sub-s. 2, of the Trustee Act, 1925, and that a
proceeding under s. 181 of the Law of Property Act, 1925, was
inapplicable.

*In re Wells* [1933] Ch. 29 applied.

*Hastings Corporation* v. *Letton* [1908] 1 K. B. 378 not followed.

ADJOURNED SUMMONS.

The company was incorporated in 1936, its business being
the acquisition and management of freehold properties. The
three applicants each held one-third of the issued share capital.
By 1938 a substantial number of its properties had been sold,
and the applicants decided that the company should be
wound up, and that the remaining properties should be divided

[Reported by F. R. DYMOND, Esq., Barrister-at-Law.]

# TAB 74

**\*153  Resolution Chemicals Ltd v. H. Lundbeck A/S**

Image 1 within document in PDF format.

Court of Appeal

29 July 2013

**[2013] EWCA Civ 924**

**[2014] R.P.C. 5**

Longmore , Moore-Bick and Floyd L.JJ.

11 and 29 July 2013

### Analysis

H1    Patent—European    patent—Revocation—Escitalopram—Patent held valid in earlier proceedings—Issue estoppel—Abuse of process—Whether privity of interest between claimant and a party to the earlier proceedings—Whether claimant had any sufficient interest in the earlier proceedings—Appeal to Court of Appeal

H2  Patents Act 1977, ss.65, 72

The appellant on this appeal ("Lundbeck") was the proprietor of European Patent (UK) No. 0347066 ("the Patent") and a supplementary protection certificate ("the SPC") relating to escitalopram, a single enantiomer of citalopram, a drug used in the treatment of depression. The UK counterpart of the Patent had been the subject of earlier patent proceedings in which it had ultimately been held valid ("the 2005 Proceedings"). [1] The respondent ("Resolution") had been a sister company of one of the defendants to the 2005 Proceedings, Arrow Generics Ltd ("Arrow"), between 2001 and 2009. However, from 2009 it had been an independent company and it was majority owned by a US investment bank.

H3  Resolution had commenced proceedings attacking the validity of the SPC on the basis of alleged invalidity of the Patent. Lundbeck then issued an application, inter alia, challenging its entitlement to do so on grounds of cause of action estoppel, issue estoppel

or abuse of process on the basis that there was a privity of interest between Resolution and parties to 2005 Proceedings (including Arrow) such that it should be bound by the outcome of the 2005 Proceedings. Directions had been made providing for this issue to be determined as a preliminary issue.

H4  At the trial of the preliminary issue, Arnold J. held, [2] inter alia, that Resolution had had no interest in escitalopram at the date of the previous proceedings and was not precluded from challenging the validity of either the Patent or the SPC on grounds of privity of interest with any such party. Lundbeck appealed that part of his decision.

H5    The grounds upon which Arnold J.'s decision was challenged were, in essence, (i) that he had made "errors of principle" in his application of the law to the facts; (ii) any contrary decision would have the effect that the principle of estoppel in the context of a corporate structure became inoperable (as demonstrated by asking what the position would have been had Resolution still been part of the same group as Arrow); and (iii) the judge had not had proper regard to the facts (a) that the Arrow **\*154** Group organised itself so that patent litigation was handled by the chief executive officer and ultimate owner of the group, T, (b) that Resolution, through T, had had knowledge of the earlier proceedings, but had elected to stand back and allow them to be run on its behalf, (c) that Resolution and Arrow served and therefore shared the same interests, being those of T and the Arrow Group as a whole, (d) that Resolution had a direct legal interest in the outcome of the previous litigation, and (e) that various factual findings made by Arnold J. had not supported his conclusion that Resolution's interest in escitalopram was at an end in 2006. The errors of principle which Lundbeck alleged Arnold J. had made were (i) failing to give sufficient weight to the principle that no one should be vexed twice in the same cause (which was said to apply even more strongly where two related claimants sought to bring successive proceedings against the same defendant) and (ii) failing to give sufficient weight to how onerous the further litigation would be and how vexed the defendant had already been.

H6  **Held** , dismissing the appeal,

H7  (1) The rules of law compendiously described as estoppels applied to actions for the revocation of patents as they did to any other type of action. ([23])

H8  (2) A court which had the task of assessing whether there was privity of interest between a new party and a party to previous proceedings needed to examine (a) the extent to which the new party had an interest in the subject matter of the previous action; (b) the extent to which the new party could be said to be, in reality, the party to the original proceedings by reason of its relationship with that party, and (c) against this background to ask whether it was just that the new party should be bound by the outcome of the previous litigation. ([32])

Gleeson v J. Wippell & Co Ltd [1977] 1 WLR 510, [1977] F.S.R. 301, Ch.D. ; House of Spring Gardens Ltd v Waite [1991] QB 241, [1990] 2 WLR 347, CA ; Wytcherley v Andrews (1869–72) LR 2 P&D 327, Ct of Probate ; Nana Ofori Atta II v Nanu Aba Bonsra II [1958] AC 58, [1957] 3 WLR 830, PC ; Carl Zeiss Stiftung v Rayner & Keeler Ltd [1967] 1 AC 853, [1967] R.P.C. 497, HL and Kirin-Amgen Inc v Boehringer Mannheim GmbH [1997] F.S.R. 289, CA considered . Johnson v Gore-Wood & Co [2002] 2 AC 1, [2001] 2 WLR 72, HL referred to.

H9  (3) Approaching the present case in the way it had been argued at first instance, i.e. solely on the basis of the requirements of privity as explained in Gleeson v J. Wippell , it made no difference whether Arrow were barred by issue estoppel or by abuse of process estoppel. However, if Arrow were only estopped on the basis of abuse of process, a broad merits-based approach would have been appropriate. ([35])

Gleeson v J. Wippell & Co Ltd [1977] 1 WLR 510, [1977] F.S.R. 301, Ch.D. ; Johnson v Gore-Wood & Co [2002] 2 AC 1, [2001] 2 WLR 72, HL and Aldi Stores Ltd v WSP Group Plc [2007] EWCA Civ 1260, [2008] 1 WLR 748, CA referred to.

H10  (4) Lundbeck had not established that the judge had made any error of law or principle. The principles which the judge had applied were firmly based on the principle that nobody should be vexed twice in the same cause. Equally important was the principle that an independent party should be free to bring a separate claim for revocation of the Patent. Further, if the judge was right that Resolution had no interest in the 2005 Proceedings and was not bound by privity of interest, then it was entitled to bring the proceedings, even if they were burdensome and even if Lundbeck had previously had to defend proceedings at the suit of Arrow. This  *155  might conceivably be relevant on a "broad, merits-based approach", but that was not the basis on which the judge had been invited to decide the case. If that approach was to be taken, other considerations, such as the fact that Resolution was now a wholly independent company, would come into play. ([38], [39], [41])

Seven Arts Entertainment Ltd v Content Media Corp Plc [2013] EWHC 588 (Ch), Ch.D. referred to.

H11  (5) Save in a very limited respect, there had been no criticism of the judge's factual findings. Accordingly success on this appeal had to be on the basis that the facts found by the judge admitted of only one possible answer, i.e. that Resolution was bound by the judgment in 2005 Proceedings. ([41])

H12  (6) Where a party to previous litigation employed a new party to re-litigate the case on its behalf, it would normally be prevented from doing so. However that was not the case here. It was not alleged that there is any subsisting relationship between Arrow and Resolution and it was not contended that Arrow and Resolution were together seeking to undermine the integrity of the estoppel created by the previous decision. ([42])

H13  (7) It made sense for Arrow to have applied to revoke the Patent as it was the company with an interest in having it revoked. If other companies subsequently acquired an interest in seeing the Patent revoked, there was no reason to treat the earlier litigation as having been conducted on their behalf, when it was commenced at a time when they were not affected by the Patent. Further, the notion that Resolution stood back and allowed Arrow to fight its battle simply failed on the facts. Resolution had no battle to fight in February 2006. Moreover, although Resolution was to be taken to have known, through T, that the litigation was going on, it had no reason to suppose that it had any further relevance to its business. ([44])

Resolution Chemicals Ltd v H Lundbeck A/S, [2014] R.P.C. 5, (2013)

Special Effects Ltd v L'Oréal SA [2007] EWCA Civ 1,
[2007] R.P.C. 15, CA distinguished .

H14  (8) The argument that there was a contingent
possibility that Resolution might be called upon to
enter into a development program with Neuland similar
to that which it had unsuccessfully undertaken with
Neuland in relation to citalopram was too speculative to
amount to a sufficient concrete interest in the outcome
of the 2005 Proceedings. Any interest Resolution may
have had in escitalopram ended in 2004. Thereafter its
interest was no different from any other company with
a general interest in generic products and that could not
be sufficient to make it just to hold it bound by the 2005
Proceedings. ([48], [49])

H15  (9) Accordingly the judge had been entitled
to come to the conclusions he had. The extent
of the identity between Arrow and Resolution was
that they were part of a group of companies under
the common control of T. There was no subsisting
relationship between them in 2006 pursuant to which
the 2005 Proceedings were being conducted by Arrow
for Resolution's benefit. Resolution had no concrete
interest in the 2005 Proceedings and it would be quite
unjust to hold Resolution bound by the outcome. ([50])

H16  (10) No different conclusion would have been
reached applying a broad merits-based approach. If
anything, the case for Resolution was stronger as it
would have been proper to take into account the fact
that Resolution was now independent of the Arrow
Group and operating under a different business model.
([52])

Johnson v Gore-Wood & Co [2002] 2 AC 1, [2001] 2
WLR 72, HL referred to.

H17  Observed by Floyd L.J.: "Whilst the final
revocation of a patent is a judgment *in rem* and therefore
can be relied on by the world at large, a judgment that
a patent is valid **\*156**  determines issues only between
the parties to the revocation action. Third parties could
launch second and subsequent attacks on the patent.
It is not necessary for any such party attacking a
patent to show any particular interest: … The patentee
does, however, receive some protection from successive,
unsuccessful attacks in terms of the costs order the court
could make, but that is all: … " ([23])

**H18 Cases referred to in the judgment:**

•Aldi Stores Ltd v WSP Group Plc [2007] EWCA Civ
1260, [2008] 1 WLR 748, CA
•Carl Zeiss Stiftung v Rayner & Keeler Ltd [1967] 1
AC 853, [1967] R.P.C. 497, HL
•Gleeson v J. Wippell & Co Ltd [1977] 1 WLR 510,
[1977] F.S.R. 301, Ch.D.
•Henderson v Henderson [1843–60] All ER Rep. 378,
(1843) 3 Hare 100, Ch.D.
•House of Spring Gardens Ltd v Waite [1991] QB 241,
[1990] 2 WLR 347, CA
•Johnson v Gore-Wood & Co [2002] 2 AC 1, [2001]
2 WLR 72, HL
•Kirin-Amgen Inc v Boehringer Mannheim GmbH
[1997] F.S.R. 289, CA
•Nana Ofori Atta II v Nanu Aba Bonsra II [1958] AC
58, [1957] 3 WLR 830, PC
•Seven Arts Entertainment Ltd v Content Media
Corp Plc [2013] EWHC 588 (Ch), Ch.D.
•Special Effects Ltd v L'Oréal SA [2007] EWCA Civ
1, [2007] R.P.C. 15, CA
•Wytcherley v Andrews (1869–72) LR 2 P&D 327, Ct
of Probate
•Yat Tung Investment Co Ltd v Dao Heng Bank Ltd
[1975] AC 581, [1975] 2 WLR 690, PC

**H19  Representation**

• Andrew Waugh Q.C. and Miles Copeland ,
instructed by Wragge & Co. LLP , appeared for the
appellant.
• Michael Tappin Q.C. and Mark Chacksfield ,
instructed by Olswang LLP , appeared for the
respondent.

**Judgment**
Floyd L.J.:

1  European Patent (UK) No. 0 347 066 ("the Patent")
and its foreign counterparts have been extensively
litigated all over the world, including in this country.
The Patent is now the subject of a supplementary
protection certificate (SPC/GB02/049) ("the SPC").

The Patent and SPC relate to escitalopram, a single enantiomer of the compound citalopram, a drug used for the treatment of depression. The proprietor of the Patent is H. Lundbeck A/S ("Lundbeck"), a Danish pharmaceutical company. The UK counterpart of the Patent was ultimately held valid in revocation proceedings in the UK commenced in December 2005 by Generics (UK) Limited and later joined by a number of other generic pharmaceutical companies including, in February 2006, Arrow Generics Limited ("Arrow") ("the 2005 proceedings"). Before and at the time of the final judgment in the 2005 proceedings the claimant in the present revocation action ("Resolution") was part of the same group of companies as Arrow. Resolution is now an independent company and, in this action, has launched its own attack on the SPC relying on invalidity of the Patent, claiming that it has better evidence than Arrow had, and new prior art. Lundbeck contends that Resolution is precluded from bringing the action because it is in privity of interest with Arrow, which is in turn estopped from bringing a similar action as a result of the judgment in the 2005 proceedings. Whether Resolution was precluded in this way was the subject of a preliminary issue **\*157** tried by Arnold J. in this action. By his order of 12 April 2013, Arnold J. held that Resolution was not precluded from challenging the validity of the Patent or the SPC. Lundbeck appeals with the judge's permission. Mr Waugh Q.C. and Mr Copeland presented Lundbeck's case. Mr Tappin Q.C. and Mr Chacksfield did so for Resolution.

2   In addition to its contention that Resolution was precluded from bringing its claim by privity of interest with Arrow, Lundbeck originally sought summary judgment on the ground that Resolution's claim had no prospect of success. That application was ordered to be determined at the same time as the preliminary issue. Arnold J. dismissed that application and there is no appeal from his judgment and order in that respect. A claim that Resolution was precluded from bringing the claim by reason of privity of interest with companies in the Teva group who were also parties to the previous revocation action is also not pursued on appeal.

3   The judge recorded that it was common ground that "Arrow Generics would be precluded by issue estoppel and the doctrine of abuse of process from challenging the validity of the SPC on the ground that the Patent is invalid." There was some debate before us about

the precise terms of the concession, in particular as to whether Arrow would be precluded on both grounds or just one or the other without specifying which. The debate as to which type of estoppel bound Arrow might be of significance, as I explain further below.

### Factual background

4   The judge made detailed findings of fact, having received written evidence and heard live witnesses. What follows is a summary of his principal findings which remain relevant in the light of the more limited issues before us.

### Resolution, and its involvement with citalopram and escitalopram

5   Resolution was established in 1986 as a manufacturer of active pharmaceutical ingredients ("APIs"). At that time it was part of the Amerpharm Group. It came under a succession of different owners, but in 2001 it was sold to Arrow Group ApS, a holding company for a new group of companies founded by Anthony Tabatznik ("Mr Tabatznik"). Between 2001 and 2009 the Arrow Group grew rapidly. Arrow was another English company in the Arrow Group throughout this period. Resolution and Arrow were therefore sister companies within the Arrow Group.

6   The business model for most companies in the group other than Resolution was to buy in marketing authorisations ("MAs") for products. For such products, the MA would stipulate the manufacturer of the API and details of the manufacturing method. It would not have been possible for Resolution to take over the manufacture of such APIs. Resolution continued to sell four APIs to Merck Generics (one of its previous owners) and sold two APIs to companies in the Arrow Group, but those intra-Group sales amounted to only about 4% of its sales during the period it was part of the Arrow Group. Conversely, while Resolution was part of the Arrow Group, companies in that group launched over 400 products, but only two contained APIs sourced from Resolution.

7   In 2009 the Arrow Group was purchased by Watson Pharmaceuticals Inc, which hived off Resolution in order to meet requirements imposed by the United

States Federal Trade Commission. Since December 2009 Resolution has been an **\*158** independent company, majority owned by a US investment bank. Under its new ownership, Resolution has adopted a new business model which is more akin to that of a generic pharmaceutical supplier than that of an API manufacturer.

8   Throughout the period 2001 to 2009 the ultimate beneficial owner of the Arrow Group, and hence of both Resolution and Arrow, was Mr Tabatznik. Mr Tabatznik was the Chief Executive Officer of the Arrow Group and one of the directors of Resolution. There was some dispute at the trial over the extent of Mr Tabatznik's control over the day to day affairs of Resolution. The dispute arose in the light of an apparent conflict between the evidence given by Mr Greenwood for Resolution and some statements made to the European Commission in connection with an inquiry by the Commission into agreements between Lundbeck, Arrow and Resolution. The judge concluded at [21]:

> "I think the position is reasonably clear. Mr Tabatznik controlled the Arrow Group, including Resolution. Accordingly he had control of Resolution's activities in the sense that, if he wanted Resolution to do something, Resolution would do it (or try to do so). That included manufacturing citalopram or escitalopram (as to which, see below). As Mr Greenwood put it, "it was his chemistry set". Thus Mr Tabatznik set the strategic direction for Resolution. He would also intervene if he was not satisfied with Resolution's progress (as he did in July 2004, as discussed below). Nevertheless, most of the time, Mr Tabatznik left Mr Greenwood and his colleagues alone. It was Mr Greenwood and his colleagues who decided how to pursue Resolution's projects, who to employ, what commercial partners to work with, budgets and so on. Mr Greenwood

met Mr Tabatznik just three or four times a year to discuss how Resolution's projects were progressing, particularly the THC project which Mr Tabatznik was most interested in. There were also occasional telephone calls, usually from Mr Greenwood to Mr Tabatznik rather than the other way around. Thus on a day-to-day basis Resolution was essentially independently managed."

9   Mr Waugh complained that the judge was prepared to accept that Mr Greenwood's evidence could be reconciled with the statements to the Commission. Nevertheless he did not quarrel with the findings which the judge actually made in the passage I have quoted above. In those circumstances the question of whether the judge should have been so generous to Mr Greenwood is academic, and it is not necessary to say any more about it.

10   The judge did hold that Mr Tabatznik took charge of major patent matters affecting companies within the Arrow Group with the assistance of Dr Andrew Lowrie, who was the Group's Head of European Patent Litigation.

11   Between 1998 and 2004 Resolution worked on the development of citalopram, the racemic (mixed enantiomer) compound of which escitalopram is a single enantiomer component. Resolution developed a process which it believed would not infringe Lundbeck's patents. For part of that time it worked on the practical development of this process in co-operation with a company called Neuland, an API manufacturer in India. Although Neuland made 10 large laboratory scale batches, it was not able to get the process to work. The batches were destroyed and the patent applications and patents allowed to lapse, ultimately, by 2005.

12   In January 2002 there was a meeting between Mr Tabatznik, on behalf of the Arrow Group, and representatives of Lundbeck to discuss the Arrow Group's interest in citalopram. Following the meeting

Lundbeck wrote to "Arrow Resolution" seeking **\*159** undertakings not to infringe the patents. Mr Tabatznik replied on Resolution notepaper suggesting a meeting. On 24 January 2002 Lundbeck on the one hand and Arrow and Resolution on the other entered into a settlement agreement. The agreement was signed by Mr Tabatznik on behalf of both Arrow and Resolution. Some litigation for infringement of a patent relating to citalopram ensued but did not proceed beyond February 2002. The judge said it was unclear why Mr Tabatznik involved Resolution in this litigation, since it was unable to manufacture citalopram at the time. Arrow did launch a citalopram product some time in 2004. The API was not supplied by Resolution.

13   None of the above had anything to do with escitalopram. This history was relied on by Lundbeck to show what might happen if Arrow became involved in escitalopram.

14 In early November 2001 escitalopram was amongst a list of drugs which Resolution identified as representing generic opportunities. During one of the meetings in January 2002 to discuss the citalopram litigation, Mr Tabatznik asked representatives of Lundbeck whether Lundbeck would give a licence under the escitalopram patents. The judge concluded that it was possible that Mr Tabatznik was considering asking Resolution to make escitalopram at that time.

15   In early September 2002 Mr Tabatznik asked Resolution to review routes for the synthesis of escitalopram. In September 2002 Dr McHattie recorded in a memo that he had found and reviewed the Patent and noted a couple of ideas for synthesis. In October 2002 Mr Greenwood told Mr Tabatznik that, if Mr Tabatznik still wanted him to look at escitalopram, he could make some after the receipt of the 50 kg of citalopram which was then being manufactured for it by Neuland. No more was done for over 10 months.

16   In September 2003 Dr McHattie asked Dr Lowrie to look for patents and patent applications for escitalopram. Dr Lowrie replied attaching copies of four patents and applications, including the Patent. This led to requests for copies of more patents, which Dr Lowrie sent in October and November 2003. In about October 2003 Dr McHattie and his colleagues produced a document entitled "Routes for the Preparation or Resolution of Escitalopram". This set out a number of routes covered by Lundbeck patents and applications and some possible routes not covered by existing patents. The purpose of this was to enable Resolution or a subcontractor to manufacture escitalopram. Nothing further was done to that end. No laboratory work was done. There was no prospect of Resolution being able to make escitalopram on a commercial scale, or at acceptable purity and cost when it had been unable to achieve that with citalopram. The cost of this work was £1,155.20 in internal costs in 2003.

17   In July 2004 Mr Greenwood sent Mr Tabatznik an email dated 22 July 2004 in which he identified four generic suppliers of escitalopram and continued:

> "Dick [Binnington, API sourcing manager for the Arrow Group] to look and see if we can get a supply. Failing that, I will look to Neuland."

18   The judge accepted Mr Greenwood's evidence that he was trying to be helpful to other companies in the Arrow Group by identifying suppliers of escitalopram and by offering to try to get it manufactured by Neuland if Mr Binnington was unable to source it, but that he did not expect Mr Binnington to be unsuccessful. He maintained that Resolution was unable to make citalopram, let alone escitalopram, at that time and that he would have had no confidence in Neuland's ability to do so. In the event Mr Binnington was successful in sourcing escitalopram for Arrow.

**\*160**

19   The judge found that these events marked the end of Resolution's involvement with escitalopram while it was a member of the Arrow Group. Resolution's costs incurred in connection with this project in 2004 amounted to just £64.95.

20   Arrow was in due course granted marketing authorisations for escitalopram. However it did not name Resolution as the source of such escitalopram. It would not have been possible for Resolution to supply escitalopram to Arrow under those MAs even if Resolution was able to manufacture escitalopram at

that time, which it was not. By 6 February 2006, the date when Arrow joined the 2005 proceedings, there were already seven different manufacturers of escitalopram oxalate who had submitted Drug Master Files to the US Food and Drug Administration.

### The 2005 proceedings

21 The 2005 proceedings were concluded when the House of Lords dismissed the claimants' (including Arrow's) appeals on 25 February 2009. There were also separate proceedings brought by all the claimants for revocation of the SPC on grounds independent of validity of the Patent, commenced in March 2007. In May 2009 Arrow discontinued their claim for revocation of the SPC. Resolution was not at any stage a party to any of the claims. The judge found that Resolution was not asked whether it could or would supply Arrow (or any other company in the Arrow Group) with escitalopram at the time of the escitalopram litigation. Nor was it asked to assist in the manufacture or supply of escitalopram at that time. Mr Greenwood was unaware of the litigation. However, it is fair to point out that Mr Tabatznik, as a director of Resolution, was.

### The law on privity of interest

22 Privity of interest provides an exception to the general principle of the law of estoppel that the estoppel binds only the parties to the previous litigation. The rules of law compendiously described as estoppels are very broadly based on the principle that nobody should be vexed twice in the same cause. Thus, in cause of action estoppel, party A will not be allowed to litigate the question of whether a cause of action exists with a counterparty B more than once. The successful litigant and the public have an interest in this being the law. The litigant has an interest in not being vexed twice in the same cause. The public also has an interest in ensuring that the scarce resources available for resolving disputes are used efficiently. There is however no reason in principle why a different party, C, who has the same complaint against B should not be free to litigate the same question. Notwithstanding, for example, the fact that A may have lost a first action, fairness normally demands that C should not be precluded by the manner in which A conducted the first action from bringing his

own action, calling his own evidence and challenging the evidence called by B.

23 These principles apply to actions for revocation of patents as they do to any other type of action. Whilst the final revocation of a patent is a judgment *in rem* and therefore can be relied on by the world at large, a judgment that a patent is valid determines issues only between the parties to the revocation action. Third parties may launch second and subsequent attacks on the patent. It is not necessary for any such party attacking a patent to show any particular interest: the cause of action is vested in "any person": see Patents Act 1977 s.72 . The patentee does, however, receive some protection from successive, unsuccessful attacks in terms of the costs order the court may make, but that is all: see Patents Act 1977 s.65 .

\*161

24 The law recognises that there are some classes of case where fairness demands that party C should be precluded from re-litigating a matter even although he was not a party to the previous proceedings between A and B. One of these is where party C is in "privity of interest" with A. Privity of interest has been said to be a "somewhat narrow" doctrine: see per Sir Robert Megarry V-C in Gleeson v J. Wippell & Co [1977] 1 WLR 510 at p.515A. That case concerned clerical shirts. Denne had manufactured shirts which were designed by Wippell. Miss Gleeson contended that Wippell had copied her shirt. She first sued Denne (and not Wippell) and lost on the ground that Wippell had not copied her shirt. In the later, separate action against Wippell it was contended by Wippell that Miss Gleeson was estopped from raising the same complaint against Wippell. Wippell was thus seeking to take advantage of privity of interest with Denne. Its design of shirt, which it had supplied to Denne had been held not to infringe in the previous action. Sir Robert Megarry dealt with the principles to be applied in this way at pp.515–16:

> "First, I do not think that in the phrase 'privity of interest' the word 'interest' can be used in the sense of mere curiosity or concern. Many matters that are litigated are of concern to many other persons than the parties to the litigation, in that the result of a case will at least

suggest that the position of others in like case is as good or as bad as, or better or worse than, they believed it to be. Furthermore, it is a commonplace for litigation to require decisions to be made about the propriety or otherwise of acts done by those who are not litigants. Many a witness feels aggrieved by a decision in a case to which he is not party without it being suggested that the decision is binding upon him.

Second, it seems to me that the substratum of the doctrine is that a man ought not to be allowed to litigate a second time what has already been decided between himself and the other party to the litigation. This is in the interest both of the successful party and of the public. But I cannot see that this provides any basis for a successful defendant to say that the successful defence is a bar to the plaintiff suing some third party, or for that third party to say that the successful defence prevents the plaintiff from suing him, unless there is a sufficient degree of identity between the successful defendant and the third party. I do not say that one must be the alter ego of the other: but it does seem to me that, having due regard to the subject matter of the dispute, there must be a sufficient degree of identification between the two to make it just to hold that the decision to which one was party should be binding in proceedings to which the other is party. It is in that sense that I would regard the phrase 'privity of interest'. Thus in relation to trust property I think there will normally be a sufficient privity between the trustees and their beneficiaries to make a decision that is binding on

the trustees also binding on the beneficiaries, and vice versa.

Third, in the present case, I think that the matter may be tested by a question that I put to Mr. Skone James in opening. Suppose that in the Denne action the plaintiff, Miss Gleeson, had succeeded, instead of failing. Would the decision in that action that Wippell had indirectly copied the Gleeson drawings be binding on Wippell, so that if sued by Miss Gleeson, Wippell would be estopped by the Denne decision from denying liability? Mr. Skone James felt constrained to answer Yes to that question. I say "constrained" because it appears that for privity with a party to the proceedings to take effect, it must take effect whether that party wins or loses … In such a case, Wippell would be unable to deny **\*162** liability to Miss Gleeson by reason of a decision reached in a case to which Wippell was not a party, and in which Wippell had no voice. Such a result would clearly be most unjust. Any contention which leads to the conclusion that a person is liable to be condemned unheard is plainly open to the gravest of suspicions. A defendant ought to be able to put his own defence in his own way, and to call his own evidence. He ought not to be concluded by the failure of the defence and evidence adduced by another defendant in other proceedings unless his standing in those other proceedings justifies the conclusion that a decision against the defendant in them ought fairly and truly to be said to be in substance a decision against him."

25 Sir Robert Megarry's second principle carries the approval of Lord Bingham in Johnson v Gore-Wood & Co [2002] 2 AC 1, [2001] 2 WLR 72 .

26 One type of case where privity is recognised is where C knows of proceedings between A and B in which his rights are being tested but stands back and does nothing. An example of such a case was House of Spring Gardens Ltd v Waite [1991] QB 241 . In that case a joint tortfeasor had, in full knowledge of the circumstances, declined to participate in an unsuccessful action by his co-tortfeasors to set aside (on the grounds of fraud) a judgment against them all. When it was sought to enforce the original judgment against him he sought to raise the fraud allegation, claiming that he was not a party to the action to set aside. Stuart-Smith L.J. said at p.254AB:

> "…he was content to sit back and leave others to fight his battle, at no expense to himself. In my judgment that is sufficient to make him privy to the estoppel … "

27 Stuart-Smith L.J. derived this principle from the judgment of Lord Penzance in Wytcherley v Andrews (1871) LR 2 P&M 327 at p.328:

> "There is a practice in this court, by which any person having an interest may make himself a party to the suit by intervening, and it was because of the existence of this practice that the judges of the Prerogative Court held, that if a person, knowing what was passing, was content to stand by and see his battle fought by someone else in the same interest, he should be bound by the result, and not be allowed to re-open the case. That principle is founded upon justice and common sense, and is acted upon in courts of equity where, if the persons interested are too numerous to be all made parties to the suit, one or two

of the class are allowed to represent them; and if it appears to the court that everything has been done bona fide in the interests of the parties seeking to disturb the arrangement, it will not allow the matter to be re-opened."

28 That statement had been approved by Lord Denning giving the judgment of the Privy Council in Nana Ofori Atta II v Nanu Aba Bonsra II [1958] AC 58 at pp.102–3. It is clear that the principle derives from what we would now call class or representative actions, where an action is brought in the name of one party as representative of a class of persons with an identical interest. It is not open to a represented party subsequently to launch fresh proceedings of his own.

29 It can be seen that Sir Robert Megarry's test: "having due regard to the subject matter of the dispute, there must be a sufficient degree of identification between the two" embraces two concepts. The first is concerned with the interest which the **163 subsequent litigant, C, has in the subject matter of the first action. In Gleeson , Wippell was very interested, in one sense, in the subject matter of the action against Denne, as its design of shirt was impugned in that action. But that was not a sufficient interest in circumstances where there was what Sir Robert Megarry described as "a trade relationship between the two, in the course of which Denne, at Wippell's request, copied a Wippell shirt: but that is all". The second concept concerns the identity of the parties. Thus in Carl Zeiss Stiftung v Rayner & Keeler Ltd [1967] 1 AC 853 at pp.911–12 Lord Reid suggested:

> "A party against whom a previous decision was pronounced may employ a servant or engage a third party to do something which infringes the right established in the earlier litigation and so raise the whole matter again in his interest. Then, if the other party to the earlier litigation brings an action against the servant or agent, the real

defendant could be said to be the employer, who alone has the real interest, and it might well be thought unjust if he could vex his opponent by relitigating the original question by means of the device of putting forward his servant."

30 In this example the new party has no interest in the previous litigation, but would be estopped because, in effect, he represents the party in the first action. That party has the identical interest in the previous action. In Gleeson , there was no identity of parties in this sense.

31 It is not necessary for the purposes of this appeal to seek to define precisely what interest in the subject matter of the previous litigation is required. The sort of interest dismissed by Sir Robert Megarry in Gleeson in his first principle is clearly inadequate. There are passages in the judgment of Aldous L.J. in Kirin-Amgen Inc v Boehringer Mannheim GmbH [1997] F.S.R. 289 which suggest that a legal interest may be necessary in the subject matter of the previous action as opposed to a commercial interest: see pp.307–309. I have not found that a particularly helpful criterion in the present case which is solely concerned with successive revocation actions. At one level Arrow and Resolution had the same legal interest in the revocation of the Patent, but that was a legal interest which they shared with all the world. If Resolution is to be bound, it must I think be possible to identify some more concrete consequence for its business which revocation of the Patent would have achieved. Unless that is so, although it can be said that Resolution could have joined the 2005 proceedings, there is no reason to hold that they should.

32 Drawing this together, in my judgment a court which has the task of assessing whether there is privity of interest between a new party and a party to previous proceedings needs to examine (a) the extent to which the new party had an interest in the subject matter of the previous action; (b) the extent to which the new party can be said to be, in reality, the party to the original proceedings by reason of his relationship with that party, and (c) against this background to ask whether

it is just that the new party should be bound by the outcome of the previous litigation.

33 In Johnson v Gore-Wood & Co [2002] 2 AC 1 , Mr Johnson wished to bring a personal action for negligence against solicitors. A company controlled by Mr Johnson, W, had previously compromised an action against those solicitors based on the same allegations of negligence. One issue in the House of Lords was whether Mr Johnson's claim was an abuse of process of the kind thought to have originated in the speech of Wigram V-C in Henderson v Henderson [1843–60] All ER Rep. 378, (1843) 3 Hare 100 and developed in later cases such as *164 Yat Tung Investment Co Ltd v Dao Heng Bank Ltd [1975] AC 581, [1975] 2 WLR 690 . The House of Lords rejected that contention. Lord Bingham of Cornhill warned against the incorporation into that principle of formulaic requirements and presumptions and advocated a broad merits-based approach: see p.31A–F. Lord Bingham also endorsed the approach to privity in Gleeson : see p.32 C–G.

34 It has subsequently been argued in this court in Aldi Stores Ltd v WSP Group Plc [2007] EWCA Civ 1260; [2008] 1 WLR 748 that, given the approval in the House of Lords of the statement of the law by Sir Robert Megarry as to privity of interest, there is a necessary preliminary question in determining whether there is abuse of process, that there should be a sufficient degree of identification between the respective defendants. Thomas L.J., with whom Wall and Longmore L.JJ. agreed, rejected that argument at [10]:

"I cannot accept this argument. Lord Bingham made clear in his speech that the approach should be a "broad merits-based judgment" and not formulaic. It is clear he was approving the passage in the judgment of Sir Robert Megarry as the "correct approach" and not as a statement of rigid application. The fact that the Defendants to the original action and to this action are different is a powerful factor in the application of the broad-merits based judgment; it does not operate as a bar to the application of the principle."

35 The present case was argued before the judge, in the appeal skeletons and, in the main, orally before us solely on the basis of the requirements of privity as explained in Gleeson . Approaching the case in that way, it made no difference whether Arrow were barred by issue estoppel or by abuse of process estoppel. Neither side referred the judge to Aldi Stores . But if Arrow were only estopped on the basis of abuse of process, the broad merits-based approach would seem to be appropriate. I will deal briefly with the broad merits-based approach at the end of this judgment, in case it leads to a different result.

**The judgment**

36 At [105] of his judgment, the judge rejected the notion that the mere fact that Resolution was part of the same group as Arrow was enough to make Resolution a privy of Arrow. He concluded at [108] that Resolution had no actual interest in escitalopram in 2006. At [109] he dismissed the relevance of Resolution's earlier interest in citalopram, which had, in any event, ceased by 2004, or at the latest 2005. At [111] he said:

> "Given that Resolution had no interest in escitalopram at the time of the previous proceedings, I conclude that there was no privity of interest between Resolution and Arrow Generics with regard to those proceedings."

**The grounds of appeal**

37 The following are the principal grounds of appeal:

• (i) The judge's findings of fact did not justify or support his conclusions in [108] to [111] of his judgment. His findings should have led him to **\*165** the opposite conclusion. The judge made

"errors of principle" in his application of the law to the facts.

• (ii) That this is so can be tested by considering the position if Resolution had remained within the Arrow Group and under Mr Tabatznik's control. In such circumstances Resolution would not have been able "to re-litigate the validity of the Patent simply by designating Resolution the claimant and recommencing proceedings in their name". If that were so it would violate the principle that no person should be twice vexed in the same cause. If Resolution is not estopped in such circumstances, the principle of estoppel in the context of a corporate structure becomes inoperable.

• (iii) The judgment should have had regard to certain particular matters:

> • (a) The Arrow Group organised itself so that patent litigation was "handled by Mr Tabatznik assisted by Dr Lowrie on behalf of all members of the Group". The judge had so found but had not addressed the consequences.
>
> • (b) Resolution, through Mr Tabatznik, had knowledge of the earlier proceedings, but elected to stand back and allow the earlier proceedings to be run on its behalf.
>
> • (c) Resolution was Mr Tabatznik's "chemistry set" and it was he who set Resolution's strategic direction. Resolution and Arrow served and therefore shared the same interests, being those of Mr Tabatznik and the Arrow Group as a whole.
>
> • (d) Resolution had a direct legal interest in the outcome of the previous litigation in that its "freedom to operate" was not academic given the funding of Resolution by the Arrow Group, the earlier identification of escitalopram as an opportunity, its API manufacturing and subcontracting activities and its investigations into routes of making escitalopram.
>
> • (e) The fact that findings of the judge did not support his conclusion that Resolution's interest in escitalopram was at an end in 2006:
>
> > • (i) escitalopram was amongst a list of drugs identified by Resolution as opportunities;

WESTLAW © 2017 Thomson Reuters.

• (ii)  Mr Tabatznik enquired about a licence for escitalopram;

• (iii)  Mr Tabatznik asked for a review of routes to escitalopram;

• (iv)  Resolution investigated those routes;

• (v)  Resolution would if necessary look to sub-contract the manufacture of escitalopram.

to which he stood by without intervening, in my judgment those cases are illustrations of a very narrow exception to the general rule. The importance of the general rule and fundamental importance of the principle of fair treatment to which it gives expression indicate the narrowness of the exception to that rule.”

**Did the judge make an error of principle?**

38  Although nowhere spelled out in this way in his grounds of appeal, Mr Waugh made a number of points which he said the judge had not had proper regard to. He first suggested that the judge gave insufficient weight to the principle that nobody should be vexed twice in the same cause. I am unable to accept this. The principles which the judge set out and applied are firmly based on that principle. But there is of course an equally important further principle in play, **\*166** namely that an independent party should be free to bring a separate claim for revocation of the Patent. The principles which have been developed in the cases, and which the judge applied, have regard to these competing principles. Sales J. put it very well in Seven Arts Entertainment Ltd v Content Media Corp Plc [2013] EWHC 588 (Ch) at [73]:

> “As stated above, the basic rule is that, before a person is to be bound by a judgment of a court, fairness requires that he should be joined as a party in the proceedings, and so have the procedural protections that carries with it. This includes the opportunity to call any evidence he can to defend himself, to challenge any evidence called by the claimant and to make any submissions of law he thinks may assist his case. Although there are examples of cases in which a person may be found to be bound by the judgment of a court in litigation in relation

39  Next Mr Waugh suggested that, in the context of abuse of process estoppel, a relevant further consideration is exactly how onerous the further litigation will be, and how vexed the defendant has already been. Even if this is correct as a statement of principle, I do not see how it can assist Lundbeck in the present case. If the judge was right that Resolution had no interest in the 2005 proceedings, and is not bound by privity of interest, then it is entitled to bring the proceedings, even if they are burdensome, and even if Lundbeck has previously had to defend proceedings at the suit of Arrow. It might conceivably be relevant on a “broad, merits-based approach”. But that was not the basis on which the judge was invited to decide the case. If that approach is to be taken, other considerations, such as the fact that Resolution is now a wholly independent company, come into play.

40  Mr Waugh's final point of law was that the principle that nobody should be twice vexed applies more strongly where two related claimants are seeking to bring successive proceedings against the same defendant than it does where the same claimant seeks to bring successive actions against related defendants. No authority was cited for this proposition and I am very doubtful that it is correct. However it is of no relevance here. We are not concerned here, with how strongly the principle should be applied, but whether it applies at all.

41  In my judgment, Lundbeck has not established that the judge made any error of law. Except in the limited respect concerning the reconciliation of statements made to the European Commission which I have already dealt with, Mr Waugh makes no criticism of the judge's factual findings. Accordingly success on

this appeal has to be on the basis that the facts found by the judge admit of only one possible answer, i.e. that Resolution is bound by the judgment in 2005 proceedings.

### Is Lundbeck's test a valid one?

42  Lundbeck's ground (ii) is that one can demonstrate that there is a flaw in the judge's approach because it would permit obviously abusive conduct, namely it would allow Mr Tabatznik and Arrow to commence an action immediately after the failure of the 2005 proceedings "by designating Resolution as the claimant and **\*167** recommencing proceedings in their name". The problem with this demonstrative is that no principle relied on by the judge would permit such conduct. I have already accepted that there is a clear exception recognised in the cases that where a party to previous litigation employs a new party to re-litigate the case on his behalf he will normally be prevented from doing so. That, of course, is not what is or could be alleged here. It is not alleged that there is any subsisting relationship between Arrow and Resolution. No case was sought to be made that Arrow and Resolution were together seeking to undermine the integrity of the estoppel created by the previous decision.

### Did Resolution "stand back and let Arrow fight its battle for it"?

43   Lundbeck's ground (iii)(a) and (b) seek to characterise the case as one where the 2005 proceedings were being conducted on Resolution's behalf and with the knowledge of Resolution through Mr Tabatznik. It is also suggested that the judge should have found that this was the case, and also that Resolution stood back and let Arrow fight the battle, and should not now be allowed to take up arms again.

44  I think there are a number of answers to this way of looking at the case. Firstly, the judge's finding at [22] was that Mr Tabatznik took charge of major patent matters affecting companies within the Arrow Group. It was not that Mr Tabatznik conducted all patent matters on behalf of all companies in the Group. So it made sense for Arrow to apply to revoke the Patent as they were the company with an interest in having it revoked. If other companies subsequently acquired an interest in seeing the Patent revoked, there is no reason to treat the earlier litigation as having been conducted on their behalf, when it was commenced at a time when they were not affected by the Patent. Secondly, the notion that Resolution stood back and allowed Arrow to fight its battle simply failed on the facts. Subject to Mr Waugh's argument about Resolution's residual interest in escitalopram, Resolution had no battle to fight in February 2006. It could not make citalopram, let alone escitalopram, and its involvement in any consideration of escitalopram had ceased. Moreover, although Resolution must be taken to have known, through Mr Tabatznik, that the litigation was going on, it had no reason to suppose that it had any further relevance to its business.

45  Mr Waugh sought to give this part of the case some impetus by referring to the decision of the Court of Appeal in Special Effects Ltd v L'Oréal SA [2007] EWCA Civ 1, [2007] R.P.C. 15 . The claimant in that case was the proprietor of the trade mark SPECIAL EFFECTS. L'Oréal SA had previously opposed the claimant's application for the trade mark, relying upon use of its mark SPECIAL FX by L'Oréal UK. The opposition failed and the claimant then brought proceedings for infringement against both L'Oréal SA and L'Oréal UK in respect of use of the mark SPECIAL FX. The defendants counterclaimed for a declaration that the claimant's trade mark was invalidly registered on the same legal grounds as those which had previously been relied on unsuccessfully in the opposition proceedings. The Chancellor, Sir Andrew Morritt, held that L'Oréal SA was precluded by cause of action estoppel from repeating its challenge to the mark, and that L'Oréal UK was bound by the estoppel as L'Oréal SA's privy. The Court of Appeal allowed the defendants' appeal, holding that L'Oréal SA was not barred by cause of action estoppel, issue estoppel or abuse of process from raising the same challenges again.
**\*168**

46   The Court of Appeal went on to make some observations about the privity point, although it was not necessary to decide it as the underlying estoppel was held not to exist. Lloyd L.J. delivering the judgment of the court said this:

Resolution Chemicals Ltd v H Lundbeck A/S, [2014] R.P.C. 5, (2013)

"81. The Chancellor's decision on the point was expressed as follows, in paragraph 55:

'The principle to be applied is that formulated by Sir Robert Megarry in Gleeson v Wippell and approved by the House of Lords in Johnson v Gore Wood … What must be ascertained is whether there is a sufficient degree of identity between the First Defendant and the Second Defendant to make it just that the decision in the opposition proceedings should be binding on the Second Defendant in these proceedings. In my judgment the answer to that question is in the affirmative. The Second Defendant could have been joined as a party to the opposition proceedings. In his evidence in the opposition proceedings M. Monteiro evidently regarded the First and the Second Defendants as one person; hence his references to 'my company' in contexts which can now be seen to refer to the Second Defendant alone. Both are concerned with marks which are owned by the First Defendant and used by the Second Defendant in its business in the UK, the former as owner the latter as licensee. The dispute with the claimant concerns the validity and use of their rival marks. Both defendants are members of the same group. Even

WESTLAW © 2017 Thomson Reuters.

accepting that the First Defendant is not entitled to give directions to the Second Defendant there is no reason to think that the ultimate holding company cannot give directions to both of them. In my view, prima facie, each company in a group is to be regarded as the privy of every other company in the group unless it demonstrates the contrary. Otherwise the principles of estoppel will become largely inoperable in a corporate structure.'

82. It seems to us that in the last two sentences of that paragraph the Chancellor went further than was necessary for his decision. With respect, we could not agree with so general a principle. However, it seems to us that the decision may have been justifiable on a more limited and specific basis, which forms part of the Chancellor's

reasoning in his paragraph 55. The First Defendant holds such registered trade marks as there are in the L'Oreal group. It was accordingly appropriate that it should have been the party which opposed the application for registration by Mr and Mrs Jones. The Second Defendant is the operating company in the UK for the L'Oreal group; in the course of its business it uses registered marks under licence from the First Defendant. It was, therefore, the company which did such acts as the Claimant complains of. If a corporate group such as L'Oreal chooses to arrange its affairs, no doubt for good reason, in such a way that matters such as trade mark oppositions, as well as applications and the holding of registered trade marks, are conducted by one company, for the benefit of others in the group, and others then use marks of which the first is the registered holder, or other marks, not yet registered, of which the first would be the holder if a registration was obtained, then it seems to us that it might well be consistent with what Sir Robert Megarry V-C said in Gleeson v J. Wippell & Co Ltd [1977] 1 W.L.R. 510 at 515 ( approved by Lord Bingham in Johnson v Gore Wood [2002] 2 AC 1 at 32) to regard any constraint on the *169 first, whether by way of cause of action estoppel, issue estoppel or abuse of process, as applying also to the second as its privy. The proposition enunciated by Sir Robert Megarry was that, 'having due regard to the subject matter of the dispute, there must be a sufficient degree of identification between the two to make it just to hold that the decision to which one was a party

should be binding in proceedings to which the other is a party'. It would be relevant to consider the corporate structure adopted by L'Oreal, and the arrangements of which Mr Monteiro gave evidence within the group. The Claimant could reasonably rely on the fact that information was provided by the Second Defendant and used in the course of the opposition proceedings. In Gleeson Sir Robert Megarry said that for employees of one company, not associated with the litigant, to give evidence on behalf of the litigant in the earlier litigation, did not constitute the first a privy of the litigant, but this seems to us a very different relationship, such that the assistance given with the evidence would be relevant. This is also emphasised by the way in which Mr Monteiro spoke of 'my Company' in relation to both the First Defendant and the Second Defendant without distinction. We do not decide the point, but it seems to us that the Claimant's contentions as regards privity might have a substantial basis, even though on less general grounds than those expressed by the Chancellor."

47  It seems to me that these observations are of little relevance to the present case. L'Oreal UK had been using the mark in question at the time of the opposition proceedings and plainly intended to continue to do so. There was a real sense therefore in which the opposition proceedings had been conducted on its behalf and for its benefit. The evidence which its witnesses gave in the proceedings was given because it had a real interest in the outcome of the proceedings. They were no doubt following the progress of the proceedings with interest as the outcome would directly affect the legality of its past and future sales. It had a concrete interest in the

outcome. Nothing could really be further from the facts of the present case.

**Should the judge have concluded that Resolution had an interest in the outcome of proceedings?**

48  For the reasons identified in his ground (iii) Mr Waugh submits that in 2006 Resolution had a legal interest in the outcome of the 2005 proceedings. He described this as Resolution's freedom to operate created by the revocation of the Patent. The high point of this case was the statement in 2004 that, in the event of failure to obtain a source of supply, Mr Greenwood would "look to Neuland". This meant that there was a contingent possibility that Resolution could be called upon to enter into a development program with Neuland similar to that which it had unsuccessfully undertaken with Neuland in relation to citalopram. If the analogy is pursued, such a project would have involved a route being identified by Resolution and passed on to Neuland to put into practice. Accordingly Resolution had a real reason for obtaining freedom to operate by revoking the Patent.

49  I think all this is far too speculative. It is not a sufficiently concrete interest in the outcome of the previous proceedings. The true position was that Resolution was simply not in a position to make or have made citalopram or escitalopram. Its previous efforts had failed and their current efforts had ceased. As to the specific matters relied on in ground (iii) (e)(i) to (vi), the dates on which they occurred are **\*170** informative. The identification of citalopram as a generic opportunity, for what it is worth, was in 2001. The enquiry about the escitalopram licence, the review of routes for manufacture of escitalopram, and Mr Greenwood's statement that he would if necessary make some escitalopram were all in 2002. The investigation of routes ended in 2004 as did Resolution's interest in escitalopram. Thereafter Resolution's interest was no different from any other company with a general interest in generic products. That cannot be sufficient to make it just to hold Resolution bound by the earlier proceedings.

**Conclusion on privity**

50 The extent of the identity between Arrow and Resolution is that they were part of a group of companies under the common control of Mr Tabatznik. There was no subsisting relationship between them in 2006 pursuant to which the 2005 proceedings were being conducted by Arrow for Resolution's benefit. Resolution was Mr Tabatznik's chemistry set, but he was not playing with it to make escitalopram. Resolution had no concrete interest in the 2005 proceedings. It would be quite unjust to hold Resolution bound by the outcome. The judge was entitled to come to that conclusion.

**A broad, merits-based judgment?**

51 As Lord Millett said in Johnson v Gore Wood , particular care is necessary in the application of the principle of abuse of process estoppel to the case of privies: see page 60C:

> "It is likely in practice to be easier for [the privy] to rebut the charge that his proceedings are oppressive or constitute an abuse of process than it would be for the original plaintiff to do so."

52 I would not come to any different conclusion applying a broad merits-based approach. Indeed, if anything, the case for Resolution is stronger as it would I think be proper to take into account the fact that Resolution is now independent of the Arrow Group and operating under a different business model. As Lord Millett again points out in Johnson v Gore Wood , the question of whether the new proceedings are abusive has to be determined at the time when those proceedings are brought, in the light of everything that had happened by then: see p.59G.

**Disposal**

53 For the reasons I have given therefore, I would dismiss this appeal.

Moore-Bick L.J.

54 I agree.

Longmore L.J.

55 I agree also.
**\*171**

Footnotes

1    See Generics (UK) Ltd v H. Lundbeck A/S [2009] UKHL 12, [2009] R.P.C. 13, HL .
2    [2013] EWHC 739 (Pat) (Arnold J.).

Crown copyright material from the Reports of Patent Cases is reproduced with the permission of the UK Intellectual Property Office on behalf of the Controller of her Majesty's Stationery

Office (c) Crown Copyright. Published by Oxford University Press on behalf of the Patent Office

© 2017 Sweet & Maxwell

[2014] R.P.C. 5

# TAB 75

*899  **Royal Brunei Airlines Sdn Bhd v. Tan Kok Ming**

Privy Council

24 May 1995

**[1995] B.C.C. 899**

Lord Goff of Chieveley , Lord Ackner , Lord Nicholls of Birkenhead , Lord Steyn and Sir John May

Judgment delivered 24 May 1995

**Analysis**

Trust—Breach of trust—Knowing assistance by third party—Dishonesty—Travel agent required to account to airline for money from ticket sales—Moneys not retained in separate account but used for general company business in breach of trust—Whether dishonesty by third party required to be accessory to breach of trust—Whether dishonesty by trustee necessary ingredient of liability of third party—Whether director liable as accessory to breach of trust by company.

This was an appeal from a decision of the Court of Appeal of Brunei Darussalam allowing an appeal by 'T', the managing director and principal shareholder of a company ('Travel'), from the decision of the Chief Justice who held that T was liable as constructive trustee for moneys received by the company from the sale of airline tickets.

In 1986 the airline appointed Travel to act as its general travel agent for the sale of passenger and cargo transportation. Travel was controlled by T, the managing director and principal shareholder. The appointment was set out in a written agreement by which Travel was required to account to the airline for all amounts received from the sale of tickets. The agreement was expressly subject to the regulations of the International Air Transport Association which provided that all moneys collected by the agent were the property of the carrier and held in trust by the agent for the carrier until accounted for. Despite the terms of the agreement Travel did not maintain a separate bank account for the airline's money but paid it into Travel's ordinary current account with its bank. By a standing arrangement any balance over a stated amount was transferred from the current account into a fixed deposit account or to T's account. Travel was required to pay the airline within 30 days, but fell into arrears at various times. In August 1992 the airline terminated the agreement and in January 1993 brought an action against T for unpaid money. T was not a party to the agency agreement but had signed it on behalf of Travel.

At the trial the judge held that T was liable as constructive trustee on the basis of knowing assistance as accessory to Travel's breach of trust. Judgment was entered for the airline in damages. T appealed. The Court of Appeal of Brunei Darussalam allowed T's appeal on the ground that an essential prerequisite to accessory liability, a dishonest and fraudulent design on the part of Travel as trustee, had not been established in relation to the sums held in trust for the airline. The airline appealed.

*Held* , allowing the airline's appeal:

1  Liability as an accessory to a breach of trust by a trustee required dishonesty on the part of the accessory, whether or not the trustee was also acting dishonestly. Dishonesty on the accessory's part was sufficient to render him liable to make good the loss resulting from his dishonest procurement of or assistance in a breach of trust or fiduciary obligation.

2  The money paid to Travel on the sale of the airline's tickets was held by Travel upon trust for the airline. The trust gave Travel no authority to use the money in the conduct of its business. By failing to hold the airline's money separately from its general business account Travel committed a breach of trust, in which T knowingly assisted. It followed that both T and Travel were acting dishonestly in so doing, since T's state of mind was to be imputed to the company. Travel's inability to pay the airline was a direct consequence of the breach of trust. Accordingly T was liable in damages to the airline as an accessory to Travel's breach of trust.

*900

**The following cases were referred to in the judgment:**

• Agip (Africa) Ltd v Jackson & Ors [1990] Ch 265 .

WESTLAW   © 2017 Thomson Reuters.

• Attorney-General v Corp of Leicester (1844) 7 Beav 176; 49 ER 1031 .

• Baden & Ors v Societe Generale pour Favoriser le Developpement du Commerce et de l'Industrie en France SA [1993] 1 WLR 509 .

• Barnes v Addy (1874) LR 9 Ch App 244 .

• Belmont Finance Corp Ltd v Williams Furniture Ltd & Ors [1979] Ch 250 .

• Carl Zeiss Stiftung v Herbert Smith & Co (No. 2) [1969] 2 Ch 276 .

• Consul Development Pty Ltd v DPC Estates Pty Ltd (1975) 132 CLR 373 .

• Cowan de Groot Properties Ltd v Eagle Trust plc [1992] 4 All ER 700 .

• DPC Estates Pty Ltd v Grey & Anor [1974] 1 NSWLR 443 .

• Eagle Trust plc v SBC Securities Ltd [1993] 1 WLR 484 .

• Eaves v Hickson (1861) 30 Beav 136; 54 ER 840 .

• Equiticorp Industries Group Ltd v Hawkins [1991] 3 NZLR 700; (1991) 5 NZCLC 67,201 .

• Fyler v Fyler (1841) 3 Beav 550; 49 ER 216 .

• Karak Rubber Co Ltd v Burden (No. 2) [1972] 1 WLR 602 .

• Marr v Arabco Traders Ltd (1987) 1 NZBLC 102,732 .

• Marshall Futures Ltd v Marshall [1992] 1 NZLR 316; (1991) 5 NZCLC 67,238 .

• Montagu's Settlement Trusts, Re [1987] Ch 264 .

• Nimmo v Westpac Banking Corp [1993] 3 NZLR 218; (1993) 4 NZBLC 103,134 .

• Polly Peck International plc v Nadir (No. 2) [1992] 4 All ER 769 .

• Powell v Thompson [1991] 1 NZLR 597 .

• R v Ghosh [1982] QB 1053 .

• Selangor United Rubber Estates Ltd v Cradock (No. 3) [1968] 1 WLR 1555 .

• Springfield Acres Ltd (in liquidation) v Abacus (Hong Kong) Ltd [1994] 3 NZLR 502 .

• Westpac Banking Corp v Savin [1985] 2 NZLR 41; (1986) 1 NZBLC 102,345 .

**Representation**

• Michael Beloff QC , Murray Hunt and Raymond Lam (of the Brunei Bar) (instructed by Norton Rose ) for the appellant airline.

• Daljit S Sandhu and Geoffrey Sim (both of the Brunei Bar) (instructed by Denton Hall ) for T.

**JUDGMENT**

(Delivered by Lord Nicholls of Birkenhead)

The proper role of equity in commercial transactions is a topical question. Increasingly plaintiffs have plaintiffs have recourse to equity for an effective remedy when the person in default, typically a company, is insolvent. Plaintiffs seek to obtain relief from others who were involved in the transaction, such as directors of the company, or its bankers, or its legal or other advisers. They seek to fasten fiduciary obligations directly onto the company's officers or agents or advisers, or to have them held personally liable for assisting the company in breaches of trust or fiduciary obligations.

This is such a case. An insolvent travel agent company owed money to an airline. The airline seeks a remedy against the travel agent's principal director and shareholder. Its claim is based on the much-quoted dictum of Lord Selborne LC, sitting in the Court of Appeal in Chancery, in Barnes v Addy (1874) LR 9 Ch App 244 at pp. 251–252:

> 'That responsibility [sc., the responsibility of a trustee] may no doubt be extended in equity to others who are not properly trustees, if they are found … actually participating in any fraudulent conduct of the trustee to the injury of the *cestui que trust* . But … strangers are not to be made constructive trustees merely because they act as the agents of trustees in transactions within their legal powers, transactions, perhaps of which a Court of Equity may disapprove, unless those **\*901** agents receive and become chargeable with some part of the trust property, or unless they assist with knowledge in a dishonest and fraudulent design on the part of the trustees.'

WESTLAW © 2017 Thomson Reuters.

In the conventional shorthand, the first of these two circumstances in which third parties (non-trustees) may become liable to account in equity is 'knowing receipt', as distinct from the second where liability arises from 'knowing assistance'. Stated even more shortly, the first limb of Lord Selborne's formulation is concerned with the liability of a person as a *recipient* of trust property or its traceable proceeds. The second limb is concerned with what, for want of a better compendious description, can be called the liability of an *accessory* to a trustee's breach of trust. Liability as an accessory is not dependent upon receipt of trust property. It arises even though no trust property has reached the hands of the accessory. It is a form of secondary liability in the sense that it only arises where there has been a breach of trust. In the present case the plaintiff relies on the accessory limb. The particular point in issue arises from the expression 'a dishonest and fraudulent design on the part of the trustees'.

**The proceedings**

The essential facts are these. In 1986 Royal Brunei Airlines Sdn Bhd appointed Borneo Leisure Travel Sdn Bhd ('BLT') to act, in various places in Sabah and Sarawak, as its general travel agent for the sale of passenger and cargo transportation. The terms of the appointment were set out in a written agreement of 1 April 1986. BLT was required to account to the airline for all amounts received from sales of tickets. For its services it was to be paid a sales commission. The agreement was expressed to be subject to the regulations of the International Air Transport Association, one of which provided:

> 'All moneys collected by the agent for transportation and ancillary services sold under this Agreement, including applicable commissions which the agent is entitled to claim thereunder, shall be the property of the Carrier and shall be held by the agent in trust for the Carrier or on behalf of the Carrier until satisfactorily accounted for to the

> Carrier and settlement made … Unless otherwise instructed by the Carrier the agent shall be entitled to deduct from remittances the applicable commission to which it is entitled hereunder.'

It was common ground that the effect of this provision was to constitute BLT a trustee for the airline of the money it received from the sale of passenger and cargo transportation by the airline.

In practice what happened was that money received by BLT on behalf of the airline was not paid into a separate bank account. It was paid into BLT's ordinary, current account with its bank. By a standing arrangement with the bank, any balance in its current account in excess of a stated amount was transferred to a fixed deposit account of BLT or, at times, of Mr Philip Tan Kok Ming. Mr Tan had founded BLT. He was managing director and principal shareholder. He was effectively in charge and control of BLT. The other director and shareholder was his wife. Nothing turns on these transfers of money to other accounts because, with one immaterial exception, all the transferred money eventually found its way back to BLT's current account.

BLT was required to pay the airline within 30 days, but at various times from 1988 onwards it was in arrears. In August 1992 the airline terminated the agreement. In January 1993 the airline commenced this action against Mr Tan in respect of the unpaid money. Mr Tan was not himself a party to the agency agreement, although he had signed it on behalf of BLT.

At the trial held in October 1993 the Chief Justice, Dato Sir Denys Roberts, rejected a claim by the airline that Mr Tan had orally guaranteed payment of the money. The Chief Justice also rejected a claim that Mr Tan had diverted the money to his own use. The **\*902** Chief Justice upheld a claim that Mr Tan was liable as a constructive trustee, under the accessory limb of Lord Selborne's formulation. Although not particularised, this issue was pleaded explicitly and unequivocally. Mr Tan knew there was an express trust of the money. The money appeared to have been used by BLT for its ordinary business purposes, paying

salaries, overheads and other expenses, and keeping down its bank overdraft. It must be assumed that Mr Tan authorised the use of the money for these purposes. That was sufficient to make him liable. A fraudulent and dishonest design is not confined to personal gain. It is sufficient if the stranger knowingly assists in the use of trust property in a way which is not permitted by the trust. Judgment was entered for the airline for B $335,160.

The Court of Appeal of Brunei Darussalam allowed Mr Tan's appeal. Counsel for Mr Tan conceded that a trust of the money had been created, and that there had been a breach of that trust in which Mr Tan had assisted with actual knowledge. The issue was whether a dishonest and fraudulent design on the part of BLT had been established. The court held that the evidence revealed a sorry tale of mismanagement and broken promises, but that it was not established that BLT was guilty of fraud or dishonesty in relation to the amounts it held in trust for the airline. Delivering the judgment of the court, Fuad P stated:

> 'As long standing and high authority shows, conduct which may amount to a breach of trust, however morally reprehensible, will not render a person who has knowingly assisted in the breach of trust liable as a constructive trustee, if that conduct falls short of dishonesty.'

This view of the state of the law has the support of the (English) Court of Appeal. In Selangor United Rubber Estates Ltd v Cradock (No. 3) [1968] 1 WLR 1555 at p. 1591, Ungoed-Thomas J held that the expression 'dishonest and fraudulent design' was to be understood according to the principles of a court of equity. That approach was emphatically rejected by the Court of Appeal in Belmont Finance Corporation Ltd v Williams Furniture Ltd & Ors [1979] Ch 250 . Buckley LJ observed at p. 267 that the rule as formulated by Lord Selborne had stood for more than 100 years, and that to depart from it would introduce an undesirable degree of uncertainty to the law over what degree of unethical conduct would suffice if dishonesty was not

to be the criterion. Goff LJ at p. 274 agreed that it would be dangerous and wrong to depart from 'the safe path of the principle as stated by Lord Selborne' to the 'uncharted sea of something not innocent … but still short of dishonesty'.

In short, the issue on this appeal is whether the breach of trust which is a pre-requisite to accessory liability must itself be a dishonest and fraudulent breach of trust by the trustee.

### The honest trustee and the dishonest third party

It must be noted at once that there is a difficulty with the approach adopted on this point in the Belmont case. Take the simple example of an honest trustee and a dishonest third party. Take a case where a dishonest solicitor persuades a trustee to apply trust property in a way the trustee honestly believes is permissible but which the solicitor knows full well is a clear breach of trust. The solicitor deliberately conceals this from the trustee. In consequence, the beneficiaries suffer a substantial loss. It cannot be right that in such a case the accessory liability principle would be inapplicable because of the innocence of the trustee. In ordinary parlance, the beneficiaries have been defrauded by the solicitor. If there is to be an accessory liability principle at all, whereby in appropriate circumstances beneficiaries may have direct recourse against a third party, the principle must surely be applicable in such a case, just as much as in a case where both the trustee and the third party have been dishonest. Indeed, if anything, the case for liability of the **\*903** dishonest third party seems stronger where the trustee is innocent, because in such a case the third party alone was dishonest and that was the cause of the subsequent misapplication of the trust property.

The position would be the same if, instead of *procuring* the breach, the third party dishonestly *assisted* in the breach. Change the facts slightly. A trustee is proposing to make a payment out of the trust fund to a particular person. He honestly believes he is authorised to do so by the terms of the trust deed. He asks a solicitor to carry through the transaction. The solicitor well knows that the proposed payment would be a plain breach of trust. He also well knows that the trustee mistakenly believes otherwise. Dishonestly he leaves the trustee under his misapprehension and prepares the necessary

documentation. Again, if the accessory principle is not be artificially constricted, it ought to be applicable in such a case.

These examples suggest that what matters is the state of mind of the third party sought to be made liable, not the state of mind of the trustee. The trustee will be liable in any event for the breach of trust, even if he acted innocently, unless excused by an exemption clause in the trust instrument or relieved by court. But *his* state of mind is essentially irrelevant to question whether the *third party* should be made liable to the beneficiaries for the breach of trust. If the liability of the third party is fault-based, what matters is the nature of his fault, not that of the trustee. In this regard dishonesty on the part of the third party would seem to be a sufficient basis for his liability, irrespective of the state of mind of the trustee who is in breach of trust. It is difficult to see why, if the third party dishonestly assisted in a breach, there should be a further pre-requisite to his liability, namely, that the trustee also must have been acting dishonestly. The alternative view would mean that a dishonest third party is liable if the trustee is dishonest, but if the trustee did not act dishonestly that of itself would excuse a dishonest third party from liability. That would make no sense.

### Earlier authority

The view that the accessory liability principle cannot be restricted to fraudulent breaches of trust is not to be approached with suspicion as a latter-day novelty. Before the accessory principle donned its Barnes v Addy straitjacket, judges seem not to have regarded the principle as confined in this way. In Fyler v Fyler (1841) 3 Beav 550 at p. 568, Lord Langdale MR expressed the view that if trustees invested in an unauthorised investment, solicitors who knowingly procured that to be done for their own benefit 'ought to be considered as partakers in the breach of trust' even though the trustees intended in good faith that the investment would be beneficial to the life-tenant and not prejudicial to the beneficiaries with interests in capital. The same judge, in Attorney-General v Corporation of Leicester (1844) 7 Beav 176 at p. 179, stated:

'it cannot be disputed that, if the agent of a trustee, whether a corporate body or not, knowing that a breach of trust is being committed, interferes and assists in that breach of trust, he is personally answerable, although he may be employed as the agent of the person who directs him to commit that breach of trust.'

In Eaves v Hickson (1861) 30 Beav 136 trustees, acting in good faith, paid over the fund to William Knibb's adult children on the strength of a forged marriage certificate produced to them by William Knibb. Sir John Romilly MR held that William Knibb was liable to replace the fund, to the extent that it was not recovered from his children, and to do so in priority to the liability of the trustees. Far from this being a case of fraud by the trustees, the Master of the Rolls at p. 141 described it as a very hard case on the trustees, who were deceived by a forgery which would have deceived anyone who was not looking out for forgery or fraud.

**\*904**

This point did not arise in Barnes v Addy . There the new sole trustee was engaged in a dishonest and fraudulent design. He intended to misapply the trust fund as soon as it reached his hands. The two solicitors were held not liable because there was no evidence that either of them had any knowledge or suspicion of this.

What has gone wrong? Their Lordships venture to think that the reason is that ever since the Selangor case highlighted the potential uses of equitable remedies in connection with misapplied company funds, there has been a tendency to cite and interpret and apply Lord Selborne's formulation as though it were a statute. This has particularly been so with the accessory limb of Lord Selborne's apothegm. This approach has been inimical to analysis of the underlying concept. Working within this constraint, the courts have found themselves wrestling with the interpretation of the individual ingredients, especially 'knowingly' but also 'dishonest and fraudulent design on the part of the trustees', without examining the underlying reason why a third party who has received no trust property is being made liable at all. One notable exception is the judgment of Thomas J in Powell v Thompson [1991] 1 NZLR 597 at pp. 610–615. On this point he observed (at p. 613):

'Once a breach of trust has been committed, the commission of which has involved a third party, the question which arises is one as between the beneficiary and that third party. If the third party's conduct has been unconscionable, then irrespective of the degree of impropriety in the trustee's conduct, the third party is liable to be held accountable to the beneficiary as if he or she were a trustee.'

To resolve this issue it is necessary to take an overall look at the accessory liability principle. A conclusion cannot be reached on the nature of the breach of trust which may trigger accessory liability without at the same time considering the other ingredients including, in particular, the state of mind of the third party. It is not necessary, however, to look even more widely and consider the essential ingredients of recipient liability. The issue on this appeal concerns only the accessory liability principle. Different considerations apply to the two heads of liability. Recipient liability is restitution-based, accessory liability is not.

### No liability

The starting point for any analysis must be to consider the extreme possibility: that a third party who does not receive trust property ought never to be liable directly to the beneficiaries merely because he assisted the trustee to commit a breach of trust or procured him to do so. This possibility can be dismissed summarily. On this the position which the law has long adopted is clear and makes good sense. Stated in the simplest terms, a trust is a relationship which exists when one person holds property on behalf of another. If, for his own purposes, a third party deliberately interferes in that relationship by assisting the trustee in depriving the beneficiary of the property held for him by the trustee, the beneficiary should be able to look for recompense to the third party as well as the trustee. Affording the beneficiary a remedy against the third party serves the dual purpose of making good the beneficiary's loss should the trustee lack financial means and imposing a liability which will discourage others from behaving in a similar fashion.

The rationale is not far to seek. Beneficiaries are entitled to expect that those who become trustees will fulfil their obligations. They are also entitled to expect, and this is only a short step further, that those who become trustees will be permitted to fulfil their obligations without deliberate intervention from third parties. They are entitled to expect that third parties will refrain from intentionally intruding in the trustee-beneficiary relationship and thereby hindering a beneficiary from receiving his entitlement in accordance with the terms of the trust instrument. There is here a close analogy with breach of contract. A person who knowingly procures a breach of contract, or knowingly **\*905** interferes with the due performance of a contract, is liable to the innocent party. The underlying rationale is the same.

### Strict liability

The other extreme possibility can also be rejected out of hand. This is the case where a third party deals with a trustee without knowing, or having any reason to suspect, that he is a trustee. Or the case where a third party is aware he is dealing with a trustee but has no reason to know or suspect that their transaction is inconsistent with the terms of the trust. The law has never gone so far as to give a beneficiary a remedy against a non-recipient third party in such circumstances. Within defined limits, proprietary rights, whether legal or equitable, endure against third parties who were unaware of their existence. But accessory liability is concerned with the liability of a person who has not received any property. His liability is not property-based. His only sin is that he interfered with the due performance by the trustee of the fiduciary obligations undertaken by the trustee. These are personal obligations. They are, in this respect, analogous to the personal obligations undertaken by the parties to a contract. But ordinary, everyday business would become impossible if third parties were to be held liable for *unknowingly* interfering in the due performance of such personal obligations. Beneficiaries could not reasonably expect that third parties should deal with trustees at their peril, to the extent that they should become liable to the beneficiaries even when they received no trust property and even when they were

WESTLAW    © 2017 Thomson Reuters.

unaware and had no reason to suppose that they were
dealing with trustees.

## Fault-based liability

Given, then, that in some circumstances a third party
may be liable directly to a beneficiary, but given also
that the liability is not so strict that there would be
liability even when the third party was wholly unaware
of the existence of the trust, the next step is to seek
to identify the touchstone of liability. By common
accord dishonesty fulfils this role. Whether, in addition,
negligence will suffice is an issue on which there has
been a well-known difference of judicial opinion. The
Selangor decision in 1968 was the first modern decision
on this point. Ungoed-Thomas J (at p. 1590) held
that the touchstone was whether the third party had
knowledge of circumstances which would indicate to
'an honest, reasonable man' that the breach in question
was being committed or would put him on enquiry.
Brightman J reached the same conclusion in Karak
Rubber Co Ltd v Burden (No. 2) [1972] 1 WLR 602
. So did Peter Gibson J in 1983 in Baden & Ors v
Societe Generale pour Favoriser le Developpement du
Commerce et de l'Industrie en France SA [1993] 1 WLR
509 . In that case the judge accepted a five-point scale
of knowledge which had been formulated by counsel.

Meanwhile doubts had been expressed about this test by
Buckley LJ and Goff LJ in the Belmont case (at pp. 267
and 275). Similar doubts were expressed in Australia
by Jacobs P in DPC Estates Pty Ltd v Grey [1974] 1
NSWLR 443 at p. 459. When that decision reached
the High Court of Australia, the doubts were echoed
by Barwick CJ, Gibbs J and Stephen J: see Consul
Development Pty Ltd v DPC Estates Pty Ltd (1975) 132
CLR 373 at pp. 376, 398, and 412.

Since then the tide in England has flowed strongly in
favour of the test being one of dishonesty: see, for
instance, Sir Robert Megarry V-C in Re Montagu's
Settlement Trusts [1987] Ch 264 at p. 285, and Millett J
in Agip (Africa) Ltd v Jackson & Ors [1990] Ch 265 at
p. 293. In Eagle Trust plc v SBC Securities Ltd [1993]
1 WLR 484 at p. 495, Vinelott J stated that it could
be taken as settled law that want of probity was a
prerequisite to liability. This received the imprimatur of
the Court of Appeal in Polly Peck International plc v
Nadir (No. 2) [1992] 4 All ER 769 at p. 777, per Scott LJ.

*906

Judicial views have diverged also in New Zealand.
In Westpac Banking Corporation v Savin [1985] 2
NZLR 41 at p. 70; (1986) 1 NZBLC 102,345 at p.
102,369 Sir Clifford Richmond preferred the Belmont
approach, as did Tompkins J in Marr v Arabco Traders
Ltd (1987) 1 NZBLC 102,732 at p. 102,762. In the
Powell v Thompson case, at pp. 612, 613,615, Thomas
J considered that the suggestion that negligence is not
enough to found liability is to be resisted. The test is
one of unconscionable behaviour. This, and knowledge
to match, whether actual or constructive, will suffice
to herald a visit from equity. In Equiticorp Industries
Group Ltd v Hawkins [1991] 3 NZLR 700 at p. 728;
(1991) 5 NZCLC 67,201 at p. 67,228 Wylie J disagreed.
He adhered to the concept of want of probity as
the standard by which unconscionability was to be
measured. In Marshall Futures Ltd v Marshall [1992]
1 NZLR 316 at p. 325; (1991) 5 NZCLC 67,238 at p.
67,247 Tipping J was concerned about the difficulty
of identifying as unconscionable conduct which was
less reprehensible than conduct which can be described
as dishonest. He would, he said, prefer the herald of
equity to be wearing more distinctive clothing than that
suggested by Thomas J. In Nimmo v Westpac Banking
Corporation [1993] 3 NZLR 218 at p. 238; (1993) 4
NZBLC 103,134 at p. 103,142 Blanchard J preferred a
test of dishonesty. Most recently, in Springfield Acres
Ltd (in Liquidation) v Abacus (Hong Kong) Ltd [1994]
3 NZLR 502 at p. 510, Henry J observed that the law in
New Zealand could not be regarded as settled.

Most, but not all, commentators prefer the test of
dishonesty: see, among others, Peter Birks (1989)
LMCLQ 296 ; MJ Brindle and RJA Hooley 61 ALJ 281;
Charles Harpum 102 LQR 114, 267, and The Frontiers
of Liability (ed. P Birks) vol. 1, 9; Patricia Loughlan 9
OJLS 260; Parker and Mellows, Modern Law of Trusts
(6th edn) 253; Pettit, Equity and the Law of Trusts (7th
edn) 172; Philip Sales 49 CLJ 491; Snell's Equity (29th
edn) 194; and Underhill and Hayton, Law Relating to
Trusts and Trustees (14th edn) 355 and noter-up.

## Dishonesty

Before considering this issue further it will be helpful
to define the terms being used by looking more
closely at what dishonesty means in this context.

Whatever may be the position in some criminal or other contexts (see, for instance, R v Ghosh [1982] QB 1053 ), in the context of the accessory liability principle acting dishonestly, or with a lack of probity, which is synonymous, means simply not acting as an honest person would in the circumstances. This is an objective standard. At first sight this may seem surprising. Honesty has a connotation of subjectivity, as distinct from the objectivity of negligence. Honesty, indeed, does have a strong subjective element in that it is a description of a type of conduct assessed in the light of what a person actually knew at the time, as distinct from what a reasonable person would have known or appreciated. Further, honesty and its counterpart dishonesty are mostly concerned with advertent conduct, not inadvertent conduct. Carelessness is not dishonesty. Thus for the most part dishonesty is to be equated with conscious impropriety.

However, these subjective characteristics of honesty do not mean that individuals are free to set their own standards of honesty in particular circumstances. The standard of what constitutes honest conduct is not subjective. Honesty is not an optional scale, with higher or lower values according to the moral standards of each individual. If a person knowingly appropriates another's property, he will not escape a finding of dishonesty simply because he sees nothing wrong in such behaviour.

In most situations there is little difficulty in identifying how an honest person would behave. Honest people do not intentionally deceive others to their detriment. Honest people do not knowingly take others' property. Unless there is a very good and compelling reason, an honest person does not participate in a transaction if he knows it **\*907** involves a misapplication of trust assets to the detriment of the beneficiaries. Nor does an honest person in such a case deliberately close his eyes and ears, or deliberately not ask questions, lest he learn something he would rather not know, and then proceed regardless. However, in the situations now under consideration the position is not always so straightforward. This can best be illustrated by considering one particular area: the taking of risks.

**Taking risks**

All investment involves risk. Imprudence is not dishonesty, although imprudence may be carried recklessly to lengths which call into question the honesty of the person making the decision. This is especially so if the transaction serves another purpose in which that person has an interest of his own.

This type of risk is to be sharply distinguished from the case where a trustee, with or without the benefit of advice, is aware that a particular investment or application of trust property is outside his powers, but nevertheless he decides to proceed in the belief or hope that this will be beneficial to the beneficiaries or, at least, not prejudicial to them. He takes a risk that a clearly unauthorised transaction will not cause loss. A risk of this nature is for the account of those who take it. If the risk materialises and causes loss, those who knowingly took the risk will be accountable accordingly. This is the type of risk being addressed by Peter Gibson J in the Baden case, at p. 574G, when he accepted that fraud includes taking 'a risk to the prejudice of another's rights, which risk is known to be one which there is no right to take'.

This situation, in turn, is to be distinguished from the case where there is genuine doubt about whether a transaction is authorised or not. This may be because the trust instrument is worded obscurely, or because there are competing claims, as in Carl Zeiss Stiftung v Herbert Smith & Co & Anor (No. 2) [1969] 2 Ch 276 , or for other reasons. The difficulty here is that frequently the situation is neither clearly white nor clearly black. The dividing edge between what is within the trustee's powers and what is not is often not clear cut. Instead there is a gradually darkening spectrum which can be described with labels such as clearly authorised, probably authorised, possibly authorised, wholly unclear, probably unauthorised and, finally, clearly unauthorised.

The difficulty here is that the differences are of degree rather than of kind. So far as the trustee himself is concerned the legal analysis is straightforward. Honesty or lack of honesty is not the test for his liability. He is obliged to comply with the terms of the trust. His liability is strict. If he departs from the trust terms he is liable unless excused by a provision in the trust instrument or relieved by the court. The analysis of the position of the accessory, such as the solicitor who

carries through the transaction for him, does not lead to such a simple, clear cut answer in every case. He is required to act honestly, but what is required of an honest person in these circumstances? An honest person knows there is doubt. What does honesty require him to do?

The only answer to these questions lies in keeping in mind that honesty is an objective standard. The individual is expected to attain the standard which would be observed by an honest person placed in those circumstances. It is impossible to be more specific. Knox J captured the flavour of this, in a case with a commercial setting, when he referred to a person who is 'guilty of commercially unacceptable conduct in the particular context involved': see Cowan de Groot Properties Ltd v Eagle Trust plc [1992] 4 All ER 700 at p. 761H. Acting in reckless disregard of others' rights or possible rights can be a telltale sign of dishonesty. An honest person would have regard to the circumstances known to him, including the nature and importance of the proposed transaction, the nature and importance of his role, the ordinary course of business, the degree of doubt, the practicability of the trustee or the third party proceeding otherwise, and the seriousness **\*908** of the adverse consequences to the beneficiaries. The circumstances will dictate which one or more of the possible courses be taken by an honest person. He might, for instance, flatly decline to become involved. He might ask further questions. He might seek advice, or insist on further advice being obtained. He might advise the trustee of the risks but then proceed with his role in the transaction. He might do many things. Ultimately, in most cases, an honest person should have little difficulty in knowing whether a proposed transaction, or his participation in it, would offend the normally accepted standards of honest conduct.

Likewise, when called upon to decide whether a person was acting honestly, a court will look at all the circumstances known to the third party at the time. The court will also have regard to personal attributes of the third party such as his experience and intelligence, and the reason why he acted as he did.

Before leaving cases where there is real doubt, one further point should be noted. To enquire, in such cases, whether a person dishonestly assisted in what is later

held to be a breach of trust is to ask a meaningful question, which is capable of being given a meaningful answer. This is not always so if the question is posed in terms of 'knowingly' assisted. Framing the question in the latter form all too often leads one into tortuous convolutions about the 'sort' of knowledge required, when the truth is that 'knowingly' is inapt as a criterion when applied to the gradually darkening spectrum where the differences are of degree and not kind.

## Negligence

It is against this background that the question of negligence is to be addressed. This question, it should be remembered, is directed at whether an honest third party who receives no trust property should be liable if he procures or assists in a breach of trust of which he would have become aware had he exercised reasonable diligence. Should he be liable to the beneficiaries for the loss they suffer from the breach of trust?

The majority of persons falling into this category will be the hosts of people who act for trustees in various ways: as advisers, consultants, bankers, and agents of many kinds. This category also includes officers and employees of companies, in respect of the application of company funds. All these people will be accountable to the trustees for their conduct. For the most part they will owe to the trustees a duty to exercise reasonable skill and care. When that is so, the rights flowing from that duty form part of the trust property. As such they can be enforced by the beneficiaries in a suitable case if the trustees are unable or unwilling to do so. That being so, it is difficult to identify a compelling reason why, in addition to the duty of skill and care vis-a-vis the trustees which the third parties have accepted, or which the law has imposed upon them, third parties should also owe a duty of care directly to the beneficiaries. They have undertaken work for the trustees. They must carry out that work properly. If they fail to do so, they will be liable to make good the loss suffered by the trustees in consequence. This will include, where appropriate, the loss suffered by the trustees being exposed to claims for breach of trust.

Outside this category of persons who owe duties of skill and care to the trustees, there are others who will deal with trustees. If they have not accepted, and the law has not imposed upon them, any such duties in favour of the

trustees, it is difficult to discern a good reason why they should nevertheless owe such duties to the beneficiaries.

There remains to be considered the position where third parties are acting for, or dealing with, dishonest trustees. In such cases the trustees would have no claims against the third party. The trustees would suffer no loss by reason of the third party's failure to discover what was going on. The question is whether in this type of situation the third party owes a duty of care to the beneficiaries to, in effect, check that a trustee is not misbehaving. The third party must act honestly. The question is whether that is enough.

**\*909**

In agreement with the preponderant view, their Lordships consider that dishonesty is an essential ingredient here. There may be cases where, in the light of the particular facts, a third party will owe a duty of care to the beneficiaries. As a general proposition, however, beneficiaries cannot reasonably expect that all the world dealing with their trustees should owe them a duty to take care lest the trustees are behaving dishonestly.

### Unconscionable conduct

Mention, finally, must be made of the suggestion that the test for liability is that of unconscionable conduct. Unconscionable is a word of immediate appeal to an equity lawyer. Equity is rooted historically in the concept of the Lord Chancellor, as the keeper of the Royal Conscience, concerning himself with conduct which was contrary to good conscience. It must be recognised, however, that unconscionable is not a word in everyday use by non-lawyers. If it is to be used in this context, and if it is to be the touchstone for liability as an accessory, it is essential to be clear on what, *in this context* , unconscionable *means* . If unconscionable means no more than dishonesty, then dishonesty is the preferable label. If unconscionable means something different, it must be said that it is not clear what that something different is. Either way, therefore, the term is better avoided in this context.

### The accessory liability principle

Drawing the threads together, their Lordships' overall conclusion is that dishonesty is a necessary ingredient

of accessory liability. It is also a sufficient ingredient. A liability in equity to make good resulting loss attaches to a person who dishonestly procures or assists in a breach of trust or fiduciary obligation. It is not necessary that, in addition, the trustee or fiduciary was acting dishonestly, although this will usually be so where the third party who is assisting him is acting dishonestly. 'Knowingly' is better avoided as a defining ingredient of the principle, and in the context of this principle the Baden scale of knowledge is best forgotten.

### Conclusion

From this statement of the principle it follows that this appeal succeeds. The money paid to BLT on the sale of tickets for Royal Brunei Airlines was held by BLT upon trust for the airline. This trust, on its face, conferred no power on BLT to use the money in the conduct of its business. The trust gave no authority to BLT to relieve its cash flow problems by utilising for this purpose the rolling 30-day credit afforded by the airline. Thus BLT committed a breach of trust by using the money instead of simply deducting its commission and holding the money intact until it paid the airline. Mr Tan accepted that he knowingly assisted in that breach of trust. In other words, he caused or permitted his company to apply the money in a way he knew was not authorised by the trust of which the company was trustee. Set out in these bald terms, Mr Tan's conduct was dishonest. By the same token, and for good measure, BLT also acted dishonestly. Mr Tan was the company, and his state of mind is to be imputed to the company.

The Court of Appeal held that it was not established that BLT was guilty of fraud or dishonesty in relation to the amounts it held for the airline. Their Lordships understand that by this the Court of Appeal meant that it was not established that Mr Tan intended to defraud the airline. Mr Tan hoped, maybe expected, to be able to pay the airline, but the money was lost in the ordinary course of a poorly-run business with heavy overhead expenses. These facts are beside the point. Mr Tan had no right to employ the money in the business at all. That was the breach of trust. The company's inability to pay the airline was the consequence of that breach of trust.

The Court of Appeal observed that it would have been unrealistic to expect BLT to keep the money in a separate bank account and not use any of the money

in the conduct **\*910** of the business, particularly as BLT was also the ticketing agent for a number of other airlines. Their Lordships express no view on this, or on what the parties are to be taken to have intended would happen in practice when the company's current bank account was overdrawn. It is possible that in certain circumstances these points might sustain an argument that, although there was a failure to pay, there was no breach of trust. They do not arise in this case because of Mr Tan's acceptance that there was a breach of trust.

Their Lordships will report their advice to His Majesty The Sultan and Yang Di-Pertuan that this appeal should be allowed, the order of the Court of Appeal set aside, and the order of the Chief Justice restored. The respondent must pay the appellant's costs before their Lordships' board and before the Court of Appeal.

(Appeal allowed) **\*911**

© 2017 Sweet & Maxwell

[1995] B.C.C. 899

---

**End of Document**

© 2017 Thomson Reuters.

# TAB 76

Secretary of State for Trade and Industry v. Frid (Civil
Appeal from Her Majesty's High Court of Justice)
House of Lords
13 May 2004

**Session 2003-04 [2004] UKHL 24**

**2004 WL 1054956**

The Appellate Committee comprised: Lord
Nicholls of Birkenhead Lord Hoffmann Lord
Hope of Craighead Lord Phillips of Worth
Matravers Lord Brown of Eaton-under-Heywood
Thursday 13 May 2004

**Analysis**

Opinions of the Lords of Appeal for Judgment in the
Cause

**JUDGMENT**
LORD NICHOLLS OF BIRKENHEAD

My Lords,

1.  I have had the advantage of reading in draft the
speech of my noble and learned friend Lord Hoffmann. I
agree that, for the reasons he gives, this appeal should be
allowed.

LORD HOFFMANN

My Lords,

2.  On 10 March 1999 West End Networks Ltd ("the
company") resolved to go into creditors' voluntary
liquidation. Its assets included a credit of £7,185.77
with HM Customs and Excise in respect of overpaid
VAT. Its liabilities included compensatory notice pay
and redundancy payments due to nine former employees

under sections 88 and 135 of the Employment Rights Act
1996 . The company did not make these payments and
the Secretary of State accordingly became liable under
sections 166(1)(b) and 167(1) of that Act to pay all or part
of them out of the National Insurance Fund. Pursuant to
this obligation the Secretary of State paid the employees
£11,574.49 and by virtue of section 167(3) all the rights and
remedies of the employees against the company thereupon
vested in her. The question of principle raised by this
appeal is whether in determining the company's claims
against the Crown or the Crown's right to prove in the
liquidation of the company, the VAT credit must be set off
against the Crown's subrogated claim under section 167(3)
.

3.  The procedure by which this question has been
brought before the House is somewhat unusual. Besides
the claim of the Secretary of State under section 167(3)
, there were claims against the company for PAYE
and National Insurance contributions which even by
themselves exceeded the VAT credit. HM Customs and
Excise allocated the credit rateably between the three
Crown claimants and paid £2,344.03 to the Secretary of
State (for the account of the National Insurance Fund) as
her share. The Secretary of State submitted a proof in the
liquidation for £9,230.46, giving credit for the £2,344.03 as
having been set off against the VAT credit. The liquidator
rejected the proof on the somewhat paradoxical ground
that it was too low. He said that it should have been for
the full sum of £11,574.49. The purpose of the rejection
was to raise the question of principle without requiring the
liquidator to bring proceedings against HM Customs and
Excise. The matter has since been litigated on this basis.

4.  The Secretary of State appealed to Mr Registrar
Jacques, who upheld the liquidator's decision on the
ground that he was bound by the decision of the Court
of Appeal in In re A Debtor (No 66 of 1955), Ex p The
Debtor v Trustee of Waite (A Bankrupt) [1956] 1 WLR
1226 . A further appeal to Mr David Mackie QC, sitting
as a deputy High Court judge, was dismissed for the
same reason. Both the registrar and the judge expressed
regret over their decisions, saying that they appeared to be
contrary to justice and principle. As it appeared likely that
the Court of Appeal would also consider itself bound by
the earlier case, Mr Mackie gave leave for an appeal to be
brought directly to your Lordships's House.

5. Set-off between an insolvent company and its creditors is currently governed by rule 4.90 of the Insolvency Rules 1986 (SI 1986/1925):

> "(1) This rule applies where, before the company goes into liquidation there have been mutual credits, mutual debts or other mutual dealings between the company and any creditor of the company proving or claiming to prove for a debt in the liquidation.
>
> (2) An account shall be taken of what is due from each party to the other in respect of the mutual dealings, and the sums due from one party shall be set off against the sums due from the other.

6. If the requirements of paragraph (1) are satisfied, the account and set-off required by paragraph (2) are mandatory and apply whenever it is necessary to ascertain the net amount owing by one party to the other: Stein v Blake [1996] AC 243 . Such an ascertainment is necessary for the purpose of determining the amount for which the Secretary of State is entitled to prove in the liquidation. So the question in this appeal is whether the requirements of paragraph (1) are satisfied.

7. The rule requires that there should have been "mutual credits, mutual debts or other mutual dealings" between the company and the Secretary of State before the company went into liquidation, that is to say, before the date of the resolution to wind it up. I shall call this "the insolvency date". In considering whether this requirement was satisfied, I shall put aside two matters for later consideration. One is the question of whether the Customs and Excise is the same party as the Secretary of State and the second is the effect of the words "or other mutual dealings". I shall consider first whether "mutual debts" existed at the relevant time between the company and the Crown, treating HM Customs and Excise and the Secretary of State as both being manifestations of the Crown.

8. There is no doubt that the liability to repay VAT was a debt which existed at the relevant time. It was quantified, due and payable. But nothing was yet due under section 167(3) . The liability arose by virtue of the payment made by the Secretary of State under section 167(1) and her liability to make that payment had in turn arisen because the company had become insolvent: see section 166(1)(b) . So Mr Davies QC, who appeared for the liquidator, says that there was no debt owing under section 167(3) at the insolvency date. There was only a possibility that such a debt would come into existence afterwards.

9. It not however necessary for the purposes of rule 4.90(2) that the debt should have been due and payable before the insolvency date. It is sufficient that there should have been an obligation arising out of the terms of a contract or statute by which a debt sounding in money would become payable upon the occurrence of some future event or events. The principle has typically been applied to claims for breach of contract where the contract was made before the insolvency date but the breach occurred afterwards ( In re Asphaltic Wood Pavement Co Ltd (1885) 30 Ch D 216 ) or claims for indemnity by a guarantor where the guarantee was given before the insolvency date but the guarantor was called upon and paid afterwards ( Jones v Mossop (1844) 3 Hare 568 ; In re Moseley-Green Coal and Coke Co Ltd, Ex p Barrett (1865) 12 LT (NS) 193 .)

10. The effect of these and similar cases was summed up by Millett J in In re Charge Card Services Ltd [1987] Ch 150 , 182:

> "By the turn of the [20th] century, therefore, the authorities showed that debts whose existence and amount were alike contingent at the date of the receiving order, and claims to damages for future breaches of contracts existing at that date, were capable of proof and, being capable of proof, could be set off under the section provided that they arose from mutual credits or mutual dealings. The only requirement was that they must in fact have resulted in quantified money

claims by the time the claim to set off was made."

11.  I agree that this principle was firmly established, but in view of the reasoning in In re A Debtor (No 66 of 1955), Ex p The Debtor v Trustee of Waite (A Bankrupt) [1956] 1 WLR 1226 , which the registrar and the judge held to require a rejection of a set-off in this case, I should give some examples of its application to claims by guarantors under pre-insolvency guarantees. In Jones v Mossop (1844) 3 Hare 568 Mr Reed was holder of a bond for £500 given by Mr Jones, who had also guaranteed some loans to Mr Reed by third parties. Mr Reed died insolvent and Mr Jones was called to pay £377 to the lenders under the guarantees. When Mr Reed's assignee Mr Mossop sued Mr Jones on the bond, he brought proceedings in equity claiming to be entitled to set off the £377 he had paid. Because Mr Reed had never actually been made bankrupt, the then equivalent of rule 4.90 did not apply and Sir James Wigram V-C gave relief under general equitable principles, but he said, at p 571: "if Richard Reed had been bankrupt, I should have had no difficulty in deciding this case."

12.  The same principle was applied to a winding up in In re Moseley-Green Coal and Coke Co Ltd, Ex p Barrett 12 LT (NS) 193 . Mr Barrett owed the company money on his partly-paid shares for which calls were made after it went into insolvent liquidation. He had also guaranteed the company's liability for the purchase price of a coal mine, for which the vendor held security in the form of a mortgage and the company's promissory note. After the winding up Mr Barrett's sister paid off the vendor and took over the mortgage and promissory note. Mr Barrett then entered into an arrangement which was treated as a payment of the company's debt and he took over the promissory note. Lord Westbury LC held that he was entitled to set off the debt on the promissory note against his liability to pay calls on his shares. The facts give rise in my mind to some doubt about whether Mr Barrett could truly be said to have paid under his guarantee but, assuming that he had, the application of the principle of contingent liability is clear enough.

13.  In re Fenton [1931] 1 Ch 85 was another case of a surety under a pre-insolvency guarantee, but this time he had not actually paid. Nor could he pay, because he was bankrupt and his assets had vested in his trustee. The creditor was still owed the money and entitled to prove in the liquidation. The Court of Appeal held, first, that one could not have more than one proof in respect of the same debt ("the rule against double proof"); otherwise, if there had been, say, four guarantors, there could have been five people receiving dividends on the same debt. Secondly, the Court of Appeal said that until the creditor had been paid, he had the superior right of proof and a proof by a surety was excluded. Thirdly, the court said that a debt which could not be proved could not be relied upon for set-off. There is no longer doubt about any of these propositions. But the judgments of Lawrence and Romer LJJ make it clear (that of Lord Hanworth MR is a little obscure) that if the guarantor had paid off the debt after the insolvency date, he would have been entitled to set it off against a debt which he owed to the company.

14.  That brings me to In re A Debtor (No 66 of 1955), Ex p The Debtor v Trustee of Waite (A Bankrupt) [1956] 1 WLR 1226 , which is the reason why leave was given to appeal to your Lordships' House. One Waite owed the debtor £101, being the balance of the price of goods sold and delivered. Waite was made bankrupt, having previously guaranteed the debtor's overdraft and deposited the deeds of his property as security. Waite's trustee paid the bank £133 out of the bankrupt's assets which had vested in him as trustee to pay off the overdraft and obtain the release of the deeds. When he claimed reimbursement, the debtor claimed to set off the £101 he was owed by Waite, for which he would otherwise have had to prove in the bankruptcy.

15.  Danckwerts J, giving the judgment of himself and Harman J in the Divisional Court in bankruptcy (In re A Debtor (No 66 of 1955) Ex p The Debtor v Trustee of Waite (A Bankrupt) [1956] 1 WLR 480 , 487) said that Waite and his trustee were not for this purpose the same person. Waite had held his assets for his own benefit. The trustee held the assets that vested in him for the benefit of the creditors:

"There was in fact no mutuality at the date of the receiving order in Waite's bankruptcy and the debt on which the action was founded was not due to Waite but to his trustee."

16. My Lords, it is unnecessary to express a concluded view but, speaking for myself, I find this reasoning convincing. But the Court of Appeal [1956] 1 WLR 1226 seem to have put the matter on a much broader basis. I say "seem" because I agree with Millett J in In re Charge Card Services Ltd [1987] Ch 150 , 189 that the judgments of Lord Evershed MR and Hodson LJ are not easy to follow. But they both appear to have decided that a surety under a pre-insolvency guarantee is not entitled to set-off unless he has actually paid the debt before the insolvency date. The Moseley-Green case 12 LT (NS) 193 was distinguished ("depending upon its own special facts": p 1232) and the other cases were not mentioned. In Day & Dent Constructions Pty Ltd (In Liquidation) v North Australian Properties Pty Ltd (1982) 150 CLR 85, 94, 106 the High Court of Australia said that In re A Debtor was contrary to principle and authority and declined to follow it. Mr Davies on behalf of the liquidator did not support the broad reasoning of the Court of Appeal (although he did propose a third ground upon which the case could be supported, to which I shall in due course return.) I also respectfully think that the broad reasoning was wrong.

17. This means that if the Secretary of State had agreed by contract before the insolvency date to guarantee any future liability of the company to pay compensatory notice pay or make redundancy payments to employees under the 1996 Act, the contract of guarantee would have created a contingent liability on the part of the company to reimburse the Secretary of State which was a "debt" at the insolvency date and became capable of set-off when the employees were afterwards paid. The next question is whether it makes a difference that the contingent liability existed by virtue of a statute rather than a contract and, not being consensual, that it involved no direct contract or other relationship with the employees or the company.

18. The question of whether the set-off provisions apply to debts arising under statute was decided by Brightman J in In re D H Curtis (Builders) Ltd [1978] Ch 162 , a case which has since been consistently followed in this country and approved by the High Court of Australia in Gye v McIntyre (1991) 171 CLR 609 . The debts in that case were, on the one side, the liability of the company to the Inland Revenue and the Department of Health and Social Security for PAYE and National Insurance contribution respectively and, on the other, the liability of HM Customs and Excise to the company for excess input VAT. All the debts were due and payable at the insolvency date. Brightman J, (at p 171), rejected the argument that the mutuality required by the statute meant that the claims sought to be set off "must be such as result in pecuniary liabilities arising out of contract". He said that the type of acts or events giving rise to the liabilities were immaterial provided that those liabilities were "commensurable", that is to say, capable of being expressed in money.

19. If a statutory origin does not prevent set-off in the case of debts due and payable at the insolvency date, I do not see why it should make any difference that the statute creates a contingent liability which exists before the insolvency date but falls due for payment and is paid afterwards. The term "mutual debts" does not in itself require anything more than commensurable cross-obligations between the same people in the same capacity. How those debts arose — whether by contract, statute or tort, voluntarily or by compulsion — is not material.

20. The analogy with a contractual guarantee appears to me exact. Indeed, section 167 was enacted to give effect to Council Directive (80/987/EEC) "on the approximation of the laws of the member states relating to the protection of employees in the event of the insolvency of their employer" (OJ 1980 L283, p 23) which required member states, by article 3 , to:

"take the measures necessary to ensure that guarantee institutions guarantee … payment of employees' outstanding claims resulting from contracts of employment or employment relationships".

21.  The United Kingdom has complied with this directive by enacting that the Secretary of State is to be our "guarantee institution". In Mann v Secretary of State for Employment [1999] ICR 898 , 902 I described the provisions of section 166 and 167 as a "state guarantee" and, at p 904, said that the Secretary of State was a "guarantor, liable only for whatever the employee was entitled to be paid by his employer". In truth, however, it does not matter how the liability is characterised. The failure of the insolvent employer to pay is the contingency which crystallises the liability imposed upon the Secretary of State by sections 166 and 167 and the payment of those liabilities is in turn the contingency upon which the right of subrogation depends. But when it does become payable, it is a debt arising out of a statutory obligation which existed before the insolvency date.

22.  My Lords, so far I have been concentrating upon the effect of the words "mutual debts". The words "or other mutual dealings" was added for the first time by the Bankruptcy Act 1869 . These words, and particularly the word "other" create what the High Court of Australia in Gye v McIntyre 171 CLR 609 , 623 tactfully called "a linguistic problem". The language suggests that the previous words "mutual credits, mutual debts" must be qualified by a requirement that the credits or debts can in some sense be described as "mutual dealings". But all the authorities since the 1869 Act have been unanimous in saying that Parliament in no way intended to restrict the ambit of the original formula. On the contrary, the purpose was to broaden it. In Booth v Hutchinson (1872) LR 15 Eq 30 , 35, Malins V-C said that the additional words "were intended to give a more extended right of set-off than previously existed" and in Peat v Jones & Co (1881) 8 QBD 147 , 149 Sir George Jessel MR said:

> "Now the enactment as to 'mutual credits' is a very old one, first appearing in 5 Geo 2, c 30, but the whole tendency of the subsequent legislation, as of the legislation respecting proveable debts, has been to extend the principle upon which it is founded."

23.  What then is the answer to the "linguistic problem" identified by the High Court of Australia in Gye v McIntyre (1991) 171 CLR 609 , 623? That court gave a clear answer:

> "'Credits' and 'debts' will ordinarily represent the outcome of dealings rather than the dealings themselves. Conversely, 'dealings' commonly do not, of themselves as distinct from their outcome, represent credits or debts susceptible of direct set-off … The requirement of mutuality in respect of "other … dealings", as distinct from 'credits' or 'debts' susceptible of immediate set-off, is directed not so much to the relationship between the dealings as such but to the relationship between the claims which have arisen from them."

24.  All that is necessary therefore is that there should have been "dealings" (in an extended sense which includes the commission of a tort or the imposition of a statutory obligation) which give rise to commensurable cross-claims. In Gye v McIntyre itself, the one party was liable to the other for money lent and the cross-claim was for damages in tort for fraudulently inducing the borrower to enter into a separate contract to which the lender was not a party.

25.  In In re Charge Card Services Ltd [1987] Ch 150 , 189, Millett J suggested that an alternative ratio for In re A Debtor [1956] 1 WLR 1226 was that the contingent obligation of the principal debtor to his surety was not referable to any transaction between debtor and surety, the parties to the alleged set-off, but rather to the guarantee which the surety had given to the creditor. The implication is that a mutual transaction may be required by rule 4.90 . But there is nothing in the term "mutual

debts" which requires that both debts must be, as Millett J put it, "exclusively referable" to a contract or other "transaction" between the parties to the set-off. It is true that if it were not for the historical background, one might have been able to argue that such a notion was implied by the words "mutual dealings". But once one accepts that the debts need not arise from consensual transactions at all, but can arise from statutory obligations as in In re D H Curtis (Builders) Ltd [1978] Ch 162 or torts as in Gye v McIntyre 171 CLR 609 , such a requirement of mutuality in the transactions giving rise to the cross-claims becomes untenable. Mr Davies, in his written case, was constrained to say of Millett J's suggestion that it was "objectionable only to the extent that it appears to require an agreement rather than a dealing". But that, in my opinion, is a very large objection when one considers the extended meaning which has been given to "dealing". I can quite understand why Millett J wanted to find some reasoning to explain In re A Debtor which was not plainly and obviously wrong. But I respectfully think that the alternative explanation, though it may have served well enough for the case before him, is ultimately also unsuccessful.

26.   The final question is whether there is mutuality between a claim against Customs and Excise and a claim by the Secretary of State on behalf of the National Insurance Fund. Mutuality requires that each party should be debtor and creditor in the same capacity. A claim by a trustee on behalf of a beneficiary cannot be set off against a debt owing to the trustee personally. The law is concerned with beneficial ownership and not mere legal title.

27.   The constitutional accountability of the Crown to Parliament for the expenditure of public money means that, as a matter of public law, the Crown may have to deal differently with money from different sources. Part XII of the Social Security Administration Act 1992 prescribes what may be paid out of the National Insurance Fund, what must be paid in, how it must be invested and so forth. But these provisions do not in any opinion create a trust in private law: compare Swain v The Law Society [1983] 1 AC 598 , 618, per Lord Brightman. In private law the Crown through its various emanations is the beneficial owner of all central funds. If it fails to comply with the provisions which require such funds to be segregated, the remedy lies in public law.

28.   In fact, there has been no difficulty in reconciling the Crown's set-off with the segregation of the various funds. All that happened was that Customs and Excise, instead of writing a cheque to the company, wrote three cheques to the Inland Revenue, the Department of Social Security and CSL Management Group Ltd, which administers the Secretary of State's obligations to make payments under sections 166 and 167 and which paid the money into the National Insurance Fund. Thus were the proprieties of public finance preserved.

29.   It follows that in my opinion the set-off of the £2,344.03 due to the Secretary of State under section 167(3) should have been allowed and the proof in the lesser sum accepted. I would allow the appeal accordingly.

LORD HOPE OF CRAIGHEAD

My Lords,

30.   I have had the advantage of reading in draft the speech of my noble and learned friend Lord Hoffmann. I agree with it, and for the reasons which he has given I too would allow the appeal. I should like to add only two brief comments.

31.   The first comment relates to the question whether it should make a difference for the purposes of rule 4.90 of the Insolvency Rules 1986 that sections 167(3) and 189(2) of the Employment Rights Act 1996 , which enable the Secretary of State to recover the amounts paid to former employees in respect of redundancy payments and compensatory notice pay respectively, create contingent liabilities on the part of the company which exist before the insolvency date but fall due for payment and are paid afterwards. Section 411(1) of the Insolvency Act 1986 contains separate rule-making powers in relation to England and Wales on the one hand and to Scotland on the other for the purposes of giving effect to Parts I to VII of the Act. Rule 4.90 of the Insolvency Rules 1986 , which reproduces the provisions regarding mutual credit and set-off in bankruptcy that are set out in section 323

of the 1986 Act (which do not extend to Scotland), has no counterpart in the Insolvency (Scotland) Rules 1986 . In Scotland the question of set-off (or compensation, as it is usually referred to in Scots law) is regulated, both in personal bankruptcy and in the winding of a company, by the common law.

32. In Scotland it is well established that, while in compensation both debts must be due at the same time, this rule is applied only when both parties are solvent: Goudy, The Law of Bankruptcy in Scotland, 4th ed (1914), pp 550–553. As Goudy puts it at p 551, the term compensation as applied in insolvency has generally to be understood in a sense very closely akin to that of retention. It is based on a principle of equity which is designed to prevent the hardship of a debtor who is also a creditor being forced to pay in full, while he only receives a dividend for his debt. So every kind of claim may be set off in a case of insolvency, the only general restriction being that the debt sought to be set off against the bankrupt estate must be one that is capable of being ranked for.

33. Bell, Commentaries on the Law of Scotland, 7th ed (1870), ii, 122 sets out the qualification that applies in the case of insolvency in this way:

"2. In compensation the debts must both be due at the same time. One who is due money presently payable, cannot defend himself against the demand by setting off money due to him six months after, or the payment of which depends on a condition.

But this is a rule which holds strictly only while the parties are solvent. If one of them becomes bankrupt, the other may defend himself against a present demand, by setting off a debt that is future or contingent, although the term be after the bankruptcy. He cannot so plead, however, on a debt arising after bankruptcy.

3. In compensation the debts must both be liquid, or capable of immediate liquidation. A debt is deemed liquid when it is actually due and the amount ascertained, 'Cum certum an et quantum debeatur.' But if the debt itself be contested, and the creditor has not his proof ready; or if the amount is disputed, and it depend on a long discussion what is to be adjudged due; the debtor will not be allowed to avoid the payment of what is liquid and due till that litigation be terminated.

This, however, does not hold as to the balancing of accounts on bankruptcy. If one party have failed, and a demand be made on the other, he will not be obliged to pay the liquid debt, and come in as a creditor only for the dividend. The immediate necessity for payment of the liquid debt is taken away by the bankruptcy; and there is no impediment to the equity which holds the one debt an extinction of the other."

34. So the fact that nothing was yet due to the Secretary of State by the company at the insolvency date would not be an obstacle to the application of the principle. And, although the point has not arisen for decision in Scotland, there seems to be no reason to doubt that the question how the debts arose is not a material consideration either. Any kind of debt will do for the purposes of the plea of compensation in a case of insolvency in Scots law, so long as it is a debt that is capable of being ranked for. That general approach makes it unnecessary to distinguish between debts that arise out of contract and those that, because they are purely statutory, do not involve any kind of direct contact or other similar relationship. It would appear that, had this case arisen in Scotland, there would have been no difficulty in holding that the company's claim against the Crown in respect of overpaid VAT must be set off against the Crown's subrogated claim under section 167(3) . It is satisfactory that it has been possible to reach the same conclusion as to the effect in England of rule 4.90 of the Insolvency Rules 1986 .

35. Secondly, as to the question of mutuality, I would add the following explanation as to the general background. The National Insurance Fund, out of which the Secretary of State became liable to pay the employees under sections 166(1)(b) and 167(1) of the Employment Rights Act 1996 (in the case of the redundancy payments) and sections 182 and 184(1)(b) of that Act (in the case of compensatory notice pay), was first established by section 35 of the National Insurance Act 1946 as a fund maintained under the control and management of the Minister. All contributions paid by employers and insured persons were to be paid into this fund, and out of it were to be paid all claims for benefit and certain other sums payable under various statutes. The fund was continued in being for these purposes by section 83 of the National Insurance Act 1965 . Section 83(4) of that Act provided for accounts of the National Insurance Fund to be prepared, for them to be examined and certified by the Comptroller and Auditor General and for copies of these accounts together with his report thereon to be laid before Parliament.

36.   In the same year section 26 of the Redundancy Payments Act 1965 established a new fund, to be called the Redundancy Fund, into which all sums received by the Minister under Part II of the Act were to be paid and out of which were to be made the payments provided for by that Act. Its original function was to provide for the payment of rebates to employers who had made redundancy payments. Section 26(2) of that Act provided for the preparation, examination and certification of accounts of this fund and their laying before Parliament in the same way as was done in the case of the National Insurance Fund. The Redundancy Fund was continued in being by section 103 of the Employment Protection (Consolidation) Act 1978 . Section 106 of that Act, the statutory predecessor of section 167 of the Employment Rights Act 1996 , provided for the making of redundancy payments direct to employees out of the fund in the event of the employer's insolvency. Sections 122 to 127 , the statutory predecessors of sections 182 to 189 of the 1996 Act, provided for the payment out of the fund of the debts to employees, including arrears of wages, which were guaranteed in the event of the insolvency.

37.   The system for the payment of rebates to employers was abolished by section 17 of the Employment Act 1989 . In the following year the Redundancy Fund was abolished by section 13 of the Employment Act 1990 , as there was no longer a good reason for its existence as a separate fund. Its assets and liabilities were merged with those of the National Insurance Fund. By that time the National Insurance Fund was under the control and management of the Secretary of State under section 133 of the Social Security Act 1975 which section 161 of the Social Security Administration Act 1992 has replaced. It is from the merged fund that the sums at issue in this case were paid to the former employees of the company. Its important characteristic for present purposes is that it is a fund which is under the control and management of the Secretary of State for the statutory purposes and for which she is accountable under the statute to Parliament. In the performance of these functions the Secretary of State is not in the position of a trustee under a private trust. She is performing a public duty on behalf of the Crown. So too is HM Customs and Excise when it accounts to taxable persons for overpayments of VAT. It too is performing on behalf of the Crown a public duty which has been laid upon it by statute.

38.   It is a general rule of the doctrine that allows for one debt to be set off against another that each of the two parties be both creditor and debtor in his own right. This is as true under the law of Scotland as it is under the English common law. As Bell, Commentaries on the Law of Scotland, ii, 124 puts it:

> "Compensation can be pleaded only when the demands are mutual; and this whether the plea be strictly compensation, or the more extended remedy of the balancing of claims in bankruptcy. To constitute this mutuality of debt and credit, the sums reciprocally due must be owing to the parties in their own right respectively."

I agree that in the present case this requirement is satisfied. The Crown is acting both as debtor and as creditor in the same capacity. The claims to the sums in question on either side are claims due to and owed by the Crown in its own

right. It is clear that there is, in this situation, no lack of mutuality.

**LORD PHILLIPS OF WORTH MATRAVERS**

My Lords,

39.  I agree that this appeal should be allowed for the reasons given by my noble and learned friend, Lord Hoffmann.

**LORD BROWN OF EATON-UNDER-HEYWOOD**

My Lords,

40.  I have had the advantage of reading in draft the speech of my noble and learned friend Lord Hoffmann. I too agree that, for the reasons he gives, this appeal should be allowed.

Crown copyright

© 2017 Sweet & Maxwell
2004 WL 1054956

---

**End of Document**                                    © 2017 Thomson Reuters.

# TAB 77

SHEDDEN,        .     .     .     .     . Appellant.

PATRICK ET AL.,      .     .     .     . Respondents.

Where a judgment has been obtained by fraud, and more
especially by the collusion of both parties—such judgment,
although confirmed by the House of Lords, may, even in an
inferior tribunal, be treated as a nullity.

But the allegations of fraud and collusion must be specific,
pointed, and relevant ; otherwise they cannot be admitted
to proof.

To set aside a judgment had by fraud, the proper course, when
such judgment has been confirmed by the House of Lords,
is to apply to the House for direction.

Hence it is wrong to ask the Court below, upon proof of the fraud
or collusion, to set aside a judgment confirmed by the House.

Whether the House in such a case can direct an issue ?  *Quære.*

By the law of Scotland, legitimation *per subsequens matri-
monium* operates only from the time of the marriage, not
from the time of the birth.

*Semble*—That the ancient fiction which supposed an inter-
change of matrimonial consent at the moment of conception,
is not sanctioned by the law of Scotland.

*Semble*—That the doctrine of mid-impediments is also without
foundation in the law of Scotland.

*Semble*—That by the law of Scotland, if the mother of a
bastard, instead of marrying the father of the bastard, marries
another man who dies,—she can afterwards, by marrying the
father of the bastard, render the bastard legitimate from the
date of her second marriage, but not from the date of the
bastard's birth.

*Semble—Kerr* v. *Malcolm*, approved of by the House—*sed
quære*—see the remarks of Lord St. Leonards, *infrà.*

A child born a bastard in a foreign country not recognising

1854.
28th Feb.
2nd, 6th, 7th, 9th,
10th, 24th, 27th,
28th, 30th, and
31st March.
3rd, 4th, 6th, 10th,
and 27th April.
4th, 5th, 8th and
9th May.

N N

536                         CASES IN THE HOUSE OF LORDS.

SHEDDEN
v.
PATRICK ET AL.

the doctrine of legitimation *per subsequens matrimonium,*
is an alien, although his putative father was a Scotchman
domiciled all his life in Scotland, and although such
putative father afterwards married the mother of the bastard
for the express purpose of rendering the bastard legitimate.
The children of natural born subjects, who under the 4 Geo.
2, c. 21, are to be considered natural born subjects of this
kingdom, must have been legitimate from their birth, and
not rendered so by the subsequent marriage of their
parents.

To be within the Act the child must be born of a British
father ; but a bastard, *filius nullius,* can have no father.

Remarks by the Law Peers on the danger which arises from
the assumption by professional persons of duties which
conflict with each other.

IN the year 1764, William Shedden, then a lad of
seventeen, left Scotland for Virginia, where he became
a clerk in a mercantile house.

· In 1768 he returned to Scotland ; but went again to
Virginia in 1769.

In 1770 his father died, leaving him the family
estate of Roughwood in Ayrshire; and about the same
time he became a partner in the American business.
He continued in Virginia till 1777, when he repaired
to New York, and was there engaged constantly in
merchandize for the remainder of his life, with the
exception of a short interval spent by him in Bermuda,
in 1778.

William Shedden died at New York in November,
1798 ; having a week before his death married a
Miss Wilson, by whom he had had two children, a son
(the Appellant) and a daughter.

The Appellant was born in 1793, and in 1800 was
sent to Scotland for education.

On the assumption that the Appellant was illegiti-
mate, Robert Patrick, nephew of William Shedden,

CASES IN THE HOUSE OF LORDS.                537

claimed the estate of Roughwood, and in October, 1799, was served heir in special to his uncle.

But the Court of Session having appointed a factor *loco tutoris* for the Appellant in respect of his minority, that officer instituted a suit for the purpose of establishing his rights. And of this proceeding we have the following account in the regular reports of the period (*a*) :

JULY 1, 1803.

SHEDDAN AGAINST PATRICK.

FOREIGN.—*One whose parents were afterwards married in a country where legitimation* per subsequens matrimonium *is not recognised, does not succeed to a landed estate in this country* ab intestato, *as a lawful child.*

William Sheddan, of the city of New York in America, entered into a regular marriage (7th November, 1798), according to the law of America, with a woman who had previously borne to him two children, William and Jean. He died a few days afterwards, having executed a settlement of his American property, in favour of his children, without taking any notice of the estate of Rughwood, in Ayrshire, in which he had some time before succeeded to his father.

Dr. Robert Patrick was served heir in special (October, 1799) to his uncle, William Sheddan, in the lands of Rughwood, upon this footing, that as by the laws of America the marriage had not the effect of legitimating children antecedently born, he was nearest lawful heir.

A reduction of this service was brought by a factor *loco tutoris* appointed to William Sheddan, who, in support of his right as a legitimate son, entitled to take landed and moveable property in Scotland by descent,

*Pleaded :* Marriage, when celebrated according to the solemnities of the law of the country where it is contracted, is valid and effectual all the world over : Erskine, b. iii. tit. 2. § 40. This rule is applicable only to the validity of the contract ; for as to its legal effects, these must be determined by the law of the country where execution is demanded ; and a contract may have an effect in its execution in a foreign country, different from what it would have in the country where it was entered into ; *Kinloch* against *Fullerton*

(*a*) See Fac. Coll., 1st July, 1803, by J. H. Forbes and John Jardine, Esquires, Advocates. The above report appears, from the initial F. at the end, to have been by Mr. Forbes, afterwards a judge, Lord Medwyn.

SHEDDEN
*v.*
PATRICK ET AL.

*and Company*, 10th July, 1739, Clerk Home ; *Wood* against *Grainger*, 24th June, 1749. Now the marriage, by the laws of America, was legal, and no power could dissolve it ; and all the effects, rights, and privileges, which the different countries bestow upon married persons, or on their children, must follow from it. These depend upon the particular laws of that country where effect is to be given to it ; more especially when the point at issue respects the right to a real estate : for every question of this kind must be decided by the law of the country where the real estate is situated. Now, by the law of Scotland, when a man marries the mother of a child born before marriage, *this* legitimates the child, and confers upon him all the rights and privileges which he would have inherited if his parents had been previously married ; Craig, lib. 2. dieg. 13. § 16; Erskine, b. 1. tit. 6. § 52.; Bankton, b. i. tit. 5. § 54. This rule existed in the civil law, and prevailed in every country where that law was received ; Voet, lib. xxv. tit. 7. § 6. A contrary practice is confined, it is believed, to England alone, and its dependencies. If, then, the legal effects of the marriage are to be decided by the law of Scotland, the children of it are to be held legitimate, although by the law of America their situation may be different.

*Answered :* The *status* or legitimacy of the child must be decided by the law of America, where his parents were domiciled, where he was born, and where the marriage was entered into. By that law marriage has not the effect of legitimating children antecedently born. No other jurisdiction has power to judge of the state of a citizen born within its territories, and whose parents were subject to its laws. Having once ascertained his *status* in life, by the law of the only country to whose jurisdiction he was subject, the *status* thus fixed must be received in every country which he may have occasion to visit, or in which he may afterwards acquire property. The question is not concerning the *status* of the *parents*, or the effects of that *status*, but concerning the *status* of the child ; and before we can determine as to the legal effects of his *status*, the previous question is, Whether the *status* of a lawful child has been constituted ? The rule, then, of ascertaining this personal quality by the law of his own country, not only is consistent with the general principles of jurisprudence, but is also highly expedient ; for nothing could be more absurd than for a person to be a bastard in one country, and lawful in another, merely by passing a river, or crossing a mountain, the boundary of their respective territories.

If at the time of the marriage the father had had no real estates in Scotland, it is admitted that the child would have been a bastard ; but if he afterwards purchased an estate, or obtained an heritable bond from one of his debtors, or adjudged his estate, would these operations affect the filiation of his children, and make them legiti-

mate in this country? If, again, a real estate in this country devolved to the father, or through him to his next heir *designativé*, but after his death, could the child claim this upon the plea of being legitimate, when he ought to begin with proving that he is so? *Macculloch* against *Macculloch*, 10th February, 1759.

The question was reported to the Court by the Lord Ordinary upon informations; upon advising which, and after a hearing in presence,

The Court repelled the reasons of reduction, with one dissentient voice.

Lord Ordinary, *Polkemmet.*

<div align="center">

For Sheddan, *H. Erskine, Fletcher.*

Alt. *Solicitor-General Blair, Cathcart.*

Clerk, *Ferrier.*

</div>

From this decision the Factor, on behalf of the minor, appealed to the House of Lords; and printed cases were deposited in the usual way.

The case for the Appellant was prepared by Lord Brougham, then Henry Brougham, of the Scotch Bar, about the year 1804 (*a*); and was as follows:—

## In the House of Lords.

| | |
|---|---|
| WILLIAM SHEDDEN, only lawful son of the deceased WILLIAM SHEDDEN, of Rughwood, in the County of Ayr, some time Merchant in New York; and HUGH CRAWFURD, Esq., Merchant ·in Greenock, his Factor *loco tutoris* | *Appellants.* |
| DOCTOR ROBERT PATRICK, of Trearne, in the County of Ayr | *Respondent.* |

### CASE OF THE APPELLANTS.

John Shedden, of Rughwood, in the county of Ayr, had two children, who survived him; Marion, the Respondent's mother, and William, the Appellant's father. He died in 1770, and was succeeded by his son, who, being then settled as a merchant in New York, left the management of his Scotch estate to his brother-in-law, the Respondent's father.

William Shedden had formed a connexion with a lady of the name of Ann Wilson, by whom he had two children, viz. the

The Appellant Mr. Shedden's father succeeds to a Scotch land estate.

Birth of the Appellant, and subsequent marriage of his parents.

(*a*) I have it from his lordship that this was the only appeal case he ever drew. It will be read now with more curiosity than when it was composed.

540                     CASES IN THE HOUSE OF LORDS.

SHEDDEN
*v.*
PATRICK ET AL.

Appellant William, an infant, and Jean. Several years after the birth of these children, he entered into a regular marriage with their mother. It was celebrated according to all the forms and solemnities prescribed by the laws of the United States ; and its validity has never been called in question.

Death of the Appellant's father.

Soon after his marriage, Mr. Shedden died, having previously executed a settlement of his American property in favour of the two children by his wife, and of Anabella, a daughter by a different mother. This settlement makes no mention of the land estate in Scotland ; and the American property was found insufficient to pay Mr. Shedden's debts.

His settlement.

In the settlement, Mr. Shedden directs his executors to send the Appellant, his only son, to Scotland, and appoints, as his sole guardian, Mr. William Patrick, the Respondent's brother. The boy has since arrived in Scotland, and been sent to school at Dunfermline. But Mr. Patrick, finding that his brother meant to claim the estate, from motives of delicacy declined accepting the guardianship, and requested the executors to name some person, unconnected with the Respondent, to manage the Appellant's interest, and support his claim to the estate. This the executors refused to do, stating that they had no funds to defray the necessary expense ; and, at Mr. Patrick's desire, the Appellant's other relations in Scotland, having held a meeting to consider of his affairs, prevailed on one of their number, the Appellant, Mr. Hugh Crawfurd, merchant in Greenock, to become his *factor loco tutoris*. A factory

Appointment of a *factor loco tutoris*.

in favour of Mr. Crawfurd was accordingly obtained from the Court of Session.

The Respondent causes himself to be served heir, and the Appellant brings a reduction of the service.

After the death of the Appellant's father, the Respondent caused himself to be served heir-at-law, in special, to the deceased. The *factor loco tutoris*, in the name of the Appellant, brought an action for the reduction of this service, upon the ground that the Appellant, being the lawful son and heir of the last proprietor, was himself entitled to succeed to his father's heritable property in Scotland, to the exclusion of the Respondent and of every other person.

Proceedings in the reduction.

After the usual preliminary steps were taken, the action came before the Lord *Polkemmet*, as *Lord Ordinary*. His Lordship heard counsel at the bar, and appointed the cause to be stated in mutual memorials. Upon advising these, he made *avizandum* to the Court, and appointed both parties to give in printed informations.

Respondent's argument.

The Respondent grounded his claim to the succession upon the alleged illegitimacy of the Appellant. He maintained that the question at issue was a question of *status*, and must be decided by the law of the person's domicile ; that the Appellant was born in America, and that his father was domiciled there ; that the law of the United States does not recognise legitimation by the marriage

## CASES IN THE HOUSE OF LORDS.    541

SHEDDEN
*v.*
PATRICK ET AL.

of parents, subsequent to the birth of the child; that being a bastard by this law, the Appellant is therefore a bastard all the world over, and cannot claim a Scotch estate, as heir *ab intestato,* any more than he can claim an estate in America.

The Appellant contended, that the whole question related to a land estate in Scotland, and that the succession to such an estate must be regulated by the law of Scotland; that whatever may be the rule of deciding with respect to personal property, real property must always follow the laws of the country where it is situated; that no principle of Scottish law is more clearly established than the legitimation of children by the subsequent marriage of the parents; that the marriage of the Appellant's parents being perfectly valid in America, the *locus contractûs* must be valid all the world over, and must fix upon him the character of legitimacy, which the Scotch law recognises in children whose parents were legally married; that he is therefore the *lawful son* of the late William Shedden, according to the only sense in which the words can be understood in a question regarding Scotch landed property, and, as such, has a right to be served heir in preference to the Respondent.

Appellant's argument.

The Court having advised the informations, and ordered a hearing in presence, pronounced the following interlocutor: "On report of Lord *Polkemmet,* and having considered the mutual informations for the parties, and heard their counsel in presence,—They repel the reasons of reduction, assoilzie the Defender, and decern; but supersede extract till the third sederunt day in November next."

*July* 1, 1803.
Interlocutor
of the Lords of
Session appealed
from.

The Appellants conceiving themselves aggrieved by this judgment, have appealed from it to your Lordships, and hope it will be reversed, altered, or amended, for the following, among other

### REASONS.

I. The marriage of the Appellant's parents must be deemed valid, whether it is judged of according to the law of the place where it was contracted, or according to the law of the husband's own country, viz. Scotland, where the question regarding its effect has arisen. The cohabitation of the parties, the certificate by the clergyman who performed the ceremony, and the acknowledgment of marriage in Mr. Shedden's will, constitute more evidence than the law of Scotland requires to establish the nuptial contract. Its validity by the law of the United States, if the *lex loci* is to be followed, has been sufficiently proved in the documents produced by the Respondent himself, and has all along been admitted by him.

Erskine, b. I. tit.
VI. § 3, 4, 5,
and 6.
Stair, b. I. tit.
IV. § 6.

II. There are certain principles, of extensive application, adopted in the jurisprudence of every nation, different from, and often quite repugnant to, the principles upon which the laws of other nations decide the same general questions. The law of some

542                          CASES IN THE HOUSE OF LORDS.

SHEDDEN
*v.*
PATRICK ET AL.

countries recognises a right of property over men, almost as
unlimited as over cattle. In other countries, a similar right is
admitted, but under greater limitations. In many countries the
law does not consider human beings as liable to the rights of pro-
perty under any limitations. Thus the fundamental principles
of law with respect to the qualities, the conditions, or the *status*
(as it is called) of persons, are radically different in these different
countries. The law of each views these qualities in a peculiar
way. In one it is a general fundamental doctrine, that a man may
be sold or bequeathed like a horse; in another, the doctrine is, that
a man can only be sold with the land to which he is attached; in a
third, the doctrine is, that a man cannot be the subject of commerce
at all; that he can neither be attached to land, nor possessed as
a separate property. In like manner, the nature of marriage is
variously laid down in various systems of jurisprudence. The law
of some countries views it as a contract which may be entered
into by more than two persons. The law of other countries con-
siders a plurality, whether of husbands or of wives, as incon-
sistent with the nature of the nuptial contract. Certain other
pactions, too, of a nature merely personal, are supported by the
laws of one country, and reprobated by those of another. Not to
mention the statutory enactments against usury, it is believed that
a contract of concubinage, which the common law of this country
would condemn *funditus*, is admitted in the jurisprudence of some
foreign states as a fit object of legal protection.—Now, in con-
sidering cases of this description, where the legal systems of
different nations have set out upon fundamental principles quite
irreconcilable, it is evident that the judicatures of each nation
must be guided by an appeal to those general doctrines which its
jurisprudence acknowledges, and not by any reference to the opposite
doctrines of foreign law. If a Russian landholder comes into an
English Court of Justice, and demands the restitution of his
vassal, who has escaped from his domain, he is met by the
answer, that villenage is unknown to our law. A West Indian
planter was stopped by the same principle, when he claimed
a slave, to whom he had an undoubted right in the country
where the contract took place which gave rise to his action: he
was told that personal slavery is unknown to the laws of this
island. Had the *essentials* of his contract been such as those
laws permitted, he would have been allowed to try its *formalities*
by the laws and customs of the country where it was entered
into; but the *substance* of the agreement was contrary to the
principles of both English and Scotch law, and accordingly the
judicatures of both countries refused to give it effect, after very
ample discussion; the Court of Session, in the case of *Wedderburn*
v. *Knight;* and the Court of King's Bench, in that of *Sommerset.*

1769.
1772.

Thus, too, the judicatures of this country support marriages between British subjects abroad, although solemnised according to the forms and ceremonies of the place where the parties were resident; because the use of the form is to afford evidence of the consent of the parties. But if an Englishman were to marry two wives in Turkey, the second would in vain assert her claim in this country, upon the ground that the two marriages were equally valid in the place where they were contracted. She would be told, that our laws do not contemplate the possibility of a person contracting a second marriage during the subsistence of the first. In like manner, as was observed by Mr. Justice *Wilmot*, on the case of *Robinson* v. *Bland*, a contract of prostitution may hold good in some countries, and still be void here at common law, though condemned by no statute.—And yet all these are, in the strictest sense of the word, questions of *status*: nevertheless, they are decided, not by the law of the country where the persons have their domicile, or where the contract that gave rise to them was made, but by the law of the country where execution of the contract is demanded, and an acknowledgment of the *status* claimed—in so far as the laws of the two countries proceed upon opposite fundamental principles. It seems impossible to assign any reason for excepting from this class the question of legitimacy. Upon no point do the laws of different countries vary more widely, and to no description of personal qualities, or *status*, have more important consequences been annexed. In so far as legitimacy is connected with the nuptial contract, it must be differently constituted in the countries of which the laws define that contract differently. The system of jurisprudence which allows polygamy, views, in the very same light, the children of the first and of all the subsequent marriages. But suppose a British subject in Turkey marries two wives, according to all the solemnities of the country; will his children, by the woman whom he marries last, be entitled to contend for their legitimacy in a British Court of Justice? Unquestionably not. The law of the country where the *status* is claimed holds these children to be bastards, the marriage of whose parents is null and void according to its fundamental principles. Again, in England, and its dependencies, those children only are legitimate who are born in wedlock. In some countries, the description of legitimacy is confined to children begotten as well as born in wedlock; but in Scotland, and all countries which have adopted the civil law, this description is extended to all children whose parents have been lawfully married at any time. Equal differences in the *details* of this subject may be perceived among the doctrines of those systems which have in general received the principle of legitimation by subsequent marriage. Thus, the Roman law holds that children born of a common

SHEDDEN
*v.*
PATRICK ET AL.

B. R. Michael-
mas, 1 Geo. III.

544                              CASES IN THE HOUSE OF LORDS.

<div style="float:left">

SHEDDEN
*v.*
PATRICK ET AL.

</div>

prostitute can no more be legitimated by the subsequent marriage of their parents, than children born in adultery. The law of Scotland makes no distinction between the children of a prostitute and of a concubine. Now these are all radical differences of principle, and must affect the determination of the question of legitimacy whenever it arises. If by the law of England a child is not held to be legitimate, merely because he was legitimate in a country where polygamy is allowed ; so neither can a child be deemed legitimate in England, merely because his parents after his birth were married in Scotland. This kind of legitimacy is as much unknown to the law of England, as the kind of marriage authorised by the Turkish law. But still less is there any ground for maintaining that the law of Scotland should refuse to acknowledge the legitimacy of a child whose parents were regularly married, merely because he was a bastard in a country where children born out of wedlock cannot be legitimated. This is a kind of bastardy as much unknown to the law of Scotland as legitimation *per subsequens matrimonium* is foreign to the principles of English and American law.—And if the general rule is to be stretched either way, it should doubtless be in favour of legitimacy. The law of Scotland recognises only one kind of bastardy, in children whose parents have been married at any time subsequent to their birth, viz. that of children whose parents could not have contracted lawful marriage previous to their birth. All others are held to have never been bastards, or, in the language of the civil law, they are deemed " *ab initio legitimi, non legitimati.*"

III. It appears, then, that the argument which considers this case as a question of *status*, is altogether favourable to the Appellant. But his advantage must be still more apparent, when the discussion is put upon the proper ground : for he submits, that it is a question upon the *effects* due to a contract *ex vi legis*. It has already been stated, that different systems of jurisprudence apply very opposite principles to determine the validity or define the nature of contracts. A difference still more remarkable may be perceived in the effects which different systems attribute to the same contract. In some countries, personal arrest for debt is unknown to the law. If a debt incurred there is sued for and established in England or Scotland, will it be a sufficient objection to the creditor's privilege of using personal diligence, that by the *lex loci contractûs*, no such diligence is allowed ? Or will an English creditor be permitted, by the judicatures of a country where personal arrest for debt is unknown, to imprison his debtor upon the ground that the law of England allows it ? Undoubtedly not. The *constitution* of the claim will be judged of in both cases by the law of the country where the contract was made, provided there is nothing in it essentially repugnant to the general doctrines of the law under

which the action is brought; and the same *effects* will be given to
the contract which it would have been by the *lex loci*, only in so
far as those effects are not repugnant to any fundamental principles
laid down by the law which is required to enforce it.  A variety
of illustrations might be added of the same position.  By the civil
law, those tutors and curators who married their wards, either to
themselves or their sons, were deemed infamous; and this principle
has been adopted, with certain limitations, in countries where the
Roman law prevails.  It cannot be maintained that the testimony
of such guardians would be refused in the Courts of this country.
In some states, the *patria potestas* extends to the infliction of
capital punishments.  Would an Englishman, who had a son born
in Japan, be permitted to defend himself here, or in the Courts of
Calcutta, from the charge of child-murder, by appealing to the laws
of the country where the child was born and his marriage con-
tracted?  It is scarcely necessary to show that these principles,
which must be acknowledged by the practice of all countries, are
supported by the decisions of the Scotch judicatures.  Nuncupative
settlements are as valid in England as written testaments; in Scot-
land, they are only good to convey a certain trifling amount of
moveable property.  But a nuncupative will made in England, was
found not to carry moveables in Scotland, although it is a general
rule that "*mobilia sequuntur personam;*" and a bastard's will
made in England was found to have no effect upon moveables in
Scotland; because, by the Scottish law, bastards have not the power
of making wills.  In determining the prescription (or limitation) of
obligations entered into in foreign countries, with foreigners, the
judicature of Scotland has decided according to the prescription
known in Scotch law, in a variety of cases; and in the late case of
*Hogg* v. *Lashley*, a contract of marriage entered into in England
between an Englishwoman and a Scotchman, whose domicile was
in London, received its effect *quoad* the personal property of the
husband, by the law of Scotland, where he died and where action
was brought.  The very same principles apply to the effects of
the marriage-contract upon the *status* of the children.  These must
be determined by the law of the country where the children claim
legitimacy.  The marriage of the Appellant's parents was good in
America, and had nothing in its substance repugnant to the prin-
ciples of Scotch law regarding the nuptial contract; a Scotch judi-
cature will therefore support it, and give it the effects prescribed
by the law of Scotland within the Scotch territory; of all these
effects the legitimation of the children is the most constant and
undoubted.  In Turkey, the children of concubines are received by
the law as in all respects on the same footing with those of married
persons.  But in a question arising before an English or Scotch
judicature, between those two descriptions of children, the effect

SHEDDEN
*v.*
PATRICK ET AL.

L. 7. Cod. de
Interd. Mat.—
Huber. Præl.
Pars II. lib. III.
tit. II. § 2—
Puffend. lib. VI.
cap. II.

*Jan.* 19, 1665.
Shaw.

*Oct.* 1, 1611.
Purves.

New Coll. vol. I.
p. 156.  Also
Randall v. Innes,
*July* 13, 1768;
Ker v. E. Home,
*Feb.* 20, 1771;
and Barret v. E.
Home, 1772.

Puffend. lib. VI.
cap. II. § ult.

CASES IN THE HOUSE OF LORDS.

SHEDDEN
v.
PATRICK ET AL.

of bastardy will be given to the contract of concubinage, and the issue of the marriage will be treated as legitimate *quoad* the rights, subject to the jurisdiction of the Court.

IV. Hitherto the argument has been stated upon the Appellant's right to be considered as legitimate *in general*, in questions which rise before a Scotch judicature. But it must be remembered, that he only claims the rights of legitimacy in so far as the succession to a Scotch land estate is concerned. The reasons formerly urged to prove that the law of Scotland must be the rule by which his legitimacy is tried, apply with double force when the question only relates to real property. The discrepancy of the principles which different systems of jurisprudence apply to the transmission of real estates, and indeed to all questions arising upon the possession of land, is so great, and the impossibility of execution ever being demanded in any other than the *locus rei sitœ* is so absolute, that inextricable confusion would arise from the judicatures of one country determining such questions by the laws of another. The doctrine, " *mobilia sequuntur personam*," is the foundation of all the argument ever urged to prove, that the law of the place, where a transaction happens, should be the rule for determining the rights claimed from it respecting moveables: and this doctrine has evidently no application to land, which is an integral and inseparable part of the national patrimony. Land has accordingly in all countries been made the object of peculiar regulations, arising from different views of state policy; and it is difficult to conceive a more absurd doctrine than that which would give to the laws of one state the power of forcibly modifying and altering the political system of another. If a Scotchman, having his domicile abroad, marries a foreigner, and dies there, it is clear that his children succeed to his Scotch land estate, according to the law of Scotland. If he makes a will, disposing of his Scotch property, that deed may be valid to the effect of carrying his moveables, provided it is executed according to the forms used in the country where it is made ; but it has absolutely no effect whatever upon the transmission of his land, though executed in the very manner in which the laws of his domicile permit real property to be bequeathed. And so every other transaction, affecting his land in Scotland, must receive effect according to the Scotch

*July 29, 1751.*

law. The case of the *Marquis* v. *the Marchioness of Annandale*, in Chancery, shows how strictly this principle applies, and in a question where the consideration of *status* was clearly involved. The Marquis had been declared a lunatic in England, but not in Scotland; and certain moneys had arisen from the sale of a Scotch heritable jurisdiction belonging to him. Lord *Hardwick* held that they must be applied as they would have been by the Court of Session, if the Marquis had been declared fatuous or furious in Scotland.—Nothing can be more a question of *status* than *majority*

*and minority*, the boundaries of which vary widely in different countries. It cannot be maintained that our law would deprive a Scotch landholder, born and having his domicile abroad, of his *restitutio in integrum* at the age of 22, because 18 might be majority in the country where he lived ; nor would our judicatures annul the bargains which he made upon his real property at the age of 28, though he might prove that the *quadriennium utile* begins to run from 25 by the law of his domicile. Both the benefit and the restraint would be interpreted according to the rules clearly established respecting majority and minority in the country where the estate lay. But what would be the consequence of the doctrine maintained by the Respondent ? A Scotch landholder marries two wives in Turkey, and dies. According to the Respondent's doctrine, both must have terce of his estate. He has a son by the second marriage before he has any children by the first. According to the Respondent, this son must inherit, to the exclusion of all the children afterwards born of the marriage first contracted. Suppose he marries at home, and has a daughter ; then settles in Turkey with his Scotch wife, and marries another, by whom he has a son ; this son, and not the daughter, must, by the Respondent's doctrine, inherit all the Scotch estate, for he is legitimate by the law of the country where his father was married and himself born; the daughter is legitimate, by the law of her own country ; and equal authority being due to both laws on the point of *status*, the male excludes the female. In like manner, an English nobleman, after living in concubinage all his life, may legitimate his children by marrying their mother in Scotland, and may thus transmit to a bastard all his titles as well as estates in England, even those honours granted by the Sovereign " to the heirs male of his body lawfully begotten ;" for this expression means heirs male whom the law acknowledges as legitimate, and is admitted on all hands to include the children begotten before, and born after marriage. It is another consequence of the Respondent's doctrine, that if an Englishman, having daughters by his wife in England, retires to France, or any other country where the mutual consent of parties is a legal ground of divorce, and there marries another woman with his former wife's consent, the son of this marriage will succeed to the English estate, and exclude the daughters of the English marriage. Some countries, copying the Roman law, admit legitimation *per rescriptum principis*, to the effect of giving the bastard right of succession. If the Respondent's argument is good for any thing, it must apply to the *status* thus bestowed, as well as to the *status* acquired by birth ; for both are equally creatures of the law. He must therefore maintain that letters of legitimation from a foreign prince may regulate the succession of land, and affect the rights of third parties in Scotland, when the same letters from the Sovereign of

CASES IN THE HOUSE OF LORDS.

the country have no other effect whatever than to yield up his share of the bastard's succession.—Again, if the succession to a Scotch land estate depends upon the legitimacy of the claimant, according to the law of the foreign country where he was born, then, in questions regarding the transmission of real property, the judicatures of the country where it lies must consider, not how the law of the land has provided for the actual case, but how the estate would have gone had it been situated in some foreign country, and how the foreign judge would have decided.   Now, in what manner is a person served heir in special to his ancestor by the law of Scotland ?   A jury is impanelled to make certain inquiries ; one of these is, Whether the claimant is nearest lawful heir to the deceased ?   How is the jury to answer this question ?   The words " *nearest heir* " mean nothing more than *that person whom the law of Scotland points out as heir*.   If the claimant was born in a country where the youngest son succeeds to the father's land estate,—in a manner, for example, subject to the custom of Borough English, would it be incumbent on the jury to refuse answering the question in the affirmative, because " *nearest heir* " according to the law of his *forum originis et domicilii*, means not the eldest but the youngest son ?   If, then, " *nearest heir* " must be taken in the sense given to the words by the law of the country where the land lies, and where the jury are commissioned to institute the inquiry, in what other sense can they take the word " *lawful ?* "   Surely they are required to examine who is the person designated by the known rules of Scotch law, and they can have no other guide in their inquiries.   There is another question of the same kind put to the jury in special services, viz. " Is the claimant of lawful age ?"   Since the tenure of ward was abolished, this inquiry, being useless, has always been answered of course in the affirmative.   But, during the subsistence of ward-holdings, how did juries determine what was meant by " *lawful age ?* "   If the claimant was born, and had his domicile in a country where 18 was the period of majority, could the jury serve him as of " *lawful age* " provided he was 18 years old ?   Certainly not.   Yet majority and minority is a question of *status* as much as legitimacy; and if the jury are bound to take the words " *lawful age* " in the meaning defined by the law of Scotland, no reason can be possibly assigned why they should not in the same inquiry take the words " *lawful son* " as signifying, " son whom the Scotch law denominates legitimate."   The whole question at issue between the Respondent and Appellant has arisen upon the validity of the Respondent's special service, that is, upon the accuracy of the retour (or verdict) of the jury who examined his claim.—It may be farther remarked, that the style of a summons of declarator of bastardy, as given by Stair, brings a strong confirmation of the view just now taken of the case.   It expressly

specifies the marriage of the parents, at any time, as a bar to the
sentence of bastardy—" to hear and see it found and declared that
he was holden and reputed bastard, and that his mother was *never*
lawfully married, or at least *never* lawfully married to his reputed
father." Stair adds, that the proper exception to this declarator, is,
that the father and mother were lawfully married, or at least were
holden and reputed man and wife at the dissolution of the marriage.
Suppose the Crown were to grant a gift of *ultimus hæres* over the
Appellant's succession, and that a declarator of bastardy was then
brought, how could the action be maintained in the face of the
exception which the circumstances of his case would instantly raise,
that his reputed father was lawfully married to his mother?

V. Although marriage is a contract depending on the will of the
parties, yet its effects upon the *status* of the children are deter-
mined by law. But even if the effects of the contract are to
be judged of by the presumed will of the parties, in the present
case that is clearly in the Appellant's favour. His father knew
that he had a land estate in Scotland when he contracted the
marriage, and certainly acted with a view to leave his son heir
of it; accordingly, he does not mention the estate in his will,
which would have been in every respect useless; but allows the
succession to be regulated by the law of the country where the
land lay—having first taken the steps which the law prescribes
for rendering his son capable of succession. If the possession
of that estate subjected him to the laws of this country in
various respects, it is fair to presume that he always acted
with a view to it. Indeed his will appointed a Scotch nephew
guardian to his son, and directed that Scotland should be his
domicile. In the case of *Sir J. Champaud* v. *Lord Ranelagh*, in
Chancery, it was decided, that a bond made in England and sent
to the obligee in Ireland, carries Irish rate of interest.

VI. The Respondent rests his chief argument upon this ground,
that if the law of *legitimatio per subsequens matrimonium* were
applied to the question, the same person would be legitimate in one
country and illegitimate in another; and that in the same country
he would be deemed a bastard when he claimed the moveable
succession, and a lawful son when he demanded heritage,—which
were stated to be absurd consequences. But it should be remem-
bered, that the first of these is the necessary result of diver-
sity of laws; the dispersion of a man's property, and his con-
sequent subjection to various jurisdictions. It is not denied that
the same person may be free in one country, and a slave in
another; of full age in England, and a minor in Holland. Nay,
are not the same subjects moveable in one country, and heritable
in another, viz. certain parts of the heirship moveables, as the
family seal and arms, which are to all legal intents heritable in

SHEDDEN
*v.*
PATRICK ET AL.

B. 4. Tit. 12. § 7.

Michaelmas
Term, 1700.

CASES IN THE HOUSE OF LORDS.

SHEDDEN
*v.*
PATRICK ET AL.

Erskine, B. III.
tit. VIII. § 18.

Scotland, and moveable everywhere else ?—With respect to the
other consequence, it is not admitted that the judicatures in
Scotland are bound to consider the claimant as a bastard, while
they determine the application of the moveable funds within their
jurisdiction. But although this were admitted, it does not appear
absurd to contend, that the real and personal property follow
different rules of succession, and that he may be heir of a land
estate who is not heir *in mobilibus.* The proposition that the same
person is to be held legitimate when he claims heritage, and ille-
gitimate when he claims moveables, means nothing more than that
the law of Scotland gives those who are in a certain predicament
a right to the one kind of succession, but not to the other. It is
just as absurd to say that the same deed is valid when moveables
are claimed under it, and void when heritable property is in
question ; or.to denominate bonds, bearing a clause of interest,
heritable with respect to the *fisc* and *jus relictœ,* and moveable
with respect to succession; or to assert that a man is a peer when
he claims exemption from personal arrest from debt, and a com-
moner when he is imprisoned for crimes. The apparent paradox
in all these cases arises from the form of expression ; from the
method of applying to ideas, created by the arbitrary destinations
of law, the language appropriate to the description of natural
and abstract relations. Legitimacy is entirely a creature of the
law ; and by denominating a man bastard, we only state that he
belongs to a class of persons whom the municipal laws of a
certain country have subjected to particular disqualifications.—
The Respondent also argues, that the Appellant is an alien, and
that the Naturalisation Act cannot apply to him, because he is
*filius nullius.* But this is the very point in dispute. The
Naturalisation Act, being a British statute, its benefit is extended
to Scotland, and its application to the children of Scotchmen
born abroad, must be made according to the principles, not of the
English, but of the Scotch law. If the Appellant has not proved
his claim to the title of legitimate according to that law, he has
certainly no case, and would have none though New York were a
British colony.

VII. It does not appear that any question of the same nature
with the present has ever come before the Courts of either England
or Scotland. But although no direct judgment can be adduced
by the Appellant, in support of his plea, he has the authorities
most respected in the Scotch law, in favour of the specific case
which he maintains, and of the general principles upon which
he has presumed to ground it. HUBER lays it down as a general
rule, for determining cases where there is a *conflictus legum,* and for
defining the extent of the *comitas* : "Rectores imperiorum id
comitur agunt ut jura cujusque populi intra terminos ejus exercita

Prælect. pars II.
lib. I. lec. III.
§ 2.

## CASES IN THE HOUSE OF LORDS.                551

teneant ubique suam vim *quatenus nihil potestati aut juri alterius imperantis ejusque civium prœjudicetur.*" VATELL delivers the same doctrine still more explicitly, in various passages of his work. " The validity of a testament, as to its form, can only be decided by the domestic Judge, whose sentence, delivered in form, ought to be everywhere acknowledged. But without affecting the validity of the testament itself, the bequests contained in it may be disputed before the Judge of the *place where the effects are situated, because those effects can only be disposed of conformably to the laws of the country.*"—" The Defendant's Judge is the Judge of that place where the Defendant has his settled abode, or the Judge of the place where any sudden difficulty arises, *provided it does not relate to an estate in land, or to a right annexed to such an estate.* In this last case, as *property of that kind is to be held according to the laws of the country where it is situated,* and as *the right of granting possession is vested in the Ruler of the country,* disputes relating to such property can only be decided in the state on which it depends."—" The property which a person leaves in a foreign country at his death, ought ultimately to devolve to those who are his heirs according to the laws of the state of which he is a member. But, notwithstanding this general rule, *his immoveable effects are to be disposed of according to the laws of the country where they are situated.*" The opinion of VOET is peculiarly in favour of the very argument maintained by the Appellant, and contains a full refutation of the precise doctrine upon which the Respondent has grounded his plea. " Evictum hactenus existimo, in omnibus statutis, realibus, personalibus, mixtis, aut quacunque alia sive denominatione sive divisione concipiendis, verissimam esse regulam, perdere omnino officium suum statuta extra territorium statuentis ; neque judicem alterius regionis, quantum ad res in suo territorio sitas, ex necessitate quadam juris obstrictum esse, ut sequatur probetur leges non suas." This general rule he admits may receive some modification in the case of moveables ; but with regard to real rights, its rigour has never, he affirms, been in the smallest degree mitigated. " Quamvis ergo a statutis suis realibus, sensu ante dato, magistratum cujusque loci *circa immobilia ne latum quidem unguem ex comitate recedere, sed suo mordicus inhærere juri,* experientia testetur, atque inde *immobilia non alia quam loci situs lege regi* tralatitium sit," &c. He then states the doctrine of the Respondent.—" Urgent tamen : cum enim, inquiunt, ab uno certoque loco statum hominis legem accipere necesse esset ; quod absurdum foret, ut, in quot loca quis iter faciens aut navigans delatus fuerit, totidem vicibus ille statum mutaret aut conditionem ; ut una eodemque tempore hic sui juris, illic alieni futurus ; sit ut uxor simul in potestate viri et extra eandem sit ; alio loco quis habeatur prodigus, alio frugi ; ac

Law of Nations,
b. II. cap. 6, 7,
§ 85.

Ibid. 18.

Ad Pand. lib. I.
tit. IV. Pars II.
§ 11.

Ibid., § 12.

Ibid., § 11.

o o

CASES IN THE HOUSE OF LORDS.

præterea, quod persona certo loco non affigeretur, cum res soli, loco fixæ, citra incommodum ejusdem legibus subjaceant ; summa providentia constitutum est, ut a loco domicilii statum ac conditionem induat ; illis legislatoribus pro soli sui genio optime omnium compertum habentibus, qua judicii maturitate polleant subditi, ut possint constituere, qui eorum ac quando ad sua tuenda negotia, indigeant auctoritate." This argument Voet then proceeds to refute as follows :—" Sed minus feliciter, cum gratis assumatur, nunquam ratione sat firma probandum, necesse esse, ut ab uno certoque loco status hominis legem. accipiat.  Quin potius, ut variis ex causis quis potest subjectus esse, vel ratione domicilii, licet bona nulla illic habeat, vel ratione rerum, licet illic, ubi res sitæ, larem non fixerit fortunarum suarum, ut ante dictum ; ita nec absurdum fuerit neque injustum, personam eandem pro vario rerum situ, ad disponendum de illis rebus habilem aut inhabilem esse, secundum qualitatem, quam loci cujusque lex personæ propter res ibidem sitas subjectæ, imposuerit aut denegaverit ; neque iniquum fuerit, personam ratione domicilii non subjectam, bonorum tamen contemplatione sequi territorii ac magistratus alterius jurisdictionem."   And again—" *Neque minus in legitimato,* cum enim legitimati legitimantis fisco quibusdam in locis quandam pendere soleant pecuniæ quantitatem, velut in pensationem juris illius, quod fiscus ratione successionis habuerat in illegitimi bona : Quæ quæso justitiæ ratio aut regula dictabit, unius legislatoris facto, non sine præmio vel pretii quadam in fiscum illatione interposito, damnum sentire loci alterius principem aut fiscum ejus, dum a legitimati, et ita ubique pro legitimo (ut volunt) habiti successione, quantum ad bona in suo territorio, excluderetur in totum, illis præcipue in locis, quibus vel universis est denegata testandi licentia, vel spuriis saltem juxta quorundam opinionem ademtum censetur testamenti condendi jus.  Atque ita de personalibus statutis censuerunt.  Andr. Gayl. lib. 2. observ. 124—Hugo Grotius ; Barry de successionibus ; Perezius, tit. cod. de Testamentis. et quotquot in universum censuerunt, nulla statuta cujuscunque conditionis egredi posse territorium statuentis."

<div align="right">AR. FLETCHER.<br>HENRY BROUGHAM.</div>

The Respondent's case is signed by Sir Samuel Romilly and Mr. Nolan.  What follows ought not to remain buried :—

There is no dispute between the parties concerning the facts of the case ; and the sole question arising upon those facts is, whether *William Shedden,* the infant (Appellant), be in point of law a

## CASES IN THE HOUSE OF LORDS. 553

SHEDDEN
*v.*
PATRICK ET AL.

legitimate son, and entitled in that character to take by descent landed property situated in *Scotland* ?

A further question was raised by the Summons in the Court below, namely, Whether he could take moveable property ? but the Appellant found himself compelled to abandon that part of his case altogether (*a*).

(*a*) Appellant's information, 12th November, 1802, pp. 33, 34.

The Appellant's right to succeed to heritable property depends upon two questions, which are not only new, but of great importance.

The first is, Whether a person who is a bastard by the law of the country where he was born, and where his parents were domiciled, can inherit as a legitimate son in *Scotland*, by reason of the subsequent marriage of those parents, although that marriage had not the effect of legitimating him in his own country, where it took place, and where he can never succeed to any property by descent, or in virtue of personal representation ?

1st Point.

The second question is, Whether the Appellant, being born out of the allegiance of the King of Great Britain, comes within the protection and exceptions created by 7th *Anne*, chap. 5, and 4th *Geo.* II., c. 21, § 1, or any other Act which naturalises the children of British parents born out of the allegiance of the Crown of *Great Britain?*

2nd Point.

The Appellant argued in the Court of Session, in support of his first point, that marriage, like every other personal contract, when celebrated according to the solemnities of the law of the country where it is contracted, is valid and effectual all the world over. This rule (it was argued) regards the validity of the contract only ; its legal effects must depend on the law of the country where execution is demanded. The marriage, therefore, between the Appellant's father and mother being admitted valid by the laws of *America*, is equally valid in *Scotland*. The question there is, not what are the effects, rights, and privileges, which marriage bestows on married persons or on their children by the law of *America*, or whether they differ from those conferred by the law of *Scotland*, but what legal effects such a marriage has by the laws of *Scotland*, where execution is demanded by the Appellant, and where the real estate is situated ? And upon this point it is clear, that, by the law of *Scotland*, one of the legal effects of the subsequent marriage of the Appellant's parents is to legitimate all the children procreated between them (whether born before or after the actual marriage), to all intents and purposes, as if the parents had been married when the first child was begotten.

Appellant's argument on 1st Point. Information for Appellant, p. 5. Erskine, lib. III. tit. II. § 40.

The question, therefore, is, Whether the Appellant's *status* as to legitimacy or illegitimacy is to be decided according to the law of *America*, where he was born, and his parents resided, or according to that of *Scotland*, where he claims to succeed to an inheritance ?

In support of the latter position, the authority of Voet, lib. 1,

554                        CASES IN THE HOUSE OF LORDS.

tit. 4, par. 2, is cited, where he lays it down, "*quod summo jure, nec personalia, nec realia, nec mixta (statuta), operantur extra territorium statuentis.*"

The Respondent does not deny this maxim, which constitutes the essence of an independent state, but he disputes its application. None of the authorities quoted by him assert that the laws of independent states possess a binding force *proprio vigore* beyond the territories of the lawgiver. But it is manifest, that neither this principle of Voet, nor his reasoning upon it, can determine the question of how far the *status* which an individual receives from the *statuta,* or positive laws of his country, accompany him into another dominion. Unless this be so, the *status* of marriage itself, which the Appellant admits to be valid all over the world, must follow his general rule; and if either husband or wife leave the country in which they marry, the journey must operate to divorce the connection, and annihilate the rights and duties consequent upon it.

The influence which the law of a foreign state obtains in determining the *status* or rights of its subjects in another kingdom, originates in a different principle. It is the necessary intercourse of the subjects of independent governments which gives rise to a sort of compact, that their municipal institutions shall receive a degree of reciprocal efficacy and sanction within their respective dominions. It is not the statutes of one community which extend their controuling power into the territories of another; it is the Sovereign of each who adopts the foreign rule, and applies it to those particular cases in which it is found necessary to protect and cherish the mutual intercourse of his subjects, with those of the country whose law he adopts.

In many instances this rule is expressly given by treaty or alliance; in others it is regulated by the ancient practice of nations. Thus it is not true, as asserted by the Appellant (*b*), that the *status* of dignity is confined in all cases to the limits of that country by the supreme power of which it is conferred. The highest and lowest dignities (*i. e.* of a king and a knight) are universally acknowledged throughout Europe. " Therefore, if a king of a foreign nation come into England by the leave of the King of this realm, in this case he shall sue and be sued by the name of a king" (*c*).

In all cases where the rule of his conduct is not prescribed by such means, the judge must follow those comprehensive laws of nature and nations, which are founded upon the common feelings, constitution, and interests of mankind. He does so, not only because the thing is consonant to reason and justice, but because, from being so, it is to be presumed, that other countries will act in the same way to the lieges of his own country, under similar circumstances.

Ingenuity may easily put speculative instances, which it will puzzle the judgment to decide, even upon this principle, inasmuch as the effect to be given to the institutions of a foreign government depends, in most cases, upon a minute and intricate combination of circumstances, which give birth to various solid, though subtle, distinctions. But, so far as it appears possible to extract general rules of decision, the following seem to regulate the practice of independent states in most of those which have come under discussion. The thing to be done must not be prejudicial to the interest of the country required to enforce it. It must not be in direct contradiction to the laws of the place in which it is to be done (*d*). The comity should, at least, in substance be reciprocal between the countries (*e*); for to use the words of Valin, if there be no reciprocity, it destroys that equality of justice which states owe to each other (*f*).

These rules, as they operate upon the various circumstances and situations in which mankind are placed, will give rise to a different result. Not only the difference of laws, but that of religion, the habits of national intercourse, the place where the thing is required to be done, the local situation of the parties, with reference to the *forum* applied to, and the temporary allegiance due thereto, may vary the decision. Hence it may well follow, that a foreign power shall pay no regard to the regulations and judgments of another kingdom, respecting the *status* of its subjects in particular respects; such are infamy or dignity; pupilage or majority, and many other instances which might be put, whilst it pays a necessary and strict attention to others, such as marriage, and the relation between parent and child.

To these two last relations all civilised and Christian nations must give efficacy, at least, so far as they are not founded upon principles absolutely repugnant to their own laws; because the *status* being universal among them, although the modes of acquiring it differ, that intercourse, which is the ground and foundation upon which the observance of the laws of another country takes place, could not subsist without it. To this may be added a less general reason, but which is undoubtedly prevalent in various countries, namely, the influence of a common principle of religion.

To these two great and universal relations, which constitute the foundation of society, respect must be paid therefore upon a necessity more cogent than that which has induced the commonwealth of European governments to enforce the contracts of foreigners, or to adopt the law of the owner's domicile in determining the succession of his personal property; and that for the plain and substantial reason, that the rights incident to these conditions are much more dear to the subject, and more important to his natural sovereign. Unless their binding force were to be admitted by

SHEDDEN
*v.*
PATRICK ET AL.

(*d*) Hub. Præl. lib. I. tit. III. § 2.

(*e*) Case of Santa Cruz, 1 Robin. Adm. Reps. 63.

(*f*) Valin, lib. III. tit. IX. Art. 10.

556                   CASES IN THE HOUSE OF LORDS.

SHEDDEN
*v.*
PATRICK ET AL.

other governments, all intercourse must cease. No King could permit a subject to depart from his territory ; no honest man could quit his country, where it might dissolve a dear connection and superinduce a new *status* upon him, not in consequence of his contract or his will, but of his journey. Although the relation, therefore, in which a man stands to his wife or his child, are adventitious in their commencement, yet when once formed, they become permanent qualities, which must remain affixed to him into whatever country he goes, which respects its intercourse with another state. To the extent of these two relations, therefore, the rule laid down by *Huber*, as an axiom, seems undoubtedly just. *Qualitates personales certo loco alicui jure impressas, ubique circum ferri et personam comitari, cum hoc effectu ut ubivis locorum eo jure, qui talis personæ alibi gaudent vel subjecti sunt fruantur et subjiciantur* ( *g* ).

*(g)* Hub. Præl. lib. I. tit. III. § 12.

The Appellant indeed admits this position, so far as respects the relation of husband and wife, when he observes, that " by the Law of Nations, marriage, when celebrated according to the solemnities of the law of the country, where it is contracted, is valid and effectual all the world over " ( *h* ). And when he does so, what reason can there be that a rule, which extends to most contracts or obligations, entered into according to the law of the place, where they are executed ( *i* ), should not embrace the relation of parent and child, as to legitimacy or otherwise.

*(h)* Appellant's Inf.

*(i)* Erskine, lib. III. tit. II. § 40.

The Appellant, feeling the force of this argument, is anxious to refer his case to another principle. Instead of considering the relation of parent and child, as a positive *status* subsisting between them, he regards it as the mere consequence of the *status* of husband and wife. He labours to maintain, therefore, that the legitimacy of the issue is only an effect of the contract of marriage, and like all other effects of a contract, must be decided by the law where execution of it is demanded.

Even if it be supposed that this, his rule, respecting contracts is universally true, which is by no means the case, still it is misapplied. The *status* of the child is not to be considered as a case of contract. An unborn infant cannot be a party to a contract, and none exists between him and his parent. His *status* as to legitimacy depends upon a different principle. It is a character which the law allows the parents to impress upon their child, as being the immediate sources of its being. Their will to do so is manifested in most countries by the celebration of marriage, but it may be evidenced by other means. It is clear, therefore, that this will of the parents can only be decided by the laws of the country, which concedes to them the power, and which prescribes the means or act by which the effect and consequence is to be manifested and produced. In this particular, it does not differ from any contract, agreement, or

other act of theirs, which has no direct reference to a foreign *forum*, as the place in which it is to be executed. Its validity must be decided by the law of the country which allows of its being done, and according to the forms of which it is done. If it were otherwise, the party would be judged and concluded.by laws to which he owed no obedience at the time when he did the act.

SHEDDEN
*v.*
PATRICK ET AL.

But although the condition is not to be considered as a mere consequential effect of the contract of marriage, but as an independent *status*, still policy and morality require that it should be regarded and treated in every respect upon the same footing as the *status* of marriage with which it is so intimately connected. The relation which subsists between a parent and his lawful child are of such high importance, and involve the interest and claims of such various parties and families, that the parent should at least have some previous knowledge, both of the time and act by which he constitutes the relation, and incurs the obligations which attend it. Few have it in their power to obtain information with regard to the laws of any country, but of that where they live. It would be unreasonable in the extreme, therefore, that the *status* of a man's child as to legitimacy or illegitimacy, should depend upon the law and custom of a foreign land, with which he was unacquainted ; and still less can it be conceived, that it ever should be the will of the parents to render him legitimate in one place, and illegitimate in another.

Against this position the Appellant insists, that the legitimacy of a child is not the act of the parent, and the consequence of his will, but that it is the effect of the contract of marriage ; because no deed or act of the parents, however solemn, could render the child illegitimate, where a marriage has taken place. It might be sufficient to observe, in answer to this remark, that the fact of marriage, upon which legitimacy or illegitimacy depends, is the act of the parents, and depends upon their will; and that having once willed it, most laws do not suffer them to retract what they have thus solemnly declared. But the argument is defective, not only in legal conclusiveness, but in matter of fact. The Appellant's observation is indeed generally true, in countries where Christianity prevails, but it is not so universally. Where that rule obtains, the law prohibits the individual from declaring his will to legitimate by any other means than marriage, which it makes a conclusive and permanent declaration of that will, as to the issue procreated under it. But there are countries where legitimation is not a necessary consequence of marriage. Such is the case of what are vulgarly called left-handed marriages in parts of Germany. There are other states, likewise, in which the law allows of different ways of legitimation besides marriage. In such states, the will to legitimate may be declared by such modes and ceremonies as the laws admit of. The

558                   CASES IN THE HOUSE OF LORDS.

general rule, therefore, is, that the fact of legitimating a child depends universally upon the parents' will, just as does his buying, selling, or exchanging his property. But the mode of declaring this will, and carrying it into execution, is defined and limited by the laws and customs of each particular country in which it takes place, and by which it must be ascertained. For, if the laws allow of other modes of legitimation than marriage, it can admit of no dispute, that the extent and validity of the mode is only to be judged of by the laws and customs of the country which admit of it.

The next argument used for the Appellant is, that if the *status* of the child is to be determined by the law of the father's domicile, that of the Appellant's father was not in *America* solely ; inasmuch as both *ratione originis,* and from having property in *Scotland,* he was subject to the jurisdiction of the Courts of *Scotland.* It is true, that the father was subject to the jurisdiction of the Scottish Courts, so far as that he might, upon these grounds, have been successfully prosecuted for payment of a debt, by reason of his having an estate in that country. But in what way could any question have been tried, which involved the *status* of himself, his wife, and children, none of whom were either in the country, or had property, by which they might be subject to the jurisdiction of its laws ?

The Appellant, who is willing to take the question in its alternative, next observes, that, supposing his legitimacy does not depend upon the domicile of the father, but upon that of the son, further discussion is, even on that supposition, unnecessary ; because the Appellant is domiciled in Scotland, where he resides, and where it was desired, by his father's settlement, that he should be educated. It is not easy to see, how an infant, who can have no will of his own, can change his domicile. But if the law were otherwise, this compendious mode of deciding the case only evades the question. The point is not, where he is domiciled now, but what his situation was at the time of his birth, and of his father's death. If he was then a bastard by the law of *America,* the only country which at that time had a right to judge of his situation, even if he should afterwards obtain letters of legitimation in this country, they cannot have the effect of injuring third parties, or of enabling American bastards to succeed to heritage in this country, to the prejudice of the lawful heirs.

Lastly, the Appellant, despairing of success upon the questions of domicile, gets out of humour with them, and boldly takes up the argument in their defiance. He insists, therefore, that, as the succession to moveables, *ab intestato,* is regulated by the law of the deceased's domicile, upon the legal fiction, that, having no permanent *situs,* they are presumed to be in the place of his domicile at

## CASES IN THE HOUSE OF LORDS. 559

the time of his death ; so, *ex paritate rationis*, his right to the real estate is to be decided by the *lex loci rei sitœ*, since no man has ever denied, that all questions concerning heritable estates must be decided by the laws of the countries where these estates are situated.

SHEDDEN
*v.*
PATRICK ET AL.

The Respondent desires no other supposition to illustrate the error of that principle for which the Appellant contends. The *lex domicilii* is not less extensive in its powers over the defunct's moveables, than the *lex loci rei sitœ* is with reference to his heritable estate. Yet, was it ever supposed, that the law of the parent's domicile is not only to regulate the succession to his moveables, but that it must likewise decide, according to its own rules, upon the legitimacy of his children, under whatever circumstances, and in whatever state, they were born ?

An Italian or Scotsman, in whose countries the law of legitimation, by a post marriage, prevails, has, while dwelling in his native country, children by a woman whom he afterwards marries there. Subsequent to this he becomes domiciled in England, where he acquires personal property, and dies. Is the law of England to decide upon the legitimacy of his children by its own rules, and disinherit them as bastards ? Yet if it does not, how can the *lex loci rei sitœ* decide it as to real property.

The Respondent does not mean to deny, that neither the law of Scotland, nor that of any other country, in which the feudal system prevailed, will suffer its rules respecting heritable or immoveable property to give way to the laws of another state. This rule is founded on that maxim already mentioned, that no state will give effect to the municipal institutions of another country, which are repugnant to its interests and its laws, and which might be enacted for the purpose of binding an independent people in their own territories. If this argument be a gordian knot, it would have been cut at once, under the common law of *Scotland*, because it permitted no alien born to inherit lands situated there, whatever his *status* as to legitimacy might be. But it seems to admit of solution with no great difficulty. For it by no means follows, that because the *lex loci rei sitœ* must be complied with to enable the Appellant to succeed to real property, that the *status* of such an heir must not be as free from stain or imputation by the laws of his native country, as by those by which he is called to inherit. The Appellant is anxious in this, as he has been in all other parts of his argument, to confound the *status* of legitimacy with its legal consequences in another country, when ascertained.

The Appellant's position, so far as it applies to his case, points out the absurdity of the conclusion which he labours to establish. The Summons in the present action contains a conclusion, that the Respondent shall be decreed to hold count and reckoning of the

CASES IN THE HOUSE OF LORDS.

SHEDDEN
*v.*
PATRICK ET AL.

rents, mails, and duties, to the Appellant, as heir to the deceased *in mobilibus*, as well as to set aside the service of the Respondent. As the rents are moveables, the Appellant's right to them must be decided by the *lex domicilii*, which was America, where he is held illegitimate. If, therefore, his illegitimacy is to be regulated as to real property by the law of Scotland, where it is situated, this inconsistency must arise, that while the Appellant claims heritable property, he is legitimate, and while he claims moveable property, he is a bastard, and that by the same Court, upon the same day, and in the same cause, judging of the same fact, viz. his birth in America, he will be held both a bastard and a lawful son of his father.

So, if *William Shedden*, the father, had left personal property in *Scotland* at the time of his death, and no real estate, the Appellant would be confessedly both a bastard and an alien. But according to his argument, if a relation of *William*, the father, should die several years subsequent to the father, and the succession to a landed estate should thereby open to the father's heir, the Appellant would by that accident become a natural born subject, and legitimate, although he had continued a bastard and an alien perhaps for twenty years after his father's death. The same rule must apply to the Appellant's son, if the succession had not opened until after the Appellant's death.

In like manner, if the Appellant's father had debts owing to him in *Scotland*, but had possessed no land there, and his attorney, with a view of securing these debts, had the day before the father's death obtained a decreet of adjudication, or taken an heritable bond, of which the father had never heard, still the Appellant would be constituted, by the agent's act, a legitimate son, and a natural born subject, although his father had never known of the proceeding, and the security had been changed with a different view.

These absurd consequences prove to demonstration, that the rule of succession to real property has no connection with the present case. The legitimacy of children is a mere matter of fact, to be determined by the law of the country where the child was born, and his parents domiciled. When that fact is ascertained, the law of succession operates upon it, and takes care that the heir designated by such means shall succeed according to its own rules. But it cannot be conceived, that the law of Scotland treats foreigners with greater courtesy, and puts them in a better situation than if they were at home, and that in a question of succession, it considers children as legitimately born in America, when, by the law of that country, it is demonstrated that they were born bastards.

Respondent's
Inf.

No case of the present nature has been solemnly decided in the

CASES IN THE HOUSE OF LORDS.    561

Courts of Scotland.  One, corresponding in circumstances, excepting that the parents lived and were married in England, occurred some years ago, in which the son, born antecedent to his parents' marriage, withdrew his claim to the Scottish estate.  As the parents were of rank and fortune, they could not have done so unless warranted by the clear and decisive opinion of counsel.  That case appears to have been considered by Lord *Kaimes,* who gives his opinion without reserve upon it.

His Lordship says, "under the head of covenants, marriage comes celebrated abroad;" and then observes, that a foreign marriage, if celebrated according to the law of the country, would be effectual in *Scotland.*  He then says, " According to the doctrine here laid down, a child ought with us to be held legitimate by a subsequent marriage, *provided the marriage ceremony was performed in a country where such is the law: because marriage in such a country must import the will of the father to legitimate his bastard children.*  But we cannot justly give the same effect to a marriage celebrated in a country where *the marriage, as in* England, *hath not the effect of legitimation.*  The reason is, that marriage in that country is not a proof of the father's will to legitimate " (*i*).

(*i*) Principles of Equity, b. III. tit. VIII. § 1.

The principle likewise upon which legitimation *per subsequens matrimonium* is supported, in the law of *Scotland,* is as hostile to the Appellant's case as the opinion of Lord *Kaimes.*  By fiction of law, the marriage is supposed to have been contracted before the child legitimated was begotten (*k*).  But this presumption is liable to be rebutted by circumstances in the condition of the parents, which show that they could not have been married at the time of the birth.  Thus, if either was married to a third person at the period of conception, although both were free at that of the birth, the legitimation cannot proceed by subsequent marriage (*l*).  The principle which prohibits the presumption in that case extends to the present, in as much as by the law of *America,* where the Appellant was born, and his parents domiciled, it could not take place.  There is a prohibition in his native country against it, according to whose laws he was born, and must ever continue illegitimate.  No marriage could exist there without actual celebration, and this is in itself·a complete legal bar to any presumption of an anterior marriage.

(*k*) Ersk. b. I. tit. VI. § 52. Bank, b. I. tit. V. § 54.   Cowan *v.* Hart, *Jan.* 20, 1802.  Respondent's Inf.

(*l*) Bank, Ibid.

But the Respondent humbly submits, that whatever the difficulty of this question may be, it is unnecessary for your Lordships to decide upon it in the present case.  The Appellant was born in *America* after the independence of that country had been acknowledged by *Great Britain* in 1783.  According to the law as it stood antecedent to the union of the kingdoms of *England* and *Scotland,* he was an alien, born *extra fidem domini regis;* and being the natural born subject of a distinct and independent state, could neither

Point II.

562                     CASES IN THE HOUSE OF LORDS.

SHEDDEN
*v.*
PATRICK ET AL.

(*m*) Ersk. Inst.,
lib. III. T. X.
735.
(*n*) Reported,
Kaimes' remark.
Decis. No. 106,
Kilk. No. 6, *v.*
Foreign, 3, Dict.
Decis. 231.
(*o*) Ersk. Inst.
*ut supra.*
(*p*) Cod. lib. XI.
tit. 55.
(*q*) 7 Co. 2, 1.
Black. Comm.
B. 1, c. 10, p. 372.

(*r*) 3 Dict. Decis.
231.

(*s*) Appellant's
Information.

enjoy nor succeed to a feudal subject in the country of *Scotland*, to
whose Sovereign he owed no allegiance as a duty incident to his
birth.   It is stated by Mr. *Erskine*, that " as this doctrine has
obtained in most countries which have adopted the feudal plan, it
may be affirmed, notwithstanding the authority of *Craig*, Lib. I.
Dieg. 4, § 7, that it has been also rigorously observed in *Scot-
land* " (*m*), and " it was unanimously adjudged, Falc. ii. 66 (*n*),
that an alien could not succeed to a land estate in *Scotland* without
naturalisation by authority of Parliament " (*o*).

The civil law seems to have admitted the same rule (*p*), and it
was scrupulously adhered to in *England* (*q*).   That this part of the
law should correspond in *England* and *Scotland*, is required by the
most obvious policy ; for, as the privileges and rights of the natives
of both countries are equal, the regulations which respect the
rights of their offspring born out of the allegiance of the Crown of
*Great Britain* should be the same in both.   The Lords of Session
were principally influenced by the weight of the principle in their
decision upon the case of *Leslie* v. *Gordon*, already cited (*r*).   It
is to be observed also, that the coincidence of their law, so far as
it is manifested by judicial decision, is uniform and complete, and
that the rights of the children of British parents born in the domi-
nions of a foreign Prince, are regulated in both parts of the kingdom
by the same provisions in the same statutes.

It was properly admitted in the Court below (*s*), as a point too
clear to be capable of dispute, that the Appellant was an alien, and
incapable of succeeding to the estate of *Rughwood* unless he is
entitled to the benefit of the naturalising statutes of 7th *Anne*, c. 5,
and 4th *Geo.* 2, c. 21.

The Respondent does humbly, but with unshaken confidence
contend, that he comes neither within the letter nor the spirit of
these statutes, but remains an alien born, unnaturalised, and inca-
pable of inheriting real property.

The words of 7th *Anne*, c. 5, ¬are, " that the children of *all
natural born subjects, born* out of the ligeance of her Majesty, &c.,
shall be deemed, adjudged, and taken to be natural born subjects
*of this kingdom* to all intents."   Some doubts seem to have been
entertained whether it was not required by this Act, that the
mother should be a natural born subject as well as the father, in
order to give their children the benefit of the statute, or, if not,
whether the privilege did not extend to children born of mothers
who were natural born subjects, although the father was an alien.
The 4th *Geo.* 2, c. 21, in conformity to the provision of antecedent
Acts upon the subject, confined this privilege to the children of
British fathers.   The material words are, " That all children born
out of the ligeance of the Crown of *England*, or of *Great Britain*,
whose fathers were or shall be natural born subjects of the Crown

CASES IN THE HOUSE OF LORDS.    `563

of *England* or of *Great Britain, at the time of the birth* of such children respectively, shall be adjudged and taken to be, and are hereby declared to be natural born subjects of the Crown of *Great Britain.*"

It neither is nor can be denied, that a bastard, as being *nullius filius,* is not a child within the meaning of these Acts, and that such a person, although the offspring of British parents, is, when born out of his Majesty's allegiance, as much an alien by the law as it now stands, as he would have been if these statutes had never passed. But while the Appellant admits this position, he argues that his alienage is taken off by the subsequent marriage of his father and mother; and contends, " That the fiction of law which establishes his legitimacy, supposes his parents to have been married at the time he was begotten, so that he was legitimate from his very birth (*t*); " or, as is expressed in another part of the Appellant's Information, "he is in the sense of law held to be a *filius legitimus* from the beginning (*u*)."

The Respondent humbly contends, in opposition to this argument, that the supposed fiction of law can work no such effect. The statute seems worded so as to anticipate this argument, and guard against the consequences to be deduced from it. It requires that the father should be a natural born subject at *the time of the* CHILD's birth. But it is impossible to say that this child had a father who was a natural born subject at the time of the birth, when in contemplation of law he had no father at that period, either alien or native. This construction is in strict conformity with the ancient law, which held, that the question of alien or natural born subject depended solely upon the fact of birth within the King's ligeance (*x*); and that a person who is an alien at the moment of his birth, never can come under the description of a natural born subject, whose subjection commences with his birth, and from whom natural allegiance is due to the Sovereign within whose dominions, and under whose protection, he came into the world. Thus natural allegiance is defined by Lord Chancellor *Ellesmere*— " *Ligeantia naturalis, absoluta, pura, et indefinita,* is due by nature and birthright, and is called *alta ligeantia,* and he that oweth it is called *subditus natus* (*y*)."

The Appellant was not a natural born subject of *Great Britain* within this or any other definition of the term known to the law of *England* or *Scotland,* either at the time of his birth, or for six years afterwards. If he had been the reputed son of an Englishman having lands in *England,* no act of his supposed father could enable him to succeed to such lands, or hold them by any species of legal conveyance. Upon what principle, then, can it be contended, that a Scotchman, domiciled in *America,* shall have power, by a subsequent marriage, to confer upon his illegitimate child,

SHEDDEN
*v.*
PATRICK ET AL.

(*t*) Appellant's Information.

(*u*) Ibid. *infra.*

(*x*) 7 Co. 15 A. 18, b, 25 b. 27 a. Craw *v.* Ramsay. Vaugh. 283, 286. Deg. 224.

(*y*) Case of *post nati,* 11 St. Tr. 88.

SHEDDEN
v.
PATRICK ET AL.

twenty years after his birth, all the privileges of a natural subject, when an Englishman has no such power. But the argument goes even farther. If the Appellant is held to be a natural born subject, so as to succeed to lands in *Scotland*, he must of course be held a natural born subject in *England*, since, by the Articles of Union, the rights and privileges of the subjects of both countries are declared to be the same. A *Scotsman* has by these means, therefore, a power, not only of legitimating his bastards, and rendering them capable of succeeding to real property in his own country, but in *England* also, and that when no act of an *Englishman* can do it in either. In such an interpretation of the law, there is no principle of reciprocity ; and it is in direct contradiction to the 4th Article of the Act of Union, which declares, " That there shall be a communication of all other rights, privileges, and advantages, which do or may belong to the subjects of either kingdom, except when it is otherwise expressly agreed in these articles." It seems impossible to maintain, therefore, that the legislature have by the same words, in the same statutes, conferred such very different privileges on its subjects, according as they are born on this side or beyond the *Tweed.*

Cases have occurred more frequently in *England* upon the subject of alienage than in *Scotland*, owing to its extensive continental dominions, and the consequent fluctuations of conquest and cession of territorial dominions. To the decisions which have occurred in the law of *England* upon the subject, the Respondent appeals ; not only as illustrative of what the law of *Scotland* is, but (for the reasons already submitted to your Lordships) as giving the rule upon the common question of alienage to both parts of the empire (z).

By the law of *England* the criterion of natural allegiance, or what constitutes a *subditus natus*, is fixed and determined by the birth alone, and depends upon it. Unless a person owes at that moment natural allegiance to the crown of *Great Britain*, no subsequent circumstance, nor fiction of law, can remove the condition of alienage. If fiction or convenience could alter a rule so wisely inexorable, it is most natural that it should have operated in cases of persons who, not being born under the allegiance of the crown of *England* before the union with *Scotland*, or that of *Great Britain* since, became subjects to the King, either by compact or conquest. But it is held, that persons of this description, called *antenati*, do not possess the right of taking or of inheriting lands, although such as are *postnati* enjoy the privilege. Such a provision would also be made most naturally in favour of alien women, who intermarry with Scottish or English husbands ; and yet, by the laws of *England* (a), such a woman is not entitled to dower, nor in *Scotland* to her terce (b). The cases therefore put by the Appel-

(z) Lord Chancellor Ellesmere seems of opinion that the laws of the two countries correspond on this subject.— See also Leslie *v.* Gordon. 3 Dict. Decis. 231, *voce* Foreign.

(a) Hargr. Co. lib. 31, a. No. 9.
(b) Stewart *contra* Hoome, 3 Dict. of Decis. 231.

lant, that the alien husband of a woman having an estate in
*Scotland* would be entitled to the benefit of courtesy, and an alien
wife to her terce, are not law (c).

But this point, that no fiction of law can operate to naturalise
those who were aliens at the time of their birth, does not rest upon
analogy or the inference, that if it existed at all, it must have
obtained in cases which seem more strongly to require its appli-
cation, upon grounds of political and moral expedience. The law
has been expressly declared to be so by the first legal authorities ;
and the reasons which they assign for their opinion go directly to
the root of the Appellant's argument.

Thus it is observed by Lord *Bacon,* in arguing the case of the
Scottish *postnati*—" If any conceive that the reasons for the *post-
nati* might serve as well for the *antenati,* he may, by the distri-
bution we have made, plainly perceive his error. For the law
looketh not back, and *therefore cannot, by any matter* ex post facto
*after birth, alter the state of the birth (d)*." The words of Lord Chief
Justice *Vaughan,* in the case of *Craw* versus *Ramsay,* which came
before the Court of Common Pleas, *Hill,* 21 & 22, *Car.* 2, are more
explicit, and seem to meet *in terminis* the case at present before
your Lordships. " But then, since all ligeance and subjection are
acts and obligations of law (for a man owes no ligeance excluding
all civil law), but a man is said to be a *natural subject, because his
subjection begins with his birth, that is, as soon as he can be subject ;*
and a king is said to be a man's natural prince, because his pro-
tection begins as soon as the subject can be protected ; and in the
same sense that a country where a man is born is his natural
country, or the language he first speaks is his natural tongue ;
why should not an act of law, making a man as if he had been
born a subject, work the same effect as his being born a subject,
which is an effect of law ? "

One of the answers which this very learned Judge gives to the
doubt raised by him in the latter part of the preceding sentence is
decisive of the present question. He says, " No FICTION *can make
a natural subject ; for he is correlative to a natural Prince,* and
cannot have two natural Sovereigns (but may have one Sovereign,
as a Queen-Sovereign, and her husband, in two persons), no more
than two natural fathers, or two natural mothers. But if a fiction
could make a natural subject, he hath two natural Princes, one
where he was born, and the other where naturalised" (e).

Unless these statutes are held strictly to relate to the actual time
of birth of the person who claims to be naturalised under them,
and not to admit of retrospect, various questions must arise, which
would throw the line of succession into uncertainty and confusion.

Thus suppose the lands of *Rughwood,* instead of descending in
fee to the right heir of *William Shedden,* the father, had been

SHEDDEN
*v.*
PATRICK ET AL.

(c) Information
for Appellant.

(d) 11 St. Tr. 80.

(e) Craw v. Ram-
say, Vaughan,
Rep. 279, 280.
Ib. 283. 2 Vent.
6. Reported in
other books by
the name of
Collingwood v.
Pace. Lord
Hale's Argu-
ment. 1 Vent. 413.

settled by another person, under a deed of tailzie, upon the eldest son of *William Shedden,* who should be in life at the time of the settler's death, and his heirs-male ; and if he should have no sons then living, then upon the eldest son of *John* and *Marion Patrick,* the Respondent's father and mother, as substitute. If the supposed settler had died previous to the marriage of *William Shedden,* the father, with *Ann Wilson,* it seems impossible to deny that the Respondent must have been served heir of entail, and could have made up a lawful title to the estate. But if the Appellant's argument be just, the subsequent marriage of his parents would carry back his legitimation to the time of his birth, and divest the Respondent of his rights.

It may be put as a farther case, that if *William* the Appellant had arrived at the years of legal discretion previous to this marriage, and had purchased lands in *England* and *Scotland,* such estates would have devolved to the Crown ; yet, upon the principle which it is contended is to naturalise the Appellant in this case a subsequent marriage of his parents, at any period however remote, would divest the rights of the Sovereign, and vest the lands in the Appellant by a fiction of antedated legitimation.

Neither are the consequences of such a construction confined to civil rights. If the Appellant is entitled under the statutes to all the privileges of a natural born subject from the period of his birth, he is by the same statutes rendered liable to all the pains and penalties incident to a violation of the allegiance and duties of a subject. If war had taken place between *England* and *America* previous to the parents' marriage, and the Appellant had been captured *flagrante bello* by his Majesty's forces, he must have been considered as a prisoner of war. Can it admit of argument, that the subsequent act of his parents, *etiam in articulo mortis,* shall convert this American into a traitor, and subject him to all the penalties and disabilities of high treason ?

Such a consequence cannot be sustained upon any sound principle of policy and justice. The relation of natural Prince and natural born subject gives rise to reciprocal and corresponding rights and duties in the several parties. The subject is entitled to protection, even with the whole force of the state, and to enjoy landed property in the country over which the Prince exercises dominion. The Sovereign is entitled to all those duties from his subject which are comprehended in the term allegiance. As nothing can carry back the subjects' duties and allegiance beyond the time at which the act of naturalisation is done to create this relation, nothing short of an express legislative Act can give him prior enjoyment of those privileges and immunities, which are the equivalents conceded by the Sovereign in commutation for such duties. If the one is impossible, the other, which is a correlative right, cannot exist.

The obligation between natural born subject and prince is in the nature of a compact, which neither can create or recede from but by mutual consent. *Nemo potest exuere patriam,* is a maxim of the law of *England,* as well as of the civil law; and the relation cannot be created by the party himself, any more than it can be destroyed. But, according to the Appellant's argument, two indifferent persons may, by their voluntary act, interfere in the relation between sovereign and subject, and create or keep back that high connection, which neither subject nor sovereign could do of himself. It concedes to the flagitious parents, as the price and premium for antecedent incontinence, the royal privilege of imposing their offspring upon their prince, as his natural and legitimate subjects.

SHEDDEN
*v.*
PATRICK ET AL.

Fost. Crown
Law, 184.

The law of *Scotland,* prior to the union, admitted of no such consequences, and the statutes enacted since have made no alteration. On the contrary, by the anxious and sedulous use and repetition of the words " natural born," as well as other provisions in the various acts passed on the subject, it is demonstrated that the legislature meant to rest the privilege of naturalisation upon the time of birth. And it is an argument never to be forgotten, that this construction of the words of the statutes, according to their direct and obvious sense, gives that uniformity of operation to the law in *England* and *Scotland,* which upon every principle of reason and justice, as well as in the true spirit of the articles of union, it is most desirable to establish. In the same spirit the legislature has not extended the privileges of naturalisation to the children of naturalised parents born in alienage, while their fathers were aliens. Thus a foreigner may be naturalised by letters of denization, or a particular statute, or if he lives seven years in his Majesty's colonies, by 13 *George* II. cap. 7. A foreign seaman, if he serve two years in the British service in war time, is naturalised under 13 *George* II. cap. 3; and one who serves three years on board English ships employed in the whale fishery, receives the same privilege under 22 *George* II. cap. 45. But their children born abroad before the parent is naturalised are considered as a species of *antenati,* and expressly excluded by the words of the statutes from the privileges attached to native British subjects.

There is as much reason, if not more, that the subsequent condition of the father should be referred back to the antecedent birth of the son, as that the subsequent condition of the child should be carried back to the same period. The legislature having refused it in the former case, is decisive that they intended, in the spirit of the common law, that the condition of the party at the season of his birth should exclusively and conclusively decide whether he was to be a natural born subject or an alien, and that no fiction of

CASES IN THE HOUSE OF LORDS.

SHEDDEN    law, or subsequent act of the party, or his parents, should alter his
*v.*
PATRICK ET AL.  condition in this respect.

The Court, of this date, pronounced the following Interlocutor :
1 *July*, 1803.   " On report of Lord *Polkemmet*, and having considered the mutual
Interlocutor    informations for the parties, and heard their counsel in presence,
appealed against.
they repel the reasons of reduction, assoilzie the Defender, and
decern : but supersede extract till the third sederunt day in
November next."

Against this Interlocutor the Appellants have appealed ; but the
Respondent hopes that your Lordships will affirm the same, for the
following among other

### REASONS.

I. Because the legitimacy or illegitimacy of the Appellant must
be determined according to the laws of America, where his parents
were domiciled and himself born ; and by the laws of that country
he is illegitimate.

II. Because he does not come within the provisions of 7 *Anne*,
cap. 5, and 4 *George* II. cap. 21, by which the children of the
King's male subjects are naturalised, although born out of his
allegiance, and enabled to succeed to landed property in this
kingdom ; for the Appellant being clearly illegitimate when born,
was not the child of a natural born subject at the time of birth, to
which period these statutes alone apply.

SAML. ROMILLY.
M. NOLAN.

The cause was put in the paper for hearing, and was
argued on the 22nd, 24th, 26th, and 29th of February,
1808. The counsel for the Appellant were Mr. *Adam*
and Mr. *Brougham*. For the Respondent, Sir *Samuel
Romilly* and Mr. *Nolan*. The *Lord Chancellor* (Lord
*Eldon*) and Lord *Redesdale* attended throughout.
There is, however, no report of what passed upon the
argument.

On the 3rd of March, 1808, the *Lord Chancellor*
(Lord *Eldon*) and Lord *Redesdale* being again present,
it was moved and carried that the interlocutor of the
Court below should be affirmed. Of this judgment
the only record remaining is but the formal entry
which appears in the Journals of the House ; no note,

## CASES IN THE HOUSE OF LORDS.            569

taken at the time, of the opinions delivered being now forthcoming (a).

The Appellant was fifteen years of age when this judgment was pronounced. He appears soon afterwards to have entered into the naval service of the East India Company; but this employment he relinquished for merchandise, which he prosecuted till 1833, when he finally returned to Great Britain.

On the 28th of February, 1848 (precisely forty years after the judgment of the House of Lords had been pronounced), he commenced fresh proceedings in the Court of Session for the purpose of recovering the Roughwood Estate. To do this it was considered necessary to get rid of the interlocutor of the Court of Session in 1803, and of the judgment pronounced by the House confirming it in 1808.

With this view, the Appellant's summons (one of Reduction and Declarator) was directed against William Patrick, writer to the Signet, and against Robert Shedden Patrick, the heir at law of that Robert Patrick who had been the successful Defendant in the former litigation.

The summons, after asserting the Appellant's legitimacy, and consequent title as the only lawful son of William Shedden aforesaid, proceeded to state as follows :—

The said William Shedden, father of the Pursuer, was born in Scotland of Scotch parents, his father being proprietor of the said estate of Roughwood, in the county of Ayr. His domicile of origin, therefore, was Scotch, and which Scotch domicile he never either lost or abandoned. He resided for some time in Virginia, in North America, then a British colony, principally engaged in taking charge of British interests, or in the sale of British manufactures, being connected in business with Mr. M'Call of Glasgow. He

---

(a) That the case, however, excited great interest and attention is clear from the fact that Lord Eldon invited Mr. Brougham to publish an account of it.

P P 2

570                    CASES IN THE HOUSE OF LORDS.

visited Scotland once, or oftener, during his said sojourn in Virginia.
He also, during that period, succeeded to the estate of Roughwood,
in Scotland, as heir-at-law of his father, the management of which
estate he committed to his friends in Scotland, and more par-
ticularly, first, to his brother-in-law, John Patrick, Esq., of Trearne,
and thereafter to his nephew, the Defender, William Patrick, as
commissioners or factors, retaining the property of the estate itself,
with a view to his return to Scotland.   Upon the breaking out of
the American Revolution, he fled to Bermuda, as a British colony
and place of safety, together with his cousin and future partner,
Mr. Robert Shedden, where he resided until the peace and declara-
tion of independence.   Whilst resident at Bermuda, he wrote (as
now appears) a long letter to his brother-in-law, John Patrick,
dated 19th April, 1783, referring to the preliminary treaty for
peace, which had just been concluded, intimating his purpose of
going to New York to see his partner, Mr. Robert Shedden; and
further stating,—" He is about going home, and I wish to do so too;
but can't determine my route till I see him.   I earnestly wish to
see my native country, and settle there for life.   Do look out some
cheerful, accomplished, prudent, and agreeable lady for me, by the
time I come home, for I think I shall not be long without a wife, if
I can meet with one I think I can be happy with, who will have
me.   But all this in due time."   And after a good deal of domestic
intelligence, intimating his having sent home presents to his sisters
and relations, adding, " I beg you'll do in my affairs what you think
best—pay off principal and interest as fast as you can, and leave the
lands " (meaning the estate of Roughwood, &c.) "out of tack till I
come here, which I hope will not be far distant.   Remember me in the
most affectionate and kindest manner to all my nephews and nieces
—George Shedden and all my relations;—also to J. Cockburn, and
let him know his papa, and brothers and sister, are all well.   We
have no news.   We all dislike the peace, which is very humiliating
to Great Britain."   He left Bermuda and returned to New York,
soon after the date of the above letter, for the purpose of winding
up his affairs, preparatory to his intended return to Scotland.   But
owing to various impediments and obstructions, and more especially
in consequence of the difficulties encountered by British loyalists in
realising their property and effects after the peace, he was detained
at New York much longer than he contemplated or intended.
During the whole period of his said residence in New York, he
adhered to his purpose of returning to Scotland, as his native
country.   He retained his heritable estate there,—kept up his
intercourse with his friends and relations in Scotland,—and, in
particular, he abstained from taking any steps for the purpose of
naturalising himself as an American citizen.   He latterly fell into
bad health, whereby his stay in New York was still further pro-

longed. It was during this last temporary residence in New York that he formed an intimacy and connection with Miss Ann Wilson, mother of the Pursuer, William Patrick Ralston Shedden, and of which connection there were born the Pursuer and a daughter. With the special view and avowed purpose of legitimating the Pursuer and his sister, the Pursuer's said father married the said Ann Wilson, the Pursuer's mother, at New York on or about the 7th day of November, 1798. He died at New York on or about the 13th day of November, 1798. At the period of his death, as well as that of his said marriage, he retained, as he had done all along, a fixed purpose and intention of returning to Scotland as his native country. This purpose and intention he avowed and declared, by letters and otherwise, to his friends and relations, and more particularly to the Defender, William Patrick. The Pursuer's father thus never lost or abandoned his Scotch domicile of origin ; and he remained, both at the date of his marriage, and at the time of his death, a domiciled Scotsman. Farther, the Defender, William Patrick, was expressly informed that the Pursuer's father had solemnised said marriage with the Pursuer's mother, for the purpose of legitimating the Pursuer and his sister according to the principle of the Scotch law, which admits of legitimation by subsequent marriage. On or about the 9th of November, 1798, Mr. John Patrick, brother of the Defender, William Patrick, wrote to the Defender from New York a long letter, informing the Defender that the Pursuer's father was moribund, and stating, *inter alia*, " every revolving hour threatens a dissolution of his existence —his fate is fixed—he must die—he cannot live. But this is not all. He has, from considerations which he conceived moral, natural, legal, and proper, at the moment when eternity was staring him in the face, united himself in matrimony to the woman who has for many years lived with him in a very different situation. His object in this proceeding was to rescue from a state of bastardy, and introduce into the world, with all the privileges appertaining to those who are born under the influence of the law, two infant children, one a girl about six years old, the other a boy about five" (the Pursuer). " The ceremony took place on the 7th instant," &c. And after various other statements and explanations relative to the general deed of settlement executed by the Pursuer's father, in which the writer was named an executor, and the supposed state of the Pursuer's father's affairs, adding—" And as we have claims, and they, from natural right, are certainly entitled to a priority, I think, in justice to ourselves, they ought not to be overlooked, and on you, as representative of the family, the guardianship of this right will devolve. I mean the dowry left to our mother with interest ; the interest on the advances of our father during the war ; the commission for his agency in accepting

SHEDDEN
*v.*
PATRICK ET AL.

572                    CASES IN THE HOUSE OF LORDS.

and paying bills, &c.; likewise as factor on the estate, on the rents, &c.," (meaning the Scotch estate of Roughwood). " All these are proper and legal claims, and ought not in right to be set aside, and put into the pocket of others. I would act with strict propriety ; nor would I swerve one degree from that justice that devolves as a duty on every honest man ; but I would carefully watch over those rights that become our inheritance in common with the rest of mankind. These are my ideas, and I know yours will fully co-operate. I am placed in a situation extremely delicate and unpleasant. I have interests of my own to watch over, and I have likewise those in opposition to them, as an executor, to promote. These must be reconciled as much as the nature of the thing will admit, and the sacred duties devolving on me will be fulfilled, as far as I am able, with justice, and a regard to truth and rectitude. Yours is likewise extremely so, as agent for his heirs, and as representative of those who have claims that counteract them; but you must reconcile them to the best of your ability, holding in view the sacred and unerring principle of truth and justice. This is a situation we never could have contemplated ; but it is part of that thorny path that we must all encounter through life, and we must meet it with a fortitude proportioned to its magnitude. . . . .
*P.S.*—The contents of this you will of course only communicate to those who have an interest, or in whom the necessary confidence can be reposed." And to this letter there was made the following addition :—" *November* 11*th.*—In the morning Mr. Shedden gradually approached his end. He has looked into his affairs, and wrote to his friends. He has two important letters to write, and he dies contented. One is to you respecting his children, &c. The boy is to be sent to Scotland. I will be glad if you will keep that part of my letter to yourself which is comprehended within the mark, &c. I may be mistaken. I should be happy was it so." In accordance with the intelligence contained in the above letter, the Pursuer's father wrote to the Defender, William Patrick, the following letter, which was attested by John Mills, the confidential clerk of the Pursuer's father, and which was duly received by the Defender :—
" *New York,* 12*th November,* 1798.—My very dear Nephew,—My long and painful illness must apologise for my long silence. I am now going to quit this world. I have married Miss Ann Wilson, which is approved of by my friends here, and which restores her and two fine children I have by her, to honour and credit. I have settled all my affairs, and appointed executors here, who will correspond with you. One of my children is a boy; named William Patrick Shedden ; they are charming children, he in particular. I have ordered my executors to send him to you. I now remit first of Griffiths and Warland's exchange, on Messrs. Thomas Daniels and Co., London, dated Barbadoes, 23rd June, at sixty days date, for

326*l*. 15*s*. 8*d*., and first of B. Farquharson and Co., at Barclay
Farquharson, London, dated Martinico, 21st July, at sixty days date,
for 91*l*.—together, 417*l*. 15*s*. 8*d*. sterling ; and I desire that such
further sum or sums of money may be appropriated for the purpose
of maintaining and educating him genteelly, and according to his
talents and inclination, not exceeding 500*l*. sterling, without the
consent of my executors, of whom you are to be totally independent
in this business. I can only add, that I remain till death, Dr.
William, your affecte. uncle." (Signed) " WILLIAM SHEDDEN." In
consequence of the solemn and important trust committed to the
Defender, William Patrick, by the Pursuer's said father, in the
aforesaid letter and otherwise, it became his duty to assert the
legal rights of the Pursuer, and to use every means and exertion in
his power for the protection and security of these rights, but this
duty was grossly violated by the Defender, inasmuch as he, the
Defender, William Patrick, having formed the fraudulent purpose
of defeating the lawful rights and interests of the Pursuer, more
especially in the said estate of Roughwood, which had belonged to
the Pursuer's father, it being the object of the Defender to acquire
the said estate, either for himself or for the said Patrick, his
brother. The said Defender accordingly proceeded to take steps
and use means with the view of carrying this fraudulent purpose
into effect. Although aware that the Pursuer's father had died
domiciled in Scotland, or at least aware that it was his fixed
purpose and intention to return to Scotland, as his native country,
he concealed his knowledge as to the Pursuer's father's true
domicile, or at least suppressed his knowledge of said purpose and
intention. On 7th April, 1800, the Defender, William Patrick,
wrote to Messrs. James Farquhar, David J. Hossack, and the said
John Patrick, his brother, being the American executors named by
the Pursuer's father in his general deed and settlement, as follows :
—" Gentlemen—Being at present obliged, as factor and commis-
sioner for my brother, Dr. Robert Patrick at Trearne, the heir-at-law
to the late Mr. William Shedden's landed property in Scotland, I
cannot accept of the appointment of guardian to William Patrick
Shedden, the son born to the late William Shedden by Ann
Wilson, nor can I take charge of his affairs in this country, being
obliged to attend to the interests of my brother, which may in
some respects be considered different from that of the boy. As
Mr. Shedden, however, in his settlement, expressed a wish that this
boy should be educated under my direction, and for that purpose
remitted to me a sum of money before his death, and I being
desirous, in so far as lies in my power, to fulfil his intentions, in
case you think it advisable to send the boy to Scotland for his
education, I shall see him properly educated and taken care of, and
shall apply the funds remitted to me by Mr. Shedden (in so far as

SHEDDEN
*v.*
PATRICK ET AL.

CASES IN THE HOUSE OF LORDS.

SHEDDEN
*v.*
PATRICK ET AL.

they will go) for that purpose ; but with regard to the other affairs of this boy, or any other claims which it may be supposed he has in this country, I can take no concern of them ; so if you conceive he has any such, it will be necessary you appoint some other person to attend to his interests. It is only in consequence of my uncle's last request contained in his settlement, and in a letter written to me the day before his death, that I shall endeavour, to the best of my judgment, (in case you think it advisable to send the boy to Scotland,) to lay out the money remitted by Mr. Shedden to the best advantage for his board and education ; but as to any other interests or concerns of this boy, and particularly as to any claim which, as I have been informed, some hints have been thrown out of an intention to make on his behalf to the landed property in Scotland, I wish you and his other friends in New York explicitly to understand that I can take no charge or direction of them whatsoever. 1 am," &c. (Signed) " WM. PATRICK." " To James Farquhar, David J. Hossack, and Jno. Patrick, Esqrs., Exrs. of the late Wm. Shedden, Esq., merchant in New York." The Pursuer was sent to Scotland by the American executors of his father some time in the year 1800, consigned and committed to the charge of the Defender, William Patrick. He was immediately thereafter placed by the Defender at School in Dunfermline. But the Defender took no steps with the view of asserting the Pursuer's legal right to the estate of Roughwood, which had belonged to his father, as being the lawful child and heir-at-law of his father in said estate. On the 18th September, 1800, the Defender, William Patrick, wrote to the American executors a long letter, announcing the Pursuer's arrival in Scotland, stating,—" It is impossible for me, situated as 1 am, to take charge of any claims he has to the landed estate in Scotland." And after setting forth his own brother's rights to the estates, as pretended heir-at-law of the Pursuer's father, and arguing his right thereto, he suggested the institution of a suit, in order to determine the question, and advised the executors to appoint some person to act in said suit on behalf of the Pursuer. The Defender, William Patrick, about the same time wrote various other letters to the said American executors, (as the Pursuer believes and avers,) urging upon them the invalidity of the Pursuer's father's marriage, the Pursuer's consequent illegitimacy, and the preferable right of his own brother, Robert Patrick, to the Scotch heritage, as heir-at-law. The said American executors, misled by the erroneous and deceitful representations and arguments contained in the Defender's said letters, were deterred from taking any steps with the view of asserting or trying the Pursuer's right and claim to the Scotch estates. The Pursuer was thus left in Scotland a mere infant, without any person to assert or protect his legal rights and interests, while the Defender, William Patrick, who stood solemnly charged

with the assertion and maintenance of said rights and interests, had
placed himself in a position adverse and hostile to the Pursuer's
said rights and interests, inasmuch as he had undertaken the
agency of his brother, and had his own private fraudulent purposes
to serve. Taking advantage of the Pursuer's situation, the
Defender, William Patrick, proceeded to follow out steps for
carrying into effect his said fraudulent purpose of defeating the
Pursuer's just right to the said estate of Roughwood, and of acquiring
the same for himself or for his said brother. So intent was the
said Defender upon this, that, as now appears, he, so early as
October, 1799, that is to say, after receiving intelligence of the
Pursuer's father's death, but before writing the said letter of 7th
April and 18th September, 1800, to the American executors, he,
the said Defender, William Patrick, expede or obtained the foresaid
service in favour of his brother, the said Robert Patrick, whereby
the latter was served heir-at-law in special to the said William
Shedden, the Pursuer's father, in the said estate of Roughwood,
and which service was obtained *ex parte* and without any contra-
dictor, all means of allowing the Pursuer to appear and oppose
said service being excluded or prevented by the said Defender,
William Patrick. At the time when the Defender expede said
service, he was aware that the domicile of the Pursuer's father was,
at the time of his death, Scotland, and not America ; or at least he
was cognizant, through the possession of said letters or otherways,
of the Pursuer's father's fixed and continued purpose and intention
of returning to Scotland. Following out the said fraudulent
scheme, the said Defender, William Patrick, next made, or caused
to be made, an *ex parte* application to our said Lords of Council
and Session, under which he got the said Hugh Crawford, his own
intimate friend and relative, appointed factor *loco tutoris* to the
Pursuer, the said Hugh Crawford being now dead ; and he likewise
got his own intimate friend, the late Archibald Miller, Writer to
our Signet, appointed to conduct the case of the Pursuer. In
further pursuance of the said fraudulent scheme, and under the
special advice of the Defender, William Patrick, the said Hugh
Crawford, as factor *loco tutoris* for the Pursuer, was made to raise a
certain action of reduction professing to challenge the foresaid
service obtained by or in favour of the said Robert Patrick. This
action of reduction was defended by the said Robert Patrick, the
defence being ostensibly conducted in the name of Edward
Lothian, Writer to our Signet, also the intimate friend of the
Defender, William Patrick, as agent, although in reality conducted,
or mainly directed by the said William Patrick himself, he having
advised, or been privy to the whole pleadings and proceedings main-
tained or taken by the said Hugh Crawford on behalf of the
Pursuer : More particularly, the Defender, William Patrick, con-

SHEDDEN
*v.*
PATRICK ET AL

SHEDDEN
*v.*
PATRICK ET AL.

cealed from the said Hugh Crawford, and also from our said Lords of Council and Session, as well as from the House of Lords, all knowledge or information in regard to the fact, that the Pursuer's father was, at the time of his death, a domiciled Scotchman, having carefully suppressed the foresaid letters of 19th April, 1783, 9th November and 12th November, 1798, and whole other correspondence and writings in his possession, or known to him, and through which he was cognizant that it was the Pursuer's father's fixed purpose and intention to return to Scotland as his native country, and that he had married the Pursuer's mother for the express and avowed purpose of legitimating the Pursuer and his sister, according to the law of Scotland, it being throughout the said pleadings both before our said Lords, and before the House of Lords, stated and admitted that the Pursuer's said father was, both at the time of his said marriage, and at the period of his death, a domiciled American. It was in consequence of this fraudulent concealment, or fraudulent misrepresentation on the part of the Defender, William Patrick, that our said Lords were induced to pronounce the foresaid decreet, repelling the reasons of reduction of the service in favour of the said Robert Patrick, and that the House of Lords was induced to pronounce the judgment of affirmance of that decreet, being the service, decreet, and judgment herein called for, and now sought to be reduced. At the time when said decreet and judgment of affirmance were obtained, the Pursuer was still in infancy, or at least in minority, and he of course was kept perfectly ignorant of the whole of the foresaid proceedings. Upon leaving college, he, at a very early period of life, went to sea as a midshipman, under the direction of the Defender, William Patrick. After serving as a midshipman for some time, he went to India when he was about twenty-one years of age. He remained in India until about the year 1823, when he returned to Great Britain for a few months on account of ill health, and pursuant to his undertaking, he left Great Britain for India again in April, 1824, where he continued until about the year 1827, when he returned to Great Britain and continued there until about the year 1830, when he again went to India, and stayed there until the year 1833, when he finally returned to Great Britain. On his return, he naturally began to make inquiry in regard to his legal rights relative to the said estate of Roughwood, which he found had belonged to his father, but which estate had, through apparent accomplishment of the foresaid fraudulent scheme, passed into the possession of the Defender, William Patrick, and is now possessed by him. After much inquiry and investigation, the Pursuer has only lately discovered the facts and documents above set forth ; and more particularly, he has only lately discovered the fact that his father was, at the time of his marriage and of his death, a domiciled Scotchman, and become

cognizant of the letters of 19th April, 1783, of 9th November, 1798, of 12th November, 1798; and the letters of 7th April and 18th September,1800,—all of which facts and letters were concealed and suppressed by the Defender William Patrick from the said Hugh Crawford—from our said Lords—and from the House of Lords, as above set forth : Farther, the Pursuer now believes, and specially avers, that there exists, or at least did exist, various other letters, writings, or documents, proving that the Pursuer's father was a domiciled Scotchman at the time of his marriage and at the period of his death, and thereby disproving the allegation and admission upon which the said decreet and judgment proceeded :

SHEDDEN
*v.*
PATRICK ET AL.

The summons called upon the Defenders to bring with them into Court, and to produce before the Lords of Council and Session—1st, a retour of service of Robert Patrick aforesaid, as heir-at-law in special to William Shedden aforesaid; 2ndly, the decree of the Court of Session of the 1st of July, 1803; 3rdly, the judgment of the House of Lords of the 3rd of March, 1808; and, 4thly, certain title-deeds of the said Robert Patrick, by virtue of which he stood infeft and seised in the said estate of Roughwood.

The summons then stated the object for which this production of documents was required, namely, that they might be seen and considered by the Court; and that the same, with the whole grounds and warrants thereof, might be reduced, rescinded, cassed, annulled, and declared void, from the being and in all time coming, and that the Appellant might be restored there-against *in integrum*, for the following reasons, namely :—

First : The foresaid service was expede, and the said decreet and judgment were obtained through fraudulent misrepresentation, or fraudulent concealment, on the part of the Defender, William Patrick, acting for his own behoof, or for behoof of his said brother, Robert Patrick, inasmuch as the said Defender set forth to the said Hugh Crawford, the Pursuer's factor *loco tutoris*, and caused it to be set forth to the said Court and House of Lords, that the Pursuer's father was at the time of his marriage, and at the time of his death, domiciled in America, whereas he was a domiciled Scotchman ; or

SHEDDEN
*v.*
PATRICK ET AL.

inasmuch as the said Defender fraudulently concealed from the said Hugh Crawford, and from the said Court and House of Lords, the foresaid facts and letters, and more particularly the fact then known to the Defender, that the Pursuer's father all along retained the fixed purpose and intention of leaving America and returning to Scotland as his native country : Secondly, the said decree and judgment were at least pronounced by the said Court and House of Lords under gross error in fact and in law, inasmuch as neither said Court nor House of Lords were made aware of the fact, that the Pursuer's father was a domiciled Scotchman at the time of his marriage and of his death, or of the documents and facts lately discovered, and which are sufficient to prove that Scotland was the place of his domicile at the time of his marriage, and likewise at the time of his death ; and therefore said decree, judgment, and said service itself, are reducible on the ground of *res noviter venientes ad notitiam,* or *instrumenta nova reperta :* Therefore, and for other reasons and causes to be proponed at discussing hereof, the whole said writs, titles, and writings, both those herein specially, with all that has followed, or may be competent to follow thereupon, Ought and Should, be Reduced, Retreated, Rescinded, Cassed, and Annulled, and Decerned and Declared to have been from the beginning, to be now, and in all time coming, void and null, and of no avail, force, strength, or effect in judgment, or outwith the same, and the Pursuer reponed and restored thereagainst. And further-more, the said writings, being so reduced, it Ought to be Found and Declared, that the Pursuer has the only good right and title to the said estate of Roughwood, &c.

The defence put in to this action was of a prelimi-nary nature. 1. That the Appellant did not possess the status of legitimacy ; 2. That the retour of service was unchallengeable by reason of the Act of Parliament of 1617, c. 13 ; 3. That the action was barred by Res Judicata ; 4. That the title sought to be displaced was fortified by prescription. And, 5. that the Appellant was barred by acquiescence.

The judgment of the House of Lords, in 1808, was no otherwise relied upon in the defence than as an ordinary res judicata. The attempt to rescind that judgment in a subordinate tribunal was not treated as an extravagance.

On the 25th April, 1849, the Appellant instituted a

CASES IN THE HOUSE OF LORDS. 579

Supplemental Summons against the same Defenders, proceeding on the same grounds, but containing a more expanded statement of particulars, and setting out various letters and other documents at great length, for the purpose mainly of showing that the domicile of William Shedden had always been Scotch, and that the Defenders had fraudulently concealed it.

Besides a multitude of other documents the Supplemental Summons contained the letter of the 12th November, 1798, from William Shedden to William Patrick, saying: " I am now going to quit this world. I have married Miss Ann Wilson—which restores her and two fine children I have by her to honour and credit; " thereby referring to the ceremony performed a week before his death.

But on the 17th January, 1851, the Appellant obtained permission to amend his libel, by putting on record the following allegations which gave the case a new complexion.

That besides his regular marriage, publicly solemnised as now mentioned, the said William Shedden, although he had not acquired a domicile in America, and Miss Wilson had been, according to the law of America, where they resided, married persons prior to and at the birth of the Pursuer, inasmuch as they had, previous to that event, as well as afterwards, lived and cohabited together as man and wife, acknowledged each other as such, and were held and reputed as such by their friends, neighbours, and acquaintances ; and the said William Shedden afterwards got his marriage publicly and regularly solemnised, as before mentioned, in order the more certainly to secure and place beyond doubt the legitimacy of the Pursuer and his sister.

That although the fact, that by the law of America, the Pursuer's father and mother were, as before mentioned, married persons at and prior to the birth of the Pursuer, was known to the said William Patrick, as well as to the said Dr. Robert Patrick, during the course of the proceedings which have been now referred to, touching the succession of the Pursuer's father, no notice was taken of that fact in any of these proceedings, but it was, on the contrary, suppressed and concealed, and the proceedings adopted and prosecuted on the footing that no such fact existed.

580                    CASES IN THE HOUSE OF LORDS.

SHEDDEN
*v.*
PATRICK ET AL.

Then followed a condescendence and answers in the usual form, but of unprecedented length, made up of recapitulations.

After a hearing before the *Lord Ordinary* (Lord *Wood*), his Lordship, instead of deciding, made a report of the case to the Inner House of the Court of Session. And there, on the 11th of March, 1852, after full argument, the following judgment was pronounced by Lord *Fullerton* on behalf of the Court.

Lord *Fullerton :* This is an action brought on the most clamorous charges of fraud, said to have been practised in certain proceedings which took place in the end of the last and beginning of the present century.

The preliminary defence involved three points. First, the alienage of the Pursuer; secondly, the vicennial prescription of retours; and thirdly, the palpable irrelevancy of these summonses, even assisted as they are by the condescendence.

On the first point, that of the alienage, I should have great difficulty in sustaining it as a conclusive defence at this stage of the procedure.

In considering it, we must assume as true what the Pursuer undertakes to make good, viz., that the subsequent marriage of his parents had, in consequence of the alleged Scottish domicile of his father, the effect of conferring on him the *status* of legitimacy. Even on that assumption the Defenders maintain that the statutes naturalising parties born out of the allegiance of Great Britain would not apply to his case ; a point which is said to have been determined by the House of Lords in the former case between these very parties.

If we could be sure of this last statement, of course the objection of alienage would be insurmountable.

But there is no satisfactory evidence on this point. The plea of alienage certainly was not the ground of the judgment in this Court. Indeed it was but slightly mentioned in the written pleadings which are now before us. It no doubt occupied a much more prominent place in the appeal cases to the House of Lords (*a*). But we have no authentic record of the grounds of the final judgment in that tribunal; and though there are incidental references in other cases to this judgment, in which it is stated historically, and that on high authority, that the objection to alienage was given effect to, I have great doubt whether we could,

_____

(*a*) See *supra*, p. 568.

in a matter of such importance, adopt that as the principle of the
decision, and hold the law on this point to be definitively fixed.

Besides, we must keep in view, that independently of the effect of
legitimation *per subsequens matrimonium*, through the operation of
his alleged Scottish domicile, the Pursuer in the amended summons
avers, and undertakes to prove, that there was by the law of New
York a good marriage between his parents prior to his birth ; a
proposition which, if true, would exclude entirely the grounds on
which the plea of alienage rests.

But the next ground of defence confines the Pursuer's action to
the allegations of fraud and conspiracy, and clearly excludes the
consideration of any error, either of fact or law, in the proceedings
now brought under challenge. This defence is the vicennial pre-
scription ; and upon this we are not prepared to say that it would
exclude a relevant and specific charge of fraud, though it might and
must exclude all other reasons of reduction. The object of the
statute (*a*) seems to us to secure the service from all challenge on
the ground of error, from whatever source that error, *qua* error,
arose. But we should most certainly hesitate to find that it was
intended to apply, and did apply, to the case of that error being
induced by the positive fraudulent act of the party benefited by the
service, or of any one employed by him.

The defence raises the question which we all must consider as
the substantial one, viz., whether there is in these summonses,
explained as they are by the condescendence, such a specific and
relevant allegation of fraud as can be received by the Court.

And that leads us to consider in what sense the expression
*relevant* is here used.

General allegations of fraud are not spared either in these sum-
monses or in the condescendence. And it was said that in discussing
the question of relevancy, we must hold those allegations *pro veritate.*

But this is going rather too summarily to work in a matter of this
kind.

It is not enough for a party, founding on the head of fraud, to
state that fraud has been committed. Fraud is a general term to
be inferred from specific acts. The party must state in what the
fraud consists, and what the acts are from which the existence of
fraud is to be inferred. And if the facts which he does state are
clearly insufficient to support such an inference, or, what is worse,
are absolutely inconsistent with such an inference, the objection of
irrelevancy must be sustained.

It is then to the alleged acts, from which fraud is said by the
Pursuer to be necessarily inferred, that we must look in discussing
the point of irrelevancy. And when considered in this light, it

---

(*a*) The Act of 1617, c. 13.

582                    CASES IN THE HOUSE OF LORDS.

SHEDDEN
v.
PATRICK ET AL.

would be difficult to imagine an action put on grounds so vague, so shadowy, and so inconsistent.

The first summons sets out various letters passing between the Defender, William Patrick, and other persons, relative to the Pursuer, at the time when his father died, and the marriage of his parents was communicated to his friends at home.

The supplementary summons, which may be held as the Pursuer's final and conclusive statement of his case, is little more than an amplification of the first. It sets out,—That these parties, *i. e.* William Patrick, John Patrick, and Robert Patrick, knew well that the Pursuer was entitled to succeed to the Scotch estate; and that " these parties accordingly, on their uncle's death, formed and acted on the fraudulent design and intention, and conspired together for the purpose of neutralising the object which their uncle had in entering into the said marriage; and for the said purpose of defeating the right of the Pursuer to succeed to his father as a legitimate son, and of acquiring the estate and property of the said William Shedden to themselves, or one or other of them." Then follows an enumeration of the acts which the Pursuer founds on, as inferring the fraudulent intent.    And these consist, in the first place, of various letters passing between the different parties; in particular, the letters of William Patrick, of date 9th February and 31st May, 1799, and 18th December, 1800, addressed to the American executors of Mr. Shedden, and various other letters partially quoted in the summons, and generally referred to, as produced and founded on by the Pursuer.

Now the first thing which must strike every one not absolutely blinded by personal prejudices on reading these letters, is, that as they stand they are absolutely negative of any fraudulent intent whatever. They are the letters of persons who had interests adverse to that of the Pursuer, and of course were lawfully entitled to defend their own interests, but who were at the same time desirous that those of the Pursuer should be fairly protected, and who recommended the steps necessary for that purpose.

No one can read those letters, founded on as they are by the Pursuer in support of a charge of fraud, without feeling that they are the very natural expressions of disappointment at an event for which the parties were unprepared, without the slightest indication of any intention but that of defending their own legitimate rights.    Nor was this feeling to be wondered at.    Robert Patrick was the recognised heir-at-law of Mr. Shedden in America, who was understood to be unmarried.    On his deathbed that gentleman, by his letter dated 12th November, 1798, founded on in the summons, informed his nephew, the Defender, William Patrick, that he had married Miss Ann Wilson, by whom he had two children, a boy and a girl,—an event of which Mr. Patrick had

## CASES IN THE HOUSE OF LORDS.    583

been previously apprised by a letter from his brother, John Patrick, in New York, dated a few days before.

This might be most natural and proper on the part of Mr. Shedden, but it is certainly not going too far to say, that a deathbed marriage, entered into for the sole purpose of conferring on the wife and children a status and pecuniary rights, which the party withheld from them till he was about to leave this world, approaches very nearly to, and is like to be viewed as a somewhat harsh interference with the rights of those whom, till that moment, he had left in the expectation of his succession.

It is not to be wondered at, then, that the Patricks, and among others the Defender, William Patrick, lost no time in ascertaining how the law of the case stood. And the result was the clear opinion of American counsel, that the marriage was good, but had not the effect, by the law of America, of rendering the children legitimate. In these circumstances it was perfectly natural that William Patrick should have no scruple in taking the steps for carrying through his brother's service. But the statement, repeated both in the summons and in the argument, that this was done while all the time William Patrick was acting as the guardian of the Pursuer, is a striking instance of the incongruity of the general allegations of the summons with the documents founded on it.

It is impossible to conceive any series of writings more utterly and absolutely inconsistent with the charge of fraud which they were brought forward to support.

No doubt the assumption of the fairest motives is often the cloak for designs of a very different character; and, accordingly, the summonses aver that they were all parts of a scheme for defrauding the Pursuer.

When a party founds on letters in evidence of fraud and conspiracy, which, according to their clear and literal meaning, express no such intent, but the reverse, it lies on him, in order to support the relevancy of his statements, to set out the facts from which the conspiracy is to be inferred, and by which a colour is thus to be given to the letters essentially different from that which they present to the uninformed eye of those who peruse them. Now, on all this these summonses, assisted as they are by the condescendence, seem an absolute blank. There is not one fact set forth which bears the slightest resemblance to an act of conspiracy between William Patrick and his brothers, to defeat the rights of the Pursuer. The Pursuer says, indeed, and that loudly enough, that these parties did conspire; but in what the conspiracy consisted, how it was conducted and carried through, is a matter on which, though essential to every relevant charge of fraudulent conspiracy, we have no information whatever.

This defect seems fatal to the allegation of conspiracy; but we

Q Q

CASES IN THE HOUSE OF LORDS.

SHEDDEN
*v.*
PATRICK ET AL.

can gather from the very loose terms of the summonses what the Pursuer really points at. It is said that all these letters were written, and all the steps recommended, on the footing of the late Mr. Shedden having been a domiciled American, while the Defender, Mr. Patrick, and his brothers knew that his domicile at the time of his marriage and death was Scotland.

The various acts charged against the Defenders are free from the slightest element of fraud, except on the assumption that these parties knew that Mr. Shedden was at the time of the marriage a domiciled Scotchman. Their knowledge of that as a fact is the sting of the whole charge of fraud.

When a party states for his own objects a certain matter as a fact, which he knows not to be so, that may constitute legitimately an element of a charge of fraud against him. And if in this case William Patrick and his alleged associates had taken measures on the footing of William Shedden having been married in New York, while they knew that he had all along resided and been married in Scotland, that might have been listened to as an overt act relevant to infer a fraudulent intent.

But that is not the sense in which the expression " knowledge of William Shedden's domicile being Scotland " is used in these summonses. William Shedden had confessedly married in America, where he had *de facto* resided for at least thirty years ; and during all that time he had never seen his native land, nor possessed any residence within it. The *gravamen* of the charge, then, when translated into language expressing its real meaning, ' is, that William Patrick knew, or must be supposed to know, that although William Shedden's *de facto* residence had been New York for thirty years, still his legal or constructive domicile continued to be Scotland, in reference to certain effects of his marriage on the legitimacy of the children previously born. In other words, the ignorance of William Patrick and his brothers of the law on a matter of extreme nicety, and on which there has been a great fluctuation of opinion, is to be imputed to them as an element of a charge of fraud ; as if they had been guilty of the misrepresentation of a fact within their own knowledge.

In considering the admitted facts of the case, according to the ordinary apprehension of mankind, the question naturally suggests itself how William Patrick or his brothers, charged with fraudulent concealment or conspiracy, knew that William Shedden, who had lived and died in America, and had not seen his native land for about thirty years, continued to be a domiciled Scotchman till the day of his death. And the affirmative of that question is evidently essential to the Pursuer's case, when put on fraudulent concealment.

Accordingly, the attempt to answer it is founded on certain

## CASES IN THE HOUSE OF LORDS. 585

letters, tending, as it is said, to show that William Shedden always entertained the intention of returning to Scotland. As this is really the hinging point of the Pursuer's case, and as the fraudulent concealment of those letters is made the subject of a serious charge against the Defender, William Patrick, it is of some importance to consider their terms. The greater part of them are said to have been addressed to John Patrick, the father of the Defender, and of an old date, being as far back as the year 1773. Thus, one letter founded on is that of William Shedden to John Patrick, in 1773, containing these expressions : " I declare upon my honour I would never think of remaining in this country if I could help it. My attachment to my own country and relations is much stronger than to anything here."

Then there is another letter of the 18th March, 1774.

" DEAR SIR,—Pray, do you imagine Thomas Shedden would part with that part of the Windy-Houses which lies betwixt my land and the high road, and runs up from Craig-house to Bogstown, on reasonable terms ? I have long had my eye on that land, and could have wished to buy it if I could raise the money; it would make my farm very complete. Could I get it, and raise money to buy it, I don't know that I should stay long here. Pray, might I depend on your friendly assistance in such an affair ? If I could, it would be one of the greatest favours you could possibly do me, and you might make the purchase immediately for me if you could. I would readily abide by any bargain you make. It would not be long before I would see if any of the Scotch lasses would have me." (Signed.) " W. S."

As another specimen, for there are many of a similar tenor, we may take that of the 16th April, 1783.

" MY DEAR FRIEND,—I expected long before this to have been in New York, but have been kept here settling old matters; the peace puts a stop to my views of remaining there this season, but I expect to leave this and go there to see Mr. Shedden in ten or fourteen days. He is about going home, and I wish to do so too, but cannot determine my route till I see him. I ardently wish to see my native country, and settle there for life. Do look me out some cheerful, accomplished, prudent, and agreeable lady for me by the time I come home. Tell the dear girls I return them a thousand thanks for their present of shirts. I will write Jeanie when I get to New York. I beg you will do in my affairs what you think best. Pay off principal and interest as fast as you can and leave the lands out of tack till I come home, which I hope will not be far distant."

It is needless to go over more of these letters in detail. They show what was natural enough, that William Shedden, like many of his countrymen, looked with hope and satisfaction to the

Q Q 2

CASES IN THE HOUSE OF LORDS.

possibility of his return, at one time or another, to his native land; but they certainly show nothing more. And it would be difficult to show that, even according to what the Pursuer considers the improved and matured law of domicile, any case has yet occurred in which such mere expressions of hope and intention to return to his own native country have been held to take off the effect of the *de facto* corporeal residence of the party in a foreign land.

But we do not go into this. In truth, the whole of the argument on the legal point was misplaced. We are not called upon, nor indeed entitled, to determine it at this stage of the procedure. The only question here is the relevancy of the acts charged as overt acts of fraud in the summons. And then the question comes to be, not what was truly the law of the case, but whether the true legal inference as to the domicile of William Shedden was, in the year 1799, so clear and notorious as to subject a set of gentlemen to the imputation of fraud, because they did not produce certain letters by which that legal inference might have been confirmed.

No doubt, if the Pursuer could have founded on letters or extraneous evidence showing that the parties possessed this knowledge, he might have had something like a case. But when he infers the fraud merely from the letters just alluded to, and nothing else, he is evidently inferring fraud from nothing but a misapprehension in law on a point of great nicety and difficulty, on which, I venture to say, nine-tenths of the lawyers of that day, and the whole of the uninitiated, would have, in the most excellent faith, come to the same conclusion.

Mr. William Patrick and his brothers might be right or wrong in that view; but the proposition that, even if ultimately found wrong in the law, their conduct must necessarily be held to be tainted with fraud, is one to which no Court, following the dictates either of law or common sense, could give the slightest countenance. Holding, then, as we must do, from the analysis of the import of these summonses, that the whole charge of fraud rests on this assumption, we can come to no other conclusion than that the statements are utterly irrelevant to support the conclusions of the action.

This would be the necessary result even if the subject of reduction were confined to the service of Robert Patrick. That, as I have already stated, is protected by the vicennial prescription from all ground of challenge, except fraud. If fraud is not relevantly averred, the summonses cannot be sustained.

But the case assumes a still more hopeless aspect for the Pursuer, when we consider what followed on the service—I mean the judgments of this Court, and the House of Lords confirming it.

Here, too, an attempt is made to neutralise the manifest effect of these proceedings, by stating that they were all fraudulent and

collusive; and on this point the averments of the Pursuer have
been gradually extended and matured as the exigencies of his case
required.  The original statement in the first summons was, that
the fact of the late Mr. Shedden's Scotch domicile had been fraud-
ulently concealed from Mr. Crawfurd, the factor *loco tutoris*.  It
afterwards seems to have occurred to the Pursuer that it would be
better to make Mr. Crawfurd a party to the fraud.  Accordingly, in
the supplementary summons it is said, not only that Mr. Crawfurd
was an intimate friend of Mr. William Patrick's, and under his
control, but that all the instructions he received in the proceedings
were given by Mr. William Patrick.  And this is further explained
in the condescendence, viz., " that the appeal to the House of Lords
was, like the action, originally taken under a concert and conspiracy
between the said Hugh Crawfurd, William Patrick, and Dr. Patrick,
who well knew throughout the whole fraudulent practices used on
his behalf, on a false and deceptive statement, for the purpose of
adding additional colour to Dr. Patrick's title, and preventing any
after challenge."  So that, according to the ultimate and finally
considered description of his own case, the Pursuer charges the
fraud and conspiracy, on which the reductive conclusions are
founded, not only against the Patricks, but against Mr. Hugh
Crawfurd, the factor *loco tutoris* who was appointed by the Court
to defend the interests of the Pursuer, and who, in so far as we can
gather *ex facie* of the proceedings, did defend them to the uttermost.

But then see what the case of the Pursuer is really brought to.

Mr. Hugh Crawfurd, a merchant in Greenock, and a connection
of the family, was appointed factor *loco tutoris* by the Court, for
the very purpose of attending to the Pursuer's interest.  The simple
fact of that appointment is a sufficient assurance that his general
character stood free from all imputation.  I presume that, as in
other cases, he took the oath *de fideli*.  He in fact and in law
became the *dominus litis* opposed to Robert Patrick ; and as far as
we can see, he performed the duties which the situation imposed on
him.  He brought a reduction of the service of Robert Patrick,
being the ordinary measure for bringing the pupil's case before the
Court.  He employed an agent, against whom no charge is made,
and as counsel the Honourable Henry Erskine and Archibald
Fletcher, whose names are a sufficient pledge of the zeal, as well as
the ability, with which the Pursuer's interests were defended.  On
the decision against the factor and the Pursuer in this Court, the
case was taken to the House of Lords.  A most elaborate appeal
case for him was prepared by Mr. Fletcher and Lord Brougham, by
whom, and the late Lord Chief Commissioner Adam, then at the
bar, the case was argued in the House of Lords.  And the result
was a final judgment affirming that pronounced by the Court of
Session.

SHEDDEN
*v.*
PATRICK ET AL.

CASES IN THE HOUSE OF LORDS.

Now, it would be difficult to conceive a case in which a more definite and specific averment of conspiracy or collusion was required, than in one of this kind. The object of the appointment of a factor *loco tutoris*, or a curator *ad litem*, or other officer of Court duly intrusted with the interests of the pupil or minor, is not only that those interests shall be defended, but that the other party shall have an opponent, with whom it is safe and conclusive to enter into the contract of *litis-contestation*, so as to obtain a *res judicata* on the matter in dispute.

It may be and is quite competent for the minor or pupil, if really injured, to challenge the fairness of the proceedings taken by the officer of Court appointed to watch over his interests, and to show that those interests have been fraudulently sacrificed. But surely it requires the clearest statement of the nature of that injury to warrant such an action. And the security generally supposed to be afforded by such a course would be absolutely worthless, if it were enough for the party to bring his action charging the officer of the Court with fraudulent collusion, without calling him into Court at all ; and that twenty years after his death, and the death of nearly all the parties who can be supposed to possess any information on the subject. I cannot conceive anything more hazardous to the legitimate interests of all parties, forced into litigations with pupils or minors, than a course of this kind, exemplified as it is in the circumstances of this very case.

The single fact from which the Pursuer chooses to infer fraud or collusion, is, that the factor *loco tutoris* and his advisers did not advance a plea or proposition in law, which he, assisted by the new lights lately obtained, thinks would have led to a different judgment. But how can such a charge be listened to, after the case was put under the guidance of eminent counsel ? *They* were the parties to determine, on their own professional responsibility, how the case was to be conducted.

But when considered in its true light, the case of the Pursuer will be found not to rest on fraud at all. The fraud lies, and so it is put by the Pursuer himself, in the failure to bring forward a certain legal proposition which is said to have been omitted in the pleadings in the former reduction, and which, according to the Pursuer's view, would now warrant a different conclusion. Even holding that view to be the sound one, what does it come to but this, that the Pursuer, under the cover of a charge of fraud, in itself untenable according to his own summonses, is attempting to obtain a review of the judgment of this Court and the House of Lords, on a matter of law which had not been brought under the notice of either tribunal ; a review which, by the force of the vicennial prescription, is entirely incompetent and inadmissible ! For if the allegation of fraud is indispensable to get the better of that pre-

scription as applicable to a bare retour, *a fortiori* it is indispensable, when that retour has been confirmed by judgments of this Court and the House of Lords.

SHEDDEN
*v.*
PATRICK ET AL.

In cases of fraud, as in many other cases of litigious warfare, the forms are, to a certain extent, in favour of the assailant. He may make his charges, however offensive, without being called upon to an instant verification, and may keep his adversary so far exposed to public obloquy till the proof is found ineffectual. But then the assailant is not absolutely free from the observance of all rule. He is at least bound to know his own case, and to be able to state it explicitly and consistently. If he avers fraud in general, he must be able to state the overt acts by which the belief of that fraud has been impressed upon him ; and above all is he bound to abstain from charging as acts of fraud and conspiracy, facts and documents which, to the ordinary sense of mankind, lead to a conclusion directly opposite.

I would suggest, then, that the objections to the relevancy of those summonses should be sustained and the Defenders assoilzied.

The Court pronounced the following interlocutor :—
" Sustain the defences : Dismiss the said actions, and assoilzie the Defenders from the whole conclusions thereof : Find the Defenders entitled to their expenses."

Against this decision of the Court of Session an appeal was forthwith taken to the House of Lords ; and the cause stood for hearing on the 2nd of March, 1854.

Sir *Fitzroy Kelly*, Mr. *Roundell Palmer*, Mr. *Anderson*, and Dr. *Phillimore*, for the Appellant.

The *Solicitor-General* (Sir *Richard Bethell*), the *Dean of Faculty* (Mr. *Inglis*), Mr. *Rolt*, and Mr. *Mure*, for the Respondents.

Sir *Fitzroy Kelly* was proceeding to open the case, when the following conversation ensued :—

The LORD CHANCELLOR (*a*) : The decision of this House in 1808 established the Appellant's illegitimacy. What you asked in the Court of Session was to obtain a decree inconsistent with that decision. How could

(*a*) Lord Cranworth.

SHEDDEN
*v.*
PATRICK ET AL.

the Court below do otherwise than say that they were bound by the judgment of this House?

Sir *Fitzroy Kelly*: Our case, my Lords, is that the proceedings in the Court below, and in this House, were begun, continued, and ended in fraud.

The LORD CHANCELLOR: Can the Court of Session decide such a question?

Lord BROUGHAM: You called on the Court of Session to set aside the judgment of this House.

The LORD CHANCELLOR: How *can* the Court of Session do *that?*

Sir *Fitzroy Kelly*: My Lords, the real object of the former suit was to confirm a title obtained fraudulently. The action in the Court below was a mock action; and the appeal to this House was a mock appeal.

The LORD CHANCELLOR: Your application should have been *here.*

Sir *Fitzroy Kelly*: True, my Lords, if the Court below had decided that it was not competent to them to impeach a judgment of this House; but the Court below has not entered into that question.

The LORD CHIEF JUSTICE OF ENGLAND (*a*): The Court below *assumed* that they had jurisdiction; but we are bound to consider whether they were right in this.

Lord BROUGHAM: You must get rid of the judgment of this House. The decree below has become a judgment of the House of Lords, which not only confirms it, but converts it into a judgment of its own.

The LORD CHIEF JUSTICE: Has this ever been done?

Sir *Fitzroy Kelly*: This point not having been adverted to in the Court below, I am not prepared to argue it. Except incidentally, it is not even alluded to in the great volume of papers on your Lordships' table.

Lord ST. LEONARDS: Suppose the Court below had decided the other way, and reversed the judgment of this

(*a*) Lord Campbell.

House; and suppose a contest between that Court and
this House by a subsequent reversal of the decree below.

Sir *Fitzroy Kelly* : My Lords, I would humbly ask
your Lordships' indulgence, to meet these difficulties.

[After some deliberation as to granting time to Sir
*F. Kelly* to prepare on the question of jurisdiction,]

The LORD CHANCELLOR :

This is in substance an action to set aside a judg-
ment of this House; but you might well suppose that
the question of jurisdiction would not be raised here,
since it was not raised in the Court below. I observe
that Lord *Fullerton,* in his long opinion, does not
discuss it. We therefore adjourn the further hearing
till Monday next, that you may be prepared on this
preliminary question; one, perhaps, depending upon
principle, and but little touched by authority.

On Monday, the 6th of March, the cause was again
in the paper, when the following intimation fell from

The LORD CHANCELLOR : The House will at this
stage assume the Appellant's legitimacy. Let the
argument, therefore, for the present, be confined to the
question of jurisdiction.

Sir *Fitzroy Kelly,* for the Appellant : When a judg-
ment has been obtained by fraud, the party aggrieved
must apply to the Court itself to set it aside. This
House has no original jurisdiction. It can only deal
with the judgments of other Courts, by affirming,
reversing, or varying them. This, however, is not an
attempt to set aside the judgment, but to be relieved
from its operation.

[Lord ST. LEONARDS : It is an attempt to get the
land from the person to whom the Court below gave it.
The decision of other Courts may be appealed from.
The decisions of this House cannot. If the House has

SHEDDEN
*v.*
PATRICK ET AL.

been misled, the question is whether you ought not to have come here, instead of resorting to the Court below.]

[Lord BROUGHAM: Would not the decree you asked below have had the effect of making the judgment of this House a nullity *in toto,* and not merely relieving the party?]

Where the object is to nullify the judgment entirely, the application must be to the Court that made it. But where the objection arises *incidentally,* any Court may hold the judgment null and void, upon proof of the fraud. The pettiest of all tribunals, the Court of Pie-Poudre, may, and indeed *must,* in such a case disregard a decision even of the highest appellate jurisdiction. All Courts are liable to imposition, and even this House was on a late occasion defrauded of its judgment in *Tommy* v. *White* (a). There the fraud was on the House, not on the Court below, and there, consequently, the application was made to the House to set the matter right. But here the fraud was on the Court of Session. Hence a suit in that Court was necessary.

If, instead of annihilation, the object is merely to have a judgment declared void in respect of fraud, the authorities are abundant. Thus, in Lord Coke's Reports, we have *Fermor's Case,* 44 Eliz., where a fine levied with proclamations was held no bar against the party claiming the inheritance, because it appeared that such fine, though among the most solemn of judicial proceedings, was had, in the particular case, by covin (b). For the common law so abhors fraud, that all acts tainted with it, as well judicial as others, are void, and bind not. There are many later authorities; but the most weighty of all is the *Duchess of Kingston's case* (c); where a sentence of jactitation was proved to have been obtained by the collusion of both parties,

(a) 4 House of Lords' Ca. 313.

(b) Coke's Rep., part 3, p. 77; and see *Farr's case,* Raym. 276, and 1 Sid. 254.          (c) 20 How. State Tr. 355.

and it was consequently treated as a nullity. The
argument of Mr. Solicitor-General *Wedderburn* in that
, case has the following passage :—" A sentence obtained
by fraud and collusion is no sentence. What is a
sentence ? It is not an instrument, with a bit of wax
and the seal of a Court put to it; it is not an
instrument with the signature of a person calling him-
self a Registrar; it is not such a quantity of ink
bestowed upon such a quantity of stamped paper: a
sentence is a judicial determination of a cause agitated
between real parties, upon a real interest. In order to
make a sentence, there must be a real interest, a real
argument, a real prosecution, a real defence, a real
decision. Of all these requisites, not one takes place
in the case of a fraudulent and collusive suit : there is
no Judge, but a person invested with the ensigns of a
judicial office, is misemployed in listening to a fictitious
cause proposed to him; there is no party litigating,
there is no party defendant, no real interest brought
into question; and, to use the words of a very sensible
civilian, ' fabula, non judicium, hoc est; in scenâ, non
in foro, res agitur.' "

So here, my Lords, we say the parties were not real
parties. The Appellant was an infant, and his guardian
in collusion with the other side; so that the description
of Mr. *Wedderburn* thoroughly applied. Even in Mr.
Chitty's book on (a) Pleading, forms are given which show
that the practice of the Courts has made provision for
the case of fraudulent judgments, by showing how they
were to be met, and how their effect was neutralised the
moment it appeared that they had been obtained by fraud.

In *Price* v. *Dewhurst* (b), Sir *Launcelot Shadwell* said,
" It is of no consequence where a judgment is given, if
it appears to have been obtained by fraud: in every

SHEDDEN
*v.*
PATRICK ET AL.

(a) *Stockdale* v. *Hansard,* 9 Ad. & El. 1.
(b) 8 Sim. 302, 304.

CASES IN THE HOUSE OF LORDS.

such case the Court will consider it as a nullity; and it is at liberty to deal with the parties and with the subject it has to administer, just as if the judgment had never taken place." To show the extent to which this doctrine had been carried, he might refer their Lordships to many cases both at law and in equity, such as *Meddowcroft* v. *Huguenin* (a), *Robson* v. *Eaton* (b), *Lloyd* v. *Mansell* (c), and *Bandon* v. *Beecher* (d). In this last case, it was held that although the Court of Chancery could not correct a decree of the Court of Exchequer, yet a party affected by it, whether Plaintiff or Defendant, might question its validity on the ground of covin or contrivance; and it was laid down by Lord *Brougham,* that a decree so obtained "should avail nothing for or against the parties affected by it to the prosecution of a claim, or the defence of a right."

[Lord St. Leonards: The question is, do these doctrines extend to a case which has been decided by this House?]

We do not see how a decision by this House can be any exception.

[The Lord Chancellor : The only question to which we directed your attention was that to which Lord *St. Leonards* refers.]

[Lord St. Leonards: In *Tommy* v. *White* could they have proceeded in the Court below notwithstanding the decision of this House?]

That case cannot be assimilated to the present. In *Tommy* v. *White* there was an affirmance of the decree below.

[Lord St. Leonards: So there has been here.]

[Lord Brougham : Suppose a suit in the Ecclesiastical Court for nullity of a marriage; suppose an appeal and an affirmance by the Delegates. You have

(a) 4 Moore's P. C. Ca. 386.          (b) 1 Term. R. 62.
(c) 2 P. Wms. 73.                     (d) 3 Cla. & Fin. 476.

SHEDDEN
*v.*
PATRICK ET AL.

then a judgment of an exclusive and supreme jurisdiction as much as if it were by this House. That case you say would be the same as this?]

Precisely. The question has been narrowed to this, whether there is any difference between a decision of this House and that of any other Court. We had not previously supposed that your Lordships had considered the point so plain with regard to those other Courts. The sentence of the Ecclesiastical Court, in the case put by Lord *Brougham,* is as absolute as if it were by the House itself.

[Lord BROUGHAM: But here the appeal in strict constitutional language is to Parliament, this House being the High Court of Parliament, and the judgment given that of the Parliament.]

Still the House is a court of justice, and must act as such. But what does Mr. Justice Blackstone say (*a*)? He affirms that even an act of the whole Legislature may be relieved against on proof of fraud. And he shows that this has been done (*b*). The same principles

(*a*) 2 Comm. 346.

(*b*) See 4 Cruise's Dig. 545, where the cases relied upon by Blackstone are set out. One of them related to an Act of the House of Assembly of Pennsylvania, which was relieved against in Chancery. The other was a Scotch case, *Mackenzie* v. *Stuart,* Dom. Pro. 1754, on appeal from the Court of Session, where it appeared that an Act of Parliament had been obtained to sell an entailed estate for payment of debts upon a false representation of facts. The House of Lords, under the direction of Lord Chancellor Hardwicke, reversed the decision of the Court below, by which relief had been refused. The case is reported in Messrs. Craigie Stewart & Paton's Appeal Cases. From their report it appears that the House held "that the Appellant (an heir of entail) was not barred by his concurrence and agreement, nor by the Act of Parliament, from opening up the whole proceedings." And they add on the authority of Lord Kaimes, "that the Lord Chancellor, in delivering his opinion, expressed a good deal of indignation at the fraudulent means of obtaining the Act, and said that he never would have consented to such private Acts, had he ever entertained a notion that they would be used to cover frauds." See Kaimes' Dictionary, 7445.

SHEDDEN
*v.*
PATRICK ET AL.

obtain in Scotland, *Macpherson* v. *Tytler* (a). But we submit with confidence that the *Duchess of Kingston's case* is of itself conclusive in our favour, and there is an end of all difficulty; unless it can be shown that the judgment here, being by this House, makes a difference. But that proposition cannot be sustained, after what Lord *Eldon* said in *Stewart* v. *Agnew* (b), that "where a fraud is practised upon the House and the party by the operation of that fraud obtains the judgment of the House, it is no more than the judgment of any other court obtained by fraud, and is an absolute nullity." Suppose an action brought to recover an estate, and a judgment against the plaintiff pleaded—he can say that that judgment does not bind him because it was obtained by fraud. It has been said, why did we not petition the House in the present case? The answer is complete. The House has no power to do anything effective; for even if it were to revoke its own judgment, it could not set aside the decree of the Court of Session. No original proceedings could have been taken in this House by the wronged heir-at-law. Suppose he had applied as in *Tommy* v. *White.* The House would have had no means —no machinery—to deal with the case, because it was one indispensably requiring the powers and functions peculiar to a tribunal of original jurisdiction.

[Lord BROUGHAM : If the judgment of this House were revoked, you might then proceed below.]

But what power would the House have to remit to the Court below? It could only act in its appellate character. It could only deal with the case as it dealt with it before.

[Lord ST. LEONARDS : The House could direct an issue.]

The House has no jurisdiction over land in Scotland

(a) 1 Sec. Ser. 718.          (b) 1 Sh. App. Ca. 434.

CASES IN THE HOUSE OF LORDS.                597

except on appeal. Here nothing wrong has been done so far as the appellate jurisdiction was concerned. The case came up in the regular way. The House cannot recal its own judgment upon matter dehors and extrinsic; and for anything appearing on the record, which is all that the House was entitled to look at, the decision of 1808 was the only decision at which the House could have arrived.

Mr. *Roundell Palmer* (with Sir *F. Kelly*): The question is what is the general law applicable to judg-- ments and estoppels. Judgments may be impeached on three distinct grounds. First of all, they may be impeached by reason of error on the merits; and in such a case, this House, when exercising its reviewing jurisdiction, proceeds on the former evidence, and has no higher function to discharge than that which belongs to other Courts of Appeal. Secondly, judgments may be impeached by reason of newly discovered matter,— what is called in Scotland *res noviter veniens ad notitiam;* and no other Court can relieve but the Court that made the judgment. Redress is then granted in Chancery by Bill of Review as it is called—which has been permitted even after an affirmance of the decree by the House of Lords (a). But the leave of the Court to file the bill must be obtained, *Barbon* v. *Stearle* (b), *Blake* v. *Foster* (c). Both these were cases of review for new matter. They show that even a judgment of this House will not deprive a party of the right of review; the only question being as to asking leave to file the bill—whether that should be here or below. And the giving leave is equivalent to saying there is no estoppel. Such are the rules as to error and new matter. But now we come to the third class of cases

(a) Lord Redesdale on Pleading, p. 88.
(b) 1 Vern. 416, and see 16 Ves. 89.
(c) Macq. H. of Lords, 448.

CASES IN THE HOUSE OF LORDS.

SHEDDEN
*v.*
PATRICK ET AL.

where judgments are impeached and resisted on the ground of fraud and collusion perpetrated in the obtaining of them. And doubtless the most striking instance is furnished by the *Duchess of Kingston's case,* where it was held that the effect of a judgment may be avoided by proving that it was procured by fraud and collusion (*a*). Persons properly on the record will be bound if the proceeding is honest. But if the suit is not real, the party can disclaim it, and say the suit was not mine, *Robson* v. *Eaton* (*b*). This is the meaning of what Lord *Brougham* said in *Bandon* v. *Beecher* (*c*). "That you may always object to a decree made in another Court if it was pronounced through fraud, contrivance, or covin, or not in a real suit; or though pronounced in a real suit, yet between parties who were not really in contest with each other." The principle of a Bill of Review, on the ground of new matter, is well distinguished by Lord *Redesdale,* from the principle of a bill to obtain relief against a judgment had by fraud (*d*). A decree enrolled is as binding as a judgment of this House; but upon proof of fraud it will be void as regards those whom the fraud affects, although it may be good in other respects, *Richmond* v. *Tayleur* (*e*), *Sheldon* v. *Fortescue* (*f*). In cases of fraud, no review is necessary. A decree obtained by fraud may be impeached without the leave of the Court (*g*). In *Mussell* v. *Morgan* (*h*), the very thing was done which it is suggested should have been done here. A petition was presented to have a decretal order discharged, as obtained by collusion, but Lord Chancellor *Thurlow* said the thing must be set right in

(*a*) 2 Smith's Lead. Cases, 432, 433, where the authorities are fully gone into.

(*b*) 1 Term R. 62.

(*c*) 3 Cla. & Fin. 471.

(*d*) Mitf. Eq. Pl. 92.

(*e*) 1 Peere Wms. 734, note.

(*f*) 3 Bro. C. C. 73 of P. W.

(*g*) 3 Peere Wms. 111.

(*h*) Mitf. Eq. Pl. 93.

CASES IN THE HOUSE OF LORDS. 599

a new suit. The analogy to the present case is perfect. On the record your Lordship's judgment of 1808 was correct. The matter showing fraud must be brought forward in a separate proceeding.

[Lord BROUGHAM: The judgment of this House affirming that below, makes the judgment below a judgment of this House. Then from what time would the limitation run ?]

We believe from the time of the judgment below.

[Lord BROUGHAM: But we have hitherto held the judgment of 1808 to be a judgment of this House, not merely an assent to that below.]

The judgment is the same judgment confirmed by a higher authority. We submit that it is still the judgment of the Court below. The jurisdiction of this House is merely appellate. It can only affirm, reverse, or vary. The House knows nothing but from the record of the Court below. If the judgment be void by matter *dehors* your Lordships cannot interpose. The House may, indeed, correct slips in its own judgments. But it cannot make fundamental alterations(a).

The terms of the summons in the present case are sufficient to bring it within the rules we have been citing. The form of pleading is in accordance with the law of Scotland. Bell's Dictionary (b), Shand's Practice.

The *Solicitor-General,* for the Respondents: A judgment of this House, having the force of a statute(c), has conclusively fixed the status of the Appellant. The only mode of reversing it is by Act of Parliament. If that course had been taken, the House would have had

SHEDDEN
v.
PATRICK ET AL.

(a) See 1 Moore's P. C. cases ; and Macqueen's H. of L. 445.
(b) Title " Exception," 385.
. (c) Preface to Lord St. Leonards' Real Property Decisions of the House of Lords. Coke's First Inst. B. 352.

R R

CASES IN THE HOUSE OF LORDS.

SHEDDEN
*v.*
PATRICK ET AL.

ample means for trying the real merits of the application. An issue might have been directed.

[The LORD CHANCELLOR: Can you show any precedent for that?]

Lord *Redesdale* says it was not uncommon for your Lordships to direct an issue(a). But even upon an inquiry at the Bar of the House there would be every facility for investigation.

In *Meadows* v. *The Duchess of Kingston* (b), Lord Chancellor *Apsley* laid it down as a general rule that wherever a matter comes to be tried in a collateral way the judgment of any other Court having competent jurisdiction shall be received as conclusive of the matter determined. And in *Prudham* v. *Phillips*(c), where a sentence of the Ecclesiastical Court was produced by the plaintiff, the defendant offered to prove that the sentence was obtained by fraud, but *Willes*, C. J., would not permit the evidence to be gone into.

The general principle is the same in Scotland;

---

(a) Macqueen's H. of L. 439. The case cited by Lord Redesdale is that of *Scudamore* v. *Morgan*, 4th March, 1677, where the House, after reversing a Decree, ordered that the Court below (namely, the Court of Chancery), should direct that a trial at law should be had upon this issue,—" Whether the Lord of the Manor of Kenchurch be compellable to renew estates from 99 years to 99 years, and if any difference shall arise about the said issue, the Lord Chancellor to direct a Master to settle the same." This, however, was done on appeal, and there are other instances to the same effect, such as that of the *Duke of Devonshire* v. *Wall*, 4th Feb., 1760, where it was ordered that the " Parties do proceed to a trial at law at the bar of the Court of King's Bench, by a special jury, upon the following issues (settled by the House), and that the Court of Chancery do give all proper directions for carrying this judgment into execution." All this, however, was ordered by the House in the exercise of its appellate jurisdiction. It does not, I think, appear that the House ever directed an issue upon an original, and still less on a legislative proceeding ; and even in the cases cited the weight of the operation is thrown on the Court below.          (b) Ambl. 756.

(c) Ambl. 763. See Mitford on Pleading. Smith's Edition, 300.

SHEDDEN
*v.*
PATRICK ET AL.

where, however, it has been fortified by the Act 1587, c. 89, which expressly affirms that the judgment of a Superior Court shall not be impeached in a lower one.

The case of *Blake* v. *Foster* (a), cited on the other side, is really in our favour, for the Lord Chancellor of Ireland refused to proceed without the authority of the House; and the course he followed, your Lordships finally by your judgment approved.

But how does it appear in the present case that the judgment sought to be set aside proceeded upon fraud? Who can tell on what points the decision of 1808 went? When a decree was affirmed, it was not then usual to assign reasons. There were a variety of circumstances in the case; and the conclusion of the House might have rested on matter entirely independent of the fraud now alleged. And if so, your Lordships cannot assume that it proceeded upon fraud.

[The LORD CHANCELLOR: You are here as if on demurrer; and you must make out that by no possibility could the judgment have gone on the fraudulent matter.]

The *Dean of Faculty* : A Court may incidentally have to decide matter beyond its ordinary functions; but it cannot grant a remedy out of its jurisdiction. Thus, in Scotland it might become necessary to ascertain whether a party were a peer—although the Court of Session has no jurisdiction to try peerage questions. Or—before the abolition of the Consistory Court—it might have been indispensable incidentally to inquire in a suit whether a woman were married, or whether a man legitimate; both points of jurisdiction being foreign to the Court of Session till the late Act was passed. But, in present case, the main object of the action was directly and expressly to displace the judgment of this House; and whatever might be the

(a) Macqueen's H. of L. 448.

R R 2

SHEDDEN
*v.*
PATRICK ET AL.

law of England, the authorities of Scotch law demon-
strated that this was a competent and the only proper
course of proceeding to effect the end desired (*a*).
There is no getting rid of a *res judicata* in Scotland
except by an action of reduction; and whether it be
by the highest or the lowest jurisdiction, the rule is
the same.

The Act of 1587, c. 89, seems conclusive; but the
general doctrine of Scotch law is fully recognised in
*Mackenzie* v. *Scott* (*b*), *Scarlett* v. *Somerville* (*c*), and
*Murray* v. *Cockburn* (*d*).

As to the contention that the suit was not the
minor's, the answer is that the minor was legally
represented in the proceeding, and by the law of
Scotland effectually bound by the acts of his factor
*loco tutoris.*

Sir *F. Kelly,* in reply: That a judgment of this
House cannot be reversed without an Act of Parliament,
—the main point urged on the other side—we do not
and need not dispute; because it leaves untouched the
question—the only question here—whether, when a
judgment of this House is obtained through fraud and
collusion, it may not be passed by in another Court as
a nullity.

[The LORD CHANCELLOR: Are you able to mention
any case of replication on the ground of fraud to a plea
of judgment recovered?]

In the second and third volumes of Chitty on
Pleadings, the cases are all collected.

[The LORD CHANCELLOR: In the *Duchess of King-
ston's case*, the proceeding was by the Crown.]

Plea of *autre fois acquit* may be got over by showing
that the judgment was obtained by fraud.

(*a*) Stair B. 4, c. 40, §§ 15, 16, 21.   Ersk. B. 1, c. 3, § 2.
   (*b*) 4 Bro. Sup. 282.        (*c*) Ibid.        (*d*) Ibid.

CASES IN THE HOUSE OF LORDS.              603

The Scotch cases cited by the *Dean of Faculty* have
no application, and the Scotch Act of Parliament, of
which we have heard so much, is equally unavailing.  It
is in truth no more than a general declaration, of what
is likewise the law of England, namely, that a subordi-
nate tribunal cannot alter the decrees of a superior one.

The *Solicitor-General* asked your Lordships, how do
you know that the House went on fraud in 1808 ?
This supposes that the fraud tainted but a single point,
or only a few points, of the case.  But we aver that the
whole proceeding was concocted and bottomed on fraud,
and that the entire mass was permeated and saturated
with fraud.

At the close of the argument, on the 10th March,
the sentiment of the House was thus expressed by

The LORD CHANCELLOR:

The principle relied upon by the Appellant's counsel
is the principle laid down by Chief Justice *De Grey,* on
behalf of himself and the other Judges, in the *Duchess
of Kingston's case*—namely, that " admitting a sentence
of jactitation to be conclusive upon an indictment for
bigamy, the counsel' for the Crown might nevertheless
be admitted to avoid the effect of such sentence by
proving the same to have been obtained by fraud or
collusion."  The question, my Lords, is, does the pre-
sent case come within that principle ?  Sir *Fitzroy Kelly*
seemed to admit, that in order to render it applicable,
it would not be enough to show that somebody had
been guilty of fraud in the conduct of the cause.  It
must appear that the suit itself was actually concocted
and conducted in fraud.  Now, to judge of this, we
must know what the facts of the case are.  Of these
we are now ignorant.  I regret the time which has
been consumed—not unnecessarily however, but indis-
pensably.  And I see no alternative but that counsel

CASES IN THE HOUSE OF LORDS.

SHEDDEN
*v.*
PATRICK ET AL.

be now directed to proceed upon the facts, so as to enable the House to decide whether they are really of such a nature as would, if established, entitle the Appellant to the relief which he prays.

The Lords BROUGHAM and ST. LEONARDS concurred.

Accordingly on the 27th of March, in compliance with the direction of the House, Sir *Fitzroy Kelly* proceeded to lay before their Lordships the facts alleged by the Appellant; contending that those facts brought the case within the principle to which the LORD CHANCELLOR had referred; and, also, that the averments respecting them were relevant and sufficient in point of pleading. Sir *Fitzroy* was followed by Mr. *Roundell Palmer*. The points mainly urged by them were 1. That the domicile of William Shedden, the Appellant's father, had all along been Scotch. 2. That this was well known to the Respondents. 3. That they nevertheless deceived the Court by representing it as a fact that the domicile of William Shedden was not Scotch, but American. 4. That the Appellant, though born in America, was in truth a Scotchman, and a subject of this kingdom. 5. That the marriage of 1798, though had in America, was in the eye of the law a Scotch marriage, *Munro* v. *Munro* (a), *Warrender* v. *Warrender* (b). 6. That being a Scotch marriage, it rendered the Appellant legitimate from his birth. 7. That the law of Scotland governed, and the law of America did not touch the case. 8. That the Appellant came within the 4 Geo. 2, c. 21, and consequently was not an alien. 9. That even if any doubt could exist as to the retrospective operation of the marriage of 1798, the Appellant's legitimacy would be established by the prior marriage alleged by way of amendment. 10.

(a) 7 Cla. & Fin. 842; 1 Rob. App. Ca. 502.
(b) 2 Cla. & Fin. 488.

That the parties were before the House as on demurrer; and that, although the Appellant might ultimately fail in his proof, his statement must now be taken to be true. And lastly, even if the Court below had been right in holding that the Appellant's case was unsustainable as it stood, they ought only to have dismissed the action. They ought not to have assoilzied the Defenders.

SHEDDEN
*v.*
PATRICK ET AL.

The *Solicitor-General* and the *Dean of Faculty*, for the Respondents, admitted that if the Appellant could make out that he was born in lawful wedlock, and that the Respondents knew the fact, the case would be serious. But he must show three things. 1. That the natural inference of the Respondents ought to have been in favour of a Scotch domicile. 2. That they must have known that the point of domicile was material to the issue of legitimacy or illegitimacy. And 3. That the impression created in the minds of the Court respecting the domicile, or the facts from which the domicile was inferred, led to the judgment sought to be got rid of. If the Appellant fail in any one of these points, his case falls to the ground. There is no averment that Patrick knew the domicile to be material, although it is averred that it *was* material. The law respecting domicile was said on the other side to have been well known in Scotland at the time of these proceedings; but it was not so, and Lord *Fullerton's* judgment shows this. It was not on domicile that the judgment affirmed in 1808 proceeded.

The maxim pater est quem nuptiæ demonstrant cannot apply here—because when the Appellant was born, his parents were not married. The old fiction that a subsequent marriage legitimates prior born issue from their birth is now exploded in Scotland, *Kerr* v. *Martin* (a).

(a) See this case, *infrà*, p. 650.

CASES IN THE HOUSE OF LORDS.

[The LORD CHANCELLOR: If the Appellant was legitimate, he was not an alien. If he was illegitimate he was an alien.]

[Lord BROUGHAM: The Roman law says the child in such a case is legitimus ab initio, non legitimatus.]

In *Kerr* v. *Martin*, the Court of Session disagreed with the civilians who espoused the doctrine of retrospective relation and the theory of mid-impediments. The Appellant, therefore, was not legitimate at his birth. He was a person who had no father for the first six years of his life.

[Lord BROUGHAM: The opposite doctrine would lead to this:—that the parents, by intermarrying, might convert the son, peradventure a prisoner of war with arms lawfully in his hands, into a person guilty of high treason.]

Then as to the allegation of a prior marriage, introduced by way of amendment at the eleventh hour, it only shows to what daring extremities parties will be carried in prosecuting a desperate litigation. It is a mere after-thought. But even if that bold assertion were established by proof, the case of the Appellant would gain nothing by it, unless fraud were brought home to the Respondents.

The judgment assoilzing the Respondents was well considered in the Court below, and went advisedly beyond a mere dismissal of the action—having regard to the harassing and unprecedented character of the suit.

Sir *Fitzroy Kelly*, in reply: The case of *Kerr* v. *Martin* is unsatisfactory and unintelligible. It was carried apparently by a single vote — the judges in Scotland dividing seven to six. This House can pay no regard to it.

The Appellant desires to go before a jury. The decision below has refused him a trial. This of itself

is enough in common justice to vindicate his claim to a reversal.

## JUDGMENT.

The LORD CHANCELLOR :

When the cause was opened, one (a) of your Lordships suggested that this was a proceeding under no circumstances competent to the Appellant; because it was an attempt to set aside, by the sentence of an inferior Court, a solemn judgment pronounced by this House in the last resort. That preliminary objection your Lordships desired first of all to be argued on the assumption that the facts were such as the Appellant represented them; and the point was, whether, under any circumstances, a party against whom there had been a final judgment of your Lordships' House, could call that judgment in question by a suit in the Court below, and have it declared to be no bar to a new proceeding.

*Lord Chancellor's opinion.*

The argument on this preliminary objection opened questions of very great nicety and very great difficulty. Now without expressing any positive opinion, I certainly do not wish it to be understood that I concur, or that I should, without further argument, concur in the suggestion that under no circumstances can a judgment of your Lordships' House be called in question, if it be established that it was not a judgment in a *bonâ fide* suit, but obtained by the fraudulent collusion of both parties, in order, either by means of that judgment, to defeat the objects of public justice, or to defeat the rights of one of the nominal parties, he being an infant, whose rights were under the guardianship of another. If it could be established that the Defenders in a suit in Scotland, or the Defendants here

(a) Lord Brougham. " Quære :—Lord Campbell." Per Lord Brougham.

608                    CASES IN THE HOUSE OF LORDS.

(which would be just the same thing), had fraudulently induced some one to act as the next friend of an infant, in order to have a pretended suit instituted in which it should be a part of the common design of the Plaintiff and the Defendant that the real rights of the infant should be kept out of sight, so that the Court below, in the first instance, and your Lordships' House afterwards, might be imposed upon and led to imagine that they were decreeing upon a state of facts which the parties knew was not a true state of facts, I wish to be understood as not meaning to express any opinion that an original suit in the Court below might not be instituted, notwithstanding that fraudulent judgment so obtained. It was decided in the celebrated case of the *Duchess of Kingston* that a judgment which had been obtained by fraud would not stand in the way of a prosecution of the duchess for bigamy; that the suit in the Ecclesiastical Court was a contrivance merely—a link in the chain of fraud; and, in truth, no judgment. According to the phrase used by Lord *Loughborough*: "*Fabula, non judicium, hoc est; in scenâ, non in foro, res agitur.*"

My Lords, the case having been thus argued upon the abstract question, your Lordships were of opinion that it would be inexpedient to come to any decision upon that abstract question, until, however long a time the argument might occupy, you had first heard the argument upon the facts in order to see whether, assuming the doctrine of the *Duchess of Kingston's case* to be applicable to a judgment affirmed by your Lordships in this House, there were facts in this case capable of raising the real point—whether, in truth, there had been any such concert and collusion between the parties who acted for the infant and the Defenders (the persons who were the heirs at law, if the infant were illegitimate), as to bring this case within the

CASES IN THE HOUSE OF LORDS.     609

doctrine of the *Duchess of Kingston's case*—I say the *Duchess of Kingston's case*, but there are several other authorities, which will illustrate what I mean.

Having heard the whole argument, and having attended to it from first to last with great anxiety, I have come to the clear opinion that there is one point which puts the decision beyond all doubt. I allude to the statute of George II. (*a*), under which it appears clear to demonstration, that (subject to what I am presently to say as to a prior marriage) the Appellant is to all intents and purposes an alien; and, consequently, incapable of succeeding as heir to lands in this country.

My Lords, the case made by the Appellant is this. He says that his father was a Scotchman by birth, that he was the owner of the estate in question called Roughwood, in Scotland; that his father went to America, first in the year 1764; that he returned in 1768, or 1769, for about a year and a half to this country; and that he went out afterwards to America, and remained till the end of the year 1798 when he died there. But his argument is that during all that time, although resident in America, he continued a domiciled Scotchman. And unquestionably it may be that a party, supposing him to live a century abroad, yet if he only lives there as a sojourner, *animo revertendi*, his home all along remaining here, no length of time, merely *qua* length of time, will necessarily confer a foreign domicile upon him. And what the Appellant contends for, is that while his father was residing in America from the year 1764 to the year 1798 when he died, (except during the year and a half when he returned to Scotland, about 1768 or 1769,) during the whole of that time he was only there for a temporary purpose, and always *animo revertendi*. He contends

(*a*) 4 Geo. II. c. 21.

610            CASES IN THE HOUSE OF LORDS.

SHEDDEN
*v.*
PATRICK ET AL.
*Lord Chancellor's
opinion.*

further that the father having lived with a woman named Ann Wilson, and having had born to him of that woman a son, himself, about the year 1793, did a week before his death marry this woman, and that by the law of Scotland (which he says was the law governing the case, Scotland being his domicile, although America was his place of residence) such marriage legitimated the son, the present Appellant, and so made him (whether you call him *legitimus* or *legitimatus* is unimportant) a legitimate son, and consequently capable of succeeding to the estate.

That case, my Lords, was endeavoured to be established in the first place by an enormous mass of evidence ; the object of which was to show the *animus* of the deceased, that he was in America only as a sojourner, and not treating that country as his home and domicile. And if the question had turned upon whether all those documents and evidence did, or did not, make out the inference which the Appellant contends ought to be drawn from them, very great nicety in examining and in commenting upon them would have been requisite. But, for the reason I have already intimated, it is, in my opinion, totally unnecessary to institute this critical examination, because for the present argument I will assume the Appellant to have made out that for which he contends. I will assume that there is ample averment in the summons, and in the condescendence, and in the documents incorporated with them, to show that William Shedden was a domiciled Scotchman, while he was living in America. Why then, he says, the consequence is this —that having had a child, namely the present Appellant, born to him of Ann Wilson, with whom he was cohabiting, and having, with the very object of making that child legitimate, six days before his death gone through a valid form of marriage with Ann Wilson on

SHEDDEN
*v.*
PATRICK ET AL.

*Lord Chancellor's opinion.*

his death-bed, according to the law of Scotland the son, who had been up to that time illegitimate, would be legitimate; and, his domicile having been all the time in Scotland, the circumstance of the events having happened in America would be immaterial to his right.

That again is a question of very great nicety and difficulty, and I shall express no opinion upon it. I will assume (as I have with respect to the fact of domicile) that, but for what I am about to state, it might make him for some purposes legitimate. But the question is whether, if it does make him legitimate, it makes him a natural born subject of Her Majesty, or of the King at that time.

Now, my Lords, it appears to me that the negative of that proposition is perfectly clear upon the statutes. I need not state to your Lordships that, independently of statute, every one born abroad is an alien. I state the proposition perhaps too generally, because the children of ambassadors and some other persons were excepted; but as a general proposition, all persons born abroad were aliens. That state of the law was interfered with first by a very early statute, I believe of one of the Henrys (*a*), with reference to merchants, but that may be dismissed from our consideration.

In the reign of Queen Anne it was enacted by a statute passed for "naturalising foreign Protestants," that "the children of all natural-born subjects born out of the ligeance of Her Majesty should be deemed, adjudged, and taken to be natural-born subjects of this kingdom" (*b*). Then, there having arisen a doubt upon the construction of that statute, and it being clear that

(*a*) 14 Hen. VIII. c. 2; and see 21 Hen. VIII. c. 46; 22 Hen. VIII. c. 13; 32 Hen. VIII. c. 16. See also 1 Ric. III. c. 9, which is apparently the early act to which his Lordship refers.

(*b*) 7 Anne, c. 5.

CASES IN THE HOUSE OF LORDS.

SHEDDEN
*v.*
PATRICK ET AL.

*Lord Chancellor's
opinion.*

it went further than was intended, the statute upon which reliance must necessarily be placed, and which is the governing statute upon the subject, the 4th Geo. II. (*a*), was passed, and that statute enacted " that all children born out of the ligeance of the Crown of England, or of Great Britain, or which shall hereafter be born out of such ligeance, whose fathers were or shall be natural-born subjects of the Crown of England, or of Great Britain, at the time of the birth of such children respectively, shall be adjudged and taken to be natural-born subjects of the Crown of Great Britain."

The language of that statute is very precise. In order to come within its provisions, the party must make out that at the time of his birth his father was a natural-born subject of this country.

Conceding, then, for the purpose of the argument, that the Appellant's father was domiciled in Scotland, although living in America; and conceding, for the purpose of the argument, that a marriage in America would have had the same operation as a marriage would have had if he had been in Scotland; what this Appellant must make out is that at the time of his birth his father was a natural-born subject. But at the time of his birth, Mr. Shedden was not his father. He had no father. He was a natural son, and in the eye of the law, *filius nullius*. The consequence was that alienage attached upon him, and, in my opinion, attached upon him irreversibly. He was an alien when born. Whatever may be the operation of the law in respect of such of Her Majesty's subjects of Scotch origin, as contradistinguished from those of English origin, it never can be that the incapacities of alienage are taken away. The results would be most anomalous and inconvenient; and there certainly cannot be such a thing as a person an alien in England and not an alien

(*a*) C. 21.

## CASES IN THE HOUSE OF LORDS.

613

in Scotland. But this Appellant, the moment he was born, was an alien in England—he was not a natural-born subject. How can it be that, because he is rendered legitimate according to the law of Scotland, he can be made *in invitum* a subject of Her Majesty? What strange consequences would follow! This person might, if we were unhappily engaged in war with America, lawfully take up arms against Her Majesty; and yet, can it be that his parents, by choosing to marry, could make him a traitor? But that consequence must inevitably follow. Again, he says that he can succeed to this estate of land in Scotland. But he is incapable of holding land in England; and if his father by his will had given him land in England, and left him to succeed to land in Scotland, the Crown, upon office found (*a*), would have been entitled to the land given to him in England. Could that right of the Crown be afterwards divested by subsequent marriage? The consequences are so anomalous that it appears to me to be clear that such is not the legitimate construction of the statute; and I am not at all satisfied that such a case as this might not have been in the contemplation of the Legislature, when they passed the statute. The first statute was passed immediately after the union with Scotland. It is in very loose language, and it evidently went further than was meant. When that act was set aside, and a new statute passed, some twenty or thirty years afterwards, one object of it may have been to defeat such a case as is now attempted to be set up. It may be that it was not so ; but the language used would accurately carry out that intention, if such were the intention of the Legislature. Be that as it may, it seems to me that as your Lordships can only determine this question on the

(*a*) Office found is where an inquisition is made of a thing to the use of the Crown.