614                         CASES IN THE HOUSE OF LORDS.

construction of the precise words of this statute, it is
quite clear that this gentleman was not at the time of
his birth the son of a natural-born subject of the Crown
of Great Britain; and, therefore, it is impossible for
him to succeed to the estate in question.

Such being the case, even if we were to assume the
fraud imputed, it was a fraud utterly immaterial; for
it was only to keep out of sight, first from the Court
of Session, and then from your Lordships' House, facts
that, whether they were suppressed or obtruded, would
lead exactly to the same result.

Upon this principle, I apprehend the case might be
entirely disposed of, were it not that after the suit had
been instituted in the Court of Session, first by an
Original Summons, and afterwards by a supplemental
one, a new statement was introduced by way of amend-
ment, which is, in truth, the only matter that has ever
created any sort of doubt in my mind, after I came
fully to understand this complicated case. I allude to
this; that although the two Summonses and the Con-
descendence (occupying 200 closely printed pages) of
the case now before your Lordships, and the enormous
volume of letters and correspondence which are also
printed by way of appendix,—although they all pro-
ceeded upon the assumption of this marriage just before
the death legitimating the child by reason of his Scotch
domicile, yet before the Record came to be closed,
permission was given to introduce, by way of amend-
ment (a), an averment of a fact, or alleged fact, scarcely
reconcileable with all the other facts of the case; namely,
that besides William Shedden's death-bed marriage,
" the said William Shedden and Miss Wilson had been,
according to the law of America, where they resided,
married persons prior to and at the birth of the pur-
suer." The amendment goes on to allege, that there

(a) Suprà, p. 579.

was a marriage before the birth of the child; a prior marriage, to be proved by cohabitation and acknowledgment.

Now, if we were reasoning upon the facts, I should have had very little difficulty in coming to the conclusion that such a case was scarcely possible. But I agree with the way in which this matter was put by Lord *Fullerton* (a), who delivered the judgment of the Court below, namely, that what we have to see is whether there is such a specific and relevant allegation of fraud as can be received by the Court. I must take the averment that there was this prior marriage (incredible as it appears to me, and absolutely irreconcileable in point of fact with all the rest of the case); but supposing, as was suggested by the learned Counsel for the Appellant, that facts may from time to time have come out, which may render it not improbable that the prior marriage might have been proved, still I must look to see whether, as connected with that marriage, there are what this very learned Judge has called specific and relevant allegations of fraud.

Now let me assume that it is sufficiently averred that prior to the birth of the child (putting the question of domicile, the fraud in concealing it, and the subsequent marriage, entirely out of the case), let us, I say, suppose that there is a sufficient averment, as there is, that prior to the birth there had been a marriage, which would undoubtedly, according to the laws of all countries, make the Appellant the legitimate son of his father, so as to get over the statute of George II. Still, in order to get rid of the decision of the Court of Session and of your Lordships' judgment, you must have a specific and relevant allegation that there was a fraudulent combination between the Defenders and those who managed the case of the Appellant while an

(a) *Supr*à, p. 581.

616                    CASES IN THE HOUSE OF LORDS.

infant—to keep that fact out of sight—so that your Lordships might adjudicate upon a state of facts, that element being suppressed, whereas, if it had been disclosed, your Lordships would have given judgment the other way, as no doubt you must.

For such specific and relevant allegations of fraud, I have looked in vain through the whole of these proceedings. Indeed, with regard to the question of domicile, the connection of Hugh Crawford with any fraud is exceedingly difficult to discover from anything stated on the face of the pleadings when looked at accurately. It is true that it is said, over and over again, that the next friend, Hugh Crawford, the *factor loco tutoris,* acted in collusion with the Defenders. But that of itself is clearly not sufficient. You cannot upset the judgment upon the ground of fraud, merely by alleging that there was fraudulent collusion. You must show how, when, where, in what way ? Hugh Crawford is expressly stated to have known nothing of the facts. What is said is, that the other parties kept him in ignorance of the real facts of the case. That was stated in the original summons, and is never controverted afterwards. Therefore, to say that he acted in collusion is saying nothing at all to the purpose. It is no fraud that a party proceeding for an infant does not bring forward something which he does not know. It is said, first of all, that Robert Patrick, who was the Defender, and William Patrick, who is now alive, and acted for him (and who, I will assume, are identified together, though there might be difficulties in establishing that proposition), well knew of this marriage. That is qualified down in the Condescendence to saying that "they were well aware, or had good reason to believe." Now, the maxim of our law, that all allegations are to be taken "*fortius contra proferentem,*" is a maxim founded in good sense; and not, I apprehend,

confined to this country.  When a Court is called upon
to adjudicate, they have a right to assume that the
person bringing forward an allegation, states his case
in the best way in which it is capable of being stated.
Therefore, this is no more than an averment that the
Defender, Robert Patrick, and his brother, William
Patrick, had good reason to believe that there had been
a prior marriage, and that they had never communi-
cated their belief to Hugh Crawford.  What then?
Morally this may not be very honest, or very high-
minded, on the part of a defendant litigating with an
infant whose interests are protected only by a *factor
loco tutoris.*  It may, I say, not be a very honourable
thing not to volunteer to tell him all the strength of
his case and the weakness of your own.  But it would
be a novelty indeed to say, that a case having been
conducted by a person who did his best for the infant
(for there is nothing to militate against that), it would,
I say, be quite extravagant to hold, that because the
Defender did not disclose to him the weakness of his
own case, and reveal a fact which he had good reason
to believe was true, and which, if investigated upon
the part of the Pursuer, might have been found to be
true, therefore, all the proceedings carried on in such
a suit are such a fraud, that—notwithstanding the con-
summation of the whole by a final judgment of the last
resort—they are now, after this great lapse of time,
to be treated as a nullity, and to be wholly disregarded.

There is nothing, therefore, which satisfies my
mind amounting to a legitimate averment that Hugh
Crawford knew of this private marriage, and fraudu-
lently kept it out of sight.  For it is expressly averred
that William Patrick concealed from Hugh Crawford
all the facts as to the domicile; and I see nowhere any
averment that he ever stated to him anything about
the prior marriage.  It appears to me that there is no

CASES IN THE HOUSE OF LORDS.

*SHEDDEN*
*v.*
*PATRICK ET AL.*
——
*Lord Chancellor's*
*opinion.*

fact whatever, and nothing whatever showing that Hugh Crawford did not conduct the case fairly; or that there was such a collusion between the two parties as to render it legitimate to say that this was *fabula, non judicium.* I believe it, according to the averments here, to have been strictly a *judicium;* after being carried first through the Court of Session, and then ultimately, by appeal to your Lordships' House; and that by that decision the interests of justice and of mankind require that all parties should be bound. If there were this prior marriage, which, even according to the Appellant's own suggestion, was not discovered till fifty years after the death of the parent, it is one of those misfortunes against which no human laws are capable of guarding. The case was carried on first in the Court of Session, and the decision was ultimately affirmed by your Lordships. In my opinion, no fraud is stated rendering it competent to the Pursuer to reopen the question; consequently he has totally failed; and the Court of Session was right in rejecting the present application for reduction. I shall, therefore, humbly move your Lordships to dismiss this appeal.

### The Lord BROUGHAM :

*Lord Brougham's*
*opinion.*

My Lords, the first question is the one which has been argued apart from the rest of the case, upon the preliminary objection, that here was a novel and extraordinary proceeding, an attempt to set aside, by an action of reduction in the Court of Session, not only the decree of that Court in 1803, but the judgment affirming it pronounced by this House in 1808; the point for our consideration being, whether any proceeding in a Court below, any proceeding other than one in this House, and even in this House other than an Act of Parliament, would suffice to set aside a judgment obtained here in the last resort.

From the view which I am disposed to take of the rest of this case, it may not be necessary for me to pronounce any opinion upon that preliminary objection, because, after hearing it argued, without adjudicating upon it, we entered into the whole consideration of the case. Nevertheless, I go to the full extent of the opinion which has been expressed by my noble and learned friend; and I know not that I am not disposed even to go a step further, and to consider that a judgment, though obtained here in the last resort, if proved to the satisfaction of this House—(and in this argument we are to assume proof, as we are upon the mere averment, and the sufficiency of that averment)— I say, if it be proved that there has not been a real suit instituted and appealed, but that there was collusion and fraud between the parties; that there was no real Plaintiff and real Defendant in real conflict together, upon whose case the Court below and this House had adjudicated; if it appear that there was no real trial, no real proceeding, and consequently no real judgment, but that the Court was imposed upon by the fraud of the parties; that the Court was led to believe that there was a contest when there was none, and that there was an opposition of parties when they were really in concert and leagued for the purpose of deceiving the Court to serve their own ends,—then, my Lords, I say I am prepared to go the full length of holding, that, in this House, as in any other Court, a proceeding so instituted, so carried on, and so consummated in a judgment thus fraudulently and collusively obtained, in a word, a fictitious judgment, may be treated as a nullity, as would be, *ex concessis,* on all hands, the judgment so obtained of any inferior tribunal.

The question is, whether or not the course of proceeding, having for its object to impeach this judgment before an inferior Court, in order to obtain there a

SHEDDEN
*v.*
PATRICK ET AL.

*Lord Brougham's opinion.*

decree that it was collusively procured, and that it must therefore be disregarded, was a competent proceeding for dealing with such a judgment; and I, for one, my Lords, can see no reason to doubt it. The judgment of this House must be dealt with in that inferior Court before which its merits were brought; that is to say, not the merits of the judgment, but the merits of the parties who had so fraudulently obtained it, the question being, was it a real judgment or not. For that is the only question in such cases, and that is the question in this case.

My Lords, the authority of the *Duchess of Kingston's case* upon the subject is, in my opinion, not to be got over, and not to be resisted—for what had we there ? This House was sitting as a High Court of Justice in full Parliament as the Lord Steward's Court, to try a peeress for felony. There was produced before the Court a sentence of another Court of competent jurisdiction to deal with the subject-matter of that sentence —the Consistorial Court—not only competent, but exclusively competent, to deal with questions of marriage and divorce; other Courts can only deal with them incidentally, but that Court alone has the jurisdiction to deal with them as the principal matter. A proceeding had been instituted in that Court of exclusive jurisdiction ; and a sentence of nullity had been obtained. To all intents and purposes, therefore, there was an end of the prior marriage, standing that sentence. But it was satisfactorily proved to the High Steward's Court here, upon the trial of the peeress, that the whole proceeding there was fraudulent and collusive. Therefore, the House disregarded that sentence, and treated it as being as much a nullity as the sentence itself had treated as a nullity the first marriage. Now, the Court which had pronounced the sentence was not an inferior Court. This House, the Lord Steward's Court,

was not a superior Court.  The Consistorial Court was
supreme as regarded the question of nullity.  From that
Court there lay no appeal to this House.  There lay
indeed an appeal to another Court, the Court of
Delegates, which had not been resorted to.  But it
would have made no sort of difference, if, instead of
the sentence being one unconfirmed upon appeal, there
had been produced a sentence confirmed by the Court
of the last resort in ecclesiastical matters, the Delegates
formerly, and since the year 1832, the Judicial Com-
mittee of the Privy Council.  The sentence of the
Consistorial Court was the sentence of a court of com-
petent and exclusive jurisdiction.  This House had no
right to interfere with the sentence of that Court any
more than that Court had to interfere with any sentence
pronounced in this House.  But it had a right to
disregard it, and it did disregard it, upon proof that it
was a nullity.

I, therefore, entertain no doubt whatever upon this
point; and the dicta of Lord *Eldon* which have been
referred to in the argument, though certainly not of equal
authority with the decision of the House itself, show
clearly that his opinion was that, in this respect, there
was no distinction to be taken between the judgments of
this House and those of any other Court in the country.

Accordingly, my Lords, I am satisfied that we did
well in going into the whole case, after having heard
the preliminary objection fully discussed.

Now, with respect to the case before us, the only
fault that I have to find with the very elaborate and
learned judgment given by my Lord *Fullerton*, and
acceded to by all his brethren, in the Court below, is,
that I do not think it quite keeps clear and separate
the two heads of mere averment, and the substance
and subject-matter of that averment with reference to
the question whether it is sufficiently proved or not;

SHEDDEN
*v.*
PATRICK ET AL.

*Lord Brougham's
opinion.*

622                    CASES IN THE HOUSE OF LORDS.

SHEDDEN
*v.*
PATRICK ET AL.

*Lord Brougham's
opinion.*

because, undoubtedly, we have no occasion, and the Court below had no occasion, or rather less than no occasion, no right, upon this form of proceeding to enter into the question of probability of the facts averred being true, or to enter into the evidence by which the facts alleged were supposed capable of being made out. The question they had to decide was a mere question of averment. Was there, or was there not, sufficient averred upon the record to entitle the party to the remedy of reducing the judgment brought before the Court by that proceeding?

My Lords, it is undeniable that the original case, which was then called *Crawford* v. *Patrick,* underwent great argument in the Court below, and was afterwards fully discussed at the bar here, and disposed of by the judgment of this House affirming the interlocutors of the Court below, and, in substance, declaring Mr. Shedden—the infant then—the present Appellant, to be not legitimated to the effect of obtaining the Scotch estate, to be not legitimated by the marriage of his parents contracted subsequently to his birth in America, where the Scotch civil law of legitimation by subsequent matrimony does not prevail.

With respect to the grounds of that decision I do not think it at all material at present to inquire into them; because we are to be satisfied of two things in this case, not only that certain matters were known to Mr. Patrick and to the other parties there, and were by them suppressed or concealed from the Court below, and mediately from the Court of Appeal here, but that those things were material things, and that the concealment was material, affecting the proceeding, and affecting the result.

Any concealment would not signify, unless that concealment was of a material fact.

10-03635-jpm   Doc 271-5   Filed 04/03/17   Entered 04/03/17 18:29:57   Exhibit A - Part 5   Pg 10 of 260

SHEDDEN
*v.*
PATRICK ET AL.
———
*Lord Brougham's
opinion.*

If, for instance, the allegation that Mr. Shedden, the father, was a domiciled Scotchman did not affect the substance and the result of the case, if the concealment of it was the concealment of a fact with respect to which it did not signify a straw which way it was given, or whether it was believed or disbelieved by the Court below and by this House, then past all doubt he allegation that the parties combined to deceive the Court by concealing that fact, or the evidence of it, would not avail for the reduction of this judgment.

Now I certainly incline to take the view which has been expressed by my noble and learned friend, of the immateriality of that fact, because supposing it were true—supposing we agreed to the proposition that a marriage subsequent to the birth of the child, (the parents of that child being Scotch parents, and the marriage being, therefore, a Scotch marriage,) legitimates the aforeborn issue to the effect of taking a Scotch estate, nay, even legitimates him absolutely, and to all intents and purposes; still, the question would remain, at what time did that subsequent marriage of his parents attach to him the quality of legitimacy, which he had not before? I presume it cannot really be doubted that he became legitimate only from the date of the marriage; for I think it a most violent presumption to hold that the subsequent marriage of his parents has relation back to the moment of his birth, and makes him to have been, at the time of his birth, the legitimate son of those parents.

Now with respect to the question of alienage, everything depends upon the facts that existed at the moment of his birth. Assuming that the effect of the subsequent marriage is legitimation, or conferring the status of legitimacy upon the issue, does it follow that it confers paternity upon the parent? Does it follow

CASES IN THE HOUSE OF LORDS.

SHEDDEN
*v.*
PATRICK ET AL.

*Lord Brougham's
opinion.*

that it confers paternity at the moment of the birth? Does it follow that because the marriage of his parents has made him legitimate, therefore it has made them his parents at the time of his birth? If it does, he is a natural-born subject; if it does not, he is an alien. If you cannot predicate paternity as well as legitimacy he is an alien. If you can predicate paternity as well as legitimacy he is a natural-born subject.

My noble and learned friend has well adverted to the anomalies—though I can hardly call them by so slight a name as anomalies—the gross inconsistencies, the self-contradictions, the glaring absurdities which must follow from holding that the retrospective doctrine imports paternity as well as legitimacy— supposing for a moment that legitimacy as contended for by the Appellant ensued. It is sufficient to remind your Lordships of one to which my noble and learned friend has adverted,—that it would be giving to the parent of the child, the putative father of the child, the power, by marrying his mother, of converting him from an alien or a foreigner into a natural-born subject. If the child had done that which he had a perfect right to do at the time, namely, taken up arms against the English Crown before the marriage of his parents, it would follow from the doctrine in question that the marriage converted him, from an alien enemy, into a traitor to the crown of this country, thereby making him guilty of high treason, instead of being only a person taken with arms in his hands, compassing what might be, on his part, a perfectly innocent and even laudable design.

My Lords, that is one of the many absurdities which would flow from this doctrine. They are too numerous to require any further illustration. And, therefore, upon the whole, I hold that even if the father had been ever so much a domiciled Scotchman, the circum-

CASES IN THE HOUSE OF LORDS. 625

stances would not have had the effect of legitimating the son, and still less of creating the relation of parent and child at the time of his birth in America, where he was born an alien.

My Lords, this therefore disposes of all that part of the case which refers to the fraud and collusion alleged to have been practised upon the Court in respect of the concealment of the domicile; and it leaves only for consideration the averment of the previous marriage. And upon this averment I take exactly the same view as that which has been taken by my noble and learned friend: I do not think there is in the record any averment upon that head sufficient to call for a reduction of the judgment; and although we are not competent here to enter upon any questions of fact, or to speculate upon how those questions would probably be disposed of, supposing we had reversed this judgment and sent the case back for further investigation, I cannot conclude the observations with which I have troubled your Lordships without expressing my opinion that it is a fortunate circumstance that we have come to an opposite result; for I can imagine nothing more intolerable than an inquiry would be as to facts which took place considerably above sixty years ago in another hemisphere, where all the witnesses must needs be persons, if they continue to live, of a very advanced age, and where the inquiry into those circumstances would be in my apprehension all but absolutely incapable of being conducted with any chance of arriving at a successful conclusion. I heartily lament that so much time has been wasted here and elsewhere, that so much anxiety has been undergone by very deserving parties, that so much money has been unhappily expended by those parties, and that so many charges have been brought against individuals who have always occupied a respectable station in society,

SHEDDEN
*v.*
PATRICK ET AL.

*Lord Brougham's
opinion.*

with a character unimpeached;—I say I cannot help feeling very great sorrow that such things should have taken place. It is not for me to make any remarks upon the conduct of Mr. Patrick, the party principally implicated in these charges; I can only say that without intending to whisper one word against that individual, in admitting the respectability of whose character, I believe all who have spoken upon the subject, I may even say on all sides, have been inclined to agree; but I must say that I somewhat regret that he should have undertaken, though I have no doubt with the best of motives, the task of acting as guardian to this infant, when the necessary consequence was to put himself in a situation encumbered with duties inconsistent and somewhat conflicting. I believe it is not a situation peculiar to Mr. Patrick; I believe it is a course too frequently pursued in the northern part of this island, where men of business do not always see the great propriety, and (for their own sake, as well as for the sake of those concerned) the all but necessity which requires that opposing functions should be kept as much as possible separate and distinct.

The Lord ST. LEONARDS:

*Lord St. Leonards'
opinion.*

The first question is with respect to the competency of the Court below. Now, without at all meaning to deny that a judgment, even of this House, may indirectly be treated as a nullity before another tribunal, where the case shows manifest, gross, direct fraud, it does appear to me, having looked into all the authorities, that it is very doubtful whether the proceeding in the Court below was in this case competent.

It must not be understood that there would be any denial of justice according to the opinion I express, even if it could be maintained; because the only question is whether the party should have gone to the

Court below, or have come to this House. Certainly, on going through the cases in the Journals, it appears exceedingly doubtful whether the proceeding ought not, in the first instance, to have been here; and the result of the case itself, upon examination, shows how proper it would have been to originate the proceeding in this House; because the Court below really was not competent to ascertain the grounds upon which this House had proceeded in deciding the case in 1808; whereas the House itself would have been competent, by means of what it could glean from its own judgment, and from its knowledge of the subject, to deal with the case in its new shape. I have got a list of all the precedents. As, however, I think that the point does not now call for your Lordships' decision, I do not propose to enter into them. But I may observe that *Blake* v. *Forster* (a) well shows the difficulty which exists in such cases; for there, after the reversal of a decree made in Ireland, the parties came to this House wishing to impeach the judgment of this House; and they were sent back to the Court of Chancery in Ireland. The Lord Chancellor of Ireland refused to hear them, and dismissed the proceeding, with liberty to apply here, because he had no means of ascertaining what were the grounds upon which that decree had been reversed; and, therefore, could not judge upon the new matter introduced, or upon the new claim set up. There was an appeal from that very decision to this House, and that decision was ultimately affirmed by this House (b). So that, in *Blake* v. *Forster*, the Lord Chancellor of Ireland was perfectly justified by the result, in referring the matter, in the first instance, to this House; where, be it observed, the merits were never entered into. It was merely a question as to the competency of the Court in Ireland; and that Court having declared

(a) Macq. House of Lords, 448.        (b) See Journ. 1 June, 1825.

628                    CASES IN THE HOUSE OF LORDS.

itself *incompetent,* the matter was remitted to this House; and this House held that the Lord Chancellor of Ireland had made a proper decision.

From the nature of the jurisdiction in Scotland (it does not happen, generally speaking, in this country, except by way of demurrer, which stands upon different grounds,) preliminary defences are allowed; and, therefore, at all events, there has been no great mischief, and certainly no denial of justice in the course which has been taken in this case; for if the Appellant had come in the first instance to this House, the House would not have entered upon the general merits, till they had ascertained whether there was such a case as would entitle the Appellant to go into the general merits, with a view to reverse the former decision. A judgment of this House can never, in the particular case, be impeached, except by Act of Parliament, unless gross fraud can be brought forward, which may enable the House itself to set aside the proceedings on that ground. The case of *Tommey* v. *White* is an instance. There, the fraud was upon the House itself. But the fraud would not be less in this case upon the House itself, if there were fraud in the Court below, because the proceedings in this House were carried on in the precise form in which they had been carried on in the Court below; and, therefore, this House was as much defrauded out of its judgment, if there were a fraud, as the Court below had been defrauded out of its judgment. The preliminary defences which are admitted by the Courts in Scotland enable the same thing to take place in those Courts. For example, in this very case preliminary defences are taken; the consequence of which is, that after the original summons and the supplemental summons, and the amendments of both in the Court below, setting forth the whole case which the Appellant could

make out, and the grounds and evidence upon which he claimed relief, the claim was met by preliminary defences; and the whole proceedings being before the Court below, the question was this—Had the Appellant made out such a *primâ facie* case as would entitle him to the relief which he prayed; assuming that the Court had jurisdiction? The Court below came to the conclusion that he had not made out such a case as would entitle him to any relief.

I have already stated that it would have been very difficult for the Court below to ascertain upon what grounds the case was decided by this House in 1808; and, in my view, that would have been a very sufficient reason for the Court below at once to have rejected the claim of the Appellant, and to have referred it to this House.

My Lords, I have looked with great anxiety to ascertain what was the real ground of the decision in 1808; but it is not very easy to come to a satisfactory conclusion upon that head. I think I have satisfied myself on two points: at least, I am satisfied upon the first; namely, that the case was really decided upon *alienage.* And the second point, upon which I entertain a very strong impression, is this; that if the question of domicile had been brought before the House at that time, and established as the law then stood, this House would have decided the case, with the question of domicile before them, precisely as they did when it was not before them. Be it remembered, that although we have now the decision in *Munro* v. *Munro,* that case had not then been decided; and, therefore, what is now law was not then known to be the law, at all events, by any lawyer in *this* country. Therefore, it is my strong impression, looking at the state of the law at that period, that if the domicile had been actually alleged and proved, the decision would have been precisely that at which this House actually arrived.

CASES IN THE HOUSE OF LORDS.

Now, with regard to the grounds of that decision, it is very material to see how the case was decided; and so far, I confess I sympathise with the Appellant, that this case having been conducted at great expense, after the lapse of so many years, I cannot help feeling desirous to satisfy him that this whole question has been very attentively considered, and that the decision of this House has not been arrived at without much care and caution. From the printed Case (*a*), your Lordships must be aware that the question of domicile was not lost sight of on behalf of the Appellant in 1808. Your Lordships will find that the Appellant contended that the *status* of legitimacy was not dependent upon the will of his father, but was to be determined by the public law of Scotland, to which his father was subject; and that his father was not an American solely, inasmuch as, both by reason of origin, and from having property in Scotland, he was subject to the jurisdiction of the Courts in Scotland. The present Appellant, therefore, did rely on the domicile in Scotland, and argued upon the *lex loci* there; and he stated that the law of the parent's domicile must be the only law to regulate the succession to estates; because the law of each country decides according to its own rules, and exercises jurisdiction over all its subjects, under whatever circumstances, and in whatever state they were born. So that, I think, it is quite clear that the question of domicile was kept fully in view. How could it be lost sight of, if you look at the Counsel—both the Scotch Counsel and the English Counsel—who were engaged in that case, and the questions that were raised and elaborately argued? The very first question which the Counsel of that day would ask would have been, Where is the domicile? They knew that the Appellant's father was a Scotchman

(*a*) *Suprà*, p. 539.

SHEDDEN
*v.*
PATRICK ET AL.
——
*Lord St. Leonards'*
*opinion.*

by birth;—they knew that he had a Scotch estate;—they knew that the boy had been sent to Scotland. Therefore, it is utterly impossible to believe that the learned counsel of that day—counsel of the first eminence, both the Scotch counsel in the Court below, and the learned counsel of the English Bar before your Lordships—could have prepared and argued the case without considering the question of domicile as one that ought to be presented to the House.

Upon what grounds the House itself decided, we must collect as well as we can from what has fallen from learned Judges in subsequent cases. Thus, in the *Strathmore Peerage case,* Lord *Eldon* says (a) :—" Under the circumstances, it does appear to me, attending to the principle which this House meant to maintain in *Shedden* v. *Patrick,* that without deciding at all what would be the consequences of a person married in Scotland before the Union, or persons married in Scotland since the Union, or persons removed from Scotland domiciled elsewhere, and going to Scotland and obtaining a domicile and marrying in Scotland; without determining those points at all, but recollecting the state and condition of these parties, and the fact that the father was a British Peer, and looking to the effect of the Act of Union, I am bound to tender to your Lordships my humble opinion that this child is not a legitimate child." I am not quite satisfied as to what the noble and learned Lord meant in the *Strathmore Peerage case,* but I think there can be no doubt that in *Shedden* v. *Patrick* he considered that illegitimacy was a bar. But Lord *Redesdale* is more distinct. He says (b) :—" I do not enter into the question whether if this marriage had been celebrated in Scotland it might have had the effect of legitimating the child, because I think it is not necessary, but I

(a) 4 Wils. & Sh. App. No. 5, p. 90.        (b) *Ib.* p. 94.

T T

632                 CASES IN THE HOUSE OF LORDS.

must say that I cannot conceive how it could have that effect. In the case of *Shedden* v. *Patrick*, it was determined that a child illegitimate in the United States of America was not capable of inheriting in Scotland. It has been stated that that was decided on the ground that he was born an alien.". Lord *Redesdale* says it is stated that the decision of this case in the year 1808 was because the child was born an alien;—and then the noble and learned Lord proceeds to ask, " Why was he born an alien? Because the law of America touched him at his birth; and the retrospective effect of the law of Scotland could not alter that character which, at his birth, attached upon him." That was the true reason why he was an alien. Lord *Redesdale* was a party to that decision. Every one knows how elaborately he considered the cases that came before him; and here we have a clear and distinct statement from him of the true ground of the decision. But your Lordships will find that in the case of *Rose* v. *Ross* (a), the same ground is taken; for there Lord *Cringletie* makes this observation :—" Natural children do not belong to the reputed father, nor do they take their domicile from him. They belong to the mother; whose domicile is theirs, and whose settlement, in case of property, is theirs." Then, further on, he says :—" I think that Lord *Redesdale's* idea in the case of *Shedden* is correct, and equally applies to this one; that the law of America touched the Defender at his birth ; and the retrospective character of the law of Scotland could not alter his *status*." The case of *Rose* v. *Ross* was originally before Commissaries, who gave some very learned judgments, which are to be found in Wilson & Shaw (b). Says Mr. Commissary Todd :—" In *Shedden's case* the marriage was contracted in America, the law of which

(a) 4 Wils. & Sh. 296-7, App. No. 4, p. 57.
(b) Vol. iv. App. No. 3, p. 41.

CASES IN THE HOUSE OF LORDS.                    633

country does not recognise legitimation by subsequent marriage." And Mr. Commissary Fergusson gives an opinion to the same effect.

In the later case of *Munro* v. *Munro,* where the *Lord Justice-Clerk,* and four other Judges, held the domicile to be in England, they said:—"We do not think it necessary to consider how the case of the Pursuer might have been affected by the English domicile of the mother alone—taken along with the fact that she herself was born in that part of the United Kingdom, and that it was the place where the marriage was subsequently celebrated, and where all parties continued to reside for upward of a year after that marriage—if Sir Hugh himself had, up to the time of the marriage, been incontestably a domiciled Scotchman. Even upon this supposition, however, we think the Pursuer must have had difficulties to encounter, which have not yet been resolved by any clear authority in the law of either country. Some of the dicta in the ultimate decision of the cases of *Shedden, Strathmore,* and *Ross,* seem to point to a conclusion against her; while others, of the very highest authority in the more recent case of *Sir George Warrender,* have rather a contrary bearing." In the same case, you will find the *Lord President* making these observations (*a*):—"As to the domicile of the putative father, I cannot think that either his past, future, or present domicile can, or ought to, have any effect on the status of the bastard. The father is not regarded in law as his father; therefore nothing in the putative father's domicile can affect the status of bastardy impressed upon the child by birth." "In short," the *Lord President* says (*b*), "I cannot see the smallest connection between the status of the bastard, and either the previous or the subsequent domicile of his putative father. The child in England was born a

(*a*) 1 Rob. App. Ca. 551.          (*b*) *Ib.* 553.

T T 2

634    CASES IN THE HOUSE OF LORDS.

bastard; and it cannot make any difference whether his putative father was a Scotchman, or a Frenchman, or a Turk." Then, he quotes the opinion of Lord *Eldon* and Lord *Redesdale*, in the *Strathmore Peerage case*, and says that he entirely agrees with them.

The result, therefore, is to show (*Munro* v. *Munro* not having then been decided), that not only in 1808, but down to a much later period, it was still considered by very learned persons, that the domicile of the putative father could not affect the status of the child. Now that would be at once a defence as regards what is called the concealment of the domicile; for if this case were decided irrespectively of the domicile, then *cadet quæstio*. But supposing it were not so—supposing that great doubts were entertained upon the question of domicile—is it reasonable to hold that a gentleman in the situation of Mr. William Patrick was to know what the law was, and the importance of the question of domicile, when none of the learned lawyers, who were consulted upon the case, had found it out? And when all the private letters, which are now brought forward between him and Robert Patrick, and between him and John Patrick (letters which were never intended to see the light), show that he really believed the boy to be illegitimate, how can it be said that there was fraud in the concealment of the domicile?

Every act proved in this case as regards domicile is against the Scotch domicile. If a Scotch domicile existed, it was not from any act that the father ever did, but from something passing in his own mind, which he has communicated, so as to be able to impress every Court of Justice with the belief of his intention to return to his native country. For what are his acts? Look at the whole of his life: he goes to America; no doubt he meant, originally, to return; but after all his troubles in America (which are entered into in these

papers in very needless and expensive detail, and which have not the slightest bearing upon the case), he goes to Bermuda; and it is said that he returned to America only to wind up his affairs. But instead of returning to Scotland after he had wound up his affairs, he resided for a great number of years in America. He had there an establishment,—he had two families in point of fact by different women; for he had a girl by another woman, that girl being several years older than the children by the lady whom he subsequently married; those are acts which, at least, show something like an intention to remain where he was. What single act did he ever do showing an absolute intention to return to this country? In the first place the mere possession of the landed estate in Scotland was no act of his—it descended to him. His father's house does not seem to have been upon the estate, and that was sold very soon after the father died. He himself had been in Scotland for a year and a half on one occasion, in his father's life-time, but he never returned to Scotland after he became himself the owner of the estate. That does not look like an intention to settle in Scotland. He was not a very young man; he had no house in Scotland at any one period of time, to which he could have returned. The house which his father occupied in his life-time did not descend to him. He never took any step to obtain a house. Therefore, if Mr. William Patrick, as a man of the world, had formed his judgment from all the circumstances, as far as Mr. Shedden's acts went, he would have decided against the domicile being Scotch. Look at the last acts of Mr. Shedden himself,—at his acts on his death-bed. How does he describe himself in his will? Simply and only as *of New York*. Is that the way in which a man would describe himself, who considered that the tie between himself and Scotland had never

CASES IN THE HOUSE OF LORDS.

been rent; who meant to die impressed with the love of his original country, and the thoughts of home? It is true that he desires the boy, his son, shall be sent to Scotland. Why? Certainly not because of his domicile being there, but because Mr. William Patrick, to whom he meant to entrust him, was resident in Scotland. He does not insist upon his wife going thither; he does not say to her, "Go to Scotland, and there you will find a home. I leave an estate there; go, and live there with your boy." He takes from her the whole care and guardianship of his boy. He sends him to Scotland; but leaves his wife, whom he had just married, in America. He had not made her very fond of Scotland; for she had so little desire to go thither, that, within some two or three months, she was married again to a gentleman, who, I believe, was in the naval service of America; and who was certainly not a very likely person to go and settle in Scotland. Then, further, Mr. Shedden does not dispose of, or even advert to, his estate in Scotland; and it is a remarkable circumstance that while he does by his will dispose of the property that he had acquired in New York, he leaves this Scotch estate to take its chance, according to its destination, without attempting to exercise any right of ownership over it. I think, therefore, that if it were now a question upon the evidence before the House, whether the domicile was in Scotland, or in America, the strong impression on my mind would be that it was an American domicile, and not a Scotch one. Some expressions in letters have been relied upon as tending to a contrary conclusion; but they are not sufficient. Nobody can doubt that this gentleman had, from his long residence there, acquired a domicile in America. Whether that was his *sole* domicile, or not, is the question; and I am strongly inclined to think that it was.

SHEDDEN
*v.*
PATRICK ET AL.

*Lord St. Leonards'
opinion.*

It appears to me, therefore, that there was no fraud whatever on the part of Mr. William Patrick in concealing the domicile. I believe his impression was, that it was an American domicile. Mr. Shedden had made three gentlemen in New-York executors under his will,—gentlemen moving in different stations of life; one of them a physician, another a merchant, and his own nephew, also a merchant; all of them resident in New York. There was, also, Mr. Colden, an American lawyer, whose opinion is set forth in this case. He had lived in New York, and was a friend of Mr. Shedden, and must be supposed to have known something about the domicile, as well as about the prior marriage; and he was a witness to the will. We know how conversant American lawyers are with questions of domicile. Is it possible that this gentleman should not have known what the fact was, in the sort of general way in which I am now looking at it, not with the scrutiny of a lawyer, but in order to see whether fraud can be fixed on Mr. William Patrick?

Now assuming the House to have decided this case on the question of alienage, my very clear opinion is that they decided it properly upon that point alone. I entertain as clear an opinion as I ever did upon any point, that this gentleman, the Appellant, is an alien by birth. The only question is, whether he is saved by the statute of George II. operating by means of the marriage. Now when you come to contrast the statute of Anne with the statute of George II., you will see in what very opposite directions they went. The statute of Anne desired to add to the people of the country, and let in a flood of persons as natural-born subjects; stating that the wealth of the country depended on its population. That was found to be exceedingly inconvenient; and then came the Act of George II., which is a restrictive Act as regards the

638                   CASES IN THE HOUSE OF LORDS.

benefits conferred upon the children of natural-born
subjects, who would otherwise be aliens. It is im-
portant to observe the alteration in the language. The
statute of Anne speaks of parents generally—both of
them ; but the statute of George II. is confined to
the *father*, and says nothing whatever about the
mother. Therefore you are forced to look at the status
of the father, without reference to that of the mother ;
and the words are free from all ambiguity. The child,
in order to have the benefits of a natural-born subject,
must, at the time of his birth, be the child of a father
who was a natural-born .subject. That clearly was
not accidental ; for it happens that there are several
provisoes in this statute providing for different events,
and in every single instance, the same term is used ; I
think in subsequent parts of the statute the time of
the birth of the child is referred to no less than seven
times with reference to different objects of the statute ;
and it is utterly impossible, as a matter of law, to read
the words, upon which reliance has been placed by my
noble and learned friend, in any other sense than that
in which they must be read in the subsequent passages.
If you were not to give the same sense, that is the
literal sense, to them in the subsequent passages, you
would render the whole Act of Parliament an absurdity
and a nullity. Now observe what it says. After
having declared that in order to entitle an alien to be
treated as a natural-born subject, he must at the time
of his birth, although a foreigner born, be the son of a
father who was a natural-born subject, it goes on to
say : "Provided always, that nothing in the said recited
Act of the seventh year of Her said late Majesty's
reign, or in this present Act contained, did, doth, or
shall extend or ought to be construed, adjudged, or
taken to extend, to make any children born, or to be
born, out of the legiance of the Crown of England or

SHEDDEN
*v.*
PATRICK ET AL.

*Lord St. Leonards'
opinion.*

of the Crown of Great Britain to be natural-born subjects of the Crown of England or of Great Britain, whose fathers, at the time of the birth of such children respectively, were or shall be attainted of high treason by judgment," and so on. There are many other provisions which it is not necessary to enter into; but those words are repeated no less than seven times over in subsequent passages. Now take that one case. You cannot possibly give anything but a literal meaning to those words : If at the time of the birth of the child, the father had been adjudged guilty of high treason, the child was not to be a natural-born subject. Nothing could be more reasonable than that. You must take the words as you find them; and you must read them exactly in the sense in which they strike the eye at first; and that, I apprehend, is exactly the sense in which the Legislature meant they should be read.

Consider what would otherwise be the effect as regards a legitimate and an illegitimate child. Nobody will dispute that under that Act a legitimate child, the child of a natural-born subject, becomes a natural-born subject from the moment of his birth; that is beyond all doubt. Supposing his father at the time to have been guilty of high treason, then he remains an alien. That is the case of a legitimate child. Now look at the case of an illegitimate child. If you strike out the words "at the time of the birth," and if you look to the time of the subsequent marriage, you then place him upon a different footing from that at the moment of his birth; for, although his father at the time should have been guilty of high treason, the child would not lose the right which the statute gave him; and, therefore, if at any subsequent period the father married the mother of the child, so that by the effect of the law of Scotland, acting retrospectively, the child became legitimate, he

CASES IN THE HOUSE OF LORDS.

SHEDDEN
*v.*
PATRICK ET AL.

*Lord St. Leonards'
opinion.*

would gain the benefit given by the Act. This does not rest upon fiction. This is substance. It is material to the safety of the realm that aliens should not become natural-born subjects, whose fathers were traitors to their country. Here is an express exclusion from great benefits given by the mother country to the children of natural-born subjects. But in the case of an illegitimate child, if you do not give the same construction to the words, you are driven at once to the necessity of saying that a subsequent marriage would give to the illegitimate child of a father, who was a traitor at the time of the birth of his child, a benefit which no legitimate child could ever take. Does anybody imagine that the Legislature meant to give to an illegitimate child a higher privilege than belongs to a legitimate one? You must remember that the case for which the Act of Parliament intended to provide is this: the child is born an alien and an alien he would remain to the hour of his death as regards this country, but for that Act. Before he can take the benefit of that Act, you must show that his father was a natural-born subject. And if he have no father, then of course he is not entitled to the benefit of the statute.

Upon this part of the case the *Dean of Faculty* raised a difficulty with respect to which, I must confess, I do not quite follow him. He said that if we were to put this interpretation upon it, then a man marrying a woman would adopt all her illegitimate children, even if she had several, and by different men. I do not go that length, because it involves the question of recognition and acknowledgment. That is a difficulty which I do not feel; and I cannot understand how, under this Act of Parliament, it is possible to give to an illegitimate child, who at the time of his birth was considered to have no father, the benefit of this law.

As regards the operation of the Scotch law, I think the case (a), which was cited at the bar, negatives the doctrine of retrospective relation. It had always been supposed when you carried back, or when you were supposed to carry back, the legitimation to the birth of the child, that an intermediate marriage with a third person would prevent the operation of that rule. But the case shows that the legitimation only takes place from the time of the marriage. Therefore, so far as that authority goes, it proves that there could be no relation back to the time of the birth.

Upon the question, therefore, of authority, as well as upon the question of domicile, I think the case of the Appellant entirely fails. And, having regard to the facts, I apprehend that there is not any pretence for the charge of fraud against Mr. William Patrick as to the domicile. My strong impression is, that the House decided this case upon the question of alienage, and upon that question alone; and that it would have come to the same decision if the domicile had been alleged and proved to have been in Scotland.

Having made these observations, I should have saved your Lordships any further trouble, if it had not been for the very strong charges of fraud which have been advanced against Mr. Patrick. When I was myself at the bar, and had occasion, as counsel, to animadvert severely upon individuals, I often expressed the satisfaction I felt from knowing, that if, by obeying my instructions, I had gone beyond what the case justified, the Court would set the party right when it pronounced its judgment. And if the Court were not to take that trouble it would, in cases where persons have had serious charges made against them without foundation, have left those parties with the benefit of the decision of the Court in their favour

SHEDDEN
*v.*
PATRICK ET AL.

*Lord St. Leonards'*
*opinion.*

(a) *Kerr* v. *Martin.* See this case, *infrà*, p. 650.

CASES IN THE HOUSE OF LORDS.

certainly, but with a slur upon their character, which few people can well bear.

Now, a great many charges of fraud have been made against Mr. Patrick. I am bound to say at once, that having read all the evidence most carefully, I cannot see the slightest reason for saying that there is any charge of fraud made out. There was a little contrivance, if you will. The parties appear to have intended, in case the boy had acquired the estate, to charge it with sums of money which they never meant to bring against Mr. William Shedden himself, if he had lived. I admit it would have been as well if that had not been so; but that is not a fraud committed against the Appellant, although they did intend to have opened an account if they could, and to have charged interest, commission, and so on, in order, in some measure, to indemnify themselves against the loss of the estate.

One grave charge of fraud which has been made is, that there had been a forgery committed of a bond for 4000*l.* I will not go into the circumstances; for it is perfectly clear that there was no fraud at all, and that there was not the slightest foundation for this accusation.

In the next place, a charge of fraud is founded upon the proceedings with reference to the retour. Now, if the boy was not the heir, Mr. Robert Patrick was; and without entering into any discussion as to whether he was or not, or whether it was necessary that there should be a retour (which has been disputed by very learned persons at the bar), it is clear that the retour did no harm,—you do not find any trace in any one of these proceedings of that retour having been set up against the right of the infant to discuss the merits of the question. There was no attempt on the part of Mr. William Patrick to set up that retour as a bar

upon the question which was believed to be the
only one to be tried. I think, therefore, that that
charge was introduced into the case without any
sufficient ground.

SHEDDEN
*v.*
PATRICK ET AL.
———
*Lord St. Leonards'
opinion.*

Then it is said that there was a fraud as regards
Mr. Hugh Crawford, and it certainly was represented
throughout as if Mr. William Patrick had not only
pulled the strings, but that he had actually appointed
him as his nominee. But how is the fact ? We see
by the documents that nothing could have been more
regularly carried into execution than the appointment
of Mr. Crawford by a considerable number of the
relations, irrespective of Mr. William Patrick ; and
that Mr. Crawford himself was one of the near
relations. Not a particle of fraud can attach to
Mr. Crawford. Be it remembered, too, that this is a
charge of fraud against Mr. William Patrick, who was
merely an agent at the time himself, not entitled to
the estate ; and although, no doubt, an agent may be
guilty of fraud, and desirous to give to his principal the
benefit of that fraud, yet it is not in the ordinary
course of things that a fraud should be committed by
an agent, simply for the benefit of those for whom he
acts. This charge likewise, I think, falls wholly to the
ground.

Again, it is said (and I was very much surprised
to hear it stated) that the letter which was written by
Mr. Shedden on his death-bed, in the year 1798,
was a forgery. Now, that is a most serious charge.
Remember that Mr. William Patrick is now alive. I
have not the honour of knowing him, or of having had
the slightest communication with him ; but he must be
a gentleman far advanced in life ; his character must
be dear to him ; a more grave charge was never brought
against any person at the bar of your Lordships' House
than this charge against Mr. William Patrick, that he

CASES IN THE HOUSE OF LORDS.

SHEDDEN
*v.*
PATRICK ET AL.
———
*Lord St. Leonards'*
*opinion.*

had forged a letter from his uncle with the view of
defrauding that uncle's son of an estate belonging to
him in Scotland.

Now, of course, it cannot fail to strike every one who
reads these papers what an extraordinary charge this
is; because the original Summons founded itself upon
that very letter in so many words, and it was charged
in the original Summons that Mr. William Patrick
had suppressed that letter. When we come to the
Supplemental Summons, the same letter is there again
founded upon; and it is not until you arrive at the
Condescendence that you find an indirect suggestion
that this letter had never been written, and could not
be relied upon. Nothing can be more clear than that
this charge in the Condescendence was not justified
by the interlocutor, which did not, in any manner,
authorise the introduction of a charge of fraud
as regards that letter. There never was a charge
more unfounded. That letter was the only letter that
gave an account of the transmission of the 400*l.*; and
it was acted upon by the receipt and application of the
money. Mr. John Patrick, in writing, tells you that
Mr. William Shedden has written that letter (which is
produced) to his nephew. Mrs. Vincent herself, in her
letter, in 1799, refers to the letter which was written
by Mr. William Shedden, her late husband, upon his
death-bed, to Mr. William Patrick. That letter was
also in duplicate and triplicate. And the mere absence
of the original, after so great a length of time, amounts
to nothing. Indeed, it is stated by Mr. William Patrick
in his Answer to the Condescendence, that he delivered
it with others in 1823, or 1824, to the Appellant
himself. If I were upon a jury, and asked to pro-
nounce upon the evidence before me whether that letter
was proved, I should hold it to be most abundantly
proved, and not open to the slightest doubt whatever;

SHEDDEN
*v.*
PATRICK ET AL.

*Lord St. Leonards'*
*opinion.*

much less to its being the foundation of a charge of forgery.

Another ground of fraud which has been alleged is, that Mr. William Patrick having received the 400*l.*, which was to be applied for the boy, withheld it, in order that his right might not be tried. Now, how does that stand? The sum was sent by Mr. William Shedden on his death-bed, and received after his death by Mr. William Patrick, for the education of the boy. It was demanded by the mother, who married again within a few months; and who never, as far as it appears, had the slightest communication with her son afterwards. I do not say that she had not, but it does not appear that she had. She seems to have left him to his fate. Therefore, how was that money applied? Of course, according to its destination; and nobody can doubt but that a great deal more was so applied. It is clear that Mr. William Patrick applied more money towards the education of the Appellant, and towards starting him in life, and providing him with outfits. Nobody can believe that the 400*l.* could have furnished all that was required. He says in one of his private letters, which were never intended to see the light, "We must do all we can for the boy." There can be no doubt that they had good intentions towards the child;— but at the same time it is equally clear that, being vexed and disappointed at the marriage which was consummated just before this gentleman's death, in order to make it quite sure that the boy would be the heir to the Scotch estate, they were desirous, and perhaps eager to assert their rights as far as they could.

The only other question that is worth referring to respects the prior marriage. And I think that a clearer case in point of fact upon the evidence never came before a Court of Justice. The prior marriage was

SHEDDEN
*v.*
PATRICK ET AL.

Lord St. Leonards'
opinion.

never heard of until the year 1799, when Mrs. Vincent, who had married again, writes a letter (with the assistance of an attorney, probably,) to Mr. William Patrick; and in that letter, it is most extraordinary that she does not say a word as to the prior marriage, but she speaks of the marriage which was solemnised; and if you wanted evidence to show that there had been no prior marriage, you can have none better than her own letter. If you want to see what Mr. William Shedden himself thought of that marriage, you have only to look at his will and his letter, in which he tells you that he has just married, and that his friends approved. But there is not a word about a prior marriage. The marriage is solemnised with whom? With Ann Wilson— not with Mrs. Shedden—not with any declaration that the object was to place her better than the former marriage had done; but for the express purpose of giving to her the rights of a married woman by that act alone. Now look at it as regards the question of probability. This is said to have been by the law of New York a good and valid marriage;—that is, they having cohabited together as man and wife, and Mr. Shedden having acknowledged her as his wife, it was a valid marriage. Is it not very odd that none of his friends was aware of this? He has three trustees, all residing at New York; one of them a physician, the other two merchants. And one of the witnesses to his will was a lawyer in New York, who had been intimate with him, and was well acquainted with his affairs. It never occurred to any one of them during the years that this gentleman was living in intimacy with them that he had acknowledged this lady as his wife. If you say that the physician and the others were not likely to know what the law was, I say it was precisely the very thing that everybody would know. It is impossible to live in a place like New York and not to know

SHEDDEN
*v.*
PATRICK ET AL.

*Lord St. Leonards'
opinion.*

that cohabitation and acknowledgment will amount to marriage. It is impossible for such a thing not to be universally known. Mothers would tell their sons of it, for fear that they should be entangled into disadvantageous alliances. It is just that precise point of law which every one would be sure, more or less, to be familiar with. Then there was Mr. Colden, an American lawyer, practising in New York. Would he not at once have said, Why do not you set up the prior marriage; every one knows of it? But nothing is said about it, until this lady sends over the two affidavits, which were not worth the paper on which they were written. Of course they were not evidence at all; and she herself, by the very letter which she writes accompanying these documents, negatives the very claim which she sets up, by stating that the marriage was solemnised, and the will was properly executed. There is no foundation for the statement that there had been a prior marriage. But suppose there had been some colour, observe what took place. These affidavits were sent over in 1799. From that moment it was not a secret. There was nothing confided to the breast of Mr. William Patrick—these affidavits were sent to her solicitors in Scotland, men of high reputation, whom she had selected to assert her claim. As far as these documents went, all Scotland would know at once of the claim. Then it was said, Yes, but she desired that the 400*l.* might be given to her. Why, the most indifferent stranger in the street might have equally claimed it; might have walked into Mr. William Patrick's office, and asked for the 400*l.* It would have been perfectly absurd for him to have given up that sum of money to her;—he must have paid every shilling of it again. She was the last person to whom he could have entrusted it,—she was not the person who could have conducted the case of her son,—she was not the

U U

648                    CASES IN THE HOUSE OF LORDS.

SHEDDEN
*v.*
PATRICK ET AL.

*Lord St. Leonards'*
*opinion.*

person to whom the father had entrusted his son,—he did not leave her the custody of his son.

My Lords, there is one other point upon which a good deal has been said. It is well to clear up these things, and I do not think I am going out of my way in doing so. I feel bound, as far as the circumstances justify it, to put the character of Mr. William Patrick, which has been very strongly reflected upon, in what appears to me the proper light. The point is with respect to the guardianship. Now upon this subject you have only to read the letter of 1800; and I may observe that we have here an advantage which is seldom possessed in such a litigation. We have not only the public acts of the parties, but their private letters are brought forward; and those letters show, conclusively, that while Mr. William Patrick did injudiciously I acknowledge (for that is all that I can admit) take the boy under his guardianship—having already had another trust reposed in him, which was to some extent inconsistent with this guardianship—he did distinctly announce to the parties that he could not undertake the prosecution of his claim; but that he should maintain the claim of his brother. He was perfectly justified in doing so. By thus taking the boy he embarrassed himself, and he has led to this vast and protracted litigation, in which your Lordships will recollect that, but for the charges of fraud which have been brought, not proved, against this gentleman, the law of Scotland has long since barred every possible remedy of the Appellant; and it is only by a case of fraud being established, that the Appellant could for a moment be heard.

I agree, therefore, with my two noble and learned friends in thinking that this Appeal should be dismissed; and considering the charges of fraud which have been so gravely brought forward and not made out, I submit to

your Lordships that the Appeal should be dismissed with costs.

Sir *Fitzroy Kelly :* Will your Lordships permit me, on the part of the Appellant, to ask that he may be allowed an opportunity, if he shall be so advised, of applying to your Lordships with reference to the form in which the judgment of this House shall be ultimately entered up.

Lord St. Leonards : I omitted to make an observation upon that ; but it is not for want of having formed an opinion. I think it is quite right to assoilzie the Defendant. I have shown to your Lordships that the result is the same as would have taken place if the application had been first made to this House; for if the House had, upon the preliminary defence, denied the right to go on, it is quite clear that it would have made an Order to put an end to the case altogether.

Lord Chancellor : I am much obliged to my noble and learned friend for mentioning this, which I had omitted to notice. My opinion entirely concurs. The charge of fraud failing, the case is concluded.

*Interlocutors affirmed, with Costs.*

(*See the next case.*)

Maitland & Graham—
Richardson, Loch, & M'Laurin.

# TAB 78

354                          CHANCERY DIVISION.        [VOL. XLIV.

C. A.       taken their rights. The Plaintiff took a wrong view when he
1890        contended that no land, in any circumstances, could be taken
FINCK       beyond the limits of deviation ; the Defendants, on the other
v.          hand, took a wrong view when they contended that the *medium
LONDON AND  filum* of the widening was to be placed on the dotted line.  I
SOUTH-      quite agree with what has been said by the other members of the
WESTERN
RAILWAY Co. Court, and I think that this appeal should be dismissed, and

Lopes, L.J. dismissed with costs.

Solicitors: *W. H. Withall & Co. ; Bircham & Co.*

M. W.

---

C. A.                         SIBUN *v.* PEARCE.

1890                          [1890 S.   188.]

NORTH, J.
Feb. 7.     *Building Society—Deed of Dissolution—Statutory Majority of Members—With-
                drawing Member—Building Societies Act,* 1874 (37 & 38 Vict. c. 42),
C. A.           s. 32, sub-s. 3 [Revised Ed. Statutes, vol. xvii., p. 215].
March 27.

>       The rules of a benefit building society provided that a member who had
>   given notice of withdrawal should cease to take part in the affairs of the
>   society :—
>       *Held* (affirming the decision of *North,* J.), that members who had given
>   notice of withdrawal, but had not received their money, were still members
>   of the society, and were to be taken into account in ascertaining the statu-
>   tory majority of members required by the *Building Societies Act,* 1874,
>   s. 32, to sign an instrument of dissolution.
>       *In re Sheffield and South Yorkshire Permanent Building Society* (1)
>   explained.

THIS was an action for the purpose of setting aside an instru-
ment of dissolution of the *East Dulwich 295th Starr Bowkett
Building Society* as void, on the ground that it had not been
signed by the requisite majority of members.

The society was incorporated under the *Building Societies Act,*
1874 (37 & 38 Vict. c. 42).

The following rules of the society were referred to in the course
of the argument :—

Rule 2. "The object of the society shall be to make advances

(1) 22 Q. B. D. 470.

-03635-jpm   Doc 271-5   Filed 04/03/17   Entered 04/03/17 18:29:57   Exhibit
Part 5   Pg 39 of 260

to members upon security of freehold, leasehold, and copyhold
property by way of mortgage."

Rule 3. "The taking up or subscribing for one or more shares
shall constitute membership, on payment of four weeks' sub-
scriptions."

Rule 5. "The amount of each share shall be £100. A mem-
ber may hold one or any number of shares; but in no case shall
he hold more than four in a group."

Rule 6 regulated the amount of the subscriptions, which were
payable weekly, and the fines for non-payments. The last clause
was as follows: "Any member, not having executed a mort-
gage to the society, who may continue to neglect the payment of
his subscriptions until the fines incurred and any other charges
due are equal to the amount of subscriptions already paid by
him, and notice of arrears shall be sent by the secretary, four
weeks from the date thereof (unless previously paid), shall then
cease to be a member, and forfeit all the moneys paid in respect
of the shares."

Rule 18. "A member cannot receive back his subscriptions
from the society until the expiration of five years from the date
of the registration of the society, or if admitted after the above
date, one year from taking his shares, cases of death excepted, as
per rule 35.

"Members wishing to withdraw after the dates above shall then
give three months' notice in writing to the secretary to receive
back subscriptions standing to his credit, less all fines due and
unpaid, and 1s. 3d. per share per annum for working expenses,
charged from the commencement of the society. Withdrawals
can only be paid from the repayments of appropriations. In the
event of there not being sufficient funds in hand at the time a
notice of withdrawal expires, the withdrawal shall be paid from
subsequent repayments as received. Members holding one or
more groups of shares may consolidate them by transferring the
cash from shares standing to their credit so as to reduce their
shares; not less than five years' working expenses from date of
registration of the society shall be deducted, and for each subse-
quent year, and fines to date of consolidation; such subscription,
when practicable, may be credited to appropriation account. In .

C. A.
1890
SIBUN
v.
PEARCE.

C. A.
1890
SIBUN
v.
PEARCE.

case of any loss to the society from whatever cause, the member
withdrawing shall have deducted from his account a fair portion,
with other members, if such loss happens before his notice to
withdraw has been received by the secretary.

"Subscriptions are reserved for making appropriations, paying
expenses, and for purposes named in rules 11, 21, 30, and 31.

"All notices of withdrawal shall be preserved and entered by the
secretary in the book for that purpose in the order they are
received, and the withdrawing member be paid in the same order
of rotation. The secretary shall inform the member in writing
when the money is ready for him.

"Members being thirteen weeks in arrear (unless out of em-
ployment or sick), or having given notice of withdrawal, shall
from the date of such notice cease to take part in the affairs of
the society, but may cancel such notice at the discretion of the
board of management. On the return of subscriptions, the with-
drawing member shall cancel his pass-book and surrender it to
the society."

Rule 30 provided for the termination of the society after the
complete repayment of all appropriations or sums advanced to
the members on their shares.

Rule 32. "The liabilities and assets of the society shall be
valued twelve months prior to the closing of the society, under
the direction of the board of management. The surplus profits,
after providing for the cost of management, interest upon loans,
and all the charges authorized by these rules, shall be rateably
credited to each share not under notice to withdraw, and be pay-
able after the last appropriation has been paid, as per rule 30.
Profits made under this rule will be retained till all the pay-
ments, fines, and other charges have been paid to complete the
last repayments due to the society, as per deed and rules, and
within one month after the last repayment is completed the title-
deeds shall be returned to the shareholder, when he shall cease
to be a member unless he has some other shares in force."

Rule 33 regulated the calling of general meetings of the share-
holders.

Rule 37 provided for the settlement by arbitration of disputes
arising between any of the officers or any person or persons

claiming on account of any member or members and which
cannot be satisfactorily settled by the board of management or a
majority of members present at a general or special meeting.

The Plaintiff, *C. Sibun*, was the holder of twelve shares. On
the 17th of September, 1886, he gave notice of his intention to
withdraw from the society under rule 18. Several other members
also gave notice of their intention to withdraw. At the date of
the instrument of dissolution hereafter mentioned sixty-nine
members had given notice of withdrawal, and the three months
prescribed by the rule had expired in the case of all of them;
but none of them had obtained a return of the subscriptions paid
by them.

On the 14th of October, 1889, an instrument of dissolution
was signed in pursuance of the provisions of the *Building Socie-
ties Act*, 1874, s. 32 (1), and was duly registered on the 24th of
October. In this instrument the total number of members was
stated to be 74, and the number of shares 247; but the amounts
standing to the credit of the members in the books of the
society was given as £3543 16s. 9d., which included the money
standing to the credit of the withdrawing members, and it was
stated that the society owed creditors £1452 2s. 9d., and that
such sum would be paid out of the first moneys which should be
received by the trustees of the committee of inspection.

C. A.
1890
SIBUN
*v.*
PEARCE.

(1) 37 & 38 Vict. c. 42, s. 32, so
far as is material is as follows :—
 "A society under this Act may ter-
minate or be dissolved—
1. Upon the happening of any
   event declared by its rules to
   be the termination of the
   society.
2. By dissolution in manner pre-
   scribed by its rules.
3. By dissolution with the consent
   of three-fourths of the mem-
   bers, holding not less than
   two-thirds of the number of
   shares in the society, testified
   by their signatures to the in-
   strument of dissolution. The
   instrument of dissolution shall
   set forth—

(*a.*) The liabilities and assets of
     the society in detail;
(*b.*) The number of members, and
     the amount standing to
     their credit in the books of
     the society;
(*c.*) The claims of depositors and
     other creditors, and the pro-
     vision to be made for their
     payment;
(*d.*) The intended appropriation
     or division of the funds and
     property of the society;
(*e.*) The names of one or more
     persons to be appointed
     trustees for the special pur-
     pose, and their remunera-
     tion."

C. A.
1890

SIBUN
v.
PEARCE.

The Defendant, *W. H. Pearce*, was appointed trustee with certain powers.

Schedule A. to the instrument contained the names of the creditors, which list included the names of the Plaintiff and the other sixty-eight members who had given notice of withdrawal, together with the amounts due to them, but without referring to any shares which they had previously possessed.

Schedule B. contained only the names of the members, in all seventy-four, who had not given notice to withdraw, with the shares standing in their names and the amounts paid on each. Of these seventy-four members, fifty-seven signed the instrument of dissolution, and they possessed more than two-thirds of the shares. If, therefore, the members who had given notice of withdrawal were not to be reckoned, the instrument was duly signed within the provisions of the Act; but if they ought to be reckoned, the instrument was not signed by the statutory majority.

After some correspondence, the Plaintiff brought this action on behalf of himself and all other members of the society, except *Pearce*, against *Pearce* and the society, claiming a declaration that the instrument of the 13th of October, 1889, was void, and an injunction to restrain the Defendant *Pearce* from acting under the powers of the instrument or dealing with the assets of the society. The Plaintiff now moved for an *interim* injunction. The motion was heard before Mr. Justice *North* on the 7th of February, 1890.

*Cozens-Hardy*, Q.C., and *Farwell*, for the Plaintiff:—

The Plaintiff and those in a similar position have become members and have not ceased to be members, inasmuch as nothing has happened to sever their connection with the society. They are interested in the proper distribution of the assets and the winding-up of the company as well as the continuing members. They have a statutory right as members to be taken into account in estimating the number of assents to the deed of dissolution. Rule 18 treats the members who have given notice of withdrawal as members, no doubt restricting the part they are to take in the business of the society; but there is nothing in the rules to

interfere with the express enactment. It has been held that a
member who has given notice of withdrawal is subject to the
rules of his society in respect of arbitration, a dispute as to the
amount he is entitled to recover being a dispute between the
society and a member: *Walker* v. *General Mutual Building
Society* (1); *Wright* v. *Deeley* (2).

*Napier Higgins*, Q.C., and *Bramwell Davis*, for the Defendants :—

We do not dispute that a withdrawing member is subject
to and entitled to the benefit of the rules for some purposes;
the amount to which he is entitled is in itself a creation of the
rules.    The question here is not whether the Plaintiff is a
member for all purposes—we say that he is to some extent in the
position of a creditor rather than that of an ordinary member;
he has no interest in the affairs of the company more than a
creditor has; his only interest is that the assets shall not be
wasted, and shall be applied in due course until his claim is
satisfied : *In re Sheffield and South Yorkshire Permanent Building
Society* (3).

[NORTH, J. :—That case only applies to members who have
been paid out.]

The rules provide in so many words that a member who has
merely given notice to withdraw shall cease to take part in the
affairs of the society.    The taking part in the determination of
whether there shall be a dissolution is taking part in the affairs
of the society.

NORTH, J. :—

The first question is, whether the deed in this case is one
which is binding upon all the members of the society under the
32nd section of the Act of 1874.    That section provides that a
society under the Act may terminate or be dissolved, first, upon
the happening of any event declared by its rules to be its termi-
nation.    That has not happened.    " Secondly, by dissolution in

(1) 36 Ch. D. 777.                    (2) 4 H. & C. 209.
        (3) 22 Q. B. D. 470.

CHANCERY DIVISION.    [VOL. XLIV.

C. A.

1890

SIBUN
v.
PEARCE.

North, J.

manner prescribed by the rules." That has not been attempted.
Then, passing over the third, we come to the fourth, which
provides another mode of winding-up, which it is not suggested
has been done. Therefore the only question here is, whether the
society has validly been dissolved under sub-sect. 3 of sect. 32.
Now that provides that it may be dissolved " with the consent
of three-fourths of the members, holding not less than two-thirds
of the number of shares in the society, testified by their signatures
to the instrument of dissolution." Then it provides : " The in-
strument of dissolution shall set forth—(a) the liabilities and
assets of the society in detail; (b) the number of members, and
the amount standing to their credit in the books of the society;
(c) the claims of depositors and other creditors, and the provi-
sion to be made for their payment; (d) the intended appropria-
tion or division of the funds and property of the society ; (e) the
names of one or more persons to be appointed trustees for the
special purpose, and their remuneration. Alterations in the
instrument of dissolution may be made with the like consent,
testified in the same manner. The instrument of dissolution and
all alterations therein shall be registered in the manner provided
for the registration of rules, and shall be binding upon all the
members of the society."

Now a certain number of the members of the society have
signed an instrument of dissolution purporting to be made under
that sub-sect. 3, and to a considerable extent it conforms with
its requirements ; but the important point raised upon it is this,
that the requisite consents have only been obtained if members
who have given notice to withdraw their shares have ceased to be
members. If, on the other hand, persons who have given such
notice have not ceased to be members, but are still members, then
it is admitted that the consent of three-fourths of the members
holding not less than two-thirds of the number of shares in the
society has not been obtained. The important question now,
therefore, is whether *Sibun*, the Plaintiff, and other persons like
him are or are not still members. *Sibun* is one of the persons
whose consent has not been obtained.

For that purpose, we must look to the rules, to see when a
person who beyond all question has become a member of the

society has ceased to be a member. Is it when he gives his notice to withdraw, or when that notice is complied with by his being paid off? What has happened in the present case is that the Plaintiff's notice of withdrawal was given in 1886, but he has not yet been paid.

The 18th rule is that which relates to the subject of the withdrawal of unappropriated shares. There is a good deal of the rule I need not read. I only read such parts as I think are material. "Members wishing to withdraw shall give three months' notice in writing to the secretary to receive back subscriptions standing to his credit, less all fines due and unpaid, and 1s. 3d. per share per annum for working expenses charged from the commencement of the society." "In the event of there not being sufficient funds in hand at the time a notice of withdrawal expires, the withdrawal shall be paid from subsequent repayments as received." Now, down to that point there is nothing saying that a person ceases to be a member upon giving notice to withdraw. *Primâ facie*, a three months' notice to withdraw means a notice to withdraw at the end of the three months for which the notice is required, and the repayment is only to take place at that time at the earliest; it may be postponed a little longer. "Members holding one or more groups of shares may consolidate them"—I do not think I need read that. Then we have this: "In case of any loss to the society from whatever cause, the member withdrawing shall have deducted from his account a fair portion with other members, if such loss happens before his notice to withdraw has been received by the secretary."

Now I have asked for the evidence to shew that the amount payable to Mr. *Sibun* has been ascertained, and although I pointed out the importance of reading evidence to me on that point, none has been read, and I assume none exists. I do not forget that in the deed certain sums are put opposite the claims of certain creditors. They are said to be the amounts of their claims; whether it be so or not I do not know. Then we come to this: "All notices of withdrawal shall be preserved and entered by the secretary in a book for that purpose in the order they are received, and the withdrawing member be paid in the

362                    CHANCERY DIVISION.            [VOL. XLIV.

C. A.
1890
SIBUN
v.
PEARCE.

North, J.

same order of rotation. The secretary shall inform the member in writing when the money is ready for him." No doubt that might be explained by something clear and definite in the rule saying that in accordance with those rules a man shall cease to be a member at the date at which he gives the notice; but in my opinion, unless there is something to that effect, the withdrawal would date from the maturity of the notice at the earliest date, and not an earlier date, and these words, "shall inform the member in writing when the money is ready for him," are entirely inconsistent with the idea that the person to whom the notice in writing is given is a person who has ceased to be a member three months at least before the notice is sent to the person who here is described as being a member. Then there are these further words, "Members being thirteen weeks in arrears or having given notice of withdrawal shall, from the date of such notice, cease to take part in the affairs of the society." It seems to me that that would be absolutely unmeaning if the person could not—whether those words were there or not—take any part in the concerns of the society because he was not a member. It points to the diminution of the power of a man who is a member, giving him less power than he would have had if he had not given notice of withdrawal; but although it prevents his taking part in the affairs of the society, I see nothing there to shew that he is not a member—on the contrary, the existence of such a rule is only consistent with his being a member at the time. Then it goes on to say he "shall cease to take part in the affairs of the society, but may cancel such notice at the discretion of the board of management." I confess I do not understand what is meant by a man cancelling a notice at the discretion of the board of management. It may mean possibly that he may cancel it if they allow him to do so; but at any rate, it treats it thus, that the notice may be cancelled, and if the notice is cancelled the member is what he was before—he continues to be a member, and he is not a person who has ceased to be a member; in other words, cancellation of notice does not make him a member *de novo*, but it puts an end to the right to withdraw and to the obligation not to take part in the affairs of the society.

Now looking at that rule, which I am told is the only rule

bearing upon the subject, I have no doubt what its meaning is. These are long printed rules, and I have not myself had the opportunity of looking through them to see if there is anything else bearing upon this point. Neither of the counsel has called my attention to any such matter—therefore I assume there is not. Then it stands thus: under the rules Mr. *Sibun* has not ceased to be a member; though he has given notice of withdrawal, he has not been paid off, and he is still a member of the society; and I see nothing to prevent his coming within the class of persons referred to in the Act, where it says that the dissolution must be with the assent of three-fourths of the members, holding not less than two-thirds of the number of shares in the society. He is a member, in my opinion, and he does hold a definite number of shares in the society—the number which he can resume the full enjoyment of by cancelling his notice of withdrawal; in other words, the number of shares which he had from the first. Therefore, as far as the section goes, I am of opinion that Mr. *Sibun* is a member of the society, and one whose consent it was essential should be procured. I do not find that the cases cited assist me very much. The general principles in *Wright* v. *Deeley* (1) and *Walker* v. *General Mutual Building Society* (2) apply; but the particular rules in those cases are different from the rules in the present case. In those cases it was clear that the rules did not make a man who had given a notice to withdraw cease to be a member. The question in the present case is whether the rules here had that result or not; but the observations of Lord Justice *Fry* in the case of *Walker* v. *General Mutual Building Society* (3) are not wanting in point when he says, speaking of the rule in that case: "Now, is this a dispute between the society and the plaintiff in his capacity of member? I have no hesitation in saying that in my judgment it is. His rights arise entirely from his membership, he is a withdrawing member, and till he has received payment it appears to me he remains a member. Rule 10 treats the person who has given notice as a member, and in my judgment rightly treats him as a member." Well, I see no difference in that respect in the

C. A.

1890

SIBUN
*v.*
PEARCE.

North, J.

(1) 4 H. & C. 209.        (2) 36 Ch. D. 777.
(3) 36 Ch. D. 786.
2 *B* 2                            I

CHANCERY DIVISION.          [VOL. XLIV.

C. A.
1890
SIBUN
v.
PEARCE.

North, J.

rules of that society from the rules of the present, because I cannot hold that the direction that he should cease to take part in the affairs of the society is in any sense equivalent to a rule that he should cease to be a member when the notice is given.

Then the further case was referred to by Mr. *Higgins* and Mr. *Bramwell Davis* of *In re Sheffield and South Yorkshire Permanent Building Society* (1); but it seems to me to be a very long way from the present case, because in that case the question did not arise whether the person who had merely given notice to withdraw had ceased to be a member or not; but there rules provided for notice by an investing member, not to withdraw a share at all, but to withdraw the whole or any part of the amount due to him; the man had not only given his notice, but had been paid everything that was due to him, and the question was whether a person whose notice had been acted upon and the money paid was still a member. That was a different question from the one which arises in the present case.

[His Lordship decided other points raised in favour of the Plaintiff and granted an injunction.]

D. P.

C. A.        From this decision the Defendants appealed. The appeal was heard on the 27th of March, 1890.

*Napier Higgins*, Q.C., and *Bramwell Davis*, for the Appellants :—

According to the true construction of the rules, shareholders who have given notice to withdraw cease to be members on giving notice. If Mr. Justice *North* is right in his construction of the rules, the society could not be dissolved at all; because the withdrawing members are precluded by rule 18 from taking any part in the affairs of the society, and therefore cannot sign the deed of dissolution. The three months' notice only refers to the payment of the money; the shareholder ceases to be a member at once. The provision in rule 18 forbidding the withdrawing members to take part in the affairs of the society was intended

(1) 22 Q. B. D. 470.

O. A.
1890
SIBUN
v.
PEARCE.

*ex abundanti cautelâ* for the operation of the notice is sufficient in itself to preclude them from so doing. The position of shareholders in an ordinary company has no analogy to the position of the members of a building society, because they cannot give up their shares and so escape liability; but here they have a right to do so: *In re Blackburn and District Benefit Building Society* (1); *In re Sheffield and South Yorkshire Permanent Building Society* (2); *Walton* v. *Edge* (3); *Auld* v. *Glasgow Working Men's Building Society* (4). [They also referred to rules 3, 6, 8, 18, 32, and 33 of the society's rules.]

*Farwell* (*Cozens-Hardy*, Q.C., with him) for the Respondent:—

The withdrawing members do not cease to be members when they give notice of withdrawal. They remain members till they have been paid off, and if there were any dispute about the amount due to them they would have to go to arbitration under rule 37: *Walker* v. *General Mutual Building Society* (5), and *Wright* v. *Deeley* (6) are in our favour. The expressions used in *In re Sheffield and South Yorkshire Permanent Building Society* respecting the effect of a notice of withdrawal have reference to the facts of that case, where the withdrawing members had been paid off. The provision in rule 18 forbidding those who have given notice to take any further part in the affairs of the society would be useless if they ceased at once to be members. It shews that for some purposes at least they continued to be members.

*Bramwell Davis*, in reply.

COTTON, L.J.:—

In this case an injunction has been granted to restrain the society from acting on a deed of dissolution. Under the Act of 1874, sect. 32, there can be a dissolution with "consent of three-fourths of the members holding not less than two-thirds of the number of shares in the society"; and that is to be done in a

(1) 24 Ch. D. 421.          (4) 12 App. Cas. 197.
(2) 22 Q. B. D. 470.        (5) 36 Ch. D. 777.
(3) 10 App. Cas. 33.        (6) 4 H. & C. 209.

-03635-jpm   Doc 271-5   Filed 04/03/17   Entered 04/03/17 18:29:57   Exhibit
Part 5   Pg 50 of 260

C. A.

1890

SIBUN
v.
PEARCE.

Cotton, L.J.

particular way—it is to be "testified by their signatures to the instrument of dissolution." Then we come to what the deed of dissolution is to set forth—"(a) the liabilities and assets of the society in detail; (b) the number of members, and the amount standing to their credit in the books of the society; (c) the claims of depositors and other creditors, and the provision to be made for their payment; (d) the intended appropriation or division of the funds and property of the society; (e) the names of one or more persons to be appointed trustees."

Mr. *Higgins* opened this case by saying, that if those who have given notice of withdrawal are still to be considered as members for the consideration of this section, then the injunction is right, and if not then it is wrong; and what he contended was this, that there had been in the year 1886 sixty-nine persons, who were then undoubtedly members of the society, who had given notice of withdrawal, seventy-four who had not, and nothing has yet been paid to those members who have given notice of withdrawal. We must, therefore, look and see what there is in the Act or rules to enable us to determine whether these are to be considered as members of the society. I will first consider what provision there is in the rules, so as to find out how the position of membership is to be maintained and what is to be done by members. Sect. 6 of the rules provides for certain things being done by a member, and then it says that any member, not having executed a mortgage to the society, who may continue to neglect the payment of his subscriptions until the fines incurred and any other charges due are equal to the amount of subscriptions already paid by him, is to be expelled; then he "shall cease to be a member." I notice that, not because it is the rule on which this question turns, for this turns on the withdrawal rule, which is rule 18, but I refer to it for this purpose, that it is the rule which definitely states when the contract of membership is to be put an end to, and then it says in a certain event he shall cease to be a member.

Then, is there anything like that in rule 18, which is the rule relating to withdrawal? There are certain provisions that the member cannot receive back his subscriptions until the expiration of five years; then he is to give three months' notice in

writing to the secretary to receive back subscriptions standing
to his credit after that time. I do not discuss the question
whether his status is affected immediately upon his giving the
notice of withdrawal, or whether it is at the end of the three
months, because I do not quite see how it is material. Then we
have this, "All notices of withdrawal shall be preserved and
entered by the secretary in the book for that purpose in the order
they are received, and the withdrawing member be paid in the
same order of rotation. The secretary shall inform the member
in writing when the money is ready for him." A good deal of
reliance has been placed, and I think rightly, upon this, that
when the member gives the notice of withdrawal, and even
when the three months have expired, he is still a member. He
is, as a member, to receive his money in rotation, and he is, as a
member, to be informed by the secretary when the money is
ready for him. Then we come to this—which has also been
very much relied upon—"Members being thirteen weeks in
arrear (unless out of employment or sick) or having given notice
of withdrawal shall, from the date of such notice, cease to take
part in the affairs of the society." But with respect to those
persons who are in arrear, where a member is thirteen weeks in
arrear, then, though there has been no expulsion and no for-
feiture of his shares, he ceases to take any part in the affairs of
the society; because, of course, if he were expelled, or his shares
were forfeited, it would not be necessary to say that he shall no
longer "take part in the affairs of the society." The same rule
applies to those who have given notice of withdrawal, that they
are not to take further part in the affairs of the society; and it
has been said that this means that they are no longer continuing
members. I say, No; it is necessary that they shall continue
members; and this rule is not inconsistent with their doing so.
Then it is said that if they continue members, this rule, which
prevents them from taking part in the affairs of the society, pre-
vents them from signing this deed, and, therefore, prevents the
necessary majority being obtained. But, in my opinion, that is
not the meaning, because to say, "not take part in the affairs of
the society" must mean "not take part in the affairs of the
society as a continuing business '; it will not prevent them doing

O. A.

1890

SIBUN
v.
PEARCE.

Cotton, L.J.

CHANCERY DIVISION. [VOL. XLIV.

C. A.
1890

SIBUN
v.
PEARCE.

Cotton, L.J.

that which, in my view, the Act of Parliament requires them to do, if they accede to the dissolution, to shew their assent by signing this deed. That, in my opinion, is not "taking part in the affairs of the society" within the fair meaning of this rule but doing something which the Act of Parliament requires to be done in order to get the dissolution in the event which has happened. Members who are thirteen weeks in arrear, or who have given notice of withdrawal, are not to take part in the affairs of the society in this sense, that they shall not have any voice as to how the affairs are to be conducted if it is a going concern; but, in my opinion, it is very reasonable that they should have a voice as to whether a dissolution shall take place in the particular way provided by this particular deed.

Then we come to this : are they persons who are excluded from the members whose assent is required by the 32nd section ? It is said that must be so, because this section means they must be members who have the full rights as such members. In my opinion, there is nothing of that sort here. If these persons who give notice of withdrawal are restricted from taking part in the affairs of the society in the sense I have mentioned, that is very reasonable; but they are still members; and although it is said they cannot then be said to be holding shares in the society, I cannot accede to that. Cannot a person still hold shares, and yet be in such a position as to be prevented from interfering in the affairs of the society as a going concern ? In my opinion, he does still hold his shares, and the fact of his holding shares necessarily involves that he shall be entitled to exercise all the rights in respect of those shares which he is not prevented from exercising by the rules of the society.

Then, why should we give a different construction to "members" in this portion of the rules from that which we are to give to "members" in sub-sect. 3 of the 32nd section of the Act of 1874 ? The instrument of dissolution, rightly, I think, gives the sum standing to the credit not only of the members who have given no notice of withdrawal, but also standing to the credit of those who have given notice of withdrawal. Under sub-division (b) of sub-sect. 3 the deed is to state "the number of members, and the amount standing to their credit." In my

opinion, they must take into account what is required under sub-division (b).

Then it is said the cases are against it; but the only case on which I think the Appellants can in any way rely, is that case of *In re Sheffield and South Yorkshire Permanent Building Society* (1), and there the decision is nowhere in favour of the Appellants, because the decision is on an entirely different point. The county court judge had held that certain members who had given notice of withdrawal, and had been paid the full amount which was standing to their credit, were not liable, and properly so; but then, as regards certain other members who had withdrawn before their shares had matured, and before the amount which they had to pay was fully paid, the county court judge held that under sect. 14 of the Act of 1874 they were liable in the winding-up for the amount unpaid on their shares. What was relied upon were certain expressions used by the Judges in giving judgment. I have had the opportunity of reading through the judgments, and I asked Mr. *Farwell* to explain them, and I understand the explanation he gives is, that those expressions are expressions applicable to those who have given notice of withdrawal, and who are to be paid off as soon as there are funds necessary for the purpose, which payment, when made, severed entirely their connection with the society. I think that is the fair meaning of what is said by Mr. Justice *Cave* in his judgment at p. 475. `

In my opinion, therefore, the decision under appeal was right.

LINDLEY, L.J.:—

I have no doubt the decision is right. The question turns upon the construction of an Act of Parliament which is less obscure than usual.

Now, first of all, I will refer to this instrument of dissolution.

I cannot myself obtain much light from that document, because it is plain to me that the word "members" there is used sometimes in one sense and sometimes in another. When they talk of the "number of members" they exclude the withdrawing members; when they talk about "the amount standing to the

(1) 22 Q. B. D. 470.

O. A.

1890

SIBUN
*v.*
PEARCE.

Cotton, L.J.

C. A.

1890

SIBUN
*v.*
PEARCE.

Lindley, L.J.

credit of members," they include the withdrawing members. I pass that by as not consistent. I do not think that this instrument helps either side.

Now, as regards the rules, the rules are made pursuant to the *Building Societies Act* of 1874, and by sect. 16 of that Act, clause 4, the rules are to regulate "the terms upon which shares may be withdrawn and upon which mortgages may be redeemed," and by clause 14, "the manner in which the society, whether terminating or permanent, shall be terminated or dissolved."

Pursuant to that enactment we have rules of this society; and first, the question is, What is the meaning of the word "members" in this rule or this set of rules? The Act of Parliament contains no interpretation of the word "member," and leaves that to be ascertained from the rules themselves. The rules which are important with reference to that are those which have been referred to, beginning with rule 3: "The taking up or subscribing for one or more shares shall constitute membership on payment of four weeks' subscriptions," and so on. Then there is the rule relating to subscriptions with the forfeiture clause which has been referred to. Then we come to the withdrawal clause, rule 18, which is important; and the question turns really upon the true construction of this rule taken in connection with the Act of Parliament. You may construe a rule by reference to the Act of Parliament, but you can hardly construe an Act of Parliament by reference to a rule; and if rule 18 does conflict with the Act of Parliament so much the worse for the rule, not so much the worse for the Act of Parliament. But I do not think there is any conflict. What the rule says is this. Having described "members," and said that members wishing to withdraw after certain dates shall give three months' notice to the secretary to receive back the subscriptions standing to their credit, the rule says, "Notice of withdrawal shall be preserved and entered by the secretary in a book"; and then it says, "The secretary shall inform the member in writing when the money is ready for him"; treating, therefore, the person who has given notice, and who is entered in the book, as a member. Then it says, "Members being thirteen weeks in arrear, or having given notice of

withdrawal, shall from the date of such notice cease to take part in the affairs of the society, but may cancel such notice at the discretion of the board of management." Now, what is the position of a member who has given notice of withdrawal, but who has not been paid back the amount due to him for his subscriptions? Some say he is a member; some say he is a creditor. The true mode of describing him is to describe him as a member who has given notice of withdrawal, and is entitled to payment. That he is not an ordinary creditor is plain. He cannot come into competition with outside creditors. On the other hand, as between himself and the continuing members, he is entitled to be paid the amount due to him before they can divide the assets. In that sense he is a creditor; and that was decided in *In re Blackburn and District Benefit Building Society* (1), which afterwards went to the House of Lords.

But does he cease to be a member before he is got rid of under these rules? It seems to me he does not. He is not to take part in the affairs of the society; neither is a person who is thirteen weeks in arrear to take part in the affairs of the society; but he does not cease to be a member until he is got rid of, neither does the person who withdraws. The words, "he shall not take part in the affairs of the society," mean that he shall not take part in the affairs of the society as a going concern. If these words mean more, they are in conflict with the Act of Parliament, which I will read presently. I do not think these words mean more on a fair construction of these rules; but if they do, the Act of Parliament must prevail over them.

Now, what does the Act of Parliament say? The Act of Parliament says, in sect. 32: "A society under this Act may terminate or be dissolved" (among other ways) "by dissolution with the consent of three-fourths of the members, holding not less than two-thirds of the number of shares in the society, testified by their signatures to the instrument of dissolution."

Then has this deed or instrument of dissolution been consented to in compliance with this Act of Parliament—that is to say, has it been consented to by three-fourths of the members holding two-thirds of the shares? The answer is, "Certainly not." It

(1) 24 Ch. D. 421.

C. A.

1890

SIBUN
*v.*
PEARCE.

Lindley, L.J.,

CHANCERY DIVISION.    [VOL. XLIV.

O. A.
1890
SIBUN
v.
PEARCE.

Lindley, L.J.

is contended that those persons who have given notice of with-drawal have ceased to be members. For the reasons I have given, I cannot come to that conclusion.

But it has been said, it has been decided that they are no longer members, and reference was made to the case of *In re Sheffield and South Yorkshire Permanent Building Society* (1). It is quite obvious when you look at the Act and the rules which the Court had to deal with there, that a man who had given notice of withdrawal, even if he had not been paid out, was not liable to contribute anything under the rules of that society. Sect. 14 makes that plain; that sect. 14 runs thus: "The liability of any member of any society under this Act in respect of any share upon which no advance has been made shall be limited to the amount actually paid or in arrear." His liability is to be limited to the amount paid. That does not mean that calls are to be made upon him to the extent of the amount which he has paid; that would be making him pay twice over. It means what he has paid, and what he is liable to pay. Then if he is in arrear—that is to say, if there is more coming due from him to the society—that excess may be called up and con-tributed to. Now, nothing can be due from him, after his notice of withdrawal, whether he has received his money out or not; he has nothing more to contribute. Therefore, it is perfectly plain that the decision in the *Sheffield* case was right.

But there are some expressions in that case which look as if the Court treated members who have given notice of with-drawal as no longer members of the society. That is to be explained by the circumstance that, in that particular case, the members there had been paid out, and therefore they had ceased to be members of the society. They had nothing whatever to do with it. That is the explanation of those expressions, which at first sight appeared to be more or less in Mr. *Higgins's* favour; not that the decision was in his favour: it has nothing to do with this case one way or the other.

The only other case which is at all important is *Walker* v. *General Mutual Building Society* (2), which, so far as it goes, is in accordance with the view which we are now taking of the Act

(1) 22 Q. B. D. 470.            (2) 36 Ch. D. 777.

—that is to say, that a member who has given notice of withdrawal, but is not paid out, is still a member.

For these reasons I am of opinion that the judgment of the Court below must be affirmed, and this appeal must be dismissed.

C. A.

1890

SIBUN
v.
PEARCE.

LOPES, L.J. :—

The question is, whether the Plaintiff and certain other persons who are withdrawing members, are "members" within sect. 32 of the *Building Societies Act* of 1874, and whether they are members for the purpose of the dissolution of this society.

Now, if the withdrawing members are "members," the deed is bad; but if they are not, the deed is good. The question depended upon sect. 32, to which I have alluded, and the rules of the society. I do not propose again to read sect. 32. I think that the withdrawing members are members of the society; and it is to be observed that sect. 32 uses the word "members" without any qualification, "by dissolution with the consent of three-fourths of the members"; and I cannot see where Mr. *Bramwell Davis* got the meaning that he sought to put upon it, namely, members who had the rights of shareholders. The word "members" is used without any qualification.

Now I come to rule 18, which is the important rule amongst the rules in question. Again, I do not propose to read that rule; but I think that the different portions of it, to some of which I alluded in the course of the argument, lead only to one conclusion, and that is, that what was intended was that the withdrawing members should continue to be members until paid up. I read the expressions in that rule as being irreconcilable with any other construction.

There is a portion of the rule which is relied upon by Mr. *Napier Higgins* with regard to the fact that the withdrawing members should cease to take part in the affairs of the society. It appears to me that that is not an expression upon which he is entitled to rely. That expression recognises the fact that they are still to be members; it is true that they are not to take interest in the affairs of the company as a going concern, but still they are to be members, and to be members for the purpose of the dissolution of the society. Rule 6 also is a rule worthy of

CHANCERY DIVISION.          [VOL. XLIV.

C. A.

1890

SIBUN

*v.*

PEARCE.

Lopes, L.J.

attention, because it makes it clear that, where it was intended that a member should cease to be a member, the apt and explicit term was used, that he should " cease to be a member."

The case relied upon by Mr. *Napier Higgins* was *In re Sheffield and South Yorkshire Permanent Building Society* (1); but, as has been pointed out, that case is clearly distinguishable from the present, because the withdrawing members had been paid out. In point of fact, that case appears to me to be rather an authority in favour of the contention of the Respondents; they had been paid out, and had ceased to be members. I think, therefore, that this appeal fails.

Solicitors for Plaintiff: *Savery & Stevens.*
Solicitors for Defendants: *Crawford & Chester.*

M. W.

----

C. A.

1890

KEKEWICH,
J.

Jan. 16, 17,
Feb. 1;

C. A.
May 14, 15.

VAN GELDER, APSIMON & CO. *v.* SOWERBY BRIDGE
UNITED DISTRICT FLOUR SOCIETY.

[1888 V. 774.]

*Parties—Patent—Mortgage—Assignment—Patent Office—Registration of Deed*
*—Patents, Designs, and Trade Marks Act,* 1883 (46 & 47 Vict. c. 57)
*s.* 87—*Rules of Supreme Court,* 1883, *Order* XVI., *r.* 11.

*V.,* the registered assignee of a patent, mortgaged it, and the mortgagee was registered "as mortgagee." After this, *V.* sued an infringer without making the mortgagee a party. The Defendant pleaded that *V.* was not the proprietor and could not sue. The mortgagee declined to be made a co-Plaintiff, and was not added as Defendant. *Kekewich,* J., dismissed the action on that ground, without going into the merits :—

*Held,* on appeal, that as the mortgagee was not registered as assignee or proprietor, sect. 87 of the *Patents, Designs, and Trade Marks Act,* 1883, did not apply, and the case must be decided according to the general law as to mortgages, and that *V.* could sue without making the mortgagee a co-Plaintiff.

*Semble,* that even if the mortgagee had been registered as assignee or proprietor, sect. 87 would not be read as taking away the mortgagor's right to sue for infringement of the patent.

*Held,* that, if it had been necessary to have the mortgagee before the Court, it would not have been right to dismiss the action on the ground of

----

(1) 22 Q. B. D. 470.

# TAB 79

IN THE CAYMAN ISLANDS COURT OF APPEAL                    CICA NO 2 OF 2016

ON APPEAL FROM THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

                                                        FSD 98 OF 2014 (NRLC)

IN THE MATTER OF THE COMPANIES LAW (2013 Revision)

AND IN THE MATTER OF WEAVERING MACRO FIXED INCOME FUND LIMITED (IN LIQUIDATION)

BETWEEN:

                    SKANDINAVISKA ENSKILDA BANKEN AB (PUBL)

                                                        Appellant

                            - and-

                    (1)   SIMON CONWAY
                    (2)   DAVID WALKER
        (as Joint Official Liquidators of Weavering Macro Fixed Income Fund Limited)

                                                        Respondents


BEFORE:
                    THE HON JOHN MARTIN QC, JA
                    THE HON DENNIS MORRISON, JA
                    THE HON SIR RICHARD FIELD, JA

Appearances: David Chivers QC instructed by  Sam Dawson and Kai McGriele of Solomon Harris appeared for the Appellant.  Jeremy Goldring QC and Shaun Folpp instructed by Mourant Ozannes appeared for the Respondents.

                    Hearing: 20 April 2016
                    Judgment: 18 November 2016



                    **JUDGMENT**


**MARTIN JA:**

*Introduction*

1. This is an appeal against an order dated 5 January 2016 of Clifford J. By that order, he
   declared that certain payments (amounting in total to US $8,217,761.54) made by
   Weavering Macro Fixed Income Fund Ltd ("the Company") to the appellant Skandinaviska
   Enskilda Banken AB (Publ) ("SEB") were invalid as preferences over the other creditors of the
   Company; and he ordered SEB to pay an equivalent amount to the respondents (who are the
   joint official liquidators of the Company – "the JOLs"), together with interest and costs.

2. The order was made pursuant to section 145 (1) of the Companies Law (2013 Revision) ("the
   Law"). That subsection is in the following terms:

   > "Every conveyance or transfer of property, or charge thereon, and every payment
   > obligation and judicial proceeding, made, incurred, taken or suffered by any
   > company in favour of any creditor at a time when the company is unable to pay its
   > debts within the meaning of section 93 with a view to giving such creditor a
   > preference over the other creditors shall be invalid if made, incurred, taken or
   > suffered within six months immediately preceding the commencement of a
   > liquidation".

3. The Company went into liquidation (initially voluntary liquidation, but subsequently subject
   to the supervision of the Court) on 19 March 2009. The payments were made on 19
   December 2008, 2 January 2009 and 11 February 2009, and so were made within six months
   of the commencement of the liquidation. The judge found that the Company was unable to
   pay its debts when the payments were made, and that they were made with a view to giving
   SEB preference over the other creditors. He held that the appropriate remedy was
   repayment to the Company, and rejected defences raised by SEB based on unjust
   enrichment, change of position, illegality and public policy.

4. SEB challenges the judge's conclusion that the Company was insolvent when the redemption
   payments were made. It asserts that he calculated the Company's liabilities by reference to
   valuations that were the product of fraud and so did not accurately state the amount of the
   liabilities; that he failed to recognise that the Company had a 30 day period, or a reasonable
   time, in which to make redemption payments, and accordingly took into account liabilities
   that were not yet due; and that he wrongly took into account future debts without
   considering future assets. It challenges the judge's conclusion that the Company intended to

prefer SEB on the basis that the judge misinterpreted the law; that he failed to have proper regard to uncontradicted evidence and drew impermissible inferences of fact; and that he wrongly included future creditors in the class of those he held the Company intended to prefer. Finally, SEB challenges the judge's rejection of its defences.

*Background*

5.  The Company was incorporated in the Cayman Islands on 2 April 2003. It carried on business as an open-ended investment company trading mainly in interest rate derivatives. It had two directors, Stefan Peterson and Hans Ekstrom.  It was part of a group of companies that included Weavering Capital (UK) Limited ("WCUK"), an English company that was the Company's investment manager and undertook its trading activities; and Weavering Capital Fund Limited ("WCF"), a BVI company that was counterparty to interest rate swaps entered into by the Company. There were other corporate entities within the Weavering group, including a Swedish investment vehicle into which investors could invest.

6.  The chief executive officer and principal investment manager, and a director, of WCUK was Magnus Peterson, the brother of Stefan Peterson and the stepson of Hans Ekstrom. The judge found that it was Magnus Peterson who was the controlling mind of the Company, both generally and specifically in relation to the payments made to SEB, and there is no appeal against that conclusion.

7.  The judge also found that the interest rate swaps conducted between the Company and WCF were, to the knowledge of Magnus Peterson, worthless. He said this (judgment paragraph [35]):

> "i. The Swaps were worthless paper transactions entered into with WCF, which was never in a position to honour its obligations pursuant to them. WCF ... had no realisable assets and did not trade other than as counterparty to the Swaps.
>
> ii. Magnus Peterson used the existence of the Swaps to show a sustained growth over the life of the Company. Large monthly adjustments were made to Swaps exposures through the full or partial closing out of existing Swaps and the opening of new Swaps so as to avoid generating the impression of too large profits that the Swaps would otherwise have showed on paper, but not in reality, and to avoid defeating the impression of the Company as relatively low risk. The result was that the Company was able to show the relatively modest but positive month on month

performance expected by its investors.

iii. No gains were ever realised by the Company in relation to the Swaps (even when some of the Swaps were closed out). They were simply used to present a picture of a fund showing sustained growth when in fact the unrealised gains represented by the Swaps were fictitious.

iv. The reality was that the Company was suffering large losses through its options trading (that were masked by the Swaps) and expending considerable sums on management and performance fees and brokerage fees largely to WCUK."

8. Persons wishing to invest in the Company acquired redeemable Participating Shares in it. SEB, a Swedish financial institution, acquired such shares. It did so as custodian for, among others, two Swedish mutual funds: HQ Solid ("HQ Solid") and Catella Stiftelsefond ("Catella"). Between April 2006 and November 2007, SEB subscribed for US$8.5 million Participating Shares on behalf of HQ Solid, and the Company issued 56,836.96 Participating Shares to "SEB Merchant Banking as nominee for HQ Solid". In March 2008, SEB subscribed for US$1 million Participating Shares on behalf of Catella; and the Company issued 5,926.98 Participating shares to "SEB Merchant Banking as nominee for Catella Stiftelsefond". The Company subsequently issued equalisation shares to SEB, again as nominee, so that SEB's total holding on behalf of Catella increased to 5,953.99 Participating Shares. Despite the reference to nomineeship, SEB was registered as the holder of all the shares in the Company's register of members.

9. Under the terms of the Company's offering memoranda (the latest of which was published on 24 September 2008), Participating Shares could be redeemed as follows:

"Redemption of Company Shares

Shareholders can redeem their Shares, in whole or in part, in a minimum amount of US$50,000 (subject to the discretion of the Board of Directors to redeem lesser amounts), on one calendar month's prior written notice (subject to the discretion of the Board of Directors to waive such notice), on each Redemption Day. To effect a redemption, a Request for Redemption of Shares, obtained from the Company must be received by the Company by 5pm Dublin time one calendar month before any Redemption Day, accompanied by the share certificates, if any, duly endorsed and in a form for redemption acceptable to the Board of Directors.

Redemptions are made at a price per Share equal to the NAV per Share of the Company, as of the close of business on the relevant Valuation Date, to the nearest whole US cent (the "Redemption Price").

Payment of Redemptions

Redemption payments are generally made within 30 calendar days after the Redemption Day. No interest is paid from the Redemption Day to the payment date. Payment is made by telegraphic transfer (with transfer charges to the account of the recipient) to the Remitting Bank/Financial Institution or to another account in the name of the shareholder."

"Redemption Day" meant the first business day of each calendar month, and "Valuation Day" meant the business day immediately preceding each Redemption Day.

10. On 9 October 2008 SEB gave notice of redemption in accordance with these provisions of all the shares it held as nominee for Catella, and on 28 October 2008 it gave notice of redemption of all its unredeemed shares held as nominee for HQ Solid. The Redemption Day first occurring one month after these notices was 1 December 2008, and the relevant Valuation Day was 30 November 2008. On 19 December 2008 the Company paid SEB US$1,096,903.58 in respect of the first notice ("the First SEB Redemption Payment"); on 2 January 2009 it paid SEB 25% of the amount due in respect of the second notice, US$1,780,214.29 ("the Second SEB Redemption Payment"); and on 11 February 2009 the Company paid SEB the remaining 75% due in respect of the second notice, US$5,340,643.47 ("the Third SEB Redemption Payment").

11. The redemption notices given by SEB were far from being the only notices of redemption received by the Company in October 2008 and subsequent months. This was a time of turmoil in the financial markets following the collapse of Lehman Brothers in September 2008.  Notice was given for 1 December 2008 in respect of shares totalling (at the 30 November 2008 NAV) US$138.4 million (of which the SEB shares amounted to some US$8.22million). Persons giving notice for 1 December 2008 are referred to as "December redeemers". For the 2 January 2009 and 2 February 2009 redemption dates, the equivalent figures were US$54.7 million and US$30 million.

12. On 19 December 2008 a total of about US$7.6 million was paid to the December redeemers. The First SEB Redemption Payment was part of that total. No further payments were made

in December 2008 to the December redeemers. Towards the end of the month, Magnus Peterson decided that the Company should initially pay only 25% of the amount due to the December redeemers, the remainder being paid by the end of January 2009. A letter to that effect, dated 31 December 2008 but not in fact sent until 7 January 2009, was sent to shareholders. The judge found that Magnus Peterson must have known by the end of December 2008 that the Company would not be in a position to pay all the December redeemers, by instalments or otherwise, let alone the amounts about to fall due at the beginning of January 2009.

13. Those amounts, totalling US$54.7 million, fell due on 2 January 2009. On that day, the Second SEB Redemption Payment was made, and partial payments were made to other December redeemers (seemingly on an ad hoc basis, according to the judge). Additional partial payments were made on 5 and 13 January 2009; and later in January 2009 most of the December redeemers (but not SEB and six others) were paid the outstanding amounts due to them.

14. On 2 February 2009 further redemption payments totalling US $30 million fell due. The Third SEB Redemption Payment was made on 11 February 2009, and three of the remaining December redeemers received the outstanding amounts due to them on 4, 11 and 26 February 2009 respectively. The other three December redeemers received no further payments.  By the end of February 2009, the overall position was that, of the approximately US$138.36 million due in respect of the December, January and February redemption dates, about US$90.16 million had been paid (US$7.6 million in December 2008, US$72.33 million in January 2009 and US$10.23 million in February 2009), leaving a shortfall of some US$48.2 million.

15. Finally, on about 5 March 2009, the directors became aware of the true nature of the swaps and the likely effect on the solvency of the company. They resolved to suspend determination of the NAV and the issue and redemption of shares with immediate effect. On 19 March 2009, the Company was put into liquidation. In January 2015 Magnus Peterson was convicted in England of fraud and sentenced to 13 years' imprisonment.

*Issues*

16. There are two main issues as to the application of section 145(1) of the Law. First, at the times that the Company made the three redemption payments to SEB, was the Company unable to pay its debts within the meaning of section 93 of the Law? This issue, which contains three sub-issues, is known as the Solvency Issue. Secondly, were the three SEB redemption payments made with a view to giving SEB a preference over the other creditors? This is known as the Preference Issue.

17. If the Solvency Issue and the Preference Issue are resolved against SEB, there are further issues about the obligation of SEB to make repayment to the Company. I refer to these issues as the Repayment Issues.

*The Solvency Issue*

18. It is a condition of the application of section 145 (1) of the Law that at the date of a relevant payment the Company should have been unable to pay its debts within the meaning of section 93. In the circumstances of this case, the only part of section 93 that is relevant is paragraph (c), by which a company is deemed to be unable to pay its debts if "it is proved to the satisfaction of the Court that the company is unable to pay its debts". It was common ground that inability to pay debts was to be judged by reference to commercial or cash flow insolvency, not balance sheet insolvency. Applying that test, the judge held on the evidence that the JOLs had discharged the burden of proving that on each of the dates when redemption payments were made to SEB the Company was unable to pay its debts. SEB does not challenge the judge's assessment of the evidence; but it asserts that he failed to take into account the fact that the relevant NAVs were the product of fraud ("the fraud point"), wrongly disregarded a 30 day period of grace available to the Company for payment of redemptions ("the 30 day point"), and wrongly took into account future debts ("the future debts point").

The fraud point

19. SEB contends that the published NAVs, which assumed that the swaps had the value fraudulently attributed to them by Magnus Peterson, were not valuations within the meaning of the Company's articles; that in consequence none of the shareholders redeeming on the December 2008, January 2009 and February 2009 redemption dates was entitled to be paid by reference to the relevant published NAV; that the figures put forward by the JOLs to establish the Company's insolvency wrongly assumed that the redeemers

were entitled to be paid by reference to the published NAVs; and that in the absence of any alternative figures stating the Company's true asset value there was no material on which the court could be satisfied that the Company was unable to pay its debts on any of the SEB Redemption Dates.

20. SEB accepts that, if this argument is correct, it means that it should not have received any of the SEB Redemption Payments. It suggests that the JOLs might once have been in a position to recover the payments as made by mistake, but any such claim is now statute-barred; and it says that, since the JOLs have chosen to attack the payments as preferences, SEB is entitled to assert that an essential condition of a preference claim, namely that the company was unable to pay its debts, has not been established.

21. In dealing with these arguments, the judge started by referring to article 34 of the Company's articles of association, which is in the following terms:

> "The assets of the Company shall be valued in accordance with such policies as the Directors may determine. Any valuations made pursuant to these Articles shall be binding on all persons".

He noted SEB's argument that a fraudulent valuation could not be a valuation made pursuant to the articles, particularly in the light of article 32, which requires the directors in calculating the NAV to "apply such generally accepted accounting principles as they may determine". He recorded SEB's reference to cases such as *Socimer International Ltd v Standard Bank London Ltd* [2008] 1 Lloyd's Rep 558 as supporting the proposition that a valuation to be carried out by a contracting party must be carried out rationally and in good faith, and to the Cayman case of *Primeo Fund v Pearson* [2015(1)CILR 482], in which Jones J had suggested that an NAV would not be binding if some conduct of an agent that could properly be imputed to a company had the effect of vitiating the contract between the company and its members. He noted SEB's submission that since Magnus Peterson was the controlling mind of the Company his fraud must be treated as that of the Company and that, in the light of these authorities, the published NAVs must be regarded as invalid. The judge then recorded the submissions of the JOLs, in particular that SEB's argument was inconsistent with the decision of the Privy Council in *Fairfield Sentry v Migani* [2014] UKPC 9, [2014] 1 CLC 611 ("*Fairfield Sentry*") to the effect that a published NAV is binding, and that it was wrong to attribute Magnus Peterson's state of mind to the Company, whether generally or in relation to implementation of the redemption procedure. The judge stated that he preferred the arguments made by the JOLs, and in conclusion said this [133-4]:

"However, I think that it is necessary to guard against the issue in relation to the NAV being weighed down by too much analysis. What it all comes down to in the end can be summarised quite simply. In my view, certainly for the purpose of this case, the NAV is binding in accordance with article 34 of the articles of association. The fact that it has emerged that the NAV is affected by fraud is not by itself sufficient to vitiate the NAV for the reasons explained by Lord Sumption in *Fairfield Sentry* and referred to by Jones J in *Primeo*. It seems to me that the claims in relation to the redemptions in this case have to be resolved by reference to the NAV which gave rise to their payment. The NAV remains binding (in accordance with article 34) for this specific, and perhaps limited, purpose, even though it has subsequently, after payment of the redemptions, proved to be affected by fraud. This I believe is the sensible and rational approach which avoids an unacceptable outcome".

22. On appeal, SEB largely repeated the submissions it had made to the judge, whilst complaining that the judge had not given any, or any adequate, reasons for rejecting them below. It complained that the judge had allowed himself to be influenced by his view that SEB's submissions were "unattractive" and resulted in "SEB benefiting from Magnus Peterson's fraud to the detriment of other redeemers". It pointed out that SEB was an unconnected shareholder with no knowledge of the fraud, and that if there were any detriment to other redeemers it was a consequence of the JOLs having elected to pursue the wrong cause of action against SEB. It reasserted its construction points on articles 34 and 32, in particular that a valuation based on fraud could not be a valuation "pursuant to the articles", which was the only sort of valuation stated by article 34 to be binding.  It again referred to cases such as *Socimer International Ltd v Standard Bank London Ltd* for the proposition that a valuation to be carried out by a contracting party must be carried out rationally and in good faith, and cited the following statement of Teare J in *WestLB AG v Nomura Bank International plc* [2010] EWHC 2863 (Comm) (upheld on appeal: [2012] EWCA (Civ) 495):

"There is no dispute that in determining the NAV of the Reference Fund and the Redemption Amount the Second Defendant as the Calculation Agent was bound to act in good faith and not to exercise its discretion in a manner which was irrational, that is, capricious, arbitrary, unreasonable (in the public law sense) or perverse. It was further common ground that its determination would not be binding in the

event of manifest error which meant an oversight or blunder so obvious as to admit
of no difference of opinion."

SEB submitted that these and similar cases suggested that the contract between the
Company and the redeemers should not be construed as containing an agreement that the
parties would be bound by a NAV notwithstanding that it was tainted by fraud. It required
clear and unmistakable terms for a party to a contract to exclude the ordinary consequences
of fraud. The judge had wrongly rejected SEB's submission, based on the statement of Jones
J in *Primeo Fund v Pearson* that for a NAV not to be binding there must be "some conduct on
the part of the company itself or conduct on the part of an agent which can properly be
imputed to the company that has the effect of vitiating the contract with its members", that
there was a distinction between internal fraud, which would vitiate a valuation, and external
fraud, which would not. In the present case, the NAV had been calculated by the
administrator but had been based on false information supplied by Magnus Peterson
through WCUK, and it was right to impute Magnus Peterson's knowledge of the falsity of the
information to the Company. This was accordingly a case of internal fraud.   The judge had
also wrongly dismissed the significance of Order 12, rule 2 of the Companies Winding Up
Rules which, by requiring an official liquidator to rectify the register of members if "the
company has from time to time issued redeemable shares at prices based on misstated net
asset value which is not binding upon the company by reason of fraud", recognised that a
fraudulent NAV would not be valid. If the JOLs had adopted the Order 12, rule 2 procedure,
there could have been a general adjustment of the rights and obligations of the shareholders
(although SEB again conceded that its own position would have been unaffected). The judge
was wrong to take the view that *Fairfield Sentry* provided an answer to these points; that
case did not concern a NAV that was the product of fraud, and said nothing about whether
such a valuation was binding.

23. The JOLs' position on the appeal was that the judge was right to apply *Fairfield Sentry* and
hold that the NAVs were binding in favour of redeemers and conclusive at the time of the
SEB Redemption Payments, notwithstanding that because of Magnus Peterson's fraud they
proceeded on the false basis that the swaps were valuable. The argument advanced by SEB
was equivalent to an argument rejected in *Fairfield Sentry* as "impossible". Properly
construed, the articles required the published NAV to be binding in respect of both
acquisition and redemption of shares: they could not be construed as conferring on the
Company an ability to adjust the NAV from time to time in the light of new information. Such

an approach to the articles would render the rights of shareholders entirely uncertain. Cases like *Socimer International Ltd v Standard Bank London Ltd* were concerned with implied terms prohibiting a party that abused a contractual discretion from binding the innocent party; whereas SEB's contention that the Company's wrongful conduct prevented it from becoming liable to innocent redeemers was in effect the reverse. A construction of the articles that meant that the innocent party suffered and the Company benefited from its own wrong was commercially unsustainable. The statement in *Primeo Fund v Pearson* was unclear: it spoke of vitiating the contract between a company and its members, but such language was more appropriate to the inception of the contract than to the consequence of a step taken in the course of its performance. Moreover, it was in any event wrong to attribute Magnus Peterson's fraud to the Company: it was not he, but the administrator, that was the relevant agent for the purpose of calculation of the NAV. As to Order 12, rule 2, it was not concerned with the position prior to rectification and had no impact on the question of whether the NAV was at that time binding.

24. In common with the judge, it seems to me that the appropriate place to start is article 34. It provides that any valuation of the Company's assets made in accordance with the articles is to be binding on all persons. Such a provision is fundamental to the mechanism by which investors in the Company acquire and redeem shares.

25. A similar provision was in issue in *Fairfield Sentry*. In that case, Fairfield Sentry Limited ("the Fund") was a BVI mutual fund that invested almost exclusively in Bernard L Madoff Investment Securities LLC ("BLMIS"). BLMIS operated a notorious Ponzi scheme. Investors in the Fund participated indirectly in the investments with BLMIS by subscribing for shares in the Fund at a price dependent on the Fund's NAV, and were entitled to withdraw funds by redeeming their shares under the provisions of the Fund's articles of association. In December 2008, when Madoff's frauds were discovered, the Fund's directors suspended determination of the Fund's NAV, thereby terminating redemption of shares. The proceedings were brought by the Fund at the instance of its liquidators against a number of financial institutions that were shareholders in the Fund but redeemed some or all of their shares before December 2008. The purpose of the proceedings was to recover from the defendants the amounts paid out to them on redemption, on the basis that they were paid out in the mistaken belief that the underlying assets were as stated by BLMIS when in fact

there were no assets. Any amounts recovered were intended to be distributed rateably between all members, irrespective of when or whether they had redeemed.

26. Two main issues fell to be decided: whether documents issued to members of the Fund recording the NAV or redemption price were binding on the Fund under article 11 of its articles of association, which provided that any certificate as to the NAV or redemption price given in good faith by or behalf of the directors should be binding on all parties ("the article 11 question"); and whether the defendants had a defence on the ground that by surrendering their shares they gave good consideration for the money that they received on redemption ("the good consideration question"). At first instance, the article 11 question was decided in favour of the Fund on the basis that no formal certificate had ever been issued, but the good consideration question was decided in favour of the defendants. Both elements of the decision were upheld on appeal to the Eastern Caribbean Court of Appeal. In the Privy Council, however, both the article 11 question and the good consideration question were determined in favour of the defendants.

27. The judgment of the Judicial Committee of the Privy Council was delivered by Lord Sumption. At [19], he said the following:

> "[T]he Fund's claim to recover the redemption payments depends on whether it was bound by the redemption terms to make the payments which it did make. That in turn depends on whether the effect of those terms is that the Fund was obliged upon a redemption to pay (i) the true NAV per share, ascertained in the light of information which subsequently became available about Madoff's frauds, or (ii) the NAV per share which was determined by the directors of the time and redemption. If (ii) is correct then, the shares having been surrendered in exchange for the amount properly due under the articles, the redemption payments are irrecoverable."

At [21], Lord Sumption set out the scheme of the Fund's articles. They included provision for the subscription price and the redemption price to be set at the NAV per share "determined in accordance with article 11", with the redemption price being paid as soon as practicable, normally within 30 days. The summarised provisions are different in form from, but in substance the same as, those contained in the Company's articles. Lord Sumption concluded his summary by saying: "It will be apparent from this summary that the whole of this scheme

depends upon the price being definitively ascertained by the dealing day and known to the
parties shortly thereafter. It is unworkable on any other basis."

28. The substance of the Privy Council's decision is contained in paragraphs [22] to [24]. They
are in the following terms.

> "[22] The Fund's case is that when article 10(2) defines the redemption price as the
> NAV per share "determined in accordance with Article 11", it means the NAV
> correctly determined by dividing the NAV of the Fund by the number of shares in
> issue in accordance with articles 11(1)[b], 11(2) and 11(3). If this is right, the same
> must be true of article 9(1)(c), which fixes the subscription price by reference to the
> same provisions of article 11. The directors' determination of the NAV per share as
> at the valuation day, under article 11, was not definitive according to this analysis
> unless a certificate was issued pursuant to article 11(1)[c], and that would happen
> only if the directors chose to issue one.
>
> [23] In the Board's opinion, this is an impossible construction. If it were correct, an
> essential term of both the subscription for shares and their redemption, namely the
> price, would not be definitively ascertained at the time when the transaction took
> effect, nor at the time when the price fell to be paid. Indeed, it would not be
> definitively ascertained for an indefinite period after the transaction had ostensibly
> been completed, because unless a certificate was issued it would always be possible
> to vary the determination of the NAV per share made by the directors at the time
> and substitute a different one based on information acquired long afterwards about
> the existence or value of the assets. This would not only expose members who had
> redeemed their shares to an open-ended liability to repay part of the price received
> if it subsequently appeared that the assets were worth less than was thought at the
> time. It would confer on them an open-ended right to recover more (at the expense
> of other members) if it later appeared that they were worth more. Corresponding
> problems would arise out of a retrospective variation of the subscription price long
> after the shares had been allotted. Indeed, it is difficult to see how the directors
> could perform their duty under article 9(1)(b) not to allot or issue a share at less
> than the subscription price if the latter might depend on information coming to light
> after the allotment had been made.
>
> [24] *If, as the articles clearly envisage, the subscription price and the redemption
> price are to be definitively ascertained at the time of the subscription or redemption,*

> *then the NAV per share on which those prices are based must be the one determined*
> *by the directors at the time, whether or not the determination was correctly carried*
> *out* in accordance with articles 11(2) and (3). That means either (i) that the directors'
> determination at the time must be treated as conclusive whether or not there is a
> certificate under article 11(1)[c]; or else (ii) that article 11(1)[c] must be read as
> referring to the ordinary transaction documents recording the NAV per share or the
> subscription or redemption price which will necessarily be generated and
> communicated to the member at the time, and not some special document issued at
> the discretion of the directors. The Board considers, for the reasons given below,
> that in a case where a provision for certification such as article 11(1)[c] has been
> included as part of the mechanics of subscription and redemption, the correct
> approach is the second one" (emphasis added).

29. In my view, the judge was right to regard this reasoning as applicable to the present case. It
is true that in *Fairfield Sentry* neither the Fund nor any of its agents was complicit in
Madoff's fraud, and to that extent SEB is right to say that the reasoning is not directly
applicable. Nevertheless, the practical reasons that underlie the decision in *Fairfield Sentry*
apply equally to a situation in which the NAV is affected by fraud. It is essential to the
operation of an investment vehicle such as the Company that permits investment through
the acquisition and redemption of shares that there should be certainty on a day-to day
basis as to the price at which shares are to be purchased or redeemed. It may be that, as in
the present case, the subscription price and the redemption price are largely or entirely
artificial, but it is nevertheless important that they are calculated on a consistent basis. That
is the purpose of article 34, which is to be construed as referring to a valuation purportedly
made in compliance with the articles. Otherwise, the problems identified in paragraph (23)
of the judgment in *Fairfield Sentry* will arise. It is important to note that many investors are
likely to have acquired and redeemed shares before any fraud and resulting insolvency
becomes apparent. Although those transactions will with hindsight be seen to have been
conducted on an artificial basis, the position of the investors is similar to that of investors in
a Ponzi scheme, about which Lord Sumption said in *Fairfield Sentry* (at [3]):

> "It is inherent in a Ponzi scheme that those who withdraw their funds before the
> scheme collapses escape without loss, and quite possibly with substantial fictitious
> profits. The loss falls entirely on those investors whose funds are still invested when
> the money runs out and the scheme fails".

This is not to say that fraud has no relevance. If the company is complicit in the fraud, it may entitle an investor to claim that he became a shareholder only as a result of a fraudulent misrepresentation, and claim damages in the liquidation for the difference between the price he paid and the true value of the shares he obtained. It may found a claim in conspiracy against the directors. If the company is innocent of the fraud, it may have a claim against the fraudster; and investors may have a provable claim for damages for negligence or innocent misrepresentation inducing them to acquire shares.   Whether or not the company is complicit in it, the existence of a fraud may give rise to additional remedies in a winding-up, such as that afforded by Order 12, rule 2 (which by section 112 of the Law applies only in the case of a solvent winding-up, something that the judge accepted was at least a possibility in the present case).   Apart from any remedies specific to a winding-up, such as the avoidance of preferences, however, it is not in my view permissible to reopen a NAV retrospectively on the ground of fraud, whether or not the company was complicit in it. It follows that I do not accept the suggestion in *Primeo Fund v Pearson* that conduct by the company or its agent "that has the effect of vitiating the contract with its members" will invalidate a NAV. A contract is capable of being vitiated at its inception, for example by misrepresentation; and in the sense that, whether the company was a participant in the fraud or not, an investor is likely to have a claim based on misrepresentation, the existence of a fraud may be said to be capable of vitiating the contract between the company and the investor consequent on the acquisition of shares. Redemption of shares once acquired, however, is an incident of the existing contract and brings it to an end according to its terms. It is not possible to regard it as giving rise to a new contract capable of being vitiated.  Nor is vitiation an appropriate description for a breach of contract, however severe; and it is in any event not on the face of it permissible for the company to rely on its own misconduct to terminate a contract.  There is in my view no difference between an internal and an external fraud in terms of the binding nature of a NAV: the whole scheme of the Company's articles requires its business to be conducted on the basis that the NAV is binding, whether it is accurate or not.

30.  Accordingly, I would hold that the fraud point fails.

### The 30 day point

31.  Article 55 of the Company's articles of association provided that the Company should remit redemption proceeds "within such period as the Directors shall determine". The Company's

offering memoranda stated that "Redemption payments are generally made within 30 calendar days after the Redemption Day". SEB contended that this meant that, as part of an investor's contract with the Company, the Company was allowed at least 30 days in which to make payment, and would not be in breach of contract until that period expired without payment. On that basis, the First SEB Redemption Payment could not be a preference, since the Company had at least until 30 December 2008 to make redemption payments to the December redeemers, there was no evidence that it owed money to anybody else on 19 December 2008 when the First SEB Redemption Payment was made, and accordingly there was no basis on which the court could be satisfied that the Company was unable to pay its debts on that date. [It is to be noted that this argument is not available in respect of the Second SEB Redemption Payment or the Third SEB Redemption Payment, since by the time they were made there were on any basis substantial amounts owed to the December redeemers.]

32. The judge dealt with this point primarily by reference to article 36 of the Company's articles of association, which is in the following terms:

> "The price to be paid for Participating Shares which are to be redeemed shall be deemed to be a liability of the Company from the Valuation Point on the Redemption Day until the price is paid".

He pointed out that in *Culross Global SPC Ltd v Strategic Turnaround Master Partnership Ltd* 2008 CILR 447 ("*Strategic Turnaround*") this Court held that an article containing similar wording created a provable debt owed to the redeeming investor from the redemption day. In relation to the statement in the Company's offering memoranda that redemption payments would generally be made within 30 calendar days, and an alternative submission from SEB that in the absence in articles 36 and 55 of a specified time for payment a reasonable time would as a matter of general law be implied, he referred to *Strategic Turnaround* in the Privy Council (2010 (2) CILR 364. In *Strategic Turnaround*, the relevant provisions were that the price payable for redeemed shares should be deemed to be a liability of the company from close of business on the redemption day until the price was paid, and that redemption proceeds would be remitted within such period as the directors should determine. Lord Mance, delivering the opinion of the Board, said this (at [20]):

> "The focus of these provisions is on the redemption date, by reference to which the redemption price payable is crystallised and from which the price is deemed to be a liability of the respondent. The remittance of the "redemption proceeds" is treated

as a matter of supplementary procedure, although it may be refused on particular money-laundering grounds. Both stages may be said to be part of a continuing process, but it does not follow that "redemption" within the meaning of arts. 55 and 32 only occurs at the conclusion of that whole process".

The judge then said this (at [110]):

"In my view much the same can be said here. The allowance of a grace period of 30 days for redemption payments was a purely practical measure to allow the orderly payment of sums which had become due on the redemption date. It had no legal bearing on the liability which arose at that date. Subsequent payment in accordance with the grace period was, mirroring the words of Lord Mance, no more than a matter of supplementary procedure. Nor is there any need, as suggested by Mr Chivers [for SEB], to consider implying terms as to payment."

33. On appeal, SEB's primary contention was that the judge had misinterpreted *Strategic Turnaround*: that case did not decide when redemption proceeds became due and payable but merely whether the company had the power to suspend redemptions after the relevant redemption date had passed. In particular, the passages from Lord Mance's judgment on which the judge relied were not intended to identify when the redemption proceeds became due and payable but rather the point at which redemption occurred, after which point it would be impossible to suspend the redemption process. By treating the 30 day grace period as purely a practical measure, the judge had deprived the Company of any benefit of that period. To hold that the redemption proceeds became due on the Redemption Day meant that the Company would be in breach of contract if it did not pay them then, despite the intention that it should have a further period to allow for orderly payment. The judge should have construed the articles and the offering memoranda together or, if he was not prepared to do so, should have recognised that on ordinary principles a reasonable time for payment was to be implied into articles 36 and 55. If the grace period was available to the Company, nothing was due to the December redeemers at the date of the First SEB Redemption Payment, and the Company was not insolvent. That SEB had received the First SEB Redemption Payment before it could legally have insisted upon its payment did not alter that fact.

34. In my view, the judge was right to regard this issue as concluded by *Strategic Turnaround*. In that case, a redeeming shareholder petitioned to wind up the company on the ground of

non-payment of the redemption price. The company applied to strike out the petition,
asserting that between the redemption date and payment the company had validly
suspended redemptions, with the result that there was no present debt due to the
petitioner capable of founding the petition. The Grand Court refused to strike out the
petition, holding that the petitioner had become a creditor on the redemption date and the
purported suspension had been beyond the company's powers. This Court allowed an
appeal on the basis that the suspension had been valid, but upheld the Grand Court's
decision that the petitioner had become a creditor on the redemption date. The Privy
Council restored the Grand Court's decision. Thus all three courts held that the petitioner
became a creditor on the redemption date, with an immediate right to present a petition,
the difference in outcome depending on the effect of the purported suspension. It is in that
light that paragraph [42] of this Court's decision, relied on by SEB in relation to the future
debts point, is to be viewed. That paragraph is in the following terms:

> "For these reasons, therefore, it seems to me that the respondent did not have the
> locus standi to petition on the "unable to pay its debts" ground as a creditor with a
> future debt. The respondent's debt was one that was not presently due and payable.
> It had been suspended under the articles and the CEM for an indeterminate period.
> Plainly, Mr McDonough is right in saying that the debt still exists, even if it has been
> validly suspended. But it is not presently due and payable in the sense that it is a
> debt "for which a creditor may go at once to the company's office and demand
> payment." Mr McDonough can also validly say that, under the Insolvency Rules, r.
> 12.3, a future debt is provable in the liquidation. That does not, however, make the
> debt automatically capable of founding a valid creditor's petition."

This paragraph is to be contrasted with paragraphs [23] to [25] of this Court's judgment,
dealing in terms with the date on which the petitioner became a creditor. The conclusion on
that issue, expressed at [25], was as follows:

> "I am, therefore, entirely satisfied that Smellie, C.J. was right to hold (as I believe he
> did) that the respondent became a creditor of the company on March 31, 2008 in
> the amount of the redemption value of the redemption shares that was yet to be
> quantified. It is wrong, in my judgment, to suggest that there was no debt until April
> 30, 2008, relying on the terms of the CEM that make 90% of the debt payable on
> that date. The respondent was, as Smellie, C.J. held, a creditor on March 31 by virtue
> of the clear provision of art. 53" [deeming the redemption price to be a liability of
> the company from the redemption date until payment].

35. In paragraph [1] of the opinion of the Privy Council, Lord Mance identified the issue as follows:

> "Whether the petition was an abuse of process depends upon whether, at the date of its issue, the appellant was a current creditor, with standing to issue it, or at best only a prospective creditor, in which case it would have no such standing".

Accordingly, paragraph [20] of Lord Mance's judgment, quoted by the judge and set out in paragraph 32 above, involves a clear rejection of the proposition that a statement in an offering memorandum or similar document indicating when payment of a redemption price would be made does not prevent an immediate liability arising – as, indeed, article 36 expressly provides. The judge was in my view correct to treat what SEB described as the period of grace as merely a practical matter, and correct to hold that the redemption prices due to the December redeemers fell due on 1 December 2008. Those amounts were accordingly properly taken into account by him for the purpose of determining whether the Company was insolvent at the date of the First SEB Redemption Payment. I would hold that the 30 day point fails.

## The future debts point

36. The future debts point arises out of paragraph [113] of the judgment under appeal, in which the judge said this:

> "In point of fact, however, Mr Lord [for the JOLs] contends that it does not matter whether or not those debts are regarded as payable on 31 December 2008 or on 1 December 2008, as long as the Court is satisfied that on 19 December 2008, on the balance of probabilities, the Company would not have been able to pay all of the 1 December 2008 redemptions on 31 December 2008. It is submitted that the evidence amply demonstrates that the Company on 19 December 2008 had no prospect of being able to pay all the 1 December 2008 redemption payments on 31 December 2008. I have no hesitation in accepting this to be the position."

SEB contends that the judge was wrong to treat the Company as having been insolvent at the date of the First SEB Redemption Payment because it had no prospect of paying debts that did not become due until the end of the same month.

37. Because this was merely an alternative basis for rejection of the 30 day point, and I have indicated that I consider that the judge's primary basis for rejection of that point, namely

that the amounts due to the December redeemers fell due on 1 December 2008, was correct, I can deal with the future debts point shortly.

38. SEB contended, rightly, that *Strategic Turnaround* in this Court had established that the test of solvency in the Cayman Islands was the cash flow test, approving *In re European Life Assurance Society* (1869) L R 9 Eq 122 and quoting the headnote in the Law Reports as follows:

> "The Court will not order a company to be wound up under the just and equitable clause by reason of any liabilities not immediately payable unless it is reasonably certain that the existing and probable assets will be insufficient to meet the existing liabilities, and will not in any case take into account the possible liabilities or profits which may accrue in respect of future business".

SEB asserted that this was to be contrasted with the position in England and Wales, where insolvency could be proved by reference to the balance sheet test. Further, in England and Wales the cash flow test was differently expressed, requiring proof to the satisfaction of the court "that the company is unable to pay its debts as they fall due". The words "as they fall due", which do not appear in the Cayman legislation, introduced an element of futurity; without them, insolvency had to be assessed by reference to debts that were immediately due and payable. However, if it was right to take into account future debts, it was also necessary to take into account future assets; and there was no evidence as to the Company's ability to raise finance to meet the December redemptions.

39. The JOLs contended that the additional words "as they fall due" merely made express what was inherent in any cash flow test, including that applicable in the Cayman Islands. Any such test required a flexible and fact-sensitive approach to the question of a company's ability to pay its debts. They referred to the statement of Lord Walker in the UK Supreme Court decision *BNY Corporate Trustee Services Ltd v Eurosail-UK 2007-3BL plc* [2013] 1 WLR 1408 ("*Eurosail*") at [37] that "the cash-flow test is concerned, not simply with the petitioner's own presently-due date, nor only with other presently-due date owed by the company, but also with debts falling due from time to time in the reasonably near future. What is the reasonably near future, for this purpose, will depend on all the circumstances, but especially on the nature of the company's business"; and they pointed out that in that case the decision in *In re European Life Assurance  Society* had been criticised.

40. In my view, the cash flow test in the Cayman Islands is not confined to consideration of debts that are immediately due and payable. It permits consideration also of debts that will become due in the reasonably near future. The approval of *In re European Life Assur. Socy.* by this Court in *Strategic Turnaround* does not prevent that conclusion: that case was primarily concerned with winding up on the just and equitable basis, not on the basis of inability to pay debts; and the headnote quoted by this Court refers to debts resulting from future business, not to future debts resulting from existing business.  Nor does paragraph [42] of this Court's judgment in *Strategic Turnaround* (quoted in paragraph 34 above) suggest otherwise. If, as this Court erroneously thought, the suspension of redemptions was valid, the petitioner's debt would not be payable for an indeterminate period; and if the period could not be determined it was impossible to say that the debt would fall due in the reasonably near future. I do not regard the words "as they fall due" as adding anything of substance. In *Eurosail*, Lord Walker, after noting that the words "as they fall due" were introduced for the first time in the Insolvency Act 1985, said (again at [37]) that despite the difference in form they made little significant change in the law and served to underline that the cash flow test was concerned both with presently-due debts and with debts falling due in the reasonably near future. Any other conclusion leads to artificiality: if a company is able to pay a small debt due on a particular day, but will inevitably be unable to pay a much larger debt due on the following day, it is artificial to say that on the first day it is not unable to pay its debts. As to SEB's suggestion that there was no evidence about the Company's ability to finance the December redemptions, the fact is that no such finance was obtained, and it is a proper inference that none was available.  I would hold that the future debts point fails.

*The Preference Issue*

41. A further condition of the application of section 145 (1) of the Law is that the payment said to be a preference is made to a creditor "with a view to giving such creditor a preference over the other creditors".

42. The judge approached this part of the case by first identifying the relevant legal principles. He referred extensively to English authority, much of which had been summarised in this jurisdiction by Smellie CJ in *RMF Market Neutral Strategies (Master) Ltd v DD Growth Premium2X Fund* [2013] 2 CILR 361; and at the end of that summary he said this (at [170]):

> "In the end all this analysis leads back to *DD Growth*. Applying those principles, it is
> plainly necessary, in my view, for the JOLs to prove to the satisfaction of the Court
> that the redemption payments were made with the intention of preferring SEB over
> other creditors. It is competent for the Court to draw the inference of an intention
> to prefer from all the facts of the case. However, the intention to prefer, which must
> be proved, must be the principal or dominant intention. There is no mention, in the
> final analysis by the Chief Justice, of there being a need for evidence of dishonesty,
> which is understandable in that the relevant statutory provision has moved away
> from fraudulent preference to voidable preference. But in reaching his conclusions
> the Chief Justice did appear to accept that the dominant intention must be to prefer
> a particular creditor, although I see no reason why that could not be a class of
> particular creditors."

SEB takes issue with only one element of this analysis, namely the implicit rejection of the
need to find some evidence of dishonesty. I refer to this as the Dishonesty Point.

43. At [117] of the judgment, the judge identified what he described as the critical point of
difference between the parties, namely "whether payment of the redeemers in the
knowledge that the Company was unable to pay its debts is of itself sufficient (in the
absence of any other explanation such as pressure) to infer objectively the necessary
intention of preference or whether there must be proof of something more, specifically a
subjective dominant intention to prefer particular creditors over others". In the end, having
decided that the Company had a specific intention to prefer SEB, the judge came to the
conclusion (at [188]) that it was not necessary for him "to decide whether, absent such
specific intention, the required intention of preference can be inferred objectively from the
fact of such payments being made when the Company was commercially insolvent". This
conclusion is challenged in a Respondents' Notice filed by the JOLs. I should record that, in
the course of the hearing of this appeal, we received a letter from Maples and Calder dated
18 April 2016 referring to the fact that the issue raised in the Respondents' Notice was due
to be litigated against other redeemers in the Grand Court at the instance of the JOLs, and
suggesting that we should defer consideration of it.

44. The judge then considered whether there was evidence of a specific intention to prefer SEB
in relation to the First SEB Redemption Payment. He referred to an e-mail sent by Magnus

Peterson to the Company's administrators (PNC) on 17 December 2008, which was in the
following terms:

> "Hi Gillian,
>
> We have a few Swedish investors that have switched into our SEK based Fund as
> at 1st December.
>
> We need to pay them value tomorrow please.
>
> On the attached spreadsheet I have highlighted those investors in yellow. It is
> approximately US$7.6 million that needs to be paid.
>
> SEB are sending funds today to PNC so there should be no problem executing it.
>
> Best regards
>
> Magnus".

The reference in that e-mail to SEB sending funds is explained by the fact that, quite
separately from its capacity as shareholder, SEB provided clearing and brokerage services to
the Company. However, one of the investors highlighted in yellow on the spreadsheet was
"SEB Merchant Banking as nominee for Catella Stiftelsefond"; although it appears that in fact
SEB never subscribed for, or expressed an interest in subscribing for, shares in the Swedish
fund on behalf of Catella, HQ Solid or anyone else. At [179], the judge expressed his
conclusion on this topic as follows:

> "I find on the evidence that there was an intention to pay the Swedish Redeemers
> on the basis that they were investors, or potential investors, in the Swedish fund.
> The fact that there may have been a mistake about this matters not. What does
> matter is the subjective intention of Magnus Peterson in acting, as I have found, as
> the Company's controlling mind. The intention appears to have been a principal or
> dominant intention to prefer a particular class of creditors. This resulted in a
> preference in fact of a particular creditor".

SEB challenges this conclusion on the basis that, in the absence of any direct evidence from
Magnus Peterson as to how the mistake had occurred, it was equally plausible that he had
simply highlighted the wrong investor and had never had any intention to prefer SEB. I refer
to this as the Mistake Point.

45. In relation to the Second SEB Redemption Payment, the judge said this (at [181-182]):

> "The question which has occurred to me is whether the intention in relation to the
> first payment continued beyond then. There is evidence that it did because of the
> email of 20th January 2009, when Magnus Peterson selected for payment three

more Swedish investors who were said to have switched into the Swedish fund. This was actually after the Second SEB Redemption Payment. It is also right to note that after the First SEB Redemption Payment (which resulted in payment in full to SEB as nominee for Catella) there was no specific mention of paying SEB as nominee for HQ Solid. However, nor is there anything to suggest that any distinction was made in the mind of Magnus Peterson as to the different capacities in which SEB was acting. The evidence rather indicates that there was a continuing general intention on his part to make preferential payments to the various Swedish Redeemers (SEB included) as a class thought, rightly or wrongly, to be re-investors in the Swedish fund.

The matter does not rest there. There is also the point that the Second SEB Redemption Payment appears to have been made with the intention of complying with the policy set out in the 31st December 2008 letter. That policy arguably had the effect of reinforcing the decision which had been made to pay SEB, resulting in a preference over other creditors. Thus it appears that in the absence of any other explanation for the Second SEB Redemption Payment (and there is none) that it was made with a view to prefer SEB."

The e-mail of 20 January 2009 was a further request from Magnus Peterson to the Company's administrator, saying: "Just like last month we have 3 Swedish investors who have switched into our SEK based Fund. We need to pay them tomorrow please". SEB was not one of the investors referred to. The letter of 31 December 2008, which was not in fact sent until 7 January 2009 but represented a decision made by Magnus Peterson at the end of December 2008, notified investors that "in order to effect an orderly liquidation of the Fund's assets to meet the requested redemptions, the directors have decided to pay at the end of this month 25% of all redemptions requested at the end of November on a pro-rata basis. The remaining redemption amounts will be paid out in one or more instalments as market conditions improve as the directors in their absolute discretion determine, and the directors envisage this improvement will take place by the end of January".

46. In relation to the Third SEB Redemption Payment, the judge said this (at [184]-[186]):

"Nor is it right that the Third SEB Redemption Payment rests solely upon the effect of preference. It can be taken to have been paid pursuant to what I have found to be a continuing general intention to make preferential payments to the particular Swedish Redeemers as a class.

It may well be, as pointed out by Mr. Chivers, by reference to the relevant schedule previously referred to, that in the meantime various other redeemers had in fact been paid ahead of SEB. The reasons for this are not presently apparent and may well have to be investigated in the context of any claims pursued in relation to other preferences of these particular redeemers. But none of this detracts from the intention which there appears to have been to make the preferential payment to SEB.

Moreover, if an inference is to be drawn, there appears to be nothing here to displace the "inference of intention" in the analysis of Lord Evershed MR in *Re Cutts*. The same can be said of the Second SEB Redemption Payment. Additionally, it appears from the Board Minutes of the 22nd February 2009 that the payment may have been made pursuant to an intentional policy to prefer smaller investors over larger investors. Again this may have had the effect of reinforcing the decision which had been taken to pay SEB. The policy was one which could lead to the recipients being preferred over the other investors who had redeemed but were not paid in full or were not paid at all."

The schedule there referred to demonstrated that other redeemers had received their payments in full before SEB. The Board Minutes included the statement that "where one redemption request is of such a size that it can only be satisfied in a number of payments or in one deferred payment (a "Large Redemption"), the Directors may satisfy all other contemporaneous or prior redemption requests in full before paying the redemption proceeds for the Large Redemption in order best to protect the Net Asset Value of the Fund and the interests of the remaining Shareholders".

47. The reference to *Re Cutts* [1956] 1 WLR 728 is to the following passage:

"For if a debtor deliberately selects for payment A in preference to all his other creditors, it cannot, to my mind, matter, in the absence of other relevant circumstances, whether A is the debtor's oldest friend, closest relative or best client. On the other hand, where a debtor, owing money in all directions, has also robbed his employer's till, he may, knowing himself to be insolvent, elect to reimburse the till in order that, when the crash comes, the damaging fact of his robbery may not be discovered. Or a debtor may elect to make a particular payment under pressure of some threat, or to obtain for himself some immediate and material benefit or to fulfil some particular obligation. In these cases the reason for the payment affects,

essentially, the intention in making it. In the instances given the intention, that is the real dominant intention, will no longer be to "prefer" (that is to pay, as it were, out of turn) but will be to avoid the detection of a criminal act; to relieve the threat; to get the benefit and postpone the evil day; or to satisfy the particular obligation. Though the question of pressure in some form or another has, in the reported cases, often been the crux of the matter, it is plain that an inference of intention to prefer may be displaced in many other ways than by showing that the debtor acted under pressure. Examples are indeed legion. But in the present case the examples that I have given provide the closest analogies to the suggestions on the society's side; and the real question before us is whether, upon the evidence and the findings of the county court judge, the true inference is intention to prefer or whether an inference of some other kind similar to those in the examples given is, at the least, not equally legitimate."

48. Finally, at [187], the Judge summarised his views as follows:

"I am satisfied that each of the SEB redemption payments was made with the principal or dominant intention of preferring SEB as a member of a particular class of creditors, the Swedish Redeemers. Here there was not mere selection, but the added dimension of conscious decision making resulting in particular selection for payment. This was clearly the case, in my view, in relation to the First SEB Redemption Payment. It is less clear in relation to the Second and Third SEB Redemption Payments, although, on balance, I think that it is reasonable to draw the inference that these further payments were made as part of a continuing general intention to make preferential payments to the Swedish Redeemers. Furthermore, the intention in this regard appears to have been reinforced by particular decision making in relation to the payments."

49. SEB challenges these conclusions on the ground that there was no evidence to support the judge's inference of a "continuing general intention" to prefer SEB. The First SEB Redemption Payment related to shares held by SEB as nominee for Catella, whereas the Second SEB Redemption Payment and the Third SEB Redemption Payment were in respect of shares held as nominee for HQ Solid, and there was nothing to suggest that Magnus Peterson thought that SEB in its capacity as nominee for HQ Solid would reinvest in the Swedish fund. There was uncontested evidence that SEB was obliged to act on the

instructions of its nominee, so that the judge could not properly have concluded that an intention to prefer SEB as nominee for Catella had any relevance to an intention to prefer SEB as nominee for HQ Solid. Moreover, the Second SEB Redemption Payment and the Third SEB Redemption Payment were made after substantial payments had been made to other investors, and there was no evidence of intention to prefer in relation to those investors; and SEB was not preferred in the application of the Company's policy to pay 25% of liabilities immediately and the balance later. I refer to these contentions as the Continuing Intention Point.

50. SEB also contends that the judge, when deciding whether SEB was preferred over other creditors, ought to have concluded that the only relevant creditors were current creditors with debts that were already due and payable, not future creditors. There is nothing in this point. At [196], the judge stated that he did not need to decide whether he could take future creditors into account. That was because he had already concluded that the amounts due to redeeming shareholders were liabilities of the Company from the redemption date; and, as I have said, in my view he was right to do so. On that basis, he identified at [197] the creditors over whom SEB was preferred by the First SEB Redemption Payment as being the other December redeemers who received no payment on 19 December 2008; those over whom SEB was preferred by the Second SEB Redemption Payment as being the unpaid December redeemers and all the January 2009 redeemers; and those over whom SEB was preferred by the Third SEB Redemption Payment as being the unpaid December redeemers and all the January 2009 and February 2009 redeemers. Those creditors were all current creditors at the date of the relevant SEB Redemption Payment.

51. By amendment to the Grounds of Appeal SEB also contended that, if it succeeded in relation to the Second SEB Redemption Payment and the Third SEB Redemption Payment but would otherwise fail in relation to the First SEB Redemption Payment, the First SEB Redemption Payment was nevertheless not liable to be set aside. That was because if the payment had not been made on 19 December 2008 it would have been paid in the ordinary course of payments made to the December redeemers during January 2009, and consequently would not have been a preference. The point is based on *Lewis v Hyde* [1997] BCC 976. I refer to it as the Amendment Point.

The Dishonesty Point

52. It is SEB's contention that it is necessary that an intention to prefer within section 145 (1) of the Law should carry with it a "taint of dishonesty". That contention is based upon the decision of the English Court of Appeal in *Re Kushler Ltd* [1943] 1 Ch 248, in which Lord Greene MR said the following (at p252):

> "The statute is directing the court to ascertain the state of mind of the payer in relation to a particular transaction. A state of mind is as much a fact as a state of digestion and the method of ascertaining it is by evidence and inference, and I can see nothing in the language of the section which justifies the view that the problem which the legislature sets the court is to be dealt with on any principles different from those commonly employed in drawing inferences of fact. It must, however, be remembered that the inference to be drawn is of something which has about it, at the least, a taint of dishonesty, and, in extreme cases, much more than a mere taint of dishonesty. The court is not in the habit of drawing inferences which involve dishonesty or something approaching dishonesty unless there are solid grounds for drawing them."

This passage does not bear the weight SEB seeks to place on it. It does not say that a payment can be a preference only if it is made dishonestly; and neither section 145 (1) of the Law nor the equivalent English legislation contains any requirement of dishonesty. What the passage appears to me to be doing is to make explicit the element of legislative disapproval that is implicit in a provision intended to avoid preferences. The idea underpinning insolvency legislation is that limited assets should be shared pari passu among the creditors, so that each bears a share of the loss that corresponds to the proportion that his debt bears to the total indebtedness. Preferring one creditor over the others means on the face of it that the preferred creditor suffers no loss, and the other creditors suffer more than their proportionate share. That subverts the principle of pari passu distribution; and intentionally giving an advantage to one creditor is something that is to be frowned on. It is perhaps not surprising that in 1943, when the relevant legislation still spoke of a "fraudulent" preference, this disapproval was regarded as akin to dishonesty (although it was well-established by then that fraud in its ordinary meaning was not necessary to bring a preference within the legislation: see for example *Re Patrick and Lyon Ltd* [1933] 1 Ch 786, 790); but in my view it is a misdescription of the disapproval implicit in section 145 (1) of the Law. I would hold that the Dishonesty Point fails.

The Mistake Point

53. The Mistake Point arises out of the fact that Magnus Peterson appears to have been mistaken in identifying SEB (in its capacity as nominee of Catella) as an intending investor in the Swedish fund. To my mind, this is irrelevant. The e-mail of 17 December 2008 and the accompanying highlighted spreadsheet show precisely why the First SEB Redemption Payment was made. It was because Magnus Peterson wanted early payment to be made to a particular class of redeemers, and he identified SEB as a member of that class.   His direction to PNC was the cause of the payment to SEB. It is merely speculation that he might have intended some other investor to benefit; the fact of the matter is that he identified SEB as a person to whom payment should be made in priority to other creditors. It is impossible to suggest that his expressed intention was not the operative one. I would hold that the Mistake Point fails.

The Continuing Intention Point

54. The judge found in terms (at [187]) that "each of the SEB redemption payments was made with the principal or dominant intention of preferring SEB as a member of a particular class of creditors, the Swedish Redeemers". That conclusion is not challenged by SEB in relation to the First SEB Redemption Payment (except by reference to the Mistake Point, which I have already said should be rejected); but it is challenged in relation to the Second SEB Redemption Payment and the Third SEB Redemption Payment. As I have indicated, SEB contends that there was nothing to suggest that Magnus Peterson regarded SEB, in its capacity as nominee for HQ Solid, as a Swedish Redeemer; the Second SEB Redemption Payment and the Third SEB Redemption Payment were made after substantial payments had been made to other investors; and SEB was not preferred in the application of the Company's policy to pay 25% of liabilities immediately and the balance later.

55. In my view, there was insufficient material to enable the judge to infer a dominant intention throughout to prefer SEB on the grounds that it intended, as Magnus Peterson appears to have believed, to invest in the Swedish fund. Whilst that plainly was, as I have said, the reason for the First SEB Redemption Payment, it cannot be said to be the case in respect of either of the Second SEB Redemption Payment or the Third SEB Redemption Payment. That is partly because, although SEB was the registered shareholder in respect of all the shares it held, the company and Magnus Peterson understood that it held some of those shares as nominee for Catella and some of them as nominee for HQ Solid. That understanding is particularly evident in the highlighted spreadsheet that, with the e-mail of 17 December

2008, provided the instruction for the First SEB Redemption Payment, where SEB was specifically referred to as nominee for Catella. As SEB contends, there is no reason to suppose on the evidence that Magnus Peterson can have thought that SEB in its capacity as nominee for HQ Solid intended to invest in the Swedish fund. Indeed, the e-mail of 20 January 2009 suggests the contrary: on the face of it, there was an intention to prefer the investors named in that e-mail, but SEB was not one of them. The judge pointed out that by the time of that e-mail the Second SEB Redemption Payment had been made; but, whilst that is true as a matter of fact, it is at best neutral for the purpose of establishing a continuing intention to prefer SEB as a Swedish Redeemer. Moreover, there was no evidence to indicate that the redeemers who had received payment in full before SEB did so because they were understood to be intending to invest in the Swedish fund; indeed, the judge described the payments to them as having been made seemingly on an ad hoc basis. But the absence of that evidence, or evidence of some reason for those payments which did not conflict with the idea of an intention to prefer Swedish investors, calls into question the hypothesis of such a continuing intention. In truth, all the evidence establishes is that Magnus Peterson intended to give preference to redeemers intending to transfer to the Swedish fund; but, except in relation to the First SEB Redemption Payment, there is nothing to indicate that he regarded SEB as such a redeemer.

56. The matter does not, however, end there. The judge did not rely only on an intention to prefer Swedish Redeemers: he said (again at [187]) that "the intention in this regard appears to have been reinforced by particular decision making in relation to the payments". He was referring to the policy set out in the letter dated 31 December 2008 of paying the December Redeemers 25% initially and the balance later, and that set out in the board minutes dated 22 February 2009 of giving priority to redemptions that were not "Large Redemptions". Although the judge regarded these merely as reinforcing his view that the payments to SEB were made pursuant to a policy of giving preference to investors in the Swedish fund, it seems to me that the letter dated 31 December 2008 at least has a significance of its own. By the time the Second SEB Redemption Payment, representing 25% of the amount outstanding, was made on 2 January 2009, the sums due to the January Redeemers had already fallen due and notice of redemption had been given by the February Redeemers. The judge found that Magnus Peterson knew that the Company had no prospect of paying the January Redeemers and the February Redeemers in full. The proper course would have been to suspend redemptions (if that were by then possible) or liquidate the Company.  He

nevertheless caused the Company to adopt a policy designed to allow the December redeemers to be paid before other redeemers. The Second SEB Redemption Payment and the Third SEB Redemption Payment were made pursuant to this policy, and had the intended effect of preferring SEB (as one of the class of December redeemers) over the body of January redeemers. SEB says that it was not preferred in the application of the policy, but that does not answer the point. Although the policy may have been applied consistently in relation to the December redeemers, so that SEB gained no advantage over them, it did give SEB an advantage over the January redeemers and (in the case of the Third SEB Redemption Payment) over the February redeemers, all of whom were to the knowledge of Magnus Peterson unlikely to be paid. That is in my opinion sufficient to justify the judge's conclusion of a specific intention to prefer. As the judge recorded at [78], SEB did not put pressure on the Company to pay, or even request payment after giving notice of redemption, so there was nothing to displace the inference that SEB was paid pursuant to that intention. Accordingly, although for slightly different reasons from those expressed by the judge, I would hold that the Continuing Intention Point fails.

57. That conclusion deals to some extent with the Respondents' Notice, which made specific reference to the letter dated 31 December 2008 and the February 2009 board minutes. I do not, however, find it necessary to address the more general question raised by the Respondents' Notice, namely whether the fact of payment in knowledge of insolvency is sufficient without more to found an inference of intention to prefer. In light of the letter from Maples and Calder to which I have referred, I also think it would be undesirable to do so.

The Amendment Point

58. The Amendment Point is expressly contingent on SEB having succeeded in relation to the Second SEB Redemption Payment and the Third SEB Redemption Payment. Since it has not, it is not necessary to consider the point further.

*The Repayment Issues*

59. The Repayment Issues related to the judge's rejection of SEB's analysis that the remedies available in a case to which section 145 (1) of the Law applied were common law remedies, to which common law defences such as the absence of unjust enrichment, and change of

position, applied; and his rejection of SEB's contention that the JOLs' claim was founded on illegality and was contrary to public policy.

60. The judge dealt with these matters at [200] to [245] of his judgment. At [211], and again at [218], he held that common law defences were not available to a statutory claim under section 145 (1) of the Law, and at [212] he said this:

> "Mr Lord [for the JOLs] submits, and I accept, the absence of any discretion built into the section reflects the policy behind it of restoring value to the company for the benefit of its creditors which overrides the common law rules on unjust enrichment and change of position as between parties to a private transaction. The cause of action derives from the section itself: pursuant to statute the payment is invalid, therefore, the recipient is obliged to repay what he received. There is no question of having to consider unjust enrichment, rather the recipient has received something he should not have received and is obliged to pay it back."

At [219] and [229], he held that SEB had not in any event made out a defence of change of position on the facts: SEB was always a nominee, and passing the redemption payments to Catella and HQ Solid did not amount to a change of position; and such indemnity as SEB had was, on the evidence, unaffected by that payment or by events that occurred subsequently. As to illegality and public policy, the judge said (at [244]):

> "There is a compelling reason why the NAV must stand to allow recovery of redemption payments made in accordance with it which are found to be invalid. The public policy, in my view, is very much in support of such recovery, rather than against it."

61. SEB challenged these conclusions on the ground that section 145 (1) said nothing about the legal basis for recovering a preference, and the judge should have held that the appropriate remedy was a common law claim in unjust enrichment; that he should have recognised the existence of a change of position defence to a preference claim; that he was wrong as a matter of fact to reject the change of position defence; and, in relation to illegality and public policy, on the ground that –

> "Contrary to the Judge's view, the JOLs' claims were based on fraud: those claims were founded on an allegation that other creditors were themselves entitled to a pari passu share of funds which were, by reason of Magnus Peterson's fraud,

> extracted from the Company. The judge ought to have held that it was repugnant to
> public policy to allow those claims."

62. In oral argument, SEB pointed out that section 145 (1) of the Law merely avoids a
preference, whilst saying nothing about the consequence of avoidance. Since the statute did
not provide an explicit remedy, the only way in which the JOLs could recover the payments
was by asserting a restitutionary remedy. The policy behind the section, namely to restore
value to a company for the benefit of its creditors, was the same as the policy behind
provisions avoiding transactions designed to defraud creditors; but in the latter case the
possibility of a change of position defence was recognised: see the English High Court
decision of *Rose v AIB Group (UK) plc* [2003] 1 WLR 2791. Moreover, in a further English High
Court decision, *Charles Terence Estates Ltd v The Cornwall Council* [2011] EWHC 2542 (QB)
local councils failed to recover payment of rent made under leases that were void against
them (because they had been entered into in breach of fiduciary duties to council taxpayers)
on the grounds that the landlords had a common law defence of change of position. This
demonstrated that the fact that there were public policy reasons for invalidating a payment
did not prevent an innocent recipient from relying on a change of position defence.

63. In response, the JOLs contended that a claim under section 145 (1) of the Law was not part
of the common law of restitution or unjust enrichment, but was a long-standing part of the
statutory law of insolvency aimed at protecting the interests of all creditors. It followed that
the claim was not based on a creditor's unjust enrichment, but on vindicating the statutory
regime for the benefit of all creditors. They referred to the following statement of Lord
Browne-Wilkinson in *Lewis v Hyde* [1997] BCC at 979:

> "The effect of the section, if applied, is to require the preferred creditor to repay
> what he has received, the monies recovered being applicable pari passu between
> the creditors in the liquidation. The underlying purpose is to ensure compliance with
> the basic principle of insolvency law, viz. pari passu distribution of the insolvent
> estate."

They also made reference to the decision of the Court of Appeal of Alberta on provisions
(which, unsurprisingly but unfortunately, were not set out in the report) of the Canadian
Bankruptcy and Insolvency Act, *Principal Group v Anderson* (1997) 147 DLR 4th 228, 231-4,
the effect of which (as summarised in the headnote) is as follows:

"The defence of change of position does not apply to statutory proceedings such as those set out in the Act, which impose a duty on the trustee to treat all creditors equally and to collect the property of the bankrupt. These duties are incompatible with the defence of change of position."

64. In my view, it is implicit in section 145 (1) of the Law that, where the conditions of that section are satisfied, a preferential payment is automatically avoided and it (or its equivalent) is to be returned. The section makes the payment invalid without more, leaving no room for the possibility that a change of position defence might cause it not to be invalidated at all. Any other conclusion would be at odds with the underlying purpose of the section identified in *Lewis v Hyde*. Although it is not necessary to decide the point, I would expect the same principle to apply to a case of a transaction in fraud of creditors, and accordingly I do not regard *Rose v AIB Group (UK) plc* as a reliable guide to the construction of section 145 (1). In my view, the judge was right to reject the possibility of common law defences.

65. I also consider that he was entitled to conclude that, as a matter of fact, the claimed defences were not available to SEB. SEB was the Company's shareholder, regardless of the capacity in which it held shares. By receiving the SEB Redemption Payments when it should not have done, it was – as between itself and the Company – unjustly enriched. It claims to have changed its position by paying the proceeds to Catella and HQ Solid in circumstances where it now has no ability to recover them; but the position in fact was that it paid them over on terms that included contractual indemnities. The deterioration in SEB's position stems not from its payment of the proceeds but from the fact that the indemnities have, according to the evidence, always been worthless. SEB's failure to procure a valuable indemnity or otherwise protect its position cannot be said to amount to a change of position sufficient to afford a defence to the preference claim.

66. So far as questions of illegality and public policy are concerned, it appears to me that the policy underlying section 145 (1) again prevents them arising. The relevant public policy is that underpinning the whole insolvency regime, namely the necessity to procure pari passu distribution of available assets; and it is difficult to see what type of illegality would prevent a liquidator taking advantage of the preference avoidance provisions. In any event, however, I consider that SEB mischaracterises the position. As explained in paragraph 86 of its skeleton argument, SEB's contention was as follows:

> "Contrary to the judge's view, the JOLs' claims to recover the three SEB Redemption Payments were founded on Magnus Peterson's fraud. This was because the JOLs' claims were to recover the proceeds of that fraud not for the benefit of the company (the victim of the fraud) but, rather, for the benefit of unpaid redeeming shareholders. Put shortly, the JOLs' claim was to deprive one beneficiary of the fraud (SEB) of the proceeds of the fraud for the purpose of distributing such proceeds among other beneficiaries (the unpaid redeemers)".

Whoever the beneficiaries of the fraud were (and they will have included Magnus Peterson, at least until his imprisonment, and shareholders who managed to redeem at inflated NAVs more than six months before the commencement of the liquidation), they do not include unpaid redeemers. They will have suffered from the fraud by acquiring their shares at inflated prices, and will not have been able to extricate themselves. What available assets there are will have to be distributed pari passu amongst them, and for that purpose it is immaterial whether they prove by reference to the inflated redemption values which they expected to receive but did not, or by reference to some revised NAV – at least so long as there is consistency among them. By contrast, however, SEB is (as it acknowledges) currently a beneficiary of the fraud, having received redemption payments by reference to the inflated NAV; and, to the extent that anyone is relying on illegality, it is SEB by asserting its entitlement to retain the inflated redemption values. I would hold that the Repayment Issues are to be resolved against SEB.

67. For the sake of completeness, I should record that the illegality point was argued on the basis of the law as it was understood prior to the United Kingdom Supreme Court decision in *Patel v Mirza* [2016] UKSC 42; [2016] 3 WLR 399.  Having regard to the way in which I consider the point is to be resolved, nothing turns on this.

*Conclusion*

68. For the reasons I have given, which largely coincide with those set out by the judge in his commendably clear and comprehensive judgment, I would dismiss this appeal.

**MORRISON JA**:

69. I agree.

**FIELD JA**:

70. I also agree.



# TAB 80

**Socimer International Bank Limited (in liquidation) v. Standard Bank London Ltd**

Case No: 2007/0534

Court of Appeal (Civil Division)

22 February 2008

**[2008] EWCA Civ 116**

**2008 WL 371088**

Before: Lord Justice Laws Lord Justice Rix Lord Justice Lloyd Date: 22/02/2008, Hearing dates: 11-14 December 2007

**Analysis**

On Appeal from the Honourable Mrs Justice Gloster DBE

2003 Folio 344

**Representation**

• Mr Richard Millett QC & Mr Iain Quirk (instructed by Messrs Allen & Overy LLP ) for the Claimant/ Respondent.
• Mr Stephen Auld QC (instructed by Messrs Jones Day ) for the Defendant/Appellant.

**Judgment**
Lord Justice Rix:

**Introduction**

1 This is large-scale litigation between two banks which, before the failure of one of them, had been trading together in the securities of emerging markets. When, shortly before the failing bank entered into liquidation, it was put into default, it owed its counter-party bank some US \$24.5 million in so-called "Unpaid Amounts" in respect of a portfolio of forward sales of securities which it had bought. That was on 20 February 1998, the so-called termination date. Under the operative agreement between the banks, the "Standard Terms for Forward Sale Transactions" dated 8 November 1996 (the "agreement"), the creditor bank, the seller, had to "liquidate or retain" that portfolio (the "Designated Assets") to satisfy the amount due to it. For these purposes it had to value the portfolio on the termination date. The critical sentence of the agreement, of which much more will have to be set out below, found in its clause 14(a)(bb), is this:

> "The value of any Designated Assets liquidated or retained and any losses, expenses or costs arising out of the termination or the sale of the Designated Assets shall be determined on the date of termination by Seller."

I shall call that the " *valuation sentence* ".

2 The seller bank, Standard Bank London Limited ("Standard"), did not in fact carry out a clause 14(a)(bb) valuation. Instead, it sold what it could over the ensuing months and (and in the case of one security) almost years, and credited the proceeds to the buyer bank, Socimer International Bank Limited ("Socimer"), in dribs and drabs. Until sale of any security, Socimer received no credit for it. In the meantime, Socimer had entered into liquidation on 3 March 1998, about two weeks after the contractual termination date. It was not until November 2002 that the liquidator's London solicitors, Messes Allen & Overy, wrote to Standard to complain that no clause 14(a)(bb) valuation had been carried out. That complaint led to the issue of these proceedings by Socimer's liquidator on 9 April 2003, in which, ignoring the amounts for which Standard had actually sold the portfolio and asserting other valuations as at the termination date, then alleged to be 3 March 1998, Socimer claimed a surplus of some \$13.8 million as due to it. Standard, however, defended these proceedings on the basis that it had done what it ought to have done and was itself still owed money in the liquidation.

3 The issue of construction thrown up by this claim and defence, namely whether Standard should have carried out an immediate valuation and credited the resultant

amount to Socimer, as Socimer maintained, or was obliged to credit Socimer only with what it had obtained from sales in its discretion, as Standard maintained, was decided as a preliminary issue in the litigation, by the judgment of Mr Justice Cooke dated 11 May 2005. He held in favour of Socimer's submissions on the construction of clause 14(a)(bb). He concluded [2004] EWHC 1041 (Comm) at para 34 that—

> "I hold therefore that, on the proper construction of the Agreement, Standard was obliged to value the Designated Assets as at the date of termination of the Agreement for the purpose of clause 14(a) of the Agreement and to bring into account the value as assessed as a credit against the amounts payable to Standard under the Agreement and Trade Confirmations and was not entitled to bring into account the actual proceeds of sale of those Designated Assets for the purpose of its continuing obligations to Socimer under that clause."

4   For the purpose of that decision, Cooke J had accepted the submissions of Mr Richard Millett QC on behalf of Socimer that "Standard was given a wide discretion in relation to valuation" at para 16. Thus the judge expressed that discretion as follows:

> "32.  There is no difficulty in this from Standard's point of view since the valuation exercise lies entirely in its hands as at the date of termination. If the value on the screens, or the information available from other sources, indicates a value which it regards as too high because of the nature of the Designated Assets and the difficulty in liquidation, Standard can take such matters into account, and provided that the assessment is in good faith and is not challengeable

on any other basis, it can value the assets at a lower figure. If the assets are truly liquid then although it may be impracticable for Standard to notify or consult Socimer before liquidating, it can sell and the value which it would ordinarily attribute, in good faith, to the Designated Assets would be the value actually realised. If the assets appear completely illiquid, then in theory a zero valuation is possible."

5   Assisted as they were in this way by Cooke J, and despite a mediation, the parties were nevertheless unable to settle for themselves the resultant question of valuation of the portfolio. Indeed, they remained over $14 million apart when default interest was taken into account. Accordingly, the valuation issues were addressed at a witness trial in June and July 2005 before Mrs Justice Gloster. Before her, Socimer now submitted that Standard no longer had a "wide discretion" in valuing, but was bound (to take reasonable care) to find the true market value. That was put as a matter of contractual implication, or alternatively as a matter of equity by analogy with the duties of a mortgagee with a power of sale. It was submitted on behalf of Standard, on the other hand, that the answer depended not on what a reasonable, objective, valuation should have produced, but on the valuation which Standard itself would have performed, if it had been alive at the time to the true meaning of its contract. Indeed, it was also said that Socimer's "should have" case (as contrasted with Standard's "would have" case) was not open to it. Gloster J, however, agreed with Socimer's submissions. For good measure she rejected the evidence of Standard's factual witnesses on valuation, and, founding herself in the main on Socimer's expert witnesses, produced a valuation greatly in excess of Standard's case. Most of that difference, however, was made up on two particular securities, a corporate bond known as *Socma DRs* , where the judge's valuation was $3,000,000 as against Standard's valuation of $500,000; and a species of Brazilian sovereign debt known as *Brazilian TDA-Es* , where the valuation was $8,500,000, as against

Standard's valuation of $3,500,000. That created a difference of $7,500,000 (plus consequential interest) on those two assets alone.

6  Gloster J also found in favour of another, major, aspect of Socimer's case, which was premised on the assertion that even if Standard's valuations had been otherwise accepted, but Standard had also credited to the "Unpaid Amounts" various cross-credits owed to Socimer deriving from other transactions between the parties, amounting to some $4,000,000, then Standard would have found itself with surplus assets in its hands and would have returned to Socimer the Socma DRs as having been fully paid for. On that basis, referred to at trial as Socimer's Socma Primary Case , the judge agreed with Socimer that the value of the Socma DRs in Socimer's hands was not merely $3,000,000, but their amortised face value namely $8,424,966. Accordingly, the judge ended up giving judgment for Socimer in the sum of $11,686,295.43, plus interest (at US Prime) in the sum of $3,528,936.59, in the total sum of $15,215,232.02.

7  Standard now appeals, with the leave of Thomas LJ. Of a number of issues on appeal, as to which there has even been some dispute as to whether or not permission to appeal has been granted, we have heard only two, or perhaps three, as we shall explain. The two issues which we have heard debated in full, for which it is common ground permission to appeal has been granted, relate to the two main matters of decision referred to above, namely:

    • (1)  whether Standard's valuation obligation was to carry out a reasonable, objective, valuation (Socimer's "should have" case) or only the honest but otherwise subjective valuation which Standard would have carried out if it had been aware of its contractual obligation to value (Standard's "would have" case); and
    • (2)  whether other credits would, could or should have been set off immediately against the "Unpaid Amounts" so that, even on Standard's valuations, Standard would have had surplus assets.

8  The importance of issue 1 is that the judge only made findings of valuation on the basis of an objective valuation. The importance of issue 2 is that it is common

ground that it is only if it is answered as the judge answered it that Socimer is able to advance its Socma Primary Case. Issue 1 may be described, loosely, as the "implied term" issue, since Socimer accepts that the objective valuation for which it contends, so far successfully, needs to be introduced by implication. Issue 2 may be described as the "Unpaid Amounts" issue, since its purpose is to define the total of the Unpaid Amounts to which Standard's valuation needs to be applied.

9  The third issue which the parties have addressed is a procedural issue inherent in issue 1, and that is whether it was open to Socimer to deploy its implied term, as it has done successfully, in circumstances where Cooke J had construed the agreement, as Standard contends, as giving to Standard a discretion as to the valuation which it was obliged to perform. If that issue were decided in Standard's favour, it would mean that the judge deployed the wrong valuation test in any event. A further related procedural issue, which has also been debated before us, is whether the judge was entitled to reject the valuation evidence of Standard's witnesses in circumstances where Socimer deliberately chose not to challenge that evidence. That issue may or may not matter if issue 1 was open to the judge and she was otherwise right in the answer she gave to it. If, however, that issue was not open to her, or she gave the wrong answer to it, the answer to the related procedural issue might guide the consequences for the parties: as between this court now accepting the evidence which Standard gave as to its "would have" valuation on the one hand, or there having to be a new trial as to the "would have" valuation on the other hand. It is also possible that this related procedural issue could by itself lead to a conclusion that the judge erred in her answer on issue 1. I shall call these procedural issues respectively issue 3(1) or the "open to Socimer" issue, and issue 3(2) or the "unchallenged evidence" issue.

**The agreement**

10  The relevant terms of the agreement, expressed to be between Standard as "Seller" and Socimer as "Buyer", are as follows—

    **Definitions**

    …

" Designated Assets" means the assets referred to as such in the Trade Confirmation.

…

" Forward Settlement Date " means the date on which the Buyer acquires ownership with full title guarantee of the Designated Assets.

…

" Forward Value " means, with respect to each Transaction, the value in the Payment Currency at which the Transaction is entered into on the Trade Date, inclusive of the Seller's cost of Funds, as specified in the Trade Confirmation.

…

" Market Value " means, on any day and for each Transaction, the value in the Payment Currency determined by the Seller in its sole and absolute discretion for assets of the same description and type, denominated in the same currency and in the same principal amount as the Designated Assets.

…

" Transaction " means each agreement between the Seller and Buyer for the sale of assets on a forward basis subject to these Standard Terms.

…

" Unpaid Amount " means, on any day, and for each Transaction, the total outstanding currency amount payable with respect to the relevant Transaction as determined by the Seller, being the Forward Value less the Downpayment, any Additional Downpayment and any Subsequent Additional Downpayment(s) plus any other moneys owing to the Seller.

**Downpayment**

(a) A downpayment as determined by the Seller (the " Downpayment ") will be required from the Buyer and shall be payable to the Seller with respect to each individual Transaction. The Downpayment … will be treated as a partial payment of the amount due to the Seller. The parties hereby agree that the Downpayment shall be non-returnable once paid.

…

**Consideration for Sale and Purchase**

(a) On or prior to the Forward Settlement Date for each Transaction, the Buyer shall pay to the Seller the Unpaid Amount with respect to such Transaction in the Payment Currency.

…

(c)   For the avoidance of doubt and subject to receipt of the Unpaid Amount in accordance with Section 3(a), the Buyer shall not acquire any legal or equitable interest in the Designated Assets until the Forward Settlement Date but the Seller shall consult with the Buyer (without any obligation to carry out the Buyer's wishes) in connection with the exercise of any right or discretion or performance of any obligation by the Seller under or pursuant to any of the Designated Assets.

### Forward Sale

(a)   On each Forward Settlement Date, subject to the prior receipt by the Seller in full of the consideration referred to in Section 3, the Seller shall sell to the Buyer, without recourse, and the Buyer shall purchase from the Seller, all of the Seller's rights, title and interest in respect of the Designated Assets (which expression shall include all interest and in the case of bonds, coupons, and other amounts due in respect thereof) for the period from (but excluding) the Effective Date to (and including) the Forward Settlement Date) …

### Additional Downpayments, Subsequent Additional Downpayments

### Additional Downpayments

If at any time there is [a series of certain defined events involving a mark-to-market loss as itself defined, such that that loss is greater than one half of remaining equity]

the Seller may at any time while such circumstance exists request the Buyer, such request to be confirmed in writing, to make such further payment (a " Transaction Additional Downpayment ", … ) to the Seller …

(f)   Any calculation made by the Seller under this Section 6 shall be conclusive and binding on the Buyer, in the absence of any manifest error …

### Payments

Subject to the due performance by the Buyer of each of its obligations under these Standard Terms and each Trade Confirmation, the Buyer will be entitled to receive on the Forward Settlement Date … amounts equal to any and all amounts received by the Seller (but subject to such withholdings as the Seller is obliged by law to make), in the currency in which those amounts are received, in respect of the Designated Assets (including, without limitation, payments of principal and interest) for the period from the Effective Date to, and including, the Forward Settlement Date … and such amounts shall be paid with interest at LIBID by the Seller to the Buyer from the date of receipt up to (but excluding) the Forward Settlement Date …

The Seller shall be entitled to set off and deduct from any amount payable to the Buyer under this Section 8 any moneys owed and then due and not paid by the Buyer to the Seller with respect to any Transaction whatsoever.

**Call Account and Set-OFF**

…

(b) The Seller may at any time, and without limiting the foregoing, after the Buyer commits any event of default specified in Section 14 and without notice to the Buyer, apply in or towards satisfaction of any moneys due and owing to the Seller under these Standard terms or any Trade Confirmation (including without limitation any Downpayment, Additional Downpayment, Subsequent Additional Downpayment, Unpaid Amount or interest due under Section 11) any credit balance (whether or not then due and irrespective of the currency of the balance) on the Account(s) or any other account (whether current, deposit, loan, fixed money-market deposit or other) maintained with the Seller in the name of the Buyer …

**Events of Default**

[The subparagraphs of sub-clause (a)(bb) below have been numbered by me to enable easier reference to them.]

In the event that:

(i) the Buyer fails to pay when due any amount payable by it under these Standard Terms or any Trade Confirmation; or

(ii) a party becomes insolvent or generally fails or becomes unable to pay its debts as they become due or commences any

bankruptcy, insolvency, liquidation, administration, receivership, administrative receivership or similar proceedings or any such proceedings are commenced against it; or … (iv) a party repudiates or does or causes or permits to be done any act or thing evidencing an intention to repudiate these Standard Terms or any Trade Confirmation; then

(a) where such a party is the Buyer, the Buyer shall promptly inform the Seller of such event and the obligation of the Seller to sell the Designated Assets to the Buyer and all the other obligations of the Seller under these Standard Terms and each Trade Confirmation shall, save as otherwise provided in these Standard Terms, terminate. Upon such termination, neither party shall be required to refund, pay or otherwise account to the other in any way whatsoever for any payments paid hereunder except as follows:

the Seller shall have the right, in its sole discretion, either:

(aa) to refund to the Buyer any Additional Downpayments and any Subsequent Additional Downpayments paid to it with respect to such terminated Transactions, after deducting therefrom any amounts due and owing to it under these Standard Terms and the Trade Confirmations (including without limitation any Downpayments or the amount of any losses, costs or expenses of the Seller, arising as a result of this termination, but not the Unpaid Amounts in respect of each terminated Transactions, the Buyer's obligation to pay the same being terminated in consideration

of the termination of the Seller's obligation to deliver the Designated Assets in respect of such terminated Transactions); or

[1] to liquidate or retain sufficient Designated Assets and to apply the proceeds of their sale to satisfy to the extent possible any amounts payable to the Seller under these Standard Terms and the Trade Confirmations, particularly, and without limitation, the amount of any Unpaid Amount, Downpayment, Additional Downpayment or Subsequent Additional Downpayment payable by the Buyer and the amount of any losses, costs or expenses of the Seller arising as a result of this termination and the sale of the Designated Assets.

[2] The Seller may in its sole and absolute discretion sell the Designated Assets at such time, in such manner and at such price as it deems reasonable and appropriate. The value of any Designated Assets liquidated or retained and any losses, expenses or costs arising as a result of the termination or the sale of the Designated Assets shall be determined on the date of termination by the Seller.

[3] Any Designated Assets remaining following the satisfaction of the Seller's claims, shall be sold to the Buyer, in the same manner as is contemplated by these Standard Terms and the relevant Trade Confirmation, as soon as practicable after the date of termination. Any proceeds from the sale of the Designated Assets

remaining following the satisfaction of all amounts payable to the Seller as stated above, shall be paid by the Seller to the Buyer.

In the event that any amounts payable to the Seller cannot be satisfied in full by the application of any Additional Downpayments and Subsequent Additional Downpayments, where (aa) applies, or the Designated Assets in the manner above, where (bb) applies, then the Buyer shall pay to the Seller an amount equivalent to the deficiency. The Seller shall prepare a certificate specifying the amount of the deficiency, and such certificate shall be conclusive and binding on the Buyer, in the absence of any manifest error. The Buyer shall make payment of such deficiency upon delivery of the certificate by the Seller in the currency or currencies specified in such certificate …

**Acknowledgment by the Buyer**

The Buyer hereby acknowledges that:—

…

(ii) the Seller shall not be liable for any loss or liability involving any Designated Assets, or arising from a currency transaction or contract or any other transaction or contract entered into in relation to a Transaction, including without limitation, where such loss or liability results, directly or indirectly, from market or price fluctuations; or nationalisation, expropriation, devaluation, revaluation,

confiscation, seizure, cancellation, destruction or similar action by any governmental authority, de facto or de jure; or enactment, promulgation, imposition or enforcement by any such governmental authority or currency restrictions, exchange controls, taxes, levies or other charges affecting the Designated Assets or any Transaction, or acts of war, terrorism, insurrection or revolution, or any act or event beyond the Seller's control; and

(iii)    (A) it invests in and is a sophisticated buyer of assets similar to the Designated Assets in the normal course of its business; (B) it is familiar with the type of transactions undertaken pursuant to these Standard Terms and with assets of the type and description of the Designated Assets; (C) it has made its own independent appraisal of, and investigations into, the financial condition, credit-worthiness, affairs, status and nature of all the Obligors and the Designated Assets and the Asset Documents, and has examined such information concerning the Designated Assets as it has deemed appropriate; (D) it understands and is able to assume the risk of loss associated with such Designated Assets and has sufficient knowledge and experience to be able to evaluate the merits and risk of entering into Transactions with the Seller pursuant to these Standard Terms and (E) it recognises the volatile nature of the emerging markets and understands and accepts that circumstances may thereby arise in which it is impracticable for the Seller to notify or consult the Buyer before liquidating a position …"

11  It will be observed that: (i) the agreement essentially concerns transactions defined as a sale of assets on a forward basis (clause 1) under which, pending a forward settlement date during which the buyer receives credit on payment of a finance charge which is incorporated in the price of the asset sold, the asset remains in the entire legal and beneficial ownership of the seller until full settlement (clause 3(c)); (ii) a part payment or "Downpayment" is required on purchase, which is non-refundable (clause 2(a)) and the balance of the transaction price is the "Unpaid Amount" payable on the forward settlement date (clause 3(a)); (iii) the critical valuation clause is contained within clause 14 as part of the "Events of Default" and in particular is to be found in clause 14(a)(bb); (iv) thus the whole valuation process is a consequence of the buyer's default; (v) although the seller is entitled to sell Designated Assets "in its sole and absolute discretion … at such time, in such manner and at such price as it deems reasonable and appropriate", the valuation obligation covers both "liquidated or retained" Designated Assets and is expressed in the simple terms that "The value [of such assets] … shall be determined on the date of termination by the Seller"; (vi) it is possible to contrast the expression "The value" in that valuation sentence with the expression "Market Value" which is defined in clause 1 (Definitions) as "the value … determined by the Seller in its sole and absolute discretion for assets of the same description and type"; (vii) the Market Value definition is utilised in clause 6 (Additional Downpayments; Subsequent Additional Downpayments) by reference to "Mark-to-Market Loss" which is itself defined in clause 1 by reference to Market Value, and for these purposes the concept of Additional Downpayment, a form of (further) margin requirement, is spoken of as something "allocated by the Seller for the purposes of subsequent settlement in its absolute and sole discretion" (clause 6(b)); (viii) clause 14(a)(bb) also provides that "following the satisfaction of the Seller's claims", any remaining Designated Assets shall be "sold" (which it is common ground means in this context transferred) to the buyer, and any remaining proceeds from the sale of Designated Assets shall be paid to the buyer: ie the buyer recovers either in specie or in cash the balance of Designated Assets remaining after full satisfaction of Standard's claims; (ix) clause 14(a)(bb) also provides that where

the valuation sentence applies but there is insufficient to satisfy Standard's claims in full so that there is a deficiency, then Standard shall "prepare a certificate specifying the amount of the deficiency" and such certificate "shall be conclusive and binding on the Buyer, in the absence of any manifest error"; (x) set-off provisions are contained in clause 8 (Payments) and clause 9 (Call Account and Set-Off), sub-clause (c) of which gives to Standard a general discretion ("may at any time … after the Buyer commits any event of default") to apply any credit balance on any account maintained with Standard in the name of the buyer in or towards satisfaction of "any moneys due and owing to the Seller".

**The judgment of Cooke J**

12  Cooke J's judgment is dated 11 May 2004, [2004] EWHC 1041 (Comm). It was concerned with "the trial of a preliminary issue concerning the true construction" of the agreement (Cooke J, para 1). The preliminary issue is not in terms defined in his judgment, but the order for directions pursuant to which the trial before him was held, made by Langley J on 14 November 2003, provided as follows:

> "1.  The issues as to the true construction of the … **Agreement** … including (to the extent necessary and admissible) the matrix of fact surrounding the conclusion of the Agreement, as contained in paragraph 11 of the Particulars of Claim, paragraphs 2 to 7 of the Defence and paragraphs 4 to 48 of the Reply (the **"Issue"** ) be tried as a preliminary issue and before all other matters …"

Langley J's order included directions for disclosure, witness statements and expert reports. Thus although the preliminary issue argued before Cooke J was essentially to clear away problems of construction which divided the parties, evidence of fact and of expert opinion as to the matrix of the agreement was deployed, and Cooke J made various findings (see below).

13  Paragraph 11 of Socimer's particulars of claim asserted in relevant part that "the market value of any Designated Asset for the purposes of [Standard's] continuing obligations to Socimer under clause 14 was to be determined as at the date of termination …". Paragraph 6.3 of Standard's defence, on the other hand, referred to "Standard Bank being entitled to the relevant assets and having an absolute discretion following default"; and paragraph 6.5 alleged that Standard "would have complete flexibility to liquidate Socimer's portfolio of assets at its absolute discretion in the event of default" and "would have the right to hold those assets for such time as it might consider to be appropriate in the circumstances before they were sold". In response, in paragraph 34(1) of its reply, Socimer pleaded that "while Standard bank had an absolute discretion, under clause 14(a)(bb) of the Agreement, as to how, when and at what price it sold the Designated Assets (whether by way of liquidation or by way of retention), Standard Bank had no discretion at all following such termination as to the valuation of the Designated Assets for the purposes of the state of the account between itself and Socimer, which had to be valued on (or as at) the date of termination", so as to provide certainty going forward as to the state of the account between the parties, which otherwise would be liable to fluctuate almost daily while Standard played the market in the Designated Assets at Socimer's expense, since default interest would continue to run until Standard sold off portfolio items at a time and price of its own choosing ( paragraph 36 of Socimer's reply).

14  Although this is not a complete statement of the "issue" tried by Cooke J or of the parties' refined submissions before him, it is nevertheless plain that there arose for decision two matters at least: (1) whether the state of the accounts between the parties, so far as it depended on Socimer's outstanding forward sale portfolio, was to be settled once and for all on or as at the date of termination, as Socimer contended, or as and when Standard sold items from the portfolio on or at any time following the date of termination, as Standard contended; and (2) how, if any valuation had to be performed as at the date of termination, it was to be carried out: in Standard's absolute discretion, as Standard asserted for all its dealings with

the Designated Assets following default, or with "no discretion at all" as Socimer appeared to assert.

15  It may be true that the first of these two issues was the primary issue debated (reflecting the circumstance that Standard had never in fact carried out a valuation on or as at the termination date), but it was still tied up inherently with the issue of discretion and how any valuation was to be performed: particularly as Socimer accepted that Standard had, in the express terms of clause 14(a)(bb), an absolute discretion as to how it sold the Designated Assets and yet asserted "no discretion at all … as to the valuation". It is possible, however, that Socimer had simply meant to say that Standard had no discretion at all but to carry out a valuation on or as at the termination date, while leaving it open how such a valuation was to be performed — other than by pleading in the particulars of claim that it was to be at "market value". That, however, in the light of the agreement definition of market value at any rate when expressed as "Market Value", might be said to maintain the ambiguity.

16  To the extent that this second aspect of the issues of construction remained in doubt on the pleadings, it was nevertheless elucidated during submissions before Cooke J, because Mr Richard Millett QC then accepted that Standard retained an absolute discretion over how the valuation he contended for was carried out by Standard. Indeed, he used the existence of this discretion as one of his arguments for insisting on a termination date valuation: for, as he submitted, the combination of the obligation on Standard to value as at a date certain, the termination date, and of the discretion in Standard as to how to perform that valuation, created a balancing of the interests of the parties which reflected the context and needs of their agreement as a whole.

17  Thus the following exchange occurred between Mr Millett and Cooke J right at the end of the former's closing submissions (at Day 2.161):

> "  *Cooke J* : On this clause you recognise that it is the seller's determination which counts.

*RM:* Yes. So we could be stuck with a rotten valuation on the termination date.

*Cooke J* : Unless it was a bad faith determination, you would be stuck with it basically. Subject to that, you are basically stuck with it.

*RM* : That is right. It cuts both ways. So it is wrong to say that valuation exercise shifts the risk to the seller. It does not at all. It cuts both ways but actually, because we are at the mercy of the seller, they have the whip hand always. That is what we say about that."

18  This exchange developed out of a discussion between Mr Millett and the judge about the way in which a valuation on or as at a certain day would work in practice. For instance, what would happen if there was no market in a given security on that day? Or if a price on a screen did not reflect the realities? There had been evidence from Mr Ian Beckman (an independent expert called by Standard) that both were possibilities and that if there are no buyers in the market and it is necessary to value on a given day, a price as low as zero will need to be applied. These possibilities emphasised that valuation can be difficult and subjective. Mr Millett said (Day 2.117/8):

> "What Mr [Beckman] is saying is absolutely right but it is also undoubtedly consistent with our construction of clause 14, which is that on or as at the termination date, the seller has to assess the value of the asset … If he cannot because there is no real buyer prepared to pay good money at that moment — and one can read into this, "there is no other way of getting a hard price" — and you have to make a

valuation, then you put zero. The result of that is that the poor buyer gets no credit at all for the value of the asset …

We can live with that perfectly well. We say that is entirely right, it entirely protects the seller and it is a risk that the buyer takes. In other words, when he enters into a forward deal contemplated by standard terms, he takes the risk that on termination, the seller will not be able to get any prices and is forced to value them at nil, and therefore he gets no credit. Given the nature of the assets, he knows that is what he is in for. He has to trust the seller to do his best to find a price if he can. But if he cannot, that is life: tough. Tough on the buyer. That is how it works and that is what Mr [Beckman] is saying."

19   Cooke J found the following facts proved by the agreement or its matrix ( para 7). Liquid assets could be valued on the basis of screen prices and conversations with market participants. For more illiquid assets, however, where there were no readily available markets and no screen prices, "Standard might have to use its own commercial judgment". The value placed on them by Standard was not necessarily that which would be obtained on an actual sale, because of the difficulty of evaluation of such assets and the volatility of the market. Smaller debts from less developed economies are highly volatile, are traded infrequently, and are as known as "exotics". Volatility is a hall-mark of emerging markets as a whole. Downpayments were designed to mitigate the risk that the seller would default on his obligations. On an illiquid asset they could range up to 50%. Where illiquid assets are concerned, terms of trade invariably favour the seller in the event of the buyer's default because of the difficulty of realising the debt. Mr Beckman's evidence was that the only definitive measure of value was the price for

which assets could actually be sold, as distinct from prices to be seen on screens or databases or calls to market professionals: if there was no real price, it would be necessary to value the asset at zero.

20   Cooke J set out the parties' submissions. It is sufficient to record this (at paras 16/17)—

"Socimer contended that there was no difficulty in treating this clause as a valuation clause because Standard was given a wide discretion in relation to valuation whilst "termination" in the clause meant the same wherever it appeared.

Socimer also contended that there was no problem here about liquid or illiquid assets since the Agreement drew no distinction between one or the other and treated all as capable of having a value to be determined by Standard. With such discretion in valuation, even if Standard was to be treated as a "lender", it had adequate protection on Socimer's construction of clause 14 in the event of default by Socimer."

21   The balance which Mr Millett had accepted and emphasised in his submissions between the obligation to value on a day certain and the discretion to perform that valuation is a recurrent theme in Cooke J's discussion and analysis. For instance:

"19.   Whilst the Agreement sets out Socimer's acknowledgment of the volatile nature of the emerging markets in which the Transactions involving Designated Assets are taking place and the impracticality for Standard to notify or consult it before liquidating a position [clause 16(a)(iii)] and the considerable risks involved in the Designated Assets

themselves [clause 16(a)(ii)], the whole of the Agreement proceeds on the basis that it is possible to value the Designated Assets on any day. If the Designated Assets are the subject of forward sale, then the Agreement assumes that there is a market for such assets or at least that a "Market Value" can be determined for them by Standard, although the method by which it makes that assessment is left entirely to Standard's own discretion. This, in my judgment is a crucial factor when approaching the question of construction of clause 14."

22  Since it is common ground that the judgment of Cooke J, which was not taken to appeal by either party, is binding on them both, it is necessary to set out the judge's conclusions and his reasoning. Gloster J set out paras 27/33 in full. I would begin at para 26:

"26.    Clause 14(a)(bb) has then to be construed in this context. It is clear that clause 14(a)(bb) provides in the first paragraph for Standard either to liquidate or retain sufficient Designated Assets and to apply the proceeds of their sale to satisfy amounts payable to it. Where the reference is to "proceeds of their sale" this must be taken to include the notional proceeds where the Designated Assets are retained and valued, as Standard accepted in argument. Of course, under the terms of the Agreement, the Designated Assets belong to Standard at all times until payment of the Unpaid Amount and transfer to Socimer, so that sub-clause (bb) gives Standard the right either to liquidate or retain sufficient Designated Assets to satisfy the amounts outstanding under the

Agreement. There is no question of Standard selling Designated Assets to itself since it already owns them but the object of sub-clause (bb) is plainly to make Standard "whole", as Counsel for Standard put it in argument. Standard had expected to transfer the Designated Assets to Socimer on payment of the Unpaid Amount at the Forward Settlement Date, thus receiving the full agreed Forward Value which included its costs of funds without taking any risk on the value of the Designated Assets. The intention of the sub-clause is that Standard should recoup the amounts which it would otherwise have received and not be out of pocket in respect of any losses, costs or expenses which arise as a result of the termination and the sale of the Designated Assets to a third party or retain them itself in order to recoup these amounts, following which the third paragraph of sub-clause (bb) comes into play.

27.    The third paragraph of sub-clause (bb) sets out what is to occur following "the satisfaction of the Seller's claims", namely the recoupment by Standard of the sums to which reference is made in the sub-clause. Once that has been done, the remaining Designated Assets which have not been liquidated or retained are to be sold to the buyer as contemplated by the Agreement and the Trade Confirmations, "but as soon as practicable after the date of termination". Moreover, if there is any balance from the sale of the Designated Assets following satisfaction of all amounts payable to Standard, Standard is also to pay this to Socimer. This provision makes it plain that the whole process of liquidation or retention is to take

place "as soon as practicable after the date of termination", which, as I have already held, can only mean the date of the event of default or notice thereof.

28. This means that Standard must elect whether to liquidate by sale to third parties or keep Designated Assets at the date of termination or at least as soon thereafter as is practicable, since the remittance to Socimer of any balance, after satisfaction of Standard's claims, ahs to take place by this point.

29. It follows therefore that the second sentence of the second sub-paragraph of (bb) [the valuation sentence] … is entirely consistent with the procedure envisaged. If Standard elects to liquidate or retain particular Designated Assets, their value is to be determined on the date of termination by Standard itself. Self-evidently, the words "on the date of termination" must allow some latitude to Standard, particularly if the event occurs or the notice of the event is given at 23.59 hours on the date in question. In practice it requires a determination "as at" the date of termination, but the principle is clear in requiring the election and the liquidation or the retention to be effected at that point or so soon thereafter as is practicable. The value of those Designated Assets, as determined by Standard, then has to be taken into account to satisfy amounts payable to Standard under the Agreement and the Trade Confirmation (which have also to be ascertained at that point), as provided by the sub-clause, including any losses, expenses or costs arising as a result

of the termination of the sale of Designated Assets.

30. The sub-clause does not envisage such lack of liquidity as would render this impossible to achieve. The words "the proceeds of their sale" in the first line of sub-clause (bb), which refer to the Designated Assets, are not therefore to be seen as inconsistent with the valuation "on the date of termination" in the second paragraph of that sub-clause. Standard itself can assess the value of the Designated Assets liquidated or retained in the same way as it can assess the Market Value as set out in the definitions clause in the Agreement. The whole point of the exercise is to crystallise the position as at the date of termination by reference to value as at that date.

31. Standard relied heavily on the first sentence of the second paragraph of sub-clause (bb) which stated that:—

> "The Seller may in its sole and absolute discretion sell the Designated Assets at such time, in such manner and at such price as it deems reasonable and appropriate."

Standard maintained that this sentence operated to give it

discretion to sell the Designated Assets and apply the proceeds of the sale which they achieved, however long after the date of termination, in satisfaction of the sums owing to it under the Agreement, regardless of the second sentence of the second paragraph [the valuation sentence] requiring the value of any Designated Assets liquidated or retained to be determined on the date of termination. The central difficulty with Standard's construction of the clause is the absence of any meaning which it can properly give to the second sentence. The same problem does not exist with Socimer's construction, since the purpose of the first sentence of the second paragraph of sub-clause (bb) is to make it clear that Standard does have, as it must have as owner of the Designated Assets in any event, a complete discretion about sale, whilst the clause as a whole is designed to ensure that the calculation of the net position between Standard and Socimer takes place at or immediately following the termination of the parties' obligations, with immediate sale to third parties or retention by Standard, so that the existence of a surplus or deficiency is immediately obvious on the basis of the value of the assets as at the termination date. If there is a surplus the third paragraph of sub-clause (bb) comes into operation whereas if there is a deficiency, the last paragraph of sub-clause (a) as a whole comes into play with the preparation by the Seller of a certificate specifying the amount of the deficiency, which is again to be conclusive and binding on Socimer in the absence of any manifest error and which gives rise to the obligation on Socimer to make good that deficiency.

32.   There is no difficulty in this from Standard's point of view since the valuation exercise lies entirely in its hands at the date of termination. If the value on the screens, or the information from other sources, indicates a value which it regards as too high because of the nature of the Designated Assets and the difficulty in liquidation, Standard can take such matters into account, and provided that the assessment is in good faith and is not challengeable on any other basis, it can value the assets at a lower figure. If the assets are truly liquid then although it may be impracticable for Standard to notify or consult Socimer before liquidating, it can sell and the value which it would ordinarily attribute, in good faith, to the Designated Assets would be the value actually realised. If the assets appear completely illiquid, then in theory a zero valuation is possible. That is the essential assumption on which sub-clause [(bb)] works so that there is no conflict between "the proceeds of their sale" and the "value of any Designated Assets liquidated" as "determined on the date of termination by the Seller".

33.   Whilst clause 14(a)(bb) is not a model of drafting, the overall intention is, in my judgment, clear. Whereas sub-clause (aa) provides for Standard to opt to retain the Downpayment and the Designated Assets and only to refund the Additional Downpayments and Subsequent Additional Downpayments (after deducting other amounts due and owing and losses arising as a result of termination), which Standard would

Socimer International Bank Ltd (in Liquidation) v Standard..., 2008 WL 5716088 (2008)

presumably wish to operate if the Market Value of the Designated Assets exceeded the Forward Value or in a rising market, sub-clause (bb) provides for it to liquidate, whether by sale to third parties or retention at a value for its own account, sufficient Designated Assets to meet the outstanding amounts owing to it under the Agreement, which it would presumably wish to operate if the Market Value was lower than the Forward Value or in the event of a falling market. In the latter situation it would take on the market risk of particular assets which it chose to retain. Whilst it remained free in its sole discretion to sell the Designated Assets which it owned at any time and in any place and at any price, it was the value of those assets at the point of election to liquidate or retain which fell to be taken into account as a credit against the sums owing to it under the Agreement, before assessing the surplus or deficiency which would give rise to the remaining obligations in clause 14(a), under the last paragraph of sub-clause (bb) and the final paragraph of sub-clause (a)."

23 Thus Cooke J concluded as follows:

"34. I hold therefore that, on a proper construction of the Agreement, Standard was obliged to value the Designated Assets as at the date of termination of the Agreement for the purpose of clause 14(a) of the Agreement and to bring into account the value so assessed as a credit against the amounts payable to Standard under the Agreement and Trade Confirmations and was not entitled to bring into account

the actual proceeds of sale of those Designated Assets for the purpose of its continuing obligations to Socimer under that clause."

24 Much of that analysis was primarily aimed at Standard's particular case, now water under the bridge, that it was only as and when it sold an asset that any sum needed to be brought into account in favour of Socimer. For present purposes, it is perhaps useful to recapitulate certain aspects of the judge's analysis which are particularly pertinent to the submissions we have heard on this appeal: namely (i) that the leading consideration under sub-clause (bb) is Standard's obligation to value all Designated Assets on or at any rate as at the termination date and in any event as soon as practicable; (ii) that the whole of that value, both that which represented assets immediately liquidated and that which represented assets retained for Standard's own account, had to be credited to Socimer; and (iii) that any surplus value had to be transferred to Socimer in specie or in cash, again as soon as practicable after the termination date. It follows that all market risk from the point of valuation onwards is transferred formally from the buyer, Socimer, to the seller, Standard.

25 It may be said that this contractual provision is remarkably favourable to the buyer, seeing that these consequences (a) arise on the buyer's default; (b) when the counter-party risk is therefore at its greatest; (c) produce the result that, for all assets which cannot be immediately sold, ie the more illiquid assets, the seller is compelled to take them on his own book at his own risk, so as to produce as it were "the proceeds of their sale" even when they have not been in fact sold, and even though he has not selected them for his own investment at all; (d) are consequences assumed to have been selected by the seller as his option under sub-clause (bb), in preference to the position under sub-clause (aa), on the basis that the assets in question have been falling in value since the forward sale was made and/or are subject to a falling market. However, the judge's analysis, consistently with Mr Millett's own submissions about Standard's "wide discretion" (see paras 16/17), balance these consequences with the other side of the coin, namely that the valuation exercise "lies

entirely in [Standard's] hands" subject to good faith (at para 32), otherwise expressed as being "left entirely to Standard's own discretion" (at para 19); that where there is no market on the valuation date the value may turn out to be zero (at para 32); and that in the case of any deficiency following the valuation process, the size of it will be conclusively determined in the absence of manifest error by Standard's certificate ( para 31).

26  One other aspect of this analysis may here be noted. If the clause 14(a)(aa) option is chosen, the seller keeps both downpayments and assets, but gives up his right to any additional downpayments or to be paid the amounts outstanding, viz the Unpaid Amounts. If the clause 14(a)(bb) option is chosen, and the assets cannot be immediately sold, the seller has to credit to the buyer the "value" of the assets retained and thus, even though he is in principle entitled to keep the downpayments because they are part of the price due and are in any event non-returnable nevertheless, were the valuation to make no allowance for the risks inherent in the asset, then the upshot would be that the seller is required to disgorge in the form of "value" the downpayments which are designed to reflect those inherent risks.

27  It is against this background that following the judgement of Cooke J the parties prepared for the outstanding issues between them. On the basis that the issues of construction had been determined at the trial of the preliminary issue, those issues were limited to those of valuation.

28  It emerged, however, that a considerable issue of construction continued to divide the parties: in essence whether the valuation which Standard ought to have carried out but had failed to put into operation, because they had misconstrued or overlooked their agreement, should now be determined by the court at the figures which Standard "would have" used in an assessment within their own discretion, had they performed their contract, or at the objectively ascertained figures which Standard "should have" used on a proper and careful market analysis.

29  That issue led to two of the issues which have now been debated on this appeal: one, the issue of construction, as to whether the determination of value is that of Standard (which might be termed a "subjective" valuation), or whether it is that of the court itself

(applying entirely objective criteria); the second, as to whether that issue was in any event properly and fairly open at the second stage of the trial process.

30  To understand those issues as they were developed before Gloster J and this court it is necessary to trace the procedural conduct of this litigation from the conclusion of the trial before Cooke J to the conclusion of the trial before Gloster J.

### The procedural aspects of the litigation up to the trial before Gloster J

31  In his order at the conclusion of his trial, Cooke J gave directions for the future conduct of the litigation. That order provided for disclosure, the exchange of witness statements and also for experts to prepare reports "confined to expert evidence on the valuation of the Designated Assets … on or as at the date of termination". It also provided for mediation.

32  On 2 September 2004 Standard served its witness statements. These included statements from Mr Jeffrey Clifford and Mr David Feld, who had been in 1998 and continued to be employed by Standard. Both gave evidence as to how Standard "would have" approached the valuation exercise required by the judgment of Cooke J. Therefore from at least that time it would have been obvious to Socimer and its legal advisers that that was how Standard approached the valuation trial. Messrs Clifford and Feld gave evidence that in the first place the valuation would have been delegated to Mr Clifford. Mr Feld, as the more senior man, agreed with Mr Clifford's view that Standard's senior management would have been involved at the review stage, and said that the ultimate responsibility and decision would have been his and that of other members of Standard's senior management. Mr Feld explained that, despite the passing of six years from the default, it was important to avoid any element of hindsight. Standard would have been gravely concerned about Socimer's default and imminent insolvency and the great financial risks arising from the obligation to value and assume the risk of extremely illiquid assets on a same day basis. Senior management would have had as its primary objective a desire to fulfil (what had been found to be) Standard's obligations in a way which best protected Standard's interests.

33  On 25 November 2004 Socimer served the expert report of Professor Luis Rosenberg, a distinguished financial consultant whose firm advises investors and investment banks on Brazilian markets. He had in the past been directly involved in fund management and at one time as a Brazilian government official. His evidence was concerned with the valuation of the Brazilian TDA-Es. He gave detailed evidence in support of his valuation of that security. He addressed the evidence of Messrs Clifford and Feld first at paras 6.26/7 of his report, where he said—

> "Similarly, I disagree with the reasoning adopted by Mr Feld … and Mr Clifford … who estimate the value of the portfolio by asking the following question: how much would I be willing to pay to keep the portfolio. In my opinion, this would be a deeply biased method of appraisal: a conservative investor would get to a very low price while a risk-lover would surpass my reasoned estimates by a large extent … In fact, in my opinion, a good appraisal method can never be based on the individual perception for the value of the asset but, rather, on the market assigned value to that good …"

This, in retrospect, highlights what became an issue at trial: whether the approach to valuation should be subjective or entirely objective.

34  Professor Rosenberg subsequently gave a detailed critique of Mr Clifford's evidence, stating in passing that it was a "good academic lecture on all possible factors that could eventually be considered in order to diminish the value of a financial asset" (at para 7.11), but concluding that "In summary, based on the above mentioned conceptual and quantitative analysis, I consider that the "internal valuation" proposed by Mr Clifford was biased towards undervaluing the assets and should not be used as a valuation for the TDA-E portfolio in question" (at para 7.31). His "Conclusions" (at para 8) included those that the

TDA-Es were of "medium liquidity" being neither illiquid nor highly liquid, that the "task of selling the portfolio could be completed in a matter of two to three weeks", and that the availability of Brazilian Government bonds with currency indexation clauses "provided a sanctuary to the proceeds of such sale, even if bureaucratic obstacles would prevent automatic remittance abroad". Professor Rosenberg's report was clearly aimed at an objective valuation of the security in question: he did not appear to dispute the "would have" aspect of Standard's evidence, but he disagreed with the subjective approach to that he plainly considered to be an objective appraisal of value. He appears to have accepted that the large portfolio of TDA-Es could not have been sold, or at any rate all sold, on the termination date. He allowed two to three weeks for their sale.

35  Standard's expert on the Brazilian TDA-Es was Mr Ricardo Quintero, whose report was served on 2 December 2004. His expertise was gained during his employment in banks in Brazil over a period of 15 years. At the beginning of his report he described his instructions as follows:

> "(1)  to comment upon the nature of the TDA-Es;
>
> (2)  to provide an opinion as to the value of the TDA-Es as at the alternative event of default dates … on a "local" basis (i.e. from my position in Brazil and not in the position of [Standard] at the relevant time;
>
> (3)  to comment on the methodology of and approach taken by [Standard] …
>
> (4)  to comment upon the report of Socimer's expert witness, Professor … Rosenberg PhD."

Mr Quintero annexed his letter of instruction. That contained a passage on the "Nature of expertise required" as follows:

> "It will be for the parties themselves, namely [Standard] and Socimer, to submit to the Court what valuation methodology would have been used and the values which would have been arrived at. Your expertise will be required to comment upon the nature of a specific emerging market asset as well as the approach taken by [Standard] and Socimer to its valuation and to provide a valuation for that asset as at two specific dates in early 1998."

36    I refer to Mr Quintero's instructions because it was Mr Millett's submission on the appeal that the fact that experts were used at all for the purposes of the valuation trial showed that it had always been the mutual contemplation of the parties that the valuation required by the agreement was an objective one. In my judgment, Mr Quintero's instructions show the very opposite. At most, one aspect only of Mr Quintero's expertise was invoked to provide his own valuation, and in context that was, as Mr Stephen Auld QC on behalf of Standard submitted, nothing more than a "reality check".

37    In his executive summary, Mr Quintero described TDA-Es as "illiquid securities with various risks attached", gave a personal valuation "based upon unlimited time within which to value" of between $5.4 and $5.7m, agreed with "the methodology and approach taken by [Standard] in accordance with the Judgment of the Court in May 2004, namely at or immediately following an event of default under the Agreement", agreed with the valuation of Mr Clifford in the circumstances prevailing (and the still more conservative valuation of Mr Feld at an executive level) and disagreed with Professor Rosenberg's approach in a number of respects, including that of using the benefit of hindsight.

38    On 2 December 2004 the report of Mr Beckman was also served by Standard. Mr Beckman had already given evidence before Cooke J. He was a managing director of WestLB AG and had until December 2002 been head of its department specialising in emerging markets. His evidence was particularly directed to "Valuation Approach upon Default" and the Socma DRs. As for the former, he described what in his experience was an appropriate process, and concluded: "Since the Court has interpreted Clause 14 to mean that Standard bank is effectively at risk when it comes to sell designated assets after accounting for their notional value to the defaulting customer, a conservative approach to valuation is not only prudent but also entirely within the bank's rights." As for the Socma DRs, he described these as totally illiquid, with an imbedded credit risk in Socimer as debtor, and concluded that a bid would not have been found so that a valuation at or very close to zero was appropriate. I should explain that Socimer was itself an intermediate debtor under the securitised issue of these corporate bonds by Socma (not itself an associate of Socimer), even if there was for some time uncertainty in the markets as to whether Socimer was a fiduciary rather than a debtor.

39    Mr Beckman's letter of instruction was also exhibited. This contained inter alia the following request:

> "5.    Having commented upon the approach taken by [Standard] and having placed yourself in [Standard's] shoes in the hypothetical scenario necessitated by the Judgment of Mr Justice Cooke, provide an opinion, insofar as you feel able, as to the value of the relevant assets."

I would make the same comments about Mr Beckman's instructions as I have done about Mr Quintero's. Indeed, since Mr Beckman's expertise was being relied on by Standard on a broader basis — Mr Quintero was essentially relied on as a "local" man in Brazil and thus the kind of person whom Standard might well have contacted for advice about the Brazilian TDA-

Es — he was specifically asked to place himself in Standard's shoes, which echoes Cooke J's comment that the valuation exercise "lies entirely in [Standard's] hands".

40  On 20 April 2005 Standard served a re-amended defence, in response to Socimer's substantially re-amended particulars of claim served on 21 March 2005 inter alia introducing its Socma Primary Case about the Socma DRs. Among the amendments made by Standard were passages specifically relying on citations from the judgment of Cooke J. In particular, at section 14 of the re-amended defence, in reliance on the judgment of Cooke J Standard pleaded that "the Court is seeking to reconstruct the contractual valuation as it would have occurred" as of 20 February 1998, and that for this purpose the valuation process and the value itself, subject obviously to good faith, was entirely within the discretion of Standard. It then proceeded to plead the essence of Standard's case on its "would have" valuation which had been previously set out in the statements of Messrs Clifford and Feld, to which reference was made.

41  In its re-amended reply served on 6 May 2005, Socimer pleaded (at para 132) that "the matters there alleged are irrelevant to the question of valuation, which is a matter of expert opinion and not a matter of what Standard Bank would or would not have done had it not breached the Agreement".

42  Although Mr Millett was to submit to Gloster J that Standard's "would have" case was the result of a late amendment for which permission should not be given, and was wrong and irrelevant and should be rejected at the outset, the fact is that it had always been inherent in Cooke J's judgment that the valuation which had to be carried out at trial was the contractual valuation which Standard ought to have carried out on or as at the termination date but had failed to carry out; and that such a valuation was one which lay in Standard's hands and for which it had a wide discretion. On the contrary, it was Socimer's case, namely that the contractual valuation which had to be reconstructed was an objective one based entirely on independent expert evidence, which was new to the litigation, being inconsistent with what had been common ground before Cooke J and had been incorporated in his judgement.

43  As will appear below, Mr Millett failed before Gloster J in his procedural objection to shut out Standard's case and its witnesses' evidence on it as a matter of principle, although the ultimate answer Gloster J arrived at was in practice not far removed from his original submission. This was because she also accepted Mr Millett's new case, developed only at the conclusion of the trial and never pleaded, that the valuation obligation contained in the agreement was subject to an implied term requiring an objective valuation to be carried out with reasonable care; and also because she was persuaded that, on such a case, Messrs Clifford's and Feld's evidence, although not challenged in cross-examination, was worthless. It is necessary therefore to show how the argument at trial developed procedurally.

### The procedural aspects of the trial before Gloster J

44  Battle was first joined at a pre-trial review held before Andrew Smith J on 27 May 2005. Socimer there sought to shut out much of Standard's evidence, both factual and expert, on various grounds. We are interested in the attack on the evidence of Messrs Clifford and Feld, which was put on the basis that they were factual witnesses who could not give expert valuation evidence. Andrew Smith J ordered that such issues should be left over for the trial judge.

45  Socimer's opening submissions in writing were served on 3 June 2005. They contained passages dealing with the status of Messrs Clifford's and Feld's evidence, an issue on which it was said that a ruling would be needed at the start of the trial. The objection remained that they were purporting to give expert valuation evidence (for which permission had not been given) under the guise of being witnesses of fact. But that rather technical objection was premised on the more substantive submission that it was only independent expert evidence that could be relevant to the valuation exercise on which the trial was engaged. At that stage this submission was put in this way (at paras 20/23 of Mr Millett's written submissions):

> "…Cooke J decided … the valuation exercise lies entirely in Standard's hands; it can apply its

Socimer International Bank Ltd (in Liquidation) v Standard..., 2008 WL 5710688 (2008)

subjective views about liquidity or nature of a particular Designated Asset when reaching its valuation, provided it does so in good faith **and** cannot be challenged on any other basis. This therefore imports an objective requirement of reasonableness into the valuation process. Socimer contends that a good faith valuation, in the context of clause 14 of the Agreement and the Judgment, is one done in an honest attempt at a valuation which most fairly and reasonably reflects the value of the Designated Asset in question at the termination date …

…However Standard now assert that the Court's function is not to decide value, but to undertake a rather different exercise, namely to decide what Standard would itself have done on 20 February 1998 … Standard's reconstructed personal approach was never pleaded until the Re-Amended Defence … The Court must decide, therefore, whether what Standard's witnesses now say, seven and a half years on, they would have done had they properly understood, and not breached, the Agreement is at all relevant, and, if so, how much weight to place on their opinions.

The short answer is that it is not relevant, or else devoid of weight … The Court's task is to decide **objectively** , on **objective** criteria, what is the value, within the parameters of the valuation methodology described in the Judgment, that Standard should **objectively** have applied to those Designated Assets at the time. The Court's task is not to reconstruct Standard's dealing room

and apply the **subjective** approach of its inhabitants on that February morning eight and a half years ago. To do so would introduce uncertainty, hindsight and one-sidedness. It also makes the Court's task difficult because the opinions of both Mr Clifford and Mr Feld, who remain employees of Standard to this day, are necessarily partisan and not independent. Their views are also to be seen darkly through the glass of hostile litigation in which they have both been active participants. The fact that the Agreement, as analysed in the Judgment, gave Standard a broad discretion as to valuation (within the proper parameters) does **not** mean that the Court may receive evidence from those individuals at the time charged with exercising that discretion."

46  Now this may be shrewd advocacy, but its analytical basis, viewed through what is now known about this appeal, is suspect. Mr Millett accepts that the basis of Cooke J's judgment is that Standard "can apply its subjective views" in exercise of a "broad discretion" in good faith to its assessment of value, but at the same time asserts the need for an entirely objective appraisal of value by the Court based on only independent expert evidence. Other than a plea, which this passage is in part, that Standard's factual evidence of what it would have done is worthless as being partisan and therefore, as is hinted, possibly lacking in good faith or motivated by hostility or other irrationality, there is no foundation at all for the submission that the subjective assessment required by Cooke J should be supplanted by an entirely objective one. The answer to this advocacy could well be: "Cross-examine and we will see how we go. The court will not assume the worst of witnesses before they are heard." The court might also have asked, to pick up the words of Cooke J to which Mr Millett had there alluded: "Do you have a case of bad faith or challenge on any other basis?"

WESTLAW   © 2017 Thomson Reuters.

47  In Standard's written opening submissions in response, Mr Auld sought to interpret Socimer's approach under the heading of "Reasonableness" (at para 47). He deprecated any attempt to "try and assert some implication of "reasonableness"; and he stoutly defended his witnesses against any charge of unreasonableness.

48  The trial before Gloster J began on 8 June 2005 and these themes were addressed by Mr Millett on the first morning. He submitted that where Designated Assets are retained, an "objective standard" was necessary because of the potential conflict of interest between the parties. If Cooke J had not imported a reasonableness qualification into the process, "then I invite your Ladyship to do so … We say it is not a would have case, it is a should have case" (at Day 1.35/37). Before the close of that day Gloster J raised the pending application to exclude the evidence of Messrs Clifford and Feld. She expressed a reluctance to rule anything out at the beginning, and a preference to hear the evidence *de bene esse* . Mr Millett, however, said he wanted the issue decided out front so that it would be clear that he did not have to cross-examine or put his expert case in cross-examination to them. However, he was then instructed by Socimer to accept the judge's suggestion, and Gloster J said: "You will have to prepare your cross-examination", to which Mr Millett replied: "As far as I am concerned, it gives me some practice for the real experts" (Day 1.162/166). At that stage, therefore, the decision in principle was going to be delayed for judgment, and Mr Millett was going to cross-examine.

49  On Day 2, Mr Auld made his opening oral submissions on behalf of Standard (see at Day 2.120/125). He contrasted Standard's would have valuation limited by good faith with Socimer's should have valuation based on reasonableness. His approach was that it was a matter of construction. The judge then raised the question whether it was not one of those cases where an obligation to do something involved "an implied duty to do so carefully". Mr Auld said, accurately in my judgment, "That is not being put against us at this stage". The judge next raised with Mr Auld another way in which Socimer's position might be protected, namely by way of analogy with the position in equity as between mortgagor and mortgagee. It

would seem therefore that both the concepts of an implied term and of the position in equity between mortgagor and mortgagee originated from the judge. As it was, however, neither concept had been pleaded by Socimer.

50  When Messrs Clifford and Feld came to give evidence, Mr Millett did not cross-examine them on the evidence they had given as to how Standard would have valued the Designated Assets. Despite his earlier exchanges with the judge on such cross-examination, Mr Millett's decision was quite deliberate. This was remarked on by Mr Auld in his closing oral submissions, when there was the following exchange with an apparently unsympathetic judge (at Day 10.55/56):

> " *SA:* … It certainly is not open to Socimer to now attack what the bank says it would have done in terms of saying that it is capricious or dishonest or anything of that sort.

> *Gloster J:* I do not understand that, Mr Auld. Let us assume that I find as a fact that the bank's witnesses are right that they would have valued something at nil or they would have given a low valuation. I do not see why the fact that he has not challenged their statement that they would have valued it at X or at nil means that I am not entitled to determine whether or not that was capricious. They are two separate things are they not?

> *SA:* It is a broad point of fairness, in my submission, and nothing more than that. It cannot be right that highly experienced city people, who are saying in good faith on oath in evidence what they would have done, can then have their opponents saying in litigation, 'No, you would not have done it,' or 'It was dishonest or capricious'."

51    In that exchange Mr Auld was dealing with the "broad point of fairness" that in the absence of cross-examination counsel cannot simply assert a challenge of dishonesty or capriciousness. A little later, however, he made the additional submission that in any event Socimer had no pleaded basis for an alternative challenge on the ground of unreasonableness or breach of a duty of care. I will return to that point.

52    Later that day Gloster J raised with Mr Millett in his closing speech the issue that he had not cross-examined Messrs Clifford and Feld on their evidence of valuation. Mr Millett then made it plain that this had been deliberate tactics. The following exchange occurred (Day 10.138/141):

> *Gloster J:* If I am against you on the would-have, I have to come up with what they would have done and should have done had they been complying with their contractual obligations … What do you say about the point that you did not cross-examine Mr Feld or Mr Clifford about it?

> *RM:* Yes, I did not, and I did not do so deliberately; it was not because I ran out of time or because I was frightened about what they were going to say; I knew what they were going to say … One can take it that he would have disagreed. But where does that take your Ladyship? The question is, what does it add to the court's task, which is to discover the value that Standard … acting reasonably should have come up with …

> *Gloster J:* You cannot dispute that is what they would have done—

> *RM:* I cannot dispute, subject to one thing—

> *Gloster J:* — because you did not cross-examine them.

> *RM:* No, but I can make two submissions. First of all, I say to your ladyship that your ladyship should not accept blindly, without scepticism, what they say they would have done … because it was self-serving … Secondly, we have set out at length in part C the reasons why we say Mr Clifford's evidence is not credible …" [Part C was a reference to Mr Millett's closing written submissions whose Part C was headed "Standard's credibility".]

53    In this important exchange, Mr Millett makes the following points: (1) that he had chosen not to cross-examine the witnesses deliberately, in reliance on his legal point (which of course the judge had still not resolved) that their "would have" evidence was irrelevant and inadmissible; (2) that he did not expect that any cross-examination would have made any difference to their evidence; (3) that despite those matters, he would invite the judge to regard their evidence with scepticism as being "self-serving" and indeed to reject it as "incredible"; (4) while at the same time acknowledging that he could not otherwise dispute it. In my judgment, those are unsatisfactory submissions. Of course, if the evidence was irrelevant and inadmissible, there was no problem. The judge, however, had asked her question on the basis that she decided otherwise. The other points were a polite way of asking the judge to reject the unchallenged evidence on the basis that it was not given in good faith. The only other theoretical possibility was that the evidence was given in good faith but was the result of the witnesses honestly but wrongly persuading

themselves that an incredible account was a true account of how they would themselves have behaved. In the circumstances, however, that was not a feasible alternative, and was inconsistent with the idea of their evidence being self-serving. It was also inconsistent with the submission that no amount of cross-examination would have altered the evidence. Moreover, there was no suggestion that what was in issue was that entirely normal experience in the courts of witnesses having honestly different views about the extent of their duties or the performance of them.

54  I revert to the separate point as to whether a case of unreasonableness or negligence could be advanced, in the absence of a pleading, on some such basis as an implied term. This was the subject-matter of increasing debate beyond the confines of the trial itself.

55  The final day of evidence had been on 24 June 2005. There was then a pause while the parties put their closing submissions into writing. During that pause Mr Auld's written submissions were served on 4 July 2005. He dealt briefly with "reasonableness" at para 40 of his document. He asked the judge to be extremely cautious, since "There is no basis for implying contractual terms to this effect (if this is what is alleged)".

56  Mr Millett's written submissions were exchanged on the same day. They opened with new and extensive submissions of construction as to the content and basis of the valuation obligation. He now submitted that there were two possible legal sources of a duty which he defined as one to perform the valuation exercise "not only in good faith but with reasonable care, by reference to objective criteria existing at the time". The first legal source was "An **implied term** to perform the valuation with reasonable care". The second was "An **obligation in equity** not to damage the residual interests of the mortgagor in the mortgaged property". In both respects he made use at this point of suggestions floated by the judge during Mr Auld's opening oral submissions.

57  On 7 July 2005 the parties returned to court for a final day of closing oral submissions. I have already cited passages from them in relation to the issue of cross-examination. As for the implied term now put forward, Mr Auld observed that nothing of that kind had ever been pleaded against Standard so as to go beyond the matters to which Cooke J

had alluded, such as good faith, capriciousness and the like. He further observed that if such a case had been made, Standard would have wanted to adduce further evidence, such as that of market practice. Mr Millett responded to say that it was a pure point of law, although he accepted that an implied term had never been pleaded. During his final oral submissions Mr Millett elaborated slightly in an exchange with the judge (at Day 10.98/99) on the difference between "unreasonable" in the sense of negligent and in the sense of " *Wednesbury* unreasonable". The judge suggested that the former went beyond the latter. Mr Millett suggested that in this case it amounted to the same thing, and that "whether you call it an obligation of care is probably just playing with words".

58  On 17 July 2005 Socimer sent to the judge a "Post-Trial Note" containing extensive further legal submissions concerning the mortgagor/mortgagee analogy. On 22 July 2005 Standard responded with further written submissions of its own. On 14 October 2005 Socimer had the last word with its "Response Submissions" which developed still further its implied term and equity bases for a duty of reasonable care. That document repeated the oral submission that Socimer perceives "little if any difference between" the duty to act with reasonable care and the duty not to behave *Wednesbury* unreasonably.

59  The judge was then left in peace to write her judgment. Before I turn to that judgment, it will I think be convenient if I refer to some authority discussed in her judgment about which there has been little controversy on this appeal. That authority is concerned with the implications implicit in the contractual allocation to one party of a power to make decisions.

**Authority concerning a contractual power to make decisions**

60  When a contract allocates only to one party a power to make decisions under the contract which may have an effect on both parties, at least two questions arise. One is, what if any are the limitations on the decision-maker's freedom of decision? The other is, what is to happen if the contractual power was not in fact exercised at the time when the relevant party was obliged to make a decision?

61  The answer to the first question is illustrated by cases such as the following. In Abu Dhabi National Tanker Co v. Product Star Shipping Ltd (The "Product Star") (No 2) [1993] 1 Lloyd's Rep 397 the charterparty contained a clause which gave charterers the right to alter the destination of the cargo in circumstances where the contractual port of loading or discharge was blockaded owing to war and "the loading or discharging of cargo at any such port be considered by the Master or the owner in his or their discretion dangerous". The trial judge, upheld by the court of appeal, held that the owners' purported decision under this clause was wholly unwarranted, and that in fact they did not consider it dangerous to proceed to the contractual loading port. Leggatt LJ (with whom Balcombe and Mann LJJ agreed) said this about the content of the owners' power (at 404):

> "For purposes of judicial review the Court is concerned to judge whether a decision-making body has exceeded its powers, and in this context whether a particular decision is so perverse that no reasonable body, properly directing itself to the applicable law, could have reached such a decision. But the exercise of judicial control of administrative action is an analogy which must be applied with caution to the assessment of whether a contractual discretion has been properly exercised. The essential question always is whether the relevant power has been abused. Where A and B contract with one another to confer a discretion on A, that does not render B subject to A's uninhibited whim. In my judgment, the authorities show that not only must the discretion be exercised honestly and in good faith, but, having regard to the provisions of the contract by which it must be conferred, it must not be exercised arbitrarily, capriciously, or unreasonably. That entails a proper consideration of the matter after making any necessary enquiries. To

these principles, little is added by the concept of fairness: it does no more than describe the result achieved by their application."

62  Ludgate Insurance Company Ltd v. Citibank NA [1998] Lloyd's Rep IR 221 concerned an agreement by which the London Market Letter of Credit Scheme was operated by Citibank. In certain circumstances the agreement gave to the bank the rights "to retain in the account(s) such additional margin as it considers appropriate in all the circumstances" and "to allocate the drawing(s) … in such manner as the Bank considers appropriate in its sole discretion". Waller J and this court held that Citibank had exercised its decision-making rights in accordance with the purposes for which they were granted. Brooke LJ (with whom Mummery and Russell LJJ agreed) said this (at 239/240):

> "35.  It is very well established that the circumstances in which a court will interfere with the exercise by a party to a contract of a contractual discretion given to it by another party are extremely limited. We were referred to Weinberger v Inglis [1919] AC 606 ; Dundee General Hospitals Board of Management v Walker [1952] 1 All ER 896 , Docker v. Hyams [1969] 1 Lloyd's Rep 487 , and Abu Dhabi National Tanker Company v Product Star Shipping Company Limited [1993] 1 Lloyd's Rep 397 (" The Product Star "). These cases show that provided that the discretion is exercised honestly and in good faith for the purposes for which it was conferred, and provided also that it was a true exercise of discretion in the sense that it was not capricious or arbitrary or so outrageous in its defiance of reason that it can properly be categorised as perverse, the courts will not intervene.

Socimer International Bank Ltd (in Liquidation) v Standard..., 2008 WL 5710886 (2008)

36.    Mr Rowland sought to derive comfort from some of the language used by Leggatt LJ, with whom the other members of this court agreed, in The Product Star at p 404 in support of a contention that the courts are more ready to apply a standard of objective reasonableness when assessing whether a discretionary decision can stand. That Leggatt LJ had not the slightest intention of watering down the well-established test is manifest from the passages in his judgment (at pp 405 RHC; 406 RHC, and 407 RHC) in which he applied the law to the facts, where it is clear that he is using the epithet "unreasonable" to characterise a view which no reasonable decision-maker could reasonably have formed on the material before him."

63    Gan Insurance Co Ltd v. Tai Ping Insurance Co Ltd (No 2) [2001] EWCA Civ 1047, [2001] 2 All ER (Comm) 299 concerned the claims co-operation clause in a facultative reinsurance policy. The clause required the prior approval of the reinsurers for any settlement or compromise of an underlying loss. The issue was raised whether it was to be implied that reinsurers could not withhold such approval unless they had reasonable grounds for doing so. This court, in a judgment given by Mance LJ (in which Latham LJ and Sir Christopher Staughton shared) held that no such implication was to be made. Mance LJ said—

"64.    I gain some assistance by analogy from these cases. In all of them, it seems to me that what was proscribed was unreasonableness in the sense of conduct or a decision to which no reasonable person having

the relevant discretion could have subscribed …

67    … I would therefore accept as a general qualification, that any withholding of approval by reinsurers should take place in good faith after consideration of and on the basis of the facts giving rise to the particular claim and not with reference to considerations wholly extraneous to the subject-matter of the particular reinsurance …

73.    If there is any further implication, it is along the lines that the reinsurer will not withhold approval arbitrarily, or (to use what I see as no more than expanded expression of the same concept) will not do so in circumstances so extreme that no reasonable company in its position could possibly withhold approval. This will not ordinarily add materially to the requirement that the reinsurer should form a genuine view as to the appropriateness of settlement without taking into account considerations extraneous to the subject matter of the reinsurance …"

64    Paragon Finance plc v. Nash [2001] EWCA Civ 1466, [2002] 1 WLR 685 concerned a variable interest clause in a mortgage agreement. The issue was whether the discretion given to the mortgagee to vary the interest rate was subject to an implied term that it was bound to exercise the discretion "fairly as between both parties to the contract, and not arbitrarily, capriciously or unreasonably". Dyson LJ (with whom Thorpe LJ and Astill J agreed) accepted a limited implication in which "unreasonably" was understood in a sense analogous to the *Wednesbury* sense: Associated Provincial Picture

Houses Ltd v. Wednesbury Corporation [1948] 1 KB 223 . That was the sense in which Leggatt LJ had used the expression in The Product Star : see at paras 37/38. Dyson LJ concluded:

> "41. So here too, [referring to Gan Insurance v. Tai Ping Insurance ] we find a somewhat reluctant extension of the implied term to include unreasonableness that is analogous to *Wednesbury* unreasonableness. I entirely accept that the scope of an implied term will depend on the circumstances of the particular contract. But I find the analogy of the Gan Insurance case and the cases considered in the judgment of Mance LJ helpful. It is one thing to imply a term that a lender will not exercise his discretion in a way that no reasonable lender, acting reasonably, would do. It is unlikely that a lender who was acting in that way would not also be acting either dishonestly, for an improper purpose, capriciously or arbitrarily. It is quite another matter to imply a term that the lender would not impose unreasonable rates …"

65   The second issue referred to above, is what is to happen if the contractual discretion ought to have been exercised but has not. That is answered in this court by Cantor Fitzgerald International v. Horkulak [2004] EWCA Civ 1287 (14 October 2004) . There an employee who had been wrongly dismissed sought compensation to include a discretionary bonus which he might otherwise have been awarded. This court held that the court's task in such a case is to put itself in the shoes of the decision-maker. Potter LJ (giving the judgment of the court, which also included Carnwath LJ and Bodey J) said:

> "51. The judge having found in favour of the claimant in this respect, his second task was to

assess the amount of the bonus likely to have been paid, bearing in mind the flexibility afforded by the contractual language. Thus the exercise would not permit the judge simply to substitute his own view of what would have been a reasonable payment for the employer to make, but required him to put himself in the shoes of those making the decision, and consider what decision, acting rationally, and not arbitrarily or perversely, they would have reached as to the amount to be paid."

See also para 30, where Potter LJ put in his own words the conclusion to be derived as to the content of the decision-maker's duty, and in particular his comment there that—

> "While, in any such situation, the parties are likely to have conflicting interests and the provisions of the contract effectively place the resolution of that conflict in the hands of the party exercising the discretion, it is presumed to be the reasonable expectation and therefore the common intention of the parties that there should be a genuine and rational, as opposes to an empty or irrational, exercise of discretion."

66   It is plain from these authorities that a decision-maker's discretion will be limited, as a matter of necessary implication, by concepts of honesty, good faith, and genuineness, and the need for the absence of arbitrariness, capriciousness, perversity and irrationality. The concern is that the discretion should not be abused. Reasonableness and unreasonableness are also concepts deployed in this context, but only in a sense analogous to *Wednesbury* unreasonableness,

not in the sense in which that expression is used when speaking of the duty to take reasonable care, or when otherwise deploying entirely objective criteria: as for instance when there might be an implication of a term requiring the fixing of a reasonable price, or a reasonable time. In the latter class of case, the concept of reasonableness is intended to be entirely mutual and thus guided by objective criteria. Gloster J was therefore, in my judgment, right to put to Mr Millett in the passage cited at para 57 above the question whether a distinction should be made between the duty to take reasonable care and the duty not to be unreasonable in a *Wednesbury* sense; and Mr Millett was in my judgment wrong to submit that it made no difference which test you deployed. Lord Justice Laws in the course of argument put the matter accurately, if I may respectfully agree, when he said that pursuant to the *Wednesbury* rationality test, the decision remains that of the decision-maker, whereas on entirely objective criteria of reasonableness the decision maker becomes the court itself. A similar distinction was highlighted by Potter LJ in para 51 of his judgment in Cantor Fitzgerald . For the sake of convenience and clarity I will therefore use the expression "rationality" instead of *Wednesbury* -type reasonableness, and confine "reasonableness" to the situation where the arbiter on entirely objective criteria is the court itself.

67  I do not think that the body of authority cited above is in dispute. Rather, what Mr Millett submits is that it is always open in any particular contract to argue for a more extensive implied limitation. His reasons for saying why an implication requiring an objective assessment by the court is to be made in this case, if it is open to Socimer, will still need to be considered below. It is, however, against the background of this authority that the argument will proceed.

68  In his judgment Cooke J cited no authorities and I do not know what if any authorities were cited to him; possibly none. Nevertheless, when he spoke (at para 32) of the valuation exercise lying "entirely in [Standard's] hands" subject to the proviso that its assessment "is in good faith and is not challengeable on any other basis", he was referring either through knowledge or sound intuition to the body of authority which I have cited above. He was not intending to suggest an implied term changing the whole basis of the assessment.

69  I now turn to the judgment of Gloster J.

## The judgment of Gloster J

70  We are concerned only with those parts of Gloster J's judgment which relate to the three issues defined in the *Introduction* above. For reasons which will become clearer, it is not easy to state precisely the terms of her findings or holdings. It will suffice for the present to say, however, that on those issues she held in favour of Mr Millett's submissions, as follows: on issue 1, the "implied term" issue, that the agreement was subject to an implied term requiring Standard to carry out its valuation reasonably and with reasonable care, so as to arrive at what objectively can be said to be a proper value of the Designated Assets, as supported by the analogy with the duties imposed by equity on a mortgagee in possession; on issue 2, the "Unpaid Amounts" issue, that whether or not Standard was obliged to set off the $4,000,000 of other credits against the Unpaid Amounts as of the valuation date, it would have done so, thus opening the door to a further finding that, even if Standard's own valuations had been accepted, there would have been a surplus of assets which would have led to the transfer to Socimer of its purchase of Socma DRs; on issue 3(1), the "open to Socimer" issue, that there was nothing to prevent Socimer adopting its new construction of the valuation obligation; and on issue 3(2), the "unchallenged evidence" issue, that although the factual evidence of Standard's witnesses as to their "would have" valuation was admissible, it was worthless and could fairly be rejected, even though it had not been challenged in cross-examination.

71  It is necessary, however, to go into greater detail.

72  As for issue 1, the judge's expression of her decision was not uniform throughout her judgment. She considered the parties' submissions and stated her conclusions on this issue at paras 31/45 of her judgment. Mr Millett's submission was that Standard was "bound to perform the valuation exercise not only in good faith but with reasonable care, by reference to objective criteria existing at the time" (see para 56 above). The valuation sentence was silent as to machinery and did not confer on Standard the broad discretion elsewhere referred to in the agreement. The rationale

was the need to protect Socimer from the abuse of Standard's self-interest. The two possible legal sources were (a) an implied term, whose necessity was proved by the rationale just referred to, and (b) an obligation analogous to that in equity "not to damage the residual interests of the mortgagor in the mortgaged property". Mr Auld, however, submitted that where a party has a contractual discretion, the law makes no implication that such discretion should be exercised reasonably with regard to the interests of the other party. There was in any event no justification of necessity for the implied term in question. As for the mortgagor/mortgagee analogy, it had no application to the agreement and would have the effect of completely rewriting it.

73   The judge concluded that "Standard was obliged to act honestly and reasonably and to arrive at a value which properly reflected the actual value of the Designated Assets as at the termination date", albeit it might also be entitled to adopt "an extremely conservative approach" to the question of valuation ( para 36). However, when the judge came to expand on her reasons, it appears that there might be some confusion or conflation in her mind between the concepts of reasonableness and rationality, for she referred to the cases from The Product Star to Cantor Fitzgerald as demonstrating that the courts are not slow to imply a term that a party must exercise its contractual discretion "not only honestly and in good faith, but also reasonably and not capriciously" (at para 38). I have made the point above that those cases use "reasonably" in that context to refer to a *Wednesbury* -type rationality. Moreover, she went on to say this (at para 40):

> "In fact I do not view the obligation to act reasonably as anything in essence different from the obligation to use good faith; it is part of the good faith obligation that Standard should conduct the valuation process in a reasonable manner, to arrive at what objectively can be said to [be] a proper value of the Designated Assets at the termination date …"

74   Up to the words "in a reasonable manner", that formulation would have had Mr Auld's agreement; but the words thereafter, reflecting similar words in para 36, are plainly liable to go beyond the concepts of good faith and rationality. This extension of the concepts of good faith and rationality is again demonstrated by the judge's acceptance of the analogy of the duties of a mortgagee in equity. The judge listed those duties (at para 42(a) to (h)) by reference to the relevant jurisprudence reviewed by Lawrence Collins J in Meftah v. Lloyds Bank plc (No 2) [2001] 2 All ER (Comm) 741 as including: a duty of care, a duty to obtain market value, and a duty fairly and properly to expose the property in the market, (albeit the mortgagee will not be adjudged in default unless he is plainly on the wrong side of the line). She said that there was every reason, in the need to value and to return any surplus to Socimer, "for the implication of a duty closely analogous to that of a mortgagee" (at para 43). She also relied (at para 44) on a similar restatement of the mortgagee's duties in equity taken from para 19 of Lightman J's judgment in this court in Silven Properties Ltd v. Royal Bank of Scotland [2003] EWCA Civ 1409, [2004] 1 BCLC 359 . Gloster J then ended this passage of her judgment by restating her implied term in the following terms:

> "45.   I agree with Mr Millett that paragraph 19 of [ Silven Properties ] supports Socimer's argument that, if a term is to be implied, it should be one that imposes on Standard a duty, in doing its valuation, to take reasonable precautions to value the Designated Assets at "the fair" or "the true market" or "proper" value of such Assets as at the termination date and cannot simply value at nil, simply because there does not happen to be a purchaser or a quoted bid price on that date."

75   Therefore, despite some uncertainty engendered by the judge's acceptance that Standard had a discretion as to its assessment and by her conflation of good faith and reasonableness, it appears that on balance

she was accepting in full or at least in general both Mr Millett's approach as a matter of law and his submission that, subject at any rate to the possibility of taking a conservative approach, what was required on objective market-based criteria was the true market value. Only such a value could also be described as fair, reasonable or proper. Standard not only had an obligation to use reasonable care to value at such a value, but had to arrive at it: the judge sometimes stressed the former aspect and sometimes the latter.

76  These conclusions of the judge have, however, to be balanced with what she said about the issue between the parties as to whether Standard's factual "would have" case was relevant and admissible. She discussed this issue even before considering the matters of law just reviewed above, at a passage in her judgment headed "Objective/subjective approach to valuation" (at paras 22/28). On this issue, on balance she favoured Mr Auld's approach. She said (at para 25):

> "However, it seems to me that Mr Auld's approach is to be preferred, at least to some extent. In reality, there is not much difference between the two approaches and it is a mistake to become too bogged down with semantic difference between a so-called "subjective" and a so-called "objective" approach. As a matter of principle, and based on the construction of the Agreement as found by Cooke J, in my judgment, what I have to decide is what, on the balance of probabilities, is the value as at the termination date that Standard would have attributed to the Designated Assets, if it had carried out that valuation on or shortly after the termination date (20 February 1998) on the assumption that, although, as Cooke J said, the valuation exercise lay entirely in Standard's hands as at the date of termination, nonetheless Standard was complying with its contractual obligations under clause 14(a)(bb) of the Agreement … In other words, the correct question in

calculating Socimer's compensation is what valuation Standard would have reached on that date if the contract had been performed."

77  Of course, the "would have" valuation to be expected is that which Standard would have performed if carrying out its obligations. In other words, Standard could not perform a valuation in bad faith, to refer to the obligation of good faith about which the parties are in common accord. However, that is not the "should have" valuation which Mr Millett was contrasting with Mr Auld's "would have" obligation. Mr Millett's "should have" valuation is his obligation to arrive, objectively, at the true market value, based on his implied term. Mr Auld's "would have" obligation was limited to that valuation which Standard was entitled to make in the exercise of its own discretion, in good faith and rationally, but otherwise consulting its own interests and therefore in that sense aiming at a subjectively valid as distinct from objectively true value. Thus, when Gloster J went on later in her judgment to prefer Socimer's submissions as to the implied content of the valuation sentence, she was removing with one hand what she had granted to Standard with the other.

78  Gloster J returned to these problems when she came to assess the evidence before her on valuation and to state her decisions about it. It was in the particular context of the valuation of the Brazilian TDA-Es that she made the following observations, which in my judgment encapsulate and point up the inconsistency which she had allowed to develop in her previous conclusions. She said (at para 94):

> "Mr Millett submitted that the evidence of the Standard witnesses as to the valuations that they would have put on the TDA-Es, had they come to value them, was irrelevant and inadmissible. That was because, he said, in circumstances where Standard had not in fact carried out a valuation exercise, the Court should pay no regard to the opinions of the Standard witnesses. I have

earlier in this judgment [ie at paras 22/28] ruled against this submission. I have concluded that, where a contract gives one party a discretion and for some reason it does not exercise that discretion, the other party's damages are to be calculated according to the court's assessment of the evidence as to how the party would have exercised that discretion, not as a matter of law according to the court's view of what is reasonable. In other words, the Court's task is to put itself in the shoes of Standard, and decide what figure it would have arrived at, had it appreciated the need to conduct a valuation. Accordingly, in conducting this exercise I have had regard to, and taken into account, the evidence given by the Standard witnesses as to the approach and criteria they would have adopted and the figures at which they would have arrived. However, at the end of the day it is for the Court itself to decide at what figure Standard would have valued the TDA-Es, if it had been acting in good faith and not in an arbitrary fashion."

79   Had this been all that the judge had said on these matters, then, like Cicero, Mr Auld would have been able to disdain the adversarial swords of Mr Millett's advocacy. [1]  However, on this basis what she had said about the need to arrive at an objective market value would have been beside the point. The concern is therefore that ultimately in valuing the Designated Assets she reversed her stated position in this passage, by the combination of maintaining her implied term analysis requiring an objective assessment of the true market value, and of rejecting Standard's (albeit unchallenged) evidence.

80   That concern is supported by the following considerations. First, this passage at para 94 comes *after*

the judge had already valued the Socma DRs not only on Socimer's primary but also on its secondary case. The judge therefore would presumably at that earlier point have had her implied term basis of valuation predominately in mind. Secondly, in valuing the Socma-DRs on Socimer's primary case (ie on the basis that they should have been transferred over to Socimer) the judge said in terms that in such circumstances the value to be placed on them "must be the value of the Socma DRs in Socimer's hands, *not an objective market based value* " (emphasis added, at para 73), where the contrast is with the objective market value which would be applied on Socimer's secondary case. Thirdly, in dealing with that secondary case (at paras 83/86) the judge rejected the evidence of all the witnesses she had heard (Socimer's case was that the Socma DRs were worth some $7.5 million, Standard's that it would have valued them at $500,000), and selected a figure of about $3,000,000. It is true that she did so on the basis that "Standard would have been likely, acting cautiously as it was entitled to do, to have ascribed a value of approximately US$ 3 million" to them: but she gave no reason for that figure other than going on immediately to say that "I am supported in this conclusion by the actual price of US $2 million that was achieved subsequently when Standard sold the instruments on 12 January 2000", that is to say nearly two years after the termination date (at para 86). It is not clear how that figure supports the judge's figure, but I am left with the conclusion that the judge has made her own assessment of an objective market value and ascribed that to Standard. In effect, having made her own assessment, she has ascribed that to Standard as the valuation it would have made in accordance with its valuation obligations.

81   Fourthly, turning to the valuation of the Brazilian TDA-Es, I observe that the judge essentially adopted the evidence of Professor Rosenberg, and rejected that of all Standard's witnesses, both factual and expert (although she gave some detailed consideration to Mr Quintero's evidence as to his own hindsight figure of some $5.5 million). Professor Rosenberg's figure was between $8.9 and $9.4 million ( para 114(i)), and he was giving evidence based on Socimer's "should have" objective market value approach. The judge adopted that figure, while making a discount to $8.5 million out of consideration for Standard's entitlement to a

cautious and conservative approach. She commented (at para 114(iii)):

> "This is less than I find to be the actual value of the instruments as at the termination date, but nonetheless I consider it would have been a figure that Standard could legitimately have put forward in compliance with its obligations of good faith and reasonableness under the Agreement."

This valuation, therefore, would seem to demonstrate something of an hybrid approach on the part of the judge. Expressly, she purported to be finding what Standard would have done (see para 94, cited above, as well as para 102: "In my approach to ascertaining what figures Standard would have arrived at for the TDA-Es … I take into account the fact that Standard would have wanted to, and would have been entitled to, have adopted an extremely conservative approach"). She applied her conservative and cautious discount on that basis. She also expressly referred in this context of the TDA-Es to Standard's "wide discretion as to value" (at para 102(iii)). However, she rejected all Standard's factual evidence, and its expert evidence in support of that factual evidence, and essentially adopted the objective market value of Professor Rosenberg.

82   What is going on here? It is hard to say. Mr Millett did not address us on the role of para 94, apart from referring to it as one of a number of places where the judge indicated that she did not simply ignore the evidence of Standard's witnesses. It remained his overall submission nevertheless that "the whole trial proceeded on the basis that the numbers were properly the subject of expert evidence", that "The search was for an objective true value" and that "the judge was faced with really a range of numbers from which she could choose" (12 December 2007 at 133/134). Doing the best I can, I would provisionally interpret the judge as saying that because Standard's evidence was unacceptable by reference to its obligations of good faith and reasonableness, she was left only with expert evidence as to what a proper valuation should have been, on which subject she preferred the evidence of

Professor Rosenberg. That is why she expressed her conclusion at para 114(iii), quoted above, by saying that the figure of $8.5 million was one that Standard "could legitimately have put forward in compliance with its obligations of good faith and reasonableness". In other words a lower figure could not be put forward on that legitimate basis. Subject to the ambiguity inherent in the word "reasonableness" discussed above, that is a return to the judge's implied term. This would be consistent with my understanding expressed above of the judge's conclusion on Socimer's secondary case as to the value of the Socma DRs. In other words, the judge has made her own assessment of an objective market value and then ascribed that to Standard, subject to a discount for cautiousness, on the basis that that figure is the figure it would have arrived at if complying with its (implied) obligations. Moreover, the reference by the judge to the obligation of good faith suggests that she also found Standards's valuation to be lacking in this respect as well.

83   Because these matters, on my provisional view, are linked with the judge's attitude to the legitimacy of rejecting Standard's factual evidence, I proceed next to consider in further detail the judge's conclusions as to issue 3(2), the "unchallenged evidence" issue. The judge did not refer at all to Mr Auld's submissions that it would be unfair to reject the evidence of Messrs Clifford and Feld in the absence of any challenge to it by way of cross-examination. Nevertheless, the judge did reject their evidence on valuation. She reflected Mr Millett's submission throughout the trial that their evidence should be discounted on the ground that it was partisan and self-serving. Thus she said of Mr Clifford that "I had to approach his evidence on the basis that there was a real risk that it might be self-serving and partisan" (at para 106); and she went on immediately to say of Mr Feld that "Likewise I did not find Mr Feld to be a persuasive witness. His evidence also gave the impression at times of being self-serving, partisan and argumentative" (at para 107). Those were general comments. Under the immediately following heading of "The evidence relating to the valuation of the TDA-Es" she said "I did not find the evidence given by the Standard witnesses as to the valuation figure which they said they would have ascribed to the TDA-Es persuasive" (at para 108). The reason she gave was that neither of them had done "a retention valuation of the sort contemplated by the Agreement",

ie a clause 14(a)(bb) valuation, before. "Thus it was not a situation where retention valuations of Designated Assets following default were routinely carried out by Standard." That was so, for clause 14(a)(bb) had never been interpreted by Standard in the way Cooke J had interpreted it. However, the judge did not say that they were not experienced bankers in the business of trading in and valuing the securities in emerging markets: as at any rate on their evidence they purported to be. The judge also gave other reasons, such as lack of support from Mr Quintero, for rejecting their evidence. We have not heard argument about those reasons in themselves. Therefore, I assume for present purposes that those reasons are sound, as far as they go. Clearly, Professor Rosenberg was an impressive witness.

84 The judge was of course entitled to form a view about the evidence before her, as Mr Millett has correctly submitted to us. Even so, there are three things which concern me in this regard. First, did she reject evidence which had not been fairly and properly challenged by Socimer in the absence of cross-examination? Secondly, did she reject their evidence on a basis on which Standard had never been challenged at all, quite apart from the absence of cross-examination? Thirdly, did she reject their evidence because she was expecting too much of it by imposing an "objective true market" test on Standard's obligation?

85 I ask my first question because Mr Millett accepted both before the judge and again before this court that he had deliberately decided not to cross-examine Messrs Clifford and Feld on their evidence that they would have valued the assets in the way that they said they would have. I ask the second question, because Mr Millett acknowledged before us that he did not challenge the honesty or good faith of their evidence and had never done so. He was quite specific about that. I ask the third question because of those parts of the judgment which suggest that Gloster J was considering the evidence through the prism of an obligation (to take care) to arrive at an objective true market value.

86 I observe that in this connection: (1) The judge gave no reason for rejecting Messrs Clifford's and Feld's "would have" valuation evidence regarding the valuation of the Socma DRs. In this respect, as I have remarked above, she did not accept the evidence of either party's expert as to this Argentinian corporate

bond over which Socimer's impending insolvency threw its own pall (Socimer's relevant expert, Mr Tether, valued this asset at about $7.5 million, Standard's expert, Mr Doyhambehere, said there was no market at all and valued it at nil). However, other than saying that she had "heard all the evidence", she gave no reason for rejecting Messrs Clifford's and Feld's valuation at $500,000 and for concluding that Standard "would have" ascribed a value of "approximately US$ 3 million". (2) In connection with the Brazilian TDA-Es, one of the judge's reasons for rejecting the evidence of Messrs Clifford and Feld was expressed as follows (at para 109):

> "In cross-examination, Mr Quintero distanced himself from what Mr Clifford and Mr Feld had done. He was at pains to stress that he did not try to justify the highest discount possible. He said " *I was just straight* ", which carried with it the clear implication that he did not regard Mr Clifford's and Mr Feld's valuations as falling within that description as representing an appropriate approach to the valuation process."

It seems to me that at this point the judge is expressly in the course of saying that those valuations were not in good faith and/or that the evidence that such valuations would have been adopted was not honest evidence. (3) In the next paragraph (at para 110) the judge said:

> "At the end of the day I conclude that I cannot accept the Standard witnesses' evidence as to the valuation at which they say they would have arrived had they appreciated Standard's obligations under the Agreement."

That is the judge rejecting unchallenged evidence of what those witnesses say they would have done. That is understandable if the judge thought that Messrs

Clifford and Feld were not being "straight". It is also understandable if the reference to "Standard's obligations under the Agreement" begs the question as to whether those obligations were to arrive at an objective true market value. Otherwise, it is not easy to understand.

87   I therefore conclude that the provisional view expressed above, namely that the judge had it in mind that the evidence of Messrs Clifford and Feld was unacceptable because it was not consistent with Standard's obligations of good faith and reasonableness, at any rate in the light of its implied term obligation, is the correct way to understand her judgment. Thus I am also concerned that one of the reasons which has led Gloster J to this strong conclusion is that she is also judging Standard's evidence by a test (the implied term test) for which its evidence was never prepared.

88   Issue 3(1), the "open to Socimer" issue is not unconnected with issue 3(2), because, if Socimer's implied term basis for criticising Standard's valuation evidence was not properly available to Socimer, then that would be an alternative reason for being concerned if it be the case that the judge's criticism of Standard's evidence was premised at least to some degree on that test of its valuation obligation. On this issue 3(1), the judge rejected Mr Auld's submission that a timeous pleading of an implied term would have affected the course of the litigation. She said (at para 37):

> "The issue is one essentially of law, and is not precluded by anything said or done earlier in this litigation by Socimer, nor by the terms of the Judgment [of Cooke J] which expressly recognised that the valuation might be challenged on the grounds that it was not conducted in good faith or for other reasons."

89   It is true that the implication is essentially one of law, being first and foremost a matter of construction. It may also be the case that the judge may have been right to have been sceptical of Mr Auld's expressed concern, had such an implied term been pleaded, to have brought forward further (unidentified) evidence of market practice bearing on the question of implication (*ibid*). However, there was a good deal of factual and expert evidence about the matrix of the contract before Cooke J, and there must be a real possibility that the nature of that evidence would have been different had Standard known that Socimer was contending for an implied term that both limited the broad valuation discretion which had been common ground before Cooke J and required the search for an objective true market value. Moreover, there is a still further concern, in the light of Gloster J's judgment, about the application of such a new implied term to the facts of the case. There is no point in bringing a new implied term to bear unless there is also a case that Standard would have been in breach of it by valuing the Designated Assets in the way they said they would have valued them. However, such a case had not been pleaded. If it had been, Socimer's witnesses would presumably have wished to address it in their evidence, beginning with their witness statements. It is fanciful to suppose that there was not further evidence which Standard would have wished to deploy, had Socimer pleaded its implied term and particulars of breach of it.

90   This is again linked to the absence of challenge by way of cross-examination to Standard's factual witnesses. If, on the basis of the new implied term, Standard's obligation was to take reasonable care in its valuation and/or to arrive at an objective true market value, what is the function of such a term unless Standard is given proper notice of how it is said that Standard's "would have" valuation failed to meet Standard's contractual obligations, and its witnesses are also given a fair opportunity in cross-examination to meet and answer any challenge which is being made? And if no challenge is made to Standard's factual witnesses, what is the point of the new implied term? And yet, seeing that the implied term was never pleaded, was new to the trial and indeed had not been clearly formulated until final speeches or even beyond final speeches, I find it difficult to discern a proper case being made of how it is said that Standard breached that implied term.

91   It is therefore possible to see that at the root of all these concerns is the appearance that Gloster J was judging Standard's witnesses against a test which they

had never come to court to deal with. They prepared their evidence of a hypothetical "would have" valuation on the basis of the valuation exercise as interpreted by Cooke J. But their evidence appears to have been rejected on the basis that it did not match up to a different interpretation of their obligations.

92    Issue 2, the "Unpaid Amounts" issue is self-contained. I shall therefore deal with the judge's analysis of it below, together with the parties' submissions on it at this appeal, and my own conclusions about it.

93    I turn now therefore to the resolution of each of the three issues we have heard argued.

**("implied term"): Discussion and decision**

94    The essence of the conflicting submissions has already been stated above. In brief, on behalf of Standard Mr Auld submits that, even if the case in favour of an implied term was open to Socimer, it should have been rejected by the judge. An implied term was not necessary. It ran against the vein of the agreement as a whole, which plainly gave the determination of value to Standard, in the exercise of its subjective judgment and subject to a wide discretion. Even if that was not expressly recognised in the valuation sentence itself, it was reflected in the definition of "Market Value", and in the sentence immediately preceding the valuation sentence, and in the provision for a conclusive certificate from Standard on the amount of any deficiency, which was binding subject only to manifest error. The context was the forward sale and purchase of assets in volatile and illiquid emerging markets. The valuation provision was triggered by the buyer's default. The effect of the "liquidated or retained" option was to require Standard to retain for its own account and risk any and all assets which it was unable immediately to liquidate on the valuation date itself (subject to any choice not immediately to liquidate a liquid asset). Even though the definition of "Market Value" did not apply in terms to the "value" referred to in the valuation sentence, it would be nonsense to give to that latter word the meaning of "market value" in an essentially different sense from that in which "Market Value" was deployed in the agreement. The hindsight imposition of an objective market value for an assessment which had to be done in an emergency on the termination date

itself, in respect of Standard's own property, which it was forced in breach of contract and against its will to retain, would be unfair and uncommercial. All of this was underlined by the terms in which the preliminary issue had been argued before and decided by Cooke J.

95    Moreover, no insight or support was to be derived from the cases about the position in equity of a mortgagee. The Designated Assets did not belong to the buyer, there was no equity of redemption, and the context of the agreement between two sophisticated trading partners in volatile markets was wholly different.

96    On behalf of Socimer, however, Mr Millett submitted to the contrary. He acknowledged that the valuation sentence was silent on the mechanism of valuation and that an implication therefore had to be made if his case was to succeed, but he submitted that it ought to succeed, for his term was necessary, in the traditional sense, for the sake of business efficacy. It would have been the common accord of the parties if raised as an issue by the "officious bystander". What was his term? It was that which Gloster J referred to at para 36 of her judgment, viz that "Standard was obliged to act honestly and reasonably and to arrive at a value which properly reflected the actual value of the Designated Assets at the termination date" ( paras 35/36 of his skeleton argument on appeal). He also glossed this as an obligation "to perform the valuation exercise not only in good faith but with reasonable care, by reference to objective criteria existing at the time" ( *ibid* at para 36(1)). The rationale of the implication was that, although Standard could be trusted in its own interest to get the best price it could when *selling* a Designated Asset, however when valuing a *retained* asset it was in conflict with the interests of its buyer because it would wish to ascribe as low a value as possible so as to maximise a potential profit on later sale. "That is the abuse from which Socimer needs protection by the imposition of a standard of reasonable care in the valuation process" ( *ibid* at para 36(1)(c)). An implied term to ward against such abuse was all the more necessary in the light of Standard's ability to certify its deficiency for itself. The only way in which to ensure that Socimer is protected from the harshness of the binding nature of the valuation is to provide that it must be carried out by reference to objective criteria against which it can be assessed. A duty of good

WESTLAW   © 2017 Thomson Reuters.

faith was insufficient, for it would not protect from honest but unreasonable or unfair valuations, such as the suggestion (already deployed before Cooke J) that where there was no buyer available on the termination date itself, the asset could be valued at zero. On the other hand, Standard did not need the protection of its own subjective assessment of value, for it already had sufficient protection in the other provisions of the agreement, such as the right to obtain downpayments on sale and additional downpayments as the market might decline or become more volatile.

97  Moreover, the fact that Standard was obliged to transfer to Socimer assets or cash which represented a surplus in Standard's hands both confirmed the need for an objective assessment of value and demonstrated the applicability of the mortgagee analogy.

98  Finally, Mr Millett submitted that there was nothing inconsistent in the judgment of Cooke J. The primary issue debated before him had been the different question of whether there was any need for a valuation at termination date at all, and when he concluded that the valuation was to be done "in good faith and not challengeable on any other basis" he was allowing for the implication now relied upon.

99  In connection with these submissions it is necessary to refer to two additional authorities. The first is Lion Nathan Ltd v. CC Bottlers Ltd [1996] 2 BCLC 371 (PC) , which Gloster J cited and Mr Millett relied on in his skeleton, but not in his oral submissions. There a share sale agreement contained a warranty that a profit forecast upon which the buyer had relied "has been calculated in good faith, and on a proper basis … and [is] achievable based on current trends and performance". The trial judge held that the seller had warranted that reasonable care had been taken in the preparation of the forecast and that the seller was in breach of warranty because it had deduced its forecast from the starting point of the sale price, rather than the other way round. Thus the actual forecast had been prepared on a wholly wrong basis. The Privy Council held that it was necessary to approach the question objectively and ask what a reasonable forecast would have been. This would have permitted a range of forecasts all of which would have been reasonable. In those circumstances it was submitted on behalf of the seller that it should be assumed to

have adopted a forecast which was the highest within the legitimate range. The Privy Council held however that in the absence of any evidence as to how the seller would actually have forecast its results on the correct methodology, the court could not choose any particular variation within that range and could make no assumption in favour of the seller. Lord Hoffmann said (at 380a):

> "In those circumstances, the only rational course open to a court is to choose the figure which it considers that a forecast made with reasonable care was most likely to have produced …"

100  As for that figure, Lord Hoffmann went on to reason that, in the absence of any evidence to displace the prima facie assumption that the most likely forecast would have accurately predicted the actual result, it was the latter which should be adopted as representative of the former. Damages were therefore awarded on that basis. Lord Hoffmann concluded (at 380i/381b):

> "It is true that the vendor did not warrant the actual figure in the PRS. He warranted only that reasonable care was taken in its preparation. If therefore it appeared from the evidence that even if reasonable care had been taken, the estimate *would* still have been to a greater or lesser extent higher than the actual outcome, it follows that to that extent the purchaser's loss has not been caused by the breach of warranty. So far as the price was referable to that part of the overestimate, the vendor is not liable. It should not however be sufficient for the vendor to say that merely because of the uncertainties of forecasting, the estimate *could* have been higher than the actual outcome, which in the absence of contrary evidence, is that if the

vendor had taken proper care, he would have got it right."

101   Gloster J referred to Lion Nathan in two passages of her judgment: at para 27, in a part of her judgment under the heading "Objective/subjective approach to valuation" where she was considering whether Standard was entitled to tender evidence about how it would have valued the Designated Assets; and at para 41, where in the context of deciding the implied term issue, she turned aside from the question of construction to comment that Standard could not say that it had honestly valued an asset at nil (in the absence of a market on the termination date) if "the evidence showed that the proper value of such assets that would have been attributed to such assets by the hypothetical reasonable financial institution in its position was far greater".

102   In his skeleton argument Mr Millett referred to Lion Nathan in support of the judge's and his implied term (at para 36(9)).

103   In my respectful judgment, Lion Nathan throws little if any light on our present problems other than supporting, but less directly than Cantor Fitzgerald , the judge's view that it was in order for Standard to tender factual evidence about how it *would have* carried out a contractual valuation. However, it throws no light whatsoever on the question of the construction of our agreement. In Lion Nathan the issue of construction had been decided by the trial judge, that the warranted forecast required the taking of reasonable care. The only issue of construction in the Privy Council arose out of the fact that the New Zealand court of appeal had differed from the trial judge in saying that the warranty that the forecast was "achievable" was a strict warranty and not merely one requiring the taking of reasonable care. There is no similarity between the forecast (looking into the future) of a warranty under a share sale agreement and clause 14(a)(bb) in our agreement; nor is there any similarity between the language of that warranty and our valuation sentence. In the present case, the issue is what the valuation sentence means or implies: and beyond the fact that a warranty which on one view is strict may be more

generously construed as only requiring the taking of reasonable care (as well as honesty) Lion Nathan teaches nothing at all as to construction. As it is, I suspect that the citation of Lion Nathan is the reason why there is some uncertainty as to whether Socimer's and the judge's implied term is one only to take reasonable care to arrive at the objective true market value, or is one actually to arrive at it.

104   The only other lesson of Lion Nathan goes to the *application* of a forecast warranty requiring good faith and reasonable care (not the issue with which I am presently engaged). Lord Hoffmann said that the requirement of good faith in a term requiring reasonable care did not permit the seller simply to pick the highest possible forecast within a range of reasonable forecasts on the basis that that would then support the highest possible price for the sale of the shares (at 379h). In this case, however, whatever the judge may have decided, Mr Millett has made it clear to us that he has had and has no challenge to Standard's honesty and good faith. Lord Hoffmann also said that in the absence of evidence to the contrary it should be assumed that the reasonably careful profit forecast and the actual result would be the same. That again has nothing to do with this case — save that if we had been concerned with the valuation of some wholly liquid security (a paradigm example of which would be (say) BP shares on an ordinary trading day) then it might be said that a valuation of such an asset which had been sold on the valuation (termination) day should, in the absence of evidence of anything untoward, be taken to be the sale price. However, we are not concerned with that scenario either. Neither the Brazilian TDA-Es nor the Socma DRs are suggested by Socimer as having been sufficiently liquid to have been liquidated on 20 February 1998.

105   The other authority which I need to mention at this point is the only authority cited in oral submissions by either party on the question of any implication (going beyond those of good faith and rationality etc discussed above). That is Phillips Electronique Grand Public SA v. British Sky Broadcasting Limited [1995] EMLR 472 (CA) . Although not reported other than in a highly specialised series of reports, it is a useful and authoritative modern restatement of the relevant principles upon which terms may be implied and of the rationale of doing or not doing so. The judgment is of

Sir Thomas Bingham MR and is a judgment of the court also constituted of Stuart-Smith and Leggatt LJJ. Sir Thomas Bingham said (at 480/482):

> "Both parties accepted as an accurate and comprehensive statement of the law on the implication of terms into commercial contracts the formulation of Lord Simon of Glaisdale on behalf of a majority of the Judicial Committee of the Privy Council in BP Refinery (Westernport) Pty Ltd v The President, Councillors and Ratepayers of Shire of Hastings (1978) 52 ALJR 20 at 26:
>
>> Their Lordships do not think it necessary to review exhaustively the authorities on the implication of a term in a contract which the parties have not thought fit to express. In their view, for a term to be implied, the following conditions (which may overlap) must be satisfied: (1) It must be reasonable and equitable; (2) It must be necessary to give business efficacy to the contract, so that no term will be implied if the contract is effective without it; (3) it must be so obvious that 'it goes without saying'; (4) it must be capable of clear expression; (5) it must not contradict any express term of the contract.

This passage, to which the judge paid close attention in reaching his decision, distils the essence of much learning on implied terms. But its simplicity could be almost misleading.

The courts' usual role in contractual interpretation is, by resolving ambiguities or reconciling apparent inconsistencies, to attribute the true meaning to the language in which the parties themselves have expressed their contract. The implication of contract terms involves a different and altogether more ambitious undertaking: the interpolation of terms to deal with matters for which, ex hypothesi, the parties themselves have made no provision. It is because the implication of terms is potentially so intrusive that the law imposes strict constraints on the exercise of this extraordinary power.

Socimer International Bank Ltd (in Liquidation) v Standard..., 2008 WL 2710888 (2008)

There are of course contracts into which terms are routinely and unquestionably implied. If a surgeon undertakes to operate on a patient a term will be implied into the contract that he exercise reasonable care and skill in doing so … Again, quite apart from statute, the courts would not ordinarily hesitate to imply into a contract for the sale of unseen goods that they should be of merchantable quality and answer to their description and conform with sample …

But the difficulties increase the further one moves away from these paradigm examples. In the first case [that of the surgeon], it is probably unlikely that any terms will have been expressly agreed, except perhaps the nature of the operation, and the time and place of operation. In the second case [that of sale of goods], the need for implication usually arises where the contract terms have not been spelled out in detail or by reference to written conditions. It is much more difficult to infer with confidence what the parties must have intended when they have entered into a lengthy and carefully-drafted contract but have omitted to make provision for the matter in issue. Given the rules which restrict evidence of the parties' intention when negotiating a contract, it may well be doubtful whether the omission was the result of the parties' oversight or of their deliberate decision; if the parties appreciate that they are unlikely to agree on what is to happen in a certain not impossible eventuality, they may well choose to leave the matter uncovered in their contract in the hope that the eventuality will not occur.

The question of whether a term is to be implied, and if so what, almost inevitably arises after a crisis has been reached in the performance of the contract. So the court comes to the task with the benefit of hindsight, and it is tempting for the court then to fashion a term which will reflect the merits of the situation as they then appear. Tempting, but wrong. For, as Scrutton LJ said in Reigate v Union Manufacturing Co (Ramsbottom) Limited [1918] 1 KB 592 at 605,

> "A term can only be implied if it is necessary in the business sense to give efficacy to the contract; that is, if it is such a term that it can confidently be said that if at the time the contract was being negotiated some one had said to the parties, 'What will happen in such a case', they would both have replied, 'Of course, so and so will happen; we did not trouble to say that; it is too clear'. Unless the court comes

to some such conclusion as that, it ought not to imply a term which the parties have not themselves expressed …"

In the familiar cases already mentioned there could be little room for doubt what the parties' joint answer would have been had the question been raised at the outset. There would, almost literally, have been only one possible answer. But this may not be so where a contract is novel, known to involve more than ordinary risk and known to be more than ordinarily uncertain in its outcome. And it is not enough to show that had the parties foreseen the eventuality which in fact occurred they would have wished to make provision for it, unless it can also be shown that one of several possible solutions would without doubt have been preferred: Trollope & Colls Limited v North West Metropolitan Regional Hospital Board [1973] 2 All ER 260, [1973] 1 WLR 601 at 609–10, 613–14."

106 The judge made no mention of such doctrine or of any cases which discuss it. Implications of good faith and rationality, and of lack of arbitrariness or perversity, are standard, for they represent the very essence of business (and other) relationships. Once one goes beyond them, however, the matter becomes much more uncertain.

107 It is against the background of these submissions and this doctrine, that I approach the current issue on this appeal.

108 In my judgment, the implied term is not necessary or sufficiently certain and I would reject it. I would seek to put the matter in the following way.

109 Mr Millett accepts that an implied term is needed, for there is no express provision. In this connection he does not simply rely on the word "value" as containing the answer, but rather as disguising it.

110 There is uncertainty as to the term required. In essence, the term contended for is the finding, on solely objective criteria, of the true market value. However, sometimes the term is expressed as the obligation to take reasonable care to arrive at the true market value. These are not the same terms. A true market value, arrived at solely on objective criteria, at a certain moment, is likely to lie within a very narrow range indeed for the most liquid of assets and a somewhat broader but essentially identifiable range for an asset which, even if not entirely liquid, remains marketable. Of course there will always be a spread between a bid price (what it would cost a buyer to buy) and an offer price (what a seller would obtain to sell). That is not the range I am talking about, because I assume that the relevant price in this context, where Standard already owns the asset and retention is a substitute for liquidation, is an offer price. Even so, there will be a range: both because the market fluctuates during the day and because once one leaves behind the most liquid of securities, market making and pricing becomes increasingly more of an art than a science, or at best an artistic science. That said, if nevertheless the term is to find the true market price, then although experts may differ somewhat about it, it should always be possible, at any rate if there is a market, to obtain a reasonably narrow range of answers. Moreover, the best evidence will be that of the most expert and independent witnesses. If, however, the term is to take reasonable care to find the market price, then, where at any rate there is factual evidence of how the valuer would have valued, there will always potentially be a larger range of values within which the valuer cannot be said to be at fault. Therefore, the objective value arrived at by expert evidence and the hypothetical value proved by witnesses of fact who were seeking and are assumed to have carried out the valuation with reasonable care

will not necessarily be the same. Moreover, a breach of the obligation to carry out a valuation with reasonable care will not be proved by the mere fact that a preferred expert arrives at a different answer from that of the bank's hypothetical valuation, or even that he adopted a different methodology. The question will be whether it can be shown that the valuer in question was negligent. Negligence would have to be proved in the ordinary way.

111  Not only is there a difference between the various formulations of the implied term adopted by Socimer, but there is of course a difference between the implied terms adopted by Standard and Socimer. Standard says that the valuation in question is not that of an expert at all: it is one to be performed by Standard, and one to be performed by it within its discretion and according to its own subjective criteria. There are standard limits on that discretion and subjectivity, which are common ground: described by concepts such as good faith, honesty, rationality, arbitrariness, perversity, capriciousness. It might perhaps in the abstract be said to be strange to think of the value of securities in terms of discretion or subjective criteria: but that is not in fact said by Socimer. Socimer (and both Cooke J and Gloster J) accept such concepts. It is entirely clear from the contractual definition of "Market Value" that it is common ground between the parties that it is possible to talk in such terms. One might debate exactly what such concepts mean, although that debate has not been canvassed before us. I suppose that the ideas of discretion and subjective criteria reflect both the context that the securities traded under the agreement are or may be more or less volatile and illiquid (see for instance clause 16 and the acknowledgments by the buyer) and the consideration that Standard, as the party who is entitled to protect itself against market risk imposed on it by its counter-party's default, is entitled to act in its own interests in measuring the risk: and that in such circumstances there may be much room to differ about value.

112  Thus in the specific context of a default and a forced retention of Designated Assets, Standard is compelled by its buyer's default to retain what it never sought, save to the extent that it can immediately liquidate the assets on the termination date. The question whether it can sensibly in the interests of either party liquidate on the termination date is part of the complex uncertainties of

this emergency situation. If it decides not to liquidate, it is forced to retain. If in that context it has to value the assets, why should it not be entitled to value them at a value which reflects the value of such assets to itself? It may dislike the risk they pose, in terms of the nature of the particular asset, its currency and/or nationality and so on. The decisions have to be taken very quickly, namely "on the date of termination" (see further below). Once the asset is not immediately sold, the risk of retention is entirely transferred to Standard. In theory and sometimes in practice anything may happen the next day, or within the time in which a sale might become possible. The difficulty multiplies if the asset is relatively or entirely illiquid. Then there is no market price by which the value can be set on the relevant day. Who knows at what price the asset can be sold when a buyer appears? In such circumstances, Standard is entitled, it may be said, to consult its own interests, subject of course to the requirements of good faith and rationality. Those factors include both subjective and objective elements, but the essence of that construction is that the decision remains that of Standard, not of the market or the court, and that in coming to its assessment, subject to the limitations of good faith and rationality, it is entitled primarily to consult its own interests.

113   There are still further possible variations of what might in theory be meant by objective criteria of reasonableness: such as that the value has to be "reasonable" in a mutual sense, as when a "reasonable price" is what implication requires to be found. In such circumstances, what is reasonable will depend on the assessment of something that is in both parties' interests. The parties are in a good position in most cases to work that out for themselves, as long as goodwill continues to exist between them. If they cannot agree, the valuation will effectively be that of an independent valuer, and in the absence of any such person, of the court or arbitrator involved in resolving the parties' dispute, again probably with the help of experts. However, I do not think that this fits the context of this case. The Designated Assets do not belong to Socimer, but to Standard. Standard does not want them, but is forced, subject to immediate liquidation, to retain them for itself, together with the ongoing risk. Socimer, although not the seller, is in the position of a forced seller, and Standard, although not the buyer, is in the position of

WESTLAW   © 2017 Thomson Reuters.

a forced buyer. And what has forced this situation on both of them is Socimer's default.

114  The valuation has to be performed "on the date of termination". Cooke J contemplated that this might not be possible, for instance in a case where the default which marks the termination date occurs shortly before midnight (23.59 hours): to which might perhaps be added any period after the relevant markets have closed. Only in this sense might the valuation have to be conducted after the termination date, on a subsequent day. Where, as here, the termination date is a Friday, it may not be possible to value until the next business day. As a matter of fact, Friday 20 February 1998 was the eve of the Mardi Gras weekend, which created further difficulties. But even if in practice the valuation has to be performed later than the valuation date, it has to be performed as soon as practicable, and by reference to valuation date value: in other words "as of" the termination date. Mr Millett sought to submit that the valuation could be performed at almost any time, as long as it was "as of" the valuation date: but that is not what the agreement says. Cooke J was quite clear about this: see para 29 of his judgment cited above.

115  It follows that where there is no buyer on or as at the valuation date, there is an additional difficulty. What is the value to be put on an asset for which there is no buyer? Or for which there is no market? Or for which there is a volatile or illiquid market? Or a market which can only absorb a small amount of stock before the price is affected? The last quoted deal before the termination date may be of little assistance in such a case. The next quoted deal will be of little assistance, because it looks beyond the relevant day. In such circumstances, it might be rational to value the asset at or close to zero: but of course it does not necessarily follow. I do not think that there was any real difference about that, either before Cooke J or Gloster J. What is plain, however, is that where it is not possible to liquidate an asset on the termination and valuation date it is unreasonable that there should be any risk at all on Standard. It makes the implication of an objective hindsight valuation an unnecessary and unreasonable imposition.

116  Mr Millett relies on the fact that any surplus cash or assets must be returned to Socimer to submit that an implication is necessary for the avoidance of abuse. In my judgment, the requirements of good faith and

rationality are a sufficient protection. The danger to be guarded against, he says, is abuse caused by self-interest. That is precisely what implicit good faith deals with. Commercial contracts assume such good faith, which is why express language requiring it is so rare. What Mr Millett's implication is dealing with, however, is not abusive self-interest, but a (possibly negligent) failure to get the valuation exactly right because of the unconscious and insidious danger of self-interest. I agree there is such a danger: but the argument assumes that Standard is in the position of a neutral valuer, rather than a bank forced by its customer's default to protect its own position in potentially highly volatile and illiquid markets.

117  The agreement was a carefully worked out contract between sophisticated parties. An implication in such circumstances is, as Sir Thomas Bingham said, "an altogether more ambitious undertaking". There is no standard term (other than that of good faith and rationality) which applies in such circumstances. Cooke J referred to the fact that Standard's terms differed from those of a standard set of terms known as the PSA/ISMA type agreements which made provision for a "Default Market Value" and which did not give to the seller the wide discretion which at that time it was common ground that Standard's terms gave to the seller in a default situation.

118  There was disagreement before Gloster J as to the extent to which the Brazilian TDA-ES and the Socma DRs were more or less liquid or illiquid investments. Whatever be the answer to that dispute, there was no dispute that the Standard agreement was designed to cater for assets among which were those illiquid to the extent of being called "exotics". In such circumstances, it may be that in the case of entirely or essentially liquid assets there would be little difficulty or difference in valuation, whatever the standard of value might be. However, the agreement had to cater for assets of all kinds, even the most exotic. Here, Standard could sensibly require the protection of a standard of value which left it with a wide discretion.

119  Mr Millett relied on the fact that, as was common ground, "value" in the valuation sentence was not the same expression as "Market Value" and that it was only the latter which was defined expressly in terms of "the value … determined by the Seller in its sole

and absolute discretion". However, I do not think that is of any particular significance. Of course, if the valuation sentence had referred to "Market Value", the test would have been set out expressly. As it is, as Mr Millett accepts, the reference to "value" is silent about the value to be found and how it is to be found. Nevertheless, the valuation sentence does say that it was to be "determined … by the Seller". In context, and with the certificate of deficiency to be settled by Standard alone, unchallengeable save for manifest error, Cooke J was entitled to say that the express discretion left to Standard in terms of "Market Value" was "a crucial factor when approaching the question of construction of clause 14" ( para 19 of his judgment). I agree with Mr Auld's submission that it would make no sense to give "value" the meaning of "market value" but with an essentially different meaning from that of "Market Value" as defined. The fact is that there was nothing in the agreement which supported the implication contended for before Gloster J, and much to make it unlikely. There was no appeal by Socimer from the judgment of Cooke J. I agree with him that the whole context of the valuation sentence was to leave the assessment "entirely in [Standard's] hands" (at para 32 of his judgment). In those circumstances, the implication contended for becomes an impossible one. I do not agree with Mr Millett's submission that Cooke J's language "provided that the assessment is in good faith and is not challengeable on any other basis" ( *ibid.* was leaving room for an entirely objective evaluation. That would have been entirely inconsistent with the judge's general approach, and to what was common ground before him.

120   In this connection it will be recalled that one of the pleaded issues of construction at the time of the preliminary issue went to the nature or absence of Standard's discretion. By the time of the oral hearing before Cooke J, however, that issue had gone: see paras 12/16 above. Socimer accepted that the logic of the situation might well be "Tough on the buyer".

121   At the end of the day, Mr Millett asks us to imply a term in circumstances where his own proposed implication takes two different forms, and where it is at least possible to take different, equally rational views on an implication either restricting an assessment in Standard's discretion to the traditional concepts of good faith, rationality and the like on the one hand,

or an implication imposing entirely independent and objective "true market price" criteria on the other. This alone demonstrates that the parties would not have been likely to rejoin "of course" to the officious bystander; and that an implication such as that contended for by Socimer is neither necessary nor sufficiently certain..

122   In these circumstances, it is difficult to see how the analogy of the position of a mortgagee in equity could throw any light on the situation. In any event, I would respectfully agree with what Lord Justice Lloyd has to say about that. In my judgment, the analogy breaks down. Standard's position is governed by its commercial contract, not by the law of equity. This is the world of sophisticated investors, not that of consumer protection. These merchants in the securities of emerging markets have made an agreement which speaks of the need for a spot valuation, not of the more leisurely process of taking reasonable precautions, such as properly exposing the mortgaged property for sale, designed to get the true market price by correct process. Meanwhile, the assets involved are those of Standard, not of Socimer: and the underlying background is that where the buyer defaults, he loses both the right to complete his purchase and his downpayment.

123   Of course, under the clause 14(a)(bb) option any surplus is the buyer's, not his seller's: but that tells one nothing in itself. The question remains how the termination date valuation, which may or may not throw up such a surplus, is to be made. If the clause 14(a)(aa) option had been exercised, then the buyer is excused completion, the full market risk of the Designated Assets rests with Standard, *but* Standard retains the downpayments to cushion it against market loss, past or future. If, however, the clause 14(a)(bb) option operates, then the buyer not Standard gets the benefit of the downpayments, and subject to that credit the buyer remains liable for the Unpaid Amounts: in such circumstances one would prima facie expect the buyer not Standard to remain liable for the market risk. What happens, however, is that a valuation is made on the termination date to allocate the market risk between the past and the future. In such circumstances that allocation needs to be made in order to protect Standard's interests, not the buyer's. Of course that allocation must be made honestly and rationally, but subject to that there is no reason whatever to think that Standard should be left with any risk of what

the markets will do. Otherwise, in a manner quite contrary to the whole of the rest of the agreement, the full risk from the termination date forwards would bear unfairly and entirely on Standard, who is simply reacting in an emergency to its buyer's default. Just as in other circumstances Standard is entitled to determine and exact, in its own protection, the downpayments, so, under the clause 14(a)(bb) option, where exceptionally the downpayments remain credited to the buyer, Standard continues to need the protection of the equivalent discretion. See para 23 above.

124   It follows that Gloster J erred in my judgment in construing the valuation sentence as requiring an objective inquiry into the true market value of the Designated Assets, or as imposing a duty of reasonable care upon Standard. It must also follow that if she found Standard's evidence, as to how it would have carried out such a valuation, to have fallen short of such obligations, then she was judging that evidence by the wrong test and her conclusions could not survive on appeal. My attempt to analyse her conclusions in the section above, headed *The judgment of Gloster J*, suggests that it is not entirely easy to determine on what basis she rejected Standard's evidence. However, it seems difficult to suppose that she went to so much care to determine the legal dispute between the parties as to the correct test to apply, unless she proposed to use her view as to that correct test in resolving the ultimate issues at trial. Moreover, it is reasonably plain that she judged Standard's evidence against the background of Socimer's experts whose evidence was directed to an ascertainment of the true market value on objective criteria. The only concession to that approach was that she was prepared to allow, perhaps somewhat inconsistently, a subjective element of conservatism and caution in reaching her final valuation results. At the same time, however, she appears to have also concluded that Messrs Clifford and Feld had either not been honest in their evidence or had spoken to a dishonest valuation. It is also possible that when she said that their valuations had been unreasonable, she was intending to say that they were irrational as well as, or rather than merely, careless. However, those conclusions, as to honesty and perhaps rationality, were themselves influenced by her adoption of the requirements of Socimer's implied term. There must therefore be real uncertainty as to whether the judge's findings as to honesty or rationality could retain any validity (even

on the assumption that those findings could survive the absence of challenge to Standard's witnesses) once the implied term has been shown to have been wrongly adopted. Certainly, Mr Millett did not submit that the judge's judgment could survive this appeal, were it shown that she had been wrong to adopt Socimer's implied term, on the ground that she had in any event rejected all Standard's evidence because of bad faith or irrationality.

125   I therefore conclude that on this first issue Standard succeeds, and that its success must at least earn Standard a new trial in relation to the termination date valuation. I will consider further the ramifications of the question of bad faith and irrationality below.

**("Unpaid Amounts"): discussion and decision**

126   The importance of this issue is that first, it is common ground that it arises even if Standard succeeds on the first issue that all the Designated Assets are to be valued as Standard says that it would have valued them; and secondly, that it is only if this issue is answered in Socimer's favour that its Socma Primary Case arises. The judge found in favour of that primary case, in the sum of $8,424,966, which constitutes the major part of her judgment award in financial terms.

127   In question was the status of four credits owed by Standard to Socimer, totalling some $4 million (the "other credits"). The essential question was whether these other credits went in immediate and prior reduction of the Unpaid Amounts as of the termination date, so as to reduce the Unpaid Amounts from the otherwise agreed total of some $24.5 million to a revised net figure of only some $20.4 million. If so, then Socimer argued that, even on Standard's valuations, a surplus became due to Socimer which ought to and would have resulted in Standard's return to Socimer of the Socma DRs. The judge agreed, and found that in Socimer's hands the Socma DRs were to be valued at the nominal face value figure of some $8.4 million.

128   Gloster J reasoned the matter as follows. She said that regardless of whether or not Standard was obliged to set off the other credits to Socimer, it was entitled to do so under clauses 8 and 9(c). She adverted to the fact that Standard had in fact set off the other credits in August/September 1998, as shown by Standard's

subsequent letters to the liquidator of Socimer about the state of the parties' accounts. There is no dispute about that: those letters referred to various sales of Designated Assets: there was at all such material times a deficiency in respect of the Unpaid Amounts, even after such sales had been credited to Socimer, and the other credits applied by way of set off (ie the other credits not deriving from sales of Designated Assets) merely reduced the deficiency, but never eliminated it.

129  The most significant of the four other credits was called the "Spot Trade Balances", and these were worth some $3 million of the total $4 million concerned. On this appeal, the parties were content to argue this issue solely by reference to these Balances. These Balances were not in fact due and owing to Socimer until 25 February 1998, five days after the termination date at which the Designated Assets had to be valued. They were not in fact credited to Socimer's account with Standard until the relevant settlement day of 25 February, as the judge found. The judge nevertheless also found, as a matter of fact, that Standard would have credited Socimer by way of set off with the value of the Spot Trade Balances as of 20 February 1998, before they were actually due. She said (at para 48):

> "I find as a fact, based to a certain extent upon the evidence given by Mr David Feld, a director of Standard, in cross-examination, as well as the documentary evidence that Standard would have applied the Spot Trade Balances against the Unpaid Amounts as at the termination date, had Standard appreciated its obligation to value or sell as at that date, notwithstanding that the settlement date was a few days later."

130  After dealing with further arguments no longer relevant for present purposes, the judge stated her conclusion in respect of the Unpaid Amounts in these terms:

"57.  Accordingly it follows that I accept Mr Millett's submission that the Unpaid Amount was, or would have been, US $20,382,063.24 as at 20 February 1998, and not US $24.5 million as Standard contends. That is because, as set out above, I have found that either Standard should have deducted, or that, had it appreciated its obligations, it would have deducted:

(i)  US $3,120, 480.93 in respect of the cash balances on the six Spot Trades;

(ii)  $700,422.37 in respect of the Other Balances; and

(iii)  US $302,914.63 in respect of the Accrued Coupon Interest on Designated Assets."

131  Other matters with regard to these Balances were argued at trial. However, for present purposes this Issue 2 on this appeal was confined, at any rate for the present, to the short point whether such a finding was justified on the evidence on which Socimer continued to rely, namely Mr Feld's evidence and the later correspondence with the liquidator. Socimer no longer contended that Standard was obliged to set off these other credits. It simply supported the judge's decision on the basis that she was right to find that Standard would have set off the Spot Trade Balances as at the termination date, even before they were due. One additional problem about the terms of para 57 however, is that, somewhat inconsistently with what she had said earlier, she appears to have concluded that the set-offs depended in one form or another on Standard's obligations. That, as I have said, is no longer maintained by Socimer.

132  Indeed, Socimer's argument before the judge and on appeal involved the additional factor that Standard would have set off the other credits as at the termination date *even before* conducting its valuation

of the Designated Assets. This was a necessary part of the argument: because, as I have observed, the Socma Primary Case depended on the premise that the Unpaid Amounts due were not in total some $24.5 million, which was prima facie common ground, but that figure less the other credits following their set off, namely a "net" figure of only some $20.4 million. It was only if the relevant Unpaid Amounts totalled that lower figure that Socimer was in a position to contend that Standard was sufficiently in surplus after the retention of all assets other than the Socma DRs to require their transfer to Socimer.

133    The judge nowhere dealt in terms with this additional point, possibly, but I am not sure, because it was common ground. What she did deal with was Socimer's argument that, on the premise of the lower net figure for the Unpaid Amounts, it would have been the Socma DRs rather than any one or more of the other Designated Assets which would have been transferred to Socimer as surplus to Standard's retention requirements. It has not been necessary so far to hear this aspect of Standard's appeal. In brief, however, the judge found (at para 72) that had Standard appreciated in full its clause 14(a)(bb) obligations it would have returned the Socma DRs to Socimer: because it was otherwise fully recouped for what it was owed, because the Socma DRs were the most difficult to value and therefore the asset most likely to give rise to dispute, because the value of the Socma DRs was peculiarly subject to the Socimer insolvency risk (owing to the prospect that Socimer was not merely the fiduciary of the asset but the debtor in respect of it), and because of its own purported valuation of the asset at nil (in fact $500,000). The judge appears merely to have assumed that in this context the Unpaid Amounts would have been reduced by the set-off of the other credits *before* Standard would have undertaken its valuation exercise.

134    On this appeal, Mr Millett has abandoned, if it was relevant at trial, any contention that Standard was *obliged* to set off the Spot Trade Balances. What he continues to say is that Standard *would have* set off these Balances (and the three other credits) before turning to its valuation exercise. He submits that the judge's findings on this point are in Socimer's favour and irrevocably control this issue. On Standard's side, Mr Auld submits that there was nothing in the

evidence to lead to the judge's conclusion, and that she misunderstood what Mr Feld said. He therefore submits that, on the basis that the Balances were not due to Socimer until 25 February 1998, the judge's findings on this issue were impossible.

135    This is a short point. The basic premise, as acknowledged by the judge herself, is that the Balances were not in fact due to Socimer until the relevant settlement day of 25 February. They were in fact credited to Socimer's account on that day, not before, and that was correct accounting. That was of course in the absence of any clause 14(a)(bb) valuation. Why should the hypothetical exercise have made any difference? To the extent that the judge relied on the correspondence in August/September 1998, there was nothing to support her conclusion there. Socimer was always in a deficiency and Standard was entitled to set off Socimer's credits against its greater liabilities. There was nothing whatsoever in that conduct to suggest that Standard could or would have set off the Balances against the Unpaid Amounts if it had been carrying out the valuation sentence exercise on and as at 20 February 1998.

136    What was critical to the judge's thinking, however, was Mr Feld's evidence at trial. The relevant passage of evidence was this (at Day 4.13/16):

" *Mr Millett* : On a would-have basis, if you had understood and operated the agreement in accordance with Mr Justice Cooke's interpretation, I assume you would have been similarly content to have applied the Spot Trade Balances to any Unpaid Amounts that were left after your valuations, if done on or shortly after 20th February?

A: Yes, *after our valuations* , that is correct.

*RM* . I want to turn to a different subject.

*Mrs Justice Gloster* : I am not sure, if you are leaving that, that I quite understand what you are saying. Mr Feld, on 20th February, you do the trades. If you had known about the way in which you should have been working the agreement, implementing the agreement, and on the assumption, as we know, that the settlement dates were 25th February in the case of the Russian security or 24th February in respect of the others, on what date would you have credited the amounts?

A: We *first* would have performed any valuations that we needed to and/or sales that were required of assets to determine whether we had a deficiency or a surplus. *Once that exercise was completed* , we would have made the accounting of the proceeds of these trades.

*Mrs Justice Gloster* : Is that as of the 20th or as at the settlement date.

A: We would argue *as at the settlement date* .

*Mrs Justice Gloster* : You say you would have argued. If you had been implementing the agreement in accordance with how Mr Justice Cooke has interpreted it, what would you have done?

A: I repeat what I said: we would have had to carry out that series of sales and/or valuations …

*Mrs Justice Gloster* : As of the 20th?

A: *As of the 20th* . Then whatever the accounting was, if there was a surplus, we would add the value of the assets to it and send it back to the counterparty; if there was a deficit, we would offset, then see what the acting [accounting?] was.

*Mrs Justice Gloster* : If you had been doing it as of the 20th February, when you know you had done these sales of the assets, although obviously such sales were subject to settlement, do you simply do your valuation as of 20th February, discounting back for the three days you are out of the money, or how do you do it? …

A: We would not have discounted for the time value money, I do not think.

Mrs Justice Gloster: Not over the three-day period?

A: No, it is not worth it.

*Mrs Justice Gloster* : You would have done it all as of 20th February?

*A:* Yes." ( *emphasis added* )

137  What is being said here? The settlement day of the Spot Trade Balances is 25 February. The valuation date is 20 February. This is a five day period (referred to by the judge at one point as the "three-day period"). Mr Feld is saying that if, after the valuation on 20 February, a deficit had been left, then Standard would

have applied the Spot Trade Balances credit to that deficit, ie would have exercised its right of set-off. The judge then asked Mr Feld about how the five day time value of money would have been dealt with, and was told "We would not have discounted for the time value, I do not think." In other words, a credit to Socimer of (say) $100 as of 25 February is not worth as much as a credit to Socimer of $100 as of 20 February. So, strictly speaking, the credit as of 25 February should have been discounted by the time value of 5 days, alternatively 5 days default interest would be added to the deficit between 20 and 25 February. But Mr Feld said that he thought that the credit, being only five days later than the established deficit, would have been squared off dollar for dollar, without discounting the later credit: ie Socimer would have been given an allowance for a five day gap before the credit became due, as if the credit had become due and had been set off on 20 February rather than on 25 February. There is nothing whatsoever in that evidence to suggest that Standard would have credited Socimer with the value of the Spot Trade Balances *before* the valuation exercise. On the contrary, Mr Feld's evidence is that that would have happened *after* the valuation exercise, if a deficit had been left. Of course, the set-off *could not* have occurred the other way around, because the credit did not occur until five days later.

138  I fear the judge is simply mistaken about this. In these circumstances, if Standard's valuations had left Socimer with a deficit of (say) $4 million, then the other credits could have been set off so as to reach balance. If the deficit had been (say) $1 million, then Standard could have set off $1 million, and would have had to return $3 million to Socimer. What Standard could not do, even if it had wanted to, was to say: We would much rather keep the $3 million cash, rather than $3 million of Designated Assets. For the balance on the valuation exercise would have already been struck.

139  In my judgment, therefore, the judge should have determined this issue in Standard's favour. Socimer's Socma Primary Case could not arise.

### the "open to Socimer" issue

140  In the light of my conclusion on issue 1, it does not matter whether Socimer's implied term case was open

to it or not, and therefore I will deal with this issue relatively briefly.

141  In my judgment, the implied term case was not open to Socimer. I do not say that the matter was not open because of res judicata (as a result of the judgment of Cooke J) or abuse of process, for Mr Auld said that he did not rely on such doctrines, and I see that in phased litigation it may sometimes be difficult to steer an entirely clear line in these respects. However, Standard's evidence was prepared on the basis that the valuation exercise which Cooke J's judgment had identified was one in which the determination of value was for itself and was one in which it had a wide discretion. However, the argument it faced during the hearing before Gloster J was that the valuation exercise in question was a different one, being ultimately for the court to decide based on objective criteria. That was unfair, and was likely to lead to error. If Standard had known that its valuation was to be attacked on the basis of lack of reasonable care or failure to achieve the true market value, then its evidence would have been likely to have been more complex than it was. As it was, Standard suffered all the difficulties of having prepared its evidence for what, by the time of judgment, had become a mistaken test, and of not having prepared its evidence for the objective test which the judge applied. In such circumstances, it may not be surprising that Standard's witnesses were found wanting.

### the "unchallenged evidence" issue

142  Finally, in my judgment the difficulties caused by the late introduction of the implied term test were exacerbated, as it turned out, by Socimer's tactical decision not to cross-examine Messrs Clifford and Feld. I say that it was a tactical decision in the light of the material set out above, which shows that Socimer wished to avoid that evidence being admitted, had then recognised, when the judge decided that it should be heard *de bene esse* , that it would have to be cross-examined, and had finally chosen not to challenge it by cross-examination. In the light of the valuation exercise as interpreted by Cooke J, Standard's evidence could have been challenged on the basis that (a) it was not credible (for whatever reason), or (b) was dishonestly false, or (c) while in itself credible, was premised on a bad faith approach to valuation, or (d) was premised on an irrational (or arbitrary,

capricious or perverse) approach to valuation. On the basis of the implied term finally adopted by the judge, that evidence might have been challenged on the further bases that, however credible and honest the evidence in itself and however honest the witnesses' approach to valuation, nevertheless (e) their evidence was irrelevant because it spoke to the wrong test, and/or (f) flawed because it demonstrated an objectively careless approach to valuation, and/or (g) flawed, even in the absence of carelessness, simply because it failed to identify by objective criteria the true market value of the Designated Assets. However, when Mr Millett decided not to cross-examine Messrs Clifford and Feld at all on their evidence as to the valuation which they would have conducted, he put himself in the position, in my judgment, where he was unable, as a matter of simple fairness, to make any of those submissions, save for (e), a matter essentially of law (albeit one on which it is not impossible that further matrix evidence might have been available to Standard, just as matrix evidence had been deployed before Cooke J), and, perhaps, (g).

143   As it was, Mr Millett, by an exercise of shrewd advocacy, was able, even in the absence of any challenge, to address the judge on the basis that Messrs Clifford's and Feld's evidence should be disregarded or discounted on the ground that it was incredible, self-serving and partisan: and in essence he succeeded in those submissions so far as the valuation exercise was concerned, as I have sought to show above. And yet, before this court, Mr Millett expressly accepted that he had no case of bad faith to make against Standard's witnesses. In these circumstances, his submission to us that the judge was simply entitled to make up her own mind as to the value of Standard's evidence did not meet the point. Of course the judge was entitled to make up her own mind about the evidence before her: but she was not entitled, at any rate not without the most explicit warnings and possible need for an adjournment, to find that evidence which had not been challenged by any cross-examination was false evidence, or evidence which spoke to a valuation exercise which was flawed by bad faith, irrationality or negligence. It is simply unfair for Standard's witnesses to be found wanting in such respects, unless the relevant challenges had been put to them and they had been afforded the opportunity (and I mean a proper opportunity, for which the ground had been sufficiently prepared in the pre-trial process) to answer the accusations made against them.

144   This is not one of those cases where a minor issue arises as to whether some detailed point had been sufficiently covered in cross-examination. As has often been said, it is not necessary to cover every point. This case, however, is remarkable. There was, quite deliberately, no cross-examination at all of Messrs Clifford and Feld on their relevant evidence, but the forensic submission was nevertheless made in effect that such evidence should be totally rejected on the ground that "They would say that, wouldn't they?"

145   Of course, the judge would have been entitled, as she was invited, subject to issue 3(1) above, to say that the Standard evidence was simply beside the point. However, she did not so rule, and if she had, she would, in my respectful judgment, have been in error.

**Conclusion and consequences**

146   In conclusion, in my judgment Standard has succeeded on all the issues which have been so far argued before us. It therefore seems to me that the judge's decision cannot stand. However, quite what the full consequences are is a matter on which we told counsel at the end of the hearing that we would wish to hear further submissions.

Lord Justice Lloyd:

147   I agree, and wish to add only some comments on the analogy which the judge drew with the duties incumbent on mortgagees.

148   If parties enter into a transaction which is a mortgage, then the law imposes certain obligations on the mortgagee, and confers certain rights on the mortgagor, which go back to the intervention of equity in the early development of mortgages. Although a mortgage is a contractual transaction, the imposition of such duties has nothing to do with the implication of terms in a contract under the general law of contracts: see Yorkshire Bank v Hall [1999] 1 W.L.R. 1713 , at 1728D. Whether these duties are imposed on a given party depends only on whether, on the true analysis of the transaction, it is or is not a mortgage.

149  Other consequences may follow if the transaction is a mortgage, for example obligations to register the security if it has been created by a company, failing which it may be void against a liquidator or other creditors.

150  It is therefore important to draw a clear distinction between a transaction which is a mortgage, on the one hand, and one which, however similar it may be to a mortgage in economic or commercial effect, is not a mortgage as a matter of true legal analysis.

151  In some circumstances it may not be easy to determine whether an agreement does or does not create a mortgage: see, for example, Welsh Development Agency v Export Finance Co [1992] BCC 270 . In the present case, however, it was common ground, and the judge rightly accepted, that the agreement did not involve lending, nor security for a debt, and therefore it did not amount to, or involve the creation of, a mortgage.

152  At paragraph 42 of her judgment, the judge summarised the duties imposed on a mortgagee in respect of the exercise of powers to realise the security. At paragraph 43 she said that

> "similar principles must apply, with the necessary adjustments, to the valuation powers of a mortgagee, or a person in an analogous position to a mortgagee, such as Standard, in circumstances such as the present, where the valuation is conducted by the seller in order to fix the amount of the buyer's indebtedness to the seller and the quantum of the buyer's deficiency, if any."

153  Mr Auld had submitted that such duties did not apply because they arose only from the relationship of mortgagor and mortgagee. She rejected that argument, and said at paragraph 43 that, given the rights of Standard, there was "every reason for the implication of a duty closely analogous to that of a mortgagee". At paragraph 45 she said that

> "if a term is to be implied, it should be one that imposes on Standard a duty, in doing its valuation, to take reasonable precautions to value the Designated Assets at "the fair" or "the true market" or "proper" value of such Assets as at the termination date and cannot simply value at nil, simply because there does not happen to be a purchaser, or a quoted bid price on that date."

154  That passage suggests that she was proceeding on the basis of the implication of a term into the contract, but by analogy with the terms imposed by law in relation to a different type of transaction, to which this agreement had economic similarities. It seems to me, with respect to her, that she was led by that similarity into drawing, and applying, an analogy with mortgage law, while overlooking, on the one hand, the need to justify the implication on the basis of conventional contract law and, on the other hand, the fact that, in relation to a mortgage, the duties by reference to which she drew the analogy do not derive, and cannot be derived, from such a process of implication, but are imposed as a matter of general law, which does not apply in the present case because the transaction is not a mortgage.

155  It seems to me that the duties to which a mortgagee is subject are no guide at all on the question whether it is legitimate to imply into the contract a term under which Standard would be subject to such a duty such as the judge found.

156  I therefore disagree with the judge's proposition in her paragraph 43 that "similar principles must apply, with the necessary adjustments, to the valuation powers of … a person in an analogous position to a mortgagee, such as Standard, in circumstances such as the present", and with her conclusion on the point expressed at her paragraph 45.

157  Like Rix LJ, I consider that the requirements of necessity and otherwise which are laid down by the

law of contract for the implication of terms cannot be satisfied in the present case in respect of the term which the judge held ought to be implied into the contract. For those reasons, and for all the reasons given by Rix LJ, I would allow this appeal.

Lord Justice Laws:

158  I agree with both judgments.

Footnotes

1    Antoni gladios potuit contemnere, si sic omnia dixisset. Cicero could have disdained the swords of Antony, if everything he had said had been like that. Juvenal, Satire X, lines 123/4.

Crown copyright

2008 WL 371088

© 2017 Sweet & Maxwell

End of Document                                                    © 2017 Thomson Reuters.

# TAB 81

EASTERN CARIBBEAN SUPREME COURT
IN THE COURT OF APPEAL

TERRITORY OF THE VIRGIN ISLANDS

HCVAP 2011/040

(On appeal from the Commercial Division)

BETWEEN:

[1] SOMERS DUBLIN LTD. A/C KBCS
[2] CITCO GLOBAL CUSTODY NV- REF 209974/ARM
[3] FIDULEX MANAGEMENT INC.
[4] DAIWA SECURITIES TRUST & BANKING

Appellants

and

MONARCH POINTE FUND LIMITED

Respondent

Before:

|  |  |
|---|---|
| The Hon. Mde. Janice M. Pereira | Chief Justice |
| The Hon. Mde. Louise E. Blenman | Justice of Appeal |
| The Hon. Mr. Don Mitchell | Justice of Appeal [Ag.] |

Appearances:

Mr. Gabriel Moss, QC with him Mr. Andrew Thorp, and Claire Robey
for the Appellants
Mr. Barry Isaacs, QC with him Mr. Oliver Clifton for the Respondent

_____

2013:    February 13;
March 11.

_____

*Civil appeal – BVI company – Mutual fund – Redeemed members of fund in liquidation claiming redemption proceeds in priority to claims of continuing members – Whether judge right to order liquidator to distribute pro rata between continuing members and redeemed members*

The appellants are four redeemed shareholders in the respondent mutual fund company incorporated in The Virgin Islands.  The fund has been put in liquidation and the external creditors have been paid.  There are not sufficient funds remaining to pay the redeemed shareholders, far less the continuing shareholders.  The liquidator wished to pay the

1

remaining assets to the redeemed shareholders pro rata, and made an application to the High Court for directions to do so. The trial judge held as a matter of law that the claims of the redeemed members and of the continuing members should rank equally. This being an interlocutory order in the winding up petition, the redeemed members appealed to the Court of Appeal with leave of the court below.

**Held**: allowing the appeal, that:

1.  A redeemed member is a creditor in respect of his unpaid redemption payment.

    **Westford Special Situations Fund Ltd. v Barfield Nominees Limited et al** Territory of the Virgin Islands High Court Civil Appeal No. 14 of 2010 (delivered 28th March 2011, unreported) followed; **Kenneth M. Krys et al v Stichting Shell Pensioenfonds** Territory of the Virgin Islands High Court Civil Appeal No. 36 of 2011 (delivered 17th September 2012, unreported) followed.

2.  The purpose of section 197 of the **Insolvency Act, 2003** is merely to subordinate the former members' claims (along with other claims arising out of membership) as creditor to that of ordinary unsecured (and usually external) creditors. When section 197 says that a past member "may not claim in the liquidation" it must be read as referring to and barring claims as an ordinary unsecured creditor, and not as barring claims as a deferred creditor as part of the "final adjustment of the rights of members and ... past members between themselves".

    Section 197 of the **Insolvency Act, 2003** applied.

3.  It was therefore wrong for the learned trial judge to have held that the redeemed members in their character as such should rank equally with the continuing members claiming a return on their capital. It was wrong to have held that redeemed members were not deferred creditors and as such entitled to have their claims against the Company satisfied in priority to any claim by the continuing members. The redeemed members must be paid before any surplus is ascertained out of which the continuing members may be paid.

    **Westford Special Situations Fund Ltd. v Barfield Nominees Limited et al** Territory of the Virgin Islands High Court Civil Appeal No. 14 of 2010 (delivered 28th March 2011, unreported) followed; **Kenneth M. Krys et al v Stichting Shell Pensioenfonds** Territory of the Virgin Islands High Court Civil Appeal No. 36 of 2011 (delivered 17th September 2012, unreported) followed.

4.  Share capital is now an obsolete concept for BVI companies. The BVI **Business Companies Act, 2004** removes the concept altogether, even with respect to par value shares. The mode of distribution of surplus among members on a liquidation depends ultimately on the Memorandum and Articles of a company, but section 34(1)(c) of the BVI **Business Companies Act, 2004** provides a default

2

position.  It provides that in the absence of anything to the contrary, a share confers "the right to an equal share in the distribution of the surplus assets of the company".  There being nothing to the contrary in the Memorandum and Articles in the present case, each share carries an equal right to share in any surplus.

BVI **Business Companies Act, 2004** applied.

## JUDGMENT

[1]    **MITCHELL JA [AG.]:** Monarch Pointe Fund Limited ("the Company") was incorporated in the Virgin Islands on 29th December 2003.[1]  It carried on business as a mutual fund and operated under a Memorandum and Articles of Association in a form commonly adopted by institutions of this type.  In particular, its Articles of Association provided for members to be able to redeem their shares in accordance with a set of regulations of the type which are frequently encountered in cases of this sort.

[2]    On 17th August 2007, the Company suspended redemptions and sometime in 2008 the High Court appointed a liquidator.  Material before the learned trial judge showed that when redemptions were suspended, seven redeemed members had yet to receive some $18 million between them of redemption proceeds to which they were entitled.  The subscription price represented by the retained shares of some of the redeemed members, together with the subscription price represented by the retained shares of the other eleven continuing members, is some $47 million in total.  The total nominal value of the unpaid redemption proceeds and retained capital subscriptions together is thus somewhere in the region of $65 million.  After payment of all the Company's external creditors the liquidator has available to satisfy these liabilities a fund of some $3.5 million.  If he distributes this fund *pro rata*, without distinguishing between continuing and redeemed members, each will receive about five cents in the dollar.  If he pays the redeemed members in priority to the continuing members, the redeemed members will

---

[1] I take the facts from the judgment of 16th November 2012 where they are very helpfully set out.

receive about twenty cents in the dollar and the continuing members nothing.  If he pays the fund to the continuing members without distributing anything to the redeemed members, each continuing member will receive just over seven cents in the dollar.

[3]    The liquidator sought directions, *ex parte*, that he be permitted to make an interim distribution of the fund to the redeemed members in priority to any rights of continuing members.  The learned trial judge by an order of 17th May 2012 refused to make such a direction and instead directed that the distribution be made rateably between the redeemed members (for the outstanding balance of their redemption proceeds) and the continuing members (for the subscription price paid for their shares).  At the same time, he directed that notice be given to all redeemed and continuing members and that any redeemed or continuing member wishing to apply to vary the direction should make an application to do so within 56 days of entry of the order.

[4]    Four redeemed members did make such an application.  The learned trial judge made a further direction that any continuing member wishing to be represented on that application must give notice of its intention to do so by a certain date, and that in default the liquidator would represent the interests of the continuing members on the substantive hearing.  That hearing eventually took place when the four redeemed members were represented by counsel and the continuing members' interests were looked after by counsel who appeared on behalf of the liquidator.

[5]    The primary contention of counsel for the interests of the continuing members was that the fund should be distributed to the continuing members in proportion to the number of shares retained by each of them when the company went into liquidation, to the exclusion of the redeemed members.  Alternatively, he submitted that the fund should be distributed between the redeemed and the continuing members rateably in proportion to the number of shares held by each at the commencement of the winding up.  Counsel for the redeemed members submitted

4

that a redeemed member was to be treated as a creditor of the company, but deferred to an ordinary third party creditor.  Thus, the liquidator was required, after the external creditors had been paid, to meet the claims of the redeemed members in priority to the continuing members.  After considering the submissions and the authorities placed before him, the learned trial judge by a written judgment of 16th November 2012 concluded that section 197 of the **Insolvency Act, 2003** ("the Act")[2] required that the fund is available to satisfy outstanding claims of members, past and present, in their capacity as such, as well as the entitlement of continuing members to a return on their capital.  He decided that there was no need or justification for a third class of creditor, the redeemed members, floating uneasily between the external creditors and the continuing members.   He therefore declined to vary his order of 17th May 2012.  He gave leave to the applicant redeemed members to appeal to the Court of Appeal.

[6]     An argument had been put forward at trial on behalf of the interests of the continuing members in support of the "black hole" solution.  This was that section 207, combined with section 197, provided only for distribution to ordinary unsecured creditors sharing *pari passu* and to continuing members, leaving redeemed members as creditors who were no longer members in a void.   The learned trial judge's solution to the "black hole" solution was to find that "member" in section 207(3) includes a redeemed member.  It would, however, not be correct on the authorities cited to treat deferred creditors *pari passu* with members, as that conflicts with fundamental notions of priority.  Section 207 only provides a *prima facie* order of priorities, being subject to other provisions of the Act.  As section 207(1) states, the section applies only and to the extent that this Act or any other enactment provides otherwise.  Section 197 does indeed provide otherwise.  In the case of redeemed but unpaid members it provides for unpaid redeemers to be creditors, not able to compete with ordinary unsecured creditors, but taking part in a "...final adjustment of the rights of members and ... past members."  In such an

---

[2] No. 5 of 2003, Laws of the Virgin Islands.

adjustment, past members who are deferred creditors, inevitably come before continuing members.

[7]     Counsel for the redeemed members, Mr. Moss, QC, and for the interests of the continuing members, Mr. Isaacs, QC provided both oral and written submissions which set out the different contentions of the liquidator, on behalf of the continuing members, on the one side, and the redeemed members on the other.   The difference of opinion turns on the interpretation of provisions of the Act.

[8]     Counsel for the redeemed members submitted that the central issue in the appeal was, put simply: does an unpaid redeemed member of a BVI company in liquidation rank as (a) a deferred creditor with higher priority than an ordinary unredeemed member; or (b) have the same priority as an ordinary unredeemed member; or (c) have the same priority as other creditors; or (d) does he fall down a "black hole" and have no claim at all, as argued by counsel for the continuing members at trial?  He submitted that solution (a) was the only one that made sense legally and commercially.   Mr. Isaacs, QC submitted that the central premise of the appellants was that the redeemed members are creditors in respect of their claims for redemption proceeds; the second premise was that creditors are to be paid in priority to members in the fund in liquidation; and the conclusion drawn from these two is that redeemed members' claims are to be paid in priority to the claims of continuing members.  The first premise, he urged, is false, as is the third.  Redeemed members are members, and not creditors of the fund in liquidation.

[9]     The relevant statutory provisions are not long and may be set out here.  Section 9 of the Act defines "creditor" and provides, so far as relevant, as follows:

> "**9.**     (1)    A person is a creditor of another person (the debtor) if he has a claim against the debtor, whether by assignment or otherwise, that is, or would be, an admissible claim in
>
>> (a)    the liquidation of the debtor, in the case of a debtor that is a company..."

6

[10]    Section 11(2) deals with admissible claims. It provides that, subject to section 12, a liability at the time of the commencement of the liquidation is admissible in a liquidation of a company as a claim.

[11]    Section 12 of the Act deals with non-admissible claims, and provides, so far as is relevant, as follows:

> "**12.**    The following liabilities are not admissible claims in the liquidation of a company...
> > (b) a liability that, under any enactment or rule of law, is of a type that is not claimable, whether on grounds of public policy or otherwise..."

[12]    Section 197 deals with sums payable to members in their character as a member, and provides as follows:

> "**197.**    A member, and a past member, of a company may not claim in the liquidation of the company for a sum due to him in his character as a member, whether by way of dividend, profits, redemption proceeds or otherwise, but such sum is to be taken into account for the purposes of the final adjustment of the rights of members and, if appropriate, past members between themselves."

Mr. Isaacs, QC, on behalf of the interests of the continuing members, urges four points. First, the section applies to a member and a past member. Second, it applies to a sum due to a past member in his capacity as a member. Third, it expressly includes a sum due by way of redemption proceeds. Fourth, it provides that a member and a past member may not claim in the liquidation of a company for such a sum. Since the provision is that the sum is not claimable, it follows that it is not an admissible claim in the liquidation.

[13]    Section 207 falls under the heading "Claims" and prescribes the priority in which the assets of a company in liquidation shall be applied, paid and distributed. It provides, so far as relevant, as follows:

> "**207.**    (1)    Unless and to the extent that this Act or any other enactment provides otherwise, the assets of a company in liquidation shall be applied

7

> (a)  in paying, in priority to all other claims, the costs and expenses properly incurred in the liquidation in accordance with the prescribed priority;
>
> (b)  after payment of the costs and expenses of the liquidation, in paying the preferential claims admitted by the liquidator in accordance with the provisions for the payment of preferential claims prescribed;
>
> (c)  after payment of the preferential claims, in paying all other claims admitted by the liquidator; and
>
> (d)  after paying all admitted claims, in paying any interest payable under section 215.
>
> (2) Subject to section 151, the claims referred to in subsection (1)(c) rank equally between themselves if the assets of the company are insufficient to meet the claims in full, they shall be paid rateably.
>
> (3) Any surplus assets remaining after payment of the costs, expenses and claims referred to in subsection (1) shall be distributed to the members in accordance with their rights and interests in the company."

It is the gravamen of the case for the continuing members that the redeemed members are to be paid under section 207(3), and not under section 197.

[14]    This Court has recently considered and interpreted these sections in the **Westford Special Situations Fund Ltd. v Barfield Nominees Limited et al** case,[3] and in the **Kenneth M. Krys et al v Stichting Shell Pensioenfonds** case.[4]  Counsel for the interests of the continuing members submitted that neither of these decisions supports the premise of the redeemed members' appeal.   Counsel for the redeemed members submitted that they do.

---

[3] Territory of the Virgin Islands High Court Civil Appeal No. 14 of 2010 (delivered 28th March 2011, unreported).
[4] Territory of the Virgin Islands High Court Civil Appeal No. 36 of 2011 (delivered 17th September 2012, unreported).

8

[15]    In the **Westford** case, a member of the company had given notice of redemption and had been paid part of the redemption price, but the remainder of the payment had been delayed. The redeemer issued a statutory demand for the balance of the redemption price. The statutory demand not having been complied with, the redeemer issued an application for the appointment of liquidators over the fund. One of the issues in the case was whether the redeemers were "creditors" with standing to seek the appointment of liquidators.

[16]    Mr. Isaacs, QC, counsel for the interests of the continuing members, submitted that the **Westford** case is authority for the propositions that: (a) a redeemed member is a creditor of the fund in the wider sense in respect of any unsatisfied redemption proceeds in respect of which he may sue the company and obtain judgment;[5] (b) a redeemed member is not a creditor of the fund in respect of any unsatisfied redemption proceeds in the liquidation of the company;[6] (c) a redeemed member's claim in respect of any unsatisfied redemption proceeds in the liquidation is a claim *qua* member; and (d) a redeemed member's claim in respect of any unsatisfied redemption proceeds cannot compete with and ranks behind claims of outside creditors in a winding up. Section 197 ranks the redeemed member's claim behind that of the outside creditor. He placed reliance on the statement that section 197 makes it clear that a member of a company (past or present) may not claim redemption proceeds once the liquidation is underway."[7] Redeemed members do not claim as creditors, they claim as members or past members. Claims for redemption proceeds may not be paid in priority to members' claims.

[17]    The question of who is a creditor for the purposes of standing to apply for the appointment of liquidators under section 162 of the Act is dealt with in detail in the **Westford** judgment. Standing is considered by reference to the definition of

---

[5] Para. 20 of the judgment of the Court of Appeal.
[6] Para. 31 of the judgment of the Court of Appeal.
[7] Para. 30 of the judgment of the Court of Appeal.

creditor in section 9. Section 9 refers to "admissible claims". The concept of admissibility is defined in section 11. A redeemed member's claim is admissible under section 11(2)(a) as a liability of a company at the time of the commencement of the liquidation. The Court pointed out[8] that redeemers cannot claim in the liquidation of a company other than in the manner permitted by section 197 which, in essence, says that where a sum is due to a member in his character as member, (such as redemption proceeds) "such sum is to be taken into account for the purposes of the final adjustments of the rights of members and, if appropriate, past members between themselves." In other words, the Court of Appeal regarded the unpaid redeemed member's claim as "claimable" and therefore admissible, but only in the manner allowed by section 197, i.e., on a deferred basis, payable after outside creditors are paid and not claimable as an ordinary unsecured claim.

[18]    The relevant ratio of the Court of Appeal decision is that the redeemed members in that case were not "creditors" for the purpose of appointment of a liquidator. This decision was limited to the meaning of "creditor" for the purpose alone of standing to apply for the appointment of liquidators. In a number of passages the Court made it clear that they regarded a redeemed member as a "creditor" in a more general sense. So, at paragraph 21, the Court stated that the redeemed member "is a creditor of the company in the wider sense in respect of any unpaid redemption proceeds." The paragraph goes on to say nevertheless that being a creditor in this general sense does not give the redeemed member standing to apply for the appointment of liquidators. Then, at paragraph 25 there is a passage stating that "it is true that the respondents were creditors of the Fund in respect of any outstanding redemption proceeds..."

[19]    In the **Shell Pensioenfonds** case, the claim concerned an application by liquidators for an anti-suit injunction against a redeemed but unpaid member who

---

[8] At para. 21 of the judgment of the Court of Appeal.

was taking legal proceedings in Holland in respect of an account in Ireland with a view to gaining priority over the general body of creditors.  The redeemed member had submitted to BVI jurisdiction by proving his claim in the liquidation.  The appeal was allowed and an injunction granted.  Pereira JA delivered the judgment of the Court and said this:

> "[4]    ... It is not disputed that Sentry's liquidators have so far not ruled on Shell's proof of claim.  Counsel for Shell surmises that this may be due to the current state of the law as interpreted by this court in **Westford**[4] *[Territory of the Virgin Islands High Court Civil Appeal No. 14 of 2010 (delivered 28ᵗʰ March 2011, unreported]* in which it was held that a redeeming shareholder claiming redemption proceeds was not a creditor <u>for the purposes of bringing insolvency proceedings under the **Insolvency Act, 2003**</u> of the Virgin Islands.  I underline this portion to make clear that **Westford** did not decide that an unpaid redeeming member is not a creditor of the company.  It merely decided that as between outside creditors and redeeming members ... the **Insolvency Act, 2003** subordinated the 'inside' creditor's rights to those of the 'outside' creditor, and that the **Insolvency Act, 2003** restricted the right of an inside creditor, whose claim was derived from the inside creditor's character as a member, to bring insolvency proceedings as a creditor in reliance on such a claim.  There is no statement in **Westford** which can or should be taken to mean that an unpaid redeemer is not a creditor of the company at all..."

[20]    It is clear from the dicta in **Shell Pensioenfunds** and **Westford** that a redeemed member is a creditor in respect of his redemption payment (save for the purpose of filing an application to appoint a liquidator).  Sections 9, 12 and 197 of the Act cannot be interpreted as overruling this right, either in nature or in form.  Section 197 indicates only that redeemed members cannot rank *pari passu* with outside creditors and are therefore deferred to them.  The reason why such a creditor is deferred is that his claim as a creditor is for a "... sum due ... in his character as a member ... by way of … redemption proceeds" in section 197.  Nowhere in the Act does it provide that redeemed members should rank equally alongside continuing members by virtue of any adjustment or any other provision.  Any adjustment must give higher priority to former members who have become creditors as a result of a

11

redemption than to mere continuing members.  To do otherwise fails to give any weight to their rights as creditors, rather than members.  Any "adjustment" necessarily involves redeemed members making a "claim".

[21]    Section 197 lays out a general rule that deferred creditors may not claim as ordinary unsecured creditors, but with the proviso that their claims will be dealt with in the adjustment between members and former members under the second half of section 197, i.e., after ordinary unsecured creditors have been paid in full.

[22]    The words "may not claim in the liquidation" in section 197 must refer to claiming as an ordinary unsecured creditor.  It reflects the old common law legal principle that redeemed members are deferred creditors, postponed behind ordinary unsecured creditors.  As deferred creditors, their claims are "... to be taken into account for the purposes of the final adjustment of the rights of members and, if appropriate, past members between themselves."

[23]    This interpretation is in keeping with long-standing rules of priority on a liquidation of a company.  There is an analogy with the position of a "depositor" in an English building society.  The word "depositor" is a misnomer, since persons who become members of the building society as a result of making a deposit are, while the deposit lasts, members and not creditors.  However, once they give notice to withdraw their "deposit" and before payment, the withdrawing member's status changes.  His status as a member or past member depends on the terms of membership, so that, if, e.g., termination of membership is subject to a period of notice and is not immediate, he remains a member, but in other cases he becomes a past member.  In either case, he ranks as a deferred creditor, ranking behind outside creditors, but having priority ahead of continuing members.[9]

[24]    The learned trial judge felt that the dictum in **Sibun's** case was of no assistance, but Lindley LJ was a very highly regarded judge, particularly in relation to

---

[9] Sibun v Pearce (1890) 44 Ch D 354, per Lindley LJ at p. 371.

partnership and company law, and his dictum, unchallenged in case law since 1890, is deserving of considerable respect. The approach in building society cases provides a good analogy. Redemption in a case such as the present terminates membership and the redeemed member becomes a deferred creditor, who necessarily ranks ahead of members who are not redeemed and therefore not creditors. It is clear that the purpose of section 197 of the Act is merely to subordinate the former members' claims (along with other claims arising out of membership) as creditor to that of ordinary unsecured (and usually external) creditors. When section 197 says that a past member "may not claim in the liquidation" it must be read as referring to and barring claims as an ordinary unsecured creditor, and not as barring claims as a deferred creditor as part of the "final adjustment of the rights of members and ... past members between themselves". This analysis is in accordance with the approach of this Court in **Westford**'s case.

[25]    Mr. Moss, QC submitted that another useful analogy is with declared dividends. When dividends are declared in favour of members, they constitute, prior to payment, a debt of the company, payable in a liquidation in priority to members.[10] Distribution among continuing members will depend on the terms agreed among them. Mr. Isaacs, QC points out that the New Zealand decision relied on by Mr. Moss, QC deals with dividends declared but not paid, involved the construction of a company's constitution, and in any event, the point went by consent.

[26]    Mr. Moss, QC urged that cases under the English **Companies Act 1948** are instructive in showing the history and rationale of the rule of priority. So, in the **Electricidad** case,[11] Slade J held:

> "True it is that the terminology of section 259(3),[12] like the terminology of section 302, is not very exact, because it does not make adequate

---

[10] In re Te Kumi Land Company Limited et al v Te Land Company Limited [1944] NZLR 924.
[11] In Re Compania do Electricidad de la Provincia de Buenos Aires Ltd. [1980] Ch 146.
[12] 259(3) provides:

allowance for the fact that, beyond the categories of creditor (simpliciter) and contributory, there exists a third category, namely, the contributory who (i) is also a creditor of the company in his capacity as a member and (ii) while subject to deferment to outside creditors, is entitled to ask for his debt to be taken into account in any adjustment as between himself and his fellow contributories. The wording of section 259(3), however, does not in my judgment justify the conclusion that a person belonging to this third category is not in general to be treated as a creditor for the purpose of the statutory provisions relating to winding up and of the Winding-up Rules.

"... By necessary implication therefore, the section contemplates that sums due to former members in respect of dividends or otherwise due to them in their character as former members, whether or not they are contributories, will be treated as "liabilities" of the company and dealt with during the process of discharging "liabilities" of the company, rather than during the process of distribution therein referred to. If sums of this nature due to former members who are contributories are to be dealt with as "liabilities," it would be surprising in principle if sums due to present members were not to be dealt with in the like manner. Consequently, it would be surprising if all such sums did not fall to be treated as "debts" for the general purposes of the Act and the Winding-up Rules.[13]

His finding was that the present and former shareholders of a company to whom the company owed money by way of dividends or repayment of capital were to be treated in any winding up as creditors for the purposes of the sections of the **Companies Act 1948** dealing with claims, subject only to the provisions for deferment contained in that Act. Mr. Isaacs, QC seeks to distinguish this case. Slade J, he urges, was considering the construction of a section of an English statute which is not similar to our section 197.

[27]    In my view, the issue can be determined purely on the construction of the words of the Memorandum and Articles and the statute, with guidance provided by the Court of Appeal decisions from the Virgin Islands previously referred to. Section 207(3) of the Act deals with the distributable surplus. It provides that any surplus

---

"In the case of any company, whether limited or unlimited, when all the creditors are paid in full, any money due on any account whatever to a contributory from the company may be allowed to him by way of set-off against any subsequent call."

[13] At p. 172-173.

assets remaining after payment of the costs, expenses and claims shall be distributed to the members in accordance with their rights and interests in the company.   The expression "surplus" usually means that which remains after discharging liabilities and costs.[14]  Paragraph 7 of the Memorandum provides that each share shall participate in the surplus assets in the event of a distribution. Article 1 of the Articles defines the "surplus" as "the excess, if any, at the time of the determination of the total assets of the Company, over the aggregate of its total liabilities, as shown in its books of account, plus the Company's capital". Thus, liabilities are excluded from the definition of "surplus assets".  The "sums due in the character as member" in respect of redeemed members under section 197 are liabilities of the company and are therefore excluded before the surplus distributable to members under section 207(3).   It was therefore wrong for the learned trial judge to have held that the redeemed members in their character as such should rank equally with those claims by continuing members to a return on their capital.  It was wrong to have held that redeemed members were not deferred creditors and as such entitled to have their claims against the Company satisfied in priority to any claim by the continuing members.  The redeemed members must be paid before any surplus is ascertained out of which the continuing members may be paid.

[28]    The learned trial judge, in dealing with distributions to members, fell into error in describing the mode of distribution amongst them.  He used the expression "return of their capital contributions".   Share capital is now an obsolete concept for BVI companies.   The BVI **Business Companies Act, 2004**[15] removes the concept altogether, even with respect to par value shares.  The starting point of returning "paid up share capital" to members in a liquidation is therefore flawed.   The fact that the Memorandum and Articles of Monarch Pointe refer to "capital" and "surplus" is no more than a hangover due to the fact that the company was first

---

[14] In Re Crichton's Oil Company [1902] 2 Ch 86.
[15] No. 16 of 2004, Laws of the Virgin Islands.

15

incorporated under the **International Business Companies Ordinance**.[16]  It was re-registered under the BVI **Business Companies Act, 2004** in July 2006.  From that date, it is correct to say that the references to capital and surplus do not reflect the law governing the company.   The mode of distribution depends ultimately on the Memorandum and Articles of a company, but section 34(1)(c) of the BVI **Business Companies Act, 2004** provides a default position.  It provides that in the absence of anything to the contrary, a share confers "the right to an equal share in the distribution of the surplus assets of the company".  There being nothing to the contrary in the Memorandum and Articles in the present case, each share carries an equal right to share in any surplus.

[29]     I would therefore allow the appeal and order that paragraphs 1 and 2 of the order of 17th May 2012 be replaced with an order that the liquidator do pay the redeemed members of the fund *pro rata* their redemption price in priority to the distribution of any surplus assets to the continuing members.

[30]     I would order the costs on the appeal of both of the liquidator (the respondent) and of the redeemed members (the appellants) to be costs in the liquidation of the Company in accordance with the Orders of Bannister J dated 13th December 2012 and 1st February 2013, to be assessed if not agreed.

**Don Mitchell**
Justice of Appeal [Ag.]


**Janice M. Pereira**
Chief Justice


**Louise E. Blenman**
Justice of Appeal

---

[16] Cap. 291, Revised Laws of the Virgin Islands, 1991.

16

# TAB 82

230                    COURTS OF PROBATE AND DIVORCE.          [L. R.

1871        such a case the Court acts within the spirit of the statute.    Now
WAIT        in this case no application was made at the trial to condemn the
v.          respondent in costs, nor was there any adjournment to allow such
WAIT.       an application to be made.    I must therefore refuse to do so.

        Attorneys for petitioner: *Wright & Venn.*
        Attorney for respondent: *W. Hitchcock.*

————

*March 7.*                SPENCER AND SPENCER v. WILLIAMS.

*Administration Suit—Suit in Chancery—Certificate therein as to Next of Kin—*
*Estoppel.*

If parties litigate a question in a court of competent jurisdiction, and a final
decision be given thereon, such parties or those claiming through them cannot
afterwards reopen the same question in another court.    This restriction does not
extend to other persons whose interest is almost identical with that of one of the
parties to the first suit if they do not actually claim through such party.

MARY EMSLEY, late of No. 9, Grove Road, Mile End Road,
Middlesex, died on or about the 13th of August, 1860, a widow and
intestate.  In the year 1861, a suit was instituted in the Court of
Probate (*Dyke* v. *Williams*) in which the Queen's Proctor claimed
administration of the effects of the deceased, on behalf of the Crown,
by reason that she was a bastard; the defendant in that suit, Samuel
Williams, alleged himself to be the lawful nephew, and one of the
next of kin, of the deceased.  The questions at issue were tried
before Sir Cresswell Cresswell and a special jury, in June, 1862,
and a verdict found in favour of the defendant.  In November,
1862, caveats were entered against the grant of letters of adminis-
tration to Samuel Williams, of the goods of the deceased, on behalf
of William Henry Spencer, and also of James Druce and William
Druce, who described themselves as nephews and next of kin of
the deceased.  A declaration was filed in the suit of *Williams* v.
*Spencer*, on behalf of the plaintiff, but in March, 1863, the con-
tentious proceedings were discontinued, and on the 14th of April,
1863, administration was granted to Samuel Williams.  In the
same month two suits were instituted in the Court of Chancery for
the administration of the estate of the deceased, the first between
Joseph Williams, plaintiff, and Samuel Williams (a bankrupt) and

Walter Thomas Emm, his assignee, defendants; and the other
between James Druce and William Druce, plaintiffs, and Samuel
Williams (a bankrupt) and Walter Thomas Emm, his assignee,
Abraham Williams and Joseph Williams, defendants. On the 24th
of April, 1863, an order was made in these suits directing that an
inquiry should be taken who were the next of kin of the deceased,
and her heir-at-law at the time of her death; and in consequence
an advertisement dated July 3rd, 1863, was inserted in the news-
papers, calling upon those who claimed to be heir-at-law and next
of kin of the deceased to prove their claims before the Master of
the Rolls, and to enter appearances for that purpose before the
27th of July, 1863. Subsequently Elizabeth Gotz, Sarah Spencer
(as administratrix of William Henry Spencer, who had died on the
10th of January, 1863), and Elizabeth Batchelor, obtained leave to
attend proceedings in these suits, and on their behalf and on behalf
of the other parties affidavits were filed and witnesses examined
and cross-examined; and the chief clerk certified, on the 5th of
February, 1868), that the next of kin of Mary Emsley living at the
time of her death were Samuel Williams, Elizabeth, the wife of
Joseph Gotz, Abraham Williams, and Joseph Williams (the children
of intestate's brother, Samuel Williams), William Henry Spencer
(child of William Spencer, intestate's brother by the half blood),
James Druce, William Druce and Elizabeth Ann, the wife of
Michael Batchelor (children of intestate's sister by the half blood,
Elizabeth Ann Spencer) of whom William Henry Spencer and
James Druce have since died. He also certified that Samuel
Williams was and is her heir-at-law. On the 22nd of February,
on the application of Sarah Spencer and George Frederick Spencer
(the son of an elder brother, deceased, of William Henry Spencer)
to vary this certificate, the matter was adjourned into court, and on
the 13th of January, 1869, the Master of the Rolls made an order
varying such certificate by omitting the names of Samuel Williams,
Elizabeth Gotz, Abraham Williams, and Joseph Williams from the
enumeration of the next of kin, and by striking out the paragraph
which relates to the heir-at-law, and by certifying that George
Frederick Spencer was at the time of the death of Mary Emsley,
and is still, her heir-at-law. On the 30th of July, 1870, Caroline
Spencer and Sarah Rose Spencer, two of the children of William

1871

SPENCER
v.
WILLIAMS.

232                    COURTS OF PROBATE AND DIVORCE.         [L. R.

Henry Spencer, on the renunciation by Sarah Spencer (the ad-
ministratrix of William Henry Spencer), William Druce, Elizabeth
Ann Batchelor, widow, and Elizabeth Druce (the administratrix of
James Druce, deceased), the next of kin, or representatives of the
next of kin, of the deceased at the time of her death, of all right
to administration of her effects, and with their consent applied
for and obtained a citation to issue, calling upon Samuel Williams
to bring into the probate registry the administration granted to
him on the 14th of April, 1863, and to shew cause why it should
not be revoked and declared null and void. This citation was
personally served upon Samuel Williams, who entered an appear-
ance thereto, and filed an affidavit in which he stated that the
letters of administration which had been granted to him were
lost or mislaid. Caroline Spencer and Sarah Rose Spencer then
filed a declaration in which they alleged that Mary Emsley died
intestate, and that her next of kin at her death were William
Henry Spencer, James Druce, William Druce, and Elizabeth Ann
Batchelor; that all the next of kin alive and the representatives
of those who have died had renounced in their favour, and that
they are two of the natural and lawful children of William Henry
Spencer. Samuel Williams pleaded that in addition to the next
of kin set out in the declaration, the deceased left others, to wit,
himself, Elizabeth Gotz, Abraham Williams, and Joseph Williams,
his natural and lawful nephews and niece. The plaintiffs in
reply set out the proceedings in the Court of Chancery, in the
administration suits, and the amended certificate of the chief clerk
of the Master of the Rolls as to the next of kin. That the order
made by the Master of the Rolls (13th of January, 1869) had
been enrolled and had not been appealed against. The defendant
demurred to this replication, and the plaintiffs joined in the
demurrer.

*Inderwick* for the defendant. The question is whether a decree
in the Court of Chancery as to the legitimacy of an individual is
to be taken as conclusive in this court against that person, on an
application by him for a grant of administration. In order that a
decree of the Court of Chancery should act as an estoppel in a
suit in this court, it must be shewn that there is the same plaintiff

and the same defendant in each suit, and that the same question, and that a material one, is distinctly in issue in both courts. The plaintiffs in this suit were no parties to the suit in Chancery—that is, there was no issue raised by bill and answer between them and any party before that Court. He referred to *Barrs* v. *Jackson.* (1)

1871

SPENCER
*v.*
WILLIAMS.

*Dr. Spinks, Q.C. (Witt* and *Pritchard* with him) for the plaintiffs. If this suit is allowed to go on, there may be a conflict between this court and the Court of Chancery. In both courts the question is, Who were the next of kin of the deceased at her death ? The Court of Chancery has decided that Samuel Williams, the defendant, was not next of kin, nor entitled in distribution, and therefore that he has improperly obtained administration in this court. If there be no estoppel, the defendant may continue to hold administration, although in a suit, in which all the parties interested in the estate, as well as himself, were before the Court of Chancery it was determined he is not entitled to it, and the Court of Chancery will be compelled to order him to act as trustee for the next of kin. In all cases of estoppel the substantial question is, was the point litigated before a competent court; if so, this Court will follow its decree: *Blackham's Case* (2); *Thomas* v. *Ketteriche* (3); *Bouchier* v. *Taylor* (4); Hargreaves' Law Tracts, 472.

[LORD PENZANCE. This Court has already decided, after litigation, that Samuel Williams is entitled to administration. Do you contend that the Court of Chancery ought not, after that, to have inquired into the matter at all ?]

The previous litigation was between Williams and the Queen's Proctor, and the point was the legitimacy of the deceased, which was entirely different from the present. The issue of fact decided by the Court of Chancery is the very one proposed to be re-opened in this court. A technical objection has been taken that the plaintiffs, or those through whom they claim, were not parties to the Chancery suits, but the decree was as binding upon them as if they had been formal parties on the record, by reason of the usual advertisements calling upon the next of kin to substantiate their claims (15 & 16 Vict. c. 86). Mrs. Spencer obtained leave to attend the

(1) 1 Phill. Ch. R. 582.        (3) 1 Ves. Sen. 333.
(2) 1 Salk. 290.                (4) 4 Browne P. C. 708.

234                    COURTS OF PROBATE AND DIVORCE.        [L. R

1871
SPENCER
v.
WILLIAMS.

proceedings, and, in fact, it was on her application that the chief clerk's certificate was varied by the Master of the Rolls. The present plaintiffs are privies in blood with Mrs. Spencer, and therefore the decree in the Court of Chancery was conclusive between them and Samuel Williams, and they are entitled to the benefit of it.

[LORD PENZANCE.    If Mrs. Spencer herself were now applying for administration, instead of her children, do you maintain that she could not set up the decree of the Court of Chancery as an estoppel?]

*Inderwick.*  Yes, because those suits would not have been between the same parties as the one in this court, so as to prevent its going on.  There has been no decision between her and Samuel Williams.

[LORD PENZANCE.  As regards the distribution of the property, the matter is concluded for all time between Mrs. Spencer and your party, however she may have been introduced into the Chancery suit.]

Possibly for the purposes of distribution; but the question of administration is still open.  The present plaintiffs do not claim through their mother; they are entitled to one part of the estate and she to another.

[LORD PENZANCE. They do not claim through their mother, but through the same person the mother does.  Suppose both suits had been in this court.    A man dies, and his next of kin come in to litigate who is entitled to administration.    The court grants it to one who afterwards dies.    On an application for a de bonis grant can the litigation be re-opened ?  Is the matter to be decided once for all, or not?  In such a case the parties to the suits would not be the same, and yet would not the first decision be binding?]

*Cur. adv. vult.*

March 7th.  LORD PENZANCE.  In this case a demurrer was argued before me a short time since.  The declaration filed in the cause stated that Mary Emsley died intestate, and that her next of kin at her death were William Henry Spencer, James Druce, William Druce, and Elizabeth Ann Batchelor; that William Henry Spencer had since died intestate, and that Sarah Spencer had taken administration of his effects, and that James Druce had

also died, and Elizabeth Druce had become his representative.
It further alleged that the plaintiffs, Caroline Spencer and Sarah
Rose Spencer, are two of the children of William Henry Spencer,
and that the next of kin of the deceased still living, and the repre-
sentatives of those dead, have renounced administration of the
goods of Mary Emsley in their favour. The plea of the de-
fendant, in substance, denies the allegations of the plaintiffs that
the persons named in the declaration are the only next of kin, and
affirms that the defendant and three other persons are also next
of kin. The replication took issue on the pleas, and further set
out the proceedings in the two Chancery suits, in one of which
Joseph Williams was plaintiff, and Samuel Williams (the present
defendant) and his assignee defendants; and in the other, James
Druce and William Druce, plaintiffs, and Samuel Williams and
his assignee, Abraham Williams, and Joseph Williams, defendants.
It also alleged that Sarah Spencer (the mother of the plaintiffs)
became a party to those suits, and that the Master of the Rolls
made an order therein by which he determined that the only next
of kin are those named in the declaration, and that Samuel Wil-
liams, the defendant, is not next of kin. The defendant demurred
to the replication. The defendant is in possession, as next of kin
of the deceased, of administration granted to him by this Court
after litigation with the Queen's Proctor, in which suit there was
no contest between Samuel Williams and the present applicants.
The plaintiffs ask that such administration shall be revoked, and
a new grant made to them, on the ground that Williams never
was next of kin, and that it has been so decided by a court of
competent jurisdiction. The question for my decision is, whether
the decree of the Master of the Rolls is an estoppel to the pro-
ceedings in this court. Now, of one thing there is no doubt, and it
is a principle which was clearly laid down in *Barrs* v. *Jackson* (1)
that when a question of fact arises in this court as to which of two
persons is next of kin of a deceased, and is determined, and the
same question is afterwards raised between the same parties in any
other court, they may be estopped from proceeding in the latter
suit. The decision in *Barrs* v. *Jackson* (1) was founded on a true
principle, and supported by a sound judgment. If two parties

1871

SPENCER
*v.*
WILLIAMS.

(1) 1 Phill. Ch. R. 582.

1871

SPENCER
*v.*
WILLIAMS.

have once, before a court of competent jurisdiction, litigated any question of fact, and that question has been finally decided, it is not reasonable that either of them, in any other court, should re-open it.  Generally, therefore, if administration has been granted in this court, after litigation here upon the question whether the one party or another is next of kin, and thereafter the same question, between the same parties, is raised in the Court of Chancery, that court will respect the decision in this court.  Such was the case of *Barrs* v. *Jackson* (1), in which the Court of Chancery held the parties were barred.  It is material to observe, in passing, that in the Court of Chancery, in that case, the parties were actually, one a party to the suit in the Ecclesiastical Court, and the other a party claiming under the party to the original suit.  So that the principle is carried one degree further, and not only is the suit barred where the parties are the same, but where they claim under the original parties.  Can the doctrine in these cases be extended any further ?  In the suit before me the parties are not the same as in the suits in the Court of Chancery, nor do they claim under the same.  The parties in the suits of Chancery were Sarah Spencer, Samuel Williams, and others.  Here the plaintiffs are the children of Sarah Spencer, but they do not claim through their mother as such, or under her in her character of administratrix of their father ; they rest their claim on the ground that Mary Emsley died intestate, leaving certain next of kin, who have all renounced and refused to take administration, and that they are the next of kin of one of the next of kin of the deceased, and that without a grant they cannot obtain that to which they are entitled.  They invoke the rule of this Court under which, if the next of kin choose to stand aside and renounce their rights, the next of kin of the next of kin is entitled to represent the intestate.  It would be improper to say that, applying in that character, they derive their title through their mother, Sarah Spencer.  She might have applied herself, but she elected to stand aside.  If she had come here, it is hardly necessary to say that Williams would have been bound by the decision of the Court of Chancery as against her ; but is he barred as against the children ? They claim this grant on the ground that they are the children of their father, and there-

(1) 1 Phil. Ch. R. 582.

fore stand in the relation of next of kin of the next of kin of Mary Emsley; but they do not claim the grant *through* their father, still less do they claim it *through* their mother in the character of their father's executrix.

1871

SPENCER
*v.*
WILLIAMS.

They stand on an independent right which accrued to them in relation to Mary Emsley's estate upon the renunciation of the next of kin who had the prior right.

There is another principle applicable to the doctrine of estoppel; it must be mutual. If Williams is barred from further proceedings against the plaintiffs, they must have been barred against him if the decision in the Court of Chancery had been in his favour. But it would be contrary to justice to hold that because somebody else had litigated this question without success the plaintiffs should suffer. Everybody litigates on his own responsibility, and no one can be deprived of his rights because somebody else has taken proceedings which have turned out unsuccessful. It is impossible to say that the defendant was barred by the proceedings in Chancery. As regards the cases cited, no case goes further than *Barrs* v. *Jackson* (1). In *Thomas* v. *Ketteriche* (2) the parties in the Ecclesiastical Court and in the Court of Chancery were the same. In *Blackham's Case* (3) it was decided that where a matter between the same parties had been directly determined in the Ecclesiastical Court, it could not be gainsaid, but that, in that particular case, the question for the decision of the Court had not been raised in the Ecclesiastical Court—the question, namely, whether a certain person was the husband of the deceased. It *is* proper, therefore, where the question is raised between the same parties, or those claiming under them, that they should be estopped; but the decisions give no authority for a proposition of a wider character—that a party who was not a party in the original litigation shall be bound by the result. Such a party may defend his rights in this court. I overrule the demurrer, with costs.

Proctors for plaintiffs: *Pritchard & Sons.*
Attorneys for defendant: *Lovell, Son & Pitfield.*

(1) 1 Phil. Ch. R. 582.     (2) 1 Ves. Sen. 333.     (3) 1 Salk. 290.

# TAB 83

Neutral Citation Number: [2010] EWHC 3349 (Ch)

Case No: 1942 of 2009

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**MANCHESTER DISTRICT REGISTRY**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 21/12/2010

**Before** :

**MR JUSTICE DAVID RICHARDS**
- - - - - - - - - - - - - - - - - - - - -
**Between :**

|   |   |
|---|---|
| **(1) PAUL STANLEY** | |
| **(2) PHILIP BARRINGTON WOOD** | **Applicants** |
| **(AS THE JOINT LIQUIDATORS OF NEW** | |
| **GRASS OF MANCHESTER LIMITED)** | |
| **- and -** | |
| **(1) TMK FINANCE LIMITED** | |
| **(2) TG HOLDCROFT (HOLDINGS) LIMITED** | **Respondents** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Mr Giles Maynard-Connor** (instructed by **Kennedys LLP**) for the **Applicants**
**Mr David Alexander QC** (instructed by **Bowcock & Pursaill LLP**) for the **Respondents**

Hearing dates: 5,6,7,8,11,12,13,14,15 October, 5 November 2010
- - - - - - - - - - - - - - - - - - - - -

# Judgment

Mr Justice David Richards **:**

*Introduction*

1.    This is a claim by the joint liquidators of New Grass of Manchester Limited, formerly called Holdcroft Properties Limited (the company), for relief under ss.238 and 241 of the Insolvency Act 1986.  The claim arises out of the sale of a freehold property in Hanley, Stoke on Trent on 11 May 2005 by the company to an associated company, TMK Finance Limited (TMK).  The price was £2,279,331 which, the liquidators allege, was about £1m less than its market value at that date.

2.    The relief claimed is against TMK an order for payment of the alleged undervalue, together with interest, and against its holding company TG Holdcroft (Holdings) Limited (Holdings) an order for payment of just over £1.55m, being the amount of a dividend paid to it out of the profits arising on a subsequent sale of the property.

3.    Section 238, so far as relevant, provides as follows:

  *"(1) This section applies in the case of a company where—*

    *(a) the company enters administration,*

*(b)the company goes into liquidation;*

*and "the office-holder" means the administrator or the liquidator, as the case may be.*

*(2)   Where the company has at a relevant time (defined in section 240) entered into a transaction with any person at an undervalue, the office-holder may apply to the court for an order under this section.*

*(3)   Subject as follows, the court shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if the company had not entered into that transaction.*

*(4)   For the purposes of this section and section 241, a company enters into a transaction with a person at an undervalue if—*

> *(a) the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration, or*

> *(b) the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company."*

4.   The company went into creditors' voluntary liquidation on 23 February 2007 and it is accepted, as is clear, that the sale took place within the "relevant time" of two years before the date of liquidation.   It has been accepted by Holdings at trial, although it did not do so in its pleaded defence, that if the sale was at a material undervalue, the court can make an order against it under s.238 (3).   Such an order would fall within the very general words of s.238(3) read with s.241(2) although not, I think, within any of the specific examples in s.241(1).   Holdings accepts that it will not be able to rebut the presumption imposed on it by s.241(2A).

5.   The parties agree that the sole issue arising for decision is whether the sale was at a significant undervalue and, if so, the amount of such undervalue.   The respondents, TMK and Holdings, deny that there was any undervalue in the sale price.

6.   In order to determine this issue, I have heard evidence of fact relating to matters relied on by the applicants in support of their case of undervalue and I have also heard extensive expert evidence called by both sides relevant to the market value of the property on 11 May 2005.   Whether the market value exceeded the sale price turns largely on the prospects for planning permission for alternative uses on the property and on the costs of remediation and associated ground works before the property would be fit for development.   There are wide disparities on these issues and I

accordingly heard evidence from experts in property valuation, planning and remediation works.

*The law*

7.   For the most part, there is agreement on the legal principles governing the application of s.238.  First, the burden of proving that a transaction was entered into at an undervalue lies upon the applicant: *Stone & Rolls Ltd v Micro Communications Inc* [2005] EWHC 1052 (Ch) at para 93, although the circumstances may be such as to impose an evidential burden on the respondents: *Phillips v Brewin Dolphin* [2001] WLR 143 at para 27.  Secondly, the applicant does not have to establish any intention to sell at an undervalue or other subjective element, although if established it may have an impact on the appropriate remedy under s.241.  Thirdly, the consideration passing between the parties is to be valued as at the date of the transaction: *Phillips v Brewin* at para 26.  Fourthly, the value of an asset is prima facie not less than the amount that a reasonably well informed purchaser is prepared, in arms' length negotiations, to pay for it: ibid at para 30.  As noted by HHJ David Cooke in *Ailyan and Fry (Trustees in Bankruptcy of Kevin Foster) v Smith and others* [2010] BPIR 289 at para 69*:*

> "The Court has to assess as best it can on the evidence what [the asset's] value in money or money's worth would be to a rational and reasonably well-informed purchaser, having knowledge of the actual characteristics of what it is he is buying."

This assumes the existence of a market for the asset: *Re Thoars (decd) (No 2)* [2003] EWHC 1999 (Ch), [2005] IBCLC 331 at para 101 (Judge Norris QC at first instance).  Fifthly, it is preferable, but not essential, that the court arrives at precise valuation figures.  If that is not possible, the court can decide that the value falls within a range: *Re Thoars (decd) (No 2)* [2004] EWCA Civ 800, [2005] 1 BCLC 331 at paras 103 – 105 (CA).

8.   The only disputed issue of law between the parties was the extent to which the court was entitled to take account of later events in determining value at an earlier date.  Specifically, the issue was whether the court could take account of the sale of the property in October 2006 in determining its value as at May 2005.

9.   Mr Alexander for the respondents submitted that, in general, the court should confine itself to matters capable of being known to a hypothetical purchaser at the valuation date.  This is the test which applies to valuations carried out by professional valuers in accordance with the rules and guidelines of the Royal Institute of Chartered Surveyors.  These are rules and guidelines carefully prepared by the professional body with the relevant expertise with a view to providing the most reliable basis for an open market valuation as at a particular date and they should therefore be applied by the court when carrying out what is in effect the same exercise.

10. Mr Maynard-Connor for the applicants submitted that the task of the court is to make a finding as to value based on all the evidence available to it, provided of course it is relevant and cogent.  Part of that evidence may well be, as it is in this case, expert valuation evidence prepared in accordance with the RICS rules and guidelines.  It is

important evidence but the court is not confined by any rule of law to those rules and guidelines nor should it be as a matter of principle. Provided that a later event genuinely sheds light on open market value at an earlier date, evidence of it is relevant and admissible.

11. There was consideration of this issue by the House of Lords in *Phillips v Brewin Dolphin Ltd* [2001] 1 WLR 143, also a claim brought under s.238 of the Insolvency Act 1986. A stockbroking business had been sold in consideration, as the House of Lords held, for (i) a nominal sum of £1 and (ii) a sub-lease of the computer equipment used in the business. The sub-lease was made in breach of covenant in the leases of the equipment and, before the sub-lease was entered into, the transferee of the business had decided not to use the equipment. Two months later, and before the first payment under the sub-lease became due, the owner of the equipment terminated the head leases for non-payment of rent and re-possessed the equipment. The relevant issue was the value to be ascribed in these circumstances to the sub-leases as consideration for the transfer of the business. Because of the way the case had been decided below, this issue was not considered by the judge at first instance or the Court of Appeal.

12. Lord Scott of Foscote, giving the only reasoned speech, noted that, because of the breach of the covenants against sub-letting, the head leases were terminable at any time by the head lessors. What, asked Lord Scott, was "the value, in money or money's worth, of a covenant by [the sub-lessee] that was so precarious?" In addressing this question, Lord Scott considered that the actual events which took place were relevant. Within a week of the sub-lease, the head lessors complained about it and threatened proceedings, and within two months there was a default in the payment of rent under the head lease, leading quickly to its termination. Lord Scott observed that "the sub-lessee's" covenant, which had been precarious at the outset, had become worthless."

13. At paragraph 26, Lord Scott said:

> "*Mr Mitchell submitted that these ex post facto events ought not to be taken into account in valuing PCG's sublease covenant as at 10 November 1989. I do not agree. In valuing the covenant as at that date, the critical uncertainty is whether the sublease would survive for the four years necessary to enable all the four £312,500 payments to fall due, or would survive long enough to enable some of them to fall due, or would come to an end before any had fallen due. Where the events, or some of them, on which the uncertainties depend have actually happened, it seems to me unsatisfactory and unnecessary for the court to wear blinkers and pretend that it does not know what has happened. Problems of a comparable sort may arise for judicial determination in many different areas of the law. The answers may not be uniform but may depend upon the particular context in which the problem arises. For the purposes of section 238(4) however, and the valuation of the consideration for which a company has entered into a transaction, reality should, in my opinion, be given precedence over speculation. I would hold, taking account of the events*

> *that took place in the early months of 1990, that the value of
> PCG's covenant in the sublease of 10 November 1989 was nil.
> After all, if following the signing of the sublease, AJB had taken
> the sublease to a bank or finance house and had tried to raise
> money on the security of the covenant, I do not believe that the
> bank or finance house, with knowledge about the circumstances
> surrounding the sublease, would have attributed any value at
> all to the sublease covenant.*"

14.  The decision of the House of Lords establishes that, in appropriate circumstances,
regard may be had to subsequent events, but it was in the context of attributing value
to a covenant which was, on the facts known at the date of the transaction, precarious.
I would agree with the comments of Professor Goode in *Principles of Corporate
Insolvency Law* (3rd ed.) at para 11-31:

> "*Lord Scott's speech has generated much debate on the use of
> hindsight to determine a value at the time of the transaction.
> But it seems clear that Lord Scott was not in truth applying a
> hindsight test; rather he was relying on evidence of subsequent
> events to show that from the outset the covenant under the sub-
> lease was so precarious and its value so speculative that even
> at the time it was entered into a bank or finance house with
> knowledge of the surrounding circumstances would not have
> attributed any value to the sub-lease covenant.*"

15.  The purpose for which the applicants seek to rely on the sale of the property in
October 2006 is not the same.  It is not to put a value on an existing quality or defect
in the asset.  The purpose is to establish that a price agreed for this property between
independent third parties in 2006 shows what the open market value was in May
2005, because the evidence establishes that there was no material difference in market
conditions between those dates, including the prospects for planning permission.  The
only difference was a general rise of about 10% in values for properties of this type in
Stoke-on-Trent, and a suitable discount can be applied to reflect this.

16.  In my judgment, as a matter of principle, the court is entitled on this basis to have
regard to the price agreed in 2006.  It is not an application of a hindsight principle,
which in an insolvency context usually means taking account of later events to value a
contingency as at an earlier date (see *Stein v Blake* [1996] AC 243).  It is simply using
the later sale to establish by inference the market value at the earlier date.

17.  This depends for its validity crucially on two factors.  The first is to establish that
there was no significant change in market conditions between the two dates, apart
from those such as a general rise in market values which can be quantified without
otherwise affecting market conditions.

18.  The second is that the circumstances of the sale are such that it can truly be
regarded as establishing market value at the date of the sale and, hence, be used as a
reliable basis for inferring market value at the earlier date.  It is this second factor
which is controversial in this case and which I will consider when dealing with the
sale in October 2006.

*The property and its location*

19. The property lies on the southern side of Clough Street, Hanley, Stoke-on-Trent which itself lies about half a mile to the west of the city centre. The site area is approximately 2.27 hectares (5.6 acres). In the early to mid part of the 20th century it was used as a greyhound track and before that it had been the site of a marl pit. There were also some mine-workings under the site. From the 1960s it was used as a car dealership, showroom and workshop. Since its acquisition by the Holdcroft group in 1998, it has been used as a car workshop, offices for the group, and vehicle storage.

20. The buildings on the site are a showroom (about 17,500 sq ft.), offices (about 2,000 sq ft.) and workshops (about 44,000 sq ft.) The general condition of the buildings is fairly poor. There are extensive open-air areas used for car storage.

21. A striking physical feature of the site is that it is on two levels. The northern part, adjacent to Clough Street for a length of about 150 metres, is on the same level as the road. It is a relatively narrow strip and covers in total an area of about one acre. Part of the showroom and a forecourt area is on this level. There is a drop of about 5 metres to the lower level which covers the rest of the site. Access to the lower level is gained from the upper level by two solid ramps on the eastern and western boundaries, each about the width of a vehicle. The general setting of the site is accurately described by one of the experts as "urban-commercial". Clough Street has mainly commercial premises, including another car dealership and trade counter outlets and some of the premises are now empty. To the north of Clough Street are mainly commercial and industrial premises. Immediately to the east is a property with an area of about 1.3 hectares (the Steelite site) which was previously a pottery but has been derelict for some years, the buildings on it having been demolished. Immediately to the west are commercial buildings adjoining a minor road, Mount Pleasant, with a residential area to the west of the road. Immediately to the south are several warehouse buildings bordering on Sun Street, to the south of which is a residential area of terraced housing built in the last 30 or so years.

22. The property is within an area which for many years before 2005 had been zoned for industrial use and the property itself had planning permission for motor retail uses.

*The Tesco site and link road*

23. To the east of the Steelite site and to the west of the city centre lies a large site. Tesco applied in 2003 for planning consent to develop it as a superstore. As was common procedure with important applications of this sort, it was called in by the Secretary of State and a public enquiry was held in October 2004.

24. Notice was given that the Secretary of State had approved Tesco's planning application on 19 May 2005, eight days after the sale of the property by the company to TMK. The decision to transfer the property to TMK had been made in March 2005, and it is not suggested that the decision or the transfer were deliberately made in advance of the announcement, so as to justify a lower price.

25. While the outcome of the Tesco application could not be predicted with certainty, it received strong backing from the local authority and the valuation experts are

agreed that it would be assumed as at 11 May 2005 that planning consent would in all probability be granted.

26. The significance of a successful application by Tesco is a matter of some dispute between the experts, which I will address later in this judgment. At this point, I will simply note the two aspects of it which may be of significance. First, a major development such as a Tesco superstore can attract other developments to the surrounding area. Secondly, as part of its application, Tesco offered to fund a major link road connecting the ring road to the south with Etruria Road to the north. Again, the significance of this is in dispute. On the one hand it would greatly improve road access to the area including the property. On the other hand, it would act as a physical barrier between the property and the city centre.

*The Holdcroft group and property holdings*

27. The company and TMK were both subsidiaries of Holdings and part of a largely successful group of companies, mainly engaged in dealing in new and used cars and car servicing. The business has been built up by Terence George Holdcroft who started the business in 1966 and remains the principal shareholder. The group now has retail franchises with ten car manufacturers and operates on a number of sites in the Stoke on Trent area.

28. In a re-organisation in 1995, all the companies then owned by Mr Holdcroft were brought under Holdings. As part of this re-organisation, the company was acquired off the shelf to act as the property holding company for the group. It was called Holdcroft Properties Limited and its present name was adopted only as a precursor to going into liquidation. The properties belonging to the various trading companies were transferred to the company.

29. The property was purchased by the company in 1998 from the receiver of a major car dealer at a price of £2.1m with an additional £150,000 for fixtures, fittings, plant and machinery. The property was shown in the company's accounts at its total cost of £2,279,033. It was purchased to be used in the group's car dealership business and has been put to a variety of uses : second-hand car sales, repairs and bodywork, fleet sales and the pre-delivery inspection of new cars. It became the group's principal car compound and an integral part of the group's operation, as continues to be the case under a lease from the freehold owners to whom it was sold in October 2006.

30. In 2002 and 2003 Mr Holdcroft was advised that as a result of tax changes introduced by the Finance Act 2002 it was disadvantageous for the group's properties to continue to be owned by the company. In September 2003 all the properties owned by the company, except for the property, were transferred to various trading companies in the group. The property was excluded because at that time it was subject to a conditional contract of sale to an unconnected third party, as a result of which stamp duty at the full rate would be payable on an intra-group transfer.

31. The property was transferred out of the company by the sale to TMK in May 2005, some time after it had ceased to be subject to any conditional contract of sale. The proceeds of sale were paid to the group's bank which had a legal charge over the property. It is not alleged that the sale was motivated by a desire to put the property beyond the reach of creditors of the company, at least in these proceedings. The

company's principal external creditor commenced proceedings in July 2008 for relief under s.423, as well as s.238, of the Insolvency Act 1986 against TMK and others. The proceedings were stayed following the issue of the present claim, to await its outcome.

*The liquidation of the company*

32.  The insolvent liquidation of the company occurred as a result of liabilities to the lessor of a site in Widnes from which a car franchise had been operated. One of the group companies acquired the franchise in October 2003 and the company took an assignment of the lease. This franchise traded at a substantial loss and was terminated in 2006. Trading ceased at the Widnes property and the company was left without funds to meet its liabilities under the lease. It went into creditors' voluntary liquidation, as I have mentioned, on 23 February 2007. Its liabilities to third party creditors, as claimed in the liquidation are £365,000 due to the lessor of the Widnes site and £6,000 due to HMRC. In addition, there is a debt of £498,000 claimed to be due to Holdings. Interest, amounting in total to £257,000, would be payable on these debts in the event of a surplus of assets over proved debts. In addition the costs of the liquidation, excluding the costs of these proceedings, amount to £134,000. The company has no assets.

*Value of the property in May 2005:introduction*

33.  The valuation experts are now agreed that the existing use value of the property in May 2005 was in the range of £2m-2.25m. This was the range at which the respondent's valuation expert placed the existing use value. The applicants' expert put it at just £2m, in a preliminary report prepared in July 2008 and repeated in his report for these proceedings. It accords with the view of Lambert Smith Hampton who prepared two reports in 2005, the first for the Holdcroft group's bank in April 2005 and the second for the group itself in July 2005. The issue is the amount, if any, to be attributed to hope value.

34.  The applicants' case is that the prospects in May 2005 for a successful re-development of the site were sufficiently good that the market value at that time was about £3.3m. They attribute a hope value of between £1m and £1.3m to the property.

35.  In order to arrive at this conclusion, it is of course necessary to identify the type or end-use of such re-development. As will become apparent, there was for four years or so up to mid - 2004, some material prospect that the property could be developed for large-scale retail use. If planning consent could have been obtained for this use, it would have maximised the value of the site. The experts are however largely agreed that there was little chance of such consent by May 2005 and the applicants do not advance a case for hope value based on large-scale retail development.

36.  Until the start of the trial, the applicants' pleaded case was that the most likely suitable use for the property was residential development. The respondents did not oppose an amendment put forward during the course of the trial, that "the most suitable use for the Property, as expanded in the BJB report dated 7 May 2010 [their valuation expert's report], involved some residential development either solely or as part of a mixed use scheme". In fact, there was only the barest discussion in their expert's report of the likely re-development.

37. In the joint report of the valuation experts, which in substance is a summary reiteration of the reasons for their conflicting opinions, the applicants' expert suggests that the mixed use would incorporate residential and retail uses. A further suggestion of the addition of hotel use was not really pursued at trial, and would in my view on the evidence be highly improbable. In his opening skeleton Mr Maynard-Connor, appearing for the applicants, submitted that hope value existed because there was a realistic chance that the property would be granted planning permission for alternative uses, "whether residential use only or mixed use – residential/retail and leisure".

38. It was only in the course of cross-examination that the outline of the applicants' alternative use crystallised to the point of identifying in broad terms the relative sizes and character of the suggested residential and retail development. Ultimately the outline of the scheme on which the applicants based their case involved blocks of apartments on the lower level, with a density of not less than 30 apartments per acre, and retail development on the upper level involving a bulky goods or motor parts store with an area of about 5,000 sq ft and associated car parking.

39. As the bulk of this development, representing about four-fifths of the ground area, would be residential, I am satisfied that the planning and valuation issues are much the same as if the whole site were to be residential. I consider it reasonably likely that consent could have been obtained for bulky goods retail use on the upper level. The real issue relates to the prospects, if any, for consent for residential development, either on the whole site or on the lower level.

40. The expert evidence of both sides in this connection was in large part directed at establishing the chances of a grant of planning permission existed as at May 2005. However, in the course of cross-examination, particularly of the defendants' valuation expert, and in closing, the emphasis of the applicants' case was not so much focussed on immediate prospects as on a perception in May 2005 that in a changing planning environment there was a good prospect that over a longer period, perhaps after about two years, planning permission would be granted. I will consider these aspects when I deal with the expert evidence.

41. There are also important factual matters on which the applicants rely in support of their case that the price agreed for the sale of the property in May 2005 was a significant under-value. There are essentially three matters. First, there were a series of offers and agreements between late 1999 and 2004 for the purchase of the property, in some cases at prices very substantially in excess of £2.2m, but all of these were conditional on the grant of planning consent and in most cases for retail use. Secondly, the property was re-valued in the company's accounts for the year ended 30 September 2000 to £3.2m, on the basis of a director's valuation. Following its transfer at cost to TMK, it was re-valued back to £3.2m in TMK's accounts, again on the basis of a director's valuation. Thirdly, in July 2006 TMK received an unsolicited offer to purchase the property for £3m. This offer was rejected but quickly increased to £4m. It was not conditional on any planning consent and was subject to a lease back of part of the property to Holdings so that the group could continue to use the property in its business. Contracts were exchanged on 12 September 2006 and completed on 24 October 2006. It was from the profit arising on this purchase that TMK declared a dividend of £1.5m in favour of Holdings.

42. I will consider the sale of the property in 2006 later, after dealing with the expert evidence. But I will deal now with the other two factual matters.

*Offers for the property 1999-2004*

43. There was substantial interest in the site between 1999 and 2004, principally for potential large-scale retail use. In November 1999 the company received an offer of £2.5m for the property, conditional on planning consent for retail use, from agents acting for Characin Developments Limited (Characin). The offer was rejected. Characin returned in May 2000 with an offer to take a 3 year option to purchase the property for £4m, conditional on retail planning consent and the acquisition of the adjacent Steelite site. There were discussions with Characin but no agreement was reached.

44. In September 2000 the Holdcroft group instructed GVA Grimley to assist in relation to a possible realisation of the property. This resulted in an approach in January 2001 from Henry Boot Developments Limited (Henry Boot) which was interested in acquiring the property and the Steelite site. An offer was in due course indicated to acquire both sites at a total price of £8.75m, conditional on retail planning consent, but no formal offer was made because the main board of Henry Boot did not give approval.

45. In April 2001, Helical Retail Limited (Helical) proposed a contract, conditional on retail planning consent, for the acquisition of the property and the Steelite site at a combined price of £9.213m. This led Grimley to contact Henry Boot and another property developer, Asda Properties Limited, to invite proposals. Henry Boot and Asda Properties offered respectively £8.75m and "a minimum" of £3.5m (quickly increased to £8.75m) for both sites, conditional on planning consent for large-scale retail use.

46. In July 2001 the company and Helical entered into a contract with a term of 30 months for the purchase of the property at a price of £5.54m, conditional on a number of matters including retail planning consent. A similar conditional contract was made at the same time with the owner of the Steelite site.

47. In November 2001, Helical submitted a planning application for both sites for non-food retail development, a drive-through restaurant, a hotel/leisure unit and a pub/restaurant. It was withdrawn in August 2002. A similar application was lodged again by Helical in November 2002, principally it appears to give Helical standing to object to a large-scale development proposed on a 5.5 hectare site at the edge of Hanley town centre at Waterloo Road by Lear Management Limited (Lear). A public inquiry took place in relation to Lear's application for the Waterloo Road site between 26 November and 6 December 2002.

48. In January and February 2003 it became clear from correspondence and meetings with Stoke City Council officials that the second Helical application was meeting considerable opposition from the Council, with a large number of sites seen as preferable to the property and Steelite site. Helical withdrew its application in August 2003 and lost interest in pursuing the development of the property. The company's agreement with Helical was formally terminated in March 2004.

49. In February 2004 there were discussions with another developer, Morbaine Limited (Morbaine) which put forward proposals for an acquisition of the property and the Steelite site at a combined price of approximately £12m, conditional on, amongst other things, retail planning permission and unconditional agreements with end-users. Heads of terms were agreed in April 2004.

50. The arrangement with Morbaine was, critically, dependent on the retail development proposed by Lear at Waterloo Road not proceeding. A grant of permission for that development made it very unlikely that consent for a large-scale retail development at the property and the Steelite site would be granted. It was for this reason that Helical had ensured it had standing to be represented at the public enquiry which took place in November/December 2002. In December 2003, the Secretary of State indicated that he was minded to agree to the grant of planning permission for the Waterloo Road development. Permission was subsequently granted. In April 2004, Morbaine issued an application for judicial review of the decision to grant permission, but the application was refused in August 2004. Morbaine pursued no further interest in the property or the Steelite site.

51. On 8 March 2004 Anthony Bland, an agent who had acted for Characin in 2000, had written to Mr Holdcroft, confirming an interest on behalf of Broad Street Properties Limited in acquiring the property and suggesting a proposal for an option period of "say, one year, during which we would obtain the necessary consents for the development". If the option were exercised, the price would be "in the order of £500,000 per acre". Mr Bland was not specific as to the use for which he would seek planning consent. This approach was rejected, the group confirming that it fell well short of its requirements and that the group's best interests were in pursuing a retail application with adjoining owners. Against the background of the discussions then taking place with Morbaine, this response is not in the least surprising.

52. An approach, apparently on behalf of Lear, was received in September 2004. The response was a request that Lear contact the group but it never did so. Mr Holdcroft and Mr Shenton, the group's property manager and consultant, were right to treat this approach as not serious or, as Mr Shenton put it, a fishing expedition.

53. In November 2004 King Sturge, property consultants, prepared a report for the owner of the Steelite site, which recommended that it be promoted for the bulky goods retail sector, with units totalling 115,000 sq.ft. Apart from a bulky goods outlet of about 5,000 sq.ft on the upper tier, this type of development is not put forward by the applicants as a basis for hope value for the property in May 2005.

54. There was no further interest shown by developers in a large-scale retail scheme, or indeed any other scheme, for the property. It seems clear that the grant of permission for retail development at Waterloo Road ended any real prospects for such development at the property. As I have earlier mentioned, the experts are agreed that by May 2005 there was little chance of permission being granted for extensive retail development.

55. For this reason, the various offers and proposals in the years 1999 – 2004, all of them conditional on planning permission and all of them except Broad Street Properties' approach conditional on retail planning permission, provide no basis for a conclusion that there was hope value in the property in May 2005. The approach

from Broad Street Properties in March 2004 was in vague terms and offered a total of only £2.8m if permission for an unspecified use were granted. It provides no basis for any hope value in May 2005.

*Revaluations of the property in the accounts of the company and TMK*

56. The original revaluation in the company's accounts for the year ended 30 September 2000, increasing the book value by £1m over cost, was prompted, and as it seems to me justified, by the interest being shown in the property for retail development.

57. The directors took no valuation advice on the revaluation amount. It was essentially Mr Holdcroft's decision and his evidence was that the amount was "plucked out of the air really" and was, he thought, a conservative figure in the light of the offers then being put forward. It is not clear exactly when the revaluation was decided but it could have been at any time until shortly before the accounts were approved in June 2001 by when offers had been received from Helical, Henry Boot and Asda Properties.

58. I have previously referred to the decision taken in August 2003 to transfer properties out of the company to other group companies. This followed advice from Christopher Kane, the group's principal tax advisor as well as auditor that as a result of changes introduced by the Finance Act 2002 it would be advantageous if the properties were held by the operating companies. As evidenced by an email to the group's solicitors, all the properties held by the company were to be transferred to operating companies at book value, including the property at its re-valued book value of £3,258,288. The transferee was to be TG Holdcroft (Motors) Limited, chosen because it was using the property more than any other group company.

59. The transfer of the property did not then proceed, only because the group's solicitors advised that stamp duty relief for intra-group transfers would not be available, because of the conditional contract with Helical.

60. Following the end of any likelihood of a large-scale retail development of the property and the end of any interest from developers, Mr Holdcroft concluded in March 2005 that the process of transferring properties out of the company should be completed with the transfer of the property, which he assumed would be effected at the re-valued book value.

61. Mr Holdcroft briefly discussed the matter with Mr Kane in early March 2005. Three significant points were raised. First, Mr Kane advised that while the profit over cost realised on the transfer by the company could be distributed by way of dividend to Holdings, it could not be distributed out of Holdings. He advised that the transfer should be at cost (including the cost of any improvements). Mr Holdcroft's evidence was that Mr Kane was emphatic about this.

62. Secondly, Mr Holdcroft was concerned at how a transfer at less than re-valued book value would affect the group balance sheet. His concern was that the reduction would be picked up by car manufacturers and would affect the amount of credit allowed to the group. Mr Kane advised that in the transferee's accounts it could be

re-valued back to the existing re-valued amount, as long as the accounts made clear that it was a directors' valuation.

63. Thirdly, Mr Kane advised that the transfer should be made to a non-trading company, so that if the property was at any time sold, there would be the option of offering to sell the company, as owner of the property, and thereby reduce the stamp duty charge.

64. Mr Holdcroft accepted Mr Kane's advice on these matters and gave instructions to the group's solicitors to proceed on that basis on 10 March 2005. TMK was chosen as the transferee. It was necessary to obtain the consent of Barclays Bank, the group's bankers, which had a first legal charge on all the group's properties.

65. In February 2005, Barclays Bank had instructed Lambert Smith Hampton (LSH) to prepare a valuation of the group's properties. The valuation was dated 15 April 2005 and placed a market value of £2m on the property. When Mr Holdcroft became aware of this, he asked Mr Kane whether this affected the price at which it should be transferred. Mr Kane advised it should be the higher of cost and market value. The transfer was completed on 11 May 2005 at a price of £2,279,331.

66. Mr Holdcroft requested Mr Shenton to obtain a valuation of the property from LSH addressed to the company. The valuation report for Barclays Bank had also contained two errors, that the property was included in the proposed site of the Tesco superstore and that the company had entered into a contract with Tesco in relation to it. LSH had expressly excluded this incorrect assumption from their market value figure.

67. The valuation report of the property prepared by LSH for the group was dated 4 July 2005. It gave a figure of £2.2m as the market value of the freehold interest in the property. Under the heading "valuation considerations", the report stated:

> "*Our valuation assumes that the existing buildings continue to be utilised for B1 or Motor Trade use and the allocation of the site stays as industrial/B1. If the Retail Study changes the allocation to retail or leisure the value of the land for development could be substantially enhanced. Once the Tesco store is developed we would expect pressure to build for a change of use for this site, as the area generally improves and road communications are enhanced. At present it is too early to tell how quickly the area will change and how this will ultimately affect values. Our valuation does show some enhancement since we last valued the property to reflect hope value.*"

68. In March 2006, the accounts for the Holdcroft group and for the individual companies within the group were approved. The re-valuation reserve of £1m in the company's accounts had been released on the transfer of the property at cost to TMK. The property was included in TMK's accounts at £3,292,701, with a note in the following terms:

> "*The freehold land and buildings were transferred at cost from Holdcroft Properties Limited on 1 May 2005. The property was subsequently re-valued on an open market basis by the directors during the period 1 May 2005 to 30 September 2005.*"

69.  The group accounts continued to show the property at the slightly different figure of £3,280,513 and continued to contain the following note:

> "*The freehold land and buildings were valued on an open market basis by John E Keenan, an independent chartered surveyor and the directors. All sites were valued in April 2004 with the exception of Clough Street, Hanley which was valued during the period ended 30 September 2000. These valuations were included in the previous years' financial statements*"

The property had not been valued by John E Keenan but only by the directors.

70.  Mr Holdcroft's evidence was that he had never read the note in TMK's accounts and that it was factually wrong. He, and the other directors, had not re-valued the property on an open market basis, nor had any decision as to its book value been taken in the period 1 May to 30 September 2005. His concern was only that the book value should remain the same in the group accounts, so as not to affect adversely its credit position with car manufacturers. He was content to accept Mr Kane's advice that it could be included at the re-valued amount, provided that the accounts made clear that it was a directors' valuation (or "only" a directors' valuation, as Mr Holdcroft put it in his oral evidence). Mr Holdcroft gave no thought to whether the re-valued amount, adding £1m to its cost, was still a proper figure. Mr Kane supported this evidence, and said that as auditor he was not concerned because the figure was not material in the context of the group accounts. I doubt that the same could be said of TMK's accounts, which were also audited by Mr Kane's firm.

71. This case is not concerned with whether Mr Holdcroft, or indeed Mr Kane, behaved properly in relation to the issue of re-valuation.

72. I am concerned with whether Mr Holdcroft in fact addressed the question of the market value of the property, and, if he did, whether he had a sound basis for including the property at its re-valued amount in the 2005 accounts.

73. Having heard Mr Holdcroft's evidence, I am satisfied that in its essentials it was truthful. I accept that his only concern was whether the group's standing with the car manufacturers would be damaged and that, acting on Mr Kane's advice as he understood it, he was content to see the re-valued amount in the accounts without giving real thought as to whether that amount could in fact be justified as its market value. The only advice as to its market value was provided by LSH in July 2005, which indicated that the re-valued amount exceeded market value by nearly £1.1m. Mr Holdcroft said that he gave no consideration to LSH's valuation in relation to the book value of the property, evidence which I find it difficult to accept. I think it more likely that he decided to ignore it, and so avoid any difficulties with the car manufacturers.

74. These findings do not reflect well on Mr Holdcroft's conduct in relation to the accounts. Equally, however, I am satisfied that the manoeuvres with the accounting entries in the 2005 accounts provide no basis for a conclusion that the property was transferred to TMK at an under-value in May 2005.

75. Mr Maynard-Connor submitted that the decision to transfer the property to TMK, a non-trading company, so as to facilitate any future sale, showed that a direct or indirect sale of the property was envisaged. It clearly shows that a future sale of the property separate from any business was seen as a possibility, but in my judgment it shows no more than contingency planning and does not assist the applicants in establishing any hope value as at May 2005.

*Expert evidence*

76. The parties called experts in three areas, remediation, planning and valuation. The valuation of the property would very largely depend on remediation costs and the prospects for planning permission for alternative use. Without a sufficient prospect of receiving planning permission, there was no hope value. The amount of any hope value could be significantly affected by the likely remediation costs.

*Remediation*

77. Remediation or abnormal development costs are costs which must be incurred to bring a site to the condition required for development for its intended use. In effect, it is the costs required to bring a brownfield site to a condition equivalent to a greenfield site. Dealing with toxic land and old mine-workings are examples. The costs have a direct impact on the cost of development and therefore on the profit to be made on a development. In turn, these costs therefore affect the market value of a site with development potential. It is in the interests of the applicants to pitch these costs for the property as low as possible and, conversely, in the respondents' interests to pitch them as high as possible.

78. In October 2001, Thornton-Firkin and Partners (Thornton-Firkin), chartered and quantity surveyors, produced for Helical Bar a ground-works estimate for a retail scheme on the combined site of the property and the Steelite site. This estimate was based on a geo-environmental investigation and assessment and drawings produced by Roscoe Capita Limited, consulting civil, structural and geotechnical engineers, and by architects. The estimate was prepared as a feasibility estimate for Helical Bar before it entered into a conditional contract for the purchase of the property, with costs based on Thornton-Firkin's knowledge of similar schemes in the Stoke on Trent area. Essentially, Roscoe Capital devised the scheme and Thornton-Firkin costed it.

79. The total cost was estimated in 2001 by Thornton-Firkin at £1.38m. In response to the prospect of a claim that the property had been sold at an undervalue, Holdcroft Holdings instructed Thornton-Firkin in 2008 to prepare an estimate as at May 2005 for the remediation costs associated with a development of the property on its own without the Steelite site, for residential purposes. To produce this estimate, Thornton-Firkin adjusted their 2001 estimate by excluding the Steelite site, making provision for work required for residential development, and allowing for cost inflation between December 2001 and May 2005.

80. The revised estimate totalled £2.16m.  It included additional works required for residential development costed at £190,841 but the principal reason for the increase from the 2001 estimate was the inclusion of £600,000 as an allowance for imported landfill material which under the scheme for the two sites would have been obtained from the Steelite site.

81. On the instructions of the applicants, Hydrock Special Projects Limited (Hydrock) prepared an estimate in December 2008 of remediation costs as at May 2005, which totalled £1.16m.  This was on the basis of a commercial, rather than residential, development. The business of Hydrock is engineering and environmental consultancy and contracting, specialising in remediation work.

82. The experts called by the applicants and the respondents are from Hydrock and Thornton-Firkin respectively.  The applicants' experts were Eric Cooper and Jonathan Ridgeway, respectively a technical director and a commercial manager with Hydrock. Mr Cooper's expertise lies in devising remediation schemes, while Mr Ridgeway's experience is in costing works for estimates and tenders.  Mr Cooper had prepared the letter in December 2008 identifying remediation solutions for the property and providing a costs estimate.  Mr Ridgeway was not involved in it.  Mr Cooper has 36 years' experience in land remediation and manages Hydrock's Stoke on Trent office in Hanley.  He is familiar with ground conditions in the area from other development projects.  Mr Cooper's methodology was to assess the land quality conditions of the property based on a review of information contained in the reports prepared by Roscoe Capita in 2001, Thornton-Firkin in 2001 and others.  Using that assessment he identified remediation requirements for commercial and residential end uses.  Those works were then costed by Mr Ridgeway on the basis that Hydrock was tendering for the work in 2005.  The total costs are stated in their report as just over £1m for commercial use and £1.2m for residential use.

83. I should mention here that in their report as originally served, these costs were stated in paragraph 6.2 as a little over £1.3m and £1.5m respectively, without any costs schedule to show the constituent elements despite a reference to a costs schedule in paragraph 6.1.   The lower figure of £1.2m for residential use appeared as Hydrock's figure in the joint report of both sides' experts.  The respondents were understandably concerned about these higher figures and both Mr Cooper and Mr Ridgeway were cross-examined about them.  Neither could understand what these figures were or why they appeared in the report as served.  Both said that they did not represent costs estimates made by them for the property, and I accept their evidence.

84. The respondents called Stephen Thomas Holman, a quantity surveyor for over 40 years and a partner in Thornton-Firkin since 1978.  His methodology was to assess the estimates prepared by Thornton-Firkin in 2001 and 2008-9 and  to consider whether they were reasonable.  The elements of the remediation scheme are those identified by Roscoe Capita in 2001, adjusted so as to exclude the Steelite site.  No separate scheme was produced for residential development.  As regards costing, the figures are based on those provided by Thornton-Firkin in 2001, adjusted for building cost inflation, subject to the adoption in some cases of figures as at 11 May 2005 quoted in 2008-09 by Hydrock

85. Mr Holman did not himself devise a remediation scheme, and he readily accepted that he was not qualified to do so.  He explained that he is not a remediation expert, and that his field is construction costs and procurement.

86. A very significant difference between the figures produced by Hydrock and Thornton-Firkin depended on whether the ground level of the lower tier of the property would be raised and therefore whether landfill material would be needed.  Thornton-Firkin had included a figure of £600,000 for this cost.  While raising the ground level of the lower tier had formed part of the proposals for a joint development of the property and the Steelite site as a single retail site, it would not necessarily be essential to a development of the property on its own.  The applicants' case is that the property could have been sold in May 2005 with a view to residential development on the lower tier and either residential or, more likely, bulk retail use on the upper tier, without the need to raise the level of the lower tier.

87. Taking account of this point, Mr Holman's report includes figures on alternative bases which totalled, for a residential scheme, £2.4m if the lower tier level were raised and £2.26m if it were not.  It might be expected that this latter figure would be significantly lower, but this is not the case largely because Mr Holman adopted, for some items, figures which appeared in Hydrock's estimate prepared in December 2008.

88. The joint report of the experts records a reduction in Mr Holman's estimate to  a little over £2m, leaving them some £800,000 apart.  The difference between them is largely accounted for by four items.

89. First, Mr Holman allows £231,150 for reconstruction work to the retaining walls which run along three sides of the lower tier of the site.  There is no evidence that they are not sound, but Mr Holman's view was that because of its importance, provision for this item would be made at the pre-purchase stage, although all or some of it might not in the event be needed.

90. I am satisfied that without evidence to justify a provision of this size, a developer would not factor it into his assessment of the price to be offered for the site.  It seems likely that the vehicle ramp on the eastern side of the property would need widening, therefore requiring a new retaining wall against the side of the ramp, and some provision would be required for it.

91. Secondly, Mr Holman allowed £50,000 for a pumping station and associated works to pump drainage from the lower to the upper tier.  He agreed in cross-examination that this was unnecessary, in the light of more detailed plans of the existing drains than he had not previously seen.

92. Thirdly, there were significant differences in the estimates for some of the remediation works.  Mr Holman used in his report estimates provided by Hydrock in December 2008.  Mr Cooper who was responsible for these estimates explained that they were conservative figures of a type which might be provided at a preliminary stage.  A serious prospective purchaser was likely to look closely at remediation costs before finalising a purchase offer, as in fact happened in relation to a number of the prospective retail schemes.

93. The figures provided by Mr Ridgeway for the report produced for these proceedings, which were significantly lower for some items, represented the figures at which, in Mr Ridgeway's opinion, a specialist remediation contractor would be prepared to tender as the basis of a binding commitment. The difference for remediation costs including imported material to fill hot spots (contaminated areas), is just over £202,000.

94. In the joint report, Mr Holman accepted that "based on its experience as a remediation contractor, Hydrock may be able to provide alternative, less expensive ways of meeting the same objectives" as those addressed by his own more expensive estimates. Nonetheless, he considered that Mr Ridgeway's figures were untested in a competitive process and that a prospective purchaser would adopt a conservative approach at the stage of deciding his offer for the property, and hope to make savings as the work progressed.

95. Hydrock are specialist remediation contractors whose business requires them to tender for contracts with prices which, if accepted, are binding on them. I accept that the relevant figures put forward by Mr Cooper and Mr Ridgeway for these particular works represent prices which would have been quoted by Hydrock in 2005, and could have been relied on by a developer deciding whether and at what price to offer for the property. The same goes for the sub-contract quotation for shallow mine workings, where the difference is just over £131,000. Mr Ridgeway was not challenged in cross-examination on any of these figures.

96. Fourthly, Mr Holman proceeds on the basis that a specialist contractor such as Hydrock would be engaged by the main contractor as a sub-contractor. This adds nearly £185,000 to his estimate, representing the main contractor's overheads and profits. Clearly, some developers will wish to deal only with one contractor and may regard that as a price worth paying. However, provided that the works were scheduled to occur before the start of the main contractor's work, I see no reason why a developer should not save himself this not insubstantial sum and engage the remediation contractor directly. It appears from Mr Cooper's evidence this occurs with some regularity.

97. Overall, I accept the figures put forward by Mr Cooper and Mr Ridgeway as a reliable guide to the provision for remediation costs which a prospective purchaser would make when deciding a price to offer for the property. Provision would need to be made for the construction of a new retaining wall along the length of a widened ramp. A figure of, say, £50,000 appears appropriate for this item, which would almost certainly be carried out as part of the main contract along with widening the ramp (the cost of which is not covered in the evidence).

98. It was submitted for the applicants that, as (i) their case involves a mixed residential/commercial scheme, (ii) remediation costs are lower for commercial end-use than for residential end-use and (iii) the Hydrock figures are for an exclusively residential scheme, I should proceed on the basis of a reduced figure. I do not propose to do so, as the commercial element is confined to the upper tier, whereas the bulk of the suggested development is residential. Any saving is insufficiently material to be taken into account, save perhaps as providing an increased contingency provision.

99. The respondents submitted that it must be reasonably likely that the remediation costs would have been somewhere between Hydrock's figure of £1.2m and a figure of about £2m put forward by Mr Holman and that the prudent buyer would have budgeted for about £1.5m-£1.6m. Having considered the differences between the experts' respective figures, I do not think that this approach is justified. The evidence satisfies me that a prospective purchaser, particularly in a competitive situation, would wish to quantify these costs as closely as possible. If a bidder builds in too much provision for remediation costs in its offer price, it risks bidding too low a price. It is clear that Helical Bar looked closely at these costs before it made the conditional contract for the purchase of the property and the Steelite site. I am satisfied that, having examined the elements of the proposed works, a prospective purchaser would feel able to proceed on the basis of the Hydrock figures. This is particularly so if, as was the evidence of Mr Cooper and Mr Ridgeway, a specialist contractor such as Hydrock would have been willing to bind itself to the tendered figures.

100.    Accordingly, allowing for the retaining wall for the ramp and for some caution, I find that a figure of no more than £1.3m would have been taken by a prospective purchaser as the remediation costs.

*Planning*

101.    Each side called an expert on planning, both members of the Royal Town Planning Institute and both with experience in the Stoke on Trent area.

102.    The applicant's expert was Carl Copestake, who has 17 years planning experience in the private and public sectors. He was employed for eight years prior to May 2005 by Stoke on Trent City Council, working in the areas of development control and regeneration and is now director of planning with a town planning consultancy.

103.    The respondent's expert was Gerald Willard, who has been in private practice for the last 10 years but before then was employed by local authorities in Staffordshire. Between 2004 and 2009 he acted for a number of clients seeking to obtain permission or allocations for residential development in North Staffordshire, including companies in the Holdcroft group, and he also issued a written submission on behalf of the Holdcroft group in relation to the property in July 2005. Having heard his evidence, I am satisfied that Mr Willard's independence and objectivity were not compromised by these connections.

104.    When expert reports were originally exchanged, the applicants did not produce a separate planning report. They relied on the valuation report of Robert Elliott who had made his own assessment of the prospects of obtaining planning permission for a new development on the property. It was clear from his oral evidence that he continued to rely principally on his own assessment. Mr Copestake's report was produced in response to the report of Mr Willard for the respondents.

105.    The explicit terms of reference of each expert's report were the prospects of receiving planning permission for the property on or about 11 May 2005. It is important to underline this, because much of the way in which the applicants' case was put in closing was that a developer purchasing the property in May 2005 would have waited perhaps two years before making an application. The planning experts

concentrated on the prospects for planning permission for residential development, as this was the pleaded basis of the applicants' case until amended during the trial. However, as the applicants' case continued on the basis that most of the property would be developed for residential use, the amendment makes no significant difference and the central issue remains the prospects for planning permission for residential development for the majority of the property. So far as obtaining permission for some retail use, such as bulky goods, on the upper tier, there is no good reason on the evidence for considering that permission would not be granted, but the upper tier is only about one-fifth of the entire site.

106.    Mr Copestake based his opinion primarily on the documents comprising the development plan for the Stoke-on-Trent area in May 2005, as to which s.38(6) of the Planning and Compulsory Purchase Act 2004 provides:

> "*If regard is to be had to the development plan for the purpose of any determination to be made under the Planning Acts the determination must be made in accordance with the plan unless material considerations indicate otherwise.*"

He also had regard, as material considerations, to a number of national planning policies and to the Renew Housing Market Renewal Prospectus (2004) which has a particular importance on the basis of both experts' evidence and to which I will refer later in more detail. Mr Copestake's opinion is that, as a brownfield site in an urban location close to the city centre in Stoke-on-Trent which itself was identified as a major urban area in the Regional Spatial Strategy for the West Midlands (RSS 11) (June 2004), development of the property for housing, or a mixed use involving a substantial amount of housing, would have conformed to the development plan and other material considerations. It was, he said in his oral evidence, suitable for housing.

107.    Mr Willard's evidence was that there was little or no prospect of a successful application for residential development on the property, because it did not lie within the city centre or within one of the areas of major interventions (AMIs) identified in the Renew Housing Market Renewal Prospectus. This prospectus was submitted by Renew North Staffordshire, with the full support of the Stoke on Trent City Council, to central government in March 2004. The background to this is that in 2002, the government announced the creation of nine market renewal pathfinders, in areas in the North of England and the Midlands with housing market weaknesses. One of the areas was North Staffordshire, including Stoke on Trent, and Renew North Staffordshire (Renew) was established as the "pathfinder" for that area. It was, and remains, responsible for securing funding, attracting public and private sector investment and co-ordinating efforts with a view to a revival of the housing market in North Staffordshire. In particular, it worked with the local authorities in the area. The government created the Housing Market Renewal Fund in 2003 with funds of £500m, increased to £1.2 billion in January 2005, to support the work of the pathfinders.

108.    The prospectus identified four first phase AMIs, including Hanley South and a further four second phase AMIs. The property is close to the Hanley South AMI but not within it, nor is it within any of the other AMIs.

109.      As mentioned above, the prospectus was strongly supported by Stoke on Trent City Council, which was the relevant planning authority.  The evidence showed that the planning officials in Stoke on Trent consistently recommended applications for significant residential development for approval only if they were for a site within an AMI.  In most cases the recommendation was followed.  In Mr Willard's opinion, consistently with this evidence, an application in May 2005 for planning consent for significant residential development on the property would have been refused, whether alone or as part of a mixed use scheme.

110.      Mr Copestake accepted that officials consistently recommended against consent for significant residential developments outside an AMI and he also accepted that the likelihood was that an application for housing development on the property would not get planning officer approval.  However, "while the LPA officers largely supported Renew's objections", he explained in his oral evidence:

> "*A. I am of the opinion that had a well-crafted planning application been submitted around that time, it had worked with Renew and not against them and you worked with the officers, then a planning application would have every chance of having support from the officers.*
>
> *Q. But you accept, do you not, in your report (and you make some criticism of it) that Renew were not going to agree to a residential planning application outside an AMI?*
>
> *A. No. Renew were objecting to planning applications at the time, but that was where those applications fell primarily in suburban areas.  This is different, Clough Street is different.  It is because it is on the fringes, if you like, on the doorstep of the sub-regional centre.  It had a lot of positives going for it, it was previously developed land, arguably one of the most sustainable locations in the North Staffordshire.  The site was large enough to accommodate a planning application of mixed uses.  I feel that it would have been an attractive proposition for Renew to have supported, and you could have shown that it aligned with the Housing Market Renewal objectives.*
>
> *Q. Is there any evidence of a planning officer supporting an application in early 2005 in circumstances when a site was outside an AMI and contrary to the Renew policy?*
>
> *A. No, but I haven't seen any evidence that demonstrates that a local planning authority were in a position to have had an application presented to them that fell within such a sustainable location as this.*
>
> *Q. Well.....*
>
> *A. Because the Renew Prospectus was very much about City Centre living as well.  And what Hanley, which was the City Centre of Stoke, was not doing at the time, it didn't have any*

*City Centre apartments, there was no City Centre living and the Renew Prospectus was about that. And this site could very much have supported that type of residential accommodation. So that type of application was not before the officers around that time.*

*Q. But any purchaser would only have evidence of the, and I think you used the phrase, somewhat "blanket" policy being adopted by Renew of saying no, would they not?*

*A. Well, that was the evidence, but what they hopefully – my job is also to give them a professional opinion, that it would be worthwhile talking and working with Renew, with the local planning authority to demonstrate how a planning application could align with the prospectus.*

*What I would say to a prospective purchaser is that the evidence so far, it's poor examples really. There is no example where you have got a planning application that would have a very good chance of being successful on a site like this.*

*Q. But there was not one illustration you could draw to the attention of that purchaser to say that Renew had been shifted from that policy, was there?*

*A. That's correct at that time, yes.*"

111.    If an application was not supported by the planning officials, Mr Copestake said that an application could nonetheless have been approved "had councillors been convinced that the proposal was in accordance with the development plan", and he instanced two applications in April/May 2005 for 34 apartments and 24 apartments. As they were in suburban areas, they were in his view less likely to be approved than a scheme close to the city centre. However, as he accepted in oral evidence, both were much smaller sites and both were disused pubs in residential areas.

112.    Mr Copestake referred in particular to the planning official's report on one of those applications, in which they pointed out that the site of the proposed development lay outside any AMI and also outside the boundaries of proposed area action plans in the "embryonic" local development plan. Mr Copestake relied on the fact that not only was the property in an inner city, as opposed to a suburban, area but also that it lay within a proposed area action plan. Since the committee members had overturned the officials' recommendation in that case, there were therefore real prospects that they would do so in the case of the property. It does not seem to me to be possible to argue from that application, which was for a smaller development in the middle of existing residential area, that there was a good chance of a grant of planning permission for the property against the advice of the officials.

113.    It is worth quoting from the officials' report prepared in February 2005 because it clearly illustrates the approach adopted by the officials:

> "…*The current Housing Market Renewal (HMR) programme is the latest incarnation of area based housing market renewal and integrates fully with the City Plan's stated aims referred to above. As well as the weight given to it by the City Plan, Housing Market Renewal is also supported by Policy CF1 of RSS 11 and is in its own right endorsed as government policy, the prospectus having been agreed by the Government office for the West Midlands. Policy H5 of the Structure Plan also supports an area based approach to housing renewal."*
>
> *Housing Market Renewal is therefore at the forefront of Development Plan Policy for housing development and provides clear guidance on where such development should be prioritised."*

It referred to the proposed Local Development Framework which was being prepared and would be subject to public consultation and stated:

> "*PPG3 advocates a plan, monitor and manage approach to the delivery of new housing sites. This would normally be done through the allocation of sites in the Development Plan but the LDF is at present too early in its production to be helpful and the existing City Plan is out of date in terms of allocations. In the absence of specific allocations, the prioritisation of renewal areas does however provide a legitimate means of managing the City's housing delivery in the interim.*
>
> *The need to prioritise housing development in a controlled way is heightened by the current housing supply situation. The City has already exceeded its 2011 Structure Plan target and is well ahead of the building rates set out in RSS 11 and as such, it is currently unnecessary to provide additional housing land to meet general market needs. Moreover, to do so would exacerbate the low market demand situation that HMR is intended to address and would divert attention and investment away from the priority sites (that are most difficult to re-develop). To divert attention away from priority areas in an already weak market could have serious consequences for the success of the HMR programme and the key Development Plan objectives that it delivers.*
>
> *In light of the above, priority for housing development at the current time must be given to those areas of greatest need that lie within the first phase Areas of Major Intervention (AMI) identified by HMR. Proposed development within the second phase AMI's or the first tranche of Area Action Plans may also be considered where it contributes to HMR delivery within these or adjoining areas.*"

114.      Mr Copestake described it as "a challenge" to persuade a planning committee to grant consent against the advice of officials, but not impossible. He

thought that there was a case to be put to the members of the planning committee. It was a question of "could" not "would", and while he did not say that it was likely that the committee would reject the officials' recommendation against permission, he thought "there was every possibility that it could have happened."

115.    If the local authority planning committee refused consent, the applicant could appeal and, as Mr Copestake states, "an Inspector may have given a favourable decision". In this connection, Mr Copestake cited four successful appeals in 2005-2006 in respect of applications for residential development which had been opposed by Renew on the grounds that the sites fell outside an AMI. Two were very small-scale, for one and four dwellings respectively. Of the other two, one in September 2006, related to an application for flats and town houses on a site with an area of 0.38 hectares. The other appeal, in December 2005, related to an application for permission to build 53 dwellings on a previously developed site near the town centre. These last two appeals related to sites with some characteristics which were similar to the property. One was in the city centre and the other was on the edge of a town centre. Both were however significantly smaller than the property and both appeal decisions were after May 2005, and so would not be known at that time.

116.    As to the overall prospects for a successful appeal, Mr Copestake considered that there was "every chance that the appeal could [or would, as per his oral evidence] have been successful". However, he agreed that it was always uncertain as to what would happen on an appeal. Mr Copestake mentions also that on a national level, 34% of all appeals across the board were successful in 2004-2005.

117.    Mr Copestake accepted that there would have been considerable uncertainty in May 2005 and he was careful not to say that it was likely that an application would succeed. I am satisfied on the basis of the evidence of both the planning experts that a prospective purchaser in May 2005 would have no confidence that planning consent would be likely to be forthcoming for significant residential development on the property.

118.    The prospects were against a recommendation by officials in favour of consent and the prospects for a contrary decision by the planning committee or a successful appeal were highly uncertain.

119.    This conclusion is not affected by the shared position of the valuation experts that as 11 May 2005 the market would have assumed that planning consent would be given (as, in fact, it was on 18 May 2005) for the Tesco superstore and associated link road. There was no evidence from either expert that this would materially improve the chances of consent for substantial residential development on the property. The furthest that Mr Copestake would go was to say that the new link would improve access, but he develops that in connection with retail, rather than residential, use. Mr Willard considered that, if anything, it was a disadvantage because the link road would sever the property from the city centre for pedestrian movement, and so make it harder to rely on proximity to the city centre. Whatever may be made of the inconsistency between that and Mr Willard's representations on behalf of Holdcroft Holdings to the city council in July 2005 in relation to the LDF, it does not help to show that the grant of consent to Tesco improved the prospects for consent to a substantial residential development.

120.     Both experts sought in their reports to gain support for their views from conversations each had with Joanne Mayne, a senior planning officer with Stoke-on-Trent City Council.  Mr Willard referred in his report to his conversation with her on 16 March 2010 and, in preparing his report, Mr Copestake spoke to her on 20 July 2010.

121.     On 5 August 2010 Ms Mayne provided a written memorandum to Mr Copestake.  On 29 September 2010 the applicants' solicitors served what purported to be a hearsay notice under s.2 (1) of the Civil Evidence Act 1995 in respect of this statement.  The memorandum is expressed in the cautious and non-committal terms that one would expect.  She writes:

> " *The City Council are not in a position to be able to provide a written statement of what the Council would have decided in 2005 had different planning applications been submitted on this site because the very nature of the planning decisions are taken on a scheme by scheme and site by site basis.  Decisions not only involve information from applicants but from public consultation comments; stakeholders; councillors and anyone with an interest in the development.  Planning applications which go through Planning Committee are decided through a democratic process.  There are therefore many varying determining factors in making such decisions that you cannot accurately speculate what may or may not be given permission.*"

She comments very briefly on seven planning applications made for other sites in 2005 and their possible relevance, but in a way which is careful not to draw conclusions as regards a hypothetical application in May 2005 for the property.  She concludes under the heading "What 'In principle' would have been acceptable on the Clough Street Site" as follows:

> "*As set out above there are both positives and negatives in this case.  The timing of any housing application at this time would also have also been a determining factor and one which cannot be answered now over five years later.  It is certainly not a case which is clear cut and by using one example which was recommended for refusal at Crane Street Cobridge at the same time, has now been given permission.  A certain level of information e.g. the nature of the proposal, would have been required and would have influenced opinion in order to determine whether the site 'in principle' would have been acceptable for housing.  The absence of a specific scheme/proposal to relate the advice to makes it all the more difficult to do anything than to provide general contextual comments as set out above.*"

122.     Ms Mayne's comments underline the uncertainty of outcome for any application for residential development on the property in May 2005.  I should, however, make clear that I regard these attempts to introduce the views, and reports of the views, of Ms Mayne as unacceptable.  Her views are necessarily expressions of

opinion on what might have happened five years ago. They are admissible therefore only as expert evidence. Expert evidence is admissible only with the permission of the court (CPR 35.4) and no directions or permission was given for her evidence.

123.    Reports by Mr Willard and Mr Copestake of what Ms Mayne has told them are inadmissible without the permission of the court and are in a wholly unsatisfactory form. At least the memorandum was in her own words, but on a contentious topic I would not have given permission for it to be admitted unless she was going to give oral evidence. This is however somewhat academic in this case because, as a serving official, it is difficult to see that it would be appropriate for her to express a personal view on the issue and she has been careful not to do so.

*Valuation*

124.    The expert valuers agreed that for the purposes of their evidence the correct approach to an assessment of the value of the property as at 11 May 2005 is as set out in the RICS Appraisals and Valuation Standards, and associated practice statements and guidance notes. Market value is defined as:

> "*The estimated amount for which a property should exchange on the date of valuation between a willing buyer and a willing seller in an arm's-length transaction after proper marketing wherein the parties had each acted knowledgeably, prudently and without compulsion.*"

Existing use value is defined as:

> "*The estimated amount for which a property should exchange on the date of valuation between a willing buyer and a willing seller in an arms-length transaction after proper marketing wherein the parties had acted knowledgeably, prudently and without compulsion, assuming that the buyer is granted vacant possession of all parts of the property required by the business and disregarding potential alternative uses and any other characteristics of the property that would cause its market value to be different from that needed to replace the remaining service potential at least cost.*"

The guidance as to hope value is as follows:

> "*Market Value will include elements of value, usually known as hope value arising from any expectation that circumstances affecting the property may change in the future. A few examples include:*
>
> • *The prospect of development where there is no current permission for that development;*
>
> • *The realisation of marriage value arising from merger with another property or interests within the same property.*

> *However the amount of hope value must be limited to the extent that it would be reflected in offers made by prospective purchasers in the general market.*"

The experts were agreed that if there were any hope value in the property, it lay in the prospect of permission being granted for development for alternative use. While a prospect of permission for large-scale retail use would add the most value, the experts were agreed that there was no real prospect of this by May 2005. Mr Chittenden, the respondents' expert, directed his report to the value of the property for residential development, as this was the applicants' pleaded case. The applicants' expert, Mr Elliott, was rather unspecific in his report, but his oral evidence was concerned principally with residential development. Both experts dealt with mixed use largely in their oral evidence. Even in a mixed use scheme, as put forward on behalf of the applicants, the predominant element would be residential development on the lower tier. I am satisfied that the prospects for the grant of permission would be much the same on either basis.

125.     The applicants' valuation expert, Robert Elliott, is a partner in a firm of chartered surveyors, specialising in particular in the North Staffordshire and South Cheshire region. He has a detailed knowledge of Stoke on Trent, having previously worked for over 17 years in its property services and regeneration departments.

126.     In arriving at his valuation of £3.3m for the property as at 11 May 2005, Mr Elliott assumed a 50 per cent prospect for consent for residential development with a density of 30 units per acre. He regarded this assumption as conservative. He thought the chances were much better than 50 per cent. In re-examination he put them at 75-85 per cent.

127.     There is little or no support for this view in Mr Elliott's own report. He states in paragraph 9.1 his belief that there was significant hope value attached to the property on 11 May 2005 due to four factors:

> "*The likelihood that the Tesco scheme would secure a planning consent.*
>
> *The potential strategic significance the Chatfield site had in relation to the Steelite site.*
>
> *The level of interest shown in the site by various developers*
>
> *The uncertainty prevailing in 2005 in the Council's planning policy framework which indicated, at that stage, retail consent or mixed use consent containing some retail uses could not be ruled out on the Chatfield site.*"

None of these factors relates to residential development. As already noted, consent for the Tesco superstore is not particularly significant to a principally residential development of the property. The suggested strategic significance of the property to the Steelite site rests on the view that access for any major development of the latter could only be provided over the property. However, Mr Elliott made clear in his oral evidence that he had not ascribed any value to this ransom strip possibility. None of

the interest shown in the site had been for residential development, and almost all of it had been for retail development.

128.　　Mr Elliott sought to support his view in his oral evidence by reference to the location of the property and by his assessment, based on his experience of dealing with Renew and planning policy officers at the city council, that Renew would not try to prevent residential schemes in or close to the city centre and that the officials were concerned to increase the number of sites available for housing.  He relied also on draft planning documents produced in 2006 and 2007.

129.　　I have concluded that Mr Elliott's personal view of the prospects for residential planning consent in May 2005 is unrealistically optimistic.  There is nothing in his evidence which causes me to change my assessment of the evidence of the planning experts, that a prospective purchaser would have viewed the prospects for a successful planning application lodged as soon as reasonably practicable after a purchase in May 2005 as highly uncertain.

130.　　Mr Elliott gave evidence as to how good the prospect for the grant of planning consent needs to be in order to create any material hope value.  He said that a 50 per cent chance was a reasonable percentage to consider.  A ten or twenty per cent chance would not add hope value.  A thirty per cent chance was not appealing.  When asked what value he would put on the property if there was a 30 per cent chance of planning permission, he replied:

> "*Well, I think you would have to take a view on that, if the feedback is 30 per cent, whether that is an avenue that you would realistically want to go down.*"

131.　　I am satisfied on the expert planning evidence that prospective purchasers would view the prospects for planning permission for residential development or mixed-use development with a substantial residential element as well below 50 per cent.  In my judgment, the prospects were not at a level which would lead to an attribution of any significant hope value to the property, judged by reference to a proposed application made in or reasonably soon after May 2005.

132.　　In his report, Mr Chittenden concluded that no hope value would attach to the property in May 2005, in the light of a number of factors, in particular the planning situation but also other factors including the location of the property and strong doubts that it would have been attractive to residential developers.  While he valued the property on an existing use basis at £2 - 2.5m, he put its value as a purely development property at less than that:

> "*..I am of the opinion, given the risks associated with obtaining planning permission, the likely timeframes involved and most significantly the fact that the majority of the property would have been vacant at the date of transfer unless a leaseback was entered into, that a notional purchaser, on an unconditional basis would have only been prepared to proceed at below Existing Use Value and at probably less than £2,000,000 (Two million).*"

133.    This conclusion was derided by Mr Maynard-Connor, but it is not in my judgment self-evidently wrong.  If existing use is removed from the equation, its value rests on holding it for rental income or on redeveloping it for existing permitted use or on the prospects for permission for alternative use.  I do not regard as fanciful Mr Chittenden's view that these purposes, excluding existing use, would be insufficient to support a value of £2.25m.  So I do not regard Mr Chittenden's credibility as an expert as damaged by his view on this.  It is not however necessary to go further than this, because it is accepted that without a sufficient prospect of planning permission for alternative use, the property had no hope value and was not worth more than was paid by TMK.

134.    The focus of the expert planning and valuation evidence was on the prospects for a planning application if made at about the time of purchase in May 2005 and the value of the property in the light of those prospects.  This was as true of the applicants' experts as it was of the respondents'.  So at para. 3.02 of his report, Mr Copestake, the applicants' planning expert, wrote that his research had enabled him:

>    "*to advise the reader of this report what types of development may, or may not have, received planning permission on the Clough Street site on or around 11 May 2005, based upon the development plan and other material considerations.*"

It was apparent too from the experts' oral evidence that they were considering the prospects for a planning application made in about May 2005, or as soon after that as was reasonably practicable.

135.    In his closing speech, Mr Maynard-Connor presented his case on a broader, somewhat different, basis.  He had sought to lay the ground for this in his cross-examination of Mr Chittenden, and his case in closing was based to a significant extent on Mr Chittenden's evidence.   By contrast, he made little of Mr Elliott's evidence.  Paragraphs 9-13 of his written closing submissions read:

>    "*9. Despite the other classifications noted by Mr Chittenden in his report, it is self evident that the most likely purchaser would have been a property developer. This is significant as is sets the context for the Court's determination of the Property's true value in 5/05.*
>
>    *10. To that end, it is important to note that the mindset of such a purchaser, and thus the amount which he is willing to pay, is not constrained by existing factors, such as the physical layout of the property in question, existing planning policies, or current market conditions. Although such factors will undoubtedly be considered by a developer, as accepted by Mr Chittenden such a purchaser buys with one eye on the future and he will delay the submission of a planning application and the commencement of his envisaged development until conditions are most favourable to maximise his profit the acquisition of land banks being common place amongst developers.*

*11. Such a purchaser is familiar with the vagaries of the planning process and is experienced with negotiating and working with planning authorities and other interested third parties, including on matters such as affordable housing, to ensure that a successful and commercially viable development is delivered.*

*12. In that regard, and as was further accepted by Mr Chittenden, a developer considering the purchase of the Property in 5/05 would have had regard to the fact that the Local Development Framework ('the LDF') was emerging because it was actually 'changing the landscape'. As confirmed by the relevant City Council report dated 29/3/05, it was projected that the LDF would be adopted during Spring 2007.*

*13. It was also accepted that developers do not apply a formulaic and scientific approach to valuation; they 'look at everything' including 'the opportunity.'*

136.     The theme of the 'changing landscape' in terms of planning policy and its effect on value is developed at paragraphs 42-50:

*"42. That said, whether or not a planning application would have been approved during 5/05 is not the issue in this case; for it cannot be sensibly argued that the hypothetical purchaser would have purchased with a view to submitting a planning application at that time; quite the opposite, as was accepted by Mr Chittenden who acknowledged that he would have advised a purchaser to wait.*

*43. Indeed, it is evident that the purchaser would have waited for the emerging LDF and the proposed designation of the Property within the Euturia Corridor AAP and that he would have recognised that the same were 'changing the landscape'. Mr Chittenden admitted that in 2005 there was a drive to regenerate the area and he accepted that there was evidence to suggest that looking forward from 5/05 residential would be considered as part of mixed use scheme.*

*44. In fact, as explained in detail by Mr Copestake and recognised by Mr Elliott when making his valuation with the benefit of his local knowledge having worked within Stoke CC and with RENEW, the new LDF and AAP were emerging to achieve the urban regeneration desired by the Local Authorities and the 29/3/05 report confirms that RENEW were working with Stoke CC in that regards.*

*45. The truth is that the only logical and reasonable assessment of these emerging policies in 5/05 was that they could only improve the prospects of obtaining a suitable planning permission and importantly, this fact was actually recognised some two months later by Mr Willard in the context of a mixed use scheme. In this respect his 7/05 submissions speak volumes:*

*46. The expected time delay also fitted well with the likely timetable for the construction of the Tesco store and the new link road; 2007 according to Savills.*

*47. In addition, Yes Car Credit's lease had another 3 years or so to run and although a break clause existed, that required 12 months notice [cl.10.1]. This lease therefore provided a valuable income of £85,000 pa and visible occupation of part of the Property (on the upper tier fronting Clough Street) 14 while the developer waited for the more favourable planning conditions to be brought into force.*

*48. Pausing there, and as hypothesised with Mr Chittenden on Day 9, the Court is invited to assume that on any sale in 5/05 the Group would have sought to lease back the remainder of the Property. This is supported by the evidence of Messrs Holdcroft and Shenton about its importance to the Group. Similarly, it is a reasonable assumption that in such circumstances the hypothetical purchaser would have been agreeable to such a lease, provided the terms of the relevant demise enabled vacant possession to be delivered up at the same time or before Yes Car Credit vacated.*

*49. Quite simply there was no incentive for a purchaser to seek a planning approval in 5/05 and, consistent with his general mindset, in planning terms the purchaser would have been looking to the future.*

*50. That fact fundamentally undermines the Rs' planning evidence which, as Mr Willard confirmed to the Court, was directed at a hypothetical planning application submitted in 5/05."*

137.    As I have earlier mentioned, the point made in paragraph 50 as regards the focus of the respondents' expert evidence is true equally of the applicants' evidence.

138.    In considering these submissions, it is necessary to look at the features of the 'changing landscape' in May 2005. Existing planning policies and factors such as the approach of Renew and the attitude of planning officials to residential developments outside AMIs represented material considerations for any planning application in May 2005. By contrast, this part of the applicants' case is directed rather to policies which were in the course of formulation and could, once developed and adopted, be expected to have a significant effect on planning decisions.

139.    The property lies in or close to an area known as Etruria Valley.  The Renew market renewal prospectus published in March 2004, had identified four present AMIs and a further four proposed AMIs, none of which included the property. Six smaller general renewal areas were proposed, again none containing the property. Looking even further forward, the prospectus stated:

> "*The Etruria Valley, on the site of the former Shelton steel works, combined with other sites in Burslem and Hanley City Centre, presents the opportunity to create up to 9,000 new homes and to support up to 25,000 new jobs, but a successful plan will depend on co-ordinated investment by all of Renew North Staffordshire's partners.*"

140.    The Planning and Compensation Act 2004 required the production by Stoke-on-Trent city council, in common with other local planning authorities, of a local development framework (LDF).  In April 2005, the city council published its local development scheme (LDS) which was, quoting from an internal but published report dated 29 March 2005, "a three year management programme outlining the preparation and adoption of the City of Stoke-on-Trent Local Development Framework (LDF) which will guide sustainable development in the City".  The LDS set out the timetable for developing the LDF.  It involved the preparation of draft plans, periods of public consultation and final adoption over a period of two to three years, although adoption did not occur until 2009.  The timetable set out in the report dated 29 March 2005 included the following items and dates which are of some significance.  The strategic planning documents, comprising or including a joint core strategy and a development portfolio, would be submitted to the planning inspectorate in December 2005 with a projected adoption date of spring 2007.  Of more direct and local significance for the property, the preparation of area action plan documents had commenced in November 2004 and again would be submitted in December 2005 with adoption projected for spring 2007.  Four area action plans were identified, including one for "City Centre and Etruria Road", an area which included the property.  The policies for these areas would be developed in the course of and following extensive public consultation.

141.    According to Mr Copestake's report, as amplified by his oral evidence, the LDS or other document published by the city council in May 2005 stated that the purpose of the proposed area action plan was to "provide detailed guidance for the regeneration of the City Centre and Etruria Road Corridor area.  The purpose of the plan is to create a vibrant City Centre that builds on its core assets for business and increasingly becomes the focus for City Living".  This document was not in evidence, nor was any other document which evidenced the city council's thinking at that time for this area.

142.    There was a lengthy public consultation process.  It was in response to the invitation for submissions that Mr Willard contacted clients with properties in the relevant areas.  They included the Holdcroft group and I refer below to the submission made on its behalf.

143.    A clear indication of the length of time taken by this process is that in September 2007 the planning officials were taking steps with a view to the release of

"the draft City Centre and Etruria Road Corridor Area Action Plan – Draft Spatial Options" *for consultation purposes.*

144.    The internal but published report dated 20 September 2007 stated that "we are at the second stage of plan making where we set out choices for public comment". The draft plan would or might be amended before submission to central government for independent scrutiny.    The purpose of the exercise was "to give interested individuals and organisations the opportunity to have their say on the choices in front of us".   The plan itself was "intended to set out where we want to be in 2026 and how we might get there".

145.    There are extracts from the draft area action plan in evidence, and they include on page 93 of the document details of the 5.9 hectare site on the south side of Clough Street, including the Steelite site and the property.  Appropriate land uses are stated to be employment/residential mixed use including shops, business, general industry and dwellings.  Development would be subject to sequential assessment (i.e. assessing the order in which sites in the area covered by the action plan should be developed) and projected impact on city centre regeneration prospects.    "Key development requirements" included "High density town housing.  This land could provide about 140 residential units".

146.    An earlier and separate development was that in November 2005, Renew issued a lengthy Scheme Update, of which a few pages were put in evidence.  At page 5, it is stated that a clear set of geographical priorities had been established for investment, and "at the top of this list is the 'Urban Core' – made up of the City Centre and the surrounding neighbourhoods".   The Urban Core Study included proposals for the Etruria Valley area.   Further detail at pages 45-46 includes residential development in the City Centre and a plan which showed a large area, including the property, zoned for "employment".

147.    Most of these documents post-date May 2005 and, in the case of the draft area action plan, it does so by over two years.  As Mr Maynard-Connor stressed in his cross-examination of Mr Chittenden, the hypothetical developer would not have known of these documents, or, I would add, their likely contents, in May 2005.  The most that can be said as at May 2005 is that the property fell within a large area for which an area action plan was to be developed with a lengthy process of public consultation, and adoption anticipated in spring 2007.

148.    There is no evidence of what, if anything, the City planners had in mind for the area in which the property lay.  There is certainly no evidence that it was being considered for residential development or for mixed-use development with a large residential element.

149.    In support of their case that the property would have been seen at that time as an attractive prospect for development, much was made of a submission sent to the planning authority in July 2005 by Mr Willard on behalf of the Holdcroft group. It was made in response to the call for suggestions in the initial round of public consultation on the proposed LDF.  Paragraph 1.3 stated:

> "*It is considered that the site is suitable and appropriate for a variety of retail uses and/or other suitably viable land-uses*

> *such as leisure or office uses or a mixed use that is commercially viable. Any such uses must demonstrate that they have no adverse impact on the vitality or viability of the town centre and demonstrate both a quantitative need and lack of sequentially better and available sites.*"

This was developed in greater detail at paragraph 3:

> "*3.1    The site at Clough Street, Hanley, is currently used for the sale of vehicles.*
>
> *3.2    It is suggested that the site be considered for, and allocated in the City Centre Area Action Plan, as retail and any other commercially viable uses, for the reasons set out below.*
>
> <u>*Contribution to the City Centre Regeneration*</u>
>
> *3.3    The regeneration of the City Centre is identified by the Council as a strategic priority, and the focus for major retail, leisure and office development. The allocation of this site for the uses suggested will assist with the delivery of City Centre regeneration, in particular the provision of a wider range of shopping offer, either for an appropriate retail offer or for bulky goods retail.*
>
> *3.4    Additional alternative retail provision will complement other retail offer in the vicinity of the site, and in particular the recently approved Tesco store on the adjoining site, off Clough Street (this site is edged in green).*
>
> <u>*Sustainability*</u>
>
> *3.5    Given the sites location adjoining the City Centre, the    site performs well when judged against a range of   sustainability criteria. The site is brownfield in character; urban in location; highly accessible by public transport, walking and cycling; and presents opportunities for a high quality mixed use development, to complement existing city centre uses, either existing or proposed.*
>
> *3.6    Overall the site and suggested development options for the site will support a number of planning policy and regeneration-related aspirations for the City Centre, as well as the underlying principle of sustainability.*"

150.      There are a number of points to be made about this document.  First, it is
not an independent assessment by Mr Willard of the suitability of the property for
development, nor in particular does it assess its suitability as against other sites in the
same broad area.  It is a submission made on behalf of a client.  Secondly, it does not
suggest that it is suitable for residential development either alone or as a substantial
part of a mixed scheme.   Thirdly, it specifically promotes the property for retail
development, but as I have earlier found there was little prospect at that time of large-
scale retail development on the property.  I accept Mr Willard's explanation of this
document when he said in evidence:

> "*The point of these submissions was to demonstrate that a site
> was available and that there was interest in some of those uses
> that you were putting forward.  And it ended at that.  It was a
> very simple, brief submission and not a great deal of time or
> cost got into preparing the submission and it was just simply
> putting on the table a range of uses which in a marketplace
> were potentially viable.   It would be then for the Local
> Authority to determine, in considering their draft whether they
> wanted to evolve policy to move forward.*"

151.      The planning experts were unanimous in their view that the steps being
taken to develop the LDF and an area action plan for the City Centre and Etruria Road
Corridor were "embryonic" in May 2005.  It could be afforded little, if any, weight in
relation to any planning application.  Mr Copestake said that the situation in May
2005 was that the area action plan was a line on a plan.  The purpose of the
consultation exercise was to assist in creating a development strategy for the area.  I
appreciate, of course, that the applicants seek to rely on this material for the different
point that the property would in general terms have been perceived as having
development potential in the longer term.  But there is in truth no evidence to support
this thesis.  I except for the moment from that the purchase of the property in
September 2006 which I will address later, but it is worth noting now that there is no
evidence that the purchasers had read any of the Renew or LDF documents or knew
anything about them, and their agent Mr Sanders gave evidence that he made no
inquiries about the planning position or prospects.

152.      The applicants adduced no evidence from any developers or agents either
that they had any interest in the property in 2005 or would have had interest in it if it
had been marketed.  No developer or agent in fact made any inquiries or showed any
interest in the property between Morbaine losing interest in about August 2004 and
Mr Sanders' approach in July 2006.

153.      The applicants' own expert evidence does not support this case.  Their
valuation expert, Mr Elliott, tied any hope value to the prospects of obtaining
planning consent on an application made in or about May 2005.  In other words, hope
value for the property was attributable to planning prospects as they then existed, not
on how they might develop in the future.  There is no support in Mr Elliott's evidence
for any significant hope value to be derived from the embryonic LDF.

154.      In view of the applicants' reliance on parts of Mr Chittenden's oral
evidence, it is important to consider his evidence in a little detail.  He accepted that
developers will buy property with an eye to the future.  He agreed that developers will

work with planners to devise a scheme that is most suitable both to the site and also to the prevailing planning conditions "either at the time or that are *about to come into force*". He agreed that they know that the planning process is uncertain and that developers have land banks. He accepted that a developer buying in 2005 would factor in building costs and sales price inflation over the following 12 to 18 months, and would know that the housing market was buoyant with an expectation of further price increases and strong demand for city centre flats.

155.     He agreed that "if I [a developer] buy on a Thursday and the circumstances are not right for me to maximise my profit on a Thursday, then I will wait until such time as I feel I can maximise my profit". It is a proposition that really answers itself, but it presupposes that the developer had already purchased the site unconditionally, as was made very clear when Mr Maynard-Connor returned to the point at the end of day 8. He was not agreeing, or being asked to agree, that the developer would in such circumstances have purchased the site. In particular he was asked to assume that the developer had purchased the site under an unconditional contract. He added that a diligent, prudent purchaser would have undertaken all their investigations before purchasing.

156.     In his report Mr Chittenden referred to planning policies and considerations current in May 2005, including in particular the Renew prospectus. He referred also to the LDF but commented that it would not have been "particularly relevant at the date of valuation as it was still in an embryonic stage". He went on to refer to the contents of the consultation documents produced in September 2007, but only because Mr Elliott had done so in his earlier report prepared in 2008.

157.     Mr Chittenden accepted that a developer considering whether to purchase the property in May 2005 would have regard to the LDF process and the fact that the property fell within an area to be covered by an area action plan. In his report, he said as regards the draft plan produced for consultation in September 2007:

> "*The date of these reports is at least two years past the date of valuation but in my view the proposals therein will have probably formed the mindset of any national purchaser in terms of type of user.*"

I should say I find that difficult to follow, unless the types of user emerged from the documents available in May 2005. As regards the LDF documents available in May 2005, there was the following exchange in cross-examination:

> "*Q. But it is relevant to a developer who is looking forward to developing, say, in 2007, is it not?*
>
> *A. He would certainly have regard to it.*
>
> *Q. Because that is changing the landscape, is it not?*
>
> *A. It is changing the landscape, yes.*"

158.     But Mr Chittenden was clear that, while there was a push for regeneration in Stoke-on-Trent and developers would have regard to the early LDF documents

which were initiating the first stage in the consultation process, this did not translate into significant hope value for the property in 2005.

159.    The fundamental difficulty faced by the applicants in this part of their case is to translate the general policy of regeneration and the very preliminary stage of the development of the LDF into sufficiently good prospects for this particular property for it to attract hope value.

160.    Mr Chittenden's evidence does not provide the basis for this conclusion, nor can the applicants rely on their own valuation expert, Mr Elliott.  Mr Elliott's evidence was firmly grounded in the prospects for a successful planning application made in about May 2005 and he was clear that any hope value was directly linked to those prospects.  He gave no evidence to support a hope value as at May 2005 based on the prospects for a planning application submitted in 2007.

161.    The fact that developers will often look to the future, will have regard to emerging planning policies and may build up land banks does not mean that there would have been demand from developers for this property in May 2005, sufficient to create hope value.

162.    A factor requiring consideration which is particular to the property is the impact of Tesco's application and the grant of consent on 18 May 2005.  Mr Elliott and Mr Chittenden are agreed that as at 11 May 2005 it would be assumed that consent would in all probability be granted.  Although Mr Chittenden drew attention to the factors which could delay completion of the development by Tesco, and in fact in the event there has been considerable delay, I find that as at May 2005 the general view would be that it was likely to be completed within about two years.

163.    In his report, Mr Elliott stated that the Tesco scheme was relevant because it provided for the building of the link road, extending the city ring road, which would improve access to Clough Street and the property.  The link road would result in a significant impact on the development potential of the sites on Clough Street.  Mr Elliott does sound a warning note:

> "*However, it should be borne in mind that the securing of the planning consent for the Tesco scheme would not of course guarantee the subject site would automatically secure a viable planning consent.  Furthermore, although the delivery of the next section of the Ring Road would undoubtedly increase the prominence of the subject site, the site itself does not immediately adjoin the line of the proposed new highway.*"

In his oral evidence, Mr Elliott said that the grant of planning consent to Tesco was "key to the hope value" of the property.

164.    Mr Chittenden stated in his report:

> "*Of particular significance in the mind set of a notional purchaser would have been the potential impact the Tesco's proposal would have had on the immediate surrounding area at the date of valuation.*

> *In establishing whether a purchaser would have paid hope value on the back of this planning permission it is important to have regard to a number of factual issues which were pertinent at that time.*"

165.    He concludes that it would not have assisted in the development of the property for large-scale retail purposes, because as the planning experts agree, there was little chance of permission being granted for it.

166.    So far as adding value to the property for other purposes, Mr Chittenden, like Mr Willard, noted that the effect of the link road would clearly be to take Clough Street outside the city centre. The link road and Tesco development would create a barrier between the property and the city centre. At the same time, he accepted that there would be regeneration benefits in the surrounding area generally, including Clough Street. When asked whether it was a game-changer, he replied:

> "*Well, it was one of the reasons why there was attraction – why developers were attracted by the site potentially, because it was going to be the next sort of step away from the town centre.*"

This refers to the interest in retail development shown in 2000-2004 by developers, as does this later exchange:

> "*Q. ...So, on Tesco's, I am putting it that the decision itself was a significant consideration in the mind of the notional purchaser; do you agree?*
>
> *A. Indeed. The fact that it was there is what generated all the interest in the site previously for retail development.*"

167.    Mr Chittenden also accepted as a general proposition that the effect of a Tesco development is to increase land values around it.

168.    It is straightforward on this evidence to find that the effect of a successful application for the Tesco superstore was to increase very significantly the value of the property for large-scale retail development. But the planning experts are agreed that there was little chance of obtaining planning consent for such retail development on the property. The applicants' case is that, while the upper tier would have bulky goods retail development, the lower tier which is most of the site would be residential development. As Mr Maynard-Connor accepted, there is no evidence that the presence of the Tesco superstore would increase the value of the property for residential purposes, or that the link road would have a significant effect on its value for those purposes.

169.    I am not persuaded that, given that the property would very probably not get planning consent for large-scale retail development, the Tesco development had a significant effect on the value of the property.

170.    In my judgment, there is no substantial basis in the evidence for concluding that there was hope value to be attributed to the property by reference to the prospects

for a purchase by a developer with a view to applying for planning permission two years or so later.

171.      Overall, my conclusion on the totality of the expert planning and valuation evidence is that there was no hope value in the property as at May 2005 which would increase its value significantly above the price of nearly £2.28m paid for it by TMK in May 2005.

*Sale to Cannon and Kirk*

172.      On 12 September 2006, contracts were exchanged for the sale of the property by TMK to Michael Cannon and Owen Kirk at a price of £4m.  The sale was completed on 24 October 2006.  The sale was subject to a lease back to the Holdcroft group of those parts of the property used by it for a fixed term of  two years, and thereafter terminable by either party on 6 months' notice, at an annual rent of £100,000.

173.      The terms of the sale had been agreed in the course of July 2006 between Darren Holdcroft, Mr Holdcroft's son and a director of the group companies, and one John Sanders, acting for the purchasers.

174.      Apart from a rise in property prices of the order of 10% in the Stoke-on-Trent area between May 2005 and September 2006, there was no significant change either in market conditions or planning expectations either generally in the area or specifically as regards the property.

175.      On the face of it, therefore, this sale negotiated at arms length with an independent third party would appear to provide a strong indication of the property's market value in September 2006 and, by inference, in May 2005.

176.      It is, however, necessary to examine the circumstances of this sale with some care, notwithstanding that it was an arms length deal between independent parties.  The sole source of evidence about the sale of the property from the point of view of the purchasers was provided by Mr Sanders.  He was initially contacted for the purposes of this case in December 2008 by Mr Elliott, who was then providing valuation advice to the applicants and who was subsequently instructed as their valuation expert.  Following a meeting Mr Elliott sent him a letter dated 10 December 2008, summarising what he had told Mr Elliott, which Mr Sanders signed as correct on 21 January 2009.  There is an unfortunate difference of recollection between Mr Elliott and Mr Sanders as to whether he was willing to give evidence.  In any event, when the applicants' solicitors sent him a draft witness statement, Mr Sanders refused to sign it.  The applicants served a hearsay notice in respect of the draft statement. The defendants required his attendance to give evidence but also shortly before the trial obtained a signed witness statement from him in respect of which they too served a hearsay notice.  It transpired that Mr Sanders was willing to attend to give evidence and I ruled that, as the defendants had served a witness statement signed by him, they should call him as their witness.

177.      It was, I think, regrettable that Mr Elliott, not a lawyer but a potential expert witness, should have been involved in this evidence-gathering process.  It identifies him too closely with one of the parties and, as here, leaves him open to differences of

recollection on matters which should not be the concern of an expert. I accept that Mr Elliott had not then been instructed as the applicants' valuation expert but, having given full advice on the subject, it must have been a real possibility that he would be instructed. I accept too that Mr Elliott was acting in complete good faith and that in the event no real harm was done.

178.    There is very little evidence before the court about Cannon and Kirk themselves. The evidence such as it is comes from Mr Sanders. They are established developers and house-builders who have been in business for a long time, undertaking developments mainly in the Republic of Ireland but also in Scotland and, more recently, in England. They had developed a site in Coventry and were developing a site in the Stoke-on-Trent area.

179.    Mr Sanders introduced the opportunity to purchase the property to Cannon and Kirk. He has been in the building trade in the Stoke-on-Trent area for most of his working life, operating as he said as "a one-man band", doing relatively small jobs such as house extensions and occasionally buying a plot of land and building a house on it. He knows the area well.

180.    He first met Cannon & Kirk in 2000. He put to them the opportunity to buy a site in the Stoke-on-Trent area. They bought it and are still developing it. It has been a success for them and gave Mr Sanders credibility in their eyes. Mr Sanders used his local knowledge to keep his eyes open for sites which he thought might have potential. He was aware of the projected development by Tesco and thought there was potential for other sites in the area. Tesco was important because "it acts like a honey-pot" and the proposed link road was, he agreed, a big plus point. Without them he would not have bothered with the property.

181.    In about January 2006 he became aware of the property, which he saw as the best in the area for his purposes of introducing it to a developer. It was close to the proposed link road and bigger than the Steelite area. He appreciated that the property must have permission for its current use as a car showroom and a repair shop. He made no enquiries of the local authority or, it would seem, anyone else as to the type of any other development which might be permitted on the property. As he said in his witness statement, "I simply relied on my own local knowledge and interest". In his oral evidence, he referred to the existing use and continued:

> "*That was good enough for me. I could take a view on that. That was good enough for me. I didn't need any more than that because I thought that the road being so close and one thing and another if I eventually got say an end user, substantial end user, that was not already in the city so to speak, then the council might be you know helpful in getting a permission on that.*"

182.    Mr Sanders decided at some time in 2006 that he would try to negotiate the terms of a purchase of the property on the basis that he was acting as agent and, once terms were agreed, take it to Cannon and Kirk. Through a contact he met Darren Holdcroft in July 2006 and offered £3m for the property. The offer was refused because, as Darren Holdcroft made clear, Holdcrofts did not wish to sell as they were still using the site.

183.    Mr Sanders formed the view that if he was to persuade Darren Holdcroft to agree a sale, he would have to go back with a much higher price.  He decided to offer £4m which Darren Holdcroft agreed, subject to a lease-back arrangement.

184.    Mr Sanders' evidence was that he "valued the site at £3m but then emotions took over".  "If I had got it at £3m I would have been happy with it".  He also knew that Cannon & Kirk were buying land elsewhere, so time was not on his side if he wanted to introduce the purchase to them.    His evidence was that he did not think that at £4m Cannon and Kirk would make a loss on the site.  He said that he knew in his own mind that he was paying £1m more than his valuation but he thought they would get it back in the long run.  He was also content to go to £4m because Cannon and Kirk were going to make a great deal of money from the development site that he had earlier introduced to them, and if they only broke even, or lost money, on the property they "wouldn't bat an eyelid".  In these circumstances, Mr Sanders did not feel it necessary to inform Cannon and Kirk that he had offered £3m and that this represented his own view of the value of the property.  It was a matter for Cannon and Kirk whether they chose to purchase at £4m.

185.    The consideration given by Cannon and Kirk to the merits of the property appears to have amounted to the following.  Mr Sanders told them the property had potential, because it was close to the Tesco site and the link road and based on "my experience of the area".  No inquiries were made with the local planning authorities and no professional advice was taken as to the prospects for planning permission or the uses for which permission might be given.  Mr Sanders, and Cannon and Kirk, relied entirely on his own local knowledge.  Mr Kirk walked round Hanley with Mr Sanders who pointed out the Tesco site and the route of the proposed link road.  They walked to the property and had a look at it without, it appears, going on to it.  Mr Kirk was positive about its potential, because in Mr Sanders' words "he knows that I know my area".  There were no ground-works investigations, because any developer in the Stoke-on-Trent area knows that allowance must be made for remedial work.  However, with costs of £1m or more, he would have negotiated the price back down to £3m.  In broad terms, with remediation costs of £1m, he would be content with a purchase price of £3m.  If he was advised that the remediation work would cost up to £1.7m, he would proceed on the basis that he could get the costs down to about £1m.

186.    As to the use of the property, Mr Sanders' evidence is that when they acquired it Cannon and Kirk had no particular use in mind.   In a subsequent discussion, they envisaged a mixed residential/commercial or retail development.  Mr Sanders told them that he did not think it should be a purely residential development.  The reason appears to have been that a commercial or retail element would make more money.    He gave no oral evidence as to the likely proportions of commercial/retail and residential use, although following a meeting with Mr Sanders in December 2008 Mr Elliott wrote to one of the applicants saying that it was to be "predominantly commercial".  I conclude on the evidence that Cannon and Kirk did not give much consideration, and certainly no detailed consideration, to uses for the property.

187.    As already noted, the property has not to date been developed and there is no evidence that Cannon and Kirk have submitted any planning applications.

188.     It would, of course, have been easier to understand more fully the reasons for the purchase by Cannon and Kirk if there had been evidence from them, but no written or oral evidence was provided by them.  As it is the applicants who seek to rely on the sale, it was most obviously for them to call such evidence.

189.     I have concluded that it is impossible to place significant weight on this purchase in determining the market value of the property in May 2005.  There is no evidence that Cannon and Kirk would themselves have been in the market for it in May 2005.  That would depend on the state of their other developments and other factors personal to them and their business at that time.  Mr Maynard-Connor accepted that I could not assume that they would have been potential purchasers at that time.

190.     The purchase could nonetheless be a very telling indication, by inference, of market value in May 2005, if Cannon and Kirk had approached the purchase in a way which, on the expert valuation evidence, a hypothetical reasonable developer would approach it.  Such a person would have investigated with some care the planning position and the prospects for the grant of permission.

191.     The valuation experts are agreed that without an assessment of those prospects it is impossible to attribute a hope value to the property.  Cannon and Kirk relied solely on Mr Sanders and his local knowledge, but he had no expertise in the subject and he made no inquiries or investigations which might have enabled him to give an informed view.  Likewise, there was no investigation of the likely level of remediation works, nor even any form of survey of the property, apart from a simple mining report which did not require any inspection of the property.

192.     In my judgment, Cannon and Kirk cannot be categorised as knowledgeable and prudent purchasers.  Without evidence that they or buyers with a similar approach would have been in the market for the property in May 2005, I must proceed on the basis that buyers would act knowledgeably and prudently.  This is not altered by the fact, as the evidence demonstrated, that this was in a period when there was a great deal of investment by Irish developers in the UK property market.  I do not agree with Mr Chittenden that the presence of a well-funded group of investors looking for buying opportunities is to be ignored when considering market value.  However, there is no evidence that Cannon and Kirk were in their approach typical of Irish buyers.  I must assume that a hypothetical buyer, whether from the Republic of Ireland or elsewhere, would take reasonable steps to be well-informed on planning and remediation issues.

*Transaction at an undervalue: an alternative basis*

193.     The applicants pleaded, by way of amendment during the trial, an alternative basis on which it was said that the sale to TMK was at an undervalue.  It was said that the sale at a price of £2.279m enabled TMK to revalue the property by £1m, thereby conferring a collateral benefit on TMK for which it gave no consideration.  It was submitted that the revaluation was worth £1m to TMK and to the group.

194.     In my judgment, this submission cannot succeed.  The short answer is that, on my findings as to the value of the property, there was no proper basis in 2005/06

for the revaluation. There is no value in the opportunity to make an unjustified increase in the book value of an asset. If by contrast, the increase, or a significant part of it, had been justified, then the sale would have been a transaction at an undervalue not because it would have provided an opportunity for a revaluation but because TMK would have paid too low a price.

*Conclusion*

195.      In the result, therefore, I find that the property was not sold at a significant undervalue in May 2005. I can well see why the particular facts and circumstances of this case, especially the revaluation of the property in TMK's accounts following the sale, caused the applicants to consider that a claim lay against the respondents. Those facts and circumstances undoubtedly created a strong prima facie case. But following the close scrutiny which is the purpose of a trial, I am satisfied that the claim is not made out. Accordingly, I dismiss the application.

# TAB 84

Jeffrey Charles Stuart v. Stephen Goldberg
and Carl Linde, Pavlos Nikos Vardinoyannis

Case No: A2 2007/0512

Court of Appeal (Civil Division)

17 January 2008

**[2008] EWCA Civ 2**

**2008 WL 40958**

Before: Sir Anthony Clarke , MR Lord
Justice Sedley and Lord Justice Lloyd
Date: 17 January 2008, Hearing date: 15 October 2007

**Analysis**

On Appeal from the High Court of Justice Queen's Bench
Division HH Judge Seymour Q.C.

[2007] EWHC 878 (QB)

On Appeal from Master Fontaine

**Representation**

• Gilead Cooper Q.C. (instructed by Stock Fraser
Cukier ) for the Appellant.
• Nicholas Elliott Q.C. and David Quest (instructed
by Reynolds Porter Chamberlin LLP ) for the
Respondents.

**Judgment**

Lord Justice Lloyd:

1  Mr Stuart, the Claimant, appeals against an order
which prevents him from suing the Respondents,
Goldberg Linde, solicitors, in respect of two causes of
action, on the grounds that if he wanted to assert such
claims against them he should have done so in other
proceedings which he brought against them in 2000, and
which came to trial, successfully from his point of view,
in January 2001. I will call this the 2000 Action; the
word "action" is not used by the CPR , but I use it

here to avoid confusion between "claim", in the sense
of proceedings brought by a claimant, and "claim", in
the sense of a cause of action asserted, or relief sought,
in those proceedings. Master Fontaine held that for Mr
Stuart to bring the second claim (which I will call the
2005 Action) was an abuse of the process of the court, of
the kind discussed in Johnson v Gore Wood [2002] 2 AC
1 . Burton J gave Mr Stuart permission to appeal to the
High Court, and directed that the appeal come before
a High Court Judge. Despite that direction, the appeal
was listed before Judge Seymour Q.C., who heard and
dismissed the appeal. On Mr Stuart's behalf Mr Cooper
Q.C. contends that this decision is wrong, and that it
was not an abuse of the process for him to start the 2005
Action, in particular because on one of the two causes
of action now raised, Mr Stuart was not aware of all the
relevant facts until after the trial of the 2000 Action in
2001.

2  The disputes arise from dealings between Mr Stuart,
Mr Linde and a Mr Vardinoyannis in 1999. Mr Stuart
and Mr Vardinoyannis made an agreement on 21 June
1999 with a view to Mr Stuart acting together with
Mr Vardinoyannis (and not with others) in relation to
possible commercial enterprises in Mongolia. It is not
in dispute that Mr Vardinoyannis thought better of the
agreement very shortly after entering into it, and did not
proceed with it. Mr Stuart has a separate claim against
him in these proceedings, which has not been struck out,
but is not relevant to this appeal.

3  His claims against Mr Linde are two-fold. The first
is that he induced Mr Vardinoyannis to break the
contract, by untrue statements about Mr Stuart. Mr
Stuart became aware of the statements which Mr Linde
had made to Mr Vardinoyannis in October 2000, from
a witness statement of Mr Linde in the 2000 Action. In
respect of that claim, which I will call the Inducement
Claim, Mr Stuart knew the facts before the trial of the
2000 Action.

4  The second claim is in misrepresentation, and
relies on statements made to himself by Mr Linde,
some about Mr Linde's own position and others
about Mr Vardinoyannis. (I will refer to it as the
Misrepresentation Claim.) These statements are said to
have influenced Mr Stuart in entering into the contract
with Mr Vardinoyannis. He knew what had been said to
him, but he did not know the true facts, he says, at

any rate as regards some of the statements, until after the trial of the first claim.

5    The 2000 Action was brought to enforce a solicitor's undertaking; I will refer to that claim as the Undertaking Claim. Mr Linde is a solicitor, and was acting for Mr Vardinoyannis at the time. Mr Stuart alleged, successfully, that in the course of two telephone conversations on 9 and 10 June 1999 Mr Linde had given him an oral undertaking, as a solicitor, that he would in any event be paid $350,000, regardless of whether Mr Vardinoyannis entered into the contract which was then contemplated. Mr Stuart needed this assurance in order to enable him to undertake a trip to Mongolia for which he left later on 10 June. Normally, proceedings to enforce a solicitor's undertaking are not lengthy or complex; they are often suitable for summary procedure. Usually, however, the undertaking has been given in writing. In the present case Mr Linde disputed having said the words relied on at all, and also denied that, if he had done so, he did so in his capacity as a solicitor. Thus the proceedings were not suitable for summary determination and had to go to trial with oral evidence over five days. Nevertheless, the issues were clear and simple, even if not easy to resolve: had the words alleged to constitute the undertaking been spoken, and if so were they spoken by Mr Linde as a solicitor? If so, Mr Stuart was entitled to be paid the balance of the sum covered by the undertaking (he had been paid a small part of it in any event).

6    By contrast, the 2005 Action, as against Mr Linde, gives rise not only to issues of fact as to what was said, and its truth or otherwise, but also as to its materiality, and, if false statements were made, whether they had any causative effect — on the one hand (misrepresentation) on Mr Stuart in inducing him to enter into the contract with Mr Vardinoyannis, and on the other hand (inducement of breach of contract) on Mr Vardinoyannis leading him to break the contract with Mr Stuart. They also give rise to substantial issues as to damages, since Mr Stuart claims to have lost large profits on projects that he would have been able to undertake in Mongolia, and seeks to recover these as damages.

7    I will first set out the facts in some more detail, sufficiently for the purposes of this appeal, then I will refer to the law, now set out in Johnson v Gore Wood , and then refer to the basis on which the matter was decided below, before dealing with the application of the relevant principles to the facts of the case.

**The facts**

8    Mr Stuart is himself a solicitor but has never practised as such. He is the managing director of Mongolian Development Corporation Ltd, through which he sought to develop commercial opportunities in Mongolia with the Mongolian Government, in relation to the privatisation of state assets and other commercial matters. Early in 1999 he met Mr Linde, who acted for Mr Vardinoyannis. The latter was interested in investing in Mongolia. Mr Linde arranged several meetings between Mr Stuart and Mr Vardinoyannis, which led eventually to their signing Heads of Agreement on 21 June 1999. During the negotiations, at a time when Mr Stuart had signed the Heads of Agreement but before Mr Vardinoyannis had done so, Mr Stuart went to Mongolia for a week, to prepare the ground for commercial co-operation with Mr Vardinoyannis. He anticipated having to incur substantial expenditure in the course of this visit, and wanted to be sure that he would be indemnified for that expenditure come what may, and in particular even if Mr Vardinoyannis did not sign the Heads of Agreement, bearing in mind that he would not only be spending money, but would be doing so specifically in relation to Mr Vardinoyannis, and thereby losing the opportunity to promote the interests of other potential investors.

9    Mr Stuart left for Mongolia on 10 June 1999, having had two telephone conversations with Mr Linde, in the course of which, as the judge found at the trial of the first claim, Mr Linde had given, and reiterated, an unconditional undertaking, in his capacity as a solicitor, that $350,000 would be transferred into bank accounts set up by Mr Stuart for the purpose.

10    On 21 June 1999 Mr Stuart was in Athens to meet Mr Vardinoyannis. In the course of that visit Mr Vardinoyannis signed the Heads of Agreement. Soon afterwards he thought better of the project, and did nothing towards it. In particular the $350,000 was not paid to Mr Stuart, though eventually £11,500 was paid to cover particular expenses.

Stuart v Goldberg, 2008 WL 40958 (2008)

11  Mr Stuart makes two relevant claims in the 2005 Action. The Misrepresentation Claim is that his own entry into the Heads of Agreement was induced by misrepresentations by Mr Linde. The Inducement Claim is that Mr Vardinoyannis' breach of the agreement (which breach he alleges separately against Mr Vardinoyannis) was induced by derogatory and untrue statements made to Mr Vardinoyannis by Mr Linde.

**12 Misrepresentation**

Mr Stuart's case as to the misrepresentations made to him is set out in paragraphs 59 to 62 of his Particulars of Claim in the present action. The representations are said to have been about Mr Vardinoyannis, or his family, and also about Mr Linde. Those about Mr Vardinoyannis were in summary as follows: statements that his family were the sole owners of Xiosbank, whereas in truth they had only a minority stake; that they owned Motor Oil Hellas, whereas they only owned 50% of it; that Mr Vardinoyannis owned Panathinaikos Football Club, whereas it was owned by two others (possibly relations of his); that he was involved in the take-over of certain European Airlines (whereas he failed in his attempt to acquire a majority stake in Olympic Airways); that he was not involved in any court proceedings at the time, whereas proceedings had been brought against him by Aramco, freezing assets to the order of $100 million, and his sister had also started proceedings against him.

13  The statements about Mr Linde were: that he was the first foreign member of the Zurich Bar, whereas he was never such a member; that he was chief executive of Motor Oil Trading, the parent company of the group, whereas he later denied this, and the company was in any event a defunct Luxembourg company, and not the parent of the group; that while at Baker & McKenzie he had specialised in and led cross-border mergers and acquisitions and privatizations; whereas this was not true and he had only worked in their construction department.

**14 Inducement of breach of contract**

Mr Stuart knew nothing of the statements made by Mr Linde to Mr Vardinoyannis until they were referred to in Mr Linde's witness statement in the 2000 Action, made on 20 October 2000, and no doubt filed and served

shortly afterwards. As such they were not relevant to the Undertaking Claim, but if true they would have reflected on Mr Stuart's credibility. That was why Mr Linde introduced the topic into his evidence.

15  In his witness statement, Mr Linde said (paragraph 24) that he became increasingly concerned about Mr Stuart from a bizarre story which he says Mr Stuart told him while they were driving through Athens on the way to the meeting on 21 June. He had previously (paragraph 8) mentioned a conversation in which Mr Stuart is said to have claimed to have psychic powers enabling him to exercise mental control over situations. He does not say that he told Mr Vardinoyannis anything about this before the meeting. He does say (paragraph 32) that he made Mr Vardinoyannis aware shortly afterwards that Mr Stuart suffered from psychological problems, and that Mr Vardinoyannis was irritated that he had not checked up on Mr Stuart more fully beforehand. The relevance of this aspect of the story, at that stage, was not whether it had had any effect on Mr Vardinoyannis, but to show that Mr Stuart was a fantasist, whose evidence should not be believed.

16  As regards the Inducement Claim, Mr Stuart knew enough, once he had received and read the witness statement, to realise that he might have a claim for inducement of breach of contract against Mr Linde. No doubt Mr Linde's story was explored a good deal more in cross-examination in order to show that it was Mr Linde who ought not to be believed.

17  In relation to the Misrepresentation Claim, Mr Stuart says that he did not discover the falsity of the statements until after the trial of the 2000 Action. That is true as regards Mr Linde's statements about himself, at least as regards the Zurich Bar and Baker & McKenzie. Mr Stuart exhibited correspondence showing that he enquired about these in 2002 and was then given the information on which he now relies for showing that the statements were false.

18  As for the statements about Mr Vardinoyannis, on the other hand, on Mr Linde's behalf it is pointed out that, in Mr Stuart's own witness statement in the 2000 Action, he referred both to the statements (or some of them) and to the fact that they were either false or at least doubtful. In paragraph 65 he said that he had learned on 19 July 1999 of the proceedings by

Aramco, and at paragraph 68 that Mr Linde told him on 2 August 1999 that Mr Vardinoyannis' sister had sued him. In the course of describing events early in July 1999, in paragraph 55, as the background to why it was said that Mr Vardinoyannis did not, as had been planned, visit Mongolia himself, Mr Stuart referred to being told of a crisis in relation to the family-owned bank, Xiosbank, and said "I was not sure which of all these stories to believe during this period. In fact subsequent research and conversations continue to cast doubt on Mr Linde's various explanations." There is no reference in that witness statement to the falsity of the other statements alleged as misrepresentations.

19  Mr Stuart issued the Claim Form to commence the 2000 Action on 6 March 2000. He was professionally represented throughout those proceedings. At that stage the sum of $350,000 (less £11,500) was claimed both by virtue of the undertaking and separately under what was alleged as a written agreement dated 8 June 1999 and a side letter signed on 21 June 1999. It was not alleged that the undertaking itself constituted a contract between Mr Linde and Mr Stuart. On 20 December 2000 Mr Stuart was given permission to amend the Particulars of Claim so as to drop the claim in contract based on the 8 June document. At the hearing on that day, it seems, Mr Vardinoyannis, who was not a party to those proceedings, applied unsuccessfully to be joined as a party. The trial took place from 15 to 19 January 2001 before Mr Arthur Marriott Q.C sitting as a Deputy Judge of the Queen's Bench Division. In the course of the trial, without formal amendment, Mr Arkush, then representing Mr Stuart, put his case on the undertaking as such (for which it is not necessary to show that any consideration was given) but also, in the alternative, on the basis that the conversations between Mr Stuart and Mr Linde gave rise to a contract; a claim in contract, therefore, but different from that which had originally been put forward on the basis of the 8 June 1999 document, and then abandoned by amendment in December 2000. The judge gave judgment on 22 January in favour of Mr Stuart, holding that both ways of putting the case were justified. Mr Linde obtained permission to appeal to the Court of Appeal, but the appeal was dismissed by consent.

20  On 17 June 2005 Mr Stuart, acting in person, issued the claim form in the 2005 Action. He repeated (in substance) the first 41 paragraphs of the Particulars of

Claim in the first action, and then proceeded to allege, first, a contractual claim which was later struck out by the Master on other grounds, not challenged on appeal, and then the Inducement and Misrepresentation Claims against Mr Linde, as well as alleging breach of contract against Mr Vardinoyannis, and claiming damages for that breach. The claim against Mr Vardinoyannis is irrelevant to this appeal. Mr Linde then applied to strike out. Master Fontaine acceded to the application on 27 July 2006, in a reserved judgment after a hearing on 19 July. Judge Seymour heard and dismissed Mr Stuart's appeal on 15 February 2007. Sir Henry Brooke gave permission for the further appeal to this court.

### The law

21  The origin of the principle invoked by Mr Linde and relied on by the Master and the Judge is generally ascribed to observations of Sir James Wigram V-C in Henderson v Henderson (1843) 3 Hare 100 . That, however, was a case in which the issue in both the first and the second proceedings was the same, namely the taking of an account of the estate of an intestate who had been in partnership with the defendant. The principle has been developed since then so as to apply to a case in which the objection to the second proceeding is not that it seeks to raise the same issue as has been decided before, but that it raises a different issue, not decided before, but which could have been raised at the same time. In that respect, the law is now set out in Johnson v Gore Wood [2002] 2 AC 1 , in which coincidentally (not relevantly for the present appeal), on the other point in the case, the House of Lords had to consider another principle driving from a decision of Wigram V-C, namely the rule in Foss v Harbottle (1843) 2 Hare 461 .

22  At [2002] 2 AC 31 Lord Bingham of Cornhill said this:

> " Henderson v Henderson abuse of process, as now understood, although separate and distinct from cause of action estoppel and issue estoppel, has much in common with them. The underlying public interest is the same: that there should be finality in litigation and that a party

should not be twice vexed in the same matter. This public interest is reinforced by the current emphasis on efficiency and economy in the conduct of litigation, in the interests of the parties and the public as a whole. The bringing of a claim or the raising of a defence in later proceedings may, without more, amount to abuse if the court is satisfied (the onus being on the party alleging abuse) that the claim or defence should have been raised in the earlier proceedings if it was to be raised at all. I would not accept that it is necessary, before abuse may be found, to identify any additional element such as a collateral attack on a previous decision or some dishonesty, but where those elements are present the later proceedings will be much more obviously abusive, and there will rarely be a finding of abuse unless the later proceeding involves what the court regards as unjust harassment of a party. It is, however, wrong to hold that because a matter could have been raised in early proceedings it should have been, so as to render the raising of it in later proceedings necessarily abusive. That is to adopt too dogmatic an approach to what should in my opinion be a broad, merits based judgment which takes account of the public and private interests involved and also takes account of all the facts of the case, focusing attention on the crucial question whether, in all the circumstances, a party is misusing or abusing the process of the court by seeking to raise before it the issue which could have been raised before. As one cannot comprehensively list all possible forms of abuse, so one cannot formulate any hard and fast rule to determine whether, on given facts, abuse is to be found or not. Thus while I would accept that lack of funds would not ordinarily excuse a failure to raise in earlier proceedings an issue which could and should have been raised then, I would not regard it as necessarily irrelevant, particularly if it appears that the lack of funds has been caused by the party against whom it is sought to claim. While the result may often be the same, it is in my view preferable to ask whether in all the circumstances a party's conduct is an abuse than to ask whether the conduct is an abuse and then, if it is, to ask whether the abuse is excused or justified by special circumstances. Properly applied, and whatever the legitimacy of its descent, the rule has in my view a valuable part to play in protecting the interests of justice."

23  In the same case Lord Millett, at 59–60, said this:

"It is one thing to refuse to allow a party to relitigate a question which has already been decided; it is quite another to deny him the opportunity of litigating for the first time a question which has not previously been adjudicated upon. This latter (though not the former) is prima facie a denial of the citizen's right of access to the court conferred by the common law and guaranteed by article 6 of the European Convention for the Protection of Human Rights and Fundamental Freedoms . While, therefore, the doctrine of res judicata in all its branches may properly be regarded as a rule of substantive law, applicable in all save exceptional circumstances, the doctrine now under consideration can be no more

than a procedural rule based on the need to protect the process of the court from abuse and the defendant from oppression. In Brisbane City Council v A G for Queensland [1979] AC 411 at 425 Lord Wilberforce, giving the advice of the Judicial Committee of the Privy Council, explained that the true basis of the rule in Henderson v Henderson is abuse of process and observed that it

> 'ought only to be applied when the facts are such as to amount to an abuse, otherwise there is a danger of a party being shut out from bringing forward a genuine subject of litigation.'

There is, therefore, only one question to be considered in the present case: whether it was oppressive or otherwise an abuse of the process of the court for Mr Johnson to bring his own proceedings against the firm when he could have brought them as part of or at the same time as the company's action. This question must be determined as at the time when Mr Johnson brought the present proceedings and in the light of everything that had then happened. There is, of course, no doubt that Mr Johnson could have brought his action as part of or at the

same time as the company's action. But it does not at all follow that he should have done so or that his failure to do so renders the present action oppressive to the firm or an abuse of the process of the court. As May LJ observed in Manson v Vooght [1999] BPIR 376 at 387, it may in a particular case be sensible to advance claims separately. In so far as the so-called rule in Henderson v Henderson suggests that there is a presumption against the bringing of successive actions, I consider that it is a distortion of the true position. The burden should always rest upon the defendant to establish that it is oppressive or an abuse of process for him to be subjected to the second action."

The other members of the House of Lords agreed with Lord Bingham on this point without adding anything which I need to quote.

24    The court's power to strike a claim out is discretionary, but it does not seem to me that on an application to strike out a claim based on the proposition that the proceedings are an abuse of the process of the court, on the principle of Johnson v Gore Wood , the case is likely to turn on the exercise of a discretion, at any rate if the court decides in favour of the application. Either the proceedings are an abuse of the process, or they are not. It could not be right to strike the case out (on this ground) unless the court is satisfied that the claim is an abuse of the process, and if the court were so satisfied, it would be only in very unusual circumstances that it would not strike the claim out. In Hunter v Chief Constable of the West Midlands Police [1982] AC 529 at 536 Lord Diplock spoke of the court's inherent power to prevent misuse of its procedure and of the court's

> "duty (I disavow the word discretion) to exercise this salutary power".

I note that Longmore LJ has expressed the same view, agreeing with Thomas LJ, in Aldi Stores Ltd v WSP Group plc and others [2007] EWCA Civ 1260 at paragraph 38. Judgment in this case was delivered after we had heard argument, but at our invitation the parties provided additional written submissions about it.

25  In the present case two particular points (among many) have been relied on by the defendant, and by the court, in favour of a finding that the claim is an abuse: lack of merit in the second claim, and delay in bringing it. Moreover, as regards Mr Stuart's reliance on the fact that he did not know the falsity of some of the statements relied on as misrepresentations, Mr Linde argues that this is irrelevant because Mr Stuart could have found out the correct position before the first trial, and that by failing to do so, he was not exercising reasonable diligence, and his lack of knowledge should therefore be disregarded. That is not based on anything in Johnson v Gore Wood , but rather on a phrase of Wigram V-C in Henderson v Henderson at 3 Hare 115:

> "The plea of res judicata applies, except in special cases, not only to points upon which the Court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time."

26  Thus, this appeal seems to me to raise three general points which deserve examination, as to whether they are properly to be taken into account in considering whether a second claim is an abuse of the process. So far as I know they have not featured in previous decisions on the point. They are these: is it relevant to consider (a) the prospects of success, or otherwise, of the second claim, or (b) the promptness, or otherwise, with which the second claim has been brought; and if the claimant explains the failure to include the second

claim in the first proceedings by reference to not having known relevant facts at the time of the first proceedings, is it relevant to consider (c) whether he might, with reasonable diligence, have found them out in time?

**The judgments below**

**27 Master Fontaine**
The Master was, of course, referred to Johnson v Gore Wood . At paragraph 31 she set out what she calls the ratio of Henderson v Henderson , rather than Lord Bingham's own formulation of the relevant principle, though she quoted part of that formulation later in her judgment at paragraph 66.

28  At paragraph 32 she commented, as noteworthy, on the repetition in the Particulars of Claim in the 2005 Action of the first 41 paragraphs from the Particulars of Claim in the 2000 Action. She then summarised the Inducement Claim and the Misrepresentation Claim. She considered a number of arguments relied on by the claimant (who appeared before her in person) for saying that it was not an abuse not to include these claims in the earlier proceedings. I do not need to refer to all of these.

29  One was that he had wished to proceed on the undertaking separately, as a simple and quicker proceeding. The Master discounted this point, though describing it as superficially reasonable, because the claim took 18 months to come to trial and the trial took 5 days. She said:

> "it is difficult to envisage that it would have taken very much longer, even had the other claims been included".

30  Another was Mr Stuart's professed lack of knowledge of the possibility of the claims until after the trial. She rejected that as regards the Inducement Claim, since it was Mr Linde's witness statement that disclosed the relevant facts. She commented that an application could have been made to amend the Particulars of

Claim, even though there were only 3 months left to go before the trial. She pointed out in that context that Mr Stuart relied on an additional contract claim at the trial, and said:

> "There is no explanation as to why, if his legal advisers had decided at the late stage to include an additional claim, they did not also include the Inducement Claim, as it would be very much in their contemplation having received Mr Linde's witness statement where such allegations were made."

31   As regards the Misrepresentation Claim, Mr Stuart is recorded as having contended that he did not know that the statements were untrue until after the trial, but as having been unable to say when he found out the true position. In fact the evidence showed that he found out the truth as regards Mr Linde's statements about himself only in early 2002, but, as mentioned above, that he knew the true position as regards some of the statements about Mr Vardinoyannis before the claim was brought. She also recorded (paragraph 47) that Mr Stuart had made no independent investigation as to Mr Vardinoyannis' financial position before entering into the agreement, nor after it became apparent that he was not intending to comply with his obligations under the agreement.

32   The Master said (at paragraphs 49 and 50) that all the relevant evidence on the Inducement Claim was before the court in the 2000 claim, and the judge had failed to make findings only because it was unnecessary for him to do so. She said:

> "Thus, the Court could very easily have explored this issue without very much more time being taken up in the 2000 Action."

33   She accepted that not all the evidence relevant to the Misrepresentation Claim was before the court, but she said that some of it was, and went on:

> "In addition, the same points apply that the factual background was before the court, the relevant witnesses were giving evidence, and they could have given further evidence in respect of the Misrepresentation Claim with perhaps only a day or two extension of the trial."

34   Later in her judgment she addressed a number of points on which Mr Stuart relied to show that there were special circumstances which showed that the 2005 Action should not be regarded as an abuse of process. She mentioned eight elements relied on by Mr Stuart in this context. In the light of the argument in this court, I need mention only one of these points. Mr Stuart had said this in a document put before the Master:

> "The Claimant's legal advisers … advised not to obscure the issue of breach of undertaking with other emerging claims, in a situation where the Defendants were not disclosing any information, and that such other issues would be better dealt with within subsequent separate proceedings when more information could be gleaned from the Defendants, as transpired as a result of cross-examination."

35   The Master's comment was that this was a matter entirely between the Claimant and his legal advisers, and not a matter which she should consider as between the Claimant and the Defendant.

36   She then referred to the merits of the new claims, and commented that Mr Stuart would face evidential

difficulties on each claim. She also said that Mr Stuart would face a problem with the "reasonable diligence" test both because he had not instructed a solicitor himself at the time of the negotiations for the agreement in 1999, and because of his failure to investigate Mr Vardinoyannis' financial position himself at that time. On all these aspects, and as regards proving loss, she clearly took the view that the prospects of success on both of the new claims were small.

37  She also mentioned Mr Stuart's delay in bringing the 2005 Action, not by reference to anything that had happened during the period of delay, but on the basis that "one would have expected" him to have brought his separate claims fairly shortly after the conclusion of the 2000 Action, or at the very latest after the settlement negotiations broke down (which was in April 2002), rather than wait until almost the end of the limitation period of 6 years.

38  She summarised her reasons for holding that the 2005 Action was an abuse of the process in respect of both claims in her paragraph 80, as follows:

"**The Inducement Claim**

(a) The Claimant and his then legal advisers were or should have been aware of the claim by October 2000 at the latest.

(b)  The Claimant successfully attempted to bring in an additional claim (for breach of contract) in the 2000 Action at a late stage. He must therefore have considered, through his legal advisers, whether any other claims could and should be brought.

(c)  If a decision was made in 2000 not to bring this claim in that action for any good reason, that was not communicated to the Defendants nor were the Claimant's rights reserved in any way. If that had been done the Claimant might well have been able to rely on an estoppel by convention or an implied waiver.

(d)  The evidence upon which this issue depends was ventilated before the Court in considerable detail in the 2000 Action. Had the claim been before the Court, the judge could have made a finding upon it, without very much further evidence being necessary.

(e)  The risk now of a collateral attack on parts of the Judgment in the 2000 action, if a different judge reaches different conclusions on the evidence.

(f)  The weakness of the merits of the claim.

(g)  The long unexplained delay in bringing the claim.

(h)  The absence of any special circumstances which would justify permitting the claim to proceed, notwithstanding the above.

**The Misrepresentation Claim**

(a)  The Claimant's lack of explanation as to why this claim could not have been brought in the 2000 Action, other than the general explanation that he did not know the representations were false until after the trial, without giving particulars.

(b)  The fact that the claimant clearly failed to exercise reasonable diligence in ascertaining whether or not he had such a claim by taking no action to investigate the truth of the alleged misrepresentations, not only during the 2000 Action but until some considerable time later.

(c) The pleaded case does not, on its face, show any causal link between

the alleged misrepresentations and the loss.

(d)   Even if the Claimant were permitted to amend this claim, the weakness of the claim on the merits. No application to amend has been made.

(e)   The fact that the Claimant did not indicate during the 2000 Action that he reserved the right to bring further claims, giving reasonable grounds why it would be preferable not to include such a claim in the 2000 Action. I accept that there may have been such grounds, as this claim might have considerably prolonged the 2000 Action, and a much smaller part of the relevant evidence was before the Court than the Inducement Claim, but the Defendants should have had the opportunity to put their position as to whether this claim should have been heard at the same time as the 2000 Action, or should be more conveniently have been dealt with at a later stage.

(f)   The unexplained and lengthy delay in bringing this action. Even if it had been brought as part of the 2000 Action, and a decision made to hear this part of this action separately, the background and the witnesses were essentially the same and the same judge could have heard this claim very shortly after the issues had been dealt with. Even if this had involved a delay in the trial, it would have been unlikely to have been lengthy, in my view, and it would have been far preferable to coming back to the matter some six or more years later.

(g)   The absence of any special circumstances which might justify

this claim being permitted to proceed."

**39 Judge Seymour Q.C.**

By this stage, Mr Stuart had the benefit of Mr Cooper Q.C. to represent him. The judge set out at paragraph 9 the passage from Lord Bingham's speech in Johnson v Gore Wood which I have quoted above.

40   Like the Master, he found it noteworthy that the Particulars of Claim in the 2005 Action repeats much of the content of that in the 2000 Action, including assertions of matters which in the 2005 Action Mr Stuart relies on as misrepresentations.

41   To Mr Cooper's submission that the Master had wrongly underestimated the additional evidence that would be relevant, and the time required, if the Inducement Claim had had to be determined at the same time as the Undertaking Claim, he said (at paragraph 22) that the Master, at paragraphs 49 to 51, was concentrating only on the evidence relevant to liability. He rejected the contention that, if Mr Stuart had applied for permission to amend the Particulars of Claim after receiving Mr Linde's witness statement in late October 2000, with the trial coming up in January 2001, the application would have failed. He said at paragraph 30 that, on such an application, the court would have been able to consider several different courses, including not only an adjournment of the trial but also directing a split trial of liability and damages, as well as others which he did not identify.

42   The judge rejected at paragraphs 32 and 33 a submission by Mr Cooper that the Master was wrong to take account of the perceived merits of the 2005 Action, and also to take the view that the Inducement Claim could have been included in the 2000 Action by amendment.

43   At paragraphs 35 and 36 he referred to a submission by Mr Quest, for the Respondent, that on a trial of the second action Mr Linde's veracity, already tried and found wanting at the hearing of the first claim, would

again be in issue, so that he would again be in jeopardy. The judge did not pay any regard to that submission on the basis that it had not been made to the Master, and that the judge was not concerned with what conclusion he would have come to if the matter had come before him at first instance, "but simply with whether it has been demonstrated that Master Fontaine's judgment was wrong". This point is not important in itself, but it suggests that, although he does not say so in terms, the judge was treating the Master's decision as one reached in the exercise of a discretion, only to be discharged on the very limited basis on which an appellate court can interfere with such an exercise. If that was his view, it was wrong, for reasons given in paragraph [24] above. Of course, the judge was correct to say that for the appeal to be allowed, the Master's order had to be shown to be wrong: see CPR 52.11(3)(a) . On a question of abuse of process of this kind raised at a preliminary stage such as this, with no oral evidence, it seems to me that the appellate court is often likely to be, and in the present case is, in as good a position as the court below to assess whether the proceedings are or are not an abuse of the process.

44  That point was touched on by Thomas LJ in Aldi Stores Ltd v WSP Group plc and others [2007] EWCA Civ 1260 at paragraph 16, in relation to a case of much greater complexity, in which there were many more factors to be balanced than are relevant in the present case in deciding whether the second proceedings amounted to an abuse of the process. Nothing in what Thomas LJ says seems to me to be inconsistent with my view that this court is (and the Judge was) in as good a position as the Master to decide in the present case whether to bring the 2005 Action was an abuse of the process on the part of Mr Stuart.

45  In the end, the Judge held that the Master had correctly identified the law which had to be applied to the issues before her, and had applied it correctly to those issues, and could not be shown to be wrong in her decision.

## Discussion

46  As I have mentioned, three of the points relied on by Master Fontaine are of some general importance, namely the prospects of success of the Misrepresentation and the Inducement Claims, Mr

Stuart's delay in bringing the 2005 Action, and his supposed failure to use reasonable diligence. Another of the points she relied on is also noteworthy, namely the relevance of Mr Stuart's failure, having decided not to add other claims to the 2000 Action, to warn Mr Linde of the fact that he was considering other claims against him arising from the same matters. Before I deal with these four points, I will mention more briefly some of the other points taken.

47  I do not regard it as of significance that Mr Stuart, when preparing the Particulars of Claim in the 2005 Action, acting in person, copied large parts of the Particulars of Claim from the 2000 Action in which the factual background to the matters at issue was set out. Obviously there was a lot of common ground between the subject matter of the two Actions. Inclusion of the same text in the two statements of case, especially given that Mr Stuart was acting for himself, does not seem to me to demonstrate by itself that either the Misrepresentation Claim or the Inducement Claim should have been included with the Undertaking Claim in the 2000 Action. The overlap between the two Actions needs to be assessed by reference to the substance of the respective claims, not by a literal comparison of the two statements of case. I respectfully disagree on this with the Master and the Judge; I consider that this was irrelevant.

48  Master Fontaine was right to regard Mr Stuart's wish to enforce the undertaking by separate self-contained proceedings, which would come to trial faster than proceedings asserting the Inducement Claim or the Misrepresentation Claim, as being a reasonable position. She discounted it because the undertaking claim took much longer to come to court, and at the hearing, than a claim on the solicitor's undertaking would normally require. It is true that it did, because it was a most unusual case on the facts. I cannot, however, agree with her comment, in paragraph 44, that "it is difficult to envisage that it would have taken much longer even had the other claims been included". That seems to me to underestimate greatly the additional scope of the Inducement Claim and the Misrepresentation Claim. That also goes with her comment, in paragraphs 49 and 50, that the court had all the evidence that would have enabled the Inducement Claim to be made. This ignores the issues of causation and damages, which would no doubt be

hotly contested. Oddly, when she came to the merits, at paragraph 69(d) she referred to the causation question, and at paragraph 75 to the damages issue. It seems to me that as regards even only the Inducement Claim, let alone the Misrepresentation Claim, the proceedings would have been on a wholly different scale if either of these had been added to the 2000 Action. If the result had been that the resolution of the Undertaking Claim had to await the trial on liability of the other issues, that would have been inconsistent with the essential point of an undertaking, namely that it provides a relatively swift and uncontroversial way for the person to whom the undertaking is given to claim performance of the subject of the undertaking.

49   Equally, her comment in paragraph 52 that the witnesses relevant to the Misrepresentation Claim were giving evidence already, and that they could have given further evidence on that claim with perhaps only a day to two extension to the trial, seems to me to underestimate altogether the consequences of adding the Misrepresentation Claim to the 2000 Action, quite apart from the fact that not all the statements now relied on were known to be false at the time of the trial.

50   If either of the additional claims had been included in the 2000 Action with the Undertaking Claim, it would have been possible for the claims to have been directed to be heard separately, or for issues in each claim to be heard separately from other issues. But it does not seem to me that the Master's comments on the feasibility and implications of joining all claims in one action allow for the practical consequences as regards delay and expense. Accordingly, it does not seem to me that she was right to regard Mr Stuart's position in seeking to enforce the undertaking by itself as other than reasonable.

51   As for the judge's comments, unlike him I cannot discern anything in paragraphs 49 to 51 of the Master's judgment which suggests that she was only considering evidence as to liability, with a view to a split trial. No doubt on an application for permission to amend in late 2000 several different courses would have been open to the court. It seems to me that any of them other than the dismissal of the application would have led almost inevitably to the loss of the trial date, and thus to additional delay on the undertaking claim, which had already been substantially delayed by Mr Linde's denial,

on which Mr Linde was not believed at the trial, of having given the undertaking at all.

52   As for the Master's comments on Mr Stuart's knowledge of the circumstances relevant to the Inducement Claim and the Misrepresentation Claim, it is fair to say that Mr Stuart did know of facts on which the Inducement Claim could be based, once he had read and considered Mr Linde's witness statement served on 20 October 2000. He therefore knew these facts before the trial of the 2000 Action. He also knew some of the facts relevant to the Misrepresentation Claim, but it is not shown that he knew all of them, and the evidence is that as regards some of them he did not. There was no material before the court from which it could be said that he ought to have realised the falsity of these statements before the trial in January 2001.

53   In these circumstances I do not understand how it could be said that Mr Stuart ought to have brought the Misrepresentation Claim — at least insofar as it relied on the statements which he did not know to be false until 2002 — as part of the 2000 Action. What view one may take of the respective significance of the falsity of the different statements is another matter, but it does not seem to me fair to criticise Mr Stuart for not advancing the Misrepresentation Claim as part of the 2000 Action even though he knew, at the time of those proceedings, that some of the statements he says he relied on were false, given that he did not discover the falsity of others until after the trial.

54   On the question whether he should have applied to amend his Particulars of Claim in the 2000 Action, the Master relied, among other things, on his late reformulation of the Undertaking Claim as a claim in contract. She did not refer in terms to his abandonment, in December 2000, of the separate claim (to the same effect) based on the 8 June 1999 document. I cannot see that to have put the undertaking claim forward in the alternative on the basis of a contract is remotely comparable to the amendment which would have been necessary in order to add the Inducement Claim. The alternative contractual formulation did not bring in any matters of relevant evidence that were not already before the court, and exactly the same remedy was sought as before. That is apparent both from the inherent nature of the claim and from the fact that it

was possible and appropriate for the judge to allow it to be raised without amendment of the statement of case.

55    By contrast, amendment of the statement of case to include the Inducement Claim would have transformed the whole proceedings, by introducing all sorts of issues (above all causation and loss) which were wholly irrelevant to the Undertaking Claim, and thereby expanding substantially the scope of the necessary evidence. The application for permission to amend could hardly have been brought on earlier than the case management conference or pre-trial review which was held on 20 December 2000. On the basis that the Claimant would have put forward a fully pleaded Amended Particulars of Claim, for which permission to amend could have been given, it would then have been necessary, if permission was granted, for the Defendant to amend the Defence, and for the future case management to be reconsidered in the light of the amended statements of case. It seems to me inconceivable that the existing trial date in January 2001 could have been held. In that way Mr Linde's reference in his witness statement to the derogatory remarks made by him to Mr Vardinoyannis, intended to provide the basis for an attack on Mr Stuart's credibility, would in addition have delayed the trial of the Undertaking Claim substantially. In my judgment the Master's reliance on this factor, and the Judge's endorsement of it, was incorrect.

56    I can now turn to the points of more general application: relevance of prospects of success, delay, and lack of reasonable diligence, and the Claimant's failure to warn the Defendant that he was considering another claim.

### 57 Prospects of success

Given Lord Bingham's emphasis on the need for the court to avoid adopting "too dogmatic an approach to what should in my opinion be a broad, merits based judgment which takes account of the public and private interests involved and also takes account of all the facts of the case, focusing attention on the crucial question whether, in all the circumstances, a party is misusing or abusing the process of the court", it is necessary to proceed with care in relation to a contention that some aspect of a particular case must be disregarded as irrelevant in principle. However, it seems to me that it would at most only be in an extreme case (either way)

that the merits, in the sense of prospects of success, of the second proceedings can be relevant to deciding whether bringing it separately is an abuse of process. If the case can be shown to be cast-iron, so that judgment could be obtained for the claimant under Part 24 , this might perhaps outweigh factors suggesting that the case ought to have been brought as part of the earlier proceedings. If, on the other hand, the case is hopeless, then it may be capable of being struck out for that reason in any event. But if (as here) the prospects of success are uncertain, but the case is not suitable for summary judgment for either party under Part 24 , then it seems to me that it is inappropriate to attempt to weigh the prospects of success in the balance in deciding whether it is an abuse of the process to bring the claim in later proceedings, rather than as part of the earlier proceedings. In my judgment, when Lord Bingham spoke of a "broad, merits based approach", the merits he had in mind were not the substantive merits, or otherwise, of the actual claim, but those relevant to the question whether the claimant could or should have brought his claim as part of the earlier proceedings. A defendant may feel harassed by having brought against him what appears to be a weak claim, but that factor should not count in this context. Whether the claim appears to be weak or strong, it is the fact of it being brought as a second claim, where the issue could have been raised as part of or together with the first claim, that may constitute the abuse.

### 58 Delay

For similar reasons, I consider that delay of itself is not relevant to whether the second claim is an abuse of process. Delay may be met with a defence under the Limitation Act , or an equitable defence such as laches. Absent any such factor, the mere fact that the claimant has brought his second claim late, but in time, is not relevant to the question whether bringing the new claim in a second set of proceedings is an abuse of process. Of course, things may have happened during the period of delay which are relevant, but nothing of that kind is relied on in the present case.

### 59 Failure to use reasonable diligence

As for the relevance of a claimant's failure to use what the court might consider to be reasonable diligence in finding out facts relevant to whether he has a possible claim, it may be that this could possibly be relevant

to the enquiry described by Lord Bingham, depending on the circumstances. On the other hand, it does not seem to me that there can be a general principle that a potential claimant is under a duty to exercise reasonable diligence, not yet having brought proceedings asserting a particular claim, to find out the facts relevant to whether he has or may have such a claim. Moreover, I do not see how it can be relevant at all that the claimant may have failed to use due diligence in attending to his own interests at the time of the transaction or the events giving rise to the claims asserted. Unless, on the merits, that is a complete and inevitable defence to the claim, it seems to me to be entirely irrelevant to the enquiry which is necessary under Johnson v Gore Wood . Nothing in Sir James Wigram's observations in Henderson v Henderson supports that. That, however, is the context of the Master's comments on lack of reasonable diligence in paragraphs 70 and 72. If relevant at all, an enquiry as to any suggested lack of diligence on the part of the claimant would have to involve considering the circumstances of the particular claimant, including what knowledge he did have of the facts at any relevant stage, in order to decide whether he knew enough to put him on enquiry so as to try to find out more. In this context, as generally, it is also relevant that the onus is always on the defendant to show that the claimant's conduct is an abuse of process.

## 60 Failure to warn the Defendant

That leaves one point to be considered, as expressed by the Master in sub-paragraph 80(c) under the heading the Inducement Claim and 80(e) under the heading the Misrepresentation Claim: what is the relevance of the fact that the Claimant knew of a possible claim against the Defendant which related to the subject matter of the first action, thought about asserting it, but said nothing about it to the Defendant before the trial of the first action?

61   In Johnson v Gore Wood the Defendant knew that Mr Johnson was contemplating bringing his own proceedings at the time when the first proceedings, brought by Mr Johnson's wholly-owned company, were compromised. Mr Johnson was a party to the compromise agreement, and the terms of that agreement affected expressly the separate claim by Mr Johnson in various ways. Those facts were undoubtedly relevant to the decision on the facts that it was not an abuse of the process for Mr Johnson to bring

separate proceedings, even though they were for an identical cause of action, and involved virtually the same evidence: see Lord Bingham, [2002] 2 AC at 33H to 34G . Logically, therefore, it must be potentially relevant that a Claimant knows about another claim, is contemplating asserting it against the same Defendant, but says nothing about it. That is borne out further by a passage in Lord Millett's speech in the same case, [2002] 2 AC at 61 :

> "Given that Mr Johnson was entitled to defer the bringing of his own proceedings until after the company's claims had been resolved, it would have been unconscionable for him to have stood by without disclosing his intentions and knowingly allowed the firm to settle the company's action in the belief that it was dealing finally with all liability arising from its alleged negligence in the exercise of the option. To bring his own claim in those circumstances would, in my opinion, amount to an abuse of the process of the court."

Lord Millett was alone in making that comment, but its force, in the context of that case, is evident.

62   In Aldi Stores Ltd v WSP Group plc Longmore LJ mentions as relevant (at paragraph 39) the fact that Aldi made their position clear to the parties whom they later sued in the second proceedings (see also paragraphs 2(xii) and (xv) in the summary of facts). Thomas LJ also alludes to the Defendants' awareness of the position at paragraphs 29 and 30.

63   Here, by contrast with Johnson v Gore Wood , and even more so with Aldi Stores v WSP Group plc , the parties to both proceedings are the same (disregarding Mr Vardinoyannis, who is important, but not for the purposes of this application). But the separate claims are very different. The claim on the undertaking is by its nature intended to be a relatively summary and easy procedure, and should be so because the issues are so limited: was the undertaking alleged given, and if so

was it given by the person in question as a solicitor? No question of consideration arises, nor of causation, foreseeability or proving loss. Admittedly in the present case there was the unusual difficulty on the first point that it was not in writing, and there was an acute dispute of evidence on the factual question. But it was a relatively confined enquiry, as compared with that which would be necessary on either of the other claim.

64 Neither the Inducement Claim, of which Mr Stuart was aware by the time of the 2000 Action trial, nor the Misrepresentation Claim, as to which he knew some but not all of the relevant facts, is at all straightforward. The evidence as to the original statements would overlap with that which was involved on the Undertaking Claim, but that would be just the starting point. There would in addition be important, substantial and no doubt controversial evidence on causation, and on damages. Moreover, it seems to me also highly relevant that the first knowledge that Mr Stuart had of the facts relevant to the Inducement Claim came from a witness statement of Mr Linde filed less than 3 months before the trial of the 2000 Action. No doubt it did make Mr Stuart and his advisers aware of the possible Inducement Claim, but it seems to me altogether a different proposition to say that it was incumbent on Mr Stuart, having become aware of these facts in these circumstances, to risk delaying the trial of the Undertaking Claim by drawing attention to the possibility that he might assert the Inducement Claim in separate proceedings.

65 The cases on this aspect of abuse of process include many reminders that a party is not lightly to be shut out from bringing before the court a genuine cause of action. That point is now underwritten by article 6 of the European Convention on Human Rights , but I do not think that this article changes English domestic law at all. It is consistent with the article to allow the court to strike out a claim which is an abuse of the process, but at common law it must be clearly shown to be an abuse before it can be struck out. The court must consider critically any suggestion that a particular cause of action should not be allowed to be asserted because of the bringing of other proceedings based on a different claim. The typical example of abuse is where the claimant is really trying to relitigate a claim or contention already unsuccessfully advanced. A good example of that is Manson v Vooght [1999] BPIR 376 .

The principle is not, of course, limited to cases where the earlier proceedings were unsuccessful. But the present case is not an example of relitigating the subject-matter of a previous claim, despite the overlap between the evidence relevant to the respective claims.

66 In Barrow v Bankside Agency Ltd [1996] 1 WLR 257 (where the later proceedings were held not to be an abuse) the abuse was identified as being that "the defendant should not be oppressed by successive suits when one would do". So it is a question of assessing whether, comparing the respective claims, and considering the circumstances including the conduct of the relevant parties, it is "manifestly unfair" (see Hunter, per Lord Diplock [1982] AC 529 at 536) to the defendant that the later proceedings should be brought against him, after the earlier proceedings had been brought and disposed of.

67 Mr Cooper submitted that, if either of the later claims had been added to the 2000 Action, at best there would have been a split trial, of liability and damages, and that the fact that there would have been a second hearing in those circumstances meant that it could not be an abuse to bring a second claim which would itself result in a second hearing. I do not accept that. If there was an abuse in the present case, it lay in the fact that Mr Linde went through the first trial supposing that all that was at issue was his liability on the undertaking, whereas in fact Mr Stuart was already contemplating bringing other proceedings against him on the Inducement Claim, based in part on the same facts, and was hoping to discover additional material relevant to whether he could or should start those additional proceedings.

### Conclusion

68 I do not consider that it was incumbent on Mr Stuart to seek to add the Inducement Claim to the 2000 Action, because the facts came to his attention so late before the trial of the 2000 Action, because to do so would (if successful) have delayed the trial of the 2000 Action, and because of the disparity between the different claims, the Undertaking Claim being essentially summary and certainly relatively simple, and also relatively (at least by comparison with the other claims) speedy, the other claims being much more complex in terms of issues and evidence, and therefore

likely to take much more time to come to trial, and at trial as well.

69   That being so, should Mr Stuart have put Mr Linde on notice that he was considering bringing the Inducement Claim, so that Mr Linde would be aware, in the course of the trial of the 2000 Action, that more might depend on how his evidence was received than a claim for payment of $350,000? At most, having received and considered Mr Linde's witness statement, and having concluded that it might provide the basis for the Inducement Claim, Mr Stuart's solicitors ought to have written to those acting for Mr Linde to inform them of the possible claim, stating that Mr Stuart reserved his rights in relation to this claim, while not intending to complicate or delay the 2000 Action by applying for permission to amend.

70   It seems to me relevant to this that the information which made Mr Stuart aware of the possible Inducement Claim came from Mr Linde himself, and that it came at a very late stage, being deployed by Mr Linde in order to attack Mr Stuart's credibility. It may not have occurred to Mr Linde that he was providing to Mr Stuart material for a possible different claim against himself, but he was as well able to draw conclusions as to its possible relevance as Mr Stuart was. There was no disparity of knowledge, other than as to the actual impact of the statements on Mr Stuart. To write a warning letter would have been a prudent and a proper course to take. In the light of what Lord Millett said in Johnson v Gore Wood , cited at paragraph [61] above, of the decision in Aldi , and of what the Master of the Rolls says at paragraph [101] of his judgment in this case, to give notice of a possible claim might make all the difference if it is said, later, that a second claim is an abuse of the process. The question is whether, such a letter not having been written in the present case, it is an abuse of the process for Mr Stuart to bring the 2005 Action as he did.

71   In my judgment to hold that this fact makes the bringing of the 2005 Action an abuse of process would be a substantial and unjustified extension of the law in this respect. It is not right, in my view, to say, as a general proposition of law, that where the claimant in existing proceedings comes to know, in the course of those proceedings, from information provided by the defendant, of an additional cause of action against the

defendant, which is quite different from that asserted in his existing claim and one which it would not be reasonable, in the circumstances, to expect him to seek to combine with that existing claim, he must inform the defendant of the fact that he is contemplating bringing such a claim in future before he brings his existing proceedings to trial. Different facts might lead to a different conclusion. For example, it might be different if the information came from another source, so that the parties' knowledge of the facts was not the same. It might well be different if the claims were essentially similar (as in Johnson v Gore Wood ) or closely related (as in Aldi Stores ) so that they could readily have been combined. It might perhaps be different if the information had come to the claimant's knowledge at a much earlier stage than occurred here. But on the facts of this case I cannot, with respect, agree with the Master or the Judge that Mr Stuart's failure to tell the defendant, before the trial of the 2000 Action, that he was contemplating asserting the Inducement Claim made the bringing of the 2005 Action an abuse of the process. The same goes, all the more strongly, for the Misrepresentation Claim, as to which Mr Stuart did not know all the relevant facts at the time of the trial of the 2000 Action.

72   I have already given my reasons for considering that neither delay, nor the prospects of success on the Inducement Claim or the Misrepresentation Claim were properly to be brought into account in deciding whether the 2005 Action is an abuse, and similarly as to the irrelevance of any lack of reasonable diligence on the part of Mr Stuart at the time of the original dealings between the parties, or in seeking to find out whether he had a worthwhile claim sooner. I have also explained why I consider that the Master came to the wrong conclusion on the other points depending on the facts of the particular case, and therefore took into account matters which she should not have done.

73   For the several reasons which I have given, I conclude that it was not an abuse of the process of the court for Mr Stuart to bring the 2005 Action against Mr Linde, having first brought the 2000 Action against him on the undertaking, and despite his having been aware, before the trial of the 2000 Action, of the facts relevant to the Inducement Claim and some of the facts relevant to the Misrepresentation Claim, and not having warned

WESTLAW   © 2017 Thomson Reuters.

Stuart v Goldberg, 2008 WL 40958 (2008)

Mr Linde of the possibility of later proceedings for a claim of that kind.

74 I would therefore allow this appeal.

Lord Justice Sedley

75 I agree that this appeal should be allowed, essentially for the reasons given by Lord Justice Lloyd. But I would respectfully adopt two important points made by Sir Anthony Clarke MR in the course of his qualified assenting judgment.

76 First, while the Aldi approach gives the judgment below a substantial margin of respect so long as the judge has not committed any of the classic errors of reasoning, it does not mean that the appellate role is confined to correcting such errors. As the words "reluctant" and "generally" imply, the appellate court also has a broader role which entitles it to intervene if, notwithstanding the absence of either a mistaken inclusion or exclusion of factors or a perverse conclusion, the decision at which the judge has arrived is plainly wrong. To reserve more to this court would be to render the exercise of judgment at first or second instance merely provisional; but to reserve less would be to abdicate part of the appellate function. For these reasons I respectfully adopt what is said at the end of §81 of the Master of the Rolls' judgment.

77 Secondly, as Aldi again makes clear and as the Master of the Rolls stresses, a claimant who keeps a second claim against the same defendant up his sleeve while prosecuting the first is at high risk of being held to have abused the court's process. Moreover, putting his cards on the table does not simply mean warning the defendant that another action is or may be in the pipeline. It means making it possible for the court to manage the issues so as to be fair to both sides.

Sir Anthony Clarke MR:

78 I gratefully adopt Lloyd LJ's account of the facts and history of the two sets of proceedings. I write a judgment of my own because my approach is somewhat different from his in some respects.

79 I agree that the question in a case of this kind is whether the second set of proceedings is an abuse of process and that that question must be decided by the application of the principles set out in Johnson v Gore Wood [2002] 2 AC 1 . Thus, as Lord Bingham observed, the crucial question is whether, in all the circumstances, a party is misusing or abusing the process of the court by seeking to raise before it an issue which could have been raised before. The burden is on the party asserting the abuse to establish it. Moreover, as Lord Bingham put it, there will rarely be a finding of abuse unless the later proceedings involve what the court regards as the unjust harassment of a party. There may be such harassment if, as Wigram V-C put it in the passage from Henderson v Henderson quoted by Lloyd LJ at [25], a party fails to rely upon a point which properly belonged to the first litigation and which, with reasonable diligence, he might reasonably have brought forward at the time. However, the question must be resolved by a consideration of all the circumstances of the case.

80 This approach seems to me to be consistent with the principles identified by Thomas LJ, with whom Wall and Longmore LJJ agreed, in the recent case of Aldi Stores Limited v WSP Group Plc, [2007] EWCA Civ 1260 , where (at [6]) the court adopted my own summary of the principles in Dexter v Vlieland-Boddy [2003] EWCA Civ 14 .

81 I agree with Lloyd LJ that the decision on the question whether a second action is an abuse of process is not the exercise of a discretion. However, although the court in Aldi said that there is only one answer to the question, that statement must be read subject to the important statement of principle set out by Thomas LJ at [16] as follows:

> "In considering the approach to be taken by this court to the decision of the judge, it was rightly accepted by Aspinwall that the decision to be made is not the exercise of a discretion; WSP were wrong in contending otherwise. It was a decision involving the assessment of a large number of factors to which there can, in such a case, only be one correct answer to whether there

is or is not an abuse of process. Nonetheless an appellate court will be reluctant to interfere with the decision of the judge where the decision rests upon balancing such a number of factors; see the discussion in Assicurazioni Generali v Arab Insurance Group [2002] EWCA Civ 1642, [2003]1 WLR 577 and the cases cited in that decision and Mersey Care NHS Trust v Ackroyd [2007] EWCA Civ 101 at paragraph 35. The types of case where a judge has to balance factors are very varied and the judgments of the courts as to the tests to be applied are expressed in different terms. However, it is sufficient for the purposes of this appeal to state that an appellate court will be reluctant to interfere with the decision of the judge in the judgment he reaches on abuse of process by the balance of the factors; it will generally only interfere where the judge has taken into account immaterial factors, omitted to take account of material factors, erred in principle or come to a conclusion that was impermissible or not open to him. In this case, I consider that the judge, despite the weight that must be accorded his view given his great experience in this type of litigation and the conspicuous success with which he has managed the TCC, reached a decision which was impermissible by taking into account factors which he should not have done and omitting factors which he should have taken into account."

I agree with that analysis, subject only to this. If the judge reached a conclusion that was plainly wrong, it would be the duty of the appeal court to interfere. I feel sure that in referring to the possibility of a judge might come to a conclusion that was impermissible or

not open to him Thomas LJ intended to include the case where the judge is plainly wrong. In any event, I am firmly of the view that it should be included.

82  Although I agree that the exercise upon which a judge of first instance embarks in a case of this kind is not, strictly speaking, the exercise of a discretion, the role of an appellate court is very similar in the two classes of case. This can be seen from Thomas LJ's conclusion that the appellant must persuade the court that the judge was wrong and will only succeed in doing so if he shows that the judge "has taken into account immaterial factors, omitted to take account of material factors, erred in principle or come to a conclusion that was impermissible or not open to him" or is plainly wrong. The line between the approach of an appellate court reviewing the exercise of a discretion and its role reviewing a decision of this kind is a very narrow. This is because the decision whether a second action is an abuse of court involves the court balancing a series of different factors before reaching its conclusion.

83  In this case, as Lloyd LJ observes at [43], Judge Seymour QC ('the judge') said that he was not concerned with what conclusion he would have come to himself if the matter had come before him at first instance but with whether Master Fontaine ('the master') was wrong. He was of course correct to say that the question was whether the master was wrong because that is the question identified by CPR 52.11(3)(a) . I am not persuaded that he was wrong to say that he was not concerned with the decision which he would have reached if he had been the judge of first instance (here the master) because it seems to me that, if the approach to the appellate process identified by Thomas LJ in the passage above is correct, there may well be cases in which the appellate court might itself have reached a different conclusion but cannot properly say that the judge or master was wrong because he or she took into account immaterial factors, omitted to take account of material factors, erred in principle, came to a conclusion that was impermissible or not open to him or her or, if that is different, was plainly wrong.

84  In these circumstances I do not think that it is fair to the judge to hold that he treated the exercise as an exercise of discretion and thereby erred in principle in that respect. However, this conclusion is not critical to the outcome of this appeal because I agree with Lloyd

LJ that both the master and the judge erred in principle in significant respects.

85  The question for us is the same as it was before the judge, namely whether the master was wrong to reach the conclusion which she did. I agree with Lloyd LJ that she was wrong in two respects, namely as to the relevance of delay and as to the relevance of the strength or weakness of the claimant's case in this second action. I agree with him that both factors are irrelevant for the reasons Lloyd LJ gives. As to delay, if the action is not otherwise an abuse and is not statute barred (or perhaps infected by laches) I can see no reason why the claimant should not be permitted to advance it. Equally, as to the merits, if the action cannot be struck out as bound to fail and if it is not a case in which it would be appropriate for the court to give summary judgment for the defendant under CPR Part 24 , I cannot see why it should not be permitted to proceed unless it is otherwise an abuse of process. Since the judge upheld the approach of the master on these issues, it follows that he too fell into error.

86  In these circumstances, applying the principles identified by Thomas LJ in Aldi , it is as I see it for us to consider afresh whether this action is an abuse of process. While I have ultimately reached the conclusion that, in all the circumstances, this action is not an abuse, I have found this issue more troubling than perhaps Lloyd LJ has done. In particular it seems to me that there are some aspects of the claimant's approach to the first action which were abusive, or at the very least would now be held to be abusive in the light of the guidance in the Aldi case.

87  While it is true that a claim on a solicitor's undertaking ordinarily raises a simple question, if only because the undertaking is usually in writing, this was an unusual case because the alleged undertaking was oral and there was a dispute as to whether it had been given. The resolution of that issue depended upon the credibility of the claimant on the one hand and Mr Linde on the other. That in turn depended upon what view the trial judge took of the oral evidence of the two protagonists with regard to two telephone conversations on 9 and 10 June 1999. While it is true, as Lloyd LJ says at [6], that the issues were clear and simple, their resolution depended upon the credibility of the claimant on the one hand and Mr Linde on

the other. As Lloyd LJ explains at [3] and [14–16], Mr Linde introduced into his witness statement made in October 2000 evidence of matters which he said that the claimant had told him before the meeting on 21 June. He said that he had received from Mr Vardinoyannis of them after the meeting and, as I understand it, before Mr Vardinoyannis withdrew from the agreement.

88  As Lloyd LJ says at [15] and [16], the relevance of this aspect of the story to the first trial was not the effect of the statements on Mr Vardinoyannis but to enable Mr Linde to show that the claimant was a fantasist, whose evidence should not be believed. Once he had read the witness statement, the claimant knew enough to realise that he might have a claim for inducement of breach of contract against Mr Linde. Yet he decided not to advance the claim. It is plain that this was a deliberate decision made on legal advice. This can be seen from the document quoted by Lloyd LJ at [34]:

> "The Claimant's legal advisers …
> advised not to obscure the issue of
> breach of undertaking with other
> emerging claims, in a situation
> where the Defendants were not
> disclosing any information, and
> that such other issues would be
> better dealt with within subsequent
> separate proceedings when more
> information could be gleaned from
> the Defendants, as transpired as a
> result of cross-examination."

The deliberate decision taken was thus not to raise "other emerging claims" but, in effect, to prepare for "subsequent separate proceedings" after more information had been gleaned from Mr Linde as a result of cross-examination.

89  As Lloyd LJ puts it at [16], Mr Linde's story was no doubt explored a good deal more in cross-examination by the claimant in order to show that Mr Linde should not be believed. Thus it was decided by the claimant, on legal advice, to use the material to cross-examine Mr Linde as to his credit for two purposes, first to improve his case at the trial in 2001 and secondly to prepare his case for future proceedings. In short, it was a purely

tactical decision. In these circumstances, there appears to me to be a strong case for concluding that the issues arising out of these conversations naturally belonged to one set of proceedings, that it was undesirable for a trial judge to have to reach conclusions on credibility in one action when either the very same or similar issues of credibility were likely to become relevant in a future action, which would be likely to be tried by a different trial judge, with the consequent risk of inconsistent conclusions.

90   This conclusion is I think highlighted by the approach of this court in Aldi . The facts of that case were very different from this. I refer the reader to the report of that case for the detailed facts. However, to put the position shortly, in the second action the defendants were, as Longmore LJ put it at [41], facing a claim by the appellant ('Aldi') for the first time. Moreover, Aldi had made its intention to bring future claims clear in letters dated 13 June and 4 September 2003, to which it received no reply. None of the parties had, however, made the position clear to the court. This court held that a second action was not an abuse of process and that the judge at first instance had erred in principle in holding that it was.

91  After reaching that conclusion, Thomas LJ said this about the future in such cases:

> "29.   I also wish to add a word as to the approach that should be adopted if a similar problem arises in the future. In circumstances such as those that arose in this case, the proper course is to raise the issue with the court. Aldi did write to the court … but not in terms that made it clear what the court was being invited to do. WSP and Aspinwall knew of Aldi's position and were before the court on numerous occasions; they did nothing to raise it.

> 30.  Parties are sometimes faced with the issue of wishing to pursue other proceedings whilst reserving a right in existing proceedings. Often, no problem arises; in this case, Aldi, WSP and Aspinwall each in truth knew at one time or another between August 2003 and the settlement of the original action in January 2004 that there was a potential problem, but it was never raised with the court. I have already expressed the view that it should have been. The court would, at the very least, have been able to express its view as to the proper use of its resources and on the efficient and economical conduct of the litigation. It may have seen if a way could have been found to determine the issues applicable to Aldi in a manner proportionate to the size of Aldi's claim and without the very large expenditure that would have been necessary if Aldi had to participate in the trial of the actions. It may be that the court would have said that it was for Aldi to elect whether it wished to pursue its claim in the proceedings, but if it did not, that would be the end of the matter. It might have enquired whether the action against excess underwriters could have been expedited. Whatever might have happened in this case is a matter of speculation.

> 31.   However, for the future, if a similar issue arises in complex commercial multi-party litigation, it must be referred to the court seized of the proceedings. It is plainly not only in the interest of the parties, but also in the public interest and in the interest of the efficient use of court resources that this is done. There can be no excuse for failure to do so in the future."

At [36] Wall LJ expressed his agreement with those paragraphs and statements and at [39], after referring to the failure of the parties to bring the matter before the court for their own good commercial reasons, Longmore LJ added:

> "This failure is, in my judgment, more attributable to WSP and Aspinwall than to Aldi who had made their intentions clear in their letters of 13th June and 4th September 2003. The judge said (paragraph 82) that no response was appropriate. In one sense that may be right since no one is ever bound to reply to another person's intimation of intention. But it seems to me to be inappropriate to make no response at that stage but then at a later stage, when intentions turn into action, to assert that that action is an abuse of process."

I wonder whether the court would have reached the same conclusion if Aldi had not made its position clear to the other parties in its letters. However that may be, I entirely agree with the views expressed in Aldi which I have just set out.

92  In the instant case, although the claimant knew that he had a potential claim for inducement to breach the contract after he received Mr Linde's witness statement in October 2000, he did not make that clear either to Mr Linde or to the court. In my opinion he should have done so and it is at least arguable that his deliberate failure not to do so for partisan tactical reasons renders this second action an abuse of the process of the court.

93  I appreciate that the information upon which an inducement claim would be based came from Mr Linde, who introduced it into his witness statement for his own purposes, that this part of the evidence did not go directly to the issues in the first action but only to credibility, that the statement was received less than three months before the trial, that the issues in a trial on inducement were different from those on the alleged solicitor's undertaking, especially extensive issues on

causation and quantum and that the trial date might be lost if the inducement claim were raised. I recognise that these are relevant factors in deciding whether this second action is an abuse.

94  However, I would attach significantly less importance to those factors than Lloyd LJ has done. I do not think that the fact that the relevant information came from Mr Linde's witness statement and not from some other source is of any real significance. It is true that the evidence went to only credibility in the first action but, as I said earlier, the same credibility of the same witnesses is relevant in both actions and should, in principle, have been resolved by one judge in one trial. The matter should have been raised by the claimant with Mr Linde and, had it been, by both parties with the court.

95  I accept that that might have affected the trial date for the first action but it is by no means certain. The issues which centred on what statements were made were directly relevant in both actions, either as to credibility or substance, and were in comparatively short compass. I also accept that there would be likely to have been separate trials of quantum and perhaps materiality and causation in the inducement claim. Separate trials in commercial (and indeed other) litigation are now common. This would have been a classic case for a split trial or trials. As I see it, a trial could have taken place on the Undertaking Claim and on a key aspect of liability in the Inducement Claim at the same time and either at about the time that the trial in fact took place or shortly thereafter. A trial on key aspects of liability on the Inducement Claim would be likely to have had a significant effect on whether or not it was sensible to litigate further issues.

96  For my part, I do not think that parties should keep future claims secret merely because a second claim might involve other issues. The proper course is for parties to put their cards on the table so that no one is taken by surprise and the appropriate course in case management terms can be considered by the judge. In particular parties should not keep quiet in the hope of improving their position in respect of a claim arising out of similar facts or evidence in the future. Nor should they do so simply because a second claim may involve other complex issues. On the contrary they should come clean so that the court can decide whether one or

more trials is required and when. The time for such a decision to be taken is before there is a trial of any of the issues. In this way the underlying approach of the CPR , namely that of co-operation between the parties, robust case management and disposing of cases, including particular issues, justly can be forwarded and not frustrated.

97   While these considerations have been highlighted in Aldi , they have been relevant considerations at least since the CPR came into force in 1999. It is for these reasons that in my view the claimant should have notified the defendants and the court of a proposed inducement claim in the autumn of 2000. I entirely understand the point made by Lloyd LJ at [48] that if the result had been that the Undertaking Claim had to await trial of liability on the inducement issues that would (or at any rate might) have been inconsistent with the essential point of an undertaking. That, however, would have been a matter for the case management judge, who would have given such directions as were appropriate. I respectfully disagree with Lloyd LJ, in so far as he says at [50] that the master was wrong to regard the claimant's position in seeking to enforce the undertaking by itself as other than reasonable. For the reasons I have given, the reasonable course was to raise the matter with the defendants and the judge rather than to make a tactical decision to keep his powder dry until he saw how the cross-examination of Mr Linde went.

98   Notwithstanding the views I have expressed, this was undoubtedly an unusual case and the question is not simply whether the claimant acted unreasonably in not raising the Inducement Claim in 2000, or indeed whether his failure to do so was an abuse of the process. The question is whether the second action is an abuse

of the process, which involves a consideration of all the circumstances of the case, judged as at the time the second action was brought.

99   By that time, the claimant may not have learned much more about the Inducement Claim but he had learned important new facts which form the basis of the Misrepresentation Claim. As Lloyd LJ has explained, in that claim the claimant relies upon facts which he did not know to be false until 2002. In these circumstances, this is not a simple case in which the new action is based on facts which the claimant knew and ought to have deployed in the first action. There is a further dimension.

100   In these circumstances, although if the inducement claim stood alone I might well have taken a different view, as it is I am not persuaded that the second action, in this unusual case, is an abuse of the process of the court. Since the burden is on the defendants to persuade the court that it is an abuse, it follows that, albeit with some hesitation, I agree with Lloyd LJ that the appeal should be allowed and the action permitted to proceed.

101   I only add by way of postscript that litigants and their advisers should heed the points made by this court in Aldi and underlined here that the approach of the CPR is to require cards to be put on the table in cases of this kind or run the risk of a second action being held to be an abuse of the process.

Crown copyright

© 2017 Sweet & Maxwell

2008 WL 40958

End of Document                                              © 2017 Thomson Reuters.

# TAB 85

Terence Paul Swain v. T Hillman (Male) and T C Gay
QBENF 1999/0741/B3
Court of Appeal (Civil Division)
21 October 1999

**1999 WL 852288**

Before: The Master of the Rolls ( Lord
Woolf ) Lord Justice Pill Lord Justice Judge
Thursday 21 October 1999

**Analysis**

Sitting at Cardiff

On Appeal from the Queen's Bench Division

(His Honour Judge Graham Jones)

**Representation**

- Mr N Bidder QC (Instructed by Messrs Palser
Grossman , Cardiff, CF1 5PJ) appeared on behalf of
the Appellant.
- Mr G Walters (Instructed by Messrs Petersons ,
Newport, South Wales) appeared on behalf of the
Respondent.

**JUDGMENT**
LORD WOOLF, MR:

This is an appeal from a decision of His Honour Judge
Graham Jones, sitting as an additional judge of the High
Court, given on Thursday 17 June 1999 at Cardiff. The
judge was dealing with a case management conference in
respect of a claim by Mr Paul Swain for personal injuries
against Mr Hillman and Mr Gay who are builders. The
chronology in this case makes sorry reading.

The accident in relation to which Mr Swain brings his
claim occurred on 8 March 1989, over ten years ago.
The position is complicated by the fact that in 1992 the

claimant also had a traffic accident in relation to which the
defendants have admitted liability, so there is a possible
problem of causation in relation the claimant's injuries.
However, if the claimant is suffering from the injuries
he alleges, which cumulatively are fairly serious, it is
unfortunate that the claim has not been dealt with before.

As was pointed out by Judge LJ in the course of argument,
one of the matters of which the claimant is complaining is
depression. Nothing is more likely to aggravate depression
than to have a case hanging over the claimant all these
years. I would emphasise that the claimant's present legal
advisers, both counsel and solicitors, have only been
involved in this case since the spring of this year and there
can be no criticism made of them for the fact that the
claimant's case has not been pursued faster. Fortunately, a
relatively early hearing date is anticipated and, if this case
is to proceed, it is important that that date should, if at all
possible, be adhered to.

His Honour Judge Graham Jones had an application
before him that the case should be disposed of summarily.
He obviously found the case near to borderline as to
whether or not it should be disposed of summarily.
I say that because the judge invited the parties to
address him as to whether or not he should make a
conditional order, which he would only have done if
he thought that it was a borderline case. In fact the
judge did not make a conditional order, but dismissed
the defendants' application that he should dispose of the
matter summarily.

The power of a court to make a summary order is
now contained in Part 24 of the Civil Procedure Rules
("CPR"). CPR 24.2 provides the grounds for summary
judgment:

> "The court may give summary
> judgment against a claimant or
> defendant on the whole of a claim or
> on a particular issue if—
>
> (a) it considers that—
> (i) that claimant has no real prospect
> of succeeding on the claim or issue; and

(ii) that defendant has no real prospect of successfully defending the claim or issue; and

(b) there is no other reason why the case or issue should be disposed of at a trial."

• (1) the claimant has shown a case which if unanswered would entitle him to that judgment, and
• (2) the defendant has not shown any reason why the claim should be dealt with at trial."

There is a note to Part 24.2 referring to rule 3.4. Rule 3.4 makes provision for the court to strike out a statement of case, or part of a statement of case, if it appears that it discloses no reasonable grounds for bringing or defending a claim.

Clearly, there is a relationship between rule 3.4 and Part 24.2. However the power of the court under Part 24, the grounds are set out in 24.2, are wider than those contained in rule 3.4. The reason for the contrast in language between rule 3.4 and rule 24.2 is because under rule 3.4, unlike rule 24.2, the court generally is only concerned with the statement of case which it is alleged discloses no reasonable grounds for bringing or defending the claim.

Under Part 24.2, the court now has a very salutary power, both to be exercised in a claimant's favour or, where appropriate, in a defendant's favour. It enables the court to dispose summarily of both claims and defences which have no real prospect of being successful. The words "no real prospect of being successful or succeeding" do not need any ampflication, they speak for themselves. The word "real" distinguishes fanciful prospects of success or, as Mr Bidder submits, they direct the court to the need to see whether there is a "realistic" as opposed to a "fanciful" prospect of success.

When Part 24 came into force, and when the matter was before the judge, it was supported by a practice direction which has since been amended. It stated in paragraph 4.1:

"Where a claimant applies for judgment on his claim the court will give that judgment if:

Paragraph 4.2 dealt with the obverse position as to a defendant. In similar terms it dealt with a defendant's right to apply for judgment. It provided if:

• "(1) the claimant has failed to show a case which, if unanswered, would entitle him to judgment, or
• (2) the defendant has shown that the claim would be bound to be dismissed at trial."

I now refer to 4.3, not because it is, in view of the judge's decision, directly relevant, but because it provides confirmation for what I previously referred to as to his state of mind. Paragraph 4.3 states:

"Where it appears to the court possible that a claim or defence may succeed but improbable that it will do so, the court may make a conditional order, as described below."

Because the judge was considering making a conditional order in this case, it is fair, as Mr Bidder submits on behalf of the claimants, to take the view that the judge regarded this as a case where he thought that it was possible, but improbable, that the claim or defence would succeed.

Since the judge's decision, the practice direction to Part 24 has been amended by deleting paragraphs 4.1 and 4.2. The reason for that deletion is obvious. It was perceived that there was a conflict between 4.1 and 4.2 and the provisions of Part 24. The practice direction was laying down a different standard which indicated that the approach required was one of certainty. The judge could only exercise his power under Part 24 if he was certain or, to read the actual language of the practice direction, "he thought that a claim would be bound to be dismissed at trial". If that was thought to be the effect of the practice direction, that would be putting the matter incorrectly because that did not give the to the word "real" to which I have already referred.

It is not necessary to have viewed the practice direction in that way. In the (so far) unreported case of Taylor & Ors v Midland Bank Trust company Limited of 21 July (Stuart-Smith and Buxton LJJ and Rattee J), Stuart-Smith LJ in a minority judgment, but a judgment which was not in the minority on this particular point, rationalised the possible conflict between Part 24 and the practice direction in its original form by saying that the correct view of the effect of the practice direction is to be gleaned from the heading to the paragraph to which I have been referring which reads "the court's approach". It indicates no more than examples of situations where it could be right to give summary judgment in favour of one party or the other.

It is not necessary to say any more about Stuart-Smith LJ's approach, which may well be right, since Mr Bidder accepts, in my view properly, that we now have to apply the practice direction in its present form, in which only paragraph 4.3 survives. It is however right, as Mr Bidder submits, that it appears that the judge, through no fault on his part, was misled by the language of the practice direction in its original form. I detect from the judge's judgment that he was looking at the matter on the basis that he had to be certain that the case could not succeed and was bound to fail before he could appropriately accede to the defendant's application.

Although I consider that the judge therefore adopted the wrong approach for that reason, I am quite satisfied that he came to the right decision. It is important that

a judge in appropriate cases should make use of the powers contained in Part 24. In doing so he or she gives effect to the overriding objectives contained in Part 1. It saves expense; it achieves expedition; it avoids the court's resources being used up on cases where this serves no purpose, and I would add, generally, that it is in the interests of justice. If a claimant has a case which is bound to fail, then it is in the claimant's interests to know as soon as possible that that is the position. Likewise, if a claim is bound to succeed, a claimant should know that as soon as possible.

In my view the judge was right to come to the conclusion which he did, it follows that I take the view that, on the material which was before the judge, this case will proceed. That being the position, it is important that I do not say anything more than necessary about the facts of the case because, unless the parties sensibly compromise the present proceedings, the result will be that another judge on the date to which I have referred, will have to try the issues.

However, it would be wrong of me not to give some indication of my reasons for rejecting the attractive and careful arguments advanced by Mr Bidder. They focus on the fact that in this case the claimant is saying that a plank, which was standing upright against a fence, fell on him suddenly without warning, although the plank had apparently been in that position for three days. One immediately appreciates that, if a plank has been in a position for three days, something must have happened to cause that plank to fall on the claimant, a fact which is not in dispute.

The defendants dispute that they were in occupation of the site where the accident occurred but, on the evidence which was before the judge and is before this court, that is an issue which is controversial, requiring investigation at the trial. However, putting that matter on one side, Mr Bidder still contends that the claimant should do more than he really is able to do at the present, which is merely to say that the defendants were in control of this site and the plank fell on him. He should say more to the defendants than, "You explain how this happened without you [the defendants] being negligent, or for somebody for whose act you are responsible being negligent".

WESTLAW    © 2017 Thomson Reuters.

On the evidence, there is an indication that quite apart from the defendants, there were other subcontractors working on the site. As I understand the evidence, it is also clear that the claimant is entitled to say that the work was coming to an end; there was no need for planks to be on site at all; that there was rubble on the site, albeit that the defendants say that the site had been cleared up. The claimant is thus entitled to argue that the plank had no reason to be standing on end for two or three days against the fence. While he cannot say who caused the plank to be in an insecure position, perhaps put at too acute an angle against the fence, or precisely when that happened, this is a matter for which the defendants are responsible and, in the circumstances, they do have, on the material which he can put forward, a responsibility for explaining what occurred.

The claimant has two witnesses, his father and another person. He does not allege that his father was responsible for what went wrong, although he was there at the time. If the judge accepts the evidence of the claimant's witnesses and the claimant, the inference would be that someone else was responsible for the plank being removed and that person could have been negligent. Likewise, the defendants could be negligent because they left a plank in a position which was inappropriate as a result of which it was interfered with, thus resulting in the accident.

Those are matters which will have to be considered carefully by the judge at the trial. I am not seeking to indicate what his view should be on those facts. It is a matter to be dealt with by the judge at a trial and not at a summary hearing. Useful though the power is under Part 24, it is important that it is kept to its proper role. It is not meant to dispense with the need for a trial where there are issues which should be investigated at the trial. As Mr Bidder put it in his submissions, the proper disposal of an issue under Part 24 does not involve the judge conducting a mini trial, that is not the object of the provisions; it is to enable cases, where there is no real prospect of success either way, to be disposed of summarily.

I would dismiss the appeal.

## LORD JUSTICE PILL:

What has concerned me about this case is the state of the evidence as to how the accident occurred. I accept that the judge was entitled to find that there was evidence which was not "intrinsically credible" that the plank fell on the claimant. I also accept that there is a real prospect of establishing that the defendants had responsibilities as main contractors for the condition of the building site in this comparatively small contract.

Mr Bidder has analysed the pleadings and the evidence. It is alleged against the defendants that they failed to remove the plank, permitted the plank to be positioned where it was and failed to have a sufficient system of inspection and maintenance on the site. That is elaborated in further particulars wherein it was said that the plank of wood was leaning upright against the fence. It is said that:

> "The Plaintiff will allege that a plank of wood was placed against the fence by one Paul Gay. It was so placed 3 days prior to the Plaintiff sustaining his injury."

and that:

> "Nobody was present in the garden when the accident occurred. People were present at the side of the house and in the house."

What is conspicuously absent from the pleading is an allegation that someone for whom the defendants were responsible negligently displaced the plank. Mr Bidder has referred to the evidence before the judge of the claimant's father, Mr Albert George Swain, that the plank was a scaffolding board approximately 12 feet long and had been leaning against the coal bunker for two to three days. The building owner, Mr Malacrino, said that he

believed that those boards had been lying around for quite sometime, and Mr Dyer, a supporting witness, said that he would confirm that there was plenty of room to pass by the boards without knocking them or brushing past them at all.

The claimant needs to establish, first, that there was negligence in the manner pleaded. It appears to me to be placing a very high standard of care upon a building contractor simply to allege that a plank should not be left upright on a building site such as this.

The second question is to consider how the plank fell in the absence of any allegation in the pleading that it was pushed.

Two suggestions have been raised in argument. The first was that a short time before someone may have dislodged it; the second (Mr Walters) was that it may have been a puff of wind which did so. These seem to be very unlikely possibilities on the material at present before the Court.

However, having expressed my misgivings in that way, I have come to the conclusion, as has the Master of the Rolls, that the judge was entitled to hold in this case that there was a real, as distinct from a fanciful, prospect of success within the meaning of CPR 24.2. There are matters of fact for trial by a judge and on those grounds, like the Master of the Rolls, I would dismiss this appeal.

LORD JUSTICE JUDGE:

To give summary judgment against a litigant on papers without permitting him to advance his case before the hearing is a serious step. The interests of justice overall will sometimes so require. Hence the discretion in the court to give summary judgment against a claimant, but limited to those cases where, on the evidence, the claimant has no real prospect of succeeding.

This is simple language, not susceptible to much elaboration, even forensically. If there is a real prospect of success, the discretion to give summary judgment does not arise merely because the court concludes that success is improbable. If that were the court's conclusion, then it is provided with a different discretion, which is that the case should proceed but subject to appropriate conditions imposed by the court.

As there is to be a trial, I deliberately and expressly do not have any comment to make on the factual issues which have been canvassed in argument before us.

I agree with the judgment of the Master of the Rolls and the reasons he has given for dismissing the appeal.

Order: Appeal dismissed with costs for detailed assessment.

Crown copyright

© 2017 Sweet & Maxwell

1999 WL 852288

---

**End of Document**                    © 2017 Thomson Reuters.

# TAB 86

thereby validated by an Act of the legitimate parliament of Grenada   A
passed by a procedure by which section 104 (which may be described as
a semi-entrenched, rather than fully entrenched provision), may validly
be repealed or amended. The repeal has therefore altered the
Constitution of Grenada since 21 February 1985. Their Lordships, in
dealing with a petition lodged on 28 June 1985, are not concerned with
any retrospective effect of amendments to the Independence Constitution
or with the effect of the words after the first 13 in People's Law No. 84.   B
These might pose highly arguable questions, but Act No. 1 of 1985
speaks to the future only. In their Lordships' view it deprives them
clearly and unambiguously of any jurisdiction to entertain this petition
under section 3 of the Privy Council Appeals Order, which is, as they
have already pointed out, their only source of jurisdiction to hear
appeals in proceedings originating in Grenada.                            C

    *Solicitors: Payne Hicks Beach; Charles Russell & Co.*

                                                                            S. S.

                                                                          D

—————

[PRIVY COUNCIL]

## TAI HING COTTON MILL LTD. .   .   .   .   . APPELLANT   E

AND

## LIU CHONG HING BANK LTD. AND OTHERS   .   . RESPONDENTS

[APPEAL FROM THE COURT OF APPEAL OF HONG KONG]

1985  March 19, 20, 21, 25, 26, 27, 28;       Lord Scarman, Lord Roskill,   F
      July 3                    Lord Brandon of Oakbrook, Lord Brightman
                                    and Lord Templeman

        *Banking—Duty of care—Forged cheque—Current accounts debited
          with payments on cheques forged by customer's employee—
          Customer required to notify bank of errors in statements—
          Customer's system of financial control inadequate to detect
          fraud—Extent of duty owed by customer to bank—Whether bank*   G
          *entitled to debit forged cheques to customer's account—Whether
          customer estopped from asserting accounts incorrectly debited*
     *Privy Council—Judicial precedent—House of Lords decision—Hong
          Kong—Banking—English law applicable to point in issue—How
          far House of Lords decision binding*

        A company with current accounts at three banks authorised   H
        the banks to pay cheques drawn on behalf of the company
        signed by the managing director or nominated signatories. The
        express terms of the company's contracts with the banks included
        a requirement that the company should notify the banks within

A    a specified time of any errors in its monthly bank statements, which would otherwise be deemed to be correct. Between November 1974 and May 1978 an accounts clerk forged the managing director's signature on about 300 cheques purporting to be drawn by the company totalling approximately HK$5·5 million. The banks honoured the cheques on presentation and debited them against the company's accounts. The company's system of internal financial control was not adequate to prevent

B    or detect forgery and so the forgeries were not discovered until May 1978, when the company then issued a writ in the High Court of Hong Kong against, inter alia, the three defendant banks claiming declarations that they were not entitled to debit the company's accounts with the amounts of the forged cheques, and payment of such sums. Mantell J. dismissed the company's claims, except in relation to six cheques debited by the first defendant bank, holding that the company, by failing to

C    challenge the debits shown on the bank statements was estopped from asserting that the accounts had been wrongly debited. The Court of Appeal of Hong Kong dismissed the company's appeal and allowed the first defendant's cross-appeal holding, inter alia, that since the company was in breach of a duty of care owed to the banks in contract and in tort it was not entitled to the relief sought.

D    On the company's appeal to the Judicial Committee:—

    *Held*, allowing the appeal, (1) that in a case where English law was applicable, the Judicial Committee would follow a decision of the House of Lords, and, accordingly, as established by authority, the only duties in connection with the operation of a current bank account that a customer owed to his bank, in the absence of express agreement, were a duty to exercise due care in drawing cheques so as not to facilitate fraud or forgery, and a

E    duty to notify the bank immediately of any unauthorised cheques of which he became aware; that no wider duty, requiring a customer to take reasonable precautions in the management of his business to prevent forged cheques being presented to the bank for payment, or to take such steps as a reasonable customer would to check the periodic bank statements in order to be able to notify the bank of any items which were not, or

F    might not have been, authorised, could be implied into banking contracts as a necessary incident of the relationship of banker and customer; and that, therefore, the banks were not relieved by any breach of duty by the company from having to bear the loss occasioned by the forged cheques (post, pp. 97c–e, e–f, 101c–g, 103c–d, 105b–c, 107a, 108a–b, b–c).

    *London Joint Stock Bank Ltd. v. Macmillan* [1918] A.C. 777, H.L.(E.) and *Greenwood v. Martins Bank Ltd.* [1933]

G    A.C. 51, H.L.(E.) followed.

    (2) That the express terms of the banking contracts were not sufficiently clear and unambiguous to impose upon the company a contractual obligation to examine its bank statements and to accept them as accurately stating the debits if not challenged within the stipulated time limit (post, pp. 109g—110a, a–b, b–c).

H    (3) That since the company was not in breach of any express or implied duty owed to the banks it was not estopped from asserting that the accounts had been incorrectly debited, and that, accordingly, the banks not having authority to pay the forged cheques or debit them to the company's accounts had to

pay those sums to the company together with interest from the    A
date the writ was issued even though the accounts were not
interest bearing (post, pp. 110D, 111C).

*Per curiam.* There is no advantage to the law's development
in searching for a liability in tort where the parties are in a
contractual relationship. Though it is possible to conduct an
analysis of the rights and duties inherent in some contractual
relationships including that of banker and customer either as a
matter of contract or as a matter of tort it is correct in principle    B
and necessary for the avoidance of confusion in the law to
adhere to the contractual analysis. Parties' mutual obligations in
tort cannot be any greater than those to be found expressly or
by necessary implication in their contract (post, p. 107B–C, G).

Decision of the Court of Appeal of Hong Kong [1984] 1
Lloyd's Rep. 555 reversed.

C

The following cases are referred to in the judgment of their Lordships:

*Anns v. Merton London Borough Council* [1978] A.C. 728; [1977] 2 W.L.R.
1024; [1977] 2 All E.R. 492, H.L.(E.)
*Asien-Pazifik Merchant Finance Ltd. v. Shanghai Commercial Bank Ltd.*
[1982] H.K.L.R. 273
*Commonwealth Trading Bank of Australia v. Sydney Wide Stores Pty. Ltd.*
(1981) 55 A.L.J.R. 574    D
*Donoghue v. Stevenson* [1932] A.C. 562, H.L.(Sc.)
*Dorset Yacht Co. Ltd. v. Home Office* [1970] A.C. 1004; [1970] 2 W.L.R.
1140; [1970] 2 All E.R. 294, H.L.(E.)
*Greenwood v. Martins Bank Ltd.* [1933] A.C. 51, H.L.(E.)
*Hart v. O'Connor* [1985] A.C. 1000; [1985] 3 W.L.R. 214; [1985] 2 All E.R.
880, P.C.
*Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd.* [1964] A.C. 465; [1963]    E
3 W.L.R. 101; [1963] 2 All E.R. 575, H.L.(E.)
*Joachimson v. Swiss Bank Corporation* [1921] 3 K.B. 110, C.A.
*Junior Books Ltd. v. Veitchi Co. Ltd.* [1983] 1 A.C. 520; [1982] 3 W.L.R.
477; [1982] 3 All E.R. 201, H.L.(Sc.)
*Karak Rubber Co. Ltd. v. Burden (No. 2)* [1972] 1 W.L.R. 602; [1972] 1
All E.R. 1210
*Kepitigalla Rubber Estates Ltd. v. National Bank of India Ltd.* [1909] 2    F
K.B. 1010
*Lam Yin-fei trading as Wah Shing Garment Manufacturing Co. v. Hang
Lung Bank Ltd.* [1982] H.K.L.R. 215
*Lister v. Romford Ice and Cold Storage Co. Ltd.* [1957] A.C. 555; [1957] 2
W.L.R. 158; [1957] 1 All E.R. 125, H.L.(E.)
*Liverpool City Council v. Irwin* [1977] A.C. 239; [1976] 2 W.L.R. 562;
[1976] 2 All E.R. 39, H.L.(E.)    G
*London Joint Stock Bank Ltd. v. Macmillan* [1918] A.C. 777, H.L.(E.)
*National Bank of New Zealand Ltd. v. Walpole and Patterson Ltd.* [1975] 2
N.Z.L.R. 7
*Overseas Tankship (U.K.) Ltd. v. Morts Dock and Engineering Co. Ltd.
(The Wagon Mound)* [1961] A.C. 388; [1961] 2 W.L.R. 126; [1961] 1
All E.R. 404, P.C.
*Selangor United Rubber Estates Ltd. v. Cradock (No. 3)* [1968] 1 W.L.R.    H
1555; [1968] 2 All E.R. 1073
*Wealdon Woodlands (Kent) Ltd. v. National Westminster Bank Ltd.*
(unreported), 11 March 1983, McNeill J.
*Young v. Grote* (1827) 4 Bing. 253

A

The following addditional cases were cited in argument:

*Agricultural Investment Co. v. Federal Bank* (1880) 45 U.C.R. 214; sub nom. *Agricultural Savings and Loan Association v. Federal Bank* (1881) 6 O.A.R. 192

*Annefield, The* [1971] P. 168; [1971] 2 W.L.R. 320; [1971] 1 All E.R. 394, C.A.

*Arrow Transfer Co. Ltd. v. Royal Bank of Canada* (1972) 27 D.L.R.(3d) 81

B

*Bank of Montreal v. The King* (1907) 38 S.C.R. 258

*Big Dutchman (South Africa) Pty. Ltd. v. Barclays National Bank Ltd.,* 1979 (3) S.A. 267

*Brewer v. Westminster Bank Ltd.* [1952] 2 All E.R. 650

*Callaway v. Hamilton National Bank of Washington* (1952) 195 F. 2d 556

*Canadian Pacific Hotels Ltd. v. Bank of Montreal* (1981) 122 D.L.R. (3d) 519

C

*Chatterton v. London and County Bank Ltd.*, The Miller, 3 November 1890, p. 394, C.A.; The Miller, 2 February 1891, pp. 491–492, Mathew J.

*Columbia Graphophone Co. v. Union Bank of Canada* (1916) 38 O.L.R. 326

*Critten v. Chemical National Bank* (1902) 63 N.E. 969

*Esso Petroleum Co. Ltd. v. Mardon* [1976] Q.B. 801; [1976] 2 W.L.R. 583; [1976] 2 All E.R. 5, C.A.

D

*Hilton v. Westminster Bank Ltd.* (1926) 135 L.T. 358, C.A.

*Joffe v. Riggs National Bank* (1962) 179 A.2d 390

*Launchbury v. Morgans* [1973] A.C. 127; [1972] 2 W.L.R. 1217; [1972] 2 All E.R. 606, H.L.(E.)

*Leather Manufacturers' National Bank v. Morgan* (1886) 117 U.S. 96

*Lewes Sanitary Steam Laundry Co. Ltd. v. Barclay, Bevan & Co. Ltd.* (1906) 11 Com.Cas. 255

E

*Lloyds Bank Ltd. v. Brooks* (1950) 6 L.D.B. 161

*Moorcock, The* (1889) 14 P.D. 64, C.A.

*Morgan v. United States Mortgage & Trust Co.* (1913) 208 N.Y. 218

*Ogilvie v. West Australian Mortgage and Agency Corporation Ltd.* [1896] A.C. 257, P.C.

*Pacific Coast Cheese v. Security First National Bank of Los Angeles* (1955) 286 P.2d 353

F

*Potts (Frederic A.) & Co. v. Lafayette National Bank* (1935) 269 N.Y. 181

*Reigate v. Union Manufacturing Co. (Ramsbottom) Ltd.* [1918] 1 K.B. 592, C.A.

*Screenland Magazine Inc. v. National City Bank of New York* (1943) 42 N.Y.S. 2d 286

*Spencer v. Wakefield* (1887) 4 T.L.R. 194

*Standard Bank of South Africa Ltd. v. Kaplan* [1922] C.P.D. 214

G

*Syndicat des Camionneurs Artisans Du Quebec Metropolitain v. Banque Provinciale du Canada* (1969) 11 D.L.R. (3d) 610

*Thomson v. New York Trust Co.* (1944) 293 N.Y. 58

*Walker v. Manchester and Liverpool District Banking Co. Ltd.* (1913) 108 L.T. 728

*Welch v. Bank of England* [1955] Ch. 508

*Weld-Blundell v. Stephens* [1920] A.C. 956, H.L.(E.)

H

*White v. John Warwick & Co. Ltd.* [1953] 1 W.L.R. 1285; [1953] 2 All E.R. 1021, C.A.

APPEAL (No. 41 of 1984) with leave of the Court of Appeal of Hong Kong by the plaintiff company, Tai Hing Cotton Mill Ltd., from a

judgment and order of the Court of Appeal of Hong Kong (Cons and <sub>A</sub> Fuad JJ.A. and Hunter J.) given on 27 January 1984 dismissing an appeal by the company and allowing a cross-appeal by the first defendant, Liu Chong Hing Bank Ltd., from the judgment of Mantell J. given in the High Court on 12 July 1983 whereby the company's claim for a declaration that the first defendant was not entitled to debit the company's account with the sum of $3,082,214·30 was dismissed save in relation to $187,195·74 thereof, and the company's claims against the <sub>B</sub> second defendant, Bank of Tokyo Ltd., and the third defendant, Chekiang First Bank Ltd., amounting respectively to $809,804·80 and $1,732,096·68 were also dismissed. The amount claimed against the third defendant was subsequently reduced to $1,599,070·20.

The facts are stated in the judgment of their Lordships.

<sub>C</sub>

*Sir Patrick Neill Q.C., Nicolas Bratza* and *Robert Tang* (of the Hong Kong Bar) for the plaintiff company. The Court of Appeal of Hong Kong erred in holding that the company was in breach of a duty of care owed to the banks in contract and in tort.

The law as previously understood was that only two positive duties are owed by a customer to a bank. Firstly, a customer owes a duty to <sub>D</sub> take reasonable care in issuing his mandate so as not to mislead the bank or to facilitate the unauthorised alteration of his mandate, and the negligence of the customer is only relevant if it is negligence in the transaction, namely in the preparation and issue of the mandate. Secondly, a customer owes a duty to inform the bank of any forgery of which he has knowledge. Negatively a customer does not owe a duty to the bank to manage his affairs prudently and efficiently so that no loss <sub>E</sub> will fall on the bank.

A completely forged cheque, on which the drawer's signature is not written by him or with his authority, is not the mandate of the customer and the bank is not entitled to debit it to the customer's account. Accordingly, if the bank pays out on such a forged cheque the loss falls on the bank.

Banks can improve their position in two ways. Under the law of <sub>F</sub> contract they can have clauses in their contracts placing responsibility on the customer, for instance verification clauses whereby a bank sends cleared cheques with periodic bank statements and gives the customer time to examine them, and the contract provides that if no complaint is made within a certain time the statement is conclusive evidence that the cheques are genuine and the debits correct. Alternatively, the banks can <sub>G</sub> try to have the law altered by statute so that if a customer does not complain about a forged cheque within a short time limit the bank is not liable.

As to the relationship between banker and customer and the terms of the contract, reliance is placed upon the judgment of Atkin L.J. in *Joachimson v. Swiss Bank Corporation* [1921] 3 K.B. 110, 126–127, which also shows that the customer owes a duty to exercise reasonable <sub>H</sub> care in executing his written orders so as not to mislead the bank or facilitate forgery. That duty was laid down by the House of Lords in *London Joint Stock Bank Ltd. v. Macmillan* [1918] A.C. 777, which has

A  been recognised as good commercial law for over 60 years and should not be disturbed. [Reference was made to the *Practice Statement (Judicial Precedent)* [1966] 1 W.L.R. 1234. The only negligence which counts against the customer is negligence in the preparation and issue of the cheque. The customer also owes a duty to inform the bank of any forged cheques as soon as he becomes aware of them: *Greenwood v. Martins Bank Ltd.* [1933] A.C. 51.

B      During the last 100 years banks have procured certain protection by legislation: see for example section 19 of the Stamp Act 1853 (16 & 17 Vict. c. 59); section 60 of the Bills of Exchange Act 1882 (45 & 46 Vict. c. 61); section 60 of the Bills of Exchange Ordinance (Laws of Hong Kong, 1964 rev., c. 19); section 42 of the Negotiable Instruments Law 1897 (Laws of New York, c. 612) and section 326 added by the

C  Negotiable Instruments Law Amendment Act 1904 (Laws of New York, c. 287) and section 47 of the Banking Act 1979. The problem was considered in Australia in the Report of the Committee appointed by the Commonwealth Government to review the Bills of Exchange Act 1909–1958 dated 1 May 1964 ("The Manning Committee Report").

The banks rely upon their express contracts with the company as providing a complete defence to the company's claims, but the contracts
D  do not contain terms sufficient to alter the ordinary common law situation and exclude the banks' liability for items debited for payment on forged cheques. [Reference was made to the express terms of business of the three defendant banks.] In Canada banks have for many years returned vouchers with the periodic statements and have had clauses in their contracts whereby if they are not notified within a
E  stipulated time of errors the statements are conclusive: see *Arrow Transfer Co. Ltd. v. Royal Bank of Canada* (1972) 27 D.L.R. (3d) 81. The defendant banks never returned cleared cheques to the company and the language of their terms of business is not sufficient to impose any obligation on the customer to examine statements and notify the banks of any error within the time stated, nor to make the statements conclusive in the absence of objection within the time limit. The notion
F  that every customer would go to the bank within the time limit and there examine his cleared cheques is absurd, and so it is no answer for the banks to say that the company could have seen its cleared cheques if it had wished. No court anywhere has ever held that a customer who did not receive back his paid cheques was estopped from asserting that they were forged. All the case law in the United States is based upon the
G  return of the cheques and vouchers with the statements. The Court of Appeal of Hong Kong overlooked the significance of the banks' failure to return the cheques to the company.

Since the banks' contracts were inadequate to achieve the effect of a Canadian-style verification agreement, the banks have tried to extend the doctrine of *Young v. Grote* (1827) 4 Bing. 253 by making the company liable for negligence not in the transaction itself, and have
H  sought to establish two separate duties called the wider and narrower duties. The alleged wider duty is a duty owed by a customer to his bank to exercise such precautions as a reasonable customer in his position would take to prevent forged cheques being presented to the bank; and

the narrower duty is a duty owed by a customer to his bank to take    A
reasonable steps to check his periodic bank statements so as to be able
to notify the bank of any items which were not, or might not have been,
authorised by him.

With regard to the narrower duty the real question is whether a
customer owes a duty to his bank to examine his bank statements so as
to be able to detect forgeries when the customer is unaware of such
forgeries and does not suspect them; the bank has treated the cheques    B
as genuine; and the bank sends the statements to the customer without
returning the cheques for his examination. Such a duty had never been
imposed anywhere by common law or by statute. [Reference was made
to section 4–406 of the American Law Institute Uniform Commercial
Code, 9th ed. (1978) entitled "Customer's Duty to Discover and Report
Unauthorized Signature or Alteration" and the official comment at    C
pp. 409–411.]

The law of contract is well established and the customer owes to the
bank the two duties laid down in *Macmillan's* case [1918] A.C. 777 and
*Greenwood's* case [1933] A.C. 51 but no others. It is impossible to imply
a contractual term imposing further duties on the customer because the
test of necessity would not be satisfied. The position is the same when    D
the question is one of imposing a term as an incident of the
banker/customer relationship, and the test being one of necessity there is
no necessity to imply or impose anything as part of the contractual
relationship. A term cannot be implied merely because it would be
reasonable. Although the law has developed and duties have been
imposed in order to protect third parties, a new duty should not be
implied into a contractual relationship to protect one of the contracting    E
parties, especially when there is a well settled commercial contractual
relationship.

With regard to tort there is no case in which it has been held in
relation to a commercial contract that a wider duty of care is owed in
tort towards the other contracting party than the contractual duty.
Where the relationship between the parties is contractual the duties of    F
care owed by one party to the other in tort in the performance of the
contract cannot extend more widely than those which have been
expressly or by necessary implication agreed in the contract. As between
contracting parties the duties in contract and tort should be coextensive.

The first question therefore is whether the duties for which the banks
contend are owed by the company to them in contract. Reliance is
placed upon the English case law as showing that only the two duties    G
accepted by the company are owed by a customer to his bank and no
others: see *Chatterton v. London and County Bank Ltd.,* The Miller, 3
November 1890, p. 394; The Miller, 2 February 1891, pp. 491–492;
*Lewes Sanitary Steam Laundry Co. Ltd. v. Barclay, Bevan & Co. Ltd.*
(1906) 11 Com. Cas. 255; *Kepitigalla Rubber Estates Ltd. v. National
Bank of India Ltd.* [1909] 2 K.B. 1010; *Walker v. Manchester and*    H
*Liverpool District Banking Co. Ltd.* (1913) 108 L.T. 728; *London Joint
Stock Bank Ltd. v. Macmillan* [1918] A.C. 777; *Brewer v. Westminster
Bank Ltd.* [1952] 2 All E.R. 650; *Welch v. Bank of England* [1955] Ch.

A  508; and *Wealdon Woodlands (Kent) Ltd. v. National Westminster Bank
   Ltd.* (unreported), 11 March 1983.

   The following foreign and Commonwealth authorities are also relied
   upon: *National Bank of New Zealand Ltd. v. Walpole and Patterson
   Ltd.* [1975] 2 N.Z.L.R. 7; *Big Dutchman (South Africa) Pty. Ltd. v.
   Barclays National Bank Ltd.*, 1979 (3) S.A. 267; *Standard Bank of South
   Africa Ltd. v. Kaplan* [1922] C.P.D. 214 and *Commonwealth Trading
B  Bank of Australia v. Sydney Wide Stores Pty. Ltd.* [1981] 55 A.L.J.R.
   574. The law of Hong Kong had previously been regarded as the same
   as the English law: *Asien-Pazifik Merchant Finance Ltd. v. Shanghai
   Commercial Bank Ltd.* [1982] H.K.L.R. 273 and *Lam Yin-fei trading as
   Wah Shing Garment Manufacturing Co. v. Hang Lung Bank Ltd.* [1982]
   H.K.L.R. 215. [Reference was made to the Law Reform Commission of
C  Hong Kong Report on Bills of Exchange dated 29 October 1982.]

   In the United States the law concerning a bank customer's duties has
   developed differently: see section 3–406 of the Uniform Commercial
   Code, 9th ed. (1978) and the official comment at pp. 279–281; *Leather
   Manufacturers' National Bank v. Morgan* (1886) 117 U.S. 96; *Critten v.
   Chemical National Bank* (1902) 63 N.E. 969; *Morgan v. United States
   Mortgage & Trust Co.* (1913) 208 N.Y. 218; *Frederic A. Potts & Co. v.
D  Lafayette National Bank* (1935) 269 N.Y. 181; *Screenland Magazine Inc.
   v. National City Bank of New York* (1943) 42 N.Y.S. 2d 286; *Thomson
   v. New York Trust Co.* (1944) 293 N.Y. 58; *Callaway v. Hamilton
   National Bank of Washington* (1952) 195 F. 2d 556; *Pacific Coast Cheese
   v. Security First National Bank of Los Angeles* (1955) 286 P. 2d 353 and
   *Joffe v. Riggs National Bank* (1962) 179 A. 2d 390. In the United States
E  therefore the customer is under a duty to examine carefully the returned
   statements and vouchers, and sometimes merely looking at a statement
   will reveal the fact that there are omissions. There are references to a
   wider duty but they tend to occur in cases where the actual negligence
   of the customer involved a breach of the duty to examine statements
   and vouchers. In some jurisdictions such as the District of Columbia
   there appears to be no wide duty on a customer, and he would only be
F  responsible for gross negligence.

   In Canada when a customer signs an agreement undertaking to verify
   the correctness of bank statements and to notify the bank of any errors
   within a short time, the agreement is effective to bar any claim by the
   customer in respect of forged cheques paid by the bank; *Arrow Transfer
   Co. Ltd. v. Royal Bank of Canada*, 27 D.L.R. (3d) 81. In *Canadian
G  Pacific Hotels Ltd. v. Bank of Montreal* (1981) 122 D.L.R. (3d) 519 it
   was held that a customer owed a duty to the bank to operate an
   acceptable internal control system so that both the bank and the
   customer were jointly engaged in the prevention and minimization of
   losses occurring through forgeries.

   The Board should not change the law, which has been well
   understood for many years. If any change is to be made in banker-
H  customer law to the fundamental extent adopted by the Court of Appeal
   of Hong Kong such change should only be made by the legislature and
   not by the courts for the following reasons: (1) To impose the new
   customer duties would involve disturbing retrospectively the basis upon

which millions of subsisting contracts have been made. (2) There has    A
been no change of circumstances, including the law and banking practice,
to warrant this change, but on the contrary the practice of the banks in
Hong Kong and elsewhere in the Commonwealth (unlike the banks in
the United States and Canada) in not returning cheques to the customer
points strongly against altering the law to the disadvantage of the
customer. (3) Legislation can balance the competing interests, as in the
United States in the Uniform Commercial Code, and thus the grant of    B
protection to banks can be conferred on certain conditions. (4) It is
impossible for the courts to evaluate the social and economic
consequences of imposing these new duties on all customers. (5) There
is no evidence of dissatisfaction with the existing law. The banks have
taken no steps to promote legislation to alter the law in this respect as
they did with regard to section 19 of the Stamp Act 1853, sections 60, 80    C
and 82 of the Bills of Exchange Act 1882, Crossed Cheques Act 1906,
sections 1–5 of the Cheques Act 1957 (following the recommendations of
the Mocatta Committee) and section 47 of the Banking Act 1979. (6)
The view that a change, if any, is a matter for the legislature and not
the courts was shown in Australia in paragraphs 181 and 241–248 of the
Manning Committee Report; in England by McNeill J. in *Wealdon
Woodlands (Kent) Ltd. v. National Westminster Bank Ltd.* (unreported),    D
11 March 1983; in New Zealand by the Court of Appeal of New
Zealand in *National Bank of New Zealand Ltd. v. Walpole and Patterson
Ltd.* [1975] 2 N.Z.L.R. 7; and in Hong Kong by Fuad J. in *Lam Yin-fei
trading as Wah Shing Garment Manufacturing Co. v. Hang Lung Bank
Ltd.* [1982] H.K.L.R. 215, 217. (7) In other instances judges have
decided against altering firmly settled commercial law unless it is plainly    E
wrong: see for example *The Annefield* [1971] P. 168 and the *Practice
Statement (Judicial Precedent)* [1966] 1 W.L.R. 1234. As to objections to
imposing a new liability in tort by judicial decision, see *Launchbury v.
Morgans* [1973] A.C. 127. (8) It is always open to the banks in Hong
Kong as elsewhere to use the law of contract to achieve the result they
desire, and that has been done in Canada at least since 1914 as shown in
*Columbia Graphophone Co. v. Union Bank of Canada* (1916) 38 O.L.R.    F
326. The courts should not intervene to cure inadequate banking
contracts or to take away from a customer an existing cause of action.
Although it is the function of the courts to develop the law, they should
not change it in the way the banks seek because the consequences may
be very far reaching. The law is that a customer is under no duty to his
bank except to exercise due care in drawing cheques and to notify the    G
bank immediately of any known forgeries. *Spencer v. Wakefield* (1887) 4
T.L.R. 194 was a strong case on its facts and it is not authority for the
general proposition stated in *Halsbury's Laws of England,* 3rd ed., vol.
2 (1953), para. 389, p. 210, that the authorities in England are conflicting
as to whether or not there is a duty on the customer to examine the
passbook and paid cheques if returned with it, and to inform the banker
within a reasonable time of all debits not admitted.    H
    It is irrelevant in this case whether the two recognised duties are
called duties imposed by law or implied terms, because they are now a
settled part of the banker-customer relationship. Only a novel set of

**A**  circumstances could justify the imposition of a new duty, and there would have to be a necessity for it: *Lister v. Romford Ice and Cold Storage Co. Ltd.* [1957] A.C. 555 and *Liverpool City Council v. Irwin* [1977] A.C. 239. There are no special circumstances requiring a new duty to be imposed in the banker–customer relationship and no necessity because the duties for which the banks contend could have been made express terms of the contract.

**B**  The banks rely on reciprocity and contend that because they owe a duty of care to their customers to take reasonable care to ascertain that a cheque presented for payment represents the customer's true intentions and instructions the customer should owe a corresponding duty of care to them in the form of the wider or narrower duty. However, there is not always a reciprocal duty, and historically a professional or skilled

**C**  person owed a duty to his customer or client but the layman seeking the services did not owe any duty of care. Although bankers and customers have mutual obligations they do not have to be reciprocal.

Mere acknowledgement of the correctness of a bank statement does not give rise to an estoppel preventing the bank from liability for the amount paid on a forged cheque: *Bank of Montreal v. The King* (1907)

**D**  38 S.C.R. 258; *Agricultural Investment Co. v. Federal Bank* (1880) 45 U.C.R. 214; on appeal sub. nom. *Agricultural Savings and Loan Association v. Federal Bank* (1881) 6 O.A.R. 192. As a result in Canada the banks changed the terms of their agreements with customers in order to avoid liability: *Columbia Graphophone Co. v. Union Bank of Canada,* 38 O.L.R. 326, 331–332; *Syndicat des Camionneurs Artisans Du Quebec Metropolitain v. Banque Provinciale du Canada* (1969) 11

**E**  D.L.R. (3d) 610, 611 and *Arrow Transfer Co. Ltd. v. Royal Bank of Canada,* 27 D.L.R. (3d) 81, 83. That has not been done in Hong Kong, where the banks' terms are similar to those in the *Agricultural Investment Co.* case but paid cheques are not returned. The judge and the majority of the Court of Appeal correctly held that the company was not precluded by the express terms from challenging the correctness of the bank statements.

**F**  The company is not estopped from alleging forgery and asserting that the accounts were wrongly debited. Silence by itself cannot give rise to an estoppel. There must be a duty to speak and that duty will only arise if there is knowledge of the forgeries: see *Greenwood v. Martins Bank Ltd.* [1933] A.C. 51, *per* Lord Tomlin, at p. 57, and *Ogilvie v. West Australian Mortgage and Agency Corporation Ltd.* [1896] A.C. 257. The

**G**  company was therefore not estopped by its failure to challenge the bank statements. The third defendant bank also alleged estoppel by representation because the company had regularly returned acknowledgment forms which stated that the balance in the monthly bank statement had been examined and found correct. However, for estoppel to arise there must be a clear and unambiguous representation that the forged cheques are genuine. In the circumstances the document only meant that

**H**  the statement had been examined and found correct but subject to the fact that as the bank knew the paid cheques had not been seen by the company, and so there was no representation sufficient to constitute an estoppel. Even if there was a representation by the company the banks

90

*Tai Hing Ltd. v. Liu Chong Hing Bank (P.C.)*    [1986]

failed to prove reliance or that they had acted to their detriment as a result. The reality was that they carried on business as usual.

The Court of Appeal erred in ignoring or explaining away the binding authorities which laid down the established customer duties; misapplying authorities and dicta to create a false theory of reciprocity and to invent a new customer duty; suggesting that the American cases and recent Canadian authorities represented Hong Kong and English law or should guide their development; wrongly equated contract and tort; wrongly introduced the questions propounded by Lord Wilberforce in *Anns v. Merton London Borough Council* [1978] A.C. 728, 751–752, into a contractual relationship so as to create a tort duty of care irrespective of whether such a duty exists in contract; and ignoring the fact that the banks retained the forged cheques. The judgment of the Court of Appeal should be reversed and the company should be granted declarations that the defendant banks were not entitled to debit its accounts with the sums claimed and should pay them to the company.

*Andrew Morritt Q.C., Oswald Cheung Q.C.* and *Andrew Li* (both the latter of the Hong Kong Bar) for the first defendant bank. Return of the forged cheques was not necessary for the company to ascertain there was something wrong, and its system of internal financial control was grossly inadequate. [Reference was made to the evidence.] There was a clear breach by the company of the wider and narrower duties which the company owed to the three banks.

In each of the four cases before *London Joint Stock Bank Ltd. v. Macmillan* [1918] A.C. 777, namely *Chatterton v. London and County Bank Ltd.,* The Miller, 3 November 1890; *Lewes Sanitary Steam Laundry Co. Ltd. v. Barclay, Bevan & Co. Ltd.,* 11 Com. Cas. 255; *Kepitigalla Rubber Estates Ltd. v. National Bank of India Ltd.* [1909] 2 K.B. 1010 and *Walker v. Manchester and Liverpool District Banking Co. Ltd.,* 108 L.T. 728, the defence was one of estoppel in relation to a claim for wrongful debit of a cheque with a forged signature. Not every breach of duty gives rise to an estoppel, because for the purposes of estoppel there must be by act or omission in breach of duty a representation that the signature is genuine. Plainly therefore for a breach of duty to be an estoppel it must be in the transaction itself, since it must be that breach of duty which leads the bank into the mistake. In *Agricultural Investment Co. v. Federal Bank,* 45 U.C.R. 214, 219, Hagarty C.J. said that the neglect must be in the transaction itself and the proximate cause of leading the party into the mistake. That is correct in dealing with estoppel, because if the neglect is not in the transaction itself the breach of duty cannot give rise to any positive representation as to the authenticity of the signature. That always has been and remains the law.

The question of negligence also arose in those four cases, but at that time the rules of remoteness in tort provided for recovery for all direct consequences and proximate causes of loss but not for indirect consequences even though they were foreseeable. The result at that time was to equate the defence of estoppel with recoverability of damages in tort, and both led to the same result. In *Overseas Tankship (U.K.) Ltd. v. Morts Dock and Engineering Co. Ltd. (The Wagon Mound)* [1961] A.C. 388 the Board held that damages were recoverable in tort for

A consequences reasonably foreseeable whether direct or indirect. Estoppel and a cross-claim in negligence which had previously led to the same result no longer did so. In so far as the four earlier cases related to negligence they were based on the old law as to causation in tort. What was approved, if anything, in *Macmillan's* case [1918] A.C. 777 were statements in those earlier cases that proximate cause was required for estoppel, which is still the law, and also that proximate cause was

B required for negligence, which is not now the law. Accordingly those four cases and *Macmillan's* case are not authority for the proposition that no wider duty of care is owed by a customer. [Reference was made to those cases.] The Court of Appeal of Hong Kong did not misread or misapply the English authorities, and there was no binding or highly persuasive authority against its finding of a duty of care owed by the

C company.

Alternatively, if *Macmillan's* case is authority in English law against the wider and narrower duties, the Board in deciding a Hong Kong case is not bound to follow the decision of the House of Lords and should not do so.

The courts have to develop the common law and changes should not necessarily be made only by legislation. The question is what should be

D a customer's duties of care in relation to a forged drawer's signature. The courts must decide in accordance with established principles new matters as they arise. The company should owe a duty of care to the banks and in view of its carelessness it should not be entitled to recover from them the amounts paid on the forged cheques.

The wider or narrower duty should be implied into the contract

E because it is necessarily incidental to the legal relationship of banker and customer. It is necessary to give that relationship business efficacy, or it is an obvious inference from the express and other implied terms. In *Liverpool City Council v. Irwin* [1977] A.C. 239 it was recognised that terms can be implied as a necessary incident of the relationship, and that test was accepted and applied by the Court of Appeal of Hong Kong. As Cons J.A. and Hunter J. held (and Fuad J.A. agreed with both), the

F courts have by the application of this principle implied a number of now well recognised obligations as necessary incidents of the banker and customer relationship. In doing so the courts have in some instances relied on the obligation concerned as mutual or reciprocal to an obligation of the other party. In *Macmillan's* case [1918] A.C. 777 it was held that a customer owes a duty to use reasonable care in drawing his

G cheques so as to preclude fraudulent alterations, and such duty was recognised to be reciprocal to the banker's duty to pay cheques on demand. The courts take a practical view of necessity: *Joachimson v. Swiss Bank Corporation* [1921] 3 K.B. 110. Terms are regarded as being implied into the banker-customer relationship because they arise out of the other party's obligations and not on the basis that the contract could not work without them. When the obligations of the banks and the

H company are considered, a term that the company is under the wider or narrower duty should be implied because it is necessary.

In *Hilton v. Westminster Bank Ltd.* (1926) 135 L.T. 358 the bank was held to be in breach of duty in paying a cheque because the bank should

have been satisfied that the customer had effectively countermanded it,    A
or the bank should have made some inquiry before payment. In *Lloyds Bank Ltd. v. Brooks* (1950) 6 L.D.B. 161 it was recognised that banks in making written statements of account are under a duty to take care that the statements are accurate. It was held in *Selangor United Rubber Estates Ltd. v. Cradock (No. 3)* [1968] 1 W.L.R. 1555 that a bank owed its customer a duty to take reasonable care to ascertain that a cheque presented for payment represented the customer's true intentions and    B
instructions. Thus a duty on the banker was established which before had been unrecognised, and the decision was affirmed in *Karak Rubber Co. Ltd v. Burden (No. 2)* [1972] 1 W.L.R. 602.

The company should owe the banks the wider duty of care. A bank's obligation is to pay on demand in terms of a particular mandate, and *Macmillan's* case [1918] A.C. 777 shows that there is a reciprocal duty    C
on the customer to take care in preparing the mandate so as to prevent fraud. There is no reason why the customer's duties should stop there. Since there are obligations on the bank to take care in relation to its customer's instructions, and in ascertaining that a cheque represents the true instructions of the customer, there should be a correlative or reciprocal obligation on the customer to take reasonable care that only cheques drawn in accordance with the mandate are presented to the    D
bank for payment. If a bank pays out on a cheque on which the drawer's signature has been forged the bank cannot debit it to the customer's account, and it is inconsistent with basic concepts of justice for the customer to be under no obligation to take steps to prevent the bank suffering that loss. The bank's absolute obligation to pay on demand should involve some obligation on the part of the customer.    E

With regard to the narrower duty, the sending and receipt of a periodic bank statement is of concern to both parties to the contract. The bank is under a duty of care as to the compilation of the statement and may be estopped if it fails to exercise reasonable care and the customer acts to his detriment in reliance upon an error in it. It should follow that the customer ought to be under a reciprocal duty to check the statement with reasonable care. The service is supplied for their    F
mutual benefit and so there should be obligations on both sides.

As to the officious bystander test, see *Reigate v. Union Manufacturing Co. (Ramsbottom) Ltd.* [1918] 1 K.B. 592. The question that would be asked when the company opened its account with the first defendant bank would be whether if the bank pays a cheque forged by an employee of the company because the company has neglected to take    G
elementary precautions in the conduct of its own business, should the company bear the loss, and the answer would have been that it should. In relation to the narrower duty the question would be whether if the bank continues to pay cheques forged by a servant of the company because the company failed to take the elementary steps of reconciling its bank statements with its books should the company bear the loss. Alternatively the questions would be whether the company is required    H
to take such precautions as a reasonable customer in its position would take to prevent forged cheques being presented to the bank for payment if the consequences of failing to take such precautions is presentation of

A   the cheques and payment of them by the bank without any right to debit
the company's account; and whether the company is required to take
such steps to check its bank statements as a reasonable customer in its
position would take to enable him to notify the bank of unauthorised
debits if the consequence of failing to do so is that the bank will
continue to pay such cheques without any right to debit the company's
account. The answer to all those questions is that the company should
B   be under those duties.

So far as the cases after *Macmillan's* case [1918] A.C. 777 are
concerned, in *Brewer v. Westminster Bank Ltd.* [1952] 2 All E.R. 650
the suggested implied term would not satisfy the officious bystander test.
In *Wealdon Woodlands (Kent) Ltd. v. National Westminster Bank Ltd.*
(unreported), 11 March 1983, the defence was estoppel. The Court of
C   Appeal of New Zealand in *National Bank of New Zealand Ltd. v.
Walpole and Patterson Ltd.* [1975] 2 N.Z.L.R. 7 read more into
*Macmillan's* case than was justified and did not consider the question of
duties arising as an incident of the legal relationship, and that was
followed in *Asien-Pazifik Merchant Finance Ltd. v. Shanghai Commercial
Bank Ltd.* [1982] H.K.L.R. 273 and *Lam Yin-fei trading as Wah Shing
Garment Manufacturing Co. v. Hang Lung Bank Ltd.* [1982] H.K.L.R.
D   215. In *Big Dutchman (South Africa) Pty. Ltd. v. Barclays National
Bank Ltd.* 1979 (3) S.A. 267 the defence was estoppel only. Support for
the wider and narrower duties can be found in the American and
Canadian authorities, in particular *Canadian Pacific Hotels Ltd. v. Bank
of Montreal,* 122 D.L.R. (3d) 519.

It is within established principles for a customer to be under the
E   wider or narrower duty of care, and so this is an appropriate case for
judicial development of the law. A change of circumstances is not
required before a new term can be implied. Although banks can ensure
protection for themselves by contract if they wish, that can lead to a
very unsatisfactory result as shown in Canada where stringent terms are
imposed on customers. Policy considerations do not preclude a customer
from being under these duties.

F   There can be a duty of care in tort as well as in contract to the other
contracting party. The absence of a contractual duty should not mean
that there is no duty in tort either. A contractual duty of care may be
expressly excluded by the contract but not the tortious duty, which is
therefore more extensive than the contractual duty: see *White v. John
Warwick & Co. Ltd.* [1953] 1 W.L.R. 1285. The test for determining
G   whether a duty of care arises in tort is different from contract. Reliance
is placed upon *Junior Books Ltd. v. Veitchi Co. Ltd.* [1983] 1 A.C. 520.
The fact that the proximity arises from contract does not exclude a duty
of care in tort, and it is appropriate here to ask the questions stated by
Lord Wilberforce in *Anns v. Merton London Borough Council* [1978]
A.C. 728, 751–752. Accordingly the Board should hold the company to
be in breach of a duty of care owed in tort to the banks.

H   The first defendant bank's rules and regulations for current accounts
were intended to have legal effect, and they imposed legal obligations.
Rule 13 relates to errors in debits and credits and no distinction is drawn
between them. The words "deemed to have been confirmed" mean that

if errors in debits are not reported to the bank within seven days the customer must accept that the debits were made with authority even if they were not. Rule 13 is unambiguous and applies to all unauthorised debits and not just forged cheques. Since the company did not object within seven days, or within a reasonable time, it is too late for it to challenge the debits. Alternatively, the effect of rule 13 is that the company's failure to object constituted an estoppel by representation. It was a representation that all credits and debits were confirmed by the company, and the first defendant bank relied upon that representation to its detriment by continuing to operate the account. Once the forgeries were discovered the bank introduced safeguards for its protection. The company is therefore estopped from claiming repayment of the sums debited.

*Neville Thomas Q.C.* and *John Jarvis* for the second defendant bank. The main arguments advanced on behalf of the first defendant bank are adopted. The judgment of the Court of Appeal should stand and can stand without disturbing authorities or amounting to judicial adventurism. In *Greenwood v. Martins Bank Ltd.* [1933] A.C. 51 it was acknowledged that if a customer has actual knowledge of fraud he must inform his bank, and from there it is hardly any step to the conclusion that if a customer is put on inquiry he cannot shut his eyes to the obvious but must make the inquiry which the facts known to him dictate. That is the mirror image of the bank's duty defined in *Karak Rubber Co. Ltd. v. Burden (No.2)* [1972] 1 W.L.R. 602. In all the circumstances irrespective of the wider or narrower duties the company was put on notice of the discrepancies. The company was in the same position as the customer in the *Greenwood* case and the principles laid down in that case should apply. A corporate customer being put on notice is equivalent to knowledge in a human customer.

In the earlier cases and *Macmillan's* case [1918] A.C. 777 the judges were in a difficult position because estoppel only operated in respect of negligence in the transaction, and under the old rules of causation the act relied upon had to be directly causative of the result. The relationship of banker and customer was expressed in those cases to be contractual, but there was no argument as to the duty owed by a customer in contract. However, if it had been alleged that a customer was under a duty of care to the bank by reason of an implied term of the contract, there would have been the same difficulties over causation as in tort: *Weld-Blundell v. Stephens* [1920] A.C. 956. In *Esso Petroleum Co. Ltd. v. Mardon* [1976] Q.B. 801, 819, Lord Denning M.R. said that the duty of a professional man to use reasonable care arises in contract and in tort and an action can be in either.

There may be difficulty in implying new terms when the contract is in a standard form which has existed for many years, and the point may be reached where as a matter of policy new obligations should not be introduced by implication into the contractual relationship. The court should consider the relationship de novo to see whether it would be proper to imply the term, and if so it should then ask if there are policy reasons for not doing so. If one is concerned to keep the expression of duties in contract and in tort in harmony, but also to preserve a clear