A   division between the two concepts, the proper approach should be a greater readiness to imply terms into a contract where necessary. If by the express terms of a contract one party has an absolute or near absolute duty in respect of fraud committed by a servant of the other, but that other party has no liability however reckless unless he has actual knowledge of the fraud, it would not be a departure from

B   principle to imply terms imposing the duties for which the defendant banks contend. Reliance is placed upon *The Moorcock* (1889) 14 P.D. 64.

A court may recoil from finding these duties because the range of individuals and corporations constituting bank customers makes it difficult to spell out the duty and may lead to endless disputes as to who should have done what and when, but the court has to keep separate

C   the question whether or not there is a duty situation, and the question what the standard of care should be in particular circumstances. If a duty attaches to customers, judges can determine whether there has been a breach in any particular case. Circumstances vary, and a corporate customer is different from a human customer, and a single forged cheque is different from many forged cheques over a long period.

D   It is not sought to impose on the customer a duty of care as stringent as that on the bank, but the customer should be required to be reasonably careful. The standard against which the customer's behaviour would have to be judged would be that of the ordinary corporate or individual customer. It is not a matter of entirely new ideas and standards, but merely of moving existing ones into a new field.

The second defendant bank relies upon clause 10 of the agreement

E   on the back of its pro-forma letter to the company, whereby in the absence of confirmation by the company within a fortnight the bank may take the statement as approved. If the company's promise to confirm the statement is not carried out the consequence is that the account is deemed to have been confirmed. Underlying the promise to confirm must be a promise to examine or inspect the statement, because

F   otherwise it cannot be confirmed. Irrespective of that the bank is entitled to assume that the statement has been examined. The customer is estopped from asserting that he has not examined the statement and he is bound by debits which such examination would have revealed to be outside the mandate. [Reference was made to other clauses in the agreement.]

G   Although the words of clause 10 are not apt to create a settled account or a conclusive evidence clause, their effect is that if a statement is not confirmed it will stand, and the customer will be estopped from challenging it save in respect of items wrongly debited which the customer did not know to be wrong and could not reasonably have identified as erroneous by examination of the statement. [Morritt Q.C.'s argument as to representation, reliance and detriment was adopted.]

H   *Peter Horsfield Q.C.* and *Doreen Le Pichon* (of the English and Hong Kong Bars) for the third defendant bank adopted the submissions of the first and second defendants on the wider and narrower duties in contract and in tort.

Even if the company did not owe either of those duties, by signing  A
the acknowledgment forms in respect of the monthly statements the
company represented that the balance shown on the statement had been
examined and found correct. In the case of an all figure coded statement
of this kind an examination must entail identification of the items as a
step to ascertaining whether the debits are authorised and the credits
fully stated, because no other form of examination will show whether
the balance is correct. In the case of a corporate customer there must be  B
reconciliation of the statement with the internal books of the company.
"Correct" means free from errors and omissions, and there are no
grounds for distinguishing erroneous debits resulting from forgery from
those arising from some other cause. Return of paid cheques or vouchers
is irrelevant to the detection of errors through forgery, and they are
discoverable without examination of the vouchers. Construing the words  C
according to their ordinary meaning in their context there is a clear and
unambiguous representation that there has been an examination item by
item and that the examination has shown the balance to be correct.
"Examination" means an examination such as will identify the items
without the vouchers and carried out with the exercise of proper skill
and care. Therefore if a customer signs an acknowledgment stating that  D
he has examined the statement and found it correct, and that is untrue,
he should bear the loss caused by forgeries which were discoverable on
examination by him. Reliance is placed upon the trial judge's findings
and conclusions in relation to estoppel.

The company must have contemplated and intended that the bank
should act upon the representations made by the company in the
acknowledgment forms. It is an inescapable inference that the bank in  E
fact acted in reliance on them. In continuing to operate the account
without further inquiry of the company the bank acted to its detriment
in that it was deprived of the opportunity to uncover the fraud and
forgery of Leung and to take action against him before it was too late.
Accordingly the company is estopped by its representation from asserting
that its account was wrongly debited with the amounts of the forged  F
cheques.

*Bank of Montreal v. The King,* 38 S.C.R. 258 and *Agricultural
Savings and Loan Association v. Federal Bank,* 6 O.A.R. 192 can be
distinguished. With regard to estoppel decisions of other courts in other
jurisdictions construing different facts cannot be of assistance and are no
grounds for disturbing this judge's findings on these facts.

*Neill Q.C.* was not called upon to reply.  G


3 July.  The judgment of their Lordships was delivered by LORD
SCARMAN.

This is an appeal by a company against a decision of the Court of
Appeal in Hong Kong whereby its action to recover from three banks
sums of money alleged to have been wrongfully debited against its  H
current account with each was dismissed. The appeal raises a question of
general principle in the law governing the relationship of banker and
customer. Additionally, the appeal calls for consideration of a number

A   of questions arising from the particular circumstances of the company's business relationship with each of the three banks.

The company was a customer of the banks, and maintained with each of them a current account. The banks honoured by payment on presentation some 300 cheques totalling approximately HK$5·5 million which on their face appeared to have been drawn by the company and

B   to bear the signature of Mr. Chen, the company's managing director who was one of the company's authorised signatories to its cheques. The banks in each instance debited the company's current account with the amount of the cheque. These cheques, however, were not the company's cheques. They were forgeries. On each the signature of Mr. Chen had been forged by an accounts clerk employed by the company, Leung Wing Ling. The central issue in the appeal is upon whom the loss arising

C   from Leung's forgeries is to fall, the company or the banks. The question of general principle is as to the nature and extent of the duty of care owed by a customer to his bank in the operation of a current account.

Very briefly, the company's submission is that, unless banker and customer agree otherwise, the customer's duty is limited to two sets of

D   circumstances. First, the customer must exercise reasonable care in drawing his cheque. If a breach of this duty causes the bank to pay on the cheque, the customer bears the loss. Otherwise, if the signature on the cheque is forged, it is not his cheque and the bank has no authority to pay it or to debit it to the customer's account. The loss falls on the bank. Secondly, the customer must notify the bank of any forgery of which the customer becomes aware so as to enable the bank to take

E   adequate precautions against future loss.

Put with equal brevity, the submission of the banks on the general question is that the relationship of banker and customer gives rise in contract and in tort to a duty owed by the customer to the bank to exercise such precautions as a reasonable customer in his position would take to prevent forged cheques being presented to the bank ("the wider

F   duty"); or, if that be too wide, at the very least to check his monthly (or other periodic) bank statements so as to be able to notify the bank of any items which were not, or may not have been, authorised by him ("the narrower duty"). Both the company and the banks accept that Hong Kong law on the point is the same as English law: but they differ fundamentally as to what the law of England is.

G   If the banks fail on the general point of principle, they have submissions to make which arise from the particular circumstances of their respective relationships with the company. They rely on their banking contracts with the company and, if they cannot escape by contract, they seek protection by way of estoppel, submitting that the company is estopped by its own conduct from asserting that the various current accounts were incorrectly debited.

H   Finally, if the company succeeds in obtaining an order for the repayment of any of the sums debited to its account by any of the banks, there is an issue as to whether the bank is liable to pay interest on the sums so debited.

*The facts*

The company, Tai Hing Cotton Mill Ltd., is a textile manufacturer carrying on business in Hong Kong. The managing director is Mr. Chen who came from Shanghai and started the company in Hong Kong in 1957. The company was described by the trial judge, Mantell J., as medium sized and reasonably successful. It showed a profit on its trading for every year but one between 1957 and 1978, the year in which the forgeries were exposed.

The company conducts its business in divisions. During the period 1957 to 1978 the company included five manufacturing divisions. The appeal concerns three of them: the garment division, which used the company's current account with Dah Sing Bank Ltd. (Dah Sing not being a party to the litigation) and later the current account with Chekiang First Bank Ltd. ("Chekiang"), the third defendant; the texturising division, which used the current account with the Bank of Tokyo Ltd. ("Tokyo"), the second defendant; and the spinning and weaving division which used the current account with Liu Chong Hing Bank Ltd. ("Liu Chong Hing"), the first defendant.

Towards the end of 1972 the company took into its employment Leung Wing Ling as an accounts clerk. Leung was dishonest: but he was trusted until 1978 when he was exposed. At first he was given responsibility for the books of account of the garment and texturising division. Almost at once he began to steal from the company. He opened bank accounts in names similar to those of real suppliers to the company and persuaded Mr. Chen to sign cheques in their favour by producing to him forged documents as evidence of transactions with these fictitious suppliers. The trial judge records that between 4 December 1972 and 31 January 1974 Leung stole HK$317,068·04 from the company's bank account with Dah Sing. He stole also from the company's accounts with Tokyo and Chekiang during the same period and by the same method.

There came a time when he adopted another, and he may have thought a safer, method of stealing his employer's money, that of forging the signature of Mr. Chen on cheques purporting to be drawn by the company. It is with this method of stealing, and these forged cheques, that the appeal is concerned. At first, he passed forged cheques through the company's accounts with Tokyo and Chekiang. In November 1977 Leung's superior, Mr. Wang, retired through ill-health and Leung assumed the additional responsibility of managing the current account with Liu Chong Hing used by the spinning and weaving division. He immediately began to draw forged cheques for substantial sums upon this account.

Between 1972 and 1978 Leung made away with some HK$7 million by fraud and forgery. The forged cheques accounted for some HK$5·5 million of the loss. The judge summarised his defalcations in a few simple words:

"the defalcations remained undetected for over five years. They involved approximately 500 cheques of which about 300 were

A

forged. The total face value of the cheques was approximately HK$7 million."

B

The judge then asked himself this question: how was Leung able to get away with it for so long? The judge's answer to his own question is now accepted. Leung was trusted. He was in a position to manipulate the accounts for which he was responsible; and the company's system of internal control was ill-adapted either to prevent fraud or to find out about it afterwards. There was no division of function, Leung being responsible for, and in almost sole control of, the receipts and payments made through the accounts for which he was responsible; and there was substantially no supervision. Specifically, the judge found that there was a failure to check or supervise Leung's reconciliation of the monthly bank statements with the cash books of the company. Mr. Wang, until ill health forced him to retire in November 1977, was supposed to undertake the task of checking and supervising but did not. After Wang retired, Leung assumed sole control of the accounts for which he was responsible. The judge summed up his view of the company's system of internal financial control as unsound and, from the point of view of preventing or detecting fraud, inadequate.

C

D

The frauds were uncovered in May 1978 when a newly appointed accountant entered upon the simple, though tedious, task which had not previously been undertaken, of reconciling bank statements with the company's account books. He realised almost at once that something was seriously wrong. He reported to Mr. Chen. Leung was interrogated and admitted the frauds.

E

*The litigation*

The company now acted with some alacrity. On 15 May 1978 it issued a writ against the three banks, Leung, and his wife Wance Cheng in which it claimed repayment of sums totalling approximately HK$7 million. A modest recovery has been obtained from the wife by a negotiated settlement. Leung has fled to Taiwan, leaving the company and the banks to fight out who of the innocent victims of his crimes are to bear the financial loss. The litigation is, so far as it concerns the banks, limited to the cheques bearing the forged signature of Mr. Chen, the total of which is of the order of HK$5·5 million.

F

G

Mantell J., basing himself on the fundamental premise that a forged cheque is no mandate to pay and that, prima facie, the customer is entitled to be relieved of the loss arising from a bank's payment upon a forged cheque, held that the banks must establish affirmatively that in this case they were entitled to debit their customer's current account with the amounts of the forged cheques. The judge negatived a defence that the company was vicariously liable for Leung's fraud: and that point is no longer pursued.

H

On the question of general principle the judge accepted the company's submission and rejected both of the two alternative formulations of duty put forward by the banks. He held that English law had been settled as submitted by the company as long ago as 1918 by the decision of the House of Lords in *London Joint Stock Bank Ltd. v. Macmillan* [1918]

A.C. 777 and that it was not for him at first instance to reject law   A
ascertained and settled for so long a time. He considered a submission
made on behalf of the banks that, even if their formulation of the
customer's duty could not be implied into the banking contract, it could
nevertheless arise in tort and held that, where parties are in a contractual
relationship, their rights and duties as between themselves cannot be
more extensive in tort than they are in contract.

Turning to the particular defences raised by the banks, he rejected   B
the submissions of the banks that their terms of business, which he
accepted were contractual and to which their Lordships will refer as "the
banking contracts," should be construed as ousting the common law rule
which he had held to be as submitted by the company.

The judge then turned to the defence of estoppel raised by each
bank. This defence had been put to him in two ways: first, that the   C
company was estopped by its negligence in the management of its bank
accounts from asserting that the accounts had been wrongly debited; and
secondly, that the company was estopped by a representation to be
implied from its course of conduct that the periodic bank statements
were correct. He rejected estoppel by negligence but held that in the
case of each bank the company, by failing to challenge the debits shown
on the bank statements, had represented to each bank that the debits   D
had been correctly made. He held that Tokyo and Chekiang had acted
in reliance upon the representations so made by their willingness to
continue operating their respective accounts and to expose themselves to
the risk of paying out on forged cheques. He did not find the same
prejudice had been suffered by Liu Chong Hing as it only became
exposed to the fraud in November 1977, the first representation to it not   E
being made until the company's failure to query the December 1977
statement of account. The judge found that the chance of recovery from
Leung had not been substantially diminished during the period (December
1977 to May 1978) during which it could be said that the estoppel was
operative.

The judge accordingly gave the company judgment against Liu
Chong Hing but dismissed its claims against the other two banks. The   F
company appealed, and Liu Chong Hing cross-appealed. The Court of
Appeal differed from the trial judge on the general question. Cons J.A.
and Hunter J. delivered judgments, with which Fuad J.A. agreed, to the
effect that the banker-customer relationship is such as to give rise to a
general duty of care in the operation of its banking accounts. They held
that the company was in breach of the duty which they held it owed to   G
the banks and must bear the loss. The duty they held arose in tort as
well as in contract. The judges were not, however, agreed as to the true
effect of the banking contracts. Cons J.A. construed the contracts as
meaning that if the customer did not object within the time specified in
the contracts the bank statements were "final" as between customer and
banks; in other words, that the statements became conclusive evidence
of the correctness of the debits recorded therein. Hunter J., with whom   H
Fuad J.A. agreed, held that none of the banking contracts could be
construed as including a term requiring the monthly statements to be
treated after a period of time or at all as conclusive evidence of the state

A
of the account. All three judges, however, agreed that the company was estopped by its own negligence from challenging the correctness of the bank statements.

The banks, therefore, emerged from the Court of Appeal with total success. The company suffered total defeat, and now appeals to Her Majesty in Council. The company submits that, save in respect of the estoppel point, the judgment of the trial judge was correct in law and,

B
save on estoppel, should be restored. The respondent banks seek to hold the judgment which they obtained in the Court of Appeal for the reasons, which they submit are sound, developed in the judgments of Cons J.A. and Hunter J.

*The question of general principle*

C
The question can be framed in two ways. If put in terms of the law's development, it is whether two House of Lords' decisions, one in 1918 and the other in 1933, represent the existing law. If put in terms of principle, the question is whether English law recognises today any duty of care owed by the customer to his bank in the operation of a current account beyond, first, a duty to refrain from drawing a cheque in such a

D
manner as may facilitate fraud or forgery, and, secondly, a duty to inform the bank of any forgery of a cheque purportedly drawn on the account as soon as he, the customer, becomes aware of it. The first duty was clearly enunciated by the House of Lords in *London Joint Stock Bank Ltd. v. Macmillan* [1918] A.C. 777, and the second was laid down, also by the House of Lords, in *Greenwood v. Martins Bank Ltd.* [1933] A.C. 51.

E
The banks accept, of course, that both duties exist and have been recognised for many years to be part of English law. Their case is that English law recognises today, even if it did not in 1918 or 1933, an altogether wider duty of care. This is, they submit, a duty upon the customer to take reasonable precautions in the management of his business with the bank to prevent forged cheques being presented to it

F
for payment. Further, and whether or not they establish the existence of this wider duty, they contend that the customer owes a duty to take such steps to check his periodic (in this case, monthly) bank statements as a reasonable customer in his position would take to enable him to notify the bank of any debit items in the account which he has not authorised. They submit that, given the relationship of banker and customer and the practice of rendering periodic bank statements, the two duties for which

G
they contend are "necessary incidents" of the relationship. The source of obligation, they say, is to be found both in the contract law as an implied term of the banking contract and in the tort law as a civil obligation arising from the relationship of banker and customer.

They accept that the reasoning to be found in *Macmillan's* case [1918] A.C. 777 appears at first sight to negative the existence of both the duties for which they contend: but they offer the explanation that

H
the law of contract and the tort law were significantly different in 1918 from the state of the relevant modern law. In particular, they point to developments in the law relating to the circumstances in which the courts will now imply a term into a contract, and to the changes in tort

law both as to the range of relationships giving rise to liability in tort  · A
and as to the circumstances in which loss or damage will be held to
result from breach of a duty of care. Their implied term point they base
on the decision of the House of Lords in *Liverpool City Council v. Irwin*
[1977] A.C. 239; and their two tort points on decisions of the Board in
*Overseas Tankship (U.K.) Ltd. v. Morts Dock and Engineering Co. Ltd.
(The Wagon Mound)* [1961] A.C. 388 and of the House of Lords in
*Anns v. Merton London Borough Council* [1978] A.C. 728.    B

The Court of Appeal accepted the banks' submissions. Cons J.A.
was led "after a great deal of hesitation" to conclude:

> "that, in the world in which we live today, it is a necessary
> condition of the relation of the banker and customer that the
> customer should take reasonable care to see that in the operation of
> the account the bank is not injured."    C

He, therefore, held that, in the absence of express agreement to the
contrary, the duty would be implied into the banking contract as a
necessary incident of the relationship between customer and banker.
Turning to tort, he based himself on the now famous passage in the
speech of Lord Wilberforce in *Anns v. Merton London Borough Council*,
at pp. 751–752:    D

> "Through the trilogy of cases in this House—*Donoghue v. Stevenson*
> [1932] A.C. 562, *Hedley Byrne & Co. Ltd. v. Heller & Partners
> Ltd.* [1964] A.C. 465, and *Dorset Yacht Co. Ltd. v. Home Office*
> [1970] A.C. 1004, the position has now been reached that in order
> to establish that a duty of care arises in a particular situation, it is ·
> not necessary to bring the facts of that situation within those of  E
> previous situations in which a duty of care has been held to exist.
> Rather the question has to be approached in two stages. First one
> has to ask whether, as between the alleged wrongdoer and the
> person who has suffered damage there is a sufficient relationship of
> proximity or neighbourhood such that, in the reasonable contem-
> plation of the former, carelessness on his part may be likely to  F
> cause damage to the latter—in which case a prima facie duty of care
> arises. Secondly, if the first question is answered affirmatively, it is
> necessary to consider whether there are any considerations which
> ought to negative, or to reduce or limit the scope of the duty or the
> class of person to whom it is owed or the damages to which a
> breach of it may give rise: see *Dorset Yacht* case [1970] A.C. 1004,
> *per* Lord Reid at p. 1027." ·    G

He held that in the relationship of banker and customer there was a
sufficient degree of proximity to give rise to the duty for which the
banks contend.

Hunter J., in the course of an elaborate and learned judgment, drew
heavily on the law of tort in concluding that the duty contended for by
the banks exists in the modern law. He expressed the opinion that the  H
source of the obligation was not so important as the recognition of its
existence and scope: and he referred to a comment by Lord Roskill in
*Junior Books Ltd. v. Veitchi Co. Ltd.* [1983] A.C. 520, 545, that the

A    issue is not "whether the proper remedy should lie in contract or in tort"
but depends upon the answer to the two questions posed by Lord
Wilberforce in the passage already quoted from his speech in *Anns'*
case.

If the Court of Appeal was correct in law to rule as it did, the appeal
must be dismissed. For there is no challenge to the finding of the trial
judge that, if either of the two duties for which the banks contend
B    exists, the company was in breach of its obligations to the banks.

First, it is necessary to determine what *Macmillan's* case [1918] A.C.
777 decided. Upon this point their Lordships are in no doubt. The
House held that the customer owes his bank a duty in drawing a cheque
to take reasonable and ordinary precautions against forgery.

C        "The duty . . . is to draw the cheques with reasonable care to
prevent forgery, and if, owing to neglect of this duty, forgery takes
place, the customer is liable to the bank for the loss": *per* Lord
Finlay L.C., at p. 793.

In so formulating the duty the House excluded as a necessary incident of
the banker-customer relationship any wider duty, though of course it is
always open to a banker to refuse to do business save upon express
D    terms including such a duty. Lord Finlay L.C. expressly excluded any
such duty saying, at p. 795:

        "Of course the negligence must be in the transaction itself, that is,
in the manner in which the cheque is drawn. It would be no
defence to the banker, if the forgery had been that of a clerk of a
customer, that the latter had taken the clerk into his service without
E        sufficient inquiry as to his character."

And the House approved the judgment of Bray J. in *Kepitigalla Rubber
Estate Ltd. v. National Bank of India Ltd.* [1909] 2 K.B. 1010. In that
case the judge held that, while it is the duty of a customer in issuing his
mandates (i.e., his cheques) to his bank to take reasonable care not to
mislead the bank, there is no duty on the part of the customer to take
F    precautions in the general course of carrying on his business to prevent
forgeries on the part of his servants. Put in the terms of the banks'
submission in this case, Bray J. negatived the existence of the two duties
for which the banks contend, and the House of Lords in *Macmillan's*
case [1918] A.C. 777 agreed with him.

So far as English law is concerned, *Macmillan's* case has until now
G    been accepted as a binding precedent on the question under consideration,
though it would be true to say that leading writers on banking law,
notably Sir John Paget, and many of the banking community have never
extended it a very warm welcome. Martell J., correctly in their
Lordships' view, held himself bound to follow the decision. He noted
that it had been followed as recently as 11 March 1983 by McNeill J. at
first instance in *Wealdon Woodlands (Kent) Ltd. v. National Westminster
H    Bank Ltd.* (unreported), 11 March 1983, McNeill J.; that it has been
cited with approval in the High Court of Australia, and followed by the
Court of Appeal in New Zealand: *Commonwealth Trading Bank of
Australia v. Sydney Wide Stores Pty. Ltd.* (1981) 55 A.L.J.R. 574;

*National Bank of New Zealand Ltd. v. Walpole and Patterson Ltd.*    A
[1975] 2 N.Z.L.R. 7. In the New Zealand case Richmond J., who
delivered the judgment of the court, summarised the law as settled in
1918 in succinct terms, at p. 19:

> "The *Kepitigalla* case was cited with approval by Lord Finlay L.C.
> in the *Macmillan* case [1918] A.C. 777, 801, and also by Viscount
> Haldane in the passage which I have already cited. I know of no    B
> sufficient reason why we should not retain, in New Zealand, the
> principle so clearly laid down by the House of Lords that the only
> type of negligence on the part of a customer which will remove
> from the banker the risk of paying on a forged cheque is negligence
> in or immediately connected with the drawing of the cheque itself."

It appears also that the courts of Hong Kong took the same view of the    C
law prior to the decision of the Court of Appeal now under review:
*Asien-Pazifik Merchant Finance Ltd. v. Shanghai Commercial Bank Ltd.*
[1982] H.K.L.R. 273, and *Lam Yin-fei trading as Wah Shing Garment
Manufacturing Co. v. Hang Lung Bank Ltd.* [1982] H.K.L.R. 215.

  The banks seek to attack the authority of the *Macmillan* ruling in a
number of ways. Their Lordships take first their least plausible attack:
the submission that the decision can be reviewed because it proceeded    D
on a now outmoded and rejected view of the nature of the causal link
which the law requires to be proved between breach of duty and
damage if a plaintiff is to recover damages in an action based on the tort
of negligence. It is, of course, true that *Macmillan's* case was decided
before the Board in *The Wagon Mound* [1961] A.C. 388 substituted
"foreseeability" for "direct cause" as the test of liability in such cases.    E
But, in their Lordships' view, it is a travesty of the House's reasoning in
*Macmillan's* case to suggest that causation in the law of tort had
anything to do with their limiting the duty of care of the customer to the
transaction of drawing the cheque. Indeed their Lordships read the
speeches in *Macmillan's* case as proceeding upon the basis, which their
Lordships have no doubt is correct, that the relationship between banker
and customer is contractual and that its incidents, in the absence of    F
express agreement, are such as must be implied into the contract
because they can be seen to be obviously necessary.

  Their Lordships turn now to the weightier submissions advanced by
the banks on the general question. There are two: that a wider duty (a
term which in this context covers both of the duties for which the banks
contend) must be implied into the contract, alternatively that such a    G
duty arises in tort from the relationship between banker and customer.

*Implied term*

  Their Lordships agree with Cons J.A. that the test of implication is
necessary. As Lord Wilberforce put it in *Liverpool City Council v. Irwin*
[1977] A.C. 239, 254:    H

> "such obligation should be read into the contract as the nature of
> the contract itself implicitly requires, no more, no less: a test, in
> other words, of necessity."

A   Cons J.A. went on to quote an observation by Lord Salmon in the *Liverpool* case to the effect that the term sought to be implied must be one without which the whole transaction would become "inefficacious, futile and absurd" (p. 262).

B   Their Lordships accept as correct the approach adopted by Cons J.A. Their Lordships prefer it to that suggested by Hunter J. which was to ask the question: does the law impose the term? Implication is the way in which necessary incidents come to be recognised in the absence of express agreement in a contractual relationship. Imposition is apt to describe a duty arising in tort, but inept to describe the necessary incident arising from a contractual relationship.

C   Their Lordships, however, part company with Cons J.A. in his conclusion (reached only after great hesitation, he said) that it is necessary to imply into the contract between banker and customer a wider duty than that formulated in *Macmillan's* case. *Macmillan's* case itself decisively illustrates that it is not a *necessary* incident of the banker-customer relationship that the customer should owe his banker the wider duty of care.

D   The relationship between banker and customer is a matter of contract. The classic, though not necessarily exhaustive, analysis of the incidents of the contract is to be found in the judgment of Atkin L.J. in *Joachimson v. Swiss Bank Corporation* [1921] 3 K.B. 110, 127:

E   "I think that there is only one contract made between the bank and its customer. The terms of that contract involve obligations on both sides and require careful statement. They appear upon consideration to include the following provisions. The bank undertakes to receive money and to collect bills for its customer's account. The proceeds so received are not to be held in trust for the customer, but the bank borrows the proceeds and undertakes to repay them. The promise to repay is to repay at the branch of the bank where the account is kept, and during banking hours. It includes a promise to repay any part of the amount due against the written order of the customer addressed to the bank at the branch, and as such written orders may be outstanding in the ordinary course of business for two or three days, it is a term of the contract that the bank will not cease to do business with the customer except upon reasonable notice. The customer on his part undertakes to exercise reasonable care in executing his written orders so as not to mislead the bank or to facilitate forgery."

F

G   Atkin L.J. clearly felt no difficulty in analysing the relationship upon the basis of the limited duty enunciated in *Macmillan's* case. And in *Macmillan's* case itself the protracted discussion, which is now only of historical interest, as to the true ratio decidendi of *Young v. Grote* (1827) 4 Bing. 253 reveals vividly that the House was aware of the possibility of a wider duty but rejected it.

H   The argument for the banks is, when analysed, no more than that the obligations of care placed upon banks in the management of a customer's account which the courts have recognised have become with the development of banking business so burdensome that they should be

met by a reciprocal increase of responsibility imposed upon the customer:    A
and they cite *Selangor United Rubber Estates Ltd. v. Cradock (No. 3)*
[1968] 1 W.L.R. 1555 (Ungoed-Thomas J.) and *Karak Rubber Co. Ltd.
v. Burden (No. 2)* [1972] 1 W.L.R. 602 (Brightman J.). One can fully
understand the comment of Cons J.A. that the banks must today look
for protection. So be it. They can increase the severity of their terms of
business, and they can use their influence, as they have in the past, to
seek to persuade the legislature that they should be granted by statute    B
further protection. But it does not follow that because they may need
protection as their business expands the necessary incidents of their
relationship with their customer must also change. The business of
banking is the business not of the customer but of the bank. They offer
a service, which is to honour their customer's cheques when drawn upon
an account in credit or within an agreed overdraft limit. If they pay out    C
upon cheques which are not his, they are acting outside their mandate
and cannot plead his authority in justification of their debit to his
account. This is a risk of the service which it is their business to offer.
The limits set to the risk in the *Macmillan* [1918] A.C. 777 and
*Greenwood* [1933] A.C. 51 cases can be seen to be plainly necessary
incidents of the relationship. Offered such a service, a customer must
obviously take care in the way he draws his cheque, and must obviously    D
warn his bank as soon as he knows that a forger is operating the
account. Counsel for the banks asked rhetorically why, once a duty of
care was recognised, should it stop at the *Macmillan* and *Greenwood*
limits. They submitted that there was no rational stopping place short of
the wider duty for which they contended. With very great respect to the
ingenious argument addressed to the Board their Lordships find in    E
certain observations of Bray J. in *Kepitigalla's* case [1909] 2 K.B. 1010 a
convincing statement of the formidable difficulties in the way of this
submission. Bray J. said, at pp. 1025–1026:

"I think Mr. Scrutton's contention equally fails when it is considered
apart from authority. It amounts to a contention on the part of the
bank that its customers impliedly agreed to take precautions in the
general course of carrying on their business to prevent forgeries on    F
the part of their servants. Upon what is that based? It cannot be
said to be necessary to make the contract effective. It cannot be
said to have really been in the mind of the customer, or, indeed, of
the bank, when the relationship of banker and customer was
created. What is to be the standard of the extent or number of the
precautions to be taken? Applying it to this case, can it be said to    G
have been in the minds of the directors of the company that they
were promising to have the pass-book and the cash-book examined
at every board meeting, and to have a sufficient number of board
meetings to prevent forgeries, or that the secretary should be
supervised or watched by the chairman? If the bank desire that
their customers should make these promises they must expressly
stipulate that they shall. I am inclined to think that a banker who    H
required such a stipulation would soon lose a number of his
customers. The truth is that the number of cases where bankers
sustain losses of this kind are infinitesimal in comparison with the

A
large business they do, and the profits of banking are sufficient to
compensate them for this very small risk. To the individual customer
the loss would often be very serious; to the banker it is negligible."

Their Lordships reject, therefore, the implied term submission.

B
*Tort*
Their Lordships do not believe that there is anything to the advantage
of the law's development in searching for a liability in tort where the
parties are in a contractual relationship. This is particularly so in a
commercial relationship. Though it is possible as a matter of legal
semantics to conduct an analysis of the rights and duties inherent in
some contractual relationships including that of banker and customer
C
either as a matter of contract law when the question will be what, if any,
terms are to be implied or as a matter of tort law when the task will be
to identify a duty arising from the proximity and character of the
relationship between the parties, their Lordships believe it to be correct
in principle and necessary for the avoidance of confusion in the law to
adhere to the contractual analysis: on principle because it is a relationship
in which the parties have, subject to a few exceptions, the right to
D
determine their obligations to each other, and for the avoidance of
confusion because different consequences do follow according to whether
liability arises from contract or tort, e.g. in the limitation of action.
Their Lordships respectfully agree with some wise words of Lord
Radcliffe in his dissenting speech in *Lister v. Romford Ice and Cold
Storage Co. Ltd.* [1957] A.C. 555. After indicating that there are cases
E
in which a duty arising out of the relationship between employer and
employee could be analysed as contractual or tortious Lord Radcliffe
said, at p. 587:

"Since, in any event, the duty in question is one which exists by
imputation or implication of law and not by virtue of any express
negotiation between the parties, I should be inclined to say that
F
there is no real distinction between the two possible sources of
obligation. But it is certainly, I think, as much contractual as
tortious. Since in modern times the relationship between master and
servant, between employer and employed, is inherently one of
contract, it seems to me entirely correct to attribute the duties
which arise from that relationship to implied contract."

G
Their Lordships do not, therefore, embark on an investigation as to
whether in the relationship of banker and customer it is possible to
identify tort as well as contract as a source of the obligations owed by
the one to the other. Their Lordships do not, however, accept that the
parties' mutual obligations in tort can be any greater than those to be
found expressly or by necessary implication in their contract. If,
therefore, as their Lordships have concluded, no duty wider than that
H
recognised in *Macmillan* [1918] A.C. 777 and *Greenwood* [1933] A.C. 51
can be implied into the banking contract in the absence of express terms
to that effect, the banks cannot rely on the law of tort to provide them
with greater protection than that for which they have contracted.

A    For these reasons their Lordships answer the general question by accepting the submission of the company that in the absence of express terms to the contrary the customer's duty is in English law as laid down in *Macmillan* and *Greenwood.* The customer's duty in relation to forged cheques is, therefore, twofold: he must exercise due care in drawing his cheques so as not to facilitate fraud or forgery and he must inform his bank at once of any unauthorised cheques of which he becomes aware.

B    Their Lordships cannot leave the general question without making some comment on a matter of some importance which was discussed in argument before them.

It was suggested, though only faintly, that even if English courts are bound to follow the decision in *Macmillan's* case the Judicial Committee is not so constrained. This is a misapprehension. Once it is accepted, as in this case it is, that the applicable law is English, their Lordships of the Judicial Committee will follow a House of Lords' decision which covers the point in issue. The Judicial Committee is not the final judicial authority for the determination of English law. That is the responsibility of the House of Lords in its judicial capacity. Though the Judicial Committee enjoys a greater freedom from the binding effect of precedent than does the House of Lords, it is in no position on a question of English law to invoke the *Practice Statement (Judicial Precedent)* [1966] 1 W.L.R. 1234 of July 1966 pursuant to which the House has assumed the power to depart in certain circumstances from a previous decision of the House. And their Lordships note, in passing, the Statement's warning against the danger of disturbing retrospectively the basis on which contracts have been entered into. It is, of course, open to the Judicial Committee to depart from a House of Lords' decision in a case where, by reason of custom, statute, or for other reasons peculiar to the jurisdiction where the matter in dispute arose, the Judicial Committee is required to determine whether English law should or should not apply. Only if it be decided or accepted (as in this case) that English law is the law to be applied will the Judicial Committee consider itself bound to follow a House of Lords' decision. An illustration of the principle in operation is afforded by the recent New Zealand appeal *Hart v. O'Connor* [1985] A.C. 1000, in which the Board reversed a very learned judgment of the New Zealand Court of Appeal as to the contractual capacity of a mentally disabled person, holding that because English law applied, the duty of the New Zealand Court of Appeal was not to depart from what the Board was satisfied was the settled principle of that law.

*The express terms of business*

The company, it is now accepted, operated its current account with each bank pursuant to the bank's printed terms and conditions.

*Chekiang.* The company opened an account with the bank in September 1957. Chekiang was authorised to pay cheques on behalf of the company if signed by Mr. Chen or by any two of four named signatories. By his request to open the account Mr. Chen agreed on behalf of the company to comply with the bank's "rules and procedures in force from time to time governing the conduct of such account." Mr.

A      Chen had notice of the rules current when he made the request. Rule 7 provided, so far as material:

> "A monthly statement for each account will be sent by the bank to the depositor by post or messenger and the balance shown therein may be deemed to be correct by the bank if the depositor does not notify the bank in writing of any error therein within 10 days after
B      the sending of such statement . . ."

From the opening of the account until March 1978 the company returned, upon receipt of its periodic bank statement, a confirmation slip signed by two authorised signatories. No cleared cheques were ever returned to the company.

     *Tokyo.* The company opened an account with the bank in November
C      1961. By letter of 17 November 1961 Mr. Chen agreed on behalf of the company to observe the provisions of an agreement appearing on the back of the bank's pro-forma letter. The company accordingly undertook to hold the bank free from any loss resulting from a failure by it to abide by the provisions of the agreement. Clause 10 provided:

> "The bank's statement of my/our current account will be confirmed
D      by me/us without delay. In case of absence of such confirmation within a fortnight, the bank may take the said statement as approved by me/us."

The bank was authorised to pay the company's cheques if signed by Mr. Chen or two authorised signatories. Periodic bank statements were rendered by the bank, but cleared cheques were not returned. No bank
E      statement relevant to this case was ever confirmed by the company.

     *Liu Chong Hing.* The company opened an account with the bank in November 1962. By his letter of request dated 8 November 1962 Mr. Chen stated that the company wished to open the account subject to the bank's rules and regulations. Rule 13 provided:

> "A statement of the customer's account will be rendered once a
F      month. Customers are desired: (1) to examine all entries in the statement of account and to report at once to the bank any error found therein, (2) to return the confirmation slip duly signed. In the absence of any objection to the statement within seven days after its receipt by the customer, the account shall be deemed to have been confirmed."

G      The bank was authorised to pay cheques if signed by Mr. Chen or by any two authorised signatories. The bank never did send any confirmation slips to the company; nor did it return cleared cheques. The company never sent the bank any confirmation slip.

     Their Lordships agree with the views of the trial judge and Hunter J. as to the interpretation of these terms of business. They are contractual
H      in effect, but in no case do they constitute what has come to be called "conclusive evidence clauses." Their terms are not such as to bring home to the customer either "the intended importance of the inspection he is being expressly or impliedly invited to make," or that they are intended to have conclusive effect against him if he raises no query, or

fails to raise a query in time, upon his bank statements. If banks wish to   A
impose upon their customers an express obligation to examine their
monthly statements and to make those statements, in the absence of
query, unchallengeable by the customer after expiry of a time limit, the
burden of the objection and of the sanction imposed must be brought
home to the customer. In their Lordships' view the provisions which
they have set out above do not meet this undoubtedly rigorous test. The
test is rigorous because the bankers would have their terms of business   B
so construed as to exclude the rights which the customer would enjoy if
they were not excluded by express agreement. It must be borne in mind
that, in their Lordships' view, the true nature of the obligations of the
customer to his bank where there is not express agreement is limited to
the *Macmillan* and *Greenwood* duties. Clear and unambiguous provision
is needed if the banks are to introduce into the contract a binding   C
obligation upon the customer who does not query his bank statement to
accept the statement as accurately setting out the debit items in the
accounts.

*Estoppel*

   Their Lordships having held that the company was not in breach of   D
any duty owed by it to the banks, it is not possible to establish in this
case an estoppel arising from mere silence, omission, or failure to act.
   Mere silence or inaction cannot amount to a representation unless
there be a duty to disclose or act: *Greenwood's* case [1933] A.C. 51, 57.
And their Lordships would reiterate that unless conduct can be
interpreted as amounting to an implied representation, it cannot
constitute an estoppel: for the essence of estoppel is a representation   E
(express or implied) intended to induce the person to whom it is made
to adopt a course of conduct which results in detriment or loss:
*Greenwood's* case, *per* Lord Tomlin, at p. 57.
   The company, it is accepted, did not know of the forgeries until the
exposure of Leung in May 1978. Had the company been under either of
the duties (the "wider" or the "narrower") for which the banks contend,
it is plain that the company would have been in breach of such duty   F
during substantially the whole period covered by Leung's frauds, in
which event an estoppel could have arisen. But in that event the
estoppel question would have been of academic interest only. For the
breach of duty by the customer and the resultant loss of the banks
would have afforded the banks a defence by way of set-off or
counterclaim.   G
   For the same reason the banks gain nothing from their submission
that an estoppel arises from their terms of business. The trial judge
clearly thought that two of the banks could show that they had suffered
loss by relying on the failure of the company to raise objection to the
debit items shown in the bank statements. He held that, while their
terms of business could not be construed so as to impose a contractual
duty upon the company to accept in the absence of objection the   H
monthly statements as accurate in so far as they related to debit items,
their contractual effect was "to turn failure to respond into a
representation" that the bank statements were correct. Their Lordships

. . .

A
cannot agree. The contractual effect of the terms of business was that on
the expiry of the time limit without objection raised by the company
either the bank statements became conclusive as to the correctness of
the debit items or they did not. Once it is held that they were not
conclusive, silence, i.e. in this case failure to object, cannot be
interpreted as a representation that the statements were correct for the
simple reason that the company was not precluded by the terms of
B
business from asserting that they were incorrect.

The same position is therefore reached. Either there was a duty to
accept that bank statements to which no objection had been raised were
correct in which event failure to object could be relied on either as a
breach of duty causing loss or as an implied representation of their
correctness estopping the company from asserting otherwise; or there
C
was no such duty, in which event failure to object could not be
interpreted as a representation that they were correct.

For these reasons their Lordships hold that, if the banks fail to
establish either of the two duties of care for which they contend, they
have no fall-back defence in the doctrine of estoppel.

*Interest*
D
Their Lordships respectfully agree with the trial judge in his rejection
of the submission that because the sums wrongly debited were in non-
interest bearing accounts interest is not recoverable. The company has
lost the opportunity of placing the money at interest as a result of the
unauthorised debits made by the banks to the respective current
accounts. Interest is, therefore, payable. In the circumstances of this
E
case interest should run from 15 May 1978: for by issuing its writ on that
day the company required the banks to eliminate the unauthorised
debits from the relevant current accounts and to repay what was due.

For these reasons their Lordships will humbly advise Her Majesty
that the appeal should be allowed and an order made in the following
terms:

F
"1. (i) The judgment of the Court of Appeal of Hong Kong dated
27 January 1984 ought to be reversed; (ii) the judgment of the High
Court of Hong Kong dated 12 July 1983 ought to be set aside save
in relation to the sum of $187,195·74 thereof; (iii) judgment ought
to be entered for the appellant for declarations that the respondents
were not entitled to debit the appellant's account with the following
sums and that the respondents ought to pay to the appellant such
G
sums, namely;

*First respondent*—H.K.$3,082,214·20
*Second respondent*—H.K.$809,804·80
*Third respondent*—H.K.$1,599,070·20

together with interest on the above sums at the rate of 1½ per cent.
over the prime rate in force in Hong Kong from time to time, to be
calculated from 15 May 1978 to the date of payment.
H
"2. As against each of the respondents: (i) the costs of the
action, the costs of the appeal to the Court of Appeal and the costs
of the appeal to the Judicial Committee of the Privy Council to be
taxed and paid by the respondents to the appellant; (ii) the orders

for costs in favour of the first, second, and third respondents made    A
by the High Court on 12 July 1983 and by the Court of Appeal on
27 January 1984 to be set aside and such costs, if any, paid by the
appellant to the respondents, or any of them, to be repaid to the
appellant together with interest, if any, earned thereon.
"3. Certificate for three counsel."

 

    *Solicitors: Kingsford Dorman; Linklaters & Paines; Cameron*    B
*Markby; Maxwell Batley & Co.*

 

                                            S. S.

 

<hr>

C

 

[HOUSE OF LORDS]

GILLICK .  .  .  .  .  .  .  .     RESPONDENT

                       AND    D

WEST NORFOLK AND WISBECH AREA
   HEALTH AUTHORITY .  .  .  .   FIRST APPELLANTS

                       AND

DEPARTMENT OF HEALTH AND
   SOCIAL SECURITY.  .  .  .   SECOND APPELLANTS
                                      E

 

1984  Nov. 19, 20, 21, 22;          Eveleigh, Fox and Parker L.JJ.
      Dec. 20
1985  June 24, 25, 26, 27;      Lord Fraser of Tullybelton, Lord Scarman,
      July 1, 2, 3, 4;        Lord Bridge of Harwich, Lord Brandon of
      Oct. 17                  Oakbrook and Lord Templeman
                                            F

       *National Health Service—Family planning clinics—Children under*
         *16—Departmental guidance to area health authority—Contracep-*
         *tive advice and treatment to children under 16 without parental*
         *knowledge or consent—Whether infringement of parental rights—*
         *Whether child under 16 having capacity to consent to medical*
         *examination and treatment—Whether advice contained in guidance*
         *lawful—Whether adherence to advice resulting in commission of*    G
         *criminal offence or unlawful conduct*

       The Department of Health and Social Security issued to area
health authorities a memorandum of guidance on family planning
services ("the guidance") which contained a section dealing with
contraceptive advice and treatment for young people. It stated
that clinic sessions should be available for people of all ages,
that in order not to undermine parental responsibility and family    H
stability the department hoped that attempts would always be
made to persuade children under the age of 16 who attended
clinics to involve their parent or guardian at the earliest stage of
consultation, and that it would be most unusual to provide

# TAB 87

From the perhaps rather strong language I have used to describe the actions of the appellant, it may not be surprising that I have come to the conclusion that what the appellant did was improper in that it was "inconsistent with the 'proper' discharge by the appellant of his duties, obligations and responsibilities" as a director. The name "Duna World" had some value — how much does not matter — the offer by the appellant to pay for it is sufficient confirmation of that. The company and its creditors suffered a detriment because the name was no longer available to the company. They suffered that detriment because of the actions of the appellant. The appellant had not acted for the benefit of the company. What he did was "improper" within the meaning of sec. 229(3). He gained an advantage for himself or for Shengli Pty. Ltd. by being able to trade using the name "Duna World".

An appeal was instituted against penalty as well as conviction but Mr Clayton told us at the beginning of the hearing that the appeal against penalty was abandoned, so I need say nothing about that.

In my view the appeal should be dismissed.

---

**Taylor v. Australia and New Zealand Banking Group Limited.**
**Supreme Court of Victoria. Judgment handed down 26 May 1988.**

> *Companies — Avoidance of preferences — Payment by company to bank to clear overdraft and advance — Subsequent liquidation of company — Whether payment void as giving bank a preference over other creditors — Whether bank was payee in good faith — Companies (Victoria) Code, sec. 451 — Bankruptcy Act 1966, sec. 122.*

This was an application by T, the liquidator of a company, for a declaration that payment by the company to the Australia and New Zealand Banking Group Ltd. ("the bank") was void as a preference under sec. 451 of the Companies Code. Section 451 of the Code imports sec. 122 of the Bankruptcy Act 1966 ("the Act") so that a payment by the company to a creditor, in circumstances where the company is unable to pay its debts as they fall due, is void as against the liquidator if made within six months of the resolution to wind up.

Initially the company opened an account at the bank with a temporarily fixed overdraft limit. The company purchased a service station and a second account was opened. Loans were also made by the bank to the directors to provide working capital for the company.

The service station was not a successful venture. A director of the company told the bank's representative that a sale of the business was probable and all debts with the bank would then be cleared. Due to liquidity problems the company requested an extension of the overdraft on the second account. Later, the overdraft was transferred to a fully drawn advance account.

The sale of the business went ahead although the purchase price was considerably less than indicated to the bank by the company. Part of the settlement cheque was used to clear the company's overdraft and repay the advance.

The company subsequently went into liquidation and the liquidator argued that the company's payment, to clear the overdraft and repay the advance, was a preferential payment.

The bank sought to rely on sec. 122(2)(a) of the Act and argued it was a payee in good faith for valuable consideration in the ordinary course of business.

The issues before the Court were whether:

(i) the liquidator had established that at the time of the payment the company was unable to pay its debts as they became due from its own money;

(ii) the liquidator had established that the bank was not a payee in good faith under the deeming provisions of sec. 122(4)(c) of the Act;

(iii) the bank had proved it was a payee in the ordinary course of business.

© 1988 CCH Australia Limited

*Held:* payment was void as a preference.

1. **The company was unable to pay its debts as they fell due from its own money.**

The question is not to be answered by merely looking at the accounts or making a mechanical comparison of assets and liabilities. However, the Court in calculating company resources would not take into account:

(a) repayments of debts by the company to the directors which, if seen as giving the directors a preference over other creditors, would create in the company a right to a chose in action for that amount;

(b) moneys which the directors may have been prepared to advance to the company;

(c) the possibility that the company could trade on and utilise its tax losses to pay off its debts.

2. **The bank received the payment from the company in good faith.**

Pursuant to sec. 122(4)(a) of the Act the question is whether the payment was made under such circumstances as to lead to the inference that the bank had reason to suspect that:

(a) the company was unable to pay its debts as they became due from its own money; and

(b) the effect of the payment would be to give the bank a preference over other creditors.

The information available to the bank, including the assurance from the company that all debts would be paid out of proceeds of sale, established that no reasonable person would have had an actual apprehension or fear that the company would be unable to pay its debts as they became due and that the payment would give the bank a preference.

3. **The payment had not been made in the ordinary course of business.**

Where a bank allows a trader an increasing overdraft to enable the trader to continue until a business is sold, the circumstances may be such that the payment to the bank of the proceeds of sale is made in the ordinary course of business.

However a transaction, which in nature and form complies with ordinary business practice, is not in the ordinary course of business if the reason for it being effected is a reason other than an ordinary business reason. For example, a transaction which is effected because of the apprehension of the insolvency of the debtor.

On the facts, the directors and the bank feared that the company might be insolvent. It was this fear that led the company to make, and the bank to insist on the making of, the payment at the time and in the manner in which it was made.

[*Headnote by the CCH COMPANY LAW EDITORS*]

Hayes appeared for the respondent.

Before: McGarvie J.

## McGarvie J.:

*The application*

Barry Keith Taylor, the liquidator of a company called Downtown Security Co. Pty. Ltd. until 6 January 1984 and from that date called Sleejac Pty. Ltd. ("the company"), applies for a declaration that a payment of $57,738.75 by the company to the respondent, the Australia and New Zealand Banking Group

Ltd. is void as a preference and for an order for payment of that amount.

By sec. 451 of the *Companies (Victoria) Code* a payment made by a company that, if it had been made by a natural person, would, in the event of his becoming a bankrupt, be void as against the trustee in bankruptcy, is, in the event of the company being wound up, void as against the liquidator. The liquidator was

appointed in a creditors' voluntary winding up and the date of the resolution to wind up, 15 March 1984, corresponds with the date of the presentation of the petition in bankruptcy in the case of a natural person.

Section 122 of the *Bankruptcy Act 1966* is applied so that a payment made in favour of a creditor by a company which is unable to pay its debts as they become due from its own money, having the effect of giving the creditor a preference over other creditors is void as against the liquidator if made within six months before the resolution to wind up. It is for the liquidator to prove those facts.

In this case the effect of sec. 122(2)(a) of the *Bankruptcy Act 1966* is that even if the liquidator establishes those facts, the payment will not be void if the respondent bank proves that it was a payee in good faith and for valuable consideration and in the ordinary course of business.

By the application of sec. 122(4)(c), the respondent is deemed not to be a payee in good faith if the liquidator establishes that the payment was made under such circumstances as to lead to the inference that the bank knew or had reason to suspect:

(i) that the company was unable to pay its debts as they became due from its own money; and

(ii) that the effect of the payment would be to give the bank a preference over other creditors.

The onus of establishing the facts which bring this deeming provision into operation is upon the liquidator (*Queensland Bacon Pty. Ltd. v. Rees* (1966) 115 C.L.R. 266 at pp. 287-288).

The issues which are contested before me are:

1. Has the liquidator established that at the time of payment, 4 January 1984, the company was unable to pay its debts as they became due from its own money?

2. Has the liquidator established the facts which bring into operation the provision which deems the bank not to be a payee in good faith?

3. Has the bank proved that it was a payee in the ordinary course of business?

*Background*

Downtown Security Co. Pty. Ltd. in 1979 commenced providing security services for relatively low charges under three directors who had previously been employed by another security company. One director retired and from 1980 the two directors who controlled and operated the company were Arthur John Birrell and Neal Edwin Evans. The bookkeeping and accounting work was done for the company by the directors' wives. The respondent bank acted as banker of the company throughout. The issued capital of the company was three $1 shares which were fully paid up.

When the company first opened its account with the bank in 1979 its overdraft limit was fixed temporarily at $10,000 to cover its initial requirements for working capital. In 1980 the bank advanced $20,000 to Mr and Mrs Birrell to assist them to provide working capital for the company. By February 1981 the company's overdraft limit was reduced to $5,000.

In October 1982 the company purchased an Esso Service Centre. This purchase was intended to reduce the fuel and maintenance costs of the company's fleet of vehicles, to provide office accommodation and to generate additional income. The company opened a second account called the "Esso account" with the bank with an overdraft limit of $10,000. The bank lent $15,000 to Mr and Mrs Evans to enable them to provide further working capital to the company.

Both accounts were operated satisfactorily within their limits until March 1983, when, on the basis that the company was facing a temporary liquidity problem, the overdraft limit on the Esso account was extended to $15,000.

The amounts owed by the company to the directors and their wives in respect of loans made by them to the company amounted to $49,604 on 4 January 1984. The composition of that sum appears later.

The purchase and operation of the Esso Service Centre was not a successful business venture and by July 1983 the company had ceased to operate it. The amount due on overdraft under the Esso account, $25,709, was by 27 October transferred to a fully drawn advance account which the company agreed to pay off at $500 a month. The purchase and operation of the Esso Service Centre brought

financial difficulties to the company which remained with it until it went into liquidation.

On 21 September 1983 Mr Evans spoke to Mr Kay who was from 14 April 1982 to 15 February 1984 manager of the branch of the bank at 390 Lonsdale Street, Melbourne where the company had its accounts. He told him that the company had been approached by a multinational company desirous of purchasing its security business, that a sale was probable and that settlement was likely to take place on 1 December 1983. Mr Evans said that on that occurring all debts to the bank would clear. On 26 October 1983 Mr Birrell informed Mr Kay that it was anticipated the sale price would be approximately $200,000 of which half would be paid in advance and the remainder on settlement on 1 December. On 27 October Mr Birrell told Mr Kay that they were negotiating with the company Metropolitan Security Services (''M.S.S.''). This company is obviously related to Mayne Nickless Ltd. the company which later purchased the business. Mr Birrell told Mr Kay that M.S.S. had offered $200,000 to $250,000, that the business would be sold at a figure adequate to clear all debts and that the directors would expect to end up with $50,000 to $80,000 each from the surplus.

At about this time Mr Birrell requested an extension of the overdraft limit to $20,000 and it was extended to this amount on 2 November. It reverted to $5,000 on 2 December and remained at that limit until 4 January 1984.

The company was having great difficulty in paying its debts including amounts due to its employees for wages. Despite the temporary increase in its overdraft limit and payments by the bank of cheques drawn beyond the increased limits, a number of cheques were dishonoured.

On 28 November Mr Evans told Mr Kay that the proposed purchaser had reduced the offered price to $125,000. The probability is that the proposed purchaser had become aware of the company's financial difficulties.

On 23 December 1983 a contract of that date was executed by the purchaser Mayne Nickless Ltd., the company and Messrs Birrell and Evans. Mayne Nickless Ltd. purchased from the company the goodwill and assets of the business for $125,000 of which $118,390 was allocated to goodwill and $6,610 to assets. The

contract provided for payment of a deposit of $6,484.29 and for the balance to be paid and possession of the business and assets to be given to the purchaser on 4 January 1984. On that date the company received from Mayne Nickless Ltd. a cheque drawn by M.S.S. for $102,051.71 for the balance of purchase price after adjustments.

Later that day Messrs Birrell and Evans called at the bank and deposited that cheque together with other cheques amounting in all to $110,554.44. On the written instructions of the directors the bank applied that amount as follows:

| | |
|---|---:|
| To clear the company's overdraft | $30,891.75 |
| To repay the fully drawn advance under the Esso account | 26,847.00 |
| To repay the personal loan extended to Mr and Mrs Evans | 13,091.52 |
| To repay the fully drawn advance to Mr and Mrs Birrell | 10,205.77 |
| | $81,036.04 |

After payment of $810.20, the amount of two cheques drawn by the company payable to Mr and Mrs Birrell and Mr and Mrs Evans, and said to be for minor outgoings, the company's account with the bank was left in credit to the extent of $28,708.20. It is in respect of the payments to clear the company's overdraft and Esso account that it is claimed that a preferential payment of $57,738.75 was made.

*Commercial insolvency of the company*

The first question is whether at the time immediately before the payment was made the company was unable to pay its debts as they fell due from its own money (*Re F.P. & C.H. Matthews Ltd.* (1982) 1 All E.R. 338 at p. 343; *Queensland Bacon Pty. Ltd. v. Rees (supra)* at p. 303). This question of fact is to be decided as a matter of commercial reality in the light of all the circumstances. As *Barwick* C.J. said of the section which in the earlier *Bankruptcy Act* was the equivalent of sec. 122:

''An essential step in making out that a payment is a preference within s. 95 is to establish by evidence to the satisfaction of the Court that the payer was at the time of the payment insolvent. Insolvency is

expressed in s. 95 as an inability to pay debts as they fall due out of the debtor's own money. But the debtor's own moneys are not limited to his cash resources immediately available. They extend to moneys which he can procure by realization by sale or by mortgage or pledge of his assets within a relatively short time — relative to the nature and amount of the debts and to the circumstances, including the nature of the business, of the debtor. The conclusion of insolvency ought to be clear from a consideration of the debtor's financial position in its entirety and generally speaking ought not to be drawn simply from evidence of a temporary lack of liquidity. It is the debtor's inability, utilizing such cash resources as he has or can command through the use of his assets, to meet his debts as they fall due which indicates insolvency. Whether that state of affairs has arrived is a question for the Court ..." (*Sandell v. Porter & Anor* (1966) 115 C.L.R. 666 at p. 670.)

It is appropriate to consider the terms of credit available to the debtor in the sense of the time available to the debtor to pay debts owed to creditors (*Calzaturificio Zenith Pty. Ltd. (in liq.) v. N.S.W. Leather & Trading Co. Pty. Ltd.* (1970) V.R. 605 at p. 609). The question is not to be answered by merely looking at the accounts or making a mechanical comparison of assets and liabilities.

While the debtor's own money is treated as including not only cash resources but also money which can be obtained relatively quickly by the sale, conversion, mortgage or pledge of assets, money obtainable by unsecured borrowing is not treated as the debtor's own money (*Bank of Australasia v. Hall* (1907) 4 C.L.R. 1514 at pp. 1528 and 1543; *Re Armour; Ex parte Official Receiver v. Commonwealth Trading Bank of Australia* (1956) 18 A.B.C. 69 at p. 74; *Kyra Nominees Pty. Ltd. (in liq.) v. National Australia Bank Ltd.* (1986) 4 A.C.L.C. 400 at p. 405).

The sequence of events is of some importance in understanding the evidence of what occurred from about the time that the agreement for the sale of the business was executed on 23 December 1983. At about that time Mayne Nickless Ltd. paid a deposit of $6,367.01. This was slightly less than the deposit of $6,484.29 referred to in the

agreement and the statement of adjustments but the difference is of no significance. The company closed its business on 31 December and the purchaser commenced to run it on 4 January 1984. There were no significant transactions by the company between those dates. The purchaser purchased the equipment used in the business except for the motor vehicles. The company conducted no business of any sort after 31 December. The directors commenced to wind up its affairs, to get in debts and to pay creditors. Before the resolution of 15 March 1984 arrears of wages had been paid to former employees, and vehicles held on hire-purchase or lease had been returned to finance companies which had been paid the amounts due upon return.

By an order made by consent, Master *Brett* on 26 September 1984 fixed as one of the issues to be determined on this application whether the company at the time of the payment was unable to pay its debts as they fell due from its own money. Notwithstanding this period of notice, both the written and oral evidence presented to the Court on behalf of the applicant on this issue lacked full preparation and was often incomplete and inexact and sometimes obviously wrong. It is not evidence which inspires confidence as to its reliability.

In March 1984 the applicant, Mr Taylor, and Mr Christie, who were partners in a firm of accountants, were appointed joint liquidators of the company. Until he retired in January 1986, Mr Christie supervised the liquidation and only since then has Mr Taylor been concerned in running it. Mr Taylor swore the only affidavits in support of the application on 20 August 1984 and 3 June 1985, but it was only at 11 a.m. on the morning he was called that he learnt that he was required for cross-examination. He apparently had not read the affidavits for about three years. He was unfamiliar with much of the detail on which he was questioned.

Included in the evidence before me are accounting statements relating to the financial position of the company as at three dates. The statement as at 31 December 1983 (ex. BKT6) was prepared by the liquidators' staff from the books of the company, the handwritten statement as at 4 January 1984 (the first page of ex. HB) was prepared by the liquidator and a member of his staff over a luncheon adjournment during the hearing and the statement as at 15 March 1984 (ex. BKT2) is a

© 1988 CCH Australia Limited

copy of the front page of the report as to affairs made by the directors of the company for the purpose of the liquidation.

It is necessary to go through the various assets and liabilities whose existence is suggested by the evidence to ascertain the position of the company at the relevant time.

Turning first to the assets, it is clear that immediately before the impugned payment the company had, in the cheques it deposited that day, liquid assets amounting to $110,554.44.

On 4 January 1984 the company had trade debts of $39,235. Eventually the liquidator recovered all these debts except for an amount of about $3,000.

A current asset of $2,845 referred to as "Deposits" appears in the financial statement as at 31 December 1983. A similar item amounting to $2,645 appears in the balance sheet as at 30 June 1983. No attention was given to the item at the hearing and I am not able to say what it represents. It is contained in a statement which the liquidator has sworn is correct.

The financial statement as at 31 December 1983 also includes a current asset "Sundry Debtors $31,237". A note to that financial statement indicates that $22,522.86 of that amount was shown in the company's accounts as owing to the company by Downtown Esso. The note points out that Downtown Esso was merely a department of the company and suggests that this accounting device appears to have been employed to defer expenditure to the next accounting period due to the loss situation of the company. Another note states that a number of amounts debited to the bank statement and amounting to $8,093.85 are included in sundry debtors. The origin of the remaining amount of $620.29 is not indicated.

In his oral evidence Mr Taylor referred to the fact that there was no corresponding item as to sundry debtors in the report as to affairs as at 15 March 1984 made by the directors. He said he had spoken to the former accountant of the company who did not know what the items called sundry debtors were. Mr Taylor said he had concluded that those items were amounts which had been paid to or on behalf of the directors. He had also concluded that the directors (and presumably their wives) had treated those amounts, together with their debts

to the bank which the company had paid off on 4 January, as offsetting the amount of $49,604 owed by the company to them for loans and shown in the accounts as non-current liabilities. The sum shown for sundry debtors ($31,237) when added to the total of the debts to the bank of the directors and their wives paid off by the company ($23,297.29), amounts to $54,534.29.

Mr Taylor has never asked the directors about the sundry debtors and was not able to say whether there had been any investigation whether there were sundry debtors. He has reached his conclusions from the fact that the directors did not mention sundry debtors in their report as to affairs and have not lodged any proof of debt for the amounts shown in the accounts as due to them in respect of loans as non-current liabilities of the company.

Mr Taylor may be correct in the conclusions he has reached in respect of sundry debtors. There is, however, no positive evidence to show that the debtors were the directors or their wives or to show that if they were, the debts had been set off against the amounts due by the company to them in respect of loans. Mr Evans was asked no questions on the subject in cross-examination. The time at which the ability of the company to pay its debts is relevant is the time immediately before the payment to the bank. It was as part of the same act of payment to the bank that the company paid off the amounts owed by the directors and their wives to the bank. I am therefore to consider the position of the company as it was immediately before those amounts owed by the directors and their wives were paid off.

In the circumstances, having regard to the unsatisfactory state of the evidence and the fact that the items have never been investigated I am not satisfied that they did not at the relevant time represent debts owed to the company by persons not identified by the evidence. In his affidavit of 3 June 1985 Mr Taylor swore they were assets of the company.

A current asset shown on the financial statement as at 31 December 1983 was cash on hand $100.

The fixed assets, furniture and fittings ($2,439) and plant and machinery ($3,457), shown in the financial statement as at 31 December 1983 are not relevant to the position of the company at the time of the payment

because by that time they had passed to the purchaser of the business and assets. There had been no watch-dogs for some time before that.

The interest of the company in motor vehicles did not add to its ability to pay its debts from its own money as they became due. The prepaid terms charges, $22,052, shown in the financial statement as at 31 December 1983 represent in accounting concept credit charges under the hire-purchase and lease agreements which had been prepaid. While the vehicles were shown in that statement at a depreciated value of $53,671, hire-purchase creditors in respect of the vehicles were shown at $50,127. In fact when the vehicles were returned to the finance companies the company had in addition to pay the finance companies $16,613.09 under the agreements.

There were other financial resources which Mr Hayes for the respondent submitted should be taken into account in assessing the resources available to the company to pay its debts.

He submitted that in paying off on behalf of the directors and their wives the total sums of $23,297.29 owed by them to the bank, the company gave them preference as creditors. It was argued that by making those payments the company had to the extent of the payments in effect paid off the amounts it owed to the directors and their wives. The contention was that this payment created in the company a right to a thing in action for that amount, recoverable in respect of the payment of a void preference and this right is to be treated as an asset.

There are difficulties in the way of concluding that the payment created in the company at that time a cause of action. Even if one assumes that it did (compare *Re Armour; Ex parte Official Receiver v. Commonwealth Trading Bank of Australia (supra)* at pp. 75-76), there are several answers to the submission. One is that the cause of action would not have existed before the payment the subject of this application was made. It would have been created at the same time as that payment was made. Another is that if the cause of action came into existence it could not in any realistic sense be regarded as making available to the company on 4 January financial resources enabling it to pay debts as they fell due. It would take a long time before litigation would convert the cause of action into available funds.

Further, the effect of a declaration that the payments were void as preferences would be that the company's debts to the directors and their wives would be considered as not partially repaid and so would remain fully in existence (*F.C. of T. v. Jaques* (1956) 95 C.L.R. 223 at p. 229).

Mr Hayes also submitted that the evidence showed that the company had made a preferential payment of $23,000 to Mayne Nickless Ltd. On examining the evidence I consider that it does not support the view that $23,000 was paid to Mayne Nickless Ltd. It appears that the idea that such a payment was made arose from a combination of errors. When the directors deposited a cheque from Mayne Nickless for about $102,000 in respect of a sale for $125,000 they explained to Mr Kay that the balance was retained by the purchaser to cover payment of wages then due to employees of the company. The directors, who left the financial affairs of the company largely to their wives, appear to have had a vague notion of its transactions. Exhibit HL shows the adjustments made on settlement of the sale which resulted in payment to the company of $102,051.71. Included in the adjustments was an allowance of $11,202.77 to the purchaser under cl. 21(c) of the contract. That clause provided for that allowance to be made in consideration of the purchaser assuming responsibility in respect of entitlements to holiday pay, long service leave and sick pay of employees of the company whom the purchaser proposed to employ. I regard it as likely that when the deposit under the agreement was paid by the purchaser on 23 December it was used by the company, probably by arrangement with the purchaser, to pay arrears of wages. I do not accept that any significant amount was paid or allowed to the purchaser except what was to be paid and allowed under the terms of the contract.

It was also submitted for the respondent that in assessing the resources of the company account should be taken of moneys which the directors may have been prepared to advance to the company. In my opinion payments made from unsecured advances from the directors could not be said to be made from the company's own money any more than if made from unsecured advances from other persons. Compare *Bank of Australasia v. Hall (supra)* at p. 1554.

© 1988 CCH Australia Limited

In deciding whether the company was able to pay its debts as they fell due from its own money one has regard to the actual situation of the company and its intention for the future. It had after some months of severe financial difficulties sold the business which it had conducted and it intended to wind up its financial affairs. Its directors proceeded to do this until the resolution to wind up. In the negotiations for sale Mayne Nickless Ltd. had indicated that it would provide employment for the directors. The evidence does not indicate whether this was done.

Mr Hayes submitted that there was no reason why the company could not trade on and utilise its tax losses to pay off its debts. In my opinion the answer to this is that there is no suggestion in the evidence that this company ever intended to trade on after the sale of its business and in fact it did not. I am satisfied that it never intended to do so. It would hardly be an application of commercial reality in deciding whether a company was unable to pay its debts as they became due, to have regard not to the course the company intended to follow but to some other course which it never intended to follow and never followed.

The result is that in setting out to establish the limits of the assets available to the company on 4 January 1984 as resources to enable it to pay its debts as they fell due, the liquidator has satisfied me that those assets did not exceed the following:

| | |
|---|---|
| Cheque from purchaser of business and assets | $102,051.71 |
| Other cheques | 8,502.73 |
| Trade debtors | 39,235.00 |
| Deposits | 2,845.00 |
| Sundry debtors | 31,237.00 |
| Cash on hand | 100.00 |
| | $183,971.44 |

I will now consider the evidence of the debts of the company.

Immediately before the payment alleged to constitute a preference, the company owed the bank on overdraft $30,891.75 and on the fully drawn advance account $26,847. It owed employees $12,394.34 for wages, vehicle allowances and related items in respect of the previous fortnight or so. This is obtained by deducting from the total of $15,210.27 shown on one of the pages in ex. HJ, the cheque for

$1,549.95 which was paid on 3 January and the other amounts which, it is apparent, were not wages.

I am satisfied that on 4 January 1984 $44,264 was owed to the Commissioner of Taxation for instalments of income tax deducted by the company from the wages of its employees but not paid to the Commissioner. While slightly higher figures are supported by some of the evidence I have taken the lowest figure. It comes from ex. BKT6 and BKT3.

A persistent difficulty in deciding this case is the obvious carelessness and lack of professional skill with which the applicant's affidavits have been prepared. The liquidator's original affidavit sets out to state the amount which the company owed the bank before the payment on 4 January 1984. It is stated as the amount for which ''the Respondent was indebted to the Applicant''. The amount is sworn to be $81,036.04 which is the amount which the summons seeks to recover as a void preferential payment. In fact that amount includes debts owed by the directors and their wives to the bank and it is now common ground that the amount owed by the company to the bank before the payment in question was $57,738.75. The liquidator's later affidavit states the financial position of the company without identifying the date the statement relates to. In an affidavit of such poor quality it should occasion no surprise that outstanding debts of the company which other documents show to have amounted to $116,208 are sworn to amount to $160,208. After exhibiting the statement relating to the financial position of the company as at 31 December 1983 the affidavit states:

''There has been no material difference between that position and that which occurred on the 1st January, 1984, prior to the payment to the Respondent, the subject matter of this application.''

The date of the payment the subject of this application was, of course, not Sunday 1 January but Wednesday 4 January 1984.

While the carelessness evident in the preparation of the affidavits is no doubt mainly the work of the applicant's solicitors, I bear in mind that the applicant swore affidavits prepared in that form. The cross-examination indicated to me that Mr Taylor himself had a meagre knowledge of the liquidation and the

**816**         Taylor v. A.N.Z. Banking Group Ltd. (*McGarvie* J.)         **(1988) 6 ACLC 808**

accounts and transactions relevant to it. In several instances facts which would not have been difficult to investigate had not been investigated. Mr Taylor said that liquidators who diminish the assets of a company by too much time and expense spent in investigations are criticised by creditors who prefer them to get in and distribute available assets expeditiously and inexpensively. He said that he thought the latter course is mainly followed by liquidators in Victoria.

The amount claimed by the applicant to have been due by the company on 4 January 1984 to the State Insurance Office is challenged and I consider it separately. The amounts due at that date to ordinary trade creditors were not challenged before me. Despite the imperfections of the evidentiary material I am satisfied that $24,057 was owing to trade creditors on 4 January. This is the amount shown in ex. BKT3, $116,208, less the items included in that amount as owing to the Australian Taxation Office ($44,264) and the State Insurance Office ($47,887).

In the statement of the financial position of the company as at 31 December 1983 there is an item shown under current liabilities as other creditors, $10,485. No evidence was given identifying or explaining this amount and I am not satisfied that it represents a liability of the company on 4 January 1984.

In considering the position of the finance companies in respect of the company's vehicles it is of importance that the inquiry is not confined to whether on 4 January 1984 the company could pay its debts which were due and payable that day. The inquiry is whether the company which had just sold its only income-producing asset and was about to wind up its financial affairs could pay its debts as they became due from its own moneys. As *Barwick* C.J. made clear in *Sandell v. Porter* (*supra*) at p. 670 in the passage quoted earlier in this judgment, whether the company was unable to pay its debts as they became due is to be decided from considering its financial position in its entirety. In considering whether it had the capacity to pay its debts as they became due it is obviously important to see what moneys it would have available. The amount it will have available at a given time is affected by existing debts which become due before or about the given time. It is also affected by future debts which will have to be

incurred and have to be paid before or about the given time. Attention has been given in the cases to the ability of the company to pay debts due at a future time (e.g. *Queensland Bacon Pty. Ltd. v. Rees (supra)* at p. 313). In *Kyra Nominees Pty. Ltd. (in liq.) v. National Australia Bank Ltd.* (1986) 4 ACLC 400 at p. 402 *Burt* C.J. in considering the capacity of a company to pay debts which would become due in future, had regard to further debts which would be incurred in the meantime.

The vehicles on hire-purchase and lease were not acquired by the purchaser of the business. The vendor which had no business in which to use the vehicles had no realistic option but to dispose of them as soon as practicable on the most favourable terms. The directors chose to return the vehicles to the finance companies and pay out the amounts necessary to bring the contracts to an end. To do this they paid out $11,849.35 to Ford Credit on 16 January, $2,962.17 to Stillwell Ford on 20 January and $1,801.57 to the Associates on 31 January. There is nothing to suggest that in disposing of these vehicles the directors did not take the course which was most in the financial interests of the company. I consider that in assessing the position on 4 January regard would have to be paid to the fact that the proper winding up of the company would require early payment to the finance companies of a total amount of about the sum $16,613.09 which was paid.

A similar approach is appropriate regarding the items shown in the balance sheet of the company as at 30 June 1966 and in the statement of the financial position of the company as at 31 December 1983 as long-term or non-current liabilities. The items were shown as follows:

| Loan | — N. Evans | $10,140 |
|------|------------|---------|
|      | — S. Evans | 14,650 |
|      | — A. Birrell | 12,257 |
|      | — A. Birrell | 12,557 |
|      |            | $49,604 |

While these liabilities might have been left outstanding for extended periods while the company was operating its business the only realistic inference is that the amounts would become due for payment together with other liabilities in the winding up of the company which was intended to follow the sale. The fact that the proceeds of the sale were used immediately to pay off amounts owed by the

© 1988 CCH Australia Limited

directors and their wives to the bank is inconsistent with their having taken the position of standing out of what was due to them in order to enable creditors of the company to be paid. In ordinary circumstances the directors and their wives who lent money to the company on the basis that repayment was to be treated as a non-current liability would be entitled to demand payment when the company sold its business and proceeded to wind up its affairs. In considering the position of the company on 4 January it is appropriate to have regard to the fact that during the impending winding up these amounts would, on the balance of probabilities, become payable to the directors and their wives.

The directors and their wives have not lodged proof of debts in the liquidation in respect of these amounts. In view of the claim by the Commissioner of Taxation as a preferential creditor for an amount which exceeds the amount of the total estimated realisable value of the assets of the company on 15 March 1984, and the payments made by the company to clear their debts to the bank, the directors and their wives may well have decided to "let sleeping dogs lie". I do not consider that the fact that the liquidator does not acknowledge the existence of these debts for which the directors and their wives have not lodged proof of debts, precludes the Court from taking them into account in assessing the position of the company on 4 January 1984.

The debt which was strongly disputed before me is the debt for $47,887 which the liquidator alleges was due and payable to the State Insurance Office on 4 January 1984. This amount is alleged to have been due as premiums for insurance of liability for workers compensation.

Most of the employees of the company were security officers who drove around in motor vehicles checking for security the premises of clients.

Mr Evans in his evidence said that for the first year of its operation the company had a workers compensation policy for which it had paid the State Insurance Office a premium of $2,500 a quarter. After that, with a view to avoiding liability for workers compensation and the need to pay insurance premiums for it, the company apparently engaged or purported to engage its security officers as subcontractors

not employees. That endeavour would seem unlikely to have been effective in law to achieve those objectives but that does not need to be investigated. After about a year on that basis a union intervened and in late 1982 the security officers were again employed and paid wages. Mr Evans' understanding was that as the company did not take out a further workers compensation policy after it reverted to treating the security officers as employees it did not have a policy and did not become liable for premiums. It is clear that Mr Evans had a very imperfect understanding of the position of the company regarding workers compensation. If anyone understood the position it would have been the directors' wives.

In the contract for the sale of the business which was tendered before me on behalf of the bank, the company, Mr Evans and his fellow director each covenants with the purchaser that the details of the workers compensation insurances effected by the vendor as at 23 December 1983 are and will on 4 January 1984 be as set out in the Fifth Schedule (cl. 7(a)(xiii)). That Schedule consists of an original or photocopy certificate dated 15 December 1983 from the Insurance Commissioner on the notepaper of the State Insurance Office in these terms:

"To Whom it May Concern

This is to certify that Downtown Security Co. Pty. Ltd. 4 Gallilee Crescent, Mill Park 3085 is/are indemnified to Workers' Compensation Policy G/2117643E current to 25th January, 1984."

This Schedule was not put to Mr Evans and was not mentioned at the hearing.

In my opinion it is established by the evidence that on 4 January 1984 the company owed the Insurance Commissioner in respect of workers compensation insurance a sum in the vicinity of $47,887.68.

The State Insurance Office on 5 October 1984 lodged proof of debt for amounts outstanding under a workers compensation insurance policy totalling $47,887.68. The amounts claimed were $9,827.18 for the period 25 January 1982 to 25 January 1983 and $38,060.50 in respect of the period 25 January 1983 to 25 January 1984.

Mr Evans gave evidence that in 1981 the company had a policy of workers compensation

**818**          Taylor v. A.N.Z. Banking Group Ltd. (*McGarvie* J.)          **(1988) 6 ACLC 808**

insurance with the State Insurance Office. That office was at the relevant times managed and controlled by the Insurance Commissioner (sec. 4(2), *State Insurance Office Act 1975*). There is no evidence that the policy was ever cancelled. Regulation 309 of the *Workers' Compensation Regulations 1975* provided that a policy unless cancelled was deemed to be renewed. The certificate in the Schedule to the agreement tendered as part of the bank's evidence is evidence that the company had a policy of workers compensation with the Insurance Commissioner in December 1983: see *Walker v. Walker & Anor* (1937) 57 C.L.R. 630.

In respect of the period for which the Insurance Commissioner claims payment, the evidence is that the accounts of the company do not show any payments made in respect of workers compensation insurance. The cash payments journal which is ex. HJ before me covers the period from 18 November 1982 to 9 January 1984 and contains no entry relating to such a payment. The amounts of the claim have been checked by members of the liquidator's staff against the wages records of the company, have been found to be correct and the proof of debt has been admitted by the liquidator. I consider that this provides some evidence that the amount was due. The liquidator through his staff has provided a system to ascertain the amount due so as to enable the liquidator to decide whether to admit the debt or not and that system showed that the whole debt claimed should be admitted. I apply the principle explained by *Dixon* J. in *Potts v. Miller* (1940) 64 C.L.R. 282 at pp. 304-305 in the passage quoted by *Tadgell* J. in *Re Action Waste Collections Pty. Ltd. (in liq.); Crawford v. O'Brien & Ors* (1981) V.R. 691 at p. 704. In this case I do not rely on the evidence of the liquidator as showing more than the outcome of the examination by the system and the admission of the debt.

There are before me two notices from the State Insurance Office to the company seeking payment of the amounts due. The first, ex. HD, dated 19 June 1984, claims $9,827.18 as adjustment premium for the earlier period. The second, ex. HE, dated 6 September 1984, claims $38,060.50 as adjusted premium for the latter period. Both claims are made under policy No. G2117643E. The statement in the proof of debt, ex. HC, that the former amount is claimed under policy No. G2117643F

appears to be an error. Each of the notices seeking payment has attached to it a detailed analysis of the way in which the amount claimed as premium adjustment is calculated. I infer that each of the documents seeking payment and each attached analysis was prepared in the ordinary course of, and for the purpose of, the business of the State Insurance Office as demands upon the company for payment of amounts due. In the same way as the invoices referred to by *Tadgell* J. in *Re Action Waste Collections Pty. Ltd. (supra)* at p. 701, these notices and analyses record the financial transaction — the demand for payment — by the State Insurance Office and are to be treated as a book of account within sec. 58A of the *Evidence Act 1958*. The entries in them are therefore prima facie evidence of the matters, transactions and accounts recorded in them. See sec. 58B(a) and (b). They therefore provide prima facie evidence that the amounts claimed in them are due.

Apart from Mr Evans' evidence as to whether there was any workers compensation policy in existence at the relevant times there was no evidence placed before me suggesting that no amount was due or that there was any error in the amounts claimed by the State Insurance Office.

My confidence in inferring from the above evidence that the amounts claimed to be due from the company to the State Insurance Office are due, is buttressed by the fact that neither of the directors' wives was called as one would expect them to be called by the bank if they could give evidence to assist the bank on this issue.

In cross-examination Mr Taylor agreed that part of the debt due to the State Insurance Office may be in respect of wages paid after 4 January 1984. I do not need to consider whether premium in respect of such wages was owed on 4 January or not. The premium adjustment of $38,061 for the period 25 January 1983 to 5 January 1984 was claimed as a result of the actual wages exceeding the estimated wages by $258,585. Assuming that the adjusted premium included an amount in respect of the $12,394.34 owed as wages on 4 January I consider that reduction of the amount of premium adjustment to $36,000 would allow for this.

© 1988 CCH Australia Limited

Accordingly I am satisfied that on 4 January the company owed the Insurance Commissioner $45,827.18 ($9,827.18 + $36,000).

The result is that I am satisfied that immediately before the payment to the bank was made on 4 January the company was in a position where the following debts were due or would soon fall due:

| | |
|---|---|
| Bank overdraft | $30,891.75 |
| Bank fully drawn advance account | 26,847.00 |
| Wages | 12,394.34 |
| Commissioner of Taxation | 44,264.00 |
| Ordinary creditors | 24,057.00 |
| Finance companies | 16,613.09 |
| Repay loans to directors and wives | 49,604.00 |
| Insurance Commissioner | 45,827.18 |
| | $250,498.36 |

With assets capable of providing resources of no more than $183,971.44 I am satisfied that immediately before the payment to the bank the company was unable to pay its debts as they fell due from its own money.

*Whether a preference given*

It was argued for the bank that about $19,886.88 of the amount of $57,738.85 paid by the company to the bank on 4 January is not in any event to be regarded as a preference. When the branch manager, Mr Kay, was first informed by the directors on 21 September 1983 that the company had been approached by a multinational company to sell its business the overdraft limit was $5,000 but the actual overdraft including a cheque debited to the account that day was $11,004.87.

Mr Hayes argued that it was appropriate to find that Mr Kay on behalf of the bank had allowed the overdraft to rise to the level of $30,891.75 where it was on 4 January 1984, pursuant to an arrangement with the company. He put it that it was apparent to Mr Kay and the directors that the business could only be sold if it were kept operating and it could only be kept operating if the bank advanced the additional amount to it by way of overdraft. The contention was that the bank agreed to advance the additional amount only if the company agreed to repay that additional amount from the proceeds of sale, which the company agreed to do and ultimately did. I find that this agreement was made between the bank and the company.

It was part of a more extensive agreement to which I refer later.

For this argument reliance was placed in particular on *Richardson v. Commercial Banking Co. of Sydney Ltd.* (1951-1952) 85 C.L.R. 110. In that case a customer, who was a solicitor, had lodged with his bank, security worth £680 to secure an overdraft of that amount in his office account. On a number of occasions during the six months before his bankruptcy, when the account was overdrawn beyond the overdraft limit, he paid cheques into his account which had the effect of reducing the overdraft below this limit. The Official Receiver claimed that these payments which eliminated the unsecured portion of his overdraft were preferential payments to the bank. On each occasion he paid in the cheques under an arrangement by which the bank honoured cheques drawn by him to the extent that they were covered by the amounts he had paid in. Usually the payment in by the customer and the meeting of the customer's cheques by the bank occurred within the day.

The High Court rejected the Official Receiver's argument that by looking separately at the customer's payment which reduced his overdraft debt, and disregarding the bank's subsequent payment of cheques of a broadly equivalent amount, the customer's payments were to be regarded as preferences. The Court held that on each occasion the customer's payments did not have the effect of giving the bank a preference because the payments were an integral part of an entire transaction which, when carried out to its intended conclusion, would give the bank no preference over other creditors. The credits to the customer's account which followed the payments in were and were intended on each occasion to be followed by the debits resulting when the cheques he had drawn were met. The customer made his payment into the bank as part of a transaction which would at the end of the day leave the bank with much the same amount of debt owed to it by the customer. When the whole transaction was taken into account the customer had not made a payment to the bank.

In effect the decision establishes that it is not open to take a still snapshot view of the transaction as it appeared for a time after the payment in and before the cheques were met later in the day and regard that as amounting to a preferential payment.

The position is similar whenever a debtor confers on a creditor the financial advantage of a payment as part of a transaction in which the payment is made for the purpose of obtaining from the creditor a broadly corresponding financial advantage. The payment by the debtor is regarded as having the effect not of giving the creditor a preference over other creditors, but of obtaining from the creditor a comparable financial advantage for the debtor. The transaction is commonly the carrying out of an informal business arrangement. Typical examples of financial advantages obtained by debtors in this way are the payment of a debtor's cheques as in *Richardson's case* or the supply of further goods on credit to a debtor.

Mr Hayes argued that the principle applies in this case because there was a running account between the company and the bank and the impugned payment was made to the bank pursuant to an arrangement under which the bank agreed to pay cheques beyond the amount of the overdraft only in return for the company's agreement to pay off the increased amount of the overdraft from the proceeds of the sale of its business. He relied particularly on the statement by *Menhennitt* J. in *Calzaturificio Zenith Pty. Ltd. (in liq.) v. N.S.W. Leather & Trading Co. Pty. Ltd. (supra)* at p. 613 of the principle laid down in *Richardson's case* which *Menhennitt* J. regarded as applied by *Barwick* C.J. in *Queensland Bacon Pty. Ltd. v. Rees (supra)*:

> "... if you have a running transaction between two parties and you conclude in the case of a person trading that he would only supply goods on the basis, express or implied, that payments would be made [therefor], any payment made in respect of goods so supplied in response to that arrangement is not a preference because the reality is that if the person to whom the goods were supplied had not agreed to the arrangement, the goods would never have been supplied in the first instance at all, and the debtor would, therefore, not have any assets of that kind available for creditors generally in the event of a liquidation, and, accordingly, if the conclusion is that the goods would not have been forthcoming from the creditor unless there had been a promise of continuing payment, then, if that is the arrangement, any payment made in satisfaction of the supply of those goods is

not a preference for that basic reason." (See also at p. 614.)

In my opinion, while the transactions on which the bank seeks to rely in this case may be regarded as literally falling within the analogy of the words used by that learned Judge to express the principle, it does not satisfy the essence of the principle.

The essence of the principle in *Richardson's case* in my opinion has to be taken from that case. In *Queensland Bacon Pty. Ltd. v. Rees (supra)*, *Barwick* C.J. was of the opinion that that principle applied in some of the appeals before the Court, *Menzies* J. was of the opinion that it did not and *Kitto* J., the other member of the Court, expressed no opinion.

In my opinion the principle of *Richardson's case* is as I have outlined it above. I rely particularly on what the Court said at pp. 129 and 132 of the report in 85 C.L.R.

I consider that it is of importance that the payment made to the bank in this case on 4 January 1984 was not made to obtain and did not obtain for the company any corresponding financial advantage beyond the payment off of its debt. In my view it was in a similar position to the payment of £390 made after the purpose of the arrangement had ended, and held in *Richardson's case* to be a preference (see pp. 135-137).

An acceptance of the bank's argument would involve the abrogation of the notion of preference in many cases. Apart from circumstances of exceptional altruism, creditors agree to provide, and provide, the financial advantage which results in the debt, only in return for an agreement by the debtor to pay off the debt. That is so whether the financial advantage provided by the creditor is a payment to or on behalf of the debtor, a supply of goods to the debtor or takes another form.

With the greatest respect which I have for any opinion of *Menhennitt* J., I do not regard it as correct to apply the full import of his words, quoted above, to the facts of this case.

I consider that the principle of *Richardson's case* has no application in the present case.

I am satisfied that payment of the whole of the amount of $57,738.75 had the effect of giving the bank a preference over other creditors.

**© 1988 CCH Australia Limited**

*Good faith*

The only issue between the parties as to whether the bank was a payee in good faith of the challenged amount turns on the application of sec. 122(4)(c). The question is whether the applicant has established that the payment was made under such circumstances as to lead to the inference that the bank had reason to suspect:

(i) that the company was unable to pay its debts as they became due from its own money; and

(ii) that the effect of the payment would be to give the bank a preference over other creditors.

The question is an objective one and it is the circumstances under which the payment of $57,738.75 was made which must support the inferences mentioned although those circumstances include the bank's knowledge of earlier events (*Queensland Bacon Pty. Ltd. v. Rees (supra)* at pp. 292 and 303-304). It is not enough that the bank had reason to suspect that the company might be insolvent: the bank must have had reason to have an actual apprehension or fear that the company was unable to pay its debts as they became due and that the payment would give the bank a preference over other creditors: the *Queensland Bacon case* at pp. 291-292 and 303-304.

The evidence is that it was Mr Kay, the bank manager, who acted on behalf of the bank and whose knowledge is to be treated as the knowledge of the bank. Evidence as to his knowledge comes mainly from his affidavit, his oral evidence, the manager's diary notes (ex. HN) and the affidavit and evidence of Mr Evans.

Mr Kay knew in September 1983 that a multinational company was negotiating to purchase the company's business. Under a covering letter of 19 October from Kennedy and Courtney, the accountants of the company, he received a copy of the interim statement and balance sheet for the year ended 30 June 1983. The letter included this paragraph:

"The accounts do not reflect the effect of the Downtown Esso operation which traded at an estimated $50,000 loss, this factor would need to be recognised by you in evaluating the future viability of the company. Please bear in mind that the security business is [on] offer to M.S.S. at

an attractive price, and if the sale proceeds, the company will then be in a position to clear its financial commitments."

On 26 October he learnt that the sale price would be approximately $200,000. At about this time he was informed by the directors that the moneys from the sale would pay all the creditors and leave each of the two directors with $50,000 to $80,000. By 28 November he was aware that the price offered had been reduced to $125,000.

On a number of occasions Mr Kay's experience with the directors of the company would have indicated to a reasonable person that their optimism as to their financial expectations went far beyond their reasonable expectations. This is shown by the entries in ex. HN.

When Mr Kay received the letter and interim financial statements from Kennedy and Courtney he had a quick glance at the balance sheet. He looked at the shareholders' funds which showed a deficiency of $9,087. Mr Kay did not notice that the interim balance sheet, while including the bank overdraft in current liabilities, did not mention the fully drawn loan account. The directors had given an unlimited guarantee to the bank of the amounts owed by the company. This may explain the lack of close attention which Mr Kay gave to the interim financial statements but the information in them was information which he had received even if he did not read it.

I examine what a reasonable person in Mr Kay's position would have known immediately before the payment if attention had been turned to all the information available to Mr Kay.

As to assets it would have been known that the company had the cheque from the purchaser of the business and the other cheques paid in on 4 January. Before receiving the payment Mr Kay was told by the directors that the company was owed approximately $50,000 by various debtors. In the interim balance sheet there were items "Deposits $1,650", "Sundry debtors $24,243" and "Petty cash $100".

As to liabilities the amounts of the bank overdraft and fully drawn advance account were known. Mr Kay had erroneously been informed that the purchaser of the business had retained the sum of $23,000 from the purchase price to pay outstanding wages, so it would be

reasonable for a person in his position to conclude that nothing was owed for wages. Before the payment was made on 4 January Mr Kay was told by the directors for the first time that the company owed the Commissioner of Taxation approximately $45,000 for group tax deducted from salaries and wages but not paid on. The trade creditors shown in the interim balance sheet amounted to $30,830 and there was no information to indicate a radical change in the position so it would have been reasonable to infer that an amount of the order of the $24,057 actually owing would have been owing on 4 January. I do not consider there was any information before Mr Kay to indicate that an amount of about $16,000 would become due to finance companies. The interim balance sheet showed long-term liabilities amounting to $34,604 to the directors and their wives for loans. Mr Kay had no information from any source at the relevant time, of the sum owing to the Insurance Commissioner.

Mr Kay had received information indicating that following the sale the affairs of the company would be wound up. On 8 December 1983 he was informed by the national sales manager of M.S.S., whom he had telephoned for information, that after the sale that company would be giving both directors a job.

I mention the way I have approached some of the items shown on the interim balance sheet included in ex. HM. In *Queensland Bacon Pty. Ltd. v. Rees (supra)* at p. 292 *Barwick* C.J. emphasised that in the application of the earlier section corresponding to sec. 122(4)(c) of the *Bankruptcy Act* it could not be said that a creditor had reason to suspect a state of affairs actually to exist which according to the trial Judge's finding did not exist. By application to that principle I have taken the higher figure when an asset on 4 January was higher in value than a person in Mr Kay's position would have known and the lower figure when a liability on that date was higher than the person would have known. Thus I have with respect to assets taken the amounts of deposits as $2,845 (instead of $1,650) and sundry debtors at $31,237 (instead of $24,243). I have taken the liability to repay loans to directors and their wives as $34,604 instead of $49,604. I disregard the item "Other Creditors $10,485" shown in ex. HM as I am not satisfied it represented a liability of the company.

A person in the position of Mr Kay would have had the following knowledge of the financial position of the company immediately before the impugned payment was made:

| | |
|---|---:|
| *Assets* | |
| Cheque from purchaser of business and assets | $102,051.71 |
| Other cheques | 8,502.73 |
| Trade debtors | 50,000.00 |
| Deposits | 2,845.00 |
| Sundry debtors | 31,237.00 |
| Petty cash | 100.00 |
| | $194,736.44 |
| | |
| *Liabilities* | |
| Bank overdraft | $ 30,891.75 |
| Bank fully drawn advance account | 26,847.00 |
| Commissioner of Taxation | 44,264.00 |
| Ordinary creditors | 24,057.00 |
| Repay loans to directors and wives | 34,604.00 |
| | $160,663.75 |

On the information available to Mr Kay, including the assurance given by the directors immediately before the payment on 4 January that the company could pay all its debts out of the proceeds of sale, I am not satisfied that a reasonable person would have had an actual apprehension or fear that the company was unable to pay its debts as they became due. In reaching that conclusion I am not overlooking that information from one of the directors on 27 October as to the surplus expected by them, when compared with the reduction in price and the later disclosed debt to the Commissioner of Taxation, indicated a deficit of $2,000. I discuss that indicated deficit later.

As it was only through the application of sec. 122(4)(c) that the applicant sought to challenge the claim of the respondent to be a payee in good faith, and that challenge has failed, I am satisfied that the bank received the payment in good faith.

*Ordinary course of business*

The authorities establish that a transaction may be not in the ordinary course of business if it, or the form which it takes, does not accord with ordinary business practice. *Downs Distributing Co. Pty. Ltd. v. Associated Blue Star Stores Pty. Ltd. (in liq.)* (1948) 76 C.L.R. 463; *Calzaturificio Zenith Pty. Ltd. (in liq.) v. N.S.W. Leather & Trading Co. Pty. Ltd. (supra)*

**© 1988 CCH Australia Limited**

SC (Vic.)        **Taylor v. A.N.Z. Banking Group Ltd.** (*McGarvie* J.)        **823**

and *Re Supreme Finance Corporation Pty. Ltd.*
(1984) 2 ACLC 529 provide examples. There
are differences in the judgments as to whether
payments, made after cheques for the amounts
have been dishonoured and steps taken to
enforce payment, are made in the ordinary
course of business (*Re Cummins (t/a Nam
Constructions); Ex parte Harris and Another v.
A.R.C. Engineering Pty. Ltd.* (1985) 66 A.L.R
129 at p. 136).

In the present case there was nothing
necessarily inherent in the transaction between
the company and the bank, or the form it took,
which would preclude the payment to the bank
from being treated as made in the ordinary
course of business. Where a bank allows a
trader an increasing overdraft to enable the
trader to continue until a business is sold, the
circumstances may be such that the payment to
the bank of the proceeds of sale is made in the
ordinary course of business. *Re Beatty: Ex parte
Bank of New South Wales and Melsom* (1964) 20
A.B.C. 97 was such a case.

I consider that the authorities also establish
that a transaction, which in nature and form
complies with ordinary business practice, is
nevertheless not in the ordinary course of
business if the reason for its being effected is a
reason other than an ordinary business reason.
One example of a transaction which, on that
basis, is not in the ordinary course of business,
is one which is effected because of the
existence or apprehension of insolvency of the
debtor.

In my opinion the test for whether a payment
is made in the ordinary course of business is
that stated by *Rich* J. in *Downs Distributing Co.
Pty. Ltd. v. Associated Blue Star Stores Pty. Ltd.
(supra)* at pp. 476-477 as applied in later
judgments. *Rich* J. said of the expression
"ordinary course of business" as used in the
earlier equivalent section of the *Bankruptcy Act*
that:

"It is an additional requirement and is
cumulative upon good faith and valuable
consideration. It is, therefore, not so much a
question of fairness and absence of
symptoms of bankruptcy as of the everyday
usual or normal character of the transaction.
The provision does not require that the
transaction shall be in the course of any
particular trade, vocation or business. It
speaks of the course of business in general.

But it does suppose that according to the
ordinary and common flow of transactions
in affairs of business there is a course, an
ordinary course. It means that the
transaction must fall into place as part of the
undistinguished common flow of business
done, that it should form part of the
ordinary course of business as carried on,
calling for no remark and arising out of no
special or particular situation.''

It is appropriate to read with that statement
of the test the statement of *Williams* J. in the
same case. He said of the expression "in the
ordinary course of business":

"that the expression refers to a transaction
into which it would be usual for a creditor
and debtor to enter as a matter of business in
the circumstances of the particular case
uninfluenced by any belief on the part of the
creditor that the debtor might be insolvent''.
(p. 480)

The case which provides authority as to the
practical application of the test is *Taylor &
Anor v. White & Anor* (1964) 110 C.L.R. 129.
A husband and wife were the sole shareholders
and directors of a building company. Acting as
the attorney under power of her mother, the
wife lent $4,000 of the mother's money at
interest to the company on terms that the
principal sum would be repaid within six
months of a demand for it. The mother became
senile and the wife was concerned to replenish
the mother's bank account to enable medical
and nursing expenses to be paid. At the
suggestion of her husband the wife made a
written demand on 30 January 1959 for
repayment of the loan. The company repaid
$500 on 8 April, $500 on 17 June, $500 on 20
June and the balance of $2,500 on 30 July. The
first payment of $500 was made at the wife's
request but she made no request for the three
later payments.

From April onwards the company was unable
to pay its debts as they became due out of its
own money. The husband, who managed the
company, knew that the company was in
difficulties but hoped that they might be
surmounted and was aware that builders move
in and out of financial difficulties. It was not
until 20 July that he realised the company was
insolvent. The wife knew the company was
experiencing difficulties, hoped they would be
overcome and did not know until 3 August that

**824**      **Taylor v. A.N.Z. Banking Group Ltd.** (*McGarvie* J.)      **(1988) 6 ACLC 808**

the company was insolvent. The trial Judge found that the husband made the last two payments with the intention of preferring his wife's mother over the other creditors. On 17 August the company resolved to go into voluntary liquidation.

The trial Judge held that each of the payments was made in the ordinary course of business. The Full Court of the Supreme Court of Queensland upheld an appeal by the liquidators as to the last three payments which had been made before their due date without request for early payment. There were two considerations relied on by the Full Court in reaching its decision that these payments were not made in the ordinary course of business. One was that the payments were made for family rather than business reasons. The other that the payments were made to avoid the consequences of possible insolvency. *Hart* J. after quoting the statement of the test by *Rich* J. which is set out above, said:

> "it seems to me that this transaction does not fall into place as part of the undistinguished common flow of business done; that it does not form part of the ordinary course of business as carried on to deliberately give a preference to a member of a man's own family, and that deliberately giving such a preference does call for remarks and does call for special and particular attention and does arise out of a particular situation." *(Re E.J. Taylor & Sons Pty. Ltd. (in vol. liq.)* (1963) Qd.R. 284 at pp. 296-297.)

The High Court, *Kitto* J. dissenting, upheld the decision of the Full Court.

*Dixon* C.J. said at p. 136:

> "The time-honoured phrase 'in the ordinary course of business' is meant to refer to transactions regularly taking place in a sustained course of activity or some usual process naturally passing without examination."

He mentioned that the history of provisions relating to preference substantially begins with an attempt to invalidate transactions made in contemplation of bankruptcy or insolvency and calculated to disturb the rateable distribution of the debtor's assets or their proceeds which the law designed. He referred to the distinction drawn by Lord *Mansfield* between an act which

was a fraudulent contrivance with a view to defeat the bankruptcy laws and one done in "the common course of business" (pp. 136-137).

*Dixon* C.J. saw the transaction as:

> "a family transaction in which a son-in-law, with the help of his wife, decided to borrow money from his mother-in-law for his company and then attempted to effect its repayment in the face of approaching disaster." (p. 136)

He concluded:

> "Here it is plain that Mrs Taylor thought her husband ought to secure enough money out of that lent by her mother to carry on the fragile life of the old lady, and the husband apparently took the additional view that she should not share in the disaster which overshadowed him. I can see no ordinary course of business in this." (p. 137)

*Dixon* C.J. thus took a view similar to that of the Full Court that because the payments were part of a family transaction and because they were made so as to remove from the mother the risk of the apprehended financial disaster, they were not made in the ordinary course of business.

I regard the judgment of *Taylor* J. as proceeding on a similar basis. It strongly makes the point that it is not enough, in deciding whether a transaction is in the ordinary course of business, to investigate only whether the transaction or the form which it takes is in accordance with ordinary business practice. He started by noting that where the concept of whether a payment was made in the ordinary course of business was used in the application of English bankruptcy law:

> "the test was whether the transaction had found its origin in and was accounted for by ordinary business considerations." (p. 150)

*Taylor* J. criticised the decision of the trial Judge. He said:

> "the learned trial judge seems to have thought that a payment must be taken to have been made in the ordinary course of business unless the payment, considered entirely apart from the circumstances which have induced it, exhibits at the time some unusual feature."

© 1988 CCH Australia Limited

SC (Vic.)    **Taylor v. A.N.Z. Banking Group Ltd.** (*McGarvie* J.)    **825**

Then he quoted from the judgment of the trial Judge and said that the trial Judge had made an adaption of the statement of *Rich* J., quoted above, that:

"It means that the transaction must fall into place as part of the undistinguished common flow of business done, that it should form part of the ordinary course of business as carried on, calling for no remark and arising out of no special or particular situation."

*Taylor* J. then said:

"But this means no more and no less than that the transaction will be taken to have been in the ordinary course of business if after examination of the circumstances in which it took place it is found to possess these characteristics."

Having examined the circumstances and referred to the fundamental position of the company, the payments having been made to the wife's mother and the intention regarding the last two payments to prefer her over the other creditors, *Taylor* J. said (at p. 154) that it was:

"impossible to say that they 'fall into place as part of the undistinguished common flow of business done' [(1948) 76 C.L.R. at p. 477]. Nor do they appear in the language of *Gavan Duffy* C.J. and *Starke* J. in *Robertson v. Grigg* (1932) 47 C.L.R. 257 at p. 268, as 'what a man might do without having any bankruptcy in view'."

The whole thrust of *Taylor* J.'s judgment was that it was insufficient merely to investigate whether there was anything unusual about the nature and form of the payments and it was necessary to look at the circumstances in which they were made. Read in that context, I think that in the passage last quoted, he meant that because the payments were made for family reasons and so as to avoid the risk of the financial failure of the company, they did not fall within the description of either of the passages which he quoted.

The views of *Menzies* J. (pp. 159-161) and *Windeyer* J. (p. 161) appear to me to be consistent with the views of *Dixon* C.J. and *Taylor* J. The statement by *Menzies* J. that the payments were in the ordinary course of business if the parties were, with regard to them, "acting in accordance with the standards of honesty and fairness which are ordinarily

accepted by the business community" are to be understood in their context. He was referring, I think, to honesty and fairness in terms of acting so as not to frustrate the distribution of assets for which the law provides in the case of bankruptcy or insolvency.

Under the test of *Rich* J. a payment is not made in the ordinary course of business if it arises from a "special or particular situation". It follows from *Taylor v. White* that a payment which originates from and is accounted for by the presence or fear of insolvency arises from a special or particular situation and not from ordinary business considerations.

Whether a payment is made in the ordinary course of business is basically a question of fact, determined by applying the test to the facts disclosed by the evidence (*Re E.J. Taylor & Sons Pty. Ltd. (in vol. liq.) (supra)* at p. 296). The existence or fear of insolvency may be regarded in a particular case as having induced the making of a payment where it led the debtor to choose to make the particular payment or the creditor to procure its making. *Kyra Nominees Pty. Ltd. (in liq.) v. National Australia Bank Ltd.* (1986) 4 ACLC 402 and *Taylor v. White* (1964) 110 C.L.R. 129 are examples of the first situation. *Re Dunemann; Ex parte the Trustee* (1935) 8 A.B.C. 148 is an instance of the second. The circumstances which may lead to the making of a payment other than in the ordinary course of business are infinite.

In the present case the evidence does not establish that on 4 January 1984 either the directors of the company or the bank manager knew that the company was insolvent. It does establish that both the directors and the bank manager feared that the company might be insolvent. It was that fear that led the company to make and the bank to insist on the making of the payment at the time and in the manner in which it was made.

The evidence is that the directors believed that upon receipt of the proceeds of the sale of the business they could pay off all the company's debts. There was a high component of hope and an unusual absence of direct knowledge involved in their assessment of the position. As Mr Evans said in evidence, their belief was based on what their wives, who controlled the books, told them as to how the company stood. There is nothing to indicate they were provided with any written interim

statements. An examination of ex. HN, the bank manager's diary, shows that over the months before settlement of the sale of the business, their business and financial expectations had to a very substantial degree been disappointed on many occasions. Mr Evans' evidence was that it was because they believed, from what their wives had told them, that the price of $125,000 would cover all their debts and outgoings that they accepted that price. In the circumstances they had no realistic option but to accept it.

The position on 4 January was that the directors had guaranteed to the bank the money owed to it by the company. The liability under those guarantees and the debts owed by the directors and their wives to the bank were all secured by mortgages on properties owned by the directors and their wives and valued for the bank on about 21 October 1983 at $65,455 and $56,300 respectively.

Mr Evans in cross-examination said he was aware that the amount owed to the Commissioner of Taxation for group tax was a priority debt. He agreed that the directors paid the bank before they paid the Commissioner because they wanted to get rid of their personal responsibilities and those of their wives to the bank.

The fact that the impugned payment was part of a payment in which the company also paid off the debts of the directors and their wives to the bank is relevant in considering the reasons which led to the making of the impugned payment (*Re E.J. Taylor & Son Pty. Ltd. (in vol. liq.) (supra)* at pp. 295 and 298.)

In some cases it may be regarded as the natural course for a trader receiving cheques to deposit them with its bank for collection. In this case the directors went beyond that. They gave the bank written instructions to apply the proceeds of the cheques so as to clear the company's overdraft, and so as to pay the bank the amounts of the company's fully drawn loan account and of the directors' and their wives' personal loans, and these things were done. If the directors had desired not to give a preference to the bank, there were ways in which they could have obtained the proceeds, or most of the proceeds, of the cheques the company had on 4 January, other than lodging them with the respondent bank.

I find that the main reason for the directors agreeing to make and making all those payments was to avoid the risk of the company being unable to pay its debts and of liabilities to the bank falling on the directors and their wives and their mortgaged properties as a result.

The bank manager Mr Kay had formed a favourable opinion of the directors of the company. However, as his diary shows, assuming they were honest and hard working, their ability to achieve their business expectations and their control and understanding of the company's affairs was unimpressive. Mr Kay had had difficulty in getting financial statements of the company, placed little reliance on the interim statements he received in October 1983 and made no attempt to obtain and did not receive final statements. The company's account with the bank had been a troublesome one. He relied primarily on what the directors told him from time to time. Just before the impugned payment was made he learnt for the first time that the company owed approximately $45,000 to the Commissioner of Taxation. He must have wondered what other debts there were of which he had not been told. He had been told on 27 October 1983 by Mr Birrell that on the offered sale price of $200,000 to $250,000 there would be sufficient to pay all the creditors of the company and he was confident there would be a surplus for the directors and shareholders. He was told the two directors expected to end up with $50,000 to $80,000 each. Mr Kay would have inferred that he was being told that the surplus could be as low as $100,000 if the sale price was $200,000. By 4 January 1984 the price had been reduced by $75,000 (from $200,000 to $125,000) and he had been told of the previously undisclosed debt of $45,000 to the Commissioner of Taxation. On the basis of what he had been told on 27 October, that indicated a deficiency of $2,000. In the circumstances Mr Kay must have thought that the company on that date might be insolvent and I find that he did.

Mr Kay said frankly that he saw clearance of the debts to the bank as his first and only responsibility and his main concern. It would not have been in his interest or that of the bank for the bank to have lost money on the transactions. Although the debts to the bank from the company were the subject of unlimited guarantees by the directors and were adequately

© **1988 CCH Australia Limited**

covered by security, both Mr Kay and the bank had a strong preference to have the moneys repaid by the company rather than to have the guarantees or securities enforced.

It was on 21 September 1983 that Mr Kay was first informed of the prospect of the sale of the business. His diary entry of that conversation states "All debts to the bank would clear". In his affidavit Mr Kay says that the amount of $19,886.88 advanced to the company between that date and 4 January 1984 was advanced to maintain the company's business and goodwill so as to ensure a reasonable and prompt settlement of the proposed sale and would not have been advanced other than in contemplation of the sale of the business.

In his diary on 7 November 1983 Mr Kay wrote:

"I am satisfied with integrity of Directors and that these funds will not be directed elsewhere."

On 8 December, having set out the current position of the company, Mr Kay wrote:

"With this in mind and as Directors can be relied on to direct these funds to us on receipt (they have in similar instances in the past) I am willing to pay wages (all up about $11,000) so that they can hold their staff (one walked out yesterday anyway) and continue to service their round until MSS takes over. If they don't, the sale could fall through as they would lose their client base (and value of goodwill)."

In the circumstances the obvious inference is that on 21 September 1983 and later, the bank agreed to advance additional amounts of money to the company and the company agreed out of the proceeds of the sale to clear all debts to the bank. I find there was that agreement. This finding goes further than the finding I made earlier regarding the advance of the sum of $19,886.88.

I am satisfied that Mr Kay insisted throughout that the directors comply with what was at least the moral obligation of this agreement and that the directors did so on 4 January 1984 when the payments were made. I find that Mr Kay insisted on this because of his fear that the company might be insolvent and the bank not fully paid.

It follows from my findings that I find that the fear that the company might be insolvent led the company to make the impugned payment when it did instead of payments to other creditors and led the bank to procure that payment to be made to it. For both these reasons the payment was not made in the ordinary course of business.

*Result*

The result is that the impugned payment is void as a preference.

There will be:

1. A declaration that the payment of $57,738.75 by Sleejac Pty. Ltd. (in liq.) (then named Downtown Security Co. Pty. Ltd.) to the respondent, Australia and New Zealand Banking Group Ltd., on 4 January 1984 is, as against the applicant liquidator, Barry Keith Taylor, void as a preference.

2. An order that the respondent pay the applicant $57,738.75.

[Discussion ensued re costs]

There will be an order that the respondent pay the applicant's costs and interest and the amount of the interest will be an amount to be notified by a memorandum to my Associate signed by the legal representatives of both parties.

Costs to include all reserved costs.

---

**Re Barrier Reef Finance and Land Pty. Ltd.**
**Supreme Court of Queensland. Judgment handed down 7 June 1988.**

*Companies — Garnishee orders against company after commencement of winding up — Whether garnishee orders incompetent — Companies (Queensland) Code, sec. 364(2)(a) and 368(3).*

**This was an application by A to wind up Barrier Reef Finance and Land Pty. Ltd. ("the company") upon the company's failure to comply with a demand for $35,000 under sec. 364 of the Companies Code.**

# TAB 88

London Joint Stock Bank v Simmons, 1892 WL 9527 (1892)

<table>
<tr><td>

**London Joint Stock Bank v Simmons**

Also known as:

</td><td>

Simmons v London Joint Stock Bank
House of Lords
04 April 1892

**Case Analysis**

</td></tr>
</table>

| | |
|---|---|
| **Where Reported** | [1892] A.C. 201 |
| **Case Digest** | **Subject:** Banking and finance |
| | **Keywords:** Brokers; Fraud; Good faith; Negotiable instruments |
| | **Judge:** Lord Halsbury LC |
| **Appellate History** | Court of Appeal |
| | **London Joint Stock Bank v Simmons** [1891] 1 Ch. 270 |
| | **Reversed by** |
| | House of Lords **London Joint Stock Bank v Simmons** [1892] A.C. 201 |
| **Cases Cited** | **Earl of Sheffield v London Joint Stock Bank Ltd** (1888) 13 App. Cas. 333 HL |
| | **Goodwin v Robarts** (1875-76) L.R. 1 App. Cas. 476 HL |
| | **Fletcher v John Heath and Others** 108 E.R. 815; (1827) 7 B. & C. 517 KB |
| | **Isaac Cooke & Sons v Eshelby** (1887) L.R. 12 App. Cas. 271 HL |
| | **Gorgier v Mieville** 107 E.R. 651; (1824) 3 B. & C. 45 KB |
| | **Raphael v Bank of England** 139 E.R. 1030; (1855) 17 C.B. 161 |

London Joint Stock Bank v Simmons, 1892 WL 9527 (1892)

CCP

**R. v The Bishop of Peterborough**
107 E.R. 652; (1824) 3 B. & C. 47
KB

**Gill v Cubitt**
107 E.R. 806; (1824) 3 B. & C. 466
KB

**Down v Halling**
107 E.R. 1082; (1825) 4 B. & C. 330
KB

**Cases Citing This Case**

**Considered**
Bank of Cyprus (London) v Jones
 (1984) 134 N.L.J. 522
QBD

Lamonby v Arthur G Foulds Ltd
1928 S.C. 89; 1928 S.L.T. 42
IH (1 Div)

Thomson v Clydesdale Bank Ltd
[1893] A.C. 282; (1893) 20 R. (H.L.) 59;
(1893) 1 S.L.T. 111
HL

Cuthbert v Robarts Lubbock & Co
[1909] 2 Ch. 226
CA

Bryce v Ehrmann
(1904) 7 F. 5; (1904) 12 S.L.T. 378
IH (2 Div)

AL Underwood Ltd v Bank of Liverpool and
Martins
[1924] 1 K.B. 775
CA

Clutton v George Attenborough & Son
[1895] 2 Q.B. 306
QBD

Venables v Baring Bros & Co

[1892] 3 Ch. 527
Ch D


Lipkin Gorman v Karpnale Ltd
[1991] 2 A.C. 548; [1991] 3 W.L.R. 10;
[1992] 4 All E.R. 512; (1991) 88(26)
L.S.G. 31; (1991) 141 N.L.J. 815; (1991)
135 S.J.L.B. 36; Times, June 7, 1991;
Independent, June 18, 1991; Financial
Times, June 11, 1991; Guardian, June 13,
1991
HL


Karak Rubber Co Ltd v Burden (No.2)
[1972] 1 W.L.R. 602; [1972] 1 All E.R.
1210; [1972] 1 Lloyd's Rep. 73; (1971) 115
S.J. 887
Ch D


Reckitt v Barnett Pembroke & Slater Ltd
[1928] 2 K.B. 244
CA


Mercantile Bank of India Ltd v Central
Bank of India Ltd
[1938] A.C. 287
PC (Ind)


Mitchell v Heys & Sons
(1894) 1 S.L.T. 590
IH (1 Div)


Lipkin Gorman v Karpnale Ltd
[1989] 1 W.L.R. 1340; [1992] 4 All E.R.
409; [1989] B.C.L.C. 756; [1989] Fin. L.R.
137; (1990) 87(4) L.S.G. 40; (1989) 139
N.L.J. 76; (1990) 134 S.J. 234; Times,
November 19, 1988; Independent, October
17, 1988; Financial Times, October 19,
1988; Daily Telegraph, October 28, 1988;
Official Transcript
CA (Civ Div)


Wilmington Trust Co v Rolls Royce Plc
[2011] CSOH 151; Official Transcript
OH


Auchteroni & Co v Midland Bank Ltd
[1928] 2 K.B. 294
KBD

Laird v Bank of Scotland
1910 S.C. 1095; 1910 2 S.L.T. 126
IH (1 Div)


Fuller v Glyn Mills Currie & Co
[1914] 2 K.B. 168
KBD


Molyneux v Hawtrey
[1903] 2 K.B. 487
CA


Bechaunaland Exploration Co v London
Trading Bank Ltd
[1898] 2 Q.B. 658
QBD (Comm)


George Attenborough & Son v Solomon
[1911] 2 Ch. 159
Ch D


Bentinck v London Joint Stock Bank
[1893] 2 Ch. 120
Ch D


Manchester Trust v Furness
[1895] 2 Q.B. 539
CA


Macmillan Inc v Bishopsgate Investment
Trust Plc (No.3)
[1996] 1 W.L.R. 387; [1996] 1 All E.R.
585; [1996] B.C.C. 453; (1995) 139
S.J.L.B. 225; Times, November 7, 1995;
Independent, December 11, 1995
CA (Civ Div)


Powell v London and Provincial Bank
[1893] 1 Ch. 610
Ch D


Gillies v Craigton Garage Co
1935 S.C. 423
IH (1 Div)

London Joint Stock Bank v Simmons, 1892 WL 9527 (1892)

Weiner v Gill
[1905] 2 K.B. 172
KBD

National Bank of Scotland v National Bank of Scotland
(1895) 3 S.L.T. 51
IH (1 Div)

John T Ellis Ltd v Hinds
[1947] K.B. 475; [1947] 1 All E.R. 337;
(1947) 80 Ll. L. Rep. 231; 63 T.L.R. 181;
[1947] L.J.R. 488; 176 L.T. 424; (1947) 91
S.J. 68
KBD

Bank of Scotland v Crerar
1921 S.C. 736; 1921 2 S.L.T. 112
IH (1 Div)

Midland Bank Ltd v Reckitt
[1933] A.C. 1
HL

Robinson v Montgomeryshire Brewery Co
[1896] 2 Ch. 841
Ch D

Smith v Prosser
[1907] 2 K.B. 735
CA

Vinden v Hughes
[1905] 1 K.B. 795
KBD

Scottish Widows Fund Life Assurance
Society v Farmer (Surveyor of Taxes)
1909 S.C. 1372; 1909 2 S.L.T. 255
IH (1 Div)

**Books**                          **Bowstead & Reynolds on Agency 20th
                                   Ed. Incorporating First Supplement**

London Joint Stock Bank V Simmons, 1892 WL 9527 (1892)

Chapter: Chapter 8 - Relations Between
Principals and Third Parties

Documents: Section 1. - Contract

**Bowstead & Reynolds on Agency 20th
Ed. Incorporating First Supplement**

Chapter: Chapter 8 - Relations Between
Principals and Third Parties

Documents: Section 2. - Dispositions of
Property and Restitutionary Claims

**Bowstead & Reynolds on Agency 20th
Ed.**

Chapter: Chapter 8 - Relations Between
Principals and Third Parties

Documents: Section 1. - Contract

**Bowstead & Reynolds on Agency 20th
Ed.**

Chapter: Chapter 8 - Relations Between
Principals and Third Parties

Documents: Section 2. - Dispositions of
Property and Restitutionary Claims

**Byles on Bills of Exchange and
Cheques 29th Ed.**

Chapter: Chapter 7 - Liability on a Bill

Documents: Requirement of a Signature

London Joint Stock Bank V Simmons, 1892 WL 9527 (1892)

**Byles on Bills of Exchange and
Cheques 29th Ed.**


Chapter: Chapter 18 - Rights of parties


Documents: Holder in Due Course


**Byles on Bills of Exchange and
Cheques 29th Ed.**


Chapter: Chapter 18 - Rights of parties


Documents: Holder for Value


**Chitty on Contracts 32nd Ed.
Incorporating First Supplement**


Chapter: Chapter 33 - Bailment


Documents: Sub-section (i) - Pledge at
Common Law


**Chitty on Contracts 32nd Ed.
Incorporating First Supplement**


Chapter: Chapter 34 - Bills of Exchange
and Banking


Documents: Sub-section (a) - The Nature
of Negotiable Instruments


**Chitty on Contracts 32nd Ed.
Incorporating First Supplement**

London Joint Stock Bank V Simmons, 1892 WL 9527 (1892)

Chapter: Chapter 34 - Bills of Exchange
and Banking

Documents: Sub-section (iii) - Travellers'
Cheques

**Chitty on Contracts 32nd Ed.**

Chapter: Chapter 33 - Bailment

Documents: Sub-section (i) - Pledge at
Common Law

**Chitty on Contracts 32nd Ed.**

Chapter: Chapter 34 - Bills of Exchange
and Banking

Documents: Sub-section (a) - The Nature
of Negotiable Instruments

**Chitty on Contracts 32nd Ed.**

Chapter: Chapter 34 - Bills of Exchange
and Banking

Documents: Sub-section (iii) - Travellers'
Cheques

**Dicey, Morris & Collins 15th Ed.**

Chapter: Chapter 33 - Particular Contracts

Documents: Section 12 - Negotiable and
Financial Instruments

London Joint Stock Bank V Simmons, 1892 WL 9527 (1892)

**Gloag and Henderson: The Law of
Scotland 13th Ed.**

Chapter: Chapter 12 - Supply of Goods

Documents: Chapter 12 - Supply of Goods

**Gloag and Henderson: The Law of
Scotland 13th Ed.**

Chapter: Chapter 18 - Agency

Documents: Chapter 18 - Agency

**Gloag and Henderson: The Law of
Scotland 13th Ed.**

Chapter: Chapter 32 - Moveable Property:
Incorporeal

Documents: Chapter 32 - Moveable
Property: Incorporeal

**Goff & Jones The Law of Unjust
Enrichment 9th Ed.**

Chapter: Chapter 29 - Bona Fide Purchase
and Good Consideration

Documents: Section 2. - Bona Fide
Purchase as a Method of Acquiring Clear
Legal Title to Property

**Palmer's Company Law**

Chapter: Chapter 6.6 - Security Interests in
Shares

Documents: 6.606 Creation

**Phipson on Evidence 18th Ed.
Incorporating First Supplement**

Chapter: Chapter 16 - Physical Conditions,
States of Mind and Emotions

Documents: Sub-section (e) - Good and
bad faith

**Phipson on Evidence 18th Ed.**

Chapter: Chapter 16 - Physical Conditions,
States of Mind and Emotions

Documents: Sub-section (e) - Good and
bad faith

**The Law of Personal Property 1st Ed.**

Chapter: Chapter 31 - Negotiation of
Documentary Intangibles

Documents: Mere holders, holders for
value and holders in due course

1892 WL 9527

© 2017 Sweet & Maxwell

---

**End of Document**                                                                 © 2017 Thomson Reuters.

# TAB 89

**P.**                        PROBATE DIVISION.                        **181**

Such an inspection in the present case would show, and did show,
that the applicant for the writ, the appellant, had been a party
to, and was bound by, the judgment of Rees J. in 1962 pro-
nouncing in favour of the force and validity of the will and
codicil of 1949 and 1951, which, by the indorsement on his pro-
posed new writ, the appellant was seeking again to challenge.
The file would also show that, at the time of the 1957 action,
the appellant knew of the interest of his mother's estate in the
estate of the testatrix, which he alleges in the indorsement on
the proposed writ. It would, therefore, be apparent to the
registrar that, if the writ were issued, it could immediately be
struck out as an abuse of the process of the court. Since, for the
reasons given, he was in my view exercising a quasi-judicial
function in determining whether the writ should issue or not, it
was not in my view necessary for him to go through the barren
form of authorising its issue. The court's inherent jurisdiction
to prevent abuse of its process attaches at the earliest moment at
which an officer of the court is called upon to exercise a judicial
discretion. In fact, as he was entitled to, the registrar referred
the matter to Faulks J., who exercised the inherent jurisdiction
of the court by refusing to allow the writ to issue. I would
therefore also dismiss the second appeal.

C. A.

1964

LANGTON,
DECD., *In the
Estate of.*

Diplock L.J.

> *Appeals dismissed with costs, payable
> by the appellant personally together
> with the costs reserved by Faulks J.
> Leave to appeal to House of Lords
> refused.*

Solicitors: *Baker & Nairne.*

C. J. E.

---

THODAY *v.* THODAY.

*Estoppel—Per rem judicatam—Divorce—Desertion plea after cruelty
    suit—Wife's cruelty petition dismissed—Similar allegations raised
    as defence to husband's desertion petition—Whether wife estopped
    from repeating cruelty allegations — Application to strike out —
    Principles applicable.*
*Husband and Wife — Divorce — Pleading — Striking out — Estoppel —
    Desertion plea after dismissal of cruelty suit.*

C. A.

1963
Dec. 17,
18, 19.

Willmer,
Pearson and
Diplock L.JJ.

In December, 1959, a wife petitioned for a divorce on the
ground of the husband's cruelty throughout their matrimonial life

182                    PROBATE DIVISION.                [**1964**]

C. A.

1963

THODAY
*v.*
THODAY.

from 1937 until the wife left the husband shortly before the presentation of the petition. At the trial in January, 1961, the husband did not go into the witness box, his counsel electing to stand upon a submission that the wife had not made out a case of cruelty. In a reserved judgment in March, 1961, Collingwood J. accepted that submission and dismissed the wife's petition, holding that he was not prepared to find the charge of cruelty proved, particularly having regard to the absence of satisfactory evidence as to injury to the wife's health.

In December, 1962, the husband presented a petition for divorce on the ground of desertion, an essential part of his pleaded case being that there were frequent arguments over domestic matters leading to the wife's departure from the matrimonial home in December, 1959. In two paragraphs of her answer, the wife put forward a plea of just cause for leaving and also of constructive desertion and she included a cross-prayer on the ground of such desertion. The wife's particulars, relating only to 1959, covered a good deal of the ground which had been traversed in her cruelty petition but went substantially beyond those allegations. Hewson J., varying an order of the registrar, ordered that the two paragraphs be struck out on the ground that they were substantially the same allegations as those which the wife had put forward in her previous unsuccessful suit and he granted the wife leave to amend her answer so as to plead to the charge of desertion by putting forward such allegations as were not covered by the previous decision. On appeal by the wife: —

*Held,* allowing the appeal, that the power to strike out a pleading was only to be exercised in a plain and obvious case and that as the allegations in the paragraphs of the wife's answer which had been ordered to be struck out raised new issues of just cause for separation and constructive desertion which had not been decided in the previous suit, there was no estoppel per rem judicatam.

*Dixon* v. *Dixon* [1953] P. 103; [1953] 2 W.L.R. 748; [1953] 1 All E.R. 910 and *Fisher* v. *Fisher* [1960] P. 36; [1959] 3 W.L.R. 471; [1959] 3 All E.R. 131, C.A. applied.

*Per* Willmer L.J. Unless the wife is permitted to put forward these allegations, the court will not be able properly to perform its statutory duty to inquire into the facts alleged by the husband. The husband will not be precluded at the trial from contending that this or that allegation is one which the wife ought not to be allowed to make (post, p. 194).

*Per* Diplock L.J. I do not think that any estoppel in its common law concept arises in the present case. The particular type of estoppel relied upon by the husband is estoppel per rem judicatam. But "issue estoppel" must not be confused with "fact estoppel" which, although a species of "estoppel in pais," is not a species of estoppel per rem judicatam (post, pp. 197, 198).

APPEAL from Hewson J.

The following statement of facts is taken substantially from the judgment of Willmer L.J. The parties were married on

**P.**  PROBATE DIVISION.  183

January 9, 1937. On December 16, 1959, the wife, Sheila Alice
Thoday, presented a petition on the ground of the cruelty of her
husband, Alfred George Thoday. That petition alleged cruelty
on the part of the husband persisting throughout the whole period
of the matrimonial life from the date of the marriage in 1937
right up to the end of 1959, when it was common ground that
the wife left the husband. It was a long petition, but most of
the allegations of cruelty arose out of the relations between the
parties during the earlier part of the marriage and also
between the parties and the wife's parents, with whom there
was apparently a good deal of friction. In addition to the allega-
tions relating to that earlier period, there were certain allegations
relating to the last year during which the parties cohabited,
namely, 1959. Those allegations could be summarised quite
briefly under two heads. First, there was a general allegation of
abuse on the part of the husband; and secondly it was alleged
that on certain occasions which were particularised by date,
the husband was guilty of physical violence of one sort or another
towards the wife. The answer filed on behalf of the husband to
the wife's petition for cruelty consisted of a plain denial.

The case was tried by Collingwood J. in January, 1961. The
wife gave evidence, and certain supporting witnesses were called
on her behalf. The husband did not go into the witness-box, but
his counsel elected to take his stand on a submission that the
wife by her own evidence and that called on her behalf had not
made out any case of cruelty. The judge reserved his judgment
and delivered it on March 13, 1961. By his judgment, Colling-
wood J. accepted the submission put forward on behalf of the
husband. He gave a long and detailed judgment and one of the
difficulties which he felt was that occasioned by the fact that he
had not heard any evidence from the husband. In brief sum-
mary, the judge found that the wife was not altogether a reliable
witness; on the other hand, he said that he could not altogether
dismiss her allegations of vulgar abuse of which she alleged the
husband was guilty. He found, however, that there was no
satisfactory evidence of injury or apprehended injury to the wife's
health arising therefrom. With regard to the allegations of
violence, the judge did not in terms reject any of the wife's
evidence in relation thereto, although he said that the violence
alleged had to be viewed in the light of the mounting dissension
and quarrels between the parties, which were clearly a feature
of the matrimonial life during the last few months of the cohabi-
tation. For those quarrels and that dissension between the

C. A.

1963

THODAY
*v.*
THODAY.

C. A.
1963
───
THODAY
*v.*
THODAY.
───

parties he thought the wife was herself in part responsible; but he also thought that the husband's conduct, as disclosed by the evidence of the wife, was certainly reprehensible. He was not, however, prepared to find the charge of cruelty proved, and he reached that conclusion more particularly having regard to the absence of satisfactory evidence as to injury to the wife's health.

That petition having been dismissed in 1961, the husband presented a new petition on December 28, 1962, on the ground of desertion. Although it was common ground that the wife did in fact leave the husband at the end of 1959, the husband did not base his petition on a simple act of desertion constituted by the departure of the wife but gave particulars, saying: " Until " about 1961, the petitioner was serving as an officer in the Royal " Navy. During 1959, the respondent was unable to adjust " herself to the petitioner residing permanently at home, and " arguments over domestic matters became increasingly frequent " until the respondent left the matrimonial home on December " 5, 1959, since when she has never returned, in spite of many " efforts on the part of the petitioner to effect a reconciliation."

By her answer dated March 23, 1963, the wife put forward pleas of just cause for separation and also included a cross-prayer on the ground of constructive desertion. Very lengthy particulars were given of the wife's allegations in support of those pleas which related only to the last year of cohabitation, namely, 1959.

The husband applied by summons to strike out the paragraphs in the wife's answer which alleged just cause for separation and constructive desertion. On May 10, 1963, Mr. Registrar Russell ordered that the husband's application be dismissed. On appeal from the registrar's order, Hewson J. on October 25, 1963, ordered that two paragraphs in the wife's answer should be struck out on the ground that they were substantially the same as the allegations which she had previously put forward in support of her earlier unsuccessful petition on the ground of cruelty, the wife being granted leave to amend her answer so as to enable her to plead to the charge of desertion and to put forward such allegations as were not covered by the previous decision in the cruelty case.

The wife appealed on the ground, inter alia, that she should not be held to be estopped per rem judicatam from relying upon the matters set forth in the particulars of the two paragraphs of her answer which had been ordered to be struck out.

*B. J. Wakley for* the wife. The remedy of striking out a

P.            PROBATE DIVISION.          185

<div style="float:right">C. A.

1963

THODAY
*v.*
THODAY.
</div>

pleading should only be exercised in plain and obvious cases. This is not such a case. As between the parties, the wife ought not to be estopped because this is not a case of failed cruelty in the proper sense of the term. Collingwood J. only heard one party and his findings were not clear cut. The issue of just cause for leaving and expulsive words were not dealt with by Collingwood J. No estoppel binds the court, which could not do its duty under section 4 of the Matrimonial Causes Act, 1950, unless the wife were allowed to present her case.

*Waters* v. *Waters* [1] shows that it is preferable for both sides to be heard. *Edwards* v. *Edwards* [2] shows that conduct short of cruelty may amount to constructive desertion. As to striking out, see *Dixon* v. *Dixon*,[3] *Foster* v. *Foster*,[4] *Bright* v. *Bright*,[5] *Hill* v. *Hill* [6] and *Thompson* v. *Thompson*.[7] Strong reliance is placed on *Cooper* v. *Cooper (No. 2)*.[8] [Reference was also made to *Fisher* v. *Fisher*,[9] *Warren* v. *Warren*,[10] *Bohnel* v. *Bohnel (No. 2)* [11] and *Laws* v. *Laws*.[12]] This is not a plain and obvious case. It is not a case of estoppel inter partes.

*G. H. Crispin Q.C.* and *Peter Coni* for the husband. The court should be slow to allow matters to be ventilated a second time at the husband's expense. The wife here is seeking to dress up cruelty under another name; see *Pike* v. *Pike*.[13] Reliance is placed on what Denning L.J. said in that case.[14] The wife calls the husband's conduct constructive desertion, but it is really an allegation of cruelty and the answer is objectionable because the matters have already been dealt with. Hewson J. gave leave to amend it.

*Wakley* in reply. What is now alleged is not cruelty, but just cause for leaving and constructive desertion. In *Timmins* v. *Timmins* [15] the manifestation of bad temper was not cruelty, but it did amount to just cause for separation.

[1] [1956] P. 344; [1956] 2 W.L.R. 661; [1956] 1 All E.R. 432, D.C.
[2] [1950] P. 8; 65 T.L.R. 419; [1949] 2 All E.R. 145, C.A.
[3] [1953] P. 103; [1953] 2 W.L.R. 748; [1953] 1 All E.R. 910.
[4] [1954] P. 67; [1953] 3 W.L.R. 623; [1953] 2 All E.R. 518, D.C.
[5] [1954] P. 270; [1953] 3 W.L.R. 659; [1953] 2 All E.R. 939.
[6] [1954] P. 291; [1954] 2 W.L.R. 473; [1954] 1 All E.R. 491.
[7] [1957] P. 19; [1957] 2 W.L.R. 138; [1957] 1 All E.R. 161, C.A.
[8] [1955] P. 168; [1954] 3 W.L.R. 923; [1954] 3 All E.R. 358, D.C.
[9] [1960] P. 36; [1959] 3 W.L.R. 471; [1959] 3 All E.R. 131, C.A.
[10] [1962] 1 W.L.R. 1310; [1962] 3 All E.R. 1031.
[11] [1964] 1 W.L.R. 179; [1963] 2 All E.R. 325.
[12] [1963] 1 W.L.R. 1133; [1963] 3 All E.R. 398, C.A.
[13] [1954] P. 81; [1953] 3 W.L.R. 634; [1953] 1 All E.R. 232, C.A.
[14] 1954] P. 81, 88.
[15] [1953] 1 W.L.R. 757; [1953] 2 All E.R. 187, C.A.

186                    PROBATE DIVISION.            **[1964]**

C. A.

1963

THODAY
*v.*
THODAY.

WILLMER L.J.   This is an appeal from an order made in
chambers by Hewson J. on October 25, 1963, whereby he varied
an order previously made by Mr. Registrar Russell and struck
out certain paragraphs of the answer filed on behalf of a wife in
a suit instituted by her husband for divorce on the ground of
desertion.   The two paragraphs in question were paragraphs
which raised, first, a plea of just cause for the separation, and
secondly, an allegation of constructive desertion.   On the basis
of the latter, the wife herself sought to cross-pray for relief.   The
ground on which the judge made the order was that the allega-
tions put forward in support of the plea of just cause and of the
cross-charge of constructive desertion were substantially the same
as allegations which had previously been put forward by the wife
in support of an earlier unsuccessful petition instituted by her
for divorce on the ground of cruelty.   The judge, however, in
making the order striking out what he regarded as the offending
paragraphs, did grant leave to the wife to amend her answer, so
as to enable her to plead to the charge of desertion made, and to
put forward such allegations as were not covered by the previous
decision in the cruelty case.

[His Lordship stated the facts substantially as stated above,
said that none of the allegations in the wife's original cruelty
petition which related to the relations between the parties during
the earlier part of the marriage or between the parties and the
wife's parents was in the least relevant to the present applica-
tion, stated that he read the husband's particulars of desertion
in his petition of December 28, 1962, as going to show that it was
an essential part of the husband's case that there were frequent
arguments over domestic matters which led to the departure of
the wife in December, 1959, observed that the judge had clearly
found the case one of some difficulty, and continued:] The
answer of the wife, which is the subject of the present applica-
tion, is dated March 23, 1963, and I mean no offence to counsel
who settled its terms when I say that it is an immensely long
and comprehensive document.   The substance of it, as I have
already indicated, is that the wife puts forward a plea of just
cause and also includes a cross-prayer on the ground of construc-
tive desertion.   The allegations which she makes in support of
those pleas relate only to the last year of cohabitation, namely,
1959.   Very lengthy particulars are given, and they cover a good
deal of the same ground as had been traversed in the petition for
cruelty to which I have already referred.   But the particulars of
the answer to the present petition do go a good deal beyond what

**P.**                   PROBATE DIVISION.                   187

had been alleged in the previous petition for cruelty. Elaborate
particulars are given with regard to the quarrels between the
parties during the last year of cohabitation. In substance the
wife's case appears to be that the husband was a man who gave
way to frequent outbursts of quite uncontrollable temper. This,
she says, led to intolerable abuse of her on his part, to unfounded
charges against her, and to unkind behaviour of one sort or
another. It is said that on a number of occasions in his tempers
he told her to " clear out " or to " get out "—allegations, of
course, which are not without their importance in a suit for
desertion. But in addition, amongst all the other allegations put
forward in the wife's particulars, she relies also on the same
alleged incidents of violence which had been included in the
previous petition for cruelty.

It is now said on behalf of the husband that those paragraphs
in the answer to which objection is taken amount in effect to an
attempt to re-litigate matters which have already been the subject
of judicial decision by Collingwood J. in the previous suit. On
that ground it is claimed that the two offending paragraphs should
be struck out in limine, so that the wife should be precluded from
raising the same allegations again. Mr. Crispin, who appeared
for the husband, has not suggested that the wife should not be
allowed to defend herself against the charge of desertion laid
against her. In inviting us to dismiss the appeal, he has said
that what he really asks for is that the offending paragraphs and
the particulars thereunder should be struck out, but that, as
ordered by the judge, the wife should be free to amend her answer
by giving such particulars of just cause and such particulars of
constructive desertion as can fairly be said not to be covered
in any way by the previous decision.

It is, I think, an elementary proposition that the somewhat
drastic remedy of striking out a pleading—which is, of course,
governed in matrimonial suits, as in any other, by the provisions
of R.S.C., Ord. 25, r. 4—is one which is only to be resorted to
in plain and obvious cases. I would say at once that, for my
part, I am not satisfied that this is such a case. But I venture
to emphasise that we are dealing at the present stage only with
the matter of pleadings. No decision which we arrive at on this
appeal can be taken to preclude the husband from contending
at the trial, if he is so advised, that the wife should be precluded
from raising this or that particular allegation.

The subject with which we are dealing is one which has
arisen in quite a considerable number of cases during recent years

C. A.

1963

THODAY
v.
THODAY.

Willmer L.J.

188                          PROBATE DIVISION.          **[1964]**

C. A.

1963

THODAY
*v.*
THODAY.

Willmer L.J.

in connection with matrimonial causes. The common case is the case, such as arises here, where it is sought, in putting forward a plea of just cause or of constructive desertion, to rely on matters which have previously formed the subject of an unsuccessful petition or answer based on cruelty. Most, I think, of the relevant cases have been cited to us in the course of the very interesting argument to which we have listened. I shall have occasion to mention most of them, although I do not think it is necessary to deal with them in detail. It can, I think, be said straight away that the decisions which have been referred to go both ways. In some cases orders have been made striking out offending paragraphs of pleadings; in other cases such orders have been refused. The reason for that, I think, is well expressed in a remark made by Scarman J. in the course of giving his judgment in the recent case of *Warren* v. *Warren*,[1] which was one of the cases cited to us. In the course of his judgment in that case he said[2]: " I would add that only a detailed analysis " of the issue sought to be raised, of the issue raised previously " whose judicial determination is the res judicata relied on, of " the pleadings under challenge, and of the judgment of the " court which is the basis of the challenge, can reveal in any " given case whether an estoppel arises or not." That means to say—and I think it is right to say—that every case must be looked at in the light of its own particular facts and in the light of the particular allegations made in the new and in the old petitions.

Certain general principles, however, do appear to me to emerge from the cases, and these I will endeavour to summarise as briefly as possible. First, it is generally true to say that in matrimonial causes, as in other causes, the maxim " Nemo debet " bis vexari pro una et eadem causa " applies. In other words, parties to a matrimonial cause are subject to the ordinary rule as to estoppel per rem judicatam; but that is qualified to this extent, that the rule cannot be invoked so as to preclude the court from discharging the statutory duty laid upon it under section 4 of the Matrimonial Causes Act, 1950, which requires the court to inquire, so far as it reasonably can, into the facts alleged, and also to inquire into any countercharge which is made against the petitioner. That proposition is, I think, established by the decision of this court, or at any rate of two members of this

[1] [1962] 1 W.L.R. 1310; [1962]   [2] [1962] 1 W.L.R. 1310, 1313.
3 All E.R. 1031.

**P.**              PROBATE DIVISION.              189

court, in *Thompson* v. *Thompson*.[3] As I read their judgments,
both Denning L.J.[4] and Morris L.J.[5] agreed[6] in stating the
principle substantially as I have sought to set it out. The same
principle was followed in a recent decision of this court in *Laws*
v. *Laws*.[7] In the *Thompson* case [8] Denning L.J. expressed him-
self thus [9]: " The question in this case is, however, whether those
" ordinary principles do apply to the Divorce Division. The
" answer is, I think, that they do apply, but subject to the
" important qualification that it is the statutory duty of the
" divorce court to inquire into the truth of a petition—and of
" any countercharge—which is properly before it, and no doctrine
" of estoppel by res judicata can abrogate that duty of the court."
A little later he went on [9]: " Whether the divorce court should
" reopen the issue depends on the circumstances. If the court
" is satisfied that there has already been a full and proper inquiry
" in the previous litigation, it will often hold that it is not
" necessary to hold another inquiry all over again: but if the
" court is not so satisfied, it has a right and a duty to inquire
" into it afresh. If the court does decide to reopen the matter,
" then there is no longer any estoppel on either party. Each can
" go into the matter afresh."

Secondly, in a case where the cause of action or the plea in
defence in the second action is precisely the same as has been
raised in the previous case, and where that has been the subject
of a full examination and adjudication in the previous case, the
party seeking to re-litigate the matter will normally be held to
be estopped. That was the ground on which this court thought
it right to strike out the relevant paragraphs of the pleading in
*Holland* v. *Holland*.[10] In that case there had been a petition for
divorce brought by a wife on the ground of cruelty. The husband
denied the charges and cross-prayed for a decree of restitution,
and in reply to that plea the wife relied upon her charges of
cruelty as amounting to just cause. The wife's petition was
dismissed, and the husband's cross-prayer rejected on the ground
that he was wanting in sincerity. Subsequently, there was a
petition by the husband for divorce on the ground of desertion,
and by her answer to that petition the wife alleged just cause and

C. A.

1963

THODAY
*v.*
THODAY.

Willmer L.J.

---

[3] [1957] P. 19; [1957] 2 W.L.R.
138; [1957] 1 All E.R. 161, C.A.
[4] [1957] P. 19, 28.
[5] Ibid. 40.
[6] Ibid. 29, 41.

[7] [1963] 1 W.L.R. 1133; [1963]
3 All E.R. 398, C.A.
[8] [1957] P. 19.
[9] Ibid. 29.
[10] [1961] 1 W.L.R. 194; [1961] 1
All E.R. 226, C.A.

190                        PROBATE DIVISION.                **[1964]**

C. A.
1963

THODAY
*v.*
THODAY.

Willmer L.J.

put forward a cross-prayer for divorce on the ground of construc-
tive desertion.  The matters relied on were precisely the same
matters as had been relied on in the previous petition for cruelty,
and as had been relied on in that earlier case as constituting just
cause.  In those circumstances this court held that the wife's
plea in the second action was an attempt to re-litigate precisely
the cause of action which had been adjudicated upon in the
previous case.

   As I understand the decision, *Warren* v. *Warren*,[11] to which
I have already referred, comes under the same principle.  I make
that observation because of the way in which Scarman J.
expressed himself in his judgment.  He said [12]: " if, upon a
" comparison of the two charges and an analysis of the judgment
" of the court dismissing the cruelty charges, it is plain that in
" the subsequent proceedings the spouse alleging expulsive con-
" duct or just cause is in truth putting forward her failed case of
" cruelty as being expulsive or just cause because it was cruel,
" she ought, in my opinion, and having regard to what I believe
" to be the principles in these matters, to be estopped from so
" doing.  An examination of the particulars delivered in this suit
" clearly shows that in so far as they cover the same charges as
" were the subject of the litigation before Marshall J., they can
" be expulsive conduct only if they were cruel treatment."  In
other words, he was taking the view that the plea in the second
case was precisely the same as that which had been dealt with in
the previous suit.

   But thirdly, where the cause of action or plea in defence in
the second suit is different from that put forward in the earlier
suit, then it can be said that the res which was the subject of the
previous adjudication is not the same res, and in such circum-
stances a party will not normally be held to be estopped from
raising the plea.  That, as I understand it, was the view of two
of the members of this court, Hodson and Morris L.JJ., in
*Thompson* v. *Thompson*,[13] to which I have already referred.  It
was also the basis of the decision in *Fisher* v. *Fisher*,[14] which,
as I will presently seek to show, seems to me to be the case
which of all the cases cited is most in point in the present case.
It was, I think, also the ground for the decision in the recent

[11] [1962] 1 W.L.R. 1310.                [14] [1960] P. 36; [1959] 3 W.L.R.
[12] Ibid. 1314.                          471; [1959] 3 All E.R. 131, C.A.
[13] [1957] P. 19, 36, 40.

**P.**                PROBATE DIVISION.                        191

case before Cairns J. of *Bohnel* v. *Bohnel* (*No. 2* ).[15]  In this con-
nection I think it useful also to refer to the two Divisional Court
cases to which we have been referred in the course of the argu-
ment, namely, *Foster* v. *Foster* [16] and *Cooper* v. *Cooper* (*No. 2*),[17]
both of which seem to me to proceed upon the same principle.

Fourthly, however, apart from cases in which the same cause
of action or the same plea in defence is raised, there may be
cases in which a party may be held to be estopped from raising
particular issues, if those issues are precisely the same as issues
which have been previously raised and have been the subject of
adjudication.  But, in formulating that proposition, I would go
on to say that it is very necessary to look at the particular circum-
stances of the individual case.  The reason for saying that is that
the adjudication in the previous suit may have been arrived at for
a number of different reasons.  If it is not clear from the judg-
ment in the previous suit that the particular issue has in fact
been specifically dealt with, a party will not be held to be estopped
from raising that issue again in a subsequent suit.  That is what
happened in *Dixon* v. *Dixon*.[18]  If, on the other hand, particular
issues have been the subject of specific adjudication, much may
depend upon how they were dealt with.  For this purpose I take
the case (which is the case here) where issues which were raised
for the first time in relation to a cruelty charge are raised again
in the second suit in relation to a desertion charge.  It is, I think,
clear that, if the previous adjudication went on the basis that the
party raising the issues was not a credible witness, so that the
court could not be satisfied that the events complained of had
ever taken place, then that party should not be allowed to raise
those issues or that issue again.  Similarly, if the charges made
in the previous petition were dismissed on the ground that they
were not such as to show any conduct of a grave and weighty
nature, and for that reason did not amount to cruelty, equally it
should not be permissible to raise them in a subsequent suit for
desertion, either as showing just cause or as amounting to con-
structive desertion.  By way of illustration of those propositions,
I would refer to *Bright* v. *Bright*,[19] and *Hill* v. *Hill*,[20] both
decisions at first instance.  On the other hand, it may be

C. A.

1963

THODAY
*v.*
THODAY.

Willmer L.J.

---

[15] [1964] 1 W.L.R. 179; [1963] 2
All E.R. 325.
[16] [1954] P. 67; [1953] 3 W.L.R.
623; [1953] 2 All E.R. 518, D.C.
[17] [1955] P. 168; [1954] 3 W.L.R.
923; [1954] 3 All E.R. 358, D.C.

[18] [1953] P. 103; [1953] 2 W.L.R.
748; [1953] 1 All E.R. 910.
[19] [1954] P. 270; [1953] 3 W.L.R.
659; [1953] 2 All E.R. 939.
[20] [1954] P. 291; [1954] 2 W.L.R.
473; [1954] 1 All E.R. 491.

192                        PROBATE DIVISION.                **[1964]**

C. A.

1963

THODAY
*v.*
THODAY.

Willmer L.J.

otherwise if the evidence in support of the allegations has been accepted in the previous proceedings as being substantially truthful and accurate, but the charges are held not to amount to cruelty because of failure to give satisfactory proof of injury or apprehended injury to health. For it is, I think, well established that conduct of a grave and weighty nature, not amounting to cruelty because of failure to give satisfactory proof of injury to health, may yet constitute just cause as a defence to a charge of desertion or may be sufficient to found a charge of constructive desertion. That was the effect of the decision of this court in *Edwards* v. *Edwards*,[21] following the well-known case of *Russell* v. *Russell*.[22] It is also, I think, clearly brought out by another decision of this court, namely, *Timmins* v. *Timmins*,[23] where charges of cruelty were dismissed, but, at the same time and by the same judgment, a decree of restitution was refused, presumably on the basis that, although cruelty was not proved, it was nevertheless held that the party concerned had just cause for remaining separate.

I hope that that brief analysis of the many cases which have been cited to us is substantially correct.

The problem which now arises is to fit this case within the appropriate principle of those which I have sought to set out. As I think I have already indicated, I find this case virtually indistinguishable from *Fisher* v. *Fisher*.[24] In that case there was a petition for cruelty brought by the husband, to which the wife put in an answer whereby she cross-prayed for divorce on the ground of cruelty. Both the petition and the cross-prayer were rejected, although the commissioner who tried the suit found that the wife's allegations were substantially proved. He held, however, that they did not make out a case of cruelty, largely because he was not satisfied on the matter of injury to health. There was then a petition by the husband for divorce on the ground of the wife's desertion. The wife sought to put in an answer denying the desertion and putting forward a cross-prayer on the ground of constructive desertion, and in support of that she relied upon the same allegations which she had made in the previous proceedings in support of her charge of cruelty. She also relied on a further allegation of expulsive conduct. In those circumstances it was held [25]—and I read from the headnote—" that there could be no

[21] [1950] P. 8; 65 T.L.R. 419;       [23] [1953] 1 W.L.R. 757; [1953] 2
[1949] 2 All E.R. 145, C.A.            All E.R. 187, C.A.
[22] [1897] A.C. 395; 13 T.L.R. 516,    [24] [1960] P. 36.
H.L.                                    [25] Ibid.

**P.**                          PROBATE DIVISION.                          193

" estoppel per rem judicatam where the subject-matter of litiga-
" tion in previous proceedings was different, and, since construc-
" tive desertion was a fresh issue not determined in the previous
" proceedings, the wife was entitled to have her allegations heard
" and assessed in the present proceedings." Hodson L.J., in a
full judgment, said, amongst other things [26]: " In the present
" case, I think that it is the duty of the court quite clearly on
" the facts, as I have stated them, to give the wife an opportunity
" of having heard her case on desertion, and her case in so far
"'as it consists of a denial of her husband's allegations of deser-
" tion.  She has so far been deprived of that opportunity by what
" I regard as a misapplication of the rule applicable to res judi-
" cata." Sellers L.J. said [27]: " . . . whatever the right view is on
" that matter, this is a case in which there can be no estoppel
" because, in my view, quite plainly the issue has never been
" tried in any way whatsoever.  The facts should be given con-
" sideration, not as to whether they amount to cruelty, but looked
" at again to see whether they amount to something other than
" cruelty and establish constructive desertion, because it was
" conceded by counsel there is a difference between the two.  It
" is not necessary in order to establish constructive desertion
" that the facts relied on should of necessity amount to cruelty."
Finally, I think it useful to read substantially the whole of Har-
man L.J.'s very brief judgment, because it seems to me to be
very much to the point.  He said [28]: " It seems to me that the
" result of the present case comes largely from a confusion of
" terms.  That is a very potent source of deception and it arises
" here again.  It can be truly said that this wife has made un-
" founded charges of cruelty against her husband; that may mean
" either that the court rejected the facts alleged or that though
" it accepted them, it decided they did not amount to cruelty as
" that word is understood in the Divorce Court.  The second is
" the present case.  It follows that these charges of cruelty may
" not be repeated as such.  That is a very different matter from
" saying that those same facts did not amount to matters relevant
" to an issue of constructive desertion which, as my Lord has
" said, has never been tried at all. It would indeed be an astonish-
" ing result of the confusion in which words can result if the wife,
" on an issue which has never been before the court, were com-
" pelled to be silent about matters which the court has already

[26] [1960] P. 36, 49.                     [28] Ibid.
[27] Ibid. 51.

194                              PROBATE DIVISION.                **[1964]**

C. A.

1963

THODAY
*v.*
THODAY.

Willmer L.J.

" declared she has truly stated. That she should be kept silent
" even from true words on a new issue is an astonishing plea.
" With all respect to the very energetic argument we have heard,
" I think this court would be landed in an absurdity if we pre-
" vented this wife from telling the truth about her case."

It seems to me that, with very few verbal alterations, those
words which I have quoted could be applied almost exactly to
the circumstances disclosed in the present case. Here, although
the judge in the first case did not specifically say that he accepted
everything that the wife said, there was certainly no rejection in
terms of the wife's evidence. It is clear from his judgment that
he came to the conclusion that the wife's allegations did not make
out a case of cruelty largely because he regarded the evidence
of injury to health as being insufficient and unsatisfactory. In
those circumstances, it seems to me that there could be no good
reason why the allegations put forward by the wife should not be
" looked at again," to quote Sellers L.J.'s phrase,[29] to see
whether they do or do not make out a case of just cause or con-
structive desertion. Moreover, it seems to me that, unless the
wife is permitted to put forward these allegations, the court will
not be able properly to perform its statutory duty to inquire into
the facts alleged by the husband. The husband has chosen by
his petition, particulars of which I have already read, to aver
that there were arguments between the parties which he plainly
regards as of material significance in relation to the wife's
departure. In those circumstances, it must, as I see it, be the
duty of the court to inquire into the causes of those arguments, to
ascertain, if it can, what was the real reason why the wife left,
and, having found the real reason, to consider whether in all the
circumstances it was or was not justifiable. As I have already
indicated, the husband will not be precluded at the trial from
contending that this or that allegation is one which the wife ought
not to be allowed to make. We are not deciding any such thing
on the present appeal. All we are called upon to decide on this
appeal is whether the drastic remedy of striking out the whole of
the two paragraphs, which really constitute the whole of the
effective part of the wife's answer, is one that should be applied
in the present case. I do not think that it should. It seems to
me that this is a case in which the wife ought to be allowed to
have her chance of making good, if she can, the case which she
has chosen to plead.

[29] [1960] P. 36, 51.

**P.**                    PROBATE DIVISION.                    195

In those circumstances, the judge, in my view, came to a     C. A.
wrong conclusion, and I would allow the appeal and restore the     1963
order made by the registrar.

THODAY
*v.*
THODAY.

PEARSON L.J.  The application in this case was for an order
that paragraphs 1 and 3 of the wife's answer dated March 23,
1963, should be struck out.  The application was evidently made
under R.S.C., Ord. 25, r. 4, or Ord. 19, r. 27, as applied to matri-
monial causes by rule 82 of the Matrimonial Causes Rules.  The
ground of the application has been referred to shortly as res
judicata or as an estoppel per rem judicatam.  The contention
involved is that these paragraphs should be struck out as dis-
closing no reasonable answer to the husband's petition, or as being
frivolous or vexatious, because the substantial issue raised by
these paragraphs is the same as an issue already decided against
the wife in previous proceedings between the same parties, and
the issue, having been so decided, should not be allowed to be
re-litigated or re-agitated in the present proceedings.

The power to strike out a pleading or part of a pleading in
this summary way should not be exercised except in a plain and
obvious case: *Dixon* v. *Dixon*,[30] following other decisions under
R.S.C., Ord. 25, r. 4.  In my judgment, the present case is by
no means a plain and obvious case for the exercise of the power.

It is true that the husband's alleged course of conduct in the
year 1959 was part of the cruelty alleged in the former proceed-
ings, and was held not to amount to cruelty; and substantially the
same alleged course of conduct (though described in more detail)
is now relied upon in paragraph 1 of the wife's answer as good
cause for the wife to leave her husband, and in paragraph 3 as
constituting constructive desertion.  It does not necessarily follow
that, because such conduct did not amount to cruelty, therefore
it could not be " good cause " for the wife to leave the husband
or constructive desertion.  The issues are substantially different
in the present case, as they were in *Fisher* v. *Fisher*,[31] and certain
passages have already been cited by my Lord.  In the former
proceedings the question, put very shortly, was whether there
was ill-treatment of the wife by the husband such as to cause or
be likely to cause injury to her health.  In the present proceedings
the question, also put very shortly, is whether the husband's
alleged expulsive words (telling his wife on many occasions to
" get out "), taken in conjunction with the alleged vulgar abuse

[30] [1953] P. 103.                    [31] [1960] P. 36.

196                          PROBATE DIVISION.                    **[1964]**

C. A.

1963

THODAY
*v.*
THODAY.

Pearson L.J.

and alleged ill-tempered, offensive and, on some occasions, violent treatment of the wife by the husband was good cause for her to leave him and caused her to do so.

There is thus a genuine new issue, which has not been decided in the previous proceedings and has to be decided in the present proceedings. Accordingly, paragraphs 1 and 3 of the wife's answer should not be struck out.

The judge gave leave for the wife to amend her answer. Mr. Crispin, supporting the decision, contended that the answer should be amended so as to leave in the allegations of expulsive words, but to delete the allegations of ill-treatment which, by reason of the result of the previous proceedings, could be described as "failed cruelty." In my judgment, such amendment is not required in this case and would not be right. The expulsive words are alleged to have been spoken from time to time in the course of the history, and to have been associated with the alleged vulgar abuse and offensive treatment. The words cannot properly be isolated or severed from the rest of the history. The whole history of the husband's treatment of his wife, both by words and by deeds, in the material period should be open to investigation, and there should be no artificial exclusion of particular incidents by reason of their having been considered in relation to the issue of cruelty in the previous proceedings. It is all one continuous history, and should not be split up.

We have had from counsel a full and helpful citation of the many cases which have been decided on this part of the law. The present case, in my view, does not raise any new question of principle, and can, in the light of the authorities, be decided on its own facts as I have stated above.

I would allow the appeal.

DIPLOCK L.J.  This case has little to do with the sanctity of marriage. In the ultimate analysis it is a dispute about money, viz., how much money, if any, the husband will have to pay the wife by way of maintenance. The husband and wife are at one in wishing the marriage to be dissolved; but each, on advice, thinks that the financial question will depend upon which, if either, of them succeeds in proving that the other was guilty of a matrimonial offence. Consequently, the dispute comes before us in the exercise of our appellate jurisdiction in divorce. In that jurisdiction the court is required by section 4 of the Matrimonial Causes Act, 1950, to exercise a quasi-inquisitorial function. To such a function it is not easy to adapt the concept of estoppel

**P.**                    PROBATE DIVISION.                    197

inter partes, which was developed under and is consistent only with
the adversary system of legal procedure which it is the function of
this court to apply except in the exercise of its jurisdiction in
divorce.

" Estoppel " merely means that, under the rules of the ad-
versary system of procedure upon which the common law of
England is based, a party is not allowed, in certain circumstances,
to prove in litigation particular facts or matters which, if proved,
would assist him to succeed as plaintiff or defendant in an action.
If the court is required to exercise an inquisitorial function and
may inquire into facts which the parties do not choose to prove,
or would under the rules of the adversary system be prevented
from proving, this is a function to which the common law con-
cept of estoppel is alien. It may well be a rational rule to apply
in the exercise of such an inquisitorial function to say that if a
court having jurisdiction to do so has once inquired into the truth
of a particular allegation of fact and reached a decision thereon,
another court of co-ordinate jurisdiction in the exercise of its own
discretion should not re-embark upon the same inquiry, but should
accept the decision of the first court. But this is a different con-
cept from estoppel as hitherto known in English law. It will be
interesting to watch its development in future cases, but for-
tunately it is not, in my view, necessary to develop it in the
present appeal. For, whatever this new concept may involve, it
would appear from those cases in which it has been adumbrated
that it only becomes relevant in cases where, under the old
common law concept of estoppel, a party to matrimonial pro-
ceedings would be prevented from proving facts or matters which
the court, in the exercise of its inquisitorial functions, might
regard as relevant to its decision of those proceedings.

I do not think that any estoppel in its common law concept
arises in the present case. The particular type of estoppel relied
upon by the husband is estoppel per rem judicatam. This is a
generic term which in modern law includes two species. The
first species, which I will call " cause of action estoppel," is that
which prevents a party to an action from asserting or denying, as
against the other party, the existence of a particular cause of
action, the non-existence or existence of which has been deter-
mined by a court of competent jurisdiction in previous litigation
between the same parties. If the cause of action was determined
to exist, i.e., judgment was given upon it, it is said to be merged
in the judgment, or, for those who prefer Latin, transit in rem
judicatam. If it was determined not to exist, the unsuccessful

C. A.

1963

THODAY
v.
THODAY.

Diplock L.J.

198

PROBATE DIVISION.    **[1964]**

C. A.

1963

THODAY
*v.*
THODAY.

Diplock L.J.

plaintiff can no longer assert that it does; he is estopped per rem judicatam. This is simply an application of the rule of public policy expressed in the Latin maxim " Nemo debet bis vexari " pro una et eadem causa." In this application of the maxim " causa " bears its literal Latin meaning. The second species, which I will call " issue estoppel," is an extension of the same rule of public policy. There are many causes of action which can only be established by proving that two or more different conditions are fulfilled. Such causes of action involve as many separate issues between the parties as there are conditions to be fulfilled by the plaintiff in order to establish his cause of action; and there may be cases where the fulfilment of an identical condition is a requirement common to two or more different causes of action. If in litigation upon one such cause of action any of such separate issues as to whether a particular condition has been fulfilled is determined by a court of competent juris-diction, either upon evidence or upon admission by a party to the litigation, neither party can, in subsequent litigation between one another upon any cause of action which depends upon the fulfilment of the identical condition, assert that the condition was fulfilled if the court has in the first litigation determined that it was not, or deny that it was fulfilled if the court in the first litigation determined that it was.

But " issue estoppel " must not be confused with " fact estoppel," which, although a species of " estoppel in pais," is not a species of estoppel per rem judicatam. The determination by a court of competent jurisdiction of the existence or non-existence of a fact, the existence of which is not of itself a con-dition the fulfilment of which is necessary to the cause of action which is being litigated before that court, but which is only relevant to proving the fulfilment of such a condition, does not estop at any rate per rem judicatam either party in subsequent litigation from asserting the existence or non-existence of the same fact contrary to the determination of the first court. It may not always be easy to draw the line between facts which give rise to " issue estoppel " and those which do not, but the distinction is important and must be borne in mind. Fortunately, it does not arise in the present case.

In the present case what I have called " cause of action " estoppel " does not arise. Translated into the terminology of the Divorce Court it could be called " matrimonial offence " estoppel." The wife does not seek in the present litigation

**P.**                     PROBATE DIVISION.                     199

C. A..

1963

———

THODAY

*v.*

THODAY.

———

Diplock L.J.

———

to allege the same matrimonial offence, namely, cruelty, as she
unsuccessfully alleged in the earlier litigation.

What she does seek to allege is, first, as a matter of defence,
just cause for separating from her husband, and, secondly, as
a matrimonial offence, and as a ground for dissolution of marriage,
constructive desertion by her husband. Both these allegations,
it would appear from a number of recent cases which are binding
on this court, involve an issue which is identical with one of the
issues involved in her allegation of cruelty in the earlier litigation.
It is thus a case where, in my view, issue estoppel could arise.
To establish the matrimonial offence of cruelty, two conditions
must be fulfilled. The marital conduct complained of must
(1) amount to serious ill-treatment of the spouse—this, I take it,
is what is intended by the now fashionable phrase " grave and
" weighty matters," and (2) adversely affect the health of the
spouse or cause reasonable apprehension that it would do so.
To establish the defence of just cause for separating, condition
(1) alone need be fulfilled. To establish the matrimonial offence
of constructive desertion, condition (1) and also a further con-
dition must be fulfilled, viz., the ill-treatment must be accom-
panied by expulsive words, or amount in itself to expulsive
conduct.

Had Collingwood J. in the earlier litigation made a specific
finding that the husband's conduct during the period before the
wife left him did not amount to serious ill-treatment of the wife,
irrespective of its actual or apprehended effect on her health, this
would, in my view, have given rise to an " issue estoppel " and
would have prevented her from relying upon the same conduct
as constituting the necessary serious ill-treatment for the purposes
of her defence of just cause for separating from her husband or
her allegation against him of the matrimonial offence of con-
structive desertion. I am inclined to think, with Scarman J. in
*Warren* v. *Warren*,[32] although it is unnecessary to decide, that it
would also have estopped her from alleging any other serious ill-
treatment, of such a character as to cause reasonable appre-
hension that it would affect her health, upon which she could
have relied but did not in fact allege in support of her allegation
of the matrimonial offence of cruelty in the earlier litigation.
But, as I read his judgment, Collingwood J. did not make any
specific finding on this issue of serious ill-treatment. Some of the
facts relevant to this issue which she alleged a detailed analysis

[32] [1962] 1 W.L.R. 1310.

200                           PROBATE DIVISION.                **[1964]**

'C. A.

1963
———
THODAY
v.
THODAY.
———
Diplock L.J.

of this judgment may show that he rejected, but, of itself, this
is not enough to estop her, per rem judicatam at any rate, from
seeking to prove them in later litigation. His judgment does not
make it clear whether he decided against the wife's case of
cruelty (1) on the issue that the husband's conduct, or whatever
allegations about it that he thought she had succeeded in estab-
lishing, did not amount to serious ill-treatment of her, or (2) on
the issue that it did not adversely affect her health or cause
reasonable apprehension that it would do so, or upon both issues.
He was not bound to make specific findings on these two issues.
All he was bound to do was to decide whether the wife had
established the matrimonial offence of cruelty she alleged. It
is, in my view, very desirable that in cases of this kind, where a
failed case of cruelty may be later followed by a case based on
actual or constructive desertion, judges should state their findings
on each of the issues. But it was not done in this case and
consequently, in my view, no " issue estoppel " arises either.

  I, too, would allow this appeal.

                              *Appeal allowed with costs.*
                              *Leave to the husband to appeal to*
                              *the House of Lords.*

  Solicitors: *Bartlett & Gregory, Bromley; Michael Kramer &
Co.*
                                                    A. H. B.

———————

1963
*April 3, 4.*
———
Cairns J.
———
C. A.
———
1963
*Nov. 5, 6,
7, 27.*
———
Lord Denning
M.R.,
Donovan and
Danckwerts
L.JJ.
———

ALEXANDRA TOWING CO. LTD. *v.* MILLET (OWNERS)
     AND EGRET (OWNERS) AND OTHERS.

            THE BRAMLEY MOORE.

            [1962 T. No. 389.]

*Shipping—Limitation of liability—Tug and tow in collision—Different
 owners of tug and tow—Negligence of tug—Tow not negligent—
 Whether liability of tug based on tonnage of tug alone or of tug
 and tow—Merchant Shipping Act, 1894 (57 & 58 Vict. c. 60), s. 503
 —Merchant Shipping (Liability of Shipowners and Others) Act,
 1958 (6 & 7 Eliz. 2, c. 62), s. 3.*
*Ships' Names—The Bramley Moore.*

———————

[Reported by MICHAEL GARDNER, Esq., Barrister-at-Law.]

# TAB 90

**Three Rivers District Council v. Governor
and Company of the Bank of England**

No. [2001] UKHL 16
House of Lords
22 March 2001

**2001 WL 239757**

Before: Lord Steyn Lord Hope of Craighead Lord
Hutton Lord Hobhouse of Wood-Borough Lord Millett
Thursday 22nd March, 2001

**Analysis**

Opinions of the Lords of Appeal for Judgment in the
Cause

**JUDGMENT**
LORD STEYN

My Lords,

1. For the reasons given by my noble and learned friends,
Lord Hope of Craighead and Lord Hutton, I would also
allow the appeal. While it is unnecessary for me to cover
the same ground, I must state in outline the principal
factors that proved decisive in my approach to the case.

2. It is right at the outset to emphasise that in substance
one is dealing with a striking out application. The Bank
of England submitted that the claims are plainly and
obviously unsustainable. In aid of this submission the
Bank deployed a written case of no less than 737 pages,
amplified by many pages of written aids and lengthy oral
argument. It was hardly a simple and obvious case for a
striking out. At the end of the argument my views were
that the Bank had not succeeded in establishing that it
would be right and fair to strike out the claims. Having
studied with care the judgments below, as well as the draft
speeches on the appeal to the House, I am reinforced in
my first view by a combination of the dissenting judgment

of Auld LJ in the Court of Appeal, and by the majority
speeches of Lord Hope of Craighead and Lord Hutton.

3. It is necessary to test the question whether the action
should be struck out against the new draft particulars of
claim drafted and served after the first hearing: [2000] 2
WLR 1220 , 1236E.

4. The case fell into two distinct parts. The first question
was whether the plaintiffs have pleaded a reasonable cause
of action. In essence this was a demurrer point. With
due deference to contrary views I have to say that I was
unimpressed by the Bank's technical arguments under this
heading. The new draft particulars of claim plead the
case in misfeasance in public office in clear terms and in
sufficient detail to enable the Bank to prepare a defence.
The Bank does not need any further particulars. I would
reject the Bank's arguments under this heading.

5. The second question was whether the action is an abuse
of the court's process in that it has no realistic prospect of
success. This is the more difficult and controversial aspect
of the appeal. The Court of Appeal was divided on the
issue. The dissenting judgment of Auld LJ is an impressive
one. The judgments of Clarke J at first instance and of the
majority (Hirst and Walker LJJ) in the Court of Appeal
are detailed and careful. Unfortunately, however, the use
made by the judge and by the majority in the Court of
Appeal of the Bingham Report of October 1992 was not
permissible. The report is self-evidently an outstanding
one produced by an eminent judge. But in law the judge
and the majority erred in relying on positive conclusions
and findings, and absence of conclusions and findings, of
Bingham LJ. Not only was such use of the report ruled
out by settled principles of law but on broader grounds
it was also unfair to the claimants. After all, the report
was the outcome of a private inquiry, the claimants were
not represented before Bingham LJ and the case against
the Bank was not put by counsel. And the Appendices
to the report, which recount the history in greater detail,
were not published and have never been seen by those
representing the claimants.

6. In these circumstances it is necessary for the House to
consider the matter entirely afresh. Since I share the views

WESTLAW    © 2017 Thomson Reuters.

of Lord Hope of Craighead and Lord Hutton I do not propose to revisit the battleground. But I must emphasise that it is indisputably the case that the Bank knew from April 1990 onwards that BCCI was in imminent danger of collapse with inevitable loss to depositors unless there was a real prospect of an effective rescue package. The Bank has failed to persuade me that the claimants have no realistic prospect of establishing that the Bank knew that there would be no effective and comprehensive rescue or was reckless as to whether there would be one. Moreover, I do not share the confidence of the judge and the majority in the Court of Appeal that discovery and cross examination will not produce significant materials assisting the claimants. It is a case that should be examined and tested with the procedural advantages of a fair and public trial.

7.  My conclusion is therefore strongly influenced by the events from April 1990. On the other hand, I also take the view that the earlier part of the history cannot be excised. The interests of justice require that the entire action should be permitted to go to trial. This conclusion involves no judgment about the likely outcome of the case but merely a finding that the threshold requirement for striking out has not been satisfied.

8.  I would, therefore, allow the appeal, dismiss the cross appeal and give leave to the claimants to amend their pleading in terms of the new draft particulars of claim. Like Lord Hope of Craighead I regard the supplementary directions sought by the claimants as entirely reasonable, but on balance I would also leave it to the Commercial Judge to give appropriate directions. I apprehend that he will wish to proceed to trial with due despatch and a minimum of technical interlocutory hearings. And in proceeding to trial it is axiomatic that the trial judge will have to approach this case in a neutral fashion and without preconceptions. He will have to ignore expressions of opinion *on the facts* in any of the speeches.

9.  At the request of the bank the issue of costs is reserved. Written submission on costs are invited within 21 days.

LORD HOPE OF CRAIGHEAD

My Lords,

10.  At the previous hearing of this appeal your Lordships were concerned only with two questions of law. The first related to the ingredients of the tort of misfeasance in public office on which the plaintiffs' first ground of action depends. The second was whether the Bank was capable of being liable to the plaintiffs in damages for violation of the requirements of the First Council Banking Co-ordination Directive of 12 December 1977 (77/780/EEC) . For the reasons given in your Lordships' judgment of 18 May 2000 [2000] 2 WLR 1220 the second question was answered in the negative. It is not necessary to give any further consideration to the Community law issues. They no longer form any part of the plaintiffs' case against the Bank. At the further hearing of the appeal with which this judgment deals your Lordships' task has been to consider whether the facts alleged or capable of being alleged by the plaintiffs meet the test for the tort of misfeasance in public office which were identified by your Lordships in answer to the first question. The question, in short, is whether the order of the Court of Appeal upholding the order of Clarke J that the action should be struck out should be upheld on the ground that the plaintiffs have no reasonable prospect of succeeding on the claim at trial.

11.  Your Lordships have been assisted by the oral arguments which were advanced at the further hearing by Lord Neill QC for the plaintiffs and by Mr Stadlen QC for the Bank and by the very substantial amount of written material which has been provided by each side. The issues which have had to be resolved are far from easy. Some indication of their complexity can be gathered from the fact that the written cases for the plaintiffs (including their reply) and for the Bank (including a detailed response on the facts but excluding two appendices) run to 385 and 737 pages respectively. There are two bundles of contemporaneous documents extending to 661 pages and a supplementary bundle of documents which extends to about 300 pages. The amount of material that must be read and understood to see whether the claim should be struck out is formidable. It will be necessary for me before I address the competing arguments to set out some of the facts by way of background.

12. There are a number of preliminary points. (1) At a procedural hearing which was held on 27 June 2000 nine issues were identified for determination at the further hearing of the appeal. But it became clear in the course of the argument that there was a considerable amount of overlap between one issue and another and that it was more likely to be helpful for them to be looked at cumulatively rather than separately. So I do not propose to examine those issues one by one in this judgment. (2) In his judgment after the first hearing of this appeal my noble and learned friend Lord Steyn said that at the further hearing there should be available a new draft pleading by the plaintiffs reflecting the position which was recorded in your Lordships' judgments: [2000] 2 WLR 1220 , 1236E. At the procedural hearing on 27 June 2000 the plaintiffs were required to serve their new draft pleading on the Bank by 17 July 2000, and they duly did so on that date. That new draft pleading is contained in a document entitled "New draft particulars of claim". For reasons which I shall explain later in more detail (see section (4)) it is to that document, which I shall call "the new draft particulars", that I shall for the most part direct my attention when I am discussing the question whether the facts pleaded meet the requirements of the tort. (3) These proceedings were issued before 29 April 1999 under the Rules of the Supreme Court ("RSC"), which were still in force when the case was in the Court of Appeal. On 29 April 1999 the Civil Procedure Rules ("CPR") came into force. This case is therefore subject to the transitional arrangements set out in the *Practice Direction — Transitional Arrangements* made under CPR rule 51.1 . In accordance with the general principles which are set out in that Practice Direction the case is to proceed in the first instance under the previous rules, but any new step taken on or after 26 April 1999 is to be taken under the CPR: 51PD-003, 011.

13. The parties are agreed that the service of the new draft particulars on the Bank was a new step, and that it follows that the question whether the claim on the ground of misfeasance in public office should be struck out must now be determined under the CPR. As the CPR require that the word "claimant" be used rather than the word "plaintiff", I propose to adopt the same terminology from now on throughout this judgment. Rule 3.2 provides, so far as relevant to this case, that the court may strike out a statement of case if it appears to the court (a) that it discloses no reasonable cause of action or (b) that it is an

abuse of the court's process. There is no exact dividing line between these two grounds: Civil Procedure 2000, 3.4.2. Mr Stadlen did not attempt to maintain an exact separation between them and in the end, as I shall explain below (in section (5)), he invited your Lordships to give summary judgment against the claimants under CPR, rule 24.2 .

14. I propose to deal with the various matters that require to be considered at this stage in this order: (1) introductory narrative, to include (a) outline chronology, (b) the Bingham report and (c) history of the proceedings to date; (2) the requirements of the tort; (3) whether the facts pleaded by the claimants are capable of meeting those requirements; (4) the decision of the courts below to strike out; (5) the test for summary judgment under CPR rule 24.2 ; (6) whether, applying that test, the claim should be summarily struck out; (7) the Bank's cross-appeal; and (8) conclusion and further procedure.

15. I should also make it clear at the outset that, although I shall be using the expression "the Bank" throughout this judgment, the claimants' position as explained in their written case is that those who were principally responsible for the regulation and supervision of BCCI SA were the officials of the Banking Supervision Division formed by the Bank in March 1980 for the purpose of implementing the Banking Act 1979 whose names are given in Schedule 1 to the particulars to the new draft particulars.

**Introductory Narrative**

**Outline Chronology**

16. The history of the rise and fall of the Bank of Credit and Commerce International SA ("BCCI SA") can conveniently be divided up for the purposes of this action into four periods: (1) the period prior to the grant of a full licence under the Banking Act 1979 on 19 June 1980; (2) the period from the grant of the full licence to December 1986; (3) the period from December 1986 to April 1990; and (4) the period from April 1990 to closure in July 1991. This history was set out in great detail by Clarke J in his third judgment of 31 July 1997 (unreported), in which the history was divided up into the same four periods, and it was reviewed again in Part III of the judgment of

the majority in the Court of Appeal of 4 December 1998 [2000] 2 WLR 15 (Part III of which is also unreported). I do not propose to set out that history all over again. No significance is to be attached to the fact that I have mentioned some events in the course of this narrative and omitted others. What follows is not intended to be a complete or definitive account of what happened. But for the purposes of this judgment it is necessary to provide an outline of the chronology and to identify some of the more important details in that history.

17.   BCCI SA was incorporated under the laws of Luxembourg on 21 September 1972. In November it established its first office in the United Kingdom and commenced its business in this country as a deposit-taker. Two years later the structure of BCCI was altered by the incorporation on 13 December 1974 of BCCI Holdings SA ("Holdings") in Luxembourg of which BCCI SA became a subsidiary. On 25 November 1975 another subsidiary of Holdings called BCCI Overseas ("Overseas") was incorporated in the Cayman Islands. Overseas opened its first branch in the United Kingdom in June 1976. At this stage a substantial part of the issued share capital of Holdings was owned by the Bank of America. Although the group was trading through various branches in the United Kingdom it was not subject to any regulatory system in this country. But Holdings was subject to regulation in Luxembourg by the Luxembourg Banking Commission ("LBC") which at that time was that country's regulatory authority. At the end of 1977 the Bank of America decided to withdraw from its relationship with BCCI. It sold its holding of shares in Holdings to International Credit and Investment Co Ltd ("ICIC") which at that time was BCCI's largest shareholder.

18.   Prior to the enactment of the Banking Act 1979 banking in the United Kingdom was not subject to any formalised system of regulation. Control was exercised in an informal way by the Bank of England and in an indirect manner by means of various statutory provisions which gave privileges to banks which were recognised by the Board of Trade and by the Bank. Following the publication of a White Paper in 1976 and the First Council Banking Co-ordination Directive (77/780/EEC) steps were taken to establish a new statutory system of banking supervision in the United Kingdom. This was

contained in the Banking Act 1979 , which came into force on 1 October 1979. It provided for the recognition of banks under section 3(1) if they satisfied the criteria in Schedule 2, Part I , and for the licensing of deposit-taking institutions under section 3(2) if they satisfied the less stringent criteria in Schedule 2, Part II . Section 3(5) of the Act provided that, in the case of an institution whose principal place of business was in a country or territory outside the United Kingdom, the Bank might regard itself as satisfied that the criteria in Schedule 2 regarding those responsible for the management of the business and the prudence with which its business was being conducted were fulfilled if the relevant supervisory authorities informed the Bank that they were satisfied with respect to them and the Bank was satisfied as to the nature and scope of the supervision exercised by those authorities.

19.   On 1 October 1979 BCCI SA applied to the Bank for recognition as a bank under the Act. On 19 June 1980 the Bank refused recognition as a bank but granted to BCCI SA a full licence under the Act as a deposit-taker. By that date its principal place of business was in the United Kingdom. Nevertheless the Bank decided to rely under section 3(5) of the 1979 Act on the supervision of its activities by LBC. The claimants' case is that when the Bank granted the licence (a) it did so knowingly deliberately contrary to the statutory scheme or (b) it was recklessly indifferent to whether it was acting in accordance with the scheme or (c) it wilfully disregarded the risk that it was not acting in accordance with that scheme (i) in bad faith and (ii)(a) in the knowledge that the likely consequences were losses to depositors and potential depositors or (b) that it wilfully disregarded the risk of the consequences or (c) that it was recklessly indifferent to those consequences: see paragraph 31 of the new draft particulars.

20.   During the period from June 1980 to December 1986 the activities of the BCCI group expanded dramatically not only in the United Kingdom but throughout the world. Officials of the Bank pointed out that it was unsatisfactory for it as the supervising authority of BCCI SA in the United Kingdom to rely, as it had been doing under section 3(5) of the 1979 Act, on the views of LBC as to the activities of the holding company in Luxembourg. They recognised that, as the activities of BCCI continued

to expand, pressure was likely to grow for its recognition as a bank under that Act. Various possible solutions were considered including, on the one hand, a proposal for the Bank to supervise the whole institution and, on the other, the incorporation of Holdings in the United Kingdom to improve the effectiveness of the Bank's supervision of the group's activities in this country. In September 1984 the effectiveness of the existing statutory regime was called into question by the collapse of Johnson Matthey Bankers. In the light of that debacle a further White Paper was produced and the enactment of a new statute, which was to become the Banking Act 1987 , was proposed. The system introduced by the 1979 Act was to be both strengthened and simplified. In place of the dual system of recognition and licensing a single system of authorisation was to be introduced with restrictions on the use of banking names. The Bank was to be required to establish a committee to be known as the Board of Banking Supervision which was to include six independent members as well as three members ex officio. Various other changes were to be made to the powers and duties of the Bank as regulatory authority.

21.   Meantime the Bank continued to rely on the views of the Luxembourg regulatory authority. In May 1983 the responsibilities of regulatory authority in that country had passed from the LBC to L'Institute Monetaire Luxembourgeois ("IML"). Further memoranda passed between officials of the Bank drawing attention yet again to the fact that the real place of business of the BCCI SA was in London and that effectively the Bank and not IML was its prime supervisor. Concern was expressed about heavy losses resulting from BCCI SA's central treasury activities which had been identified by BCCI SA's auditors but not been reported to the Bank and BCCI's lack of candour about its decision to relocate its central treasury operation from London to Abu Dhabi.

22.   The claimants' case regarding this period, which follows the same pattern as that set out in paragraph 31 of the new draft particulars which relates to the first period, is that the Bank was continuing to rely on assurances from LBC and IML and, that despite its knowledge of the illegality of this arrangement and the likelihood of losses to depositors, it failed in bad faith to take steps to revoke BCCI SA's licence under section 7 of the 1979 Act.

23.   The next period was marked by a number of changes in the supervisory regime and further expressions of concern about the activities of BCCI. The 1987 Act came into force on 1 October 1987. Section 3(5) of the 1979 Act was replaced by an equivalent provision in section 9(3) of the 1987 Act. BCCI SA was deemed to be authorised under the 1987 Act by section 107 of that Act and Schedule 5, paragraph 2 . An international co-operative group, known as "the College", was established to enable the various national supervisors of the operations of the BCCI Group to meet twice-yearly to discuss its financial condition. Concern was expressed at meetings of the College about a large concentration of exposures due to the group's lending and the effect on the group's activities of the arrest of seven of its officials in Tampa, Florida in October 1988 on charges of drug-trafficking, money-laundering and conspiracy. Further consideration was given to proposals for the restructuring of the group's activities with a view to achieving effective consolidated supervision in London by the Bank. On 30 January 1990 the Bank decided to continue BCCI SA's authorisation following a decision of the Tampa prosecutor to enter into a plea-bargain agreement, approved by the court, by which SA and Overseas pleaded guilty to all counts of money-laundering and conspiracy. Concerns were expressed to the Bank by the group's auditors, Price Waterhouse ("PW"), about the probity of BCCI's senior management.

24.   The claimants' case regarding this period contains three specific allegations about decisions by the Bank not to withdraw the authorisation from BCCI SA. These are said to have been taken (1) after the Bank had learned in May 1986 that BCCI, which had been dealing on a massive scale in the financial and commodity markets through its central treasury in London, had incurred losses amounting to some $285 million: new draft particulars, Schedule 5, paragraphs 26 and 27; (2) after a paper prepared by the Bank for the Board of Banking Supervision in November 1989 had revealed serious defects in the group's structure and the existing supervisory regime and the extent to which BCCI's activities in the UK were dependent upon what happened elsewhere in the group which was largely unsupervised: new draft particulars, Schedule 6, paragraph 19; and (3) after the officials of BCCI had pleaded guilty in Tampa, Florida in January 1990 to charges of money-laundering

and conspiracy: new draft particulars, Schedule 6, paragraph 24.

25. The final period from April 1990 to closure in July 1991 began with expressions of concern to the Bank by PW about the group's serious financial problems and reports about efforts which were being made to obtain financial support from the majority shareholders. On 18 April 1990 PW reported to the board of Holdings that they were unable to sign the 1989 accounts. Later that month they felt able to do so in the light of expressions of support for the group by the Abu Dhabi Government. In early June 1990 IML, recognising that they were no longer in a position effectively to supervise their activities, gave notice to Holdings and to BCCI SA that they must leave Luxembourg within the next 12 to 15 months. These matters were discussed at a meeting of the College on 19 June 1990 when IML repeated its ultimatum and the Cayman supervisor said that, if SA had to leave Luxembourg, Overseas would have to leave Cayman. Further consideration was given to the need for a clear group structure, consolidated supervision of its activities, relocation of the group to Abu Dhabi and the need for a clear and substantial commitment by the Abu Dhabi Government of its support for it.

26. In October 1990 PW reported to Holdings' audit committee that an urgent investigation was needed to quantify the group's liabilities and its need for financial support. On 5 October 1990 a letter was produced to the College on behalf of the majority shareholders undertaking to provide support to the level indicated by PW. But IML refused to extend its deadline unless certain conditions were met and the supervisors did not regard the shareholders' proposals for support as acceptable. By December 1990 a revised support package had been put together which PW regarded as acceptable, but later that month PW became aware of the extent to which BCCI's financial problems were due to fraudulent activities on the part of management. On 4 March 1991 the Bank commissioned PW to investigate and report to it under section 41 of the Banking Act 1987 on malpractice within BCCI. PW delivered their report to the Bank on 24 June 1991. It contained a comprehensive account of widespread frauds and deceptions which had been perpetrated by BCCI. Four days later the Bank decided that the proposed reconstruction of the group could not be pursued and that

to protect depositors BCCI SA had to be closed down. On 5 July 1991 the Bank presented a petition for the appointment of a provisional liquidator.

27. The claimants' case regarding this period, as explained by Lord Neill QC in oral argument, is based on general allegations that the Bank failed in bad faith to face up to its responsibilities as a supervisor to take decisions that would protect the interests of depositors and potential depositors when it was aware that there was a serious and immediate threat that unless it was rescued by the Abu Dhabi Government BCCI would collapse.

### The Bingham Report

28. The closure of BCCI on 5 July 1991 provoked widespread concern in the financial community on the ground that this action was long overdue, yet the action that was taken was criticised by depositors, employees and shareholders as precipitate. In a prompt response to that concern Bingham LJ was invited to conduct an inquiry into the supervision of BCCI under the Banking Acts, to consider whether the action taken by all the UK authorities was timely and to make recommendations. The establishment of the inquiry was announced on 19 July 1991. Bingham LJ submitted his report to the Chancellor of the Exchequer and the Governor of the Bank in July 1992. Among the questions which he understood to call for consideration by his terms of reference were the following: What did the UK authorities know about BCCI at the relevant times? Should they have known more? And should they have acted differently?

29. The report (Inquiry into the Supervision of the Bank of Credit and Commerce International (HC Paper (1992-93) No 198) contains a masterly and eminently readable account of the entire sequence of events from the establishment of BCCI in the UK in 1972 to its closure in July 1991. Bingham LJ took evidence both orally and in writing from a large number of witnesses and he had access to many documents. In his covering letter he paid tribute to the very high level of co-operation which he had received from, among others, the Bank and the UK firm of Price Waterhouse, who acted from June 1987 to July 1991 as the group's auditors. He said that in deciding what was said and done during BCCI's nineteen year

history he had relied heavily on contemporary notes and minutes of meetings and conversations between the Bank and Price Waterhouse. His report contains numerous findings of fact and expression of opinion relevant to the questions which he understood to have been comprised within his terms of reference. The report was published in October 1992, but eight appendices to the report were not published.

30.  Much of the claimants' pleading has been based upon material taken from that report. This is unsurprising, in view of the fact that the claimants have not yet had the benefit of discovery of documents or the obtaining of answers to interrogatories. The assumption can properly be made at this stage that the narrative which the report contains will in due course be capable of being established by evidence once the claimants have obtained access to the relevant documents. But there are important limitations on the use which can be made of this document. I shall have to deal with this matter in more detail later when I come to the arguments relating to strike out, but I should like to make the following observations at this stage.

31.  The first point that has to be borne in mind is that neither the report itself nor any of its findings or conclusions will be admissible at any trial in this case. At this stage, when the only material that is available for consideration apart from the pleadings is the report and an incomplete bundle of relevant documents, it is tempting to fill in the gaps by reference to Bingham LJ's findings and the conclusions which he was able to draw from his review of the evidence. Nevertheless a sharp dividing line must be observed between, on the one hand, his narrative of the evidence and, on the other hand, his findings and conclusions in the light of that evidence.

32.  It can, as I have said, be assumed that if the claim is not struck out the claimants will in due course have access to the evidence which provides the source material for that narrative, and that that evidence will be capable of being led by them at the trial. But, as Bingham LJ's findings and conclusions based on that narrative are inadmissible, they must be held to be incapable either of being led in evidence at the trial or of being used by either side in any other way in support of the competing arguments. As Hirst LJ observed in the Court of Appeal, no comparable statutory

provisions to those which are to be found in section 441 of the Companies Act 1985 apply to the Bingham report: [2000] 2 WLR 15 , 91A–C. The investigation which Bingham LJ conducted was a private and not a statutory inquiry. The rigorous attention which must be paid to the distinction between what would and what would not be admissible has not always been observed in the written cases, and I had the impression that it was not always being observed during the oral argument. Nor, for reasons which I shall explain later, do I think that it was always observed either by Clarke J or by the majority in the Court of Appeal in their judgments on the issues relating to the question of strike out. This has an important bearing on the question whether those judgments were soundly based and should be upheld or whether, because they were not soundly based, the question of strike out is now at large for your Lordships' re-consideration.

33.  A further point that should be noted at this stage about the findings and conclusions in the Bingham report is that they were the result of an investigation that lacked the benefit of statutory powers and was conducted behind closed doors. The claimants were not present nor were they represented. In the conduct of his fact-finding exercise Bingham LJ was, as he said in his covering letter, greatly assisted by the co-operation which he received especially from the Bank and Price Waterhouse. But he had no power to compel the attendance of witnesses or to require the production of documents, and there was no counsel to the inquiry. As the appendices have not been published, the claimants have not had access to all the material which Bingham LJ had before him. None of these observations are intended to suggest that the investigation was incomplete or that the report, for the purposes for which it was prepared, is in any way open to criticism. But it is plain that it cannot be suggested that Bingham LJ was in a position to conduct a fair trial of the issues relating to the tort of misfeasance in public office which the claimants are seeking to raise against the Bank in this case. In these circumstances I agree with the views which Auld LJ expressed in the Court of Appeal in his minority judgment when he said that it would not be right to treat the Bingham report as effectively conclusive on the questions that arise in this litigation or to conclude that all the available evidence on those questions has been gathered in: [2000] 2 WLR 15 180 D–E .

**History of proceedings to date**

34.   The claimants' writ of summons was issued on 24 May
1993. On 19 July 1995 Clarke J made an order for the
following questions to be tried as preliminary issues: (1)
Is the defendant capable of being liable to the plaintiffs
for the tort of misfeasance in public office? (2) Were
the plaintiffs' alleged losses caused in law by the acts or
omissions of the defendant? (3) Are the plaintiffs entitled
to recover for the tort of misfeasance in public office as
existing depositors or potential depositors?

35.    On 19 July 1995 Clarke J gave the claimants
leave to amend their pleadings for the purposes of these
preliminary issues. On 21 August 1995 the claimants
lodged a re-amended statement of claim. Following
Clarke J's first and second judgments of 1 April 1996
and 10 May 1996 [(1996) 3 All ER 558 and 634) in
which he expressed his preliminary conclusions on the
three preliminary issues, the claimants applied for leave
to re-re-amend their statement of claim and the Bank
made an application for the statement of claim to be
struck out. Clarke J heard argument on these applications
in November and December 1996. The claimants then
proposed a series of further amendments to their proposed
re-re-amended statement of claim, and an eighth draft was
lodged on 6 January 1997.

36.    After a further hearing in April 1997 when he
considered the claim as then formulated Clarke J delivered
a judgment on 30 July 1997 (unreported) in which he
held that, on the basis of the evidence then available, the
claim was bound to fail; that, as there was no reasonable
possibility that the claimants would obtain evidence in the
future which might enable them to succeed, the claim was
bound to fail in the future; that in these circumstances it
would be an abuse of process or vexatious or oppressive to
allow the action to proceed; that the application to re-re-
amend the statement of claim should be refused; and that
action should be struck out.

37.   When he was expressing his conclusions in his third
judgment on the present material, at pp 166–167, Clarke
J said:

"I have reached the firm conclusion
that on the material available at
present the plaintiffs have no arguable
case that the Bank dishonestly granted
the licence to BCCI or dishonesty
failed to revoke the licence or
authorisation in circumstances when
it knew, believed or suspected that
BCCI would probably collapse. There
is nothing in the Bingham report or
in the documents which I have seen to
support such a conclusion and there is
much to contradict it."

38.   In regard to the future, he recognised, at p. 167, that
Bingham LJ was not conducting a trial but an inquiry,
that he did not see a number of Bank officials, that the
witnesses whom he did see were not cross-examined in an
adversarial process and that there was no right of appeal.
But he then went on to say that there was in his judgment
no realistic possibility that he had not correctly set out the
state of mind of the Bank at each stage. He concluded, at
p 169:

"In these circumstances I accept Mr
Stadlen's further submission that there
is no realistic possibility of more
evidence becoming available, whether
by further investigation, discovery,
cross-examination or otherwise, which
might throw light upon the state of
mind of the Bank or any of its relevant
officials during the period in which
BCCI was operating."

39.   In the Court of Appeal the majority (Hirst and
Robert Walker LJJ) upheld the order pronounced by
Clarke J. They asked themselves the question whether the
claimants had an arguable case that the Bank actually
foresaw BCCI's imminent collapse at each relevant stage.
They said that they agreed with the judge's conclusion

that, on the material then available, the plaintiffs did not have an arguable case that the Bank actually foresaw BCCI's imminent collapse at each relevant stage. They also agreed with him that, in all the circumstances, it was now for all practical purposes inconceivable that new material would emerge of such significance as to alter that conclusion: [2000] 2 WLR 15 , 101F–H. Auld LJ dissented as to the test to be applied. He did not consider that a claimant in an action for misfeasance in public office who could establish dishonesty in the sense of a knowing and deliberately or recklessly unlawful act by the defendant need also establish some knowledge on the officer's part of consequential damage, whether in the form of foresight or foreseeability: p 166A–B. But he went on to consider and give his view on the question whether the claim should be struck out on the assumption that the claimants had to establish that the Bank knew, believed or suspected that its conduct would probably cause loss: p 175F. He said that there were no exceptional circumstances to justify departing from the normal rule of leaving the matter to the trial judge: p 180D–H.

40.   On 21 January 1999 the Court of Appeal gave leave to the claimants to appeal to the House of Lords on the claimants' undertaking to apply to your Lordships for a direction that the correct test for misfeasance in public office should be determined before any consideration of whether the facts alleged or capable of being alleged were capable of meeting that test. On 12 May 1999 your Lordships gave the claimants leave to appeal against the refusal of leave to re-re-amend the statement of claim. On 17 July 2000, as they were directed to do at the procedural hearing on 27 June 2000 which followed the delivery of your Lordships' first judgment, the claimants served the new draft particulars on the Bank.

**The Requirements of the Tort**

41.   The correct test for misfeasance in public office was established by your Lordships' judgment following the previous hearing of this appeal: [2000] 2 WLR 1220 . I do not wish to repeat or to analyse what your Lordships said in that judgment. But there are two matters with which I must deal. In the first place it is necessary for me to identify my understanding of the various elements in the light of which the question whether the facts pleaded by the claimants in the new draft particulars

satisfy its requirements must be tested. In the second place I must examine Mr Stadlen's argument that the claimants' pleadings are based on a misunderstanding of those requirements.

42.   The following are the essential elements of the tort which are relevant to the examination of the new draft particulars. First, there must be an unlawful act or omission done or made in the exercise of power by the public officer. Second, as the essence of the tort is an abuse of power, the act or omission must have been done or made with the required mental element. Third, for the same reason, the act or omission must have been done or made in bad faith. Fourth, as to standing, the claimants must demonstrate that they have a sufficient interest to sue the defendant. Fifth, as causation is an essential element of the cause of action, the act or omission must have caused the claimants' loss.

43.   As to standing, the interest to sue of those who were already depositors with BCCI is not in doubt. A question has been raised about the interest to sue of potential depositors. This is because a widespread economic effect resulting from the misfeasance does not give a cause of action to the public in general. But the Bank, while reserving the right to pursue the issue at trial, accepts that it is capable of being liable for the tort to claimants who were potential depositors with BCCI at the time of any relevant act or omission of misfeasance by the Bank. As to causation, the Bank submits that it is not capable of having caused loss to depositors or potential depositors where the proximate cause of the loss was the deliberate act of a third party — in this case, fraudulent acts of individuals within BCCI. But questions of fact are raised by this argument which are unsuitable for summary determination at this stage.

44.   The first, second and third requirements lie at the heart of the argument. No further explanation is required as to the test which must be met to satisfy the first requirement. As to the second and third requirements, the claimants do not allege that the Bank did or made the acts or omissions intentionally with the purpose of causing loss to them. The allegation is that this is a case of what is usually called "untargeted malice". Where the tort takes this form the required mental element is satisfied where

the act or omission was done or made intentionally by the public officer (a) in the knowledge that it was beyond his powers and that it would probably cause the claimant to suffer injury, or (b) recklessly because, although he was aware that there was a serious risk that the claimant would suffer loss due to an act or omission which he knew to be unlawful, he wilfully chose to disregard that risk. In regard to this form of the tort, the fact that the act or omission is done or made without an honest belief that it is lawful is sufficient to satisfy the requirement of bad faith. In regard to alternative (a), bad faith is demonstrated by knowledge of probable loss on the part of the public officer. In regard to alternative (b), it is demonstrated by recklessness on his part in disregarding the risk. The claimants rely on each of these two alternatives.

45.    At the first hearing Mr Stadlen argued that recklessness was not sufficient to satisfy the required mental element. Your Lordships rejected this submission, with the result that it must be assumed for the purposes of the argument at this stage that the claimants are entitled to include this alternative as part of their case. His argument at the further hearing was that, as one of the essential requirements of the tort was knowledge, belief or suspicion that the act or omission would probably cause loss to depositors or potential depositors, in order to achieve harmony between the two alternatives knowledge, belief or suspicion of "probable loss" was a necessary element in the case of the alternative of recklessness. He submitted that without evidence to support this requirement there could be no liability under the second, or "untargeted malice", limb of the tort.

46.    I would reject these submissions also. The effect of your Lordships' decision following the first hearing is that it is sufficient for the purposes of this limb of the tort to demonstrate a state of mind which amounts to subjective recklessness. That state of mind is demonstrated where it is shown that the public officer was aware of a serious risk of loss due to an act or omission on his part which he knew to be unlawful but chose deliberately to disregard that risk. Various phrases may be used to describe this concept, such as "probable loss", "a serious risk of loss" and "harm which is likely to ensue". Although I have used the phrase "serious risk of loss", I do not think that for present purposes it is necessary to choose between them. Further attempts to define their meaning would raise issues of fact

and degree which are best considered at trial. The absence of an honest belief in the lawfulness of the conduct that gives rise to that risk satisfies the element of bad faith or dishonesty.

**Whether the facts pleaded are capable of meeting the requirements of the tort**

47.    The question to which I now turn relates to the adequacy of the pleadings. This is the first of the two broad grounds on which the Bank say the claim should be struck out. The issue here is directed to the sufficiency of the particulars. It is whether, assuming the facts alleged to be true, a case has been made out in the pleadings for alleging misfeasance in public office by the Bank. If it has, then the question whether the pleading is supported by the evidence is normally left until trial. In McDonald's Corp v Steel [1995] 3 All ER 615 , 621E–F Neill LJ said:

> "It is true that a pleader must not put a plea of justification (or indeed a plea of fraud) on the record lightly or without careful consideration of the evidence available or likely to become available. But, as counsel for the plaintiffs recognised in the course of the argument, there will be cases where, provided a plea of justification is properly particularised, a defendant will be entitled to seek support for his case from documents revealed in the course of discovery or from answers to interrogatories."

I shall deal later (in section (3)) with the question to which Mr Stadlen directed the main part of his argument. This is whether there are reasonable grounds for thinking that evidence to support the allegations is or is capable of being made available. The question with which I propose to deal at this stage is whether the grounds for the claim have been properly particularised.

48.    The Bank makes much of the fact that the claimants have received numerous warnings of the need

Three Rivers DC v Bank of England (No.3) (Summary Judgment) 2001 WL 239757 (2001)

for particulars to be given of the facts relied on in support of their allegations and of the many opportunities that they have been given to amend their statement of claim. Your Lordships are invited to infer from the absence of particulars, and in the light of the available evidence, that the claimants are not able to make good their allegations and that on this ground alone Clarke J was right to order that the claim should be struck out. On the other hand the claimants say that the Bank is well aware of the case that they seek to bring and that the Bank's argument is calculated to place an insuperable obstacle in their path.

49.  In my judgment a balance must be struck between the need for fair notice to be given on the one hand and excessive demands for detail on the other. In British Airways Pension Trustees Ltd v Sir Robert McAlpine & Sons Ltd (1994) 72 BLR 26 , 33–34 Saville LJ said:

> "The basic purpose of pleadings is to enable the opposing party to know what case is being made in sufficient detail to enable that party properly to prepare to answer it. To my mind it seems that in recent years there has been a tendency to forget this basic purpose and to seek particularisation even when it is not really required. This is not only costly in itself, but is calculated to lead to delay and to interlocutory battles in which the parties and the court pore over endless pages of pleadings to see whether or not some particular point has or has not been raised or answered, when in truth each party knows perfectly well what case is made by the other and is able properly to prepare to deal with it."

50.  These observations were made under the old rules. But the same general approach to pleadings under the CPR was indicated by Lord Woolf MR in McPhilemy v Times Newspapers Ltd [1999] 3 All ER 775 , 792J–793A:

> "The need for extensive pleadings including particulars should be reduced by the requirement that witness statements are now exchanged. In the majority of proceedings identification of the documents upon which a party relies, together with copies of that party's witness statement, will make the detail of the nature of the case the other side has to meet obvious. This reduces the need for particulars in order to avoid being taken by surprise. This does not mean that pleadings are now superfluous. Pleadings are still required to mark out the parameters of the case that is being advanced by each party. In particular they are still critical to identify the issues and the extent of the dispute between the parties. What is important is that the pleadings should make clear the general nature of the case of the pleader. This is true both under the old rules and the new rules."

51.  On the other hand it is clear that as a general rule, the more serious the allegation of misconduct, the greater is the need for particulars to be given which explain the basis for the allegation. This is especially so where the allegation that is being made is of bad faith or dishonesty. The point is well established by authority in the case of fraud.

52.  In Wallingford v Mutual Society (1880) 5 App Cas 685 , 697 Lord Selborne LC said:

> "With regard to fraud, if there be any principle which is perfectly well settled, it is that general allegations, however strong may be the words in which they are stated, are insufficient even to amount to an averment of fraud of which any court ought to take notice."

Three Rivers DC v Bank of England (No.3) (Summary Judgment) 2001 WL 239757 (2001)

In the same case, at p 709, Lord Watson said:

> "My Lords, it is a well-known and a very proper rule that a general allegation of fraud is not sufficient to infer liability on the part of those who are said to have committed it. And even if that were not the rule of the common law, I think the terms of Order XIV would require the parties to state a very explicit case of fraud, or rather of facts suggesting fraud, because I cannot think that a mere statement that fraud had been committed, is any compliance with the words of that rule which require the defendant to state facts entitling him to defend. The rule must require not only a general and vague allegation but some actual fact or circumstance or circumstances which taken together imply, or at least very strongly suggest, that a fraud must have been committed, those facts being assumed to be true."

53.   The Bank says that, as an allegation of misfeasance in public office involves an allegation of dishonesty or bad faith on the part of the public officer, particulars must be given of the facts which, if proved, would justify the allegation. It is also said that it is not enough to aver facts which are consistent either with dishonesty or with negligence. Dishonesty or bad faith must be proved, so the facts relied on must point distinctly to dishonesty. Reference was made to Davy v Garrett (1878) 7 Ch D 473 , 489 where Thesiger LJ said:

> "It may not be necessary in all cases to use the word 'fraud' — indeed in one of the most ordinary cases it is not necessary. An allegation that the defendant made to the plaintiff representations on which

he intended the plaintiff to act, which representations were untrue, and known to the defendant to be untrue, is sufficient. The word 'fraud' is not used, but two expressions are used pointing at the state of mind of the defendant — that he intended the representations to be acted upon, and that he knew them to be untrue. It appears to me that a plaintiff is bound to show distinctly that he means to allege fraud. In the present case facts are alleged from which fraud might be inferred, but they are consistent with innocence. They were innocent acts in themselves, and it is not to be presumed that they were done with a fraudulent intention."

54.   It seems to me that it can no longer seriously be maintained by the Bank that they do not have sufficient notice of the case which is being made against them. It is abundantly clear that what the claimants are seeking to prove is misfeasance in public office. As my noble and learned friend Lord Hutton has pointed out, the draft new particulars contain detailed allegations to the effect that the Bank acted in bad faith. It has all along been common ground that the claimants cannot base their claim against the Bank in negligence. As Hirst LJ observed in the Court of Appeal, at p 32, the immunity which the Bank enjoys under section 1(4) of the Banking Act 1987 unless it is shown that the act or omission was in bad faith goes a long way to explaining why the claimants have undertaken the burden of seeking to prove misfeasance in public office.

55.   In my view this point alone is a sufficient answer to the criticism based on Thesiger LJ's remarks in Davy v Garrett . The principle to which those remarks were directed was a rule of pleading. As the Earl of Halsbury LC said in Bullivant v Attorney General for Victoria [1901] AC 196 , 202, where it is intended that there be an allegation that a fraud has been committed, you must allege it and you must prove it. We are concerned at this stage with what must be alleged. A party is not entitled

to a finding of fraud if the pleader does not allege fraud directly and the facts on which he relies are equivocal. So too with dishonesty. If there is no specific allegation of dishonesty, it is not open to the court to make a finding to that effect if the facts pleaded are consistent with conduct which is not dishonest such as negligence. As Millett LJ said in Armitage v Nurse [1998] Ch 241 , 256G , it is not necessary to use the word "fraud" or "dishonesty" if the facts which make the conduct fraudulent are pleaded. But this will not do if language used is equivocal: Belmont Finance Corporation Ltd v Williams Furniture Ltd [1979] Ch 250 , 268 per Buckley LJ. In that case it was unclear from the pleadings whether dishonesty was being alleged. As the facts referred to might have inferred dishonesty but were consistent with innocence, it was not to be presumed that the defendant had been dishonest. Of course, the allegation of fraud, dishonesty or bad faith must be supported by particulars. The other party is entitled to notice of the particulars on which the allegation is based. If they are not capable of supporting the allegation, the allegation itself may be struck out. But it is not a proper ground for striking out the allegation that the particulars may be found, after trial, to amount not to fraud, dishonesty or bad faith but to negligence.

56.   In this case it is clear beyond a peradventure that misfeasance in public office is being alleged. There is an unequivocal plea that the Bank was acting throughout in bad faith. The Bank says that the facts relied on are, at best for the claimants, equally consistent with negligence. But the substance of that argument is directed not to the pleadings as such, which leave no doubt as to the case that is being alleged, and the basis for it in the particulars, but to the state of the evidence. The question whether the evidence points to negligence rather than to misfeasance in public office is a matter which must be judged in this case not on the pleadings but on the evidence. This is a matter for decision by the judge at trial.

57.   The Bank nevertheless submits that the facts pleaded fail to meet the requirements of the tort. Three reasons are advanced in support of this argument. The first is that the claimants have failed to allege the requisite mental element as to loss. Mr Stadlen said that it was not enough for the claimants to show that the Bank knew that depositors and potential depositors were at risk. As he put it, nothing

short of a properly particularised allegation of knowledge or recklessness of probable loss, known or suspected, would satisfy the test. The second is that the pleadings do not contain a properly particularised allegation that the Bank in the person of identified officials committed acts or omissions of misfeasance dishonestly in the sense of committing them with subjective bad faith. Mr Stadlen submitted that it was well understood that an allegation of dishonesty had to be supported by particulars from which the inference of dishonesty could be drawn. A failure to satisfy this requirement was in itself a ground for a strike out. The third is that the pleadings do not contain a properly particularised allegation that Bank officials took conscious decisions capable of amounting to acts or omissions of misfeasance. Mr Stadlen directed this part of his argument to what he described as the revocation claim. He accepted that the initial decision to licence BCCI SA was particularised. But he said that only three instances were given of decisions not to revoke, and that in the case of only one of these instances — the Bank's decision in October 1986 not to revoke notwithstanding the scale of the central treasury losses — was there any attempt to suggest that the decision was taken dishonestly.

58.   I would reject the first of these three arguments on the ground that it was based on a misunderstanding of the requirements of the tort. The claimants' case on the pleadings is that at each stage in the history the Bank knew that the likely consequences were that depositors and potential depositors would suffer losses, wilfully disregarded the risk of the consequences or was recklessly indifferent to the consequences: new draft particulars, paragraphs 31 — 35. Knowledge that the depositors were likely to suffer loss is averred. But the claimants are also offering in the alternative to prove reckless indifference to the risk of loss. As I have already said (in section (2)) I do not think that it is necessary for present purposes to choose between the various phrases that may be used to describe the nature or degree of the risk. This would be to raise issues of fact and degree that are best considered at trial. It was not suggested that, if there was a case to be made on knowledge of probable loss, the pleading as to recklessness should be struck out at this stage. The Bank's position, as explained in its written case, is that it will not be possible to identify with precision which allegations should be struck out until the parties have seen your Lordships' judgment and that for the time being this exercise is premature.

59.  Mr Stadlen said that the essential difference between the parties on this part of the case at this stage is on the question whether knowledge, belief or suspicion of probable loss has to be established where the allegation is that the act or omission was done or made recklessly. He accepted that an allegation of knowledge that loss was "likely" was, in effect, the same as an allegation that it was "probable". He also accepted that the words used in the new draft particulars to describe the tort, although not precisely the same as those used in your Lordships' judgment, were formulated with sufficient accuracy. But he maintained that the material referred to in the particulars did not support an allegation of knowledge, belief or suspicion of likely or probable loss. He said that none of this material came near to meeting that test, and that there was no indication in the Bingham report that material which would do so was available. At best it supported an allegation of knowledge that there was a risk of loss. But this was not enough to satisfy the test of knowledge that loss was probable.

60.  As I have already said more than once, I do not think that it is appropriate at this stage to attempt to define the required state of mind more precisely. This is a matter which is so bound up with the facts that it is best left until trial. It is a question of fact and degree. The greater the risk of loss the easier it is likely to be to say that loss was probable and the easier it will be to find that where that risk was known, believed or suspected there was recklessness. The statutory powers of supervision were conferred on the Bank for the protection of depositors and potential depositors. As the fourth recital of the First Council Banking Co-ordination Directive (77/780/ EEC) puts it, supervision of a credit institution is needed "in order to protect savings". The system is based on the assumption that, where that protection is lacking, deposits are likely to be at risk. The question whether at any given point of time that risk is sufficiently serious to justify a finding of recklessness on the part of a supervisor, who knows that the statutory requirements are not fulfilled, is aware of the risk but takes no action to withdraw authorisation or otherwise limit the activities of the deposit-taker, is one of degree. I would hold that it is essentially a question of fact for the trial judge. I do not think that a view on this matter can safely be formed at this stage by a reading of the available documents.

61.  I should add, in order to emphasise the importance which I attach to seeing this as a question of fact and degree, that I see much force in Auld LJ's observation in his dissenting judgment about the Orwellian illogicality of sharpening the test of foresight of probable damage for the purposes of the strike out application to one of foresight of probable (imminent) collapse of BCCI. He said at [2000] 2 WLR 15 , 177C:

> "If such a test is to survive it will enable a banking regulator who deliberately and knowingly does not supervise a bank as it should do (as is conceded to be arguable here), with resulting damage to its depositors, to defeat a misfeasance claim simply by saying 'because I did not make the inquiries that I should have done, I did not suspect that the plaintiff would *probably* suffer loss.' In short it enables a banking regulator to rely on its own deliberate and knowing illegality as a justification for its lack of foresight that it would cause damage. If 'policy' and 'principle' are to be invoked, it must be against providing such an incentive to a banking regulator, or any public body exercising a supervisory function over institutions in the interest of persons for whom they provide a service, not to do their duty. And to load a plaintiff/depositor with the further burden of proving that, despite the regulator's self-imposed ignorance, it foresaw damage in the particular form in which it occurred seems to me, with respect, even more illogical and unjust in a common law remedy the purpose of which is to provide a remedy for abuse of public duty."

62.   The second argument on the pleadings is that the claimants have failed to give particulars of their allegation of dishonesty and to link those allegations with particular officials of the Bank. Here again regard must be paid to the fact that the claimants rely on a different view on the concept of recklessness. I refer to the comments which I made in the previous section about Mr Stadlen's submission that an allegation of dishonesty in the sense of subjective bad faith is an essential element. The effect of your Lordships' decision following the first hearing is to the contrary. Recklessness is demonstrated where it is shown that the public officer was aware of a serious risk of loss due to an act or omission on his part which was unlawful but chose deliberately to disregard that risk. That is sufficient to establish that he did not have an honest belief in the lawfulness of the conduct which, to his knowledge, gave rise to that risk. Recklessness about the consequences, in the sense of not caring whether the consequences happen or not, will satisfy the test. In this context there is no additional element of dishonesty or bad faith that requires to be satisfied. As for the particular officials against whom the allegation is made, I consider that the Bank has been given sufficient notice of the claimants' case against their officials in the particulars when read with the documents.

63.   It is alleged in paragraph 31 of the new draft particulars that the Bank in bad faith at all times from 1979 onwards purported to rely pursuant to section 3(5) of the 1979 Act, and subsequently section 9(3) of the 1987 Act, upon assurances given by LBC/IML concerning the management and financial soundness of BCCI SA. Particulars are then given in that paragraph of the matters about this arrangement which are said to have been known to the Bank or about which it was recklessly indifferent. These are that the principal place of business of BCCI SA was in the UK, that LBC/IML did not and could not assure the Bank that it was satisfied with the management and overall financial soundness of BCCI SA, and that for various reasons that are specified LBC/IML had declared itself unable to carry out adequate supervision of both BCCI SA and the BCCI group. It is also said that the Bank knew that the consequence of its unlawful reliance upon LBC/IML was that BCCI SA would be and would continue to be unlawfully licensed, and subsequently authorised, and that it was recklessly indifferent to the risk that this presented to depositors and potential depositors. In paragraph 37 of the new draft

particulars, under reference at each stage in the history to the facts and matters set out in Schedules 2 to 7 of the particulars, details are given of the respects in which the motives of the Bank for breaching its statutory duties as regulator were in bad faith. It seemed to me at first sight that these particulars give ample notice to the Bank of the case which is being made against it as to the requirement of bad faith. But the point requires further examination in the light of further points in Mr Stadlen's argument.

64.   The claimants are taken some distance down the road they must travel by a concession which the Bank made to Clarke J which the judge recorded in his third judgment, at p 32, in these terms:

"with one exception I shall assume that they can establish that the Bank knew, believed or suspected at each stage that its proposed act or its omission was unlawful. With that one exception, the Bank has conceded that it cannot show that the plaintiffs' case that it knew, believed or suspected that its acts or omissions were unlawful is doomed to failure. That exception is the way that section 3(5) of the Banking Act 1979 was applied."

65.   In the Court of Appeal, as appears both from the majority judgment and that of Auld LJ, it was understood to be common ground that there was an arguable case that the Bank was aware of illegality in its supervision of BCCI SA: [2000] 2 WLR 15 , 92H, 179G . Mr Stadlen objected to these passages on the ground that the extent of the Bank's concession was being misrepresented. He said that the Bank made one very narrow concession only, which was that for the purposes of the preliminary issue it was arguable that the Bank knew, believed or suspected that it was not entitled to rely, for the purpose of ongoing supervision of BCCI SA, on assurances given by LBC/IML because after, but not before, the licence was granted it knew, believed or suspected that its principal place of business was not in Luxembourg. I am content to accept Mr Stadlen's assurance that the concession was limited to

this point. Nevertheless it seems to me to be a significant one. It limits the areas for discussion to the granting of the licence on the one hand, as to which all issues remain in play, and to the Bank's ongoing supervision on the other hand, as to which the issue relates to the question whether the pleadings reveal an arguable case as to recklessness about the consequences.

66.    With regard to the question whether the claimants have sufficiently alleged dishonesty or bad faith when the Bank granted the licence in the first place, the majority in the Court of Appeal agreed with Clarke J's finding at p 44 of his third judgment that there was material from which it was at least arguable that the Bank must have known at that stage that LBC were not regulating BCCI SA properly and that it did not have the resources to do so in the future: [2000] 2 WLR 15 , 92B. I agree, and I also consider that sufficient notice of the facts on which the claimants propose to rely is given in Schedule 2 to the new draft particulars. As for Mr Stadlen's argument that the documents read in the light of the Bingham report do not provide any support for these particulars, I consider that issues of fact are raised here which, subject to further arguments about abuse of process, I would not expect to be answered satisfactorily in advance of a trial. As for the later stages in the history, the issue of dishonesty or bad faith is so bound up with the broad issue of recklessness that here too, subject to further arguments about abuse of process, I would hold that the issue raises questions of fact and degree which are best left for decision by the trial judge in the light of the evidence.

67.    The third argument is that there was a failure to provide particularised allegations in regard to the revocation claim. Mr Stadlen accepted that the initial decision to licence BCCI SA was particularised. But he said that, despite Clarke J's warning that particulars had to be given of the decisions that were said to amount to misfeasance, the claimants' case was still largely based on alleged omissions. He said that only three instances could be identified in the new draft particulars where it was alleged that decisions had been taken by the Bank not to revoke. These were the decision in October 1986 not to revoke the authorisation despite its knowledge of the scale of BCCI SA's central treasury losses, the decision not to revoke in December 1989 in the light of the criticisms expressed in the paper prepared by

the Banking Supervision Department for the Board of Banking Supervision in November of that year and the decision not to revoke in January 1990 following the plea bargain which led to the settlement of the Tampa indictment: new draft particulars, Schedule 5, paragraphs 27 and Schedule 6, paragraphs 19 and 24. He maintained that this was a fundamental defect in the revocation claim, as a conscious decision was needed to support a case of misfeasance in public office. It was not open to the claimants to rely on a general reference to the Bank's omission to act day by day over the entire period, as the tort required proof of acts done by the public official intentionally.

68.    In my opinion this argument is based on a misconception of the thrust of the claimants' allegations and on a misunderstanding of the requirements of the tort. The claimants' case, as Lord Neill explained, is that the Bank deliberately ran away from its responsibility as the relevant supervisory authority throughout the history of BCCI SA's activities in this country to safeguard the interests of depositors and potential depositors. He said that a series of events could be identified in the particulars to show that the Bank deliberately failed to take steps which it might have taken to deal with the situation despite its awareness of facts or circumstances which revealed the extent of the risk to those interests. I agree that particulars are given throughout the pleadings of events which are arguably of this character. Examples of such events are given in the new draft particulars, Schedule 5, paragraphs 17 and 34–35, and there are many more.

69.    Furthermore, as Lord Neill pointed out, the tort extends to decisions not to exercise powers as well as decisions to exercise them. In the early days, when the tort was largely confined to disputes over voting rights, it was invoked to deal with the improper exercise of official power. Later, it was invoked in other areas of official regulation through licensing and other controls of that kind. Again the typical complaint was of the improper exercise of the power. That remains true in the majority of the more modern cases. Bourgoin SA v Ministry of Agriculture, Fisheries and Food [1986] QB 716 is an example, as that case was concerned with the withdrawal of a licence. But, as Brennan J said in Northern Territory of Australia v Mengel (1995) 69 ALJR 527 , 545 in a passage which was approved in your Lordships' previous

judgment in this case, any act or omission done or made by a public official can found an action for misfeasance in public office. If it were otherwise, a banking regulator would be able to defeat a misfeasance claim simply by resorting to inaction in the face of obvious and immediate risks despite the fact that it knew, believed or suspected that its reckless and deliberate course of inaction was likely to result in damage to depositors and potential depositors. For these reasons I would reject the argument that proof of conscious decisions to act or not to act is required. In my view the tort extends to a deliberate or wilful failure to take those decisions.

70. For these reasons I would hold that the facts pleaded by the claimants in the new draft particulars are capable, if proved, of meeting the requirements of the tort. I must now turn to the alternative ground for striking out, which was that of abuse of process.

**The decision of the courts below to strike out**

71. Clarke J said that he understood it to be common ground between the parties that in appropriate circumstances the court had power to strike an action out under its inherent jurisdiction and under RSC Ord 18 r 19 . The question which he then asked himself was whether the Bank had shown that the claimants' case was bound to fail on the material presently available and that there was no reasonable possibility of evidence becoming available to them, whether by further investigation, discovery, cross-examination or otherwise sufficiently to support their case and to give it some prospect of success. As he put it, if the Bank were to discharge that burden, it would follow that the claim was bound to fail: third judgment, pp 6–7. He then embarked on a detailed examination of all the material which was available to the claimants to support their claim. I agree with the majority in the Court of Appeal that this was a vastly difficult undertaking: [2000] 2 Wlr 15 , 90A.

72. Clarke J's conclusion, after examining the available material over many days, was that the claimants had no arguable case on the material then available that the Bank dishonestly licensed BCCI SA or dishonestly failed to revoke the licence or authorisation in circumstances when it knew, believed or suspected that it would probably collapse without being rescued: third judgment, p 166. The Court of Appeal agreed with the judge that it was right, in the exceptional circumstances of this case, to conduct this exercise: [2000] 2 WLR 15 , 88B–D, 90A–B. After reviewing the judge's conclusion in great detail, the majority agreed with the judge that all the evidence indicated that up to April 1990 the Bank did not actually foresee BCCI SA's imminent collapse, and thereafter that it did but properly relied on the prospect of a rescue: p 101H.

73. Concurrent findings of fact are not normally open to review in your Lordships' House. For the like reasons as those on which this rule is based I would not have thought that it was appropriate for your Lordships to interfere with the concurrent findings of the judge and the majority in the Court of Appeal after conducting such a detailed and time-consuming exercise unless some flaw in their reasoning could be demonstrated. There are however two grounds on which it was contended they misdirected themselves. The first relates to the requirements of the tort. The second relates to the use which they made of the Bingham report.

74. It is not necessary for me to deal in detail with the differences which have emerged between your Lordships and the courts below as to the requirements of the tort. For the most part Clarke J's conclusions as to the legal principles to be applied which he summarised at the end of his first judgment [1996] 3 All ER 558 , 632G–633E were approved in the judgment given by your Lordships after the first hearing of this appeal [2000] 2 WLR 1220 . The majority in the Court of Appeal said that they were in broad agreement with the judge's conclusions on the tort and that they had adopted the same approach as he had taken when they were considering whether the claimants' case was bound to fail: [2000] 2 WLR 15 , 67E–F, 101H. But there is one point of difference which is of obvious importance, as it lies at the heart of the argument between the parties. This relates to the state of knowledge of the public officer about the prospect of loss that has to be demonstrated where the claim is based on the concept of recklessness.

75. In his formulation Clarke J said that, for the purposes of the requirement that the officer knows that his act

will probably injure the claimant, it is sufficient if he has actual knowledge that his act will probably damage the claimant or, in circumstances in which he believes or suspects that his act "will probably" damage the plaintiff, he does not ascertain whether that is so or fails to make inquires as to "the probability" of such damage: [1996] 3 All ER 558, 633A–B. In the Court of Appeal the majority asked themselves whether the claimants had an arguable case that the Bank "actually foresaw" BCCI's imminent collapse at each relevant stage: [2000] 2 WLR 15 , 101H. They went on to say at p 102A–B that that formulation might have been too favourable to the claimants and that, in view of the stringent requirements of the tort of misfeasance in public office, the more appropriate question might be whether the Bank "knew" that its decision would cause loss to the claimants. I would not regard the fact that the latter observation is not supported by your Lordships' judgment as important, as the majority do not say that they based their decision on this view. But it is clear that the theme of knowledge of probable loss informed the approach which was taken throughout these judgments to the question whether the claim should be struck out.

76.  Mr Stadlen sought to support this approach. But, for the reasons which I have already given, I would hold that it is not consistent with the effect of your Lordships' judgment following the first hearing. As I have already said when I was reviewing the requirements of the tort in an earlier section of this judgment (section (2)), the state of mind which amounts to subjective recklessness is demonstrated where it is shown that the public officer was aware of a serious risk of loss due to an act or omission on his part which he knew to be unlawful but chose deliberately to disregard that risk, and the question whether at any given point of time that risk is sufficiently serious to justify a finding of recklessness is one of degree. I consider that this point alone is sufficient to justify taking a fresh look at the question whether the claimants have a seriously arguable case directed to the issue of recklessness.

77.  Then there is the use which was made in their judgments by Clarke J and the majority in the Court of Appeal of the findings and conclusions in the Bingham report. Clarke J said (at p 167 of his third judgment) that he recognised that Bingham LJ was not conducting a trial

but an inquiry, that he did not see a number of Bank officials, that the witnesses whom he did see were not cross-examined in an adversarial process and that there was no right of appeal. But he went on to say this, at pp 167–169:

> "On the other hand, it is plain that in addition to questioning witnesses Bingham LJ considered in detail all the relevant internal documents in the possession of the Bank, which involved a perusal of a mass of documentation. As I have already said, it is clear from the terms of Bingham LJ's covering letter to the Chancellor of the Exchequer, and indeed from many passages in the report itself, that he was applying his mind to question what was the state of mind of the Bank at each stage. In these circumstances I accept Mr Stadlen's submission that it is inconceivable that Bingham LJ was aware of material which was materially at odds with his conclusions as to the state of mind of the Bank. There is, in my judgment, no realistic possibility that he has not correctly set out the state of mind of the Bank at each stage.

> "While it is, of course, true that I have seen only the report and not the appendices, the published report is a summary of an even more detailed narrative in the appendices. Since, as just stated, Bingham LJ was expressly considering the state of mind of the Bank at each stage, it is in my judgment inconceivable that there is in the appendices material which would or might support the conclusion that the Bank had the state of mind which the plaintiffs must establish. If there was, Bingham LJ would have referred to it, even if only to dismiss it. He would certainly not have disregarded it. As I have tried to indicate, at no doubt inordinate length, there is nothing in the material

which I have seen which gives arguable support for the plaintiffs' case. I would, however, go further. There is nothing in that material which gives reasonable grounds for supposing that there might be other evidence which might in the future support the plaintiffs' case. In these circumstances I accept Mr Stadlen's further submission that there is no realistic possibility of more evidence becoming available, whether by further investigation, discovery, cross-examination or otherwise, which might throw light upon the state of mind of the Bank or any of its relevant officials during the period in which BCCI was operating."

78.  The Court of Appeal said that, while the judge seemed to them to be putting the matter too high in the first of the two paragraphs which I have quoted from his judgment, they agreed with him that there was no realistic possibility that the picture which would emerge if officials of the Bank were to give evidence which was tested by cross-examination would be fundamentally different. In that respect the report was, despite its informal status, an invaluable aid to distinguishing between what was a practical possibility and what was fanciful and inconceivable:

[2000] 2 WLR 15 , 91F–G. Auld LJ disagreed with this approach. In his view Clarke J was not entitled to treat the Bingham report effectively as conclusive on the questions that arise in this litigation or to conclude that all the available evidence about the Bank's state of knowledge had been gathered in or properly tested. He said that there were no exceptional circumstances to justify departing from the normal rule of leaving the matter to the trial judge: p180D–H.

79.  As I said in a previous section of this judgment (section (1)(b)), there are important limitations on the use which can be made of the Bingham report in these proceedings.

A sharp dividing line must be observed between Bingham LJ's narrative of the evidence, which is a legitimate source to which reference can be made for the purposes of the motion to strike out, and his findings and conclusions in the light of that evidence. It is not just that those findings and conclusions would not be admissible at trial. Fairness to the claimants requires that proper weight is given to the nature of Bingham LJ's inquiry and its limitations. He was not asked to determine the issues relating to the tort of misfeasance in public office which the claimants now seek to raise. These issues were not on trial in those proceedings. There is no doubt that Bingham LJ was chosen to conduct the inquiry because of his outstanding qualities as a judge and the weight of authority which his findings and recommendations would command. But those considerations must not be allowed to affect the rigorous distinction that must be maintained between those parts of the report that are and are not relevant to the Bank's motion to strike out.

80.  As I have already said, Clarke J made it clear that he recognised these limitations: see p 167 of his third judgment. Nevertheless I have formed the clear impression that his view that the claim should be struck out was materially influenced by findings and conclusions and the absence of findings and conclusions in the Bingham report, and that he did not confine himself, as I consider he should have done, strictly to the narrative. I do not leave out of account the fact that he was responding to the way in which the claimants had presented their case. It is clear that they were drawing on those aspects of the report that suited them. It is not surprising that the Bank replied by pointing out those parts of the report that did not, and that the judge in his turn was drawn into this argument. Nevertheless the claimants are, in my view, entitled to say that Bingham LJ's findings and conclusions ought not to be used against them in this way. Bingham LJ's findings and conclusions about the availability of further evidence coming to light were made in proceedings to which they were not parties, and they could not challenge them on appeal. Cogent though these findings and conclusions may appear to be, the claimants are entitled to a fair trial of the claim which they have made against the Bank.

81.  In the following passage at pp 37–38 of his third judgment Clarke J explained his general approach to

the Bingham report before he embarked upon a detailed consideration of the various stages in the history:

> "Mr Stadlen submits that there is no support anywhere in the Bingham report for the conclusion that the Bank acted dishonestly, or that it knew that it was acting unlawfully or that it suspected that its acts or omission would probably cause loss to depositors or potential depositors. For the reasons already stated I shall focus only on the last of these, but I accept the submission that there is no statement in the report which gives any support for the conclusion that at any stage the Bank suspected that depositors and potential depositors would probably suffer loss as a result of the Bank's action or inaction. Yet, as stated on page iii of the covering letter to which I have already referred, it is clear that Bingham LJ was considering the Bank's state of mind at every stage. In my judgment, if Bingham LJ had formed the view that at any stage the Bank suspected that its action or inaction would probably injure depositors or potential depositors he would have said so. Thus, if he had thought that the Bank suspected that BCCI would probably collapse so that new depositors would probably lose their money at any stage of the story from 1979 to 1991 he would have said so.

> "Yet, not only did he not say so, but his observations on the evidence are inconsistent with any such conclusion."

or to the absence of conclusions and findings, in the Bingham report. His purpose in doing so was to explain why he was of the opinion that there was nothing in the material he had seen which gave reasonable grounds for supposing that other evidence might become available to throw light on the state of mind of the Bank during the relevant period: see the conclusion, already quoted, which he expressed at pp 167–168. The following passage, in which he dealt with the claimants' submission that the Bank must have known when it granted the licence that the principal place of business of BCCI was in the United Kingdom and not in Luxembourg, at p 43, illustrates this point:

> "However, the difficulty with the plaintiffs' submission is that Bingham LJ held in paragraph 2.23 that the Bank never addressed the question what was meant by principal place of business. It assumed wrongly that the principal place of business was in the country of incorporation. Further Bingham LJ says in paragraph 2.24 that the Bank never inquired where the principal place of business was, in the sense of where the mind and management of the company and its central direction resided. The Bank thus treated section 3(5) of the Act as applicable and applied it. In paragraph 2.25 Bingham LJ says that he read nothing sinister in that approach. Moreover, on the footing that the principal place of business was in the United Kingdom, under section 36 BCCI was not entitled to describe itself as a bank, but Bingham LJ says in paragraph 2.33 that it was not until after the licence had been granted that the Bank recognised that fact. There is, in my judgment, no material available to the plaintiffs or to the court to lead to any different conclusion."

82.    Thereafter during his examination of the history he made frequent reference to findings or conclusions,

83.   Among the other passages that might be quoted here are those at p 89, where the judge referred to a conclusion in paragraph 2.66 of the report in support of the view that there was no evidence that the Bank suspected in June 1986 following the central treasury losses that BCCI would probably collapse, let alone that it would probably collapse because of an absence of remedial steps; at p 110, where he referred to a conclusion in paragraph 2.154 of the report to the same effect as to the Bank's state of mind in December 1989; and at pp 153–154, where he referred to paragraphs 2.333 and 2.337 of the report as to the Bank's state of mind in March 1991 when it commissioned PW to investigate and report on malpractice within the group under section 41 of the 1987 Act.

84.   In their written submissions to the Court of Appeal (paragraph 61) the claimants said that they did not object to the court having regard to the report. But they pointed out that its contents would not be admissible in any trial and that it was odd that the judge considered it permissible or appropriate to determine factual issues by reference to it and to strike out the action in reliance upon it. Nevertheless it is clear that the majority in that court followed Clarke J's approach, and that to a material extent their decision to dismiss the appeal was based on the same view as that which the judge had formed in the light of the findings and conclusions that Bingham LJ expressed.

85.   That there was a fundamental difference of view in the Court of Appeal on this point is clear from Auld LJ's dissenting judgment. He noted the fact that Clarke J relied heavily on the Bingham report as a justification for taking the exceptional course of striking out the claim as doomed to fail [2000] 2 WLR 15 , 179C. After pointing out the different functions of that inquiry from those involved in this litigation and the disadvantages that were inherent in that procedure, he said at p 180D–F:

"In the circumstances, I am of the view that Clarke J was not entitled to treat Bingham LJ's report effectively as conclusive on the questions he, the judge, had to answer in this litigation or to conclude, as he did, that all the available material evidence on those questions had been gathered in. Given the greater generality of the questions in the Bingham inquiry, the limitations of it as a fact-finding exercise when compared with litigation, his acknowledgement of a number of challenges to some of his factual conclusions and the emergence of additional material since the inquiry indicating the Bank's state of knowledge as to the Gokal unrecorded loans, I can see no basis for Clarke J's confidence in this extraordinary and complex case for concluding that Bingham LJ had seen and fully tested all the material evidence available or likely to become available on the issues confronting the court in this case."

86.   I respectfully agree with and would endorse these observations. In my judgment the extent to which the opinions expressed by both Clarke J and the majority in the Court of Appeal were dependent upon passages in the Bingham report which are irrelevant to the issue of strike out provides a further reason for taking a fresh look at this critical issue. For the same reasons I consider that the claimants' motion for leave to re-re-amend the statement of claim is open to re-consideration by your Lordships. The draft re-re-amended statement of claim has now been superseded by the draft new particulars, and it is to that document that I shall direct my remarks on the question whether leave should now be given.

### The test for summary judgment under CPR rule 24.2

87.   Clarke J ordered that the action should be struck out under RSC, Ord 18, r 19 on the grounds that the re-amended statement of claim disclosed no reasonable cause of action and that it would be an abuse of process or vexatious or oppressive to give leave to re-re-amend. The parties are agreed that if the question whether the claim should be struck out is to be reconsidered it must now be determined under the Civil Procedure Rules 1998 : see the general principle stated in *Practice Direction —*

*Transitional Arrangements* , 51PD–011. The power which is given to the court to strike out under CPR Part 3 , which is concerned with the court's case management powers, is expressed in rule 3.4(2) in these terms:

> "The court may strike out a statement of case if it appears to the court —
>
> (a) that the statement of case discloses no reasonable grounds for bringing or defending the claim;
> (b) that the statement of case is an abuse of the court's process or is otherwise likely to obstruct the just disposal of the proceedings; or
> (c) that there has been a failure to comply with a rule, practice direction or court order."

88. The parties also agree that, if Clarke J were to be held to have applied the wrong test when he ordered the action to be struck out, the relevant rules under the CPR are not confined to the provision for striking out in CPR rule 3.4 . In Margulies v Margulies (unreported) 16 March 2000 the judge's decision to strike out was given pursuant to RSC Ord 18, r 19 before the coming into effect of the Civil Procedure Rules. Nourse LJ said at paragraph 63 that, if the judge wrongly applied the test, the Court of Appeal would have to determine the matter pursuant to CPR Part 24.2. I would not go so far as to say that your Lordships are obliged to treat the Bank's motion to strike out as an application for summary judgment under rule 24.2. It would, I think, be more accurate to say that your Lordships have power to do so, and that the question is whether your Lordships should exercise that power: see Taylor v Midland Bank Trust Co Ltd (No 2) (unreported) 21 July 1999 : Court of Appeal (Civil Division) Transcript No 1200 of 1999 Civil Procedure 2000 , 3.4.6. CPR Part 24 sets out various procedural requirements which do not apply to rule 3.4 But the claimants do not object to the application of rule 24.2 on procedural grounds. So I would accept Mr Stadlen's submission that it is appropriate for the Bank's application for the claim to be struck out to be treated as if it were an application for summary judgment.

89. CPR rule 24.2 provides:

> "The court may give summary judgment against a claimant or defendant on the whole of a claim or on a particular issue if —
>
> (a) it considers that —
> (i) that claimant has no real prospect of succeeding on the claim or issue; or
> (ii) that defendant has no real prospect of successfully defending the claim or issue; and
> (b) there is no other reason why the case or issue should be disposed of at a trial."

90. The test which Clarke J applied, when he was considering whether the claim should be struck out under RSC Ord 18, r 19 , was whether it was bound to fail: see p 171 of the third judgment. Mr Stadlen submitted that the court had a wider power to dispose summarily of issues under CPR Part 24 than it did under RSC Ord 18, r 19 , and that critical issue was now whether, in terms of CPR rule 24.2(a)(i) , the claimants had a real prospect of succeeding on the claim. As to what these words mean, in Swain v Hillman [2001] 1 All ER 91 , 92, Lord Woolf MR said:

> "Under r 24.2, the court now has a very salutary power, both to be exercised in a claimant's favour or, where appropriate, in a defendant's favour. It enables the court to dispose summarily of both claims or defences which have no real prospect of being successful. The words 'no real prospect of being successful or succeeding' do not need any amplification, they speak for themselves. The word 'real' distinguishes fanciful prospects of success or, as Mr Bidder QC submits, they direct the court to the need to see

whether there is a 'realistic' as opposed to a 'fanciful' prospect of success."

91. The difference between a test which asks the question "is the claim bound to fail?" and one which asks "does the claim have a real prospect of success?" is not easy to determine. In Swain v Hillman at p 4 Lord Woolf explained that the reason for the contrast in language between rule 3.4 and rule 24.2 is that under rule 3.4, unlike rule 24.2, the court generally is only concerned with the statement of case which it is alleged discloses no reasonable grounds for bringing or defending the claim. In Monsanto plc v Tilly, The Times, 30 November 1999; Court of Appeal (Civil Division) Transcript No 1924 of 1999; Stuart Smith LJ said that rule 24.2 gives somewhat wider scope for dismissing an action or defence. In Taylor v Midland Bank Trust Co Ltd he said that, particularly in the light of the CPR, the court should look to see what will happen at the trial and that, if the case is so weak that it had no reasonable prospect of success, it should be stopped before great expense is incurred.

92. The overriding objective of the CPR is to enable the court to deal with cases justly: rule 1.1. To adopt the language of article 6.1 of the European Convention for the Protection of Human Rights and Fundamental Freedoms with which this aim is consistent, the court must ensure that there is a fair trial. It must seek to give effect to the overriding objective when it exercises any power given to it by the Rules or interprets any rule: rule 1.2. While the difference between the two tests is elusive, in many cases the practical effect will be the same. In more difficult and complex cases such as this one, attention to the overriding objective of dealing with the case justly is likely to be more important than a search for the precise meaning of the rule. As May LJ said in Purdy v Cambran (unreported) 17 December 1999: Court of Appeal (Civil Division) Transcript No 2290 of 1999:

> "The court has to seek to give effect to the overriding objective when it exercises any powers given to it by the rules. This applies to applications to strike out a claim. When the court is

considering, in a case to be decided under the Civil Procedure Rules, whether or not it is just in accordance with the overriding objective to strike out a claim, it is not necessary to analyse that question by reference to the rigid and overloaded structure which a large body of decisions under the former rules had constructed."

93. In Swain v. Hillman Lord Woolf gave this further guidance at pp 94 and 95:

> "It is important that a judge in appropriate cases should make use of the powers contained in Part 24. In doing so he or she gives effect to the overriding objectives contained in Part 1. It saves expense; it achieves expedition; it avoids the court's resources being used up on cases where this serves no purpose, and, I would add, generally, that it is in the interests of justice. If a claimant has a case which is bound to fail, then it is in the claimant's interests to know as soon as possible that that is the position. Likewise, if a claim is bound to succeed, a claimant should know this as soon as possible ….

> "Useful though the power is under Part 24, it is important that it is kept to its proper role. It is not meant to dispense with the need for a trial where there are issues which should be investigated at the trial. As Mr Bidder put it in his submissions, the proper disposal of an issue under Part 24 does not involve the judge conducting a mini trial, that is not the object of the provisions; it is to enable cases, where there is no real prospect of success either way, to be disposed of summarily."

**Whether the claim should be summarily struck out**

94.  For the reasons which I have just given, I think that the question is whether the claim has no real prospect of succeeding at trial and that it has to be answered having regard to the overriding objective of dealing with the case justly. But the point which is of crucial importance lies in the answer to the further question that then needs to be asked, which is — what is to be the scope of that inquiry?

95.  I would approach that further question in this way. The method by which issues of fact are tried in our courts is well settled. After the normal processes of discovery and interrogatories have been completed, the parties are allowed to lead their evidence so that the trial judge can determine where the truth lies in the light of that evidence. To that rule there are some well-recognised exceptions. For example, it may be clear as a matter of law at the outset that even if a party were to succeed in proving all the facts that he offers to prove he will not be entitled to the remedy that he seeks. In that event a trial of the facts would be a waste of time and money, and it is proper that the action should be taken out of court as soon as possible. In other cases it may be possible to say with confidence before trial that the factual basis for the claim is fanciful because it is entirely without substance. It may be clear beyond question that the statement of facts is contradicted by all the documents or other material on which it is based. The simpler the case the easier it is likely to be take that view and resort to what is properly called summary judgment. But more complex cases are unlikely to be capable of being resolved in that way without conducting a mini-trial on the documents without discovery and without oral evidence. As Lord Woolf said in Swain v Hillman , at p 95, that is not the object of the rule. It is designed to deal with cases that are not fit for trial at all.

96.  In Wenlock v Moloney [1965] 1 WLR 1238 the plaintiff's claim of damages for conspiracy was struck out after a four day hearing on affidavits and documents.

Danckwerts LJ said of the inherent power of the court to strike out, at p 1244B–C:

> "this summary jurisdiction of the court was never intended to be exercised by a minute and protracted examination of the documents and facts of the case, in order to see whether the plaintiff really has a cause of action. To do that is to usurp the position of the trial judge, and to produce a trial of the case in chambers, on affidavits only, without discovery and without oral evidence tested by cross-examination in the ordinary way. This seems to me to be an abuse of the inherent power of the court and not a proper exercise of that power."

Sellers LJ said, at p 1243C–D, that he had no doubt that the procedure adopted in that case had been wrong and that the plaintiff's case could not be stifled at that stage, and Diplock LJ agreed.

97.  In the Court of Appeal [2000] 2 WLR 15 , 86F the majority said that "this somewhat rigid position" had been modified in Williams and Humbert Ltd v W & H Trade Marks (Jersey) Ltd [1986] AC 368 , where Lord Templeman said at pp 435H–436A that if an application to strike out involves a prolonged and serious argument the judge should, as a general rule, decline to proceed with the argument unless he not only harbours doubts about the soundness of the pleading but, in addition, is satisfied that striking out will obviate the necessity for a trial or will substantially reduce the burden of preparing for the trial or the burden of the trial itself: see also Lord Mackay of Clashfern at p 441E–F. But they were satisfied that this case fell within the exceptional class for the same reasons as those explained in the Williams and Humbert case, and that Clarke J was right to embark upon the exercise. I too would not criticise the judge for undertaking the exercise. But I would also pay careful regard to what the Court of Appeal in Wenlock v Moloney regarded as objectionable. In Morris v Bank of America National Trust [2000] 1 All ER 954 , 966B Morritt LJ said that Wenlock's case illustrated a salutary principle. He then said at p 966B–C:

"In the Three Rivers DC case the Court of Appeal upheld the decision of Clarke J to strike out a complicated claim for damages for misfeasance in a public office made against the Bank of England for authorising BCCI to carry on the business of banking. In that case all the evidence then available to the plaintiff was before the court because all the facts had been investigated by Bingham LJ as he then was … Obviously the fact of a recent inquiry is a material distinction."

For reasons already explained (in section (4)), I do not think that the investigation that was conducted by Bingham LJ justifies a departure from the principle. I consider that both Clarke J and the majority in the Court of Appeal were wrong to approach this case on the basis that all the facts that are relevant to the claim that is being made in this case had been investigated.

98.   The present case is, as everyone concerned with it has recognised, one of a quite exceptional character. The issues of fact which the claimants seek to raise are highly complex. They relate to matters in which they were not directly involved, as they were third parties to the system of regulation which was set up to protect them. They involve meetings and discussions between many parties at which they were not represented and they extend, through no fault of theirs, over a very long period. The issues of law are also complex, as the claim depends on an assessment of the state of mind of the Bank's officials at each of the various stages in the history. Much of what was passing through their minds can be discovered by examining the documents. But the court is normally reluctant to draw inferences of the kind that need to be drawn in this case without seeing and hearing the witnesses. Bingham LJ had that advantage. The court, so far, has not.

99.   My approach to this issue can therefore be summarised against this background as follows. For the reasons which I have already given (in section (3)), I consider that the claimants' pleadings give sufficient notice

to the Bank of the case which they wish to present and that the facts pleaded are capable of satisfying the requirements of the tort. That being so, I would be inclined to hold that this highly complex case should not be decided on the documents without hearing oral evidence but should go to trial. This view is reinforced by what I have said about the Bingham report. I would leave out of account the findings and conclusions in that report which the parties are agreed would at any trial be inadmissible. It is not just that, strictly speaking, they are irrelevant to any decision that might be made by the trial judge. I also believe, for the reasons that I have just given, that it would be contrary to the overriding requirement of fairness for them to be taken into account in reaching a decision as to whether this case can be decided without hearing oral evidence.

100.   I would also examine the question whether the claim has no real prospect of succeeding at the outset from a totally neutral standpoint. By that I mean that I would not make any assumptions either one way or the other about the competence or integrity of the Bank or its officials as a prelude to examining the available evidence. I accept that conduct amounting to misfeasance in public office is not to be inferred lightly. That is true as a general proposition, whatever may be the task or status of the impugned public officer. But I think that it would be to risk pre-judging the case to attempt to evaluate the action's prospects of success by considering at this stage, before hearing evidence, whether the claimants' case against the Bank as regulator is inherently implausible or scarcely credible. These factors, taken as a whole, seem to me to point clearly against giving a summary judgment in the Bank's favour under CPR rule 24 .

101.   I turn then to the state of the evidence. I shall deal with this matter briefly. It is clear, as my noble and learned friend Lord Steyn has indicated, that the facts must be left to the trial judge if the case is to go to trial. As I said in my introduction (section (1)(a)), the history can conveniently be divided up into four periods: (a) prior to the grant of the licence in June 1980, (b) June 1980 to December 1986, (c) December 1986 to April 1990 and (d) April 1990 to closure in July 1991.

102. In regard to the period prior to the grant of the licence in June 1980 the majority in the Court of Appeal said that they agreed with Clarke J that there was material from which it could be said to be at least arguable that the Bank must have known that the Luxembourg regulators were not regulating BCCI SA properly and did not have the resources to do so. They were against the claimants on the question whether there was an arguable case on foresight of loss during this period: [2000] 2 WLR 15 , 92A–C. Clarke J said, at p 40 of his third judgment, that it seemed to him to offend common sense to conclude that it actually knew, believed or suspected that if it licensed BCCI SA it would, or even might, collapse. By April 1990 however the picture had, in their view, entirely changed. The majority in the Court of Appeal said that the PW report to the board of BCCI Holdings of 18 April 1990 was highly significant, as it marked a date after which it would be impossible in their judgment to contend that there was no arguable case that the Bank was aware of a very serious and very immediate threat to depositors of BCCI SA: [2000] 2 WLR 15 , 99H. Clarke J said (at p 117) that it is plain that the Bank appreciated that in the absence of remedial steps BCCI would probably collapse. His conclusion however was, at pp 164–165, that at no time between April 1990 and June 1991 did the Bank believe or suspect that the majority shareholders would probably not save the Bank. At this point therefore, as the majority in the Court of Appeal observed, at p 99H, the prospect of a rescue operation being promoted by the Abu Dhabi government, and the Bank's perception of the various possible outcomes, assumes central importance. The majority said, at p 101F, that they agreed with the judge that the claimants had no arguable case that the Bank dishonestly failed to revoke the authorisation of BCCI SA in circumstances when it knew, believed or suspected that the company would probably collapse without being rescued.

103. These views were, as can be seen from the judgments, heavily influenced by passages in the Bingham report which I consider to be irrelevant to the question whether the claim should be struck out. I have examined the available material from a different standpoint. I have left those passages out of account. I have asked myself whether, in regard to each of the four periods, the available material can be taken to have been fully examined and tested at this stage. The limitations which are inherent in this exercise are obvious. All we can do is

read the material and compare it with the case that is being made in the new draft particulars. In a simple case this may be all that needs to be done in order to reach a clear view that the claim has no real prospect of succeeding. If one can reach that view, it follows as night follows day that all the usual fact-finding exercises of discovery, interrogation and cross-examination of witnesses will achieve no purpose and the claim should be struck out. But I am not persuaded this exceptional case falls into that category.

104. I agree that there is material in the documents that are already available to support the pleading in Schedule 2, of the new draft particulars that the Bank knew that before the grant of the full licence to BCCI SA that it was not entitled to rely on the Luxembourg regulator. Given that starting point, I cannot say that the claimants have no real prospect of proving that the Bank knew that their initial act in licensing BCCI SA was unlawful, that its licence and authorisation remained unlawful throughout the remaining three periods and that all subsequent omissions to revoke the licence and authorisation were affected by the same illegality. I have more difficulty with the question whether there is material to support the pleading in Schedule 3 that at the time of licensing the Bank knew that loss was probable or that it had the state of mind regarding loss to depositors and potential depositors that amounted to recklessness. There is no direct evidence of this in the available documents, and I am not confident that they contain any material which suggests that contemporary documentary evidence to this effect is likely to become available. At best for the claimants, it appears that is a matter which will have to be inferred from other evidence.

105. But it seems to me that, as events unfold, this part of the case gathers momentum and that the available material makes it clear that the Bank knew by April 1990 at the latest that, unless a rescue could be put in hand in time by the Abu Dhabi government, BCCI would collapse and that serious loss to depositors would then be inevitable. The pattern of events during this final period is complicated, as the majority in the Court of Appeal recognised: [2000] 2 WLR 15 , 100F. For reasons already given I would leave out of account the fact, relied on by the majority at p 101E–F, that the conclusion in the Bingham report was that rescue was feasible and collapse

not inevitable. In my opinion the documents alone do not tell the full story, and the question whether the Bank knew that loss to depositors was probable or was reckless in the relevant sense cannot be answered satisfactorily without hearing oral evidence.

106. I agree with my noble and learned friend Lord Hobhouse that the overriding objective of dealing with cases justly includes dealing with them in a proportionate manner, expeditiously, fairly and without undue expense. As he says, each case is entitled only to an appropriate share of the court's resources. Account has to be taken of the need to allot resources to other cases. But I do not believe that the course which I favour offends against these important principles. The most important principle of all is that which requires that each case be dealt with justly. It may well be that the claimants, on whom the onus lies, will face difficulties in presenting their case. They must face the fact that each and every allegation of bad faith will be examined rigorously. A trial in this case will be lengthy and it will be expensive. There is only so much that astute case management can do to reduce the burdens on the parties and on the court. Nevertheless it would only be right for the claim to be struck out if it has no real prospect of succeeding at trial. I do not think that one should be influenced in the application of this test by the length or expense of the litigation that is in prospect. Justice should be even-handed, whether the case be simple or whether it be complex. It is plain that the situation in which the claimants find themselves was not of their own making, nor are they to be blamed for the volume and complexity of the facts that must be investigated. I would hold that justice requires that the claimants be given an opportunity to present their case at trial so that its merits may be assessed in the light of the evidence.

107. I have taken one other factor into account. The decision which your Lordships are being asked by the Bank to take is to give summary judgment in its favour on the entire claim. It would only be right to strike out the whole claim if it could be said of every part of it that it has no real prospect of succeeding. That would mean that even the latest depositors who were entrusting their money to BCCI SA up to the very end of the final period would be left without a remedy. I think that that is too big a step to take on the available material. Conversely, I consider that if one part of the claim is to go to trial it would be

unreasonable to divide the history up and strike out other parts of it. A great deal of time and money has now been expended in the examination of the preliminary issues, and I think that this exercise must now be brought to an end. I would reject the Bank's application for summary judgment.

**the Bank's cross-appeal**

108. The cross-appeal by the Bank is directed to the second and third of the three questions which in his order of 19 July 1995 Clarke J said should be tried as preliminary issues. The first question was whether the Bank is capable of being liable to the claimants for the tort of misfeasance in public office. That is the question to which the main part of this judgment has been directed. For the reasons which I have given I consider that it cannot be answered until the facts have been established at trial. The second and third questions were whether the claimants' alleged losses were caused in law by the acts or omissions of the Bank, and whether the claimants are entitled to recover for the tort of misfeasance in public office as existing or potential depositors. The Court of Appeal held that it would be premature to decide these points conclusively in the Bank's favour until the facts have been established; [2000] 2 WLR 15 , 68–70. I respectfully agree. As I said earlier (see paragraph 34) the Bank, while reserving the right to pursue the issue at trial, accepts that it is capable of being liable for the tort to potential depositors and questions of fact are raised by the issue about causation which are unsuitable for summary determination at this stage.

**Conclusion and further procedure**

109. For these reasons I would allow the appeal and I would dismiss the cross-appeal. I would set aside the order that the re-amended statement of claim be struck out, and I would give permission to the claimants to amend their particulars of claim in terms of the new draft particulars.

110. The claimants invited your Lordships to direct the Bank to serve an amended defence within two months of the date of this order and the claimants to serve a reply, if so advised, within six weeks of service of the

amended defence, and to direct the parties to arrange a case management conference with the Commercial Court within four weeks of the date for service of the reply with a view to determining further progress of this action and establishing all necessary timetables and directions for bringing the case on for trial at the earliest date the Commercial Court considers feasible. These proposals seem to me to be entirely reasonable. Like Lord Steyn, I anticipate that the court will wish to exercise its powers of case management with a view to bringing the case to trial with due despatch in accordance with the overriding objective and that further delay due to the hearing of interlocutory applications will now be kept to a minimum. But on balance I think that it is preferable to leave it to the Commercial Judge in charge of the case to make the appropriate directions.


LORD HUTTON


My Lords,


111.  I have had the advantage of reading in draft the speech of my noble and learned friend Lord Hope of Craighead and I gratefully adopt his account of the factual and statutory background to this appeal and of the course of the proceedings in the High Court and the Court of Appeal. I am in general agreement with his conclusions and with the reasons which he gives for them, but because of the importance of the issues which have arisen for decision I propose to state the reasons which have led me to the conclusion that the plaintiffs' appeal should be allowed and that the action should not be struck out.


112.  In his first judgment dated 1 April 1996 Clarke J stated the ingredients of the tort of misfeasance in public office. In his second judgment dated 10 May 1996 the learned judge held that the amended statement of claim as pleaded at that date did not allege the necessary knowledge of, or recklessness as to, the probability of loss, and that accordingly if that statement of claim were not further amended the plaintiffs' claim would fail and should be dismissed. But the judge gave leave to the plaintiffs to apply to amend further the statement of claim. The plaintiffs then brought an application before the judge for leave to re-amend the statement of claim and by his third

judgment dated 30 July 1997 the judge held that even if all the proposed amendments to the statement of claim were permitted the plaintiffs' claim was bound to fail. The judge stated, at pp 166–167:

> "I have reached the firm conclusion that on the material available at present the plaintiffs have no arguable case that the Bank dishonestly granted the licence to BCCI or dishonestly failed to revoke the licence or authorisation in circumstances when it knew, believed or suspected that BCCI would probably collapse. There is nothing in the Bingham report or in the documents which I have seen to support such a conclusion and there is much to contradict it."

Accordingly the judge ordered that the action be struck out, but the judge made it clear at p 169 that, but for the conclusion which he had reached that the plaintiffs' action was bound to fail, it is likely that he would have allowed all, or almost all, the proposed amendments to the statement of claim.


113.  The Court of Appeal (Auld LJ dissenting) upheld the decision of Clarke J and delivering the joint judgment of himself and Robert Walker LJ, Hirst LJ stated [2000] 2 WLR 15 , 101F:

> "The judge reached the firm conclusion, in his third judgment, that, on the material then available, the plaintiffs had no arguable case that the Bank dishonestly licensed BCCI SA or dishonestly failed to revoke the licence or authorisation in circumstances when it knew, believed or suspected that the company would probably collapse without being rescued. We agree with that conclusion. We also agree that, in all the circumstances of this extraordinary case, it is now for practical purposes inconceivable that new material would emerge of such

significance as to alter that conclusion.
The tort alleged is a tort of dishonesty,
and the plaintiffs' claim must be
rigorously assessed on their pleaded
case and the evidential material shown
to be available to support it."

In his dissenting judgment, at p 180F, Auld LJ stated:

"As the authorities to which Hirst
and Robert Walker LJJ have referred
indicate, it is normally only in clear
and obvious cases that a court should
strike out a claim as incapable of
proof at the interlocutory stage and
before full discovery. In cases, such
as this, of great legal and factual
complexity, it requires a justified
confidence that the plaintiffs' case is
and will remain incapable of proof
and most exceptional circumstances
to justify stifling it at an early stage.
For the reasons that I have given, I
do not consider that the court can
be confident that all the evidence
material to Clark J's conclusion about
the Bank's state of knowledge has been
gathered in or, which is as important,
properly tested."

114.  In giving judgment on the legal issues relating to
the nature of the tort of misfeasance in public office
the House directed that the plaintiffs should prepare a
new draft pleading ( [2000] 2 WLR 1220 , 1236E) and
accordingly the plaintiffs have prepared and served a new
pleading consisting of particulars of claim which, with
a few additions, largely contain the allegations pleaded
in the re-amended statement of claim and in the re-re-
amendments which the plaintiffs sought leave to make
from Clarke J.

115.  Before the House in the present hearing the plaintiffs
submitted that the new particulars of claim disclosed a
cause of action on which they were entitled to proceed to
trial. The Bank advanced two main submissions. The first
was that the plaintiffs' claim, whether as formulated in the
re-amended statement of claim or in the re-re-amendments
which Clarke J considered in his third judgment, or as
formulated in the new particulars of claim, disclosed
no reasonable cause of action so that the action should
remain struck out. The Bank's second submission was that
the plaintiffs' claim, in whatever way it was formulated,
was frivolous and vexatious and/or an abuse of process
and on that ground also the action should remain struck
out.

116.   The issues which arose before Clarke J and the
Court of Appeal as to whether the pleadings disclosed
a reasonable cause of action and/or were frivolous and
vexatious and/or an abuse of process were issues which
were governed by Ord 18, r 19 (1)(a)(b) and (d) of the
Rules of the Supreme Court . I think that in applications
under the Rules of the Supreme Court a clear distinction
was not always drawn between an application under Ord
18, r 19(1)(a) to strike out a statement of claim on the
ground that it disclosed no reasonable cause of action
and an application under Ord 18, r 19(1)(b) and (d) to
strike out a statement of claim on the ground that it was
frivolous or vexatious and/or an abuse of the process of
the court, and, in practice, there were cases where it was
difficult to draw or give effect to this distinction. But in a
complex case such as the present one I think it is helpful
to recognise the distinction.

117.   The 1999 White Book stated at 18/19/10 with
reference to r 19(1)(a):

"A reasonable cause of action means
a cause of action with some chance
of success when only the allegations
in the pleading are considered (per
Lord Pearson in Drummond-Jackson
v British Medical Association [1970] 1
WLR 688; [1970] 1 All ER 1094, CA
). So long as the statement of claim
or the particulars ( Davey v Bentinck
[1893] 1 QB 185 ) disclose some cause
of action, or raise some question fit to

be decided by a judge or a jury, the mere fact that the case is weak, and not likely to succeed, is no ground for striking it out ( Moore v Lawson (1915) 31 TLR 418, CA ; Wenlock v Moloney [1965] 1 WLR 1238; [1965] 2 All ER 871, CA );"

Therefore if a plaintiff would be entitled to judgment if he were successful in proving the matters alleged in his pleadings, the statement of claim could not be struck out under rule 19(1)(a) on the ground that he had no prospect of adducing evidence to prove the matters which he alleged. If a defendant wished to strike out a statement of claim and to obtain an order for the dismissal of the action on the ground that the plaintiff had no prospect of proving the case which he alleged in his statement of claim he had to do so under rule 19(1)(b) and/or (d). A case which illustrates this (although the application was to strike out, not a statement of claim, but a plea of justification in a defence) was the application made in McDonald's Corporation v Steel [1995] 3 All ER 615 where the Court of Appeal considered the correct approach to an application under Ord 18, r 19(d) to strike out a pleading for abuse of process and held, at p 623E–F, that the power to strike out was a draconian remedy which was to be employed only in clear and obvious cases where it is possible to say at an interlocutory stage and before full discovery that a particular allegation was incapable of being proved.

118.   In the present case when Clarke J struck out the action he did so on the ground that even with all the proposed re-re-amendments the plaintiffs' claim was bound to fail and that in those circumstances it would be an abuse of the process or vexatious or oppressive to allow the action to proceed (see paragraph 6 and 7 at p 172 of his third judgment).

119.   The applications before Clarke J and the Court of Appeal were governed by the Rules of the Supreme Court but those Rules have now been replaced by the Civil Procedure Rules . I think that rule 3.4 (2)(a) of the new Rules corresponds in a broad way to Ord 18, r 19(1)(a) and

rule 3.4 (2)(b) and rule 24.2 (a)(i) correspond in a broad way to Ord 18, r 19(1)(b) and (d). Rule 3.4(2) provides:

"The court may strike out a statement of case if it appears to the court—

(a)   that the statement of case discloses no reasonable grounds for bringing or defending the claim;
(b)   that the statement of case is an abuse of the court's process or is otherwise likely to obstruct the just disposal of the proceedings;"

Rule 24.2(a)(i) provides:

"The court may give summary judgment against a claimant or defendant on the whole of a claim or on a particular issue if—

(a)   it considers that—
(i)   that claimant has no real prospect of succeeding on the claim or issue;

120.   The new particulars of claim, served pursuant to the direction of the House, were served after the new Civil Procedure Rules came into force, and therefore if Clarke J and the majority of the Court of Appeal erred in their approach to the application to strike out the action the question whether the action should remain struck out falls to be determined by the House under the wording of the new Rules. In the present case I think it is desirable, as I have stated, to distinguish between the two grounds on which the Bank submits that the action should remain struck out. Using the terminology of the new Rules one ground is that the statement of case (looking only at the pleadings themselves) discloses no reasonable ground for bringing the claim (which I shall term "the attack on the pleadings point"), and the other ground is that taking into account the evidence available to the plaintiffs to adduce at a trial, they have no real prospect of succeeding on the

claim (which I shall term "the no real prospect of success point").


**The attack on the pleadings point**

121.  My Lords, the essential ingredients of the tort of misfeasance in public office were stated in the judgment of the House following the previous hearing [2000] 2 WLR 1220 and I do not propose again to restate those elements with precision. But it is clear that a plaintiff must prove (1) an abuse of the powers given to a public officer; (2) that the abuse was constituted by a deliberate act or deliberate omission by the public officer with knowledge that the act or omission was wrongful or with recklessness as to whether or not the act or omission was wrongful; (3) that the public officer acted in bad faith; and (4) that the public officer knew that his act or omission would probably injure the plaintiff or was reckless as to the risk of injury to the plaintiff. In addition the plaintiff must prove that the act or omission caused him loss, but issues of causation do not arise at this stage. As to the first and second matters to be proved, I consider that the particulars of claim sufficiently allege that the Bank deliberately abused its statutory powers in licensing BCCI and in failing to revoke the licence after it had been granted. Paragraph 33, for example, alleges:

> "33.  No revocation of the licence under the 1979 Act The Bank, knowingly, deliberately contrary to the statutory scheme or recklessly indifferent to whether it was acting in accordance with the statutory scheme or wilfully disregarding the risk that it was not acting in accordance with the statutory scheme and in bad faith:

> 33.1  purported to conclude that it was still entitled to rely upon assurances from the LBC/IML and/or that it had no discretion or power to revoke the full licence when the Bank knew or was recklessly indifferent to or wilfully disregarded the risk that, as was the case:

> 33.1.1  the criteria under paragraphs 7 (fit and proper), 8 (four eyes) and 10 (prudent manner) of Schedule 2 to the 1979 Act had not been fulfilled at the time of the grant of the full licence and remained unfulfilled at all times thereafter;

> 33.1.2  BCCI SA was illegally calling itself a bank contrary to subsection 36(1) of the 1979 Act;

> 33.1.3  BCCI SA had conducted and continued to conduct its affairs in a way which threatened the interests of its depositors;

> 33.1.4  the Bank's continued reliance upon assurances from the LBC/IML as to BCCI SA's management and financial soundness was unlawful,

> and the Bank further knew that the likely consequences were that depositors and potential depositors would suffer losses or the Bank wilfully disregarded the risk of the consequences or was recklessly indifferent to the consequences; and/or …"

122.  Bad faith is an essential element in the tort of misfeasance. In accordance with a well established rule it is necessary that bad faith (or dishonesty — the term used in some authorities) should be clearly pleaded. In Davy v Garrett (1878) 7 Ch D 473 , 489 Thesiger LJ said:

> "There is another still stronger objection to this statement of claim. The plaintiffs say that fraud is intended

to be alleged, yet it contains no charge of fraud. In the Common Law Courts no rule was more clearly settled than that fraud must be distinctly alleged and as distinctly proved, and that it was not allowable to leave fraud to be inferred from the facts. It is said that a different rule prevailed in the Court of Chancery. I think that this cannot be correct. It may not be necessary in all cases to use the word 'fraud' — indeed in one of the most ordinary cases it is not necessary. An allegation that the defendant made to the plaintiff representations on which he intended the plaintiff to act, which representations were untrue, and known to the defendant to be untrue, is sufficient. The word 'fraud' is not used, but two expressions are used pointing at the state of mind of the defendant — that he intended the representations to be acted upon, and that he knew them to be untrue. It appears to me that a plaintiff is bound to show distinctly that he means to allege fraud. In the present case facts are alleged from which fraud might be inferred, but they are consistent with innocence. They were innocent acts in themselves, and it is not to be presumed that they were done with a fraudulent intention."

I would observe that the last two sentences in this passage have to be read together with the sentence which immediately precedes them.

In Belmont Finance Corporation Ltd v Williams Furniture Ltd [1979] Ch D 250 , 268 A–C Buckley LJ stated:

"In the present case, do the facts alleged in the statement of claim suffice to bring home to the defendants or any of them a charge that (a) the object of the alleged conspiracy was a dishonest one; and (b) that they actually knew, or must be taken to have known, that it was so?"

"An allegation of dishonesty must be pleaded clearly and with particularity. That is laid down by the rules and it is a well-recognised rule of practice. This does not import that the word 'fraud' or the word 'dishonesty' must necessarily be used: see Davy v Garrett, 7 Ch D 473 , 489, per Thesiger LJ. The facts alleged may sufficiently demonstrate that dishonesty is allegedly involved, but where the facts are complicated this may not be so clear, and in such a case it is incumbent upon the pleader to make it clear when dishonesty is alleged. If he uses language which is equivocal, rendering it doubtful whether he is in fact relying on the alleged dishonesty of the transaction, this will be fatal; the allegation of its dishonest nature will not have been pleaded with sufficient clarity."

123.  In the present case paragraphs 36, 37 and 38 of the particulars of claim allege:

"36.  Failure to supervise The Bank, knowingly, deliberately contrary to the statutory scheme or recklessly indifferent to whether it was acting in accordance with the statutory scheme or wilfully disregarding the risk that it was not acting in accordance with the statutory scheme and in bad faith failed in the respects set out in these particulars of claim to supervise either BCCI SA or BCCI Overseas when:

Three Rivers DC v Bank of England (No.3) (Summary Judgment 2001) WL 239757 (2001)

36.1 the Bank knew that it had a duty to supervise under the 1979 and 1987 Acts;

36.2 the Bank's motives in deliberately failing to supervise were those pleaded in paragraph 37;

36.3 the Bank knew that the consequences of BCCI SA and/or BCCI Overseas being unsupervised was that depositors and potential depositors would suffer losses or was recklessly indifferent to the consequences or wilfully disregarded the risk of the consequences.

In support of these contentions the claimants will rely, prior to disclosure, on the facts and matters set out in Schedules 2 to 7.

**The Bank's Motives for Breaching its Statutory Duties**

37. The motives of the Bank in acting as pleaded above were improper and unlawful and in the premises the Bank acted in bad faith. The Bank's motives were:

37.1 to avoid having to comply with its duty to make, review and, if necessary revise its own express evaluation of the relevant statutory criteria in relation to BCCI SA, the Bank at all times knowing or suspecting that such criteria were not satisfied (as pleaded above);

37.2 to avoid having to become the lead supervisor in relation to BCCI or the consolidated supervisor of the BCCI Group, even though it knew that it was the only supervisor capable of performing those roles;

37.3 to avoid the risks attaching to the Bank from taking on responsibility for becoming lead supervisor or in undertaking consolidated supervision of the BCCI Group including:

37.3.1 the risk of blame; and

37.3.2 the risk of Her Majesty's Treasury having to act as a lender of last resort;

37.4 to avoid the substantial political and diplomatic problems which would have been generated by the refusal or revocation of BCCI SA's licence or authorisation and the closure of its 45 branches in the United Kingdom;

37.5 as to the use of a bank name by BCCI, to perpetuate a situation, which the Bank had favoured since as early as 1978, that regardless of any statutory requirements, BCCI SA should continue to be permitted to use the word 'bank' as part of its corporate description in the United Kingdom;

37.6 to avoid having to comply with its statutory duty whereby it should have required BCCI Overseas forthwith to apply for and obtain a full licence under the 1979 Act or to cease trading in the United Kingdom.

38. The claimants' case is that in determining the Bank's motives the Bank must be considered in the round

as the body made responsible by the 1979 and 1987 Acts for providing the supervisory regime mandated by those Acts for banks. The motives attributed to the Bank pleaded above are a matter of inference from the primary facts pleaded in Schedules 2 to 7. Further particulars will be given following disclosure."

124.  In Armitage v Nurse [1998] Ch 241 , 256G Millett LJ said:

"It is not necessary to use the word 'fraud' or 'dishonesty' if the facts which make the conduct complained of fraudulent are pleaded; but, if the facts pleaded are consistent with innocence, then it is not open to the court to find fraud."

Later in his judgment at p 259G the learned Lord Justice said:

"I am of opinion that, as at present drawn, the amended statement of claim does not allege dishonesty or any breach of trust for which the trustees are not absolved from liability by clause 15."

In Taylor v Midland Bank Trust Co Ltd (unreported, 21 July) 1999 Buxton LJ referred to the first observation of Millett LJ at p 256G and said:

"That, however, was an observation about pleading, not about substance. If (unlike the pleader in our case)

the claim does not expressly allege dishonesty, but stands on facts alone, those facts on their face will meet the requirement of a specific allegation of dishonesty only if they can bear no other meaning."

But in the present case, unlike in Armitage v Nurse , the pleader does expressly allege bad faith because paragraph 37 pleads that "the motives of the Bank in acting as pleaded above were improper and unlawful and in the premises the Bank acted in bad faith" and the paragraph sets out particulars in support of that allegation. In my opinion those particulars are not consistent with mere negligence.

125.  I further consider that if a plaintiff clearly alleges dishonesty or bad faith and gives particulars, the statement of claim cannot be struck out under rule 3.4(2)(a) because the facts he pleads as giving rise to an inference of dishonesty or bad faith may at the trial, after a full investigation of the circumstances, be held not to constitute proof of that state of mind. If a defendant applies to strike out an action on the ground that the plaintiff has no prospect of adducing evidence at the trial to establish the case which he pleads the application should be brought under rule 3.4(2)(b) or rule 24.2(a)(1).

126.  Mr Stadlen QC, for the Bank, submitted that the pleadings were defective because they did not allege that identified or identifiable bank officials took conscious decisions to do acts or to refrain from doing acts with the requisite guilty state of mind. I do not accept that submission. It is clear from the authorities that a plaintiff can allege misfeasance in public office against a body such as a local authority or a government ministry (see Dunlop v Woollahra Municipal Council [1982] AC 158 and Bourgoin SA v Ministry of Agriculture, Fisheries and Food [1986] QB 716 ). Therefore I consider that the plaintiffs are entitled in their pleadings to allege in the manner they have done misfeasance in public office against the Bank without having to give particulars of the individual officials whose decisions and actions they claim combined to bring about the misfeasance alleged.

Three Rivers DC v Bank of England (No.3) (Summary Judgment) 2001 WL 239757 (2001)

127.  The fourth element which the plaintiff must prove to establish the tort is that the public officer knew that his act or omission would probably injure the plaintiff or was reckless as to the risk of injury to the plaintiff. Mr Stadlen submitted that the judgments of the House after the earlier hearing established that to prove recklessness the plaintiff must not merely establish that the officer was aware that there was a risk of injury to the plaintiff but that he believed or suspected that his act or omission would probably injure the plaintiff and was recklessly indifferent to that probable injury. Mr Stadlen further submitted that in pleading recklessness in a number of places in the particulars of claim the plaintiffs had failed to plead that the Bank believed or suspected that its act or omissions would probably damage the plaintiffs and was recklessly indifferent to that injury and merely pleaded that the Bank "wilfully disregarded the risk of the consequences or was recklessly indifferent to the consequences": see for example the last four lines of paragraph 33.1 which I have set out above.

128.  Having expressly pleaded that "the Bank further knew that the likely consequences were that depositors and potential depositors would suffer losses" the plaintiff then pleaded "or the Bank wilfully disregarded the risk of the consequences or was recklessly indifferent to the consequences", and in my opinion the distinction between so pleading and pleading that the Bank believed or suspected that its acts or omissions would probably damage the plaintiffs and was recklessly indifferent to that probable injury is such a fine one that an argument based on the distinction cannot constitute a ground for a strike-out under rule 3.4(2)(a). In British Airways Pension Trustees Ltd v Sir Robert McAlpine & Sons Ltd (1994) 72 BLR 26 the plaintiffs' statement of claim alleged that defects in a development constructed by McAlpine and designed by Project Design Partnership had diminished its value. The defendants applied to strike out the statement of claim on the ground (inter alia) that it failed to identify which of the alleged defects had caused which part of the alleged diminution in value. In the Court of Appeal Saville LJ stated, at pp 33C–34C:

> "The various defects alleged by the plaintiffs might not all be attributable to all the defendants, the cost of

remedying the individual defects was not given and no attempt was made to ascribe to each defect the amount by which it contributed to the alleged diminution in value. At the same time I have some difficulty in seeing how the defendants could fairly be said to be seriously prejudiced by these omissions. The pleading alleges that the defects respectively attributable to McAlpine and PDP each caused the alleged diminution in value. The alleged defects themselves were set out in some detail, McAlpine and PDP had been on site for a considerable time after practical completion and so had their own means of knowledge of the alleged defects. Thus it seems to me that it can hardly be said that these defendants were in any real fashion placed in a position where they were unable to know what case they had to meet or were facing an unfair hearing. …

> "The basic purpose of pleadings is to enable the opposing party to know what case is being made in sufficient detail to enable that party properly to prepare to answer it. To my mind it seems that in recent years there has been a tendency to forget this basic purpose and to seek particularisation even when it is not really required. This is not only costly in itself, but is calculated to lead to delay and to interlocutory battles in which the parties and the court pore over endless pages of pleadings to see whether or not some particular point has or has not been raised or answered, when in truth each party knows perfectly well what case is made by the other and is able properly to prepare to deal with it. Pleadings are not a game to be played at the expense of the litigants, nor an end in themselves, but a means to the

end, and that end is to give each party
a fair hearing."

And in considering the purpose of pleadings under the
Civil Procedure Rules in McPhilemy v Times Newspapers
Ltd [1999] 3 All ER 775 , 793B Lord Woolf MR stated:

> "What is important is that the
> pleadings should make clear the
> general nature of the case of the
> pleader. This is true both under the old
> rules and the new rules."

129.  In the present case where the plaintiffs plead that
the Bank knew that the likely consequences were that
depositors and potential depositors would suffer loss
and then, in the alternative, plead recklessness, I do not
consider that the omission to plead in the context of
recklessness that the Bank believed or suspected that
injury was likely could prejudice the Bank; and if the
ultimate outcome of the trial were to depend on the precise
elements necessary to constitute recklessness, I do not
consider that the state of the pleadings would prejudice the
Bank in advancing any arguments available to it.

**The no real prospect of success point**

130.  The decision by Clarke J, upheld by the majority of
the Court of Appeal, that the action was bound to fail and
therefore should be struck out was based on two principal
conclusions. One was that there was before him all the
evidence which was at that time available to the plaintiffs
and that there was no reasonable possibility of the
plaintiffs obtaining more evidence in the future, whether
by further investigation, discovery, cross-examination of
the Bank's witnesses or otherwise which might enable
them to succeed. The second conclusion was that on
the basis of the evidence before him the plaintiff's claim
was bound to fail (see pp 171–172 of Clarke J's third
judgment).

131.  It is apparent from the judgments of Clarke J and
the majority of the Court of Appeal that in ruling that the
plaintiff's claim was bound to fail they took into account
the findings and conclusions of Bingham LJ set out in his
report. Thus at pp 37–38 of his third judgment Clarke J
stated:

> "Mr Stadlen submits that there is
> no support anywhere in the Bingham
> report for the conclusion that the
> Bank acted dishonestly, or that it
> knew that it was acting unlawfully
> or that it suspected that its acts or
> omissions would probably cause loss
> to depositors or potential depositors.
> For the reasons already stated I shall
> focus only on the last of these, but
> I accept the submission that there is
> no statement in the report which gives
> any support for the conclusion that
> at any stage the Bank suspected that
> depositors and potential depositors
> would probably suffer loss as a result
> of the Bank's action or inaction. Yet, as
> stated on page iii of the covering letter
> to which I have already referred, it is
> clear that Bingham LJ was considering
> the Bank's state of mind at every
> stage. In my judgment, if Bingham
> LJ had formed the view that at any
> stage the Bank suspected that its action
> or inaction would probably injure
> depositors or potential depositors he
> would have said so. Thus, if he had
> thought that the Bank suspected that
> BCCI would probably collapse so that
> new depositors would probably lose
> their money at any stage of the story
> from 1979 to 1991 he would have said
> so.
>
> Yet, not only did he not say
> so, but his observations on the
> evidence are inconsistent with any such
> conclusion."

There are other passages in his judgment where it is clear that Clarke J was influenced by findings or conclusions arrived at by Bingham LJ, and these have been referred to by my noble and learned friend Lord Hope of Craighead in his speech.

132.  Bingham LJ is a judge of the greatest eminence and distinction and his report sets out the entire history of BCCI from its establishment in the United Kingdom until its liquidation and the Bank's relationship to it with the greatest clarity and with much detail. It was therefore inevitable that the plaintiffs would make use of the information contained in the report in drafting their statement of claim. However, notwithstanding the distinction of its author, it is clear that under well established principles the findings and conclusions of Bingham LJ as to the actions and motives of the Bank would be inadmissible on the hearing of the action: it would be the duty and responsibility of the trial judge to decide for himself, on the evidence which he heard, what were the actions and motives of the Bank. And notwithstanding that it appears that both before Clarke J and the Court of Appeal the plaintiffs themselves sought to rely on certain passages of the Bingham report which they thought supported their case, I consider that it was also impermissible for the judge and the majority of the Court of Appeal in deciding at this interlocutory stage whether there was no real prospect of the action succeeding to be influenced by the findings and conclusions of Bingham LJ. Therefore I am in respectful agreement with the observation of Auld LJ in his dissenting judgment [2000] 2 WLR 15 , 180D:

> "In the circumstances, I am of the view that Clarke J was not entitled to treat Bingham LJ's report effectively as conclusive on the questions he, the judge, had to answer in this litigation …"

133.  Therefore I am of the opinion that by taking into account the findings and conclusions of Bingham LJ,

Clarke J and the majority of the Court of Appeal erred in considering the issue whether the plaintiffs' claim was bound to fail and that accordingly the House must itself address its mind to the issue (using the terminology of rule 24.2(a)(i)) whether the plaintiffs have no real prospect of succeeding in their claim.

134.  In Swain v Hillman [2000] 1All ER 91 , 92 Lord Woolf MR said:

> "The words 'no real prospect of being successful or succeeding' do not need any amplification, they speak for themselves. The word 'real' distinguishes fanciful prospects of success or, as Mr Bidder QC submits, they direct the court to the need to see whether there is a 'realistic' as opposed to a 'fanciful' prospect of success."

And at p 95:

> "Useful though the power is under Part 24, it is important that it is kept to its proper role. It is not meant to dispense with the need for a trial where there are issues which should be investigated at the trial. As Mr Bidder put it in his submissions, the proper disposal of an issue under Part 24 does not involve the judge conducting a mini trial, that is not the object of the provisions; it is to enable cases, where there is no real prospect of success either way, to be disposed of summarily."

135.  Mr Stadlen submitted that an action should be struck out if it was apparent that at the trial the plaintiff could adduce no evidence to establish the case which he pleaded and he relied on the judgment of Neill LJ in McDonald's Corporation v Steel [1995] 3 All ER 615 , 621E:

Three Rivers DC v Bank of England (No.3) (Summary Judgment) 2001 WL 239757 (2001)

"It is true that a pleader must not put a plea of justification (or indeed a plea of fraud) on the record lightly or without careful consideration of the evidence available or likely to become available. But, as counsel for the plaintiffs recognised in the course of the argument, there will be cases where, provided a plea of justification is properly particularised, a defendant will be entitled to seek support for his case from documents revealed in the course of discovery or from answers to interrogatories.

In recent times there has been what I regard as a sensible development whereby pleadings in libel actions are treated in the same way as pleadings in other types of litigation. It is therefore instructive to refer to a short passage in the judgment of May LJ in Steamship Mutual Underwriting Association Ltd v Trollope & Colls Ltd (1986) 6 Con LR 11 , 27, where, on an application by a firm of structural engineers that the claim against them should be struck out, he said:

'In my opinion, to issue a writ against a party … when it is not intended to serve a statement of claim, and where one has no reasonable evidence or grounds on which to serve a statement of claim against that particular party, is an abuse of the process of the court.'

Actions for defamation take many forms. The allegations complained about may vary from the moderately serious to the very grave. It may therefore be unwise to put forward a formula which will match all occasions. Nevertheless I am satisfied that before a plea of justification is included in a defence the following criteria should normally be satisfied: (a) the defendant should believe the words complained of to be true; (b) the defendant should intend to support the defence of justification at the trial; and (c) the defendant should have reasonable evidence to support the plea or reasonable grounds for supposing that sufficient evidence to prove the allegations will be available at the trial."

136. Mr Stadlen submitted that in this case the plaintiffs have no reasonable evidence to support their allegations of deliberate abuse of power in bad faith with knowledge of probable loss to the depositors or potential depositors, and he further submitted that the plaintiffs have no reasonable grounds for supposing that sufficient evidence to prove the allegations would be available at the trial. However in considering this submission it is necessary to take into account a later passage in the judgment of Neill LJ, at pp 622H–623A:

"It is to be remembered, however, that the evidence on which a defendant may be entitled to rely at trial may take a number of different forms. It may include: (a) his own evidence and the evidence of witnesses called on his behalf, (b) evidence contained in Civil Evidence Act statements, (c) evidence contained in his own documents or in documents produced by third parties

on subpoena, (d) evidence elicited from the plaintiff or the plaintiff's witnesses in the course of cross-examination, (e) answers to interrogatories and (f) evidence contained in documents disclosed by the plaintiff on discovery.

*"At the outset of the trial*

"I understand that it has become the practice in actions for defamation to consider at the outset of the trial whether some parts of the defence should be struck out on the basis that it has become apparent that some of the matters pleaded are not going to be supported by evidence. I can understand that in an appropriate case this is a sensible course which is likely to shorten the trial. On the other hand there may be cases where a defendant pleads some matter which he believes to be true but which he may still be unable to prove by admissible evidence otherwise than by eliciting an answer in cross-examination. Each case will have to be considered on its own facts."

137. Clarke J and the majority of the Court of Appeal were of the opinion that Bingham LJ had conducted such a thorough examination of the Bank's dealings with BCCI that it was unrealistic to think that any further material of relevance would emerge and that accordingly the question whether there was reasonable evidence to support the plaintiff's case was to be determined on the basis of the evidence referred to in the Bingham report. Mr Stadlen submitted that Clarke J and the majority of the Court for Appeal were right to hold that that evidence provided no support for an allegation that the Bank had acted dishonestly or in bad faith or with knowledge of probable loss to depositors. I am unable to accept that submission. Both Clarke J and the majority of the Court of Appeal found that by April 1990 the Bank knew that

BCCI would probably collapse with consequential loss to depositors and potential depositors in the absence of a rescue package. Clarke J, referring to April 1990, said at pp 116–117 of his third judgment:

"Bingham LJ concludes that he did not think that any informed reader of the report could have failed to read it as seriously impugning the honesty with which the group had been run. However, according to paragraph 2.186, with the possible exception of Mr Beverly, no-one did. Indeed in paragraph 2.187 Bingham LJ concludes that in April 1990 and for a number of months afterwards the Governors, the Board of Banking Supervision, Mr Quinn and Mr Barnes were unaware of the serious doubts thrown by Price Waterhouse on the integrity of the [b]ank's most senior management. Sir Patrick submits that that conclusion is incredible. He submits that senior representatives of the Bank must have appreciated that that was the position. I see the force of that submission, but, for present purposes, the question is not whether the Bank appreciated that there had been fraud within BCCI but whether it suspected that BCCI would probably not be rescued and nevertheless dishonestly failed to revoke its authorisation. It is plain that the Bank appreciated that in the absence of remedial steps BCCI would indeed probably collapse."

And in the judgment of the majority of the Court of Appeal Hirst LJ said at p 99G:

"The report of 18 April 1990 was not therefore a totally unheralded shock for the Bank. Nevertheless it is highly significant as marking a date after which it would be impossible, in our

Three Rivers DC v Bank of England (No.3) (Summary Judgment) 2001 WL 239757 (2001)

judgment, to contend that there was no arguable case that the Bank was aware of a very serious and very immediate threat to depositors of BCCI SA. At this point, therefore, the prospect of a rescue operation being promoted by the Abu Dhabi ruling house, and the Bank's perception of the various possible outcomes, assumes central importance."

And, at p 101H:

"Throughout the preceding four sections we have adopted the same approach as that taken by the judge, and asked ourselves whether the plaintiffs have an arguable case that the Bank actually foresaw BCCI's imminent collapse at each relevant stage. We have agreed with the judge's conclusion that all the evidence indicates that up to April 1990 it did not, and that thereafter it did, but properly relied on the prospect of a rescue. That is sufficient to dispose of the case in the Bank's favour."

138.  In my opinion the Bank cannot validly contend that on the documentary evidence available to them the plaintiffs have no real prospect of succeeding in establishing that the Bank knowingly and in a deliberate way abused its statutory powers in failing to revoke BCCI's licence after it had been granted. A memorandum dated 19 October 1983 from an official in the Bank's Banking Supervision Division to a number of senior officials of the Bank states:

"This note reviews our approach to the supervision of BCCI, arguing that our present approach fails to satisfy the requirements of the Banking Act and

recommending that we should press BCCI for local incorporation of UK operations. …

"However, these problems are less serious than the present deficiencies in our supervisory approach in the light of the Banking Act's requirements.

"The problem with regard to the section 36 contraventions is more difficult, particularly with regard to the branches of BCCI SA, to which there seems no practicable alternative to turning a blind eye."

And in a note of a meeting of Bank officials dated 17 December 1985 after a team from the Bank had visited the BCCI offices in Leadenhall Street the following comment by an official is noted:

"There is no doubt in my mind that BCCI has centralised its management, control and operations in the City. This is a UK-based bank, with its White House encompassing two buildings fronting Leadenhall Street and three at the rear. There is absolutely no way that we should continue the pretence that Luxembourg are the prime supervisors. Luxembourg is prehistoric; Grand Cayman is a tax haven; and it is the Bank of England who are the lender of last resort. If UK incorporation of the UK branch network means the movement of the Treasury Support Organisation from London to Abu Dhabi, the Bank must encourage Abedi all the way. This surely is the only route to effective supervision."

Three Rivers DC v Bank of England (No.3) (Summary Judgment) 2001 WL 239757 (2001)

139.   I observed in my speech after the earlier hearing [2000] 2 WLR 1220 , 1266F–H that I considered that, in the context of misfeasance, "in bad faith" is a preferable term to "dishonesty". In relation to the element of bad faith the plaintiffs plead in paragraph 37 of the particulars of claim that the Bank's motives set out in that paragraph constitute bad faith. Lord Neill QC, for the plaintiffs, submitted that an inference can be drawn from a number of the Bank's documents that it was reluctant to face up to the difficulties and responsibilities involved in an adequate supervision of BCCI and that it placed its own interests before the discharge of its duty to protect depositors and that this constituted bad faith on its part. It is relevant to emphasise that this is the case made by the plaintiffs. They do not make the case that the officials of the Bank were dishonest, in the sense that they acted improperly for their own financial gain. Therefore I consider, with respect, that the point that it is inherently improbable that in the absence of some financial incentive bank officials would act dishonestly, does not assist the Bank's case.

140.   Lord Neill referred (inter alia) to a letter dated 8 April 1987 from a senior official of the Bank to a senior official of the Commissariat au Controle des Banques in Luxembourg written after the Bank had been informed that it was no longer possible for Luxembourg to carry out the consolidated supervisory role which it had accepted in the last few years. In the letter the official said:

"The precise formulation set out in your letter poses a particular problem for us. This is that having decided not to take a leading supervisory role, we believe that the incorporation of the 45 UK branches here, combined with the presence in London of a large part of BCCI's overall administration, is likely to draw us in practice into the position of lead supervisor which we seek to avoid. In those circumstances, our ability to do the job effectively would be even more restricted than if we had assumed the role officially from the outset. In any case we are not at all certain that we would feel able to

grant a licence by applying the criteria under the UK Banking Act, to any part of the operation at this stage. This is because we have to be satisfied under our new legislation not only that an institution will be prudently run but that it will be run with integrity — and our experience with BCCI in the past make such a judgment difficult."

141.   In respect of the need for the plaintiffs to show material to support their allegation that the Bank knew of probable loss to depositors or was reckless as to whether there would be loss to depositors, Lord Neill referred to certain paragraphs in the affidavit of a senior Bank official sworn in July 1991 in support of the Bank's petition to wind up BCCI. The official stated:

"20.   The Bank is seriously concerned that BCCI has been managed and may still be being managed in a dishonest and fraudulent manner. The Bank is and continues to be concerned that the true financial position of BCCI has been and continues to be concealed by BCCI from the Bank and other regulatory authorities which are part of the 'college' … It appears from the Price Waterhouse report that the accounting records have completely failed and continue to fail to meet the standards required of institutions authorised under the Banking Act. It further appears that there is no proper or adequate system or controls for managing the business of BCCI. The management of BCCI have acted without integrity and with a lack of skill. Notwithstanding the fact that it might be said of some of the senior managers that they were not directly involved in the fraudulent activity described in the Price Waterhouse report, management have as a whole been involved

Three Rivers DC v Bank of England (No.3) (Summary Judgment) 2001 WL 239757 (2001)

in keeping that activity and its consequences concealed from the Bank and other regulatory authorities. As a result of the information provided to it, the Bank has no trust or confidence in the senior management of BCCI which is essential to the relationship between the regulator and the regulated bank.

"21.  As a supervisor of BCCI the Bank is concerned that the interest of depositors will be jeopardised if the affairs of BCCI are left in the hands of its managers and it has formed the view that the interest of depositors will be best served by the winding-up of BCCI. In these circumstances the Bank believes that it would be just and equitable to wind up BCCI. …

"24.  In April 1990 it became apparent that BCCI had a substantial portfolio of US \$4 billion of problem loans. In the 1989 year-end accounts substantial provisions were first raised against a US \$4 billion portfolio of problem loans in the group, many of which were booked in BCCI. On 22 May 1991 a financial support arrangement was entered into by BCCI whereby these problem loans were transferred to new companies which were either owned directly by the Government of Abu Dhabi, or if not, largely guaranteed by the Government of Abu Dhabi. In return for the loan assets BCCI received promissory notes in US\$ and UAE Dhirams equivalent in face value to US \$3,061 million. However, from the report it appears that the loan assets can be reassigned to BCCI in the event of any breach of warranty that the loan assets do not involve any activity which is criminal or illegal and which, if revealed might be expected to damage the international reputation of the Abu Dhabi Government. At

a meeting held on 5 October 1990 the Abu Dhabi Government said that if fraud was detected there could be a serious problem about the continuation of the support of the Abu Dhabi Government. Whilst the Abu Dhabi Government has said that it has no present intention to reassign the loan assets, there must be a risk that it will do so. If it does, the problem portfolio will revert to BCCI. In July 1991 the Abu Dhabi Government indicated to Price Waterhouse that it was not prepared to commit itself to providing further funds for BCCI to m[e]et all its liabilities on an unqualified basis. Given the present uncertainty surrounding BCCI's liabilities it is fair to conclude that there is no real prospect of sufficient funds being made available within such time as the relevant regulators might require."

142.  Lord Neill submitted that the concerns of the Bank set out in paragraphs 20 and 21 had been known to the Bank for a number of years, as evidenced by the letter dated 8 April 1987 to the official in Luxembourg in which the senior official of the Bank stated that the Bank had to be satisfied that BCCI would be run with integrity, "and our experiences with BCCI in the past make such a judgment difficult." Lord Neill also referred to a memorandum to the Governors of the Bank dated 15 July 1983 from a senior official of the Bank in which he said that the Bank's officials had become increasingly concerned about the ineffectiveness of the present arrangements for the overall supervision of BCCI and that he attached a note setting out possible ways of dealing with "what has now become, in our view, an unacceptable position." The note, which was headed "WHY HAS BCCI BECOME A PROBLEM? WHY IS ACTION NOW URGENTLY REQUIRED?", stated that it was clear that the principal place of BCCI was not Luxembourg but was, administratively, the United Kingdom and that being so, and in the light of the

Luxembourg authorities' admission that their resources were no longer up to the task of supervising BCCI's operations, the Bank was in "a vulnerable position". The note further stated that the Bank's knowledge of the activities of BCCI in the United Kingdom and its limited knowledge of the BCCI group as a whole did not inspire confidence in the soundness of BCCI's worldwide operations. The note went on to state:

> "As noted, the present arrangements are wholly unsatisfactory and it is not therefore considered an option to sit back and do nothing. This leaves two basic choices:
>
> • (a)  to try to have BCCI closed down, either worldwide or just the UK region;
> • (b) to arrange for its supervision on a satisfactory basis."

Lord Neill further referred to a paper of the Board of Banking Supervision dated 3 September 1987 which stated that at their last meeting they had expressed concern about whether the UK depositors with BCCI SA were receiving adequate protection from the supervisory regime in place, or in prospect. The Board asked whether the UK depositors might not be better protected if BCCI were only permitted to take deposits in the UK via a UK subsidiary. They questioned whether the formation of such a subsidiary would increase the "moral hazard" of the UK supervisors in relation to the whole BCCI group and whether, even if it did, the interests of the UK depositors should not be paramount. The paper went on to state that the cause of the concern did not stem from any obvious weakness in the BCCI group. The concern was rather one of scepticism towards a large, shadowy and swift growing bank with no natural geographic base. The paper then stated:

> "The BCCI group is frequently subject to rumours which suggest that it or its clients operate at the margin of legality. Many observers accordingly have developed a gut feeling that the

bank might suddenly run into serious difficulties without warning. The fact that so much of the group's business is booked in centres where supervision is less professional, particularly in relation to the type of business which BCCI undertakes, makes the absence of warning all the more likely."

Lord Neill submitted that in July 1983, in September 1987 and in April 1990 the Bank took no steps to arrange for supervision of BCCI on a satisfactory basis but was reckless as to the serious risk of loss to depositors.

143.  There are passages in the documents which support the Bank's case that whilst, prior to April 1990, it had concerns about the soundness of BCCI's operations, nonetheless it recognised that its overriding duty was to protect the interests of depositors and that its decisions and its conduct towards BCCI were intended to discharge that duty, so that the allegation of bad faith on its part cannot be established. Thus in the note sent to the Governors of the Bank dated 15 July 1983 its author states:

> "The closure route could only be pursued if it could be shown, with reasonable certainty, that the group's operations were fundamentally unsound; and that continued existence posed a greater threat to depositors' money than a winding up. Without a very wide ranging investigation and the fullest co-operation of other supervisory authorities it would not be possible to state, categorically, that the group's operations are unsound to the extent of endangering depositors."

But at this stage in the proceedings a court is not concerned to try to assess which side will probably succeed if there is a trial: the question is whether there is material which shows that there are issues which should

be investigated at a trial, and in my opinion the material does show this.

144.    As regards the prospect from April 1990 onwards of a rescue operation by the Abu Dhabi Government I would not take the view that the plaintiffs have no real prospect of establishing that the Bank knew that it was probable, or was reckless as to the probability, that that Government, notwithstanding its stated willingness to rescue BCCI, would not commit itself fully to meet all its liabilities as more information became available as to the extent of its liabilities and as to the dishonesty of its managers. In differing from the opinion of Clarke J and the majority of the Court of Appeal that the plaintiffs have no real prospect of success, I take into account two further considerations. One is that I think that it is reasonably possible that further material may become available to the plaintiffs before trial, and I am in respectful agreement with the view of Auld LJ, at p 180B of his judgment:

> "In addition to the different function of Bingham LJ's inquiry from the more focused issues for determination in this litigation, there are several obvious disadvantages of his procedure when compared with the court's process for determining the truth of the matter and its legal significance. His was not a statutory inquiry, so he had no power to compel the attendance of witnesses or require the production of documents; he heard the evidence of some, but not all, relevant and important players in the story; there was no counsel to the inquiry and no opportunity for adversarial discovery, interrogation or cross-examination of witnesses; and, as I have said, he acknowledged that most of his criticisms and a number of his factual conclusions were challenged, the validity of such challenges not capable of being tested on appeal.

> "In the circumstances, I am of the view that Clarke J was not entitled … to conclude, as he did, that all

the available material evidence on those questions had been gathered in. Given the greater generality of the questions in the Bingham inquiry, the limitations of it as a fact-finding exercise when compared with litigation, his acknowledgement of a number of challenges to some of his factual conclusions and the emergence of additional material since the inquiry indicating the Bank's state of knowledge as to the Gokal unrecorded loans, I can see no basis for Clarke J's confidence in this extraordinary and complex case for concluding that Bingham LJ had seen and fully tested all the material evidence available or likely to become available on the issues confronting the court in this case."

145.    Secondly, I consider that the material already available to the plaintiffs provides reasonable grounds for thinking that they may be able to advance their case by the cross-examination of the Bank's officials.

146.    In McDonald's Corporation v Steel [1995] 3 All ER 615 Neill LJ recognised that the prospect of evidence emerging on cross-examination was a matter to be taken into consideration. Mr Stadlen relied on the judgment of Chadwick LJ in Jarvis v Hampshire County Council The Times 23 November 1999; Court of Appeal (Civil Division) Transcript No 1908 of 1999 where he said, at p 35:

> "it is an abuse of the process of the court to make allegations of [dishonesty and deliberate abuse of power] in circumstances in which they cannot be supported by particulars; no less so when they are inconsistent with the substantial documentary material which is available. It is not enough to assert, as counsel for the

claimant did assert before us, that
— if the matter were allowed to go
to trial — something might emerge
through cross-examination. That is
not a proper basis on which to
make allegations of dishonesty. The
judge was right to strike out those
allegations."

147.   But the assessment whether it is reasonable to take
the view that evidence may emerge in cross-examination
depends on the particular facts of the case. In Jarvis
v Hampshire County Council it was clear that the
allegations were groundless and could not be given any
substance by the cross-examination of the defendant's
witnesses. But in the present case where there is an
arguable case that the Bank had increasing concern
about BCCI for a number of years prior to April 1990
and knew from April 1990 onwards of the imminent
collapse of BCCI unless there was a rescue, I think
that justice requires that the plaintiffs, after discovery
and interrogation, should have the opportunity to cross-
examine the Bank's witnesses as to their concerns before
1990 and as to their belief from April 1990 onwards that
there would be a rescue operation.

148.   The fact that a plaintiff does not have direct evidence
as to the belief or foresight or motives of the defendant is
not in itself a reason to strike out the action. In Taylor v
Midland Bank Trust Co Ltd the plaintiff alleged dishonest
breach of trust and the defendant applied for the dismissal
of the claim without trial under rule 24.2(a)(i). Upholding
the decision of Carnwath J to dismiss the application
Buxton LJ stated:

"[Counsel for the defendant] appeared
at one stage to argue that the case must
be made good by direct evidence, and
could not rely, as it does, on inference.
If that was the submission, I cannot
agree with it. Where the motives or
knowledge of a party is in issue, it
may often be necessary to rely on
inference rather than direct statements

or admissions by that party. There is
nothing objectionable in principle in
that, however much an inference may
be less cogent than an admission. Nor
is it right that, in drawing inferences,
a court can only infer this form of
dishonesty if the primary evidence
admits of no other explanation. That
puts the test too high. The process
of reasoning should be constrained
only by the court's appreciation of
the seriousness of the charge and the
substantiality of the evidence therefore
necessary to make it good."

149.   At p 91F of their judgment the majority of the Court
of Appeal stated:

"Were officials of the Bank to give
evidence which was fully tested by
cross-examination in the adversarial
process of a trial, it is not merely
possible, but even likely, that a clearer
and somewhat different picture would
emerge as to the Bank's corporate
state of mind from time to time,
as constituted by the states of mind
of a small number of its responsible
officials. But we would agree that
there is no realistic possibility that
the picture which emerged would
be fundamentally different. In that
respect the Bingham report is,
despite its relatively informal status,
an invaluable aid to distinguishing
between what is a practical possibility
and what is fanciful or inconceivable."

I am in full agreement with the first sentence of that
passage, but I am, with respect, unable to agree with
the last two sentences and I do not share the majority's
confidence that though in cross-examination it is likely
that a somewhat different picture would emerge, there

is no realistic possibility that a fundamentally different picture would emerge.

150.  The Bank's application has been to strike out the entire action. The Bank's case that the plaintiffs have no reasonable prospect of success can be more strongly advanced in respect of the allegations relating to the earlier part of the history of the Bank's dealings with BCCI. But having regard to the extent to which the allegations in respect of the entire period from 1979 to 1991 are interwoven and interrelated I consider that it would not be appropriate to consider striking out certain parts of the claim and that the entire action should be permitted to proceed to trial.

151.  Because of the large number of documents which were referred to by counsel and the detailed and lengthy submissions which were advanced to the House I have thought it right to state my views at much greater length than is usual when an appellate court considers a strike out application, particularly when the appellate court decides that the action should proceed to trial. But I wish to state my agreement with the observation of my noble and learned friend Lord Steyn as to the duty of the trial judge in paragraph 8 of his speech. The judge will have to decide the case after the examination and cross-examination of witnesses on the evidence which he hears and he should not be influenced by any parts of the speeches of the House in this hearing which may appear to express any opinion on the facts of the case.

152.  Accordingly for the reasons which I have given I would allow this appeal. I would dismiss the Bank's cross-appeal for the reasons given by my noble and learned friend Lord Hope of Craighead and I would make the order proposed by him.

LORD HOBHOUSE OF WOODBOROUGH

My Lords,

153.  It has been estimated that the trial of this action will occupy a whole year; I sincerely hope that this is too pessimistic. But, on any view, the continuation of the action will involve the application of very substantial resources both at the trial and in preparation for it by both of the parties and the system of justice. The volume of paper, forensic and evidential, is already formidable and the events which will have to be trawled over extend over some 15 years. The investigation of those events gave rise to a Report (the Bingham Report: 1992 HC Paper 198) which runs to 218 printed pages together with 8 volumes of (unpublished) appendices recounting the history in greater detail. It was thus understandable that it should have been thought right to examine whether such a trial and such proceedings were really appropriate and necessary in order to determine the just outcome to the parties' dispute. Indeed, under Part 1 of the Civil Procedure Rules now in force it is the overriding objective, and the duty of the courts and the parties, that cases should be dealt with justly and that this includes dealing with cases in a proportionate manner, expeditiously and fairly, without undue expense and by allotting only an appropriate share of the court's resources while taking into account the need to allot resources to other cases. This represents an important shift in judicial philosophy from the traditional philosophy that previously dominated the administration of justice. Unless a party's conduct could be criticised as abusive or vexatious, the party was treated as having a right to his day in court in the sense of proceeding to a full trial after having fully exhausted the interlocutory pretrial procedures.

154.  There were limited exceptions to this traditional approach. One was the RSC O.14 procedure for summary judgment. This was not a procedure for an informal trial; it was a procedure for enabling judgment to be entered for the plaintiff where there was no issue to be tried, in the words of the rule, no "issue or question in dispute which ought to be tried" or "other reason" why there ought to be a trial. It was to avoid delaying tactics on the part of a defendant and enable speedy judgment to be given for the plaintiff where that was appropriate and just notwithstanding that the defendant asserted that he had a defence. One of the court's powers under O.14 was to order the defendant to pay money into court as a condition of being permitted to defend. O.14 was available to the plaintiff alone; there was no equivalent procedure for summary judgment in favour of the defendant This procedure was not the same as the striking out jurisdiction which had two aspects. One was the striking out of a

party's pleading (or part of it) because the conduct of the party was objectionable, ie abusive or vexatious. For this purpose evidence was relevant and admissible. The other was the demurrer procedure which had completely different origins and served a different purpose. It derived from the formal distinction between law and fact. It provided a mechanism for testing the propositions of law upon which the party (plaintiff or defendant) was relying; it was decided upon the pleadings alone and no evidence was admissible. The court could in its discretion deal with the issue of law as a matter of striking out, or by directing the trial of a preliminary point of law, or by directing that the decision of the point of law should be left over to the full trial. In principle, though not always in practice, the striking out procedure should be used only where the point of law was not reasonably arguable. Warnings against the inappropriate use of the striking out procedure to decide arguable points of law were given by Lords Templeman and Mackay in Williams & Humbert v W & H Trade Marks [1986] AC 368 , 435–6 and 441; but the motive of simplifying procedures and saving costs was applauded and may, in the end, show that the procedure adopted was appropriate.

155.   Another exception in practice was the policy of the Commercial Court to assist the expeditious and efficient determination of disputes of commercial parties by adopting relatively informal procedures, usually at an early stage of the case, to identify the real points at issue and, by deciding them, enable the dispute to be resolved. Often this was an aspiration rather than a reality. Commercial disputes often involve lengthy and costly investigations and trials which defeat these aspirations. At times commercial litigation has been allowed to drift into over elaborate and drawn out procedures which overlook any other priority than investigating every nook and cranny and ensuring that every angle receives the full forensic exposure. In Ashmore v Corporation of Lloyd's [1992] 1 WLR 446 at pp. 453–4, Lord Templeman objected strenuously to the practice of taking "every point conceivable and inconceivable without judgment and discrimination" and exhorted judges and appellate courts to control the conduct of proceedings. Lord Roskill agreed with him (at p.448), saying:

"The Court of Appeal appear to have taken the view that the plaintiffs were entitled of right to have their

case tried to conclusion in such manner as they thought fit and if necessary after all the evidence on both sides had been adduced. With great respect, like my noble and learned friend, I emphatically disagree. In the Commercial Court and indeed in any trial court it is the trial judge who has control of the proceedings. It is part of his duty to identify the crucial issues and to see they are tried as expeditiously and as inexpensively as possible. … Litigants are not entitled to the uncontrolled use of a trial judge's time. Other litigants await their turn. …"

156.   There is always an exercise of judgment to be undertaken by the judge whether the perceived short-cut will turn out to have been beneficial and, inevitably in a proportion of cases expectations will be confounded. Caution is required. But it is simplistic to suppose that in complex litigation the exercise should never be attempted. The volume of documentation and the complexity of the issues raised on the pleadings should be the subject of critical scrutiny and should not without more deter the judge from considering whether it is really necessary to commit the parties and the court to a lengthy trial and all the preparatory steps which that will involve. Indeed it can be submitted with force that those are just the sorts of case which most strongly cry out for the exclusion of anything that is unnecessary for the achievement of a just outcome for the parties.

157.   The present case illustrates these considerations. The Commercial Judge was faced with an action dependant upon a cause of action of which the parameters were not wholly certain and a statement of claim which may or may not have disclosed a case sufficient in law to enable the plaintiffs to succeed. He ordered the trial of preliminary questions of law. He was clearly right to do so even though the decision of those questions has led to appeals to your Lordships' House. However difficulties then arose with the plaintiffs' pleadings. At each level the plaintiffs have

re-pleaded their case to accommodate the fresh thinking about the elements of the tort of misfeasance in public office. Further, the courts at each level have been called on to adjudicate upon the proposed revised pleading, your Lordships included. This has led to an unsatisfactory state of affairs. Any skilful pleader should be able to draft a pleading which sufficiently makes the minimum allegations to support the legal definition of the tort and I have detected no lack of skill in the lawyers acting for either side in this litigation. The question then becomes whether the particulars given provide realistic support for the primary allegations. This has in turn led to a detailed examination both in the courts below and before your Lordships of these allegations. I will have to comment upon the suitability of that course in your Lordships' House. It was probably inevitable before the judge and may have been so before the Court of Appeal where questions of leave to amend were also debated. It was complicated in the Court of Appeal by the fact that Auld LJ did not agree with the majority on the law. Before the judge and in the Court of Appeal the decision was given on the basis of the Rules of the Supreme Court not the Civil Procedure Rules .

158.  This leads me back to the CPR. As previously noted, Part 1 adopts a philosophy similar to that enunciated in Ashmore v Lloyd's . It is followed through into the new version of RSC O.14. It is Part 24 . It authorises the court to decide a claim (or a particular issue) without a trial. Unlike O.14, it applies to both plaintiffs (claimants) and the defendants. It therefore can be used in cases such as the present where the application for judgment without trial is being made by the defendant. The court may exercise the power where it considers that the "claimant has no real prospect of succeeding on the claim" and "there is no other reason why the case or issue should be disposed of at a trial". The concluding phrase corresponds to the similar phrase used in RSC O.14 r.3(1) and has not been relied upon in the present case. The important words are "no real prospect of succeeding". It requires the judge to undertake an exercise of judgment. He must decide whether to exercise the power to decide the case without a trial and give a summary judgment. It is a 'discretionary' power, *ie* one where the choice whether to exercise the power lies within the jurisdiction of the judge. Secondly, he must carry out the necessary exercise of assessing the prospects of success of the relevant party. If he concludes that there is "no real prospect", he may decide the case

accordingly. I stress this aspect because in the course of argument counsel referred to the relevant judgment of Clarke J as if he had made "findings" of fact. He did not do so. Under RSC O.14 as under CPR Part 24 , the judge is making an assessment not conducting a trial or fact-finding exercise. Whilst it must be remembered that the wood is composed of trees some of which may need to be looked at individually, it is the assessment of the whole that is called for. A measure of analysis may be necessary but the 'bottom line' is what ultimately matters. Part 24 includes provisions covering various ancillary matters, at what stage the application can be made (24.4), the filing of evidence (24.5) and supplementary powers of the court (24.6). The Practice Direction which was originally appended filled out some of what is in the rules.

> Where a defendant applies for judgment in his favour on the claimant's claim, the court will give that judgment if either:
>
> > • (1)  the claimant has failed to show a case which, if unanswered, would entitle him to judgment, or
> > • (2) the defendant has shown that the claim would be bound to be dismissed at trial.

> "4.3   Where it appears to the court possible that a claim or defence may succeed but improbable that it will do so, the court may make a conditional order as described below."

The criterion which the judge has to apply under Part 24 is not one of probability; it is absence of reality. The majority in the Court of Appeal used the phrases "no realistic possibility" and distinguished between a practical possibility and "what is fanciful or inconceivable". ( [2000] 2 WLR p.91G ) Although used n a slightly different context these phrases appropriately express the same idea. Part 3 of the CPR contains similar provisions in relation to the court's case management powers. These include explicit powers to strike out claims and defences on the ground, among others, that the statement of case discloses no reasonable ground for bringing or defending the claim.

159.  Before your Lordships it was accepted by counsel that this part of the appeal should be decided under CPR Part 24 applying the criterion "no real prospect of success". An exchange of correspondence has confirmed this. (A similar criterion is also appropriate where there is an application for leave to amend to add a new case.) Recent statements in the Court of Appeal concerning Part 24 bear repetition:

> "The words 'no real prospect of being successful or succeeding' do not need any amplification, they speak for themselves. The word 'real' distinguishes fanciful prospects of success or, as [counsel] submits, they direct the court to the need to see whether there is a 'realistic' as opposed to a 'fanciful' prospect of success."

> "It is important that a judge in appropriate cases should make use of the powers contained in Part 24. In doing so he or she gives effect to the overriding objectives contained in Part 1. It saves expense; it achieves expedition; it avoids the court's resources being used up on cases where this serves no purpose and, I would add, generally, that it is in the interests of justice. If a claimant has a case which is bound to fail, then it is in the claimant's interests to know as soon as possible that that is the position."
> Swain v Hillman [2001] 1 All ER 91 , 92, 94, Lord Woolf MR

> "The CPR are a procedural code with the overriding objective of enabling the court to deal with cases justly including saving expense and ensuring that it is dealt with expeditiously and fairly. The court must seek to give effect to the overriding objective when it exercises any power given to it or interprets any rule. I take this into account when

considering the application under Part 24.2. … [The language of Part 3.4] is very akin to that in the now extinct RSC O.18 & 19 and under which this application was commenced (and as good as succeeded) at the first hearing. This Part includes 'a claim which raises an unwinnable case where continuance of the proceedings is without any possible benefit to the respondent and would waste resources on both sides'."
> Sinclair v Chief Constable of West Yorkshire and Anor (A2/2000/2075), CA, 12 December 2000 , Otton LJ at p 15. (and see Harris v Bolt Burdon 2000 CPLR 9 )

There is no point in allowing claims to proceed which have no real prospect of success, certainly not in proceeding beyond the stage where their hopelessness has clearly become apparent.

160.  The difficulty in the application of the criterion used by Part 24 is that it requires an assessment to be made in advance of a full trial as to what the outcome of such a trial would be. The pre-trial procedures give the claimant an opportunity to obtain additional evidence to support his case. The most obvious of these is discovery of documents but there is also the weapon of requesting particulars or interrogatories and the exchange of witness statements may provide a party with additional important material. Therefore the courts have in the present case recognised that they must have regard not only to the evidence presently available to the plaintiffs but also to any realistic prospect that that evidence would have been strengthened between now and the trial. Indeed, it was the submission of Mr Stadlen QC for the defendants that Clarke J had applied the right test when he said:

> "In my judgment the question in the instant case is whether the Bank has persuaded the court that the plaintiffs' case is bound to fail on the material at present available and that there is no reasonable possibility of evidence becoming

available to the plaintiff, whether by
further investigation, discovery, cross-
examination or otherwise sufficiently
to support their case and to give it
some prospect of success. If the Bank
discharges that burden, it will follow
that the plaintiffs' claim is bound
to fail. In that event to allow the
action to proceed would serve no
useful purpose. It would only involve
the expenditure of time and money
— in this case a very great deal of
both. Neither party would have any
legitimate interest in such expenditure
because it could not benefit either."
(p.6–7)

It is possible that this test, in its reference to cross-
examination, may be rather too favourable to the
plaintiffs. It is derived from what was said in relation
to a plea of justification by Neill LJ in McDonald's
Corporation v Steel [1995] 3 AER 615 , a defamation
action. He included cross-examination no doubt because
in a defamation action, although the burden of proving
justification is upon the defendant, the publisher of the
libel, it is normal for the plaintiff to call his evidence
first; justification is a defence. Where an allegation of
dishonesty is being made as part of the cause of action
of the plaintiff, there is no reason why the rule should
not apply that the plaintiff must have a proper basis
for making an allegation of dishonesty in his pleading.
The hope that something may turn up during the cross-
examination of a witness at the trial does not suffice. It
is of course different if the admissible material available
discloses a reasonable *prima facie* case which the other
party will have to answer at the trial.

161. The judge's assessment has to start with the relevant
party's pleaded case but the enquiry does not end there.
The allegations may be legally adequate but may have
no realistic chance of being proved. On the other hand,
the limitations in the allegations pleaded and any lack
of particularisation may show that the party's case is
hopeless. The tort of misfeasance in public office is a tort
which involves bad faith and in that sense dishonesty.
It follows that to substantiate his claim in this tort, first

in his pleading and then at the trial, a plaintiff must be
able to allege and then prove this subjectively dishonest
state of mind. The law quite rightly requires that questions
of dishonesty be approached more rigorously than other
questions of fault. The burden of proof remains the
civil burden — the balance of probabilities — but the
assessment of the evidence has to take account of the
seriousness of the allegations and, if that be the case,
any unlikelihood that the person accused of dishonesty
would have acted in that way. Dishonesty is not to
be inferred from evidence which is equally consistent
with mere negligence. At the pleading stage the party
making the allegation of dishonesty has to be prepared
to particularise it and, if he is unable to do so, his
allegation will be struck out. The allegation must be made
upon the basis of evidence which will be admissible at
the trial. This common sense proposition has recently
been re-emphasised by the Court of Appeal in Medcalf
v Mardell (A3/2000/6456) 24 November 2000 , in which
Peter Gibson LJ said (§40): "The material evidence must
be evidence which can be put before the court to make
good the allegation." Evidence which cannot be used in
court cannot be relied upon to justify the making of
the allegation of dishonesty. I mention this because it
shows the principle to be applied and not because there
is any suggestion in the present case that there is any
inadmissible material which would support allegations of
dishonesty in the present case. It is normally to be assumed
that a party's pleaded case is the best case he can make
(or wishes to make). Therefore, in the present case, the
particulars given provide a true guide to the nature of the
case being made by the plaintiffs (claimants).

162. I agree with my noble and learned friend Lord
Hope that in substance Clarke J asked himself the right
questions and that, as he expressed it, he directed himself
correctly as to the relevance of the Bingham Report. My
noble and learned friend and those who agree with him
however critical of the actual use made by Clarke J and
the majority of the Court of Appeal of the Report. I consider
that with minor exceptions these criticisms are not fair to
Clarke J nor to Hirst and Robert Walker LJJ. The relevant
exercise was as I have said earlier not one of making
findings of fact or comparable to a trial on admissible
evidence. It was to make a predictive assessment. To use
the Report as an aid was clearly appropriate and proper.
Further, as the plaintiffs themselves said, their pleading
and its particularisation was substantially taken from the

Three Rivers DC v Bank of England (No.3) (Summary Judgment) 2001 WL 239737 (2001)

facts set out in the Report. They were using the Report to plead their case: "With one principal exception, the statement of claim is pleaded on the basis of the Bingham Report." (Clarke J at p.48) It was therefore not only permissible but also pertinent to compare their selection from the history recounted in the Report with the whole and the conclusions drawn in the Report. If the plaintiffs seek to infer bad faith which Bingham LJ declined to infer or even contradicted, is it realistic to suppose that a judge will hereafter be persuaded to do so? The Report is in reality at the present stage the context in which the plaintiffs' particulars must be read and their viability assessed. The approach of Clarke J was careful and fair to the plaintiffs. He distinguished between the presently available material and that which might become available in the future (pp.166–9). He said:

> "I have reached the firm conclusion that on the material available at present the plaintiffs have no arguable case that the bank dishonestly granted the licence to BCCI or dishonestly failed to revoke the licence or authorisation in circumstances when it knew, believed or suspected that BCCI would probably collapse. There is nothing in the Bingham Report or in the documents which I have seen to support such a conclusion and there is much to contradict it.

> …

> "There is nothing in [the Report] which gives reasonable grounds for supposing that there might be other evidence which might in the future support the plaintiffs' case. In these circumstances I accept Mr Stadlen's further submission that there is no realistic possibility of more evidence becoming available, whether by further investigation, discovery, cross-examination or otherwise, which might throw light upon the state of mind of the bank or any of its relevant

officials during the period in which BCCI was operating."

He therefore concluded that the plaintiff's case would be bound to fail and that he could see no justification for allowing the action to continue: "To do so would be to require an enormous expenditure of time and money to no avail." For myself, I see nothing to criticise in this methodology or chain of reasoning. The critical matter is whether one agrees with his assessment of the inevitability of failure. Were this appeal simply about whether Clarke J had misdirected himself or acted improperly in some way in the exercise of his discretion, I would regard it as improper to allow the appeal. But that is not the manner in which this appeal has been argued. The defendants have accepted that your Lordships' House should reassess the decision to dismiss the plaintiffs' claim using CPR 24 and it is to that that I now turn albeit with the apprehension that your Lordships may have been over influenced by the plaintiffs' submissions about the relevance of the Report.

**The cause of action:**

163.   This was the subject of the earlier hearing and decision of your Lordships, [2000] 2 WLR 1220 . It is easy to forget that the reason why the plaintiffs have to rely upon the tort of misfeasance in public office is that they cannot allege that the defendants owed them a duty of care. If the plaintiffs were able to rely upon the tort of negligence, their claim would be easy to formulate and, whether or not it would ultimately succeed, would undoubtedly have to go to trial. But, in the present context, to formulate and sustain a claim in the tort of misfeasance in public office is not straightforward, hence a need to have regard to its constituents.

164.   In the speeches of your Lordships, in which I joined, delivered in May of last year, the essential constituents of that tort were explained. The tort is exceptional in that it is necessary to prove the requisite subjective state of mind of the defendant in relation not only to his own conduct but also its effect on others. That state of mind is one equivalent to dishonesty or bad faith and knowledge includes both direct knowledge and what

Three Rivers DC v Bank of England (No.3) (Summary Judgment) 2001 WL 239757 (2001)

is sometimes called 'blind eye' knowledge. ('Blind eye' knowledge has since been discussed in different contexts by your Lordships in Manifest Shipping v Uni-Polaris Shipping [2001] 2 WLR 170 and White v White [2001] UKHL/9 .) These features are referred to in the speeches.

> "It involves bad faith inasmuch as the public officer does not have an honest belief that his act is lawful." "The [19th century] decisions laid the foundation of the modern tort; they established the two different forms of liability; and revealed the unifying element of conduct amounting to an abuse of power accompanied by subjective bad faith." (Lord Steyn at p.1231)

> "My Lords, I consider that dishonesty is a necessary ingredient of the tort and it is clear from the authorities that in this context dishonesty means acting in bad faith." (Lord Hutton at p.1266)

> "The official concerned must be shown not to have had an honest belief that he was acting lawfully;" (Lord Hobhouse at p.1269)

> "The policy underlying it is sound: reckless indifference to consequences is as blameworthy as deliberately seeking such consequences. It can therefore now be regarded as settled law that an act performed in reckless indifference as to the outcome is sufficient to ground the tort in its second form." (Lord Steyn at p.1232)

> "The official does the act intentionally being aware that it risks directly causing loss to the plaintiff or an identifiable class to which the plaintiff belongs and the official wilfully disregards that risk. ... His recklessness arises because he chooses

wilfully to disregard that risk." "Subjective recklessness comes into the formulation at the first and last stage because it is in law tantamount to knowledge and therefore gives rise to the same liability:" (Lord Hobhouse at p.1270)

165.   Having carefully considered the submissions of the parties on both sides, the material which has been placed before us, what further material may reasonably be expected to become available to the plaintiffs before the time of the trial and the judgments of the courts below, I have come to the conclusion that the appeal should be dismissed. Like my noble and learned friend Lord Millett, my assessment is that the plaintiffs' claim does not have a real prospect of success. The majority of your Lordships are however of a different view and would allow the appeal and direct that the case proceed to a full trial on the alleged liability in tort. Under these circumstances, whilst it is my duty to state what my decision would have been and briefly give my reasons, it is inappropriate that I should say anything which will prejudge the conduct or outcome of that trial when it occurs. The outcome will be a matter for the trial judge in the light of the ruling which your Lordships have earlier given on the law, the evidence adduced at the trial and the submissions of the parties. It is the trial judge who will have to decide how the trial should be conducted and what findings of fact to make.

166.   To turn now to the reasons for my assessment of the prospects of the claim, I will structure what I say applying the law as stated last May and applying it to the facts in two periods, first that period ending with the grant of the licence in June 1980, secondly that from July 1980 to the collapse of BCCI in July 1991. The plaintiffs' complaint in these two periods is different. In the first period it is that the defendants wrongly licensed BCCI under section s.3 of the Banking Act 1979 when they were forbidden by the statute from doing so. In the second period the complaint is that the defendants failed to supervise BCCI as they were required to do by the 1979 Act and its successor the Banking Act 1987 and failed to perform an obligation under those Acts to revoke the licence. I will take the law

as stated in my speech, not because it is materially different from what was said by Lord Steyn, but because its analysis is unifying and therefore easier to apply in the discussion of these two periods and was, indeed, the formulation primarily relied upon by the plaintiffs.

167. The commission of the tort has two stages. The first is the act done by the defendant. The act must be an unlawful act, not in the sense that it is itself tortious but in the sense that it is contrary to the law for the defendant to have done what he did. In the case of a failure to act it must be a failure to do a specific act which it was the legal obligation of the defendant to do and which was therefore unlawful. In either case there must be unauthorised or forbidden conduct. The conduct must be accompanied by either actual or subjectively reckless, or 'blind eye', knowledge that it is unauthorised or forbidden. The second stage is that which relates to the defendants' appreciation of the consequences of his conduct. This may arise from his purpose in doing what he did (my first 'limb', Lord Steyn's first form of the tort) or from his appreciation that the plaintiff will in the ordinary course be caused loss or his consciously and wilfully turning a blind eye to the possibility of such loss (my second and third 'limbs', Lord Steyn's second form of the tort). Therefore, in making the assessment required by this appeal, one must apply this two stage test to the plaintiffs' case for the two periods.

**The First Period:**

168. The Act of 1979 introduced a system of licensing for deposit-takers which was new. The task of the defendants was not easy since they were faced with having to decide for the first time and within a relatively short time-scale whether to grant or refuse a licence to a substantial number of institutions which were already established businesses. The refusal of a licence would mean that the institution could no longer accept deposits and would have to go out of business. (s.1(1)) However the defendants' statutory obligation was clearly stated. In s.3(3)(b) and Part II of the Second Schedule, criteria are laid down which must be met unless subsection (5) applies. In any other case the defendants were forbidden from granting the licence. The defendants purported to grant the licence under subsection (5). For this to apply, the principal place of business of the institution must be in a country outside the United Kingdom *and* the

supervisory authority in that country must have informed the defendants that they are satisfied with respect to the management of the institution and its overall financial soundness *and* the defendants must be satisfied with the nature and scope of the supervision exercised by those authorities. I consider that the plaintiffs clearly have a fully arguable case that these criteria were not satisfied and that the officials acting for the defendants cannot have believed that these criteria were satisfied. Therefore the plaintiffs have an arguable case on the first stage of the legal test. The courts below were of the same opinion and Mr Stadlen for the defendants only faintly argued the contrary.

169. The plaintiffs failed in the courts below on the second stage. Clarke J said:

> "Both BCCI SA and the group appeared to be profitable, the shareholders appeared to be supportive and willing to supply more capital when asked, the auditors were giving unqualified opinions on the accounts and the LBC continued to give favourable opinions. [Bingham] also refers to the attitude of the Bank of America, to which I shall return. In these circumstances, it cannot fairly be said that at this stage the Bank suspected that BCCI would probably collapse." (pp.42–3)

> "In all the circumstances I have reached the clear conclusion that on the evidence available at present, either as referred to in the Bingham Report or as contained in the documents to which I have been referred, the plaintiffs' case that the Bank knew, believed or suspected that if it gave BCCI a licence it would probably collapse is bound to fail." (pp.58–9)

> "I must say that, however critical one is of the Bank (and there is plenty of scope for criticism), it seems to me to

offend common sense to conclude that
before it licensed BCCI SA, in 1980
it actually knew, believed or suspected
that if it licensed BCCI SA, BCCI SA
would (or even might) subsequently
collapse." ( [2000] 2 WLR pp.91–2 )

In the Court of Appeal, the majority agreed that there
was no arguable case on foresight of loss. (p.92) Auld LJ
based his view on the application of a different view of the
constituents of the tort, a view which has been held to be
wrong by your Lordships.

170. It is not suggested that the defendants granted
the licence with the purpose of causing loss to any of
the plaintiffs. The plaintiffs' case is, rather, that the
officials consciously closed their eyes to what might be the
consequences to present and future depositors of granting
and not refusing the licence. There is no direct evidence
to support this improbable allegation. The main evidence
which is said to support the allegation is in part the
self evident proposition that the officials probably had
in mind that one of the main purposes of the regime
introduced by the 1979 Act was to protect depositors as
is stated in the preamble of the Act plus the proposition
that if the safeguards in the Act were not observed before
granting a licence there must be a risk that depositors will
not be effectively protected; and partly that the officials
had already learnt some very disturbing facts about the
conduct of the BCCI, for example, from the publicity
surrounding the withdrawal of the Bank of America.
But there is no evidence to support the appreciation
of the officials of the risk they were running nor that,
having appreciated it, they wilfully chose to disregard it
and hazard the depositors. At the relevant time BCCI
appeared to be a flourishing and successful, though to
some extent controversial, institution with very many
satisfied depositors. The evidence both at the time and
subsequently is that the officials thought that they would
look silly if they raised difficulties for the approval of
BCCI and that if they did they would not have been
supported if challenged on an appeal. The objective fact is
that no depositor actually lost any money until many years
later after much else had happened, including the passing
of a new Act in 1987. Problems of proving legal causation
will obviously also arise.

171. There is simply no evidence of any contemplation
at this stage that depositors with BCCI would lose
their money. There is no evidence whatsoever, nor any
allegation, of any corruption of any official of the
defendants, either at this time or subsequently. The
evidence of the requisite *subjective* state of mind is not
there and there is no reasonable basis for believing that
it ever will be. The case of the plaintiffs is in reality one
in negligence supported by *objective* criteria and this does
not suffice for the tort upon which they have to rely. This
is as I see it an insuperable difficult for them on this part
of the case.

**The Second Period:**

172. Here the difficulties which the plaintiffs have to
overcome are more fundamental. The foundation of the
tort is that the relevant person has done something (in
the positive or negative sense) which is contrary to the
law. The statutory provisions upon which the plaintiffs
rely are ones which give the defendants powers in respect
of licensed institutions. Their case is that they constitute
a statutory scheme which included a duty to supervise
the deposit-taker which the defendants failed to perform
adequately. Their more specific case is that the defendants
failed to make use of the statutory power given to them
under s.11 of the 1987 Act to revoke the authorisation
of BCCI, or to exercise one or more of the lesser powers
given by sections such as s.12 (restriction of authorisation)
or s.19 (directions). The difficulty for the plaintiffs here is
that they are unable to sue in the tort of negligence and
that the failures of the defendants which they allege do
not have the character of unlawfulness. They all involve
the exercise of discretions and judgment. There is no
allegation which the plaintiffs can make that the statute
made it *unlawful* for the defendants not to take some
particular step at any given time.

173. This ties in with the plaintiffs' next difficulty. There
is no evidence that the defendants and their officials
were doing anything other than their best to handle
the developing situation in a responsible manner in
accordance with the Act. The officials may have been
out of their depth. They may have been more optimistic
than was justified now that all the facts are known. But,

Three Rivers DC v Bank of England (No.3) (Summary Judgment) 2001 WL 239757 (2001)

particularly in the later stages they were faced with a delicate situation where there were a number of conflicting interests to be taken into account and where any over-reaction would have caused BCCI to collapse without hope of rescue and with far greater losses to its creditors than ultimately occurred. It is easy to overlook the fact that the defendants' forbearance led to the injection in 1990 of substantial additional shareholder funds (how much these were and what happened to them is apparently questioned). The situation developed over the years. In the earlier years, the problem was indiscipline without the anticipation of a threat of default. Later, that situation developed into one which included a growing threat of failure, at first remote, finally grave and imminent. But in all these situations the defendants had to exercise judgment. The wrong step on their part would only make things worse. In 1988 the "College" was constituted and an international approach adopted in which the defendants participated; the defendants would have been irresponsible not to have done so. The plaintiffs have sought to identify some four occasions when they submit that the defendants knew that they had grounds for exercising one or more of their statutory powers and decided not to. Their inaction may be open to criticism. It can be argued that they should have acted differently but that is not the same as arguing that they acted unlawfully and, naturally, there is no evidence that they knew or even suspected that they might be acting unlawfully. The plaintiffs wish to present a case of dishonesty but they have not got the material to justify the allegation and have no realistic prospect of ever obtaining it. Instead, their case seeks to proceed from the proposition that the defendants were under a statutory duty to supervise BCCI to an allegation that the defendants were aware that they were not exercising effective supervision and thence to the allegation that it was unlawful for the defendants not to have exercised one or more of certain powers given to them under the Act. This is a *non sequitur* . The powers remain discretionary. It does not follow from the proposition that it would have been lawful to exercise one or more of those powers that not to exercise them was unlawful.

174. The same applies to the second stage of the test. There is no evidence that the defendants were setting out to cause anyone loss. In the earlier stages they did not foresee the disaster that was to come. In the later stages they were striving to avoid disaster and, if it proved not possible

to avoid it, to limit the losses which would in that event inevitably be suffered. The officials had nothing to gain. All the evidence is that they were doing their best. Once they realised the scale of the problem with BCCI, they did not close their eyes to the consequences of a failure; they attempted to avoid precipitating that collapse which would clearly have been the consequence of the wrong kind of intervention. One can illustrate the general point from the plaintiffs' own pleading, schedule 5, paragraph 27(ii): the decision not to revoke the full licence in October 1986 was taken because the officials concluded that "there appeared to be no immediate danger to depositors and it seemed unlikely that there were grounds for revoking BCCI SA's licence outright".

175.    The hearing before your Lordships has been concerned with whether the plaintiffs have a real prospect of success in the action. On any view they face very serious difficulties in presenting and substantiating their case. The burden of proof is upon them. The tort upon which they must rely is one which requires the plaintiffs to prove serious allegations of actual bad faith — dishonesty — against the officials. It is an abuse of process to make the allegations unless the plaintiffs have material to support at least a prima facie case that the allegations are correct. They do not have that material. For the action to be allowed to proceed on the speculation, not backed up by any real expectation, that they may before trial find evidence to support their allegations is vexatious. It is also contrary to the procedural rules now in force. These rules are based upon sound principles of the administration of justice. Doing justice includes bringing to a conclusion highly expensive and long drawn out litigation procedures, inevitably complex, which have no real prospect of success. The real grievance of the actual plaintiffs is that they believe that the law ought to allow actions in negligence against regulators but they accept through their counsel that it does not. I would dismiss the appeal.

LORD MILLETT

My Lords,

176.  The Bank of Credit and Commerce International SA ("BCCI") was incorporated under the laws of Luxembourg and obtained a banking licence from the Luxembourg Banking Commission ("the LBC") in 1972. In the years which followed it carried on a world-wide business as a bank and deposit taking institution. Shortly after it received the licence from the LBC it established an office in London which eventually became its principal place of business. By 1979 it had 45 branches in the United Kingdom through which it offered a full range of banking services to members of the public.

177.  The Banking Act 1979 came into force in October 1979. The Act made the Bank of England ("the Bank") formally responsible for supervising banks and other deposit taking institutions in the United Kingdom and conferred wide regulatory powers upon the Bank to enable it to discharge its functions. For the first time authorisation was required for a banking or deposit taking business to be carried on in the United Kingdom. The Act applied to companies like BCCI which was already carrying on an existing business in the United Kingdom as well as to those which wished to commence business here.

178.  In 1980 the Bank granted BCCI a licence to accept deposits. Withholding the licence would have compelled the closure of BCCI's business in the United Kingdom (and in all likelihood elsewhere), with virtually certain loss to depositors. In granting the licence the Bank relied on the judgment of the LBC and made no independent judgment of its own whether the statutory criteria for authorisation were satisfied. It was not entitled to do this because BCCI's principal place of business was in the United Kingdom. Thereafter BCCI continued to carry on business in the United Kingdom and elsewhere for a further 11 years before it was closed down in July 1991 by regulatory action taken by the Bank. Depositors, most of whom must have become depositors or increased their deposits after 1980, have suffered substantial losses. They blame the Bank for its supervisory failures and seek to hold it responsible for their losses. They believe that the Bank was grossly negligent in granting the licence in the first place and in failing to revoke it or take other regulatory action long before it did.

179.  Unfortunately for the depositors, a regulatory authority cannot be held liable in English law for negligence, however gross, in the exercise of its supervisory functions. So the depositors have been forced to base their claim on a very different cause of action. They allege that the Bank has been guilty of misfeasance in public office. This is an intentional tort. It involves deliberate or reckless wrongdoing. It cannot be committed negligently or inadvertently. Accordingly it is not enough for the depositors to establish negligence, or even gross negligence, on the part of the Bank. They must establish some intentional or reckless impropriety. As your Lordships ruled unanimously at an earlier stage of these proceedings ( [2000] 2 WLR 1220 ), and in the absence of what has been described as "targeted malice" (which is not alleged), the tort has two elements. In the present case the depositors must prove (i) not merely that the Bank acted unlawfully, that is to say in excess of its powers or for an improper purpose, but that it did so *knowingly* (or recklessly not caring whether it had the necessary power or not); and (ii) that the Bank *knew* that its actions would probably cause loss to depositors (or was recklessly indifferent to the consequences of its actions). Such conduct in a public official is grossly improper and equates to dishonesty in a private individual.

180.  Seen in this light, the depositors' case is a most implausible one. A bank regulator has a very difficult task and one which may call for an exercise of judgment of some nicety, since it must seek to protect future depositors against the risk of loss without sacrificing the interests of existing depositors. No responsible regulator would contemplate closing down a bank or other deposit taking institution (or taking other action which risked a run on it) with inevitable loss to existing depositors unless there was no alternative, ie unless it considered that collapse was virtually inevitable. A regulator's task has often to be performed on incomplete information and is highly judgmental. Even an action based on negligence would face formidable difficulties. But it is scarcely credible that, unless corrupt, public officials should have been guilty of intentional wrongdoing or have been indifferent to the consequences of their actions to the very people they were supposed to protect. It is not beyond the bounds of possibility, of course, but in the absence of any incentive to act in this way it is in the highest degree unlikely. Certainly such conduct cannot lightly be inferred.

181. But the present case goes far beyond this. The Bank was formally concerned with the supervision of BCCI for more than 11 years (and informally for a further 8 years) and the supervisory attention which it paid to BCCI during this time was very great. The depositors are alleging deliberate or reckless wrongdoing on the part of a large number of officials at different levels of seniority over a long period. This would involve wholesale wrongdoing on a spectacular scale in the public service. Absent any plausible motive for such conduct it is an extravagant allegation. It will require evidence of the most compelling kind to establish. As Lord Nicholls of Birkenhead observed in In re H (minors) (Sexual abuse: Standard of proof) [1996] AC 563 , p 586:

> "The more improbable the event, the stronger must be the evidence that it did occur before, on the balance of probability, its occurrence will be established. Ungoed-Thomas J expressed this neatly in In re Dellow's Will Trusts [1964] 1 WLR 451 , 455: "The more serious the allegation the more cogent is the evidence required to overcome the unlikelihood of what is alleged and thus to prove it."

In the absence of evidence to support the allegation, it would be an abuse of process to make it. It is not at all surprising that the depositors have striven hard to avoid pleading any such case until they were compelled to do so, preferring instead to argue that it was not necessary.

182. In describing the depositors' case as "implausible" or "scarcely credible", I should not be taken as making any assumptions about the integrity of the Bank and its officials or as departing from the proper judicial stance of neutrality and impartiality. I do not take the view that the Bank can do no wrong or that public officials are incapable of acting in bad faith. But we are called upon to evaluate the action's prospects of success, and that exercise involves an impartial consideration of the inherent plausibility of the allegations and the strength of the evidence needed to establish them. The scales of justice must be evenly balanced at the commencement of such an

operation; but they should not be incapable of movement while the operation is being undertaken. It is not unfair to observe that, in the absence of some financial or other incentive, a charge of dishonesty against professional men and public officials is possible but inherently improbable.

### The pleadings: demurrer

183. Having read and re-read the pleadings, I remain of opinion that they are demurrable and could be struck out on this ground. The rules which govern both pleading and proving a case of fraud are very strict. In Jonesco v Beard [1930] AC 298 Lord Buckmaster, with whom the other members of the House concurred, said, at p 300:

> "It has long been the settled practice of the court that the proper method of impeaching a completed judgment on the ground of fraud is by action in which, *as in any other action based on fraud, the particulars of the fraud must be exactly given and the allegation established by the strict proof such a charge requires* " (my emphasis).

184. It is well established that fraud or dishonesty (and the same must go for the present tort) must be distinctly alleged and as distinctly proved; that it must be sufficiently particularised; and that it is not sufficiently particularised if the facts pleaded are consistent with innocence: see *Kerr on Fraud and Mistake* 7th ed (1952), p 644; Davy v Garrett (1878) 7 Ch D 473 , 489; Bullivant v Attorney Genera; for Victoria [1901] AC 196 ; Armitage v Nurse [1998] Ch 241 , 256. This means that a plaintiff who alleges dishonesty must plead the facts, matters and circumstances relied on to show that the defendant was dishonest and not merely negligent, and that facts, matters and circumstances which are consistent with negligence do not do so.

185. It is important to appreciate that there are two principles in play. The first is a matter of pleading. The function of pleadings is to give the party opposite

sufficient notice of the case which is being made against him. If the pleader means "dishonestly" or "fraudulently", it may not be enough to say "wilfully" or "recklessly". Such language is equivocal. A similar requirement applies, in my opinion, in a case like the present, but the requirement is satisfied by the present pleadings. It is perfectly clear that the depositors are alleging an intentional tort.

186.  The second principle, which is quite distinct, is that an allegation of fraud or dishonesty must be sufficiently particularised, and that particulars of facts which are consistent with honesty are not sufficient. This is only partly a matter of pleading. It is also a matter of substance. As I have said, the defendant is entitled to know the case he has to meet. But since dishonesty is usually a matter of inference from primary facts, this involves knowing not only that he is alleged to have acted dishonestly, but also the primary facts which will be relied upon at trial to justify the inference. At trial the court will not normally allow proof of primary facts which have not been pleaded, and will not do so in a case of fraud. It is not open to the court to infer dishonesty from facts which have not been pleaded, or from facts which have been pleaded but are consistent with honesty. There must be *some* fact which tilts the balance and justifies an inference of dishonesty, and this fact must be both pleaded and proved.

187.  In Davy v Garrett 7 Ch D 473 , 489 Thesiger LJ in a well known and frequently cited passage stated:

> "In the present case facts are alleged from which fraud might be inferred, but they are consistent with innocence. They were innocent acts in themselves, and it is not to be presumed that they were done with a fraudulent intent."

This is a clear statement of the second of the two principles to which I have referred.

188.  In Armitage v Nurse [1998] Ch 241 the plaintiff needed to prove that trustees had been guilty of fraudulent breach of trust. She pleaded that they had acted "in

reckless and wilful breach of trust." This was equivocal. It did not make it clear that what was alleged was a dishonest breach of trust. But this was not fatal. If the particulars had not been consistent with honesty, it would not have mattered. Indeed, leave to amend would almost certainly have been given as a matter of course, for such an amendment would have been a technical one; it would merely have clarified the pleading without allowing new material to be introduced. But the Court of Appeal struck out the allegation because the facts pleaded in support were consistent with honest incompetence: if proved, they would have supported a finding of negligence, even of gross negligence, but not of fraud. Amending the pleadings by substituting an unequivocal allegation of dishonesty without giving further particulars would not have cured the defect. The defendants would still not have known why they were charged with dishonesty rather than with honest incompetence.

189.  It is not, therefore, correct to say that *if there is no specific allegation of dishonesty* it is not open to the court to make a finding of dishonesty if the facts pleaded are consistent with honesty. If the particulars of dishonesty are insufficient, the defect cannot be cured by an unequivocal allegation of dishonesty. Such an allegation is effectively an unparticularised allegation of fraud. If the observations of Buxton LJ in Taylor v Midland Bank Trust Co Ltd (unreported) 21 July 1999 are to the contrary, I am unable to accept them.

190.  In the present case the depositors (save in one respect with which I shall deal later) make the allegations necessary to establish the tort, but the particulars pleaded in support are consistent with mere negligence. In my opinion, even if the depositors succeeded at the trial in establishing all the facts pleaded, it would not be open to the court to draw the inferences necessary to find that the essential elements of the tort had been proved.

**The evidential material: prospects of success**

191.  But I prefer to decide this appeal on the broader and simpler ground that the action has no real prospects of success. In reaching this conclusion I have not relied upon the Bingham report or its findings. My reasons are as follows.

• 1.  The grant of the licence

• (1)  It is clear that the Bank was not entitled to grant the licence in reliance on the LBC. So the depositors can prove that the Bank acted unlawfully. However, it was not unlawful for the Bank to grant a licence, but only to do so without first making its own independent inquiries. It must now be a matter of speculation whether the Bank would still have granted the licence if it had made its own inquiries, so there is a difficult (though I am willing to assume not insuperable) question of causation. The burden of proving this lies with the depositors.

• (2)  It is arguable that the Bank knew the facts which deprived it of the power to grant the licence in reliance upon the LBC and without making its own inquiries. But knowledge of facts which deprive a party of the power to take a particular course of action is not the same as knowledge that it is acting in excess of power. There is no reason to suppose, and not a shred of evidence to suggest, that any official of the Bank appreciated the position, or that any official suspected it but turned a blind eye. If the Bank had realised or suspected that it was not entitled to rely on the LBC, it would obviously have made its own inquiries. It had not the slightest reason not to do so. The facts pleaded, and all the evidence we have seen, are entirely consistent with an honest but (possibly) negligent failure to appreciate the legal consequences of the known facts. This is insufficient to sustain the claim, since the first element of the tort is lacking.

• (3)  Even if the depositors could establish the first element of the tort, they have no prospect of establishing the second. There is no case for supposing that in 1980 BCCI was in fact already insolvent or likely to collapse; and even if it was the Bank obviously had no knowledge or suspicion that it was. As Clarke J said: it defies common sense to suppose that regulators would licence a bank which they foresaw would probably (or be at all likely to) collapse.

• 2.  The failure to revoke the licence prior to 1990.

• (1)  The tort is concerned with the *abuse* of power by public officials who act in excess of their powers to the injury of the subject. It is not concerned with their failure to exercise the powers they do have, particularly when they have a discretion whether to exercise them or not.

• (2)  The Bank had a *power* to revoke the licence in certain circumstances. But it had no *duty* to do so unless the circumstances were such that (objectively) the discretion could only be exercised in favour of revocation. This was never the case, nor is it alleged that it was. Even if the Bank appreciated (after the event) that it had acted in excess of its powers when granting the licence, this did not impose a duty (as distinct from a power) to revoke the licence. It follows that the Bank never acted unlawfully in failing to exercise its power to revoke the licence.

• (3)  In any case, the Bank's internal documents show that it never believed that it had grounds to revoke the licence, and considered that even if it did revocation would not be justified. There is no reason to suppose (and there is nothing pleaded which would justify a finding) that these views were not honestly (even if erroneously) held. Accordingly, the first element of the tort is lacking.

• (4)  The real problem was that, as the Bank knew, BCCI was effectively unsupervised. The depositors laid considerable emphasis on this, and rightly so; but they did not face up to the consequences. It meant that the Bank did not know enough to justify either letting BCCI continue or closing it down. It was not unlawful to abstain from revoking the licence in these circumstances. The real charge against the Bank is that it never got to grips with the problem of supervision. This may have been negligent, but it did not amount to deliberate wrongdoing or bad faith.

• (5)  The right course may have been to impose restrictions. This never entered anyone's head. The failure to take a step which was never even considered may be negligent but cannot possibly amount to deliberate (or reckless) wrongdoing.

• (3)  The failure to revoke the licence: 1990-91.

Three Rivers DC v Bank of England (No.3) (Summary Judgment) 2001 WL 239757 (2001)

• (1)  By 1990 the Bank knew that BCCI was insolvent and fraudulently run. So it knew (for the first time) that there were grounds for closing it down. But it still had to consider whether this was in the interests of depositors, both present and future.

• (2)  No regulator would close down a bank in such circumstances while there was any reasonable prospect of a rescue. The first question is whether, objectively and without the benefit of hindsight, there was a reasonable possibility of a rescue (with new funds and new management) until the section 41 report put paid to it. If so, the Bank was not acting unlawfully in exercising its discretion not to revoke the licence, and the first element of the tort would be lacking.

• (3)  But even if the depositors satisfy the court that there was in fact no reasonable prospect of a rescue, this is not enough. The essential question is whether it was the Bank's honestly held view that there was. There is no reason to suppose and not a shred of evidence from which it could be inferred that the Bank did not honestly believe that a rescue was a reasonable possibility. All the documents we have seen show that this was why the Bank stayed its hand. There is no hint of any other reason. As soon as it received the section 41 report, and realised that there would be no rescue, it moved to close the business down.

• (4)  The depositors do not even plead the necessary averment. They still plead only that (negatively) the Bank did not believe that there would probably be a rescue. This is remarkable given that Clarke J told them that what they needed to allege and prove was that (positively) the Bank knew or suspected that there would probably *not* be a rescue. There can be only one reason for their failure to plead the necessary averment: it is because they know that they cannot. In the absence of the necessary pleading (supported by proper particulars), it is not open to the court to find that the Bank knew that depositors would probably suffer loss. The second element of the tort is lacking.

• (5)  The depositors' case is that a regulator has a legal duty to close down an insolvent bank even if it believes that there is a reasonable prospect of a rescue, unless it also believes that a rescue is likely. It is only necessary to formulate

the proposition to see that it must be rejected. Nothing could be more inimical to the interests of depositors than to place such a restriction on the regulator's power in their interests to explore every alternative to closure. Not to do so would display the very reckless indifference to their interests of which the depositors in the present case complain.

**Conclusion**

192.  I agree with my noble and learned friend Lord Hope of Craighead that, while cases should in principle be disposed of as expeditiously and cheaply as the circumstances permit, the most important principle of all is that justice should be done. But this does not mean justice to the plaintiff alone. It is not just to a plaintiff to strike out his claim without a trial unless it has no real prospect of success. It is not just to defendants to subject them to a lengthy and expensive trial to defend their integrity when there is no foundation in the evidence for the attack upon it.

193.  In my opinion the depositors cannot establish the requisite elements of the tort in respect of any matter of complaint. They have either failed to make the necessary allegations, or where they have done so they have pleaded insufficient facts in support to entitle the court to draw the necessary inferences. They have produced no document which supports their case, and every document which they have produced and on which they have placed reliance is either neutral or more often contradictory of their case. When in addition regard is had to the seriousness and sheer improbability of their case and the cogency of the evidence required to prove it, the conclusion is inescapable that it has no real prospects of success.

194.  In agreement with my noble and learned friend Lord Hobhouse of Woodborough, I would dismiss the appeal and strike out the action.

Crown copyright

© 2017 Sweet & Maxwell

2001 WL 239757

**End of Document**

© 2017 Thomson Reuters.

# TAB 91

*412  **Tinsley v. Milligan**
House of Lords
24 June 1993

**(1994) 68 P. & C.R. 412**

( Lords Keith of Kinkel, Goff of Chievely, Jauncy of Tullichettle, Lowry and Browne-Wilkinson ):
June 24, 1993

**Analysis**

Land law—Resulting, constructive or implied trusts—Unmarried couple—Lodging house acquired by joint efforts and run as a joint business venture—Purchase of property in plaintiff's sole name to facilitate defendant making fraudulent claims on D.S.S.—Plaintiff claimed possession and gave defendant notice to quit —Defendant counterclaimed for beneficial interest—Whether defendant's equitable interest in property defeated by illegal purpose of putting property into sole name of plaintiff

Stella Tinsley, the plaintiff, and Kathleen Milligan, the defendant, an unmarried couple, took on the running of a bed-and-breakfast business together. In July 1984 they purchased a lodging house at 9 Fitzhamon Embankment. These premises were later sold, and replaced in August 1988 by the purchase of 141 Thomas Street. In each case title was put in the sole name of the plaintiff, although both plaintiff and defendant expressly recognised that they were running the lodging house as a joint business venture, and that the ownership of the respective houses were also on a joint basis. Title was taken in the sole name of the plaintiff in order to assist the defendant in making false claims on the Department of Social Security. The money which the defendant obtained from the D.S.S. helped the two of them to meet their bills but it was not a substantial part of their income and contributed only a small part toward the acquisition of the equity in the house. The parties quarrelled soon after the purchase of 141 Thomas Street, and the plaintiff moved out, the defendant remaining in occupation. Late in

1988 the defendant ceased to defraud the D.S.S. and informed them of her previous deception, so that there was no continuing illegality. The plaintiff gave the defendant notice to quit and six months later brought an action for possession, asserting sole ownership. The defendant counterclaimed for an order for sale and for a declaration that the plaintiff held the property on trust for the two of them in equal shares. The plaintiff raised the defence of illegality to the defendant's counterclaim. The county court judge dismissed the plaintiff's claim and found for the defendant on the counterclaim. The plaintiff appealed, and the Court of Appeal by a majority (Lloyd and Nicholls L.JJ., Ralph Gibson L.J. dissenting) dismissed the plaintiff's appeal. The Court of Appeal found that equity should take a flexible approach to cases of illegality and weigh or balance the adverse consequences of granting relief against the adverse consequences of refusing relief by applying the public conscience test. On the facts both parties had participated in the illegality and it would be an affront to the public conscience not to grant relief. There was no dispute that apart from the question of illegality the defendant was entitled in equity to a one-half share in the house under a resulting or implied trust. Leave to appeal to the House of Lords was granted on the question whether the claim of the defendant to an interest in the property was defeated by reason of the frauds practised on the D.S.S. On appeal to the House of Lords:

**Held,** (Lord Keith of Kinkel and Lord Goff of Chievely dissenting) dismissing the appeal, but overruling the Court of Appeal, that the consequences of being a party to an illegal transaction cannot depend on such an imponderable factor as the extent to which the public conscience would be affronted by recognising rights created by illegal transactions. The effect of illegality is not to prevent a proprietary interest in equity from arising but to render the equitable interest unenforceable in certain circumstances. The rule is the same whether in law or in equity, a plaintiff is entitled to recover if he is not forced to rely on the illegality, even if it emerges that the title on which he relied was Acquired in the course of carrying through an illegal transaction.

Where the presumption of advancement applies, in order to rebut that *413 presumption the plaintiff has to rely on evidence of the underlying illegal purpose. However, where the presumption of resulting

trust applies, unless it is displaced by the contrary presumption of advancement, or by evidence rebutting the presumption of resulting trust, the plaintiff can establish an equitable interest in the property without in any way relying on the underlying illegal transaction. On the facts, the defendant had established a resulting trust by showing that she had contributed to the purchase price of the house and that there was a common understanding between her and the plaintiff. Having proved those facts, she had raised a presumption of resulting trust and there was no evidence to rebut that presumption. The defendant was not relying on the illegality to establish her claims, the illegal purpose only emerged at all because the plaintiff sought to raise it. Therefore the defendant was entitled to succeed on her counterclaim and the appeal was dismissed.

## Cases referred to:

- (1)  Alexander v. Rayson [1936] 1 K.B. 169 .
- (2)  Ayerst v. Jenkins (1873) L.R. 16 Eq. 275 .
- (3)  Birch v. Blagrave (1755) 1 Amb. 265 .
- (4)  Bowmakers Ltd v. Barnet Instruments Ltd [1945] K.B. 65 .
- (5)  Burns v. Edman [1970] 2 Q.B. 541; [1970] 2 W.L.R. 1005; 114 S.J. 356; [1970] 1 All E.R. 886; The Times December 13, 1969 .
- (6)  Cantor v. Cox (1976) 239 E.G. 121 .
- (7)  Cecil v. Butcher (1821)
- (8)  Childers v. Childers (1857) 3 K. & J. 310 .
- (9)  Cottingtpn v. Fletcher (1740) 2 Atk. 155 .
- (10)  Crichton v. Crichton (1895) 13 R. 770 .
- (11)  Curtis v. Perry (1802) 6 Ves. 739 .
- (12)  Bering v. Earl of Winchelsea (1787) 1 Cox Eq. 318 .
- (13)  Dewar v. Dewar [1975] 1 W.L.R. 1532; 119 S.J. 681; [1975] 2 All E.R. 728 .
- (14)  Euro-Diam Ltd v. Bathurst [1990] 1 Q.B. 1 .
- (15)  Ex p. Yallop (1808) 15 Ves. 60 .
- (16)  Ferret v. Hill (1854) 15 C.B. 207 .
- (17)  Gascoigne v. Gascoigne [1918] 1 K.B. 223 .
- (18)  Geismar v. Sun Alliance and London Insurance Ltd [1978] Q.B. 383; [1978] 2 W.L.R. 38; (1977) 121 S.J. 201; [1977] 3 All E.R. 570; [1977] 2 Lloyd's Rep. 62; [1977] Crim.L.R. 475 .
- (19)  Gissing v. Gissing [1971] A.C. 886; [1970] 3 W.L.R. 255; 114 S.J. 550; [1970] 2 All E.R. 780; 21 P. & C.R. 702, H.L.; reversing[1969] 2 Ch. 85; [1969] 2

W.L.R. 525; 113 S.J. 187; [1969] 1 All E.R. 1043; 20 P. & C.R. 276, C.A.

- (20)  Gorog v. Kiss (1977) 78 D.L.R. (3d.) 690 .
- (21)  Grant v. Edwards [1986] Ch. 638; [1986] 3 W.L.R. 114; (1986) 130 S.J. 408; [1986] 2 All E.R. 426; [1987] 1 F.L.R. 87; [1986] 16 Fam. Law 300; (1986) 136 New L.J. 439; (1986) 83 L.S.Gaz. 1996, C.A.
- (22)  Groves v. Groves (1828) 3 Y. & J. 163 .
- (23)  Haigh v. Kaye (1872) L.R. 7 Ch.App. 469 .
- (24)  Holman v. Johnson (1775) 1 Cowp. 341 .
- (25)  Howard v. Shirlstar Container Transport Ltd [1990] 1 W.L.R. 1292; [1990] 3 All E.R. 366, C.A.
- (26)  Lloyds Bank Plc v. Rosset [1991] A.C. 107; [1990] 2 W.L.R. 867; [1990] 1 All E.R. 1111; [1990] 2 F.L.R. 155; (1990) 22 H.L.R. 349; (1990) 60 P. & C.R. 311; (1990) 140 New L.J. 478, H.L. reversing[1989] Ch. 350; [1988] 3 W.L.R. 1301; [1988] 3 All E.R. 915; [1989] 1 F.L.R. 51; [1988]Fam. Law 472; [1989] L.S.Gaz. January 5, 39, C.A.
- (27)  McEvoy v. Belfast Banking Co. Ltd [1934] N.I. 67 .
- (28)  Mucklestone v. Brown (1801) 6 Ves. 53 .
- (29)  Murphy v. Culhane [1977] Q.B. 94; [1976] 3 W.L.R. 458; 120 S.J. 506; [1976] 3 All E.R. 533, C.A.
- (30)  Palaniappa Chettiar v. Arunasalam Chettiar [1962] A.C. 294; [1962] 2 W.L.R. 548; 106 S.J. 110; [1962] 1 All E.R. 494, P.C.
- (31)  Pearce v. Brooks (1866) L.R. 1 Exch. 213 .
- (32)  Perpetual Executors and Trustees Association of Australia Ltd v. Wright(1917) 23 C.L.R. 185 .
- (33)Petherpermal Chetty v. Muniandi Servai (1908) L.R. 35 Ind. App. 78.
- (34)  Platamone v. Staple (1815) 2 Jac. & W. 565 .
- (35)  Preston v. Preston [1960] N.Z.L.R. 385 .
- (36)  Re Emery's Investments Trusts, Emery v. Emery [1959] Ch. 410; [1959] 2 W.L.R. 461; 103 S.J. 257; [1959] 1 AH E.R. 577 .
- (37)  Re Great Berlin Steamboat Co. (1884) 26 Ch.D. 616 .
- (38)  Rider v. Kidder (1805) 10 Ves. 361 .
- (39)  Roberts v. Roberts (1818) Dan. 143 .
- (40)  Sounders v. Edwards [1987] 1 W.L.R. 1116; (1987) 131 S.J. 1039; [1987] 2 All E.R. 651; (1987) 84 L.S.Gaz. 2193; (1987) 137 New L.J. 389; (1987) 84 L.S.Gaz. 2535, C.A.
- (41)  Scarfe v. Morgan (1838) 4 M. & W. 270 .
- (42)  Scott v. Brown, Doering, McNab and Co. (1892) 2 Q.B. 724 .

• (43) Shelley v. Paddock [1980] Q.B. 348; [1980] 2 W.L.R. 647; (1979) 123 S.J. 706; [1980] 1 All E.R. 1009, C.A., affirming [1979] Q.B. 120; [1978] 2 W.L.R. 877; (1977) 122 S.J. 317; [1978] 3 All E.R. 129 .

• (44) Shepherd v. Cartwright [1954] A.C. 431 .

•(45) Singh v. Ali [1960] A.C. 167; [1960] 2 W.L.R. 180; 104 S.J. 84; [1960] 1 All E.R. 269, P.C.

• (46) St John Shipping Corporation v. Joseph Rank Ltd [1957] 1 Q.B. 267; [1956] 3 W.L.R. 870; 100 S.J. 841; [1956] 3 All E.R. 683; [1956] 2 Lloyd's Rep. 413 .

• (47) Standing v. Bowring (1885) 31 Ch.D. 282 .

• (48) Symes v. Hughes (1870) L.R. 9 Eq.Cas. 475 .

• (49) Taylor v. Bowers (1876) 1 Q.B.D. 291 .

• (50) Taylor v. Chester (1869) L.R. 4 Q.B. 309 .

• (51) Thackwell v. Barclays Bank Pic [1986] 1 All E.R. 676 .

•(52) Tinker v. Tinker [1970] P. 136; [1970] 2 W.L.R. 331; (1969) 114 S.J. 32; [1970] 1 All E R. 540; 21 P. & C.R. 102, C.A.

• (53) Tinsley v. Milligan [1992].

**Appeal** by the plaintiff, Stella Ruth Tinsley, from an order of the Court of Appeal dated July 30, 1991 dismissing the plaintiff's appeal from the order of the Caerphilly County Court dated July 26, 1990. The county court judge had ordered that the plaintiff's claim for possession of 141 Thomas Street Abertridwr, Mid-Glamorgan, be dismissed, and had granted the defendant's counterclaim for an order for sale and for a declaration that the plaintiff held the property on trust for the two of them in equal shares. The primary ground of appeal was that the claim of the defendant to an equitable interest in the property was defeated by reason of the illegal purpose of putting the property into the sole name of the plaintiff. The facts are stated in the judgment of Lord Goff of Chievely.

**Representation**

• James Munby, Q.C. and Alexander Hill-Smith for the plaintiff.
• Vernon Pugh, Q.C. and Philip Davies for the defendant.

Lord Keith of Kinkel.

I agree with the speech to be delivered by my noble and learned friend Lord Goff of Chieveley, which I have had the advantage of reading in draft. I would therefore allow this appeal.

Lord Goff of Chieveley.

There is before your Lordships an appeal by the appellant Stella Ruth Tinsley, from an order by the Court of Appeal whereby the court, by a majority (Lloyd and Nicholls L.JJ., Ralph Gibson L.J. dissenting), dismissed the appellant's appeal from an order of Judge Hywed Ap Robert, sitting in the Caerphilly County Court, ordering **\*415** ( *inter alia* ) that the appellant's claim for possession of 141 Thomas Street, Abertridwr, Mid-Glamorgan, be dismissed, and that the appellant holds 141 Thomas Street on trust for the respondent, Kathleen Milligan, and herself in equal shares.

The appeal, which is brought by leave of the Court of Appeal, raises the question whether the claim of the respondent to an interest in the property in question is defeated by reason of frauds practised on the Department of Social Security. The facts of the case can be encapsulated in a few brief sentences. However it is desirable to obtain the full flavour of the case; and for that reason I propose to adopt the account given by Nicholls L.J., [1] which for convenience of reference I propose to set out in full.

> The house in question is 141, Thomas Street, Abertridwr, Mid-Glamorgan. It is registered in the name of the plaintiff Miss Stella Tinsley. She is the sole legal owner. She and the defendant Miss Kathleen Milligan were, to use the judge's expression, lovers for about four years, from 1984 to 1988. In the discussions they had during the course of their relationship, both the plaintiff and the defendant expressly recognised they were running a lodging house first at 9, Fitzhamon Embankment, Cardiff, and subsequently at Thomas Street,

as a joint business venture and that the ownership of the respective houses was also on a joint basis.

The parties are intelligent and articulate. They met in 1984. The plaintiff was then 19, and the defendant 38. The defendant was the dominant character, but not such as to be able to impose her will on the plaintiff. The defendant was living at 9, Fitzhamon Embankment, which belonged to a Mr Slater. She was running a bed-and-breakfast business. In 1983 a Miss Llewellyn began living in the house, and after a while she was treated as being the housekeeper in place of the defendant. The housekeeper was the person to whom the D.S.S. turned for verification that those to whom it was paying benefits were indeed resident there. In December 1984 the plaintiff moved in and Miss Llewellyn moved out. After a month or two the plaintiff took her place as the nominal housekeeper, although most of the physical work and much of the managerial work were done by the defendant.

The bank and building society accounts used by the parties were put in the plaintiff's sole name, but they were regarded as joint property. Through these accounts the parties conducted most of their financial affairs: nearly all their money went into them, and nearly everything they spent was paid from them. In July 1986 9 Fitzhamon Embankment was purchased in the plaintiff's name. The price was £29,000. A bank provided £24,000 by way of a mortgage loan to the plaintiff alone. The balance was provided principally from the sale

proceeds of a car which belonged to them jointly.

Two years later this house was sold for £33,000, and the mortgage repaid. 141, Thomas Street was brought for £19,000, again in the sole name of the plaintiff. That was in August 1988. £12,000 was provided by a bank loan to the plaintiff alone, and the balance came from the proceeds of sale of 9, Fitzhamon Embankment. In this way all the **\*416** money provided by the parties for 141, Thomas Street came ultimately from their joint business. Shortly thereafter, the parties quarrelled. The plaintiff moved out, and the defendant remained in occupation. The plaintiff divided the money in her building society account between them in roughly equal shares. In February 1989 she gave the defendant notice to quit. Six months later she brought this action, claiming possession and asserting ownership of the whole of the house. The defendant was willing that the house should be sold. Indeed she counterclaimed for an order for sale. She also sought a declaration that the property was held by the plaintiff upon trust for the two of them in equal snares.

I can now turn to the illegality. Over a period of years the defendant with the knowledge and assent of the plaintiff, made false claims to the D.S.S. for benefits of one kind or another. The money paid by the D.S.S. in response to those claims was paid into the bank or building society accounts I have mentioned. The defendant was not alone in perpetrating frauds upon the D.S.S.

The plaintiff also did so. She was prosecuted, convicted and fined, and had to make some repayments to the D.S.S. As to 141, Thomas Street, the judge shied away from holding that the reason why the transfer of this house was in the plaintiff's sole name was to assist in a fraud on the D.S.S. Having the property in the plaintiff's sole name assisted with the fraud in the sense that it assisted in the concealment of the defendant's fraud. On the claim forms the defendant answered "No" to the question, "Do you own your own home?" and she named the plaintiff as her landlady, to whom she said she was paying rent. If the D.S.S., having received such claims, had made further inquiries, the falsity of the defendant's answers would be more likely to remain concealed with the title deeds in the plaintiff's sole name. The judge considered it was a great over-simplification to regard fraud as the sole or even main object of the defendant in rendering herself invisible not only as to the legal title to the house but also as to the bank account and the accounts for electricity, gas, rates and so forth. He seems to have regarded this as a "psychological quirk".

I do not think this conclusion can stand. At the outset of her cross-examination the defendant frankly accepted that the reason why the business and 9, Fitzhamon Embankment and 141, Thomas Street were in the plaintiff's sole name was so that she, the defendant, could misrepresent to the D.S.S. that she had no stake in the business or the properties and that she was simply a lodger. The defendant did not suggest any other reason for either property being put in the plaintiff's sole name. The case was fought on that footing. It should be decided on the same footing.

Two further features are to be noted. First, the money obtained from the D.S.S. helped the two of them meet their bills, but it was not a substantial part of their income. Their income consisted mostly of rent from their lodgers. The fraud perpetrated by them both on the D.S.S. played only a small financial part in the acquisition of the equity in the house which is now in dispute. Secondly, there is no continuing illegality. Late in 1988 the defendant made her peace with the D.S.S. She told the D.S.S. what she had done. Thereafter she continued to **\*417** draw benefit, but on a lawful basis. Apparently the D.S.S. did not regard the situation with any alarm. The judge observed that no doubt this was because it had become inured by daily experience of much worse forms of fraud being practised upon it than any which could be laid at the door of these two women.

Before the Court of Appeal it was the submission of the appellant that there was a principle of law, binding on the Court of Appeal, that the court will not give effect to an equitable interest arising from a transaction which is unlawful by reason of a claimant's unlawful purpose; and that accordingly the respondent was unable to establish any equitable interest in 141, Thomas Street, or to defeat the appellant's claim to possession. This principle was said to be well recognised in a number of authorities; but reliance was placed in particular on Gascoigne v. Gascoigne [2] and Tinker v. Tinker , [3] both decisions of the Court of Appeal. It was this line of authority which ultimately persuaded Ralph Gibson L.J., in his dissenting judgment, that the appellant's appeal should be allowed. But Nicholls L.J. was not so

persuaded. He first invoked a group of recent Court of Appeal decisions, which point to a more flexible approach than has been adopted in the past in cases of illegality under which, according to Nicholls L.J. [4] :

> … the underlying principle is the so-called public conscience test. The court must weigh, or balance, the adverse consequences of granting relief against the adverse consequences of refusing relief. The ultimate decision calls for a value judgment.

On that approach he concluded that "…far from it being an affront to the public conscience to grant relief in this case, it would be an affront to the public conscience not to do so." Furthermore, Nicholls L.J. rejected [5] the inflexible approach embodied in the earlier authorities as according ill "with the underlying considerations of public policy the court is seeking to discern and apply in this field"; the approach would, he considered, also mean that equity was taking a less flexible attitude to illegality than the common law, which would constitute a remarkable reversal of the traditional functions of law and equity. He accordingly sought to rationalise the older authorities in which relief was denied as cases in which, in particular circumstances, the court considered that to have granted relief would have been an affront to the public conscience. In answer to the proposition that the legal estate must lie where it falls, Nicholls L.J. regarded the proposition as being as apt to equitable estates as it is to legal estates. Lloyd L.J., while agreeing with Nicholls L.J. that the appellant's claim must fail, adopted a rather different approach. First he considered that in the present case it was the appellant, and not the respondent, who was pleading illegality; and that the illegality did not taint the respondent's claim, but was purely collateral and incidental to it. Accordingly, the principle embodied in the maxim *ex turpi causa non oritur actio* did not operate to bar the respondent's claim. Nor did he consider that the court should refuse to bar her claim on grounds of public policy, since (on the test recently applied in the Court of Appeal,

which Lloyd L.J. with some reluctance held to be **\*418** binding on him) it would not shock the ordinary citizen that the respondent should recover her half share in the property. Finally, Lloyd L J. rejected the argument, founded on the line of cases culminating in Gascoigne v. Gascoigne and Tinker v. Tinker , that the court would not assist a claimant such as the respondent who was seeking the aid of equity, because she did not come to equity with clean hands; he distinguished these authorities as cases in which the equitable balance came down against the plaintiff, whereas in the present case it came down firmly in favour of the respondent who was seeking the assistance of equity.

This brief summary of the judgments in the Court of Appeal reveals a considerable difference of opinion among the members of the court. Faced with this variety of reasoning it is, I consider, essential for your Lordships to return to first principles; and, having identified the applicable principles of law, to consider to what extent the opinions expressed by the members of the Court of Appeal are consistent with them. If not, it will be necessary to consider whether it was open to them, and if not open to them, whether it is now open to your Lordships' House, to develop these principles among the lines now suggested; and, if so, whether it is desirable to do so.

I turn then to the established principles; and I wish at once to express my indebtedness to the scholarly argument of Mr James Munby, Q.C., who appeared for the appellant in your Lordships' House. The basic principle was stated long ago by Lord Mansfield C.J. in Holman v. Johnson [6] in the context of the law of contract, when he said:

> The objection, that a contract is immoral or illegal as between plaintiff and defendant, sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed; but it is founded in general principles of policy, which the defendant has the advantage of, contrary to the real justice, as between him and the plaintiff, by accident, if I may so say. The principle of public policy is this;

*ex dolo malo non oritur actio* . No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act. If, from the plaintiff's own stating or otherwise, the cause of action appears to arise *ex turpi causa* , or the transgression of a positive law of this country, there the court says he has no right to be assisted. It is upon that ground the court goes; not for the sake of the defendant, but because they will not lend their aid to such a plaintiff. So if the plaintiff and defendant were to change sides, and the defendant was to bring his action against the plaintiff, the latter would then have the advantage of it; for where both are *equally* in fault, *potior est conditio defendentis* .

That principle has been applied again and again, for over 200 years. It is applicable in courts of equity as well as courts of law: see, *e.g.* the notes to Roberts v. Roberts , [7] and Ayerst v. Jenkins , [8] . *per* Lord Selborne L.C. In 1869 Mellor J. said that the maxim in *pari delicto potior est conditio possidentis* "is as thoroughly settled as any proposition of law can be": see Taylor v. Chester . [9] It is important to observe that, as Lord Mansfield made clear, the **\*419** principle is not a principle of justice; it is a principle of policy, whose application is indiscriminate and so can lead to unfair consequences as between the parties to litigation. Moreover the principles allow no room for the exercise of any discretion by the court in favour of one party or the other. Even so, the mere fact that a transaction is illegal does not have the effect of preventing property, whether general or special, from passing under it. In Scarfe v. Morgan , [10] Parke B. said that "if the [illegal] contract is executed, and a property either special or general has passed thereby, the property must remain; …". This principle has been applied on numerous occasions. Notable examples are to be found in Taylor v. Chester , Alexander v. Rayson [11] ; and Singh v. Ali .

[12] In Singh v. Ali , the principle was explained by Lord Denning in the following passage:

> There are many cases which show that when two persons agree together in a conspiracy to effect a fraudulent or illegal purpose —and one of them transfers property to the other in pursuance of the conspiracy—then, so soon as the contract is executed and the fraudulent or illegal purpose is achieved, the property (be it absolute or special) which has been transferred by the one to the other remains vested in the transferee, notwithstanding its illegal origin … The reason is because the transferor, having fully achieved his unworthy end, cannot be allowed to turn round and repudiate the means by which he did it—he cannot throw over the transfer. And the transferee, having obtained the property, can assert his title to it against all the world, not because he has any merit of his own, but because there is no one who can assert a better title to it. The court does not confiscate the property because of the illegality —it has no power to do so—so it says, in the words of Lord Eldon: "Let the estate lie where it falls"; see Muckleston v. Brown 6 Ves. 52, 69.

Likewise a court of equity will not, at the instance of the settlor or his personal representative, set aside a settlement which has been made for an illegal consideration: see Ayerst v. Jenkins . The effect in that case was that the legal estate remained absolutely vested in the trustees and (implicitly) that the beneficial interest vested in the beneficiary. (There was however, in that case no contest between the trustees and the beneficiary; and in any event the case was not one in which (as in the present case). A puts his property in the name of B in order to conceal his (A's) interest in it for a fraudulent

purpose. In such a case, it is most unlikely that A will have constituted B an express trustee of the property.)

From these two principles there is to be derived the principle invoked by the appellant in the present case, *viz.* that if A puts property in the name of B intending to conceal his (A's) interest in the property for a fraudulent or illegal purpose, neither law nor equity will allow A to recover the property, and equity will not assist him in asserting an equitable interest in it. This principle applies whether the transaction takes the form of a transfer of property by A to B, or the purchase by A of property in the name of B.

The principle appears first to have been recognised by Lord Hardwicke L.C. in two cases decided before Holman v. Johnson , *viz.* Cottington v. Fletcher , [13] and Birch v. Blagrave . [14] But the case which has for nearly 200 years been regarded as the authoritative source of the principle is Muckleston v. Brown , [15] in which Lord Eldon L.C. said in a much-quoted passage:

> … the plaintiff stating, he had been guilty of a fraud upon the law, to evade, to disappoint, the provision of the legislative, to which he is bound to submit, and coming to equity to be relieved against his own act, and the defence being dishonest, because the two species of dishonesty the court would not act; but would say, "Let the estate lie, where it falls".

There followed a consistent line of authority in which the principle has been applied. The cases include: Curtis v. Perry [16] ; Ex p. Yallop [17] ; Roberts v. Roberts ; Groves v. Groves [18] ; Childers v. Childers [19] ; Re Great Berlin Steamboat Co . [20] ; Crichton v. Crichton [21] ; Gascoigne v. Gascoigne ; McEvoy v. Belfast Banking Co. Ltd [22] ; Re Emery's Investments Trusts, Emery v. Emery [23] ; Preston v. Preston [24] ; Palaniappa Chettiar

v. Arunasalam Chettiar [25] ; Tinker v. Tinker ; and Cantor v. Cox . [26]

Furthermore, the existence of the principle has been recognised on numerous occasions, even where it has not been given effect to on the facts of the case in question. In particular, an exception to the principle is to be found in cases in which the illegal purpose has not been carried into effect; but all those cases in which that exception has been recognised have proceeded on the basis that, absent those exceptional circumstances, the principle would have applied. It is not necessary to examine the nature of this exception for present purposes. It is often said to derive from Taylor v. Bowers , [27] which was in fact a case at law. However, the exception was foreshadowed in a number of earlier cases in equity, notably Platamone v. Staple [28] ; Cecil v. Butcher , [29] and Symes v. Hughes [30] ; and it has since been applied in, for example, Petherpermal Chetty v. Muniandi Servai , [31] and Perpetual Executors and Trustees Association of Australia Ltd v. Wright . [32] Likewise Haigh v. Kaye , [33] in which the defendant failed successfully to invoke the *in pari delicto* principle because he did not specify the illegality in **\*421** plain terms (he "must clearly put forward his own scoundrelism if he means to reap the benefit of it" *per* James L.J.), proceeded on the assumption that, if the defendant had done so, it would have been possible for him to succeed. The reason why the court of equity will not assist the claimant to recover his property or to assert his interest in it has been variously stated. It is sometimes said that it is because he has not come to equity with clean hands. This was the reason given by the Lord Chief Baron in Groves v. Graves , [34] and by Salmon L.J. (with whom Cross L.J. agreed) in Tinker v. Tinker . [35] Sometimes it is said that the claimant cannot be heard or allowed to assert his claim to an equitable interest, as in Curtis v. Perry , [36] *per* Lord Eldon L.C.; Childers v. Childers , [37] *per* Page Wood V.–C.; and Cantor v. Cox , [38] *per* Plowman V.–C. But this is, as I see it, another way of saying that the claimant must fail because he has not come to the court with clean hands. It follows that in these cases the requirements necessary to give rise to an equitable interest are present; it is simply that the claimant is precluded from asserting them. This explains why, in cases where the unlawful

purpose has not been carried into effect, the court is able to hold that, despite the illegality, there is an equitable interest to which the claimant is entitled.

Another conclusion follows from the identification of the basis upon which equity refuses its assistance in these cases. This is that the circumstances in which the court refuses to assist the claimant in asserting his equitable interest are not limited to cases in which there is a presumption of advancement in favour of the transferee. If that was the case, the principle could be said to be limited to those cases in which the transferor has to rely upon the illegal transaction in order to rebut the presumption; in other words the cases could be said to fall within what is sometimes called the Bowmakers rule, under which a claimant's claim is unenforceable when he has either to found his claim on an illegal transaction, or to plead its illegality in order to support his claim: Bowmakers Ltd v. Barnet Instruments Ltd . [39] Of course, in a number of cases of this kind, especially in modern times, the presumption of advancement does apply, because many cases are concerned with a man hiding away his assets in order to escape his creditors or for some other similar purpose, by transferring them to his wife or to one of his children. But there are cases in which the principle has been applied, or has been recognised, where there was no presumption of advancement. Examples are Curtis v. Perry ; Ex p. Yallop ; Roberts v. Roberts ; Groves v. Groves ; Haigh v. Kaye ; Re Great Berlin Steamboat Co.; and Cantor v. Cox . Of course, where the presumption of advancement does apply, and the illegality is not established from another source, for example by the defendant, the claimant will be in the particular difficulty that, in order to rebut the presumption, he will have to rely upon the underlying transaction and so will of necessity have to disclose his own illegality. This is what happened in Palaniappa Chettiar v. Arunasalam Chettiar , where the property in question had been transferred by the claimant to his son who, having fallen ill, took no part in the hearing and so himself gave no evidence **422 of the illegality; even so, the father's claim failed because he was unable to rebut the presumption of advancement without relying upon the illegal transaction. But the case does not decide that the principle only applies where it is necessary to rebut the presumption of advancement; and, as I have already stated, there are many cases in which the principle has been recognised or applied where there

was no such presumption. Furthermore, if for example the defendant proves that the property was transferred to him for a fraudulent or illegal purpose, a court of equity will refuse to assist the claimant when asserting his interest in it, even though the claimant's case can be, and was, advanced, without reference to the underlying legal purpose, for example on the simple basis that the transfer of the property to the defendant was without consideration. This conclusion follows inevitably from the nature of the principle, and the grounds upon which equity refuses its assistance; it is at least implicit in a number of cases, such as Platamone v. Staple, Groves v. Groves ; and Haigh v. Kaye . It follows that the so-called Bowmakers rule does not apply in cases concerned with the principle under discussion, because once it comes to the attention of a court of equity that the claimant has not come to the court with clean hands, the court will refuse to assist the claimant, even though the claimant can prima facie establish his claim without recourse to the underlying fraudulent or illegal purpose. This is a point to which I will return when I come to consider the judgment of Lloyd L.J. in the present case.

It is against the background of these established principles that I turn to consider the judgments of the majority of the Court of Appeal. As I have recorded, Nicholls L.J. in particular invoked a line of recent cases, largely developed in the Court of Appeal, from which he deduced the proposition that, in cases of illegality, the underlying principle is the so-called public conscience test, under which the court must weigh, or balance, the adverse consequences of respectively granting or refusing relief. This is little different, if at all, from stating that the court has a discretion whether to grant or refuse relief. It is very difficult to reconcile such a test with the principle of policy stated by Lord Mansfield C.J. in Holman v. Johnson , or with the established principles to which I have referred. It is necessary therefore to examine with some care the authorities relied upon by Nicholls L.J. in support of his statement of the applicable law.

The first case is Thackwell v. Barclays Bank Plc . [40] In that case the plaintiff claimed damages from the defendant bank for negligence and conversion of a cheque by the bank. The point was taken that the cheque formed part of a fraudulent financing scheme, to which the plaintiff was a party; and the bank (whose defence under section 4 of the Cheques Act 1957 failed,

because the judge (Hutchison J.) held that the bank ought to have been.put on enquiry) pleaded that the plaintiff's claim must fail by reason of the maxim *ex turpi causa non oritur actio* . It was conceded on behalf of the plaintiff that, if he knew at the time that there was such a scheme, his claim must fail. Hutchison J. held that the plaintiff knew from the outset that the scheme was fraudulent and willingly participated in it. Accordingly the plaintiff's claim failed. However, the defendant had advanced an alternative argument on the basis of which he submitted that, even if the plaintiff was innocent, his claim should fail. The judge accepted this alternative argument, and indicated that, even if he had held the plaintiff to be innocent, he would have denied him **\*423** recovery. In this argument, we find the origin of the so-called public conscience test, which involved [41]

> … the court looking at the quality of the illegality relied on by the defendant and all the surrounding circumstances, without fine distinctions, and seeking to answer two questions: first, whether there had been illegality of which the court should take notice and, second, whether in all the circumstances it would be an affront to the public conscience if by affording him the relief sought the court was seen to be indirectly assisting or encouraging the plaintiff in his criminal act.

It is to be observed that the test is not stated as a general principle, but as a limited principle under which the court may deny relief in certain specific circumstances, even though the claimant is not implicated in the illegality. Furthermore, the test does not as stated involve any balancing exercise of the kind described by Nicholls L.J. in the present case. It is unnecessary for your Lordships' House to consider for present purposes whether the test accepted by Hutchison J. is good law or not. I wish only to refer to the fact that of the four cases relied upon as providing support for it, the first ( Burns v. Edman [42] ) was concerned with a claim under the

Fatal Accidents Acts founded upon the income from the deceased as a burglar; the second ( Murphy v. Culhane [43] ) was concerned with a claim for damages by the deceased's widow, the deceased having been killed by the defendant during a criminal affray initiated by the deceased); the third ( Shelley v. Paddock [44] ) was concerned with a claim for damages for fraud, where the defendant had swindled the plaintiff out of the price paid by her for property in Spain, the plaintiff having innocently paid the money in breach of the Exchange Control Act 1947 ; and the fourth ( Geismar v. Sun Alliance and London Insurance Ltd [45] ) was a case in which the plaintiff's claim to an indemnity under a contract of insurance, in respect of the loss of jewellery deliberately imported in breach of the Customs and Excise Act 1952 , failed because recovery of such an indemnity would indirectly enable the plaintiff to profit from his deliberate breach of the law. It is by no means easy to see how any broadly applicable public conscience test could be derived from these authorities.

However, in three subsequent cases the principle so accepted by Hutchison J. was adopted and expanded by the Court of Appeal. The first was Saunders v. Edwards . [46] The case was concerned with a claim by the purchasers of the lease of a flat against the vendor for damages for fraudulently misrepresenting that the flat included a roof terrace. In answer, the defendant pleaded illegality, on the ground that the respective values of the flat and certain chattels in it had been distorted in the contract at the suggestion of the plaintiffs by exaggerating the value of the chattels and so diminishing the value of the flat, in order to reduce the stamp duty payable on the transaction. The plaintiffs succeeded in their claim, having an unassailable claim for damages for fraud which did not involve any reliance on the contract of sale itself; but reference was made to Hutchison J.'s **\*424** judgment in Thackwell , and Nicholls L.J., in particular adopted and applied the public conscience test as being applicable in a case concerned with a claim in tort arising out of fraudulent activities.

A further step was taken by the Court of Appeal in Euro-Diam Ltd v. Bathurst , [47] a case concerned with a claim under an insurance policy in respect of a consignment of precious stones exported to West Germany which was stolen from a German company's

warehouse. The defendant raised an issue of illegality, which was rejected both at first instance and by the Court of Appeal. It is enough for present purposes to record that Kerr L.J., citing Saunders v. Edwards , stated the principles relating to illegality in a series of numbered paragraphs, in the first of which he stated, that [48] :

> the *ex turpi causa* defence … applies if in all the circumstances it would be an affront to the public conscience to grant the plaintiff the relief which he seeks because the court would thereby appear to assist or encourage the plaintiff in his illegal conduct or to encourage others in similar acts. …

This broad general statement appears to have been qualified in a later paragraph in Kerr L.J.'s statement of the law; even so, we can here see the limited principle accepted by Hutchison J. being given a new and wider role, apparently with the purpose of softening the rigour of the principle of policy established in the older authorities.

A more decisive step was taken in the third case, Howard v. Shirlstar Container Transport Ltd. [49] The case was concerned with a contract for the recovery from Nigeria of an aircraft owned by the defendants which was being detained by the Nigerian authorities at Lagos. Under the contract, the plaintiff was entitled to recover a fee of £25,000 if he "successfully" removed the aircraft from Nigerian airspace. He succeeded in so doing, in so far as he, at some risk to his life, flew the aircraft out of Lagos as far as the Ivory Coast, where however the aircraft was impounded by the authorities and returned by them to Nigeria. The plaintiff's claim for the balance of his fee was met by the defence of illegality, on the ground that he took off without obtaining the necessary clearance in breach of air traffic control regulations at Lagos; in fact he had left in a hurry, without obtaining clearance, because he had been warned that his and his wireless operator's lives were in danger and that he would not be given permission to take off. The Court of Appeal, deciding

that the defence of illegality failed, relied explicitly on the public conscience test, holding that the conscience of the court would not be affronted by enforcing the plaintiff's claim under the contract for the balance of his fee. This appears to have been a case concerned not so much with an illegal contract as such, but with illegality committed in the performance of the contract. In normal circumstances, one would have expected it to be decided on the principle stated by Devlin J. in St John Shipping Corporation v. Joseph Rank Ltd. [50] In any event, there was evidence that the plaintiff's and his companion's lives were in danger, and that this might well have provided a defence to the alleged breach of Nigerian law—a point left open by the Court of Appeal.
**\*425**

Finally there came the explicit reliance on the public conscience test by Nicholls L.J., in the present case, in the manner I have described.

I feel driven to say that what appears to have happened is that a principle, developed by counsel for the defendant bank in Thackwell for a limited purpose in the context of a claim in tort, has been allowed to expand, both in its terms and in its range of application, so that it is now suggested that it operates as a broad qualifying principle, modifying and indeed transforming the long established principles applicable in cases of illegality, and in particular in relation to the principle established as applicable in cases such as the present. Furthermore, this development has been allowed to occur without addressing the questions (1) whether the test is consistent with earlier authority; (2) if it was not so consistent, whether such a development could take place consistently with the doctrine of precedent as applied in the Court of Appeal; or (3) whether the resulting change in the law, if permissible, was desirable. It is unnecessary for your Lordships to decide whether any such test is applicable in the limited context in which it originally emerged before Hutchison J. It is sufficient for present purposes to say, with the greatest respect, that to apply the public conscience test as qualifying the principle established for nearly 200 years as applicable in cases such as the present is, for reasons I have already stated, inconsistent with numerous authorities binding on the Court of Appeal. In expressing this opinion, I wish to stress that, as can so often happen, your Lordships have had the benefit of a far fuller citation of authority than was available to the

Court of Appeal, which has revealed that (contrary to the view expressed by Nicholls L.J. [51] ) the decision in Curtis v. Perry was not followed by "a surprising dearth of authority, for over a century". On the contrary, there were numerous cases decided during that period, many of which I have already cited, in which the principle was recognised or applied. Nor in my opinion can it be said (as stated by Nicholls L.J. [52] ) that the authorities in this line in which equity refuses its assistance can properly be regarded as examples of cases in which, in particular circumstances, the court considered that to have granted relief would have been "an affront to the public conscience," or (as suggested by Lloyd L.J. [53] ) as cases "where the equitable balance came down against the plaintiff". There is no trace of any such principle forming part of the decisions in any of the cases in question. It follows that in my opinion, on the authorities, it was not open to the majority of the Court of Appeal to dismiss the appellant's claim on the basis of the public conscience test invoked by Nicholls L J., or indeed on the basis of the flexible approach adopted by Lloyd L.J., to whose judgment I now turn.

Lloyd L.J, held that it was not the respondent, but the appellant, who had relied on the illegality in the present case; and that accordingly, on the Bowmakers rule, the respondent was entitled to succeed in her claim for an equitable interest in the house. This theme is developed in the speech of my noble and learned friend Lord Browne-Wilkinson, who has discerned a development in the law since the late nineteenth century which supports this approach.

For reasons which I have already given, I have been unable to discover any such development in the law. As I read the authorities, they reveal a **\*426** consistent application of the principle, subject only to the recognition of a *locus poenitentiae* for the claimant where the illegal purpose has not been carried into effect. Furthermore, the invocation by Lloyd L.J. of the Bowmakers rule is, as I have already indicated, inconsistent with principle and authority. This conclusion flows from the nature of the principle itself, which is that a court of equity will not assist a claimant who does not come to equity with clean hands. This equitable maxim is more broadly based than the Bowmakers rule. It is founded on the principle that he who has committed iniquity shall not have equity;

and what is required to invoke the maxim is no more than that the alleged misconduct has "an immediate and necessary relation to the equity sued for": see Dering v. Earl of Winchelsea [54] and Snell's Equity . [55]

I have already expressed my respectful disagreement with the view expressed by my noble and learned friend Lord Browne-Wilkinson that the law has already developed at least in the direction of the conclusion which he favours. I have nevertheless considered whether your Lordships' House should in the present case develop the law, with a view to qualifying the principle by the application to it of the Bowmakers rule. I can see the temptation of doing so, if one focuses only on the facts of the present case in which it seems particularly harsh not to assist the respondent to establish her equitable interest in the house where not only was the appellant implicated in precisely the same fraud on the Department of Social Security, but the fraud in question can be regarded as relatively minor and indeed all too prevalent, and the respondent has readily confessed her wrongdoing to the Department and has made amends to them. Furthermore it is probable that, if the appeal should be allowed, the effect will be that she will lose all her capital. But it is not to be forgotten that other cases in this category will not evoke the same sympathy on the part of the court. There may be cases in which the fraud is far more serious than that in the present case, and is uncovered not as a result of a confession but only after a lengthy police investigation and a prolonged criminal trial. Again there may be cases in which a group of terrorists, or armed robbers, secure a base for their criminal activities by buying a house in the name of a third party not directly implicated in those activities. In cases such as these there will almost certainly be no presumption of advancement. Is it really to be said that criminals such as these, or their personal representatives, are entitled to invoke the assistance of a court of equity in order to establish an equitable interest in property? It may be said that these are extreme cases; but I find it difficult to see how, in this context at least, it is possible to distinguish between degrees of iniquity. At all events, I cannot think that the harsh consequences which will arise from the application of the established principle in a case such as the present provide a satisfactory basis for developing the law in a manner which will open the door to far more unmeritorious cases, especially as the proposed

development in the law appears to me to be contrary to the established principle underlying the authorities.

Finally, I wish to revert to the public conscience test favoured by Nicholls L.J. in the Court of Appeal. Despite the fact that I have concluded that on the authorities it was not open to the Court of Appeal to apply the **\*427** conscience test to a case such as the present, I have considered whether it is open to your Lordships' House to do so and, if so, whether it would be desirable to take this course. Among the authorities cited to your Lordships, there was no decision of this House; technically, therefore, it may be said that this House is free to depart from the line of authority to which I have referred. But the fact remains that the principle invoked by the appellant has been consistently applied for about two centuries. Furthermore the adoption of the public conscience test, as stated by Nicholls L.J., would constitute a revolution in this branch of the law, under which what is in effect a discretion would become vested in the court to deal with the matter by the process of a balancing operation, in place of a system of rules, ultimately derived from the principle of public policy enunciated by Lord Mansfield C.J. in Holman v. Johnson , which lies at the root of the law relating to claims which are, in one way or another, tainted by illegality. Furthermore, the principle of public policy so stated by Lord Mansfield cannot be disregarded as having no basis in principle. In his dissenting judgment in the present case, Ralph Gibson L.J. pointed out [56] :

> In so far as the basis of the *ex turpi causa* defence, as founded on public policy, is directed at deterrence it seems to me that the force of the deterrent effect is in the existence of the known rule and in its stern application. Lawyers have long known of the rule and must have advised many people of its existence. It does not stop people making arrangements to defraud creditors, or the revenue, or the D.S.S. Such arrangements as are under consideration in this case are usually made between married couples as in Tinker v. Tinker , or between unmarried lovers as in this

case or in Cantor v. Cox . If they do not fall out, no one will know. If they do fall out, no one will know. If they do fall out, one side may reveal the fraud. It is an ugly situation when that is done. I think that the law has upheld the principle on the simple ground that, ugly though its working may be, it is better than permitting the fraudulent an avenue of escape if the fraud is revealed.

I recognise, of course, the hardship which the application of the present law imposes upon the respondent in this case; and I do not disguise my own unhappiness at the result. But, bearing in mind the passage from the judgment of Ralph Gibson L.J. which I have just quoted, I have to say that it is by no means self-evident that the public conscience test is preferable to the present strict rules. Certainly, I do not feel able to say that it would be appropriate for your Lordships' House, in the face of a long line of unbroken authority stretching back over 200 years, now by judicial decision to replace the principles established in those authorities by a wholly different discretionary system.

In saying this, I have well in mind the reform introduced in New Zealand by the New Zealand Illegal Contracts Act 1970 , which in section 6 provides that "… every illegal contract shall be of no effect and no person shall become entitled to any property under a disposition made by or pursuant to any such contract: …"; and in section 7 confers on the court the power to grant relief "by way of restitution, compensation, variation of the contract, validation of the contract in whole or part or for any particular purpose, or otherwise howsoever as the court in its discretion thinks just". These **\*428** provisions of the Act demonstrate how sweeping a reform was considered necessary by the New Zealand legislature in order to substitute a system of discretionary relief for the present system of rules founded upon the *in pari delicto* principle; and even then the Act is restricted to cases concerned with illegal contracts. Your Lordships have no means of ascertaining how successful the Act has proved to be in practice; or whether, for example, it is considered that the scope of the Act should be extended to

embrace other types of illegality. In truth, everything points to the conclusion that, if there is to be a reform aimed at substituting a system of discretionary relief for the present rules, the reform is one which should only be instituted by the legislature, after a full inquiry into the matter by the Law Commission, such inquiry to embrace not only the perceived advantages and disadvantages of the present law, but also the likely advantages and disadvantages of a system of discretionary relief, no doubt with particular reference to the New Zealand experience. The real criticism of the present rules is not that they are unprincipled, but rather that they are indiscriminate in their effect, and are capable therefore of producing injustice. It is this effect which no doubt prompted the reform of the law in New Zealand, embodied in the Act of 1970; and it prompts me to say that, speaking for myself, I would welcome an investigation by the Law Commission, if this is considered desirable and practicable by the authorities concerned; and that I would be more than happy if a new system could be evolved which was both satisfactory in its effect and capable of avoiding the kind of result which flows from the established rules of law in cases such as the present.

For these reasons, which are substantially the same as those expressed by Ralph Gibson L.J. in his dissenting judgment in the Court of Appeal, I would allow the appeal.

Lord Jauncey of Tullichettle.

The parties to this appeal lived together for some years in a house in mid-Glamorgan which they ran as a lodging-house. The purchase price of the house was provided by a mortgage loan from the bank and a sum of money which was provided jointly by the parties. It was, however, agreed between them that the title should be taken in the sole name of the appellant in order to facilitate the making by the respondent of false claims upon the D.S.S. In 1988 the parties fell out and the appellant moved out of the house. She subsequently raised the present action claiming possession of the property and the respondent counter-claimed for a declaration to the effect that the appellant held the property on trust for the respondent and the appellant in equal shares. The county court judge dismissed the claim and found for the defendant on the

counter-claim and the Court of Appeal by a majority (Ralph Gibson L.J. dissenting) dismissed the appellant's appeal. The issues in the courts below and before this House revolved round the illegal purpose of taking the title of the house in the name of the appellant alone.

Had the case been heard by Lord Eldon in the early years of the nineteenth century there could be no doubt as to what the results would have been. In Muckleston v. Brown Lord Eldon L.C. said [57] :

> … the plaintiff stating, he had been guilty of a fraud upon the law, to **\*429** evade, to disappoint, the provision of the legislature, to which he is bound to submit, and coming to equity to be relieved against his own act, and the defence being dishonest, between the two species of dishonesty the court would not act; but would say "Let the estate lie, where it falls".

In the following year in Curds v. Perry , the Lord Chancellor had to consider whether a deceased Member of Parliament could have claimed an equitable interest in a ship which had been registered in the sole name of his partner in order to evade a statutory provision which would have imposed penalties on the Member of Parliament had the ship been employed in the service of the Government while he was a member. It appears to have argued, *inter alia* , that there was an implied trust by operation of law since the purchase had been made of joint properties. The Lord Chancellor rejected this argument saying that as between the two partners, Chiswell, the Member of Parliament, could not be heard to say that he had any interest in the ship. He went on to say [58] :

> The reason for waiving any right Chiswell had in consequence of the manner, in which Nantes made this purchase, the object of keeping the ships registered in the name of Nantes, was, that a profit might be made by the employment of

them in contracts with Government; and Chiswell was a Member of Parliament; who, the law says, shall not be a contractor. The moment the purchase to defeat the policy of the law by fraudulently concealing, that this was his property, is admitted, it is very clear, he ought not to be heard in this Court to say, that is his property.

Curtis v. Perry was commented on by Lord Eldon in Ex p. Yallop , in which it was held that the registry of ship was conclusive evidence of ownership. The Lord Chancellor, after referring to Chiswell's conduct, said [59] :

Two principles therefore stood in his way: first, that he had broken in upon the policy of the Act of Parliament; and could not be permitted to say, he had property of this nature, not subject to the regulations of the Act; and farther, that he had done so for the purpose of defeating another law; meaning to hold himself out not to be owner of those ships; as they were bound by contracts, of which he, being a Member of Parliament, could not have the benefit. Under those circumstances it could not possibly be contended, that he had that character of owner, which for his own private and fraudulent purpose he had disclaimed.

The Act of Parliament was of course the Act providing for registration of ownership of ships. I do not understand the Lord Chancellor to be there saying that Chiswell's claim to an equitable interest was defeated only because of a combination of two grounds but rather that it would have been defeated on either ground. It seems probable that the second ground

would have been decisive of the present appeal. The question in 1993 is whether the law remains the same or whether in the intervening 180 or more years the very broad principles enunciated by Lord Eldon have been to any extent modified.

At the outset it seems to me to be important to distinguish between the enforcement of executory provisions arising under an illegal contract or *430 other transaction and the enforcement of rights already acquired under the completed provisions of such a contract or transaction. Your Lordships were referred to a very considerable number of authorities, both ancient and modern, from which certain propositions may be derived.

*First:* it is trite law that the court will not give its assistance to the enforcement of executory provisions of an unlawful contract whether the illegality is apparent *ex facie* the document or whether the illegality of purpose of what would otherwise be a lawful contract emerges during the course of the trial. ( Holman v. Johnson [60] *per* Lord Mansfield C.J.; Pearce v. Brooks [61] *per* Pollock C.B.; Alexander v. Rayson [62] ; Bowmakers Ltd v. Barnet Instruments Ltd. [63] )

*Secondly* : it is well established that a party is not entitled to rely on his own fraud or illegality in order to assist a claim or rebut a presumption. Thus when money or property has been transferred by a man to his wife or children for the purpose of defrauding creditors and the transferee resists his claim for recovery he cannot be heard to rely on his illegal purpose in order to rebut the presumption of advancement. ( Gascoigne v. Gascoigne [64] ; Palaniappa Chettiar v. Arunasalam Chettiar [65] ; Tinker v. Tinker . [66]

*Thirdly* : it has, however, for some years been recognised that a completely executed transfer of property or of an interest in property made in pursuance of an unlawful agreement is valid and the court will assist the transferee in the protection of his interest provided that he does not require to found on the unlawful agreement ( Ayerst v. Jenkins , [67] Alexander v. Rayson , [68] Bowmakers Ltd v. Barnet Instruments Ltd , Singh v. Ali [69] ). To the extent, at least, of his third proposition it would appear

that there has been some modification over the years of Lord Eldon's principles.

The ultimate question in this appeal is, in my view, whether the respondent is claiming the existence of a resulting trust in her favour is seeking to enforce unperformed provisions of an unlawful transaction or whether she is simply relying on an equitable proprietary interest that she has already acquired under such a transaction. The nature of a resulting trust was described by Lord Diplock in Gissing v. Gissing [70] as follows:

> A resulting, implied or constructive trust—and it is unnecessary for present purposes to distinguish between these three classes of trust—is created by a transaction between the trustee and the *cestui que trust* in connection with the acquisition by the trustee of a legal estate in land, whenever the trustee has so conducted himself that it would be inequitable to allow him to deny to the *cestui que trust* a beneficial interest in the land acquired. And he will be held so to have conducted himself if by his words or conduct he has induced the *cestui que trust* to **\*431** act to his own detriment in the reasonable belief that by so acting he was acquiring a beneficial interest in the land.

I find this a very narrow question but I have come to the conclusion that the transaction whereby the claimed resulting trust in favour of the respondent was created was the agreement between the parties that although funds were to be provided by both of them, nevertheless the title to the house was to be in the sole name of the appellant for the unlawful purpose of defrauding the D.S.S. So long as that agreement remained unperformed neither party could have enforced it against the other. However, as soon as the agreement was implemented by the sale to the appellant alone she became trustee for the respondent who can now rely on the equitable proprietary interest which has thereby been presumed to have been created in her favour and has no need to rely on the illegal transaction which led to its creation.

My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend, Lord Browne-Wilkinson. I agree with it and for the reasons contained therein as well as for the reasons in this speech I would dismiss the appeal.

Lord Lowry.

I have had the advantage of reading in draft the speeches prepared by your Lordships and find myself in agreement with the conclusions reached by my noble and learned friends Lord Jauncey of Tullichettle and Lord Browne-Wilkinson. I acknowledge the persuasive force which has informed both the speech of my noble and learned friend Lord Goff of Chieveley and the judgment of Ralph Gibson L.J. in the Court of Appeal, but I am unable to accept and act upon Lord Eldon's wide principle despite its eminent authorship and its impressive antiquity.

The advancement cases belong to a class in relation to which the rule seems to me to conform with equitable principles. The ostensible donor makes a gift with a fraudulent purpose in view; when he tries to assert his equitable title, he is obliged to rely on his own fraud in order to rebut the presumption of advancement. Equity, through the mouth of the court, then says, "We will not assist you to recover your property, because you have to give evidence of your own wrongdoing in order to succeed". On the other hand, under the wide principle, someone in the position of Miss Milligan, who has only to show a trust, resulting from the fact (which he must prove or which may be admitted) that the property was acquired wholly or partly by the use of his money, is said to be defeated by the maxim that he who comes into equity must come with clean hands, on the ground that the original transaction was undertaken for a fraudulent purpose. But in the latter case the claimant is not relying on his own fraud in order to succeed and is merely said to be defeated by a *rule of policy* , despite the fact that he already has an equitable interest, as the *locus poenitentiae* rule confirms.

Tinsley v Milligan, (1994) 68 P. & C.R. 412 (1993)

In Curtis v. Perry , as to which I happily adopt the analysis of my noble and learned friend Lord Jauncey, Lord Eldon gave two reasons for defeating the creditors of Chiswell's estate, but much the more important and just reason to my mind, as I think— the report of the judgment indicates, was the fact that Nantes had registered the ships in his name under the relevant Acts and that both he and Chiswell had led the trading world to believe that they were Nantes's sole property. Of course, as my noble and learned friend Lord Goff has illustrated, Curtis v. Perry is by no means a unique example of the application of Lord Eldon's wide principle to cases in which there was no **\*432** presumption of advancement, but even a plurality of examples does not in my opinion endow the wide principle with validity.

The rule of policy which is said to justify the wide principle should be closely examined. A and B buy property in equal shares and by agreement B acquires the legal title. A, either by himself or in conspiracy with B (who may or may not stand to benefit from the fraud), plans to obtain a financial advantage by falsely pretending that he owns no property: if A goes through with the scheme, the wide principle applies, although, in order to assert his rights against B, A does not need to rely on his own fraud. Indeed, where the presumption of advancement does not apply, it is B who will have to rely on the fraud (to which in some cases he has been privy) as a defence. If, on the other hand, the property has been innocently acquired and A later takes advantage of his lack of a legal title to make the same false pretence, his claim against B on the foot of a resulting trust cannot be defeated. The criminal sanction against A is the same in either case.

I am not impressed by the argument that the wide principle acts as a deterrent to persons in A's position. In the first place, they may not be aware of the principle and are unlikely to consult a reputable solicitor. Secondly, if they commit a fraud, they will not have been deterred by the possibility of being found out and prosecuted. Furthermore, the wide principle could be a positive encouragement to B, if he is aware of the principle, because by means of his complicity, he may become not only the legal owner but the beneficial owner.

For A to take proceedings in order to vindicate his equitable rights as sole or joint beneficial owner is not an example of the maxim *ex turpi causa non oritur actio* because his equitable title and his cause of action do not arise out of his illegal or immoral act. It is B who must rely on the *ex turpis causa* as a defence.

The foregoing considerations render me all the more convinced that the right view is that a party cannot *rely* on his own illegality in order to prove his equitable right, and *not* that a party cannot recover if his illegality is proved as a defence to his claim. I consider that the wide principle is not well founded and, since it is not binding on your Lordships, that your Lordships should not follow it.

While the Bowmaker rule could not unaided overturn a sound and estabished principle of equity, I find it satisfactory that the course preferred by my noble and learned friends Lord Jauncey and Lord Browne-Wilkinson will promote harmony between equity and the common law. Accordingly, for the reasons which they have given, and also for the further reasons which I have mentioned, I would dismiss the appeal.

Lord Browne-Wilkinson.

I agree with the speech of my noble and learned friend Lord Goff of Chieveley that the consequences of being a party to an illegal transaction cannot depend, as the majority in the Court of Appeal held, on such an imponderable factor as the extent to which the public conscience would be affronted by recognising rights created by illegal transactions. However, I have the misfortune to disagree with him as to the correct principle to be applied in a case where equitable property rights are acquired as a result of an illegal transaction.

Neither at law nor in equity will the court enforce an illegal contract which is been partially, but not fully, performed. However, it does not follow that all acts done under a partially performed contract are of no effect. In **\*433** particular it is now clearly established that a law (as opposed to in equity), property in goods or land can pass under, or pursuant to, such a contract. If so, the rights of the owner of the legal title thereby acquired will be enforced, provided that the plaintiff can

establish such title without pleading or leading evidence of the illegality. It is said that the property lies where it falls, even though legal title to the property was acquired as a result of the property passing under the illegal contract itself. I will first consider the modern authorities laying down the circumstances under which an illegal transaction will be enforced by the courts. I will then consider whether the courts adopt a different attitude to equitable proprietary interests so acquired.

The position at law is well illustrated by the decision in Bowmakers Ltd v. Barnet Instruments Ltd [71] In that case Barnet acquired three parcels of machine tools which had previously belonged to Smith. The transaction was carried through by three hire-purchase agreements under which Smith sold the goods to Bowmakers who then hired them to Barnet. All three agreements were unlawful as being in breach of Defence Regulations : it is important to note that in the case of at least two of the parcels the illegality lay in the contract under which Bowmakers acquired the machine tools from Smith. [72] Bowmakers succeeded in an action for conversion against Barnet. Even though it appeared from the pleadings and the evidence that the contract under which Bowmakers acquired the goods was illegal, such contract was effective to pass the property in the goods to Bowmakers who could therefore found their claim on the property right so acquired.

The position at law is further illustrated by Ferret v. Hill [73] where A, with intent to use premises as a brothel, took a lease from B. B, having discovered that the premises were being used as a brothel, ejected A. A was held entitled to maintain ejectment against B notwithstanding that A entered into the lease for an illegal purpose.

In Taylor v. Chester [74] the plaintiff had deposited with the defendant half a £50 note as security for payment due under an illegal contract with the defendant. The plaintiff was held unable to recover the half note as a special property in it, ( i.e. the security interest) had passed to the defendant.

In Alexander v. Rayson [75] the plaintiff had leased a property to the defendant. For the purpose of defrauding the rating authorities, the plaintiff had carried through the transaction by two documents, one a lease which expressed a low rent, the other a service agreement providing for additional payments sufficient to. bring up the annual payment to the actual rent agreed. The plaintiff failed in an action to recover rent due under the agreements but the Court of Appeal said that if the plaintiff had let the flat to be used for an illegal purpose, the leasehold interest in the flat would have vested in the defendant who would have been entitled to remain in possession of the flat until and unless the plaintiff could eject her without relying on the unlawful agreement.

From these authorities the following propositions emerge:

- (1) Property in chattels and land can pass under a contract which is illegal and therefore would have been unenforceable as a contract;
- (2) A plaintiff can at law enforce property rights so acquired provided that he does not need to rely on the illegal contract for any purpose other than providing the basis of his claim to a property right;
- (3) It is irrelevant that the illegality of the underlying agreement was either pleaded or emerged in evidence: if the plaintiff has acquired legal title under the illegal contract that is enough.

I have stressed the common law rules as to the impact of illegality on the acquisition and enforcement of property rights because it is the appellant's contention that different principles apply in equity. In particular it is said that equity will not aid Miss Milligan to assert, establish or enforce an equitable, as opposed to a legal, proprietary interest since she was a party to the fraud on the D.H.S.S. The house was put in the name of Miss Tinsley alone (instead of joint names) to facilitate the fraud. Therefore, it is said, Miss Milligan does not come to equity with clean hands; consequently, equity will not aid her.

Most authorities to which we were referred deal with enforcing proprietary rights under a trust: I will deal with them in due course. But before turning to them, I must point out that if Miss Tinsley's argument is correct, the results would be far reaching and, I suggest, very surprising. There are many proprietary rights, apart from trusts, which are only enforceable in equity. For example, an agreement for a lease under which the

tenant has entered is normally said to be as good as a lease, since under such an agreement equity treats the lease as having been granted and the "lessee" as having a proprietary interest enforceable against the whole world except the bona fide purchaser for value without notice. Would the result in Ferret v. Hill have been different if there had only been an agreement for a lease? Say that in Taylor v. Chester the plaintiff had deposited by way of security share certificates instead of half a bank note (thereby producing only an equitable security): would the outcome have been different? Similarly, if the plaintiff were relying on an assignment of a chose in action would he succeed if the assignment was a legal assignment but fail if it were equitable?

In my judgment to draw such distinctions between property rights enforceable at law and those which require the intervention of equity would be surprising. More than 100 years has elapsed since law and equity became fused. The reality of the matter is that, in 1993, English law has one single law of property made up of legal and equitable interests. Although for historical reasons legal estates and equitable estates have differing incidents, the person owning either type of estate has a right of property, a right *in rem* not merely a right *in personam* . If the law is that a party is entitled to enforce a property right acquired under an illegal transaction, in my judgment the same rule ought to apply to any property right so acquired, whether such right is legal or equitable.

In the present case, Miss Milligan claims under a resulting or implied trust. The court below have found, and it is not now disputed, that apart from the question of illegality Miss Milligan would have been entitled in equity to a half share in the house in accordance with the principles exemplified in Gissing v. Gissing [76] ; Grant v. Edwards [77] and Lloyds Bank Pic. v. Rosset . [78] **\*435** The creation of such an equitable interest does not depend upon a contractual obligation but on a common intention acted upon by the parties to their detriment. It is a development of the old law of resulting trust under which, where two parties have provided the purchase money to buy a property which is conveyed into the name of one of them alone, the latter is presumed to hold the property on a resulting trust for both parties in shares proportionate to their contributions to the purchase price. In arguments, no distinction was drawn

between strict resulting trusts and a Gissing v. Gissing type of trust.

A presumption of resulting trust also arises in equity when A transfers personalty or money to B: see Snell's Equity [79] ; Standing v. Bowring *per* Cotton L.J. [80] ; Dewar v. Dewar . [81] Before 1925 there was also a presumption of resulting trust when land was voluntarily transferred by A to B: it is arguable, however, that the position has been altered by the 1925 property legislation. [82] The presumption of a resulting trust is, in my view, crucial in considering the authorities. On that presumption (and on the contrary presumption of advancement) hinges the answer to the crucial question "does a plaintiff claiming under a resulting trust have to rely on the underlying illegality?". Where the presumption of resulting trust applies, the plaintiff does not have to rely on the illegality. If he proves that the property is vested in the defendant alone but that the plaintiff provided part of the purchase money, or voluntarily transferred the property to the defendant, the plaintiff establishes his claim under a resulting trust unless either the contrary presumption of advancement displaces the presumption of resulting trust or the defendant leads evidence to rebut the presumption of resulting trust. Therefore, in cases where the presumption of advancement does not apply, a plaintiff can establish his equitable interest in the property without relying in any way on the underlying illegal transaction. In this case Miss Milligan as defendant simply pleaded the common intention that the property should belong to both of them and that she contributed to the purchase price: she claimed that in consequence the property belonged to them equally. To the same effect was her evidence in chief. Therefore Miss Milligan was not forced to rely on the illegality to prove her equitable interest. Only in the reply and the course of Miss Milligan's cross-examination did such illegality emerge: it was Miss Tinsley who had to rely on that illegality.

Although the presumption of advancement does not directly arise for consideration in this case, it is important when considering the decided cases to understand its operation. On a transfer from a man to wife, children or others to whom he stands in *loco parentis,* equity presumes an intention to make a gift. Therefore in such a case, unlike the case where the

presumption of resulting trust applies, in order to establish any claim the plaintiff has himself to lead evidence sufficient to rebut the presumption of gift and in so doing will normally have to plead, and give evidence of, the underlying illegal purpose.

Against this background, I turn to consider the authorities dealing with the position in equity where A transferred property to B for an illegal **\*436** purpose. The earlier authorities, primarily Lord Eldon, support the appellant's proposition that equity will not aid a plaintiff who has transferred property to another for an illegal purpose. In Cottington v. Fletcher a Roman Catholic had assigned an advowson to the defendant for a term of 99 years for the purpose of avoiding a statutory prohibition. On subsequently becoming a Protestant, he sought to recover the advowson from the defendant. The defendant pleaded the Statute of Frauds but also admitted that the advowson was assigned to him as trustee. On what appears to have been an interlocutory hearing, Lord Hardwicke, L.C., held, that in view of the admission of trust, the plea of the Statute of Frauds was bad. However he said that as the assignment was done in fraud of statute [83] "I doubt at the hearing whether the plaintiff could be relieved, such fraudulent conveyances being made absolute against the grantor".

In Muckleston v. Brown (a case concerning secret trusts) Lord Eldon, … cast doubt on Lord Hardwicke's view, possibly misunderstanding that Lord Hardwicke was dealing with the question whether the Statute of Frauds provided a defence and not directly with the question of illegality. Lord Eldon said [84] :

> Lord Hardwicke means to say, that, if the defendant admits the trust, though against the policy of the law, he would relieve: but if he does not admit the trust, but demurs, he would do, what does not apply in the least to this case; the plaintiff stating, he had been guilty of a fraud upon the law, to evade, to disappoint, the provision of the Legislature, to which he is bound to submit, and coming to equity to be relieved against his own act, and the defence being dishonest, between the

two species of dishonesty the court would not act; but would say, "Let the estate lie, where if falls".

Those remarks were *obiter* . But in Curtis v. Perry Lord Eldon founded his decision on the same principle. In that case Nantes and Chiswell (who was a Member of Parliament) were partners. Ships had been purchased by Nantes out of partnership assets but registered in the sole name of Nantes. When Chiswell discovered the position, the ships were shown in the partnership books as being partnership property. However with Chiswell's connivance the ships remained registered in the sole name of Nantes so as to evade a statutory prohibition against the ships being used for Government contracts if owned by a Member of Parliament. In a dispute between the partnership creditors and Nantes' separate creditors, Lord Eldon held in favour of the latter. He said [85] :

> The moment the purpose to defeat the policy of the law by fraudulently concealing, that this was his property, is admitted, it is very clear, he ought not to be heard in this Court to say, that is his property. In the case of a bill filed to have a reconveyance of a qualification given by the plaintiff to his son to enable him to sit in Parliament, the purpose being answered, the Bill was very properly dismissed by Lord Kenyon with costs.

See also, Ex p. Yallop .
**\*437**

The same broad principle was applied by the Exchequer Chamber in Equity in Groves v. Groves . In that case the plaintiff had purchased land in the name of his brother so as to give the brother a necessary qualification to vote. The plaintiff claimed to recover the land under a resulting trust. His claim was dismissed on the grounds

WESTLAW © 2017 Thomson Reuters.

*inter alia* , [86] "… that the illegal purpose for which this conveyance was made bars that equity". There are many cases in the first half of the nineteenth century where the same principle was applied.

However, in my view, the law was not so firmly established as at first sight it appears to have been. The law on the effect of illegality Was developing throughout the nineteenth century. In particular, if Lord Eldon's principle were to apply in its full vigour it would apply as much to claims by a guilty party to enforce an *express* trust as to enforce an implied or resulting trust: equity would not aid the plaintiff to enforce equitable claims against the holder of the legal estate. Yet in Ayerst v. Jenkins Lord Selborne L.C. apparently treated a party to the illegality as being entitled to enforce express trusts against trustees. In that case, the settlor transferred investments to trustees and executed a settlement for the sole benefit of the defendant with whom he was about to go through a ceremony of marriage which, to the knowledge of both, was illegal, *i.e.* the settlement was made in contemplation of unlawful cohabitation. After the death of the settlor, his personal representative sought to recover the investments from the trustees claiming that the express trust were invalid and that there was therefore a resulting trust to the settlor. The claim failed, partly on the ground that there was not equity in the settlor to recover from the trustees in whom the legal title was vested, but also on the ground that there was a fully executed trust vesting in the defendant "the immediate and absolute beneficial interest": see the explanation [87] of Rider v. Kidder . [88] The whole case proceeded on the footing that the defendant, even if a party to the illegality, was entitled to enforce against the trustees her equitable rights as beneficiary under the express trusts against the trustees. This view would be quite inconsistent with a general rule such as that propounded by Lord Eldon that a court of equity will never enforce equitable proprietary interests at the suit of a party to an illegality.

The law was developing in another direction the nineteenth century. There was originally a difference of view as to whether a transaction entered into for an illegal purpose would be enforced at law or in equity if the party had repented of his illegal purpose before it had been put into operation, *i.e.* the doctrine of *locus poenitentiae* . It was eventually recognised

both at law and in equity that if the plaintiff had repented before the illegal purpose was carried through, he could recover his property: see Taylor v. Bowers ; Symes v. Hughes . The principle of *locus poenitentiae* is in my judgment irreconcilable with any rule that where property is transferred for an illegal purpose no equitable proprietary right exists. The equitable right, if any, must arise at the time at which the property was voluntarily transferred to the third party or purchased in the name of the third party. The existence of the equitable interest cannot depend upon events occurring after that date. Therefore if, under the principle of *locus poenitentiae* , the courts recognise **\*438** that an equitable interest did arise out of the underlying transaction, the same must be true where the illegal purpose was earned through. The carrying out of the illegal purpose cannot, by itself, destroy the pre-existing equitable interest. The doctrine of *locus poenitentiae* therefore demonstrates that the effect of illegality is not to prevent a proprietary interest in equity from arising or to produce a forfeiture of such right: the effect is to render the equitable interest unenforceable in certain circumstances. The effect of illegality is not substantive but procedural. The question therefore is, "In what circumstances will equity refuse to enforce equitable rights which undoubtedly exist".

It is against this background that one has to assess the more recent law. Although in the cases decided during the last 100 years there are frequent references to Lord Eldon's wide principle, with on exception ( Cantor v. Cox ) none of the English decisions are decided by simply applying that principle. They are all cases where the unsuccessful party was held to be precluded from leading evidence of an illegal situation in order to rebut the presumption of advancement. Lord Eldon's rule would have provided a complete answer whether the transfer was made to a wife or child (where the presumption of advancement would apply) or to a stranger. Yet with one exception none of the cases in this century has been decided on that simple basis.

The majority of cases have been those in which the presumption of advancement applied: in those authorities the rule has been stated as being that a plaintiff cannot rely on evidence of his own illegality to rebut the presumption applicable in such cases that the plaintiff intended to make a gift of the property to the transferee. Thus in Gascoigne v. Gascoigne ; McEvoy

v. Belfast Banking Co. Ltd ; Re Emery's Investments Trusts ; Palaniappa Chettiar v. Arunasalam Chettiar and Tinker v. Tinker [89] the crucial point was said to be the inability of the plaintiff to lead evidence rebutting the presumption of advancement. In each case the plaintiff was claiming to recover property voluntarily transferred to, or purchased in the name of, a wife or child, for an illegal purpose. Although reference was made to Lord Eldon's principle, none of those cases was decided on the simple ground (if it were good law) that equity would not in any circumstances enforce a resulting trust in such circumstances. On the contrary in each case the rule was stated, to be that the plaintiff could not recover because he had to rely on the illegality to rebut the presumption of advancement.

In my judgment, the explanation for this departure from Lord Eldon's absolute rule is that the fusion of law and equity has led the courts to adopt a single rule (application both at law and in equity) as to the circumstances in which the court will enforce property interests acquired in pursuance of an illegal transaction *viz.* the Bowmaker rule. A party to an illegality can recover by virtue of a legal or equitable property interest if, but only if, he can establish his title without relying on his own illegality. In cases where the presumption of advancement applies, the plaintiff is faced with the presumption of gift and therefore cannot claim under a resulting trust unless and until he has rebutted that presumption of gift: for those purposes the plaintiff does have to rely on the underlying illegality and therefore fails.

The position is well illustrated by two decisions in the Privy Council. In the first, Singh v. Ali a plaintiff who had acquired legal title to a lorry under an **\*439** illegal transaction was held entitled to succeed against the other party to the illegality in detinue and trespass. The Board approved the Bowmaker test. Two years later in Palaniappa Chettiar v. Arunasalam Chettiar the Board had to consider the case where a father, who had transferred land to his son for an illegal purpose, sought to recover it under a resulting trust. It was held that he could not, since he had to rely on his illegal purpose in order to recover it under the presumption of advancement. The Board distinguished the decision in Haigh v. Kaye [90] on the following grounds [91] :

It appears to their Lordships, however, that there is a clear distinction between Haigh v. Kaye and the present case. In Haigh v. Kaye the plaintiff conveyed a freehold estate to the defendant. In the conveyance it was stated that a sum of £850 had been paid by the defendant for it. The plaintiff proved that no such sum was paid and claimed that the defendant was a trustee for him. Now in that case the plaintiff had no reason to disclose any illegality and did not do so. It was the defendant who suggested that the transaction was entered into for a fraudulent purpose. He sought to drag it in without pleading it distinctly and he was not allowed to do so. But in the present case the plaintiff had of necessity to disclose his own illegality to the court and for this reason: He had not only to get over the fact that the transfer stated that the son paid $7,000 for the land, he also had to get over the presumption of advancement, for, whenever a father transfers property to his son, there is a presumption that he intended it as a gift to his son; and if he wishes to rebut that presumption and to say that his son took as trustee for him, he must prove the trust clearly and distinctly, by evidence properly admissible for the purposes, and not leave it to be inferred from slight circumstances: see Shepherd v. Cartwright [1955]A. C. 431 , 445.

Further, the Board distinguished Singh v. Ali . It was pointed out that in Singh v. Ali the plaintiff founded his claim on a right of property in the lorry and his possession of it. The Board continued [92] :

[The plaintiff] did not have to found his cause of action on an immoral or illegal act. He was held entitled to recover. But in the present case the father has of necessity to put forward, and indeed, assert, his own fraudulent purpose, which he has fully achieved. He is met therefore by the principle stated long ago by Lord Mansfield "No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act" see Holman v. Johnson (1775) 1 Cowp. 341 , 343.

In my judgment these two cases show that the Privy Council was applying exactly the same principle in both cases although in one case the plaintiffs claim rested on a legal title and in the other on an equitable title. The claim based on the equitable title did not fail simply because the plaintiff was a party to the illegal transaction; it only failed because the plaintiff was bound to disclose and rely upon his own illegal purpose in order to rebut the presumption of advancement. The Privy Council was plainly treating the principle applicable both at law and in equity as being that a man can recover property provided that he is not forced to rely on his own illegality.

*440

I therefore reach the conclusion that, although there is no case overruling the wide principle stated by Lord Eldon, as the law has developed the equitable principle has become elided into the, common law rule. In my judgment the time has come to decide clearly that the rule is the same whether a plaintiff founds himself on a legal or equitable title: he is entitled to recover if he is not forced to plead or rely on the illegality, even if it emerges that the title on which he relied was acquired in the course of carrying through an illegal transaction.

As applied in the present case, that principle would operate as follows. Miss Milligan established a resulting trust by showing that she had contributed to the purchase price of the house and that there was common understanding between her and Miss Tinsley that they owned the house equally. She had no need to allege or prove *why* the house was conveyed into the name of Miss Tinsley alone, since that fact was irrelevant to her claim: it was enough to show that the house was in fact vested in Miss Tinsley alone. The illegality only emerged at all because Miss Tinsley sought to raise it. Having proved these facts, Miss Milligan had raised a presumption of resulting trust. There was no evidence to rebut that presumption. Therefore Miss Milligan should succeed. This is exactly the process of reasoning adopted by the Ontario Court of Appeal in Gorog v. Kiss [93] which in my judgment was rightly decided.

Finally, I should mention a further point which was relied on by Miss Tinsley. It is said that once the illegality of the transaction emerges, the court must refuse to enforce the transaction and all claims under it whether pleaded or not: see Scott v. Brown, Doering, McNab & Co. [94] Therefore, it is said, it does not matter whether a plaintiff relies on or gives evidence of the illegality: the court will not enforce the plaintiff's rights. In my judgment, this submission is plainly ill founded. There many cases where a plaintiff has succeeded, notwithstanding that the illegality of the transaction under which she acquired the property has emerged: see, for example, Bowmakers Ltd v. Barnet Instruments Ltd and Singh v. Ali . In my judgment the court is only entitled and bound to dismiss a claim on the basis that it is founded on an illegality in those cases where the illegality is of a kind which would have provided a good defence if raised by the defendant. In a case where the plaintiff is not seeking to enforce an unlawful contract but founds his case on collateral rights acquired under the contract (such as a right of property) the court is neither bound nor entitled to reject the claim unless the illegality of necessity forms part of the plaintiff's case.

I would therefore dismiss the appeal.

### Representation

•Solicitors— Blake Lapthorn as agents for Bowen-Rees-Jones, Risca; Belmont and Lowe as agents for Hugh James Jones and Jenkins, Cardiff.

*Reporter* —Fiona Shotter.

Tinsley v Milligan, (1994) 68 P. & C.R. 412 (1993)

Appeal dismissed (Lords Keith of Kinkel and Goff of Chieveley dissenting). **\*441**

Footnotes

| | |
|---|---|
| 1 | [1992] Ch. 310 , 315–317. |
| 2 | [1918] 1 K.B. 223 . |
| 3 | [1970] P. 136 . |
| 4 | [1992] Ch. 310 at 319H and 321D. |
| 5 | *ibid.* at 323G. |
| 6 | (1775) 1 Comp. 341 , 343. |
| 7 | (1818) Dan 143 at 150–151. |
| 8 | (1873) L.R. 16 Eq. 275 at 283 |
| 9 | (1869) L.R. 4 Q.B. 309 at 313. |
| 10 | (1838) 4 M. & W. 270 at 281. |
| 11 | [1936] 1 K.B. 169 . |
| 12 | [1960] A.C. 167 at 176–177. |
| 13 | (1740) 2 Atk. 155 . |
| 14 | (1755) 1 Amb. 265 . |
| 15 | (1801) 6 Ves. 53 at 68–69. |
| 16 | (1802) 6 Ves. 739 . |
| 17 | (1808) 15 Ves. 60 . |
| 18 | (1828) 3 Y. & J. 163 . |
| 19 | (1857) 3 K. & J. 310 . |
| 20 | (1884) 26 Ch.D. 616 . |
| 21 | (1895) 13 R. 770 . |
| 22 | [1934] N.I. 67 . |
| 23 | [1959] Ch. 410 . |
| 24 | [1960] N.Z.L.R. 385 . |
| 25 | [1962] A.C. 294 . |
| 26 | (1976) 239 E.G. 121 . |
| 27 | (1876) 1 Q.B.D. 291 . |
| 28 | (1815) G.Coop. 250 . |
| 29 | (1821) 2 Jac. & W. 565 . |
| 30 | (1870) L.R. 9 Eq. Cas. 475 . |
| 31 | (1908) L.R. 35 Ind.App. 78 . |
| 32 | (1917) 23 C.L.R. 185 . |
| 33 | (1872) L.R. 7 Ch.App. 469 at 473. |
| 34 | (1829) 3 Y. & J. 163 at 174. |
| 35 | [1970] P. 136 at 143. |
| 36 | (1802) 6 Ves. 739 at 746. |
| 37 | (1857) 3 K. & J. 310 at 315. |
| 38 | (1976) 239 E.G. 121 at 122. |
| 39 | [1945] K.B. 65 . |
| 40 | [1986] 1 All E.R. 676 . |
| 41 | *ibid.* at 687d. |
| 42 | [1970] 2 Q.B. 541 . |
| 43 | [1977] Q.B. 94 . |
| 44 | [1980] Q.B. 348 . |
| 45 | [1978] Q.B. 383 . |
| 46 | [1987] 1 W.L.R. 1116 . |
| 47 | [1990] 1 Q.B. 1 . |
| 48 | *ibid.* at 35. |
| 49 | [1990] 1 W.L.R. 1292 . |
| 50 | [1957] 1 Q.B. 267 . |
| 51 | [1992] Ch. 310 at 322E. |
| 52 | *ibid.* at 324C–D. |

| | |
|---|---|
| 53 | *ibid.* at 341H. |
| 54 | (1787) 1 Cox Eq. 318 at 319–320. |
| 55 | (29th ed., 1990), p. 32. |
| 56 | [1992] Ch. 310 at 334E–G. |
| 57 | (1801) 6 Ves. 53 at 69. |
| 58 | (1802) 6 Ves. 739 at 744. |
| 59 | (1808) 15 Ves. 60 at 70. |
| 60 | [1775] 1 Comp. 341 at 343. |
| 61 | (1866) L.R. 1 Exch. 213 at 217–218. |
| 62 | [1936] 1 K.B. 169 at 182. |
| 63 | [1945] K.B. 65 at 70. |
| 64 | [1918] 1 K.B. 223 at 226. |
| 65 | [1962] A.C. 294 at 302. |
| 66 | [1970] P. 136 at 143. |
| 67 | (1873) L.R. 16 Eq. 275 at 283. |
| 68 | [1936] 1 K.B. 169 at 184–185. |
| 69 | [1960] A.C. 167 at 176. |
| 70 | [1971] A.C. 886 at 905B. |
| 71 | [1945] K.B. 65 . |
| 72 | *ibid* . at 69. |
| 73 | (1854) 15 C.B. 207 . |
| 74 | (1869) L.R. 4 Q.B. 309 . |
| 75 | [1936] 1 K.B. 169 at 186. |
| 76 | [1971] A.C. 886 . |
| 77 | [1986] Ch. 638 . |
| 78 | [1991] A.C. 107 . |
| 79 | 29th ed. (1990) at 184. |
| 80 | (1885) 31 Ch.D. 282 at 287. |
| 81 | [1975] 1 W.L.R. 1532 at 1537D. |
| 82 | Snell, 29th ed. (1990) at 182. |
| 83 | (1740) 2 Atk. 155 at 156. |
| 84 | (1801) 6 Ves. 53 at 68–69. |
| 85 | (1802) 6 Ves. 739 at 747. |
| 86 | (1829) 3 Y. & J. 163 at 172. |
| 87 | (1873) L.R. 16 Eq. 275 at 284–285. |
| 88 | [1805] 10 Ves. 361 at 366. |
| 89 | [1970] P. 136 at 141H and 142C. |
| 90 | (1872) L.R. 7 Ch. 469 . |
| 91 | [1962] A.C. 294 at 301. |
| 92 | *ibid.* at 303. |
| 93 | (1977) 78 D.L.R. (3d) 690 . |
| 94 | [1892] 2 Q.B. 724 . |

(1994) 68 P. & C.R. 412

© 2017 Sweet & Maxwell

# TAB 92

Virgin Atlantic Airways Limited v. Zodiac Seats UK
Limited (formerly known as Contour Aerospace Limited)

On appeal from: [2009] EWCA Civ 1062

SC

3 July 2013

**[2013] UKSC 46**

**2013 WL 3197314**

before Lord Neuberger , President Lady Hale
Lord Clarke Lord Sumption Lord Carnwath
Judgment given on 3 July 2013

**Analysis**

Heard on 29 and 30 April 2013

**Representation**

> • Henry Carr QC Iain Purvis QC Brian Nicholson
> (Instructed by Wragge & Co LLP ).
> • Jonathan Crow QC Richard Meade QC Henry
> Ward (Instructed by DLA Piper UK LLP ).

**Judgment**

Lord Sumption (With Whom Lady Hale, Lord Clarke and
Lord Carnwath Agree)

1  In this case, Virgin Atlantic Airways Ltd wishes
to recover damages exceeding £49,000,000 for the
infringement of a European Patent which does not exist
in the form said to have been infringed. The Technical
Board of Appeal ("TBA") of the European Patent
Office ("EPO") has retrospectively amended it so as to
remove with effect from the date of grant all the claims
said to have been infringed.

2  The TBA found that in the form in which the patent
was originally granted the relevant claims were invalid
because they had been anticipated by prior art. Virgin
says that it is nevertheless entitled to recover damages
for infringement because before the TBA had issued

its decision, the English courts had held the patent to
be valid and specifically rejected the objection based
on prior art. Their case is that this conclusion and the
finding of validity on which it is based are res judicata
notwithstanding the later but retrospective decision of
the TBA. A similar argument had succeeded before
the Court of Appeal in very similar circumstances in
Coflexip SA v Stolt Offshore MS Ltd (No 2) [2004] FSR
708 and Unilin Beheer BV v Berry Floor NV [2007]
FSR 635 . The Court of Appeal, conceiving itself to be
bound by these decisions and regarding them as correct
in principle, arrived at the same conclusion.

**The statutory framework**

3  The appeal perfectly illustrates the problems arising
from the system of parallel jurisdiction for determining
the validity of European patents.

4  Part II of the Patents Act 1977 gives effect
to the principal provisions of the European Patent
Convention . Section 77(1) of the Act provides that a
European Patent (UK), i.e. one which is granted for
the United Kingdom or for states including the United
Kingdom, is to be treated as if it were a patent granted
under the Act, and that "the proprietor of a European
Patent (UK) shall accordingly as respects the United
Kingdom have the same rights and remedies, subject to
the same conditions, as the proprietor of a patent under
this Act." Section 77(2)-(4A) deal with the revocation or
amendment of a European Patent by the EPO ("EPO"):

**Effect of European Patent (UK)**

…

(2)   Subsection (1) above shall
not affect the operation in relation
to a European patent (UK) of
any provisions of the European
Patent Convention relating to the
amendment or revocation of such
a patent in proceedings before the
EPO.

(3)  Where in the case of a European
patent (UK)—

(a)  proceedings for infringement, or proceedings under section 58 above, have been commenced before the court or the comptroller and have not been finally disposed of, and

(b)  it is established in proceedings before the EPO that the patent is only partially valid,

the provisions of section 63 … apply as they apply to proceedings in which the validity of a patent is put in issue and in which it is found that the patent is only partially valid.

(4)  Where a European patent (UK) is amended in accordance with the European Patent Convention , the amendment shall have effect for the purposes of Parts I and III of this Act as if the specification of the patent had been amended under this Act; but subject to subsection (6)(b) below.

(4A)   Where a European patent (UK) is revoked in accordance with the European Patent Convention , the patent shall be treated for the purposes of Parts I and III of this Act as having been revoked under this Act."

The provisions of section 63 to which section 77(3) refers deal with the power of the Comptroller in a case where a patent is found to be only partially valid to grant relief in respect of that part which is found to be valid and infringed.

5  Section 77(2) of the Act refers to "the provisions of the European Patent Convention relating to the amendment or revocation". This is a reference to article 68 of the Convention, and indirectly to article 64 . They provide:

"Article 64

Rights conferred by a European patent

"(1)   A European patent shall, subject to the provisions of paragraph 2, confer on its proprietor from the date [of publication of the mention of its grant], in each Contracting State in respect of which it is granted, the same rights as would be conferred by a national patent granted in that State.

(2)   If the subject-matter of the European patent is a process, the protection conferred by the patent shall extend to the products directly obtained by such process.

(3)  Any infringement of a European patent shall be dealt with by national law.

Article 68

Effect of revocation or limitation of the European patent

The European patent application and the resulting European patent shall be deemed not to have had, from the outset, the effects specified in articles 64 and 67, to the extent that the patent has been revoked or limited in opposition, limitation or revocation proceedings."

6  Part V of the Convention provides for opposition procedure before the Opposition Division of the EPO and on appeal from them to the TBA. A European

patent may be opposed on the ground (among others) that the invention is not patentable by reason of lack of novelty. The procedure is available to any one affected, provided that it is initiated within nine months of the grant. Under articles 101 and 111 of the Convention, the Opposition Division and the TBA are empowered to revoke a patent found to be invalid or to accept an amendment proposed by the patentee which will cause the patent to satisfy the requirements of the Convention.

7   The effect of these provisions is that the English courts have the same jurisdiction to determine questions of validity and infringement in the case of a European patent as they have for domestic patents, but that concurrent jurisdiction over questions of validity is exercisable by the EPO. There is, however, an important difference between the legal effect of a decision in the two jurisdictions. Both are decisions in rem. They determine the validity of the patent not only as between the parties to the proceedings, but generally. But the English court's jurisdiction over the question of validity is purely national. A decision of an English court declaring a patent invalid, or (which will normally follow) revoking it, will have effect in the United Kingdom only, whereas a corresponding decision of the EPO, which was the authority by which the patent was granted, will have effect in all the states for which the patent was granted. These considerations make it highly desirable to avoid inconsistent decisions if it can be done. National procedures for achieving this differ from one contracting state to another. In England, there are established procedures for staying English proceedings in which the validity of a European patent is in issue, if there are concurrent opposition procedures in the EPO. However the value of these procedures is somewhat diminished by the current practice of the High Court, which is based on dicta of Jacob LJ in Unilin Beheer BV v Berry Floor NV [2007] FSR 635 , at para 25 and on the subsequent decision of the Court of Appeal in Glaxo Group Ltd v Genentech Inc (Practice Note) [2008] Bus LR 888 . Their effect is that the primary consideration on an application for a stay is the probable duration of the proceedings before the two tribunals. If the question of validity would be likely to be resolved quicker in the English court than in the EPO, it would normally be appropriate not to stay the English proceedings. The consequences of this practice are particularly serious in a case where the English courts "win" the race to

judgment if, as the Court of Appeal decided in Unilin , the effect is to bind the parties to a decision of the English court that the patent is valid notwithstanding that the EPO which granted it subsequently decides that it should be revoked or amended ab initio. In Glaxo Group Ltd v Genentech Inc , at para 83 Mummery LJ, delivering the judgment of the court thought that this consequence was inherent in the existence of concurrent systems of adjudication:

> "…the possibility of the duplication of proceedings contesting the validity of a patent granted by the EPO is inherent in the system established by the Convention. In practice national courts exercise exclusive jurisdiction on infringement issues and they have concurrent jurisdiction with the EPO on validity issues. As Mr Daniel Alexander appearing for the claimant said, the contracting states and the UK Parliament contemplated that the national patents courts should be able to determine the same issues of patentability as the EPO. The resultant legislation allowed the determination by the national court and the EPO at the same time. Indeed, there is nothing in the Convention or the 1977 Act to prevent the commencement of revocation proceedings in the Patents Court on the very date of the grant of the patent by the EPO."

It is undoubtedly right that the draftsmen of both the Convention and the Patents Act 1977 envisaged concurrent jurisdiction over questions of validity, but it may be doubted whether they envisaged anything like the consequence which has come about in this case.

**The facts**

Virgin Atlantic Airways Ltd v Premium Aircraft Interiors UK Ltd, 2013 WL 3197314 (2013)

8    The patent in suit is a European patent for a "seating system and passenger accommodation unit for a vehicle", granted to Virgin and published on 30 May 2007. The seat, which was designed in about 2005, reclines to provide a flat bed. It is commonly used in long-haul aircraft. Zodiac Seats UK Ltd (as it is now called) manufactures a seating unit called the "Solar Eclipse" in the United Kingdom. It has been supplied to a number of international airlines. On 30 July 2007, two months after the grant of the patent, Virgin began proceedings against Zodiac in the High Court claiming an injunction and damages on the footing that its seats infringed the patent. Zodiac defended the action on the ground that its seats did not fall within the claims of the patent. But, they said, if the claims were wide enough to cover their seats, then the patent was invalid on account of prior art and for added matter. They also, on 29 February 2008, opposed the validity of the patent in the EPO, along with a number of airlines who had bought their seats and were at risk of infringement proceedings if the patent was valid. Initially, no application was made for a stay of the English proceedings. There was a certain amount of argument before us about the significance of this fact, if any. For present purposes, however, it is enough to say that under the Glaxo v Genentech guidelines, an application for a stay would not necessarily have succeeded.

9    The English action was heard by Lewison J. He gave judgment in January 2009, holding that Zodiac's "Solar Eclipse" seats did not infringe the patent. He recorded that if the claims of the patent had been wide enough to cover Zodiac's seating system, he would have held it to be invalid for added matter. But he rejected every other ground of invalidity advanced. Virgin appealed against the decision on infringement, and Zodiac cross-appealed on validity.

10    On 31 March 2009, some two months after Lewison J's judgment, the Opposition Division of the EPO upheld the patent subject to minor amendments which are agreed to be immaterial to the present dispute. Zodiac and other opponents of the patent immediately indicated their intention to appeal to the TBA. This gave rise to a brief correspondence between the parties' solicitors about what would happen if the English Court of Appeal held the patent to be valid but the TBA later held it to be invalid in some relevant respect. Zodiac's solicitors proposed that if the appeal on

validity succeeded in England, the "making of any final order" by the Court of Appeal should be stayed until the final determination of the opposition proceedings in the EPO. Virgin's solicitors refused, on their client's behalf, to agree. They then wrote on the same day to the Court of Appeal informing them of the progress and likely course of the opposition proceedings, and summarising their correspondence with Zodiac's solicitors. On 12 May 2009, the Civil Appeals Office replied that "Lord Justice Jacob has directed that he will not grant a stay of proceedings at present, however, parties can apply for a stay following judgment in the Court of Appeal if it is still possibly relevant." That direction was given without prior notice to either party and without inviting any observations from those acting for Zodiac.

11    The Appeal was heard in October 2009 by Jacob and Patten LJJ and Kitchin J. On 22 October, they gave judgment reversing Lewison J's decision on validity and holding the patent to have been valid and infringed. They specifically rejected the argument based on prior art. Zodiac then made the application for a stay of the order apparently envisaged in Jacob LJ's direction of 12 May 2009, pending an application for permission to appeal to the Supreme Court and the conclusion of the opposition proceedings in the EPO. In a further judgment handed down on 21 December 2009 the Court of Appeal refused the application. The main ground on which they refused it was that it was pointless to stay the order on the appeal, because the effect of the decision in Unilin was that any later decision of the TBA revoking the patent would make no difference. This was because the decision of the Court of Appeal would bind the parties per rem judicatam. On 12 January 2010 the Court of Appeal sealed an order making a declaration that the patent was valid and infringed, together with an injunction and an enquiry as to damages. The injunction was qualified so as to allow the delivery of seats to Delta under an existing contract, upon Zodiac undertaking to pay £10,000 to Virgin for each seat delivered, but otherwise covered all future infringements.

12    At this stage, the decision of the TBA on the opposition proceedings was due to be given on 20 April 2010. In the event, however, this was postponed to 9 September 2010 as a result of the disruption of flights following the eruption of the Eyjafjalajökull volcano in Iceland. When the adjourned date came, the TBA

varied the decision of the Opposition Division. They held that all the claims found in England to have been infringed were invalid by reason of prior art, and accepted amendments proposed by Virgin removing them from the patent. By that time, however, the appeal proceedings had been completed and permission to appeal on the merits of the Court of Appeal's findings had been refused by the Supreme Court.

13  As a result of this decision, further applications were made by Zodiac to the Court of Appeal to vary the Court of Appeal's order and to discharge the injunction. The injunction was discharged by consent on 1 December 2010. The application to vary the court's order was heard by the Court of Appeal (Smith, Jacob and Patten LJJ) in February 2011. So far as relevant to this appeal, the variations actually sought were (i) the replacement of the declarations made by new declarations making it clear that the patent held to be valid was the unamended patent; (ii) the discharge of the order for delivery up of the allegedly infringing articles; (iii) the discharge of the order for an enquiry as to damages; and (iv) the release of Zodiac from its undertaking to pay £10,000 per seat delivered to Delta and the repayment of the £3,600,000 already paid under it.

14  Judgment was given on 23 February 2011. The Court of Appeal held (following the same numbering) (i) that the declaration would not be varied; (ii) that the order for delivery up would be discharged because it was redundant in the light of the amendment of the patent; (iii) that the order for an enquiry as to damages would stand, because it was no more than the mechanism for working out the effect of the Court of Appeal's decision that the patent was valid, and that decision was res judicata; and (iv) that the £3,600,000 was not repayable because it was an advance referable to (among other things) the damages to be assessed in the enquiry.

15  To complete the story, on 27 July 2012 Floyd J gave judgment in three actions against customers who had bought and were using Zodiac's seating units; actions to which Zodiac were also joined. They had been sued by Virgin on the footing that the "Solar Eclipse" seating units infringed the amended patent. Floyd J held that they did not. His judgment confirms that Zodiac's seating units do not infringe the patent in the form

which it is now deemed to have taken from the moment it was granted.

## The issue

16  The order of the Court of Appeal of 12 January 2010 upholding the validity of the patent and directing an enquiry as to damages can now be varied only by way of appeal, and no further avenues of appeal are open. It is therefore right to start by pointing out that this is not an appeal against that order. The fundamental question is whether Zodiac is entitled to contend upon the enquiry as to damages that there have been no damages because the patent has been retrospectively amended so as to remove the claims held to have been infringed. This depends on whether the Court of Appeal was right to say that its order declaring the patent to be valid continued to bind the parties per rem judicatam notwithstanding that the patent was later amended on the footing that it was not valid in the relevant respects.

## Res judicata: general principles

17   Res judicata is a portmanteau term which is used to describe a number of different legal principles with different juridical origins. As with other such expressions, the label tends to distract attention from the contents of the bottle. The first principle is that once a cause of action has been held to exist or not to exist, that outcome may not be challenged by either party in subsequent proceedings. This is "cause of action estoppel". It is properly described as a form of estoppel precluding a party from challenging the same cause of action in subsequent proceedings. Secondly, there is the principle, which is not easily described as a species of estoppel, that where the claimant succeeded in the first action and does not challenge the outcome, he may not bring a second action on the same cause of action, for example to recover further damages: see Conquer v Boot [1928] 2 KB 336 . Third, there is the doctrine of merger, which treats a cause of action as extinguished once judgment has been given upon it, and the claimant's sole right as being a right upon the judgment. Although this produces the same effect as the second principle, it is in reality a substantive rule about the legal effect of an English judgment, which is regarded as "of a higher nature" and therefore as superseding the underlying cause of action: see King

v Hoare (1844) 13 M & W 494 , 504 (Parke B). At common law, it did not apply to foreign judgments, although every other principle of res judicata does. However, a corresponding rule has applied by statute to foreign judgments since 1982: see Civil Jurisdiction and Judgments Act 1982, section 34 . Fourth, there is the principle that even where the cause of action is not the same in the later action as it was in the earlier one, some issue which is necessarily common to both was decided on the earlier occasion and is binding on the parties: Duchess of Kingston's Case (1776) 20 St Tr 355 . "Issue estoppel" was the expression devised to describe this principle by Higgins J in Hoysted v Federal Commissioner of Taxation (1921) 29 CLR 537 , 561 and adopted by Diplock LJ in Thoday v Thoday [1964] P 181 , 197–198. Fifth, there is the principle first formulated by Wigram V-C in Henderson v Henderson (1843) 3 Hare 100 , 115, which precludes a party from raising in subsequent proceedings matters which were not, but could and should have been raised in the earlier ones. Finally, there is the more general procedural rule against abusive proceedings, which may be regarded as the policy underlying all of the above principles with the possible exception of the doctrine of merger.

18  It is only in relatively recent times that the courts have endeavoured to impose some coherent scheme on these disparate areas of law. The starting point is the statement of principle of Wigram V-C in Henderson v Henderson (1843) 3 Hare 100 , 115. This was an action by the former business partner of a deceased for an account of sums due to him by the estate. There had previously been similar proceedings between the same parties in Newfoundland in which an account had been ordered and taken, and judgment given for sums found due to the estate. The personal representative and the next of kin applied for an injunction to restrain the proceedings, raising what would now be called cause of action estoppel. The issue was whether the partner could reopen the matter in England by proving transactions not before the Newfoundland court when it took its own account. The Vice-Chancellor said:

> "In trying this question I believe I state the rule of the Court correctly when I say that, where a given matter becomes the subject of litigation in, and of adjudication by, a Court of competent jurisdiction,

the Court requires the parties to that litigation to bring forward their whole case, and will not (except under special circumstances) permit the same parties to open the same subject of litigation in respect of matter which might have been brought forward as part of the subject in contest, but which was not brought forward, only because they have, from negligence, inadvertence, or even accident, omitted part of their case. The plea of res judicata applies, except in special cases, not only to points upon which the Court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time … Now, undoubtedly the whole of the case made by this bill might have been adjudicated upon in the suit in Newfoundland, for it was of the very substance of the case there, and prima facie, therefore, the whole is settled. The question then is whether the special circumstances appearing upon the face of this bill are sufficient to take the case out of the operation of the general rule."

19  Wigram V-C's statement of the law is now justly celebrated. The principle which he articulated is probably the commonest form of res judicata to come before the English courts. For many years, however, it was rarely invoked. The modern law on the subject really begins with the adoption of Wigram V-C's statement of principle by the Privy Council in Yat Tung Investment Co Ltd v Dao Heng Bank Ltd [1975] AC 581 . Yat Tung was an appeal from Hong Kong, in which the appellant sought to unsuccessfully avoid the exercise by a mortgagee of a power of sale in two successive

actions, contending on the first occasion that the sale was a sham and that there was no real sale, and on the second that the sale was fraudulent. Lord Kilbrandon, giving the advice of the Board, distinguished at 589–590 between res judicata and abuse of process:

"The second question depends on the application of a doctrine of estoppel, namely res judicata. Their Lordships agree with the view expressed by McMullin J that the true doctrine in its narrower sense cannot be discerned in the present series of actions, since there has not been, in the decision in no. 969, any formal repudiation of the pleas raised by the appellant in no. 534. Nor was Choi Kee, a party to no. 534, a party to no. 969. But there is a wider sense in which the doctrine may be appealed to, so that it becomes an abuse of process to raise in subsequent proceedings matters which could and therefore should have been litigated in earlier proceedings."

Lord Kilbrandon referred to the statement of Wigram V-C in Henderson v Henderson as the authority for the "wider sense" of res judicata, classifying it as part of the law relating to abuse of process.

20    The implications of the principle stated in Henderson v Henderson were more fully examined by the House of Lords in Arnold v National Westminster Bank plc [1991] 2 AC 93 . The question at issue in that case was whether in operating a rent review clause under a lease, the tenants were bound by the construction given to the very same clause by Walton J in earlier litigation between the same parties over the previous rent review. The Court of Appeal had subsequently, in other cases, cast doubt on Walton J's construction, and the House approached the matter on the footing that the law (or perhaps, strictly speaking, the perception of the law) had changed since the earlier litigation. Lord Keith of Kinkel began his analysis by restating the classic

distinction between cause of action estoppel and issue estoppel:

"Cause of action estoppel arises where the cause of action in the later proceedings is identical to that in the earlier proceedings, the latter having been between the same parties or their privies and having involved the same subject matter. In such a case the bar is absolute in relation to all points decided unless fraud or collusion is alleged, such as to justify setting aside the earlier judgment. The discovery of new factual matter which could not have been found out by reasonable diligence for use in the earlier proceedings does not, according to the law of England, permit the latter to be re-opened. (104D-E)

Issue estoppel may arise where a particular issue forming a necessary ingredient in a cause of action has been litigated and decided and in subsequent proceedings between the same parties involving a different cause of action to which the same issue is relevant one of the parties seeks to re-open that issue." (105E)

The case before the committee was treated as one of issue estoppel, because the cause of action was concerned with a different rent review from the one considered by Walton J. But it is important to appreciate that the critical distinction in Arnold was not between issue estoppel and cause of action estoppel, but between a case where the relevant point had been considered and decided in the earlier occasion and a case where it had not been considered and decided but arguably should have been. The tenant in Arnold had not failed to bring his whole case forward before Walton J. On the contrary, he had argued the very point which he now wished to reopen and had lost. It was not therefore a Henderson v Henderson case. The real

issue was whether the flexibility in the doctrine of res judicata which was implicit in Wigram V-C's statement extended to an attempt to reopen the very same point in materially altered circumstances. Lord Keith of Kinkel, with whom the rest of the Committee agreed, held that it did.

21  Lord Keith first considered the principle stated by Wigram V-C that res judicata extended to "every point which properly belonged to the subject of litigation and which the parties exercising reasonable diligence might have brought forward at the time." He regarded this principle as applying to both cause of action estoppel and issue estoppel. Cause of action estoppel, as he had pointed out, was "absolute in relation to all points decided unless fraud or collusion is alleged". But in relation to points not decided in the earlier litigation, Henderson v Henderson opened up

> "the possibility that cause of action estoppel may not apply in its full rigour where the earlier decision did not in terms decide, because they were not raised, points which might have been vital to the existence or non-existence of a cause of action" (105B).

He considered that in a case where the earlier decision had decided the relevant point, the result differed as between cause of action estoppel and issue estoppel:

> "There is room for the view that the underlying principles upon which estoppel is based, public policy and justice, have greater force in cause of action estoppel, the subject matter of the two proceedings being identical, than they do in issue estoppel, where the subject matter is different." (108G-H)

The relevant difference between the two was that in the case of cause of action estoppel it was in principle possible to challenge the previous decision as to the existence or non-existence of the cause of action by taking a new point which could not reasonably have been taken on the earlier occasion; whereas in the case of issue estoppel it was in principle possible to challenge the previous decision on the relevant issue not just by taking a new point which could not reasonably have been taken on the earlier occasion but to reargue in materially altered circumstances an old point which had previously been rejected. He formulated the latter exception at 109B as follows:

> "In my opinion your Lordships should affirm it to be the law that there may be an exception to issue estoppel in the special circumstance that there has become available to a party further material relevant to the correct determination of a point involved in the earlier proceedings, whether or not that point was specifically raised and decided, being material which could not by reasonable diligence have been adduced in those proceedings. One of the purposes of estoppel being to work justice between the parties, it is open to courts to recognise that in special circumstances inflexible application of it may have the opposite result."

This enabled the House to conclude that the rejection of Walton J's construction of the rent review clause in the subsequent case-law was a materially altered circumstance which warranted rearguing the very point that he had rejected.

22  Arnold is accordingly authority for the following propositions:

• (1) Cause of action estoppel is absolute in relation to all points which had to be and were decided in order to establish the existence or non-existence of a cause of action.
• (2) Cause of action estoppel also bars the raising in subsequent proceedings of points essential to the existence or non-existence of a cause of action

which were not decided because they were not raised in the earlier proceedings, if they could with reasonable diligence and should in all the circumstances have been raised.

• (3) Except in special circumstances where this would cause injustice, issue estoppel bars the raising in subsequent proceedings of points which (i) were not raised in the earlier proceedings or (ii) were raised but unsuccessfully. If the relevant point was not raised, the bar will usually be absolute if it could with reasonable diligence and should in all the circumstances have been raised.

23 It was submitted to us on behalf of Virgin that recent case-law has re-categorised the principle in Henderson v Henderson so as to treat it as being concerned with abuse of process and to take it out of the domain of res judicata altogether. In these circumstances, it is said, the basis on which Lord Keith qualified the absolute character of res judicata in Arnold v National Westminster Bank by reference to that principle is no longer available, and his conclusions can no longer be said to represent the law.

24 I do not accept this. The principle in Henderson v Henderson has always been thought to be directed against the abuse of process involved in seeking to raise in subsequent litigation points which could and should have been raised before. There was nothing controversial or new about this notion when it was expressed by Lord Kilbrandon in Yat Tung . The point has been taken up in a large number of subsequent decisions, but for present purposes it is enough to refer to the most important of them, Johnson v Gore-Wood & Co [2002] 2 AC 1 , in which the House of Lords considered their effect. This appeal arose out of an application to strike out proceedings on the ground that the plaintiff's claim should have been made in an earlier action on the same subject-matter brought by a company under his control. Lord Bingham took up the earlier suggestion of Lord Hailsham of St. Marylebone LC in Vervaeke v Smith [1983] 1 AC 145 , 157 that the principle in Henderson v Henderson was "both a rule of public policy and an application of the law of res judicata". He expressed his own view of the relationship between the two at p 31 as follows:

" Henderson v Henderson abuse of process, as now understood, although separate and distinct from cause of action estoppel and issue estoppel, has much in common with them. The underlying public interest is the same: that there should be finality in litigation and that a party should not be twice vexed in the same matter. This public interest is reinforced by the current emphasis on efficiency and economy in the conduct of litigation, in the interests of the parties and the public as a whole. The bringing of a claim or the raising of a defence in later proceedings may, without more, amount to abuse if the court is satisfied (the onus being on the party alleging abuse) that the claim or defence should have been raised in the earlier proceedings if it was to be raised at all. I would not accept that it is necessary, before abuse may be found, to identify any additional element such as a collateral attack on a previous decision or some dishonesty, but where those elements are present the later proceedings will be much more obviously abusive, and there will rarely be a finding of abuse unless the later proceeding involves what the court regards as unjust harassment of a party. It is, however, wrong to hold that because a matter could have been raised in earlier proceedings it should have been, so as to render the raising of it in later proceedings necessarily abusive. That is to adopt too dogmatic an approach to what should in my opinion be a broad, merits-based judgment which takes account of the public and private interests involved and also takes account of all the facts of the case, focusing attention on the crucial question whether, in all the

circumstances, a party is misusing or abusing the process of the court by seeking to raise before it the issue which could have been raised before."

The rest of the Committee, apart from Lord Millett, agreed in terms with Lord Bingham's speech on this issue. Lord Millett agreed in substance in a concurring speech. He dealt with the relationship between res judicata and the Henderson v Henderson principle at pp 58H–59B as follows:

"Later decisions have doubted the correctness of treating the principle as an application of the doctrine of res judicata, while describing it as an extension of the doctrine or analogous to it. In Barrow v Bankside Members Agency Ltd [1996] 1 WLR 257, Sir Thomas Bingham MR explained that it is not based on the doctrine in a narrow sense, nor on the strict doctrines of issue or cause of action estoppel. As May LJ observed in Manson v Vooght [1999] BPIR 376 , 387, it is not concerned with cases where a court has decided the matter, but rather cases where the court has not decided the matter. But these various defences are all designed to serve the same purpose: to bring finality to litigation and avoid the oppression of subjecting a defendant unnecessarily to successive actions. While the exact relationship between the principle expounded by Sir James Wigram V-C and the defences of res judicata and cause of action and issue estoppel may be obscure, I am inclined to regard it as primarily an ancillary and salutary principle necessary to protect the integrity of those defences and prevent them from being deliberately or inadvertently circumvented."

25  It was clearly not the view of Lord Millett in Johnson v Gore-Wood that because the principle in Henderson v Henderson was concerned with abuse of process it could not also be part of the law of res judicata. Nor is there anything to support that idea in the speech of Lord Bingham. The focus in Johnson v Gore-Wood was inevitably on abuse of process because the parties to the two actions were different, and neither issue estoppel nor cause of action estoppel could therefore run (Mr Johnson's counsel conceded that he and his company were privies, but Lord Millett seems to have doubted the correctness of the concession at p 60D-E, and so do I). Res judicata and abuse of process are juridically very different. Res judicata is a rule of substantive law, while abuse of process is a concept which informs the exercise of the court's procedural powers. In my view, they are distinct although overlapping legal principles with the common underlying purpose of limiting abusive and duplicative litigation. That purpose makes it necessary to qualify the absolute character of both cause of action estoppel and issue estoppel where the conduct is not abusive. As Lord Keith put it in Arnold v National Westminster Bank at p 110G, "estoppel per rem judicatam, whether cause of action estoppel, or issue estoppel is essentially concerned with preventing abuse of process."

26  It may be said that if this is the principle it should apply equally to the one area hitherto regarded as absolute, namely cases of cause of action estoppel where it is sought to reargue a point which was raised and rejected on the earlier occasion. But this point was addressed in Arnold , and to my mind the distinction made by Lord Keith remains a compelling one. Where the existence or non-existence of a cause of action has been decided in earlier proceedings, to allow a direct challenge to the outcome, even in changed circumstances and with material not available before, offends the core policy against the re-litigation of identical claims.

**Application to the present case**

27  If this case is to be determined according to these general principles of the modern law, there can, I think, be little doubt about the answer. The Court of Appeal decided, before the result of the opposition proceedings in the EPO, that in its unamended form the patent was valid and infringed. It follows that Zodiac are estopped from asserting on the enquiry as to damages that in its unamended form the patent was invalid or was not infringed. This estoppel is a true cause of action estoppel. The Court of Appeal has determined in favour of Virgin issues essential to the existence of the cause of action for infringement of the unamended patent, which are the basis of the claim for damages. However, the point which Zodiac seek to make on the enquiry is that the unamended patent has been retrospectively amended. It no longer exists, and is deemed never to have existed, in the form on which these issues were adjudicated by the Court of Appeal. Zodiac's reliance on the retrospective amendment is a new point which was not raised before. It could not have been raised before, because the decision of the TBA retrospectively amending the patent was made after the order giving effect to the judgment of the Court of Appeal. There are two related reasons why Zodiac cannot be precluded from relying on the decision of the TBA on the enquiry as to damages. One is that they are relying on the more limited terms of a different patent which, by virtue of the decision of the TBA, must at the time of the enquiry be treated as the only one that has ever existed. The other is that Zodiac are not seeking to reopen the question of validity determined by the Court of Appeal. The invalidity of the patent may be the reason why the TBA amended the patent, but the defendant is relying on the mere fact of amendment, not on the reasons why it happened.

**The patent cases**

28  How then did the Court of Appeal come to a different conclusion? The answer is that they followed a line of cases culminating in the decision of the Court of Appeal in Unilin Beheer BV v Berry Floor NV [2007] FSR 635 , which had held that a patentee whose patent has been held to be valid is entitled to claim damages for its infringement without regard to a subsequent revocation of the patent. This has been held to be so, even though it has always been the law in England (as it is under the European Patent Convention ) that the revocation of a patent for invalidity relates back to the

date of grant: see, currently, section 75(3) of the Patents Act 1977 .

29  The decisions which support the Court of Appeal's conclusion are Poulton v Adjustable Cover and Boiler Block Co [1908] 2 Ch 430 , Coflexip SA v Stolt Offshore MS Ltd (No 2) [2004] FSR 708 and Unilin itself.

30  The facts in Poulton were that the court had held the patent to be valid and infringed and had ordered an enquiry as to damages. An attempt to have the patent declared invalid for prior use had been rejected. After the judgment, the defendant found a further and better instance of prior use on the basis of which he successfully petitioned for the revocation of the patent. He then sought to rely on the revocation on the enquiry as to damages. The question presently before this court was not argued. The defendant's case was that the revocation of the patent was a decision in rem which itself gave rise to an estoppel against the world. There was therefore, it was said, "an estoppel against an estoppel". Parker J rejected this argument. The Court of Appeal (Vaughan Williams, Fletcher Moulton and Buckley LJJ) also rejected it in an extempore judgment delivered on a Friday afternoon after an argument in which no authority was cited on the ambit of the law of res judicata other than the Duchess of Kingston's Case (1776) 20 St Tr 355 . Vaughan Williams LJ appears to have thought that the revocation of the patent operated only from the date it occurred, but he held that it did not matter whether the patent was valid or not, nor whether the revocation was retrospective. This was because the Court having declared it to be valid, it must be treated as valid as between the same parties notwithstanding its subsequent revocation. Fletcher Moulton LJ considered that it was enough that the patent had been declared to be a valid patent at the time of the judgment. That was determinative on an enquiry as to damages in the same proceedings. Buckley LJ did not "feel so clear on this point as my learned brothers", but considered that their view could be justified on the footing that the enquiry as to damages was no more than the working out of the effect of the judgment on liability. The decision may have been in accord with the law of res judicata as it was then thought to be, before the implications of Henderson v Henderson were appreciated or the doctrine had acquired its modern flexibility. What is clear is that without special facts

the grounds on which Poulton was decided cannot be reconciled with the modern law on the subject.

31  The real origin of the principle applied by the Court of Appeal in the present case was a much more recent case, namely the decision of the Court of Appeal in Coflexip SA v Stolt Offshore MS Ltd (No 2) [2004] FSR 708 . The patent in this case related to a system for laying flexible flowlines in the seabed in subsea oil installations. The facts were substantially the same as in Poulton . The court had rejected a challenge to the validity of the patent based on prior art, and had held that the only infringement alleged in the pleadings (relating to the performance of a contract for the Magnus Swift field) was made out. The court gave judgment for the patentee, ordering an enquiry as to damages. In accordance with the ordinary practice, the enquiry as to damages extended not just to the Magnus Swift field infringement but to fourteen other similar infringements. While it was in progress a third party, relying upon different prior art in parallel proceedings, succeeded in having the patent revoked. The majority of the Court of Appeal (Peter Gibson LJ and Sir Martin Nourse) held that they were bound by Poulton and that the defendant was estopped. They rejected the submission that it was no longer good law, for two reasons. The first was based on Lord Keith's distinction in Arnold between cause of action estoppel and issue estoppel. The second was that unless the defendant was estopped, the patentee would be harassed by two successive proceedings in which he would be required to defend the validity of the patent. Neuberger LJ dissented. He distinguished between "strict cause of action estoppel" (i.e. where the same issue had been decided in the earlier proceedings) and "abuse of process cause of action estoppel" (where the unsuccessful party wishes to reargue the point by reference to new material or a new argument not put before the court before). Neuberger LJ assigned the Magnus Swift field infringement to the second category of cause of action estoppel, because the defendant was seeking to rely not on the prior art which had led to the revocation of the patent in the parallel proceedings, but on the mere fact of revocation, which was a decision in rem, and decisive irrespective of the ground for it. He regarded the fourteen other alleged infringements raised only on the enquiry as being governed by the principles relating to issue estoppel. He considered that the estoppel was not absolute in either case.

32  In my opinion the majority in Coflexip were mistaken on both of the points which they made, for substantially the reasons given by Neuberger LJ in his dissenting judgment. The point can best be tested by reference to the Magnus Swift field infringement, which unquestionably turned on cause of action estoppel. I would for my part leave open the question whether the same applied to the other fourteen infringements, which has given rise to a certain amount of controversy since: see Hormel Foods Corp v Antilles Landscape Investments NV [2005] RPC 657 , Unilin Beheer BV v Berry Floor NV [2007] FSR 635 at paras 47-48. The essential fallacy in the majority's reasoning in Coflexip lay in their view that Lord Keith in Arnold had held that cause of action estoppel was always absolute. He did not. He held that it was absolute only in relation to points actually decided on the earlier occasion. Because of this mistake, the majority had no regard to the fact that the consequences of the patent's revocation had not been decided on the earlier occasion, and could not have been because it had not happened. As for the policy considerations, they were also wrong, as it seems to me, to suppose that the court would be rehearing on the enquiry the question of validity decided by the judgment on liability. The revocation of the patent was an act in rem which determined the status of the patent as against the world. It had been revoked by the authority which had granted it and must be treated as never having existed. Although the patent had been revoked on the ground of invalidity, the issue which the defendant wished to raise on the enquiry was not invalidity but revocation. The revocation would be decisive regardless of the ground on which it was ordered.

33  In Unilin Beheer BV v Berry Floor NV [2007] FSR 635 the Court of Appeal reached the same conclusion. The facts were in some ways an even more exacting test of the principle, because the policy considerations invoked in Coflexip could not possibly have justified the outcome in Unilin . This was because, as in the present case, the patent was retrospectively amended by the EPO to limit its scope to valid claims, after the English court had given judgment in favour of the patentee. The "vexation" associated with the pursuit of two proceedings challenging the validity of the patent was an inescapable feature of the statutory scheme which conferred concurrent jurisdiction on questions of validity on both the English court and the EPO. It can

hardly be said that the vexation inherent in there being two perfectly proper proceedings concurrently is made more tolerable by ignoring the outcome of one of them. It was common ground in Unilin that the court was bound by Coflexip , and there was therefore only limited consideration of the merits of the principle decided in that case. The argument was directed to a different issue, namely whether the law stated in Coflexip was inconsistent with the scheme of the legislation relating to European patents, and therefore impliedly excluded where such a patent was revoked or amended by the EPO.

34  In his judgment in Unilin , Jacob LJ said that he was "not sorry" to reach the conclusion that he did: (i) it was conducive to certainty because it enabled the parties to get a final decision on validity from an English court without waiting "to find out who has won until the slowest horse in the race gets there"; and (ii) any injunction against future infringements will be discharged if the EPO subsequently revokes or amends the patent. I have to say that I do not find either of these considerations convincing. Jacob LJ plainly assumed that the "slowest horse" would usually be the EPO. That assumption was not necessarily correct, especially in the light of the availability of at least one and potentially two tiers of appeal in England. The truth is that the effect of the decision in Coflexip is not to introduce certainty in this field but to make the outcome dependent on the wholly adventitious question which of two concurrently competent jurisdictions completes its procedures first. In the present case, the Court of Appeal may have reached a different conclusion if the Opposition Division of the EPO had reached the conclusion subsequently reached by the TBA. Permission to appeal the decision on validity to this court might well have been granted if the eruption of the Icelandic volcano had not deferred the decision of the TBA to a date after the application for permission had been resolved. The fate of £49m must surely depend on more substantial and predictable considerations than these. As for the discharge of any injunction restraining future infringements, this was a point also made by the majority in Coflexip (see para 137), but to my mind it simply underlines the irrationality of their conclusion. Logically, if the defendant is bound by the court's declaration that the patent is valid although it has been revoked or amended, he should be equally bound whether the remedy sought is damages or an injunction.

The distinction between past and future infringements makes no sense in a case where a single cause of action embraces both and the revocation or amendment is by statute effective ab initio.

35  In my opinion Poulton is no longer good law, and Coflexip was wrongly decided. It follows that Unilin was also wrongly decided because it proceeded on the premise of the law stated in Coflexip . The point with which Unilin was actually concerned, namely whether there is a different rule for European patents arising from the scheme of the relevant legislation, has been argued before us but it does not arise, because the anomaly in English law to which that point is directed does not exist. Accordingly, where judgment is given in an English court that a patent (whether English or European) is valid and infringed, and the patent is subsequently retrospectively revoked or amended (whether in England or at the EPO), the defendant is entitled to rely on the revocation or amendment on the enquiry as to damages.

36  Once the enquiry is concluded, different considerations will arise. There will then be a final judgment for a liquidated sum. At common law, that judgment could be challenged on the ground that the patent had later been revoked or amended only by way of appeal, and then only if an appeal is still open. I doubt whether an implied statutory right to reopen it could be derived from the scheme of the Patents Act 1977 , but that is a question which will have to await a case in which it arises.

**Disposal**

37  I would allow the appeal and declare that Zodiac are entitled to rely on the amendment of Virgin's patent in answer to their claim for damages on the enquiry.

**The Glaxo v Genentech guidelines**

38  I add a brief observation on the procedural implications. If I had concluded that the defendant was estopped from relying on the revocation or amendment of the patent once the court had adjudged it to be valid, that would have had important implications for the question whether English proceedings should be stayed pending a decision in concurrent opposition

proceedings in the EPO. On that footing, it would in my opinion have been essential to stay the English proceedings so that the decision of the EPO would not be rendered nugatory by the operation of the law of res judicata. On that hypothesis, it would have been difficult to defend the guidance given by the Court of Appeal in Glaxo Group Ltd v Genentech Inc [2008] Bus LR 888 to the effect that the English court should normally refuse a stay of its own proceedings if it would be likely to resolve the question of validity significantly earlier. The effect of that guidance is to put more litigants in the impossible situation in which successive decisions of the Court of Appeal placed the parties in this case. As it is, the problem has not gone away, even on the footing that those decisions are overruled. In the first place, a similar problem may well arise if the patent is revoked by the EPO after a judgment has been given for a liquidated sum. Second, that problem is aggravated by the fact that a decision of the English court on validity is directly effective only in the United Kingdom, whereas the EPO's decision, being the decision of the authority which granted the patent, is directly effective in every country for which the patent was granted. Third, even if the EPO opposition proceedings are concluded in time to affect the English proceedings, the uncertainty and waste of costs involved do little credit to our procedures. This is not a suitable occasion, nor is the Supreme Court the appropriate tribunal to review the guidelines, but I think that they should be re-examined by the Patents Court and the Court of Appeal.

Lord Neuberger (With Whom Lady Hale, Lord Clarke and Lord Carnwath Agree)

**The factual background**

39   The facts of this case are fully set out by Lord Sumption in paras 8-15 of his judgment, but it is worth summarising them. Virgin was the registered proprietor of a European patent (UK) ("the Patent") granted out of the European Patent Office ("EPO"). They began infringement proceedings ("the English proceedings") in the High Court against Zodiac, who were manufacturing and selling an allegedly infringing product. Zodiac denied infringement, and counterclaimed for revocation of the Patent on the grounds, inter alia, that it was invalid in the light of prior art. Those proceedings resulted in a hearing in

front of the Court of Appeal, which (i) decided that the Patent was valid, (ii) declared that Zodiac's product infringed it, and (iii) ordered an assessment of damages ("the assessment") – [2009] EWCA Civ 1062 and 1513.

40   Meanwhile, opposition proceedings in the EPO had been initiated by Zodiac in respect of the Patent. Following the decision of the Court of Appeal in the English proceedings, the opposition proceedings came before the Technical Board of Appeal ("TBA"). During the course of the hearing before the TBA, Virgin abandoned the claims which Zodiac had been held to infringe, and the Patent was amended accordingly. Virgin then contended that Zodiac's product infringed one or more of the surviving claims of the Patent, as amended, but Floyd J concluded that the amendment limited the scope of the Patent so as to render Zodiac's product no longer infringing – [2012] EWHC 2153 (Pat). It is common ground that the consequence of this is that the Patent is to be treated as limited in its scope pursuant to the amendment, with retrospective effect from its priority date.

41   Virgin contend that, because the English proceedings have been finally determined in their favour on validity and infringement, it is not now open to Zodiac to rely in the assessment on the subsequent amendment of the Patent, by virtue of res judicata. In other words, Virgin's contention is that the assessment should proceed on the basis that Zodiac are precluded from contending that they are not liable for any damages for infringement in the light of the amendment of the Patent. If that contention is right, then it seems likely that Virgin will recover damages probably running to tens of millions of pounds, whereas if it is wrong, they will presumably recover nothing.

**Res judicata and the authorities on the point in this appeal**

42   In paras 17-26 of his judgment, Lord Sumption summarises the law in relation to res judicata, and I agree with his exposition.

43   Virgin's contention is that res judicata compels the conclusion that, where a patent has been held by a court to be valid and infringed as between the patentee and an alleged infringer, but it is subsequently revoked (or amended so that the alleged infringer would no longer be held to infringe), the patentee is nonetheless

entitled to damages from the alleged infringer as if the patent had not been revoked (or relevantly amended). This contention receives support from three previous decisions of the Court of Appeal, which were followed by the Court of Appeal in this case. Those decisions are Poulton v Adjustable Cover and Boiler Block Co [1908] 2 Ch 430 , Coflexip SA v Stolt Offshore MS Ltd (No 2) [2004] FSR 708 , and Unilin Beheer BV v Berry Floor NV [2007] FSR 635 .

44  Poulton and Coflexip both involved an assessment of damages following a hearing at which the alleged infringer had unsuccessfully challenged the patentee on the validity and infringement of a purely British patent, in the English courts, but, before the assessment of damages had taken place, the patent had been revoked in other proceedings which were also in the English courts. The present case, like Unilin , is concerned with a European patent, in respect of which issues of validity and infringement have been determined by the English courts, but, before the assessment of damages has taken place, validity is being, or has been, considered by the EPO in opposition proceedings.

45  In Poulton [1908] 2 Ch 430 , 437, Vaughan Williams LJ explained that the judgment obtained by the patentee "made the question whether there had been an infringement … of a patent then valid … res judicata as between the parties to the action, and operated as a complete estoppel between them". On the following page, he said that the subsequent "order of revocation … could not affect the already existing estoppel, by virtue of which the defendants were prevented from denying that which … had been finally determined to be the truth of the matter as between [the] parties … involved in [the] action", and he therefore concluded that the alleged infringer could not rely on the subsequent revocation of the patent on the assessment of damages.

46  At first sight, one can see the force of that reasoning. It is well established that the fact that an identical issue is determined differently in two different sets of proceedings is irrelevant to the rights of the parties to each set of proceedings inter se. Thus, in the normal run of things, where A has lost against B on an issue in one case, it is simply irrelevant to A's legal obligations and rights as against B if C subsequently defeats B on the very same issue (except it may help

A to obtain permission to appeal out of time – see Arnold v National Westminster Bank plc [1991] 2 AC 93 , 109F-110C – but that is rather a different matter). That is because the determination of most issues in litigation can only bind the parties to the litigation (and their privies).

47  The point is starkly illustrated by In re Waring, Westminster Bank v Burton-Butler [1948] Ch 221 . In that case, Jenkins J held that (i) an annuitant under a will was bound by a decision of the Court of Appeal in earlier litigation, where the will trustees and he were parties, as to the effect of tax legislation on his rights, but (ii) another annuitant was entitled to rely on a subsequent, more favourable, decision of the House of Lords on the point in a different case, because he had not been a party to the earlier litigation. Whilst Jenkins J acknowledged that the result may appear to be "anomalous", in reality it was a clear and principled application of the fundamental rule.

**Discussion**

48  In my view, however, the same cannot be said of the reasoning of the Court of Appeal in Poulton [1908] 2 Ch 430 , and in the three cases which followed it (including this case). It seems to me that the mistake of the courts in those four decisions was attributable to the fact that they did not have appropriate regard to the statutory provisions relating to patents, which reflect the nature of a patent and the effect of its revocation. They therefore treated the subsequent decision to revoke the patent as no more than a later determination by another court in other proceedings between different parties.

49  The essential point is that, although the decision to revoke the patent was indeed made in proceedings involving different parties, the effect of the Patents Act 1977 (and its statutory predecessors) ("the Patents Act") and the European Patent Convention ("the EPC") whose relevant provisions are set out in paras 3-7 of Lord Sumption's judgment, was that the revocation did not just have effect between those parties. The revocation of the patent deprived the patentee of the rights which the patent had bestowed on him as against the world; furthermore, it did so retrospectively. In other words, the effect of the revocation was that everyone was entitled to conduct their affairs as if the patent had never existed.

50  The failure to consider the nature of a patent and the effect of its revocation led the Court of Appeal into error, as it failed to take into account the fact that the issue of res judicata was being raised by the (former) patentee in connection with a particular statutory right. In this connection, it is worth referring to an observation of Lord Bridge in Thrasyvoulou v Secretary of State for the Environment [1990] 2 AC 273 , 289C-D:

> "In relation to adjudications subject to a comprehensive self-contained statutory code, the presumption … must be that where the statute has created a specific jurisdiction for the determination of any issue which establishes the existence of a legal right, the principle of res judicata applies to give finality to that determination unless an intention to exclude the principle can properly be inferred as a matter of construction of the relevant statutory provisions."

I do not suggest that the Patents Act or the EPC "created a specific jurisdiction", but the observation emphasises that an issue of res judicata in connection with a patent case cannot be considered correctly without proper regard to the effect of that Act and the EPC .

51  In Poulton [1908] 2 Ch 430 and the cases which followed it, the Court of Appeal failed to focus on the point that the effect of the Patents Act was that the revocation meant that, as against the world, the patentee had never had a valid patent. They wrongly concluded that cause of action estoppel applied so as to preclude the alleged infringer from relying on the revocation of the patent in the assessment, because they failed correctly to formulate the point which the alleged infringer wished to take on the assessment. The alleged infringer was bound by strict cause of action estoppel from running any argument that it had run on validity or infringement, but there was no such strict rule to prevent it from contending that the

patent had, as a matter of fact, been revoked. Not merely was that an argument which had not been run in the earlier proceedings: it was an argument which, ex hypothesi, could not have been run in the earlier proceedings. Accordingly, following the reasoning in Arnold , it was a fact which the court could at least have contemplated permitting the alleged infringer to rely on in the assessment.

52  In my view, however, it goes further than that. Absent special factors, principle, fairness and commercial sense support the view that the fact that the patent in issue had been revoked was a point which the alleged infringer should have been entitled to rely on in the assessment. It was a new, centrally important, uncontroversial fact, and to deny the alleged infringer the ability to raise it would be to give effect to a monopoly right which the patentee never should have had. Further, while not enough of a point on its own, it can fairly be said that, far from increasing litigation, permitting Zodiac to rely on the amendment of the Patent, would serve to put an end to the assessment.

53  On the facts of this case, Zodiac are not seeking to challenge any of the conclusions reached by the Court of Appeal in the English proceedings. They accept that they cannot say that the Patent, in its unamended form, is susceptible to attack on the grounds raised in the English proceedings, or that Zodiac's product did not infringe the Patent in that form, or that Virgin is not entitled to an assessment of damages. All that Zodiac are seeking to do is to contend that the damages on the assessment should be assessed at nil (or, perhaps, a nominal figure), because, as the Patent has been amended in the course of the EPO proceedings, it is now retrospectively to be treated as amended, so that Zodiac's product does not infringe, and so Virgin have suffered no damage.

54  Further, Zodiac are not seeking to relitigate or raise a point which was determined by the Court of Appeal in the English proceedings. Indeed, they could not have raised the point that the Patent had been amended during those proceedings, for the very good reason that it had not been revoked. Zodiac are simply seeking to rely on a highly relevant event which occurred after the determination of those proceedings, and which self-evidently would have a very significant effect on the assessment.

Virgin Atlantic Airways Ltd v Premium Aircraft Interiors UK Ltd, 2013 WL 3197314 (2013)

55   It is true that the grounds upon which the TBA concluded that the Patent in its original form had to be amended were grounds on which Zodiac had unsuccessfully relied before the Court of Appeal, namely invalidity over the prior art. However, Zodiac are not seeking to rely on those grounds in the assessment: they are simply seeking to rely on the fact that the Patent has been amended. The position would be the same if validity had not been in issue in the English proceedings. The purpose of res judicata is not to punish a party for failing to take a point, or for failing to take a point properly, any more than to punish a party because the court which tried its case may have gone wrong. It is, as explained above, to support the good administration of justice, in the public interest in general and in the parties' interest in particular. Assessed from either perspective, it seems to me wrong to prevent a person who has been held to infringe a patent from invoking in proceedings thereafter a subsequent revocation or amendment of the patent, in order to avoid liability for infringement (at least in the absence of exceptional facts).

56   The inappropriateness of relying, as the Court of Appeal did, on the approach in the normal run of cases is highlighted by the fact that the decision between the will trustees and one annuitant in *Waring [1948] Ch 221* was not binding as between the will trustees and another annuitant. On the other hand, the decision to revoke the patent in a case such as this and *Poulton [1908] 2 Ch 430* can be relied on by everyone, even though the decision may have been reached in proceedings in which only one person and the patentee (or its privy) was involved.

57   The point may also be made by considering a hypothetical case, instanced in argument by Lord Sumption, where, after the Court of Appeal found for Virgin on validity and infringement, another court decided that X's product, which was identical to that of Zodiac, did not infringe the Patent. That would not have been a decision which would have assisted Zodiac in any way, as the position of Zodiac and X would have been analogous to that of the two annuitants in *Waring* . A decision on infringement is in personam, so it only binds the parties to the action (and their privies), whereas a decision that a patent is invalid (or must be amended) is in rem, so it binds the world, just as the

patent, so long as it is in force, can be enforced against the world.

58   The policy of the Patents Act is that valid patents are enforceable against the world, even if an infringer is honestly and reasonably unaware of the existence of the patent. Equally, if a patent is revoked (or amended), the policy is that the revocation (or amendment) takes effect retrospectively, and that this can be relied on by the world. I find it hard to see why someone who has failed in an attack on the patent should not be entitled, like anyone else, to rely on the points that the patent has been revoked (or amended), and that the revocation (or amendment) is retrospective in its effect, whether in legal proceedings or in another context.

59   This conclusion is supported by another point. As Virgin accept, any injunction restraining Zodiac from infringing the Patent granted at the end of the English proceedings either became ineffective or would have to be discharged, following the amendment of the Patent in the EPO proceedings. In my view, there is a logical difficulty with the notion that Zodiac cannot rely on the fact that the Patent was retrospectively amended when it comes to the assessment, if they can rely on the amendment in order to discharge or to ignore the injunction. It is true that the injunction is prospective and the assessment retrospective, but the amendment is both prospective and retrospective in its effect.

60   Fletcher Moulton LJ rightly said in *Poulton [1908] 2 Ch 430* , 439, that "[t]he order of revocation is in the nature of a judgment in rem which terminates the res", and he was also right when he added that "[i]t has … no further effect so far as estoppel is concerned". However, where he went wrong was to conclude that this meant that the fact and consequences of the revocation could not be relied on by a person who had previously been held to be an infringer, for instance when damages come to be assessed. He acknowledged that "[a]s regards the world at large, every one is bound by the fact that the patent ceased to exist", and, as a matter of legal principle and consistency, as well as a matter of common sense and fairness, I consider that "every one" includes a party who has previously been held to infringe it.

61   So far as the interests of patentees are concerned, it is inherent in the grant of a patent under the Patents Act

that, however often its validity may be unsuccessfully challenged in earlier litigation, it may none the less be revoked (or amended), and with retrospective effect, at some point by a court or by the EPO. A patentee therefore must appreciate that it can never be sure that a decision of a court that the patent is valid will settle the question for good. It is true that an unsuccessful challenge to the validity of a patent by a particular person will normally give rise to a res judicata to prevent that person raising another challenge, but, as is common ground, it would not enable the patentee to rely on the patent against that person once the patent had been revoked, at least in respect of what would be infringements after its revocation.

## Other matters

62  When seeking to justify a conclusion that, though it applies, res judicata does not preclude a point being taken, it can be dangerous to invoke the observation of Lord Keith in Arnold [1991] 2 AC 93 , 109B, that estoppel is intended "to work justice between the parties", because it is only too easy to fall back on it as an excuse for an unprincipled departure from, or an unprincipled exception to, the rule. However, in a case where the rule has been relied on, I consider that it is helpful for a court which is inclined to accept the argument that it does not prevent a point being taken, to consider whether that outcome would work justice between the parties. In this case, as in cases such as Poulton , it seems to me that it would be positively unjust, as between the parties, for a (former) patentee to recover damages for infringement of a patent after the patent has been irrevocably and retrospectively revoked (or, as in this case, relevantly amended). And I can see no public interest in such an outcome. There is no question of extra further litigation, as it is undeniable that the Patent has been revoked (or amended); indeed, further litigation will be avoided as the assessment need not proceed.

63  In the course of his submissions on behalf of Virgin, Mr Crow QC relied on the doctrine of merger, viz the principle whereby whatever rights a claimant has against a defendant are treated as merged into the order made in the proceedings. I do not think that that aspect takes the point at issue on this appeal any further.

64  Mr Crow realistically did not suggest that it would cause any problems if we were to overturn a decision which had stood for over a hundred years and had been followed and applied in the last ten years. We therefore do not have to address the problem which was faced by the House of Lords in Hindcastle Ltd v Barbara Attenborough Associates Ltd [1997] AC 70 , when they decided to overturn an early twentieth century decision of the Court of Appeal which had stood for around a century.

65  We were taken to some articles on the attitude of the courts of Germany, France and the Netherlands to the point raised in these proceedings. I am not confident that we have a full and accurate picture of the position in those three jurisdictions, but it seems clear that, to put it at its very lowest, there is not a consistent approach which could be said to reflect Virgin's contention in this case. Indeed, my strong impression is that Zodiac's contention is closer to the practice in those three countries. However, as Mr Crow submits, that is of little weight, as this is the sort of issue which has to be resolved by reference to domestic law, and is not the subject of any attempt to harmonise practices across the EPC territories.

66  As to the temporal limit of Zodiac's right to rely on the amendment of the Patent in the assessment of damages, I have no doubt that they could raise the amendment until judgment for the assessed damages had been drawn up, or passed and entered to use the time-honoured legal expression. While the court would, I think, have power to refuse to do so, I would expect it normally to agree to reopen such a judgment if any revocation or amendment was raised before the assessed damages had been paid.

67  If the Patent had been amended after the order had been formally passed and entered, but before the damages had been paid, I suspect that the only course open to Zodiac would have been to seek to appeal against the award of damages, relying on the amendment as new evidence, as strict cause of action estoppel (indeed merger) would apply. Once the damages had been paid, it seems to me that an alleged infringer would have to try and raise a restitutionary claim if it wished to recover the damages on the ground that the patent had been revoked or varied. I express no

view on the strength of such a claim, which may well be highly dependent on the facts of the particular case.

68  This conclusion renders it unnecessary to consider whether, if Poulton was rightly decided, it would none the less be open to Zodiac to rely on the amendment of the Patent in the assessment, because the amendment was effected in the EPO rather than in a domestic court. I find it slightly difficult to consider that hypothetical question, not merely because I would be proceeding on an artificial hypothesis, but also because my reasons for concluding that Poulton was wrongly decided in relation to a UK patent apply a fortiori to a European patent.

**Conclusion**

69  Accordingly, for these reasons, which follow those of Lord Sumption, and with whose reasoning I agree, I would allow Zodiac's appeal, and overrule the decisions in Poulton and Coflexip . It also follows that I disagree with the reasoning of the Court of Appeal in Unilin . I also agree with what Lord Sumption says in para 38 about the guidance given by the Court of Appeal in Glaxo Group Ltd v Genentech Inc (Practice Note) [2008] Bus LR 888 .

Crown copyright

© 2017 Sweet & Maxwell

2013 WL 3197314

© 2017 Thomson Reuters.

# TAB 93

TERRITORY OF THE VIRGIN ISLANDS

IN THE COURT OF APPEAL

HCVAP 2010/014

On appeal from the Commercial Division

WESTFORD SPECIAL SITUATIONS FUND LTD.

Appellant

and

[1]  BARFIELD NOMINEES LIMITED
[2]  VIRGINIA MOLINA AS TRUSTEE FOR THE MCKINSEY
[3]  MASTER RETIREMENT TRUST

Respondents

Before:
    The Hon. Mde. Janice George Creque                Justice of Appeal
    The Hon. Mr. Davidson Kelvin Baptiste             Justice of Appeal
    The Hon. Mr. Michael Gordon, QC           Justice of Appeal [Ag.]

Appearances:
    Mr. Stephen Moverly Smith and Ms. Claire Robey for the Appellant
    Mr. S. Jack Husbands for the Respondents

_____

2010:    September 22;
2011:    March 28.

_____

*Civil Appeal – Commercial Law – appointment of liquidators over fund – locus standi – whether the respondents were creditors within the meaning of section 9.1(a) of the Insolvency Act with standing under section 162 of the Insolvency Act – section 197 of the Insolvency Act – Article 62 of the Company's Articles – payment in specie in part satisfaction of redemption price – whether the trial judge was correct in concluding that the interests transferred by the Transfer Agreements were not 'assets' within the meaning of Article 62 – whether an adjournment should have been granted in order that the giving of assets could be further explored – costs*

The Appellant Fund incorporated in the Virgin Islands, is an investment fund regulated by the Financial Services Commission and acts as a feeder fund for a Master Fund which is incorporated in the Cayman Islands as a limited partnership.  The assets of the Fund comprise its interest, in the Master Fund and its liability is analogous to the liability of a shareholder in a limited liability company.  Articles 58 to 68 of the Fund's Articles of Association made provision for the redemption of a member's shares at the request of that

member whereupon the member would be entitled to payment of the Redemption Price
determined in accordance with the formula set out in the Articles.  Article 59 states that the
redemption price is to be paid as to 90% of the redemption price no later than 30 days
following the Redemption Date with the balance within 15 days after receipt by the Fund of
its annual financial statements for the fiscal year.  Article 62 states that on any redemption
the directors shall have power to divide 'in specie' the whole or any part of the assets of
the Company and appropriate such assets in satisfaction or part satisfaction of the
Redemption Price.  The Fund experienced difficulty brought about by the collapse of credit
market liquidity in paying redemptions after the latter part of 2007.  The respondents made
redemption requests in respect of their shareholdings in the Fund.  The respondents
received partial cash payments pari passu during 2008 and 2009.  The Fund however,
delayed in making full payment. The respondents issued a statutory demand for the
balance of the Redemption Price outstanding. The statutory demand remaining
unsatisfied, subsequently issued an application for the appointment of liquidators over the
Fund on the basis of the unsatisfied statutory demand.  The Fund invoked its powers
under Article 62 and sought to make payment 'in specie' by a proportionate transfer of
assets of the Fund and sought to execute transfer agreements to effect the 'in specie'
payment.  The Fund also filed a notice of opposition to the appointment of liquidators
contending among other things that the Redemption Price had been fully satisfied by the
'in specie' payment and that the respondents, in any event, were not creditors of the Fund
in reliance on section 197 of the **Insolvency Act** and thus lacked standing to bring the
application.  The trial judge made an order for the appointment of liquidators over the
Fund.  The Fund appealed.

**Held:** allowing the appeal, setting aside the order of the learned trial judge appointing
liquidators over the Fund, dis-applying the costs regime in CPR 65.13 and applying CPR
69B and awarding costs to the appellants:

1. The learned trial judge was wrong in proceeding on the basis that the
   respondents, as redeemers claiming redemption proceeds, were creditors of the
   Fund with locus to apply for the appointment of liquidators for the purposes of the
   **Insolvency Act.**  A member relying on a debt due from a company arising in his
   character as a member is not a creditor of the company for the purposes of
   winding up the company.

   Dicta in **SV Special Situations Fund Limited v Headstart Class F Holdings
   Limited** [1906] 2 KB 119 at pg. 125  and in **Western Union International Limited
   v Reserve International Liquidity Fund Ltd** BVI HCV 2009/322 – unreported
   (26th January 2010) to the contrary effect disapproved.

2. Article 62, to which the respondents agreed, is clear.  In essence, it says that the
   directors are empowered 'to appropriate' such assets in satisfaction (or part
   satisfaction) of the Redemption Price. It says nothing about requiring the
   respondents' acceptance to it to make the appropriation effective.  Therefore once
   the appropriation has occurred and has been tendered or the redeeming
   shareholder so advised, then it becomes effective. The learned trial judge
   therefore erred in failing to properly apply the test in **Sparkasse** having failed to

properly or adequately assess all the relevant facts and circumstances guiding its application in the instant case.

**Sparkasse Bregenz Bank AG v Associated Capital Corporation** BVI 10/2002 (18th June 2003) followed.

3.  The exercise of the learned trial judge's discretion in refusing the grant of the limited adjournment was outwith the generous ambit within which reasonable disagreement is possible.

4.  With regard to costs, the prescribed costs approach on appeal is dis-applied notwithstanding CPR 65.13 in as much as CPR 69B specifically dis-applies the prescribed costs approach at first instance. Accordingly the following orders are made:

    (a) That the respondents bear the appellant's costs in the court below such amount if not agreed within 30 days, to be remitted to the court below to be assessed;

    (b) That the respondents bear the appellant's costs of the appeal such costs to be two thirds of the assessed costs found to be payable in the court below;

    (c) That the remuneration of the liquidators be remitted to the court below for assessment unless the amount of such remuneration is agreed within 30 days such remuneration to be paid by the appellant, provided that such sum paid by way of remuneration, shall be recoverable by the appellant from the respondents.

## JUDGMENT

[1]    **GEORGE-CREQUE, J.A:**  On 22nd September 2010, the court heard and allowed an appeal against the order of the commercial judge made on 18th March 2010, appointing liquidators over the appellant ("the Fund") with written reasons to follow. We now so do.

### The background

[2]    The Fund, incorporated in the Virgin Islands, is an investment fund regulated by the Financial Services Commission and acts as a feeder fund for a master fund namely Westford Special Situations Master Fund LP, ("the Master Fund") incorporated in the Cayman Islands as a limited partnership.

[3]    The assets of the Fund comprise its interest, as a limited partner, in the Master Fund.  The liability of a limited partner in a limited partnership is limited to the amount of his capital contribution, in much the same way that the liability of a shareholder in a limited company is limited to the amount required to be paid up on subscription for his shares. [1]

[4]    Articles 58 to 68 of the Fund's Articles of Association deal with redemption of shares.  The Fund is required at the request of a member to redeem the whole or part of his shareholding on the redemption date at a redemption price, being the Net Asset Value per share on the valuation day immediately preceding the Redemption Date.[2]

[5]    Article 59 of the Fund says in a nutshell that the redemption price is to be paid as to 90 percent of the Redemption Price no later than 30 days following the Redemption Date with the balance within 15 days after receipt by the Fund of its annual financial statements for the fiscal year.

[6]    Article 62 states that on any redemption:

> "the directors shall have the power to divide in specie the whole or any part of the assets of the Company and appropriate such assets in satisfaction or part satisfaction of the Redemption Price."

[7]    The respondents, during 2004 and 2005, subscribed for shares in the Fund pursuant to an offering memorandum dated 1st January 2004.  The Master Fund, which performed well during the credit crisis, nevertheless experienced difficulty brought about by the collapse of credit market liquidity in paying redemptions after the latter part of 2007.

[8]    In September and October 2007, the respondents submitted redemption requests in respect of their shareholdings in the Fund.  The relevant Redemption Date was 31st December 2007, which date was also the Valuation Date.  As at that date, the net asset value ("NAV") of the Fund was US$233.49 per share.

---

[1] See: Article 12.1.1 of the Master Fund Partnership Agreement – Tab 10/471
[2] These terms are all defined in the Articles.

[9]     The respondents, among other redeemers received partial payments made pari passu during the course of 2008 and 2009.  The respondents however, being unhappy with the delay in the Fund making full redemptions issued a statutory demand for the sums remaining outstanding on their redemption requests.

[10]    The Fund did not seek to set aside the statutory demand.  Based on the unsatisfied statutory demand the respondents, on 9th February 2010, issued an application for the appointment of liquidators over the Fund.  The Fund, in light of the application to appoint liquidators decided to utilise its powers under Article 62 by seeking to pay the amounts outstanding to the respondents by making an 'in specie' distribution of the Fund's assets being its interest in the Master Fund which, in essence, was the appropriate percentage interest calculated by reference to the then NAV of the Fund.  To this end the Fund sought to execute transfer agreements to effect this 'in specie' payment.

[11]    The Fund filed a Notice of Opposition to the application to wind up and relied on the following points:

(a) That the Fund was entitled to satisfy the upstanding balance of the Redemption Price in specie pursuant to Article 62;

(b) That the interests transferred by the Transfer Agreements satisfied the outstanding balance;

(c) That the debts owing had accordingly been discharged;

(d) That the respondents were not in any event "creditors" within the meaning of section 9(1)(a) of the **Insolvency Act (2003)** ("IA") with standing under section 162 of the IA to pursue the Application for the appointment of liquidators.

[12]    The trial judge in making an order for the appointment of liquidators over the Fund concluded in an ex tempore judgment that:

(a) under the Transfer Agreements the transferees would make themselves liable without limit in time  for all  future and contingent liabilities of the limited partnership;

(b) a bundle of rights which involves currently assessed value but also time unlimited acceptance of liabilities did not fall within the meaning of 'assets' under Article 62; and

(c) no adjournment should be granted so as to consider whether some acceptable assets within the meaning of Article 62 could be provided.

[13]    Conspicuously absent from the trial judge's ruling is any consideration of the fourth limb of the Fund's attack, namely whether the respondents were creditors within the meaning of section 9.1(a) of the IA with standing under section 162 to bring the application.

### The Issues on Appeal

[14]    The appeal by the Fund as succinctly put by counsel for the Fund, raised the following issues:

(a) whether the respondents were creditors within the meaning of section 9.1(a) of the IA with standing under section 162 of the IA; ("the Locus issue")

(b) whether the trial judge was correct in concluding that the interests transferred by the Transfer Agreements were not 'assets' within the meaning of Article 62; ('the Article 62 issue')

(c) whether an adjournment should have been granted in order that the giving of assets could be further explored ("the adjournment issue").

I propose to deal with the issues in the same order as raised.

### The Locus Issue

[15]  Although the issue as to whether the respondents were creditors formed a plank of the Fund's attack in their Notice of Opposition, it does not appear to have been pursued with much vigour at the hearing.  The transcript at the hearing reveals the following exchanges between counsel for the respondents and the Court:[3]

> "The Court:     I go back to their Notice of Opposition then. …"If contrary to the Fund's position, the redemption price remains outstanding the sum due to each Applicant would not represent an admissible claim in any liquidation by reason of section 197."  So they would not be creditors. So we are in 197
>
> Ms. Corbett:   It appears so, yes.
>
> The Court:     So your next submission?"

The trial judge however without any further consideration of this aspect proceeded on the basis that the respondents were creditors within the meaning of section 162 of the IA.  This approach may no doubt have been adopted in keeping with his approach applied in his earlier decision given in **Western Union International Limited v Reserve International Liquidity Fund Ltd**[4].

[16]  An appropriate starting point in respect of the law on this issue is with a recital of the relevant provisions of the IA.  Section 162 states, in essence, and among other things, that a creditor may apply for the appointment of a liquidator.  Section 2(1) states that a "creditor" has the meaning specified in section 9.  Section 9(1) states:

> "A person is a creditor of another person (the debtor) if he has a claim against the debtor, whether by assignment or otherwise, that is, or would be, **an admissible claim in (a) the liquidation** of the debtor,... that is a company. …"  (my emphasis)

Clearly then, a creditor of a company only has standing to apply for the appointment of liquidators over a company, if he has an admissible claim in the liquidation.  In this regard section 197 becomes relevant.  Section 197 states as follows:

---

[3] See: pgs. 25-26 transcript of proceedings.
[4] BVI HCV 2009/322 – unreported (26th January 2010).

"A member, and a past member, of a company **may not claim** in the liquidation of the company for a sum due to him **in his character as a member**, whether by way of dividend, profits, **redemption proceeds** or otherwise, but such sum is to be taken into account for the purposes of the final adjustment of the rights of members and, if appropriate, past members between themselves." (my emphasis)

[17]    Section197, construed in isolation, would appear to be unambiguous in saying that a member (past or present) in respect of a debt and thus a claim arising in that capacity (such as a claim arising from the right to redemption proceeds) could not bring an application to appoint liquidators by treating that debt (and thus such claim) as one which constituted them a creditor, for the purposes of section 9(1) and hence with standing to apply under section 162 of the IA.  But that is not the end of the matter.  The **Business Companies Act (2004)** ("BCA") subsequently came into effect, and section 197 must be juxtaposed against section 62 of the BCA which, in dealing with share redemption, says this:

"(1) If a share is redeemable at the option of the shareholder and the shareholder gives the company proper notice of his intention to redeem the share:

(a)  The company shall redeem the share on the date specified in the notice, or … on receipt of the notice;

(b)  Unless the share is held as a treasury share under section 64, the share is deemed to be cancelled;

(c)  From the date of redemption, the former shareholder ranks as an unsecured creditor of the company for the sum payable on redemption.

(2)  If a share is redeemable on a specified date:

(a)  ….

(b)  ….

(c)  ….

[18]    It bears note that section 250 of the BCA refers to various enactments which have been either repealed, or amended by the BCA and these are specifically identified in schedule 3 of the BCA.  Schedule 3 lists twelve sections of the IA which have been amended by the BCA.  Section 197 of the IA is not among the sections listed

as having been amended or repealed which must be taken to mean that the framers of BCA having conducted the exercise of specifying in the schedule the specific provisions of the IA which have been amended or repealed, and section 197 of the IA, having not been so specified, that it was intended to remain as a free standing provision which is not to be read down by section 62 of the BCA as counsel for the respondents seek to suggest.

[19]    Is section 197 of the IA in conflict with section 62 of the BCA?  The Fund contends, in essence, that there are good reasons for a section 197 provision.  Counsel for the Fund says firstly, that it is clearly undesirable that members who may have been responsible, through the officers they have elected, for the insolvency of the a company, should be able to compete in a liquidation on a *pari passu* basis with outside creditors in relation to sums due to them *qua* member and that this has led a number of jurisdictions to demote the members' claims behind those of other creditors.  This approach, counsel for the Fund says, was achieved by section 197 of the IA.  Apart from this counsel contends that a second rationale for the section 197 provision is to ensure that members who have redeemed before liquidation (and possibly have become past members) but have not been paid all of their redemption proceeds, do not gain priority over those members who did not redeem in time, thus preventing an unfair and unseemly scramble in the dying days of the company, and thus ensuring that members inter se are treated *pari passu*.

[20]    Counsel for the Fund contends that section 62 of the BCA and section 197 of the IA are reconcilable once it is recognised that section 62(1)(c) and 62(2)(c) do not deal with ranking in a liquidation (which would be in conflict with section 197) but rather with the position of a shareholder once the shareholder has redeemed.  In short, section 62 sets out, subject to any contrary provisions in a company's memorandum and articles,[5] the redemption process and makes a shareholder who has redeemed, an unsecured creditor in the wider sense in respect of any unsatisfied redemption proceeds in respect of which he may sue the company and

---

[5] S.59 of the BCA states that ss. 60, 61 and 62 do not apply to a company to the extent that they are negated, modified or inconsistent with provisions for the purchase, redemption or acquisition of  its own shares specified in the company's memorandum and articles.

obtain judgment but not a creditor in the narrower sense for the purposes of section 162 of the IA by virtue of section 197 of the IA.

[21]   I agree with this analysis.  The redeemed shareholder, notwithstanding that he is a creditor of the company in the wider sense in respect of any unpaid redemption proceeds, encounters a restriction on the steps he can initiate in relation to a liquidation of the company.   By virtue of section 197 of the IA the redeemed shareholder, notwithstanding that he may be a creditor of the company in the general or wider sense, simply does not get the right to apply to wind up the company or claim in its liquidation in the same way as an ordinary 'third party' creditor. This is the restriction section 197of the IA places on a member or past member in respect of a claim arising in favour of a member, qua member, in respect of the liquidation of a company, whilst section 62 of the BCA recognises that such a redeemed member in all other respects is a creditor (in the wider sense) of the company.  Put succinctly, the redeeming member is a creditor of the company but <u>not a creditor with locus</u> to apply for the appointment of liquidators or to claim in a liquidation of the company other than in the manner permitted by section 197 which, in essence, says that where a sum is due to a member in his character as a member, (such as redemption proceeds) "such sum is to be taken into account for the purposes of the final adjustments of the rights of members and, if appropriate, past members between themselves." Once this distinction is understood the confusion in construing these provisions and confining them to their proper application should be considerably reduced.

[22]   On the issue as to whether the claim to redemption proceeds arises in any other capacity save in his character as a member, I am quite satisfied that it is in the redeeming member's character <u>as a member</u> that the liability of the company to pay redemption proceeds and the claim by the redeeming member to receive such proceeds arises, based on the contractual relationship between the member and the company established by its memorandum and articles, in the absence of some other collateral agreement providing otherwise. In **Soden v British &**

**Commonwealth Holdings Plc**[6], a decision of the House of Lords in England, Lord Browne Wilkinson at page 323 in speaking of section 74(2)(f) of the **Insolvency Act 1986** [UK] had this to say:

> "Section 74(2)(f) requires a distinction to be drawn between, on the one hand, sums due to a member in his character of a member by way of profits, dividends or otherwise and, on the other hand, sums due to a member otherwise than in his character as a member. In the absence of any other indication to the contrary, sums due in the character as a member must be sums falling due under and by virtue of the statutory contract between the members and the company and the members inter se constituted by section 14(1) the Companies Act 1985"

[23]    It is worthwhile to recite section 74 of the **Insolvency Act 1986** [UK] for the purposes of comparison with section 197 of the IA. So far as material, it says:

> "(1) When a company is wound up, every present and past member is liable to contribute to its assets to any amount sufficient for payment of its debts and liabilities, and the expenses of winding up, and for the adjustment of the rights of the contributories among themselves. (2) This is subject as follow … (f) a sum due to any member of the company (in his character as a member) by way dividends profits or otherwise is not deemed to be a debt of the company payable to that member in a case of competition between himself and any other creditor not a member of the company, but any such sum may be taken into account for the purpose of the final adjustment of the rights of the contributories among themselves."

In my view, although section 197 of the IA is not a verbatim mirror of section 74 of the **Insolvency Act 1986** [UK], when sections 196 and197 of the IA are taken together, it is clear that the effect and objective of section 74 of the **Insolvency Act 1986** [UK] and sections 196 and 197 of the IA are the same – that is, to subordinate the claims of members (past or present) arising in that character, to the claims of any outside creditor (i.e. a creditor who is not a member of the company). Indeed it may be said that section 197 is more specific than its UK counterpart in that it expressly includes redemption proceeds within the class of sums which may become due to a member qua member. There can be no doubt that the respondent's claim, and thus their cause of action against the Fund, arises from the statutory contract contained in the Fund's Memorandum and Articles by virtue of

---

[6] [1998] AC 298.

section 11 of the BCA[7] under which the Fund was incorporated.  It is the Fund's Articles[8] on which the respondents rely for payment of the redemption proceeds. Accordingly, the Articles which form the statutory contract and its breach, is the cause of action on which the respondents' claims are grounded.  The respondents have not sought to suggest otherwise, nor in my view could they. This basis, in my view, makes it pellucid that the claim based on outstanding redemption proceeds is one arising in the respondents' character as member notwithstanding that, having exercised their right to redemption, they are said to be past members.  It matters not. They are caught by section 197 of the IA which restricts this type of debt from being treated as an ordinary creditor's debt.  In short, a member relying on a debt due from a company arising in his character as a member is not a creditor of the company for the purposes of winding up the company.  He is not allowed to compete with outside creditors of the company in a winding up on such a claim. This is what section 197 of the IA seeks to ensure by ranking his claim behind that of the outside creditor.

[24]    The respondent, though acknowledging that the Fund raised a challenge to locus in its Notice of Opposition, contends that the Fund acknowledged that the respondents are creditors, in that they did not consider that they could in good faith seek to set aside the statutory demand and accordingly accepted that the respondents were creditors for the purposes of the IA with standing to apply for the winding up of the company.  Counsel for the respondents also say that the Fund not having addressed the court on this issue below was now raising this issue on appeal for the first time.

[25]    The first point as to whether the Fund accepted that the respondents were creditors, to my mind, adds nothing to the point once the senses in which the term 'creditor' may be used are accepted as I have already addressed in paragraphs 21 to 23 above.  It is true that the respondents were creditors of the Fund in respect of any outstanding redemption proceeds, but that fact alone does not as a matter of

---

[7] This section states that the Memorandum and Articles of a company is binding as between a company and each member and as between member and member.
[8] See: Tab 9 Supplemental Record – Pg. 148-149.

law, make them creditors for the purposes of section 162 of the IA by virtue of section 197.  In short, the respondents, although they are creditors of the Fund, are not creditors <u>with standing</u> to apply for the appointment of liquidators or to claim in a liquidation of the Fund.

[26]    As to the second point, suffice it to say that the challenge to locus was expressly made in the Notice of Opposition and reference made thereto in the course of the proceedings.  Whether or not the challenge was developed further in argument does not absolve the trial judge from addressing it, particularly if it goes to the grounding of the court's jurisdiction to appoint liquidators on the respondents' application.  It cannot be doubted that the issue of locus goes to grounding of the court's jurisdiction to entertain the application.  I agree with counsel for the Fund that even were the point not raised in the court below, the Fund is not precluded from raising it on appeal, being a challenge to jurisdiction.   This is a long established legal principle. In **Norwich Corporation v Norwich Tramways**[9] Vaughan Williams LJ had this to say:

> "A point as to jurisdiction has been raised on this appeal which was not raised at trial… I have always supposed it to be well established law that the objection that the tribunal has no jurisdiction to entertain the case is one which, at all events in reference to proceedings in the high Court, may be taken at any time.  If the court in any case is itself satisfied that it has no jurisdiction to entertain the application made, it is its duty in my opinion, to give effect to that view, taking if necessary, the initiative upon itself."

[27]    On the respondents' analysis of section 197 of the IA, they say that section 197 is only relevant **after** the liquidation of a company has commenced and deals exclusively with the admissibility of claims in a liquidation and thus does not affect the fundamental status of a party as a creditor before the commencement of the liquidation.  Counsel for the respondents also contends that section 197 only settles the order of priority and does not relate to locus standi.  Further he urges that it could not be contemplated that section 197 could take away the right of a "member creditor" in that way.  These contentions appear to be in reliance respectively, on

---

[9] [1906] 2KB 119 at pg. 125.

the decisions in **SV Special Situations Fund Limited v Headstart Class F Holdings Limited**[10] and **Reserve**, two first instance decisions.

[28]    In **Headstart** both parties were funds.  Headstart held redeemable shares in SV. Headstart sought to redeem its shares but did not receive from SV the redemption proceeds.  Headstart issued a statutory demand pursuant to section 155 of the IA, for payment of the redemption proceeds.   SV applied to set aside the statutory demand.   One of the bases of SV's challenge to the statutory demand was that Headstart did not have standing to serve a statutory demand as it was not a creditor of SV under the IA.  The trial judge concluded [para.18] that section 12 of the IA 'is an all-encompassing definition of non-admissible claims'. She then opined, in essence, that:

(a)    claims due to former members in respect of redemptions were not included in the list of non-admissible claims established under section 12;

(b)    section 11 (listing liabilities which form the basis of admissible claims in a liquidation) was subject only to section 12 and was not subject to section 197, and thus section 197 could not be prayed in aid to whittle away section 11 or expand section 12 and therefore has no role in the definition of a creditor for the purposes of section 155 of the IA.  In support of this construction she opined further that: "sections 2, 9, 11 and 12 all fall within Part 1 headed "preliminary provisions" and therefore are of general application.   Not so section 197 which is contained in Part V entitled "Liquidation" and specifically under the subheading "Members".

(c)    section 197 only needs to be adverted to after the liquidation is underway and the liquidator is considering what claims to honour and cannot be considered when determining whether Headstart is a creditor for the purposes of making a statutory demand under section 155 of the IA.

---

[10] BVI HCV 2008/0239 - unreported - (per Olivetti J 25th November 2008).

[29]    Counsel for the Fund in this appeal says that the trial judge's reasoning is flawed in that:

(a)    firstly, by suggesting that section 197 becomes relevant only once a liquidation is underway misses the point that it is <u>only</u> when a liquidation is underway that a claim is admitted.  As such, a claim cannot be admissible in a liquidation before the liquidation starts but ceases to be so after that point.

(b)    secondly, sections 11 and 12 clearly deals with what claims can and cannot be admitted to proof by the liquidator under section 207.  If section 197 applies once the liquidation is underway (and thus section 12 is not all - encompassing at that stage), it begs the question why should section 12 be all – encompassing <u>before</u> liquidation commences.

(c)    Thirdly, section 9 of the IA says that it is only a person who has a claim which <u>"is</u>, or <u>would be"</u> admissible in a liquidation that may be considered a creditor for the purposes of the IA.  The use of the word 'is" is a reference to the time after the commencement of a liquidation and the words "would be" is a reference to a time before a liquidation, the requirement being that when liquidation takes place, the claim would <u>then</u> be admissible.

[30]    To my mind, the position would be incongruous were the case to be that section 197, which makes it clear that a member of a company (past or present) may not claim redemption proceeds once the liquidation is underway, could nonetheless on reliance on the same claim, be allowed to commence liquidation proceedings.  Put simply, it would mean that whilst, a 'redeeming member' has a claim which enables him to take steps or commence a liquidation he would nonetheless be barred from having his claim admitted and treated as an ordinary creditor once the liquidation is underway. What then would be the point of having locus to commence a liquidation only to have your claim barred or not being admissible in the actual liquidation?  It is clear to me that the entire scheme of the IA is to tie together the provisions in terms of who is considered a creditor for the purposes of commencing a liquidation, with those provisions which stipulate what claims are and are not admissible to proof once the liquidation commences.  This, in my view, makes perfect sense and avoids the incongruous result the trial judge's reasoning in **Headstart** seems to suggest.  Accordingly, I agree with counsel for the Fund that the trial judge's reasoning in **Headstart** is flawed and in this respect should

not be followed.  I also agree with counsel for the Fund that although whether a person is a creditor for the purpose of serving a statutory demand (or applying for the appointment of a liquidator) is an analysis conducted before liquidation, section 9 requires that the admissibility of that person's claim is assessed by reference to what the position would be post - liquidation.  The test as to whether a person has a claim which is or would be admissible in a liquidation so as to constitute that person a creditor for the purposes of the IA is a threshold requirement which must be addressed by reference to all relevant provisions of the IA as may be applicable to the particular facts and circumstances of the case as presented.

[31]    In respect of **Reserve,** suffice it to say that the trial judge concluded that the redeeming shareholder was a creditor for the purposes of the IA, on grounds entirely different from those given by the trial judge in **Headstart.**  He decided in **Reserve** that a past member (having redeemed) was a creditor for the purposes of the IA on the basis that the redemption proceeds were not due to the past member <u>in his character as a member</u> but rather 'as a seller entitled to the price.'  Counsel for the Fund similarly urges that **Reserve** was wrongly decided and should not be followed.  The decision in **Reserve** was appealed to this court, but interestingly, and in my view rightly, the appeal was, **by consent**, allowed and the decision of the trial judge set aside.[11]

[32]    It is quite clear that the position, on reading sections 2, 9 and 197 of the IA, is that a redeeming shareholder claiming redemption proceeds has no locus to apply for the appointment of liquidators.  For the foregoing reasons I consider that the learned trial judge was wrong in proceeding on the basis that the respondents, as redeemers claiming redemption proceeds, were creditors of the Fund with locus to apply for the appointment of liquidators for the purposes of the IA.  Accordingly, their application ought to have been dismissed.

---

[11]  Subsequent to the hearing of this Appeal, a Consent Order was made in Reserve, on 30th November 2010 allowing the Appeal and discharging the Order of the of the trial judge appointing liquidators.

[33]     This conclusion is sufficient for allowing the appeal.  However, for completeness, I address the two remaining issues in turn, assuming for those purposes that the respondents had locus to bring the application.

### The Article 62 Issue

[34]     The principles to be applied where the company asserts that the debt is disputed are well settled and the case of **Sparkasse**[12] is the watershed authority in this jurisdiction for the principle.  Byron CJ [para.14] set it out this way:

> "The Court will order a winding up for failure to pay a due and undisputed debt over the statutory limit, without other evidence of insolvency.  If the debt is disputed, the reason given must be substantial and it is not enough for a thoroughly bad reason to be put forward honestly.  But if the dispute is simply as to the amount of the debt and there is evidence of insolvency the company could be wound up.  To fall within the principle, the dispute must be genuine in both a subjective and objective sense.  That means that the reason for not paying the debt must be honestly believed to exist and must be based on substantial or reasonable grounds.  Substantial means having substance and not frivolous, which disputes the Court should ignore.  There must be so much doubt and question about the liability to pay the debt that the Court sees that there is a question to be decided.  The onus is on the company to bring forward a prima facie case which satisfies the Court that there is something which ought to be tried…."

[35]     Article 62 of the Fund says this:

> "On any redemption (….) the directors shall have the power to divide in specie the whole or any part of the assets of the Company and **appropriate** such assets in satisfaction or part satisfaction of the redemption price." (my emphasis)

It is not disputed that the only asset of the Fund is its investment in the Master Fund and that where a redemption request is made which is to be met in cash, the feeder fund makes a corresponding redemption request to the Master Fund and the proceeds passed on from the Master Fund to the feeder fund which then passes it on to the redeemer.  Where a redemption request is to be met by an appropriation of a part of the assets of the Fund, the only asset that the Fund could appropriate to satisfy the redemption request in specie would be an

---

[12] Sparkasse Bregenz Bank AG v Associated Capital Corporation [BVI 10/2002] (18th June 2003).

appropriate part of its interest in the Master Fund.  This, counsel for the Fund says, must be what was contemplated (and I would add, 'agreed to') under Article 62, or, at the very least would have amounted to a strong prima facie case, satisfying the **Sparkasse** test (i.e. that the debt was genuinely disputed on substantial grounds) that such was the case.  In this event, the application ought to have been dismissed.  Instead, argues counsel for the Fund, the trial judge went further than the **Sparkasse** test by deciding the point when he held that the bundle of assets and liabilities proposed by the Transfer Agreement did not amount to an asset of the Fund within the meaning of Article 62 having considered that the Transfer Agreement was asking the respondents to accept unlimited liabilities. This appears to have ignored the fact that the Master Fund was a limited partnership which limited the liability of a partner in much the same way as a limited liability company.  A partner's limitation was expressly so set out in Article 12.1.1 of the Articles of the Master Fund which were exhibited.  Accordingly the liabilities could not in effect be unlimited in the sense considered by the trial judge as the respondents, in reality and as contemplated by Article 62 of the Fund, would be holding the interest in the Master Fund on the same terms as the Fund in accordance with Article12.1.1.

[36]    On this issue the respondents contend, in essence, that the transfer of a portion of the Fund's interest in the Master Fund comprised in the Transfer Agreement was ineffective as the transfer was not accepted by the respondents and as such no in-specie distribution had occurred to discharge the debt.  That being the case there could be no genuine dispute as to whether the debt was due as at 18th March 2010.  It must be pointed out that the trial judge did not base his decision on this point (and there is no Counter Notice) but rather on the point that the in-specie distribution as set out in the Transfer Agreement could not be said to be 'an asset' of the Fund within the meaning of Article 62.  Be that as it may, it raises the question as to whether a redeeming shareholder is required to accept an in specie distribution of the Fund's asset appropriated and tendered in satisfaction (or part satisfaction) of the Redemption Price.  In this regard the language used in Article 62 is important. In essence it says that the directors are empowered 'to

appropriate' such assets in satisfaction (or part satisfaction) of the Redemption Price.  As counsel for the Fund points out, this is the provision to which the respondents agreed and it says nothing about requiring the respondents' acceptance to it to make the appropriation effective.  I would think that once the appropriation has occurred and has been tendered or the redeeming shareholder so advised then it becomes effective.

[37]    I would conclude accordingly that the trial judge erred in failing to properly apply the test in **Sparkasse** having failed to properly or adequately assess all the relevant facts and circumstances guiding its application in the instant case.  For this reason also, the appeal is allowed.

### The adjournment Issue

[38]    The Fund's primary complaint here is that the trial judge in the exercise of his discretion did so in a manner which fell 'outside the generous ambit within which reasonable disagreement is possible'[13] in that he failed to factor into his consideration the following:

   (a)  It was the first hearing of the application;

   (b)  There was uncontested evidence that the Fund was balance sheet solvent with an NAV of at least $97m;

   (c)  The appointment of liquidators was a draconian remedy;

   (d)  A limited adjournment was unlikely to prejudice the respondents and appears to based his refusal to grant an adjournment simply on the basis that there was no evidence before him as to the time scale in which it may be possible to realise any of the underlying assets of the Master Fund. The Fund also complained that the trial judge failed to address the alternative basis for the adjournment which was to afford an opportunity to see if suitable assurances or indemnities could be offered to meet the

---

[13] See: GvG [1985] 1 WLR 647; Dufour v Helen Air Corporation 52 WLR 188.

judge's concern that the respondents were being exposed to open-ended partnership liabilities, despite the fact that these points had been raised by him during the course of argument.

[39]    The Fund accordingly contends that even if the learned judge was of the view that the interest offered by the Fund were not "assets" per Article 62 for the reasons he gave, then he ought to have allowed the Fund a reasonable opportunity:

(a)    to deal with the points he had raised about the partnership liabilities whether by way of further evidence as to valuation or by way of assurances as to the limited nature of the liabilities; and/or

(b)    to provide alternative assets through a redemption in the Master Fund.

The respondents in essence say that an adjournment would have merely been a postponement of the inevitable.

[40]    Would further evidence as to valuation and /or assurances as to the limited nature of the liabilities have swayed the judge into accepting that the appropriation of a portion of the Fund's interest in the Master Fund amounted to assets within the meaning of Article 62?   Interestingly, counsel for the respondents during the course of oral argument conceded that value would come into play in considering the 'asset' and therefore would have been relevant to the adjournment issue, but then sought to show in their skeletal arguments that the solvency of the Fund and the values placed on it and the Master Fund was viewed by the respondent with much scepticism.  This in my view would clearly bring into play a genuine dispute as to the debt, applying the Sparkasse test.   When this is factored into the equation along with the other factors mentioned at paragraph 38 above, and having regard to the fact of the manner in which the matters arose during the proceedings more or less at the instance of the trial judge, I am satisfied that the exercise of the learned trial judge's discretion in refusing the grant of the limited adjournment was outwith the generous ambit within which reasonable disagreement is possible.  I would say however, that were the adjournment sought on the basis only of allowing an opportunity to explore whether a redemption of

assets from the Master Fund was available, I would be in agreement with the learned trial judge as I do not consider that an adjournment would have assisted.

## Conclusion

[41]    For all of the foregoing reasons the appeal was allowed and the order of the learned trial judge appointing liquidators over the Fund set aside.

## Costs

[42]    At the conclusion of the hearing of the appeal the court directed the parties to file and serve written submissions on costs by 8th October 2010.  I have been ably assisted by the detailed submissions on both sides.  I must mention that I was particularly impressed by the analysis of the costs regime in commercial matters conducted in the Virgin Islands which is governed by a new Part 69B which applies to the Virgin Islands only and for pointing out the seeming anomaly between the costs structure in relation to appeals from such matters vis-a-vis the costs structure at first instance which has sought to dis-apply the prescribed costs regime under CPR 65.  Having digested them, I am satisfied that it would be illogical to adopt a 'prescribed costs' approach on appeal notwithstanding CPR 65.13 when CPR 69B at first instance specifically dis-applies this approach to commercial matters in the court below and treat the failure to address this in the parts of CPR dealing with appeals as an inadvertent omission.  Accordingly, applying the costs regime guiding the commercial division of the Court at first instance, I consider that the following orders accord with the principles to be applied and best suit the ends of justice in this matter:

    (a)  That the respondents bear the appellant's costs in the court below (such amount if not agreed within thirty (30) days, to be remitted to the court below to be assessed;

    (b)  That the respondents bear the appellant's costs of the appeal such costs to be two thirds of the assessed costs found to be payable in the court below;

(c) That the remuneration of the liquidators be remitted to the court below for assessment unless the amount of such remuneration is agreed within thirty (30) days such remuneration to be paid by the appellant, provided that such sum paid by way of remuneration, shall be recoverable by the appellant from the respondents.

Janice George-Creque
Justice of Appeal

I concur.

Davidson Kelvin Baptiste
Justice of Appeal

I concur.

Michael Gordon, QC
Justice of Appeal [Ag.]

# TAB 94

**\*737  Wilson v. Brett**

Image 1 within document in PDF format.

27 January 1843

**(1843) 11 Meeson and Welsby 113**

**152 E.R. 737**

1843

**Analysis**

[113] Exch. of Pleas. Jan. 27, 1843.—A person who rides a horse gratuitously, at the owner's request, for the purpose of shewing him for sale, is bound, in doing so, to use such skill as he actually possesses; and if proved to be a person conversant with and skilled in horses, he is equally liable with a borrower for injury done to the horse while ridden by him.

[S. C. 12 L. J. Ex. 264. Discussed, *Giblin* v. *M'Mullen* , 1869, 5 Moore, P. C. 434; L. R. 2 P. C. 317. Approved, *Grill* v. *General Iron Screw Collier Company* , 1866, L. R. 1 C. P. 612.]

Case. The declaration stated, that the plaintiff, at the request of the defendant, caused to be delivered to the defendant a certain horse of the plaintiff of great value, **\*738**  to wit, &c., to be by the defendant shewn to a certain person to the plaintiff unknown, and to be re-delivered by the defendant to the plaintiff on request, and that thereupon it then became and was the duty of the defendant to take due and proper care of the said horse, and to use and ride the same in a careful, moderate, and reasonable manner, and in places fit and proper for that purpose: yet the defendant, not regarding his duty &c., did not nor would take due and proper care of the said horse, but on the contrary used and rode the same in a careless, immoderate, and improper manner, and in unfit and improper places, &c., whereby the said horse was injured, &c. Plea, not guilty.

At the trial before Rolfe, B., at the London Sittings in this term, it appeared that the plaintiff had intrusted the horse in question to the defendant, requesting him to ride it to Peckham, for the purpose of shewing it for sale to a Mr. Margetson. The defendant accordingly rode the horse to Peckham, and for the purpose of shewing it, took it into the East Surrey Race Ground, where Mr. Margetson was engaged with others playing the game of cricket: and there, in consequence of the slippery nature of the ground, the horse slipped and fell several times, and in falling broke one of his knees. It was proved that the defendant was a person conversant with and skilled in horses. The learned Judge, in summing up, left it to the jury to say whether the nature of the ground was such as to render it a matter of culpable negligence in the defendant to ride the horse there; and told them, that under the circumstances, the defendant, being shewn to be a [114] person skilled in the management of horses, was bound to take as much care of the horse as if he had borrowed it; and that, if they thought the defendant had been negligent in going upon the ground where the injury was done, or had ridden the horse carelessly there, they ought to find for the plaintiff. The jury found for the plaintiff, damages 51. 10s.

Byles, Serjt., now moved for a new trial, on the ground of misdirection. There was no evidence here that the horse was ridden in an unreasonable or improper manner, except as to the place where he was ridden. The defendant was admitted to be a mere gratuitous bailee; and there being no evidence of gross or culpable negligence, the learned Judge misdirected the jury, in stating to them that there was no difference between his responsibility and that of a borrower. There are three classes of bailments; the first, where the bailment is altogether for the benefit of the bailor, as where goods are delivered for deposit or carriage; the second, where it is altogether for the benefit of the bailee, as in the case of a borrower; and the third, where it is partly for the benefit of each, as in the case of a hiring or pledging. This defendant was not within the rule of law applicable to the second of these classes. The law presumes that a person who hires or borrows a chattel is possessed of competent skill in the management of it, and holds him liable accordingly. The learned Judge should therefore have explained to the jury, that that which would amount to proof of negligence in a borrower, would not be sufficient to charge the defendant, and that he could be liable only for gross or culpable negligence.

Lord Abinger , C. B. We must take the summing up altogether; and all that it amounts to is, that the defendant was bound to use such skill in the management of the horse as he really possessed. Whether he did so or not **[115]** was, as it appears to me, the proper question for the jury. I think, therefore, that the direction was perfectly right, and that no rule ought to be granted.

Parke , B. I think the case was left quite correctly to the jury. The defendant was shewn to be a person conversant with horses, and was therefore bound to use such care and skill as a person conversant with horses might reasonably be expected to use: if he did not, he was guilty of negligence. The whole effect of what was said by the learned Judge as to the distinction between this case and that of a borrower, was this; that this particular defendant, being in fact a person of competent skill, was in effect in the same situation as that of a borrower, who in point of law represents to the lender that he is a person of competent skill. In the case of a gratuitous bailee, where his profession or situation is such as to imply the possession of competent skill, he is equally liable for the neglect to use it.

Alderson , B. The learned Judge thought, and correctly, that, this defendant being shewn to be a person of competent skill, there was no difference between his case

and that of a borrower; because the only difference is, that there the party bargains for the use of competent skill, which here becomes immaterial, since it appears that the defendant has it. **\*739**

Rolfe , B. The distinction I intended to make was, that a gratuitous bailee is only bound to exercise such skill as he possesses, whereas a hirer or borrower may reasonably be taken to represent to the party who lets, or from whom he borrows, that he is a person of competent skill. If a person more skilled knows that to be dangerous which another not so skilled as he does not, surely that makes a difference in the liability. I said I could see no difference between negligence and gross negligence—that it **[116]** was the same thing, with the addition of a vituperative epithet; and I intended to leave it to the jury to say whether the defendant, being, as appeared by the evidence, a person accustomed to the management of horses, was guilty of culpable negligence.

Rule refused.

© 2017 Sweet & Maxwell

152 E.R. 737

---

© 2017 Thomson Reuters.

 © 2017 Thomson Reuters.

# TAB 95

470                                    HIGH COURT                                    [1941.

[HIGH COURT OF AUSTRALIA.]

WISHART    .    .    .    .    .    .    .    .    APPLICANT ;
DEFENDANT AND APPELLANT,

AND

FRASER AND OTHERS    .    .    .    .    .    RESPONDENTS.
INFORMANT AND RESPONDENTS,

ON APPEAL FROM A COURT OF PETTY SESSIONS OF NEW SOUTH
WALES, AND ON APPEAL FROM A COURT OF QUARTER
SESSIONS OF NEW SOUTH WALES.

H. C. OF A.    *Constitutional Law—Delegation of legislative powers—Act relating to national security*
1941.              *and defence—Regulations thereunder—Validity—National Security Act 1939-*
  ⌒              *1940 (No. 15 of 1939—No. 44 of 1940), sec. 5—National Security (General)*
SYDNEY,            *Regulations, reg. 41 (1), (2).*
*April* 2, 4,
  10.          *High Court—Practice—Conviction by State Court of Petty Sessions exercising Federal*
                  *jurisdiction—Prohibition—Application to High Court—Conviction affirmed by*
Rich A.C.J.,      *State Court of Quarter Sessions—The Constitution (63 & 64 Vict. c. 12), sec.*
Starke, Dixon,    *73 (ii)—Judiciary Act 1903-1940 (No. 6 of 1903—No. 50 of 1940), sec. 39 (2) (b),*
McTiernan and
Williams JJ.      *(c)—Rules of the High Court, Part II., sec. IV., r. 1—Justices Act 1902 (N.S.W).*
                  *(No. 27 of 1902), secs. 112, 122.*

Sec. 5 of the *National Security Act* 1939-1940 is not an illegal delegation
to the Executive of legislative power, but is a valid exercise of the defence power.

An order of a Court of Quarter Sessions of New South Wales confirming on
appeal a conviction by a magistrate exercising Federal jurisdiction is, while it
stands, a bar to any appeal from the magistrate's decision direct to the High Court.

APPEAL, by way of order nisi for prohibition, from a Court of Petty
Sessions of New South Wales, and APPLICATION for special leave to
appeal from a Court of Quarter Sessions of New South Wales.

John Royston Wishart, a solicitor, was charged before a Court
of Petty Sessions at Sydney on the information of Jack Lyall
Fraser, a detective of the police force of the State of New

64 C.L.R.]                    OF AUSTRALIA.                          471

South Wales attached to the Commonwealth Military Police
Intelligence, with an offence under sec. 10 of the *National Security
Act* 1939-1940 and reg. 41 (1) (*b*) of the *National Security (General)
Regulations* made pursuant to that Act, for that on 25th June 1940
at Sydney he did, with intent to endeavour to cause disaffection
among members of the Second Australian Imperial Forces engaged
in the service of the King, have in his possession a document
which was of such a nature that the dissemination of copies
thereof among such members would constitute an endeavour to
cause disaffection among those members, contrary to the Act.
The document referred to, which was set forth at length in the
information, was addressed " To the soldiers of the Second A.I.F.,"
and was headed " Military punishment and the rank and file."   It
contained a statement, which was alleged to have appeared in a
newspaper, of the treatment said to have been meted out to some
members of the A.I.F. " who were doing time for minor offences,
mainly A.W.L.," and the comment thereon was that " all this is
just a first taste of the evils that military stupidity and red tape
can cause and which the rank and file will have to put up with,"
and that " the solution of all your problems lies in the setting up
of soldiers' committees."   " Common causes of dispute " were said
to be :—(1) " Canteen funds and comforts funds " :  it was stated
that " in the last war maladministration and lack of proper super-
vision led to the diversion of great quantities of supplies and money
from the soldiers to the pockets of private individuals."   (2) " Fines
and field punishment " :  these, it was stated, " are handed out
arbitrarily without any effective right of appeal.  Representative
committees would act as a check on irresponsible officers and at the
same time protect the soldier."   (3) " Leave " :  there was, it was
stated, " already a sharp difference developing between the amount
of leave allowed to officers and the rank and file."   (4) " Care of
dependants " :  it was stated that " in the last war dependants'
allowances were delayed and cut off on trivial and arbitrary excuses."
(5) " Pensions " :  it was alleged that " from the start of the war
the Government has stated that it is going to avoid piling up a large
debt and in many ways it has shown a desire to run the war on the
cheap.   .   .   .   Economy and the war needs of the soldiers will be
sure to come into conflict."   At the end of the document in bold
type was an exhortation to " Elect soldiers' committees."
    The evidence showed that on 25th June 1940, upon the police
searching Wishart's office and his home, they found about fourteen
copies of the document referred to in the information, and also
copies of another document entitled " This Imperialist War," and

H. C. OF A.
1941.

WISHART
*v.*
FRASER.

472 HIGH COURT [1941.

H. C. of A.
1941.

WISHART
v.
FRASER.

a considerable quantity of communist literature. Wishart, who was the joint author of the subject document, said he believed that he had burnt all the copies of the document, but he admitted that between the date of its composition in January 1940 and the end of February 1940 he used the document with intent to endeavour to cause disaffection amongst members of the Second Australian Imperial Forces. About the end of March 1940 the Revolutionary Workers' League, an organization consisting of a few persons and of which Wishart was the secretary, became affiliated with the Communist League, and Wishart became a member of the executive of that body. He said that the subject document was not used after the affiliation, because it had not received the approval of the executive, but he admitted that in the middle of 1940 it was still a principle of the doctrines of the Fourth International that communist *nuclei* should be formed in every military unit and he considered that this principle should be acted upon. He said that he regarded the army as an instrument of capitalistic oppression, that he considered that soldiers' committees should be organized which would take over control of the army in due course, and that he would have liked the general situation to have advanced to such a stage on 25th June 1940 that the right time for doing this would have arrived, although it had not in fact done so.

In the margin of the information appeared the following, which —except that the italicized " *W. M. Hughes* " appeared written in ink by hand—was typewritten :—" I consent to the institution of this prosecution in respect of the contravention herein alleged of regulation 41 (1) (*b*) of the *National Security (General) Regulations*, and I also consent to the prosecution summarily of the offence herein alleged.

<div align="right">

*W. M. Hughes*,
Attorney-General.
6-9-1940."

</div>

The magistrate, on 16th January 1941, convicted Wishart and sentenced him to imprisonment with hard labour for a term of six months.

Upon being so convicted Wishart lodged an appeal under sec. 122 of the *Justices Act* 1902 (N.S.W.) to the Court of Quarter Sessions against his conviction and sentence. On 6th February 1941 an application made by Wishart, within the time allowed by sec. 112 of the *Justices Act* 1902 (N.S.W.), to the High Court for a rule nisi for a statutory prohibition under that Act directed to the Right Honourable William Morris Hughes, Attorney-General for the

OF AUSTRALIA.

Commonwealth, the informant, Jack Lyall Fraser, and the magistrate, Frederick Donald Hercules Sutherland, was stood over by *Williams* J. until the appeal to the Court of Quarter Sessions had been disposed of. That appeal was heard before Judge *Stacy*, Chairman of Quarter Sessions, on 18th, 19th, 20th and 21st March 1941. The judge rejected part of the documentary evidence submitted by the informant which had been admitted by the magistrate. The judge, on 21st March, dismissed the appeal and confirmed the conviction and sentence of imprisonment with hard labour for a term of six months. On the ground that there was not any question of law which ought to be so submitted, he refused to exercise the discretionary power conferred upon him by sec. 5B of the *Criminal Appeal Act* 1912 (N.S.W.) to submit a question or questions of law to the Court of Criminal Appeal for determination.

Upon Wishart renewing, in the High Court, on 28th March, his application for a rule nisi for a writ of prohibition, *Williams* J. made an order returnable before the Full Court on 2nd April, and that application duly came on for hearing.

*Mitchell* K.C. (with him *Snelling*), for the respondents other than the magistrate, on a preliminary point. The applicant appealed under the *Justices Act* 1902 (N.S.W.) to the Court of Quarter Sessions against his conviction. That court heard the matter *de novo*, on evidence which was different from the evidence given before the magistrate, confirmed the conviction and ordered that the applicant be imprisoned for six months. The Chairman of Quarter Sessions is not a party to the proceedings before this court, nor is his order before this court. In the circumstances the magistrate's order, which is the only order before this court, is now defunct, and, therefore, there is nothing for this court to prohibit. The position which has arisen in this case was not dealt with in *R.* v. *Poole*; *Ex parte Henry* (1).

*Barry*, Assistant Crown Solicitor (N.S.W.), for the respondent magistrate.

*Farrer*, for the applicant. The procedure usually followed in cases where an appeal is made to the Court of Quarter Sessions, and an appeal on the law is made to the Supreme Court, is that the appeal to the Court of Quarter Sessions is held over pending the determination of the law by the Supreme Court, as in *Ex parte Giles* (2). That procedure was followed in this court until the decision in *R.* v. *Poole*; *Ex parte Henry* (1). If that decision be followed serious consequences

(1) (1938) 61 C.L.R. 1.                    (2) (1912) 29 W.N. (N.S.W.) 83.

**474**           HIGH COURT           [1941.

H. C. OF A.
1941.
⌣
WISHART
*v.*
FRASER.

might flow in cases where imprisonment is possible. An aggrieved person is entitled to pursue both remedies (*R.* v. *Skinner* (1) ). The Chairman of Quarter Sessions dismissed the appeal and confirmed the order of the magistrate ; therefore the applicant is being imprisoned under the order of the magistrate. In the circumstances, if the magistrate's order were set aside, there would not be any warrant for holding the applicant as a prisoner. If necessary, the further hearing of the matter should be adjourned with a view to the applicant making an application under sec. 73 (ii) of the Constitution and sec. 39 (2) (*c*) of the *Judiciary Act* 1903-1940 for special leave to appeal from the order of the Court of Quarter Sessions.

RICH A.C.J. This matter will be adjourned until Friday next, and that day will be fixed for the hearing of the application for special leave to appeal.

April 4.    Wishart applied by way of notice of motion to the High Court for special leave to appeal from the order of the Court of Quarter Sessions dismissing his appeal from his conviction and sentence.

*Farrer*, for the applicant. The *National Security Act* 1939-1940 is an invalid exercise of power by the Federal Parliament, inasmuch as by sec. 5 of that Act the power given to the Parliament to legislate for the peace, order and good government of the Commonwealth in respect of the naval and military defence of the Commonwealth and of the several States and the control of the forces to execute and maintain the laws of the Commonwealth has been arrogated to the Executive. It is not competent for the Federal Parliament to hand over to the Executive the whole of the power to make a law, whether by regulation or otherwise, with respect to the defence of the Commonwealth. Parliament is unable to divest itself completely in favour of a subordinate body, of law-making power in respect of any particular function with which it has been itself endowed (*In re Initiative and Referendum Act* (2) ). It is important to remember that it is not for this court to inquire into the nature of a regulation ; once a power has been handed over to the Executive, it can make such regulation as it thinks fit (*The Zamora* (3) ; *Farey* v. *Burvett* (4) ). This case is vastly different from the case of *Roche* v. *Kronheimer* (5). The generality of sec. 5 is not restricted by the particular provisions of that section (*Huddart Parker Ltd.* v. *The Commonwealth* (6) )—See also *Victorian Stevedoring and General Contracting Co. Pty. Ltd. and Meakes* v.

(1) (1870) 1 A.J.R. 151.
(2) (1919) A.C. 935, at p. 945.
(3) (1916) 2 A.C. 77, at p. 107.
(4) (1916) 21 C.L.R. 433.
(5) (1921) 29 C.L.R. 329.
(6) (1931) 44 C.L.R. 492.

*Dignan* (1). The point was not raised in *Pankhurst* v. *Kiernan* (2)    H. C. OF A.
or in *Ferrando* v. *Pearce* (3). The only reason that can be advanced      1941.
for regarding sec. 5 as a valid exercise of power is that, in spite       ~~~~~
of the decision in *Huddart Parker Ltd.* v. *The Commonwealth*            WISHART
(4), the words " and in particular " in fact indicate the subject          *v.*
matters upon which the Executive may make regulations. Reg. 41           FRASER.
does not fall within any one of those specified subject matters. The
Attorney-General's consent which is purported to have been given
in this case is not in proper form. In *Holland* v. *Jones* (5) there
was authority for the consent as given, but reg. 41 requires a type
of consent other than a written consent. The charges against the
applicant are not established by the evidence. It was not proved
that at the date of the charge the applicant had the intention of
subsequently making use of the document referred to or in any way
disaffecting the members of the Second Australian Imperial Forces
by means of that document. On the contrary, the evidence shows
that the applicant's possession of the document on the date charged
was an accidental happening. As compared with the numerical
strength of the Second Australian Imperial Forces the number of
copies of the document said to have been found in the possession of
the applicant is infinitesimal : See *R.* v. *McMahon* (6). Mere possession
of the document is not sufficient to prove the charge.

*Mitchell* K.C. (with him *Snelling*), for the respondents, was called
upon to deal with the facts. This court does not grant special
leave to appeal in criminal cases on mere matters of fact. The
Chairman of Quarter Sessions properly drew an inference of guilt
on the part of the applicant from the facts in evidence before him.
The facts that the applicant was the author or part author of the
document ; that, on his own admission, he had used it until March
1940 ; that, until it had just previously been so declared, he had
been an active member of an organization which recently had
been declared illegal ; that, on his own admission, his ideas as to
the social structure had not changed ; and that he had retained
possession of copies of the document and of other " revolu-
tionary " documents, were sufficient to justify the inference drawn
by the Chairman of Quarter Sessions. The applicant's state of
mind with reference to the document until March is strong prima-
facie evidence that that was a continuous state of mind which
existed until and on the date charged (See *Attorney-General* v.

(1) (1931) 46 C.L.R. 73.          (5) (1917) 23 C.L.R. 149.
(2) (1917) 24 C.L.R. 120.         (6) (1894) 15 L.R. (N.S.W.) (L.) 131 ;
(3) (1918) 25 C.L.R. 241.              10 W.N. (N.S.W.) 204.
(4) (1931) 44 C.L.R. 492.

476                                HIGH COURT                                [1941.

H. C. of A.    *Bradlaugh* (1) ) ; this, coupled with the fact that he retained copies of
1941.          the document concerned and other documents, is additional evidence.
WISHART        The Chairman of Quarter Sessions was entitled to disregard or
*v.*           disbelieve, in whole or in part, evidence given by and on behalf of
FRASER.        the applicant, and, also, to draw inferences adverse to the applicant
               from admissions made by him.

               *Farrer*, in reply.   The evidence established only that the applicant
               has a very definite and very confirmed political opinion ; it does not
               prove the charge brought against him.   There was not any evidence
               that on the date charged he had any intention to disaffect members
               of the Second Australian Imperial Forces by means of the docu-
               ment, or otherwise ; nor is there any evidence that the document
               was capable of being used in an endeavour to cause such disaffection.

                                                                *Cur. adv. vult.*

April 10.      The following written judgments were delivered :—
               RICH A.C.J.   In this matter the applicant was on 16th September
               1940 charged with an offence against reg. 41 of the *National Security
               (General) Regulations* 1939-1940 made pursuant to the provisions of
               the *National Security Act* 1939-1940.   The hearing of this charge,
               which lasted some days, was concluded on 16th January 1941, when
               he was convicted of the offence that he did on 25th June 1940 at
               Sydney with intent to endeavour to cause disaffection among certain
               persons, namely, members of the Second Australian Imperial Forces,
               engaged in the service of the King, have in his possession a certain
               document, which said document was of such a nature that the dis-
               semination of copies thereof among such persons would constitute
               an endeavour to cause disaffection among such persons, contrary
               to the Act in such case made and provided.   Against this conviction
               the applicant appealed to the Court of Quarter Sessions, which on
               21st March 1941 confirmed the conviction.   The applicant on 28th
               March 1941 applied to *Williams* J. and obtained an order nisi for
               prohibition to restrain the respondents from proceeding further in
               respect of the conviction.
               On the return of the order nisi before this court it was suggested
               that while the order of the Court of Quarter Sessions confirming the
               conviction stood it would bar any right to appeal direct from the
               magistrate's order and that the applicant should apply for special
               leave to appeal from the order of the Court of Quarter Sessions.
               That is admittedly a valid order made by the Court of Quarter

                              (1) (1885) 14 Q.B.D. 667.

Sessions exercising Federal jurisdiction. If this court were to deal with the conviction by the magistrate and quash it, the extraordinary result would follow of two orders in existence at the same time—the order of this court and that of Quarter Sessions. The situation in *R.* v. *Poole* ; *Ex parte Henry* (1) was different. There the court prevented a possible clash of orders by refusing to hear an appeal. As a matter of history I may state that the applicant in that case asked the judge of Quarter Sessions for leave to withdraw his appeal, the leave was granted, and the appeal was withdrawn. But, whether concurrent and cumulative remedies are permissible under the *Justices Act* 1902 (N.S.W.) or not, that Act cannot govern this court in hearing appeals from courts exercising Federal jurisdiction.

As to special leave the grounds alleged are four in number, viz., that (*a*) sec. 5 of the *National Security Act* 1939-1940 is invalid, (*b*) reg. 41 of the regulations made under the Act is *ultra vires* the Act, (*c*) the consent of the Attorney-General to prosecute was not proved, (*d*) there is no evidence of the charge laid. In support of the first ground it was contended that sec. 5 of the Act purported to delegate the whole power to make laws with respect to the naval and military defence of the Commonwealth and was therefore invalid. A similar contention has been raised in this court and has not been sustained. The decision in *Victorian Stevedoring and General Contracting Co. Pty. Ltd. and Meakes* v. *Dignan* (2) and the former decisions there referred to finally dispose of this contention, and it follows that sec. 5 is a valid exercise of the power. (*b*) If the Act is, as I hold it to be, valid, the second objection fails. (*c*) We are bound to take judicial notice of the Attorney-General's signature, which is written under the consent indorsed on the information. (*d*) The character of the document speaks for itself. But it was contended that the intention to disseminate disaffection among soldiers which appears on the face of the document had ceased to exist at the end of March and that 25th June 1940, the date laid in the information, is the material date and of the essence of the offence. Since the adjournment I have carefully reread the evidence before the Court of Quarter Sessions. It is proved that the applicant was a part author of the document and joined in duplicating copies of it. Copies were found both in his office and in his bedroom in another dwelling on 25th June, and on this date "a close associate and co-worker of his" had other copies. Copies had been distributed at any rate before the end of March. I have no doubt in holding that the authorship of the document, its possession and retention of possession up to 25th June 1940, its distribution, and the other

H. C. OF A.
1941.
WISHART
*v.*
FRASER.

Rich A.C.J.

(1) (1938) 61 C.L.R. 1.    (2) (1931) 46 C.L.R. 73.

478                              HIGH COURT                          [1941.

H. C. of A.   relevant and admissible evidence before the learned judge of Quarter
   1941.      Sessions fully justified him in inferring that the applicant's intention
             of himself using the document for the unlawful purpose or of allowing
  WISHART     others to use it existed at the end of March and continued up to
    v.
  FRASER.     25th June 1940.   I should add that the date laid in the information
             is not of the essence of the offence (*R.* v. *James* (1) ; *R.* v. *Dossi* (2) ).
Rich A.C.J.
                In my opinion an appeal from the order of the Court of Quarter
             Sessions would fail and special leave should be refused.   It follows
             from this refusal that the rule *nisi* should be discharged.

                STARKE J.   " It seems to me that it is burning daylight," to use
             an expression of *Halsbury* L.C., to state elaborate reasons for rejecting
             this appeal.
                The appellant was charged with an offence under reg. 41 of the
             *National Security (General) Regulations* 1939-1940 made pursuant to
             the *National Security Act* 1939-1940 in that he, on 25th June 1940,
             with intent to endeavour to cause disaffection among Australian
             soldiers, had in his possession a certain document.   A stipendiary
             magistrate, sitting as a Court of Petty Sessions in the exercise of
             Federal jurisdiction, convicted the appellant of the offence.   He
             appealed to the Court of Quarter Sessions, as he was entitled to
             do under the law : See *Judiciary Act* 1903-1940, sec. 39 (2).
             But that court affirmed the conviction.   Next he brought an
             appeal to this court by means of a rule *nisi* for statutory prohibition
             (*Grayndler* v. *Cunich* (3) ) against his conviction by the stipendiary
             magistrate.   If the Court of Quarter Sessions had reversed the decision
             of the stipendiary magistrate, its judgment would have held
             " the field to the exclusion " of the conviction by the stipen-
             diary magistrate.   And when Quarter Sessions affirmed the convic-
             tion, its judgment was equally conclusive, for it operated as a
             judicial determination by a competent and higher authority that
             the conviction was right.   An application was made to the
             Chairman of Quarter Sessions to state a case pursuant to the
             provisions of the *Criminal Appeal Act* 1912 (N.S.W.), sec. 5B, but he
             refused the application.   And no appeal has been brought to this
             court by way of case stated or otherwise against the judgment of
             Quarter Sessions.   That judgment therefore holds the field so long
             as it stands unreversed, and precludes this court making any judicial
             determination to the contrary.
                The appellant, however, when it was plain that his rule *nisi* must
             be discharged, moved for special leave to appeal from the judgment

          (1) (1923) 17 Cr. App. R. 116.          (2) (1918) 87 L.J. K.B. 1024.
                       (3) (1939) 62 C.L.R. 573, at p. 589.

**64 C.L.R.]**            OF AUSTRALIA.                        **479**

of Quarter Sessions (*Judiciary Act* 1903-1940, sec. 39) upon the
grounds :—

1. That the *National Security Act* 1939-1940 and the regulations
made thereunder were invalid because the Act delegated legislative
power to the Governor-General, contrary to the provisions of the
constitution.

But this argument has been considered and rejected in many
cases by this court : See *Victorian Stevedoring and General Contracting
Co. Pty. Ltd. and Meakes* v. *Dignan* (1) and the cases there collected.

2. That it was not proved that the prosecution of the appellant
was instituted with the consent of the Attorney-General (reg. 41 (2) ).

But a consent signed by the Attorney-General appears upon the
face of the information. Such an objection is hardly one for special
leave to appeal, but it is disposed of by the decision of this court in
*Holland* v. *Jones* (2).

3. That there was no evidence that the appellant committed the
offence charged against him, or at all events that the conviction was
against evidence and the weight of evidence.

Special leave to appeal should not be granted upon such a ground :
it involves no important question of law nor any matter of public
importance : it is an objection peculiar to the particular case. The
objection, however, was argued before the court at some length,
and the discussion made it abundantly clear that there was ample
evidence to support the conviction.

The rule nisi for statutory prohibition should be discharged and
special leave to appeal from the decision of Quarter Sessions should
be refused.

DIXON J. For the purpose of relieving Wishart of a summary
conviction and a sentence of imprisonment, two proceedings have
been brought before us. Under sec. 10 of the *National Security Act*
1939-1940 and reg. 41 (1) (*b*) of the *National Security (General)
Regulations* he was convicted before a police magistrate exercising
Federal jurisdiction upon a charge that he did with intent to endeav-
our to cause disaffection among certain persons, namely, members
of the Second Australian Imperial Forces, engaged in the service of
the King, have in his possession a document of such a nature that
the dissemination of copies among such persons would constitute
an endeavour to cause such disaffection. He was sentenced to
imprisonment for a term of six months.

Wishart appealed against the conviction to a Court of Quarter
Sessions. But that court confirmed the conviction. Wishart then

(1) (1931) 46 C.L.R. 73.            (2) (1917) 23 C.L.R. 149.

H. C. OF A.
1941.

WISHART
*v.*
FRASER.

Starke J.

**480**                              HIGH COURT                              [1941.

H. C. OF A.  
1941.  

WISHART  
v.  
FRASER.  

DIXON J.

took steps to invoke the appellate jurisdiction of this court. Under sec. 39 (2) (*b*) of the *Judiciary Act* 1903-1940 an appeal lies of right to this court from the decision of a court of a State exercising Federal jurisdiction, wherever an appeal lies, under State law, from its decision to the Supreme Court. An appeal by way of statutory prohibition lay from the magistrate to the Supreme Court, but no such appeal lay from the Court of Quarter Sessions. Wishart, in the first instance, ignored the confirmation by that court of his conviction and attempted to appeal from the conviction as of right. When it was objected that the order of the Court of Quarter Sessions confirming the conviction stood in the way of a direct appeal from the magistrate, he then applied under sec. 73 (ii) of the Constitution and sec. 39 (2) (*c*) of the *Judiciary Act* for special leave to appeal from the order of the Court of Quarter Sessions.

The two proceedings now before us for determination are the appeal from the magistrate and the application for special leave to appeal from the Court of Quarter Sessions. The first question to be decided is whether an appeal as of right from the decision of the magistrate exercising Federal jurisdiction can be maintained after it has been confirmed by the Court of Quarter Sessions, at all events while the confirmation stands.

The appeal to this court is given by sec. 73 (ii) of the Constitution and not by sec. 39 (2) (*b*) and (*c*) of the *Judiciary Act*, the operation of which is to distinguish between appeals as of right and appeals by special leave. It is a full appeal on law and fact of the same nature as other appeals to this court in its appellate jurisdiction. When sec. 39 (2) (*b*) refers to State law, it does so for the purpose only of saying from what decisions given by State courts exercising Federal jurisdiction an appeal shall lie as of right. It does not draw in the law of the State for the purpose of defining the nature or scope of the remedy or the jurisdiction of this court. In the same way, when sec. IV., rule 1, of the *Rules of Court* provides that appeals from inferior courts exercising Federal jurisdiction shall be brought in the same manner and within the same times and subject to the same conditions as are prescribed by the law of the State for bringing appeals to the Supreme Court in like matters, State law is invoked only for the purpose of supplying a procedure for appealing. It does not affect the nature of the appeal : See *Bell* v. *Stewart* (1) : *Victorian Stevedoring and General Contracting Co. Pty. Ltd. and Meakes* v. *Dignan* (2) ; *Dunlop Perdriau Rubber Co. Ltd.* v. *Federated Rubber Workers' Union of Australia* (3) ; *R.* v. *Hush* ; *Ex parte Devanny* (4) ; *R.* v.

---

(1) (1920) 28 C.L.R. 419, at p. 424.  
(2) (1931) 46 C.L.R., at pp. 85, 87, 107.  
(3) (1931) 46 C.L.R. 329, at p. 338.  
(4) (1932) 48 C.L.R. 487, at pp. 506, 507.

**64 C.L.R.]**                    OF AUSTRALIA.                    **481**

*Darling Island Stevedoring and Lighterage Co. Ltd.* ; *Ex parte Halliday*
*and Sullivan* (1) ; *Grayndler* v. *Cunich* (2). In the present instance
the law of the State relied upon as showing that a right of appeal
to the Supreme Court would exist and as providing the procedure
is secs. 112 et seq. of the *Justices Act* 1902 (N.S.W.). It is said
that in a matter within State jurisdiction the Supreme Court would
regard itself as bound to hear and determine an appeal by statutory
prohibition against a conviction by a magistrate notwithstanding
that in the meantime an unsuccessful appeal had been taken to a
Court of Quarter Sessions and an order confirming the conviction
had been made by that court. It is true that for a very long period
in the Supreme Court of New South Wales it has been the accepted
view that an appeal against a conviction to Quarter Sessions under
what is now sec. 122 of the *Justices Act* 1902 (N.S.W.) might be
pursued concurrently with the remedy by way of a statutory
prohibition directed to the magistrate. " The remedy by prohibition
is different and cumulative " is the short ground upon which an
objection to the coexistence of the two remedies was overruled in
*Ex parte Marx* (3) by *Stephen* C.J., *Hargrave* and *Faucett* JJ.: Cp.
*Ex parte Wedlock* (4) ; *Ex parte King* (5). Further, it has been decided
that by instituting an appeal to Quarter Sessions against his convic-
tion a defendant does not preclude himself from obtaining a statutory
prohibition from the Supreme Court while his appeal to Quarter
Sessions is pending (*Ex parte Giles* (6) ). The reasons given for
that conclusion depend upon the difference in the nature of the
remedies : the appeal to Quarter Sessions entitling the defendant to
a second investigation of the facts upon oral evidence and a recon-
sideration of the penalty, while statutory prohibition means only
an examination of the propriety of the decision of the magistrate.
Accordingly it is the practice of the Supreme Court to decide a rule
or order *nisi* for a statutory prohibition notwithstanding that an
appeal from the conviction is pending in a Court of Quarter Sessions
and for that court to hear an appeal notwithstanding that the
Supreme Court has discharged the rule *nisi* for statutory prohibition.
There does not appear to be any reported decision upon the question
whether the converse course may be followed and a statutory
prohibition obtained in spite of the fact that a Court of Quarter
Sessions has in the meantime reheard the charge and confirmed the
conviction. To hold that the *Justices Act* 1902 authorizes such a

H. C. OF A.
1941.

WISHART
*v.*
FRASER.

Dixon J.

(1) (1938) 60 C.L.R. 601, at pp. 618,
    619.
(2) (1939) 62 C.L.R., at pp. 583, 591,
    592.

(3) (1868) 7 S.C.R. (N.S.W.) 344.
(4) (1899) 20 L.R. (N.S.W.) (L.) 353,
    at p. 356.
(5) (1913) 30 W.N. (N.S.W.) 70.
(6) (1912) 29 W.N. (N.S.W.) 83.

HIGH COURT                                [1941.

H. C. of A.
1941.

WISHART
v.
FRASER.

Dixon J.

course appears to be an extension of the reported decisions of the Supreme Court. But assuming that such an extension would or should be made for the purposes of State jurisdiction, the consequence by no means follows that in matters of Federal jurisdiction an appeal may be maintained directly to this court from a magistrate notwithstanding that his decision has been confirmed in Quarter Sessions.

The jurisdiction of Quarter Sessions to hear appeals in matters of Federal jurisdiction arises from the operation which the decision of this court in *Ah Yick* v. *Lehmert* (1) gave to sec. 39 (2) of the *Judiciary Act* 1903-1940, and it is coextensive with its State jurisdiction. But, as I have already pointed out, the law of the State is not so incorporated in Federal law as either to limit or enlarge the appellate power of this court. It has no other operation than to distinguish in appeals from inferior jurisdictions between those as of right and those by special leave, and to supply a procedure.

The very consideration which led to the decision of the Supreme Court in *Ex parte Giles* (2) is lacking in the case of appeals to this court. For, although such appeals are reheard on the same evidence, they are in the nature of appeals by way of rehearing, and are very different from the limited remedy given by statutory prohibition. But in any case the present question is independent of the distinction between appeals as of right and appeals by leave. It is a question whether this court can ignore a decision of a competent court of Federal jurisdiction confirming an order or conviction of a court below it and, although the order of confirmation is left standing and is not brought before us by way of appeal or otherwise, nevertheless proceed to hear an appeal from the order so confirmed.

To that question there can, I think, be only one answer. It is not denied that the order of the Court of Quarter Sessions was within its jurisdiction and was validly made. While it stands it is a judicial declaration by a competent court exercising Federal jurisdiction establishing the order of the magistrate and preventing its being called in question. If this court made an order setting aside the conviction, there would be two inconsistent judicial orders in operation at the same time, that of the Court of Quarter Sessions confirming the conviction and that of this court discharging it. It would, of course, be open to the legislature to authorize a superior court to deal with an order of an inferior court notwithstanding that an intermediate court had confirmed it and the order of confirmation was not brought up for review. But even if the *Justices Act* 1902 (N.S.W.) has any such effect in State jurisdiction,

(1) (1905) 2 C.L.R. 593.                    (2) (1912) 29 W.N. (N.S.W.) 83.

64 C.L.R.]                OF AUSTRALIA.                                      483

at all events so much of it as so operates has no application to appeals
to this court from courts exercising Federal jurisdiction.

In *R.* v. *Poole* ; *Ex parte Henry* (1) an attempt was made to
induce this court to hear an appeal from a conviction by a magis-
trate exercising Federal jurisdiction while an appeal to Quarter
Sessions from the same conviction was pending.  The court refused
to proceed with the hearing of the appeal until the party had aban-
doned his appeal to Quarter Sessions or that appeal had otherwise
been disposed of.  The correctness of the view that the two appeals
were not mutually exclusive alternatives and that a party was not
put to his election between them, but might institute both remedies
concurrently, was tacitly assumed for the purposes of the court's
decision : Cp. *O'Sullivan* v. *Morton* (2).  No opinion was expressed
upon the question whether, if this court did make an order affirming
the conviction or any other positive order in reference to the convic-
tion, it would remain possible for the Court of Quarter Sessions to
interfere with the conviction.  That question had not arisen, but in
order to ensure that it would not arise and in order to maintain the
position of this court as a court of final appeal, we refused to hear
the appeal until the proceedings in Quarter Sessions were completely
disposed of.  An undertaking had been offered by the appellant to
abandon these proceedings, but the court was not content with an
undertaking and insisted that they should be brought to a formal
end.  Having regard to the appellant's offer to abandon his appeal
to Quarter Sessions, there was no likelihood in *Henry's Case* (1) that
the question presented by the appeal now before us would there
arise, namely, the question what should be done by this court
when Quarter Sessions had already confirmed the conviction under
appeal to this court.

In my opinion the answer to that question is that we cannot
ignore the order of the Court of Quarter Sessions confirming the
conviction and that, unless we are satisfied that it was made without
jurisdiction and is totally void, we must regard it as conclusive while
it stands.  The proper course for a defendant to take in such circum-
stances is to apply under sec. 39 (2) (*c*) of the *Judiciary Act* for
special leave to appeal from the decision of the Court of Quarter
Sessions exercising Federal jurisdiction.

That course Wishart has now taken, and it remains to deal with
the substantive grounds of his application for special leave to appeal.

The first ground upon which his counsel relied is that sec. 5 of the
*National Security Act* 1939 (No. 15 of 1939) is invalid.  The regula-
tion under which Wishart was convicted rests for its validity upon

H. C. OF A.
1941.

WISHART
*v.*
FRASER.

Dixon J.

(1) (1938) 61 C.L.R. 1.          (2) (1911) V.L.R. 235. ╰32 A L-C ╰73

H. C. OF A.
1941.

WISHART
v.
FRASER.

Dixon J.

the general words found at the beginning of that section and perhaps, alternatively, those at the end.

The material parts of the provision purport to confer power upon the Governor-General in Council to make regulations for securing the public safety and the defence of the Commonwealth and the Territories of the Commonwealth and for prescribing all matters which are necessary or convenient to be prescribed for the more effectual prosecution of the present war. It is said that such a provision is not a real exercise by the legislature of the power to make laws with respect to the naval and military defence of the Commonwealth and of the several States, but an invalid attempt to delegate that power or some part of it to the Executive.

Two distinct grounds of objection are involved in the argument, viz., (*a*) the objection that the legislature cannot " delegate " any of its powers at all, and (*b*) the objection that because of the separation of powers between the legislative, executive and judicial organs of government, none of the three can be made a repository of any power which properly belongs to either of the others.

In *Victorian Stevedoring and General Contracting Co. Pty. Ltd. and Meakes* v. *Dignan* (1) I have expressed my views upon the nature of each of these objections and the place they have under the Australian Constitution, and I shall not repeat what I then said. It is enough for me to say (i) that upon principle I have never understood how the theory, which is applied in the United States, that the legislature could not " delegate " at all any authority considered to be legislative could have any place in our Constitution (See *Victorian Stevedoring and General Contracting Co. Pty. Ltd. and Meakes* v. *Dignan* (2) ), and (ii) that it has been uniformly decided in this court that the distribution of powers in the Commonwealth Constitution does not prevent the legislature from confiding to the Executive such a power as that expressed in the words I have set out (See *Victorian Stevedoring and General Contracting Co. Pty. Ltd. and Meakes* v. *Dignan* (3) ).

It was suggested that in this particular instance of sec. 5 there was such a width or uncertainty of the subject matter handed over to the Executive that the enactment could not be said to be a law with respect to the naval and military defence of the Commonwealth or with respect to any other head of legislative power.

This suggestion cannot be sustained. The defence of a country is peculiarly the concern of the Executive, and in war the exigencies are so many, so varied and so urgent that width and generality are

(1) (1931) 46 C.L.R., at pp. 89-102.      (2) (1931) 46 C.L.R., at pp. 94-96.
(3) (1931) 46 C.L.R., at p. 101.

64 C.L.R.]    OF AUSTRALIA.    485

a characteristic of the powers which it must exercise. Sec. 5 is clearly directed to the prosecution of the war and is a valid exercise of the defence power. The whole question is, in my opinion, concluded by the decision of this court in *Victorian Stevedoring and General Contracting Co. Pty. Ltd. and Meakes* v. *Dignan* (1) and by the prior decisions of the court upon which that decision was founded.

It is, I think, undeniable that, once the validity of sec. 5 is established, it authorizes the regulation under which Wishart was convicted, viz., reg. 41.

The second ground upon which his counsel relied in support of the application for special leave is that it was not proved that the consent of the Attorney-General had been obtained for the prosecution as required by sub-reg. 2 of reg. 41. In the margin of the actual information is a typewritten consent purporting to bear the Attorney-General's signature. It is said that, as the sub-regulation is not expressed to require a consent in writing by the Attorney-General, the evidentiary provision contained in sec. 9 of the *National Security Act*, which relates to documents issued in pursuance of the regulations, cannot apply and therefore will not authorize the reception of the consent in evidence without proof. As the purpose of the sub-regulation is really to ensure that the written consent required by sec. 10 (4) shall be given for the purpose of reg. 41 by no other person but the Attorney-General, the foundation of this contention is more than doubtful. But in any case the court must take judicial notice of the Attorney-General's signature, and his consent therefore is made to appear (*Holland* v. *Jones* (2) ).

Finally, it was contended that the evidence before the learned Chairman of Quarter Sessions did not warrant his conclusion that Wishart entertained the intention required by reg. 41 (1) (*b*) at the material date.

In the information 25th June 1940 was the date laid as that upon which he had in his possession with intent to cause disaffection a document the dissemination of which would, to state it briefly, cause disaffection among the troops. The finding that the document was of the required description clearly was justified. It is hardly open to doubt that it was composed with intent to endeavour to cause disaffection among soldiers, to whom it was addressed. Fifteen copies were found in Wishart's possession on 25th June 1940. He admits that he took part in composing the document. But that was in January, and in March circumstances arose which, he said, made it a document which he no longer desired to use. Accordingly

(1) (1931) 46 C.L.R. 73.    (2) (1917) 23 C.L.R. 149.

H. C. OF A.
1941.

WISHART
*v.*
FRASER.

Dixon J.

**486**                          HIGH COURT                          [1941.

he says that in June the document was dead and the copies found were not in his possession for use. He says that they were retained by accident. It is no doubt true that to amount to the offence charged possession of the document must be accompanied by an intention to use it to cause disaffection. But I think it is a certain inference that he had possession of the copies in March and that possession was then accompanied by the required intention. Time is in no way of the essence of the offence, and March is within twelve months of the information : See sec. 21 (1) (*b*), *Crimes Act* 1914-1937. The proof of the coexistence in March of all the elements of the offence is therefore sufficient to justify the conviction under the information, the variance between the date proved and that alleged being treated as immaterial.

But in any case I am of opinion that the inference was fairly open to the Chairman of Quarter Sessions that Wishart had never completely given up his intention of using the documents he retained if the opportunity or occasion arose or offered. That inference I think is well founded in probability.

I am therefore of opinion that an appeal from the decision of the Court of Quarter Sessions should not succeed and that special leave should be refused.

McTIERNAN J. The applicant was convicted by a stipendiary magistrate exercising Federal jurisdiction as a Court of Petty Sessions in New South Wales of an offence against reg. 41 (1) (*b*) of the *National Security (General) Regulations.* The offence with which he was charged and convicted was that he did, with intent to endeavour to cause disaffection among members of the Second Australian Imperial Forces in the service of the King, have in his possession a document of such a nature that the dissemination of copies of it would constitute an endeavour to cause disaffection among them.

By the combined operation of sec. 39 (2) (*b*) of the *Judiciary Act* 1903-1940 and sec. 112 of the *Justices Act* 1902 of New South Wales as amended the applicant was entitled to appeal against the order by means of an application to this court for an order *nisi* for statutory prohibition. The proceedings in this court were begun in that fashion.

The applicant also had a right to appeal to a Court of Quarter Sessions in New South Wales by reason of the combined effect of sec. 39 (2) and sec. 122 of the *Justices Act* as amended. The applicant exercised this right of appeal. The conviction was, therefore, the subject of two simultaneous appeals.

64 C.L.R.]                    OF AUSTRALIA.                           487

When the hearing of the appeal to this court was begun, we were

H. C. OF A.
1941.
WISHART
v.
FRASER.

McTiernan J.

informed that the Court of Quarter Sessions had heard and deter-
mined the appeal made to that court and had confirmed the convic-
tion: See sec. 125 of the *Justices Act.* The appeal to Quarter
Sessions is a rehearing of the case, and fresh evidence may be adduced.
" It is evident that the Court of Quarter Sessions is seised of the
whole question of the guilt or innocence of the accused, and is bound
to pronounce upon all the issues of fact or questions of law which
are necessary for the determination of the question whether the
accused ought or ought not to be convicted upon the information "
(*R.* v. *Poole* ; *Ex parte Henry* (1) ).

It follows that, even if the appeal by way of the application
for statutory prohibition against the magistrate's order were
to succeed, the order of the Court of Quarter Sessions would
stand. This court, therefore, decided not to proceed further with
the hearing of the appeal against the magistrate's order but to
adjourn that appeal to give the applicant the opportunity, if he
were so advised, to apply for special leave to appeal against the
order of the Court of Quarter Sessions : See sec. 39 (2) (c) of the
*Judiciary Act* 1903-1940. The application for special leave is now
before us.

The conviction is challenged on the ground that the *National
Security Act* 1939-1940 is *ultra vires* the Commonwealth Parliament
because sec. 5 is an illegal delegation to the Executive of legislative
power. The two familiar grounds upon which a law vesting the
Executive with power to make regulations has been attacked are,
first, that such a law infringes the doctrine of the separation of
powers and, secondly, that the nature and extent of the vesting
are such that the law is not a good exercise of the power of the
Parliament to make laws with respect to any subject entrusted to it
by the Constitution. The decisions of this court make the first
ground an untenable one. Their effect is summed up by *Dixon* J. in
*Victorian Stevedoring and General Contracting Co. Pty. Ltd. and Meakes*
v. *Dignan* (2) in these words :—" But I think the judgment " (in
*Roche* v. *Kronheimer* (3) ) " really meant that the time had passed
for assigning to the constitutional distribution of powers among the
separate organs of government, an operation which confined the
legislative power to the Parliament so as to restrain it from reposing
in the Executive an authority of an essentially legislative character.
I, therefore, retain the opinion which I expressed in the earlier case "

(1) (1938) 61 C.L.R., at p. 6.              (2) (1931) 46 C.L.R., at pp. 100, 101.
                    (3) (1921) 29 C.L.R. 329.

488                                    HIGH COURT                                    [1941.

H. C. OF A.
1941.

WISHART
*v.*
FRASER.

McTiernan J.

(*Huddart Parker Ltd.* v. *Commonwealth* (1)) "that *Roche* v. *Kron-
heimer* (2) did decide that a statute conferring upon the Executive
a power to legislate upon some matter contained within one of the
subjects of the legislative power of the Parliament is a law with
respect to that subject, and that the distribution of legislative,
executive and judicial powers in the Constitution does not operate
to restrain the power of the Parliament to make such a law." How-
ever, the second ground does not necessarily fall with the first.
The uncertainty or width of the subject matter with respect to
which the Executive is given power to make regulations may prevent
the law attempting to confer such power being a law with respect
to any subject within the legislative powers of Parliament (*Victorian
Stevedoring and General Contracting Co. Pty. Ltd. and Meakes* v.
*Dignan* (3)). Sec. 5 cannot fail for vagueness, for it clearly defines
the field within which Parliament has empowered the Executive to
make regulations. The section gives very wide powers to the
Executive within that field. But it is obviously a valid exercise of
the legislative power of the Commonwealth with respect to defence
to vest the Executive, which has the duty of executing the defence
power, with authority to make regulations within the field marked
out by the section.

Another ground of appeal is that reg. 41 (1) (*b*) is *ultra vires*
sec. 5. The section enumerates matters with respect to which it
confers power on the Executive to make regulations and concludes
with a general grant of power. The contention which is made for
the applicant is that the generality of the grant is limited by the
enumeration of particular matters preceding it. In my opinion,
the language of the section leaves no doubt that its intention is that
the general grant should not be controlled in that way. It follows
that the regulation is *intra vires* sec. 5.

Reg. 41 (2) provides that "a prosecution in respect of a contra-
vention of this regulation shall not be instituted except with
the consent of the Attorney-General." There is an indorsement
on the information purporting to be a consent signed by the
Attorney-General. But it is contended that, while the signature
proves itself (sec. 9 of the Act), the indorsement does not prove
itself. The *National Security Act*, by sec. 10 (4), provides that
where consent is required written consent will suffice. This section
makes it unnecessary for the Attorney-General to be called to
give oral evidence of his consent. The indorsement signed by him

(1) (1931) 44 C.L.R. 492.            (2) (1921) 29 C.L.R. 329.
(3) (1931) 46 C.L.R., at p. 101.

64 C.L.R.]                 OF AUSTRALIA.                          489

and purporting to be his written consent is, therefore, admissible
evidence that he consented to the prosecution.

The remaining question arises on the evidence. It is whether
there was evidence which justified the finding that the applicant
entertained contemporaneously with the possession of the document
found on him the intent charged against him. After reading the
evidence I find it impossible to agree with the applicant's conten-
tion that the evidence is insufficient to justify this finding.

There is, therefore, no ground upon which the application for
special leave to appeal should succeed. The result is that the order
of the Court of Quarter Sessions confirming the conviction must
stand.

The application to make the order *nisi* absolute is, however,
still before us, although in the argument the application for special
leave was treated as the substantial matter. There is no decision
of the Supreme Court of New South Wales on the question what it
would do if an application to make absolute an order *nisi* for pro-
hibition came before it after the conviction against which prohibition
was sought had been confirmed by a Court of Quarter Sessions on
appeal to it by the applicant. In the High Court the application
to make the order *nisi* absolute is an appeal against the applicant's
conviction of the offence charged against him. It puts in controversy
the issue whether or not the applicant was guilty of the offence.
The Court of Quarter Sessions was, upon the applicant's appeal to
it, seised of that question, and its order is an adjudication that the
applicant was guilty. The issues raised by the application to make
the order *nisi* absolute are the same as those concluded by the order
of the Court of Quarter Sessions. The result which should follow
from the refusal to give special leave to appeal against that order is
that the concurrent appeal should be dismissed by discharging the
order *nisi*.

WILLIAMS J. I agree that the application for special leave to
appeal against the order of the learned judge of Quarter Sessions
should be refused. With respect to the first three grounds argued
in support of the application and which are referred to in the judgment
of the Acting Chief Justice, I agree with his judgment and that of
my brother *Dixon*.

I only desire to deal shortly with the fourth ground, namely,
that there is no evidence of the charge laid. The appellant admitted
that he had copies of the document referred to in the information
in his possession in February 1940 with intent to endeavour to cause
disaffection amongst soldiers of the Second Australian Imperial

H. C. OF A.
1941.

WISHART
*v.*
FRASER.

McTiernan J.

490                          HIGH COURT                          [1941.

H. C. OF A.    Forces, and there is sufficient evidence to show that this intention
   1941.       continued to exist on 25th June.  When the police searched
 WISHART       the appellant's office and home on that date, they found about
   v.          fourteen copies of this document together with copies of another
 FRASER.       document entitled "This Imperialist War" and a mass of com-
Williams J.    munist literature.  The appellant said he believed that he had burnt
               all the copies of this document, but the learned judge was quite
               entitled to disbelieve him.  The evidence showed the appellant was
               a joint author of the document, the terms of which plainly showed
               that it was intended for use in order to endeavour to cause such
               disaffection.  He admits that he used it between the date of its
               composition in January and the end of February for this purpose.
                  About the end of March the Revolutionary Workers' League, a
               society consisting of a few persons and of which the appellant was
               the secretary, became affiliated with the Communist League, and
               the appellant became a member of the executive of that body.  He
               said that the document was not used after the affiliation because it
               had not received the approval of this executive, but he admitted
               that in the middle of 1940 it was still a principle of the doctrines
               of the Fourth International that communist *nuclei* should be formed
               in every military unit and he considered that this principle should
               be acted upon.  He said that he looked upon the army as an instru-
               ment of capitalist oppression, that he considered that soldiers'
               committees should be organized which would take over control of
               the army in due course, and that he would have liked the general
               situation to have advanced to such a stage on 25th June that the
               right time for doing this would have arrived, although it had not
               in fact done so.
                  All this is evidence to show that the clear intention he had at the
               end of February to endeavour to disaffect the troops still persisted
               on 25th June, although, on that date, the fear of punishment was
               causing him to bide his time until the situation became more pro-
               pitious for the resumption of that persistent and systematic pro-
               paganda which Lenin had advised his disciples must be carried on
               to final victory.
                  The learned judge was therefore entitled to confirm the conviction
               of the appellant, and the fourth ground also fails.
                  With respect to the application to make the rule *nisi* for prohibition
               absolute the position is shortly as follows.  The appellant was
               convicted by the stipendiary magistrate on 16th January 1941.
               On 6th February he applied to me for a rule *nisi* for a statutory
               prohibition under the *Justices Act* 1902 (N.S.W.).  The applica-
               tion was made within the time allowed by sec. 112 of that Act.

64 C.L.R.]                    OF  AUSTRALIA.                           491

In the meantime the appellant had appealed to the Court of
Quarter Sessions in accordance with sec. 122 of the Act, so that,
in view of the decision of this court in *R.* v. *Poole* ; *Ex parte
Henry* (1), I stood the application over until the appeal had been
disposed of.  The appellant did not withdraw the appeal but elected
to prosecute it.  As a result the order of the magistrate was con-
firmed on 21st March by the learned judge of Quarter Sessions.
On the appellant renewing his previous application for the rule *nisi*
on 28th March I made an order returnable before the Full Court
on 2nd April.  As a result of the conviction having been confirmed,
the order which is now effective is that of the Court of Quarter
Sessions (See sec. 125), and I agree that there is no longer any order
of the magistrate in respect of which a prohibition can be granted.

The application to make the rule *nisi* absolute should therefore
be refused.

> *Special leave to appeal from order of Court of
> Quarter Sessions refused.  Rule nisi for writ
> of prohibition in respect of order of magis-
> trate discharged.*

Solicitors for the applicant. *Glasheen & Co.*

Solicitor for the respondent magistrate. *A. H. O'Connor*, Crown
Solicitor for New South Wales.

Solicitor for the other respondents. *H. F. E. Whitlam*, Crown
Solicitor for the Commonwealth.

J. B.

(1)  (1938) 61 C.L.R. 1.

# TAB 96

VIRGIN ISLANDS

NO. 16 0F 2004

THE BVI BUSINESS COMPANIES ACT, 2004

Based on the BVI Business Companies Act 2004 (No. 16 of 2004) and amendments made by the BVI Business Companies (Amendment) Act 2005 ("26/2005").

**Important**

This is an <u>unofficial</u> consolidation of the BVI Business Companies Act and the amendments made by the BVI Business Companies (Amendment) Act 2005.  While every effort has been made to ensure correctness, no responsibility is assumed for any errors which may appear.

Forbes Hare
Clarence Thomas Building
P.O. Box 4649
Road Town, Tortola
British Virgin Islands

(ii)    convert registered shares to bearer shares, or

(iii)    exchange registered shares for bearer shares.

26/2005    (3)    REPEALEAD.

26/2005    (4)    The Regulations may require the memorandum of a company to contain a statement, in the form specified in the Regulations, as to any limitations on the business that the company may carry on.

Additional matters to be stated in memorandum of restricted purposes company.    10.    (1)    The memorandum of a company limited by shares may state that the company is a restricted purposes company.

(2)    The memorandum of a restricted purposes company shall state the purposes of the company.

26/2005    (3)    Nothing in this section prevents the memorandum or articles of a company that is not a restricted purposes company from limiting the purposes, capacity, rights, powers or privileges of the company.

Effect of memorandum and articles.    11.    (1)    The memorandum and articles of a company are binding as between

(a)    the company and each member of the company; and

(b)    each member of the company.

(2)    The company, the board, each director and each member of a company has the rights, powers, duties and obligations set out in this Act except to the extent that they are negated or modified, as permitted by this Act, by the memorandum or the articles.

(3)    The memorandum and articles of a company have no effect to the extent that they contravene or are inconsistent with this Act.

Amendment of memorandum and articles.    12.    (1)    Subject to subsection (2) and section 14, the members of a company may, by resolution, amend the memorandum or articles of the company.

(2)    Subject to subsection (3), the memorandum of a company may include one or more of the following provisions:

(a)    that specified provisions of the memorandum or articles may not be amended;

(b)    that a resolution passed by a specified majority of members, greater

Personal liability.

30.    Subject to section 108, no director, agent or voluntary liquidator of a company is liable for any debt, obligation or default of the company, unless specifically provided in this Act or in any other enactment, and except in so far as he may be liable for his own conduct or acts.

Dealings between company and other persons.

31.    (1)    A company or a guarantor of an obligation of a company may not assert against a person dealing with the company or with a person who has acquired assets, rights or interests from the company that

    (a)    this Act or the memorandum or articles of the company has not been complied with,

    (b)    a person named as a director in the company's register of directors

        (i)    is not a director of the company,

        (ii)    has not been duly appointed as a director of the company, or

        (iii)    does not have authority to exercise a power which a director of a company carrying on business of the kind carried on by the company customarily has authority to exercise,

    (c)    a person held out by the company as a director, employee or agent of the company

        (i)    has not been duly appointed, or

        (ii)    does not have authority to exercise a power which a director, employee or agent of a company carrying on business of the kind carried on by the company customarily has authority to exercise,

    (d)    a person held out by the company as a director, employee or agent of the company with authority to exercise a power which a director, employee or agent of a company carrying on business of the kind carried on by the company does not customarily have authority to exercise, does not have authority to exercise that power, or

    (e)    a document issued on behalf of a company by a director, employee or agent of the company with actual or usual authority to issue the document is not valid or not genuine,

unless the person has, or ought to have, by virtue of his relationship to the company, knowledge of the matters referred to in any of paragraphs (a) to (e).

(2)    Subsection (1) applies even though a person of the kind specified in paragraphs (b) to (e) of that subsection acts fraudulently or forges a document that appears to have been signed on behalf of the company, unless the person dealing with the company or with a person who has acquired assets, rights or interests from the company has actual knowledge of the fraud or forgery.

Constructive notice.

32.    (1)    A person is not deemed to have notice or knowledge of any document relating to a company, including the memorandum and articles, or of the provisions or contents of any such document, by reason only of the fact that a document

(a)    is available to the public from the Registrar; or

26/2005

(b)    is available for inspection at the registered office of the company or at the office of its registered agent.

(2)    Subsection (1) does not apply

26/2005

(a)    in relation to a document filed under Part VIII; or

(b)    to a document relating to a restricted purposes company.


## PART III

## SHARES

### Division 1 - General

Legal nature of shares.

33.    A share in a company is personal property.

Rights attaching to shares and classes of shares.

34.    (1)    Subject to subsection (2), a share in a company confers on the holder

(a)    the right to one vote at a meeting of the members of the company or on any resolution of the members of the company;

(b)    the right to an equal share in any dividend paid in accordance with this Act; and

(c)    the right to an equal share in the distribution of the surplus assets of the company.

(2)    Where expressly authorised by its memorandum in accordance with section 9(1)(e), a company

(a)    may issue more than one class of shares; and

(b)    may issue shares subject to terms that negate, modify or add to the rights specified in subsection (1).

(a)    the names and addresses of the persons who hold registered shares in the company;

(b)    the number of each class and series of registered shares held by each shareholder;

(c)    in the case of a shareholder who holds bearer shares, the total number of each class and series of bearer shares held;

(d)    with respect to each bearer share certificate issued by the company,

      (i)    the identifying number of the certificate,

      (ii)    the number of each class or series of bearer shares specified in the certificate,

      (iii)    the date of issue of the certificate, and

      (iv)    the name and address of the custodian of the certificate;

(e)    the names and addresses of the persons who are guarantee members of the company;

(f)    the names and addresses of the persons who are unlimited members;

(g)    the date on which the name of each member was entered in the register of members; and

(h)    the date on which any person ceased to be a member.

26/2005

(2)    The register of members may be in such form as the directors may approve but if it is in magnetic, electronic or other data storage form, the company must be able to produce legible evidence of its contents.

26/2005

(3)    REPEALED.

(4)    The Regulations may provide for the circumstances in which information relating to persons who are no longer members of a company, and to bearer shares that have been cancelled, may be deleted from the register of members.

(5)    A company that contravenes subsection (1) commits an offence and is liable on summary conviction to a fine of $1,000.

Register of members as evidence of legal title.

42.    (1)    The entry of the name of a person in the register of members as a holder of a share in a company is *prima facie* evidence that legal title in the share vests in that person.

(2)    A company may treat the holder of a registered share as the only person entitled to

(a)    exercise any voting rights attaching to the share;

(b)    receive notices;

(c)    receive a distribution in respect of the share; and

(d)    exercise other rights and powers attaching to the share.

Rectification of register of members.

43.    (1)    If

(a)    information that is required to be entered in the register of members under section 41 is omitted from the register or inaccurately entered in the register,  or

(b)    there is unreasonable delay in entering the information in the register,

26/2005

a member of the company, or any person who is aggrieved by the omission, inaccuracy or delay, may apply to the Court for an order that the register be rectified, and the Court may either refuse the application, with or without costs to be paid by the applicant, or order the rectification of the register, and may direct the company to pay all costs of the application and any damages the applicant may have sustained.

(2)    The Court may, in any proceedings under subsection (1), determine any question relating to the right of a person who is a party to the proceedings to have his name entered in or omitted from the register of members, whether the question arises between

(a)    two or more members or alleged members, or

(b)    between members or alleged members and the company,

and generally the Court may, in the proceedings, determine any question that may be necessary or expedient to be determined for the rectification of the register of members.

Share certificates.

44.    (1)    A company shall state in its articles the circumstances in which share certificates shall be issued.

(2)    If a company issues share certificates, the certificates

26/2005

(a)    shall be signed by at least one director of the company or by such person who may be authorised by the memorandum or articles to sign share certificates; or

34

(9)    If the directors of a company are satisfied that an instrument of transfer has been signed but that the instrument has been lost or destroyed, they may resolve.

(a)    to accept such evidence of the transfer of the shares as they consider appropriate; and

(b)    that the transferee's name should be entered in the register of members, notwithstanding the absence of the instrument of transfer.

Transfer of bearer share.

55.    Subject to Division 5, a bearer share is transferred by delivery of a certificate relating to the share.


## Division 4 - Distributions

Meaning of solvency test and distribution.

56.    For the purposes of this Division,

(a)    a company satisfies the solvency test if

(i)    the value of the company's assets exceeds its liabilities, and

(ii)    the company is able to pay its debts as they fall due; and

(b)    "distribution", in relation to a distribution by a company to a member, means

26/2005

(i)    the direct or indirect transfer of an asset, other than the company's own shares, to or for the benefit of the member, or

(ii)    the incurring of a debt to or for the benefit of a member,

in relation to shares held by a shareholder, or the entitlements to distributions of a member who is not a shareholder, and whether by means of the purchase of an asset, the purchase, redemption or other acquisition of shares, a transfer of indebtedness or otherwise, and includes a dividend.

Distributions.

57.    (1)    Subject to this Part and to the memorandum and articles of the company, the directors of a company may, by resolution, authorise a distribution by the company

26/2005

to members at such time and of such an amount, as it thinks[1] fit if they are satisfied, on reasonable grounds, that the company will, immediately after the distribution, satisfy the solvency test.

---

[1]    The words "it thinks" should read "they think".

(2)    A resolution of directors passed under subsection (1) shall contain a statement that, in the opinion of the directors, the company will, immediately after the distribution, satisfy the solvency test.

(3)    If, after a distribution is authorised and before it is made, the directors cease to be satisfied on reasonable grounds that the company will, immediately after the distribution is made, satisfy the solvency test, any distribution made by the company is deemed not to have been authorised.

Recovery of distribution made when company did not satisfy solvency test.

58.    (1)    A distribution made to a member at a time when the company did not, immediately after the distribution, satisfy the solvency test may be recovered by the company from the member unless

(a)    the member received the distribution in good faith and without knowledge of the company's failure to satisfy the solvency test;

(b)    the member has altered his position in reliance on the validity of the distribution; and

(c)    it would be unfair to require repayment in full or at all.

(2)    If, by virtue of section 57(3), a distribution is deemed not to have been authorised, a director who

(a)    ceased, after authorisation but before the making of the distribution, to be satisfied on reasonable grounds for believing that the company would. satisfy the solvency test immediately after the distribution is made; and

(b)    failed to take reasonable steps to prevent the distribution being made;

is personally liable to the company to repay to the company so much of the distribution as is not able to be recovered from members.

(3)    If, in an action brought against a director or member under this section, the Court is satisfied that the company could, by making a distribution of a lesser amount, have satisfied the solvency test, the Court may

(a)    permit the member to retain; or

(b)    relieve the director from liability in respect of;

an amount equal to the value of any distribution that could properly have been made.

Company may purchase, redeem or otherwise acquire its own shares.
26/2005

59.    (1)    Subject to section 57, a company may purchase, redeem or otherwise acquire its own shares in accordance with either

(a)    sections 60, 61 and 62; or

(b)    such other provisions for the purchase, redemption or acquisition of its own shares as may be specified in its memorandum or articles.

26/2005

(2)    Sections 60, 61 and 62 do not apply to a company to the extent that they are negated, modified or inconsistent with provisions for the purchase, redemption or acquisition of its own shares specified in the company's memorandum or articles.

(3)    Where a company may purchase, redeem or otherwise acquire its own shares otherwise than in accordance with sections 60, 61 and 62, it may not purchase, redeem or otherwise acquire the shares without the consent of the member whose shares are to be purchased, redeemed or otherwise acquired, unless the company is permitted by the memorandum or articles to purchase, redeem or otherwise acquire the shares without that consent.

(4)    Unless the shares are held as treasury shares in accordance with section 64, any shares acquired by a company are deemed to be cancelled immediately on purchase, redemption or other acquisition.

26/2005

Process for purchase, redemption or other acquisition of own shares.
26/2005

60.    (1)    The directors of a company may make an offer to purchase, redeem or otherwise acquire shares issued by the company, if the offer is

(a)    an offer to all shareholders to purchase, redeem or otherwise acquire shares issued by the company that

(i)    would, if accepted, leave the relative voting and distribution rights of the shareholders unaffected; and

(ii)    affords each shareholder a reasonable opportunity to accept the offer; or

(b)    an offer to one or more shareholders to purchase, redeem or otherwise acquire shares

(i)    to which all shareholders have consented in writing; or

(ii)    that is permitted by the memorandum or articles and is made in accordance with section 61.

(2)    Where an offer is made in accordance with subsection (1)(a),

26/2005

    (a)    the offer may also permit the company to purchase, redeem or otherwise acquire additional shares from a shareholder to the extent that another shareholder does not accept the offer or accepts the offer only in part; and

    (b)    if the number of additional shares exceeds the number of shares that the company is entitled to purchase, redeem or otherwise acquire, the number of additional shares shall be reduced rateably.

Offer to one or more shareholders.

61.    (1)    The directors of a company shall not make an offer to one or more shareholders under section 60(l)(b) unless they have passed a resolution stating that, in their opinion.

26/2005

    (a)    the purchase, redemption or other acquisition is to the benefit of the remaining shareholders; and

    (b)    the terms of the offer and the consideration offered for the shares are fair and reasonable to the company and to the remaining shareholders.

(2)    A resolution passed under subsection (1) shall set out the reasons for the directors' opinion.

(3)    The directors shall not make an offer to one or more shareholders under section 60(l)(b) if, after the passing of a resolution under subsection (1) and before the making of the offer, they cease to hold the opinions specified in subsection (1).

26/2005

(4)    A shareholder may apply to the Court for an order restraining the proposed purchase, redemption or other acquisition of shares under section 60(1)(b) on the grounds that

    (a)    the purchase, redemption or other acquisition is not in the best interests of the remaining shareholders; or

    (b)    the terms of the offer and the consideration offered for the shares are not fair and reasonable to the company or the remaining shareholders.

Shares redeemed otherwise than at option of company.

62.    (1)    If a share is redeemable at the option of the shareholder and the shareholder gives the company proper notice of his intention to redeem the share

    (a)    the company shall redeem the share on the date specified in the notice, or if no date is specified, on the date of the receipt of the notice;

41

     (b)    unless the share is held as a treasury share under section 64, the share is deemed to be cancelled; and

     (c)    from the date of redemption, the former shareholder ranks as an unsecured creditor of the company for the sum payable on redemption.

    (2)    If a share is redeemable on a specified date

     (a)    the company shall redeem the share on that date;

     (b)    unless the share is held as a treasury share under section 64, the share is deemed to be cancelled; and

     (c)    from the date of redemption, the former shareholder ranks as an unsecured creditor of the company for the sum payable on redemption.

    (3)   Where a company redeems a share under subsections (1) and (2), sections 60 and 61 do not apply.

**Purchases, redemptions or other acquisitions deemed not to be a distribution. 26/2005**

63.    The purchase, redemption or other acquisition by a company of one or more of its own shares is deemed not to be a distribution where

     (a)    the company redeems the share or shares under and in accordance with section 62;

     (b)    the company redeems the share or shares pursuant to a right of a shareholder to have his shares redeemed or to have his shares exchanged for money or other property of the company; or

     (c)    the company purchases, redeems or otherwise acquires the share or shares by virtue of the provisions of section 179.

**Treasury shares. 26/2005**

64.    (1)   A company may hold shares that have been purchased, redeemed or otherwise acquired under section 59 as treasury shares if

     (a)    the memorandum or articles of the company do not prohibit it from holding treasury shares;

     (b)    the directors resolve that shares to be purchased, redeemed or otherwise acquired shall be held as treasury shares; and

(c)    the number of shares purchased, redeemed or otherwise acquired, when aggregated with shares of the same class already held by the company as treasury shares, does not exceed 50% of the shares of that class previously issued by the company, excluding shares that have been cancelled.

(2)    All the rights and obligations attaching to a treasury share are suspended and shall not be exercised by or against the company while it holds the share as a treasury share.

**Transfer of treasury shares. 26/2005**

65.    Treasury shares may be transferred by the company and the provisions of this Act and the memorandum and articles that apply to the issue of shares apply to the transfer of treasury shares.

**Mortgages and charges of shares.**

66.    (1)    A mortgage or charge of shares of a company shall be in writing signed by, or with the authority of, the holder of the bearer share or the registered holder of the registered share to which the mortgage or charge relates.

(2)    A mortgage or charge of a bearer share is not valid and enforceable unless the certificate for the share is deposited with a custodian.

(3)    A mortgage or charge of shares of a company need not be in any specific form but it shall clearly indicate

(a)    the intention to create a mortgage or charge; and

(b)    the amount secured by the mortgage or charge or how that amount is to be calculated.

(4)    Where the governing law of a mortgage or charge of shares in a company is not the law of the Virgin Islands

(a)    the mortgage or charge shall be in compliance with the requirements of its governing law in order for the mortgage or charge to be valid and binding on the company; and

(b)    the remedies available to a mortgagee or chargee shall be governed by the governing law and the instrument creating the mortgage or charge save that the rights between the mortgagor or mortgagee as a member of the company and the company shall continue to be governed by the memorandum and the articles of the company and this Act.

(2)    A person acting on a declaration made by the Court as a result of an application under subsection (1) shall be deemed, in so far as regards the discharge of any fiduciary or professional duty, to have properly discharged his duties in the subject matter of the application.

Judge in Chambers.

247.    A Judge of the High Court may exercise in Chambers any jurisdiction that is vested in the Court by this Act and in exercise of that jurisdiction, the judge may award costs as may be just.

Transitional provisions.

248.    The transitional provisions set out in Schedule 2 apply.

Schedule 2 Amendment of Schedules.

249.    (1)    The Executive Council may, on the advice of the Commission, by order amend the Schedules to this Act in such manner as it considers necessary.

(2)    An order made under subsection (1) shall be subject to a negative resolution of the Legislative Council.

Repeals and amendments. Schedule 3

250.    The enactments set out in the second column of Schedule 3 to this Act are repealed or amended to the extent specified in the third column with effect from the date specified in the fourth column.

Act binding on the Crown.

251.    This Act is binding on the Crown.

# TAB 97

**VIRGIN ISLANDS**

**INSOLVENCY ACT, 2003**
**No. 5 of 2003**

**VIRGIN  ISLANDS**

**INSOLVENCY  ACT, 2003**

**ARRANGEMENT  OF  SECTIONS**

Section

## PART I

## PRELIMINARY PROVISIONS

1. Short title and commencement.
2. Interpretation.
3. Meaning of "company".
4. Meaning of "subsidiary" and "holding company".
5. Meaning of "connected person" and "related company".
6. Meaning of "director".
7. Meaning of "unlicensed financial services business".
8. Meaning of "insolvent".
9. Meaning of "creditor", "secured creditor" etc.
10. Meaning of "liability".
11. Admissible claims.
12. Non-admissible claims.
13. Meaning of "public document".

## PART II

## CREDITORS' ARRANGEMENTS

### Division 1 - Interpretation

14. Interpretation for and scope of this Part.
15. Arrangements.
16. Remuneration of supervisor and interim supervisor.

# PART I

## PRELIMINARY PROVISIONS

1.    (1)    This Act may be cited as the Insolvency Act, 2003.

<div style="float:right">Short title and commencement.</div>

        (2)    The provisions of this Act come into operation on such date or dates as may be appointed by the Governor by proclamation published in the *Gazette* and different dates may be appointed for different provisions and different purposes.

2.    (1)    In this Act, unless the context otherwise requires,

<div style="float:right">Interpretation.</div>

        "administration order" has the meaning specified in section 76;

        "administrative receiver" has the meaning specified in section 142;

        "administrator", in relation to a company, means an administrator appointed under section 79;

        "arrangement" means a company creditors' arrangement under Part **II**, Division **2** or an individual creditors' arrangement under Part **II**, Division **3**, as the case may be;

        "articles" means

            (a)    the articles of association of a company, or

            (b)    where the context permits, in the case of a foreign company the articles of association, by-laws or such other document having the same effect by whatever name called;

        "asset" includes money, goods, things in action, land and every description of property wherever situated and obligations and every description of interest, whether present or future or vested or contingent, arising out of, or incidental to, property;

        "bankrupt" means an individual against whom a bankruptcy order is made under Part **XII**;

        "bankruptcy trustee" means the person appointed by the Court to be the trustee of the assets of a bankrupt;

        "bankrupt's estate" has the meaning specified in section 313;

        "board", in relation to a body corporate, means

(a) the board of directors, committee of management, council or other governing authority of the body corporate, or

(b) if the body corporate has only one director, that director;

"business day" means any day other than a Saturday, Sunday or public holiday in the Virgin Islands;

"charge" includes a mortgage, a fixed charge and a floating charge, whether crystallised or not;

"chargee" means the holder of a charge and includes a person in whose favour a charge is to be given or executed under an agreement, whether on demand or otherwise;

"chattel leasing agreement" means an agreement for the bailment of goods which is capable of subsisting for more than three months;

"Civil Procedure Rules" means the Eastern Caribbean Supreme Court Civil Procedure Rules 2000;

No. 12 of 2001    "Commission" means the Financial Services Commission established under the Financial Services Commission Act, 2001;

Cap. 285    "Companies Act" means the Companies Act (Cap. 285);

"company" has the meaning specified in section 3;

"connected person"

(a) in relation to a company or a foreign company has the meaning specified in section 5(1), and

(b) in relation to an individual has the meaning specified in section 5(3);

"Court" means the High Court;

Cap. 35    "court rate" means the rate of interest specified in section 7 of the Judgements Act (Cap 35);

"creditor" and "secured creditor" have the meanings specified in section 9;

"creditors' committee" means a committee appointed under section

421;

"director" has the meaning specified in section 6;

"disqualification order" has the meaning specified in section 260(1);

"disqualification undertaking" has the meaning specified in section 260(2);

"document" means a document in any form and includes

    (a)   any writing or printing on any material,

    (b)   any record of information or data, however compiled, and whether stored in paper, electronic, magnetic or any non-paper based form and any storage medium or device, including discs and tapes,

    (c)   books and drawings, and

    (d)   a photograph, film, tape, negative, facsimile or other medium in which one or more visual images are embodied so as to be capable (with or without the aid of equipment) of being reproduced,

and without limiting the generality of the foregoing, includes any court application, order and other legal process and any notice;

"dollar" or "$" means the lawful currency for the time being of the United States of America;

"eligible insolvency practitioner" means an insolvency practitioner who is eligible to act in relation to a company, foreign company or individual in accordance with section 482;

"floating charge" means a charge created by a company or a foreign company which is, or as created was, a floating charge;

"foreign company" means a body corporate that is incorporated, registered or formed outside the Virgin Islands but excludes a company within the meaning of section 3;

"insolvency practitioner" means a person acting in a capacity specified in section 474(1);

"insolvent",

    (a)   in relation to a company or a foreign company, has the meaning specified in section 8(1), and

    (b)   in relation to an individual, has the meaning specified in section 8(2);

No. 15 of 1994     "Insurance Act" means the Insurance Act, 1994;

No. 15 of 1994     "insurance company" means a company or a foreign company that holds, or at any time in the previous two years has held, a licence as an insurer issued under the Insurance Act;

"interim supervisor" means the person appointed as the interim supervisor under a proposal for an arrangement;

Cap. 291     "International Business Companies Act" means the International Business Companies Act (Cap. 291);

"liability" has the meaning specified in section 10;

"licensed insolvency practitioner" means a person holding a licence to act as an insolvency practitioner issued under section 476;

"liquidator", in relation to a company or a foreign company, means a liquidator appointed under section 159;

"member", in relation to a company, includes

    (a)   a member of a company limited by guarantee; and

Cap. 285     (b)   a person to whom shares in a company have been transferred or transmitted by law, even though that person is not a member of the company within the meaning of the Companies Act;

"memorandum" means

    (a)   the memorandum of association of a company, or

    (b)   where the context permits, in the case of a foreign company its memorandum of association or other constituting document, by whatever name called;

"officer", in relation to a body corporate, includes a director and secretary of that body corporate but does not include an administrator, liquidator, receiver, supervisor or interim supervisor;

"Official Receiver" means the Official Receiver appointed by the Commission under section 488;

"preferential claim" means a claim of a type prescribed by the Rules as a preferential claim;

"preferential creditor" means a creditor having a preferential claim;

"prescribed" means prescribed by the Rules and "prescribed form" means a form specified in the Rules;

"prescribed priority" means

(a)   in a liquidation, the priority for the payment of the costs and expenses of a liquidation prescribed in the Rules, and

(b)   in a bankruptcy, the priority for the payment of the costs and expenses of a bankruptcy prescribed in the Rules;

"public document" has the meaning specified in section 13;

"receiver" means the receiver of the whole or any part of the assets of a company or a foreign company and includes

(a)   a manager and a receiver and manager,

(b)   a receiver of income, and

(c)   an administrative receiver;

"receiver appointed out of court" means a receiver appointed in the exercise of a power conferred by a debenture or other instrument;

"Registrar" means the Registrar of Companies appointed under the Companies Act;                                                                    Cap. 285

"regulated person" means a person that holds a prescribed financial services licence;

"related company" means a company that is related to another company in accordance with section 5(2);

27

"remuneration" includes properly incurred expenses and disbursements;

"retention of title agreement" means any agreement for the sale of goods under which the seller reserves title in the goods until payment, but excludes an agreement that constitutes a charge on the goods;

"Rules" means the Insolvency Rules made under section 498;

"security interest" includes a charge and a lien;

"statement of affairs" means a statement of the affairs of a company or a foreign company complying with section 277 and "verified statement of affairs" means a statement of affairs that has been verified by affidavit;

"statement of assets and liabilities" means a statement of the assets and liabilities of an individual complying with section 366 and "verified statement of assets and liabilities" means a statement of assets and liabilities that has been verified by affidavit;

"statutory demand" means a demand made under section 155;

"subsidiary" and "holding company" have the meanings specified in section 4;

"supervisor" means the person appointed to act as the supervisor of an arrangement under Part **II**;

"unlicensed financial services business" has the meaning specified in section 7; and

"Virgin Islands court" means any court having jurisdiction in the Virgin Islands.

(2)    References in this Act or in the Rules to the "venue" for any proceeding, attendance before the Court or for a meeting are to the time, date and place for the proceeding, attendance or meeting.

Meaning of "company".

Cap. 285

3.    Unless this Act expressly provides otherwise, "company" means

(a)   a company incorporated under the Companies Act; or

(b) an international business company incorporated or continued under the International Business Companies Act.

4.    (1)    A company is a "subsidiary" of another company, its "holding company", if that other company

    (a)  holds a majority of the voting rights in it,

    (b)  is a member of it and has the right to appoint or remove a majority of its board,

    (c)  is a member of it and controls alone, pursuant to an agreement with other members, a majority of the voting rights in it,

or if it is a subsidiary of a company which is itself a subsidiary of that other company.

    (2)  For the purposes of subsection (1), "company" includes a foreign company and any other body corporate.

*Meaning of "subsidiary" and "holding company".*

5.    (1)    In relation to a company, "connected person" means any one or more of the following

    (a)  a promoter of the company;

    (b)  a director or member of the company or of a related company;

    (c)  a beneficiary under a trust of which the company is or has been a trustee;

    (d)  a related company;

    (e)  another company one of whose directors is also a director of the company;

    (f)  a nominee, relative, spouse or relative of a spouse of a person referred to in paragraphs (a) to (c);

    (g)  a person in partnership with a person referred to in paragraphs (a) to (c); and

    (h)  a trustee of a trust having as a beneficiary a person who is, apart from this paragraph, a connected person.

    (2)  A company is related to another company if

*Meaning of "connected person" and "related company".*

(a)  it is a subsidiary or holding company of that other company;

(b)  the same person has control of both companies; and

(c)  the company and that other company are both subsidiaries of the
same holding company.

(3)  In relation to an individual, "connected person" means any one or
more of the following

(a)  a relative, spouse or relative of a spouse of the individual;

(b)  a person in partnership with the individual;

(c)  a relative or spouse of a person in partnership with the individual;

(d)  a company in respect of which he is a connected person under
subsection (1);

(e)  a trustee of a trust having as a beneficiary a person who is, apart
from this paragraph, a connected person.

(4)  For the purposes of this section, "company" includes a foreign
company and any other body corporate.

Meaning of
"director".

6.    (1)    Subject to subsection (3), "director" in relation to a body corporate
includes

(a)  a person occupying or acting in the position of director by
whatever name called;

(b)  a person in accordance with whose directions or instructions a
director or the board of a  body corporate may be required or is
accustomed to act; and

(c)  a person who exercises, or is entitled to exercise, or who controls,
or is entitled to control, the exercise of powers which, apart from
the memorandum or articles, would fall to be exercised by the
board.

(2)  Notwithstanding subsection (1)

(a)  a person is not to be regarded as a director of a body corporate by
reason only that a director or the board act on advice given by him
in a professional capacity; and

(b)   a person acting as an insolvency practitioner in relation to a company or a foreign company is not to be regarded as a director of the company or foreign company by virtue of his acting in that capacity.

(3)   In Parts **IX** and **X**, "director" has the meaning specified in this section with the deletion of subsection (1)(c).

7.     A person carries on unlicensed financial services business if he carries on an activity for which a prescribed financial services licence is required without having such a licence authorising him to carry on the activity.

*Meaning of "unlicensed financial services business".*

8.     (1)   A company or a foreign company is insolvent if

*Meaning of "insolvent".*

(a)   it fails to comply with the requirements of a statutory demand that has not been set aside under section 157;

(b)   execution or other process issued on a judgment, decree or order of a Virgin Islands court in favour of a creditor of the company is returned wholly or partly unsatisfied; or

(c)   either

(i)   the value of the company's liabilities exceeds its assets, or

(ii)   the company is unable to pay its debts as they fall due.

(2)   An individual is insolvent if

(a)   he fails to comply with the requirements of a statutory demand that has not been set aside under section 157; or

(b)   execution or other process issued on a judgment, decree or order of a Virgin Islands court in favour of a creditor of the individual is returned wholly or partly unsatisfied.

9.     (1)   A person is a creditor of another person (the debtor) if he has a claim against the debtor, whether by assignment or otherwise, that is, or would be, an admissible claim in

*Meaning of "creditor", "secured creditor" etc.*

(a)   the liquidation of the debtor, in the case of a debtor that is a company or a foreign company; or

(b)   the bankruptcy of the debtor, in the case of a debtor who is an individual.

(2)   A creditor is a secured creditor of a debtor if he has an enforceable security interest over an asset of the debtor in respect of his claim.

(3)   An unsecured creditor is a creditor who is not a secured creditor.

Meaning of "liability".

10.   (1)   For the purposes of this Act, "liability" means a liability to pay money or money's worth including a liability under an enactment, a liability in contract, tort or bailment, a liability for a breach of trust and a liability arising out of an obligation to make restitution, and "liability" includes a debt.

(2)   A liability may be present or future, certain or contingent, fixed or liquidated, sounding only in damages or capable of being ascertained by fixed rules or as a matter of opinion.

(3)   For the purposes of this Act, an illegal or unenforceable liability is deemed not to be a liability.

Admissible claims.

11.   (1)   For the purposes of this section, "relevant time" means the time of the commencement of the liquidation of a company or a foreign company or the commencement of the bankruptcy of an individual, as the case may be.

(2)   Subject to section 12, the following liabilities are admissible as claims in the liquidation of a company or foreign company or in the bankruptcy of an individual;

(a)   liabilities of the company, foreign company or individual at the relevant time;

(b)   liabilities of the company, foreign company or individual arising after the relevant time by virtue of any obligation incurred before the relevant time; and

(c)   any interest that may be claimed in accordance with this Act or the Rules.

(3)   For the purposes of determining whether a liability in tort is an admissible claim in the liquidation of a company or foreign company or in the bankruptcy of an individual, the company, foreign company or individual is deemed to become subject to that liability by reason of an obligation incurred at the time the cause of action accrued.

Non-admissible claims.

12.   The following liabilities are not admissible claims in the liquidation of a company or a foreign company or the bankruptcy of an individual;

(a)   an obligation arising under a confiscation order made under

    (i)   the Drug Trafficking Offences Act, 1992, or     No. 5 of 1992

    (ii)  the Proceeds of Criminal Conduct Act, 1997;     No. 5 of 1997

(b)   a liability that, under any enactment or rule of law, is of a type that is not claimable, whether on grounds of public policy or otherwise; and

(c)   such other liabilities or claims as may be prescribed.

13.    (1)    Subject to subsection (3), a "public document", in relation to a person, means a document of, or purporting to be issued, published or signed by or on behalf of that person that

   Meaning of "public document".

(a)   in the case of a company or foreign company, is required or permitted to be filed with the Registrar under

    (i)   this Act or the Rules,

    (ii)  the Companies Act, or     Cap. 285

    (iii) the International Business Companies Act;     Cap. 291

(b)   is issued, published or signed under, or for the purposes of, this Act or the Rules or any other enactment; or

(c)   is issued or signed in the course of, or for the purposes of, a particular transaction or dealing.

(2)   Without limiting subsection (1), "public document" includes a business letter, statement of account, invoice, receipt, order for goods, order for services or an official notice of, or purporting to be issued, published or signed by, or on behalf of, that person.

(3)   A document is not a public document if it is applied, or intended or required to be applied, to goods or to any container, package or wrapping within which goods are, or are intended to be, supplied for a purpose connected with the supply of those goods.

52.    (1)    At any time when an application under section 51 for a moratorium order is pending, the Court may, on the application of the debtor or the interim supervisor, stay any action, execution or other legal process against the debtor or his assets. <span style="float:right">Court may grant stay.</span>

(2)    Any Virgin Islands court, or any tribunal in the Virgin Islands, in which proceedings are pending against a debtor may, on proof that an application under section 51 has been made by the debtor, either stay those proceedings or allow them to continue on such terms as it considers just.

53.    (1)    The Court may make a moratorium order on an application under section 51 if it considers that it would be appropriate to do so for the purpose of facilitating the consideration of the debtor's proposal. <span style="float:right">Moratorium order.</span>

(2)    Unless extended by the Court under this section, a moratorium order ceases to have effect at the end of the fourteenth day after the date upon which it is made.

(3)    If the Court makes a moratorium order under subsection (1), it shall at the same time fix a venue for consideration of the interim supervisor's report under section 56, no later than the date of expiry of the moratorium order under subsection (2).

(4)    In a case where the interim supervisor has failed to submit his report as required by section 56, the Court may, on the application of the debtor, direct that the moratorium order shall continue or, if it has ceased to have effect, be renewed for such further period as the Court may order.

(5)    The Court may, on the application of the interim supervisor, extend the period for which the moratorium order has effect so as to enable the interim supervisor to have more time to prepare and submit his report under section 56.

(6)    The Court may, at any time, discharge the moratorium order if it is satisfied, whether by reason of a report made to it by the interim supervisor under section 54 or otherwise

(a)    that the debtor has failed to comply with his obligations under section 49(2);

(b)    that it would not be appropriate for a meeting of creditors to be called to consider the debtor's proposal; or

(c)    that, for any other reason, it is appropriate for the moratorium order to be discharged.

(4)    If a liquidator is not appointed, the Court may order the applicant for the appointment of the provisional liquidator to pay or contribute to the remuneration and expenses of the provisional liquidator if it is satisfied that the applicant

    (a)  misled the Court when making the application; or

    (b)  acted unreasonably in applying for the appointment of the provisional liquidator.

(5)    If the assets of the company are not sufficient to pay the remuneration of the provisional liquidator, the Court may order the shortfall, or part of the shortfall, to be paid by the applicant for the appointment of the provisional liquidator.

(6)    Unless the Court otherwise orders, where subsection (4)(a) applies, the provisional liquidator may retain out of the company's assets such sums or assets as are, or may be, required for meeting his remuneration.

173. (1)    The Court may, on the application of the provisional liquidator or of any person specified in section 170(2) or on its own motion, terminate the appointment of a provisional liquidator.

*Termination of appointment of provisional liquidator.*

(2)    If the Court has not previously terminated the appointment of a provisional liquidator under subsection (1), it terminates on the determination by the Court of the application to appoint a liquidator.

(3)    On the termination of the appointment of a provisional liquidator, the Court may give such directions or make such order with respect to the accounts of his administration, or to any other matters, as it considers appropriate.

174. (1)    Where an application for the appointment of a liquidator of a company has been filed but not yet determined or withdrawn, a person specified in section 170(2) may,

*Power to stay or restrain proceedings etc.*

    (a)  where any  action or proceeding is pending against the company in the Court, the Court of Appeal or the Privy Council, apply to the Court, the Court of Appeal or the Privy Council, as the case may be, for a stay of the action or proceeding; and

    (b)  where any  action or proceeding is pending against the company in any other Virgin Islands court or tribunal in the Virgin Islands, apply to the Court for a stay of the action or proceeding.

196. (1)   For the purposes of this section, a "past member" of a company is a person who ceased to be a member of the company at any time during the period of one year before the commencement of the liquidation of the company.

(2)   Unless the Court is satisfied that the members of a company are able to discharge the liabilities set out in 195(1), a past member of a company in liquidation is liable to contribute to the assets of the company for the purposes specified in that subsection to the same extent as a member.

(3)   Notwithstanding subsection (2), a past member is not liable to contribute to the assets of the company in respect of any liability of the company contracted after he ceased to be a member.

197. A member, and a past member, of a company may not claim in the liquidation of the company for a sum due to him in his character as a member, whether by way of dividend, profits, redemption proceeds or otherwise, but such sum is to be taken into account for the purposes of the final adjustment of the rights of members and, if appropriate, past members between themselves. *Dividends payable to member.*

198. (1)   This section applies where an unlimited company in liquidation was at some former time registered as a limited company. *Liability where limited company becomes unlimited company.*

(2)   A person who ceased to be a member of a company before the company became registered as an unlimited company, and has not since become a member of the company, is liable to contribute to the assets of the company only to the extent that he would have been liable had the company remained registered as a limited company.

199. (1)   This section applies where a limited company in liquidation was at some former time registered as an unlimited company. *Liability where unlimited company becomes limited company.*

(2)   Notwithstanding section 196, if a company referred to in subsection (1) goes into liquidation within the period of one year from the date on which it was registered as a limited company, a person who was a member of the company at the date of its registration as a limited company is liable, without limit, to contribute to the assets of the company in respect of liabilities contracted before that time.

200. The personal representatives of a member or past member who has died are liable to contribute out of his estate to the assets of the company under sections 195, 196, 198 and 199 to the same extent as the member. *Liability of personal representative.*

201. The liquidator of a company is entitled to submit a claim in the bankruptcy or liquidation of any member or past member of the company in respect of any contribution that the member or past member is required to make under sections 195, 196, 198 and 199. *Effect of member or past member becoming bankrupt.*

139

(2)   In carrying on the insurance company's long term business under subsection (1), the liquidator may agree to the variation of any contracts of insurance at the commencement of the liquidation, but he shall not effect any new contracts of insurance.

(3)   On the application of the liquidator of a long term insurance company, the Court may by order reduce the amounts of the contracts made by the company in the course of carrying on its long term business.

(4)   An order under subsection (3) may be made subject to such conditions as the Court considers appropriate.

(5)   Without limiting section 186 or Schedule **2**, the liquidator of a long term insurance company may appoint an actuary to investigate and report to him on the long term business of the company and, if appropriate, to conduct actuarial valuations of the business.

Schedule 2

243.  (1)   In the liquidation of a long term insurance company, the assets of the segregated funds of the company shall first be applied to meet the company's long term liabilities attributable to such funds.

Protection of segregated funds and assets.

(2)   If the value of the assets referred to in subsection (1) exceeds the amount of the long term liabilities of the company attributable to the segregated funds, the excess is an asset of the company available for distribution in accordance with this Act.

(3)   Where the Court makes an order under section 254(3) in respect of a long term insurance company requiring a person to repay, restore or account for money or other assets, to pay compensation to the company or to pay interest to the company, the Court shall, insofar as the delinquency relates to assets belonging to the company's segregated funds, order that the money, assets or contribution is to be treated for the purposes of subsection (1) as assets of those funds.

## PART VIII

## VOIDABLE TRANSACTIONS

244.  (1)   In this Part,

Interpretation for this Part.

"insolvent liquidation" means a liquidation of a company where the assets of the company are insufficient to pay its liabilities and the expenses of the liquidation;

"insolvency transaction" has the meaning specified in subsection (2).

"onset of insolvency" means

    (a)   the date on which the application for the administration order
was filed, where a company is in liquidation and the
liquidator was appointed by the Court immediately following
the discharge of an administration order;

    (b)   the date on which the application for the appointment of the
liquidator was filed, where a company is in liquidation and
the liquidator was appointed by the Court in circumstances
other than those set out in paragraph (a); or

    (c)   the date of the appointment of the liquidator, where a
company is in liquidation and the liquidator was appointed by
the members.

"voidable transaction" means

    (a)    an unfair preference;

    (b)    an undervalue transaction;

    (c)    a floating charge that is voidable under section 247; and

    (d)    an extortionate credit transaction.

"vulnerability period", means,

    (a)   for the purposes of sections 245, 246 and 247

       (i)   in the case of a transaction entered into with, or a
preference given to, a connected person, the period
commencing 2 years prior to the onset of insolvency and
ending on the appointment of the administrator or, if the
company is in liquidation, the liquidator; and

      (ii)   in the case of a transaction entered into with, or a
preference given to, any other person, the period
commencing six months prior to the onset of insolvency
and ending on the appointment of the administrator or, if
the company is in liquidation, the liquidator; and

     (b)  for the purposes of section 248, the period commencing 5 years prior to the onset of insolvency and ending on the appointment of the administrator or, if the company is in liquidation, the liquidator;

(2)   A transaction is an insolvency transaction if

     (a)  it is entered into at a time when the company is insolvent; or

     (b)  it causes the company to become insolvent;

(3)   For the purposes of subsection (2), "insolvent" has the meaning specified in section 8(1) with the deletion of paragraph (c)(i).

(4)   This Part applies in respect of

     (a)  a company that is in administration; and

     (b)  a company and a foreign company that is in liquidation and, where appropriate, "company" includes a foreign company.

245. (1)   Subject to subsection (2), a transaction entered into by a company is an unfair preference given by the company to a creditor if the transaction   *Unfair preferences.*

     (a)  is an insolvency transaction;

     (b)  is entered into within the vulnerability period; and

     (c)  has the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if the transaction had not been entered into.

(2)   A transaction is not an unfair preference if the transaction took place in the ordinary course of business.

(3)   A transaction may be an unfair preference notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4)   Where a transaction entered into by a company within the vulnerability period has the effect specified in subsection (1)(c) in respect of a creditor who is a connected person, unless the contrary is proved, it is presumed that the transaction was an insolvency transaction and that it did not take place in the ordinary course of business.

Undervalue transactions.

246. (1)    Subject to subsection (2), a company enters into an undervalue transaction with a person if

(a)    the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration; or

(b)    the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than  the value, in money or money's worth, of the consideration provided by the company; and

(c)    in either case, the transaction concerned

(i)    is an insolvency transaction; and

(ii)    is entered into within the vulnerability period.

(2)    A company does not enter into an undervalue transaction with a person if

(a)    the company enters into the transaction in good faith and for the purposes of its business; and

(b)    at the time when it enters into the transaction, there were reasonable grounds for believing that the transaction would benefit the company.

(3)    A transaction may be an undervalue transaction notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4)    Where a company enters into a transaction with a connected person within the vulnerability period and the transaction falls within subsection (1)(a) or subsection (1)(b), unless the contrary is proved, it is presumed that

(a)    the transaction was an insolvency transaction; and

(b)    subsection (2) did not apply to the transaction.

Voidable floating charges.

247. (1)    Subject to subsection (2), a floating charge created by a company is voidable if

(a)    it is created within the vulnerability period; and

(b)    it is an insolvency transaction.

(2)    A floating charge is not voidable to the extent that it secures

(a)    money advanced or paid to the company, or at its direction, at the same time as, or after, the creation of the charge;

(b)    the amount of any liability of the company discharged or reduced at the same time as, or after, the creation of the charge;

(c)    the value of assets sold or supplied, or services supplied, to the company at the same time as, or after, the creation of the charge; and

(d)    the interest, if any, payable on the amount referred to in paragraphs (a) to (c) pursuant to any agreement under which the money was advanced or paid, the liability was discharged or reduced, the assets were sold or supplied or the services were supplied.

(3)    For the purposes of this section, where a company creates a floating charge in favour of a connected person within the vulnerability period, unless the contrary is proved, it is presumed that the charge was an insolvency transaction.

(4)    For the purposes of subsection (2)(c), the value of assets or services sold or supplied is the amount in money which, at the time they were sold or supplied, could reasonably have been expected to be obtained for the sale or supply of the goods or services in the ordinary course of business and on the same terms, apart from the consideration, as those on which the assets or services were sold or supplied to the company.

248.  A transaction entered into by the company within the vulnerability period for, or involving the provision of, credit to the company is an extortionate credit transaction if, having regard to the risk accepted by the person providing the credit

*Extortionate credit transactions.*

(a)    the terms of the transaction are or were such as to require grossly exorbitant payments to be made (whether unconditionally or in certain contingencies) in respect of the provision of credit; or

(b)    the transaction otherwise grossly contravenes ordinary principles of fair trading.

249.  (1)    Subject to section 250, where it is satisfied that a transaction entered into by a company is a voidable transaction the Court, on the application of the liquidator of the company,

*Orders in respect of voidable transactions.*

161

(a) may make an order setting aside the transaction in whole or in part;

(b) in respect of an unfair preference or an undervalue transaction, may make such order as it considers fit for restoring the position to what it would have been if the company had not entered into that transaction; and

(c) in respect of an extortionate credit transaction, may by order provide for any one or more of the following:

(i) the variation of the terms of the transaction or the terms on which any security interest for the purposes of the transaction is held;

(ii) the payment by any person who is or was a party to the transaction to the liquidator of any sums paid by the company to that person by virtue of the transaction;

(iii) the surrender by any person to the liquidator of any asset held by him as security for the purposes of the transaction; and

(iv) the taking of accounts between any persons.

(2)    Without prejudice to the generality of subsection (1)(b), an order under that paragraph may

(a) require any assets transferred as part of the transaction to be vested in the company;

(b) require any assets to be vested in the company if it represents in any person's hands the application either of the proceeds of sale of assets transferred or of money transferred, in either case as part of the transaction;

(c) release or discharge, in whole or in part, any security interest given by the company or the liability of the company under any contract;

(d) require any person to pay, in respect of benefits received by him from the company, such sums to the liquidator as the Court may direct;

(e) provide for any surety or guarantor whose obligations to any person were released or discharged, in whole or in part, under the transaction, to be under such new or revived obligations to that

person as the Court considers appropriate;

(f)   provide for security to be provided for the discharge of any obligation imposed by or arising under the order, for such an obligation to be charged on any assets and for the security interest or charge to have the same priority as a security interest or charge released or discharged, in whole or in part, under the transaction;

(g)   provide for a person effected by an order made under subsection (1) to prove in the liquidation of the company in such amount as the Court considers fit; and

(h)   require the company to make a payment or transfer assets to any person affected by an order made under subsection (1).

(3)   Subject to section 250, in respect of an unfair preference or an undervalue transaction, an order under subsection (1) may affect the assets of, or impose any obligation on, any person whether or not he is the person with whom the company in question entered into the transaction.

250.  (1)   This section applies to an order made under section 249(1) in respect of an unfair preference or an undervalue transaction.

*Limitations on orders under section 249.*

(2)   An order to which subsection (1) applies shall not

(a)   prejudice any interest in assets that was acquired in good faith and for value from a person other than the company, or prejudice any interest deriving from such an interest; or

(b)   require a person who received a benefit from the transaction in good faith and for value to pay a sum to the liquidator, except where that person was a party to the transaction or, in respect of an unfair preference, the preference was given to that person when he was a creditor of the company.

(3)   For the purposes of subsection (2), where a person would, apart from the requirement for good faith, fall within the circumstances specified in paragraph (a) or (b), it is presumed, unless the contrary is proved, that he acquired the interest or received the benefit in good faith.

(4)   Subsection (3) does not apply to a person

(a)   who, at the time of the transaction, had notice of

(i)   the fact that the transaction was an unfair preference or an undervalue transaction, as the case may be; or

(ii)  the relevant proceedings as defined in subsection (5); or

(b)  who was, at the time of the transaction, a connected person.

(5)  For the purposes of subsection (4), a person has notice of the relevant proceedings if,

(a)  in the case of a company in administration, he had notice of the filing of the application on which the administration order was made;

(b)  in the case of a company where a liquidator was appointed immediately following the discharge of an administration order, he had notice of the filing of the application on which the administration order was made or the filing of the application on which the order appointing a liquidator was made; or

(c)  in the case of a company where a liquidator was appointed in circumstances other than those set out in paragraph (b), he had notice of the filing of the application on which the order appointing a liquidator was made.

Recoveries.

251.  Any money paid to, assets recovered or other benefit received by the liquidator as a result of an order made under section 249 are deemed to be assets of the company available to pay unsecured creditors of the company.

Remedies not exclusive.

252.    The provisions of this Part apply without prejudice to the availability of any other remedy, even in relation to a transaction that the company had no power to enter into.

# PART IX

# MALPRACTICE

Interpretation for this Part.

253.  In this Part,

(a)  a company or a foreign company goes into insolvent liquidation if a liquidator is appointed at a time when its assets are insufficient to pay its liabilities and the expenses of the liquidation; and

(b)  a relevant company is a company or a foreign company that has gone into insolvent liquidation.

254. (1)  On the application of the liquidator of a relevant company, the Court may make an order under subsection (3) where it is satisfied that a person specified in subsection (2)

Summary remedy against delinquent officers and others.

    (a)  has misapplied or retained, or become accountable for any money or other assets of the company; or

    (b)  has been guilty of any misfeasance or breach of any fiduciary or other duty in relation to the company.

(2)  An order under subsection (3) may be made against a person

    (a)  who is or has been an officer of the company;

    (b)  who has acted as liquidator of the company;

    (c)  who, in the case of a relevant company that is not a foreign company, has acted as administrator, administrative receiver, supervisor or interim supervisor of the company; or

    (d)  who, not being a person falling within paragraphs (a) or (b), is or has been concerned in the promotion, formation, management, liquidation or dissolution of the company.

(3)  Where subsection (1) applies, the Court may make one or more of the following orders against the person:

    (a)  that he repays, restores or accounts for the money or other assets, or any part of it;

    (b)  that he pays to the company as compensation for the misfeasance or breach of duty such sum as the Court considers just; and

    (c)  that he pays interest to the company at such rate as the Court considers just.

(4)  The Court shall not make an order under subsection (3) unless it has given the person the opportunity

    (a)  to give evidence, call witnesses and bring other evidence in relation to the application; and

    (b)  to be represented, at his own expense, by a legal practitioner who may put to him, or to other witnesses, such questions as the Court may allow for the purpose of explaining or qualifying any answers or evidence given.

(5)    Application may not be made for an order under this section against a liquidator or an administrator who has been released, except with the leave of the Court.

(6)    Nothing in this section prevents any person from instituting any other proceedings in relation to matters in respect of which an application may be made under this section.

Fraudulent trading.

255.  (1)    On the application of the liquidator of a relevant company, the Court may make an order under subsection (2) where it is satisfied that, at any time before the commencement of the liquidation of the company, any of its business has been carried on

(a)   with intent to defraud creditors of the company or creditors of any other person; or

(b)   for any fraudulent purpose.

(2)    Where subsection (1) applies, the Court may declare that any person who was knowingly a party to the carrying on of the business in such manner are liable to make such contribution, if any, to the company's assets as the Court considers proper.

Insolvent trading.

256.  (1)    On the application of the liquidator of a relevant company, the Court may make an order under subsection (2) against a person who is or has been a director of the company if it is satisfied that

(a)   at any time before the commencement of the liquidation of the company, that person knew or ought to have concluded that there was no reasonable prospect that the company would avoid going into insolvent liquidation, and

(b)   he was a director of the company at that time.

(2)    Subject to subsection (3), where subsection (1) applies, the Court may order that that the person concerned makes such contribution, if any, to the company's assets as the Court considers proper.

(3)    The Court shall not make an order against a person under subsection (2) if it is satisfied that after he first knew, or ought to have concluded, that there was no reasonable prospect that the company would avoid going into insolvent liquidation, he took every step reasonably open to him to minimise the loss to the company's creditors.

166

(4)  For the purposes of subsections (1) and (3), the facts which a director of a company ought to know or ascertain, the conclusions which he ought to reach and the steps reasonably open to him which he ought to take are those which would be known or ascertained, or reached or taken, by a reasonably diligent person having both

> (a)  the general knowledge, skill and experience that may reasonably be expected of a person carrying out the same functions as are carried out by that director in relation to the company; and
>
> (b)  the general knowledge, skill and experience that that director has.

(5)  The reference in subsection (4) to the functions carried out in relation to a company by a director of the company includes any function which he does not carry out but which have been entrusted to him.

(6)  Nothing in this section affects section 255.

257.  Any money paid to, assets recovered or other benefit received by the liquidator as a result of an order made under section 255 or section 256 are deemed to be assets of the company available to pay unsecured creditors of the company.

> *Recoveries under sections 255 and 256.*

258.  (1)  Where the Court makes an order under section 255 or section 256, it may make give such directions or make such further order as it considers proper for giving effect to the order.

> *Ancillary orders.*

(2)  Without limiting subsection (1), the Court may

> (a)  provide for the liability of any person under the order to be a charge on any debt or obligation due from the company to him, or on any mortgage or charge or any interest in a mortgage or charge on assets of the company held by or vested in him, or any person on his behalf, or any person claiming as assignee from or through the person liable or any person acting on his behalf; and
>
> (b)  from time to time make such further order as may be necessary for enforcing any charge imposed under this subsection.

(3)  For the purposes of subsection (2), "assignee"

> (a)  includes a person to whom or in whose favour, by the directions of the person made liable, the debt, obligation, mortgage or charge was created, issued or transferred or the interest created, but

bankruptcy order was filed;

"voidable transaction" means

    (a)    an unfair preference;

    (b)    an undervalue transaction;

    (c)    a voidable general assignment of book debts; or

    (d)    an extortionate credit transaction;

"vulnerability period" means,

    (a)  for the purposes of sections 401, 402 and 403,

        (i)  in the case of a transaction entered into with, or a preference given to, a connected person, the period commencing 2 years prior to the onset of insolvency and ending on the date of the bankruptcy order; and

        (ii)  in the case of a transaction entered into with, or a preference given to, any other person, the period commencing six months prior to the onset of insolvency and ending on the date of the bankruptcy order; and

    (b)  for the purposes of section 404, the period commencing 5 years prior to the onset of insolvency and ending on the date of the bankruptcy order;

(2)    A transaction is an insolvency transaction if

    (a)  it is entered into at a time when the debtor is insolvent; or

    (b)  it causes the debtor to become insolvent;

(3)    For the purposes of subsection (2)(b), an individual is insolvent if he is unable to pay his debts as they fall due for payment.

(4)    This Part applies in respect of an individual only if a bankruptcy order is made against him.

401.  (1)   Subject to subsection (2), a transaction entered into by an individual is an unfair preference given by the individual to a creditor if the transaction     *Unfair preferences.*

    (a)  is an insolvency transaction;

(b)   is entered into within the vulnerability period; and

(c)   has the effect of putting the creditor into a position which, in the event of the individual becoming a bankrupt, will be better than the position he would have been in if the transaction had not been entered into.

(2)   A transaction is not an unfair preference if the transaction took place in the ordinary course of business.

(3)   A transaction may be an unfair preference notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4)   Where a transaction entered into by an individual within the vulnerability period has the effect specified in subsection (1)(c) in respect of a creditor who is a connected person, unless the contrary is proved, it is presumed that the transaction was an insolvency transaction and that it did not take place in the ordinary course of business.

Undervalue transactions.

402. (1)   Subject to subsection (2), an individual enters into an undervalue transaction with a person if

(a)   he makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for him to receive no consideration; or

(b)   he enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than  the value, in money or money's worth, of the consideration provided by him; and

(c)   in either case, the transaction concerned

(i)   is an insolvency transaction; and

(ii)   is entered into within the vulnerability period.

(2)   An individual does not enter into an undervalue transaction with a person if

(a)   the individual enters into the transaction in good faith and for the purposes of his business; and

(b)   at the time when he enters into the transaction, there were

242

reasonable grounds for believing that the transaction would benefit him.

(3)    A transaction may be an undervalue transaction notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4)    Where an individual enters into a transaction with a connected person within the vulnerability period and the transaction falls within subsection (1)(a) or subsection (1)(b), unless the contrary is proved, it is presumed that

    (a)  the transaction was an insolvency transaction; and

    (b)  subsection (2) did not apply to the transaction.

403. (1)    This section applies where an individual engaged in any business makes a general assignment to another of his existing or future book debts, or any class of them, and a bankruptcy order is subsequently made against him.

*Voidable general assignment of book debts.*

(2)    The assignment is voidable as regards book debts which were not paid before the filing of the application for the bankruptcy order, unless the assignment has been registered under the Bills of Sale Act.

*Cap. 284*

(3)    For the purposes of subsections (1) and (2),

    (a)  "assignment" includes an assignment by way of security or charge on book debts; and

    (b)  "general assignment" does not include

        (i)  an assignment of book debts due at the date of the assignment from specified debtors or of debts becoming due under specified contracts, or

        (ii)  an assignment of book debts included either in a transfer of a business made in good faith and for value or in an assignment of assets for the benefit of creditors generally.

(4)    For the purposes of registration under the Bills of Sale Act, an assignment of book debts is to be treated as if it were a bill of sale given otherwise by way of security for the payment of a sum of money; and the provisions of that Act with respect to the registration of bills of sale apply accordingly with such necessary modifications as may be made by rules under that Act.

(3)   In granting relief under this section to a representative of a foreign ancillary proceeding, the Court shall be satisfied that the relief relates to property that, under the law of the Virgin Islands, should be administered in the foreign ancillary proceeding or concerns information required in that proceeding.

455. (1)   In granting or denying relief under section 452 or 454, or in modifying or terminating relief under subsection (3), the Court shall be satisfied that the interests of the creditors and other interested persons, including the debtor, are adequately protected.

Protection of creditors and other interested persons.

(2)   The Court may subject relief granted under section 452 or 454 to such conditions as it considers appropriate, including the giving of any security interest or the filing of any bond.

(3)   The Court may, at the request of the foreign representative or a person affected by relief granted under section 452 or 454, or at its own motion, modify or terminate the relief.

456. (1)   Subject to subsection (2), upon recognition of a foreign proceeding, the foreign representative shall have power to apply to the Court for an order under section 249 or 405, as the case may be.

Actions to avoid acts detrimental to creditors.

(2)   The Court shall not make an order under section 249 or 405 on the application of the foreign representative of a recognised foreign proceeding unless it is satisfied that,

(a)   in the case of an application under section 249, the foreign representative has roles and functions that are equivalent or broadly similar to the roles and functions of a liquidator appointed under this Act; and

(b)   in the case of an application under section 405, the foreign representative has roles and functions that are equivalent or broadly similar to the roles and functions of a bankruptcy trustee appointed under this Act.

(3)   When the foreign proceeding is a foreign ancillary proceeding, the Court shall be satisfied that the action relates to property that, under the law of the Virgin Islands, should be administered in the foreign ancillary proceeding.

457.   Upon recognition of a foreign proceeding, the foreign representative may, if the requirements of the law of the Virgin Islands are met, intervene in any proceedings in which the debtor is a party.

Intervention by foreign representative in proceedings in the Virgin Islands.

(3)   The designation of a country for the purposes of Part **XVIII** does not affect the validity of any order made under this Part.

Order in aid of foreign proceeding.

467.  (1)   For the purposes of this section "property" means property that is subject to or involved in the foreign proceeding in respect of which the foreign representative is authorized.

(2)   A foreign representative may apply to the Court for an order under subsection (3) in aid of the foreign proceeding in respect of which he is authorized.

(3)   Subject to section 468, upon an application under subsection (1), the Court may

(a)  restrain the commencement or continuation of any proceedings, execution or other legal process or the levying of any distress against a debtor or in relation to any of the debtor's property;

(b)  subject to subsection (4), restrain the creation, exercise or enforcement of any right or remedy over or against any of the debtor's property;

(c)  require any person to deliver up to the foreign representative any property of the debtor or the proceeds of such property;

(d)  make such order or grant such relief as it considers appropriate to facilitate, approve or implement arrangements that will result in a co-ordination of a Virgin Islands insolvency proceeding with a foreign proceeding;

(e)  appoint an interim receiver of any property of the debtor for such term and subject to such conditions as it considers appropriate;

(f)  authorize the examination by the foreign representative of the debtor or of any person who could be examined in a Virgin Islands insolvency proceeding in respect of a debtor;

(g)  stay or terminate or make any other order it considers appropriate in relation to a Virgin Islands insolvency proceeding; or

(h)  make such order or grant such other relief as it considers appropriate.

(4)   An order under subsection (3) shall not affect the right of a secured creditor to take possession of and realise or otherwise deal with property of the debtor over which the creditor has a security interest.

276

(5)   In making an order under subsection (3), the Court may apply the law of the Virgin Islands or the law applicable in respect of the foreign proceeding.

468. (1)   In determining an application under section 467, the Court shall be guided by what will best ensure the economic and expeditious administration of the foreign proceeding to the extent consistent with

Matters to be considered by Court in determining application under section 467.

    (a)   the just treatment of all persons claiming in the foreign proceeding;

    (b)   the protection of persons in the Virgin Islands who have claims against the debtor against prejudice and inconvenience in the processing of claims in the foreign proceeding;

    (c)   the prevention of preferential or fraudulent dispositions of property subject to the foreign proceeding, or the proceeds of such property;

    (d)   the need for distributions to claimants in the foreign proceedings to be substantially in accordance with the order of distributions in a Virgin Islands insolvency; and

    (e)   comity.

(2)   An order under section 467 shall not, without the consent of the person concerned,

    (a)   affect the right of any creditor of the debtor to benefit from set-off as provided for in section 150; or

    (b)   result in a person who is a preferential creditor of the debtor, or who in a Virgin Islands insolvency proceeding in respect of the debtor would be a preferential creditor, receiving less than he would receive in a Virgin Islands insolvency proceeding .

(3)   The Court shall not make an order under 467 that is contrary to the public policy of the Virgin Islands.

469. (1)   Subject to subsection (2), an application to the Court by a foreign representative under section 467 does not submit the foreign representative to the jurisdiction of the Court for any other purpose except with regard to the costs of the proceedings.

Limitation on effect of application under this Part.

(2)   The Court may make an order under this Part conditional on the compliance by the foreign representative with any other order of the Court.

# TAB 98

# Insolvency Act 1986

CHAPTER 45

# ARRANGEMENT OF SECTIONS

THE FIRST GROUP OF PARTS

COMPANY INSOLVENCY; COMPANIES WINDING UP

## PART I

COMPANY VOLUNTARY ARRANGEMENTS

### *The proposal*

Section
1. Those who may propose an arrangement.
2. Procedure where nominee is not the liquidator or adminis-
trator.
3. Summoning of meetings.

### *Consideration and implementation of proposal*

4. Decisions of meetings.
5. Effect of approval.
6. Challenge of decisions.
7. Implementation of proposal.

## PART II

ADMINISTRATION ORDERS

### *Making, etc. of administration order*

8. Power of court to make order.
9. Application for order.
10. Effect of application.
11. Effect of order.
12. Notification of order.

A

(3) Subsection (2) does not apply in relation to the powers of the directors—    <span style="float:right">PART IV</span>

    (*a*) to dispose of perishable goods and other goods the value of which is likely to diminish if they are not immediately disposed of, and

    (*b*) to do all such other things as may be necessary for the protection of the company's assets.

(4) If the directors of the company without reasonable excuse fail to comply with this section, they are liable to a fine.

**115.** All expenses properly incurred in the winding up, including the remuneration of the liquidator, are payable out of the company's assets in priority to all other claims.    <span style="float:right">Expenses of voluntary winding up.</span>

**116.** The voluntary winding up of a company does not bar the right of any creditor or contributory to have it wound up by the court; but in the case of an application by a contributory the court must be satisfied that the rights of the contributories will be prejudiced by a voluntary winding up.    <span style="float:right">Saving for certain rights.</span>

CHAPTER VI

WINDING UP BY THE COURT

*Jurisdiction (England and Wales)*

**117.**—(1) The High Court has jurisdiction to wind up any company registered in England and Wales.    <span style="float:right">High Court and county court jurisdiction.</span>

(2) Where the amount of a company's share capital paid up or credited as paid up does not exceed £120,000, then (subject to this section) the county court of the district in which the company's registered office is situated has concurrent jurisdiction with the High Court to wind up the company.

(3) The money sum for the time being specified in subsection (2) is subject to increase or reduction by order under section 416 in Part XV.

(4) The Lord Chancellor may by order in a statutory instrument exclude a county court from having winding-up jurisdiction, and for the purposes of that jurisdiction may attach its district, or any part thereof, to any other county court, and may by statutory instrument revoke or vary any such order.

In exercising the powers of this section, the Lord Chancellor shall provide that a county court is not to have winding-up jurisdiction unless it has for the time being jurisdiction for the purposes of Parts VIII to XI of this Act (individual insolvency).

66          c. 45                *Insolvency Act 1986*

PART IV          (5) Every court in England and Wales having winding-up
jurisdiction has for the purposes of that jurisdiction all the
powers of the High Court; and every prescribed officer of the
court shall perform any duties which an officer of the High Court
may discharge by order of a judge of that court or otherwise in
relation to winding up.

(6) For the purposes of this section, a company's "regis-
tered office" is the place which has longest been its registered
office during the 6 months immediately preceding the presen-
tation of the petition for winding up.

Proceedings
taken in
wrong court.
**118.**—(1) Nothing in section 117 invalidates a proceeding by
reason of its being taken in the wrong court.

(2) The winding up of a company by the court in England
and Wales, or any proceedings in the winding up, may be re-
tained in the court in which the proceedings were commenced,
although it may not be the court in which they ought to have
been commenced.

Proceedings in
county court;
case stated for
High Court.
**119.**—(1) If any question arises in any winding-up proceedings
in a county court which all the parties to the proceedings, or
which one of them and the judge of the court, desire to have
determined in the first instance in the High Court, the judge
shall state the facts in the form of a special case for the opinion
of the High Court.

(2) Thereupon the special case and the proceedings (or such
of them as may be required) shall be transmitted to the High
Court for the purposes of the determination.

*Jurisdiction (Scotland)*

Court of
Session and
sheriff court
jurisdiction.
**120.**—(1) The Court of Session has jurisdiction to wind up
any company registered in Scotland.

(2) When the Court of Session is in vacation, the jurisdiction
conferred on that court by this section may (subject to the
provisions of this Part) be exercised by the judge acting as
vacation judge in pursuance of section 4 of the Administration
1933 c. 41.     of Justice (Scotland) Act 1933.

(3) Where the amount of a company's share capital paid up
or credited as paid up does not exceed £120,000, the sheriff court
of the sheriffdom in which the company's registered office is
situated has concurrent jurisdiction with the Court of Session to
wind up the company; but—

(*a*) the Court of Session may, if it thinks expedient having

PART IV

    (*d*) the company does not commence its business within a year from its incorporation or suspends its business for a whole year,

    (*e*) the number of members is reduced below 2,

    (*f*) the company is unable to pay its debts,

    (*g*) the court is of the opinion that it is just and equitable that the company should be wound up.

(2) In Scotland, a company which the Court of Session has jurisdiction to wind up may be wound up by the Court if there is subsisting a floating charge over property comprised in the company's property and undertaking, and the court is satisfied that the security of the creditor entitled to the benefit of the floating charge is in jeopardy.

For this purpose a creditor's security is deemed to be in jeopardy if the Court is satisfied that events have occurred or are about to occur which render it unreasonable in the creditor's interests that the company should retain power to dispose of the property which is subject to the floating charge.

Definition of inability to pay debts.

**123.**—(1) A company is deemed unable to pay its debts—

    (*a*) if a creditor (by assignment or otherwise) to whom the company is indebted in a sum exceeding £750 then due has served on the company, by leaving it at the company's registered office, a written demand (in the prescribed form) requiring the company to pay the sum so due and the company has for 3 weeks thereafter neglected to pay the sum or to secure or compound for it to the reasonable satisfaction of the creditor, or

    (*b*) if, in England and Wales, execution or other process issued on a judgment, decree or order of any court in favour of a creditor of the company is returned unsatisfied in whole or in part, or

    (*c*) if, in Scotland, the induciae of a charge for payment on an extract decree, or an extract registered bond, or an extract registered protest, have expired without payment being made, or

    (*d*) if, in Northern Ireland, a certificate of unenforceability has been granted in respect of a judgment against the company, or

    (*e*) if it is proved to the satisfaction of the court that the company is unable to pay its debts as they fall due.

(2) A company is also deemed unable to pay its debts if it is proved to the satisfaction of the court that the value of the

company's assets is less than the amount of its liabilities, taking    PART IV
into account its contingent and prospective liabilities.

(3) The money sum for the time being specified in subsection
(1)(*a*) is subject to increase or reduction by order under section
416 in Part XV.

**124.**—(1) Subject to the provisions of this section, an applica- Application
tion to the court for the winding up of a company shall be by for winding
petition presented either by the company, or the directors, or up.
by any creditor or creditors (including any contingent or pros-
pective creditor or creditors), contributory or contributories, or
by all or any of those parties, together or separately.

(2) Except as mentioned below, a contributory is not entitled
to present a winding-up petition unless either—

    (*a*) the number of members is reduced below 2, or

    (*b*) the shares in respect of which he is a contributory, or
        some of them, either were originally allotted to him,
        or have been held by him, and registered in his name,
        for at least 6 months during the 18 months before
        the commencement of the winding up, or have devolved
        on him through the death of a former holder.

(3) A person who is liable under section 76 to contribute to
a company's assets in the event of its being wound up may
petition on either of the grounds set out in section 122(1)(*f*) and
(*g*), and subsection (2) above does not then apply; but unless
the person is a contributory otherwise than under section 76, he
may not in his character as contributory petition on any other
ground.

This subsection is deemed included in Chapter VII of Part V
of the Companies Act (redeemable shares; purchase by a com-
pany of its own shares) for the purposes of the Secretary of
State's power to make regulations under section 179 of that
Act.

(4) A winding-up petition may be presented by the Secretary
of State—

    (*a*) if the ground of the petition is that in section 122(1)(*b*)
        or (*c*), or

    (*b*) in a case falling within section 440 of the Companies
        Act (expedient in the public interest, following report
        of inspectors, etc.).

(5) Where a company is being wound up voluntarily in
England and Wales, a winding-up petition may be presented
by the official receiver attached to the court as well as by any

*Insolvency Act 1986*    c. **45**    131

may for the time being be, or in a place outside the United    PART VI
Kingdom.

(4) Any person who appears or is brought before the court
under section 236 or this section may be examined on oath,
either orally or (except in Scotland) by interrogatories, con-
cerning the company or the matters mentioned in section
236(2)(c).

### *Adjustment of prior transactions (administration and liquidation)*

**238.**—(1) This section applies in the case of a company    Transactions at
where—                                                        an undervalue
                                                              (England and
    (a) an administration order is made in relation to the    Wales).
        company, or

    (b) the company goes into liquidation ;

and " the office-holder " means the administrator or the liqui-
dator, as the case may be.

(2) Where the company has at a relevant time (defined in
section 240) entered into a transaction with any person at an
undervalue, the office-holder may apply to the court for an
order under this section.

(3) Subject as follows, the court shall, on such an applica-
tion, make such order as it thinks fit for restoring the position
to what it would have been if the company had not entered
into that transaction.

(4) For the purposes of this section and section 241, a com-
pany enters into a transaction with a person at an undervalue
if—

    (a) the company makes a gift to that person or otherwise
        enters into a transaction with that person on terms that
        provide for the company to receive no consideration,
        or

    (b) the company enters into a transaction with that person
        for a consideration the value of which, in money or
        money's worth, is significantly less than the value, in
        money or money's worth, of the consideration pro-
        vided by the company.

(5) The court shall not make an order under this section in
respect of a transaction at an undervalue if it is satisfied—

    (a) that the company which entered into the transaction did
        so in good faith and for the purpose of carrying on its
        business, and

    (b) that at the time it did so there were reasonable grounds
        for believing that the transaction would benefit the
        company.

132        c. 45          *Insolvency Act 1986*

PART VI          **239.**—(1) This section applies as does section 238.
Preferences
(England and     (2) Where the company has at a relevant time (defined in the
Wales).          next section) given a preference to any person, the office-holder
                 may apply to the court for an order under this section.

(3) Subject as follows, the court shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if the company had not given that preference.

(4) For the purposes of this section and section 241, a company gives a preference to a person if—

    (a) that person is one of the company's creditors or a surety or guarantor for any of the company's debts or other liabilities, and

    (b) the company does anything or suffers anything to be done which (in either case) has the effect of putting that person into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if that thing had not been done.

(5) The court shall not make an order under this section in respect of a preference given to any person unless the company which gave the preference was influenced in deciding to give it by a desire to produce in relation to that person the effect mentioned in subsection (4)(b).

(6) A company which has given a preference to a person connected with the company (otherwise than by reason only of being its employee) at the time the preference was given is presumed, unless the contrary is shown, to have been influenced in deciding to give it by such a desire as is mentioned in subsection (5).

(7) The fact that something has been done in pursuance of the order of a court does not, without more, prevent the doing or suffering of that thing from constituting the giving of a preference.

" Relevant       **240.**—(1) Subject to the next subsection, the time at which a
time " under     company enters into a transaction at an undervalue or gives a
ss. 238, 239.    preference is a relevant time if the transaction is entered into, or the preference given—

    (a) in the case of a transaction at an undervalue or of a preference which is given to a person who is connected with the company (otherwise than by reason only of being its employee), at a time in the period of 2 years ending with the onset of insolvency (which expression is defined below),

(b) in the case of a preference which is not such a transac-   PART VI
tion and is not so given, at a time in the period of 6
months ending with the onset of insolvency, and

(c) in either case, at a time between the presentation of a
petition for the making of an administration order in
relation to the company and the making of such an
order on that petition.

(2) Where a company enters into a transaction at an under-
value or gives a preference at a time mentioned in subsection
(1)(a) or (b), that time is not a relevant time for the purposes of
section 238 or 239 unless the company—

(a) is at that time unable to pay its debts within the mean-
ing of section 123 in Chapter VI of Part IV, or

(b) becomes unable to pay its debts within the meaning of
that section in consequence of the transaction or pref-
erence;

but the requirements of this subsection are presumed to be
satisfied, unless the contrary is shown, in relation to any transac-
tion at an undervalue which is entered into by a company with
a person who is connected with the company.

(3) For the purposes of subsection (1), the onset of insolven-
cy is—

(a) in a case where section 238 or 239 applies by reason of
the making of an administration order or of a com-
pany going into liquidation immediately upon the dis-
charge of an administration order, the date of the
presentation of the petition on which the administra-
tion order was made, and

(b) in a case where the section applies by reason of a com-
pany going into liquidation at any other time, the date
of the commencement of the winding up.

**241.**—(1) Without prejudice to the generality of sections   Orders under
238(3) and 239(3), an order under either of those sections with   ss. 238, 239.
respect to a transaction or preference entered into or given by
a company may (subject to the next subsection)—

(a) require any property transferred as part of the transac-
tion, or in connection with the giving of the preference,
to be vested in the company,

(b) require any property to be so vested if it represents in
any person's hands the application either of the pro-
ceeds of sale of property so transferred or of money
so transferred,

(c) release or discharge (in whole or in part) any security
given by the company,

PART VI

    (d) require any person to pay, in respect of benefits received by him from the company, such sums to the office-holder as the court may direct,

    (e) provide for any surety or guarantor whose obligations to any person were released or discharged (in whole or in part) under the transaction, or by the giving of the preference, to be under such new or revived obligations to that person as the court thinks appropriate,

    (f) provide for security to be provided for the discharge of any obligation imposed by or arising under the order, for such an obligation to be charged on any property and for the security or charge to have the same priority as a security or charge released or discharged (in whole or in part) under the transaction or by the giving of the preference, and

    (g) provide for the extent to which any person whose property is vested by the order in the company, or on whom obligations are imposed by the order, is to be able to prove in the winding up of the company for debts or other liabilities which arose from, or were released or discharged (in whole or in part) under or by, the transaction or the giving of the preference.

(2) An order under section 238 or 239 may affect the property of, or impose any obligation on, any person whether or not he is the person with whom the company in question entered into the transaction or (as the case may be) the person to whom the preference was given ; but such an order—

    (a) shall not prejudice any interest in property which was acquired from a person other than the company and was acquired in good faith, for value and without notice of the relevant circumstances, or prejudice any interest deriving from such an interest, and

    (b) shall not require a person who received a benefit from the transaction or preference in good faith, for value and without notice of the relevant circumstances to pay a sum to the office-holder, except where that person was a party to the transaction or the payment is to be in respect of a preference given to that person at a time when he was a creditor of the company.

(3) For the purposes of this section the relevant circumstances, in relation to a transaction or preference, are—

    (a) the circumstances by virtue of which an order under section 238 or (as the case may be) 239 could be made in respect of the transaction or preference if the company were to go into liquidation, or an administration order were made in relation to the company, within a

*Insolvency Act 1986*       c. **45**       135

particular period after the transaction is entered into          PART VI
or the preference given, and

(b) if that period has expired, the fact that the company
has gone into liquidation or that such an order has
been made.

(4) The provisions of sections 238 to 241 apply without pre-
judice to the availability of any other remedy, even in relation
to a transaction or preference which the company had no
power to enter into or give.


**242.**—(1) Where this subsection applies and—          Gratuitous
alienations
(a) the winding up of a company has commenced, an (Scotland).
alienation by the company is challengeable by—

(i) any creditor who is a creditor by virtue of a
debt incurred on or before the date of such com-
mencement, or

(ii) the liquidator ;

(b) an administration order is in force in relation to a com-
pany, an alienation by the company is challengeable by
the administrator.

(2) Subsection (1) applies where—

(a) by the alienation, whether before or after 1st April
1986 (the coming into force of section 75 of the Bank- 1985 c
ruptcy (Scotland) Act 1985), any part of the company's
property is transferred or any claim or right of the
company is discharged or renounced, and

(b) the alienation takes place on a relevant day.

(3) For the purposes of subsection (2)(b), the day on which an
alienation takes place is the day on which it becomes com-
pletely effectual ; and in that subsection " relevant day " means, if
the alienation has the effect of favouring—

(a) a person who is an associate (within the meaning of
the Bankruptcy (Scotland) Act 1985) of the company, a
day not earlier than 5 years before the date on which—

(i) the winding up of the company commences, or

(ii) as the case may be, the administration order is
made ; or

(b) any other person, a day not earlier than 2 years before
that date.

(4) On a challenge being brought under subsection (1), the
court shall grant decree of reduction or for such restoration of
property to the company's assets or other redress as may be

3635-jpm   Doc 271-6   Filed 04/03/17   Entered 04/03/17 18:29:57   Exhibit
Part 6   Pg 287 of 309
*Insolvency Act 1986*   c. **45**   141

**248.** In this Group of Parts, except in so far as the context otherwise requires—

    (*a*) " secured creditor ", in relation to a company, means a creditor of the company who holds in respect of his debt a security over property of the company, and " unsecured creditor " is to be read accordingly ; and

    (*b*) " security " means—

        (i) in relation to England and Wales, any mortgage, charge, lien or other security, and

        (ii) in relation to Scotland, any security (whether heritable or moveable), any floating charge and any right of lien or preference and any right of retention (other than a right of compensation or set off).

<div align="right">PART VII<br>" Secured<br>creditor ", etc.</div>

**249.** For the purposes of any provision in this Group of Parts, a person is connected with a company if—

    (*a*) he is a director or shadow director of the company or an associate of such a director or shadow director, or

    (*b*) he is an associate of the company ;

and " associate " has the meaning given by section 435 in Part XVIII of this Act.

<div align="right">" Connected "<br>with a<br>company.</div>

**250.** For the purposes of any provision in this Group of Parts, a person who is not a member of a company but to whom shares in the company have been transferred, or transmitted by operation of law, is to be regarded as a member of the company, and references to a member or members are to be read accordingly.

<div align="right">" Member " of<br>a company.</div>

**251.** In this Group of Parts, except in so far as the context otherwise requires—

    " administrative receiver " means—

        (*a*) an administrative receiver as defined by section 29(2) in Chapter I of Part III, or

        (*b*) a receiver appointed under section 51 in Chapter II of that Part in a case where the whole (or substantially the whole) of the company's property is attached by the floating charge ;

    " business day " means any day other than a Saturday, a Sunday, Christmas Day, Good Friday or a day which is a bank holiday in any part of Great Britain ;

    " chattel leasing agreement " means an agreement for the bailment or, in Scotland, the hiring of goods which is capable of subsisting for more than 3 months ;

<div align="right">Expressions<br>used generally.</div>

F

142      c. **45**            *Insolvency Act 1986*

PART VII

" contributory " has the meaning given by section 79 ;

" director " includes any person occupying the position of director, by whatever name called ;

" floating charge " means a charge which, as created, was a floating charge and includes a floating charge within section 462 of the Companies Act (Scottish floating charges) ;

" office copy ", in relation to Scotland, means a copy certified by the clerk of court ;

" the official rate ", in relation to interest, means the rate payable under section 189(4) ;

" prescribed " means prescribed by the rules ;

" receiver ", in the expression " receiver or manager ", does not include a receiver appointed under section 51 in Chapter II of Part III ;

" retention of title agreement " means an agreement for the sale of goods to a company, being an agreement—

  (a) which does not constitute a charge on the goods, but

  (b) under which, if the seller is not paid and the company is wound up, the seller will have priority over all other creditors of the company as respects the goods or any property representing the goods ;

" the rules " means rules under section 411 in Part XV ; and

" shadow director ", in relation to a company, means a person in accordance with whose directions or instructions the directors of the company are accustomed to act (but so that a person is not deemed a shadow director by reason only that the directors act on advice given by him in a professional capacity) ;

and any expression for whose interpretation provision is made by Part XXVI of the Companies Act, other than an expression defined above in this section, is to be construed in accordance with that provision.

## THE SECOND GROUP OF PARTS

### INSOLVENCY OF INDIVIDUALS ; BANKRUPTCY

### PART VIII

### INDIVIDUAL VOLUNTARY ARRANGEMENTS

#### *Moratorium for insolvent debtor*

Interim order of court.

**252.**—(1) In the circumstances specified below, the court may in the case of a debtor (being an individual) make an interim order under this section.

otherwise towards the outgoings of the premises, the bankrupt    PART IX
does not, by virtue of those payments, acquire any interest in
the premises.

### *Adjustment of prior transactions, etc.*

**339.**—(1) Subject as follows in this section and sections 341 Transactions at
and 342, where an individual is adjudged bankrupt and he has an undervalue.
at a relevant time (defined in section 341) entered into a trans-
action with any person at an undervalue, the trustee of the bank-
rupt's estate may apply to the court for an order under this
section.

(2) The court shall, on such an application, make such order
as it thinks fit for restoring the position to what it would have
been if that individual had not entered into that transaction.

(3) For the purposes of this section and sections 341 and 342,
an individual enters into a transaction with a person at an under-
value if—

   (a) he makes a gift to that person or he otherwise enters
       into a transaction with that person on terms that pro-
       vide for him to receive no consideration,

   (b) he enters into a transaction with that person in
       consideration of marriage, or

   (c) he enters into a transaction with that person for a con-
       sideration the value of which, in money or money's
       worth, is significantly less than the value, in money or
       money's worth, of the consideration provided by the
       individual.

**340.**—(1) Subject as follows in this and the next two sections, Preferences.
where an individual is adjudged bankrupt and he has at a rele-
vant time (defined in section 341) given a preference to any per-
son, the trustee of the bankrupt's estate may apply to the court for
an order under this section.

(2) The court shall, on such an application, make such order
as it thinks fit for restoring the position to what it would have
been if that individual had not given that preference.

(3) For the purposes of this and the next two sections, an
individual gives a preference to a person if—

   (a) that person is one of the individual's creditors or a surety
       or guarantor for any of his debts or other liabilities,
       and

   (b) the individual does anything or suffers anything to be
       done which (in either case) has the effect of putting
       that person into a position which, in the event of the

246        c. **45**            *Insolvency Act 1986*

PART XV    (2) An order under this section may make different provision
for different cases and may contain such incidental, supple-
mental and transitional provisions as may appear to the Lord
Chancellor necessary or expedient.

(3) An order under this section shall be made by statutory
instrument subject to annulment in pursuance of a resolution
of either House of Parliament.

(4) For the purposes of this section the estate of a deceased
person is insolvent if, when realised, it will be insufficient to
meet in full all the debts and other liabilities to which it is
subject.

Recognised    **422.**—(1) The Secretary of State may, by order made with the
banks, etc.    concurrence of the Treasury and after consultation with the
Bank of England, provide that such provisions in the first
Group of Parts as may be specified in the order shall apply in
relation to—

1979 c. 37.        (a) recognised banks and licensed institutions within the
                meaning of the Banking Act 1979, and
            (b) institutions to which sections 16 and 18 of that Act
                apply as if they were licensed institutions,

with such modifications as may be so specified.

(2) An order under this section may make different provision
for different cases and may contain such incidental, supple-
mental and transitional provisions as may appear to the Secre-
tary of State necessary or expedient.

(3) An order under this section shall be made by statutory
instrument subject to annulment in pursuance of a resolution
of either House of Parliament.


## PART XVI

### PROVISIONS AGAINST DEBT AVOIDANCE (ENGLAND AND WALES ONLY)

Transactions    **423.**—(1) This section relates to transactions entered into at
defrauding    an undervalue ; and a person enters into such a transaction with
creditors.    another person if—

            (a) he makes a gift to the other person or he otherwise
                enters into a transaction with the other on terms that
                provide for him to receive no consideration ;
            (b) he enters into a transaction with the other in considera-
                tion of marriage ; or
            (c) he enters into a transaction with the other for a con-
                sideration the value of which, in money or money's

worth, is significantly less than the value, in money or    PART XVI
money's worth, of the consideration provided by him-
self.

(2) Where a person has entered into such a transaction, the
court may, if satisfied under the next subsection, make such
order as it thinks fit for—

  (a) restoring the position to what it would have been if
      the transaction had not been entered into, and

  (b) protecting the interests of persons who are victims of
      the transaction.

(3) In the case of a person entering into such a transaction,
an order shall only be made if the court is satisfied that it was
entered into by him for the purpose—

  (a) of putting assets beyond the reach of a person who is
      making, or may at some time make, a claim against
      him, or

  (b) of otherwise prejudicing the interests of such a person
      in relation to the claim which he is making or may
      make.

(4) In this section " the court " means the High Court or—

  (a) if the person entering into the transaction is an indi-
      vidual, any other court which would have jurisdiction
      in relation to a bankruptcy petition relating to him ;

  (b) if that person is a body capable of being wound up
      under Part IV or V of this Act, any other court having
      jurisdiction to wind it up.

(5) In relation to a transaction at an undervalue, references
here and below to a victim of the transaction are to a person
who is, or is capable of being, prejudiced by it ; and in the
following two sections the person entering into the transaction
is referred to as " the debtor ".

**424.**—(1) An application for an order under section 423 shall    Those who
not be made in relation to a transaction except—    may apply for
    an order
  (a) in a case where the debtor has been adjudged bankrupt    under s. 423.
      or is a body corporate which is being wound up or in
      relation to which an administration order is in force,
      by the official receiver, by the trustee of the bankrupt's
      estate or the liquidator or administrator of the body
      corporate or (with the leave of the court) by a victim
      of the transaction ;

  (b) in a case where a victim of the transaction is bound
      by a voluntary arrangement approved under Part I or
      Part VIII of this Act, by the supervisor of the volun-

248        c. **45**                    *Insolvency Act 1986*

PART XVI            tary arrangement or by any person who (whether or not
                    so bound) is such a victim ; or

        (c) in any other case, by a victim of the transaction.

        (2) An application made under any of the paragraphs of
subsection (1) is to be treated as made on behalf of every
victim of the transaction.


Provision           **425.**—(1) Without prejudice to the generality of section 423,
which may be        an order made under that section with respect to a transaction
made by order       may (subject as follows)—
under s. 423.

        (a) require any property transferred as part of the trans-
            action to be vested in any person, either absolutely or
            for the benefit of all the persons on whose behalf the
            application for the order is treated as made ;

        (b) require any property to be so vested if it represents, in
            any person's hands, the application either of the pro-
            ceeds of sale of property so transferred or of money
            so transferred ;

        (c) release or discharge (in whole or in part) any security
            given by the debtor ;

        (d) require any person to pay to any other person in re-
            spect of benefits received from the debtor such sums
            as the court may direct ;

        (e) provide for any surety or guarantor whose obligations
            to any person were released or discharged (in whole
            or in part) under the transaction to be under such
            new or revived obligations as the court thinks appro-
            priate ;

        (f) provide for security to be provided for the discharge
            of any obligation imposed by or arising under the
            order, for such an obligation to be charged on any
            property and for such security or charge to have the
            same priority as a security or charge released or dis-
            charged (in whole or in part) under the transaction.

        (2) An order under section 423 may affect the property of,
or impose any obligation on, any person whether or not he is
the person with whom the debtor entered into the transaction ;
but such an order—

        (a) shall not prejudice any interest in property which was
            acquired from a person other than the debtor and was
            acquired in good faith, for value and without notice
            of the relevant circumstances, or prejudice any interest
            deriving from such an interest, and

(b) shall not require a person who received a benefit from the transaction in good faith, for value and without notice of the relevant circumstances to pay any sum unless he was a party to the transaction.

(3) For the purposes of this section the relevant circumstances in relation to a transaction are the circumstances by virtue of which an order under section 423 may be made in respect of the transaction.

(4) In this section " security " means any mortgage, charge, lien or other security.

## PART XVII

### MISCELLANEOUS AND GENERAL

**426.**—(1) An order made by a court in any part of the United Kingdom in the exercise of jurisdiction in relation to insolvency law shall be enforced in any other part of the United Kingdom as if it were made by a court exercising the corresponding jurisdiction in that other part.

(2) However, without prejudice to the following provisions of this section, nothing in subsection (1) requires a court in any part of the United Kingdom to enforce, in relation to property situated in that part, any order made by a court in any other part of the United Kingdom.

(3) The Secretary of State, with the concurrence in relation to property situated in England and Wales of the Lord Chancellor, may by order make provision for securing that a trustee or assignee under the insolvency law of any part of the United Kingdom has, with such modifications as may be specified in the order, the same rights in relation to any property situated in another part of the United Kingdom as he would have in the corresponding circumstances if he were a trustee or assignee under the insolvency law of that other part.

(4) The courts having jurisdiction in relation to insolvency law in any part of the United Kingdom shall assist the courts having the corresponding jurisdiction in any other part of the United Kingdom or any relevant country or territory.

(5) For the purposes of subsection (4) a request made to a court in any part of the United Kingdom by a court in any other part of the United Kingdom or in a relevant country or territory is authority for the court to which the request is made to apply, in relation to any matters specified in the request, the insolvency law which is applicable by either court in relation to comparable matters falling within its jurisdiction.

PART XVII        In exercising its discretion under this subsection, a court shall have regard in particular to the rules of private international law.

(6) Where a person who is a trustee or assignee under the insolvency law of any part of the United Kingdom claims property situated in any other part of the United Kingdom (whether by virtue of an order under subsection (3) or otherwise), the submission of that claim to the court exercising jurisdiction in relation to insolvency law in that other part shall be treated in the same manner as a request made by a court for the purpose of subsection (4).

1977 c. 45.        (7) Section 38 of the Criminal Law Act 1977 (execution of warrant of arrest throughout the United Kingdom) applies to a warrant which, in exercise of any jurisdiction in relation to insolvency law, is issued in any part of the United Kingdom for the arrest of a person as it applies to a warrant issued in that part of the United Kingdom for the arrest of a person charged with an offence.

(8) Without prejudice to any power to make rules of court, any power to make provision by subordinate legislation for the purpose of giving effect in relation to companies or individuals to the insolvency law of any part of the United Kingdom includes power to make provision for the purpose of giving effect in that part to any provision made by or under the preceding provisions of this section.

(9) An order under subsection (3) shall be made by statutory instrument subject to annulment in pursuance of a resolution of either House of Parliament.

(10) In this section " insolvency law " means—

(*a*) in relation to England and Wales, provision made by or under this Act or sections 6 to 10, 12, 15, 19(*c*) and 20 (with Schedule 1) of the Company Directors Disqualification Act 1986 and extending to England and Wales ;

1986 c. 46.

(*b*) in relation to Scotland, provision extending to Scotland and made by or under this Act, sections 6 to 10, 12, 15, 19(*c*) and 20 (with Schedule 1) of the Company Directors Disqualification Act 1986, Part XVIII of the Companies Act or the Bankruptcy (Scotland) Act 1985 ;

1985 c. 66.

(*c*) in relation to Northern Ireland, provision made by or under the Bankruptcy Acts (Northern Ireland) 1857 to 1980, Part V, VI or IX of the Companies Act (Northern Ireland) 1960 or Part IV of the Companies (Northern Ireland) Order 1978 ;

1960 c. 22
(N.I.).
S.I. 1978/1042
(N I 12).

(d) in relation to any relevant country or territory, so much
of the law of that country or territory as corresponds
to provisions falling within any of the foregoing para-
graphs ;

and references in this subsection to any enactment include, in
relation to any time before the coming into force of that enact-
ment the corresponding enactment in force at that time.

(11) In this section " relevant country or territory " means—

(a) any of the Channel Islands or the Isle of Man, or

(b) any country or territory designated for the purposes of
this section by the Secretary of State by order made
by statutory instrument.

**427.**—(1) Where a court in England and Wales or Northern  Parliamentary
Ireland adjudges an individual bankrupt or a court in Scotland  disqualifica-
awards sequestration of an individual's estate, the individual is  tion.
disqualified—

(a) for sitting or voting in the House of Lords,

(b) for being elected to, or sitting or voting in, the House
of Commons, and

(c) for sitting or voting in a committee of either House·

(2) Where an individual is disqualified under this section, the
disqualification ceases—

(a) except where the adjudication is annulled or the award
recalled or reduced without the individual having been
first discharged, on the discharge of the individual, and

(b) in the excepted case, on the annulment, recall or reduc-
tion, as the case may be.

(3) No writ of summons shall be issued to any lord of Parlia-
ment who is for the time being disqualified under this section
for sitting and voting in the House of Lords.

(4) Where a member of the House of Commons who is dis-
qualified under this section continues to be so disqualified until
the end of the period of 6 months beginning with the day of the
adjudication or award, his seat shall be vacated at the end of
that period.

(5) A court which makes an adjudication or award such as
is mentioned in subsection (1) in relation to any lord of Parlia-
ment or member of the House of Commons shall forthwith cer-
tify the adjudication or award to the Speaker of the House of
Lords or, as the case may be, to the Speaker of the House of
Commons.

PART XVIII    power at any general meeting of a company have effect with
              any necessary modifications.

Expressions      **436.** In this Act, except in so far as the context otherwise re-
used          quires (and subject to Parts VII and XI)—
generally.
                   " the appointed day " means the day on which this Act
                        comes into force under section 443 ;

                   " associate " has the meaning given by section 435 ;

                   " business " includes a trade or profession ;

1985 c. 6.         " the Companies Act " means the Companies Act 1985 ;

                   " conditional sale agreement " and " hire-purchase agree-
1974 c. 39.             ment " have the same meanings as in the Consumer
                        Credit Act 1974 ;

                   " modifications " includes additions, alterations and omis-
                        sions and cognate expressions shall be construed accor-
                        dingly ;

                   " property " includes money, goods, things in action, land
                        and every description of property wherever situated and
                        also obligations and every description of interest,
                        whether present or future or vested or contingent, aris-
                        ing out of, or incidental to, property ;

                   " records " includes computer records and other non-docu-
                        mentary records ;

                   " subordinate legislation " has the same meaning as in the
1978 c. 30.             Interpretation Act 1978 ; and

                   " transaction " includes a gift, agreement or arrangement,
                        and references to entering into a transaction shall be
                        construed accordingly.


## PART XIX

### FINAL PROVISIONS

Transitional     **437.** The transitional provisions and savings set out in Sche-
provisions,   dule 11 to this Act shall have effect, the Schedule comprising the
and savings.  following Parts—

                   Part I: company insolvency and winding up (matters
                   arising before appointed day, and continuance of proceed-
                   ings in certain cases as before that day) ;

# TAB 99

# BUTTERWORTHS
# INSOLVENCY LAW
# HANDBOOK

## Eighteenth edition

### Editors
### GLEN DAVIS QC
### MARCUS HAYWOOD



**[6.1111]**

**[13.12 "Debt", "liability" (winding up)**

(1)    "Debt", in relation to the winding up of a company, means (subject to the next paragraph) any of the following—

[(a)    any debt or liability to which the company is subject—

    (i)    in the case of a winding up which was not immediately preceded by an administration, at the date on which the company went into liquidation;

    (ii)    in the case of a winding up which was immediately preceded by an administration, at the date on which the company entered administration.]

(b)    any debt or liability to which the company may become subject after that date by reason of any obligation incurred before that date; and

(c)    any interest provable as mentioned in Rule 4.93(1).

(2)    For the purposes of any provision of the Act or the Rules about winding up, any liability in tort is a debt provable in the winding up, if either—

[(a)    the cause of action has accrued—

    (i)    in the case of a winding up which was not immediately preceded by an administration, at the date on which the company went into liquidation;

    (ii)    in the case of a winding up which was immediately preceded by an administration, at the date on which the company entered administration.]

(b)    all the elements necessary to establish the cause of action exist at that date except for actionable damage.

(3)    For the purposes of references in any provision of the Act or the Rules about winding up to a debt or liability, it is immaterial whether the debt or liability is present or future, whether it is certain or contingent, or whether its amount is fixed or liquidated, or is capable of being ascertained by fixed rules or as a matter of opinion; and references in any such provision to owing a debt are to be read accordingly.

(4)    In any provision of the Act or the Rules about winding up, except in so far as the context otherwise requires, "liability" means (subject to paragraph (3) above) a liability to pay money or money's worth, including any liability under an enactment, any liability for breach of trust, any liability in contract, tort or bailment, and any liability arising out of an obligation to make restitution.

(5)    This Rule shall apply where a company is in administration and shall be read as if—

[(a)    references to winding up were references to administration,

(b)    references to administration were references to winding up,

(c)    references to going into liquidation were references to entering administration, and

(d)    references to entering administration were references to going into liquidation.]]

**NOTES**

Substituted by the Insolvency (Amendment) Rules 2006, SI 2006/1272, r 4, subject to transitional provisions in r 3 thereof at **[2.55]**.

Para (1): sub-para (a) substituted by the Insolvency (Amendment) Rules 2010, SI 2010/686, r 2, Sch 1, para 498(1), (2), subject to transitional provisions in r 6(1) of, and Sch 4, para 1 to, the 2010 Rules at **[2.93]**, **[2.95]**, and previously read as follows:

"(a)    any debt or liability to which the company is subject at the date on which it goes into liquidation;".

Para (2): sub-para (a) substituted by SI 2010/686, r 2, Sch 1, para 498(1), (3), subject to transitional provisions in r 6(1) of, and Sch 4, para 1 to, the 2010 Rules at **[2.93]**, **[2.95]**, and previously read as follows:

"(a)    the cause of action has accrued at the date on which the company goes into liquidation; or".

Para (5): words in square brackets substituted for original words "references to winding-up were a reference to administration." by SI 2010/686, r 2, Sch 1, para 498(1), (4), subject to transitional provisions in r 6(1) of, and Sch 4, para 1 to, the 2010 Rules at **[2.93]**, **[2.95]**.

Application: see the note at the beginning of this Part.

Prior to the substitution by the 2006 Rules, r 13.12 (as amended by SI 2003/1730, r 12, Sch 1, para 65, subject to savings in r 5(3), (4) thereof at **[2.25]**) read as follows:

"**13.12    "Debt", "liability" (winding up)**

(1)    "Debt", in relation to the winding up of a company, means (subject to the next paragraph) any of the following—

(a)    any debt or liability to which the company is subject at the date on which it goes into liquidation;

(b)    any debt or liability to which the company may become subject after that date by reason of any obligation incurred before that date; and

(c)    any interest provable as mentioned in rule 4.93(1).

(2)    In determining for the purposes of any provision of the Act or the Rules about winding up, whether any liability in tort is a debt provable in the winding up, the company is deemed to become subject to that liability by reason of an obligation incurred at the time when the cause of action accrued.

(3)    For the purposes of references in any provision of the Act or the Rules about winding up to a debt or liability, it is immaterial whether the debt or liability is present or future, whether it is certain or contingent, or whether its amount is fixed or liquidated, or is capable of being ascertained by fixed rules or as a matter of opinion; and references in any such provision to owing a debt are to be read accordingly.

(4)    In any provision of the Act or the Rules about winding up, except in so far as the context otherwise requires, "liability" means (subject to paragraph (3) above) a liability to pay money or money's worth, including any liability under an enactment, any liability for breach of trust, any liability in contract, tort or bailment, and any liability arising out of an

obligation to make restitution.

[(5)    This Rule shall apply where a company is in administration and shall be read as if references to winding-up were a reference to administration.]".

## [6.1112]
## [13.12A    "Authorised deposit-taker and former authorised deposit-taker"

(1)    "Authorised deposit-taker" means a person with permission under Part 4 of the Financial Services and Markets Act 2000 to accept deposits.

(2)    "Former authorised deposit-taker" means a person who—
    (a)    is not an authorised deposit-taker,
    (b)    was formerly an authorised institution under the Banking Act 1987, or a recognised bank or a licensed institution under the Banking Act 1979, and
    (c)    continues to have liability in respect of any deposit for which it had a liability at a time when it was an authorised institution, recognised bank or licensed institution.

(3)    Paragraphs (1) and (2) must be read with—
    (a)    section 22 of the Financial Services and Markets Act 2000;
    (b)    any relevant order under that section; and
    (c)    Schedule 2 to that Act.]

### NOTES
Inserted by the Financial Services and Markets Act 2000 (Consequential Amendments and Repeals) Order 2001, SI 2001/3649, art 381.

Banking Act 1987: repealed by the Financial Services and Markets Act 2000 (Consequential Amendments and Repeals) Order 2001, SI 2001/3649, art 3(1)(d).

## [6.1113]
## 13.13    Expressions used generally

[(1)    "Business day" means any day other than a Saturday, a Sunday, Christmas Day, Good Friday or a day which is a bank holiday in any part of [England and Wales] under or by virtue of the Banking and Financial Dealings Act 1971    . . . ]

(2)    "The Department" means [the Department for Business, Innovation and Skills].

[(2A)    "Duly authorised representative" means, in relation to a corporation, a person who is authorised by or under the constitution of the corporation to act on behalf of the corporation; and like expressions are to be construed accordingly.]

(3)    "File in court" [and "file with the court"] means deliver to the court for filing.

(4)    "The Gazette" means the London Gazette.

[(4A)    "Gazetted" means [advertised] once in the Gazette.]

[(4B)    "Standard contents" means—
    (a)    in relation to a notice to be gazetted, the contents specified in Rules 12A.33 to 12A.35; and
    (b)    in relation to a notice to be advertised in any other way, the contents specified in Rules 12A.38 to 12A.40.]

(5)    "General regulations" means regulations made by the Secretary of State under Rule 12.1.

[(6)    "Practice direction" means a direction as to the practice and procedure of any court within the scope of the CPR.

(7)    "Prescribed order of priority" means the order of priority of payments laid down by Chapter 20 of Part 4 of the Rules, or Chapter 23 of Part 6.]

[(8)    "Centre of main interests" has the same meaning as in the EC Regulation.]

(9)    "Establishment" has the meaning given by Article 2(h) of the EC Regulation.

(10)    "Main proceedings" means proceedings opened in accordance with Article 3(1) of the EC Regulation and falling within the definition of insolvency proceedings in Article 2(a) of the EC Regulation and
    (a)    in relation to England and Wales    . . .    set out in Annex A to the EC Regulation under the heading "United Kingdom", and
    (b)    in relation to another member State, set out in Annex A to the EC Regulation under the heading relating to that member State.

(11)    "Member State liquidator" means a person falling within the definition of liquidator in Article 2(b) of the EC Regulation appointed in proceedings to which it applies in a member State other than the United Kingdom.

(12)    "Secondary proceedings" means proceedings opened in accordance with Articles 3(2) and 3(3) of the EC Regulation and falling within the definition of winding-up proceedings in Article 2(c) of the EC Regulation and
    (a)    in relation to England and Wales    . . .    set out in Annex B to the EC Regulation under the heading "United Kingdom", and
    (b)    in relation to another member State, set out in Annex B to the EC Regulation under the heading relating to that member State.

# TAB 100

Refer to Reprint of this Act.



**NEW ZEALAND**

## ANALYSIS

Title.

1. Short Title and commencement. Division into Parts.

### PART I

#### PRELIMINARY

2. Interpretation.
3. Registrar of Companies.
4. Deputy Registrar of Companies.
5. District and Assistant Registrars of Companies.
6. Official seals.
7. Registers to be kept for purposes of this Act.
8. Fees.
9. Inspection, production, and evidence of documents kept by Registrar.
10. Power of Registrar to destroy old documents, or deliver them to libraries and museums.
11. Enforcement of duty of company to make returns to Registrar.
12. Regulations.

### PART II

INCORPORATION OF COMPANIES AND MATTERS INCIDENTAL THERETO

*Memorandum of Association*

13. Mode of forming company.

A—20

14. Requirements with respect to memorandum.
15. Signature of memorandum, and exemption from stamp duty.
16. Incidental and ancillary objects and powers.
17. Restriction on alteration of memorandum.
18. Mode in which and extent to which objects of company may be altered.
19. Extending powers of dairy companies to engage in associated industries.

*Articles of Association*

20. Articles prescribing regulations for companies.
21. Regulations required in case of unlimited company or company limited by guarantee.
22. Adoption and application of Table A.
23. Printing and signature of articles, and exemption from stamp duty.
24. Alteration of articles by special resolution.

*Form of Memorandum and Articles*

25. Statutory forms of memorandum and articles.

evidence against him, and shall be open to the inspection of any creditor or contributory at all reasonable times.

(7) The Court may, if it thinks fit, adjourn the examination from time to time.

(8) An examination under this section may, if the Court so directs, and subject to general rules, be held before any Magistrate, or before any Registrar of the Supreme Court, and the powers of the Court under this section as to the conduct of the examination may be exercised by the person before whom the examination is held.

Power to arrest absconding contributory.
1933, No. 29, s. 217;
1948, ch. 38, s. 271 (U.K.)

264. The Court, at any time either before or after making a winding-up order, on proof of probable cause for believing that a contributory is about to quit New Zealand, or otherwise to abscond, or to remove or conceal any of his property for the purpose of evading payment of calls or of avoiding examination respecting the affairs of the company, may cause the contributory to be arrested, and his books and papers, money, securities for money, and movable personal property to be seized, and him and them to be safely kept until such time as the Court may order.

Powers of Court cumulative.
1933, No. 29, s. 218;
1948, ch. 38, s. 272 (U.K.)

265. Any powers by this Act conferred on the Court shall be in addition to and not in restriction of any existing powers of instituting proceedings against any contributory or debtor of the company, or the estate of any contributory or debtor, for the recovery of any call or other sums.

Delegation to liquidator of certain powers of Court.
1933, No. 29, s. 219;
1948, ch. 38, s. 273 (U.K.)

266. Provision may be made by general rules for enabling or requiring all or any of the powers and duties conferred and imposed on the Court by this Act in respect of the following matters:

(*a*) The holding and conducting of meetings to ascertain the wishes of creditors and contributories:

(*b*) The settling of lists of contributories and the rectifying of the register of members where required, and the collecting and applying of the assets:

(*c*) The paying, delivery, conveyance, surrender, or transfer of money, property, books, or papers to the liquidator:

(*d*) The making of calls:

(*e*) The fixing of a time within which debts and claims must be proved,—

to be exercised or performed by the liquidator as an officer of the Court, and subject to the control of the Court:

Provided that the liquidator shall not, without the special leave of the Court, rectify the register of members, and shall not make any call without either the special leave of the Court or the sanction of the committee of inspection.

**267.** (1) When the affairs of a company have been completely wound up, the Court, if the liquidator makes an application in that behalf, shall make an order that the company be dissolved from the date of the order, and the company shall be dissolved accordingly.

Dissolution of company. 1933, No. 29, s. 220; 1948, ch. 38, s. 274 (U.K.)

(2) A sealed copy of the order shall within fourteen days from the date thereof be forwarded by the liquidator to the Registrar, who shall make in his books a minute of the dissolution of the company.

(3) If the liquidator makes default in complying with the requirements of this section he shall be liable to a fine not exceeding five pounds for every day during which he is in default.

### (iii) VOLUNTARY WINDING UP

*Resolutions for and Commencement of Voluntary Winding Up*

**268.** (1) A company may be wound up voluntarily—

(*a*) When the period, if any, fixed for the duration of the company by the memorandum or articles expires, or the event, if any, occurs, on the occurrence of which the memorandum or articles provide that the company is to be dissolved, and the company in general meeting has passed a resolution requiring the company to be wound up voluntarily:

(*b*) If the company resolves by special resolution that the company be wound up voluntarily:

(*c*) If the company resolves by extraordinary resolution to the effect that it cannot by reason of its liabilities continue its business, and that it is advisable to wind up.

Circumstances in which company may be wound up voluntarily. 1933, No. 29, s. 221; 1948, ch. 38, s. 278 (U.K.)

# TAB 101

# PRIVATE INTERNATIONAL LAW



A treatise from
the standpoint of Scots law

by

A. E. ANTON, C.B.E., F.B.A,
*Honorary Professor of Law in the University of Aberdeen*

with

P. R. BEAUMONT
*Lecturer in Law in the University of Aberdeen*

SECOND EDITION

*Published under the auspices of*
THE SCOTTISH UNIVERSITIES LAW INSTITUTE

W. GREEN
EDINBURGH
1990

entails that the Scottish courts will require creditors to account for the proceeds of foreign preferences obtained after the sequestration to the prejudice of the general body of creditors. If a foreign creditor claims in the sequestration but declines to account for these preferences he will be subject to the jurisdiction *ex reconventione*.[34]

**Equalisation of diligence.** Under Scots law, as under the law of England and several other systems, a sequestration operates to cut down diligences and alienations to the prejudice of creditors over a period prior to the date of sequestration.[35] In England this is known conveniently as the principle of "relation-back." When the Scottish court is asked to treat as void a diligence effected or a conveyance granted abroad, are the Scottish courts to apply their own or the foreign principles of relation-back? It is thought that our courts would apply exclusively the Scottish rules.[36] In *White* v. *Briggs,* however, Lord Justice-Clerk Hope[37] expressed the view that the whole transaction had taken place in Scotland. In *Lindsay* v. *Paterson*[38] the First Division granted interdict against a creditor in a Scottish sequestration continuing proceedings in an English court designed to follow up a prior attachment of the debtor's property in England.

It is, of course, an entirely different question whether the foreign system of law will take account of this view of the effect of a Scottish bankruptcy. In *Galbraith* v. *Grimshaw*[39] the trustee in a Scottish sequestration sought to cut down a prior diligence of English creditors, a garnishee order attaching an English debt due by the bankrupt. This security, having been obtained less than 60 days before the Scottish sequestration, would have been cut down had it taken the form of letters of arrestment of a Scottish debt. The security would have been equally ineffective if the bankruptcy had been an English bankruptcy. The House of Lords held that the English law of relation-back applied only to an English bankruptcy and that the Scottish rules for equalising diligences had no operation in England until the sequestration had actually commenced. It is thought, however, that this result (at least in relation to other parts of the United Kingdom) is unfortunate and calls for the making of an amending provision by order under section 426(3) of the Insolvency Act 1986.[40]

**Assistance to foreign courts.** In the case of foreign bankruptcies the Scottish court takes a liberal view of its duty to come to the assistance of foreign trustees so as to preserve estate in Scotland for the benefit of creditors. In *Obers* v. *Paton's Trustees*[41] the Court of Session, while not applying in terms

---

[34] *Ord* v. *Barton* (1847) 9 D. 541; *Barr* v. *Smith and Chamberlain* (1879) 7 R. 247; *Wilsons (Glasgow and Trinidad) Ltd.* v. *Dresdner Bank*, 1913, 2 S.L.T. 437.

[35] 1985 Act, s.37.

[36] *Lindsay* v. *Paterson* (1840) 2 D. 1373. *Cf. White* v. *Briggs* (1843) 5 D. 1148, a decision of the whole court.

[37] At p. 1174.

[38] Above.

[39] [1910] A.C. 508.

[40] s.185 of the Insolvency Act 1986 applies in the liquidation of companies under the law of Scotland the provisions of the 1985 Act relating to the equalisation of diligence.

[41] (1897) 24 R. 719.

# TAB 102

# PRINCIPLES OF CORPORATE

## INSOLVENCY LAW

by

## Roy Goode

SWEET & MAXWELL

THOMSON REUTERS