transaction, which is neither invalid nor necessarily wholly reversible but may be set aside, wholly or in part, or simply varied, as the justice of the case requires.[16] Again, the statutory provisions are not self-executing; they have to be invoked by the office-holder.

An entirely distinct power of avoidance is given to the Pensions Regulator (TPR) to order restoration of assets to a defined benefit occupational pension scheme where these were transferred by a transaction at an undervalue.[17] This is not discussed further.

For brevity, all of these forms of adjustment will be referred to as "avoidance" in the ensuing pages but it should be constantly borne in mind that this term is shorthand for a widely differing range of effects and reliefs. In particular, where payments or transfers of property made by the company are void, they are deemed to remain assets of the company in its own right so as to be susceptible to capture by a floating charge or fixed charge over after-acquired property of the same description, whereas recoveries resulting from a court order after application by the liquidator are considered to be held for the creditors and not for the company itself and are therefore not captured by a prior security.[18] Further, a transferee from the company under a disposition which is void *ab initio* and who then deals with the transferred asset, whether absolutely or in any other way, commits a conversion if the asset is tangible and is liable to a proprietary restitutionary claim for the proceeds whatever the nature of the asset. A transferee under a disposition that is initially valid who later deals with the asset after it has become void against a particular category of third party may incur a liability to that party for interference with his interest, as where the holder of an unregistered floating charge which has crystallised sells it without the consent of a person who had become the holder of a fixed security interest after expiry of the 21 days allowed for registration of the floating charge. By contrast, no wrong is committed by a person holding a good title to an asset under a disposition to him by the company the effect of which is merely reversible who deals with the asset prior to the avoidance of the disposition under the statutory provisions.

## 2. *THE POLICIES UNDERLYING THE AVOIDANCE PROVISIONS*

**13–03** The conditions of avoidance vary according to the particular ground of avoidance involved but are for the most part dictated by a common policy, namely to protect the general body of creditors against a diminution of the assets available to them by a transaction which confers an unfair or improper

[16] ibid., s.244.
[17] Pensions Act 2004 ss.52–53.
[18] See below, paras 13–140 et seq.

advantage on the other party. All but two of the grounds of avoidance known to insolvency law[19] involve the unjust enrichment of a particular party at the expense of other creditors, whether they are preferential creditors or ordinary unsecured creditors.[20] Once this crucial point is grasped, much of the legislative structure falls into place. The unjust enrichment may affect other creditors in one of two ways. It may reduce the company's net asset value, as where it involves a transfer of the company's property to another party, otherwise than as a creditor, at a wholly inadequate price or a purchase of property by the company at an inflated price; or it may, without disturbing the company's net asset position, involve payment or transfer to a particular creditor in satisfaction or reduction of his debt, thereby giving him a preference over other creditors in disregard of the priority position of preferential creditors or, if there remains enough to pay them in full, then in breach of the *pari passu* principle of distribution among ordinary unsecured creditors. The avoidance provisions may thus be seen as necessary both to preserve the company's net asset value and to ensure equality of distribution, at least among classes of creditors.[21] Whether the defendant is or should be entitled to avail himself of defences and cross-claims that would be available in answer to claims of unjust enrichment at common law is a question we shall discuss later in this chapter.[22]

Section 238, which deals with transactions at an undervalue, is aimed at improper reduction of the company's net asset value and is thus conceptually linked to the common law anti-deprivation rule, while s.239 is linked to the common law *pari passu* principle and addresses unfair preferences. However, there are significant differences between the common law principles and the statutory provisions in that: (i) the former operate only on uncompleted transactions, the latter on completed transactions; (ii) the former are aimed at payments and transfers fixed to occur at the point of an insolvency proceeding, while the latter operate retrospectively by providing for the reversal of transactions concluded within the prescribed statutory period prior to an insolvency proceeding; and (iii) a provision in breach of

[19] The two exceptions are failure to register a registrable charge and the making of a post-petition disposition of the company's property without the court's authorisation.

[20] In *Hollicourt (Contracts) Ltd v Bank of Ireland* [2001] Ch. 555, it was common ground that a claim under s.127 of the Insolvency Act 1986 is restitutionary in character. See the judgment of Mummery L.J. at [22]. However, this is true only in the sense that the asset disposed of in breach of s.127 has to be given back. It does not follow that the purpose and effect are to reverse an unjust enrichment, for there may have been none, s.127 applying as much to transactions for full value as to those at an undervalue. Unjust enrichment is therefore not the basis of this ground of avoidance. The point is more fully discussed below in paras 13–03 and 13–145 et seq.

[21] See *Rubin v Eurofinance SA* [2010] EWCA Civ 895, in which this passage was cited by Ward L.J. at [55], adding (at [61]) that the statutory avoidance mechanisms under the Insolvency Act and the US Bankruptcy Code "are integral to and are central to the collective nature of bankruptcy and are not merely incidental procedural matters".

[22] Below, paras 13–145 et seq.

the common law rules is void, whilst a transaction in breach of s.238 or s.239 is valid but its effects are reversible in the discretion of the court on the application of the office-holder.

It will be apparent from what is said above that the phrase "unjust enrichment" is here used in a restricted sense to denote the conferment on the other party of an unfair or improper benefit to the prejudice of its existing *creditors*. Damage to the members of the company is not our present concern. If the directors improperly apply the company's assets, they can be called to account by the members. If the company is solvent, it is the members' prerogative to ratify the improper acts of the directors, for only the members themselves are injured. The position is otherwise where the company is insolvent, for then it is the creditors who have the primary interest in the proper application of the company's assets, although this can usually be asserted only when the company is in winding up or administration.[23]

There is a subsidiary policy underlying the avoidance provisions, namely the protection of an insolvent company's business from dismemberment through the improper disposition of its assets.

**13–04** A third policy is sometimes invoked as the rationale of the rule against preferences, namely deterrence of future creditors from gaining an unfair advantage. But it is hard to see why a creditor should be deterred from taking the benefit of a preference when if he is lucky the company will survive the preference period, the liquidator might anyway take no steps to recover the preference and even if he does the worst that happens is that the creditor will have to give up the benefit he received.[24]

Despite references to the first two of these two policies in a number of cases, it cannot be said that the underlying rationale of the statutory provisions has been very clearly articulated either by the legislature or by the courts. The point has been trenchantly made by a leading scholar, Professor Andrew Keay, with reference to Australia's insolvency laws:

> "Over the years avoidance provisions have regularly come under the scrutiny of the courts. Yet, there is little evidence of the courts seeking to ascertain the rationale for the existence of these provisions. It is submitted that the existence of such provisions is not a matter which excites any debate in Australia. There has been hardly any consideration of the underlying basis for the decisions; in fact there are few cases in which the reason for the inclusion of avoidance provisions in corporation or bankruptcy legislation has been mentioned."[25]

[23] See below, para.13–06.

[24] See to similar effect Vern Countryman, "The Concept of a Voidable Preference in Bankruptcy" (1985) 38 Vand. L. Rev. 713, 747; and David Gray Carlson, "Security Interests in the Crucible of Voidable Preference" (1995) U. Ill. L. Rev. 211, 215.

[25] Andrew Keay, "In Pursuit of the Rationale Behind the Avoidance of Pre-Liquidation Transactions" (1996) 18 Sydney Law Rev. 55.

## 6. *TRANSACTIONS AT AN UNDERVALUE*[51]

### *(i) Overview*

**The basic provision**

13–12 Where a company in administration or liquidation has at a relevant time entered into a transaction with any person at an undervalue and the statutory defence referred to below is not available, the office-holder may apply to the court to order restoration of the status quo, with consequential relief.[52]

As we shall see below, there is no possibility of overlap between the provisions relating to transactions at an undervalue and those relating to preferences. This is because s.238, relating to transactions at an undervalue, is concerned with payments or transfers that reduce the company's net asset value and thus do not cover payments or transfers to a creditor, while to the extent that a payment is made to a creditor in excess of what is due to him, he does not receive it *qua* creditor and is thus vulnerable only under s.238, not s.239.

**What constitutes a transaction at an undervalue**

13–13 A company enters into a transaction with a person at an undervalue if it:

(1) makes a gift to that person; or

(2) otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration; or

(3) enters into a transaction with that person for a consideration the value of which is significantly less than the value, in money or money's worth, of the consideration provided by the company.[53]

"Transaction" is defined as including a gift, agreement or arrangement, and references to entering into a transaction are to be construed accordingly.[54]

[51] See *Transaction Avoidance in Insolvencies* (above, n.28), Ch.4, and see John Armour, "Transactions at an Undervalue" in Armour and Bennett (eds), *Vulnerable Transactions in Corporate Insolvency*, 2002, p.37. For the power of the Pensions Regulator to direct the restoration of assets transferred from an occupational defined benefits scheme under a transaction at an undervalue, see the Pensions Act 2004 ss.52–53.

[52] Insolvency Act 1986 ss.238, 240 and 241. "Relevant time" is defined in s.240. See below, para.13–39, text and n.121.

[53] Insolvency Act 1986 s.238(4).

[54] Insolvency Act 1986 s.436.

"Arrangement" is widely construed, covering any form of agreement between the parties, formal or informal, oral or in writing.[55]

**Examples of transactions at an undervalue**

**13–14** The company enters into a transaction at an undervalue where it:

(1) makes a gift of property;

(2) undertakes a burden (for example, binds itself to supply goods or services) for no consideration (this would usually require a deed);

(3) purchases an asset for significantly more, or sells an asset for significantly less, than its value;

(4) takes an asset on lease or hire at a rent significantly above the rental value of the asset or lets it out on lease or hire at a rent significantly below its rental value;

(5) agrees to pay for services a sum significantly more, or to charge for services a sum significantly less, than their value;

(6) allows an asset to be retained by the other party in satisfaction of a claim against the company which is significantly less than the value of the asset or takes an asset in satisfaction of a claim which is significantly more than the value of the asset;

(7) accepts in satisfaction of a debt a sum significantly less than the recoverable value of the debt; or

(8) gives a guarantee or indemnity and receives by way of benefit significantly less than the value of the benefit conferred by the guarantee or takes a guarantee or indemnity against a benefit which is significantly less in value than that of the guarantee.

In all of these cases, the company either receives nothing for what it supplies or pays significantly too much or receives significantly too little to ensure equality of exchange, and the transaction will be vulnerable under s.238 unless the statutory defence under s.238(5) is available. The same applies to the distribution of a declared dividend at a time when the company is insolvent, and this could also be attacked as a preference.[56] Most of the examples given are straightforward and require no explanation. However, it will be

[55] *Feakins v Department for Environment Food and Rural Affairs* [2007] B.C.C. 54, discussed below, para.13–45.

[56] See below, para.13–78, n.181.

necessary to say something about gifts, transactions for no consideration, the benefits to be considered in valuing the consideration and the treatment of guarantees, and to explain the omission from the list of security given by the company for a previously unsecured loan.

It will be obvious that where a transaction is attacked on the ground of significant inequality of exchange, difficult questions of valuation may arise which are similar in kind to those previously discussed in relation to the test of insolvency.[57] As will be seen, what matters is the true value of a benefit received or given up, which is not necessarily its stated or face value.

**Conditions to be satisfied under s.238**

**13–15** The court cannot make an order under s.238 unless the following seven conditions are satisfied:

(1) the company is in liquidation or administration;

(2) application for the order is made by the liquidator or administrator;

(3) a transaction was concluded;

(4) the company was a party to the transaction;

(5) the transaction was at an undervalue;

(6) the transaction was entered into at a relevant time; and

(7) the company was unable to pay its debts at the time of or in consequence of entering into the transaction.

Even where all of these elements are present, the court may be precluded from making any order by reason of s.238(5) of the Act. Under s.241, the court has wide powers both as to the orders it can make to reverse the effect of the transaction and as to the persons against whom an order can be made but the particular defendant may be protected by s.241(3) of the Act. It is also necessary to consider whether a restitutionary defence or cross-claim is available based on principles of unjust enrichment.

**Onus of proof**

**13–16** In general, the onus lies on the office-holder to show that the above seven conditions are satisfied and on the defendant to make out a defence under s.238(5) or 241(3). But in the case of a transaction entered into by the company with a

[57] Above, paras 4–32 et seq.

person connected with the company,[58] condition (7) is presumed to be satisfied unless the contrary is shown,[59] and there is a presumption against good faith as regards such a person in the circumstances set out in s.241(2A).[60]

### *(ii) The elements in detail*

**Company is in liquidation or administration**

**13–17** The statutory provisions do not apply unless the company is in liquidation or administration. The reasons for this have already been discussed.[61]

**Application is made by the liquidator or administrator**

**13–18** The requirement that the application for an order be made by the relevant office-holder reflects two considerations. First, the remedy is not automatic, it has to be sought. This is because the application of the statutory provisions depends on a careful examination of the facts and does not lend itself to an automatic trigger. Secondly, the remedy is also necessarily discretionary, since the circumstances may vary widely from case to case, and because it is designed for the protection of the creditors generally in an insolvency proceeding it would be inappropriate to allow application to be made by anyone other than the liquidator or administrator as the representative of the creditors' interests. So it is not open to a creditor or group of creditors or to a member or group of members to invoke the statutory provisions. What they are entitled to do, if they believe that the liquidator or administrator is neglecting to pursue a remedy which ought to be pursued, is to apply to the court,[62] although the court will be slow to substitute its own judgement for that of the office-holder.

**"Transaction"**

**13–19** The word "transaction" has a very wide meaning. It is not confined to contracts[63] but extends to gifts and other arrangements which are not based on contract, and where there is a contract, "transaction" may cover not only that contract but any linked transaction, even though involving a different

58 See below, para.13–39, n.121.
59 Insolvency Act 1986 s.240(2).
60 See below, para.13–68.
61 Above, para.13–09.
62 Under the Insolvency Act 1986 ss.167(3), 168(5) and 212(1) (liquidator) or Sch.B1 para.74 (administrator).
63 *Re HHO Licensing Ltd* [2008] 1 B.C.L.C. 223.

party.[64] In Australia, it has been established in a series of cases that "transaction" is wide enough to include: a series of steps over a period involving several parties and not always contractual consequences; a unilateral act[65]; and arrangements giving rise to an estoppel.[66] A court order directing a transfer has also been held to constitute a transaction[67] and is susceptible to avoidance under the insolvency provisions, for example, in the case of a collusive consent order for a transfer at an undervalue or by way of preference. But apart from court orders and gifts, there has to be some element of dealing, this being implicit in the word "transaction" itself and being reinforced by the references in s.238 to: (a) the "entry into" a transaction; (b) "with a person"; and (c) "on terms that provide".[68]

**The company as party to the transaction**

**13–20** Section 238 applies only where it is the company that enters into the transaction at an undervalue. So a transaction is not within the ambit of the section unless the company is a party to it. The first step is thus to identify the relevant transaction. So in a case involving s.423 of the Act, when debtors to a bank decided to place farming assets out of its reach by forming a company of which they were the sole directors and shareholders, selling the farming stock and other agricultural assets to the company at a proper value and then procuring the grant to it of a 20-year agricultural tenancy of the farm, the relevant transactions were the sale and the tenancy agreement, not the incorporation of the company and the issue of shares in it, so that the impact of the sale and the grant of the tenancy on the value of the shares in the company was irrelevant.[69] In *Secretary of State for the Environment, Food and*

[64] See *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] 1 W.L.R. 143, discussed in more detail below, para.13–31; *Re Taylor Sinclair (Capital) Ltd, Knights v Seymour Pierce Ellis Ltd* [2001] 2 B.C.L.C. 176; and *Feakins v Department for Environment, Food and Rural Affairs* [2007] B.C.C. 54.

[65] e.g. a gift (expressly provided by the section) or a declaration of trust, as in *Ramlort Ltd v Reid* [2004] B.P.I.R. 985.

[66] *Australian Kitchen Industries Pty Ltd v Albarran* (2005) 51 A.C.S.R. 604, a decision of the New South Wales Supreme Court, in which Barrett J. cited, amongst other authorities, *Re Emanuel (No.14) Pty Ltd, Macks v Blacklaw & Shadforth Pty Ltd* (1997) 14 A.L.R. 281; and *Somerset Marine Inc v New Cap Reinsurance Corp* [2003] NS.W.C.A. 38.

[67] *Hill v Haines* [2008] Ch. 412.

[68] *Re Taylor Sinclair (Capital) Ltd, Knights v Seymour Pierce Ellis Ltd* [2001] 2 B.C.L.C. 176, *per* Robert Englehart Q.C. (sitting as a Deputy High Court Judge); and *Re HHO Licensing Ltd* [2008] B.C.L.C.,223 *per* Peter Leaver Q.C. at para. 31. See further Armour, "Transactions at an Undervalue", 2003, pp.55 et seq.

[69] *National Westminster Bank Plc v Jones* [2002] 1 B.C.L.C. 55. The statement by Lord Scott in *Brewin Dolphin*, cited above n.64, at [20] that "the issue in the present case is not, in my opinion, to identify the section 238(4) 'transaction'; the issue is to identify the section 238(4) 'consideration' " is not, it is thought, intended to deny the importance of identifying the relevant transaction but is simply a consequence of his conclusion that in the case before the House of Lords the various linked contracts all formed part of the transaction, so that the real question to be considered *in that case* was what constituted the consideration.

However, Ho and Mokal are surely right in saying that so long as a transaction has no effect on the debtor's net asset value, s.238 is not engaged, so that if a diminution in the debtor's assets is reversed by a recovery under ss.239 and 241, it must follow that s.238 cannot apply.

*(2) Distinction between gifts and other no-consideration transactions*

**13–25** A gift by definition involves a transfer of an asset for no consideration. However, as s.238(4)(a) implies, there are other types of transaction which are unsupported by consideration but are not gifts because they do not involve the transfer of an asset. These include unperfected gift-promises (normally binding only if by deed or by way of proprietary estoppel), voluntary releases of a debt and voluntary acceptance of part-payment in satisfaction of a debt.

**Valuing benefits received or given up**

*(1) The approach to the valuation*

**13–26** Prima facie the value of an asset is not less than the amount that a reasonably well-informed purchaser is prepared, in arm's-length negotiations, to pay for it.[90] Where there is a market for assets of the type in question, in general the figure to be taken is the market value.[91] This is normally to be determined by expert evidence. The fact that the parties took reasonable steps to obtain an accurate valuation is not in itself the determining factor, for the valuation may have ignored relevant factors or taken into account factors that should not have been considered or may simply have been based on a mistaken view as to the attributes of what was being sold.[92]

Even where there is no mistake as to the quality of the subject matter, there may be significant differences among competent experts as to an asset's value. In such a case, the court has to weigh the expert testimony and do the best it can to determine the appropriate figure or alternatively the appropriate range of figures within which the value must lie. In the former case, the transaction will be a sale at an undervalue if at a price significantly below the amount so determined, even if that price was supported by one of the valuers; in the latter case, the transaction should be upheld if the price falls anywhere within the range selected,[93] but if

[90] *Brewin Dolphin*, cited above n.64, *per* Lord Scott at [30].
[91] *Re Brabon, Treharne v Brabon* [2001] B.C.L.C. 11, *per* Jonathan Parker L.J. at 38.
[92] *Re Brabon, Treharne v Brabon*, cited above n.91, at 38–41.
[93] *Ramlort Ltd v Reid* [2004] B.P.I.R. 985; and *Ailyan v Smith* [2010] EWHC 24 (Ch). See below, para.13–32.

significantly below the lowest figure of that range, it should be held a transaction at an undervalue.

*(2) From whose viewpoint?*

**13–27** The question to be determined in each case is whether the value of the consideration given by the company significantly exceeds the value received by the company. This has to be assessed from the viewpoint of the company, not the other party.[94] So while an asset of the company may be disposed of for full value, the sale may nevertheless be a transaction at an undervalue if its effect is to reduce the value of the remaining assets held by the company and this effect was part of the bargain. In other words, the consideration provided by the company is considered to include any bargained-for detriment it suffers to its remaining assets or business, for example, because of a "ransom" power it confers on the other party.[95] Conversely, the fact that an asset has a special value to the purchaser—for example, for where it is a painting which completes his collection—is to be ignored in determining whether the company has parted with it at an undervalue; what has to be compared (leaving aside questions of detriment) is the consideration received by the company and the market value of the asset rather than its ransom value.

*(3) Values to be based on the totality of the transaction*

**13–28** In valuing the consideration on either side for the purpose of determining whether there is a significant inequality of exchange—for which purpose both values must be measurable in money or money's worth[96]—it is necessary to look at the whole of the transaction and the totality of the benefits the party dealing with the company will receive, not merely the market value in isolation from other factors. This is well illustrated by the decision of the Court of Appeal in *Agricultural Mortgage Corp Plc v Woodward*[97]:

> The first defendant had borrowed money from the plaintiff and given in security a charge by way of legal mortgage of his farm. Shortly before expiry of the deadline set by the plaintiff for payment of arrears outstanding under the mortgage the first defendant granted the second defendant

[94] *Re M.C. Bacon Ltd (No.2)* [1990] B.C.L.C. 324, *per* Millett J. at 340.

[95] *Agricultural Mortgage Corp Plc v Woodward* [1994] B.C.C. 688. But not, it is thought, unbargained-for detriment.

[96] *Re M.C. Bacon*, cited above n.94.

[97] Cited above n.95. The case involved s.423 of the Insolvency Act 1986 (transactions defrauding creditors), not s.238 but s.423 imports the requirement of s.238 that the transaction be at an undervalue.

the making of an order in their favour, which is entirely within the court's discretion.

One difficult question remains. In the case of a creditor or surety not connected with the company, a preference is voidable only if the onset of insolvency occurs within six months; in the case of a creditor or surety connected with the company, it is two years. Now suppose that a payment is made to the creditor nine months before the onset of insolvency and the creditor is not connected with the company, whereas the surety is a director. If the decision to pay the creditor was influenced by a desire to prefer the surety, can an order be made against the creditor under s.241(1)(d) when he himself would no longer be susceptible to a claim as a preferred party? It is thought that the answer is no[262] and that the appropriate order is one for payment direct against the surety, who on making the payment will be entitled to prove for its amount as creditor in the winding up.

**Relationship between transactions at an undervalue and preferences**

**13–107** As stated earlier,[263] there can be no overlap in the impact of the statutory provisions relating to transactions at an undervalue and those concerning preferences. That is to say, it is not possible for the same part of a payment to fall simultaneously within s.238 and s.239. It may be helpful to identify more precisely the relationship between the two sets of provisions.

(1) A key distinction is that the provisions relating to transactions at an undervalue are aimed at payments, transfers or other acts which diminish the company's assets, whereas the provisions relating to preferences are concerned with transactions that unfairly favour one creditor at the expense of the others, whether or not they diminish the company's assets. For example, payment of a debt which does not exceed the amount due is not a transaction at an undervalue, as the net asset position is unchanged, whilst to the extent that the payment exceeds what is due to the creditor, he does not receive it *qua* creditor and his liability, if any, arises under s.238, not s.239. This was the position in *Re HHO Licensing Ltd*[264] where the company paid an amount for services substantially in excess of their value. To the extent of the value of the services the payment was a preference under s.239, to the extent of the excess it was a transaction at an undervalue under s.238. We have already seen that where the company gives security for a previously

[262] *Contra* Prentice, "Some Observations on the Law Relating to Preferences" in Cranston (ed.), *Making Commercial Law*, 1997, pp.458–459.

[263] Above, para.13–12.

[264] [2008] 1 B.C.L.C. 223.

unsecured loan, there is no diminution in the company's net asset value, only a possible preference of one creditor at the expense of the others. This is because any realisation of the security by the creditor *pro tanto* reduces the company's indebtedness.[265]

(2) The provisions relating to transactions at an undervalue are concerned with the existence of a significant imbalance between a payment, transfer or other act and the consideration for which it is made or done. If the bargain is fair, the provisions do not apply. By contrast, the preference provisions are concerned not with the fairness of the original bargain but with the improvement of the creditor's position relative to other creditors on a winding up notionally occurring immediately after the payment, transfer, etc. in question. So payment by an insolvent company of one creditor but not the others gives rise to a preference.

(3) The rules as to preference are confined to payments, transfers, etc. in favour of an existing creditor, and thus do not apply to gifts, whereas the rules as to transactions at an undervalue are aimed exclusively at transfers involving a gift element.

(4) The two sets of statutory provisions have two characteristics in common. First, both transactions at an undervalue and preferences are determined without reference to the bona fides of the payee or transferee. Secondly, both sets of provisions embody a subjective element in that the company's good faith is an ingredient of the defence to a claim to upset a transaction made at an undervalue, while the avoidance of a preference requires the company to be influenced by a desire to prefer.

(5) For policy reasons which remain unclear, the backward reach of the provisions relating to transactions at an undervalue is two years in all cases, whereas for preferences the normal period is six months and the two-year period is confined to preferences in favour of a person connected with the company otherwise than solely as its employee.

## 8. EXTORTIONATE CREDIT TRANSACTIONS

### Re-opening of extortionate credit transactions

**13–108** Under s.244 of the Insolvency Act 1986, the court may set aside or vary a transaction for, or involving, the provision of credit to the company where the following conditions are satisfied:

[265] See above, para.13–38.

# TAB 103



# Insolvency Law and Practice

## Report of the Review Committee

*Chairman*
Sir Kenneth Cork, GBE

*Presented to Parliament by the
Secretary of State for Trade
by Command of Her Majesty
June 1982*

First Published 1982
Reprinted 1997
£33.00

Cmnd. 8558

1205. For these reasons, we conclude that the remedy provided by section 172 must be regarded as one of the remedies which are available to the creditors of an insolvent debtor, and ought properly to be taken into consideration in any comprehensive review of the law of insolvency. We deal with this subject in paragraphs 1210 to 1220 and make proposals for reform.

1206. Several different statutory provisions fall within the second category. From the earliest attempts to introduce a bankruptcy code in England in the Sixteenth Century, it has been found necessary to provide for the setting aside of certain transactions between the debtor, later made bankrupt, and other parties in the period preceding his bankruptcy. There are two types of case. In the first, the transaction is one in which the initiative is taken by the creditor who, foreseeing the probable insolvency of his debtor, takes active steps to recover the debt or otherwise improve his own position in that event. In the other, the initiative is taken by the debtor himself who, in contemplation of his own imminent insolvency, seeks to preserve his assets for the benefit of his family and friends or favoured creditors.

1207. Cases where the initiative is taken by the creditor are dealt with by various statutory provisions which enable mortgages and charges created over the insolvent's property within a limited period before the insolvency to be set aside in certain circumstances; the assignment by a trader of his existing and future book debts to be set aside in the absence of registration; and incomplete executions over the insolvent's property to be rendered ineffective in an insolvency. One issue raised in such cases is whether, and to what extent, the diligent creditor who has taken steps to protect his own position should be permitted to retain the fruits of his diligence, or whether his attempts to gain priority in the event of an insolvency should be frustrated. We deal with this issue elsewhere (Chapter 34).

1208. In the present chapter, we shall be concerned with transactions voluntarily initiated by the debtor himself. Such cases fall into two classes:

(a) the disposal of assets by the debtor by way of gift or other voluntary disposition, including any disposition for less than full consideration, even when there is no intent on the part of the debtor to defraud creditors (see paragraphs 1221 to 1240); and

(b) the preferring of one creditor (or more than one) by paying to him the whole or part of his debt, or otherwise treating him more favourably than other creditors of like degree; for example, by providing security or further security for an existing debt, or by returning goods which have been delivered but not paid for, to the detriment of the general body of creditors (see paragraphs 1241 to 1277).

1209. The statutory provisions dealing with such transactions are directed at an altogether different objective from that at which section 172 of the Law of Property Act, 1925, and the Statute of Elizabeth I which preceded it were directed. The latter were designed to protect creditors from fraud; the bankruptcy code, on the other hand, is directed towards achieving a *pari passu* distribution of the bankrupt's estate among his creditors. The justification for setting aside a disposition of the bankrupt's assets made

# TAB 104

# Jowitt's Dictionary of English Law

## Volume 2: J–Z

Fourth Edition

**Daniel Greenberg**
*Editor*
Barrister; Parliamentary Counsel, Berwin Leighton Paisner LLP; Legal Adviser, Office of Speaker's Counsel, House of Commons

**Klara Banaszak**
*Deputy Editor*

**Yisroel Greenberg**
*Assistant Editor*

SWEET & MAXWELL

THOMSON REUTERS

**Training, Military.** Unauthorised military training is illegal, by the Unlawful Drilling Act 1819. See Sedition. As to compulsory military training, see National Service.

**Training Services Agency.** See the Employment and Training Act 1973 s.1; Social Security Act 1973 Sch.28; Health and Safety at Work etc. Act 1974 Sch.10. The body was abolished by the Employment and Training Act 1981 s.9.

**Traitor** (Lat. *traditor*). One who, being trusted, betrays; one guilty of treason. See Treason.

**Traitor's gate.** The river gate of the Tower of London by which traitors, and State prisoners generally, were committed to the Tower.

**Tramps.** See Casual pauper; Vagabonds.

**Tramways.** Rails for conveyance of traffic along a road not owned, as a railway is, by those who lay down the rails and convey the traffic, the rails being level with the surface of the ground, which is, or may be, laid along a public road so that the space occupied by the line is available for ordinary wheeled traffic as well as for tramway cars. A tramway is constructed under a provisional order made pursuant to the Tramways Act 1870, or under a private Act of Parliament, unless it is such a tramway as comes within the meaning of the term "light railway" (*q.v.*). A local authority may purchase a tramway within six months after the expiration of 21 years from the time of authorisation of construction, or within six months after the expiration of every subsequent period of seven years, under the Tramways Act 1870 s.43, as amended by the Local Government Act 1933 (*London Street Tramways Co. v London CC* [1894] A.C. 489).

**Trani, Laws of.** A code of maritime law which originated in 1063 at the Italian seaport of Trani, situate on the Adriatic about 80 miles north of Brindisi. They are printed, with a translation, in Sir Francis Twiss' edition of the *Black Book of the Admiralty*, vol.4. The full title of the code is the *Ordinamenta et Consuetudo Maris, edita per Consules Civitatis Trani*.

**Transaction.** A very broad term which as used in legislation is capable of including all kinds of legal, commercial and other agreements and other arrangements. For judicial and statutory constructions and definitions in different contexts see *Stroud's Judicial Dictionary*.

**Transaction at an undervalue.** A transaction entered into by a company which has since gone into liquidation or administration or an individual who has since been made bankrupt which was either a gift by the company or the individual or which was entered into on terms which provided that the company or the individual received no consideration or which provided consideration to be received by the company or the individual the value of which in money or money's worth is significantly less than the value in money or money's worth of the consideration provided by the company (Insolvency Act 1986 ss.238, 339). In relation to individuals who have been declared bankrupt a transaction entered into in consideration of marriage or the formation of a civil partnership can also be a transaction at an undervalue (Insolvency Act 1986 s.339). In order for a trustee in bankruptcy, a liquidator or an administrator to be entitled to bring proceedings in relation to a transaction at an undervalue the transaction must have been undertaken at a relevant time (Insolvency Act 1986 ss.240, 341). In relation to a company however the court will not made an order if it is satisfied that the company entered into the transaction in good faith, for the purpose of

carrying on its business and at the time it did so there were reasonable grounds for believing the transaction would benefit the company (Insolvency Act 1986 s.238).

**Transcript.** (1) A copy; anything written from an original; an official copy of certain proceedings in a court.

(2) In the Privy Council, when an appeal was brought to the Judicial Committee, the appellant had formerly to see that a transcript of the proceedings and evidence in the court below was prepared and transmitted to the Colonial Office by the proper officer. What was formerly called the transcript is now known as the record, which is transmitted to the Registrar of the Privy Council (see Judicial Committee (Appellate Jurisdiction) Rules Order 2009 (SI 2009/224), Sch., r.20).

See Shorthand-writers.

**Transcripto pedis finis levati mittendo in cancellarium, De.** A writ which was used for certifying to the Court of Chancery the foot (or chirograph) of a fine (*q.v.*) levied before the justices in eyre (Reg.Brev. 169).

**Transcripto recognitionis factae coram justiciariis itinerantibus, De.** A writ which was used for certifying a recognisance taken before the itinerant justices (or justices in eyre) (Reg.Brev. 151).

**Transept.** The part of a church between the nave and the choir. In churches of the Gothic style the ends of the transept project on each side of the edifice. Prima facie the transept belongs to the incumbent and the churchwardens.

**Transfer.** To convey; to make over to another; the document by which property, as shares in a public company, is made over by one person to another.

(1) In the law of property, a transfer is where a right passes from one person to another, either (i) by virtue of an act done by the transferor with that intention, as in the case of a conveyance or assignment by way of sale or gift, etc.; or (ii) by operation of law, as in the case of forfeiture, bankruptcy, descent, or intestacy. A transfer may be absolute or conditional, by way of security, etc. See Assignment; Bill of sale; Conveyance.

(2) "Transfer" is used principally in the sense of voluntary transfer, and is applied especially to the operation of changing the ownership of stock, shares, etc., whether by registering an assignment or other instrument, or by making a simple entry in the register kept for that purpose. The person making the transfer is called the transferor, and the person to whom it is made the transferee.

(3) By the Companies Act 2006 ss.541, 544 and 770 shares or other interests of a member in a company are personal estate transferable in manner provided by the articles of the company, and a transfer of shares or debentures is not to be registered except on production of a proper instrument of transfer (as provided for by the articles). See Share; Stock.

(4) Under the Court Funds Rules 1987 r.15 stocks and other securities may be lodged in court in certain circumstances or pursuant to an order persons pending the proceedings, in order that they may be kept in safety until the time comes for them to be transferred out of court to the parties entitled. Part 30.7 CPR provides for money to be notionally transferred from one court to another where that is more convenient. See Certificate; Payment into court.

(5) The Law of Property Act 1925 s.52 provides that, with certain exceptions, all conveyances of land or of any interest therein are void for the purpose of conveying or creating a legal estate unless made by deed. There are no requirements as to the form of deed required to convey or create an estate in unregistered land provided the

# TAB 105

# KEATING ON CONSTRUCTION CONTRACTS

TENTH EDITION

BY

STEPHEN FURST, **QC, B.A. (Hons), LL.B. (Hons),**
*of Middle Temple*

and

THE HON. SIR VIVIAN RAMSEY **M.A.,**
*of Middle Temple, Formerly one of Her Majesty's Justices, International Judge, Singapore International Commercial Court, Chartered Engineer, Fellow of the Institution of Civil Engineers, Fellow Royal Academy of Engineering, Visiting Professor, Dickson Poon School of Law, King's College, London*

With a chapter on Public Procurement

BY

SARAH HANNAFORD, **QC, M.A. (Oxon),**
*of Middle Temple*

a commentary on JCT Forms of Contract

BY

ADRIAN WILLIAMSON, **QC, M.A.,**
*of Middle Temple*

a commentary on the Infrastructure Conditions of Contract

BY

JOHN UFF, **C.B.E., QC, FREng,**
*of Gray's Inn, Emeritus Professor of Engineering Law at King's College, London*

a commentary on the FIDIC Standard Forms

BY

SIMON HUGHES, **QC, M.A. (Oxon),**
*of Gray's Inn*

and a commentary on the NEC3 Form of Contract

BY

DAVID THOMAS, **QC, M.A. (Oxon),**
*of Middle Temple*

SWEET & MAXWELL



**5-051** **Employer's breach of contract.** It seems that clear language is required before an architect's powers of certification extend to cover breaches of contract by the employer.[160] Where contracts do provide that breaches of contract by the employer can give rise to extensions of time or loss and expense then those matters fall within the remit of the certifier for that purpose. In the absence of clear words if an architect gives a certificate for payment and the contractor has incurred losses caused by the employer's breach of contract, such as delay or interference, the certificate is not conclusive upon the contractor's claim for damages unless it is an award upon a proper reference of the dispute.[161] However, the contractor may waive its rights to object to the certificate by expressly seeking the architect's decision on the matter.[162]

**5-052** **New contract.** The architect's power of certifying under a contract cannot extend to matters which have arisen under a new and independent contract.[163]

**5-053** **Outside time-limit.** If there is a time-limit for the giving of a certificate, a purported certificate given after the expiry of the time-limit is void and of no effect unless the parties agree to extend the time.[164] It is a question of construction in each case whether the time-limits in a certification clause provide a timetable which is mandatory. Express words are likely to be necessary to have that effect. An alteration to the timetable must be made pursuant to any express or implied terms for its alteration agreed by the parties.[165]

### (b) Not properly made

**5-054** A certificate is invalid, and therefore not conclusive, if it is not properly made in accordance with the contract.[166] This will also be so if any necessary precondition as to its issue has not been fulfilled.[167]

**5-055** **Form of certificate.** The certificate must be in the form, if any, required by the

---

*len* (1912) H.B.C. (4th edn), Vol.2, para.462, CA; *Panamena, etc. v Frederick Leyland & Co Ltd* [1947] A.C. 428, HL.

159 See *Re Meadows and Kenworthy* (1896) H.B.C. (4th edn), Vol.2, para.265 (CA, affirmed HL); *East Ham BC v Bernard Sunley & Sons Ltd* [1966] A.C. 406, HL, explaining the final certificate under the 1939 RIBA form (pre-1957 revision). See also, *Kaye (P. & M.) Ltd v Hosier & Dickinson* [1972] 1 W.L.R. 146, HL referred to in para.5-044.

160 *Russell v Sa da Bandeira* (1862) 13 C.B. (N.S.) 149; *Roberts v Bury Commissioners*, see (1870) L.R. 5 C.P. 310; *Lawson v Wallasey Local Board* (1883) 48 L.T. 507, CA.

161 *Lawson v Wallasey Local Board* (1883) 48 L.T. 507, CA, upholding the Divisional Court (1883) 11 Q.B.D. 229, but on different grounds; cf. *Sattin v Poole* (1901) H.B.C. (4th edn), Vol.2, para.306, DC. See also *Roberts v Bury Commissioners* (1870) L.R. 5 C.P. 310 at 327. For extension of time, see para.8-022.

162 *Sattin v Poole* (1901) H.B.C. (4th edn), Vol.2, para.306, DC.

163 *Trade Indemnity Co v Workington Harbour and Dock Board* [1937] A.C. 1, HL.

164 *E.C.C. Quarries v Merriman* (1988) 45 B.L.R. 90.

165 *B.R. & E.P. Cantrell v Wright & Fuller Ltd* [2003] B.L.R. 412 at 437. See also, *Tameside MBC v Barlow Securities Group Services Ltd* [2001] B.L.R. 113 at 125.

166 *Lamprell v Billericay Union* (1849) 18 L.J.Ex. 282; *Coleman v Gittins* (1884) 1 T.L.R. 8, where an employer successfully resisting payment on a technicality was not awarded his costs; *Kaye (P. & M.) Ltd v Hosier & Dickinson* [1972] 1 W.L.R. 146 at 157, HL; *John Barker Construction v London Portman Hotel* (1996) 83 B.L.R. 31 at 62, extension of time not based on a proper application of the provisions of the contract was held to be invalid based on the court having limited powers of review but see, now, *Beaufort Developments (NI) Ltd v Gilbert-Ash (NI) Ltd* [1999] 1 A.C. 266.

167 *Crestar v Carr* (1987) 37 B.L.R. 113, CA.

contract.[168] Thus a mere checking of the contractor's account for extras was held not to be a certificate of satisfactory completion.[169] Where, an engineer's "decision" was required as a condition precedent to arbitration, an informal rejection of the contractor's claims was held not to amount to such decision.[170] If the architect is merely required to certify their satisfaction with no express requirement for a written certificate, an oral statement of satisfaction is sufficient.[171] In all cases it must be clear that there was an intention to issue the certificate in question and that it was in substance what the contract required.[172] The ordinary rules of construction apply[173] so that the test of intention, it is submitted, is objective. It is thought that evidence of surrounding circumstances such as relevant letters or conversations would frequently be admissible in deciding whether a document or, in the unusual case, an oral statement, was the certificate.[174] A certificate was held upon the facts of the case to be the final certificate, although not so expressed upon its face, by reference in particular to an accompanying letter which said "We are enclosing the final certificate".[175]

5-056 **Delegation of duties.** In giving a certificate, the architect is entitled to make use of the assistance of others, such as, for example, a quantity surveyor, for detailed matters of measurement and valuation, but the certificate must be the architect's. The architect cannot delegate the whole function of certifying.[176] An engineer may receive help from the resident or project engineer.

> "In the commercial world many decisions are made by people such as [the engineer], who append their signatures to letters drafted by others. It would require compelling evidence to establish in such circumstances that the decision was not that of the signatory."[177]

5-057 **Given by wrong person.** A certificate must be given by the person or persons authorised by the contract.[178] If a particular person is named as the certifier, in the absence of a term indicating the contrary, that person and no other can give the certificate.[179] Where the contract identifies the certifier by description, as, for example, "anyone whom from time to time the (employer) might choose to select

---

168 See also "Formal requirements" at para.5-009.

169 *Morgan v Birnie* (1833) 9 Bing. 672; *Elmes v Burgh Market Co* (1891) H.B.C. (4th edn), Vol.2, para.170 at 171.

170 *Monmouthshire CC v Costelloe and Kemple* (1965) 63 L.G.R. 429, CA also 5 B.L.R. 83; *Havant BC v South Coast Shipping (No.1)* (1996) 14 Const. L.J. 420 at 426; *Al Waddan Hotel Ltd v MAN Enterprise SAL (Offshore)* [2015] B.L.R. 478 at [67].

171 *Roberts v Watkins* (1863) 14 C.B. (N.S.) 592; *Elmes v Burgh Market Co* (1891) H.B.C. (4th edn), Vol.2, para.170.

172 See *Token Construction Company Ltd v Charlton Estates Ltd* (1973) 1 B.L.R. 48, CA (not overruled on this point by *Modern Engineering (Bristol) Ltd v Gilbert Ash (Northern) Ltd* [1974] A.C. 689, HL) applying a passage from *Minster Trust Ltd v Traps Tractors Ltd* [1954] 1 W.L.R. 963 at 982, per Devlin J.

173 See para.3-029 and following.

174 *B.R. & E.P. Cantrell v Wright & Fuller Ltd* [2003] B.L.R. 412 at 431.

175 *London Borough of Merton v Lowe* (1981) 18 B.L.R. 130, CA.

176 *Clemence v Clarke* (1880) H.B.C. (4th edn), Vol.2, paras 54 and 59, CA; cf. *Burden Ltd v Swansea Corp* [1957] 1 W.L.R. 1167 at 1173, HL; cf. also *Croudace v London Borough of Lambeth* (1986) 33 B.L.R. 20, CA, where the finding of the employer's breach of contract in not appointing a new architect implicitly assumes that their duties cannot be delegated.

177 *Anglian Water Authority v R.D.L. Contracting* (1988) 43 B.L.R. 98 at 112.

178 *Lamprell v Billericay Union* (1849) 18 L.J. Ex. 282.

179 *Ess v Truscott* (1837) 2 M. & W. 385; *Att Gen v Briggs* (1855) 1 Jur. (N.S.) 1084.

# TAB 106

# Muir Hunter on Personal Insolvency

**Authors**

JOHN BRIGGS, LLB
*of Gray's Inn, Barrister.*
*A Deputy Bankruptcy Registrar of the High Court*

CHRISTOPHER BROUGHAM QC, BA
*of Inner Temple, Barrister.*
*A Deputy Bankruptcy Registrar of the High Court*
*Bencher of the Inner Temple*

**Contributor**

STEPHEN BAISTER, MA, PhD
*Chief Bankruptcy Registrar of the High Court*

**The Development of English Bankruptcy Law**

DAVID GRAHAM QC, MA, BCL,
*of Middle Temple, Barrister*
*Visiting Professor of Law, Faculty of Business,*
*Kingston University*

**Foreword by**

THE LATE RT HON. LORD JUSTICE DILLON, PC

SWEET & MAXWELL

THOMSON REUTERS

to make a claim for about ten years. The registrar, having concluded that the trustee was guilty of inordinate and exceptional delay, exercised his discretion (see the notes to subs.339(2)) not to make an order. Mann J., in allowing the trustee's appeal, held that delay by itself, unmixed with any other circumstances, cannot be a relevant reason for declining to grant relief ([2010] EWHC 1033 (Ch) at [34], [35]). The respondents appealed to the Court of Appeal, but not on this point ([2011] EWCA Civ 119; [2011] 1 W.L.R. 1617). However, the Court's opinion on the question of the delay was summarised in these words of Rix LJ at [61]:

> "I have some sympathy for [the registrar's] position, but it has to be said that he ought to have had more information about the reasons for the delay and possible prejudice to the [respondents] before reaching his conclusion. However, trustees who for no good reason sit on their hands when aware of a claim under s.339 in respect of a matrimonial home, may find themselves in difficulty."

*Subsection (2)*

**3-2259** This subsection states that, where an application is made under s.339, the court "shall ... make such order as it thinks fit for restoring the position to what it would have been if [the prospective bankrupt] had not entered into" the transaction at an undervalue. Section 342(1) contains a list of orders that the court "may" make in order to achieve this objective, but the list is inexhaustive and is expressly without prejudice to the generality of s.339(2). Although the subsection uses the word "shall", it would appear that the court may, in its discretion, decline to make any order at all (*Re Paramount Airways Ltd (No.2)* [1993] Ch. 223 CA, at 239G–H). For an example of an exceptional case in which the court declined to make an order, see *Singla v Brown* [2007] EWHC 405 (Ch); [2008] Ch. 357. See also *Trustee in Bankruptcy of Claridge v Claridge* [2011] EWHC 2047 (Ch) and the comments thereon in the notes to s.423(2). In *Walker v WA Personnel Ltd* [2002] B.P.I.R. 621, the court (Judge Havelock-Allan QC) rejected a submission that monetary compensation rather than revesting of assets would generally be appropriate in a case where the assets transferred had altered since the date of transfer. For two cases (both under IA 1986 s.423: s.423(2)(a) and s.339(2) are to the same effect) in which the court was willing to order monetary compensation rather than the revesting of assets, see *Gil v Baygreen Properties Ltd* [2004] EWHC 1732 (Ch); [2005] B.P.I.R. 95 and *Pena v Coyne* [2004] B.P.I.R. 1286.

In *Ramlort Ltd v Reid* [2004] EWCA Civ 800; [2004] B.P.I.R. 985, Jonathan Parker LJ (with whom Waller LJ and Judge LJ concurred) agreed with the approach in the *Walker v WA Personnel Ltd* case above. In Jonathan Parker LJ's view, in considering what is the appropriate remedy on the facts of any particular case, the court should not start from any a priori position. Each case will turn on its particular facts, and the task of the court in every case is to fashion the most appropriate remedy with a view to restoring, so far as is practical and just to do so, the position as it "would have been if [the debtor] had not entered into the transaction". In some cases that remedy may take the form of reversing transactions; in others it may not. Moreover, in deciding how to exercise the statutory discretion as to remedy, the court must inevitably have regard to subsequent events, and to the facts as they are at the date of the order. On the facts of the *Ramlort Ltd v Reid* case, there were no obstacles to a straightforward reversal of the transaction and Jonathan Parker LJ took the view, like the trial judge, that the most appropriate remedy in the particularly unusual circumstances of the case was to set aside the declaration of trust on terms that the transfereee recovered the payments which it made: in other words to reverse the transaction.

*Subsection (3)*

**3-2260** This subsection defines the "undervalue" requirement of a transaction falling within the section.

Under subs.(3)(a), a gift by a prospective bankrupt, or any arrangement made by him providing for no consideration to be received by him, falls within the section.

Under subs.(3)(b) so too does a transaction "in consideration of marriage or the formation of a civil partnership". This marks a reversal of the position as it was under s.42 of the 1914 Act, under which a settlement "made before and in consideration of marriage" was expressly excluded from the purview of the section.

Subsection (3)(c) is the one most likely to give rise to contention. Under this subsection, a transaction is at an undervalue if it is entered into by the prospective bankrupt "for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the" prospective bankrupt.

The value of the consideration is to be assessed as at the date of the transaction. Some commentators have suggested that *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] UKHL 2; [2001] 1 W.L.R. 143, a case concerned with s.238(4)(b), the corporate equivalent of this subsection, casts doubt on this proposition. In that case the House of Lords had to consider the value of a covenant to pay rent over a period of four years, contained in a sublease of computer equipment. Lord Scott, in delivering the judgment of the House, found that the creation of the sublease constituted, ipso facto, a breach of a term of the headlease, which thereupon became terminable at any time by the head lessors and the equipment liable to be repossessed—events which, in fact, subsequently occurred.

> "If a covenant with the precarious character of [the] covenant in the sublease is to have value attributed to it for s.238 purposes, the value must ... be placed on a more firm footing than that of speculative suggestion. The actual events that took place [after the creation of the sublease], before any payment under the sublease had become due, are ... relevant" (ibid., at [24]).

"[It was] submitted that these ex post facto events ought not to be taken into account in valuing [the] covenant as at [the date of the sublease]. I do not agree. In valuing the covenant as at that date, the critical uncertainty is whether [and how long] the sublease would survive .... Where the events, or some of them, on which the uncertainties depend have actually happened, it seems to me unsatisfactory and unnecessary for the court to wear blinkers and pretend that it does not know what has happened ... For the purposes of s.238(4)..., and the valuation of the consideration ... reality should ... be given preference over speculation. I would hold, taking account of the events that took place in the [months immediately following the creation of the sublease], that the value of [the] covenant ... was nil. After all, if, following the signing of the sublease, [the sublessor] had taken the sublease to a bank or finance house and had tried to raise money on the security of the covenant, I do not believe that the bank or finance house, with knowledge about the circumstances surrounding the sublease, would have attributed any value at all to the sublease covenant" (ibid., at [26]).

"Where the value of the consideration ... is as speculative as is the case here, it is ... for the party who relies on that consideration to establish its value" (ibid., at [27]).

It is submitted that there is nothing in the language of the judgment, taken as a whole, that contradicts the proposition that the value of the consideration is to be assessed as at the date of the transaction. Nor does the judgment lay down a rule that that value is to be assessed with the benefit of hindsight; any such rule would deter many perfectly proper commercial transactions. In *Re Thoars (Deceased)* [2002] EWHC 2416 (Ch); [2003] B.P.I.R. 489 (subsequently named *Ramlort Ltd v Reid*), the Vice-Chancellor in declining to try a preliminary issue as to the value of the consideration provided by the debtor, took the ratio decidendi of *Brewin Dolphin Bell Lawrie Ltd*, above, to be that: (1) the value of the consideration in money or money's worth is to be assessed as at the date of the transaction; (2) if at that date value is dependent on the occurrence or non-occurrence of some event and that event occurs before the assessment of value has been completed then the valuer may have regard to it; but (3) the valuer is entitled, indeed bound, to take account of all other matters relevant to the determination of value as at the date of the transaction (*Re Thoars (Deceased)*, above, at [17]). "In the same way that Lord Scott of Foscote referred.to the likelihood of [the sublessor] raising money on the security of the covenant so the valuer is entitled to consider the likelihood of a lottery ticket being sold for more than the value of the stake before the draw has been carried out, notwithstanding that he knows that thereafter it entitled the holder to £5m" (ibid., at [20]).

In *Stanley v TMK Finance Ltd* [2010] EWHC 3349 (Ch); [2011] B.P.I.R. 876, the only disputed issue of law between the parties was the extent to which the court was entitled to take account of later events in determining value at an earlier date. Specifically, the issue was whether the court could take account of the sale of a property in October 2006 in determining its value as at May 2005. Having considered Lord Scott's speech in *Phillips v Brewin Dolphin Bell Lawrie Ltd* (above), David Richards J stated that Lord Scott was not intending to introduce a hindsight test or principle:

"The purpose for which the Applicants seek to rely on the sale of the property in October 2006 ... is to establish that a price agreed for this property between independent third parties in 2006 shows what the open market value was in May 2005, because the evidence establishes that there was no material difference in market conditions between those dates ... [A]s a matter of principle, the court is entitled on this basis to have regard to the price agreed in 2006. It is not an application of a hindsight principle ... It is simply using the later sale to establish by inference the market value at the earlier date" (ibid., at [15], [16]).

In an Irish corporate insolvency case (*Levy McCallum Ltd v Allen* [2007] NI Ch. 3), the impugned transaction was the giving of a guarantee. "The value of the guarantee to a creditor depends on the financial strength/weakness of the principal debtor [at the date of the guarantee] and the extent to which the creditor is therefore dependent upon the guarantee. Inevitably such an assessment would require the ... liquidator, upon whom the onus lies, to put the necessary material before the court to enable this assessment to be made ... The other side of the balancing exercise involves an assessment of the value of the consideration received by the surety" (ibid, at [46], [47]). See also the discussion of this case in *Tailby v HSBC Bank Plc* [2015] B.I.P.R. 143.

In *McDonald v Hanselmann* [1998] 28 A.C.S.R. 49, Young J, sitting in the Equity Division of the Supreme Court of New South Wales, had to consider the meaning of "uncommercial transaction" within the meaning of the Corporations Law s.588B. A company, three months before going into administration, had sold to the son of one of its directors certain equipment together with the company's client base and the goodwill of its business for $40,000:

"I have to deal with the questions of value. Value is not a matter which is decided in a vacuum. Value usually is associated with a person. The pure concept of value is, of course, what a reasonable objective person would pay for the property rather than lose it, but very often property will have a special value to a person because of factors unique to that person ... If that special fact is known to the vendor and to other persons, it may be a matter to take into account when working out what the hypothetical objective purchaser would pay rather than lose it ..." (p.53 at 35 to p.54 at 5).

"[T]he controller of the company knew that his son was ... willing to take virtually the whole of the plant and equipment for his new business. [W]here one has such a situation even if there are no

other potential buyers, the value of the property is the amount which the only purchaser would be prepared to pay for it rather than to lose the property" (p.55 at 15 to 20).

By way of contrast, in *Hargreaves v Salt* [2010] EWHC 3549 (Fam); [2011] B.P.I.R. 656, a case concerned, in effect, with the transfer of "a substantial villa", the court rejected a submission that market value as defined by the RICS was not the true test of value for the purposes of s.339, insofar as the transferor had been under great pressure to sell the villa and had been willing to offer it to anybody who was prepared to take over the mortgage and certain other debts, rather than offer it for sale on the open market.

"I was not referred to any authority which suggested that the value to be identified by the court is to be determined by what the seller is subjectively willing to accept, as distinct from the price which a purchaser might reasonably be expected to pay given the market conditions at the time. No doubt in evaluating that price the conditions relevant to the market at that time, and particularly any factors requiring the property to be marketed over a truncated period are relevant to establishing what price a purchaser might be expected to pay." (ibid., at [26])

"The focus of [the] authorities ... is ... on what a purchaser would be prepared to pay and not what a seller would be willing to accept in the hypothetical transaction. The authorities show that the existence of a purchaser must be assumed even if, on the evidence, there was a restricted or even no market for the relevant asset at the time of the transaction ... [T]he focus ... must always be on what a hypothetical purchaser would be prepared to pay and not on what the vendor would be prepared to accept." (ibid., at [29])

In *Barber v CI Ltd* [2006] B.C.C. 927, the court held that where A, to whom B has lent money borrowed from C, repays the money directly to C, in circumstances constituting a voidable preference of B, the payment by A to C is a transaction at an undervalue within this section. The judge accepted counsel's submission, based upon the last paragraph of the above quotation from *Brewin Dolphin Bell Lawrie Ltd*, above, that a preferential payment, which is inevitably susceptible to challenge, cannot amount to consideration for the making of that very payment.

In the case of *Re Thoars (Deceased)*; sub nom. *Reid v Ramlort Ltd* above, the trial ([2003] EWHC 1999 (Ch); [2003] B.P.I.R. 1444) was concerned with whether a declaration of trust dated July 26, 1996, whereby Mr Thoars, who was suffering from cirrhosis of the liver, declared that he held the benefits of a Scandia life insurance policy on trust for Ramlort Ltd, was a transaction at an undervalue. It was common ground that as consideration for the making of the declaration of trust Ramlort Ltd made two payments. One was a payment of £1,100 to a third party, the other was a payment of £1,900 which the Judge found at the trial, was made by way of a loan to Mr Thoars. HH Judge Norris QC found that as at the date of the declaration of trust the policy had a minimum value of £10,000. As to the payments made by Ramlort Ltd as consideration, the Judge valued each payment at nil and he accordingly found that the making of the declaration of trust was a transaction at an undervalue within the meaning of s.339. By his Order the Judge ordered that the proceeds of the policy (amounting to some £180,000), together with accrued interest, be held on trust to repay to Ramlort Ltd the sums of £1,900 and £1,100 which Ramlort Ltd had paid as a consideration, and subject thereto, on trust for Mr Reid, the judicial factor for the insolvent estate of Mr Thoars, who had died on 19 September 1996, the day after he underwent a liver transplant. On appeal to the Court of Appeal, [2004] EWCA Civ 800; [2004] B.P.I.R. 985, Ramlort Ltd challenged the Judge's findings as to the minimum value of the policy and as to the value of the consideration provided by it, contending that as at the date of the declaration of trust the policy was not worth significantly more than the consideration which Ramlort Ltd gave for it and accordingly the declaration of trust was not a transaction at an undervalue. In the alternative, it contended that the appropriate remedy was not to set aside the declaration of trust, but rather for Ramlort Ltd to pay monetary compensation equal to the amount of the undervalue. The Trial Judge had accepted Ramlort Ltd's submission that the values of the policy and of the consideration given for it had to be assessed as at the date of the transaction and that the general rule is that the value is to be ascertained by reference to what a purchaser would have paid. The Judge went on to make the qualification that he did not regard it as an absolute requirement in every case that the court should arrive at specific values. As regards Ramlort Ltd's submission that on the evidence of its expert that the value of the policy as at the date of the declaration of trust was its surrender value of £71, the Trial Judge said that looking at the reality of the situation the surrender value was only the value that Scandia could be compelled to pay if the policy-holder exercised the unilateral right to surrender the policy. But if Mr Thoars, facing a liver transplant and with severely impaired mortality, had gone to Scandia and said: "at the moment you are on risk for £185,000, I have only paid two premiums but I am willing to release you from your obligation; what will you pay me?" [it is incredible] that Scandia would have said: "£71 not a penny more". In agreeing with the Trial Judge's approach, Jonathan Parker LJ (with whom Waller LJ and Judge LJ concurred) said that there was nothing in the express provisions of s.339(3)(c) which requires the court to ascribe a precise figure either to the outgoing value or to the incoming value. It will apply whenever the court is satisfied that, whatever the precise values may be, the incoming value is on any view "significantly less" than the outgoing value. Moreover, even in the absence of direct evidence of the existence of a special purchaser for the policy, Jonathan Parker LJ was unable to accept the proposition that the conclusion must follow that its value was no more than its surrender value of £71. The appeal was substantially dismissed, the Court of Appeal considering that the Judge was fully entitled to find that the outgoing value was at least £10,000. The

Court of Appeal did not find it necessary to hear argument on the point made in the Respondent's Notice that in valuing the policy as at the date of the declaration of trust the Judge should have taken account of the fact that Mr Thoars had died shortly thereafter.

In *Carman v Letchford*; sub nom. *Re Hollier (A Bankrupt)* [2010] EWHC 3155 (Ch); [2014] B.P.I.R. 927, HH Judge Hodge QC, sitting in the Chancery Division, stated:

> "As appears from the leading judgment of Jonathan Parker LJ in *Re Thoars (Deceased)* [above], the court is not required, for the purposes of deciding whether there is a significant difference between the incoming and outgoing values, to have reference to expert evidence as to values but is entitled to apply a common sense approach and can, if necessary, take from a range of possible values those which are most favourable to the party seeking to uphold the transaction in question" (at [7]).

Significantly less

**3-2261** The expression "significantly less" is not a term of art. Its applicability to any particular case must depend upon the facts of that case. The determination of rights by reference to adverbs of magnitude can often lead to a considerable area of uncertainty, as was demonstrated, for example, by the various interpretations given to the adjective "substantial", running from "not insubstantial" to "quite large", contained in the phrase "a substantial portion of the whole rent" used in the Rent and Mortgage Interest Restrictions Act 1923 s.10(1) (repealed) (see *Palser v Grinling* [1948] A.C. 291 HL, and subsequent cases). Under s.42(1) of the 1914 Act, a purchaser in good faith and "for valuable consideration" was excluded from the purview of s.42. For the purposes of that subsection, the courts construed the expression "purchaser … for valuable consideration" as meaning the provider of a commercial quid pro quo; that is to say, someone who could be said to have given a consideration for his purchase which had a real and substantial value, and not one which was merely nominal or trivial or colourable (see *Re Abbott (Bankrupt No.8 of 1980)* [1983] Ch. 45 DC, at 54E–H, 57G–H). The old law effectively located the invalidity point above the level of "nominal" or "insignificant", but below the level of equality. It is plain that, by the adoption of the term "significantly less", the legislature intended to give the court a margin within which to seek to do justice between the recipient and the creditors generally, according to the particular circumstances of the case.

Can the giving of security be a transaction at an undervalue?

**3-2262** In *Re MC Bacon Ltd (No.1)* [1990] B.C.L.C. 324, Millett J. had to consider whether the giving of a debenture by a company to a bank, with which it had existing overdraft facilities, was a transaction at an undervalue within IA 1986 s.238.

> "[Section 238(4)(b)] requires a comparison to be made between the value obtained by the company for the transaction, and the value of consideration provided by the company. Both values must be measurable in money or money's worth and both must be considered from the company's point of view. In my judgment, the [liquidator's] claim to characterise the granting of the bank's debenture as a transaction at an undervalue is misconceived. The mere creation of a security over a company's assets does not deplete them and does not come within the paragraph. By charging its assets the company appropriates them to meet the liabilities due to the secured creditor and adversely affects the rights of other creditors in the event of insolvency. But it does not deplete its assets or diminish their value. It retains the right to redeem and the right to sell or remortgage the charged assets. All it loses is the ability to apply the proceeds otherwise than in satisfaction of the secured debt. That is not something capable of valuation in monetary terms and is not customarily disposed of for value … By granting the debenture the company parted with nothing of value, and the value of the consideration which it received in return was incapable of being measured in money or money's worth." (ibid., at 340g–341b).

This passage was approved in *National Bank of Kuwait v Menzies* [1994] B.C.C. 119 CA, and was further applied in *Agricultural Mortgage Corp Plc v Woodward* [1995] 1 B.C.L.C. 1 CA.

However, in *Hill v Spread Trustee Co Ltd* [2006] EWCA Civ 542; [2007] 1 W.L.R. 2404 at [138], Arden LJ, with the concurrence of other members of the Court, said:

> "[Counsel for the appellants] sought to argue that as a matter of law the grant of security involved no diminution in the value of [the prospective bankrupt's] assets … As to that, I would observe that section 423(1)(c) [in the same terms as s.339(3)(c)] did not refer to a diminution in assets and does not depend on the grant of proprietary rights. The grant of other rights can constitute consideration; this approach is supported by section 425 [in terms similar to s.342] which refers to "obligations" and "benefits" as well as to property. If it had been necessary to find the grant of a proprietary right, I would provisionally not have accepted the argument that the grant of security in this case did not involve the disposition of any property right in favour of the [appellants]. Obviously there is no change in the physical assets of the debtor when the security is given but there seems to be no reason why the value of the right to have recourse to the security and to take priority over other creditors, which the debtor creates by granting the security, should be left out of

# TAB 107

# PALMER'S COMPANY LAW

VOLUME 4

LONDON
Sweet & Maxwell

EDINBURGH
W Green

**15.563**     The statutory test for a transaction at an undervalue is contained in s.238(4) of the Insolvency Act 1986, which states that a company enters into such a transaction with a person if:

> "(a)  the company makes a gift to that person or otherwise enters into a transaction with that person on terms which provide for the company to receive no consideration; or
>
> (b)  the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company."

Subject to what is stated below regarding certain special situations, the onus is on the liquidator, as the party seeking to bring about the avoidance of the transaction in question, to prove that it took place at a significant undervalue for the purposes of s.238 of the Insolvency Act 1986.[1] For a transaction to fall within the ambit of s.238(4) as being "at an undervalue" it must either amount to an outright gift, or it must involve some element of dealing between the parties to it.[2] Section 238(2) indicates that, to be impeachable, a transaction at an undervalue must have been entered into by the company at "a relevant time". That expression is defined by s.240 in relation to both ss.238 and 239, and is discussed below.[3]

**15.564**     However, the provisions of s.238(5) of the Insolvency Act 1986 must be further considered before it can be held that a transaction, though demonstrably at an undervalue, is voidable. This subsection is designed to enable the company to engage in genuine business transactions carried out in good faith in the reasonable belief that they will benefit the company. For example, a so-called "fire" sale whose purpose is to generate cash-flow for the business by selling stock at well below cost prices could only achieve its objective if the purchasers can be certain that their "bargains" will not be impeachable if the company later goes into liquidation or administration. Such transactions may retain their validity thanks to the effect of s.238(5), notwithstanding that in objective terms the criteria with respect to "undervalue" may have been satisfied. The onus is on the person who seeks to resist the making of an order under s.238 to satisfy the court that all the requirements of subs.(5) were fulfilled with respect to the transactions in question.[4]

**15.565**     The scope and effects of the alternative statutory test of a "transaction at an undervalue" supplied by s.238(4)(b) of the Insolvency Act 1986 (see above) were examined by the House of Lords in *Phillips (Liquidator of AJ Bekhor & Co) v Brewin Dolphin Bell Lawrie Ltd (formerly Brewin Dolphin & Co Ltd)*[5] On the one

---

[1] *Stanley v TMK Finance Ltd* [2010] EWHC 3349 (Ch); [2011] B.P.I.R. 876 per David Richards J.

[2] *Knights v Seymour Pierce Ellis Ltd (formerly Ellis & Partners Ltd)* [2001] 2 B.C.L.C. 176 Ch D (Companies Ct). (The limited terms of the definition of "transaction" supplied by s.436 of the Insolvency Act 1986 leave the court with the task of amplifying its meaning according to common sense approaches to its application in the context of s.238). See, e.g. *Ovenden Colbert Printers Ltd (In Liquidation), Re* [2013] EWHC 311 (Ch); [2013] B.P.I.R. 370 Ch D (Companies Ct) per Peter Smith J, affirmed in the Court of Appeal: [2013] EWCA Civ 1408; [2014] B.P.I.R. 285.

[3] See PCL para.15.571 onwards; PCI para.1.571 onwards.

[4] Compare *Barton Manufacturing Co Ltd, Re* [1998] B.C.C. 827 Ch D.

[5] [2001] UKHL 2; [2001] 1 W.L.R. 143; [2001] B.C.C. 864. An instructive aspect of this case concerns the consequence of having to treat as separate, for the purposes of establishing whether any of them had taken place at an undervalue, transactions which, although commercially linked, had been separately structured out of regard for other objectives—primarily fiscal—which the parties had sought to accomplish. On the burden of proof that the transaction took place at a significant undervalue, see *Stanley v TMK Finance Ltd* [2010] EWHC 3349 (Ch); [2011] B.P.I.R. 871 per David Richards J.

# TAB 108

or a declarator of marriage, (ii) a promise *subsequente*

*lachinery Co Ltd v Cutlan* for its decision: *ACCC v* 3.

*aacs v Ocean Accident and*

granting *habeas corpus* nd the applicant could urisdiction[3]. This was ter was then dealt with s cannot be made now

15 App Cas 506; *Secretary shugbayi Eleko v Officer* New Zealand it was held in using the writ exercises the es as an estoppel; *Wall v R*

1959] Ch 368; affd [1959] 09] 2 MLJ 660 CA. *Pentonville Prison ex parte*

CTION (CIVIL)

urts of summary juris- s the dismissal of an decision that he is not er for the maintenance thout deciding that the sion on paternity, with make a fresh applica- echnically fresh[5]. The nial offence under the stopped the complain- ot bar such a finding at

*Justices, ex p Hodgkinson* 7.
*d Justices, ex p Hodgkinson*

CJ: 'All the cases show that

4 *R v Sunderland Justices, ex p Hodgkinson* [1945] KB 502, 506–509; *Robinson v Williams* [1965] 1 QB 89, 100; *Re F (W) (an infant)* [1969] 2 Ch 269.
5 *Robinson v Williams* [1965] 1 QB 89, 98–100.
6 Now the Domestic Proceedings and Magistrates' Courts Act 1978.
7 *Stokes* [1911] P 195, 198–200.
8 *Froud* (1920) 123 LT 176.

## DISMISSALS BY COURTS OF SUMMARY JURISDICTION (CRIMINAL)

**2.32** This is considered in paras 14.05 & foll.

## APPELLATE DECISIONS

**2.33** When an appellate court reverses the judgment below, the former decision, until then conclusive, is avoided *ab initio*[1] and replaced by the appellate decision, which becomes the *res judicata* between the parties. Even if the appeal fails, the decision of the appellate court becomes the source of any estoppels[2]. An issue not dealt with below which the appellate court treats as material when dismissing the appeal is also *res judicata*[3]. Where the appellate tribunal reverses a judgment for lack of jurisdiction, that judgment is a nullity, and the reversal does not decide any question on the merits[4].

1 *P & O Nedlloyd BV v Arab Metals Co (No 2)* [2007] 1 WLR 2288 CA, 2300–2301; *Railway Comr (NSW) v Cavanough* (1935) 53 CLR 220; D M Gordon 'Effect of reversal of judgment' (1958) 74 LQR 517, 518–521; *The People v Quilligan (No 3)* [1993] 2 IR 305 SC, 328; cf *The People v O'Callaghan* [2001] 1 IR 584, 596–597. For the effect of order for a new trial: para 5.14.
2 *Shedden v Patrick* (1854) 1 Macq 535 HL, 590, 599; *Wishart v Fraser* (1941) 64 CLR 470; *R v Marks* (1981) 147 CLR 471, 476.
3 *Midnapur Zamindary Co Ltd v Roy* (1924) LR 51 Ind App 293.
4 *Cross v Salter* (1790) 3 TR 639 (reversal for lack of jurisdiction); *R v Drury* (1848) 3 Car & Kir 190, 199, 200; *Conlin v Patterson* [1915] 2 IR 169 (order quashing conviction could not support plea of *autrefois acquit*); *R v Marsham, ex p Phethick Lawrence* [1912] 2 KB 362. For settlement cases *R v St Andrew, Holborn* (1796) 6 Term Rep 613 (quashing of order of removal no adjudication); *R v Wick St Lawrence Inhabitants* (1833) 5 B & Ad 526 (quashing order *prima facie* not a 'decision' on any other question); *Singh v Assets Recovery Agency* [2005] 1 WLR 3747 CA, 3751 (statutory bar to double recovery not attracted where decision quashed for lack of jurisdiction); para 2.15.

**2.34** Where an appellate tribunal records a compromise without exercising any judicial function, there is no *res judicata*[1]. However, if it enters a judgment or order *in personam* by consent, the ordinary consequences follow[2].

1 Para 2.18.
2 Paras 2.16–2.19; *Khan v Goleccha International Ltd* [1980] 1 WLR 1482 CA.

## CRIMINAL DECISIONS

**2.35** These are considered in Chs 14 and 23.

establish the existence of rights, but to provide a … collective execution against the property of the debtor by creditors whose rights are admitted or established. … The important point is that bankruptcy, whether personal or corporate, is a collective proceeding to enforce rights and not to establish them.'

1 [2007] 1 AC 508, 516.

**9.04** He held that bankruptcy and corporate insolvency proceedings are universal in their operation and the Manx court had jurisdiction to enforce the Chapter 11 plan[1]. The fact that proceedings enforce the collective rights of creditors is an inadequate reason for holding that a judgment is not *in personam*. The claimant enforces the rights of a class, and all creditors are bound by, and entitled to the benefit of the judgment. Nor is it apparent why proceedings to enforce a collective execution against the property of a debtor are not proceedings to establish rights merely because the debts do not merge in the order for bankruptcy or winding up[2]. An execution for the benefit of the claimant appears to be *in personam*. Lord Hoffmann relied on[3] *Solomons v Ross*[4] to support the universal operation of such orders without noticing that it had been overruled in *Galbraith v Grimshaw and Baxter*[5]. There were at least two grounds for holding that the New York judgment was binding on Cambridge *in personam*. Although there were concurrent findings that it had not submitted to the jurisdiction[6] it was aware, through its parent and directors, of the proceedings and could have intervened, but allowed the proceedings to be conducted by its parent in the same interest[7], and was therefore a deemed party[8]. As a 70% owner of the debtor it was also bound as a privy of its subsidiary and its own parent[9] which participated in the Chapter 11 proceedings[10].

1 [2007] 1 AC 508, 518.
2 *Wight v Eckhardt Marine GmbH* [2004] 1 AC 147, 155–156.
3 [2007] 1 AC 508, 517.
4 (1764) 1 Hy Bl 131n.
5 [1910] AC 508, 511, followed in *Anantapadmanabhaswami v Official Receiver of Secunderabad* [1933] AC 394.
6 [2007] 1 AC 508, 515.
7 Ibid at 520.
8 Para 9.12.
9 Para 9.47.
10 [2007] 1 AC 508, 514–515; para [8].

## MUTUALITY

**9.05** A decision *in personam* only operates as an estoppel in favour of, and against, parties and privies, not strangers[1]. Thus, as *Petrie v Nuttall* decided[2], *res judicata* estoppels in civil cases must be 'mutual'. This was rejected by Lord Denning MR and Sir George Baker in *McIlkenny v Chief Constable of West Midlands Police Force*[3] who followed the US Supreme Court[4] and would have overruled *Petrie v Nuttall*, but Reginald Goff LJ held that mutuality was basic to *res judicata*[5], and his judgment was approved by the House of Lords[6]. This is important when determining whether a person is a privy[7]. The position of the parties on the record in the two cases is irrelevant[8].

ıllective execution against
's are admitted or estab-
ıether personal or corpo-
ot to establish them.'

solvency proceedings are
jurisdiction to enforce the
ce the collective rights of
at a judgment is not *in*
lass, and all creditors are
ıt. Nor is it apparent why
t the property of a debtor
se the debts do not merge
:ecution for the benefit of
nann relied on[3] *Solomons*
ı orders without noticing
*ı and Baxter*[5]. There were
judgment was binding on
urrent findings that it had
through its parent and
ervened, but allowed the
same interest[7], and was
ebtor it was also bound as
vhich participated in the

ı56.

*swami v Official Receiver of*

:stoppel in favour of, and
*Petrie v Nuttall* decided[2],
ıal'. This was rejected by
*ınny v Chief Constable of*
upreme Court[4] and would
.J held that mutuality was
:d by the House of Lords[6].
ın is a privy[7]. The position
evant[8].

1 *Duchess of Kingston's Case* (1776) quoted *R v Hutchings* (1881) 6 QBD 300 CA, 304; para 8.23 n 4; *Gray v Lewis* (1873) 8 Ch App 1035, 1059–1060 per Mellish LJ: 'It unquestionably is not the general rule of law that a judgment obtained by A against B is conclusive in an action by B against C. On the contrary, the rule of law is otherwise ... a judgment *inter partes* is conclusive only between the parties and those claiming under them.'

2 (1856) 11 Exch 569, 575 per Alderson B: 'It is essential to a [*res judicata*] estoppel that it be mutual, so that the same parties or privies may both be bound and take advantage of it.'

3 [1980] QB 283 CA, 321.

4 *Blonder-Tongue Laboratories Inc v University of Illinois Foundation* 402 US 313 (1971). *Saffron v Federal Comr of Taxation* (No 2) (1991) 30 FCR 578 contains a discussion of the US doctrine of collateral estoppel that a party who litigated an issue and lost is bound against a non-party.

5 *McIlkenny* [1980] QB 283 CA, 329.

6 *Hunter* [1982] AC 529; *Concha* (1886) 11 App Cas 541, 553, 554; *Carl-Zeiss* (No 2) [1967] 1 AC 853, 909–910, 928, 935, 942–943, 968–969; *Blathwayt v Baron Cawley* [1976] AC 397, 419, 430; *DPP v Humphrys* [1977] AC 1, 20, 33, 51; *Sun Life* [2005] 1 Lloyds Rep 606 CA, 627, 630; *Ramsay v Pigram* (1967) 118 CLR 271, 276, 282; *Rogers v R* (1994) 181 CLR 251, 267; *Effem Foods* (1993) 43 FCR 510, 526, 528, 543; *Danyluk* [2001] 2 SCR 460, 491.

7 *Spencer v Williams* (1871) LR 2 P&D 230, 237; *Concha* (1886) 11 App Cas 541, 553; *Ramsay v Pigram* (1867) 118 CLR 271, 276; *Carl-Zeiss* (No 3) [1970] Ch 506, 541; *Effem Foods* (1993) 43 FCR 510, 542.

8 *Kinsey* (1754) 2 Ves Sen 577; *Eastmure v Laws* (1839) 5 Bing NC 444; *Geils* (1852) 1 Macq 255 HL; *Webster v Armstrong* (1885) 54 LJQB 236; *Marginson* [1939] 2 KB 426 CA.

## BURDEN OF PROOF

**9.06** The person asserting the estoppel must establish identity or privity[1]. Any question of physical identity is one of fact[2].

1 *Carl-Zeiss* (No 2) [1967] 1 AC 853; *O'Keefe v Williams* (1907) 5 CLR 217, 228.

2 *Russell v Smyth* (1842) 9 M & W 810.

## FOREIGN DECISIONS

**9.07** The rules as to parties and privies apply to foreign decisions *in personam*[1].

1 *Carl-Zeiss* (No 2) [1967] 1 AC 853, 910, 919, 928–929, 936–937, 945–946, 968–969 where the estoppel failed *inter alia* for lack of privity; *Blohn v Desser* [1962] 2 QB 116, 124.

## ESTOPPELS BETWEEN DEFENDANTS

**9.08** *Res judicata* estoppels may operate between defendants. The principles were developed by the Privy Council in Indian appeals. In *Munni Bibi v Tirloki Nath*[1] Sir George Lowndes said:

> '... three conditions are requisite: (1) there must be a conflict of interest between the defendants ...; (2) it must be necessary to decide the conflict ... to give the plaintiff the relief he claims and (3) the question between the defendants must have been judicially decided.'

ın 19:22

BUTTERWORTHS COMMON LAW SERIES

Spencer Bower and Handley

# Res Judicata

Fourth Edition

**The Honourable Mr Justice KR Handley**
*Officer of the Order of Australia,*
*BA, LLB, LLD (Honoris Causa) (Sydney),*
*Honorary Bencher of Lincoln's Inn,*
*Visiting Fellow, Wolfson College, Cambridge*
*A Judge of the Court of Appeal of New South Wales*

Series editor

**Andrew Grubb MA (Cantab), LLD (Lond), FMedSci**
*Senior Immigration Judge, Asylum and Immigration Tribunal; Visiting Professor of Law, Cardiff Law School, Cardiff University*

LexisNexis®

ıay recover contribution
ued have been liable in

y Viscount Simonds and
dgment[5] a construction
a plaintiff had recovered
ıut any other proof of its
rent tortfeasor who was
in favour of a defendant
could not claim contri-
vise have been liable[7]. A
ding on other joint or
of an action against a
nent and does not bar a

39) 1 Meg 402 CA.
lc [1996] 1 WLR 1 CA.
others, or give it greater effect
A; para 4.04 n 9.
pn [1955] AC 169, 178, 192

r for Government Transport
v Helmers (1966) 114 CLR

[1975] 2 SCR 884, 896–897.
CLR 53; para 2.19.

on) Act 1978 (the 1978

by another person may
n respect of the same

ere it first appears there
ct. Section 1(5) is also

the United Kingdom by
n question against any
tion shall be conclusive
nined by that judgment
sought'.

n contribution is sought,
eks contribution. It only
ution is sought. Conse-
s binds other tortfeasors
ment for a defendant on
5) it would not establish
ne damage within s 1(1).



This is consistent with s 1(3) which provides that a limitation defence which does not extinguish the right does not affect the tortfeasor's liability for contribution under s 1(1). Thus[1] the 1978 Act displaced the result in BOAC[2].

1 *Nottingham Health Authority v Nottingham County Council* [1988] 1 WLR 903 CA, 906.
2 [1955] AC 169.

9.37 Section 1(1) of the Fatal Accidents Act 1976 provides:

> 'If death is caused by any wrongful act, neglect or default which is such as would (if death had not ensued) have entitled the person injured to maintain an action and recover damages in respect thereof, the person who would have been liable if death had not ensued shall be liable to an action for damages, notwithstanding the death of the person injured.'

The statute confers a new cause of action based on the death which the deceased could never have enforced[1], provided he could have maintained an action if death had not ensued. Judgment recovered by the deceased bars any action by or on behalf of his dependants after his death[2], as does a judgment for the defendant[3] or a release by the victim in his lifetime[4].

1 *The Vera Cruz* (1884) 10 App Cas 59, 67, 70.
2 *Pickett v British Rail Engineering Ltd* [1980] AC 136, 146, 152.
3 *Noall v Middleton* [1961] VR 285, 288; *Scala v Mammolitti* (1965) 114 CLR 153, 161.
4 *Cable Estate v Ferguson* (2008) 301 DLR (4th) 746.

## PRIVIES (GENERAL)

9.38 *Res judicata* estoppels operate for or against privies of the parties in blood, title or interest[1] for the reasons explained by Cababe[2]:

> '... although the estoppel is only a personal matter between the particular parties yet to really give the parties the benefit of it, and subject them to the burden of it, it is essential that not they only, but those of whom it can be predicted that they are their representatives in interest, should likewise have the benefit of and be subject to the burden of the [estoppel]. Upon any one therefore upon whom all the rights and obligations of any legal entity devolved such as an executor, administrator or trustee in bankruptcy, there will devolve as one of such rights and obligations, the right to exact or the obligation to be subjected to, the [estoppel], and so too upon anyone upon whom the right and obligations arising out of a particular transaction that gave rise to the estoppel devolve, as, for example, a purchaser or assignee, that will also devolve this right and this obligation.'

Privies include any person who succeeds to the rights or liabilities of a party on death[3], insolvency[4], by assignment or by statute, or who is otherwise identified in estate or interest[5]. The party estopped by privity must have some interest, legal or beneficial, in the previous litigation or its subject matter[6], and accordingly assignees are privies of the assignor[7]. Privity was described by the US Supreme Court as a mutual or successive relationship to the same right of property[8], although this cannot be exhaustive. Privity is a matter of substance, not form[9].

1 *Carl-Zeiss (No.2)* [1967] 1 AC 853, 909–910.

2 *Cababe 'Principles of Estoppel'* (1888) at 111–113 cited by Starke J in *Partridge v McIntosh & Sons Ltd* (1933) 49 CLR 453–463. This passage in the 3rd edn was cited in *Powell v Wiltshire* [2005] QB 117 CA, 123, 130. A *res judicata* estoppel is a substantive right: paras 1.08–1.09.

3 *Douglas v Forest* (1828) 4 Bing 686; *Don v Lippman* (1837) 5 Cl & Fin 1; *Holland v Clark* (1842) 1 Y & C Ch Cas 151; *Reimers v Druce* (1857) 26 LJ Ch 196; *Innis v Rochford* (1884) 14 LR Ir 285; *Barrs v Jackson* (1845) 1 Ph 582 (residuary legatee); *Whittaker v Jackson* (1864) 2 H & C 926 (devisee).

4 *Douglas v Forest* (1828) 4 Bing 686 (assignees entitled to estoppel); *Re South American and Mexican Co, ex p Bank of England* [1895] 1 Ch 37 CA (liquidator liable to estoppel).

5 *R v Blakemore* (1852) 21 LJMC 60 (privy in estate); *Re Allsop and Joy's Contract* (1889) 61 LT 213 (successor in title); *North Eastern Rly Co. v Dalton Overseers* [1898] 2 QB 66 (successors of highway authority); *O'Connor* [1916] 2 IR 148 (sucessors in title); *Jones v Lewis* [1919] 1 KB 328 CA (successor in office).

6 *Carl-Zeiss* (No.2) [1967] 1 AC 853, 910; *Effem Foods* (1992) 43 FCR 510, 540–542.

7 *Kolden Holdings Ltd v Rodette Commerce Ltd*) [2008] Bus LR 1051 CA, 1073 (citing this passage from the 3rd edn).

8 *Bigelow v Old Dominion Copper Mining Co.* 225 US 111 (1912), 128–129.

9 *MCC Proceeds Inc* [1998] 4 All ER 675 CA, 695–696.

## PRIVITY OF ESTATE

**9.39** Where privity of estate exists, a judgment binding on the assignor is binding on the assignee. There are three possible situations, the judgment may predate the assignment, the assignment may occur while the action is pending or the judgment may postdate the assignment. An assignee who acquired his interest before the proceedings against his assignor were commenced is not bound by the judgment. The question arose in *Doe d Foster v Earl of Derby*[1]. The Earl claimed under a conveyance in 1823 by Henry Foster as heir of Mary Travers. In 1834 in an action of ejectment against Thomas Foster, who also claimed to be the heir of Mary Travers, counsel for the Earl tendered the evidence of a witness, since deceased, given in 1830 in an ejectment action between Henry Foster and Thomas Foster relating to a different estate owned by Mary Travers at the date of her death. The estate acquired by the Earl in 1823 was not, in any sense, 'represented' in the 1830 litigation. The evidence was rejected and Littledale J said[2]:

> 'A passage has been cited from Com. Dig. Evidence ... where it is said that "a verdict in another action for the same cause shall be allowed in evidence between the same parties so, it shall be evidence, where the verdict was for one under whom any of the present parties claim." But that must mean a claim acquired through such party subsequently to the verdict: if, as has been now argued, the rule could be extended to parties claiming other lands under the same title previously to the verdict the effect of such verdicts might be carried back for 100 years.'

1 (1834) 1 Ad & El 783.

2 Ibid at 790; *Hodson v Walker* (1872) LR 7 Ex ch 55, 61.

**9.40** This was treated as settled law by the Privy Council in 1948[1] where Sir John Beaumont said:

> 'It is contended that appellants 2 and 3 are bound by the decree in the former suit because they claim through Din Mohammad who was a party to that suit. But the answer to this contention is that the alienations under which appellants

ıy Starke J in *Partridge v*
in the 3rd edn was cited in
*ıta* estoppel is a substantive

) 5 Cl & Fin 1; *Holland v*
:7) 26 LJ Ch 196; *Innis v*
?h 582 (residuary legatee);

oppel); *Re South American*
quidator liable to estoppel).
*ı and Joy's Contract* (1889)
*Overseers* [1898] 2 QB 66
(sucessors in title); *Jones v*

43 FCR 510, 540–542.
1051 CA, 1073 (citing this

12), 128–129.

ing on the assignor is
ons, the judgment may
e the action is pending
gnee who acquired his
ere commenced is not
*ɔster v Earl of Derby*[1].
Foster as heir of Mary
ɔmas Foster, who also
the Earl tendered the
n an ejectment action
different estate owned
cquired by the Earl in
itigation. The evidence

here it is said that "a
allowed in evidence
e verdict was for one
: must mean a claim
if, as has been now
ıther lands under the
licts might be carried

ıuncil in 1948[1] where

decree in the former
s a party to that suit.
ıder which appellants

2 and 3 claimed were made before the date of the former suit. Those appellants therefore do not claim under a party to the former suit who represented their interests in that suit, but under a person who subsequently became a party, and who at the time of the suit did not represent their interests. Their Lordships think that appellants 2 and 3 … are not affected by the plea of *res judicata*.'

The position is also clear where the judgment predates the assignment as Madden J said[2]:

> 'According to the clear principles of the law of estoppel it is necessary, in order to estop the [assignee], to show that he derives title under [the assignor] by act or operation of law subsequent to the recovery of the judgment. If this is shown it is reasonable that he should be estopped, because his estate was represented at the time of the recovery of the judgment, though not in his person.'

This was approved in *Powell v Wiltshire*[3], where the assignment occurred during pending litigation. These decisions are consistent with the principle that an assignor cannot[4] 'by any statement … after he had parted with his interest, make evidence against the title of the party to whom he had conveyed.' In the same way the admissions of a husband after the marriage that he was already married and his first wife was alive, were not admissible to invalidate the marriage or bastardise the children[5].

1 *Beli Ram v Chandri Mohammad Afzal* [1948] AIR (PC) 168, 171. The Board included Lord Normand and Lord MacDermott.
2 *In Re De Burgho's Estate* [1896] 1 IR 274, 280 (real estate); *Re Walton* (1873) 28LT 12, 16; para 9.14 nn 3–4.
3 [2005] QB 117 CA, 126, 128, 132 (personal property).
4 *Roe of Lord Trimelstown v Kemmis* (1843) 9 Cl & F 749, 779.
5 *Dysart Peerage Case* (1881) 6 App Cas 489, 499–500.

## LIS PENDENS

**9.41** An alienation of real, but not personal property, while litigation is pending, attracts the *lis pendens* principle. Alienations of personal property are governed by the general principle that a judgment against the vendor only binds the purchaser if it predates the assignment[1]. The doctrine of *lis pendens* as it affected real estate or chattels real was summarised by Lord Cranworth LC in *Bellamy v Sabine*[2]:

> 'Where a litigation is pending … as to … a particular estate, the necessities of mankind require that the decision of the Court in the suit shall be binding, not only on the litigant parties, but also on those who derive title under them by alienations pending the suit, whether such alienees had or had not notice of the pending proceedings. If this were not so there could be no certainty that the litigation would ever come to an end. A mortgage or sale made before final decree to a person who had no notice of the pending proceedings would always render a new suit necessary, and … interminable litigation might be the consequence.'

In the same case Turner LJ said[3]:

> 'The doctrine of *lis pendens* is not … founded upon any of the peculiar tenets of a Court of Equity as to implied or constructive notice. It is … a doctrine common to the Courts both of Law and of Equity, and rests … upon the

foundation that it would plainly be impossible that any action or suit could be brought to a successful termination if alienations *pendente lite* were permitted to prevail. The plaintiff would be liable in every case to be defeated before the judgment or decree, and would be drawn to commence his proceedings *de novo*, subject again to being defeated by the same course of proceeding.'

1 *Wigram v Buckley* [1894] 3 Ch 483 CA; *Powell v Wiltshire* [2005] QB 117 CA.
2 (1857) 1 De G & J 566, 578. (The alienation pre-dated the Judgments Act 1839); *Damodaran s/o Raman v Choe Kuan Him* [1980] AC 497, 503.
3 (1857) 1 De G&J 566, 584.

**9.42** The doctrine operated harshly on bona fide purchasers without notice and Parliament intervened in 1839[1]. The Judgments Act s 7 established a system for the registration of pending actions or suits and provided that 'no *lis pendens* shall bind a Purchaser or Mortgagee without express Notice thereof unless and until' a memorandum or minute thereof had been duly recorded in the Court of Common Pleas. The position with land under common law title is now governed by the Land Charges Act 1972. Section 5(1)(a) provides for a register of pending land actions[2], and subs (7) provides that such an action shall not bind the purchaser without express notice unless it is for the time being registered under the section[3]. A pending land action affecting registered land will not prevent its alienation unless the claimant entered notice of his action in the register. If this is done a subsequent registered disposition is postponed to the interest protected by the notice[4]. The Torrens system of title by registration excludes the *lis pendens* doctrine and the claimant in a pending action must lodge a caveat[5].

1 2 & 3 Vict c 11.
2 The action must be capable of binding the land: *Mercantile Investment* [1894] 1 Ch 578, 595.
3 *Perez-Adamson v Perez-Revas* [1987] Fam 89 CA (mortgagee without notice bound by registered pending action).
4 Land Registration Act 2002 ss 34(1), (2)(b); 35; 87(1)(c).
5 *Damodaran s/o Raman v Choe Kuan Him* [1980] AC 497, 503, 504; *ACC Bank plc v Markham* [2007] 3 IR 533.

## PRIVITY IN INTEREST

**9.43** A landlord is not the privy of a tenant unless the latter litigates with his authority[1]. A mortgagee who has not adopted a tenancy is not a privy of the mortgagor as landlord[2]. Receivers appointed by mortgagees of a leasehold (and thus agents of the mortgagor) were privies of the mortgagor as lessee[3]. Children, not claiming through their mother as administratrix of their deceased father, but as next of kin to others are not privies of their father and cannot set up a judgment obtained by their mother as administratrix[4]. Children are not privies of parents or grandparents when their claims to share in a gift to issue per capita compete with those of their ancestors[5]. Parties who claim under a common ancestor are not estopped *inter se* by a decision between their ancestor and a stranger[6].

1 *Lady Wenman v McKenzie* (1855) 5 E & B 447, 458–459; para 9.16.
2 *Clarke v Hall* (1888) 24 LR Ir 316.
3 *Official Custodian for Charities v Mackey (No. 2)* [1985] 1 WLR 1308 (judgment for *mesne* profits against lessee barred landlord claiming higher rate from receivers).

action or suit could be
ente lite were permitted
be defeated before the
nce his proceedings de
se of proceeding.'

[2005] QB 117 CA.
d the Judgments Act 1839);
503.

ırchasers without notice
s Act s 7 established a
and provided that 'no lis
t express Notice thereof
ad been duly recorded in
under common law title
on 5(1)(a) provides for a
ides that such an action
unless it is for the time
ction affecting registered
nt entered notice of his
registered disposition is
e Torrens system of title
he claimant in a pending

Investment [1894] 1 Ch 578,

gee without notice bound by

, 503, 504; ACC Bank plc v

e latter litigates with his
ncy is not a privy of the
rtgagees of a leasehold
he mortgagor as lessee[3].
administratrix of their
rivies of their father and
her as administratrix[4].
hen their claims to share
r ancestors[5]. Parties who
inter se by a decision

ara 9.16.

1 WLR 1308 (judgment for
rate from receivers).

4 *Spencer v Williams* (1871) LR 2 P&D 230.
5 *Re Manly's Will Trusts (No. 2)* [1976] 1 All ER 673.
6 *De Mora v Concha* (1885) 29 Ch D 268 CA, 305; *Syed Ashgar Reza Khan v Syed Mohamed Khan* (1903) LR 30 Ind App 71, 75.

**9.44** A *res judicata* estoppel against the beneficiary binds the trustee by privity of interest and *vice versa*, and a *res judicata* estoppel binding on former trustees binds the new[1]. Different legal personal representatives for the same estate in different jurisdictions are privies[2]. Privity of interest exists where a party bound by an estoppel employs a servant or agent in an attempt to relitigate the question[3]. It is not enough that a relationship of principal and agent exists between a party to the earlier action, and the party sought to be estopped, if it is not binding on the latter. In *Pople v Evans*[4] C as the undisclosed agent of P entered into a contract for sale and, without disclosing the relationship, brought an action for specific performance against E which was dismissed for want of prosecution. P was not estopped from seeking the same relief[5].

1 *Churchill and Sim v Goddard* [1937] 1 KB 92 CA, 103–104; *Gleeson* [1977] 1 WLR 510, 515; *Cromwell v County of Sac* 94 US 351 (1876); *Young v Murphy* [1996] 1 VR 279 CA, 285–287.
2 *Carvel* [2008] Ch 395, 406–407.
3 Paras 9.14–9.16.
4 [1969] 2 Ch 255.
5 The estoppel also failed because the dismissal was not a final decision on the merits. The decision on the absence of privity is suspect. C held the benefit of the contract in trust for P (at 261) and this should have established privity. P would have been bound if he had allowed C to litigate the claim to a final decision on the merits. The rights of E appear irrelevant. C would hold the contract for the benefit of P even if E elected to hold C personally liable.

**9.45** The privy must claim under, through, or on behalf of, the party bound. So it was held by the High Court of Australia that a judgment in favour of the driver did not create an estoppel in favour of his employer who had no interest in that action, and did not claim under or through his employee[1]. In *Reichel v Bishop of Oxford*[2] the House of Lords held that a former incumbent had resigned his parish. The patrons presented and the Bishop appointed a successor, but the former incumbent refused to leave. When the successor brought ejectment the defendant's plea that he was the incumbent was struck out as an abuse of process[3]. While this was clearly correct the question was *res judicata* because the plaintiff claimed under the patrons and the Bishop[4]. The first decision was also *in rem*, because it determined the status of the incumbent[5]. A party suing an agent who challenges his authority to act for a principal, cannot rely on a judgment against the principal which will only bind the agent if he is a privy[6]. Where a trade union secured a judicial interpretation of an industrial award, employees suing in their own right did not claim through or under the union, and were not its privies[7]. Where a trade union brought proceedings against trustees of a superannuation fund on behalf of its members, but not in a representative action, a member was bound as a privy of the union[8].

Privity is not established by proof of curiosity or concern about the litigation, or 'some interest in the outcome'[9]. Megarry VC proposed[10] as the test of

privity, in cases outside any recognised category, the existence of 'a sufficient degree of identification between the two parties to make it just to hold that the decision to which one was party should be binding in proceedings to which the other was party'. This is circuitous and does not identify the necessary degree of identification[11] but was approved by Lord Bingham in *Johnson*[12]. A person who has relied on a decision, such as an incumbrancer who obtained stop orders on a fund in court, claims under the assignor and is a privy[13]. A person who has given financial assistance or an indemnity to a party does not become his privy[14]. However the principle in *Spring Gardens*[15] might establish privity if the indemnifier took a more active role. In Canada Lloyds names bound to indemnify banks which had opened letters of credit in favour of Lloyds were privies of the banks 'because they shared an identical interest in substance.'[16]

1 *Ramsay v Pigram* (1967) 118 CLR 271, 279–280, 282, 290; nor is the driver of a motor vehicle, without more, the privy of its owner: *Bryan v Kildangan Stud Unlimited* [2005] 1 IR 587. An employer who paid workers' compensation to an injured worker and sued a tortfeasor for indemnity does not claim through the worker and is not bound by a judgment in proceedings brought by the worker: *QBE Workers Compensation (NSW) v Dolan* (2004) 62 NSWLR 42 CA.

2 (1889) 14 App Cas 259.

3 *Reichel v Magrath* (1889) 14 App Cas 665; para 10.11 nn 3–4.

4 The view in the 3rd edn is now supported by *Arthur Hall* [2002] 1 AC 615, 701. In *R v York Corpn* (1792) 5 Term Rep 66, 72 Kenyon CJ said during argument that a judgment of ouster bound a person holding office under the vote of the ousted office holder.

5 Para 10.11.

6 *Carl-Zeiss* (No. 2) [1967] 1 AC 853. The defendant challenged the retainer of the solicitors, ie asserted in proceedings against them that they had no authority from the plaintiff to commence or carry on the proceedings. Lord Reid was surprised that the defendants thought their case could be assisted by a judgment against the plaintiff which would only bind the solicitors if they were privies (ibid at 910); *Carl-Zeiss (No.3)* [1970] Ch 506, 541.

7 *Young v Public Service Board* [1982] 2 NSWLR 456.

8 *Shiels v Blakeley* [1986] 2 NZLR 262 CA; *James v British Columbia* (2007) 288 DLR (4th) 380 BCCA.

9 *Gleeson* [1977] 1 WLR 510, 515. Plaintiffs in different class actions against the defendant, based on the same conduct, and represented by the same solicitors were not privies: *Currie v McDonald's Restaurants of Canada Ltd* (2005) 250 DLR (4th) 224 Ont. CA.

10 Ibid at 515; *Sheils v Blackley* [1986] 2 NZLR 262 CA, 268.

11 *Effem Foods* (1992) 36 FCR 406, 416; (1993) 43 FCR 510, 540–541; *Carl-Zeiss (No.3)* [1970] Ch 506, 541–542.

12 [2002] 2 AC 1, 32.

13 *Re Eyton* (1890) 45 Ch D 458.

14 *Mercantile Investment* [1894] 1 Ch 578, 594–595; *Carl-Zeiss (No.2)* [1967] 1 AC 853, 911; *Gleeson* [1977] 1 WLR 510, 514.

15 [1991] 1 QB 241 CA, 252–254; para 9.12.

16 *Bank of Montreal v Mitchell* (1997) 143 DLR (4th) 697, 740; aff sub nom *Timmis v Toronto Dominion Bank* (1997) 151 DLR (4th) 574 CA Ont.

## ESTOPPEL BY CONDUCT IN PROCEEDINGS

**9.46** A party's conduct in legal proceedings may estop him adopting an inconsistent position in later proceedings. In *Kok Hoong* Viscount Radcliffe said[1] this was the basis of *Roe v Mutual Loan Fund Ltd*[2] and continued:

> '… a litigant may be shown to have acted positively in the face of the Court, making an election and procuring from it an order affecting others apart from