**BROWN RUDNICK LLP**
David J. Molton
May Orenstein
Daniel J. Saval
Marek P. Krzyzowski
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800

**KELLOGG, HANSEN, TODD,**
  **FIGEL & FREDERICK, P.L.L.C.**
Michael K. Kellogg (admitted *pro hac vice*)
Aaron M. Panner (admitted *pro hac vice*)
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C.  20036
Telephone: (202) 326-7900

*Counsel for the Foreign Representatives*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 15 Case** |
| **FAIRFIELD SENTRY LIMITED, et al.,** | **Case No: 10-13164 (SMB)** |
| Debtors in Foreign Proceedings. | **Jointly Administered** |
| **FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al.,** | |
| Plaintiffs, | **Adv. Pro. No. 10-03496** |
| -against- | |
| **THEODOOR GGC AMSTERDAM, et al.,** | **Administratively** |
| Defendants. | **Consolidated** |

**DECLARATION OF WILLIAM HARE IN SUPPORT OF THE
LIQUIDATORS' OPPOSITION TO CERTAIN DEFENDANTS'
MOTIONS TO DISMISS ON GROUNDS OF *FORUM NON CONVENIENS***

I, William Hare, do hereby declare, under penalty of perjury under the laws of the

United States of America, that the following is true and correct to the best of my knowledge

and belief:

1.	I make this declaration further to my declaration dated October 21, 2016.

2.	In this declaration I direct the Court to certain principles as concern BVI rules and procedures pertinent to points made in the Liquidators' opposition to certain Defendants' motions to dismiss on the grounds of *forum non conveniens*.  I adopt the definitions used in my first declaration.  Nothing in this declaration is intended to waive privilege in relation to any advice that has been given to the Liquidators.  I am not authorized to and do not waive privilege in any respect.

3.	In particular, I deal with the following matters:

(1)	BVI Court jurisdiction:  an overview of the grounds on which the BVI Court may assert jurisdiction for the purposes of determining claims.

(2)	Recognition and enforcement at common law: an overview of what must be shown at common law regarding the basis for jurisdiction of the foreign court whose judgment is sought to be recognised and enforced.

(3)	Limitations under BVI law with respect to the Liquidators' claims.

**Part 1:  Jurisdiction to Determine Claims**

4.	In this section I direct the Court to and identify the circumstances in which a BVI Court may assert jurisdiction over a defendant for the purpose of determining a claim. In a later section of this declaration I direct the Court to and identify the principles applicable to recognition and enforcement of foreign judgments at English common law, including a BVI judgment where enforcement of that BVI judgment is sought in another jurisdiction in which English common law is applicable.

*Jurisdiction and Service*

5.      Under English / BVI law the court has jurisdiction over the subject matter of an action to entertain a claim *in personam* if, and only if, the defendant is served with process in circumstances authorised by, and in the manner prescribed by statute or statutory order.[1]

6.      The methods of service are laid down by the Civil Procedure Rules.  In the BVI, if a defendant cannot be served properly with the claim form within the jurisdiction under the provisions of CPR Part 5 then permission to serve out under CPR Part 7 must be obtained.

*Service Within the Jurisdiction*

7.      If the defendant is present in the BVI, service can be effected as of right on the defendant and the BVI Court will have jurisdiction.  Presence is determined by whether the defendant can validly be served in the BVI pursuant to the provisions of the BVI Civil Procedure Rules ("CPR"), which are dealt with below.  A defendant might apply to the BVI Court to stay the proceedings in favour of an alternative forum (on *forum non conveniens* ("FNC") grounds), but the grant of such a stay does not mean the BVI Court did not have jurisdiction; it just chose to decline to exercise it.

8.      A defendant is amenable to being served in the BVI if:

  (1)    In the case of an individual defendant, he is physically located in the BVI (by virtue of CPR 5.3 and 5.4); or

  (2)    in the case of a corporate defendant (CPR 5.7),

     (a)    it has a place of business at which an officer or manager of the company can be personally served (as long as the place of business has a real connection with the claim) or

     (b)    a director or officer[2] of the company can be personally served.

---

[1] Dicey, Morris & Collins on The Conflict of Laws, 15th Edition, 2012, Rule 29.

[2] Or liquidator or receiver.

3

9.      As will be seen below, the place of business, or the place where the director or officer can be served, must be in the BVI.

10.      A claim form is served personally on an individual by handing it to or leaving it with the person to be served: CPR 5.3.

11.      There must be a place within the BVI at which the claim form can be served (unless permission is given to serve outside the jurisdiction): CPR 5.4. This is why the place of service for the purpose of CPR 5.7 (mentioned above) must be the BVI.

12.      This means that although service by fax and post is available in principle in relation to a limited company (see CPR 5.7), in practice that is not available where there is no place of business in the BVI and no director or officer of the company present in the BVI[3].

13.      Further, personal service on a director or officer of the company requires that person to be present in the BVI at the time when service is effected: CPR 5.4. The same applies to serving an officer or manager of the company at a place of business: the effect of CPR 5.4 is that the place of business must be in the BVI.

*Service Outside the Jurisdiction*

14.      Rule 7.2 provides that a claim form may be served out of the jurisdiction only if Rule 7.3 allows it (Rule 7.3 identifies a number of "jurisdictional gateways", which are an exhaustive list) and the Court grants permission to serve out. Even if one of the jurisdictional gateways is met, the Court has a residual discretion to decide whether or not to allow service out.

15.      Rule 7.3 sets out a number of general and specific circumstances where permission to serve out may be granted. The burden is on the applicant to show a 'good arguable case' that the claim falls within one of these heads.[4]

---

[3] And similarly, where the registered office of the company is not in the BVI, CPR 5.7(a) is not available.

16.     In terms of the merits of the claim, the claimant must also show that there is a serious question to be tried, in that there is a substantial question of fact or law or both arising on the facts disclosed by the affidavits in support, that the claimant in good faith desires to be tried.[5]

17.     The mere fact that the defendants are or were shareholders in a BVI company is not sufficient on its own to render them amenable to service, *i.e., their shareholder status in a BVI company does not make them "present" in the BVI*.  Further, just because one or more of the gateways is available is also insufficient: the other requirements identified above must also be met.

18.     If the BVI Court grants permission to serve the defendant outside the jurisdiction, and the defendant is so served, the BVI Court then has jurisdiction over the defendant and may proceed to determine the claim.  This is, however, subject to the possibility that the permission to serve out may be set aside (which I deal with in the next paragraph).  It is also subject to this important caveat: although the BVI Court may proceed to determine the claim so served, when the claimant seeks to enforce any subsequent judgment in an English common law jurisdiction, it may well be met with the argument that the BVI Court did *not* have jurisdiction within the meaning used in the context of recognition and enforcement of judgments.  Accordingly, if the claimant were to attempt to enforce that judgment in a country where the common law principles governing recognition and enforcement of judgments are applied (and assuming no special bilateral treaty regime were to be relevant), the BVI Court judgment might well be refused recognition and enforcement on the basis that the BVI Court did not have jurisdiction in the international sense.  I return to recognition and enforcement in a later section.

---

[4] *Seaconsar Far East Ltd v Bank Markazi Jomhouri Islami Iran* [1994] 1 AC 43.  This has been interpreted as meaning that the claimant must have "a much better argument on the material available": *Canada Trust Co v Stolzenberg (No 2)* [1998] 1 WLR 547.

[5] Ibid.

*Application for Permission to Serve Out; Applications to Set Aside Permission*

19.    The application for permission to serve out is brought by the claimant on an *ex parte* basis (i.e. without the defendant being party to the application).  If the BVI Court grants permission, and the defendant is served, the defendant will have a right to apply to the BVI Court to set aside the permission.

20.    If the permission to serve out is set aside, then any service is also set aside.  As service is fundamental to the assertion of jurisdiction (see above), a successful application by a defendant to set aside service means that the BVI Court will have no jurisdiction over that defendant.

21.    If a defendant seeks to set aside the permission to serve out, on the basis that no gateway was available, it will be contesting the BVI Court's jurisdiction.  This may be done without being held to have submitted to the jurisdiction: see *William & Glyn's Bank v Astro Dinamico* [1984] 1 All ER 760 and *Rubin v Eurofinance* [2012] UKSC 46 at para 159. The general rule is that the party alleged to have submitted to the jurisdiction of the BVI Court must have "taken some step which is only necessary or only useful if" an objection to jurisdiction "has been actually waived, or if the objection has never been entertained at all": *Williams & Glyn's Bank plc v Astro Dinamico Compania Naviera SA* [1984] 1 WLR 438 , 444 (HL) approving *Rein v Stein* (1892) 66 LT 469 , 471 (Cave J).  Although these are English decisions, they would be followed by the BVI Court.

*The Jurisdictional Gateways: Before 1 October 2011*

22.    A copy of the version of the BVI CPR in force prior to 1 October 2011 (i.e. at the time the BVI Redeemer Claims were filed is attached.

23.    In 2011, Rule 7.3 of the BVI Civil Procedure Rules was repealed and substituted by statutory instrument, the Eastern Caribbean Supreme Court Civil Procedure (Amendment) Rules 2011, which came into force on 1 October 2011.  A copy of the statutory instrument is attached.

24.    Until the Eastern Caribbean Supreme Court Civil Procedure (Amendment) Rules 2011 came into force on 1 October 2011, there were no specific jurisdictional gateways for 'claims for restitution' or for 'claims about companies' or 'claims under an enactment'.

25.    There was however a specific jurisdictional gateway for 'claims about contracts'.  As described below, in the BVI Redeemer Claims (which comprised common law restitution claims), permission was granted to serve out of the jurisdiction under the 'claims about contracts' jurisdictional gateway.  The contract relied upon was each Fund's Articles of Association.

*The Jurisdictional Gateways:  From 1 October 2011*

26.    As of 1 October 2011, a new version of CPR 7.3 was brought into force, which contained additional jurisdiction gateways.  In particular, there were introduced:

(1)    A specific jurisdictional gateway for restitution claims as follows (Rule 7.3(9)):

"Claims for restitution: A claim is made for restitution where the defendant's alleged liability arises out of acts committed within the jurisdiction or out of acts which, wherever committed, were to the detriment of a person domiciled within the jurisdiction."

(2)    A specific jurisdictional gateway for certain claims relating to companies (Rule 7.3(7)):

"Claims about companies

A claim form may be served out of the jurisdiction if the subject matter of the claim relates to -

(a) the constitution, administration, management or conduct of the affairs; or

(b) the ownership or control of a company incorporated within the jurisdiction."

(3)     A specific jurisdictional gateway for claims under enactments conferring jurisdiction (Rule 7.3(10)):

"Claims under an enactment conferring jurisdiction on the Court

A claim is made under an enactment which confers jurisdiction on the Court and the proceedings are not covered by any of the other grounds referred to in this Rule."

27.     Further, the Eastern Caribbean Supreme Court Civil Procedure (Amendment) Rules 2011 also amended the jurisdictional gateway for 'claims about contracts'.  The former rule which provided that the claim had to "affect" a relevant contract was replaced, requiring that the claim be made "in respect of" a contract.

## Part 2: Recognition and Enforcement of Foreign Judgments at Common Law

28.     The BVI is a party to arrangements for the reciprocal enforcement of judgments with the UK and a limited number of other Commonwealth countries[6].  In relation to all other countries where enforcement is possible, including the United States, any judgment of the BVI Court must be enforced under the principles applicable in the relevant jurisdiction.

29.     Under English common law principles concerning recognition and enforcement (which are followed in the BVI), a court of a foreign country has jurisdiction to give a judgment *in personam*, and the judgment may be recognised and enforced, in the following circumstances[7]:

a)     If the person against whom the judgment was given was, at the time the proceedings were first instituted, present in the foreign country.

b)     If the person against whom the judgment was given was claimant, or counterclaimed in the proceedings in the foreign court.

c)     If the person against whom the judgment was given, submitted to the jurisdiction of that court by voluntarily appearing in the proceedings; or

---

[6] Northern Ireland, Scotland, the Bahamas, Barbados, Bermuda, Belize, Trinidad & Tobago, Guyana, St Lucia, St Vincent and Grenada, Jamaica, New South Wales (Australia), Nigeria.

[7] Rule 43 in *Dicey, Morris and Collins, Conflict of Laws,* 15th ed, 2012, para 14R-054.  These apply also in relation to judgments in insolvency proceedings, in respect of which there are no special rules: *Rubin v Eurofinance SA* [2012] UKSC 46.

d)    If the person against whom the judgment was given, had before the commencement of the proceedings agreed, in respect of the subject matter of the proceedings, to submit to the jurisdiction of that court or of the courts of that country.

30.    Consequently, any BVI judgment would only be enforced at common law if the judgment debtors were present in the BVI when the proceedings were commenced, or if they submitted (or had agreed to submit) to its jurisdiction.

31.    As to being "present in the BVI", the question (in the case of corporate defendants[8]) is the same as that applicable in determining whether the corporate defendant can be served in the BVI: see *Dicey* at paragraph 14-060 and see also paragraphs 14-065 to 14-067[9] (the corporation must be carrying on business at a definite and fixed place, either by having established a fixed place of business within the jurisdiction or by having a representative there that is carrying on the corporation's business).

32.    An agreement to submit to the jurisdiction of the foreign court may, of course, arise by express contractual provision (as in the case of the Defendants' New York forum selection clause in the Subscription Agreements), or may arise through an implied term (*Vizcaya Partners Limited (Appellant) v Picard and another (Respondents) (Gibraltar)* [2016] UKPC 5).    However, the implication of a term would need to meet the usual requirements (at least in English/BVI law) of being necessary for business efficacy and/or being "obvious."    In *Vizcaya*, where the BLMIS Trustee unsuccessfully sought to enforce in Gibraltar (an English common law jurisdiction) an $180 million default judgment obtained in this Court in New York, the Privy Council held that an express *choice of governing law* provision (providing for application of New York law) did not, without more, result in an implied *choice of forum*.

---

[8] In *Dicey* it is left open whether, in the case of individuals, residence rather than mere fleeting presence is sufficient: see paragraphs 14-060.

[9] And *Adams v Cape Industries* [1990] Ch 433, 530-544, cited in *Dicey*.

33.     A judgment of the BVI Court against non-present and non-submitting defendants could face challenge to enforcement under common law principles if such enforcement was sought against the defendants or their assets outside the BVI in a common law jurisdiction (see *Vizcaya* (above) and see also *Rubin v Eurofinance* [2012] UKSC 46).

34.     Faced with a claim being brought in the BVI Court, a non-present defendant could take one of the following approaches:

(1)     Submit to the jurisdiction.

(2)     Bring an application to set aside the permission to serve out, disputing the availability of the gateways and/or on FNC grounds, but then submit to the jurisdiction if its application is unsuccessful.

(3)     Bring an application to set aside the permission to serve out, disputing the availability of the gateways and/or on FNC grounds, but then ignore the proceedings if the application fails.  As stated above, by bringing such an application, the defendant does not thereby submit to the jurisdiction.  Accordingly, if its application fails, it may then ignore the proceedings and (at least in any court applying common law principles) later contest recognition and enforcement of any resulting judgment.

(4)     Ignore the proceedings altogether and (at least in any court applying common law principles) later contest recognition and enforcement of any resulting judgment.

35.     In other words, it is possible for defendants to have "two bites at the cherry": a defendant can dispute the BVI Court's jurisdiction and, if its application fails, ignore the proceedings and still maintain its ability to resist recognition and enforcement of any judgment in a jurisdiction in which it is present or has assets.

## Part 3:  Limitations Periods Under BVI Law

36.     I have been asked to direct the Court to and identify the limitation principles under BVI law in connection with the Liquidators' claims.  So far as relevant to the claims at issue, the position is governed by statute (the Limitation Ordinance 1961, Cap 43) and the relevant statutory provisions are as follows:

(1)     Section 3: "The provisions of this Part shall have effect subject to the provisions of Part III which provide for the extension of the periods of

10

limitation in the case of disability, acknowledgment, part payment, fraud and mistake."

(2)   Section 4: "(1) The following actions shall not be brought after the expiration of six years from the date on which the cause of action accrued, that is to say:

(a)   actions founded on simple contract or on tort;

…

(d)   actions to recover any sum recoverable by virtue of any enactment, other than a penalty or forfeiture or sum by way of penalty or forfeiture.

…

(3)   An action upon a specialty shall not be brought after the expiration of twelve years from the date on which the cause of action accrued: Provided that this subsection shall not affect any action for which a shorter period of limitation is prescribed by any other provision of this Ordinance.

…

(7)   This section shall not apply to any claim for specific performance of a contract or for an injunction or for other equitable relief, except in so far as any provision thereof may be applied by the Court in analogy in like manner as the corresponding enactment repealed by this Ordinance has heretofore been applied."

(3)   Section 25: "Where, in the case of any action for which a period of limitation is prescribed by this Ordinance, either –

(a) the action is based upon the fraud of the defendant or his agent or of any person through whom he claims or his agent, or

(b) the right of action is concealed by the fraud of such person as aforesaid, or

(c) the action is for relief from the consequences of mistake,

the period of limitation shall not begin to run until the plaintiff has discovered the fraud or mistake, as the case may be, or could with reasonable diligence have discovered it:

Provided that nothing in this section shall enable any action to be brought to recover, or enforce any charge against, or set aside any transaction affecting, any property which –

(i) in the case of fraud, has been purchased for valuable consideration by a person who was not a party to the fraud and did not at the time of the purchase know or have reason to believe that any fraud had been committed, or

(ii) in the case of mistake, has been purchased for valuable consideration, subsequently to the transaction in which the mistake was made, by a person wo did not know or have reason to believe that the mistake had been made."

37.    Actions to recover money paid under mistake are subject to the six year limitation period, unless and to the extent that the running of time is postponed under section 25: see the English decision of *Deutsche Morgan Grenfell Group plc v Inland Revenue Commissioners and another* – [2006] UKHL 49, [2007] 1 All ER 449, at paragraphs 7, 36; see also *Dexia Crediop SpA v Comune di Prato* [2016] EWHC 2824 (Comm), [2016] All ER (D) 112 (Nov).

38.    Actions to avoid transactions under the Insolvency Act provisions may constitute actions falling within section 4(1)(d) (resulting in a six year period) or section 4(3) (resulting in a twelve year period).  Where the claim is focused on avoidance of a transaction, the twelve year period applies, but where the substance of the claim is recovery of money, the six year period applies.  See the English case of *Nolan v Wright* [2009] 2 All ER (Comm) 503 at paragraph [8]:

> "I turn next to the authorities. In Re Priory Garage (Walthamstow) Ltd [2001] BPIR 144 it was held by Mr John Randall QC (sitting as a deputy judge of the High Court) that applications to set aside transactions under ss 238 to 241 of the Insolvency Act 1986 (relating to transactions at an undervalue and voidable preferences) are generally actions on a specialty within the meaning of s 8 of the 1980 Act and subject to a 12-year limitation period accordingly; but where the substance of the claim is not to set aside a transaction, but to recover a sum of money, such applications will be governed by s 9, and thus subject to a six-year limitation period. That approach was effectively indorsed by the Court of Appeal, and applied to claims under s 423 of the 1986 Act (relating to transactions defrauding creditors), in the later case of Hill v Spread Trustee Co Ltd [2006] EWCA Civ 542, [2007] 1 All ER 1106, [2007] 1 WLR 2404."

39.    See also *Giles v Rhind* [2007] All ER (D) 474 (Mar): "I turn therefore to consider the limitation issues. It is established by the decision of the Court of Appeal in Hill v Spread Trustee Co Ltd that claims under section 423 are subject to a limitation period under

the Limitation Act 1980. It is either 12 years under section 8(1) or 6 years under section 9(1)

depending on the nature of the remedy sought."  (This point was unaffected by the decision

on appeal: see [2008] EWCA Civ 118).


Executed on the 6th day of April, 2017


_____/s/ William Hare_____
William Hare

## COMPENDIUM OF AUTHORITIES CITED IN
## DECLARATION OF WILLIAM HARE IN SUPPORT OF
## THE LIQUIDATORS' OPPOSITION TO CERTAIN DEFENDANTS'
## MOTIONS TO DISMISS ON GROUNDS OF *FORUM NON CONVENIENS*

| **TAB** | |
|---------|---|
| **FOREIGN CASES** | |
| 1. | *Adams v Cape Industries* [1990] Ch 433, 530-544 |
| 2. | *Canada Trust Co v Stolzenberg (No 2)* [1998] 1 WLR 547 |
| 3. | *Deutsche Morgan Grenfell Group plc v Inland Revenue Commissioners and another* [2006] UKHL 49, [2007] 1 All ER 449 |
| 4. | *Dexia Crediop SpA v Comune di Prato* [2016] EWHC 2824 (Comm), [2016] All ER (D) 112 (Nov) |
| 5. | *Giles v Rhind* [2007] All ER (D) 474 (Mar) |
| 6. | *Hill v Spread Trustee Co Limited* [2007] 1 BCLC 450 |
| 7. | *In Re Priory Garage (Walthamstow) Ltd* [2001] BPIR 144 |
| 8. | *Nolan v Wright* [2009] 2 All ER (Comm) 503 |
| 9. | *Rein v Stein* (1892) 66 LT 469 (Cave J) |
| 10. | *Rubin v Eurofinance* [2012] UKSC 46 |
| 11. | *Seaconsar Far East Ltd v Bank Markazi Jomhouri Islami Iran* [1994] 1 AC 43 |
| 12. | *Vizcaya Partners Limited (Appellant) v Picard and another (Respondents) (Gibraltar)* [2016] UKPC 5) |
| 13. | *William & Glyn's Bank v Astro Dinamico* [1984] 1 All ER 760 |
| **RULES & STATUTES** | |
| 14. | English Insolvency Act 1986 §§ 238-241, 423 |
| 15. | Eastern Caribbean Supreme Court Civil Procedure 2000 (Amended to May 2014) |
| 16. | Eastern Caribbean Supreme Court Civil Procedure Rules 2000, Part 7 – as in force pre-2011 |
| 17. | Eastern Caribbean Supreme Court Civil Procedure (Amendment) Rules 2011 |

| **TAB** | |
|---|---|
| | |
| **OTHER AUTHORITIES** | |
| 18. | *Dicey, Morris and Collins, Conflict of Laws,* 15th ed, 2012, Rules 29 and 43 |
| 19. | Limitation Ordinance 1961, Cap 43 |

# TAB 1

**Jimmy Wayne Adams & Ors. v.**
**Cape Industries Plc & Capasco Ltd.**
In the Supreme Court of Judicature
Court of Appeal (Civil Division)
On Appeal from the High Court of Justice
Chancery Division
27 July 1989

**1989 WL 651250**

Lord Justice Slade Lord Justice Mustill
and Lord Justice Ralph Gibson
Thursday, 27th July 1989

Analysis

**Representation**

• MR. T. MORISON Q.C. AND MR. C.
FALCONER (instructed by Messrs Oppenheimer
Nathan & Vandyke) appeared on behalf of the
Appellants (Plaintiffs).
• SIR GODFRAY Le QUESNE Q.C. , MR.
J. PLAYFORD Q.C. and MR. A. BRUNNER
(instructed by Messrs Davies Arnold & Cooper)
appeared on behalf of the Respondents (Defendants).

**JUDGMENT (Revised)**
LORD JUSTICE SLADE:

# I INTRODUCTION

This is the judgment of the Court, to which all its members
have contributed, on an appeal by the plaintiffs in 205
consolidated actions. On 27th July 1988, Scott J. dismissed
all their claims. The trial in the Court below lasted some
35 days and the argument before this Court extended over
some 17 days. The case raises important points of law and
some substantial issues of fact.

Having reserved judgment at the end of the argument
on 3rd May last, we subsequently came to the firm
conclusion that the appeal must be dismissed and that in
the particular circumstances of this case it was right that
the parties should be informed of our decision at once,
rather than having to wait for some more weeks before we
were in a position to give the reasons for our decision.

On 24th May last we accordingly announced that the
appeal would be dismissed and that we would give the
reasons for our decision in writing at a later date, at which
date the Order dismissing the appeal would be drawn up.
This we now do.

The plaintiffs in these proceedings are persons, or the
personal representatives of persons, in whose favour
awards of damages were made by the judgment, dated
12th September 1983, of the Honourable Judge Steger, a
United States Federal District Court judge, in the District
Court for the Eastern District of Texas, U.S.A. ("the
Tyler Court"). The judgment was a default judgment
against Cape Industries PLC ("Cape") and Capasco
Ltd. ("Capasco"), companies registered in England and
the sole defendants in all the actions before this court.
They had taken no part in the proceedings in which
the judgment was made. The judgment was for the
specific sums payable to individual plaintiffs set out
in an appendix to the judgment: $37,000 each for 67
plaintiffs; $60,000 each for 31 plaintiffs; $85,000 each for
47 plaintiffs and $120,000 each for 61 plaintiffs. The total
of the individual awards was $15.654 m. and the awards
were directed to bear interest at 9% from judgment until
payment.

The awards were made in respect of claims for damages for
personal injuries and consequential loss allegedly suffered
by each plaintiff as a result of exposure to asbestos fibres
emitted from the premises of a primary asbestos insulation
factory in Owentown, Smith County, Texas, which was
operated from 1954 to 1962 by Unarco Industries Inc.
("Unarco") and from 1962 to 1972 by Pittsburgh Corning
Corporation ("PCC"). The basis of liability of Cape and
Capasco was alleged to be negligent acts and omissions
and breaches of implied and express warranties.

The relationship of Cape and Capasco to the emission
of asbestos fibres from the Owentown factory was, in

summary, that Cape owned the shares in subsidiary companies in South Africa which had mined the asbestos and in its subsidiary Capasco. Capasco was concerned in organising the sale of asbestos, mined in South Africa, throughout the world to those who wished to use it in various industrial processes. Between 1953 and 1978 when it was dissolved, another subsidiary of Cape, North American Asbestos Corporation ("NAAC") assisted in the marketing of asbestos of the Cape Group in the U.S.A. The plaintiffs' contention was that the defendants had been responsible for the supply of asbestos fibres directly or indirectly to Unarco and PCC without giving proper warning of the dangers thereof.

**Summary of the Proceedings in the Tyler Court**

Different sets of proceedings with reference to claims arising from the processing of asbestos in the Owentown factory had extended over many years. An account of what took place is necessary for a proper understanding of the course of the present proceedings. The first action was commenced in the Tyler Court in January 1974 and was framed as a "class" action in which the plaintiffs sued "on behalf of themselves and all other: similarly situated" . A second action was commenced in the same month. They were assigned to Judge Steger. Cape was one of the defendants. Capasco was added as a defendant in 1976. Egnep (Proprietary) Ltd. ("Egnep"), a wholly owned South African subsidiary of Cape, engaged in mining asbestos, was also a defendant. All filed motions to quash service on the ground of lack of jurisdiction.

By July 1974 it was apparent that hundreds of claimants, alleging injury caused by the amosite asbestos used in the Owentown plant, were intending to pursue claims. Judge Steger in December 1974 ruled that the actions should not proceed as class actions; that they should be conducted under the Federal "Rules for complex and multi-district litigation" ; and that intervention in the proceedings should be allowed freely for those claimants who wished to join. In consequence a large number of claimants were added. In December 1974 a third action with reference to asbestos from the Owentown plant was commenced in the Tyler Court in which the only defendant was the USA. All these proceedings together have been known as the Tyler 1 proceedings. They were separate and distinct from the

proceedings in which the appellants, now before this court, obtained their judgment in September 1983.

The motions by Cape, Capasco and Egnep to dismiss the Tyler 1 proceedings as against them on the ground of lack of jurisdiction were dismissed by Judge Steger in August 1977. That dismissal was not final and it was open to the Cape companies to take the jurisdiction point at the trial of the action. They filed answers in which they pleaded to the merits of the claim while maintaining their objection to jurisdiction.

The number of claimants in the Tyler 1 proceedings had by mid 1977 risen to more than 400 and was still increasing. Trial was set for 12th September 1977. The purpose of Judge Steger in fixing that date included that of causing the parties to consider settlement. On 12th September 1977 settlement discussions proceeded in which Judge Steger took part in a manner which would be unusual, if not impossible, in this country but which was effective and normal under the United States system of civil justice. By 28th September 1977 a settlement figure of $20 m. was agreed for all the claimants who then numbered 462. Upon agreement of the settlement figure it was ordered that as from 28th September 1977 no further intervention in any of the Tyler 1 actions would be permitted.

The sum of $20 m. was provided by the defendants in agreed proportions: £5.2 m. by NAAC, Cape and Egnep; $1 m. by Unarco (who had operated the Owentown plant from 1954 to 1962); $8.05 m. by PCC (who had operated the plant from 1962 to 1972) and its shareholders; and $5.75 m. by the United States government. The settlement was recorded and approved in a final judgment in the Tyler 1 actions dated 5th May 1978. The reference to shareholders in PCC is to Pittsburgh P.G. Industries Inc. ("PPG") and to Corning Glassworks Inc. who had been joined as defendants on the basis that each had taken such part in the management decisions regarding the use of asbestos as to be liable for injuries arising from that use. (J.6E).

Upon prohibition by the order of Judge Steger of further interventions in the Tyler 1 proceedings, new actions were commenced by claimants in what have been called the

Tyler 2 proceedings. There were 8 separate actions. They were assigned to Judge Steger. The first was commenced on 19th April 1978 and the last on 19th November 1979. There followed intervention by a very large number of claimants. Cape, Egnep and NAAC were defendants in all the actions. Capasco was a defendant in three only. PCC, PPG, Corning Glassworks Inc. and OCAW, a trade union to which some claimants had belonged, were also defendants in all actions. The United States Government was a defendant in some actions and third party defendant in others.

In December 1981 Judge Steger gave directions by which each claimant was required to provide specified information with reference to his claim "on personal knowledge and attested to under penalty of perjury" . As a result of those directions, and of the response, or lack of response, thereto, a large number of claimants had their claims summarily dismissed "without prejudice" . The number of plaintiffs left in the Tyler 2 actions was about 206. It is to be assumed that each of those remaining claimants had responded to the order of December 1981 by alleging some physical condition that was capable of having been caused by exposure to asbestos dust and of constituting an injury.

Cape, Capasco and Egnep took the decision to play no part in any of the Tyler 2 actions. They had initially regarded the Tyler 1 actions as having little more than nuisance value. They could not understand how tortious liability to the Owentown workers could be imposed upon the Cape companies merely on the ground that Cape subsidiary companies had mined the asbestos and sold it into the United States of America. They had had expectations of success on their jurisdiction objection. They had, however, succumbed to the pressure for settlement. They were unwilling to be left as the only defendants in a large and expensive jury trial. Having joined in the settlement of the Tyler 1 actions they decided, since they had no assets in the United States of America, to take no part in the Tyler 2 proceedings; to allow default judgments to be obtained against them; and to defend any actions brought in this country for enforcement of any such judgment on the ground that, under the law of this country, the Tyler Court had no jurisdiction over Cape, Capasco or Egnep with reference to the claims of the claimants.

**The Settlement Against some Defendants of the Tyler 2 Proceedings**

In circumstances which will be considered in more detail later in this judgment, the Tyler 2 proceedings were in February 1983 settled, as against the effective defendants other than the Cape companies, for a sum of $1.33 m. The figure of $1.33 m. was based upon an average award of $10,000 for each of 133 plaintiffs represented in the settlement negotiations. The sum of $1.33 m. was to be provided as to $900,000 by PCC, the firm which had operated the Owentown factory from 1962 to 1972, and by PPG, one of the corporations owning shares in PCC; $130,000 by Corning Glassworks Inc., the other corporation holding shares in PCC; $150,000 by OCAW, and $250,000 by NAAC. (J.20). Such was the considered value of the claims, as it emerged from the settlement process between the judge and the parties, as against the parties which included those alleged to have had some direct concern in connection with the emission of asbestos particles at or from the Owentown factory. On payment of those sums the settling defendants were to be released from all claims by the 133 plaintiffs.

That settlement was complicated by a "device" devised by Mr. Bailey, who was the attorney negotiating the settlement on behalf of the claimants and which was intended, it was said, to give the claimants the chance of additional recovery against the United States. The form of this device, and the part which it was alleged to have played in the formulation of the terms of the default judgment against the Cape companies, was important to the allegations of fraud put forward against Mr. Bailey, which, as stated below, were rejected by Scott J. It is necessary to describe what happened to render intelligible some of the matters discussed later in this judgment. The device was described by Scott J. at page 21 of his judgment as follows:

> "The device was this: the settlement figure would be expressed in the intended settlement agreement not as $1.33 m. but instead as $6.65 m., an average of $50,000 per plaintiff. The defendants would

be obliged to pay only $1.33 m. The balance of $5.32 m. ($40,000 per plaintiff) would be payable only if and to the extent that the defendants' third party claims against the United States succeeded. The prosecution of those claims in the names of the defendants was to be the responsibility of the plaintiffs' counsel, no cost in respect thereof falling on any of the defendants. The $6.65 m. was a figure proposed by Mr. Bailey. It was not a figure which mattered at all to the defendants since their obligation to pay was limited to the $1.33 m. They did not bargain about the amount. They simply agreed to Mr. Bailey's proposal which would cost them nothing. Mr. Bailey told me that the figure was based upon what he thought might be awarded against the US government at the suit of the settling defendants. How it could have been supposed that the liability of the US under the third party claims could exceed the $1.33 m. that the settling defendants, the third party claimants, had agreed to pay the plaintiffs, defeats me."

On 2nd February 1983 Judge Steger approved the settlement of the Tyler 2 proceedings as against the settling defendants, and that approval extended to the fairness and reasonableness of the settlement in the case of any minor claimants. The trial date for the outstanding Tyler 2 claims against the United States was fixed for 20th June 1983. Settlement was discussed. An agreement of compromise dated 15th June 1983 was signed. The United States government contributed nothing directly to the claimants but, in settlement of their claims against the United States, it was agreed that the United States would bear the costs of enforcement of default judgments against Cape, Capasco and Egnep in the United Kingdom or in South Africa. It is in performance of that promise that these proceedings have been pursued in this country.

The default judgment in the Tyler Court, upon which the present proceedings in this country are based, was, as stated above, signed on 12th September 1983. The nature of the process in which that judgment came to be signed will be examined in detail later in this judgment when the issue of natural justice is considered.

### The consolidated actions in this country

There is no statutory provision for the registration in this country of the judgments of the Federal or State courts of the United States of America. The plaintiffs, therefore, took proceedings in this country seeking to recover the amount of their judgments from Cape and Capasco. The writ in the lead action of Mr. Jimmy Adams was issued on 1st August 1984 and claimed the amount of his separate award with interest. In law the claims of all the plaintiffs are based upon the principle of common law that, subject to certain qualifications, the judgment in personam of a foreign court of competent jurisdiction may be sued on in this country as creating a debt between the parties to it.

It would have been open to the plaintiffs in the first place to sue the defendants in this country rather than the U.S.A. provided that they could have shown that the acts complained of were actionable as a tort both under English law and the law of the place or places where they were committed: (see Boys v Chaplin [1971] A.C. 356 ). However, they chose to bring the proceedings in the U.S.A. and then to seek to enforce them in this country, where presumably the defendants are believed to have substantial assets.

### The issues at the trial before Scott J. and his decision

The circumstances in which our courts will recognise a foreign court as competent to give a judgment in personam capable of enforcement in this country are stated thus in Dicey & Morris The Conflict of Laws (11th Edition) ( " Dicey & Morris " ) Volume 1, pp. 436-437:

> "First Case –If the judgment debtor was, at the time the proceedings were

Adams v Cape Industries Plc, 1989 WL 651250 (1989)

instituted, resident (or, perhaps, present) in the foreign country.

Second Case –If the judgment debtor was plaintiff in, or counterclaimed, in the proceedings in the foreign court.

Third Case –If the judgment debtor, being a defendant in the foreign court, submitted to the jurisdiction of that court by voluntarily appearing in the proceedings.

Fourth Case –If the judgment debtor, being a defendant in the original court, had before the commencement of the proceedings agreed, in respect of the subject matter of the proceedings, to submit to the jurisdiction of that court or of the courts of that country."

At the trial the plaintiffs relied on three separate grounds for enforcement of the judgment of the Tyler Court in England, namely: (i) that the defendants had voluntarily appeared in the proceedings in the Tyler Court; (ii) that the defendants had, before the proceedings commenced, agreed to submit to the jurisdiction of the Tyler Court; (iii) that the defendants were resident in the United States of America at the time of the commencement of the plaintiffs' proceedings in the Tyler Court. (A fourth pleaded ground, referred to as "comity or reciprocity" , was not in the event relied on at the trial).

Scott J. concluded that the Tyler Court had been competent to give a judgment against Cape and Capasco on none of the three grounds relied on ( Dicey and Morris' First, Third and Fourth Cases). The plaintiffs' claim, therefore, failed for this reason, if no other.

However, the learned Judge proceeded to consider certain additional points raised by the defendants by way of defence. The first point arose in this way. According to

the case made for the plaintiffs, the presence (if any) of Cape and Capasco was in the State of Illinois where Cape's subsidiary, NAAC, had its office in Chicago from 1953 to 1978 when it was wound up; and where in the same building from 1978 onwards Continental Products Corporation ("CPC"), also an Illinois corporation but not a subsidiary of Cape, carried out similar marketing functions in the U. S.A. for the sale of asbestos produced by Cape's South African subsidiaries. The plaintiffs did not contend that Cape or Capasco had been present in Texas. In these circumstances, the defendants contended that under English law presence in Illinois did not suffice to give the Tyler Court (a Federal District Court sitting in Texas) jurisdiction to hear a claim in tort against the defendants governed by the law of Texas. This argument, which we will call " the country issue " , Scott J. rejected. He said (J. 94C-D) that if he had felt able to conclude that Cape and Capasco were present in Illinois when the Tyler 2 actions were commenced, he would have held that to be a sufficient basis in English law for the exercise by the Tyler Court of jurisdiction over them.

The defendants further contended that, even if any grounds of jurisdiction in the Tyler Court had existed, yet the judgment should not be enforced because (i) the judgment had been obtained by the fraud of Mr. Blake Bailey, the attorney who had represented some of the plaintiffs before Judge Steger in the proceedings upon the making of the default judgment and who had drafted the terms in which the default judgment was finally expressed; and (ii) it would be contrary to the standards of natural justice required by our law, and contrary to the principles of public policy applied by our law, to enforce the judgment having regard to the circumstances in which, and the procedures by which, it came to be made. Scott J. considered these issues again on the assumption that, contrary to his conclusion, the plaintiffs had made out a ground for jurisdiction in the Tyler Court over Cape and Capasco. He acquitted Mr. Bailey of having had any intention to deceive and of having deceived anyone with reference to the terms and form of the judgment. The allegations that the judgment had been obtained by fraud accordingly failed. However, the defendants succeeded before Scott J. on the natural justice point. The Judge found that the judgment was not such that it could be enforced in the courts of this country. The primary ground of that finding was that the procedure adopted in this particular case by the Judge of the Tyler Court offended

against the principles of substantial justice contained in our law.

Scott J. gave his judgment in two parts, which together covered 150 pages of transcript. On 11th June 1988 he announced that the claims of all the plaintiffs would be dismissed and he gave his reasons for rejecting each of the three grounds upon which the plaintiffs had claimed that their judgment in the Tyler Court should be enforced in this country. He also stated in summary form his reasons for rejecting the allegations of fraud against Mr. Bailey and for upholding the contentions of Cape/ Capasco on the natural justice issue. On 27th July 1988 he gave his full reasons with reference to the issues of fraud and natural justice. The plaintiffs have invited this Court to take a different view on some parts of the facts in this case, and to apply principles of law which the Judge considered to be inapplicable. Mr. Morison, however, began his submissions by rightly acknowledging the great care expended in, and the great accuracy and clarity of, the judgment of the learned Judge, to which we also pay tribute.

**The issues on this appeal**

On this appeal the plaintiffs do not seek to challenge those parts of Scott J. 's judgment by which he rejected their submissions based on the alleged voluntary appearance by the defendants in the Tyler Court proceedings or their alleged agreement to submit to the jurisdiction of that Court. The defendants do not challenge his rejection of their allegation of fraud against Mr. Bailey. The plaintiffs do, however, seek to challenge those parts of his judgment by which (a) he rejected their submissions based on the alleged residence or presence of Cape and Capasco in the U.S.A. (" the presence issue "); (b) he accepted the defendants' submissions based on natural justice (" the natural justice issue ").

As part of their answer to the plaintiffs' case on presence, the defendants have cross-appealed on what we have described as " the country issue " .

To sum up, the three issues which have been argued on this appeal are

• (A)  the presence issue ;
• (B)  the country issue ; and
• (C)  the natural justice issue .

A decision on any one of these issues in favour of the defendants would strictly render a decision on the other two issues unnecessary. However, we think it right to deal fully with all three issues, not only out of deference to the excellent arguments which have been presented to us on both sides, but also because these issues are important and we suppose that the case could proceed to a higher Court. Furthermore, at least the first two of the three issues are closely connected with one another.

## II THE PRESENCE ISSUE

**The form of the evidence before Scott J. relating to the presence issue**

There was put before Scott J. at the hearing a large amount of written material, some of it consisting of the depositions taken in the course of pre-trial discovery in the Tyler 1 and in other proceedings. The plaintiffs put in under the Civil Evidence Act : (i) four depositions of Mr. G. Morgan who had worked for NAAC from 1970 and had been the President (or Managing Director) of NAAC from 1974 until its dissolution in 1978: these depositions were dated 20th May 1975; 19th May 1982; 20th February 1981; and 18th September 1986; (ii) one deposition of Mr. Higham, Managing Director of Cape from the beginning of 1972, made on 4th June 1975; (iii) one deposition of Dr. Gaze, Chief Scientist of the Cape Group, a Director of Capasco since 1961 and later Chairman, and executive director of Cape, and on the Board of NAAC from a date in the late 1960s until July 1975, made on 5th June 1975; (iv) one deposition of Mr. Buckley, Vice-President of PCC, made on 9th September 1975; (v) four depositions of Mrs. J. Holtze, who had started with NAAC on its formation in 1953 as general factotum and as a secretary to Mr. Cryor, then the President of NAAC. Later, Mrs. Holtze in the 1960s, became Secretary and Assistant Treasurer of NAAC until its dissolution, and thereafter Mrs. Holtze continued with CPC. Her depositions were made on 12th April 1979, 7th November 1980, 20th February 1981 and 17th May 1982. There were, in addition to the depositions, many

documents including those disclosed by Cape/Capasco in the course of the consolidated actions in this country. The only witness called for Cape and Capasco on the issue of presence was Mr. A.J. Penna, a solicitor who had entered the employment of Cape in 1973 as Group Solicitor and remained in their employment until June 1985.

**The facts on "presence" as found by Scott J.**

We will now state in summary form the facts as found by the learned Judge on the "presence" issue. This summary will be taken from the judgment of Scott J. and, for the most part, in his words. Some references to pages of the transcript of the judgment and some comments and explanations will be added in brackets.

• 1. Cape until 1979 presided over a group of subsidiary companies engaged in the mining and marketing of asbestos. On 29th June 1979 their interest in asbestos ended when their subsidiary companies were sold by Cape to Transvaal Consolidated Exploration Co. Ltd. ("TCL"), a South African company. (J.4A).

• 2. The mining mines were in South Africa. The mining companies were South African. The most important of them was Egnep. The shares in Egnep and the other mining companies were held by Cape Asbestos South Africa (Pty) Ltd., ("Casap"), also a South African company. Prior to 2nd December 1975 the shares in Casap were held by Cape. (J.4D).

• 3. In 1953 Cape caused to be incorporated in Illinois the company called NAAC. (This is the company whose office in Chicago is said by the plaintiffs to have been the place of business in the USA at which, until May 1978, Cape and Capasco were present.) The shares in NAAC were held by Cape. The function of NAAC was to assist in the marketing of the asbestos in the USA upon sales by Egnep or Casap to purchasers there. (J.4F). NAAC was the marketing agent of the Cape Group in the USA.

• 4. NAAC did not at any time have authority to make contracts, in particular for the sale of asbestos, which would bind Cape or any other subsidiary of Cape. (J61).

• 5. On a date before 1960 Capasco, an English company, was incorporated. (J.4). Its shares had at all times been held by Cape. It was responsible for the supply, marketing and sales promotion throughout

the world of Cape's asbestos or asbestos products but, since in 1960 NAAC was already at work, marketing in the USA was left in the main to NAAC. (J.5A).

• 6. In 1975 there was a change in the organisation of the Cape Group. Cape International and Overseas Ltd. ("CIOL"), an English company, was incorporated as a wholly owned subsidiary of Cape. The shares in Casap (the South African company which owned the shares in the mining subsidiaries) and the shares in NAAC (the marketing subsidiary in Illinois) were transferred to CIOL. This insertion of CIOL between Cape, on the one hand, and Casap and NAAC on the other, did not materially alter the way in which the subsidiaries carried on business and managed their affairs. The sale by Cape to TCL in June 1979 (see para 1 above) was effected by sale of the shares in CIOL. (J.5).

• 7. Before 1962 the Owentown factory was run by Unarco who were customers for Egnep's amosite asbestos. In 1962 PCC purchased the factory and, until 1972 when the factory was closed, purchased asbestos supplied by Egnep and used it in the factory. (J.5).

• 8. When the settlement of the Tyler 1 proceedings was concluded in September 1977 Cape, as stated above, decided to take no part in the Tyler 2 proceedings. (J.16B). The further decision was made at a Board meeting of Cape in November 1977 to reorganise the group's asbestos selling arrangements in the USA which would in future be more closely controlled from South Africa; and as part of this reorganisation, NAAC should be wound up. (J.16). Part of the reason for that decision was to counter an argument that under English law Cape's interest in NAAC's business sufficed to give the Tyler Court jurisdiction over Cape. (J.17).

• 9. Cape, however, did not intend to abandon the USA as a market for Cape's asbestos. To accompany the liquidation of NAAC, alternative marketing arrangements were made. Associated Mineral Corporation ("AMC"), a Liechtenstein corporation, was formed, the bearer shares in which were held by Dr. Ritter, a lawyer, on behalf of CIOL. All sales into the USA of Cape's asbestos were to be sales by AMC. (J.17).

• 10. A new marketing entity in the United States was on 12th December 1977 created, namely Continental Products Corporation ("CPC"). CPC was not a subsidiary of Cape. The shares were held by Mr.

Morgan, a US citizen and resident of Illinois, who had for four years been President of NAAC. By an agency agreement in writing dated 5th June 1978, between CPC and AMC (see para 28 below), CPC were to act as agent for AMC in the USA for the purpose of the sale of asbestos. CPC would be remunerated by commission but had no authority to contract on behalf of AMC or any other Cape company. CPC was to act as a link between AMC and the US purchasers in connection with shipping arrangements, insurance etc. (J.17).

• 11.  As from 31st January 1978 NAAC ceased to act on behalf of any of the Cape companies or to carry on its own business save for the purpose of liquidating its assets. (J.68E-H). (This finding is challenged by the appellants. The cessation of NAAC's business occurred, it is said, on 18th May 1978. It is to be remembered that the Tyler 2 actions were commenced on dates between 19th April 1978 and 19th November 1979. If presence of Cape/Capasco could be proved through the office and actions of NAAC but not through the office and actions of CPC under the new marketing arrangements, the point could be of importance). NAAC executed articles of dissolution on 18th May 1978. (J.68).

• 12.  Through the medium of AMC and with the assistance of CPC, Egnep's amosite asbestos continued to be sold into the US until the sale on 29th June 1979 to TCL by Cape of its interests in the subsidiaries: (J.18B) see para 1. above.

•[In paragraphs 13 to 23 below we summarise the detailed findings of Scott J. as to the location, control and operations of NAAC as marketing agent for the Cape Group asbestos. These are to be compared with the location, control and operation of the alternative marketing arrangements provided by AMC and CPC after those arrangements came into existence on some date between 12th December 1977 when CPC was formed and 5th June 1978 when the agency agreement of that date between CPC and AMC was made. We summarise the findings of Scott J. as to the location, control and operations of CPC and AMC in paragraphs 24 to 37 below . ]

• 13.  Mr. Morgan in December 1970 had been appointed Vice-President of NAAC. He was made President on 1st July 1974 and so continued until dissolution of NAAC in 1978. At all material times the Vice-President of NAAC was Mr. Meyer, an

attorney and partner in the firm of Lord Bissell and Brook of Chicago. That firm acted for the Cape Group of companies as their US attorneys. NAAC had offices on the 5th Floor of 150 North Wacker Drive, Chicago. NAAC was the lessee; paid the rent; owned the office furniture and fittings; and employed a staff of some 4 people. Mr. Morgan was in charge. (J.58).

• 14.  NAAC's dominant purpose was to assist and encourage sales in the US of asbestos mined by the Cape subsidiaries, of which one was Egnep. Contracts with US customers for the supply of asbestos were made by Egnep or Casap. The contracts tended to be long term without specification of the quantity. The US customer would, through NAAC, notify Casap or Egnep of the quantity required and the time for delivery. It was not clear to Scott J. whether the information went directly from NAAC to Casap and Egnep or whether it went via Capasco. Shipping arrangements and delivery date would be arranged by Casap or Egnep and passed to the US customer through NAAC. Egnep could not always provide the full amount of asbestos ordered. If that happened NAAC would, if it could, purchase asbestos from US Government stocks in order to supply it to the US customers. (J.59)

• 15.  NAAC thus had two main forms of business which it carried on: first, as intermediary in respect of sales by Egnep to US customers in return for commission paid by Casap; and, secondly, so as to supplement sales from Egnep, sales of asbestos to US customers in which NAAC contracted as principal both in purchasing and in selling on. (J.59G).

• 16.  In addition, NAAC also carried on business as principal on its own account in buying asbestos textiles, mainly from Japan, and selling the textiles to US customers; and, from time to time, in buying asbestos from Casap or Egnep for sale on to US customers. (J.60A). Further, for storing asbestos which it had purchased, whether from US Government stocks or from Egnep or Casap, NAAC rented in its own name and paid for warehousing facilities. (J.60C).

• 17.  NAAC was the channel of communication between US customers, such as PCC, and Capasco or Casap. There was undoubtedly "a sense in which NAAC was, if the Cape Group of companies is viewed as a whole, part of the selling organisation of the group and Cape's agent in the US" . (J.61C-D).

• 18. Directorships: prior to 11th July 1975 the Board of Directors of NAAC included two senior officers of Cape. Until 1974 Mr. Dent, Chief Executive of Cape, was Chairman of NAAC. In 1975, Mr. Higham succeeded Mr. Dent in both positions. The other Cape director of NAAC was Dr. Gaze, Chief Scientist of the Group, Chairman of Capasco and an Executive Director of Cape. In July 1975, Mr. Higham and Dr. Gaze resigned from the Board of NAAC. This change was, according to the deposition of Mr. Morgan in the Tyler 1 proceedings, attributable to the existence of the Tyler 1 proceedings and was made "to dissociate the parent company as fully as possible from the operating companies" but implied no "change whatever in the method of operation or the present responsibilities of individuals concerned." (J.60D-G).

• 19. As to control over corporate activities: the corporate, as opposed to commercial, activities of NAAC were controlled by Cape. Subject to compliance with Illinois law, and to some arguments or representations from Mr. Morgan, Cape directed the level of the dividend and the level of permitted borrowing. Such corporate financial control was no more and no less than was to be expected in a group of companies such as the Cape Group. (J.61).

• 20. As to control over commercial activities: there was no evidence that Cape or Capasco exercised such control over the commercial activities of NAAC as was exercised in respect of its corporate activities. Mr. Morgan was in executive control of its business. (J.62). (That finding is challenged by the plaintiffs). Dr. Gaze and Mr. Higham visited US customers from time to time to discuss their asbestos supply requirements and dealt with complaints. In so doing they acted as directors of Cape and Capasco and not as representatives of NAAC. (J.62). The business carried on by NAAC was its own business. (J.68). (That finding is also challenged).

• 21. There was no agency agreement between Cape and NAAC comparable to that which had existed at one time between Cape and Capasco under which all of Capasco's business had been carried on by Capasco as agent for Cape so that, in effect, until termination of the agreement in the mid 1970s, Capasco's business had been Cape's business. The annual accounts of NAAC were drawn on the footing that NAAC's business was its own business and there

was nothing to suggest that the accounts were drawn on a false footing: (J.79D-H).

• 22. NAAC had a separate identity and was not the "alter ego" of Cape. NAAC, an Illinois Corporation, carried on business in the USA; earned profits; and paid US taxes thereon. NAAC's creditors and debtors were its own and not Cape's. Cape was not taxed in the UK or in the USA on NAAC's profits. The return to Cape, as NAAC's shareholders, took the form of an annual dividend passed by a resolution of NAAC's Board of Directors. The corporate forms applicable to NAAC as a separate legal entity were observed. NAAC had its own pension scheme for its own employees. It made its own warehousing arrangements for the storage of its own asbestos. (J.62-63).

• 23. As to place of business, neither Cape nor Capasco had an office in Illinois. The offices at 150 North Wacker Drive were NAAC's offices. (J.68). (That finding is challenged).

• 24. The arrangements for the dissolution of NAAC and the formation of AMC and CPC (see paras 8 to 10 above) over the period November 1977 to February 1978 were part of one composite arrangement designed to enable Cape asbestos to continue to be sold into the USA while reducing, if not eliminating, the appearance of any involvement therein of Cape or its subsidiaries (J.70C). This arrangement was associated with the decision to take no part in the Tyler 2 proceedings and to resist enforcement of any default judgments on the ground that the Tyler Court had no jurisdiction over Cape or its subsidiaries other than NAAC. The defence on those lines would require the trading connection between Cape and its subsidiaries on the one hand and the United States on the other to be kept to a minimum. Hence the need to liquidate NAAC, a Cape subsidiary, and to allow at least some of NAAC's trading functions to be assumed by an Illinois corporation which was not a Cape subsidiary, i.e. CPC. (J.70-71).

• 25. The senior management of Cape, including Mr. Penna, the Cape Group solicitor, were very anxious that Cape's connections with CPC and AMC should not become publicly known. Some of the letters and memoranda had a conspiratorial flavour to them. The question, however, whether CPC's presence in Illinois can, for purposes of jurisdiction under our law, be treated as Cape's presence must be answered

by considering the nature of the arrangements implemented and not the motive behind them, and the "conspiratorial" references in the documents, although interesting, were in the Judge's view not relevant to the main question. (J.71).

• 26.  As to the formation of AMC:- The cost of forming this Liechtenstein corporation, in which the bearer shares were held by Dr. Ritter on behalf of CIOL, was borne within the Cape Group. The intention was that all sales of Cape asbestos to US customers would be made by AMC. The exact nature of the arrangements between AMC and Egnep/ Casap, whereby AMC became the owner of the asbestos so as to be able to resell it into the USA, was not disclosed in the evidence. That was not surprising since the relevant documentation had, since the sale of CIOL and Casap to TCL in 1979 been under the control of TCL but it was clear that AMC was no more than a corporate name. It was an "invoicing company" with no employees of its own and it probably acted through employees or officers of Casap or Egnep. (J.72A).

• 27.  As to the formation of CPC: see para 10 above: the lawyers who acted in the formation of CPC, in which corporation Mr. Morgan owned all the shares, were Lord Bissell and Brook, attorneys for Cape in the US. Directly or indirectly, the costs of incorporation were paid by Cape or Capasco. The shares in CPC, however, were owned independently by Mr. Morgan (J.76G) both in equity and in law. (J.72E).

• 28.  The agency agreement of 5th June 1978 between AMC and CPC: see para 10 above: Mr. Morgan was also a party to this agreement. By it AMC appointed CPC as its exclusive advice and consultancy bureau to assist the sale of its asbestos fibre in the territory of USA, Canada and Mexico for a period of 10 years from 1st February 1978 to 31st January 1988. There was a proviso for termination on 12 months' notice. The duties imposed on CPC were to carry out the appointment diligently and in particular (a) to keep AMC advised… as to competitor products… and market conditions… (b) to… facilitate or expedite delivery of products contracted to be sold by AMC in the territory; (c) to seek out and promote prospective business on behalf of AMC and to forward to AMC requests for supplies of products provided always that supplies should only be at prices and upon terms and conditions determined by AMC. It was expressly

provided that nothing in the agreement should be construed so as to give CPC any authority to accept any orders, to make any sales, or to conclude any contracts on behalf of AMC. CPC was left free to sell material and products other than asbestos fibre and to involve itself in other commercial activities. CPC was required to provide, maintain and operate at its own cost office accommodation and staff for running an efficient advice and consultancy bureau. Remuneration for CPC was to be by commission upon the cost of all asbestos sales by AMC in the territory. (J.72-73).

• 29.  As to the goodwill of CPC:- the agency agreement provided in paragraph 11, under the heading "Pre-emption Rights" , that in the event that Mr. Morgan should desire to cease management control of CPC, or to dispose of all of his share holding in CPC or such part as constituted majority control, or to dispose of any shares to a person, firm or company which was directly or indirectly engaged in the sale of asbestos fibre or the manufacture or sale of insulation materials; or in the event that CPC terminated this agreement for any reason or refused to agree to further renewal upon its expiry; or in the event that AMC terminated the agency agreement in the event of insolvency of either party or substantial breach of obligations; then Mr. Morgan should in such event offer all shares owned by him in CPC for sale to AMC at their net book value excluding goodwill. Beneficial ownership of the name "Continental Products Corporation" was provided to belong to AMC. (J.73G-H).

• 30.  CPC commenced business on 1st February 1978 in order to fit in with the cesser of business of NAAC on 31st January 1978. The terms of the agency agreement were a reliable guide to the nature of the relationship between CPC and AMC and, hence, between CPC and Cape. (J.74B).

• 31.  As to CPC's place of business:- CPC leased offices on the 12th Floor of 150 North Wacker Drive. NAAC's offices had been on the 5th Floor in the same building. Most of the furniture and fittings in NAAC's offices were removed to CPC's offices. CPC took over NAAC's telephone number: (J.74C).

• 32.  As to the cost of CPC's commencement in business:–CPC had an immediate need for funds for rent, furniture, and payment of staff but commission under the agency agreement with AMC would not be payable immediately. The sum of $12,000 was paid

by and on behalf of Cape to CPC to assist in meeting the cost of establishing itself. In addition a sum of $160,000 was paid to CPC on 4th January 1978 to enable CPC to set up in business and to perform the agency obligations expected of it: (J.74-75).

• 33.  As to the business activities of CPC:- CPC acted as an agency in connection with sales of Cape asbestos and, in addition, it traded in asbestos textiles on its own account, buying and selling as principal. (J.75E). Like NAAC, CPC acted as "agent" for the purpose of facilitating the sale in the US of Cape's asbestos. In NAAC's time the seller was Egnep or Casap. The seller in CPC's time was, nominally, AMC but, in reality, still Egnep or Casap. Like NAAC, CPC had no authority to bind any Cape subsidiary to any contract. (J.76-77).

• 34.  CPC's conduct of its affairs was much the same as NAAC's had been. It paid the rent for its offices and paid its employees. It received commission from AMC as well as incurring expenditure and receiving payments in connection with its independent trading activities. (J.76D-E).

• 35.  CPC was an independently owned company (J.76G). CPC, like NAAC, carried on its own business from its own offices at 150 North Wacker Drive. (J.77B). (Both these findings are challenged).

• 36.  Upon the evidence the corporate form of the Cape Group was not "form" only. Each corporate member of the Cape Group had its own well-defined commercial function designed to serve the overall commercial purpose of mining and marketing asbestos. (J.77F-H).

• 37.  In August 1984, according to the evidence of Mr. Summerfield, a solicitor acting for the plaintiffs, there was at 150 North Wacker Drive a noticeboard giving the names of both CPC and AMC as the occupants of the offices on the 12th Floor. There was no evidence whether the board was there in 1979 when the sale of the subsidiaries was made by Cape to TCL: (see para 1 above). There was no evidence to suggest that AMC was an occupant of the offices at the time of the commencement of the Tyler 2 actions in the period 19th April 1978 to 19th November 1979. (J.78-79).

**The plaintiffs' challenge to Scott J.'s finding of facts relevant to the "presence" issue: the Appendix to this judgment**

The plaintiffs' challenge to the judgment of Scott J. on the "presence" issue is based not so much on the findings of primary fact which were made, but on his supposed failure to find all the material facts and to draw the correct inferences and conclusions which should have been drawn from such facts. In their amended notice of appeal (which we gave leave to amend at the hearing) the plaintiffs included a "Schedule of facts which ought to have been found" . This Schedule included 25 paragraphs. For convenience we will set out and deal with the issues of fact raised by this Schedule in an Appendix to this judgment, which in our view would not need to be reported. We observe at this point that, having been taken through the evidence relating to such of these 25 paragraphs as are disputed, we think that the majority of them (though by no means all) are in broad terms borne out by the evidence. However, we do not think that those which are substantiated add very much to the strength of the plaintiffs' case on the presence issue or that they suffice to invalidate the ultimate conclusion of the learned Judge on that issue.

On the basis of the findings of fact made by Scott J. and the further facts which they submit he ought to have found, the plaintiffs in their amended notice of appeal submit that he was wrong to conclude that

> "(1)  NAAC's business was its own business and not the business of Cape or Capasco (J. p. 68C);
>
> (2)  CPC…was…an independently owned company and carried on its own business (J. pp. 76G-H, 77B);
>
> (3)  As from January 31st 1978 NAAC ceased to act on behalf of any of the Cape companies or to carry on any business on its own account save for the purpose of liquidating its assets (J. pp. 17H and 68F-H);

(4)   Mr. Morgan was in executive control of NAAC's conduct of its business (J. p. 62A-B)."

Two important inferences of fact made by the Judge (numbers (1) and (2)) and two important findings of primary fact (numbers (3) and (4)) are thus challenged on this appeal. We shall consider contention (4) in the section of this judgment dealing with the "single economic unit" argument and in the Appendix. We shall consider the contention that CPC was "not an independently owned company" in the section dealing with the "corporate veil argument" . We shall consider contention (3) and the contentions that NAAC's business was not "its own business" and that CPC's business was not "its own business" in the section dealing with what we will call the "agency" argument.

**Some leading authorities relevant to the presence issue**

Provision has been made by statute for the enforcement in this country of the judgments of the courts of Commonwealth and foreign countries in a number of different circumstances: (see in particular section 9 of the Administration of Justice Act 1920 ; section 4 of the Foreign Judgments (Reciprocal Enforcement) Act 1933 and the Civil Jurisdiction and Judgments Act 1982 ). However, none of these statutory provisions applies in the present case. We are concerned solely with the common law ( Dicey & Morris' "First Case" ).

So far as appears from the many cases cited to us, neither this court nor the House of Lords has ever been called on to consider the principles which should guide an English court in deciding whether or not a foreign court was competent to assume jurisdiction over a corporation (as opposed to an individual) on a territorial basis; and we have seen only two decisions of courts of first instance in which these principles fell to be considered. We will begin by mentioning some of the leading cases relating to judgments given against individuals.

Two points at least are clear. First, at common law in this country foreign judgments are enforced, if at all, not through considerations of comity but upon the basis of a principle explained thus by Parke B. in Williams v. Jones (1845) 13 M. & W. at p. 133 :

> "Where a court of competent jurisdiction has adjudicated a certain sum to be due from one person to another, a legal obligation arises to pay that sum, on which an action of debt to enforce the judgment may be maintained. It is in this way that the judgments of foreign and colonial courts are supported and enforced." [Emphasis added]

Blackburn J. stated and followed the same principle in delivering the judgment of himself and Mellor J. in Godard v. Gray (1870) L.R. 6 Q.B. 139 at p. 146 and the judgment of the Court of Queen's Bench in Schibsby v. Westenholz & Others (1870) L.R. 6 Q.B. 139 at p. 159 . In the latter case he said (at p. 159):

> "It is unnecessary to repeat again what we have already said in Godard v. Gray .
>
> We think that, for the reasons there given, the true principle on which the judgments of foreign tribunals are enforced in England is that stated by Parke, B. in Russell v. Smyth , and again repeated by him in Williams v. Jones , that the judgment of a court of competent jurisdiction over the defendant imposes a duty or obligation on the defendant to pay the sum for which judgment is given, which the courts in this country are bound to enforce; and consequently that anything which negatives that duty, or forms a legal excuse for not performing it, is a defence to the action."

Secondly, however, in deciding whether the foreign court was one of competent jurisdiction, our courts will apply not the law of the foreign court itself but our own rules of private international law. As Lindley M.R. put it in Pemberton v. Hughes (1899) 1 Ch. 781 :

> "There is no doubt that the Courts of this country will not enforce the decisions of foreign Courts which have no jurisdiction in the sense above explained – i.e., over the subject-matter or over the persons brought before them … But the jurisdiction which alone is important in these matters is the competence of the Court in an international sense – i.e., its territorial competence over the subject-matter and over the defendant. Its competence or jurisdiction in any other sense is not regarded as material by the Courts of this country".

Subsequent references in this section of this judgment to the competence of a foreign court are intended as references to its competence under our principles of private international law, which will by no means necessarily coincide with the rules applied by the foreign court itself as governing its own jurisdiction. As the decision in Pemberton v. Hughes shows, our courts are generally not concerned with those rules.

Under the plaintiffs' case as pleaded, the obligation of the defendants to obey the judgment of the Tyler Court is said to arise because "the defendants were resident in the United States of America at the time the plaintiffs' proceedings were commenced in the Tyler Court" . The jurisdiction of the Tyler Court is thus said to be founded on territorial factors.

Nearly 120 years ago in Schibsby v. Westenholz the "residence" of an individual in a foreign country at time of commencement of suit was recognised by the Court of Queen's Bench as conferring jurisdiction on the court of that country to give a judgment in personam against him. In that case the court declined to enforce a judgment of a French tribunal obtained in default of appearance against defendants who at the time when the suit was brought in France were not subjects of nor resident in France. On these facts the court decided (at p. 163) that "there existed nothing in the present case imposing on the defendants any duty to obey the judgment of the French tribunal" . However, it regarded certain points as clear on principle (at p. 161):

> "If the defendants had been at the time of the judgment subjects of the country whose judgment is sought to be enforced against them, we think that its laws would have bound them. Again, if the defendants had been at the time when the suit commenced resident in the country, so as to have the benefit of its laws protecting them, or, as it is sometimes expressed, owing temporary allegiance to that country, we think that its laws would have bound them."

In Roussillon v. Roussillon (1880) 14 Ch. D. 351 , Fry J., after referring to Schibsby v. Westenholz and in enumerating the cases where the courts of this country regard the judgment of a foreign court as imposing on the defendant the duty to obey it, (at p. 371) similarly referred to one such case as being "where he was resident in the foreign country when the action began" .

In Emanuel v. Symon (1908) 1 K.B. 302 , this court had to consider whether the fact of possessing property situate in Western Australia or the fact of entering into a contract of partnership in that country was sufficient to give a Western Australian court jurisdiction (in the private international law sense) over a British subject not resident

Adams v Cape Industries Plc, 1989 WL 651250 (1989)

in Western Australia at the start of the action, who had neither appeared to the process nor expressly agreed to submit to the jurisdiction of that court. This question was answered in the negative. Buckley L.J. said (at p. 309):

> "In actions in personam there are five cases in which the courts of this country will enforce a foreign judgment: (1) Where the defendant is a subject of the foreign country in which the judgment has been obtained; (2) where he was resident in the foreign country when the action began; (3) where the defendant in the character of plaintiff has selected the forum in which he is afterwards sued; (4) where he has voluntarily appeared; and (5) where he has contracted to submit himself to the forum in which the judgment was obtained. The question in the present case is whether there is yet another and a sixth case."

After referring to the principles established by (inter alia) Godard v. Gray and Schibsby v. Westenholz , Buckley L.J. observed (at p. 310):

> "In other words, the Courts of this country enforce foreign judgments because those judgments impose a duty or obligation which is recognised in this country and leads to judgment here also."

In agreement with the rest of the court, he considered that the factors relied on by the plaintiff mentioned above did not suffice to impose a duty on the defendant to obey the Western Australian judgment which should be recognised in this country.

We pause to observe that Buckley L.J.'s second, third, fourth and fifth cases mentioned in his statement broadly

correspond with Dicey & Morris' respective four cases. It is doubtful whether the first case mentioned in his statement would still be held to give rise to jurisdiction: (see Dicey & Morris Vol. 1 at pp. 447-448 and the cases there cited). With this point we are not concerned.

Residence will much more often than not import physical presence. On the facts of the four cases last mentioned, any distinction between residence and presence would have been irrelevant. However, the brief statements of principle contained in the judgments left at least three questions unanswered. First, does the temporary presence of a defendant in a foreign country render the court of that country competent (in the private international law sense) to assume jurisdiction over him? Secondly, what is the relevant time for the purpose of ascertaining such competence? Thirdly, what is to be regarded as the "country" in the case of a political country, such as the U.S.A. comprising different states which have different rules of law and legal procedure?

We will have to revert to the third question in the section of this judgment dealing with the "country" issue; in the present section we will assume in favour of the plaintiffs that the U.S.A., rather than the state of Texas, is to be regarded as the relevant country. As to the first and second questions, we think that the most helpful guidance is to be obtained from the decision of the Privy Council in Sirdar Gurdyal Singh v. Rajah of Faridkote (1894) A.C. 670 (" Singh "), the decision of Lord Russell of Killowen in Carrick v. Hancock (1895) 12 T.L.R. 59 and the decision of the House of Lords in Employers' Liability Assurance Corporation v. Sedgwick Collins & Co. (1927) A.C. 95 (" Employers' Liability " ).

In Singh the Privy Council on an appeal from the Chief Court of the Punjab considered the question whether the Courts of British India ought to have enforced against the defendant two judgments obtained against him ex parte in the native state of Faridkote, which for this purpose fell to be regarded as foreign judgments. The defendant had ceased to reside in the state before the actions were brought, and though he had received notice of the proceedings, he had never appeared in either of them or otherwise submitted to the jurisdiction of the Faridkote Court. The Privy Council held the judgments

to be a nullity under international law. Lord Selborne, delivering their opinion, said (at pp. 683-684):

> "Under these circumstances there was, in their Lordships' opinion, nothing to take this case out of the general rule, that the plaintiff must sue in the Court to which the defendant is subject at the time of suit ( 'Actor sequitur forum rei' ); which is rightly stated by Sir Robert Phillimore (International Law, Vol. 4, s. 891 ) to 'lie at the root of all international, and of most domestic, jurisprudence on this matter.' All jurisdiction is properly territorial, and 'extra territorium jus dicenti, impune non paretur' . Territorial jurisdiction attaches (with special exceptions) upon all persons either permanently or temporarily resident within the territory while they are within it; but it does not follow them after they have withdrawn from it and when they are living in another independent country … no territorial legislation can give jurisdiction which any foreign Court ought to recognise against foreigners, who owe no allegiance or obedience to the Power which so legislates.

> In a personal action, to which none of these causes of jurisdiction apply, a decree pronounced in absentem by a foreign Court, to the jurisdiction of which the defendant has not in any way submitted himself, is by international law an absolute nullity".

The Privy Council held (at p, 684) that the mere fact that the cause of action had arisen in one country did not operate to confer jurisdiction on the courts of that country over a defendant not otherwise subject to it.

In Carrick v. Hancock (1895) 12 T.L.R. 59 the principle of territorial dominion was again referred to. In that case an action was brought upon a monetary judgment obtained in Sweden by an Englishman domiciled in Sweden against a defendant who resided and carried on business at Newcastle. The writ was served on the defendant during a short visit he was paying to Sweden and he duly appeared to answer it. Though he did not himself remain in Sweden, he was represented throughout the subsequent proceedings. He put in a defence and counterclaim and on three separate occasions appealed to the Court of Appeal at Gota. It may be that in those circumstances, notwithstanding his protestations that he had "only appeared under pressure, duress and compulsion of law" , the English court could properly have enforced the foreign judgment on the ground that the defendant had submitted to the jurisdiction of the Swedish court. However, Lord Russell of Killowen did not decide the case in favour of the plaintiff on that ground. After reviewing the facts and arguments, he is reported as saying:

> "that the jurisdiction of a Court was based upon the principle of territorial dominion, and that all persons within any territorial dominion owe their allegiance to its sovereign power and obedience to all its laws and to the lawful jurisdiction of its Courts. In his opinion that duty of allegiance was correlative to the protection given by a State to any person within its territory. This relationship and its inherent rights depended upon the fact of the person being within its territory, It seemed to him that the question of the time the person was actually in the territory was wholly immaterial. This being so it was quite clear that under the facts of this case it was properly and lawfully initiated, and all its subsequent proceedings were lawful and valid, and that the Swedish Courts had ample jurisdiction to enforce the plaintiff's claim against the defendant."

In Employers' Liability Lord Parmoor said this (at pp. 114-115):

> "My Lords, in the case of actions in personam, in which a writ has been regularly served on foreigners or foreign corporations, when present in this country, and a judgment has been obtained, it seems to be clear, as a general rule, that, under the obligations of that branch of international law, which governs the application of foreign judgments, other countries, whose Governments have been recognised de jure and de facto by the Government of this country, will accept the jurisdiction of the Courts of this country, and regard their judgments as valid. In the case of such actions, it may also be stated negatively that, where a writ cannot be served on a defendant foreigner, or foreign corporation, when in this country, and no submission to jurisdiction is proved, any consequent judgment has no validity in any other country, on the ground that the Courts of this country have no jurisdiction under international law over the person of an absent foreign defendant. In other words, the right to serve a writ, in an action in personam, on a foreign defendant, only becomes effective, as a source of jursidiction, to be recognised in other countries when, at the date of service, such defendant is within the territorial jurisdiction of the English Courts."

Lord Parmoor was in terms referring to the recognition by foreign countries of judgments given by our courts, but

he was speaking generally in terms of private international law and would presumably have regarded the same principles as applicable (mutatis mutandis) in a case where our courts were asked to enforce a foreign judgment.

From the three last-mentioned authorities read together, the following principles can, in our judgment, be extracted. First, in determining the jurisdiction of the foreign court in such cases, our court is directing its mind to the competence or otherwise of the foreign court "to summon the defendant before it and to decide such matters as it has decided" : (see Pemberton v. Hughes (1899) 1 Ch. at p. 790 per Lindley M.R.). Secondly, in the absence of any form of submission to the foreign court, such competence depends on the physical presence of the defendant in the country concerned at the time of suit. (We leave open the question whether residence without presence will suffice). From the last sentence of the dictum of Lord Parmoor cited above, and from a dictum of Collins M.R. in Dunlop Pneumatic Tyre Company v. Actiengesselschaft fur Motor Und Motorfahr-Zeugbau Vorm, Cudell & Co. (1902) 1 K.B. 342 at p. 346 it would appear that the date of service of process rather than the date of issue of proceedings is to be treated as "the time of suit" for these purposes. But nothing turns on this point in the present case and we express no final view on it. Thirdly, we accept the submission of Sir Godfray Le Quesne (not accepted by Mr. Morison) that the temporary presence of a defendant in the foreign country will suffice provided at least that it is voluntary (i.e. not induced by compulsion, fraud or duress), Some further support for this submission is to be found in dicta of Parke B. in The General Steam Navigation Company v. Guillou (1843) 11 M. & W. 877 .

The decision in Carrick v. Hancock has been the subject of criticism in Cheshire & North's Private International Law (11th Edition) at p. 342 ( " Cheshire & North " ), and in Dicey & Morris where it is said (at pp. 439-440):

> "It may be doubted, however, whether casual presence, as distinct from residence, is a desirable basis of jurisdiction if the parties are strangers and the cause of action arose outside the country concerned. For the court is not likely to be the forum conveniens, in the sense of the

Adams v Cape Industries Plc, 1989 WL 651250 (1989)

appropriate court most adequately equipped to deal with the facts or the law. Moreover, the English case referred to above is open to the comment that the jurisdiction of the foreign court might just as well have been based on the defendant's submission as on his presence."

Our own courts regard the temporary presence of a foreigner in England at the time of service of process as justifying the assumption of jurisdiction over him: (see Colt Industries Inc. v. Sarlie (1966) 1 A.E.R. 673 and H.R.H. Maharanee Seethaderi of Baroda v. Wildenstein (1972) 2 Q.B. 283 . However, Cheshire & North comment (at p. 342):

"Any analogy based on the jurisdiction of the English courts is not particularly convincing, since the rules on jurisdiction are operated in conjunction with a discretion to stay the proceedings, and the exercise of the discretion is likely to be an issue when jurisdiction is founded on mere presence".

We see the force of these points. They highlight the possible desirability of a further extension of reciprocal arrangements for the enforcement (or non-enforcement) of foreign judgments by Convention. Nevertheless, while the use of the particular phrase "temporary allegiance" may be a misleading one in this context, we would, on the basis of the authorities referred to above, regard the source of the territorial jurisdiction of the court of a foreign country to summon a defendant to appear before it as being his obligation for the time being to abide by its laws and accept the jurisdiction of its courts while present in its territory. So long as he remains physically present in that country, he has the benefit of its laws, and must take the rough with the smooth, by accepting his amenability to the process of its courts. In the absence of authority compelling a contrary conclusion, we would conclude that the voluntary presence of an individual in

a foreign country, whether permanent or temporary and whether or not accompanied by residence, is sufficient to give the courts of that country territorial jurisdiction over him under our rules of private international law.

In the forefront of his argument on this issue, Mr. Morison submitted that the essential feature of this country's rules relating to the enforcement of foreign judgments is "curial allegiance" , which arises "where there is sufficient connection between the debtor and the rendering court at the date of suit so as to make it 'just' to enforce a judgment of that court". The relevance of residence or presence, in his submission, is that it provides the requisite connection. This, in our judgment, is not quite the correct way to look at the matter. While residence or presence will ex hypothesi give rise to a connection, it is the residence or presence, not the connection as such, which gives rise to the jurisdiction of the court. The question whether residence or presence existed at the time of suit is determined by our courts not by reference to concepts of justice or by the exercise of judicial discretion; it is a question of fact which has to be decided with the help of the guidance given by the authorities.

However, none of the authorities so far referred to was concerned with the question of enforcement of a foreign judgment against a corporate body. The residence or presence of a corporation is a difficult concept. A corporation is a legal person but it has no corporeal existence. It can own property. It can by its agents perform acts. It is clear that if an English corporation owns a place of business in a foreign state from which it carries on its business that English corporation is, under our law, present in that state for the purposes of in personam jurisdiction. Those clear circumstances, however, may be varied in many different ways. The corporation may not own the place of business but have only the use of it or part of it. It may, instead of carrying on its business by its own servants, cause its business to be done by an agent, or through an agent, in the foreign state. The question will then arise whether the commercial acts done are, for the purposes of our law, to be regarded as done within the jurisdiction of the foreign state (a) by the agent in the course of the agent's business or (b) by the corporation itself. Further, and this is of central importance in this case, if the English corporation causes to be formed under the law of the foreign state a separate but wholly-owned

corporation to carry out the business or commercial acts which it requires to be done, are those acts within the jurisdiction of the foreign state to be regarded, for the purposes of enforcement of a judgment of the courts of that state, as the acts of the English corporation within that jurisdiction merely by reason that it owns all the shares of its foreign corporation; and, if not, what degree of power of control, or of exercise of control, and/or what other factors will suffice, in our law, to cause the English corporation to be held to be "present" within the jurisdiction of the foreign state?

The earliest case cited to us in which this court had to consider the concept of residence or presence of a corporation in the context of a claim to enforce a foreign judgment was Littauer Glove Corporation v. F.W. Millington (1920) Limited (1928) 44 T.L.R. 746 ( " Littauer " ). In that case the plaintiffs were manufacturers in the State of New York. The defendant company, which conducted the business of clothiers' merchants, had its principal place of business in Manchester. It bought from manufacturers in various parts of the world and sold to wholesalers. On March 17th 1922 its managing director, Mr. Millington, arrived in New York on a business visit with a view to seeing samples and making purchases. He stayed in a New York hotel for 4 or 5 nights, where he did some business for his company. Thereafter he visited various other states where he also did business. On April 1st the plaintiffs took out a summons against the defendant company. On April 3rd Mr. Millington returned to New York. On that date, while he was in the sales office in New York of Union Mills Corporation, the defendant's principal U.S. suppliers, he was served with process in the action. He entered no appearance, took no steps in the proceedings and did not submit to the jurisdiction of the American court. On April 4th he sailed for England. The plaintiffs, having in due course obtained judgment against the defendant company in default of appearance in New York, sought to enforce the judgment against it in England. The defendant contended that (under the rules of private international law) the New York court had no jurisdiction to make the order against it. Many authorities were cited to Salter J. From the report of the argument, it appears to have been common ground that the question turned on the "residence" or otherwise of the defendant company in the State of New York on April 1st 1922 when the proceedings were instituted. Salter J. identified the question for his decision as being

whether on 1st April 1922 "the defendant company were resident in the State of New York so as to have the benefit and be under the protection of the laws of that state" . The plaintiffs' counsel had contended that it was not necessary for them to show that the defendant company was carrying on business at a fixed place. In his submission, it was resident in New York because it carried on business there: "the company is resident by its travellers and would be subject to process of the country in which they happened to be" . Salter J. rejected this contention, saying this (at p. 747):

"What was meant by saying that a business corporation was resident in a foreign jurisdiction for that purpose? That depended on whether, on the day in question, it was carrying on business in the foreign State so that it could fairly and properly be said to be then resident in that State. If the defendant company were resident in the State of New York on April 1, 1922, where in that State were they resident? Mr. Le Quesne said that they were resident in Broadway, New York, but there must be some place of residence on which one could put a finger. There was no suggestion that the name of the defendant company was in any way displayed at the address in Broadway, or that any letter-paper of the company was used there, or that any business was done there except what the company did with firms in other parts of the United States. If the defendant company were resident in Broadway, it would follow that they were resident wherever Mr. Millington did business. He was, however, nothing more than a commercial traveller on that tour.

If the company had 40 or 50 travellers ranging all over the world, was it to be said that the company were resident wherever the travellers

put up at an hotel and took orders? He (his Lordship) did not rely on the expression 'fixed place' , but on what was the fair meaning of 'residence' . The inference which he drew from the cases cited was that there must be some carrying on of business at a definite and, to some reasonable extent, permanent place. There was no residence within the jurisdiction on the part of the defendant company, and the action on that point must fail".

Thus, the effect of Salter J.'s decision was that if a foreign judgment is to be enforced in this country against a corporation, it must be shown that at the relevant time (a) the corporation was carrying on business, and (b) it was doing so at a definite and "to some reasonable extent permanent place" . This test is significantly different from that applicable in the case of judgments against individuals. Littauer does not bind this court, but we see no reason to doubt the correctness of this test so far as it goes. It seems to us consistent with authority and to represent a commonsense approach to the question of "presence" in the case of a corporation. The difficulty may be to determine whether it can properly be said in any given case that the corporation is itself carrying on business in the country concerned.

The other, and most recent, leading case relating to the enforcement of foreign judgments against corporations is Vogel v. R.A. Konstamm Ltd. (1973) 1 Q.B. 133 (" Vogel "). There the defendants were a company registered in England. They sold leather skins to the plaintiffs through a Mr. Kornbluth who had an office in Tel Aviv. The defendants had no office of their own in Israel. All the material correspondence was conducted with them in England. The contract of sale was not made in Israel. The court in Israel gave judgment for the plaintiff on a claim for breach of contract and the plaintiff sought to enforce it in England. Ashworth J. dismissed the plaintiff's claim. In his judgment he described the functions of Mr. Kornbluth vis-a-vis the defendants thus (at p. 136):

"Mr Kornbluth's role was that of a person seeking customers who would buy the defendants' goods. For this purpose he was provided with samples for which he paid, and having found a potential customer he would act as a go-between between that person and the defendants. Correspondence would pass between the defendants and Mr. Kornbluth regarding a proposed order and Mr. Kornbluth would be in communication with the customer. If as a result a contract was made it would be made between the defendants and the customer and at no time had Mr. Kornbluth any authority to make a contract on behalf of the defendants."

He said (at p. 136) that:

"in order to succeed the plaintiff here has to persuade me either that the defendants were resident in Israel through Mr. Kornbluth as their agent or that they were carrying on business through him in such a way as to give rise to an implied agreement on their part to submit to the jurisdiction of Israeli courts".

With reference to the first of these two points, he observed (at p. 141):

"As has been said in many cases, residence is a question of fact and when one is dealing with human beings one can normally approach the matter on the footing that residence involves physical residence by the person in question. I keep open the possibility that even in regard to such a person he may be constructively resident

Adams v Cape Industries Plc, 1989 WL 651250 (1989)

in another country although his physical presence is elsewhere. But in the case of a corporation there is broadly speaking no question of physical residence. A corporation or company, if resident in another country, is resident there by way of agents".

He recognised (at p. 141G) that Littauer was distinguishable on the grounds that:

"the person through whom the defendant corporation was said to have residence in the United States was not a person with any fixed or reasonably permanent place".

However, Ashworth J. pointed out (at p. 142) that the defendants in the case before him had no office of their own in Israel. He continued: "All the material correspondence was conducted with them in England and their connection with the State of Israel was limited … to their dealings through Mr Kornbluth" .

"In examining how far the presence of a representative or agent will, so to speak, impinge on the absent company so as to render that absent company subject to the relevant jurisdiction, I find help to be obtained from cases in which the converse situation has been considered: namely, where the English courts have been invited to allow process to issue to foreign companies on the footing that such foreign companies are 'here' ".

He expressed his ultimate conclusion thus (at p. 143):

"I have asked myself anxiously in this case whether in any real sense of the word the defendants can be said to have been there in Israel: and all that emerges from this case is that there was a man called Kornbluth who sought customers for them, transmitted correspondence to them and received it from them, had no authority whatever to bind the defendants in any shape or form. I have come to the conclusion really without any hesitation that the defendants were not resident in Israel at any material time."

On this appeal, in accordance with the approach of the courts in Littauer and Vogel , it has been common ground that the Tyler Court was competent to exercise jurisdiction over Cape and Capasco, if at all, only if they could properly be said to be resident or present in the U.S.A. at the relevant time. (In view of their contentions on the "country" issue, the defendants do not accept that the Tyler Court would have been competent, even if the latter condition had been fulfilled). The words "resident" or "present" or equivalent phrases have been used interchangeably in argument, just as they have been used in the cases; we see no objection to this terminology if it is understood that in the case of a corporation the concept of "residence" or "presence" in any particular place must be no less of a legal fiction than the existence of the corporation itself. The argument has centred on the features which this concept embodies in the case of a corporation.

In considering these features, Salter J. in Littauer and Ashworth J. in Vogel clearly attached great weight to a long line of cases where the English court has considered whether it should allow process to issue to foreign companies as being amenable to is jurisdiction, We will call this line "the Okura line of cases" , because a leading example is the decision of this court in Okura & Co. Ltd. v. Forsbacka Jernverks Aktiebolag (1914) 1 K.B. 715 (" Okura ").

The origin of this line requires some brief explanation. After it had been decided in Newby v. Van Oppen (1872) 7 Q. B. 293 that in appropriate circumstances a foreign corporation was capable of being sued in this country, our courts in a number of cases had to consider (a) whether on the facts the foreign corporate defendant was amenable to the jurisdiction of the English court, and if so (b) whether it had been properly served with the process. Most of these cases were concerned with the old Order IX, rule 8 of the Rules of the Supreme Court 1883 , which provided:

> "In the absence of any statutory provision regulating service of process, every writ of summons issued against a corporation aggregate may be served on the mayor or other head officer, or on the town clerk, treasurer or secretary of such corporation."

The rule contained no such expressions as "reside" or "carry on business" . However, as Ackner L.J. pointed out in South India Shipping Corporation Ltd. v. Export-Import Bank of Korea (1985) 1 W.L.R. 585 at p. 589 :

> "Those expressions were used as convenient tests, to ascertain whether the corporation had a sufficient 'presence' within the jurisdiction, since 'generally' , courts exercised jurisdiction only over persons who 'are within the territorial limits of their jurisdiction' . Apart from statute 'a court has no power to exercise jurisdiction over anyone beyond its limits' , per Cotton L.J. in In re Busfield (1886) 32 Ch.D. 123, 131 , quoted by Lord Scarman in Bethlehem Steel Corporation v. Universal Gas (unreported), 17 July 1978, House of Lords".

Phrases referring to residence or presence within the jurisdiction, or equivalent phrases, have been used by way of shorthand reference to the condition (or one of the conditions) which a foreign corporation has to satisfy if it is to be amenable to the jurisdiction of the English court. And indeed they have been used more or less interchangeably by the courts. One typical example is the phraseology used by the Earl of Halsbury L.C. in La 'Bourgogne' (1899) A.C. 431 , who said (at p. 433):

> "It appears to me that as a consequence of these facts the appellants are resident here in the only sense in which a corporation can be resident – to use the phrase which Mr. Joseph Walton has so constantly referred to, they are 'here' ; and, if they are here, they may be served".

Perhaps the most helpful guidance in determing whether a foreign corporation is "here" so as to be amenable to the jurisdiction of our courts is the following passage from the judgment of Buckley L.J. in Okura (1914) 1 K.B. 715 (at pp. 718-719) :

> "The point to be considered is do the facts shew that this corporation is carrying on its business in this country? In determining that question, three matters have to be considered. First, the acts relied on as showing that the corporation is carrying on business in this country must have continued for a sufficiently substantial period of time. That is the case here. Next, it is essential that these acts should have been done at some fixed place of business. If the acts relied on in this case amount to a carrying on of a business, there is no doubt that those acts were done at a fixed place of business. The third essential, and one which it is always more difficult to satisfy,

is that the corporation must be 'here' by a person who carries on business for the corporation in this country. It is not enough to shew that the corporation has an agent here; he must be an agent who does the corporation's business for the corporation in this country. This involves the still more difficult question, what is meant exactly by the expression 'doing business' ?".

It is clear that (special statutory provision apart) a minimum requirement which must be satisfied if a foreign trading corporation is to be amenable at common law to service within the jurisdiction is that it must carry on business at a place within the jurisdiction: (see The Theodohos (1977) 2 LL.L.R. 428 at p. 430 per Brandon J.).

[All the authorities cited to us have been directed, and all the statements later in this judgmentwill be directed, to trading corporations. In the case of non-trading corporations, the same principles would presumably apply, with the substitution of references to the carrying on of the corporation's corporate activities for references to the carrying on of business].

The court will not find much difficulty in holding that a foreign corporation is present in this country if it has a fixed place of business of its own here (whether as owner, lessee or licensee) and for more than a minimal period of time has carried on its own business from such premises by its servants or agents. Typical examples of such cases (which we will call "branch office cases" ) which have been cited to us are:

• (1)  Newby v. Van Oppen (supra),
• (2)  Haggin v. Comptoir d'Escompte (1889) 23 Q.B.D. 519
• (3)  La "Bourgogne" (1899) P.1 and (1899) A.C. 431 .
• (4)  Dunlop Pneumatic Tyre Company Limited v. Aktien-Gesellschaft Fur Motor Und

Motorfahrzeugbau Verm Cudell & Co. (1902) 1 K.B. 342 ( " Dunlop " )

However, the cases also show that it may be permissible to treat a foreign corporation as resident in this country so as to be amenable to the jurisdiction of our court even if it has no fixed place of business here of its own, provided that an agent acting on its behalf carries on its business (as opposed to his own business) from some fixed place of business in this country. Typical examples of such cases are:

• (1)  Saccharin Corporation Limited v. Chemische Farbik Von Heyden Aktiengesellschaft (1911) 2 K.B. 517 ( " Saccharin " ) where the agent, Blasius, occupied and paid rent for offices in London, and in the words of Fletcher Moulton L.J. (at p. 524) "He carries on business at a fixed place in London as sole agent for the defendants in the United Kingdom, though it is true that he is also agent for another firm. He has power to enter into contracts of sale for the defendants" .
• (2)  Thames and Mersey Marine Insurance Company v. Societa di Navigazione A Vapore Del Lloyd Austilaco (1914) 111 L.T. 97 ( " Thames and Mersey " ), where Buckley L.J. began his judgment with the following statement of principle (at p. 98):

> "If contracts have been habitually made for a reasonably substantial period of time at a fixed place of business within the jurisdiction by a firm or a person there, without referring each time to the foreign corporation for instructions, and with the result that the foreign corporation has become bound to another party, then the foreign corporation for the present purpose carries on business at that place."

The ultimate problem in such cases may lie in determining whether the business carried on by the agent on behalf of the principal should properly be regarded on the one hand as his own business or on the other hand as the business of the foreign corporation. This must necessitate an investigation both of the activities of the agent and of the relationship between him and the corporation.

In a few of the Okura line of cases which have been cited to us, the court has had to consider the question whether a foreign corporation was carrying on business in this country in a context other than that of the old Order IX, rule 8 , but nevertheless the like investigation was necessary. In Grant v. Anderson & Co. (1892) 1 Q.B. 108 the context was the old Order XLVIIIA, rule 1 , which provided that any two or more persons claiming or being liable as co-partners "and carrying on business within the jurisdiction" might sue or be owed in the name of the respective firms … The defendants, who were a Scottish firm of manufacturers carrying on business in Glasgow, employed an agent in London to obtain orders for them in London. He occupied an office in London, the rent of which he paid himself, and received a commission if, but only if, he got an order which the firm accepted. In rejecting the contention that the firm carried on business in London, the Court of Appeal attached great weight to the fact that, in the words of Lord Esher M.R. (at p. 116) "when he gets an order he has no power himself to accept it" . As he put it (at p. 117): "One might as well say that the defendants carry on business in any place through which their goods pass while being sent to their customers" .

The case of Sfeir & Co. v. National Insurance Company of New Zealand (1964) 1 LL.L.Rep. 330 concerned a claim covered by section 9(2) of the Administration of Justice Act 1920 , of which sub-paragraph (b) precluded the registration of a judgment under the section if the judgment debtor "being a person who was neither carrying on business nor ordinarily resident within the jurisdiction of the original court did not voluntarily appear or otherwise submit or agree to submit to the jurisdiction of the court." The first question Mocatta J. had to determine (see at p. 336) was whether the defendants at any material time carried on business in Ghana. If they did so, this could only have been through a Ghanaian company called Glyndova. He expressed his conclusion on this point thus (at p. 339):

"In my judgment, Mr. Mustill was right in submitting that the decision of the Court at the end of the day after considering the guidance contained in the authorities and their application to the facts of a particular case is one of impression. The conclusion I have reached is that the limited authority possessed by Glyndova to bind the defendants by settlements of claims arising in Ghana under the defendants' policies issued elsewhere, even when coupled with the other matters relied upon which I have recited, did not amount to a carrying on of business by the defendants in Ghana. The business carried on in Ghana by Glyndova was their own and not that of the defendants,"

At least in cases other than branch office cases it is obvious that the activities of the agent by whom the foreign corporation is said to be present in this country and the extent of the authority of that agent will be of particular importance in determining whether or not the corporation is amenable to our courts' jurisdiction. Counsel on both sides have referred us to numerous examples from the Okura line of cases in which a number of different aphorisms have been used to express the relevant test. Buckley L.J. (later Lord Wrenbury) "who made this subject particularly his own" (see The Lalandia (1933) P. 56 at p. 62 per Langton J.) himself used a variety of expressions to state it on the facts of particular cases. In Thames and Mersey (at pp. 98-99) he stated it thus:

"Does the agent in carrying on the foreign corporation's business make a contract for the foreign corporation or does the agent in carrying on the agent's own business sell a contract with the foreign corporation? In the former case, the corporation is and in the latter it

is not carrying on business at that place."

In Okura itself, Buckley L.J. (at p. 721) summarised his reasons for concluding that the defendant corporation was not present in this country as follows:

> "In my opinion the defendants are not 'here' by an alter ego who does business for them here or who is competent to bind them in any way. They are not doing business here by a person but through a person."

At the trial of the present case a number of decisions from the Okura line of authorities were cited to Scott J. He said that Counsel before him had treated the statements of principle to be found in the authorities as applicable equally to both classes of case. While expressing "a little unease" in this context (J.57B) he therefore assumed that the statements of principle applied equally to both classes of case.

Having made this assumption, he extracted the following propositions from the Okura line of cases:

• (1) "The cases establish that jurisdiction on the territorial basis may be taken by an English Court over a foreign company if the foreign company has business premises in England from which or at which its business is carried on" . (J. 50G-51A.)
• (2) "There are, however, cases where residence or presence of a foreign company in England has been held established notwithstanding that the foreign company did not itself own or lease any business premises in England. A feature of these cases has been that the foreign company had a resident English agent who had authority to contract on behalf of and thereby to bind the principal. In these circumstances the presence or residence in England of the agent has been treated as the presence or residence of the foreign company, the principal." (J. 51F-52A.)

• (3) "Trading in a country is insufficient, by the standards of English law, to entitle the courts of the country to take in personam jurisdiction over the trader: see The Littauer Glove Co. case. The trading must be reinforced by some residential feature, be it a branch office or a resident agent with power to contract" . (J.65G-H).

These conclusions as to the law were of critical importance because the learned judge later found as facts (at p. 68B) that the 150 North Wacker Drive offices were N.A.A.C.'s offices and that N.A.A.C. had no authority to contract on behalf of Cape or Capasco or any other company in the Cape Group. He also found as facts (at p. 77B) that C.P.C,, "like N.A.A.C., had no authority to bind Egnep, Casap or any other of the Cape subsidiaries to any contract" and the offices at 150 North Wacker Drive were C.P.C.'s "own offices" .

Mr. Morison did not challenge these particular findings of fact. However, he submitted that Scott J. erred in law in holding that, in cases other than branch office cases, "the trading must be reinforced by … a resident agent with power to contract " . This conclusion, he pointed out, was based primarily on the learned judge's analysis of the Okura line of cases. However, this line of cases, in Mr Morison's submission, while of some relevance and interest, does not provide the correct yardstick to be applied in the present context. Contrary to the suggestion made by Ashworth J. in Vogel , he said, those authorities do not represent the situation truly converse to the enforcement of a foreign judgment; the true converse would be a foreign court applying its own conflict rules, adjudicating on the enforcement of an English judgment. Comity, as Blackburn J. pointed out in Schibsby v. Westenholz , is not the basis on which our courts enforce foreign judgments. Furthermore, the circumstances in which an English court will assume jurisdiction over a foreign corporation are closely bound up with our own rules of procedure which are derived largely from statute or statutory instrument and will be amended from time to time.

Pausing at this point, we would not go so far as to say that in every case one can determine whether a foreign court

was competent at common law on territorial grounds to give a judgment against a corporation merely by ascertaining whether in like circumstances, and mutatis mutandis, our courts would have assumed jurisdiction over a foreign corporation. Nevertheless, enough has been said to demonstrate that in each case the same broad question falls to be answered by the court under our own common law: "Was the corporation present in the relevant jurisdiction at the relevant time?" . In our judgment, Scott J. was fully entitled to derive guidance from the Okura line of cases in deciding whether Cape and Capasco were resident in the U.S.A. at the relevant time.

Mr. Morison went on to submit that in any event the Okura line of cases does not establish a universal rule that in cases where the foreign corporation has no fixed place of business of its own "the trading must be reinforced by … a resident agent with power to contract " . There are, it is true, many dicta which suggest that the existence of power in the agent to bind his principal to contracts, without reference back to the principal, is an important indication that the principal himself is carrying on business by the agent. However, it has apparently never been held that this is an essential feature of "presence" in cases where the corporation has no branch office in this country. Many of the reported cases were concerned with selling agencies, particularly in the shipping field, which were usually not exclusive to the principal concerned. It is therefore hardly surprising, Mr Morison submitted, that the courts concentrated on the question of authority to contract, because the agency was in a real sense carrying on its own agency business. In the present case it is not alleged that N.A.A.C. or C.P.C. had power to enter into sales contracts on behalf of Cape or Capasco. However, it is said, they were carrying out a recognised business activity for the exclusive benefit of Cape and Capasco, that is to say, the function of marketing agents. The question whether N.A.A.C. or C.P.C. were properly to be described as doing their own business or that of their principals was not to be determined by asking whether or not they had authority to contract, but by asking whether they had authority to market and were carrying out this function. Mr. Morison invited us to follow the general approach adopted by the court in two Canadian cases, Miller v. B.C. Turf Ltd. (1969) 8 D.L.R. (3d) 383 and Moore v. Mercator Enterprises Ltd. (1978) 90 D.L.R. , 3rd Ed. 590.

We would agree with Mr. Morison that the existence of a power in the resident agent to bind the foreign corporation to contracts can be neither an exclusive nor conclusive test of the residence of the corporation itself. As he pointed out, there are many cases in which the corporation has been held not to be carrying on business at the agency notwithstanding the existence of authority of this kind: (see for example The Princess Clementine (1897) P. 13 , The Lalandia (1933) P. 56 , The Holstein (1936) 2 A.E.R. 1660 ). Conversely, we can conceive hypothetical cases in which it might be absurd to regard the test as conclusive. If in any given case all other factors indicate that the business carried on by the representative of a corporation in a particular country was clearly the business of the corporation (rather than that of its representative), it could make no difference that the corporation required him to take its instructions before he actually concluded contracts on its behalf; the existence of such a requirement would not by itself prevent the corporation from being present in the country concerned and thus from being amenable to the jurisdiction of its courts.

Nevertheless, it is a striking fact that with one possible exception ( The World Harmony (1967) P. 341 ) in none of the many reported English decisions cited to us has it been held that a corporation has been resident in this country unless either (a) it has a fixed place of business of its own in this country from which it has carried on business through servants or agents, or (b) it has had a representative here who has had the power to bind it by contract and who has carried on business at or from a fixed place of business in this country.

We do not find this surprising as a matter of principle. Indubitably a corporation can carry on business in a foreign country by means of an agent. "It may be stated as a general proposition that whatever a person has power to do himself he may do by means of an agent" : ( Halsbury's Laws of England (4th Edition) Volume 1, para. 703). However, though the terms "agency" and "agent" have in popular use a number of different meanings, "in law the word 'agency' is used to connote the relation[ship] which exists where one person has an authority or capacity to create legal relations between a person occupying the position of principal and third parties": (ibid, para. 701). Where the representative of an overseas corporation has general authority to create contractual relations between

the corporation and third parties and exercises this authority, there may be little difficulty in applying the maxim "qui facit per alium facit per se" . Where no such authority exists, there may be much greater difficulty. We were not persuaded by Mr. Morison's submission, based primarily on a dictum of Verchere J. in Miller v. B.C. Turf Ltd. (supra) (at p. 386), that the capacity (or possible capacity) of N.A.A.C. or C.P.C. to render Cape/Capasco vicariously liable for negligence (and thereby to create relations in tort between them and third parties) is of any weight in deciding whether Cape/Capasco were present in the U.S.A. The mere authority given by Cape/Capasco to N.A.A.C. or C.P.C. to convey a message to a third party could render Cape/ Capasco potentially liable in tort to a third party if that message was carelessly transmitted, The existence of such potential liability would go no way towards establishing the presence of Cape/Capasco in the U.S.A.

**General Principles derived from the authorities relating to the "presence" issue**

In relation to trading corporations, we derive the three following propositions from consideration of the many authorities cited to us relating to the "presence" of an overseas corporation:—

• (1)   The English court will be likely to treat a trading corporation incorporated under the law of one country ("an overseas corporation") as present within the jurisdiction of the courts of another country only if either

• (i)  it has established and maintained at its own expense (whether as owner or lessee) a fixed place of business of its own in the other country and for more than a minimal period of time has carried on its own business at or from such premises by its servants or agents (a "branch office" case), OR
•(ii) a representative of the overseas corporation has for more than a minimal period of time been carrying on the overseas corporation's business in the other country at or from some fixed place of business.

• (2)   In either of these two cases presence can only be established if it can fairly be said that

the overseas corporation's business (whether or not together with the representative's own business) has been transacted at or from the fixed place of business. In the first case, this condition is likely to present few problems. In the second, the question whether the representative has been carrying on the overseas corporation's business or has been doing no more than carry on his own business will necessitate an investigation of the functions which he has been performing and all aspects of the relationship between him and the overseas corporation.
• (3)   In particular, but without prejudice to the generality of the foregoing, the following questions are likely to be relevant on such investigation:

• (a)   whether or not the fixed place of business from which the representative operates was originally acquired for the purpose of enabling him to act on behalf of the over-seas corporation;
• (b)  whether the overseas corporation has directly reimbursed him for

• (i)  the cost of his accommodation at the fixed place of business;
• (ii)  the cost of his staff;

• (c)   what other contributions (if any) the overseas corporation makes to the financing of the business carried on by the representative;
• (d)  whether the representative is remunerated by reference to transactions (e.g. by commission) or by fixed regular payments or in some other way;
• (e)   what degree of control the overseas corporation exercises over the running of the business conducted by the representative;
• (f)   whether the representative reserves (i) part of his accommodation, (ii) part of his staff for conducting business related to the overseas corporation;
• (g)  whether the representative displays the overseas corporation's name at his premises or on his stationery, and if so, whether he does so in such a way as to indicate that he is a representative of the overseas corporation;
• (h)  what business (if any) the representative transacts as principal exclusively on his own behalf;

WESTLAW   © 2017 Thomson Reuters.

• (i)  whether the representative makes contracts with customers or other third parties in the name of the overseas corporation, or otherwise in such manner as to bind it;

• (j)  if so, whether the representative requires specific authority in advance before binding the overseas corporation to contractual obligations.

This list of questions is not exhaustive, and the answer to none of them is necessarily conclusive. If the learned judge (at p. 65G-H of his judgment) was intending to say that in any case, other than a branch office case, the presence of the over-seas company can never be established unless the representative has authority to contract on behalf of and bind the principal, we would regard this proposition as too widely stated. We accept Mr. Morison's submission to this effect. Every case of this character is likely to involve "a nice examination of all the facts and inferences must be drawn from a number of facts adjusted together and contrasted" : ( "La Bourgogne" (1899) P. at p. 18 per Collins L.J.).

Nevertheless, we agree with the general principle stated thus by Pearson J. in F. & K. Jabbur v. Custodian of Absentee Property for the State of Israel (1953) 2 L. Rep. 760 at p. 776 :

> "A corporation resides in a country if it carries on business there at a fixed place of business, and, in the case of an agency, the principal test to be applied in determining whether the corporation is carrying on business at the agency is to ascertain whether the agent has authority to enter into contracts on behalf of the corporation without submitting them to the corporation for approval".

On the authorities, the presence or absence of such authority is clearly regarded as being of great importance

one way or the other. A fortiori the fact that a representative, whether with or without prior approval, never makes contracts in the name of the overseas corporation or otherwise in such manner as to bind it must be a powerful factor pointing against the presence of the overseas corporation.

**The plaintiffs' submissions on the "presence" issue**

Ordinarily the three propositions set out above will fall to be applied in the same way whether or not the representative is an individual or itself a corporate body. However, the present case has the peculiar feature that one of the representatives in the U.S.A., whose acts are relied on as the carrying on of business by Cape, was itself a subsidiary of Cape – a feature which has not been present in any of the directly relevant authorities cited to us. We will make some further observations on the legal relevance (if any) of this feature when we come to consider the second of Mr. Morison's main submissions on the presence issue.

These three main submissions were substantially as follows:

• (1) Cape and Capasco were present and carrying on business in the U.S.A., namely marketing and selling the Cape Group's asbestos, through N.A.A.C. until May 1978, and through C.P.C. (or A.M.C.) until June 1979 from a place of business in Illinois because N.A.A.C. and C.P.C. were the agents of Cape. (We will call this "the agency argument" ).

• (2)  Cape/Capasco and N.A.A.C. constituted a single commercial unit and for jurisdictional purposes, N.A.A.C.'s presence in Illinois therefore sufficed to constitute the presence of Cape/Capasco. Likewise, Cape/Capasco and C.P.C., which performed the same functions as those previously carried on by N.A.A.C., constituted a single economic unit, and C.P.C.'s presence in Illinois sufficed to constitute the presence of Cape/Capasco. (We will call this "the single economic unit argument" ).

• (3)  In relation to C.P.C./A.M.C., the corporate veil should he lifted so that C.P.C.'s and A.M.C.'s presence in the U.S.A. should be treated as the presence of Cape/Capasco. (We will call this

WESTLAW    © 2017 Thomson Reuters.

argument, which does not extend to N.A.A.C., "the corporate veil" argument).

We find it convenient to deal with the second and third of these arguments before coming to the first.

### The "single economic unit" argument

There is no general principle that all companies in a group of companies are to be regarded as one. On the contrary, the fundamental principle is that "each company in a group of companies (a relatively modern concept) is a separate legal entity possessed of separate legal rights and liabilities" : ( The Albazero (1977) A.C. 774 at p. 807 per Roskill L.J.).

It is thus indisputable that each of Cape, Capasco, N.A.A.C. and C.P.C. were in law separate legal entities. Mr. Morison did not go so far as to submit that the very fact of the parent-subsidiary relationship existing between Cape and N.A.A.C. rendered Cape or Capasco present in Illinois. Nevertheless, he submitted that the court will, in appropriate circumstances, ignore the distinction in law between members of a group of companies treating them as one, and that broadly speaking, it will do so whenever it considers that justice so demands. In support of this submission, he referred us to a number of authorities.

In The Roberta (1937) 58 LL. Rep, 159 agents acting on behalf of the Dordtsche Company, had signed bills of lading. It was conceded at the trial that in so doing the agents had made Walford Lines Ltd., the parent company of Dordtsche Company, responsible for the bills of lading. Langton J., who described the concession as properly made, said (at p. 169):

> "The Dordtsche Company are a separate entity from Walford Lines Ltd., in name alone, and probably for the purposes of taxation. Walford Lines Ltd. own all the issued shares of the Dordtsche

Company, and in fact supply two out of the three directors".

In Harold Holdsworth & Co. (Wakefield) Ltd. v. Caddies (1955) 1 W.L.R. 352 (" Holdsworth ") the question arose whether the respondent company, which had entered into a service agreement with Mr. Caddies under which he was appointed managing director of the company, was entitled to require him to devote his whole time to duties in relation to subsidiaries of the company. It was argued that the subsidiary companies were separate legal entities each under the control of its own board of directors, that in law the board of the appellant company could not assign any duties to anyone in relation to the management of the subsidiary companies, and that therefore the agreement could not be construed as entitling them to assign any such duties to Mr. Caddies. Lord Reid, in agreement with the majority, rejected this argument, saying (at p. 367):

> "My Lords, in my judgment this is too technical an argument. This is an agreement in re mercatoria and it must be construed in light of the facts and realities of the situation."

In Scottish Co-operative Wholesale Society Ltd. v. Meyer (1959) A.C. 324 (" Scottish Co-operative ") the respondent based his complaint on section 210 of the Companies Act 1948 , which provided that "any member of a company who complains that the affairs of the company are being conducted in a manner oppressive to some part of the members (including himself) … may make application to the court by petition for an order under this section" . The appellant society had formed a subsidiary company, of which the respondent was a member. It was submitted on behalf of the Society that even if it had acted in an oppressive manner, yet it had not conducted the affairs of the company in an oppressive manner within the meaning of the section. The House of Lords unanimously rejected this submission. Lord Simonds said (at p. 342):

> "My Lords, it may be that the acts of the society of which

complaint is made could not be regarded as conduct of the affairs of the company if the society and the company were bodies wholly independent of each other, competitors in the rayon market, and using against each other such methods of trade warfare as custom permitted. But this is to pursue a false analogy. It is not possible to separate the transactions of the society from those of the company. Every step taken by the latter was determined by the policy of the former."

A little later (at p. 343) Lord Simonds expressly approved words which had been used by Lord President Cooper on the first hearing of the case:

"In my view, the section warrants the court in looking at the business realities of a situation and does not confine them to a narrow legalistic view".

In D.H.N. Food Distributors Ltd. v. Tower Hamlets London Borough Council (1976) 1 W.L.R. 852 ("the D.H.N. case") a group of three companies, "D.H.N." , "Bronze" and "Transport" , all in voluntary liquidation at the relevant time, were seeking compensation under the Land Compensation Act 1961 following a compulsory purchase made by the respondent Council. D.H.N. held all the shares in Bronze and Transport. The business of the group was owned by D.H.N. The land was owned by Bronze. The vehicles were owned by Transport. The Lands Tribunal held that D.H.N. were licensees of Bronze and had no claim to compensation for disturbance beyond that which could be allowed under section 20 of the Compulsory Purchase Act 1965 , which was negligible. This court allowed D.H.N.'s appeal on three separate grounds. We are concerned with only one of them, which Lord Denning N.R. explained (at p. 860) as follows:

"Third, lifting the corporate veil. A further very interesting point was raised by Mr. Dobry on company law. We all know that in many respects a group of companies are treated together for the purpose of general accounts, balance sheet, and profit and loss account. They are treated as one concern. Professor Gower in Modern Company Law, 3rd ed. (1969), p. 216 says:

'there is evidence of a general tendency to ignore the separate legal entities of various companies within a group, and to look instead at the economic entity of the whole group'.

This is especially the case when a parent company owns all the shares of the subsidiaries – so much so that it can control every movement of the subsidiaries. These subsidiaries are bound hand and foot to the parent company and must do just what the parent company says. A striking instance is the decision of the House of Lords in Harold Holdsworth & Co. (Wakefield) Ltd. v. Caddies (1955) L W.L.R 352 . So here. This group is virtually the same as a partnership in which all the three companies are partners. They should not be treated separately so

WESTLAW    © 2017 Thomson Reuters.

as to be defeated on a technical point. They should not be deprived of the compensation which should justly be payable for disturbance. The three companies should, for present purposes, be treated as one, and the parent company D.H.N. should be treated as that one. So D.H.N. are entitled to claim compensation accordingly. If was not necessary for them to go through a conveyancing device to get it".

Goff L.J. (at p. 861) said:

"… this is a case in which one is entitled to look at the realities of the situation and to pierce the corporate veil. I wish to safeguard myself by saying that so far as this ground is concerned, I am relying on the facts of this particular case. I would not at this juncture accept that in every case where one has a group of companies one is entitled to pierce the veil, but in this case the two subsidiaries were both wholly owned, further, they had no separate business operations whatsoever; thirdly, in my judgment, the nature of the question involved is highly relevant, namely, whether the owners of this business have been disturbed in their possession and enjoyment of it".

In [Revlon Inc. v. Cripps & Lee Ltd. (1980) F.S.R. 85](#) the question (among many other questions) arose as to whether the goods in question were "connected in the course of trade with the proprietor … of the trade mark" within the meaning of section 4(3) of the Trade Marks Act 1938 ". The proprietor of the trade mark was Revlon Suisse S.A., a subsidiary of Revlon Inc. Buckley L.J., in the course of deciding that the goods were connected in

the course of trade with Revlon Suisse S.A., said this (at p. 105):

"Since, however, all the relevant companies are wholly owned subsidiaries of Revlon, it is undoubted that the mark is, albeit remotely, an asset of Revlon and its exploitation is for the ultimate benefit of no one but Revlon. It therefore seems to me to be realistic and wholly justifiable to regard Suisse as holding the mark at the disposal of Revlon and for Revlon's benefit. The mark is an asset of the Revlon Group of companies regarded as a whole, which all belongs to Revlon. This view does not, in my opinion, constitute what is sometimes called 'piercing the corporate veil' ; it recognises the legal and factual position resulting from the mutual relationship of the various companies,"

Principally, in reliance on those authorities and the case next to be mentioned, Mr. Morison submitted that in deciding whether a company had rendered itself subject to the jurisdiction of a foreign court it is entirely reasonable to approach the question by reference to "commercial reality" . The risk of litigation in a foreign court, in his submission, is part of the price which those who conduct extensive business activities within the territorial jurisdiction of that court properly have to pay. He invited us to follow the approach of Advocate-General Warner (as he then was) in Institute Chemioterapico Italiano SpA & Commercial Solvents Corporation v. E.C. Commission (1974) C.M.L.R. 309 (" Commercial Solvents ") when considering whether a parent company and subsidiary were separate "undertakings" within the meaning of Articles 85 and 86 of the Treaty of Rome. He said (at pp. 319-320):

"One starts to my mind from this, that neither Article 85 nor Article 86 anywhere refers to

'persons' . In both Articles the relevant prohibitions are directed to 'undertakings' , a much wider and looser concept. This inaeed is what one would expect, because it would be inappropriate to apply rigidly in the sphere of competition law the doctrine referred to by English lawyers as that of Salomon v. Salomon & Co. Ltd . – i.e. the doctrine that every company is a separate legal person that cannot be identified with its members. Basically that doctrine exists in order to preserve the principle of limited liability. It is concerned with the rights of creditors in the context of company law. It has been applied, with more or less happy results, in other spheres, such as those of conveyancing, of contracts and of liability for tort. But to export it blindly into branches of the law where it has little relevance, could, in my opinion, serve only to divorce the law from reality.

Suppose, my Lords, that CSC had traded in Italy through a branch ofice. There could have been no doubt then that it was amenable to the jurisdiction of the Commission and of this Court. Could it have made any difference if CSC has chosen to trade in Italy through a wholly owned subsidiary? The difference would have been one only of legal form, not of reality. Why then should it make any difference that it chose to trade in Italy through a subsidiary that it controlled by a 51 per cent. majority rather than by a 100 per cent. majority? What matters in this field, in my view, is control".

Advocate-General Warner (at p. 321) said:

"(1) that there is a presumption that a subsidiary will act in accordance with the wishes of its parent – because according to common experience subsidiaries generally do so act;

(2) that, unless that presumption is rebutted, it is proper for the parent and the subsidiary to be treated as a single undertaking for the purposes of Article 85 and 86 of the EEC Treaty."

We have some sympathy with Mr. Morison's submissions in this context. To the layman at least the distinction between the case where a company itself trades in a foreign country and the case where it trades in a foreign country through a subsidiary, whose activities it has full power to control, may seem a slender one. Mr. Morison referred us to Bulova Water Company Inc. v. Haltori & Co. 508 F. Supp. 1322 (1981) , where the United States District Court held that it had jurisdiction over a Japanese corporation which was expanding into a new market by setting up subsidiaries and dealing with competition, both on the theory that the corporation was "doing business" in New York and under the New York "long-arm statute" . In the course of his judgment, Chief Justice Weinstein said (at p. 1342):

"these subsidiaries almost by definition are doing for their parent what their parent would otherwise have to do on its own".

It is not surprising that in many cases such as Holdsworth , Scottish Co-operative , Revlon and Commercial Solvents the wording of a particular statute or contract has been held to justify the treatment of parent and subsidiary as one unit, at least for some purposes. The relevant parts of the judgments in D.H.N . must, we think, likewise be regarded as decisions on the relevant statutory provisions for compensation, even though these parts were somewhat

broadly expressed, and the correctness of the decision was doubted by the House of Lords in Woolfson v. Strathclyde Regional Council (" Woolfson ") (1978) S.L.T. 2, 159 in a passage which will be quoted below.

Mr. Morison described the theme of all these cases as being that where legal technicalities would produce injustice in cases involving members of a group of companies, such technicalities should not be allowed to prevail. We do not think that the cases relied on go nearly so far as this. As Sir Godfray submitted, save in cases which turn on the wording of particular statutes or contracts, the court is not free to disregard the principle of Salomon v. Salomon merely because it considers that justice so requires. Our law, for better or worse, recognises the creation of subsidiary companies, which though in one sense the creatures of their parent companies, will nevertheless under the general law fall to be treated as separate legal entities with all the rights and liabilities which would normally attach to separate legal entities.

In deciding whether a company is present in a foreign country by a subsidiary, which is itself present in that country, the court is entitled, indeed bound, to investigate the relationship between the parent and the subsidiary. In particular, that relationship may be relevant in determining whether the subsidiary was acting as the parent's agent and, if so, on what terms. In Firestone v. Llewellyn (1957) 1 W.L.R. 464 (which was referred to by Scott J.) the House of Lords upheld an assessment to tax on the footing that, on the facts, the business both of the parent and subsidiary were carried on by the subsidiary as agent for the parent. However, there is no presumption of any such agency. There is no presumption that the subsidiary is the parent company's alter ego. In the court below the Judge (J.79) refused an invitation to infer that there existed an agency agreement between Cape and N.A.A.C. comparable to that which had previously existed between Cape and Capasco and that refusal is not challenged on this appeal. If a company chooses to arrange the affairs of its group in such a way that the business carried on in a particular foreign country is the business of its subsidiary and not its own, it is, in our judgment, entitled to do so. Neither in this class of case nor in any other class of case is it open to this court to disregard the principle of Salomon v. Salomon merely because it considers it just so to do.

In support of the single commercial unit argument, Mr. Morison made a number of factual submissions to the following effect: The purpose of N.A.A.C.'s creation was that it might act as a medium through which goods of the Cape Group might be sold. The purpose of the liquidation of NA.A.C. was likewise to protect Cape. Any major policy decisions concerning N.A.A.C. were taken by Cape. Cape's control over N.A.A.C. did not depend on corporate form. It exercised the same degree of control both before and after the removal of the Cape directors from the N.A.A.C. board. The functions of N.A.A.C.'s directors were formal only. Dr. Gaze effectively controlled its activities. Cape represented N.A.A.C. to its customers as its office in the U.S.A. In broad terms, it was submitted, Cape ran a single integrated mining division with little regard to corporate formalities as between members of the group in the way in which it carried on its business.

The plaintiffs further submitted in their notice of appeal that N.A.A.C. "did not deal and was not permitted to deal with Egnep or Casap, but had to go through Cape or Capasco." It seems clear that N.A.A.C., as principal, made direct purchases of raw asbestos from Egnep. On the balance of probabilities, we accept the plaintiffs' submission that it made similar direct purchases from Casap: (see our observations under item (4) of the Appendix). In referring to the absence of dealing with Egnep or Casap, the plaintiffs were, we understand, intending to submit that as a matter of Group policy, which Cape could and did enforce by its power of control over the boards of Egnep, Capasco and N.A.A.C., the transmission of information and orders to or from customers had to be effected and was effected by N.A.A.C. through Capasco. We accept that submission. We also accept that the matters referred to in this paragraph lend some broad support to the submission that Cape ran a single integrated mining division with little regard to corporate formalities as between members of the Group. However, there has been no challenge to the judge's finding that the corporate forms applicable to N.A.A.C. as a separate legal entity were observed.

As to the plaintiffs' other factual submissions in this context we will deal with the purpose of N.A.A.C.'s creation and existence in considering the "agency"

argument. As to the relationship between Cape and N.A.A.C., it is of the very nature of a parent company-subsidiary relationship that the parent company is in a position, if it wishes, to exercise overall control over the general policy of the subsidiary. The plaintiffs, however, submitted that Cape's control extended to the day-to-day running of N.A.A.C. They challenged the finding of fact made by Scott J. that "Mr. Morgan was in executive control of N.A.A.C.'s conduct of its business" . We explore further the facts relative to this finding and to the extent of Cape's control over N.A.A.C.'s activities in the Appendix to this judgment under items (11), (12) and (13). Our conclusion, shortly stated, is that the finding was justified by the evidence. A degree of overall supervision, and to some extent control, was exercised by Cape over N.A.A.C. as is common in the case of any parent-subsidiary relationship – to a large extent through Dr. Gaze. In particular, Cape would indicate to N.A.A.C. the maximum level of expenditure which it should incur and would supervise the level of expenses incurred by Mr. Morgan. Mr. Morgan knew that he had to defer in carrying out the business activities of N.A.A.C. to the policy requirements of Cape as the controlling shareholders of N.A.A.C. Within these policy limits, such as Cape's requirement that N.A.A.C.'s orders for asbestos for sale by NA.A.C. in the U.S.A. be placed through Capasco on behalf of Egnep and Casap, the day-to-day running of N.A.A.C. was left to him. There is no challenge to the judge's findings that –

• (a)  the corporate financial control exercised by Cape over N.A.A.C. in respect of the level of dividends and the level of permitted borrowing was no more and no less than was to be expected in a group of companies such as the Cape Group (J. 61);
• (b)  the annual accounts of N.A.A.C. were drawn on the footing that N.A.A.C.'s business was its own business and there was nothing to suggest that the accounts were drawn on a false footing (J. 70).

In the light of the set-up and operations of the Cape Group and of the relationship between Cape/Capasco and N.A.A.C. we see the attraction of the approach adopted by Lord Denning M.R. in the D.H.N. case (1976) 1 W.L.R. at p. 860 which Mr. Morison urged us to adopt:

"This group is virtually the same as a partnership in which all the three partners are companies,"

In our judgment, however, we have no discretion to reject the distinction between the members of the group as a technical point. We agree with Scott J. that the observations of Robert Goff L.J. in Bank of Tokyo Ltd. v. Karoon (1987) A.C. 45 (at p. 64) are apposite:

"(Counsel) suggested beguilingly that it would be technical for us to distinguish between parent and subsidiary company in this context; economically he said they were one. But we are concerned not with economics but with law. The distinction between the two is in law fundamental and cannot be bridged".

As to C.P.C., in Mr. Morison's submission, the replacement of N.A.A.C. by C.P.C. was simply a substitute arrangement. The creation of C.P.C. was effected and paid for by Cape so that it could perform the same functions on behalf of Cape as N.A.A.C. had previously performed. C.P.C., on behalf of A.M.C. (and thus Cape) made payment arrangements with third parties and received moneys for A.M.C. (Cape). While Mr. Morgan held all the shares in CPC for his own benefit, the rights of pre-emption reserved to A.M.C. by the agency agreement of 5th June 1978 left him with little substantial financial interest in C.P.C.'s business, save for the office furniture and a right to an account which would be of little value; effectively, it was submitted, C.P.C.'s business was owned by A.M.C. (Cape).

Our reasons for rejecting the "single economic unit" argument in relation to N.A.A.C. apply a fortiori in relation to C.P.C., because C.P.C. was not Cape's subsidiary and its shares were held by Mr. Morgan for his own benefit. We give our reasons in the next section of this

judgment for agreeing with the judge that C.P.C. was an independently owned company.

**The "corporate veil" point**

Quite apart from cases where statute or contract permits a broad interpretation to be given to references to members of a group of companies, there is one well-recognised exception to the rule prohibiting the piercing of "the corporate veil". Lord Keith of Kinkel referred to this principle in Woolfson v. Strathclyde Regional Council (1978) S.L.T. 159 (" Woolfson ") in the course of a speech with which Lord Wilberforce, Lord Fraser of Tullybelton and Lord Russell of Killowen agreed. With reference to the D.H.N. decision he said (at p. 161):

> "I have some doubts whether in this respect the Court of Appeal properly applied the principle that it is appropriate to pierce the corporate veil only where special circumstances exist indicating that it is a mere facade concealing the true facts."

The only allegation of a facade in the plaintiffs' pleadings was that the formation and use of C. P.C. and A.M.C. in the "alternative marketing arrangements of 1978 were a device or sham or cloak for grave impropriety on the part of Cape or Capasco, namely to ostensibly remove their assets from the U.S.A. to avoid liability for asbestos claims whilst at the same time continuing to trade in asbestos there". In their notice of appeal (paragraph 2 (b)) the plaintiffs referred to their contention made at the trial that C.P.C. "was set up to replace N.A.A.C. in such a way as to disguise the defendants' continued involvement in the marketing of the Group's asbestos in the U.S.A.".

Scott J. more or less accepted this contention. He found as a fact that "the arrangements made regarding N.A.A.C., A.M.C. and C.P.C. were part of one composite arrangement designed to enable Cape asbestos to continue to be sold into the United States while reducing, if not

eliminating, the appearance of any involvement therein of Cape or its subsidiaries".

However, he went on to say (at p. 71B-D):

> "But the question whether C.P.C.'s presence in Illinois can, for jurisdiction purposes, be treated as Cape's presence, must, in my view, be answered by considering the nature of the arrangements that were implemented, not the motive behind them. The documentary evidence I have seen has made clear that the senior management of Cape, including Mr. Penna, were very anxious that Cape's connections with C.P.C. and with A.M.C. should not become publicly known. Some of the letters and memoranda have a somewhat conspiratorial flavour to them. But this too, although interesting to notice, is not, in my opinion, relevant to the main question."

If and so far as the learned judge intended to say that the motive behind the new arrangements was irrelevant as a matter of law, we would respectfully differ from him. In our judgment, as Mr. Morison submitted, whenever a device or sham or cloak is alleged in cases such as this, the motive of the alleged perpetrator must be legally relevant, and indeed this no doubt is the reason why the question of motive was examined extensively at the trial. The decision in Jones v. Lipman (1962) 1 W.L.R. 832 referred to below was one case where the proven motive of the individual defendant clearly had a significant effect on the decision of Russell J.

The judge's finding of fact quoted above as to the motives of Cape behind the new arrangements is accepted (no doubt welcomed) by the plaintiffs, so far as it goes. They submit, rightly in our judgment, that any such motives are

relevant to the "corporate veil" point. They further submit that the learned judge

- (a)  erred in concluding that C.P.C. was an "independently owned company" ; and
- (b)  failed to make a number of findings of fact which are relevant in the context of the "corporate veil" point.

Mr. Morison has taken us through the arrangements which led to the extinction of N.A.A.C. and the emergence of A.M.C. and the C.P.C. with care and in considerable detail. The additional facts which the appellants say the learned judge ought to have found, and which are set out in paragraphs (16) to (25) of the Appendix to this judgment, all relate to these arrangements. It is true that, as the judge said, some of the letters and memoranda have a "somewhat conspiratorial flavour to them" . Since, contrary to the judge's view, we think motive is relevant in this context, we have thought it right to investigate these contentions in some detail in the Appendix.

On analysis, much of the new naterial does little more than amply support the judge's finding quoted above as to the purpose of the composite arrangement. In this court Mr. Morison made it clear that the plaintiffs were not alleging any unlawful purpose or impropriety on the part of Cape in the sense of any intention to deceive or to do any unlawful act, either in Illinois or in this country. It was, however, asserted for the plaintiffs that A.M.C. and C.P.C. together constituted a façade which concealed the real activities of Cape. We understand that to mean that the purpose bf Cape was to conceal, so far as it lawfully could having regard to the requirements of the law in Illinois and this country, any connection of Cape with A.M.C. or C.P.C.

Before expressing our own views as to Cape's purpose, we will state our conclusions as to Mr. Morgan's position. It is, in our judgment, right to infer, substantially as submitted by Mr. Morison, that the assistance derived from the presence of Mr. Morgan in Illinois, undertaking the task through C.P.C. of marketing agent for the Cape subsidiaries in the United States, was regarded as being at least of great importance to the general purposes of the

Cape Group, and possibly essential for those purposes, because, if it was not so regarded, there is no apparent reason why Cape should assume the cost and such risk as might have arisen from setting up C.P.C. Sir Godfray, however, was in our view plainly right in submitting that the agreement of Mr. Morgan was required for the creation of the alternative marketing arrangements by means of a new independent Illinois company and that his agreement, when given, was real. Cape had obligations of a moral nature to Mr. Morgan and to the long serving staff of N.A.A.C. Cape also, for its own purposes, wanted Mr. Morgan and Mrs. Holtze to continue with the work previously done by them for N.A.A.C. If Mr. Morgan decided to take on the task of providing services to the subsidiaries of the Cape Group through C. P.C., on the terms available to him as owner of the shares in C.P.C., Cape would get the benefit of his knowledge and experience as the person in charge of C.P.C. Nothing in the material to which our attention was drawn under these headings, however, causes us to doubt the correctness of Scott J.'s conclusion that the shares in C.P.C. belonged both at law and in equity to Mr. Morgan. It is clear that Cape intended C.P.C. to be in reality Mr. Morgan's company because that was part of their purpose. Such as it was, and dependent for almost all of its business on the Cape subsidiaries, C.P.C. was Mr. Morgan's company. We therefore reject the challenge to the judge's finding that C.P.C. was an independently owned company.

As to Cape's purpose in making the arrangements for the liquidation of N.A.A.C. and the creation of A.M.C. and C.P.C., we think that the extracts from the evidence set out in the Appendix to this judgment (particularly under item (17) ), sufficiently reveal both the substance of what the officers of Cape were doing and what they were trying to achieve. The allegation of impropriety was, in our view, rightly abandoned. The inference which we draw from all the evidence was that Cape's intention was to enable sales of asbestos from the South African subsidiaries to continue to be made in the United States while (a) reducing the appearance of any involvement therein of Cape or its subsidiaries, and (b) reducing by any lawful means available to it the risk of any subsidiary or of Cape as parent company being held liable for U.S. taxation or subject to the jurisdiction of the U.S. courts, whether State or Federal, and the risk of any default judgment by such a court being held to be enforceable in

this country. Inference (a) was also made by the learned judge. Inference (b) is our own addition.

The question of law which we now have to consider is whether the arrangements regarding N.A.A.C., A.M.C. and C.P.C. made by Cape with the intentions which we have inferred constituted a façade such as to justify the lifting of the corporate veil so as that C.P.C.'s and A.M.C.'s presence in the U.S.A. should be treated as the presence of Cape/Capasco for this reason if no other.

In Merchandise Transport Ltd. v. British Transport Commission (1962) 2 Q.B. 173 Danckwerts L.J. (at p. 206-207) referred to certain authorities as showing that

> "where the character of a company, or the nature of the persons who control it, is a relevant feature the court will go behind the mere status of the company as a legal entity, and will consider who are the persons as shareholders or even as agents who direct and control the activities of a company which is incapable of doing anything without human assistance."

The correctness of this statement has not been disputed, but it does not assist in determining whether "the character of a company or the nature of the persons who control it" will be relevant in the present case.

Rather greater assistance on this point is to be found in Jones v. Lipman (1962) 1 W.L.R. 832 . In that case the first defendant had agreed to sell to the plaintiffs some land. Pending completion the first defendant sold and transferred the land to the defendant company. The evidence showed that this company was at all material times under the complete control of the first defendant. It also showed that the acquisition by him of the company and the transfer of the land to the company had been carried through solely for the purpose of defeating the plaintiff's right to specific performance (see at p. 836). Russell J. made an order for specific performance against

both defendants. He held that specific performance cannot be resisted by a vendor who, by his absolute ownership and control of a limited company in which the property is vested, is in a position to cause the contract to be completed. As to the defendant company, he described it (at p. 836) as being "the creature of the first defendant, a device and a sham, a mask which he holds before his face in an attempt to avoid recognition by the eye of equity" . Following Jones v. Lipman , we agree with Mr. Morison that, contrary to the learned judge's view, where a façade is alleged, the motive of the perpetrator may be highly material.

Other cases were cited to us in which the court, on interlocutory applications, has to a greater or lesser extent been prepared to look behind the corporate veil and have regard to the persons ultimately interested in a company under a group's company structure. For example, it did so in exercising its Mareva injunction in X Bank Ltd. v. G. (1985) Law Society's Gazette p. 2016 and in considering stays of execution in Canada Enterprises Corporation Ltd. v. MacNab Distillers Ltd. (1987) 1 W.L.R. 813 and Burnet v. Francis Industries PLC (1987) 1 W.L.R. 802 . The two last-mentioned decisions contain no statement of relevant principle and the report of X. Bank Ltd. v. G. is so brief that we think it would not be safe to rely on it for present purposes.

We were referred to certain broad dicta of Lord Denning M.R. in Wallersteiner v. Moir (1974) 1 W.L.R. 991 at p. 1013 , and in Littlewoods Mail Order Ltd. v. I.P.C. (1969) 1 W.L.R. 1241 at p. 1254 . In both these cases he expressed his willingness to pull aside the corporate veil, saying in the latter:

> "I decline to treat the [subsidiary] as a separate and independent legal entity … The courts can and often do draw aside the veil. They can, and often do, pull off the mask. They look to see what really lies behind. The legislature has shown the way with group accounts and the rest. And the courts should follow suit, I think that we should look at the Fork Manufacturing Co. Ltd. and see it as it really is – the wholly-

owned subsidiary of Littlewoods. It is the creature, the puppet, of Littlewoods, in point of fact: and it should be so regarded in point of law."

However, in Wallersteiner v. Moir (supra) Buckley L.J. at p. 127 and Scarman L.J. (at p. 1032) expressly declined to tear away the corporate veil. In Littlewoods, Sachs L.J. (at p. 1255) expressly dissociated himself from the suggestion that the subsidiary was not a separate legal entity and Karminski L.J. refrained from associating himself with it. We therefore think that the plaintiffs can derive little support from those dicta of Lord Denning M.R.

From the authorities cited to us we are left with rather sparse guidance as to the principles which should guide the court in determining whether or not the arrangements of a corporate group involve a façade within the meaning of that word as used by the House of Lords in Woolfson . We will not attempt a comprehensive definition of those principles.

Our conclusions are these. In our judgment, the interposition of A.M.C. between Cape and C.P.C. was clearly a facade in the relevant sense. Scott J. (J. pp. 71H-72A) said it seemed clear that A.M.C. was "no more than a corporate name" and that he would expect to find, if all the relevant documents were available, that "A.M.C. acted through employees or officers of either Casap or Egnep" . He rejected (p. 76A) Mr. Morgan's evidence that he understood A.M.C. to be an independent South African trading company, and was satisfied that he knew very well that it was a "creature of Cape" . "The seller in C.P.C.'s time was, nominally, A.M.C. but in reality still, I think, Egnep or Casap" : (p. 77A). In our judgment, however, the revelation of A.M.C. as the creature of Cape does not suffice to enable the plaintiffs to show the presence of Cape/Capasco in the U.S.A., since on the judge's undisputed findings, A.M.C. was not in reality carrying on any business in the U.S.A.

The relationship between Cape/Capasco and C.P.C . is the crucial factor, since C.P.C. was undoubtedly carrying

on business in the U.S.A. We have already indicated our acceptance of the judge's findings that C.P.C. was a company independently owned by Mr. Morgan and that the shares therein belonged to him in law and in equity. These findings by themselves make it very difficult to contend that the operation of C.P.C. involved a façade which entitles the court to pierce the corporate veil between C.P.C. and Cape/Capasco and treat them all as one. Is the: legal position altered by the facts that Cape's intention, in making the relevant arrangements (as we infer), was to enable sales of asbestos from the South African subsidiaries to be made while (a) reducing if not eliminating the appearance of any involvement therein of Cape or its subsidiaries, and (b) reducing by any lawful means available to it the risk of any subsidiary or of Cape as parent company being held liable for U.S. taxation or subject to the jurisdiction of the U.S. courts and the risk of any default judgment by such a court being held to be enforceable in this country?

We think not. Mr. Morison submitted that the court will lift the corporate veil where a defendant by the device of a corporate structure attempts to evade (i) limitations imposed on his conduct by law; (ii) such rights of relief against him as third parties already possess; and (iii) such rights of relief as third parties may in the future acquire. Assuming that the first and second of these three conditions will suffice in law to justify such a course, neither of them apply in the present case. It is not suggested that the arrangements involved any actual or potential illegality or were intended to deprive anyone of their existing rights. Whether or not such a course deserves moral approval, there was nothing illegal as such in Cape arranging its affairs (whether by the use of subsidiaries or otherwise) so as to attract the minimum publicity to its involvement in the sale of Cape asbestos in the U.S.A. As to condition (iii), we do not accept as a matter of law that the court is entitled to lift the corporate veil as against a defendant company which is the member of a corporate group merely because the corporate structure has been used so as to ensure that the legal liability (if any) in respect of particular future activities of the group (and correspondingly the risk of enforcement of that liability) will fall on another member of the Group rather than the defendant company. Whether or not this is desirable, the right to use a corporate structure in this manner is inherent in our corporate law. Mr. Morison urged on us that the purpose of the operation was in substance

that Cape would have the practical benefit of the Group's asbestos trade in the U.S.A, without the risks of tortious liability. This may be so. However, in our judgment, Cape was in law entitled to organise the Group's affairs in that manner and (save in the case of A.M.C. to which special considerations apply) to expect that the court would apply the principle of Salomon v. Salomon in the ordinary way.

The plaintiffs submitted (para. 7 of their notice of appeal) that the motive of the defendants in setting up the arrangements regarding N.A.A.C., A.M.C. and C.P.C. as revealed in the documentary evidence were "consistent only with an acceptance by Cape that they were present in the United States through N.A.A.C. and C.P.C." We think there is no substance in this point. These arrangements at most indicated an apprehension on the part of the defendants that they might be held to be so present and a desire that they should not be. They involved no admission or acceptance of such presence.

We reject the "corporate veil" argument.

**The "agency argument" in relation to N.A.A.C.**

We now proceed to consider the agency argument in relation to N.A.A.C. on the footing, which we consider to be the correct one, that N.A.A.C. must for all relevant purposes be regarded as a legal entity separate from Cape/Capasco. In an earlier section of this judgment we summarised three propositions which we derived from the authorities relating to the "presence" of an overseas corporation. There we stated that, save in a "branch office" case (which the instant case is not), the English court will be likely to treat an overseas trading corporation as present within the jurisdiction of the courts of another country only if a representative of the overseas corporation has for more than a minimal period of time been carrying on the overseas corporation's business in the other country at or from some fixed place of business. In the present case N.A.A.C., as representative of Cape/ Capasco, unquestionably carried on business at a fixed place of business in the U.S.A., 150 North Wacker Drive, for a substantial period of time. So no difficulty arises on that score. The crucial question is whether it can fairly be said that Cape's business has been transacted by N.A.A.C. at or from 150 North Wacker Drive. The judge's answer

to it was that "N.A.A.C.'s business was its own business and not the business of Cape or Capasco" : (J. 68C). The plaintiffs challenge the correctness of this answer to the question.

This question, as we said earlier, will necessitate an investigation of the functions which N.A.A.C. performed and all aspects of the relationship between it and Cape.

The factual material which we have principally in mind in considering whether Cape's business was being transacted at or from 150 North Wacker Drive is to be found in the section of this judgment headed "The facts on 'presence' as found by Scott J.", and in our observations on items (1) to (13) in the Appendix to this judgment. We summarise below what we consider the most material facts in context, having regard to the list of potentially relevant factors set out in an earlier section of our judgment.

We accept that the intention of Cape in procuring the incorporation of N.A.A.C. in the State of Illinois was that N.A.A.C. should assist in the marketing of asbestos in the U.S.A upon sales by Egnep or Casap to purchasers in the U.S.A. and that it was to be the marketing agent of the Cape Group in the U.S.A. Nevertheless, in our judgment, it is indisputable that at very least a substantial part of the business carried on by N.A.A.C. at all material times was in every sense its own business. In these contexts we draw attention in particular to the following facts:

• (1)  Though we were referred to no evidence relating to the original acquisition by N.A.A.C. of its premises at 150 North Wacker Drive, we know that N.A.A.C. itself was the lessee of the premises and paid the rent for them. Furthermore, it owned the office furniture and employed there its own staff of 4 persons for whom it ran its own pension scheme.

• (2)  From time to time it conducted the following activities as principal on its own account:–

• (a)  it bought asbestos from U.S. Government Stocks or from Egnep or Casap and sold it to U.S. customers, such purchases representing about 25% of N.A.A.C.'s business in terms of tonnage;

• (b) it imported asbestos goods from Japan and sold them to U.S. customers.

•(While we accept that the purchase by N.A.A.C. of asbestos goods was subordinate to its business with or for Cape's subsidiaries, we do not accept the plaintiffs' submission that such sales were trivial, having regard to the turnover of N.A.A.C: (see our observations under item (5) in the Appendix.)

• (3) For storing the asbestos which it had purchased from U.S. Government stocks or Egnep or Casap, N.A.A.C. rented in its own name and paid for warehousing facilities.

• (4) N.A.A.C. earned profits and paid U.S. taxes thereon.

• (5) N.A.A.C.'s creditors and debtors were its own (not those of Cape.)

• (6) The return to Cape as N.A.A.C.'s shareholder took the form of an annual dividend passed by a resolution of N.A.A.C.'s Board of Directors.

• (7) In other respects also the corporate forms applicable to N.A.A.C. as a separate entity were observed.

In the face of these facts, now unchallenged, it is in our judgment clear beyond argument that N.A.A.C. was carrying on business of its own. The only question is whether, in performing the functions which it performed on behalf of Cape/Capasco, it was carrying on its own business or their business. What, then, were these functions? As we see the position from the findings of the judge and the evidence put before us, its functions were to assist in the marketing of asbestos in the U.S.A. upon sales by Egnep or Casap and generally to assist and encourage sales in the U.S.A. of asbestos of the Cape Group. It acted as the channel of communication between Cape/Capasco and U.S. customers, such as P.C.C. It organised and arranged the performance of contracts between U.S. customers and Egnep. It had a co-ordinating role, particularly in arranging delivery. The U.S. customer would specify to N.A.A.C. from time to time the quantity of asbestos which it wished to purchase and the time when it desired delivery to be made. This information would be conveyed through N.A.A.C. to Casap and Egnep. Shipping arrangements and delivery dates would be arranged by Casap or Egnep and communicated to the U.S. customers via N.A.A.C. N.A.A.C. would receive

documents and pass them on to the customers. It also received requests and complaints which it would normally pass on to Capasco. Generally it assisted in "nursing" the Group's customers for asbestos and ensuring that they were satisfied. For its services N.A.A.C. was remunerated by way of a commission paid to it by Casap on sales effected by Egnep or Casap. There was no evidence that N.A.A.C. reserved any part of its office premises or any part of its staff exclusively for performing its agency functions.

Our further findings as to the functions which N.A.A.C. performed and as to its relationship between N.A.A.C. and Cape are to be found set out in the Appendix under items (1) to (3). We bear in mind particularly the submissions contained in item (9) that (i) when corresponding with U.S. customers, Cape referred to N.A.A.C. as "our Chicago office" and N.A.A.C. referred to Cape and Capasco as "our London office" ; (ii) N.A.A.C. held itself out to a large U.S. customer as being part of the Cape selling organisation, and (iii) N.A.A.C. was treated by the major customer "as the channel between them and Cape and Capasco" . However, in the Appendix we give our reasons for concluding that the matters shown in the evidence considered under this heading do not by themselves show anything inconsistent with the findings of Scott J. as to N.A.A.C.'s role and functions.

There is no doubt that the services rendered by N.A.A.C. in acting as intermediary in respect of contracts between the U.S. customers and Egnep or Casap were active and important services which were of great assistance to Cape/Capasco in arranging the sales of their Group's asbestos in the U.S.A. Nevertheless, for all the closeness of the relationship between Cape/Capasco and N.A.A.C., strictly defined limits were imposed on the functions which N.A.A.C. were authorised to carry out or did carry out as their representative. First, N.A.A.C. had no general authority to bind Cape/Capasco to any contractual obligation. Secondly, as Mr. Morison expressly accepted, there is no evidence that N.A.A.C., whether with or without prior authority from Cape/Capasco, ever effected any transaction in such manner that Cape/Capasco thereby became subject to contractual obligations to any person. This significant factor renders the arguments in favour of "presence" , at least in some respects, even less

strong than they were in cases such as The Lalandia (1933) P. 56 and The Holstein (1936) 2 A.E.R. 1660 where the argument failed. Having regard to the legal principles stated earlier in this judgment, and looking at the facts of the case overall, our conclusion is that the judge was right to hold that the business carried on by N.A.A.C. was exclusively its own business, not the business of Cape or Capasco, and that Cape and Capasco were not present within the U.S.A. through N.A.A.C. at any material time. We see no sufficient grounds for disturbing this finding of fact.

Under this section of our judgment we should mention one further point. The plaintiffs challenged the judge's finding that as from 31st Jamuary 1978, N.A.A.C. ceased to act on behalf of any of the Cape companies or to carry on any business on its own account save for the purpose of liquidating its assets. The object of the challenge was to refute the suggestion that Cape could not be regarded as present in the U.S.A. through N.A.A.C. during the period between 31st January 1978 and N.A.A.C.'s formal dissolution on 19th May 1978. (They accepted that after 19th May Cape could not be said to be present in the U.S.A, by or through N.A.A.C.). The plaintiffs regard this point as having potential legal relevance, since two of the eight actions which comprise Tyler II were begun before 18th May 1978. In the Appendix (under item (19)) we give our reasons for rejecting the challenge to the judge's finding of fact.

**The agency argument in relation to C.P.C.**

We now consider whether Cape/Capasco were present in the U.S.A. by or through C.P.C. In dealing with the "corporate veil" point we have stated our inferences as to Cape's purpose in making the arrangements for the liquidation of N.A.A.C. and the creation of A.M.C. and C.P.C. Part of the very purpose of these arrangements was to enable sales of asbestos from the Cape Group to continue to he made in the U.S.A. while creating a greater distance both in appearance and reality between Cape and the company (C.P.C.) which was intended to carry out the functions on its behalf in the U.S.A. which had previously been carried out by N.A.A.C. Having dealt with the "corporate veil" point, we agree with the following passage in Scott J.'s judgment (pp. 76F-77B):

"I do not think, on analysis, that the plaintiffs' case is any stronger than their case regarding N.A.A.C. If anything, I think the case is weaker. N.A.A.C. was at least a wholly owned subsidiary. C.P.C., even if incorporated and launched with Cape money, was, on my reading of the facts, an independently owned company. Like N.A.A.C., C.P.C. acted as agent for the purpose of facilitating the sale in the U.S. of Cape's asbestos. The seller of the asbestos in NA.A.C.'s time was Egnep or Casap. The seller in C.P.C.'s time was, nominally, A.M.C. but, in reality, still, I think, Egnep or Casap. C.P.C., like N.A.A.C., had no authority to bind Egnep, Casap or any other of the Cape subsidiaries to any contract, C.P.C., like N.A.A.C., carried on its own business from its own offices at 150 North Wacker Drive. The provision by Cape of the $160,000 as a starting-up fund does not make the offices Cape's offices or the business Cape's business."

The interposition of A.M.C. in the new arrangements made in 1978 cannot one way or the other affect the question whether Cape/Capasco were present in the U.S.A. thereafter. For all relevant purposes, as we have already indicated, we are prepared to treat Cape and A.M.C. as one. The functions performed by C.P.C. and its relationship with Cape through A.M.C. are the relevant considerations for present purposes. Since Mr. Morgan held all the shares in C.P.C., beneficially Cape had no control as a shareholder over the activities of C.P.C. similar to the control which it had exercised over N.A.A.C. Mr. Morison did not dispute the judge's finding that the terms of the agency agreement of 5th June 1978 were a reliable guide to the nature of the relationship between C.P.C. and A.M.C. and hence between C.P.C. and Cape. Under the terms of this agreement, C.P.C.

werelt free to sell materials and products other than
asbestos fibre and to involve itself in other commercial
activities. It is clear that it did so. While there is
no evidence that it followed N.A.A.C. in buying raw
asbestos from Egnep or Casap or the U.S. Government,
it undoubtedly bought and sold manufactured textiles on
its own behalf as principal.

It is thus quite plain that at least a substantial part of
C.P.C.'s business was in every sense its own business.
As with N.A.A.C., the only question is whether, in
performing the functions which it performed on behalf
of Cape/Capasco, it was carrying on its own business
or their business. As the terms of the agency agreement
show, these functions were very similar to those which
had been performed by N.A.A.C. The services rendered
by C.P.C. to Cape /Capasco were similarly active and
important. Again, however, strictly defined limits were
imposed on the functions which C.P.C. was authorised to
carry out or did carry out as the representative of Cape/
Capasco (through A.M.C.). C.P.C. had no authority to
bind A.M.C. or Cape or Capasco to any contractual
obligation. Again too, there is no evidence that C.P.C.,
whether with or without prior authority from any of
those three companies, ever carried out any transaction
in such manner as to subject any of them to contractual
obligations to any person. In the light of the legal
principles stated above and of the facts of the case
looked at as a whole, we see no sufficient grounds for
disturbing the judge's finding that the business carried
on by C.P.C. was exclusively its own business and that Cape
and Capasco were not present within the U.S.A through
C.P.C. (or A.M.C.) at any material time.

Under this heading, we refer to one further matter. The
plaintiffs, on the evidence of Mr. Summerfield, (that in
August 1984 A.M.C.'s name was given as one of the
occupants of the offices on the 12th floor at 150 North
Wacker Drive) invited us to infer that A.M.C. had their
plate up on those offices in 1978/79. Scott J. declined to
draw any such inference. In our judgment, he was right
to do so for the reasons given in the next section of this
judgment dealing with burden of proof and under item
(25) in the Appendix.

**The onus of proof**

The plaintiffs submitted to Scott J. that the onus was on
Cape to establish that it was not resident in the U.S.A.
and that he should hold that the defendants had failed
to discharge that onus. He rejected that argument (J. 78)
saying:

> "The plaintiffs sue Cape on a
> judgment given by a United
> States court. The judgment is
> an apparently regular one. Cape
> disputes jurisdiction on the ground
> that it is a foreign company with
> no place of business in the United
> States. The plaintiffs' answer is to
> assert that the presence in the United
> States of N.A.A.C. and C.P.C. is
> to be treated as Cape's presence.
> But each of N.A.A.C. and C.P.C. is
> in law an individual legal persona.
> A contention that the presence
> in the U.S. of either is to be
> treated as the presence of Cape
> requires, in my opinion, he who so
> contends to establish facts sufficient
> to support the contention. This, in
> my judgment, the plaintiffs have
> failed to do."

Mr. Morison submitted that the judge misdirected himself
as to the burden of proof. A foreign judgment, in his
submission, prima facie gives rise to a legal obligation on
the part of the defendant to obey the judgment and is
thus prima facie enforceable in England. In support of this
submission he invoked Dicey & Morris , where it is said
(Volume 1 at p. 465):

> "the statement of claim in an action
> upon such a judgment need not
> specifically assert that the foreign
> court was competent in terms either
> of the foreign law or of the English
> rules of conflict of laws, though it is
> usual to insert an allegation of this
> sort."

Adams v Cape Industries Plc, 1989 WL 651250 (1989)

We agree that generally no specific assertion need be made that the foreign court was competent in terms of the foreign law , not because of any question of burden of proof, but because such assertion is irrelevant. As is stated in Dicey & Morris (Volume 1 at pp. 464-465) a foreign judgment cannot, in general, be impeached on the ground that the court which gave it was not competent to do so according to the law of the foreign country concerned.

However, as all the authorities show, it is only the judgment of a foreign court recognised as competent by English law which will give rise to an obligation on the part of the defendant to obey it. As a matter of principle it seems to us that in the first place the onus must fall on the plaintiff seeking to enforce the judgment of a foreign court to prove the competence (in this sense) of such court to assume jurisdiction over him. None of the authorities cited to us establish the contrary.

No doubt, in any case, the evidentiary burden may shift at the trial. However, we agree with the judge that the presence of A.M.C.'s name on a notice board at the office at 150 North Wacker Drive in 1984 did not give rise to any presumption that it had been there in 1979.

More generally we should state that if, contrary to our view, the onus fell on the defendants to disprove the competence of the Tyler Court to give judgment against it, they have discharged that onus by showing that they were not "present" in any part of the U.S.A, at the time of commencement of the various suits between April 1978 and November 1979.

This conclusion as to the presence issue means that this appeal must fail on this account if no other. However, for reasons already stated, and in case our conclusion on the "presence" issue is wrong, we think it right to proceed to consider the "country" issue and the "natural justice" issue. (As to the latter issue, there is no dispute that the onus of proof falls on the defendants).

Crown copyright

© 2017 Sweet & Maxwell

1989 WL 651250

End of Document                                     © 2017 Thomson Reuters.

# TAB 2

*290  **The Canada Trust Company**
**v. Wolfgang Otto Stolzenberg**

Before the English Court of Appeal [1]
29 October 1997

**[1998] I.L.Pr. 290**

(Nourse, Pill and Waller L.JJ.)
29 October 1997

**Analysis**

On appeal from the High Court, Chancery Division (Rattee J.)

EFTA Judgments Convention (Lugano) 1988. Interpretation. Where the E.C. Judgments (Brussels) and EFTA Judgments Conventions (Lugano) are in identical terms the English court must follow the interpretation of the E.C. Judgments Convention by the European Court when interpreting the EFTA Judgments Convention. [6], [39], [56]

Jurisdiction. EFTA Judgments Convention (Lugano) 1988. Domicile of a defendant. Standard of proof. "Good arguable case" is the appropriate standard of proof to apply to the question whether a defendant is domiciled in England on an application under R.S.C. Ord. 12, r. 8 involving issues arising under Article 6 of the Convention. [38], [57]

Jurisdiction. EFTA Judgments Convention (Lugano) 1988. Domicile of a defendant. Relevant date. The correct date for determining whether or not a defendant is domiciled in England for the purposes of determining whether the court has jurisdiction under Article 6 of the Convention, is the date of issue of the proceedings against the defendant domiciled in England. [38], [58]

Jurisdiction. EFTA Judgments Convention (Lugano) 1988. Service on a defendant as a prerequisite to the existence of jurisdiction. Article 6 of the Convention does not require service on the defendant domiciled in England prior to issue or service of the proceedings against other defendants. [38], [59]

Proceedings were brought by the plaintiffs against a number of defendants. The plaintiffs alleged that some of the defendants had partaken in a fraud to induce the plaintiffs to make certain investments, and that others held assets into which they sought to trace those investments. Most of the defendants were domiciled abroad, some of *291 them in Switzerland. The plaintiffs sought to join all the defendants to proceedings in England by commencing an action against the first defendant on the basis that he was domiciled in England. A number of issues material to jurisdiction were contested by the defendants, and notably the question whether the first defendant was indeed domiciled in England at the material time, since he was a highly mobile individual and had anyway sold his house in England in the period between issue and service of the writ. At first instance Rattee J. had concluded that the English courts could exercise jurisdiction. On appeal, a number of points of principle were raised for decision at an early stage to attempt to dispose of or curtail further argument. The points of principle were as follows: the correct standard of proof to apply to the question whether a defendant is domiciled in England for the purposes of Article 6 of the EFTA Judgments Convention (Lugano) 1988, the correct date for determining whether or not a defendant is domiciled in England for the purpose of determining whether the court has jurisdiction under Article 6; and the question whether Article 6 on its true construction requires the defendant domiciled within England to have been served prior to issue or service of the proceedings against defendants in other Contracting States.

The majority of the Court of Appeal (Waller and Nourse L.JJ.) answered the questions posed as set out above. Pill L.J. concurred as to the appropriate standard of proof, but took the view that the appropriate date for determining whether the defendant was domiciled within the jurisdiction should be the date of service, and that this meant that the defendant domiciled in England must have been served prior to service of the proceedings against defendants in other Contracting States.

**Representation**

• Andrew Hochhauser Q.C., Martin Griffiths, and Vernon Flynn, instructed by Richards Butler, and on 29 October 1997, Charles Salter, instructed by Colman Coyle, appeared for the second, Tom Ivory,

Canada Trust Co v Stolzenberg (No.2), [1998] I.L.Pr. 290 (1997)

instructed by Rakisons, appeared for the fourth defendant.
• Christopher Carr Q.C., Phillip Marshall and Andrew Lenon, instructed by Denton Hall, appeared for the plaintiffs.

The following cases were referred to in the judgment:

*European Court of Justice*

• 1. Shevill (F.), Ixora Trading Inc. Chequepoint Sarl and Chequepoint International Ltd v. Presse Alliance S.A. [1995] E.C.R. I-415; [1995] I.L.Pr. 267.
• 2. Kalfelis (Athanasios) v. Bankhaus Schroder, Munchmeyer, Hengst & Co. (189/87), 27 September 1988: [1988] E.C.R. 5565; [1989] E.C.C. 407.
• 3. Mulox IBC Ltd v. H. Geels(C-125/92), 13 July 1993: [1993] E.C.R. I-4075; [1993] I.L.Pr. 668.
• 4. Zelger v. Salinitri (No. 2)(129/83), 7 June 1984: [1984] E.C.R. 2397.

*English courts*

• 5. Kuwait Oil Tanker Co. v. Al Bade [1997] 2 All E.R. 855. **\*292**
• 6. Seaconsar Far East Ltd v. Bank Markazi Jomhouri Islami Iran [1994] I.L.Pr. 678.
• 7. Vitkovice Horni A Hutni Tezirsto v. Korner [1951] A.C. 869.
• 8. Chemische Fabrik Vormals Sandos v. Badische Anilin und Soda Fabriks (1904) 90 L.T. 733.
• 9. Malik v. Narognibanka [1946] 2 All E.R. 663.
• 10. Agrafax Public Relations Ltd v. United Scottish Society Inc. [1995] C.L.C. 862.
• 11. Attock Cement v. Romanian Bank for Foreign Trade [1989] 1 W.L.R. 1147.
• 12. Dubai Bank Ltd v. Fouad Haji Abbas [1997] I.L.Pr. 308.
• 13. Tesam Distribution Ltd v. Schuh Mode Team GmbH [1990] I.L.Pr. 149.
• 14. Molnlycke AB v. Procter & Gamble [1992] 1 W.L.R. 1112.
• 15. Gascoigne v. Pyrah, The Times, 26 November 1991.
• 16. I.P. Metal v. Ruote [1993] 2 Lloyd's Rep. 60.
• 17. Dresser v. Falcongate [1991] 1 Lloyd's Rep. 557.

• 18. Sargasso, The [1994] 2 Lloyd's Rep. 6.
• 19. Adams v. Cape Industries [1990] Ch. 433.
• 20. Trade Indemnity v. Forsakringsaktiebolaget Njord [1995] 1 All E.R. 796.
• 21. A.B. Jarrett v. Barclays Bank [1997] 2 All E.R. 484.

*Irish courts*

• 22. Gannon v. B.I. Steampacket Co. Ltd [1993] 2 I.R. 359.

WALLER L.J:

[1] This is an appeal by the second, fifth, seventh, tenth, fifteenth and sixteenth defendants, on behalf of whom Mr Hochhauser q.c. presented the appeal, and of the fourth defendant, for whom Mr Ivory presented separate but supporting arguments. The appeals are from the judgment of Rattee J. delivered on 27 May 1997. That judgment was concerned with the question of the jurisdiction of the English court over the defendants. The plaintiffs assert that the first defendant ("Mr Stolzenberg") has at all material times been domiciled in England, and it is on that basis that they assert that the English court has jurisdiction over him, and indeed it is on that basis alone (as will appear) that they assert that the English court has jurisdiction over the other defendants. It is the plaintiffs' case that Mr Stolzenberg is the principal defendant, and responsible with other defendants for inducing them by fraud to make investments in a Group of Companies called the Castor Group. The plaintiffs have accordingly commenced these proceedings against Mr Stolzenberg in England, and have sought to join as parties those whom they assert partook in the fraud together with certain entities or persons whom they assert hold assets into which the plaintiffs claim to trace their investment.

[2] The plaintiffs assert that the English court has jurisdiction over the second, sixteenth and fourth defendants on the basis that they were domiciled in Switzerland, a Contracting State under the EFTA Judgments Convention (Lugano) 1988, relying on Article 6(1) of that convention which provides as follows:

> A person domiciled in a Contracting
> State may also be sued:  **\*293**
> 1.  Where he is one of a number
> of defendants, in the courts for
> the place where anyone of them is
> domiciled.

The EFTA Judgments Convention was incorporated into English law by section 3A of the Civil Jurisdiction and Judgments Act 1982 inserted by the Civil Jurisdiction and Judgments Act 1991. The plaintiffs desired to serve the above defendants in Switzerland, and, by RSC, Ord. 11, r. 1(2) were entitled so to do without leave of the court provided that prior to issue of the same they could in compliance with Ord. 7, r. 7 indorse the writ with a statement that the court had power under the Civil Jurisdiction and Judgments Act 1982 (the 1982 Act) to hear and determine the claim, and that no other proceedings involving the same cause of action were pending in another Contracting State or in another part of the United Kingdom. Prior to issuing the writ the plaintiffs so indorsed the same in relation to the above defendants. These defendants were served with the proceedings, but applied under Ord. 12, r. 8 for declarations that the English court had no jurisdiction over them on the ground that the English court did not have jurisdiction to hear and determine the claim because Mr Stolzenberg was not domiciled within the United Kingdom at the material time. It is that declaration which the Judge refused to grant from which refusal these defendants ("the Convention Defendants") appeal.

As regards the fifth, seventh, tenth and fifteenth defendants (entities domiciled in Panama, Liechtenstein and Netherlands Antilles, *i.e.* non-Contracting States) the plaintiffs needed leave under Ord. 6, r. 7(1) to issue the writ or a concurrent writ for service out of the jurisdiction. The grounds on which they sought leave were that those defendants were necessary and proper parties within Ord. 11, r. 1(1) (c), *i.e.* necessary or proper parties to a claim brought against a person duly served (whether within or out of England). The plaintiffs sought that leave prior to having served any defendants, and these defendants accordingly applied to set aside leave. It was accepted before the judge that before leave to serve out of the jurisdiction could be granted in reliance on Ord. 11, r. 1(1)

(c), at least one other defendant should have been served, and that thus prima facie leave had been wrongly granted. However, the judge having ruled that Mr Stolzenberg was domiciled in the United Kingdom at the material time, and that the Convention Defendants had been duly served, was prepared to validate service retrospectively on these "non-Convention Defendants" following the guidance given in Kuwait Oil Tanker Co. v. Al Bade. [2] The non-Convention defendants challenge the judge's decision to validate, but they do so simply by reference to the point which arises in relation to the Convention Defendants. Their submission is that the judge was wrong to conclude that Mr Stolzenberg was domiciled in England at any material time, and was wrong thus to conclude that the English court could ever have any jurisdiction over any defendant. Thus, it is **\*294** submitted, since such service as has taken place must be set aside there could never be a basis for leave under Ord. 11, r. 1(1)(c), and obviously thus no foundation for any validation.

[3]  Various matters were raised before the judge and have been raised on the appeal which may need further consideration; for example the judge, when the matter was before him, was asked to consider whether Mr Stolzenberg had been served within the United Kingdom, and there is a respondents' notice on that aspect of the case. There are further applications to adduce fresh evidence from both sides, the application from the defendants seeking to put in further evidence to challenge whether Mr Stolzenberg was ever domiciled within the United Kingdom at any material time, but we have been asked to deal at this stage with certain points of principle decided by the judge against the appellants in the hope that that will dispose of the appeal or at least curtail the same.

[4]  Those points of principle are as follows:

(1)  What is the correct standard of proof to apply to the question whether a defendant is domiciled in England on an application under Ord. 12, r. 8 involving issues arising under Article 6?
(2)  What is the correct date for determining whether or not a defendant is domiciled in England for the purpose of determining whether the court has jurisdiction under Article 6?
(3)  Should Article 6 on its true construction require the defendant domiciled within England to have been

Canada Trust Co v Stolzenberg (No.2), [1998] I.L.Pr. 290 (1997)

served prior to issue or service of the proceedings against defendants in other contracting states?

**The relevant standard of proof**

[5]   The judge held that the Convention Defendants' applications to set aside service would fail if the plaintiffs had shown a good arguable case that the requirements of Article 6(1) had been satisfied. He refused to accept the submission made on behalf of those defendants that the standard of proof required was what he described as "the ordinary civil standard of proof, that is to say, on the balance of probabilities".

[6]   We have had a full and helpful citation of authority. What can be gleaned from those authorities can in some instances be summarised, but also calls for some comment.

(1)  There is no doubt that where the English court is considering whether any of the sub-paragraphs under Ord. 11, r. 1(1) apply in relation to leave to serve out of the jurisdiction, the relevant question is whether the plaintiff has established a good arguable case [3]:

(2)  There are however points in and arising from the speech of **\*295** Lord Goff of Chievely in Seaconsar [4] which establishes the above proposition and in his analysis of Vitkovice Horni A Hutni Tezirsto v. Korner, [5] on which I should expand a little:

a.  First, he makes clear that under Ord. 11, r. 4(2) the words "No such leave shall be granted unless it shall be made sufficiently to appear ..." are directed to whether the plaintiff has established that the case falls within one of the heads of jurisdiction specified in rule 1. In this he is following Lord Davey in Chemische Fabriik Vormals Sandos v. Badische Anilin und Soda Fabriks [6] where he said in relation to similar words under the former rule: "The words at the end of the order do not, I think, mean more than that the court is to be satisfied that the case comes within the class of cases in which service abroad may be made under the first rule of the order."

b.  Secondly, he demonstrates through his analysis of Korner [7] that the House of Lords in that case rejected the civil standard of proof in relation to establishing that a case fell within one of the relevant sub-paragraphs. In Korner the question that arose was whether a breach of contract had occurred

within the jurisdiction. Slade J., purporting to follow Lord Goddard in Malik v. Narognibanka, [8] had distinguished between the questions: (1) whether there was a contract; (2) whether there had been a breach of contract; and (3) whether such breach had been committed within the jurisdiction and had applied the civil burden of proof to the third question. Lord Goff's summary is as follows:

> This House took the view that Lord Goddard's statement of the law in Malik, or at least Slade J.'s understanding of it, was erroneous in so far as it required that the plaintiff must satisfy the court on the civil burden of proof that his case fell within one of the heads of jurisdiction in Ord. 11, r. 1(1). The applicable standard was laid down in Ord. 11, r. 4(2), which required no more than that it should be made sufficiently to appear to the court that the case was a proper one for service out of the jurisdiction, a requirement that was inconsistent with a standard of proof 'which in effect amounted to a trial of the action or a premature expression on its merits' see *per* Lord Simonds, at page 879. Equally, the expression 'prima facie case' was rejected as inappropriate, because a conflict may arise on the material before the court, which has to reach a conclusion on all the materials then before it. In an endeavour to assist on the degree of sufficiency required by rule 4(2) Lord Simonds (with whom Lord Normand, at page 881, agreed) said, at page 880, that 'the description "a good arguable case" has been suggested [by counsel for the plaintiff] and I do not quarrel with it'; and Lord Radcliffe (with whose statement of principle Lord Tucker, at page 890, agreed) used the expression

'a strong argument', at pages 883 and 855, and 'a strong case for argument', at page 884. There is no reason to suppose that there is any material difference **\*296** between these various expressions, from which is derived the 'good arguable case' test which has been applied in innumerable cases since. At all events, the House of Lords held unanimously that, on that test, the plaintiff was entitled to succeed, and so dismissed the appeal.

For present purposes, it is relevant to consider to which elements in what is now paragraph (e) of Ord. 11, r. 1(1) the House of Lords concluded that the 'good arguable case' test should be applied. Lord Radcliffe, at pages 883–884, was of the opinion that he was unable to be 'satisfied as to where a breach of contract had taken place without being at any rate as much satisfied that the contract existed and had been broken'. On this approach (with which, as I understand it, Lord Tucker was in agreement) it will be necessary for the purpose of establishing jurisdiction under paragraph (e) not merely to show (to the extent required by rule 4(2)) that, if there was a contract and it had been broken, such breach was committed within the jurisdiction (which had been the view of Lord Goddard C.J. in Malik) but so to establish all three elements of contract, breach and place of breach. Likewise, Lord Simonds considered, at page 879, that the plaintiff's prospects of establishing the existence of the oral agreement on which he relied were relevant to the question of jurisdiction.

Lord Normand agreed generally with Lord Simonds; and Lord Oaksey expressed no opinion on the point. It follows that four members of the Appellate Committee must be taken to have decided that, when considering what is now paragraph (e), all three elements of contract, breach and place of breach must be established, to the extent required by rule 4(2), before the plaintiff can successfully invoke the jurisdiction of the court under that paragraph. It also follows that, under that paragraph, no separate issue will arise on the merits of the plaintiff's claim to which a lower standard of proof might be applied; and for that reason no question arose directly as to the standard of proof applicable to the merits of the plaintiff's claim in Korner's case, though the point was adverted to by Lord Tucker. I wish to record in parenthesis my suspicion that a failure to appreciate this point has led to a belief that the 'good arguable case' test established in Korner's case is as applicable to the merits of the plaintiff's case as it is to the question of jurisdiction under Ord. 11, r. 1(1)—as indeed has been stated in successive editions of The Supreme Court Practice: see the 1993 edition, paragraph 11/1/6, page 85.

c.  Thirdly, by necessary implication Lord Goff must have rejected the notion of there being any different standard of proof depending on whether or not a point will only arise at the jurisdiction stage. This point has now been affirmed by the Court of Appeal in Agrafax Public Relations Ltd v. United Scottish Society Inc. [9] Accordingly, in so far as in Attock Cement v. Romanian Bank for Foreign Trade [10] Staughton L.J. could be taken to be suggesting a different standard of proof

in relation to an issue which relates to jurisdiction and which will not be an issue at the trial he is not to be followed. But Lord Goff was not concerned to explore in Seaconsar [11] the application of the standard "good arguable case" to all the various factors that can **\*297** arise. It is I believe important to recognise, as the language of their Lordships in Korner [12] demonstrated, that what the court is endeavouring to do is to find a concept not capable of very precise definition which reflects that the plaintiff must properly satisfy the court that it is right for the court to take jurisdiction. That may involve in some cases considering matters which go both to jurisdiction and to the very matter to be argued at the trial, *e.g.* the existence of a contract, but in other cases a matter which goes purely to jurisdiction, *e.g.* the domicile of a defendant. The concept also reflects that the question before the court is one which should be decided on affidavits from both sides and without full discovery and/or cross examination, and in relation to which therefore to apply the language of the civil burden of proof applicable to issues after full trial, is inapposite. Although there is power under Ord. 12, r. 8(5)— to order a preliminary issue on jurisdiction, as Staughton L.J. pointed out in Attock, [13] it is seldom that the power is used because trials on jurisdiction issues are to be strongly discouraged. It is also important to remember that the phrase whch reflects the concept "good arguable case" as the other phrases in Korner "a strong argument" and "a case for strong argument" were originally employed in relation to points which related to jurisdiction but which might also be argued about at the trial. The court in such cases must be concerned not even to appear to express some concluded view as to the merits, *e.g.* as to whether the contract existed or not. It is also right to remember that the "good arguable case" test, although obviously applicable to the *ex parte* stage, becomes of most significance at the *inter partes* stage where two arguments are being weighed in the interlocutory context which, as I have stressed, must not become a "trial". "Good arguable case" reflects in that context that one side has a much better argument on the material available. It is the concept which the phrase reflects on which it is important to concentrate, *i.e.* of the court being satisfied or as satisfied as it can be having regard to the limitations which an interlocutory process imposes that factors exist which allow the court to take jurisdiction.

The civil standard of proof has itself a flexibility depending on the issue being considered and the concept "good arguable case" has a similar flexibility. It is natural for example in a case concerned with a contract where the jurisdiction depends on whether the breach took place within the jurisdiction, but where the issue to be tried will be whether there was a contract at all, not to wish to give even the appearance of pre-trying the central issue, even though the concept of being satisfied must apply both to the **\*298** existence of the contract and the place of the breach. It is equally natural for the court in the process of being satisfied to scrutinise most jealously that factor which actually provides jurisdiction. It is equally natural that where the foundation of jurisdiction is domicile, *i.e.* an issue that will not arise at the trial, that particular scrutiny of the material available takes place in the context of the limitations applied to an interlocutory process.

(3) Under sub-paragraph (a) of Ord. 11, r. 1(2), where the question is whether the defendant is domiciled within the jurisdiction, domicile in that sub-paragraph has the same meaning as under the 1982 Act (see Ord. 11, r. 1(4)), and in Dubai Bank Ltd v. Fouad Haji Abbas [14] one can see Saville L.J., in a judgment with which Simon Brown and Aldous L.JJ. agreed, applying the test of "good arguable case" to the issue of domicile, but, as appears from the judgment, Saville L.J. scrutinised the material which was before the court before concluding that the plaintiffs had failed to make out a good arguable case for the defendant being domiciled in England. His approach is I believe to be consistent with what I have suggested above.

(4) On a reference from the House of Lords in relation to Article 5(3) of the E.C. Judgments Convention Brussels (1968) the European Court of Justice in Case C-68/93Shevill (F) v. Presse Alliance S.A. [15] ruled that in relation to the standard of proof required before a national court was entitled to conclude that it had jurisdiction, the question was one for the national courts. The court held that the "criteria for assessment" were governed by national law "provided that the effectiveness of the convention is not thereby impaired". It is perhaps right to recognise that we are concerned with the EFTA Judgments Convention in relation to which the European Court does not have jurisdiction. This is reflected in sections 3 and 3B of the 1982 Act as amended by the 1991 Act, section 3 making the decisions of the European Court determinative in interpreting the Convention, and section 3B simply

requiring the English court to take account of any relevant decision of any other Lugano Contracting State. But this is a distinction without a difference having regard to the fact that the E.C. Judgments Convention and EFTA Judgments Convention are in identical terms and the English court must accordingly follow the interpretation of the European court. In any event, in declarations signed between Member States of the European Community and the EFTA member states, the EFTA member states have declared that they consider it appropriate that their courts, when interpreting the EFTA Judgments Convention, pay due regard to the case law of **\*299** the European Court and the courts of the Member States of the European Communities in respect of provisions of the E.C. Judgments Convention. [16]

(5) The English court has had to consider the standard of proof to be applied to Convention and in particular E.C. Judgments Convention cases. The two most important decisions are decisions of the court of appeal in Tesam Distribution v. Schuh Mode Team [17] and Molnlycke AB v. Procter & Gamble. [18] They held that the standard of proof to be applied to the question whether a plaintiff had established whether, in the one case, the English court had jurisdiction under Article 5(1), and in the other whether it had jurisdiction under Article 5(3) was the same as for the establishment of whether a plaintiff had brought himself within one of the sub-paragraphs of Ord. 11, r. 1(1). Paragraph 49 of the judgment of Stocker L.J. in Tesam [19] with which O'Connor L.J. agreed, says as much, and Dillon L.J. (with whose judgment on this aspect Woolf and Leggatt L.JJ. agreed) also refers to the test being "a good arguable case" [20] in Molnlycke. [21] However, both decisions were prior to Seaconsar, [22] and it is possible that some of the language used might have been different after that decision.

In Tesam, the issue between the parties was whether a contract existed at all, it being clear that if it did performance would have been in London and that thus Article 5(1) would have applied. Nicholls L.J. having, it is right to emphasise, referred to the passage in the Schlosser Report, much relied on by Mr Hochhauser before us, to the effect that "… a court may assume jurisdiction only if it is completely satisfied of all the facts on which such jurisdiction is based …" said in relation to the issue relating to the existence of the contract as follows:

This is not to say that the bare assertion of the existence of a contract is the end of the matter on an interlocutory application such as this. Far from it. The English court has ample powers of its own to see that the jurisdiction which it is given by **Article 5(1)** of the Convention is not abused. When leave to serve a writ out of the territorial jurisdiction of the English court is needed under Ord. 11, r. 1(1), leave is not granted unless it is made sufficiently to appear to the court that the case is a proper one for service out of the jurisdiction (see Ord. 11, r. 4). To satisfy that requirement a good arguable case must be made out: see Lord Simonds in Vitkovice v. Korner. Ord. 11, r. 1(1) does not apply in the present case. Jurisdiction under the Convention is not a matter of discretion. Nevertheless, bearing in mind that jurisdiction under Article 5 is an exception to the general rule under Article 2, the English court will be astute to see that **\*300** frivolous or vexatious claims for the existence of a contract are stopped summarily at the outset, either under Ord. 18, r. 19 or under the inherent jurisdiction of the court. There must be evidence establishing a genuine and real dispute. The court should be satisfied that there is a serious question which calls for a trial for its proper determination.

The phrase "serious question which calls for a trial" reflects the language of which Lord Goff in Seaconsar would have approved in relation to the merits of the dispute after a good arguable case has been established for bringing the case within one of the sub-paragraphs of Ord. 11, r. 1(1). Nicholls L.J.'s language could be

said to be a little different when he turns to deal with the actual point which established jurisdiction, *i.e.* in that case where the contract was to be performed. At paragraph 26 he said "The national court has to be satisfied that it has jurisdiction. For example, if the defendant is sued in the court of the state in which he is not domiciled … where the claim is for breach of contract the court must be satisfied as to the place of performance …"

Stocker L.J. put the matter this way:

> There must be evidence adduced from which a conclusion could properly and genuinely be drawn that a contract existed and that the place of performance was the country in which the action was brought. Once jurisdiction can be properly established on this basis then the effect of Article 5(1) in the light of the Effer v. Kaniner decision is that the court has jurisdiction finally to determine the issues between the parties. If after full trial the conclusion is that no contract existed, then since the court had jurisdiction to determine the issue, that determination is final and binding upon the parties.

Later he made clear that the standard he was applying was the "Ord. 11—*viz.* a good arguable case".

In Molnlycke [23] Dillon L.J. when saying the test should be "good arguable case" went on to say "as interpreted by Nicholls L.J." in Tesam. [24] He then quoted the passage in the judgment of Nicholls L.J. in Tesam suggesting the test of "serious question which calls for trial". He then dealt with Stocker L.J.'s reference to Order 11, and said that he had no doubt that Stocker L.J. was using the phrase "good arguable case" in the sense used by Nicholls L.J.

In the light of Seaconsar it seems to me that in the Order 11 context it can now be seen that it was probably inappropriate to use the phrase "serious question to be tried" as if it was equated with "good arguable case". Seaconsar demonstrates that what has to be sufficiently shown for the purpose of establishing jurisdiction both in relation to the argument as to whether the

contact existed or not (which may arise more fully at the trial) and as to where the breach took place, (which will not), has to be shown to the standard of a "good arguable case". As further appears from **\*301** Seaconsar, that is a threshold below "proved on a balance of probabilities", because that is the civil burden after a full trial, but higher than "serious question to be tried" which relates of the plaintiff's claim relative to the contract. But, as I have sought to stress, "good arguable case" is a concept with some degree of flexibility depending on the issue. Accordingly, although at first sight there may in the judgment of Nicholls L.J. appear to have been some elision between the "good arguable case" and "the serious issue to be tried" when considering at the jurisdiction stage, a question ultimately also to be in issue at the trial, *i.e.* the existence of the contract, I do not think he was in fact eliding the concepts Lord Goff had in mind in the use of the different phrases "good arguable case" and "serious issues to be tried". The judgment is merely consistent with the flexibility in the concept of "good arguable case" to which I have referred. In any event it is clear in my view: (1) that the Court of Appeal intended that the test in relation to convention cases should be the same as in the context of Ord. 11, r. 1(1); and (2) that in relation to points that went to jurisdiction they intended "good arguable case" as interpreted in the Order 11 context to be the standard of proof.

(6)  There is a further point to have in mind. In relation to Order 11, the court is of course exercising a discretion which gives it an additional basis for ensuring that the spirit of that rule is complied with. No discretion is being exercised so far as the Convention is concerned, but even in relation to the Convention there is a further protection for a defendant to which I have already made a passing reference. The court will be anxious to see that the Convention is not abused and that its effectiveness is not impaired. In the Article 6 context in particular, despite the notion that the court has no discretion where the Convention is concerned, one sees that the court has formulated what are in essence terms to be implied into Article 6, *e.g.* that there must be a connection between the claims made. [25] Thus in approaching the question whether the court is satisfied that it should take jurisdiction under Article 6 for example, it will certainly have in mind the implications in relation to prevention of abuse.

(7)  I ought finally to refer to a decision of my own relied on by Mr Hochhauser—I.P. Metal v. Ruote, [26] and to the

Canada Trust Co v Stolzenberg (No.2), [1998] I.L.Pr. 290 (1997)

ruling of the Court of Appeal refusing leave to appeal from that decision. [27] That case was concerned with Article 17 (agreements as to jurisdiction) **\*302** and as to whether that Article, if applicable, in effect overrode Articles 21 and 22. I expressed the view that Article 17 did override, but that the English court would want to be as clear as possible, and at least form the view that it was highly likely that if the matter were tried out the plaintiff would succeed in his argument on the jurisdiction clause, before concluding that Article 17 applied. I was referred to Tesam and Molnlycke and Mr Gaisman for the plaintiffs in that case was seeking to persuade me that "a good arguable case" was the appropriate test. I rejected "good arguable case" as the appropriate test when dealing with Article 17, and preferred what I conceived to be a higher test because the question of whether there was a consensus within the terms of that Article was likely only to be of relevance when jurisdiction was being decided. In addition, I applied what I conceived to be a higher test, because I was dealing with a situation in which another court was seised and where it was being argued that it was that court which should decide the question of jurisdiction, not the English court. When leave to appeal was refused Saville L.J. referred to my formulation "highly likely", but I do not read the judgment as approving or disapproving of the words I used.

I too was dealing with the matter without the benefit of Lord Goff's analysis in Seaconsar. I think I was probably wrong to reject "good arguable case" as being the appropriate test. I say probably because the court may be in a slightly different position when faced with whether Article 17 should apply and override Article 21 or 22, than it is when considering whether it has jurisdiction under Articles 5 or 6. But I rather suspect that in truth "good arguable case" is the appropriate standard which I should have adopted, and that I failed to appreciate that that language would have enabled me to take the attitude that I did.

**Conclusion**

[7]  In the result in my view the judge was right to rule that the relevant standard of proof on the domicile issue was "good arguable case", and there is no indication that he did not apply that concept correctly.

**Time for testing domicile under Article 6**

[8]  The relevant words of Article 6 are as follows:

> A person domiciled in a Contracting State may also be sued:
> 1.  Where he is one of a number of defendants, in the courts for the place where any one of them is domiciled.
> 2.  As a third party in an action on a warranty or guarantee or in any other third-party proceedings, in the court seised of the original proceedings, unless these were instituted solely with the object of removing him from the jurisdiction of the court which would be competent in his case. **\*303**

[9]  The relevant words of Article 2 are as follows:

> Subject to the provisions of this Convention, persons domiciled in a Contracting State shall, whatever their nationality, be sued in the courts of that State.
>
> Persons who are not nationals of the State in which they are domiciled shall be governed by the rules of jurisdiction applicable to nationals of that State.

[10]  There is no issue between the parties that, as the European Court of Justice held in Case 189/87, Kalfelis v. Bankhaus, Schröder, Munchmeyer, Hengst & Co. [28]:

> …  the 'special jurisdictions' enumerated in Articles 5 and 6 of the Convention constitute derogations from the principle that jurisdiction

is vested in the courts of the State where the defendant is domiciled and as such must be interpreted restrictively.

But this helps very little in solving the problem as to the time at which the domicile of "any one of the defendants" must exist under Article 6 because it would seem obvious that the relevant time must be the same under Article 2 as under Article 6.

[11] What the Convention Defendants submit is that the words "be sued" wherever they appear in Articles 2, 3, 5, 6, 8 and 9 refer to the service of proceedings and not to the mere issue of proceedings. In his reply Mr Hochhauser suggested that sued really meant "summonsed" and that a defendant was not summonsed until he had been served. The most formidable argument of Mr Hochhauser was that unless "sued" bore that meaning there would be an inconsistency with Articles 19, 21, 22 and 23.

[12] In relation to Articles 19, 21, 22 and 23 where the Convention is attempting to resolve situations where courts of Member States might be competing for jurisdiction, the concept which the Convention uses is of courts being "seised". Thus by Article 19 it is provided that a court of a Contracting State "seised" of a claim which is principally concerned with a matter over which the courts of another Contracting State has exclusive jurisdiction by virtue of Article 16, it shall, of its own motion, declare it has no jurisdiction. Article 21 deals with proceedings involving the same cause of action and between the same parties being brought in different Contracting States, and imposes an obligation on any court other than he one first "seised" (1) to stay its proceedings until the jurisdiction of the court first "seised" is established, and (2) where it is established, to decline jurisdiction in favour of that court. Article 22 deals with related actions giving a discretion to courts other than the one first "seised" to stay proceedings. Article 23 deals with actions which are within the "exclusive jurisdiction of several courts" and imposes an obligation on all courts other than the one first "seised" to decline jurisdiction.

[13] The concept seised has been considered by the Court of Appeal **\*304** on two occasions, firstly in Dresser v. Falcongate [29]; and then further in The Sargasso. [30] Those cases have established that the English court is not "seised" of proceedings until the proceedings have been actually served. Bingham L.J. in Dresser summarised the matter in this way [31]:

> With genuine respect to the contrary opinions of Hirst J.L. and Hobhouse J., it is in my judgment artificial, far-fetched and wrong to hold that the English court is seised of proceedings, or that proceedings are decisively, conclusively, finally or definitely pending before it, upon mere issue of proceedings, when at that stage (1) the court's involvement has been confined to a ministerial act by a relatively junior administrative officer; (2) the plaintiff has an unfettered choice whether to pursue the action and serve the proceedings or not, being in breach of no rule or obligation if he chooses to let the writ expire unserved; (3) the plaintiff's claim may be framed in terms of the utmost generality; (4) the defendant is usually unaware of the issue of proceedings and, if unaware, is unable to call on the plaintiff to serve the writ or discontinue the action and unable to rely on the commencement of the action as a lis alibi pendens if proceedings are begun elsewhere; (5) the defendant is not obliged to respond to the plaintiff's claim in any way, and not entitled to do so save be calling on the plaintiff to serve or discontinue; (6) the court cannot exercise any powers which, on appropriate facts, it could not have exercised before issue; (7) the defendant has not become subject to the jurisdiction of the court.
>
> It would be wrong, at this early stage in the life of the Convention

(in so far as it affects the United Kingdom), to attempt to formulate any rule which will govern all problems which may arise in the future. I am, however, satisfied that the English court became seised of these proceedings, which first became definitively pending before it, when the defendants were served on 13 July 1989. The plaintiffs and the defendants then became bound by the Rules of Court to perform the obligations laid on them respectively or suffer the prescribed consequences of default. The defendants became subject to the court's jurisdiction unless they successfully challenged or resisted it which they were required to do then or not at all. In the ordinary, straightforward case service of proceedings will be the time when the English court becomes seised. I would, however, stress the qualification, because that is not an invariable rule. The most obvious exception is where an actual exercise of jurisdiction (as by the granting of a *Mareva* injunction or the making of an *Anton Piller* order or the arrest of a vessel) precedes service: plainly the court is seised of proceedings when it makes an interlocutory order of that kind. Further exceptions and qualifications may well arise in practice, but they do not fall for consideration in this case.

It is that last aspect with which the Court of Appeal in The Sargasso [32] disagreed holding that service in all cases was required.

[14]  The argument of Mr Hochhauser is that there is no reason in principle or logic for applying a different test when considering Article 6, particularly as the policy lying behind both provisions (in relation to which it should be said there is no issue) is of avoiding inconsistent  ***305** judgments. Mr Hochhauser accepts Mr Carr q.c.'s submission that the phrases used in Articles 2, 3, 5 and 6 and the phrase used in Articles 11, 12 and 14 "bring proceedings" involve the same concept, one viewed from the defendant's point of view, and the other from the plaintiff's point of view, but he says that the word "seised" is dealing with the same concept simply from the court's point of view. How, he would ask rhetorically, can a court not be seised, if either a defendant has been sued or a plaintiff has brought proceedings? But he submits Mr Carr's submissions involve that being possible.

[15]  When pressed to demonstrate how, as a matter of language he suggested that the Convention should be read so as to give effect to his submissions, Mr Hochhauser showed us during the course of his reply a passage from Briggs on *Civil Jurisdiction and Judgments* [33]:

> The Conventions are European texts, designed and drafted by civil lawyers trained in the continental legal tradition; and they are interpreted by judges who are, by a large majority, civilian lawyers. The texts have to be understood, and interpreted, according to the European style, at least if they are to be understood in a way which will conform, to the views of the Court of Justice. The English custom of interpreting, more or less literally, the precise relevant words, following the prior decisions of earlier courts, is not the European way. Instead, the Conventions are interpreted "teleologically"; that is to say, with a view predominantly given to the overall purposes of the Convention as a whole, as distinct from simply seeking to ascertain the natural meaning of a single provision in isolation from the rest of the text. For this reason, attention to the general principles underpinning the Convention, as the Court of Justice has declared them and as set out here, is the proper

first step in the interpretation of any individual provision: they must be taken as read in all cases. A sound teleological argument may well defeat a good literal one.

He further showed how, in addition to the phrases "be sued", "bringing proceedings", and "seised", the Convention also used the concept of proceedings being "instituted" [34] and of the document "instituting" [35] or which "instituted". [36] He relied both in his original argument and in reply on Article 52 which provides as follows:

> In order to determine whether a party is domiciled in the Contracting State whose courts are seised of a matter, the Court shall apply its internal law.

> If a party is not domiciled in the State whose courts are seised of the matter, then, in order to determine whether the party is domiciled in another Contracting State, the court shall apply the law of that State.

Mr Hochhauser submitted that the use of the present tense, and the reference to the court being seised, showed that the court was only intended to consider domicile after service.

[16]  I have to say that at the end of the day I did not find the use of  *306  other phrases in other Articles and/or Article 52 of any particular assistance. What was clearly a powerful point however was that at first sight it may seem strange if the concept under Articles 21 and 22 of a court being seised involved service, but being sued or bringing proceedings does not. But even if the point is a powerful one, I could not follow why, as Mr Hochhauser submitted, Articles 21 and 22 could not operate if "be sued" and "bring proceedings" meant commence the proceedings by issuing a writ. As Mr Carr forcefully pointed out, those Articles are concerned with a different stage, *i.e.*

a stage when a tie break has to operate. That tie break will only operate as between courts which actually have jurisdiction under the provisions of the Convention. There is accordingly actually no reason why the point of time at which that tie break operates should not be different from the point of time for deciding whether the court should be entitled to take jurisdiction originally even if at first sight it may seem surprising that it should be so.

[17]  Accordingly (with the above passage of Briggs in mind), the question is ultimately one of construction of the relevant Articles. But I would stress that by using the word construction I do not intend to confine myself slavishly to the language. Obviously, if it is necessary to imply terms so that the Convention achieves its objectives, it appears from the illustrations already given that such terms will be implied. Strict construction will not necessarily supply the answer if the objectives of the Convention would thereby be frustrated.

[18]  The starting point is Article 2. The Article is concerned to establish **the courts** in which a person or company "shall" be sued. It is not concerned with the **country** in which a person or company shall be served. It is not in issue however that whether or not in one sense the courts of a country can be said to have jurisdiction over the people who live there, the *in personam* jurisdiction of the court is only achieved by service of the court process. [37] In this sense it seems to me that point (7) of Bingham L.J.'s points in Dresser [38] (despite Mr Carr's protest to the contrary) is right.

[19]  If the proceedings are ones to which Article 2 of the Convention applies, in order to sue in the courts of a defendant's domicile, a writ or other document instituting the proceedings will have to be issued in the relevant court, and then served either within the Contracting State of the relevant court **or** in any other Contracting State.

[20]  It must in fact be rare for it to be a relevant question to ask whether it is at the time of the issue of the process in the relevant court or time of service of the process, that the defendant should be domiciled in the Contracting State of the court that has issued the process. Article 2 reflects the fundamental principle—defendants should

be sued in their home state. Normally a person whose home is in **\*307** a certain state will be both sued and served there, and if he were served elsewhere it would be because of some temporary visit to another state. In the instant case it would seem that Mr Stolzenberg may (and we know little about the facts and so I stress may) be seeking to change his domicile from the United Kingdom so as to avoid the jurisdiction of the English court. That produces one circumstance where the point in time becomes of importance. Mr Hochhauser stressed that it was important not to construe the Convention on the basis that the reason why there might be a difference in domicile between date of issue and date of service was through an attempt to evade service, and suggested that it might well happen that a writ had been issued and not served and a defendant without any knowledge of proceedings moved and changed his domicile prior to service. In such a case he submitted that to give effect to the fundamental principle such a defendant should be entitled to have proceedings issued in the Contracting State to which he had moved, and to have the first proceedings set aside.

[21]  I reject the notion that date of service is the relevant date under Article 2, either as a matter of language or as a matter of implication. I accept that the court is searching for one moment in time, *i.e.* either the issue of proceedings or the service of the same, but not both. The language of Article 2 is only consistent with that moment being the issue, because it contemplates taking action "in the courts". It furthermore seems to me that since the issue of proceedings is a step that the plaintiff is bound to take and incur cost in taking, it is important that a plaintiff can identify easily the court before which he can bring his action before he launches it. Support for this being the plaintiff's right is provided by a passage in the judgment of the European Court in Case C-125/92, Mulox IBC Ltd v. H. Geels [39] where it is said as follows:

> It is settled case law that, as far as possible, the Court of Justice will interpret the terms of the Convention autonomously so as to ensure that it is fully effective having regard to the objectives of Article 220 of the EEC Treaty, for the implementation of which it was adopted. That autonomous interpretation alone is capable of ensuring uniform application of the

Convention, the objectives of whcih include unification of the rules of jurisdiction of the Contracting States, so as to avoid as far as possible the multiplication of the bases of jurisdiction in relation to one and the same legal relationship and to reinforce the legal protection available to persons established in the Community by, at the same time, **allowing the plaintiff easily to identify the court before which he may bring an action** and the defendant reasonably to foresee the court before which he may be sued (my emphasis).

[22]  Mr Hochhauser emphasises that the above quotation also refers to the defendant being able "reasonably to foresee the court before which he may be sued". But if the choice is between a court which the plaintiff was absolutely right in thinking was the defendant's home court when he issued the proceedings and a court **\*308** which has only recently become the defendant's home court after the issue of proceedings, I am not sympathetic to the view that the plaintiff should be disadvantaged. On any view the court chosen was one which the defendant would, for a considerable period of his life, have been happy to have been sued in; his disadvantage is therefore very small.

[23]  Furthermore, if the above were not the correct view there are much greater disadvantages to which the plaintiff will be put. First, he will have been put to the cost and expense of preparing for and issuing the first proceedings. Secondly, if he has issued proceedings in the courts of the defendant's domicile just prior to the limitation period expiring, and the defendant changes his domicile either innocently or with some more devious motive, if time of service is the relevant moment in time, the defendant can not only insist on being sued in his newly acquired domiciliary, but can insist on the original proceedings being set aside on the basis that that original court had no jurisdiction. He would thus obtain the advantage of a limitation defence. Thirdly, if by chance the defendant is one who would wish to evade service of proceedings, he

would on the defendants' construction, be able to change domicile once he appreciated that proceedings in what was then his state of domicile had been commenced. I follow Mr Hochhauser's submission that the Convention should not be construed with persons evading service as the only defendants in mind, but nevertheless it has to be recognised that defendants are not always willing litigants. It does in fact seem to me that a change or attempted change in domicile between issue and service is more likely to come from an unwilling defendant. A plaintiff accordingly should be entitled not to have proceedings set aside where they have been issued in the courts of a defendant's domicile at the time of issue, and in my view under Article 2 time of issue is the relevant time.

[24] I have spent some time on Article 2 and addressed the arguments in relation to that Article because it is difficult to see how the point in time could be different when Article 6 comes to be considered. But before turning to Article 6 it is worth mentioning Article 5. Article 5 provides the first exceptions to Article 2, and allows a person "to be sued" "in another Contracting State" in certain situations. The language is not consistent with allowing "service" in another Contracting State, indeed clearly once again the contemplation is of proceedings issued in the State to which one of the exceptions applies, with service in any Contracting State. The exceptions do on the whole either exist as at the date of issue or not at all, but little assistance can be gained from that fact. But exception (6) allows a defendant to be sued in his capacity as "settlor, trustee or beneficiary of a trust … in the courts of the Contracting State in which the trust is domiciled". The whole purpose is to allow a defendant to be sued in a country where he is not domiciled but where the trust is domiciled. It seems again that it would be an unnatural construction to **\*309** place on that provision that would allow a plaintiff perfectly properly to form the view that the trust was domiciled in country X, incur the expenditure of consulting lawyers and getting proceedings issued, but find because it took time to locate the relevant defendant in some other Contracting State so as to serve him, that because in the meanwhile the trust had moved its domicile, the plaintiff had to start again elsewhere. Furthermore, what it might be asked if there were more than one trustee being sued? Unless date of issue is the correct point in time there could be a needless uncertainty as to the way in which Article 5(6) was to operate. Assume proceedings started against three trustees in the place where the trust

was domiciled; assume one served immediately, but the others not for some period during which period the trust moved its domicile. Assume the trustee first served wanted the proceedings to remain in the court where they were started but the others applied to set the same aside on the basis that they must be sued in the country of their domicile, or the country of the trust's new domicile. Suffice it to say the solution would not be easy if date of service were the relevant date.

[25] Now to Article 6 itself. In Article 6(2) the concept seised is referred to in relation to third-party proceedings. In that context seised would appear to have the same meaning as in Articles 21 and 22, but since prior to the taking of any such proceeding there must have been service on the defendant I do not myself think that any assistance is gained either way from the use of that term in that context. If anything it could be said to contrast with the expression sued.

[26]    Article 6 is concerned to avoid irreconcilable judgments being handed down in different Contracting States, and so far as Article 6(1) is concerned it does fulfil a function similar to the "necessary or proper party" provision of Ord. 11, r. 1(1)(c).[40] But it is in my view not necessarily to be equated with that provision alone. The Rules of the Supreme Court recognise by other provisions the convenience of enabling connected issues being determined between all parties interested before the same tribunal; see for example in relation to joinder of defendants Ord. 15, r. 4(1) and if the proceedings are already in being the joinder of other parties Ord. 15, r. 6(2). Article 6(1) simply recognises that principle, and seeks to provide a solution for the situation in which defendants from different domiciles should be defendants in the same proceedings in accordance with that principle. Mr Hochhauser stressed in relation to the construction of Article 6(1) that it should be construed in his clients' favour because it was being sought to deprive his clients of their fundamental rights under Article 2. That factor would seem to me rightly to be material in relation to whether the proceedings are sufficiently connected or whether Article 6 is being abused. However, I do not think it assists in determining the relevant date at which a defendant has to be domiciled. The relevant **\*310** date must be the same for Article 6 as for Article 2. A plaintiff faced with wishing to sue defendants in proceedings

connected in the sense required for Article 6 purposes has to take the same decisions as a plaintiff seeking to sue one defendant in the courts of his domicile under Article 2. What in fact Article 6 allows him to do is to comply with Article 2 so far as one or more defendants are concerned, and join others who are domiciled in other Contracting States. It is Article 6 that provides the power to issue the process in the court of the domicile of one defendant, and that court then allows service on the defendants so joined. It must once again be as at the date when the writ is issued that the relevant domicile must be tested for all the reasons already given in relation to Article 2.

[27] Mr Hochhauser in his reply laid emphasis on the fact that the plaintiffs in this case had a choice and chose a less stable defendant for founding the jurisdiction of the English court. This was to support his argument that it was not unjust for the relevant date to be the date of service of the proceedings. But there are two comments to make. First, it has not been submitted, nor as I understand the allegations made by the plaintiffs could it be submitted, that Mr Stolzenberg was made a defendant simply to oust the jurisdiction of Contracting States where others were domiciled. If that were an allegation that could be made and was well founded, as already indicated by process of some implication into Article 6 of words similar to those appearing in Article 6(2), the court would have jurisdiction to stay such proceedings. Secondly, there is no question that the plaintiffs do have to establish the domicile of Mr Stolzenberg to the standard of proof already indicated, and it is for them to choose whether they wish to take on that burden (**if** they appreciated there might be doubt about the matter), or continue with attempting to discharge that burden once they did appreciate there was a contest.

[28] Article 6 also itself supports the construction I have placed on Article 2 in this way. Unless the defendants' further argument to which I am about to turn is right, *i.e.* that service on Mr Stolzenberg was required before issue or at least service of the proceedings under Article 6 vis-à-vis the Convention Defendants, date of service produces great uncertainty and possible frustration of the objectives of Article 6(1). The argument has to be that the date for ascertaining Mr Stolzenberg's domicile is the date of service on each individual defendant. If again one assumes a multiplicity of defendants a domicile in

England at the date of issue and some defendants served before the change in domicile, and if one then assumes a change of domicile and service on others; assume again the defendants first served wish to fight the proceedings in England and not in the place of the new domicile, but the other defendants want either the places of their own domicile or the courts of the new domicile. How does the court resolve the problem? If one point in time is appropriate in multiple defendant **\*311** cases that point has to be issue if grave uncertainty and possible frustration of the objectives of the Convention is to be avoided.

[29] I should finally on this aspect refer to certain other points.

[30] Reliance was placed by Mr Hochhauser and Mr Ivory on Ord. 11, r. 1(2) their emphasis being placed on the fact that that rule concentrated on **service.** I cannot myself see how that rule helps to construe the Convention albeit I suppose it might assist in demonstrating what the English court contemplated in the concept "sued" or "bringing proceedings". All I need say is that even if it is right to construe "sued" and the "bringing of proceedings" from the English court's point of view,[41] as those representing the defendants emphasised, the English court will still in the context of the Convention "have regard to the international purpose which the Convention was made to achieve".[42] The court's perspective is accordingly unlikely to be assisted by textual analysis of its own rules of court. But in any event, of equal relevance would then be Ord. 6, r. 7 which requires the indorsement on the writ **prior to issue** that the court has the power to hear and determine the claim under the 1982 Act.

[31] Article 20 sub-paragraph 2 could be said to give support to the view I have expressed in that it could be said to be contemplating a court dealing with the matter before service. Mr Hochhauser sought to demonstrate that it was in fact dealing with situations in which there had been service but too little time for the defendant to arrange his defence. I do not think Mr Hochhauser's submission is well founded, but I do not think the point is of any great influence.

Canada Trust Co v Stolzenberg (No.2), [1998] I.L.Pr. 290 (1997)...

[32]  Mr Ivory referred us to Rule 36 of Dicey & Morris [43] concerned with the recognition by the English courts of foreign judgments, and to the first case where such judgments are recognised being "If the judgment debtor was at the time the proceedings were instituted, present in the foreign country". This reflects the general rule that "the plaintiff must sue in the court to which the defendant is subject at the time of suit …". He then sought to persuade us that albeit the court of Appeal in Adams v. Cape Industries [44] had ultimately left the point open, because they had referred to dicta in earlier cases and said "It would appear that date of service of process rather than the date of issue of the proceedings is to be treated as the 'time of suit' …" this should influence our approach to the construction of the Convention. In my view the starting point, *i.e.* that time of suit is time of service, is not very firmly based, but in any event the point does not persuade me that the construction which seems to me to flow from the words and the  **\*312**  objectives of the Convention should be any different from that I have suggested.

**Does Article 6 require there to have been service on the defendant domiciled in the state of the courts in which the proceedings have been brought?**

[33]  Ord 11, r. 1(1)(c) expressly requires the claim to have been brought against a person "duly served within or out of the jurisdiction", as well as the intended defendant to be a necessary or proper party. There is nothing in the wording of Article 6 which equates with that specific requirement in Ord. 11, r. 1(1)(c).

[34]  The reason for the express requirement in Ord. 11, r. 1(1)(c) flows from the original rule which required service on a defendant within the jurisdiction before a further defendant could be made a necessary or proper party. That was a requirement to ensure that someone within the jurisdiction was not simply made a party to obtain jurisdiction. Now the requirement is there in order to ensure that an action is genuinely brought against a defendant in relation to whom jurisdiction can be established by some other means. It is further a requirement to swear an affidavit in accordance with Ord. 11, r. 4(1)(d) stating the grounds for belief that there is between the plaintiff and the person on whom the writ has been served a real issue which the plaintiff may ask

the court to try. But the rule is dealing with a situation in which leave to issue and serve is required from the court. That leave is obtained *ex parte*, and one can see that insistence on service on another defendant prior to obtaining leave may provide some practical safeguard.

[35]  There is no requirement for the obtaining of leaves before the issuing of proceedings in reliance on Article 6. The concept is thus possibly more akin to Ord. 15, r. 4 under which there are safeguards against the abuse of the power to join co-defendants in the same proceedings, but an insistence that one should have been served before issue against, or service on another, is not one of them.

[36]  It is in my view not surprising that Article 6 does not provide for the service of proceedings on one defendant before the issue and joinder of others, because no practical safeguard would be provided by so insisting. The first time that a court will review the question of whether Article 6(1) provides jurisdiction is on an *inter partes* application contesting that jurisdiction. At that stage sufficient protection is available to a defendant and the order in which defendants have been served or whether one was served before the issue of proceedings against another has no materiality whatever. The proper question at that stage under Article 6(1) is simply whether a defendant domiciled within the jurisdiction is a party and a genuine party, and whether the Convention is in any way being abused.

[37]  I accordingly do not construe Article 6 as requiring service on the defendant domiciled within the country of the relevant court prior  **\*313**  to issue or service of proceedings on other defendants. Furthermore I can see no necessity for implying a term to that effect.

**Answers to points of principle**

[38]  I would accordingly answer the points of principle as follows:

(1)  "Good arguable case" is the appropriate standard of proof to apply to the question whether a defendant is domiciled in England on an application under Ord. 12, r. 8 involving issues arising under Article 6.

*Canada Trust Co v Stolzenberg (No.2), [1998] I.L.Pr. 290 (1997)*

(2) The correct date for determining whether or not a defendant is domiciled in England for the purpose of determining whether the court has jurisdiction under Article 6, is the date of issue of the proceedings against the defendant domiciled in England.

(3) Article 6 does not require service on the defendant domiciled in England prior to issue or service of the proceedings against other defendants.

PILL L.J.:

[39]  I gratefully adopt Waller L.J.'s statement of facts. I also agree that the judge's approach to the relevant standard of proof was correct.

[40]  The respondents seek to sue the appellants by relying upon Article 6(1) of the EFTA Judgments Convention and the first defendant's domicile in England. The second issue, stated by Waller L.J., is as to the correct date for determining whether or not a defendant is domiciled in England for the purpose of determining whether the court has jurisdiction by virtue of Article 6. Is it the date on which the English writ was issued or the date of service?

[41]  That question requires a consideration of Article 2 of the Convention which, in so far as is material, provides that "subject to the provisions of this Convention, persons domiciled in a Contracting State shall, whatever their nationality, be sued in the courts of that state". That is a general rule and, if it applies, the appellants cannot be sued in England.

[42]  Article 6 of the Convention creates a special jurisdiction which provides for a derogation from the general rule. Article 6(1) provides that "a person domiciled in a Contracting State may also be sued— where he is one of a number of defendants, in the courts of the place where any one of them is domiciled." The judge held that, a writ having been issued against the first defendant, in England, at a time when for present purposes it is assumed he was domiciled in England, Article 6(1) operates to permit the appellants to be sued in England. The appellants contend that, because the writ was not at a material time served upon the first defendant, Article 6(1) does not operate so as to permit them to be sued in England.

[43]  In Trade Indemnity v. Forsakringsaktiebolaget Njord [45] Rix **314** J. referred [46] to the "underlying philosophy that jurisdiction is vested in the courts of the state where the defendant is domiciled". That reflects the language of the Jenard Report on the 1968 Convention where it was stated in the commentary on Article 2:

> The maxim 'actor sequitur forum rei', which expresses the fact that the law leans in favour of the defendant, is even more relevant in the international sphere than it is in a national court. It is more difficult, generally speaking, to defend oneself in the courts of a foreign country than in those of another town in the country where one is domiciled.

[44]  In Kalfelis v. Schroder [47] the European Court of Justice held [48]:

> … the 'special jurisdictions' enumerated in Articles 5 and 6 of the Convention constitute derogations from the principle that jurisdiction is vested in the courts of the state where the defendant is domiciled and as such must be interpreted restrictively.

Morritt L.J. reflected that language in A.B. Jarrett v. Barclays Bank, [49] when considering the language of Article 16 which also creates jurisdictions regardless of domicile and Rix J. reflected it in the Trade Indemnity case. [50]

[45]  It is common ground that one moment in time must be chosen to apply the test of domicile for the purposes of Articles 2 and 6. "Sued" must have the same meaning in the two Articles. It must in my judgment also be accepted that it is possible conceptually for a court to be seised of a matter for the purposes of Article 22 of the Convention only when a writ has been served but for a defendant to

Canada Trust Co v Stolzenberg (No.2), [1998] I.L.Pr. 290 (1997)

be sued under Articles 2 and 6 upon issue of a writ against him. The "tie-break rule", to quote the expression used by Bingham L.J. in Dresser v. Falcongate Ltd, [51] operates at a point in time different from that for deciding whether the court is entitled to take jurisdiction originally.

[46]   The expression "sued" should be considered in its context and having regard to the purposes of the Convention. Reference has been made to the expression "bring proceedings" in Articles 11, 12 and 14, to proceedings being "instituted" in Article 6(2) and to a "document instituting the proceedings" in Articles 20 and 27. A writ is a document instituting the proceedings but I do not regard the presence of the expression "may bring proceedings" as determinative of the present issue in the respondents' favour. It begs the question whether proceedings are brought upon issue of the writ or upon service.

[47] The appellants understandably rely upon the decision of this court in Dresser. The leading judgment was given by Bingham L.J., with whom Sir Stephen Brown P. and Ralph Gibson L.J. agreed. In considering, for the purposes of Article 22, whether the English court **315** or the Dutch court was first seised of the matter, the court held that the High Court did not become seised of the matter until the writ had been served. Bingham L.J. stated seven reasons why it was wrong to hold that the English court was seised of proceedings upon mere issue of proceedings. These are:

> (1) the court's involvement has been confined to a ministerial act by a relatively junior administrative officer; (2) the plaintiff has an unfettered choice whether to pursue the action and serve the proceedings or not, being in breach of no rule or obligation if he chooses to let the writ expire unserved; (3) the plaintiff's claim may be framed in terms of the utmost generality; (4) the defendant is usually unaware of the issue of proceedings and, if unaware, is unable to call on the plaintiff to serve the writ or discontinue the action and unable to rely on the commencement of

the action as a lis alibi pendens if proceedings are begun elsewhere; (5) the defendant is not obliged to respond to the plaintiff's claim in any way, and not entitled to do so save be calling on the plaintiff to serve or discontinue; (6) the court cannot exercise any powers which, on appropriate facts, it could not have exercised before issue; (7) the defendant has not become subject to the jurisdiction of the court.

Bingham L.J. contemplated exceptions and qualification to the rule but in The Sargasso, [52] it was held in this court that there were no genuine exceptions to the rule that the date of service of the writ marked the time when the court becomes definitely seised of the proceedings. [53] Steyn L.J. affirmed the rejection in Dresser of the date of issue of the writ solution and added that the adopted rule was "a simple and practical rule which will readily be understood in England and in other jurisdictions which have to grapple with the question when an English court is seised of the proceedings. … And it seems to me that a 'date of service' rule will be readily comprehensible not only in England but also in other Contracting States." Peter Gibson L.J. stated, [54] that "the issue of a writ is not sufficient but service is required as a general rule. It is too preliminary a step being one which would have no consequences whatever if the plaintiff chooses not to serve the writ. Upon issue of the writ proceedings might be said to be pending, but surely not definitively pending in the court."

[48]   Having set out the authorities and the relevant considerations in considerable detail in Dresser, Bingham L.J. stated that "the question is at root quite a short one". In my judgment, that is true also of the present issue. Jurisdiction and seisin are intimately connected and the considerations set out by Bingham L.J. in Dresser appear to me to have considerable weight in the present context and weigh heavily in favour of the conclusion that the defendant is not sued upon mere issue of the writ. The Convention is constructed around the principle stated in Article 2 and the phrase "sued in the courts" is to be considered in that context. A defendant is sued

Canada Trust Co v Stolzenberg (No.2), [1998] I.L.Pr. 290 (1997)

in the courts of England upon service **\*316** and not mere issue. The writ being a writ of summons, I have no difficulty with that use of language quite apart from the considerations (1) to (6) set out by Bingham L.J. in Dresser. Consideration (7) was that upon mere issue of proceedings "the defendant has not become subject to the jurisdiction of the court" which is consistent with his not being "sued".

[49]  The European Court of Justice held in Kalfelis [55] that Article 6 is to be interpreted restrictively in so far as it constitutes a derogation from the principle stated in Article 2. That restrictive interpretation requires, in context, that a defendant cannot be sued out of the country of his domicile by virtue of the issue of a writ in the country of another defendant's domicile. While conceptually possible, it would also be an odd result if a defendant is held to be "sued" in England by virtue of Article 6 without the English court being "seised" of the action under Articles 21–23.

[50]  The wording of Article 20 of the Convention, which provides a degree of protection to defendants sued in a state other than that of their domicile, and Article 52 which provides how domicile is to be determined, appear to me to fit comfortably with that approach to Articles 2 and 6. Article 20, first paragraph, contemplates suing as including service by its reference to entering an appearance, an act which could only follow service. The second paragraph imposing obligations upon a court in the absence of service and does not detract from that.

[51]   Further, I would construe the expression "bring proceedings" in Articles 11, 12 and 14 in the same way. To find that proceedings are brought, or constituted, upon service and not mere issue, is in my view an acceptable use of language. That finding is not necessary for the present decision but I mention it in support of my view that the presence of the words "bring proceedings" in other Articles does not adversely affect the appellants' case on the meaning of "sued" in Article 2.

[52]  Waller L.J. has stressed the advantages to a plaintiff of a date of issue rule. I follow that there may be situations in which a plaintiff is at a disadvantage upon

the construction of Articles 2 and 6 which I favour. There may be policy reasons for favouring a plaintiff and Waller L.J. has set out uncertainties, difficulties and possible frustration which may in some cases arise for him. They should not however in my view be permitted to weaken the protection provided for a defendant in Article 2, having regard to the Dresser considerations. The principle in issue should not be determined upon the possibility that a potential defendant may try to arrange a change of domicile between issue and service in an attempt to frustrate a plaintiff. Moreover, in a situation such as the present, in which there is more than one potential defendant, a plaintiff may minimise the risk to **\*317** him of a change of domicile between issue and service by an appropriate selection of forum. A result which, as in the present case, would involve defendants coming to England, a country with which they have no connection, to defend a claim in which no English defendant had been served would defeat the purpose of Article 2. There would be uncertainties for a defendant too, who upon contemplating a quite legitimate change of domicile, would not know whether he was already subject to a suit in the domicile he was planning to relinquish.

[53]  I do not consider that the general statement of the European Court of Justice in Case C-125/92, Mulox IBC Ltd v. H. Geels, [56] cited by Waller L.J., with its reference to reinforcing "the legal protection available to persons established in the community", supports the respondents' construction of Article 2. It recognises the interests of defendants as well as those of plaintiffs.

[54]   I agree with Waller L.J. that an analysis of the High Court's own rules is of limited assistance for present purposes but RSC, Ord. 11, r. 1(1)(c) does require valid service on the principal defendant as a pre-condition of the grant of leave to serve out of the jurisdiction on other defendants. Further, in giving the judgment of this court in Adams v. Cape Industries, [57] Slade L.J., while declining to express a final view on the point, stated [58] that "it would appear that the date of the service of process rather than the date of issue of proceedings is to be treated as 'the time of suit' for the purposes there in issue".

Canada Trust Co v Stolzenberg (No.2), [1998] I.L.Pr. 290 (1997)

[55] In my judgment the first defendant has not been sued under Article 2 and the appellants cannot be sued under Article 6 of the Convention. It follows that my answer to the question as posed in the notice of appeal, would be that there was no valid service on the appellants under Article 6 in the absence of service of a writ upon the defendant domiciled in England at the date of service upon him.

NOURSE L.J.:

[56] I agree with the judgment of Waller L.J. and would give the same answers to the three questions which have been argued.

**The relevant standard of proof**

[57] The authorities reviewed by Waller L.J. disclose that there may at times have been a measure of confusion between "good arguable case" and "serious question to be tried" or the like, perhaps because these expressions can mean different things to different minds and, to some at any rate, there cannot be a serious question to be tried if the plaintiff does not have a good arguable case. Be that as it may, the authorities disclose no confusion at all in rejecting the notion that the balance of probabilities, the standard appropriate to a trial, is applicable to a preliminary question of domicile such as that which has arisen in this case. The balance of probabilities having been firmly **\*318** rejected, the authorities establish that "good arguable case" is the standard of proof to be

applied. It has not been suggested that Rattee J. did not correctly apply that standard in this case.

**Date for determining domicile under Article 6**

[58] The difficulty of this question is attested by the difference of opinion which has arisen between Pill and Waller L.JJ., each of whose judgments makes a persuasive case for the conclusion to which it leads. In agreeing with Waller L.J., I do not suggest that the words "be sued" are incapable of referring to the time at which process is served as opposed to that at which it is issued. I acknowledge that it is well possible to conceive of contexts in which someone could not be said to be sued until he had been served. But the concern of Articles 2 and 6 of the EFTA Judgments Convention is to identify the courts in which a person domiciled in a Contracting State is to be sued, in other words the courts in which the process against him is to be issued, from which it seems necessarily to follow that his domicile is to be determined as at the date of issue and not service.

**Time for service on the domiciled defendant**

[59] I do not wish to add anything to the reasoning of Waller L.J. on this question.

Declarations made in accordance with the answers given at the end of Waller L.J.'s judgment. **\*319**

---

Footnotes

| | |
|---|---|
| 1 | See also the judgment of the Court of Appeal in the same matter dated 25 April 1997 on the question of establishing jurisdiction, reported at [1998] I.L.Pr. 30. |
| 2 | [1997] 2 All E.R. 855. |
| 3 | Seaconsar Far East Ltd v. Bank Markazi Jomhouri Islami Iran [1994] I.L.Pr. 678. |
| 4 | Cited above. |
| 5 | [1951] A.C. 869. |
| 6 | (1904) 90 L.T. 733, at p. 735. |
| 7 | Cited above. |
| 8 | [1946] 2 All E.R. 663. |
| 9 | [1995] C.L.C. 862. See in particular the passage in Henry L.J.'s judgment at p. 869E with which Ward and Russell L.JJ. agreed. |
| 10 | [1989] 1 W.L.R. 1147. |
| 11 | Cited above. |
| 12 | Cited above. |
| 13 | Cited above at p. 1156D. |

| 14 | [1997] I.L.Pr. 308. |
|----|---------------------|
| 15 | Case C-68/98, Shevill (F.), Ixora Trading Inc. Chequepoint Sarl and Chequepoint International Ltd v. Presse Alliance S.A.: [1995] E.C.R. I-415; [1995] I.L.Pr. 267. |
| 16 | See Dicey & Morris (12th ed.), pp. 288, 289. |
| 17 | [1990] I.L.Pr. 149. |
| 18 | [1992] 1 W.L.R. 1112. |
| 19 | Cited above. |
| 20 | At p. 1120F. |
| 21 | Cited above. |
| 22 | Cited above. |
| 23 | Cited above. |
| 24 | Cited above. |
| 25 | See, E.G. Gascoigne v. Pyrah, The Times , 26 November 1991: it must not be the sole object of joining a defendant to oust the jurisdiction of the court of the domicile of the other defendants. (See the additions to n. 75 in the 4th cumulative supplement to Dicey & Morris (12th ed.) and the reference to an Irish case Gannon v. B. & I. Steampacket Co. Ltd [1993] 2 I.R. 359) and it would be an abuse of Art. 6 to join a defendant simply to obtain discovery (see Molnlycke, cited above, at p. 1117B). |
| 26 | [1993] 2 Lloyd's Rep. 60. |
| 27 | [1994] 2 Lloyd's Rep. 560. |
| 28 | [1988] E.C.R. 5565; [1989] E.C.C. 407, at para. [19]. |
| 29 | [1991] 1 Lloyd's Rep. 557. |
| 30 | [1984] 2 Lloyd's Rep. 6. |
| 31 | At p. 569. |
| 32 | Cited above. |
| 33 | (2nd ed.), p. 16. |
| 34 | *e.g.* Art. 6(2). |
| 35 | Art. 20. |
| 36 | Art. 27(2). |
| 37 | See r. 22 of Dicey & Morris, cited above, at p. 270. |
| 38 | Cited above. |
| 39 | Case C-125/92, Mulox IBC Ltd v. H. Geels: [1993] E.C.R. I-4075; [1993] I.L.Pr. 668. |
| 40 | See Dicey & Morris, cited above, at p. 369. |
| 41 | In the light of Case 129/83, Zelger v. Salinitri (No. 2) [1984] E.C.R. 2397; [1985] 3 C.M.L.R. 366 that may be right. |
| 42 | See Bingham L.J. in Dresser, at p. 564 and the similar words of Steyn L.J. in The Sargasso, at p. 10. |
| 43 | (12th ed.). |
| 44 | [1990] Ch. 433. |
| 45 | [1995] 1 All E.R. 796. |
| 46 | At p. 815. |
| 47 | Cited above. |
| 48 | At para. [19]. |
| 49 | [1997] 2 All E.R. 484, at p. 492. |
| 50 | Cited above. |
| 51 | Cited above, at p. 514C. |
| 52 | Cited above. |
| 53 | Steyn L.J. at pp. 11 and 12. |
| 54 | At p. 12. |
| 55 | Cited above. |
| 56 | Cited above. |
| 57 | Cited above. |
| 58 | At p. 518C. |

[1998] I.L.Pr. 290

© 2017 Sweet & Maxwell

# TAB 3

**Deutsche Morgan Grenfell Group Plc v. Her Majesty's Commissioners of Inland Revenue and Another**

**Deutsche Morgan Grenfell Group Plc v. Her Majesty's Commissioners of Inland Revenue and Another**

House of Lords

25 October 2006

**[2006] UKHL 49, SESSION 2005-06**

**2006 WL 2929564**

Before: Lord Hoffmann Lord Hope of Craighead
Lord Scott of Foscote Lord Walker of Gestingthorpe
Lord Brown of Eaton-under-Heywood
Wednesday 25th October, 2006,
Hearing dates: 26 and 27 July 2006

*Analysis*

On appeal from [2005] EWCA Civ 78

**Representation**

•For HM Commissioners of Inland Revenue and
HM Attorney General Ian Glick QC David Ewart
(Instructed by HM Revenue and Customs Solicitors
Office ).
•For Deutsche Morgan Grenfell Laurence
Rabinowitz QC Francis Fitzpatrick Steven Elliott
(Instructed by Slaughter & May ).

**Judgment**

Lord Hoffmann

My Lords,

1   On 8 March 2001 the Court of Justice for
the European Communities decided that that United
Kingdom revenue law, which had since 1973 allowed
companies whose parents were resident in the United
Kingdom to elect to pay dividends free of advanced
corporation tax ("ACT"), discriminated unlawfully

against companies with parents resident in other
Member States: Metallgesellschaft Ltd v Inland
Revenue Commissioners (Joined Cases C-397 and
C-410/98) [2001] Ch. 620 . The exaction of the tax from
such companies had been contrary to the EC Treaty and
they were entitled to compensation.

2   The forensic fall-out from this decision has been
very considerable. Large numbers of subsidiaries of
companies resident in other Member States have lodged
claims for compensation or restitution, some raising
difficult ancillary points of law. The High Court has
made a group litigation order to enable these points to
be resolved in an orderly fashion. The main point in this
appeal concerns the period of limitation applicable to
such claims. But that in turn raises some fundamental
questions about the cause of action upon which the
claimants rely.

3   Before coming to these questions, I must briefly
enlarge upon the provisions relating to advance
corporation tax which the ECJ held to be contrary to
Community law. The tax, which was abolished in 1999,
was in theory corporation tax payable in advance of the
date on which it would otherwise have been payable.
A company resident in the United Kingdom pays
corporation tax on profits arising in a given accounting
period and, generally speaking, the tax is payable
nine months after the period ends. But the trigger
for the payment of corporation tax was the payment
of a dividend. A company which paid a dividend
became liable to account to the Inland Revenue for
ACT calculated as a proportion of the dividend. This
could afterwards be set off against the corporation
tax ("mainstream corporation tax" or "MCT") which
became chargeable on its profits. The Revenue thereby
obtained early payment of the tax and, in cases in which
the company's liability for MCT turned out to be less
than it had paid as ACT, payment of tax which would
not otherwise have fallen due.

4   The rule that ACT was payable on dividends was
however subject to an exception if the dividend was
paid to a parent company in the same group. Under
section 247 of the Income and Corporation Taxes Act
1988 the company and its parent could jointly make
a group income election which gave them the right to
be treated for the purposes of ACT as if they were
the same company. No ACT would be payable on the

distribution by the subsidiary. It would however be payable on any distribution by the parent. The Act confined the right of election to cases in which the parent was resident in the United Kingdom. Otherwise a subsidiary which had elected would not be liable to ACT and the parent, being non-resident, would not be liable either.

5 In the Metallgesellschaft case the Court of Justice decided that these arrangements infringed the right of establishment guaranteed by article 52 (now 43) of the EC Treaty in that they discriminated against companies resident in other Member States. It held that the companies which had been unlawfully required to pay ACT were entitled to restitution or compensation. The nature of the remedies, the procedures by which they could be enforced and matters like the appropriate limitation periods were said to be matters for domestic law. The only specific qualification imposed by the Court of Justice was that English courts could not apply the rule in the The Pintada ( President of India v La Pintada Compania Navigacion SA [1985] AC 104 ) to deny any recovery of interest to a claimant whose ACT had been set off against MCT before the commencement of proceedings. The claimant was entitled to be compensated for loss of the use of the money between the date on which it was paid and the date when MCT became due.

6 In these proceedings, commenced on 18 October 2000, Deutsche Morgan Grenfell Group plc ("DMG") claims compensation for having had to pay ACT on three dividends paid to its German parent company between 1993 and 1996: in October 1993, February 1995 and January 1996. (No mention of the 1995 and 1996 ACT payments appeared in the pleadings until an amendment made on 19 August 2002 and there is an issue, to which I shall return later, over whether that latter date should be taken for the purposes of limitation as the commencement date of the proceedings in respect of those dividends.) All the payments were subsequently set off against MCT. The facts are set out more fully in the speech to be delivered by my noble and learned friend Lord Walker of Gestingthorpe, which I have had the privilege of reading in draft.

7 There is no dispute that if DMG had been entitled to make a group election, it would have done so. There is likewise no dispute that DMG

is entitled to compensation for breach of statutory duty (the infringement of article 43 ) or by way of restitution of tax unlawfully demanded under the principle established in Woolwich Equitable Building Society v Inland Revenue Commissioners [1993] AC 70 . But the period of limitation for both of these causes of action runs from the date of payment and DMG wishes to claim in respect of the 1993 payment, which on any view was made more than six years before proceedings were commenced. In addition, if the proceedings in respect of the 1995 and 1996 ACT payments are treated as having been commenced on 19 August 2002, they would also have been more than 6 years earlier. DMG therefore argues that it has an additional cause of action for restitution on the ground that the money was paid by mistake. Section 32(1)(c) of the Limitation Act 1980 provides that where the action is for "relief from the consequences of a mistake", the period of limitation does not begin to run until the claimant has discovered the mistake "or could with reasonable diligence have discovered it." (With effect from 8 September 2003, this provision no longer applies to mistakes of law in tax cases: see section 320 of the Finance Act 2004 .) DMG says that it did not discover its mistake until the ECJ gave judgment (after the commencement of proceedings) and no amount of diligence could have enabled it to know in advance what the ECJ was going to say.

8 The first question, therefore, is whether DMG has a cause of action which can be described as being "for relief from the consequences of a mistake" within the meaning of section 32(1) of the 1980 Act. It claims that it seeks relief against having paid money to the Inland Revenue in the mistaken belief that, since section 247 of the Taxes Act made no provision for a group election by a company with a German parent, it was obliged to pay ACT. In fact, article 43 of the Treaty made this denial of a right of election unlawful and, in consequence, since DMG would have exercised its election, it was not obliged to pay ACT.

9 Before the decision of the House of Lords in Kleinwort Benson Ltd v Lincoln City Council [1999] 2 AC 349 , this mistake would not have given rise to any cause of action because it was a mistake of law. That rule has now been abandoned. Nevertheless, Mr Glick QC for the Inland Revenue submits that while it is now in general true that money paid by mistake can

be recovered, whether the mistake is of fact or law, tax is different. There is still no cause of action at common law for the recovery of tax paid under a mistake of law. He says that there are only two remedies for the recovery of tax which was not due. One is the common law remedy to recover tax unlawfully demanded which was established in the Woolwich case. The other is the statutory remedy provided by section 33 of the Taxes Management Act 1973 :

> (1)  If any person who has paid tax charged under an assessment alleges that the assessment was excessive by reason of some error or mistake in a return, he may by notice in writing at any time not later than six years after the end of the year of assessment (or, if the assessment is to corporation tax, the end of the accounting period) in which the assessment was made, make a claim to the Board for relief.

> (2)  On receiving the claim the Board shall inquire into the matter and shall, subject to the provisions of this section, give by way of repayment such relief … in respect of the error or mistake as is reasonable and just:

> Provided that no relief shall be given under this section in respect of an error or mistake as to the basis on which the liability of the claimant ought to have been computed where the return was in fact made on the basis or in accordance with the practice generally prevailing at the time when the return was made.

> (3)  In determining the claim the Board shall have regard to all the relevant circumstances of the case, and in particular shall consider whether the granting of relief would result in the exclusion from charge to tax of any part of the profits of the claimant, and for this purpose the Board may take into consideration

the liability of the claimant and assessments made on him in respect of chargeable periods other than that to which the claim relates.

10  Whether the claim is under the Woolwich principle or section 33 , time runs from when the payment was made. So Mr Glick says that in either case, the claim for interest on the 1993 payment is statute barred. The judge (Park J) rejected the submission. He saw no reason in principle why the right to restitution of payments made by mistake, which had been extended in Kleinwort Benson to include mistakes of law, should not apply to payments of tax. No argument based on section 33 appears to have been advanced to him.

11  The Court of Appeal (Jonathan Parker, Rix and Buxton LJJ) disagreed. The main reason was their view that Lord Goff of Chieveley, in his speech in Kleinwort Benson, had said that payments of tax under a mistake of law were subject to a separate and distinct regime which provided remedies only under the Woolwich principle and section 33 . Buxton LJ also offered some reasons why it would cause difficulties if payment by mistake was accepted as a ground for the recovery of taxes. I will come back to this point later, when I deal with the question of whether DMG did in fact pay the tax by mistake.

12  First, however, I must deal with the opinion attributed by the Court of Appeal to Lord Goff. Both Jonathan Parker LJ and Buxton LJ subjected his speeches in the Woolwich and Kleinwort Benson case to a detailed analysis which I have read more than once with attention and respect. The chief support for Mr Glick's argument is to be found in the following passage in Kleinwort Benson [1999] 2 AC 349 , 382:

> "… in our law of restitution, we now find two separate and distinct regimes in respect of the repayment of money paid under a mistake of law. These are (1) cases concerned with repayment of taxes and other similar charges which, when

Deutsche Morgan Grenfell Group Plc v Inland Revenue..., 2006 WL 2929564...

exacted ultra vires, are recoverable as of right at common law on the principle in Woolwich, and otherwise are the subject of statutory regimes regulating recovery; and (2) other cases, which may broadly be described as concerned with repayment of money paid under private transactions, and which are governed by the common law."

13  There is no doubt that the regimes are different. Both the Woolwich principle and section 33 apply only to the recovery of money paid as taxes or the like. They do not apply to "private transactions". The Woolwich principle is indifferent as to whether the taxpayer paid the tax because he was mistaken or, as in Woolwich, for some other reason. And section 33 has its own rules. So the regime for taxes is certainly different. But the question is whether Lord Goff meant to say that the remedies provided by the two regimes are mutually exclusive. Woolwich and section 33 are available only for "taxes and other similar charges". Does it follow that the common law rule for recovery of payments made by mistake, as applied to private transactions in Kleinwort Benson, does not apply to taxes? That would be going a good deal further. It is one thing to say that the regimes are different and another to say that their remedies are mutually exclusive.

14  This question is discussed at considerable length in the judgments in the Court of Appeal. It is, I think, neither here nor there for me to say that, as one who (in the end) gave wholehearted concurrence to Lord Goff's speech, I never thought that it had the meaning attributed to it by the Court of Appeal. Once a judgment has been published, its interpretation belongs to posterity and its author and those who agreed with him at the time have no better claim to be able to declare its meaning than anyone else. But to my mind the context in which Lord Goff made the remarks which I have quoted demonstrates conclusively that he could not have meant what the Court of Appeal thought.

15  Early in his speech ( [1999] 2 AC 349 , 367) Lord Goff announced that he proposed to address first the question of whether the rule precluding recovery of money paid under a mistake of law should remain part of English law. This had not been much discussed in argument. Counsel for the respondents had not attempted to defend the old rule but had concentrated his fire on the questions of whether someone who acts in accordance with a settled understanding of the law can be said to have made a mistake, or whether, if he has, the rule should be subject to an exception in such a case. Nevertheless, Lord Goff devoted some space to an examination of the history and possible policies of the mistake of law rule and finally concluded (at p 375) that it should be abrogated. That part of his speech contains no hint of an exception for taxes paid under a mistake of law.

16  Lord Goff then went on to the question of whether it made a difference that the payments were made in accordance with a settled understanding of the law. It is here that the passage which I have quoted appears. He uses the distinction between tax payments and private transactions to argue that the case for a settled law exception is stronger in the case of tax payments ("large numbers of taxpayers may be affected" and "there is an element of public interest") than in the case of private transactions. At the end of this discussion, he leaves the door slightly open for an argument that there is such a defence for tax payments. But he rejects it for private payments.

17  My Lords, this reasoning is quite inconsistent with the absence of a cause of action for recovery of tax on the grounds of mistake of law. What kind of claim did Lord Goff contemplate that a settled law defence might protect the Revenue against? Surely, a claim to recover tax on the ground that it had been paid under a mistake of law. Lord Goff was not suddenly turning to the Woolwich cause of action and asking whether it should be subject to a defence that the demand for tax, although ultra vires, was in accordance with a settled understanding of the law. The question which he had announced (at p 367) that he intended to answer was "whether … there should be an exception to recovery on the ground of mistake of law … in cases where the money has been paid under a settled understanding of the law which has subsequently been changed by judicial decision." There would be little point in discussing whether a settled understanding of the law should be a defence to a claim for recovery of a

tax payment on the grounds of mistake of law if there was no such cause of action.

18   In my opinion, Lord Goff's speech in Kleinwort Benson does not deny the right to recover tax on the ground that it was paid by mistake. On the contrary, his discussion of a possible settled law defence necessarily entails that he thought that there was such a cause of action. And for the reasons I gave in Kleinwort Benson, I do not think that there is an exception for cases in which there is a settled view of the law.

19   Mr Glick's alternative submission was that section 33 excluded any common law claim on the grounds of mistake. He said that Parliament, having provided a qualified remedy for one category of mistaken payments of tax (when "the assessment was excessive by reason of some error or mistake in a return"), must be taken to have dealt exhaustively with any kind of mistaken payment of tax and, so far as section 33 did not provide a remedy, must be taken to have intended that no remedy should exist. Mr Glick accepts that section 33 has no application to the present case because ACT was payable without any assessment, but nevertheless submits that section 33 excludes a remedy. In my opinion this goes much too far. Mr Glick advanced a similar argument in the Woolwich case, where section 33 did not apply because there had been no lawful assessment. The House of Lords rejected it. It is true that in Woolwich Mr Glick's argument was more ambitious, in that he was trying to use section 33 to exclude a remedy even when there had been no mistake of any kind. But the question is in the end one of construction. When a special or qualified statutory remedy is provided, it may well be inferred that Parliament intended to exclude any common law remedy which would or might have arisen on the same facts. That was the case in Marcic v Thames Water Utilities Ltd [2003] UKHL 66; [2004] 2 AC 42 , upon which Mr Glick relied. But I see no reason to infer that Parliament intended to exclude a common law remedy in all cases of mistake (whether of fact or law) in which the Revenue was unjustly enriched but did not fall within section 33 .

20   The next question is whether the money was paid by mistake. This might seem at first sight to be a simple question but the division of opinion in the Kleinwort Benson case [1999] 2 AC 349 and the academic literature show that it can lead one into deep waters. One might start by asking why it matters. The effect of the decision in Metallgesellschaft [2001] Ch 620 was that the Inland Revenue had not been entitled to the money. Nor could the Revenue have thought that DMG was intending to make an interest-free loan to the British government or that there was any other proper ground on which they had been entitled to retain it. Why, then, is it necessary to investigate the precise state of mind (of which the Revenue would have known nothing) with which DMG made the payment?

21   The answer, at any rate for the moment, is that unlike civilian systems, English law has no general principle that to retain money paid without any legal basis (such as debt, gift, compromise, etc) is unjust enrichment. In the Woolwich case [1993] AC 70 , 172 Lord Goff said that English law might have developed so as to recognise such a general principle — the condictio indebiti of civilian law — but had not done so. In England, the claimant has to prove that the circumstances in which the payment was made come within one of the categories which the law recognizes as sufficient to make retention by the recipient unjust. Lord Goff provided a list in the Woolwich case at pp 164–165 and the decision itself added another. One such category, long recognized, is payment by mistake: see Kelly v Solari (1841) 9 M & W 54 . The late Professor Birks argued, in the second edition of his book on Unjust Enrichment (2005), that the trend of recent English decisions meant that, for the purpose of entitling a claimant to recover, the categories were now superfluous. The fact that the money had not been due was, in the absence of some other causa for payment, a sufficient ground for recovery. We have now developed a condictio indebiti. The absence of a basis for the payment is a ground which generalises and subsumes all the separate categories of situation in which a payment of money not due was recoverable.

22   I do not think it is necessary for us to decide this question about the fundamental basis of enrichment liability because the question before the House is not the fundamental juridical basis of DMG's cause of action but whether the action can be described as being "for relief from the consequences of a mistake" within the meaning of section 32(1)(c) of the 1980 Act. Kleinwort Benson [1999] 2 AC 349 is recent authority for the proposition that an action for restitution of money paid

under a void contract can fall within this description. That does not seem to me inconsistent with the existence of the mistake not being essential to the cause of action but merely one example of a case which falls within a more general principle, just as one could have (say, for the purposes of limitation) a category called "clinical negligence" without implying that it is a cause of action different in nature from other kinds of negligence.

23  I come back, therefore, to the question of whether DMG made a mistake, against the consequences of which the action seeks relief. The first point to make is that the alleged mistake was one of a very special kind. If DMG had known for certain what the Court of Justice was going to say in Metalgesellschaft on 8 March 2001, it is very unlikely that it would have paid ACT. But it had no means of knowing that. It was only in retrospect that it became clear that the ACT could not lawfully have been exacted. Professor Birks said that this was not a mistake at all. It was merely an inability to predict what the Court of Justice was going to say, just as one cannot predict with certainty what the weather is going to be like. And Sir Jack Beatson, writing extra-judicially in the volume to be published in memory of Professor Birks (Unlawful Statutes and Mistake of Law: Is there a Smile on the Face of Schrödinger's Cat? in Mapping the Law (ed Burrows and Rodger) at pp 163–180) describes the majority decision in Kleinwort Benson to treat a similar failure of prediction as a mistake as an "emphatic endorsement … of the declaratory theory of judicial decision-making" and "abstract juridical correctitude". This seems to me, with respect, to muddle two different questions. One is whether judges change the law or merely declare what it has always been. The answer to this question is clear enough. To say that they never change the law is a fiction and to base any practical decision upon such a fiction would indeed be abstract juridical correctitude. But the other question is whether a judicial decision changes the law retrospectively and here the answer is equally clear. It does. It has the immediate practical consequence that the unsuccessful party loses, notwithstanding that, in the nature of things, the relevant events occurred before the court had changed the law: see In re Spectrum Plus Ltd [2005] UKHL 41; [2005] 2 AC 680 . There is nothing abstract about this rule. So the main question in the Kleinwort Benson case was whether a person whose understanding of the law (however reasonable and widely shared at the time) is falsified by a subsequent

decision of the courts should, for the purposes of the law of unjust enrichment, be treated as having made a mistake. The majority view in Kleinwort Benson was that he should. The effect of the later judgment is that, contrary to his opinion at the time, the money was not owing. It is therefore fair that he should recover it. It may be that this involves extending the concept of a mistake to compensate for the absence of a more general condictio indebiti and perhaps it would make objectors feel better if one said that because the law was now deemed to have been different at the relevant date, he was deemed to have made a mistake. But the reasoning is based upon practical considerations of fairness and not abstract juridical correctitude.

24  Mr Glick, taking Kleinwort Benson at face value, accepted that the DMG made the 1993 and February 1995 payments by mistake. But he said that the commencement of the Metallgesellschaft litigation in July 1995 must, at the very lowest, have raised a doubt in the relevant minds of DMG. There was evidence that in July 1995 DMG had discussed the implications of the Metallgesellschaft challenge and considered making a "protective" group election in case Metallgesellschaft won its case. (Whether such an election would have done them any good is another matter: see Park J at [2003] 4 All ER 645 , 657.) So the Revenue say that the 1996 payment was made when a state of doubt existed and that this was not a mistake.

25  There is some authority for the view that a state of doubt does not amount to a mistake: see Burrows The Law of Restitution (2nd ed 2002) pp 139–140. In the Kleinwort Benson case ([1999] 2 AC 349 , 410) my noble and learned friend Lord Hope of Craighead said:

> "A state of doubt is different from that of mistake. A person who pays when in doubt takes the risk that he may be wrong — and that is so whether the issue is one of fact or one of law."

26  This was a very compressed remark in the course of a discussion of other matters and I do not think that Lord Hope could have meant that a state of

doubt was actually inconsistent with making a mistake. Contestants in quiz shows may have doubts about the answer ("it sounds like Haydn, but then it may be Mozart") but if they then give the wrong answer, they have made a mistake. The real point is whether the person who made the payment took the risk that he might be wrong. If he did, then he cannot recover the money. Speaking for myself, I think that there is a parallel here with the question of whether a common mistake vitiates a contract. As Steyn J said in *Associated Japanese Bank (International) Ltd v Credit du Nord SA [1989] 1 WLR 255* , 268:

> "Logically, before one can turn to the rules as to mistake … one must first determine whether the contract itself, by express or implied condition precedent or otherwise, provides who bears the risk of the relevant mistake. It is at this hurdle that many pleas of mistake will either fail or prove to have been unnecessary."

27   Likewise, the circumstances in which a payment is made may show that the person who made the payment took the risk that, if the question was fully litigated, it might turn out that he did not owe the money. Payment under a compromise is an obvious example: see *Brennan v Bolt Burdon [2004] EWCA Civ 1017; [2005] QB 303* . I would not regard the fact that the person making the payment had doubts about his liability as conclusive of the question of whether he took the risk, particularly if the existence of these doubts was unknown to the receiving party. It would be strange if a party whose lawyer had raised a doubt on the question but who decided nevertheless that he had better pay should be in a worse position than a party who had no doubts because he had never taken any advice, particularly if the receiving party had no idea that there was any difference in the circumstances in which the two payments had been made. It would be more rational if the question of whether a party should be treated as having taken the risk depended upon the objective circumstances surrounding the payment as they could reasonably have been known to both parties,

including of course the extent to which the law was known to be in doubt.

28   These thoughts may be said to support the view of Professor Birks that English law should be less concerned with whether the person who paid the money made a mistake (involving an inquiry into his subjective state of mind) than with whether there was a valid causa for the payment, such as a debt, compromise or gift, these being matters of objective inquiry into the circumstances of the payment as they would have been known to both parties. But they do not arise in this case because both the judge and Jonathan Parker LJ in the Court of Appeal decided on the facts that, even if a state of doubt was inconsistent with a mistake, DMG had been mistaken. Mr Thomason, the Head of Taxation at DMG, gave evidence about his state of mind when it paid the ACT. He said:

> "At all times prior to the determination of the European Court in the Hoechst case, I believed that the United Kingdom statute denying the ability to make a group income election was the law and that I was bound to act in accordance with this law. … It did not occur to me that I could ignore the law as it stood for the simple reason that the law is the law. Just because another taxpayer challenged the law that did not mean that I could or should ignore it."

29   Park J accepted this evidence as showing that, whether or not a state of doubt was consistent with making a mistake, DMG, in the person of Mr Thomason, was not in a state of doubt. Jonathan Parker LJ agreed. He said ( *[2006] 2 WLR 103* , 179, para 235):

> "I accept Mr Rabinowitz's submission … that mere knowledge that the statutory provisions in question are under challenge is not to be equated with a state of doubt as to the validity of those provisions. In

any event, as I have already pointed out, Mr Thomason's evidence was that he was in no doubt that the ACT was payable, whatever the decision in the Metallgesellschaft case."

30  Buxton and Rix LJJ, on the other hand, doubted whether this could be reconciled with the observations of Lord Hope which I have cited above. But I do not understand why this should be so. The judge attributed Mr Thomason's state of mind to DMG and found as a fact that he was not in doubt. He thought that DMG had to pay. Someone with a more sophisticated approach to the law might have had doubts — might even have thought that Metallgesellschaft had a good case and that the ECJ ruling would apply retrospectively — but not Mr Thomason. I would therefore agree with the judge and Jonathan Parker LJ that on any view of the law on this point, he made a mistake.

31  If DMG made a mistake about the law, when could they "with reasonable diligence" have discovered it? On this question it is important to bear in mind the special nature of the mistake, namely that it was deemed to have been made because of the retrospective operation of a later decision of the Court of Justice. The "reasonable diligence" proviso depends upon the true state of affairs being there to be discovered. In this case, however, the true state of affairs was not discoverable until the Court of Justice pronounced its judgment. One might make guesses or predictions, especially after the opinion of the Advocate General. This gave DMG sufficient confidence to issue proceedings. But they could not have discovered the truth because the truth did not yet exist. In my opinion, therefore, the mistake was not reasonably discoverable until after the judgment had been delivered.

32  Two footnotes on the question of mistake. First, Park J took a rather sophisticated view of the nature of the mistake. He said that the mistake was not about whether ACT was payable. DMG had not made an election and therefore it was payable. The mistake was about whether DMG should have been allowed to elect.

But I agree with the Court of Appeal that the mistake was about whether DMG was liable for ACT. The election provisions were purely machinery, which DMG would undoubtedly have used, by which it could enforce its right to exemption from liability.

33  Secondly, Buxton LJ said that the problems about what counted as a mistake, some of which I have discussed above, showed the "ineptitude" of extending the law of payment under a mistake to payment of taxes. It is true that there may be anomalies in the different limitation treatment of claimants who paid under a mistake and those who paid without a mistake but pursuant to an ultra vires demand (Woolwich) or a void contract (Kleinwort Benson): see [2006] 2 WLR 103 , 190 and 192. But these anomalies flow from any recognition of payment by mistake as a cause of action and not from a distinction between payments of tax and private payments. In either case, there is the possibility of alternative causes of action, with one producing more favourable treatment under the Limitation Act than the other.

34  It follows that in my opinion section 32(1)(c) postponed the commencement of the limitation period in respect of all three ACT payments until 8 March 2001. That makes it unnecessary to decide whether the proceedings in respect of the last two payments were begun when the proceedings were issued or when they were amended. I will say only that on this point I agree with the majority of the Court of Appeal. I would allow the appeal and restore the judgment of Park J.

Lord Hope of Craighead

My Lords,

35  I have had the great advantage of reading in draft the speeches of my noble and learned friends Lord Hoffmann and Lord Walker of Gestingthorpe, in which the background to this appeal is so comprehensively and helpfully set out. With that advantage, which I gratefully acknowledge, I can proceed directly to the three of the various issues in dispute which Lord Walker has summarised in para 117 on which I wish to comment. These are (1) the cause of action" issue; (2) the "mistake" issue; and (3) the "discovery" issue.

36 As Lord Walker points out (para 96), the focus of the present appeal is on limitation of actions. DMG seeks to avoid the six year time limit by taking advantage of the extended limitation period that is available in England and Wales (but not in Scotland: see the Prescription and Limitation (Scotland) Act 1973, section 6 and Schedule I, para 1(b) ) under section 32(1)(c) of the Limitation Act 1980 which provides that, where the action is for relief from the consequences of a mistake, the period of limitation shall not begin to run until the claimant has discovered the mistake or could with reasonable diligence have discovered it. This provision no longer applies in relation to a mistake of law relating to a taxation matter under the care and management of the Commissioners for Revenue and Customs: Finance Act 2004, section 320 (read together with section 5 of the Commissioners for Revenue and Customs Act 2005 ). That section, which applies only to actions brought on or after 8 September 2003, was enacted in response to the judgment of Park J in this case which was given on 18 July 2003: [2003] 4 All ER 645 . The application of this provision to claims existing but not yet made by 8 September 2003 is being challenged under Community law: Aegis Group plc v IRC [2005] EWHC 1468 (Ch); [2006] STC 23 . It is enough, however, for the purposes of this case to say that it is not in dispute that the extended limitation period is available to DMG if the issues which are raised in this appeal are decided in its favour.

37 The fact that the benefit of the extended period is being removed from future cases does not deprive the question whether English law recognises a restitutionary claim for tax paid under a mistake of law of all its interest. But the fact that the limitation period is now the same, at least for all new claims, whichever of the various available avenues for the recovery of money from the Revenue is chosen makes it unlikely that this issue will require to be revisited in cases to which it is a party. Tax paid in response to an unlawful demand will be recoverable under the Woolwich principle, subject to the ordinary time limit of six years: Woolwich Equitable Building Society v Inland Revenue Commissioners [1993] AC 70 . Where the revenue's assessment to tax was excessive by reason of some error or mistake made by the taxpayer in a return, a statutory remedy for repayment is available. The leading examples are to be found in section 33 of the Taxes Management Act 1970 as to income tax and

capital gains tax and the Finance Act 1998, Schedule 18, para 51 as to corporation tax. The remedy available under these provisions must be sought not later than six years after the end of the relevant accounting period: see TMA 1970, section 33(1) . Cases not covered by one or other of these remedies in which it will be necessary to resort to a remedy under the principle of unjust enrichment are likely to be rare.

**The cause of action issue**

38 Lord Goff of Chieveley made it clear in Kleinwort Benson Limited v Lincoln City Council [1999] 2 AC 349 , 371H–372A (his speech in that case, so rich in scholarship, was the last which he prepared before his retirement as Senior Law Lord) that he was under no illusions about the difficulties which the House faced in formulating satisfactory limits to the right to recover money paid under a mistake of law. He observed that there was more sense in the old mistake of law rule than its more strident critics had been prepared to admit. But its rejection by the common law world was not, as he said at pp 372F–373D, due to a wish to depart from the policy underlying the rule but rather to an acknowledgement, due essentially to the work of scholars, that it could best be achieved by recognising a general right of recovery subject to specific defences to cater for the fears which formerly appeared to require a blanket exclusion of recovery. It was his acceptance of this general right of recovery of money paid under a mistake, whether of fact or law, that lay at the centre of the discussion that then followed. As he put it at p 373C, a blanket rule of non-recovery, irrespective of the justice of the case, could not survive in a rubric of the law based on the principle of unjust enrichment. Instead it was for the law to evolve appropriate defences which could, together with the acknowledged defence of change of position, provide protection where appropriate for recipients of money paid under a mistake of law in those cases in which justice or policy does not require them to refund the money.

39 This then is the background against which the argument for the Revenue on this issue must be examined. On the one hand there is the proposition which lay at the heart of Lord Goff's analysis. (An indication of the immense care he took over his speech, which was so evident to those of your Lordships who had the privilege of sitting with him on that case, can

Deutsche Morgan Grenfell Group Plc v Inland Revenue ... 2006 WL 2929564...

be gathered from the fact that the original version of it lacked some of the section headings that appear in the revised version that was later published in the Appeal Cases: see [1998] 3 WLR 1095 at pp 1119G and 1121A–B; [1999] 2 AC 349 at pp 379F and 381B). As he put it at p 385A–B, money paid under a mistake of law is recoverable on the ground that its receipt by the defendant will, prima facie, lead to his unjust enrichment, just as receipt of money paid under a mistake of fact will do so. Then there is the principle recognised by Professor Peter Birks, to whom Lord Walker has so fittingly paid tribute. With characteristic simplicity he declared that, unless displaced by statute, causes of action good against private citizens are no less good against public bodies: see his essay (in the volume Essays on Restitution (1990), edited by Professor P D Finn) entitled Restitution from the Executive, at p 174. That was why he acknowledged that, if in Woolwich Equitable Building Society v Inland Revenue Commissioners [1993] AC 70 the building society had made a mistake of fact, it would undoubtedly have entitled the society to restitution of the money paid to the Revenue in consequence of its mistake, just as it plainly would have been had the transaction been with a private citizen.

40   The question is whether an exception to the general rule which Lord Goff identified should now be recognised in the case of payments made under a mistake of law to the Revenue. How would Lord Goff himself have reacted to it? I think that there is no doubt what his initial reaction would have been. We can see what he made of the argument that the Revenue was in a special position in the Woolwich case at pp 171–172. The Revenue had made an unlawful demand for tax but it was asserting that it was under no obligation to pay back the money. That position seemed to him, as matter of common justice, to be untenable — a position made worse by the fact that it involved the Revenue having the benefit of a massive interest-free loan as the fruit of its unlawful action:

> "Common justice seems to require that tax to be repaid, unless special circumstances or some principle of policy require otherwise; prima facie, the taxpayer should be entitled to repayment as of right."

We can also see, from the way in which he dealt with the suggested defence of honest receipt in Kleinwort Benson [1999] 2 AC 349 , pp 384–385, how determined he was to preserve the purity and simplicity of the principle which he had described earlier:

> "In my opinion, it would be most unwise for the common law, having recognised the right to recover money paid under a mistake of law on the ground of unjust enrichment, immediately to proceed to the recognition of so wide a defence as this which would exclude the right of recovery in a very large proportion of cases. The proper course is surely to identify particular sets of circumstances which, as a matter of principle or policy, may lead to the conclusion that recovery should not be allowed."

I think that Mr Rabinowitz QC for DMG was right therefore to take as the starting point for his argument the general right to recover, and then to ask on what grounds either of policy or principle the Revenue can claim that an exception should be made in its case.

41   I should add, before I complete this introduction, that I believe that we are in a very different field from that which Lord Rodger of Earlsferry was contemplating when in Commissioners of Customs and Excise v Barclays Bank plc [2006] UKHL 28; [2006] 3 WLR 1 , 19, para 51 he reminded us of the philosopher's advice to "Seek simplicity and distrust it." The proposition that money paid under a mistake is recoverable is based on the principle that, prima facie, its receipt by the defendant will lead to his unjust enrichment. There is no reason to distrust a proposition based on such an elementary principle just because it is simple. Now that the common law world has recognised that there is a general right of recovery whether the mistake is of fact or law, it should be careful not to disturb its purity and its simplicity unless there is a clear basis on grounds of principle or policy for doing so.

Deutsche Morgan Grenfell Group Plc v Inland Revenue... 2006 WL 2929564...

42  The Revenue submit that a common law claim for restitution based on mistake of law is not available to a party in relation to an overpayment of tax to the Revenue. They maintain that common law claims for restitution arising from a tax measure which is ultra vires or otherwise unlawful can only be made on the principle in Woolwich or by analogy with that principle, and that they are subject to a limitation period of six years. They also point to the existence of statutory remedies. To bring the case within the Woolwich principle by analogy they submit that, while ACT cannot be said to have been an unlawful tax, the payments that were made in this case were the result of the unlawful exclusion of certain subsidiaries in section 247(1) of the ICTA 1988 . It follows that a right to a remedy arises in respect of that unlawfulness. As for the statutory remedies, they submit that there is a general principle that a common law remedy will be excluded where Parliament has enacted a statutory scheme inconsistent with the remedy. That scheme is revealed by the various provisions that have been enacted which, subject to certain conditions, permit the recovery of tax paid by reason of an error or a mistake in an assessment. The authority which they cite in support of this proposition is Marcic v Thames Water Utilities Ltd [2004] 2 AC 42 .

43  Two issues of principle lie at heart of this argument. The first is whether the remedy in restitution that is available for payments made under a mistake recognised in Kleinwort Benson Limited v Lincoln City Council [1999] 2 AC 349 is subject to an exception in the case of taxes paid under a mistake of law to the Revenue. The second is whether, if they are not subject to any such exception, it is open to a litigant to choose whichever of two or more concurrent remedies best suits his interests. The argument that, where there is a statutory scheme which occupies the same ground as the common law remedy, the common law remedy must be held to be excluded by it, cannot be said to raise an issue of principle as the effect of the scheme must depend on the words of the statute. Nevertheless it raises an issue of policy that needs to be dealt with.

44  The submission that the restitutionary remedy for payments made under a mistake is subject to an exception in favour of the Revenue where the mistake was one of law runs into difficulty as soon as it is articulated. It seeks to build in two exceptions, not just one, into the generality of the remedy that was recognised in Kleinwort Benson. The first exception would involve treating payments made under a mistake of fact differently from payments made under a mistake of law. The second would involve treating the Revenue differently from all other public authorities which receive payments made under a mistake of law. If this argument were to succeed it would have a significant impact on the law's taxonomy. English law has been moving step by step towards a principled statement of the law of restitution. The carving out of exceptions which are not clearly based on principle would risk reversing this process.

the debatable passage

45  The Revenue's argument on grounds of principle is based on a passage in Lord Goff's speech in Kleinwort Benson which Lord Walker has referred to (para 29(5)) as the debatable passage. In this passage Lord Goff drew a distinction between, on the one hand, "payments of taxes and other similar charges and, on the other hand, payments made under ordinary private transactions": p 381G–H. Elaborating on this distinction at p 382B–D, he said that under our law of restitution there were now to be found "two separate and distinct regimes" in respect of the repayment of money paid under a mistake of law. These were (1) cases concerned with repayment of "taxes and other similar charges" exacted ultra vires, recoverable as of right at common law under the Woolwich principle, and (2) other cases, which might broadly be described as concerned with the repayment of money paid under private transactions, governed by the common law. At p 382D–E he went on to say that a case might be made in favour of a principle that, in cases concerned with taxes, payments made in accordance with a prevailing practice or a settled understanding of the law should be irrecoverable.

46  There are a number of points about this passage that have to be taken into account in assessing its significance. The first is that it appears in a section of Lord Goff's speech where, having concluded at p 375 that English law should recognise that there was a general right to recover money paid under a mistake whether of fact or law, he was considering whether it would be appropriate to develop a defence of settled

understanding of the law on the lines proposed by the Law Commission as a corollary to the newly developed right of recovery: p 381B–C. He was, in effect, clearing the ground for a further examination of this point. Cases where taxes and other similar charges exacted ultra vires were recoverable as of right under the Woolwich principle could be left on one side because there was no need in those cases to invoke a mistake of law by the payer: p 381H. The phrase "taxes and other similar charges" lacks the precision that would be needed if it was intended to define the extent of an exception to the general right of recovery. But Lord Goff's point was simply that there was no room in the case of an ultra vires demand for a defence that it was made on a settled understanding of the law. The only context in which a limit to recovery on that ground needed to be considered was where repayment of money was sought as having been paid under a mistake of law under the newly recognised common law principle.

47  In the Court of Appeal [2006] 2 WLR 103 , 173–174, para 205 Jonathan Parker LJ said that the first of the two regimes which Lord Goff identified in this passage was a comprehensive and complete regime in relation to overpayments of tax made under a mistake of law, and that it was not limited to cases where the payment of tax was made pursuant to an unlawful demand — in other words that it was not limited to Woolwich cases. I do not think that this can be right. Not only does it read far more into the passage than the words used justify. It also fails to take account of the fact that in the Woolwich case there was no error of law by the taxpayer. So the House was not called upon to consider the effect of a mistake of law in that case at all. Lord Goff's use of the phrase "or other similar charges" is perfectly intelligible if it is understood as referring to the case of an ultra vires demand. All statutory charges which are the subject of an ultra vires demand fall easily within this category. It begs many questions if it was intended to identify a category that was to be excluded from the general common law right of recovery for payments made under a mistake: see, for example, Sir Jack Beatson's comments in Chapter 9, Unlawful Statutes and Mistake of Law, p 174–175 in Burrows and Rodger (Eds), Mapping the Law (Oxford 2006).

48  It has to be acknowledged, of course, that at p 382C–D Lord Goff indicated that these cases were limited to private transactions, and that he repeated this point at p 382E–F when he said that the case he was dealing with was concerned with payments made under private transactions. But it can, I think, be inferred that the reason for this is to be found in his reference at p 381H–382A to the various statutory provisions which regulate the repayment of overpaid tax. This is why, when he came at p 382C–D to identify the first regime more precisely, he included in it not only those cases where the payment was recoverable under the Woolwich principle but also those cases which were the subject of statutory regimes regulating recovery. Here too it was unnecessary to consider a defence of common understanding, as it was open to the statutory regime which regulated recovery to deny relief where, for example, the return was made on the basis of or in accordance with prevailing practice: see, for example, the proviso to section 33(2) of TMA 1970 . When he was describing these two separate and distinct regimes Lord Goff did not contemplate the possibility that there was a third category: cases concerned with the repayment of money paid under a mistake of law to a public authority which was not covered by any statutory regime regulating recovery and which, although recoverable as of right on the principle in Woolwich because it had been exacted by a demand ultra vires, was also within the scope of the newly articulated common law principle. It is into this third category that this case falls.

49  I think that it is safe to assume that if he had appreciated that there was this third category Lord Goff would have treated it in the same way as the second. In other words he would have recognised that, as the common law remedy was available, the question whether a settled understanding defence should be available was relevant here too. The element of public interest which is lacking in the case of private transactions would have to be taken into account in considering whether there was room for such a defence. But it would have been wholly inconsistent with the general principle which he had identified for Lord Goff to conclude that there was no cause of action on the ground of unjust enrichment at common law for payments made under a mistake of law in the case of the third category just because it was also within the scope of the Woolwich principle. I respectfully agree with Sir Jack Beatson's comment in his chapter on Unlawful Statutes and Mistake of Law at p 173 that, if Lord

Goff had thought that the general right of recovery did not apply to payments of taxes and general charges, he would surely have said so in his discussion of that general right.

## concurrent remedies

50    The question then is whether DMG must be denied a remedy on the ground that the payments were made under a mistake because a remedy under the Woolwich principle is available. Lord Goff treated the two categories which he identified in the debatable passage as providing separate and distinct remedies. This might be taken to suggest that, if a remedy was available to DMG by analogy with the Woolwich principle, it should not be allowed to pursue a remedy on the common law ground of unjust enrichment. But in his discussion at p 387 of the question whether in the context of void transactions failure of consideration should be allowed to trump mistake of law as a ground for recovery of benefits conferred in consequence of that mistake, he pointed out that an equally strong argument might perhaps be made in favour of mistake of law trumping failure of consideration. The same point could be made in this case. The Revenue argue that primacy should be given to a ground of recovery based on the Woolwich analogy because, if this is given, the six year limitation period will apply. DMG, on the other hand, wishes to take the benefit of section 32(1)(c) of the 1980 Act, which is why it suits it to base their claim on the general right to recover money paid under a mistake.

51    There is no obvious way of deciding which of these two approaches must be adopted if only one can be allowed. The question however is whether a claimant is under an obligation to select the remedy that will best suit his opponent. In his note on this case, Restitution in Respect of Mistakenly Paid Tax (2005) 121 LQR 540, 542, Professor Andrew Burrows said:

"The starting point for a principled analysis is that, in general terms now that this concurrent liability has been accepted, a claimant ought to be free to choose between causes of action and that it would be odd for one cause of action, offering an advantage to a claimant, to be

knocked out by a wider cause of action which does not offer that advantage."

It would indeed be odd, and I can think of no principle that could justify such a strange result. The answer to this point is to be found in an observation by Lord Goff in a case where the question was whether a contract legislated exclusively for the parties, with the result that a parallel duty of care was excluded by it. He said that there is no sound basis for a rule which automatically restricts the claimant to either a tortious or a contractual remedy and that there could be no objection to his taking advantage of the remedy which was most advantageous to him: Henderson v Merrett Syndicates Ltd [1995] 2 AC 145 , 193. We are in a different field, but I think that his reasoning is just as compelling in this context: see his reference in Kleinwort Benson [1999] 2 AC 349 , 387 at p 387 to the usual preference of English law to allow either of two alternative remedies to be available, leaving any possible conflict to be resolved by election at a late stage.

## the statutory regime

52    The issue here is whether DMG's claim under the Kleinwort Benson principle is excluded on grounds of policy. The policy which the Revenue invoke is that, where there is a statutory regime for the recovery of payments made under a mistake, a common law claim cannot exist in parallel with it. The argument is that the statutory regime, of which section 33 of TMA 1970 provides the leading example, excludes recovery on the ground of mistake at common law whether the mistake is of fact or law, and whether or not the statutory regime applies to the payment that is in question. DMG, for its part, accepts that there can be no recovery at common law where the claim falls within the ambit of the statutory regime. But it submits, first, that section 33 has no application to this case and, secondly, that Parliament cannot be taken to have intended that restitution should be barred by the statutory regime where it does not provide a remedy because the payment was not made under an excessive assessment.

53  Mr Glick QC for the Revenue said that section 33 was an exhaustive provision which covered the whole field of recovery for payments made under a mistake by the taxpayer. It did so both in respect of the mistakes for which it provided expressly and also, by necessary implication, in respect of those situations for which Parliament had deliberately chosen not to legislate. I understood him to submit that ACT fell within section 33 because it was a form of corporation tax which is charged on profits of companies and is recoverable under an assessment. Although he accepted that it was possible to envisage a case where the mistake did not fall within the terms of section 33 , he said that the gap if it did exist was at best a very narrow one.

54  The problem with fitting the payment of ACT into the regime provided for by section 33 lies in the way this tax was collected. The system that was laid down for its collection in para 1 of Schedule 13 to ICTA 1980 was for a return to be made for each of the company's accounting periods of the franked payments made during that period which was to be accompanied by the amount of the ACT, if any, payable by it in respect of those payments. It was not tax charged under an assessment, which is what section 33(1) of TMA 1970 contemplates.

55  In support of his argument that, even if section 33 of TMA 1970 did not apply, Parliament had enacted a statutory scheme which was inconsistent with the common law remedy, Mr Glick relied on the judgment of your Lordships' House in Marcic v Thames Water Utilities Ltd [2004] 2 AC 42 . I do not think that that case is in point here. Mr Marcic's claim in nuisance was held to be inconsistent with the statutory scheme. His argument was that Thames Water ought to have built new sewers to prevent flooding of his property. But, as Lord Nicholls of Birkenhead pointed out, this ignored the statutory limitations on the enforcement of sewerage undertakers' drainage obligations: para 35. An important purpose of the statutory scheme was that individual householders should not be able to launch proceedings in respect of a failure to build sufficient sewers. That would supplant the regulatory role of the industry's regulator, whose role was to decide whether to make an enforcement order when questions of flooding arose. Section 33 has none of the features of a statutory scheme of that kind.

56  For all these reasons I would hold that the general right to recover payments made under a mistake of law on the Kleinwort Benson principle extends to the payment of taxes made to the Revenue on the mistaken belief that they were due and payable, and that DMG is entitled to take advantage of section 32(1)(c) of the Limitation Act 1980 by basing its claim for restitution on that principle.

**The mistake issue**

57  The availability of a cause of action under the Kleinwort Benson principle is of no help to DMG unless it can show that it made the payments of ACT under a mistake. The Revenue maintain that it did not make the payments under any mistake. They say that the tax was due and payable when DMG paid it because it had not made a group income election in respect of the relevant dividends.

58  There is no doubt that the only way that a company resident in the United Kingdom could avoid liability under section 14(1) of ICTA 1988 to ACT on qualifying distributions made to its shareholders was by making an election jointly with the receiving company under section 247(1) of the Act, a group income election, that section 247(1) was to apply to the dividends received from the paying company. So long as a group income election was in force the election dividends, as section 247(1) described them, were excluded from section 14(1) . But if no group income election was in force ACT was due and payable. So, if the correct approach is to look only at the system laid down by the statute, it is plain that because there was no election there was no mistake.

59  But this approach overlooks the principle on which the claim for restitution that was recognised in Kleinwort Benson is founded, which is unjust enrichment. As Lord Goff put it at [1999] 2 AC 349 , 385, it is unjust for the defendant to retain the money paid under a mistake. The essence of the principle is that it is unjust for a person to retain a benefit which he has received at the expense of another which that person did not intend him to receive because it was made under a mistake that it was due. The claimant must prove that he acted under a mistake. But the stage when he made his mistake does not matter, so long as it can be said that if he had known of the true state of the facts or of the law at the time of the payment he would not have

made it. A wrong turning half way along the journey is just as capable of being treated as a relevant mistake as one that is made on the doorstep at the point of arrival.

60 Robert Goff J, as he then was, said in Barclays Bank Ltd v W J Simms Son & Cooke (Southern) Ltd [1980] QB 677 , 694, after a careful review of the leading authorities about payments made under a mistake of fact, that it is sufficient to ground recovery that the claimant's mistake should have caused him to pay the money to the payee. As Professor Burrows, The Law of Restitution, 2nd ed (2002), p 136 puts it, the type of mistake does not matter. It is purely its effect on the payer that counts. In Kleinwort Benson at p 379 Lord Goff said that it was plain that the money in that case was paid over under a mistake:

> "The payer believed, when he paid the money, that he was bound in law to pay it. He is now told that, on the law as held to be applicable at the date of the payment, he was not bound to pay it. Plainly, therefore, he paid the money under a mistake of law, and accordingly, subject to any applicable defences, he is entitled to recover it."

61 Mr Peter Thomason, DMG's Head of Taxation in London, gave evidence about his state of mind at the time when the payments of ACT were made. He made it clear in his witness statement that the ACT was paid because the relevant provisions of ICTA 1988 required it to be paid and because he believed that the UK statute denying the ability to make a group income election was the law and that he was bound to act in accordance with it. As Park J records in his judgment at para 27, he was cross-examined on his witness statement. But the judge did not believe that this passage in his evidence was challenged or affected by his answers on other points. In his opinion the mistake that DMG made when the Act was paid was that it did not realise that it could have made a valid group election with the non-resident companies. In para 29 he repeated a point that he made in para 11 when he was summarising the evidence. He said that he had no doubt that if DMG had submitted

elections the Revenue would have pointed to the clear terms of the statute and rejected them, and that DMG would have been liable to pay the ACT and would have paid it.

62 Park J acknowledged in para 25 of his judgment that DMG's mistake was not directly a mistake about whether there was a liability to pay ACT. As he put it, it was directly a mistake about whether group income elections could be made. The liabilities to pay ACT arose as secondary consequences of that primary mistake. In the Court of Appeal Jonathan Parker LJ said that he could not agree with this analysis and that DMG's mistake lay not in its belief that a group election was not available but rather in its belief that the ACT was payable when, on the true state of the law, it was not: paras 231–232. I think, with respect, that Park J's analysis was the correct way of looking at what happened in this case. It was the mistaken belief that group relief could not be claimed that led inevitably to the liability to pay ACT which, absent a valid claim to group relief, DMG was not in a position to dispute. That was where the mistake was made, of which the payment of ACT was a secondary consequence. But, as Park J was right to recognise, if the mistake about the availability of group income relief had not existed, the ACT would not have been paid. There was an unbroken causative link between the mistake and the payment. It follows that the payments were made under a mistake. The mistake was, of course, a mistake of law. But under the Kleinwort Benson principle a cause of action at common law for their recovery is available.

### The discovery issue

63 The next question is when, for the purposes of section 32(1)(c) of the 1980 Act, DMG discovered its mistake or could with reasonable diligence have done so. The Revenue submit that the relevant mistake was discovered in relation to the 1993 and 1995 ACT payments in or about July 1995 when DMG learned that the provisions of section 247 of ICTA 1988 were the subject of serious legal challenge on the basis of EC law in the Hoechst case and might not be lawful. They submit that the 1996 payment was not made under a mistake as, when this payment was made, DMG was aware that the provisions of section 247 were the subject of serious challenge and might not be lawful.

WESTLAW    © 2017 Thomson Reuters.                                                                                   15

64  In support of these arguments reference is made to what I said in Kleinwort Benson [1999] 2 AC 349 about the state of mind of the payer who claims to have made a payment under a mistake. At p 409–410 I said that cases of mistake could vary from complete ignorance to a state of ample knowledge but a misapplication of what was known to the facts — from sheer ignorance to positive but incorrect belief, as Mason CJ said in David Securities Pty Ltd v Commonwealth Bank of Australia (1992) 175 CLR 353 , 374. But I also said that a state of doubt was different from a mistake, and that a person who pays when in doubt takes the risk that he may be wrong. I ended this passage at p 411C–D by saying that the critical question was whether the payer would have made the payment if he had known what he is now being told was the law.

65    These propositions are capable of further refinement: see Professor McKendrick, 'Mistake of Law' — Time for a Change, in The Limits of Restitutionary Claims: A Comparative Analysis (ed Swadling, 1997), pp 232–233; Graham Virgo, The Principles of the Law of Restitution (1999), p 161; Professor Burrows, the Law of Restitution, 2nd ed (2002), p 140. The difficult question is what degree of doubt is compatible with a mistake claim, as Professor Burrows points out. I see the issue as being essentially one of causation. What was the effect of the mistake on the payer? But the basic principle is, of course, that of unjust enrichment. At what point can it be said that the payee has been unjustly enriched? The answer to these questions will depend on the facts of the case. One can leave on one side cases where there is another ground on which the payee was entitled to be paid: frustra petis quod mox restiturus es. As for the rest, the payer's reason for making the payment despite his doubt will have a part to play in resolving the issue as to whether the payer, who would not have made the payment had he known the true state of the facts or the law at the time of the payment, should bear the risk or can recover on the ground that he was mistaken.

66  The argument that DMG simply took the risk that it might have been wrong when it made the payments was considered and rejected by Park J. He held in para 30 of his judgment that DMG did not discover its mistake in 1995 when it learned about the argument that Hoechst was advancing. It did not do so until the decision in Hoechst was released by the European Court on 8

March 2001. In the Court of Appeal Jonathan Parker LJ said in para 234 that he agreed with the judge's conclusion on this point. But Rix LJ and Buxton LJ found it difficult to reconcile the judge's conclusion that DMG was still labouring under a mistake of law with what I said in Kleinwort Benson. Buxton LJ, recalling that that case was about the rights of the opposite party in a private law transaction, said in para 282 that the considerations which applied in such a case could only be applied very imperfectly to a citizen faced with an ultra vires demand. He said that persons who pay in response to a demand by the Revenue are in a quite different position from persons who pay under a private transaction, as the demand for tax is implicitly backed by the coercive powers of the state. He compared the Woolwich case, where the society was certain that the Revenue's demand was ultra vires but paid none the less and was restricted to a claim within the six year period, with the present case where DMG claims relief because of payment under a mistake. Although it was aware of doubts raised by other persons and of pending litigation, it paid because it thought, as it turned out incorrectly, that the law was the law. This result, he said, was reached through machinery developed to deal with the quite different issue that arises where a citizen makes a private law payment under a mistake that is his own mistake.

67  I recognise the force of Buxton LJ's concern. But I see it as a criticism primarily of the uneven way the limitation rules operate, rather than of the conclusion which the judge drew in the light of the evidence. In so far as it amounts to a suggestion that the law ought to distinguish between payments made under a mistake of law in private transactions and those made in response to a demand by a public authority made in the mistaken belief that the law under which is was made was the law, I think that the answer to it must be found in a return to first principles. The fundamental point, as Lord Goff recognised in Kleinwort Benson at [1999] 2 AC 349 , 373, is that a blanket rule of non-recovery cannot sensibly survive in a rubric of the law based on the principle of unjust enrichment. The enrichment of a public authority because a payment was made to it in response to a demand in the mistaken belief that the law under which the demand was made was the law is no less unjust than an enrichment arising from a mistake of law in a private transaction. Unevenness in the operation of the limitation rules is a matter for Parliament.

68  The matter has, of course, been addressed so far as the Revenue is concerned by section 320 of the Finance Act 2004 . But there are still some loose ends. As Lord Goff mentioned in his concluding remarks in Kleinwort Benson, this is a matter for consideration by the Law Commission with a view to finding a solution that can be made the subject of legislation by Parliament. As Professor Burrows has indicated, if there is perceived to be a problem, the right way forward is not to distort the common law of restitution by artificially limiting the scope of Kleinwort Benson but for the legislature to stop time running indefinitely in mistake cases: (2005) 121 LQR 540, 543. I would respectfully endorse his reference in this passage to mistake cases generally. There seems to be no good reason why cases of mistake of fact, the nature of which and the occasion for the discovery of which can vary greatly, should not be treated in the same way for limitation purposes as mistakes of law. Relief from the general six year time limit could be given in either case where the mistake was induced by the payee's words or conduct.

69  What then of the evidence? Mr Thomason said in his witness statement that he learned of Hoechst's challenge to the ACT rules in around July 1995. Whilst he monitored developments, it was not clear what the outcome would be. His position was that at all times prior to the determination of the European Court in the Hoechst case the law was to be found in the UK statute. In para 45 he said that, so far as he was concerned, there were no good grounds prior to the date when the European court delivered its judgment for doubting the validity of the statutory payments requiring payment of ACT. In cross-examination he said that he did not feeling anything near certainty that Hoechst's challenge would succeed.

70  It may be said that there was enough in Hoechst's challenge to raise a doubt in Mr Thomason's mind as to whether or not the law with which he was faced would survive it. But the situation with which he was faced is quite different from that where a payer who is in a state of doubt about the state of the law in a private transaction decides to pay nevertheless and take the risk that he may be wrong. In such a case the causative link between the mistake and the payment may be broken because the evidence shows that the payer was content to pay irrespective of whether the sum is due or not. In

this case DMG was in no position to do anything else but pay the ACT. It had not claimed group income relief because, wrongly as it turned out, it believed that group income relief was not available.

71  It is plain, as the judge recognised, that if DMG had submitted a claim for group income relief under section 247(1) the Revenue would have pointed to the clear terms of the statute and rejected it. It has never been suggested that they would have conceded in a question with DMG the point which they were resisting so strongly in their litigation with Hoechst. DMG's mistaken belief that a group income election was not available was not shown to be wrong until the issue which Hoechst had raised was determined by the European Court on 8 March 2001. The issue, which was one of law, was not capable of being resolved except by litigation. Until the determination was made the mistake could not have been "discovered" in the sense referred to in section 32(1) of the 1980 Act. In this situation I would hold, in agreement with Park J and Jonathan Parker LJ, that DMG was not in a state of doubt, when it paid the ACT. It was not then obvious that the payments might not be due. They were made in accordance with the law as it was then understood to be. There was nothing yet to be discovered to the contrary which could have been revealed by the exercise of reasonable diligence.

### Conclusion

72  For these reasons and those given by Lord Hoffmann and Lord Walker, with which I agree, I would allow the appeal and make the order that Lord Walker proposes.

Lord Scott of Foscote

My Lords,

73  This appeal is another, but assuredly not the last, of the appeals to your Lordships' House in the litigation that has arisen as a result of the judgment of the European Court of Justice (the "ECJ"), given on 8 March 2001, in the Metallgesellschaft Ltd and Hoechst AG conjoined cases, but which I will, for convenience refer to as the "Hoechst case", reported in [2001] Ch 620 . The ECJ held, first, that it was contrary

to Article 52 of the Treaty (now Article 43 EC) for the tax legislation of the United Kingdom to establish a tax regime under which group income elections (enabling dividends to be paid by UK subsidiaries to their parent companies without incurring an obligation to pay advance corporation tax) could be made only where the parent company was resident in the UK, and, accordingly, which denied the possibility of benefiting from a group income election where the parent company had its seat in another Member State. Secondly, the ECJ held that where a UK subsidiary had been obliged to pay ACT in respect of dividends paid to its parent company with a seat in another Member State, even though UK subsidiaries with parent companies resident in the UK were entitled in similar circumstances to make group income elections and thereby avoid that obligation, European law (i.e. Article 43 EC) required that the subsidiary and its non-resident parent

> "should have an effective legal remedy in order to obtain reimbursement or reparation of the financial loss which they have sustained and from which the authorities of the [UK] have benefited as a result of the advance payment of tax by the [UK subsidiary]" (ruling 2).

74  The issue in this particular appeal is whether and, if so, how section 32 (1) (c) of the Limitation Act 1980 applies to the cause (or causes) of action on which the appellant company ("DMG") is suing the Revenue. The factual background to DMG's action and the manner in which the action was dealt with in the courts below is comprehensively set out in the opinion of my noble and learned friend Lord Walker of Gestingthorpe. I have had the great advantage of reading his opinion in draft and gratefully adopt and need not repeat all that he has said. But as I have the misfortune to differ from him, and a majority of your Lordships, as to the right conclusion to be reached in this appeal I must refer to some of the background in order to explain the reasons for my dissent.

75  In paragraph 117 of his opinion Lord Walker has helpfully summarised six issues in dispute between the parties. The issues which have led to my dissent are those Lord Walker has numbered (2) and (5). Issue (2) asks the question whether DMG made its payments of ACT under a mistake of law. Issue (5) asks whether DMG can bring its cause of action within section 32 (1) (c) of the 1980 Act. As to issue (5) I would respectfully venture an amendment to Lord Walker's description of the issue. Lord Walker has suggested that issue (5) arises if DMG fails on issue (1), that is to say, fails to satisfy your Lordships that English law recognises a restitutionary claim for tax paid under a mistake of law. I agree that issue (5) arises in that event, but it would arise also if DMG were to succeed on issue (1) but fail on issue (2). If that were to be the case DMG's cause of action could not be a restitutionary claim for tax paid under a mistake of law (the recognition of which by English law could not therefore assist DMG) but would have to be either a compensation claim or, perhaps, a claim based upon unjust enrichment, the Revenue having obtained payment of an amount of corporation tax earlier than would have happened if the group of which DMG formed part had been able to make a group income election. Whichever way the claim were put the question would arise whether DMG's action could be described, for section 32 (1) (c) purposes, as an "action for relief from the consequences of a mistake".

76  My Lords, these issues, and the identification of the nature of DMG's action against the Revenue, require, in my opinion, as an essential preliminary, a careful analysis of the ECJ judgment in order to be clear as to what it was about the UK tax regime that was ruled to be a breach of European law. Park J said that

> "the mistake of law which DMG made was not that it paid ACT which was not payable: the ACT was as a matter of law payable when DMG paid it, and the decision of the [ECJ] in Metallgesellschaft/ Hoechst does not mean that it was not payable" (para 22).

But, in the Court of Appeal, Jonathan Parker LJ disagreed. He said, at para 231

"… the Court of Justice, at para 76, held that the relevant statutory regime was contrary to article 52, and consequently unlawful under Community law. It follows that although under the terms of that regime ACT was due and payable, 'the true state of the law' (to use the judge's expression) was that the regime gave rise to no obligation to pay. Thus the payments were made pursuant to an unlawful demand."

If the Lord Justice's analysis of the Hoechst judgment is correct, it must follow that his conclusion that DMG was under no legal obligation to pay ACT too is correct. The critical question is whether that conclusion is correct.

**The Hoechst judgment**

77   The unlawfulness found by the ECJ in the UK's ACT tax regime was the unjustified discrimination against corporate groups the parent companies of which were resident in Member States other than the UK. The discrimination consisted of withholding from those corporate groups the option of making group income elections and thereby avoiding the obligation of a UK resident subsidiary of paying ACT to the Revenue when paying dividends to its non-resident parent company. This discrimination was held to be incompatible with Article 52 because it would tend to discourage companies resident in other Member States from establishing subsidiaries in the UK. It thus constituted an unlawful restriction on the freedom of establishment guaranteed by Article 52 (see para 36 of the ECJ judgment).

78   The ECJ was answering two questions which had been referred to it by the Chancery Division of the High Court. The first was whether it was consistent with Community law

"for the legislation of [the UK] to permit a group income election

… only where both the subsidiary and parent are resident in [the UK]" (para 33(1)).

The ECJ gave to this question the answer "no". It did so because

"The abolition [by Article 52] of restrictions on freedom of establishment also applies to restrictions on the setting up of … subsidiaries by nationals of any Member State established in the territory of another Member State" (para 41)

At paragraph 54 the ECJ explained that

"to afford resident subsidiaries of non-resident companies the possibility of making a group income election would do no more than allow them to retain the sums which would otherwise be payable by way of [ACT] until such time as Mainstream Corporation Tax [MCT] falls due. They would thus enjoy the same cashflow advantage as resident subsidiaries of resident parent companies …"

And, at paragraph 55, that

"… the fact that a non-resident parent company will, unlike a resident parent company, not be subject to [ACT] when it in turn pays out dividends, cannot justify denying the resident subsidiary of the non-resident parent the possibility of exemption from

payment of [ACT] when paying dividends to the parent."

And, in paragraph 76, the ECJ answered the first question by declaring that it was

> "… contrary to Article 52 of the Treaty for the tax legislation of [the UK] … to afford companies resident in [the UK] the possibility of benefiting from a taxation regime allowing them to pay dividends to their parent company without having to pay [ACT] where their parent company is also resident in [the UK], but to deny them that possibility where their parent company has its seat in another Member State."

The reference by the ECJ in each cited passage to "the possibility" of making a group income election, a "possibility" that the tax regime denied to corporate groups with a non-resident parent company, identifies the element in the tax regime that the ECJ found to be inconsistent with European law. The ECJ did not hold that subjecting resident subsidiaries of non-resident companies to the obligation of paying ACT was contrary to European law. What was unlawful was the discriminatory nature of the group income election provisions which failed to give corporate groups with a non-resident parent company the same possibility of enabling subsidiaries to avoid the payment of ACT as was open to corporate groups with a resident parent company. The question is what effect this unlawful feature of the ACT tax regime should be held to have had on the obligation of subsidiaries, such as DMG, to pay ACT in respect of dividends paid to their non-resident parent companies. This is a question to which I must return.

79    The second question for the ECJ to answer concerned remedies. The Chancery Division had asked, if the answer to the first question was 'no', about the remedies which national courts should grant. In

paragraph 77 of its judgment the ECJ explained the question. Was the subsidiary and/or its parent company

> "… entitled to obtain a sum equal to the interest accrued on the advance payments made by the subsidiary from the date of those payments until the date on which the tax became chargeable [i.e. until MCT became payable], even when national law prohibits the payment of interest on a principal sum which is not due."

The ECJ recorded that the Chancery Division had framed that question in two hypotheses—

> "… in the first alternative, where the claim by the subsidiary and/or parent company is made in an action for restitution of taxes levied in breach of Community law and, in the second, where the claim is made in an action for compensation for damage resulting from the breach of Community law."

In paragraph 81, however, the ECJ stressed that it was not for the ECJ but for the parties and the national law of the forum to specify the nature and basis of the remedy or remedies being sought. Community law required no more than that

> "… resident subsidiaries and their non-resident parent companies should have an effective legal remedy in order to obtain reimbursement or reparation of the financial loss which they have sustained and from which the authorities of the Member State concerned have benefited as a result of the advance payment of tax by the subsidiaries" (para 96)

80  The Hoechst judgment contains passages which cast light upon the nature of the breach of Community law for which the appropriate remedy must be provided. Thus:

> "It is important to bear in mind in this regard that what is contrary to Community law … is not the levying of a tax in the United Kingdom on the payment of dividends by a subsidiary to its parent company but the fact that subsidiaries, resident in the United Kingdom, of parent companies having their seat in another Member State were required to pay that tax in advance whereas resident subsidiaries of resident parent companies were able to avoid that requirement" (para 83);

and, to the same effect,

> "… the breach of Community law arises, not from the payment of the tax itself but from its being levied prematurely" (para 87);

and

> "… the principal sum due is none other than the amount of interest which would have been generated by the sum, use of which was lost as a result of the premature levy of the tax" (para 88)

81  These passages show that the breach of Community law was the failure of the UK's ACT tax regime to provide for corporate groups with a parent company resident in a Member State other than the UK the same opportunity of postponing the payment of corporation tax by making a group income election as was available to domestic corporate groups. Does it follow that section 14 (1) of the Income and Corporation Taxes Act 1988 (originally section 84 (1) of the Finance Act 1972 ), which imposed the obligation on UK companies to pay ACT in respect of dividends paid to their shareholders, was unlawful, or, to put the question another way, imposed an unlawful tax? In my opinion, it does not. The effect of the ECJ judgment in the Hoechst case on the validity of the section 14 (1) charge to tax is a matter for the domestic courts of the UK. (See Thoburn v. Sunderland City Council [2002] EWHC 195 (Admin); [2003] QB 151 paras 68 and 69) If, under domestic law, the right conclusion is that section 14 (1) imposed an unlawful tax, then it would follow that every demand for ACT had been an ultra vires demand, that every payment of ACT had been paid under a mistake of law and that every payer of ACT should be entitled, subject to limitation defences, to a restitutionary remedy. There must be many domestic corporate groups which, for one reason or another, did not make a group income election and whose subsidiaries accordingly paid ACT in respect of dividends paid to their corporate shareholders. If ACT was an unlawful tax, the tax would have been paid under a mistake of law and, in any event, would be recoverable under the principle established in the Woolwich case [1993] AC 70 . This would be a remarkable state of affairs. There is nothing, however, in the ECJ's Hoechst judgment that requires this conclusion and no reason at all why the domestic courts should reach it.

82  In my opinion, the proposition that the Hoechst judgment requires the conclusion that section 14 (1) imposed an unlawful tax cannot be sustained. The unlawfulness of the tax regime identified by the ECJ lies not with the imposition of ACT but in the discriminatory nature of the group income election provisions. So how should the domestic law deal with that unlawfulness? It would clearly be an inappropriate response for the domestic courts to hold that the benefits afforded by the group income election provisions to domestic corporate groups were unlawful and ultra vires. Nor was that suggested by the ECJ.

Deutsche Morgan Grenfell Group Plc v Inland Revenue ..., 2006 WL 2929564...

The simple answer is that the UK courts must provide a remedy to the non-domestic corporate groups for the failure of the statutory provisions to extend the same benefits to them. The ECJ made it clear that it was no concern of Community law how, as a matter of domestic law, that remedy was to be categorised provided the remedy was an adequate and sufficient one (para 96). However the remedy cannot, in my opinion, be based on the premise that the payments of ACT were a response to unlawful demands or were payments of an unlawful tax or were payments that were not due. None of these premises is required to be made by the ECJ's judgment in the Hoechst case and none should be constructed by UK domestic law.

83  The first issue referred to by Lord Walker, the issue to which more time was devoted by counsel than to all the other issues combined, was whether English law recognised a restitutionary claim for tax paid under a mistake of law. On this issue I am in full agreement with, and there is nothing I wish to add to, the opinions given by my noble and learned friends. I agree that the effect of the speeches in this House in the Woolwich case [1993] AC 70 is that tax paid in response to an unlawful demand can be recovered by the taxpayer regardless of compulsion and regardless of whether the taxpayer made the payment in consequence of a mistake; and I agree that the effect of the speeches in the Kleinwort Benson case [1999] 2 AC 349 was that the rule barring a restitutionary remedy for money paid, or property transferred, under a mistake of law was overturned. Accordingly, I agree that the answer to issue (1) is that English law does now recognise a restitutionary remedy for tax paid under a mistake of law.

84  But the answer to issue (1) does not mean that money paid, or property transferred, under a mistake of law is necessarily recoverable, just as money paid, or property transferred, under a mistake of fact is not necessarily recoverable. It surely all depends on the part played by the mistake, whether of fact or law, in the sequence of events that has led to the payment or transfer. If A and B enter into a contract with one another for the sale by A to B of a horse and B pays the price and takes delivery of the horse, B cannot, absent some causative misrepresentation on A's part, claim his money back, proffering the horse in return, on the ground that he was mistaken as to the horse's breeding. The money once paid would be irrecoverable unless there were

some ground for invalidating the contract. It cannot be enough for the buyer to assert and prove that but for his mistake about the horse's breeding he would not have entered into the contract and so would not have paid the money. In Barclays Bank Ltd v. W J Simms Son & Cooke (Southern) Ltd [1980] QB 677 at 695 Robert Goff J (as he then was) said that

> "if a person pays money to another under a mistake of fact which causes him to make the payment, he is prima facie entitled to recover it as money paid under a mistake of fact" (emphasis added).

He then described three types of circumstance which might lead to the claim failing. The first of these was that the payor intended the payee to have the money in any event, whether the believed fact was true or false. The second was that

> "… the payment is made for good consideration, in particular if the money is paid to discharge, and does discharge, a debt owed to the payee … by the payer or by a third party by whom he is authorised to discharge the debt …"

The third was that the payee had changed his position in good faith. There is, I would respectfully suggest, a fundamental difference between the first and the third of these types of circumstances on the one hand and the second of them on the other. The first and third involve circumstances which have had no causative effect on the payment of the money. In the first, the money would have been paid in any event and the third involves circumstances which have nothing at all to do with the reasons why the payer paid the money or with any misapprehensions under which the payer may have been labouring. Neither of these types of case invalidates Robert Goff J's general proposition that if a mistake of fact causes a payment to be made that would not have been paid but for the mistake, the payer will have a cause of action for its recovery. They are not true

exceptions. The second, however, does invalidate that proposition. If a contract has been entered into that would not have been entered into but for a mistake, but the contract is then completed by a payment of the price for the goods or services that the payee has supplied, the payment cannot be recovered unless the contract can be set aside. The proposition seems such an obviously correct one that it may seem pointless to ask why it is that it is correct. But I think the question does need to be asked for the answer casts, in my opinion, valuable light on the nature of the restitutionary remedy for the recovery of money paid under a mistake.

85  The reason, it seems to me, why the proposition is correct is that the mistake does not necessarily undermine the legal obligation which required the payment of the money or for the discharge of which the money was paid. If the mistake does enable the contract to be set aside then, subject to a change of position defence, the money should be recoverable. If the contract was void from the outset (as in the "swaps" cases) or had been avoided before the payment was made, the money should be recoverable. But if the legal obligation under which the money was paid cannot be, or has not been, invalidated, then, in my opinion, whether or not it can be shown that "but for" the mistake in question the money would not have been paid, a restitutionary remedy for the recovery of the money would not be available.

86  This approach to the recovery of money paid under a mistake should, in my opinion, apply whether the mistake be of fact or of law. In the Woolwich case [1993] AC 70 the tax paid by the Woolwich was recoverable because it had been paid on account of a non-existent legal obligation. In the Kleinwort Benson [1999] 2 AC 349 case the payments of which recovery was sought by the bank had been paid under contracts that were void ab initio. In neither case could it have been suggested that the payments had been made with any animus donandi.

87  There are, I think, some problems about voluntary payments made as gifts but that would not have been made but for some causative mistake, whether of fact or law, e.g. a gift of £1000 by A to B where B is believed by A to be impecunious but is in fact a person of substantial wealth and where A would not have made the gift if he had known that to be so. My present

opinion is that unless there were some other reason, such as a misrepresentation by B, to enable the gift to be set aside, the mistake made by A would not suffice, notwithstanding that the payment had not been made pursuant to any legal obligation and that but for the mistake it would not have been made. But the availability of a restitutionary remedy to recover gifts which would not have been made but for some mistake of fact or of law does not need to be pursued on this appeal and can be left for another day.

88  In my opinion the important question for the purposes of this appeal is whether the payments by DMG of the ACT were made in discharge of a legal obligation to pay. Park J thought they were. Jonathan Parker LJ thought not. For the reasons I have already expressed I agree with Park J. The mistake made by DMG and its parent company in Germany was in not realising that the failure of the ACT tax regime to allow the group to make a group income election was unlawful and could successfully have been challenged. If the group had purported to make a group income election the Revenue would certainly have rejected it. That rejection we now know, post Hoechst, would have been unlawful under Community law but even so, in my opinion, the lawfulness of section 14 (1) would not have been undermined. What might, perhaps, have been undermined would have been the Revenue's ability to recover the ACT in an action against DMG since any claim for payment might have been met by an equitable set-off or cross claim based upon the Revenue's breach of Community law in rejecting the group income election.

89  In the events that actually happened DMG paid the ACT that was due under section 14 (1) . DMG and its German parent company did make a mistake of law in that they did not realise that they could successfully challenge the failure of the ACT tax regime to allow them, too, to make a group income election. It is possible to argue that this mistake of law was, in a "but for" sense, a cause of their payment of the ACT. The argument has difficulties but even if it were right it would not, in my opinion, justify the conclusion that the ACT was paid under a mistake of law in the sense necessary for a restitutionary remedy. The ACT was paid because there was a legal obligation under a valid statutory provision for the money to be paid. DMG's remedy was, in my opinion, not a restitutionary one

for the re-payment of money paid that was not due, or for the repayment of money paid under a mistake, but was, and is, a claim for compensation to recover the loss caused by the breach of Community law.

90  Before leaving the important issue of whether, in the light of Hoechst, DMG was under a legal obligation to pay the ACT, I should record the assistance I have had from the article "Justified Enrichment" by Robert Stevens (2005) 5 OUCLJ 141 and in particular from the section entitled "Was the Money Due". I am in respectful agreement with the conclusions there expressed.

### DMG's cause of action and section 32 (1) (c) of the 1980 Act

91  It is common ground that DMG has a cause of action in tort for compensation for the loss caused by the breach of Community law found by the ECJ in the Hoechst case to be inherent in the ACT tax regime. It is also common ground that for Limitation Act purposes time began to run when each payment of ACT was made. The details of the payments are set out in paragraph 111 of Lord Walker's opinion. Section 32 (1) (c) applies where an action is brought "for relief from the consequences of a mistake". In Phillips-Higgins v. Harper [1954] 1 QB 411 Pearson J expressed the view at p 419 that section 26 (c) of the Limitation Act 1939 (the statutory predecessor of section 32 (1) (c) of the 1980 Act)

> "… applies only where the mistake
> is an essential ingredient of the cause
> of action …"

If it is right, as I think it is, that when the ACT was paid by DMG the ACT was due, DMG's cause of action is an action for compensation for tort. It is not, in my opinion, an action for restitution based on the payment of money under a mistake. An allegation of a mistake but for which the ACT would not have been paid is not an essential ingredient in DMG's cause of action.

92  I would accordingly dismiss this appeal albeit for reasons different to those of the Court of Appeal.

### The other issues

93  In each of the other issues I am in respectful agreement with the opinions of my noble and learned friends, and accordingly, if it were relevant to do so, would dismiss the Revenue's cross-appeal.

Lord Walker of Gestingthorpe

My Lords,

### Introduction

94  Article 43 (formerly 52) of the EU Treaty , headed 'Right of Establishment' provides as follows:

> "Within the framework of the provisions set out below, restrictions on the freedom of establishment of nationals of a Member State in the territory of another Member State shall be prohibited. Such prohibition shall also apply to restrictions on the setting-up of agencies, branches or subsidiaries by nationals of any Member State established in the territory of any Member State.
>
> Freedom of establishment shall include the right to take up and pursue activities as self-employed persons and to set up and manage undertakings, in particular companies or firms within the meaning of the second paragraph of Article 48, under the conditions laid down for its own nationals by the law of the country where such establishment is effected, subject to the provisions of the chapter relating to capital."

Deutsche Morgan Grenfell Group Plc v Inland Revenue...2006 WL 2929564...

95   Several different statutory provisions relating to United Kingdom corporation tax (in particular, as it applies to multi-national groups or consortia of companies) have been successfully challenged, or are at present under challenge, as infringing Article 43 . The challenges have been so numerous that litigation is proceeding under several different group litigation orders ("GLOs") made in the Chancery Division, and some appeals have already reached this House: Pirelli Cable Holding NV v Inland Revenue Commissioners [2006] UKHL 4; [2006] 1 WLR 400 and (as to procedural matters) Autologic Holdings plc v Inland Revenue Commissioners [2005] UKHL 54; [2006] 1 AC 118 . At the end of 2005 the Court of Justice of the European Communities (the "ECJ") gave judgment on a reference made by the Chancery Division in litigation of this type (though not proceeding under a GLO): Marks & Spencer plc v Halsey (Case C-446/03), [2006] Ch 184 .

96   The particular focus of the present appeal is on limitation of actions — in practical terms, the length of time during which the premature payment of advance corporation tax ("ACT") by the appellant company Deutsche Morgan Grenfell Group plc ("DMG") gives rise to a remedy enforceable in the national court. DMG's claim has been selected (under a GLO made on 26 November 2001) as a suitable test case for the determination of what are defined (in a further order made on 12 March 2002) as "EU issues (i) Limitation (A) and (B)." DMG was successful before Park J (whose judgment given on 18 July 2003 is reported at [2003] 4 AER 645 , [2003] STC 1017) but on 4 February 2005 the Court of Appeal allowed the appeal of the Commissioners of Inland Revenue ([2006] 2 WLR 103, [2005] STC 329) . Her Majesty's Attorney General is also a party to the proceedings but I shall refer to the respondents simply as "the Revenue".

97   The issues summarised above may appear fairly narrow and very technical, and on one possible view this appeal could be disposed of as a relatively short point of construction on section 32(1)(c) of the Limitation Act 1980 . But it has produced some complex and sophisticated arguments from counsel. The decisions of Park J and the Court of Appeal have also led to some stimulating and far-reaching comments from legal scholars, including Professor Andrew Burrows,

"Restitution in respect of Mistakenly Paid Tax", (2005) 121 LQR 540, Professor Steve Hedley, "Tax Wrongly Paid — Basis of Recovery — Limitation" [2005] CLJ 296, Robert Stevens, "Justified Enrichment" (2005) 5 OUCLJ 141, Graham Virgo, "Deutsche Morgan Grenfell: the right to restitution of tax paid by mistake rejected" [2005] BTR 281, Sir Jack Beatson, Chapter 9 ("Unlawful Statutes and Mistake of Law") in Burrows and Rodger (Eds), Mapping the Law (to be published shortly) and two articles by Dr James Edelman, "Limitation Periods and the Theory of Unjust Enrichment" (2005) 68 MLR 848 and "The Meaning of 'Unjust' in the English Law of Unjust Enrichment" (2006) 3 ERPL 309. I shall return to some of these at a later stage in this opinion, but I wish to acknowledge at once my debt to these commentators and to other academic writers, including of course the most recent work of the late Professor Peter Birks.

98   I shall begin with a brief summary of the relevant statutory provisions relating to ACT, followed by a rather fuller summary of the decision of the ECJ in the important joined cases of Metallgesellschaft Ltd and others v Inland Revenue Commissioners and another and Hoechst AG and another v Inland Revenue Commissioners and another (Joined Cases C-397 and C-410/98) [2001] Ch 620 ("Hoechst"). Then I will come to the facts of the test case, the pleadings and the course of the litigation on its way to your Lordships' House. Then it will be necessary to look in some detail at the very important decisions of this House in Woolwich Equitable Building Society v Inland Revenue Commissioners [1993] AC 70 ("Woolwich") and Kleinwort Benson Limited v Lincoln City Council [1999] 2 AC 349 ("Kleinwort Benson"), both majority decisions in which the leading speech was given by Lord Goff of Chieveley.

**ACT**

99   The relevant statutory provisions are very clearly described in the judgment of Park J (paras 6 and 7) and a brief summary will therefore suffice. Corporation tax was first introduced by the Finance Act 1965 . The structure of the tax was radically altered by the Finance Act 1972 with the introduction of ACT, which was in force from 1973 until its abolition (probably hastened by the oncoming wave of litigation based on Article 43 ) in 1999. From 1988 until 1999 the

relevant provisions were to be found in a consolidating statute, the Income and Corporation Taxes Act 1988 ("ICTA"). The political and economic background to these changes has been described by Professor John Tiley, Revenue Law 4th ed (2000), pp 758–762.

100   When a company paid a dividend to its shareholders it was required to pay to the Revenue (within 14 days from the end of the quarter in which the dividend was paid) an amount of ACT equal (for most of the relevant period) to 25% of the dividend ( ICTA section 14 ). The ACT paid in this way was later set off against the company's liability for mainstream corporation tax ("MCT") if (as happened in this case) the company made sufficient taxable profits to be liable to pay at least as much MCT as it had paid ACT. The payment of MCT would thus be accelerated by a period of between 8½ and 17½ months (depending on the timing of the dividend payment). A subsidiary company paying a dividend to its parent company could however avoid liability to pay ACT if both companies made a group income election ("GIE") under ICTA section 247 . The GIE had to be made at least three months in advance of payment of the dividend. This relief was however available only if both companies were for tax purposes resident in the United Kingdom. So a dividend paid by a British subsidiary to a German parent company was not (on the face of the United Kingdom corporation tax legislation) able to make a GIE and so obtain relief under section 247 . In Hoechst [2001] Ch 620 the ECJ declared that part of the corporation tax legislation to be unlawful under EU law. The judgment of the ECJ also deals with the consequences of the infringement in terms of remedies in the national courts.

**Hoechst**

101   The claimants in these two joined cases were two or more companies in groups which had a German parent company and one or more United Kingdom subsidiaries. In actions against the Revenue (in which the Attorney General was also made a defendant) the claimants sought damages or compensation for loss (during the period until they would have been set off against MCT) of sums paid in ACT by the English subsidiaries in respect of dividends paid to the German parent companies. The complaint was that these losses were caused by the discriminatory

and unlawful character (under EU law) of the ACT regime under which GEIs were not available to these multinational groups, but would have been available if all the relevant members of the group had been United Kingdom companies.

102   Claims were brought in 1995 in respect of ACT paid (in one case) between 1974 and 1995 and (in the other case) between 1989 and 1994. In 1998 the Chancery Division made references to the ECJ for preliminary rulings. Advocate General Fennelly delivered his opinion on 12 September 2000 and the ECJ gave its judgement on 8 March 2001. The latter date has come to be seen as being of considerable importance in these proceedings, so far as they turn on mistake of law.

103   On the first referred question (paras 35–76 of its judgment) the ECJ concluded (para 76)

> "that it is contrary to article 52 [now 43] of the Treaty for the tax legislation of a member state, such as that in issue in the main proceedings, to afford companies resident in that member state the possibility of benefiting from a taxation regime allowing them to pay dividends to their parent company without having to pay advance corporation tax where their parent company is also resident in that member state, but to deny them that possibility where their parent company has its seat in another member state"

In reaching that conclusion the ECJ rejected the argument (put forward by the United Kingdom and some other member states) that the difference in tax treatment was objectively justified by the differing circumstances of national and multinational groups, and in order to preserve the coherence of the United Kingdom's tax system.

104   The second question (set out in para 33(2) of the ECJ's judgment) was whether EU law gave rise to a restitutionary right to claim a sum of money by way

of interest, or whether the claimant was limited to an action for damages, and

> "in either case is the national court obliged to grant a remedy even if under national law interest cannot be awarded (whether directly or by way of restitution or damages) on principal sums which are no longer owing to the claimants?"

The rule of national law alluded to was that upheld by this House in President of India v La Pintada Compania Navigacion SA [1985] AC 104 , mentioned in para 12 of the opinion of the Advocate General.

105   The whole of the ECJ's answer to the second question (paras 77–96) is set out in full in the judgment of Jonathan Parker LJ (para 45) and it is unnecessary to repeat it in full. The crucial passages (in the text as slightly edited in the Law Reports, [2001] Ch 620 , 663–664), are as follows:

> "81.   It must be stressed that it is not for the Court of Justice to assign a legal classification to the actions brought by the claimants before the national court. In the circumstances, it is for the claimants to specify the nature and basis of their actions (whether they are actions for restitution or actions for compensation for damage), subject to the supervision of the national court …

> 83.   It is important to bear in mind in this regard that what is contrary to Community law, in the disputes in the main proceedings, is not the levying of a tax in the United Kingdom on the payment of dividends by a subsidiary to its parent company but the fact that subsidiaries, resident in the United Kingdom, of parent

companies having their seat in another member state were required to pay that tax in advance whereas resident subsidiaries of resident parent companies were able to avoid that requirement.

> 84.   According to well-established case law, the right to a refund of charges levied in a member state in breach of rules of Community law is the consequence and complement of the rights conferred on individuals by Community provisions as interpreted by the court: Amministrazione delle Finanze dello Stato v Sp A San Giorgio (Case 199/82) [1983] ECR 3595 , 3612, para 12 [etc] … The member state is therefore required in principle to repay charges levied in breach of Community law …

> 85.   In the absence of Community rules on the restitution of national charges that have been improperly levied, it is for the domestic legal system of each member state to designate the courts and tribunals having jurisdiction to lay down the detailed procedural rules governing actions for safeguarding rights which individuals derive from Community law, provided, first, that such rules are not less favourable than those governing similar domestic actions (principle of equivalence) and, secondly, that they do not render practically impossible or excessively difficult the exercise of rights conferred by Community law (principle of effectiveness) …

> 86.   It is likewise for national law to settle all ancillary questions

relating to the reimbursement of charges improperly levied, such as the payment of interest, including the rate of interest and the date from which it must be calculated …

87.    In the main proceedings, however, the claim for payment of interest covering the cost of loss of the use of sums paid by way of [ACT] is not ancillary, but is the very objective sought by the claimants' actions in the main proceedings. In such circumstances, where the breach of Community law arises, not from the payment of the tax itself but from its being levied prematurely, the award of interest represents the 'reimbursement' of that which was improperly paid and would appear to be essential in restoring the equal treatment guaranteed by article 52 [now 43] of the Treaty.

88.  The national court has said that it is in dispute whether English law provides for restitution in respect of damage arising from loss of the use of sums of money where no principal sum is due. It must be stressed that in an action for restitution the principal sum due is none other than the amount of interest which would have been generated by the sum, use of which was lost as a result of the premature levy of the tax."

106  The fifth question, though phrased in abstract terms, asked in effect whether the United Kingdom could rely on the defence that the two groups of companies did not seek to make GIE's and (para 98)

"did not therefore make use of the legal remedies available to them to challenge the refusals of the tax authorities, by invoking the primacy and direct effect of the provisions of Community law, where on any view national law denied resident subsidiaries and their non-resident parent companies the benefit of that taxation regime".

In rejecting this argument the ECJ invoked the principle of effectiveness (para 106):

"The exercise of rights conferred on private persons by directly applicable provisions of Community law would, however, be rendered impossible or excessively difficult if their claims for restitution or compensation based on Community law were rejected or reduced solely because the persons concerned had not applied for a tax advantage which national law denied them, with a view to challenging the refusal of the tax authorities by means of the legal remedies provided for that purpose, invoking the primacy and direct effect of Community law"

107  The Revenue's position before your Lordships is to concede that the ECJ expects DMG to be entitled to a restitutionary remedy, but only (as Mr Glick QC put it) by analogy with the remedy in Woolwich [1993] AC 70 (and, crucially, subject to the usual 6-year limitation period). The Revenue contend that DMG is trying to obtain a concurrent domestic remedy in circumstances where, if the case were purely domestic, it would get nothing. This is of course only a brief summary of its argument on an important point to which it will be necessary to return.

**The facts**

Deutsche Morgan Grenfell Group Plc v Inland Revenue..., 2006 WL 2925564...

108   As just noted, DMG is seeking a concurrent domestic remedy based on mistake of law, because it wishes to rely on section 32(1)(c) of the Limitation Act 1980 . Section 32(1) provides that (subject to immaterial exceptions)

> "… where in the case of any action for which a period of limitation is prescribed by this Act, either —
>
> a) the action is based upon the fraud of the defendant; or
>
> b)   any fact relevant to the plaintiff's right of action has been deliberately concealed from him by the defendant; or
>
> c)  the action is for relief from the consequences of a mistake;
>
> the period of limitation shall not begin to run until the plaintiff has discovered the fraud, concealment or mistake (as the case may be) or could with reasonable diligence have discovered it."

It was therefore necessary for Park J to make findings of fact relevant to this issue, and he heard oral evidence from Mr Peter Thomason, DMG's Head of Taxation, who was cross-examined by Mr Glick. Mr Glick took your Lordships through quite a lot of his oral evidence but before coming to the judge's findings on the issue of mistake I should record the undisputed facts about DMG, the group of which it came to form part, and the relevant payments of ATC.

109   DMG (formerly Morgan Grenfell Group Plc) was established in 1971 as a holding company for Morgan Grenfell & Co Limited, a long-established merchant bank. DMG was listed on the London Stock Exchange in 1986. Deutsche Bank AG ("DBAG"), a well-known German bank, had acquired a 5% stake in DMG in 1984 and in 1989 it made a successful takeover bid. DBAG became the direct holder of about 14% of the shares in DMG and the remainder (about 86%) were held through another United Kingdom subsidiary of DBAG, DB Investments (GB) Limited ("DBI"). At first DMG continued to operate in a fairly independent way, despite the takeover, but in October 1994 DBAG decided to adopt a more integrated approach and to consolidate all its investment banking opportunities in London. But the integration was not fully achieved, as far as the tax departments were concerned, until May 1996. Until then Mr Thomason has responsibility for the tax affairs of DMG but not for those of DBI (or, of course, DBAG).

110  I gratefully adopt Park J's summary of the history of the dividend payments:

> "10.    According to the terms of ICTA, section 247 , group income elections could not have been made between DMG and DBAG or between DBI and DBAG because DBAG was not a company resident in the United Kingdom. A group income election could have been made between DMG and DBI (because both companies were resident in the United Kingdom), but no such election was made. The reason was that, although an election would have enabled dividends to flow from DMG to DBI without ACT, onward dividends from DBI to DBAG would have had to be paid subject to a liability on the part of DBI to pay ACT: or at least that was how the matter appeared on the terms of the domestic United Kingdom legislation. In the circumstances DMG paid ACT by reference to all its dividends — the 86% of them paid to DBI as well as the 14% of them paid to DBAG — and DBI did not pay ACT when it paid onward dividends to DBAG. DBI did not have to pay ACT on those onward dividends because of the rules about franked investment income in ICTA, sections 238 and 241 .

11.  DMG has pleaded in this case, and the Revenue admit, that, if section 247 had permitted group income elections to be made between a United Kingdom subsidiary and a parent company in another member state, elections would have been made between DMG and DBI, between DMG and DBAG and between DBI and DBAG. The corollary is that, because section 247 appeared clearly not to permit group income elections to which a parent company in another member state was a party, the companies did not attempt to make group income elections. There is no doubt that, if they had attempted to make them, the Revenue would have rejected the elections and pointed to the clear terms of the United Kingdom statute in justification of the rejection."

111 The amounts of ACT paid by DMG are now agreed to have been as follows (rounding pence):
Date of Payment On dividends to DBAG On dividends to DBI14 October 1993 £887,076 £5,472,95615 February 1995 £41,843 £258,15714 January 1996 £487,471 £3,007,529These figures have however emerged by a surprisingly laboured process. There has been more than one amendment of the particulars of claim. Further discussion of this point is best deferred until I come to the last issue in the appeal, the pleading point.

112  The judge accepted that at the time of the ACT payments in October 1993 and February 1995 DMG (primarily in the person of Mr Thomason) knew nothing about the argument which was ultimately successful in Hoechst. But by July 1995 DMG knew about the Hoechst litigation, which received a good deal of publicity in the financial press. There was some discussion at DMG about the possibility of a 'protective

GIE' (Mr Thomason was cross-examined about this) but in fact nothing was done before a dividend was paid on 17 July 1995 (giving rise to the ACT payment in January 1996).

113  The judge's main findings of fact on this point are set out in para 27 of his judgment:

> "Before I move on I wish to record the evidence which Mr Thomason (the Head of Taxation at DMG) gave about his state of mind when he learned of the Hoechst argument. In his witness statement he said this:
>
>> 'At all times prior to the determination of the European Court in the Hoechst case, I believed that the United Kingdom statute denying the ability to make a group income election was the law and I was bound to act in accordance with this law … It did not occur to me that I could ignore the law as it stood for the simple reason that the law is the law. Just because another taxpayer challenged the law that did

not mean that I could or should ignore it.'

Mr Thomason was cross-examined, but I do not believe that the foregoing passage was challenged or affected by his answers on other points. He added the general point (obvious but plainly relevant) that it was not clear in 1995 what would be the outcome of the Hoechst case (or, as it turned out, of the Metallgesellschaft/Hoechst conjoined cases). He also said that there were more arguments being advanced by Hoechst in 1995 than the one which eventually succeeded in the [ECJ]."

114  The judge concluded (paras 30–31) that all three relevant payments of ACT were made under a mistake of law and that DMG did not discover its mistake until the decision of the ECJ on 8 March 2001, after DMG had commenced proceedings against the Revenue (it did so shortly after delivery of the opinion of Advocate General Fennelly).

### The Pleadings

115  DMG issued its claim form on 18 October 2000, describing the claim as "for damages for breach of European Community law". In its original particulars of claim (served on 9 February 2001) it pleaded that ICTA sections 14 and 247 and Schedule 13 ("the statutory provisions") were contrary to EU law. It pleaded (paras 9 and 11) that from time to time DMG paid dividends to DBAG and DBI (which passed them on to DBAG). Para 9 (but not para 11 in its original form) pleaded that ACT was paid in respect of these dividends "pursuant to the unlawful statutory provisions and to unlawful demands made by the First and/or Second Defendant and further and/or

alternatively under a mistake of law as to the validity of the statutory provisons". Para 11 was later amended to bring it into line with para 9. By para 13 DMG claimed to be entitled to "restitution of, and further and/or alternatively compensation for, and further and/or alternatively compensation for the loss of use of, monies paid on account of ACT pursuant to unlawful demands by the First and/or Second Defendant and/or under a mistake of law and pursuant to the statutory provisions in respect of the DBAG dividends" (later amended to both sets of dividends), compensation for loss of use of the monies to be calculated "from the dates of payment until set-off against mainstream corporation tax or other repayment or utilisation".

116  Paras 9 and 11 each ended with an averment that the amounts of ACT "include, but are not limited to, payments of ACT made by the Claimant as specified in the [First or Second] Schedule hereto." Both Schedules (giving dates and amounts of ACT payments) were substantially amended on various later dates. The pleading issue is whether these amendments added or substituted a new cause of action outside the category permitted by section 35(5)(a) of the Limitation Act 1980 ("if the new cause of action arises out of the same facts or substantially the same facts as are already in issue on any claim previously made in the original action.")

### The issues

117  Before your Lordships, as in the courts below, there have been six issues in dispute. Drawing on both the agreed statement of facts and issues and the competing version in para 5 of DMG's printed case (but finding the latter rather more helpful) I would summarise them as follows:

  • (1)  The "cause of action" issue: does English law recognise a restitutionary claim for tax paid under a mistake of law?
  • (2)  The "mistake" issue (arising if DMG succeeds on issue (1)): did DMG make the payments of ACT under a mistake of law?
  • (3)  The "discovery" issue (arising if DMG succeeds on issues (1) and (2)): when did DMG discover (or could with reasonable diligence have discovered) its mistake?
  • (4)  The "settled law" issue (arising if DMG succeeds on issues (1) to (3)): does English law

recognise a defence of "settled law" to a claim for restitution of tax paid under a mistake of law?

• (5) The "scope of section 32(1)(c) " issue (arising if DMG fails on issue (1), and raised for the first time in this House): can DMG bring itself within section 32(1)(c) even if mistake of law is not an essential element of its cause of action?

• (6) The "pleading" issue (raised by the Revenue's cross-appeal and linked to the limitation issues): this is the point on section 35 of the Limitation Act 1980 already identified.

118   It will be apparent that it may not be strictly necessary for your Lordships to resolve each of these issues in order to dispose of the appeal. But as this is a test case under the GLO, and the facts of other cases will differ, it seems desirable to consider all the issues. On DMG's printed case there is a seventh issue, the "expiration" issue, arising only if DMG cannot rely on section 32(1)(c) , and if the Revenue succeeds on its cross-appeal. This is a truly arcane point raised (but then left undecided) by Park J in paras 39 and 40 of his judgment, and not discussed at all in the Court of Appeal. Like Park J I would leave it for another day unless there is some practical need to answer it.

**Woolwich and Kleinwort Benson**

119   The speeches delivered in this House in Woolwich [1993] AC 70 and Kleinwort Benson [1999] 2 AC 349 have attracted a great deal of academic interest and commentary. The speeches (especially those of Lord Goff) were also subjected to very close scrutiny in the courts below. Buxton LJ warned himself (para 265) against treating Lord Goff's speeches as if they were statutes, but the fact is that they were in the courts below subjected to the same sort of minute examination as would be appropriate for a statutory (or even, if I may say so without disrespect, a scriptural) text. Your Lordships have been invited to undertake the same sort of exercise.

120   That invitation cannot be wholly disregarded. But before getting too caught up in the exegesis of Lord Goff's speeches, and at the danger of stating the obvious, I would by way of preliminary make some simple observations about the issues in the two cases, and about all the speeches which were delivered

(in each case there were quite full speeches from every member of the Appellate Committee, with two dissenting speeches).

121   To my mind the salient points about Woolwich [1993] AC 70 were as follows:

• (1)  It was decided in 1992 when the general rule barring recovery of money paid under a mistake of law still held the field.

• (2)   In any case there was no mistake on the part of the building society, which had from the first challenged the validity of the transitional provisions in the relevant regulations. It seems to have received confident professional advice and to have acted confidently on the advice. It paid the tax under protest, which was a reasonable thing to do since thousands of small investors might have been alarmed by the news that it was said to be in default.

• (3)   The claim (as originally formulated) was for the repayment of a principal sum of almost £57m with interest. After the issue of the writ the principal sum was repaid (with interest from the date of the writ). So only pre-writ interest was eventually at stake, but there had been a principal sum claimed to be due when the writ was issued.

• (4)   The majority (Lord Goff, Lord Browne-Wilkinson and Lord Slynn of Hadley) upheld the simple principle that tax paid in response to an unlawful demand could be recovered, regardless of compulsion, and that this result was not ousted (or "trumped") by any concurrent mistake of law (Lord Goff, at p 177 F–H, Lord Browne-Wilkinson, at p 198 C–H, agreeing with Lord Goff but not expressly mentioning mistake of law; Lord Slynn, at pp 204 H–205 A).

• (5) The minority (Lord Keith of Kinkel and Lord Jauncey of Tullichettle) considered that there could be no recovery in the absence of compulsion or duress, and that there was no relevant distinction between payment of tax in response to a demand under an ultra vires regulation and payment in response to a demand under a misconstrued statute. If the statutory provisions for repayment of overpaid taxes were inadequate that was a matter for Parliament.

• (6)   The case had no European element at all, though Lord Goff did refer (at p 177 C–E) to the

San Giorgio case [1983] ECR 3593 , remarking that it would be strange if the right of the citizen to recover overpaid charges were to be more restricted under domestic law than it is under European law.

122   The salient points about Kleinwort Benson [1999] 2 AC 349 were as follows:

• (1)  It was not about tax but about interest rate swaps.

• (2)     There were arguably concurrent restitutionary claims, that is a claim based on money paid under a void contract and (if and only if the House abrogated the long-standing bar on recovery of money paid under a mistake of law) a claim on that ground.

• (3)    The significance of section 32(1)(c) of the Limitation Act 1980 was clearly recognised; that was the whole point of the appellant bank seeking to overturn the rule barring recovery for mistake of law. The majority decided to overturn the rule despite explicitly acknowledging that an indefinitely extended limitation period might produce unsatisfactory results (Lord Goff at p 389 A–C; Lord Hoffmann, at p 401 D–F; Lord Hope of Craighead, at p 417 G–H). The minority also noted this point (Lord Browne-Wilkinson at p 359 H; Lord Lloyd of Berwick at p 390 A).

• (4)  The House divided as to whether a mistake of law included a mis-prediction of the result of litigation (in that case, of the outcome of Hazell v Hammersmith and Fulham London Borough Council [1992] 2 AC 1 , decided by this House in 1991 after a challenge made in 1989 by a local authority auditor). This issue brought the House into the difficult area of the declaratory nature of judgments. The majority held that mistake of law should be broadly interpreted. I will not try to note all the relevant passages in their complex reasoning, but I note in particular Lord Goff at p 379 G; Lord Hoffmann at p 400 D–E and Lord Hope at p 411 C–D. The minority held that this was unrealistic and amounted to falsification of history (Lord Browne-Wilkinson at p 358 A–B and Lord Lloyd at p 394 A).

• (5)  "Settled law" was therefore for the minority not a defence to a prima facie restitutionary claim, but a reason why there was no claim at all (Lord

Browne-Wilkinson at pp 360A–362G and Lord Lloyd at p 394 B–H). The majority discussed "settled law" as a defence, as had recently been proposed by the Law Commission in its Report (No 227, 1994) on "Restitution: Mistakes of Law and Ultra Vires Public Authority Receipts and Payments" ('the 1994 report') para 5. The majority rejected the proposed defence (Lord Goff at pp 381 B–383C; Lord Hoffmann at p 401 B–D; Lord Hope at pp 414A–415B). The passage in Lord Goff's speech which I have just mentioned has led to much discussion and I shall refer to it as the debatable passage.

• (6) There was a further issue as to "closed swaps" which is not relevant to this appeal.

• (7)  The case had no European element at all.

123   The decision in Kleinwort Benson has attracted some academic criticism (notably from Professor — as he then was — Jack Beatson, who was the chief architect of the Law Commission report). It has also attracted some approbation (notably from Professor Burrows). It has not been argued that your Lordships should depart from the decision.

**The judgments below**

124   Park J addressed the first issue in a section of his judgment (paras 14–19) headed 'Does English law recognise a claim in restitution to recover taxes paid under a mistake of law?' He quoted at length what I have called the debatable passage in Lord Goff's speech in Kleinwort Benson. He concluded that it did not bear the meaning for which the Revenue contended, for a number of reasons (set out in para 18 of his judgment). In particular he noted that none of the other speeches in Kleinwort Benson supported the view that the payment of unlawfully exacted tax was to be an exception to the new principle permitting recovery of money paid under a mistake of law.

125  As to the second and third issues, Park J held, after a careful analysis (paras 20–32), that DMG did make all three payments of ACT under a mistake of law, and that the mistake was not discovered until the decision of the ECJ in Hoechst on 8 March 2001. He had already, at the Revenue's request, para 18 (iv), left open the fourth issue (as to a possible settled law defence). The fifth issue

was not raised before him. On the sixth issue (as to the pleadings) he decided (para 38) that the amendments did not plead a new cause of action. Instead they merely gave further particulars of a cause of action which had already been pleaded.

126  In the Court of Appeal (Buxton, Rix and Jonathan Parker LJJ) the cause of action issue was most fully covered in the long and careful judgment of Jonathan Parker LJ (paras 146–160, summarising the arguments, and paras 192–227, the Lord Justice's reasoning and conclusions). Buxton LJ set out his reasons separately (paras 265–291). On this issue Rix LJ agreed with both (paras 250 and 261).

127  The reasoning on the cause of action issue in the judgments of Jonathan Parker LJ and Buxton LJ is complex and it is not easy to summarise it briefly. But the crucial passage in Jonathan Parker LJ's judgment seems to me to be para 195. He had just quoted from Lord Goff's speech in Woolwich [1993] AC 70 , 176 approving the dissenting judgment of Wilson J in Air Canada v British Columbia (1989) 59 DLR (4th) 161, 169 . The Lord Justice continued (para 195):

> "It seems to me that the above passage, notwithstanding that it is strictly obiter, is of direct significance in the context of the cause of action issue. Lord Goff is plainly referring to cases (of which the Air Canada case was one) in which there is an unlawful demand and a mistake of law by the taxpayer; indeed, if it were otherwise his reference to the mistake of law rule would not be explicable. His conclusion (as I read it) is that in such cases the mistake of law rule has no application since the taxpayer's cause of action is founded not on his mistake but on the unlawful nature of the demand (in effect, on the revenue's mistake): in other words, that the Woolwich cause of action effectively subsumes any cause of action which might otherwise exist for mistake of law."

Jonathan Parker LJ went on to a very detailed discussion of the debatable passage in Lord Goff's speech in Kleinwort Benson, and to a consideration of Park J's reasons for not giving that passage the significance which the Revenue sought to attach to it.

128  Buxton LJ took a rather different approach to the cause of action issue (paras 265–278). But he too concentrated on analysing the speeches of Lord Goff in Woolwich and Kleinwort Benson. He saw the development of the law in Woolwich (para 270) as "not any deduction from or development of the existing rules of restitution" and (para 271) as "a new remedy, perhaps drawing upon, but certainly not directly applying, ordinary principles of restitution." He pointed out that in Woolwich Lord Goff contemplated ( [1993] AC 70 , 174C–177C) that strict rules of limitation might be needed for cases of unlawfully exacted tax but that on DMG's interpretation of his speech Lord Goff must have "none the less looked with equanimity in the Kleinwort Benson case upon the prospect of claims in respect of such demands that, in the present case, were not raised until nine or ten years after demand made." On the same theme the Lord Justice referred (para 283) to the fact that "Woolwich is restricted to a claim with a six-year limitation period because, as Lord Goff pointed out in the Kleinwort Benson case, it had made no mistake."

129  On the second and third issues Jonathan Parker LJ agreed with the judge (paras 229–236). Buxton LJ took a different line (paras 279–284) developing his earlier reasoning and expressing the view (para 279):

> "that the considerations that lead to recovery in a case of an ultra vires demand can only with the greatest difficulty be fitted into the rules governing recovery on grounds of mistake."

Rix LJ (para 262) agreed with Buxton LJ's observations.

130  Only Jonathan Parker LJ dealt with the fourth issue (settled law) and he did so briefly (para 237),

agreeing with the view of Lord Hoffmann in Kleinwort Benson that it was a matter for Parliament. The Court of Appeal did not consider the fifth issue. On the sixth issue (pleadings) the majority agreed with the judge, but Buxton LJ dissented (see Jonathan Parker LJ at paras 238–248, Rix LJ at paras 252–260 and Buxton LJ at paras 292–297).

## The cause of action issue

131   My Lords, it is impossible to read through the judgments (totalling almost 300 paragraphs) in the Court of Appeal without some surprise at the amount of time which the court devoted to what a single Law Lord (however eminent, and without doubt Lord Goff is pre-eminent in this field) said about mistake of law in a case (Woolwich) in which the claimant was never under a mistake (and so the mistake of law rule was not an issue) and about unlawfully exacted taxes in a case (Kleinwort Benson) which had nothing to do with tax. I fear that this may have led to some basic matters of principle being overlooked, or at least being insufficiently considered.

132   These matters of principle (which have very properly been relied on and developed before your Lordships) include the following: (1) the constitutional principle of equality; (2) the need for coherence in the development of the English law of unjust enrichment; (3) English law's general readiness to permit a claimant to chose between concurrent claims; (4) the consequences of treating the Woolwich principle as exhaustive and exclusive, especially as regards (i) mistake of fact (ii) limitation of actions and (iii) legal certainty of any proposed exception; and (5) the European element (which was not present in either Woolwich or Kleinwort Benson). I must develop these points briefly.

133   Under the rule of law, the Crown (that is the executive government in its various emanations) is in general subject to the same common law obligations as ordinary citizens. This is recognised by section 21(1) of the Crown Proceedings Act 1947 : see the observations of Vaisey J in Sebel Products Limited v Commissioners of Customs and Excise [1949] Ch 409 , 413 (though the notion of implied contract applied in that case must now be obsolete). There are exceptions to this principle but they are generally the subject of express enactment.

The Revenue's case requires a non-statutory exception whose extent is both far-reaching and uncertain.

134   Buxton LJ saw Woolwich as a major departure in the common law, rather than as an incremental development of the English law of unjust enrichment. I would respectfully disagree. Woolwich was certainly a very important development but the majority saw it as a development which was within the proper province of the court, and not an exercise in exorbitant judicial legislation. The Law Commission's thorough examination of Woolwich in its 1994 Report (Part VI paras 6.1–6.46) seems to have accepted this, while noting some uncertainties as to how far the principle would extend.

135  When Parliament enacts a special regime providing special rights and remedies, that regime may (but does not always) supersede and displace common law rights and remedies (or more general statutory rights and remedies). Whether it has that effect is a question of statutory construction: Marcic v Thames Water Utilities Limited [2003] UKHL 66; [2004] 2 AC 42 , 56–58, paras 29–36 and Autologic Holdings plc v Inland Revenue Commissioners [2006] 1 AC 118 (which Mr Rabinowitz QC for DMG put forward as a procedural analogue to the present case). Where section 33 of the Taxes Management Act 1970 ("TMA") applies it does no doubt displace any common law remedy for tax paid under a mistake. But in Woolwich tax was demanded under a regulation which was void. There was therefore no valid assessment and the statutory regime was simply not engaged: see Lord Goff in Woolwich [1993] AC 70 , 169. Similarly, the ECJ has decided in Hoechst that the ACT regime is unlawful under EU law so far as it discriminates between national and multi-national groups of companies. The Revenue accepts that neither section 33 of TMA (as it stood at the relevant time) nor any other statutory provision applies to the situation in which DMG finds itself. The gap in the statutory provisions cannot provide the Revenue with a defence, both because of Woolwich and, in the context of EU law, because of the principle of effectiveness. The appropriate remedy for DMG is, as the Revenue concedes, restitutionary in nature. It is not for the repayment of a principal sum unlawfully exacted from the taxpayer, but for its unlawful exaction before it became due. The ECJ has made it clear that the domestic court must provide an appropriate remedy,

despite the principle reaffirmed by this House in President of India v La Pintada Compania Navigacion SA [1985] AC 104 . Your Lordships heard no argument as to whether and how the Pintada principle applies to the law of unjust enrichment; I note that in his leading speech in the case, Lord Brandon covered (at pp 115–116) the position in terms of damages under common law, Admiralty law, equity and statute law, but did not refer to restitution or unjust enrichment.

136  I would leave open the question whether DMG has to rely on any special principle of EU law in order to obtain a remedy in respect of an exaction which is unlawful only in being premature. In other respects, DMG's claim relies on ordinary domestic principles. English law generally permits a claimant to chose between concurrent causes of action and concurrent remedies as best suits his interests. Lord Goff has been one of the most important influences in developing that approach: see especially Henderson v Merrett Syndicates Limited [1995] 2 AC 145 , 193–194:

> "My own belief is that, in the present context, the common law is not antipathetic to concurrent liability, and that there is no sound basis for a rule which automatically restricts the claimant to either a tortious or a contractual remedy. The result may be untidy; but, given that the tortious duty is imposed by the general law, and the contractual duty is attributable to the will of the parties, I do not find it objectionable that the claimant may be entitled to take advantage of the remedy which is most advantageous to him, subject only to ascertaining whether the tortious duty is so inconsistent with the applicable contract that, in accordance with ordinary principle, the parties must be taken to have agreed that the tortious remedy is to be limited or excluded."

137  Lord Goff reaffirmed the same approach, in the context of unjust enrichment, in Kleinwort Benson [1999] 2 AC 349 , 387:

> "However an equally strong argument may perhaps be made in favour of mistake of law trumping failure of consideration, though either approach is antagonistic to the usual preference of English law to allow either of two alternative remedies to be available, leaving any possible conflict to be resolved by election at a later stage."

The Law Commission took the same view in the 1994 Report (para 10 footnote 1). The claimant bank was allowed to put its case on mistake of law, rather than on payment under a void contract, precisely in order to rely on an extended limitation period under section 32(1)(c) of the Limitation Act 1980 . None of the members of the Court of Appeal cited this passage from Lord Goff's speech or even, so far as I can see, paid any regard to it.

138  I have so far been considering what appear to me to be the main positive arguments in favour of allowing the appeal, and their cumulative effect appears to me to be formidable. That effect is buttressed by considering some of the difficulties involved in the Revenue's case. In the first place, if the Woolwich principle is the only ground for recovery of wrongly paid tax, it would exclude not only an alternative cause of action based on mistake of law, but also one based on mistake of fact. That would involve a departure from a well-established principle from which public authorities are not excepted (see for instance Meadows v Grand Junction Waterworks Company (1905) 21 TLR 538 ) and I can see no good reason for doing so.

139  I do not think that the departure can be justified simply by pointing to the possibility that the claimant may, by relying on mistake, obtain a longer limitation period. Parliament has enacted that where there is an action for relief from the consequences of a mistake, time should not run so long as the mistake remains undiscovered. If that is thought to be too generous in some cases, Parliament can change it (and has done so

by section 320 of the Finance Act 2004 ). But the notion that it is right to show some indulgence to a claimant labouring under an undiscovered mistake is an entirely natural one, and it is not to my mind made unnatural simply because the claim is for unlawfully exacted tax. Taxpayers naturally assume that Parliament has got it right. I am puzzled by Buxton LJ's reference (para 283) to the building society being

> "restricted to a claim with a six-year limitation period because, as Lord Goff pointed out in the Kleinwort Benson case it had made no mistake"

with the suggestion that this was somehow unfair. In Woolwich the building society was fortunate in having expert legal advice that the relevant regulation was invalid, and the resources and determination to take on the Revenue promptly. It did not need any extended limitation period. Many other taxpayers would not be in the same position.

140  If the Woolwich principle is to be an exhaustive and exclusive regime for unlawfully exacted taxes, set apart from the general law of unjust enrichment, legal certainty would require the limits of the exception to be ascertainable with a fair degree of precision. In the debatable passage in his speech in Kleinwort Benson Lord Goff referred twice to "taxes and other similar charges," which is imprecise. Mr Glick suggested that the similarity was to be found in the existence of a special statutory regime regulating recovery. This suggested test was not fully explored in argument but it seems unlikely to be a satisfactory means of setting a clear dividing line within a spectrum which stretches from central government taxes and duties through rates, community charge, drainage rates and charges, special levies and licence fees imposed by statute on different industrial and commercial activities, and charges made by statutory undertakers (as to the last category see South of Scotland Electricity Board v British Oxygen Co Limited (No 2) [1959] 1 WLR 587 ). This point was touched on, inconclusively, by the Privy Council in Waikato Regional Airport v Attorney-General of New Zealand [2003] UKPC 50 at para 80 (discriminatory charges levied on New Zealand airports in respect of official biosecurity services).

141  My Lords, all these considerations lead me to the conclusion that the judge was right, and the Court of Appeal was wrong, in relation to the cause of action issue. That is not to say that I see no difficulty in reconciling this conclusion with the debatable passage in Lord Goff's speech in Kleinwort Benson. Undoubtedly that passage represented part of Lord Goff's mature reflections on the development of the English law of unjust enrichment. It is not easy to reconcile the passage with the rest of Lord Goff's reasoning, but I think that the explanation is provided in the opinions of my noble and learned friends Lord Hoffmann and Lord Hope of Craighead, both of whom sat with Lord Goff in Kleinwort Benson (and whose opinions I have had the great advantage of reading in draft). But whatever the difficulties of the passage, there are to my mind two clear beacons in Lord Goff's speech, one before and one after the debatable passage, which are clearer and more reliable guides. The first is his affirmation of a general right to recover money paid under a mistake of law ( [1999] 2 AC 349 , 375):

> "I would therefore conclude on issue (1) that the mistake of law rule should no longer be maintained as part of English law, and that English law should now recognise that there is a general right to recover money paid under a mistake, whether of fact or law, subject to the defences available in the law of restitution."

The other passage, at p 387, is that referring to "the usual preference of English law to allow either of two alternative remedies" which I have already cited.

142  I reach this conclusion without any heavy reliance on principles of EU law, except perhaps in relation to the Pintada principle (which I regard as uncertain in relation to the law of unjust enrichment). But the European context confirms my conclusion. The domestic court must give DMG an equivalent and effective remedy, and that would not be achieved, in my opinion, if recovery were limited so as to exclude an

Deutsche Morgan Grenfell Group Plc v Inland Revenue... 2006 WL 2925564...

alternative concurrent remedy which would be available in a dispute between private citizens.

### The mistake issue

143  I can set out my views on this issue more briefly. I agree with the judge's conclusions, and I largely agree with his reasoning, though I respectfully think that he was rather over-analytical in his approach. I agree with the observation of Neuberger J in Nurdin & Peacock plc v D D B Ramsden & Co Ltd [1999]l WLR 1249 , 1272:

> "For the issue of recoverability to turn upon a nice analysis as to the precise nature of the mistake of law appears to me to be almost as undesirable as it is for recoverability to turn upon whether the mistake made by the payer was one of fact or law."

The straightforward test of causation put forward by Robert Goff J (as he then was), after a full survey of authority, in Barclays Bank Limited v W J Simms Son & Cook (Southern) Limited [1980] QB 677 , has stood the test of time. DMG paid the ACT because it mistakenly thought that it had to. The fact that there was a procedural requirement for a GIE does not alter the substance of its mistake, since (as Park J expressly found, para 11) any attempt at making a GIE would undoubtedly have been rejected in this case.

144  I think the judge and Jonathan Parker LJ were correct in their views that the mistake was not discovered until the ECJ gave judgment in Hoechst [2001] Ch 620 . Perusal of the report in that case suggests that the United Kingdom government tenaciously defended the ACT regime on every available ground. At no time before the judgment did the government concede that the ACT regime was (in discriminating between national and multi-national groups) contrary to EU law and unlawful. It was the judgment that first turned recognition of the possibility of a mistake into knowledge that there had indeed been a mistake. I agree with the view of Lightman J in First Roodhill Leasing

Limited v Gillingham Operating Company Limited (5 July 2001) para 22 that there may be cases

> "where a party may be held to have discovered a mistake without there being an authoritative pronouncement directly on point on the facts of that case by a court, let alone an appellate court."

It all depends on the facts. But in this case it is, in my opinion, clear that the judgment of the ECJ on 8 March 2001 was the decisive moment.

### Settled law

145  Like the judge, I agree with the view expressed in Kleinwort Benson by my noble and learned friend Lord Hoffmann, that the fashioning of a settled law defence would be a legislative act and is therefore a matter for Parliament. Parliament has indeed incorporated its own version of the defence, in terms of "the practice generally prevailing", in section 33(2A)(a) of TMA 1970 , re-enacting the proviso to section 33(2) . As Lord Goff recognised in Woolwich and Kleinwort Benson, there are strong policy arguments in favour of a general common law right of recovery of wrongly exacted tax, and also strong countervailing arguments in favour of some restrictions on that right of recovery, especially as the defence of change of position could seldom, if ever, apply to wrongfully exacted tax. But the balancing of these high policy arguments is essentially a matter for the legislature.

### The "scope of section 32(1)(c)" issue

146  This issue arises only if DMG fails on the first (cause of action) issue. In my opinion it does not arise on this appeal. The rule that in order to come within section 32(1) a mistake must be an essential ingredient of the claimant's cause of action rests on a surprisingly uncertain basis, that is a view expressed by Pearson J in Phillips-Higgins v Harper [1954] 1QB 411 , 419. Nevertheless it has been generally accepted (with some

10-03635-jpm    Doc 277    Filed 04/10/17    Entered 04/10/17 17:06:11    Main Document
Pg 120 of 1055

Deutsche Morgan Grenfell Group Plc v Inland Revenue..., 2006 WL 2929564...

dissentient academic voices raised against it) for over fifty years.

147   The Law Commission has now completed and published its review of the law of limitation of actions (2001, Law Com. 270) and the government has accepted its general recommendations with a view to legislation as soon as time permits. In those circumstances your Lordships need not, in my opinion, reconsider the now nearly traditional view of the scope of section 32(1)(c) , although there are persuasive arguments for its reinterpretation (see Dr James Edelman, "Limitation Periods and the Theory of Unjust Enrichment" (2005) 68 MLR 848 and Professor Andrew Burrows, "Restitution in respect of Mistakenly Paid Tax" (2005) 121 LQR 540).

**The pleading issue**

148   This point was fully considered in the courts below. I agree with the reasoning and conclusions of Park J and the majority of the Court of Appeal. I would only echo the observations of Millett LJ in Paragon Finance plc v DB Thakerar & Co (a firm) [1999] 1 All ER 400 , 405:

> "The pleading of unnecessary allegations or the addition of further instances or better particulars do not amount to a distinct cause of action. The selection of the material facts to define the cause of action must be made at the lightest level of abstraction".

The formula used in DMG's particulars of claim ("Such amounts include, but are not limited to, payments of ACT … specified in the [First or Second] Schedule") was imprecise and unsatisfactory, but the defect could have been cured by a request for particulars.

149   For these reasons I would allow the appeal and restore the order of Park J.

**The foundations of unjust enrichment**

150   I do however wish to add some brief observations on the views of the late Professor Peter Birks, who died on 6 July 2004, after the first-instance decision of Park J but before the decision of the Court of Appeal.

151   Professor Birks was (in the words of Professor Burrows in his introduction to the second edition of Birks' Unjust Enrichment, published posthumously in 2005) one of the most influential academic lawyers of our time. After Lord Goff and Professor Gareth Jones (the first edition of whose joint work on The Law of Restitution was published in 1966) Professor Birks was one of the foremost, and many would say the very foremost, of the scholars working on developing the law of restitution. In the revised paperback edition of his Introduction to The Law of Restitution (1989) he explained his views as to the essential function in the law of unjust enrichment of "unjust factors" (such as mistake, undue influence, and compulsion). Most if not all other leading textbooks adopt the same or similar terminology, for instance Burrows, The Law of Restitution, second edition (2002) pp 41 ff; Goff and Jones, The Law of Restitution, sixth edition (2002) para 1–053; Hedley and Halliwell (gen. eds.) The Law of Restitution (2002) para 1.20; Tettenborn, Law of Restitution in England and Ireland, third edition (2002) pp 13 ff; Virgo, The Principles of the Law of Restitution (1999) pp 119 ff.

152   But in the preface to the first (2003) edition of Unjust Enrichment Birks, with characteristic intellectual courage, explained that he had changed his views in some fundamental respects (he wrote to Sir Jack Beatson that he was "back to square one"). In particular, he switched from the concept of "unjust factors" to the civilian concept of "lack of basis" (or "lack of cause"). As he said in his preface to the first edition, summarising the points on which his views had changed:

> "Thirdly, and perhaps most importantly, the onward march of case law and academic analysis, especially comparative analysis, has both compelled and convinced me that it was a misjudgement to insist that the common law, late coming, had by good luck hit upon a better way of answering the

question whether an enrichment was unjust than, with their much longer experience, the civilian jurisdictions had achieved."

a mistake of fact, and under certain forms of compulsion."

The law of Scotland has, by contrast, closely followed the civilian model: see the Lord President (Rodger) in Shilliday v Smith [1998] SC 725 , 727–728 and generally Professor Robin Evans-Jones, Unjustified Enrichment: Vol.One, Enrichment by Deliberate Conferral: Condictio (2003).

153  Birks ascribed his change of view partly to the swaps litigation, and especially to Kleinwort Benson. In his own contribution, the first chapter, to Birks and Rose (Eds), Lessons of the Swaps Litigation, (2000) he wrote of the decision of this House in Kleinwort Benson (p14),

> "The disagreement between the majority and the minority turns on whether one can be retrospectively mistaken in any sense relevant to restitutionary relief. The majority holds that one can, and in so holding it appears to have approved a notion of operative mistake of law which is not only broader than operative mistake of fact but broader than the rationale underlying relief for mistake. Without saying so expressly, it has moved English law towards a civilian condictio indebiti. 'Condictio indebiti' means 'Claim in respect of something not due'."

154  In explaining his changes of view Professor Birks also acknowledged the influence of Dr Sonja Meier, a lecturer in law at the University of Regensberg. Her views are accessible in English in her contributions to Lessons of the Swaps Litigation (chapter 6, Restitution After Executed Void Contracts) and to Johnston and Zimmermann, Unjustified Enrichment: Key Issues in Comparison (2002) (chapter 2, Unjust Factors and Legal Grounds). On this point English law may be at something of a crossroads (a metaphor first used, I think, by Waller LJ in Guinness Mahon & Co Ltd v Kensington and Chelsea London Borough Council [1999] QB 215, 233 , and since picked up by others including Dr Krebs, Restitution at the Crossroads, A Comparative Study (2001)). The choice as to the way forward which restitution scholars identify is between continuing to view unjust enrichment as depending on the presence of one or more of a variety of "unjust factors" and adopting the single test of "absence of basis".

This can be contrasted with the well-known statement by Lord Goff in Woolwich [1993] AC 70 , 172,

> "The first [objection] is to be found in the structure of our law of restitution, as it developed during the 19th and early 20th centuries. That law might have developed so as to recognise a condictio indebiti — an action for the recovery of money on the ground that it was not due. But it did not do so. Instead, as we have seen, there developed common law actions for the recovery of money paid under

155  My Lords, the House is being invited (much more pressingly, it must be said, by scholars than by counsel for the parties) to make a choice at a very high level of abstraction. Most scholars would take the view (though Professor Birks himself would not, I suspect, have agreed, since he regarded taxonomy as very important) that the choice is one which will rarely make much if any practical difference to the outcome of any particular case before the court. For several reasons I doubt whether this is the right time for your Lordships to decide whether to rebase the whole law of unjust enrichment on a highly abstract principle which (although familiar to civilians and to Scottish lawyers, and discussed in the speech of my noble and learned friend Lord Hope of Craighead in Kleinwort Benson

[1999] 2 AC 349 , pp 408–409) would represent a distinct departure from established doctrine.

156  It is of the nature of the common law to develop slowly, and attempts at dramatic simplification may turn out to have been premature and indeed mistaken. As Lord Rodger of Earlsferry put it in Commissioners of Customs and Excise v Barclays Bank plc [2006] UKHL 28; [2006] 3 WLR 1 , 19, para 51:

> "Part of the function of appeal courts is to try to assist judges and practitioners by boiling down a mass of case law and distilling some shorter statement of the applicable law. The temptation to try to identify some compact underlying rule which can then be applied to solve all future cases is obvious. [Counsel for the appellants] submitted that in this area the House had identified such a rule in the need to find that the defendant had voluntarily assumed responsibility. But the unhappy experience with the rule so elegantly formulated by Lord Wilberforce in Anns v Merton London Borough Council [1978] AC 728 , 751–752, suggests that appellate judges should follow the philosopher's advice to 'Seek simplicity, and distrust it.'"

Other members of the House showed a similar disinclination to wide generalisation: see Lord Bingham of Cornhill at para 8, Lord Hoffmann at para 36 and Lord Mance at para 83. Commissioners of Customs & Excise v Barclays Bank plc shows that more than forty years on from Hedley Byrne & Co Ltd v Heller & Partners Ltd [1964] AC 465 , the true foundations of the law of tortious liability for negligent mis-statement are still open to debate.

157  By contrast the English law of unjust enrichment has in the space of a decade seen four very important developments, all informed by the learning of Lord Goff: Lipkin Gorman v Karpnale Ltd [1991] 2 AC 548

in 1991, Woolwich [1993] AC 70 in 1992, Westdeutsche Landesbank Girozentrale v Islington London Borough Council [1996] AC 669 in 1996, and Kleinwort Benson [1999] 2AC 349 in 1998. The change in the views of Professor Birks is a recent development (which sadly he could not pursue further) and it has not yet been fully considered by other legal scholars. There is, it seems to me, much to be said for a period of reappraisal.

158  Nevertheless I would add that my tentative inclination is to welcome any tendency of the English law of unjust enrichment to align itself more closely with Scottish law, and so to civilian roots. I see attractions in the suggestion made by Professor Birks in Unjust Enrichment (2nd edition, p.116, under the heading 'The Pyramid: a Limited Reconciliation'):

> "A pyramid can be constructed in which, at the base, the particular unjust factors such as mistake, pressure and undue influence become reasons why, higher up, there is no basis for the defendant's acquisition, which is then the master reason why, higher up still, the enrichment is unjust and must be surrendered."

I would be glad to see the law developing on those lines. The recognition of "no basis" as a single unifying principle would preserve what Lord Hope refers to as the purity of the principle on which unjust enrichment is founded, without in any way removing (as this case illustrates) the need for careful analysis of the content of particular "unjust factors" such as mistake.

Lord Brown of Eaton-under-Heywood

My Lords,

159  DMG's claim in these proceedings (issued on 18 October 2000) is for compensation in respect of three payments of ACT made respectively on 14 October 1993, 15 February 1995 and 14 January 1996. These payments could and would have been avoided had the UK tax regime not breached article 43 (formerly 52) of

the EU Treaty by denying DMG (as a multinational rather than exclusively UK group) the right to make a group income election. So much, the majority of your Lordships would hold, was established by the ECJ's decision in Hoechst on 8 March 2001. The claim is not for the capital sums paid: those were subsequently set off against the company's liability for MCT. Rather it is for compensation for the loss of use of the monies prior to such setoffs, i.e. for having made accelerated payments.

160 The Revenue do not dispute DMG's entitlement to such compensation in principle. On the contrary, they readily accept that the company has a perfectly good remedy, either in tort for breach of statutory duty or in restitution by analogy with the principle established in Woolwich–see Woolwich Equitable Buildings Society v Inland Revenue Commissioners [1993] AC 70 . But under these causes of action DMG would be confined to a six year limitation period (i.e. six years from the date of the respective payments) and on this basis would fail in respect of the October 1993 payment (and fail too in respect of the later payments were the Revenue to succeed in their cross appeal on the pleading issue, contending as they do that such claims were only brought by later amendment rather than when the writ was first issued). That is why DMG assert their claim as one for restitution based on a mistake of law—precisely so as to benefit from section 32 (1)(c) of the Limitation Act 1980 , just as the claimants succeeded in doing in the landmark case of Kleinwort Benson Ltd v Lincoln City Council [1999] 2 AC 349 .

161 All this is fully and lucidly explained in the speech of my noble and learned friend, Lord Walker of Gestingthorpe, as too are the various issues which arise for decision on the appeal. With almost all of Lord Walker's speech (and the speeches of my noble and learned friends, Lord Hoffmann and Lord Hope of Craighead) I find myself in full agreement and, in common with them, I too would allow DMG's appeal and restore Park J's order. On one issue, however, the "discovery" issue (linked in one respect, as it is, with the "mistake" issue), I have the misfortune to take a different view, indeed a view which puts me in a minority of one. As it happens, because of the inter-relationship of this issue with other issues arising on the appeal, my disagreement has in fact no effect whatsoever on the overall outcome of the proceedings.

But it would not, I think, be right to ignore it entirely: the point could well be of decisive importance in other actions, perhaps indeed actions awaiting the outcome of this very appeal. Let me explain.

162 As I understand it, your Lordships have concluded, first, that DMG was acting under a mistake of law when making the three relevant payments of ACT (it is on this issue that my noble and learned friend, Lord Scott of Foscote dissents on the basis that DMG was in any event under a legal obligation to make the payments and so should not be regarded within the Kleinwort Benson principle as having made them under a mistake of law); and, secondly, that that mistake was not discovered until the decision of the ECJ in the Hoechst case was handed down on 8 March 2001. The contrary view which I take is that DMG ceased to be acting under any relevant mistake of law in July 1995 when they first became aware of the Hoechst proceedings and recognised that there was a serious legal challenge to the legality of the UK's ACT regime under EC law. If I am correct in this view it would follow that DMG, although paying the October 1993 and February 1995 payments under a mistake of law, discovered that mistake in July 1995 so as to set time running in respect of those particular payments as from that date; and that the January 1996 payment was not made under a mistake of law at all. (It is because, however, as already stated, the claim was issued on 18 October 2000, within six years of July 1995, and because DMG have the benefit of undisputed alternative grounds of claim in respect of the January 1996 payment, that none of this matters given your Lordships' rejection, with which I agree, of the Revenue's cross appeal.)

163 Let me turn then to this narrow though potentially important issue upon which I diffidently disagree with your Lordships. First I should for convenience set out again section 32(1) of the 1980 Act:

"… where in the case of any action for which a period of limitation is prescribed by this Act, either—

(a) the action is based upon the fraud of the defendant; or

(b) any fact relevant to the plaintiff's right of action has been

deliberately concealed from him by the defendant; or

(c)  the action is for relief from the consequences of a mistake;

the period of limitation shall not begin to run until the plaintiff has discovered the fraud, concealment or mistake (as the case may be) or could with reasonable diligence have discovered it."

164   It is, I acknowledge, difficult to articulate the precise touchstone by which to determine whether a payment ought properly to be held to have been made under a mistake of law (or, indeed, answering essentially the same question from a different standpoint, whether such a mistake should be held to have been discovered-or able with reasonable diligence to have been discovered). Section 32 itself affords little help on the question-unsurprisingly, perhaps, given that the provision (based as it was on section 26 of the Limitation Act 1939 ) was framed at a time when no plaintiff could have hoped to pray in aid a mistake of law.

165   For my part, however, I would hold that as soon as a paying party recognises that a worthwhile claim arises that he should not after all have made the payment and accordingly is entitled to recover it (or, as here, to compensation for the loss of its use), he has "discovered" the mistake within the meaning of section 32 ; and, by the same token, I would hold that if he makes any further payments thereafter, they are not to be regarded as payments made under a mistake of law.

166   Where, I would respectfully ask, is there any injustice in this? No one is suggesting, let me repeat, that the monies are not recoverable or that the payee should remain unjustly enriched. All that is required is that the payer does not sit upon what ex-hypothesi he recognises to be a worthwhile legal argument for more than six years. Provided he acts within that (surely ample) time, he can pursue his claim (whether in respect of past payments or, indeed, payments he may

choose to continue making) under whatever may be the appropriate cause of action: restitution for mistake of law in respect of past payments made when he had no reason to question his liability to make them, total failure of consideration, or a claim based on the Woolwich principle.

167   Once a plaintiff recognises that he has a worthwhile case on the facts to pursue a claim in fraud or to extend the limitation period for a particular claim because of the defendant's deliberate concealment of a fact relevant to his cause of action, time surely then starts to run against him under section 32 : he could not successfully argue that time starts running only when the court eventually comes to reject the defendant's denial of wrongdoing and to find fraud (or, as the case may be, deliberate concealment) established.

168   Nor do I find it easy to reconcile the approach taken by your Lordships with other provisions of the 1980 Act, most notably section 14A(9) : "Knowledge that any acts or omissions did or did not, as a matter of law, involve negligence is irrelevant for the purposes of subsection (5) above." ( Section 14A(5) determines the starting date for reckoning the period of limitation based on the claimant's date of knowledge.) As Lord Nicholls of Birkenhead recently observed in Haward v Fawcetts [2006] 1 WLR 682 , 686F, para 12: "A claimant need not know he has a worthwhile cause of action." On your Lordships' view, however, such a claimant could well argue that he was labouring under a mistake of law so as to extend time under section 32(1) .

169   Woolwich was decided on the explicit basis that the building society was in no way mistaken when making its payments under the disputed regulations-see particularly the speech of Lord Goff at p 173D and that of Lord Slynn at p 201A–B. Rather the payments were made because, as Lord Goff put it at p 171G–H:

"[The taxpayer] is faced with the revenue, armed with the coercive power of the state, including what is in practice a power to charge interest which is penal in its effect. In addition, being a reputable society which alone among building societies is challenging the lawfulness of the

Deutsche Morgan Grenfell Group Plc v Inland Revenue..., 2006 WL 2929564...

demand, it understandably fears damage to its reputation if it does not pay. So it decides to pay first, asserting that it will challenge the lawfulness of the demand in litigation."

I can see no real distinction between that case and this (this case, that is, after July 1995). True, as Lord Goff observed (at p 171G), Woolwich was 'convinced that the demand [was] unlawful' whereas here Mr Thomason, DMG's Head of Taxation, believed that the company was in law bound to make the payments (precisely, indeed, as Lord Scott would hold to be so). But I fail to see why the question whether monies are paid under a mistake of law should turn on the degree of conviction or optimism which the parties hold upon the legal issue dividing them. Were the claimants in Hoechst (who issued their proceedings against the Revenue in 1995) nonetheless to be regarded as having made all subsequent payments under a mistake of law? Surely not. Even DMG itself, it will have been noted, brought its claim in October 2000. Is it nevertheless to be said that their original mistake remained undiscovered until the ECJ's actual decision in Hoechst some five months later?

170  In Kleinwort Benson, as I understand that case, nothing turned upon the particular state of mind of the payer as to whether the payments for which restitution was sought were made under a mistake. As Lord Hope noted (at p 403G), the only issue on that part of the case was whether the bank's mistake was one of law. It was certainly not critical to the decision there that the mistake of law was assumed, at least by Lord Lloyd, to have been discovered only when the House of Lords finally held in Hazell v Hammersmith & Fulham LBC [1992] 2 AC 1 that the swap agreements were void. As Lord Hoffmann observed (at p 401F–H), the decision (in Kleinwort Benson) "leaves open what may be difficult evidential questions over whether a person making a payment has made a mistake or not … There is room for a spectrum of states of mind between genuine belief in validity, founding a claim based on mistake, and a clear acceptance of the risk that they are not. But these questions are not presently before your Lordships."

171  Lord Hope too left open for another day cases where payments are made in a state of doubt about the law. The Revenue on the present appeal understandably place some reliance on what Lord Hope said at p 410B–C:

> "Cases where the payer was aware that there was an issue of law which was relevant but, being in doubt as to what the law was, paid without waiting to resolve that doubt may be left on one side. A state of doubt is different from that of mistake. A person who pays when in doubt takes the risk that he may be wrong —and that is so whether the issue is one of fact or one of law."

172  On the present appeal, however, Lord Hope concludes his judgment on "the discovery issue" (paragraphs 63–71 of his speech) with the view that, when DMG paid the ACT, "[i]t was not then obvious that the payments might not be due." I confess to some difficulty with that conclusion. Surely, when DMG learned in July 1995 that there was a serious legal challenge to the legality of the ACT regime, it must then have been obvious to them that these payments might not after all be due. Of course they could not be sure and of course nothing short of a final judgment from the ECJ would have persuaded the Revenue to accept any claim by DMG here for group income relief. But it does not seem to me to follow that DMG paid under a mistake of law—any more than Woolwich would be regarded as having paid under such a mistake simply because the Revenue in that case were insisting on the validity of the contested regulations.

173  I have the same difficulty with paragraph 144 of Lord Walker's opinion. Again, I see no good reason why the Revenue's tenacious defence of their position and their refusal to concede its unlawfulness means that DMG's mistake must be treated as undiscovered prior to the Hoechst judgment. The passage quoted by Lord Walker from Lightman J's judgment in First Roodhill

10-03635-jpm    Doc 277    Filed 04/10/17    Entered 04/10/17 17:06:11    Main Document
Pg 126 of 1055

Deutsche Morgan Grenfell Group Plc v Inland Revenue..., 2006 WL 2929564...

Leasing Ltd v Gillingham Operating Company Ltd (5 July 2001) para 22, continues:

> "For this purpose it cannot be necessary that the party knows of the mistake as a certainty. There are gradations of knowledge. It may well be sufficient to constitute the necessary discovery when the claimant has good reason to believe that a mistake has been made (consider Earl Beatty v IRC [1953] 1 WLR 1090 ) or has been given 'a line' on this question (see G L Baker v Medway [1958] 1 WLR 1216 at 1224)."

174  To much the same effect is Maurice Kay LJ's judgment in Brennan v Bolt Burdon [2004] EWCA Civ 1017; [2005] QB 303 , 315:

> "This [the plaintiff's extreme difficulty in obtaining permission to appeal and 'small chance' of persuading the Court of Appeal], it seems to me, falls short of the unequivocal but mistaken view of the law which underlay the Kleinwort Benson case [1999] 2 AC 349 . As Lord Hope observed, at p 410B, the House of Lords was not dealing with the case where there is doubt as to the law-'a state of doubt is different from that of mistake. An appeal might have been correctly perceived as an uphill struggle but not as an inherently insuperable one- as subsequent events were to prove."

175  Lord Hoffmann suggests (at paragraph 26) that: "The real point is whether the person who made the payment took the risk that he might be wrong. If he did, then he cannot recover the money." But my thesis is not that, if someone pays money knowing that he may not be under any liability to do so, he cannot recover it. Rather it is that he cannot recover it as money paid under a mistake of law so as to benefit from the longer limitation period available under section 32 . Certainly he can recover the money provided only that he sues in time and has some other cause of action, such as total failure of consideration. Clearly the quiz contestant who, in doubt whether Haydn or Mozart wrote the eine kleine nachtmusik answers Haydn, made a mistake. Suppose, however, that, making that mistake, he had paid out money legally due only if Haydn had been the correct answer. To my mind he, no less than the quiz contestant, took the risk that he might be wrong: he could not recover his payment as money paid under a mistake of law (or fact) although, provided he sued within six years, he could well recover it on another basis.

176  The precise point at which a party may be said to be, or to cease being, under a mistake of law is, I acknowledge, by no means easy to formulate. Just when a party comes to recognise he has "a worthwhile claim" (the touchstone I have suggested in paragraph 163 above) will not always be obvious. Essentially, however, I am in broad agreement with Lightman J's and Maurice Kay LJ's approach in the cases mentioned above, as indeed I am with the views of the majority of the Court of Appeal on this issue in the present case —see Rix LJ's judgment at para 262 and Buxton LJ's judgment at paras 281–283.

177  For the reason already given, however, even if that view were shared by a majority of this Committee, it would avail the Revenue nothing. The appeal must in any event be allowed.

Crown copyright

© 2017 Sweet & Maxwell

2006 WL 2929564

    © 2017 Thomson Reuters.

# TAB 4

**Dexia Crediop S.p.A. v. Comune di Prato**

Case No: CL-2010-000481

High Court of Justice Queen's

Bench Division Commercial Court

10 November 2016

**[2016] EWHC 2824 (Comm)**

**2016 WL 06639477**

Before: Mr Justice Walker

Date: 10/11/2016

**Analysis**

Hearing date, in addition to dates listed in the main claim judgment: 23 October 2015

Subsequent written submissions were received during the period 16 to 24 November 2015 and 18 to 21 July 2016

**Representation**

    • Richard Handyside QC & Rupert Allen (instructed by Allen & Overy ) for the Claimant.

    • Jonathan Davies Jones QC & Christopher Burdin (instructed by Seddons ) for the Defendant.

**Approved Judgment**

Paul Walker, 10 November 2016

The Hon Mr Justice Walker:

**Introduction**

My judgment dated 25 June 2015 dealt with local government law defences and financial services law defences to the main claim in these proceedings. I shall refer to it as "the main claim judgment" or "MCJ". The present judgment is concerned with issues not dealt with in the main claim judgment. Where convenient, I shall refer to the present judgment as "the judgment on remaining issues" or "JORI".

In the present judgment I adopt the short forms used in the main claim judgment. There is one exception. In the main claim judgment I used "Consob 11522/1998" to refer to regulation 11522 made by Consob on 1 July 1998. In the present judgment I use a shorter abbreviation: "CR". For ease of reference, Annex 1 to the present judgment sets out abbreviations and short forms used in the main claim judgment, and those used in the present judgment, along with the corresponding long form and notes.

An overview of the case will be found in section A1 of the main claim judgment. As to the structure of that judgment:

    • (1)  sections A2, A3 and A4 of the main claim judgment describe the written evidence relied on by the parties, the course of the trial, market concepts concerning types of interest rate swap, the use of the expression "mark to market" or "MTM", and the use of terms "hidden" or "implicit" costs;

    • (2)  section B describes key features of the background and history, and section C describes some general aspects of Italian law along with English law's approach to Italian law;

    • (3)  in section D defences asserting contravention of Italian local government law are examined, and reasons are given for concluding that none of the defences in this category succeeds;

    • (4)  in section E certain aspects of defences asserting contravention of Italian financial services and civil law are examined, and reasons are given for concluding that one such defence, relying on article 30 TUF, succeeds;

    • (5)  section F notes that Prato, for the reasons given in section E, has succeeded in defending the main claim; it adds that while it is unnecessary to consider other defences advanced by Prato, other defences will, to the extent appropriate, be considered in a further judgment;

    • (6)  section G explained why my conclusion in section E gave rise to a need for further submissions in relation to Prato's counterclaim and Dexia's alternative claims;

    • (7)  section H explained that I would hear oral submissions on the directions to be given in order to take the matter forward.

The directions contemplated in section H of the main claim judgment were given after hearing oral submissions on 25 June 2015. They resulted in written submissions in July 2015 and a hearing on 23 October 2015. There were further written submissions in November 2015 and July 2016.

The matters dealt with in the present judgment (and the outcome) are these. Section B below deals with Dexia's alternative claims. (I find that the alternative claim for restitution succeeds.) Turning to Prato's other defences, section C discusses those which rely on Italian financial services law (which succeed) and Italian concepts of *causa* and *oggetto* (which do not succeed). Section D makes some observations on Prato's other defences. Turning to Prato's counterclaims, section E deals with the restitution counterclaim (which succeeds). Section F deals with the regulatory counterclaim. (I find that allegations of breach are, save in one instance, not established. The one instance concerns an established breach of article 30.6 TUF, but I conclude that this breach caused Prato no loss. Accordingly no damages are awarded to Prato.) The advisory counterclaim and the misrepresentation counterclaim are discussed in section G. (Neither of those counterclaims succeeds.) Section H deals with concluding matters, including the set-off defence. (The set-off defence succeeds: it appears likely that the amount payable by Dexia to Prato under the restitution counterclaim will be greater than the amount payable by Prato to Dexia under the restitution claim, and after set-off a net sum only will be payable by Dexia to Prato.)

**Dexia's alternative claims**

**Dexia's alternative claims: introduction**

Two alternative claims were advanced by Dexia. The first alternative claim was briefly described in paragraph 14 of the main claim judgment. It was that, if swap 6 were invalid or unenforceable, then there should be declaration that Prato is bound by the terms of swaps 3, 4 and 5, because in such circumstances they would not have been terminated pursuant to swap 6. Dexia now recognises that the main claim judgment has the consequence that there is no scope for this first alternative claim. The reasoning in the main claim judgment concerning article 30 TUF is just as much applicable to the earlier swaps as it is to swap

6. Applying that reasoning, Prato has by its defence validly invoked article 30.7 TUF in relation to all the earlier swaps. It follows that Dexia cannot rely on swaps 3, 4 and 5 in the way which is envisaged in the first alternative claim.

Dexia advances a second alternative claim. I shall call it "the restitution claim". As noted in paragraph 254 of the main claim judgment, it arises in relation to swap 1, swap 2, swap 4 and swap 5: if those swaps are invalid, Dexia seeks to recover the net differentials paid to Prato under those swaps. The total of these net differentials is &euro;1,252,784.

In the remainder of this section I analyse the arguments advanced on the restitution claim. I begin in section B2 with what I shall refer to as "the Italian law objection". The Italian law objection is a submission by Prato urging that the court should hold the proper law of the restitution claim to be Italian law, with drastic alleged consequences for Dexia. Section B3, in the event that Prato does not succeed on the submissions discussed in section B2, examines an English law time bar defence advanced by Prato. Section B4 examines the remaining English law defence advanced by Prato, which was a defence of change of position.

For the reasons given in sections B2 to B4, I conclude that the Italian law objection fails, as do both the time bar and change of position defences. The result is that Dexia's restitution claim succeeds.

**Restitution claim: proper law**

**Restitution claim — proper law: introduction**

The restitution claim as pleaded by Dexia relied solely on principles of English law. So far as the proceedings in this court are concerned, the first suggestion that there was an issue as to choice of law was in Dexia's written closing submissions filed on 21 July 2014. On 24 June 2015 Prato's skeleton argument, prepared for the purposes of oral submissions after the handing down of the main claim judgment, set out the Italian law objection.

The Italian law objection was summarised by Prato in broad terms in paragraph 9 of Prato's Note dated 16 November 2015:

…if Italian law governs the restitution claim and counterclaim, Dexia's restitution claim does not get off the ground because no Italian law claim has been pleaded.

Thus the Italian law objection depends upon a finding by the court that Italian law governs both the restitution claim and the restitution counterclaim. In section E2 below I make a finding that Italian law governs the restitution counterclaim. That being the case, I consider in section B2.2 below whether Prato is entitled to assert that Italian law governs the restitution claim. If so, I consider in section B2.3 whether the reasoning of the Italian law objection is valid.

**Restitution claim: the Italian law objection**

Dexia introduced the restitution claim by amendment in 2014. It relied on principles of English law only. At that stage Prato had said, in its counterclaim, that Prato relied primarily on Italian law for the purposes of the restitution counterclaim. Also at that stage Dexia had said, in its defence to counterclaim, that English law governed the restitution counterclaim.

During the period up to the close of evidence I was not aware of any suggestion by either side that Italian law governed the restitution claim. However, that position changed. By 25 June 2015 my understanding, as set out in para 254 of the main claim judgment, had two elements:

• (1)  the first element was that Prato said that the restitution claim was governed by Italian law; and
• (2)  the second element was that if Prato were right, Dexia recognised that it must apply for permission to amend its particulars of claim.

My understanding arose from the following course of events:

• (1)   Section K of Dexia's written closing submissions began by dealing with the restitution claim and the restitution counterclaim together. When dealing with them together it stated at paras 305 and 306:

305.  Three issues arise:

305.1.       Are these claims governed by English law or Italian law?

305.2.  If English law applies, does either party have a change of position defence?

305.3.  If English law applies, does Prato have a limitation defence to the alternative restitutionary claim in relation to payments made before 7

December 2004?

…

306. Dexia contends that the restitutionary claims are governed by English law, whereas Prato contends that they are governed by Italian law.

• (2) Dexia said at paragraph 310 of its written closing submissions that the same system of law must govern both the restitution claim and the restitution counterclaim, that if the court decided that the restitution counterclaim was governed by Italian law then the court should also apply Italian law to the restitution claim, and that if necessary Dexia would seek to amend to plead in the alternative that the restitution claim was governed by Italian law.

• (3) The amendment proposed by Dexia was that a single sentence should be added to the part of the particulars of claim that dealt with the restitution claim. The proposed sentence was set out in footnote 620:

It is averred that this claim is governed by English law or in the alternative Italian law.

• (4) In oral closing submissions Dexia sought permission to make this amendment, adding that all the relevant evidence as to Italian law had been deployed because the restitution counterclaim had been pleaded under Italian law.

• (5) In answer Prato's oral closing submissions commented that no such claim had been pleaded, that it had been left very late to advance a completely new claim, and that that was all that Prato would say about it.

My understanding was incorrect in relation to both elements. As to the first element, despite what was said in paras 305 and 306 of Dexia's written closing, it is common ground that Prato had not at that stage either pleaded or submitted that the restitution claim was governed by Italian law. As to the second element, the position was:

• (1) Dexia had said that if the court decided that the restitution counterclaim was governed by Italian law then the court should also apply Italian law to the restitution claim, and
• (2) Dexia had orally sought permission to amend to plead in the alternative that the restitution claim was governed by Italian law, in answer to which Prato had commented only that no such claim had been pleaded and that it had been left very late to advance a completely new claim.

In a skeleton argument on 24 June 2015 Prato said it would "oppose Dexia's amendment application if made". Prato added, among other things:

25. … The rule that foreign law must be pleaded is there for a reason. It is essential that the court and the other parties have proper notice of the provisions of foreign law that are being relied on, with a fair opportunity to investigate those provisions and seek the assistance of foreign law experts. However, because it has never advanced any pleaded claim under Italian restitution law, any such claim *by Dexia* (as opposed to *by Prato* ) has not been fully addressed or considered by the Italian law experts during the trial.

In paragraph 27 of that skeleton argument Prato advanced the Italian law objection as set out in section B1 above. When doing so, it made reference to *Dicey, Morris and Collins on the Conflict of Laws* ("Dicey"):

27. If Dexia is not permitted to amend its statement of case, it cannot advance a restitution claim in Italian law. It is trite law that " *foreign law must be pleaded* " (see e.g. [ *Dicey* ], 15th edition, at para 9-003). Accordingly, if the Court decides that Italian law governs any cause of action Dexia may have in restitution, Dexia's restitution claim must fail.

Dexia's oral submissions on 25 June 2015, among other things:

• (1) observed that as the pleadings currently stood it was not open to the court to decide that the restitution claim was governed by Italian law;
• (2) added that an application for permission to amend in that regard had been made in its oral closing submissions, and that Prato in its oral closing submissions did not expressly oppose the application;
• (3) submitted that the court should decide whether to allow the amendment;
• (4) in response to a query from me, acknowledged that there was an omission in the draft amendment in that it did not identify any way in which Dexia said that Italian law differed from English law; and
• (5) as regards that omission, relied upon the circumstances at the time when the amendment was sought to be made, namely that in relation to the restitution counterclaim the experts had addressed "the topic of the right to obtain restitution under contracts that are invalid".

I responded that if an application for permission to amend were to go forward it would be necessary to formulate an amendment identifying what Dexia said were the relevant principles of Italian law and how they gave Dexia an entitlement. Dexia asked for liberty to come back. I suggested a period of 7 days for this purpose. Prato did not object to such a period, but reserved its position on other aspects of the matter. The

upshot was that paragraphs 9 to 11 of my order dated 25 June 2015 stated:

9. The Claimant's application to amend its Particulars of Claim to plead in the alternative that its claim in restitution is governed by Italian law is refused.

10. If so advised, the Claimant may renew its application so to amend by issuing, filing and serving by 4pm on 2 July 2015 an application notice supported by a properly formulated draft amendment and a written skeleton argument which identifies such existing evidence of Italian law in these proceedings that the Claimant relies on.

11. If the Claimant makes an amendment application under paragraph 10 above, the Defendant may (if so advised) file and serve by 4pm on 9 July 2015 a written skeleton argument in response and any relevant evidence of Italian law on which it wishes to rely to the extent not currently addressed in the evidence before the Court.

In the event, no application was made under para 10 of the order: Dexia decided not to take the matter further. It informed the court of this in para 2 of its written submissions dated 17 July 2015. Para 3 of those submissions stated:

3. Accordingly no issue of choice of law arises in relation to Dexia's restitution claim, and the court must decide the claim solely by reference to English law principles.

However Prato, consistently with what it had said earlier, decided to take forward the Italian law objection. In supplementary written submissions for the hearing on 23 October 2015 Prato repeated the Italian law objection. Prato added, among other things, that Dexia had conceded that the same system of law must govern both the restitution claim and the restitution counterclaim. Dexia's response on this aspect, among other things, said that it had made no such concession, and that if it had made a concession then there was no legal or procedural obstacle to withdrawing it. Prato replied, among other things, that it was not open to Dexia "to renege on this concession".

Dexia's oral submissions on 23 October 2015, among other things:

• (1) adopted submissions made in writing that:

• (a) as Dexia had not renewed its application to amend, no issue of choice of law arose in relation to the restitution claim, and the court must decide the claim solely by reference to English law principles;
• (b) it was for Prato to plead that Dexia's restitution claim was governed by Italian law if that was its position;
• (c) as Prato had not taken this course, it was not open to Prato to contend that Dexia's restitution claim was governed by Italian law;

• (2) repeated an observation made on 25 June 2015, namely that when formulating section K of its written closing submissions, Dexia had overlooked the fact that although the restitution counterclaim had relied on Italian law Prato had not pleaded that the restitution claim was governed by Italian law;
• (3) denied that what was said in paragraph 310 of its written closing amounted to a "concession"; and
• (4) in support of its entitlement to withdraw any such "concession", relied upon authorities cited in its written submissions.

Prato's oral submissions on 23 October 2015, among other things:

• (1) adopted submissions made in writing that there had been a concession by Dexia;
• (2) did not, however, contest Dexia's ability to resile from that concession; and
• (3) added that this did not matter because it was clearly correct to say that the same system of law must govern both the restitution claim and the restitution counterclaim.

As to the lack of any pleaded case by Prato that Italian law governed the restitution claim, Prato:

• (1) said that when introducing the restitution claim by amendment in 2014 Dexia took a deliberate decision to rely only on English law, knowing that Prato relied on Italian law for the purposes of the restitution counterclaim, and that Dexia may have done this so as not to prejudice its argument that English law governed the restitution counterclaim;
• (2) repeated earlier observations that Dexia's closing submissions made a concession in para 310 that the same system of law must govern both the restitution claim and the restitution counterclaim;
• (3) asserted that when Dexia took a deliberate decision not to renew its application to amend it did so without having withdrawn the concession in para 310;
• (4) referred to what had been said by Dexia in paras 305 and 306 of its written closing;
• (5) as to the question of the proper law of any restitutionary obligation arising from an invalid swap, submitted that no-one at the trial was in any doubt that this question was in issue;
• (6) added that in any event this was a question of law for the court to decide; and
• (7) submitted that there was a fundamental difference between saying that the applicable law for the relevant restitutionary obligations was in play and saying that "Dexia has only pleaded its claim under English law because it has".

There was a final contention on this aspect by Prato in its note dated 16 November 2015. What was said in the

note was that it would be "absurd" for the court to be "forced" into:

> holding both (1) that the restitution claims and counterclaims are governed by Italian law, but (2) Dexia has only opted to plead under English law, so the court will apply English law.

On consideration of all that has been said on this, in my view Dexia has established that it is not open to Prato to contend that Italian law governs the restitution claim. The reason is that neither side has ever pleaded that Italian law governed the restitution claim, and that in the present circumstances it is appropriate to insist on the general rule that a party seeking to advance an assertion that foreign law applies must plead that assertion in its statement of case.

Prato seeks to reply that it has pleaded a contention that its own restitution counterclaim under swap 6 is governed by Italian law. That is true, and in section E2 below I give a ruling which, in relation to the restitution counterclaim, upholds that contention. But it does not follow that the court is entitled to extend that ruling to the restitution claim in the absence of a pleaded assertion to that effect.

Prato advanced contentions that when introducing the restitution claim by amendment in 2014 Dexia took a deliberate decision to rely only on English law, knowing that Prato relied on Italian law for the purposes of the restitution counterclaim, and that Dexia may have done this so as not to prejudice its argument that English law governed the restitution counterclaim. I am willing to assume that these contentions are correct. Of themselves, they do not warrant proceeding on the basis that the same system of law must govern both the restitution claim and the restitution counterclaim.

Prato does not deny that in private law proceedings the general rule is that it is for the parties to define the issues by their statements of case. This rule applies with particular force if one or other party wants to say that foreign law governs an aspect of the case, for the content

of foreign law is, with certain limited exceptions, a matter of fact which must be pleaded. Prato submits, in effect, that nonetheless in the present case the general rule should not apply.

In that regard, however, Prato does not rely on any overriding statutory provision. Nor does it rely on any overriding principle of public policy.

Prato points out that the assertion which Prato now wishes to make is an assertion of law. That characterisation is accurate. But in a case where the other side responds that the point ought to have been pleaded and was not pleaded, that characterisation will not automatically entitle the court to proceed as if it had been pleaded.

Prato advances a contention that it would be "absurd" for the court to be "forced" into "holding both (1) that the restitution claims and counterclaims are governed by Italian law, but (2) Dexia has only opted to plead under English law, so the Court will apply English law." The contention, however, is based on misconceptions. The court is not "forced" into doing anything. The position in private law cases is that in the absence of any applicable overriding legislative provision, principle of public policy, or other good reason for taking a different approach, the court simply decides the issues arising from the statements of case. In these circumstances, as it is the parties that define the issues, it is not "absurd" for an issue arising on a claim to involve a question of English law only, and for a similar issue on a counterclaim to raise a question whether foreign law applies with a particular result. The court is not "holding" that English law governs the restitution claim: it simply applies English law because neither side has pleaded that foreign law applies to the restitution claim.

As to Prato's "fundamental difference", if it were the case that an issue had been "in play" during the trial then that might be a good reason for departing from the general rule. Prato advanced a contention that, as to the question of the proper law of any restitutionary obligation arising from an invalid swap, no-one at the trial was in any doubt that this question was in issue. If that contention is said to apply to the restitution claim then I cannot accept it. In the present case all that happened was that when formulating section K of its

written closing, Dexia overlooked the absence of a plea by Prato that Italian law governed the restitution claim. The notion that Italian law might govern the restitution claim had not been "in play" at all. What had been "in play" was Prato's contention that Italian law governed the restitution counterclaim. Save for that, not a single element of the Italian law objection had been advanced by Prato before receipt of Dexia's written closing.

I agree with Prato's submissions to this extent: paragraphs 305, 306 and 310 of Dexia's written closing made positive assertions that in relation to the restitution claim there was an issue as to the proper law of any restitutionary obligation arising from an invalid swap, and that the same system of law must govern both the restitution claim and the restitution counterclaim. Those assertions, however, were not concessions for the purposes of the Italian law objection. The Italian law objection had not been advanced at the time that those assertions were made. Until the Italian law objection was advanced there was nothing to concede. In any event, as Prato rightly accepted in oral submissions on 23 October 2015, Dexia was entitled to resile from any "concession". I reject the assertion by Prato in oral submissions that the "concession" was not withdrawn. The decision not to pursue para 310 of the closing submissions was notified to the court in Dexia's written submissions dated 17 July 2015. Para 3 of those submissions was manifestly inconsistent with the "concession". By that time Dexia had, in oral submissions on 25 June 2015, informed the court of the mistake that it had made.

In these circumstances I conclude that there is no good reason for departing from the general rule. It follows that Prato, as it failed to plead that Italian law governed the restitution claim, cannot advance the Italian law objection.

**Validity of the reasoning in the Italian law objection**

The consequence of my ruling in section B2.2 above is that I do not need to examine the validity of the reasoning in the Italian law objection. For that reason my observations on this topic are not extensive.

If Prato were entitled to advance the Italian law objection, then there are two propositions that it would need to establish in order for that objection to be successful. The first is that the same system of law must govern both the restitution claim and the restitution counterclaim. I am prepared to assume for present purposes only that this is correct, that Prato is entitled to assert that it is correct, and that, consistently with my conclusion that Italian law governs the restitution counterclaim, I should hold that the restitution claim is governed by Italian law.

The second proposition is that because Dexia has not identified the content of relevant Italian law it follows that Dexia cannot advance the restitution claim. I do not accept this proposition. It is inconsistent with long established principles of private international law. Rule 25 of *Dicey* , 15th ed., is concerned with cases to which foreign law applies. In that regard Rule 25(2) states:

> (2)  In the absence of satisfactory evidence of foreign law, the court will apply English law to such a case.

Prato maintains that its position is consistent with a passage in *Dicey* , 15th ed., at para 9-002. It is true that this paragraph makes an observation, echoed in para 9-026, about "cases where it would be wholly artificial to apply rules of English law to an issue governed by foreign law". For present purposes I will assume that Rule 25(2) may not be operative in cases where it would be wholly artificial to apply it.

As to whether application of the rule would be wholly artificial, while I have held that Italian law governs the restitution counterclaim, Dexia's argument that English law governs that counterclaim, cannot in my view be characterised as wholly artificial. I think, too, that it is relevant that in the present case neither side has pleaded that Italian law, in so far as it affects the restitution claim, is any different from English law. Moreover, a particular feature of the present case is that the effect of Italian law on the restitution counterclaim has been considered by the parties. If Italian law applies to the restitution counterclaim, then Prato asserts, and Dexia accepts, that under Italian law the restitution counterclaim succeeds. By contrast, Prato has not pleaded that failure to apply Italian law prejudices its

defence to the restitution claim. Prato's sole purpose in advancing the Italian law objection is to torpedo the restitution claim without needing to show that Italian law would reject that claim. In these circumstances it is Prato's Italian law objection, and not Dexia's reliance on English law, that is "wholly artificial".

For these reasons, even if Prato were entitled to advance the Italian law objection, I would have held that the Italian law objection failed. I add an observation in relation to the opening words of Rule 25(2) in *Dicey*, 14th edition. It was not suggested by Prato that, in relation to the restitution claim, I already had satisfactory evidence of foreign law. Such evidence of Italian law as had been given at the trial suggested that under Italian law the restitution claim would succeed. Prato, however, made it clear for obvious reasons that it did not accept that this was the case.

## Restitution claim: time bar

### Restitution claim – time bar: introduction

For the purposes of the Limitation Act 1980 the restitution claim arising from the invalidity of the swaps is an "action founded on simple contract". It is an action under an implied contract. For present purposes that implied contract can be described using the historic terminology that money "had and received" by a defendant under a transaction will be repaid if the transaction is invalid and, by reason of the invalidity, the money in question was had and received "to the use of" the claimant.

Under ss 1 and 5 of the Act an ordinary time limit is imposed: such an action shall not be brought after the expiration of 6 years from the date on which the cause of action accrued. The restitution claim was introduced by amendment. It is common ground that under s 35(1)(b) of the Act it is deemed to be a separate action and to have been commenced on the same date as the original action, namely 7 December 2010. The ordinary time limit would thus bar recovery of a payment where the cause of action for restitution of that payment accrued before 7 December 2004.

The ordinary time limit is subject to exceptions. One such exception is found in s 32 of the Act. That section includes provisions under which, if the action is for

relief from the consequences of a mistake, the period of limitation shall not begin to run until the claimant has discovered the mistake or could with reasonable diligence have discovered it.

Paragraph 7A of Prato's defence relied on statutory limitation as a defence to the restitution claim. It noted that the restitution claim relates to 10 payments by Dexia to Prato between 4 December 2002 and 29 June 2006. It said, in effect, that the defence of time bar applied to the entire restitution claim, or alternatively to the claim in respect of 5 payments made before 7 December 2004. But Prato's closing submissions confined the time bar defence to those 5 payments. The remainder of section B3 of this judgment accordingly applies only to those 5 payments. The other payments were made after 7 December 2004 and in relation to them there is no longer any suggestion that the time bar defence can assist Prato.

Throughout the trial, and during the period up to and immediately after the main claim judgment, Dexia's only answer to the time bar defence relied on the exception in s 32 for relief from the consequences of a mistake. In Dexia's supplemental written submissions dated 17 July 2015, however, it advanced a new, and logically prior, answer that in so far as the swaps were invalidated under article 30(7) TUF its cause of action for the restitution claim accrued well within the limitation period. This new answer had not been pleaded, but there was no objection by Prato to it being advanced.

Section B3.2 below deals with Dexia's new answer and examines when the cause of action accrued. In section B3.3 I turn to examine the pleaded answer relying on mistake.

### Restitution claim – time bar: accrual of the cause of action

The words of s 5 of the Act make it plain that time does not begin to run until the cause of action has accrued. As noted in section B1 above, the reasoning in the main claim judgment has the consequence that Prato by its defence validly invoked article 30.7 TUF in relation to all the earlier swaps. The defence was served on 29 June 2011. Dexia's new answer is that it was only on that date that the cause of action for the restitution claim, in so

far as based upon invalidity of the swaps under article 30 TUF, accrued.

Dexia submitted orally on 23 October 2015 that it was easy to test the position by asking this question: could Dexia have sued to recover the payments during the period before 29 June 2011? Dexia's response to that question was that it could not have sought restitution in reliance on invalidity under article 30 TUF, because Prato had not during that period exercised its option to treat the swaps as invalid under article 30.7 TUF. In this regard Dexia relied by analogy upon the decision of the Court of Common Pleas (Sir Nicholas Tindal CJ, Park, Gaselee and Alderson JJ) in Cowper v Godmond (1833) 9 Bing 748 .

Prato responded orally on 23 October 2015 by drawing attention to the wording of article 30.7 TUF. As set out in translation in section E2 of the main claim judgment, Dexia's failure to state the right of withdrawal in the forms:

> …shall result in the related contracts being null and void, …

This must, Prato submitted, mean that the swaps were null and void from the moment of the transaction. The suggested consequence was that Dexia's cause of action for restitution accrued at the time of payment, for at that time the payment was made under a swap which was null and void.

Prato acknowledged that the words cited above did not conclude article 30.7. The words which followed were:

> …with only the client having the right to enforce this provision.

As to that, Prato said that if time ran against the bank because a number of years passed before the client's right was exercised, then that was an aspect of the scheme under article 30 TUF. In response to an inquiry from me, however, Prato accepted that Dexia had to

keep making payments due under a swap during the period prior to exercise by Prato of its article 30.7 TUF right, and that during this period Dexia could not say that the swap in question was invalid. Prato added that Cowper v Godmond was not in point because the transaction in that case was not invalidated from the outset. By contrast, submitted Prato, the language of article 30.7 TUF must mean that the transaction was null and void from the beginning.

Dexia observed in reply that these submissions cannot change the answer to the question it posed at the outset. I agree. Applying first principles, it cannot be right to say that a cause of action, arising because payment had been made under an invalid swap, accrued during the period before 29 June 2011 if, as Prato accepts, during that period Dexia could not say that the swap was invalid.

Moreover the same principles, as it seems to me, constitute the essential reason for the decision in Cowper v Godmond . The plaintiffs in that case held the rights of the grantee of an annuity. They claimed the return of money paid as part of the consideration for purchase of the annuity. The deed of annuity had been executed, and the money had been paid, more than 6 years before the action was brought. A memorial registered shortly after the deed contained an error which entitled the grantor to avoid the annuity. It was within the six year period, however, that the grantor elected to avoid. When sued, one of the answers given by the grantor was that the limitation period of 6 years began to run when the money was paid, and thus had expired when the action was brought. The judges of the Court of Common Pleas rejected that answer. It is not clear to me from the report whether Prato is right to say that the avoidance did not render the transaction null and void from the beginning. What is clear is that the reasoning did not turn on the distinction identified by Prato. The court found that the action had been brought within time because, in the words of Sir Nicolas Tindal CJ, the cause of action "was not complete" until the grantor elected to avoid. Park and Gaselee JJ agreed, with Park J pointing out that the cause of action was not complete until the grantee could sue. That reasoning is directly applicable to the present case. So also is the reasoning of Alderson J, substituting "net payment" for "consideration money", "Prato" for "the

grantor", "Dexia" for "the grantee", and "swap" for "annuity":

> It may be conceded that the consideration money was money had and received by the grantor at the time of payment; but it was not had and received by the grantor, to the use of the grantee, until the grantor elected to treat the annuity as void.

It follows from this reasoning that the restitution claim, in so far as it arises because relevant swaps were invalid under article 30 TUF, was brought within the ordinary time limit. The result is that, without needing to examine other contentions by Dexia, Prato's time bar defence fails.

**Restitution claim – time bar: relief from mistake**

In so far as the restitution claim arises because relevant swaps were invalid under article 30 TUF, my conclusion in section B3.2 makes it unnecessary for Dexia to rely upon an exception to the ordinary time limit. In case I am wrong, I deal briefly here with Dexia's reliance on s 32 of the Act.

When introducing the restitution claim by amendment, Dexia pleaded that each of the net payments was made in the mistaken belief that Dexia was under a valid, binding and enforceable obligation to do so. Prato's responsive amendment to its defence did not contest this. The contention advanced by Prato was that Dexia ought, with due diligence, to have been aware of the mistake alleged at or about the time of the relevant payments. The reasons pleaded by Prato in support of this contention concerned matters which, on Prato's case, would have led a conclusion that the swaps were invalid because Prato lacked capacity to enter into them. None of the reasons pleaded by Prato advanced a contention that Dexia, by the exercise of reasonable diligence, could have discovered that the swaps were invalid under provisions in article 30 TUF concerning off-site offers. Following the conclusions in the main

claim judgment, however, Dexia does not say that Prato should be barred from advancing such a contention.

Dexia's opening submissions at the start of the trial relied on the decision of the House of Lords in Kleinwort Benson v Lincoln City Council [1999] 2 AC 349 (" Kleinwort "). After the conclusion of evidence, Prato's closing submissions:

- (1)  sought to distinguish Kleinwort ;
- (2)  asserted that Dexia held itself out to Prato as having not only financial expertise but also legal expertise in structuring legally suitable and compliant swap operations;
- (3)  submitted that in such circumstances, it did not lie in Dexia's mouth to allege that it could not with reasonable diligence have discovered the legal defects in the structures it proposed; and
- (4)  added that there could be no suggestion that Dexia did not know the relevant facts: its employees structured the transactions, they knew full well their terms and characteristics, and Dexia was very alive to the positive values it was creating for itself by entering into the transactions.

There was no evidence at trial as to what, if any, steps Dexia had taken, during the relevant period or at all, to consider whether the swaps might be invalid for failure to comply with Italian financial services law. In that regard, Dexia submitted that it made the net payments on the tacit assumption that the swaps were valid and binding. As noted above, Prato did not expressly contest Dexia's plea that it had believed in the validity of the swaps. It seems to me to be a fair inference that, whether by reason of a tacit assumption or otherwise, there was such a belief. For the reasons given in the main claim judgment that belief was mistaken.

The parties' submissions at the close of evidence proceeded on the footing that I should consider the question whether a commercial bank such as Dexia could with reasonable diligence have discovered that it was mistaken in assuming that the swaps complied with Italian law. The focus at that stage was on Italian law concerning the powers of local authorities. In their submissions after the main claim judgment the focus was on Italian financial services law, and in particular the "off-site offer" requirements of article 30 TUF.

The question that I consider below is thus whether a commercial bank such as Dexia could with reasonable diligence have discovered that relevant swaps were in breach of the "off-site offer" requirements of article 30 TUF. During the relevant period there were rival views as to the extent of those requirements. Reasonable diligence would have uncovered that among the rival views there were some which would have the consequence that relevant swaps were invalid. It does not seem to me, and it was not suggested, that the entitlement to relief from the consequences of mistake would be lost merely for this reason. The question under debate for present purposes, as it seems to me, is whether with reasonable diligence Dexia could have discovered that the better view under Italian law was that relevant swaps were invalid because they were in breach of the "off-site offer" requirements of article 30 TUF.

As to reasonable diligence in this context, Dexia's oral submissions on 23 October 2015 noted that the Court of Cassation in Mediolanum had departed from the interpretation adopted previously in *Fideuram* . Dexia submitted that in those circumstances there could be no basis for saying that it could, with reasonable diligence, have discovered before 7 December 2004 that the net payments by it to Prato had been made by mistake.

In broad terms Prato's oral submissions on 23 October 2015 made 4 points:

• (1) the text of article 30.6 TUF had been constant throughout the relevant period: this is not a case involving a change in legislation;
• (2) while Dexia's case on article 30 TUF had urged an interpretation under which there was a need for surprise for that article to be engaged, article 30 itself makes no reference to a need for surprise;
• (3) neither the decision in Mediolanum nor that in *Fideuram* were relevant: in the absence of a doctrine of precedent in Italy neither decision was a source of law, and it could not be said that the law had changed as a result of a subsequent judicial decision; and
• (4) the decision in *Fideuram* could not justify failure to appreciate that there had been breaches

of article 30.6 TUF, for that decision in 2012 was long after the relevant swaps were entered into.

My analysis is:

• (1) Kleinwort resolves issues of principle that are not disputed in the present case; I do not gain assistance from it for the purposes of the objective assessment I must make as to whether Dexia could with reasonable diligence have discovered its mistake;
• (2) I am content to assume that the factual assertions in Prato's closing submissions, as summarised earlier in this section, are correct;
• (3) those factual assertions are matters that I take into account in considering what Dexia ought, with reasonable diligence, to have discovered;
• (4) the mere fact that Dexia held itself out as having relevant legal expertise does not debar Dexia from asserting that it could not with reasonable diligence have discovered a mistake: even the most accomplished lawyers may reasonably be mistaken;
• (5) Prato is right to point out that the present case does not involve a change in legislation, that article 30 TUF makes no reference to a need for surprise, and that Fideuram had not been decided at the time that the swaps were entered into;
• (6) nevertheless, the two lines of reasoning in *Fideuram* reflected earlier lines of reasoning in legal writing and judicial decisions, and if those earlier lines of reasoning had been applied in the present case then the swaps would not have been invalidated for failure to comply with article 30 TUF;
• (7) while article 30.6 TUF makes no express reference to a need for surprise, that does not of itself show that a need for surprise is absent from what Italian courts refer to as the *ratio legis* ;
• (8) moreover if the *ratio legis* did not include the wider approach eventually taken in Mediolanum , then the need for surprise relied on by Dexia could logically justify the meaning of the word "placement" propounded in the earlier lines of reasoning mentioned above;
• (9) the lack of a system of precedent in Italy does not mean that *Fideuram* is irrelevant: the decision in that case shows that eminent judges

thought in 2012 that the scope of article 30 TUF was narrower than has now been held to be the case in Mediolanum ;

• (10) my assessment overall of the material before me, including the approach taken by Consob, is that what became the *Fideuram* lines of reasoning were the dominant trend during the period prior to 2012;

• (11) for all these reasons I conclude that in the period prior to 7 December 2004 the exercise of reasonable diligence could not have led Dexia to discover its mistake: on the contrary, it would have led to the conclusion that in law the better view was that the relevant swaps did not engage the "off-site offer" provisions in article 30 TUF.

In these circumstances I conclude that, if necessary, Dexia would be entitled to rely upon s 32 of the Act in order to say that the restitution claim was not time-barred.

**Restitution claim: change of position**

**Restitution claim – change of position: introduction**

In section B3 above I have rejected Prato's limitation defence to the restitution claim. The only other defence pleaded by Prato to that claim was change of position. I deal with it in section B4.2 below.

**Restitution claim — change of position: analysis**

Prato's pleaded case said that it relied on a defence of change of position. In that regard, its pleaded case was that:

• (a) at the time it received the payments, [Prato] regarded the First, Second, Fourth and Fifth Swaps as valid and binding, …; and
• (b) [Prato] treated the proceeds of the payments as additions to its revenues for the years in question and, having received such additional revenues, then disbursed them in various ways including the payment of interest on debt. In the premises, the receipt of the proceeds has not resulted in a net overall increase in [Prato's] wealth and it would

now be inequitable to enforce restitution of the sums received.

Dexia's pleaded reply put Prato to strict proof of any relevant change of position. In addition, Dexia advanced an objection that ordinary expenditure (such as the payment of interest on debt) could not constitute a relevant change of position since Prato would have incurred such costs in any event. I shall refer to this as "the ordinary expenditure objection".

Prato's submissions at the close of evidence relied upon the analysis by Hamblen J in Bloomsbury International Ltd v Sea Fish Industry Authority [2009] EWHC 1721 (QBD), [2010] 1 CMLR 12 (" Bloomsbury "), at para 137. I set out the relevant passage with emphasis added by Prato:

> .. the mere fact that the recipient has spent the money is not enough. A causal connection must be shown, on at least a "but for" basis between the receipt and any expenditure or change of position upon which the defendant wishes to rely. However, in the context of government expenditure, there is no need to demonstrate a precise link between particular receipts and particular items of expenditure and that it is reasonable to infer that planned expenditure would not have taken place at the level which it did but for the availability of the tax receipts which were taken into account in fixing departmental budgets . In such circumstances it would be inequitable to require restitution to be made for tax which was paid by mistake when the money has long ago been spent in the public interest and everybody assumed in good faith that it had been validly levied.

Dexia Crediop SpA v Comune di Prato, 2016 WL 06633477 (2016)

In that passage Hamblen J was summarising views expressed in paras 343 to 347 of the judgment of Henderson J in Test Claimants in the FII Group Litigation v Revenue and Customs Commissioners [2008] EWHC 2893 (Ch.); [2009] STC 254 (" *FII 2008* "). In those paragraphs Henderson J applied to a claim for restitution of tax payments the "wider" approach to the change of position defence adopted by the Court of Appeal in Scottish Equitable plc v Derby [2001] EWCA Civ 369; [2001] 3 ALL ER 818 .

In supplemental written submissions dated 17 July 2015 Dexia:

　• (1)　submitted that what might be a reasonable inference in the context of tax receipts would not be a reasonable inference in the context of a swap;
　• (2)　noted that at para 147 of Bloomsbury Hamblen J had identified, as one of the tests to be satisfied in order for a change of position defence to succeed, that the recipient of the monies in question:

> …has arranged its budgeting and planned its expenditure on the basis that it was entitled to receive and spend those monies
> …

　• (3)　submitted that Prato's evidence, as set out in para 3 of Zenti 2, did not satisfy this test;
　• (4)　added that the only concrete example of expenditure given by Mr Zenti was the payment of loan interest, which Prato would have been bound to pay whether or not it had received the net payments in question;
　• (5)　cited observations by Henderson J in paragraphs 349 to 353 and 397 of a further judgment handed down on 18 December 2014, Test Claimants in the FII Group Litigation v Revenue and Customs Commissioners [2014] EWHC 4302 (Ch.); [2015] STC 1471 (" *FII 2014* "), including:

> 349　… my preliminary views on the factual elements of the defence at the first trial were probably premature, and should not be read as implying

that the defence is likely to succeed whenever the Revenue choose to invoke it …

350　The basic question which I have to consider is whether I am satisfied, on the balance of probabilities, that the Revenue have changed their position as a consequence of the payments of unlawful tax by the … claimants in such a way that they would be worse off by making restitution than if the overpayments had never been received. If that question is answered in the affirmative, the defence will succeed to the extent that the Revenue would be worse off, but no further.

…

353　… it is not enough for the defendant merely to show that the money in question has been spent. The expenditure must be "extraordinary", in the sense that it would not have been incurred but for the overpayment. The expenditure need not, however, be extraordinary in the sense of being of an unusual nature, either intrinsically or for the particular defendant. Thus increased expenditure of a routine nature can qualify, provided that the causative test is satisfied.

…

Dexia Crediop SpA v Comune di Prato, 2016 WL 06833477 (2015)

397 Furthermore, even if the Revenue's methodology were otherwise reliable, I would not be satisfied on the evidence before me that it could be applied to the payments of utilised ACT. The benefit to the government in such cases is of a cash flow nature, but I have no reliable evidence of the way in which this was reflected in government forecasts. Indeed, for all I know it may be the case that all receipts of ACT were routinely left out of account when planning future government expenditure, on the footing that it could not be known in advance when, or to what extent, they would be utilised by being set off against MCT. Had that been the case, it would follow that all the overpayments of ACT should be left out of account, whether or not they were subsequently utilised, leaving only the relatively trivial overpayments of corporation tax to which the defence of change of position could in principle apply. I consider, therefore, that a full explanation of the way in which payments of ACT were in fact taken into account in government forecasts would have been a prerequisite for any successful establishment of the defence on the facts in relation to the ACT claims, and that the absence of such evidence is in itself a fatal flaw in the Revenue's case.

• (6) submitted that in the present case Prato's evidence did not come close to establishing that it incurred additional expenditure as a result of the payments under the swaps, still less that if Prato

were required to give restitution, then it would be worse off than if it had never received those payments.

Dexia's oral opening submissions on 23 October 2015 stressed the need for a defendant to establish a "but for" causal connection between the receipt and any change of position on which the defendant wished to rely. They went on to repeat and develop the points made in writing on 17 July 2015. Prato's oral answering submissions repeated what had been said in Prato's closing at the end of the evidence, and added that Prato did not propose to say anything more.

To my mind Dexia is right to stress the need for a defendant to establish a "but for" causal connection between the receipt and any change of position on which the defendant wished to rely. The wider approach in Scottish Equitable does not do away with this need. In this regard Dexia's ordinary expenditure objection must, as it seems to me, be limited to such ordinary expenditure as would have been incurred in any event. As so limited, it will rightly debar Prato from relying on the payments of interest cited by Mr Zenti. I do not find it to be likely, and indeed Mr Zenti does not suggest, that, in the absence of any or all of the payments, Prato would have failed to meet its obligation to pay interest. The question therefore becomes whether I can conclude that in some other way there was a change of position, causally linked to the mistaken receipt, which makes it inequitable for Prato to be required to make restitution.

In the present case nowhere in Prato's evidence is any such change of position identified. Thus it was not, for example, said that after receipt of any particular payment Prato spent money in a way that it would not otherwise have done. I acknowledge that in an appropriate case this can be established by inference. It is not necessary for me to embark on a consideration of the extent to which what was said in *FII 2014* may detract from the views expressed in *FII 2008* and in Bloomsbury . The reason is that I accept Dexia's submission that those cases can be distinguished because there is an important difference from this case on the facts. Those cases were concerned with receipts of taxes and levies, in circumstances where these were one of the main ways in which expenditure was financed. Receipts of that kind are very different

from receipts, should they arise, under a swap. A local authority's budget and its planned expenditure would not ordinarily be determined by whether or not there had been net payments under a swap. I have no evidence that Prato's budgeting and planning of expenditure was affected by the fact, on those occasions when it was the fact, that net payments had been received. It was not suggested by Prato that the payments were substantial in size when compared with Prato's overall planned expenditure. Nor were any other particular features of the payments identified by Prato as features which could lead the court to conclude that the payments had caused Prato to change its position. It does not seem to me inherently likely that Prato's budgeting and planning decisions would have been affected by the presence of the net payments that were made under the swaps. The result is that I cannot make an inference to that effect.

Consistently with the factual allegations in Prato's pleaded case as set out above, Mr Zenti said in his second witness statement that sums received were used to finance current expenses. That of itself does not suggest that there is any injustice in requiring repayment. The last sentence of subparagraph (b) of Prato's pleaded case, as set out above, is that an obligation to repay Dexia would be unjust on the premise that Prato's receipt of the payments had not resulted in a net overall increase in Prato's wealth. My conclusion set out above has the consequence that the premise is wrong. Dexia's payments have in fact resulted in a net overall increase in Prato's wealth, because Prato financed current expenses from those payments when it would otherwise have financed those same expenses from Prato's other resources. In these circumstances there is no causal change of position and no basis on which to hold that it would be inequitable for Prato to make restitution. Prato's defence of change of position accordingly fails.

**Other financial services & civil law defences**

**Italian financial services & civil law: introduction**

In the present case the parties made a choice of English law to govern their relationship under the swaps. Section E1 of the main claim judgment noted that Prato relies on particular provisions of Italian financial services law and Italian civil law. In order to be able to rely on these provisions it was necessary for Prato

to show that this is a case where, in the words of article 3 of the Rome Convention , "all other elements relevant to the situation at the time of the choice are connected with one country only …". I shall refer to the country contemplated by article 3 in this way as "the sole connected country". Prato asserted that in the present case the sole connected country was Italy. In section E1 of the main claim judgment I gave my reasons for concluding that Prato was right.

Section E1 of the main claim judgment explained that the consequence is that Prato is entitled to rely on provisions of Italian law if they have a particular character. The provisions in question will have that character if they meet the test necessary to constitute "mandatory rules" for the purposes of article 3 of the Rome Convention . The expression "mandatory rules" is used in that article to describe "rules which cannot be derogated from by contract". The expression "mandatory rules" has, however, been used elsewhere in different senses. Accordingly in the remainder of this judgment I use the expression " Article 3 non-derogable rules" to refer to rules which, within the meaning of article 3 of the Rome Convention , "cannot be derogated from by contract".

The main claim judgment then set out in the remainder of section E and in section F my reasons for concluding that, even if it were Prato that solicited the swaps, they nevertheless constituted "contracts for the placement of financial instruments … executed off-site" within the meaning of article 30.6 TUF. It was accepted by Dexia that if the swaps fell within article 30.6 TUF, then they were in breach of an Article 3 non-derogable rule requiring relevant forms to state the 7 day right of withdrawal. It was also accepted by Dexia that, if there had been such a breach of article 30.6, then article 30.7 was an Article 3 non-derogable rule giving Prato a right to insist that the swaps were null and void, a right which Prato had exercised in its defence in these proceedings.

My conclusion in the main claim judgment made it unnecessary to examine the other grounds on which Prato said that the swaps breached Article 3 non-derogable rules. Prato asks that I nevertheless deal with those other grounds. I agree that it is desirable for me to do so. When doing so, I assume that, for the reasons given in section E1 of the main claim judgment, I am right to hold that Prato is entitled to rely upon such

provisions of Italian law as constitute Article 3 non-derogable rules. Without such an assumption none of these grounds would assist Prato.

On that basis, in sections C2 and C3 below I discuss Prato's contentions that the swaps fell within article 32 TUF and thus engaged article 30.6 and 30.7 TUF (section C2) and fell within article 23 TUF and article 30 CR (section C3). Section C4 sets out provisions in the Civil Code dealing with *causa* and *oggetto.* Sections C5 and C6 discuss Prato's additional reliance upon the Italian civil law requirements for, respectively, a lawful *causa* and a determined or determinable *oggetto* . Dexia accepts that the rules discussed in sections C2 and C3 are Article 3 non-derogable rules. However it does not accept that the requirements discussed in sections C5 and C6 have that character. Thus, depending on my conclusions in sections C5 and C6, a question might arise as to whether, in the event of breach of these requirements, such a breach constituted a breach of an Article 3 non-derogable rule. In section C7 I explain why my conclusions in sections C5 and C6 make it unnecessary and undesirable to examine that question.

For the reasons given in those sections I conclude that:

- (1)  Prato is entitled to say that the swaps, if otherwise valid, are nonetheless null and void because they breached Article 3 non-derogable rules on distance contracts, and Prato has in the defence in these proceedings validly exercised its entitlement under articles 30 and 32 TUF to assert that this is the case;
- (2)  Prato is entitled to say that the swaps, if otherwise valid, are nonetheless null and void because they breached Article 3 non-derogable rules requiring adherence to the form prescribed by article 23 TUF and article 30 CR, and article 23 TUF lays down that contracts not in the prescribed form are null and void;
- (3)  if the swaps were otherwise valid, Prato's complaints of unlawful *causa* and lack of *causa* would not succeed as a matter of Italian law, and it is unnecessary to decide whether requirements of Italian law in this regard constitute Article 3 non-derogable rules;
- (4)  if the swaps were otherwise valid, Prato's complaints of lack of a determined or determinable *oggetto* would not succeed as a matter of Italian

law, and it is unnecessary to decide whether requirements of Italian law in this regard constitute Article 3 non-derogable rules.

**Did art 32 TUF apply, engaging art 30.6 and 30.7?**

Article 32 TUF is concerned with distance marketing techniques. Section E2 of the main claim judgment sets out article 32.1 TUF, along with relevant provisions in article 30 TUF. For present purposes, the only question which arises is whether the swaps fell within article 32 TUF in the way contemplated by article 30.6 TUF. If it did, then the swaps engaged the 7 day right of withdrawal conferred by article 30.6 TUF and the consequence identified in article 30.7 TUF for failure to state that right in relevant forms, with the result that, for the reasons given in the main claim judgment, Prato was entitled in its defence in these proceedings to insist that the swaps are null and void.

Prato's case for present purposes is that article 30.6 TUF is engaged by the swaps because both the "contract for the placement" and the "contract proposal" for the swaps came about through "distance marketing techniques" as defined in article 32.1 TUF. Applying the specific wording of article 32.1 TUF, the techniques used by Dexia in both respects included "techniques of contacting customers … which do not involve the simultaneous presence" of representatives of Prato and Dexia. For this purpose Prato's defence asserts that the documents drafted to comprise Prato's offer to enter into each swap were sent to Prato by Dexia and executed by Prato at Prato's offices. This factual contention is plainly correct.

In these circumstances the only question which arises concerns what is contemplated by article 30.6 TUF when it uses the italicised words below:

> …contracts for the placement of financial instruments … which are … *placed at a distance pursuant to* Article 32 … The provisions above also apply to *contract proposals made … at a distance pursuant to* Article 32.

It is common ground that there are no relevant decisions of Italian courts on the meaning of the italicised words. As to that meaning, I must be guided by Italian principles of statutory interpretation described in section C4.2 of the main claim judgment.

Dexia's pleaded reply made reference to provisions using the Italian word " *intermediari* ". The translation used at the trial was "intermediaries". In English the word "intermediaries" connotes those acting as brokers. However both TUF and CR at times use the word " *intermediari* " to refer not only to brokers but also, depending on the context, to those acting for their own account. On this basis, Dexia's reply was that:

> Art. 30 and Art. 32 TUF only apply where an intermediary carries out an unsolicited activity of offer, promotion and/or placement of investment services. They have no application where no marketing activity and/or solicitation and/or offer is undertaken by an intermediary in relation to the provision of investment services (which include the execution of swap transactions).

In the context of off-site offers as defined in article 30 TUF, I have held in the main claim judgment that the assertions in this pleaded reply cannot stand in the light of the decision of the joint chambers in Mediolanum . If I am right, then the same applies when determining what is meant by the passages in article 30.6 TUF referring to article 32 TUF. But even if I am wrong, Professor Gentili agreed in cross examination that references in article 30.6 TUF to contracts "placed at a distance pursuant to article 32" were not subject to the limitation he had identified for "off site" contracts. In particular he accepted, subject to a proviso, that references in article 30.6 TUF to contracts "placed at a distance pursuant to article 32" would apply

whether the initiative came from the customer or the intermediary.

The proviso identified by Professor Gentili thus becomes the only basis that can realistically be advanced by Dexia for contending that references in article 30.6 TUF to contracts and contract proposals "placed at a distance pursuant to article 32" are limited in scope so as not to apply to the present case. Professor Gentili's proviso is that, for a contract or contract proposal to have been "placed at a distance pursuant to article 32", there must never have been any direct contact. However in subsequent cross examination Professor Gentili accepted that nothing in the wording of article 30.6 TUF and article 32 TUF expressed his "concept of exclusivity" of distance contact.

Professor Gentili also agreed that Professor Sciarrone Alibrandi's interpretation, under which exclusivity of distance contact was not required, would maximise consumer protection. When agreeing, he added:

> Yes, but maybe with costs on another front, for example, [investors] could not write or call. They could only deal with this in the presence [of both sides].

Dexia's closing submissions protested that Prato's interpretation was absurd: any occasion on which negotiation took place or documents were provided at a distance would give rise to a right of withdrawal. This characterisation of Prato's interpretation may, I suspect, be broader than that urged by Prato, for Prato recognises that article 30.6 TUF is engaged only where the placement of the contract, or the contract proposal, involves distance contact. But even if Prato's interpretation is as broad as Dexia protests, the "costs on another front" do not create difficulties for retail investors such as Prato: they gain a 7 day right of withdrawal, along with the benefit of an obligation that the financial service provider must state the right of withdrawal in relevant forms. As to potential difficulties for service providers, there was no evidence, and indeed no suggestion, from Dexia that a swap could not be

Dexta Crediop SpA v Comune di Prato, 2016 WL 6833477 (2016)

structured in such a way as to allow for a 7 day right of withdrawal.

In these circumstances, an Italian court must have regard to the consumer protection purpose of articles 30.6 and 32 TUF. Those provisions confer benefits on "retail" investors which are not conferred on "professional" investors. I consider that the Court of Cassation would, for similar reasons to those set out in Mediolanum , reject Professor Gentili's "exclusivity of distance contact" interpretation and would instead adopt Professor Sciarrone Alibrandi's interpretation so as to maximise consumer protection.

It follows that even if I had not found in Prato's favour on the "off-site" provisions in article 30.6 TUF, I would have concluded that article 30.6 TUF applied to the swaps because both the placement of the contract and the contract proposal involved distance marketing techniques. For the reasons given in the main claim judgment, the consequence would have been that Prato had, by its defence in these proceedings, validly enforced its right to say that the swaps were null and void.

**Article 23.1 TUF & article 30 CR**

The translation provided at the hearing for Article 23 TUF states:

> 1.    Contracts relating to the providing of investment and accessory services shall be drawn up in writing and a copy provided to clients. The Consob, upon the advice of Banca d'Italia, may provide by regulation that, for justified technical reasons or in relation to the professional nature of the contracting parties, particular types of contracts may or must be entered into another form. Contracts which do not adhere to the prescribed form shall be null and void.

1.    Authorized intermediaries may not supply investment services except on the basis of a contract in writing: a copy of the contract shall be given to the investor.

2.    The contract with the investor must:

a)  specify the service provided and their characteristics;

b)  establish the period of validity of the contract and the procedure for renewing it, and the procedure for modifying the contract;

c)  specify the procedures by means of which the investor may give orders and instructions;

d)  establish the frequency, type and content of the documentation to be sent to the investor to report on the activity carried out;

e)    specify and regulate, with reference to contracts for trading and the reception and transmission of orders, the procedures for providing and replenishing the means for carrying out or guaranteeing the transactions ordered, with the means provided for carrying out transactions involving derivative financial instruments and warrants indicated separately;

f)  specify any other contractual conditions agreed with the investor for the supply of the service

Article 30 CR states:

Dexia Crediop SpA V Comune di Prato, 2016 WL 6833477 (2015)

It is common ground that article 30 CR is a regulation falling within article 23.1 TUF. Prato accepts that the 2002 advisory agreement complied with article 30 CR. Prato's case for present purposes is that the master agreement did not comply with subparas c), d), and e) of article 30.2 CR. I shall refer to them together as "the relevant subparas" and to each such subpara individually by its letter. Professor Gentili accepted in cross examination that, if relevant subparas applied and were not complied with, then the swaps would be null and void under article 23.1 TUF.

Dexia's closing submissions did not suggest that the master agreement, with the exception of clause 12, contained the specific provisions and specifications set out in all the relevant subparas. Indeed in cross-examination Professor Gentili accepted that it did not do so. Instead, Dexia advanced arguments which can conveniently be described in a series of summarised assertions:

• (1)  this aspect of Prato's defence appeared to be a makeweight point, as the relevant subparas were not necessary for swaps, these being the only transactions which it was ever contemplated that Prato would enter into with Dexia;

• (2)  it involved an absurd interpretation of article 30 CR: Prato had identified no rationale or justification for requiring intermediaries to enter into framework agreements with their customers which contain provisions that are not necessary to establish the basis for their relationship in relation to the particular types of transactions that are contemplated;

• (3)  the master agreement used an internationally accepted standard form, adopted in large numbers of Italian transactions, and it could not be right that it failed to satisfy formal requirements of Italian law on the basis that it did not make provision in relation to matters which are of no relevance to the relationship between a bank and a counterparty on an interest rate swap transaction;

• (4)  there was Italian case law, cited by Professor Gentili, holding that an ISDA master agreement was a valid framework agreement, and there was no suggestion that the decisions cited turned on the contents of the schedule rather than the ISDA master agreement itself;

• (5)  there was no need for any provision specifying the procedures by which the investor may give orders and instructions, as Prato was not entitled to give "orders" or "instructions" to Dexia in relation to the swaps;

• (6)  in any event, the master agreement contained express provision as to how the parties should give notices to each other at clause 12;

• (7)  there was no need for any provision establishing "the frequency, type and content" of documentation to be sent to the investor to report on the activity carried out, as Dexia did not carry out any "activity" under the swaps on which it could be expected to "report" to Prato;

• (8)  in any event, the 2002 advisory agreement provided for "relative reporting" and "transmission of all information which is considered to be useful" to Prato on request;

• (9)  there was no need for any provision dealing with the procedures for providing and replenishing the means for carrying out or guaranteeing the transactions ordered, as there was no requirement for Prato to "provide" or "replenish" the "means for carrying out or guaranteeing" the swaps;

• (10)  moreover, on the express terms of subpara e), this requirement only applied to "contracts for trading and the reception and transmission of orders", which was not apt to describe the master agreement or any of the swaps.

Prato's oral closing submissions did not go through these summarised assertions one by one. Accordingly in what follows I identify and analyse the answers that appear to me to emerge from Prato's written closing submissions and the evidence of Professor Sciarrone Alibrandi.

Prato's answer to summarised assertions (1), (2) and (3) above starts with a proposition that is common ground: article 30 CR provided protections for retail investors such as Prato. On that footing, Prato relies on Professor Sciarrone Alibrandi's evidence that general terms were used because the rules in article 30 CR had a wide application. Professor Sciarrone Alibrandi did not accept that in the present case the rules lacked meaning. Even if, however, they had no application to the parties' relationship under the specific agreement in question,

Dexia Crediop SpA V Comune di Prato, 2016 WL 6833477 (2016)

she reasoned that "they have a sense, and they have to be adhered to …".

Dexia's view is that particular information stipulated in article 30 CR is information which there is no need to provide. In the context of provisions designed to protect retail investors, however, Professor Sciarrone Alibrandi's reasoning appears to me to be compelling. In such a context Dexia does not contend that its own view is determinative. Nor is there good ground to think that the *ratio legis* is that the stipulated information should be provided only where the provision of information is objectively necessary on the facts of the case. On the contrary, an important purpose of article 23.1 TUF is to enable CR "for justified technical reasons or in relation to the professional nature of the contracting parties" to prescribe what must appear in particular types of contract. I add that in such a context the fact that an international standard form has been used does not of itself preclude the possibility that retail investors have not been given the protection which article 30 CR requires. These conclusions do not invalidate all Italian transactions using an ISDA master agreement: they affect only transactions with retail investors, and only those transactions where ISDA's standard terms did not comply, and were not supplemented so as to comply, with article 30 CR. Accordingly I reject the arguments of Dexia in summarised assertions (1), (2) and (3) above.

As to summarised assertion (4), Prato pointed out that Professor Gentili had been cross-examined about the cases he had cited. He accepted that of the 13 cases he had cited, only 3 related to swaps. He did not dispute that of those 3, only one, at most, related to an ISDA master agreement. Moreover he accepted that in that one case the judgment did not set out the terms of the ISDA master agreement or its schedule, and that "it could have been" that the schedule contained terms complying with art 30 CR. The result in my view is clear: the cases cited by Professor Gentili have not been shown to assist Dexia.

Summarised assertions (5) and (6) concern subpara c). Summarised assertion (5) argues, relying on an asserted proposition of law, that there was "no need" to specify procedures by which Prato could give orders and instructions. The asserted proposition of law is that Prato was not entitled to give "orders" or "instructions"

to Dexia in relation to the swaps. Even if this asserted proposition of law were right, however, my conclusion on summarised assertions (1), (2) and (3) has the consequence that summarised assertion (5) does not assist Dexia. I add that in my view Dexia has not established that this asserted proposition of law is right. It must, as it seems to me, depend upon whether the words "orders" and "instructions" within the meaning of subpara c) have a narrow meaning limited to commands which Prato is entitled to give, or whether they have a wider meaning extending to things which Prato wishes to be done. No questions were asked of Professor Sciarrone Alibrandi to suggest that subpara c) had the narrow meaning only.

Summarised assertion (6) was that clause 12 of the master agreement contained express provision as to how the parties should give notices to each other. In cross-examination Professor Gentili asserted that merely by setting out addresses where communications could be sent, the contract "provides something with reference to [subpara c)]". No suggestion, however, was made to Professor Sciarrone Alibrandi that clause 12 would be adequate to comply with subpara c). In these circumstances I conclude that summarised assertions (5) and (6) do not assist Dexia.

Summarised assertions (7) and (8) concern subpara d). Summarised assertion (7) appears to me to be similar to summarised assertion (5) in that it argues, relying on an asserted proposition of law, that there was "no need" to specify matters which are the subject of subpara d). The asserted proposition of law is that Dexia did not carry out any "activity" under the swaps on which it could be expected to "report" to Prato. Even if this asserted proposition of law were right, however, my conclusion on summarised assertions (1), (2) and (3) has the consequence that summarised assertion (7) does not assist Dexia. Moreover in my view Dexia has not established that this asserted proposition of law is right. It must, as it seems to me, depend upon whether the words "documentation to be sent to the investor to report on the activity carried out" have a narrow meaning limited to such reporting as is expressly required by the contract, or whether they have a wider meaning so that the contract must expressly clarify whether there will be reporting and the frequency, type and content of that reporting. Professor Sciarrone Alibrandi's evidence in cross examination was that it

Dexia Crediop SpA v Comune di Prato, 2016 WL 6833477 (2016)

was "in the spirit of the law of [article 30.2 CR] for the contract to provide for the type and content of the information on the relationship which are going to be provided to the investor by the intermediary". No questions were asked of Professor Sciarrone Alibrandi to suggest that subpara c) had a narrow meaning only.

Summarised assertion (8) was that the 2002 advisory agreement provided for "relative reporting" and "transmission of all information which is considered to be useful" to Prato on request. In cross examination, however, Professor Sciarrone Alibrandi rejected the suggestion that this sufficed to fulfil the requirements of subpara d). Professor Sciarrone Alibrandi noted that the 2002 advisory agreement is dealing with what she called a "consultancy service". She pointed out that this does not cover such documentation, and the frequency of such documentation, as is to be used to report about the activity carried out in execution of the swaps.

To my mind Professor Sciarrone Alibrandi's evidence on all aspects of subpara d) was compelling. In these circumstances I conclude that summarised assertions (7) and (8) do not assist Dexia.

Summarised assertions (9) and (10) concern subpara e). Summarised assertion (9) appears to me to be similar to summarised assertions (5) and (7) in that it argues, relying on an asserted proposition of law, that there was "no need" to specify matters which are the subject of subpara e). The asserted proposition of law is that there was no requirement for Prato to "provide" or to "replenish" the "means for carrying out or guaranteeing" the swaps. Even if this asserted proposition of law were right, however, my conclusion on summarised assertions (1), (2) and (3) has the consequence that summarised assertion (9) does not assist Dexia. Moreover in my view Dexia has not established that this asserted proposition of law is right. It must, as it seems to me, depend upon whether the words "procedures for providing and replenishing the means for carrying out or guaranteeing the transactions ordered" have a narrow meaning limited to such "providing and replenishing" as is expressly required by the contract, or whether they have a wider meaning so that the contract must in any event expressly specify and regulate procedures for providing and replenishing the means for carrying out or guaranteeing the transactions ordered. No questions were asked of

Professor Sciarrone Alibrandi to suggest that subpara e) had a narrow meaning only. In these circumstances summarised assertion (9) does not assist Dexia.

Summarised assertion (10) begins with a proposition that subpara e) is limited to contracts for trading and the transmission of orders. No such proposition was put to Professor Sciarrone Alibrandi. Assuming it to be correct, however, summarised assertion (10) goes on to claim that neither the master agreement nor the swaps fall within this description. If such a claim were to be relied upon it ought to have been put specifically to Professor Sciarrone Alibrandi. It was not. In any event it is difficult to see why the master agreement did not fall squarely within this wording: it was a contract for trading, concerned to make provision under which future interest rate swaps could be readily agreed upon through the use of confirmations under the master agreement. Similarly the confirmations used to create the swaps might appropriately be described as the transmission of orders. Moreover the final clause in subpara e) specifically envisaged that derivatives would be contracts to which subpara e) would apply. The result is that there is no merit in summarised assertion (10).

For all these reasons I conclude that Prato is right to say that the swaps did not comply with article 30 CR, and for that reason were null and void under art 23.1 TUF.

**CC provisions dealing with "causa" and "oggetto"**

In relation to *causa* and *oggetto* the parties placed reliance on provisions in the Civil Code, Book IV (Obligations), Title II (Contracts in general), Chapters II and XI. For ease of reference in this section I set out the principal provisions relied upon, with additional numbering in square brackets. In doing so I have, with exceptions, adopted translations found in the trial bundles. The exceptions include *causa* and *oggetto*. In relation to each of these terms, rather than using any of the translations, I have simply set out the Italian word in italics.

Article 1325, in Chapter II dealing with "Requisites of Contract", states:

      **Indication of requisites.**

Dexia Crediop SpA v Comune di Prato, 2016 WL 6653477 (2016)

The requisites of the contract are:

[1325.1]
Agreement of the parties …;

[1325.2] *Causa* …;

[1325.3]
*Oggetto* …;

[1325.4]
Form, when prescribed by law, under penalty of nullity …

Article 1343 , in section II of Chaper II dealing with *causa,* states:

**Unlawful causa.**

The causa (1325 No. 2) is unlawful when it is contrary to mandatory rules, public policy, or morals (14182).

Article 1346 , in section III of Chapter II dealing with *oggetto,* states:

**Requisites.**

The *oggetto* of the contract (1325 No. 3) must be possible, lawful, determined, or determinable (14182).

Article 1418, in Chapter XI dealing with "Nullity of Contract", states:

**Causes of nullity of contract.**

[1418.1]  A contract that is contrary to mandatory rules is void, unless the law provides otherwise.

[1418.2]   A contract is rendered void by the lack of one of the requisites indicated in Article 1325, unlawfulness (1343) of *causa* , unlawfulness of the motives in the case indicated in Article 1345, and lack in the *oggetto* of the requisites set forth in Article 1346 …

[1418.3]  A contract is also void in the other cases established by law …

**"Causa": did the swaps meet Italian law requirements?**

**"Causa": introduction**

The Civil Joint Memorandum recorded agreement on certain features of principles concerning *causa* and concerning the consequences when there is a breach of rules relating to contracts for the provision of investment services. Additional features of these principles were effectively agreed in the oral evidence of Professor Gentili and Professor Sciarrone Alibrandi. The agreed features included those which I have numbered and listed below:

• (1)  with specific reference to a contract relating to the provision of investment services:

• (a) when the rules relating to the content of such contracts are breached, that contract is null and void, and then not binding;

• (b) on the other hand, when the rules relate to the conduct of the intermediary, the consequence of their breach is liability in damages of the intermediary, unless the contract has to be terminated or is null and void due to the application of other rules;

• (2) the concept of *causa* in Art. 1325 refers to the economic and social function of the agreement, distinct from the individual aims of each party to the contract;

• (3) in modern doctrine and case law the function of an agreement is to be established by reference to the facts;

• (4) as a consequence, under Italian law, a contract will lack a *causa* when it has no function, or when its function is possible only in the abstract;

• (5) taking features (3) and (4) together, in order to establish whether there is a lack of *causa* , the court may examine the facts in order to determine whether there was a concrete *causa* , for only then will article 1325.2 CC be complied with;

• (6) generally speaking, hedging derivative contracts which actually have the function of containing interest rate risk and limiting the cost of debt can have a valid *causa* ;

• (7) article 1418 CC is a mandatory rule of Italian law; and

• (8) under article 1418.2 CC a contract will be void where there is either:

• (a) a lack of *causa* ; or
• (b) unlawfulness of *causa* .

On certain other suggested features, however, there was disagreement. I discuss relevant disputed matters in sections C5.2 to C5.4 below, where I deal with the various ways in which Prato's closing submissions said that Italian law on *causa* provided a defence upon which it could rely. I set out my conclusions in section C5.5.

**"Causa": breaches of Italian law**

Prato submitted that the *causa* of the swaps was unlawful because the swaps contravened provisions of Italian law. At the outset of the trial Prato made it clear that the provisions of Italian law that it relied on for this purpose were the provisions of local government law discussed in section D of the main claim judgment. For the reasons given in that section of the main claim judgment I have concluded that the swaps did not contravene these provisions. Accordingly Italian law on *causa* , in this respect, does not provide a defence to the claim. In any event Prato accepted that reliance upon *causa* in this regard would not take the case any further than the arguments relied upon in support of Prato's local government law defences.

**"Causa": non-disclosure of MTM**

Prato advances an assertion that the *causa* of the swaps was lacking because of Dexia's failure to disclose to Prato the negative initial MTM, with the result that Prato was never able to take a rational decision to enter into them. This assertion relies upon a line of cases exemplified by a judgment of the Court of Appeal of Milan dated 18 September 2013. I shall refer to this judgment as " *Gommeservice"*, as it concerned a company of that name which had entered into swaps with a bank.

In its written closing submissions Prato relied on particular passages in *Gommeservice.* With agreed corrections to the translation, and the addition of paragraph numbers in square brackets for ease of reference, they were as follows:

> [3.15] In the case of over the counter derivatives the purpose is an exchange of differential with specified expiry terms. But their *causa* is a gamble which both parties assume.

> [3.16] In the legally authorised gamble…the risk cannot help but be (and must be!) rational for both parties to the gamble: regardless of the intended purpose for entering

into the contract, be it for hedging purposes or for speculation.

…

[3.20]    Therefore the contract must explicitly state the value of the derivatives, any implicit costs, and the criteria to be used for determining withdrawal penalties. All these elements have an effect on the risk assumed by the contracting party.

[3.21]    Only under these circumstances can there be a rational risk.

[3.22]  In other words all the risk elements and the scenarios derived therefrom go to make up the *causa* of the contract …

[3.23    In the absence of these elements the contract must be regarded as invalid due to the absence of *causa* , because in the judgment of this Court legislative recognition resides in the rationality of the risk, and therefore in its 'measurability'.

…

[4.4]  The mere fact … that at the time of entering into the contract … the defendants…did not know the…mark to market … and the fact … that the mark to market was not included in the content of the contracts … must result in the invalidity of the interest

rate swap contracts because, in the present case, it rules out the possibility that the defendants could have accepted the gamble present in the contract aware of the risk they were assuming, whereas the Bank, on the other hand, had full knowledge of its own risk – and even a precise scientific measurement of that risk since it had drawn up the instrument.

Prato noted that the approach of the Court of Appeal of Milan in *Gommeservice* was followed by the Tribunal of Turin in a decision dated 17 January 2014. The judgment of the tribunal, as reported, did not reveal the names of the parties. I shall refer to this judgment as " *Turin mortgage swap* ", as it concerned a 30 year variable rate mortgage for the purchase of a first home. At the request of the bank which lent the money under the mortgage, there was an interest rate swap under which the bank was to receive a fixed rate of 4.72% in exchange for paying 6M Euribor. In *Turin mortgage swap* the tribunal cited extensively from *Gommeservice* and commented:

> …what this reveals for the purpose of the lack of existence of a concrete *causa* is the absence of adequate information provided by the bank to the client with regard to the risks effectively assumed, information which required at least the indication of the respective mark to markets.

Moreover, submits Prato, in *Municipality of C* (discussed in section D2.2 and section E2 of the main claim judgment) the Court of Appeal of Bologna cited *Gommeservice* . At page 12 of its judgment the Court of Appeal noted that none of the contracts in that case "include the determination of their current value at the time of execution (the so-called "mark to market")." In

relation to the MTM, the Court of Appeal of Bologna added, citing *Gommeservice* for this purpose:

> A thorough and compatible case-law guideline (see [ *Gommeservice* ]) considers this to be an essential element of the contracts and integral to its typical *causa* (a logical, and therefore measurable, risk), which must necessarily be specified …

Dexia responded by drawing attention to two decisions handed down on 19 December 2007 by the joint civil chambers of the Court of Cassation. Both decisions involved appeals from orders of the Court of Appeal of Turin on 10 November 2001. Both cases involved, among other things, a failure by a financial intermediary to supply information to its customer. The obligation to do this arose under article 6 of law 1 of 1991. The transactions involved were described as "foreign currency transactions and transactions on derivatives".

The appellant in the first case, number 26724, was described as "Fincom Valori", and I shall refer to the judgment in the Court of Cassation in that case as " *Fincom Valori* ". The judgment in the second case, number 26725, involved an appellant described as "GL", and I shall refer to the judgment in the Court of Cassation in this second case as " *GL* ". Dexia relied upon *Fincom Valori* as holding that the transactions were not to be treated as "gaming or betting". The reason was that there had been a finding below that the bank was persuaded that the transactions could constitute "simple re-hedging of cross-entries maintained with another operator and therefore not purely for purposes of chance".

In section C5.1 above I have noted at subparagraph (1) that the experts for the parties agree on an important distinction. Where there is a breach of a rule relating to the content of contracts for the provision of investment services, such a breach has the consequence that the contract is null and void. By contrast, if the breach is of a rule relating to the conduct of the financial intermediary, the consequence is a liability in damages

on the part of the intermediary, unless the contract has to be terminated or is null and void due to the application of other rules. In both *Fincom Valori* and *GL* the Court of Cassation reaffirmed this important distinction.

Dexia relies upon a discussion by the Court of Cassation in *GL* of the applicability of article 1418 in financial services cases. In section 1.4 of its judgment in *GL* the Court of Cassation stated, with the addition of paragraph numbers in square brackets:

> [1.4.1]  … the rules [requiring the supply of information under article 6 of law number 1 of 1991] are imperative in nature …

> [1.4.2]  This remark is not sufficient by itself, however, to prove that the breach of one or more of said rules leads to the invalidity of the contracts agreed by the broker with the client. It is obvious that their breach cannot be, from a legal point of view, without consequences – and this will always be the case – but it is not a given that the consequence is automatically the invalidity of the contract.

> [1.4.3]  Above all it is obvious that the legislator – who certainly would have been able to do so and who, under the same law, did not hesitate, what is more, to do so – did not clearly establish that the failure to comply with the aforementioned provisions interferes with the genetic phase of the contract and causes the radical effect of the invalidity which has been claimed by the appellants. Therefore it is certainly not a matter of one of those cases of invalidity established by the law to which Article 1418 of the Civil Code , paragraph 3 refers.

WESTLAW   © 2017 Thomson Reuters.

[1.4.4]   Not even the cases of invalidity which were considered under paragraph 2 of the recently cited article can be invoked in the situation in question. It is true that the instance of a lack of one of the requirements indicated by Article 1325 appears amongst these cases, and that the first of these requirements is the agreement of the parties. But, even where there is a desire to admit that in the pre-transactional stage the breach of the broker's behavioural obligations referred to above are suited to influencing the consent of the contractual counterparty, by corrupting it, it seems difficult to claim that based on this breach alone the consent is entirely missing; and the vices of consent – if we can also mention these – do not determine the invalidity of the contract, but only its chances of being annulled, when the conditions provided for by Article 1427 of the Civil Code et seq. recur.

The Court of Cassation went on to consider whether breach of article 6 of law number 1 of 1991 might give rise to nullity under article 1418.1, and concluded that it did not.

Dexia also relied on, among other decisions, a judgment of the tribunal of Turin dated 24 April 2014. The published version of the judgment does not name the claimant, but it refers to the defendant bank as "I SPA". I shall accordingly refer to the judgment as " *I SPA* ". Among other claims rejected by the tribunal was a claim that an interest rate swap between the parties was invalid because of lack of *causa*. In that regard the tribunal stated in section 2.4, with emphasis as in the original and with paragraph numbering added for ease of reference:

[2.4.1]   Finally the objection for invalidity of the IRS contract for lack of causa must also be rejected.

[2.4.2]   It is noted that the Interest Rate Swap contract is atypical and of a hazardous nature, characterised by swapping at fixed maturities the cash flows produced from the application of various criteria to the same notional principal (notional amount).

[2.4.3]   This agreement, if entered into (as in this case) by an entrepreneur who intends to protect himself from fluctuation in the reference rates on a loan with a variable rate has a precise logic that makes it impossible to consider it without *causa* , and it is irrelevant whether the reference rates established, in particular, proved to be far from those of the market, as it falls within the hazardous nature of the contract (see in this sense: Court of Lanciano, 06/12/2005).

[2.4.4] Only if the IRS contract were concluded merely for a speculative purpose, outside a function linked to entrepreneurial activities, could it be comparable to gambling.

[2.4.5]   It is, therefore, deemed necessary to not adhere to the decisions on the evaluation of the *causa* of the IRS contact expressed recently by the Court of Appeal of Milan (ruling 18/9/2013) and by the Court of Turin (17/1/2014)

[2.4.6] According to these decisions:

– [2.4.6(1)] the IRS contract falls within the category of legally authorised gambling, whose *causa* of financial intermediation, deemed worthy by the legislature, resides in the cognizant and rational creation of risks, which, in the so-called symmetrical derivative are reciprocal and bilateral;

– [2.4.6(2)] because the risk is rational, it is necessary for the probabilistic scenarios and the consequences of the events to be defined and known *ex ante* with certainty, including the knowledge of any implicit costs;

– [2.4.6(3)] the lack of knowledge by the customer, at the time of entering into the contract, of the so-called mark-to-market (understood as the market value of the contract estimated by discounting the expected cash flows) involves the essential invalidity of the IRS, as excluding the possibility that the investor was able to make the bet knowing the degree of risk assumed (while the Bank had perfect knowledge of its own risk).

[2.4.7] However the IRS contract pure and simple, which had the function of risk coverage (and is not merely speculative), finds its *causa* in the exchange of amounts corresponding to the differential that, over the time of the execution of the contract, is created between two different and pre-determined interest rates, applied to a notional reference amount and that aims to balance the fluctuation of floating rates relating to the associated loan agreement.

Dexia Crediop SpA v Comune di Prato, 2016 WL 6833477 (2016)

[2.4.8]  Naturally the variation over time of interest rates that are unfavourable to the customer does not exclude the original *causa* of the contract, all of which falls within the hazardous nature thereof.

A similar assertion of lack of concrete *causa* was rejected in a decision of the Tribunal of Milan dated 8 May 2014. It concerned a claim bought by Novital Ad Altiora SRL against Banca Popolare Commercio e Industria SPA. I shall refer to the case as *Novital* .

Prato's response relied, first, not only on *Turin mortgage swap* and *Municipality of C,* but also on decisions prior to *Gommeservice* adopting a similar approach to that of the Court of Appeal of Milan in that case, and on academic writing supporting that approach. Professor Sciarrone Alibrandi's evidence was that the approach adopted in *Gommeservice* gains strong support from the decisions relied on by Prato, and from academic writing. I agree. Nevertheless, while such support is a feature in Prato's favour, this is not an area where the courts and the academy speak with one voice. As Prato recognises, I must examine the experts' explanations in support of their reasoning.

Second, Professor Sciarrone Alibrandi noted that under article 1933 CC no action can be brought to collect claims deriving from gambling or wagers. She added that, when disapplying this for derivatives in the context of providing investment services, article 23.5 TUF had not confined the disapplication to "speculative swaps". Article 23.5 TUF, concluded Professor Sciarrone Alibrandi, thus treated all swaps, not just speculative swaps, as gambling/wagers. However this conclusion does not, in my view, follow from the premise. It makes sense for article 23.5 TUF to give protection to derivatives, in the context of the provision of investment services, by referring to derivatives generally. By doing so article 23.5 TUF avoids the risk that, rightly or wrongly, such derivatives will be said to fall within article 1933 CC.

Nevertheless on this basis Prato sought to dismiss Professor Gentili's view that *Fincom Valori* showed that the Court of Appeal of Milan was wrong to describe all swaps as gambles . An assertion was made in Prato's closing submissions that Professor Gentili accepted in cross examination that he had not identified any Italian case supporting his view. As to that, the case law Professor Gentili relied on, including *Fincom Valori,* was set out in Gentili 2. In cross examination Professor Gentili was being asked about the Court of Appeal of Milan's characterisation of "rational wager". He accepted that some swaps were wagers, but said that while others depended on risk to a certain extent, they were not bets. He made the point that in insurance contracts the risk could be high or low, but no-one categorised these as bets. It was on this point that Professor Gentili accepted that there was a lack of case law. Thus Prato's assertion is misguided.

Moreover, as it seems to me, Professor Gentili's point is a strong one. The Court of Appeal of Milan reasons that a swap, including a hedging swap, is "a legally authorised gamble" which will lack a "rational risk", and therefore lack *causa,* if the contract does not explicitly state "the value of the derivatives" and other elements which "have an effect on the risk assumed by the contracting party". It is difficult to see how that reasoning would not apply equally to insurance contracts. Thus it was that Professor Gentili went on to add an observation ("the vital interest observation") that while a party entering into a swap has a vital interest in doing so on a rational and informed basis, that vital interest is not part of the *causa* of the contract.

In support of Prato's position, Professor Sciarrone Alibrandi drew attention to passages in *Gommeservice* making express reference to *Fincom Valori.* Those passages described the view expressed on this point in *Fincom Valori* as an *obiter dictum* on facts which were "clearly quite different" from those in *Gommeservice* . Even if this were right, it is nevertheless a view expressed not just by a single chamber, but by the joint civil chambers, of the Court of Cassation. Moreover to my mind it is not right to say that the facts were clearly quite different. *Fincom Valori* does not appear to have involved an argument about *causa* , but it did involve examination of whether transactions, including derivatives, constituted gambling or wagers.

Dexta Crediop SpA V Comune di Prato, 2016 WL 6833427 (2016)

Turning to what was said in paragraph [1.4.4] of *GL* about the inapplicability of article 1418.2 , Professor Sciarrone Alibrandi rightly observed that in paragraph [1.4.4] the second sentence and subsequent sentences are concerned with nullity on account of lack of the agreement that is required under article 1325 . But in the opening sentence of that paragraph the joint civil chambers of the Court of Cassation ruled out, in general terms, invocation of "the cases of invalidity" under article 1418.2 . One of those "cases of invalidity" is lack of *causa* . Moreover the joint civil chambers were concerned with a duty to provide information, and they clearly explained that because it was a duty of conduct, breach of this duty did not entail nullity of the contract. Yet on the *Gommeservice* analysis failure to include similar information in the terms of the contract had the consequence of nullity for lack of *causa.* If *Gommeservice* were right, those involved in *GL* had overlooked a point of vital importance.

Prato also made reference to two articles by Professor Gentili that were published in 2008. Those articles suggested that the decisions of the joint civil chambers had not given enough scope to the possibility of nullity on account of lack of the agreement that is required under article 1325. I did not detect anything in those articles which detracted from Professor Gentili's evidence concerning relevant criticisms of the reasoning in *Gommeservice.*

In this section I have omitted some of the points taken by Dexia, and therefore have not included Prato's answers on those points. It suffices for present purposes to say that in relation to the remaining case cited above, *I SPA,* it does not seem to me that Prato provided any satisfactory answer to the points made by the Tribunal of Turin at paragraphs [2.4.2] to [2.4.4], [2.4.7] and [2.4.8].

For all these reasons, despite the strong support in decisions and in academic writing for Professor Sciarrone Alibrandi's view, I am persuaded by the reasoning of Professor Gentili. I conclude, on the evidence before me, that if the matter were to come before the Court of Cassation then that court would not adopt the approach in *Gommeservice.* Prato criticised Professor Gentili's vital interest observation, but to my mind the criticisms are inconsistent with my analysis above. In my view the vital interest observation is right.

Accordingly Prato fails in its assertion of lack of *causa* arising from non-disclosure of the initial MTM.

**"Causa": speculative contracts**

Prato advances an assertion that the swaps lacked *causa* because they were speculative contracts. In this regard the "Irrevocable Proposal" forming part of the swaps stated that Prato had taken the decision to proceed with the transaction not for speculative purposes but solely for hedging against interest rate risks and the management of its liabilities resulting from forms of recourse to the financial market permitted in law. Prato observes that Professor Gentili and Professor Sciarrone Alibrandi agree that the task of an Italian court under this head would be to consider whether a derivative entered into for a contractually declared hedging purpose is capable, or suitable, to deliver that purpose.

For the reasons given in section F4 below, however, Prato's assertions as to lack of suitability are unfounded. It follows that the swaps were all capable of, and suitable for, achieving their stated aims. Accordingly Prato fails in its assertion of lack of *causa* arising from the alleged speculative nature of the contracts.

**"Causa": conclusions**

In sections C5.2 to C 5.4 above I have rejected Prato's assertions of unlawful *causa* and lack of *causa.* It follows that Prato's defences in relation to *causa* do not succeed.

**"Oggetto": did the swaps meet Italian law requirements?**

Paragraph 45(2) of the defence relied on an assertion that each swap:

> ...lacked a 'determined [ *oggetto* ]' within the meaning of that concept in Article 1346 of the Italian Civil Code in that the [ *oggetto* ] ... (viz the money flows to be exchanged thereunder) was to be determined by [Dexia] unilaterally and in the

exercise of discretions apparently afforded to it ….

Dexia, in my view rightly, understood this assertion to be founded on a premise that each swap gave Dexia a discretion to determine what amounts were to be exchanged under the swap. Dexia's opening submissions set out extensive reasons for rebutting that premise. They also noted that Sciarrone Alibrandi 1 advanced two additional reasons for saying that the relevant *oggetto* was not "determined" or "determinable". The first additional reason said that the sums due upon early termination were to be calculated by Dexia in the exercise of its discretion. The second said that the swaps contained "hidden costs" at inception. Dexia protested that these additional reasons were not part of Prato's pleaded case.

Neither side asked for this protest to be resolved prior to evidence. After the evidence, only one asserted "defence" concerning *oggetto* was relied on in Prato's closing submissions. This sole "defence" concerned Professor Sciarrone Alibrandi's first additional reason. The complaint about Dexia having a discretion was said to be justified by an express provision for "extinguishment costs" to be:

> …calculated by Dexia in accordance with the practice adopted in the international market of derivatives.

This was not a satisfactory way of proceeding. It was suggested by Prato that the first additional reason fell within paragraph 45(2) of the defence. The suggestion is plainly unfounded. The amount payable on early termination was not a "money flow" to be "exchanged" under the swap. If the point were to be relied on then permission to amend should have been sought.

Prato argued that the failure to seek permission to amend did not matter because both Professor Gentili and Professor Sciarrone Alibrandi had given evidence on the topic. It is true that Professor Gentili was

asked questions on the topic. Those questions, however, failed to recognise that, as Dexia had pointed out, the meaning of the provisions on early termination was a question of English law. Applying English law the provisions enabling Dexia to calculate extinguishment costs did not give Dexia any discretion. Dexia was required, as I observed in the course of Professor Gentili's cross examination, to adopt "the practice" of the international market. If necessary the court would decide what that practice was. The wording in question makes no reference to there being a number of practices from which Dexia can choose. Accordingly, had there been an application to amend I would have refused it because it was based upon a false premise.

During the course of Professor Gentili's evidence it was suggested to him that reference to the practice of the international market was contrary to article 23.2 TUF. He did not accept this. If it were contrary to article 23.2 TUF, I am at a loss to understand how this would lead to a lack of *oggetto*. Under article 23.2 TUF, as regards amounts "to be borne by the client", any provision which makes reference to the usage of trade for the determination of such amounts is null and void. Article 23.2 TUF adds:

> In such a case no amount shall be due.

There was no pleaded case that the early termination provisions contravened article 23.2 TUF. Nor was there any pleaded case that article 23.2 TUF was an Article 3 non-derogable rule. As it seems to me, even if it applied to the early termination provisions, and even if it were an Article 3 non-derogable rule, it would simply have the consequence that Dexia could not claim extinguishment costs. As I cannot understand how that would lead to a lack of *oggetto,* I would have refused permission to amend in that regard as well.

Accordingly Prato fails in its assertion of lack of *oggetto.*

**"Causa" & "oggetto": Article 3 non-derogable rules?**

In sections C5 and C6 I have rejected Prato's assertions that the swaps breached requirements of Italian law concerning *causa* and *oggetto*. It is thus not necessary for me to consider questions as to whether any, and if so which, of those requirements constituted Article 3 non-derogable rules. It seems to me that answers to those questions might depend upon which requirement was breached. Moreover, while Dexia asserted that Article 3 was not concerned with requirements which can be categorised as concerning the topics of formation and material validity of contracts, I was not taken to decisions and academic writing on Article 3 generally or on those topics in particular. In those circumstances I do not think it desirable for me to attempt to consider such questions.

**Prato's remaining defences**

As noted in the main claim judgment, my conclusions on Italian local government finance law had the consequence that the capacity defence failed. The same is true of a variation of the capacity defence which said that by purporting to enter into the swaps Prato acted in excess of, or in abuse of, its powers.

The remaining defences relied on by Prato at trial are the illegality defence, the misrepresentation defence, and the set-off defence.

The illegality defence is, like the capacity defence, based on an assertion that the swaps involved a violation of local government finance law. My findings in section D of the main claim judgment have the consequence that it cannot succeed.

I deal with the misrepresentation defence when considering Prato's misrepresentation counterclaim in section G below. It is preferable to give consideration to the set-off defence after considering Prato's counterclaims, and accordingly I deal with this in section H below.

**Prato's restitution counterclaim**

**Prato's restitution counterclaim: introduction**

The parties agree that under swap 6 net sums totalling &euro;1,580,465 were paid by Prato to Dexia. The main

basis for the restitution counterclaim seeks repayment of these sums on the premise that swap 6 is "null and void". The conclusions in sections E and F of the main claim judgment have the consequence that this premise is established by breach of Italian law requirements in cases of off-site offers. The premise is also established by breaches of Italian law requirements in cases of contracts made at a distance, and by breaches of Italian law requirements as to the contents of contracts relating to the provision of investment and accessory services: see sections C2 and C3 of the present judgment.

Prato's primary case relies on Italian law, and says that article 2033 CC entitles it to the return of all sums paid. Prato's alternative case relies on English law entitlements to return of payments made on a total failure of consideration and return of payments made pursuant to a mistake of fact or law.

The first main question arising concerns the proper law of the obligation to repay. If the proper law is Italian law, then Dexia accepts that the restitution counterclaim succeeds in the amount of &euro;1,580,465. I deal with this first main question in section E2 below.

If Italian law is not the proper law, then it is common ground that the proper law would be English law. The second main question arising concerns an English law defence advanced by Dexia to the restitution counterclaim. That defence asserts that change of position by Dexia justifies a refusal to repay. I comment on this second main question in section E3 below.

**Restitution counterclaim: proper law**

It is common ground that:

• (1) the Rome II Regulation does not apply to unjust enrichment claims arising as a consequence of nullity of contract;
• (2) if the restitution counterclaim fell within either the Rome I Regulation or the Rome Convention , then the law of the putative contract would govern "the consequences of nullity of the contract": see article 12(1)(e) of the Rome I Regulation and article 10(1)(e) of the Rome Convention ;
• (3) however:

• (a) the Rome I Regulation, by article 28 , only applies in respect of "contracts concluded after 17 December 2009", whereas swap 6 was purportedly entered into in 2006; and
• (b) article 10(1)(e) of the Rome Convention does not carry the force of law in England: see the Contracts (Applicable Law) Act 1990 , section 2(2) ;

• (4) the result is that neither the Rome I Regulation nor the Rome Convention applies to the restitution counterclaim;
• (5) accordingly the court must apply common law principles of choice of law in order to determine the proper law of the restitution counterclaim.

As to the common law principles, Dexia said that a clear statement of them was set out in Rule 230(2)(a) of *Dicey* , 14th ed.:

• (1) The obligation to restore the benefit of an enrichment obtained at another person's expense is governed by the proper law of the obligation.
• (2) The proper law of the obligation is ( *semble* ) determined as follows:

• (a) If the obligation arises in connection with a contract, its proper law is the law applicable to the contract; …
• (b) If it arises in connection with a transaction concerning an immovable (land), …
• (c) If it arises in any other circumstances, its proper law is the law of the country where the enrichment occurs.

I do not accept that Rule 230(2), as it appears in the 14th edition, gives a clear statement applicable to the restitution counterclaim. The subparagraphs of paragraph (2) of Rule 230 are introduced by the term "( *semble* )". In the 15th edition there is no equivalent to Rule 230, as the common law has been overtaken by EU developments. When summarising the common law position, para 36-008 of the 15th edition described the

principles that had been set out in Rule 230 of the 14th edition as:

…guidance intended to be applied flexibly …

There is, however, clear guidance to be found in the decision of Christopher Clarke J in OJSC Oil Company Yugraneft v Abramovich [2008] EWHC 2613 (Comm) . In paragraphs 239 to 245 of his judgment he reviewed relevant authorities and text books. In paragraph 246 he recorded his agreement with the Court of Appeal of the Eastern Caribbean in adopting the view taken both in the commentary to Rule 230 in *Dicey* , 14th ed., and in *Cheshire & North's Private International Law,* 13th ed., that:

The proper law of the obligation refers to the law of the country with which the obligation has its closest and most real connection.

Returning to Dexia's reliance on subparagraph (2)(a) of Rule 230, the first case cited in the 14th edition in support of subparagraph (2)(a) is the well known decision of the House of Lords in Fibrosa Spolka Akeyjina v Fairbairn Lawson Combe Barbour Ltd [1943] AC 32 . There a contract governed by English law was made in 1936 for the delivery of machinery in Gdynia. That contract was frustrated by the German occupation of Gdynia in 1939. English law was applied to the claim by the Polish company for return of money paid, no foreign law having been pleaded. Thus the parties proceeded on the basis that the law of a frustrated contract governed a claim to recover money paid under that contract. The Law Reform (Frustrated Contracts) Act 1943 proceeds on the same basis. This plainly makes sense when a contract is frustrated, as the frustrating event does not in itself cast doubt on the validity of the parties' agreement as to the law governing their relationship.

Dexia Crediop SpA v Comune di Prato, 2016 WL 6638427 (2016)

Where, however, a restitutionary claim arises because of invalidity of the parties' agreement at the time that it was made, the position seems to me to be inherently different. The mere fact that the agreement identified a governing law is unlikely in these circumstances to give a close or real connection to that governing law. On the contrary, in my view the invalidity of the parties' agreement at the time that it was made will ordinarily have the consequence that the suggested connection is unreal. The position seems to me in principle the same where a restitutionary claim arises because a party has a continuing right to assert the invalidity of the parties' agreement at the time that it was made, and exercises that right. The upshot is that ordinarily a suggestion of a connection with England, if solely based on what was said in the agreement, cannot be made good. The reason is that the party objecting to that suggestion is entitled to say that the suggestion depends upon a link which was invalid from the outset.

I am fortified in this view by the reasoning of Lord Penrose in Baring Bros & Co Ltd v Cunninghame DC [1997] CLC 108 (Court of Session). That case concerned an agreement that was invalid for lack of capacity. In the present case, the invalidity arises by application of a rule that is compulsory for purposes of consumer protection. It seems to me that in deciding upon the proper law of a related restitutionary obligation it will ordinarily be equally compulsory to put out of account the fact that the invalid agreement introduced connections with a particular country.

It was submitted by Dexia that even if such an approach were adopted, it should be subject to a qualification where the contract in question was merely voidable rather than void. Dexia did not suggest, however, that this qualification would apply where, as in the present case, Prato exercised a right to say that the contract was void from the outset. Accordingly I do not need to consider Dexia's suggested qualification, and I express no view on it.

I recognise that international agreements have not adopted the approach set out above. They have opted for "bright line" rules. The common law, however, is able to look at the matter with more flexibility. For the reasons given above it seems to me that there are compelling reasons for the common law to use that flexibility in the way that I have described.

My conclusion is thus that I should have no regard to provisions in the master agreement and schedule identifying English law as the governing law and recording an irrevocable submission to the jurisdiction of the English courts. In these circumstances, subject to a proviso advanced by Dexia, there can be no contest that the obligation to give restitution to Prato has its closest and most real connection to Italy.

The proviso identified by Dexia involves an assertion that an Italian court would, if Prato sought restitution in that court, be required by article 10(1)(e) of the Rome Convention to conclude that English law was the proper law of the obligation to give restitution. This, however, would require me to have regard not to Italian substantive law, but to Italian principles of the conflict of laws.

Dexia rightly disclaimed any attempt at *renvoi*, saying that it was not urging the English court to adopt a conflicts rule under which the English court would apply the conflict of law principles of the country with which the obligation had its closest and most real connection. Instead, the assertion advanced by Dexia was, as it seems to me, that in circumstances where Prato said that Italy was the country with which the obligation had its closest and most real connection, reasons which would otherwise lead me to agree with Prato should be discounted because I should pay regard to Italian principles of conflict of laws under which courts in Italy would be required to apply English law to that obligation.

Prato objected to this assertion because there is no evidence that an Italian court would be required to do this, and because the English court is concerned to identify the country whose substantive law will be the proper law without regard to that country's principles of conflict of laws. I agree with both objections. As to the first, it seems to me that Dexia is asking me to make a finding about Italian law in circumstances where I do not have the wherewithal to do so. As to the second, it is common ground that I cannot apply the doctrine of *renvoi* because sound reasons of policy prevent me from applying Italian principles of conflict of laws. To my mind Dexia's assertion that I should pay regard to Italian principles of conflict of laws runs counter to the

same reasons of policy. It follows that Dexia's assertion cannot be accepted.

For the reasons given above I reject Dexia's assertions. I am persuaded by Prato that its restitution counterclaim is governed by Italian law. The undisputed consequence is that Prato's restitution counterclaim succeeds.

**Restitution counterclaim: change of position**

Dexia's change of position defence would only arise if the restitution counterclaim were governed by English law. For reasons given in section E2 above, however, I have held that English law does not govern the restitution counterclaim. It is accordingly not necessary for me to rule on Dexia's change of position defence. As this is an area of developing law I consider that it is undesirable for me to attempt to deal with it in the present judgment.

**Regulatory counterclaim**

**Regulatory counterclaim: introduction**

**The regulatory assertions**

Paragraphs 60 to 65 of Prato's counterclaim set out assertions ("the regulatory assertions") which were listed in paragraph 63 under 5 heads. Each head specified one or more particular features of Dexia's conduct, and alleged that the feature(s) thus specified constituted a breach of one or more requirements of Italian financial services regulatory legislation. One thing that all the regulatory assertions had in common was that Prato said the applicable law governing those claims was Italian law. This was initially disputed by Dexia, but was conceded in Dexia's opening submissions. Dexia did not dispute that if under Italian law it was in breach of the regulatory legislation, and Prato suffered damage which under Italian law was caused by the breach, then under Italian law this would give rise to a tortious liability in damages.

The 5 heads concerned:

• (1) failure by Dexia prior to each swap to disclose to Prato "the existence of the Hidden Costs or their implications for 'economic convenience' in

Art. 41 [of law 448/2001] and/or (in the case of the Fourth-Sixth Swaps) for compliance with Art. 3 [of ministerial decree 389/2003]" ("the non-disclosure assertions");
• (2) conduct on the part of Dexia which "structured the [swaps] to embody the Hidden Costs and/or failed to structure the [swaps] so as to provide the best rates for [Prato]" ("the structuring assertions");
• (3) conduct on the part of Dexia which "failed to inform the Defendant that each [swap] was unsuitable [because of the existence of the Hidden Costs in respect of that swap] and/or to obtain written consent from the Defendant to proceed" ("the unsuitability assertions");
• (4) conduct on the part of Dexia which "failed to include reference to a 7 day right of withdrawal" in each swap ("the right of withdrawal assertions");
• (5) conduct on the part of Dexia which, in acting in each of the ways set out in sub-paragraphs (1)-(4) above, "failed to act in the best interests of [Prato] and, as a result, alternatively in any event, … put itself in a position of conflict with [Prato] and failed to inform [Prato] of that in writing or to obtain its written consent" ("the conflict assertions").

**Structure of this section & overlap with section G**

There is potential for overlap between the regulatory counterclaim, the misrepresentation counterclaim and the advisory counterclaim. In the present section of this judgment I examine the regulatory counterclaim independently of the 2002 advisory agreement. The effect of that agreement, including its impact on the legislative provisions discussed below, is dealt with in section G below.

In section F1.3 I set out the legislative provisions relied on by Prato. Section F1.4 identifies certain matters which were common ground. Section F1.5 sets out an explanation of "Hidden Costs" in Prato's statement of case. Sections F1.6 and F1.7 analyse, respectively, Prato's four propositions as to the significance of MTM and the parties' observations on other aspects of MTM. In section F2 I discuss the non-disclosure assertions. In sections F3 to F6 I deal with the structuring assertions, the unsuitability assertions, the right of withdrawal assertions, and the conflict assertions. Section F7

examines the extent to which Dexia was in breach of regulatory obligations. Section F8 deals with causation and damages.

**Regulatory counterclaim: legislative provisions**

I set out below the legislative provisions relied on by Prato in the regulatory counterclaim. Most, but not all, of these provisions were compulsorily applicable irrespective of the status of the investor. Certain of the provisions were not applicable to "qualified" investors. I have indentified those provisions by adding "[retail investors only]".

The fundamental legislative provision for the regulatory counterclaim is article 21 TUF, and in particular article 21.1:

> **Chapter II**
>
> **Performance of services**
>
> **Art. 21 (General criteria)**
>
> [21.1]    In providing investment and non-core services, authorised persons must:
>
> a)    act diligently, correctly and transparently in the interests of clients and the integrity of the market;
>
> b)    acquire the necessary information from clients and operate in a way that they are always adequately informed;
>
> c) organise themselves in such a way as to minimise the risk of conflicts of interest and, where such conflicts arise, act in such a way as to ensure transparency and the fair treatment of clients;
>
> d)    have resources and procedures, including internal control mechanisms, likely to ensure the efficient provision of services;
>
> e)    carry out independent, sound and prudent management and make appropriate arrangements for safeguarding the rights of clients in respect of assets entrusted to them.

In addition CR included detailed provisions relied upon by Prato for the purposes of the regulatory counterclaim. Prato relies on articles 26.1f), 28, 29, 32.3, 32.5, 36.1 c) and 61.1 g) CR as follows:

> **Regulation of the Provision of Investment and Non-Core Services and of Collective Asset Management Services**
>
> **Investment and non-core services**
>
> **General Provisions**
>
> **General rules of conduct**
>
> [26.1]    Authorized intermediaries, in the interest of investors and the integrity of the securities market, shall:
>
> …
>
> f)    operate so as to keep down the costs borne by investors and to obtain the best possible result from each investment service, taking into account the level of risk chosen by the investor.
>
> **[retail investors only]**

Dexia Crediop SpA v Comune di Prato, 2016 WL 6833427 (2016)

## Conflicts of interest

[27.1]    Authorized intermediaries shall be on the alert for conflicts of interest.

[27.2]    Authorized intermediaries may not carry out transactions with or on behalf of their clients where they have directly or indirectly a conflicting interest, including any such interest arising from intragroup dealings, the joint provision of more than one service or other business dealings of their own or of group companies, unless they have previously informed the investor in writing of the nature and extent of their interest in the transaction and the investor has expressly agreed in writing to the carrying out thereof. Where the transaction is concluded by telephone, compliance with the foregoing information requirements and the issue of the related authorization by the investor must be evidence by a recording on magnetic tape or an equivalent medium.

[27.3]    Where, for the purpose of complying with the requirements referred to in paragraph 2, authorized intermediaries use printed forms, these must indicate in a graphically highlighted manner that the transaction involves a conflict of interest.

**[retail investors only]**

## Communication of information between intermediaries and investors

[28.1]  Before concluding contracts for asset management or investment advice services and starting to supply investment services or related non-core services, authorized intermediaries must:

a)    ask investors for information about their experience in investing in financial instruments, financial situation, investments objectives and propensity to incur risks. In the event of refusal to provide the information requested, this must be stated in the contract referred to in article 30 or in a declaration signed by the investor;

b)    give investors a copy of the document on the general risks of investments in financial instruments referred to in Annex 3.

[28.2]    Authorised intermediaries may not carry out or recommend transactions or supply management services until they have provided investors with adequate information on the nature, risks and implications of the transaction or service in question, knowledge of which is needed to make informed investment and disinvestment decisions.

**[retail investors only]**

## Unsuitable transactions

[29.1]    Authorized intermediaries shall refrain from carrying out transactions on behalf of investors that are not suitable in terms of type, *oggetto* , frequency or size.

[29.2]    For the purposes of paragraph 1, authorized intermediaries shall take into account the information referred to in Article 28 and any other information available in relation to the service supplied.

[29.3]    Where an authorized intermediary receives instructions from an investor relative to an unsuitable transaction, it shall inform the investor of the fact and state the reasons why it is not advisable to carry out the transaction. Where the investor nonetheless intends to proceed with the transaction, the authorized intermediary may carry it out only on the basis of an order given in writing or, in the case of orders given by telephone, recorded on magnetic tape or an equivalent medium in which explicit reference is made to the warning received.

…

**Rules for the supply of individual services**

**Dealing**

**Dealing**

…

[32.3]  … authorized intermediaries shall carry out transactions for own or customer account at the best possible conditions with reference to the time, size and nature of the transactions. In determining the best possible conditions consideration shall be given to the price paid or received and the other costs borne directly or indirectly by the investor.

…

[32.5]  In supplying the service of dealing for own account, authorized intermediaries shall inform the investor at the time of receiving the order of the price at which they are prepared to buy or sell the financial instruments and execute the trade upon receiving the investor's consent; they may not charge any commission on the price agreed.

…

**Placement and off-site offers**

…

**Off-site offers**

[36.1]  In the offering off-site of financial instruments, investment services and financial products governed by article 30 TUF,

Dexia Crediop SpA V Comune di Prato, 2016 WL 6833477 (2016)

authorized intermediaries shall use financial salesmen to:

…

c) explain to investors:

– before they sign an order form for the purchase or subscription of financial instruments or other financial products or a contract for the supply of investment services, the essential elements of the transaction, service or product, with special reference to the related costs and capital risks;

– the right provided for in article 30.6 TUF.

…

**Obligations of Certification, Reporting and Registration**

…

[retail investors only]

**Information on transactions**

[61.1]    In supplying dealing services, authorized intermediaries shall send to investors' domiciles, for each transaction carried out and within seven working days from the execution date, a transaction confirmation notice showing separately the following information:

…

g)  the commissions and expenses charged;

…

Annex 3, referred to in article 28.1 b), comprised 11 pages in small type in the Italian printed version of CR. Passages of particular relevance are set out in Annex 3 to the present judgment.

The legislative provisions above have been set out in the form that they took during the period 2002 to 2006 inclusive. They all applied to the swaps, either because they were applicable to relations between intermediaries and investors generally, or because they applied to relations between intermediaries and retail investors.

**Regulatory counterclaim: common ground**

In relation to relevant provisions of Italian financial services legislation, the Civil Joint Memorandum recorded in paragraph 6:

6.  … We … agree that under these provisions the intermediary must, amongst other things, act diligently, correctly, transparently and fairly, must operate so as to keep down the

costs borne by investors and obtain the best possible result from each investment service, assess the client's profile as an investor, evaluate the suitability of the transaction, and operate in such a way that the investor is always adequately informed. Whilst Professor Gentili agrees in the abstract that the relevant articles of TUF and [CR] provide for the above, he wishes to note that the facts of each individual case have to be applied to these provisions and this will have a bearing on how the provisions of TUF and [CR] are applied to each individual case.

Aspects that are either agreed or unchallenged in the course of evidence are:

• (1)  there is no express obligation on a bank to disclose an initial negative MTM value under relevant legislative provisions;
• (2)  in the present case, the obligation of transparency under article 21.1 TUF and the obligation to disclose adequate information under article 28.2 CR come to the same thing;
• (3)  the duty in article 21.1 moulds itself "to the characteristics of the particular client" along with ancillary legislative provisions;
• (4)  more detailed information must be provided to a retail investor, such as Prato, than would be the case with a qualified investor;
• (5)  the information must be provided in such a way that it can be comprehended by "a retail investor that declares that it doesn't have a large knowledge of the financial market and of the law that governs this";
• (6)  the obligation to provide information to a client incorporates an obligation to verify that the client has fully understood the information provided, recognising however that investors also have a duty to ensure that they understand and that there are limitations on what an intermediary can do to ensure that the investor has understood.

It is not disputed that prior to the swaps Mr Sommavilla provided Dexia with a copy of Annex 3 CR. Dexia's opening submissions relied on a number of other general assertions that were either common ground or not contested in evidence:

• (1)  prior to each swap Dexia provided Prato with a presentation including, in particular, an explanation of the circumstances in which Prato would be the net payer and information about projected 6M Euribor forward rates for the relevant period;
• (2)  As a general rule, under Italian law:

    • (a) each contracting party is responsible for determining whether it wishes to enter into a contract and if so on what terms; and
    • (b)  contracting parties generally owe each other no duty of disclosure;

• (3)  in practice, the initial MTM of a derivative will always be negative to the counterparty since the bank must price the transaction so as to cover the risk that it takes on, to cover the costs it will incur and to earn a margin;
• (4)  during the period 2002 to 2006, if a bank and a counterparty entered into a swap then, unless there was a specific agreement that the bank would disclose the initial MTM, banks did not disclose that initial MTM at the start of or immediately prior to a swap; this was accepted by Dr Faro at T16, p. 30, line 15 to p. 31 line 2, where Dr Faro added that "municipalities didn't even understand the significance of the term, and virtually all municipalities had been qualified as qualified players."

### Prato's Hidden Costs explanation

Section A4.4 of the main claim judgment set out the definition of "Hidden Cost" and "Implicit Cost" given in paragraph 21 of Faro 1. The quotations in the 5 heads set out in section F1.1 above, however, are taken from Prato's statement of case, which contained a general explanation concerning "Hidden Costs". I shall refer to it as "Prato's Hidden Costs explanation". In their

Dexia Crediop SpA v Comune di Prato, 2016 WL 6833477 (2016)

final form, paragraphs 10, 11 and 11A of Prato's Hidden Costs explanation stated:

**The Hidden Costs of the Transactions**

10. As at the date of their purported entry, each of the Transactions had a negative initial MTM value to the Defendant and a positive initial MTM value to the Claimant as follows in the following amounts (alternatively such other amounts as the Court shall determine following the exchange of expert evidence):

(1) The First Swap (4 December 2002): &euro;817,005.66;

(2) The Second Swap (6 August 2003): &euro;1,380,227.39;

(3) The Third Swap (6 August 2003): &euro;65,659.58;

(4) The Fourth and Fifth Swaps (30 December 2004):

&euro;947,848.26;

(5) [deleted];

(6) The Sixth Swap (26 June 2006): &euro;1,266,507.05.

11. The above negative/positive values in respect of each Transaction represented implicit costs of the Transactions to the Defendant and implicit profits or fees or commissions to the Claimant all of which were undisclosed by the Claimant to the Defendant and of which at all material times the Defendant was unaware. The term "Hidden Costs" is used below as shorthand for the undisclosed negative values and/or implicit costs of the Transactions to the Defendant particularised above.

11 A.For the avoidance of doubt:

(1) The characterisation of the Transactions' negative values as "costs" is a matter of labelling only and is not essential to the defences or causes of action advanced by the Defendant below. The matters alleged below are alleged whether or not the negative values are properly so to be characterised; and

(2) Without prejudice to all expert evidence to be adduced at trial, the quantification of the Transactions' negative values to the Defendant is not affected by the fact that the Claimant carried credit risk and interest rate risk, and (it contends) other transaction costs in entering into the Transactions and would have sought to price those into the terms agreed. Howsoever the existence of the negative values came about or is now sought to be justified by the Claimant, the Transactions remained negative value transactions for the Defendant as particularised.

It is apparent from paragraph 11 of this explanation that "Hidden Costs" refers to the negative initial MTM amounts of the swaps, either as specified in paragraph 10 or as determined by the court. Those same amounts are said in paragraph 11:

• (1) to be positive initial MTM values for Dexia;
• (2) insofar as they are negative initial MTM values to Prato, to represent "implicit costs" of the swaps to Prato; and
• (3) insofar as they are positive initial MTM values to Dexia, to represent "implicit profits or fees or commissions" to Dexia.

It is also made clear by Prato in this explanation:

    • (1)  in paragraph 11A(1):

        • (a)  that it is the negative values that are said to matter for Prato's purposes, and
        • (b)  that whether those negative values are properly characterised as costs is said to be "a matter of labelling only" which "is not essential for Prato's purposes";

    • (2)  in paragraph 11A(2):

        • (a)  that "without prejudice to all expert evidence to be adduced at trial", when quantifying the negative values it does not matter that Dexia carried transaction costs in entering into the swaps which it "would have sought to price … into the terms agreed", and
        • (b)  that what matters is that there were negative values, and it matters neither how they came about nor how they are now sought to be justified by Dexia.

**Significance of initial MTM: Prato's propositions**

Prato's oral closing identified four propositions about the significance of the initial MTM. I deal with them in turn.

The first proposition was expressed in various ways. At its heart it identified common ground between Prato and Mr Malik as to what initial MTM represents. In this regard I begin with some observations about Mr Malik's terminology.

    • (1)  The term "mark to market" or "MTM" is discussed in section A4.3 of the main claim judgment. Mr Malik said that he used the term "MTM" to mean valuations made using mid-market interbank rates.
    • (2)  Mr Malik said that market participants commonly referred to the term "day one present value" or "day 1 PV" instead of "MTM" for the day 1 value of the derivative calculated at mid-

market rates. By contrast, he commented that MTM was generally understood to be a subsequent recalculation of the value of the derivative using prevailing mid-market rates.
    • (3)  Mr Malik used the term "traded value" to mean the actual trading price of the derivative. This was the price at which a bank would be willing to transact, and included adjustments for dealer costs and a reasonable margin. Mr Malik added that the term "traded value" applied to a derivative valuation at all times – at inception, on an unwind/ close-out, restructuring or default.

Mr Malik in his oral evidence gave an explanation of the calculation of day 1 PV. It started with the expected cash flows under the swap. These were then discounted at market interest rates. Those expected cash flows and interest rates were themselves arrived at from the prices in the market that day of market trading instruments. In summary, Mr Malik said that the day 1 PV is the present value of what that day's market rates suggested would be the expected cash flows and the appropriate discount rate.

So much was, indeed, common ground. Prato sought to build on that by suggesting to Mr Malik that if the day 1 PV was plus 100 for the bank, and correspondingly minus 100 for the client, this reflected an expectation on that day that the client would be the net payer to the tune of 100. Mr Malik refused to accept this. His response was that in the example that had been given the client was the net payer on that day. Later in his evidence he added:

      …it is the present value of the expected cash flows discounted at today's market rates. That's all it tells you. It's today's price. Today's price does not give you any indication of what the expected outcome would be. … a present value of the cash flows at today's rate, in my view does not indicate an outcome.

I accept that evidence. It was common ground that the amount of the day 1 PV is constituted by and reflects the spread from notional mid-market interbank rates. The bank builds that spread into its pricing to cover its costs and to give it a reasonable margin. In that regard Prato placed reliance on what was said by Mr David Mengle in issue 3, 2010 of *ISDA Research Notes.* In my view what Mr Mengle said is consistent with, and supports, Mr Malik's evidence. It is convenient to include here an extract ("the Mengle extract") from this article, in which I have numbered the paragraphs in square brackets. These paragraphs form part of, among other things, an explanation of how the fixed rate on a notional par swap is effectively a weighted average of estimated floating rates:

> [1]   A central concept of financial instrument pricing is that of zero net present value at inception; the concept is also known as mid-market pricing. Applied to a derivatives transaction, the concept means that the terms of the transaction are set so that the present value of expected cash flows to be paid by one party is equal to the present value of expected cash flows to be paid by the other. For an interest rate swap, for example, zero net present value means that the swap fixed rate is set so the present value of fixed rate cash flows equals the present value of expected floating rate cash flows. For a credit default swap, it means that the credit spread is set so the present value of expected spread payments equals the present value of expected default payments. And for an option it means that the option premium paid at inception is equal to the present value of expected in-the-money cash flows. In all cases, once the market moves, net present value is no longer zero.

> [2]   But in practice, originating and executing a transaction involves

costs that must be covered by the dealer that arranges it. If the actual price of a transaction were set so net present value was zero, the dealer would not cover its costs of transacting and of serving more generally as a market maker, nor would it be compensated for the credit risk it takes in a bilateral transaction. It is therefore necessary to adjust the mid-market price to cover various costs and risks of transacting as well as provide a return to the dealer that makes a market; this is true not only of derivatives but of market making for all financial instruments. The result is that the actual price agreed for the transaction is not the mid-market price, but typically either a bid price if the dealer is paying the fixed rate or an offer price if the dealer is receiving the fixed rate. And because the actual price is the bid or offer price, the net present value to the dealer will be a positive amount and not zero.

> ….

> [4]   Pricing and valuation, as the terms are used in financial markets, refer to two different aspects of the same process. Pricing refers to the process of setting the initial terms of a transaction, for example, the fixed rate on a plain vanilla interest rate swap. Valuation refers to determining the net present value of expected cash flows after the initial terms have been agreed and set. The following discussion will focus on pricing a swap transaction.

> [5]   A plain vanilla interest rate swap involves one party paying a

Dexia Crediop SpA v Comune di Prato, 2016 WL 6833477 (2016)

fixed rate to and receiving a floating rate, usually Euribor or Libor, from the other party. Pricing a vanilla swap begins with determining a benchmark fixed rate for a par swap, which is defined as an interest rate swap with a net present value of zero. This benchmark fixed rate is neither a bid price nor an offer price, but instead a mid-market price based on prices currently quoted in the market. This mid-market price is not itself a market price at which a transaction would be dealt.

[6]    Determination of the mid-market price involves calculating three interrelated yield curves. The first yield curve is the par curve, which is the set of fixed rates currently quoted for par swaps of various maturities. The par yield curve for interest rate swaps is also called the mid-market swap curve because, in practice, it is derived by averaging the bid and offer rates for each quoted maturity. A market participant considering entering into an interest rate swap would consult the par swap curve to determine the fixed rates currently being quoted for various maturities.

[7]    The second yield curve is known as the zero coupon curve, and is related through arbitrage to the par yield curve. The zero coupon yield curve is a set of rates paid on instruments that accumulate interest until maturity, with no immediate cash flows. For interest rate swaps, zero coupon rates have traditionally been used to discount expected cash flows.

[8]    The third yield curve is the forward curve, and is derived from the zero coupon yield curve. The forward yield curve consists of the future values of zero coupon rates that are implied by current zero coupon rates. For interest rate swaps, forward rates are used as proxies to estimate expected floating rate cash flows for the future dates. This calculation is based on the unbiased expectations hypothesis, an economic theory that asserts that forward prices are unbiased predictors of future spot prices.

It can be seen from paragraph [5] of the Mengle extract that, when pricing a swap, market participants use a "benchmark fixed rate for a par swap", being a "mid-market price [which] is not itself a market price at which a transaction would be dealt." Thus, it is in relation to a notional bench mark, which is not "a market price at which a transaction would be dealt", that the forward curve is used to predict future cash flows: see the Mengle extract at paragraph [8]. Paragraph [2] of the Mengle extract makes it plain that, far from being a predictor of cash flows, the MTM is the present value of an adjustment made to this notional bench mark. It seems to me plain from the Mengle extract that:

• (1)  the MTM is not dependant on the notional benchmark: the MTM represents an adjustment to that notional benchmark reflecting the provision that the bank has made for costs and risks and a return;
• (2)  the notional benchmark does not seek to predict an outcome: it has been arrived at by using the forward curve to determine a mid-market rate which is not itself a rate at which a transaction would be dealt;
• (3)  the forward curve has been derived by using forward rates as a predictor of future spot prices, and thus arrive at expected floating rate cash flows; and

Dexia Crediop SpA v Comune di Prato, 2016 WL 6833477 (2016)

• (4) to the extent that anything is used as a predictor of cash flows, it is the forward curve and not the MTM.

In the language of the market, as expressed by Mr Malik in cross examination, "today's price" depends on "today's market rates". Nobody offering "today's price" is saying that in reality "this is the expected outcome". Market practitioners know that the calculations have been done using a benchmark which is only notional, that the eventual outcome will and must depend on market movements, and that predictions (embodied in the forward curve) as to movements will change on a daily basis and often within the day.

Prato's second proposition was that if, on day one, the counterparty was the expected net payer in the light of the expected cash flows, then the initial MTM must reflect "the risk or probability of that". Prato asserted that Professor Gentili had accepted this proposition. I disagree. What the initial MTM, or day 1 PV, reflects is that the bank, when entering into the swap with the counterparty, has secured for itself a spread over notional mid-market interbank rates. That spread has a present value (see the Mengle extract at paragraph [2]), and the greater the spread, the higher its present value will be.

As to Professor Gentili's evidence, he was asked about what had been said by the Court of Appeal of Milan, civil section, in *Gommeservice* (see section C5.3 above). In his evidence Professor Gentili accepted that Prato's second proposition was something which had been said in the judgment in that case. Professor Gentili did not say that he agreed with it.

Prato's third proposition was that because initial MTM is an expression of the expected net cash flows on day one in present value terms, it is necessarily an expression of the then expected cash flow outcome. This, however, to my mind is meaningless. The outcome of the swap is going to depend on market rates over time. The bank, in order to recover its costs and to achieve a margin, has secured a spread over the mid-market interbank rate. The initial MTM simply gives the present value of that spread. All that it indicates is that on each payment date the difference between what the bank pays and what the counterparty pays will be better for the bank than

if it had entered into the swap at day 1 mid-market interbank rates. Those rates are notional only: see the last sentence of paragraph [5] of the Mengle extract. Thus the initial MTM gives no information at all about the expected outcome of the swap.

Prato's fourth proposition was put in two different ways. First, it was said that where the initial MTM is negative for a counterparty, that represents the cost of entering into the swap for that counterparty. The second way in which the fourth proposition was put was to say that, at the very least, it represented the expected cost on day one.

An assertion by Prato in support of this proposition was that initial MTM had only come into existence as a vehicle for recovering cost by the bank. This assertion confuses the MTM and the choice of the fixed rate. The proposed fixed rate undoubtedly has been chosen in order to ensure that the bank can recover its costs along with a profit element. The MTM is no more than the present value of the spread between the fixed rate and the notional mid-market interbank rate.

Three sub-points were relied upon by Prato. As will be seen, in these sub-points Prato sought to show that a negative MTM at inception was indeed a "cost". This reflected the approach to cross-examination taken by Prato in the course of oral evidence. There was thus a departure from the assertion in paragraph 11A(1) of Prato's Hidden Costs explanation that characterisation as "costs" was immaterial.

The first sub-point was an assertion that the cost of the swap resides in the present value of the net cash flows. Mr Malik's answer to this was to give an analogy of buying a pint of milk. The cost to the consumer is the price that the consumer pays. The fact that the shop was able to buy the milk at a lower price from a wholesaler did not mean that the shop's mark up represented a "cost" to the consumer.

Prato said that this was a false analogy. The reason was that under the swaps in the present case the parties agreed to exchange cash flows and for there only to be physical settlement of the net differential. Prato then said this:

Dexia Crediop SpA v Comune di Prato, 2016 WL 06633477 (2016)

The right analogy would be … an arrangement under which X binds itself to pay Y £100 in six months, Y binds itself to pay X £70 on the same date and both agree that only the net sum need be physically settled. The cost of the arrangement for X is plainly £30 not £100.

the other part of the swap and a component which represents cost [£30]… there is a part that they pay out [£100] and they receive another part [£70] which compensates for it, and there is another part [£30] which is the cost component, and that for me is what I call cost.

The computation of cost in this example is a computation of profit or loss, in this case a loss. As a computation of eventual loss, it is plainly right, on the assumptions that the agreement comes to an end at the six month stage, and that the profit/loss is measured at that stage. The example, however, needs refinement in order to be a true analogy. In refining it, I apply principles of market practice described by Mr Malik and not contested by Dr Faro. Assume that the figures given in Prato's example arise because the amount that X has to pay at the end of six months is derived from a floating rate. Assume also that Y is a bank which pays a fixed rate of 14% per annum on a notional principal sum of £1000, and that Y's fixed rate gives it a spread by comparison with the notional mid-market rate because Y pays 100 basis points (1%) per annum less than the notional mid-market rate. If Y's payments were at the notional mid-market rate, then at the six month stage it would have paid 15% per annum rather than 14% per annum, which over a six month period would come to £75 rather than £70. In these circumstances it can be said that X is notionally £5 worse off as a result of the spread. However the "cost" to X at the six month stage is not £5. Insofar as "cost" is used to mean the eventual loss, then the "cost" is, as Prato rightly says in the example, the £30 difference between the amount X pays to Y and the lower amount that, on this example, X receives from Y.

Prato cited an explanation given by Dr Faro in a passage of cross examination. To my mind, if I insert in square brackets the sums given in Prato's example, then the passage makes precisely the point which is stressed by Dexia:

…in terms of the payment that Prato is making [£100], there is a component [£70] which is offset by

If, however, Dr Faro intended by "cost" to refer to the spread represented by the initial MTM, then the result is inconsistent with his explanation. His explanation identifies the whole of the difference between what Prato receives and what Prato pays as the cost. In the example given, it is £30 at the six month stage. Looking at the position at the six month stage, a notional value can be attributed to the spread. As explained above, a spread of 100 basis points per annum would equate to a notional £5 out of the £30. But at the six month stage the cost is not the notional £5 but the actual £30.

The reason for the £30 "cost" is that the market floating rate on the relevant day has moved to a rate which requires X to pay £100. Sometimes the market may move in a way which means that X has a net obligation to pay. The "cost" to X has turned out to be the amount of that obligation. Other times it may move in a way which means that X has a net entitlement to receive. The "cost" to X has turned out to be nil, and X has made a gain. It is conceivable that after six months the market will arrive at a point where X's obligation to make payment to Y equates to Y's obligation to make payment to X. In that event there is neither a loss to X nor a profit for X: at the end of the six month period the "cost" to X has turned out to be nil. What all this has in common is that it looks at the position at the six month stage and compares it with the position at the outset, where, in this example, neither side pays anything to the other.

A calculation of what the position would have been if Y had agreed to pay a higher fixed rate has no bearing on the presence or absence of "cost". A calculation of that kind would simply constitute a calculation of what might have been. But what might have been did not happen.

Moreover, the present case arises in a context where Y is a bank entering into the swap as part of its normal commercial activity, and X is its customer. In such a context it is fanciful to suggest that Y might agree upon a fixed rate equal to the notional mid-market interbank rate. Such a rate would deprive Y of a positive initial MTM. As Mr Malik has demonstrated, and Dr Faro accepts, a positive MTM to the bank, with a corresponding negative MTM to the customer, is necessary to cover the bank's own exposure to various types of risk and to give it a margin. In commercial terms, a comparison with the notional mid-market interbank rate is not a comparison with something that might have been. It is, rather, a comparison with something which never might have been.

What this analysis demonstrates is that Mr Malik's analogy is sound. At the supermarket checkout the customer enters into a transaction with the supermarket under which the customer buys a pint of milk. It is a nonsense to suggest that the cost of the pint of milk is the difference between the amount the customer actually pays and a notional mid-market rate at which supermarkets would buy and sell milk to each other. The cost to the customer is the amount by which the customer is out of pocket once the transaction has taken place. It might be that there was a loyalty scheme or something similar under which the customer received points that could be exchanged for cash. If the points gained for buying the milk could be swapped at the checkout for, say, a penny, then the cost to the customer of the milk will be the price less a penny. The notional mid-market rate at which supermarkets would trade milk between themselves has nothing to do with it, and nor does the difference between that rate when applied to a single pint of milk and the net amount by which the customer is out of pocket.

The second sub-point was an assertion that "the cost of the swap is not theoretical". If "cost" is used to refer to the £30 differential in Prato's example then this is plainly right. But that is not what this second sub-point is seeking to assert. It is seeking to assert that the initial MTM is not a merely theoretical element in the cost. Prato cited passages from the evidence of Professor Sciarrone Alibrandi and from the evidence of Dr Faro. In this regard Prato said that the essential point was that once the spread is brought into the prices

that the counterparty pays, the cash flow performance will always reflect that. It did not matter whether on a particular payment day the counterparty may be a net payer or may be a net recipient.

This "essential point" is misleading. On each payment date Prato would have been better off if the swap had been entered into at notional mid-market interbank rates. This will be the case throughout the life of the swap. If, on a particular payment date, the cash flow due from Prato is equal to the cash flow due from Dexia, then no net payment will arise. Prato can, if it were so minded, say to itself that if only the swap had been entered into at day 1 notional mid-market interbank rates, then the amount that Dexia would have had to pay would have been more, and on the particular payment date in question Prato would have been a net recipient. The amount by which it would, on this notional basis, have been a net recipient will be determined by the amount of the spread on day 1. Similar calculations can be done under which Prato is a net payer under the swap, but at day 1 notional mid-market interbank rates would have been a net recipient. Or the position may be that Prato is a net recipient but would have received more on the occasion in question if the swap had been at day 1 notional mid-market interbank rates. Alternatively the position may be that on a particular occasion Prato is a net payer, but the amount of the net payment would have been reduced if the swap had been at day 1 notional mid-market interbank rates. At all stages, however, the comparison that is being made is with something which never might have been.

Thus I do not accept that this "essential point" has the consequence that the "cost" thus identified is anything other than theoretical. Evidence was cited from Dr Faro which to my mind took the matter no further. He added that it was necessary "to separate out the concept of cost from the concept of outcome". In that context, he said:

> …the cost of the transaction can be seen as an additional value … which has an effect on the rate that [Prato] is paying. This is a spread, as we call it, and that has an effect in the transaction …

Dexia Crediop SpA v Comune di Prato, 2016 WL 06633477 (2016)...

I do not accept this analysis. A swap is a transaction under which parties agree that they will make payments to each other in the future, and that these payments may be netted off. I accept that, because the payments may be netted off, the future cost to any one party on each payment date will be the net amount, if any, that the party in question will have to pay. In a swap between a bank and a retail customer this has nothing to do with the notional mid-market interbank rate at the time that the transaction is entered into.

Professor Sciarrone Alibrandi explained that, by comparison with an initial MTM of zero, a swap which has a negative MTM at inception for the customer will mean that the customer, on each payment date, will be worse off in an amount determined by the spread. She then asserted:

> So in any case, either there will be an actual cost, an actual payment, or a lower gain. But in neither case is this a virtual value.

Professor Sciarrone Alibrandi's expertise is, of course, in the field of Italian civil law. It may be that in the passage cited above she was seeking only to reflect the views espoused by Dr Faro. So far as the practical realities of the relationship between a bank and a retail customer are concerned, however, it seems to me that for reasons similar to those identified above these propositions cannot be accepted. I add that Professor Sciarrone Alibrandi's own analysis starts by taking something which is entirely theoretical, namely a swap in which the initial MTM is zero. By definition, no such swap occurs: the definition takes a notional mid-market interbank rate. That notional value is something derived from actual transactions, looking at bids and offers in order to arrive at a value which is at "mid-market". It is commercially absurd to think that a retail customer could obtain a swap at mid-market rates in the absence of some particular reason on the part of the bank to trade in a way which gave it nothing for the credit and other risks which it was incurring, and which gave it no profit element. Thus Professor Sciarrone

Alibrandi's own analysis gives no basis for departing from the analysis above under which the cost to the retail customer will be the net amounts, if any, that it has to pay during the life of the swap.

Prato's submissions on its first and second sub-points cited passages in Mr Malik's evidence in which he spoke of the "cost" of the back to back swaps by which Dexia hedged against the interest rate risk element in the swaps that it entered into with Prato. Those back to back swaps are described at paragraphs 62, 75, 76, 95 and 111 of the main claim judgment. I have not referred to these citations by Prato in my discussion above, because it seems to me that whether they have value depends upon Prato's third sub-point, to which I now turn. In the third sub-point Prato suggested that there was "a stark inconsistency between Mr Malik's approach between the hedge swaps on the one hand and to the underlying Prato swaps on the other."

In Mr Malik's written evidence, he calculated figures for the day 1 PV of the back to back swaps. He confirmed in his oral evidence that he took this as the cost to Dexia of entering into the back to back swap. He described it as "the cost of the hedge to Dexia … [on] day one."

Prato suggested to Mr Malik that, just as the initial MTM of the back to back swaps was a cost to Dexia, so the initial MTM of swaps 1 to 6 was a cost to Prato on swaps 1 to 6. Mr Malik refused to accept this. In its closing submissions Prato criticised the reasons given by Mr Malik for distinguishing the two. To my mind the criticisms do not do justice to Mr Malik's answers when the point was put to him:

> A. … when a bank enters into a swap with a counterparty such as Prato, it has to hedge its market risk because it is not in the business of taking the opposite view to what the client is taking. It has two choices: it can go to a bank … and lay off the market risk, for which it pays a certain amount – this is what they have done – or they could go out into the market and unbundle the risks and dynamically hedge it themselves …

…Q. It's perfectly accurate to describe [the day 1 PV of the back to back swap] as the cost to Dexia of entering into the hedge …?

A. Well, that's because as a market maker or as a bank they have to go out and replicate this swap in the market and lay off all their risks, because they are not in the business of taking a market view like the counterparty is taking.

In this passage Mr Malik is explaining the practical context. The terms which Dexia offers to Prato are not offered in a vacuum. To the extent that those terms would require payments by Dexia to Prato, it is common ground that Dexia will be looking to the interbank market to see how much more another bank would be willing to pay Dexia in exchange for the cash flows which are to be paid by Prato to Dexia. Thus there are two transactions in the offing, and in order to decide whether to enter into them both Dexia must compare the two. This can be done by comparing the extent to which the fixed payments it would receive under the back to back swap exceeded the fixed payments it would make under swap with Prato. A more sophisticated approach is to compare the day 1 PV of the two transactions. If a comparison using day 1 PV is made, one comparator is a present value for the spread above notional mid-market interbank rates as regards the swap between Dexia and Prato. In that swap Dexia assumes the risk that rates will change adversely to Dexia, which is what Mr Malik refers to as "the market risk". Dexia has chosen to lay off that market risk. Mr Malik speaks of this being something "for which [Dexia] pays a certain amount". The comparison that is done is thus looking, on the one hand, at the extent to which, in present value terms, the swap contemplated with Prato will give Dexia a spread over and above a notional mid-market interbank rate, and how much in its turn Dexia will have to "pay" in present value terms, again over and above a notional mid-market interbank rate, to a hedge bank in order to be covered against the market

risk element of the proposed swap with Prato. In these circumstances, far from being meaningless, the notional mid-market interbank rate is a crucial feature of Dexia's commercial assessment. It forms a common benchmark used in both comparators. The commercial assessment can be made by a calculation comparing the day 1 PV for each of the two proposed swaps. Assuming that they were both entered into at the time of the calculation, the cash flows that form part of the notional mid-market interbank rate drop out of the equation, because they are common to both sides.

As Dexia pointed out, Mr Malik recognised that in this context he was using the word "cost" in a loose sense. In response to questions from me towards the end of day 15, Mr Malik recognised that the actual cost was the traded value. Nevertheless, for the reasons explained above, in the context of the back to back swaps it makes commercial sense to speak of the day 1 PV to Dexia of the back to back swap as a "cost". There is simply no scope for any similar type of exercise from Prato's point of view. As Mr Malik points out, when entering into the swap with Dexia Prato is taking a market view. Prato seems to suggest that when entering into the swaps with Dexia it is hedging in the same way as Dexia is hedging when it enters into the back to back swaps. I do not accept this. I agree that Prato is entering into the swaps with Dexia so as to gain a measure of protection against market risks which are features of transactions between Prato and certain groups of creditors. Those features, however, have nothing to do with any notional mid-market interbank swap rate. It makes no commercial sense at all to speak of Prato incurring a cost referable to the difference between the cash flows under its swaps with Dexia and the cash flows if the swaps had been made at a notional mid-market interbank rate.

For these reasons I accept neither Prato's fourth proposition nor any of the sub-points relied on by Prato. Before leaving the fourth proposition it is convenient to note some observations of Professor Sciarrone Alibrandi in Sciarrone Alibrandi 3. Paragraph 27 of Sciarrone Alibrandi 3 drew attention to three provisions concerning financial accounting which were mentioned in *Arosio* . Paragraphs 28 to 30 drew attention to something not cited in *Arosio* , namely Eurostat Guidance on accounts rules for Excessive Deficit Procedure (EDP) concerning financial derivatives issued on 13 March 2008. It does not appear

to me that these matters fall within Professor Sciarrone Alibrandi's area of expertise.

After dealing with these four propositions Prato's oral closing submissions touched on a number of other aspects of MTM. I deal with those other aspects in section F1.7 below.

**Other aspects of MTM urged by the parties**

Prato's closing submissions, after advancing the four propositions on the significance of initial MTM, moved on to deal with a number of points urged by Dexia. In part these points, or Prato's answer, involved assertions of Italian law. To the extent that those assertions are relevant I deal with them, as developed by Prato when making submissions on Italian law, in later sections of this judgment. On aspects other than Italian law it is convenient to discuss these points here.

The points in question appeared in paragraph 5 of Dexia's written closing submissions. That paragraph began by noting that it was not market practice at the relevant time for the initial MTM of a derivative transaction to be disclosed by a bank to a counterparty. The comment was then made by Dexia that this was "unsurprising". The justification for this comment was said to lie in a proposition that "a counterparty such as Prato entering into interest rate swaps such as those in issue in this case did not need to know the initial MTM of the swap in order to make an informed investment decision". I shall call this "the no need to know factual proposition".

Paragraph 5 of Dexia's written closing submissions made a number of points in support of the no need to know factual proposition. Before turning to them, I note that there was, rightly, no suggestion that market practice of itself provided an answer to the regulatory counterclaim. Market practice is neutral in this context. Whether any particular practice met legal requirements depends upon what the law actually required, and what the practice actually involved, on the occasion in question. There were occasions when Dexia gave warning that a submission by Prato, if right, would have an adverse impact on numerous swaps already in existence. As with market practice, however, it seems to me that this cannot be a determinative feature.

Paragraph 5.1 asserted, among other things, that the initial MTM of a swap is neither economically, nor as a matter of ordinary language, a "cost" borne by the counterparty. Prato disputed this, relying on what Mr Malik had said about the back to back swaps. I have noted in section F1.6, when dealing with Prato's third sub-point, that in relation to the back to back swaps Mr Malik used the word "costs" in a loose way. For the reasons given in that section Mr Malik's evidence demonstrates that in the swaps between Dexia and Prato the initial MTM is not a true economic cost. It is a calculation of the present value of a notional difference between the actual swap rates and rates that were, by definition, not on offer to anyone at the time that the calculation was made.

In responding to paragraph 5.1 Prato noted a reference in an Italian decision to a document from the Bank of Italy describing "market values at the start of the transaction, reflecting implicit commissions …". This document was not put to Mr Malik. It appears to me to be no more than a loose way of describing how the spread from a notional mid-market inter-bank rate can be seen in economic terms as giving the bank cover for risks and a margin.

A submission was also made by Prato that paragraph 5.1 ignored Professor Sciarrone Alibrandi's evidence, along with a suggested concession by Professor Gentili. This submission misunderstands their roles. They gave evidence to assist the court on Italian law. To the extent that their evidence concerned Italian law, I deal with it in later sections of this judgment. To the extent that their evidence did not concern Italian law it is irrelevant.

Paragraph 5.2 of Dexia's written closing submissions stated:

> The only payments which the counterparty is required to make under a swap are the differentials calculated by reference to the rates and thresholds set out in the swap contract and future interest rates. A swap with a negative initial MTM may result in the counterparty being a net recipient of positive cashflows over its term (and vice versa).

Here Prato complained that Dexia had asserted that "the cost may never materialise". That is a misconception. Dexia did not identify any particular cost as being one which may never materialise. Its point was that, irrespective of the initial MTM, whether a swap results in a profit or a loss to the counterparty depends on the rates and thresholds set out in the swap contract, on the one hand, and future interest rates on the other.

Prato then referred to passages in the evidence of Professor Sciarrone Alibrandi and Dr Faro. As explained above, the evidence of Professor Sciarrone Alibrandi is irrelevant for present purposes. The evidence from Dr Faro concerned the spread "having an effect in the transaction ex post at any event". This evidence, however, does not detract from Dexia's paragraph 5.2. The passage cited from Dr Faro's evidence is, in essence, saying merely that things would have been better for Prato on each payment date if only Dexia had been willing to agree to pay fixed interest at a higher rate. Moreover, the spread referred to by Dr Faro is determined by reference to a higher fixed rate which was not, by definition, on offer in the market when the spread was calculated: see section F1.6 above.

Paragraphs 5.3 and 5.4 of Dexia's written closing submissions concerned the initial MTM (in paragraph 5.3) and the back to back swaps (in paragraph 5.4). They distinguished between Dexia hoping to cover its costs/risks, on the one hand, and the fact that this would not be a cost to Prato, on the other. Prato's comments in response failed to take account of this distinction.

Paragraph 5.5 of Dexia's written closing submissions made criticisms of assertions which would later become part of Prato's propositions concerning the significance of initial MTM. When responding to paragraph 5.5 Prato observed that its points on these criticisms had been made already. As explained in section F1.6 above, however, the points relied on by Prato were, to the extent indicated in that section, unsound.

Paragraph 5.6 of Dexia's written closing submissions made a point which is common ground: there can be significant fluctuations in MTM during the course of

a day. Paragraph 5.7 noted that differing calculations of MTM had been made by experts, and asserted that further uncertainty would be introduced by adjustments to determine implicit costs.

Prato criticised Dexia for relying on these paragraphs in the way that it did. In particular Dexia relied on them to make an assertion, in effect, that it would have been unreasonable to expect disclosure of these matters. I am not persuaded of this assertion. I agree with Prato's first criticism, namely that since March 2009 banks have "unbundled" and disclosed various notional elements at the time when they propose a derivative transaction. Of course that may not tell the investor what the position will be at the time when the transaction is agreed upon. Nonetheless it is something which it is clearly possible for banks to do. In these circumstances I do not need to comment on Prato's other criticisms.

Paragraph 5.8 of Dexia's written closing submissions said that Dexia's presentations gave Prato clear information which was easy for Prato to understand. Taking the examples of Swap 4, Swap 5 and Swap 6, it was obvious that, all other things being equal, the lower the caps and floors, Prato stood to be better off, since this would reduce both the maximum and minimum rates payable by Prato. It was not necessary for Dexia to disclose the initial MTM of the Swaps to Prato for it to appreciate that basic point. Paragraph 5.10 added that Dexia had provided forward rate information.

Prato criticised Dexia for relying on these paragraphs in the way that it did. The essential criticism was that Dexia's presentations did not tell the customer the likelihood that the thresholds would be triggered, they did not quantify the value of expected payments, and they did not "reveal the net cost". Prato made a claim that the initial MTM did all these things. However, as regards "net cost" this claim is misconceived for the reasons given above. As regards the triggering of thresholds and the value of expected payments, the claim has no foundation. Those matters depend on future movements in interest rates, as compared with the rates and thresholds in the swap: see section F1.6 above.

Paragraph 5.9 of Dexia's written closing submissions made the point that it was open to Prato to obtain proposals from other banks, and Prato would not have

needed to know the initial MTM of the proposed swaps to compare the rates and thresholds proposed by Dexia with those proposed by others. Prato's response was that if Dexia had provided the initial MTM of its proposed swap this would have enabled Prato to consider whether or not to seek better terms or to seek competitive quotes. When I queried this, Prato's first response was that provision by Dexia of the initial MTM might have prompted it to do these things. That, as it seems to me, would be a matter for evidence. There was no evidence that merely disclosing the negative MTM might reasonably have been expected to lead Prato to consider seeking better terms from Dexia or anyone else. Prato's second response was that if Dexia had told it the size of the initial MTM, and that the initial MTM represented the expected cost on day 1, this might have caused Prato to say it would walk away or would seek competitive quotes. This second response is inherently flawed. It would have been quite wrong to say that the initial MTM represented the expected cost on day 1: see section F1.6 above.

**Regulatory counterclaim: non-disclosure assertions**

**Non-disclosure: introduction**

The primary feature relied on in the non-disclosure assertions is the failure by Dexia prior to each swap to disclose to Prato "the existence of the Hidden Costs …". An alternative feature is added: failure by Dexia, as regards the Hidden Costs, "to disclose their implications for 'economic convenience' in Art. 41 [of law 448/2001] and/or (in the case of the Fourth-Sixth Swaps) for compliance with Art. 3 [of ministerial decree 389/2003]". As to this alternative feature, however, I have concluded in sections D2.3 and D2.4 of the main claim judgment that none of the swaps had "implications" under either article 41 of law 448/2001 or article 3 of ministerial decree 389/2003. Accordingly in the present judgment I shall examine the primary feature of non-disclosure of "the existence of the Hidden Costs".

The main legislative provisions relied on by Prato in this regard comprise article 28.2 CR, along with the fundamental provision found in article 21 TUF. It must be borne in mind, however, that article 28.2 CR applies only to dealings between service providers and retail investors. Thus while article 28.2 CR is relevant to

dealings between Dexia and Prato, it has no application to cases involving dealings between service providers and qualified investors.

As noted in section F1.4 above, it is common ground that, in the present case, the obligation of transparency under article 21.1 TUF and the obligation to disclose adequate information under article 28.2 CR come to the same thing. Subject to one general question, it is accordingly convenient to begin in sections F2.3 to F2.6 below by examining article 28.2 CR before turning to other legal obligations concerning disclosure. Turning to those other obligations, the non-disclosure assertions specifically rely upon article 32.5 CR, a particular aspect of article 36.1 CR, and article 61.1 g) CR, as set out in section F1.3 above. They are discussed in section F2.7 below. Section F2.8 below sets out my conclusions in relation to Prato's non-disclosure assertions.

I now turn in section F2.2 to the general question mentioned in the preceding paragraph. The general question concerns the significance of a later regulatory development.

**Non-disclosure: significance of 2009 changes**

In relation to the non-disclosure assertions, each side said it gained support from a later regulatory development. This was Consob Communication n.9019104 of 2 March 2009 ("the Consob March 2009 communication"). The Consob March 2009 communication was published two years and eight months after swap 6 came into being. It made recommendations for illiquid securities, such as swaps. In that regard footnote (ii) defined "fair value" to mean:

> "Correct value" of a position determined using mark to market quotations …

Recommendation 1.2 envisaged (with the addition of sub paragraph numbers in square brackets for ease of reference):

Dexia Crediop SpA v Comune di Prato, 2016 WL 6609477 (2015)

[1]   "the so called unbundling of the different components of the aggregate financial cost borne by the client for the taking of the position in the illiquid product",

[2]   "distinguishing fair value (with separate indication of the derivative component, if any) and costs – also to be borne at a later stage – to be borne, implicitly or explicitly, by the client."

[3]   "The latter is provided with the indication of the disinvestment value of the investment in the moment immediately subsequent the transaction, assuming stable market conditions."

I am not in a position to decide what this means, as it was not examined in evidence. Mr Belarbi accepted that initial MTM is now disclosed, but he was not asked about the details. Prato submitted that the recommendation at 1.2 [2] above envisaged that the initial MTM should be disclosed. If so, what it envisages cannot, however, be the actual initial MTM, which will not be known until the transaction is agreed. Recommendation 1.1 made it clear that the relevant time for disclosure under recommendation 1.2 is "in the phase of proposal of investment transactions over illiquid products".

This, as it seems to me, is also made clear by the recommendation at 1.2 [3] above. It indicates that when an investment is at the proposal stage, in addition to the "fair value" as defined in footnote (ii), there is to be an additional indication. The additional indication concerns the financial consequences if the client were to change its mind immediately after the transaction had been executed. Recommendation 1.2 [3] recognises that, as was acknowledged by Dr Faro, the MTM can change substantially within a matter of hours. For this reason the "indication of the disinvestment value" is to

be given "assuming stable market conditions" between the time that the calculation is done for the purposes of the proposal and the "moment immediately subsequent the transaction".

By contrast, as regards information falling within recommendation 1.2 [2], no reference time is specified. Without seeking to decide the point, I comment that this appears to me to leave it up to the service provider whether to indicate the time at which calculations were made in order to arrive at the envisaged initial MTM. The service provider might also consider whether to warn that the actual values may change substantially from those calculated in advance.

Prato made a further submission about the provision in recommendation 1.2 [2] for disclosure of the initial MTM. It was submitted that such provision was "fatal for any argument that initial MTM is irrelevant for a counterparty or its disclosure in some way impractical." I cannot accept this submission. As to impracticality, I have noted above that it is impractical to specify the eventual initial MTM in a proposal. All that can be done is to indicate when the MTM was calculated for the purposes of the proposal, with a warning that this may well change substantially by the time the transaction is executed. As to the relevance of the MTM, the Consob March 2009 communication takes the view that "unbundling" is desirable, and that this should include a "mark to market quotation" calculated for the purposes of the proposal. It does not follow that such a procedure is necessary to provide investors with "adequate information on the nature, risks and implications of the transaction" within the meaning of article 28.2 CR. The meaning of that expression is a matter of law, and its application to the case in question is to be decided on the facts.

On behalf of Dexia Professor Gentili noted that the Consob March 2009 communication set out "level 3" provisions under 2004/39/EC Parliament & Council Directive of 21 April 2004 (the "Markets in Financial Instruments Directive" or "MiFID"). MiFID replaced 93/22/EEC Council Directive 10 May 1993 (the "Investment Services Directive" or "ISD") with effect from 1 November 2007. Professor Gentili noted in his first report that TUF was partially modified in compliance with MiFID by delegated decree number 164 of 17 September 2007, which came into force on

1 November 2007. Thus these partial modifications came into force on the date that MiFID took effect. It is not suggested by either side that any of these partial modifications are relevant to the present case. Nevertheless Professor Gentili in the same report identified two features as indicating that no duty to declare "implicit costs" to counterparties existed under Italian law prior to MiFID. The first feature was that MiFID expressly provided for such a duty. To my mind, however, this sheds no light at all on what duties did or did not exist under Italian law prior to MiFID. The purpose of MiFID was to make provision for EU and EEA member states. The nature of the provision decided upon generally for EU and EEA member states does not, in itself, indicate anything about the provision in Italy prior to MiFID. The second feature was that it was only in 2009 that the March 2009 Consob communication made recommendations for "unbundling". As to that, however, Consob's decision that it was desirable to issue such a communication in 2009 does not of itself give any basis for saying that on a proper understanding of Italian law there was no such obligation at times relevant to the present case.

**Non-disclosure – art 28.2 CR: agreed propositions of law**

Prato's Hidden Costs explanation equates non-disclosure of the existence of "Hidden Costs" with non-disclosure of the existence of an initial MTM which is negative to Prato, and/or of the existence of "implicit costs" in the same amount, at the start of the swap. I have already considered certain aspects of non-disclosure of the initial MTM and so-called "implicit costs". In section D2.3 of the main claim judgment I have explained why, if it were necessary to do so, I would have held that the initial MTM and so-called "implicit costs" were not actual costs for the purposes of article 41 of law 448/2001. In section C5 of the present judgment I have rejected the contention that a swap, for the purposes of Italian civil law, is "a legally authorised gamble" which will lack a "rational risk", and therefore lack *causa,* if the contract does not explicitly state "the value of the derivatives" and other elements which "have an effect on the risk assumed by the contracting party". I have also in that section noted the observation of Professor Gentili, which appears to me to be right, that while a party entering into a swap has a vital interest in doing so on a rational and informed basis, that vital interest is not part of the *causa* of the contract.

The questions which now arise overlap with, but are not in all respects the same as, the questions which are discussed in section D2.3 of the main claim judgment and in section C5 in the present judgment. In principle, there is a legal question as to the test under article 28.2 CR for identifying whether something falls within the category of what has to be disclosed, followed by a factual question as to whether in the present case the initial MTM and/or "implicit costs" fell within that category. Also in principle, expert evidence of Italian law is relevant to the first of those questions and not to the second.

Italian courts have, on occasion, sought the assistance of a court appointed expert in relation to MTM and "implicit costs". One of those occasions is mentioned in section D2.3 of the main claim judgment. As noted there, the Council of State in *Pisa I* appointed Dr Angeletti to report on relevant matters "according to criteria of economic-financial science". As also noted in that section, the Council of State in *Pisa II* reached a conclusion that "implicit costs" of a derivative "do not by any means constitute an effective cost … but merely stand for the value that the swap could have had in an abstract and hypothetical (but utterly unrealistic and untrue) negotiation". In that regard the Council of State indicated that the approach which it considered correct for the purposes of article 41 of law 448/2001 differed from the approach taken by Professor Angeletti, who had given negative weight to certain "implicit costs". Another case in which the Italian court appointed an expert was *Arosio* , where the first instance court, the Tribunal of Milan (criminal section), appointed Professor Corielli. Both these cases demonstrate that the expert's role is factual, not legal.

Many features of the legal framework relevant to disclosure obligations under article 21 TUF and article 28.2 CR give rise to no dispute. Section F1.4 above records matters which are common ground. Taking those which are relevant for present purposes, and renumbering them accordingly:

• (1)  contracting parties generally owe each other no duty of disclosure;
• (2)  the intermediary must, among other things, act diligently, correctly, transparently and fairly

Dexia Crediop SpA V Comune di Prato, 2016 WL 6833477 (2015)

… and operate in such a way that the investor is always adequately informed;

• (3) there is no express obligation on a bank to disclose an initial negative MTM value under relevant legislative provisions;

• (4) in the present case, the obligation of transparency under article 21.1 TUF and the obligation to disclose adequate information under article 28.2 CR come to the same thing;

• (5) the duty in article 21.1 moulds itself "to the characteristics of the particular client";

• (6) more detailed information must be provided to a retail investor, such as Prato, than would be the case with a qualified investor;

• (7) the information must be provided in such a way that it can be comprehended by "a retail investor that declares that it doesn't have a large knowledge of the financial market and of the law that governs this";

• (8) the obligation to provide information to a client incorporates an obligation to verify that the client has fully understood the information provided, recognising however that investors also have a duty to ensure that they understand and that there are limitations on what an intermediary can do to ensure that the investor has understood.

Dexia's no need to know factual proposition necessarily implies a legal proposition. It identifies a category of things which, as a matter of law, article 28.2 CR does not require to be disclosed. Dexia's submissions proceeded on the implicit, if not explicit, basis that, as a matter of law, this category comprised matters which there is no need to know when considering the nature, risks and implications of a proposed transaction in order to make an informed decision on whether to invest. I shall refer to this proposition as "the no need to know legal proposition". As it seems to me, the proposition does no more than to particularise, by reference to article 28.2 CR, the agreed proposition which I have numbered (4) at the start of this section.

Prato advanced certain propositions which were not accepted by Dexia. For present purposes there are two main propositions which call for discussion.

In her first report, after referring to article 21 TUF and article 28.2 CR, Professor Sciarrone Alibrandi

advanced what I shall call "Prato's first main disclosure proposition":

> …financial institutions are obliged to disclose all the relevant elements of the relevant investment services and instruments.

I have concerns about this suggested proposition. As regards a case such as the present, which is concerned with retail investors, the proposition appears plainly to be broader than article 28.2 CR. As noted above, it is common ground that in the present case the obligation of transparency under article 21.1 TUF and the obligation to disclose adequate information under article 28.2 CR come to the same thing. What is required by article 28.2 CR is the provision to investors of adequate information on the nature, risks and implications of the transaction, knowledge of which is needed to make informed investment and disinvestment decisions.

As to the approach to be taken by an Italian civil court, there is a helpful passage in a decision cited by Professor Sciarrone Alibrandi. I have in mind the decision of the Court of Appeal of Milan dated 28 February 2011. The case involved two claimants, the first of whom is referred to in the judgment by using the initials "CT". I shall accordingly refer to the case as *CT*. The claimants were retail investors and had been given the document on the general risks of financial instruments set out in Annex 3 CR. The Court of Appeal agreed with the claimants that this was insufficient disclosure in relation to a transaction for the purchase of Argentine bonds. In its reasons the Court of Appeal said this, with emphasis added by me:

> Moreover, since the essential purpose that inspires the legislation in question is to balance the so-called "information asymmetry" – that distinguishes the relationship between the intermediary and the non-qualified investor, it appears clear that *the required compliance can only be evaluated* with special

Dexia Crediop SpA V Comune di Prato, 2016 WL 6833477 (2016)

rigor *in relation to specific purposes that it is called upon to fulfil* , otherwise being able to dissolve into mere statements of only a formal observance with the provisions required.

What I shall call "Prato's second main disclosure proposition" was more specific. It was in these terms:

> With regard to derivative transactions, the prevailing Italian case law has clarified that a financial institution must inform the client of the existence of any hidden costs because this information is essential for the client to take fully informed investment decisions.

I do not accept that this is a proposition of law. To my mind, the question whether any particular piece of information is "essential for the client to take fully informed investment decisions" is a question of fact. That question of fact is to be decided, in any particular case, on the basis of the evidence in that case. In section F2.4 I consider the cases that were relied upon by Prato, while in section F2.5 I consider the cases that have been relied upon by Dexia. My analysis in relation to article 28.2 CR is set out in section F2.6.

**Non-disclosure – art 28.2 CR: Prato's cases**

The first decision relied on in Prato's closing submissions in this regard was a decision of the Tribunal of Orvieto on 13 April 2012. It concerned protective measures that were sought by an unnamed city against an unnamed bank in respect of 16 derivatives that had been entered into between the parties from 2001 onwards. I shall refer to it as *Orvieto grant of protection* . The decision on 13 April 2012 concerned a challenge by the bank to an earlier decision of the tribunal granting protective measures. The conclusion reached by the

tribunal on 13 April 2012 was that the earlier decision should be fully confirmed. As I understand it, this was an interim order providing for suspension of obligations on the part of the city to make payment until the final determination of the case in question. The city had signed various documents describing itself as a qualified investor, but the bank admitted that, after reviewing assessments it had made at the time, the true position was that the city was a retail investor. Consistently with this, the tribunal made a finding under article 61.1g) CR (which only applies to retail investors). I deal with this in section F2.7 below. As regards disclosure of information prior to the making of the contract, the passage cited by Prato did not specifically refer to the provisions applicable to retail investors in article 28.2 CR. Instead, a more general observation was made concerning article 21 TUF:

> …it is necessary to identify in this initial market imbalance a cost … the same would have to be adequately illustrated because it remunerates the business activity of the bank … while *they have limited themselves* to showing the true cost of the contract, without constituting, or only constituting in part, the lucrative margin of the bank, and this must be paid by the party to the contract who suffers an alteration from the natural conditions of the contract, moving an entire series of duties to provide information to the broker who is acting in accordance with the regulations in the sector (article 21 of the TUF) …

It is difficult to identify the proposition of law which gave rise to the tribunal's observations regarding article 21 TUF. The concern appears to be that the bank had not adequately illustrated the remuneration that it was to receive, with the result that there had been "an alteration from the natural conditions of the contract". If that was indeed the tribunal's reasoning, then it seems to me that it proceeds upon a misconception. For the

Dexta Crediop SpA v Comune di Prato, 2015 WL 06833477 (2015)

reasons given in section F1.6 above, as explained in the Mengle extract, there is nothing unnatural about the inclusion of a spread with a resultant negative MTM to the customer. On the contrary, this is the normal commercial way of providing for the bank's remuneration.

An alternative reading may be that the tribunal concluded that the initial MTM was an actual cost, or reflected actual costs, which would be incurred by the city if it entered into the swaps in question. If so, then this is also a misconception: see section F1.6 above.

The next case relied upon in Prato's closing submissions was a decision of the Tribunal of Pescara on 20 June 2012 in proceedings between the Comune di Penne and Banca Nazionale del Lavoro. I shall refer to it as *Penne* . This was a case where, in relation to each of two swaps between Penne and the bank, the contract provided for very substantial payments at the outset of the swap by the bank to Penne. These payments were known as "upfronts". The contracts also provided that Penne undertook to pay the bank "the fees stated in attachment A." Each swap included an attachment A in which the amount of the upfront was specified, but no costs or expenses to be paid by Penne were specified. Each swap also had a very substantial initial MTM which was negative for Penne. An expert appointed by the tribunal had calculated that in large part this negative differential accounted for the cost of the upfront in each case. However there remained a substantial part of the initial MTM, in broad terms somewhere between a quarter and a third, which was not accounted for in this way. The tribunal upheld Penne's claim to recover the amount of the MTM which was not attributable to the upfronts. The tribunal's judgment, at an early stage, cited Annex 3 CR for the proposition that "the contracting parties shall agree on the fact that he discounted-back algebraic sum of the positive and negative flows of the exchanged options shall be equal to zero". The tribunal stated, at a later stage in its judgment:

> …the upfront composes an immediate payment in favour of the other party. The agreement value for the counterparty is negative the higher it is and it is clearly due to the acceptance of a greater risk.

It is clear that as the upfront composes a valid indicator of the existence of a financial risk concerning the related contractual structure, it firstly concerns an issue of the trustworthy advice of the finance broker. Given "the duty to conduct oneself with care, accuracy and transparency in the client's interest" ( article 21, paragraph 1 , letter a of the TUF) related to the finance brokerage agreement, this generally means (where the Bank is not acting as financial broker; however, as direct counterparty to the transaction as in the matter at hand) that the Bank is under a duty to act with good faith (or conforming to the duty regarding cooperation and the provision of information) in the developments of the negotiation and contract drafting (article 1337 of the Italian civil code).

Therefore, the Bank's duty regarding information and transparency toward the client is also relevant in relation to the so-called implied fees, that is, the fees encashed by the Bank, able to be calculated by the difference between the mark to market (mtm means the estimated market value of the agreement that is discounting-back the expected cash flows) of the Authorities payments and the mark to market of the payments for which the Bank is liable. The financial broker's omitted or part payment of the upfront illustrates the implied fee encashed by the Bank.

It follows that, if it is true that the Bank (both in its role

WESTLAW    © 2017 Thomson Reuters.

Dexia Crediop SpA v Comune di Prato, 2016 WL 6833477 (2015)

as finance broker and direct contracting party) is under a duty in relation to information regarding the nature, risks and implication of the transaction that the parties shall draw up, such duties (concerning the negotiation of derivatives) shall firstly concern the accurate illustration of the derivative mechanisms to the client. The latter shall be in such a way that the client is properly informed regarding the suitability of the financial instrument to attain the hedging purpose theoretically required prior to agreement execution. Furthermore, the same agreement shall clearly state the true costs of the structure, therein expressly including the derivative production costs charged to the client and the actual margin earned by the bank counterparty.

It is not clear from the report whether Penne was a qualified investor. For the reasons given in section F2.6 below it seems to me that the reasoning of the tribunal has proceeded upon an inaccurate understanding of Annex 3 CR. Putting that on one side, however, the reasoning of the tribunal starts with the proposition that the duty in article 21 TUF to act with care, accuracy and transparency also entails good faith in "conforming to the duty regarding cooperation and the provision of information", and that whether the bank is a finance broker or is a direct contracting party, it has a duty as regards information concerning the nature, risks and implications of the transaction. The tribunal here tracks the wording of article 28.2 CR, which is applicable to retail investors only. On the assumption that Penne was a retail investor, it seems to me that there is nothing controversial about these propositions if they are confined, as set out in article 28.2 CR, to those matters of which knowledge "is needed to make informed investment … decisions". Nor in my view is there anything controversial about the propositions that in accurately illustrating the derivative mechanisms

the client must be properly informed regarding the suitability of the swap to attain the hedging purpose of the client. The tribunal however, moves straight from these propositions to an assertion that there must be a statement of "the true costs of the structure … including the derivative production costs charged to the client and the actual margin earned by the bank …". No explanation is given for this assertion. The assertion involves a factual conclusion which is inconsistent with the evidence in the present case.

The third decision relied upon in Prato's closing submissions was also a decision of the Tribunal of Pescara, on this occasion dated 24 October 2012. It is one of a number of decisions arising in proceedings between the Comune of Pescara and a bank, which is not identified in the judgment. In order to distinguish the decision of 24 October 2012 from other decisions involving Pescara I shall refer to it as *Pescara reimbursement* . There was a series of swap contracts between the parties. Those relevant for present purposes were described as the first and second contracts. The part of the decision of 24 October 2012 which arises for consideration related to a request by Pescara for "reimbursement of the so-called implicit commissions that were allegedly applied to the first and second contracts". As to what these "implicit commissions" were, the tribunal explained that they:

> …are attributable to the difference between the Fair Value of the swap contract and the amount effectively paid out by the Bank as upfront.

At an early stage in its judgment the tribunal noted that an expert witness had been appointed. It commented that there was no reason to discard the "technical reconstruction of the implicit commissions drawn up by the expert …". However, the tribunal added that it could not agree with the expert's evaluations "regarding the 'adequacy' of these same implicit commissions". In particular, the tribunal stated:

> …we cannot … accept the justification of the implicit commissions, recognised in the

bank's right to compensation for the service offered (the funding of or hedging for the exchange of financial flows) supplied by the bank …

The first reason given by the tribunal was that there were no contractual provisions regarding the application of commissions. Moreover, said the tribunal, no agreement had been reached in that regard.

The second reason given by the tribunal concerned provisions of local government law which I have dealt with in section D of the main claim judgment, and do not call for further comment here. It was after elaborating that second reason that the tribunal added:

> The rejection of the application of implicit commissions also appears to comply with the requirement of compliance, on the part of the Bank, with known obligations of honesty and transparency.

I am prepared to assume that the tribunal had in mind article 21 TUF, and perhaps article 28.2 CR as well. There is no express explanation by the tribunal as to why those obligations call for disclosure of "implicit commissions". This is a factual conclusion which is inconsistent with the evidence in the present case.

Prato's oral closing then turned to cases which I have discussed in section C5 above: *Gommeservice* , *Municipality of C* , and *Turin Mortgage Swap* . For the reasons given in section C5, I am persuaded by Professor Gentili that the approach taken to the question of *causa* in *Gommeservice* does not represent Italian law. The *causa* in a swap is to be found in the exchange of amounts of the relevant cash flows. It is not, as was held in *Gommeservice,* to be found by asking whether there has, in concrete terms, been a "rational wager". It was not necessary in that context for me to examine the reasons why it was said that a lack of information led to the absence of a "rational wager".

Reasons why that conclusion was reached in *Gommeservice* were put to Professor Gentili. Professor Gentili agreed that the reasons in question were indeed those found in the judgment in *Gommeservice* . As to those reasons:

• (1)  "Implicit costs" need to be disclosed to inform the investor of the magnitude of the risk that it will be a net payer under the swap: for the reasons given in section F1.6 above, however, this is a misunderstanding. All that the "implicit costs" will disclose is the extent to which the rates will give Prato a spread designed to cover its costs and a margin. The magnitude of the risk for Prato is entirely different: the spread will not change but the risk is open to market fluctuations.

• (2)  If the investor is to make an informed decision to enter into the swap "that is a risk it needs to know about": there can be no doubt that the risk that the investor will be a net payer under the swap is a risk that the investor needs to know about. That involves a judgment as to how market conditions may change over the life of the swap. Such a comparison is made against the terms in the swap. It does not depend upon the initial notional mid-market interbank rate at inception, nor does it depend upon the amount of the bank's spread from that initial notional rate.

• (3)  It is essential that the initial mark to market value be explicitly disclosed: on the evidence in the present case, this does not appear to me to be essential at all.

• (4)  In addition to disclosing the initial mark to market, the criteria for determining withdrawal penalties ought also to be disclosed: Prato's statement of case in the present proceedings is confined to failure to disclose the "Hidden Costs" as described in Prato's Hidden Costs explanation. This includes the existence of a negative initial mark to market, and the existence of implicit costs, but Prato does not complain about any lack of information concerning the criteria for determining withdrawal penalties.

• (5)  Anything less than this would deprive the investor of the ability to make a rational decision: for the reasons set out above I disagree.

• (6)  Disclosure of the initial MTM gives "a firm anchorage point" at the time of entering into the

Dexta Crediop SpA V Comune di Prato, 2016 WL 6868427 (2015)

contract for the quantity and the quality of the risks being assumed: for the reasons given above, this conclusion is not established by the evidence in the present case.

The judgment in *Gommeservice* begins by setting out facts which "provide an initial picture of negligence on the part of the bank which treated as a qualified operator a client that it knew did not have that status …". It observed that accordingly provisions contained in articles 27, 28 and 29 CR and "the reporting obligations contemplated therein for protection of the investor" applied in full. It observed that whatever the status of the investor, the bank remained answerable for obligations in article 21 TUF. It added that in the negotiation of interest rate swaps the obligations found in article 21 TUF were of particular significance. It continued:

> When negotiating an interest rate swap the broker must provide the client with specific advice, regardless of whether or not a consultancy contract has been entered into for that purpose, based solely on the assumption that the very nature of the financial instrument requires that in the definition of its contents – and thus the conditions relating to risk – the broker takes the client's best interests into account, …

The court then observed that the bank was dealing on its own account, and in that regard was subject to provisions that preceded MiFID, adding:

> …the contracting of over the counter derivative contracts brings with it a natural state of conflict between the broker and the client because the same party has the status of both offeror and consultant.

The judgment then set out relevant principles of article 11 ISD, and noted that they were fully incorporated into article 21 TUF in the version that applied at the time of the events in question. The court then added:

> It has become a well recognised principle that the [service provider] must act taking the investor's best interests into account, essentially as a party working together with the latter, protecting the integrity of the market, as a principle of economic public order (art. 21 of the TUF) …

After some further preliminary observations the judgment then turned to set out the reasoning in relation to *causa* which is summarised section C5 above. In the course of those observations the judgment noted that the reporting obligation under TUF and CR did not, if breached, constitute a ground for invalidity, and that certain aspects of those obligations were "translated into the broker's (active and passive) obligations to provide information". At a later stage the judgment observed that the bank had not offered a reasonable justification in support of supposed suitability of the financial product for satisfying its client's requirements, thereby violating the fundamental rule of conduct laid down in article 21 TUF.

No further mention is made in the judgment of TUF or CR. As it seems to me, the observation made about TUF and CR do not involve any proposition of law going beyond the common ground indentified earlier. Moreover, as is acknowledged by Prato, the court in *Gommeservice* does not specifically address the question whether requirements for disclosure found in TUF and CR were actually breached on the facts. Prato noted, however, that the court had identified elements necessary for there to be a rational risk, and one of those elements was disclosure of any implicit costs. In those circumstances Prato submitted that it must follow that a bank which had failed to disclose implicit costs will not have acted "diligently, correctly and transparently in the interests of customers" (article 21 TUF). Nor would it have provided the investor

Dexta Crediop SpA v Comune di Prato, 2016 WL 6833477 (2016)

with "adequate information on the nature, risks and implications of the transaction … knowledge of which is needed to make informed investment and disinvestment decisions" (article 28.2 CR). In this regard, as it seems to me, Prato is advancing a proposition of fact rather than a proposition of law. For the reasons given earlier, the evidence before me does not establish that either the initial MTM or the "implicit costs" have an effect on the risk assumed by the investor. For these reasons I conclude that *Gommeservice* does not assist Prato.

The next decision relied upon by Prato was *Turin Mortgage Swap* . The judgment in that case made the same link as Prato between the disclosure needed to ensure a concrete *causa* pursuant to *Gommeservice* and the bank's obligation of transparency under TUF. For the reasons given when discussing the link made by Prato, the link made in *Turin Mortgage Swap* does not assist Prato in the present case.

Prato also relied upon *Municipality of C* . In that case, however, the judgment involved no discussion of obligations of disclosure under TUF or CR. The result is that the judgment does not assist Prato in the present context.

The final decision relied upon by Prato for present purposes was *Novital* (see section C5.3 above). The parties had entered into an interest rate swap on 4 August 2008. At that stage (see section F2.2 above) TUF had been partially modified in compliance with MiFID. Neither of the parties in the present case suggests that those partial modifications had any effect on the aspects of the decision now relied upon by Prato. Also in compliance with MiFID CR had been replaced by a new regulation. The *Novital* decision, however, makes no reference to any Consob regulation. Again, the parties in the present case do not suggest that there is any feature of the replacement Consob regulation which has relevance to the aspects of *Novital* which are relied upon by Prato. It may also be noted that the Consob March 2009 communication had no application to the contract, it having been made a little over six months before that communication.

In *Novital* the tribunal rejected certain aspects of the claim. As noted in section C5.3 above, among the aspects rejected was an assertion that there was a lack of concrete *causa* . The claim succeeded, however, in

relation to assertions that there had been a breach by the bank of article 21 TUF, that this breach was so serious as to entitle the claimant to terminate the contract, and that in consequence the bank was liable to return to the claimant "all the amounts paid for the swap's negative differentials".

The conclusion arrived at by the tribunal seems difficult to reconcile with the decisions of the joint chambers of the Court of Cassation in *Fincom Valori* and *GL* . Neither of those cases is mentioned in the tribunal's judgment. For present purposes, however, the principal question arising concerns whether the tribunal proceeded on the footing that article 21 TUF had a meaning going beyond the common ground identified earlier.

For this purpose I set out below, with the addition of paragraph numbers in square brackets, the passage in the tribunal's judgment that Prato relies upon:

> [23]    Basically, if the fact that the transaction can establish, since the beginning, an imbalanced risk distribution between the parties does not affect the lawfulness of the transaction, it is in any case necessary that the parties are fully aware of it and, therefore, that an assessment on whether or not enter into the contract pursuant to certain parameters is made consciously and rationally by both the contractors.

> [24]    Therefore, each of them can assume the risks involved in this type of contract to the extent they prefer, unless, of course, they are in a position to understand the accepted risk.

> [25]    These considerations on the risk accepted by entering into the derivative are particularly important if we consider the financial intermediary's obligation of information provided by Article

21 of the TUF, which, after having stated that the intermediary must act in the client's interest, establishes something that goes beyond the good faith principle which must characterise the contractual and pre-contractual relationships between the parties (see Articles 1337, 1358, 1366, 1370, 1375 of the Italian Civil Code), this principle implies that the parties are on the same level and that both understand that they are entering into a contract aimed to reach their own interest worthy of protection (Article 1322, paragraph 1, of the Italian Civil Code); as far as the relationship between the intermediary and the investor is concerned, the bank should act taking into account the best client's interest, which is a principle deriving from the obligation of information and maximum transparency, that requires the intermediary to disclose to the clients both the risk to which they are exposed in dealing with the investment – investment that, therefore, could not be in line with the client's interest – and their own interest which, in that transaction, is opposed to the client's one.

[26] This implies that the intermediary shall provide to the counterparty correct information on all the contractual elements which may affect the same and the risk that it is inevitably going to take.

[27] Well, in the present case, the expert advice asked by the judge confirmed the claimant's allegations, highlighting, when decomposing the contract, that it contained implicit fees, i.e. unrevealed charges to be borne by the claimant.

[28] This aspect was not disputed by the defendant which, making reference to the expert's considerations on this aspect, stated that this charges were completely balanced with the need to ensure the bank an adequate consideration for both credit risks and costs incurred.

[29] So it has to be noted that such profitable charge for the bank had to be disclosed when the contract was entered into, in order to allow the counterparty to assess the opportunity and convenience of the same.

[30] Then, regardless the fact that, with reference to this contractual element, the claimant did not provide an aware approval, the hidden insertions of it not only led to a benefit for the defendant, but even before and in particular it made the contract imbalanced during the time, causing an initial swap's negative value (Mark to Market) which was not known by the counterparty. The incidence of such initial data, in fact, is important not only as it consists of an expense incurred at the moment the contract was entered into, but also as it is an element that altered the apparent balance of the different risks, modifying the mechanism for the cash flows' exchange under the terms agreed by the parties."

As it seems to me, it is clear from the opening words of paragraph [25] that paragraphs [23] and [24] describe "considerations on the risk accepted by entering into the derivative". It seems that those considerations are that,

Dexia Crediop SpA v Comune di Prato, 2016 WL 6833477 (2016)

while it is lawful for the swap to have "an imbalanced risk distribution between the parties", it is "in any case necessary that the parties are fully aware of it" so that "an assessment on whether or not [to] enter into the contract pursuant to certain parameters is made consciously and rationally" by both parties.

The relevance of these considerations is explained in paragraph [25] by reference to article 21 TUF. The tribunal first makes the point that even without article 21 TUF the good faith principle under the civil code implies that the parties are on the same level and understand that they are entering into a contract in which each aims to reach its own interest worthy of protection. The tribunal notes that article 21 TUF goes beyond this, for it requires the bank to act, in the words of article 21, "transparently in the interests of clients".

Thus far, as it seems to me, the legal principles identified by the tribunal do not identify any duty on the bank greater than is common ground in the present case.

Putting on one side for the moment the final passage in paragraph [25], the tribunal's discussion of the law ends at paragraph [26]. That paragraph identifies (with emphasis added by me) an obligation on the bank to provide "correct information on *all the contractual elements which may affect [the investor]* and the risk that [the investor] is inevitably going to take". Here it seems to me that the tribunal has expressed too broad a proposition of law. The reasons given above when rejecting Prato's first main disclosure proposition, apply equally to paragraph [26].

In the passage at the end of paragraph [25], there appear to me to be three elements:

• (1) The bank is required to disclose to the investor the risk to which the investor is exposed by reason of the proposed investment;
• (2) The proposed investment is one "that, therefore, could not be in line with the client's interests"; and
• (3) The bank is required to disclose to the investor the bank's own interest which, in that transaction, is opposed to the investor's interest.

I shall defer, for the time being, any discussion of element (3). It raises questions which I discuss in sections F4 and F6 below.

As to element (1), this is a proposition of law which imposes no greater duty upon the bank than is common ground in the present case. Element (2) appears to me to be a proposition of fact. For the reasons given in section F1.6 it appears to me to be based upon a misconception.

Prato's closing submissions referred to a passage in Professor Gentili's cross examination. As I understood Professor Gentili, he was accepting that the tribunal considered the initial negative MTM to be "a risk for the investor" and that the tribunal considered that "the investor must know it in all its details". Those matters involve conclusions of fact which are not borne out by the evidence in the present case.

### Non-disclosure – art 28.2 CR: Dexia's cases

In the present context Dexia relies primarily on three decisions. The first of the three is *Pisa II* . In section D2.3 of the main claim judgment I hold, in reliance upon *Pisa II* , that "implicit costs" do not constitute an effective cost for the purposes of article 41 of law 448/2001. Dexia suggests that *Pisa II* also supports its contention that article 21 TUF and article 28.2 CR imposed no obligation to disclose "implicit costs" or the initial MTM of a swap. In this context it is necessary to give a short account of the judgment in *Pisa II* .

On 4 July 2007 the Province of Pisa entered into two identical interest rate swap transactions. One was with Dexia. The other was with Depfa Bank Plc ("Depfa"). However a subsequent report criticised the swaps. A resolution dated 29 June 2009 purported to annul the resolutions by which Pisa had entered into the swaps. Dexia and Depfa challenged the annulment. The Regional Administrative Court of Tuscany accepted part only of the assertions made by Dexia and Depfa. Assertions which were not accepted included the assertions about article 41 of law 448/2001 discussed in section D2.3 of the main claim judgment. Dexia and Depfa appealed to the Council of State. In *Pisa I* the Council of State ordered a report to be drawn up by an official technical consultant to the Council of State to ascertain whether these swaps complied with article 41, and specifically whether the swaps entailed

Dexia Crediop SpA v Comune di Prato, 2016 WL 6833477 (2016)

implicit costs which had not been declared or of which no knowledge could be obtained. Sections 1 to 12 of the judgment in *Pisa II* dealt with this course of events, noted that the court had appointed Dr Angeletti as the technical consultant, and dealt with various procedural matters.

Section 13 of the judgment gave an account of the conclusions and reasoning of Dr Angeletti. Dr Angeletti used the term "implicit costs" in a special sense. Prato's Hidden Costs explanation said that the initial negative MTM value of each swap represented "implicit costs of the [swap] to [Prato]". Dr Angeletti, however, used "implicit costs" to mean such part of the initial value of the MTM as was not accounted for by fair value adjustments. These adjustments formed a component, referred to as "DFV", which in broad terms allowed for the extent to which risks that the banks undertook in relation to Pisa were greater than they would have been if the banks' counterparty had been another bank. The judgment used the term "implicit costs" in a similar way.

On this basis, paragraph 13.1.9.2 of the judgment recorded, among other things, that Dr Angeletti stated that there was no definition of implicit costs in the regulations, and that this meant that the banks were under no corresponding obligation to supply information in this respect. Paragraph 13.4.5.2 recorded, among other things, Dr Angeletti's explanation that the banks were under no obligation to declare "implicit costs" to Pisa, as no such notion could be derived to article 21 TUF, nor could it be derived from CR as in force at the relevant time.

In addition, paragraph 13.4.6 of the judgment noted that Dr Angeletti had described the nature of the DFV component. It added that:

> …these are only virtual cost components, because … a local authority does not possess the requirements necessary to gain direct access to [the swaps] market. …

The judgment also noted in paragraph 13.4.6 that Dr Angeletti had emphasised:

> …the merely hypothetical nature of the initial estimates of the single components, which, while supported by mathematical and statistical processes, determine the virtual rather than the effective characteristics.

In sections 14 and 15 the judgment dealt with an objection made by Pisa to Dr Angeletti's observations. It rejected that objection, commenting that the role of Dr Angeletti was:

> …to verify (and procure) all the evidence, both technical and otherwise, which existed and was known or could have become known, at the time … not to pass judgment on the decisions taken by the authority, but solely with a view to carrying out a precise assessment of the underlying facts on which the administrative power was exercised (and therefore to establish whether this was exercised correctly, in the full and due knowledge of all the factors necessary for that purpose.

Section 16 of the judgment held, among other things, that in evaluating "financial advantage" for the purposes of article 41 of law 448/2001 the entire transaction, and not the swap agreements alone, must be examined. In paragraph 16.3.2.1 the judgment included the following:

> …on the basis of the lucid, detailed and consistent clarifications provided by [Dr Angeletti], it has to be noted that the so-called "implicit

costs" of the swap … do not by any means constitute an effective cost, that is, a sum effectively paid out by the Province, but merely stand for the value that the swap could have had in an abstract and hypothetical (but utterly unrealistic and untrue) negotiation …

The judgment noted that the implicit costs in question, even if they had been of significance, would not in themselves have been sufficient to lead to a negative evaluation of the "financial advantage" of the overall transaction.

At paragraph 16.3.2.2 the judgment referred to a question as to whether any implicit costs involved had to be made known to Pisa by the banks or whether Pisa could have obtained knowledge of them directly. The judgment stressed that, in relation to the matter before the Council of State, this did not concern possible violation of pre-contractual disclosure obligations but rather:

> …the more general full and precise knowledge of the underlying facts in respect of which the administrative power was exercised.

Having said this, the judgment went on to observe that:

> …there is no evidence, not even circumstantial, of any incorrect, unprofessional and non-transparent conduct aimed at not serving the best interests of the customer (pursuant to the terms of article 21 [TUF] …), nor can we assume that the appellant banks acted without procuring the necessary information from the customer and without ensuring that it was adequately informed at all times, as such

assumptions are denied by the very characteristics of the swaps stipulated … which were clearly adapted to the specific requirements of the provincial authority.

Dexia placed reliance about what was said in *Pisa II* concerning article 21 TUF. In that regard I do not attach significance to what was said in paragraphs 13.1.9.2 and 13.4.5.2 of the judgment. They simply record the view of Dr Angeletti.

More significant, to my mind, is what is said in paragraph 16.3.2.2 of the judgment. As noted above, it began by recognising that the Council of State's role was to consider an administrative law question, and that this was different from the civil law question of pre-contractual disclosure. Nonetheless, the judgment went out of its way to acquit the banks of any breach of article 21 TUF. In that regard the Council of State specifically found that there had been no failure by the banks to ensure that Pisa was adequately informed at all times. In the second passage quoted above the Council of State does not expressly identify what it understood to be the extent of the obligations under article 21. There can be no doubt that the Council of State was unconcerned about the failure on the part of the banks to advise Pisa of the initial MTM, the DVF forming part of the initial MTM, or the "implicit costs" forming the remainder of the initial MTM. It seems to me that the obvious reason for this is that the Council of State had already, in preceding paragraphs of its judgment, noted what Dr Angeletti had said about the "virtual" and "hypothetical" nature of the DVF, and the Council of State's own conclusion, founded upon the observations of Dr Angeletti, that the "implicit costs" did not constitute an effective cost but represented a value which was abstract, hypothetical, utterly unrealistic, and untrue. These are, to my mind, all findings of fact which are consistent with the evidence in the present case.

Prato points out that Pisa was classified as a qualified investor. That is true. It is also true that Dr Angeletti thought that Pisa would have been able to work out the MTM for itself. These may be additional reasons why

the Council of State was unconcerned by the failure to disclose the MTM or its components. Nevertheless, it seems to me that they do not detract from the obvious reason identified above. It is, of course, common ground that the duty of disclosure under article 21 TUF moulds itself to the characteristics of the client, and that article 28.2 CR applies only in the case of retail clients. Nevertheless it can fairly be said that the Council of State stressed in emphatic terms that the "implicit costs" were "utterly unrealistic and untrue". The fact that an investor was classified as a retail investor only would not render the "implicit costs" any less unreal and untrue.

Prato added that there had been no advisory agreement between Pisa and the banks. I deal with this in section G below.

Prato asserts that neither the Court of Appeal of Milan in *Gommeservice,* nor the Court of Appeal of Bologna in *Municipality of C* , considered that the approach taken in *Pisa II* to the nature of "implicit costs" should be adopted. As to that, however, there is no indication in either of these decisions that the court in question had been referred to what was said in *Pisa II* . In any event, the analysis of whether "implicit costs" fall within relevant disclosure obligations is, as explained earlier, a question of fact rather than law.

The second case relied on by Dexia was the decision on 18 April 2014 in *I SPA* . As noted in section C5 above, the civil section of the Tribunal of Turin in this case declined to follow the approach to *causa* taken in *Gommeservice* . An initial argument raised by the claimant concerned an alleged failure to give due disclosure. The tribunal concluded that the claimant had been well apprised of the hazardous nature of an IRS and the financial risk of the product, which could (as happened to Prato in the case of swap 6) be resolved to the disadvantage of the client in the event of lower interest rates. The tribunal was plainly unconcerned by the failure on the part of the bank to disclose the initial MTM or any "implicit costs" (whether in the sense used by Prato in the present case or in the sense used by Dr Angeletti). As it seems to me the obvious reason for this conclusion is found in paragraphs [2.4.7] and [2.4.8], quoted in section C5 above. There the tribunal identifies the hazard to the investor as arising from the variation of interest rates over time in the light of

the terms of the contract. It is true that the tribunal, in a separate part of its judgment, identified matters which entitled the bank to proceed upon the basis that the claimant's representatives were professionally qualified and perfectly able to understand and manage the financial products involved in the case. Again, this does not seem to me to detract from the obvious reason why, in the light of its findings, the tribunal was unconcerned by the failure to disclose initial MTM or "implicit costs".

The third main case relied upon by Dexia in this context was *Arosio* . This is another case which is mentioned in section D2.3 of the main claim judgement. I noted in paragraph 167 of that judgment that the decision in that case was made by the criminal division of the Court of Appeal of Milan. At paragraph 171(3) I noted that the decision in *Arosio* gave support to the way in which the Council of State had approached the requirements of article 41 of law 448/2001. In addition, in paragraph 180 I set out a citation from *Arosio* where the court commented on *Pisa II* . The first comment in that passage noted that the Council of State had felt that on no account did "implicit costs" represent an actual cost, that is to say an amount actually sustained by the investor. The second comment noted in the same passage was that the Council of State had concluded that the "implicit costs" represented a theoretical value in a context which was "abstract and hypothetical" (albeit unrealistic and untrue). I dealt in paragraph 181 with two points made by Prato when responding on this aspect of *Arosio* . At paragraph 181(1) and (2) I explained why it did not seem to me that these points detracted from the force of what was said in the passage that I have cited.

As to the relevance of *Arosio* in the present context: there is a clear conclusion by the court that the banks in that case were under no duty to disclose the initial MTM. Nor were they under duty to disclose any "implicit costs". Nor were they under duty to disclose "margin". As noted in paragraph 14 of Gentili 4, the court considered that Italian law imposed no duty on banks to disclose the profit that they expect to make on a transaction. Moreover, paragraph 16 of Gentili 4 noted that transparency requirements under article 21 TUF were satisfied if the rates and thresholds in the swap confirmation were disclosed by the bank to the customer. All of these conclusions arose, in my view,

by making findings of fact when applying propositions of law essentially similar to those which are common ground in the present case.

Prato commented that the case was about the offence of contractual fraud, and that much was said in the judgment which was not strictly necessary for disposing of that criminal charge. That is true. However, one of the criminal charges asserted that the banks were under a duty to disclose the margin and the implicit costs of the swap and the initial MTM to the customer. Thus, to my mind, the passages that I have drawn attention to above were passages which properly formed part of the court's reasoning for concluding that the defendants had not been guilty of any offence.

Prato rightly points out that a civil court would not be bound by the decision in *Arosio* . However, Prato then goes on to assert that Professor Gentili accepted that the judgment in *Arosio* did not adopt the reasoning set out in the passage cited at paragraph 180 of main claim judgment. There was no acceptance of this by Professor Gentili. His only comment when the point was put to him was that he would have to read the judgment again. Reading the judgment, it appears clear to me that it proceeds upon the footing that what was said in *Pisa II* in this regard was right. As with earlier cases, Prato stresses that this is a judgment concerning the relationship between banks and a "qualified" investor. My analysis in relation to this point is the same as in relation to those earlier cases.

### Non-disclosure – art 28.2 CR: analysis

My analysis is that in the absence of special circumstances, no good reason has been identified for going beyond the no need to know legal proposition. In particular, as regards "costs", factors said to constitute "costs" fall within article 28.2 only to the extent that the investor needs to know about them in order to understand about the nature, risks and implications of the transaction. There are three broad reasons for this conclusion. The first reason is that this conclusion is consistent with the approach taken by the Court of Appeal of Milan on 28 February 2011 in the case of CT . In my citation from the judgment in that case (see the start of section F2.4 above), the court discussed the essential purpose of legislation imposing a regulatory duty of disclosure. It is to redress the balance, and thus

compensate for "information asymmetry". The Court of Appeal of Milan notes that the service provider's compliance with the obligation of disclosure must be evaluated with special rigour. That rigour is to be used in relation to the "specific purposes that [disclosure] is called upon to fulfil". As regards article 28.2 CR those specific purposes have been spelt out. They are to provide adequate information on "the nature, risks and implications" of the transaction, knowledge of which is needed to make informed investment decisions.

The second main reason concerns the Italian decisions relied upon by Prato. As discussed in section F2.4 above, the observations in *Orvieto grant of protection* , relied upon by Prato, were based upon misconceptions. The propositions of law found in *Penne* assumed that the MTM represents "derivative production costs charged to the client". For the reasons given in sections F1.6 and F1.7 above, this is a misconception. The tribunal added that there must be a statement of "the actual margin earned by the bank": this aspect is discussed in section F2.8 below. The decision in *Pescara reimbursement* gives no reason for saying that "known obligations of honesty and transparency" required disclosure of "implicit commissions". Moreover, for the reasons given in sections F1.6 and F1.7 above, the tribunal's assumption that initial MTM represented amounts received by the bank was incorrect. The trio of cases about *causa* do not, as regards duties of disclosure, involve any proposition of law going beyond what is common ground in the present case. The analysis in those cases of the impact of the initial MTM is, for the reasons given in sections F1.6 and F1.7 above, not borne out by the evidence in the present case. In *Novital* the tribunal's discussion of the law involves the flaw identified in section F2.3 above when discussing Prato's first main disclosure proposition.

My third reason concerns the cases relied upon by Dexia. As explained in section F2.5 above, the courts in those cases have applied propositions of law which are essentially similar to those which are common ground in the present case. On the basis of those propositions of law, conclusions had been reached which are consistent with the conclusions that I reach on the basis of the evidence before me.

Prato observed that in a civil case like the present, the question which I must consider is what the civil division

of the Court of Cassation would conclude to be the true position under Italian law. Thus, said Prato, decisions of the civil will have much greater weight than decisions of administrative and criminal courts. I accept that that will generally be the case. But in the present context I am concerned with a decision of the highest court, of comparable standing with the Court of Cassation itself, in the field of administrative law. In the field of criminal law, I am concerned with a decision of the criminal section of the same court, the Court of Appeal of Milan, as is relied upon Prato. Moreover, and to my mind particularly importantly, *Pisa II* and *Arosio* are decisions which involve a detailed and careful examination both of the law and of the facts. These matters are inherently more likely to influence the civil section of the Court of Cassation than the fact that the decisions are not decisions of civil tribunals.

I turn to consider whether there are special circumstances affecting the present case. It is convenient here to consider a passage in Annex 3 CR to which Prato attaches particular importance.

Under article 28.1b) CR Dexia was required to provide Prato with a copy of Annex 3 CR. As can be seen from Annex 2 to the present judgment, the document began by stressing that it did not describe all the risks and other important aspects of investments in financial instruments. It stated that its purpose was to provide "some basic information on the risks connected with such investments …". It can also be seen that the introductory section of Part "B" stressed that derivative financial instruments were characterised by a very high degree of risk, which it was difficult for investors to assess because of the instruments' complexity. Section 4 of Part "B" also stressed that before engaging in such activities investors should collect all relevant information about the transaction, the applicable rules and the consequent risks.

The passage in Part "B" to which Prato attaches significance is found in section 4.1) of that Part. This contains a sentence which begins with an introduction containing a statement that the value of a swap is always nil at the time the contract is signed. That introduction is followed by the remainder of the sentence, giving a warning that the swap can rapidly assume a negative (or positive) value depending on the behaviour of the parameter to which the contract is linked.

Prato relies on this for two purposes. First, it says that this passage demonstrates that Consob considered the MTM of a swap to be significant information for an investor. That does not seem to me to be the case. There is no express reference to MTM. What is stated, immediately after passage cited by Prato, is that before signing contracts, investors should be certain they understand how and how quickly variations in the reference parameter are reflected in the calculation of the differences they are to pay or receive. That is not a calculation which requires any consideration of MTM.

Second, Prato pointed out that the statement was correct only in relation to a notional par swap. Mr Sommavilla said in cross-examination that he read Annex 3 to Ms De Castelli. He was asked whether, after reading the sentence now relied upon by Prato, he had said to her, "but actually you must know that that's not correct". He accepted that he did not say this. When asked why, he gave two reasons. Prato rightly says that neither of those two reasons made sense, and that the value to Prato of each swap was negative at the time that it was signed. It is nonetheless difficult to see how this evidence assists Prato, for there was no evidence from Ms De Castelli that she relied upon what was said in this particular passage of Annex 3.

To my mind, Prato's approach reads too much into a single remark. The concern of Consob in Annex 3 is to warn investors about the dangers of rapid changes in market rates. The statement which is asserted to be incorrect is no more than a starting point from which to set out this warning.

Observations were made about this passage in Annex 3 in each of *CT* , *Penne* and *Arosio* . The proposition derived in *Penne* (see section F2.4 above) goes far beyond anything said in Annex 3 CR. Prato observes that in *Arosio* the Court of Appeal of Milan, criminal division, noted that the passage relied upon by Prato could lead to misunderstanding for a retail investor. In Prato's written closing it was suggested that Professor Gentili had agreed that in order to cure such a misunderstanding it will be necessary to explain to the investor "about the existence of the implicit costs". Prato has, in my view, taken Professor Gentili's response out of context: when read as a whole, he was not accepting that there was any such obligation. Nor,

indeed, did the judgment in *Arosio* suggest that there was any such obligation.

There is a separate feature of the facts in the present case that has been stressed by Prato. This concerned the internal email quoted at paragraph 103 of the main claim judgment. It can fairly be said that in this email Mr Poddighe disparaged Prato's understanding of interest rates. It does not, to my mind, have the significance which Prato sought to derive from it. It was no more than a dismissive comment by an expert practitioner about a lay client.

This is borne out, in my view, by two features of the facts in the present case. Prato was treated as a retail customer by Dexia. Suggestions that it should be treated as less qualified than other retail customers seem to me to be wide of the mark when consideration is given to these two features. The first is that at the outset Prato were advised by an expert technical committee. That committee did not consider that initial MTM was something that called for disclosure either before or immediately after entry into a swap. The view taken by the committee was simply that MTM should be supplied by the bank if it were requested by Prato. Second, Ms De Castelli could by no means be described as naive. She was the holder of a doctorate. Having heard her evidence, I have no doubt that in Ms De Castelli Prato had the benefit of an astute and careful senior financial officer. My reasons for this conclusion are set out in Annex 2B.

**Non-disclosure: articles 32.5, 36 and 61.1 g) CR**

Article 32.5 CR, set out in section F1.3 above, applied to all investors. It stated that when receiving an order service providers must:

> ...inform the investor ... of the price at which they are prepared to buy or sell the financial instruments ...; they may not charge any commission on the price agreed.

Prato's counterclaim asserts that by failing to disclose the initial MTM Dexia acted in breach of article 32.5 CR:

> ...because in so acting [Dexia] charged commissions without obtaining the investor's consent.

Gentili 1 dealt with this assertion at paragraphs 90 to 92. Reliance was placed upon a communication released by Consob dated 20 August 1997. The communication quoted article 32.5 CR and commented that the intention was:

> ...that the price applied to the client (and previously notified ...) must be presumed to be inclusive of the broker's remuneration for the service rendered.

Gentili 1 noted that Consob added to this in a further communication dated 1 March 1999:

> There is a different economic function between the services rendered as intermediary and the services rendered as counterparty. This difference is reflected in the structure of the price. The counterparty [the dealer] makes its profits on the spread applied between the bid and the ask price and such spread must remunerate in addition to the cost of the transaction the market risk that instead the broker or the intermediary does not face... in the case of the counterparty transparency is achieved imposing on the bank to disclose the final price that the bank is willing to charge.

Professor Gentili's comment was that the prohibition on adding commissions in article 32.5 CR has the purpose of protecting the investor. That purpose is achieved by requiring the bank to disclose the final price, not the individual components which make up that price. He added at paragraph 93 of Gentili 1 that when a bank was acting as a counterparty, a reference to the concept of commissions was inappropriate. Commissions would be charged when acting as an intermediary charging a fee for its services.

Sciarrone Alibrandi 1 made no mention of these Consob communications. In paragraphs 142 to 145 Professor Sciarrone Alibrandi cited *Turin Mortgage Swap* as requiring disclosure of margin.

Professor Sciarrone Alibrandi's oral evidence was that the communications had been written in response to questions about practice in respect of the sale of bonds. Prato submitted that there was an important distinction, namely that the bonds in question were instruments where there was no difficulty in identifying what the price was. There was, submitted Prato, nothing to suggest that the communications had been written with derivatives in mind, and Professor Sciarrone Alibrandi had pointed out that there were difficulties in identifying a statement of price. She asserted that a mere description of the parameters on the basis of which the parties would pay money periodically was not a statement of a price. It does not seems to me that this response can assist Prato to make good the assertion advanced in the counterclaim in relation to article 32.5 CR. The complaint is not about a failure to state the price, but about charging commissions contrary to article 32.5 CR. That must mean requiring the investor to pay more than the notified price. Unless there was indeed a notified price, there is no basis upon which Prato's assertion of breach of article 32.5 CR can be made good.

In any event, it seems to me that there is no reason to doubt that the terms of the swap disclose the price that is to be paid by Prato for the promises given by Dexia. That price is found in the promises given by Prato. This accords with what was said in *Pisa II* and *Arosio*. The notional existence of a negative initial

MTM does not connote that there is anything more that will have to be paid by Prato in this regard. It seems to me that this conclusion is supported by the Consob communications, which reflect the natural meaning of the words used in article 32.5 CR. Prato's written closing submissions cited a passage from Professor Sciarrone Alibrandi's evidence which in my view began by confusing the notion of price and the notion of value. The assertion was then made that the "concrete concept of price" couldn't be defined by linking it to the flows of money under the swap. The reason given was that "from an information point of view" this "cannot say anything clear to the investor". I disagree. Under each swap Prato purchased an entitlement to receive cash flows from Dexia, subject to netting, at defined intervals over a defined period. The price that Prato paid was its own promise, on the same defined dates and over the same period, to pay to Dexia cash flows which were determined by a floating rate. There was nothing unclear about how those payments were to be calculated.

Turning to article 36 CR, as can be seen from section F1.3 above, this concerned the offering off-site of financial instruments. Article 36.1 c) CR required that, when doing this, financial salesmen were to explain certain things to investors. One of them concerned the right provided for in article 30.6 TUF. I have held in section E2 of the main claim judgment that this right applied in the present case, with the consequences set out in article 30.6 and 30.7 TUF. I will deal later in this judgment with Prato's separate claim for breach of article 30.6 TUF in this regard.

For present purposes the relevant part of article 36.1 c) CR is a requirement that the financial salesman must explain:

> …the essential elements of the transaction … with special reference to the related costs and capital risks …

There is no suggestion by Prato that this part of article 36.1 c) CR imposes on Dexia any greater obligation than is already imposed by article 28.2 CR. It is an

Dexia Crediop SpA v Comune di Prato, 2016 WL 6433427 (2016)

obligation which applies more widely than article 28.2 CR, for article 36 CR is not confined to retail investors. The result is that in the present case Prato secures the benefit of similar obligations placed upon Dexia by virtue of Prato's status as a retail investor, engaging article 28.2 CR, and by virtue of my finding that the present case involved an off-site offer, engaging article 36 CR. No useful purpose is served, as it seems to me, by a separate examination of the particular obligation which arises under article 36.1 CR. The reason is that if Dexia complied with what was required by article 28.2 CR, then there is no reason to think that it would have failed to comply with what is required by article 36.1 c) CR in this respect.

As to article 61.1 g) CR, as can be seen from section F1.3 it applies to transactions with retail investors only, and concerns information that must be supplied after the transaction. Professor Gentili asserted that article 61.1 CR had no relevance to swaps in which the "intermediary" acted as the counterparty. I do not need to decide whether this is right. The reason is that Prato's only complaint under article 61.1 CR is that the initial negative MTM of each swap should have been included in a transaction confirmation notice because it constituted a commission or expense. For the reasons given in relation to article 32.5, the MTM constituted no such thing. In *Orvieto grant of protection* there was a finding that article 61.1g) CR had been breached. That finding, however, was based on misconceptions: see section F2.4 above.

**Non-disclosure assertions: conclusion**

In sections F2.1 to F2.7 above I have examined the non-disclosure assertions pleaded by Prato. For the reasons given in those sections, I conclude that those assertions are not made out.

I note at this point, however, that there is an aspect of non-disclosure relied upon by Prato later in its regulatory counterclaim. It concerned the failure to inform Prato of the right of withdrawal, something which both article 30.6 TUF and article 36.1 CR made compulsory in relation to off-site offers. This aspect forms the subject matter of the right of withdrawal assertions. I deal with them in section F5 below. Before doing so, I deal in section F3 and F4 with the structuring assertions and the unsuitability assertions.

**Regulatory counterclaim: structuring assertions**

The structuring assertions were set out in paragraph 63(2) of Prato's counterclaim. That paragraph used the term "Hidden Costs". As noted in section F1.5 above, Prato's Hidden Costs explanation made it clear that the "Hidden Costs" for each swap, also referred to by Prato as "implicit costs", comprised the specific negative initial MTM pleaded in paragraph 10 of the counterclaim, or such amount as the court determined to be the negative initial MTM.

On this basis, the structuring assertions were as follows:

> The Claimant structured the Transactions to embody the Hidden Costs and/or failed to structure the Transactions so as to provide the best rates for the Defendant. In doing so, it acted:
>
> (a) In breach of Art. 21 TUF, because in so acting it was not acting diligently, fairly or transparently in the interests of the Defendant.
>
> (b) In breach of Art. 26 para 1f) of the Consob Regulations, because in so acting the Claimant was not operating so as to keep down the costs borne by the Defendant or to obtain the best possible result for the Defendant.
>
> (c) In breach of Art. 32 para 3 of the Consob Regulations, because in so acting the Claimant did not transact at best possible conditions for the Defendant.
>
> (d) In breach of the guidelines in Annex 3 of the Consob Regulations that the value of a swap at inception should be nil (i.e. having neither negative nor positive value).

Each of these four assertions about the "Hidden Costs", and thus about the negative initial MTM to Prato, is inconsistent with the findings that I have made earlier in this judgment. Beginning with sub-paragraph (a), for the reasons given in section F2 above, the presence of a negative MTM was perfectly normal and involved no failure to act diligently, fairly or transparently.

As to sub-paragraphs (b) and (c), the presence of the negative initial MTM did not show any failure to keep down the costs borne by Prato. Nor did it show any failure to obtain the best possible result, or the best possible conditions, for Prato. For the reasons given in sections F1.6 and F2 above, those figures involve a comparison with something which never might have been. It is utterly unrealistic to suppose that Prato could have obtained terms for any of the swaps under which there would be anything other than a negative MTM to Prato.

Turning to sub-paragraph (d), Annex 3 CR did not constitute "guidelines". Its stated purpose was "to provide some basic information on the risks connected with [investments in financial instruments]". It did not prescribe that the value of a swap at inception must be neither negative nor positive. As noted in section F2.6 above, the purpose of the passage relied upon by Prato was to warn of the danger that swaps can rapidly assume a negative value depending on the behaviour of the parameter to which the contract is linked. In that regard investors are specifically warned that they should be certain that they understand how and how quickly variations in the reference parameter are reflected in the calculation of the differences that investors are to pay or receive. Dr Faro acknowledges that if banks are to enter into swaps on a commercial basis then there must be a negative initial MTM to the counterparty. It cannot seriously be suggested that Annex 3 was instructing banks to behave in an un-commercial way.

The reasons I have given above for rejecting each of the structuring assertions are, in essence, reasons given at greater length in Dexia's written opening submissions. Prato's written opening submissions did not seek to meet any of those assertions. Instead, it was said that Dexia had wrongly assumed that the complaint made in the structuring assertions was that an initial negative

MTM was not permitted in principle. On that footing, Prato's written opening submissions asserted that the swaps were self-evidently not the best possible result that could have been obtained for Prato. In that regard, Prato said that Dexia's actual margin on the swaps greatly exceeded the minimum margin it required.

I cannot accept that Dexia made any wrong assumption in this regard. The only way in which Dexia was specifically said to have done anything impermissible was by the inclusion of a negative MTM. If Prato wanted to say that there was something else which was impermissible, then it was up to Prato to seek permission for an amendment to its counterclaim in that regard. The need for such an amendment is obvious in relation to the new assertion made by Prato for the first time in its written opening submissions. That assertion contended that a failure to achieve "the best possible result" was demonstrated by an alleged excess of margin over the minimum that Dexia itself required. It would be grossly unfair to Dexia to make a finding as to the amount of such minimum, let alone as to whether a transaction involving margin greater than the minimum was impermissible, without advance notice of the assertion and an opportunity to meet it.

The unfairness was made all the more apparent in Prato's written closing submissions. It was noted that Mr Belarbi in his oral evidence had not accepted that Dexia could have traded at the suggested minimum. Reference was made to a statement in Belarbi 1 that the bank's pricing team had "an obligation not to go below the minimum set by the committee". Prior to Prato's written opening submissions, there was no warning, either before or after service of Belarbi 1, that Prato would seek to assert that Dexia could have traded at the suggested minimum. Any such assertion would need to be properly particularised so that the issues arising were identified in the pleadings, and could be focused upon in factual witness statements and expert reports. It was then said by Prato that when entering into the back to back swaps Dexia would have had the benefit of comparative pricing. There was, however, no evidence about the circumstances in which the back to back swaps came about. More generally, there was no evidence as to market movements between the time when Dexia proposed the swap in question at particular rates which it specified, the time at which Dexia accepted Prato's irrevocable proposal, and the

time at which Dexia entered into the relevant back to back swap. Prato then went on to criticise the difference between the margin obtained by Dexia on its swap with Prato and the margin which had been obtained by the "hedge bank" that had been Dexia's counterparty on the back to back swap. When this was raised by Mr Malik in cross-examination he responded with the common sense point that Dexia incurred substantial costs in employing a team providing client services to customers such as Prato. Prato's written closing sought to say that such costs could not justify the amount of the difference in margin, and that to charge for such costs would run counter to the 2002 advisory agreement. All of these assertions came without any notice being given to Dexia prior to the trial.

In these circumstances I have no hesitation in upholding Dexia's objection that Prato's new ways of seeking to put its case cannot properly be advanced under the guise of saying that they formed part of the structuring assertions. They did not. Accordingly I conclude that Prato's proposed assertions in this regard are inadmissible.

**Regulatory counterclaim: unsuitability assertions**

Paragraph 63(3) of the counterclaim asserted that each swap was unsuitable for Prato "because of the existence of the Hidden Costs in respect of that [swap] …". This was said to have been a breach of article 21 TUF and article 29 CR. It is unnecessary, however, to examine those provisions in this context. The reason is that Prato's grounds for asserting unsuitability, as set out in closing submissions, relied on three specific complaints, each of which I have already rejected. The first was that the negative MTM "reflected the fact that Prato's payments under the swap were expected to be greater in present value terms than its receipts." For the reasons given in sections F2 above, whether cash flows in future would be positive or negative depended on movements in market rates, not on the existence of the negative MTM at inception. The second reason was that the initial negative MTM values had the consequence that the swaps violated local government finance legislation and a prohibition on speculative transactions. The main claim judgment rejects those complaints: see section D of that judgment.

The third matter of complaint says that "this information was necessary to enable [Prato] properly to assess whether or not to proceed with the [swaps]." It is not clear whether "this information" refers to the first complaint, the second complaint, or simply the fact that there was a negative initial MTM. However for the reasons given earlier no complaint in any of these respects is justified.

**Regulatory counterclaim: right to withdraw assertions**

I noted in section F2 above, that Prato makes a complaint about failure to advise of the right to withdraw. As noted in that section, article 30.6 TUF imposes obligations on service providers in relation to off-site offers. The relevant obligation for present purposes is an obligation to inform the investor of the 7 day right of withdrawal arising under article 30 TUF.

In section E of the main claim judgment I have held that dealings between Dexia and Prato in relation to the swaps were such as to engage the special rules applying to off-site offers. The 7 day "cooling off period", with its associated right of withdrawal, form part of those special rules. My conclusion in the main claim judgment inevitably means that, by failing to inform Prato of the 7 day right of withdrawal, Dexia was in breach of this aspect of article 30.6 TUF.

I deal in section F7 with Prato's claim for damages in this regard.

**Regulatory counterclaim: conflict assertions**

As indicated in section F1.2 above, in this section I consider Prato's conflict assertions without regard to the 2002 advisory agreement. Separate consideration of the position in the light of that agreement will be found in section G below.

The first relevant legislative provision is article 21 TUF, a provision applicable to dealings with all types of investor. It states in article 21.1c) that authorised service providers must:

> Organise themselves in such a way
> as to minimise the risk of conflicts
> of interest and, where such conflicts

Dexia Crediop SpA v Comune di Prato, 2016 WL 06639477 (2016)

arise, act in such a way as to ensure transparency and the fair treatment of clients …

The second relevant legislative provision is article 27 CR, which applies only to dealings with retail investors. Article 27.1 CR states that authorised service providers must be on the alert for conflicts of interest. Article 27.2 CR will be engaged if the service provider has "directly or indirectly a conflicting interest, including any such interest arising from intragroup dealings, the joint provisions of more that one service or other business dealings of their own or of group companies". If article 27.2 is engaged, then the service provider may only carry out the relevant transaction if it has previously informed the investor in writing of the nature and extent of its interest in the transaction and the investor has expressly agreed in writing to it being carried out. Separate provision is made for transactions by telephone.

Dexia observes that in a transaction between a buyer and a seller it does not make sense to speak of a conflict of interest. Each side has its own interest.

On behalf of Prato, Professor Sciarrone Alibrandi's oral evidence included:

> To act as a counterparty of the investor implies a potential conflict of interest, and that is undoubtedly so…I have to inform my counterparty of a potential conflict of interest, and this is so in every transaction where the bank is a direct counterparty.

> …In the case of a derivative, I am the one who constructs the product, because these are all over-the-counter derivatives, they are built and constructed according to the client's features or characteristics.

> Now, I think it is rather clear why there is a potential conflict of interest, because I build a product which I am offering to my counterparty, I am supposed to build it in the interest of my client, and at the same time, however, I must configure the product and decide the profit, my profit, and all the features of the product itself. So I think that this situation is a typical situation of conflict of interests. So much so that some judgments… mention an intrinsic conflict of interest in these kind of derivatives contracts, because these contracts are built in the interest of the customer, but the intermediary is his counterparty.

> …this is not so clear to the retail investor. I think that for a retail investor it is not easy at all to understand that, in the rate, in the rate to which the flow that he will have to pay is anchored, there are implicit commissions, there is a profit margin, there are other remunerations for other risks run by the intermediary.

This evidence proceeds on the footing that the bank is "supposed to build [the swap] in the interest of [its] client." It is plain that Professor Sciarrone Alibrandi has in mind the obligation on service providers, whether the counterparty is a retail investor or a qualified investor, to keep down the costs borne by investors and to obtain the best possible result from each investment service, taking into account the level of risk chosen by the investor. To my mind Dexia is right to say that this is not an obligation which envisages an objective appraisal of what could have been obtained in the market. There is no suggestion by Prato that the obligation required, for example, an investigation by Dexia as to what other banks would be willing to offer. As

will be seen below, the approach taken by Consob is that what a service provider must do is to operate in accordance with the aim of realising the client's interests as best possible. That does not require a bank to do other than act commercially, so long as it has, in the interests of investors and the integrity of the securities market, identified the best possible result that can be achieved for the investor consistent with the bank's own commercial needs.

If the customer believes that the bank has not done this, one option is to bring proceedings asserting that there has been a breach of article 26 CR. However, that may not be necessary. There is an alternative remedy available to the customer if the bank did not comply with the requirements of article 21 TUF as to conflict of interest. If the customer is a retail investor, an alternative remedy may be available under article 27.2 CR in the event that the bank had directly or indirectly a conflicting interest. A question which arises is how this dovetails with the obligation under article 26 CR, which applies to dealings between service providers and all investors.

The decisions cited by the parties in this context were largely concerned with the position where a conflict arose under an advisory relationship. I consider the position in that regard in section G. In the absence of such a relationship, but in circumstances where the making of the investment has been solicited by the bank, the correct approach appears to me to have been explained by Consob.

The explanation that I have in mind is found in Consob Communication no. DAL/97006042 of 9 July 1997. A bank proposed to purchase from a municipality an entire issue of municipal bonds. It envisaged that it would then include the bonds in a "basket" of securities that it offered to clientele visiting the bank. In response to an enquiry from an officer of the bank, Consob sent a reply. I set out below, with paragraph numbers added in square brackets for ease of reference, relevant parts of that reply:

> [12]    With regard to the aforementioned transactions on its own behalf, with the clientele as the counterparty, your bank has asked,

as stated above, whether there is a conflict of interest.

[13]    In this regard, firstly it is necessary to specify that a conflict of interest hypothesis cannot be indentified – *a priori* – in all cases in which the intermediary trades financial instrument, as the direct counterparty, with its own clientele, but, conversely, it must be assessed with regard to the peculiarities of the specific case.

[14]  Transactions of this kind can be carried out, on [two hypotheses]:

…

[15]    In said hypotheses the transaction is … formally preceded by an order from the client, but said order was to some extent "solicited" by the intermediary.

[16]    It is therefore necessary to assess whether the "suggestion" is not only aimed at realising the client's interest as best possible, but also (or only) at the realisation of ulterior and different goals for the intermediary itself.

[17]  Given the above, we are of the opinion that in cases such as the one proposed, as a rule, the conflict of interest could easily and effectively arise, given the declared intention, and therefore the presumable need for the intermediary to quickly remove from its portfolio securities of which there is an overabundance following the full subscription of

the issue. The conflict could be deemed to be non-existent only in cases in which the conditions of the individual transaction are – compared to other transactions with similar characteristics that could be proposed as alternatives – so favourable for the client that they rule out any concrete prejudice for it, even in comparative terms in relation to the inability to take a more favourable investment opportunity; and this is taking particular account of the quality of the issue and the liquidity if the investment.

Each side relied upon what was said by Consob in this communication. To my mind it assists Dexia, for it makes plain that not all cases in which a bank trades as the direct counterparty of its client will involve a conflict of interest. It is clear from paragraph [16] that there would be no conflict of interest if the bank's goal was simply to enter into a financial transaction in which, in accordance with article 26 CR, it would seek to meet its client's interests as best possible. In such circumstances, Consob explains that there would be no conflict of interest, and it must follow that there would be no need to disclose the profit or margin which the bank envisaged would accrue to it as a result of the trade.

What gave rise to a conflict of interest was an ulterior and different ground for the transaction. This was, as explained in paragraph [17], that the bank would be dealing with its customer while at the same time being under commercial pressure as a result of holding an overabundance of bonds with a consequent need to dispose of them as quickly as possible. This plainly had to be disclosed. Applying this to the present case, Dexia had no such ulterior or different goal. Accordingly, I conclude that no conflict of interest arose within the meaning of article 21 TUF and article 27 CR.

**Regulatory counterclaim: causation and damages**

For the reasons given above, I conclude that Prato's regulatory counterclaim succeeds in one respect only. On or before entering into each swap Dexia should, as required by article 30.6 TUF, have explained that Prato had the benefit of a 7 day period within which it could, if it wishes, withdraw: see section F5 above. There was a failure by Dexia to do this. The question now arising is what, if any, damages Prato can recover in respect of that failure.

The parties' closing submissions had not addressed this specific question. Accordingly submissions on it formed part of the written and oral procedures after the main claim judgment was handed down.

Prato's starting point in written submissions was that the regulatory counterclaim offered Prato a fall back position if its restitution claim were unsuccessful. If, for example the counterclaim for restitution of sums paid under swap 6 were to fail, Prato would be left in a position where it had lost &euro;1,580,465. In relation to the failure to comply with the mandatory provisions of article 30 TUF, Prato made reference both to the counterclaim at paragraph 63(4) and to evidence from Professor Sciarrone Alibrandi at paragraph 85 of Sciarrone Alibrandi 1 that:

> In addition to the nullity of the related contract [under Art 30(7) TUF], the conduct of the bank which caused the entry into of contracts which did not set out the right of withdrawal [as required by Art 30 TUF] is regarded as bad faith conduct which also gives rise to a liability for damages.

A further point was made by Prato at this stage. This was that Professor Sciarrone Alibrandi and Professor Gentili had agreed in paragraph 7 of the Civil Joint Memorandum that the measure of damages was simply:

> The loss deriving from the derivative financial instrument concern.

Dexia Crediop SpA v Comune di Prato, 2016 WL 6833477 (2015)

Dexia filed written submissions in response. So far as material, Dexia said, first, that it was entitled to set off, against any liability to Prato, its entitlement to restitution in relation to sums received by Prato under swaps 1, 2, 4 and 5. If, however, Dexia's restitution claim were unsuccessful, then it was said that the true measure of Prato's loss caused by Dexia's breach of article 30 TUF would be the net amount paid by Prato under all of the swaps, giving credit for the sums that Prato received from Dexia under swaps 1, 2, 4 and 5. At the same time, Prato lodged further submissions stating that its claim to damages arose not only in relation to swap 6 but also in relation to swap 3.

A note by Dexia two days before the oral hearing involved a new assertion. This was that, in relation to the regulatory breach now under consideration Prato would need to prove that it would not have entered into (or would have exercised its right to withdraw from) the swaps if Dexia had complied with its obligations under article 30 TUF by giving written notice of the 7 day right of withdrawal. Dexia added that there was no evidence that compliance with article 30 TUF would have made any difference to Prato. Indeed, said Dexia, the overwhelming likelihood was that Prato would have entered into the swaps regardless and would not have exercised the 7 day right of withdrawal. This was said to be Dexia's "primary position". The submissions previously made by Dexia were described as "alternative positions".

Prato filed a responsive note the following day. In that note Prato said that Dexia's submissions ran counter to the unchallenged evidence from Professor Sciarrone Alibrandi.

To my mind Dexia's oral submissions made a powerful case that its newly adopted primary position was right:

• (1)  The causation hurdle identified in the new primary position had been identified as arising generally in Dexia's written closing submissions;
• (2)  Prato's own written closing submissions had acknowledged that assessment of quantum would depend upon an examination of what Prato would have done if Dexia had properly complied with its duties;

• (3)  Gentili 2 had stated at paragraph 44 that causation was an essential requirement of liability, that damages could only be awarded if shown to be a direct consequence of an unlawful act or omission, and that in order to recover damages for breach of TUF or CR a claimant must prove losses coming directly and exclusively from the unlawful act or omission, and that the whole amount can be derived from that unlawful act or omission;
• (4)  Paragraph 44 had not been challenged in cross-examination when Professor Gentili gave evidence;
• (5)  When the propositions in paragraph 44 were put to Professor Sciarrone Alibrandi in cross-examination she conceded that they were correct;
• (6) Paragraph 85 of Sciarrone Alibrandi 1 did not deal with the quantum of any liability in damages.

Dexia's oral submissions also responded to an assertion by Prato that because the breach consisted of "entry into contracts which did not set out the right of withdrawal" it followed that, in the absence of the breach, there would have been no contract at all and Prato would have not suffered the net losses it claimed. Dexia's oral submissions pointed out that the breach under article 30 TUF consisted of a failure to state the right of withdrawal on relevant forms. I add that a similar point can be made in relation to the breach of article 36.1 CR.

An assertion was made by Prato that if retail clients had to prove causation, then the availability of a damages claim under article 30 TUF would be "purely academic". Dexia rightly refuted this, observing that there might be some investors who would have utilised the right of withdrawal, because within a few days of entering into the transaction they had realised that it was undesirable to have done so.

Prato said that paragraph 85 of Sciarrone Alibrandi 1 had given examples of cases in which claims for damages under article 30 TUF had succeeded. As to that:

• (1)  Dexia rightly pointed out, in fairness to Professor Sciarrone Alibrandi, that she had not cited the cases for a proposition that there was no need to prove causation.

• (2) The first case cited was a decision of the Court of Cassation, civil section, dated 3 October 2003. The claimant in the case was Ruberto Dante, and I shall refer to the decision as *Dante* . It was not in fact concerned with article 30 TUF, but it concerned a similar provision in relation to consumer contracts. It showed that in the context of such a provision there was a right to damages for failure to indicate, in the manner required, the right of withdrawal. Quantum, however, was referred back to the court below.
• (3) The second case cited by Professor Sciarrone Alibrandi was a decision of the Tribunal of Mantova dated 10 December 2004. This decision involved claimants who were anonymised by using the initials F and C: I shall refer to it as *F and C* . Dexia submitted that *F and C* was not concerned with damages at all, but with a claim to restitution.

In answer to these observations Prato relied upon the points that it had made in earlier submissions. It asserted that paragraph 85 of Sciarrone Alibrandi 1 demonstrated that it was no part of a claim to damages that the claimant must show that the right of withdrawal would have been exercised. In relation to *F and C* Prato sought to make further submissions once it had had an opportunity to review the assertions made by Dexia. In my ruling at the end of oral submissions I gave permission to either side to make any further submissions which might appropriately be advanced in writing within 7 days of receipt of a transcript of the hearing. When taking advantage of that opportunity Prato did not return to the decision in *F and C* .

In my view the propositions advanced in Gentili 2 at paragraph 44 are clearly established. They were not overtaken by the Civil Joint Memorandum; on the contrary, they were advanced at a stage when the Civil Joint Memorandum had already been prepared and signed. There was no objection to those propositions being put to Professor Sciarrone Alibrandi in cross-examination. When they were put to her she agreed with them. There is nothing inconsistent with those propositions in paragraph 85 of Sciarrone Alibrandi 1 or in the two cases cited in that paragraph. This is not a case in which Prato had "cold feet" within the period when a right of withdrawal would have been available. There is no reason to think that if Prato had

been informed of that right it would have made use of it. In these circumstances I conclude that the only breach shown to have occurred of relevant regulatory provisions caused no loss and gives rise to no claim in damages.

As to Dexia's alternative contention, I make one comment only. It is this. If Prato withdrew from any particular swap, it would be necessary to consider consequences that would have arisen under earlier swaps terminated by the swap in question. Neither side adverted to this. The result was that I did not have submissions on whether, for example, the matter could appropriately be dealt with by an order for an inquiry.

### Advisory & misrepresentation counterclaims

### Advisory counterclaim

### Advisory counterclaim: introduction

As noted in sections A1 and B of the main claim judgment, the 2002 advisory agreement came into being at the end of November 2002. It was created by two letters. The first was from Prato to Dexia on 25 November 2002, formally appointing it to act as Prato's advisor. The second was from Dexia to Prato formally accepting the appointment. Dexia's acceptance referred to the mandate given to it as:

> …a mandate to act as advisor for definition of the strategies for debt restructuring and for assistance, consultancy and the management of an interest rate swap transaction …

Both Prato's letter to Dexia and Dexia's letter to Prato cited executive resolutions by Prato on 29 July 2002 and 20 November 2002. Prato's letter referred to them as numbers 2331 and 3622 respectively. Dexia's letter referred to them as numbers 524 and 745. The difference in numbering is immaterial: it seems that Dexia quoted the numbers of executive committee decisions which preceded the executive resolutions identified in Prato's letter.

Prato's executive resolution number 2331 of 29 July 2002, and the executive committee decision which preceded it, came about as a result of the technical committee recommendation of 10 July 2002: see section B2 of the main claim judgment. The executive resolution recorded the technical committee's conclusion that, of the seven banks which had submitted proposals, the "appointment … for defining the strategies for restructuring of the debt and providing assistance, consultancy and the management of an Interest Rate Swap operation" should go to Dexia. It also recorded that before making this recommendation, the technical committee had asked institutions to submit further proposals drawn up in accordance with specified parameters. One of those parameters was described in this way:

> …the Interest Rate Swap transaction, limited to a period of three, four and five years, taking into account all the fixed rate loans …

Resolution 3662 of 20 November 2002 stated that it was intended as a supplement to executive resolution number 2331/2002. Resolution 3622 of 2002 then proceeded to set out what it described as "the definition of the conditions governing relations between the advisor and [Prato] during the management of the interest rate transaction":

> • 1)  assistance and consulting in relation to the Interest Rate Swap operation proposal, accepted by the City Council Board with Decision no. 745 of 20/11/2002;
> • 2) assistance within the area of the standards and regulations applicable in relation to the completion of the operation;
> • 3)  financial analysis and monitoring of the operation throughout the entire operation, with relative reporting to the City Council's Financial Service, and transmission of all information which is considered to be useful, at the request of that Financial Service;
> • 4)  the City Council acknowledges that the granting of the engagement in relation to the Interest Rate Swap operation proposal, authorised

by the City Council Board no. 745/02, represents for [Dexia] an obligation of means and not of results, releasing [Dexia] from all liability, both in relation to the proposal authorised by the City Council with the decision referred to above and the completion of the consequent swap operation following signing of the ISDA Master Agreement and in relation to the execution of the engagement as Advisor;
> • 5)  the City Council acknowledges that the engagement specified in points 1), 2) and 3) above is carried out by [Dexia] without any fee from the City Council;
> • 6)  this engagement has a maximum duration of five years starting on the date of receipt of the letter of acceptance of the engagement from [Dexia], with annual renewal, unless cancelled by one of the parties, which must be sent within thirty days, and is entrusted to [Dexia] on an exclusive basis;
> • …

At one stage it appeared to be suggested that references in these documents to "an" or "the" interest rate transaction had the consequence that the advisory agreement applied only during the period of swap 1. No such case, however, was pleaded. Nor, as it seems to me, would it be a correct analysis. Dexia advised Prato on the termination of swap 1 and continued to advise Prato in exactly the same way until relations broke down between the parties during the course of the swaps.

It is now common ground that the advisory agreement was governed by Italian law. On that basis, paragraph 69 of the counterclaim described the obligations which Prato said were owed to it by Dexia under the 2002 advisory agreement:

> Pursuant to Art 1176, 2 of the Italian Civil Code it was a term of the contract to advise, alternatively in any event, that the Claimant, as the Defendant's Advisor, was required to pursue the best interests of its client and to act fairly and in good faith towards its client. Further or alternatively, pursuant to Art. 21 TUF it was a term of the contract

Dexia Crediop SpA v Comune di Prato, 2016 WL 6833477 (2016)

to advise, alternatively in any event, that the Claimant was obliged to act diligently, fairly and transparently in the interests of its clients.

The main question in relation to the advisory agreement was whether those obligations, in the context of the advisory agreement, added in any material way to the obligations arising under article 21 TUF and the articles in CR discussed in section F above. I discuss that question in section G1.2 below.

**Advisory counterclaim: what does it add?**

Article 1176 CC is found in chapter II of book IV. Chapter II is concerned with performance of obligations, and article 1176 is the first article in section I, concerned with performance in general. With the addition of paragraph numbers in square brackets, article 1176 states:

> 1176.  Diligence in performance.

> 1176.[1]    In performing the obligation the debtor shall observe the diligence of a good *pater familias* …

> 1176.[2]    In the performance of obligations inherent in the exercise of a professional activity, diligence shall be evaluated with respect to the nature of that activity …

The Civil Joint Memorandum recorded that Professor Gentili and Professor Sciarrone Alibrandi agreed that:

> …in the context of an advisory relationship between a client and a financial institution, art. 1176 para

2 had been made specific by art. 21 TUF and the implementing [CR].

However, there was an aspect of this which was not agreed, as explained in paragraphs 33, 42 and 43 of the Civil Joint Memorandum:

> 33.  Professor Sciarrone Alibrandi … believes that a more rigorous interpretation of the rules of conduct set forth in the TUF and in the Consob Regulation is required where the intermediary is expressly appointed as an advisor. Professor Gentili believes that at the material time the law did not distinguish between an intermediary's and an advisor's diligence and liability, and the same rules applied to both.

> …

> 42.  We are unable to reach agreement as to how in the context of an advisory relationship has Italian law interpreted and applied Art 1176 para 2 Civil Code and Art 21 TUF.

> 43.  As noted above, Professor Sciarrone Alibrandi believes that a more rigorous interpretation of these rules of conduct is required in any case – such as the present – where the intermediary is expressly appointed as an advisor. Professor Gentili points out that at the material time the law did not distinguish between an intermediary's and an advisor's diligence and liability, and the same rules applied to both. In Professor Gentili's opinion, there was no

Dexia Crediop SpA v Comune di Prato, 2016 WL 06653477 (2015)

difference between the duties of an intermediary and the duties of an advisor as regards any so called Hidden Costs.

Prato's closing submissions made two observations about the disagreement between Professor Gentili and Professor Sciarrone Alibrandi set out in the Civil Joint Memorandum. I shall take them in turn.

Prato's first observation summarised Professor Sciarrone Alibrandi's evidence as being that the appointment of an advisor itself raised the level of the duty owed to the customer. It would, said Prato, be counterintuitive if Dexia's duties to Prato as advisor meant nothing more than Dexia's duties to Prato as counterparty. Instead, submitted Prato, article 21 TUF should be recognised as a duty which moulded itself to the circumstances, depending on the service being provided. This would recognise that the advisory service is different from the purely dealing service.

As to that, however, Professor Sciarrone Alibrandi identified no proposition of law to justify a suggestion of a raised level of duty or, as she put it in para 136 of Sciarrone Alibrandi 2, a position under which the duty would "be interpreted and applied even more strictly than it would normally be". The justification which she gave in paragraph 138 (i) of Sciarrone Alibrandi 2 was a heightened version of the remaining part of this first observation in Prato's closing submissions. The notion that, as regards duties of disclosure, the advisor was under the same duty as a counterparty who was not an advisor was described by Professor Sciarrone Alibrandi as "incomprehensible … on this basis the advisory would be totally useless for the client." As Dexia observed, whichever way it is put, the point is a false one. The advisory agreement can itself impose higher obligations on the advisor. Once it is appreciated that legislative provisions have imposed duties on service providers when dealing which are akin to those imposed upon an advisor, Prato's point falls away.

The second observation was that the debate was probably academic. The reason was said to be that

Professor Gentili had accepted in cross-examination that he did not mean that the duties of an advisor were cut down to those of a dealer. Rather, his point was that the duties of a dealer were raised to those of an advisor. Dexia suggested that this misrepresented Professor Gentili's evidence. Even if what is said by Prato is accurate, however, the point does not in my view assist Prato. I have examined in section F the duties which arise on the footing that, even though there is no advisory agreement, Dexia in its capacity as counterparty owes special obligations set out in article 21 TUF and the relevant provisions of CR. I have concluded that in all respects save one there was no breach of those obligations. The exception concerns Dexia's failure to comply with article 30.6 TUF. That failure, which is pleaded at paragraph 63(4) of the counterclaim, is not said to constitute a breach of the advisory agreement: see paragraph 70 of the counterclaim.

The stance taken by Professor Sciarrone Alibrandi resulted in the identification by her in paragraph 234 of Sciarrone Alibrandi 1 of four obligations:

> Therefore, the Claimant, as the Defendant's advisor, was compelled to:
>
> (i)    diligently pursue the best interests of the client;
>
> (ii)   adequately disclose to the Defendant the existence and the amount of any hidden costs;
>
> (iii)  refrain from offering to the client derivative financial instruments which were not suitable or adequate in relation to the interest/need of the Defendant;
>
> (iv)  refrain from pursuing the firm's own interests to the detriment of those of the Defendant.

Professor Gentili was content to accept the existence of the obligations set out at (i) and at (iii) above. For the reasons that I have given in section F above, Prato's suggestion that those obligations were breached is unfounded. As to (iv), for the reasons given in section F above the obligation on Dexia concerning conflict of interest is an obligation which arises not from Dexia's commercial role in the ordinary course, of which Prato is well aware, but from any ulterior or different motive that it may have for entering into a transaction.

That leaves the suggested obligation at (ii) above. Here it seems to me that Professor Sciarrone Alibrandi has elevated a question of fact into a proposition of law. For the reasons given in section F above, on the evidence before me in the present case, performance of Dexia's duties as advisor did not require disclosure of the "Hidden Costs", as Prato was fully able to take an informed decision on the proposed investment by reference to the rates and thresholds that were identified in the proposal for each swap.

Prato sought to place reliance on observations in *Arosio* in relation to the duty of an advisor. It seems to me that Dexia is right to say that the relevant passages in *Arosio* are contemplating a very different type of advisory agreement from the 2002 advisory agreement. Moreover, there may have been features about the facts of that case which led to those observations. In any event, the question appears to me to be a question of fact which must depend upon the circumstances of each case.

It was not pleaded by Prato that the 2002 advisory agreement required Dexia to provide information about the fixed rates at which other banks might be willing to enter into a swap which contained the thresholds and floating rates proposed by Dexia. Prato's opening submissions included a suggestion which would have had that effect. The suggestion, however, was modified in Prato's closing submissions. The result of the modification amounted to an allegation that Dexia would have to seek a product in which the counterparty would offer "a neutral MTM value at inception to the client". For the reasons given in section F above, this notion is simply unreal. Prato then suggested that Dexia should disclose any negative initial MTM to Prato "and make sure that [Prato] understood what that meant". However, for the reasons given in section F above,

"what that meant" was that it had no bearing in itself on the decision whether to invest.

For all these reasons I accept Dexia's submission that the advisory agreement did not, as regards the specific duties which are relied upon in the counterclaim, add in any material way to the obligations which I have already considered in section F.

### Advisory counterclaim: other matters

In these circumstances it is not necessary for me to consider matters which would otherwise arise in relation to the advisory counterclaim. Certain of those matters, for example a question which might arise as to whether a breach by Dexia involved "slight negligence", which Italian law permits to be the subject of an exemption clause, are best considered in the context of a finding of actual breach.

It is common ground that, to the extent there were breaches of the regulatory provisions discussed in section F above, the release in paragraph 4 of resolution 3622 of 2002 would not apply. In those circumstances I do not consider it desirable to seek to resolve in the present judgment other matters which would, but for my conclusion in section G1.2, have arisen for consideration.

### The misrepresentation counterclaim & defence

The misrepresentation defence said that Prato was entitled to rescind, and had rescinded, the swaps on the grounds of misrepresentation. In that regard it relied on the obligations identified in section F2 above, arising both under the 2002 advisory agreement and independently of that agreement. It asserted that:

> Prior to and in respect of each Transaction, in failing to disclose the Hidden Costs of that Transaction or the implications of those Hidden Costs to the Defendant, in circumstances where it was obliged by the TUF and Consob Regulations and/or by its retainer as the Defendant's Advisor1 to do so if there were any, the Claimant

Dexia Crediop SpA v Comune di Prato, 2016 WL 6833477 (2016)...

impliedly represented that there
were none.

My findings earlier in this judgment are that Dexia
complied with the obligations of disclosure relied on
in section F2. The inevitable result is that this defence
cannot succeed.

The misrepresentation counterclaim sought damages
for the misrepresentations alleged in the
misrepresentation defence. It follows from what is said
above that the misrepresentation counterclaim cannot
succeed.

In these circumstances it is not necessary for me to
address other aspects of the misrepresentation defence.
Nor is it necessary to do so in relation to other aspects
of the misrepresentation counterclaim. Such aspects, in
my view, are best left for consideration in the specific
context of such breaches of disclosure obligations as are
actually found to have occurred.

### Concluding matters

For the reasons given above I have concluded that
Dexia is entitled to succeed on its alternative restitution

claim, and that Prato is entitled to succeed on its
restitution counterclaim. The restitution claim and
restitution counterclaim plainly arise out of the same
transactions. In those circumstances they can in
my view be set off against each other. Subject to
any submissions that may be made in relation to
consequential orders, it appears that the amount of
Prato's restitution counterclaim will exceed the amount
of Dexia's restitution claim. If so, the position will be
that a net sum will be payable by Dexia to Prato.

My analysis above has not made it necessary to make
observations on a number of aspects of Dr Faro's
evidence. I deal with certain of those aspects in Annex
2A to the present judgment. Nor has it been necessary
for me to comment on Ms De Castelli's evidence as to
what Prato would have done if Dexia had done what
Prato says it should have done. Comments on those
matters are set out in Annex 2B to the present judgment.

I ask the parties to seek to agree upon consequential
orders.

### abbreviations and short forms

Unless the context otherwise requires, the abbreviation
and short forms listed in the first column below have
the meaning set out in the second column. Notes in the
third column are provided for ease of reference only.

| Abbreviation/ short form | Long form | Notes |
| --- | --- | --- |
| 1990 Act | Contracts (Applicable Law) Act 1990 | MCJ para 208 |
| 1998 ISDA FX and Currency Option Definitions | definitions incorporated in the master agreement | MCJ para 5. |
| 2000 ISDA Definitions | definitions incorporated in the master agreement | MCJ para 5. |
| 2002 advisory agreement | advisory agreement made by Prato's letter of appointment dated 25 Nov 2002, accepted by Dexia's letter dated 28 Nov 2002 | MCJ para 4. |

Dexia Crediop SpA v Comune di Prato, 2016 WL 6833477 (2016)

| | | |
|---|---|---|
| 2004 bond restructuring | restructuring of Prato's public debt in 2004 | MCJ para 8. Under the 2004 bond restructuring fixed interest loans initially denominated in lire, which by that time had become denominated in euros, were repaid, and the 2004 bonds were issued. |
| 2004 bonds | the November 2004 bonds and the December 2004 bonds | MCJ para 8. |
| 2006 bond restructuring | restructuring of Prato's public debt in 2006 | MCJ para 8. The 2006 bond restructuring extended the maturity of the 2004 bonds. |
| Administrative Joint Memorandum | joint memorandum by Professor Napolitano and Professor Dettori | MCJ para 25(3). The Administrative Joint Memorandum is dated 17 April 2014. |
| advisory counterclaim | counterclaim advanced by Prato in the present case | MCJ para 16(3). In the advisory counterclaim Prato claims damages in respect of Dexia's alleged breaches of the 2002 advisory agreement under Italian law. |
| advisory release | assertion advanced by Dexia in the present case | MCJ para 17(2). The advisory release is said by Dexia to be a release from any liability relating to its performance as Prato's adviser. |
| Agreement | agreement constituted by the master agreement and each confirmation together | MCJ para 6. |
| Alibrandi, Professor | Professor Sciarrone Alibrandi | See entry under "Sciarrone Alibrandi". |
| Angeletti, Dr | Dr Roberto Angeletti | Dr Angeletti, an inspector of the Bank of Italy, was appointed as expert by the Consiglio di Stato in Pisa I; his report is discussed by the Consiglio di Stato in Pisa II. |
| App. | Corte d'Appello Court of Appeal (Italian Civil or Criminal Appeal Court) | MCJ para 132, citing para 4.3(b) of Napolitano 1: second instance appellate courts based in certain cities in Italy, also [have] local jurisdiction. The local appellate court for Prato is the Corte d'Appello di Firenze, which is the second instance civil court for the whole Region of Tuscany. |

Dexia Crediop SpA V Comune di Prato, 2016 WL 6833477 (2016)

| | | |
|---|---|---|
| Arosio | App. Milano 3 Jun 2014, 1937/2014 | MCJ paras 167, 171, 180, 181.App. Milano Sez. Pen. 3 Jun 2014, 1937/2014 |
| Article 3 non-derogable rules | rules which, within the meaning of article 3 of the Rome Convention , "cannot be derogated from by contract". | JORI, section C1 |
| barrier rate | cap rate in an interest rate cap; floor rate in an interest rate floor | See "cap rate" and "floor rate". |
| Belarbi, Mr | Mr Samir Belarbi | MCJ para 22. Mr Belarbi was Head of Hedging Solutions (based in Rome) during Prato's entry into swaps 2 and 3, and then Head of the Debt Management Desk in Dexia's public finance division (also based in Rome), in which role he was involved in Prato's entry into swaps 4, 5 and 6. |
| Belarbi 1 to 4 | Mr Belarbi's first to fourth witness statements | MCJ para 22. The statements are dated 25 November 2013 ("Belarbi 1"), 21 March 2014 ("Belarbi 2"), 13 May 2014 ("Belarbi 3") and 29 May 2014 ("Belarbi 4"). |
| Bompani, Professor | Professsor Aldo Bompani | A tenured professor in the Department of Economics of the University of Florence. Expert member of the technical committee. See under "technical committee". |
| buyer | party which is to receive a particular advantage from the seller | MCJ para 35. The consideration provided by the buyer to the seller in return for the seller's promise may take various forms, but is commonly described as "the premium". |
| cap | interest rate cap | See "cap rate" and "interest rate cap". |
| cap rate | cap rate agreed between a buyer and a seller | MCJ para 35(1). In an interest rate cap if the floating rate exceeds the cap rate for a particular period the seller makes a payment to the buyer, usually calculated by applying the amount of the excess to the notional sum, thereby protecting the buyer from the danger that the buyer in relation to that sum may have to pay to its |

Dexia Crediop SpA v Comune di Prato, 2016 WL 6833477 (2015)

| | | |
|---|---|---|
| | | own counterparty a floating rate going beyond the cap rate. |
| capacity defence | defence advanced by Prato in the present case | MCJ para 15(1). The capacity defence is that the swaps were null and void in English law by reason of Prato's lack of capacity to enter them under Italian law. |
| Cass. | Corte Suprema di Cassazione | MCJ para 132, citing para 4.4(c) of Napolitano 1: the Corte Suprema di Cassazione (the Court of Cassation or Italian Supreme Court) based in Rome. This is the highest instance court in the Italian civil and criminal court system. It hears appeals from the regional Courts of Appeal and other courts in some instances. |
| Cass. civ. | Cassazione civile | Civil chamber of Cass. |
| Cass. pen. | Cassazione penale | Criminal chamber of Cass. |
| Cass. sez. un. | Cassazione, sezioni unite | Joint chambers of Cass. |
| causa | Italian law requirement that a contract must have a lawful causa | MCJ para 214. CC, article 1418 , paragraph 2, requires that a contract must have a lawful "causa". |
| CC | Italian Civil Code | MCJ para 214. |
| CdC | Corte dei Conti | Court of Auditors. |
| CDP | Cassa Depositi e Prestiti | MCJ para 49. As at 31 December 2001, the majority of Prato's fixed rate borrowing was with CDP. |
| CdS | Consiglio di Stato | MCJ para 132, citing para 4.4(b) of Napolitano 1: the Consiglio di Stato (Council of State) is the administrative court of second instance, located in Rome, before which TAR decisions may be appealed within the deadline of 6 months from the publication of the judgment or sixty days from notification to the parties. Decisions of the CdS can only be appealed to the Court of Cassation, within the deadline of 6 months from their publication or sixty days from their notification and such an appeal is only permitted on limited grounds concerning the CdS's jurisdiction |

| | | and not on any point of law or concerning the merits of the earlier decision. |
|---|---|---|
| ceiling | cap rate | See "cap rate". |
| Civil Joint Memorandum | joint memorandum by Professor Gentili and Professor Sciarrone Alibrandi | MCJ para 26(3). The Civil Joint Memorandum was dated 21 March 2014. |
| Co. Cost. | Corte Costituzionale della Repubblica Italiana | MCJ para 132, citing para 4.5 of Napolitano 1: the Corte Costituzionale della Repubblica Italiana (the Constitutional Court), based in Rome, is responsible for upholding the Italian Constitution and, among other things, may strike down laws which are inconsistent with the Constitution. |
| collar | interest rate collar | See "interest rate collar". |
| conflict assertions | conflict of interest assertions | Head (5) of the regulatory assertions. See entry under "regulatory assertions". |
| Consob | Commissione Nazionale per le Società e la Borsa | MCJ para 213.Italian Securities and Exchange Commission. |
| Consob 11522/1988 | Consob Regulation 11522 of 1 July 1998 | Regulation implementing the TUF on providers of investment services in force at the material time. See also entry under "CR". |
| Consob February 1999 communication | Consob Communication n.DI/99013791 of 26 February 1999 | JORI, Annex 2A |
| Consob March 2009 communication | Consob Communication n.9019104 of 2 March 2009 | JORI section F2.2 |
| convenienza economica | financial advantage | MCJ para 168. |
| Corielli, Professor | Professor Francesco Corielli | Professor Corielli, Associate Professor of Mathematics and Financial Mathematics at the Department of Finance at Bocconi University, was appointed as expert in Arosio. |

| corridor | corridor (in an interest rate collar) | corridor comprising floating rates lower than the cap rate and higher than the floor rate. |
|---|---|---|
| Cost. | La Costituzione della Repubblica Italiana | Constitution of the Republic of Italy. |
| Council | Consiglio Comunale of Prato | MCJ para 48. The constitutional structure of Prato is that it consists of a body of elected representatives, the elected Consiglio Comunale. Responsibility for executive functions lies with the Giunta ("the Executive"). |
| CR | Consob Regulation 11522 of 1 July 1998 | Regulation implementing the TUF on providers of investment services in force at the material time. See also entry under "Consob 11522/1998". |
| CT | App. Milano 28 Feb 2011 | Decision of the Court of Appeal of Milan dated 28 February 2011. |
| D'Agliana, Mr | Mr Giancarlo D'Agliana | An accountant and banker who had been Managing Director of Banca Steinhauslin of Florence, General Manager of Banca Popolare of Marsica and Managing Director of Market Risk and Studies at Banca Agricola Mantovana. See under "technical committee". |
| Dante | Cass. civ. 3 Oct 2003 | Decision of the Court of Cassation, civil section, dated 3 October 2003 |
| De Castelli, Ms | Ms Graziella De Castelli | MCJ para 24. Ms De Castelli was Prato's Manager of Financial Resources between 1996 and 2007. She was Prato's primary point of contact with Dexia. |
| De Castelli 1 | Ms De Castelli's first witness statement dated 25 November 2013. | MCJ para 24. |
| December 2004 bonds | second tranche of floating rate notes issued on 29 December 2004 in the sum of &euro;37,553,000 | MCJ para 8. |

Dexia Crediop SpA v Comune di Prato, 2016 WL 6833477 (2016)

| | | |
|---|---|---|
| derivative | derivative contract | MCJ para 2. Contract that derives its value from the performance of an underlying entity. |
| Dettori, Professor | Professor Salvatore Dettori | MCJ para 25(2). Italian administrative law expert for Prato. Professor Dettori is Professor of Administrative Law at the University of Teramo. |
| Dettori 1 to 3 | Professor Dettori's first to third reports | MCJ para 25(2). The reports are dated 21 March 2014 ("Dettori 1"), 12 May 2014 ("Dettori 2") and 16 June 2014 ("Dettori 3"). |
| Dexia | Dexia Crediop SpA | The claimant in the present proceedings. (MCJ para 1) |
| Dicey | Dicey, Morris and Collins on the Conflict of Laws | |
| end user | party seeking an interest rate collar | MCJ para 35(3). See "interest rate collar". |
| estoppel reply | estoppel reply assertion advanced by Dexia in the present case | MCJ para 17(1). The estoppel reply is that a contractual estoppel bars Prato from raising certain points. |
| Euribor | Euro Interbank Offered Rate | MCJ para 33. Rate of interest determined daily for loans made between banks and denominated in euros. Euribor is determined for loans of particular durations. A shorthand is commonly used under which rates for loans with a maturity of n months are known as "nM Euribor" or "EURnM" |
| EURnM | Euro Interbank Offered Rate for loans with a maturity of n months | MCJ para 33. Also known as "nM Euribor". |
| Executive | Giunta of Prato | MCJ para 48. The constitutional structure of Prato is that it consists of a body of elected representatives, the elected Consiglio Comunale ("the Council"). Responsibility for executive functions lies with the Giunta. |
| F and C | Trib Mantova | Tribunal of Mantova dated 10 December 2004 |

| | | |
|---|---|---|
| Faro, Dr | Dr Enzo Faro | MCJ para 27(2). Derivative pricing expert for Prato. Dr Faro is a Senior Financial Consultant at Finance Active Italia Srl; |
| Faro 1 and 2 | Dr Faro's first and second reports | MCJ para 27(2). The reports are dated 20 March 2014 ("Faro 1") and 12 May 2014 ("Faro 2"). |
| Fideuram | Cass. civ., sez. 1, 14 February 2012, no. 2065 | MCJ paras 220 to 238.Decision 2065/2012 of the Court of Cassation dated 14 February 2012. |
| Fideuram primary interpretation | Interpretation in Fideuram of the reference to "placement" in article 30.6 TUF as being characterised by an agreement by an issuer or offeror and the intermediary in charge of the placement, aimed at an offer of financial instruments to an undetermined public, issued subject to predetermined time and price conditions. | MCJ para 220. |
| Finance Active | Finance Active Italia Srl | Dr Faro's employer (see MCJ para 27(2)). |
| Fincom Valori | Cass. civ., sez. uni. n.26724, 19 Dec 2007 | JORI section C5.3.One of two decisions handed down on 19 December 2007 by the joint civil chambers of the Court of Cassation. Both decisions involved appeals from orders of the Court of Appeal of Turin on 10 November 2001. |
| fixed leg | fixed leg side of a simple IRS. | MCJ para 34. The fixed leg promises to pay a fixed rate of interest on a notional sum. |
| floating leg | floating leg side of a simple IRS. | MCJ para 34. The floating leg promises to pay a floating rate of interest on a notional sum. |
| floor | interest rate floor | See "floor rate" and "interest rate floor". |
| floor rate | floor rate agreed between a buyer and a seller | MCJ para 35(2). In an interest rate floor if the floor rate exceeds the floating rate for a particular period |

|  |  | the seller makes a payment to the buyer, usually calculated by applying the amount of the excess to the notional sum, thereby protecting the buyer from the danger that the buyer in relation to that sum may receive from its own counterparty a floating rate lower than the floor rate. |
|---|---|---|
| general prohibition contravention | alleged contravention of a suggested general prohibition a general prohibition on speculative transactions by the State, said by Prato to give rise to a defence | MCJ para 140. |
| Gentili, Professor | Professor Aurelio Gentili | MCJ para 26(1). Italian civil law expert for Dexia. Professor Gentili is a professor of Italian private law at the University of Rome III. |
| Gentili 1 to 4 | Professor Gentili's first to fourth reports | MCJ para 26(1). The reports were dated 21 March 2014 ("Gentili 1"), 13 May 2014 ("Gentili 2"), 20 May 2014 ("Gentili 3") and 13 June 2014 ("Gentili 4"). |
| GL | Cass. civ., sez. uni. n.26725, 19 Dec 2007 | JORI section C5.3.One of two decisions handed down on 19 December 2007 by the joint civil chambers of the Court of Cassation. Both decisions involved appeals from orders of the Court of Appeal of Turin on 10 November 2001. |
| Gommeservice | App. Milano 18 Sep 2013 | Decision of the Court of Appeal of Milan dated 18 September 2013 |
| hidden cost | Hidden Cost as defined by Dr Faro | MCJ para 41. Dr Faro states in para 21 of Faro 1 that a "Hidden Cost" (or "Implicit Cost") is "the Cost of a Swap Transaction when it is not disclosed at inception by the Bank to the End User". |
| I SPA | Trib Torino H2976 24 Apr 2014 | Decision of the Tribunal of Turin dated 24 April 2014 |
| illegality defence | defence advanced by Prato in the present case | MCJ para 15(2). The illegality defence is that Prato's alleged obligations under the swaps are unenforceable in English law in circumstances where enforcing |

Dexia Crediop SpA v Comune di Prato, 2016 WL 6833477 (2016)

| | | |
|---|---|---|
| | | them would require Prato to act illegally under Italian law in Italy. |
| implicit cost | Implicit Cost as defined by Dr Faro | MCJ para 41. See "Hidden Cost". |
| initial MTM | | See entry under "MTM". |
| interest rate cap | agreement between a buyer and a seller on a cap rate | MCJ para 35(1). See "cap rate". |
| interest rate collar | agreement between an end user and a counterparty involving an interest rate cap and an interest rate floor | MCJ para 35(3). An end user may, when seeking an interest rate cap, reduce the premium otherwise payable by selling an interest rate floor to the same counterparty, giving up profits it would otherwise gain when the floating rate goes below the floor rate. Alternatively, an end user may, when seeking an interest rate floor, reduce the premium otherwise payable by selling an interest rate cap to the same counterparty, giving up profits it would otherwise gain when the floating rate rises above the cap rate. |
| investment provider initiative interpretation | Interpretation in Fideuram of the reference to "placement" in article 30.6 TUF as indicating that there will not be "placement" within the meaning of article 30.6 if the purchase does not take place out of the investment provider's initiative | MCJ para 223. |
| IRS | interest rate swap | MCJ para 2. |
| ISD | Investment Services Directive | 93/22/EEC Council Directive 10 May 1993 : see JORI, section F2.2. |
| ISDA | International Swap Dealers Association, Inc., subsequently named International Swaps and Derivatives Association, Inc. | MCJ para 3. |

Dexia Crediop SpA v Comune di Prato, 2016 WL 6833477 (2016)...

| | | |
|---|---|---|
| ISDA 1992 Multicurrency- Cross Border form | form used for the master agreement | MCJ para 5. |
| Italian law objection | submission by Prato urging that the court should hold the proper law of the restitution claim to be Italian law, with drastic alleged consequences for Dexia | JORI section B1 |
| JORI | judgment on remaining issues (or if the context so requires, the judgment on remaining issues) | Judgment on Remaining Issues:judgment in the present case handed down on 10 November 2016. |
| Law 448/2001 | Italian Law 448 of 28 December 2001 (Budget Law for 2002) | |
| local government legislation contraventions | alleged contraventions of local government legislation said by Prato to give rise to defences | MCJ para 139. |
| Malik, Mr | Mr Pawan Malik | MCJ para 27(1). Derivative pricing expert for Dexia. Mr Malik currently works for Navigant Consulting (Europe) Ltd. |
| Malik 1 to 3 | Mr Malik's first to third reports | MCJ para 27(1). The reports are dated 21 March 2014 ("Malik 1"), 13 May 2014 ("Malik 2") and 20 May 2014 ("Malik 3"). |
| mandatory rules | | See "mandatory rules defence". |
| mandatory rules defence | defence advanced by Prato in the present case | MCJ para 15(3) and section E. The mandatory rules defence is that Prato's alleged obligations under the swaps are unenforceable by reason of mandatory rules of Italian law, which must be given effect under the Rome Convention, Article 3(3) , and the 1990 Act. |
| mark to market | mark to market value | See "MTM". |
| master agreement | agreement signed and sealed by Prato on 25 Nov 2002 and signed by Dexia on 29 Nov 2002 | MCJ para 5. The master agreement was based on the ISDA 1992 Multicurrency — Cross Border form, and included a schedule supplementing and |

| | | amending the form, among other things by incorporating the 2000 ISDA Definitions and the 1998 ISDA FX and Currency Option Definitions |
|---|---|---|
| MCJ | main claim judgment (or if the context so requires, the main claim judgment) | Judgment on Local Government & Financial Services Defences:judgment in the present case handed down on 25 June 2016 as approved on 29 June 2016. |
| Mediolanum | decision 13905/2013 of the Joint Chambers of the Court of Cassation of 3 June 2013 | MCJ paras 224 to 248.Cass. civ., sez. un. civ., 3 June 2013, no. 13905. |
| MEF | Ministry of Economics and Finance | MCJ para 145 |
| MEF Circular | Ministry of Economics and Finance Circular letter dated 27 May 2004 | |
| MEF Decree | Decree of the Italian Ministry of Economics and Finance 389 of 1 December 2003 (Regulation concerning access of local administrations to capital markets, pursuant to Art. 41, para. 1, of Law 448/2001) | |
| Mengle extract | extract from am article by Mr David Mengle in issue 3, 2010 of ISDA Research Notes | JORI, section F1.6. |
| MiFID | Markets in Financial Instruments Directive | 2004/39/EC Parliament & Council Directive of 21 April 2004 |
| misrepresenta-tion counterclaim | counterclaim advanced by Prato in the present case | MCJ para 16(4). In the misrepresentation counterclaim Prato claims damages in respect of Dexia's alleged misrepresentations under Italian law. |
| misrepresenta-tion defence | defence advanced by Prato in the present case | MCJ para 15(4). The misrepresentation defence is that Prato has under English law rescinded the swaps by |

| | | |
|---|---|---|
| | | reason of Dexia's actionable misrepresentation, or alternatively is entitled to rescind the swaps for this reason. |
| MTM | Mark to market value | MCJ para 36. Dr Faro and Mr Malik agree that the MTM of a transaction is generally understood in its simplest form to mean the present value of the expected cash-flows under that transaction, calculated according to a series of generally accepted conventions. |
| Municipality of C | App. Bologna 734/2014, 11 March 2014 | MCJ para 157, 227 to 246.Corte d'Appello di Bologna, Sezione Terza Civile, 734/2014 |
| Napolitano, Professor | Professor Giulio Napolitano | MCJ para 25(1). Italian administrative law expert for Dexia. Professor Napolitano is Professor of Administrative Law at the University of Roma Tre. |
| Napolitano 1 to 3 | Professor Napolitano's first to third reports. | MCJ para 25(1). The reports are dated 21 March 2014 ("Napolitano 1"), 13 May 2014 ("Napolitano 2") and 13 June 2014 ("Napolitano 3"). |
| Navigant | Navigant Consulting (Europe) Ltd | Mr Malik's employer (see MCJ para 27(1)). |
| Nigro, Professor | Professsor Giampiero Nigro | A tenured professor in the Department of Economics of the University of Florence. Expert member of the technical committee. See under "technical committee". |
| nM Euribor | Euribor for loans with a maturity of n months | MCJ para 33. Also known as "EURnM" |
| no need to know factual proposition | Dexia's proposition that "a counterparty such as Prato entering into interest rate swaps such as those in issue in this case did not need to know the initial MTM of the swap in order to make an informed investment decision". | JORI section F1.7 |
| no need to know legal proposition | Dexia's proposition that article 28.2 CR does not require disclosure of matters | JORI section F2.3 |

| | which there is no need to know when considering the nature, risks and implications of a proposed transaction in order to make an informed decision on whether to invest. | |
|---|---|---|
| non-disclosure assertions | non-disclosure assertions | Head (1) of the regulatory assertions. See entry under "regulatory assertions". |
| November 2004 bonds | first tranche of floating rate notes issued by Prato on 30 November 2004 in the sum of &euro;27,870,000 | MCJ para 8. |
| Novital | Trib. Milan 8 May 2014 | Decision of the Tribunal of Milan dated 8 May 2014. |
| oggetto | Italian law requirement that a contract must have a determinable oggetto | MCJ para 214. CC, article 1418 , paragraph 2, requires that a contract must have a determinable "oggetto". |
| ordinary expenditure objection | Dexia's objection that ordinary expenditure (such as the payment of interest on debt) could not constitute a relevant change of position since Prato would have incurred such costs in any event. | JORI section B4.2 |
| Orvieto grant of protection. | Trib. Orvieto 13 Apr 2012. | Decision of the Tribunal of Orvieto on 13 April 2012. |
| para(s) | paragraph(s) | |
| Pisa I | CdS 5032/2011 | MCJ paras 167, 171. |
| Pisa II | CdS 5962/2012 | MCJ paras 167, 171, 178 to 180. |
| Prato | Comune di Prato | MCJ para 1. The defendant in the present proceedings. |
| Prato's first main disclosure proposition | Proposition by Professor Sciarrone Alibrandi that financial institutions are obliged to disclose all the relevant elements of the relevant | JORI section F2.3 |

| | investment services and instruments. | |
|---|---|---|
| Prato's Hidden Costs explanation | Prato's general explanation concerning "Hidden Costs", including paragraphs 10, 11 and 11A of the defence | JORI section F1.5 |
| Prato's second main disclosure proposition | Prato's proposition that: "With regard to derivative transactions, the prevailing Italian case law has clarified that a financial institution must inform the client of the existence of any hidden costs because this information is essential for the client to take fully informed investment decisions." | JORI section F2.3 |
| premium | consideration provided by the buyer to the seller in return for the seller's promise | MCJ para 35. Where a seller makes a promise to provide a buyer with a particular advantage, the consideration provided by the buyer to the seller in return for the seller's promise may take various forms, but is commonly described as "the premium". |
| regulatory assertions | regulatory counterclaim assertions as to duties owed and broken by Dexia | See under "non-disclosure assertions", "structuring assertions", "unsuitability assertions", "right of withdrawal assertions", and "conflict assertions". |
| regulatory counterclaim | counterclaim advanced by Prato in the present case | MCJ para 16(2). In the regulatory counterclaim Prato claims damages in respect of Dexia's alleged breaches of the Italian financial services regulatory regime. |
| relevant subparas | subparas c) d) and e) of article 30.2 CR | JORI section C3 |
| restitution claim | second alternative claim advanced by Dexia in the present case | JORI section B |

Dexia Crediop SpA v Comune di Prato, 2016 WL 6833477 (2016)

| | | |
|---|---|---|
| restitution counterclaim | counterclaim advanced by Prato in the present case | MCJ para 16(1). JORI section E. In the restitution counterclaim Prato asserts, as regards sums it paid on and after 30 June 2009, that it is entitled to restitution under Italian law, alternatively English law, on the basis that swap 6 is invalid and/or unenforceable. |
| right of withdrawal assertions | right of withdrawal assertions | Head (4) of the regulatory assertions. See entry under "regulatory assertions". |
| Rome Convention | Convention on the law applicable to contractual obligations, open for signature in Rome on 19 June 1980 (80/934/ ECC). | MCJ para 208. See " article 3 non-derogable rule". |
| Sciarrone Alibrandi, Professor | Professor Antonella Sciarrone Alibrandi | MCJ para 26(2). Italian civil and financial law expert for Prato. Professor Sciarrone Alibrandi is Vice-Rector and Professor of Banking Law and Financial Markets Law and Professor of Italian Private Law at the Università Cattolica del Sacro Cuore, Milan. |
| Sciarrone Alibrandi 1 to 4 | Professor Sciarrone Alibrandi's first to fourth reports | MCJ para 26(2). The reports are dated 20 March 2014 ("Sciarrone Alibrandi 1"), 12 May 2014 ("Sciarrone Alibrandi 2"), 16 June 2014 ("Sciarrone Alibrandi 3") and 25 June 2014 ("Sciarrone Alibrandi 4"). |
| seller | party which is to receive a particular advantage as "the buyer" and the party making a promise to provide that advantage as "the seller". The consideration provided by the buyer to the seller's promise may take various forms, but is commonly described as "the premium" | MCJ para 35. party which is to receive a particular advantage as "the buyer" and the party making a promise to provide that advantage as "the seller". The consideration provided by the buyer to the seller in return for the seller's promise may take various forms, but is commonly described as "the premium" |

| set off defence | defence advanced by Prato in the present case | MCJ para 15(5). The set off defence states that if found liable to pay any sum to Dexia, Prato will seek to set off that liability against the sums it counterclaims. |
| --- | --- | --- |
| simple IRS | simple interest rate swap. | MCJ para 34. In a simple IRS the fixed leg and the floating leg exchange promises under which the fix leg will pay a fixed rate of interest on a notional sum and the floating leg will pay a floating rate of interest on the same notional sum. |
| sole connected county | country contemplated by article 3 of the Rome Convention | JORI section C1. The relevant passage in article 3 is: "all other elements relevant to the situation at the time of the choice are connected with one country only ". |
| Sommavilla, Mr | Mr Riccardo Sommavilla | MCJ para 21. Mr Sommavilla was Dexia's Client Relationship Manager with Prato throughout the duration of the 2002 advisory agreement, and thus at the time when the swaps were entered into. |
| Sommavilla 1 | Mr Sommavilla's first witness statement dated 28 Nov 2013 | MCJ para 21. |
| strike price | cap rate in an interest rate cap; floor rate in an interest rate floor | See "cap rate" and "floor rate". |
| structuring assertions | structuring assertions | Head (2) of the regulatory assertions. See entry under "regulatory assertions". |
| swap 1 | swap with an initial notional sum of &euro;83,824,626.884 evidenced by a confirmation dated 4 December 2002 | MCJ para 10. Details are set out in MCJ paras 59 to 61. See "swaps, the". |
| swap 2 | swap with an initial notional sum of &euro;113,105,592.42 evidenced by a confirmation dated 6 August 2003 | MCJ para 10. Details are set out in MCJ paras 67 to 71. See "swaps, the".Swap 2 terminated swap 1, and was entered into at the same time as swap 3. |
| swap 3 | swap with an initial notional sum of &euro;13,055,932.44 evidenced by a | MCJ para 10. Details are set out in MCJ paras 72 to 74. See "swaps, the".Swap 3 was entered into at the same time as swap 2. |

| | | confirmation dated 6 August 2003 |
|---|---|---|
| swap 4 | swap with an initial notional sum of &euro;27,870,000 ("swap 4") evidenced by a confirmation dated 30 December 2004 | MCJ para 10. Details are set out in MCJ paras 90 to 94. See "swaps, the".Swaps 4 and 5 together terminated swap 2. |
| swap 5 | swap with an initial notional sum of &euro;37,553,000 evidenced by a confirmation dated 30 December 2004 | MCJ para 10. Details are set out in MCJ paras 90 to 94. See "swaps, the".Swaps 4 and 5 together terminated swap 2. |
| swap 6 | swap with an initial notional sum of &euro;67,524,044.17 evidenced by a confirmation dated 29 June 2006 | MCJ para 10. Details are set out in MCJ paras 107 to 110. See "swaps, the".Swap 6 terminated swaps 3, 4 and 5. |
| swaps, the | IRS transactions entered into between Dexia and Prato evidenced by confirmations and said to form part of the Agreement contemplated by the master agreement | MCJ para 7. See swaps 1 to 6. |
| TAR | Tribunale Amministrativo Regionale | MCJ para 132, citing para 4.4(a) of Napolitano 1: Tribunali Amministrativi Regionali are the administrative courts of first instance, located in each of Italy's administrative regions. The local TAR for Prato is the TAR of Tuscany. |
| technical committee | technical committee set up by Prato's decision 1453 of 22 May 2002 | MCJ para 51. The technical committee comprised Ms De Castelli (chair) and Ms Belli from Prato, and 3 external expert members, Professor Nigro, Professor Bompani, and Mr D'Agliana. Ms Rappuoli of Prato acted as secretary to the technical committee. |
| tender notice | tender notice dated 24 April 2002 | MCJ para 50. The tender notice was issued by Prato for the appointment of an adviser in relation to Prato's intention to optimise the cost of its debt. |

Dexia Crediop SpA v Comune di Prato, 2016 WL 6833477 (2016)

| | | |
|---|---|---|
| threshold rate | cap rate in an interest rate cap; floor rate in an interest rate floor | See "cap rate" and "floor rate". |
| Trib. | Tribunale | MCJ para 132, citing para 4.3(a) of Napolitano 1: first instance tribunals based in various towns and cities in Italy [have] jurisdiction over local civil and criminal matters. The local court in Prato is the Tribunale di Prato. |
| TUF | Italian Legislative Decree 58 of 24 February 1998 (Consolidated law on financial markets and investment services) | MCJ para 213. |
| unsuitability assertions | unsuitability assertions | Head (3) of the regulatory assertions. See entry under "regulatory assertions". |
| Turin mortgage swap | Trib. Torino 17 Jan 2014 | Decision of the Tribunal of Turin dated 17 January 2014. |
| Valuation Joint Memorandum | joint memorandum by Mr Malik and Dr Faro | MCJ para 27(3). The Valuation Joint Memorandum is dated 16 April 2014. |
| vital interest observation | observation by Professor Gentili that while a party entering into a swap has a vital interest in doing so on a rational and informed basis, that vital interest is not part of the causa of the contract | JORI section C5.3. |
| Zenti, Mr | Mr Davide Zenti | MCJ para 23. Mr Zenti has been Prato's Manager of Financial Resources since 1 January 2011. |
| Zenti 1 to 4 | Mr Zenti's first and second witness statements | MCJ para 23. The statements are dated 22 November 2013 ("Zenti 1") and 9 May 2014 ("Zenti 2"). |

A2A/ 1. Faro 1 made references to the criminal proceedings described in section B6 of the main claim judgement. It also made reference to what it called the " *Autotutela* proceedings". These were the administrative

**Dr Faro's evidence**

Dexta Credibop SpA V Comune di Prato, 2016 WL 6833477 (2015)

redress proceedings described in section B6 of the main claim judgment.

A2A/ 2. Paragraph 8 of Faro 1 stated, among other things, that:

• (1)  from November 2001 to April 2012 Dr Faro worked for Brady Italia Srl ("Brady Italia");
• (2)  in April 2012 Brady Italia became part of the Finance active Group, an international financial advisory organisation;
• (3)  Dr Faro is now a senior financial consultant at Finance active Italia Srl ("Finance Active");
• (4)  in 2010:

> Prato asked Brady Italia to analyse the Swap Transactions which are the subject of this dispute. Brady Italia evaluated, from a financial view, whether or not the financial conditions of Article 41 law 448/01 ("Art. 41") and the conditions of Decree 389/03 ("Decree 389") were met by the Swap Transactions.

• (5)  since that evaluation:

> Brady Italia, and subsequently Finance Active, have acted for Prato in connection with the *autotutela* proceedings and with the criminal proceedings which have been taking place in Italy.

A2A/ 3. The first two sentence of paragraph 9 of Faro 1 stated, with the addition of sentence numbers for ease of reference:

> [9.1]  I have been asked to provide expert evidence on the characteristics, valuation and pricing of, and market

practice in relation to, derivatives contracts of the types entered into by the parties and to provide calculations for the purpose of assisting the Court. [9.2] I also give my opinion, based on my experience of market practice in Italy in this field, as to the disclosure that would be expected of a bank on entering into a swap with a Municipality and as to what advice would be expected from a bank when acting as adviser to a Municipality on such transactions.

A2A/ 4. The third sentence of paragraph 9 stated:

> [9.3]  For the purpose of fulfilling these instructions, I understand that I am appointed as expert personally and the opinions in this report constitute my own opinions and my own independent expert evidence, not that of Finance active or Brady Italia.

A2A/ 5. A section at the end of Faro 1 was headed, "Expert Declaration". So far as material for present purposes, it stated in paragraphs 150, 151 and 154:

> 150.  I confirm that I fully understand my overriding duty to the Court and that I must help the Court on matters within my expertise. I believe that I have complied with this duty, and I will continue to comply with this duty.

> 151.  I am aware of the requirements of Part 35 , the practice direction to Part 35 and the Protocol for Instruction of Experts to give Evidence in Civil Claims. I have complied and

will continue to comply with Part 35 of the Civil Procedure Rules , the Civil Justice Council's Protocol for the Instruction of Experts to Give Evidence in Civil Claims and paragraph H2 of the Admiralty and Commercial Court Guide.

…

154. This report must not be construed as expressing opinions on matters of law, which are for the Court to determine, although it necessarily reflects my understanding thereof in my capacity as a financial expert operating in the specialised field of swap transactions between local authorities and banks.

A2A/ 6. Faro 1 did not explain to what extent, if any, Dr Faro personally had advised Prato in relation to the administrative redress proceedings and the criminal proceedings. Dr Faro was asked about those proceedings at an early stage in cross-examination. He was initially asked to confirm that Brady Italia and subsequently Finance Active had acted for Prato in connection with those proceedings. He replied:

> …Finance Active … intervened with the reports that we have provided for the court. In these documents, there is my contribution. In other cases, sometimes there is my signature, which means that that represents my opinion.

A2A/ 7. It was apparent from later answers that Dr Faro intended, in the answer quoted above, to refer not only to Finance Active but also to Brady Italia. Dr Faro

chose in that answer, although he had not been asked about it at that stage, to give evidence about his personal involvement. As I understand it, he said that in some reports provided for an Italian court or courts there had been a contribution from him, and that sometimes a report was signed by him, and that when he signed a report then the report represented his opinion.

A2A/ 8. The next question asked Dr Faro to confirm that he was the person within Brady Italia and Finance Active who had been acting for Prato in those respects. Dr Faro's answer dealt first with his role in relation to the administrative redress proceedings and criminal proceedings, and contrasted that with his reports in the present case. As to his reports in the present case, he said that they were the expression of his personal opinion. By contrast, in relation to the administrative redress proceedings and criminal proceedings, Dr Faro said that it was not right to say that he was the person within Brady Italia and Finance Active who had been acting for Prato:

> …because I worked with a team, and within the team, the team issued various reports, I can say that from 2010 my involvement became greater …

A2A/ 9. Dr Faro was then asked to agree that Prato's aim in commencing the first set of administrative redress proceedings was to cancel swap 6. Dr Faro's answer was:

> I can't confirm what Prato's aim was in 2006. All I can say is that Prato asked me to carry out an assessment, and that was on the basis of that assessment that Prato's lawyer decided to launch proceedings. That's all I can say.

Dexia Crediop SpA v Comune di Prato, 2016 WL 6833477 (2015)

A2A/ 10. Dr Faro was pressed with the suggestion that in late 2010 he was assisting Prato in its attempt to cancel swap 6. His reply was:

> No, that's not true at all. In 2010 I carried out an analysis on specific issues and on the basis of that analysis [Prato] and their lawyer decided to bring a suit.

A2A/ 11. Dr Faro was then asked about a letter which Prato had sent to Dexia on 17 December 2010. The letter concerned the administrative redress procedure in relation to swap 6. Dr Faro was shown a copy of the transcript of evidence of Mr Zenti. In that evidence Mr Zenti confirmed that Prato indicated in the letter of 17 December 2010 that "the hearing" would take place on Tuesday 21 December, and that a lawyer, Mr Vulcano, and Dr Faro would attend on behalf of Prato. As I understand it "the hearing" formed part of administrative redress procedures conducted at Prato's municipal building. When asked to confirm that he and Mr Vulcano represented Prato as described in the letter, Dr Faro replied:

> On that day, I was summoned to Prato, as far as I remember, to hand over my report, and that's what happed that day. So I was present, yes.

A2A/ 12. As to whether the letter gave an accurate characterisation of Dr Faro's role, Dr Faro stated:

> Well, the first thing is Davide Zenti was not present at that time, so I assume that Davide Zenti is just expressing an opinion, because he was not there. What I can say is that the *Autotutela* procedure started with some technical questions which I dealt with, and then the purely interpretations were

conducted by the lawyer, Pasquale Vulcano, who is the only person who is an expert at law and who could say what should be done and what shouldn't be done. What I pointed out in the report, is that if there are certain conditions laid down at law, whether from a technical point of view those had been complied with or not. That was my role. … all I can say is that my role is strictly technical. I carried out a technical assessment and, over time, I confirmed my conclusions and I commented on my reactions to Prato and to Vulcano, the lawyer. That was the extent of my involvement.

A2A/ 13. It was then suggested to Dr Faro that he had continued to assist Prato in its attempt to cancel not only swap 6 but all the swaps. Dr Faro replied:

> That's your opinion. What I did was merely to issue technical assessments. The outcome and legal interpretation of my technical representations was not my role. My role is just to assess the technical points associated with the regulations and then the management and the lawyer took it further. That's all I can say.

A2A/ 14. It was then suggested to Dr Faro that he was not independent of Prato. The first part of his answer was this:

> I repeat, that's your opinion. Our work for Prato and other bodies is to produce technical expert opinions, and after that the client assesses the technical aspects and, with the support of the lawyer, they then decide what type of action to take. Our activity that

WESTLAW   © 2017 Thomson Reuters.

Dexia Crediop SpA V Comune di Prato, 2016 WL 6803477 (2016)

we are carrying out in Italy very often, in the vast majority of cases, has not led to litigation. So our role is that of providing opinion.

A2A/ 15. Dr Faro continued by giving an example:

…we are like an analyst. Say you break a leg, the first thing you do is have an x-ray. We … provide the x-ray, … after that you go to the doctor and the doctor tells you what type of activity should happen, not me. I can just provide an expert opinion and all I can do is describe what I see from a technical point of view, but that doesn't mean what I see will lead to treatment.

A2A/ 16. It was then suggested to Dr Faro that he had been willing to advance points or arguments in his expert reports that fell outside the scope of his expertise. Dr Faro replied:

…it's not true at all … my role is to assist in a technical assessment of the number, the quantification, and after that it is … Prato and [its] lawyer who is in the doctor role in this situation, they then decide what treatment to carry out. …

A2A/ 17. There was then a series of questions asking Dr Faro about passages in his report where it was suggested that he had given opinions on questions of law. After Dr Faro had dealt with those questions I pointed out to him that the question of his independence was an important

question. I explained that there had been two aspects to the cross-examination. The second concerned the overlap between Dr Faro's technical expertise and questions of law. I asked Dr Faro to put that on one side.

A2A/ 18. At that stage Dr Faro intervened:

If I might speak, my lord. My experience is not linked just to matters of numbers, but also to act as an advisor, a consultant. So in my activity, one can verify that I've helped the Comune for other aspects, I or my company. But what I base this on is my experience and my assessment of the facts as an independent expert. …

A2A/ 19. I explained to Dr Faro that I needed to raise with him a feature of the first aspect of the cross-examination. This was that Dr Faro and his employers had worked for Prato. Dr Faro replied:

Yes, that's a fact … but our company doesn't just work as consultants, but also as distributors of financial software. So the fact that we worked for Prato on technological platforms, on information technology or an analysis of that, doesn't I think in any way suggest a conflict of interest. … at any rate, I wanted to specify in my report that in this trial it's not Brady Italia or Finance Active bearing witness now, it is Dr Enzo Faro who is testifying.

A2A/ 20. Referring to Dr Faro's example, I pointed out that if there was an issue about the approach that had been taken by the radiographer immediately after an accident, I would commonly hear expert evidence from different

radiographers on each side. I asked Dr Faro whether he had thought about the fact that, when giving expert evidence in the present case, he had to put on a completely different hat from the hat of the person who was advising Prato. Dr Faro's response began by developing his earlier example:

> …My experience is that often you go to the doctor and the doctor has two different approaches. One is to send you off to have an x-ray, and then after that he decides what to do with regard to the treatment. The second approach is that he starts treatment without actually knowing what the problem is, what the damage is. And this is my experience as a footballer.

A2A/ 21. Dr Faro then said that Prato had drawn on opinions not only from Brady Italia and Finance Active, but also from others:

> So in this case, I think Prato drew on three or four opinions. So I would presume … the municipality looked at the figures, the assessments of several analysts, where upon after that they decided what to do. So probably, when it comes to this case … I am acting in an individual personal capacity …

> So I am an independent consultant … I look at the numbers, I propose numbers and I provide assessments on the basis of my experience. … I wouldn't go so far as to say myself whether or not this corresponds to the law. I am saying that certain components need a technical key to interpret them, and then it's up to others to give a legal interpretation of this, and that was my job. …

A2A/ 22. Dexia's closing submissions suggested that Dr Faro's evidence on the meaning of "speculation" was indicative of his lack of independence and of his willingness to act as an advocate for Prato. My conclusions on the law made it unnecessary for me to examine that evidence. It is appropriate, however, to comment upon it here.

A2A/ 23. Paragraph 64 of Faro 1 identified four conditions which, in Dr Faro's "experience and opinion", had to be met if a swap were to be classified as a hedging transaction for a municipality. The first condition was this:

> i. The swap transaction must be put in place explicitly to reduce the cash flow risk of an underlying debt instrument (Hedge Item);

A2A/ 24. Faro 1 said that this came from Consob Communication n.DI/99013791 of 26 February 1999 ("the February 1999 communication"). In cross-examination, however, Dr Faro accepted that the February 1999 communication did not use this terminology. He explained orally that what he had done was to adapt advice given by Consob to a company so that it reflected the special circumstances applying to municipalities. This had not been explained in Faro 1.

A2A/ 25. The second condition was:

> ii. There should be a complete or very high correlation between the Hedge Item and the financial instrument (Hedging Instrument) used for this purpose. Such a correlation will ensure that interest rate movements will be cash flow neutral on a net basis because their effect on cash flow for the Hedged Item will be offset by an equal and

opposite effect on cash flow for the Hedging Instrument;

rates go up. So far as I am concerned, the only criterion to say whether a derivative is a hedging derivative or not is to verify the effects where the rates go up.

A2A/ 26. This also was said to be derived from the February 1999 communication. In cross examination Dr Faro accepted that the words used in the February 1999 communication were not "a complete or very high correlation". That communication had referred to "a high correlation". Again, Dr Faro sought to explain this by saying that he had taken account of the special position of municipalities. Again, that had not been said in Faro 1. Moreover, when Dr Faro sought to explain the special position of municipalities he asserted that the correlation had to be "perfect, in that the underlying debt must be equal". I am left unsure as to what Dr Faro meant by this, but it seems rather different from what he said in Faro 1. Faro 1 made no reference to a "perfect correlation", but instead suggested that a "very high correlation" would suffice.

A2A/ 29. Here, too, Dr Faro's condition did not reflect the text that he cited. Again, this was not explained in Faro 1. On this occasion Dr Faro developed a point he had advanced earlier, namely that if a local authority were to take on a floating rate of interest then it will be entering into a risk. He said the consequence was that it could not be seen as a hedging derivative "because it's a trade-off".

A2A/ 30. Dr Faro's fourth condition was:

A2A/ 27. The third condition was:

    iv.   The Hedging Instrument is put in place only to hedge the cash flow risk of the underlying debt instrument (Hedge Item), not to receive a net premium (or *Up front* ) at inception or to net (i.e. fund) the *Unwind Cost* of previous swap transactions.

    iii.   The Hedging Instrument should limit the Municipality's exposure to cash flow risks resulting from increases in interest rates *( Cash Flow Hedging* ).

A2A/ 28. Faro 1 stated that this third condition came from the ministerial circular of 27 May 2004. I discussed this circular in section D2.4 of the main claim judgment. In cross-examination Dr Faro was taken to the passage in the circular that he relied upon. It was rightly pointed out to him that it did not say what was said in Dr Faro's third condition. Dr Faro's reply was:

A2A/ 31. This was said to come from International Accounting Standard 39. In cross-examination Dr Faro said that he was not an expert on accountancy but some terms and values were very familiar to him because he had studied accountancy and he worked to support accountants. In cross-examination he was shown a commentary on IAS 39, in which it was said that valid economic hedging strategies might not comply with IAS 39. His reply was:

    Well, what I understand from this text, since the aim of the local authority is to contain the exposure of the local authority to financial risk, in a particular circumstance, when the

    I don't have the accounting knowledge, but … when a transaction in a company doesn't comply with these criteria, mini alarm bells are triggered, … evaluating these tests is a very

important thing in a company and its something that they really focus on.

A2A/ 32. Thus in relation to each of Dr Faro's 4 suggested conditions, there were important qualifications and explanations that needed to be considered. Not one of them was mentioned in Faro 1. As regards the qualifications and explanations that were required in relation to the first 3 conditions, Dr Faro was well aware of them. As regards the fourth condition, if Dr Faro were to rely upon an accounting standard, then he needed to consider whether there might nonetheless be valid economic hedging transactions which did not fall within that accounting standard.

A2A/ 33. I add that a full analysis of Dr Faro's four conditions was set out in Malik 2. That analysis gave clear and convincing reasons for rejecting Dr Faro's four conditions.

A2A/ 34. Prato identified a number of points which should, it submitted, lead me to conclude that Dr Faro had given proper consideration to the important distinction between his consultancy role for Prato and his role as an expert witness. The points were drawn together in Prato's oral Closing Submissions.

A2A/ 35. Prato asserts that the present case does not involve a dispute as to the competence of advice previously given by Dr Faro, and that he had consistently given "the technical input which he gives in his report". However, on major issues Dr Faro's reports in the present case are seeking to support advice which Prato relied upon in the administrative self-redress proceedings.

A2A/ 36. Prato also asserts that Dr Faro viewed his role as that of a technician giving technical help and numbers. That observation, however, was immediately qualified by recognition that Dr Faro additionally expressed opinions. I do not accept that Dr Faro saw himself as no more than a technician. He sought to give that impression

from the example that he chose concerning the work of a radiographer after an accident. It was not an accurate reflection of his role.

A2A/ 37. As to the discharge of that role, Prato noted that it had not been suggested by Dexia that Dr Faro signed the expert declaration in bad faith, or that Dr Faro had misunderstood the declaration. It seems to me, however, that a clear inference from Dexia's closing submissions was that one or other of these things must have happened. It is right that Dexia did not accuse Dr Faro of bad faith. Nor do I. The matters discussed above in relation to Dr Faro's four conditions, however, clearly demonstrate that there was a failure by Dr Faro to give proper consideration to the true nature of his role.

A2A/ 38. It was said that Dr Faro had not hesitated to give what he thought was the right answer, without regard to Prato's interests. Reliance was placed on paras 50 and 51 of Faro 1, discussing the approaches to what I have called "financial advantage". He said that, from the perspective of a financial expert, the approach taken by Professor Corielli was preferable to that taken by Dr Angeletti. There were aspects of subsequent calculations where Dr Faro's approach was not as beneficial to Prato as other approaches would have been. It was also said in this regard that in Faro 2 Dr Faro had adopted data identified in Malik 1 in the interests of narrowing the differences between the parties.

A2A/ 39. Prato added that there were occasions when Dexia relied on Dr Faro's evidence. First, Dexia, when noting that the market practice of banks at the relevant time was not to disclose the initial MTM to a counterparty, observed that this was accepted by Dr Faro. It was indeed accepted by Dr Faro – but only in cross-examination. The court was, in my view, entitled to expect that an independent expert would have drawn attention to this when producing a report for the court. Second, Dexia had pointed out that Dr Faro's oral evidence contradicted Prato's assertion that the initial MTM was the best estimate of the most likely outcome of a swap. I acknowledge that this is true.

A2A/ 40. I have carefully reconsidered Dr Faro's evidence concerning "speculation" and the evidence he gave as to his independence. As noted earlier, Faro 1 at paragraph 150 contained an express statement that Dr Faro fully understood his overriding duty to the court. The passages in Dr Faro's oral evidence set out above gave real cause for concern that he did appreciate that he had in fact misunderstood the nature of that duty. He had been closely involved, on behalf of his employers, in events which were highly relevant to the present litigation. Much of his involvement was at a stage when the present litigation was underway. The letter of 17 December 2010 may or may not have been right in describing Dr Faro as a person who would attend the self redress hearing on behalf of Prato. But it was undoubtedly the case that Dr Faro was assisting Prato. Faro 1 made no attempt whatever to disclose the fact that Dr Faro had done so, let alone the extent to which he had done so. Dr Faro's answers in cross-examination on the point were evasive.

A2A/ 41. Someone who had advised a party would not normally be put forward to the court as a person who could give independent evidence. The reason is that there is a fundamental difference between duties that are owed to a client and duties that are owed to the court. It is not as simple as merely saying, "I gave my own opinion in both". Dr Faro chose to liken his role to that of a radiographer after an injury has occurred. That example, however, did not give any indication of an appreciation that the duty to the court was very different from the duty to a client.

A2A/ 42. Despite what was said in the Expert Declaration, the oral evidence quoted above leads me to conclude that Dr Faro had not given any thought at all as to how, in order to give evidence as an expert witness in these proceedings, he needed to take a very different approach from the approach that he had taken to Prato as a client.

A2A/ 43. Turning to the second aspect of the cross-examination on independence, on numerous occasions Dr Faro expressed himself in a way which might have been thought to be expressing a view on the law. As noted above, paragraph 154 of Faro 1 made it clear that Dr Faro did not intend to express opinions on matters of law. In my view it was not difficult to identify, in relation to any particular aspect of law, the part of Dr Faro's evidence

which was relevant to the issues arising in the present proceedings. It is right to add, however, that Mr Malik in his reports, and in his oral evidence, took great care to avoid saying anything which might be misconstrued as expressing a view upon the law.

A2A/ 44. I readily accept that there were occasions when Dr Faro gave evidence which did not assist Prato, where a determined advocate for Prato might cynically have taken a less responsible stance. My criticisms, however, are not of bad faith. They are criticisms of an understandable inability on the part of Dr Faro to separate out his role as independent expert assisting the court from the role that he had previously adopted of giving assistance to Prato.

A2A/ 45. In these circumstances, I cannot have confidence in Dr Faro's evidence on any occasion when it differed from that of Mr Malik. I have no hesitation in concluding that wherever such differences occurred, I should prefer the evidence of Mr Malik.

### what would Prato have done?

A2B/ 1. Prato's regulatory counterclaim asserted at paragraph 64, in effect, that each of the alleged regulatory breaches caused it to enter into the swaps. I have held in section F of JORI that the only breach that occurred involved the failure to state the right of withdrawal on relevant forms. In that section I have also held that if Prato had been told of the right of withdrawal it would not have exercised it. Accordingly I concluded that this breach did not cause Prato to enter into any of the swaps, and thus resulted in no loss to Prato.

A2B/ 2. In the present annex I consider what the position would have been if other regulatory breaches had occurred as alleged. My reasoning applies equally to allegations in the counterclaim at paragraphs 71 and 75 in relation to alleged breaches of advisory duties and alleged misrepresentations.

A2B/ 3. It was said by Prato that precise calculation of quantum would be very sensitive to the findings that the court made on other aspects of the case. This is likely

to be true as regards precise calculations. The question I am examining is a broader question of whether particular types of alleged breach would, if proven, have caused Prato to enter into the swaps in circumstances where it would not otherwise have done. This is necessarily a hypothetical question. However it is an important question as regards causation. Both sides approached it on the footing that, at least as regards swaps 2 to 6, Ms De Castelli's assessment of whether to proceed with a proposed swap would have been determinative.

A2B/ 4. For reasons given below, it seems to me that, under the hypotheses advanced in closing submissions, there are certain extreme circumstances where Ms De Castelli would have decided not to proceed with a particular swap. In the absence of those extreme circumstances, I conclude that alleged breaches would not have led Prato to do things differently. At the outset, I rule out the submission in Prato's closing that the court might conclude that Prato would have entered into the swaps at more beneficial rates: no such assertion was pleaded.

A2B/ 5. Paragraphs 262.2 to 262.8 of Dexia's written closing submissions formed part of a series of reasons why Prato would not have done things differently:

> 262.2. Dr De Castelli accepted in cross-examination that Prato had already decided to pursue a policy of active debt management using interest rate derivatives in April 2002 when the tender notice was issued by Prato. Many other local authorities in Italy were entering into derivatives transactions for this purpose at around this time.

> 262.3. Dr De Castelli gave evidence that Prato had been under severe financial pressure since 1996 and that it needed to make savings on the cost of its debt and that it was *"constantly looking"* to make savings on its debt.

262.4. Swap 2 and Swap 3 were entered into against the background of the savings that Prato had already made on its fixed rate debt using Swap 1. The disclosure of the initial MTM would not have made any difference to Prato because it wished to make further savings on more of its borrowing.

262.5. The 2004 Bond Issue made obvious economic sense to Prato. It enabled Prato to refinance its existing fixed rate debt and to replace it with floating rate bonds at a significantly lower interest rate. However, in order to proceed with the 2004 Bond Issue, it was necessary in practice for Prato to enter into an interest rate collar to protect it against the risk of rising rates.

262.6. Prato would not have given up the very substantial economic benefits of the 2004 Bond Issue if it had known that the initial MTM of Swap 4 and Swap 5 was negative. Prato also needed to make substantial short term savings.

262.7. Indeed, when it decided to enter into Swap 4 and Swap 5, Prato had already issued the First Tranche of the 2004 Bonds so Prato had no option but to put in place Swap 4. In any event, the initial MTM of Swap 4 and Swap 5 was not significant to Prato because the purpose of these transactions was to fix Prato's borrowing costs within the range of the cap and the floor. What mattered therefore was the level of the rates and thresholds in the contract.

262.8. Prato needed to enter into Swap 6 because it was incurring negative differentials under Swap 3 which it could not afford and because it needed

to restructure the 2004 Bonds to make savings in the short to medium term. It is therefore unrealistic to suggest that Prato would not have entered into Swap 6 just because the initial MTM was negative.

had no idea that they had negative mark-to-market values or, as a result, implicit costs and [Dexia] should have made that clear if it was so. We were certainly not in a position to work that out, as [Dexia] was well aware. I relied on [Dexia] to tell us that…and [Dexia's] silence confirmed to me that there were no negative values or implicit costs…

A2B/ 6. The points in paragraphs 262.2 to 262.8 were not specifically contested by Prato. In my view each of them is sound.

43.  I trusted [Dexia] because it was our financial advisor, and therefore, as far as I thought, a reliable party. …

A2B/ 7. Prato's closing submissions relied on what had been said in De Castelli 1 at paragraphs 39, 42-43, 52–53. As to the first of these citations, the relevant part of paragraph 39 stated:

> [Prato] and I relied on the advice of our financial advisor and, as a result, between 2002 and the end of 2006 a number of resolutions were passed to enter further swaps…

A2B/ 10. These passages, however, do not deal with causation. They do not address the question of what Prato would have done if it had been told that the proposed swap would have an initial MTM that was negative to Prato.

A2B/ 11. Prato's remaining citations from what was said in De Castelli 1 are found in paragraphs 52-53. Those paragraphs began with a reference to the technical committee described in section B2 of the MCJ. They stated:

A2B/ 8. This says that if Dexia had not advised entering into the swaps then Prato would not have become party to them. It might be relevant if Prato were to succeed in an allegation that Dexia should have advised Prato not to enter into the swaps. It might also be relevant if Prato were to succeed in an allegation that Dexia should not have proposed the swaps. It does not seem to me to address the main point debated in closing submissions. This was: if Dexia had disclosed that the proposed swap would have an initial MTM that was negative to Prato, would Prato have decided not to agree to that proposal?

> 52.  Had the Committee known, at the time of their decision in July 2002, that [swap 1] had or was going to have a negative value and implicit costs to [Prato] at the date of entry, I believe that they would not have accepted [Dexia's] proposal for the restructuring, as they (and I) would have considered it to breach provisions of Italian law. [Dexia] presented Swap 1 as resulting in a saving to [Prato] but gave no indication that it had a significant negative mark to market value for [Prato].

A2B/ 9. As to Prato's reliance on De Castelli 1 at paragraphs 42-43, the passages cited by Prato were:

> 42.  At the time these 6 Swap transactions were entered into we

> 53.  Similarly, in respect of each of the [swaps] which followed, had [Prato]

known that the [swap] had a negative value and implicit costs to [Prato] at the date of entry they would not have been entered into.

A2B/ 12. In my view paragraph 52 begins with a false premise. Three of the five members of the technical committee were experts: Professor Giampiero Nigro, tenured professor in the Department of Economics of the University of Florence, Professor Aldo Bompani, also a tenured professor in the Department of Economics of the University of Florence, and Mr Giancarlo D'Agliana, an accountant and banker who had been Managing Director of Banca Steinhauslin of Florence, General Manager of Banca Popolare of Marsica and Managing Director of Market Risk and Studies at Banca Agricola Mantovana. There is no reason to doubt that they knew, in relation to each of the bids under consideration, that the proposed swap would have an initial MTM that was negative to Prato. Ms De Castelli was chairwoman of the technical committee. Her oral evidence was that she lacked an understanding of the concept of MTM. She did not say that the expert members of the committee lacked an understanding of this concept. On the contrary, when asked whether she was suggesting this, she replied that they:

> …were chosen because they knew about these aspects. …

A2B/ 13. Paragraph 52 of De Castelli 1 identified a reason why, had it known that the proposed swap would have an initial MTM that was negative to Prato, Prato would not have entered into swap 1. This was that she and the technical committee would have considered it to breach provisions of Italian law.

A2B/ 14. De Castelli 1 did not identify the precise feature of Italian law that she had in mind. I accept that if Prato had been advised that a proposed swap was beyond its

capacity then it would not have proceeded unless and until satisfied that such advice was wrong. By contrast, however, it is easy to think of possible breaches of Italian law which would have had no bearing on the decision whether to proceed. An example is the unlawful failure to ensure that relevant forms gave notice of the right of withdrawal: see section F7 of JORI.

A2B/ 15. Thus, on the question whether swap 1 would have been entered into if Prato had known that it would have an initial MTM that was negative to Prato, the sole reason given in paragraph 52 would, it seems to me, clearly apply if that knowledge was accompanied by advice that the proposed swap was beyond Prato's capacity. In the absence of such advice, however, the position seems to me essentially different.

A2B/ 16. As to paragraph 53 of De Castelli 1, this addresses swaps 2 to 6. It begins with the word "Similarly". In so far as it applies the same reasoning as is advanced in paragraph 52, my comments above will be equally applicable.

A2B/ 17. Turning to Ms De Castelli's oral evidence, Prato relied on passages from day 8 at pp. 72–73 and day 9 pp. 75–77. As to the passages from day 8, Prato cited the following:

> Q. …if you or anybody else at Prato had ever thought that the mark to market value of any of the swaps was of any interest or relevant to any decision Prato proposed to take, you or somebody else at Prato would have asked Dexia to provide that mark to market value, wouldn't you?

> A. Of course, because this would have meant not to enter these transactions because they were not considered to be advantageous for the municipality and the municipality would have not entered into these transactions.

A2B/ 18. I think it likely that when using the word translated as "advantageous" Ms De Castelli had in mind her belief, at the time of giving her evidence, that a swap with an initial negative MTM to Prato would be beyond Prato's capacity. Her belief was that such a swap would fail the "financial advantage" test in article 41 of law 448/2001: see section D2.3 of the MCJ. If so, this oral evidence takes matters no further. The reason is that I have already concluded that if Prato were advised that it lacked capacity, then it would not have proceeded: see above.

A2B/ 19. If I am wrong, then Ms De Castelli must have been using the expression "not considered to be advantageous" simply in the sense of being no better off. I have explained in section F of JORI why I consider that the negative initial MTM had no impact on the commercial outcomes of the swaps. That commercial outcome was determined by movements in market floating rates as they impact upon the rates and thresholds in the swap. If my reasoning in section F of JORI were wrong then there would be a theoretical possibility that Prato might have been better off, or at least no worse off, if it had entered into an alternative transaction on the market, or if it had done nothing. I refer to this as a theoretical possibility because no specific assertion of this kind was advanced in Prato's statement of case, nor was there any evidence to support it.

A2B/ 20. The passage cited by Prato from day 9 was:

> Q. I also suggest to you that the day one mark to market of the swaps was of no concern to you or Prato, and that you were content to assess all of the swaps on the basis of the forward curve, as indeed had the technical committee in 2002?

> A. This is what you say. I can confirm that Dexia, as an adviser, should have provided all the information, all the elements and clarified the value of the mark to market in the

different periods. I do not accept what you are saying…This is not a joke. We are talking about clear and transparent elements and information, such as direct and indirect costs and as chief accountant, I could not allow, I could not have uncovered elements or additional charges with no financial coverage. I had criminal responsibilities, I had to perform my job correctly…

> Q. You assert in paragraphs 52 to 53 of your statement that, had Prato known of the existence of implicit costs, it would not have entered into any of the swaps. I suggest to you that that's not correct, that you knew the rates that Prato had to pay under each of the swaps, and you were content to agree to pay those rates having regard to the forward curve?

> A. Well, if Prato had [known] or was put in a position by Dexia to know these elements, these details, to know these details and the quantity or to quantify these elements, so the quantification of these elements certainly will not have entered into such a risky transaction, because these are bets and these have been prohibited by the legislator. So if Prato had been aware of these transactions, Prato would have never entered into such transactions because these were risky transactions.

A2B/ 21. As it seems to me, the reasoning here described by Ms De Castelli turns on it becoming apparent to Prato that a particular swap was prohibited by law or would leave Prato worse off than was envisaged in Prato's budget. If either or both of those things had become

apparent in relation to a proposed swap then I accept that Prato would not have proceeded with that swap. I record, however, that for reasons given elsewhere, in so far as Prato has in these proceedings alleged any of the elements needed to make good those assertions, those allegations have not succeeded.

A2B/ 22. In the result it does not seem to me that, on a careful analysis, Ms De Castelli's evidence provided a sound basis for Prato's submissions on causation. Lest it might be thought to offer some wider basis for a conclusion on causation, however, I need to add that I would not regard Ms De Castelli's evidence as affording a reliable basis on which to reach any conclusion:

• (1)  De Castelli 1 stated at paragraph 24:

> At that time [when recommending acceptance of Dexia's tender], the [technical] committee assumed that the interest rate swap would be structured so that, on the basis of forecasts at the time, the cashflows under it would be economically neutral over the life of the swaps i.e. the expected payments from each party to the other would cancel each other out. The Swap Transaction was therefore seen as merely a risk management tool ….

• (2)  For reasons given in section F of JORI, no commercial bank would have entered into a swap on the basis described in paragraph 24. The experts on the technical committee would have been well aware of this.
• (3)  I am satisfied that paragraph 24 was pure invention. It can only have been invented in order to assist Prato.
• (4)  As Dexia pointed out, swap 1 was entered into in the hope that Prato would receive net differentials from Dexia to reduce the effective cost of its fixed rate borrowing.
• (5)  As Dexia also pointed out, when this was put to Ms De Castelli in cross-examination she was unable to provide any justification for paragraph 24. Ms De

Castelli was an astute and careful senior financial officer. I have no doubt that she was well aware that each of the swaps was proposed and entered into by Dexia on a commercial basis. Her protestations to the contrary were inherently incredible.
• (6)  As set out above and below, in her oral evidence Ms De Castelli made assertions which were inconsistent and incredible.
• (7)  At an early stage in her evidence she denied that her role at Prato had included the assessment and in-depth analysis of swaps. She was then shown a CV saying exactly that – a CV that she herself had prepared. Her response was bluster. The reality was that each swap was a very important financial transaction for Prato. I have no doubt that Ms De Castelli assessed each swap proposal and analysed it in depth.
• (8)  I have no difficulty in accepting Ms De Castelli's evidence that she was not an expert on swaps, that Dexia was appointed to advise Prato because neither she nor her staff had expertise on swaps, and that she looked to Dexia for advice. However she was well able to understand the advice Dexia gave. She fully appreciated the crucial importance of the rates and thresholds in each proposed swap. She learnt about MTM in her role as chairwoman of the technical committee, charged with assessing tenderers which were required to undertake to provide MTM on request. She also learnt about MTM in the context of Dexia's explanations of payments arising on early termination of proposed swaps. In that regard Prato's resolution 745 of 20 November 2002 contained a passage referring to "a compensation to be paid to the Municipality or to be received by the same Municipality". This was an obvious error: it only made sense if "received by" were read as either "paid by" or "received from". Dexia's consistent explanations both before and after this resolution made it quite clear that, depending upon the MTM at the time of termination, payments could go one way or the other. Ms De Castelli's suggestion that she understood that such payments would always be in favour of Prato was absurd.
• (9)  On the first day of her evidence, when taken through Dexia's first proposal, she accepted that, if she had read it, she would have understood the explanations that it gave. Later that day, however, when taken through a later proposal with similar explanations that she must have read both then

and in proposals for later swaps, she disingenuously suggested that she was pleased to learn things that would be useful to her in future.

• (10)  In these circumstances where Ms De Castelli's evidence was not confirmed by contemporaneous documents or other witness evidence I cannot rely on it.

A2B/ 23. Thus I conclude that in the extreme circumstances identified above Prato would have behaved differently. For the reasons given above, however, if those extreme circumstances did not apply then in my view Prato's course of action would have been unchanged.

**extracts from Annex 3, CR**

A3/ 1. The initial section of Annex 3 to Consob Regulation n.11522 of 1 July 1998 included the following:

> **The general risks of investments in financial instruments**
>
> This document does not describe all the risks and other important aspects of investments in financial instruments or individual portfolio management services. Its purpose is to provide some basic information on the risks connected with such investments and services.
>
> **General advice**
>
> Before investing in financial instruments prospective investors should ask their intermediary about the nature and risks of the transactions they are preparing to carry out.
>
> Investors should conclude a transaction only if they understand its nature and the degree of exposure to risk it involves.

Once the risk associated with a transaction has been assessed, before concluding the contract the investor and the intermediary must determine whether the investment is appropriate, with special reference to the investor's net assets, investment goals and experience in investing in financial instruments.

A3/ 2. This was followed by Part "A". Part "A" was headed "Measuring the risk of an investment in financial instruments". Under this heading it discussed relevant factors under four heads: variability of price of the financial instrument, its liquidity, the currency in which it is denominated, and other factors.

A3/ 3. What was set out under the first head included the following:

> **Price variability**
>
> The price of a financial instrument depends on numerous factors and can vary more or less markedly according to its nature.
>
> …
>
> **Interest rate risk**
>
> With reference to debt securities, investors need to consider that the effective rate of interest adjusts continuously to market conditions as a result of movements in the prices of the securities. The yield of debt securities will approach that incorporated in the

security at the time of purchase only if investors hold them to maturity.

If investors should have to dispose of their investments before the security matures, the effective yield may be different from that offered by the security at the time it was purchased.

In particular, for securities for which the interest to be paid is predetermined and not modifiable during the life of the loan (fixed-rate securities), the longer the residual maturity, the greater the variability of the security's price with respect to changes in market interest rates. For example, in the case of a zero-coupon security – a fixed-rate security that provides for payment of interest in a lump sum at the end of the period – with a residual maturity of 10 years and a yield of 10% per annum, an increase of 1 percentage point in market rates will cause the price of the security to fall by 8.6%.

Thus, in order to assess the appropriateness of an investment in debt securities, it is important for investors to consider whether, and at what stage, they may need to disinvest.

…

A3/ 4. What was set out under the second head included the following:

**Liquidity**

The liquidity of a financial instrument consists in the possibility of converting it promptly into cash without losing value.

A security's liquidity depends in the first place on the characteristics of the market in which it is traded. As a rule, other things being equal, **securities traded in organized markets are more liquid than securities not traded in such markets** . This is because the demand for and supply of securities is largely channelled into such markets, so that the prices recorded in them are more reliable indicators of financial instruments' effective value.

…

A3/ 5. What was set out under the fourth head included the following:

**Other factors of general risk**

…

**Commissions and other charges**

Before starting to invest, investors should obtain detailed information regarding all the commissions, expenses and other charges that will be payable to the intermediary. Such information must in any case be stated in the investment service contract. Investors must always remember that such charges will be subtracted from any gains on transactions whereas they will be added to any losses.

Dexia Crediop SpA v Comune di Prato, 2016 WL 6833477 (2016)

…

**Transactions executed outside organized markets**

Intermediaries may execute transactions outside organized markets. The intermediary investors choose may also act the direct counterparty to the customer (i.e. act for own account). In transactions for execution outside organized markets it may prove difficult or impossible to liquidate a financial instrument or measure its effective value and the effective exposure to risk, especially if the instrument it not traded in any organized market.

For these reasons such transactions involve higher risks.

Before engaging in such activities investors should collect all the relevant information about the transactions, the applicable rules and the consequent risks.

A3/ 6. The introductory section of Part "B" was as follows:

**The Riskiness of Investments in Derivative Financial Instruments**

Derivative financial instruments are characterized by a very high degree of risk which it is difficult for investors to assess because of the instruments' complexity.

Investors should therefore conclude transactions in derivative instruments only if they understand the nature and extent of the exposure to risk they entail. Investors must bear in mind that the complexity of these instruments can more easily result in unsuitable transaction being carried out.

As a rule, trading in derivatives instruments is not suitable for many investors.

Once the risk associated with a transaction has been assessed, the investor and the intermediary must determine whether the investment is appropriate, with special reference to the investor's net assets, investment goals and experience in investing in derivative instruments.

Some risk characteristics of the most widespread derivative instruments are described below.

A3/ 7. Section 4 of Part "B" included the following:

**Transactions in derivative instruments executed outside organized markets. Swaps**

Intermediaries may execute transactions in derivative instruments outside organized markets. The intermediary to which investors give orders may also act as the direct counterparty to the customer (i.e. for own account). In transactions executed outside organized markets it may prove difficult or impossible

Dexia Crediop SpA v Comune di Prato, 2016 WL 06639477 (2016)

to liquidate a position or measure its effective value and the effective exposure to risk.

For these reasons **such transactions involve higher risk** .

Furthermore, the rules applicable to such transactions may be different and offer investors less protection.

Before engaging in such activities investors should collect all the relevant information about the transactions, the applicable rules and the consequent risks.

**Swaps**

Swaps involve a high degree of risk. There is no secondary market for these contracts, nor is there a standard form. At the most there are standardized model contracts, the details of which are usually adapted case by case. For these reasons it may prove impossible to terminate the contract before the

agreed maturity without incurring high costs.

The value of a swap is always nil at the time the contract is signed, but the swap can rapidly assume a negative (or positive) value depending on the behaviour of the parameter to which the contract is linked.

Before signing contracts investors should be certain they understand how and how quickly variations in the reference parameter are reflected in the calculation of the differences they are to pay or receive.

…

Crown copyright

© 2017 Sweet & Maxwell
2016 WL 06639477

---

**End of Document**

© 2017 Thomson Reuters.

# TAB 5

Edward John Giles v. Caroline Bridget Towers Rhind

Case No: A3/2007/0753

Court of Appeal (Civil Division)

28 February 2008

**[2008] EWCA Civ 118**

**2008 WL 371127**

Before: Lord Justice Buxton Lord
Justice Sedley and Lady Justice Arden

Date: 28/02/2008, Hearing date: 18 December 2007

**Analysis**

On Appeal from the High Court of Justice (Chancery Division) David Richards J

**Representation**

• Ms Georgia Bedworth (instructed by Messrs Hewitsons ) for the Appellant.
• Mr Richard O'Dair (instructed by Direct Access Scheme ) for the Respondent.
• Mr Rhind was not a party to this appeal.

**Judgment**

Lady Justice Arden:

**Introduction**

1  This appeal is brought by Mrs Caroline Rhind from the order of David Richards J ( [2007] 2 BCLC 531 ) giving permission to Mr Edward John Giles, the claimant in these proceedings, to amend his particulars of claim in this action, which concerns a transaction alleged to fall within s 423 of the Insolvency Act 1986 (Transactions defrauding creditors). (I refer to the Insolvency Act 1986 below as "the 1986 Act"). It raises a point of general importance about the postponement under s 32 of the Limitation Act 1980 ("the 1980 Act") of the limitation period where the defendant has deliberately concealed relevant facts.

2  The application before the judge was an application for permission to amend. The relevant principles about the amendment of pleadings are not in doubt. A party should have permission to amend his pleadings so that all the issues between the parties can be effectively adjudicated upon, provided that any prejudice to any other party caused by the amendment can be compensated in costs and provided that the public interest in the efficient administration of justice is not significantly harmed: see per Peter Gibson LJ in Cobbold v Greenwich LBC [1999] EWCA Civ. 2074 at [10]. Permission to amend should be refused if the claim, as amended, would fail to disclose a viable cause of action either because it is statute-barred or because the ingredients required for the relevant cause of action are not made out. On this appeal, Mrs Rhind contends that the amendments should have been refused on the ground that they were statute-barred. She also contends that the amendments would be unfairly prejudicial to her.

3  The respondent, Mr Giles, commenced these proceedings on 27 January 2006. The application to amend was made on 24 January 2007. The applicable limitation period for the claim in the original proceedings and that sought to be raised by amendment is twelve years. Unless some exception applies, that twelve year period must be calculated from the date on which the transaction sought to be impugned ("the new claim") was entered into and in addition Mr Giles became a person who could bring a claim under s 423 of the 1986 Act in relation to it. Thus the new claim is statute-barred and leave to amend should not have been given unless (a) the cause of action arose on or after 24 January 1995, or (b) the start of the limitation period arose at some earlier date but was postponed until on or after that date by virtue of s 32 of the 1980 Act, or (c) s 35 of that Act applies. Ss 32 and 35 of the 1980 Act are set out below. The effect of the judge's order is that by virtue of s 32 of the 1980 Act the new claim can be added to the claims in the existing proceedings even though it arose before 24 January 1995.

**The background in outline**

4  Mr Giles is a judgment creditor of Mr Rhind, having obtained judgment for damages to be assessed in 2000. The circumstances leading to the claim which

culminated in this judgment are described in the judgment of this court on a preliminary issue: see Giles v Rhind [2003] Ch 618 . No purpose would be served by my setting out those circumstances in any detail. It is sufficient to say that Mr Giles and Mr Rhind were the principal shareholders and directors of a company called Surrey Hills Foods Ltd ("SHF"). By a shareholders' agreement dated 11 June 1990, Mr Rhind owed Mr Giles an express duty of confidence in relation to the affairs of SHF. In March 1993 Mr Rhind resigned as a director and sold his shares but as part of the termination agreement he agreed with Mr Giles personally not to breach his obligation of confidence set out in the shareholders' agreement. In breach of that obligation of confidence, Mr Rhind diverted business from SHF to a company which he owned between about 1993 and 1994.

5   By order dated 24 October 2003, damages were assessed at approximately £1.5 million. In 2004 Mr Giles obtained a charging order over Mr Rhind's home ("the Property"). The Property was subsequently sold and the proceeds of sale after the payment of a secured debt amounted to £628,437 of which £127,000 was paid to Mr Giles in reduction of his judgment debt.

6   In these proceedings, Mr Giles seeks to challenge the allocation of the proceeds of sale of the Property as between Mr Rhind and Mrs Rhind. This allocation is governed by a deed apparently dated 2 April 1992 (referred to below as "the deed"), which provided that Mr and Mrs Rhind owned the Property in the proportions of 20:80 respectively, rather than in equal shares. In his original claim Mr Giles alleges that the deed was executed in 1998. It is clear that, if the Property were owned in equal shares, Mr Giles would have received a large proportion of the proceeds of sale. Accordingly, in these proceedings Mr Giles contends that the deed is a sham, or alternatively it was a transaction in fraud of creditors to which s 423 of the Insolvency Act 1986 ("the 1986 Act") applies. We are only concerned with the cause of action that Mr Giles asserts under s 423 of the 1986 Act. I propose to disregard the claim based on the allegation that the deed is a sham.

7   Mr Giles' original case was that the deed was in fact executed in 1998. By the amendment, he seeks to introduce a case that the deed was in fact executed in

1992 or 1994. As I have said, the date that it bears is 1992.

**Introduction to the relevant statutory provisions**

**ss 32 and 35 of the 1980 Act**

8   S 32 of the 1980 Act as now in force provides:

> **Postponement of limitation period in case of fraud, concealment or mistake**
>
> (1)   Subject to subsections (3) and (4A) below, where in the case of any action for which a period of limitation is prescribed by this Act, either—
>
> (a)   the action is based upon the fraud of the defendant; or
>
> (b)   any fact relevant to the plaintiff's right of action has been deliberately concealed from him by the defendant; or
>
> (c)   the action is for relief from the consequences of a mistake; the period of limitation shall not begin to run until the plaintiff has discovered the fraud, concealment or mistake (as the case may be) or could with reasonable diligence have discovered it.
>
> References in this subsection to the defendant include references to the defendant's agent and to any person through whom the defendant claims and his agent.
>
> (2)   For the purposes of subsection (1) above, deliberate commission of a breach of duty in circumstances in which it is unlikely to be discovered for some time amounts to deliberate concealment of the facts involved in that breach of duty.

(3)   Nothing in this section shall enable any action—

(a)  to recover, or recover the value of, any property; or

(b) to enforce any charge against, or set aside any transaction affecting, any property; to be brought against the purchaser of the property or any person claiming through him in any case where the property has been purchased for valuable consideration by an innocent third party since the fraud or concealment or (as the case may be) the transaction in which the mistake was made took place.

(4) A purchaser is an innocent third party for the purposes of this section —

(a)  in the case of fraud or concealment of any fact relevant to the plaintiff's right of action, if he was not a party to the fraud or (as the case may be) to the concealment of that fact and did not at the time of the purchase know or have reason to believe that the fraud or concealment had taken place; and

(b)  in the case of mistake, if he did not at the time of the purchase know or have reason to believe that the mistake had been made.

(4A)  Subsection (1) above shall not apply in relation to the time limit prescribed by section 11A(3) of this Act or in relation to that time limit as applied by virtue of section 12(1) of this Act.

(5)   Sections 14A and 14B of this Act shall not apply to any action to which subsection (1)(b) above applies (and accordingly the period of limitation referred to in that subsection, in any case to which either of those sections would otherwise apply, is the period applicable under section 2 of this Act).

9   Section 32(1) deals with the postponement of the limitation in a number of situations, including where the defendant or his agent has concealed relevant facts. The effect of s 32(2) is to enable a person to be treated as having concealed information. These circumstances can occur when, and only when, he has deliberately committed a breach of duty in circumstances where it is likely to remain undiscovered some time. For there to be a deliberate breach of duty for the purpose of s 32, the defendant must have known of his wrongdoing ( Cave v Robinson Jarvis & Rolf [2003] 1 AC 384 ).

10  S 35 of the 1980 Act as now in force provides:

**New claims in pending actions: rules of court**

(1)  For the purposes of this Act, any new claim made in the course of any action shall be deemed to be a separate action and to have been commenced—

(a)  in the case of a new claim made in or by way of third party proceedings, on the date on which those proceedings were commenced; and

(b)  in the case of any other new claim, on the same date as the original action.

(2)   In this section a new claim means any claim by way of set-off or counterclaim, and any claim involving either—

(a) the addition or substitution of a new cause of action; or

(b) the addition or substitution of a new party;

and "third party proceedings" means any proceedings brought in the course of any action by any party to the action against a person not previously a party to the action, other than proceedings brought by joining any such person as defendant to any claim already made in the original action by the party bringing the proceedings.

(3) Except as provided by section 33 of this Act or by rules of court, neither the High Court nor any county court shall allow a new claim within subsection (1)(b) above, other than an original set-off or counterclaim, to be made in the course of any action after the expiry of any time limit under this Act which would affect a new action to enforce that claim.

For the purposes of this subsection, a claim is an original set-off or an original counterclaim if it is a claim made by way of set-off or (as the case may be) by way of counterclaim by a party who has not previously made any claim in the action.

(4) Rules of court may provide for allowing a new claim to which subsection (3) above applies to be made as there mentioned, but only if the conditions specified in subsection (5) below are satisfied, and subject to any further restrictions the rules may impose.

(5) The conditions referred to in subsection (4) above are the following—

(a) in the case of a claim involving a new cause of action, if the new cause of action arises out of the same facts or substantially the same facts as are already in issue on any claim previously made in the original action; and

(b) in the case of a claim involving a new party, if the addition or substitution of the new party is necessary for the determination of the original action.

(6) The addition or substitution of a new party shall not be regarded for the purposes of subsection (5) (b) above as necessary for the determination of the original action unless either —

(a) the new party is substituted for a party whose name was given in any claim made in the original action in mistake for the new party's name; or

(b) any claim already made in the original action cannot be maintained by or against an existing party unless the new party is joined or substituted as plaintiff or defendant in that action.

(7) Subject to subsection (4) above, rules of court may provide for allowing a party to any action to claim relief in a new capacity in respect of a new cause of action notwithstanding that he had no title to make that claim at the date of the commencement of the action.

This subsection shall not be taken as prejudicing the power of rules of court to provide for allowing a party to claim relief in a new capacity without adding or substituting a new cause of action.

(8) Subsections (3) to (7) above shall apply in relation to a new claim made in the course of third party proceedings as if those proceedings were the original action, and subject to such other modifications as may be prescribed by rules of court in any case or class of case."

11 The relevant provision of the CPR is CPR17.4(2) , which is set out below in my summary of the judge's judgment.

**Ss 423 and 424 of the 1986 Act — Transactions defrauding creditors**

12 Ss 423 and 424 of the 1986 Act (prior to the Enterprise Act 2002 and the Civil Partnerships Act 2004 , which made amendments with which we are not concerned) provided in material part as follows:

**Transactions defrauding creditors**

(1) This section relates to transactions entered into at an under- value; and a person enters such a transaction with another person if —

(a) he makes a gift to the other person or he otherwise enters into a transaction with the other person on terms that provide for him to receive no consideration; …

(2) Where a person has entered into such a transaction, the court may, if satisfied under the next subsection, make such order as it thinks fit for —

(a) restoring the position to what it would have been if the transaction had not been entered into, and

(b) protecting the interests of persons who are victims of the transaction.

(3) In the case of a person entering into such a transaction, an order shall only be made if the court is satisfied that it was entered into by him for the purpose —

(a) of putting assets beyond the reach of a person who is making, or may at some time make, a claim against him, or

(b) of otherwise prejudicing the interest of such a person in relation to the claim which he is making or may make.

(4) In this section "the court" means the High Court or—

(a) if the person entering into the transaction is an individual, any other court which would have jurisdiction in relation to the bankruptcy petition relating to him;

(b) if that person is a body capable of being wound up on Part IV or V of this Act, any other court having jurisdiction to wind it up.

(5) In relation to a transaction at an under value, references here and below to a victim of the transaction to a person who is, or is capable of being, prejudiced by it; and in the following two sections the person entering into the transaction is referred to as the "debtor".

**Those who may apply for an order under section 423**

(1) An application for an order under section 423 shall not be made in relation to a transaction except —

(a) in a case where the debtor has been adjudged bankrupt or is a body corporate which is being wound up or in relation to which an administration order is in force, by the official receiver, by the trustee of the bankrupt's estate or the liquidator or administrator of the body corporate or (with the leave of the court) by a victim of the transaction;

(b) in a case where a victim of the transaction is bound by a voluntary arrangement approved under Part I or Part VIII of this Act, by the supervisor of the voluntary arrangement or by any person who (whether or not so bound) is such a victim; or

(c) in any other case, by a victim of the transaction.

(2) An application made under any of the paragraphs of subsection (1) is to be treated as made on behalf of every victim of the transaction."

13 In this case, the relevant transaction is the allocation of beneficial interests in the Property by the deed. S 424(1)(a) and (b) do not apply, so the only person who can challenge the transaction is a "victim". No party suggests that there is any potential "victim" other than Mr Giles. Provided that a person is a victim at the time of his application, it is not essential that he should have been a person within the purpose of the person entering into the transaction required by s 423(3) of the 1986 Act: see Hill v Spread Trustee Co Ltd [2007] 1 BCLC 450 .

14 The principle that creditors should be protected from the consequences of transactions which are designed to prejudice their interests has long been embedded in English law. S 423 of the 1986 Act is derived from a Statute of Elizabeth (13 Eliz c 5) which provided that all dispositions of property made with the intention of delaying, hindering or defrauding creditors should be void against creditors. This did not extend to any estate or interest created bona fide and for good consideration in favour of any person not having at the time notice of such fraud. It has even been said that the Statute of Elizabeth was merely declaratory of the common law. It was replaced by s 172 of the Law of Property Act 1925 , which in turn was replaced by s 423 and following.

15 There is considerable case law on the predecessors of s 423 . Lord Mansfield held that the Statute of Elizabeth (13 Eliz. c 5) should be liberally interpreted ( Cadogan v Kennett (1776) 2 Cowp. 434 ). Intent to defraud could be inferred from the making of a conveyance that would leave creditors unpaid ( Freeman v Pope (1870) LR 5 Ch App 538). As Lord Hatherley LC so pithily put it in that case (at 540), "persons must be just before they are generous".

16 Much of the argument on this appeal revolved around the question whether a claim under s 423 of the 1986 Act was properly described as a claim for a "breach of duty". Outside of s 423 , a person who incurs credit or liabilities undoubtedly owes responsibilities to his present and future creditors. A person should not incur a debt unless he has reasonable or probable grounds for expecting to be able to pay it when it is due. It therefore follows that the person should not make a gift at a time when he has no reasonable or probable grounds for believing that (without the asset which he is proposing to give away) he will be able to pay his debts, present or future, as and when they fall due. As Cave J said in Re Stainton (1887) 4 Mor 242 at 251:

"With regard to the unjustifiable extravagance in living, the learned County Court judge said that the debtor acted under the *bonâ fide* belief which was shared by others, that trade would soon revive. Now, a man, of course has a perfect right as long as he is solvent, to

determine that he will go on with a business, although it may be a losing business. He may trust that before he becomes insolvent matters will change, and he will again be in a condition of prosperity. But the moment he becomes insolvent, then he is no longer going on at his own risk in case of failure; he is going on at the risk of his creditors, in case things do not mend as he hopes they will. In my judgment a man has no right to do that. The moment things have got to such a pitch that he cannot pay 20s. in the pound, but he nevertheless thinks that if he goes on he may be able to retrieve his position, in my opinion he ought to call his creditors together, and leave them who will have to bear the loss in case his calculations are wrong, to determine whether that course of going on shall be proceeded with or not. Now, the learned County Court judge says the extravagance in living was done with a view to maintain his position and keep up appearances, and further that it was necessary for the purpose of enabling him, should such an improvement not take place, to sell his iron foundry at a larger price. I confess I cannot understand at all that view. A man is bound not to keep up appearances, but to pay his debts, and if his profits will not allow of his living at the particular rate he has been accustomed to live at, then his plain duty is to reduce his scale of living, and not to go on living out of the money of his creditors. As to keeping up the reputation of the business, that again I fail to understand, because, it is meant by that that an intending purchaser seeing him living at a particular rate, will assume from that that the business is a profitable one, and give more than he otherwise would for the business. That cannot be commended, certainly, as being honest to the purchaser. It is an attempt to delude him by a fictitious appearance of prosperity. I cannot regard that as being a reasonable excuse for spending more money than the trader is aware he is able in justice to his creditors to expend."

17  S 423 does not impose a sanction on a debtor whose actions prejudice his creditors unless the debtor's purpose satisfies s 423(3) . Nonetheless, as I see it, s 423 has to be seen in the context of a debtor's responsibilities to his creditors generally. It actualises those responsibilities in particular circumstances. Any argument that s 423 does not involve a breach of duty has therefore a somewhat counter-intuitive ring to it. S 423 can be contrasted with for example s 238 of the 1986 Act which invalidates transactions at an undervalue within a given period of the insolvency. The object of this sanction is at least in part to enlarge the pool of assets available for creditors generally.

18  It was only recently established by this court that the 1980 Act applied to s 423 of the 1986 Act: see Hill v Spread Trustee Co Ltd .

19 I shall have to return below to the time when a person becomes a "victim" for the purpose of s 423 (5) .

**Mr Giles' application to amend**

20  The particulars of claim, as served on issue of the proceedings, assert that the deed was executed in 1998. Until the start of trial, this was Mr Giles' case as to the date on which the deed was executed. However, at the start of the trial, Mr Giles applied to amend his particulars of claim so as to allege that the deed was in fact executed in either April 1992 or alternatively April 1994. In his draft amendment, Mr Giles alleged with respect to the latter claim (1) that by 1994 Mr Rhind had substantial liabilities arising out of commitments undertaken in relation to SHF's business; (2) that the equity in the Property was then valuable and Mr Rhind

was (and indeed remained) responsible in fact for all of the payments that had to be made to discharge the mortgage which had been taken out on the Property on its acquisition; (3) that from mid-1993, Mr Rhind was diverting to his own company business of SHF in breach of his contractual duty of confidence. He alleged that the diversion of SHF's business led to SHF losing a major customer, Netto Foods Ltd ("Netto"), in March 1994. This resulted in the claim that was tried before Mr Michel Kallipetis QC sitting as a deputy judge of the Chancery Division. In the premises, when Mr Rhind executed the deed in April 1994 he did so with a view to putting 30% of the equity of the Property beyond the reach of his creditors, particularly Mr Giles. Mr Giles' case is that he became a "victim" of the transaction constituted by the deed in April 1994, or alternatively at some other date which enabled him to issue proceedings within the twelve year limitation period.

21    Mr Giles alleges that the disproportionately favourable allocation of the beneficial interest in the Property to Mrs Rhind was a deliberate breach by Mr Rhind of his duty to Mr Giles, that Mr Rhind failed to disclose these matters to him and that these matters were not reasonably discoverable by him until October 2003. He further alleges that the breach of duty was unlikely to be discovered for some time because there was no indication on the Land Registry file that Mrs Rhind had a beneficial interest in the Property and because Mr and Mrs Rhind were both in possession.

22    Mr Giles further alleges that Mrs Rhind knew, or ought to have known, the circumstances that rendered the deed a transaction to which s 423 applied.

23    There are serious issues as the credibility of Mr Giles arising from his account of how in the course of preparation for trial he came to be aware that the deed was executed in 1994, as opposed to 1998. What Mr Giles said in summary was that the date was revealed by an e-mail dated 23 October 2003. This was the subject of late disclosure. In a witness statement filed at the direction of the judge as described at [22] and [23] of his judgment, Mr Giles explained how he had found the e-mail and what steps he had taken to locate it. The judge felt that the fairest thing to do was to give permission to amend so that the matter could be explored in cross-examination.

**The judge's judgment**

24    The judge held that the amendment should be allowed. I will summarise only those points in his judgment that are relevant to this appeal. With respect to that element of the new claim which was based on an allegation that the deed was executed in 1994, Mr Giles contended that the start of the limitation period was postponed under s 32(2) of the 1980 Act because his claim under s 423 involved a "breach of duty" by Mr Rhind and the deed had been executed in circumstances where it was unlikely to be discovered by him. The judge accepted the argument that there was a breach of duty for the purpose of s 32(2) of the 1980 Act:

"41.    Sub-section (2) applies where there has been a "deliberate commission of a breach of duty". This requires a deliberate breach of duty: Cave v Robinson James & Rolf[2003] 1 AC 384 . A transaction to which section 423 applies clearly involves the deliberate commission of an actionable wrong but does it involve a "breach of duty" within the meaning of section 32(2)? In my judgment, it does. It is true that "breach of duty" most obviously connotes a breach of a duty owed by the defendant to the claimant, such as a contractual, fiduciary or tortious duty. Section 423 is in a sense more amorphous. If a person enters into a transaction to which it applies, a range of possible claimants, including many who may not exist as such at the date of the transaction, may subsequently apply to set it aside or for other relief. It would however be unjustifiably restrictive to construe breach of duty as confined in the way indicated above. In my view, it is no more than the obverse of "right of action" in sub-section (1)(b) and means simply legal wrongdoing, that is acts or omissions giving rise to a right of action. That was undoubtedly the

position under section 26 of the Limitation Act 1939 , which section 32 replaced: see, for example, King v Parsons & Co [1973] 1 WLR 29 at 33 per Lord Denning MR. There is nothing in the Report of the Law Reform Committee (Cmnd 6923), which led to the provisions now contained in section 32, or elsewhere to suggest that sub-section (2) was intended to limit the scope of the pre-existing law."

25  The judge further held, in relation to the claims that the deed was executed in 1992 or 1994 that Mr Giles could not have had knowledge of the relevant facts until 2003 ([43]). There is no appeal against that finding.

26  With respect to that element of the new claim that was based upon an allegation that the deed was executed in 1992, the cause of action could not accrue until Mr Giles became a "victim", as only a "victim" can bring s 423 proceedings. If the deed was executed in 1992, Mr Giles could only have acquired that status in 1993 or later when Mr Rhind began to act in breach of his duty of confidence. The Rhinds contended before the judge that Mr Giles became a victim by 30 November 1993, when Mr Rhind first entered into negotiations with third parties in breach of his duty of confidence. Mr Giles wanted a later date and contended that he did not become a victim until February or March 1994, when Netto terminated its contract with SHF and awarded it to Mr Rhind's new company. It was only at that date that he suffered damage. The judge rejected Mr Giles' argument, and held that Mr Giles became a victim by the end of November 1993 ([31]).

27  The judge held that Mr Giles could not rely on s 35 of the 1980 Act. He noted that, by virtue of s 35 and CPR17.4(2) , an amendment to add a new claim may be made:

> "only if the new claim arises out of the same facts or substantially the same facts as a claim in respect of which the party applying for

permission has already claimed a remedy in the proceedings."

28  The purpose of the transaction completed in 1994 could not be the same as that of the transaction which was completed in 1998 as the pleadings in relation to the latter claim depended on a dispute that had not arisen by 1994. The judge distinguished the decision of this court in Goode v Martin [2002] 1 All ER 620 on the grounds that the claimant's case in negligence in that case was based exclusively on facts pleaded by the defendant.

29  The judge decided to exercise his discretion in favour of allowing the amendment, despite the costs, delay and anxiety that this would cause to Mrs Rhind:

> "19.  Leaving aside the limitation issue, to which I will return, I have concluded that it would be right to allow this amendment. Clearly serious questions arise as regards the reliability and credibility of Mr Giles' evidence. These can, and I have no doubt will be, fully explored in cross-examination. But I do not consider that it would be right, without hearing Mr Giles' evidence, to say that his account is so incredible as to make his case unsustainable. It is also true that, as Mr Giles had the memorandum before him in January 2006, it would appear that the new case, even if true, was not pleaded as a result of a culpable level of carelessness on the part of Mr Giles. I have taken that into account. I have, however, concluded that if in fact the deed was created in 1994 and back-dated to 1992 the greater injustice would be to deny Mr Giles the opportunity of establishing that case."

Giles v Rhind, 2008 WL 371127 (2008)

**Issues on this appeal**

30  The issues on this appeal and the respondent's notice may be summarised as follows:

- i)  Does a claim under s 423 of the 1986 Act amount to an allegation of a "breach of duty" for the purposes of s 32(2) of the 1980 Act?
- ii)  Did Mr Giles become a "victim" for the purposes of s 423 of the 1986 Act as soon as Mr Rhind acted in breach of his duty of confidence in November 1993?
- iii)  Did the judge err in the exercise of his discretion in giving permission to amend with respect to (a) proportionality or (b) the issues as to Mr Giles' disclosure and as to his credibility or (c) as to the weakness of the claim that the deed was executed in 1994?
- iv)  Did the amendments arise out of substantially the same facts so that s 35 of the 1980 Act was available?

31  I can deal briefly with the issues (iii) and (iv). First, as to issue (iii)), there is no doubt that the judge took account of all the points referred to in my formulation of this question. The judge made his decision in the exercise of his discretion and it has to be shown that his decision is perverse. The lateness of the disclosure of the e-mail reflected on Mr Giles' credibility, which was the point to which the judge referred in [19] of his judgment (set out above). Accordingly, there is in my judgment no basis on which the judge's exercise of discretion can be set aside.

32  As to issue (iv) ( s 35 ), I agree with the conclusion of the judge. Mr Giles' claim is that Mr Rhind disposed of his assets to defeat his creditors. He is now seeking to add two new (alternative) cases as to the time when the deed was executed. Mr Richard O'Dair, who appears for Mr Giles, relies upon Goode v Martin [2002] 1 All ER 620 , especially [31] and [32]. The amended claim ought in his submission to be regarded as based on substantially the same facts and interconnected dealings. But, as the judge points out, Goode was a case where the claimant merely wanted to rely on facts already pleaded by the defendant. The terms of s 35 have been interpreted restrictively: see per Buxton LJ, with

whom Smith and Moore-Bick LJJ agreed, in Society of Lloyd's v Henderson [2007] EWCA Civ 930 :

> "53.  Before us, it was argued that a new claim sufficiently "arises out of" the same facts as an existing claim if there is a sufficient nexus between the old and the new claim, in the sense that some or a substantial part of the facts relied on to promote the new claim were relied on to promote the old claim. That takes far too broad an approach to the rule, which it effectively rewrites. The new claim does not arise out of the facts on which the old claim was based if, in order to prove it, new facts have to be added. That is why this court has said that the basic test is whether the plea introduces new facts: Goode v Martin [2002] 1 WLR 1828 at paragraph 42."

33  In this case, material new facts would have to be introduced to support the claim that the deed was in fact executed in 1994, alternatively 1992. The nature of the transaction changes according to when the deed was executed. The 1994 date involves a wholly new claim because by that date Mr Rhind was already diverting business from SHF. That was not the case in 1992. By 1998, things were different again as by then there was litigation between Mr Giles and Mr Rhind. I would therefore reject Mr Giles' argument on this point.

34  The skeleton arguments filed on behalf of Mr Giles asserted a violation of art 6 of the European Convention on Human Rights in relation to s 35 of the 1980 Act, but that point was neither pursued in this court nor (as I understand it) was it argued before the judge.

35  I now turn to issues (i) and (ii).

**Does a claim under s 423 of the 1986 Act amount to an allegation of "breach of duty" for the purposes of s 32(2) of the 1980 Act?**

36   The doubt as to whether s 32(2) applies arises because (a) s 423 of the 1986 Act is not expressed in terms of the imposition of a duty and (b) there was no active concealment of any relevant fact in this case. As to (a), the right to relief under s 423 does not depend on showing that the victim was a person to whom some duty in contract or tort or some fiduciary duty was owed. As the judge said: "if a person enters into the transaction to which [ s 423 ] applies, a range of possible claimants including many who may not exist as such at the date of the transaction, may subsequently apply to set it aside or for other relief." ([41]). As to (b), s 32(1)(b) requires the facts relevant to the cause of action to be "deliberately concealed". The expression "concealed", must bear its normal meaning, which is that something was actually hidden from view. Mr Rhind is not alleged to have taken a step to conceal the deed in this sense.

37   If Mr Giles can rely on s 32(2) , he does not have to show concealment in this sense. This is because under that provision, if applicable, the deliberate commission of the breach of duty is enough. There is no dispute about whether the deed could have been discovered before the Rhinds told Mr Giles about it. It had not been registered at the Land Registry. So the judge asked himself whether the transaction in this case involved the deliberate commission of a breach of duty. He answered that question affirmatively. The essence of the judge's approach was to hold that the expression "breach of duty" in s 32(2) was merely the "obverse" of the expression "right of action" in s 32(1)(b) , by which he meant legal wrongdoing of any kind, giving rise to a right of action ([42] set out above). He reasoned that this was the position under s 26 of the Limitation Act 1939 , and it was not the intention of the 1980 Act to limit the scope of the pre-existing law. The judge thus held that the expression "breach of duty" applied to any legal wrongdoing in contradistinction to a breach of duty in a tortious or contractual sense or in the sense of a breach of an equitable or fiduciary duty (which I will call "the narrower meaning").

38   With one qualification, I agree with the judge's conclusion. The qualification I would make is this. I do not consider that the expression "breach of duty" includes *any* legal wrongdoing whatsoever. In my judgment there must be a legal wrongdoing of a kind that can properly be raised in action to which s 32

applies. I will call this the "wider meaning" of "breach of duty". Thus, the expression "breach of duty" would not cover legal wrongs which are not justiciable, for example target duties. It may also not cover a breach of duty owed by a public authority which can be the subject of judicial review proceedings at the instance of a person who is not directly affected thereby but who has a sufficient interest for the purposes of standing in public law. I would not wish to be taken as approving the view that any such actions fall within s 32 , at least without further argument.

39   My reasons, which I amplify below, for holding that the expression "breach of duty" in s 32 (2) includes a claim under s 423 of the 1986 Act may be summarised as follows,:

- a.  The wider meaning is a legitimate meaning of breach of duty.
- b.   S 32(2) was enacted pursuant to the recommendations of the Law Reform Committee's report on limitation in 1977 and the court can look at that report to see the mischief to which s 32(2) was directed. That Committee did not recommend that the new provision be limited to some causes of action only.
- c.  The general structure of the 1980 Act indicates that s 32(2) is consistent with the wider meaning.
- d.  The expression "breach of duty" is used in s 11 of the 1980 Act but in a different context and so does not necessarily restrict the meaning of "breach of duty" in s 32(2) .
- e.  S 32 does not require the phrase to be given the narrower meaning.
- f.  The narrower meaning does not promote any part of the statutory purpose of s 32 .

**The wider meaning is a legitimate meaning of breach of duty**

40   Ms Bedworth submits that the expression "breach of duty" involves a situation where there is proximity between the parties. As the judge said, the expression "breach of duty" most obviously connotes a breach of duty owed by the defendant to the claimant in the sense of a contractual, fiduciary or tortious duty. Ms Bedworth points out that s 423 is not cast in terms of a duty. She submits that it cannot be said that there is a duty on a person entering into a transaction which

might be vulnerable to attack under section 423 to disclose it to persons who are or become his creditors. So too, she submits, there cannot be said to be any general duty not to alienate assets or to pay one's debts. Instead, the unpaid creditors have to rely on the specific provisions of bankruptcy law or s 423 .

41   Ms Bedworth's submissions invite the court to take a relatively formalistic approach to the expression "breach of duty" in s 423 . The only point that I make at this stage is that the expression "breach of duty" is capable of bearing the wider meaning. The word "duty" is an ordinary English word, meaning obligation or constraint. Accordingly, it is possible for the expression "breach of duty" in an appropriate context to mean simply a breach of a legal obligation or constraint.

42   There is a further point about s 32(2) , which may be noted here, though it has not been argued and so I express only a provisional view here. For s 32(2) to apply, (1) there must be the deliberate commission of an act; (2) that act must amount to a "breach of duty"; and (3) that breach of duty must occur in circumstances in which it is unlikely to be discovered for some time. If those ingredients are satisfied, then the next step (where the claimant relies on s 32(1)(b) ) is to go back to s 32(1)(b) and to identify the facts that are involved in the relevant breach of duty. After that, those facts can be tested against the right of action relied on in the proceedings. There is no need, as I see it, on an ordinary reading of s 32(1) (b) to show that the right of action was for a breach of duty. All that it is necessary to show is that the relevant facts involved a breach of duty. Accordingly, in this case, all that matters is whether the execution of the deed *involved* the deliberate commission of a breach of duty of some kind.

**S 32(2) was enacted pursuant to the recommendations of the Law Reform Committee's report on limitation in 1977 and the court can look at that report to see the mischief to which s 32(2) was directed. That Committee did not recommend that the new provision be limited to some causes of action only**

43   S 32(2) did not appear in s 26 of the Limitation Act 1939 (as originally enacted), which was the statutory predecessor of s 32(1) . For present purposes there was no material difference between s 26 and s 32(1) . The Twenty-First Report of the Law Reform Committee

(Final Report on Limitation of Actions) (1977) (Cmnd 6923) contained a particular recommendation on "concealed fraud". It is appropriate to refer to the report of the Law Reform Committee because it sets out the pre-existing law and the mischief to which the amendments to s 26 were directed. S 7 of the Limitation Amendment Act 1980 includes the provision that now constitutes s 32(2) of the 1980 Act.

44   In the opinion of the Law Reform Committee, the courts had developed s 26 of the Limitation Act 1939 so that where a person knowingly committed a wrong it was unnecessary to show active steps to conceal his wrongdoing or breach of contract. The knowing commission of the act and the failure to tell the owner was sufficient to render his conduct unconscionable. In support of this, the committee set out the following passage from the judgment of Lord Denning MR in King v Victor Parsons [1973] 1 WLR 29 at 33 (emphasis added):

> "The word "fraud" here is not used in the common law sense. It is used in the equitable sense to denote conduct by the defendant or his agent such that it would be 'against conscience' for him to avail himself of the lapse of time. The cases show that, if a man knowingly commits a wrong (such as digging underground another man's coal); or a breach of contract (such as putting in bad foundations to a house), in such circumstances that it is unlikely to be found out for many a long day, he cannot rely on the Statute of Limitations as a bar to the claim: see Bulli Coal Mining Co v Osborne [1899] AC 351 and Applegate v Moss [1971] 1 QB 406 . In order to show that he 'concealed' the right of action 'by fraud', it is not necessary to show that he took active steps to conceal his wrongdoing or breach of contract. It is sufficient that he knowingly committed it and did not tell the owner anything about it. He did the wrong or committed the breach secretly. By saying nothing

he keeps it secret. He conceals the right of action. He conceals it by 'fraud' as those words have been interpreted in the cases. To this word 'knowingly' there must be added 'recklessly': see Beaman v ARTS Ltd [1949] 1 KB 550 , 565–566. Like the man who turns a blind eye, he is aware that what he is doing may well be a wrong, or a breach of contract, but he takes the risk of it being so. He refrains from further inquiry least it should prove to be correct: and says nothing about it. The court will not allow him to get away with conduct of that kind. It may be that he has no dishonest motive: but that does not matter. He has kept the plaintiff out of the knowledge of his right of action: and that is enough: see Kitchen v Royal Air Force Association [1958] 1 WLR 563 . If the defendant was, however, quite unaware that he was committing a wrong or a breach of contract, it would be different. So if by an honest blunder he unwittingly commits a wrong (by digging another man's coal), or a breach of contract (by putting in an insufficient foundation) then he could avail himself of the Statute of Limitations." (emphasis added)

45  Having noted that development in the law, the Law Reform Committee considered that, if this were thought to be the best approach, it would not be difficult to reformulate s 26 in a way that reproduced in a more readily intelligible form the construction placed on that section by the courts. The Law Reform Committee drew attention to the function of the concept of unconscionability in this context:

"2.22    The essential feature of the concealed fraud approach (as distinct from the date of knowledge approach) is that it operates on some degree of blameworthiness on the part of the defendant beyond his mere failure to comply with his legal obligations; the traditional expression is 'unconscionable conduct'."

46    The Law Reform Committee's own draft reformulation introduced the concept of dishonest conduct concealing the cause of action, but this reformulation was expressly subject to redrafting by Parliamentary counsel. In due course, a bill, which subsequently became the Limitation (Amendment) Act 1980 , was introduced to amend the Limitation Act 1939 . Parliament reflected that concept of unconscionability by making the further provision for the extension of time as a result of conduct arising from concealment of the relevant facts now to be found in s 32(2) . In fact, this provision followed closely the approach to concealment in Beaman v ARTS Ltd , where the bailees had wrongfully disposed of the bailor's property without making any attempt to get the bailor's consent or inform her of what they proposed to do. The plaintiff was unable to bring an action for conversion within the limitation period of six years but the Court of Appeal held that relevant facts had been concealed for the purpose of s 26 of the Limitation Act 1939 . Lord Greene MR held at 566:

"I am of opinion that the conduct of the defendants, by the very manner in which they converted the plaintiff's chattels in breach of the confidence reposed them, and in circumstances calculated to keep in ignorance of the wrong that they had committed amounted to a fraudulent concealment of the cause of action."

47  Significantly, there is nothing in the passages from the report of the Law Reform Committee to which

we have been taken which suggests that it was their recommendation that the new provision now to be found in s 32(2) was to apply to some causes of action only. I would have expected that to be expressly stated if it was intended. The absence of any recommendation about this is an indication of some weight that there was no policy reason for restricting the application of what is now s 32(2) in this way.

48   Mr O'Dair submits that this court should look at Hansard in accordance with the guidelines set out in Pepper v Hart [1993] AC 593 and he refers to the statement of the Lord Chancellor, Lord Hailsham, at the Committee stage in the House of Lords of the Bill which became the Limitation Amendment Act 1980 , in response to a question raised by Lord Mischcon on behalf of the Law Society, that what is now s 32(2) was "required since it is not intended that the new section should be in any way more restrictive than the present law". (House of Lords Debates 16 July 1979, Col. 1173 to 1174). I am prepared to assume for present purposes that this statement is admissible in the interpretation of s 32(2) . This statement does no more, however, than set the extent of what Parliament intended, namely that s 32(2) was to go at least as far as the common law then stood. That information does not take the matter any further than I have already taken it from the pre-existing law and the report of the Law Reform Committee.

**The general structure of the 1980 Act indicates that s 32(2) is consistent with the wider meaning**

49   In my judgment, support for the wider meaning can be found by examining the general structure of the 1980 Act. Like s 1 of the Limitation Act 1939 , s 1(1) provides that Part 1 of the 1980 Act sets out the ordinary time limits for bringing actions of the various classes mentioned in the following provisions of the Act. These time limits are no doubt described as "ordinary" because the time limits in Part 1 are those which generally apply, as opposed to those which apply when the time limit is capable of being extended. These classes include actions for tort ( ss 3–4, 11–14B ) and actions for breach of contract ( ss 5–8 ). In addition they include actions for sums recoverable by statute ( s 9 ), actions for possession ( s 15 ), actions for redemption ( s 16 ) and actions to enforce a judgment ( s 24 ). S 1(2) provides that the time limits given in Part 1 are subject to extension or exclusion in accordance with

Part 2 of the 1980 Act. Part II deals with the extension or exclusion of the time limits, for example where a person is under a disability, and s 32 . Significantly, the provisions of Part II are generally not expressed to be limited in their application to (for example) sections which provide time limits for actions for breach of contract or tort. Thus, on the face of it and subject to any special provision, each of the provisions for extension or exclusion of time limits in Part II applies to any class of action within Part I , including for example actions to recover sums recoverable under a statute. This suggests that s 32(2) should not be limited to particular causes of action.

**The expression "breach of duty" is used in s 11 but in a different context and so does not necessarily restrict the meaning of "breach of duty" in s 32(2)**

50   In Stubbings v Webb [1993] AC 498 , the House of Lords had to interpret the words "negligence, nuisance or breach of duty (whether the duty exists by virtue of a contract or a provision made by or under a statute or independently of any contract or any such provision)" in s 11 of the 1980 Act, which is part of a separate and more flexible statutory scheme for the limitation of actions for damages for personal injuries. The issue was whether those words were apt to include intentional trespass. The House of Lords held that this expression was intended by Parliament to be limited to actions for personal injury arising from accidents caused by negligence, nuisance or breach of a duty of care. However, in the recent case of A v Hoare [2008] UKHL 6 , the House of Lords overruled this decision. The House in effect accepted the view of Diplock LJ in Letang v Cooper [1965] 1 QB 232 at 247 that s 11 applies to all claims for personal injuries. In those circumstances, it is clear that the expression "breach of duty" in s 32(2) need not be restricted (if it would otherwise be so restricted) to the meaning previously ascribed to those words in s 11 of the 1980 Act. The decision in Hoare is in addition an encouragement to adopt the wider meaning in s 32(2) , but the decision has to be read in its particular context and the light of the history of s 11 , and thus Hoare cannot of itself mandate that result.

**S 32 does not require s 32(2) to be given the narrower meaning**

51  In looking for clues as to the meaning of "breach of duty" in s 32(2) , it is necessary to ask whether there is any expression in the remainder of s 32 which would restrict the meaning of "breach of duty" in s 32 (2) . Counsel have not suggested that there is any such provision. In my judgment, they were right about this. Far from restricting the wider meaning, S 32 (1) contains indications to support. In particular, s 32 (1)(b) refers to any right of action. It is not limited to a right of action, for example, for breach of contract or tort.

52  I should note one particular submission by Ms Bedworth based on AIC Ltd v ITS Testing Services (United Kingdom) Ltd ("The Krtiti Palm") [2007] 1 Lloyd's Rep 555 . In that case, Rix LJ held that under s 32(1)(b) :

> "…there must be either active concealment of a fact relevant to a cause of action, or at the least the intentional concealment by omission to speak of a fact relevant to a cause of action which the defendant knew himself to be under a duty to disclose. There is no decision that anything less than a duty to disclose will suffice in the absence of active concealment." ([321])

53  However, the majority, Buxton LJ and Sir Martin Nourse, did not find it necessary to deal with this point. Ms Bedworth submits that there could not be concealment for the purposes of s 32 (2) unless there was a duty to disclose. She submits that there is no authority to the effect that Mr Rhind would have been under a duty of disclosure in this case. However, in my judgment these submissions do not advance the case for Mrs Rhind because in the passage relied by Rix LJ was dealing with s 32(1) (b) and not s 32(2) of the 1980 Act, which specifically provides for a deemed concealment where the breach of duty is unlikely to be discovered for some time.

### The narrower meaning does not promote any part of the statutory purpose of s 32

54  I have already observed that the Law Reform Committee does not indicate that section 32(2) should be limited to some only of the causes of action within s 32(1) . I have not been able to think of any reason why Parliament should wish to restrict s 32(2) to some only of the causes of action within s 32(1) , namely to actions for breach of trust, breach of contract or tort. Counsel did not suggest any such reason. The limitation period applicable to actions for the recovery of land was capable of extension under the "concealed fraud" provision in the Real Property Limitation Act 1833 , which postponed the limitation period until the claimant for rent or possession could reasonably have known that he had been deprived of possession by fraud (see for example Re McCallum [1901] 1 Ch 143, referred to in Beaman v ARTS ). This provision was repealed by the Limitation Act 1939 (which introduced s 32(1) as originally enacted). There does not seem to be any reason to suppose that the case law, summarised by Lord Denning MR in King v Victor Parsons , could not apply to this sort of case. Furthermore, a transaction under s 423 is a type of transaction of which there is likely to be concealment and thus there would be a heightened policy reason for the application of s 32(2) to claims under that section.

55  I reject the proposition advanced by Ms Bedworth that, because s 423 was so widely drafted and could have applied to events occurring over a considerable period of time, s 32(2) should not be interpreted to extend beyond breaches of duty in the narrow sense. If Parliament has created a cause of action which applies over a long period of time and to a large variety of transactions, it would be wrong for this court to impose an indirect restriction on s 423 by excluding it from s 32(2) if that provision would otherwise on its natural meaning apply to it.

### Did Mr Giles become a "victim" for the purposes of s 423 of the 1980 Act as soon as Mr Rhind acted in breach of his duty of confidence in November 1993?

56  The judge dealt with this point in relation to the new allegation that the deed was executed in 1992. No cause of action under s 423 could accrue to Mr Giles until

he became a "victim" for the purpose of that section and therefore are able to bring proceedings. Likewise, time could not start to run against him until he had become a victim. The judge held that by November 1993 when Mr Rhind breached his contractual duty of confidence, there was a very real prospect that Mr Giles had a claim for breach of contract against Mr Rhind for substantial damages and that he was by that date, a person "capable of being prejudiced" by the allocation of beneficial interests under the deed for the purpose of s 423 (5) of the 1986 Act (set out above). Mr O'Dair contends that Mr Giles did not become a victim until February or March 1994.

57  In the light of my decision on s 32 of the 1980 Act, this question no longer arises. We have not been shown the findings of Michel Kallipetis QC and have very little information beyond that narrated in this judgment as to the events of November 1993 to March 1994. In those circumstances I do not propose to express a view on this point.

## Disposition

58  For the reasons given above, I would dismiss this appeal and the respondent's notice.

Lord Justice Sedley:

59  Like Arden LJ (§38 ante) I would reserve the question of how wide breach of duty is for the purposes of s.32(2). I respectfully agree with her that it is certainly wide enough to include the present case, and that for this and the other reasons so clearly spelt out in her judgment this appeal should be dismissed.

Lord Justice Buxton:

60  I also agree with the judgment of Arden LJ.

Crown copyright

© 2017 Sweet & Maxwell
2008 WL 371127

© 2017 Thomson Reuters.

# TAB 6

Hill v Spread Trustee Co Ltd, 2006 WL 1288358 (2006)

Hill (As Trustee in Bankruptcy of Nurkowski)
v. Spread Trustee Company Ltd & Anor
Case No: A3/2005/1183
Court of Appeal (Civil Division)
12 May 2006

**[2006] EWCA Civ 542**

**2006 WL 1288358**

Before: Lord Justice Waller Lady
Justice Arden and Sir Martin Nourse
Friday 12th May, 2006

**Analysis**

On Appeal from HHJ Weeks QC Sitting as a Deputy
Judge of the High Court of Justice Chancery Division
Dated 16 May 2005

**Representation**

　• Catherine Newman QC and Timothy Evans
(instructed by Osborne Clarke ) for the Appellants.
　• Stephen Davies QC and Stefan Ramel (instructed
by Clarke Willmott ) for the Respondents.

**Judgment**
Lady Justice Arden:

1  The judgment under appeal in this case occupies
nearly eighty pages of the law reports ( [2005] BPIR 842
). It concerns claims made by the trustee in bankruptcy
of a Mr Nurkowski to obtain relief under section 423
of the Insolvency Act 1986 ("the 1986 Act") in respect
of a settlement made by Mr Nurkowski in favour of his
daughter, and in respect of certain charges given by him
to the trustees of that settlement. The appellant trustees
challenge a number of the judge's crucial findings of
fact. But this appeal also raises a number of important
issues of law about claims made under section 423
with which we must also deal. The relevant statutory
provisions are set out in the appendix to this judgment.

The essence of section 423 of the 1986 Act is that it
empowers the court to avoid transactions entered into
at any time if made by a person at an undervalue and
with the purpose of prejudicing his creditors. As we shall
see, section 423 is cast in very wide terms in order to
cover the vast range of transactions which might meet
the basic criteria which I have just mentioned. As I said
in IRC v Hashmi [2002] 2 BCLC 489 , 504:

> "Section 423 plays an important role
> in insolvency law. It can moreover
> apply even though the debtor is
> not in a formal insolvency …
> Section [423] is a carefully calibrated
> section forming part of a carefully
> calibrated group of sections."

2  I have dealt with all the issues that were argued, save
as stated in paras 118 and 138 below.

3  This then is an appeal by Spread Trustee Company
Limited and Mr David John Warr, the trustees of the
Henry Stanley Nurkowski Maintenance and Settlement
Trust ("the trustees"), against the order of HHJ Weeks
QC sitting as a deputy Judge of the High Court of
Justice, Chancery Division. By his order it was declared,
on the application of Mr Richard Hill, Mr Nurkowski's
trustee in bankruptcy, that the settlement dated 10
March 1989 ("the settlement"), of which the trustees
are trustees, two legal charges dated 17 April 1996 and
12 August 1996 (respectively "the second legal charge"
and "the third legal charge" and collectively "the
later charges") and an assignment dated 21 November
1997 in their favour of a loan account owed to Mr
Nurkowski by his company HS and KM Nurkowski
Ltd ("the company") constituted transactions within
section 423(3) of the 1986 Act. By way of relief in respect
of these transactions, the order provided (1) that the
trustees should indemnify the estate of Mr Nurkowski
in bankruptcy against any claim by HM Revenue &
Customs ("the Revenue") to set aside a compromise of
tax liabilities made with Mr Nurkowski on 30 March
1993 ("the compromise"); (2) that the first legal charge
and the second legal charge should be set aside; and
(3) that the trustees should repay the sum of £162,051
plus interest to Mr Nurkowski paid to them under the

WESTLAW    © 2017 Thomson Reuters.                                                    1

assignment dated 21 November 1997, such sum to be recredited to the amounts owed by him to the trustees.

**The background**

4    The judge set out the background in detail in his judgment, and my summary, which follows, is based largely on his judgment. The paragraphs of the judgment of the judge are not numbered and accordingly I will use page references from the report in BPIR. My summary should be read with the report of the judge's judgment. The numbers in brackets are references to the pages of that report.

5    The events in issue occurred between 1988 and 2001. I will start with an overview of the facts. Mr Nurkowski, an ice-cream manufacturer and vendor with commercial interests also in building and property development, owned two fields, called respectively OS149 (3½ acres) ("the bottom field") and OS160 (4½ acres) (the bottom field), at Hilperton, near Trowbridge, Wiltshire. These fields abutted an area of some 200 acres ("the Paxcroft Mead development") for which Gallagher Limited ("Gallagher") made an application for planning permission. (Unless otherwise stated, when I refer to OS 149, I include a small parcel of land forming part of the top field which was known as OS 149A). The application for planning permission was made to West Wiltshire District Council and Mr Nurkowski was a member of the planning committee of that Council, though he did not vote on the grant of permission to Gallagher on 4 April 1989. About a month before that resolution, Mr Nurkowski had made a gift into settlement of OS160. The settlement was a newly formed accumulation and maintenance settlement for Mr Nurkowski's 2 7frac12; year old daughter, Anna. Those representing Mr Nurkowski advised subsequently the Revenue that OS 160 was worth only £35,000 on its settlement in March 1989. In fact, the judge found that Mr Nurkowski had already received an offer for this field of £700,000 from Gallagher and that Mr Nurkowski knew that £700,000 was the minimum value of OS160. OS149 and OS160 were sold some five months after the settlement for £2m, even though neither field was within the planning permission which had been given.

6    The Revenue did not accept the valuation of £35,000 for OS 160 put forward by Mr Nurkowski's advisers.

In due course, the Revenue agreed to compromise its claim against Mr Nurkowski in the sum of £160,000. The trustee in bankruptcy takes the view that that compromise was colourable and that the Revenue could now raise a new assessment under section 29 or section 36 of the Taxes Management Act 1970 .

7    Following the receipt of the sale consideration, the trustees made a number of loans to Mr Nurkowski. Between 1994 and 1997 Mr Nurkowski executed charges conferring additional security on the trustees for its loans to him. He also made an assignment to the trustees of the sums owed to him by the company on loan account. The first of these charges is not material for the purposes of this appeal.

8    We have been provided with a helpful chronology prepared by counsel. In reading the summary below, the following critical dates should be borne in mind:

- •14 March 1986 Mr Nurkowski acquires OS 149 and OS 160 for £21,000
- •10 March 1989 gift of OS 160 into settlement
- •4 April 1989 Gallagher's planning application granted for land abutting OS 149 and OS 160
- •1/2 August 1989 OS160 sold to Gallagher (£218,000 paid immediately and £518,000 deferred until 2 February 1991)
- •10 October 1989 Submission to the Revenue of a valuation of £35,000 for OS160
- •16 February 1993 No 1 Loan (£250,000) secured over the share certificates representing shares in the company
- •28 March 1993 No 2 Loan (£198,500) secured over the Lion & Fiddle public house
- •30 March 1993 compromise between Mr Nurkowski, the trustees and the Revenue
- •30 March 1993 No 3 Loan (£160,000) secured over land at Cockhill, Trowbridge
- •19 May 1993 No 4 Loan (£30,000) (no additional security)
- •29 June 1993 No 5 Loan (£70,000) secured over The Three Lions, Holt, Wiltshire
- •17 April 1996 the second legal charge. This was an all monies charge which gave the trustees security over Mr Nurkowski's home, a property called Enniswood
- •12 August 1996 a field adjoining Enniswood was charged to the trustees — the third legal charge

•27 September 1996 all monies charge executed in favour of the trustees ranking behind a charge over the property already given to Lloyds Bank plc (Lloyds)

•21 November 1997 assignment by way of charge by Mr Nurkowski in favour of the trustees of his loan account with the company

•7 January 1998 the Revenue assess capital gains tax on Mr Nurkowski in respect of the sale of OS 149 in the sum of £436,790.32

•28 January 1999 a bankruptcy order was made against Mr Nurkowski on the Revenue's petition

•4 December 2002 Notice of this application was issued by the trustee in bankruptcy

9  I will now amplify this summary of events. The judge deals with the planning history (846), and I do not consider that I need set it out. The process was a long and drawn out one, but the judge found that it was generally agreed between Gallagher and the planning officers that OS 160 should eventually be part of the comprehensive development of the area, and that OS 149 might either be developed as an independent site or as a means of access to adjacent land.

10  Mr Nurkowski's own accountant was a Mr Holdway. In late 1987 he approached the Revenue on behalf of Mr Nurkowski for their view of the income tax implications of a sale of the land. The Revenue replied that they could not give a tax clearance without more information. So the tax implications of a disposal were under consideration at this early stage.

11  Gallagher were in touch with Mr Nurkowski before permission was given. In May 1988 they made an offer to buy an option over OS 149 and 160 for £40,000. If the option was exercised, Gallagher would pay 80% of the market value following grant of planning permission. On 12 December 1988, Mr Cox of Gallagher and Miss Foster, representing the agents for Gallagher, met Mr Nurkowski. It was agreed that the negotiations should be put on hold so Mr Nurkowski "could put his own house in order". He said that he would revert to Gallagher in due course. There is an important issue as to whether in the course of these negotiations Gallagher offered Mr Nurkowski £700,000 for OS 160. Mr Nurkowski's evidence was that no such offer was made but the judge rejected his evidence on this point.

12  In January 1989, Mr Nurkowski went to take tax advice from Spicer & Oppenheim. On 9 January 1989, Mr Nurkowski met Miss Horrocks of that firm. The judge set out the material parts of the attendance note prepared by Ms Horrocks at 846G to 847G of the judge's judgment. In that attendance note, Mr Nurkowski is recorded as saying that he had received an offer of £700,000 for OS 160. The attendance note also stated that it was Mr Nurkowski's opinion that this sum represented neither the current value of the land nor the value of the land with planning permission. Miss Horrocks' attendance note states that the main concern of Mr Nurkowski was how to alleviate capital gains tax of about £1m. The issue on which he sought advice is recorded in the following terms:

> "He wondered if his offshore company could be used by transferring the land to that company which he realised would trigger off a capital gain by his sale into the company but he hoped [that this] would protect the final greater gain when planning permission was granted [and] the land was sold to the development company. [H]e considers this very urgent and would like action very very quickly …"

Miss Newsham, another representative of Spicer & Oppenheim, spoke to Mr Nurkowski the following day and ascertained his view as to the current market value which he said was in the region of £25,000 to £40,000. He said that he was expecting OS 149 and OS 160 to be worth at least £300,000 and more "if he obtained planning permission in his own right". He also told Miss Newsham that he expected the district council to grant planning permission in April 1989.

13 Mr Nurkowski is recorded as saying that the market value of his land was as agricultural land with possibly some hope value thrown in and that it was worth about £5,000 per acre when valued as agricultural land but that it would be worth considerably more in view of the development. On the basis of the offer that he had received the bottom field would be worth £1.5m. He

thought that the final offer from the developer would be worth some £2.4m once planning permission was obtained.

14 Spicer & Oppenheim consulted Reads, a firm of accountants in Guernsey. On 13 January 1989, Mr Donaldson, a partner in Reads, sent his advice by fax. The material parts of that advice are set out at 848G to 849H. The essence of the advice was that the best course would be to set up an accumulation and maintenance settlement for a child with UK trustees, gift into it one of the fields and then immediately appoint foreign trustees in their place (or "export" the settlement to Guernsey). This would enable Mr Nurkowski to argue that any sale of the land by the trustees was not subject to income tax. Mr Nurkowski could make an election to hold over the gain on making the gift into settlement, which could accumulate income and capital gains. There would, however, be a charge to capital gains tax when the settlement was exported, based on the then value of the land. The significant points about this advice for the purposes of this appeal are as follows. Firstly, it proceeded on the basis that there was a sporting chance that Mr Nurkowski would be able to defer capital gains tax or even avoid it altogether if he formed a settlement. But success was not guaranteed. Mr Nurkowski might find that he had incurred the expenses of setting up a settlement for no purpose. Secondly, the advice supports the inference that when Mr Nurkowski proceeded to make the gift into settlement of OS160 he was simply following the advice he had received from Spicer & Oppenheim. Thirdly, Mr Donaldson must have thought that the land even at that stage was worth more than its agricultural value since he talks of transferring "(say) £100,000 worth of the land" into a discretionary settlement (849C).

15 There was a further meeting on 16 January 1989 at the offices of Spicer & Oppenheim in Bristol. A note was taken by Miss Goillau. She recorded that Mr Nurkowski thought that the market value of the land, meaning the then current market value, was £700,000, the amount of Gallagher's offer for OS 160 plus a further £100,000/150,000 for OS 149 (850C). The meeting note also records that Mr Nurkowski had a meeting with his developers planned for the following Wednesday as "he has put a proposal to them for a joint venture whereby he provides" OS 160. There is therefore in this file note a further reference to the

£700,000 offer and to active negotiations for the sale of the land.

16 The deed setting up an accumulation and maintenance trust of Mr Nurkowski's daughter Anna then aged 2½ years was executed on 10 March 1989. The original trustees were UK residents. The deed contained a clause (clause 17) excluding the settlor and his spouse from any benefit from the capital or income of the settlement. In due course the trustees made substantial loans to Mr Nurkowski. It was suggested in argument that the loans did not involve a breach of clause 17. We expressed our surprise at that suggestion but we do not have to decide if it is right or not but note that the Revenue might reasonably have taken the view that as a result of this clause Mr Nurkowski could not as a result arrange a loan from the settlement. After execution of the deed, OS 160 (the bottom field) was simultaneously gifted into the settlement. On 13 March 1989, the appellants replaced the original trustees and the settlement was thereby "exported" to Guernsey (852A).

17 The planning committee of the West Wiltshire District Council approved Gallagher's planning application on 4 April 1989. Mr Nurkowski was not present when this business was taken. Within a few weeks Mr Nurkowski had re-opened negotiations with Gallaghers' agent, Mrs Foster, and received offers from other developers. There is a curious letter from Mrs Foster to Gallagher of 24 April 1989, set out at 852B to G, in which Mrs Foster states that Mr Nurkowski had been under the incorrect impression that his land had planning permission and that he was looking for an option arrangement with Gallagher, and she also ends the letter by stating that Mr Nurkowski had been "a good ally" and encouraging Gallagher to do a deal with him. The judge makes no findings as to what she meant by these last matters and indeed Mrs Foster was unable to enlighten the court what she meant when she was cross-examined. It seems unlikely that Mr Nurkowski, a member of the planning committee, would have been unaware of the fact that his fields were outside the permission that was granted. In April 1989 Mr Nurkowski also opened negotiations with other developers, such as Beazer Homes.

18 However that may be, Gallagher did not leave the matter in Mrs Foster's hands. Mr Cox took

over the negotiations and agreed with Mr Nurkowski that he would sell OS 149 and OS 160 for a total aggregate price of £2m. The purchase of the bottom field was not conditional on planning permission but the consideration was to be paid in part as a deposit and part was to be deferred for a maximum of two years. The purchase of the top field was however conditional on planning permission.

19  The original deal provided that the price for OS160 would be paid outright without any deferral (853C). In the course of negotiating the contract, Mr Boyd, Mr Nurkowski's solicitor, took tax advice on behalf of Mr Nurkowski and the settlement. At one stage, Mr Nurkowski considered an exchange of land between the settlement and himself as the bottom field was worth more and Gallaghers only wanted to enter into a conditional contract for the top field (856E). Further negotiations took place between Mr Nurkowski, Mr Boyd and Gallagher and a contract for the sale of the bottom field was prepared and signed by the trustees for £1.25m. in early June 1989. At that time OS 149 was agreed to be sold for £875,000. But the agreement was then renegotiated without the active participation of the trustees. The parties then executed contracts whereunder consideration (£2m) was apportioned as to £740,000 for the bottom field (the settlement's property) and £1,260,000 for Mr Nurkowski's property. The consideration for the sale of OS 160 was payable in two instalments, a deposit of £220,000 and the balance being due in February 1991. In the case of OS 149 the deal was structured as to one acre as an outright sale for £378,000 payable on completion and as to the balance as a put option exercisable by Mr Nurkowski at a price of £882,000 by 8 January 1993. In due course Mr Nurkowski exercised his option against Gallagher. Accordingly the contracts for the top field were not in the event conditional on planning permission. Completion took place on 2 August 1989. The price paid was wholly remarkable given the lack of development prospects for the land but that would of course not prevent the incurring of tax.

20  There was no explanation for why the price was reapportioned in the way described, other than that Mr Nurkowski decided that after all he want a larger slice of the profits than before. It is doubtful whether the trustees took separate advice before accepting the renegotiated contract. If, as seems likely, they did not

do so, that is evidence of their willingness to do Mr Nurkowski's bidding, rather than act as independent trustees. The renegotiation of the contract also shows Mr Nurkowski's intense interest in money matters. The judge's assessment of him was that he was an astute business man (914H).

21  Shortly before the renegotiated contracts were exchanged, Mr Boyd arranged for OS 160 to be valued by Mr Nicolson of Carter Jonas on the basis of sale of the freehold with vacant possession as at 16 March 1989. Mr Boyd did not disclose the negotiations with Gallagher: the judge held that neither Mr Boyd nor Mr Nicolson knew about the offer of £700,000 in December 1988. Mr Nicolson made enquiries as to whether there was any planning potential in OS 160 and the planning officer told him that this field had no planning hope at all. On 14 July 1989 Mr Nicolson provided a written valuation of OS 160 in the sum of £35,000 which was submitted to the Revenue. The transaction with Gallagher was in due course completed.

22  In November 1990 the district valuer asked for further information about the land.

23  At Mr Nurkowski's suggestion, the settlement bought Mr Nurkowski's land at Cockhill, Trowbridge in April 1990 for £130,000. In February 1991 the settlement agreed to lend £510,000 to Mr Nurkowski to help him settle his capital gains tax bill arising on the sale of that part of OS 149/149A which was sold outright. Interest was agreed at 1% over base rate, with six monthly rests. This was in due course secured by a loan agreement secured by an assignment by Mr Nurkowski of his rights against Gallaghers under his put option in respect of Field 149.

24  In December 1991 Mr Nurkowski was assessed for £30,000 tax in respect of the sale of the Cockhill land. Mr Nurkowski's accountant said that he was not in a position to pay.

25  In April 1992 the Revenue sought information about the sale of OS 160 from Gallagher.

26  On 26 May 1992, Mr Nurkowski made an offer to buy a public house called the Lion & Fiddle for £150,000. This did not in the event proceed at this stage

but the settlement lent £10,000 in cash to Mr Nurkowski on 8 July 1992.

27  In June 1992, the district valuer told the Revenue that he could not see why the value of OS160 in March 1989 should be less than the amount paid by Gallagher in August 1989.

28  According to a document prepared by Mr Gardner of the trustees, on 14 July 1992 Mr Nurkowski and Mr Gardner had a meeting at which Mr Nurkowski said that he was in dispute with the Revenue over valuation and that he therefore wanted to dispose of as many of his assets as he could to the settlement. He would not be able to repay the loan due to the settlement before January 1993 and he would then either transfer assets or repay in cash which could be used to buy assets from him.

29  On 12 November 1992, a new district valuer advised his colleagues in the Revenue that OS 160 was worth £650,000 as at 16 March 1989.

30  In December 1992, Mr Nurkowski (having exercised his put option) became liable to pay a further £352,000 tax in respect of the sale of the balance of OS 149 payable in December 1993. He also owed some £665,000 to the settlement. He and Mr Boyd agreed to offer to repay one half of the monies owed to the settlement. The trustees accepted this proposal and that the repayment should be made out of the proceeds of the consideration outstanding from the sale of OS149.

31  Shortly after this, Lloyds Bank plc, with which the company had a loan account, sought a reduction in the company's overdraft.

32  On 29 January 1993, Mr Boyd had a meeting with the Revenue in order to negotiate the value of the land sold to Gallagher. He told the Revenue that the sale to Gallagher had only been secured at the last minute (879H). Mr Boyd told the Revenue that no deal had been concluded before the settlement had taken place.

33  In a telephone conversation on 3 February 1993, as recorded by Mr Fuller of the Revenue, Mr Boyd told Mr Fuller that Mr Nurkowski was "very heavily in debt. He owed substantial amounts to two banks, particularly in respect of his company's account. The

£880,000 realised last month had wholly gone to settle the money owed to the bank." (881E). He said Mr Nurkowski "simply did not have the wherewithal to meet even the £143,000 and was relying on being able to raise this amount from the bank by way of loan". Mr Fuller asked for a statement of Mr Nurkowski's financial position. Mr Boyd said that he had drafted a balance sheet and it showed that Mr Nurkowski was "in the red by some £350,000". In answer to a question from Mr Fuller Mr Boyd said that "he understood that the funds to buy the investments held by the settlement had been financed by bank loans" (881–2).

34  In February 1993, Mr Nurkowski agreed to buy two public houses, the Three Lions and the Nettleton Arms for £52,000 plus VAT and £150,000 respectively. Mr Boyd told the trustees that Mr Nurkowski would be drawing down on his loan arrangements with them to make a number of acquisitions. The terms as agreed meant that Mr Nurkowski would not have to pay any interest to the trustees for five years.

35  In February 1993, Mr Nurkowski made a further offer to purchase the Lion & Fiddle public house.

36  On 15 February 1993, Mr Fuller telephoned Mr Boyd. Mr Fuller referred to the substantial assets of the settlement and raised the question whether the trustees would lend money to Mr Nurkowski to pay his tax. Mr Boyd said that he thought that the trustees would not make any loan to Mr Nurkowski except on commercial terms. Mr Boyd said that he would need instructions from Mr Nurkowski. Mr Nurkowski instructed him to continue to negotiate.

37  On 16 February 1993, the trustees lent £250,000 to Mr Nurkowski so that the company's overdraft with Lloyds Bank could be paid off. This loan carried interest at 1.5% above Lloyds Bank base rate, payable at six-monthly intervals, and was secured over the shares in the company. In fact the last audited accounts of the company, drawn up as at 31 March 1991, showed that the company was then insolvent but the trustees did not ask to see these accounts. The terms of the loan were set out in a loan agreement, which the judge called "Loan 1". Clauses 5 and 6 of Loan 1 provided for the making of further advances and the grant of further security as follows:

"5.    It is intended that further sums may from time to time be advanced to the borrower. The parties acknowledge that all such further advances should be on the same terms and conditions as the principal loan and as are contained in this agreement.

6. … The Borrower will deposit such further security from time to time in connection with further advances as the trustees shall reasonably require …"

38   Meanwhile, Mr Boyd continued his negotiations with the Revenue and made an offer of compromise of £160,000. He reported the offer to Mr Nurkowski, who was proceeding to acquire three public houses.

39   On 24 February 1993, the Revenue accepted the offer of £160,000 made by Mr Boyd. On 26 February 1993, contracts were exchanged for the purchase for the Lion & Fiddle for £165,000 plus VAT.

40   On 1 March 1993, Mr Nurkowski instructed Mr Boyd to apply to the settlement for a further loan of £198,500 to complete the purchase of the Lion & Fiddle and also a loan of £160,000 to pay the Revenue. The trustees agreed to make both loans. The loan of £198,500 was recorded in an agreement which the judge called "Loan 2". It was dated 25 March 1993. The terms as to interest and other terms in Loan 1 applied. This loan was secured by a charge over the Lion & Fiddle public house.

41   The loan of £160,000 was recorded in a loan agreement dated 30 March 1993 which the judge called "Loan 3". This was not supplemental to Loan 1 and was interest free for up to twenty years as the terms of this loan provided that it was not repayable for 20 years or if earlier 28 days after the death of Mr Nurkowski. Mr Nurkowski was given a right to pre-pay the loan. The trustees asked for security against Enniswood House. Mr Nurkowski refused to offer Enniswood House as

security but gave security over the balance of the land at Cockhill not previously sold to the trustees. He gave an indemnity to the trustees against liabilities arising by reason of the trustees making the loan free of interest. Clause 5 of Loan 3 contained the following provision for further security:

"The Borrower will deposit such further security from time to time in connection with the Number 3 loan as the trustees shall reasonably require …"

42   On 30 March 1993, Mr Nurkowski signed an agreement of compromise with the Revenue. The Revenue agreed to accept the sum of £160,000 in full and final settlement of all tax liabilities of whatever description arising on the making of the settlement, on the sale of the land in August 1989 and on the disposal of the Cockhill land. That sum of £160,000 was duly paid.

43   In May 1993, Mr Nurkowski asked the trustees for yet more loans. On 19 May the trustees agreed to lend a further £30,000. This was recorded in a loan agreement which the judge called "Loan 4", which was supplemental to loan 1. There was no additional security for this loan (890G).

44   In June 1993, Mr Boyd asked the trustees for a loan of a further £90,000 to make a further property acquisition. The trustees indicated that they would be willing to lend their remaining cash (£40,000) and to liquidate their remaining investments. Mr Nurkowski through Mr Boyd asked the trustees to do this. Accordingly the trustees made a further loan of £70,000 to Mr Nurkowski, which was recorded in a loan agreement dated 29 June 1993 which the judge called "Loan 5". The security was the Three Lions public house which Mr Nurkowski had bought for £52,000 plus VAT. The terms were those applying to Loan 1.

45   On 23 November 1993, the trustees had to ask Mr Nurkowski to lend some small sums so that they could pay the tax due from them as trustees. Later they asked

for small sums to pay their own fees but none of these sums were paid.

46  Meanwhile Mr Nurkowski had received a further assessment for £372,457 in respect of the gain on OS 149. Mr Boyd told Mr Nurkowski's accountant that he had no sums to pay the tax. The balance sheet of the settlement as at 5 April 1994 showed that the debts then owed by Mr Nurkowski to the settlement amounted to £762,729.

47  On 16 June 1994, the trustees asked for the security for the loans made to Mr Nurkowski to be increased. On 4 November 1994, Mr Boyd made a number of proposals to the trustees, including a proposal for a second charge over Enniswood House. On 24 November 1994, Pritchard Englefield & Tobin, solicitors, wrote to Mr Boyd on behalf of the trustees asking for a reduction in the borrowings or an increase in the security offered. Their letter stated:

> "It would seem there is a serious shortfall and our clients have instructed us to press for either a reduction in the borrowings or a major increase in the security offered. It is important that a formal offer with valuations is made to the trustees at an early date."

48  Mr Boyd replied on 30 December 1994, stating that Mr Nurkowski was unlikely to be able to reduce the borrowings but was willing to offer further security. Mr Boyd stated that he intended to continue to negotiate with the trustees direct. Nothing further was heard from Pritchard Englefield & Tobin.

49  On 30 December 1994, Mr Nurkowski executed a legal charge over the Lion & Fiddle in favour of the trustees.

50  In May 1995, having taken advice from counsel, Mr Boyd told the trustees that he could no longer act for them. On 7 October 1995, Mr Nurkowski told the trustees that he was unable to pay their fees. The

Revenue continued to press both the trustees and Mr Nurkowski in respect of tax due.

51  In February 1996 the trustees asked Mr Nurkowski if the land at Cockhill could be sold "to provide some liquidity for the trust", although this was a trust asset. On 27 March 1996, Mr Nurkowski sold the Three Lions public house to the company and the trustees released the charge without requiring any repayment of the debts due from Mr Nurkowski. On 17 April 1996, Mr Nurkowski executed a second charge over Enniswood in favour of the trustees. In August 1996 and February 1997, Mr Nurkowski provided the trustees with further security over property he owned.

52  On 23 October 1997, the trustees wrote to Mr Nurkowski stating that they were only willing to allow the loans to Mr Nurkowski to remain outstanding if they were satisfied that the security was adequate. On 4 December 1997 the trustees wrote to Mr Boyd saying that the trustees would like to have the maximum security available and that they would be pleased if Mr Boyd would pursue that matter with Mr Nurkowski.

53  On 21 November 1997, Mr Nurkowski assigned to the trustees all the indebtedness of the company to himself. This was absolute in its terms but it was common ground that it was given by way of security only.

54  On 30 June 1998, the Revenue made an assessment on Mr Nurkowski in the sum of £437,147 tax plus interest on the gain on OS 149.

55  In August 1998, Mr Nurkowski was served with a statutory demand in respect of the unpaid tax. On 12 January 1999, Mr Nurkowski was served with a bankruptcy petition and on 28 January 1999 a bankruptcy order was made against him.

56  On 21 January 1999, the trustees made a demand for repayment of £548,500 being the amount outstanding of the monies lent by them, plus interest due thereon of £311,458, even though some of these monies could not be rendered due on demand.

57  Mr Hill was appointed trustee in bankruptcy. Mr Boyd told Mr Hill that he acted for the settlement and had not acted for Mr Nurkowski for some time.

Hill v Spread Trustee Co Ltd, 2006 WL 1288358 (2006)

**The judge's findings**

58  In his general observations about the witnesses, the judge said:

> "Mr Nurkowski was a dreadful witness. At times he did not even attempt to make plausible replies to questions and his evidence was at odds with the contemporary documents and the likely chain of events. I find that he was completely dishonest and I can place no reliance on anything he said."

59  The judge was also critical of Mr Boyd. He said that Mr Boyd was not prepared to tell a direct lie but was a master of what Kipling called the "truthful answer that tells the blacker lie" (906C). By way of example he held that he had wrongly misrepresented to the trustees that the reapportionment of the consideration for the sale of OS 149 and OS 160 was Gallagher's idea.

60  The judge then made his findings in respect of the argument that the settlement was a sham. There is no appeal against his judgment so I need say no more about it. At 914B, the judge turned to the claim under section 423 of the 1986 Act. He held that Mr Nurkowski had three purposes in making the settlement, namely an understandable and proper intention to provide for his daughter, a proper intention to defer tax on the property and a purpose to evade tax by pretending that there was little difference between the current value of the land and the cost to him on acquisition in 1986. The judge held that this was so even if Mr Nurkowski had intended to elect to hold over the tax payable on the gift into settlement as there would have been at least a partial clawback when the settlement was exported. The judge continued:

> "Mr Nurkowski thought, until he was later corrected by Miss Foster, that OS 160 was going to get planning permission in April. *He*

> *therefore decided to conceal the current value of the land and to endeavour to persuade the Inland Revenue that it had little or no hope value in March 1989* . He was aware that he should have taken action some time ago, but he hoped that by misrepresenting the current value he would be able to achieve the benefit he would have had if he had settled the land in 1987. *I find that, as Miss Newsham recorded, he had an offer in 1988 of £700,000 for OS160 and he was aware that that was probably its minimum value at the time* . I do not find Miss Foster's evidence to the contrary convincing she was not a party to Gallagher's negotiations." (914F) (Italics added)

61  The judge went on to hold that although Mr Nurkowski instructed Mr Boyd to give him tax advice he did not give him anything like the same information that he had given Spicer & Oppenheim in January. He held that Mr Nurkowski had deliberately concealed the offer he had received for the land from his advisers in the summer of 1989. He found that neither Mr Boyd nor Mr Nicolson knew of it: it is indeed the trustees' case that Mr Boyd did not know of the £700,000 offer (appellants' skeleton argument page 23, para. 64(iii)). He held that he could infer that it was Mr Nurkowski's intention in March 1989 not to reveal that offer or the extent of the interest shown by Gallagher in 1988 to the Revenue, and that one of his purposes in making the settlement was to prejudice the interests of the Revenue by inducing them to make a wrong assessment of capital gains tax. The judge held that he could not do this without the settlement because if he retained the land the capital gain would be the difference between the cost adjusted for indexation, and the sale price. The judge held that although this was not his sole or dominant purpose this was positively intended and a factor which substantially motivated him. The judge rejected the submission that it was the deception not the settlement which caused any prejudice.

"The settlement was an essential part of the purpose. If I buy petrol, I can say that I do so for the purpose of making a fire, although I cannot make the fire without buying matches." (915B)

62   The judge rejected a defence that the claim was statute barred. He held that the claim under section 423 was a specialty and that section 8(1) of the Limitation Act 1980 applied. He held that the action could not have arisen before the bankruptcy order was made. Since that order had been made on 28 January 1999 the application was not statute- barred.

63   The judge also rejected the argument that the Revenue was not a victim for the purpose of section 423(5) because it had entered into a compromise with Mr Nurkowski. He held that the question whether section 423(3) was satisfied had to be determined at the time the transaction was entered into. If his interests had not actually been prejudiced that might be a matter to be taken into account when the court gave relief.

64   The judge considered a number of the transactions under which Mr Nurkowski had given security over his assets in favour of the trustees. In particular he held that section 423 did not apply to the security given for the loans made in 1991 and 1993. The aggregate amount which Mr Nurkowski borrowed from the settlement was £1,228,500. The 1991 transaction had been repaid and the 1993 loans were not within section 423 . He held that the charge over the Lion & Fiddle on 30 December 1994 was outside section 423 because it was made pursuant to a contractual obligation to perfect security on demand from the trustees. However he held that the charges over Enniswood and the land at the rear of that property, in April and August 1996 respectfully, and the assignment of the loan account in November 1997 were transactions within section 423 . These transactions involved the grant of security for loans already made and although it might appear that the trustees had given consideration in the form of forbearance from enforcing their loans, in fact the trustees' pressure was "synthetic" and no consideration was given. The purpose was to put assets beyond the reach of the Revenue.

65   In the light of his findings the judge heard further argument as to the appropriate form of order and gave the relief described in para. 3 of this judgment and made orders for the payment of costs.

**The issues on this appeal**

66   The following are the issues which arise on the judge's findings of fact:

- a.   *The £700,000 offer issue:* Was the judge entitled to find that Gallagher had made an oral but unconditional offer of £700,000 to purchase OS 160 from Mr Nurkowski in 1988, and as at the date of the settlement dated 10 March 1989 Mr Nurkowski knew that such offer represented the minimum value of OS160?
- b.   *The purpose issue (fact)* : Was the judge entitled to find that one of Mr Nurkowski's purposes in making the settlement was, by concealing the £700,000 offer, to cause the Revenue to value the land at less than its true value as at the date of the settlement?
- c.   *The later charges and assignment issue* : was the judge entitled to conclude that the later charges and the assignment were given for no consideration for the purposes of section 423 of the 1986 Act?

67   The following are the issues of law which arise on this appeal:

- d.   *The limitation issue:* is the trustee in bankruptcy's application statute- barred?
- e.   *The purpose issue (law)* : was Mr Nurkowski's intention as found by the judge sufficient to constitute a purpose capable in law of being a purpose for the purposes of section 423(3)(b) ? i.e. was it prejudicial? was it sufficiently realistic? did it cause prejudice?
- f.   *The victim issue:* was the Revenue a victim for the purposes of section 423(5) ? i.e. did the applicant have to prove that the Revenue was a victim at the date of the trial?
- g.   *The charges and assignment issue* : if the later charges were outside section 423(1)(a) , should the judge have held that they were within section

423(1)(c) as they involved the disposition of the property of Mr Nurkowski at an undervalue?

68   In the course of the hearing of this appeal an application was made to amend the grounds of appeal to include new points of law as to the form of relief that the judge should have granted and in addition a point which was not investigated at trial as to whether the second and third charges were granted pursuant to clause 5 (the covenant to provide such further security as the trustees might reasonably require) in Loan 3. We granted the application to raise new points of law as to relief, which were not opposed. We refused permission to amend the grounds of appeal in respect of the remaining issue. It raised the issue of the reasonableness of any requirement by the trustees, and this was not investigated at the trial as it was not raised by the appellants until after all the witnesses other than Mr Boyd had by then given their evidence. Indeed we have not been shown any evidence that the trustees were seeking to invoke this clause in any event.

69   A number of issues arise on this appeal but have been stood over for hearing following the handing down of this judgment. Those further issues are therefore not dealt with in this judgment. They include issues as to costs are:

> • h.  *The relief issue (the settlement)* : did the judge err in the exercise of his discretion as to the form of relief in respect of the settlement?
> • i.  *The penalties issue* : should relief have extended to penalties and also to tax which Mr Nurkowski owed apart from the gift into settlement?
> • j.  *The relief issue (charges)* : should the judge have brought into account the release by the trustees of their charge over the shares in the company?

## Issues of fact

70   The judge could not have concluded that the settlement was a transaction to which section 423 applied unless he had found that one of Mr Nurkowski's purposes in entering into it on 10 March 1989 was to prejudice the interests of the Revenue. If therefore Mr Nurkowski only formed that intention at a later date,

for example when he saw Mr Nicolson's valuation of OS 160, or if he had never formed anything that might be described in law as a "purpose", the settlement could not be avoided under section 423 .

71   An unusual feature of this case is that the settlement alone could not prejudice the Revenue. It was the failure to reveal the offer of £700,000 made in December 1988 (if made) for the purposes of valuing the land vested in the settlement that was capable of prejudicing the Revenue. It would indeed succeed in prejudicing the Revenue if it led to an incorrect valuation of the land and that valuation caused the Revenue to agree a lower value for it than it would otherwise have done. On the other hand if there had been no settlement there would have been no charge to tax and no valuation. Mr Nicolson's valuation was incomplete for the Revenue's purposes since at it took no account of any prior offer for OS 160. However, the position is further complicated by the fact that the Revenue did not rely on Mr Nicolson's valuation but on internal advice as to the value of OS 160. The position is further complicated by the fact that the Revenue yet further complicated by the fact that the Revenue proceeded to enter into a compromise with Mr Nurkowski and to relinquish its claim to assess tax arising out of the gift into settlement. However, the Revenue certainly was a form of future creditor by reason of the settlement. Moreover, its position is that in the events which have happened there are still claims to tax and interest of about £270,000 arising out of the gift into settlement, and that the compromise does not prevent these claims from being advanced. The Revenue also claims tax pursuant to section 739 of the Income and Corporation Taxes Act 1988 as a result of loans made by the trustees to Mr Nurkowski.

72   The judge did not decide whether the Revenue was correct about being able to reopen the compromise. Indeed he could not do so in a way that would bind the Revenue because the Revenue was not a party to the application. He did not, however, dismiss the application on the basis that it had not been shown that the Revenue was a victim who still had a claim at the date of the trial. He fashioned the relief in a way which he considered was appropriate to deal with the situation that the Revenue might or might not be shown later to be a victim in relation to the tax due as a result of the gift into settlement. Whether he gave appropriate relief is not in issue at this stage. The point to be made at this stage is

that this is a most unusual case; in the usual situation the bankrupt has entered into a transaction which removes assets from the reach of a creditor or creditors and has a direct effect on their ability to recover their debts, and that creditor or those creditors remain unpaid at the date of the trial. Here, as I have said the settlement did not as such prejudice the Revenue and indeed the Revenue received a sum which at the time it accepted in full discharge of the tax due in respect of the gift into settlement.

73  The appeal must be considered at two levels. First, the court must examine whether the judge's findings of fact can be successfully challenged. Then, the court must consider the questions of law. It should be borne in mind, however, that, while questions of fact have been separated out for ease of analysis, there are in some cases closely connected issues of law which are considered separately.

**The £700,000 offer issue**

74  This is an appeal against the judge's finding of fact. Accordingly, the only issue here is whether the judge was entitled to make a finding that Gallagher made an offer of £700,000 in December 1988. Mr Nurkowski's evidence was that no such offer was made. Mr Cox of Gallagher was not called to give evidence, but Miss Foster, who represented Gallagher's agents, was called and she denied that an offer of £700,000 had been made. Miss Newman submits that the existence of such an offer conflicted with Mr Cox's file note made in April 1992 in preparation for the inspection of his file by the Revenue. She also submits that it is more probable that Gallagher offered to buy merely an option over OS 160 and that Mr Nurkowski merely exaggerated the position when he had meetings with Spicer & Oppenheim in January 1989.

75  Miss Newman further submits that the question whether such an offer was made was irrelevant because the question at issue as between Mr Boyd and the Revenue was whether the £740,000 agreed to be paid by Gallagher in August 1989 was significantly more than market value. I do not accept this submission. If an offer of £700,000 was made in December 1988 it was clearly material to determining the market value at March 1989.

76  The three contemporaneous attendance notes prepared by Spicer & Oppenheim record statements by Mr Nurkowski that Gallagher had made an offer of £700,000 in December 1988. Mr Nurkowski's denials in evidence that such an offer had been made were partly based on the lack of a written offer.

77  Mr Nurkowski had clearly been interested in disposing of his land for some time, as the enquiry which Mr Holdway made of the Revenue in late 1987 demonstrates. Moreover, this is confirmed by the negotiations with other developers after the grant of planning permission in respect of the main development. In normal circumstances it would not be expected that developers would be keen to acquire sites on the periphery of the main development which did not have planning permission but that was not the case in respect of these two sites.

78  The judge took the view that there were negotiations between Gallagher and Mr Nurkowski to which Miss Foster was not a party. Her suggestion that Mr Nurkowski thought that his land had planning permission is difficult to accept having regard to Mr Nurkowski's involvement in the planning matter. It was therefore open to the judge to reject her evidence that no negotiations had taken place in December 1988. His conclusion was supported by contemporaneous documents.

79  In my judgment, particularly in the light of the Spicer & Oppenheim attendance notes, the judge was entitled to make the finding that Gallagher had made an offer to Mr Nurkowski to acquire OS 160 in December 1988. On no less than three occasions Mr Nurkowski is recorded as saying that such an offer had been made. Moreover, Mr Nurkowski said he wanted to proceed as quickly as he could and one of the reasons why he might have wished to do that was to make sure the December offer from Gallagher was not lost.

**The purpose issue (fact)**

80  Again this is an appeal against the judge's findings of fact. The judge inferred that one of the purposes in setting up the settlement was to evade tax by pretending that there was little difference between the cost of OS 160 to him and its value as at March 1989. To do this,

Hill v Spread Trustee Co Ltd, 2006 WL 1288358 (2006)

Mr Nurkowski had concealed the offer of £700,000 from his adviser, Mr Boyd, and from Mr Nicolson.

81    Miss Newman focuses on the judge's general assessment of Mr Nurkowski as a witness. She submits that the judge was not entitled to find that Mr Nurkowski was "completely dishonest" and that the judge should have given specific examples and reasons for finding that he was dishonest. The judge failed to make allowance for the fact that the cross-examination was conducted (by Mr Stephen Davies QC) in what she submitted was a bullying way. She submits that the judge should have made express allowance for this conduct. In addition, insufficient allowance was made for the fact that Mr Nurkowski was severely dyslexic: at the trial Miss Newman made an application that when he was to be cross-examined on a document it should first be read to him. The judge said he would make every allowance for Mr Nurkowski's disability. In my judgment he was right not to prescribe how Mr Davies should cross-examine from the outset. The judge intervened from time to time in the cross-examination so that Mr Nurkowski was given a proper opportunity to answer a question. Miss Newman submits that he did not do so sufficiently.

82   By way of further example, Miss Newman submits that the cross-examiner's approach to Mr Boyd was so aggressive that he was paralysed and unable to answer questions in a way which put his evidence in its best light: she described him as "a rabbit stuck in the headlights". She added that her objections to this approach were overruled by the judge or waved aside without reasons.

83   Miss Newman informed us that of the evidence of Miss Foster was interrupted because she broke into tears. She declined the judge's offer of a break. I do not see from the transcript that any improper pressure was brought to bear on this witness in the cross-examination which led up to that interruption.

84   In relation to Mr Nurkowski and Mr Boyd, Miss Newman's submission clearly raises serious issues. However, there is nothing in the grounds of appeal to support the way the submission is put. There is a general ground of appeal that the judge's findings on such matters as purpose were against the weight of the evidence, but that does not of itself cover a submission

that the judge gave too much weight to the evidence of particular witnesses because he failed to take into account that they had unfairly been pressurised into giving their answers. It does not give the respondent proper notice of the points to be made. Furthermore, the submission is not substantiated by the necessary evidence. This court only has the transcript of the evidence. Some aspects of the alleged bullying would not be recorded in the transcripts, such as tone of voice, rapid fire of questioning and so forth. I can see from the transcript that for instance there were comments by the cross-examiner in the course of the cross-examination which offended the rule that advocates should not express any personal opinion on the matters in issue. That should not have occurred. There were also instances in the extracts shown to the court where a number of comments made by the cross-examiner in the course of cross-examination were highly critical of the witness. These comments too should not have been made. The duty of the advocate is at all times to be courteous to witnesses and, if this does not occur, the judge should intervene. However, the responsibility does not rest only on the judge. If the judge does not intervene, counsel for the other side should consider whether to object. We do not see that that occurred very often in this case, and if counsel's objections are brushed aside counsel needs to make a general statement which is recorded in the transcript to explain why counsel will not be intervening on every occasion and reserving all the parties' rights. Needless to say, cross-examination of a witness that is excessive may also lead to any answers that are favourable to the cross-examiner being rejected in any event, and so even apart from being discourteous the technique may be self-defeating.

85   Miss Newman has prepared a file of extracts from transcripts with her comments interposed. I have used this file as the basis of making my criticisms of the cross-examination in the last paragraph. But some of the comments which she makes in those comments in my judgment are not fair criticisms of the cross-examiner. His role was to elicit answers from which the judge could draw some very serious inferences against Mr Nurkowski and Mr Boyd. In all the circumstances I would reject Miss Newman's submission that the judge's findings of fact against the appellants can be set aside because of the conduct of the cross-examination of these witnesses. This was a very experienced judge and

in making findings of fact he would be well practised at making all the allowances which need to be made for witnesses, particularly in the situation where their reputation is at stake. There is no evidence to suggest that the approach had a material adverse effect on the witnesses. It would not be fair to the respondents for this court to proceed on the basis that they were so affected unless there was evidence to that effect to which the respondents had had an opportunity to reply.

86 I now turn to the question whether the crucial finding of purpose was a finding which the judge was not entitled to make. The judge gave few clues as to how he reached his finding. The test whether Mr Nurkowski had the necessary intention is a subjective test: the judge had to be satisfied that he actually had the purpose, not that a reasonable person in his position would have it. On the other hand, the judge could infer that such a purpose existed even if Mr Nurkowski himself denied it.

87 It is incontrovertible that Mr Nurkowski had tax planning advice which suggested a gift into settlement. At first sight therefore this looks like a case where the lay client merely followed his advisers' advice, and left it to them to provide the necessary information to the Revenue. Section 423 does not prevent a person from acting on legitimate tax avoidance advice in this way. After all Mr Nurkowski's case is that he did not try to hide anything from Mr Boyd, to whom he gave Spicer & Oppenheim's contact details. Mr Boyd could if he had followed up those leads have found out what Mr Nurkowski had told Spicer & Oppenheim. The judge did not refer to this evidence. It was always possible that Mr Nurkowski had no intention of deceiving the Revenue. He simply found later that Mr Nicolson was prepared to give a valuation which just happened to give him a benefit in tax terms which he was not expecting. Mr Nicolson was not on the scene at 10 March 1989. There is a risk that the judge saw that the sale of OS 160 and OS 149 occurred within a short period after March 1989 and therefore assumed that Mr Nurkowski must have intended throughout to set up the settlement with a view to getting an incorrect valuation which would lead the Revenue to assess him with far less tax than he would otherwise have to pay. Did the judge work backwards from what happened in July and August 1989 and conclude that the purpose must have been to conceal the gain in March 1989? It can be said that the fact that the sale occurred so soon after

the grant of planning permission goes against the idea that Mr Nurkowski intended to conceal the existence of an earlier offer from Gallagher. It is said that he would have put more distance between the offer and the eventual deal if he really intended this.

88 The difficulty with these arguments is that, taking the judge's findings step by step, the judge's conclusion was that Mr Nurkowski had had an offer from Gallagher in December 1988, and that Mr Nurkowski's evidence to the contrary was untrue. His subsequent actions have to be viewed in the light of those findings. Moreover, it is common ground that Mr Boyd did not know of the offer and Mr Nurkowski did not expressly inform him of it. It was clearly a relevant matter to be mentioned to his solicitor and therefore the fact that it was not expressly disclosed was a factor for which there was no real explanation: it is hardly an answer to say that Mr Boyd could have found the information out for himself if he had contacted Spicer & Oppenheim. In addition, Mr Nurkowski wanted money in a hurry. He clearly regarded the settlement as a vehicle of his own and that is why he felt able to renegotiate the contract without the participation of the trustees in a way that disadvantaged the settlement. It must have been obvious to him the law did not actually allow him to do that. He was very familiar with the tax issues and with the importance of land values. These points are apparent from the Spicer & Oppenheim attendance notes. There is nothing in Mr Boyd's attendance notes which we have seen that suggests that Mr Nurkowski needed detailed advice on these issues. Mr Nurkowski was experienced in doing property deals. Moreover the chronology of events shows that Mr Nurkowski was unwilling to pay tax and regularly delayed paying it, all of which demonstrates a constant awareness in what he did of tax implications. The memo of 16 July 1992 referred to above is subsequent evidence of his desire to ensure that the Revenue recovered as little as possible.

89 As to the lie in relation to the £700,000, the judge could, as Charles J had done in Carman v Yates [2005] BPIR 476 , have reminded himself of the direction, known as the Lucas direction, used by judges when summing up to juries that a person may have several different reasons to lie and the fact that he lies on one occasion or about certain matters does not necessarily mean that he did so on other occasions or on other matters as well (see R v Lucas [1981] 1 QB 720 and R v

Middleton [2000] TLR 293 ). A tribunal must consider whether there were special circumstances which would help explain why he lied on past occasions. The need to do this, however, is well known to judges and there is no need for them to give themselves an express direction.

90 In my judgment, in the light of all the circumstances, the judge was entitled to take the view that, when Mr Nurkowski was in discussion with Mr Boyd, that it was unlikely that he just forgot about the offer in December 1988 and that he could be satisfied that the non-disclosure to Mr Boyd was deliberate. It is not enough for Miss Newman to say that the allegation was not pleaded. It was pleaded that there was concealment of the offer from the Revenue and it must have followed from that that concealment from Mr Boyd would also be alleged.

91 Having reached that point the judge was faced with the question why should Mr Nurkowski have dissembled on both these matters? The judge heard all the evidence and there were many different strands in the evidence. In my judgment it was open to him to conclude that Mr Nurkowski had the plan for making the gift into settlement and hiding information from the Revenue. I accept Miss Newman's submission that it would be unsatisfactory if the judge had merely relied on his impression of Mr Nurkowski as a witness but in my judgment there was plenty of other evidence from which he could draw the inference that he did, particularly the contemporaneous Spicer & Oppenheim attendance notes.

**The later charges and assignment issue**

92 The judge found that the later charges and the assignment were given for the purpose of putting assets beyond the reach of the Revenue. He took the view that there was no consideration for these transactions for the purposes of section 423(1)(a) . It has not been suggested that for a transaction to be "on terms that provide for … no consideration" within that paragraph the terms of the transaction must expressly provide for there to be no consideration. The claim as originally pleaded was under section 423(1)(c) , i.e. that the charges were transactions at an undervalue, but in the end the respondent succeeded on section 423(1)(a) .

93 Miss Newman submits that a transaction which grants security cannot be for no consideration because a charge does not deplete the debtor's assets. In my judgment this argument must be rejected. Miss Newman's argument relies on the holding of Millett J as he then was in Re M C Bacon Ltd [1990] BCLC 324 at 340c to 341d that the grant of security cannot constitute a transaction at an undervalue. It does not follow from this that a transaction involving the grant of security can never amount to a transaction for no consideration. In my judgment, it is no different from any other transaction in that respect. This in my judgment was also the view of Millett J who was careful to point out that the security in the case before him was not given without consideration because it was given in exchange for forbearance by the creditor (340f).

94 Clause 6 of Loan 1 provided for the grant of further security in connection with further advances. Since neither of the later charges nor the assignment was given for further advances, it cannot be said that the judge was in error in holding that this clause did not apply. Miss Newman submits that the judge should have interpreted the covenant for further security in clause 6 of Loan 1 as arising not simply when the trustees were making further advances to Mr Nurkowski but also by implication when he was in default of his covenants, for example to make repayment. The judge's interpretation meant that the trustees were unprotected. In my judgment, although Miss Newman's interpretation would have produced a more commercial result, it is not possible to reach that interpretation except by an impermissible rewriting of the terms of Loan 1.

95 The trustees also argued before the judge that they were entitled to take possession of the profits of the Three Lions and the Lion & Fiddle and that they took the later charges and assignment in lieu of enforcing such rights. However the question is then whether that argument is substantiated by the evidence and in particular whether the trustees in fact applied genuine pressure so that the later charges and the assignment can be said to have been given as consideration for their forbearance from enforcing such rights as they had. The forbearance which the trustees gave was to enable Mr Nurkowski to develop the Three Lions and the Lion & Fiddle and continued after 16 February

1998. Accordingly, on Miss Newman's submission, forbearance was given.

96   Miss Newman accepts that the question whether the later charges and the assignment were for no consideration can be determined on the documentary evidence, consisting mainly of correspondence. In my judgment the facts appearing from the documents summarised above show that the trustees were asking for repayment and for further security without applying pressure. They naturally wanted their fees paid and to be put in funds to pay tax due from them. However, subject to those matters, they were in reality otherwise content to let matters roll forward. The letter from Pritchard Englefield and Tobin was a contrived and artificial attempt to demonstrate the imposition of pressure. That firm's quick departure from the scene lends support to the argument that the trustees did not wish to apply any pressure at all. The fact that the trustees thought that the debts due to them were repayable before 16 February 1998, or that Mr Nurkowski also thought that they were in a position to enforce repayment of the sums due to them, does not mean that consideration in that form was in fact given. The test is objective and consideration was plainly not given in that circumstance. The grant of the security over Enniswood or the land at the rear was not to obtain the trustees' consent to the release of their charge over the Three Lions so that it could be developed; this was not the reason why those charges were granted. Those charges were granted so that the trustees could have as much security as possible even though they were in no position to demand repayment or exert any pressure or give forbearance. The fact that the development of the Three Lions continued after 16 February 1998 does not mean that there was consideration for the grant of security before that date, as Miss Newman submits. It is no answer that the trustees felt that they had to apply pressure gently as Mr Nurkowski was providing a home for the beneficiary of the settlement. The truth is that the trustees were prepared to act in accordance with Mr Nurkowski's wishes and that attitude did not significantly change when the trustees became short of money themselves. It was not the trustees who were pressing for payment of the amounts due to them. It was the Revenue.

97   Miss Newman submits that there was consideration for the assignment of the loan account because

Lloyds Bank were seeking to increase the amount for which they had priority over Enniswood from £75,000 to £120,000. There is a reference to that proposal before the assignment is signed. However the deed of postponement was not signed until 1998 and it is not suggested in the correspondence that the trustees were only prepared to execute the deed of postponement if they were given the further security in the form of the assignment of the loan account.

98   In my judgment the judge was entitled to conclude that the trustees were not pressing for repayment of the sums due to them and did not give any consideration in the form of forbearance for the grant of the later charges and the assignment. Loans 1, 2, 4 and 5 were not repayable until 16 February 1998. Loan 3 was not repayable until 30 March 2013 (unless Mr Nurkowski died in the meantime). Accordingly the trustees were in no position to demand repayment at the date of the later charges or the date of the assignment. The loans were one-sided in Mr Nurkowski's favour. The trustees were in law prospective creditors of Mr Nurkowski. However, they did not threaten to start proceedings to obtain a judgment or to bring bankruptcy proceedings against Mr Nurkowski. Moreover, the trustees were advised by Mr Boyd at most times, which makes it even more unlikely that they would apply any real pressure on Mr Nurkowski.

99   Accordingly in my judgment, the appeal against the judge's findings in respect of the later charges must be dismissed.

### Issues of law

100   Most of the issues of law which arise concern section 423 and therefore I start with some general observations about that section and sections 424 and 425 , which are connected with it. Sections 423 to 425 are drafted in wide terms. The sections apply to transactions defrauding creditors (using the terminology in the marginal note) whether or not the person effecting the transaction has become insolvent.

101   The scheme of section 423 is unusual. Subs (1) defines the circumstances in which section 423 applies: there must be a transaction at an undervalue as defined. Both gifts and transactions with a gratuitous element are covered. Subs (2) defines the objects for which the

court can grant relief and refers to "victims". Subs (2) does not set out the circumstances in which the court may grant that relief. Those circumstances appear from subs (3) . Subs (3) stipulates the purpose with which the transaction must have been entered into before relief can be granted. Subs (4) identifies the court which can hear a claim under section 423 . Subs (5) defines a "victim" of a transaction defrauding creditors, and it is to be noted that the definition is not restricted to creditors with present or actual debts: whether a person is a victim turns on actual or potential prejudice suffered. The definition of "victim" is employed in relation to the criteria for relief in subs (2) . It is not used in subs (3) , which defines the necessary purpose. The person or persons who fulfil the conditions in section 423(3) may thus be a narrower class of persons than those who at the date of the transaction are victims for the purpose of section 423(5) . For a person to be a "victim" there is no need to show that the person who effected the transaction intended to put assets beyond his reach or prejudice his interests. Put another way, a person may be a victim, and thus a person whose interests the court thinks fit to protect by making an order under section 423 , but he may not have been the person within the purpose of the person entering into the transaction. That person may indeed have been unaware of the victim's existence. That answers the question: what connection must there be between the purpose and the prejudice? Section 423(2) in conjunction with the definition of victim in 423(5) makes prejudice or potential prejudice a condition for obtaining relief. That prejudice does not have to be achieved by the purpose with which the transaction was entered into. Nor in my judgment does the purpose have to be one which by itself is capable of achieving prejudice. What subs (3) requires is that the purpose should be one which is to prejudice "the interests" of a claimant or prospective claimant. The "interests" of a person are wider than his rights. The expression the "interests" of a member in section 459*of the Companies Acts 1985* (right of members of a company to apply for relief against unfair prejudice) have been similarly construed: see for example Re Sam Weller & Sons Ltd [1990] Ch.682 , 685. Likewise in Peter Buchanon Ltd v McVey [1955] AC 516n at 521, Kingsmill Moore J of the Supreme Court of Ireland spoke of having to consider the *interests* of creditors (which included in that case the tax authority in respect of a tax liability triggered by a sale of whiskey stocks), when a dividend is paid by a solvent company, even though those creditors have no right in law to stop a dividend being paid. I do not therefore consider that it is any answer to the application of section 423 in the present case that the settlement did not by itself prejudice the right of the Revenue to make an assessment of tax on the disposal of OS 160 to the settlement when it was exported to Guernsey. In my judgment, therefore, where as in this case the applicant relies on section 423(3)(b) , the crucial step is to identify the interests of the person which are said to be prejudiced.

102 The next question is whether a person can be said to have the necessary purpose if he is completely mistaken as to whether entry into the transaction can have the effect of prejudicing a person's interests. This question assumes a rather exceptional state of affairs where a person has the necessary purpose of putting assets beyond the reach of his creditors and wrongly thinks that if he enters into a transaction at an undervalue (e.g. gifts property to his wife) his creditor, B, will be prejudiced. If unbeknown to him his wife has agreed to pay the monies transferred to her to B, the purpose that he had in mind will not be achieved. If the creditor takes the benefit of the transaction solely for himself and refuses to share it out with other creditors, they will be persons who (arguably at least) are prejudiced by the transaction and can constitute victims within section 425(5) . Another situation that might occur is where the debtor enters into a transaction knowing that his entry into that transaction, together with the happening of some other event, will prejudice a creditor. I consider that the court does not have to consider the relative causal effect of the two matters. If the transaction is entered into with the requisite purpose, the fact that some other event needs to occur does not mean that the transaction cannot itself be within section 423(3) . I consider that this is what the judge meant by his test of whether the transaction was an essential part of the purpose (in which connection he applied his analogy with petrol and matches for a fire). I therefore do not accept Miss Newman's submission that it is necessary to approach section 423 as if a test of causation were to be applied. The right approach in my judgment is to apply the statutory wording. It is enough if the transaction sought to be impugned was entered into with the requisite purpose. It is entry into the transaction, not the transaction itself, which has to have the necessary purpose.

103  Miss Newman seeks to test her propositions by supposing that Mr Nurkowski had entered into the transaction with the requisite purpose but had then thought the better of it with the result that there was no concealment of the £700,000 offer from the Revenue. I infer that the Revenue would in this case have gone on to make a proper assessment of the tax. It is not necessary to express a final view on the application of section 423 to this example but if that example had happened and there was no reason why Mr Nurkowski should not make the gift to the settlement, it is doubtful whether there would have been any victims for the purpose of section 423 . However, the point does not arise in this case and I express no view on it.

104    Section 424 sets out who may apply for an order under section 423 . A victim may bring proceedings under section 424 as well as (say) a trustee in bankruptcy, but any application, by whomsoever brought must be brought on behalf of all the victims of the transaction.

105  Section 425 sets out a non-exhaustive list of the orders that may be made under section 423 . The 1986 Act does not specify any period of limitation in relation to a claim under section 423 . Although section 423 has been in statute in one form or another since 1571, there is no reported case that we have seen which decides whether any period of limitation applies to claims under the section and if so what that period is. I shall have to deal with that question and a number of detailed points that arise on the interpretation of sections 423 to 425 below.

**The limitation issue**

106  The argument on limitation has been conducted on the following basis. The questions that have been argued are:

• a.  Is there a statutory period of limitation for claims under section 423 ?
• b.  If the answer to a is yes, when did the period of limitation begin to run?

107  These proceedings were begun on 4 December 2002, that is over twelve years after the settlement was executed. Therefore this action must fail unless there is no period of limitation, or the period is six or twelve years and began within the period of six or twelve years (as the case may be) ending on 4 December 2002. That would be the case if the period begins on the date of the bankruptcy order, which was 28 January 1999.

108  If there is a statutory period of limitation, it is either twelve years or six years. The relevant statutory provisions of the 1980 Act are as follows:

> (1)  An action upon a specialty shall not be brought after the expiration of twelve years from the date on which the cause of action accrued.

> (2)  Subsection (1) above shall not affect any action for which a shorter period of limitation is prescribed by any other provision of this Act.

> (1)    An action to recover any sum recoverable by virtue of any enactment shall not be brought after the expiration of six years from the date on which the cause of action accrued …"

109  Before the judge Mr Davies submitted that the commencement of the period of limitation could be postponed under section 32 of the 1980 Act set out in para 120 below. Under that section, the commencement of a statutory limitation period can be postponed if there has been fraud, concealment or mistake. The judge did not find it necessary to reach a decision on section 32 but he observed that it raised a number of difficulties. The fraud or concealment must be the act of the defendant (as defined in section 32(1) ). Here any fraud or concealment was on the face of it that of Mr Nurkowski, not the appellant trustees. Mr Davies did not develop his submissions on section 32(1) at the hearing of this appeal.

WESTLAW    © 2017 Thomson Reuters.

110  We were shown no authority which decides the limitation point. In the recent case of Law Society v Southall [2002] BPIR 336 , this court proceeded on the basis that there was no applicable limitation period. (That case concerned gifts made by the debtor and it may be that the parties took the view that if there was any statutory period, its commencement would be postponed under section 32 of the 1980 Act). In the present case, the judge held that there was an applicable limitation period and considered that the claim was a specialty (915E to F). However he held that the limitation period (twelve years) ran from the date of the bankruptcy order so that the claim was brought in time.

111  Before I go to the authorities, attention should be drawn to the features of claims under section 423 which mean that, if such claims are subject to a statutory limitation period, there may be practical difficulties in bringing such claims. As noted above, there is no requirement that the transaction should have occurred in a specified "twilight" period before the bankruptcy. It is quite possible that it will have lain undiscovered for some time. It is one of the characteristics of transactions to which section 423 applies that they are entered into by a person when he is solvent just in case he becomes unable to pay his debts as they fall due later (as where a person is about to begin a new and risky business venture). In that situation he might well have entered into the transaction with the necessary purpose of prejudicing his creditors in those circumstances. Moreover, if the statutory limitation period runs, as Miss Newman submitted, from the date of the transaction, that period might well have expired before the appointment of the office holder who is entitled to bring a claim under section 424(1) (a) or (b) unless, of course, section 32 applies.

112  Under section 424(1)(c) a victim can bring an application under section 423 at any time. If he does so, he is deemed to bring the claim on behalf of every victim of the transaction ( section 424(2) ). If the judge is right, then there must be separate limitation periods for different applicants even though there can only be a single cause of action. On the face of it, that is anomalous. A victim who brings an application under section 423 is not enforcing a remedy for prejudice to himself alone because he, like the trustee to bankruptcy, is deemed to bring the proceedings on behalf of all the victims ( section 424(2) ). Moreover, once the court has

made an order on an application under section 423 , that must be the end of any claim by any other person under section 423 in respect of that transaction. If there is a statutory limitation period commencing on the date of the transaction, there may well be victims who only come into existence after its expiry, but it may be said that it is the inevitable consequence of any limitation period that it will give the defendant a good defence to claims brought after the expiry of the period. I would add that there is a question on which we have not heard argument as to who benefits from an order under section 423 . It may not be the general body of creditors in the bankruptcy (see for example Fidelis Oditah, *Legal Aspects of Receivables Financing* , 1991, para 7.6).

113  Notwithstanding the above, it is the policy of the statute of limitations that there should be an end to litigation and that this is in the public interest. On this basis, there is no reason why claims under this section should not be subject to some time limit. A trustee in bankruptcy is always liable to find himself in a position where claims that he might have made have become statute-barred before he can take steps to enforce them. The hardship is arguably not great here because the cause of action could always have been enforced by a victim of the transaction, even before the trustee was appointed. In any event, the trustee may be able to rely on section 32(1) of the 1980 Act. Section 424(1)(a) reflects the practice under earlier legislation: see for example Re Lane-Fox [1900] QB 508 . In Re Eichholz [1959] Ch 708 , Harman J left open the question whether, if the proceedings were brought by a trustee in bankruptcy, a representative creditor had to be joined. It may be that the purpose of providing in section 424(1)(a) that a trustee in bankruptcy could make the application was simply to resolve this question. It would be odd if by inserting section 424(1)(a) Parliament had made a radical change to the question when time starts to run for limitation purposes. If it runs from the appointment of a trustee in bankruptcy or the appointment of a supervisor of a voluntary arrangement within section 424(1) , time may start to run again many years after the transaction sought to be set aside, and indeed there may be successive bankruptcies or voluntary arrangements. It is, moreover, not clear whether a victim who makes an application with the permission of the court pursuant to section to 424(1)(a) or (b) would then be entitled to the benefit of the same limitation period.

114 With that introduction I turn to the first of the two questions set out in para 106 above.

**Is there a statutory period of limitation?**

115  In his notice of application, the trustee seeks declarations that the settlement, the later charges and the assignment were transactions defrauding creditors under the meaning of section 423 of the 1986 Act which should be set aside accordingly. The trustee also seeks an order vesting the assets of the settlements in him, but that is of little use now as nearly all the assets of the settlement have been applied in making loans to Mr Nurkowski. He also asks for further or other relief. By his respondent's notice, the trustee in bankruptcy seeks a "compendious money judgment" (as his skeleton argument puts it) to put the Revenue into the position that it would have been in if Mr Nurkowski had himself sold both OS 149 and OS 160 to Gallagher for the sum of £2m., and an order setting aside the later charges and the assignment. The judge's order does not set aside the settlement, and the trustee does not in his respondent's notice contend that the order should have done so. (It may be that the range of orders mentioned in section 425 was not available under earlier legislation.) While the relief sought in respect of the later charges and the assignment is clearly not to recover a sum of money (though it may lead to a consequential order for the payment of money), the order sought in respect of the gift into settlement may be such an order. In those circumstances, section 9(1) may apply: see section 9(1) and section 8(2), above. However that may be, I do not see how it can be said that, in that case, the 1980 Act provides no limitation period. Of course, the court has jurisdiction to make some form of order other than the payment of money, but it is established by earlier decisions of this court that where statute enables the court to give relief in monetary or non-monetary form the court should look to see what is actually claimed: see West Riding of Yorkshire CC v Huddersfield Corp [1957] 1 QB 540, and Re Farmizer (Products) Ltd [1997] 1 BCLC 589.

116  Insofar as the relief sought is not for "the recovery of a sum recoverable by virtue of" an enactment, within section 9 of the 1980 Act, I agree with the judge that this is an action for a specialty. The essence of a specialty is a covenant under seal or an obligation imposed by statute: see Collin v Duke of Westminster [1985] 1 QB 581, at 601D to 603H per Oliver LJ with whom May LJ and Sir Roger Ormrod agreed, citing in particular Lord Hanworth MR in Aylott v West Ham Corporation [1927] 1 Ch 30, 50 and Lord Atkin in Pratt v Cook, Son & Co (St Paul's) Ltd [1940] AC 437, 446. In both the cases cited the claim was to recover a sum of money under a statute. The Collin case itself concerned a claim for a declaration as to entitlement to acquire the freehold of a property under the Leasehold Reform Act 1967. This court did not determine whether such a claim was a specialty but we have not been shown any authority which establishes that an obligation imposed by statute other than to pay money is not a specialty. On the contrary, section 8 seems to assume that it is as otherwise there would be little purpose in section 8 in relation to statutory obligations having regard to section 8(2) (see also Preston & Newsom, Limitation of Actions, 1989, para 8.9, page 59).

117  I note that the view is expressed in the Cork Report (Report of the Review Committee on Insolvency Law and Practice, 1982, Cmnd 8558) that there is no time limit in which proceedings must be brought to have a transaction set aside under section 172 of the Law of Property Act 1925 (paras 1203 and 1213), but no authority is cited for this opinion. It may be that the Cork Committee had in mind Re Maddever (1884) 27 Ch D 523 (not cited to us in argument) in which this court held that a specialty creditor who applied to set aside a conveyance as fraudulent under the statute 13 Eliz. c.5, the predecessor of section 172 of the Law of Property Act 1925, was not barred by laches and could be brought at any time before his own claim as a creditor became statute-barred. However, at this time there was no statutory limitation period for claims made pursuant to statute, other than debts (see section 3 of the Civil Procedure Act 1833). A statutory limitation period for non-monetary claims made pursuant to statute was introduced for the first time by section 2 of the Limitation Act 1939, pursuant to the recommendation of the Law Review Committee chaired by Lord Wright MR in its Fifth Interim Report (Statutes of Limitation) (Cmnd 5334,1936) (see in particular page 8 of the Report). Once there was a statutory limitation period for non-monetary claims based on a statute, that period must in my judgment apply. However it must follow from Re Maddever that a claim which is statute-barred as against the debtor cannot be the basis of a claim

to set aside a fraudulent conveyance. This principle is consistent with the principle that a statute-barred debt cannot be proved in bankruptcy (see, for example, Cotterill v Price [1960] 1 WLR 1907 ), and accordingly I would hold that the same principle applies to claims which may result in the distribution of the benefits of a judgment under section 423 .

118  My conclusion as to the application of a statutory limitation period is consistent with the decision of this court in the Farmizer case that a claim for a contribution to the assets of a company under section 214 of the 1986 Act in consequence of wrongful trading was subject to the limitation period in section 9(1) . It is also consistent with the decision of John Randall QC sitting as a deputy judge of the High Court of Justice, Chancery Division, in Re Priory Garage (Walthamstow) Limited [2001] BPIR 144 in relation to applications to set aside transactions as at an undervalue or as voidable preferences under section 238 to 241 of the 1986 Act. As we have not heard argument on the form of relief in respect of the settlement, I would leave open the question whether section 9(1) could apply to that part of the trustee's application in that respect.

**When did the period of limitation begin to run?**

119  I now turn to the question when the period begins. The argument that it begins on the appointment of the trustee where an application is made by a trustee in bankruptcy under section 424(1)(a) is that that section prevents any application being made under section 423 except by the persons mentioned in section 424(1) . Thus the requirements for making an application cannot be satisfied in the case of a trustee in bankruptcy until he has been appointed. The judge accepted this argument, citing para. 182 of the judgment of Charles J in Carman v Yates . The holding of Charles J was based on an opinion expressed in Muir Hunter on *Personal Insolvency* and a passage in Re Priory Garage , though I agree with the judge that the passage cited is not directed to this point.

120  I do not consider that the judge was correct on this point. The question is one of statutory interpretation. A period of limitation runs from the date on which the ingredients of the cause of action are complete: Coburn v Colledge [1897] 1 QB 702 , 706 (see also Letang v

Cooper [1967] 1 QB 232 at 242 to 243). A cause of action is complete when all the facts which it would be necessary to prove, if traversed, in support of the right to a judgment of the court, can be pleaded.

121  It must be uncontroversial that the matters contained in section 423(1) and (3) are ingredients of the cause of action under section 423 . The difficult question is whether section 424 also sets out ingredients of the cause of action. As the marginal note states, section 424 deals with the question of who can bring the application. Is this — in whole or part — purely a procedural question, or does section 424(1) set out ingredients of the cause of action?

122  In favour of the former view, it can be said that the appointment of the trustee is not a matter which has to be pleaded before any claim under section 423 can be pleaded. It is likely that there will be a victim prior to his appointment (if there are any victims at all). I have already observed that if the judge is right, the limitation period can begin many years after the transaction. It also means that there are separate limitation periods applying to different applicants. These considerations would tend to make it less likely that time began to run in this case for the purpose of the 1980 Act only when the trustee was appointed. Likewise, it would be very odd if a statutory limitation period began on the appointment of a trustee in bankruptcy if there were in fact no victims at that date.

123  It can also be said that, if the claim is brought outside a statutory period starting on the date of the conveyance, the application may be saved by section 32(1) . This provides:

> "(1)  Subject to subsections (3) and (4A) below, where in the case of any action for which a period of limitation is prescribed by this Act, either—
>
> (a)  the action is based upon the fraud of the defendant; or
>
> (b)  any fact relevant to the plaintiff's right of action has been deliberately concealed from him by the defendant; or

WESTLAW  © 2017 Thomson Reuters.

(c) the action is for relief from the consequences of a mistake;

the period of limitation shall not begin to run until the plaintiff has discovered the fraud, concealment or mistake (as the case may be) or could with reasonable diligence have discovered it.

References in this subsection to the defendant include reference to the defendant's agent and to any person through whom the defendant claims and his agent."

124  This section could clearly be invoked where the defendant was party to the fraud or to any deliberate concealment. Here, however, there is no basis for saying that the appellants were party to any fraud or that they have deliberately concealed any relevant facts. It is possible that the fraud of Mr Nurkowski can be treated as that of the trustees as a result of the extended meaning given in section 32(1) to references to the defendant. However we have not heard any submissions on this point and it is thus inappropriate to express a view on the application of section 32 to this case as that matter has not been fully argued.

125  On the other hand, if it is correct that for the purposes of limitation time begins to run from the date of the transaction, there may be no person at all at the start of the period. It would be odd if Parliament enacted a provision for victims where time started to run before the person who wanted to enforce his rights as a victim had become a victim. In the present case, for instance, the Revenue did not become a victim before Mr Nurkowski made the gift into settlement and submitted the valuation of the land for £35,000. Likewise, a person who enters into (say) a voluntary settlement of all his assets in contemplation of entering into a risky trade may remain solvent for many years. In such a case, I doubt whether a person is "capable of being prejudiced" by the settlement for the purposes of

section 423(5) until the debtor becomes insolvent. Until that point in time, there may therefore be no person capable of applying for an order.

126  In these circumstances, in my judgment, the statutory limitation period cannot start to run until there is a victim within the statutory definition. It must be part of the cause of action that it can be shown that he is a victim. The limitation period must in my judgment then continue unless and until whichever first occurs of (a) the disposal of the possibility of any claim under section 423 by a binding judgment or settlement, or (b) the expiry of the period of limitation applicable to the section 423 claim.

127  The next issue is whether the period also begins when a trustee in bankruptcy is appointed. I do not consider that that is the effect of section 424 because the trustee's application is also made on behalf of the victims. This is an indication that he is to be in no better position than the victims themselves, and thus not able to bring a claim if their claims under section 423 or against the debtor are statute-barred. On the other hand he must be in a position to make an application so long as there is any victim whose claim is not statute barred. I note that in Re Maddever , the co-applicant was the nominee under letters of administration of the insolvent estate of the deceased but the judgment of this court does not suggest that his presence had any effect on the limitation question. I accept, of course, that that case was decided before section 424 was enacted. I have put forward in para. 113 above a possible explanation for including the trustee as a person who may make an application under section 423 .

128  The next issue is whether the limitation period begins each time a victim comes into existence. I would put my answer to this issue in this way. Section 424 establishes the collective nature of the remedy under section 423 : any victim can make the application but if he does so he represents all victims. Likewise, a trustee in bankruptcy can make an application. However, if the trustee makes an application under section 423 , his application is also on behalf of all victims. Section 423 is thus a collective remedy. It follows that the ingredients of the cause of action can be established by pointing to the existence of any one of the victims. It must follow logically from this that the limitation period applicable to the section 423 claim made on any

particular application cannot start before the victim for the purposes of that application (ie the applicant, or, if the applicant if not himself a victim, the person(s) on whose behalf the applicant makes the application) became a victim. The period then runs from this date or, if the commencement of that period is postponed under section 32 of the 1980 Act, from that postponed date. The length of the period is governed by section 8(1) of the 1980 Act, unless section 9 of that Act applies.

129 In this case, the claim which the Revenue now seeks to advance in respect of the capital gains tax liability apparently settled by the compromise did not come into existence until the compromise was made in 1993. This court has not heard argument on the form of relief and therefore this court must as I see it proceed on the basis that section 8 applies. Accordingly the trustee's claim cannot be struck out as statute barred at this stage.

**The purpose issue (law)**

130 There can be no doubt but that section 423(3) requires the person entering into the transaction to have a particular purpose. It is not enough that the transaction has a particular result. The question which Miss Newman raises is: what must be shown in order for the court to be able to find that a purpose has been formed?

131 This is different from the question considered by this court in the recent case of IRC v Hashmi [2002] 2 BCLC 489 . In that case the question was whether when there was more than one purpose the proscribed purpose had to be dominant or not. This court held that it is not necessary for the proscribed purpose to be the dominant purpose; it was sufficient if it was a real substantial purpose.

132 Here it is said that Mr Nurkowski could not be confident that he would get any tax advantage. It was just a hope that he would save tax, rather than an intention. I would accept that there is a line to be drawn between mere hopes and settled aims. As Asquith LJ said in Cunliffe v Goodman [1950] 2 KB 237 , 253, a person cannot be said to have an intention merely because he contemplates something as a possibility or if his wishes are merely a minor factor in the achievement of a particular result.

133 The judge did not draw a distinction between hopes and purposes. However, in my judgment the strength of his finding makes the distinction irrelevant since he found that inducing the Revenue to make a wrong assessment of the capital gains was something that Mr Nurkowski positively intended and was a factor which "substantially motivated" him (915A). This in my judgment was enough to show that Mr Nurkowski acted with what was in law a purpose.

134 I have already dealt with the question whether the purpose was prejudicial or had to be causative of the prejudice to the Revenue.

**The victim issue**

135 If I may be forgiven for saying so, this issue is a bit like the chicken and the egg. The appellants criticise the judge for not making a finding about the compromise. They say that he heard all the evidence that there was likely to be on that issue. The position as it existed before the settlement could not be restored and so court has no jurisdiction to make an order unless there was a victim as defined in section 423(5) .

136 In my judgment there is nothing in section 423 which mandates this result. I have already observed that it is a feature of sections 423 to 425 that they are drafted in wide terms, and this is another example of their inbuilt elasticity. It is correct that normally the court would consider that it was not proportionate to hear an application unless it could be shown at that date that there was a person who could benefit by a positive finding under section 423 . But there are bound to be cases where that cannot be shown, perhaps because the person who seems to have been prejudiced has to establish his claim in foreign proceedings, or because there are creditors whose claims have not yet matured into present debts. Here the Revenue has grounds for saying that they were deceived as to Mr Nurkowski's means and as to his ability to raise loans from the settlement. There is as it seems to me a deliberate avoidance of the term "victim" in section 423(1) and (3) , which set out the conditions which have to be satisfied before the court can make an order under section 425 . On the contrary, all that has to be shown is that the person is making or may at some time make a claim (see section 423(3)(a) and (b) ).

Hill v Spread Trustee Co Ltd, 2006 WL 1288358 (2006)

137 There is another perspective on the victim issue. The Revenue in the unusual circumstances of this case appeared to move out of the class of victims when it agreed to the compromise but to move back into the class when it resuscitated the claims thereby settled. The position is more apparent than real because it contends that it has had the right to set the compromise aside since the date of entry into the compromise. On that basis it did not move out of the class of victims when it agreed to the compromise. However I see no reason why a person cannot cease to be the person within section 423(3) but become a victim for the purposes of section 423(5) (perhaps by reason of some other indebtedness which the debtor owes to it) before the court makes its order so as to be a person whose interests may be protected by such order. Section 423 is sufficiently flexible to allow this.

**The charges and assignment issue**

138 The respondent initially relied on section 423(1)(c) as the basis for invoking section 423 in relation to the later charges and the assignment. The question of the application of section 423(1)( c) to these transactions does not arise in the light of my rejection of the appeal against the judge's finding that the trustees gave Mr Nurkowski no consideration for these transactions. It would be difficult on the judge's findings to consider the appeal on the alternative basis of section 423(1)(c) applies because that paragraph requires a comparison to be made between the consideration provided by the parties, for which there is no factual basis which could be reviewed on appeal. Miss Newman, however, sought to argue that as a matter of law the grant of security involved no diminution in the value of Mr Nurkowski's assets. Therefore the fact that the consideration provided by the trustees was negligible did not bring the transactions within this paragraph. As to that, I would observe that section 423(1)(c) did not refer to a diminution in assets and does not depend on the grant of proprietary rights. The grant of other rights can constitute consideration; this argument is supported by section 425 which refers to "obligations" and "benefits" as well as to property. If it had been necessary to find the grant of a proprietary right, I would provisionally not have accepted the argument that the grant of security in this case did not involve the disposition of any property right in favour of the trustees. Obviously there is no change in the physical

assets of the debtor when the security is given but there seems to be no reason why the value of the right to have recourse to the security and to take priority over other creditors, which the debtor creates by granting the security, should be left out of account. In the circumstances, I would respectfully doubt whether the holding in MC Bacon on which Miss Newman relied could apply to the later charges, which were in fact charges by way of legal mortgage, especially in the light of what was said by Lord Hoffmann and Lord Millett in Buchler v Talbot [2004] 2 AC 298 at [29] and [51] respectively. I would have the same doubts in relation to the assignment, under which (even though section 136 of the Law of Property Act 1925 was not satisfied) title to the debt was transferred to the trustees. The holding in MC Bacon was applied by this court in National Bank of Kuwait v Menzies [1994] 2 BCLC 306 , where a further assignment was made of a debt that had already been assigned by way of charge, and if this point had to be decided we would have to consider whether that case was distinguishable or was now binding on this point in the light of the Buchler case. However it is not necessary for me to express a final view on these points on this appeal.

**Disposition of this appeal**

139 For the reasons given above I would dismiss this appeal as respects the issues so far argued, and stand over the remaining issues in the appeal and on respondent's notice to a further hearing.

Sir Martin Nourse :

140 I have had the opportunity of reading in draft the judgment of Lady Justice Arden. I agree with her conclusions on all the questions we have to decide except the limitation issue (paras 106 to 129).

141 On that issue the first question is whether there is a period of limitation at all. It is not clear why in Law Society v Southall [2002] BPIR 336 the parties, and thus this court, proceeded on the basis that there was no period of limitation applicable to the claim under section 423 of the 1986 Act. What is clear is that the point was not argued, so that the decision is of no assistance in the present case.

142  Those who may apply for an order under section 423 are specified in section 424(1) . They include, in para (a):

> "in a case where the debtor has been adjudged bankrupt … the trustee of the bankrupt's estate … or (with the leave of the court) … a victim of the transaction. "

In the present case the action is brought by a trustee in bankruptcy and there is at least one victim of the transaction in the shape of the Inland Revenue.

143  There is no general rule that an action brought by a trustee in bankruptcy is not subject to the provisions of the Limitation Act 1980 , and I can see no justification for there to be an exception in the case of a claim brought under s.423 . That is confirmed by such authority as may be said to bear on the point; see in particular Re Priory Garage (Walthamstow) Ltd [2001] BPIR 144 , a case relating to the somewhat comparable provisions of section 238 to 241 of the 1986 Act.

144  The second question is whether the claims of the trustee in bankruptcy fall within section 8(1) or section 9(1) of the Limitation Act 1980 . My own view, like that of Judge Weeks QC (pp 915–916), is that, since the main claim was in origin and substance a claim to set aside the settlement, the action as a whole was "an action upon a specialty" within section 8(1) . But because the action was commenced on 4 December 2002, more than twelve years after the settlement was made on 10 March 1989 and less than six years after the bankruptcy order was made on 28 January 1999, the question whether the applicable period of limitation was twelve years under section 8(1) or six years under section 9(1) is academic.

145  So the third and decisive question is whether the period started on the date of the settlement, in which case the action is barred, or on 28 January 1999, in which case it was brought in due time. Following the view expressed by Charles J in para 182 of his judgment in Re Yates (A Bankrupt) [2004] All ER (D) 373 , Judge Weeks held that the cause of action could not have accrued before the bankruptcy order was made. Charles J said:

> "If there is a limitation period, the passages in *Muir Hunter* suggest that in the case of a claim by a trustee in bankruptcy begins to run from the date of the bankruptcy order. Counsel for the trustee made the same submission on the basis that that is the date when the cause of action accrued to the trustee. I agree …"

146  The principal objection to that view is that, because section 424(2) provides that an application made under any of the paragraphs of sub-section (1) is to be treated as made on behalf of every victim of the transaction there can only be a single cause of action, while if the view expressed by Charles J and Judge Weeks is right, there must be separate limitation periods for different applicants under section 423 .

147  In my respectful view the premise of this objection is incorrect. It may be difficult to know exactly what Parliament did or did not have in mind in enacting section 424(2) , but it seems that its main purpose must have been to ensure that a victim who had not applied under section 423 should gain the same advantage as one who had.

148  In any event, I do not think it is right to say that the effect of section 424(2) is that there can only be a single cause of action in respect of one transaction. In Letang v Cooper [1965] 1 QB 232 , 242, Diplock LJ said:

> "A cause of action is simply a factual situation the existence of which entitles one person to obtain from the court a remedy against another person."

That shows that the identity of the claimant or applicant is an ingredient of the cause of action and because two different persons may have the same or a similar cause

of action it does not follow that there is only a single cause of action.

149   Further, I see no inherent objection to the notion that there may be separate limitation periods for different applicants under section 423 . While it has always been the policy of the Limitation Acts to put an end to stale claims, it has not been part of their policy to provide that time shall run against a claimant or applicant before he has been able to commence his action; see in particular section 28 of the 1980 Act (disability).

150   Three further points must be made. First, it is not an objection to the judge's view that the limitation period may begin many years after the transaction. That state of affairs is perfectly capable of arising under other sections of the 1980 Act, e.g. sections 28 and 32 . Secondly, I do not agree that the appointment of the trustee in bankruptcy is not an ingredient of the cause of action vested in *the trustee* . It is not until a bankruptcy order is made that the trustee is identified as the person entitled to sue. Thirdly, it is in my view immaterial that when the bankruptcy order is made there may be other victims of the transaction whose individual claims may already be statute-barred but who may nevertheless be able to claim as creditors in the bankruptcy.

151   For these reasons, differing from Lady Justice Arden, I have come to the conclusion that the judge's view of the limitation issue was correct. Like him, I would decide it in favour of the trustee in bankruptcy and dismiss the appeal accordingly.

Lord Justice Waller:

152   I too agree with conclusions reached by Lady Justice Arden on all questions we have to decide except the limitation issue. On that issue I agree with the judgment of Sir Martin Nourse, and am fully persuaded by his reasoning that the judge's conclusion on this issue was correct.

153   It follows that the appeal on the issues which were before us will be dismissed and (for the avoidance of doubt) further argument on relief will not include argument on the limitation issue.

**The Appendix**

**Sections 423 to 435 of the 1986 Act**

Sections 423 to 435 of the 1986 Act (as amended and now in force) provide as follows:

**Transactions defrauding creditors**

(1)    This section relates to transactions entered into at an undervalue; and a person enters into such a transaction with another person if —

(a)   he makes a gift to the other person or he otherwise enters into a transaction with the other on terms that provide for him to receive no consideration;

(b)   he enters into a transaction with the other in consideration of marriage; or

(c)   he enters into a transaction with the other for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by himself.

(2)  Where a person has entered into such a transaction, the court may, if satisfied under the next subsection, make such order as it thinks fit for —

(a)  restoring the position to what it would have been if the transaction had not been entered into, and

(b)   protecting the interests of persons who are victims of the transaction.

(3)  In the case of a person entering into such a transaction, an order shall only be made if the court is

WESTLAW   © 2017 Thomson Reuters.

satisfied that it was entered into by him for the purpose —

(a)  of putting assets beyond the reach of a person who is making, or may at some time make, a claim against him, or

(b)  of otherwise prejudicing the interests of such a person in relation to the claim which he is making or may make.

(4) In this section "the court" means the High Court or —

(a)  if the person entering into the transaction is an individual, any other court which would have jurisdiction in relation to a bankruptcy petition relating to him;

(b)  if that person is a body capable of being wound up under Part IV or V of this Act, any other court having jurisdiction to wind it up.

(5)  In relation to a transaction at an undervalue, references here and below to a victim of the transaction are to a person who is, or is capable of being, prejudiced by it; and in the following two sections the person entering into the transaction is referred to as "the debtor".

**Those who may apply for an order under s 423**
(1)  An application for an order under section 423 shall not be made in relation to a transaction except —

(a)  in a case where the debtor has been adjudged bankrupt or is a body corporate which is being wound up or is in administration, by the official receiver, by the trustee of the bankrupt's estate or the liquidator or administrator of the body corporate or (with the leave of the court) by a victim of the transaction;

(b)  in a case where a victim of the transaction is bound by a voluntary arrangement approved under Part I or Part VIII of this Act, by the supervisor of the voluntary arrangement or by any person who (whether or not so bound) is such a victim; or

(c)  in any other case, by a victim of the transaction.

(2)  An application made under any of the paragraphs of subsection (1) is to be treated as made on behalf of every victim of the transaction.

**Provision which may be made by order under s 423**
(1)    Without prejudice to the generality of section 423, an order made under that section with respect to a transaction may (subject as follows)—

(a)  require any property transferred as part of the transaction to be vested in any person, either absolutely or for the benefit of all the persons on whose behalf the application for the order is treated as made;

(b)  require any property to be so vested if it represents, in any person's hands, the application either of the proceeds of sale of property so transferred or of money so transferred;

(c)  release or discharge (in whole or in part) any security given by the debtor;

Hill v Spread Trustee Co Ltd, 2006 WL 1288358 (2006)

(d) require any person to pay to any other person in respect of benefits received from the debtor such sums as the court may direct;

(e) provide for any surety or guarantor whose obligations to any person were released or discharged (in whole or in part) under the transaction to be under such new or revived obligations as the court thinks appropriate;

(f) provide for security to be provided for the discharge of any obligation imposed by or arising under the order, for such an obligation to be charged on any property and for such security or charge to have the same priority as a security or charge released or discharged (in whole or in part) under the transaction.

(2) An order under section 423 may affect the property of, or impose any obligation on, any person whether or not he is the person with whom the debtor entered into the transaction; but such an order —

(a) shall not prejudice any interest in property which was acquired from a person other than the debtor and was acquired in good faith, for value and without notice of the relevant circumstances, or prejudice any interest deriving from such an interest, and

(b) shall not require a person who received a benefit from the transaction in good faith, for value and without notice of the relevant circumstances to pay any sum unless he was a party to the transaction.

(3) For the purposes of this section the relevant circumstances in relation to a transaction are the circumstances by virtue of which an order under section 423 may be made in respect of the transaction.

(4) In this section "security" means any mortgage, charge, lien or other security."

Crown copyright

© 2017 Sweet & Maxwell

2006 WL 1288358

End of Document                                                    © 2017 Thomson Reuters.

# TAB 7

**\*1  Arif Anwar v. Tony David Caperoe Giblett**

No. 00767 of 1993

High Court of Justice Chancery

Division Companies Court

23 May 2000

**2000 WL 1918580**

Before: Mr. John Randall, Q.C. (Sitting
as a Deputy Judge of the High Court)
Tuesday 23rd May, 2000

**Analysis**

In the Matter of: Priory Garage (Walthamstow) Limited

**Representation**

• Miss S. Barber (instructed by Messrs. Moon Beever)
appeared on behalf of the Applicant.
• Miss K. Howells (instructed by Messrs. Pilgrims,
Bedford) appeared on behalf of the Respondent.

**JUDGMENT**
**\*2**
THE DEPUTY JUDGE:

This matter raises an important, but apparently
undecided, point of law: what is the limitation period
which governs an application to the court made by a
liquidator pursuant to ss.238 to 241 of the Insolvency Act
1986 (hereafter "IA86")?

The point arises as follows. On or about 23rd December
1991 Priory Garage (Walthamstow) Limited (hereafter
"the Company") transferred 125 year leases of two flats
at 25 Recreation Ground, Stansted, Essex (hereafter "the
properties") to one of its directors, Mr. Giblett, who is
the respondent to these proceedings. That information
appears from the answers to an insolvency questionnaire
signed by the respondent himself on 20th October 1993
(see the bundle at pp.24 et seq, especially at 61).

In the questionnaire the respondents gave their
approximate value as £90,000. They have since been
valued for the liquidator at £104,000 (bundle p.109). The
transfers were only registered at H. M. Land Registry
some time later, the relevant entries on the respective
proprietorship registers both being dated 23rd October
1992 (bundle pp.104 and 107). In the event, nothing turns
on that delay, at least for the purposes of the present
application.

On 24th January 1993 a petition to wind up the company
was presented to the court by Honda (UK) Limited
(bundle pp.2–4). A compulsory winding-up order was
made on that petition on 24th March 1993 (bundle p.5).
Hence, for the purposes of s.240(1)(a) IA86 the onset of
insolvency was 24th  **\*3**  January 1993 (see s.240(3)(b) and
s.129(2) IA86). However, both parties are agreed that,
by virtue of ss.238(1)(a), 239(1) and 247(2), the date on
which it is first possible to commence such proceedings is
when the company "goes into liquidation", and that this
is the date of the winding-up order (s.129(2) is directed
to a different phrase, namely, "the commencement of the
winding-up".

It follows that, on the respondent's own dates, the
transfers of the properties occurred well within the period
of two years before the onset of insolvency, which period
is "the relevant time" for the purposes of a case such as
this under s.240(1)(a) IA86.

The applicant, Mr. Anwar, was appointed liquidator of
the company by the Secretary of State with effect from
9th August 1994 (bundle p.6). Cautions were registered
against both properties by or on behalf of the liquidator
on 9th December 1994 (bundle pp.104 and 107).

Much time then elapsed before the commencement of the
proceedings. However, as no point is taken in respect of
abuse of process separate from the limitation point to
which I must come, I need not go into the reasons for that.
Presumably, it was during that long period of time that
the respondent moved to British Columbia. On a "without
notice" application lodged in late May of last year,

WESTLAW   © 2017 Thomson Reuters.

Priory Garage (Walthamstow) Ltd, Re, 2000 WL 1918580 (2000)

the applicant was granted leave to issue the substantive application herein for service on the respondent out of the jurisdiction by order of Mr. Registrar Rawson dated 1st June 1999 (p.7 of the bundle).

**\*4**

The proceedings, which invoke ss.238 and 239 in the alternative, were then issued on 15th July 1999 (pp.8 and 9), supported by the second affidavit of the applicant sworn on 7th July 1999. All this was, of course, over six years since the making of the winding-up order on 24th March 1993.

In due course, the present proceedings came before Mr. Registrar Buckley for directions on 22nd October 1999. The respondent wished to take the limitation point and the Registrar accordingly ordered that the issue of whether this claim is statute barred or is an abuse of process be tried as a preliminary issue and gave ancillary directions to that end. It is the trial of that issue which is now before me. It has been conducted on the basis of a paginated bundle containing 110 pages. The only witness evidence in it is the applicant's second affidavit and the respondent has not required him to be cross-examined on it at this stage, instead simply and economically confining himself to making the point that passages within it are contentious.

It is against that somewhat bald background that the point of law I identified at the outset of this judgment arises for decision. That was: what is the limitation period which governs an application to the court made by a liquidator pursuant to ss.238 to 241 of the Insolvency Act 1986?

Somewhat surprisingly it appears, as I have been told by both counsel, not to have been the subject of any previous judicial decision. The predecessor of s.239 of IA86 under the regime of the 1948 Companies Act was s.320 of that Act which **\*5** in turn brought in the provisions of s.44 of the Bankruptcy Act 1914. Consistently with s.44, s.320 simply invalidated a disposition of a company's property which was a fraudulent preference of its creditors in the event of the company being wound up within the then relevant period thereafter. There was, on the other hand, no direct equivalent of s.238 IA86 in the earlier legislation. The equivalent of ss.238 to 241 IA86 with respect to bankruptcy or personal insolvency, are ss.339 to 342 IA86.

There is a brief obiter dictum in one unreported case at first instance with regard to the likely limitation position under s.339 to which I shall refer later in this judgment.

I have received skeleton arguments and oral submissions from both parties. Ultimately, it appears that the crux of the respondent's case may be found in para.6.(ii) of his skeleton argument where it is asserted that:

> "In reality, the applicants claim is for the payment of a sum of money."

I shall revert to that once I have reviewed the various authorities which have been cited to me. First, however, there are a number of statutory provisions of relevance to which I must refer.

From the Insolvency Act 1986 the following, in particular, should be noted. Section 238(3) [Court order]:

> "Subject as follows, the court shall, on such an application, make such orders as it thinks fit for restoring the position to what it would have been if the **\*6** company had not entered into that transaction."

Section 239(3) [Court order]:

> "Subject as follows, the court shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if the company had not given that preference."

Section 241(1) [Extent of orders]:

WESTLAW   © 2017 Thomson Reuters.

Priory Garage (Walthamstow) Ltd, Re, 2000 WL 1918580 (2000)

"Without prejudice to the generality of sections 238(3) and 239(3), an order under either of those sections with respect to a transaction or preference entered into or given by a company may (subject to the next subsection) —

"(a) require any property transferred as part of the transaction, or in connection with the giving of the preference, to be vested in the company,

"(b) require any property to be so vested if it represents in any person's hands the application either of the proceeds of sale of property so transferred or of money so transferred,

"(c) release or discharge (in whole or in part) any security given by the company,

"(d) require any person to pay, in respect of benefits received by him from the company, such sums to the office-holder as the court may direct,

"(e) provide for any surety or guarantor whose obligations to any person were released or discharged (in whole or in part) under the transaction, or by the giving of the preference, to be under such new or revived obligations to that person as the court thinks appropriate,

*7

"(f) provide for security to be provided for the discharge of any obligation imposed by or arising under the order, for such an obligation to be charged on any property and for the security or charge to have the same priority as a security or charge released or discharged (in whole or in part) under the transaction or by the giving of the preference, and

"(g) provide for the extent to which any person whose property is vested by the order in the company, or on whom obligations are imposed by the order, is to be able to prove in the winding up of the company for debts or other liabilities which arose from, or were released or discharged (in whole or in part) under or by, the transaction or the giving of the preference."

Section 241(2) [Restriction on orders]:

"An order under section 238 or 239 may affect the property of, or impose any obligation on, any person whether or not he is the person with whom the company in question entered into the transaction or (as the case may be) the person to whom the preference was given; but such an order —

"(a) shall not prejudice any interest in property which was acquired from a person other than the company and was acquired in good faith and for value, or prejudice any interest deriving from such an interest, and

"(b) shall not require a person who received a benefit from the transaction or preference in good faith and for value to pay a sum to the office-holder, except where that person was party to the transaction or the payment is to be in respect of a preference given to that person at a time when he *8 was a creditor of the company."

Section 241(4) [Application of s.238–241]:

"The provisions of sections 238 to 241 apply without prejudice to the availability of any other remedy, even in relation to a transaction or

preference which the company had no power to enter into or give."

expiration **\*9** of six years from the date on which the cause of action accrued."

By contrast to the wording of those sections, and in the light of an important authority which I will have to consider in a moment, it may be helpful also to refer to the wording of s.214(1) [Declaration by court, on application] where it is provided:

> "Subject to subsection (3) below, if in the course of the winding up of a company it appears that subsection (2) of this section applies in relation to a person who is or has been a director of the company, the court, on the application of the liquidator, may declare that that person is to be liable to make such contribution (if any) to the company's assets as the court thinks proper."

Turning to the provisions of the Limitation Act 1980, by virtue of s.8 of that Act:

> "(1)  An action upon a speciality shall not be brought after the expiration of twelve years from the date on which the cause of action accrued.
> "(2)  Subsection (1) above shall not affect any action for which a shorter period of limitation is prescribed by any other provision of this Act."

Section 9(1) of the Act provides:

> "An action to recover any sum recoverable by virtue of any enactment shall not be brought after the

Section 23 of the same Act provides:

> "An action for an account shall not be brought after the expiration of any time limit under this Act which is applicable to the claim which is the basis of the duty to account."

In addition, it may be of some relevance to note that under s.21 the general position provided for in subsection (3) is qualified, relevantly for these purposes, by subsection (1) (b) as follows. Section 21(1) provides:

> "No period of limitation prescribed by this Act shall apply to an action by a beneficiary under a trust, being an action —
>
> (a)  in respect of any fraud or fraudulent breach of trust to which the trustee was a party or privy; or
> (b)  to recover from the trustee trust property or the proceeds of trust property in the possession of the trustee, or previously received by the trustee and converted to his use."

Section 21(3) itself provides:

> "Subject to the preceding provisions of this section, an action by a beneficiary to recover trust property or in respect of any breach of trust, not being an

action for which a period of limitation is prescribed by any other provision of this Act, shall not be brought after the expiration of six years from the date on which the right of action accrued.

"For the purposes of this subsection, the right of action shall not be treated as having accrued to any beneficiary entitled to a future interest in the trust property until **\*10** the interest fell into possession."

It is common ground between the parties that a "specialty" includes an Act of Parliament and that prima facie a statutory cause of action created by the Insolvency Act 1986 will be a speciality within the meaning of ss.8 and 9 of the Limitation Act. Authority for that, if needed, may be found in Collin v Duke of Westminster [1985] 1 Q.B. 581 CA at 601–603 and in Re Farmizer Products [1997] 1 B.C.L.C 589 CA at 594C–D, supplemented by a passage from the judgment of Blackburne J at first instance, [1995] 2 B.C.L.C. 462 at 472B–C.

Taking the other case law in order of time, first comes West Riding v Huddersfield Corporation [1957] 1 Q.B. 540. In this case a council brought claims for two financial adjustments in what, in 1953, were the very substantial sums of £214,516 and £44,273 under s.151 of the Local Government Act 1933. At that time the 1939 Limitation Act was in force, and s.21(d) of that Act provided:

"The following actions shall not be brought after the expiration of six years from the date on which the cause of action accrued, that is to say, (d) actions to recover any sum recoverable by virtue of any enactment other than a penalty or forfeiture or sum by way of penalty or forfeiture."

The trial judge, Lord Goddard CJ, held that such claims were statute barred under that provision. The headnote states **\*11** the decision succinctly:

"Although s.151 of the Act of 1933 made provision for adjustments of other than a financial nature, the claims made in the present case were for specified sums of money and as such were within the ambit of s.2(1) (d) of the Limitation Act, 1939, and thereby statute barred."

In the course of his judgment, the Lord Chief Justice, having read s.151 of the Act said this (picking up on page 544):

"There follow several provisions for the payment of moneys found due by the arbitrator. I have no doubt that there are matters which may not involve the payment of money. It may be that some functions can be transferred without having to make financial provision with regard to them; but it is quite obvious to me from the whole of the section, including the following subsections, that the statute clearly is contemplating that in most cases at any rate there will be payments of money.

"What has happened in this case is simply this. On January 29, 1953, the treasurer of the West Riding County Council wrote to the town clerk of the Huddersfield Borough Council as follows: 'I enclose the claim, with supporting financial tables, of the county council against the corporation of the city … in respect of the areas added … on April 1, 1937, under the

provisions of the above-named Review Order. The claim is marked "without prejudice and subject to revision" and if any of the items are not quite clear to you, I shall be pleased to explain them if we can arrange an appointment. The question of orders for continuing county expenditure remains to be considered.' That was sending in a money claim — there is no question about that — for £214,516, and it was followed by another letter submitting a claim for £44,273. These letters were accompanied by most elaborate and lengthy accounts and figures showing how **\*12** these amounts were made up. It seems to me that one would be shutting one's eyes to the truth of the matter if one did not regard this as being simply a claim by the West Riding County Council on the Huddersfield Borough Council for roughly £260,000: and that is what it was, taking the two claims together."

At p.546 at the end of his judgment, the Lord Chief Justice concluded thus:

"In my opinion this is really, when the realities of the transaction are looked at and documents to which I have been referred are considered, simply an action to recover a sum of money by virtue of the provisions of s.151 of the Local Government Act, 1933. Therefore, in my judgment the answer to the arbitrator's question is that the claim is barred by statute, and I so declare."

This is the source of what I shall call the "look and see" approach which has subsequently been approved and applied by the Court of Appeal in the Farmizer case to which I must revert shortly.

In Collin v The Duke of Westminster [1985] 1 Q.B. 581, the case concerned leasehold enfranchisement under the Leasehold Reform Act 1967. The enfranchising tenant was guilty of substantial delay and in due course it was argued, unsuccessfully in the event, that he had lost his right to enfranchisement by abandonment. An argument was also advanced that the tenant's claim to enfranchisement under the 1967 Act was statute barred. Oliver LJ, who in effect gave the judgment of the court, said this at 601H to 602F:

"The obvious and most common case of an action upon a specialty is an action based on a contract under seal, **\*13** but it is clear that 'specialty' was not originally confined to such contracts but extended also to obligations imposed by statute. Under the Statute of Limitations of 1623 (21 Jac.1, c.16) no limit was prescribed for actions on a specialty and it was not until the Civil Procedure Act of 1833 (3 & 4 Will 4, c.42) that a time limit of 20 years was introduced for actions of debt 'upon any bond or other specialty': section 3. There was no statutory definition of a specialty but it was established in Cork and Bandon Railway Co. v. Goode (1853) 13 C.B. 826 that (to adopt the words of Lord Hanworth M.R. in Aylott v West Ham Corporation [1927] 1 Ch. 30, 50):

'where a plaintiff relies and has to rely upon the terms of a statute so that his claim is under the statute the nature of the claim is one of specialty and the 20 years applies.'

"Goode's case, 13 C.B. 826 was an action for calls and a similar principle was applied to an action for interest on debenture stock (In re Cornwall Minerals Railway Co. [1897] 2 Ch. 74) and to an action for recovery of rates and duties imposed by statute: Shepherd v. Hills (1855) 11 Exch. 55. A distinction, however, was drawn between the case where all that the statute did was to make binding a contract which otherwise would not be binding or to vary one term of a contract (see Aylott'scase [1927] 1 Ch. 30 and Gutsell v. Reeve [1936] 1 K.B. 272) and the case where the action rested on the statute and only on the statute: see, for instance, Pratt v. Cook, Son & Co (St. Paul's) Ltd. [1940] A.C. 437. Broadly the test is whether any cause of action exists apart from the statute: per Lord Atkin at p.446.

"It seems to me to be quite clear that in the instant case any cause of action which the applicant has derived from the statute and from the statute alone. Apart from the statutory provisions he could have no claim and it is only by virtue of the statute and the regulations made *14 thereunder that there can be ascertained the amount of the price to be paid under the statutory contract the terms of which can be gathered only from the sections of the Act and the Schedules. Subject, therefore, to one question, namely whether the word 'specialty' as used in the Limitation Act 1939 and the Act of 1980 has assumed a more limited meaning than it originally bore, I have no doubt at all that the applicant's claim is a claim on a specialty."

Thirdly, during the course of argument reference via a text book was made to the decision of the Court of Appeal in British Coal Corporation v Ellis Town Pipes [1994] Rating & Valuation Reporter 81. The case has helpfully been brought to court and I have been briefly addressed on it. The source of the reference was a passage on **McGee on Limitation Periods** 1998 Edition, appearing at pages 180–182 of that work, and in particular paras 11.003(f) and 11.005, the second paragraph within that number. The case is a complex one but for our purposes there is but one point in it which is worthy of note. As is set out at p.84 in the judgment of Ralph Gibson LJ, which again is the judgment of the court in that case, the terms of s.2(4) of the Coal Industry Act 1975are set out. It provides:

> "(4)    Subject to the provisions of Schedule 1 to this Act, where damage to any land arises from the exercise of the right to withdraw support conferred on the Board by this section, the Board shall either —
>   (a) pay proper compensation for the damage, or
>   (b) with the consent (which shall not be unreasonably withheld of the person who would otherwise be entitled to the payment of compensation for the damage, make good the damage to the reasonable satisfaction of that person and **15 without expense to him;
> and the obligation imposed on the Board by this subsection shall extend to damage to buildings and works on that land, whenever constructed."

At p.90 at the foot of the left-hand column, having considered arguments as to the applicability of either a 6 or 12 limitation period to causes of action relating, on the one hand, to a claim for compensation under s.24(a), and

on the other hand to a claim for property to be made good under s.24(b) of the same Act, the learned Lord Justice said this:

> "For my part, I am reluctant to attribute to parliament the intention to create in one section of the 1975 Act obligations upon BCC in respect of which two limitation periods are applicable.

> "I would hold that section 2(4) of the 1975 Act creates one obligation, namely, to pay proper compensation for damage to land with the right in BCC at its election to make good the damage. That alternative is available only with the consent of the person entitled to payment of the compensation and no question of making good with such consent arises unless BCC asks for that consent. In this case the tribunal made no finding of fact with reference to election by BCC or the asking or giving of consent. The claimant sought no such findings and did not seek an order for remission of the case for amendment with reference thereto … The period of limitation applicable **\*16** to the claimant's claim was, in my judgment, six years preceding the making of the 1986 reference."

I should add, without the need to cite passages from the judgment, that having found for the shorter limitation period, the Court of Appeal then held that the relevant claim was nevertheless not statute barred.

The case on which argument has primarily turned is that of Re Farmizer (Products) Ltd. Moore and another v Gadd and another, the citations for which both at first instance and in the Court of Appeal, I have already given. The

case arose by way of a claim pursuant to s.214 of the Insolvency Act which was initially commenced about four and a half years after the commencement of the creditors' voluntary winding up. However, there was inordinate and inexcusable delay in its prosecution. The defendants applied to dismiss for want of prosecution and thus, in order to apply the well-know principles in Birkett v James [1978] A.C. 297 the learned judge had to consider whether, by the time of the hearing before him, the limitation period for the commencement of fresh proceedings had expired. By then more than six, but less than twelve years, had expired.

At p.470I through to p.471A, Blackburne J records the three submissions made to him on the liquidators' behalf in the following terms:

> "Mr. de Lacy for the liquidators submitted that no limitation period is applicable to claims under s.214, alternatively that a claim under s.214 is an action on a speciality to which s.8(1) of the 1980 Act applies, which **\*17** provides for a 12-year limitation period which, on any view, has not yet expired, and, in the further alternative that, if s.9(1) of the 1980 Act is the applicable provision, the six year period prescribed by that section only began to run when these very proceedings were commenced, i.e. 13th April 1992, with the consequence that the six year period still has just under three years to run."

In the event, all three submissions failed. In the course of rejecting the first and second of them, Blackburne J said this at 471F–G:

> "I am quite unable to agree with Mr. De Lacey's submissions on this point. In my view, it is clear that the facts that a liquidator must prove to establish a claim for wrongful trading

are those set out in subsection (2) of
s.214 and no others. The statutory
cause of action created by the section
accrues on the occurrence of the latest
of the matters to which the subsection
referred. That is self-evidently when
the company in question goes into
insolvent liquidation."

In the Court of Appeal the judgment of Blackburne J. on
the limitation issues and indeed generally was upheld. The
judgment of Peter Gibson LJ was in effect the judgment
of the court. It contains extensive citations from the
judgment of Blackburne J. In addition, Peter Gibson LJ
said this, firstly from 596I to 597A:

"In the light of these considerations,
I reach the clear conclusion that the
judge was right to reject the liquidators'
contention that the 1980 Act did not
apply. The words 'in the course of
the winding up of the *18 company'
make clear that the court's jurisdiction
to make an order under the section
is limited to the period whilst the
company is being wound up. I would
give them no more significance than
that.

"Before I leave this
point I must deal
with an alternative
argument of Mr.
Oliver, that the
cause of action
under s.214 was
not properly
constituted unless
and until it appears
that subsection 2
of this section
applies."

Further down that page at 597F through to 598D, the
learned judge said:

"Mr. Davis submitted that the whole
substance of a claim under s.214
is to recover money and that this
was supported by the language of
s.214 and its ancillary provisions in
s.215. He further submitted that in
any event the claim made by the
liquidator against Mr. and Mrs. Gadd
was to recover money, namely, at
least £1.25 million. Accordingly, s.9
was, he contended, satisfied. "On this
point I start with the question what
is recoverable under s.214. The word
'contribution' if taken in isolation
could be either monetary or in kind,
particularly when conjoined with 'to
the company's assets' which themselves
may or may not be monetary. It is
common ground that 'contribution' in
s.214 must have the same meaning as
in s.213. One notes that in s.213(3)
(b) 'contribute' is used together with
'such sum', but that is in contrast
with sub-s (3)(a) where the words
'repay, restore or account for the
money or property' are to be found.
However, as Mr. Davis pointed out,
the verb 'contribute' has in and since
the 1862 Act always been used in
s.212 and its predecessors only in
relation to money. The basis of the
claim under s.214 is that it is to
compensate for loss caused to the
creditors *19 of the company through
wrongful trading and one notes that
this is expressly recognised in s.214(2)
in the reference to "the potential loss
to the company's creditors". Further
in s.215(2) of the 1986 Act it is
provided that where under either s.213
or s.214 the court makes a declaration

Priory Garage (Walthamstow) Ltd, Re, 2000 WL 1918580 (2000)

it may give further directions as it thinks proper for giving effect to the declaration, and in particular it may 'provide for the liability of any person under the declaration to be a charge on any debt or obligation due from the company to him.' That provision plainly contemplates that the liability under the declaration is a liability that can be made the subject of a charge on a debt or obligation, and that can only be a liability to pay a monetary sum. Mr. Oliver sought to find in s.215(4) of the 1986 Act an indication that what could be recovered under s.213 or s.214 need not be a sum of money. Subsection (4) provides:

> 'Where the court makes a declaration under either section in relation to a person who is a creditor of the company, it may direct that the whole or any part of any debt owed by the company to that person and any interest thereon shall rank in priority after all other debts owed by the company …'

"But that power is only exercisable when the court makes a declaration as to liability to make a contribution. I do not accept Mr. Oliver's suggestion that it contemplates the court first making a declaration that the delinquent is to be liable to make no contribution so that the substantive relief is that subordination

which subsection (4) allows. I conclude from this examination of the statutory provisions that the liability to make a contribution under s.213 or s.214 is in respect of a sum of money."

At p.599 between letters A and G, the learned judge stated:

> "I therefore conclude that s.214 (no less than s.213) **\*20** proceedings are for the recovery of a sum of money which the court declares the delinquent respondent liable to contribute to the assets of the company. This does not of course preclude the liquidator accepting property other than money to satisfy that liability.

> "Does the fact that the court has a discretion whether to make a declaration at all, even if it appears to the court that s.214(2) applies, and as to the amount of the contribution, if any, cause the claim made not to be an action to recover any sum recoverable by virtue of any enactment? I do not think so. If one asks, 'By virtue of what is the sum of £1.25m recoverable?', the answer would surely be: 'By virtue of s.214'. It is of course only capable of being recovered if the court chooses to make the declaration after the statutory conditions are shown to be satisfied, but I have no difficulty in holding that s.9 of the 1980 Act applies to such a case. Mr. Oliver accepted that the recoverable sum under the section could be damages. That the court with jurisdiction to award the recoverable sum has a discretion was not a matter which deterred Lord Goddard CJ in West Riding of Yorkshire CC v. Huddersfield Corp [1957] 1 All ER 669, [1957] 1 QB 540, when he held

that for the purposes of the predecessor to s.9(1), proceedings for an order for financial adjustment under s.151 of the Local Government Act 1933 were an action for the recovery of any sum recoverable by virtue of any enactment.

I therefore agree with the judge's conclusion that s.9(1) is the applicable provision of the 1980 Act.

"For the sake of completeness I add that I also accept Mr. Davis's alternative submission that even if the contribution, liability for which the court can declare under s.214, could be other than in a sum of money, nevertheless the claim made by the liquidators against Mr. and Mrs. Gadd comes within s.9(1). The decision in the West Riding case supports the view that when the **\*21** statutory provision relied on for the recovery of a sum enables the court to make an order either to give monetary relief or relief in some other non-monetary form, one should look to what was actually being claimed in the proceedings. An argument that the section would not be satisfied if the relief given need not sound in money was not accepted, Lord Goddard CJ looking to what had actually been sought. In the present case, although the summons by which the s.214 claim was made did not specify a sum for the claimed contribution, it is clear from the liquidator's affidavit in support of the summons that they were seeking to recover a sum of money. Accordingly s.9(1) is satisfied on this basis too."

It is quite clear, in my judgment, that the decisions both of Blackburne J and of the Court of Appeal were closely dependent on the words of s.214 which are materially different from those of ss.238–241.

In Rowan Companies v Lambert Egink [1999] 2 Lloyd's Reports 443, David Steel J had before him a contested application for leave to join certain parties to the action which had been remitted to the Admiralty judge at a previous hearing before the Court of Appeal. A summary of the position may be found in the judgment of David Steel J at 446 in the right hand column to 447 in the left hand column. The application was made more than six years after the accrual of the relevant cause of action. At p.447, in the right hand column, immediately after having set out the words of ss.8 and 9(1) of the Limitation Act, the learned judge said this:

> "It was common ground that the claim was 'upon a speciality' in the sense it was under a statute: Collin v. Duke of Westminster [1985] 1 Q. B. 581. Thus, it was **\*22** the case for Rowan that the applicable period was 12 years under s.8(1). The partners' submission was the applicable period was six years under section 9(1), the action being within the exception furnished by s.8(2). The resolution of this dispute accordingly centred on the meaning of the word 'sum' in s.9(1). Rowan contended that this word was not apt to encompass a claim for unliquidated damages. I am unable to accept that submission.

> "As a matter of first impression: (1) The word 'sum' in its ordinary and natural meaning means any sum of money; (2) there is no express restriction of the scope of the section to claims for liquidated sums of money, i.e. debts; (3) the relevant distinction would seem to be between claims under an enactment for non-monetary relief and those claims under an enactment for monetary relief whether in a form

of debt, damages, compensation or otherwise.

"This first impression is fortified, in my judgment, by the authorities. (1) It is clear that actions on a speciality are not confined to claims for liquidated sums: Pratt v. Cook, Son & Co [1940] A.C. 437 (quantum meruit), Lievers v. Barton Walker & Co [1943] 1 K.B. 385 (workmen's compensation), Aiken v. Stewart Wrightson Member's Agency Ltd. [1995], 2 Lloyd's Rep 618; [1995] W.L.R. 1281(damages). (2) The scheme of the Act is to impose a six year limitation period on claims for money under an enactment thus constituting an exception to the general rule as regards specialities: West Riding County Council v Huddersfield Corporation [1957] 1 Q.B. 540, Central Electricity Board v. Halifax Corporation, [1963] A.C.785, Re Farmizer (Products) Ltd. , [1997] B.C.C. 655. "I conclude that the claim against the partners is now time barred by virtue of s.9."

The applicant seeks particularly to rely on the third enumerated "matter of first impression" set out in that *23 passage of the judgment.

In Re Field (a bankrupt) decided in July 1999 by Mr. Jules Scher Q.C. sitting as a Deputy Judge of the High Court, the case was again an application dismissal for want of prosecution in which the question of limitation arose in the context of the principles in Birkett v James. The substantive claim was brought under s.399 IA86. Mr. Scher Q.C. upheld the decision of District Judge Marsh in the Birmingham County Court, albeit on rather different grounds.

Having cited the dates concerned, on the first page of the transcript at lines 15-18 he said:

"By any standards we are dealing with a pretty stale claim."

This was a matter relied on in submissions on behalf of the respondent. At p.5, having identified the relevant principle in Birkett v James between lines 16 and 24, the learned deputy judge said this:

"There is no authority whether the Limitation Act 1980applies to claims under s.339 of the Insolvency Act 1986. If it does, the period is much more likely to be the six year period under s.9(1) of the Limitation Act 1980 than the 12 year period under s.8(1) of that Act. See Re Farmizer Products Ltd [1997] B.C.C. 655. Whether it does or not may depend upon the precise nature of the relief sought. See Muir Hunter, Personal Insolvency, at 3.296. On any view, it seems if the application was struck out, the trustee could start again unless the period of limitation was six years and ran from the date of the impugned transaction rather than, as appears to me to be the case, from the date of the bankruptcy."

*24

I note that in the event the learned deputy judge's observations were limited as to the likelihood of which of the two limitation periods would apply to s.339 as, for the reasons that appear in the remainder of the judgment immediately after the passage I have cited, he concluded that the action could properly be struck out without coming to a firm view one way or the other on the limitation point.

I have also been referred on behalf of the respondent to a short extract from the report of Sir Kenneth Cork's Review Committee on Insolvency Law and Practice of

Priory Garage (Walthamstow) Ltd, Re, 2000 WL 1918580 (2000)

June 1982, in particular the section from paras.1278 to 1282. Within para.1282 the report states this, and this is to be read in the context of voidable preference claims:

> "Under the law as it stands at present, once the bankruptcy or winding up has commenced, there is no time limit within which proceedings must be brought. While this is appropriate where the transaction is challenged as a fraudulent conveyance, we regard it as unjust in the other cases. Accordingly, we recommend that in future no proceedings to set aside a gift or other voluntary disposition, or a voidable preference other than as a fraudulent conveyance, should be brought more than three years before the making of the Protection Order, appointment of the liquidator, receiver or administrator or execution of the arrangement (as the case may be), with power for the Court to extend the time in any particular case for just cause shown."

Given that parliament did not see fit to enact the recommendation for an express three year limitation period, I do not see how the presence of that passage within the report can assist the respondent's position in the present *25 case. However, given the underlying legal point I do have to determine, it is perhaps worth noting why the report would have asserted there was at that time (1982) no limitation period applicable to proceedings to set aside a voidable preference.

The relevant statutory provision is s.44 of the Bankruptcy Act 1914 imported into company law by s.323 of the Companies Act 1948. Counsel have kindly obtained for me a copy of the last edition of **Williams & Muir Hunter on Bankruptcy** and the notes to s.44 do not indicate any authority under the 1914 Act whereby a limitation period, in the proper sense of those words, applied to that section.

The reasoning for what the Cork Committee observed would appear to me to be this. Both the Bankruptcy Act and the Company Act sections simply provided that a transaction which was a voidable preference was void or invalid rather than conferring a power on the court to set them aside. Hence if the transaction was simply void by statute, no question would arise of there being a limitation period in respect of a particular cause of action to have them set aside.

The matter has been closely and carefully argued before me by both counsel. I shall not endeavour to rehearse all of the submissions which I have heard, but I note in particular the following.

Neither counsel has gone so far as to submit that the result as to whether it is a 6 or 12 year limitation period **\*26** will always be the same in cases under ss.238 and 239 IA86. For the applicant it was submitted that the primary purpose of ss.238 and 239 as reflected by subsection (3) in each case, is restorative, not compensatory, in contrast to the provisions of s.214. The applicant's primary position was that the 12 year limitation period applies to both heads of claim under the originating application. Ultimately, in reply, the applicant's secondary and tertiary positions were as follows. Secondarily, that if the time limit for head one was 12 years, nevertheless for head two I should not be persuaded that the 12 year period also followed. In that situation, a 6 year period for head two would be contended for. The tertiary position was to put down a marker that should it appear from my reasoned judgment that the presence of head two of the claim for relief imperilled the survival of the entire action, an application to withdraw head two would be made.

On behalf of the respondent, Miss Howells submitted first that monetary relief is claimed in this action (see head two of the prayer for relief), heads one and two all derive from one cause of action, that the two heads are not severable, and that it would be too late to abandon one of them once I have delivered a reasoned judgment. Second, alternatively, and at the least, head two of the claim should be struck out in its entirety because the account claimed would catch at least some money more than six years before the claim was brought. Thirdly, and

with considerable emphasis, the substance of the whole claim in this case is a monetary claim. That links to para 6(ii) of the skeleton argument for the respondent which **\*27** is ultimately the crux of the argument as I have already indicated.

My attention was drawn to the suggested form for an originating application under s.238 appearing in what I take it is the current edition of Atkins Court Forms in the Companies Winding Up volume, where words much more closely tying in to those of s.238(3) appear as the draft form of relief following a formal declaration.

It was submitted on the respondent's behalf that sections 238(3) and 239(3) are not limited to setting aside and that it is important for the court always to look behind the substance of the pleading. It was further submitted that on an application under these sections a simple revesting order would seldom be sufficient to restore the position to that which it had been. All such claims, it was submitted, are in substance about money. The judge will inevitably have to conduct a balancing exercise, by which I think counsel meant a valuation exercise making a series of balancing adjustments in either direction. That, she submitted, is the scheme of the Act. That is the position here, and it is reinforced by public policy arguments in favour of (a) judgments being monetary (assisting with finality in disputes) and (b) keeping the limitation period as short as possible for the reasons rehearsed by Lord Justice Peter Gibson at p.595C-E in the Court of Appeal's consideration of the Farmizer case.

The respondent directed me to the evidence at pp.89 and 101 of the bundle which, in the form of notes to accounts of **\*28** the company, seemed to suggest that, at least prior to transfer, to the respondent, these properties were likely to have been charged to the company's bankers in support of what, on 30th April 1991, was its not inconsiderable short and long term borrowing from the bank. Hints were dropped that the respondent considered himself to be in a position of disadvantage as to having evidence available to put in, by reason that all the documents were with the liquidator. It is my experience and view that such complaints are easily and too frequently made in proceedings of this nature, and for that reason I invited Miss Howells to indicate first what particular documents

her client felt embarrassed for not having available to put in evidence and, second, to indicate whether or not they had been requested in writing. Having taken instructions, answers to neither of those questions were proffered but instead it was made clear that it was the documents at pp.89 and 101 which were the sole documentary references on which the respondent would wish to rely.

The applicant's counsel submitted in reply that there was no firm evidential basis here for my inferring that the inevitable result of this case going to trial and the applicant succeeding on head one was that the trial judge would have to conduct a delicate evaluation and balancing exercise of the nature asserted on the respondent's behalf. She pointed out that the evidence of the existence of a charge was less than conclusive, and that the submissions for the respondent assumed that a substantial amount was still owing to the bank and the company, and hence still secured by the **\*29** charge mentioned in the note by the date of the transfer. However, if one turns to the affidavit evidence at p.13 of the bundle, para.9 of Mr. Anwar's affidavit, it is clear that there had been a huge reduction in the liabilities to the bank, the long term liabilities having been extinguished and the overdraft reduced to a figure of only about £10,000 by 30th April 1992, only four months or so after the transfers, and indeed that the personal guarantees of the respondent and his wife had been discharged by January 1993. It was further pointed out, and accepted by both counsel, that the insolvency questionnaire indicates that by the time of winding up, Midland Bank was not an unpaid creditor at all.

Counsel for the applicant further submitted that there was no evidence that the respondent's director, as opposed to the company itself, had been responsible for paying off this bank borrowing off. The terms of the affidavit at pp.12 to 13 indicate that it is somewhat improbable that at about December 1991 the respondent had discharged £190,000 worth of the company's bank borrowing himself.

In relation to the British Coal Corporation case, counsel for the applicant submitted, first, that the present case was not a case which came within category F of the formulation in McGee's book. Her second submission was that the limitation defence having failed, the relevant passages in the British Coal Corporation case were strictly

obiter. I agree with that submission. Thirdly, as no findings were made as to election or consent by the tribunal, nor made by the Court of Appeal (as appeared from the passage that I cited), again matters **\*30** were strictly obiter. I agree with that submission too. Fourthly, and finally, she relied on the same passage as counsel for the respondent as to the judge's reluctance to find two different limitation periods within one section of an Act of Parliament, but relied on it for the opposite result, that is, periods of twelve years in the case of each head of relief as opposed to the respondent's submission that it pointed towards periods of six years in each case.

In the light of the foregoing, the legal position is, in my judgment, as follows:

• (1) An application to the court under s.238 to 241 IA86 to set aside one or more transactions is an action on a speciality within s.8(1) Limitation Act 1980 and hence prima facie subject to a twelve year limitation period. The case of Re Farmizerproducts is clearly distinguishable because the words of s.214 are different and because the claim there was a claim for monetary compensation, not a claim to set aside a transaction. To that extent, I must respectfully differ from the dictum of Mr. Scher Q.C. where he expressed a view as to what the more likely limitation period (6 years or 12 years) was in the case of the equivalent personal insolvency section (399). I accept the submission of counsel for the applicant that the case cited by him at the end of that sentence (Re Farmizer in the Court of Appeal) does not on analysis offer any support for his proposition that the 6 year period under s.9(1) of the Limitation Act 1980 is more likely to be that applicable. Particularly given the great experience of the learned Deputy Judge, I do wonder whether **\*31** the overall result of the Farmizer case — as opposed to a full analysis of the terms of the judgment — is all that had been laid before him. It seems also that the text of **Muir Hunter on Personal Insolvency**, para.3.296 which was placed before him must have been more similar to the September 1999 edition which I have seen, than the 1996 editions which are the only others which I have seen. That sentence, which runs from lines 19 to 21 of the penultimate page of the transcript of Mr. Scher Q.C.'s judgment, is a further example of what I have called the "look and see" approach, as to which

there is no difficulty in reconciling the judgment in the Farmizer case and that which I am now giving.

• (2) There may however be examples of applications under ss.238 to 241 which are taken outside the scope of s.8(1) of the Limitation Act by the combined operation of ss.9(1) and 8(2) of that Act with the effect that the limitation period is reduced from 12 years to 6.

• (3) An application under ss.238 to 241 will come into the latter category if it can fairly be said that the substance or the essential nature of the application is "to recover a sum recoverable by virtue of" those sections. The applicant accepts that some cases under ss.238 and 239 will be caught by s.9(1). Which category will prove to be the more frequent has been the subject of extended debate, and I do not propose to offer any prediction of my own. One example of a case caught by ss.9(1) and 8(2) might be where the transaction to be set aside is a simple payment of a sum of money. Another might be where the only substantive relief available to the applicant **\*32** is an order for the payment of money, such as where s.241(2) precludes the setting aside of the transaction.

• (4) Where there is doubt as to whether a claim falls into the first (that is, 12 year) category, or the second (that is, 6 year) category, the "look and see" approach adopted by Lord Goddard CJ in the West Riding case and approved by Peter Gibson LJ in the Farmizer Productscase at 599F should be applied, and the court should look to see what the substance or essential nature of the relief truly sought by the applicant in the particular case before it is. The court is not limited just to the words of the pleading. The court may look at the substance behind the pleading. However, provided the pleaded claim to set aside is a bona fide claim, which is neither a sham nor bound to fail, the applicant is entitled to pursue it, and it cannot be without significance that the first example of the types of relief which may be granted to implement ss.238(3) and 239(3) given in s.241(1), which is ultimately a list of examples, is that set out at subsection (a), which I have already quoted earlier in this judgment.

• (5) Given the possibility that a six year, rather than a twelve year, limitation period may apply in any particular case, liquidators — and for that matter, other office holders within the meaning of these sections — would be well advised to ensure that any such proceedings are commenced within this shorter

Priory Garage (Walthamstow) Ltd, Re, 2000 WL 1918580 (2000)

six year period. Those who allow such a claim to draft past the first six years after accrual of the cause of action before commencing proceedings, as appears to have occurred here, do so at the risk of finding either all, or **\*33** possibly part, of their claim lost.

Applying those general propositions to the present case, my conclusions are as follows. The first and primary head of relief sought is for the setting aside of the two transfers (as provided for by ss.238(3), 239(3) and 241(1)(a)IA86). If one looks into the factual background to check whether that reflects the substance of the position, there is every indication that it does. Both properties have registered titles which are still vested in the respondent. The liquidator's interest has been protected by cautions since December 1994. In neither case is there any mortgage or other financial charge registered against the titles. They therefore appear to be valuable assets which the applicant would have every reason to wish to have restored to the company of which he is liquidator. I cannot accept the assertion in para.6(ii) of the respondent's skeleton argument, notwithstanding that the vigour and persistence with which it was advanced to me. I accept the applicant's submissions as to the true nature of the evidence before me, and its significance as to the type of relief which may result in this case. If this claim goes to trial, I see no reason to believe either that this primary head of relief will not be pursued or that there is no realistic prospect that a judge may grant it. At most, in this case, all the respondent's assertion can mean is that the applicant hopes ultimately to obtain a sum of money. As a liquidator, presumably he does so hope, whether by means of selling the properties if and when they are re-vested in the company, or by means of reaching a commercial **\*34** settlement of the litigation before trial. However, neither of these possibilities can bring the case within s.9(1) of the Limitation Act and thus take it outside s.8(1) of the same Act.

For the foregoing reasons, I conclude that the claim in paragraph 1 of the originating application is not statute barred, from which (by concession) it follows that the proceedings as a whole are not an abuse of the process of the court.

Turning to head two, initially both parties pressed me to decide the position on this head separately even if I were to find for the applicant on head one. Later on in the hearing, the respondent's position as to that changed, possibly in response to picking up some straws in the forensic wind, and the respondent would now be content for me to leave over to trial the question of whether head two is also statute barred. Miss Howells points out in particular that there are a number of permutations as to how this case may be resolved both before me and indeed at trial. That would have been my inclination had I been of the mind that there was real doubt as to the limitation position with regard to head two. However, in the course of argument I have been persuaded that the position here is clear. Accordingly, I ought to and shall determine it now. It also appears to be necessary to determine this point in order to deal with one of the ways in which Miss Howells puts her substantive submissions, which is that the very presence of head two is fatal to the whole claim.

**\*35**

Paragraph two is put by the applicant as an ancillary claim to the setting aside and revesting orders which are primarily sought. The obvious logic of this claim is this. If the property is to be revested in the company in order to restore the position in accordance with the statutory sanctions I have now cited several times, the revesting alone would not restore the position because in the meantime nine or ten years' income from the property will have been lost to the company. The claim is therefore, in my judgment, genuinely ancillary and not simply ancillary in the form of drafting.

Both counsel agree that s.23 applies to it but each says that that means that their answer, rather than the other party's answer, to head one should also be the answer in the case of head two. It was rightly pointed out that although two separate heads of relief are formulated, the cause of action is one and the same. I would respectfully share the reluctance of Ralph Gibson LJ, expressed in another statutory context, to attribute to parliament the intention to create within one section two possible limitation periods for a particular case. The claim is (a) clearly ancillary, (b) governed by s.23 and (c) dependent on one and the same cause of action as claim one. For these reasons, I conclude that the twelve year period applicable to the primary claim is therefore also applicable to the claim under head two of the prayer for relief.

I therefore propose to answer the issue posed for the court by Mr. Registrar Buckley in these terms: that this claim is neither statute barred nor an abuse of the process of *36 the court.

MISS BARBER: My Lord, there are two outstanding points which we will deal with very briefly. The first is the question of ongoing directions. I have suggested to my learned friend that this matter, subject to your Lordship's approval, can properly be remitted back to the Registrar for directions rather than thrashing out directions for now.

THE DEPUTY JUDGE: That is a very attractive thing to say at 5.05. If it was 3.30 I would not dream of doing anything other than giving the next set of directions to keep the thing moving and then happily allowing a final directions hearing or case management conference to go on before the Registrar. You will have to draw up a minute of order, please, anyway. Do you think the two of you could put your heads together and see whether you could agree some basic directions for the next couple of steps required with a view to any subsequent directions hearing being before the Registrar. If you think you can give directions right through to trial, in that event put them in, include liberty to apply to the Registrar for further directions, if so required, and do it that way.

MISS BARBER: The suggestion is that we endeavour to put together a short series of directions now.

THE DEPUTY JUDGE: You have got to decide whether you want any more in chief. You may or may not. I do not know.

MISS BARBER: Disclosure is a problem. Categorising disclosure is not a matter I would want to do on the hoof.

THE DEPUTY JUDGE: I understand that. I am here for the rest of the week. If you really cannot agree the next two or three steps, the matter can be mentioned at any time

before the end of the week, but I would hope you would be able to agree enough for the next couple of steps to take place, and then you have got a choice. If you can agree it right the way through to trial, do it with liberty to apply to the Registrar; if it is just a couple of steps and another directions hearing will be needed, that again should be before the Registrar.

MISS BARBER: My Lord, we are grateful to your Lordship for that. That simply leaves the question of costs. Our submission would be that in this case the issue before your Lordship, which has taken a good day of court time, has been brought *37 about by the objections taken by the respondent.

THE DEPUTY JUDGE: It is a trial of a defence issue.

MISS BARBER: My Lord, yes. The respondent having lost on that issue, we would be asking for our costs on the usual basis. I do not know whether my learned friend wishes to say anything on that point.

THE DEPUTY JUDGE: When you say "on the usual basis", are you going to ask for them to be assessed by the court now?

MISS BARBER: My Lord, yes.

THE DEPUTY JUDGE: As long as I understand that. In principle, subject to the amount, is there anything you would want to say about that Miss Howells?

MISS HOWELLS: Yes, very much. We object to the order for costs for this reason. We do not accept this has been brought about by us. It is a legitimate to take, a limitation defence, and we would rather suggest this has been brought by the drifting of the applicant in failing to take cases within the six year limitation period. In particular, there has been no explanation as to why this case has taken so long to bring to court.

In those circumstances, I have several positions. The first is that we have our costs which we are seeking to have summarily assessed. Secondly, if you are against me on that — and I note the eyebrows — there should be no order for costs or that the applicants should have their costs in the application, i.e. if they won in the end they would get their cases of this issue, but if they do not, they will not get them.

THE DEPUTY JUDGE: I am afraid I take the view that whilst the opportunity to take a limitation point may have arisen by virtue of a lack of proper expedition on the part of the liquidator, the fact remains that the defendant has chosen to take it. Of course, limitation does not have to be considered by the court at all unless the defendant takes the point. In those circumstances, I think the costs of this hearing are plainly attributable to the defendant choosing to take a chance on this point. Clearly they could have been avoided if the defendant did not take the point. I see no reason why costs should not follow the event in the usual way, tempting as it might be at ten past five for me to come to another conclusion. Money? Miss Barber.

MISS BARBER: Schedules have been exchanged. I am handing up our schedule.

MISS HOWELLS: May I hand up our schedule as well before submissions start?
    *38

THE DEPUTY JUDGE: Yes, that is very fair of you. I think the burden of submissions switches to you, does it not, Miss Howells, unless there are any items on the bill Miss Barber is inclined to abandon before you have a go at it.

MISS BARBER: I am in your Lordship's hands on this. It is not a process which —

THE DEPUTY JUDGE: We are all having to become familiar with it.

I think the schedule goes in and, in the absence of any special explanations, it is up to you, Miss Howells, to have a go at it.

MISS HOWELLS: The first thing is that, in fact, Mr. Anwar is VAT registered and therefore cannot claim the VAT.

MISS BARBER: My instructions are that he is VAT registered.

MISS HOWELLS: So you do not pursue the VAT item on this.

MISS BARBER: I have come across this before. I know the suggestion is that you have to claim the VAT back.

MISS HOWELLS: Yes. If he is VAT registered.

MISS BARBER: It is normally a point that arises in the context of a debt rather than a costs award.

MISS HOWELLS: This is a standard point. The point is this is a business expense for Mr. Anwar for which he is VAT registered for his business. If he pays solicitors VAT, as he will, it will be recovered by him from Customs & Excise. If he therefore receives it from us as well it is a windfall, it is a double recovery of the VAT.

THE DEPUTY JUDGE: Yes, I understand. Let us move on.

MISS HOWELLS: It is quite standard.

THE DEPUTY JUDGE: Let us move on. I understand, yes. What do you say about the other items?

MISS HOWELLS: I have to say that the reason I have handed up my schedule is so that you can see the comparison between the two. Solely for the limitation point, we would contend that each of these is excessive sums. Nineteen letters in respect of —

THE DEPUTY JUDGE: Absolutely. I cannot believe there are 19 letters for a preliminary hearing. You have put in 5. Come on.

MISS HOWELLS: It is right to point out that we did the bundle as well. I am not entirely sure what are attendance and documents when no further evidence was put in. This evidence has all been in the original evidence and exhibit.

**\*39**

THE DEPUTY JUDGE: You did the bundle?

MISS HOWELLS: Yes.

THE DEPUTY JUDGE: So the other side would have been entitled to review it.

MISS HOWELLS: The index was agreed beforehand.

THE DEPUTY JUDGE: The agreeing of the index involves some work, does it not?

MISS HOWELLS: I accept that. Similarly, we have attendances, including telephone calls at an hour and a half. I am not entirely sure of the unit cost, I have to say.

THE DEPUTY JUDGE: You are not far off on that.

MISS HOWELLS: Attendance and hearing. The one point we would make is that travel and waiting is not chargeable at the same rate. There should be a reduction, as indeed we have and that is very standard.

THE DEPUTY JUDGE: You are saying 80 an hour for that.

MISS HOWELLS: Counsel's fees. I do not like criticising my fellow counsel's fees.

THE DEPUTY JUDGE: You are the second barrister who has had to do it today in this very court room. We all have to get used to it and nobody, I hope, takes it personally.

MISS HOWELLS: The total is we have got a total of £3,700 for counsel's fees for a preliminary issue.

THE DEPUTY JUDGE: Let us look at the hearing first. The last authority in the bundle I disposed of at 10.45 this morning was the Chancery Bar Association guide which suggested for half a day to a day for counsel over 10 years call, up to £1,500. Is my recollection correct there?

MISS HOWELLS: I do not have the guide.

THE DEPUTY JUDGE: You are supposed to say it on the costs schedule to spare people the embarrassment of asking. How many years call are you, Miss Barber?

MISS BARBER: 1988.

THE DEPUTY JUDGE: So you are just over 10?

MISS BARBER: 11 years call.

THE DEPUTY JUDGE: It is a substantial matter with a good deal of law to look up. I think that would take it to the top of the **\*40** bracket, in my view. It is a question of what you are entitled to recover from the other side. I will pencil in £1,500 there. What about advice, conference and documents?

MISS HOWELLS: As far as we are concerned, it is one and the same thing.

THE DEPUTY JUDGE: Your side is asking for one brief fee which covers the incidental work?

MISS HOWELLS: Yes, it also covers the incidental preparation for the hearing on 22 October as well, i.e. dealing with the question of the raising of limitation.

THE DEPUTY JUDGE: One side attended by counsel and one did not.

MISS HOWELLS: That was our side attended by counsel.

THE DEPUTY JUDGE: That does not arise for the other side. Understood.

MISS HOWELLS: I should also point to the VAT provisions.

THE DEPUTY JUDGE: I understand the VAT provisions and that is in your favour for the moment. Miss Barber, I am not going to go through every last item for £100 with you, but you had better tell me what the £1,200 is supposed to relate to as a first stage, so that as a second stage I can decide what figure should be allowed for?

MISS BARBER: My Lord, I wish I could assist you more on that, but in fact my learned Miss Giret , of counsel, gave initial advice on this matter, and I assumed from the reference in conference as well. I have seen her written advice on it.

THE DEPUTY JUDGE: The liquidator faced with a limitation action, took counsel's advice before deciding whether to fight the point or not?

MISS BARBER: My Lord, yes.

THE DEPUTY JUDGE: That seems reasonable enough. £1,200?

MISS BARBER: I am in your Lordship's hands on that.

THE DEPUTY JUDGE: Some silks might do you an opinion for that price!

MISS BARBER: I do know that Miss Giret is —

THE DEPUTY JUDGE: Very experienced, yes.

MISS BARBER: Quite a senior counsel.

THE DEPUTY JUDGE: I know. I know her. I think it is fair enough to take counsel's advice. There is an element of duplication **41** because she cannot come today but that is inherent in the system. It is not for your client to be penalised for that. £750 for an advice requiring some research. £1,500 for the brief fee. Last opportunity to say anything about figures?

MISS BARBER: My Lord, I have nothing.

THE DEPUTY JUDGE: It is all invidious anyway.

MISS BARBER: The one point I have been instructed to mention, my Lord, is that only three hours has been allowed for my solicitors' attendance at the hearing.

THE DEPUTY JUDGE: I see. That is an advance estimate. We have gone way past that.

MISS BARBER: We have gone past that and I would ask your Lordship to bear that in mind.

THE DEPUTY JUDGE: That is a fair point. I am going to assess the costs in the sum of £3,750 including no VAT. I have allowed

a round sum of £500 for the first three items, a round sum of £1,000 for the attendance and travelling, given the hours, presence etc, and the figures I mentioned to you provisionally, £750, and £1,500 for counsel's fees. Everybody knows it has got to be rough and ready. £3,750. No VAT for the reason previously indicated. I think the Rating and Valuation Report is the court's, but this ancient bankruptcy book is yours so you had better have that back when I rise.

MISS HOWELLS: The only matter left is that we would be seeking permission to appeal.

THE DEPUTY JUDGE: Yes. What is the current test? Is it still the 1999 practice direction or has that been changed now that we have just got brand new rules?

MISS HOWELLS: Guidance was given in The Times.

THE DEPUTY JUDGE: I will accept it from The Times, the White Book or anywhere, but I had better make sure I apply the right test.

MISS HOWELLS: The new rules came into force on 1 May and it is not clear exactly what takes preference.

THE DEPUTY JUDGE: There was a very clear practice direction issued in 1999 as to when leave should be granted. I suspect it is out of date.

MISS HOWELLS: I will hand up the original. It is the third full paragraph.

THE DEPUTY JUDGE: That ties in with this morning. I think that is not applicable.

**\*42**

MISS HOWELLS: I am aware of the fact that there is a potential conflict between the practice direction and the rule.

THE DEPUTY JUDGE: "… if the court considers that the appeal will have a real prospect of success or there is some other compelling reason why the appeal should be heard."

MISS HOWELLS: What we say is this. As to compelling reason, this is a very important area, in my submission, and just as Farmizer went to the Court of Appeal, so we would seek to take this to the Court of Appeal and have a definitive ruling by the Court of Appeal in respect of this matter, and I say that with the greatest of respect.

THE DEPUTY JUDGE: No offence taken whatever.

MISS HOWELLS: I am always tentative in making this submission.

THE DEPUTY JUDGE: Not at all.

MISS HOWELLS: It is, in my submission, that this should be sorted out. Secondly, I take into account where it says "real" must meant he prospect must be realistic rather than fanciful. In my submission, we do have realistic prospects of success and a very compelling reason to take this to the Court of Appeal.

THE DEPUTY JUDGE: I need not trouble you. Permission to appeal is sought under 52.3(6), and very recently inserted into the CPR is the test I now have to apply. The change of test from the 1999 practice direction results in this case in a change in the decision that I otherwise have made.

WESTLAW    © 2017 Thomson Reuters.

Priory Garage (Walthamstow) Ltd, Re, 2000 WL 1918580 (2000)

It is submitted in reverse order, firstly, that the general importance of the point of law I have considered is a compelling reason why the Court of Appeal should deal with this matter and analogy is sought to be drawn with *Farmizer Products* which is extensively referred to in my judgment. Were it the case that my judgment would represent, in the absence of an appeal, would provide an answer to whether or not the 6 or 12 year limitation period applied to all applications under ss.238 and 239, I would accede to that submission. However, that is not the position. Neither counsel has gone so far as to submit that the result as to whether it is a 6 or 12 year limitation period, will always be the same in ss.238 and 239 cases. In those circumstances, my judgment is not of the wide ranging importance that the *Farmizer Products* one would appear to me to be, albeit that it does appear to be the first at least potentially reportable case in which this point has been specifically litigated. If the test is "compelling" as I see it is, I do not, I am afraid, consider for my own part that it is compelling that the limitation decision in this particular case and the observations I have made, be reconsidered by the Court of Appeal.

As to realistic prospect of success, this is always **\*43** a difficult matter for a judge whose decision is potentially to be appealed to consider, but ultimately, as was common ground, the case for the respondent was absolutely dependent on making out para.6(ii) of the respondent's skeleton argument. Although the matter has been looked at with great care from all angles, ultimately I have come to a very clear view on the evidence that the respondent really cannot make good the proposition that the true nature of this claim must be regarded by the court as being one for financial relief. In those circumstances, applying the new test, I do not think that conscientiously I can give permission to appeal. If the matter is restored for further consideration by a judge of the Court of Appeal, no doubt he or she will consider the matter afresh with the advantage of not having themselves delivered the judgment which I just have.

**\*44**

Crown copyright

© 2017 Sweet & Maxwell

2000 WL 1918580

---

    © 2017 Thomson Reuters.

# TAB 8

Peter Nolan v. Graham Michael Wright

Case No: M8X054

7MA90040

High Court of Justice Chancery

Division Manchester District Registry

26 February 2009

**[2009] EWHC 305 (Ch)**

**2009 WL 506401**

Before: His Honour Judge Hodge QC

Sitting as a Judge of the High Court

Date: Thursday 26th February 2009

**Analysis**

On Appeal from District Judge Needham

Hearing dates: Tuesday 17th & Wednesday 18th February 2009

**Representation**

• Mr Clive Freedman QC and Mr Pepin Aslett (instructed by Bishop & Co ) for the Claimant/Appellant.
• Miss Lesley Anderson QC and Mr Nigel Clayton (instructed by Blacks ) for the Defendant/Respondent.

**Judgment**

His Honour Judge Hodge QC:

1   In this case I have to decide whether an attempt to reopen a credit agreement as an extortionate credit bargain under sections 137 to 140 of the Consumer Credit Act 1974 is an action upon a specialty for which the relevant limitation period under section 8 of the Limitation Act 1980 is 12 years. It might have been thought that this point had been decided, at least up to the level of the House of Lords, by the decision of the Court of Appeal in the case of Rahman v Sterling Credit

Ltd [2001] 1 WLR 496 (" Rahman "). But in the later case of Paragon Finance Plc v Nash [2001] EWCA Civ 1466, [2002] 1 WLR 685 (" Paragon ") it was submitted that the Rahman decision had proceeded on the basis of a concession by counsel, and that the case was wrongly decided insofar as it held that the 1980 Act had any application at all to a claim to reopen an extortionate credit bargain. Happily for the Court of Appeal in Paragon , Dyson LJ (with whose judgment both Thorpe LJ and Astill J agreed) found it unnecessary to decide the limitation point, and he declined the invitation to do so: see paragraph 70. Unhappily, in this case that course is not available to me because Miss Lesley Anderson QC (who appears for the defendant and respondent to this appeal, Mr Wright, together with Mr Nigel Clayton of counsel) revives the submission that was advanced in Paragon that a claim to reopen an extortionate credit bargain is not a claim for substantive relief to which any period of limitation applies. For Mr Nolan, the appellant, Mr Clive Freedman QC (who appears with Mr Pepin Aslett of counsel) submits that Rahman is determinative of this issue, that it was correctly decided, and that Mr Wright's claim to invoke the provisions of the 1974 Act relating to extortionate credit bargains is statute-barred.

2   This is an appeal from a decision of District Judge Needham in a claim by a moneylender. In a reserved judgment handed down in writing on 21 April 2008, the district judge dismissed the claimant's application for summary judgment under CPR 24 . At a hearing on 12 September 2008 I granted the claimant permission to appeal; and I directed that, at the hearing of the appeal, the appeal court should decide, as a preliminary issue, the question of whether the claim by the defendant borrower to reopen the credit agreement as an extortionate credit bargain was statute-barred. It seemed to me that, provided it was still open to the defendant to challenge the credit agreement as an extortionate credit bargain, that was an issue that could only be determined at a full trial after hearing oral evidence; and that, in such circumstances, for that reason alone the appeal should fall to be dismissed. In that event, it seemed to me that it would be undesirable that I should express any view on the other arguments raised by the claimant in support of his appeal for two reasons: First, because, if the case had to go for trial on the issue of whether the credit agreement was an extortionate credit bargain, the trial

judge should not be fettered in his approach to the evidence, and in making relevant findings of fact, by any views that I had expressed, or conclusions that I had reached, as a result of a hearing conducted entirely on written evidence. Secondly, because, having acceded to the defendant's submission that I should dismiss the appeal and send the matter for trial, it would be wrong for me to proceed to adjudicate upon the claimant's challenge to the individual grounds of defence raised by the defendant in circumstances where, ex hypothesi, my decision would be irrelevant to the outcome of the appeal, and where, if any issue should fall to be resolved against the defendant, he might find it difficult effectively to challenge my decision. In other words, at the time of the September hearing, I contemplated that the decision on the preliminary issue might be determinative of the outcome of the appeal. In the event, that has proved not to be the case.

### The background

3  The claim was commenced on 7 February 2007 for the recovery of £973,627.35 from the defendant pursuant to an unregulated credit agreement dated 14 November 1994 and a legal charge dated the following day. (The property which is the subject of that charge, 12 Poplar Grove, Knottingley, West Yorkshire, was repossessed by the claimant in February 2007 and forms no part of this action.) The principal sum originally advanced to the defendant was £16,000; and it is common ground that on or about 23 October 1995 £5,000 was repaid from the sale proceeds of one of two other properties that had been charged to the claimant as part of the original loan transaction. However, under the terms of the loan agreement interest fell to be paid at the rate of 3% per calendar month, compounded monthly (equivalent to an APR of 42.5%). Thus, by the time the matter came before the district judge in February 2008, the claim exceeded £1 million.

4  The defence puts the whole purported basis of the transaction at issue. It is the defendant's case that he was induced by the claimant and one Nigel Thompson (who was later convicted for some unrelated fraud) to transfer moneys totalling some £48,000, and derived from pension funds he had invested with Allied Dunbar and Scottish Widows, into the Basdring Pension Scheme , a self-administered occupational pension scheme of which the claimant was one of

the trustees (until he was removed on 7 April 1998 by the relevant regulatory body) on the footing that £16,000 would be returned to the defendant in order to assist him in the purchase of 12 Poplar Grove on terms that, on the eventual sale of that property, the defendant would pay 36% of the net sale proceeds to the Basdring Pension Scheme together with a further 6% to the claimant and Mr Thompson in respect of "administrative costs", and that the defendant would retain the balance of the net sale proceeds for himself. The defendant says that, at the insistence of the claimant and Mr Thompson, the transaction that was recorded in the loan documentation was "dressed up" as a secured loan from the claimant in his capacity as a financier and moneylender. By his defence and counterclaim, the defendants seeks to set aside the loan documentation as a sham, or as having been procured by undue influence and/or misrepresentation on the part of the claimant; and he also seeks to have it set aside or reopened as an extortionate credit bargain.

5  Before the district judge, the claimant was represented by Mr Michael Booth QC, leading Mr Aslett, and the defendant was represented by Mr Clayton. The claimant relied upon his witness statements dated 24 January and 27 February 2008. The defendant relied upon witness statements from himself and from Bryan Howard Smith both dated 13 February 2008. The defendant later made a second witness statement dated 7 March 2008 confirming certain further matters of fact upon which his counsel had relied in the course of his address. At the hearing of the appeal, and without objection from either party, I allowed applications to adduce additional evidence in the form of witness statements (with exhibited documents) from the claimant (dated 19 September 2008) and from the defendant's solicitor, Yat Hung Wong (dated 11 February 2009).

### The preliminary issue

6  I turn first to the relevant statutory provisions. Section 137 (1) of the Consumer Credit Act 1974 provides that: "If the court finds a credit bargain extortionate it may reopen the credit agreement so as to do justice between the parties." Section 138 sets out the circumstances in which a credit bargain may be found to be extortionate. Section 139 is concerned with the reopening of credit bargains. In particular, section

139(1) provides that: "A credit agreement may, if the court thinks just, be reopened on the ground that the credit bargain is extortionate - (a) on an application for the purpose made by the debtor or any surety to the High Court, county court or sheriff court; or (b) at the instance of the debtor or a surety in any proceedings to which the debtor and creditor are parties, being proceedings to enforce the agreement, any security relating to it or any linked transaction; or (c) at the instance of the debtor or a surety in other proceedings in any court where the amount paid or payable under the credit agreement is relevant." The powers available to a court in reopening an extortionate credit bargain are set out in section 139(2) . They include (a) directing accounts to be taken, (b) the setting aside in whole or in part of any obligation imposed on the debtor, (c) requiring the creditor to repay the whole or part of any sum paid, (d) directing the return to the surety of any property, and (e) altering the terms of the credit agreement or any security instrument.

7  No limitation period is stipulated in the 1974 Act, so if there is an applicable limitation period, it must be found in the Limitation Act 1980 . Section 8 prescribes the time limit for actions on a specialty. By sub-section (1) "an action upon a speciality shall not be brought after the expiration of 12 years from the date on which the cause of action accrued". It is common ground that an action upon a specialty includes an action upon a statute. By sub-section (2) , that 12 year limitation period does not affect any action for which a shorter period of limitation is prescribed by any other provision of the Act. Thus, it does not apply to "an action to recover any sum recoverable by virtue of any enactment" for which the lesser period of 6 years from the date on which the cause of action accrued is prescribed by section 9 .

8  I turn next to the authorities. In Re Priory Garage (Walthamstow) Ltd [2001] BPIR 144 (" Priory Garage ") it was held by Mr John Randall QC (sitting as a Judge of the High Court) that applications to set aside transactions under sections 238 to 241 of the Insolvency Act 1986 (relating to transactions at an undervalue and voidable preferences) are generally actions on a specialty within the meaning of section 8 of the 1980 Act and subject to a 12 year limitation period accordingly; but where the substance of the claim is not to set aside a transaction, but to recover a sum of money, such applications will be governed by section 9 , and thus

subject to a six-year limitation period. That approach was effectively endorsed by the Court of Appeal, and applied to claims under section 423 of the Insolvency Act 1986 (relating to transactions defrauding creditors), in the later case of Hill v Spread Trustee Co Ltd [2006] EWCA Civ 542, [2007] 1 WLR 2404 (" Hill "). More pertinently, in the earlier case of Rahman, the Court of Appeal (Simon Brown and Mummery LJJ) has held that where a debtor sought, whether by counterclaim or by separate action, to reopen a credit agreement under section 139 of the 1974 Act as an extortionate credit bargain, his claim was an action upon a specialty, for which the appropriate limitation period under section 8 of the 1980 Act was 12 years.

9  As noted in paragraph 1 above, in the later case of Paragon , it was submitted that the decision in Rahman had "proceeded on the basis of a concession by counsel for the borrower that a claim to relief under section 139 is an action upon a specialty, and that it is wrong". Since the Court of Appeal in Paragon had reached the clear conclusion that the debtors had no real prospect of succeeding in their claim under section 139 , it was unnecessary for that court to decide the limitation point, and it declined to do so: see paragraph 70. For the defendant, Miss Anderson reserves her position as to whether section 8 was intended to extend to **all** claims based on statute. Her submission is that, to the extent that Rahman proceeded on the basis of a concession that every claim under section 139 is an action upon a specialty, it is wrongly decided. She submits that the reasoning of Mummery LJ (who delivered the only reasoned judgment) should be regarded as questionable since the precise nature of "an action upon a specialty" was not considered in any detail in that case. The single authority cited in support of the court's decision, Collin v Duke of Westminster [1985] QB 581 , concerned the exercise of a statutory **right** to enfranchise under the Leasehold Reform Act 1967 , which creates correlative statutory rights and obligations, and confers jurisdiction upon the court to determine any ensuing dispute. Unlike the 1967 Act, she submits that the 1974 Act merely vests in the court a supervisory jurisdiction to determine and adjust the enforceability of existing contractual rights, which (citing observations of Dillon LJ, with whom Ralph Gibson LJ agreed, in First National Bank Plc v Syed [1991] 1 All ER 250 at 252E) the court can exercise of its own motion, irrespective of any application by the

debtor. As such, the jurisdiction falls outwith the scope of section 8 . A claim to reopen an extortionate credit bargain is, she submits, not an action for substantive relief for which one would ordinarily expect a period of limitation to apply. Rather, it is an entitlement to invoke the jurisdiction of the court, which one would not ordinarily expect to be the subject of any limitation period. She invokes the analogy of the court's inherent supervisory jurisdiction over solicitors, as to which it has been held (by Warner J in Bray v Stuart A West & Co (1989) 139 NLJ 753 ) that they are not proceedings founded on any cause of action to which the Limitation Act applies.

10  Miss Anderson also points to the problems which she says are inherent in any attempt to force claims to reopen extortionate credit bargains into the straitjacket of the various limitation periods applied by different sections of the 1980 Act. Can it be right, she asks by way of example, that a debtor who seeks general relief to reopen a credit bargain is subject to the 12 year limitation period under section 8 ; but if he claims specific relief, in the form of the repayment of sums paid under that credit bargain, his claim is subjected to a 6 year limitation period under section 9 ? What is to stop the court, when entertaining a generally pleaded claim to reopen a credit agreement which is issued within 12, but more than 6, years after the date of the credit agreement, from deciding to make a repayment order? Problems such as this, she submits, demonstrate the inherent difficulties in attempting to apply differing statutory limitation periods, which were clearly not specifically designed to cater for the types of case that is here in issue. There are, she submits, no obvious reasons of policy to prescribe the time within which the court may choose to exercise its discretion, and good policy reasons for leaving the matter to the court's inherent discretion.

11  The facts of the present case seem to me to demonstrate the undesirability of applying a strict limitation period - even the generous period of 12 years prescribed by section 8 - to a claim to reopen an extortionate credit bargain. When addressing the issue of delay in his witness statement in support of the application, the claimant explained (at paragraph 56) "that I quite often leave loans to 'run' for more than 12 years. Whilst I would not suggest that I am a man of considerable wealth I am financially comfortable and

I don't need to recover loan monies in order to meet everyday expenses. I have had many loans, which I have not sought to enforce until something has triggered me to do so, and some current loans are older and have been in default longer than the loan I made to the defendant. **This strategy also has the added benefit of allowing me to accrue a limitation defence to the inevitable claims that the relevant credit agreement might constitute an extortionate credit bargain** . [Emphasis supplied.] In this case the action was 'triggered' by a letter from the defendant's solicitor [dated 21 June 2006]." Not all credit agreements will be executed as a deed and thus be subject to a 12 year limitation period rather than the 6 year period which applies to claims founded on a simple contract by section 5 of the 1980 Act. However, even in the case of a simple contract, it is possible to conceive of situations in which a debtor may experience difficulty in pursuing a claim to reopen an extortionate credit bargain in circumstances where the creditor is seeking to enforce the agreement in reliance upon the provisions of sections 29 to 31 of the 1980 Act, relating to acknowledgment and part payment. I therefore confess to a natural sympathy for Miss Anderson's submissions. However, I feel bound to reject them as inconsistent with the ratio of the Court of Appeal's decision in Rahman .

12  In Rahman the relevant credit agreement (a legal charge) was dated 5 October 1989. The order of the district judge dismissing the debtor's application for leave to serve a counterclaim seeking to reopen the loan transaction as an extortionate credit bargain had been made on 23 December 1998. The appeal was heard by the Court of Appeal on 21 June 2000; and its reserved judgment was handed down on 20 July 2000. Thus, as Mummery LJ observed at 502C-D, the claim to reopen the loan agreement had arisen less than 12 years previously. It was therefore understandable that counsel for the debtor (Mr John McDonnell QC), when challenging the authority of a long line of reported decisions of district judges to the effect that the relevant period of limitation was 6 years from the date of the credit bargain, should have contended (as recorded at 498A) that the correct period for making an application to reopen an extortionate credit bargain was 12 years from the date of the credit bargain sought to be reopened. There was no need for Mr McDonnell to contend, and it was apparently no part of his submission, that **no** period of limitation applies

to a claim to reopen an extortionate credit bargain.
Inevitably, arguments have been advanced before me on
behalf of the defendant that were not raised on behalf
of the debtor in Rahman .

13  However, it does not follow from the fact that
counsel in Rahman did not seek to argue that no period
of limitation applies to a claim to reopen an extortionate
credit bargain that I can effectively treat the Court of
Appeal's decision in that case that section 8 applies a
12 year limitation period to such a claim as having
been reached per incuriam and decline to follow it
accordingly. In the course of his leading judgment in
Rahman (with which Simon Brown LJ, as the only
other member of a two-man court, expressly agreed)
Mummery LJ (at 502A-B) cited the following passage
from the judgment of Oliver LJ (with whose judgment
both May LJ and Sir Roger Ormrod agreed) in the
earlier case of Collin v Duke of Westminster at 602D-E:

> "It seems to me to be quite
> clear that in the instant case any
> cause of action which the applicant
> has derived from the statute and
> the statute alone. Apart from the
> statutory provisions he could have
> no claim and it is only by virtue
> of the statute and the regulations
> made thereunder that there can
> be ascertained the amount of the
> purchase price to be paid under
> the statutory contract the terms of
> which can be gathered only from
> the sections of the Act and the
> Schedules."

Mummery LJ continued (at 502B-D):

> "That reasoning applies to the
> statutory right of a borrower to
> make application to the court under
> section 139. The cause of action
> arises out of and only out of those
> provisions of the 1974 Act. Apart
> from those provisions, Mr Rahman
> would have no right to have the loan
> agreement reopened in that manner.

> It follows that, in so far as
> Mr Rahman seeks, whether by
> counterclaim or by separate action,
> to make a claim to reopen the loan
> agreement under section 139, that
> claim is not barred by limitation:
> that cause of action arose in 1989,
> less than 12 years ago. If he is
> successful in his claim, the court
> may make an order relieving him in
> whole or in part from the obligation
> to make future payments."

Mummery LJ went on to recognise that if the debtor
were to claim repayment of sums of money already
paid by him under the credit agreement, an objection
could be raised that section 9 applied and that the
limitation period would be six years. Counsel for the
debtor acknowledged that the counterclaim would be
amended to exclude any claims for the repayment of
moneys.

14  In my judgment, it was an integral part of the
Court of Appeal's reasoning and decision in Rahman
(by which I am bound) that a claim to reopen an
extortionate credit bargain constitutes a statutory cause
of action within the meaning, and for the purposes, of
section 8 of the 1980 Act. As such, a 12 year limitation
period applies unless the claim expressly extends to the
repayment of money previously paid under the credit
bargain, in which event the application will be governed
by section 9 and subject to a 6 year limitation period
accordingly. The subsequent decisions in Priory Garage
and Hill demonstrate that the applicable period of
limitation may change depending upon the nature of
the relief that is claimed. Speaking for myself, I have
little difficulty in understanding why a shorter period of
limitation may be appropriate where the relief sought is
the repayment of sums previously paid by the debtor to
the creditor rather than the future regulation of the loan
relationship between them.

15  Whilst I acknowledge that the statutory provisions
that were considered in Priory Garage and in Hill
conferred a free-standing right upon a person who

was not a party to an existing contractual relationship, whereas the statutory provisions that are in issue in the present litigation affect an existing contractual relationship of debtor and creditor, I do not consider that that consideration means that those decisions are of no assistance in resolving the issue that is before me: it is the statutory source of the right to relief that is the relevant consideration rather than the identity and characteristics of the person upon whom it is conferred.

16 I derive no assistance from the observations of Dillon LJ in First National Bank at 252E to the effect that he had considered whether it would be right for the Court of Appeal, of its own motion, to direct an issue, to be tried in the lower court, as to whether or not the transaction, which had never thus far been challenged by the debtors on that basis, was an extortionate credit bargain within the 1974 Act. My reasons are: (1) that the court in that case in fact declined to direct the trial of such an issue; (2) that the relevant credit agreement had been entered into in 1986, only some 4 years earlier, and therefore no limitation issue arose; (3) that the debtors appeared as litigants in person; and (4) that the court does not appear to have referred to section 139(1) of the 1974 Act (cited at paragraph 6 above) which appears to require some positive action on the part of the debtor before the court will entertain an application to reopen a credit agreement as an extortionate credit bargain. I do not consider that Dillon LJ's observation (albeit contained in a reserved judgment) to amount to a considered analysis of the nature of the jurisdiction conferred upon the court by the relevant provisions of the 1974 Act. Nor do I derive any assistance from Warner J's decision in Bray since that was directed to the inherent jurisdiction of the court over solicitors whereas I am concerned with a jurisdiction that would not exist but for the relevant provisions of the 1974 Act.

17 It is clear from his judgment in Rahman that Mummery LJ had no difficulty in equating the statutory right of a borrower to apply to the court under section 139 of the 1974 Act with the notion of "an action upon a speciality"; nor did he have any difficulty in identifying "the date on which the cause of action accrued" as the date of the credit agreement which it is sought to reopen. In my judgment, he was right on both counts. So far as the former point is concerned, section 38(1) of the 1980 Act defines "action" as including "any proceeding in a court of law". Whichever of

the three routes provided by section 139(1) of the 1974 Act is adopted for the purpose of reopening a credit agreement as an extortionate credit bargain, some positive action on the part of the debtor appears to be required, thereby satisfying the requirement of some "proceeding in a court of law". Here the claim to reopen the credit agreement has been raised in the defendant's counterclaim; but Mr Freedman has referred me to paragraphs 10.2A and 10.3 of the (amended) *Practice Direction under* CPR Part 7 which requires a debtor or surety who intends to apply for a credit agreement to be reopened after a claim on or relating to the agreement has already begun to serve written notice of his intention on the court and every other party to the proceedings within 14 days of the service of the claim form upon him, whereupon he will be treated as having filed a defence for the purposes of the Consumer Credit Act procedure. So far as the latter point is concerned, I have struggled in vain to identify any other possible candidate for the date on which the debtor's cause of action to reopen the credit agreement as an extortionate credit bargain could be said to have accrued; and Miss Anderson was unable to offer any convincing alternative to the date of entry into the credit agreement itself. Such an approach is consistent with the emphasis accorded by Dyson LJ in Paragon (at paragraph 66) to considering matters "as at the date when the credit bargain is made, and at no other time" when determining whether a credit bargain is extortionate. (Although strictly unnecessary for the purposes of this decision, and without having heard any argument on the point, I acknowledge that if the claim is one to recover a sum of money previously paid to the creditor, and is therefore subject to the 6 year limitation period prescribed by section 9 , time may not begin to start running until the payment has been made.) I should add that, following the well-known observations of Diplock LJ in Letang v Cooper [1965] 1 QB 232 at 242-3, it is clear that "a cause of action is simply a factual situation the existence of which entitles one person to obtain from the court a remedy against another person". The entry into a credit agreement clearly satisfies this requirement.

18 For all of these reasons, I therefore conclude that a claim to reopen a credit agreement as an extortionate credit bargain is an action upon a specialty to which in principle, and subject to section 9 (and the other provisions) of the 1980 Act, a limitation period of 12 years from the date of entry into the relevant credit

agreement applies. I reject the submission (apparently founded upon two pre- Rahman articles) at paragraph 3H-323 of the current (2008) edition of volume 2 of Civil Procedure , that "the Limitation Act has no application all where the debtor makes the application to re-open the credit agreement (e.g. to be relieved of the obligation to pay a sum) as part of his *defence*" (whilst acknowledging that it may apply to a claim or counterclaim). I accept Mr Freedman's submission that the notion that the debtor is making an application to reopen the credit agreement simply as part of his defence reflects "confused thinking". It is not the **form** of the application that matters but rather its substance: the debtor who seeks in his defence to reopen a credit agreement as an extortionate credit bargain is necessarily making a claim for relief pursuant to the jurisdiction conferred on the court by the relevant provisions of the 1974 Act.

19   The defendant seeks alternatively to rely on the provisions of section 32 of the 1980 Act, which has the effect of postponing the limitation period in cases of fraud, deliberate concealment or mistake until such time as the person invoking the section has discovered the fraud, concealment or mistake or could with reasonable diligence have done so. Insofar as the defendant seeks to reopen the credit agreement as an extortionate credit bargain, I accept Mr Freedman's submission that this is not an action "based upon" the claimant's fraud (within paragraph (a) of section 32 (1) ) nor is it one for "relief from the consequences of a mistake" (within paragraph (c) of the same subsection). On the basis of the material which is presently before me, I confess to some difficulty in understanding how the defendant can realistically assert that any fact relevant to his right to reopen the credit agreement as an extortionate credit bargain was deliberately concealed from him by the claimant so as to enable him to invoke paragraph (b) section 32 (1) : either his claim that the loan documentation was a sham succeeds (in which event there is no credit agreement to reopen), or it fails (in which event the factual basis for a plea of deliberate concealment is missing). Similar reasoning applies to the defendant's allegations of deceit and undue influence which, if successful, would lead to the setting aside of the loan agreement. It also seems to me that the defendant may find it difficult to resist the conclusion that, with reasonable diligence, he could have discovered any fraud, concealment or mistake in or about October 1995 when his solicitors, Inesons,

received the correspondence and loan statement from the claimant which tended to indicate that he was intending to stand by the strict terms of the loan documentation. However, I am conscious that the defendant's invocation of the 1980 Act is particularly fact-sensitive; and, for this reason, if his claim is one that should otherwise go to trial, then my decision on the preliminary issue should not be taken to preclude the defendant from seeking to rely upon section 32 by way of escape from my decision that his claim to reopen the loan transaction as an extortionate credit bargain is otherwise statute-barred.

### The appeal

20   I therefore turn to the appeal itself. I should allow the appeal if I am satisfied that the district judge's decision was wrong or if it was unjust because of a serious procedural or other irregularity in the proceedings of the lower court. At paragraphs 1 to 4 of his judgment, the district judge summarised the issues in the proceedings and the nature of the application and the supporting evidence that was before him. At paragraphs 5 to 9, he set out the background to the dispute. At paragraphs 10 to 15, he referred to certain "circumstantial matters". At paragraph 16, he reminded himself of the applicable legal test. At paragraphs 17 to 21, he summarised the claimant's submissions, concluding with the statement that "in the light of my analysis of the factual background in the context of the application, I do not propose to deal with each submission by either Mr Booth or Mr Clayton". At paragraphs 22 to 25, the district judge summarised the defendant's submissions. District Judge Needham's conclusions were set out at paragraphs 26 and 27 of the judgment, which I reproduce in full:

> "26.  I have no doubt whatsoever that the claimant's application should fail and that the whole issue should be put to the test at a trial. The circumstances in which the documentation came to be signed on 14 November 1995 is an issue between the parties. I note that in the second witness statement of the claimant no comment is made by him on the defendant's

evidence. I find that surprising. Instead the claimant concentrates on the resolution, so far as he was concerned, of the previous proceedings brought by Mr Allan and also the letter dated 12 May 1998, the author of which is disputed. Strangely he does not deal in any way with the events before, at and after the visit on 14 November 1995 of the parties to the offices of Inesons. There is also an issue between the parties as to the status of those documents. The defendant says, in terms, they are not to be taken at face value. The real agreement between the parties was for a profit-sharing deal on the sale of 12 Poplar Grove and that there was no question of any interest being paid under the loan agreement, yet alone cumulative interest rate of 42.5% in the event of default and a loan of £16,000 morphing into an indebtedness of over £1 million with interest running at £960 per day. It is also a curious fact, that cannot go unremarked, that proceedings were left to be issued two days before the expiry of the limitation period.

27. There is no absence of reality here which entitles the claimant to judgment under Lord Hobhouse's test. All matters excite such disquiet that a trial to resolve the issues is the only proper course to allow. The scheme proposed by the claimant and Mr Thompson to the defendant appears as conceived in corruption. Issues of fact between the parties are as stark and fundamental as one could find."

21 The grounds of appeal in relation to the district judge's substantive decision are set out in 5 numbered paragraphs. (A sixth ground of appeal relates to his order that the claimant should pay the costs of the summary judgment application. Pending the outcome of the appeal on the substantive decision, I have not heard any oral argument on this point.) The claimant's skeleton argument in support of the appeal (signed by Mr Freedman and Mr Aslett) extends to some 90 paragraphs and 25 pages. The claimant also relies upon further skeleton arguments (again signed by both counsel) directed to the preliminary issue (27 paragraphs over 12 pages) and the additional evidence (13 paragraphs over 5 pages). The skeleton argument for the defendant (signed by Miss Anderson and Mr Clayton) extends to 49 paragraphs covering some 18 pages. The oral submissions occupied 1 full day and some 1 ½ hours on the second day. I do not intend to burden this judgment by attempting to reproduce the parties' submissions in full; but I have borne all of those submissions (both written and oral) firmly in mind in preparing this written judgment.

22 I have been taken at length to a number of authorities by way of guidance on the approach that the court should adopt when considering a summary judgment application. On this aspect of the case, I have been referred to the following decided cases: (1) National Westminster Bank v Daniel [1993] 1 WLR 1453 at 1456D-F and 1457D-F per Glidewell LJ; (2) Swain v Hillman [2001] 2 All ER 91 at 92J and 95B per Lord Woolf MR and at 96B-C per Judge LJ; (3) Three Rivers DC v Bank of England (No 3) [2001] UKHL 16, [2003] 2 AC 1 at paragraphs 95 per Lord Hope, 143 per Lord Hutton, and 158 per Lord Hobhouse; (4) ED & F Man Liquid Products Ltd v Patel [2003] EWCA Civ 472 at paragraphs 8 and 10 per Potter LJ; and (5) Nationwide BS v Dunlop Haywards Ltd [2007] EWHC 1374 (Com) at paragraphs 8 and 9 per Simon J.

23 For the claimant, Mr Freedman submits that, whilst it is trite law that the court ought not to conduct a 'mini-trial' in reaching its conclusion, this does not mean that the court must take at face value, and without analysis, everything that the defendant says in his statements before the court. Where it is clear that there is no real substance in factual assertions which are made, particularly where those assertions are flatly contradicted by contemporaneous documents,

the court should grant summary judgment. In the instant case, it is said that virtually all of what the defendant says is contradicted by contemporaneous documents, as well as documents created by him (or on his instructions) years later. The underlying reality, from which it is said that there is no escape, is that because of the contemporary documents, both at the time and consistently thereafter, the purported defences are in fact fanciful and incredible. It is said that the defendant fails to satisfy the test as to each alleged defence having a real prospect of success. It is therefore submitted that the only proper conclusion is that summary judgment ought to have been given against the defendant, particularly bearing in mind the defendant's 'shifting position'; and his seeming necessity to plead what are contrary positions - notably fraud as opposed to being "in" on a supposed sham - means that the defences are nothing but incredible. It is said that it is misguided to suggest that, simply because there are allegations of fraud, the defendant should be entitled to a full trial. Even where serious allegations are made, there is said to be no good or compelling reason to have a trial if the judge, on a summary determination, can justly dispose of the point. The various defences raised by the defendant amount to nothing more than a collateral matters designed to throw the court "off the scent".

24  Mr Freedman's principal objection to the judgment of the court below is its failure to recognise that there was no real prospect of success in the purported defences and no compelling reason for the case to go to trial. The first and obvious gateway to this conclusion is said to be the way in which the matters relied upon, and the defendant's shifting position, were incredible, and contradicted by the contemporaneous documents. That by itself, it is said, should have been dispositive of the matter. But it is said that there was another route to the same conclusion. The district judge could, and it is said should, have dealt with the matters raised by the defendant point by point. The approach that he adopted of addressing globally the facts and the law is said to have been an error in itself. This was fundamental in that had the district judge adopted this approach, it is said that he would have exposed for himself the fundamentally flawed nature of the purported defences, which it is said do not stand up to any form of scrutiny. There are no bones, and thus no flesh to be put on the bones. It is said that District

Judge Needham fell into error in taking the broad brush approach that he did of dealing with the issues in a blanket fashion rather than considering the reality of the defendant's purported defences point by point as matters of law. For those reasons, the claimant seeks a rehearing of the application. Alternatively, and on the basis of an appeal by way of review, he submits that the appeal should be allowed. Mr Freedman also submits that the district judge should, in any event, have analysed each of the purported defences and identified those which did not withstand scrutiny, and so should not go to trial. By not embarking upon the case in this manner, the district judge is said to have acted contrary to the overriding objective and the court's own duty to manage the case effectively.

25  For the defendant, Miss Anderson refuted the claimant's submissions that District Judge Needham was wrong to conclude that all of the issues should be determined at trial, and that he erred in law in failing to deal with the discrete issues raised by the defence and in deciding that a trial was necessary. She submits that the approach that he adopted was an entirely proper one, which accords with the authorities. Against the background of the claimant's unexplained involvement in, and dealings with the assets of, the Basdring Pension Scheme , involving resort to subterfuge and the creation of false documents, and the extraordinary outcome whereby an original loan of £16,000 (of which £5,000 was admittedly repaid after about a year) is said by the claimant to have given rise to a claim in excess of £1 million, with interest running at a rate of £960 per day, Miss Anderson's submits that it is scarcely surprising that this very experienced district judge held that the case was not one that was suitable for summary determination. She submits that he was absolutely right to conclude that there were matters which excited disquiet. She submits that, far from being the case that this conclusion was likely to be dispelled by a point by point analysis of the defendant's case, such analysis was only likely to confirm the disquiet. Issues of fraud ran throughout the entire case, which is quite simply that the claimant is lying. Unless the court thinks that there is absolutely no merit in the defendant's version of events, she submits that the case can, and should, go to trial in order to enable the evidence to be fully and properly investigated after, and in the light of, full disclosure. This is said to be quite apart from the number and complexity of the legal issues involved,

in respect of which it is submitted that the defendant plainly has a real prospect of success. In short, Miss Anderson says that the claim is plainly one that is not susceptible to summary determination.

26 In the course of her oral submissions, Miss Anderson acknowledged that the defendant's case is inconsistent with the contemporaneous documents. But the whole thrust of his case is that the documents themselves are part and parcel of the scam that was being perpetrated upon him. The court simply cannot take the documents at their face value because they were devised to deceive. The starting point is not, as Mr Freedman urged upon the court, the fact that the monies advanced to the defendant came from the claimant but rather the prior undisputed fact that, shortly before the purported advance, the defendant had transferred sums totalling some £48,000 from reputable pension fund holders (Allied Dunbar and Scottish Widows) into an occupational pension scheme operated by the claimant on behalf of the employees of a company with which the defendant had no apparent connection. Mr Nolan - a man who, she says, has suppressed documents and engaged in sham transactions - simply does not deign to address this aspect of the background to the case in his evidence. Miss Anderson acknowledges that I may entertain real scepticism about the defendant's account of events, and that there would be good reason for that scepticism were it not for the contra-indications resulting from the claimant's dealings with the Basdring Pension Scheme , its assets and its members, and his apparent willingness to resort to subterfuge and to the creation of false documents. She submits that the district judge was absolutely right to conclude that detailed investigation of the individual defences would not affect the position that this is a case that should go to trial.

27 Both counsel addressed me at length as to the facts, and the evidence, in the case. It is not possible, in this judgment, to do full justice to Mr Freedman's cogent and forceful submissions on the documentary evidence and the implausibilities inherent in the defendant's shifting evidence and case. I do not propose to address the individual points made by Mr Freedman; but I have borne all of them firmly in mind. Having formed the clear view that this is a case that should go to trial, it is undesirable for me to say more than is really necessary to explain to the claimant the reasons why I consider

that this appeal should be dismissed, particularly since it is possible that I may be the trial judge: I intend to create no hostages to fortune for either party, nor do I wish to be seen to be in any way contributing to the future development of this litigation.

28 It might be thought sufficient for me to say that I entirely agree with the conclusions expressed by the district judge at paragraphs 26 and 27 of his judgment (cited at paragraph 20 above). But I should add that the following considerations compel me to the conclusion that this is a claim that cannot be disposed of simply on the papers and without full investigation at trial. First, there is no satisfactory explanation from the claimant as to why, apparently shortly before the purported advance, the defendant should have chosen to transfer some £48,000 from reputable pension fund holders into the Basdring Pension Scheme if this was not, as the defendant says, part of some wider scheme devised to enable the defendant illicitly to obtain access to monies within his pension pot. Secondly, there is no satisfactory explanation as to why, given the considerable experience and expertise that the claimant had, by 1994, already developed in the field of money lending, and the care which he had taken to devise a system calculated to minimise the risk of successful default on the part of any of his debtors (as explained at paragraphs 10 to 16 of the claimant's first witness statement), the claimant should simply have taken no steps to recover any of the £11,000 that apparently remained outstanding from the defendant between November 1995 and the receipt of the defendant's solicitors letter of 21 June 2006. The suggested explanation (at paragraph 56 of the claimant's first witness statement) that he did not need to recover this loan seems to me to invite cross-examination. Thirdly, if this was a genuine loan arrangement, and appreciated to be such by the defendant, I find it staggering that he should have done nothing to attempt to repay the balance of the loan after November 1995 when interest was running on that balance at the rate of 3% per month on a compound basis. It is equally surprising that the defendant should have caused his solicitors to write to the claimant in the terms of Blacks's letter of 21 June 2006. All of these are matters that cry out for investigation at trial. I acknowledge that the defendant's case is attended with considerable difficulties; and that at trial Mr Freedman's strictures on that case, may prove to be

fully justified. But that is a matter for trial, and not for determination at the stage of this appeal.

29   Although it was not cited to me, my conclusion is consistent with, and supported by, the approach of the Court of Appeal (Watkins and Slade LJJ, reversing Webster J) in a pre- CPR case that used to be referred to in the old White Book : see, e.g. para 14/4/9 at p 175 of *The Supreme Court Practice 1999* . The note reads: "Where there are unexplained features of both the claim and the defence which are disturbing because they bear the appearance of falsity and disreputable business dealings and questionable conduct, the Court should not make tentative assessments of the respective chances of success of the parties or the relative strengths of their good or bad faith, and should not on such an examination grant the defendant conditional leave to defend but should give unconditional leave to defend ( Extraktionstechnik Gesellschaft fur Anlagenbau GmbH v Oskar (1984) 128 SJ 417; (1984) LS Gaz 1362, CA )."

30   Given that, in my judgment, this is a case that should go for trial, I consider that it is undesirable for me to strike out any part of the defence unless it is clear that, irrespective of the evidence that may be called at trial, it cannot be sustained as a matter of law. In my judgment, that criterion is satisfied only in relation to one aspect of the defence, namely the plea that the claim is statute barred. The claim was brought on 7 February 2007, just two days short of the 12th anniversary of the earliest date for repayment under the loan agreement. (In any event, by section 29 of the 1980 Act, any right of action to recover the debt is not to be treated as having accrued before the part payment of £5,000 that was effected by the defendant's solicitors on 23 October 1995.) It follows that, by section 8 of the 1980 Act, the claim is

not statute barred provided that it is a claim founded on a deed rather than a simple contract. I accept Mr Freedman's submission that this raises an issue of law and of the parties' objective intention, and that what each of the parties may subjectively have thought about it is irrelevant. The legal charge dated 15 November 1994, effectively incorporates the provisions of the loan agreement of the previous day. I am entirely satisfied that the legal charge itself was executed as a deed. Not only was the formality of a deed required in order to create a valid legal charge of the subject property, and not only is the legal charge expressed to be "SIGNED SEALED AND DELIVERED" in the presence of the defendant's solicitor as attesting witness, but clause 10 expressly refers to the legal charge as "this deed". I am therefore entirely satisfied that the claim to recover the alleged debt is not statute barred, and that this ground of defence should be struck out.

**Conclusion**

31   I therefore conclude that this appeal should be dismissed, save that the plea that this claim is statute-barred should be struck out as disclosing no reasonable ground of defence. On the preliminary issue, I determine that, apart from the possible application of the provisions of section 32 (1) (b) of the 1980 Act, the defendant's claim to reopen the credit agreement as an extortionate credit bargain is statute barred. I invite submissions as to the further conduct of this litigation, and also as to costs.

Crown copyright

© 2017 Sweet & Maxwell

2009 WL 506401

---

End of Document © 2017 Thomson Reuters.

# TAB 9

June 11, 1892.]    THE LAW TIMES.    [Vol. LXVI., N. S.—469

ADM.]    REIN v. STEIN.    [CT. OF APP.

they occur, in a book to be kept for that purpose, and shall, if required, produce such book at the time of the payment of wages, and also upon the hearing before any competent authority of any complaint or question relating to such payments.

*Joseph Walton*, for the defendants, in support of the appeal.—The judge was wrong in holding that sect. 171 of the Merchant Shipping Act 1854 was not complied with. The reduction of wages from 10*l.* to 7*l.* a month is not a deduction from wages; it is merely an alteration in the rate of wages. As a matter of fact the account on the face of it shows the alteration of wages, and therefore, if this be a deduction, it does appear on the account.

*Carver*, for the plaintiff, *contrd.*—The object of the section was to protect seamen by giving them information of the reason of any diminution of their wages. In the present case the alteration of wages was a deduction, and essentially a matter within the spirit of the section. The entry in the account of " wages at 10*l.* and 7*l.* per month " is not a compliance with the Act. By itself it does not show a deduction, and even if it did, it does not say what it is in respect of. It is also submitted that a master has no power to disrate a seaman, and if so the plaintiff is for that reason entitled to hold the judgment. [The PRESIDENT.—I always thought that the master was the proper person to disrate.]

The PRESIDENT.—I am of opinion that the learned judge was wrong in holding that this was an insufficient account. The main question here, and the only question for us to decide to-day is, whether the defence fails by reason of the insufficiency of the account. Now it is conceded by the defendant's counsel that the question of the propriety of the disrating as it is called, that is to say, the sufficiency of the cause assigned and the question whether, if it could be made, it was made in proper form, are matters that cannot be finally decided by this court, because the evidence requisite to determine these points was not adduced before the learned judge below. All those matters will be open therefore to the plaintiff to raise upon this case going back to the court below, as we think it must. The only question therefore that I am called upon to decide, and intend to decide now, is whether this is a sufficient account. Now what happened ? The plaintiff entered upon his duties. It is alleged that he was drunk and incapable of performing them. That is a very serious matter in the case of a man who has to deal with machinery, because it may at any moment occasion a disaster which may wreck the ship and sacrifice the lives of all on board. The master finding this state of things disrated the man, that is, reduced his wages—telling him so at the time—by 3*l.* a month. That is a matter which is contemplated in the articles of agreement between the parties. Mr. Carver has raised the question, who is to disrate. It is very true that the contract does not distinctly state the person who is to do it, but I have asked whether it can be said that anyone but the master or person in command of the ship ever does it. My belief is, and this is not denied, that the person who performs this duty is always the master. He has done it here, and done it, I think, in accordance with the contract, and I think it must prevail. I do not think that the 3*l.* off the 10*l.* is a matter of such deduction as the deductions

Vol. LXVI., N. S., 1700.

mentioned in the printed form. I think that from the time of disrating, assuming it to have been properly done, the man's wages were 7*l.* a month, and not 10*l.* I do not think that the difference of 3*l.* a month comes within the meaning of deductions. I therefore hold that the learned judge was wrong in his decision as to this account.

JEUNE, J.—I am of the same opinion. What we have to deal with to-day arises on the question of disrating. It must be clearly understood that, when the case goes down, it will be open to the parties to show either that the disrating was not warranted by the form of the contract, or that on the evidence there was nothing to justify the master in disrating. The only question here is, whether the account that was furnished to the plaintiff was in compliance with sect. 171 of the Merchant Shipping Act 1854. That requires two things. In the first place, there is to be a " full and true account " of the wages. In this case there was, I think, a full and true account of the wages. The effect of the disrating was to reduce the wages. That reduction is shown in the account. In the second place, the section requires that all deductions from the wages are to be shown on the account. Now, the form of account issued by the Board of Trade divides the deductions referred to in sect. 171 into two heads, viz., forfeitures and other deductions. Forfeitures, it appears to me, point to the matters referred to in sect. 243. Deductions point to matters referred to in sect. 192, being sums deducted for relief to seamen's families, and to matters referred to in sect. 228, being medical expenses and other expenses of that kind. None of these matters appear to me to fall within the reduction of wages under this contract. Then it is said that the plaintiff cannot be disrated by the master. It seems to me to be clear that, if the disrating is to take place when incompetency is manifested, the only person who can do it is the master; subject, of course, to the plaintiff's right to question its propriety in a court of law. Under these circumstances it appears to me that there was a proper account delivered. The appeal is therefore allowed, and the case is remitted for a new trial.

Solicitors for the appellants, *Lightbound* and *Dobell*, Liverpool.

Solicitors for the respondent, *Cartwright* and *Co.*, Liverpool.

# Supreme Court of Judicature.

## COURT OF APPEAL.

*Saturday, March 5.*
(Before LINDLEY and KAY, L.JJ.)

REIN *v.* STEIN. (*a*)

APPEAL FROM THE QUEEN'S BENCH DIVISION.

*Practice — Writ — Service out of jurisdiction— Contract to be performed partly abroad and partly in England—Breach of contract within the jurisdiction—Rules of Court 1883, Order XI., r. 1 (e).*

(*a*) Reported by E. A. SCRATCHLEY, Esq., Barrister-at-Law.

470—Vol. LXVI., N. S.]                    THE LAW TIMES.                    [June 11, 1892.

CT. OF APP.]                    REIN *v.* STEIN.                    [CT. OF APP.

*The plaintiffs carried on business in London as broken-glass merchants. The defendant carried on business in Germany.*

*By agreement contained in letters between the plaintiffs and the defendant it was agreed that the defendant should take from the plaintiffs consignments of broken glass to sell on their account in Germany, the glass to be shipped from London by the plaintiffs, who were to fix the price inclusive of insurance and freight; "payment, cash against bills of lading."*

*The letters did not state where the money was to be paid.*

*The defendant had remitted some of the money to London, but had not paid the balance due from him, and the plaintiffs desired to bring an action to recover such balance.*

*The plaintiffs applied for leave to issue a writ against the defendant for service out of the jurisdiction.*

*Held, that, looking at the circumstances existing at the time of the contract, the true inference was that it was part of the contract that the money was to be paid in this country; that it was sufficient that some part of the contract was to be performed within the jurisdiction; that the application came within the terms of rule 1 (e) of Order XI.; and that therefore service out of the jurisdiction might be allowed.*

*Reynolds v. Coleman (57 L. T. Rep. N. S. 588 ; 36 Q. B. Div. 453) and Robey and Co. v. The Snaefell Mining Company Limited (20 Q. B. Div. 152) followed.*

*Decision of the Divisional Court (Cave and Williams, JJ.) affirmed.*

*Per Cave, J.: In order to establish a waiver of the right to object to the issuing of a writ out of the jurisdiction it must be shown that the party alleged to have waived his objection has taken some step which is only necessary or only useful if the objection has been actually waived, or if the objection has never been entertained at all.*

MARIA L. H. WALBURGA REIN and Thomas Wrathall, the plaintiffs in this action, sued as executors of Hubert Joseph Leeuw, deceased. The defendant was S. Stein.

The plaintiffs claimed the sum of 781*l.* 13*s.* 5*d.*, balance of account for broken glass sold and consigned to the defendant. The plaintiffs also claimed that sum as money had and received by the defendant to their use.

H. J. Leeuw for many years prior to his death, which occurred on the 30th March 1891, carried on business under the name of P. R. Leeuw and Co. as a dealer in broken glass. His business was to collect broken glass from various houses in London and to consign the same for sale to various persons with the object of its being melted and manufactured into new bottles.

The defendant was a German subject carrying on business at Hamburg, and, as the plaintiffs alleged, his course of business with H. J. Leeuw for some years past was from time to time to come to H. J. Leeuw's warehouse in London and give orders for large quantities of broken glass to be consigned to him and delivered on board his ships in the river Thames upon terms of credit and payment agreed between him and H. J. Leeuw. The broken glass was then carried in lighters down the Thames and placed on board his ships, which proceeded to Hamburg.

On the 31st Jan. 1890 the following letter was written by H. J. Leeuw to the defendant :

Dear Sir,—We hereby authorise you to sell for our account about 3000 tons of broken green glass at U. 1.45 per 100 German lbs. and about 1500 tons of broken black glass at 95 pfg per 100 German lbs. delivered c. i. f. Hamburg, Harburg, or Altona.—Yours truly,
P. R. LEEUW AND CO.

The plaintiffs alleged that, according to the usual practice, the defendant should have remitted from time to time to H. J. Leeuw in London the purchase money of the broken glass which had been consigned to him, either by cheque or acceptance payable in London.

The plaintiffs also alleged that at the time of the death of H. J. Leeuw there was due and owing to him from the defendant the sum of 476*l.* 13*s.* 5*d.* in respect of broken glass so sold and consigned to the defendant by H. J. Leeuw between the 19th Jan. 1887 and the 18th Feb. 1891.

On the 16th May 1891 the following letter was written by the plaintiffs to the defendant :

Dear Sir,—We herewith authorise you to sell 1/1500 tons of broken green bottle glass at U. 1.05 pfenning per centner, and not exceeding 200 tons of black bottle glass at 90 pfenning per centner. Prices to be understood c. i. f. Hamburg, Harburg, or Altona; payment, cash against bills of lading, and insurance policy less 2½ per cent. shipment by the end of September. Your commission to be 4 per cent. of the approximate amount of values of cargoes to be paid in cash, the remainder after the vessel is discharged, and the weight ascertained.—Yours truly, THOMAS WRATHALL, WALBURGA REIN.

The plaintiffs further alleged that subsequently to the death of H. J. Leeuw they contracted to sell, and in pursuance thereof delivered to the order of the defendant, about 400 tons more of broken glass, amounting to 305*l.*

The plaintiffs further alleged that there was consequently due and owing from the defendant to them the sum of 781*l.* 13*s.* 5*d.*, which should have been remitted to them by the defendant by cheque or draft payable in London.

Accordingly they applied for leave to issue a writ of summons in an intended action against the defendant for service out of the jurisdiction, and to serve notice thereof on him out of the jurisdiction.

The ground of their application was that, there had been a breach of contract by the defendant which should have been performed within the jurisdiction, payment of the goods within the jurisdiction being part of that contract.

On the 6th Nov. 1891 an *ex parte* order was made by Collins, J., whereby leave was given to the plaintiffs to issue a writ for service out of the jurisdiction, and to serve the defendant with notice of such writ.

The defendant, on being served with notice of the writ, applied for and obtained an order to inspect the documents annexed to the affidavits upon which the order for service was granted. The defendant then entered a conditional appearance, and, after successfully resisting an attempt to strike it out, applied for and obtained on two occasions an extension of time within which to deliver a defence on the ground that he intended to object to the jurisdiction. This the defendant subsequently did by summons before Collins, J. in chambers, and obtained an order on the 31st Dec. 1891 setting aside the previous order made by his Lordship *ex parte*, and setting aside all

# THE LAW TIMES.

CT. OF APP.]       REIN *v.* STEIN.       [CT. OF APP.

subsequent proceedings, on the ground that the court had no jurisdiction.

The plaintiffs appealed to the Divisional Court, and in addition to their main contention that part of the contract was to be performed and had been broken within the jurisdiction, they argued that, by applying to see the documents, and also for extensions of time in which to defend, the defendant had waived his right to object to the jurisdiction.

On the 3rd Feb. 1891 the appeal came on for hearing before Cave and Williams, JJ.

*J. Eldon Bankes* and *Herbert Jacobs* for the plaintiffs.

*Crump*, Q.C. and *Clavell Salter* for the defendant.

CAVE, J.—In this case three kinds of objection have been taken to the order of my brother Collins. With regard to the one to which Mr. Bankes has last addressed himself, that there was a waiver of the right to object to the issuing of this writ, I am of opinion that that is not established. It seems to me that, in order to establish a waiver, you must show that the party alleged to have waived his objection has taken some step which is only necessary or only useful if the objection has been actually waived, or if the objection has never been entertained at all. If, for instance, after leave to issue a writ an ordinary appearance is entered, that is a matter which indicates that the defendant either never has entertained the notion, or, if he did entertain it, he abandoned it. Such a step would be unnecessary and useless if the intention of insisting on his objection still held good. With regard to the application here to see the documents which were mentioned in the affidavit—that is, the affidavit upon which leave to issue the writ was obtained—it would be impossible to say that an application for leave to see those documents amounted to any indication that there had been a waiver of the objection to the writ. On the contrary, it seems to me that it rather tends to show the reverse. If there was no intention of proceeding with the objection it would not have been necessary to look at that affidavit unless, as Mr. Bankes suggests, it was done for the purpose of seeing what could be learned from the affidavit. That might be done no doubt, and when that case occurs one would have to deal with it. But here it is obvious that the defendant was still insisting on and intending to proceed with his notice of motion. He did no more, it seems to me, than he had a right to do; that is to say, take steps to procure a sight of the affidavit which he had got to answer, and upon which the leave to issue the writ had been obtained. With regard to the conditional appearance and with regard to obtaining time to put in a statement of defence, whatever that might amount to under ordinary circumstances, and where no notice of motion has been given, I think there is this : looking at what had been done, even assuming that those steps were not strictly necessary, yet looking at the position in which matters were, that a conditional appearance had been entered, that an application to strike out that conditional appearance had been resisted, and that on Dec. 5 this summons was taken out to discharge the order for issuing the writ, it seems to me it would be quite an unfair inference to draw from what had been done that the defen-

dant had abandoned his intention to object to the jurisdiction by applying to set aside this writ. On those grounds it seems to me that that objection cannot be supported. Then there was another objection made with regard to the jurisdiction of the learned judge to entertain the application to discharge the order that he had made. Now, there again I do not think it necessary to pronounce any opinion as to whether there is or is not jurisdiction on the part of the judge. Undoubtedly under certain circumstances there is and must be—for instance, in vacation when no other court is sitting. As I understand, this application was made in vacation. But, even if it was made otherwise, I should not have come to the conclusion that this order should be discharged for want of jurisdiction. The matter being here, we might treat it as the hearing of the motion made to us in the first instance, and deal with it on that footing if necessary to do so. However, for reasons already given, I do not think it is. Then I come to the main point, and that is, whether the plaintiff has established here a case of a contract under which the defendant was bound to make these payments in London, and it seems to me that he has done so. I do not feel it necessary to decide whether this was a case of vendor and purchaser, or a case of principal and agent. There are some points in the case which look in one direction, and some points which look in another, and a man might, with a very great amount of plausibility, contend for either view. It seems to me, however, unnecessary, at this stage at all events, to decide which of those views is correct. I think, whichever you take, the result remains the same, that there was here a liability to pay in London, and a breach of that contract. Now, I do not for one moment throw any doubt upon the case cited by Mr. Crump, of *Bell and Co.* v. *Antwerp, London, and Brazil Line* (64 L. T. Rep. N. S. 276 ; (1891) 1 Q. B. 103). That no doubt is a perfectly proper decision by which I am bound, and I do not desire to get out of it. But the circumstances of that case are not the circumstances which exist here. In that case there had been no course of dealing at all. It simply stood on this, that the defendants were bound to indemnify the plaintiff against certain lighterage charges ; that there was a breach of that promise as soon as he had been damnified by having to pay those lighterage charges ; and that, that being so, their obligation to indemnify him arose, and was broken at the port of discharge. Now, similarly here, if there had been nothing more than a delivery of these particular goods in the way in which they actually were delivered without anything else, without anything in the course of dealing throwing a light on the circumstances under which they were delivered, I should come to the same conclusion as the court arrived at in *Bell's* case (*ubi sup.*). But it seems to me that the circumstances here differ, and differ in a very material point. Whatever may have been the position of the defendant towards the plaintiffs, whether of purchaser or agent, it appears, according to the last agreement, which is said to have been practically the same as the former agreement, that the defendant was to pay cash against the bills of lading, but that there had been a course of dealing in which both parties had put aside that stipulation, and had dealt differently

CT. OF APP.]      REIN v. STEIN.      [CT. OF APP.

in the matter. The plaintiffs had sent the bills of lading by post to the defendant, and the defendant had for some considerable time been in the habit of remitting the bills or cheques in some way or other making payment in London. It seems to me that, so long as he continued to take these bills of lading in the way in which he had taken them before, there was an implied undertaking on his part (if there was not an express one, at any rate an implied undertaking on his part) to pay in the same manner in which he had paid before, that is, by remitting bills to London. If he meant to fall back upon his strict rights under the contract, his duty would have been to give notice to the other side, and say: "It is quite true that up to this time a course of conduct has been pursued which warrants you, perhaps, in expecting that I shall pay the money in London; but I tell you I do not intend to do that any further, and if you choose after this to send me the bills of lading by post, you must understand that I shall not go on with the course which I have hitherto pursued, but I shall refuse to make the payment in London." He did nothing of the kind; he continued to receive the bills of lading as he had done before; and it seems to me that, so long as he continued to receive them in the way he had done before, without notice to the plaintiffs, he was bound to pay for them in the way he had done before, that is, by transmitting the money to London. Consequently it seems to me there was a breach of this contract in London, and that the writ was properly ordered to issue. The appeal will be allowed with costs. They will be the plaintiffs' costs in any event.

WILLIAMS, J.—I am of the same opinion, and for the same reasons. I have nothing to add.

From that decision the defendant now appealed.

*Crump*, Q.C. (*Clavell Salter* with him), for the defendant, referred to

> Rules of Court 1883, Order XI., r. 1 (e);
> *Bell and Co.* v. *Antwerp, London, and Brazil Line*, 64 L. T. Rep. N. S. 276; (1891) 1 Q. B. 103 ;
> *Reynolds* v. *Coleman*, 57 L. T. Rep. N. S. 588 ; 36 Ch. Div. 453.

[KAY, J. referred to *Robey and Co.* v. *The Snaefell Mining Company Limited*, 20 Q. B. Div. 152.]

*J. Eldon Bankes* and *Herbert Jacobs*, for the plaintiffs, were not called upon to argue.

LINDLEY, L.J.—I am of opinion that we cannot depart from the view taken by the Divisional Court in this case. The plaintiffs I may describe as persons who sell broken glass and send it abroad to be melted down and made into bottles, and the defendant may be truly and properly described as the agent of the plaintiffs. He lives abroad. According to the letters of the 31st Jan. 1891 and the 16th May 1891 written to him by the plaintiffs—I treat them as including their testator—the arrangement come to between the plaintiffs and the defendant, according to my view of it, was that the defendant should sell, and sell for them, in Germany, consignments of broken glass and remit them the proceeds. Although the letters themselves do not say where the money was to be paid to the plaintiffs, yet the evidence under which this arrangement was made, and especially as to the course of business between the parties, is plain enough. The evidence shows that the money was to be paid in England.

With reference to the fact that the letters do not state where the money is to be paid, I will avail myself of the language of Cotton, L.J. in *Reynolds* v. *Coleman* (57 L. T. Rep. N. S. 588, 589 ; 36 Ch. Div. 453, 464) to which Mr. Crump, on behalf of the appellant, the defendant, referred. The learned judge said: "The question we have to consider is this : what is the meaning of 'which according to the terms thereof ought to be performed within the jurisdiction.' It was said by the appellant to mean that it must be an express term of the contract that it should be performed within the United Kingdom. In my opinion that is not the true construction. The difficulty arises from the words 'according to the terms thereof;' but, in my opinion, those words mean that you must look at the time when the contract was made, and then determine whether, having regard to the terms, the contract was one which ought to be performed within the jurisdiction, and do not mean that there must be an express provision that the contract is to be performed within the jurisdiction." Now, before I part with that case, I will make another observation on the construction of this clause (e) of rule I of Order XI. I do not understand that it is the whole of the contract that has to be performed within the jurisdiction. It is sufficient if some part of it is to be performed within the jurisdiction, and if there is a breach of that part of it within the jurisdiction. That was the view taken by the Divisional Court in *Robey and Co.* v. *The Snaefell Mining Company Limited* (20 Q. B. Div. 152). There the action was brought for the price of machinery erected in the Isle of Man. The court came to the conclusion that payment was to be made in London, and therefore they gave leave to issue the writ. So here, all the duties of the defendant under his contract, except the duty of paying the plaintiffs, were to be performed abroad. He was to sell abroad ; but the most important part of all was payment, and that payment was to be made here. I should infer that payment was to be made in London from the circumstances existing at the time when the letters were written. But it does so happen that the course of business pursued by the defendant since the dates of those letters leads to the inference that part of the defendant's duty under his contract was to pay the plaintiffs in England. In my opinion the decision of the Divisional Court was correct, and that the learned judges were perfectly right in allowing the writ to issue.

KAY, L.J.—I am of the same opinion. The breach of contract for which this action was brought is the nonpayment of certain moneys by the defendant which he was bound by the contract to pay. Looking at the contract, and the circumstances under which the money was to be paid, if the money had to be paid in this country, then, according to the authorities, the case falls within the rule which has been referred to, and the nonpayment by the defendant was a breach of a contract, part of which was to be performed in England. The question is, whether there is enough in this contract to enable us to come to the conclusion that payment was to be made in England. I have no doubt about it. In the first place, the contract is between a merchant in England and a person who is constituted his agent in Hamburg. Goods were consigned to the latter to be sold, and the very terms of one

CT. OF APP.]    CARTER v. SILBER.    [CT. OF APP.

of the letters under which the contract was made are these, " Payment, cash against bills of lading." The letter does not say that the agent is to pay cash abroad, or that the agent abroad is to be paid, but that the cash is to be paid to the principal. *Primâ facie* in commercial transactions, when cash is to be paid by one person to another, that means that it is to be paid at the place where the person who is to receive the money resides or carries on business. I therefore think that " cash " must mean cash to be paid in England. The letter I have already referred to says that part of the value of the goods is to be paid in cash, and that the rest is to be paid when the whole of the goods has been delivered. The exact words are these: " The approximate amount of values of cargoes to be paid in cash, the remainder after the vessel is discharged and the weight ascertained." So that, before the vessel was discharged, it would be the duty of this agent in Hamburg to remit part of the values of the cargoes in cash, and the rest afterwards. Now Mr. Crump says, and says truly, that the only circumstances to look at are the circumstances existing at the time of the contract. The circumstances existing at the time were these: One of the parties was resident in England, and the other party, who was resident in Hamburg, was to pay the party resident in England in cash. It is clear what the course of dealing between the parties was. It was, that the party resident in Hamburg should remit the value of the goods in cash to England. Therefore, the breach of contract now complained of was in England. Accordingly, the writ ought to be allowed to be issued for service out of the jurisdiction, and notice of it served out of the jurisdiction. The appeal must be dismissed with costs.

*Appeal dismissed.*

Solicitor for the appellant, *Robert Greening.*
Solicitors for the respondents, *Emmanuel, Round,* and *Nathan.*

---

*Tuesday, March 22.*

(Before LINDLEY, BOWEN, and KAY, L.JJ.)

CARTER v. SILBER. (a)

APPEAL FROM THE CHANCERY DIVISION.

*Infant's marriage settlement—Voidable deed—Covenant to settle after-acquired property—Repudiation five years after attaining majority—Reasonable time—Infants' Relief Act 1874 (37 & 38 Vict. c. 62), s. 2.*

*By a marriage settlement dated in Oct. 1883 the father of the intended husband, a minor, covenanted to pay to the trustees of the settlement an annuity of 1500l. during the life of the intended wife, also a minor, and such further period as there should be living any issue of the marriage, such sum to be paid to the husband for life until bankruptcy or alienation, or any other event whereby that sum would become vested in or payable to some other person, whereupon the annuity was to be applied for the benefit of the husband and his wife and issue. It was further agreed that if the husband then was, or if he or the trustees should become, entitled to any property under any settlement or will of his father,*

*unless otherwise directed, such property was to be vested in the trustees and be applicable in reduction of the annuity of 1500l. The settlement was approved by the court on behalf of the wife but not on behalf of the husband, who attained his majority in Nov. 1883.*

*The father died in May 1887, and by his will confirmed certain settlements made by him in his lifetime under which the husband took an interest and gave the residue of his real and personal estate to his two sons (one of whom was the husband) in equal shares. The husband received the 1500l. a year from the trustees of his settlement during his father's lifetime, and, after his death, until July 1888, when he repudiated the settlement. An action was thereupon brought by the trustees claiming that the husband was bound by the settlement and could not repudiate it, and, in the alternative, for compensation for the parties disappointed by such repudiation.*

*Held, that the settlement being merely a voidable and not a void instrument was binding upon the husband unless and until he repudiated it; that it was incumbent upon him to repudiate it, if he desired so to do, within a reasonable time after attaining twenty-one years of age; that that, under all the circumstances of the case, and having regard to the lapse of time which had occurred, had not been done; and that therefore the settlement was still binding upon him.*

*Decision of Romer, J. (65 L. T. Rep. N. S. 51; (1891) 3 Ch. 553) reversed.*

BY an indenture of settlement, dated the 16th Oct. 1883, and made between Albert Marcius Silber of the first part, Martin Albert Silber (stated to be then an *infant* of the age of twenty years and upwards and a son of the said Albert M. Silber) of the second part, Lady Lucy Silber (then Lady Lucy Vaughan, spinster, and stated to be an infant of the age of eighteen years) of the third part, and Robert Brudenell Carter and the Right Hon. the Earl of Lisburne as trustees of the fourth part (being one of the settlements made previously to the marriage then intended and shortly afterwards solemnised between Martin A. Silber and Lady Lucy Vaughan) after reciting a policy on the life of Martin A. Silber for 20,000l., effected by Albert M. Silber, payable on Martin A. Silber attaining sixty years, or on his death under that age; and reciting an agreement that Albert M. Silber should enter into the covenant thereinafter contained for the payment during the life of Lady Lucy Silber, and for such further period as therein mentioned of the yearly sum of 1500l., reducible as thereinafter mentioned; it was witnessed that in pursuance of the agreement and in consideration of the intended marriage Albert M. Silber covenanted with the trustees that in case the said intended marriage should take place, he, his heirs, executors, and administrators would pay to the trustees or trustee of the settlement the yearly sum of 1500l. during the life of Lady Lucy Silber, and during such further period (if any) as there should be living any child or grandchild of the said intended marriage, such sum of 1500l. to be payable by equal quarterly payments payable in advance every three months. And it was agreed and declared that the trustees or trustee should pay the yearly sum of 1500l. as and when the growing payments thereof should be received by them or him to Martin A. Silber during his life,

(a) Reported by E. A. SCRATCHLEY, Esq., Barrister-at-Law.

# TAB 10

**Rubin and another v. Eurofinance SA and others**

**New Cap Reinsurance Corporation (in Liquidation) and another v. A E Grant and others as Members of Lloyd's Syndicate 991 for the 1997 Year of Account and another**

On appeal from: [2010] EWCA
Civ 895;, [2011] EWCA Civ 971
SC
24 October 2012

**[2012] UKSC 46**

**2012 WL 4866933**

before Lord Walker Lord Mance Lord
Clarke Lord Sumption Lord Collins
Judgment Given on 24 October 2012

**Analysis**

Heard on 21, 22, 23 and 24 May 2012

**Representation**

- Appellant Marcus Staff (Instructed by Brown Rudnick LLP ).
- Respondent Robin Dicker QC Tom Smith (Instructed by Chadbourne& Parke LLP ).
- Appellant Robin Knowles QC Blair Leahy (Instructed by Edwards Wildman Palmer UK LLP ).
- Respondent Gabriel Moss QC Barry Isaacs QC (Instructed by Mayer Brown International LLP ).
- Intervener Pushpinder Saini QC Adrian Briggs Shaheed Fatima Ian Fletcher Stephen Robins (Instructed by Taylor Wessing ).
- Intervener Michael Driscoll QC Rosanna Foskett (Instructed by Wilsons Solicitors LLP & Wedlake Bell LLP).

**Judgment**
Lord Collins (with whom Lord Walker and Lord Sumption agree)

**Introduction**

**The appeals**

1   There are two appeals before the court: Rubin v Eurofinance SA (" Rubin ") and New Cap Reinsurance Corpn Ltd v Grant (" New Cap "). These appeals raise an important and novel issue in international insolvency law. The issue is whether, and if so, in what circumstances, an order or judgment of a foreign court (on these appeals the United States Bankruptcy Court for the Southern District of New York, and the New South Wales Supreme Court) in proceedings to adjust or set aside prior transactions, eg preferences or transactions at an undervalue ("avoidance proceedings"), will be recognised and enforced in England. The appeals also raise the question whether enforcement may be effected through the international assistance provisions of the UNCITRAL Model Law (implemented by the Cross- Border Insolvency Regulations 2006 (SI 2006/1030) ("CBIR")), which applies generally, or the assistance provisions of section 426 of the Insolvency Act 1986 , which applies to a limited number of countries, including Australia.

2   In Rubin a judgment of the US Federal Bankruptcy Court for the Southern District of New York ("the US Bankruptcy Court") in default of appearance for about US$10m under State and Federal law in respect of fraudulent conveyances and transfers was enforced in England at common law. In New Cap (in which the Court of Appeal was bound by the prior decision in Rubin ) a default judgment of the New South Wales Supreme Court, Equity Division, for about US$8m in respect of unfair preferences under Australian law was enforced under the Foreign Judgments (Reciprocal Enforcement) Act 1933 ("the 1933 Act"), and, alternatively, pursuant to powers under section 426 of the Insolvency Act 1986 .

3   In each of the appeals it was accepted or found that the party against whom they were given was neither present (nor, for the purposes of the 1933 Act, resident) in the foreign country nor submitted to its jurisdiction (which are the relevant conditions for enforceability at common law and under the 1933 Act), but that those conditions did not apply to judgments or orders in foreign insolvency proceedings.

4    In addition to the arguments on these two appeals, the court has had the great benefit of written submissions on behalf of parties to proceedings pending in Gibraltar. Those proceedings are to enforce default judgments entered by the US Bankruptcy Court for some $247m in respect of alleged preferential payments to companies in the British Virgin Islands and Cayman Islands arising out of the notorious Ponzi scheme operated by Mr Bernard Madoff.

5  It has been necessary to emphasise that the judgments in all three matters were in default of appearance, because if the judgment debtors had appeared and defended the proceedings in the foreign courts, the issues on these appeals would not have arisen. The reason is that the judgments would have been enforceable on the basis of the defendants' submission to the jurisdiction of the foreign court. Enforcement would have been at common law, or, in the New Cap case either under the common law, or under the 1933 Act which substantially reproduces the common law principles — there is a subsidiary issue on this appeal as to whether the 1933 Act applies to judgments in insolvency proceedings, dealt with in section IX below.

6  Under the common law a court of a foreign country has jurisdiction to give a judgment in personam where (among other cases) the judgment debtor was present in the foreign country when the proceedings were instituted, or submitted to the jurisdiction of the foreign court by voluntarily appearing in the proceedings. In the case of the 1933 Act the foreign court is deemed to have jurisdiction where the judgment debtor submitted to the jurisdiction by voluntarily appearing in the proceedings otherwise than for the purpose (inter alia) of contesting the jurisdiction; or where the judgment debtor was resident at the time when the proceedings were instituted, or being a body corporate had an office or place of business there: section 4(2)(a)(i),(iv) .

**The Dicey Rule**

7  The general principle has been referred to on these appeals, by reference to the common law rule set out in *Dicey, Morris & Collins, Conflict of Laws* (14th edition, 2006), as "Dicey's Rule 36." This was only by way of shorthand, because the rules in the 1933 Act are not quite identical, and in any event has been purely for convenience, because the Rule has no standing beyond

the case law at common law which it seeks to re-state. What was Rule 36 now appears (incorporating some changes which are not material on this appeal) as Rule 43 in the new 15th edition, and I shall refer to it as "the Dicey Rule." So far as relevant, Rule 43 ( *Dicey, Morris and Collins, Conflict of Laws,* 15th ed, 2012, para 14R-054) states:

> "a court of a foreign country outside the United Kingdom has jurisdiction to give a judgment in personam capable of enforcement or recognition as against the person against whom it was given in the following cases:
>
> **First Case—**
>
> If the person against whom the judgment was given was, at the time the proceedings were instituted, present in the foreign country.
>
> **Second Case—**
>
> If the person against whom the judgment was given was claimant, or counterclaimed, in the proceedings in the foreign court.
>
> **Third Case—**
>
> If the person against whom the judgment

was given submitted to the jurisdiction of that court by voluntarily appearing in the proceedings.

**Fourth Case—**

If the person against whom the judgment was given had before the commencement of the proceedings agreed, in respect of the subject matter of the proceedings, to submit to the jurisdiction of that court or of the courts of that country."

8   The first edition of *Dicey* in 1896 stated (Rule 80) that the foreign court would have jurisdiction if "the defendant was resident [or present?]" in the foreign country "so as to have the benefit, and be under the protection, of the laws thereof." By the 6th edition in 1949 the formula was repeated by Professor Wortley (Rule 68) but without the doubt about presence as a basis of jurisdiction. In the 8th edition in 1958 Dr (later Professor) Clive Parry removed the phrase (then Rule 189) about the benefit and protection of the foreign

country's laws. The Rule, subsequently edited by Dr Morris and then by Professor Kahn-Freund, remained in that form until the decision in Adams v Cape Industries plc [1990] Ch 433 (CA), which established that presence in the foreign jurisdiction, as opposed to residence, was a sufficient basis for the recognition of foreign judgments. Then, edited by myself and later by Professor Briggs, the Rule took substantially its present form in the 12th edition in 1993.

9   The theoretical basis for the enforcement of foreign judgments at common law is that they are enforced on the basis of a principle that where a court of competent jurisdiction has adjudicated a certain sum to be due from one person to another, a legal obligation arises to pay that sum, on which an action of debt to enforce the judgment may be maintained: Williams v Jones (1845) 13 M & W 628 , 633 per Parke B; Godard v Gray (1870) LR 6 QB 139 , 147, per Blackburn J; Adams v Cape Industries plc [1990] Ch 433 , 513; Owens Bank Ltd v Bracco [1992] 2 AC 443 , 484, per Lord Bridge of Harwich. As Blackburn J said in Godard v Gray , this was based on the mode of pleading an action on a foreign judgment in debt, and not merely as evidence of the obligation to pay the underlying liability: LR 6 QB 139, 150. But this is a purely theoretical and historical basis for the enforcement of foreign judgments at common law. It does not apply to enforcement under statute, and makes no practical difference to the analysis, nor, in my judgment, to the issues on these appeals.

10   Consequently, if the judgments in issue on the appeals are regarded as judgments in personam within the Dicey Rule , then they will only be enforced in England at common law if the judgment debtors were present (or, if the 1933 Act applies, resident) in the foreign country when the proceedings were commenced, or if they submitted to its jurisdiction. It is common ground that the judgment debtors were not present or resident, respectively, in the United States or in Australia, although there is an issue as to whether the New Cap defendants submitted to the jurisdiction of the Australian court, which is dealt with in section VIII below.

**Insolvency proceedings and the international dimension**

11   There are some general remarks to be made. First, from as early as the mid-18th century the English courts have recognised the effect of foreign personal bankruptcies declared under the law of the domicile: Solomons v Ross (1764) 1 H Bl 131n , where Dutch merchants were declared bankrupt in Amsterdam, and the Dutch curator was held entitled to recover an English debt in priority to an English creditor of the merchants who had attached the debt after the bankruptcy: see Nadelmann, Conflict of Laws: International and Interstate (1972) , p 273; Blom- Cooper, Bankruptcy in Private International Law (1954) , pp 107–108.

12   In Galbraith v Grimshaw [1910] AC 508 Lord Dunedin said that there should be only one universal process of the distribution of a bankrupt's property and that, where such a process was pending elsewhere, the English courts should not allow steps to be taken in its jurisdiction which would interfere with that process (p 513):

> "Now so far as the general principle is concerned it is quite consistent with the comity of nations that it should be a rule of international law that if the court finds that there is already pending a process of universal distribution of a bankrupt's effects it should not allow steps to be taken in its territory which would interfere with that process of universal distribution."

13   Second, in the case of corporations the English courts have exercised a winding up jurisdiction which is wider than that which at common law they have accorded to foreign courts. The court exercises jurisdiction to wind up a foreign company if there is a sufficient connection between the company and England, there are persons who would benefit from the making of a winding up order, and there are persons interested in the distribution of assets of the company who are persons over whom the court can exercise jurisdiction: see Dicey , 15th ed, para 30R-036. But as regards foreign liquidations, the general rule is that

the English court recognises at common law only the authority of a liquidator appointed under the law of the place of incorporation ( Dicey , 15th ed, para 30R-100). That is in contrast to the modern approach in the primary international and regional instruments, the EC Insolvency Regulation on Insolvency Proceedings (Council Regulation (EC) No 1346/2000 ) ("the EC Insolvency Regulation") and the Model Law, which is that the jurisdiction with international competence is that of the country of the centre of main interests of the debtor (an expression not without its own difficulties). It is ultimately derived from the civil law concept of a trader's domicile, and was adopted in substance in the draft EEC Convention of 1980 as a definition of the debtor's centre of administration: see Report by M Lemontey on the draft EEC Bankruptcy Convention, Bulletin of the European Communities, Supp 2/82, p 58; American Law Institute, Transnational Insolvency: Global Principles for Co-operation in International Insolvency Cases (2012) , Principle 13, pp 83 et seq.

14   Third, it is not only in recent times that there have been large insolvency proceedings with significant cross-border implications. Even before then there were the Russian Bank cases in the 1930s (arising out of the nationalisation and dissolution of the banks by the Soviet Government) and the Barcelona Traction case in the 1940s and 1950s (see In re Barcelona Traction, Light and Power Co Ltd (second phase) (Belgium v Spain) [1970] ICJ Rep 69 ), but there is no doubt that today international co-operation in cross-border insolvencies has become a pressing need. It is only necessary to recall the bankruptcies or liquidations of Bank of Credit and Commerce International, Maxwell Communications, or Lehman Brothers, each with international businesses, assets in many countries, and potentially competing creditors in different countries with different laws. There is not only a need to balance all these interests but also to provide swift and effective remedies to combat the use of cross-border transfers of assets to evade and to defraud creditors.

15   Fourth, there is no international unanimity or significant harmonisation on the details of insolvency law, because to a large extent insolvency law reflects national public policy, for example as regards priorities or as regards the conditions for the application of avoidance provisions: "the process of collection of assets will include, for example, the use of powers

Rubin v Eurofinance SA, 2012 WL 4866953 (2012)

to set aside voidable dispositions, which may differ very considerably from those in the English statutory scheme": In re HIH Casualty and General Insurance Ltd [2008] UKHL 21, [2008] 1 WLR 852 , para 19, per Lord Hoffmann.

16  Fifth, there has been a trend, but only a trend, to what is called universalism, that is, the "administration of multinational insolvencies by a leading court applying a single bankruptcy law": Westbrook, "A Global Solution to Multinational Default" (2000) 98 Mich L Rev 2276, 2277. What has emerged is what is called by specialists "modified universalism."

17  The meaning of the expression "universalism" has undergone a change since the time it was first used in the 19th century, and it later came to be contrasted with the "doctrine of unity." In 1834 Story referred to the theory that assignments under bankrupt or insolvent laws were, and ought to be, of universal operation to transfer movable property, in whatever country it might be situate, and concluded that there was great wisdom in adopting the rule that an assignment in bankruptcy should operate as a complete and valid transfer of all his movable property abroad, as well as at home, and for a country to prefer an attaching domestic creditor to a foreign assignee or to foreign creditors could "hardly be deemed consistent with the general comity of nations … [T]he true rule is, to follow out the lead of the general principle that makes the law of the owner's domicil conclusive upon the disposition of his personal property," citing Solomons v Ross as supporting that doctrine: Story, Commentaries on the Conflict of Laws , 1st ed (1834), pp 340–341, para 406.

18  Professor Cheshire, in his first edition (Cheshire, Private International Law, 1935 , pp 375–376), said that although English law "neglects the doctrine of unity it recognizes the doctrine of universality." What he meant was that English law was committed to separate independent bankruptcies in countries where the assets were situate, rather than one bankruptcy in the country of the domicile (the doctrine of unity), but also accepted the title of the foreign trustee to English movables provided that no bankruptcy proceedings had begun within England (universality). He cited Solomons v Ross for this proposition:

"The English Courts … have consistently applied the doctrine of universality, according to which they hold that all *movable* property, no matter where it may be situated at the time of the assignment by the foreign law, passes to the trustee."

19  In In re HIH Casualty and General Insurance Ltd [2008] UKHL 21, [2008] 1 WLR 852 , para 30, Lord Hoffmann said:

"The primary rule of private international law which seems to me applicable to this case is the principle of (modified) universalism, which has been the golden thread running through English cross-border insolvency law since the 18th century. That principle requires that English courts should, so far as is consistent with justice and UK public policy, co-operate with the courts in the country of the principal liquidation to ensure that all the company's assets are distributed to its creditors under a single system of distribution."

and in Cambridge Gas Transportation Corporation v Official Committee of Unsecured Creditors of Navigator Holdings plc [2006] UKPC 26, [2007] 1 AC 508, para 16 he said, speaking for the Privy Council :

"The English common law has traditionally taken the view that fairness between creditors requires that, ideally, bankruptcy proceedings should have universal application. There should be a single bankruptcy in which all creditors are entitled and required to prove. No one should have an advantage because he happens to live in a

jurisdiction where more of the assets
or fewer of the creditors are situated
…"

20  The US Bankruptcy Court accepted in Re Maxwell
Communication Corp, 170 BR 800 (Bankr SDNY
1994) that the United States courts have adopted
modified universalism as the approach to international
insolvency:

"… the United States in ancillary
bankruptcy cases has embraced
an approach to international
insolvency which is a modified
form of universalism accepting the
central premise of universalism, that
is, that assets should be collected
and distributed on a worldwide
basis, but reserving to local courts
discretion to evaluate the fairness
of home country procedures and
to protect the interests of local
creditors."

**International co-operation and assistance**

21  Jurisdiction in international bankruptcy has been
the subject of multilateral international instruments
at least since the Montevideo Treaty on International
Commercial Law of 1889, Title X, although bilateral
treaties go back much further, and the subject
of international recognition and co-operation in
insolvency was the subject of early discussion by
the International Law Association (1879), the Institut
de droit international (1888–1912) and the Hague
Conference on Private International Law (1904):
Nadelmann, *op. cit* . pp 299 *et seq* .

22  In more modern times, the European Convention
on Certain International Aspects of Bankruptcy (the
Istanbul Convention) was concluded under the auspices
of the Council of Europe in 1990, but never came into

force. The European Community/Union initiative took
40 years to come to fruition. In 1960 the European
Community embarked on a project for a Bankruptcy
Convention, which resulted in a draft Convention in
1980, to which there was significant opposition. But the
project was renewed in 1989, and this led to the tabling
of a draft Convention in 1995, which provided that it
would only come into force when signed by all 15 of
the then member states. The United Kingdom, however,
alone of the states, did not sign the Convention (for
political reasons), and it never came into force. In 1999
the project was re-launched as a Council Regulation,
which resulted in the EC Insolvency Regulation in
2000 .

23  The United Nations Commission on International
Trade Law ("UNCITRAL") adopted a Model Law
on cross-border insolvency in 1997. The Model
Law was adopted following initiatives in the 1980s
by the International Bar Association and later by
INSOL International (the International Association
of Restructuring, Insolvency and Bankruptcy
Professionals). In 1993 UNCITRAL adopted a
resolution to investigate the feasibility of harmonised
rules of cross- border insolvencies. In 1994 an expert
committee was assembled consisting of members
of INSOL and representatives of the UNCITRAL
Secretariat, and following a series of reports and
drafts, UNCITRAL adopted the Model Law in May
1997. The Model Law provides for a wide range
of assistance to foreign courts and office-holders. It
has been implemented by 19 countries and territories,
including the United States and Great Britain (although
by some states only on the basis of reciprocity). It was
not enacted into law in Great Britain until 2006, by the
CBIR .

24  Apart from the EC Insolvency Regulation , none of
these instruments deals expressly with the enforcement
of judgments in insolvency proceedings. The question
whether the Model Law does so by implication will be
considered below in section IV.

25  Consequently, there are four main methods under
English law for assisting insolvency proceedings in
other jurisdictions, two of which are part of regionally
or internationally agreed schemes. First, section 426 of
the Insolvency Act 1986 provides a statutory power
to assist corporate as well as personal insolvency

Rubin v Eurofinance SA, 2012 WL 4866953 (2012)

proceedings in countries specified in the Act or designated for that purpose by the Secretary of State. All the countries to which it currently applies are common law countries or countries sharing a common legal tradition with England. They include Australia: the Co-operation of Insolvency Courts (Designation of Relevant Countries and Territories) Order 1986 (SI 1986/2123).

26    Second, the EC Insolvency Regulation applies to insolvency proceedings in respect of debtors with their centres of main interests (COMI) within the European Union (excluding Denmark). The EC Insolvency Regulation has no role in the present appeal because none of the debtors has its centre of main interests in the European Union.

27    Third, the CBIR came into force on 4 April 2006, implementing the Model Law. The CBIR supplement the common law, but do not supersede it. Article 7 of the Model Law provides: "Nothing in this Law limits the power of a court or British insolvency officeholder to provide additional assistance to a foreign representative under other laws of Great Britain".

28    Article 23 of the Model Law allows avoidance claims to be made by foreign representatives under the Insolvency Act 1986 , and the CBIR apply to preferences after they came into force on 4 April 2006. The UNCITRAL Guide to Enactment (to which resort may be had for the purposes of interpretation of the CBIR ) also emphasises that the Model Law enables enacting states to make available to foreign insolvency proceedings the type of relief which would be available in the case of a domestic insolvency ( UNCITRAL Legislative Guide on Insolvency Law (2005) , Annex III, Ch IV, p 311, para 20(b)):

> "The Model Law presents to enacting states the possibility of aligning the relief resulting from recognition of a foreign proceeding with the relief available in a comparable proceeding in the national law."

29    Fourth, at common law the court has power to recognise and grant assistance to foreign insolvency proceedings. The common law principle is that assistance may be given to foreign officeholders in insolvencies with an international element. The underlying principle has been stated in different ways: "recognition … carries with it the active assistance of the court": In re African Farms Ltd [1906] TS 373 , 377; "This court … will do its utmost to co-operate with the United States Bankruptcy Court and avoid any action which might disturb the orderly administration of [the company] in Texas under ch 11": Banque Indosuez SA v Ferromet Resources Inc [1993] BCLC 112 , 117.

30    In Credit Suisse Fides Trust v Cuoghi [1998] QB 818 , 827, Millett LJ said:

> "In other areas of law, such as cross-border insolvency, commercial necessity has encouraged national courts to provide assistance to each other without waiting for such co-operation to be sanctioned by international convention … It is becoming widely accepted that comity between the courts of different countries requires mutual respect for the territorial integrity of each other's jurisdiction, but that this should not inhibit a court in one jurisdiction from rendering whatever assistance it properly can to a court in another in respect of assets located or persons resident within the territory of the former."

31    The common law assistance cases have been concerned with such matters as the vesting of English assets in a foreign officeholder, or the staying of local proceedings, or orders for examination in support of the foreign proceedings, or orders for the remittal of assets to a foreign liquidation, and have involved cases in which the foreign court was a court of competent jurisdiction in the sense that the bankrupt was domiciled in the foreign country or, if a company, was incorporated there.

32   An early case of recognition was Solomons v Ross 1 H Bl 131n , where, as I have said, the bankruptcy was in Holland, and the bankrupts were Dutch merchants declared bankrupt in Amsterdam, and the Dutch curator was held entitled to recover an English debt: see also Bergerem v Marsh (1921) B&CR 195 (English member of Belgian firm submitted to Belgian bankruptcy proceedings: movable property in England vested in Belgian trustee).

33   One group of cases involved local proceedings which were stayed or orders which were discharged because of foreign insolvency proceedings. Thus in Banque Indosuez SA v Ferromet Resources Inc [1993] BCLC 112 an English injunction against a Texas corporation in Chapter 11 proceedings was discharged; cf In re African Farms Ltd [1906] TS 373 (execution in Transvaal by creditor in proceedings against English company in liquidation in England stayed by Transvaal court), applied in Turners & Growers Exporters Ltd v The Ship Cornelis Verolme [1997] 2 NZLR 110 (Belgian shipowner in Belgian bankruptcy: ship released from arrest); Modern Terminals (Berth 5) Ltd v States Steamship Co [1979] HKLR 512 (stay in Hong Kong of execution against Nevada corporation in Chapter 11 proceedings in United States federal court in California), followed in CCIC Finance Ltd v Guangdong International Trust & Investment Corpn [2005] 2 HKC 589 (stay of Hong Kong proceedings against Chinese state owned enterprise in Mainland insolvency). Cases of judicial assistance in the traditional sense include In re Impex Services Worldwide Ltd [2004] BPIR 564 , where a Manx order for examination and production of documents was made in aid of the provisional liquidation in England of an English company.

34   Cases involving remittal of assets from England to a foreign office-holder include In re Bank of Credit and Commerce International SA (No 10) [1997] Ch 213 (Luxembourg liquidation of Luxembourg company); and In re HIH Casualty and General Insurance Ltd [2008] UKHL 21, [2008] 1 WLR 852 (the view of Lord Hoffmann and Lord Walker) (Australian liquidation of Australian insurance company); and In re SwissAir Schweizerische Luftverkehr-Aktiengesellschaft [2009] EWHC 2099 (Ch), [2010] BCC 667 (Swiss liquidation of Swiss company).

**The Cambridge Gas and HIH decisions**

35   The opinion of Lord Hoffmann, speaking for the Privy Council, in Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc [2006] UKPC 26, [2007] 1 AC 508 (" Cambridge Gas ") and his speech in the House of Lords in In re HIH Casualty and General Insurance Ltd [2008] UKHL 21, [2008] 1 WLR 852 (" HIH ") have played such a major role in the decisions of the Court of Appeal and in the arguments of the parties on these appeals that it is appropriate to put them in context at this point.

**Cambridge Gas**

36   The broad facts of Cambridge Gas were these. In 1997 a shipping business was initiated by a Swiss businessman, Mr Giovanni Mahler. The investors borrowed $300m on the New York bond market and the business bought five gas transport vessels. The venture was a failure, and ended with a Chapter 11 proceeding in the US Bankruptcy Court in New York. The question for the Privy Council on appeal from the Isle of Man was whether an order of the New York court was entitled to implementation in the Isle of Man.

37   The corporate structure of the business was that the investors owned, directly or indirectly, a Bahamian company called Vela Energy Holdings Ltd ("Vela"). Vela owned (through an intermediate Bahamian holding company) Cambridge Gas, a Cayman Islands company.

38   Cambridge Gas owned directly or indirectly about 70% of the shares of Navigator Holdings plc ("Navigator"), an Isle of Man company. Navigator owned all the shares of an Isle of Man company which in turn owned companies which each owned one ship.

39   In 2003 Navigator petitioned the US Bankruptcy Court for relief under Chapter 11 of the US Bankruptcy Code , which allows insolvent companies, under supervision of the court and under cover of a moratorium, to negotiate a plan of reorganisation with their creditors. The petition was initiated by the investor interests, who proposed a plan to sell the

ships nominally by auction but in fact to the previous investors, but the bondholders did not accept this and proposed their own plan under which the assets of Navigator would be vested in the creditors and the equity interests of the previous investors would be extinguished. The judge rejected the investors' plan and approved the creditors' plan.

40    The mechanism which the plan used to vest the assets in the creditors was to vest the shares in Navigator in their representatives, ie, the creditors' committee. That would enable them to control the shipping companies and implement the plan. The plan provided that upon entry of the confirmation order title to all the common stock of Navigator would vest in the creditors' committee to enable it to implement the plan. The order of the New York court confirming the plan recorded the intention of the court to send a letter of request to the Manx court asking for assistance in giving effect to "the plan and confirmation order" and such a letter was sent. The committee of creditors then petitioned the Manx court for an order vesting the shares in their representatives.

41    At this point it is necessary to emphasise two features of the case. The first feature is that Navigator was an Isle of Man company and 70% of its common stock was owned directly or indirectly by Cambridge Gas. Under the normal principles of the conflict of laws the shares would have been situate in the Isle of Man: *Dicey* , 15th ed, para 22-045. That is why Lord Hoffmann said, at para 6, that the New York court was aware that the order vesting title to the common stock of Navigator in the creditors' committee could not automatically have effect under the law of the Isle of Man; and also why he accepted (paras 12-13) that if the judgment were a judgment in rem it could not affect title to shares in the Isle of Man.

42    The second feature which it is necessary to emphasise is that Cambridge Gas was a Cayman Islands company which (as held by the Manx courts) had not submitted to the jurisdiction of the US Bankruptcy Court. Lord Hoffmann said, at para 8, that the position that Cambridge Gas had not submitted to the jurisdiction of the US Bankruptcy Court bore little relation to economic reality since the New York proceedings had been conducted on the basis that the contest was between rival plans put forward by the shareholders and

the creditors; Vela, the parent company of Cambridge Gas, participated in the Chapter 11 proceedings; and they had been instituted by Navigator. Consequently the claim by Cambridge Gas that it had not submitted was highly technical, but there was no appeal from the decisions of the Manx courts that it had not submitted. But Lord Hoffmann also accepted that if the order of the US Bankruptcy Court were to be regarded as a judgment in personam it would not be entitled to recognition or enforcement in the Isle of Man because "the New York court had no personal jurisdiction over Cambridge [Gas]": para 10.

43    Nevertheless the Privy Council held that the plan could be carried into effect in the Isle of Man. The reasoning was as follows: first, if the judgment had to be classified as in personam or in rem the appeal would have to be allowed, but bankruptcy proceedings did not fall into either category:

> "[13]    …    Judgments in rem and in personam are judicial determinations of the existence of rights: in the one case, rights over property and in the other, rights against a person. When a judgment in rem or in personam is recognised by a foreign court, it is accepted as establishing the right which it purports to have determined, without further inquiry into the grounds upon which it did so. The judgment itself is treated as the source of the right.

> [14]    The purpose of bankruptcy proceedings, on the other hand, is not to determine or establish the existence of rights, but to provide a mechanism of collective execution against the property of the debtor by creditors whose rights are admitted or established. …

> [15]    …    [B]ankruptcy, whether personal or corporate, is a collective proceeding to enforce rights and

not to establish them. Of course, as Brightman LJ pointed out in In re Lines Bros Ltd [1983] Ch 1 , 20, it may incidentally be necessary in the course of bankruptcy proceedings to establish rights which are challenged: proofs of debt may be rejected; or there may be a dispute over whether or not a particular item of property belonged to the debtor and is available for distribution. There are procedures by which these questions may be tried summarily within the bankruptcy proceedings or directed to be determined by ordinary action. But these again are incidental procedural matters and not central to the purpose of the proceedings."

44    Second, the principle of universality underlay the common law principles of judicial assistance in international insolvency, and those principles were sufficient to confer jurisdiction on the Manx court to assist, by doing whatever it could have done in the case of a domestic insolvency: paras 21-22. Third, exactly the same result could have been achieved by a scheme under the Isle of Man Companies Act 1931 . Fourth, it was no objection to implementation of the plan in the Isle of Man that the shares in Navigator belonged to a person (Cambridge Gas) which was not a party to the bankruptcy proceedings for these reasons, at para 26:

> "… [A] share is the measure of the shareholder's interest in the company: a bundle of rights against the company and the other shareholders. As against the outside world, that bundle of rights is an item of property a chose in action. But as between the shareholder and the company itself, the shareholder's rights may be varied or extinguished by the mechanisms provided in the articles of association or the Companies Act. One of those

mechanisms is the scheme of arrangement under section 152 [of the Isle of Man Companies Act 1931] . As a shareholder Cambridge is bound by the transactions into which the company has entered, including a plan under Chapter 11 or a scheme under section 152."

45    At this point it is necessary to point out that the opinion in Cambridge Gas does not articulate any reason for holding that, in the eyes of the Manx court, the US Bankruptcy Court had international jurisdiction in either of two relevant senses.

46    The first sense is the jurisdiction of the US Bankruptcy Court in relation to the Chapter 11 proceedings themselves. The entity which was in Chapter 11 was Navigator. The English courts exercise a wider jurisdiction in bankruptcy and (especially) in winding up than they recognise in foreign courts. At common law, the foreign court which is recognised as having jurisdiction in personal bankruptcy is the court of the bankrupt's domicile or the court to which the bankrupt submitted ( Dicey , 15th ed, para 31R-059) and the foreign court with corresponding jurisdiction over corporations is the court of the place of incorporation ( Dicey , 15th ed, para 30R-100). Under United States law the US Bankruptcy Court has jurisdiction over a "debtor", and such a debtor must reside or have a domicile or place of business, or property in the United States. From the standpoint of English law, the US Bankruptcy Court had international jurisdiction because although Navigator was not incorporated in the United States, it had submitted to the jurisdiction by initiating the proceedings.

47    The second sense in which international jurisdiction is relevant is the jurisdiction over the third party, Cambridge Gas, and its shares in Navigator. Cambridge Gas was not incorporated in the United States, and it was held by the Isle of Man courts that it had not submitted to the jurisdiction of the US Bankruptcy Court (and this was, as I have said, accepted with evident reluctance by the Privy Council).

The property which was the subject of the order of the US Bankruptcy Court was shares in an Isle of Man company. Consequently the property dealt with by the US Bankruptcy Court was situate, by Manx rules of the conflict of laws, in the Isle of Man, and the shareholder relationship was governed by Manx law.

48 Cambridge Gas was the subject of brief comment a few months later by the Privy Council in Pattni v Ali [2006] UKPC 51, [2007] 2 AC 85 . The decision in that case was simply that a Kenyan judgment deciding that A was bound to sell shares in a Manx company to B was entitled to recognition in the Isle of Man. It resulted in an order in personam against a person subject to the jurisdiction of the Kenyan court, and was not a judgment in rem against property in the Isle of Man and outside the jurisdiction of the Kenyan court, because the fact that a judicial determination determines or relates to the existence of property rights between parties does not in itself mean that it is in rem. Lord Mance, speaking for the Board, said, at para 23:

> "In Cambridge Gas … the Board touched on the concepts of in personam and in rem proceedings, but held that the bankruptcy order with which it was concerned fell into neither category. Its purpose was simply to establish a mechanism of collective execution against the property of the debtor by creditors whose rights were admitted or established."

**HIH**

49 The decision in HIH does not deal with foreign judgments. HIH concerned four Australian insurance companies which were being wound up in Australia and in respect of which provisional liquidators had been appointed in England. The question was whether the English court had power to direct remission of assets collected in England to Australia, notwithstanding that there were differences between the English and Australian statutory regimes for distribution which

meant that some creditors would benefit from remission whilst some creditors would be worse off. The House of Lords unanimously directed that remission should take place, but the reasons differed.

50 The reasoning of the majority (Lord Scott of Foscote and Lord Neuberger of Abbotsbury, with Lord Phillips of Worth Matravers agreeing)) was based exclusively on the statutory power to assist foreign insolvency proceedings under section 426 of the Insolvency Act 1986 , but Lord Hoffmann (with whom Lord Walker agreed) also considered that such a power existed at common law.

51 Lord Hoffmann characterised the principle of universality as a principle of English private international law that, where possible, there should be a unitary insolvency proceeding in the courts of the insolvent's domicile which receives worldwide recognition and which should apply universally to all the bankrupt's assets, at para 6:

> "Despite the absence of statutory provision, some degree of international co-operation in corporate insolvency had been achieved by judicial practice. This was based upon what English judges have for many years regarded as a general principle of private international law, namely that bankruptcy (whether personal or corporate) should be unitary and universal. There should be a unitary bankruptcy proceeding in the court of the bankrupt's domicile which receives worldwide recognition and it should apply universally to all the bankrupt's assets."

52 Other parts of Lord Hoffmann's speech have already been quoted above, and it is only necessary for present purposes to recall that he said that (a) "the process of collection of assets will include, for example, the use of powers to set aside voidable dispositions, which may differ very considerably from those in the English

statutory scheme" (at para 19) and (b) that the purpose of the principle of universality was to ensure that the debtor's assets were distributed under one scheme of distribution, and that the principle required that English courts should co-operate with the courts in the country of the principal liquidation to ensure that all the company's assets are distributed to its creditors under a single system of distribution: para 30.

### Subsequent treatment of Cambridge Gas

53   The decision in Cambridge Gas was not applied by the Supreme Court of Ireland in In re Flightlease (Ireland) Ltd [2012] IESC 12 (to which I shall revert) and has been subject to academic criticism. Professor Briggs has expressed the view ((2006) 77 BYIL 575, 581) that

> "the decision in [ Cambridge Gas ] is wrong, for it requires a Manx court to give effect to a confiscation order made by a foreign court of property belonging to a person who was not subject to the personal jurisdiction of the foreign court. That a Manx court could have done so itself is nothing to the point."

I shall return to the question whether it was correctly decided.

### The cases before the court and the issues

### Rubin

54   Eurofinance SA is a company incorporated in the British Virgin Islands. It was established by Adrian Roman, the second appellant on the Rubin appeal. Eurofinance SA settled "The Consumers Trust" ("TCT") under a deed of trust made in 2002 under English law, with trustees resident in England, of whom two were accountants and two were solicitors.

55   TCT was established to carry on a sales promotion scheme in the USA and Canada. The class of beneficiaries was made up of persons who had

successfully participated in the scheme by claiming validly in certain sales promotions owned and operated by Eurofinance SA. The trustees were to hold the capital and income of TCT for the beneficiaries and subject thereto for Eurofinance SA as beneficiary in default. The promotion, known as the Cashable Voucher Programme, was entered into with participating merchants in the United States and Canada who, when they sold products or services to their customers, offered those customers a cashable voucher comprising a rebate of up to 100% of the purchase price for the product or service. Under the terms of the voucher the rebate was to be paid to customers in three years' time provided that certain conditions were followed by the customer involving the completion by the customer of both memory and comprehension tests.

56   The participating merchants paid TCT 15% of the face value of each cashable voucher issued by the merchant during a week. TCT retained 40% of the payments received (ie 6% of the face value of each cashable voucher). About one half of the 60% balance received from merchants was paid to Eurofinance SA (and so effectively to Adrian Roman) and the remainder was paid to others involved in the operation of the programme, such as solicitors, accountants and US lawyers. From about 2002 Adrian Roman's sons, Nicholas Roman and Justin Roman, each began to receive about 2%. The trustees maintained bank accounts in the USA and Canada where the payments they had received from merchants were kept.

57   Since the trustees only retained 6% of the face value of the issued vouchers, the success of the scheme necessarily involved the consumers either forgetting to redeem the vouchers or being unsuccessful in navigating the process required to be followed in order to obtain payment. When the scheme folded in 2005 the trustees held nearly US$10m in bank accounts in the United States and Canada.

58   By about 2005 TCT's business ceased after the Attorney General of Missouri brought proceedings under Missouri's consumer protection legislation which resulted in a settlement involving a payment by the trustees of US$1,650,000 and US$200,000 in costs.

59   When it became clear that further proceedings were likely to be brought by Attorneys General in

other states, that the number of consumer claims would increase, and that TCT would not have sufficient funds to meet all the valid claims of its beneficiaries, in November 2005 Adrian Roman caused Eurofinance to apply for the appointment by the High Court of the respondents on the Rubin appeal, David Rubin and Henry Lan, as receivers of TCT for the purposes of causing TCT then to obtain protection under Chapter 11 of Title 11 of the United States Code ("Chapter 11"). The English court was told that Chapter 11 reorganisation proceedings would result in an automatic stay of proceedings against TCT, would enable the receivers to reject unprofitable or burdensome executory contracts, and might result in the recovery as preferential payments of sums paid to consumers and to the Missouri Attorney General.

60   In November 2005 the respondents were appointed as receivers by order of Lewison J, and in the following month, the respondents and the trustees then caused TCT to present a voluntary petition to the US Bankruptcy Court for relief under Chapter 11. TCT was placed into Chapter 11 proceedings in New York as virtually all of its 60,000 creditors were located in the United States or Canada as were its assets. As a matter of United States bankruptcy law, TCT could be the subject matter of a petition for relief under Chapter 11 as a debtor. This is because a trust such as TCT is treated under Chapter 11 as a separate legal entity under the classification of a "business trust".

61   A joint plan of liquidation for TCT was prepared, and in September 2007 Lewison J ordered that the respondents (as receivers) be at liberty to seek approval of the plan from the US Bankruptcy Court. Under the terms of the plan the respondents were appointed legal representatives of TCT and given the power to commence, prosecute and resolve all causes of action against potential defendants including the appellants. The US Bankruptcy Court approved the plan in October 2007, and appointed the respondents as "foreign representatives" of the debtor to make application to the Chancery Division in London for recognition of the Chapter 11 proceedings as a foreign main proceeding under the CBIR ; and to seek aid, assistance and co-operation from the High Court in connection with the Chapter 11 proceedings, and, in particular to seek the High Court's assistance and co-operation in the prosecution of litigation which might

be commenced in the US Bankruptcy Court including "the enforcement of judgments of this court that may be obtained against persons and entities residing or owning property in Great Britain …"

62   In December 2007 proceedings were commenced in the US Bankruptcy Court by the issue of a complaint against a number of defendants including the appellants. These claims fall within the category of "adversary proceedings" under the US bankruptcy legislation, and I will use this term to refer to them. The adversary proceedings comprised a number of claims including causes of action arising under the US Bankruptcy Code , which related to funds received by TCT from merchants which were paid out to the defendants (including the appellants), or to amounts transferred to the defendants within one year prior to the commencement of the TCT bankruptcy case including the appellants.

63   The defendants were the appellants and other parties involved with the programme. The appellants were served personally with the complaint commencing the adversary proceedings but did not defend, or participate, in the adversary proceedings, although it appears from a judgment of the US Bankruptcy Court that Eurofinance SA had filed a notice of appearance in the main Chapter 11 proceedings (Order of 22 July 2008, paras 42-43).

64   On 22 July 2008 default and summary judgment was entered against the appellants in the adversary proceedings by the US Bankruptcy Court. The US Bankruptcy Court entered a judgment against the appellants on the ten counts of the complaint.

65   In November 2008 the respondents applied as foreign representatives to the Chancery Division for, inter alia, (a) an order that the Chapter 11 proceedings be recognised as a "foreign main proceeding" (b) an order that the respondents be recognised as "foreign representatives" within the meaning of article 2(j) of the Model Law in relation to those proceedings; and (c) an order that the US Bankruptcy Court's judgment be enforced as a judgment of the English court in accordance with CPR Pts 70 and 73 .

66   Nicholas Strauss QC, sitting as a deputy judge of the Chancery Division, recognised the Chapter

11 proceedings (including the adversary proceedings) as foreign main proceedings, and the respondents as foreign representatives, but refused to enforce the judgments in the adversary proceedings because (a) at common law the English court will not enforce a judgment in personam contrary to the normal jurisdictional rules for foreign judgments; and (b) there was nothing in CBIR, articles 21(e) (realisation of assets) and 25 (judicial co-operation), which justified the enforcement of judgments in insolvency proceedings.

67 At first instance the respondents sought to enforce the entirety of the US Bankruptcy Court's judgment, but before the Court of Appeal they sought an order for the enforcement of those parts of the judgment which were based on state or federal avoidance laws, including fraudulent conveyance under State Fraudulent Conveyance Laws, and under federal law, namely fraudulent transfers under section 548(a) of 11 USC ; liability of transferees of avoided transfers under section 550; fraudulent transfers under section 548(b) and liability of transferees of avoided transfers under section 550.

68 The Court of Appeal (Ward and Wilson LJJ and Henderson J) allowed an appeal, and held that the judgment was enforceable: [2010] EWCA Civ 895, [2011] Ch 133.

**New Cap**

69 In the New Cap appeal the appellants are members of Lloyd's Syndicate Number 991 ("the Syndicate") for the 1997 and 1998 years of account. The respondents are a reinsurance company ("New Cap") and its liquidator, a partner in Ernst & Young in Sydney.

70 New Cap is an Australian company, which was licensed as an insurance company in Australia under the Australian Corporations Act 2001 (Cth) ("the Australian Act"). New Cap did not conduct insurance business in any country other than Australia, and the majority of New Cap's business was generated through reinsurance brokers conducting business in Australia and the balance was generated from overseas insurance brokers.

71 New Cap reinsured the Syndicate in relation to losses occurring on risks attaching during the 1997 and 1998 years of account under reinsurance contracts which were subject to English law, and contained London arbitration clauses and also (oddly) English jurisdiction clauses. The reinsurance contracts were placed with New Cap by the Syndicate's Australian broker, which was the sub-broker for the Syndicate's London broker.

72 Each reinsurance contract contained a commutation clause. The Syndicate and New Cap entered into a commutation agreement to commute the reinsurances with effect from 11 December 1998. Under the commutation agreement, New Cap agreed to make a lump sum payment to the Syndicate by 31 December 1998 in consideration for its release from liability under the reinsurance contracts. The payments were calculated on the basis of a 7.5% discount and a deduction from premium. New Cap made payment pursuant to the commutation agreements in two instalments of US$2,000,000 and US$3,980,600 in January 1999. The commutation payments were made from a bank account held by New Cap at the Sydney branch of the Commonwealth Bank of Australia to a bank account in London.

73 The second respondent was appointed the administrator of New Cap by a resolution of its directors in April 1999. In September 1999 the creditors of New Cap resolved that New Cap be wound up and the second respondent ("the liquidator") was appointed its liquidator. Under the Australian legislation, the winding up is deemed to have commenced on the day on which the administration began.

74 In April 2002 the liquidator caused proceedings to be commenced against the Syndicate in the Supreme Court of New South Wales alleging that because New Cap was insolvent when the commutation payments were made in January 1999, and because those payments were made within the period of six months ending on the date when the administrator was appointed, they constituted unfair preferences and were thus "voidable transactions" under Part 5.7B of the Australian Act .

75 The Syndicate (which does not accept that the payments were preferences) refused to accept service of the Australian proceedings. The liquidator obtained leave from the Australian court to serve the Australian

proceedings on the Syndicate's English solicitors in London. The Syndicate did not enter an appearance to the proceedings, but corresponded with the liquidator's solicitors, including commenting on an Independent Expert's Report to be used by the respondents as evidence of New Cap's insolvency in all of the avoidance proceedings including the proceedings against the Syndicate.

76   The Australian court (White J in a judgment in September 2008, and Barrett J in a judgment in July 2009) recognised that there had been no submission by the Syndicate to the jurisdiction of the Australian court in that it did not enter an appearance, but White J held that the Australian court had jurisdiction over the Syndicate because a cause of action available under the Australian Act for the recovery of a preferential payment to an overseas party made when the company is insolvent was a cause of action which arose in New South Wales for the purposes of the New South Wales provisions for service out of the jurisdiction.

77   Barrett J gave a reasoned judgment in July 2009 holding the Syndicate liable. After the respondents had been given leave to re-open their case so that the orders made by the Australian court would more accurately reflect the differences between those appellants who were members of the Syndicate for the 1997 year of account and those appellants who were members for the 1998 year of account, the Australian court entered final judgment against the Syndicate in its absence on 11 September 2009. The Australian judgment declared that the commutation payments were voidable transactions within the meaning of part 5.7B of the Australian Act and ordered the Syndicate to repay the amount of the commutation payments to the liquidator together with interest.

78   On the liquidator's application the Australian court issued, in October 2009, a letter of request to the High Court in England and Wales requesting that the court "act in aid of and assist" the Australian court and exercise jurisdiction under section 426 of the Insolvency Act 1986 by: (1) ordering the Syndicate to pay the sums specified in the Australian judgment; alternatively (2) allowing the liquidator to commence fresh proceedings under the Australian Act in the English Court; (3) granting such further and other relief as the High Court may consider just; and (4) making such further or other

orders as may, in the opinion of the High Court, be necessary or appropriate to give effect to the foregoing orders.

79   On 30 July 2010, the Court of Appeal handed down judgment in Rubin . As a result, the respondents' alternative application for permission to commence fresh proceedings against the Syndicate under the Australian Act in England pursuant to section 426 of the Insolvency Act 1986 was adjourned generally, and the respondents were granted permission to seek relief at common law as an alternative to relief under section 426 .

80   In New Cap Lewison J and the Court of Appeal were bound by the decision of the Court of Appeal in Rubin . Lewison J held: (a) the judgment was not enforceable under the Foreign Judgments (Reciprocal Enforcement) Act 1933 because, although it applied to Australian judgments, it did not apply to orders made in insolvency proceedings; but (b) the judgment was enforceable under the assistance provision of section 426 of the Insolvency Act 1986 and also at common law: [2011] EWHC 677 (Ch).

81   The Court of Appeal (Mummery, Lloyd and Macfarlane LJJ) affirmed Lewison J's judgment on these grounds: (a) the 1933 Act applied, and registration would not be set aside for lack of jurisdiction in the foreign court, because of the Rubin decision; (b) section 426 could also be used and was not excluded by section 6 of the 1933 Act; (c) but section 6 would preclude an action at common law; (d) it was not necessary to decide whether the court's power of assistance at common law was exercisable where the statutory power was available: [2011] EWCA Civ 971, [2012] 2 WLR 1095.

### Picard v Vizcaya Partners Ltd

82   This court gave permission for intervention by a written submission on behalf of Mr Irving Picard ("the trustee"), the trustee for the liquidation in the United States under the Securities Investor Protection Act of 1970 ("SIPA") of Bernard L Madoff Investment Securities LLC ("Madoff"), which was Bernard Madoff's broking company. The trustee is seeking to enforce at common law in Gibraltar judgments of the US Bankruptcy Court against

Vizcaya Partners Ltd ("Vizcaya"), a BVI company, for $180m, and against Asphalia Fund Ltd ("Asphalia"), a Cayman Islands company, for $67m, representing alleged preferential payments. He is also seeking to enforce a US Bankruptcy Court default judgment in excess of $1 billion in the Cayman Islands in Picard v Harley International (Cayman) Ltd . The Gibraltar and Cayman Islands proceedings have been adjourned to await the outcome of the present appeals.

83   In Picard v Vizcaya Partners Ltd proceedings have been brought in Gibraltar to enforce the default judgments against Vizcaya and Asphalia because $73m is held there on behalf of Vizcaya which the trustee maintains is available to satisfy the judgments. Vizcaya and Asphalia have also, with the permission of the court, intervened by written submission.

84   There is no agreed statement of facts relating to this aspect of the case, and nothing which is said here about the facts should be taken as representing or reflecting any finding. According to Vizcaya and Asphalia the position is as follows. Between 2002 and 2007, a bank in Europe, acting as a custodian trustee for Vizcaya, sent $327m to Madoff for investment in securities. Unknown to the bank, or to Vizcaya, or its shareholder Asphalia, Madoff had been engaged in a Ponzi scheme for some 30 years, and their money was never invested in securities. In 2008, at the time of the credit crunch and the banking crisis, the custodian trustee withdrew $180m (leaving $147m with Madoff) and $67m of the $180m was paid to Asphalia.

85   In late 2008, the Madoff fraud came to light, and the trustee was appointed. The trustee targeted investors who had withdrawn investments from Madoff in the two years before its collapse in December 2008 as a source for recovery of "customer property" for the benefit of other investors who had not withdrawn their investments. The trustee commenced adversary proceedings in the US Bankruptcy Court alleging preference and fraudulent conveyance against Vizcaya and Asphalia under SIPA and under the Bankruptcy Code , the effect of which, they say, is that (a) as the trustee argues, a person who, on the basis that he has received "customer money" has been required to repay a preference, does not necessarily become a "customer" and thereby entitled to share with other customers in the bankruptcy; and (b) the trustee may avoid a payment

made by the bankrupt to a creditor 90 days before the commencement of the bankruptcy, irrespective of the intention with which the payment is made or received.

86   The trustee obtained judgments in default, and Vizcaya and Asphalia say that they took no part in the New York proceedings because they had no connection with New York, and in particular (a) Asphalia was not a customer of Madoff but a shareholder of Vizcaya; (b) arguably Vizcaya was not a customer since it had appointed the bank to act as custodian trustee and it was the bank which entered into contracts with Madoff.

## The issues

87   The principal issue on these appeals is whether the rules at common law or under the 1933 Act regulating those foreign courts which are to be regarded as being competent for the purposes of enforcement of judgments in avoidance proceedings in insolvency, and, if not, what rules do apply (section V below). The other issues are whether, in the Rubin appeal, enforcement may be effected through the assistance provisions of the Cross-Border Insolvency Regulations 2006 (section VI) or, in the New Cap appeal, section 426 of the Insolvency Act 1986 (section VII); whether the judgments are enforceable as a result of the submission by the judgment debtors to the jurisdiction of the foreign courts (section VIII); and, in the New Cap appeal, if the judgment is enforceable, whether enforcement is at common law or under the 1933 Act (section IX).

## The first issue: recognition and enforcement of foreign judgments in insolvency proceedings

### Reasoning of the Court of Appeal in Rubin and the issue on the appeal

88   The Court of Appeal in the Rubin appeal decided that a foreign insolvency judgment could be enforced in England and Wales at common law against a defendant not subject to the jurisdiction of the foreign court under the traditional rule as formulated in the Dicey Rule .

89   As I have already said, on the Rubin appeal in the Court of Appeal the receivers sought only to enforce those parts of the judgment which in effect related to

the avoidance causes of action. The Court of Appeal held that the judgment (as narrowed) was enforceable at common law. The reasoning was as follows: (a) the judgment was final and conclusive, and for definite sums of money, and on the face of the orders was a judgment in personam; (b) it was common ground that the judgment debtors were not resident (this was a slip for "present" since the action was at common law and not under the 1933 Act) when the proceedings were instituted, and did not submit to the jurisdiction, and so at first blush had an impregnable defence; (c) Cambridge Gas decided that the bankruptcy order with which it was concerned was neither in personam nor in rem, and its purpose was simply to establish a mechanism of collective execution against the property of the debtor by creditors whose rights were admitted or established: Pattni v Ali [2006] UKPC 51, [2007] 2 AC 85 , para 23; (d) bankruptcy was a collective proceeding to enforce rights and not to establish them: Cambridge Gas [2006] UKPC 26, [2007] 1 AC 508 , para 15; (e) the issue was whether avoidance proceedings which could only be brought by the representative of the bankrupt were to be characterised as part of the bankruptcy proceedings, ie part of the collective proceeding to enforce rights and not to establish them; (f) the adversary proceedings were part and parcel of the Chapter 11 proceedings; (g) the ordinary rules for enforcing foreign judgments in personam did not apply to bankruptcy proceedings; (h) avoidance mechanisms were integral to and central to the collective nature of bankruptcy and were not merely incidental procedural matters; (i) the process of collection of assets will include the use of powers to set aside voidable dispositions, which may differ very considerably from those in the English statutory scheme: HIH [2008] UKHL 21, [2008] 1 WLR 852 , para 19; (j) the judgment of the US Bankruptcy Court was a judgment in, and for the purposes of, the collective enforcement regime of the insolvency proceedings, and was governed by the sui generis private international law rules relating to insolvency; (k) that was a desirable development of the common law founded on the principles of modified universalism, and did not require the court to enforce anything that it could not do, mutatis mutandis, in a domestic context; (l) there was a principle of private international law that bankruptcy should be unitary and universal, and there should be a unitary insolvency proceeding in the court of the bankrupt's domicile which receives worldwide recognition and should apply

universally to all the bankrupt's assets; (m) there was a further principle that recognition carried with it the active assistance of the court which included assistance by doing whatever the English court could do in the case of a domestic insolvency; (n) there was no unfairness to the appellants in upholding the judgment because they were fully aware of the proceedings, and after taking advice chose not to participate: [2011] Ch 133, paras 38, 41, 43, 45, 48, 50, 61–62, 64. It was unnecessary to decide whether the judgment was enforceable under the CBIR : para 63.

90  In short, Ward LJ accepted that the judgment was an in personam judgment, but he decided that the Dicey Rule did not apply to foreign judgments in avoidance proceedings because they were central to the collective enforcement regime in insolvency and were governed by special rules.

91  The essential questions on this aspect of the appeals are these. Is the judgment in each case to be regarded as a judgment in personam within the scope of the traditional rules embodied in the Dicey Rule , or is it to be characterised as an insolvency order which is part of the bankruptcy proceedings, ie part of the collective proceeding to enforce rights and not to establish them? Is that a distinction which has a role to play? Is there a distinction between claims which are central to the purpose of the proceedings and claims which are incidental procedural matters? As a matter of policy, should the court, in the interests of universality of insolvency proceedings, devise a rule for the recognition and enforcement of judgments in foreign insolvency proceedings which is more expansive, and more favourable to liquidators, trustees in bankruptcy, receivers and other officeholders, than the traditional common law rule embodied in the Dicey Rule , or should it be left to legislation preceded by any necessary consultation?

92   Ward LJ's conclusion derives from a careful synthesis of dicta in Lord Hoffmann's brilliantly expressed opinion in Cambridge Gas and his equally brilliant speech in HIH , each of which has on these appeals been subjected to an exceptionally detailed analysis. For reasons which will be developed, I do not agree with the conclusions which Ward LJ draws.

93  But I begin with two matters on which I accept the respondents' analysis. The first is that avoidance proceedings have characteristics which distinguish them from ordinary claims such as claims in contract or tort. The second is that, if it were necessary to draw a distinction between insolvency orders and other orders, it would not be difficult to formulate criteria for the distinction, along similar lines to that drawn by the European Court in relation to the Brussels Convention , the Brussels I Regulation ( Council Regulation (EC) 44/2001 ) and the EC Insolvency Regulation .

**Nature of avoidance proceedings**

94  In order to achieve a proper and fair distribution of assets between creditors, it will often be necessary to adjust prior transactions and to recover previous dispositions of property so as to constitute the estate which is available for distribution. The principle of equality among creditors which underlies the pari passu principle may require the adjustment of concluded transactions which but for the winding up of the company would have remained binding on the company, and the return to the company of payments made or property transferred under the transactions or the reversal of their effect. Systems of insolvency law use avoidance proceedings as mechanisms for adjusting prior transactions by the debtor and for recovering property disposed of by the debtor prior to the insolvency. Thus under the Insolvency Act 1986 an administrator, or liquidator, or trustee in bankruptcy may, where there has been a transaction at an undervalue, or amounting to an unlawful preference, apply for an order restoring the position to what it would have been had the transaction not taken place: sections 238 et seq and 339 et seq . Other systems of law have similar mechanisms, but they will differ in matters such as the period during which such transactions are at risk of reversal and the role of good faith of the parties to the transaction.

95  The underlying policy is to protect the general body of creditors against a diminution of the assets by a transaction which confers an unfair or improper advantage on the other party, and it is therefore an essential aspect of the process of liquidation that antecedent transactions whose consequences have been detrimental to the collective interest of the creditors should be amenable to adjustment or avoidance:

Fletcher, Law of Insolvency , 4th ed (2009), para 26-002; Goode, Principles of Corporate Insolvency Law , 4th ed (2011), para 13-03.

96    Thus the UNCITRAL Legislative Guide on Insolvency Law (2005) says:

> "150. Many insolvency laws include provisions that apply retroactively from a particular date (such as the date of application for, or commencement of, insolvency proceedings) for a specified period of time (often referred to as the 'suspect' period) and are designed to overturn those past transactions to which the insolvent debtor was a party or which involved the debtor's assets where they have certain effects. …

> 151.   It is a generally accepted principle of insolvency law that collective action is more efficient in maximizing the assets available to creditors than a system that leaves creditors free to pursue their individual remedies and that it requires all like creditors to receive the same treatment. Provisions dealing with avoidance powers are designed to support these collective goals, ensuring that creditors receive a fair allocation of an insolvent debtor's assets consistent with established priorities and preserving the integrity of the insolvency estate."

97  In In re Condor Insurance Ltd, 601 F 3d 319, 326 (5th Cir 2010), the Court of Appeals for the Fifth Circuit said that:

> "Avoidance laws have the purpose and effect of re-ordering the

distribution of a debtor's assets … in favor of the collective priorities established by the distribution statute … [and] must be treated as an integral part of the entire bankruptcy system."

98  In different phases of the Australian proceedings in New Cap Barrett J made similar points. He said that in an action for unfair preference under the Australian legislation the liquidator might obtain an order for the payment of money, but the action did not contemplate recovery in the sense applicable to damages and debts; and the proceedings sought to remedy or counter the effects of that depletion caused by the payment by New Cap: New Cap Reinsurance Corpn v Renaissance Reinsurance Ltd [2002] NSWSC 856 , paras 23, 27. The order does not vindicate property rights which the company itself would have had prior to liquidation, but statutory rights which the liquidator has under the statutory scheme in consequence of winding up. The purpose of the order for the payment of money to a company in liquidation is not to compensate the company, but to adjust the rights of creditors among themselves in such a way as to eliminate the effects of favourable treatment afforded to one or more creditors, to the exclusion of others, in the period immediately before an insolvent administration commences: New Cap Reinsurance Corpn v Grant [2009] NSWSC 662, 257 ALR 740 , paras 20-21.

**Difference between insolvency claims and others**

99  I also accept that, if there were to be a separate rule for the recognition and enforcement of insolvency orders, it would not normally be difficult to distinguish between judgments in insolvency proceedings which are peculiarly the subject of insolvency law such as avoidance proceedings, and other judgments of the kind which are covered by the Dicey Rule .

100  In the context of the Brussels Convention , the Brussels I Regulation and the EC Insolvency Regulation , the European Court has developed a distinction between claims which derive directly from

the bankruptcy or winding up, and which are closely connected with them, on the one hand, and those which do not, on the other hand, and the distinction has been applied by the English court. In my judgment, the distinction is a workable one which could be adapted to other contexts should it be useful or necessary to do so.

101  Claims which were regarded as bankruptcy claims have been held to include a claim under French law by a liquidator against a director to make good a deficiency in the assets of a company ( Gourdain v Nadler (Case 133/78) [1979] ECR 733 ); or a claim under German law to set aside a transaction detrimental to creditors ( Seagon v Deko Marty NV (Case C-339/07) [2009] 1 WLR 2168 ). Claims outside the category of bankruptcy claims have been held to include an action brought by a seller based on a reservation of title against a purchaser who was insolvent ( German Graphics Graphische Maschinen GmbH v van der Schee (Case C-292/08) [2009] ECR I-8421 ) or a claim by a liquidator as to beneficial ownership of an asset ( Byers v Yacht Bull Corp [2010] EWHC 133 (Ch), [2010] BCC 368 ). In Oakley v Ultra Vehicle Design Ltd [2005] EWHC 872 (Ch), [2006] BCC 57, Lloyd LJ (sitting as an additional judge of the Chancery Division) said, at para 42):

> "it has been held that a claim by a liquidator to recover pre-liquidation debts, although made in the course of the winding up and so, in a sense, relating to it, does not derive directly from it and is therefore not excluded from the Brussels Convention (and therefore now not from the [Brussels I] Regulation) by article 1.2(b): see In re Hayward decd [1997] Ch 45 , and UBS AG v Omni Holding AG [2000] 1 WLR 916 . By contrast, proceedings by a liquidator against a director or a third party to set aside a transaction as having been effected at an undervalue or on the basis of wrongful or fraudulent trading would be claims deriving directly from the winding up and therefore excluded from the Brussels Convention and now from the [Brussels I] Regulation."

Rubin v Eurofinance SA, 2012 WL 4869953 (2012)

**In personam or sui generis?**

102  I have already quoted the passage in Cambridge Gas in which Lord Hoffmann distinguished between judgments in rem and in personam, on the one hand, and judgments in bankruptcy proceedings, on the other, but it is necessary to repeat it at this point. He said:

> "13.  … Judgments in rem and in personam are judicial determinations of the existence of rights: in the one case, rights over property and in the other, rights against a person. When a judgment in rem or in personam is recognised by a foreign court, it is accepted as establishing the right which it purports to have determined, without further inquiry into the grounds upon which it did so. The judgment itself is treated as the source of the right.

> 14.  The purpose of bankruptcy proceedings, on the other hand, is not to determine or establish the existence of rights, but to provide a mechanism of collective execution against the property of the debtor by creditors whose rights are admitted or established. …"

103  There is no doubt that the order of the US Bankruptcy Court in Cambridge Gas did not fall into the category of an in personam order. Even though the question whether a foreign judgment is in personam or in rem is sometimes a difficult one ( *Dicey* , 15th ed, para 14-109), that was not a personal order against its shareholders, including Cambridge Gas. The order vested the shares in Navigator in the creditors'

committee. It did not declare existing property rights. Indeed the whole purpose of what was the functional equivalent of a scheme of arrangement was to alter property rights. But it is not easy to see why it was not an in rem order in relation to property in the Isle of Man in the sense of deciding the status of a thing and purporting to bind the world: see *Jowitt's Dictionary of English Law* , 3rd ed (2010) (ed Greenberg), p 1249.

104  The judgments in the Rubin and New Cap appeals were based on avoidance legislation which, with some differences of substance, performs the same function as the equivalent provisions in the Insolvency Act 1986 and its predecessors. But Ward LJ in Rubin accepted that the judgment was in personam and the Rubin respondents have not sought to argue that it was not an in personam judgment. What they say is that, even if it is in personam, it is within a sui generis category of insolvency orders or judgments subject to special rules.

105  There can be no doubt that the avoidance orders in the present appeals are in personam. In In re Paramount Airways Ltd [1993] Ch. 223 , 238, Nicholls LJ said that the remedies under section 238 of the Insolvency Act 1986 , (transactions at an undervalue) were "primarily of an in personam character," and that accords with the nature of the orders in these appeals. The form of judgment of the US Bankruptcy Court in the Rubin case was that "plaintiffs have judgment … against the defendants …" in the sums awarded, and the orders of the New South Wales Supreme Court in the New Cap case included orders that "the defendants … pay to the first plaintiff" the sums due under section 588FF(1) of the Australian Corporations Act .

**The question of principle and policy**

106  Since the judgments are in personam the principles in the Dicey Rule are applicable unless the court holds that there is, or should be, a separate rule for judgments in personam in insolvency proceedings, at any rate where those judgments are not designed to establish the existence of rights, but are central to the purpose of the insolvency proceedings or part of the mechanism of collective execution.

107  Prior to Cambridge Gas and the present cases, there had been no suggestion that there might be a different rule for judgments in personam in insolvency

proceedings and other proceedings. There are no cases in England which are helpful. The normal rules for enforcement of foreign judgments were applied to a claim by a liquidator for moneys due to the company ( Gavin Gibson & Co Ltd v Gibson [1913] 3 KB 379 ) and to a claim on a debt ascertained in bankruptcy under German law ( Berliner Industriebank Aktiengesellschaft v Jost [1971] 2 QB 463 ). A judgment of the US Bankruptcy Court in Chapter 11 proceedings for repayment of a preferential transfer was enforced in Ontario on the basis of the judgment debtor's submission to the New York court, without any suggestion that the normal rules did not apply: Gourmet Resources International Inc v Paramount Capital Corpn (1991) 3 OR (3d) 286, [1993] ILPr 583, app dismissed (1993) 14 OR (3d) 319 (Ont CA).

108   The principles in the Dicey Rule have never received the express approval of the House of Lords or the UK Supreme Court and the leading decisions remain Adams v Cape Industries plc [1990] Ch 433 and the older Court of Appeal authorities which it re-states or re-interprets. But there can be no doubt that the references by the House of Lords in the context of foreign judgments to the foreign court of "competent jurisdiction" are implicit references to the common law rule: eg In re Henderson, Nouvion v Freeman (1890) 15 App Cas 1 , 8; Owens Bank Ltd v Bracco [1992] 2 AC 443 , 484.

109   The Rubin respondents question whether the rules remain sound in the modern world. It is true that the common law rule was rejected in Canada, at first in the context of the inter-provincial recognition of judgments. The Supreme Court of Canada held that the English rules developed in the 19th century for the recognition and enforcement of judgments of foreign countries could not be transposed to the enforcement of judgments from sister provinces in a single country with a common market and a single citizenship. Instead a judgment given against a person outside the jurisdiction should be recognised and enforced if the subject matter of the action had a real and substantial connection with the province in which the judgment was given: Morguard Investments Ltd v De Savoye [1990] 3 SCR 1077 , para 45. This approach was applied, by a majority, to foreign country judgments in Beals v Saldanha [2003] 3 SCR 416 (applied to the recognition of an English order convening meetings in a scheme

of arrangement in Re Cavell Insurance Co (2006) 269 DLR (4th) 679 (Ont CA)).

110   There is no support in England for such an approach except in the field of family law. In Indyka v Indyka [1969] 1 AC 33 it was held that a foreign decree of divorce would be recognised at common law if there was a "real and substantial connection" between the petitioner (or the respondent) and the country where the divorce was obtained. This rule (now superseded by the Family Law Act 1986 ) was in part devised to avoid "limping marriages", ie cases where the parties were regarded as divorced in one country but regarded as married in another country. It has never been adopted outside the family law sphere in the context of foreign judgments.

111   The Supreme Court of Ireland in In re Flightlease (Ireland) Ltd [2012] IESC 12 declined to follow Cambridge Gas (and also the decision of the Court of Appeal in Rubin) and also held that the Dicey Rule should not be rejected in favour of a real and substantial connection test. In Flightlease the airline Swissair was in a form of debt restructuring proceeding in Switzerland, where it was incorporated. Flightlease is an Irish company in the same group as Swissair. An application was before the Swiss courts under the Swiss federal statute on debt enforcement and bankruptcy seeking the return of money paid by Swissair to Flightlease. The proceedings had reached the stage of judgment, but the liquidators of Flightlease were concerned to know whether a Swiss judgment would be enforceable in Ireland so that they could decide whether to appear in the Swiss proceedings.

112   The Irish Supreme Court held that the judgment would not be enforceable if Flightlease did not appear in the Swiss proceedings for these reasons: (1) the effect of the Swiss order would be to establish a liability on Flightlease to repay moneys and would therefore result in a judgment in personam; (2) it would be preferable for any change in the rules relating to the enforcement of foreign judgments to take place in the context of international consensus by way of treaty or convention given effect by legislation. In particular, the Irish Supreme Court said that it would not adopt the approach in Cambridge Gas because it had resulted from legislative changes in the United Kingdom (this appears to have been based on a misapprehension),

and should not be adopted in Ireland in the absence of consensus among common law jurisdictions.

113 But there is no suggestion on this appeal that the principles embodied in the Dicey Rule should be abandoned. Instead the Rubin respondents suggest that the principles should not apply to foreign insolvency orders.

114 The respondents accept that the Dicey Rule applies to claims which may be of considerable significance by an officeholder in a foreign insolvency, such as a claim for breach of contract, or a tort claim, or a claim to recover debts. It is clear that such claims may affect the size of the insolvent estate just as much, and often more, than avoidance claims. Like claims to recover money due to the insolvent estate such as restitutionary claims not involving avoidance, avoidance claims may establish a liability to pay or repay money to the bankrupt estate (as in the present cases). There is no difference of principle.

115 The question, therefore, is one of policy. Should there be a more liberal rule for avoidance judgments in the interests of the universality of bankruptcy and similar procedures? In my judgment the answer is in the negative for the following reasons.

116 First, although I accept that it is possible to distinguish between avoidance claims and normal claims, for example in contract or tort, it is difficult to see in the present context a difference of principle between a foreign judgment against a debtor on a substantial debt due to a company in liquidation and a foreign judgment against a creditor for repayment of a preferential payment. The respondents suggest that a person who sells goods to a foreign company accepts the risk of the insolvency legislation of the place of incorporation. Quite apart from the fact that the suggestion is wholly unrealistic, why should the seller/ creditor be in a worse position than a buyer/debtor?

117 The second reason is that if there is to be a different rule for foreign judgments in such proceedings as avoidance proceedings, the court will have to ascertain (or, more accurately, develop) two jurisdictional rules. There are two aspects of jurisdiction which would have to be satisfied if a foreign insolvency judgment or order is to be outside the scope of the Dicey Rule : the first

is the requisite nexus between the insolvency and the foreign court, and the second is the requisite nexus between the judgment debtor and the foreign court.

118 In Cambridge Gas Navigator was an Isle of Man company, and the jurisdiction of the United States Bankruptcy Court depends on whether the "debtor" resides or has a domicile or place of business, or property, in the United States. The shares in Navigator owned by Cambridge Gas (a Cayman Islands company) were, on ordinary principles of the conflict of laws, situated in the Isle of Man, and the shareholder relationship between Navigator and Cambridge Gas was governed by Manx law. The Privy Council, as noted above, did not articulate any rule for the jurisdiction of the US Bankruptcy Court over Navigator (although it had plainly submitted to its jurisdiction) or over Cambridge Gas (which, the Manx courts had held and the Privy Council accepted, had not submitted) or over Cambridge Gas' Manx assets.

119 Nor did the Court of Appeal in Rubin articulate the reasons why the English court recognised the jurisdiction of the US Bankruptcy Court over TCT, or over the appellants. The receivers appear to have proceeded originally on the basis that the United States Bankruptcy Court had jurisdiction under United States bankruptcy law because of TCT's residence and principal place of business in New York (petition, 5 December 2005), but the US Bankruptcy Court, in deciding to appoint the receivers as foreign representatives also noted that TCT's business operations were conducted primarily in the United States, the majority of its creditors, substantially all of its assets, and its centre of main interests, were all in the United States. The basis of jurisdiction of the US Bankruptcy Court under United States law over the individual defendants in Rubin was that they were subject both to the general jurisdiction of the court (ie connection of the defendant with the jurisdiction) and also to the specific jurisdiction of the court (ie connection of the cause of action with the jurisdiction) because they specifically sought out the United States as a place to do business and specifically sought out United States merchants and consumers with whom to do business. Accordingly, the exercise of jurisdiction satisfied the due process requirements of the Fifth Amendment.

120 The basis of jurisdiction in New Cap over New Cap itself was of course that it was incorporated in Australia. The basis of jurisdiction over the Syndicate under New South Wales law was that the cause of action against the Syndicate arose in New South Wales.

121 The respondents do not put forward any principled suggestion for rules which will deal with the two aspects of jurisdiction. They accept, as regards the jurisdictional link between the foreign country and the insolvent estate, that English law has traditionally recognised insolvency proceedings taking place in an individual bankrupt's place of domicile, or, in the case of corporations, the place of incorporation, but (because the connection which the trustees of the TCT, or the TCT itself, had with the United States was that the trust's main business was there) they rely on what Lord Hoffmann said in HIH [2008] UKHL 21, [2008] 1 WLR 852, para 31:

> "I have spoken in a rather old-fashioned way of the company's domicile because that is the term used in the old cases, but I do not claim it is necessarily the best one. Usually it means the place where the company is incorporated but that may be some offshore island with which the company's business has no real connection. The Council Regulation on insolvency proceedings ( Council Regulation (EC) No 1346/2000 of 29 May 2000 ) uses the concept of the 'centre of a debtor's main interests' as a test, with a presumption that it is the place where the registered office is situated: see article 3.1. That may be more appropriate."

122 They propose that each of these issues be resolved, not by a black letter rule like the common law rule for enforcement of judgments, but instead by an appeal to what was said in oral argument to be the discretion of the English court to assist the foreign court.

123 On the second aspect, the jurisdictional link between the foreign country and the judgment debtor, they accept that it is necessary for there to be an appropriate connection between the foreign insolvency proceeding and the insolvency order in respect of which recognition and enforcement is sought. They propose that, in the exercise of the discretion, the court should adopt an approach similar to that taken by the English court in deciding whether to apply provisions of the Insolvency Act 1986 , such as section 238 (transactions at an undervalue), to persons abroad, relying on In re Paramount Airways Ltd [1993] Ch 223 .

124 That case decided that there is no implied territorial limitation to the exercise of jurisdiction over "any person." The Court of Appeal rejected the argument that the section applied only to British subjects and to persons present in England at the time of the impugned transaction. In particular the physical absence or presence of the party at the time of the transaction bore no necessary relationship to the appropriateness of the remedy. Nor was the test of "sufficient connection" with England satisfactory because it would hardly be distinguishable from the ambit of the sections being unlimited territorially: p 237. Instead, the approach was to be found in the discretion of the court, first to grant permission to serve the proceedings out of the jurisdiction, and secondly, to make an order under the section. On both aspects the court would take into account whether the defendant was sufficiently connected with England for it to be just and proper to make the order against him despite the foreign element.

125 The Rubin respondents say that In re Paramount Airways Ltd is instructive because, if the facts of the present case were reversed such that TCT had carried on the scheme in England and had been placed into insolvency proceedings here and the appellants were resident in New York, then it can be expected that the English court would have considered that England was the correct forum in which to bring section 238 proceedings to recover payments made to the appellants and would have given permission to serve out of the jurisdiction accordingly. They go on to say that it is implicit in this that the English court would have expected the New York court then to recognise and enforce any judgment of the English court even if the appellants had remained in New York and had not contested the proceedings; and that by the same

token that the court seeks and expects the recognition and enforcement abroad of its own insolvency orders, the court should recognise and enforce in England insolvency orders made in insolvency proceedings in other jurisdictions.

126 There is no basis for this line of reasoning. There is no necessary connection between the exercise of jurisdiction by the English court and its recognition of the jurisdiction of foreign courts, or its expectation of the recognition of its judgments abroad. It has frequently been said that the jurisdiction exercised under what used to be RSC Ord 11, 1 (and is now CPR Practice Direction 6B, para 3.1) is an exorbitant one, in that it was a wider jurisdiction than was recognised in English law as being possessed by courts of foreign countries in the absence of a treaty providing for recognition: see The Siskina (Owners of cargo lately laden on board) v Distos Cia Naviera SA [1979] AC 210 , 254 per Lord Diplock; Amin Rasheed Shipping Corpn v Kuwait Insurance Co [1984] AC 50 , 65 per Lord Diplock; Spiliada Maritime Corpn v Cansulex Ltd [1987] AC 460 , 481 per Lord Goff of Chieveley.

127 Outside the sphere of matrimonial proceedings (see Travers v Holley [1953] P 246, disapproved on this aspect in Indyka v Indyka [1969] 1 AC 33 ) reciprocity has not played a part in the recognition and enforcement of foreign judgments at common law. The English court does not concede jurisdiction in personam to a foreign court merely because the English court would, in corresponding circumstances, have power to order service out of the jurisdiction: In re Trepca Mines Ltd [1960] 1 WLR 1273 .

128 In my judgment, the dicta in Cambridge Gas and HIH do not justify the result which the Court of Appeal reached. This would not be an incremental development of existing principles, but a radical departure from substantially settled law. There is a reason for the limited scope of the Dicey Rule and that is that there is no expectation of reciprocity on the part of foreign countries. Typically today the introduction of new rules for enforcement of judgments depends on a degree of reciprocity. The EC Insolvency Regulation and the Model Law were the product of lengthy negotiation and consultation.

129 A change in the settled law of the recognition and enforcement of judgments, and in particular the formulation of a rule for the identification of those courts which are to be regarded as courts of competent jurisdiction (such as the country where the insolvent entity has its centre of interests and the country with which the judgment debtor has a sufficient or substantial connection), has all the hallmarks of legislation, and is a matter for the legislature and not for judicial innovation. The law relating to the enforcement of foreign judgments and the law relating to international insolvency are not areas of law which have in recent times been left to be developed by judge-made law. As Lord Bridge of Harwich put it in relation to a proposed change in the common law rule relating to fraud as a defence to the enforcement of a foreign judgment, "if the law is now in need of reform, it is for the legislature, not the judiciary, to effect it": Owens Bank Ltd v Bracco [1992] 2 AC 443 , 489.

130 Furthermore, the introduction of judge-made law extending the recognition and enforcement of foreign judgments would be only to the detriment of United Kingdom businesses without any corresponding benefit. I accept the appellants' point that if recognition and enforcement were simply left to the discretion of the court, based on a factor like "sufficient connection," a person in England who might have connections with a foreign territory which were only arguably "sufficient" would have to actively defend foreign proceedings which could result in an in personam judgment against him, only because the proceedings are incidental to bankruptcy proceedings in the courts of that territory. Although I say nothing about the facts of the Madoff case, it might suggest that foreigners who have bona fide dealings with the United States might have to face the dilemma of the expense of defending enormous claims in the United States or not defending them and being at risk of having a default judgment enforced abroad.

131 Nor is there likely to be any serious injustice if this court declines to sanction a departure from the traditional rule. It would not be appropriate to express a view on whether the officeholders in the present cases would have, or would have had, a direct remedy in England, because there might be, or might have been, issues as to the governing law, or issues as to time-limits or as to good faith. Subject to those reservations, several of the ways in which the claims were put (especially

those parts of the judgment which were not the subject of these proceedings) in the United States proceedings in Rubin could have founded proceedings by trustees in England for the benefit of the creditors (as beneficiaries of the express trust). In addition there are several other avenues available to officeholders. Avoidance claims by a liquidator of an Australian company may be the subject of a request by the Australian court pursuant to section 426(4) of the Insolvency Act 1986 , applying Australian law under section 426(5) . In appropriate cases, article 23 of the Model Law will allow avoidance claims to be made by foreign representatives under the Insolvency Act 1986 . In the cases where the insolvent estate has its centre of main interests in the European Union, judgments will be enforceable under Article 25 of the EC Insolvency Regulation .

132   It follows that, in my judgment, Cambridge Gas was wrongly decided. The Privy Council accepted (in view of the conclusion that there had been no submission to the jurisdiction of the court in New York) that Cambridge Gas was not subject to the personal jurisdiction of the US Bankruptcy Court. The property in question, namely the shares in Navigator, was situate in the Isle of Man, and therefore also not subject to the in rem jurisdiction of the US Bankruptcy Court. There was therefore no basis for the recognition of the order of the US Bankruptcy Court in the Isle of Man.

**Issue 2: Rubin: Enforcement under the Cross-Border Insolvency Regulations**

133   In the Rubin appeal it was argued by the respondents that the judgment should also be enforced through the CBIR , implementing the UNCITRAL Model Law.

134   The order made by the deputy judge recognised the Chapter 11 proceeding "including the Adversary Proceedings," because "bringing adversary proceedings against debtors of the bankrupt is clearly part of collecting the bankrupt's assets with a view to distributing them to creditors" and "the adversary proceedings are part and parcel of the Chapter 11 insolvency proceedings": [2010] 1 All ER (Comm) 81, paras 46, 47. The Court of Appeal was of the same view: [2011] Ch 133, para 61(2)-(3). The appellants no longer maintain that the adversary proceedings should not be recognised under the Model Law.

135   The issue which still arises in relation to the Model Law as implemented by the CBIR is whether the court has power to grant relief recognising and enforcing the relevant parts of the judgment.

136   Article 21 provides that:

> "1.   Upon recognition of a foreign proceeding, whether main or non- main, where necessary to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including –
>
> (a)   staying the commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities, to the extent they have not been stayed under paragraph l(a) of article 20;
>
> (b)   staying execution against the debtor's assets to the extent it has not been stayed under paragraph l(b) of article 20;
>
> (c)   suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under paragraph 1(c) of article 20;
>
> (d)   providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;
>
> (e)   entrusting the administration or realisation of all or part of the debtor's assets located in Great Britain to the foreign representative or another person designated by the court;

Rubin v Eurofinance SA, 2012 WL 4869953 (2012)

(f)   extending relief granted under paragraph 1 of article 19; and

(g)   granting any additional relief that may be available to a British insolvency officeholder under the law of Great Britain, including any relief provided under paragraph 43 of Schedule B1 to the Insolvency Act 1986 ."

137   The reference to relief under paragraph 43 of Schedule B1 to the Insolvency Act 1986 is a reference to a moratorium on claims in an administration.

138   The Guide to Enactment states, at paras 154, 156:

"[154]   The types of relief listed in article 21, paragraph 1, are typical or most frequent in insolvency proceedings; however, the list is not exhaustive and the court is not restricted unnecessarily in its ability to grant any type of relief that is available under the law of the enacting state and needed in the circumstances of the case.

…

[156]   It is in the nature of discretionary relief that the court may tailor it to the case at hand. This idea is reinforced by article 22, paragraph 2, according to which the court may subject the relief granted to conditions that it considers appropriate."

139   Article 25 provides (under the heading "Co-operation and direct communication between a court of Great Britain and foreign courts or foreign representatives") that:

"1.   … the court may co-operate to the maximum extent possible with foreign courts or foreign representatives, either directly or through a British insolvency officeholder.

2.   The court is entitled to communicate directly with, or to request information or assistance directly from, foreign courts or foreign representatives."

140   Article 27 provides that the co-operation referred to in article 25 may be implemented "by any appropriate means", including

"(a)   appointment of a person to act at the direction of the court;

(b)   communication of information by any means considered appropriate by the court;

(c)   coordination of the administration and supervision of the debtor's assets and affairs;

(d)   approval or implementation by courts of agreements concerning the coordination of proceedings;

(e)   coordination of concurrent proceedings regarding the same debtor."

141   The respondents say that (a) the power under article 21 is to grant any type of relief that is available under the law of the relevant state, and that the fact that recognition and enforcement of foreign judgments is not specifically mentioned in article 21 as one of the forms of relief available, does not mean that such relief cannot be granted; (b) the recognition and enforcement of the judgments of a foreign court is the paradigm means of co-operation with that court; and (c) the examples of co-operation in article 27 are merely examples and are not exhaustive.

142   But the CBIR (and the Model Law) say nothing about the enforcement of foreign judgments against third parties. As Lord Mance pointed out in argument, recognition and enforcement are fundamental in international cases. Recognition and enforcement of judgments in civil and commercial matters (but not in insolvency matters) have been the subject of intense international negotiations at the Hague Conference on Private International Law, which ultimately failed because of inability to agree on recognised international bases of jurisdiction.

143   It would be surprising if the Model Law was intended to deal with judgments in insolvency matters by implication. Articles 21, 25 and 27 are concerned with procedural matters. No doubt they should be given a purposive interpretation and should be widely construed in the light of the objects of the Model Law, but there is nothing to suggest that they apply to the recognition and enforcement of foreign judgments against third parties.

144   The respondents rely on United States decisions but the only case involving enforcement of a foreign judgment in fact supports the appellants' argument. The Model Law has been implemented into United States law through Chapter 15 of Title 11 of the United States Code, which has in sections 1521, 1525 and 1527 provisions which are, with modifications not relevant for present purposes, equivalent to articles 21, 25 and 27 of the CBIR . In Re Metcalfe & Mansfield Alternative Investments 421 BR 685 (Bankr SDNY 2010) the US Bankruptcy Court ordered that orders made by a Canadian court in relation to a plan of compromise and arrangement under the (Canadian) Companies' Creditors Arrangement Act 1985 be enforced. That decision does not assist the respondents because the

US Bankruptcy Court applied the normal rules in non-bankruptcy cases for enforcement of foreign judgments in the United States: pp 698–700. In my judgment the Model Law is not designed to provide for the reciprocal enforcement of judgments.

### Issue 3: New Cap: Enforcement through assistance under section 426 of the Insolvency Act 1986

145   In view of my conclusion in the next section (section VIII) that the Syndicate submitted to the jurisdiction of the Australian court, the issues on section 426(4) and (5) of the Insolvency Act 1986 , and their relationship with section 6 of the Foreign Judgments (Reciprocal Enforcement) Act 1933 do not arise, but since the matter was fully argued I will express a view on the applicability of section 426(4) to a case such as this.

146   Section 426(4)-(5) of the Insolvency Act 1986 provides:

> "(4)  The courts having jurisdiction in relation to insolvency law in any part of the United Kingdom shall assist the courts having the corresponding jurisdiction in any other part of the United Kingdom or any relevant country or territory.
>
> (5)  For the purposes of subsection (4) a request made to a court in any part of the United Kingdom by a court in any other part of the United Kingdom, or in a relevant country or territory is authority for the court to which the request is made to apply, in relation to any matter specified in the request, the insolvency law which is applicable by either court in relation to comparable matters falling within its jurisdiction.
>
> In exercising its discretion under this subsection, a court shall have regard in particular to the rules of private international law."

Rubin v Eurofinance SA, 2012 WL 4869933 (2012)

147 The reference to the application of rules of private international law in section 426(5) is difficult and obscure: see *Dicey* , 15th ed, para 30-119; my discussion in In re Television Trade Rentals [2002] EWHC 211 (Ch), [2002] BCC 807 , para 17, and the cases there cited; and Al-Sabah v Grupo Torras SA [2005] UKPC 1, [2005] 2 AC 333 , para 47. But nothing turns on it on these appeals.

148 The question is whether section 426(4) of the 1986 Act provides a procedure by which a judgment of a court having jurisdiction in relation to insolvency law in a "relevant country or territory" may be enforced in the United Kingdom. As I have said, Australia is a relevant country.

149 A further question arises if section 426(4) applies to the enforcement of foreign judgments and that is whether section 426 is ousted by section 6 of the Foreign Judgments (Reciprocal Enforcement) Act 1933 , which provides:

> "No proceedings for the recovery of a sum payable under a foreign judgment, being a judgment to which this Part of the Act applies, other than proceedings by way of registration of the judgment, shall be entertained by any court in the United Kingdom."

150 Both Lewison J and the Court of Appeal [2012] 2 WLR 1095 held that section 426(4) was available as a tool for the enforcement of the judgment.

151 Section 426(4) has been given a broad interpretation: see Hughes v Hannover Rückversicherungs-Aktiengesellschaft [1997] 1 BCLC 497 (CA); England v Smith [2001] Ch 419 (CA); HIH [2008] UKHL 21, [2008] 1 WLR 852 . It has been held that the fact that a letter of request has been made is a weighty factor, and public policy and comity favour the giving of assistance: Hughes v Hannover ,

at pp 517–518; England v Smith , at p 433. Thus in England v Smith the Australian court overseeing the liquidation of the Bond Corporation made an order for the examination of a London partner in Arthur Andersen. It issued a letter of request asking the English court to assist it by making its own order for the examination. The Court of Appeal decided that the order should be made.

152 But, despite the respondents' argument to the contrary, England v Smith was not a case of the enforcement of the Australian order, but rather the making of the court's own order in aid of the Australian liquidation. In my judgment, subsections 426(4) and (5) of the 1986 Act are not concerned with enforcement of judgments. Section 426(1)-(2) , by contrast, deals with enforcement of orders in one part of the United Kingdom in another part, and refer expressly to the enforcement of such orders ("shall be enforced" in section 426(1) ). Section 426(4) deals with assistance not only for foreign designated countries such as Australia but also to intra-United Kingdom assistance. If section 426(4) applied to intra- United Kingdom enforcement of orders, then section 426(1) would be largely redundant, going beyond what the Court of Appeal [2012] 2 WLR 1095, para 57 described as "a degree of overlap."

153 Sections 426(1) and (4) have their origin in sections 121 and 123 of the Bankruptcy Act 1914 . Section 121 of the 1914 Act provided that orders of bankruptcy courts in one part of the United Kingdom were to be enforced in other parts. Section 122 provided that the courts exercising bankruptcy and insolvency jurisdiction in the United Kingdom and "every British court elsewhere" were to act in aid of, and be auxiliary to, each other; and, upon a request by the non-English court, could exercise the jurisdiction of either court.

154 The Insolvency Law and Practice Report of the Review Committee (1982) (Cmnd 8558) (the "Cork Report") said (paras 1909-1913) that section 122 was the "vital section in this context", and recommended that the section should be extended to winding up. But, despite the respondents' arguments, I do not discern any recommendation which would suggest that section 426(4) applies to the enforcement of foreign judgments.

Rubin v Eurofinance SA, 2012 WL 4866933 (2012)

155  Consequently the applicability of section 6 of the 1933 Act does not arise for decision, except in a context which makes little practical difference, and to which I will revert.

**Submission**

156  If the Dicey Rule applies the judgments in issue will be enforceable in England if the judgment debtors submitted to the jurisdiction of the foreign court.

**New Cap**

157  The Australian court granted leave to serve these proceedings out of the jurisdiction on the Syndicate: section IV, above. The Syndicate did not enter an appearance, but its solicitors commented in writing on evidence presented to the Australian court about New Cap's insolvency and their comments were placed before the Australian judge.

158  More relevant is the fact that from August 1999 the Syndicate submitted proofs of debt (in relation to unsettled claims and outstanding premiums for the 1997, 1998, and 1999 years of account, and not to the reinsurance contracts which are the subject of these proceedings) and attended and participated in creditors' meetings. In particular at an adjourned meeting of creditors on 16 September 2009 the Syndicate had given a proxy for that meeting to the chairman, and submitted a proof of debt and proxy form for that meeting. The Syndicate voted at a meeting of creditors in favour of a scheme of arrangement. The liquidator has admitted claims by the Syndicate for the sterling equivalent of more than £650,000, although the liquidator is retaining the dividend in partial settlement of the costs incurred in these proceedings.

159  The general rule in the ordinary case in England is that the party alleged to have submitted to the jurisdiction of the English court must have "taken some step which is only necessary or only useful if" an objection to jurisdiction "has been actually waived, or if the objection has never been entertained at all": Williams & Glyn's Bank plc v Astro Dinamico Compania Naviera SA [1984] 1 WLR 438 , 444 (HL) approving Rein v Stein (1892) 66 LT 469 , 471 (Cave J).

160  The same general rule has been adopted to determine whether there has been a submission to the jurisdiction of a foreign court for the purposes of the rule that a foreign judgment will be enforced on the basis that the judgment debtor has submitted to the jurisdiction of the foreign court: Adams v Cape Industries [1990] Ch 433 , 459 (Scott J); Akai Pty Ltd v People's Insurance Co Ltd [1998] 1 Lloyd's Rep 90 , 96–97 (Thomas J); see also Desert Sun Loan Corpn v Hill [1996] 2 All ER 847 , 856 (CA); Akande v Balfour Beatty Construction Ltd [1998] ILPr 110 ; Starlight International Inc v Bruce [2002] EWHC 374 (Ch), [2002] ILPr 617 , para 14 (cases of foreign judgments); Industrial Maritime Carriers (Bahamas) Inc v Sinoca International Inc (The Eastern Trader) [1996] 2 Lloyd's Rep 585 , 601 (a case involving the question whether the party seeking an anti-suit injunction in support of an English arbitration clause had waived the agreement by submitting to the jurisdiction of the foreign court).

161  The characterisation of whether there has been a submission for the purposes of the enforcement of foreign judgments in England depends on English law. The court will not simply consider whether the steps taken abroad would have amounted to a submission in English proceedings. The international context requires a broader approach. Nor does it follow from the fact that the foreign court would have regarded steps taken in the foreign proceedings as a submission that the English court will so regard them. Conversely, it does not necessarily follow that because the foreign court would not regard the steps as a submission that they will not be so regarded by the English court as a submission for the purposes of the enforcement of a judgment of the foreign court. The question whether there has been a submission is to be inferred from all the facts.

162  It is in that context that Scott J said at first instance in Adams v Cape Industries plc [1990] 1 Ch 433 , 461 (a case in which the submission issue was not before the Court of Appeal): "If the steps would not have been regarded by the domestic law of the foreign court as a submission to the jurisdiction, they ought not … to be so regarded here, notwithstanding that if they had been steps taken in an English court they might have constituted a submission. The implication of procedural steps taken in foreign proceedings must … be assessed in the context of the foreign proceedings."

Rubin v Eurofinance SA, 2012 WL 4869953 (2012)

163   I agree with the way it was put by Thomas J in *Akai Pty Ltd v People's Insurance Company Ltd [1998] 1 Lloyd's Rep 90* , 97:

> "The court must consider the matter objectively; it must have regard to the general framework of its own procedural rules, but also to the domestic law of the court where the steps were taken. This is because the significance of those steps can only be understood by reference to that law. If a step taken by a person in a foreign jurisdiction, such as making a counterclaim, might well be regarded by English law as amounting to a submission to the jurisdiction, but would not be regarded by that foreign court as a submission to its jurisdiction, an English court will take into account the position under foreign law."

164   The Syndicate did not take any steps in the avoidance proceedings as such which would be regarded either by the Australian court or by the English court as a submission. Were the steps taken by the Syndicate in the liquidation a submission for the purposes of the rules relating to foreign judgments?

165   In English law there is no doubt that orders may be made against a foreign creditor who proves in an English liquidation or bankruptcy on the footing that by proving the foreign creditor submits to the jurisdiction of the English court. In *Ex p Robertson, In re Morton (1875) LR 20 Eq 733* trustees were appointed over the property of bankrupt potato merchants in a liquidation by arrangement. A Scots merchant received payment of £120 after the liquidation petition was presented, and proved for a balance of £247 and received a dividend of what is now 20p in the pound. The trustees served a notice of motion, seeking repayment of the £120 paid out of the insolvent estate, out of the jurisdiction. The respondent objected to the jurisdiction of the English court on the ground that he was a domiciled Scotsman. On appeal from the county

court, Sir James Bacon CJ held that the court had jurisdiction. He said, at pp 737–738:

> "… what is the consequence of creditors coming in under a liquidation or bankruptcy? They come in under what is as much a compact as if each of them had signed and sealed and sworn to the terms of it — that the bankrupt's estate shall be duly administered among the creditors. That being so, the administration of the estate is cast upon the court, and the court has jurisdiction to decide all questions of whatever kind, whether of law, fact, or whatever else the court may think necessary in order to effect complete distribution of the bankrupt's estate. … [C]an there be any doubt that the Appellant in this case has agreed that, as far as he is concerned, the law of bankruptcy shall take effect as to him, and under this jurisdiction, to which he is not only subjected, but under which he has become an active party, and of which he has taken the benefit.. [The Appellant] is as much bound to perform the conditions of the compact, and to submit to the jurisdiction of the court, as if he had never been out of the limits of England."

166   The Syndicate objected to the jurisdiction of the Australian court. Barrett J in his judgment of 14 July 2009 accepted that it had made it clear that it was not submitting to its jurisdiction, and he also accepted that as a result the judgment of the Australian court would not be enforceable in England. His judgment is concerned exclusively with the preference claims, and he did not deal with the question of submission by reference to the Syndicate's participation in the liquidation by way of proof and receipt of dividends. He decided that the court had jurisdiction because the New

South Wales rules justified service out of the jurisdiction on the basis that the cause of action arose in New South Wales.

167 I would therefore accept the liquidators' submission that, having chosen to submit to New Cap's Australian insolvency proceeding, the Syndicate should be taken to have submitted to the jurisdiction of the Australian court responsible for the supervision of that proceeding. It should not be allowed to benefit from the insolvency proceeding without the burden of complying with the orders made in that proceeding.

**Rubin**

168 The position is different in the Rubin appeal. It would certainly have been arguable that Eurofinance SA had submitted to the jurisdiction of the United States District Court, for these reasons: first, it was Eurofinance SA which applied for the appointment by the High Court of Mr Rubin and Mr Lan as receivers of TCT specifically for the purpose of causing TCT then to obtain protection under Chapter 11; second, it was Eurofinance SA which represented to the English court that officeholders appointed by the United States court would be able to pursue claims against third parties; third, the judgment of the US Bankruptcy Court states that the court had personal jurisdiction over Eurofinance SA not only because it did business in the United States but also (as I have mentioned above) because it had filed a notice of appearance in the Chapter 11 proceedings (Order 22 of July 2008, paras 42-43).

169 But the Rubin appellants did not appear in the adversary proceedings, and it was not argued in these proceedings that Eurofinance SA (or Mr Adrian Roman, who caused Eurofinance SA to make the application) had submitted to the jurisdiction of the US Bankruptcy Court in any other way and it is not necessary therefore to explore the matter further.

**New Cap: enforcement at common law or under the 1933 Act**

170 In view of my conclusion that the Australian judgment in New Cap is enforceable by reason of the Syndicate's submission, a purely technical point arises

on the method of enforcement. The point is whether the enforcement is to be under the 1933 Act or at common law. If insolvency proceedings are excluded from the 1933 Act, then enforcement would be at common law. If they are not excluded, then (as I have said) section 6 has the effect of excluding an action at common law on the judgment and making registration under the 1933 Act the only method of enforcement of judgments within Part I of the Act.

171 Section 11(2) of the 1933 Act provides that the expression "action in personam" shall not be deemed to include (inter alia) proceedings in connection with bankruptcy and winding up of companies. But the effect of section 4(2)(c) is that in the case of a judgment given in an action other than an action in personam or an action in rem, the foreign court shall be deemed to have jurisdiction if its jurisdiction is recognised by the English court, ie at common law. Accordingly, the question whether insolvency proceedings are wholly excluded from the operation of the 1933 Act still arises. There is no other provision in the 1933 Act which throws any light on the point.

172 The main object of the 1933 Act was to facilitate the enforcement of commercial judgments abroad by making reciprocity easier. The only reference to insolvency proceedings in the Report of the Foreign Judgments (Reciprocal Enforcement) Committee (1932) (Cmnd 4213), (the Greer Report), which recommended the legislation, is the statement (para 4): "It is not necessary for our present purposes to consider the effect in England of foreign judgments in bankruptcy proceedings…". The Report annexed draft Conventions which had been drawn up in consultation with experts from Belgium, France and Germany. The draft Conventions with Belgium ( article 4(3), (4) ) and Germany ( article 4(4) ) provided that the jurisdictional rules in the Convention did not apply to judgments in bankruptcy proceedings or proceedings relating to the winding up of companies or other bodies corporate, but that the jurisdiction of the original court would be recognised where such recognition was in accordance with the rules of private international law observed by the court applied to. That provision paralleled what became sections 4(2)(c) and 11(2) of the 1933 Act. The draft Convention with France did not apply to judgments in bankruptcy proceedings etc (article 2(3)), but provided that nothing was deemed to preclude the

recognition and enforcement of judgments to which the Convention did not apply: article 2(4).

173   The Conventions concluded with countries to which the 1933 Act applied adopted similar techniques. It is unnecessary to set them out in detail. But there is no reason to suppose that bankruptcy proceedings were not regarded as being "civil and commercial matters." Thus the 1961 Convention with the Federal Republic of Germany of 1961 (the Reciprocal Enforcement of Foreign Judgments (Germany) Order ) (SI 1961/1199) provided in article I(6) that the expression "judgments in civil and commercial matters" did not include judgments for fines or penalties, and had a separate provision in article II(2) that the Convention did not apply to judgments in bankruptcy proceedings or proceedings relating to the winding up of companies or other bodies corporate (although, in accordance with the usual technique, it did not rule out recognition and enforcement: Art II(3)). Other Conventions simply excluded bankruptcy proceedings from the specific jurisdictional provisions of the Convention, like the draft Conventions annexed to the Greer Report: article 4(5) of the Reciprocal Enforcement of Foreign Judgments (Austria) Order 1962 (SI 1962/1199), article 4(3) of the Reciprocal Enforcement of Foreign Judgments (Norway) Order 1962 (SI 1962/636), and article IV(3) of the Reciprocal Enforcement of Foreign Judgments (Italy) Order 1963 (SI 1973/1894).

174   The Reciprocal Enforcement of Judgments (Australia) Order 1994 (SI 1994/1901) extended the 1933 Act to Australia, implementing the UK-Australia Agreement for the reciprocal enforcement of judgments in civil and commercial matters. The Agreement is expressed in article I(c)(i) to apply to judgments in civil and commercial matters. The Order applies Part I of the Act to judgments in respect of a "civil or commercial matter" (article 4(a)).

175   There is no reason to conclude that the phrase "civil and commercial matters" does not include insolvency proceedings, and the history of the 1933 Act and the Conventions shows that it does. The fact that insolvency was expressly excluded from the operation of the Brussels Convention , the original and revised Lugano Conventions and the Brussels I Regulation in fact suggests that otherwise they would have been within their scope. The respondents relied on a passage in the

ruling of the European Court of Justice in Gourdain v Nadler (Case 133/78) [1979] ECR 733 , paras 3-4, as suggesting that the exclusion of bankruptcy in article 1 of the Brussels Convention was an example of a matter excluded from the concept of civil and commercial matters. But it is clear from the context (and from the opinion of Advocate General Reischl) that the court was simply saying that because the expression "civil and commercial matters" in Article 1 had to be given an autonomous meaning, so also was the case with the expression "bankruptcy". That the exclusion of bankruptcy proceedings does not affect their character as civil or commercial matters is confirmed by the recent ruling in F-Tex SIA v Lietuvos-Anglijos UAB-Jadecloud-Vilma (Case C-213/10) 19 April 2012 , where the court said that the Brussels I Regulation was "intended to apply to all civil and commercial matters apart from certain well-defined matters" and as a result actions directly deriving from insolvency proceedings and closely connected with them were excluded: para 29.

176   It follows that the 1933 Act applies to the Australian judgment and that enforcement should be by way of registration under the 1933 Act.

**Disposition**

177   I would therefore allow the appeal in Rubin , but dismiss the appeal in New Cap on the ground that the Syndicate submitted to the jurisdiction of the Australian court .

Lord Mance

178   I agree with Lord Collins' reasoning and conclusions in his judgment on these appeals, essentially for the reasons he gives, though without subscribing to his incidental observation (para 132) that the Privy Council decision in Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc [2006] UKPC 26, [2007] 1 AC 508 was necessarily wrongly decided. This was not argued before the Supreme Court, and I would wish to reserve my opinion upon it. Cambridge Gas is, on any view, distinguishable.

Rubin v Eurofinance SA, 2012 WL 4869953 (2012)

179  The common law question central to these appeals is whether the Supreme Court should endorse or introduce a special rule of recognition and enforcement, one falling outside the scope of the Dicey Rule which Lord Collins has identified (Rule 36 in the 14th and Rule 43 in the 15th edition) and applicable to judgments in foreign insolvency proceedings setting aside voidable pre-insolvency transactions. For the principal reasons which Lord Collins gives in paras 95 to 131, I agree that we should not do so.

180  Since much weight was placed by the respondents and the Court of Appeal upon the Board's reasoning and decision in Cambridge Gas , I add some observations to indicate why, as the present appellants submitted, it concerned circumstances and proceeded upon factual assumptions and a legal analysis which have no parallel in the present case.

181  Cambridge Gas has attracted both Irish judicial dissent and English academic criticism, to which Lord Collins refers in paras 53 and 111-112. Giving the judgment of the Board in Pattni v Ali [2006] UKPC 51, [2007] 2 AC 85 , I said that the purpose of the bankruptcy order with which the Board was concerned in Cambridge Gas "was simply to establish a mechanism of collective execution against the property of the debtor [Navigator] by creditors whose rights were admitted or established" (para 23).

182  This analysis, admittedly, involved treating the vesting in creditors of shares *in* Navigator as no different in substance from the vesting in creditors of Navigator's shares in its ship-owning subsidiaries. But it is clear from paras 8 and 9 and again 24 to 26 of the Board's advice in Cambridge Gas that the Board saw no difference. It did not regard Cambridge Gas as having any interest of value to advance or protect in the shares still held nominally in its name. Their vesting in Navigator's creditors was no more than a mechanism for disposing of Navigator's assets, which did not affect or concern Cambridge Gas. The Board was therefore, in its view (and rightly or wrongly), concerned with distribution of the insolvent company's assets in a narrow and traditional sense.

183  Amplifying this, the Board approached the situation in Cambridge Gas as follows. The New York court had jurisdiction over Navigator's assets, since

Navigator had submitted to the New York proceedings. Cambridge Gas's shares in Navigator (located in the Isle of Man, Navigator's place of incorporation) were "completely and utterly worthless": [2007] 1 AC 508, para 9. The transfer to Navigator's creditors of Cambridge Gas's shares in Navigator had the like effect to a transfer of Navigator's assets, since Navigator was "an insolvent company, in which the shareholders ha[d] no interest of any value" (para 26). Cambridge Gas's shares in Navigator were vulnerable in the Isle of Man, under section 152 of the Companies Act 1931 , to a similar scheme of arrangement to that which the New York Court intended by its Chapter 11 order. More generally, as I noted in Stone & Rolls Ltd v Moore Stephens [2009] UKHL 39, [2009] AC 1391 , paras 236 to 238, in insolvency shareholders' interests yield to those of creditors.

184  It was in this limited context that the Board concluded that the New York and Manx courts' orders could be regarded as doing no more than facilitating or enabling collective execution against Navigator's property.

185  The Court of Appeal believed on the contrary that the answer to the present cases lay in the Board's general statements in Cambridge Gas at paras 19 to 21 regarding the nature of insolvency proceedings. It is true that proceedings to avoid pre-insolvency transactions can be related to the process of collection of assets. That is, their general purpose and effect is to ensure a fair allocation of assets between all who are and were within some specified pre-insolvency period creditors. A dictum of Lord Hoffmann in In re HIH Casualty and General Insurance Ltd [2008] UKHL 21, [2008] 1 WLR 852 , para 19, quoted by Lord Collins in paras 15 and 52, is to that effect, though again uttered in a different context to the present.

186  However, the Board did not see these considerations as answering or eliminating all questions regarding the existence of jurisdiction or at least its exercise in Cambridge Gas . On the contrary, it went on to examine in close detail in paras 22 to 26 the limits of the assistance that a court could properly give. In rejecting the argument that the interference with the shareholding held in Cambridge Gas's name was beyond the Manx court's jurisdiction (para 26), the only reason it gave related to the nature of shares in an

insolvent company. This meant, according to its advice, that Cambridge Gas had no interest of any value to protect and that registration of the shares in Navigator's creditors' name was no more than a mechanism for giving creditors access to Navigator's assets.

187   On this basis, the decision in Cambridge Gas is, as Professor Adrian Briggs noted in a penetrating case-note in The British Year Book of International Law (2006) p575–581, less remarkable (although, as Professor Briggs also notes, it perhaps still poses problems of reconciliation with the House's decision in Société Eram Shipping Co Ltd v Hong Kong & Shanghai Banking Corp Ltd [2003] UKHL 30, [2004] AC 260 ). But, because the actual decision in Cambridge Gas was so narrowly focused on the nature of a shareholder's rights in an insolvent company and was not directly challenged, I prefer to leave open its correctness.

188   Whatever view may be taken as to the validity of the Board's reasoning in Cambridge Gas , it is clear that it does not cover or control the present appeal. The present cases are not concerned with shares, with situations in which shares are, or are treated by the court as, no more than a key to the insolvent company's assets or even with situations in which it is clear that those objecting to recognition and enforcement of the foreign courts' orders have no interests to protect. There are, on the contrary, substantial issues as to whether there were fraudulent preferences giving rise to in personam liability in large amounts. The persons allegedly benefitting by fraudulent preferences did not appear in the relevant foreign insolvency proceedings in which judgment was given against them. They were (leaving aside any question of submission) outside the international jurisdiction of the relevant foreign courts.

189   Lord Clarke takes a different view from Lord Collins, but does not define either the circumstances in which a foreign court should, under English private international law rules, be recognised as having "jurisdiction to entertain" bankruptcy proceedings or, if one were (wrongly in my view) to treat the whole area as one of discretion, the factors which might make it either unjust or contrary to public policy to recognise an avoidance order made in such foreign proceedings (see paras 193, 200 and 201 of Lord Clarke's judgment). The scope of the jurisdiction to entertain bankruptcy

proceedings which English private international law will recognise a foreign court as having is described in Dicey (in para 31-064 in the 14th and 15th editions) as a "vexed and controversial" question. But it would include situations in which the bankrupt or insolvent company had simply submitted to the foreign bankruptcy jurisdiction. On Lord Clarke's analysis, in such a case (of which Rubin v Eurofinance is an example), it would be irrelevant that the debtor under the avoidance order had not submitted, and was not on any other basis subject, to the foreign jurisdiction. It would be enough that the judgment debtor had had the chance of appearing and defending before the foreign court. For the reasons given by Lord Collins, I do not accept that this is the common law.

190   In the light of the above, the Court of Appeal was, in my view, in error in seeing the solution to the present appeals as lying in the advice given by the Board in Cambridge Gas . Even on an assumption that the actual decision in *Cambridge Gas* can be supported, it cannot and should not be treated as supporting the respondents' case that fraudulent preference claims and avoidance orders in insolvency proceedings generally escape the common law rules requiring personal or in rem jurisdiction.

Lord Clarke

191   I would like to pay tribute to the learning in Lord Collins' comprehensive judgment. However, left to myself, I would dismiss the appeal in the Rubin case. Since I am in a minority of one, little is to be gained by my writing a long dissent. I will therefore try to explain my reasons shortly. In doing so, I adopt the terminology and abbreviations used by Lord Collins.

192   I agree with Lord Collins and Lord Mance that the decision of the Privy Council in Cambridge Gas Transportation Corpn v Official Committee of Unsecured Creditors of Navigator Holdings plc [2007] 1 AC 508 is distinguishable. The facts there were quite different from those here. However, in so far as it is suggested that Cambridge Gas was wrongly decided, I do not agree. Moreover, I do not think that it would be appropriate so to hold because it was not submitted to be wrong in the course of the argument. To my mind the approach which should be adopted is presaged in

the speech of Lord Hoffmann in In re HIH Casualty and General Insurance Ltd [2008] 1 WLR 852 and in his judgment in Cambridge Gas .

193  As I see it, the issue is simply whether an avoidance order made by a foreign bankruptcy court made in the course of the bankruptcy proceedings, whether personal or corporate, which the court has jurisdiction to entertain, is unenforceable if it can fairly be said to be an order made either in personam or in rem. I would answer that question in the negative. Put another way, the question is whether the English court has jurisdiction under English rules of private international law to enforce an avoidance order made in foreign bankruptcy proceedings in circumstances where, under those rules, the foreign court has jurisdiction to entertain the bankruptcy proceedings themselves. I would answer that question in the affirmative. It is not, as I understand it, suggested here that the US court did not have jurisdiction to entertain the bankruptcy proceedings themselves.

194  The relevant paragraphs of Lord Hoffmann's judgment in Cambridge Gas are in these terms (as quoted by Lord Collins at para 43 above):

> "13.  … Judgments in rem and in personam are judicial determinations of the existence of rights: in the one case, rights over property and in the other, rights against a person. When a judgment in rem or in personam is recognised by a foreign court, it is accepted as establishing the right which it purports to have determined, without further inquiry into the grounds upon which it did so. The judgment itself is treated as the source of the right.

> 14.  The purpose of bankruptcy proceedings, on the other hand, is not to determine or establish the existence of rights, but to provide a mechanism of collective execution against the property of the debtor by

creditors whose rights are admitted or established. …

> 15  … [B]ankruptcy, whether personal or corporate, is a collective proceeding to enforce rights and not to establish them. Of course, as Brightman LJ pointed out in In re Lines Bros Ltd [1983] Ch 1 , 20, it may incidentally be necessary in the course of bankruptcy proceedings to establish rights which are challenged: proofs of debt may be rejected; or there may be a dispute over whether or not a particular item of property belonged to the debtor and is available for distribution. There are procedures by which these questions may be tried summarily within the bankruptcy proceedings or directed to be determined by ordinary action. But these again are incidental procedural matters and not central to the purpose of the proceedings."

195  The critical paragraph is para 15, which seems to me to make it clear that it is possible to have an order which is both in personam or in rem and an order of the kind referred to by Lord Hoffmann in para 14. Thus it may be incidentally necessary to establish substantive rights in the course of the bankruptcy proceedings as part of a collective proceeding to enforce rights. In such a case the order will be doing two things. It will be both establishing the right and enforcing it. This can be seen from the examples given in para 15. Proofs of debt may be rejected, which is a process which may involve determining, for example, the substantive rights of the creditor against the debtor. Or it may be necessary to determine whether or not a particular item of property belongs to the debtor and is available for distribution. As para 15 contemplates, such procedures may be tried either summarily within the bankruptcy proceedings or by ordinary action. In either such case Lord Hoffmann describes them as incidental procedures which are not

Rubin v Eurofinance SA, 2012 WL 4869953 (2012)

central to the purpose of the bankruptcy proceedings. As I see it, in such a case, an avoidance order may be both an order in personam or in rem and an order in the bankruptcy proceedings.

196   I agree with Lord Collins at para 103 that it is not easy to see why the order of the US Bankruptcy Court in Cambridge Gas was not an order in rem. However, that does not to my mind show that Cambridge Gas was wrongly decided but demonstrates that it is possible to have an in rem order which is made as incidental to bankruptcy proceedings but which is enforceable at common law, provided that the bankruptcy court has jurisdiction in the bankruptcy.

197   The approach is explained by Lord Hoffmann in HIH at para 30 and in Cambridge Gas at para 16, both of which are quoted by Lord Collins at para 19 above. In HIH he said:

> "The primary rule of private international law which seems to me applicable to this case is the principle of (modified) universalism, which has been the golden thread running through English cross-border insolvency law since the 18th century. That principle requires that English courts should, so far as is consistent with justice and UK public policy, co-operate with the courts in the country of the principal liquidation to ensure that all the company's assets are distributed to its creditors under a single system of distribution."

In Cambridge Gas he said:

> "The English common law has traditionally taken the view that fairness between creditors requires that, ideally, bankruptcy proceedings should have universal application. There should be a single bankruptcy in which all creditors are entitled and required to prove.

> No one should have an advantage because he happens to live in a jurisdiction where more of the assets or fewer of the creditors are situated. …"

198   At paras 94 to 98 above Lord Collins discusses the nature of avoidance proceedings. I entirely agree with his analysis. Avoidance provisions requiring the adjustment of prior transactions and the recovery of previous dispositions of property so as to constitute the estate available for distribution are necessary in order to maintain the principle of equality among creditors. At para 15 Lord Collins notes that Lord Hoffmann said at para 19 of HIH that

> "the process of collection of assets will include, for example, the use of powers to set aside voidable dispositions, which may differ very considerably from those in the English statutory scheme."

In short, avoidance proceedings, and therefore avoidance orders, are central to the bankruptcy proceedings. As Lord Collins puts it at para 98, avoidance proceedings are peculiarly the subject of insolvency law.

199   I accept that to permit the enforcement of an avoidance order in circumstances of this kind would be a development of the common law. However, it seems to me that it would be a principled development. It would in essence be an application of the principle identified by Lord Hoffmann in the passage quoted above from para 30 of HIH that the principle of modified universalism requires that English courts should, so far as is consistent with justice and United Kingdom public policy, co-operate with the courts in the country of the principal liquidation to ensure that all the company's assets are distributed to its creditors under a single system of distribution.

200 The position of the judgment debtor in such a case would be protected by the principle that the English court would only enforce a judgment in a case like this where to do so was consistent with justice and United Kingdom public policy. All would depend upon the facts of the particular case. In the case of Rubin , there would be no injustice in enforcing the judgment against the appellants.

201 Lord Mance notes at para 189 that I do not define either the circumstances in which a foreign court should be recognised as having jurisdiction to entertain bankruptcy proceedings or the factors which would make it unjust or contrary to public policy to recognise an avoidance order made in such foreign proceedings. As I see it, these are matters which would be worked out on a case by case basis in (as Lord Hoffmann put it in HIH at para 30) co-operating with the courts in the country of the principal liquidation to ensure that all the company's assets are distributed to its creditors under a single system of distribution. It would not be irrelevant that the debtor under the avoidance order had not submitted. All would depend upon the particular circumstances of the case, including the reasons why the debtor had not submitted.

202 In essence, on the critical question, I prefer the reasoning of the Court of Appeal, which is contained in the judgment of Ward LJ, with whom Wilson LJ and Henderson J agreed. Lord Collins has concisely summarised their reasoning in paras 88 to 90, substantially as follows: (a) the judgment was final and conclusive, and for definite sums of money, and on the face of the orders was a judgment in personam; (b) it was common ground that the judgment debtors were not present when the proceedings were instituted, and did not submit to the jurisdiction, and so at first blush had an impregnable defence; (c) Cambridge Gas decided that the bankruptcy order with which it was concerned was neither in personam nor in rem, and its purpose was simply to establish a mechanism of collective execution against the property of the debtor by creditors whose rights were admitted or established: Pattni v Ali [2007] 2 AC 85 , para 23; (d) bankruptcy was a collective proceeding to enforce rights and not to establish them: Cambridge Gas [2007] 1 AC 508 , para 15; (e) the issue was whether avoidance proceedings which could only be brought by the representative of the bankrupt were to be characterised as part of the bankruptcy proceedings,

ie part of the collective proceeding to enforce rights and not to establish them; (f) the adversary proceedings were part and parcel of the Chapter 11 proceedings; (g) the ordinary rules for enforcing foreign judgments in personam did not apply to bankruptcy proceedings; (h) avoidance mechanisms were integral to and central to the collective nature of bankruptcy and were not merely incidental procedural matters; (i) the process of collection of assets will include the use of powers to set aside voidable dispositions, which may differ very considerably from those in the English statutory scheme: HIH [2008] 1 WLR 852 , para 19; (j) the judgment of the US Bankruptcy Court was a judgment in, and for the purposes of, the collective enforcement regime of the insolvency proceedings, and was governed by the sui generis private international law rules relating to insolvency; (k) that was a desirable development of the common law founded on the principles of modified universalism, and did not require the court to enforce anything that it could not do, mutatis mutandis, in a domestic context; (l) there was a principle of private international law that bankruptcy should be unitary and universal, and there should be a unitary insolvency proceeding in the court of the bankrupt's domicile which receives worldwide recognition and should apply universally to all the bankrupt's assets; (m) there was a further principle that recognition carried with it the active assistance of the court which included assistance by doing whatever the English court could do in the case of a domestic insolvency; (n) there was no unfairness to the appellants in upholding the judgment because they were fully aware of the proceedings, and after taking advice chose not to participate: see [2011] Ch 133, paras 38, 41, 43, 45, 48, 50, 61-62 and 64.

203 That seems to me to be a correct summary of the views of the Court of Appeal. I agree with those views subject to this comment on point (c). I am not sure that in Cambridge Gas the Privy Council decided that the bankruptcy order with which it was concerned was neither in personam nor in rem. It held that the purpose of the order was simply to establish a mechanism of collective execution against the property of the debtor by creditors whose rights were admitted or established. As discussed above, it may well have appreciated that it was also an order in rem. However that may be, I agree with Lord Collins at para 90 that, in short, the Court of Appeal accepted that the judgment sought to be enforced in the instant cases was an in personam

judgment, but decided that the Dicey Rule did not apply to foreign judgments in avoidance proceedings because they were central to the collective enforcement regime in insolvency and were governed by special rules. I agree with the reasoning of the Court of Appeal. Put another way, the Dicey Rule should in my opinion be modified to include a fifth case in which a foreign court has jurisdiction to give a judgment in personam capable of enforcement or recognition as against the person against whom it is given. That fifth case would be if the judgment was given in avoidance proceedings as part of foreign bankruptcy proceedings which the foreign court had jurisdiction to entertain.

204  I recognise that there are other ways of achieving such a result, as for example by an equivalent provision to the EC Insolvency Regulation : per Lord Collins at paras 99-101. I also recognise that it would be possible to adopt a more radical approach not limited to avoidance proceedings. However, so limited, I respectfully disagree with the view expressed by Lord Collins at para 128 that this development would not be an incremental development of existing principles but

a radical departure from substantially settled law. For the reasons given in para 198, it would in essence be an application of the principle of modified universalism. It seems to me that in these days of global commerce, the step taken by the Court of Appeal was but a small step forward. Judgment debtors are protected by the principle that no order would be made if it were contrary to justice or United Kingdom public policy. Moreover, on the facts here, I can see no basis upon which the order made by the Court of Appeal would be either unjust or contrary to public policy. Finally, I do not think that that conclusion is undermined by any absence of reciprocity.

205  For these reasons, I would dismiss the appeal in the Rubin case on the common law point. On all other issues I agree with the judgment of Lord Collins.

Crown copyright

© 2017 Sweet & Maxwell

2012 WL 4866933

 © 2017 Thomson Reuters.

  © 2017 Thomson Reuters.

# TAB 11

*678  Seaconsar Far East Limited v.
Bank Markazi Jomhouri Islami Iran
Before: the House of Lords (England)
14 October 1993

**[1994] I.L.Pr. 678**

( Lord Templeman , Lord Griffiths , Lord Goff of
Chieveley , Lord Browne-Wilkinson and Lord Mustill )
14 October 1993

**Analysis**

Appeal concerning an application for leave to serve a writ
out of the jurisdiction.

Leave to serve outside jurisdiction. Application. Under
many paragraphs of the Rules of the Supreme Court
relating to leave to serve out of the jurisdiction, once
the plaintiff's claim is shown to have been made under a
certain statutory provision, the jurisdiction of the court
is established, and a separate question will arise as to
the merits of the plaintiff's claim. As regards the contract
provision, what has to be sufficiently shown by the
plaintiff for the purpose of establishing jurisdiction is not
merely that, if the contract existed, it was made within the
jurisdiction, but that (1) there was a contract, and (2) such
contract was made within the jurisdiction. But once the
existence of the contract is proved, there arises a separate
question as to the merits of the plaintiff's claim relative to
that contract. [20]

Jurisdiction. Forum conveniens. It has been consistently
stated that it is a serious question whether jurisdiction
under the jurisdictional provisions of the Rules of the
Supreme Court ought to be invoked in order to put
a person outside the jurisdiction to the inconvenience
and annoyance of being brought to contest his rights in
England. This point of principle is, however, very largely
met by the application in this context of the doctrine
of forum conveniens . The effect of this development
is that, given that jurisdiction is established under one
of the paragraphs of the relevant rule and that proper
regard is paid to the principle of forum conveniens , it is
difficult to see why the fact that the writ is to be served

out of the jurisdiction should have any particular impact
upon the standard of proof required in respect of the
existence of the cause of action. A case particularly strong
on the merits cannot compensate for a weak case on forum
conveniens , and vice versa. The two elements are separate
and distinct. The invocation of the principle of forum
conveniens springs from the often expressed anxiety that
great care should be taken in bringing  *679  before the
English court a foreigner who owes no allegiance here.
But if jurisdiction is established under the rules, and it is
also established that England is the forum conveniens ,
there is no good reason why any particular degree of
cogency should be required in relation to the merits of the
plaintiff's case. A judge faced with a question of leave to
serve proceedings out of the jurisdiction will, therefore,
in practice have to consider both whether jurisdiction has
been sufficiently established on the criterion of the good
arguable case under one of the paragraphs of the rule and
whether there is a serious issue to be tried, so as to enable
him to exercise his discretion to grant leave, before he
goes on to consider the exercise of that discretion with
particular reference to the issue of forum conveniens . [20]
—[23]

The appellant was a Hong Kong arms dealer which agreed
to sell a large quantity of artillery shells to the Iranian
Ministry of Defence, payment to be by letter of credit. The
respondent Iranian bank opened the letter of credit, which
was unconfirmed and available at sight in London at the
London branch of another Iranian bank. Pursuant to the
sales contract, the appellant made two shipments from
Portugal to Iran and made presentations of documents to
the bank in London in respect of each. The bank failed or
refused to pay on either on the ground that the documents
presented were in certain respects not in accordance with
the terms of the letter of credit. Both consignments were
delivered, but the balance of the contract was cancelled.
The appellant brought an action against the bank for
damages for breach of contract in respect of its failure
to pay against both presentations. Leave was granted to
serve the proceedings outside the jurisdiction, but the bank
applied to set it aside. Its application was dismissed as
regards the first presentation, but the order for leave was
set aside as regards the second. The Court of Appeal
dismissed the appeals of both parties, and the appellant
alone appealed that dismissal.

WESTLAW   © 2017 Thomson Reuters.

The application for leave had been made either on the basis that the contract was made within the jurisdiction, or that it was made by or through the bank in London acting as agent within the jurisdiction for the respondent in Iran, or that the breach of contract took place within the jurisdiction. The respondent never disputed that the case fell under one of these heads; merely that the appellant had not established a sufficiently strong case on the merits. The issues were, therefore: (a) what constituted a sufficiently strong case on the merits; and (b) whether the appellant had satisfied the test in relation to whether the documents were in conformity with the requirements of the letter of credit, whether the London bank had the authority to reject the documents, whether that bank did, in fact, reject those documents, and whether such rejection took place within a reasonable time. A third issue arose, namely whether the court should take into account, in exercising its discretion in respect of the second presentation, the fact **680** that the appellant's claim relating to the first presentation would be determined in England in any event.

The House held that the Court of Appeal was wrong when it refused the appellant leave to serve the proceedings out of the jurisdiction, and that the House should therefore substitute its own discretion. It was not prepared to hold that there was no serious issue to be tried as to the London bank's authority to reject the documents. The appellant should not be debarred from arguing that the London bank's rejection was in any event made out of time, and thus there was a serious issue to be tried on that point, too. Thus, the appellant plaintiff had shown the existence of a serious issue to be tried, and leave to serve out of the jurisdiction should be given in respect of both presentations.

## Representation

• Sidney Kentridge, Q.C. and Simon Rainey , instructed by Clyde & Co. , appeared for the appellants.
• Nicholas Chambers, Q.C. and Mark Hapgood , instructed by Stephenson Hardwood , appeared for the defendants.

The following cases were referred to in the judgment:

*English courts*

• 1.  Great Australian Gold Mining Co. v. Martin (C.A.), 2 February 1877: (1877) 5 Ch.D. 1 .
• 2.  Societe Generale de Paris v. Dreyefus Brothers (Ch.D.), 26 March 1885; (1885) 29 Ch.D. 239, (1887) 37 Ch.D. 215 .
• 3.  Badische Anilin (C.A.), 1 April 1903; (1903) 88 L.T. 490 , (H.L.), 19 May 1904: (1904) 90 L.T. 733 .
• 4.  Vitkovice Horni A Hutni Tezirstyo v. Korner (H.L.), 20 June 1951: [1951] A.C. 869 .
• 5.  Malik v. Narodni Banka: (1947) 176 L.T. 136 .
• 6.  Spiliada Maritime Corporation v. Canulex Ltd. (H.L.), 19 November 1986: [1987] 1 A.C. 460, [1987] E.C.C. 168 .
• 7.  Societe Commerciale de Reassurance v. Eras International Ltd. (C.A.), 22 July 1991: [1992] 1 Lloyd's Rep. 570 .
• 8.  Overseas Union Insurance Ltd. v. Incorporated General Insurance Ltd. (C.A.), 29 July 1991: [1992] 1 Lloyd's Rep. 439 .
• 9.  Banque Paribas v. Cargill International S.A. (Q.B.), 25 February 1991: [1992] 1 Lloyd's Rep. 96 .
• 10.  Banker's Trust Co. v. State Bank of India (C.A.), 16 May 1991: [1991] 2 Lloyd's Rep. 443 .

## JUDGMENT
LORD TEMPLEMAN:

[1] I have had the advantage of reading in draft the speech prepared by my noble and learned friend Lord Goff of Chieveley, and for the reasons he gives I, too, would allow the appeal.

LORD GRIFFITHS:

[2] For the reasons given in the speech to be delivered by my noble and learned friend Lord Goff of Chieveley, which I have had the opportunity of reading in draft and with which I agree, I would allow this appeal.

LORD GOFF OF CHIEVELEY:

[3] This appeal is concerned with an **\*681** application for leave, under R.S.C. Order 11 , to serve a writ out of the jurisdiction; and it raises in particular the question of the extent to which the plaintiff has to establish, in relation to such an application, a sufficiently strong case on the merits of his claim.

[4]    The appellant, Seaconsar Far East Ltd. ( "Seaconsar" ), is a Hong Kong company which deals in arms. The respondent, Bank Markazi Jomhouri Islami Iran ( "Bank Markazi" ), is an Iranian bank. Under a contract of sale dated 30 June 1986 Seaconsar agreed to sell a large quantity of artillery shells to the Iranian Ministry of Defence for a total price of US$193 million. Payment was to be made by letter of credit. On 15 January 1987 Bank Markazi opened a letter of credit in favour of Seaconsar, covering shipment of "special equipments" (i.e. artillery shells), in a sum of US $18,600,000, valid until 17 March 1988. The letter of credit was unconfirmed, and was available at sight in London at the counters of Bank Melli Iran. It permitted partial shipments, and was expressed to be subject to the Uniform Customs and Practice for Documentary Credits, 1983 Revision ( "the UCP" ). Bank Melli advised Seaconsar of the opening of the credit by letter dated 16 January 1987.

[5]   The credit (as amended) was payable at sight on presentation to Bank Melli in London of the original set of a number of specified documents, including

> Process verbal of goods confirmed
> by orderer's authorized rep. who will
> be fully identified later on.

[6]  Under the heading "other conditions" , there appeared ( *inter alia* ) the following provision:

> Our LC no. and our principal's
> name should appear on all docs. and
> packages.

It is this latter provision which is the principal source of the controversy in the present case, a question having arisen from the fact that the details there specified were omitted from the "process verbal of goods" , which was interpreted as meaning a list of the goods shipped.

[7]   Pursuant to the contract of sale, Seaconsar made two shipments of artillery shells from Setubal in Portugal to Bandar Abbas in Iran. The first shipment was made on 29 September 1987, and the second on 1 December 1987. Seaconsar made a presentation of documents to Bank Melli in London in respect of each shipment, the first presentation being made on Thursday 1 October 1987, and the second on Thursday 3 December 1987. Bank Markazi has failed or refused to make payment in respect of both presentations, on the ground that the documents presented were in certain respects not in conformity with the requirements of the letter of credit. So far as appears from the material before your Lordships, both consignments have been **\*682** discharged in Iran but neither has been paid for, and the balance of the contract has been cancelled.

[8]  The present proceedings are concerned with a claim by Seaconsar against Bank Markazi for damages for breach of contract in respect of Bank Markazi's failure to pay against both presentations. Leave to serve the proceedings on Bank Markazi outside the jurisdiction was granted to Seaconsar *ex parte* by Hobhouse J. Bank Markazi then applied to set aside the order of Hobhouse J. in respect of both presentations. Saville J. dismissed Bank Markazi's application so far as it related to the first presentation, but he set aside the order of Hobhouse J. in relation to the second. Seaconsar then appealed to the Court of Appeal against the latter part of Saville J.'s order, and Bank Markazi cross-appealed against the former. The Court of Appeal (Lloyd, Stuart-Smith and Beldam L.JJ.) dismissed both Seaconsar's appeal and Bank Markazi's cross-appeal, Stuart-Smith L.J. dissenting on the dismissal of Seaconsar's appeal. Seaconsar now appeals to your Lordships' House, with leave of the Court of Appeal, against the dismissal of its appeal. Bank Markazi no longer pursues its cross-appeal. It follows that your Lordships' House is directly concerned only with the second presentation.

[9] Seaconsar applied for leave to serve proceedings out of the jurisdiction under either paragraph (d) or paragraph (e) of R.S.C. rule 1(1) . The application under paragraph

(d) was made either under sub-paragraph (i), on the basis that the contract was made within the jurisdiction, or under sub-paragraph (ii), on the basis that the contract was made by or through Bank Melli, as agent trading within the jurisdiction, for Bank Markazi, which was outside the jurisdiction. The application under paragraph (e) was on the basis of breach of contract within the jurisdiction, *viz.* refusal to pay at the counters of Bank Melli in London. Bank Markazi has never disputed that the case fell under either paragraph (d) or paragraph (e), its sole contention being that Seaconsar had not established a sufficiently strong case on the merits of its claim. On this point, the issues which have arisen in respect of both presentations are very similar. In substance, they are as follows:

(1) What is the test of a sufficiently strong case on the merits to justify the grant to a plaintiff of leave to serve proceedings out of the jurisdiction under Order 11.

(2) Whether Seaconsar has satisfied this test in relation to the merits of the following issues:

> • (a) Whether the documents were in conformity with the requirements of the letter of credit and/or did not give rise to a right of rejection by Bank Markazi;
> • (b) if not, whether Bank Melli had the authority of Bank Markazi to reject the documents;
> • (c) if so, whether Bank Melli did in fact reject the documents;
> • (d) if so, whether such rejection took place within a reasonable time as required by Article 16 of the UCP. **\*683** In addition, in relation to the second presentation there has arisen a third issue, *viz:*

(3) Whether the Court should take into account, in exercising its discretion in respect of the second presentation, the fact that Seaconsar's claim relating to the first presentation will be determined in England in any event.

[10] So far as the first presentation was concerned, the crucial point which persuaded Saville J. to refuse to set aside the order of Hobhouse J. was that, in his opinion, Seaconsar had established a sufficient case on the merits that there was no rejection of the documents by Bank Melli at the material time. In the case of the second

presentation, however, he held that Seaconsar had failed to establish a sufficient case on the merits of any of the four issues listed above as (2)(a)–(d), and so he allowed Bank Markazi's application.

[11] In the Court of Appeal, however, it was held that Saville J. had erred in applying too strict a standard on the question whether Seaconsar had established a sufficient case on the merits, Saville J. having proceeded on the basis that Seaconsar must establish its case on the balance of probabilities. The Court of Appeal, which was united in the opinion that Saville J. had applied too strict a standard, was divided on the proper standard to apply. Lloyd and Beldam L.JJ. considered that Seaconsar had to establish a good arguable case on the merits, whereas Stuart-Smith L.J. was of the opinion that it was enough for Seaconsar to show that it had a case on the merits which was worthy of consideration. All were agreed, however, that in any event Bank Markazi's cross-appeal on the first presentation must fail. On Seaconsar's appeal, the majority held that Seaconsar had failed to establish a good arguable case on any of the four issues raised by it. Stuart-Smith L.J. however considered that Seaconar had established a case worthy of consideration on all four issues. He also considered, in disagreement with the majority, that it was relevant to take into account the fact that proceedings in respect of the first presentation would in any event take place in England, and that this factor provided an additional and cogent reason why the Court should exercise its discretion in favour of Seaconsar in relation to the second presentation.

[12] In argument before the Appellate Committee, attention was concentrated upon the question of the strength of the case on the merits which a plaintiff has to establish in order to justify the grant of leave to serve proceedings out of the jurisdiction under Order 11. On this matter your Lordships had the benefit of a full citation of authority, and were much assisted by the admirable arguments presented to them, both by Mr Kentridge for Seaconsar and by Mr Chambers for Bank Markazi. It became apparent, however, in the course of argument that this point cannot be considered in isolation, but must be examined in its context, together with the other matters **\*684** which fall for consideration by the Court when it is called on to exercise its jurisdiction under Order 11. It is necessary therefore to look at the jurisdiction as a whole,

before reaching a conclusion on the question directly at issue in the present case.

[13] I start, as I must, with the relevant provisions of Order 11. Order 11, rule 1(1) provides that, subject to certain specified exceptions, "…service of a writ out of the jurisdiction is permissible with the leave of the court if in the action begun by the writ …," and there follows a list of 20 specified circumstances, set out in paragraphs lettered (a) to (t) respectively, in which service out of the jurisdiction is permissible. These lettered paragraphs cover a wide range of circumstances. The paragraphs most commonly invoked are (d) and (e), concerned with contractual claims; indeed many of the decided cases are concerned with one or other or both of these two paragraphs. But the problem which has arisen in the present case is not confined to those two paragraphs and may, in theory at least, arise under others. For this reason alone, it is essential not to consider the problem only in relation to the facts of the present case, or to paragraphs (d) and (e), but also in relation to other fact-situations and other paragraphs of rule 1(1). I myself have found this exercise both helpful and revealing, especially as it so happens that paragraphs (d) and (e) are, for present purposes, more complicated in their effect than most, if not all, of the other paragraphs of the rule.

[14] The other rule in Order 11 which is relevant for present purposes is rule 4 , of which we are only concerned with paragraphs 1 and 2. These provide as follows:

    4 —

An application for the grant of leave under rule 1(1) must be supported by an affidavit stating:

    • (a) the grounds on which the application is made;
    • (b) that in the deponent's belief the plaintiff has a good cause of action;
    • (c) in what place or country the defendant is, or probably may be found; and
    • (d) where the application is made under rule 1(1)(c), the grounds for the deponent's belief

that there is between the plaintiff and the person on whom a writ has been served a real issue which the plaintiff may reasonably ask the Court to try.

(2) No such leave shall be granted unless it shall be made sufficiently to appear to the Court that the case is a proper one for service out of the jurisdiction under this Order.

[15] When construing the relevant provisions of these rules, and in particular the relationship between rules 1(1) and 4 , it is helpful first to look at the historical background to the rules in their present form. Order 11 in its original form was one of the Rules of Court scheduled to the Judicature Act 1873 . Rule 1 contained a list of circumstances (shorter than the present list) in which service of a writ outside the jurisdiction might be allowed in the discretion of the court, and rule 3 *685 required an affidavit to be sworn in support of an application for leave for such service, in which the deponent was required to state ( *inter alia* ) the grounds upon which the application was made. At first there was doubt whether evidence must be provided of the existence of the cause of action relied upon, a doubt accentuated by the differing practices on this point previously applicable respectively in the Chancery and common law courts. It was decided that such evidence was required, as part of the affidavit evidence required to state the grounds on which the application was made; and that such statement must identify and substantiate a cause of action falling within one of the authorised heads of jurisdiction. For that purpose, however, it was considered that very probably it would be sufficient if an appropriate deponent swore an affidavit identifying the relevant cause of action, and stating that there was in his belief a good cause of action: see Great Australian Gold Mining Co. v. Martin, [1] especially *per* Bramwell J.A., [2] and the report of the further hearing of the Court of Appeal. [3] When Order 11 came to be revised in 1883, it is plain that the former rule 3 was amended (in the new rule 4) to give effect to the decision of the Court of Appeal in that case. In the result, the affidavit was required in addition to state that

in the belief of the deponent the plaintiff had a good cause of action; and there were added to the rule the words now found in the present rule 4(2). From this it follows that the grounds upon which the application is made, required to be stated in the affidavit, were understood to embrace not merely the head of jurisdiction relied upon but also the cause of action invoked by the plaintiff as falling within that head of jurisdiction. However, although under the new rule 4 the deponent had to state his belief that the plaintiff had a good cause of action, it was later held that that would not necessarily be enough for this purpose to establish the existence of the relevant cause of action, because the Court had still to decide whether it should exercise its discretion to give leave; and for that purpose it had to consider whether the evidence showed that the cause of action relied upon the plaintiff was sufficiently firmly established (see Societe Generale de Paris v. Dreyfus Brothers ). [4] In this connection, the concluding words of the new rule 4 (now rule 4(2)) were not regarded as relevant, for they are directed not to the existence of the cause of action but to the question whether the plaintiff has sufficiently established that the case falls within one of the heads of jurisdiction specified in rule 1 .

[16] For the purpose of considering whether the existence of the relevant cause of action has been sufficiently established, a number of different test have been stated by judges as being apposite. For example, in Dreyfus, which appears to have been the first reported case after the amendment of Order 11 in 1883, Pearson J. at first *686 instance considered [5] that it was enough that there was "a very serious question to be tried between the parties." In the Court of Appeal, both Cotton and Lindley L.JJ. preferred the test of "a probable cause of action" and Lopes L.J. the test of "a prima facie case" . [6] We find a comparable divergence of opinion in the judgments in the Badische Anilin litigation. [7] This divergence of opinion reflects a number of conflicting considerations. Perhaps the clearest and most authoritative statement of the position is to be found in the speech of Lord Davey, [8] where he said:

> An injunction is sought to restrain the defendants from doing some act within the jurisdiction. Rule 4 of the same order prescribes that the application is to be supported by evidence stating that in the belief of

the deponent the plaintiff has a good cause of action, and no such leave is to be granted unless it be made sufficiently to appear to the court or judge that the case is a proper one for service out of the jurisdiction under this order. This does not, of course, mean that a mere statement by any deponent who is put forward to make the affidavit that he believes that there is a good cause of action is sufficient. On the other hand, the court is not, on an application for leave to serve out of the jurisdiction, or on a motion made to discharge an order for such service, called upon to try the action or express a premature opinion on its merits, and where there are conflicting statements as to material facts, any such opinion must necessarily be based on insufficient materials. But I think that the application should be supported by an affidavit stating facts which, if proved, would be a sufficient foundation for the alleged cause of action, and, as a rule, the affidavit should be by some person acquainted with the facts, or, at any rate, should specify the sources or persons from whom the deponent derives his information. A more difficult question is where it is in dispute whether the alleged or admitted facts will, as a matter of law, entitle the plaintiff to the relief which he seeks. If the court is judicially satisfied that the alleged facts, if proved, will not support the action, I think the court ought to say so, and dismiss the application or discharge the order. But where there is a substantial legal question arising on the facts disclosed by the affidavits which the plaintiff bona fide desires to try, I think that the court should, as a rule, allow the service of the writ. The words at the end of the order do not, I think,

mean more than that the court is to be satisfied that the case comes within the class of cases in which service abroad may be made under the first rule of the order.

On this approach, if in support of the plaintiff's *ex parte* application an affidavit is sworn in proper form deposing to facts which, if proved, provide a sufficient foundation for the alleged cause of action, that should generally be enough for present purposes. This is no doubt what a number of judges have referred to when they have used the expression "prima facie case" in this context. The problem arises from the fact that the court will consider, on an application to set aside leave so given, affidavit evidence on the part of the defendant, and will take such evidence into account when deciding whether or not to exercise **\*687** its discretion in favour of the plaintiff. But the court cannot resolve disputed questions of fact on affidavit evidence; and it is consistent with the statement of the law by Lord Davey that if, at the end of the day, there remains a substantial question of fact or law or both, arising on the facts disclosed by the affidavits, which the plaintiff bona fide desires to try, the court should, as a rule, allow the service of the writ. If this approach is correct, the standard of proof in respect of the cause of action can broadly be stated to be whether, on the affidavit evidence before the court, there is a serious question to be tried.

[17]  The question arose again, though indirectly, before your Lordships' House in Vitkovice Horni A Hutni Tezirstvo v. Korner, [9] which was concerned, primarily at least, not with the strength of the plaintiff's case on the merits, but with the standard of proof applicable when considering whether the jurisdiction of the court has been sufficiently established under one or more of the paragraphs of rule 1(1). The plaintiff's claim was advanced under what is now paragraph (e), it being alleged that the claim was brought in respect of a breach committed within the jurisdiction of a contract made within or out of the jurisdiction. The plaintiff brought an action in 1946 claiming arrears of pension and salary which he said were due to him from the defendant company, which was incorporated in Czechoslovakia. In support of his case that his claim fell within paragraph (e), he relied on an oral agreement which he said had been made early in January 1929, in Czechoslovakia, with the general manager of the

defendant company, that he should receive payment of his pension from the defendants in the country in which he might be living at the time when it accrued. It was on this basis ( *inter alia* ) that he contended that the defendant company was bound to pay him his pension in London and that its failure to do so constituted a breach of contract within the jurisdiction. Slade J. refused his application for leave to serve the proceedings outside the jurisdiction. In so doing, he relied upon a statement of the law by Goddard L.J. in Malik v. Narodni Banka, [10] a case also concerned with what is now paragraph (e) of rule 1(1), in which Goddard L.J. [11] appears to have drawn a distinction between, on the one hand, the questions (1) whether there was a contract and (2) whether there had been a breach of the contract; and on the other hand the question (3) whether such breach had been committed within the jurisdiction. Goddard L.J. stated that, so far as the first two questions were concerned, the plaintiffs was only required to show "a case which can be properly put before the court and argued" ; but so far as the third question was concerned, Slade J. understood him to say that the plaintiff had to satisfy the Court on the civil burden of proof. Applying the latter test, Slade J. considered that the plaintiff had not so satisfied him that the alleged breach had been committed within the **\*688** jurisdiction. In the Court of Appeal, there was some difference of opinion between the members of the Court as to the applicable principle; but the majority of the Court held that the plaintiff's appeal must be allowed.

[18]  The case was therefore in some disarray when it came before the House of Lords. This House took the view that Goddard L.J.'s statement of the law in Malik, or at least Slade J.'s understanding of it, was erroneous in so far as it required that the plaintiff must satisfy the court on the civil burden of proof that his case fell within one of the heads of jurisdiction in rule 1(1). The applicable standard was laid down in rule 4(2) of Order 11, which required no more than that it should be made sufficiently to appear to the court that the case was a proper one for service out of the jurisdiction, a requirement which was inconsistent with a standard of proof "which in effect amounted to a trial of the action or a premature expression of opinion on its merits" . [12] Equally, the expression "prima facie case" was rejected as inappropriate, because a conflict may arise on the material before the court, which has to reach a conclusion on all the materials then before it. In an

endeavour to assist on the degree of sufficiency required by rule 4(2) Lord Simonds (with whom Lord Normand agreed) said [13] that: "The description 'a good arguable case' has been suggested [by counsel for the plaintiff] and I do not quarrel with it" ; and Lord Radcliffe (with whose statement of principle Lord Tucker agreed) used the expressions "a strong argument" , [14] and "a strong case for argument" . [15] There is no reason to suppose that there is any material difference between these various expressions, from which is derived the "good arguable case" test which has been applied in innumerable cases since. At all events, the House of Lords held unanimously that, on that test, the plaintiff was entitled to succeed, and so dismissed the appeal.

[19]   For present purposes, it is relevant to consider to which elements in what is now paragraph (e) the House of Lords concluded that the "good arguable case" test should be applied. Lord Radcliffe was of the opinion that he was unable to be "satisfied as to where a breach of contract had taken place without being at any rate as much satisfied that the contract existed and had been broken" . [16] On this approach (with which, as I understand it, Lord Tucker was in agreement), [17] it will be necessary for the purpose of establishing jurisdiction under paragraph (e) not merely to show (to the extent required by rule 4(2)) that, if there was a contract and it had been broken, such breach was committed within the jurisdiction (which had been the view of Goddard L.J. in Malik ) but so to establish all three **689** elements of contract, breach and place of breach. Likewise, Lord Simonds considered [18] that the plaintiff's prospects of establishing the existence of the oral agreement on which he relied were relevant to the question of jurisdiction. Lord Normand agreed generally with Lord Simonds; and Lord Oaksey expressed no opinion on the point. It follows that four members of the Appellate Committee must be taken to have decided that, when considering what is now paragraph (e), all three elements of contract, breach and place of breach must be established, to the extent required by rule 4(2), before the plaintiff can successfully invoke the jurisdiction of the court under that paragraph. It also follows that, under that paragraph, no separate issue will arise on the merits of the plaintiff's claim to which a lower standard of proof might be applied; and for that reason no question arose directly as to the standard of proof applicable to the merits of the plaintiff's claim in Korner's case, though the

point was adverted to by Lord Tucker. I wish to record in parenthesis my suspicion that a failure to appreciate this point has led to a belief that the "good arguable case" test established in Korner's case is as applicable to the merits of the plaintiff's case as it is to the question of jurisdiction under rule 1(1)—as indeed has been stated in successive editions of the Supreme Court Practice. [19]

[20]   But the same does not apply in the case of other paragraphs of rule 1(1). Under many paragraphs, once the plaintiff's claim is shown to have been made under a certain statutory provision, the jurisdiction of the court is established; and a separate question will arise as to the merits of the plaintiff's claim. [20] Another obvious example is to be found in paragraph (a), concerned with relief sought against a person domiciled within the jurisdiction. There, once the plaintiff has established, to the standard required by rule 4(2), that the defendant is domiciled within the jurisdiction, jurisdiction under paragraph (a) is established and a separate question will arise as to the merits of his claim. Paragraph (d), the other paragraph concerned with contractual claims, and one which is relevant in the present case, is more complex. It provides as follows:

> (d) the claim is brought to enforce, rescind, dissolve, annul or otherwise affect a contract, or to recover damages or obtain other relief in respect of the breach of a contract, being (in either case) a contract which:
>
> • (i)   was made within the jurisdiction; or
> • (ii)  was made by or through an agent trading or residing within the jurisdiction on behalf of a principal trading or residing out of the jurisdiction; or
> • (iii)   is by its terms, or by implication, governed by English law; or
> • (iv) contains a term to the effect that the High Court shall have **690** jurisdiction to hear and determine any action in respect of the contract;

As I read the paragraph, however, and having regard to the view formed in Korner 's case, I am of the opinion that what has to be sufficiently shown by the plaintiff for the purpose of establishing jurisdiction is, in the case of, for example, sub-paragraph (i), not merely that, if the contract existed, it was made within the jurisdiction, but that (1) there was a contract, and (2) such contract was made within the jurisdiction. Likewise, under sub-paragraphs (ii), (iii) and (iv), the existence of the relevant contract has to be sufficiently proved. But, once that is done, there arises a separate question as to the merits of the plaintiff's claim relative to that contract. That question was however not addressed by their Lordships in Korner 's case, with the exception of Lord Tucker, who expressed the opinion (with reference to claims founded on a tort under paragraph (ee), now paragraph (f)) that a lesser burden will fall on the plaintiff with regard to the merits of his claim, [21] *viz.* whether the affidavits disclose a case which appears to merit consideration at the trial— a test consistent with the approach of Lord Davey in the Badische Anilin case, and indeed with that of Goddard L.J. in Malik insofar as he was not concerned with the question of jurisdiction under rule 1(1).

[21] This approach is consistent with rule 4(1)(d) of Order 11 , concerned with applications made under rule 1(1)(c). Moreover, support for this approach is to be derived from the development of the requirement of forum conveniens as an element in the exercise of the court's discretion under Order 11. It has been consistently stated, at least since the judgment of Pearson J. in Dreyfus, that it is a serious question whether the jurisdiction under Order 11 ought to be invoked, to put a person outside the jurisdiction to the "inconvenience and annoyance of being brought to contest his rights in this country." It is, of course, true to say that any inconvenience involved has been much reduced by modern methods of communication; but the point of principle remains. This is however very largely met by the application in this context of the principle of *forum convenient,* (as to which see Spiliada Maritime Corporation v. Cansulex Ltd. ). [22] The effect of this development is that, given that jurisdiction is established under one of the paragraphs of rule 1(1) and that proper regard is paid to the principle of *forum conveniens,* it is difficult to see why the fact that the writ is to be served out of the jurisdiction should have any particular impact

upon the standard of proof required in respect of the existence of the cause of action. On this point, I find myself in respectful disagreement with the opinion expressed by Lloyd L.J. to the contrary in the Court of Appeal. [23] I prefer the approach of Stuart-Smith L.J. **\*691** when [24] he commended his preferred view as consonant with common sense and policy, and continued:

> It seems to me to be wholly inappropriate once the question[s] of jurisdiction and forum [ conveniens ] are established for there to be prolonged debate and consideration of the merits of the plaintiffs' claim at the interlocutory stage.

[22] It has been suggested that, since both the assessment of the merits of the plaintiff's claim and the principle of forum conveniens fall to be considered as elements in the exercise of the Court's discretion, these should be regarded as interrelated in the sense that "the more conspicuous the presence of one element, the less insistent the demands of justice that the other should also be conspicuous" : see Societe Commerciale de Reassurance v. Eras International Ltd. [25] This approach originated in the speech of Lord Oaksey in Korner's case [26] to the effect that the strength of the evidence in that case as to *forum conveniens* was such that only the slightest evidence was required of there having been a breach of contract within the jurisdiction. Lord Oaksey's speech also provided the inspiration for an expression of opinion by Parker L.J. to the effect that, if there is overwhelming evidence that England is the appropriate forum, it will be enough that, on the merits, the plaintiff's case is worthy of serious consideration: see Overseas Union Insurance Ltd. v. Incorporated General Insurance Ltd., [27] and see also Banque Paribas v. Cargill International S.A. [28] I must however express my respectful disagreement with this approach. Suppose that, for example, the plaintiff's case is very strong on the merits. If so, I cannot see that a case particularly strong on the merits can compensate for a weak case on forum conveniens . Likewise, in my opinion, a very strong connection with the English forum cannot justify a weak case on the merits, if a stronger case on the merits would otherwise be required. In truth, as I see it, the two elements are separate and distinct. The

invocation of the principle of forum conveniens springs from the often expressed anxiety that great care should be taken in bringing before the English court a foreigner who owes no allegiance here. But if jurisdiction is established under rule 1(1), and it is also established that England is the forum conveniens , I can see no good reason why any particular degree of cogency should be required in relation to the merits of the plaintiff's case.

[23] I wish also to refer to the view expressed by Stuart-Smith L.J. in the Court of Appeal that it was relevant to take into account the fact **\*692** that proceedings in respect of the first presentation would in any event take place in England, and that this factor provided an additional and cogent reason why the court should exercise its discretion in favour of Seaconsar in relation to the second presentation. [29] However, if the plaintiff's case is not sufficiently strong on the merits, I cannot see that that weakness can be compensated for by the fact that other related proceedings are to proceed within the English jurisdiction. That is a matter which may be relevant to the question whether England is the forum conveniens for the proceedings in question. In the present case, however, there is no issue between the parties on forum conveniens , and I cannot therefore see that the fact that the proceedings in respect of the first presentation are going to proceed in this country in any event has any bearing on the issues in the present appeal.

[24] Once it is recognised that, so far as the merits of the plaintiff's claim are concerned, no more is required than that the evidence should disclose that there is a serious issue to be tried, it is difficult to see how this matter, although it falls within the ambit of the court's discretion, has not in practice to be established in any event. This is because it is very difficult to conceive how a judge could, in the proper exercise of his discretion, give leave where there was no serious issue to be tried. Accordingly, a judge faced with a question of leave to serve proceedings out of the jurisdiction under Order 11 will in practice have to consider both (1) whether jurisdiction has been sufficiently established, on the criterion of the good arguable case laid down in Korner's case, under one of the paragraphs of rule 1(1), and (2) whether there is a serious issue to be tried, so as to enable him to exercise his discretion to grant leave, before he goes on to consider the exercise of that

discretion, with particular reference to the issue of forum conveniens .

[25] For these reasons I have come to the conclusion that, so far as sub-paragraphs (d)(i) or (ii) of rule 1(1) are concerned, the majority of the Court of Appeal erred when they held that Seaconsar had to establish under either of those sub-paragraphs good arguable case on the merits. In my opinion, it was enough for Seaconsar to establish under either of those sub-paragraphs that there was, in respect of one or more of the four points arising on the second presentation, a serious issue to be tried. It follows that the Court of Appeal erred in the exercise of their discretion when they refused leave to Seaconsar to serve proceedings out of the jurisdiction, and it is now necessary for your Lordships to consider whether, in the exercise of their discretion, such leave should be given.

[26] As I have already indicated, the four points which arose on the second presentation were (1) whether the documents conformed to the letter of credit; (2) if not, whether Bank Melli had the authority of Bank Markazi to reject the documents; (3) if so, whether Bank Melli **\*693** did in fact reject the documents; and (4) if so, whether such rejection took place within a reasonable time as required by Article 16 of the UCP.

[27] I can deal with this aspect of the appeal quite briefly. I take first point (2). It appears that the UCP do not positively confer authority on the advising bank to reject the documents. Indeed, Article 16(d) speaks in terms of the decision to refuse the documents being made by the issuing bank. If that is right, the question whether Bank Melli had the necessary authority from Bank Markazi is a matter of evidence; and, on the evidence presently available, I am not prepared to hold that there is no serious issue to be tried as to the existence of the relevant authority. Turning next to point (4), Seaconsar first put forward its case on the basis that a reasonable time for rejecting the documents under Article 16(c) of the UCP was five working days. But, before the Court of Appeal, it indicated that it wished to argue that a period of five working days was in fact too long a time, and that a reasonable time for objection in the circumstances of the present case was no more than two working days. If this latter proposition is correct, it appears on the evidence that the rejection was not made

in time. In support of this proposition Seaconsar seeks to rely on Bankers Trust Co. v. State Bank of India, 30 and on passages in certain textbooks, in particular *Paget's Law of Banking.* 31 I myself do not consider that Seaconsar should be shut out from advancing this second proposition, even though it may be handicapped by its previous stance as to the relevant period of time; and on this basis, I consider that there is a serious issue to be tried on point (4) as well. For these reasons, the claim identified by Seaconsar gives rise to serious issues to be tried, and in the circumstances, it is unnecessary for me to say anything about points (1) and (3).

[28]  I would therefore allow the appeal, and I would propose that leave be given to Seaconsar to serve the proceedings outside the jurisdiction in respect of the second presentation, as well as the first. I would also propose that Bank Markazi be ordered to pay the costs of Seaconsar before your Lordships' House, but that costs incurred at first instance and in the Court of Appeal be

costs in the cause save that, as ordered by Saville J., Seaconsar must pay the costs of Bank Markazi in respect of the period down to 30 November 1990 forthwith.

LORD BROWNE-WILKINSON:

[29]  For the reasons given in the speech prepared by my noble and learned friend Lord Goff of Chieveley, I too would allow the appeal.

LORD MUSTILL:

[30]  I have had the advantage of reading in draft the speech prepared by my noble and learned friend Lord Goff of Chieveley, and for the reasons which he gives I, too, would allow the appeal.  **\*694**

## Footnotes

| | |
|---|---|
| 1 | (1877) 5 Ch.D. 1 . |
| 2 | At pp. 16–18. |
| 3 | At pp. 18–19. |
| 4 | (1885) 29 Ch.D. 239, (1887) 37 Ch.D. 215 . |
| 5 | See (1885) 29 Ch.D. 239 at pp. 245–46. |
| 6 | See (1887) 37 Ch.D. 215 at pp. 222–23, 225 and 226 respectively. |
| 7 | See (1903) 88 L.T. 490 (C.A.), (1904) 90 L.T. 733 (H.L.). |
| 8 | (1904) 90 L.T. 733 at p. 735. |
| 9 | [1951] A.C. 869 . |
| 10 | (1947) 176 L.T. 136 . |
| 11 | At p. 137. |
| 12 | See p. 879, *per* Lord Simonds. |
| 13 | At p. 880. |
| 14 | At pp. 883, 885. |
| 15 | At p. 884. |
| 16 | See pp. 883–84. |
| 17 | See p. 890. |
| 18 | At p. 879. |
| 19 | See the 1993 edition, para. 11/1/6 at p. 85. |
| 20 | See, e.g., paras. (q), (r) and (s). |
| 21 | See p. 889. |
| 22 | [1987] 1 A.C. 460 at pp. 481–82, [1987] E.C.C. 168 . |
| 23 | At p. 242. |
| 24 | At p. 248. |
| 25 | [1992] 1 Lloyd's Rep. 570 at p. 588, *per* Mustill L.J. |
| 26 | At pp. 881–82. |
| 27 | [1992] 1 Lloyd's Rep. 439 at p. 448. |
| 28 | [1992] 1 Lloyd's Rep. 96 . |
| 29 | At p. 250. |

Seaconsar (Far East) Ltd v Bank Markazi Jomhouri Islami..., [1994] I.L.Pr. 678 (1993)

30    [1991] 2 Lloyd's Rep. 443 .
31    10th ed., p. 643.

[1994] I.L.Pr. 678

© 2017 Sweet & Maxwell

---

**End of Document**                                              © 2017 Thomson Reuters.

# TAB 12

Vizcaya Partners Limited v.
**Picard and another (Gibraltar)**
Privy Council Appeal No 0048 of 2014
Court of Appeal of Gibraltar
3 February 2016

**[2016] UKPC 5**

**2016 WL 00386273**

before Lord Neuberger Lord Mance
Lord Clarke Lord Sumption Lord Collins
Judgment Given On 3 February 2016

**Analysis**

Heard on 14 December 2015

**Representation**

 •Appellant Michael Driscoll QC (Instructed by
Katten Muchin Rosenman UK LLP ).
 •Respondent (Irving Picard) Pushpinder Saini QC
Keith Azopardi QC Shaheed Fatima (Instructed by
Browne Jacobson LLP ).

**Judgment**
Lord Collins:

**Introduction**

1    This appeal arises out of the fraudulent Ponzi
scheme operated by Bernard Madoff, through his
company Bernard L Madoff Investment Securities LLC
("BLMIS"), a New York corporation. After Madoff's
fraud came to light in 2008, Irving Picard ("the trustee")
was appointed as trustee in BLMIS's liquidation in
the US Bankruptcy Court for the Southern District
of New York ("the New York Bankruptcy Court").
The trustee commenced proceedings under the anti-
avoidance provisions of the US Bankruptcy Code
against investors who had been repaid before the
fraud was discovered, including the appellant, Vizcaya

Partners Limited ("Vizcaya"), a BVI company which
carried on business as an investment fund, and which
invested about US$328m with BLMIS between January
2002 and December 2008, but was repaid US$180m
before the fraud was discovered.

2    In New York the trustee obtained a judgment
in default of appearance against Vizcaya and its
shareholders. The judgment against Vizcaya was for
US$180m, and US$74m of the funds transferred to
Vizcaya was in Gibraltar. Because of his concern to
enforce the judgment against Vizcaya (and others)
abroad, the trustee sought (in his capacity as a party to
proceedings in Gibraltar, including these proceedings,
and in the Cayman Islands), and was given permission
to intervene in the appeal in the UK Supreme Court
in Rubin v Eurofinance SA [2012] UKSC 46, [2013]
1 AC 236 . That appeal concerned the enforceability
in England of an unrelated default judgment in the
New York Bankruptcy Court. In that decision the UK
Supreme Court held, in summary, that at common law
a foreign judgment *in personam* would be enforced in
England only if the judgment debtor had been present
in the foreign country when the proceedings had been
commenced, or if it had submitted to its jurisdiction;
and that, as a matter of policy, the court would not
adopt a more liberal rule in respect of the enforcement
of judgments in insolvency cases in the interests of the
universality of bankruptcy, any change in the settled law
of the recognition and enforcement of judgments being
a matter for the legislature.

3    This appeal concerns primarily the content and
scope of the rule that a foreign default judgment is
enforceable against a judgment debtor who has made a
prior submission to the jurisdiction of the foreign court
(as distinct from a submission by appearance in the
proceedings). The principle is set out in Dicey, Morris
& Collins, *Conflict of Laws* , 15th ed, 2012 ("Dicey"),
para 14R-054 ("Dicey's Fourth Case"):

> "… a court of a foreign country
> outside the United Kingdom has
> jurisdiction to give a judgment *in
> personam* capable of enforcement or
> recognition as against the person
> against whom it was given …

Vizcaya Partners Ltd v Picard, 2016 WL 00386273 (2016)

…


**Fourth Case —**

If the person against whom the judgment was given had before the commencement of the proceedings agreed, in respect of the subject matter of the proceedings, to submit to the jurisdiction of the court or of the courts of that country."


4  An important and controversial question which has been debated on this appeal is whether the agreement to submit must be express, or can also be implied or inferred.

5   The conditions for the enforcement of foreign judgments at common law remain an important practical question, notwithstanding the fact that in the United Kingdom much of the ground is covered by statute and by European Union legislation, for these reasons: first, the common law rules continue to apply in the United Kingdom to the many countries, some of them of great trading importance (such as the United States, China and Japan), with which there are no treaties or other arrangements for the reciprocal enforcement of judgments; second, the statutory schemes in the Administration of Justice Act 1920 (which applies to many Commonwealth countries) and the Foreign Judgments (Reciprocal Enforcement) Act 1933 (which still applies to several foreign countries, to some British dependencies, and to some Commonwealth countries including Australia, Canada and India), and their equivalents in the Commonwealth, are based on the common law and fall to be interpreted in accordance with the common law; and third, the common law rules continue to apply in many parts of the Commonwealth.

6  The common law rules which identified those foreign courts which were to be regarded as having jurisdiction for the purpose of the recognition and enforcement of judgments were developed in the 19th century, and had

largely (though not entirely) been settled by the time of the great decisions of the Court of Appeal in Schibsby v Westenholz (1870-1871) LR 6 QB 155 and Copin v Adamson (1875) 1 Ex D 17 , so that when Fry J came to give his summary of the principles in Rousillon v Rousillon (1880) 14 Ch D 351 , 371, he was able to say that having regard to those decisions: "The Courts of this country consider the defendant bound … where he has contracted to submit himself to the forum in which the judgment was obtained."

7   Jurisdiction clauses were not then the everyday occurrence they now are today, but there are early cases on enforcement of foreign judgments applying the principle, such as Feyerick v Hubbard (1902) 71 LJKB 509 (Walton J: "All disputes … shall be submitted to the Belgian jurisdiction"); Jeannot v Fuerst (1909) 25 TLR 424 (Bray J: "the French Tribunals of Commerce alone to have jurisdiction").

8   The common law principles were reflected in the legislation governing recognition and enforcement of foreign judgments. The Administration of Justice Act 1920, section 9(2)(b) , provides that no judgment is to be enforced under the section if "the judgment debtor, being a person who was neither carrying on business nor ordinarily resident within the jurisdiction of the original court, did not voluntarily appear or otherwise submit or agree to submit to the jurisdiction of that court". The Foreign Judgments (Reciprocal Enforcement) Act 1933, section 4(2) , provides, so far as material, that the foreign court would be regarded as having jurisdiction "(iii) if the judgment debtor, being a defendant in the original court, had before the commencement of the proceedings agreed, in respect of the subject matter of the proceedings, to submit to the jurisdiction of that court or of the courts of the country of that court".

9   After the hearing of the appeal but before the advice was tendered, the Board was informed by the parties that the litigation had been settled, subject to the approval of the New York Bankruptcy Court. Where an appeal raises issues which are of general importance (as opposed to being of significance only to the parties), and full argument has been heard, a court may deliver judgment notwithstanding any settlement. This is a case which raises issues which are not only of general importance, but which are of international importance in other common law countries. The Board indicated

Vizcaya Partners Ltd v Picard, 2016 WL 00386273 (2016)

to the parties that it retained the power to deliver its advice, but that the advice would not be delivered until the settlement was approved by the New York Bankruptcy Court.

## Background

10    The contractual documents which governed Vizcaya's investment with BLMIS were entered into on Vizcaya's behalf by a custodian bank (originally Bank Safra (France) and then Bank Safra (Gibraltar)) on behalf of Vizcaya. Those which were in force in 2008 were those dated March 23, 2005. There were three contractual documents, namely: (1) a Trading Authorization, (2) an Option Agreement, and (3) a Customer Agreement ("the Account Management Documents").

11  The Trading Authorization authorised Madoff to act as Vizcaya's "agent and attorney in fact to buy, sell and trade in stocks, bonds, options and any other securities", until such authorisation was revoked in writing. The Option Agreement anticipated the opening of an option account with BLMIS.

12  The Customer Agreement, on BLMIS headed note paper, was signed by Bank Safra (Gibraltar) as the custodian for and on behalf of Vizcaya on March 23, 2005. BLMIS is defined in the Customer Agreement as the "Broker".

13  The Customer Agreement provided:

### Choice of Laws

THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED, AND THE RIGHTS AND LIABILITIES OF THE PARTIES DETERMINED, IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

…

### Arbitration Disclosures

*ARBITRATION IS FINAL AND BINDING ON THE PARTIES.

*THE PARTIES ARE WAIVING THEIR RIGHT TO SEEK REMEDIES IN COURT, INCLUDING THE RIGHT TO JURY TRIAL.

…

### Arbitration

THE CUSTOMER AGREES, AND BY CARRYING AN ACCOUNT FOR THE CUSTOMER THE BROKER AGREES THAT ALL CONTROVERSIES WHICH MAY ARISE BETWEEN US CONCERNING ANY TRANSACTION OR THE CONSTRUCTION, PERFORMANCE, OR BREACH OF THIS OR ANY OTHER AGREEMENT BETWEEN US PERTAINING TO SECURITIES AND OTHER PROPERTY, WHETHER ENTERED INTO PRIOR, ON OR SUBSEQUENT TO THE DATE HEREOF, SHALL BE DETERMINED BY ARBITRATION UNDER THIS AGREEMENT [AND] SHALL BE CONDUCTED PURSUANT TO THE FEDERAL ARBITRATION ACT AND THE LAWS OF THE STATE DESIGNATED IN PARA 10, BEFORE THE AMERICAN ARBITRATION ASSOCIATION, OR AN ARBITRATION FACILITY PROVIDED BY

WESTLAW    © 2017 Thomson Reuters.

ANY EXCHANGE OF WHICH THE BROKER IS A MEMBER, OR THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC AND IN ACCORDANCE WITH THE RULES PERTAINING TO THE SELECTED ORGANISATION. THE CUSTOMER MAY ELECT IN THE FIRST INSTANCE WHETHER ARBITRATION SHALL BE BY THE AMERICAN ARBITRATION ASSOCIATION, OR BY AN EXCHANGE OR SELF-REGULATORY ORGANIZATION OF WHICH THE BROKER IS A MEMBER, BUT IF THE CUSTOMER FAILS TO MAKE SUCH ELECTION, BY REGISTERED LETTER ADDRESSED TO THE BROKER AT THE BROKER'S MAIN OFFICE, BEFORE THE EXPIRATION OF TEN DAYS AFTER RECEIPT OF A WRITTEN REQUEST FROM THE BROKER TO MAKE SUCH ELECTION, THEN THE BROKER MAY MAKE SUCH ELECTION, THE AWARD OF THE ARBITRATORS, OR OF THE MAJORITY OF THEM SHALL BE FINAL, AND JUDGMENT UPON THE AWARD RENDERED MAY BE ENTERED IN ANY COURT, STATE OR FEDERAL, HAVING JURISDICTION."

14 The funds invested by the custodian on behalf of Vizcaya were allocated by BLMIS, but BLMIS purchased no securities, options, or treasury bills or entered into any transactions in securities on behalf of Vizcaya.

15 Bank Safra (Gibraltar), as custodian for Vizcaya, instructed BLMIS to make transfers to Vizcaya of US$180m in August and October 2008. The funds were then credited to Vizcaya's account with Bank Safra (Gibraltar) in Gibraltar. Part of the funds were subsequently transferred on to Vizcaya's own shareholders and then to their own respective shareholders, and some of the funds (about US$74m) remained in bank accounts in Gibraltar.

16 None of BLMIS's customers' money was used on transactions relating to securities. BLMIS used the funds deposited by new customers to meet requests for withdrawals by old customers. The number and amount of requests for withdrawals in 2008 left BLMIS with insufficient funds to meet requests for redemptions and the fraud was exposed. BLMIS did not maintain segregated accounts for its customers; moneys invested by customers were paid into and commingled in a single BLMIS bank account at JP Morgan Chase in New York.

17 In April 2009, the trustee commenced a civil action in the New York Bankruptcy Court against Bank Safra (Gibraltar) and Vizcaya, the purpose of which was to avoid and recover the transfers to Vizcaya. On August 6, 2010 the New York Bankruptcy Court entered a judgment in default of appearance in the sum of US $180m against Vizcaya (and for other sums against other related defendants) ("the New York default judgment").

18 The New York proceedings were based upon the exercise of statutory avoidance powers conferred on a trustee in bankruptcy by the US Bankruptcy Code: Chapter 5, sections 547 (avoidance of preferences), 548 (avoidance of fraudulent transfers) and 550 (liability of transferee of avoided transfer). These are powers conferred on a trustee in bankruptcy, who may avoid and recover transfers of an interest of the debtor in property when certain statutory requirements are satisfied. The debtor for this purpose and in this case is BLMIS.

19 The New York default judgment recognized that the New York Bankruptcy Court had determined that the trustee had made a proper prima facie showing of personal jurisdiction over the defaulting defendants.

Vizcaya Partners Ltd v Picard, 2016 WL 00386273 (2016)

**Legal proceedings in Gibraltar**

20   By amendment in February 2011 to existing proceedings in Gibraltar (which are not material on this appeal) following the New York default judgment, the trustee made a claim for the enforcement of the judgment against Vizcaya.

21   After the decision of the UK Supreme Court in Rubin v Eurofinance SA , the trustee pursued the claim against Vizcaya on the grounds that either (1) Vizcaya was present in New York when the proceedings against it were commenced or (2) it had agreed to submit to the jurisdiction of the New York courts.

22   On June 19, 2013, Dudley CJ dismissed an application by Vizcaya for summary judgment on its defence, holding that the trustee had a reasonable prospect of success so far as both grounds were concerned.

23   On February 7, 2014, on Vizcaya's appeal from the judgment of Dudley CJ, the Gibraltar Court of Appeal (Sir Paul Kennedy P, Sir William Aldous JA and Sir Mark Potter JA) dismissed the trustee's claim to enforce the New York default judgment in reliance on the presence in New York of Vizcaya on the ground that the trustee had no reasonable prospect of success, but held that the trustee's claim to do so in reliance on an agreement to submit had a reasonable prospect of success.

24   Vizcaya applied to the Judicial Committee for special leave to appeal against the judgment of the Gibraltar Court of Appeal. On October 8, 2014 the Judicial Committee gave leave to appeal in relation to the submission issue alone. Consequently, the issue on this appeal is whether the trustee has a real prospect of succeeding on the claim that the New York default judgment for US$180m should be enforced in Gibraltar against Vizcaya on the basis that Vizcaya had agreed to submit to the jurisdiction of the New York Bankruptcy Court before that court entered the New York default judgment against Vizcaya.

**The judgments of the Chief Justice and the Court of Appeal and the arguments on this appeal**

25   So far as is relevant to the issue on this appeal the reasoning of the courts below was as follows. Dudley CJ considered that the trustee could reasonably argue that New York law governed the jurisdiction agreement, and could rely on the expert evidence of Mr Zeballos that under New York law Vizcaya agreed to the jurisdiction of the New York courts because it explicitly agreed to a choice of New York law involving the transaction of business in New York. The point was not suitable for summary determination in favour of Vizcaya because the trustee had a prospect of succeeding on the submission issue in the light of further argument and investigation of the evidence.

26   Potter JA's reasoning was as follows: (1) whether clause 10 of the Customer Agreement amounted to an agreement to submit depended on the governing law which was expressly chosen, namely New York law; (2) it was necessary to look to New York law, in the light of the provision that the agreement was deemed to be made in New York, to determine whether clause 10 amounted, not simply to an express choice of governing law, but by implication or importation, to an agreement as to jurisdiction; (3) there was uncontradicted (but untested) expert evidence from Mr Zeballos for the trustee to the effect that, by agreeing to a contract governed by New York law and involving the transaction of business by an agent (BLMIS), a party (Vizcaya) submits to the specific jurisdiction of the New York courts for adjudication of matters arising out of that contract; (4) Vizcaya had not made good its argument that the jurisdictional test was that of the English (Gibraltar) common law even if the governing foreign law had a different jurisdictional test which, unlike the common law, would treat the parties as having agreed to submit to the jurisdiction of the foreign court. His conclusion was that (1) the trustee could reasonably argue (a) that New York law governed the Customer Agreement; (b) that under the terms of the Customer Agreement construed according to New York law, Vizcaya had agreed to submit to the jurisdiction of the New York courts; and (c) that upon that basis the New York default judgments were enforceable against Vizcaya in Gibraltar; but (2) the issues were not suitable for final determination.

**Vizcaya's argument**

27  On this appeal, in summary Vizcaya's argument is that the question whether there is a jurisdiction agreement in the contract is a question of contractual interpretation. An agreement to submit must be express or at any rate is not to be implied from any or all of the following, namely, that the contract is governed by a foreign law, the contract is to be performed in a foreign country, the contract is made in a foreign country, and/or that the foreign law confers jurisdiction on the foreign court. There is no evidence that the rules of construction applied by a New York court are materially different from those of an English court.

28  The decision of the Court of Appeal was wrong because: (1) Potter JA did not deal at all with the point that, even had there been an agreement as to jurisdiction, it could only have been intended to relate to contractual disputes between the parties and not to statutory avoidance claims made in insolvency proceedings by the trustee in bankruptcy of one of them; (2) he thought wrongly that the words "This agreement shall be deemed to have been made in the State of New York …" amounted to an implied agreement to submit to the jurisdiction of a New York court; (3) he was wrong to accept the trustee's argument that whether the contract amounted to a submission is a matter for the foreign law; (4) he was wrong to decide that it was arguable that where the foreign law expressly governing the contract had a different test for determining the jurisdiction of the foreign court, the English court had to apply the foreign law test and not the English law test.

**The trustee's argument**

29  New York law governs the construction of clause 10 and the question whether, by that clause, Vizcaya agreed to submit to the jurisdiction of the New York Bankruptcy Court.

30  Full resolution of the trustee's claim, at trial, will require detailed evidence on the content of New York law, and in particular whether clause 10 includes a choice of jurisdiction agreement. The trustee has a real prospect of success in showing that Vizcaya did agree to submit.

31  The trustee accepts that, where it is sought to extrapolate from the facts an agreement to submit to the jurisdiction of the foreign court, it is unclear

whether an agreement can be implied (as well as being express) and there is inconsistent case law on that issue. But in this case the agreement to submit to the jurisdiction of the foreign court is extrapolated from the foreign applicable law of the contract between the parties (not from a simple equation of choice of law with choice of jurisdiction) because of the proper construction of the contract, pursuant to an application of the substantive foreign law. Potter JA was right to reject Vizcaya's assertion that the question of whether there is a jurisdiction agreement is to be determined by reference to English law and not by reference to the governing/applicable law of the (putative) jurisdiction agreement; and Potter JA was right to place emphasis on the provision in clause 10 that the agreement was deemed to have been made in the state of New York.

**Was there a submission?**

32  There has been a division of authority on the question whether at common law an agreement or consent to submit to the jurisdiction of the foreign court can be implied or inferred, and, if so, how the implication or inference can arise. In Sirdar Gurdyal Singh v Rajah of Faridkote [1894] AC 670 , 686, Lord Selborne LC, speaking for the Privy Council, said that "such obligation, unless expressed, could not be implied". Nearly 70 years later, however, Diplock J said (at 123) that it was "clear law that the contract …, to submit to the forum in which the judgment was obtained, may be express or implied": Blohn v Desser [1962] 2 QB 116 , 123.

33  Dicey, in his first edition of *Conflict of Laws* , 1896, wrote that the judgment debtor would have submitted by expressly or implicitly contracting to submit to the jurisdiction of the foreign court (at pp 370, 377), whereas since 1973 (Dicey and Morris, 8th ed 1973, p 999) successive editions have said that an agreement to submit to the jurisdiction of a foreign court must be express, and cannot be implied. So also early editions of Cheshire, *Private International Law* , said that the agreement might be implied (1st ed 1935, p 492) or "less explicit" (5th ed 1956, p 612), but ultimately accepted (Cheshire and North, 9th ed 1974, p 636) that the weight of authority was that the agreement could not be implied.

34  The Report of the Foreign Judgments (Reciprocal Enforcement) Committee, 1932 (Cmd 4213), under the chairmanship of Greer LJ, proceeded on the basis that the common law was that there could be a submission to the jurisdiction of the foreign court "by virtue of a contract (express or implied) under which such party had, before the commencement of the proceedings in the foreign court, agreed that the courts of such country should deal with the dispute in question …" (para 7). The result included a recommendation that the proposed Conventions and the 1933 Act should contain the provision which emerged as section 4(2) of the Foreign Judgments (Reciprocal Enforcement) Act 1933, the material provision of which is set out above.

**The Dicey Rule**

35  The case law which is referred to below has been markedly influenced by the Dicey Rule. What is now Dicey's Fourth Rule was part of Rule 80 in the first edition, Dicey, *Conflict of Laws* , 1896, pp 369-370, which dealt in Case 3 with three situations in which a party objecting to the jurisdiction of a foreign court had, by his own conduct, precluded himself from objecting thereto. The first was appearance as plaintiff. The second was voluntary appearance as a defendant, and the third was "by having *expressly or implicitly* contracted to submit to the jurisdiction" (emphasis added) of the foreign court.

36  The comment on this Rule stated (377): "The parties to a contract may make it one of the express or implied terms of the contract that they will submit in respect of any alleged breach thereof, or any matter having relation thereto, to the jurisdiction of a foreign court, and a person who has thus contracted is clearly bound by his own submission."

37  The principle was stated as a separate Case only in the 8th edition, 1967, which also dropped the reference to implicit agreement in the Rule (p 974). It said (at 979): "Although it has been said that an agreement to submit to the jurisdiction of a foreign court may be express or implied [citing Blohn v Desser [1962] 2 QB 116 , 123; Sfeir & Co v National Insurance Co of New Zealand [1964] 1 Lloyd's Rep 330 , 339-340], English judges have generally been reluctant to imply such an agreement. If the parties agree, expressly or by implication, that their contract shall be governed by a particular foreign

law, it by no means follows that they agree to submit to the jurisdiction of the courts which apply it. Nor can any such agreement be implied from the fact that the cause of action arose within a foreign country or from the additional fact that the defendant was present there when the cause of action arose." It then went on to criticise Blohn v Desser , noting that it had also been criticised by eminent academic writers, including Professor Cheshire, Dr Cohn, and Mr Peter Carter.

38  But by the 9th edition, 1973, p 999 (after the decision in Vogel v RA Kohnstamm Ltd [1973] QB 133 ) it was said (now in 15th ed 2012, para 14-079): "It may be laid down as a general rule that an agreement to submit to the jurisdiction of a foreign court must be express: it cannot be implied."

**Membership of foreign companies and partnerships**

39  The authorities cited in successive editions of Dicey for the proposition that submission would occur where the judgment debtor had "expressly or implicitly contracted to submit to the jurisdiction" of the foreign court were Vallée v Dumergue (1849) 4 Ex 290 ; Bank of Australasia v Harding (1850) 9 CB 661 ; Bank of Australasia v Nias (1851) 16 QB 717 ; and Copin v Adamson (1875) 1 Ex D 17 . Each of these decisions concerned the enforcement of foreign default judgments against shareholders of foreign companies or partnerships and turned on questions of sufficiency of pleading.

40  The actual decision (as distinct from the argument) in Vallée v Dumergue was not about the jurisdiction of the foreign court, but was an early case on the requirement of natural justice. It concerned the effect of a provision in the constitution of a company regulating proceedings against shareholders. The plaintiff liquidators sought enforcement in England of a French judgment against a shareholder for his contribution to the debts of the company. The judgment debtor was resident in England. It was pleaded by the liquidators that under French law it was necessary for a shareholder to elect a domicile in France, at which the directors of the company might notify him of all proceedings relative to the company, or to the defendant as such shareholder; and that the defendant made election of domicile at a place in Paris, and gave notice thereof to the plaintiffs. It was held in the Court

of Exchequer (Alderson, B) that it was not contrary to
natural justice that a man who has agreed to receive
a particular mode of notification of legal proceedings
should be bound by a judgment in which that particular
mode of notification has been followed, even though he
may not have had actual notice of them.

41  In Bank of Australasia v Harding the defendant was
a member, resident in England, of an unincorporated
company (the Bank of Australia, which was treated
as a partnership) in New South Wales. The colonial
legislature enacted legislation ("a statute which may
be assumed to have been obtained at the request of
the parties", per Wilde CJ at 685) which authorised
actions against (inter alios) members of the bank
naming the chairman as defendant. It was held by
the Court of Common Pleas that the judgment was
enforceable against the defendant. The defendant, being
a member of a company who must be taken to have
been a consenting party to the passing of the colonial
act, had to be regarded as having agreed that suits
upon contracts entered into by the company, might be
brought against the chairman, and that the chairman
should for all purposes represent him in such actions:
Cresswell J at 687.

42  Bank of Australasia v Nias involved a judgment
against another shareholder of the bank. It was held
by the Court of Queen's Bench that the judgment
was enforceable against him. The Act was passed for
the benefit of the bank, and he was a shareholder
in the bank when the Act was passed and when the
promises were made by the bank (per Lord Campbell
CJ at 733), on which the action against the chairman
was commenced. There was nothing repugnant to
English law, or to the principles of natural justice, in
enacting that actions on such contracts, instead of being
brought individually against all the shareholders in
the company, should be brought against the chairman
whom they have appointed to represent them.

43  In Copin v Adamson the judgment debt was for
unpaid calls on shares in a bankrupt French company.
A default judgment was entered for amounts unpaid
on the judgment debtor's shares. In answer to the
judgment debtor's plea that he was not resident in
France or otherwise subject to French jurisdiction the
judgment creditor replied that (1) the defendant was
subject to the conditions contained in the statutes of

the company, by which "it was provided and agreed
that all disputes arising during the liquidation of the
company between the shareholders of the company,
the administrators, the commissioners, or between the
shareholders themselves, with respect to the affairs of
the company, should be submitted to the jurisdiction
of the French court; that every shareholder provoking
a contest must elect a domicile at Paris, and in default
election might be made for him at the office of the
imperial procurator of the civil tribunal of the
department in which the office of the company was
situated, and that all summonses, & c, should be validly
served at the domicile formally or impliedly chosen"
and (2) the judgment debtor had been validly served
under provisions of French law to the same effect
as those contained in the statutes. In the Court of
Exchequer it was held that the first plea was a good
one, but that (by a majority, Kelly CB dissenting) the
second plea, which did not rely on the agreement in the
statutes, was a bad one. There was no appeal on the
second ground and the appeal on the first ground was
dismissed. It was held that the plea that the judgment
debtor was bound by the judgment was sufficient,
even though it did not allege express knowledge of
the statutes of the company. Lord Cairns LC said (at
18-19):

> "It appears to me that, to all
> intents and purposes, it is as if there
> had been an actual and absolute
> agreement by the defendant; and
> that, if it were necessary to bring
> an action against him on the part
> of the company, the service of the
> proceedings at the office of the
> imperial procurator, if no other
> place were pointed out, would be
> good service. Therefore, the appeal
> from the judgment of the court
> below on the demurrer must fail."

44  The effect of these cases is that a partner or
shareholder in a foreign partnership or corporation,
who consents, expressly or impliedly, to being sued in
the foreign country is subject to the jurisdiction of that
country for the purposes of the enforcement of foreign

judgments. Consent may be by the election of domicile for the purposes of suit (as in Vallée v Dumergue ) or by the promotion of legislation allowing for suit in that country (as in Bank of Australasia v Harding and Bank of Australasia v Nias ), or by being a shareholder pursuant to company statutes which provide for suit in that country even if the judgment debtor is not aware of their provisions (as in Copin v Adamson ).

45  But mere membership of a foreign partnership was held in Emanuel v Symon [1908] 1 KB 302 not to be sufficient. The judgment debtor was a partner in a partnership in Western Australia. The other partners obtained a default judgment there against him for an account of profits, and sought to recover in England the share of the amount due from him. The Court of Appeal refused to recognise the Australian judgment against Mr Symon. The headnote stated that the foreign court did not have jurisdiction where the judgment debtor "has neither appeared to the process nor expressly agreed to submit to the jurisdiction of the foreign court".

46  Lord Alverstone CJ said (307-309): "The second ground of the decision under appeal … was that the fact of entering into a contract of partnership in a foreign country involves an irrevocable agreement that all matters and disputes arising in connection with the partnership shall be submitted to, and therefore lie within, the jurisdiction of the courts of that country. In my opinion this question … has been concluded by authority of great weight which this court cannot disregard. … I think the conclusion from these authorities is that, to make a person who is not a subject of, nor domiciled nor resident in, a foreign country amenable to the jurisdiction of that country, there must be something more than a mere contract made or the possession of property in the foreign country." See also Buckley LJ at 311-312 and Kennedy LJ at 314 ("Such an obligation may exist by express agreement, as in the case of Copin v Adamson , and as in many cases of foreign contracts where the parties by articles of agreement bind themselves to accept the jurisdiction of foreign tribunals …").

47  In Blohn v Desser [1962] 2 QB 116 the plaintiff had obtained a default judgment in Austria against an Austrian partnership, and sought to enforce it in England against an English resident who was a sleeping partner in the firm. Her name was registered as a partner in the commercial register in Vienna. It was held that the defendant, as a partner in the firm, must be regarded as having carried on business in Vienna through an agent resident there and that, having permitted those matters to be notified to persons dealing with the firm by registration in a public register, she had impliedly agreed with those persons to submit to the jurisdiction of the court of Vienna, and that, therefore, the English courts would recognise the judgment. But she succeeded because the judgment against the partnership firm was not enforceable against the defendant as either it was not a judgment against her personally or, if it was, by reason of the defences which would be available to her in Vienna it was not a final and conclusive judgment. After referring to Emanuel v Symon and Buckley LJ's fifth case ("where he has contracted to submit himself to the forum in which the judgment was obtained") in which an English court would enforce a foreign judgment Diplock J said (at 123) that it was "clear law that the contract referred to in the fifth case, to submit to the forum in which the judgment was obtained, may be express or implied".

48  Diplock J went on (at 123-124):

> "It seems to me that, where a person becomes a partner in a foreign firm with a place of business within the jurisdiction of a foreign court, and appoints an agent resident in that jurisdiction to conduct business on behalf of the partnership at that place of business, and causes or permits, as in the present case, these matters to be notified to persons dealing with that firm by registration in a public register, he does impliedly agree with all persons to whom such a notification is made — that is to say, the public — to submit to the jurisdiction of the court of the country in which the business is carried on in respect of transactions conducted at that place of business by that agent."

49 It is understandable why Diplock J took the view that it was clear law that the agreement to submit could be express or implied, since that view had been expressed in seven editions of Dicey and by the Greer committee. But on the facts Diplock J did not refer to Copin v Adamson , in which the Court of Appeal had left open the question whether mere membership of a foreign entity was an implied submission, and in which the majority in the Court of Exchequer expressed a view which was inconsistent with that of Diplock J; and he referred to Emanuel v Symon only for the general principles, without considering why the judgment was not enforceable in that case, which was because mere membership of a partnership in a foreign country was not to be regarded as an agreement to submit to the jurisdiction of the courts of that country.

**Other authorities**

50 It has already been seen that in Rousillon v Rousillon (1880) 14 Ch D 351 , 371, Fry J considered Copin v Adamson as authority for the view that the foreign court would have jurisdiction where the judgment debtor "has contracted to submit himself to the forum in which the judgment was obtained".

51 In Sirdar Gurdyal Singh v Rajah of Faridkote [1894] AC 670 , PC, the Rajah of Faridkote obtained in the Civil Court of Faridkote (a native state) ex parte judgments against Singh (his former treasurer), which he sought to enforce in Lahore, in British India. Singh was not then resident in Faridkote and did not appear in the actions or otherwise submit to the jurisdiction. It was argued, for the Rajah, that the Faridkote court had jurisdiction over Singh because, "[b]y becoming state treasurer, [he] submitted himself to the jurisdiction of the Faridkote Court, for where a man takes office in a state he must be deemed to have agreed to be bound by the jurisdiction of that state as accounting for money due from him to that state in respect of that office. In any case, where an office is accepted in that way, and the whole cause of action arises in that state, there is jurisdiction which is obligatory on the acceptor" (at 680). The argument was rejected.

52 The advice given by the Privy Council through Lord Selborne LC was (at 686):

"…Upon the question itself, which was determined in Schibsby v Westenholz , Blackburn J, had at the trial formed a different opinion from that at which he ultimately arrived; and their Lordships do not doubt that, if he had heard argument upon the question, whether an obligation to accept the forum loci contractus, as having, by reason of the contract, a conventional jurisdiction against the parties in a suit founded upon that contract for all future time, wherever they might be domiciled or resident, was generally to be implied, he would have come (as their Lordships do) to the conclusion, that such obligation, unless expressed, could not be implied."

53 In Emanuel v Symon [1908] 1 KB 302 , at 314, Kennedy LJ underlined the point that the Faridkote case had decided that "the obligation [to submit to the foreign jurisdiction] was not to be implied from the mere fact of entering into a contract in a foreign country".

54 There are several later relevant decisions in the United Kingdom and the Commonwealth on the enforcement of foreign judgments, some of which accept that a contractual submission or consent must be express and not implied, and others of which accept, sometimes purely for the purposes of argument, that the submission or consent can be implied, but in none of the latter group of cases (apart from Blohn v Desser ) was there found on the facts to be an implied submission:

• (1) In Mattar and Saba v Public Trustee [1952] 3 DLR 399 , 401 (NS) the Alberta Appellate Division applied Sirdar Gurdyal Singh v Rajah of Faridkote and Emanuel v Symon to deny enforcement of a Quebec judgment on promissory notes, and held that an agreement to submit to the jurisdiction of a foreign court is not to be implied from the fact

that the defendant has entered into a contract in the foreign country or to be performed there. [1]

• (2) Sfeir & Co v National Insurance Co of New Zealand [1964] 1 Lloyd's Rep 330 was decided after Blohn v Desser , but does not refer to that decision. It concerned the enforceability of a Ghanaian judgment on a marine insurance contract under the Administration of Justice Act 1920 . Mocatta J accepted (at 339-340) that "an implied submission or agreement to submit can satisfy the words of [ section 9(2)(b) ]". But it was not enough that it should be reasonable to find the implied submission or agreement: it must be a necessary one. It could not be implied from a choice of the governing law nor from the fact that claims were payable in Ghana.

• (3) In Dunbee Ltd v Gilman & Co, (Australia) Pty Ltd (1968) 70 SR (NSW) 219, [1968] 2 Lloyd's Rep 394 the question of law for the New South Wales Court of Appeal was whether, for the purposes of the enforcement of an English default judgment under the Australian equivalent of the Administration of Justice Act 1920 , the judgment debtor had "agree[d] to submit to the jurisdiction" of the English court by virtue of a contractual provision that the agreement was "governed by and construed under the Laws of England". Walsh J referred to the division of authority (particularly between Emanuel v Symon and Blohn v Desser ) on the question whether a submission could be implied, but said that that need not be decided. If the agreement had to be an express one, it was not essential that a particular form of words should be used: it could mean only that the express terms of the contract, when properly construed, contained an agreement to submit. If an implied agreement sufficed, there was nothing which could lead to the conclusion that, if the agreement was silent on the question, a term could be implied that the judgment debtor had submitted to the jurisdiction. The fact that leave could be given to serve proceedings under RSC Order 11 by virtue of the choice of English law did not amount to a law which "govern[ed]" the contract.

• (4) In Jamieson v Northern Electricity Supply Corp (Private) Ltd, 1970 SLT 113 , registration of a Zambian judgment was set aside because the 1933 Act did not apply to Zambia. It had been argued that there had been an implied submission

to the Zambian courts by an employee because the contract of employment was entered into in, and to be performed in Zambia, and assumed to be governed by Zambian law. Lord Johnston (at 116) took the view that a submission was not lightly to be implied, and could not be implied from a conjunction of those factors.

• (5) In Vogel v RA Kohnstamm Ltd [1973] QB 133 Ashworth J held that Blohn v Desser had been wrongly decided, and that an implied submission was not sufficient. That was a case of enforcement at common law of an Israeli default judgment in favour of an Israeli buyer of leather against an English company. The plaintiffs argued that the defendants were resident in Israel or had by implication agreed to submit themselves to the jurisdiction of the Tel Aviv court, relying on these alleged facts for the implied submission: (a) the contract was made within the jurisdiction of the foreign tribunal; (b) by or through an agent residing there; (c) such agent was a person carrying on business and resident within that jurisdiction; and (d) the contract was to be performed within the jurisdiction. Ashworth J found that the defendants were not resident in Israel and that they had not agreed to submit to the jurisdiction of the Tel Aviv court. He referred to Sirdar Gurdyal Singh v Rajah of Faridkote , and to Emanuel v Symon , which in his view established "the principle that an implied agreement to assent to the jurisdiction of a foreign tribunal is not something which courts of this country have entertained as a legal possibility. Recognising that such an agreement may be made expressly they have in terms decided that implication is not to be relied upon". He regarded Blohn v Desser as inconsistent with those decisions.

• (6) A similar view was taken at first instance by Scott J in Adams v Cape Industries [1990] Ch 433 (Scott J and CA), where most of the authorities were reviewed. He referred to Sirdar Gurdyal Singh v Rajah of Faridkote and Emanuel v Symon and to the views expressed in the then current editions of Cheshire and North and Dicey & Morris that an agreement to submit must be express and cannot be implied, and said that Diplock J was wrong in Blohn v Desser to regard it as settled law that an agreement to submit to the jurisdiction need not be expressed but could be

implied. He then said (at 465-466): "But, accepting that an implied agreement to submit might suffice, nonetheless it is, in my judgment, a clear indication of consent to the exercise by the foreign court of jurisdiction that is required."

55  In the face of these conflicting decisions and dicta, it is necessary to step back and consider the question as a matter of principle and authority.

56  First, the question is whether the judgment debtor agreed to submit to the jurisdiction of the foreign court. Second, the agreement does not have to be contractual in nature. The real question is whether the judgment debtor consented in advance to the jurisdiction of the foreign court. This point was made by Goff LJ in SA Consortium General Textiles v Sun and Sand Agencies Ltd [1978] QB 279 , 303, who said that the expression "agreed … to submit to the jurisdiction" in the Foreign Judgments (Reciprocal Enforcement) Act 1933, section 4(2)(a)(iii) , meant "expressed willingness or consented to or acknowledged that he would accept the jurisdiction of the foreign court. It does not require that the judgment debtor must have bound himself contractually or in formal terms so to do". Third, it is commonplace that a contractual agreement or a consent may be implied or inferred. Fourth, there is no reason in principle why the position should be any different in the case of a contractual agreement or consent to the jurisdiction of a foreign court: *cf* Briggs, *Civil Jurisdiction and Judgments* , 6th ed, para 7.59 . [2] Fifth, on analysis in context the authorities which deny the possibility of an implied agreement (especially Sirdar Gurdyal Singh v Rajah of Faridkote ) really meant that there had to be an *actual* agreement (or consent). Thus where a person became a shareholder in a foreign company, "to all intents and purposes, it is as if there had been an actual and absolute agreement" by the shareholder to the provisions for suit and service in its constitution: Copin v Adamson at 18-19.

57  In English domestic law, there are, broadly, two classes of implied term. The first class, sometimes called terms implied as a matter of fact, consists of terms implied from the circumstances in order to give effect to the intention of the parties to the contract. The authorities on this class of implied term have been reviewed comprehensively by Lord Neuberger in Marks

& Spencer plc v BNP Paribas Securities Services Trust Co (Jersey) Ltd [2015] UKSC 72, [2015] 3 WLR 1843 , at paras 15-31, and it is not necessary to repeat what he said there. The policy of the common law is not to imply such terms lightly, and that is why the principles have been formulated in terms of necessity or business efficacy or "it goes without saying." The second class consists of terms implied by law, which are implied into classes of contractual relationship as a necessary incident of the relationship concerned. An example is the obligation of confidentiality in banking contracts or in arbitration agreements: Michael Wilson & Partners Ltd v Emmott [2008] EWCA Civ 184, [2008] Bus LR 1861 ("really a rule of substantive law masquerading as an implied term": at para 84). On the different types of implied term see Luxor (Eastbourne) Ltd v Cooper [1941] AC 108 , 137, per Lord Wright; and more recently Geys v Société Générale [2012] UKSC 63, [2013] 1 AC 523 , at para 55, per Lady Hale.

58  Because there has to be an actual agreement, the agreement or contractual term cannot be implied or inferred from such matters as:

• (1)  the mere fact of being a shareholder in a foreign company or a member of a foreign partnership: Copin v Adamson (in the Court of Exchequer); Emanuel v Symon (and Blohn v Desser must be regarded as wrongly decided on this point);

• (2)  the fact that the contract which was the subject of the foreign proceedings was made in the foreign country: Sirdar Gurdyal Singh v Rajah of Faridkote ; Emanuel v Symon ; Mattar and Saba v Public Trustee ; Jamieson v Northern Electricity Supply Corp (Private) Ltd ; Vogel v RA Kohnstamm Ltd ;

• (3)  the fact that the contract was governed by the law of the foreign country: Sfeir & Co v National Insurance Co of New Zealand ; Jamieson v Northern Electricity Supply Corp (Pte) Ltd ; Vogel v RA Kohnstamm Ltd ; cf New Hampshire Insurance Co v Strabag Bau AG [1992] 1 Lloyd's 361 , 371-372 (a case on jurisdiction of the English court);

• (4) the fact that the contract was to be performed in the foreign country: Sfeir & Co v National Insurance Co of New Zealand ; Mattar and Saba v Public Trustee ; Jamieson v Northern Electricity

Supply Corp (Pte) Ltd ; Vogel v RA Kohnstamm Ltd ; or

• (5) the fact that the result of the contract being governed by the foreign law gives the foreign court jurisdiction under its own law: Dunbee Ltd v Gilman & Co, (Australia) Pty Ltd .

**Implied terms in the conflict of laws**

59  Finally it is necessary to consider the implications in the conflict of laws of the distinction between terms implied in fact or from the circumstances, on the one hand, and terms implied by law, on the other hand. The starting point is that the characterisation of whether there has been a submission to the jurisdiction of the foreign court for the purposes of enforcement of foreign judgments depends on English law: Rubin v Eurofinance SA [2012] UKSC 46, [2013] 1 AC 236 (a case on submission in the course of proceedings). But in the present context what that means is that there must have been an agreement to submit to the jurisdiction of the foreign court, and that agreement may arise through an implied term.

60  Terms implied as a matter of fact depend on construction of the contract in the light of the circumstances. Where the applicable law of the contract is foreign law, questions of interpretation are governed by the applicable law. [3] In such a case the role of the expert is not to give evidence as to what the contract means. The role is "to prove the rules of construction of the foreign law, and it is then for the court to interpret the contract in accordance with those rules": King v Brandywine Reinsurance Co [2005] EWCA Civ 235, [2005] 1 Lloyd's Rep 655 , para 68; Dicey, paras 9-019 and 32-144 ("the expert proves the foreign rules of construction, and the court, in the light of these rules, determines the meaning of the contract"). [4]

61  The position is different in the case of terms implied by law, where the function of the expert would be to give an opinion on whether a particular term is implied by law. That is because whether there are statutory terms or other terms implied by law depends on the foreign law. The common law rules, as indicated above, apply to the question whether there has been a contractual submission, and at common law "[t]he proper law of

the contract does indeed fix the interpretation and construction of its express terms and supply the relevant background of statutory or implied terms" ( Vita Food Products Inc v Unus Shipping Co Ltd [1939] AC 277 , 291 (PC)); and for other cases, the Rome Convention and the Rome I Regulation refer to the applicable law of the contract or the putative law of the term. [5] As a matter of English law, the fact that a contract is governed by English law or was made in England provides a basis for service out the jurisdiction under what was previously RSC Order 11, rule 1 and is now CPR, Practice Direction 6B , does not mean that there is an implied contractual submission to the jurisdiction: cf Dunbee Ltd v Gilman & Co (Australia) Pty Ltd , above.

**Jurisdiction under New York law**

62  So far as concerns Vizcaya, the complaint in the New York proceedings claimed that the New York Bankruptcy Court had jurisdiction over Vizcaya for these reasons: the account agreements were deemed to be entered into in the State of New York and were to be performed in New York through securities trading activities that would take place in New York; the Vizcaya account was held in New York, and Vizcaya wired funds from its Bank Safra account to the BLMIS account in New York for application to its account with BLMIS and the conduct of trading activities in New York, and invested in BLMIS; Vizcaya purposefully availed itself of the benefits of conducting transactions in New York, out of which the action arose. Vizcaya had therefore submitted itself to the jurisdiction of the courts of New York.

63  The motion for summary judgment pleaded that the trustee met the necessary standard of showing that the court had prima facie jurisdiction over the defendants. The basis of jurisdiction which was asserted was that the transfers arose out of a business transaction tied to Vizcaya's securities account in New York; and that under the New York long arm statute, CPLR 302(a)(1), [6] the maintenance of a securities account in New York was a sufficient basis for finding personal jurisdiction for claims arising out of "transaction of business". It was claimed that the defaulting defendants purposefully availed themselves of the benefits of the transactions arising out of the Vizcaya accounts by requesting or

directing that funds be invested by BLMIS in New York and by receiving the US$180m in transfers.

64  The motion relied on another decision in the Madoff affair dealing with avoidance of fraudulent transfers arising out of BLMIS account transactions, in which the defendants had customer agreements deemed to be made in New York and subject to New York law, directed transfers to and from their BLMIS account, and where one of the defendants designated a United States agent to direct financial transactions to act on its behalf; as a result, the defendant's conduct established sufficient minimum contacts to support a finding of personal jurisdiction: Picard v Cohmad Securities Corp, 418 BR 75 , 80-81 (Bankr, SDNY 2009).

65  The order entering the default judgment recited that "the Trustee made a proper *prima facie* showing of personal jurisdiction".

66  Evidence on New York law submitted by the trustee in these proceedings was (1) a witness statement by Professor Kenneth Klee, who specialises in insolvency law, and who is a member of the law faculty of UCLA Law School and a practising lawyer and (2) a witness statement by Mr Gonzalo Zeballos, a partner in the firm of Baker & Hostetler LLP, who act for the trustee.

67  Professor Klee's evidence was directed to the trustee's rights under the Account Management Documents, and only Mr Zeballos' evidence was directly relevant to the issues in this appeal. Under the heading "Submission to New York Law" his evidence was as follows:

> "18.   The Customer Agreement deems New York state law as the law governing the Agreement. It is the Trustee's position that the language of the Customer Agreement in and of itself supports the application of substantive New York law to all matters pertaining to the Account Management Documents.
>
> 19.   It is notable, however, that even if the New York choice of law test (the 'significant relationship'

or 'grouping of contacts' approach [footnote omitted] [7] ) is applied to determine the applicable/proper law of the Account Management Documents, that New York law would still be the applicable law relating to the Account Management Documents.

> 20.   As a matter of New York law (ie since it is the applicable law of the Account Management Documents), Vizcaya agreed to the jurisdiction (and venue) of the New York courts. This is apparent from, *inter alia* , the fact it executed and agreed to the Account Management Documents that explicitly establish a contractual agency relationship governed by New York substantive law and the fact that Vizcaya carried on business in New York.

…

> 22.   It is well-settled under New York law that by agreeing to a contract governed by New York law, involving the transaction of business in New York by an agent, a party submits to the 'specific jurisdiction' of New York courts for adjudicating matters arising from that contract. Parke-Bernet Galleries Inc v Franklyn 26 NY 2d 13 , 16 (1970).

> 23.   Specific jurisdiction "exists when 'a state exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum'." Chlose v Queen Bee of Beverly Hills LLC 616 F 3d 158 , 164 (2d Cir 2010) (quoting Helicopteros

Nacionales de Colombia SA v Hall, 466 US 408 , 414, n 8 (1984).

24.  Under New York law, specific jurisdiction is established over a non-domiciliary who, in person or through an agent: (1) transacts any business within the state … New York Civil Practice Law and Rule para 302; Malmsteen v Universal Music Group Inc, 2012 WL 2159281 , at *3 (SDNY June 14, 2012).

25.   Because the Account Management Documents establish an on-going principal-agent relationship with BLMIS, Vizcaya's execution and agreement to the Account Management Documents constitutes the transacting of business in New York. The Account Management Documents define the commercial structure that provides the foundation for Vizcaya's sole commercial activity – to invest with BLMIS in New York."

68   His evidence is therefore that under New York law: (1) the choice of New York law to govern the contract is effective to apply New York substantive law to all matters relating to the Account Management Documents; (2) the contractual relationship would have been governed by New York law even in the absence of an express choice; (3) Vizcaya agreed to the jurisdiction (or specific jurisdiction) of the New York courts by agreeing to the Account Management Documents which established an agency relationship and by carrying on business in New York (or transacting business in New York); (4) specific jurisdiction is established under the New York CPLR over a non-domiciliary who transacts any business within New York.

69  Even as a matter of New York law the evidence does not state that a choice of law carries with it an agreement to the jurisdiction of the New York court, since it only does so, according to the evidence, if there is also transaction of business in New York. [8]  All that is being said is that in the factual circumstances of the case the New York court has jurisdiction under the long arm statute.

70  Most relevant for present purposes, there is no suggestion that there is a term implied as a matter of fact or as a matter of law that Vizcaya consented to the jurisdiction of the New York court. For a term to be implied as a matter of fact, the trustee would have to adduce evidence of New York law, not on what the contract means, but that there is a rule of interpretation or construction, on the basis of which the Gibraltar court could conclude that clause 10 in the context of the choice of law and the deemed place of contracting amounts to a choice of jurisdiction. For a term to be implied as a matter of law, the expert would have to show what relevant terms are implied under New York law. There is no relevant evidence under either head. The statements that Vizcaya agreed to the jurisdiction of the New York court by agreeing to New York as the governing law and by transacting business in New York say no more than that these factors justified the assumption of jurisdiction under New York CPLR, section 302 .

71  There is no basis on the wording of the contract or in the evidence for the trustee's suggestion that it makes a difference that the contract deems it to have been made in New York. In the English cases the fact that a contract was made in the foreign country had no weight in determining whether a party had agreed to submit. If there had been an implied term under New York law as a result of that provision, no doubt it would have been relied upon in the motion in New York for the default judgment. The unsurprising overall effect of the evidence is that, as in English law or Gibraltar law, these are factors in the exercise of long arm jurisdiction.

72  There is therefore no basis in the evidence for the assertion that there was a contractual term that Vizcaya submitted to the New York jurisdiction.

**The scope of any jurisdiction agreement**

73    The trustee would in any event have other formidable difficulties. The first is that, if a jurisdiction agreement is to be implied as a matter of fact or law, prima facie it would not apply to these proceedings. In AWB (Geneva) SA v North America Steamships [2007] EWCA Civ 739, [2007] 2 Lloyd's Rep 315 a swap agreement provided that pursuant to the ISDA Master Agreement, the agreement was governed by English law and subject to the exclusive jurisdiction of the English courts. The trustee of one of the parties brought statutory avoidance proceedings in Canada. The Court of Appeal refused to grant an anti-suit injunction, because the choice of law and choice of jurisdiction agreement did not apply to the insolvency proceedings. The proceedings in Canada did not relate to a dispute under the contract. They were part of insolvency proceedings. It was a matter for the Canadian Court to decide on the relief that it is prepared to grant within the scope of those proceedings as it is concerned with issues of insolvency and not with issues which relate to the contractual obligations under the agreement.

74    In this case, of course, the jurisdiction agreement would be governed by New York law, and what disputes to which it is applicable would be a question of interpretation governed by the applicable law. But there is no evidence of any rules of interpretation under New York law which could lead the Gibraltar court to the conclusion that any implied submission under clause 10 would apply to avoidance proceedings.

### Arbitration agreement

75  It is therefore unnecessary to go further and consider whether the arbitration agreement in clause 13 applies to the insolvency proceedings, and therefore whether the default judgment would be unenforceable in any event because it was obtained in breach of an arbitration agreement: see Dicey, para 14R-097.

### Disposition

76  The Board will therefore humbly advise Her Majesty that the appeal should be allowed. Any consequential order will depend on the terms of the settlement between the parties, who have liberty to apply.

Footnotes

1    Since then the Canadian common law on the enforcement of foreign judgments has developed differently from English law: see Beals v Saldanha [2003] 3 SCR 416; (2003) 234 DLR (4th) 1 ; Dicey, para 14-091.

2    It should be noted, however, that (1) the formal requirements for the existence of a jurisdiction agreement under the recast Brussels I Regulation (1215/2012), Article 25 (and its predecessors) are strict, and (2) the Hague Convention on Choice of Court Agreements, 2005, provides ( Article 3(b) ) that "an exclusive choice of court agreement must be concluded or documented – i) in writing; or ii) by any other means of communication which renders information accessible so as to be usable for subsequent reference." The Hague Convention is not in force as between the United Kingdom and the United States.

3    The Rome Convention and the Rome I Regulation ( Regulation 593/2008 ) on the law applicable to contractual obligations apply in Gibraltar. Because the contract was made in 2005 it is the Rome Convention which would be applicable to this case. But "agreements on the choice of court" are excluded from the scope of each of them ( article 2(2)(d) ), and the common law rules therefore apply in the present case.

4    The law is the same in the United States: see Wright, Miller etc, *Federal Practice and Procedure* , section 2444 ("The purpose of an expert witness in foreign law is to aid the court in determining the content of the applicable foreign law, not to apply the law to the facts of the case").

5    Rome Convention, articles 8(1), 10(1)(a) ; Rome I Regulation, articles 10(1) , 12(1)(a) .

6    New York CPLR, section 302 , is headed "Personal jurisdiction by acts of non-domiciliaries" and so far as material provides: "(a) Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary … who in person or through an agent: (1) transacts any business within the state …"

7    The omitted footnote concludes that the various contacts with New York (performance in New York; subject matter of the contract; Vizcaya's only business being in New York) meant that the significant relationship test for the law governing the contract led inexorably to the conclusion that New York law applied.

WESTLAW   © 2017 Thomson Reuters.

8    Mr Zeballos does not refer to the New York General Obligations Law, section 5-1402 , which provides, in summary, that any person may sue a foreign corporation in New York, where the action relates to any contract in which a choice of New York law has been made, and which (a) is a contract arising out of a transaction covering in the aggregate not less than US$1m, and (b) which contains a provision whereby such foreign corporation agrees to submit to the jurisdiction of the courts of New York.

Crown copyright                                                © 2017 Sweet & Maxwell
2016 WL 00386273

---

**End of Document**                                              © 2017 Thomson Reuters.

# TAB 13

**760**          **All England Law Reports**          **[1984] 1 All ER**

# Williams & Glyn's Bank plc v Astro Dinamico   *a*<br>Cia Naviera SA and another

HOUSE OF LORDS

LORD FRASER OF TULLYBELTON, LORD EDMUND-DAVIES, LORD BRIDGE OF HARWICH, LORD BRANDON OF OAKBROOK AND LORD TEMPLEMAN

8 FEBRUARY, I MARCH 1984   *b*

*Practice – Stay of proceedings – Foreign defendant – Jurisdiction – Foreign defendant simultaneously disputing jurisdiction of court and applying for stay of proceedings pending outcome of proceedings abroad – Whether application to stay amounting to submission by defendant to jurisdiction of court – Whether court having jurisdiction to consider application to stay before considering question of jurisdiction to deal with merits – Whether court ought first to*   *c*<br>*consider application to stay if decision on jurisdiction can only be reached by deciding issue which is subject of foreign proceedings.*

Where a foreign defendant disputes the jurisdiction of the court and at the same time applies for a stay of proceedings pending the outcome of proceedings abroad, the application to stay the proceedings does not amount to a submission to the jurisdiction   *d*<br>of the court. Furthermore, the court has jurisdiction in those circumstances to consider the application to stay the proceedings before considering the question of jurisdiction to deal with the merits, and it ought first to consider the application to stay if a decision on jurisdiction can only be reached by deciding the issue which is the subject of the foreign proceedings (see p 763 *d* to *j*, p 764 *h j* and p 765 *d* to *g*, post).

  Dictum of Denning LJ in *Re Dulles's Settlement Trusts, Dulles v Vidler* [1951] 2 All ER at   *e*<br>72, approved.

### Notes
For stay of proceedings generally, see 37 Halsbury's Laws (4th edn) paras 437–439, and for cases on the subject, see 37(3) Digest (Reissue) 53–56, 3247–3258.   *f*

### Cases referred to in opinions
*Dulles's Settlement Trusts, Re, Dulles v Vidler* [1951] 2 All ER 69, [1951] Ch 842, CA.<br>
*Pitchers Ltd v Plaza (Queensbury) Ltd* [1940] 1 All ER 151, CA.<br>
*Rein v Stein* (1892) 66 LT 469; *affd* [1892] 1 QB 753, CA.<br>
*Wilkinson v Barking Corp* [1948] 1 All ER 564, [1948] 1 KB 721, CA.   *g*

### Interlocutory appeal
The plaintiffs, Williams & Glyn's Bank plc, appealed, with leave of the Appeal Committee of the House of Lords granted on 28 July 1983, from the judgment of the Court of Appeal (Stephenson and Robert Goff LJJ) ([1983] 2 Lloyd's Rep 485) dated 18 May 1983 allowing the appeal of the respondent defendants, Astro Dinamico Cia Naviera SA and   *h*<br>Georgian Shipping Enterprises SA, against part of the order of Bingham J dated 2 November 1982 made pursuant to RSC Ord 12, r 8(5) giving directions for the disposal of the summons dated 1 June 1982 issued by the respondents whereby the judge ordered, inter alia, that the application for a stay of proceedings be heard and ruled on, if necessary, after the court had determined the question of whether it had jurisdiction. The facts are set out in the opinion of Lord Fraser.   *j*

*Edward Evans-Lombe QC* and *John Bertin* for the appellants.<br>
*Michael Tugendhat* for the respondents.

Their Lordships took time for consideration.

1 March. The following opinions were delivered.

*a* **LORD FRASER OF TULLYBELTON.** My Lords, the appellants, Williams & Glyn's Bank, are suing the respondent companies, which are both registered in Panama but are owned and managed in Greece. The respondents have made an application under RSC Ord 12, r 8 disputing the jurisdiction of the English courts. They have also, simultaneously, applied for a stay of the action on grounds which may be summarised in one or other or both of the brocards forum non conveniens and lis alibi pendens. The

*b* respondents say that the issues which will determine the decision on jurisdiction, and to a large extent also the decision on the merits, are already raised in proceedings in the courts in Greece and that it is more appropriate and convenient for the dispute to be decided in Greece. The only question before the House at this stage is whether the English court should consider the question of jurisdiction first or the question of the stay first. Bingham J decided that the first question to be decided was whether the English

*c* court has jurisdiction. The Court of Appeal (Stephenson and Robert Goff LJJ) on 18 May 1983 reversed his decision and ordered that the question of whether or not to grant a stay should be decided first. Against that decision the appellants have appealed to your Lordships' House.

The factual background, so far as directly material to the present question, is as follows. In accordance with an agreement dated 12 October 1976 the appellants lent the sum of

*d* $US10m to a Greek company called Ulysses Shipping Agency Ltd which was one of their customers. The loan was secured by, inter alia, two guarantees, one from each of the respondent companies. Each guarantee was backed by a mortgage of a ship belonging to the company. The guarantees and mortgages were expressed to be executed on behalf of the respondents by a Mr Nicholas Vlassopulos. His authority to do so was vouched by documents which were expressed to be powers of attorney signed by an officer of each of

*e* the respondent companies and extracts of minutes of meetings of directors and shareholders of each of the respondent companies certified by the same officer.

In 1982, as the loan to Ulysses had not been repaid, the appellants sought to enforce their security and they demanded repayment from, inter alia, the respondents. In March 1982 by a writ and points of claim the appellants claimed payment from the respondents.

*f* The loan agreement to Ulysses and the guarantees are all expressed to be governed by English law. The mortgages are both expressed to be governed by Greek law. The basis on which jurisdiction over the respondents is asserted is that the respondents have expressly submitted to the jurisdiction of the English courts by a clause in the guarantees. Each guarantee includes a clause (cl 7) to the following effect:

*g*       'THIS GUARANTEE shall be governed and construed in all respects in accordance with the laws of England in relation to all claims hereunder. The guarantor irrevocably submits to the jurisdiction of the English courts and any legal process or demand or notice may be made or served on the Guarantor at the registered office in England for the time being of N. & J. Vlassopulos Ltd . . .'

Service of the writ in the action was duly effected at the specified office. In reply the

*h* respondents contended that the guarantees and mortgages were invalid on various grounds. One ground was that they were gratuitous alienations of the respondents' property, and as such were ultra vires the respondents' officers and the respondents themselves. Another ground was that the guarantees and mortgages had been executed without any authority whatever, that the power of attorney was invalid and that the meeting at which it was said to have been authorised never took place. In short the

*j* defence is that the power of attorney and the minutes were fraudulent. If the latter ground is well-founded the guarantees, including of course cl 7, on which the jurisdiction of the English courts depends, are null and void, and the English courts have no jurisdiction.

As I mentioned earlier the respondents have started proceedings in Greece. The appellants have a branch office there and are therefore subject to the jurisdiction of the

Greek courts. We were informed that criminal proceedings against some of the persons involved had also been started in Greece, but it is not clear whether these proceedings are similar to a private prosecution in England and I do not regard the criminal proceedings as having any bearing on the present question. It appears that the Greek civil proceedings raise questions very similar to those in issue in the English proceedings; in particular they seek declarations that the guarantees are void and of no effect by reason of the fact that they had been entered into without authority and for fraudulent purposes.

In these circumstances the appellants on 24 March 1982 issued their writ in England relying for jurisdiction on cl 7 in each of the guarantees. The respondents wish to dispute the jurisdiction and they accordingly followed the procedure laid down in RSC Ord 12. They acknowledged service of the writ; such acknowledgment does not constitute a waiver of an irregularity in the writ: see Ord 12, r 7. Then they took out a summons giving notice of their intention to dispute the jurisdiction in accordance with Ord 12, r 8(1). Their notice was dated 1 June 1982 and was in two parts. The first part applied for—

'(1) an order setting aside the Writ issued on 24th March 1982 or service of the said Writ on the [respondents], and/or
(2) an order declaring that the said Writ had not been duly served on the [respondents], and/or
(3) such other relief as may be appropriate on the grounds that the contracts purportedly made on behalf of the [respondents].which are the subject of this action were signed without authority and pursuant to a conspiracy to defraud the [respondents] between the signatory thereof Mr Vlassopulos and [the officer who signed the power of attorney].'

The second part of the summons was in the following terms:

'(4) alternatively an order that all further proceedings herein be stayed on the ground that: (i) in November 1981 the [respondents] commenced proceedings in the Court of Piraeus Greece to whose jurisdiction the [appellants] have submitted and that court will determine the issues arising in the [appellants'] claim herein; (ii) the subject matter of the proceedings has little connection with England; (iii) neither of the [respondents] is English nor resident in England; and (iv) it is more appropriate and convenient for the dispute to be decided in Greece.'

The appellants had applied for an order under Ord 14 but this was refused by Staughton J on 12 July 1982. At that stage the matter came before Bingham J on 2 November 1982. He was invited to decide, in the light of the respondents' summons, whether the court ought first to decide the question of a stay or the question of jurisdiction. In the ordinary case there can be little doubt that the question of jurisdiction would fall to be decided first; logically the court must decide whether it has jurisdiction before it can go on to consider any other question in the action. But the peculiarity of this case is that a decision on jurisdiction could only be reached by deciding whether the guarantees were valid or not and thus in effect deciding the issue which is at the heart of the action. A decision on that issue would turn largely on disputed questions of fact which are likely to be strenuously contested, and the investigation of which would inevitably take a considerable time.

The primary contention on behalf of the appellants is that the court has no power to give priority to hearing the respondents' application for a stay over their objection to the jurisdiction. This was said to be the effect of Ord 12, r 8. If that rule were the only source of the court's power in this matter, there would be considerable force in this submission. Rule 8(1), which sets out the various forms of order on this subject for which a defendant may apply, evidently contemplates an order which immediately decides the issue. Paragraph (h) although wide in its terms ('such other relief as may be appropriate') must be read in its context and is not appropriate to include an order to stay. Similarly, r 8(5) seems to contemplate that the court will either dispose of the matter in dispute

a

immediately or give directions for its disposal: for example by making an order allowing cross-examination of witnesses, as the judge did in this case. But the powers of the court are not limited to those derived from r 8. It has also the much wider and more general power conferred, or preserved, by the Supreme Court Act 1981, s 49(3), which provides:

b

'Nothing in this Act shall affect the power of the Court of Appeal or the High Court to stay any proceedings before it, where it thinks fit to do so, either of its own motion or on the application of any person, whether or not a party to the proceedings.'

c

That subsection recognises the wide powers of the court, including power to stay proceedings 'of its own motion', but the argument for the appellants involves saying that the court has no power, even of its own motion, to stay an action in which its jurisdiction is disputed. That seems to me an extravagant proposition which could only be made to appear plausible by drawing a technical distinction between staying an action and adjourning it. For example, it can hardly be doubted that the court has power to adjourn a hearing on a question of disputed jurisdiction until a vital witness can be available. If so, I can see no reason in principle why it cannot stay the proceedings to await the outcome of proceedings in Greece. I do not think that a technical distinction can sensibly be drawn between adjourning for the former purpose and staying for the latter purpose. Accordingly I reject this contention.

d

It was further contended on behalf of the appellants that the respondents either had waived any objection to the jurisdiction because they had taken a step in the action by applying for a stay, or that they would waive any objection if they persisted with their application in priority to disputing the jurisdiction. My Lords, it would surely be quite unrealistic to say that the respondents had waived their objection to the jurisdiction by applying for a stay as an alternative in the very summons in which they applied for an order giving effect to their objection to the jurisdiction. That summons makes it abundantly clear that they are objecting, and the fact that they ask for a decision on their objection to be postponed until the outcome of the Greek proceedings is known is not in any way inconsistent with maintaining their objection. I can see no reason in principle or common sense why the respondents should not be entitled to say: 'We object to the jurisdiction of the English courts, but we ask for the proceedings necessary to decide that and the other issues to be stayed pending the decision of the proceedings in Greece.' The argument to the contrary which was accepted by Bingham J was that, if the court were to entertain the application for a stay, it would be assuming that it had jurisdiction to entertain the action. With the greatest respect to the judge, I agree with Robert Goff LJ in the Court of Appeal that that view is mistaken. The fallacy is in confusing two different kinds of jurisdiction: the first is jurisdiction to decide the action on its merits, and the second is jurisdiction to decide whether the court has jurisdiction of the former kind. The distinction was explained in Wilkinson v Barking Corp [1948] 1 All ER 564 at 567, [1948] 1 KB 721 at 725 by Asquith LJ, who said:

e

f

g

h

'The argument we are here rejecting seems to be based on a confusion between two distinct kinds of jurisdiction. The Supreme Court may by statute lack jurisdiction to deal with a particular matter—in this case, matters including superannuation claims under s 8 of the Act of 1937. It has, however, jurisdiction to decide whether or not it has jurisdiction to deal with such matters, and by entering an unconditional appearance, a litigant submits to the former jurisdiction (which exists), but not to the latter (which does not).'

j

By entertaining the application for a stay in this case, the court would be assuming (rightly) that it has jurisdiction to decide whether or not it has jurisdiction to deal with the merits, but would not be making any assumption about its jurisdiction to deal with the merits.

Counsel for the appellants referred to some cases as authorities for his proposition that the respondents, by merely applying for a stay, had taken a step in the proceedings which

necessarily involved waiving their objection to the jurisdiction. Several of the cases arose
under the Arbitration Act 1889, s 4 and they are not helpful in considering the present $a$
issue. But in one of the arbitration cases, *Pitchers Ltd v Plaza (Queensbury) Ltd* [1940] 1 All
ER 151 at 156, Goddard LJ made an observation on facts, hypothetical in that case, which
come very close to the actual facts in the present case. He said:

> 'For myself, I am not at all satisfied that, if the defendant filed an affidavit in
> answer to an application for judgment under R.S.C., Ord. 14, although he may raise
> the arbitration clause, it may not be said that he has taken a step in the action *unless* $b$
> *at the same time* he has taken out a summons to stay the action. Of course, if he has
> taken out a summons to stay the action which comes on (as, in the ordinary course,
> it would) at the same time as the summons for judgment, and the master refuses
> the application to stay, and says, "On the plaintiff's summons, I give judgment;" I
> should say that there could be no doubt that, in appealing against both the refusal
> of the master to stay and the order giving leave to sign judgment, the defendant is $c$
> not taking a step in the action. He has done what he can, by taking out the summons
> to stay, to get the action referred.' (Emphasis mine.)

A case which was concerned with waiver of the right to object to the jurisdiction of
the court also contains observations adverse to the appellants' contention. The case is *Rein
v Stein* (1892) 66 LT 469 at 471, where Cave J in the Divisional Court said: $d$

> 'It seems to me that, in order to establish a waiver, you must show that the party
> alleged to have waived his objection has taken some step which is only necessary or
> only useful if the objection has been actually waived, or if the objection has never
> been entertained at all.'

Applying that to the present case, the stay is not *only* useful if the objection to jurisdiction $e$
has been waived, because one principal purpose of the stay would be to postpone the
inquiry into the questions on which jurisdiction depends until the outcome of the Greek
proceedings is known. In *Re Dulles's Settlement Trusts, Dulles v Vidler* [1951] 2 All ER 69,
[1951] 1 Ch 842 the question was whether a father, who was an American resident
outside England, had submitted to the jurisdiction of the English courts in a dispute
about payment of maintenance to his child in England. He had been represented by $f$
counsel in the English court, who argued that he was not subject to their jurisdiction.
Denning LJ said ([1951] 2 All ER 69 at 72, [1951] 1 Ch 842 at 850):

> 'I cannot see how anyone can fairly say that a man has voluntarily submitted to
> the jurisdiction of a court when he has all the time been vigorously protesting that
> it has no jurisdiction. If he does nothing and lets judgment go against him in default
> of appearance, he clearly does not submit to the jurisdiction. What difference in $g$
> principle does it make, if he does not merely do nothing, but actually goes to the
> court and protests that it has no jurisdiction? I can see no distinction at all.'

That observation seems very apposite in the present case, where the respondents have
from the beginning been vigorously protesting that the English courts have no
jurisdiction over them. The fact that they have simultaneously asked for a stay is, in the $h$
unusual circumstances of this case, in no way inconsistent with that protest.

For these reasons I am of opinion that the Court of Appeal rightly held that the judge
had erred in law when he decided that the application for a stay necessarily implied
acceptance of the jurisdiction. If that is right, the decision whether to deal first with the
question of jurisdiction or with the application for a stay was one for the exercise of the
judge's discretion. The judge appears to have regarded himself as exercising a discretion, $j$
but with all respect that seems to me to be wrong: if he had been right in his view as to
the necessary effect of dealing first with the application for a stay, he was obliged to
decide, as he did, to deal with jurisdiction first. Even if his decision was made in the
exercise of his discretion, it was made on an erroneous view of the law, and the Court of
Appeal therefore had to exercise their own discretion on a correct view of the law. That

*a*   they have done, and their decision that the application for a stay be considered first cannot in my view be said to be unreasonable. Indeed I consider it was plainly right. It is unnecessary for me to repeat at length the reasoning of Robert Goff LJ who gave the leading judgment in the Court of Appeal. It is enough to say that his view was that a decision on the application for a stay could probably be reached by the court after a hearing lasting not more than one day, whereas a decision on the question of jurisdiction would take much longer and would involve considerable inquiry into the facts. It is

*b*   relevant to notice that Bingham J had ordered that cross-examination of the deponents to affidavits was to be allowed. Difficult questions of foreign law will also arise, and these may involve both Greek law and Panamanian law as the defendant companies are registered in Panama. Many of the same questions will be raised in the proceedings in Greece. Accordingly there are obvious arguments of convenience and economy in time and money in favour of deferring a decision on jurisdiction until the Greek proceedings

*c*   have been concluded.

    I must emphasise that, in what I said in the last paragraph, I am doing no more than indicating why the application for a stay should be considered first. I am far from indicating any view, even of the most tentative character, whether the decision should be in favour of granting a stay or not. That decision will be for the judge after hearing argument, and nothing that is said in your Lordships' House at the present stage of

*d*   proceedings should influence his decision in any way.

    I would dismiss the appeal and affirm the order of the Court of Appeal.

**LORD EDMUND-DAVIES.** My Lords, having had the advantage of reading in draft the speech prepared by my noble and learned friend Lord Fraser, I restrict myself to saying that I respectfully agree with it and with the reasons he gives for dismissing this

*e*   appeal.

**LORD BRIDGE OF HARWICH.** My Lords, for the reasons given in the speech of my noble and learned friend Lord Fraser, with which I agree, I would dismiss this appeal.

**LORD BRANDON OF OAKBROOK.** My Lords, I have had the advantage of

*f*   reading in draft the speech prepared by my noble and learned friend Lord Fraser. I agree with it and for the reasons which he gives I would dismiss the appeal.

**LORD TEMPLEMAN.** My Lords, for the reasons given by my noble and learned friend Lord Fraser I would dismiss this appeal.

*g*   *Appeal dismissed.*

Solicitors: *Constant & Constant* (for the appellants); *Allen & Overy* (for the respondents).

Mary Rose Plummer   Barrister.

# TAB 14

# Insolvency Act 1986

CHAPTER 45

# ARRANGEMENT OF SECTIONS

THE FIRST GROUP OF PARTS

COMPANY INSOLVENCY; COMPANIES WINDING UP

## PART I

### COMPANY VOLUNTARY ARRANGEMENTS

*The proposal*

Section
1. Those who may propose an arrangement.
2. Procedure where nominee is not the liquidator or adminis-
    trator.
3. Summoning of meetings.

*Consideration and implementation of proposal*

4. Decisions of meetings.
5. Effect of approval.
6. Challenge of decisions.
7. Implementation of proposal.

## PART II

### ADMINISTRATION ORDERS

*Making, etc. of administration order*

8. Power of court to make order.
9. Application for order.
10. Effect of application.
11. Effect of order.
12. Notification of order.

A

may for the time being be, or in a place outside the United
Kingdom.

(4) Any person who appears or is brought before the court
under section 236 or this section may be examined on oath,
either orally or (except in Scotland) by interrogatories, con-
cerning the company or the matters mentioned in section
236(2)(c).

### *Adjustment of prior transactions (administration and liquidation)*

**238.**—(1) This section applies in the case of a company   Transactions at
where—                                                       an undervalue
                                                             (England and
   (a) an administration order is made in relation to the   Wales).
       company, or

   (b) the company goes into liquidation ;

and " the office-holder " means the administrator or the liqui-
dator, as the case may be.

(2) Where the company has at a relevant time (defined in
section 240) entered into a transaction with any person at an
undervalue, the office-holder may apply to the court for an
order under this section.

(3) Subject as follows, the court shall, on such an applica-
tion, make such order as it thinks fit for restoring the position
to what it would have been if the company had not entered
into that transaction.

(4) For the purposes of this section and section 241, a com-
pany enters into a transaction with a person at an undervalue
if—

   (a) the company makes a gift to that person or otherwise
       enters into a transaction with that person on terms that
       provide for the company to receive no consideration,
       or

   (b) the company enters into a transaction with that person
       for a consideration the value of which, in money or
       money's worth, is significantly less than the value, in
       money or money's worth, of the consideration pro-
       vided by the company.

(5) The court shall not make an order under this section in
respect of a transaction at an undervalue if it is satisfied—

   (a) that the company which entered into the transaction did
       so in good faith and for the purpose of carrying on its
       business, and

   (b) that at the time it did so there were reasonable grounds
       for believing that the transaction would benefit the
       company.

132        c. 45                    *Insolvency Act 1986*

PART VI
Preferences
(England and
Wales).

**239.**—(1) This section applies as does section 238.

(2) Where the company has at a relevant time (defined in the next section) given a preference to any person, the office-holder may apply to the court for an order under this section.

(3) Subject as follows, the court shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if the company had not given that preference.

(4) For the purposes of this section and section 241, a company gives a preference to a person if—

    (a) that person is one of the company's creditors or a surety or guarantor for any of the company's debts or other liabilities, and

    (b) the company does anything or suffers anything to be done which (in either case) has the effect of putting that person into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if that thing had not been done.

(5) The court shall not make an order under this section in respect of a preference given to any person unless the company which gave the preference was influenced in deciding to give it by a desire to produce in relation to that person the effect mentioned in subsection (4)(b).

(6) A company which has given a preference to a person connected with the company (otherwise than by reason only of being its employee) at the time the preference was given is presumed, unless the contrary is shown, to have been influenced in deciding to give it by such a desire as is mentioned in subsection (5).

(7) The fact that something has been done in pursuance of the order of a court does not, without more, prevent the doing or suffering of that thing from constituting the giving of a preference.

" Relevant
time " under
ss. 238, 239.

**240.**—(1) Subject to the next subsection, the time at which a company enters into a transaction at an undervalue or gives a preference is a relevant time if the transaction is entered into, or the preference given—

    (a) in the case of a transaction at an undervalue or of a preference which is given to a person who is connected with the company (otherwise than by reason only of being its employee), at a time in the period of 2 years ending with the onset of insolvency (which expression is defined below),

(b) in the case of a preference which is not such a transac-    PART VI
tion and is not so given, at a time in the period of 6
months ending with the onset of insolvency, and

(c) in either case, at a time between the presentation of a
petition for the making of an administration order in
relation to the company and the making of such an
order on that petition.

(2) Where a company enters into a transaction at an under-
value or gives a preference at a time mentioned in subsection
(1)(a) or (b), that time is not a relevant time for the purposes of
section 238 or 239 unless the company—

(a) is at that time unable to pay its debts within the mean-
ing of section 123 in Chapter VI of Part IV, or

(b) becomes unable to pay its debts within the meaning of
that section in consequence of the transaction or pref-
erence;

but the requirements of this subsection are presumed to be
satisfied, unless the contrary is shown, in relation to any transac-
tion at an undervalue which is entered into by a company with
a person who is connected with the company.

(3) For the purposes of subsection (1), the onset of insolven-
cy is—

(a) in a case where section 238 or 239 applies by reason of
the making of an administration order or of a com-
pany going into liquidation immediately upon the dis-
charge of an administration order, the date of the
presentation of the petition on which the administra-
tion order was made, and

(b) in a case where the section applies by reason of a com-
pany going into liquidation at any other time, the date
of the commencement of the winding up.

**241.**—(1) Without prejudice to the generality of sections    Orders under
238(3) and 239(3), an order under either of those sections with    ss. 238, 239.
respect to a transaction or preference entered into or given by
a company may (subject to the next subsection)—

(a) require any property transferred as part of the transac-
tion, or in connection with the giving of the preference,
to be vested in the company,

(b) require any property to be so vested if it represents in
any person's hands the application either of the pro-
ceeds of sale of property so transferred or of money
so transferred,

(c) release or discharge (in whole or in part) any security
given by the company,

134        c. **45**                    *Insolvency Act 1986*

PART VI
  (*d*) require any person to pay, in respect of benefits received
    by him from the company, such sums to the office-
    holder as the court may direct,

  (*e*) provide for any surety or guarantor whose obligations
    to any person were released or discharged (in whole or
    in part) under the transaction, or by the giving of the
    preference, to be under such new or revived obliga-
    tions to that person as the court thinks appropriate,

  (*f*) provide for security to be provided for the discharge of
    any obligation imposed by or arising under the order,
    for such an obligation to be charged on any property
    and for the security or charge to have the same pri-
    ority as a security or charge released or discharged (in
    whole or in part) under the transaction or by the
    giving of the preference, and

  (*g*) provide for the extent to which any person whose
    property is vested by the order in the company, or on
    whom obligations are imposed by the order, is to
    be able to prove in the winding up of the company for
    debts or other liabilities which arose from, or were
    released or discharged (in whole or in part) under or
    by, the transaction or the giving of the preference.

(2) An order under section 238 or 239 may affect the property
of, or impose any obligation on, any person whether or not he
is the person with whom the company in question entered into
the transaction or (as the case may be) the person to whom the
preference was given ; but such an order—

  (*a*) shall not prejudice any interest in property which was
    acquired from a person other than the company and
    was acquired in good faith, for value and without notice
    of the relevant circumstances, or prejudice any interest
    deriving from such an interest, and

  (*b*) shall not require a person who received a benefit from
    the transaction or preference in good faith, for value
    and without notice of the relevant circumstances to pay
    a sum to the office-holder, except where that person was
    a party to the transaction or the payment is to be in
    respect of a preference given to that person at a time
    when he was a creditor of the company.

(3) For the purposes of this section the relevant circumstances,
in relation to a transaction or preference, are—

  (*a*) the circumstances by virtue of which an order under
    section 238 or (as the case may be) 239 could be made
    in respect of the transaction or preference if the com-
    pany were to go into liquidation, or an administration
    order were made in relation to the company, within a

particular period after the transaction is entered into     PART VI
or the preference given, and

(*b*) if that period has expired, the fact that the company
has gone into liquidation or that such an order has
been made.

(4) The provisions of sections 238 to 241 apply without pre-
judice to the availability of any other remedy, even in relation
to a transaction or preference which the company had no
power to enter into or give.


242.—(1) Where this subsection applies and—     Gratuitous

(*a*) the winding up of a company has commenced, an     alienations
alienation by the company is challengeable by—     (Scotland).

(i) any creditor who is a creditor by virtue of a
debt incurred on or before the date of such com-
mencement, or

(ii) the liquidator ;

(*b*) an administration order is in force in relation to a com-
pany, an alienation by the company is challengeable by
the administrator.

(2) Subsection (1) applies where—

(*a*) by the alienation, whether before or after 1st April
1986 (the coming into force of section 75 of the Bank-   1985 c
ruptcy (Scotland) Act 1985), any part of the company's
property is transferred or any claim or right of the
company is discharged or renounced, and

(*b*) the alienation takes place on a relevant day.

(3) For the purposes of subsection (2)(*b*), the day on which an
alienation takes place is the day on which it becomes com-
pletely effectual ; and in that subsection " relevant day " means, if
the alienation has the effect of favouring—

(*a*) a person who is an associate (within the meaning of
the Bankruptcy (Scotland) Act 1985) of the company, a
day not earlier than 5 years before the date on which—

(i) the winding up of the company commences, or

(ii) as the case may be, the administration order is
made ; or

(*b*) any other person, a day not earlier than 2 years before
that date.

(4) On a challenge being brought under subsection (1), the
court shall grant decree of reduction or for such restoration of
property to the company's assets or other redress as may be

246        c. **45**                *Insolvency Act 1986*

PART XV    (2) An order under this section may make different provision
for different cases and may contain such incidental, supple-
mental and transitional provisions as may appear to the Lord
Chancellor necessary or expedient.

(3) An order under this section shall be made by statutory
instrument subject to annulment in pursuance of a resolution
of either House of Parliament.

(4) For the purposes of this section the estate of a deceased
person is insolvent if, when realised, it will be insufficient to
meet in full all the debts and other liabilities to which it is
subject.

Recognised    **422.**—(1) The Secretary of State may, by order made with the
banks, etc.    concurrence of the Treasury and after consultation with the
Bank of England, provide that such provisions in the first
Group of Parts as may be specified in the order shall apply in
relation to—

1979 c. 37.

(a) recognised banks and licensed institutions within the
meaning of the Banking Act 1979, and

(b) institutions to which sections 16 and 18 of that Act
apply as if they were licensed institutions,

with such modifications as may be so specified.

(2) An order under this section may make different provision
for different cases and may contain such incidental, supple-
mental and transitional provisions as may appear to the Secre-
tary of State necessary or expedient.

(3) An order under this section shall be made by statutory
instrument subject to annulment in pursuance of a resolution
of either House of Parliament.

## PART XVI

### PROVISIONS AGAINST DEBT AVOIDANCE (ENGLAND AND WALES ONLY)

Transactions    **423.**—(1) This section relates to transactions entered into at
defrauding    an undervalue; and a person enters into such a transaction with
creditors.    another person if—

(a) he makes a gift to the other person or he otherwise
enters into a transaction with the other on terms that
provide for him to receive no consideration;

(b) he enters into a transaction with the other in considera-
tion of marriage; or

(c) he enters into a transaction with the other for a con-
sideration the value of which, in money or money's

worth, is significantly less than the value, in money or    PART XVI
money's worth, of the consideration provided by him-
self.

(2) Where a person has entered into such a transaction, the
court may, if satisfied under the next subsection, make such
order as it thinks fit for—

- (a) restoring the position to what it would have been if
the transaction had not been entered into, and
- (b) protecting the interests of persons who are victims of
the transaction.

(3) In the case of a person entering into such a transaction,
an order shall only be made if the court is satisfied that it was
entered into by him for the purpose—

- (a) of putting assets beyond the reach of a person who is
making, or may at some time make, a claim against
him, or
- (b) of otherwise prejudicing the interests of such a person
in relation to the claim which he is making or may
make.

(4) In this section " the court " means the High Court or—

- (a) if the person entering into the transaction is an indi-
vidual, any other court which would have jurisdiction
in relation to a bankruptcy petition relating to him ;
- (b) if that person is a body capable of being wound up
under Part IV or V of this Act, any other court having
jurisdiction to wind it up.

(5) In relation to a transaction at an undervalue, references
here and below to a victim of the transaction are to a person
who is, or is capable of being, prejudiced by it ; and in the
following two sections the person entering into the transaction
is referred to as " the debtor ".

**424.**—(1) An application for an order under section 423 shall    Those who
not be made in relation to a transaction except—    may apply for
an order
- (a) in a case where the debtor has been adjudged bankrupt    under s. 423.
or is a body corporate which is being wound up or in
relation to which an administration order is in force,
by the official receiver, by the trustee of the bankrupt's
estate or the liquidator or administrator of the body
corporate or (with the leave of the court) by a victim
of the transaction ;
- (b) in a case where a victim of the transaction is bound
by a voluntary arrangement approved under Part I or
Part VIII of this Act, by the supervisor of the volun-

# TAB 15

# EASTERN CARIBBEAN
# SUPREME COURT



# CIVIL PROCEDURE RULES
# 2000

**The Caribbean Law Publishing Company**
Kingston

First published in Jamaica 2001 by
The Caribbean Law Publishing Company
11 Cunningham Avenue
Box 686
Kingston 6

© 2001 Eastern Caribbean Supreme Court

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means electronic, photocopying, recording or otherwise without the prior permission of the Eastern Caribbean Supreme Court.

ISBN 976-8167-20-3


A catalogue of record of this book is available from the
National Library of Jamaica



Typeset by Robert Harris


Set in Stone Informal  10/14 x 30

Printed in the United States of America

# EASTERN CARIBBEAN SUPREME COURT
# CIVIL PROCEDURE RULES 2000

The Chief Justice and two other judges of the Supreme Court, being the authority empowered by section 17 of the West Indies Associated States Supreme Court Order 1967 (Vol. X of the Laws of Grenada 1990, p. 470) to make rules regulating the practice and procedure of the Court of Appeal and the High Court, have made the following rules —

1. **Citation**: Theses rules may be cited as the
**EASTERN CARIBBEAN SUPREME COURT CIVIL PROCEDURE RULES 2000**

2.**Rules in the Schedule:** The Rules in the Schedule hereto are the rules governing civil procedure in the Eastern Caribbean Supreme Court.

3.Reference to the Rules: It shall not be necessary to include the Schedule to these rules in the annual volume of the Laws of a Member State or Territory of the Eastern Caribbean Supreme Court, but a reference may be made thereto in such volume and shall be sufficient.

4.Repeal: The Rules of the Supreme Court (Revision) 1970 are repealed, subject to the transitional provisions contained in Part 73 of the Schedule hereto.

5.Commencement: These Rules are deemed to have come into effect in each of the Member States and Territories of the Eastern Caribbean Supreme Court on  December 31st 2000.

**SCHEDULE**                                    (Rule 2)

Eastern Caribbean Supreme Court Civil Procedure Rules 2000, published by The Caribbean Law Publishing Company Ltd. at the request and by the authority of the Chief justice and two other judges appointed by him.

    Made the 3rd day of May 2001.

Sir Dennis Byron
Chief Justice

Albert N. J. Matthew
Justice of Appeal

Adrian Saunders
High Court Judge

# TABLE OF CONTENTS

---------------------------------------------------------------------------------

## Part 1: Overriding Objective

| | |
|---|---|
| The overriding objective | Rule 1.1 |
| Application of overriding objective by the court | Rule 1.2 |
| Duty of parties | Rule 1.3 |

## Part 2: Application and Interpretation of these Rules

| | |
|---|---|
| Citation | Rule 2.1 |
| Application of these Rules | Rule 2.2 |
| Application of Interpretation Acts | Rule 2.3 |
| Definitions | Rule 2.4 |
| Who may exercise the powers of the court | Rule 2.5 |
| Court staff | Rule 2.6 |
| Court's discretion as to where, when and how it deals with cases | Rule 2.7 |

## Part 3: Time, Documents

| | |
|---|---|
| Time – court to state calendar date | Rule 3.1 |
| Time – computation | Rule 3.2 |
| Vacations | Rule 3.3 |
| Hearings in vacations | Rule 3.4 |
| Time – vacations | Rule 3.5 |
| Documents | Rule 3.6 |
| Filing of documents | Rule 3.7 |
| Filing and service by FAX | Rule 3.8 |
| Sealing of documents issued by the court | Rule 3.9 |
| Forms | Rule 3.10 |

Statements of case – address for service                        Rule 3.11

Statements of case – certificate of truth                       Rule 3.12

Failure to give certificate of truth                            Rule 3.13

Right to inspect, etc. certain documents filed in court office  Rule 3.14

## Part 4: Practice Directions and Guides

Who may issue practice directions                               Rule 4.1

Scope of practice directions                                    Rule 4.2

Publication of practice directions                              Rule 4.3

Compliance with practice directions                            Rule 4.4

Practice guides                                                 Rule 4.5

Date from which practice directions and guides take effect      Rule 4.6

## Part 5: Service of Claim Form within Jurisdiction

Service of claim form – normal method                          Rule 5.1

Statement of claim to be served with claim form                Rule 5.2

Method of personal service                                     Rule 5.3

Permitted place of service                                     Rule 5.4

Proof of personal service                                      Rule 5.5

Service on legal practitioner                                  Rule 5.6

Service on limited company                                     Rule 5.7

Service on firm or partnership                                 Rule 5.8

Service on body corporate                                      Rule 5.9

Service on minors and patients                                 Rule 5.10

Proof of postal service                                        Rule 5.11

Proof of service by FAX                                        Rule 5.12

Alternative methods of service                                 Rule 5.13

Power of court to make order for service by specified method    Rule 5.14

Proof of service by specified method                          Rule 5.15

Service of claim form by contractually agreed method           Rule 5.16

Service of claim form on agent of principal who is out of jurisdiction   Rule 5.17

Service of claim for possession of vacant land                 Rule 5.18

Deemed date of service                                         Rule 5.19

## Part 6: Service of other Documents

Who is to serve documents other than claim form                 Rule 6.1

Method of service                                               Rule 6.2

Address for service                                             Rule 6.3

Serving documents where no address for service is given         Rule 6.4

Service of documents on person who is not a party               Rule 6.5

Deemed date of service                                          Rule 6.6

Proof of service                                                Rule 6.7

Power of court to dispense with service                         Rule 6.8

Service of notices, etc. on Attorney General                    Rule 6.9

## Part 7: Service of Court Process out of Jurisdiction

Scope of this Part                                                              Rule 7.1

General rule as to service of claim form out of jurisdiction                    Rule 7.2

Service of claim form out of jurisdiction in specified proceedings              Rule 7.3

Proceedings which include other types of claim                                  Rule 7.4

Permission to serve claim form out of jurisdiction                              Rule 7.5

Acknowledgment of service and defence where claim form served out of the jurisdiction   Rule 7.6

Application to set aside service under rule 7.3                                  Rule 7.7

Mode of service of claim form – general provisions                              Rule 7.8

Mode of Service - alternative procedure                                         Rule 7.8A

Power of Court to dispense with service of the claim form                       Rule 7.8B

Service of claim form through foreign governments, or judicial or consular authorities   Rule 7.9

Procedure where claim form is to be served through foreign Governments, etc.    Rule 7.10

Service of claim form on a State where court permits service out of jurisdiction   Rule 7.11

Translation of claim form                                                       Rule 7.12

Undertaking to be responsible for expenses of Minister with responsibility for foreign affairs   Rule 7.13

Service of court process other than claim form                                  Rule 7.14

## Part 8: How to Start Proceedings

The claimant – how to start proceedings                         Rule 8.1

Statement of claim, etc. to be issued and served with claim form   Rule 8.2

Where to start proceedings                                      Rule 8.3

Right to make claim which includes two or more claims                                    Rule 8.4

Claim not to fail by adding or failing to add parties                                    Rule 8.5

What must be included in claim form                                                      Rule 8.6

Claimant's duty to set out case                                                          Rule 8.7

Permission to rely on allegation or factual argument                                     Rule 8.7A

Certificate of value (small claims)                                                      Rule 8.8

Special requirements applying to claims for personal injuries                            Rule 8.9

Relator claims                                                                           Rule 8.10

Service of claim form                                                                    Rule 8.11

Time within which claim form may be served                                               Rule 8.12

Extension of time for serving claim form                                                 Rule 8.13

Defence form, etc. must be served with claim form                                        Rule 8.14

## Part 9: Acknowledgment of Service and Notice of Intention to Defend

Scope of this Part                                                                       Rule 9.1

Filing acknowledgment of service and consequence of not doing so                         Rule 9.2

The period for filing acknowledgment of service                                          Rule 9.3

Notice to claimant of filing of acknowledgment of service                                Rule 9.4

Contents of acknowledgment of service                                                    Rule 9.5

Right to dispute jurisdiction of court not taken away by acknowledgment of service       Rule 9.6

Procedure for disputing court's jurisdiction,                                            Rule 9.7

Procedure for applying for a stay etc. where defendant served out of jurisdiction        Rule 9.7A

## Part 10: Defence

Scope of this Part                                                                       Rule 10.1

The defendant – filing defence and consequences of not doing so                          Rule 10.2

The period for filing defence                                                            Rule 10.3

Service of copy of defence                                                               Rule 10.4

Defendant's duty to set out case                                                         Rule 10.5

Special requirements applying to claims for personal injuries                            Rule 10.6

Consequences of not setting out defence                                                  Rule 10.7

Defence of tender                                                                        Rule 10.8

Reply to defence                                                                         Rule 10.9

## Part 11: General Rules about Applications for Court Orders

Scope of this Part                                                      Rule 11.1

Applicants and respondents                                              Rule 11.2

Applications to be dealt with at case management conference             Rule 11.3

Time when application is made                                           Rule 11.4

Where to make application                                               Rule 11.5

Application to be in writing                                            Rule 11.6

What application must include                                           Rule 11.7

Notice of application and evidence in support                           Rule 11.8

Evidence in support of application                                      Rule 11.9

Contents of notice of application                                       Rule 11.10

Service of notice of application                                        Rule 1 1.11

Powers of court in relation to conduct of application                   Rule 11.12

Consequence of not asking for order in application                      Rule 11.13

Applications which may be dealt with without hearing                    Rule 11.14

Service of application where order made on application made without notice   Rule 11.15

Applications to set aside or vary order made on application made without notice   Rule 11.16

Power of court to proceed in absence of party                           Rule 11.17

Application to set aside order made in absence of party                 Rule 11.18

## Part 12: Default Judgments

Scope of this Part                                                      Rule 12.1

Claims in which default judgment may not be obtained                    Rule 12.2

Cases in which permission required                                      Rule 12.3

Conditions to be satisfied – judgment for failure to file acknowledgment of service   Rule 12.4

Conditions to be satisfied – judgment for failure to defend            Rule 12.5

Admission of part – request for time to pay                            Rule 12.6

Procedure                                                               Rule 12.7

Claim for specified sum of money                                        Rule 12.8

Claim against more than one defendant                                   Rule 12.9

Nature of default judgment                                              Rule 12.10

Interest                                                                Rule 12.11

Costs                                                                   Rule 12.12

Defendant's rights following default judgment                                    Rule 12.13

## Part 13: Setting Aside or varying Default Judgment

Scope of this Part                                                               Rule 13.1

Cases where court must set aside default judgment                                Rule 13.2

Cases where court may set aside or vary default judgment                         Rule 13.3

Applications to vary or set aside default judgment – procedure                   Rule 13.4

Court to impose condition as to filing of defence                                Rule 13.5

Hearing to be treated as case management conference                              Rule 13.6

Abandoned claims to be restored if judgment set aside                            Rule 13.7

## Part 14: Judgment on Admissions

Making an admission                                                              Rule 14.1

Satisfaction                                                                     Rule 14.2

Admissions where party a minor or patient                                        Rule 14.3

Admission by notice in writing – application for judgment                        Rule 14.4

Admission in whole or in part of money claim                                     Rule 14.5

Admission of whole of claim for specified sum of money                           Rule 14.6

Admission of part of claim for money only                                        Rule 14.7

Admission of liability to pay whole of claim for unspecified sum of money        Rule 14.8

Requests for time to pay                                                         Rule 14.9

Requests for time to pay – procedure where time and rate agreed a               Rule 14.10

Requests for time to pay – procedure where lime and rate not agreed             Rule 14.11

Right of redetermination                                                         Rule 14.12

Variation of order                                                               Rule 14.13

## Part 15: Summary Judgment

Scope of this Part                                                               Rule 15.1

Grounds for summary judgment                                                     Rule 15.2

Types of proceedings for which summary judgment is not available                 Rule 15.3

Procedure                                                                        Rule 15.4

Evidence for purpose of summary judgment hearing                                 Rule 15.5

Powers of court on application for summary judgment                              Rule 15.6

## Part 16: Assessment of Damages

| | |
|---|---|
| Scope of this Part | Rule 16.1 |
| Assessment of damages after default judgment | Rule 16.2 |
| Assessment of damages after admission of liability on claim for unspecified sum of money | Rule 16.3 |
| Assessment of damages after direction for trial of issue of quantum | Rule 16.4 |

## Part 17: Interim Remedies

| | |
|---|---|
| Orders for interim remedies | Rule 17.1 |
| Time when an order for interim remedy may be made | Rule 17.2 |
| How to apply for interim remedy | Rule 17.3 |
| Interim injunctions and similar orders | Rule 17.4 |
| Interim payments – general procedure | Rule 17.5 |
| Interim payments – conditions to be satisfied and matters to be taken into account | Rule 17.6 |
| Powers of court where it has made order for interim payment | Rule 17.7 |
| Power of court to order early trial | Rule 17.8 |

## Part 18: Ancillary Claims

| | |
|---|---|
| Meaning of ancillary claim | Rule 18. 1 |
| Ancillary claim to be treated as claim for purposes of these Rules | Rule 18.2 |
| Defendant's claim for contribution or indemnity from co-defendant | Rule 18.3 |
| Procedure for making ancillary claim | Rule 18.4 |
| Service of ancillary claim form | Rule 18.5 |
| Counterclaim may survive claim | Rule 18.6 |
| Restrictions on right to make counterclaim or set-off in proceedings by or against Crown | Rule 18.7 |
| Adding other defendants to counterclaim | Rule 18.8 |
| Defence to ancillary claim | Rule 18.9 |
| Matters relevant to whether ancillary claim should be dealt with separately from main claim | Rule 18.10 |
| Effect of service of ancillary claim form | Rule 18.11 |
| Special provisions relating to judgment on failure to file defence to ancillary claim | Rule 18.12 |
| Procedural steps on service of ancillary claim form on person who is not a party | Rule 18.13 |
| Case management where there is defence to ancillary claim | Rule 18.14 |

## Part 19: Addition and Substitution of Parties

Scope of this Part                                                                Rule 19.1

Change of parties – general                                                       Rule 19.2

Procedure for adding and substituting parties                                     Rule 19.3

Special provisions about adding or substituting parties after end of relevant limitation period    Rule 19.4

## Part 20: Changes to Statements of Case

Changes to statements of case                                                     Rule 20.1

Changes to statement of case after end of relevant limitation period              Rule 20.2

Filing an amended statement of case                                               Rule 20.3

## Part 21: Representative Parties

Representative claimants and defendants – general                                 Rule 21.1

Appointment of representative claimant or defendant – procedure                   Rule 21.2

Consequence of order appointing representative party                              Rule 21.3

Representation of persons who cannot be ascertained, etc. in proceedings about
        estates, trusts and construction of written instruments                   Rule 21.4

Compromise in proceedings to which rule 21.4 applies                              Rule 21.5

Representation of beneficiaries by trustees                                        Rule 21.6

Proceedings against estate of deceased person                                     Rule 21.7

Power of court to give directions to enable proceedings to be carried on after party's death    Rule 21.8

Power of court to strike out action after death of claimant                       Rule 21.9

## Part 22: Miscellaneous Rules about Parties

Partners                                                                          Rule 22.1

Person carrying on business in another name                                       Rule 22.2

Bodies corporate                                                                  Rule 22.3

## Part 23: Minors and Patients

Scope of this Part                                                                Rule 23.1

Requirement of next friend in proceedings by or against minors or patients        Rule 23.2

Stage of proceedings at which next friend becomes necessary    Rule 23.3

Who may be minor's next friend    Rule 23.4

Who may be patient's next friend    Rule 23.5

Conditions for being next friend    Rule 23.6

How person becomes next friend without court order    Rule 23.7

How person becomes next friend by court order    Rule 23.8

Court's power to terminate appointment of and substitute next friend    Rule 23.9

Appointment of next friend by court order – supplementary    Rule 23.10

Procedure where appointment as next friend ceases    Rule 23.11

Compromise, etc. on behalf of minor or patient    Rule 23.12

Control of money recovered by or on behalf of minor or patient    Rule 23.13

## Part 24: Security for Costs

Scope of this Part    Rule 24.1

Application for order for security for costs    Rule 24.2

Conditions to be satisfied    Rule 24.3

Security for costs against counter-claiming defendant    Rule 24.4

Enforcing order for security for costs    Rule 24.5

## Part 25: Case Management – The Objective

Court's duty to actively manage cases    Rule 25.1

## Part 26: Case Management –The Court's Powers

Court's general powers of management    Rule 26.1

Courts power to make orders of its own initiative    Rule 26.2

Sanctions - striking out statement of case    Rule 26.3

Court's general power to strike out statement of case    Rule 26.4

Judgment without trial after striking out    Rule 26.5

Setting aside judgment after striking out    Rule 26.6

Court's powers in cases of failure to comply with rules, etc.    Rule 26.7

Relief from sanctions    Rule 26.8

General power of court to rectify matters where there has been a procedural error    Rule 26.9

## Part 27: Case Management Conferences – Procedure

Scope of this Part                                                                Rule 27.1

Fixed date claims – first hearing                                                 Rule 27.2

Case management conference                                                        Rule 27.3

Attendance at case management conference or pre-trial review                      Rule 27.4

Orders to be made at case management conference                                   Rule 27.5

Dispensing with case management conference in simple and urgent proceedings       Rule 27.6

Adjournment of case management conference                                         Rule 27.7

Variation of case management timetable                                            Rule 27.8

Listing questionnaire                                                             Rule 27. 9

Fixing trial date                                                                 Rule 27. 10

## Part 28: Disclosure and Inspection of Documents

Scope of this Part                                                                Rule 28.1

Duty of disclosure limited to documents which are or have been in party's control  Rule 28.2

Disclosure of copies                                                              Rule 28.3

Standard disclosure                                                               Rule 28.4

Specific disclosure                                                               Rule 28.5

Criteria for ordering specific disclosure                                         Rule 28.6

Procedure for disclosure                                                          Rule 28. 7

Duty of legal practitioner                                                        Rule 28. 8

Requirement for maker to certify understanding of the duty of disclosure          Rule 28.9

Disclosure in stages                                                              Rule 28.10

Inspection and copying of listed documents                                        Rule 28.11

Duty of disclosure continuous during proceedings                                  Rule 28.12

Consequence of failure to disclose documents under order for disclosure           Rule 28.13

Claim of right to withhold disclosure or inspection document                      Rule 28.14

Restriction on use of a privileged document inspection of which has been inadvertently allowed   Rule 28.15

Documents referred to in statements of case, etc.                                 Rule 28.16

Subsequent use of disclosed documents                                             Rule 28.17

Notice to prove document                                                          Rule 28.18

## Part 29: Evidence

Power of court to control evidence                                          Rule 29.1

Evidence at trial – general rule                                            Rule 29.2

Evidence by video link or other means                                       Rule 29.3

Requirement to serve witness statements                                     Rule 29.4

Form of witness statements                                                  Rule 29.5

Witness summaries                                                           Rule 29.6

Procedure where one party does not serve witness statement by date directed  Rule 29.7

Witness to give evidence unless court otherwise orders                      Rule 29.8

Amplifying witness statements at trial                                      Rule 29.9

Cross-examination on witness statement                                      Rule 29.10

Consequence of failure to serve witness statement or summary                Rule 29.11

Use of witness statement for other purposes                                 Rule 29.12

Notice to admit facts                                                       Rule 29.13

## Part 30: Affidavits

Affidavit evidence                                                          Rule 30.1

Form of affidavits                                                          Rule 30.2

Contents of affidavits                                                      Rule 30.3

Documents to be used in conjunction with affidavits                         Rule 30.4

Making of affidavits                                                        Rule 30.5

Service of affidavits                                                       Rule 30.6

## Part 31: Miscellaneous Rules about Evidence

Use of plans, photographs, etc. as evidence                                 Rule31.1

Evidence on questions of foreign law                                        Rule 31.2

Evidence of consent of trustee to act                                       Rule 31.3

## Part 32: Experts and Assessors

Scope of this Part                                                          Rule 32.1

General duty of court and of parties                                        Rule 32.2

Expert's overriding duty to court                                           Rule 32.3

Way in which expert's duty to court is to be carried out          Rule 32.4

Expert's right to apply to court for directions          Rule 32.5

Court's power to restrict expert evidence          Rule 32.6

General requirement for expert evidence to be given in written report          Rule 32.7

Written questions to experts          Rule 32.8

Court's power to direct evidence by single expert          Rule 32.9

Cross-examination of court appointed expert          Rule 32.10

Instructions to single expert          Rule 32.11

Power of court to direct party to provide expert report          Rule 32.12

Expert's reports to be addressed to court          Rule 32.13

Contents of report          Rule 32.14

Meeting of experts          Rule 32.15

Consequence of failure to disclose expert's report          Rule 32.16

Appointment of assessor          Rule 32.17

## Part 33: Court Attendance by Witnesses and Depositions

Scope of this Part          Rule 33.1

Witness summonses          Rule 33.2

Issue of witness summons          Rule 33.3

Witness summons in aid of inferior court or tribunal          Rule 33.4

Time for serving witness summons          Rule 33.5

Compensation for loss of time          Rule 33.6

Evidence by deposition before examiner          Rule 33.7

Conduct of examination          Rule 33.8

Evidence without examiner being present          Rule 33.9

Enforcing attendance of witness          Rule 33.10

Special report          Rule 33.11

Fees and expenses of examiner          Rule 33.12

Order for payment of examiner's fees          Rule 33.13

Use of deposition at hearing          Rule 33.14

Where person to be examined is out of the jurisdiction –letter of request          Rule 33.15

Early appointment to produce documents          Rule 33.16

## Part 34: Requests for Information

Right of parties to obtain information                                      Rule 34.1

Orders compelling reply to request for information                          Rule 34.2

Information obtained under Part 34 not to be used in other proceedings      Rule 34.3

Certificate of truth                                                        Rule 34.4

## Part 35: Offers to Settle

Scope of this Part                                                          Rule 35.1

Introductory                                                                Rule 35.2

Making offer to settle                                                      Rule 35.3

Time when offer to settle may be made                                       Rule 35.4

Procedure for making offer to settle                                        Rule 35.5

Extent to which offer to settle covers interest, costs or counterclaim      Rule 35.6

Offer to settle made after interim payment                                  Rule 35.7

Offer to settle part of claim                                               Rule 35.8

Time limit for accepting offer to settle                                    Rule 35.9

Procedure for acceptance                                                    Rule 35.10

Effect of acceptance – generally                                            Rule 35.11

Effect of acceptance  – more than two parties                               Rule 35.12

Costs of offeror and offeree where offer is accepted – defendant's offer    Rule 35.13

Costs of offeror and offeree where offer is accepted – claimant's offer     Rule 35.14

Costs where offer not accepted – general rules                              Rule 35.15

How costs are to be dealt with                                              Rule 35.16

## Part 36: Payments into Court to Support Offers under Part 35 and under Court Order

Scope of this Part                                                          Rule 36.1

Payments into court to support offers to settle                             Rule 36.2

Right to payment out on acceptance of offer                                 Rule 36.3

Cases where payment out requires court order                                Rule 36.4

Money paid into court under order                                           Rule 36.5

Money paid into court as condition for permission to defend or to continue to defend    Rule 36.6

Proceedings under Fatal Accidents Acts                                      Rule 36.7

## Part 37: Discontinuance

Scope of this Part                                                                 Rule 37.1

Right to discontinue claim                                                         Rule 37.2

Procedure for discontinuing                                                        Rule 37.3

Right to apply to have notice of discontinuance set aside                          Rule 37.4

Effect of discontinuance                                                           Rule 37.5

Liability for costs                                                                Rule 37.6

Quantification of costs                                                            Rule 37.7

Discontinuance and subsequent proceedings                                          Rule 37.8

## Part 38: Pre-Trial Review

Scope of this Part                                                                 Rule 38.1

Direction for pre-trial review                                                     Rule 38.2

Rules relating to case management conference to apply                              Rule 38.3

Who is to conduct pre-trial review                                                 Rule 38.4

Parties to prepare pre-trial memorandum                                            Rule 38.5

Directions at pre-trial review                                                     Rule 38.6

## Part 39: Trial

Documents for use at trial                                                         Rule 39.1

Cross-examination                                                                  Rule 39.2

Written submissions                                                                Rule 39.3

Failure of party to attend trial                                                   Rule 39.4

Applications to set aside judgment given in party's absence                        Rule 39.5

Adjournment of trial                                                               Rule 39.6

Inspection                                                                         Rule 39.7

## Part 40: Appointment of Referee to Inquire and Report

Power to order trial before referee                                                Rule 40.1

Reference to referee to inquire and report                                         Rule 40.2

Appointment of referee                                                             Rule 40.3

Conduct of reference                                                               Rule 40.4

Report following reference                                                      Rule 40.5

Consideration of report by court                                                Rule 40.6

Restrictions on appointment of referee in a claim by or against Crown           Rule 40.7


## Part 41: Accounts and Inquiries

Scope of this Part                                                              Rule 41.1

Directions for account                                                          Rule 41.2

Verification of account                                                         Rule 41.3

Notice of omissions                                                             Rule 41.4

Allowances                                                                      Rule 41.5

Delay                                                                           Rule 41.6

Distribution before entitlement ascertained                                     Rule 41.7

## Part 42: Judgments and Orders

Scope of this Part                                                              Rule 42.1

Parties present when order made or notified of terms to be bound                Rule 42.2

Practice forms to be used where available                                       Rule 42.3

Standard requirements                                                           Rule 42.4

Drawing of judgments and orders                                                 Rule 42.5

Service of orders                                                               Rule 42.6

Consent judgments and orders                                                    Rule 42.7

Time when judgment or order takes effect                                        Rule 42.8

Time for complying with judgment or order                                       Rule 42.9

Correction of errors in judgments or orders                                     Rule 42.10

Cases where court gives judgment both on claim and counterclaim                 Rule 42.11

Service of copy order on person not a party                                     Rule 42.12


## Part 43: Enforcement – General Provisions

Scope of this Part                                                              Rule 43.11

Procedure for beginning enforcement                                             Rule 43.2

Judgment subject to conditions                                                  Rule 43.3

Separate enforcement of costs                                                   Rule 43.4

Effect of setting aside judgment or order                                       Rule 43.5

Court's powers where person ordered to do act fails to comply                   Rule 43.6

| | |
|---|---|
| Judgment for sum in foreign currency | Rule 43.7 |
| Enforcement by or against person who is not a party | Rule 43.8 |
| Enforcement against partnership | Rule 43.9 |
| Enforcement of awards, etc. made by outside bodies | Rule 43.10 |

## Part 44: Oral Examination in Aid of Enforcement

| | |
|---|---|
| Scope of this Part | Rule 44.1 |
| Who may be orally examined | Rule 44.2 |
| Procedure to obtain order for oral examination | Rule 44.3 |
| Order for oral examination | Rule 44.4 |
| Conduct of oral examination | Rule 44.5 |
| Order for payment by instalments | Rule 44.6 |
| Financial position notice | Rule 44.7 |

## Part 45: How Judgments may be Enforced

| | |
|---|---|
| Scope of this Part | Rule 45.1 |
| How money judgments may be enforced | Rule 45.2 |
| Enforcement of orders for payment of money into court | Rule 45.3 |
| Enforcement of judgments and orders for possession of land | Rule 45.4 |
| Enforcement of judgments and orders for delivery of goods | Rule 45.5 |
| Enforcement of judgments and orders requiring person to do act within specified time or not to do act | Rule 45.6 |
| Enforcement of judgments and orders requiring body corporate to do act within specified time or not to do act | Rule 45.7 |

## Part 46: General Rules about Writs of Execution

| | |
|---|---|
| Meaning of "writ of execution" | Rule 46.1 |
| Permission required to enforce in certain cases | Rule 46.2 |
| Application for permission to enforce | Rule 46.3 |
| Amount to be recovered on enforcement | Rule 46.4 |
| Enforcement of judgment or order requiring judgment debtor to do two or more different things | Rule 46.5 |
| No writ of execution against Crown | Rule 46.6 |
| Enforcement of judgment for payment by instalments | Rule 46.7 |

No writ of execution for goods or payment of assessed value unless court has assessed value    Rule 46.8

Order for specific delivery    Rule 46.9

Period for which writ of execution valid    Rule 46.10

Renewal of writ of execution    Rule 46.11

Period for which court may renew writ of execution    Rule 46.12

Effective date of renewed writ unchanged    Rule 46.13

Claims to goods seized under writ of execution    Rule 46.14

Suspension of writ of execution at request of judgment creditor    Rule 46.15

Return to writ of execution    Rule 46.16

## Part 47: Variation of Terms of Judgments and Suspension of Writs

Scope of this Part    Rule 47.1

Applications to vary time and method of payment or to suspend order for seizure and sale of goods or writ of delivery    Rule 47.2

Where no objection except as to terms – procedure    Rule 47.3

Application for redetermination of court's decision    Rule 47.4

Where judgment creditor objects to variation or suspension    Rule 47.5

Pre-suspension costs    Rule 47.6

Judgment creditor's right to re-issue writ of execution    Rule 47.7

## Part 48: Charging Orders

Scope of this Part and definitions    Rule 48.1

How to apply for charging order    Rule 48.2

Evidence in support of application for charging order    Rule 48.3

Single charging order for more than one judgment debt    Rule 48.4

Procedure for making provisional charging order    Rule 48.5

Interested persons    Rule 48.6

Service of provisional charging order and of copies    Rule 48.7

Making of final charging order    Rule 48.8

Effect of provisional or final charging order    Rule 48.9

Discharge or variation of final charging order    Rule 48.10

Enforcement of charging order by sale    Rule 48.11

## Part 49: Stop Notices and Stop Orders

| | |
|---|---|
| Scope of this Part | Rule 49.1 |
| Right to apply for stop notice | Rule 49.2 |
| Procedure for obtaining stop notice | Rule 49.3 |
| Service | Rule 49.4 |
| Amendment of stop notice | Rule 49.5 |
| Withdrawal or discharge of stop notice | Rule 49.6 |
| Stop orders | Rule 49.7 |
| Procedure on application for stop order | Rule 49.8 |
| Power to vary or discharge stop order | Rule 49.9 |

## Part 50: Attachment of Debts

| | |
|---|---|
| Scope of this Part | Rule 50.1 |
| Circumstances in which court may make order for attachment of debts | Rule 50.2 |
| Procedure – making of provisional order | Rule 50.3 |
| Money in bank accounts, etc. | Rule 50.4 |
| Joint funds | Rule 50.5 |
| Presumption of equal shares in joint funds | Rule 50.6 |
| Attachment of debts owed by firm | Rule 50.7 |
| Service of provisional order | Rule 50.8 |
| Effect of provisional order | Rule 50.9 |
| Hearing to consider making final order | Rule 50.10 |
| Claim to debt by person other than judgment debtor | Rule 50.11 |
| Enforcement against garnishee | Rule 50.12 |
| Discharge of garnishee's debt to judgment debtor | Rule 50.13 |
| Costs of attachment of debts proceedings | Rule 50.14 |
| Money in court | Rule 50.15 |

## Part 51: Appointment of Receiver

| | |
|---|---|
| Scope of this Part | Rule 51.1 |
| Application for appointment of receiver and injunction | Rule 51.2 |
| Conditions for appointment of receiver | Rule 51.3 |

Giving of security by receiver                    Rule 51.4

Remuneration of receiver                          Rule 51.5

Receiver's powers                                 Rule 51.6

Accounts of receiver                              Rule 51.7

Payment of balance into court                     Rule 51.8

Default by receiver                               Rule 51.9

## Part 52: Judgment Summonses

Scope of this Part                          Rule 52.1

Issue of judgment summons                   Rule 52.2

Service of judgment summons                 Rule 52.3

Hearing of judgment summons                 Rule 52.4

Failure to comply with instalment order     Rule 52.5

Restored hearing of judgment summons        Rule 52.6

## Part 53: Committal and Confiscation of Assets

Scope of this Part                                                              Rule 53.1

Order specifying time for act to be done                                        Rule 53.2

When committal order or sequestration order may be made                         Rule 53.3

Committal order or sequestration order against officer of body corporate        Rule 53.4

Making committal order or sequestration order when judgment or order not served Rule 53.5

Undertakings                                                                    Rule 53.6

Application for committal order or sequestration order                          Rule 53.7

Service of notice of hearing                                                    Rule 53.8

Powers of the court                                                             Rule 53.9

Restoration of adjourned hearing                                                Rule 53.10

Application for enforcement of suspended committal order or order for sequestration Rule 53.11

Special provisions relating to order for sequestration                          Rule 53.12

## Part 54: Interpleader

Scope of this Part                          Rule 54.1

Claim to goods taken in execution           Rule 54.2

How to interplead                           Rule 54.3

Service of interpleader application                                      Rule 54.4

Powers of the court                                                      Rule 54.5

Power to order sale of goods taken in execution                          Rule 54.6


## Part 55: Sale of Land by Order of Court

Scope of this Part                                                       Rule 55.1

Application for order for sale                                           Rule 55.2

Hearing of application                                                   Rule 55.3

Order for sale                                                           Rule 55.4

Directions                                                               Rule 55.5

Further directions                                                       Rule 55.6


## Part 56: Administrative Law

Scope of this Part                                                       Rule 56.1

Who may apply for judicial review                                        Rule 56.2

Judicial review – application for leave                                  Rule 56.3

Judicial review – hearing of application for leave                       Rule 56.4

Delay                                                                    Rule 56.5

Proceedings by way of claim which should be application for administrative order    Rule 56.6

How to make application for administrative order                         Rule 56.7

Joinder of claims for other relief                                       Rule 56.8

Service of claim form for administrative order                           Rule 56.9

Evidence in answer                                                       Rule 56.10

First hearing                                                            Rule 56.11

Procedural applications                                                  Rule 56.12

Hearing of application for administrative order                          Rule 56.13

Special provisions relating to orders for judicial review                Rule 56.14


## Part 57: Habeas Corpus

Scope of this Part                                                       Rule 57.1

Application for issue of writ of Habeas Corpus                           Rule 57.2

Power of court                                                           Rule 57.3

Service of writ                                                          Rule 57.4

Return to writ                                                    Rule 57.5

Powers of court on hearing writ                                   Rule 57.6

Bringing up prisoner to give evidence, etc.                       Rule 57.7


## Part 58: Bail Applications

Scope of this Part                                                Rule 58.1

How to apply to the court                                         Rule 58.2

Hearing of application                                            Rule 58.3


## Part 59: Proceedings by and against the Crown

Scope of this Part                                                Rule 58.1

Service of claim form                                             Rule 59.2

Claimant's duty to give particulars                               Rule 59.3

Applications in certain revenue matters                           Rule 59.4

Proceedings relating to postal packets                            Rule 59.5

Applications under s. 24 (2) or 25 (2) of the Act                 Rule 59.6

Enforcement against Crown                                         Rule 59.7


## Part 60: Appeals to the High Court

Scope of this Part                                                Rule 60.1

How to appeal to the court                                        Rule 60.2

Effect of appeal                                                  Rule 60.3

Persons on whom claim form must be served                         Rule 60.4

Time within which claim form must be served                       Rule 60.5

Amendment of statement of case                                    Rule 60.6

First hearing                                                     Rule 60.7

Hearing of appeal                                                 Rule 60.8

Right of minister to be heard                                     Rule 60.9


## Part 61: Appeals to the Court by
## way of Case Stated

**Contents of this Part**

Scope of this Part                                                Rule 61.1

Application for order to state a case                                          Rule 61.2

Persons on whom claim form must be served                            Rule 61.3

Time within which claim form must be served                          Rule 61.4

Signing and service of case                                                    Rule 61.5

How to commence proceedings in the High

Court to determine a case                                                      Rule 61.6

How to commence proceedings in the Court

of Appeal to determine a case                                                Rule 61.7

Determination of Case                                                          Rule 61.8

Time within which case must be stated                                    Rule 61.9


## Part 62: Appeals to the Court of Appeal

Scope of this Part                                                              Rule 62.1

How to obtain leave to appeal                                              Rule 62.2

How to appeal                                                                     Rule 62.3

Contents of notice of appeal                                                Rule 62.4

Time for filing notice of appeal                                            Rule 62.5

Summary appeal                                                                  Rule 62.6

Service of notice of appeal                                                  Rule 62.7

Counter notice                                                                    Rule 62.8

Action to be taken on receipt of notice of appeal                    Rule 62.9

Interlocutory appeal                                                           Rule 62.10

Skeleton arguments                                                           Rule 62.11

The record – appeals from High Court                                  Rule 62.12

The record – appeals from magistrates' courts                      Rule 62.13

Case management                                                              Rule 62.14

Procedural applications to court                                          Rule 62.15

Powers of single judge of the court, master and Chief Registrar to make certain orders    Rule 62.16

Security for costs of appeal                                                Rule 62.17

Non-disclosure of payment into court, etc.                            Rule 62.18

Stay of execution                                                             Rule 62.19

General powers of the court                                               Rule 62.20

Failure of party to attend appeal                                        Rule 62.21

Application to set aside a decision made in party's absence        Rule 62.22

Adjournment of appeal        Rule 2.23

Certificate of result of appeal        Rule 62.24

Withdrawal or discontinuance        Rule 62.25

Liability for costs on withdrawal or discontinuance        Rule 62.26

Quantification of costs on withdrawal or discontinuance        Rule 62.27

Judicial Review appeal        Rule 62.28

## Part 63: Change of Legal Practitioner

Scope of this Part        Rule 63.1

Change of legal practitioner        Rule 63.2

Notice of appointment of legal practitioner        Rule 63.3

Party acting in person        Rule 63.4

Application by another party to remove legal practitioner from record        Rule 63.5

Application by legal practitioner to be removed from record        Rule 63.6

Time when notice or order takes effect        Rule 63.7

## Part 64: Costs – General

Scope of this Part        Rule 64.1

Definitions and application        Rule 64.2

Orders about costs        Rule 64.3

Costs where there is an appeal        Rule 64.4

Entitlement to recover costs        Rule 64.5

Successful party generally entitled to costs        Rule 64.6

Two or more parties having same interest        Rule 64.7

Wasted costs orders        Rule 64.8

Court's powers in relation to wasted costs orders        Rule 64.9

Costs against person who is not a party        Rule 64.10

## Part 65: Costs – Quantification

Scope of this Part        Rule 65.1

Basis of quantification        Rule 65.2

Ways in which costs are to be quantified        Rule 65.3

Fixed costs        Rule 65.4

Prescribed costs.                                                                         Rule 65.5

Applications to determine value of claim for purpose of prescribed costs                  Rule 65.6

What is included in prescribed costs                                                      Rule 65.7

Budgeted costs                                                                            Rule 65.8

Client's consent to application for budgeted costs                                        Rule 65.9

What is included in costs budget                                                          Rule 65.10

Assessed costs – procedural applications                                                  Rule 65.11

Assessed costs – general                                                                  Rule 65.12

Costs of Proceedings in Court of Appeal .                                                 Rule 65.13

Costs capping orders – General                                                            Rule 65.14

Application  for a costs capping order                                                    Rule 65.15

Application to vary a costs capping order                                                 Rule 65.16

     Appendix A – Fixed Costs

     Appendix B – Prescribed Costs

     Appendix C – Prescribed Costs: Percentage to be allowed at various stages of claim

## Part 66: Mortgage Claims

Scope of this Part                                       Rule 66.1

Mortgage claim to be by fixed date claim                 Rule 66.2

Evidence at first hearing                                Rule 66.3

Claim for possession or payment of mortgage debt         Rule 66.4

## Part 67: Administration Claims

Scope of this Part                                       Rule 67.1

Parties                                                  Rule 67.2

Claims by third parties                                  Rule 67.3

Determination of questions without administration claim  Rule 67.4

Judgments and orders in administration claims            Rule 67.5

Conduct of sale of trust property                        Rule 67.6

## Part 68: Contentious Probate Proceedings

Scope of this Part                                       Rule 68.1

How to commence probate proceedings                      Rule 68.2

Parties to proceedings for revocation of grant           Rule 68.3

Lodgment of grant in proceedings for revocation          Rule 68.4

Affidavit of testamentary scripts          Rule 68.5

Failure to file acknowledgment of service          Rule 68.6

Counterclaim          Rule 68.7

Contents of statements of case          Rule 68.8

Discontinuance and dismissal          Rule 68.9

Compromise of claim: trial on affidavit evidence          Rule 68.10

Application for order to bring in will, etc.          Rule 68.11

Probate counterclaim in other proceedings          Rule 68.12

## Part 69: Defamation Claims

Scope of this Part          Rule 69.1

Claimant's statement of claim          Rule 69.2

Defendant's statement of case          Rule 69.3

Ruling on meaning          Rule 69.4

Payments into court and offers          Rule 69.5

Statement in open court          Rule 69.6

Requests for information          Rule 69.7

Evidence to mitigate damages          Rule 69.8

## Part 70: Admiralty Proceedings

Scope of this Part          Rule 70.1

Claims to be dealt with under this Part          Rule 70.2

Admiralty claims in rem          Rule 70.3

How to make Admiralty claim          Rule 70.4

Service of claim form in rem          Rule 70.5

Service on ships, etc. – how effected          Rule 70.6

Service of claim form out of jurisdiction          Rule 70.7

Acknowledgment of service          Rule 70.8

Warrant of arrest          Rule 70.9

Caveat against arrest          Rule 70.10

Committal of legal practitioner for failing to comply with undertaking          Rule 70.11

Execution, etc. of warrant of arrest          Rule 70.12

Directions with respect to property under arrest                                    Rule 70.13

Release of property under arrest                                                    Rule 70.14

Caveat against release etc.                                                        Rule 70.15

Duration of caveats                                                                Rule 70.16

Bail                                                                               Rule 70.17

Intervenors                                                                        Rule 70.18

Preliminary acts                                                                   Rule 70.19

Failure to file preliminary act: proceedings against party in default              Rule 70.20

Special provisions as to statements of case in collision, etc. proceedings         Rule: 70.21

Judgment by default                                                                Rule 70. 22

Order for sale of ship: determination of priority of claims                        Rule 70.23

Appraisement and sale of property                                                  Rules 70.24

Undertakings as to expenses, etc.                                                  Rules 70.25

Payment into and out of court                                                      Rules 70.26

Case management conferences                                                        Rules 70.27

Trial                                                                              Rule 70.28

Stay of proceedings in collision, etc. proceedings until security given            Rule 70. 29

Inspection of ship, etc.                                                           Rule 70.30

Examination of witnesses and other persons: evidence by affidavit                  Rule 70. 31

Proceedings for apportionment of salvage                                           Rule 70. 32

Applications in proceedings in rem                                                 Rule 70.33

Limitation proceedings: parties                                                    Rule 70.34

Limitation proceedings: payments into court                                        Rule 70.35

Application for decree or directions in limitation proceedings                     Rule 70.36

Limitation proceedings: proceedings under decree                                   Rule 70.37

Limitation proceedings: proceedings to set aside decree                            Rule 70. 38

## Part 71: Obtaining Evidence for Foreign Courts

Scope of this Part                                                                 Rule 71.1

Application for order                                                               Rule 71.2

Application by Attorney General in certain cases                                   Rule 71.3

Person to take and manner of taking examination                                    Rule 71.4

Dealing with depositions                                                           Rule 71.5

Claim to privilege                                                                 Rule 71.6

## Part 72: Reciprocal Enforcement of Judgments

Scope of this Part                                                              Rule 72.1

Application for registration                                                    Rule 72.2

Security for costs                                                              Rule 72.3

Order for registration                                                         Rule 72.4

Register of judgments                                                          Rule 72.5

Notice of registration                                                         Rule 72.6

Application to set aside registration                                          Rule 72.7

Issue of execution                                                             Rule 72.8

Certified copy of High Court judgment for enforcement in another country       Rule 72.9

## Part 73: Transitional Provisions

Scope of this Part                                                              Rule 73.1

New proceedings                                                                 Rule 73.2

Old proceedings                                                                 Rule 73.3

Exercise of discretion                                                          Rule 73.4

## Part 74: Schedules

Scope of this Part                                                              Rule 74.1

Subject matter of schedules                                                     Rule 74.2

## Appendix

**Prescribed Forms**

Form 1:                 Claim Form

Form 1A:                Notes for Defendant

Form 2:                 Fixed Date Claim Form

Form 3:                 Application to Pay by Instalments

Form 4:                  Acknowledgment of Service of Claim Form

Form 4A:                 Acknowledgment of Service of Fixed Date Claim Form

Form 5:                  Defence and Counterclaim

Form 6:                  Application

Form 7:                  Request for Default Judgment

Form 8:                  Request for Entry of Judgment on Admissions

Form 9:                  Ancillary Claim Form

Form 10:                 Listing Questionnaire

Form 11:                 List of Documents

Form 12:                 Witness Summons

Form 13:                 Notice to Non-Party Served With Order

Form 14:                 Order for Oral Examination

Form 15:                 Notice of Adjourned Examination

Form 16:                 Financial Position Notice

Form 17:                 Writ of Execution Against Goods (Fieri Facas)

Form 18:                 Writ of Possession

Form 19:                 Writ of Delivery or Value

Form 20:                 Writ of Specific Delivery

Form 21:                 Judgment Summons

Form 22:                 Writ of Habeas Corpus

Form 23:                 Notice of Appeal

Form 24:                 Certificate of Result of Appeal

Form 25:                 Admiralty Claim In Rem

Form 26                  Admiralty Limitation Claim

Form 27:                 Warrant of Arrest (Admiralty)

Form 28:                 Request for Claim to be recorded as satisfied

Form 29:                 Request for Order for Oral Examination of an individual

Form 30:                 Request for Order for Oral Examination of an officer of a debtor company

Form 31:                 Hearing On Assessment Of Damages

Form 32:                 Form of Judgment for amount to be decided by the Court

PART 1

# The Overriding Objective

**Contents of this Part**

The overriding objective                        Rule 1.1

Application of overriding objective by the court     Rule 1.2

Duty of parties                                 Rule 1.3

## The overriding objective

1.1 (1) The overriding objective of these Rules is to enable the court to deal with cases justly.

(2) Dealing justly with the case includes –

(a) ensuring, so far as is practicable, that the parties are on an equal footing;

(b) saving expense;

(c) dealing with cases in ways which are proportionate to the –

(i) amount of money involved;

(ii) importance of the case;

(iii) complexity of the issues; and

(iv) financial position of each party;

(d) ensuring that it is dealt with expeditiously; and

(e) allotting to it an appropriate share of the court's resources, while

taking into account the need to allot resources to other cases.

## Application of overriding objective by the court

1.2 The court must seek to give effect to the overriding objective when it –

(a) exercises any discretion given to it by the Rules; or

(b) interprets any rule.

## Duty of parties

1.3  It is the duty of the parties to help the court to further the overriding

objective.

- Part 25 deals with the court's duty to forward the overriding objective by active

case management.

PART 2

# Application and Interpretation of these Rules

**Contents of this Part**

| | |
|---|---|
| Citation | Rule 2.1 |
| Application of these Rules | Rule 2.2 |
| Application of Interpretation Acts | Rule 2.3 |
| Definitions | Rule 2.4 |
| Who may exercise the powers of the court | Rule 2.5 |
| Court staff | Rule 2.6 |
| Court's discretion as to where, when and how it deals with cases | Rule 2.7 |

# Citation

2.1 (1) These Rules may be cited as the EASTERN CARIBBEAN SUPREME COURT CIVIL PROCEDURE RULES 2000.

(2) A reference to a rule as CPR 2.7 or rule 2.7 is a reference to a rule so numbered in these Rules.

# Application of these Rules

2.2  (1) Subject to paragraph (3), these Rules apply to all civil proceedings in the Eastern Caribbean Supreme Court in any of the Member States or Territories.

(2) In these rules "civil proceedings" include Judicial Review and applications to the court under the Constitution of any Member State or Territory under Part 56.

(3)  These Rules do not apply to the following–

(a)  family proceedings;

(b)  insolvency proceedings (including winding up of companies);

(c)  non-contentious probate proceedings;

(d)  proceedings when the High Court is acting as a prize court; or

(e)  any other proceedings in the Supreme Court instituted under any enactment, in so far as Rules made under that enactment regulate those proceedings, except that Part 62 shall apply to sub-paragraphs (a) and (b) and criminal appeals, to the extent that the Court of Appeal Rules 1968 are silent as to procedure in respect of criminal appeals.

(4) Notwithstanding paragraph (3) (d) these Rules apply to proceedings when the High Court is acting as a prize court in St. Vincent and The Grenadines

## Application of Interpretation Acts

2.3  The Interpretation Act of the Member State or Territory where a claim proceeds applies to the interpretation of these Rules in those proceedings.

## Definitions

2.4  In these Rules, unless otherwise provided for or the context otherwise requires –

**"ADR procedure"** means any procedure for alternative dispute resolution including, in particular, mediation;

 **"ancillary claim"** has the meaning given in rule 18.1;

**"ancillary claimant"** has the meaning given in rule 18.1;

**"ancillary defendant"** and **"second ancillary defendant"** have the meanings given in rule 18.1;

**"applicant"** has the meaning given in rule 11.2;

**"application"** has the meaning given in rule 11.2;

**"body corporate"** means a company or other body corporate wherever or however incorporated, other than a corporation sole, and includes a limited company unless a rule otherwise provides;

**"certificate of value"** has the meaning given in rule 8.8;

**"Chief Justice"** includes, in relation to any period in which the office of Chief justice is vacant, the person for the time being performing the functions of the Chief Justice;

**"circuit"** means –

   (a) the Saint Christopher circuit; and

(b) the Nevis circuit;

in the State of Saint Christopher and Nevis;

**"claim"** is to be construed in accordance with Part 8;

**"claim form"** is to be construed in accordance with Part 8;

**"claim for a specified sum of money"** means –

(a )a claim for a sum of money that is ascertained or capable of being ascertained as a matter of arithmetic and is recoverable under a contract; and

(b)for the purposes of Parts 12 (default judgments) and 14 (judgment on admissions), a claim for –

(i)the cost of repairs executed to a vehicle;

(ii)the cost of repairs executed to any property in, on or abutting a road; or

(iii) any other actual financial loss other than loss of wages or other

income;

claimed as a result of damage which is alleged to have been caused in an accident as a result of the defendant's negligence where the amount of each item in the claim is specified and copies of receipted bills for the amounts claimed are attached to the claim form or statement of claim;

**"claim for personal injuries"** means proceedings in which there is a claim for damages in respect of personal injuries to the claimant or any other person or in respect of a person's death;

**"claimant"** means a person who makes a claim and, in relation to any proceedings commenced before these Rules came into force, includes a plaintiff in an action or the petitioner or applicant in any proceedings commenced by petition, originating summons or motion;

**"Constitution"** means the Constitution of the relevant Member State or Territory;

**"court"** means the High Court and, where the context so admits and in Part

62, the Court of Appeal;

**"court office"** refers to –

(a)the place where documents are to be filed, etc. and includes a Registry of the High Court and of the Court of Appeal; and

(b) members of the court staff who carry out work of a formal or administrative nature under rule 2.6(1);

**"Crown"** for the purpose of these Rules includes the Commonwealth of

Dominica;

**"defendant"** means a person against whom a claim is made and, in relation to proceedings commenced before these Rules came into force, includes a respondent to any petition, originating summons or motion;

**"external company"** means any incorporated body of persons that is formed under the laws of a country

other than a Member State or Territory;

**"FAX"** means the making of a facsimile copy of a document by the transmission of electronic signals;

**"filing"** is to be construed in accordance with rule 3.7;

**"fixed date claim form"** is a claim form in Form 2 upon which there is stated a date, time and place for the first hearing of the claim.

**"Hague Convention"** means the Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil or Commercial Matters signed at The Hague on November 15, 1965;

**"judge"** –

(a) includes the Chief justice and, in the case of Part 62, a judge of the Court of Appeal; but

(b) does not include a master except where required by the context;

**"judgment creditor"** has the meaning given in rule 43.1;

**"judgment debtor"** has the meaning given in rule 43.1;

**"jurisdiction"** means the jurisdiction of the court as extending throughout the Member States and Territories and any part of their territorial waters;

**"legal practitioner"** includes a Queen's or Senior Counsel, a barrister at law, a solicitor, an attorney at law and a notary royal;

**"limited company"** means a body corporate that is incorporated or continued under the relevant legislation relating to companies in each Member State or Territory;

**"master"** means a master of the Eastern Caribbean Supreme Court;

**"Member States"** means –

(a) Antigua and Barbuda;

(b) Commonwealth of Dominica;

(c) Grenada;

(d) Saint Christopher and Nevis;

(e) Saint Lucia; and

(f) Saint Vincent and the Grenadines;

**"minister with responsibility for foreign affairs"** includes in the case of a Territory the person within the Territory who has responsibility for the service of foreign process;

**"minor"** means a person who has not attained the age of majority in accordance with the relevant enactment of the appropriate Member State or Territory;

**"month"** means a calendar month;

**"next friend"** has the meaning given by Part 23;

**"order"** includes an award, declaration, decree, direction, or judgement;

**"overriding objective"** means the objective set out in rule 1.1;

**"party"** includes both the party to the claim and any legal practitioner on  record for that party unless any rule specifies or it is clear from the context  that it relates to the client or to the legal practitioner only;

**"patient"** means a person who by reason of mental disorder within the meaning of the relevant mental health legislation in the Member State or Territory where the proceedings are being conducted is incapable of managing his or her own affairs and in St. Lucia also includes a person to whom a curator has been given under the Civil Code (Cap.242);

**"period for filing a defence"** has the meaning given by rule 10.3;

**"personal injuries"** includes any disease and any impairment of a person's physical or mental condition;

 **"statement of case"** means –

> (a) a claim form, statement of claim, defence, counterclaim, ancillary claim form or defence and a reply; and

> (b) any further information given in relation to any statement of case under Part 34 either voluntarily or by order of the court;

**"statutory rate of interest"** means the rate of interest on judgment debts that may be prescribed for the time being under any relevant enactment of the appropriate Member State or Territory;

**"summary appeal"** is an appeal in accordance with rule 62.6;                                           1

**"Supreme Court"** means the Eastern Caribbean Supreme Court established under the West Indies Associated States Supreme Court Order 1967;

**"Territories"** means –

> (a) Anguilla;

> (b) Montserrat; and

> (c) the British Virgin Islands.


## Who may exercise the powers of the court

2.5  (1) Except where any enactment, rule or practice direction provides otherwise the functions of the High Court may be exercised by –

> (a) a master

> (b) a registrar;

> (c) a single judge of the court whether or not assigned to the Member State or Territory in which the proceedings are taking place;

(d) the Chief Justice; or

(e) the Chief Registrar;

in accordance with these Rules and any practice direction made by the
Chief Justice.

(2) The functions of the Court of Appeal relating to –

(a) a procedural appeal;

(b) an application for leave to appeal;

(c) a summary appeal;

(d) the case management of an appeal including the giving of directions relating to an appeal;
and

(e) procedural applications (other than applications for leave to appeal);
may be carried out by any one judge of the Court of Appeal.

(3) The functions of the Court of Appeal relating to –

(a) applications for leave to appeal may also be carried out by the judge of the court below;

(b) the case management of an appeal including the giving of directions relating to an appeal
may, where the Chief Justice directs, be carried out by a master or the Chief Registrar;
and;

(c) procedural applications (other than applications for leave to appeal) may, where the Chief
Justice so directs, be carried out by a master, the Chief Registrar or the registrar of the
court below.

(4) An appeal from a magistrate's court may be heard by any 2 judges of the Court of Appeal.

(5) All other functions of the Court of Appeal may be carried out by any 3 judges of the Court of
Appeal.

(6) The Chief Justice may by direction allocate the work of the court between judges, masters, the
Chief Registrar and registrars.

(7)The Chief Registrar may exercise any of the functions of a master.

(8) Where –

(a) a trial has been commenced but not completed by a judge; or

(b) any enactment or rule requires an application to be made to, or jurisdiction exercised by, the judge by whom a claim was tried; then if –

    (i) the judge ceases to be a judge of the High Court;

    (ii) the judge dies or is incapacitated; or

    (iii) for any other reason it is impossible or inconvenient for the judge to act in the claim;

the Chief Justice may nominate some other judge to retry or complete the trial of the claim or to hear any application.

## Court staff

2.6 (1) Where these Rules refer to an act being done by the court office or require or permit the performance of an act of a formal or administrative character, that act may be performed by a member of the court staff authorised generally or individually in writing by the Chief Justice.

(2) Where these Rules expressly so provide, any other functions of the court may be carried out by a member of the court staff authorised in writing by the Chief Justice.

(3) If a step may be taken by a member of the court staff –
(a) that person may consult a judge, master or registrar before taking the step; and
(b) that step may be taken by a judge, master or registrar instead of a member of the court staff.

## Court's discretion as to where, when and how it deals with cases

2.7 (1) Claims, motions and petitions shall be heard in open court and shall be in chambers except that –

(a) any hearing except the trial of an action may be conducted in chambers if the court so directs; and the court shall in each case decide whether the application is a proper on to be made in open court or by application in chambers, and may at or before hearing, it shall think fit, remove the same into open court or into chambers, as the case may be; and

(b) any proceedings may be heard in private, with the consent of the parties.

(2) An order made in chambers shall have the same force an effect as an order made in open court, and the court sitting in chambers shall have the same power to enforce, vary, or deal with any such order, as if sitting in open court.

(3) The court may order that any hearing be conducted in whole or in part by means of a telephone conference call, video-conference or any other form of electronic communication.

(4) The court may give directions to facilitate the conduct of a hearing by the use of any electronic or digital means of communication or storage or retrieval of information, or any other technology it considers appropriate.

*"Action" has the meaning given to it by the Supreme Court Act.

PART 3

# Time, Documents

**Contents of this Part**

| | |
|---|---|
| Time – court to state calendar date | Rule 3.1 |
| Time – computation | Rule 3.2 |
| Vacations | Rule 3.3 |
| Hearings in vacations | Rule 3.4 |
| Time – vacations | Rule 3.5 |
| Documents | Rule 3.6 |
| Filing of documents | Rule 3.7 |
| Filing and service by FAX | Rule 3.8 |
| Sealing of documents issued by the court | Rule 3.9 |
| Forms | Rule 3.10 |
| Statements of case – address for service | Rule 3.11 |
| Statements of case – certificate of truth | Rule 3.12 |
| Failure to give certificate of truth | Rule 3.13 |
| Right to inspect, etc. certain documents filed in court office | Rule 3.14 |

# Time – court to state calendar date

3.1 When making any judgment, order or direction which imposes a time limit for doing any act

the court must, wherever practicable, state –

   (a) the calendar date; and

   (b) the time of day; by which the act must be done.


## Time – computation

3.2 (1) This rule shows how to calculate any period of time for doing any act which is fixed by –

   (a) any judgment or order of the court;

   (b) any practice direction; or

   (c) these Rules.


  (2) All periods of time expressed as a number of days are to be computed as clear days.

  (3) In this rule –

   **"clear days"** means that in computing the number of days the day on which the period begins and the day on which the period ends are not included.


**(Examples**

   (a)  Documents served by post are deemed to be served 14 days after posting: A Document posted on 1st September is deemed to be served on 16th September.

   (b)  Document must be filed at least 3 days before the hearing – application is to be heard on Friday 20th October:

The last date for filing the document is Monday 16th October.)


  (4) When the specified period –

   (a) is 7 days or less; and

   (b) includes –

     (i) a Saturday or Sunday; or

     (ii) any other day on which the court office is closed; that day does not count.

**(Example**

Notice of application must be given not less than 7 days before  a hearing – Hearing on Friday 20th October:

Notice must be given not later than Tuesday 10th October.)


  (5) If the period specified for doing any act at the court office ends on a day on which the court is

closed, the act is in time if done before close of business on the next day on which the court is open.

(6) If the period specified for doing any act which does not need to be done at court ends on –

    (a) a Saturday or Sunday; or

    (b) any public holiday;

the act must be done before 4 p.m. on the next ordinary business day.

## Vacations

3.3 There are 3 vacations in each year, that is to say the –

    (a) Christmas vacation which begins on 23rd December and ends on 10th January;

    (b) Easter vacation which begins on the Thursday before and ends on the Saturday after Easter Sunday; and

    (c) long vacation which begins on 1st August and ends on 15th September;

      and the dates are inclusive.

## Hearings in vacations

3.4 (1) During vacations the –

    (a) Court of Appeal may sit to hear and determine appeals and applications as the Court of Appeal may direct; and

    (b) High Court may sit to hear and determine trials and applications as a judge of the court may direct.

(2) A party may apply to the Court of Appeal for any appeal or application to be heard in vacation.

(3) Any such application may be determined by a single judge of the Court of Appeal.

(4) A party may apply to the High Court for any trial to take place or application to be heard in vacation.

## Time – vacations

3.5 (1) During the long vacation, the time prescribed by these Rules or by any practice direction  for
filing or serving any statement of case (other than a statement of claim) does not run
unless the court orders or directs that time shall run.

(2) In this Rule "long vacation" has the meaning given by Rule 3.3.

## Documents

3.6 (1) So far as is practicable, every document prepared for use in the Supreme Court must be on "letter
size" paper approximately 11 inches (28cm) long by 8.5 inches (21.5cm) wide. Margins of 1" (2.5
cm) must be left at the top and bottom and of 1.5" (3.5 cm) at each side.

(2) The Chief Justice may by practice direction –

(a) require any document filed or to be used at court to be in the format that the Chief
Justice prescribes to facilitate electronic recording or filing of that document; and

(b) prescribe the conditions under which documents may be served or filed electronically.


(3) Every document to be filed at the court must –

(a) be headed with the –

(i)full title of the proceedings; and

(ii)title of the document;

(b) state the –

(i) name;

(ii)business address;

(iii) reference (if any);

(iv) telephone number; and

(v) FAX number (if any);

of the person or persons filing it;

(c) contain its date;

(d)(except in the case of an affidavit) be signed by the person filing

it; and

(e) state the name of the party on whose behalf it is filed.

(4)If a document is signed the full name of the signatory must be set out legibly below the signature.

## Filing of documents

3.7 (1) A document may be filed by–

    (a) delivering it;

    (b) posting it; or

    (c) sending it by FAX; or

    (d) transmitting it by other electronic means of communication as authorized by the Chief Justice in a practice direction;

  to the court office where the claim is proceeding or intended to proceed.

  (2) A document is filed on the day when it is received at the court office or, if it is received at a time when the court office is closed, on the next day on which the court office is open.

  (3) If a fee is to be paid, a document is not to be treated as filed until –

    (a) the fee is paid; or

    (b) an undertaking to pay the fee acceptable to the registrar is received.

## Filing and service by FAX

3.8    In addition to any condition contained in a practice direction, any document –

    (a) filed; or

    (b) served;

by FAX, must include a cover page stating the –

    (i) name, address and telephone number of the sender;

    (ii) date and time of transmission;

    (iii) total number of pages transmitted, including the cover page;

    (iv) number of the FAX machine at which documents may be received; and

    (v) name and telephone number of a person to contact if problems occur in transmission.

## Sealing of documents issued by the court

3.9 (1) The court must seal the following documents on issue –

(a)the claim form;

(b)all notices of appeal; and

(c)all judgments, orders or directions of the court.

(2)The court may place the seal on any document by –

(a)hand; or

(b)printing a facsimile of the seal on the document electronically or by any other means.

(3)All judgments and orders and directions of the court must also be signed by the registrar.

(4)A document purporting to bear the court's seal is admissible in evidence without further proof.

## Forms

3.10 (1) The forms in the Appendix to these Rules and, where appropriate,
practice forms must be used in the cases to which they apply.

(2) A form may be varied if the variation is required by the circumstances
of a particular case.

(3) A form must not be varied so as to leave out any information or guidance which the form
in the Appendix or practice form gives to the intended recipient of the form.

(4) If these Rules require a party to send a blank form to any other party, the party must send it to the
other party without variation except the insertion of the title of the case and the court's address
to which that document is to be returned.

(5) A form marked with the word 'Seal' must bear the seal of the Supreme Court.

## Statement of case – address for service

3.11 (1) Every statement of case must contain an address within the jurisdiction at which the party filing
the statement of case will accept service of documents.

(2) The address for service must also state –

    (a)  if given by a legal practitioner – the name or reference of the person who is dealing with the matter; and

    (b)  the telephone number and (if applicable) the FAX number of the legal practitioner filing the document or of the party if in person.

(3) A party must notify the court and all other parties immediately if the address for service is changed, and any document sent to the original address before notice of such change is received by the party serving the document is regarded as validly served.

      • Rule 2.4 defines "statement of case".

## Statement of case – certificate of truth

3.12 (1) Every statement of case must be verified by a certificate of truth.

(2) The certificate of truth should be signed by the party personally.

(3) If it is impracticable for the party personally to sign the certificate required by paragraph (1) it may be given by that person's legal practitioner.

(4) A certificate of truth given by the legal practitioner must also certify –

    (a) that the certificate is given on the client's instructions; and

      the reasons why it is impractical for the client to give the certificate.

(5) If a statement of case is changed under Part 20, the amended statement of case must be verified by a certificate of truth.

(6) Information given under Part 34 (whether voluntarily or following an order of the court) must be verified by a certificate of truth.

(7) A certificate of truth given by a party personally must be in the following form –

    "I [name] certify that I believe that the facts stated in this [name document] are true."

(8) A certificate given by the legal practitioner for a party must be in the following form –

"I *[name of the individual legal practitioner giving the certificate]* certify that –

(a) the *[claimant or as the case may be]* believes that the facts stated in this [name document] are true; and

(b) this certificate is given on the *[claimant's or as the case may be]* instructions.

The *[claimant or as the case may be]* cannot give the certificate because [state reason]".

## Failure to give certificate of truth

3.13 (1)   The court may strike out any statement of case which has not been verified by a certificate of truth.

(2)   Any party may apply for an order under paragraph (1).

## Right to inspect, etc. certain documents filed in court office

3.14 (1)   On payment of the prescribed fee, any person is entitled, during office hours, to search for, inspect and take a copy of any of the following documents filed in the court office, namely —

(a) a claim form;

(b) a notice of appeal;

(c) a judgment or order given or made in court; and

(d) with the leave of the court, which may be granted on an application made without notice, any other  document.

(2) Nothing in paragraph (1) prevents a party in any proceedings from searching for, inspecting and taking a copy of any affidavit or other document filed in the court office in those proceedings or filed before the commencement of those proceedings but with a view to its commencement.

(3)Any document filed in or in the custody of a court office must not be taken out of the court office without the leave of the court unless the document is to be sent to another court office or to a magistrate's court.

PART 4

# Practice Directions and Guides

**Contents of this Part**

Who may issue practice directions                              Rule 4.1

Scope of practice directions                                  Rule 4.2

Publication of practice directions                            Rule 4.3

Compliance with practice directions                          Rule 4.4

Practice guides                                              Rule 4.5

Date from which practice directions and guides take effect    Rule 4.6

## Who may issue practice directions

4.1 Practice directions may be issued only by the Chief Justice.

## Scope of practice directions

4.2 (1) A practice direction may be issued in any case where provision for such a direction is made by these Rules.

(2) Where there is no express provision in these Rules for such a direction, the Chief Justice may give directions as to the practice and procedure to be followed in the Supreme Court.

## Publication of practice directions

4.3 Practice directions and guides must forthwith be –

(a)published in the Official Gazette for each Member State and Territory; and

(b)displayed and made available at each court office.

## Compliance with practice directions

4.4 (1) A party must comply with any relevant practice direction unless there are good reasons for not doing so.

(2) The court may make an order under Part 26 (case management – the court's powers) or Part 64 (costs – general) against a party who fails to comply with a practice direction.

## Practice guides

4.5 (1) The Chief Justice may issue practice guides to assist parties in the conduct of litigation.

(2) Parties must have regard to any relevant practice guide.

(3) The court may take into account the failure of any party to comply with any practice guide when deciding whether or not to make an order under Part 26 (case management – the court's powers) or Part 64 (costs – general).

## Date from which practice directions and guides take effect

4.6 A practice direction or guide takes effect from the date specified in the direction or guide.

**PART 5**

# Service of Claim Form within Jurisdiction

**Contents of this Part**

| | |
|---|---|
| Service of claim form – normal method | Rule 5.1 |
| Statement of claim to be served with claim form | Rule 5.2 |
| Method of personal service | Rule 5.3 |
| Permitted place of service | Rule 5.4 |
| Proof of personal service | Rule 5.5 |
| Service on legal practitioner | Rule 5.6 |
| Service on limited company | Rule 5.7 |
| Service on firm or partnership | Rule 5.8 |
| Service on body corporate | Rule 5.9 |
| Service on minors and patients | Rule 5.10 |
| Proof of postal service | Rule 5.11 |
| Proof of service by electronic means | Rule 5.12 |
| Alternative methods of service | Rule 5.13 |
| Power of court to make order for service by specified method | Rule 5.14 |
| Proof of service by specified method | Rule 5.15 |
| Service of claim form by contractually agreed method | Rule 5.16 |
| Service of claim form on agent of principal who is out of jurisdiction | Rule 5.17 |
| Service of claim for possession of vacant land | Rule 5.18 |
| Deemed date of service | Rule 5.19 |

# Service of claim form – normal method

5.1(1) The general rule is that a claim form must be served personally on each defendant.

(2)  The Chief Justice may by practice direction authorise the use of electronic means of communication (including FAX and e-mail) for service of a claim form.

•Part 6 deals with service of other documents.

## Statement of claim to be served with claim form

5.2 (1) The general rule is that the claimant's statement of claim must be served with the claim form.

(2)The claim form may be served without the statement of claim in accordance with rule 8.2.

(3)In this Part reference to service of the claim form requires that –

(a) the statement of claim; or

(b)if these Rules so require, an affidavit or other document;

(c) a copy of any order that may have been made; and

(d) a copy of any order or application made under rule 8.2;

must be served with the claim form unless the statement of claim is contained in the claim form.

## Method of personal service

5.3 A claim form is served personally on an individual by handing it to or leaving it with the person to be served.

## Permitted place of service

5.4 Except as permitted by Part 7 (service out of the jurisdiction), a claim form must be served at a place within the jurisdiction.

## Proof of personal service

5.5 (1) Personal service of the claim form is proved by an affidavit sworn by

the server stating –

(a)the date and time of service;

(b) the precise place or address at which it was served;

(c)the precise manner by which the person on whom the claim form was served was identified; and

(d)precisely how the claim form was served.


(2) If the person served was identified by another person, there must also

be filed where practicable an affidavit by that person –

(a) proving the identification of the person served; and

(b)stating how the maker of the affidavit was able to identify the person served.

(3) If the server identified the person to be served by means of a photograph or description there must also be filed an affidavit by a person –

    (a) verifying the description or photograph as being of the person intended to be served; and

    (b) stating how the maker of the affidavit is able to verify the description or photograph as being of the person intended to be served.

## Service on legal practitioner

5.6 If a legal practitioner –

    (a) is authorised to accept service of the claim form on behalf of a party; and

    (b) has notified the claimant in writing that he or she is so authorised; the claim form must be served on that legal practitioner.

## Service on limited company

5.7 Service on a limited company may be effected –

    (a) by leaving the claim form at the registered office of the company;

    (b) by sending the claim form by telex, FAX or prepaid post or cable addressed to the registered office of the company;

    (c) by serving the claim form personally on an officer or manager of the company at any place of business of the company which has a real connection with the claim;

    (d) by serving the claim form personally on any director, officer, receiver, receiver-manager or liquidator of the company; or

    (e) in any other way allowed by any enactment.

## Service on firm or partnership

5.8 (1) Service on a firm or partnership may be effected –

    (a) by serving the claim form personally on a manager of the firm at any place of business of the firm or partnership which has a real connection with the claim;

    (b) serving the claim form personally on any partner of the firm;

      or

    (c) in any other way allowed by any enactment.

(2) If the claimant knows that a partnership has been dissolved when the claim is issued, the claim form  must be served personally on every person within the jurisdiction whom the claimant seeks to make   liable.

## Service on body corporate

5.9(1) Service on a body corporate (other than a limited company) may be effected –

    (a) by sending the claim form by prepaid post to the principal office

     of the body corporate;

    (b) by serving the claim form personally on any principal officer of the body corporate; or

    (c)in any other way allowed by any enactment.

    (2) In this rule –

   **"principal officer"** means the mayor, chairman or president of the body, or the town clerk, chief executive officer, clerk, secretary, treasurer or other similar officer of the body.

   • Rule 59.2 deals with service on the Crown.

## Service on minors and patients

5.10 (1)Paragraphs (2) to (5) specify the persons on whom a claim form must be served if it would otherwise be served on a minor or patient.

    (2) A claim form which would otherwise be served on a minor who is not also a patient must be served on –

    (a) one of the minor's parents or guardians (including in Saint Lucia the curator appointed under the Civil Code (Cap 242)); or

    (b) the person with whom the minor resides or in whose care the minor is, if there is no parent or guardian.

    (3)If a person is authorised under any relevant enactment to conduct the proceedings in the name of the patient or on the patient's behalf, a claim form must be served on that person.

    (4) If there is no person so authorised, a claim form must be served on the person with whom the patient resides or in whose care the patient is.

(5) The court may make an order permitting the claim form to be served on the minor or patient, or on some person other than the person specified in paragraphs (2) to (4).

(6) The court may order that, although paragraphs (2) to (4) have not been complied with, the claim form is to be treated as properly served.

(7) An application for an order under paragraph (5) or (6) may be made without notice but must be supported by evidence on affidavit.

- Part 23 deals generally with parties who are minors or patients.

## Proof of postal service

5.11(1) Service by post is proved by an affidavit of service by the person responsible for posting the claim form to the person to be served.

(2) The affidavit must exhibit a copy of the claim form and state the –
   (a) address to which it was sent; and
   (b) date and time of posting.

## Proof of service by electronic means

5.12 (1) Service by electronic means is proved by an affidavit of service by the person responsible for transmitting the claim form to the person to be served.

(2) The affidavit must exhibit a copy of –
   (a) the document served;
   (b) any cover sheet or email to that document;
   (c) the transmission record; and
   (d) proof of electronic service of the document, and must state the –
   (i) electronic means by which the document was served;
   (ii) e-mail address or FAX number to which the document was transmitted; and
   (iii) date and time of the transmission.

(3) Electronic confirmation of delivery may be treated as proof of service for a document that is served electronically and may include a written e-mail response, a read receipt, a successful FAX transmission notification or an automated response that a document was posted in an online shared drive.

## Alternative methods of service

5.13 (1)Instead of personal service a party may choose an alternative method of service.

(2)Where a party –

(a) chooses an alternative method of service; and

(b) the court is asked to take any step on the basis that the claim form has been served;

the party who served the claim form must file evidence on affidavit proving that the method of service was sufficient to enable the defendant to ascertain the contents of the claim form.

(3)An affidavit under paragraph (2) must –

(a)exhibit a copy of the documents served;

(b)give details of the method of service used;

(c)show that –

(i)the person intended to be served was able to ascertain the contents of the documents; or

(ii)it is likely that he or she would have been able to do so; and

(d) state the time when the person served was or was likely to have been in a position to ascertain the contents of the documents.

(4)The court office must immediately refer any affidavit filed under paragraph (2) to a judge, master or registrar who must –

(a) consider the evidence; and

(b) endorse on the affidavit whether it satisfactorily proves service.

(5)If the court is not satisfied that the method of service chosen was sufficient to enable the defendant to ascertain the contents of the claim form, the court office must fix a date, time and place to consider making an order under rule 5.14 and give at least 7 days notice to the claimant.

## Power of court to make order for service by specified method

5.14 (1)  The court may direct that a claim form served by a method specified in the court's order be deemed to be good service.

(2) An application for an order to serve by a specified method may be made without notice but must be supported by evidence on affidavit –

(a) specifying the method of service proposed; and

(b) showing that that method of service is likely to enable the person to be served to ascertain the contents of the claim form and statement of claim.

## Proof of service by specified method

5.15  Service is proved by an affidavit made by the person who served the document showing that the terms of the order have been carried out.

## Service of claim form by contractually agreed method

5.16 (1)  This rule applies where a contract contains a term specifying how any proceedings under the contract should be served.

(2)  A claim form containing a claim in respect of a contract may be served by any method permitted by that contract.

(3)  If the claim form is served within the jurisdiction in accordance with the contract, it is to be treated as having been served on the defendant.

(4)  If the claim form is served out of the jurisdiction in accordance with the contract, it is not to be treated as having been served on the defendant unless service out of the jurisdiction is permitted under Part 7.

## Service of claim form on agent of principal who is out of jurisdiction

5.17 (1)  If the conditions specified in paragraph (2) are satisfied, the court may permit a claim form relating to a contract to be served on a defendant's agent.

(2) The court may not make an order under this rule unless it is satisfied that –

(a) at the time of the application –

(i) the agent's authority had not been terminated; or

(ii) the agent is still in business relations with the defendant

(b) the contract to which the claim relates was entered into within the jurisdiction with or through the defendant's agent; and

(c) the defendant cannot be served within the jurisdiction.

(3) An application may be made without notice but must be supported by evidence on affidavit.

(4) An order under this rule must state the periods within which the defendant must file –

(a) an acknowledgment of service; and

(b) a defence.

(5) When the court makes an order under this rule, the claimant must serve the agent with the –

(a) claim form;

(b) order; and

(c) statement of claim;

and at the same time send to the defendant at the defendant's address out of the jurisdiction a copy of each document.

## Service of claim form for possession of vacant land

5.18(1) Paragraphs (2) to (3) deal with the service of a claim form for possession of land where –

(a) there is no person in occupation of the land; and

(b) service cannot otherwise be effected on the defendant.

(2) The court may direct that a claim form and statement of claim be served by affixing a copy of the claim form to some conspicuous part of the land and by publishing a notice of the claim at least once in one or more newspapers of general circulation in the Member State or Territory in which the land is situated.

(3) An application for an order under this rule –

(a) may be made without notice; but

(b) must be supported by evidence on affidavit that there is no –

(i) other method of serving the defendant; and

(ii)person in occupation of the land.

## Deemed date of service

5.19 (1)  A claim form that has been served within the jurisdiction by pre-paid post is deemed to be served, unless the contrary is shown, on the day shown in the table in rule 6.6.

(2) If a claim is sent to the legal practitioner of a party who certifies that he or she accepts service on behalf of the defendant, the claim is deemed to have been served on the date on which the legal practitioner certifies that he or she accepts service.

(3)If an acknowledgment of service is filed, whether or not the claim form has been duly served, the claimant may treat –
(a) the date of filing the acknowledgment of service; or
(b) (if earlier) the date shown on the acknowledgment of service for receipt of the claim form; as the date of service.

(4) A claimant may file evidence on affidavit to prove that service was in fact effected on a date earlier than the date on which it is deemed to be effected.

PART 6
# Service of other Documents

**Contents of this Part**

Who is to serve documents other than claim form        Rule 6.1

Method of service        Rule 6.2

Address for service        Rule 6.3

Serving documents where no address for service is given        Rule 6.4

Service of documents on person who is not a party        Rule 6.5

Deemed date of service        Rule 6.6

Proof of service        Rule 6.7

Power of court to dispense with service        Rule 6.8

Service of notices, etc. on Attorney General        Rule 6.9

# Who is to serve documents other than claim form

6.1 (1) Subject to paragraph (2) any judgment or order which requires service must be served by the court, unless –

  (a) a rule provides that a party must serve the document in question; or

  (b)the court orders otherwise.

  (2) The following orders must be served by the party obtaining the order –

    (a) a freezing order under rule 17.1(f);

    (b) an injunction;

    (c) any order listed in rule 17.1 (c),(d),(k) or (l);

    (d) an order under rule 17.1(g); and

    (e) a search order under rule 17.1(h).

  (3) Any other document must be served by a party, unless –

    (a) a rule otherwise provides; or

    (b) the court orders otherwise.

## Method of service

6.2 If these Rules require a document other than a claim form to be served

on any person it may be served by any of the following methods –

(a)any means of service in accordance with Part 5;

(b) leaving it at or sending it by prepaid post to any address for service in accordance with rule 6.3(1);

(c) if rule 6.3(2) applies by FAX; or

(d) other means of electronic communication if this is permitted by a relevant practice direction;

unless a rule otherwise provides or the court orders otherwise.

## Address for service

6.3 (1)Documents must be delivered or posted to a party at any address for service within the jurisdiction

given by that party.

(2)If a party's address for service includes a FAX number, documents may be sent by FAX to that

number.

(3)If a party to be served has not given an address within the jurisdiction at which documents for that

party may be served, documents must be served at the address indicated in rule 6.4.

## Serving documents where no address for service is given

6.4 (1) If no address is given for service the document may be served by leaving it or posting it at or to –

(a) in the case of a firm or partnership – either –

(i) the principal or last known address of the firm or partnership or any place where the firm or

partnership carries on business and which has a real connection with the claim; or

(ii) the usual or last known place of residence of one of the partners;

(b) in the case of an individual – that person's usual or last known place of residence;

(c) in the case of a proprietor of a business – that person's –

(i) usual or last known place of residence; or

(ii) place of business or last known place of business; or

(d) the business address of any legal practitioner who purports to act for the party in the proceedings.

(2) The provisions of Part 5 may be applied to such a document as if it were a claim form.

## Service of documents on person who is not a party

6.5  If the court or a party is to serve documents on a person who is not a party, such documents must be served by one of the methods specified in Part 5.

## Deemed date of service

6.6 (1) A document which is served within the jurisdiction in accordance with these Rules is deemed to be served on the day shown in the following table –

| Method of Service | Deemed date of service |
|---|---|
| Post | 14 days after posting |
| Registered Post | 10 days after the date indicated on the Post Office or courier receipt |
| Leaving document at a permitted address | The day after leaving the document |
| FAX | (a) If it is transmitted on a business day before 4 p.m. – the day of transmission; (b) In any other case – the business day after the day of transmission. |
| Other electronic method of service | The business day after the day of transmission. |

(2) Any document served after 4 p.m. on a business day or at any time on a day other than a business day is treated as having been served on the next business day.

(3)In this rule "business day" means any –

(a) day other than a Saturday, Sunday or Bank Holiday; or

(b) other day on which the court office is closed;

and is to be determined by reference to the relevant enactment of the Member State or Territory in which the document is to be served.

## Proof of service

6.7  If proof of service of any document is required, it may be proved by any method of proving service set out in Part 5.

## Power of court to dispense with service

6.8(1) The court may dispense with service of a document if it is appropriate to do so.

(2) An application for an order to dispense with service may be made without notice.

## Service of notices, etc. on Attorney General

6.9 (1) This rule applies where any document has to be served on the Attorney General of any Member State or Territory in connection with any proceedings of which notice has to be given to the Attorney General and where express provision as to service is not made by any enactment or rule.

(2) Any such document must be served in accordance with rule 59.2.

PART 7

# Service of Court Process out of Jurisdiction

**Contents of this Part**

Scope of this Part                                                                          Rule 7.1

General rule as to service of claim form out of jurisdiction                                 Rule 7.2

Service of claim form out of jurisdiction in specified proceedings                           Rule 7.3

Proceedings which include other types of claim                                               Rule 7.4

Permission to serve claim form out of jurisdiction                                           Rule 7.5

Acknowledgment of service and defence where claim form served out of the jurisdiction        Rule 7.6

Application to set aside service under rule 7.3                                               Rule 7.7

Mode of service of claim form – general provisions                                           Rule 7.8

Mode of Service - alternative procedure                                                      Rule 7.8A

Power of Court to dispense with service of the claim form                                    Rule 7.8B

Service of claim form through foreign governments, or judicial or consular authorities       Rule 7.9

Procedure where claim form is to be served through foreign Governments, etc.                 Rule 7.10

Service of claim form on a State where court permits service out of jurisdiction             Rule 7.11

Translation of claim form                                                                    Rule 7.12

Undertaking to be responsible for expenses of Minister with responsibility for foreign affairs  Rule 7.13

Service of court process other than claim form                                               Rule 7.14

## Scope of this Part

7.1(1) This Part contains provisions about the –

　　(a)circumstances in which court process may be served out of the  jurisdiction; and

　　(b)　　procedure for serving court process out of the jurisdiction.

(2) In this Part references to service or filing copies of the claim form include –

　　(a) the statement of claim (unless contained in the claim form);

　　(b)an affidavit in support of the claim, if these Rules so require; and

　　(c) if permission has been given under rule 8.2 to serve the claim form without the statement of

　　　　claim – a copy of the order giving permission.

## General rule as to service of claim form out of jurisdiction

7.2 A claim form may be served out of the jurisdiction only if –

   (a) rule 7.3 allows; and

   (b) the court gives permission.

## Service of claim form out of jurisdiction in specified proceedings

7.3       (1) The court may permit a form to be served out of the jurisdiction if the proceedings are listed in this Rule.

*Features which may arise in any type of claim*

   (2) A claim form may be served out of the jurisdiction if a claim is made –

      (a)      Against someone on whom the claim form has been or will be served, and –

         (i)       there is between the claimant and that person a real issue which it is reasonable for the court to try; and

         (ii)      the claimant now wishes to serve the claim form on another person who is outside the jurisdiction and who is necessary or proper party to claim;

      (b)      for an injunction ordering the defendant to do or refrain from doing some act within  the jurisdiction; or

      (c)      for a remedy against a person domiciled or ordinarily resident within the jurisdiction.

*Claims about contracts*

   (3) A claim form be served out of the jurisdiction if –

      (a)      a claim is made in respect of a breach of contract committed within the jurisdiction;

      (b)      a claim is made in respect of a contract where the contract –

         (i)       contains a term to the effect that the court shall have jurisdiction to determine any claim in respect of the contract; or

         (ii)      is by its terms or by implication governed by the law of any Member State Territory;

(iii)    was made by or through an agent trading or residing within the jurisdiction; or

(iv)    was made within the jurisdiction; or

(c)    the claim is for a declaration that no contracts exists, where, if the contract did exist, it would fulfill one or more of the conditions in sub-paragraph (b) of this Rule.

*Claims in tort*

(4) A claim form may be served out of the jurisdiction if a claim in tort is made and the act causing the damage was committed within the jurisdiction or the damage was sustained within the jurisdiction.

*Enforcement*

(5)    A claim form may be served out of the jurisdiction if a claim is made to enforce any judgment or arbitral award which was made by a foreign court or tribunal and is amenable to be enforced at common law.

*Claims about property within the jurisdiction*

(6) A claim form may be served out of the jurisdiction if the whole subject matter of the claim relates to property within the jurisdiction.

*Claims about companies*

(7) A claim form may be served out of the jurisdiction if the subject matter of the claim relates to –

(a) the constitution, administration, management or conduct of the affairs; or

(b) the ownership or control of a company incorporated within the jurisdiction.

*Claims about trusts*

(8) A claim form may be served out of the jurisdiction if –

(a) a claim is made for a remedy against the defendant as constructive trustee and the defendant's alleged ability arises out of acts committed within the jurisdiction;

(b) a claim is made for –

(i)    any remedy which might be obtained in proceedings for the administration of the estate of; or

            (ii)      in probate proceedings as defined in Part 68 relating to; a person who died domiciled within the jurisdiction; or

(c) a claim is made for any remedy which might be obtained in proceedings to execute the trust of a written instrument and the –

            (i)      trusts ought to be executed according to the law of any Member State or Territory; and

            (ii)      person on whom the claim is to be served is a trustee of the trusts.

*Claims of restitution*

(9) A claim is made for restitution where the defendant's alleged ability arises out of acts committed within the jurisdiction or out of acts which, wherever committed, where to the detriment of a
person domiciled within the jurisdiction

*Claims under an enactment conferring jurisdiction on the Court*

(10) A claim is made under an enactment which confers jurisdiction on the court and the proceedings are not covered by any of the other grounds referred to in this Rule.


## Proceedings which include other types of claim


7.4 If the claimant makes a claim which falls within –

    (a) rule 7.3(3) (claims about contracts);

    (b) rule 7.3(4) (claims in tort); or

    (c) rule 7.3(7) (a) (claims against the defendant as a constructive

     trustee);

the court may grant any claim for a remedy which –

       (i) does not fall within rule 7.3; but

       (ii) arises out of the same facts or substantially the same facts as

       the claim in respect of which the order is made.


## Permission to serve claim form out of jurisdiction

7.5(1) An application for permission to serve out of the jurisdiction may be made without notice but must be supported by evidence on affidavit stating –

(a) the grounds on which the application is made;

(b) that in the deponent's belief the claimant has a claim with a realistic prospect of success;

(c) in what place, within what country, the defendant may probably be found; and

(d) if the application is made under rule 7.3 (2) (a), the grounds for the deponent's belief that the conditions are satisfied.

(2) An order granting permission to serve the claim form out of the jurisdiction must state the periods within which the defendant must –

(a) file an acknowledgement of service in accordance with Part 9; and

(b) file a defence in accordance with Part 10.

(3) The periods for filing a document under paragraph (2) are to be determined by reference to a relevant practice direction.

## Acknowledgment of service and defence where claim form served out of the jurisdiction

7.6 A claim form to be served out of the jurisdiction must be amended to state the period within which the –

(a) acknowledgement of service; and

(b) defence;

must be filed.

## Application to set aside service under rule 7.3

7.7 (1) Any person on whom a claim form has been served out of the jurisdiction under rule 7.3 may apply to set aside service of the claim form.

(2) The court may set aside service under this rule if –

(a) service out of the jurisdiction is not permitted by the rules;

(b) the claimant does not have a good cause of action; or

(c) the case is not a proper one for the court's jurisdiction.

(3) This rule does not limit the court's power to make an order under rule

9.7 (procedure for disputing the court's jurisdiction, etc.).

## Mode of service of claim form – general provisions

7.8 (1) Subject to the following paragraphs of this rule, and Rule 7.8A if a claim form is to be served out of the jurisdiction, it may be served –

(a) by a method provided for by –

(i) rule 7.9 (service through foreign governments, etc.); or

(ii) rule 7.11 (service on a State);

(b) in accordance with the law of the country in which it is to be served; or

(c) personally by the claimant or the claimant's agent.

(2) Nothing in this Part or in any court order may authorise or require any person to do anything in the country where the claim form is to be served which is against the law of that country.

## Mode of service – alternative procedure

7.8A       (1)  Where service under Rule 7.8 is impracticable, the claimant may apply for an order under this Rule that the claim form be served by a method specified by the court.

(2) An order made under this Rule shall specify the date on which service of the claim form shall be deemed to have been affected.

(3) Where an order is made under this Rule, service by the method specified in the court's order shall be deemed to be good service.

(4) An application for an order under this Rule may be made without notice but must be supported by evidence on affidavit –

(a) specifying the method of service proposed;

(b) providing full details as to why service under Rule 7.8 is impracticable;

(c) showing that such method of service is likely to enable the person to be served to ascertain the contents of the claim form and statement of claim; and

(d) certifying that the method of service proposed is not contrary to the law of the country in which the claim form is to be served.

(5) Where any method of service specified in an order made under this Rule is subsequently shown to be contrary to the law of the country in which the claim was purportedly served, such service shall be invalid.

## Power of the court to dispense with service of the claim form

7.8B    (1) The court may dispense with service of a claim form in exceptional circumstances.

(2) An application for an order to dispense with service may be made at any time and –

(a)    must be supported by evidence on affidavit; and

(b)    may be made without notice.

## Service of claim form through foreign governments, or judicial or consular authorities

7.9  (1) This rule does not apply to service in –

(a) any independent Commonwealth country;

(b) the Republic of Ireland; or

(c) the United Kingdom, the Isle of Man or the Channel Islands;

unless the claim form is to be served in accordance with paragraph

(3)

(2) The methods of service permitted by this rule are in addition to any method of service permitted under rule 7.8(1) (b) or (c).

*Service under the Hague Convention*

(3) A claim form to be served on a defendant in any country which is a party to the Hague Convention may be served –

  (a) through the authority designated under the Hague Convention in respect of that country; or

  (b) if the law of that country permits –

    (i) in the case of a claim form issued in a Member State – through its consular authority in that country;

    (ii) in the case of a claim form issued in a Territory – through the British consular authority in that country; or

    (iii) through the judicial authorities of that country.

*Service under other Conventions*

(4) A claim form to be served on a defendant in any country which is a party to a Civil Procedure Convention (to which the relevant Member State or Territory is also a party or which has been extended to the relevant Member State or Territory) other than the Hague Convention providing for service of court process in that country, may be served, if the law of that country permits –

  (i) in the case of a claim form issued in a Member State – through its consular authority in that country (subject to any provision of the convention as to the nationality of persons who may be so served);

  (ii) in the case of a claim form issued in a Territory – through the British consular authority in that country (subject to any provision of the convention as to the nationality of persons who may be so served); or

  (iii) through the judicial authorities of that country.

*Service where there is no applicable Convention*

(5) A claim form to be served on a defendant in any country with respect to which there is no relevant Civil Procedure Convention providing for service of court process in that country may be served, if the law of that country so permits –

  (i) in the case of a claim form issued in a Member State – through its consular authority in that

country;

(ii) in the case of a claim form issued in a Territory – through the British consular authority in that country; or

(iii) through the government of that country, if that government is willing to serve it.

## Procedure where claim form is to be served through foreign governments, etc.

7.10 (1) This rule applies where the claimant wishes to serve the claim form through the –

(a) authority designated under the Hague Convention or any other relevant Civil Procedure Convention in respect of that country;

(b) consular authority of a Member State or, in the case of a Territory, the British consular authority in that country;

(c) government of that country; or

(d) judicial authorities of the country where the claim form is to be served.

(2) If this rule applies, the claimant must file –

(a) a copy of the claim form;

(b) an additional copy of the claim form for each person to be served;

(c) a request for service of the claim form by the claimant's chosen method; and

(d) any translation required by rule 7.12.

(3) When the claimant files the documents specified in paragraph (2) the court office must –

(a) seal the copy of the claim form; and

(b) send the documents filed to the minister with responsibility for foreign affairs with a request that the minister arrange for the claim form to be served –

(i) by the method indicated in the request for service filed under paragraph (2); or

(ii) if the request indicates alternative methods – by the most convenient method.

(4) An official certificate which –

(a) is made by –

(i) a consular authority of a Member State or a British consular authority in the country where the claim form was served;

(ii) the government or judicial authorities in that country; or

(iii) any other authority designated in respect of that country under the Hague Convention or any other relevant Civil Procedure Convention;

(b) states that the claim form has been served in accordance with this rule either personally or in accordance with the law of the country in which service was effected; and

(c) specifies the date on which the claim form was served;

is evidence of the facts stated in the certificate.

(5) A document purporting to be an official certificate under paragraph (4) is to be treated as such a certificate, unless it is proved not to be.

## Service of claim form on a State where court permits service out of jurisdiction

7.11 (1) This rule applies where a claimant wishes to serve a claim form on a State.

(2) If the State has agreed to a method of service other than a method permitted by this Part, the claim form may be served either by the method agreed or in accordance with the other rules in this Part.

(3) The claimant must file at the court office –

(a) a copy of the claim form;

(b) any translation required by virtue of rule; and

(c) a request for service to be arranged by the Minister with responsibility for foreign affairs.

(4) The court office must send documents filed under this rule to the minister with responsibility for foreign affairs with a request that the minister arrange for the claim form to be served.

(5) If a Member State or Territory has under any enactment relating to state immunity agreed to a

method of service, the claim form may be served either by the method agreed or in accordance
with this rule.

(6) An official certificate by the minister with responsibility for foreign affairs stating that a claim
form has been duly served on a specified date in accordance with a request made under this rule
is evidence of that fact.

(7) A document purporting to be such a certificate is to be treated as such a certificate, unless it is
proved not to be.

## Translation of claim form

7.12 (1)  Except where paragraph (4) or (5) applies, every copy of the claim form filed under rule 7.10 or
rule 7.11 must be accompanied by a translation of the claim form.

(2) The translation must be –
(a) in the official language of the country in which it is to be served; or
(b) if there is more than one official language of that country – in any official language which is
appropriate to the place in the country where the claim form is to be served.

(3) Every translation filed under this rule must be certified by the person
making it to be a correct translation, and the certificate must state –
(a) the name of the person making the translation; and
(b) his or her –
(i) address; and
(ii) qualifications for making the translation.

(4) If the claim form is to be served –

(a) in a country of which English is an official language; or
(b) by a consular authority of a Member State or, in the case of a
Territory, a British consular authority on a citizen of a Member

State or Territory;

the claimant is not required to file a translation of a claim form filed under rule 7.9

(service through foreign governments, etc.) unless a relevant Civil Procedure Convention

expressly requires a translation.

(5) The claimant is not required to file a translation of a claim form filed under rule 7.11 (service on

a State) if English is an official language of the State where the claim form is to be served.


## Undertaking to be responsible for expenses of minister with responsibility for foreign affairs

7.13 (1) A person filing a request for service under rule 7.9 (service through foreign governments, etc.) or

rule 7.11 (service on a State) must undertake in the request –

(a) to be responsible for all expenses incurred by the Minister with responsibility for foreign

affairs; and

(b) on being informed of the amount of those expenses to –

(i) pay that amount to the Accountant General or other financial officer for the Member State

or (Territory concerned; and

(ii) produce a receipt for the payment to the court office.

(2) The claimant may take no further step in the proceedings until the claimant produces the receipt

required by paragraph (1) (b) (ii).


## Service of court process other than claim form

7.14 (1) An application, order or notice issued, made or given in any proceedings may be served out of

the jurisdiction without the court's permission if it is served in proceedings in which permission

has been given to serve the claim form out of the jurisdiction.

(2)The procedure by which a document specified in paragraph (1) is to be served is the same as that

applicable to the service of a claim form and accordingly rules 7.8 to 7.13 apply.

PART 8
# How to Start Proceedings

**Contents of this Part**

| | |
|---|---|
| The claimant – how to start proceedings | Rule 8.1 |
| Statement of claim, etc. to be issued and served with claim form | Rule 8.2 |
| Where to start proceedings | Rule 8.3 |
| Right to make claim which includes two or more claims | Rule 8.4 |
| Claim not to fail by adding or failing to add parties | Rule 8.5 |
| What must be included in claim form | Rule 8.6 |
| Claimant's duty to set out case | Rule 8.7 |
| Permission to rely on allegation or factual argument | Rule 8.7A |
| Certificate of value (small claims) | Rule 8.8 |
| Special requirements applying to claims for personal injuries | Rule 8.9 |
| Relator claims | Rule 8.10 |
| Service of claim form | Rule 8.11 |
| Time within which claim form may be served | Rule 8.12 |
| Extension of time for serving claim form | Rule 8.13 |
| Defence form, etc. must be served with claim form | Rule 8.14 |

**The claimant – how to start proceedings**

8.1 (1) A claimant starts proceedings by filing in the court office the original

and one copy (for sealing) of –

(a) the claim form; and (subject to rule 8.2)

(b) the statement of claim; or

(c) if any rule or practice direction so requires – an affidavit or other document.


(2) A claim is issued on the date entered on the claim form by the court office.


(3) For the purpose of any enactment relating to the limitation of proceedings, a claim is brought on

the    day on which the claim form is filed at the court office.

- Rule 3.7(2) defines when a document is filed.

(4)A claim form must be in Form 1 except in the circumstances set out in paragraph (5).

(5)Form 2 (fixed date claim form) must be used –

    (a) in claims arising out of hire-purchase or credit sale agreements;

    (b)in proceedings for possession of land;

    (c)whenever its use is required by a rule or practice direction; and

    (d) where by any enactment proceedings are required to be commenced by originating summons or motion.

- Rule 27.2 deals with the procedure under a fixed date claim.

(6) A person who seeks a remedy –

    (a) before proceedings have been started; or

    (b) in relation to proceedings which are taking place, or will take place, in another jurisdiction;

must seek that remedy by an application under Part 11.

## Statement of claim, etc. to be issued and served with claim form

8.2 (1) A claim form may be issued and served without the statement of claim or affidavit or other document required by rule 8.1 (1) (b)or (c) only if the –

    (a) claimant has included in the claim form all the information required by rules 8.6. 8.7, 8.8 and 8.9; or

    (b) court gives permission.

(2) In a case of emergency when it is not practicable to obtain the permission of the court a claimant may issue and serve the claim form without a statement of claim or affidavit or other document required by rule 8.1(1) (b) or (c) provided that the claimant –

    (a) certifies in writing that the issue and service of the claim form is a

      matter of emergency, stating why; and

    (b) serves a copy of the –

        (i)certificate; and

        (ii) application for permission;

    with the claim form.

(3)If a claim form is issued under paragraph (2), the claimant may take no further steps except to serve the claim form until permission is given.

(4)The court may give permission under paragraph (1) only if it is satisfied that –

    (a) a relevant limitation period is about to expire and the claimant has obtained legal advice relating to the claim for the first time within the 28 days prior to the date that the claimant wishes to file the claim; or

    (b) the claim form must be issued as a matter of urgency and it is not practicable for the claimant to prepare a statement of claim or affidavit.

(5) An application for permission may be made without notice but must be supported by evidence on affidavit.

(6) Any order giving permission for the claim form to be served without a statement of claim or affidavit or other document required by rule 8.1

    (1) (b) or (c) must state a date by which that document must be served.

(7) Such date must in no case be more than 56 days from the date of issue of the claim form.

(8) A copy of the order or the certificate and application under paragraph

    (2) must be served with the claim form.

(9) The claimant must file a copy of the statement of claim or affidavit or other document required by rule 8.1(1) (b) or (c), served in accordance with paragraph (6), endorsed with a certificate stating the date of service and the address at which and the manner in which it was served.

## Where to start proceedings

8.3 (1) This rule identifies the court office at which a claim form maybe issued.

(2)Where proceedings relate to land they may be commenced only in the court office for the Member State, Territory or circuit in which the land is situated.

(3)Any other proceedings may be commenced only in the court office for the Member State, Territory

or circuit where either the –

(a)cause of action arose; or

(b)defendant resides or carries on business.

## Right to make claim which includes two or more claims

8.4 A claimant may use a single claim form to include all or any other claims which can be conveniently disposed of in the same proceedings.

## Claim not to fail by adding or failing to add parties

8.5 (1) The general rule is that a claim will not fail because a person –

    (a)who should have been made a party was not made a party to the proceedings; or

    (b) was added as a party to the proceedings who should not have been added.

  (2) However –

    (a) where a claimant claims a remedy to which some other person is jointly entitled, all persons jointly entitled to the remedy must be parties to the proceedings, unless the court orders otherwise; and

    (b) if any such person does not agree to be a claimant, that person must be made a defendant, unless the court orders otherwise.

  (3) This rule does not apply in probate or administration proceedings.

   •   Rules 67.2 and 68.3 deal with parties in such proceedings.

## What must be included in claim form

8.6 (1) The claimant must in the claim form –

    (a) include a short description of the nature of the claim;

    (b) specify any remedy that the claimant seeks; and

    (c) give an address for service in accordance with rule 3.11.

  (2) Notwithstanding paragraph (1) (b) the court may grant any other remedy to which the claimant may be entitled.

  (3)A claimant who seeks aggravated damages and/or exemplary damages must say so in the claim form.

(4) A claimant who is seeking interest must –

    (a) say so expressly in the claim form; and

    (b) include, in the claim form or statement of claim, details of the –

      (i) basis of entitlement;

      (ii) rate; and

      (iii) period for which it is claimed.

(5) If the claim is for a specified sum of money, the total amount of interest claimed to the date of the claim and the daily rate at which interest will accrue after the date of the claim must be expressly stated in the claim form.

(6) A claimant who claims in a representative capacity under Part 21 must state what that capacity is.

(7) A claimant suing a defendant in a representative capacity under Part 21 must state what that capacity is.
    •Rule 3.12 requires the claim form to include a certificate of truth.

## Claimant's duty to set out case

8.7 (1) The claimant must include in the claim form or in the statement of claim a statement of all the facts on which the claimant relies.

(2) The statement must be as short as practicable.

(3) The claim form or the statement of claim must identify any document which the claimant considers to be necessary to his or her case.

(4) If the claimant seeks recovery of any property, the claimant's estimate of the value of that property must be stated.

(5) The statement of claim must include a certificate of truth in accordance with rule 3.12.

## Permission to rely on allegation or factual argument

8.7A  The claimant may not rely on any allegation or factual argument which is not set out in the claim, but which could have been set out there, unless the court gives permission or the parties agree.

*Rule 20.1 contains provisions about amendments to statements of case.

## Certificate of value (small claims)

8.8 In any case in which the quantum of damages alone determines in which court the claim is to be brought but the amount of any damages claimed is not specified, the claim form must include a certificate by the claimant that the damages claimed exceed the civil jurisdiction of the District or Magistrate's Court in the Member State or Territory in which the claim form is issued.

## Special requirements applying to claims for personal injuries

8.9 (1) This rule sets out additional requirements with which a claimant making a claim for personal injuries must comply.

(2) The claimant's date of birth or age must be stated in the claim form or statement of claim.

(3) If the claimant intends to rely at trial on the evidence of a medical  practitioner, the claimant must attach to the claim form a report from the medical practitioner on the personal injuries alleged in the claim.

(4)Paragraph (3) does not restrict the right of the claimant to call other or additional medical evidence at the trial of the claim.

(5) The claimant must include in, or attach to the claim form or statement of claim a schedule of any special damages claimed.

## Relator claims

8.10 A person's name may not be used in any claim as a relator unless that person has given written authority to that effect and the authority is filed at the court office before the claim is issued.

## Service of claim form

8.11 After the claim form has been issued it may be served on the defendant in accordance with Part 5 (service of claim form within jurisdiction) or Part 7 (service of court process out of the jurisdiction).

## Time within which claim form may be served

8.12 (1) The general rule is that a claim form must be served within 6 months after the date when the claim was issued.

(2)The period for –

(a) service of a claim form out of the jurisdiction; or

(b) service of an Admiralty claim form in rem;

is 12 months.

- Part 7 deals with service out of the jurisdiction.
- Part 70 deals with Admiralty proceedings.

## Extension of time for serving a claim form

8.13 (1) The claimant may apply for an order extending the period within which a claim form may be served.

(2) The period by which the time for serving a claim form is extended may not be longer than 6 months on any one application.

(3) An application under paragraph (1) –

(a)must be made within the period –

(i) for serving a claim form specified by rule 8.12; or

(ii) of any subsequent extension permitted by the court; and

(b) may be made without notice but must be supported by evidence on affidavit.

(4) The court may make an order under paragraph (1) only if it is satisfied that –

  (a) the  claimant has taken all reasonable steps to –

    (i) trace the defendant; and

    (ii) serve the claim form;

  but  has been unable to do so; or

  (b) there is some other special reason for extending the period.

(5) If an order is made extending the validity of the claim form –

  (a) the claim form must be marked with an official stamp showing the period for which its validity has been extended; and

  (b) a sealed copy of any order made must be served with the claim form.

(6) No more than one extension maybe allowed unless the court is satisfied that  –

  (a) the defendant is deliberately avoiding service; or

  (b) there is some other compelling reason for so doing.

## Defence form, etc. must be served with claim form

8.14 (1) When a claim form is served on a defendant, it must be accompanied by -

(a) a copy of any order made under rule 8.2 or 8.13;

(b) a defence form (Form 5);

(c) a form of acknowledgment of service (Form 4 or 4(A));

(d) if the claim is for money – an application to pay by installments (Form 3); and

(e) the prescribed notes for defendants (Form 1A).

(2) There must be inserted on each form the –

(a) address of the court office to which the defendant is to return the forms;

(b) reference number of the claim; and

(c) title of the claim.

(3) If there is a standard defence form appropriate to the particular case set out in a practice guide, the form sent to the defendant must be in a standard form of that type.

PART 9

# Acknowledgment of Service and Notice of Intention to Defend

**Contents of this Part**

Scope of this Part                                                                          Rule 9.1

Filing acknowledgment of service and consequence of not doing so                            Rule 9.2

The period for filing acknowledgment of service                                             Rule 9.3

Notice to claimant of filing of acknowledgment of service                                   Rule 9.4

Contents of acknowledgment of service                                                       Rule 9.5

Right to dispute jurisdiction of court not taken away by acknowledgment of service          Rule 9.6

Procedure for disputing court's jurisdiction,                                               Rule 9.7

Procedure for applying for a stay etc. where defendant served out of jurisdiction           Rule 9.7A

## Scope of this Part

9.1 (1) This Part deals with the procedure to be used by a defendant who wishes to contest proceedings
and avoid a default judgment being entered.

- Part 12 deals with default judgments.


(2) The defendant does so –

   (a) by filing –

     (i) a defence in accordance with Part 10; and

     (ii) an acknowledgment of service in Form 3 or 4 containing a notice of intention to defend
within the time limit under rule 9.3;or

   (b) by filing a defence in accordance with Part 10 within the time limit under rule 9.3.


(3) The filing of an acknowledgment of service is to be treated as the entry of an appearance for the
purpose of any enactment referring to the entry of such an appearance.

- Part 14 deals with the case where the defendant wishes to admit all or part of the claim and enables the
defendant to make an offer as to the time and rate of payment.

## Filing acknowledgment of service and consequence of not doing so

9.2 (1) A defendant who wishes to –

     (a) dispute the claim; or

     (b) dispute the court's jurisdiction;

must file at the court office at which the claim form was issued an acknowledgment of service in Form 4 or 4(A) containing a notice of intention to defend.

(2) A defendant files an acknowledgment of service by completing the form of acknowledgment of service and handing it in at, or sending it by post or FAX to the court office.

(3) An acknowledgment of service has no effect until it is received at the court office.

(4) A defendant need not file an acknowledgment of service if a defence is filed within the period specified in rule 9.3.

(5) If a defendant fails to file an acknowledgement of service or a defence, judgment may be entered if Part 12 allows it.

## The period for filing acknowledgment of service

9.3 (1) The general rule is that the period for filing an acknowledgment of service is the period of 14 days after the date of service of the claim  form.

(2) If a claim form is issued in one Member State, Territory or circuit and served in another the period is 28 days after the date of service of the claim form.

(3) If permission has been given under rule 8.2 for a claim form to be served without a statement of claim, the period for filing an acknowledgment of service is to be calculated from the date when the statement of claim is served.

(4) A defendant may file an acknowledgment of service at any time before  a request for default judgment is received at the court office out of which the claim form was issued.

(5) Paragraph (1) does not apply where the claim is served –

     (a) outside the jurisdiction in accordance with Part 7; or

(b) on an agent of an overseas principal under rule 5.17.

• Rules 7.5(2) and 5.17(4) deal with the time for filing an acknowledgment of service in those cases.

• Rule 59.3 makes special provision for extending the time for the Crown to acknowledge service.

## Notice to claimant of filing of acknowledgment of service

9.4(1) The court office must forthwith notify the claimant in writing that an acknowledgment of service has been filed.

(2) A copy of the acknowledgment of service must be annexed to the notice.

## Contents of acknowledgment of service

9.5 (1) A defendant acknowledging service –

(a) may state in the acknowledgment of service that all or part of the claim is admitted;

(b) must state in the acknowledgment of service the date on which the defendant received the claim form;

(c)who admits all or part of a claim for a specified sum of money – may file with the acknowledgment of service –

(i) details of the defendant's financial circumstances; and

(ii) proposals for payment of any sums admitted;

(d) who admits part of the claim under paragraph (a) – must state the amount admitted.

•Part 14 deals with the way in which proposals referred to in this paragraph are decided.

(2)A defendant who admits part of the claim must also file a defence as to the disputed part of the claim within the time for filing a defence.

•Rule 10.3 sets out the time far filing a defence.

(3) The defendant or the defendant's legal practitioner must sign the acknowledgment of service.

(4)The defendant must include in the acknowledgment of service an address for service within the jurisdiction to which documents may be sent.

## Right to dispute jurisdiction of court not taken away by acknowledgment of service

9.6 A defendant who files an acknowledgment of service does not by doing so lose any right to dispute the court's jurisdiction.

## Procedure for disputing court's jurisdiction

9.7  (1) A defendant who disputes the court's jurisdiction to try the claim may apply to the court for a declaration to that effect.

(2) A defendant who wishes to make an application under paragraph (1) must first file an acknowledgement of service.

(3) An application under paragraph (1) of this Rule muse be made within the period for filing a defence; the period for making an application under this Rule includes any period by which the time for filing a defence has been extended where the court has made an order, or the parties have agreed, to extend the time for filing a defence.

> *Rule 10.3 sets out the period for filing a defence.

(4) An application under this Rule must be supported by evidence on affidavit.

(5) A defendant who –

(a)    files an acknowledgement of service; and

(b)    does not make an application under this Rule within the period for filing a defence, is treated as having accepted that the court has jurisdiction to try the claim.

(6) An order under this Rule may also –

(a)    discharge an order made before the claim was commenced or the claim form served;

(b)      set aside service of the claim form; and

(c)      strike out a statement of claim.

(7) If on application under this Rule the court does not make a declaration, it –

(a)      may –

(i)      fix a date for a case management conference; or

(ii)     treat the hearing of the application as a case management conference; and

(b)      must make an order as to the period for filing a defence.

*Part 26 sets out powers which the court may exercise at a case management conference.

(8) Where a defendant makes an application under this Rule, the period for filing a defence is extended until the time specified by the court under paragraph (7) (b) and such period may be extended only by an order of the court.

\* Rule 10.3(4) deals with an application to stay proceedings where there is a binding agreement to arbitrate.

## Procedure for applying for a stay etc. where defendant served out of jurisdiction

9.7A  (1)     A defendant who contends that the court should not exercise its jurisdiction in respect of any proceedings may apply to the court for a stay and a declaration to that effect.

(2)    A defendant who wishes to make an application under this paragraph 1 must first file an acknowledgment of service if he has not previously done so.

(3)  An application under paragraph (1) of this Rule may be made at any time.

(4)  An application under this Rule must be supported by evidence on affidavit.

(5) If on application under this Rule the court does not make a declaration, it -

(a)  may-

(i)  fix a date for a case management conference; or

(ii)  treat the hearing of the application as a case management conference; and

   (b) must make an order as to the period for filing a defence if none has yet been filed.

 *Part 26 sets out powers which the court may exercise at a case management conference.

 (6)  Where a defendant makes an application under this Rule, the period for filing a defence (where none has yet been filed) is extended until the time specified by the court under paragraph (5)(b) and such period may be extended only by an order of the court.

 *Rule 10.3(4) deals with an application to stay proceedings where there is a binding agreement to arbitrate.

PART 10
# Defence

**Contents of this Part**

Scope of this Part                                                      Rule 10.1

The defendant – filing defence and consequences of not doing so        Rule 10.2

The period for filing defence                                          Rule 10.3

Service of copy of defence                                             Rule 10.4

Defendant's duty to set out case                                       Rule 10.5

Special requirements applying to claims for personal injuries          Rule 10.6

Consequences of not setting out defence                                Rule 10.7

Defence of tender                                                      Rule 10.8

Reply to defence                                                       Rule 10.9

## Scope of this Part

10.1 The Rules in this Part set out the procedure for disputing the whole or part of a claim.

- Part 18 deals with the procedure for making a counterclaim.

## The defendant – filing defence and the consequences of not doing so

10.2 (1) A defendant who wishes to defend all or part of a claim must file a defence (which may be in Form 5).

(2) If -
   (a) a claim is commenced by a fixed date claim form in Form 2 and there is served with that claim form an affidavit instead of a statement of claim; or

   (b) any rule requires the service of an affidavit;

   the defendant may file an affidavit in answer instead of a defence.

(3) In this Part the expression "defence" includes an affidavit filed under paragraph (2).

(4) If a defendant fails to file a defence within the period for filing a defence, judgment for failure to defend may be entered if part 12 allows it.

Part 14 deals with the procedure to admit all or part of the claim.

## The period for filing defence

10.3 (1) The general rule is that the period for filing a defence is the period of
28 days after the date of service of the claim farm.

(2) If a claim form is issued in one Member State, Territory or circuit and served in another, the period is 42 days after the date of service of the claim form.

(3) If permission has been given under rule 8.2 for a claim form to be served without a statement of claim, the period for filing a defence is the period of 28 days after the service of the statement of claim.

(4) If the defendant within the period set out in paragraph (1), (2) or (3) makes an application under any relevant legislation relating to arbitration to stay the claim on the grounds that there is a binding agreement to arbitrate, the period for filing a defence is extended to 14 days after the determination of that application.

(5) The parties may agree to extend the period for filing a defence specified in paragraph (1), (2), (3) or (4).

(6) The parties may not make more than two agreements under paragraph (5).

(7) The maximum total extension of time that may be agreed is 56 days.

(8) The defendant must file details of such an agreement.

(9) A defendant may apply for an order extending the time for filing a defence.

(10) The general rule is subject to –

(a) rule 5.17(4) (service of claim form on agent of overseas principal);

(b) rule 7.5(2) (service of claim form outside jurisdiction);

(c) rule 9.7 (procedure for disputing court's jurisdiction); and

(d) rule 59.3 (claims against the Crown).

## Service of copy of defence

10.4 On filing a defence, the defendant must also serve a copy on every other party.

## Defendant's duty to set out case

10.5 (1) The defence must set out all the facts on which the defendant relies to dispute the claim.

(2) Such statement must be as short as practicable.

(3) In the defence the defendant must say which (if any) allegations in the claim form or statement of claim –

    (a) are admitted;

    (b) are denied;

    (c) are neither admitted nor denied, because the defendant does not know whether they are true; and

    (d) the defendant wishes the claimant to prove.

(4) If the defendant denies any of the allegations in the claim form or statement of claim –

  (a) the defendant must state the reasons for doing so; and

  (b) if the defendant intends to prove a different version of events from that given by the claimant, the defendant's own version must be set out in the defence.

(5) If, in relation to any allegation in the claim form or statement of claim, the defendant does not –

  (a) admit it; or

  (b) deny it and put forward a different version of events;

  the defendant must state the reasons for resisting the allegation.

(6) The defendant must identify in or annex to the defence any document which is considered to be necessary to the defence.

(7) A defendant who defends in a representative capacity must say –

  (a) what that capacity is; and

  (b) whom the defendant represents.

(8) The defendant must verify the facts set out in the defence by a certificate of truth in accordance with rule 3.12.

## Special requirements applying to claims for personal injuries

10.6 (1) This rule sets out additional requirements with which a defendant to a claim for personal injuries must comply.

(2) If the claimant has attached to the claim form or statement of claim a report from a medical practitioner on the personal injuries which the claimant is alleged to have suffered, the defendant must state in the defence –

(a) whether all or any part of the medical report is agreed; and

(b) if any part of the medical report is disputed, the nature of the dispute.

(3) If the defendant intends to rely on a report from a medical practitioner to dispute any part of the claimant's claim for personal injuries and the defendant has obtained such a report, the defendant must attach that report to the defence.

## Consequences of not setting out defence

10.7 The defendant may not rely on any allegation or factual argument which  is not set out in the defence, but which could have been set out there, unless the court gives permission or the parties agree.

* Rule 20.1 contains provisions about amendments to statements of case.

## Defence of tender

10.8 (1) The defence of tender is not available unless the defendant pays into –

(a) an interest bearing account with the agreement of the claimant or the permission of the court;

or

(b) court;

the amount alleged to have been tendered within the period for filing a defence.

2) If the claimant does not give notice accepting the payment into court within 28 days of service of the defence, the defendant may apply for payment out of the monies.

- Rule 10.3 states the period for filing a defence.
- Part 36 deals with payments into court.

## Reply to defence

10.9 (1) A claimant may file and serve a reply to a defence –

  (a) 14 days after the date of service of the defence; or

  (b) At any time with the permission of the court.


  (2) Where the defence contains a counterclaim, Part 18 shall apply.

   * Part 18 deals with a defence to an ancillary claim including counterclaims

PART 11

# General Rules about Applications for Court Orders

**Contents of this Part**

| | |
|---|---|
| Scope of this Part | Rule 11.1 |
| Applicants and respondents | Rule 11.2 |
| Applications to be dealt with at case management conference | Rule 11.3 |
| Time when application is made | Rule 11.4 |
| Where to make application | Rule 11.5 |
| Application to be in writing | Rule 11.6 |
| What application must include | Rule 11.7 |
| Notice of application and evidence in support | Rule 11.8 |
| Evidence in support of application | Rule 11.9 |
| Contents of notice of application | Rule 11.10 |
| Service of notice of application | Rule 1 1.11 |
| Powers of court in relation to conduct of application | Rule 11.12 |
| Consequence of not asking for order in application | Rule 11.13 |
| Applications which may be dealt with without hearing | Rule 11.14 |
| Service of application where order made on application made without notice | Rule 11.15 |
| Applications to set aside or vary order made on application made without notice | Rule 11.16 |
| Power of court to proceed in absence of party | Rule 11.17 |
| Application to set aside order made in absence of party | Rule 11.18 |

## Scope of this Part

11.1 This Part deals with applications for court orders made before, during or after the course of the proceedings.

## Applicants and respondents

11.2 In this Part –

"**applicant**" means a person who seeks a court order by making an application;

"**respondent**" means –

(a) the person against whom the order is sought and any other person on whom the applicant considers it just to serve the application; and

(b) any other person whom the court directs is to be served with the application.

## Applications to be dealt with at case management conference

11.3 (1) So far as is practicable all applications relating to pending proceedings must be listed for hearing at a case management conference or pre-trial review.

(2) If an application is made which could have been dealt with at a case management conference or pre-trial review the court must order the applicant to pay the costs of the application unless there are special circumstances.

## Time when application is made

11.4 If an application must be made within a specified period, it is so made if it is received by the court office or made orally to the court within that period.

## Where to make application

11.5 (1) The general rule is that an application must be made to the court office where the claim was issued.

(2) If the claim has been transferred to another court office the application must be made to that court office.

(3) An application made before a claim has been issued must be made to the court office where it is likely that the claim to which the application relates will be made.

## Application to be in writing

11.6 (1) The general rule is that an application must be in writing in Form 6.

(2) An application may be made orally if –

(a) the court dispenses with the requirement for the application to be made in writing; or

(b) this is permitted by a rule or practice direction.

What application must include

11.7(1) An application must state –

    (a) briefly, the grounds on which the applicant is seeking the order; and

    (b) what order the applicant is seeking.

(2) The applicant must file with the application or not less than 3 days before the hearing of the application a draft of the order sought and serve a copy on all respondents to whom notice is given.

(3) If the application is made without notice, the draft order must be filed with the application.

## Notice of application and evidence in support

11.8 (1) The general rule is that the applicant must give notice of the application to each respondent.

(2)An applicant may make an application without giving notice if this is permitted by a –

    (a) practice direction; or

    (b) rule.

(3)The applicant need not give evidence in support of an application unless it is required by a —

    (a) court order;

    (b) practice direction; or

    (c) rule.

(4) Notice of the application must be included in the form used to make the application.

## Evidence in support of application

11.9 Evidence in support of an application must be contained in an affidavit unless a —

    (a) court order;

    (b) practice direction; or

    (c) rule;

otherwise provides.

- Part 30 deals with affidavit evidence.

## Contents of notice of application

11.10 (1) The notice must state the date, time and place when the application is to be heard.

(2) If there is not going to be a hearing but notice of the application is required, the notice must state how the court will deal with the application.

- Rule 11.14 sets out the circumstances in which there may not be a hearing.

## Service of notice of application

11.11 (1) The general rule is that a notice of an application must be served –

(a) as soon as practicable after the day on which it is issued; and

(b) at least 7 days before the court is to deal with the application.

(2) The period in paragraph (1) (b) does not apply if any rule or practice direction specifies some other period for service.

(3) If –
(a) notice of an application has been given; but
(b) the period of notice is shorter than the period required;

the court may nevertheless direct that, in all the circumstances of the case, sufficient notice has been given and may accordingly deal with the application.

(4) The notice must be accompanied by –

(a) a copy of any draft order which the applicant has attached to the application; and
(b) any evidence in support.

(5) The notice must be served in accordance with Part 6 unless any 5 respondent is not a party, in which case the notice must be served in accordance with Part 5.

## Powers of court in relation to conduct of application

11.12 (1) The court may –

(a) issue a witness summons requiring a party or other person to attend the court on the hearing of the application;

(b) question any party or witness at the hearing; and

(c) require a party to produce documents or things at the hearing.

(2) The court may question a party or witness –

(a) by putting written questions and asking the witness to give written answers; or

(b) orally.

(3) Any party may then cross-examine the witness.

(4) The court may exercise any power which it might exercise at a case management conference.

## Consequence of not asking for order in application

11.13 An applicant may not ask at any hearing for an order which was not sought in the application unless the court gives permission.

## Applications which may be dealt with without hearing

11.14 The court may deal with an application without a hearing if –

(a) no notice of the application is required;

(b) the court considers that the application can be dealt with over the

telephone or by other means of communication;

(c) the court does not consider that a hearing would be appropriate;

(d) the parties agree; or

(e) the parties have agreed to the terms of an order –

(i) which does not come within rule 27.8(1); and

(ii) the application (or a copy of the application) is signed by the legal practitioners for all parties

to the application.

- Rules 2.7(3) and (4) contain powers to enable the court to deal with applications

by electronic means.

- Rule 42.7 deals with consent orders.

## Service of application where order made on application made without notice

11.15 After the court has disposed of an application made without notice,

the applicant must serve a copy of the application and any evidence in support on all other

parties.

## Applications to set aside or vary order made on application made without notice

11.16 (1) A respondent to whom notice of an application was not given may apply to the court for any

order made on the application to be set aside or varied and for the application to be dealt with

again.

(2) A respondent must make such an application not more than 14 days after the date on which the

order was served on the respondent.

(3) An order made on an application of which notice was not given must contain a statement telling

the respondent of the right to make an application under this rule.

## Power of the court to proceed in absence of party

11.17 If the applicant or any person on whom the notice of application has been served fails to attend the

hearing of the application, the court may proceed in the absence of that party.

## Application to set aside order made in absence of party

11.18 (1) A party who was not present when an order was made may apply to set aside or vary the order.

(2)The application must be made not more than 14 days after the date on which the order was

served on the applicant.

(3) The application to set aside the order must be supported by evidence on affidavit showing –

    (a) a good reason for failing to attend the hearing; and

    (b) that it is likely that had the applicant attended some other order might have been made.

# Part 12

# Default Judgments

**Contents of this Part**

Scope of this Part                                                                          Rule 12.1

Claims in which default judgment may not be obtained                                        Rule 12.2

Cases in which permission required                                                          Rule 12.3

Conditions to be satisfied – judgment for failure to file acknowledgment of service        Rule 12.4

Conditions to be satisfied – judgment for failure to defend                                 Rule 12.5

Admission of part – request for time to pay                                                  Rule 12.6

Procedure                                                                                    Rule 12.7

Claim for specified sum of money                                                             Rule 12.8

Claim against more than one defendant                                                        Rule 12.9

Nature of default judgment                                                                   Rule 12.10

Interest                                                                                     Rule 12.11

Costs                                                                                        Rule 12.12

Defendant's rights following default judgment                                                Rule 12.13

## Scope of this Part

12.1 (1) This Part contains provisions under which a claimant may obtain

judgment without trial where the defendant has failed to file –

(a) a defence in accordance with Part 10; or

(b) an acknowledgment of service giving notice of intention to defend in accordance with Part 9.

(2) Such a judgment is called a "**default judgment**".

## Claims in which default judgment may not be obtained

12.2 A claimant may not obtain default judgment if the claim is-

(a) a claim in probate proceedings;

(b) a fixed date claim; or

(c) an admiralty claim in rem.

•Rule 68.6 deals with probate proceedings.

- Rule 70.22 makes special provision for default judgment in admiralty cases for personal injury arising out of a collision between two ships.

## Cases in which permission required

12.3 (1) A claimant who wishes to obtain a default judgment on any claim which is a claim against a –

(a) minor or patient as defined in rule 2.4; or

(b) State as defined in any relevant enactment relating to state immunity;

must obtain the court's permission.

- Part 59 deals with proceedings against the Crown.

- Part 23 deals with proceedings involving a minor or patient.

(2) A claimant who wishes to obtain judgment in default of acknowledgment of service against a diplomatic agent who enjoys immunity from civil jurisdiction by virtue of any relevant enactment relating to diplomatic privileges must obtain the court's permission.

(3) An application under paragraph (1) or (2) must be supported by evidence on affidavit.

- Rule 12.9(2) contains restrictions on a default judgment where it is sought against some but not all defendants.

## Conditions to be satisfied – judgment for failure to file acknowledgment of service

12.4 The court office at the request of the claimant must enter judgment for failure to file an acknowledgment of service if –

(a) the claimant proves service of the claim form and statement of claim;

(b) the defendant has not filed –

(i) an acknowledgment of service; or

(ii) a defence to the claim or any part of it;

(c) the defendant has not satisfied in full the claim on which the claimant seeks judgment;

(d) the only claim is for a specified sum of money, apart from costs and interest, and the defendant has not filed an admission of liability to pay all of the money claimed together with a request for time to pay it;

(e) the period for filing an acknowledgment of service under rule 9.3 has expired; and

(f) (if necessary) the claimant has the permission of the court to enter judgment.

- Rules 5.5, 5.11, 5.12 and 5.15 deal with how to prove service of the claim form
  and statement of claim.

## Conditions to be satisfied – judgment for failure to defend

12.5 The court office at the request of the claimant must enter judgment for failure to defend if –

    (a) (i) the claimant proves service of the claim form and statement of claim; or

        (ii) an acknowledgment of service has been filed by the defendant against whom judgment is sought;

    (b) the period for filing a defence and any extension agreed by the parties or ordered by the court has expired;

    (c) the defendant has not –

        (i)filed a defence to the claim or any part of it (or the defence has been struck out or is deemed to have been struck out under rule 22.1(6)); or

        (ii) (if the only claim is for a specified sum of money)filed or served on the claimant an admission of liability to pay all of the money claimed, together with a request for time to pay it; or

        (iii) satisfied the claim on which the claimant seeks judgment; and

    (d) (if necessary) the claimant has the permission of the court to enter judgment.

## Admission of part – request for time to pay

12.6(1) This rule deals with the situation where the –

    (a) defendant is an individual who has admitted liability to pay either –

        (i) a specified sum towards a claim for an unspecified sum of money; or

        (ii) part only of a claim for a specified sum;

    (b) defendant has not filed a defence; and

    (c) claimant does not accept the sum admitted.

    (2)Subject to any restriction imposed by this Part, the claimant may apply for judgment to be entered for –

        (a) the whole amount of the claim for a specified sum together with

interest and fixed costs under rule 65.4; or

        (b) if the claim is for an unspecified sum – the payment of an amount to be decided by the court.

(3) If the defendant has requested time to pay, that request must be dealt with, if the claim is for –

(a) a specified sum – in accordance with rules 14.9 and 14.10 or 14.11;

(b) an unspecified sum – when damages are assessed in accordance with rule 16.3.

## Procedure

12.7 A claimant applies for default judgment by filing a request in Form 7.

- Rule 16.2 sets out additional information that must be provided where the claim is for an unspecified sum of money.

## Claim for specified sum of money

12.8 (1) The fact that the claimant also claims costs and interest at a specified rate does not prevent a claim from being a claim for a specified sum of money.

(2) A claimant who claims a specified sum of money together with interest at an unspecified rate may apply to have judgment entered for either the sum of money claimed –

(a) and for interest to be assessed; or

(b) together with interest at the statutory rate from the date of the claim to the date of entering judgment.

(3) If a claim is partly for a specified sum and partly for an unspecified sum the claimant may abandon the claim for the unspecified sum and enter default judgment for the specified sum.

- Rule 2.4 defines "claim for a specified sum of money".

## Claim against more than one defendant

12.9 (1) A claimant may apply for default judgment on a claim for money or a claim for delivery of goods against one of two or more defendants and proceed with the claim against the other defendants.

(2) If a claimant applies for a default judgment against one of two or more defendants, then if the claim –

(a) can be dealt with separately from the claim against the other defendants –

(i) the court may enter judgment against that defendant; and

(ii) the claimant may continue the proceedings against the other defendants;

(b) cannot be dealt with separately from the claim against the other

defendants, the court –

(i) may not enter judgment against that defendant; and

(ii) must deal with the application at the same time as it disposes

of the claim against the other defendants.

(3) If a claim for delivery of goods is made against more than one defendant (with or without any

other claim), the claimant may not enforce any judgment for

delivery entered under this Part against a defendant unless the –

(a) claimant has obtained a judgment for delivery (whether or not obtained under this Part) against

all the defendants to the claim; or

(b) court gives permission.

## Nature of default judgment

12.10(1) Default judgment on a claim for –

(a) a specified sum of money – must be judgment for payment of that

amount or, a part has been paid, the amount certified by the claimant as outstanding –

(i) if the defendant has applied for time to pay under Part 14 – at the time and rate ordered

by the court; or

(ii) in all other cases – at the time and rate specified in the request for judgment;

- Rule 2.4 defines "a claim for a specified sum of money" and sets out the circumstances under which a claim for the cost of repairing property damaged in a road accident can be treated as such a claim.
- Part 65 deals with the quantification of costs.

(b) an unspecified sum of money – must be judgment for the payment of an amount to be

decided by the court and must be in Form 32.

- Rule 16.2 deals with the procedure for assessment of damages where judgment is entered under this paragraph.

(c) goods – must be –

(i) judgment requiring the defendant either to deliver the goods

or pay their value as assessed by the court;

(ii) judgment requiring the defendant to pay the value of the goods as assessed by the court; or

(iii) (if the court gives permission) a judgment requiring the defendant to deliver the goods

without giving the defendant  the alternative of paying their assessed value.

(2)   An application for permission to enter a default judgment under paragraph (1) (c) (iii) must be supported by evidence on affidavit.

(3) A copy of the application and the evidence under paragraph (2) must be served on the defendant against whom judgment has been sought even though that defendant has failed to file an acknowledgment of service or a defence.

(4) Default judgment where the claim is for some other remedy shall be in such form as the court considers the claimant to be entitled to on the statement of claim.

(5) An application for the court to determine the terms of the judgment under paragraph (4) need not be on notice but must be supported by evidence on affidavit and rule 11.15 does not apply.

## Interest

12.11 (1) A default judgment must include judgment for interest for the period claimed if the –
    (a) claim form includes a claim for interest;
    (b) claim form or statement of claim includes the details required by rule 8.6(4); and
    (c) request for default judgment states the amount of interest to the date it was filed.

(2) If the claim form includes any other claim for interest, the default judgment must include judgment for an amount of interest to be decided by the court.

## Costs

12.12 (1) A default judgment must include fixed costs under rule 65.4 unless the court assesses the costs.

(2) An application to assess costs must be on notice to the defendant.
•Rule 65.11 deals with the assessment of costs.

**Defendant's rights following default judgment**

12.13   Unless the defendant applies for and obtains an order for the judgment to be set aside, the only matters on which a defendant against whom a default judgment has been entered may be heard are -

(a)        the assessment of damages, provided that he or she has indicated that he or she wishes to be heard by filing a Notice in Form 31 within seven [7] days after service of the claimant's submissions and witness statements on the defendant pursuant to Rule 16.2(2);

(b)        an application under Rule 12.10(4);

(c)        costs;

(d)        enforcement of the judgment; and

(e)        the time of payment of the judgment debt.

- Part 13 deals with setting aside or varying default judgments"

PART 13

# Setting Aside or Varying Default Judgment

**Contents of this Part**

Scope of this Part                                          Rule 13.1

Cases where court must set aside default judgment            Rule 13.2

Cases where court may set aside or vary default judgment     Rule 13.3

Applications to vary or set aside default judgment – procedure   Rule 13.4

Court to impose condition as to filing of defence            Rule 13.5

Hearing to be treated as case management conference          Rule 13.6

Abandoned claims to be restored if judgment set aside        Rule 13.7

# Scope of this Part

13.1 The Rules in this Part set out the procedure for setting aside or varying a default judgment entered under Part 12 (default judgments).

• Part 47 deals with variation of the terms of a judgment as to time and method of payment.

# Cases where court must set aside default judgment

13.2 (1) The court must set aside a judgment entered under Part 12 if judgment was wrongly entered because in the case of –

(a) a failure to file an acknowledgment of service – any of the conditions in rule 12.4 was not satisfied; or

(b) judgment for failure to defend – any of the conditions in rule 12.5 was not satisfied.


(2) The court may set aside judgment under this rule on or without an application.

# Cases where the court may set aside or vary default judgment

13.3(1) If Rule 13.2 does not apply, the court may set aside a judgment entered under Part 12 only if the defendant –

(a) Applies to the court as soon as reasonably practicable after finding out that judgment had been entered;

(b) Gives a good explanation for the failure to file an acknowledgement of service or a defence as the same case may be; and

(c)     Has a real prospect of successfully defending the claim.

(2) In any event the court may set aside a judgment entered under Part 12 if the defendant satisfies the court that there are exceptional circumstances.

(3) Where this Rule gives the court power to set aside a judgment, the court may instead vary it.

*Rule 26.1(3) enables the court to attach conditions to any order.

## Applications to vary or set aside judgment – procedure

13.4 (1) An application may be made by any person who is directly affected by the entry of judgment.

(2) The application must be supported by evidence on affidavit.

(3) The affidavit must exhibit a draft of the proposed defence.

## Court to impose condition as to filing of defence

13.5 If judgment is set aside under rule 13.3, the general rule is that the order must be conditional upon the defendant filing and serving a defence by a specified date.

## Hearing to be treated as case management conference

13.6 (1) If judgment is set aside under rule 13.3 the court must treat the hearing as a case management conference unless it is not possible to deal with the matter justly at that time.

(2) If it is not possible to deal with the matter justly at that time, the court office must fix a date, time and place for a case management conference and give notice to the parties.

- Part 26 deals with the powers of the court on a case management conference.
- Part 27 deals with the procedure for case management conferences.

## Abandoned claims to be restored if judgment set aside

13.7 If the claimant has abandoned any remedy sought in the claim form in order to enter a default judgment, the abandoned claim is restored if judgment is set aside.

PART 14

# Judgment on Admissions

**Contents of this Part**

| | |
|---|---|
| Making an admission | Rule 14.1 |
| Satisfaction | Rule 14.2 |
| Admissions where party a minor or patient | Rule 14.3 |
| Admission by notice in writing – application for judgment | Rule 14.4 |
| Admission in whole or in part of money claim | Rule 14.5 |
| Admission of whole of claim for specified sum of money | Rule 14.6 |
| Admission of part of claim for money only | Rule 14.7 |
| Admission of liability to pay whole of claim for unspecified sum of money | Rule 14.8 |
| Requests for time to pay | Rule 14.9 |
| Requests for time to pay – procedure where time and rate agreed a | Rule 14.10 |
| Requests for time to pay – procedure where lime and rate not agreed | Rule 14.11 |
| Right of redetermination | Rule 14.12 |
| Variation of order | Rule 14.13 |

# Making an admission

14.1 (1) A party may admit the truth of the whole or any part of any other party's case.

(2) A party may do this by giving notice in writing (such as in a statement of case or by letter) before or after the issue of proceedings.

(3) A defendant may admit the whole or part of a claim for money by filing an acknowledgment of service containing the admission.

(4) The defendant may do this in accordance with the following rules –
   (a) rule 14.6 (admission of whole of claim for specified sum of money);
   (b) rule 14.7 (admission of part of claim for money only); or
   (c) rule 14.8 (admission of liability to pay whole of claim for unspecified sum of money).

(5) A defendant may file an admission under paragraph (4) at any time before a default judgment is entered, but the claimant may apply for assessed costs if the admission is filed after the time for filing an acknowledgement of service has expired.

- Rule 9.3 specifies the time for filing an acknowledgment of service.
- Rules 65.11 & 12 deal with assessed costs.

## Satisfaction

14.2 (1) If the defendant pays the claimant the sum claimed, together with interest at the statutory rate (if claimed) and the fixed costs as set out on the claim form, within the period for filing an acknowledgment of service under rule 9.3 the –

(a) claim is stayed; and

(b) claimant must forthwith file and serve a notice of discontinuance.

(2) Rule 37.6 (liability for costs) does not apply to a notice of discontinuance served under this rule.

(3) If the claimant does not file and serve a notice of discontinuance in accordance with paragraph (1) within 7 days of payment, the defendant may file and serve a notice in the form specified in Form 28 to request that the claim be recorded as satisfied.

(4) If there is no dispute the court office must record that the claim has been satisfied.

(5) If the claimant disputes satisfaction, the court office must fix a hearing to consider the application and give not less than 7 days notice of the hearing to the claimant and defendant.

## Admissions where party a minor or patient

14.3 Judgment may not be entered on an admission if the –

(a) defendant is a minor or patient; or

(b) claimant is a minor or patient and the admission is made under rule 14.7 or 14.8.

- Rule 23.12 deals with compromise of claims made by or against a minor or patient.

## Admission by notice in writing – application for judgment

14.4 (1) If a party makes an admission under rule 14.1(2) (admission by notice in writing), any other party may apply for judgment on the admission.

(2)The terms of the judgment must be such as it appears to the court the applicant is entitled to on the admission.

## Admission in whole or in part of money claim

14.5 On receipt of an admission of the whole or part of a claim for money under rule 14.1(3), the court office must send a copy of the admission and any request for time to pay under rule 14.9 to the claimant.

## Admission of whole of claim for specified sum of money

14.6 (1) This rule applies where the –

(a)defendant admits the whole of the claim in the acknowledgment of service;

(b)defendant has not requested time to pay; and

(c) only remedy which the claimant is seeking is payment of a specified sum of money.

(2)The claimant may file a request for judgment in Form 8 for the amount claimed, interest and fixed costs under rule 65.4 and may specify the  –

(a) date on which the judgment debt is to be paid; or

(b) time and rate at which it is to be paid if by instalments.

(3)The court office must enter judgment in accordance with the request.

- Rule 2.4 defines "a claim for a specified sum of money" and sets out the circumstances under which a claim for the cost of repairing property damaged in a road accident can be treated as such a claim.

### Admission of part of claim for money only

14.7  (1) This Rule applies where –

(a)       the only remedy which the claimant is seeking is the payment of money;

(b)       the defendant admits a specified –

(i)       sum of money; or

(ii)      proportion of a claim for an unspecified sum of money; in acknowledgement of service or defence; and

(c)       the defendant has filed a defence as to the amount not admitted.

*If the defendant does not file a defence the claimant will be entitled  default judgment in accordance with Rule 12.5.

(2) The claimant must service a notice on the defendant stating that –

(a)        the amount or proportion admitted in satisfaction of the claim is accepted; or

(b)        The claimant intends to continue the claim

(3) The claimant must –

(a)        file the notice under paragraph (20; and

(b)        serve a copy on the defendant ;

within 14 days after service of the defendant's acknowledgment of service or defence, as the case may be.

(4) If the claimant does not file the notice within 14 days after service of the defendant's acknowledgement of service or defence –

(a)        the claim is stayed until the notice is filed; and

(b)  any party may apply for the stay to be lifted.

(5) If the defendant has not requested time to pay under Rule 14.9, the claimant may file a request for judgment in Form 8 for the amount admitted, interest and fixed costs and may specify –

(a)  the date on which the judgment debt is to be paid; or

(b)  the time and rate at which it is to be paid by installments.

(6) The court office must enter judgment in accordance with the request.

(7) If the claimant gives notice that he accepts the defendant's admission of a specified proportion of a claim for an unspecified sum of money, the court must enter judgment for that proportion of an amount to be decided by the court and costs.

(8) If the claimant files notice under paragraph (2)(b) the court office must fix a date, time and place for a case management conference.

*Part 27 sets out the procedure relating to a case management  conference. Rule 65.4 deals with fixed costs.

## Admission of liability to pay whole of claim for unspecified sum of money

14.8(1) This rule applies where the –

(a) amount of the claim is not specified;

(b) defendant admits liability in the acknowledgment of service to pay the whole of the claim and does not offer to pay a specified sum of money or proportion of the claim in satisfaction of the claim;

(c) defendant has not requested time to pay under rule 14.9; and

(d) only remedy the claimant seeks is the payment of money.

(2 )The claimant may file a request for judgment in Form 7.

(3) The court office must enter judgment in accordance with the request.

(4)Judgment will be for an amount to be decided by the court and costs.
•Rule 16.3 deals with how the court decides the amount of the judgment.
•Part 65 deals with the quantification of costs.

## Requests for time to pay

14.9(1) A defendant who –

(a)makes an admission under rules 14.6, 14.7 or 14.8; and

(b) is an individual;

    may make a request for time to pay.                                                        -

(2) A request for time to pay is a proposal –

(a) about the date of payment; or

(b) to pay by instalments at a rate specified in the request.

(3)The defendant's request for time to pay must be –

(a) accompanied by a statement of his or her financial position in the appropriate practice form; and

(b) filed with the admission.

(4)The statement under paragraph (3) (a) must be certified by the defendant as being correct and may be used as evidence of the defendant's financial position at the date it was signed in any subsequent proceedings with regard to enforcement of the judgment.

(5)If the –

    (a) request for time to pay relates to a claim for an unspecified sum of money; and

    (b) court must assess damages under rule 14.8(4);

       the court must deal with the request for time to pay when it assesses damages.


## Requests for time to pay – procedure where time and rate agreed

14.10(1) This rule applies where the –

    (a) only remedy which the claimant seeks is the payment of a sum of money together with interest and costs;

    (b) defendant –

      (i) admits the whole of a claim for a specified sum of money; or

      (ii) offers to pay a specified sum; and

      (iii) requests time to pay or makes an offer to pay by instalments; and

    (c) claimant in the request for judgment on the admission in Form 7 accepts the defendant's offer as to the amount, time and rate of payment.

    (2) If this rule applies, judgment on the admission must be judgment for the specified sum of money admitted (less any payments made), interest and fixed costs under rule 65.4, to be paid at the agreed time and rate.


## Requests for time to pay – procedure where time and rate not agreed

14.11(1) This rule applies where –

    (a)the only remedy which the claimant seeks is the payment of a sum of money together with interest and costs;

    (b)the defendant –

      (i) admits the whole of a claim for a specified sum of money; or

      (ii) offers to pay a specified sum; and

      (iii) requests time to pay or makes an offer to pay by instalments; and

    (c) the claimant accepts the sum admitted but does not accept the defendant's offer as to the amount, time and rate of payment.


    (2) If this rule applies, the claimant must state in the request for judgment in Form 7 the reasons for objecting to the defendant's proposals as to payment.

(3) The court must consider the defendant's request and the claimant's objections and enter judgment for the amount of the claim, interest and fixed costs under rule 65.4 on such terms as it sees fit.

(4) The general rule is that the court should enter judgment under paragraph (3) without a hearing.

(5) If the court decides to deal with the matter at a hearing, it must give the parties at least 7 days' notice of the hearing.

(6)   If there is a hearing, the court must determine whether to make an order for the costs of the application and by whom the costs should be paid and assess such costs under rule 65.11.

- The claimant is entitled to fixed costs on the judgment in accordance with Part 65, Appendix A.

## Right of redetermination

14.12(1) If the court has determined the time and rate of payment under rule 14.11 without a hearing, either party may apply for the decision to be redetermined by the court at a hearing.

(2) An application for redetermination must be made within 14 days after service of the judgment on the applicant.

(3) At the hearing the court may confirm the judgment or make such other order as to the time and rate of payments as it considers just.

(4) The court must determine whether to make an order for costs and by whom the costs should be paid and assess such costs under rule 65.11.

## Variation of order

14.13(1) Either a claimant or a defendant may apply to vary an order made under this Part.

(2) An application by a defendant must be made in accordance with Part 47.

PART 15

# Summary Judgment

**Contents of this Part**

Scope of this Part                                                    Rule 15.1
Grounds for summary judgment                                          Rule 15.2
Types of proceedings for which summary judgment is not available      Rule 15.3
Procedure                                                             Rule 15.4
Evidence for purpose of summary judgment hearing                      Rule 15.5
Powers of court on application for summary judgment                   Rule 15.6

# Scope of this Part

15.1 This Part sets out a procedure by which the court may decide a claim or a particular issue without a trial.

# Grounds for summary judgment

15.2 The court may give summary judgment on the claim or on a particular issue if it considers that the –

(a) claimant has no real prospect of succeeding on the claim or the issue; or

(a) defendant has no real prospect of successfully defending the claim or the issue.

- Rule 26.3 gives the court power to strike out the whole or part of a statement of case if it discloses no reasonable ground for bringing or defending the claim.

# Types of proceedings for which summary judgment is not available

15.3 The court may give summary judgment in any type of proceedings except –

(a) admiralty proceedings in rem;

(b) probate proceedings;

(c) Proceedings by way of fixed date claim;

(d) proceedings for –

　(i) claims against the Crown;

　(ii) defamation;

(iii) false imprisonment;

(iv) malicious imprisonment; and

(v) redress under the Constitution of any Member State or Territory.

## Procedure

15.4 (1)Notice of an application for summary judgment must be served not less than 14 days before the
date fixed for hearing the application.

(2)The notice under paragraph (1) must identify the issues which it is proposed that the court should
deal with at the hearing.

(3)The court may exercise its powers without such notice at any case management conference.
•Part 11 contains general rules about applications.

## Evidence for purpose of summary judgment hearing

15.5(1) The applicant must –

(a) file affidavit evidence in support with the application; and

(b) serve copies of the application and the affidavit evidence on each party against whom summary
judgment is sought;

not less than 14 days before the date fixed for hearing the application.

(2) A respondent who wishes to rely on evidence must –

(a) file affidavit evidence; and

(b) serve copies on the applicant and any other respondent to the application;

at least 7 days before the summary judgment hearing.

## Powers of court on application for summary judgment

15.6 (1) The court may give summary judgment on any issue of fact or law whether or not the judgment
will bring the proceedings to an end.

(2) If the proceedings are not brought to an end the court must also treat the hearing as a case

management conference.

PART 16
## Assessment of Damages

**Contents of this Part**

Scope of this Part                                                                          Rule 16.1

Assessment of damages after default judgment                                                Rule 16.2

Assessment of damages after admission of liability on claim for unspecified sum of money    Rule 16.3

Assessment of damages after direction for trial of issue of quantum                         Rule 16.4

## Scope of this Part

16.1 This Part deals with the procedure by which a hearing to assess damages is fixed.

## Assessment of damages after default judgment

16.2 (1) An application for a default judgment to be entered under rule 12.10(1)(b) must state –

    (a) whether the claimant is in a position to prove the amount of the damages; and, if so

    (b) the claimant's estimate of the time required to deal with the assessment; or

    (c) that the claimant is not yet in a position to prove the amount of the damages.

    (2) Unless the application states that the claimant is not in a     position to prove the amount of damages -

    (a)    the court office must fix a date for the assessment of damages and give the claimant and the defendant at least 42 days' notice of the date, time and place fixed for the hearing;

    (b)    the claimant shall file and serve on the Defendant all witness statements and written submissions on which he or she intends to rely within 14 days of service of the notice of assessment;

    (c)    the defendant shall be at liberty to file and serve witness statements and written submissions on which he or she intends to rely within 14 days of service of the claimant's witness statements and submissions on him or her.

        • Rules 29.8 - 29.12 deal with Witness Statements."

    (3) A claimant who is not in a position to prove damages must state the period of time that will elapse before this can be done.

(4) The court office must then fix a period within which the assessment of damages will take place and a date on which a listing questionnaire is to be sent to the claimant.

- Rules 27.9 and 27.10 deal with listing questionnaires and the fixing of a date for a trial.

(5) (a) The claimant shall be entitled to rely on the evidence of all witnesses called by him or her pursuant to the witness statements filed and served by him or her and to make submissions to the court.

(b) The defendant is entitled to cross-examine any witness called on behalf of the claimant, call evidence as disclosed in his or her Notice filed pursuant to Form 31 and in respect of witness statements which have been filed and served pursuant to Rule 16.2(2)(c) and to make submissions to the court.

## Assessment of damages after admission of liability on claim for unspecified sum of money

16.3 (1) This rule applies where the defendant has admitted liability for the whole or a specified proportion of a claim for an unspecified sum of money.

(2) An application for judgment to be entered for damages to be assessed on an admission under Part 14 must –

(a) state whether the claimant is in a position to prove the amount of damages; and, if so

(b) give an estimate of the time required to deal with the assessment; or

(c) state that the claimant is not yet in a position to prove the amount of damages.

(3) Unless the application states that the claimant is not in a position to prove the amount of damages -

(a) the court office must fix a date for the assessment of damages and give the claimant and the defendant at least 42 days' notice of the date, time and place fixed for the hearing;

(b) the claimant shall file and serve on the defendant all witness statements and written submissions on which he or she intends to rely within 14 days of service of the notice of assessment;

(c) the defendant shall file a Notice in Form 31 within seven [7] days after service of the claimant's submissions and witness statements on the defendant;

(d)    the defendant shall be at liberty to file and serve witness statements and written submissions on which he or she intends to rely within 14 days of service of the claimant's witness statements and submissions on him or her."

- Rules 29.8 - 29.12 deal with Witness Statements.

(4) A claimant who is not in a position to prove damages must state the period of time that will elapse before this can be done –

(5)The court office must then fix either –

(a) a case management conference and give notice to the parties ; or

(b) a period within which the assessment of damages will take place and a date on which a listing questionnaire is to be sent to the claimant.

- Rules 27.9 and 27.10 deal with listing questionnaires and the fixing of a date for trial.

(6)    (a) The claimant shall be entitled to rely on the evidence of all witnesses called by him or her pursuant to the witness statements filed and served by him or her and to make submissions to the court.

(b) The defendant is entitled to cross-examine any witness called on behalf of the claimant, call evidence as disclosed in his Notice filed pursuant to Form 31 and in respect of witness statements which have been filed and served pursuant to Rule 16.3(3)(d) and to make submissions to the court.

(7) The court must also deal with any request under Part 14 for time to pay.

## Assessment of damages after direction for trial of issue of quantum

16.4 (1) This rule applies where the court makes a direction for the trial of an issue of quantum.

(2)The direction may be given at –

(a) a case management conference;

(b) the hearing of an application for summary judgment; or

(c) the trial of the claim or of an issue, including the issue of liability.

(3) On making such a direction the court must exercise the powers of a case management conference and in particular may give directions about –

(a) disclosure under Part 28;

(b) service of witness statements under Part 29; and

(c) service of expert reports under Part 32.

(4) The court must also fix –

(a) a date on which the court office is to send a listing questionnaire to the parties; and

(b) a period within which the assessment of damages is to commence.

- Rules 27.9 and 27.10 deal with listing questionnaires and the fixing of a date for trial.

**PART 1 7**

**Interim Remedies**

**Contents of this Part**

| | |
|---|---|
| Orders for interim remedies | Rule 17.1 |
| Time when an order for interim remedy may be made | Rule 17.2 |
| How to apply for interim remedy | Rule 17.3 |
| Interim injunctions and similar orders | Rule 17.4 |
| Interim payments – general procedure | Rule 17.5 |
| Interim payments – conditions to be satisfied and matters to be taken into account | Rule 17.6 |
| Powers of court where it has made order for interim payment | Rule 17.7 |
| Power of court to order early trial | Rule 17.8 |

**Orders for interim remedies**

17.1 (1) The court may grant interim remedies including-

    (a) an interim declaration;

    (b) an interim injunction;

    (c) an order authorising a person to enter any land or building in the possession of a party to the proceedings for the purposes of carrying out an order under sub-paragraph (h);

    (d) an order directing a party to prepare and file accounts relating to the dispute;

    (e) an order directing a party to provide information about the location of relevant property or assets or to provide information about relevant property or assets which are or may be the subject of an application for a freezing order;

    (f) an order for a specified fund to be paid into court or otherwise secured where there is a dispute over a party's right to the fund;

    (g) an order for interim costs;

    (h) an order for the –

        (i) carrying out of an experiment on or with relevant property;

        (ii) detention, custody or preservation of relevant property;

        (iii) inspection of relevant property;

        (iv) payment of income from relevant property until a claim is decided;

(v) sale of relevant property (including land) which is of a perishable nature or which for any other good reason it is desirable to sell quickly;

(vi) taking of a sample of relevant property;

(i) an order permitting a party seeking to recover personal property to pay a specified sum of money into court pending the outcome of the proceedings and directing that, if the party does so, the property must be given up to the party;

(j) an order (referred to as a **"freezing order")** restraining a party from –

(i) dealing with any asset whether located within the jurisdiction or not;

(ii) removing from the jurisdiction assets located there;

(k) an order to deliver up goods;

(l) an order (referred to as a **"search order"**) requiring a party to admit another party to premises for the purpose of preserving evidence, etc.;

(m) an order (referred to as an **"order for interim payment")** under rules 17.5 and 17.6 for payment by a defendant on account of any damages, debt or other sum which the Court may find the defendant liable to pay.

(2) In paragraph (1) (e) and (h), **"relevant property"** means property which is the subject of a claim or in relation to which any question may arise on a claim.

(3) The fact that a particular type of interim remedy is not listed in paragraph (1) does not affect any power that the court may have to grant that remedy.

(4) The court may grant an interim remedy whether or not there has been a claim for a final remedy of that kind.

(5) The Chief Justice may issue a practice direction as to the procedure for applying for an interim order including, in particular, interim injunctions, search orders and freezing orders.

## Time when an order for interim remedy may be made

17.2(1) An order for an interim remedy may be made at any time, including –

(a) after judgment has been given; or

   (b) before a claim has been made.

(2)Paragraph (1) is subject to any rule which provides otherwise.

(3) The court may grant an interim remedy before a claim has been made only if –

   (i) the matter is urgent; or

   (ii) it is otherwise necessary to do so in the interests of justice.

(4)  Unless the court otherwise orders, a defendant may not apply for any of the orders listed in rule 17.1(1) before filing an acknowledgment of service under Part 9.

(5)If the court grants an interim remedy before a claim has been issued, it must require an undertaking from the claimant to issue and serve a claim form by a specified date.

(6)If no claim has been issued the application must be made in accordance with the general rules about applications contained in Part 11.

## How to apply for interim remedy

17.3 (1) An application for an interim remedy must be supported by evidence on affidavit unless the court otherwise orders.

(1A) Where, in support of any application under this Rule, it is not practicable to produce evidence on affidavit then the application may be supported by evidence given by witness statement and, in due course, of evidence by affidavit.

(2)The court may grant an interim remedy on an application made without notice if it appears to the court that there are good reasons for not giving notice.

(3)The evidence in support of an application made without giving notice must state the reasons why notice has not been given.

## Interim injunctions and similar orders

17.4 (1) This rule deals with applications for —

    (a) a freezing order under rule 17.1 (1) (j);

    (b) a search order under rule 17.1(1) (1);

    (c) an interim injunction under rule 17.1(1) (b);

    (d) an order authorising a person to enter any land or building for the purpose of carrying out an order under paragraph (e); and

    (e) an order for the detention, custody or preservation of relevant property under rule 17.1(1) (h) (ii).

(2) Unless the court otherwise directs, a party applying for an interim order under this rule must undertake to abide by any order as to damages caused by the granting or extension of the order.

(3) An application for an interim order under this rule may in the first instance be made on 3 days notice to the respondent.

(4) The court may grant an interim order under this rule on an application made without notice for a period of not more than 28 days (unless any of these Rules permits a longer period) if it is satisfied that –

    (a) in a case of urgency no notice is possible; or

    (b) that to give notice would defeat the purpose of the application.

(5) On granting an order under paragraph (4) the court must –

    (a) fix a date for further consideration of the application; and

    (b) fix a date (which may be later than the date under paragraph (a)) on which the injunction will terminate unless a further order is made on the further consideration of the application.

(6) When an order is made under paragraph (4), the applicant must, not less than 7 days before the date fixed for further consideration of the application, serve the respondent personally with –

    (a) the application for an interim order;

    (b) the evidence on affidavit in support of the application;

    (c) any interim order made without notice; and

    (d) notice of the date and time on which the court will further consider the application.

(7) An application to extend an interim order under this rule must be made on notice to the
respondent unless the court otherwise orders.


## Interim payments – general procedure

17.5 (1) The claimant may not apply for an order for an interim payment before the end of the period for
entering an acknowledgment of service applicable to the defendant against whom the application
is made.
- Rule 9.3 sets out the period for filing an acknowledgment of service.


(2) The claimant may make more than one application for an order for an interim payment even
though an earlier application has been refused.


(3) Notice of an application for an order must be –
(a) served at least 14 days before the hearing of the application; and
(b) supported by evidence on affidavit.


(4) The affidavit must –
(a) exhibit any documentary evidence relied on by the claimant in support of the application;
(b) set out the grounds of the application;
(c) state the claimant's assessment of the amount of damages or other monetary judgment that are
likely to be awarded; and
(d) if the claim is made under any relevant enactment in respect of
injury resulting in death – contain full particulars of the –
(i) nature of the claim in respect of which the damages are sought to be recovered; and
(ii) person or persons for whom and on whose behalf the claim is brought.


(5) If the respondent to an application for an interim payment wishes to
rely on evidence or the claimant wishes to rely on evidence in reply, that party must –
(a) file the evidence on affidavit; and
(b) serve copies on every other party to the application;
at least 7 days before the hearing of the application.

(6)The court may order an interim payment to be made in one sum or by instalments.

# Interim payments – conditions to be satisfied and matters to be taken into account

17.6(1) The court may make an order for an interim payment only if –

   (a) the defendant against whom the order is sought has admitted liability to pay damages or some other sum of money to the claimant;

   (b) the claimant has obtained an order for an account to be taken as between the claimant and the defendant and for judgment for any amount certified due on taking the account;

   (c)the claimant has obtained judgment against that defendant for damages to be assessed or for a sum of money (including costs) to be assessed;

   (d)(except where paragraph (3) applies), it is satisfied that, if the claim went to trial, the claimant would obtain judgment against the defendant from whom an order for interim payment is sought for a substantial amount of money or for costs; or

   (e) the following conditions are satisfied –

      (i) the claimant is seeking an order for possession of land (whether or not any other order is also being sought); and

      (ii) the court is satisfied that, if the case went to trial, the defendant would be held liable (even if the claim for possession fails) to pay the claimant a sum of money for rent or for the defendant's use and occupation of the land while the claim for possession was pending.

(2) In addition, in a claim for personal injuries the court may make an order for the interim payment of damages only if the defendant is –

   (a) a person whose means and resources are such as to enable that person to make the interim payment;

   (b) insured in respect of the claim; or

   (c) a public authority.

(3) In a claim for damages for personal injuries where there are two or more defendants, the court may make an order for the interim payment of damages against any defendant if –

   (a)it is satisfied that, if the claim went to trial, the claimant would obtain judgment for substantial

damages against at least one of the defendants (even if the court has not yet determined which of them is liable); and

(b) paragraph (2) is satisfied in relation to each defendant.

(4) The court must not order an interim payment of more than a reasonable proportion of the likely amount of the final judgment.

(5)The court must take into account –

(a) contributory negligence (where applicable); and

(b) any relevant set-off or counterclaim.

## Powers of court where it has made order for interim payment

17.7 (1) If a defendant has been ordered to make an interim payment, or has voluntarily made an interim payment, the court may make an order to adjust the interim payment.

(2)The court may in particular –

(a) order a defendant to reimburse, either in whole or in part, another defendant who has made an interim payment;

(b)order all or part of the interim payment to be repaid; and

(c) vary or discharge the order for interim payment.

(3)The court may make an order under this rule –

(a) on an application by a party made at any time; or

(b) without an application by a party if it makes the order when it disposes of the claim or any part of it.

## Power of court to order early trial

17.8 On hearing any application under this Part, the court may exercise any of its case management powers under Parts 26 and 27 and may in particular give directions for an early trial of the claim or any part of  the claim.

PART 18

# Ancillary Claims

**Contents of this Part**

Meaning of ancillary claim                                                                 Rule 18. 1

Ancillary claim to be treated as claim for purposes of these Rules                         Rule 18.2

Defendant's claim for contribution or indemnity from co-defendant                          Rule 18.3

Procedure for making ancillary claim                                                       Rule 18.4

Service of ancillary claim form                                                            Rule 18.5

Counterclaim may survive claim                                                             Rule 18.6

Restrictions on right to make counterclaim or set-off in proceedings by or against Crown   Rule 18.7

Adding other defendants to counterclaim                                                    Rule 18.8

Defence to ancillary claim                                                                 Rule 18.9

Matters relevant to whether ancillary claim should be dealt with separately from main claim   Rule 18.10

Effect of service of ancillary claim form                                                  Rule 18.11

Special provisions relating to judgment on failure to file defence to ancillary claim      Rule 18.12

Procedural steps on service of ancillary claim form on person who is not a party           Rule 18.13

Case management where there is defence to ancillary claim                                  Rule 18.14

# Meaning of ancillary claim

18.1 (1) An **"ancillary claim"** is any claim other than a claim by a claimant against a defendant or a claim for a set off contained in a defence and includes a –

    (a) claim by a defendant against any person (whether or not already a party) for contribution or indemnity or some other remedy; and

    (b) claim by an ancillary defendant against any other person (whether or not already a party); and

    (c) counterclaim by a defendant against the claimant or against the claimant and some other person.

  (2) In this Part –

    **"ancillary claimant"** means a person who makes an ancillary claim; and

    **"ancillary defendant"** means the defendant to that claim.

(3) If an ancillary defendant makes an ancillary claim against a further person that person is to be called the **"second** (or as the case may be) **ancillary defendant"**.

## Ancillary claim to be treated as claim for purposes of these Rules

18.2 (1) An ancillary claim is to be treated as if it were a claim for the purposes of these Rules except as provided by this rule.

(2) Particulars of an ancillary claim must be contained in or served with the ancillary claim form in Form 9.

(3) An ancillary claim form must include –

(a) the ancillary claimant's address for service in accordance with rule 3.11; and

(b) a certificate of truth in accordance with rule 3.12.

(4) The following rules do not apply to ancillary claims –                                              -

(a) rules 8.12 and 8.13 (time within which a claim may be served);

(b) Part 12 (default judgments); and

(c) Part 14 (admissions) other than rule 14.1(1) and (2), 14.3 and

(5) If the ancillary claim is a counterclaim by the defendant against a claimant (with or without any other person) the claimant is not required to file an acknowledgment of service and therefore Part 9 (acknowledgment of service) does not apply to the claimant.

## Defendant's claim for contribution or indemnity from co-defendant

18.3 (1) A defendant who has filed an acknowledgment of service or a defence may make an ancillary claim for contribution or indemnity against another defendant by –

(a) filing a notice containing a statement of the nature and grounds of the claim; and

(b) serving the notice on the other defendants.

(2) Rule 18.4 does not apply to an ancillary claim under this rule.

- Part 9 deals with filing an acknowledgment of service.
- Part 10 deals with filing a defence.

## Procedure for making ancillary claim

18.4 (1) A defendant may make an ancillary claim (other than a claim falling within rule 18.3) without the court's permission if in –

    (a) the case of a counterclaim – it is filed with the defence; or

    (b) any other case – the ancillary claim form is filed before the case management conference.

(2) Where paragraph (1) does not apply an ancillary claim may be made only if the court gives permission.

(3) An application for permission under paragraph (2) may be made without notice unless the court directs otherwise.

(4) The applicant must attach to the application a draft of the proposed ancillary claim form and ancillary statement of claim.

(5) The court may give permission at the case management conference.

(6) The court may not give permission after the first case management conference to any person who was a party at the time of that conference unless it is satisfied that there has been a significant change in circumstances which became known after the case management conference.

(7) The ancillary claim is made in –

    (a) the case of a counterclaim – when it is filed; and

    (b) any other case – when the court issues the ancillary claim form.

## Service of ancillary claim form

18.5 (1) An ancillary claim which may be made without the court's permission must be served on the person against whom it is made within 14 days after the date the defendant files a defence.

(2) If the court gives permission to make an ancillary claim it must at the same time give directions as to the service of the ancillary claim form.

(3) A copy of the ancillary claim form and ancillary statement of claim (if any) must be served on all other parties.

## Counterclaim may survive claim

18.6 The defendant may continue a counterclaim if the –

    (a) court gives judgment on the claim for the claimant and does not dismiss the counterclaim; or

    (b) claim is stayed, discontinued or dismissed.

## Restrictions on right to make counterclaim or set-off in proceedings by or against the Crown

18.7 (1) A counterclaim may not be made or set-off pleaded in proceedings by the Crown if the –

    (a)  proceedings are for the recovery of; or

    (b)  counterclaim or set-off arises out of;

    a right or claim to repayment in respect of any tax, duty or penalty.

    (2) A counterclaim may not be made or set-off pleaded in any other proceedings by or against the Crown without the permission of the court or the consent of the Attorney General.

## Adding other defendants to counterclaim

18.8 (1) The defendant who alleges that another person as well as the claimant is liable on the counterclaim may add that other person as a defendant to the counterclaim.

    (2) If a person so added is not already a party, the defendant must add the person's name to the title of the claim as "defendant to the counterclaim".
- Rule 18.13 deals with the documents to be served on a defendant who is not already a party.

## Defence to ancillary claim

18.9(1) A person against whom an ancillary claim is made may file a defence.

    (2)The period for filing a defence is the period of 28 days after the date of service of the ancillary claim.

    (3) The Rules relating to a defence to a claim apply to a defence to an ancillary claim except Part 12 (default judgments).

(4) An ancillary defence must include –

    (a) a certificate of truth in accordance with rule 3.12; and

    (b) the ancillary defendant's address for service in accordance with rule 3.11.

## Matters relevant to question whether ancillary claim should be dealt with separately from main claim

18.10 (1) This rule applies when the court is considering whether to –

    (a) dismiss an ancillary claim;

    (b) permit an ancillary claim to be made; or

    (c) require the ancillary claim to be dealt with separately from the claim.

- Rules 26.1(d) and (e) deal with the court's power to decide the order in which issues are to be tried or to order that part of the proceedings be dealt with separately.

(2) The court must have regard to all the circumstances of the case including –

    (a) the connection between the ancillary claim and the claim;

    (b) whether the ancillary claimant is seeking substantially the same remedy which some other party is claiming from the ancillary claimant;

    (c) whether the ancillary claimant wants the court to decide any question connected with the subject matter of the proceedings –

        (i) not only between the existing parties but also between existing parties and the proposed ancillary claim defendant; or

        (ii) to which the proposed ancillary defendant is already a party but also in some further capacity; and

    (d) whether the facts in the ancillary claim are substantially the same, or closely connected with, the facts in the claim.

## Effect of service of ancillary claim form

18.11 (1) A person on whom an ancillary claim form (other than a counterclaim) is served becomes a party to the proceedings if that person is not already a party.

(2) When an ancillary claim form is served on an existing party for the purpose of requiring the court to decide a question against that party in a further capacity, that party also becomes a party in the further capacity specified in the notice.

**Special provisions relating to judgment on failure to file defence to ancillary claim**

18.12 (1)This rule applies if the party against whom an ancillary claim is made fails to file a defence in respect of the ancillary claim within the permitted time.

•Rule 18.9(2) deals with the time for filing a defence to an ancillary claim.

(2)The party against whom the ancillary claim is made –

(a) is deemed to admit the ancillary claim, and is bound by any judgment or decision in the main proceedings in so far as it is relevant to any matter arising in the ancillary claim;

(b) subject to paragraph (5), if judgment under Part 12 is given against the ancillary claimant – may apply to enter judgment in respect of the ancillary claim.

(3)Paragraph (2) does not apply in ancillary proceedings against the Crown unless the court gives permission.

(4)An application for the court's permission under paragraph (3) may be made without notice unless the court directs otherwise.

(5)The ancillary claimant may not enter judgment under paragraph (2) (b) if the ancillary claimant wishes to obtain judgment for any remedy other than a contribution or indemnity for a sum not exceeding that for which judgment has been entered against the ancillary claimant.

(6)The court may at any time set aside or vary a judgment entered under paragraph (2) if it is satisfied that the ancillary defendant –

(a) applied to set aside or vary the judgment as soon as reasonably practicable after finding out that judgment had been entered;

(b) gives a good explanation for the failure to file a defence; and

(c) has a real prospect of successfully defending the ancillary claim.

## Procedural steps on service of ancillary claim form on person who is not a party

18.13 An ancillary claimant who serves an ancillary claim form on a person who is not already a party must also serve on that person a copy of –

(a) every statement of case which has already been served in the proceedings; and

(b) such other documents as the court may direct.

## Case management where there is defence to ancillary claim

18.14(1) If a defence is filed to an ancillary claim the court must consider the future conduct of the proceedings and give appropriate directions.

(2) The court must fix a case management conference for all parties unless it is satisfied that such further directions as are required can be given in written form.

(3) In giving directions under this rule the court must ensure that, so far as is practicable, the ancillary claim and the main claim are managed together.

PART 19

# Addition and Substitution of Parties

**Contents of this Part**

| | |
|---|---|
| Scope of this Part | Rule 19.1 |
| Change of parties – general | Rule 19.2 |
| Procedure for adding and substituting parties | Rule 19.3 |
| Special provisions about adding or substituting parties after end of relevant limitation period | Rule 19.4 |

**Scope of this Part**

19.1 This Part deals with the addition or substitution of parties after proceedings have been commenced.

# Change of parties – general

19.2(1) A claimant may add a new defendant to proceedings without permission at any time before the case management conference.

(2) The claimant does so by filing at the court office an amended claim form and statement of claim, and Parts 5 (service of claim within jurisdiction), 7 (service of court process out of jurisdiction), 9 (acknowledgment of service and notice of intention to defend), 10 (defence) and 12 (default judgments) apply to the amended claim form as they do to a claim form.

   • Part 18 deals with counterclaims and the adding of additional parties by a defendant.

(3) The court may add a new party to proceedings without an application if –

   (a) it is desirable to add the new party so that the court can resolve all the matters in dispute in the proceedings; or

   (b) there is an issue involving the new party which is connected to the matters in dispute in the proceedings and it is desirable to add the new party so that the court can resolve that issue.

(4) The court may order any person to cease to be a party if it considers that it is not desirable for that person to be a party to the proceedings.

(5) The court may order a new party to be substituted for an existing one if the –

(a) court can resolve the matters in dispute more effectively by substituting the new party for the existing party; or

(b) existing party's interest or liability has passed to the new party.

(6) The court may add, remove or substitute a party at the case management conference.

(7) The court may not add a party (except by substitution) after the case management conference on the application of an existing party unless that party can satisfy the court that the addition is necessary because of some change in circumstances which became known after the case management conference.

## Procedure for adding and substituting parties

19.3 (1) The court may add, substitute or remove a party on or without an application.

(2) An application for permission to add, substitute or remove a party may be made by –

(a) an existing party; or

(b) a person who wishes to become a party.

(3) An application for an order under rule 19.2(5) (substitution of new party where existing party's interest or liability has passed) may be made without notice but must be supported by evidence on affidavit.

(4) A person may not be added or substituted as a claimant unless that person's written consent is filed with the court office.

(5) An order for the addition, substitution or removal of a party must be served on –

(a) all parties to the proceedings;

(b) any party added or substituted; and

(c) any other person affected by the order.

(6) If the court makes an order for the removal, addition or substitution of a party, it must consider whether to give consequential directions about –

(a) filing and serving the claim form and any statements of case on any new defendant;

(b) serving relevant documents on the new party; and

(c) the management of the proceedings; and subject to such directions, rule 19.2(2) applies.

(7) If the –

(a) court makes an order for the addition or substitution of a new defendant; and

(b) claim form is served on the new defendant;

these Rules apply to the new defendant as they apply to any other defendant.

## Special provisions about adding or substituting parties after end of relevant limitation period

19.4 (1) This rule applies to a change of parties after the end of a relevant limitation period.

(2) The court may add or substitute a party only if the –

(a) addition or substitution is necessary; and

(b) relevant limitation period was current when the proceedings were started.

(3) The addition or substitution of a party is necessary only if the court is satisfied that the –

(a) claim cannot properly be carried on by or against an existing party unless the new party is added or substituted as claimant or defendant;

(b) interest or liability of the former party has passed to the new party; or

(c) new party is to be substituted for a party who was named in the claim form in mistake for the new party.

PART 20

# Changes to Statements of Case

**Contents of this Part**

Changes to statement of case                                        Rule 20.1

Changes to statement of case after end of relevant limitation period    Rule 20.2

Filing an amended statement of case                                  Rule 20.3

Amendments to statements of case and time for service               Rule 20.4

**Changes to statement of case**

20.1 – (1)      A statement of case may be amended once, without the court's permission, at any time prior to the date fixed by the court for the first case management conference.

(2)  The court may give permission to amend a statement of case at a case management conference or at any time on an application to the court.

(3)  When considering an application to amend a statement of case pursuant to Rule 20.1(2), the factors to which the court must have regard are –

(a) how promptly the applicant has applied to the court after becoming aware that the change was one which he or she wished to make;

(b) the prejudice to the applicant if the application were refused;

(c) the prejudice to the other parties if the change were permitted;

(d) whether any prejudice to any other party can be compensated by the payment of costs and or interest;

(e) whether the trial date or any likely trial date can still be met if the application is granted; and

(f) the administration of justice.

(4)  A statement of case may  not be amended without permission under this Rule if the change is one to which any of the following applies –

(a) Rule 19.4 (special provisions about adding or substituting parties at the end of the relevant limitation period); and

(b) Rule 20.2 (changes to statement of case after the end of relevant period).

(5)  An amended statement of case must include a certificate of truth under Rule 3.12.

(6)  The Chief Justice may, by practice direction, set out the procedure for –

(i)  making an application to change a statement of case where the Court's permission is required;

(ii)  setting out changes to an amended statement of case.

*Rule 27.3(1) deals with the fixing of case management conference.

## Changes to statements of case after end of relevant limitation period

20.2 (1) This rule applies to a change in a statement of case after the end of a relevant limitation period.

(2) The court may allow an amendment the effect of which will be to add or substitute a new claim but only if the new claim arises out of the same or substantially the same facts as a claim in respect of which the party wishing to change the statement of case has already claimed a remedy in the proceedings.

(3) The court may allow an amendment to correct a mistake as to the name of a party but only where the mistake was –

(a) genuine; and

(b) not one which would in all the circumstances cause reasonable doubt as to the identity of the party in question.

(4) The court may allow an amendment to alter the capacity in which a party claims.

•Rule 19.4 specifies the circumstances in which the court may allow a new party to be added or substituted after the end of a relevant limitation period.

## Filing an amended statement of case

20.3 A party who amends his statement of case must file in the court office the original amended statement of case and one copy of the amended statement of case and, after filing, serve a copy of it on every other party.

**Amendments to statements of case and time for service**

20.4 – (1) Where an amended statement of claim is served on a defendant –

(a) the defendant, if he or she has already served a defence on the claimant, may file and serve an amended defence;

(b) the period for filing and serving an amended defence is the period of 28 days after the date of service of the amended statement of claim;

(c) if the defendant has not already served a defence on the claimant, the period for filing and serving a defence is the period of 28 days after the date of service of the amended statement of claim.

(2) Where an amended defence is served on the claimant by a defendant –

(a) the claimant, if he or she has already served a reply on that defendant, may amend his or her reply; and

(b) the period of service of his or her reply or amended reply, as the case may be, shall be 14 days after the amended defence is served on him or her.

(3) In paragraphs (1) and (2), references to a defence and a reply include references to a counterclaim and a defence to a counterclaim respectively.

(4) Where a party has filed a statement of case in answer to another statement of case which is subsequently amended and served on him or her under this rule, then, if that party does not amend his or her statement of case in accordance with this rule, he or she shall be taken to rely on it in answer to the amended statement of case.

(5) This rule shall apply *mutatis mutandis* to an amended ancillary claim.

PART 21

# Representative Parties

**Contents of this Part**

Representative claimants and defendants – general     Rule 21.1

Appointment of representative claimant or defendant – procedure     Rule 21.2

Consequence of order appointing representative party     Rule 21.3

Representation of persons who cannot be ascertained, etc. in proceedings about
       estates, trusts and construction of written instruments     Rule 21.4

Compromise in proceedings to which rule 21.4 applies     Rule 21.5

Representation of beneficiaries by trustees     Rule 21.6

Proceedings against estate of deceased person     Rule 21.7

Power of court to give directions to enable proceedings to be carried on after party's death     Rule 21.8

Power of court to strike out action after death of claimant     Rule 21.9

# Representative claimants and defendants – general

21.1 (1) This rule applies to any proceedings, other than proceedings falling within rule 21.4, in which 5 or more persons have the same or a similar interest.

(2) The court may appoint —

    (a) a body having a sufficient interest in the proceedings; or

    (b) one or more of those persons;

   to represent all or some of the persons with the same or similar interest.

(3) A representative under this rule may be either a claimant or a defendant.

# Appointment of representative claimant or defendant – procedure

21.2 (1) An application for an order appointing a representative party may be made at any time, including a time before proceedings have been started.

(2) An application for such an order may be made by any –

   (a) party;

   (b) person or body who wishes to be appointed as a representative party; or

   (c) person who is likely to be a party to proceedings.

(3) An application for such an order must –

   (a) be supported by affidavit evidence; and

   (b) identify every person to be represented, either

     (i) individually; or

     (ii) by description, if it is not practicable to identify a person individually.

(4) An application to appoint a representative defendant must be on notice to the claimant.

(5) An application to appoint a representative claimant may be made without notice.

(6) The court may direct that notice of an application be given to such other persons as it thinks fit.

(7) If the court directs that a person not already a party is to be a representative defendant, it must make an order adding that person as a defendant.

## Consequence of order appointing representative party

21.3 (1) If there is a representative claimant or defendant, an order of the court binds everyone whom that party represents.

(2) It may not however be enforced against a person not a party to the proceedings unless the person wishing to enforce it obtains permission from the court.

(3) An application for permission must be supported by evidence on affidavit and must be served on the person against whom it is wished to enforce the judgment.

## Representation of persons who cannot be ascertained, etc. in proceedings about estates, trusts and construction of written instruments

21.4 (1) This rule applies only to proceedings about –

(a) the construction of a written instrument;

(b) the estate of someone who is deceased; or

(c) property subject to a trust.

(2) The court may appoint one or more persons to represent any person or class of persons (including an unborn person or persons) who is or may be interested in or affected by the proceedings (whether presently or for any future, contingent or unascertained interest) where –

(a) the person, or the class or some member of it, cannot be ascertained or cannot readily be ascertained;

(b) the person, or the class or some member of it, though ascertained cannot be found; or

(c) it is expedient to do so for any other reason.

(3) An application for an order to appoint a representative party under this rule may be made by any –

(a) party; or

(b) person who wishes to be appointed as a representative party.

(4) A representative appointed under this rule may be either a claimant or a defendant.

(5) A decision of the court binds everyone whom a representative claimant or representative defendant represents.

## Compromise in proceedings to which rule 21.4 applies

21.5 (1) If –

(a) a compromise is proposed in proceedings to which rule 21.4 applies;

(b) some of the persons who are interested in, or who may be affected by the compromise are not parties to the proceedings;

(c) those persons are represented by a representative appointed under rule 21.4 when the court considers the proposed compromise; and

(d) the court is satisfied that the compromise will be for the benefit of the absent persons;

the court may approve the compromise.

(2)The persons for whose benefit the court may approve a compromise may be unborn or unascertained.

(3) The court's order approving the compromise binds the absent persons
unless it has been obtained by fraud or non-disclosure of material facts.

## Representation of beneficiaries by trustees

21.6 (1) A claim may be made by or against a person in that person's capacity as a trustee, executor or administrator.

(2)If a claim is so made, there is no need for a beneficiary also to be a party.

(3)The court may direct that notice of the proceedings be given to any beneficiary.

(4)A decision of the court in such proceedings binds a beneficiary unless the court otherwise orders.

(5)The only grounds for an order that a decision is not binding on a beneficiary is that the trustee, executor or administrator –
(a) could not or did not in fact, represent the interest of the beneficiary; or
(b) has acted fraudulently.

## Proceedings against estate of deceased person

21.7 (1) If in any proceedings it appears that a deceased person was interested in the proceedings but the deceased person has no personal representatives, the court may make an order appointing someone to represent the deceased person's estate for the purpose of the proceedings

(2)A person may be appointed as a representative if that person –
(a) can fairly and competently conduct proceedings on behalf of the estate; and
(b) has no interest adverse to that of the estate;
of the deceased person.

(3)The court may make such an order on or without an application.

(4)Until the court has appointed someone to represent the deceased person's estate, the claimant may take no step in the proceedings apart from applying for an order to have a representative appointed under this rule.

(5) A decision in proceedings in which the court has appointed a representative under this rule binds the estate to the same extent as if the person appointed were an executor or administrator of the deceased person's estate.

## Power of court to give directions to enable proceedings to be carried on after party's death

21.8 (1) If a party to proceedings dies, the court may give directions to enable the proceedings to be carried on.

(2)An order under this rule may be made on or without an application.

## Power of court to strike out claim after death of claimant

21.9 (1) If a claimant dies and the claimant's personal representatives do not apply for an order under rule 19.3 to be substituted as claimants, the defendant may apply for the claim to be struck out.

(2)Notice of the application must be given to the personal representatives of the claimant (if any) and such other persons as the court directs.

(3)The general rule is that if the court makes an order on an application under this rule it will be that unless the personal representatives or some other persons on behalf of the estate apply to be substituted under rule 19.3 or for directions under rule 21.8 by a specified date, the claim is to be struck out.

(4)The court may give directions under rule 21.8 at the hearing of an application under this rule.

PART 22

# Miscellaneous Rules about Parties

**Contents of this Part**

| | |
|---|---|
| Partners | Rule 22.1 |
| Person carrying on business in another name | Rule 22.2 |
| Bodies corporate | Rule 22.3 |

# Partners

22.1 (1) Persons claiming to be entitled, or alleged to be liable as partners may sue or be sued in the firm's name if –

    (a) the firm's name is the name of the firm in which they were partners; and

    (b) they carried on business in that name within the jurisdiction, when the right to claim arose.

(2) If partners sue or are sued in the firm's name, they must, if any other party so demands in writing, immediately –

    (a) deliver to that party; and

    (b) file;

    a statement of the names and residential addresses of all the persons who were partners in the firm when the right to claim arose.

(3) If they do not comply, the court on application by any other party may order them to provide such a statement and to certify it to the court.

(4) An application under paragraph (3) may be made without notice.

(5) The party making the application must –

    (a) certify that the other party has not complied;

    (b) certify that the party has made a demand in writing; and

    (c) state the date of the demand.

(6) If the partners do not comply within 21 days after service of the order any claim or defence brought by them is deemed to be struck out.

•Rule 26.5 deals with the procedure for striking out a statement of case.

(7)A duly authorised employee of a partnership or firm may –

(a)  conduct proceedings on behalf of the partnership or firm; or

(b)  represent it in court with the court's permission.

(8)Permission under paragraph (7) (b) is to be given or refused at a case management conference.

•Rule 43.9 deals with enforcement of a judgment against a partnership or by a firm against one of its members.

## Person carrying on business in another name

22.2 (1) A claim may be made by or against a person

(a) carrying on business within the jurisdiction; or

(b) who was carrying on business within the jurisdiction when the right to claim arose –

(i) in that person's own name;

(ii) in that person's own name, followed by the words "trading as X.Y.";

(iii) as "X.Y." followed by the words "a trading name"; or

(iv) as "X.Y." followed by the words "a firm".

(2)  If a claim is made by or against a person in his or her business name, the Rules about claims by or against partners apply as if that person had been a partner in a firm when the right to claim arose and the business name were the firm's name.

## Bodies corporate

22.3 (1) Subject to any statutory provision to the contrary, a duly authorised director or other officer of a body corporate may conduct proceedings on its behalf.

(2) A body corporate must be represented by a legal practitioner at any hearing in open court unless the court permits it to be represented by a duly authorised director or other officer.

(3) Permission to represent the body corporate at the trial should wherever practicable be sought at a case management conference or pre-trial review.

(4) In considering whether to give permission the court must take into account all the circumstances including the complexity of the case.

(7) In paragraphs (1) and (2) –

"**duly authorised**" means authorised by the body corporate to conduct the proceedings on its behalf.

PART 23
# Minors and Patients

**Contents of this Part**

| | |
|---|---|
| Scope of this Part | Rule 23.1 |
| Requirement of next friend in proceedings by or against minors or patients | Rule 23.2 |
| Stage of proceedings at which next friend becomes necessary | Rule 23.3 |
| Who may be minor's next friend | Rule 23.4 |
| Who may be patient's next friend | Rule 23.5 |
| Conditions for being next friend | Rule 23.6 |
| How person becomes next friend without court order | Rule 23.7 |
| How person becomes next friend by court order | Rule 23.8 |
| Court's power to terminate appointment of and substitute next friend | Rule 23.9 |
| Appointment of next friend by court order – supplementary | Rule 23.10 |
| Procedure where appointment as next friend ceases | Rule 23.11 |
| Compromise, etc. on behalf of minor or patient | Rule 23.12 |
| Control of money recovered by or on behalf of minor or patient | Rule 23.13 |

# Scope of this Part

23.1(1) This Part –

(a) contains special provisions which apply in proceedings involving minors and patients; and

(b) sets out how a person becomes a minor's or patient's next friend.

• Rule 5.10 contains provisions about the service of documents on minors and patients.

• Rule 14.3 contains restrictions on entering judgment on an admission where a party is a minor or patient

(2)In this Part –

**"Act"** means any relevant enactment relating to Mental Health and in St. Lucia includes the relevant provisions of the Civil Code (Cap. 242).

## Requirement of next friend in proceedings by or against minors or patients

23.2 (1) The general rule is that a minor or patient must have a next friend to conduct proceedings on his or her behalf.

(2)The court may, on the application of a minor, make an order permitting the minor to conduct proceedings without a next friend.

(3)An application for an order under paragraph (2) –

   (a) may be made by the minor;

   (b) if the minor has a next friend – must be on notice to that next friend; and

   (c) if there is no next friend – may be made without notice.

(4) If –

   (a) the court has made an order under paragraph (2); and

   (b) it subsequently appears to the court that it is desirable for a next friend to conduct the proceedings on behalf of the minor;

   the court may appoint a person to be the minor's next friend.

(5) A next friend must act by a legal practitioner unless the court otherwise orders.

(6)The next friend must sign any certificate of truth under rule 3.12 on behalf of the minor or patient.

## Stage of proceedings at which next friend becomes necessary

23.3 (1) A minor or patient must have a next friend in order to issue a claim except where the court has made an order under rule 23.2(2).

(2)A person may not –

   (a) make any application against a minor or patient before proceedings have started; or

   (b) take any step in proceedings except –

(i) applying for the appointment of a next friend under rule 23.8, until the minor or patient has a next friend; or

(ii) issuing and serving a claim form against a minor or patient.

(3) If a person other than a minor becomes a patient during proceedings, any party may not take any step in the proceedings apart from applying to the court for the appointment of a next friend until the patient has a next friend.

(4) Any step other than an application under –

(a) rule 23.2(2); or

(b) paragraph (2)(b);

taken before a minor or patient has a next friend is of no effect unless the court otherwise orders.

## Who may be minor's next friend

23.4 (1) A person who satisfies the conditions set out in rule 23.6 may act as a minor's next friend without a court order, unless the court –

(a) has already appointed a next friend; or

(b) makes or has made an order under rule 23.9 (court's power to terminate appointment of and substitute next friend).

(2) In Saint Lucia the curator appointed under the Civil Code (Cap. 242) is to act as the next friend of a minor unless the court otherwise orders.

## Who may be patient's next friend

23.5 (1) Unless the court appoints some other person, a person authorised under the Act to conduct legal proceedings in the name of the patient or on the patient's behalf is entitled to be the next friend of the patient in any proceedings to which the authority extends.

(2) Where nobody has been appointed by the court or authorised under the Act, a person who satisfies the conditions set out in rule 23.6 may be a patient's next friend without a court order.

(3)In Saint Lucia the curator appointed under the Civil Code (Cap. 242) is to act as the next friend of a patient unless the court otherwise orders.

## Conditions for being next friend

23.6 A person may act as a next friend if that person –

    (a) can fairly and competently conduct proceedings on behalf of the minor or patient; and

    (b) has no interest adverse to that of the minor or patient.

## How person becomes next friend without court order

23.7 (1)Where the court has not appointed a next friend, a person who wishes to act as next friend must follow the procedure set out in this rule.

(2)A person authorised under the Act must file an official copy of the order or other document which constitutes that person's authorisation to act.

(3)Any other person must file a certificate that that person satisfies the conditions specified in rule 23.6.

(4)A person who is to act as a next friend for a claimant must file the –

    (a) authorisation; or

    (b) certificate under paragraph (3);

    at the time when the claim is made.

(5)A person who is to act as a next friend for a defendant must file the –

    (a) authorisation; or

    (b) certificate under paragraph (3);

    at the time when the next friend first takes a step in the proceedings on behalf of the defendant.

(6)The next friend must –

    (a) serve a copy of the certificate under paragraph (3) on every person on whom in accordance with rule 5.10 (service on minors and patients) the claim form should be served; and

(b) file an affidavit of service.

## How person becomes next friend by court order

23.8 (1) The court may make an order appointing a next friend with or without an application.

(2) An application for an order appointing a next friend may be made by a –

    (a) party; or

    (b) person;

who wishes to be a next friend.

(3) If –

    (a) a person makes a claim against a minor or patient;

    (b) the minor or patient has no next friend; and

    (c) either –

        (i) someone who is not entitled to be a next friend files a defence; or

        (ii) the claimant wishes to take some step in the proceedings;

the claimant must apply to the court for an order appointing a next friend for the minor or patient.

(4) An application for an order appointing a next friend must be supported by evidence on affidavit.

(5) The court may not appoint a next friend under this rule unless it is satisfied that the person to be appointed complies with the conditions specified in rule 23.6.

## Court's power to terminate appointment of and substitute next friend

23.9 (1) The court may –

    (a) appoint a new next friend in substitution for an existing one;

    (b) direct that a person may not act as a next friend; or

    (c) terminate a next friend's authority to act.

(2) The court may make an order under paragraph (1) with or without an application.

(3) An application for an order under paragraph (1) must be supported by evidence on affidavit.

(4) The court may not appoint a next friend under this rule unless it is satisfied that the person to be appointed complies with the conditions specified in rule 23.6.

## Appointment of next friend by court order – supplementary

23.10 (1) An application for an order under rule 23.8 or 23.9 must be served on every person on whom, in accordance with rule 5.10 (service on minors or patients) the claim form should have been served.

(2) An application for an order under rule 23.9 (courts power to terminate appointment of and substitute next friend) must also be served on the person who –

(a) is or purports to act as next friend; and

(b) it is proposed should act as next friend if that person is not the applicant.

(3) On an application for an order under rule 23.8 or 23.9, the court may appoint the person proposed or any other person.

## Procedure where appointment as next friend ceases

23.11 (1) The appointment of a minor's next friend ceases when a minor who is not a patient reaches the age of majority.

(2) When a party, other than a minor, ceases to be a patient during the course of proceedings, the next friend's appointment continues until it is ended by court order.

(3) An application for an order under paragraph (2) maybe made by –

(a) a party; and

(b) the former patient; or

(c) the next friend;

must be supported by evidence on affidavit.

(4)The minor or patient in respect of whom the appointment to act has

ceased must serve notice on the other parties –

(a) giving an address for service;

(b) stating that the appointment of the next friend has ceased; and

(c)stating whether or not he or she chooses to carry on the proceedings.


(5) If the notice is not served within 28 days after the appointment of the next friend ceases the court may, on application, strike out any claim or defence brought or filed by the minor or patient.


(6)The liability of a next friend for costs continues until the –

(a) minor or patient serves the notice referred to in paragraph (4); or

(b) next friend serves notice on the other parties that the appointment has ceased.


## Compromise, etc. by or on behalf of minor or patient

23.12(1) If a claim is made –

(a) against a minor or patient; or

(b) by or on behalf of a minor or patient;

any settlement, compromise or payment and any acceptance of money is not valid, so far as it relates to the claim by, on behalf of, or against the minor or patient, without the approval of the court.


(2) If –

(a) before proceedings in which a claim is to be made by or on half of a minor or patient (whether alone or with any other person) are begun, an agreement is reached for the settlement of the claim; and

(b) the sole purpose of proceedings on that claim is to obtain the approval of the court to a settlement or compromise of the claim; the claim may be made by a fixed date claim form (Form 2) which may -

(i) be issued jointly by the claimant and defendant; and

(ii) include a request to the court for approval of the settlement.

## Control of money recovered by or on behalf of minor or patient

23.13(1) If, in any proceedings money –

    (a) is recovered by or on behalf of or for the benefit of a minor or patient; or

    (b) paid into court is accepted by or on behalf of a minor or patient; that money must be dealt with in accordance with directions given by the court under this rule and not otherwise.

    (2) Directions given under this rule may provide that the money must be wholly or partly paid into court and invested or otherwise dealt with.

**PART 24**

# Security for Costs

**Contents of this Part**

| | |
|---|---|
| Scope of this Part | Rule 24.1 |
| Application for order for security for costs | Rule 24.2 |
| Conditions to be satisfied | Rule 24.3 |
| Security for costs against counter-claiming defendant | Rule 24.4 |
| Enforcing order for security for costs | Rule 24.5 |

# Scope of this Part

24.1 This Part deals with the power of the court to require a claimant to give security for the costs of the defendant.

- Additional provision is made in relevant enactments relating to limited companies for security to be ordered against an insolvent claimant company.

# Application for order for security for costs

24.2 (1) A defendant in any proceedings may apply for an order requiring the claimant to give security for the defendant's costs of the proceedings.

(2) Where practicable such an application must be made at a case management conference or pre-trial review.

(3) An application for security for costs must be supported by evidence on affidavit.

(4) The amount and nature of the security shall be such as the court thinks fit.

# Conditions to be satisfied

24.3 The court may make an order for security for costs under rule 24.2 against a claimant only if it is satisfied, having regard to all the circumstances of the case, that it is just to make such an order, and

that –

(a) some person other than the claimant has contributed or agreed to contribute to the claimant's costs in return for a share of any money or property which the claimant may recover;

(b) the claimant –

  (i) failed to give his or her address in the claim form;

  (ii) gave an incorrect address in the claim form; or

  (iii) has changed his or her address since the claim was commenced;

    with a view to evading the consequences of the litigation;

(c) the claimant has taken steps with a view to placing the claimant's assets beyond the jurisdiction of the court;

(d) the claimant is acting as a nominal claimant, other than as a representative claimant under Part 21, and there is reason to believe that the claimant will be unable to pay the defendant's costs if ordered to do so;

(e) the claimant is an assignee of the right to claim and the assignment has been made with a view to avoiding the possibility of a costs order against the assignor;

(f) the claimant is an external company; or

(g) the claimant is ordinarily resident out of the jurisdiction.

## Security for costs against counter-claiming defendant

24.4 Rules 24.2 and 24.3 apply where a defendant makes a counterclaim as if references in those rules –

  (a) to a claimant – were references to a defendant making a counterclaim;

  (b) to a defendant – were references to a claimant defending a counterclaim.

## Enforcing order for security for costs

24.5 On making an order for security for costs the court must also order that –

  (a) the claim (or counterclaim) be stayed until such time as security for costs is provided in accordance with the terms of the order;

(b) if security is not provided in accordance with the terms of the order by a specified date, the

claim (or counterclaim) be struck out

PART 25

# Case Management –The Objective

**Contents of this Part**

Court's duty to actively manage cases        Rule 25.1

# Court's duty to actively manage cases

25.1 The court must further the overriding objective by actively managing cases. This may include –

(a) actively encouraging and assisting parties to settle the whole or part of their case on terms that are fair to each party;

(b) considering whether the likely benefits of taking a particular step will justify the cost of taking it;

(c) dealing with as many aspects of the case as is practicable on the same occasion;

(d) dealing with as many aspects of the case, as it appears appropriate to do, without requiring the parties to attend court;

(e) deciding promptly which issues need full investigation and trial and accordingly disposing summarily of the others;

(f) deciding the order in which issues are to be resolved;

(g) encouraging the parties to co-operate with each other in the conduct of proceedings;

(h) encouraging the parties to use any appropriate form of dispute resolution including, in particular, mediation, if the court considers it appropriate and facilitating the use of such procedures;

(i) ensuring that no party gains an unfair advantage by reason of that party's failure to give full disclosure of all relevant facts prior to the trial or the hearing of any application;

(j) fixing timetables or otherwise controlling the progress of the case;

(k) giving directions to ensure that the trial of the case proceeds quickly and efficiently;

(1) identifying the issues at an early stage; and

(m) making appropriate use of technology.

• Part 1 sets out the overriding objective.

PART 26

## Case Management –The Court's Powers

Court's general powers of management                                          Rule 26.1

Courts power to make orders of its own initiative                             Rule 26.2

Sanctions - striking out statement of case                                    Rule 26.3

Court's general power to strike out statement of case                         Rule 26.4

Judgment without trial after striking out                                     Rule 26.5

Setting aside judgment after striking out                                     Rule 26.6

Court's powers in cases of failure to comply with rules, etc.                 Rule 26.7

Relief from sanctions                                                         Rule 26.8

General power of court to rectify matters where there has been a procedural error    Rule 26.9

## Court's general powers of management

26.1 (1) The list of powers in this rule is in addition to any powers given to the court by any other rule, practice directions or any enactment.

(2) Except where these rules provide otherwise, the court may –

(a) adjourn or bring forward a hearing to a specific date;

(b) consolidate proceedings;

(c) deal with a matter without the attendance of any of the parties;

(d) decide the order in which issues are to be tried;

(e) direct a separate trial of any issue;

(f) direct that any evidence be given in written form;

(g) direct that notice of any proceedings or application be given to any person;

(h) direct that part of any proceedings (such as a counterclaim or other ancillary claim) be dealt with as separate proceedings;

(i) dismiss or give judgment on a claim after a decision on a preliminary issue;

(j) exclude an issue from determination if the court can do substantive justice between the parties on the other issues and determines it would therefore serve no worthwhile purpose;

(k) extend or shorten the time for compliance with any rule, practice direction, order or direction of the court even if the application for an extension is made after the time for compliance has passed;

(1) give the conduct of any matter to any person it thinks fit and make any appropriate consequential order about costs;

(m) hold a hearing and receive evidence by telephone or use any other method of direct oral communication;

(n) instead of holding an oral hearing deal with a matter on written representations submitted by the parties;

(o) require any party or a party's legal practitioner to attend the court;

(p) require the maker of an affidavit or witness statement to attend for cross-examination;

(q) stay the whole or part of any proceedings generally or until a specified date or event;

(r) transfer proceedings to the Family Court or the District or Magistrate's Court;

(s) transfer the whole or any part of any proceedings to another court office from the court office of one Member State, Territory or circuit;

(t) try two or more claims on the same occasion;

(u) where there is a substantial inequality in the proven financial position of each party, order any party having the greater financial resources who applies for an order to pay the other party's costs of complying with the order in any event;

(v) where two or more parties are represented by the same legal practitioner –

    (i) direct that they be separately represented;

    (ii) if necessary, adjourn any hearing to a fixed date to enable separate representation to be arranged; and

    (iii) make any consequential order as to costs thrown away; and

(w) take any other step, give any other direction, or make any other order for the purpose of managing the case and furthering the overriding objective.

(3) When the court makes an order or gives a direction, it may make the order or direction subject to conditions.

(4) The conditions which the court may impose include a condition –

    (a) requiring a party to give an undertaking;

    (b) requiring a party to give security;

    (c) requiring a party to pay all or part of the costs of the proceedings;

(d) requiring the payment of money into court or as the court may direct; and

(e) that a party permit entry to property owned or occupied by that party to another party or someone acting on behalf of another party.

(5) In considering whether to make an order, the court may take into account whether a party is prepared to give an undertaking.

(6) In special circumstances on the application of a party the court may dispense with compliance with any of these rules.

## Court's power to make orders of its own initiative

26.2 (1) Except where a rule or other enactment provides otherwise, the court may exercise its powers on an application or of its own initiative.

(2) If the court proposes to make an order of its own initiative, it must give any party likely to be affected a reasonable opportunity to make representations.

(3) The opportunity may be to make representations orally, in writing, telephonically or by any other means as the court considers reasonable.

(4) If the court proposes to –

(a) make an order of its own initiative; and

(b) hold a hearing to decide whether to do so;

the court office must give each party likely to be affected by the order at least 7 days' notice of the date, time and place of the hearing.

## Sanctions – striking out statement of case

26.3(1) In addition to any other power under these Rules, the court may strike out a statement of case or part of a statement of case if it appears to the court that –

(a) there has been a failure to comply with a rule, practice direction, order or direction given by the court in the proceedings

(b) the statement of case or the part to be struck out does not disclose any reasonable ground for bringing or defending a claim;

(c) the statement of case or the part to be struck out is an abuse of the process of the court or is likely to obstruct the just disposal of the proceedings; or

(d) the statement of case or the part to be struck out is prolix or does not comply with the requirements of Part 8 or 10.

(2)If –

(a) the court has struck out a claimant's statement of case;

(b) the claimant is ordered to pay costs to the defendant; and

(c) before those costs are paid, the claimant starts a similar claim against the same defendant based on substantially the same facts;

the court may on the application of the defendant stay the subsequent claim until the costs of the first claim have been paid.


## Court's general power to strike out statement of case

26.4 (1) If a party has failed to comply with any of these rules or any court order in respect of which no sanction for non-compliance has been imposed, any other party may apply to the court for an "unless order".

(2)Such an application may be made without notice but must be supported by evidence on affidavit which –

(a) contains a certificate that the other party is in default;

(b) identifies the rule or order which has not been complied with; and

(c) states the nature of the breach.

(3)The court office must refer any such application immediately to a judge, master or registrar who may –

(a)grant the application;

(b) direct that an appointment be fixed to consider the application

and that the court office give to all parties notice of the date, time and place for such appointment; or

(c) seek the views of the other party.

(4)If an appointment is fixed the court must give 7 days notice of the date, time and place of the appointment to all parties.

(5)An "unless order" must identify the breach and require the party in default to remedy the default by a specified date.

(6) The general rule is that the respondent should be ordered to pay the assessed costs of such an application.

(7)If the defaulting party fails to comply with the terms of any "unless order" made by the court that party's statement of case shall be struck out.

(8)Rule 26.9 (general power of the court to rectify matters where there has been a procedural error) shall not apply.

• Rule 11.16 deals with applications to set aside any order made on an application made without notice.

## Judgment without trial after striking out

26.5 (1) This rule applies where the court makes an order which includes a term that the statement of case of a party be struck out if the party does not comply with the "unless order" by the specified date.

(2)If the party against whom the order was made does not comply with the order, any other party may ask for judgment to be entered and for prescribed costs appropriate to the stage that the proceedings have reached.

(3)A party may obtain judgment under this rule by filing a request for judgment.

(4)The request must –

(i) certify that the right to enter judgment has arisen because the court's order was not complied with;

(ii) prove service of the "unless order"; and

(iii) state the facts which entitle the party to judgment.

(5) If the party wishing to obtain judgment is the claimant and the claim is for –

    (a) an amount of money to be decided by the court;

    (b) a specified sum of money;

    (c) delivery of goods and the claim form gives the defendant the alternative of paying their value; or

    (d) any combination of these remedies;

judgment must be in accordance with the terms of the statement of claim plus any interest and costs after giving credit for any payment that may have been made.

(6) If the party wishing to obtain judgment is the claimant and the claim is for some other remedy, the judgment must be such as the court considers that the claimant is entitled to.

(7) If the party wishing to obtain judgment is a defendant, judgment must be for assessed costs.

(8) If a decision of the court is necessary in order to decide the terms of the judgment, the party making the request must apply for directions.

- Part 65 deals with the quantification of costs.

## Setting aside judgment entered after striking out

26.6(1) A party against whom the court has entered judgment under rule 26.5 when the right to enter judgment had not arisen may apply to the court to set it aside.

(2) If the right to enter judgment had not arisen at the time when judgment was entered, the court must set aside judgment.

(3) If the application to set aside is made for any other reason, rule 26.8 (relief from sanctions)
applies.


## Court's powers in cases of failure to comply with rules, etc.

26.7 (1) If the court makes an order or gives directions, the court must whenever practicable also specify
the consequences of failure to comply.


(2) If a party has failed to comply with any of these rules, a direction or any order, any sanction for
non-compliance imposed by the rule, direction or the order has effect unless the party in default
applies for and obtains relief from the sanction, and rule 26.9 does not apply.


(3) If a rule, practice direction or order –
(a) requires a party to do something by a specified date; and
(b) specifies the consequences of failure to comply;
the time for doing the act in question may not be extended by agreement between the parties.


### Procedural default costs

(4) In circumstances where –

(a)  a pre-trial memorandum or a bundle is not filed in accordance with Rule 39.1(5);

(b)  a core bundle is not filed in accordance with Rule 62.12(4); or

(c)  a legal practitioner fails to comply with a provision of these Rules, a court order, a
practice direction or a practice guide,

and, as a result of that default, a party has incurred costs or a hearing has to be vacated, then the
court may on its own initiative order the practitioner responsible to pay to any party and or to the
court an amount of money which does not exceed the sum or sums specified by the relevant
practice direction.


(5) Any sum paid under an order made under Rule 26.7(4) may be payable in addition to any sum
which the court may order a practitioner to pay by way of wasted costs under Rule 64.8 or
pay under Rule 64.10.

## Relief from sanctions

26.8 (1) An application for relief from any sanction imposed for a failure to comply with any rule, order or direction must be –

   (a) made promptly; and

   (b) supported by evidence on affidavit.

(2)The court may grant relief only if it is satisfied that –

   (a) the failure to comply was not intentional;

   (b) there is a good explanation for the failure; and

   (c)the party in default has generally complied with all other relevant rules, practice directions, orders and directions.

(3) In considering whether to grant relief, the court must have regard to –

   (a) the effect which the granting of relief or not would have on each party;

   (b) the interests of the administration of justice;

   (c) whether the failure to comply has been or can be remedied within a reasonable time;

   (d) whether the failure to comply was due to the party or the party's legal practitioner; and

   (e) whether the trial date or any likely trial date can still be met if relief is granted.

(4)  The court may not order the respondent to pay the applicant's costs in relation to any application for relief unless exceptional circumstances are shown.

## General power of court to rectify matters where there has been a procedural error

26.9 (1)This rule applies only where the consequence of failure to comply with a rule, practice direction, court order or direction has not been specified by any rule, practice direction or court order.

(2)An error of procedure or failure to comply with a rule, practice direction, court order or direction does not invalidate any step taken in the proceedings, unless the court so orders.

 (3)If there has been an error of procedure or failure to comply with a rule, practice direction, court

order or direction, the court may make an order to put matters right.

(4)The court may make such an order on or without an application by a party.

PART 27

# Case Management Conferences – Procedure

**Contents of this Port**

Scope of this Part                                                                      Rule 27.1

Fixed date claims – first hearing                                                       Rule 27.2

Case management conference                                                              Rule 27.3

Attendance at case management conference or pre-trial review                            Rule 27.4

Orders to be made at case management conference                                         Rule 27.5

Dispensing with case management conference in simple and urgent proceedings  Rule 27.6

Adjournment of case management conference                                               Rule 27.7

Variation of case management timetable                                                  Rule 27.8

Listing questionnaire                                                                   Rule 27. 9

Fixing trial date                                                                       Rule 27. 10

# Scope of this Part

27.1 This Part deals with the procedures by which the court will manage cases.

# Fixed date claims – first hearing

27.2 (1) When a fixed date claim is issued the court must fix a date for the first hearing of the claim.

(2) On that hearing, in addition to any other powers that the court may have, the court shall have all the powers of a case management conference.

(3) The court may, however, treat the first hearing as the trial of the claim if it is not defended or it considers that the claim can be dealt with summarily.

(4)The general rule is that the court must give at least 14 days notice of any first hearing.

5

(5)The general rule is subject to any rule or statutory provision which specifies a different period.

(6)The court may on or without an application direct that shorter notice be given –

   (a)  if the parties agree; or

   (b) in urgent cases.

(7)Unless the defendant files an acknowledgement of service the claimant must file evidence on affidavit of service of the claim form and the relevant documents specified in rule 5.2(3) at least 7 days before the first hearing.

## Case management conference

27.3 (1) The general rule is that the court office must fix a case management conference immediately upon the filing of a defence to a claim other than a fixed date claim.

(2)If the defendant files a defence and also an admission of a specified sum of money, the case management conference is not to be fixed until the claimant gives notice under rule 14.7(3) that the claim is to continue.

(3)The case management conference must take place not less than 4 weeks nor more than 8 weeks after the defence is filed (or notice is given under rule 14.7(3)) unless any rule or practice direction prescribes a shorter or longer period or the case is urgent.

(4)Notwithstanding paragraph (3) a party may apply to the court to fix a case management conference before a defence is filed.

(5)The application may be without notice but must state the reasons for the application.

(6)The court office must give all parties not less than 14 days notice of the date, time and place of the case management conference.

(7)The court may with or without an application direct that shorter notice be given –

(a) if the parties agree; or

(b)  in urgent cases.

## Attendance at case management conference or pre-trial review

27.4 (1) If a party is represented by a legal practitioner, that legal practitioner or another legal practitioner who is authorised to negotiate on behalf of the client and competent to deal with the case must attend the case management conference and any pre-trial review.

(2) The general rule is that the party or a person who is in a position to represent the interests of the party (other than the legal practitioner) must attend the case management conference or pre-trial review.

(3) The court may dispense with the attendance of a party or representative (other than a legal practitioner).

(4) If the case management conference or pre-trial review is not attended by the legal practitioner and the party or a representative, the court may adjourn the case management conference or pre-trial review to a fixed date and may exercise any of its powers under Part 26 (case management – the court's powers) or Part 64 (costs – general).

## Orders to be made at case management conference

27.5 (1) The general rule is that at a case management conference the court must consider whether to give directions for –

(a) service of experts' reports (if any);

(b) service of witness statements; and

(c)  standard disclosure and inspection;

by dates fixed by the court.

(2) The court may also give directions for the preparation of an agreed statement –

(a) as to any relevant specialist area of law;

(b) of facts;

(c) of issues; and

(d) of the basic technical, scientific or medical matters in issue;

which statement does not bind the trial judge.

(3) The court must fix a date for a pre-trial review unless it is satisfied that
having regard to the value, importance and complexity of the case it
may be dealt with justly without a pre-trial review.

(4) The court must in any event fix the –

(a) date on which a listing questionnaire is to be sent by the court office to the parties; and

(b) period within which the trial is to commence; or

(c) trial date.

(5) The court office must serve an order containing the directions made on all
parties and give notice of the –

(a) date of any pre-trial review;

(b) date on which the listing questionnaire is to be sent out by the court office; and

(c) trial date or trial period.

## Dispensing with case management conference in simple or urgent proceedings

27.6 (1) The court may, of its own volition or on the application of a party, make an order dispensing with
a case management conference if it is satisfied that the –
(a) case can be dealt with justly without a case management conference;
(b) case should be dealt with as a matter of urgency; or
(c) cost of a case management conference is disproportionate to the value of the proceedings or
the benefits that might be achieved from a case management conference.

(2) If the court dispenses with a case management conference, it must at
the same time –

(a) fix a trial date or the period within which the trial is to take place;

(b) give directions in writing about the preparation of the case; and

(c) set a timetable for the steps to be taken before the date of trial.


(3) If the court dispenses with a case management conference, it may

(a)  dispense with a listing questionnaire under rule 27.9;

(b) dispense with all or any of the requirements relating to the

preparation and filing of bundles of documents under rule 39.1;

(c) dispense with a pre-trial review under Part 38; and

(d) give any other direction that will assist in the speedy and just trial of the claim, including any

direction that might be given under Part 38.


## Adjournment of case management conference


27.7 (1)  The court may not adjourn a case management conference without fixing a new date, time and

place for the adjourned case management conference.


(2)If the court is satisfied that the parties are –

(a)  attending, or have arranged to attend, a form of ADR procedure;

or

(b)  in the process of negotiating, or are likely to negotiate a settlement;

the court may adjourn the case management conference to a suitable date, time and place to

enable negotiations or the ADR procedure to continue.


(3) If the case management conference is adjourned under paragraph (2) each party must notify the

court office promptly if the claim is settled.


(4)The court may give directions as to the preparation of the case for trial if the case management

conference is adjourned.

(5) So far as practicable any adjourned case management conference and procedural application made prior to a pre-trial review must be heard and determined by the judge, master or registrar who conducted the first case management conference.

## Variation of case management timetable

27.8 (1) A party must apply to the court if that party wishes to vary a date which the court has fixed for –

   (a) a case management conference;

   (b) a party to do something where the order specifies the consequences of failure to comply;

   (c) a pre-trial review;

   (d) the return of a listing questionnaire; or

   (e) the trial date or trial period.

(2)Any date set by the court or these rules for doing any act may not be varied by the parties if the variation would make it necessary to vary any of the dates mentioned in paragraph (1).

(3) A party seeking to vary any other date in the timetable without the agreement of the other parties must apply to the court, and the general rule is that the party must do so before that date.

   • Rule 42.7 deals with consent orders.

(4) A party who applies after that date must apply for –

   (a) an extension of time; and

   (b) relief from any sanction to which the party has become subject

   under these Rules or any court order.

   •   Rule 26.8 provides for applications for relief from sanctions.

(5)The parties may agree to vary a date in the timetable other than one mentioned in paragraph (1) or (2).

(6) Where the parties so agree, they must –

   (a) file a consent application for an order to that effect; and

   (b) certify on that application that the variation agreed will not affect

      the date fixed for the trial or, if no date has been fixed, the period

in which the trial is to commence;

and the timetable is accordingly varied unless the court directs otherwise.


## Listing questionnaire

27.9 (1) The court office must send the parties a listing questionnaire in Form 10 on the date fixed under rule 27.5(4) (a).

(2) Each party must file the completed listing questionnaire at the court office within the period of 21 days after the date on which it is served on that party.

(3) If –
   (a) a party fails to –
      (i) give all the information requested by the listing questionnaire; or
      (ii) return the completed questionnaire to the court office within the period of 21 days; or
   (b) the court considers that a hearing is necessary to enable it to decide what directions to give in order to complete the preparation of the case;
      the court office may fix a listing appointment and direct any or all of the parties to attend the listing hearing.

(4) The court office must give all parties at least 7 days notice of the date, time and place of the listing hearing.

(5) Any party at fault must attend the listing hearing.

(6) At the listing hearing the court must –
   (a) give any directions which maybe needed to complete the preparation of the case for trial without any adjournment of the trial; and

(b) if the listing appointment has been fixed under paragraph (3) (a) –

make a wasted costs order unless there is a special reason why it should not make such an order.

(7) Apart from the requirement to complete a listing questionnaire the court may at any time require the parties to answer a questionnaire to assist it in the management of the case.


## Fixing trial date

27.10  (1) As soon as practicable after –

(a) each party has returned a completed listing questionnaire to the court office; or

(b) the court has held a listing hearing under rule 27.9(3);

the court office must fix the date of the trial (or, if it has already done so, confirm that date) and notify the parties.

(2) The general rule is that the court office must give the parties at least 8 weeks' notice of the date of the trial.

(3) The court may however give shorter notice –

(a) if the parties agree; or

(b) in urgent cases.

PART 28

# Disclosure and Inspection of Documents

### Contents of this Part

Scope of this Part                                                                                    Rule 28.1

Duty of disclosure limited to documents which are or have been in party's control    Rule 28.2

Disclosure of copies                                                                                  Rule 28.3

Standard disclosure                                                                                   Rule 28.4

Specific disclosure                                                                                   Rule 28.5

Criteria for ordering specific disclosure                                                       Rule 28.6

Procedure for disclosure                                                                            Rule 28. 7

Duty of legal practitioner                                                                           Rule 28. 8

Requirement for maker to certify understanding of the duty of disclosure          Rule 28.9

Disclosure in stages                                                                                  Rule 28.10

Inspection and copying of listed documents                                                  Rule 28.11

Duty of disclosure continuous during proceedings                                         Rule 28.12

Consequence of failure to disclose documents under order for disclosure          Rule 28.13

Claim of right to withhold disclosure or inspection document                          Rule 28.14

Restriction on use of a privileged document inspection of which has been inadvertently allowed    Rule 28.15

Documents referred to in statements of case, etc.                                          Rule 28.16

Subsequent use of disclosed documents                                                        Rule 28.17

Notice to prove document                                                                           Rule 28.18

## Scope of this Part

28.1 (1) This Part sets out rules about the disclosure and inspection of documents.

(2) In this Part –

"**copy**", in relation to a document, means anything onto which information recorded in the document has been copied, by whatever means and whether directly or indirectly; and

"**document**" means anything on or in which information of any description is recorded.

(3) A party "**discloses**" a document by revealing that the document exists or has existed.

(4) For the purposes of this Part a document is "**directly relevant**" if –

    (a) the party with control of the document intends to rely on it;

    (b)  it tends to adversely affect that party's case; or

    (c) it tends to support another party's case; but

the rule of law known as "the rule in Peruvian Guano" does not apply.

## Duty of disclosure limited to documents which are or have been in party's control

28.2 (1) A party's duty to disclose documents is limited to documents which are or have been in the control of that party.

    (2) For this purpose a party has or has had control of a document if –

    (a)  it is or was in the physical possession of the party;

    (b)  the party has or has had a right to inspect or take copies of it; or

    (c) the party has or has had a right to possession of it.

## Disclosure of copies

28.3 (1) Except where required by paragraph (2), a party need not disclose more than one copy of a document.

    (2) A party must however disclose a copy if it contains a modification, obliteration or other marking or feature which is not present in the original or any copy of the document which is being disclosed.

## Standard disclosure

28.4 If a party is required by any direction of the court to give standard disclosure, that party must disclose all documents which are directly relevant to the matters in question in the proceedings.

## Specific disclosure

28.5 (1) An order for specific disclosure is an order that a party must do one or more of the following things –

(a) disclose documents or classes of documents specified in the order;

(b) carry out a search for documents to the extent stated in the order;

(c) disclose any document located as a result of that search.

(2) An order for specific disclosure may be made on or without an application.

(3) An application for specific disclosure may be made without notice at a case management conference.

(4) An application for specific disclosure may identify documents –

(a) by describing the class to which they belong; or

(b) in any other manner.

(5) An order for specific disclosure may require disclosure only of documents which are directly relevant to one or more matters in issue in the proceedings.

## Criteria for ordering specific disclosure

28.6 (1) When deciding whether to make an order for specific disclosure, the court must consider whether specific disclosure is necessary in order to dispose fairly of the claim or to save costs.

(2) The court must have regard to –

(a) the likely benefits of specific disclosure;

(b) the likely cost of specific disclosure; and

(c) whether it is satisfied that the financial resources of the party against whom the order would be made are likely to be sufficient to enable that party to comply with any such order.

(3) If, having regard to paragraph (2) (c), the court would otherwise refuse to make an order for specific disclosure, it may nonetheless make such an order on terms that the party seeking the order must pay the other party's costs of such disclosure in any event.

(4)If the court makes an order under paragraph (3), it must assess the costs to be paid in accordance with rule 65.12.

(5) The party in whose favour such order for costs was made may apply to vary the amount of costs so assessed.

## Procedure for disclosure

28.7 (1) Paragraphs (2) to (5) set out the procedure for disclosure.

(2) Each party must make, and serve on every other party, a list of documents in Form 11.

(3) The list must identify the documents or categories of documents in a convenient order and manner and as concisely as possible.

(4)The list must state –

   (a) what documents are no longer in the party's control;

   (b) what has happened to those documents; and

   (c) where each such document then is, to the best of the party's knowledge, information or belief.

(5) The list must include documents already disclosed.

(6) A list of documents served by a company, firm, association or other organisation must –

   (a) state the name and position of the person responsible for identifying individuals who might be aware of any document which should be disclosed; and

   (b) identify those individuals who have been asked whether they are aware of any such documents and state the position of those individuals.

## Duty of legal practitioner

28.8 The legal practitioner for a party must –

   (a) explain to the maker of the list of documents the –

      (i) necessity of making full disclosure in accordance with the terms of the order for disclosure and these Rules; and

(ii) possible consequences of failing to do so; and

(b) certify on the list of documents under rule 28.7(2) that the explanation required by sub-paragraph

(a) has been given.


## Requirement for maker to certify understanding of duty of disclosure

28.9 (1) The maker of the list of documents must certify in the list of documents that –

(a) the maker understands the duty of disclosure; and

(b) to the best of the knowledge of the maker the duty has been carried out.

(2) In the case of a list served on behalf of a company, firm, association or other organisation the certificate referred to in paragraph (1) must be made by the person identified in rule 28.7(6) (a).

(3) If it is impracticable for the maker of the list of documents to sign the certificate required by paragraph (1), it may be given by that person's legal practitioner.

(4) A certificate given by the legal practitioner must also certify –

(a) that the certificate is given on the instructions of the maker; and

(b) the reasons why it is impractical for the maker of the list of documents to give the certificate.


## Disclosure in stages

28.10 The parties may agree in writing or the court may direct that disclosure or inspection or both may take place in stages.


## Inspection and copying of listed documents

28.11(1) When a party has served a list of documents on any other party, that party has a right to inspect any document on the list, except documents –

(a) for which a right to withhold from disclosure is claimed; or

(b) which are no longer in the physical possession of the party who served the list.

(2) The party wishing to inspect the documents must give the party who served the list written notice

of the wish to inspect documents in the list.

(3) The party who is to give inspection must permit inspection not more than 7 days after the date
on which the notice is received.

(4) If the party giving the notice undertakes to pay the reasonable cost of copying, the party who
served the list must supply the other with a copy of each document requested not more than 7
days after the date on which the notice was received.

## Duty of disclosure continuous during proceedings

28.12 (1) The duty of disclosure in accordance with any order for standard or specific disclosure
continues until the proceedings are concluded

(2) If documents to which that duty extends come to a party's notice at any time during the
proceedings, that party must immediately notify every other party and serve a supplemental list of
those documents.

(3) The supplemental list must be served not more than 14 days after the documents to which that
duty extends have come to the notice of the party required to serve it.

## Consequence of failure to disclose documents under order for disclosure

28.13 (1) A party who fails to give disclosure by the date ordered, or to permit inspection, may not rely on
or produce at the trial any document not so disclosed or made available for inspection.

(2) A party seeking to enforce an order for disclosure may apply to the court for an order that the
other party's statement of case or some part of it be struck out.

(3) An application under paragraph (2) relating to an order for specific disclosure may be made
without notice but must be supported by evidence on affidavit that the other party has not
complied with the order.

(4) On an application under paragraph (2) the court may order that unless the party in default complies with the order for disclosure by a specific date that party's statement of case or some part of it be struck out.

 •Rule 11.16 deals with applications to set aside order made on application without notice.

 •Rule 26.5 deals with judgment without trial after striking out.

 •Rule 26.8 deals with relief from sanctions.

## Claim of right to withhold disclosure or inspection of document

28.14 (1) A person who claims a right to withhold disclosure or inspection of a document or part of a document must –

 (a) make such claim for the document; and

 (b) state the grounds on which such a right is claimed;

 in the list or otherwise in writing to the person wishing to inspect the document.

(2) A person may however apply to the court, without notice, for an order permitting that person not to disclose the existence of a document on the ground that disclosure of the existence of the document would damage the public interest.

 (3) A person who applies under paragraph (2) must –

 (a) identify the document, documents or parts thereof for which a right to withhold disclosure is claimed; and

 (b) give evidence on affidavit showing –

 (i) that the applicant has a right or duty to withhold disclosure; and

 (ii) the grounds on which the right on duty is claimed.

 (4) Unless the court orders otherwise, an order of the court under paragraph (2) is not to be –

 (a) open for inspection by; nor

 (b) served on;

 any person.

(5) person who does not agree with a claim of right to withhold inspection or disclosure of a document may apply to the court for an order that the document be disclosed or made available for inspection.

(6) On hearing such an application the court must make an order that the document be disclosed unless it is satisfied that there is a right to withhold disclosure.

(7) If a person –
- (a) applies for an order permitting that person not to disclose the existence of a document or part of a document; or
- (b) claims a right to withhold inspection;
  the court may require the person to produce that document to the court to enable it to decide whether the claim is justified.

(8) On considering any application under this rule, the court may invite any person to make representations on the question of whether the document ought to be withheld.

## Restrictions on use of a privileged document inspection of which has been inadvertently allowed

28.15 If a party inadvertently allows a privileged document to be inspected, the party who has inspected it may use it only with the –
- (a)  agreement of the party disclosing the document; or
- (b) permission of the court.

## Documents referred to in statements of case, etc.

28.16 (1) A party may inspect and copy a document mentioned in –
- (a) an affidavit;
- (b) an expert's report;
- (c) a statement of case;
- (d) a witness statement or summary; or
- (e) the claim form.

(2) A party who wishes to inspect and copy such a document must give written notice to the party who, or whose witness, mentioned the document.

(3) The party to whom the notice is given must comply with the notice not more than 7 days after the date on which the notice is served.

## Subsequent use of disclosed documents

28.17 (1) A party to whom a document has been disclosed may use the document only for the purpose of the proceedings in which it is disclosed, unless –

> (a) the document has been read to or by the court, or referred to, in open court; or

> (b) (i) the party disclosing the document and the person to whom the document belongs; or

> (ii) the court;

> gives permission.

(2) The court may make an order restricting or prohibiting the use of a document which has been disclosed, even where the document has been read to or by the court, or referred to in open court.

(3) An application for such an order may be made by any –

> (a) party; or

> (b) person to whom the document belongs.

## Notice to prove document

28.18 (1) A party shall be deemed to admit the authenticity of any document disclosed to that party under this Part unless that party serves notice that the documents must be proved at trial.

(2) A notice to prove a document must be served not less than 42 days before the trial.

PART 29

# Evidence

**Contents of this Part**

Power of court to control evidence                                                   Rule 29.1

Evidence at trial – general rule                                                     Rule 29.2

Evidence by video link or other means                                                Rule 29.3

Requirement to serve witness statements                                              Rule 29.4

Form of witness statements                                                           Rule 29.5

Witness summaries                                                                    Rule 29.6

Procedure where one party does not serve witness statement by date directed          Rule 29.7

Witness to give evidence unless court otherwise orders                               Rule 29.8

Amplifying witness statements at trial                                               Rule 29.9

Cross-examination on witness statement                                               Rule 29.10

Consequence of failure to serve witness statement or summary                         Rule 29.11

Use of witness statement for other purposes                                          Rule 29.12

Notice to admit facts                                                                Rule 29.13

## Power of court to control evidence

29.1 The court may control the evidence to be given at any trial or hearing by giving appropriate

directions, at a case management conference or by other means, as to the –

(a) issues on which it requires evidence; and

(b) way in which any matter is to be proved.

## Evidence at trial – general rule

29.2   (1) The general rule is that any fact which needs to be proved by evidence of witnesses is to be

proved at –

(a) trial – by their oral evidence given in public; and

(b) any other hearing – by affidavit.

(2) The general rule is subject to any –

(a) order of the court; and

(b) provision to the contrary contained in these Rules or elsewhere.

(3) Any evidence taken at the trial or other hearing of any proceedings may be used subsequently in those proceedings.
   • Part 30 deals with affidavits.

## Evidence by video link or other means

29.3    The court may allow a witness to give evidence without being present in the courtroom, through a video link or by any other means.

## Requirement to serve witness statements

29.4 (1) The court may order a party to serve on any other party a statement of the evidence of any witness upon which the first party intends to rely in relation to any issue of fact to be decided at the trial.

(2) A statement of the evidence referred to in paragraph (1) is known as a "**witness statement**".

(3) A party's obligation to serve a witness statement is independent of any other party's obligation to serve such a statement.
   • Rule 29.7 provides a procedure that may be adopted when one party does not serve witness statements by the date directed.

(4) The court may give directions as to –
   (a) the order in which witness statements are to be served; and
   (b) when they are to be filed.

## Form of witness statements

29.5    (1) A witness statement must –
   (a) be dated;
   (b) be signed or otherwise authenticated by the intended witness;
   (c) give the name, address and occupation of the witness;
   (d) include a statement by the intended witness that he or she believes the statements of fact in it to be true;

(e) not include any matters of information or belief which are not admissible or, where admissible, must state the source of any matters of information or belief;

(f) so far as reasonably practicable, be in the intended witness' own words; and

(g) sufficiently identify any document to which the statement refers without repeating its contents unless this is necessary in order to identify the document.

(2) The court may order that any inadmissible, scandalous, irrelevant or otherwise oppressive matter be struck out of any witness statement.

## Witness summaries

29.6 (1) A party who is required to provide and is not able to obtain a witness statement may serve a witness summary instead.

(2) The party who serves a witness summary must certify on the witness summary the reason why a witness statement could not be obtained.

(3) A "**witness summary**" is a summary of the –
  (a) evidence, so far as is known, which would otherwise be included in a witness statement; or
  (b) matters about which the party serving the witness summary proposes to question the witness, if the evidence is not known.

(4) Unless the court orders otherwise, a witness summary must include the name and address of the intended witness or other sufficient means of identifying the intended witness.

(5) A witness summary must be served within the period in which a witness statement would have had to be served.

(6) Where a party provides a witness summary, so far as practicable, rules 29.4 (requirement to serve witness statements), 29.7 (procedure where one party does not serve witness statements by date directed), 29.8 (witness to give evidence unless court otherwise orders) and 29.9 (amplifying witness statements at trial) apply to the witness summary.

## Procedure where one party does not serve witness statement by date directed

29.7 (1) This rule applies where –

    (a)  one party (the "first party") is able and prepared to comply with the order to serve witness statements; and

    (b)  the other party fails to make reasonable arrangements to exchange statements.

  (2) The first party may comply with the requirements of this Part by  -

    (a) filing the witness statements In a sealed envelope at the court office by the date directed; and

    (b) giving notice to all other parties that the witness statements have been filed.

  (3) Statements filed pursuant to paragraph (2) must not be disclosed to the other party until the other party certifies that the witness statements or summaries in respect of all witnesses upon whose evidence the other party intends to rely have been served.

## Witness to give evidence unless court otherwise orders

29.8 (1) If a party –

    (a) has served a witness statement or summary; and

    (b) wishes to rely on the evidence of that witness;

    that party must call the witness to give evidence unless the court orders otherwise.

  (2) If a party –

    (a) has served a witness statement or summary; and

    (b) does not intend to call that witness at the trial;

    that party must give notice to that effect to the other parties not less than 28 days before the trial.

## Amplifying witness statements at trial

29.9 A witness giving oral evidence may with the permission of the court –

    (a) amplify the evidence as set out in his or her witness statement if that statement has disclosed the substance of the evidence which the witness is asked to amplify;

(b) give evidence in relation to new matters which have arisen since the witness statement was
served on the other parties; or

(c) comment on evidence given by other witnesses.

## Cross-examination on witness statement

29.10 If a witness is called to give evidence at trial, that witness may be cross examined on the evidence
as set out in his or her witness statement, whether or not the statement or any part of it was referred
to during the witness' evidence in chief.

## Consequence of failure to serve witness statement or summary

29.11 (1) If a witness statement or witness summary is not served in respect of an intended witness within
the time specified by the court, the witness may not be called unless the court permits.

(2) The court may not give permission at the trial unless the party asking for permission has a good
reason for not previously seeking relief under rule 26.8.

## Use of witness statement for other purposes

29.12 (1) Except as provided by this rule, a witness statement may be used only for the purpose of the
proceedings in which it is served.

(2) Paragraph (1) does not apply if and to the extent that the –
(a) court gives permission for some other use of it;
(b) witness gives consent in writing to some other use of it; or
(c) witness statement has been put in evidence.

## Notice to admit facts

29.13 (1) A party may serve notice on another party requiring that other party to admit the facts or the
part of the first party's case specified in the notice.

(2) A notice to admit facts must be served no later than 42 days before the trial.

(3) If the other party makes any admission in response to the notice to admit facts, the admission may be used against that party only –
    (a) by the party who served the notice; and
    (b) in the proceedings in which the notice is served.

(4) If the party served with the notice to admit does not admit the facts set out in the notice within 21 days of service of the notice upon that party, the court may assess the costs incurred by the party serving the notice in proving such facts and order the party served with the notice to pay such costs.
    •Rule 65.11 deals with assessment of costs.

PART 30

# Affidavits

**Contents of this Part**

| | |
|---|---|
| Affidavit evidence | Rule 30.1 |
| Form of affidavits | Rule 30.2 |
| Contents of affidavits | Rule 30.3 |
| Documents to be used in conjunction with affidavits | Rule 30.4 |
| Making of affidavits | Rule 30.5 |
| Service of affidavits | Rule 30.6 |

# Affidavit evidence

30.1 (1) The court may require evidence to be given by affidavit instead of, or in addition to oral evidence.

(2) In this Part –
   "**deponent**" means the maker of an affidavit.

(3) Whenever an affidavit is to be used in evidence, any party may apply to the court for an order requiring the deponent to attend to be cross-examined.

(4) Such an application must be made not less than in the case of –
   (a) a trial – 21 days; or
   (b) any other hearing – 7 days;
      before the date of the hearing at which it is intended to cross-examine the deponent.

(5) If the deponent does not attend as required by the court order, the affidavit may not be used as evidence unless the court permits.

(6) The general rule is that an affidavit must be filed before it may be used in any proceedings.

(7) In a case of urgency the court may make an order on an affidavit which 5 has not been filed if the party tendering it undertakes to file it.

## Form of affidavits

30.2 Every affidavit must –

   (a) be headed with the title of the proceedings;

   (b) be divided into paragraphs numbered consecutively;

   (c) be in the first person and state the name, address and occupation of the deponent and, if more than one, of each of them;

   (d) be marked on the top right hand corner of the affidavit (and of the backsheet) with –

      (i) the name of the party on whose behalf it is filed;

      (ii) the initials and surname of the deponent;

      (iii) (where the deponent swears more than one affidavit in any proceedings), the number of the affidavit in relation to the deponent;

      (iv) the identifying reference of each exhibit referred to in the affidavit;

      (v) the date when sworn; and

      (vi) the date when filed;

   (**Example**

   "Claimant: N. Berridge: 2nd: NB 3 and 4:1.10.98: 3.10.98.") and

   (e) state if any deponent is employed by a party to the proceedings.

## Contents of affidavits

30.3 (1) The general rule is that an affidavit may contain only such facts as the deponent is able to prove from his or her own knowledge.

   (2) An affidavit may contain statements of information and belief –

   (a) if any of these Rules so allows; and

   (b) if the affidavit is for use in an application for summary judgment  under Part 15 or any procedural or interlocutory application, provided that the affidavit indicates –

      (i) which of the statements in it are made from the deponent's own knowledge and which are matters of information or belief; and

      (ii) the source of any matters of information and belief.

(3) The court may order that any scandalous, irrelevant or otherwise oppressive matter be struck out of any affidavit.

(4) An affidavit containing any alteration may not be used in evidence unless all such alterations have been initialed both by the deponent and the person before whom the affidavit is sworn.

## Documents to be used in conjunction with affidavits

30.4 (1) Any document to be used in conjunction with an affidavit must be exhibited with it.

(2) If there is more than one such document those documents may be included in a bundle which is arranged chronologically or in some other convenient order and is properly paginated.

(3) Clearly legible photocopies of original documents may be exhibited, provided that the originals are made available for inspection by the other parties before the hearing and by the court at the hearing.

(4) Each exhibit or bundle of exhibits must be —
    (a) produced to and verified by the deponent;
    (b) accurately identified by an endorsement on the exhibit or on a certificate attached to it signed by the person before whom the affidavit is sworn or affirmed; and
    (c)  marked in accordance with rule 30.2(d).

## Making of affidavits

30.5 (1) An affidavit must –
    (a) be signed by all deponents;
    (b) be sworn or affirmed by each deponent;
    (c) be completed and signed by the person before whom the affidavit is sworn or affirmed; and
    (d) contain the full name, address and qualifications of the person before whom it is sworn or affirmed.

(2) The statement authenticating the affidavit ("the jurat") must follow immediately from the text and not be on a separate page.

(3) An affidavit may not be admitted into evidence if sworn or affirmed before the legal practitioner of the party on whose behalf it is to be used or before any agent, partner, employee or associate of such legal practitioner.

(4) If it appears that the deponent is illiterate or blind, the person before whom the affidavit is sworn or affirmed must certify in the jurat that the –

   (a) affidavit was read to the deponent by him or her in his or her presence;

   (b) deponent appeared to understand it; and

   (c) deponent signed or made his or her mark in his or her presence.

(5) A person may make an affidavit outside the jurisdiction in accordance with –

   (a) the law of the place where the affidavit is made; or

   (b) this Part.

(6) Any affidavit which purports to have been sworn or affirmed in accordance with the law and procedure of any place outside the jurisdiction is presumed to have been so sworn.

## Service of affidavits

30.6 (1) The general rule is that a party who is giving evidence by affidavit must serve a copy of the affidavit on every other party.

(2) The general rule applies whether the affidavit was made in the proceedings or in some other proceedings.

(3) The general rule does not apply if the affidavit is being used in support of an application that may be made without notice.

PART 31

# Miscellaneous Rules about Evidence

**Contents of this Part**

Use of plans, photographs, etc. as evidence          Rule31.1

Evidence on questions of foreign law          Rule 31.2

Evidence of consent of trustee to act          Rule 31.3

# Use of plans, photographs, etc. as evidence

31.1 (1) A party who intends to rely at a trial on evidence which is not –

(a) to be given orally; and

(b) contained in a witness statement, affidavit or expert report; must disclose that intention to the other parties in accordance with this rule.

(2) If a party fails to disclose the intention to rely on the evidence as required by this rule, the evidence may not be given.

(3) Subject to paragraphs (4) and (5) a party who intends to use the evidence referred to in paragraph (1) to prove any fact must disclose such intention not later than the latest date for serving witness statements.

(4) If –

(a) there is no order for service of witness statements; or

(b) a party intends to put in the evidence referred to in paragraph (1) solely in order to disprove an allegation made in a witness statement;
that party must disclose the evidence at least 21 days before the hearing at which it is proposed to put in the evidence.

(5) If the evidence referred to in paragraph (1) forms part of expert evidence, the intention to put in the evidence must be disclosed when the expert's report is served on the other party.

(6) If a party has disclosed the intention to put in the evidence referred to in paragraph (1), that party must give every other party an opportunity to inspect the evidence and to agree to its admission without proof.

## Evidence on questions of foreign law

31.2    (1) This rule sets out the procedure which must be followed by a party who intends to adduce evidence on a question of foreign law.

(2) A party who intends to adduce evidence on a question of foreign law must first give every other party notice of that intention.

(3) Notice under paragraph (2) must be given not less than 42 days before the hearing at which the party proposes to adduce the evidence.

(4) The notice must –
  (a) have attached a document which forms the basis of the evidence;
      and
  (b) specify the question on which the evidence is to be adduced.

## Evidence of consent of trustee to act

31.3    A document purporting to contain the written consent of a person to act as trustee and to bear that person's signature verified by some other person is evidence of such consent.

Part 32

# Experts and Assessor

**Contents of this Part**

Scope of this Part                                                          Rule 32.1

General duty of court and of parties                                        Rule 32.2

Expert's overriding duty to court                                           Rule 32.3

Way in which expert's duty to court is to be carried out                    Rule 32.4

Expert's right to apply to court for directions                             Rule 32.5

Court's power to restrict expert evidence                                   Rule 32.6

General requirement for expert evidence to be given in written report       Rule 32.7

Written questions to experts                                                Rule 32.8

Court's power to direct evidence by single expert                           Rule 32.9

Cross-examination of court appointed expert                                 Rule 32.10

Instructions to single expert                                               Rule 32.11

Power of court to direct party to provide expert report                     Rule 32.12

Expert's reports to be addressed to court                                   Rule 32.13

Contents of report                                                          Rule 32.14

Meeting of experts                                                          Rule 32.15

Consequence of failure to disclose expert's report                         Rule 32.16

Appointment of assessor                                                     Rule 32.17

## Scope of this Part

32.1 (1) This Part deals with the provision of expert evidence to assist the court.

(2) In this Part –

"**expert witness**" means an expert who has been instructed to prepare

or give evidence for the purpose of court proceedings.

## General duty of court and of parties

32.2  Expert evidence must be restricted to that which is reasonably required to resolve the proceedings

justly.

## Expert's overriding duty to court

32.3 (1) It is the duty of an expert witness to help the court impartially on the matters relevant to his or her expertise.

(2) This duty overrides any obligation to the person by whom he or she is instructed or paid.

## Way in which expert's duty to court is to be carried out

32.4 (1) Expert evidence presented to the court must be, and should be seen to be, the independent product of the expert uninfluenced as to form or content by the demands of the litigation.

(2) An expert witness must provide independent assistance to the court by way of objective, unbiased opinion in relation to matters within the witness' expertise.

(3) An expert witness must state the facts or assumptions upon which his or her opinion is based, and must consider and include any material fact which could detract from his or her conclusion.

(4) An expert witness must state if a particular matter or issue falls outside his or her expertise.

(5) If the opinion of an expert witness is not properly researched then this must be stated with an indication that the opinion is no more than a provisional one.

(6) If an expert witness cannot assert that his or her report contains the truth, the whole truth and nothing but the truth without some qualification, that qualification must be stated in the report.

(7) If after service of a report, an expert witness changes his or her opinion on a material matter, that change of opinion must be communicated to all parties.

## Expert's right to apply to court for directions

32.5 (1) An expert witness may apply in writing to the court for directions to assist him or her in carrying out his or her functions and duty to the court as an expert witness.

(2) An expert witness who applies for directions under paragraph (1) need not give notice of the application to any party.

(3) The court may direct that –
    (a) notice of an application under paragraph (1) be given to any party; or
    (b) a copy of the application and any directions given be sent to any party.

## Court's power to restrict expert evidence

32.6 (1) A party may not call an expert witness or put in the report of an expert witness without the court's permission.

(2) The general rule is that the court's permission is to be given at a case management conference.

(3) When a party applies for permission under this rule –
    (a) that party must name the expert witness and identify the nature of his or her expertise; and
    (b) any permission granted shall be in relation to that expert witness only.

(4) The oral or written expert witness' evidence may not be called or put in unless the party wishing to call or put in that evidence has served a report of the evidence which the expert witness intends to give.

(5) The court must direct by what date the report must be served.

(6) The court may direct that part only of an expert witness' report be disclosed.

## General requirement for expert evidence to be given in written report

32.7 (1) Expert evidence is to be given in a written report unless the court directs otherwise.

(2) This rule is subject to any enactment restricting the use of "hearsay evidence".

## Written questions to experts

32.8 (1) A party may put written questions to an expert witness instructed by another party or jointly about his or her report.

(2) Written questions under paragraph (1) –

    (a) may be put once only;

    (b) must be put within 28 days of service of that expert witness' report; and

    (c) must only be in order to clarify the report; unless –

        (i) the court permits; or

        (ii) the other party agrees.

(3) An expert witness' answers to questions under this rule must be treated as part of that expert witness' report.

(4) If a party has put a written question to an expert witness instructed by another party in accordance with this rule and the expert witness does not answer the question, the court may make one or more of the following orders in relation to the party who instructed the expert, namely that –

    (a) that party may not recover the fees and expenses of the expert witness from any other party;

    (b) that party may not rely on the evidence of the expert witness;

    (c) the party asking the questions may seek to obtain answers from another expert.

(5) This rule also applies where evidence from a single expert witness is to be used under rule 32.9.

## Court's power to direct evidence by single expert

32.9 (1)  If two or more parties wish to submit expert evidence on a particular issue, the court may direct that expert evidence be given by one expert witness.

(2) The parties referred to in paragraph (1) are known as "the instructing parties".

(3) If the instructing parties cannot agree who should be the expert witness, the court may –

    (a) select the expert witness from a list prepared or identified by the instructing parties; or

    (b) direct that the expert witness be selected in such other manner as the court may direct.

(4)The court may vary a direction given under this rule.

(5) The court may appoint a single expert witness instead of the parties instructing their own expert witnesses or may replace expert witnesses instructed by the parties.

## Cross-examination of court appointed expert

32.10. If an expert appointed by the court under rule 32.9 (5) gives oral evidence, the expert may be cross-examined by any party.

## Instructions to single expert

32.11 (1) If the court gives directions under rule 32.9 for a single expert witness to be used, each instructing party may give instructions to the expert witness.

(2) When an instructing party gives instructions to the expert witness that party must, at the same time, send a copy of the instructions to the other instructing parties.

(3) The court may give directions about the arrangements for –
(a) any inspection, examination or experiment which the expert witness wishes to carry out; and
(b) the payment of the expert witness' fees and expenses.

(4) The court may, before an expert witness is instructed –
(a) limit the amount that can be paid by way of fees and expenses to the expert witness; and
(b) direct that the instructing parties pay that amount into court in such proportions as may be directed.

(5) Unless the court directs otherwise, the instructing parties are jointly and severally liable for the payment of the expert witness' fees and expenses.

## Power of court to direct party to provide expert report

32.12 (1) If a party has access to information which is not reasonably available to the other party, the court may order that party –
(a) to arrange for an expert witness to prepare a report on any matter;
(b) if appropriate, to arrange for an examination to be carried out in relation to that matter; and

(c) to file the report and serve a copy on any other party.


(2) The court's powers under this rule may be exercised only on the application of a party.


## Expert's reports to be addressed to court

32.13 An expert witness must address his or her report to the court and not to any person from whom the expert witness has received instructions.


## Contents of report

32.14(1) An expert witness' report must –

   (a) give details of the expert witness' qualifications;

   (b) give details of any literature or other material which the expert witness has used in making the report;

   (c) say who carried out any test or experiment which the expert witness has used for the report;

   (d) give details of the qualifications of the person who carried out any such test or experiment;

   (e) If there is a range of opinion on the matters dealt with in the report –

      (i) summarise the range of opinion; and

      (ii) give reasons for his or her opinion; and

   (f) contain a summary of the conclusions reached.


(2) At the end of an expert witness' report there must be a statement that the expert witness –

   (a) understands his or her duty to the court as set out in rules 32.3 and 32.4;

   (b) has complied with that duty;

   (c) has included in the report all matters within the expert witness' knowledge and area of expertise relevant to the issue on which the expert evidence is given; and

   (d) has given details in the report of any matter which to his or her knowledge might affect the validity of the report.


(3) There must also be attached to an expert witness' report copies of –

   (a) all written instructions given to the expert witness;

   (b) any supplemental instructions given to the expert witness since the

original instructions were given; and

(c) a note of any oral instruction given to the expert witness;

and the expert must certify that no other instruction than those disclosed have been received by him or her from the party instructing the expert, the party's legal practitioner or any other person acting on behalf of the party.

(4) If a report refers to photographs, plans, calculations, survey reports or other similar documents, these must be provided to the opposite party at the same time as the service of the report.

(5) If it is not practicable to provide a copy of the documents referred to in paragraph (4), those documents must be made available for inspection by the other party or any expert witness instructed by that party within 7 days of a request to do so.

## Meeting of experts

32.15(1) The court may direct a meeting of expert witnesses of like speciality.

(2) The court may specify the issues which the expert witnesses must discuss.

(3) The contents of the discussion between the expert witnesses must not be referred to at the trial unless the parties agree.

(4) The meeting may take place personally, over the telephone or by any other suitable means.

(5) After the meeting, the expert witnesses must prepare for the court a statement of any issue within their expertise on which they –
(a) agree; and
(b) disagree, with their reasons for disagreeing.

(6) Instead of, or in addition to such statement the court may direct that the expert witnesses prepare an agreed statement of the basic 'science' which applies to the matters relevant to their expertise.

(7) The statement referred to in paragraph (6) must be as short as practicable.

## Consequence of failure to disclose expert's report

32.16(1) A party who fails to comply with a direction to disclose an expert witness' report may not use the report at the trial or call the expert witness unless the court gives permission.

(2) The court may not give permission at the trial unless the party asking for permission can show that it was not reasonably practicable to have applied for relief at an earlier stage.

- Rule 26.8 deals with relief from sanctions.

## Appointment of assessor

32.1 7(1) The court may appoint an assessor to –

    (a) advise the judge at the trial with regard to evidence of expert witnesses called by the parties;

    (b) assist the court in understanding technical evidence; or

    (c) provide a written report.

(2) On making an order under paragraph (1), the court must decide

    (a) what fee is to be paid to the assessor; and

    (b) by whom.

(3) Notwithstanding paragraph (2), the court may ultimately order any party to pay the fee of the assessor.

(4) All communications apart from written instructions between the court and an assessor must be in open court.

(5) Before requesting a written report or opinion from an assessor the court must allow the parties to make submissions in respect of the form and content of the questions to be asked.

(6) Before giving judgment the court must provide the parties with the questions asked of, and any opinion given by the assessor and give them an opportunity to make submissions.

PART 33
# Court Attendance by Witnesses and Depositions

**Contents of this Part**

Scope of this Part                                                          Rule 33.1

Witness summonses                                                           Rule 33.2

Issue of witness summons                                                    Rule 33.3

Witness summons in aid of inferior court or tribunal                        Rule 33.4

Time for serving witness summons                                            Rule 33.5

Compensation for loss of time                                               Rule 33.6

Evidence by deposition before examiner                                      Rule 33.7

Conduct of examination                                                      Rule 33.8

Evidence without examiner being present                                     Rule 33.9

Enforcing attendance of witness                                             Rule 33.10

Special report                                                              Rule 33.11

Fees and expenses of examiner                                               Rule 33.12

Order for payment of examiner's fees                                        Rule 33.13

Use of deposition at hearing                                                Rule 33.14

Where person to be examined is out of the jurisdiction –letter of request   Rule 33.15

Early appointment to produce documents                                      Rule 33.16

## Scope of this Part

33.1 (1) This Part provides –

    (a) for a party to obtain evidence prior to a hearing; and

    (b) for the circumstances in which a person may be required to attend court to give evidence or to
        produce a document.

    (2) In this Part, reference to a hearing includes a reference to the trial.

## Witness summonses

33.2 (1) A witness summons is a document issued by the court requiring a witness to attend court –

(a) to give evidence; or

(b) to produce documents to the court.

(2) A witness summons must be in Form 12.

(3) There must be a separate witness summons for each witness.

(4) A witness summons may require a witness to produce documents to the court either on –

(a) the date fixed for the trial or the hearing of any application in the proceedings; or

(b) any other date the court may direct.

## Issue of witness summons

33.3 (1) A witness summons is issued on the date entered on the summons by the court office.

(2) A party must obtain permission from the court when that party wishes to have –

(a) a witness summons issued less than 21 days before the date of the hearing; or

(b) a summons issued for a witness to attend court to give evidence or to produce documents on any date except the date fixed for the trial or the hearing of any application.

(3) An application for permission under paragraph (2) may be without notice but must be supported by evidence on affidavit.

(4) The court may set aside or vary a witness summons.

## Witness summons in aid of inferior court or tribunal

33.4 (1) The court may issue a witness summons in aid of an inferior court or of a tribunal.

(2) The court may set aside a witness summons issued under this rule.

(3) In this rule – "**inferior court or tribunal**" means any court or tribunal which does not have power to issue a witness summons in relation to proceedings before it.

## Time for serving witness summons

33.5 (1) The general rule is that a witness summons is binding only if it is served at least 14 days before the date on which the witness is required to attend before the court or tribunal.

(2) The court may direct that a witness summons shall be binding although it will be served less than 14 days before the date on which the witness is required to attend before the court or tribunal.

(3) An application under paragraph (2) may be made without notice but must be supported by evidence on affidavit.

(4) A witness summons which –

(a) is served in accordance with this rule; and

(b) requires the witness to attend court to give evidence;

is binding until the conclusion of the hearing at which the attendance of the witness is required.

## Compensation for loss of time

33.6 At the time of service of a witness summons the witness must be offered or paid –

(a) a sum reasonably sufficient to cover his or her subsistence and expenses in travelling to and from the court; and

(b) such sum by way of compensation for loss of time as may be specified in a practice direction.

## Evidence by deposition before examiner

33.7 (1) A party may apply for an order for a person to be examined before the trial or the hearing of any application in the proceedings.

(2) In this rule –

"**deponent**" means a person from whom evidence is to be obtained following any order under this rule, and "**deposition**" means the evidence given by the deponent.

(3) An order under this rule shall be for a deponent to be examined on oath before –

(a) a judge;

(b) a legal practitioner who has practised for at least 5 years;

(c) a magistrate;

(d) a master;

(e) a registrar; or

(f) the Chief Registrar.

(4) A person listed in paragraph (3) is referred to as an "examiner".

(5) The order must state –

    (a) the date, time and place of the examination; and

    (b) the name of the examiner.

(6) The order may require the production of any document which the court considers may be necessary for the purposes of the examination.

(7) Rule 2.7 applies to an examination under this rule.

(8) At the time of service of the order the deponent must be offered or paid travelling expenses and compensation for loss of time in accordance with rule 33.6.

(9) An application may be made by any party whether or not that party would otherwise call the witness.

(10) If the application is made by the party who would call the witness to give evidence, the court may order that party to serve a witness statement or witness summary in relation to the evidence to be given by the person to be examined.

    •Part 29 contains general rules about witness statements and witness summaries.

## Conduct of examination

33.8 (1) Subject to any directions contained in the order for examination, the examination must be conducted in the same way as if the witness were giving evidence at a trial.

(2) If all the parties are present, the examiner may, with the consent of the parties, conduct the examination of a person not named in the order for examination.

(3) The examiner may conduct the examination in private if he or she considers it appropriate to do so.

(4) The examiner must ensure that a full record is taken of the evidence given by the witness.

(5) If any person being examined objects to answer any question put to him or her, the ground of the objection and the answer to any such question must be set out in the deposition or in a statement annexed to the deposition.

(6) The examiner must send the original deposition to the court office and a copy of the deposition to–

(a) every party to the proceedings; and

(b) the deponent.

(7) If the witness or any legal practitioner present at the hearing is of the opinion that the deposition does not accurately represent the evidence, he or she may –

(a) endorse on the copy deposition the corrections which in his or her opinion should be made;

(b) file the endorsed copy deposition; and

(c) serve a copy of it on all other parties.

## Evidence without examiner being present

33.9 (1) With the consent of the parties, the court may order that the evidence of a witness be taken as if before an examiner, but without an examiner being appointed or present.

(2) Where such an order is made then, subject to any directions that may be contained in the order –

(a) a legal practitioner for any party may administer the oath to a witness;

(b) any person transcribing evidence given need not be sworn but must certify as correct the transcript of the evidence and deliver it to the legal practitioner for the party whose witness was examined;

(c) the legal practitioner for the party whose witness was examined must file the original transcript and deliver a true copy to all other parties and to the witness who was examined;

(d) the party whose witness is to be examined must provide a means of recording the evidence of the witness; and

(e) if the witness or any legal practitioner present at the hearing is of the opinion that the transcript does not accurately represent any evidence given, he or she may –

(i) endorse on the copy transcript the corrections which in his or her opinion should be made;

(ii) file the endorsed copy transcript; and

(iii) serve a copy of it on all other parties.

## Enforcing attendance of witness

33.10(1) If a person served with a witness summons to attend before an examiner –

(a) fails to attend;

(b) refuses to answer any lawful question or produce any document at the examination; or

(c) refuses to be sworn or to affirm for the purpose of the examination; the party requiring the deposition may file a certificate signed by the examiner of such failure or refusal.

(2) On the certificate being filed, the party requiring the deposition may apply to the court for an order requiring the person to attend, to be sworn, to affirm or to answer any question or produce any document, as the case may be.

(3) An application for an order under this rule may be made without notice.

(4) Any order made by the court must be served personally on the person served with the witness summons and be endorsed with a notice in the first form given in rule 53.3(b).

(5) The court may order the person against whom an order is made under this rule to pay any costs resulting from the –

(a) failure to attend before a referee;

(b) refusal to answer any lawful question or produce any document at the inquiry; or

(c) refusal to be sworn or to affirm for the purpose of the inquiry.

•Part 53 deals with the procedure relating to committal for contempt of court.

## Special report

33.11 The examiner may make a special report to the court with regard to the –

(a) absence of any person; or

(b) conduct of any person present;

when the deposition was taken.

## Fees and expenses of examiner

33.12(1) On appointing an examiner the court must fix the fee to be paid to the examiner for carrying out the examination.

(2) If an examination is carried out by a person other than a legal practitioner, the fee must be paid into the court office.

(3) The party who obtained the order must also pay the fee and all reasonable travelling and other expenses including charges for a room (other than the examiner's own chambers or office) where the examination takes place.

(4) Notwithstanding paragraphs (1) and (3), the court may ultimately order any party to bear the costs of the examination.

## Order for payment of examiner's fees

33.13(1) The examiner may report to the court the fact that any fees or expenses due to him or her have not been paid and the court may make an order that the party who obtained the order for the examination should pay such fees and expenses.

(2) An order under paragraph (1) may be enforced as a money judgment.

## Use of deposition at hearing

33.14(1) A deposition ordered under rule 33.7 or 33.9 may be given in evidence at the trial unless the court orders otherwise.

(2) A party intending to put in evidence a deposition at a hearing must serve notice of such intention on every other party at least 21 days before the day fixed for the hearing.

(3) The court may require a deponent to attend the hearing and give oral evidence.

## Where person to be examined is out of the jurisdiction – letter of request

33.15(1) If a party wishes to take a deposition from a party outside the jurisdiction, the court may direct the issue of a letter of request to the judicial authorities of the country in which the proposed deponent is.

(2) A letter of request is a request to a judicial authority to take the evidence of that person, or arrange for it to be taken.

(3) If the government of the country to which the letter is sent allows a person appointed by the court to examine a person in that country, the court may make an order appointing an examiner for that purpose.

(4) A person may be examined under this rule on oath or affirmation or in accordance with any procedure permitted in the country in which the examination is to take place.

(5) If the court makes an order for the issue of a letter of request, the party who sought the order must file –

    (a) the following documents and, except where paragraph (6) applies, a translation of them –

        (i) a draft letter of request

        (ii) a list of questions or the subject matter of questions to be put to the person to be examined; and

        (iii) a statement of the issues relevant to the proceedings; and

    (b) an undertaking to be responsible for the expenses of the minister with responsibility for foreign affairs in relation to the request.

(6) There is no need to file a translation if English is one of the official languages of the country where the examination is to take place.

## Early appointment to produce documents

33.16(1) The court may permit a party to issue a witness summons requiring any person to attend at a date, time or place specified in the summons prior to the date of the trial for the purpose of producing one or more documents.

(2) The only type of document that a summons under this rule can require a person to produce is a document which that person could be compelled to produce at the trial.

PART 34

# Requests for Information

**Contents of this Part**

Right of parties to obtain information                                    Rule 34.1

Orders compelling reply to request for information                        Rule 34.2

Information obtained under Part 34 not to be used in other proceedings     Rule 34.3

Certificate of truth                                                       Rule 34.4

## Right of parties to obtain information

34.1 (1) This Part enables a party to obtain from any other party information about any matter which is in dispute in the proceedings.

(2) To obtain the information referred to in paragraph (1), the party must serve on the other party a request identifying the information sought.

## Orders compelling reply to request for information

34.2 (1) I f a party does not, within a reasonable time, give information which another party has requested under rule 34.1, the party who served the request may apply for an order compelling the other party to do so.

(2) An order may not be made under this rule unless it is necessary in order to dispose fairly of the claim or to save costs.

(3) When considering whether to make an order, the court must have regard to –

(a) the likely benefit which will result if the information is given;

(b) the likely cost of giving it; and

(c) whether the financial resources of the party against whom the order is sought are likely to be sufficient to enable that party to comply with the order.

**Information obtained under Part 34 not to be used in other proceedings**

34.3 A party may use information obtained –

    (a) in compliance with an order under rule 34.2; or

    (b) in response to a request under rule 34.1;

    only in the proceedings in which the request or order was made.


**Certificate of truth**

34.4 Any information provided under this Part must be verified by a certificate of truth in accordance with

    rule 3.12.

PART 35
# Offers to Settle

**Contents of this Part**

| | |
|---|---|
| Scope of this Part | Rule 35.1 |
| Introductory | Rule 35.2 |
| Making offer to settle | Rule 35.3 |
| Time when offer to settle may be made | Rule 35.4 |
| Procedure for making offer to settle | Rule 35.5 |
| Extent to which offer to settle covers interest, costs or counterclaim | Rule 35.6 |
| Offer to settle made after interim payment | Rule 35.7 |
| Offer to settle part of claim | Rule 35.8 |
| Time limit for accepting offer to settle | Rule 35.9 |
| Procedure for acceptance | Rule 35.10 |
| Effect of acceptance – generally | Rule 35.11 |
| Effect of acceptance  – more than two parties | Rule 35.12 |
| Costs of offeror and offeree where offer is accepted – defendant's offer | Rule 35.13 |
| Costs of offeror and offeree where offer is accepted – claimant's offer | Rule 35.14 |
| Costs where offer not accepted – general rules | Rule 35.15 |
| How costs are to be dealt with | Rule 35.16 |

## Scope of this Part

35.1 (1) This Part contains Rules about –

   (a) offers to settle which a party may make to another party; and

   (b) the consequences of such offers.


   (2) This Part does not limit a party's right to make an offer to settle otherwise than in accordance

   with this Part.


   (3) The Rules in this Part are subject to rule 23.12 (compromise, etc. on behalf of a minor or patient).

   • Part 36 deals with payments into court.

## Introductory

35.2 (1) An offer to settle may be made in any proceedings whether or not there is a claim for money.

(2) The party who makes the offer is called the "offeror".

(3) The party to whom the offer is made is called the "offeree".

(4) An offer to settle is made when it is served on the offeree.

## Making offer to settle

35.3 (1) A party may make an offer to another party which is expressed to be "without prejudice" and in which the offeror reserves the right to make the terms of the offer known to the court after judgment is given with regard to –

(a) the allocation of the costs of the proceedings; and

(b) (in the case of an offer by the claimant) the question of interest on damages.

(2) The offer may relate to the whole of the proceedings or to part of them or to any issue that arises in them.

## Time when offer to settle may be made

35.4 A party may make an offer to settle under this Part at any time before the beginning of the trial.

## Procedure for making offer to settle

35.5 (1) An offer to settle must be in writing.

(2) The offeror must serve the offer on the offeree and a copy on all other parties.

(3) Neither the fact nor the amount of the offer or any payment into court in support of the offer must be communicated to the court before all questions of liability and the amount of money to be

awarded (other than costs and interest) have been decided.

(4) Paragraph (3) does not apply to an offer which has been accepted or where a defence of tender before claim has been pleaded.

## Extent to which offer to settle covers interest, costs or counterclaim

35.6 (1) An offer to settle a claim for damages must state whether or not the amount offered includes interest or costs.

(2) If the offer covers interest or costs it must state the amount which is included for each.

(3) If there is a counterclaim as well as a claim, the offer must state in the case of an offer by the –
(a) claimant – whether or not it takes into account the counterclaim; or
(b) defendant – whether or not it takes into account the claim;
and in each case in what amount.

## Offer to settle made after interim payment

35.7 If an interim payment has been made, whether voluntarily or under an order under Part 17, any subsequent offer to settle must state whether it is in addition to the interim payment or whether it is intended to replace it.

## Offer to settle part of claim

35.8 (1) An offer to settle must state whether or not it covers the whole or part of the claim.

(2) If it does not state that it covers part of the claim, it is to be taken to cover the whole claim.

(3) If the offer covers only part or parts of the claim it must –
(a) identify the part or parts of the claim in respect of which it is made;
and

(b) if more than one, state what is offered in respect of each part covered by the offer.

## Time limit for accepting offer to settle

35.9 (1) The offeror may state in the offer that it is open for acceptance until a specified date.

(2) The offer shall have no effect on any decision that the court makes as   to  the  consequences  of the  offer unless it is open for acceptance for at least 21 days.

(3) Acceptance of the offer after the beginning of the trial shall have no effect on any decision that the court makes as to the consequences of such acceptance.

(4) The court may permit an offeree to accept an offer after the specified date on such terms as the court considers just.

## Procedure for acceptance

35.10(1) To accept an offer a party must –

(a) serve written notice of acceptance on the offeror; and

(b) send a copy of the notice to any other party.

(2) The offeree accepts the offer when notice of acceptance is served on the offeror.

(3) If an offer or payment into court under Part 36 is made in proceedings to which rule 23.12 applies –

(a) the offer or payment may be accepted only with the permission of the court; and

(b) no payment out of any sum paid into court may be made without a court order.

•Rule 23.12 deals with compromises, etc. by or on behalf of a minor or patient.

## Effect of acceptance – generally

35.11(1) If the offeree accepts an offer which is not limited in accordance with rule 35.8, the claim is stayed upon the terms of the offer.

(2) If the offer covers a claim and a counterclaim, both the claim and the counterclaim are stayed on the terms of the offer.

(3) In any other case, the proceedings are stayed to the extent that they are covered by the terms of the offer.

(4) If the court's approval is required for the settlement of the proceedings, any stay arising on the acceptance of the offer has effect only when the court gives its approval.

•Rule 23.12 deals with the settlement of proceedings involving minors and patients.

(5) A stay arising on the acceptance of an offer does not affect proceedings to deal with any question of costs relating to the proceedings which have been stayed and which have not been dealt with by the offer.

(6) If money has been paid into court in support of an offer, a stay arising out of the acceptance of the offer does not affect any proceedings to obtain payment out of court.

•Part 36 deals with payments into court.

(7) If an offer is accepted and its terms are not complied with, any stay arising on acceptance ceases to have effect and –

(a) the proceedings or the part which was stayed may continue; and

(b) either party may apply to the court to enforce those terms.

(8) If a party claims damages for breach of contract arising from an alleged failure of another party to carry out the terms of an agreed offer, that party may do so by applying to the court without the need to commence new proceedings unless the court orders otherwise.

## Effect of acceptance – more than two parties

35.12(1) If there is more than one defendant whom the claimant claims are jointly and severally, or severally, liable and the claimant —

(a) agrees to settle the claim as against one or more, but not all of them; and

(b) discontinues the claim against any other defendant;

the claimant is liable to pay the costs of that defendant unless the court otherwise orders.

•Part 37 deals with discontinuance.

(2) If a claimant accepts an offer made by one of a number of joint defendants –

    (a) paragraph (1) does not apply; and

    (b) the defendant who made the offer is liable for the costs of the other joint defendants.


(3) If–

    (a) there is more than one claimant and

    (b) one or more, but not all, of them agree to settle;

    the other claimants may continue the proceedings.


## Costs of offeror and offeree where offer is accepted – defendant's offer

35.13(1) If the –

    (a) defendant makes an offer to settle; and

    (b) claimant accepts the offer within any period stated for accepting it and before the beginning of the trial;

    the claimant is entitled to the costs of the proceedings up to the date of acceptance of the offer.


(2) If the defendant permits a claimant to accept an offer after the time stated for accepting it, the general rule is that the –

    (a) claimant is entitled to costs to the end of the period stated for accepting the offer; and

    (b) defendant is entitled to any costs incurred between the end of the period stated for accepting the offer and the date when the offeree accepts the offer;

    unless the court orders otherwise.


(3) If the settlement relates only to part of the proceedings and the remaining part or parts of the proceedings continue –

    (a) the claimant is entitled under this rule only to the costs relating to that part of the proceedings which has been settled; and

    (b) unless the court orders otherwise or the defendant agrees, the claimant may not recover any such costs, nor have them quantified, until the conclusion of the rest of the proceedings, when the court can deal with the costs of the whole of the proceedings including any costs relating to those parts of the proceedings that were not settled.

## Costs of offeror and offeree where offer is accepted  – claimant's offer

35.14    If the claimant makes an offer which is accepted by the defendant, the claimant is entitled to costs up to the time when notice of acceptance of the offer is served.

## Costs where offer not accepted – general rules

35.15(1) The general rule for defendants' offers is that, if the defendant makes an offer to settle which is not accepted and in –

    (a) the case of an offer to settle a claim for damages – the court awards less than 85% of the amount of the defendant's offer;

    (b) any other case – the court considers that the claimant acted  unreasonably in not accepting the defendant's offer;

    the claimant must pay any costs incurred by the defendant after the latest date on which the offer could have been accepted without the court's permission.

    (2) If a claimant makes an offer to settle and in –

    (a) the case of an offer to settle a claim for damages – the court awards an amount which is equal to or more than the amount of the offer;

    (b) any other case – the court considers that the defendant acted unreasonably in not accepting the claimant's offer;

the court may, in exercising its discretion as to interest take into account the rates set out in the following table:

| Net amount of damages | Rate of interest |
| --- | --- |
| not exceeding EC$ 100,000 | 15% per annum |
| for the next EC$l50,000 | 12% per annum |
| for the next EC$500,000 | 10% per annum |
| in excess of EC$ 800,000 | 8% per annum |

where 'net' means the amount of damages on the claim less the amount (if any) awarded on any counterclaim.

(**Example**

One year since the offer. Damages – EC$400,000;

The court might award –

15% on the first $100,000 for one year ($15,000);

plus 12% interest on the next $150,000 for one year ($18,000);

plus 10% interest on the remaining $150,000 for one year ($15,000);

a total of EC$48,000 interest on damages.)

(3) The court may decide that the general rule under paragraph (1) is not to apply in a particular

case.

(4) In deciding whether the general rule should not apply and in considering the exercise of its

discretion under paragraph (2), the court may take into account the –

(a) conduct of the offeror and the offeree with regard to giving or refusing information for the

purposes of enabling the offer to be made or evaluated;

(b) information available to the offeror and the offeree at the time that the offer was made;

(c) stage in the proceedings at which the offer was made; and

(d) terms of any offer.

(5) This rule applies to offers to settle at any time, including before proceedings were started.

## How costs are to be dealt with

35.16(1) If an offer to settle is accepted, the parties may agree the amount of costs that are due to be paid

under this Part.

(2) If the amount of costs falls to be quantified by the court, then the general rule is that, unless an

order has been made for budgeted costs under rule 65.8, the costs are to be determined in

accordance with the scale of prescribed costs contained in Part 65, Appendices B and C.

(3) If an offer to settle –

(a) is accepted after the time originally stated for accepting it under rule 35.10 (2); or

(b) deals only with part of the case in accordance with rule 35.13 (3); the amount of costs to be

paid to the party entitled to such costs must be assessed by the court and in assessing the costs

the court must take into account the scale of prescribed costs or the amount of the budgeted

costs as the case may be.

(4) In determining the appropriate amount of costs to be paid where an order has been made under rule

65.8 (budgeted costs), the court may take into account any written information provided by either party

when the costs budget was made.

PART 36

# Payments into Court to Support Offers under Part 35 and under Court Order

**Contents of this Part**

| | |
|---|---|
| Scope of this Part | Rule 36.1 |
| Payments into court to support offers to settle | Rule 36.2 |
| Right to payment out on acceptance of offer | Rule 36.3 |
| Cases where payment out requires court order | Rule 36.4 |
| Money paid into court under order | Rule 36.5 |
| Money paid into court as condition for permission to defend or to continue to defend | Rule 36.6 |
| Proceedings under Fatal Accidents Acts | Rule 36.7 |

## Scope of this Part

36.1 (1) This Part deals with payments into court made –

    (a) in accordance with an order of court;

    (b) to support a defence of tender; and

    (c) to support an offer of payment under Part 35.

  (2) A defendant is not obliged to make a payment into court to support an offer under Part 35.

  (3) With the –

    (a) agreement of the claimant; or

    (b) permission of the court;

a defendant may pay money in support of an offer of payment into an interest bearing account on such terms as to the –

    (i) names of the account holders; and

    (ii) terms on which money may be paid out of the account

as may be ordered by the court or agreed between the parties.

## Payments into court to support offers to settle

36.2 (1)  A defendant who offers to settle the whole or part of a claim may pay money into court in support of the offer.

(2) A defendant may not pay money into court unless the –

(a) defendant certifies that such payment is in support of an offer to settle;

(b) payment is made to support a defence of tender; or

(c) payment is made under a court order.

(3) A payment into court may not be made until a claim is issued.

(4) A payment into court to support an offer may be made –

(a) when the offer is made; or

(b) at any time while the offer is outstanding.

(5) A defendant who pays money into court must –

(a) serve notice of payment on the claimant; and -

(b) file a copy of the notice with a statement of the date (if any) by which the offer is open for acceptance under rule 35.9 (1).

## Right to payment out on acceptance of offer

36.3 (1)  The general rule is that a claimant who accepts an offer to settle –

(a) within the period stated; or

(b) where no period is stated;

for accepting it in the defendant's offer is entitled to payment of the sum which the defendant paid into court to support the offer, without needing a court order.

(2) To obtain payment, the claimant must file a request for payment certifying that the offer has been accepted in accordance with paragraph (1) (a) or (b).

(3) The general rule is qualified by rule 36.4.

## Cases where payment out requires court order

36.4 (1) If a claimant accepts money paid into court –

    (a) after the end of the period stated for accepting it;

    (b) by one or more, but not all, of a number of defendants;

    (c) to settle a claim to which –

      (i) Part 23 (claims by minors and patients); or

      (ii) rule 36.7 (proceedings under Fatal Accidents Acts) apply; or

    (d) with a defence of tender before claim;

the money in court may only be paid out under an order of the court.

(2) An order under paragraph (1) (c) may not be made by consent.

(3) If –

    (a) a claimant accepts money paid into court after the trial has begun;

    and

    (b) all further proceedings on the claim or that part of it to which the acceptance relates are
      stayed;

the money in court may only be paid out under a court order.

(4) An order under this rule must deal with the costs of the proceedings which have been stayed.

## Money paid into court under order

36.5 (1) When a party makes a payment into court under a court order that party must give notice of the payment to every other party.

(2) Money paid into court under a court order may not be paid out unless the court gives permission.

(3) Paragraph (2) does not apply where –

    (a) the money is paid into court by a defendant;

    (b) in accordance with rule 36.6 (2) that defendant chooses to treat the money paid into court as
      if it were payment into court in support of an offer to settle; and

    (c) the claimant accepts the offer to settle.

## Money paid into court as condition for permission to defend or to continue to defend

36.6 (1) This rule applies where the court makes an order permitting a defendant to –

    (a) continue to defend; or

    (b) defend;

on condition that the defendant makes a payment into court.

    (2) If –

    (a) a defendant makes such a payment into court; and

    (b) makes an offer to settle (whether before or after the order to pay money into court);

the defendant may choose to treat the whole or any part of the money paid into court as if it were a payment into court made in support of the offer to settle.

    (3) To do this the defendant must –

    (a) file a notice that the defendant so chooses; and

    (b) serve a copy of it on every other party to the proceedings.

## Proceedings under Fatal Accidents Acts

36.7 (1)  If a single sum of money is paid into court in satisfaction of proceedings arising under a Fatal Accidents Act and that sum is accepted, the court must apportion that sum between the different causes of action when –

    (a) giving directions under rule 23.13; or

    (b) authorising its payment out of court.

    (2) If in proceedings arising under a Fatal Accidents Act a claim is made by more than one person and a single sum of money is paid into or apportioned by the court to the cause of action under the Act and is accepted by such persons, the court must apportion the payment between those persons.

PART 37
# Discontinuance

**Contents of this Part**

Scope of this Part                                        Rule 37.1

Right to discontinue claim                                Rule 37.2

Procedure for discontinuing                               Rule 37.3

Right to apply to have notice of discontinuance set aside Rule 37.4

Effect of discontinuance                                  Rule 37.5

Liability for costs                                       Rule 37.6

Quantification of costs                                   Rule 37.7

Discontinuance and subsequent proceedings                 Rule 37.8

## Scope of this Part

37.1 (1) The Rules in this Part set out the procedure by which a claimant may discontinue all or any part of a claim.

(2) A claimant who –

(a) claims more than one remedy; and

(b) subsequently abandons a claim to one or more remedies but continues with the claim for the other remedies;

is not treated as discontinuing part of a claim for the purposes of this Part.

- Rule 42.7 deals with consent orders which may include orders bringing a claim to an end by way of a consent judgment or otherwise,

## Right to discontinue claim

37.2 (1) The general rule is that a claimant may discontinue all or part of a claim without the permission of the court.

(2) However –

(a) a claimant needs permission from the court to discontinue all or part of a claim in relation to which –

        (i) any party has given an undertaking to the court; or

        (ii) the court has granted an interim injunction;

    (b) a claimant who has received an interim payment in relation to a claim (whether voluntarily or pursuant to an order under Part 17)

    may discontinue only if the –

        (i) court gives permission; or

        (ii) defendant who made the payment consents in writing;

    (c) if there is more than one claimant, a claimant may not discontinue unless –

        (i) every other claimant consents in writing; or

        (ii) the court gives permission.

  (3) If there is more than one defendant the claimant may discontinue all or part of the claim against all or any of the defendants.

## Procedure for discontinuing

37.3 (1) To discontinue a claim or any part of a claim a claimant must –

    (a) serve a notice of discontinuance on every other party to the claim;

      and

    (b) file a copy of it.

  (2) The claimant must certify on the filed copy that notice of discontinuance has been served on every other party to the claim.

  (3) If the claimant needs the consent of some other party, a copy of the necessary consent must be attached to the filed copy of the notice of discontinuance.

  (4) If the claimant needs permission from the court, the notice of discontinuance must contain details of the order by which the court gave permission.

  (5) If there is more than one defendant, the notice of discontinuance must specify against which defendant or defendants the claim is discontinued.

## Right to apply to have notice of discontinuance set aside

37.4 (1) If the claimant discontinues without the consent of the defendant or the permission of the court, any defendant who has not consented may apply to have the notice of discontinuance set aside.

(2) A defendant may not apply under this rule more than 28 days after the date when the notice of discontinuance was served on that defendant.

## Effect of discontinuance

37.5 (1) Discontinuance against any defendant takes effect on the date when the notice of discontinuance is served on that defendant under rule 37. 3 (1) (a).

(2) A claim or the relevant part of a claim is brought to an end as against that defendant on that date.

(3) However, this does not affect –

(a) any proceedings relating to costs; or

(b) the right of the defendant under rule 37.4 to apply to have the notice of discontinuance set aside.

## Liability for costs

37.6 (1) Unless the –

(a) parties agree; or

(b) court orders otherwise;

a claimant who discontinues is liable for the costs incurred by the defendant against whom the claim is discontinued, on or before the date on which notice of discontinuance was served.

(2) If a claim is only partly discontinued –

(a) the claimant is only liable for the costs relating to that part of the claim which is discontinued; and

(b) unless the court orders otherwise, the costs which the claimant is liable to pay are not to be quantified until the conclusion of the rest of the claim.

## Quantification of costs

37.7 (1) The general rule is that, unless an order has been made for budgeted costs under rule 65.8, the costs are to be determined in accordance with the scale of prescribed costs contained in Part 65, Appendices B and C.

(2) If the claimant discontinues part of the case only, the amount of costs must be assessed by the court when the remainder of the claim is resolved.

(3) In determining the appropriate amount of costs to be paid where an order has been made under rule 65.8 (budgeted costs), the court may take into account any written information provided by either party when the costs budget was made.

## Discontinuance and subsequent proceedings

37.8 If the claimant –

(a) discontinues a claim after the defendant against whom the claim is discontinued has filed a defence; and

(b) makes a subsequent claim against the same defendant arising out of facts which are the same or substantially the same as those relating to the discontinued claim; and

(c) has not paid the defendant's costs of the discontinued claim;

the court may stay the subsequent claim until the costs of the discontinued claim are paid.

PART 38
# Pre-Trial Review

**Contents of this Part**

| | |
|---|---|
| Scope of this Part | Rule 38.1 |
| Direction for pre-trial review | Rule 38.2 |
| Rules relating to case management conference to apply | Rule 38.3 |
| Who is to conduct pre-trial review | Rule 38.4 |
| Parties to prepare pre-trial memorandum | Rule 38.5 |
| Directions at pre-trial review | Rule 38.6 |

## Scope of this Part

38.1 This Part deals with the pre-trial review which is to be held shortly before trial if the court so orders.

## Direction for pre-trial review

38.2 (1) At any case management conference and at any subsequent hearing in the claim other than the trial, the court must consider whether a pre-trial review should be held to enable the court to deal justly with the claim.

(2) A party may apply for a direction that a pre-trial review be held.

(3) An application for a pre-trial review must be made at least 60 days before the trial date or the beginning of any trial period fixed under rule 27.5(3).

(4) The court office must give each party at least 14 days notice of the date, time and place for the pre-trial review.

## Rules relating to case management conference to apply

38.3  Parts 25 and 26, where appropriate, apply to a pre-trial review as they do to a case management
conference.

## Who is to conduct pre-trial review

38.4  Wherever practicable the pre-trial review is to be conducted by the trial judge.

## Parties to prepare pre-trial memorandum

38.5 (1)The parties must seek to agree on and file at the court office a pre-trial memorandum not less than
7 days before the pre-trial review.

(2) If the parties are not able to agree on a memorandum, each party must file its own
memorandum and serve a copy on all other parties not less than 3 days before the date fixed for
the pre-trial review.

(3) A pre-trial memorandum must contain –
   (a) a concise statement of the nature of the proceedings;
   (b) a statement of the issues to be determined at the trial;
   (c) details of any admissions made; and
   (d) the factual and legal contentions of the party or parties filing it.

## Directions at pre-trial review

38.6 (1)At the pre-trial review the judge must give directions as to the conduct of the trial in order to
ensure the fair, expeditious and economic trial of the issues.

(2) In particular, the court may –
   (a) decide on the total time to be allowed for the trial;
   (b) direct either party to provide further information to the other ;
   (c) direct how that time shall be allocated between the parties;
   (d) direct the parties jointly to prepare one or more of –

(i) a core bundle of documents (that is, a bundle containing only the documents which the trial judge will need to pre-read or to which it will be necessary to refer repeatedly at the trial);

(ii) an agreed statement of facts;

(iii) an agreed statement of the basic technical, scientific or medical matters in issue;

(iv) an agreed statement as to any relevant specialist area of law, which statement shall not be binding on the trial judge;

(e) direct when and by whom the documents should be filed at the court;

(f) direct whether or not there are to be any opening or closing addresses and the time to be allocated to each;

(g) give directions as to the extent to which evidence may be given in written form;

(h) give directions as to the procedure to be followed at the trial; and

(i) give directions for the filing by each party and service on all other parties of one or more of the following –

(i) a chronology of relevant events;

(ii) a list of authorities which it is proposed to cite in support of those propositions;

(iii) a skeleton argument; and

(iv) a summary of any legal propositions to be relied on at the trial.

**PART 39**
# Trial

**Contents of this Part**

| | |
|---|---|
| Documents for use at trial | Rule 39.1 |
| Cross-examination | Rule 39.2 |
| Written submissions | Rule 39.3 |
| Failure of party to attend trial | Rule 39.4 |
| Applications to set aside judgment given in party's absence | Rule 39.5 |
| Adjournment of trial | Rule 39.6 |
| Inspection | Rule 39.7 |

# Documents for use at trial

39.1 (1) At least 21 days before the date fixed for the trial, all parties must inform the claimant of the documents that they wish to have included in the bundle of documents to be used at the trial.

(2) The claimant must prepare a bundle including all the documents which any party wishes to make use of at the trial.

(3) The bundle of documents should separate those which are agreed and those which are not agreed.

(4) The claimant must paginate and index the bundle of documents.

(5) At least 10 days before the date fixed for the trial the claimant must file at the court office –

(a) a bundle comprising copies of –

(i) all statements of case;

(ii) any document which the parties were ordered to file under rule 38.6(2)(b);

(iii) any requests for information and the replies;

(iv) the claim form; and

(v) the pre-trial memorandum or memoranda;

(b) a second bundle comprising copies of –

(i) all expert reports;

(ii) all witness statements; and

(iii) any agreed statements under rule 38.6(2) (c) (ii)-(iv);

(c) a third bundle comprising the documents referred to in paragraph

(2); and

(d) where the bundles exceed 100 pages of documents in total, a core bundle (that is, a bundle containing only the documents which the trial judge will need to pre-read or to which it will be necessary to refer repeatedly at the trial).

(6) There must be excluded from the bundles prepared under this rule any –

(a) application or order relating to interim payments under Part 17; and

(b) offer to settle under Part 35 or notice of payment into court under Part 36;

and any reference to any such payment or offer must be excised from any document contained in the bundles.

(7) If only a counterclaim is to be tried, references in this rule to the "**claimant**" should be construed as references to the defendant.

• Rule 27.6 allows the court to dispense with all or some of the requirements of this rule in simple and urgent cases.

## Cross-examination

39.2  The court may limit examination, cross-examination or re-examination of any witness.

## Written submissions

39.3 (1) The parties may, with the consent of the judge, file written submissions instead of or in addition to closing speeches.

(2) Such written submissions must be filed within 7 days of the conclusion of the trial or such shorter period as the judge directs.

## Failure of party to attend trial

39.4 If the judge is satisfied that notice of the hearing has been served on the absent party or parties in accordance with these Rules -

(a) if any party does not appear at the trial, the judge may strike out the claim;

(b) if one or more but not all parties appear, the judge may proceed in the absence of the parties who do not appear.

## Applications to set aside judgment given in party's absence

39.5 (1) A party who was not present at a trial at which judgment was given or an order made may apply to set aside that judgment or order.

(2) The application must be made within 14 days after the date on which the judgment or order was served on the applicant.

(3) The application to set aside the judgment or order must be supported by evidence on affidavit showing –

(a) a good reason for failing to attend the hearing; and

(b) that it is likely that had the applicant attended, some other judgment or order might have been given or made.

## Adjournment of trial

39.6 (1) The judge may adjourn a trial on such terms as the judge thinks just.

(2) The judge may only adjourn a trial to a date and time fixed by the judge or to be fixed by the court office.

## Inspection

39.7 The judge trying a claim may inspect any place or thing that may be  relevant to any issue in the claim.

**PART 40**

# Appointment of Referee to Inquire and Report

**Contents of this Part**

Power to order trial before referee                                      Rule 40.1

Reference to referee to inquire and report                               Rule 40.2

Appointment of referee                                                   Rule 40.3

Conduct of reference                                                     Rule 40.4

Report following reference                                               Rule 40.5

Consideration of report by court                                         Rule 40.6

Restrictions on appointment of referee in a claim by or against Crown    Rule 40.7

## Power to order trial before referee

40.1 If the –

   (a) court considers that the claim requires –

   (i) prolonged examination of documents; or

   (ii) scientific or local investigation which cannot conveniently be carried out by the court;

   (b) matters in dispute are wholly or mainly a matter of account; or

   (c) parties agree;

   then subject to rule 40.7, then the court may order the claim or any issue or allegation to be tried by a referee.

## Reference to referee to inquire and report

40.2    The court may refer to a referee for inquiry and report any question or issue of fact arising in a claim.

## Appointment of referee

40.3 (1) The general rule is that a referee must be appointed at a case management conference or pre-trial review.

(2) The referee must be a person agreed on by the parties or, if they fail to agree, a person selected by the court in accordance with paragraph (3).

(3) If the parties cannot agree who should be the referee, the court may –

(a) select the referee from a list prepared or identified by the parties; or

(b) direct that the referee be selected in such other manner as the court directs.

(4) The court must identify the question or issue upon which the referee is to report.

(5) The court must decide what fee is to be paid to the referee and by whom.

(6) Notwithstanding paragraph (5), the court may ultimately order any party to pay the fee of the referee.

## Conduct of reference

40.4 (1) For the purpose of the inquiry, the referee has the same powers as the court other than the power to commit for contempt of court.

(2) Unless the court otherwise orders, the referee must adopt the simplest, least expensive and most expeditious method of conducting the reference.

(3) The referee may hold the trial or conduct the inquiry at any place and at anytime which appears to the referee to be convenient to the parties.

(4) If a person served with a witness summons to appear before a referee –

(a) fails to attend;

(b) refuses to answer any lawful question or produce any document at the inquiry; or

(c) refuses to be sworn or affirm for the purposes of the inquiry;

the referee must sign and file a certificate of such failure or refusal.

(5) Any party may apply to the court for an order requiring the person served with the witness summons to appear before a referee to attend, be sworn or affirmed, or answer any question or produce any document, as the case may be.

(6) An application for an order under paragraph (5) maybe made without notice but must be supported by evidence on affidavit.

(7) In the case of non-attendance, the affidavit must prove –

(a) service of the witness summons; and

(b) that the person served with the witness summons was paid or offered the payments required by rule 33.6.

(8) An order under this rule must be served personally on the person served with the witness summons and be endorsed with a notice in accordance with the first form in rule 53.3(b).

(9) A person who willfully disobeys an order made against that person under this rule commits contempt of court.

(10) The court may order the person against whom an order is made under this rule to pay any costs resulting from the –

(a) failure to attend before a referee;

(b) refusal to answer any lawful question or produce any document at the inquiry; or

(c) refusal to be sworn or to affirm for the purpose of the inquiry.

•Part 53 deals with the procedure to apply to commit a person for contempt of court.

## Report following reference

40.5 (1) The report of the referee is to be made to the court.

(2) The referee must supply a copy of the report to each party.

(3) The referee may in the report –

(a) make a special statement of facts from which the court may draw inferences; or

(b) submit any question for the decision of the court.

## Consideration of report by court

40.6 (1) Upon receipt of the report of the referee, the court office must fix a date, time and place for consideration of the report by the court.

(2) The court office must give 14 days notice to the parties of such consideration.

(3) The court may –

(a) adopt the report in whole or in part;

(b) ask the referee to explain any part of the report;

(c) decide the question or issue on the evidence taken by the referee;

(d) direct that additional evidence be given to the court;

(e) remit any question or issue for further consideration; or
(f) vary the report.

## Restrictions on appointment of referee in a claim by or against Crown

40.7 In a claim by or against the Crown an appointment of a referee may not be made without the consent of the relevant Attorney General.

**PART 41**
# Accounts and Inquiries

**Contents of this Part**

| | |
|---|---|
| Scope of this Part | Rule 41.1 |
| Directions for account | Rule 41.2 |
| Verification of account | Rule 41.3 |
| Notice of omissions | Rule 41.4 |
| Allowances | Rule 41.5 |
| Delay | Rule 41.6 |
| Distribution before entitlement ascertained | Rule 41.7 |

## Scope of this Part

41.1 (1) This Part deals with claims –

    (a) for an account; or

    (b) for some other relief which requires the taking of an account.


    (2) A claim for an account must be made by fixed date claim supported by evidence on affidavit.

    •Rule 8.1 deals with the issue of a fixed date claim.

    •Rule 27.2 deals with the first hearing of such a claim.


## Directions for account

41.2 (1) If a claim or counterclaim is made for an account or requires the taking of an account, an application for directions relating to the taking of the account must be made at the case management conference or first hearing.


    (2) The court may –

    (a) direct that any preliminary issue of fact be tried;

    (b) order an account to be taken;

    (c) order inquiries be made; or

    (d) order that any amount shown to be due to a party on the account be paid by a date specified in the order.

(3) Every direction that an account be taken must be so numbered that each distinct account and inquiry can be designated by that number.

(4) On directing that an account be taken, or subsequently, the court must direct how it is to be taken or vouched.

(5) The court may direct that any relevant books of account shall be evidence of the matters contained in them, subject to any objection that any party may take.

## Verification of account

41.3 (1) When there has been a direction for an account to be taken the accounting party must make out its account and verify it by affidavit exhibiting the account.

(2) The items on each side of the account must be numbered consecutively.

(3) Unless the court otherwise orders, the accounting party must file the affidavit and the account and serve a copy on all other parties.

## Notice of omissions

41.4 Any party who claims that there are omissions or challenges any item in the account must give notice to the accounting party with the –
(a) best particulars that the party who so claims can give of the omission or error; and
(b) grounds for alleging it.

## Allowances

41.5 In taking any account all just allowances must be made.

## Delay

41.6 If there is undue delay in taking the account, the court may –
(a) require the accounting party, or any other party, to explain the delay;
(b) give directions to expedite the taking of the account;

(c) direct any other party to take over the taking of the account; and

(d) make such order for costs as is just.


## Distribution before entitlement ascertained

41.7 (1) This rule applies where some, but not all, of the persons entitled to share in a fund are ascertained and there is likely to be delay in determining the existence or entitlement of the other persons.

(2) The court may order immediate payment of their shares to the persons who have been ascertained.

(3) The court need not reserve any part of those shares for the purpose of meeting any subsequent costs of determining the existence or entitlement of the other persons.

PART 42

# Judgments and Orders

**Contents of this Part**

Scope of this Part                                                          Rule 42.1

Parties present when order made or notified of terms to be bound            Rule 42.2

Practice forms to be used where available                                   Rule 42.3

Standard requirements                                                       Rule 42.4

Drawing of judgments and orders                                             Rule 42.5

Service of orders                                                           Rule 42.6

Consent judgments and orders                                                Rule 42.7

Time when judgment or order takes effect                                    Rule 42.8

Time for complying with judgment or order                                   Rule 42.9

Correction of errors in judgments or orders                                 Rule 42.10

Cases where court gives judgment both on claim and counterclaim             Rule 42.11

Service of copy order on person not a party                                 Rule 42.12

## Scope of this Part

42.1 (1) This Part contains rules about judgments and orders made by the court.

(2) This Part does not apply to the extent that any other rule makes a different provision in relation to the judgment or order in question.

## Parties present when order made or notified of terms to be bound

42.2 A party who is –

(a) notified of the terms of the judgment or order by telephone, FAX or otherwise; or

(b) present whether in person or by legal practitioner when the judgment was given or order was made;

is bound by the terms of a judgment or order whether or not the judgment or order is served.

## Practice forms to be used where available

42.3 If there is a practice form for a judgment or order of any description, a judgment or order of that description must be in that form.

## Standard requirements

42.4 (1) Every judgment or order must state the name and judicial title of the person who made it, unless it is a –

    (a) consent order under rule 42.7;

    (b) default judgment under Part 12; or

    (c) judgment entered on an admission or following a court order under Rule 14.6, 14.7, 14.8, 14.10 or 14.11.

    (2) Every judgment or order must –

    (a) be sealed by the court;

    (b) bear the date on which it is given or made; and

    (c) be signed by the registrar.

## Drawing of judgments and orders

42.5 (1) Every judgment or order must be drawn by the court, unless –

    (a) a party with the permission of the court agrees to draft it;

    (b) it is a consent order under rule 42.7;

    (c) the court directs a party to draft it; or

    (d) the court dispenses with the need to do so.

    (2) If a draft of an order is directed it must be filed no later than 7 days from the date on which the direction was given so that the court office can seal the order.

    (3) If a party fails to file a draft of an order within 7 days after the direction was given any other party may draw and file the order.

(4) A party who drafts an order must file sufficient copies for service on all parties who are to be served.

## Service of orders

42.6 (1) Unless the court otherwise directs the court office must serve every judgment or order on –

(a) any person on whom the court orders it to be served; and

(b) every party to the claim in which the judgment or order is made.

• Part 6 deals with service.

(2) If a party is acting by a legal practitioner, the court may direct that any judgment or order be served on the party in person as well as on the legal representative.

## Consent judgments and orders

42.7 (1) Subject to paragraphs (2) to (5), a consent order or judgment must be –

(a) drawn in the terms agreed;

(b) expressed as being "By Consent";

(c) signed by the legal practitioner acting for each party to whom the order relates; and

(d) filed at the court office for sealing.

(2) This rule applies where –

(a) all relevant parties agree to the terms in which judgment should be given or an order made; and

(b) none of these Rules prevents the parties agreeing to vary the terms of any court order.

(3) Except as provided by paragraphs (4) and (5), this rule applies to the following kinds of judgments or orders –

(a) a judgment for –

(i) costs;

(ii) the delivery up of goods with or without the option of paying the value of the goods to be assessed or the agreed value; and

(iii) the payment of a debt or damages (including a judgment or order for damages or the value of goods to be assessed);

(b) an order for the –

(i) discharge from liability of any party;

(ii) dismissal of any claim, wholly or in part;

(iii) payment, assessment or waiver of costs, or such other provision for costs as may be agreed;

(iv) payment out of money which has been paid into court;

(v) setting aside of a default judgment under Part 13;

(vi) stay of enforcement of a judgment, either unconditionally or on condition that the money due under the judgment is payable on a stated date or by instalments specified in the order; and

(vii) stay of proceedings on terms which are attached as a schedule to the order but which are not otherwise part of it (a "Tomlin Order"); and

(c) any procedural order other than one falling within rule 26.7(3) or rule 27.8(1) and (2).

(4) This rule does not apply –

(a) in Admiralty proceedings;

(b) where any party is a litigant in person;

(c) where any party is a minor or patient; or

(d) where the court's approval is required by these Rules or any enactment before an agreed order can be made.

(5) This rule does not allow the making of a consent order by which any hearing date fixed by the court is to be adjourned.

## Time when judgment or order takes effect

42.8 A judgment or order takes effect from the day it is given or made, unless the court specifies that it is to take effect on a different date.

## Time for complying with judgment or order

42.9 A party must comply with a judgment or order immediately, unless the –

(a) claimant, on requesting judgment in default under Part 12 or judgment on an admission under Part 14, specifies a different time for compliance;

(b) court varies the time for compliance including specifying payment by instalments; or

(c) judgment or order specifies some other date for compliance.

## Correction of errors in judgments or orders

42.10 (1) The court may at any time (without an appeal) correct a clerical mistake in a judgment or order, or an error arising in a judgment or order from any accidental slip or omission.

(2) A party may apply for a correction without notice.

## Cases where court gives judgment both on claim and counterclaim

42.11 (1) This rule applies where the court gives judgment for specified amounts both for the claimant on the claim and the defendant on the counterclaim.

(2) If there is a balance in favour of one of the parties, the court may order the party whose judgment is for the lesser amount to pay the balance.

(3) In a case to which this rule applies, the court may make against the claimant and the defendant (whether or not it makes an order under paragraph (2)) a separate order as to –

(a) costs; or

(b) damages.

## Service of copy order on person not a party

42.12 (1) If in any claim an order is made which might affect the rights of persons who are not parties to the claim, the court may at any time direct that a copy of any judgment or order be served on any such person.

(2) Service must be effected in accordance with Part 5 and the court may direct which party is to be responsible for service.

(3) The copy order must be endorsed with a notice in Form 13.

(4) The court may dispense with service of the copy order or judgment if it appears impracticable to serve that person.

(5) Any person so served, or on whom service is dispensed with –

    (a) is bound by the terms of the judgment or order; and

    (b) may take part in any proceedings under the judgment or order.


(6) Notwithstanding paragraph (5), any person to whom that paragraph applies may apply within 28

days to discharge, vary or add to the judgment or order.

PART 43

# Enforcement – General Provisions

**Contents of this Part**

Scope of this Part                                                Rule 43.11

Procedure for beginning enforcement                               Rule 43.2

Judgment subject to conditions                                    Rule 43.3

Separate enforcement of costs                                     Rule 43.4

Effect of setting aside judgment or order                         Rule 43.5

Court's powers where person ordered to do act fails to comply     Rule 43.6

Judgment for sum in foreign currency                              Rule 43.7

Enforcement by or against person who is not a party               Rule 43.8

Enforcement against partnership                                   Rule 43.9

Enforcement of awards, etc. made by outside bodies                Rule 43.10

# Scope of this Part

43.1 (1) This Part deals generally with the enforcement of judgments and orders.

(2) In this Part and in Parts 44 to 53 –

"**judgment creditor**" means the person who is entitled to enforce a judgment or order; and

"**judgment debtor**" means the person who is liable to enforcement under the judgment or order, even though the judgment or order is not a money judgment.

# Procedure for beginning enforcement

43.2 (1) The general rule is that, once a judgment or order has become enforceable, the court must issue an enforcement order if the judgment creditor files the appropriate request.

(2) If any of these Rules requires permission to begin enforcement proceedings the judgment creditor must first obtain that permission.

## Judgment subject to condition

43.3 (1) A person who has a judgment or order subject to the fulfillment of a condition may not enforce the judgment or order unless the –

(a) condition is fulfilled; or

(b) court gives permission for the judgment or order to be enforced.


(2) If a person has the benefit of a judgment or order subject to fulfillment of a condition and there is a failure to fulfill that condition, then unless the court otherwise orders –

(a) that person loses the benefit of the judgment or order; and

(b) any other person interested under the judgment or order may take any step which –

    (i) is warranted by the judgment or order; or

    (ii) might have been taken if the judgment or order had not been given.


## Separate enforcement for costs

43.4 A judgment creditor who has judgment with costs may enforce the judgment and the costs separately.

## Effect of order setting aside judgment or order

43.5 (1) The general rule is that if the court sets aside a judgment or order, any order made for the purpose of enforcing it ceases to have effect.


(2) The court may however direct that an order remains in force.


## Court's powers where person ordered to do act fails to comply

43.6 (1) If –

(a) the court orders a party to do on act; and

(b) that party does not do it;

the judgment creditor may apply for an order that –

(i) the judgment creditor; or

(ii) some person appointed by the court;

may do the act.

(2) The court may order the judgment debtor to pay the costs and expenses of the person who does the act.

(3) If the court makes an order under paragraph (2), it must assess the costs under rule 65.11 and determine the amount of expenses to be allowed.

- Part 53 deals with contempt proceedings.

## Judgment for sum in foreign currency

43.7 If the court gives judgment for a sum expressed in a currency of a country other than that in use in the Member State or Territory in which the judgment is to be enforced, the judgment creditor must, when commencing enforcement proceedings, file a certificate stating the exchange rate current in the Member State or Territory where enforcement is to be carried out (for the purpose of the unit of foreign currency in which the judgment is expressed) at the close of business on the previous business day.

## Enforcement by or against person who is not a party

43.8 (1) A judgment or order in favour of a person who is not a party may be enforced in the same way as a judgment or order in favour of a party.

(2) A judgment or order against a person who is not a party may be enforced in the same way as a judgment or order against a party.

## Enforcement against partnership

5 43.9 (1) This rule has effect where the court gives a judgment or makes an order against a firm or partnership.

(2) A judgment creditor may enforce the judgment or order against –

   (a) any of the firm's property; or

   (b) any person who –

      (i) has acknowledged service as a partner in the firm;

      (ii) has admitted in a statement of case to being a partner in the firm;

      (iii) was adjudged by the court to be a partner;

      (iv) was served with the claim form as a partner within the jurisdiction or, with leave of the court under Part 7, out of the jurisdiction; or

      (v) in Saint Lucia, is registered as a partner in the firm under article 20 of the Commercial Code (Cap. 243).

(3) In a case to which paragraph (2) does not apply the judgment creditor may issue enforcement proceedings against a person whom it claims to be a partner if it has the court's permission to do so.

(4) Notice of an application for permission must be served on the person against whom the judgment creditor seeks to enforce judgment and must be supported by evidence on affidavit.

(5) A judgment or order given or made on a claim by –

   (a) or against a firm against or by a member of the firm; or

   (b) another firm against a firm where the two firms have one or ore partners in common;

   may not be enforced without the permission of the court.

## Enforcement of awards, etc. made by outside bodies

43.10(1) This rule has effect as to the –

   (a) enforcement of an award not made by the court but which is enforceable by virtue of a statutory provision as if it were an order of the court; and

   (b) registration of such an award so that it may be enforceable as if it were an order of the court.

(2) In this rule –

   "**award**" means the award, order or decision which it is sought to enforce; and

"**outside body**" means any authority other than the court.

(3) The general rule is that an application –

   (a) for permission to enforce an award; or

   (b) to register an award;

  may be made without notice but must be supported by evidence on affidavit.

(4) The general rule does not apply where a rule or statutory provision requires notice to be given.

(5) The applicant must –

   (a) exhibit to the affidavit the award or a copy of it;

   (b) give an address for service on the person against whom the applicant seeks to enforce the award; and

   (c) (if the award is for the payment of money), certify the amount remaining due to the applicant.

**PART 44**

# Oral Examination in Aid of Enforcement

Contents of this Part

| | |
|---|---|
| Scope of this Part | Rule 44.1 |
| Who may be orally examined | Rule 44.2 |
| Procedure to obtain order for oral examination | Rule 44.3 |
| Order for oral examination | Rule 44.4 |
| Conduct of oral examination | Rule 44.5 |
| Order for payment by instalments | Rule 44.6 |
| Financial position notice | Rule 44.7 |

## Scope of this Part

44.1 This Part deals with the examination of a judgment debtor to obtain information to assist in enforcing a judgment. Such an examination is called an "**oral examination**".

## Who may be orally examined

44.2 (1) The following persons maybe ordered to attend an oral examination –

    (a) the judgment debtor; or

    (b) an officer or former officer of a judgment debtor which is a body corporate.

  (2) A person referred to in paragraph (1) is called "**the examinee**".

## Procedure to obtain order for oral examination etc.

44.3 (1) Where permission is not required to enforce the judgment, a request for an order that a person attend an oral examination may be made by filing a request as specified in Form 29 or 30 of the Appendix, as the case requires, which contains the information required by the relevant practice direction.

(2) Where permission is required to enforce the judgment, an application for an order that a person attend an oral examination must be made and a copy of the permission must be attached to the application. An application under this paragraph may be made without notice.

(3) Where a request or an application for the order is against an officer or a body corporate, the request or the application must be supported by evidence on affidavit showing that the person to be orally examined is such an officer.

## Order for oral examination

44.4 (1) The order, in Form 14, must state the date, time and place of the examination.

(2) The judgment creditor must serve the order personally on the examinee at least 7 days before the date fixed for the examination.

(3) The judgment creditor must file an affidavit of service not less than 3 days before the date fixed for the examination.

## Conduct of oral examination

44.5 (1) The examination may take place before the registrar or an officer of the court authorised by the Chief Justice.

(2) A person referred to in paragraph (1) is called "**the examiner**."

(3) The examination must be on oath or affirmation.

(4) The statement made by the examinee must be taken down and read to the examinee who must then be asked to sign it.

(5) If the examinee refuses to sign the statement it must be signed by the examiner and certified to be a true record of the examination.

(6) If the examinee –

    (a) fails to attend;

    (b) refuses to be sworn or affirm; or

    (c) refuses to answer any question;

the examiner may adjourn the examination to a judge.

(7) The notice of the adjourned hearing must be in Form 15.

(8) The judgment creditor must –

    (a) serve the examinee personally with the notice of the adjourned hearing endorsed with the first form of notice set out in rule 53.3(b) at least 7 days before the adjourned examination; and

    (b) file an affidavit proving service of Form 15 and that the examinee was offered his or her travelling expenses to and from the court.

## Order for payment by instalments

44.6 If the parties agree that the judgment debt should be paid by instalments or at some future date, the court office may draw an order to that effect.

## Financial position notice

44.7 (1) If the judgment to be enforced is a money judgment, the judgment creditor may serve, in addition to or in place of an order for an oral examination, a financial position notice in Form 16 requiring a judgment debtor to complete a statement of the judgment debtor's financial position in the practice form and serve it on the judgment creditor within 14 days of service.

(2) The judgment creditor may notify the court if satisfied with the information provided by the judgment debtor.

(3) The court office must then notify the person to be examined that he or she need not attend the examination.

(4) If the judgment debtor is a body corporate, the financial position notice must require an officer of the body corporate to comply with paragraph (1).

**PART 45**

# How Judgments may be Enforced

**Contents of this Part**

| | |
|---|---|
| Scope of this Part | Rule 45.1 |
| How money judgments may be enforced | Rule 45.2 |
| Enforcement of orders for payment of money into court | Rule 45.3 |
| Enforcement of judgments and orders for possession of land | Rule 45.4 |
| Enforcement of judgments and orders for delivery of goods | Rule 45.5 |
| Enforcement of judgments and orders requiring person to do act within specified time or not to do act | Rule 45.6 |
| Enforcement of judgments and orders requiring body corporate to do act within specified time or not to do act | Rule 45.7 |

## Scope of this Part

45.1 This Part sets out the ways in which judgments may be enforced. It has effect subject to any enactment as to enforcement of judgments in force for the time being in any Member State or Territory.

## How money judgments may be enforced

45.2 A judgment or order for payment of a sum of money other than an order for payment of money into court may be enforced by –

(a) a charging order under Part 48;

(b) a garnishee order under Part 50;

(c) (subject to the restrictions of any relevant Debtors Act) a Judgment Summons under Part 52;

(d) on order for the seizure and sale of goods under Part 46; or

(e) the appointment of a receiver under Part 51.

## Enforcement of orders for payment of money into court

45.3 (1) An order for the payment of money into court may be enforced by –

    (a) a committal order under Part 53;

    (b) an order for sequestration of assets under Part 53; or

    (c) the appointment of a receiver under Part 51.

    (2) An order for committal or sequestration of assets under paragraph (a) or (b) may be made only if the order requires payment to be made within a specified time or by a specified date.

## Enforcement of judgments and orders for possession of land

45.4 (1) A judgment or order for the possession of land may be enforced by –

    (a) a committal order under Part 53;

    (b) a sequestration of assets order under Part 53; or

    (c) a writ of possession of land.

    (2) An order for committal or sequestration of assets under paragraph (a) or (b) may be made only if the court has given a judgment or made an order requiring possession of land to be given within a specified time or by a specified date.

## Enforcement of judgments and orders for delivery of goods

45.5 (1) The ways in which an order for delivery of goods may be enforced depend on whether or not the judgment or order gives the judgment debtor the choice of paying the assessed value of the goods.

    (2) If it gives the judgment debtor the choice, the means of enforcement are a writ of –

    (a) delivery to recover the goods or their assessed value under Part 46;

    or

    (b)  specific delivery for the recovery of specified goods under Part 46.

(3) A judgment creditor may only obtain a writ of specific delivery under paragraph (2)(b) if the court gives permission under rule 46.9.

(4) If the judgment or order gives the judgment debtor the choice of paying the assessed value of the goods, that judgment or order may not be enforced by order of committal under Part 53.

(5) However on the application of the judgment creditor the court may make an order requiring the judgment debtor to deliver the goods to the judgment creditor within a specified time or by a specified date, and if the judgment debtor does not comply, that order may be enforced by an order for committal under Part 53.

(6) If the judgment or order does not give the judgment debtor the choice of paying the assessed value of the goods, or an order is made under rule 46.9, the means of enforcing the order are by orders for –

(a) committal under Part 53;

(b) recovery of specified goods under Part 46; or

(c) sequestration of assets under Part 53.

(7) The judgment creditor may obtain an order for sequestration of assets or committal under paragraph (5) or (6) only if the court has given a judgment or made an order requiring delivery within a specified time.

## Enforcement of judgments and orders requiring person to do act within specified time or not to do act

45.6 A judgment or order which requires a person to –

(a) abstain from doing an act; or

(b) do an act within a specified time or by a specified date; may be enforced by an order under Part 53 for –

(i) committal; or

(ii) sequestration of assets.

# Enforcement of judgments and orders requiring body corporate to do act within specified time or not to do act

45.7 (1) If the court gives a judgment or makes an order under rule 45.6 which requires a body corporate to do or abstain from that act it may make an order under Part 53 for –

   (i) committal or for sequestration of assets against an appropriate person; or

   (ii) sequestration of assets of the body corporate.


   (2) In this rule –

   "**appropriate person**" means a director or other officer of the body corporate.

**PART 46**

# General Rules about Writs of Execution

**Contents of this Part**

Meaning of "writ of execution"                                                          Rule 46.1

Permission required to enforce in certain cases                                          Rule 46.2

Application for permission to enforce                                                    Rule 46.3

Amount to be recovered on enforcement                                                    Rule 46.4

Enforcement of judgment or order requiring judgment debtor to do two or more different things    Rule 46.5

No writ of execution against Crown                                                       Rule 46.6

Enforcement of judgment for payment by instalments                                       Rule 46.7

No writ of execution for goods or payment of assessed value unless court has assessed value    Rule 46.8

Order for specific delivery                                                              Rule 46.9

Period for which writ of execution valid                                                 Rule 46.10

Renewal of writ of execution                                                             Rule 46.11

Period for which court may renew writ of execution                                       Rule 46.12

Effective date of renewed writ unchanged                                                 Rule 46.13

Claims to goods seized under writ of execution                                           Rule 46.14

Suspension of writ of execution at request of judgment creditor                          Rule 46.15

Return to writ of execution                                                              Rule 46.16

## Meaning of "writ of execution"

46.1 In these Rules a "**writ of execution**" means any of the following –

(a) an order for the sale of land (or, in Saint Lucia, a writ for the seizure and sale of immovable property);

(b) an order for the seizure and sale of goods a writ of fieri facias (or, in Saint Lucia, a writ for the seizure and sale of moveable property);

(c) an order for sequestration of assets;

(d) a writ of delivery, being either an order for –

(i) recovery of specified goods; or

(ii) the recovery of goods or their assessed value; and

(e) a writ of possession.

•Part 53 deals with enforcement by an order for sequestration of assets.

# Permission required to enforce in certain cases

46.2 A writ of execution may not be issued without permission if –

    (a) any party against whom a judgment or order was liable to enforced is no longer liable to have it enforced against it;

    (b) any statutory provision requires the permission of the court to be obtained before judgment is enforced;

    (c) 6 years have elapsed since the judgment was entered;

    (d) the goods against which it is wished to enforce the judgment or order are in the hands of a receiver or confiscator appointed by the court;

    (e) the judgment creditor is no longer entitled to enforce the order;

    (f) the judgment debtor has died and the judgment creditor wishes to enforce against assets of the deceased person which have passed to that person's personal representatives since the date of the order; or the judgment was made subject to conditions.

46.3 (1) An application for permission may be made without notice unless the court otherwise directs but must be supported by evidence on affidavit.

    (2) On an application for leave the applicant must satisfy the court that it is entitled to proceed to enforce the judgment or order, and, in particular must satisfy the court –

    (a) if the judgment is a money judgment – as to the amount –

        (i) originally due; and

        (ii) due together with interest at the date of the application;

    (b) if rule 46.2 applies – as to the reasons for the delay;

    (c) if rule 46.2 (a) or (e) applies – as to the change that has taken place;

    (d) if rule 46.2 (d) or (f) applies – that a demand to satisfy the judgment or order has been made on the person holding the assets and that that person has refused or failed to do so;

    (e) that the applicant is entitled to enforce the judgment; and

    (f) that the person against whom enforcement is sought is liable to satisfy the judgment.

## Amount to be recovered on enforcement

46.4 (1) A judgment creditor may recover on a writ of execution –

    (a) fixed costs in accordance with rule 65.4;

    (b) interest on a money judgment; and

    (c) the balance of any money judgment.


    (2) The rate of interest payable on a judgment debt is the statutory rate of interest unless the court has directed that some other rate shall apply.


    (3) Unless the court otherwise orders, the amount for which a writ of execution may be issued may include the unpaid fixed costs and fees of any previous enforcement proceedings on the same judgment.


## Enforcement of judgment or order requiring the judgment debtor to do two or more different things

46.5 If a judgment or order requires the judgment debtor to do two or more different things, the judgment creditor may obtain –

    (a) a single writ of execution to enforce every part of the judgment or order; or

    (b) separate writs of execution to enforce one or more parts of it.


## No writ of execution against Crown

46.6 A writ of execution may not be issued where the judgment debtor is the Crown.


## Enforcement of judgment for payment by instalments

46.7 (1) This rule has effect where the court has made an order for payment by instalments of –

    (a) a sum of money; or

    (b) the value of goods assessed;

    after the court has made an order for the recovery of goods or their assessed value and the judgment debtor has failed to pay one or more instalments.

(2) The judgment creditor may issue an order for the seizure and sale of the goods for the purpose of recovering the whole of the amount recoverable under the judgment and not merely the installment(s) in arrears.

## No writ of execution for goods or payment of assessed value unless court has assessed value.

46.8 A judgment creditor may not issue a writ of delivery for the recovery of goods or payment of their assessed value unless that value has previously been assessed by the court or an order has been made under rule 46.9.

## Order for specific delivery

46.9 (1) If the court makes an order for delivery of goods or payment of their assessed value, the judgment creditor may apply to the court for permission to issue an order for delivery of specified goods without the alternative of payment of the assessed value.

(2) An application for permission must be served on the defendant whether or not that defendant has filed an acknowledgment of service.

## Period for which writ of execution is valid

46.10(1) A writ of execution is valid for a period of 12 months beginning with the date of its issue.

(2) After that period the judgment creditor may not take any step under the writ unless the court has renewed it.

## Renewal of writ of execution

46.11(1) The judgment creditor may apply for the renewal of a writ of execution.

(2) The general rule is that an application for renewal must be made within the period for which the writ is valid.

(3) If the judgment creditor applies for renewal after the end of that period, the court may renew the writ only if it is satisfied that the judgment creditor has –

(a) taken all reasonable steps to execute the writ or some part of it; and

(b) been unable to do so.

(4) An application for renewal may be made without notice but must be supported by evidence on affidavit.

(5) The judgment creditor must state in the affidavit under paragraph (4) whether or not the judgment creditor is aware of any other judgment creditor and, if so, give such details of which the judgment creditor is aware as to the money due from the judgment debtor to each such judgment creditor.

(6) On such an application the court must have regard to the interests of any other judgment creditor of whose existence it is aware.

## Period for which court may renew writ of execution

46.12 On an application for renewal of a writ of execution the court may renew it for a period of not more than 6 months.

## Effective date of renewed writ unchanged

46.13 (1) The renewal of a writ of execution does not change its effective date.

(2) The effective date is therefore still that of the writ as originally issued.

(3) The priority of the renewed writ and of any other writ of execution must be determined accordingly.

## Claims to goods seized under writ of execution

46.14 If –

(a) goods are seized under a writ of execution; and

(b) some person other than the judgment creditor or judgment debtor subsequently claims any of them;

the validity of the writ of execution is extended until the end of 12 months from the conclusion of interpleader proceedings on that claim.

•Part 54 deals with interpleader proceedings.

## Suspension of writ of execution at request of judgment creditor

46.15 (1) The judgment creditor may ask the sheriff to suspend execution.

(2) If the judgment creditor does so, neither the judgment creditor nor the sheriff may take any further step under the writ of execution unless the court first renews it.

## Return to writ of execution

46.16 (1) A judgment creditor who has issued a writ of execution may serve a notice on the sheriff requiring the sheriff to make a return of the manner in which it has been executed.

(2) If the sheriff fails to comply with the notice within 14 days the judgment creditor may apply to the court for an order directing the sheriff to comply.

**PART 47**

# Variation of Terms of Judgments and Suspension of Writs

**Contents of this Part**

Scope of this Part                                                                          Rule 47.1

Applications to vary time and method of payment or to suspend order for seizure and sale of
        goods or writ of delivery                                                           Rule 47.2

Where no objection except as to terms – procedure                                           Rule 47.3

Application for redetermination of court's decision                                         Rule 47.4

Where judgment creditor objects to variation or suspension                                  Rule 47.5

Pre-suspension costs                                                                        Rule 47.6

Judgment creditor's right to re-issue writ of execution                                     Rule 47.7

## Scope of this Part

47.1 This Part deals with –

    (a) variation of the terms of a judgment for payment of a specified sum of money as to the time and
        method of payment; and

    (b) suspension of orders for the seizure and sale of goods and writs of delivery.

## Applications to vary time and method of payment or to suspend order for seizure and sale of goods or writ of delivery

47.2 (1) This rule applies to –

    (a) judgments for payment of a sum of money;

    (b) judgments for the delivery of goods or payment of their value;

    (c) orders for seizure and sale of goods; and

    (d) writs of delivery where the defendant has the alternative of paying the assessed value.

    (2) An application by the judgment debtor to vary the terms of the judgment as to the time or
        method of payment or to suspend a writ of execution under this rule must be supported by
        evidence in the appropriate practice form.

## Where no objection except as to terms – procedure

47.3 (1)  The court must serve the application to vary or suspend on the judgment creditor.

(2) The judgment creditor may file and serve on the judgment debtor objections to the application.

(3) If the judgment creditor does not do so before the end of 14 days from the date of service of the application, the court may make an order according to the terms which the judgment debtor asks.

(4) If the judgment creditor objects only to the rate and time of any payment proposed by the judgment debtor, the court –
(a) may decide the rate and time of payments; and
(b) may make an order suspending the writ of execution on those terms.

(5) The court may make this decision without a hearing.

(6) The court office must serve a copy of the order made under paragraph  (3) or (4) on the judgment creditor and judgment debtor.

## Application for redetermination of court's decision

47.4 (1) The judgment creditor or the judgment debtor may apply to the court  to re-determine the decision.

(2) The application may not be made more than 14 days after the date of service of the court's order under rule 47.3(6).

(3) The court office must fix a hearing and give the judgment creditor and judgment debtor at least 7 days notice of the date, time and place of the hearing.

## Where judgment creditor objects to variation or suspension

47.5 If the judgment creditor gives the court notice that it does not agree to any variation as to the time or method of payment or suspension of the writ of execution on any terms, the court office must fix a hearing and give the judgment creditor and judgment debtor at least 7 days notice of the date, time and place of the hearing.

## Pre-suspension costs

47.6 If the court hears an application to vary the judgment or suspend a writ of execution it may add to the judgment debt –

(a) any costs or fees incurred by the judgment creditor in connection with any writ of execution; and

(b) the costs of the application for variation or suspension;

and such costs must be assessed by the court.

• Rule 65.11 deals with assessed costs.

## Judgment creditor's right to re-issue writ of execution

47.7 (1) A judgment creditor may re-issue a writ of execution if –

(a) execution has been suspended on terms; and

(b) the judgment debtor has not complied with those terms.

(2) The re-issued order has the same priority as the original order.

**PART 48**

# Charging Orders

**Contents of this Part**

Scope of this Part and definitions                              Rule 48.1

How to apply for charging order                                 Rule 48.2

Evidence in support of application for charging order           Rule 48.3

Single charging order for more than one judgment debt          Rule 48.4

Procedure for making provisional charging order                Rule 48.5

Interested persons                                              Rule 48.6

Service of provisional charging order and of copies            Rule 48.7

Making of final charging order                                  Rule 48.8

Effect of provisional or final charging order                   Rule 48.9

Discharge or variation of final charging order                 Rule 48.10

Enforcement of charging order by sale                          Rule 48.11

## Scope of this Part and definitions

48.1 (1) This Part deals with the enforcement of a judgment debt by charging –

      (a) stock (including stock held in court); and

      (b) other personal property.


    (2) In this Part –"**proper officer**" means the court officer who is responsible for the
custody of funds in court; and
"**stock**" includes securities, shares and dividends arising therefrom.

## How to apply for charging order

48.2 (1) An application for a charging order must be made on the appropriate practice form.

(2) The application is to be made without notice but must be supported by evidence on affidavit.

(3) An application for a charging order relating to stock may incorporate an application for an order for sale of such stock under rule 48.11.

## Evidence in support of application for charging order

48.3 (1) This rule sets out the evidence required to support an application for a charging order.

(2) The affidavit must –

    (a) certify the amount remaining due under the judgment;

    (b) identify the judgment or order to be enforced;

    (c) state that the applicant is entitled to enforce the judgment;

    (d) state that to the best of the deponent's information and belief the debtor is beneficially entitled to the stock or personal property as the case may be;

    (e) state the name and address of every person who is believed to be an unsecured creditor of the judgment debtor;

    (f) state the name and address of the judgment debtor;

    (g) where the application relates to stock –

        (i) identify the company and the stock of that company to be charged;

        (ii) identify any person who has responsibility for keeping a register of the stock;

        (iii) state whether any person other than the judgment debtor is believed to have an interest in that stock whether as a beneficiary, a joint owner or trustee; and

        (iv) if so, give the names and addresses of such persons and details of their interest; and

    (h) in the case of any other personal property —

        (i) identify that property; and

        (ii) state whether any other person is believed to have an interest in the property.

## Single charging order for more than one judgment debt

48.4  A judgment creditor may apply for a single charging order in respect of more than one judgment or order against a judgment debtor.

## Procedure for making provisional charging order

48.5 (1) In the first instance the court must deal with an application for a charging order without a hearing and may make a provisional charging order.

(2) On the application of the judgment creditor the court may grant an injunction to secure the provisional charging order.

(3) An application for an injunction may be made without notice and may remain in force until 7 days after the making of an order under rule 48.8(4).

## Interested persons

48.6 (1) In this Part –

"**interested persons**" means the persons specified in paragraph (2) as well as the judgment creditor and the judgment debtor.

(2) The interested persons are –

(a) any person who is responsible for keeping the register of stock for that company;

(b) any person who owns the stock to be charged jointly with the judgment debtor;

(c) any unsecured creditor;

(d) if the stock is held in court, the proper officer;

(e) the company whose stock is to be charged;

(f) if the stock is held by the judgment debtor as a trustee – such of the other trustees and beneficiaries as the court may direct;

(g) if the stock is held under a trust – the trustees or such of them as the court may direct; and

(h) any other person who has an interest in the personal property to be charged.

## Service of provisional charging orders and of copies

48.7 (1) If the court makes a provisional charging order, the judgment creditor must serve on the judgment debtor in accordance with Part 5 –

(a) a copy of the affidavit in support of the application for the order;

and

(b) the order.

(2) The judgment creditor must also serve a copy of the order on the interested persons listed in the affidavit filed in support of the application.

(3) Any interested person other than the company and the person responsible for keeping the register must be served personally.

(4) The provisional charging order must state the date, time and place when the court will consider making a final charging order.

(5) The order and copy orders must be served at least 28 days before the hearing.

(6) The judgment creditor must file an affidavit of service not less than 7 days before the hearing.

## Making of final charging order

48.8 (1) This rule deals with the –

    (a) filing of objections to a provisional charging order; and

    (b) making of a final charging order.

(2) The following persons may file objections to a provisional charging

order –

(a) any interested person;

(b) the judgment creditor; and

(c) the judgment debtor.

(3) The objection must be filed not less than 14 days before the hearing.

(4) At the hearing if satisfied that the provisional charging order has been served on the judgment debtor, the court has power to –

(a) discharge the provisional charging order;

(b) give directions for the resolution of any objection that cannot be fairly resolved summarily; or

(c) make a final charging order.

(5) If the court makes an order under paragraph (4) (b), it may continue any injunction made under rule 48.5 until 7 days after the application is finally determined.

(6) A copy of the charging order must be served by the court office on —

    (a) any interested person who has filed an objection;

    (b) the judgment creditor;

    (c) the judgment debtor; and

    (d) in the case of stock –

        (i) any person who has responsibility for keeping a register of the stock; and

        (ii) the company.

(7) Every copy of the charging order served on –

    (a) any person who has responsibility for keeping a register of the stock; and

    (b) the company;

    must contain a stop notice.

- Part 49 deals with the effect of a stop notice.

## Effect of provisional or final charging order

48.9 (1) A disposition by a judgment debtor of an interest in property subject to a provisional or final charging order is not valid against the judgment creditor.

(2) Any person or body on whom an order was served under rule 48.6 (2) (a) or (e) must not permit the transfer of any stock specified in the order or pay any interest or dividend payable out of the stock to any person while the order remains in force.

(3) If after service of the order the person or body listed in rule 48.6 (2) (a) or (e) makes a transfer or payment prohibited by paragraph (2), that person or body is liable to pay the judgment creditor an amount equivalent to the value of the stock transferred or payment made or as much of it as is necessary to satisfy the judgment debt and costs.

## Discharge or variation of final charging order

48.10 (1) An application to discharge or vary a final charging order may be made

by -

(a) any interested person;

(b) the judgment creditor; or

(c) the judgment debtor.

(2) Notice of application must be served on the –

(a) judgment creditor and judgment debtor, if made by an interested person;

(b) judgment creditor, if made by the judgment debtor; or

(c) judgment debtor, if made by the judgment creditor.

(3) Any order must be served on every person on whom the final charging order was served.

## Enforcement of charging order by sale

48.11 (1) If a judgment creditor wishes to enforce a charging order of stock or personal property by sale, the judgment creditor may apply to the court for an order for sale of the stock or personal property.

(2) The application must be supported by evidence on affidavit.

(3) Notice must be served on the judgment debtor.

(4) The court may give such directions as seemed appropriate to secure the expeditious sale of the stock or property charged at a price that is fair to both creditor and judgment debtor.

**PART 49**

# Stop Notices and Stop Orders

**Contents of this Part**

Scope of this Part                              Rule 49.1

Right to apply for stop notice                  Rule 49.2

Procedure for obtaining stop notice             Rule 49.3

Service                                         Rule 49.4

Amendment of stop notice                        Rule 49.5

Withdrawal or discharge of stop notice          Rule 49.6

Stop orders                                     Rule 49.7

Procedure on application for stop order         Rule 49.8

Power to vary or discharge stop order           Rule 49.9

## Scope of this Part

49.1 (1) This Part enables a person by obtaining a –

    (a) stop notice – to be notified of proposed dealings relating to stock;

    (b) stop order – to prevent certain specified steps being taken with regard to stock or funds in court.

    (2) In this Part –

    "**proper officer**" means the officer of the court who is responsible for the custody of funds in court;

    "**stop notice**" means a notice requiring any person or body on whom it is served to refrain from taking, in respect of any of the stock specified in the notice, any of the specified steps without first notifying the person by whom, or on whose behalf, the notice was served;

    "**stop order**" means an order of the court prohibiting the taking, in respect of any of the stock or funds in court specified in the order, any of the specified steps; and

    "**the specified steps**" means –

(a) in the case of stock or funds in court – the transfer, sale or other dealing with the stock or funds or the payment out of the income thereof;

(b) the making of any payment by way of dividend, interest or otherwise in respect of the stock;

(c) the registration of any transfer of the stock.

## Right to apply for stop notice

49.2 Any person who claims to be beneficially entitled to an interest in stock may apply for a stop notice.

## Procedure for obtaining stop notice

49.3 (1) Anyone who wants the court office to issue a stop notice may obtain one by filing a notice in the practice form.

(2) The applicant must also file an affidavit which –

(a) gives an address for service for the applicant;

(b) identifies the stock; and

(c) identifies the applicant's interest in it.

(3) The court office must then issue a stop notice.

(4) Anyone who applies to the court to issue a stop notice is referred to as the "**applicant**".

## Service

49.4 (1) The applicant must serve a copy of the –

(a) affidavit; and

(b) stop notice;

on the company and any keeper of the register on whom the applicant would have had to serve a charging order relating to the stock in accordance with rule 48.7.

(2) After that, so long as the stop notice is in force, neither the company nor the keeper of the

register may register any transfer of the stock or take any step mentioned in the stop notice until 14 days after sending a notification of the proposed registration or other step to the applicant.

## Amendment of stop notice

49.5 (1) If a stop notice describes any stock incorrectly, the applicant may ask the court office to issue an amended notice.

(2) The application may be made without notice.

•Rule 49.4 applies to an amended notice as it applies to the original notice.

## Withdrawal or discharge of stop notice

49.6 (1) The person on whose behalf the court office issued a stop notice may withdraw it by serving a notification of withdrawal on the court and on every person on whom the stop notice was served.

(2) On the application of any person claiming to be beneficially interested in the stock to which a stop notice relates, the court may by order discharge or vary the notice.

(3) An application for such an order must be served on the person on whose behalf the court originally issued the stop notice.

(4) The application must be supported by evidence on affidavit.

## Stop orders

49.7 (1) The court may make a stop order relating to –

(a) funds in court; or

(b) stock.

(2) The stop order may prohibit the taking of any of the specified steps.

## Procedure on application for stop order

49.8 (1) Any person claiming to be beneficially entitled to stock may apply for a stop order.

(2) In the case of money in court any person –

(i) who has a mortgage or charge on the interest of any person in funds in court;

(ii) to whom that interest has been assigned; or

(iii) who is a judgment creditor of the person entitled to that interest; may apply for a stop order.

(3) Notice of an application for a stop order must be served by the applicant at least 7 days before the hearing on any person whose interest may be affected by the order and, in the case of funds in court, on the proper officer.

## Power to vary or discharge stop order

49.9 The court may vary or discharge a stop order on the application of any person claiming to be entitled to any interest in the stock to which the order relates.

**PART 50**

# Attachment of Debts

**Contents of this Part**

Scope of this Part                                                          Rule 50.1

Circumstances in which court may make order for attachment of debts         Rule 50.2

Procedure – making of provisional order                                     Rule 50.3

Money in bank accounts, etc.                                                Rule 50.4

Joint funds                                                                 Rule 50.5

Presumption of equal shares in joint funds                                  Rule 50.6

Attachment of debts owed by firm                                            Rule 50.7

Service of provisional order                                                Rule 50.8

Effect of provisional order                                                 Rule 50.9

Hearing to consider making final order                                      Rule 50.10

Claim to debt by person other than judgment debtor                          Rule 50.11

Enforcement against garnishee                                               Rule 50.12

Discharge of garnishee's debt to judgment debtor                            Rule 50.13

Costs of attachment of debts proceedings                                    Rule 50.14

Money in court                                                              Rule 50.15

# Scope of this Part

50.1 (1) This Part provides a procedure under which a judgment creditor can obtain payment of all or part of a judgment debt from a person who owes the judgment debtor money.

(2) In this Part –

"**attachment of debts order**" means the order served on a garnishee attaching a debt in the garnishee's hands;

"**garnishee**" means a debtor in whose hands a debt has been attached;

And

"**proper officer**" means the officer of the court who is responsible for the custody of funds in court.

(3) The attachment of debts order may require the garnishee to pay enough to satisfy the fixed costs

of the attachment of debt proceedings as well as the judgment debt.

•Part 65, Appendix A sets out the fixed costs.


## Circumstances in which court may make order for attachment of debts

50.2 (1) The attachment of debts procedure may not be used if the order is to pay money into court.


(2) An attachment of debts order can be made only against a garnishee who is within the jurisdiction.


(3) An attachment of debts order may not be made to attach debts due from the Crown.

•Rule 59.7(3) provides an alternative procedure in this situation.


(4) A debt may be attached if it –

   (a) is due or accruing to the judgment debtor from the garnishee on the date that the provisional order under rule 50.3 is served on the garnishee; or

   (b) becomes due or accrues due to the judgment debtor at any time between the service of the provisional order under rule 50.3 and the date of the hearing.


## Procedure – making of provisional order

50.3 (1) An application by a judgment creditor for an attachment of debts order must be in the appropriate practice form.


(2) The application may be made without notice but must be supported by evidence on affidavit.


(3) If the court considers that on the evidence submitted the judgment creditor is entitled to an attachment of debts order, it must make a provisional order.


(4) The court must do this without a hearing.


(5) The court office must state in the provisional order the date, time and place of the hearing.

## Money in bank accounts, etc.

50.4 (1) An attachment of debts order may be made in respect of any type of debt but includes money standing to the credit of any account of the judgment debtor with a bank or other financial institution.

(2) An attachment of debts order must not require a payment that would reduce below EC$50 the amount standing in the name of a judgment debtor in an account with a bank or other financial institution.

## Joint funds

50.5 (1) This rule applies where an application is made to attach a fund which is owned jointly by the judgment debtor and another person or persons.

(2) The evidence in support of the application must state –
(a) details of the joint fund;
(b) the names and addresses of the person or persons who own the fund jointly with the judgment debtor; and
(c) if the applicant claims that the judgment debtor is entitled to more than an equal share in the fund – the grounds for that claim.

(3) Each owner of the fund must be served with the provisional attachment of debts order and the evidence in support.

## Presumption of equal shares in joint funds

50.6 (1) The general rule is that a fund held jointly by the judgment debtor and another person or persons is to be presumed to be owned in equal shares.

(2) Any person served under rule 50.5(3) may apply to the court to determine the actual beneficial entitlement of each owner of the joint fund.

## Attachment of debts owed by firm

50.7 (1) This rule applies to the attachment of debts due or accruing due from a firm carrying on business within the jurisdiction.

(2) Such debts may be attached even if one or more members of the firm is resident outside the jurisdiction.

(3) A provisional order under rule 50.3 must be served on –
    (a) a member of the firm; or
    (b) some other person having the control or management of the partnership business;
      in the jurisdiction.

(4) Any member of the garnishee may attend a hearing of an application for an attachment of debts order.

## Service of provisional order

50.8 (1)  The judgment creditor must serve the provisional attachment of debts order.

(2) It must be served first on the garnishee at least 21 days before the hearing. It must be served personally on the garnishee unless the garnishee is a body corporate.

(3) If the garnishee is a bank or other financial institution, the provisional attachment of debts order must be served at its principal or registered office and also the branch at which the judgment debtor's account is kept, if that address is known to the judgment creditor.

(4) Secondly, the order must be served on the judgment debtor.

(5) It must be served on the judgment debtor at least 7 days after it has been served on the garnishee and not less than 7 days before the hearing.

## Effect of provisional order

50.9 (1) This rule sets out the effect of a provisional attachment of debts order.

(2) The order becomes binding on the garnishee as soon as it is served on the garnishee.

(3) The garnishee does not then have to pay the judgment creditor anything except to the extent that

the garnishee's debt to the judgment debtor is greater than the amount of the attachment of debts order.

(4) However, if the garnishee pays anyone but the judgment creditor the garnishee may have to make further payment to the judgment creditor in accordance with the terms of any final attachment of debts order that the court may make.

## Hearing to consider making final order

50.10 At the hearing fixed by the provisional order the court, if satisfied that the order has been properly served, may –

(a) discharge the provisional order;

(b) give directions for the resolution of any dispute; or

(c) make a final attachment of debts order.

## Claim to a debt by person other than judgment debtor

50.11(1) This rule has effect where the court is aware from information supplied by the garnishee or from any other source that someone other than the judgment debtor –

(a) is or claims to be entitled to the debt; or

(b) has or claims to have a charge or lien on it.

(2) In this rule –

"**lien**" means a right to retain possession of goods to protect a debt.

(3) Where this rule has effect, the court may require the judgment creditor to serve notice of –

(a) any hearing fixed by the court; and

(b) the application for an attachment of debts order;

on any person who may have such an interest as is set out in paragraph (1).

(4) The notice must be served personally unless the person is a body corporate.

(5) Notice must also be served on the –

(a) garnishee; and

(b) judgment debtor.

(6) A notice under this rule must contain a warning to every person on whom it is served that, if that person does not attend court, the court may proceed to decide the issue in that person's absence.

## Enforcement against garnishee

50.12 If a garnishee does not fulfill the terms of an attachment of debts order, the judgment creditor may issue enforcement proceedings against the garnishee.

## Discharge of garnishee's debt to judgment debtor

50.13(1) This rule has effect where–

(a) an attachment of debts order is enforced against the garnishee; or

(b) the garnishee pays money to the judgment creditor in compliance with an attachment of debts order.

(2) The garnishee's liability to the judgment debtor is then discharged to the extent of the amount paid by, or recovered from the garnishee.

(3) This rule has effect even if the court later sets aside the attachment of debts order or the original judgment or order.

## Costs of attachment of debts proceedings

50.14(1) This rule contains general provisions about the costs of attachment of debts proceedings.

(2) The judgment creditor's costs are those fixed by Part 65, Appendix A unless the court makes some other order in which case it must assess the costs.

(3) The judgment creditor may retain the costs out of the money recovered through the attachment of debts order.

(4) The costs are to be taken to have been paid to the judgment creditor before any payment in respect of the judgment debt.

(5) A garnishee who appears at attachment of debts proceedings may deduct the garnishee's costs before paying any sum over to the judgment creditor in pursuance of the attachment of debts order.

(6) Costs payable under paragraph (5) must be assessed under rule 65.11 if not agreed.

## Money in court

50.15(1) An attachment of debts order may not be made in respect of money in court standing to the credit of the judgment debtor.

(2) The judgment creditor may however apply for an order that a sufficient amount of the money in court to satisfy the judgment and the fixed costs of the application be paid to the judgment creditor.

(3) Notice of the application must be given to the proper officer and any person who has an interest in the fund.

(4) Until hearing of the application the money to which it relates must not be paid out of court.

- Part 65, Appendix A sets out the fixed costs.

**PART 51**

# Appointment of Receiver

**Contents of this Part**

Scope of this Part                                          Rule 51.1

Application for appointment of receiver and injunction      Rule 51.2

Conditions for appointment of receiver                      Rule 51.3

Giving of security by receiver                              Rule 51.4

Remuneration of receiver                                    Rule 51.5

Receiver's powers                                           Rule 51.6

Accounts of receiver                                        Rule 51.7

Payment of balance into court                               Rule 51.8

Default by receiver                                         Rule 51.9

## Scope of this Part

51.1 This Part deals with the appointment of a receiver and includes an application to appoint a receiver
to obtain payment of the judgment debt from the income or capital assets of the judgment debtor.

## Application for appointment of receiver and injunction

51.2 (1) An application for the appointment of a receiver must be supported by
evidence on affidavit.

(2) The applicant may also apply for an injunction to restrain the judgment debtor or other
respondent from assigning, charging or otherwise dealing with any property identified in the
application.

(3) If an application for an immediate injunction is made, the application for the appointment of a
receiver and for an injunction may be made without notice.

- Rules 17.3 and 17.4 deal with applications for interim injunctions.

## Conditions for appointment of receiver

51.3 In deciding whether to appoint a receiver to recover a judgment debt the court must have regard to the –

(a) amount likely to be obtained by the receiver;

(b) amount of the judgment debt; and

(c) probable cost of appointing and remunerating the receiver.

## Giving of security by receiver

51.4 (1) The general rule is that a person may not be appointed receiver until that person has given security.

(2) The court may however dispense with security.

(3) The order appointing the receiver must state the amount of the security.

(4) The security must be by guarantee unless the court allows some other form of security.

(5) The guarantee or other security must be filed at the court.

## Remuneration of receiver

51.5 The receiver may be allowed such remuneration as the court directs.

## Receiver's powers

51.6 A receiver's powers operate to the exclusion of the powers of the judgment debtor for the duration of the receiver's appointment.

## Accounts of receiver

51.7 (1) The order appointing a receiver must direct on what dates the receiver must file accounts.

(2) Unless the court orders otherwise the account must be verified by affidavit.

(3) The receiver must serve a copy of the account on the applicant.

(4) The applicant must obtain an appointment to pass the account.

(5) The passing of the account must be verified by a registrar.

## Payment of balance into court

51.8 The receiver must pay into court any balance shown on the accounts under rule 51.7 as due from the receiver within 7 days of the passing of any account.

## Default by receiver

51.9 (1) This rule applies if the receiver fails to –

    (a) attend for the passing of any account;

    (b) pay into court any balance shown on the account as due from the receiver; or

    (c) submit an account by the date ordered.

(2) The applicant must ask the court office to fix a hearing for the receiver to show cause for the receiver's failure.

(3) The court office must issue a notice stating the date, time and place of the hearing to show cause.

(4) The applicant must serve the notice on the receiver at least 7 days before the hearing.

(5) At the hearing the court may do any of the following –

    (a) give directions to remedy the default;

    (b) give directions for the discharge of the receiver;

    (c) appoint another receiver;

    (d) disallow any remuneration claimed by the receiver;

    (e) order the receiver to –

        (i) pay the costs of the applicant as assessed by the court; and

        (ii) pay interest at the statutory rate on any monies which may appear from a subsequent account to be due from the receiver.

**PART 52**

# Judgment Summonses

**Contents of this Part**

Scope of this Part                       Rule 52.1

Issue of judgment summons        Rule 52.2

Service of judgment summons       Rule 52.3

Hearing of judgment summons      Rule 52.4

Failure to comply with instalment order   Rule 52.5

Restored hearing of judgment summons   Rule 52.6

# Scope of this Part

52.1 This Part deals with applications to commit a judgment debtor for non-payment of a debt where this is not prohibited by any relevant enactment.

# Issue of judgment summons

52.2 (1) An application to commit a judgment debtor for failing to pay all or part of the judgment debt must be made by way of judgment summons in Form 21 and must state —

    (a) any payment that has been made by the judgment debtor;

    (b) the date and details of the judgment or order requiring payment of the debt; and

    (c) the amount of interest claimed to the date of the application and the daily rate thereafter.

    (2) The court order must –

      (a) fix a date for hearing of the judgment summons;

      (b) seal the judgment summons; and

      (c) return the order to the judgment creditor for service.

## Service of judgment summons

52.3 (1) The judgment creditor must serve the judgment debtor with the judgment summons in accordance with Part 5 not less than 7 days before the date fixed for the hearing of the application to commit.

(2) The judgment creditor must file an affidavit of service not less than 3 days before the hearing.

## Hearing of judgment summons

52.4 At the hearing of the judgment summons, the court may –

(a) if satisfied that all reasonable efforts have been made to served the judgment debtor and the –

(i) judgment debtor is willfully evading service; or

(ii) summons has come to the knowledge of the judgment debtor;

proceed in the absence of the judgment debtor as if the judgment debtor had been personally served;

(b) receive evidence as to the means of the debtor in any manner that it thinks fit; and

(c) if satisfied that all statutory requirements have been met –

(i) adjourn the hearing of the summons to a fixed date;

(ii) commit the judgment debtor for such fixed term as is permitted by law;

(iii) suspend such committal upon payment of the judgment debt on such dates and by such instalments as the court may order;

(iv) dismiss the judgment summons; or

(v) make an order for payment of the judgment debt by a particular date or by specified instalments and adjourn the hearing of the judgment summons to a date to be fixed on the application of the judgment creditor.

## Failure to comply with installment order

52.5 If the judgment debtor fails to comply with the terms of the judgment summons, the judgment creditor may –

(a) issue a further judgment summons;

(b) if a suspended committal order has been made – apply to commit the judgment debtor in accordance with the provisions of Part 53 (committal orders); or

(c) if an order has been made under rule 52.4(c) (v) – apply to the court in writing to restore the judgment summons.

## Restored hearing of judgment summons

52.6 (1) The judgment creditor must –

    (a) serve the notice of the restored hearing of a judgment summons in accordance with Part 5 at least 7 days before the date fixed for hearing; and

    (b) file an affidavit of service at least 3 days before the hearing.

(2) At the restored hearing the court may exercise any of its powers under rule 52.4.

**PART 53**


# Committal and Sequestration


**Contents of this Part**

Scope of this Part                                                                    Rule 53.1

Order specifying time for act to be done                                              Rule 53.2

When committal order or sequestration order may be made                               Rule 53.3

Committal order or sequestration order against officer of body corporate              Rule 53.4

Making committal order or sequestration order when judgment or order not served       Rule 53.5

Undertakings                                                                          Rule 53.6

Application for committal order or sequestration order                                Rule 53.7

Service of notice of hearing                                                          Rule 53.8

Powers of the court                                                                   Rule 53.9

Restoration of adjourned hearing                                                      Rule 53.10

Application for enforcement of suspended committal order or order for sequestration   Rule 53.11

Special provisions relating to order for sequestration                                Rule 53.12


## Scope of this Part

This Part deals with the power of the court to commit a person to prison or to make a sequestration order
for failure to comply with an –

(a) order requiring that person to do; or

(b) undertaking by that person to do;

an act within a specified time or by a specified date or not to do an act.


## Order specifying time for act to be done

53.2 (1) If a judgment or order specifies the time or date by which an act must be done the court may by
order specify another time or date by which the act must be done.

(2) If a judgment or order does not specify the time or date by which an act must be done, the court may by order specify a time or date by which it must be done.

(3) The time by which the act must be done may be specified by reference to the day on which the order is served on the judgment debtor.

(4) An application for an order under this rule may be made without notice but the court may direct that notice be given to the judgment debtor.

(5) Any order made under this rule must be served in the manner required by rule 53.3 (enforcement against an individual judgment debtor) or 53.4 (enforcement against an officer of a body corporate).

## When committal order or sequestration order may be made

53.3 Subject to rule 53.5, the court may not make a committal order or a sequestration order unless —

    (a) the order requiring the judgment debtor to do an act within a specified time or not to do an act has been served personally on the judgment debtor;

    (b) at the time the order was served it was endorsed with a notice in the following terms:

      "**NOTICE: If you fail to comply with the terms of this order, proceedings may be commenced against you for contempt of court and you may be liable to be imprisoned.";** or,

    in the case of an order served on a body corporate, in the following terms:

      "**NOTICE: If you fail to comply with the terms of this order,**

      **proceedings may be commenced against you for contempt of court.";** and

    (c) if the order requires the judgment debtor to do an act within a specified time or by a specified date, it was served in sufficient time to give the judgment debtor a reasonable opportunity to do the act before the expiration of that time or before that date.

## Committal order or sequestration order against officer of body corporate

53.4 Subject to rule 53.5, the court may not make a committal order or a sequestration order against an officer of a body corporate unless —

    (a) a copy of the order requiring the judgment debtor to do an act within a specified time or not to

do an act has been served personally on the officer against whom the order is sought;

(b) at the time the order was served it was endorsed with a notice in the following terms:

**"NOTICE: If [name of body corporate] fails to comply with the terms of this order proceedings may be commenced for contempt of court and you [name of officer] may be liable to be imprisoned or to have an order of sequestration made in respect of your property.";** and

(c) if the order required the judgment debtor to do an act within a specified time or by a specified date, it was served in sufficient time to give the judgment debtor a reasonable opportunity to do the act before the expiration of that time or before that date.

## Making committal order or sequestration order when judgment or order not served

53.5 (1) This rule applies where the judgment or order has not been served.

(2) If the order requires the judgment debtor not to do an act, the court may make a committal order or sequestration order only if it is satisfied that the person against whom the order is to be enforced has had notice of the terms of the order by being –

(a) notified of the terms of the order by post, telephone, FAX or otherwise; or

(b) present when the order was made.

(3) The court may make an order dispensing with service of the judgment or order under rule 53.3 or 53.4 if it thinks it just to do so.

## Undertakings

53.6 An undertaking given to the court must, if practicable, be given in writing in the appropriate practice form and a copy of this form endorsed with a notice in accordance with rule 53.3(b) or 53.4 (b) must, if practicable, be served on the person giving the undertaking.

## Application for committal order or sequestration order

53.7 (1) The application must specify the

(a) exact nature of the alleged breach or breaches of the order or undertaking by the judgment debtor; and

(b) precise term of the order or undertaking which it is alleged that the judgment debtor has disobeyed or broken.

(2) The application must be verified by affidavit.

(3) The applicant must prove –

(a) service of the order endorsed with the appropriate notice under rule 53.3(b) or rule 54.3 (b); and

(b) that the person against whom it is sought to enforce the order had notice of the terms of the order under rule 53.5 if the order required the judgment debtor not to do an act; or

(c) that it would be just for the court to dispense with service.

## Service of notice of hearing

53.8 (1) The judgment creditor must serve on the judgment debtor or, in the case of a body corporate, the officer against whom it is sought to make a committal order or sequestration order, notice of the application for the order at least 7 days before the date fixed for hearing.

(2) If the notice of application is served on the judgment debtor less than 7 days before the hearing, the court may direct that in all the circumstances of the case sufficient notice has been given and may accordingly deal with the application.

(3) The notice of application must be served in accordance with Part 5.

(4) A copy of the application and of the evidence in support must be served with the notice.

## Powers of the court

53.9 If satisfied that the notice of application has been duly served, the court may –

(a) accept an undertaking from the judgment debtor or an officer of a body corporate who is present in court and adjourn the application generally;

(b) adjourn the hearing of the application to a fixed date;

(c) dismiss the application and make such order as to assessed costs under rule 65.11 as it considers to be just;

(d) make a committal order against a judgment debtor who is an individual;

(e) make a committal order against an officer of a judgment debtor  which is a body corporate;

(f) make a sequestration order against a judgment debtor who is an individual or a body corporate;

(g) make a sequestration order against an officer of a judgment debtor which is a body corporate; or

(h) make a suspended committal order or sequestration order on such terms as the court considers just.

## Restoration of adjourned hearing

53.10 (1) If an application for a committal order or a sequestration order has been adjourned under rule 53.9 (b), the court office may fix a date for the adjourned hearing.

(2) An application for a date to be fixed –

(a) may be made without notice; but

(b) must be supported by evidence on affidavit specifying –

(i) the exact nature of the alleged breach or breaches of the undertaking by the judgment debtor; and

(ii) the precise term or terms of the undertaking which it is alleged that the judgment debtor has disobeyed.

(3) The notice of the restored hearing must  –

(a) state the date, time and place of the restored hearing; and

(b) be served on the judgment debtor or the officer of a body corporate personally at least 3 days before the adjourned hearing.

(4) A copy of the evidence under paragraph (2) must be served with the notice.

## Application for enforcement of suspended committal order or order for sequestration

53.11 (1) If the court has imposed terms under rule 53.9 (h) and the judgment

creditor alleges that the judgment debtor has failed to comply with the terms imposed, the judgment creditor may apply for the suspended order to be enforced.

(2) The application must specify the –

   (a) precise term or terms of the suspended order which it is alleged that the judgment debtor has disobeyed; and

   (b) exact nature of the alleged breach or breaches of the terms of the suspended order by the judgment debtor.

(3) The application must be verified by affidavit.

(4) The court office must fix a hearing of the application.

(5) The notice of hearing must be served on the judgment creditor or the officer of a body corporate personally at least 3 days before the adjourned hearing.

(6) A copy of the evidence under paragraph (2) must be served with the application.

## Special provisions relating to order for sequestration order

53.12 (1) The judgment creditor may not sell any property seized under a sequestration order without the permission of the court.

(2) An application for permission must be supported by evidence on affidavit.

**PART 54**

# Interpleader

**Contents of this Part**

Scope of this Part                                  Rule 54.1

Claim to goods taken in execution                   Rule 54.2

How to interplead                                   Rule 54.3

Service of interpleader application                 Rule 54.4

Powers of the court                                 Rule 54.5

Power to order sale of goods taken in execution     Rule 54.6

# Scope of this Part

54.1 (1) This Part deals with the situation where a –

    (a) claim is made to any money, goods or chattels seized or intended to be seized by the sheriff or the proceeds or value of such goods or chattels; or

    (b)  person is under a liability in respect of a debt or in respect of any money, goods or chattels and a claim is made or is likely to be made against that person, by two or more persons making adverse claims in respect of the debt, money, goods or chattels.

    (2) The person under a liability under paragraph (1) (b) or the sheriff may apply for relief.

    (3) That procedure is called an "**interpleader**".

# Claim to goods taken in execution

54.2 (1) A person who makes a claim against any money, goods or chattels seized or about to be seized by the sheriff must give written notice to the sheriff.

    (2)The notice must –

    (a) give that person's name and address for service;

(b) identify the money, goods or chattels claimed; and

(c) set out the grounds of the claim.

(3) Forthwith on receipt of the claim the sheriff must give written notice to the judgment creditor.

(4) Within 7 days after receiving the notice the judgment creditor must give notice to the sheriff admitting or disputing the claim.

(5) If the judgment creditor gives notice admitting the claim, the –

(a) judgment creditor is liable only for the fees and expenses of the sheriff incurred before the sheriff receives the notice;

(b) sheriff must withdraw from possession of the money, goods or chattels; and

(c) sheriff may apply to the court for an order restraining any claim being brought in respect of having taken possession of the money, goods or chattels.

(6) If the judgment creditor gives notice disputing the claim, or fails to give notice and the claim is not withdrawn, the sheriff may apply to the court for relief under this Part.

## How to interplead

54.3 (1)A person interpleads by filing an application for relief by way of interpleader.

(2) The application must be filed –

(a) in the court office out of which the writ of execution was issued;

(b) if a writ of execution has not been issued but there are proceedings in respect of the money, goods or chattels – in the court office in which such proceedings are being conducted; or

(c) if there are no such proceedings – in any court office.

(3) An application other than by the sheriff must be supported by evidence on affidavit that the applicant –

(a) claims no interest in the subject matter in dispute other than for charges or costs;

(b) does not collude with any of the claimants to that subject-matter; and

(c)  is willing to pay or transfer that subject-matter into court or dispose of it as the court directs.

## Service of Interpleader application

54.4 (1) An application by the sheriff must be served on the judgment creditor and on the person claiming the money, goods or chattels.

(2) An application by any other person must be served on all persons making a claim to the money, goods or chattels.

(3)  The application must be served not less than 14 days before the date fixed for hearing of the application.

## Powers of the court

54.5 (1) On an application by the sheriff the court may, unless any claimant objects, summarily determine the question in issue between the parties.

(2) On any other application the court may order that –

(a) any person claiming the money, goods or chattels be made a defendant in any pending claim relating to such money, goods or chattels either in addition to, or in substitution for, the applicant for relief; or

(b) the issue between two or more persons claiming the money, goods or chattels be tried, and may direct which person claiming is to be the claimant in those proceedings and which the defendant.

(3)If a person making a claim to any money, goods or chattels who has been served with the application –

(a) fails to attend the hearing; or

(b) fails to comply with any order made by the court;

the court may make an order barring that person and any person claiming under that person forever from prosecuting any claim to the money, goods or chattels as against the applicant and any person claiming under the applicant.

(4) An order under paragraph (3) does not affect the rights as between the persons claiming the money, goods or chattels.

**Power to order sale of goods taken in execution**

54.6 On an application by a sheriff who has seized any goods or chattels where a person claims to be entitled to such goods or chattels by way of security, the court may order that all or part of such goods or chattels be sold and the proceeds applied in accordance with the order.

**PART 55**

# Sale of Land by Order of Court

**Contents of this Part**

Scope of this Part                 Rule 55.1

Application for order for sale     Rule 55.2

Hearing of application             Rule 55.3

Order for sale                     Rule 55.4

Directions                         Rule 55.5

Further directions                 Rule 55.6

## Scope of this Part

55.1 (1) This Part deals with the sale of land –

      (a) under any enactment which authorizes the court to order a sale; and

      (b) when it appears to the court to be necessary or expedient that the land should be sold.

    (2) In this Part  –

     "**land**" includes any interest in, or right over, land.

## Application for order for sale

55.2 (1)  An application for an order for sale must be supported by affidavit evidence.

    (2) The evidence under paragraph (1) must –

     (a) exhibit a current valuation of the land by a qualified land valuer or surveyor;

     (b) identify the land in question; and

     (c )state —

    (i) any restriction or condition that should be imposed on the sale for the benefit of any adjoining

      land of the judgment debtor or otherwise;

(ii) the full names and addresses of all persons who to the knowledge or belief of the applicant have an interest in the land;

(iii) the nature and extent of each such interest;

(iv) the grounds on which the court should order a sale of the land;

(v) the proposed method of sale and why such method will prove most advantageous;

(vi) the reason for seeking an order for sale; and

(vii) whom it is proposed should have conduct of the sale.

(3) The application and copies of the evidence in support must be served in accordance with Part 5 on the judgment debtor and every person who has an interest in the land.

## Hearing of application

55.3 The court on hearing the application may –

(a) direct that notice be given to any person who appears to have an interest in the land but has not been served with the application and adjourn the application to a fixed date;

(b) order the sale of the land or a specified part of the land;

(c) direct who shall have conduct of the sale;

(d) order that any person in –

(i) possession; or

(ii) receipt of the rents or profits;

of the land or any part of the land do deliver up possession of the land or receipt of the rents and profits to such person and on such date as the court directs;

(e) suspend any such order on such terms as the court thinks fit; or

(f) dismiss the application.

## Order for sale

55.4 On making an order for sale, the court may –

(a) direct the manner in which the land is to be sold; or

(b) permit the person having conduct of the sale to sell the land in  such manner as that person thinks fit.

## Directions

55.5 The court may give directions for the purpose of the sale, including –

 (a) fixing any reserve or minimum price for the sale;

 (b) obtaining further evidence as to the valuation of the land;

 (c) settling the particulars and conditions of sale;

 (d) fixing the remuneration of the auctioneer or estate agent dealing with the sale;

 (e) requiring payment of the net proceeds of sale into court or otherwise;

 (f) an inquiry into what interests any interested persons may have in
  the land and the extent of such interests in the net proceeds of sale;

 (g) how the net proceeds of sale should be applied; and

 (h) certification of the result of the sale.

## Further directions

55.6 Any party or the person having the conduct of the sale may apply to the court to vary the directions or to make further directions.

## PART 56

# Administrative Law

**Contents of this Part**

| | |
|---|---|
| Scope of this Part | Rule 56.1 |
| Who may apply for judicial review | Rule 56.2 |
| Judicial review – application for leave | Rule 56.3 |
| Judicial review – hearing of application for leave | Rule 56.4 |
| Delay | Rule 56.5 |
| Proceedings by way of claim which should be application for administrative order | Rule 56.6 |
| How to make application for administrative order | Rule 56.7 |
| Joinder of claims for other relief | Rule 56.8 |
| Service of claim form for administrative order | Rule 56.9 |
| Evidence in answer | Rule 56.10 |
| First hearing | Rule 56.11 |
| Procedural applications | Rule 56.12 |
| Hearing of application for administrative order | Rule 56.13 |
| Special provisions relating to orders for judicial review | Rule 56.14 |

# Scope of this Part

56.1 (1) This Part deals with applications —

   (a) by way of originating motion or otherwise for relief under the Constitution of any Member State or Territory;

   (b) for a declaration in which a party is the State, a court, a tribunal or any other public body;

   (c) for judicial review; and

   (d) where the court has power by virtue of any enactment or at common law to quash any order, scheme, certificate or plan, any amendment or approval of any plan, any decision of a minister or government department or any action on the part of a minister or government department.

(2) In this Part –

such applications are referred to generally as "**applications for an administrative order**".

(3) The term "**judicial review**" includes the remedies (whether by way of writ or order) of –

(a) certiorari, for quashing unlawful ads;

(b) mandamus, for requiring performance of a public duty, including a duty to make a decision or determination or to hear and determine any case; and

(c) prohibition, for prohibiting unlawful acts.

(4) In addition to or instead of an administrative order the court may, without requiring the issue of any further proceedings, grant –

(a) an injunction;

(b) an order for the return of any property, real or personal; or

(c) restitution or damages.


## Who may apply for judicial review

56.2 (1) An application for judicial review may be made by any person, group or body which has sufficient interest in the subject matter of the application.

(2) This includes –

(a) any person who has been adversely affected by the decision which is the subject of the application;

(b) any body or group acting at the request of a person or persons who would be entitled to apply under paragraph (a);

(c) any body or group that represents the views of its members who may have been adversely affected by the decision which is the subject of the application;

(d) any body or group that can show that the matter is of public interest and that the body or group possesses expertise in the subject matter of the application;

(e) any statutory body where the subject matters falls within its statutory limit; or

(f) any other person or body who has a right to be heard under the terms of any relevant enactment or Constitution.

## Judicial review – application for leave

56.3 (1) A person wishing to apply for judicial review must first obtain leave.

(2) An application for leave may be made without notice.

(3) The application must state –

(a) the name, address and description of the applicant and respondent;

(b) the relief, including in particular details of any interim relief sought;

(c) the grounds on which such relief is sought;

(d) the applicant's address for service;

(e) whether an alternative form of redress exists and, if so, why judicial review is more appropriate or why the alternative has not been pursued;

(f) details of any consideration which the applicant knows the respondent has given to the matter in question in response to a complaint made by or on behalf of the applicant;

(g) whether any time limit for making the application has been exceeded and, if so, why;

(h) whether the applicant is personally or directly affected by the decision about which complaint is made;

(i) if the applicant is not personally or directly affected – what public or other interest the applicant has in the matter;

(j) the name and address of the applicant's legal practitioner (if applicable); and

(k) the applicant's address for service.

(4) The application must be verified by evidence on affidavit which must include a short statement of all the facts relied on.

## Judicial review – hearing of application for leave

56.4 (1) An application for leave to make a claim for judicial review must be considered forthwith by a judge of the High Court.

(2) The judge may give leave without hearing the applicant.

(3) However, if –

    (a) it appears that a hearing is desirable in the interests of justice;

    (b) the application includes a claim for immediate interim relief; or

    (c) the judge is minded to refuse the application;

      the judge must direct that a hearing in open court be fixed.

(4) The judge may direct that notice of the hearing be given to the respondent or the Attorney General of the relevant Member State or Territory.

(5) Where the application relates to any judgment, order, conviction or other proceedings which are subject to appeal, the judge may adjourn consideration of the application to a date after the appeal has been determined.

(6) The judge may allow the application to be amended.

(7) The judge may grant leave on such conditions or terms as he or she considers just.

(8) Where the application is for an order (or writ) of prohibition or certiorari the judge must direct whether or not the grant of leave operates as a stay of the proceedings.

(9) The judge may grant such interim relief as appears just.

(10) On granting leave the judge must direct when the first hearing or, in case of urgency, the full hearing of the claim for judicial review should take place.

(11) Leave must be conditional on the applicant making a claim for judicial review within 14 days of receipt of the order granting leave.

## Delay

56.5 (1) In addition to any time limit imposed by any enactment, the judge may refuse leave or to grant relief in any case in which the judge considers that there has been unreasonable delay before

making the application.

(2) When considering whether to refuse leave or to grant relief because of delay the judge must consider whether the granting of leave or relief would be likely to –

(a) be detrimental to good administration; or

(b) cause substantial hardship to or substantially prejudice the rights of any person.

## Proceedings by way of claim which should be application for administrative order

56.6 (1) This rule applies where a claimant issues a claim for damages or other relief other than an administrative order but where the facts supporting the claim are such that the only or main relief is an administrative order.

(2) The court may at any stage direct that the claim is to proceed by way of an application for an administrative order.

(3) If the appropriate administrative order would be for judicial review, the court may give leave for the matter to proceed as if an application had been made under rule 56.3.

(4) If the court makes an order under paragraph (2), it must give such directions as are necessary to enable the claim to proceed under this Part.

## How to make application for administrative order

56.7 (1) An application for an administrative order must be made by a fixed date claim in Form 2 identifying whether the application is for

(a) a declaration;

(b) judicial review;

(c) relief under the relevant Constitution; or

(d) for some other administrative order (naming it); and must identify the nature of any relief sought.

(2) The claim form in an application under a relevant Constitution requiring an application to be

made by originating motion should be headed 'Originating Motion'.

(3) The claimant must file with the claim form evidence on affidavit.

(4)The affidavit must state –

    (a) the name, address and description of the claimant and the defendant;

    (b) the nature of the relief sought identifying –

        (i) any interim relief sought; and

        (ii) whether the claimant seeks damages, restitution, recovery of any sum due or alleged to be due or an order for the return of property, setting out the facts on which such claim is based and, where practicable, specifying the amount of any money claimed;

    (c) in the case of a claim under the relevant Constitution – the provision of the Constitution which the claimant alleges has been, is being or is likely to be breached;

    (d) the grounds on which such relief is sought;

    (e) the facts on which the claim is based;

    (f) the claimant's address for service; and

    (g) the names and addresses of all defendants to the claim.

(5) The general rule is that the affidavit must be made by the claimant or, if the claimant is not an individual, by an appropriate officer of the body making the claim.

(6) If the claimant is unable to make the affidavit it may be made by some person on the claimant's behalf but must state why the claimant is unable to do so.

(7) On issuing the claim form the court office must fix a date for a first hearing which must be endorsed on the claim form.

(8) The general rule is that the first hearing must take place no later than 4 weeks after the date of issue of the claim.

(9) Notwithstanding paragraph (8), any party may apply to a judge in chambers for that date to be brought forward or for an early date to be fixed for the hearing of the application for an administrative order.

(10)The application may be made without notice but must be supported by evidence on affidavit.

## Joinder of claims for other relief

56.8 (1)  The general rule is that, where permitted by the substantive law, an applicant may include in an application for an administrative order a claim for any other relief or remedy that –

(a) arises out of; or

(b) is related or connected to;

the subject matter of an application for an administrative order.

(2)  In particular the court may, on a claim for judicial review or for relief under the Constitution award –

(a) damages;

(b) restitution; or

(c) an order for return of property to the claimant;

if the –

(i)  claimant has included in the claim form a claim for any such remedy arising out of any matter to which the claim for an administrative order relates; or

(ii)  facts set out in the claimant's affidavit or statement of case justify the granting of such remedy or relief; and

(iii)  court is satisfied that, at the time when the application was made the claimant could have issued a claim for such remedy.

(3)  The court may however at any stage –

(a)  direct that any claim for other relief be dealt with separately from the claim for an administrative order; or

(b)  direct that the whole application be dealt with as a claim and give appropriate directions under Parts 26 and 27; and

(c)  in either case, make any order it considers just as to costs that have been wasted because of the unreasonable use of the procedure under this Part.

## Service of claim form for administrative order

56.9 (1)  The claim form and the affidavit in support must be served on the defendants not less than 14

days before the date fixed for the first hearing.

(2) A claim form relating to an application for relief under a relevant Constitution must be served on the Attorney General of the Member State or Territory concerned.

(3) If leave has been given to make a claim for judicial review, the claimant must also serve a copy of the –
(a) application for leave;
(b) affidavit in support; and
(c) order giving leave.

(4) The claimant must file at the court office not less than 7 days before the date fixed for the first hearing an affidavit which –
(a) gives the names and addresses of all defendants who have been served with the claim;
(b) states the date and place of service on each defendant;
(c) where applicable, states when the claim form was served on the Attorney General; and
(d) if any defendant has not been served, states that fact and the  reason for not doing so.

(5) If the judge considers that any person who should have been served has not been served, the judge may adjourn the first hearing to a fixed date and give directions for service.
• Part 5 deals generally with the service of claims.

## Evidence in answer

56.10  Any evidence filed in answer to a claim for an administrative order must be by affidavit but the provisions of Part 10 (defence) apply to   such affidavit.

## First hearing

56.11 (1)   At the first hearing the judge must give any directions that may be required to ensure the expeditious and just trial of the claim and the provisions of Parts 25 to 27 of these Rules apply.

(2) In particular the judge may –
(a) allow any person or body appearing to have sufficient interest in the subject matter of the

claim to be heard whether or not served with the claim form;

(b) direct whether any person or body having such interest –

(i) is to make submissions by way of written brief; or

(ii) may make oral submissions at the hearing;

(c) allow the claimant to –

(i) add or substitute a claim for relief other than an administrative order;

(ii) amend any claim for an administrative order; or

(iii) substitute another form of application for that originally made;

(d) direct that claims by one or more persons or bodies or against one or more persons in respect of the same office made on the same grounds be consolidated or heard together; and

(e) make orders for –

(i) witness statements or affidavits to be served;

(ii) cross-examination of witnesses; and

(iii) disclosure of documents.

## Procedural applications

56.11    Wherever practicable any procedural application during a claim for an administrative order must be made to the judge who dealt with the first hearing unless that judge orders otherwise.

## Hearing of application for administrative order

56.13(1) At the hearing of the application the judge may allow any person or body which appears to have a sufficient interest in the subject matter of the claim to make submissions whether or not served with the claim form.

(2) Such a person or body must make submissions by way of a written brief unless the judge orders otherwise.

(3) The judge may grant any relief that appears to be justified by the facts proved before the judge, whether or not such relief should have been sought by an application for an administrative order.

(4)The judge may, however, make such orders as to costs as appear to the judge to be just including a wasted costs order.

(5)  If the judge makes any order as to costs the judge must assess them.
- Rules 65.11 and 65.12 deal with the assessment of costs.

(6)  The general rule is that no order for costs may be made against an applicant for an administrative order unless the court considers that the applicant has acted unreasonably in making the application or in the conduct of the application.
- Part 64 deals with the court's general discretion as to the award of costs.


## Special provisions relating to orders for judicial review

56.14(1)  If the claimant seeks an order or writ of certiorari to remove any proceedings for the purpose of quashing them, the claimant may not question the validity of any order, warrant, commitment, conviction or record unless –

(a) before the trial the claimant has lodged with the court office a copy of the order, etc. verified by affidavit; or

(b) the claimant can account for the failure to do so to the satisfaction of the court.


(2)  If the claim is for an order or writ of certiorari, the judge may if satisfied that there are reasons for quashing the decision to which the claim relates –

(a) direct that the proceedings be quashed on their removal to the High Court; and

(b) may in addition remit the matter to the court, tribunal or authority concerned with a direction to reconsider it in accordance with the findings of the High Court.

**PART 57**

# Habeas Corpus

**Contents of this Part**

| | |
|---|---|
| Scope of this Part | Rule 57.1 |
| Application for issue of writ of Habeas Corpus | Rule 57.2 |
| Power of court | Rule 57.3 |
| Service of writ | Rule 57.4 |
| Return to writ | Rule 57.5 |
| Powers of court on hearing writ | Rule 57.6 |
| Bringing up prisoner to give evidence, etc. | Rule 57.7 |

## Scope of this Part

57.1 This Part deals with applications for the issue of a writ of Habeas Corpus and proceedings upon such a writ.

## Application for issue of writ of Habeas Corpus

57.2 (1) An application for the issue of a writ of Habeas Corpus *ad subjiciendum* must be made to the court.

(2)  An application under paragraph (1) may be made without notice but must be supported by evidence on affidavit.

(3) Such evidence must be given by the person restrained stating how that person is restrained.

(4) If the person restrained is not able to make the affidavit it may be made by another person on that person's behalf and must state why the person restrained is not able to make the affidavit.

(5) The application must be heard in open court unless it is made on behalf of a minor when it must be heard in chambers.

## Power of court

57.3 (1) The court may –

    (a) adjourn the application and give directions for notice to be given to –

      (i) the person against whom the issue of the writ is sought; and

      (ii) any other person as the judge may direct; or

    (b) forthwith make an order for the writ in Form 22 to issue.

  (2) The court may also order that the person restrained be released.

  (3) An order under paragraph (2) is sufficient warrant to any person for the release of the person under restraint.

  (4)  On making an order for the writ to issue the court must give directions as to the date, time and place of hearing.

## Service of writ

57.4 (1)The general rule is that the writ must be served personally on the person to whom it is directed.

  (2) If it is not possible to serve that person personally or if that person is the keeper of a prison or other public official, the writ may instead be served personally on a servant or agent of the person to whom it is directed at the place where the person restrained is confined or restrained.

  (3) If the writ is directed to more than one person it must be served on the person first named and copies served on each of the other persons named in accordance with paragraph (1) or (2).

  (4) Each person served must also be served with a —

    (i) copy of the evidence filed under rule 57.2 (2); and

    (ii) notice in the form included in Form 22 of the date, time and place at which the person restrained is to be brought and containing a warning that in default of compliance with the writ proceedings for committal may be taken.

## Return to writ

57.5 (1) Each person served must endorse on or annex to the writ a return stating each cause of detention of the person restrained.

(2) The return may be amended or another substituted with the permission of the court.

## Powers of court on hearing writ

57.6 On the date fixed for the person detained to be brought before the court, the court must make such orders as are just and, in particular, may give directions as to the manner in which any claim for compensation is to be dealt with by the court without requiring the issue of any further process.

## Bringing up prisoner to give evidence, etc.

57.7 An application for –

    (a) a writ of habeas corpus *ad respondendum;*

    (b) a writ of habeas corpus *ad testificandum;* or

    (c) an order to bring up a prisoner to give evidence otherwise than by writ of habeas corpus;

      may be made without notice to a judge in chambers but must be supported by evidence on affidavit.

**PART 58**

# Bail Applications

**Contents of this Part**

Scope of this Part                          Rule 58.1

How to apply to the court                   Rule 58.2

Hearing of application                      Rule 58.3

# Scope of this Part

58.1 (1) This Part deals with applications to the court to review a decision by a magistrate about bail.

(2) In this Part –

"**Commissioner**" means the Commissioner of Prisons or other person responsible for the administration of prisons in the Member State or Territory concerned; and

"**magistrate**" includes a Justice of the Peace.

# How to apply to the court

58.2 (1) An application under this Part must be in the appropriate practice form.

(2) If the applicant is in custody and is not represented by a legal practitioner, the application must be lodged with the Commissioner.

(3) The Commissioner must forthwith file the application at the court office.

(4) If the applicant is –

(a) not in custody; or

(b) represented by a legal practitioner;

the applicant must file the application at the court office.

(5) The court office must immediately –

  (a) send a copy of the application to the Director of Public Prosecutions;

  (b) fix a date, time and place to hear the application; and

  (c) give notice of the date, time and place to –

    (i) the applicant;

    (ii) the Director of Public Prosecutions; and

    (iii) (if the applicant is in custody) the Commissioner.

## Hearing of application

58.3  (1)  The court may confirm, modify or reverse the decision of the magistrate.

(2) The court office must serve a copy of any order on the –

  (a) Chief Magistrate (if any);

  (b) Commissioner; and

  (c) magistrate who made the decision under review.

**PART59**

## Proceedings by and against the Crown

**Contents of this Part**

| | |
|---|---|
| Scope of this Part | Rule 58.1 |
| Service of claim form | Rule 59.2 |
| Claimant's duty to give particulars | Rule 59.3 |
| Applications in certain revenue matters | Rule 59.4 |
| Proceedings relating to postal packets | Rule 59.5 |
| Applications under s. 24 (2) or 25 (2) of the Act | Rule 59.6 |
| Enforcement against Crown | Rule 59.7 |

# Scope of this Part

59.1   (1) This Part deals with claims to which the Crown or the State is a party.

(2) In this Part –

"**Act**" means in –

(a) Anguilla – the Crown Proceedings Ordinance (Cap. 22);

(b) Antigua and Barbuda – the Crown Proceedings Act (Cap. 121);

(c) Dominica – the State Proceedings Act (Cap. 7.80);

(d) Grenada – the Crown Proceedings Act (Cap. 74);

(e) Montserrat – the Crown Proceedings Ordinance (Cap. 22);

(f) Saint Christopher and Nevis – the Crown Proceedings Act (Cap.22);

(g) Saint Lucia – the Crown Proceedings Ad (Cap. 13);

(h) Saint Vincent and the Grenadines – the Crown Proceedings Act (Cap. 85); and

(i) the British Virgin Islands – the Crown Proceedings Ordinance (Cap 21);

"**Crown**" means, for the purpose of Dominica, the State; and

"**Dominica**" means the Commonwealth of Dominica.

(3) References in these Rules to a claim for possession of land are to be construed as including references to a claim against the Crown for an order declaring that the claimant is entitled as against the Crown to the land or to possession of the land.

## Service of claim form

59.2 (1) Part 5 (service of claim form) and Part 6 (service of other documents) do not apply in civil proceedings against the Crown.

(2) Service of any document including a claim form on the Crown must be effected in accordance with the relevant Act.

## Claimant's duty to give particulars

59.3 (1) If a claim is made against the Crown, the claim form or statement of claim must contain reasonable information as to the circumstances in which it is alleged that the liability of the Crown has arisen and as to the government department and officers of the Crown involved.

(2) At any time during the period for entering an acknowledgment of service under rule 9.3(1) the defendant may request information under Part 34.1.

(3) The defendant's time for filing an acknowledgment of service is then extended until 7 days after the –

(a) court on the application of the claimant decides that no further information is reasonably required; or

(b) defendant gives notice in writing to the claimant that it is satisfied with the information supplied; whichever first occurs.

(4) The defendant's time for filing a defence is extended to 21 days after the earlier event in paragraph (3).

## Applications in certain revenue matters

59.4 (1) This rule applies to applications under section 11 of the Acts of Dominica and Grenada and section 12 of the Act of Saint Vincent and the Grenadines only.

(2) An application must be made by fixed date claim in Form 2.

(3) The person from whom an account or information is claimed or by whom any books are required to be produced must be made defendant to the claim.

(4) The claim form or the statement of claim must —

(a) refer to the enactment under which the account or information or payment or the production of books is claimed; and

(b) where information is claimed must show (by appropriate questions or otherwise) what information is required.

(5) An affidavit by a duly authorised officer of the government department concerned setting out the facts on which the application is based and stating the deponent's belief in such facts is evidence of the facts so set out.

(6) If the defendant files evidence disputing any fact the Crown may file further evidence.

(7) The court may order that the deponents or any of them attend to be cross-examined.

(8) The court may –

(a) decide the matter upon the affidavit evidence after any cross-examination that may be ordered; or

(b) direct that it be decided by oral evidence in court.

(9) If the court makes an order in favour of the Crown, it must specify a date by which the defendant is to comply with each of the terms of the order.

•Rules 8.1(5) and 27.2 deal with the procedure relating to fixed date claims.

## Proceedings relating to postal packets

59.5 (1) This rule deals with applications under the Act for leave to bring a claim in the name of a sender or addressee of a postal packet or that person's personal representative.

(2) An application must be by fixed date claim in Form 2.

(3) The defendants to the claim must be the Attorney General and the person in whose name the applicant seeks to bring the claim.

(4) No acknowledgment of service need be entered to the claim.
  •Rules 8.1(5) and 27.2 deal with the procedure relating to fixed date claims.

## Applications under s.24(2) or s.25(2) of the Act

59.6 An application under s.24 (2) of the Act of Saint Lucia or s.25 (2) of the Acts relating to other Member States and Territories may be made in accordance with Part 11.

## Enforcement against Crown

59.7 (1) Parts 44 to 53 do not apply to any order against, or money due or accruing due, or alleged to be due or accruing due from the Crown.

(2) Any application under the Act for a direction that a separate certificate be issued with respect to costs (if any) ordered to be paid to the applicant may be made without notice.

(3) Every application for an order under the Act restraining any person from receiving money payable to that person by the Crown and directing payment to the applicant or some other person must be served on the Crown at least 14 days before the date of hearing and, unless the court otherwise orders, on the person to be restrained.

(4) Every application under paragraph (3) must be supported by evidence on affidavit –
  (a) identifying the particular debt from the Crown in respect of which it is made; and
  (b) of the facts giving rise to it.

**PART 60**

# Appeals to the High Court

**Contents of this Part**

Scope of this Part                              Rule 60.1

How to appeal to the court                      Rule 60.2

Effect of appeal                                Rule 60.3

Persons on whom claim form must be served       Rule 60.4

Time within which claim form must be served     Rule 60.5

Amendment of statement of case                  Rule 60.6

First hearing                                   Rule 60.7

Hearing of appeal                               Rule 60.8

Right of minister to be heard                   Rule 60.9

## Scope of this Part

60.1 (1) This Part deals with appeals to the High Court from any tribunal or person under any enactment other than an appeal by way of case stated.

(2) In this Part –

**"clerk to the tribunal"** means the clerk, secretary or other person responsible for the administration of the tribunal;

**"decision"** means the award, decision, determination or order appealed against; and

**"tribunal"** means any tribunal other than a court of law established under an enactment.

(3) This Part takes effect subject to any provisions in the relevant enactment.

## How to appeal to the court

60.2 (1) An appeal to the court is made by issuing a fixed date claim form in Form 2 to which must be annexed the grounds of appeal.

(2) The appellant's grounds of appeal must state the –

    (a) decision against which the appeal is made;

    (b) enactment enabling an appeal to be made to the Court;

    (c) name of the tribunal or person whose decision is being appealed;

    (d) facts found by that tribunal or person; and

    (e) grounds of the appeal, identifying any finding of –

      (i) fact; and

      (ii) law;

which the claimant seeks to challenge.

(3) The date for the first hearing must not be less than 28, nor more than 56, days after issue of the claim form.

   • Rules 8.1(5) and 27.2 deal with the procedure relating to fixed date claims.

   • Part 56 deals with applications to quash a decision by way of certiorari.

## Effect of appeal

60.3 The making of an appeal does not operate as a stay of proceedings on the decision against which the appeal is brought unless the –

    (a) court; or

    (b) tribunal or person whose decision is being appealed; so orders.

## Persons on whom claim form must be served

60.4 The claimant must serve the claim form and grounds of appeal on –

    (a) every party to the proceedings in which the decision was made; and

    (b) the clerk to the tribunal, minister or other person by whom the decision appealed against was made.

## Time within which claim form must be served

60.5 The claim form and grounds of appeal must be served within 28 days of the date on which notice of the decision was given to the claimant.

## Amendment of statement of case

60.6 (1) The appellant may amend the grounds of appeal without permission not less than 7 days before the first hearing.

(2) Permission to amend the grounds of appeal may be given at the first hearing.

(3) The court may not give permission to amend the grounds of appeal after the first hearing unless the appellant satisfies the court that the change is necessary because of some change in circumstance which became known after the first hearing.

## First hearing

60.7 (1) The appellant must file at the court office a signed copy of any note made by the person presiding at the proceedings in which the decision was made not less than 7 days before the first hearing.

(2) If the court does not hear the appeal at the first hearing it must fix a date, time and place for the full hearing.

## Hearing of appeal

60.8 (1) Unless an enactment otherwise provides, the appeal is to be by way of rehearing.

(2) The court may receive further evidence on matters of fact.

(3) The court may draw any inferences of fact which might have been drawn in the proceedings in which the decision was made.

(4) The court may–

(a) give any decision or make any order which ought to have been given or made by the tribunal or person whose decision is appealed; and

(b) make such further or other order as the case requires; or

(c) remit the matter with the opinion of the court for rehearing and determination by the tribunal or person.

(5) The court is not bound to allow an appeal because of –

   (a) a misdirection; or

   (b) the improper admission or rejection of evidence;

unless it considers that a substantial wrong or a miscarriage of justice has been caused.


## Right of minister to be heard

60.9 A minister is entitled to be heard on any appeal against a decision made by that minister.

PART 61

# Appeals to the Court by way of Case Stated

**Contents of this Part**

| | |
|---|---|
| Scope of this Part | Rule 61.1 |
| Application for order to state a case | Rule 61.2 |
| Persons on whom claim form must be served | Rule 61.3 |
| Time within which claim form must be served | Rule 61.4 |
| Signing and service of case | Rule 61.5 |
| How to commence proceedings in the High Court to determine a case | Rule 61.6 |
| How to commence proceedings in the Court of Appeal to determine a case | Rule 61.7 |
| Determination of Case | Rule 61.8 |
| Time within which case must be stated | Rule 61.9 |

# Scope of this Part

**61.1**   **(1)**   An appeal by case stated is an appeal to a superior court on the basis of a set of facts specified by the inferior court for the superior court to make a decision on the application of the law to those facts.

**(2)**   This Part deals with the way in which the Court determines –

   *(a)*   (i)   an appeal which lies to the court by way of case stated; or

   (ii)   a question of law brought by way of case stated;

   referred to it, by a minister, magistrate, judge of a tribunal, a tribunal or   other person; or

   *(b)*   an application for an order directing a minister, magistrate, judge of a tribunal, tribunal, arbitrator or other person to refer a question of law to the court by way of case

stated, where under any enactment the High Court or the Court of Appeal has power to determine such matters.

**(3)**    **In this Part –**

"**case**" includes a special case;

"**clerk to the tribunal**" means the clerk, secretary or other person responsible for the administration of the tribunal;

"**court**" means the High Court or the Court of Appeal as required by the particular enactment;

"**enactment**" includes the Constitution of the relevant Member State or Territory; and

"**tribunal**" means in relation to –

> (*a*)    proceedings brought under the Constitution – a court other than the High Court, the Court of Appeal or a court martial;

> (*b*)    any other proceedings – any tribunal other than a court of law constituted by or under any enactment.

**Application for order to state a case**

**61.2**    **(1)**    An application for an order requiring a minister, magistrate, judge of a tribunal, tribunal, arbitrator or other person to -

> (*a*)    state a case for the decision of the court, or
> (*b*)    refer a question of law to the court by way of case stated;

must be made to the court which would be the appeal court if the case were stated.

**(2)**    An application -

> (a)    to the High Court shall be made by a fixed date claim in Form 2 and must –

> > (i)    identify the question of law upon which it is sought to have a case stated;

> > (ii)    set out any reasons given by the minister, magistrate, judge of a tribunal, tribunal, arbitrator or other person for the failure or refusal to state a case; and

> > (iii)    state the grounds of the application.

(b)    to the Court of Appeal shall be made by a notice of appeal in Form 23 and must –

    (i)    identify the question of law upon which it is sought to have a case stated;

    (ii)    set out any reasons given by the minister, magistrate, judge of a tribunal, tribunal, arbitrator or other person for the failure or refusal to state a case; and

    (iii)    state the grounds of the application.

**(3)**    The application must be filed at the court and served on –

(a)    the minister, magistrate, judge of a tribunal, tribunal, arbitrator or other person as the case may be; and

(b)    every party to the proceedings to which the application relates;

within 14 days after the appellant receives notice of the failure or refusal of his request to state a case.

**(4)**    The court office must fix a date for a hearing of the application and specify the date, time and place of that hearing.

**(5)**    The applicant must file at the court office a copy of the proceedings to which the application relates not less than 7 days before the date fixed for the hearing.

**Persons on whom claim form must be served**

**61.3**    The claimant must serve the claim form –

*(a)*    if the application relates to a claim brought under the relevant Constitution - on–

    (i)    the Attorney General;
    (ii)    the clerk to the tribunal; and
    (iii)    every other party to the proceedings to which the application relates;

*(b)*    in any other claim – on –

    (i)    the clerk to the tribunal;
    (ii)    the minister or other person whose decision is questioned; and
    (iii)    every other party to the proceedings to which the application relates.

- Rule 6.9 deals with service on the Attorney General
- Rule 59.2 deals with service on the Crown or State.

**Time within which claim form must be served**

**61.4**    The claimant must serve the claim form within 14 days of the date on which notice of refusal to state a case was given to the claimant.

**Signing and service of case**

**61.5**  **(1)**  A case stated by a tribunal must be signed by the magistrate, judge, chairman or president of the tribunal.

**(2)**  A case stated by any other person must be signed by that person.

**(3)**  An application made under the Constitution must be served on the Attorney General and all parties to which the application relates.

**(4)**  An application other than an application under Rule 61.5(3) must be served on –

(a)  the party whose application it is to state the case;
(b)  the party who requested the case stated; and
(c)  all parties to which the case relates.

**How to commence proceedings in the High Court to determine a        case**

**61.6**  **(1)**  Proceedings to determine a case must be commenced by filing a claim in Form 2 at the court office.

**(2)**  The claim form may be issued by –

*(a)*  A minister, magistrate, judge of a tribunal, tribunal, arbitrator or other person entitled by any enactment to state a case or to refer a question of law by way of case stated to the court; or
*(b)*  Any other party to the claim to which the case relates.

**(3)**  The claim form must have the case stated annexed.

**(4)**  Where an application has been granted under rule 61.2, the fixed date claim filed for that application may be deemed to have commenced proceedings and the claimant must –

*(a)*  file the case stated at the court office within 14 days of receipt of the case stated by the minister, magistrate, judge of a tribunal, tribunal, arbitrator or other person entitled by any enactment to state a case or to refer a question of law by way of case stated to the court; and
*(b)*  within 7 days serve a notice of filing on the persons set out in Rule 61.5(3).

**(5)**  The claim form or a statement of claim issued and served with it must set out the claimant's contentions on the question of law to which the claim relates.

**(6)**  The contentions may be in the form of a skeleton argument.

**(7)**  The court office must fix a date, time and place for the determination of a case.

**(8)**  The claim must be served on the persons set out in rule 61.5(3).

**(9)**  It must be served within 14 days after the service of the case stated.

**How to commence proceedings in the Court of Appeal to determine   a case**

**61.7    (1)**    Proceedings to determine a case must be commenced by filing a notice of appeal in Form 23 at the court office.

**(2)**    The notice of appeal may be issued by –

(*a*)    A minister, magistrate, judge of a tribunal, tribunal, arbitrator or other person entitled by any enactment to state a case or to refer a question of law by way of case stated to the court; or
(*b*)    Any other party to the claim to which the case relates.

**(3)**    Where an application has been granted under rule 61.2, the notice of appeal filed for that application may be deemed to have commenced proceedings and the claimant must –

(*a*)    file the case stated at the court office within 14 days of receipt of the case stated by the minister, magistrate, judge of a tribunal, tribunal, arbitrator or other person entitled by any enactment to state a case or to refer a question of law by way of case stated to the court; and
(*b*)    within 7 days serve a notice of filing on the persons set out in Rule 61.5(3).

**(4)**    The case stated must be annexed to the notice of appeal and must set out the appellant's contentions on the question of law to which the case relates.

**(5)**    The contentions may be in the form of a skeleton argument.

**(6)**    The court office must fix a date, time and place for the determination of a case.

**(7)**    The notice of appeal must be served on the persons set out in rule 61.5(3).

**(8)**    It must be served within 14 days after the service of the case stated.

**Determination of case**

**61.8    (1)**    Not less than 7 days before the date fixed to determine the case, the claimant must file a copy of the proceedings to which the case relates.

**(2)**    The court may amend the case or order it to be returned to the person or tribunal stating the case for amendment.

**(3)**    The court may draw inferences of fact from the facts stated in the case.

**(4)**    A minister is entitled to be heard on any case stated by that minister.

**Time within which case must be stated**

**61.9**    Where a minister, magistrate, judge of a tribunal, tribunal, arbitrator or other person has received a request or is expected to state a case, this must be done within 14 days of either the request or the date of the decision.

PART 62

**Appeals to the Court of Appeal**

**Contents of this Part**

| | |
|---|---|
| Scope of this Part | Rule 62.1 |
| How to obtain leave to appeal | Rule 62.2 |
| Judicial review appeals | Rule 62.2A |
| How to appeal | Rule 62.3 |
| Method of filing documents in an appeal | Rule 62.3A |
| Contents of notice of appeal | Rule 62.4 |
| Time for filing notice of appeal | Rule 62.5 |
| Summary appeal | Rule 62.6 |
| Service of notice of appeal | Rule 62.7 |
| Counter notice | Rule 62.8 |
| Action to be taken on receipt of notice of appeal | Rule 62.9 |
| Interlocutory appeal | Rule 62.10 |
| Skeleton arguments | Rule 62.11 |
| The record – appeals from High Court | Rule 62.12 |
| The record – appeals from magistrates' courts | Rule 62.13 |
| Case management | Rule 62.14 |
| Procedural applications to court | Rule 62.15 |
| Powers of single judge of the court, master and Chief Registrar to make certain orders | Rule 62.16 |
| Variation, discharge or revocation of an order, direction or decision of a single judge | Rule 62.16A |
| Security for costs of appeal | Rule 62.17 |
| Non-disclosure of payment into court, etc. | Rule 62.18 |
| Stay of execution | Rule 62.19 |
| General powers of the court | Rule 62.20 |
| Failure of party to attend appeal | Rule 62.21 |
| Application to set aside a decision made in party's absence | Rule 62.22 |
| Adjournment of appeal | Rule 2.23 |
| Certificate of result of appeal | Rule 62.24 |
| Withdrawal or discontinuance | Rule 62.25 |
| Liability for costs on withdrawal or discontinuance | Rule 62.26 |
| Quantification of costs on withdrawal or discontinuance | Rule 62.27 |

## Scope of this Part

62.1    (1) This Part deals with appeals to the Court of Appeal from –

       (a)  the High Court;
       (b)  a magistrate's or district court; or

       (c)  a tribunal, not being –

              (i)    appeals or applications to the court for which other provision is made by these Rules or any other law; or

              (ii)    appeals by way of case stated on a question of law for determination by the court.

*Part 60 deals with appeals to the High Court and cases stated are dealt with in Part 61.

(2)    In this Part -

"appellant" means the party who first files a notice of appeal;

"core bundle" means a bundle containing only such documents listed in Rule 62.12 which the court will need to pre-read or to which it will be necessary to refer repeatedly at the appeal;

"court" means the Court of Appeal;

"court below" means the court or tribunal from which the appeal is brought;

"interlocutory appeal" means an appeal from an interlocutory judgment or an interlocutory order.

"respondent" means  any party to the appeal other than the appellant whether or not the respondent files a counter-notice.

(3)    In this Part -

(a)    a determination whether an order or judgment is final or interlocutory is made on the "application test";

(b)    an order or judgment is final if it would be determinative of the issues that arise on a claim, whichever way the application could have been decided; and

(c)    an order on an application for disclosure against a person who is not a party is a final order.

## How to obtain leave to appeal

62.2 (1) Where an appeal may be made only with the leave of the court below or the court, a party wishing to appeal must apply for leave within 14 days of the order against which leave to appeal is sought.

(1A) Where an application for leave has been refused by the court below, an application for leave may be made to the court within 7 days of such refusal.

(2) The application for leave of appeal must be made in writing and set out concisely the grounds of the proposed appeal.

(3) An application for leave to appeal made to the court may be considered by a single judge of the court.

(4) The judge considering an application under Rule 62.2(3) may give leave without hearing the applicant.

(5)       However if the judge considering an application under Rule 62.2(3) is minded to refuse leave he or she must direct –

(a)  that a hearing be fixed; and

(b)  whether that hearing is to be by a single judge or the court.

*Rule 2.7 deals with how, when and where the court may deal with cases.

## Judicial review appeals

62.2A (1) Where leave to apply for judicial review has been refused at a hearing in the court below, the person seeking that leave may apply to the court for leave to appeal.

(2) An application in accordance with paragraph (1) must be made within 7 days of the decision of the court below to refuse to give leave to apply for judicial review.

(3) On an application under paragraph (1), the court may, instead of giving leave to appeal, give leave to apply for judicial review.

(4)Where the court gives leave to apply for judicial review in accordance with paragraph (3), the claim will proceed in the court below, unless the court orders otherwise.

## How to appeal

62.3 (1) In the case of an appeal from the High Court, an appeal is made by filing a notice of appeal –

(a) at the court office where the judgment was entered; or

(b) by electronic means of communication in accordance with the relevant practice direction issued by the Chief Justice.


(2) In the case of an appeal from a Magistrate's or District Court or a tribunal, an appeal is made by filing a notice of appeal

(a) at the court's office; or

(b) by electronic means of communication, in accordance with the relevant practice direction issued by the Chief Justice.


(3) A notice of appeal takes effect on the day that is filed at the appropriate court office.


## Method of filing documents in an appeal

62.3A A document in an appeal may be filed by:

(a) delivering it;

(b) posting it;

(c) sending it by FAX; or

(d) transmitting it by other electronic means of communication as authorized by the Chief Justice in a practice direction; to the court office where the appeal is proceeding or intended to proceed.


## Contents of notice of appeal

62.4 (1) A notice of appeal must be in Form 23 and must give details of –

(a) any power which the appellant wishes the court to exercise;

(b) the decision which is being appealed, identifying so far as practicable any finding of –

(i) fact; and

(ii) law;

which the appellant seeks to challenge;


(c) the grounds of the appeal; and

(d) the order the appellant seeks.

(2) A copy of the judgment or order which is the subject of the appeal must wherever practicable be attached to the notice of appeal.

(3) Where leave to appeal is required a copy of the order giving leave to appeal must be attached to the notice of appeal.

(4) The notice of appeal must –
   (a) be signed by the appellant or the appellant's legal practitioner;
   (b) give the details required by rule 3.11; and
   (c) state the names and addresses and the legal practitioners and their addresses for service of all other parties affected by the appeal.

(5) The grounds of appeal under paragraph (1) (c) must set out –
   (a) concisely;
   (b) in consecutively numbered paragraphs; and
   (c) under distinct heads;
   the grounds on which the appellant relies, without any argument or narrative.

(6) The court may, on or without an application, strike out any ground which –
   (a) discloses no reasonable ground of appeal; or
   (b) is vague and general in terms.

(7) The appellant may, except on an interlocutory appeal, amend the grounds of appeals once without permission at any time within 28 days from receiving notice under Rule 62.9(1) (a), (b) or (c) that a transcript of the evidence and the judgment have been prepared.

(8) The appellant may not rely on any ground not mentioned in the notice of appeal without the permission of the court.

(9) The court is not confined to the grounds set out in the notice of appeal, but may not make its decision on any ground not set out in the notice of appeal unless the respondent has had sufficient opportunity to contest such ground.

## Time for filing notice of appeal

62.5(1) The notice of appeal must be filed at the appropriate court office –

> (a)    in the case of an interlocutory appeal where leave is not required, within 21 days of the date the decision appealed against was made;

> (b)    in an interlocutory appeal where leave is required, within 21 days of the date when such leave was granted; or

> (c)    in the case of any other appeal, within 42 days of the ate when judgment is delivered or the order is made, whichever is earlier.

(2) The court below making the interlocutory decision in respect of which a party intends to appeal may extend any of the time in this Rule on application made orally at the time the decision is made.

(3) The court may extend any of the time limits in this Rule on an application made under Part 11 and any such application may be determined without a hearing.

## Summary appeal

62.6 (1) This rule applies to any appeal in which the appellant files with the notice of appeal –

(a) a certificate that the –

(i) appeal is of exceptional urgency;

(ii) appeal relates to specific issues of law and can be heard justly without the production of the full record; or

(iii) circumstances of the appellant and/or the respondent are such that the cost of preparing the record would impede that party's ability to prosecute the appeal and that the appeal can be heard justly without production of the full record; and

(b) evidence of the parties' agreement that the appeal should proceed as a summary appeal.

(2) The court office must immediately refer the notice of appeal to the Chief Registrar.

(3) The Chief Justice shall assign the matter to a single judge of the court to determine whether the appeal should be dealt with summarily, and if the judge so determines, the judge must give such case management directions as are appropriate to enable the appeal to be dealt with summarily, including dispensing with any procedural requirements in this Part with regard to an appeal proceeding under this Rule.

## Service of notice of appeal

62.7 (1) The notice of appeal must be served on –

        (a)  all parties to the proceedings; and

        (b)  any other person if the court directs, or if required by law.

    (2) The notice of appeal or amended notice of appeal must be served within 14 days, or within such period as prescribes by law, or order, after the notice has been filed.

## Counter notice

62.8 (1) Any party upon whom a notice of appeal is served may file a counter-notice.

    (2) The counter-notice must comply with rule 62.4.

    (3) The counter-notice must be filed at the appropriate court office in accordance with rule 62.3 within 14 days of service of the notice of appeal.

    (4) The party filing a counter-notice must serve a copy on all other parties to the proceedings within 7 days or filing.

## Action to be taken on receipt of notice of appeal

62.9  (1) Upon the notice of appeal being filed (unless Rule 62.6 applies) the court below must forthwith, if the appeal is –

      (a)      from the High Court –

          (i)      arrange for the transcript of the proceedings; and

          (ii)     when these are prepared give notice to all parties that copies of the transcript are available on payment of the prescribed fee;

(b)     from the magistrate's or district court, comply with any provision for appeal in the Codes of Procedure, Criminal Code or any other enactment regulation appeals from the magistrate's or district court;  or

(c) from a tribunal- apply to the clerk or other officer of the court or tribunal for a -

    (i)     certified copy of the record of the proceedings;

    (ii)    certified copy of the most notes of evidence given; and

    (iii)   statement of the judgment, the reasons for the decision and any finding on any question of law under appeal;

and forthwith upon receipt of these documents give notice to all parties that copies of the record and other documents are available on payment of the prescribed fee.

(2) Where in any case, the transcript of the notes of evidence and of the judgment, or of the proceedings or the notes of evidence is unavailable, the court below shall inform all parties of this in writing.

(3) The parties may by agreement in writing dispense with the need for the transcript to be included in the record in whole or in part.

## Interlocutory appeal

62.10    (1) On an interlocutory appeal the appellant shall be required to file and serve with the notice of appeal, written submissions in support of the appeal together with six bundles of documents comprising a copy of each of the following documents in the order set out below bound, indexed and paginated –

    (a)     the judgment (if any) or order appealed;

    (b)     such affidavits, witness statements or exhibits relevant to the question at issue on the appeal which were put in evidence before the court below;

    (c)     any written admissions or requests for information and replies;

    (d)     the judge's notes of any submissions made (if any); and

    (e)     any other relevant documents applicable to the appeal.

(2) The appellant's notice of appeal must state in the heading that the appeal is an interlocutory appeal and is made under Rule 62.10 of the Civil Procedure Rules.

(3) A respondent who intends to oppose the notice of appeal must within 7 days or receipt of the appeal file and serve a notice of opposition.

(4) The respondent may within 14 days of receipt of the notice of appeal file and serve six copies of any written submissions in opposition to the appeal or in support of any cross appeal, together with any other documents, which have not been filed pursuant to paragraph (1) and the documents must be bound, indexed and paginated.

(5) Consideration of the appeal must take place not less than 14 days after the filing of the notice of appeal, unless the court otherwise directs.

(6) The Court may direct that there be an oral hearing and the parties shall be entitled to make oral submissions.

## Skeleton arguments

62.11(1) Within 52 days of receipt of the notice under Rule 62.9(1) (a), (b) or (c) the appellant must file with the court office and serve on all other parties a skeleton argument.

(2) Within 28 days of service of the appellant's skeleton argument, any other party wishing to be heard on the appeal must file its skeleton argument and serve a copy on all other parties.

(3) The appellant may file and serve a skeleton argument in reply within 14 days of service of the skeleton argument by any other party.

(4) A skeleton argument must –

(a) set out concisely the nature of the appellant's arguments on each ground of appeal;

(b) in the case of a point of law, state the point and cite the principal authorities in support with references to the particular page where the principle concerned is set out; and

(c) in the case of questions of fact, state briefly the basis on which it is contended that the court can interfere with the finding of fact concerned, with cross references to the passages in the transcript or notes of evidence which bear on the point.

(5) The appellant's skeleton argument must be accompanied by a written chronology of events relevant to the appeal cross-referenced to the core bundle or record.

(6) The Chief Justice may, by practice direction, set out those factors to which the court must have regard when considering the application of this Rule.

## The record –appeals from High Court

62.12  (1) This Rule applies to all appeals from the High Court other than-

(a)  interlocutory appeals; or

(b)  summary appeals under Rule 62.6.

(2) Within 21 days of receipt of the notice under Rule 62.9(1)(a), (b) or (c) that the transcript is available, all parties must inform the appellant of the documents that they wish to have included in the record or the core bundle.

(3) Subject to paragraph (4), within 42 days of receipt of such notice under rule 62.9(1)(a), the appellant must prepare and file with the court office 6 sets of the record for the use of the court comprising a copy of each of the following documents –

(a) affidavits (with exhibits) which were put in evidence before the court below;

(b) a transcript or other record of the —

    (i) evidence given in the court below; and

    (ii) judgment;

(c) the documents required by rule 39.1(5) to be lodged with the court  (including any core bundle);

(d) the notice of appeal and any counter-notices that have been served on the appellant; and

(e) the chronologies under Rule 62.11.

(4) If the record consists of more than 100 pages the appellant must prepare a core bundle and file –

    (a) 4 copies of the core bundle; and

(b) 2 copies of the record in accordance with paragraph (3);

for the use of the court.

(5) Where a record of appeal is filed electronically, the appellant shall prepare and file such number of hard copies of the record and core bundle as authorized by the Chief Justice in a practice direction.

(6) The appellant must forthwith serve one copy of the record or (if paragraph (4) applies) one copy of any core bundle on every respondent.

(7) Any application to correct the record must be made in writing to the Chief Registrar no later than 21 days after the service of the record or core bundle in accordance with paragraph (4).

## The record – appeals from magistrates' courts

62.13   (1) This rule applies to appeals from Magistrates' or District Courts.

(2) In the case of an appeal from a magistrate's or district court the record must consist of the documents referred to in Rule 62.9(1) (b) together with the notice of appeal and any counter-notices that have been served on the appellant.

(3) Within 28 days of receipt of the notice under Rule 62.9(1) (b) the appellant must file at the court office six copies of the record for the use of the court.

(4) The appellant must forthwith serve one copy of the record on each respondent to the appeal.

## Case management

62.14(1) Parts 25 to 27 so far as relevant apply to management of an appeal case as they do to case management of a trial.

(2) The Chief Justice may designate a single judge of the court, a judge, master or the Chief Registrar to manage an appeal case.

(3) The person designated under paragraph (2) may –

(a) give written directions which may include a direction that a date for hearing of the appeal be

fixed or that a case management conference be held; or

(b) hold a case management conference.

(4) Directions, whether or not given at a case management conference, must include directions fixing a date for the hearing of the appeal or directions fixing a date by which a listing questionnaire must be sent to all parties and may include directions

(a) as to the length of time to be allocated to the hearing of the appeal;

(b) that the parties agree a core bundle for use at the appeal;

(c) that the parties agree and file a statement of issues for the appeal;

(d) that the parties agree and file a statement summarising the facts found at the trial; and

(e) as to the filing of written briefs and as to the length of time allowed to each party for oral argument; or

(f) that the appeal be considered solely on written briefs without oral argument and as to the time by which such briefs are to be filed.

(5) If directions are given that a listing questionnaire be sent to all parties, rules 27.9 and 27.10 apply as if the references to the trial were references to the hearing of the appeal.

(6) If the management of an appeal has been referred to a single judge of the court under paragraph (2) that judge must wherever practicable be a member of the court hearing the appeal.

(7) The Chief Justice may, by practice direction, set out those factors to which the court must have regard when considering the application of this Rule.

## Procedural applications to court

62.15(1) Any application (other than an application for leave to appeal) to the court must be made in writing in the first instance and be considered by the Chief Justice, or if the Chief Justice directs, by –

(a) a judge;

(b) a master;

(c) a single judge of the court;

(d) the Chief Registrar;

(e) the court; or

(f) the registrar of the court below.

(2) If an appeal has been referred under rule 62.14(2) to a single judge of the court for case management, the application should, wherever practicable, be considered by that judge.

(3) So far as practicable, a procedural application is to be dealt with on paper or by telephonic or other means of communication.

(4) The court office must give the parties to the appeal at least 7 days notice of any hearing.

## Powers of single judge of the court, master and Chief Registrar to make certain orders

62.16(1) A single judge of the court may make orders for –

(a) an injunction restraining any party from disposing of or parting with the possession of the subject matter of an appeal pending the determination of the appeal;

(b) a stay of execution on any judgment or order against which an appeal has been made pending the determination of the appeal;

(c) extension or abridgement of any time limit prescribed in this Part;

(d) the giving of security for any costs occasioned by an appeal.

(2) The Chief Justice may designate a master or the Chief Registrar to make orders for –

(a) extension or abridgement of any time limit prescribed in this Part;

(b) the giving of security for any costs occasioned by an appeal.

(3) An order made by a master or the Chief Registrar may be varied or discharged by a single judge.

## Variation, discharge or revocation of an order, direction or decision of a single judge

62.16A (1) Any order, direction or decision made or given by a single judge may be varied, discharged or revoked by two judges where the order, direction or decision relates to an appeal of a class which may be heard and determined by two judges and by the full court in any case.

(2) An application to vary, discharge or revoke an order, direction or decision made or given by a single judge may be made within 14 days of the date of the order, direction or decision.

• See The Windward Islands and Leeward Islands (Court's) Order in Council, 1959, section 10(3) and CPR 2.5 (4) and (5) which provide for actions that may be heard and determined by two judges of the court and actions that may be heard and determined by the full court.

## Security for costs of appeal

62.17 (1) The court may order –

(a) an appellant; or

(b) a respondent who files a counter notice asking the court to vary or set aside an order of a lower court;

to give security for the costs of the appeal.

(2) An application for security may not be made unless the applicant has made a prior written request for such security.

(3) In deciding whether to order a party to give security for the costs of the appeal, the court must consider –

(a) the likely ability of that party to pay the costs of the appeal if ordered to do so; and

(b) whether in all the circumstances it is just to make the order.

(4) On making an order for security for costs the court must order that the appeal be dismissed with costs if the security is not provided in the amount, in the manner and by the time ordered.

(5) Any costs to be paid under paragraph (4) must be assessed by the court.

• Rule 65.12 deals with the assessment of costs.

## Non-disclosure of payment into court, etc.

62.18 (1) If

(a) any question on an appeal in a claim for a debt, damages or salvage relates to liability for the debt, damages or salvage or to the amount thereof; and

(b) an offer of settlement was made under Part 35 or payment into court in support of such an offer was made under Part 36 in the proceedings in the court below before judgment;

neither the fact nor the amount of the offer or payment is to be stated in any notice of appeal or counter-notice or communicated to the court until all such questions have been decided.

(2) For the purpose of complying with this rule the appellant must cause to be omitted from the copies of the documents lodged by the appellant every part which states, or refers to the fact, that money was paid into court or an offer to settle was made in the proceedings in that court before judgment.

(3) This rule does not apply to an appeal relating only to costs.

## Stay of execution

62.19   Except so far as the court below or the court or a single judge of the court otherwise directs –

(a) an appeal does not operate as a stay of execution or of proceedings under the decision of the court below; and

(b) any intermediate act or proceeding is not invalidated by an appeal.

## General powers of the court

62.20 (1) In relation to an appeal the Court of Appeal has all the powers and duties of the High Court including in particular the powers set out In Part 26.

(2) The court may hear an appeal in a Member State or Territory other than where the decision of the court below was made.

## Failure of party to attend appeal

62.21 (1) If no party appears at the appeal and the court is satisfied that the parties have received notice of

the hearing in accordance with these Rules, the court may strike out the appeal and any counter appeal.

(2) If one or more but not all parties appear, the court may proceed in the absence of the parties who do not appear if satisfied that the party who does not appear has received notice of the hearing in accordance with these Rules.

## Application to set aside decision made in party's absence

62.22 (1)  A party who was not present at an appeal at which a decision was made or where an appeal was struck out may apply to set aside that order.

(2) The application must be made within 14 days after the date on which the judgment was served on the applicant.

(3) The application to set aside the order must be supported by evidence on affidavit showing –
(a) a good reason for failing to attend the hearing; and
(b) that it is likely that had the applicant attended, some other decision might have been made.

## Adjournment of appeal

62.23 (1) The court may adjourn an appeal on such terms as it thinks just.

(2) The court may only adjourn an appeal to a date and time fixed by the court.

## Certificate of result of appeal

62.24 At the conclusion of each appeal the court office must prepare a certificate of the result of the appeal in Form 24 and –
(a) file a copy at the court office at which the Notice of Appeal was lodged; and
(b) serve a copy on each party to the appeal.

## Withdrawal or discontinuance

62.25 (1) If the appellant files a notice that he desires to withdraw or discontinue his appeal, the appeal shall stand dismissed on the date on which such notice is filed.

(2) The appellant shall serve copies of the notice of withdrawal or discontinuance on all the parties with regard to whom the appellant wishes to withdraw his appeal within 2 days of filing, and shall file such notice and evidence of service within 2 days of service.

(3) Any party served in accordance with this Rule shall be precluded from laying claim to any costs incurred by him after such service unless the court shall otherwise order.

(4) Notwithstanding the appeal stands dismissed, the appellant shall be liable for the costs incurred by the respondent.

## Liability for costs on withdrawal or discontinuance

62.26 (1) Unless the –
    (a)   parties agree; or
    (b)   court orders otherwise;
an appellant who discontinues is liable for the costs incurred by the respondent against whom the claim is discontinued, on or before the date on which notice of discontinuance was served.

(2) If an appeal is only partly discontinued –

    (a)   the appellant is only liable for the costs relating to that part of the appeal which is discontinued; and

    (b)   unless the court orders otherwise, the costs which the appellant is liable to pay are not to be quantified until the conclusion of the rest of the appeal.

## Quantification of costs on withdrawal or discontinuance

62.27    (1) The general rule is that, unless an order has been made for budgeted costs under Rule 65.8, the costs are to be determined in accordance with the scale of prescribed costs contained in Part 65, Appendices B and C.

(2) If the appellant discontinues part of the appeal only, the amount of costs must be assessed by the court when the reminder of the appeal is resolved.

(3) In determining the appropriate amount of costs to be paid where an order has been made under Rule 65.8 (budgeted costs), the court may take into account any written information provided by either party when the costs budget was made.

**PART 63**

# Change of Legal Practitioner

**Contents of this Part**

Scope of this Part                                                    Rule 63.1

Change of legal practitioner                                          Rule 63.2

Notice of appointment of legal practitioner                           Rule 63.3

Party acting in person                                                Rule 63.4

Application by another party to remove legal practitioner from record  Rule 63.5

Application by legal practitioner to be removed from record           Rule 63.6

Time when notice or order takes effect                                Rule 63.7

## Scope of this Part

63.1 This Part deals with the procedure where –

  (a) a legal practitioner acts in the place of a party in person;

  (b) a party who has previously acted by a legal practitioner acts in person; or

  (c) there is a change of legal practitioner.

## Change of legal practitioner

63.2 When a party changes its legal practitioner the new legal practitioner must –

  (a) file a notice of acting which states the legal practitioner's business name, address, telephone number and FAX number (if any);

  (b) serve a copy of the notice on every other party and the former legal practitioner; and

  (c) file a certificate of service.

## Notice of appointment of legal practitioner

63.3 If a person who has previously acted in person instructs a legal practitioner, that legal practitioner must –

  (a) file notice of acting at the court office which states the legal practitioner's business name,

address, telephone number and FAX number (if any);

(b) serve a copy of the notice on every other party; and

(c) file a certificate of service.

## Party acting in person

63.4 If  a party who has previously been represented by a legal practitioner decides to act in person, that
party must –

(a) file notice of acting in person at the court office which states the address, an address for service
within the jurisdiction, telephone number and FAX number (if any) of that party;

(b) serve a copy of the notice on every other party and the former legal practitioner; and

(c) file a certificate of service.

## Application by another party to remove legal practitioner from record

63.5 (1) If –

(a) a legal practitioner on record for a party has –

(i) become bankrupt;

(ii) been removed from the roll;

(iii) died; or

(iv) failed to take out a practising certificate; and

(b) notice of the appointment of a new legal practitioner under rule 63.2 or of the party acting in
person under rule 63.4 has not been received;

any other party may apply to the court for an order declaring that the legal practitioner in question
has ceased to act.

(2) An application under this Part must be supported by evidence on affidavit and must be served on
the legal practitioner (if practicable) and personally on the client.

(3) Any order made must be served by the applicant on the legal practitioner or former legal
practitioner (if practicable) and personally on the client.

(4) The applicant must file a certificate of service of the order.

## Application by legal practitioner to be removed from record

63.6 (1)  A legal practitioner who wishes to be removed from the record as acting for a party may apply to the court for an order that he or she be removed from the record.

(2) The application must be on notice to the client or former client and to all other parties.

(3) The application must be supported by evidence on affidavit which must be served on the client but must not be served on any other party to the proceedings.

(4) Any order made must be served by the applicant on the other parties' legal practitioners and personally on the former client.

(5) The applicant must file a certificate of service of the order.

## Time when notice or order takes effect

63.7 Any notice under rule 63.2, 63.3 or 63.4, or order under rule 63.5 or 63.6 does not take effect until service.

**PART 64**

**Costs – General**

**Contents of this Part**

Scope of this Part                                    Rule 64.1

Definitions and application                           Rule 64.2

Orders about costs                                    Rule 64.3

Costs where there is an appeal                        Rule 64.4

Entitlement to recover costs                          Rule 64.5

Successful party generally entitled to costs          Rule 64.6

Two or more parties having same interest              Rule 64.7

Wasted costs orders                                   Rule 64.8

Court's powers in relation to wasted costs orders     Rule 64.9

Costs against person who is not a party               Rule 64.10

# Scope of this Part

64.1 This Part contains general Rules about costs and the entitlement to costs. Part 65 deals with the quantification of such costs.

# Definitions and application

64.2   (1)  In this Part and in Part 65, unless the context otherwise requires –

"**assessed costs**" and "assessment" have the meanings given them by rules 65.11 and 65.12;

"**budgeted costs**" has the meaning given it by rule 65.8;

"**costs**" include a legal practitioner's charges and disbursements, fixed costs, prescribed costs, budgeted costs or assessed costs;

"**fixed costs**" has the meaning given it by rule 65.4; and

"**prescribed costs**" has the meaning given it by rule 65.5.

(2) If costs of –

(a) a legal practitioner to his or her client;

(b) arbitration proceedings; or

(c) proceedings before a tribunal or other statutory body;

are to be taxed or assessed by the court, they must be assessed in accordance with rule 65.12.

(3) If in any enactment there is a reference to the taxation of any costs this is to be construed as referring to the assessment of such costs in accordance with rule 65.12, unless the enactment otherwise provides.

## Orders about costs

64.3 The court's powers to make orders about costs include power to make orders requiring a party to pay the costs of another person arising out of or related to all or any part of any proceedings.

## Costs where there is an appeal

64.4 The court hearing an appeal may make orders about the costs of the proceedings giving rise to the appeal as well as the costs of the appeal.

## Entitlement to recover costs

64.5 A person may not recover the costs of proceedings from any other party or person except by virtue of –

(a) an agreement between the parties;

(b) an order of the court; or

(c) a provision of these Rules.

## Successful party generally entitled to costs

64.6 (1) Where the court, including the Court of Appeal, decides to make an order about the costs of any proceedings, the general rule is that it must order the unsuccessful party to pay the costs of the successful party.

(2) The court may however order a successful party to pay all or part of the costs of an unsuccessful party or may make no order as to costs.

(3) This rule gives the court power in particular to order a person to pay –

(a) costs from or up to a certain date only;

(b) costs relating only to a certain distinct part of the proceedings; or

(c) only a specified proportion of another person's costs.

(4) The court may not make an order under paragraph 3(a) or 3(b) unless it is satisfied that an order under paragraph 3(c) would not be more practicable.

(5) In deciding who should be liable to pay costs the court must have regard to all the circumstances.

(6) In particular it must have regard to –
    (a) the conduct of the parties both before and during the proceedings;
    (b) the manner in which a party has pursued –
        (i) a particular allegation;
        (ii) a particular issue; or
        (iii) the case;
    (c) whether a party has succeeded on particular issues, even if the party has not been successful in the whole of the proceedings;
    (d) whether it was reasonable for a party to –
        (i) pursue a particular allegation; and/or
        (ii) raise a particular issue; and
    (e) whether the claimant gave reasonable notice of intention to issue a claim.
    •Rule 65.11 sets out the way in which the court must deal with the costs of procedural hearings other than a case management conference or pre-trial review.


## Two or more parties having same interest

64.7 If two or more parties having the same interest in relation to proceedings are separately represented the court may disallow more than one set of costs.


## Wasted costs orders

64.8 (1)In any proceedings the court may by order –
    (a) direct the legal practitioner to pay; or
    (b) disallow as against the legal practitioner's client;
the whole or part of any wasted costs.

(2) In this rule –

"**wasted costs**" means any costs incurred by a party –

(a)  as a result of any improper, unreasonable or negligent act or omission on the part of any legal practitioner or any employee of the legal practitioner; or

(b) which, in the light of any act or omission occurring after they were incurred;

the court considers it unreasonable to expect that party to pay.

## Court's powers in relation to wasted cost orders

64.9 (1) The court may make an order under this Rule where –

(a)  a party or his legal representative, fails to comply with a Rule, practice direction or court order; or

it appears to the court that the conduct of a party or his legal representative, before or during the proceedings, was unreasonable or improper.

(2) Where paragraph (1) applies, the court may –

(a)  disallow all or part of the costs which are being assessed; or

(b)  order the party at fault or his legal representative to pay costs to the court or which he has caused any other party to incur; or both.

(3) Where –

(a)  the court makes an order under paragraph (2) against a legally represented party: and

(b)                          the party is not present when the order is made, the party's legal practitioner receives notice of the order.

## Costs against person who is not a party

64.10(1) This rule applies where

(a) an application is made for; or

(b) the court is considering whether to make;

an order that a person who is not a party to the proceedings nor the legal practitioner to a party should pay the costs of some other person.

(2) Any application by a party must be on notice to the person against whom the costs order is sought and must be supported by evidence on affidavit.

(3) If the court is considering making an order against a person the court must give that person notice of the fact that it is minded to make such an order.

(4) A notice under paragraph (3) must state the grounds of the application on which the court is minded to make the order.

(5) A notice under paragraph (2) or (3) must state a date, time and place at which that person may attend to show cause why the order should not be made.

(6) The person against whom the costs order is sought and all parties to the proceedings must be given 14 days notice of the hearing.

**Part 65**

**Costs – Quantification**

**Contents of this Part**

| | |
|---|---|
| Scope of this Part | Rule 65.1 |
| Basis of quantification | Rule 65.2 |
| Ways in which costs are to be quantified | Rule 65.3 |
| Fixed costs | Rule 65.4 |
| Prescribed costs. | Rule 65.5 |
| Applications to determine value of claim for purpose of prescribed costs | Rule 65.6 |
| What is included in prescribed costs | Rule 65.7 |
| Budgeted costs | Rule 65.8 |
| Client's consent to application for budgeted costs | Rule 65.9 |
| What is included in costs budget | Rule 65.10 |
| Assessed costs – procedural applications | Rule 65.11 |
| Assessed costs – general | Rule 65.12 |
| Costs of Proceedings in Court of Appeal . | Rule 65.13 |
| Costs capping orders – General | Rule 65.14 |
| Application  for a costs capping order | Rule 65.15 |
| Application to vary a costs capping order | Rule 65.16 |
| Appendix A – Fixed Costs | |
| Appendix B – Prescribed Costs | |
| Appendix C – Prescribed Costs: Percentage to be allowed at various stages of claim | |

## Scope of this Part

65.1 This Part deals with the way in which any costs awarded by the court are quantified.

## Basis of quantification

65.2 (1) If the court has a discretion as to the amount of costs to be allowed to a party, the sum to be

allowed is –

(a) the amount that the court deems to be reasonable were the work to be carried out by a legal

practitioner of reasonable competence;

and

(b) which appears to the court to be fair both to the person paying and the person receiving such costs.

(2) If the court has a discretion as to the amount of costs to be paid to a legal practitioner by his or her client the sum allowed is –

(a) the amount that the court deems to be reasonable; and

(b) which appears to be fair both to the legal practitioner and the client.


(3) In deciding what would be reasonable the court must take into account all the circumstances, including –

(a) any order that has already been made;

(b) the care, speed and economy with which the case was prepared;

(c) the conduct of the parties before as well as during the proceedings;

(d) the degree of responsibility accepted by the legal practitioner;

(e) the importance of the matter to the parties;

(f) the novelty, weight and complexity of the case;

(g) the time reasonably spent on the case; and

(h) in the case of costs charged by a legal practitioner to his or her client –

(i) any agreement about what grade of legal practitioner should carry out the work;

(ii) any agreement that may have been made as to the basis of charging; and

(iii) whether the legal practitioner advised the client and took the client's instructions before taking any unusual step or one which was unusually expensive having regard to the nature of the case.


## Ways in which costs are to be quantified

65.3 Costs of proceedings under these Rules are to be quantified as follows –

(a) where rule 65.4 applies – in accordance with the provisions of that rule; and

(b) in all other cases if, having regard to rule 64.6, the court orders a party to pay all or any part of the costs of another party – in one of the following ways –

(i) costs determined in accordance with rule 65.5 ("prescribed costs");

(ii) costs in accordance with a budget approved by the court under rule 65.8 ('budgeted costs"); or

(iii) (if neither prescribed not budgeted costs are applicable), by assessment in accordance with rules 65.11 and 65.12.

## Fixed costs

65.4 (1) A party is entitled to the costs set out in column 3 of Appendix A to this Part in the circumstances set out in column 2 of that Appendix.

(2) The court may however direct that some other amount of costs be allowed for the work covered by any item in Part 2 of Appendix A.

(3) If it does so, the court must assess such costs.
• Rule 65.11 and 65.12 deals with the assessment of costs.

## Prescribed costs

65.5 (1) The general rule is that where rule 65.4 does not apply and a party is entitled to the costs of any proceedings, those costs must be determined in accordance with Appendices B and C to this Part and paragraphs (2) to (4) of this rule.

(2) The "value" of the claim, whether or not the claim is one for a specified or unspecified or unspecified sum, coupled with a claim for other remedies is to be decided in the case of the claimant or defendant –

(a) by the amount agreed or ordered to be paid; or if the claim is for damages and the claim form does not specify an amount that is claimed, such sum as may be agreed between the party entitled to, and the party liable to, such costs or, if not agreed, a sum stipulated by the court as the value of the claim; or

(b) if the claim is not for a monetary sum it is to be treated as a claim for $50,000 unless the court makes an order under Rule 65.6(1)(a).

(3) The general rule is that the amount of costs to be paid is to be calculated in accordance with the percentages specified in column 3 of Appendix B against the appropriate value.

(4) The court may –

    (a) award a proportion only of such sum having taken into account

the matters set out in rule 64.6(4) and (5); and

    (b) order a party to pay costs –

      (i) from or to a certain date; or

      (ii) relating only to a certain distinct part of the proceedings, in which case it must specify the proportion of the fixed costs which is to be paid by the party liable to pay such costs and in so doing may take into account the table set out in Appendix C.

## Applications to determine value of claim for purpose of prescribed costs

65.6 (1) A party may apply to the court at any time before trial –

    (a)    to determine the value to be placed on a case which has no monetary value; or

    (b)    where the likely value is known, to direct that the prescribed costs to be calculated on the basis of some higher or lower value.

    (2) If an application is made for costs to be prescribed at a higher level, rules 65.8(4)(c) and 65.9 apply.

## What is included in prescribed costs

65.7 (1) Prescribed costs include all work that is required to prepare the proceedings for trial including, in particular, the costs involved in –

    (a) instructing any expert;

    (b) considering and disclosing any report made by the expert;

    (c) arranging the expert witness' attendance at trial; and

    (d) attendance and advocacy at the trial including attendance at any

     case management conference or pre-trial review.

    (2) Prescribed costs exclude –

    (a) expert's fees for preparing a report and attending any conference, hearing or trial;

    (b) costs incurred in enforcing any order (which are generally fixed in accordance with rule 65.4 but may, in certain cases, be assessed in accordance with rule 65.12);

    (c) the cost of obtaining a daily transcript of the evidence if the trial judge certifies this as a

reasonable disbursement in all the circumstances of the case; and

(d) the making or opposing of any application except at a case management conference or pre-trial review.

## Budgeted costs

65.8 (1) A party may apply to the court to set a costs budget for the proceedings.

(2) An application for a costs budget must be made at or before the first case management conference.

(3) The application may be made by either or both parties but an order setting a costs budget may not be made by consent unless all relevant parties are bodies corporate.

(4) An application for a costs budget must be accompanied by –

(a) a statement of the amount that the party seeking the order wishes
    to be set as the costs budget;

(b) a statement showing how the budget has been calculated and setting out in particular –

(i) a breakdown of the costs incurred to date;

(ii) the anticipated amount of any expert witness fees and whether or not such fees are included in the budget;

(iii) the disbursements other than expert fees that are included in the budget;

(iv) the fees that are anticipated to be paid to any legal practitioner other than the legal practitioner on record for advocacy (including advocacy by a Queen's Counsel, a State Counsel or more than one counsel), advising or settling any document;

(v) the hourly rate charged by the legal practitioner (or other basis of charging);

(vi) a statement of the number of hours of preparation time (including attendances upon the party, any witness and any  other party to the proceedings) that the legal practitioner for
the party making the application has already spent and anticipates will be required to bring
    the proceedings to trial; and

(vii) what procedural steps or applications are or are not included
    in the budget; and

(c) the written consent from the client in accordance with rule 65.9.

(5) A party may apply to vary the terms of an order made under this rule at any time prior to the commencement of the trial but no order may be made increasing the amount of the budgeted costs unless the court is satisfied that there has been a change of circumstances which became known after the order was made.


## Client's consent to application for budgeted costs


65.9 (1) The court may not make an order for budgeted costs unless –

   (a) the court satisfies itself that each party fully understands the consequences of the order that is being sought as to –

      (i) the party's liability for costs to the party's own legal practitioner, whether the party obtains an order for costs against any other party or not;

      (ii) the party's liability to pay costs in the budgeted sum to the other party if that other party obtains an order for costs against the party; and

      (iii) what the party's liability might be under paragraphs (i) and (ii) if rule 65.5 applied;

   (b) the  consent under sub-paragraph (c) is in a separate document which –

      (i) deals only with the question of budgeted costs;

      (ii) gives an estimate of the total costs of the proceedings as between the legal practitioner and the client;

      (iii) is signed by the party in person;

      (iv) states the legal practitioner's estimate of what the prescribed costs appropriate to the proceedings would be; and

      (v) sets out the basis of that estimate including the amount of any hourly charge;

   (c) there has been filed a document recording the express consent of the party in person to the application and to any order made as a consequence of the application; and

   (d) the party seeking the order is present in person when the application is made except where–

      (i) that party is a body corporate; or

      (ii) for some exceptional reason this is impracticable.


(2)  The written consent of the client must not be disclosed to the other party.

(3)  This rule also applies to any other party personally who consents to or does not oppose an order
for a costs budget.

## What is included in costs budget

65.10 Unless the costs budget approved by the court specifies otherwise, rule 65.7 applies to budgeted
costs as it does to prescribed costs.


## Assessed costs – procedural applications

65.11(1) On determining any application except at a case management conference, pre-trial review or the
trial, the court must –

(a) decide which party, if any, should pay the costs of that application;

(b) assess the amount of such costs; and

(c) direct when such costs are to be paid.


(2)  In deciding which party, if any, should pay the costs of the application the general rule is that
the unsuccessful party must pay the costs of the successful party.


(3)  The court must take into account all the circumstances including the factors set out in rule
64.6(6) but where the application is –

(a) an application to amend a statement of case;

(b) an application to extend the time specified for doing any act under these Rules or an order or
direction of the court;

(c)  an application for relief under rule 26.8 (relief from sanctions); or

(d) one that could reasonably have been made at a case management conference or pre-
trial review;

the court must order the applicant to pay the costs of the respondent unless there are special
circumstances.


(4)  In assessing the amount of costs to be paid by any party the court must take into account any
representations as to the time that was reasonably spent in making the application and preparing
for and attending the hearing and must allow such sum as it considers fair and reasonable.


(5)  A party seeking assessed costs must supply to the court and to all other parties a brief statement
showing –

(a) any counsel's fees incurred;

(b) how that party's legal representative's costs are calculated; and

(c) the disbursements incurred.

(6) The statement under paragraph (5) must comply with any relevant practice direction.

(7) The costs allowed under this rule may not exceed one tenth of the amount of the prescribed costs appropriate to the claim unless the court considers that there are special circumstances of the case justifying a higher amount.

## Assessed costs – general

65.12(1) This rule applies where costs fall to be assessed in relation to any matter or proceedings, or part of a matter or proceedings, other than a procedural application.

(2) If the assessment relates to part of court proceedings it must be carried out by the judge, master or registrar hearing the proceedings.

(3) If the assessment does not fall to be carried out at the hearing of any proceedings then the person entitled to the costs must apply to a master or the registrar for directions as to how the assessment is to be carried out.

(4) The application must be accompanied by a bill or other document showing the sum in which the court is being asked to assess the costs and how such sum was calculated.

(5) On hearing any such application the master or registrar must either –

(a) assess the costs if there is sufficient material available to do so; or

(b) fix a date, time and place for the assessment to take place.

(6) The master or registrar may direct that the party against whom the bill is assessed pay the costs of the party whose bill is being assessed and, if so, must assess such costs and add them to the costs ordered to be paid.

## Costs of Proceedings in Court of Appeal

65.13(1)    The general rule is that the costs of any appeal must be determined in accordance with rules 65.5, 65.6 and 65.7 and Appendix B but the costs must be limited to two thirds of the amount that would otherwise be allowed.

   (2)   The Court of Appeal may, if the circumstances of the appeal or the   justice of the case require, depart from the general rule and, in such a case, it may -

        (a)     make an order for budgeted costs whether on an application made in accordance with rules 65.8 and 65.9 or otherwise; or

        (b)     make such other order as it sees fit.

## Costs capping orders – General

65.14 (1) A costs capping order is an order limiting the amount of future costs (including disbursements) which a party may recover pursuant to an order for costs subsequently made.

(2) In this Rule, "future costs" means costs incurred in respect of work done after the date of the costs capping order but excluding the amount of any additional liability.

(3) A cost capping order may be in respect of –

        (a)     the whole litigation; or

        (b)     any issues which are ordered to be tried separately.

(4) The court may at any stage of proceedings make a costs capping order against all of any of the parties, if –

        (a)     it is in the interests of justice to do so;

        (b)     there is a substantial risk that without such an order costs will be disproportionately incurred; and

        (c)     it is not satisfied that the risk in sub-paragraph (b) can be adequately controlled by –

            (i)     case management directions or orders made under Part 26; and

            (ii)    detailed assessment of costs.

(5) In considering whether to exercise its discretion under this Rule, the court will consider all the circumstances of the case, including –

(a)    whether there is a substantial imbalance between the financial position of the parties;

(b)    whether the costs of determining the amount of the cap are likely to be proportionate to the overall costs of the litigation;

(c)    the stage which have been incurred to date and the future costs.

(6) A costs capping order, once made, will limit the costs recoverable by the party subject to the order unless a party successfully applies to vary the order. No such variation will be made unless –

(a)    there has been a material and substantial change of circumstances since the date when the order was made; or

(b)    there is some other compelling reason why a variation should be made.

## Application for a costs capping order

65.15(1) An application for a costs capping order muse be made on notice in accordance with Part 11.

(2) The application must –

(a) set out –

(i)    whether the costs capping order is in respect of the whole of the litigation or a particular issue which is ordered to be tried separately; and

(ii)    why a costs capping order should be made; and

(b)    be accompanied by an estimate of cost setting out –

(i)    the costs (and disbursements) incurred by the applicant to date; and

(ii)    the costs (and disbursements) which  the applicant is likely to incur in the future conduct of the proceedings.

(3) The court may give directions for the determination of the application and such directions may-

(a)    direct any party to the proceedings –

(i)    to file a schedule of costs;

(ii)    to file written submissions on all or any part of the issues arising;

(b)      fix the date and time estimate of the hearing of the application;

(c)      include any further directions as the court sees fit.

## Application to vary a costs capping order

65.16 An application to vary a costs capping order must be made by application notice pursuant to Part 11.

**Appendix A – Fixed Costs**
**Part 1**

This Part of the Appendix sets out the fixed costs applicable to a claim for a
specified sum of money –
(a)      which a defendant who does not defend must pay to the claimant, in addition to the amount claimed and interest and the court fees paid by the claimant, in order to avoid judgment being entered under Part 12. These sums are to be entered on the claim form. The table also deals with claims for possession of land or delivery of goods and an application for an order for attachment of debts – Table 1 refers; and
(b)      which a claimant is entitled to include as costs in any default judgment under Part 12 in addition to the costs set out in Table 1 Table 2 refers.

**Scale of Fixed Costs**

**Table 1**

1. This table shows the amounts to be entered on a claim form or provisional attachment of debts order in respect of a legal practitioner's charges in –
        (a) a claim for payment of a specified sum of money;
        (b) attachment of debt proceedings; or
        (c) a claim for the recovery of land.

2. In addition to the fixed costs the appropriate court fee is to be allowed together with the sum of $100 for personal service of the claim form.

| Column    1 | Column 2 | Column 3 |
|---|---|---|
| (1) | Claim exceeding $5,000 but not exceeding $15,000 or a claim for recovery of land or delivery of goods | $ 750 |
| (2) | Claim exceeding $15,000 but not exceeding $50,000 | $ 1000 |
| (3) | Claim exceeding $50,000 but not exceeding $100,000 | $1,500 |
| (4) | Claim exceeding $100,000 but not exceeding $500,000 | $ 2,000 |
| (5) | Claim exceeding $500,000 | $ 2,500 |

**Table 2**

This table shows additional costs which may be added on the entry of a default judgment under Part 12 or a judgment on admissions under Part 14 for a specified sum of money.

| Column 1 | Column 2 | Column 3 |
|---|---|---|
| (1) | Where there is only one defendant and items (3) to (6) of this table do not apply | $350 |
| (2) | Where there is more than one defendant, in respect of each additional defendant served against whom judgment is entered | $50 |
| (3) | Where an order is made under Rule 5.14 (specified method of service) for each defendant served | $500 |
| (4) | Where an order is made under Part 7 for service out of the jurisdiction (to cover the obtaining of an order under Part 7 and service) | $500 |
| (5) | Where judgment is entered on an admission and the claimant accepts the defendant's proposals as to method of payment under rule 14.10 | $350 |
| (6) | Where judgment is entered on an admission and the time and rate of payment are not agreed under rule 14.11 | $500 |

**Part 2**
**Miscellaneous enforcement proceedings**

The following table shows the amount to be allowed in respect of a legal practitioner's charges in the circumstances set out. The appropriate court fee is to be added. The court may order that the costs of any such matter be assessed.

| Column 1 | Column 2 | Column 3 |
|---|---|---|
| (1) | For filing a request for the issue of a writ of execution | $150 |
| (2) | For each attendance at a hearing of – (i) an application for time to pay where the debt is admitted (ii) an application to suspend a writ of execution; or (iii) an oral examination; $300 | |

| Column 1 | Column 2 | Column 3 |
|---|---|---|
| (3) | For the costs of the judgment creditor where allowed in proceedings for an attachment of debts order or an ap- | |

| | | |
|---|---|---|
| | plication for payment out of money in court under rule 50.15, where the amount recovered — | |
| | (i) does not exceed $1000; | One half of the amount recovered |
| | (ii) exceeds $1000 | $500 |
| (4) | For the costs of the judgment creditor where allowed in an application for a charging order | $500 |
| (5) | In addition, for the personal service of any application requiring such service | $ 100 |

## "APPENDIX B

### Scale of prescribed costs

| Column 1 | Column 2 | Column 3 |
|---|---|---|
| | Value of Claim | Percentage |
| (1) | Not exceeding $100,000 | 15% |
| (2) | Exceeding 100,000 but not exceeding $250,000 | 12.5% |
| (3) | Exceeding 250, 000 but not exceeding 500,000 | 10% |
| (4) | Exceeding 500,000 but not exceeding $1, 000, 000 | 7% |
| (5) | Exceeding 1, 000, 000 but not exceeding $2, 500, 000 | 3% |
| (6) | Exceeding 2,500,00 | 0.5% |

Note: The costs for each staged of the scale are cumulative

| | | |
|---|---|---|
| (Example | Claim for | $750,000 |
| First | $100, 000 | $ 15,000 |
| Next | $150,000 | $ 18,750 |
| Next | $250,000 | $ 25,000 |
| Next | $250,000 | $ 17,500 |
| | | |
| Total | $76, 250)"; | and |

## APPENDIX C
# Prescribed Costs: Percentage to be allowed at various stages of claim

Table showing the percentage of the prescribed costs to be allowed under Appendix B where a claim concludes prior to trial.

| Column 1 | Column 2 | Column 3 |
|---|---|---|
| | Stage | Percentage |
| (1)  Up to and including service of defence | | 45% |
| (2)   After  defence and up to and including the case management conference | | 55% |
| (3) From listing questionnaire and up to and including listing questionnaire | | 70% |
| (4) From listing questionnaire and up to and including pre-trial review (if any) | | 75% |
| (5) To trial | | 100% |
| (6) Up to default judgment and including assessment of damages | | 60% |

(Example
Claim for $ 750,000 — full costs as in Appendix 3 —$ 76,250
Claim discontinued after case management conference —
defendant entitled to 70% of total costs — $53,375)

**PART 66**

# Mortgage Claims

**Contents of this Part**

Scope of this Part                                          Rule 66.1

Mortgage claim to be by fixed date claim                    Rule 66.2

Evidence at first hearing                                   Rule 66.3

Claim for possession or payment of mortgage debt            Rule 66.4

## Scope of this Part

66.1 (1) This Part deals with claims by a mortgagor or mortgagee for any of the following forms of relief
–

   (a) foreclosure;

   (b) delivery of possession by the mortgagee;

   (c) payment of moneys secured by a mortgage;

   (d) possession of a mortgaged property;

   (e) reconveyance of the property or release from the mortgage;

   (f) redemption of a mortgage; and

   (g) sale of a mortgaged property.


   (2) In this Part —

      "**mortgage**" includes a legal or equitable charge and a legal or equitable mortgage;

      "**mortgage claims**" means the claims by a mortgagee or mortgagor for any of the forms of relief
      referred to in paragraph (1);

      "**mortgagee**" means the person to whom the mortgage was granted;

   and

      "**mortgagor**" means the person who has granted a mortgage of the mortgaged property.


   (3) This Part does not apply to Saint Lucia.


   (4) This Part does not affect any procedure under any enactment relating to the registration of title to
   land unless court proceedings are taken.

## Mortgage claim to be by fixed date claim

66.2 (1) A mortgage claim is made by issuing a fixed date claim in Form 2.

(2) Notice of the claim must be given to all other mortgagees of the land.

•Rules 8.1 and 27.2 deal with the procedure relating to fixed date claims.

## Evidence at first hearing

66.3 A claimant who seeks final judgment at the first hearing must –

(a) file evidence on affidavit in support of the claim;

(b) serve –

(i) a copy of the affidavit but not the exhibits; and

(ii) a notice stating what relief is sought; with the claim form; and

(c) file a certificate of service not less than 7 days before the first hearing.

•Rule 28.16 enables a party to require copies of any document referred to in an affidavit.

## Claim for possession or payment of mortgage debt

66.4 (1) On a claim for possession of the mortgaged property or for payment of the mortgage debt the claimant must file with the claim form evidence by affidavit –

(a) exhibiting a copy of the original mortgage;

(b) exhibiting a copy of any other document which sets out the terms of the mortgage; and

(c) giving particulars of –

(i) the amount of the advance;

(ii) the interest payable under the mortgage;

(iii) the amount of any periodic payments required to be made stating whether or not such payments include interest;

(iv) the amount of repayments that have been made;

(v) the amount of any repayments or interest due but unpaid at the date of the claim and at the date of the affidavit;

(vi) the amount remaining due under the mortgage; and

(vii) if the claim includes a claim for interest to judgment – the daily rate at which such interest accrues.

(2)If the claimant seeks possession of the mortgaged property, the claimant must also file with the claim form evidence by affidavit –

    (i) giving details of any person other than the defendant and the defendant's family who to the claimant's knowledge is in occupation of the mortgaged property; and

    (ii) stating the circumstances under which the right to possession arises.

(3)If the mortgage creates a tenancy other than a tenancy at will between the mortgagor and the mortgagee, the affidavit must show how and when the tenancy was determined and if by service of a notice when and how that notice was served.

**PART 67**

# Administration Claims

**Contents of this Part**

Scope of this Part                                      Rule 67.1

Parties                                                 Rule 67.2

Claims by third parties                                 Rule 67.3

Determination of questions without administration claim Rule 67.4

Judgments and orders in administration claims           Rule 67.5

Conduct of sale of trust property                       Rule 67.6

## Scope of this Part

67.1 (1) This Part deals with –

    (a) claims for –

      (i) the administration of the estate of a deceased person; and

      (ii) the execution of a trust under the direction of the court;

      which are referred to as "administration claims"; and

    (b) claims to determine any question or grant any relief relating to the administration of the estate of a deceased person or the execution of a trust.

 (2) Such claims must be brought by a fixed date claim in Form 2.

 (3) In this Part –

    "**administration claims**" mean claims for –

    (a) the administration of the estate of a deceased person; and

    (b) the execution of a trust under the direction of the court.

## Parties

67.2  (1)  An administration claim or a claim under rule 67.4 may be brought by any -

(a) executor or administrator of the relevant estate;

(b) person having or claiming to have a beneficial interest in the estate of a deceased

person or under a trust; or

(c) trustee of the relevant trust.

(2) Any executor or administrator of the relevant estate or trustee of the

relevant trust who is not a claimant must be a defendant to the claim.

(3) The general rule is that the claimant need not join as a defendant any person having a beneficial

interest under the estate or trust.

(4) (a) The claimant may make any such person a defendant; and

(b) the court may direct that any such person be made a defendant.

## Claims by third parties

67.3 (1) This rule applies where –

(a) there are proceedings under a judgment or order made in an administration claim relating to

the estate of a deceased person;

and

(b) a person not a party to the claim makes a claim against the estate.

(2) Any person other than the executors or administrators may not appear in proceedings relating to

that claim unless the court otherwise directs.

## Determination of questions without administration claim

67.4 (1) An executor, administrator or trustee may issue a claim for –

(a) any relief; or

(b) the determination of any question;

without bringing an administration claim.

(2) The "**determination of any question**" includes any question –

(a) arising in the administration of the estate of a deceased person;

(b)arising in the execution of, or under a trust;

(c) as to the composition of any class of persons having a claim against –

    (i) a beneficial interest in the estate of a deceased person;

    (ii) any property subject to a trust; or

    (iii) the estate of a deceased person; and

(d) as to the rights or interests of a person claiming to be –

    (i) a creditor of the estate of a deceased person;

    (ii) beneficially entitled under a trust; or

    (iii) entitled under a will or on the intestacy of a deceased person.

(3) "**Any relief**" includes an order –

(a) approving any sale, purchase, compromise or other transaction by a person in the capacity of executor, administrator or trustee;

(b) directing any act to be done in the administration of the estate of a deceased person or in the execution of a trust, which the court could order to be done if the estate or trust were being administered or executed under the direction of the court;

(c) directing a person to do or abstain from doing a particular act in the capacity of executor, administrator or trustee;

(d) requiring an executor, administrator or trustee to furnish and verify accounts; or

(e) requiring the payment into court of money held by a person in the capacity of executor, administrator or trustee.

## Judgments and orders in administration claims

67.5 (1) The court need not make any judgment or order in an administration claim unless satisfied that the question in issue cannot be determined by other means.

(2) If an administration claim is brought by a –

(a) creditor of the estate of a deceased person;

(b) person claiming to be beneficially entitled under a trust; or

(c) person claiming to be entitled under the will or the intestacy of a deceased person; and

the claimant alleges that no, or no sufficient accounts have been furnished by the executors, administrator or trustees, the court may –

    (i) stay the proceedings until a specified date and direct the executors, administrators or trustees to supply proper accounts to the claimant; or

(ii) if it is necessary to prevent proceedings by other creditors or claimants, give judgment or make an order for the administration of the estate and include an order that no proceedings are to be taken under the judgment or order, or under any particular account or inquiry directed without the court's permission.

## Conduct of sale of trust property

67.6 If in an administration claim an order is made for the sale of any property vested in administrators, executors or trustees, they are to have conduct of the sale unless the court otherwise directs.

**PART 68**

# Contentious Probate Proceedings

**Contents of this Part**

Scope of this Part                                              Rule 68.1

How to commence probate proceedings                             Rule 68.2

Parties to proceedings for revocation of grant                  Rule 68.3

Lodgment of grant in proceedings for revocation                 Rule 68.4

Affidavit of testamentary scripts                               Rule 68.5

Failure to file acknowledgment of service                       Rule 68.6

Counterclaim                                                     Rule 68.7

Contents of statements of case                                  Rule 68.8

Discontinuance and dismissal                                     Rule 68.9

Compromise of claim: trial on affidavit evidence                Rule 68.10

Application for order to bring in will, etc.                    Rule 68.11

Probate counterclaim in other proceedings                       Rule 68.12

## Scope of this Part

68.1 (1) This Part applies to probate causes and matters, including applications for the rectification of a will, and the other provisions of these Rules apply to those causes and matters subject to this Part.

(2) In this Part –

"**probate claim**" means a claim for the grant of probate of the will, or letters of administration of the estate, of a deceased person or for the revocation of such a grant or for a decree pronouncing for or against the validity of an alleged will, not being a claim which is

non-contentious or common form probate business; and

"**will**" includes a codicil.

## How to commence probate proceedings

68.2 (1) Probate proceedings must be begun by issuing a fixed date claim form in Form 2.

(2) The claim form must state the nature of the interest of the claimant and of the defendant in the estate of the deceased person to which the claim relates.

(3) The claimant must file a statement of claim with the claim form.

## Parties to proceedings for revocation of grant

68.3 Every person who is entitled or claims to be entitled to administer the estate of a deceased person under or by virtue of an unrevoked grant of probate of the deceased person's will or letters of administration of the estate must be made a party to any proceedings for revocation of the grant.

## Lodgment of grant in proceedings for revocation

68.4 (1) If, at the commencement of proceedings for the revocation of a grant of probate of the will or letters of administration of the estate of a deceased person, the probate or letters of administration, as the case may be, have not been lodged in court the –

(a) claimant must lodge the probate or letters of administration at the court within 7 days after the issue of the claim where the proceedings are commenced by a person to whom the grant was made; or

(b) applicable defendant must lodge the probate or letters of administration at the court within 14 days after the service of the claim form, if it or them are in the possession or under the control of that defendant.

(2) Any person who fails to comply with paragraph (1) may, on the application of any party to the proceedings, be ordered by the court to lodge the probate or letters of administration within a specified time.

(3) If an order is made under paragraph (2), a person against whom such an order is made may not take any step in the proceedings without the permission of the court until that person has complied with the order.

## Affidavit of testamentary scripts

68.5 (1)  Unless the court otherwise directs, the claimant and every defendant who has entered an acknowledgment of service in probate proceedings must swear an affidavit –

(a) describing any testamentary script of the deceased person, whose  estate is the subject of the claim, of which he or she has any knowledge or, if such be the case, stating that he or she knows of no such script; and

(b) if the defendant has knowledge of any such script which is not in his or her possession or under his or her control –

(i) giving the name and address of the person in whose possession or under whose control it is; or

(ii) that he or she does not know the name or address of that person.

(2) (a) Any affidavit required by this rule must be filed; and

(b) any testamentary script referred to therein which is in the possession  or under the control of the deponent;

must be  lodged at the court –

(i) within 14 days after the filing of an acknowledgment of service by a defendant to the proceedings; or

(ii) if no defendant files an acknowledgment of service and the court does not otherwise direct –before the first hearing.

(3) If any testamentary script required by this rule to be lodged or any part thereof is written in pencil, then, unless the court otherwise directs, a facsimile copy of that script, or of the page or pages thereof containing the part written in pencil, must also be lodged and the words which appear in pencil in the original must be underlined in red ink in the copy.

(4) Notwithstanding rule 3.14 (2), except with the leave of the court, a party to probate proceedings may not be allowed to inspect an affidavit filed, or any testamentary script lodged, by any other party to the proceedings under this rule, until an affidavit sworn by the first party containing the information referred to in paragraph (1) has been filed.

(5) In this rule –

"**testamentary script**" means a will or draft thereof, written instructions for a will made by or at the request or under the instructions of the testator and any document purporting to be evidence of the contents, or to be a copy, of a will which is alleged to have been lost or destroyed.

## Failure to file acknowledgment of service

68.6 (1) Part 12 does not apply to probate proceedings.

(2) If any of several defendants to probate proceedings fails to file an acknowledgment of service or to file and serve a defence, the claimant may -

(a) after the time for entering an acknowledgment of service or filing a defence has expired; and

(b) upon filing an affidavit proving due service of the claim form and statement of claim on that defendant;

proceed with the claim as if that defendant had entered an acknowledgment of service.

(3) If the defendant, or all the defendants, to probate proceedings, fails or fail to file an acknowledgment of service or file and serve a defence, then, unless on the application of the claimant the court orders the claim to be dismissed or discontinued, the claimant may apply to the court at the first hearing –

(a) for the claim to be dealt with summarily at that hearing; or

(b) for a trial date to be fixed and any necessary directions to be given.

(4) Before applying for an order under paragraph (3) the claimant must file an affidavit proving due service of the claim form and statement of claim on the defendant.

(5) If the court grants an order under paragraph (3), it may direct the proceedings to be tried on affidavit evidence.

## Counterclaim

68.7 A defendant to probate proceedings who alleges that he or she has any claim or is entitled to any relief or remedy in respect of any matter relating to the grant of probate of the will, or letters of administration of the estate of the deceased person which is the subject of the proceedings must add to the defence a counterclaim for that relief or remedy.

## Contents of statements of case

68.8 (1)If the claimant in probate proceedings disputes the interest of a defendant, the claimant must –

    (a) deny the interest of that defendant; and

    (b) state the claimant's reasons for so doing; in the statement of claim.

    (2) In probate proceedings in which the interest by virtue of which a party claims to be entitled to a grant of letters of administration is disputed, the party disputing that interest must show in that party's statement of case that if the allegations made therein are proved he or she would be entitled to an interest in the estate.

    (3) Any party who pleads that at the time when a will, the subject of the proceedings, was alleged to have been executed the testator did not know and approve of its contents, must specify the nature of the case on which he or she intends to rely, and no allegation in support of that plea which would be relevant in support of any of the following other pleas, that is to say that –

    (a) at the time of the execution of the will the testator was not of sound mind, memory and understanding;

    (b) the execution of the will was obtained by undue influence or fraud; or

    (c) the will was not duly executed;

    may be made by that party unless that other plea is also set out in his or her statement of case.

## Discontinuance and dismissal

68.9 (1) Part 37 does not apply to probate proceedings.

    (2) At any stage of the proceedings the court may, on the application of the claimant or of any party to the proceedings who has entered an acknowledgment of service order the proceedings to be –

    (a) discontinued; or

    (b) dismissed;

    on such terms as to costs or otherwise as it thinks just, and may further order that a grant of probate of the will, or letters of administration of  the estate of the deceased person, as the case may be, be made to the person entitled.

## Compromise of claim: trial on affidavit evidence

68.10 If, either before or after the service of the defence in probate proceedings, the parties to the proceedings agree to a compromise, the court may order the trial of the proceedings on affidavit evidence.


## Application for order to bring in will, etc.

68.11(1) Any application in probate proceedings for an order requiring a person to bring a will or other testamentary paper into court or to attend in court for examination may be made without notice but must be supported by evidence on affidavit setting out the grounds of the application.

(2) Any person against whom an order is made under paragraph (1) and who denies that the will or other testamentary paper referred to in the order is in his or her possession or under his or her control may file an affidavit to that effect.


## Probate counterclaim in other proceedings

68.12(1) In this rule, "**probate counterclaim**" means a counterclaim in any claim other than probate proceedings by which the defendant claims any such relief as is mentioned in rule 68.1(2).

(2) Subject to the following paragraph, this Part applies with the necessary modifications to a probate counterclaim as it applies to probate proceedings.

(3) A probate counterclaim must contain a statement of the nature of the interest of the defendant and of the claimant in the estate of the deceased person to which the counterclaim relates.

PART 69

# Defamation Claims

**Contents of this Part**

Scope of this Part                  Rule 69.1

Claimant's statement of claim       Rule 69.2

Defendant's statement of case       Rule 69.3

Ruling on meaning                   Rule 69.4

Payments into court and offers      Rule 69.5

Statement in open court             Rule 69.6

Requests for information            Rule 69.7

Evidence to mitigate damages        Rule 69.8

## Scope of this Part

69.1 These Rules apply to claims for libel or slander subject to the rules in this Part.

## Claimant's statement of claim

69.2 The statement of claim (or counterclaim) in a defamation claim must, in addition to the matters set out in Part 8 –

(a) give sufficient particulars of the publications in respect of which the claim is brought to enable them to be identified;

(b) if the claimant alleges that the words or matters complained of were used in a defamatory sense other than their ordinary meaning – give particulars of the facts and matters relied on in support of such sense; and

(c) if the claimant alleges that the defendant maliciously published the words or matters – give particulars in support of the allegation.

## Defendant's statement of case

69.3 A defendant (or in the case of a counterclaim, the claimant) who alleges that –

(a) in so far as the words complained of consist of statements of facts, they are true in substance and in fact; and

(b) in so far as they consist of expressions of opinion, they are fair comment on a matter of public interest; or

(c) pleads to like effect;

   must give particulars stating –

   (i) which of the words complained of are alleged to be statements of fact; and

   (ii) the facts and matters relied on in support of the allegation that the words are true.

## Ruling on meaning

69.4 (1) At any time after the service of the statement of claim, either party may apply to a judge in chambers for an order determining whether or not the words complained of are capable of bearing a meaning or meanings attributed to them in the statement of case.

(2) If it appears to the judge on the hearing of an application under paragraph (1) that none of the words complained of are capable of bearing the meaning or meanings attributed to them in the statement of case, the judge may dismiss the claim or make such other order or give such judgment in the proceedings as may be just.

## Payments into court and offers

69.5 If the claimant claims against several defendants sued jointly and accepts money paid into court under Part 36 or a written offer under Part 35 by any one or more but not all of those defendants, the claim must be stayed against that defendant or those defendants, but –

(a) the sum recoverable under any judgment in favour of the claimant against any other defendant must not exceed the amount paid into court or the offer by the defendant or defendants against whom the claim has been stayed; and

(b) the claimant is not entitled to any costs after the date of acceptance of the payment into court or the offer to settle unless either the –

(i) court is satisfied that there were reasonable grounds to continue the claim against the other defendant or defendants; or

(ii) damages awarded exceed the amount paid into court or offered.

## Statement in open court

69.6 If a defamation claim is settled before trial either party may apply to a judge in chambers for leave to make a statement in open court in terms agreed by the judge.

## Requests for Information

69.7 In a defamation claim where the defendant states that the words or matters complained of –

(a) are fair comment on a matter of public interest; or

(b) were published on a privileged occasion;

the claimant may not make a request for information under Part 34 as to the defendant's sources of information or grounds of belief.

## Evidence to mitigate damages

69.8 A defendant who does not in the defence assert the truth of the statement of which complaint is made may not give evidence in chief as to the –

(a) character of the claimant; or

(b) circumstances under which the libel or slander was published; with a view to mitigating damages unless particulars are given in a witness statement served at least 42 days before the trial.

# PART 70
## Admiralty Proceeding

**Contents of this Part**

Scope of this Part — Rule 70.1

Claims to be dealt with under this Part — Rule 70.2

Admiralty claims in rem — Rule 70.3

How to make Admiralty claim — Rule 70.4

Service of claim form in rem — Rule 70.5

Service on ships, etc. – how effected — Rule 70.6

Service of claim form out of jurisdiction — Rule 70.7

Acknowledgment of service — Rule 70.8

Warrant of arrest — Rule 70.9

Caveat against arrest — Rule 70.10

Committal of legal practitioner for failing to comply with undertaking — Rule 70.11

Execution, etc. of warrant of arrest — Rule 70.12

Directions with respect to property under arrest — Rule 70.13

Release of property under arrest — Rule 70.14

Caveat against release etc. — Rule 70.15

Duration of caveats — Rule 70.16

Bail — Rule 70.17

Intervenors — Rule 70.18

Preliminary acts — Rule 70.19

Failure to file preliminary act: proceedings against party in default — Rule 70.20

Special provisions as to statements of case in collision, etc. proceedings — Rule: 70.21

Judgment by default — Rule 70. 22

Order for sale of ship: determination of priority of claims — Rule 70.23

Appraisement and sale of property — Rules 70.24

Undertakings as to expenses, etc. — Rules 70.25

Payment into and out of court — Rules 70.26

Case management conferences — Rules 70.27

Trial — Rule 70.28

Stay of proceedings in collision, etc. proceedings until security given — Rule 70. 29

Inspection of ship, etc. — Rule 70.30

Examination of witnesses and other persons: evidence by affidavit    Rule 70. 31

Proceedings for apportionment of salvage    Rule 70. 32

Applications in proceedings in rem    Rule 70.33

Limitation proceedings: parties    Rule 70.34

Limitation proceedings: payments into court    Rule 70.35

Application for decree or directions in limitation proceedings    Rule 70.36

Limitation proceedings: proceedings under decree    Rule 70.37

Limitation proceedings: proceedings to set aside decree    Rule 70. 38

## Scope of this Part

70.1 (1) This Part applies to Admiralty proceedings including those proceedings listed in rule 70.2 and any other Admiralty jurisdiction of the High Court.

(2) The other provisions of these Rules apply to Admiralty proceedings subject to the provisions of this Part.

(3) In this Part –

**"Act"** means any relevant enactment relating to merchant shipping in force in the particular Member State or Territory;

"**caveat against arrest**" means a caveat entered in the caveat book under rule 70.10;

"**caveat against release and payment**" means a caveat entered in the caveat book under rule 70.15;

"**caveat book**" means the book in which caveats issued under this Part are entered;

"**claim in rem**" means any such claim as is mentioned in rule 70.3;

"**collision regulations**" means regulations made under the Act or in accordance with any international convention or treaty applicable to the relevant Member State or Territory;

"**limitation claim**" means any proceedings by ship owners or other persons under the Act for the limitation of the amount of their liability in connection with a ship or other property;

"**relevant person**" means the person referred to in rule 70.9(3) (b) that is the person who would be liable on the claim in a claim in personam; and

**"ship"** includes every description of vessel used in navigation and not propelled by oars and, where the context so admits, includes an aircraft.

## Claims to be dealt with under this Part

70.2 The following claims, questions and proceedings, namely –

(a) all proceedings to enforce a claim for damage, loss of life or personal injury arising out of –

(i) a collision between ships;

(ii) the carrying out of or omission to carry out a manoeuvre in the case of one or more of two or more ships; or

(iii) non-compliance, on the part of one or more of two or more ships, with the collision regulations;

(b) any application to the court under the Act;

(c) any claim arising out of an act which is or is claimed to be a general average act;

(d) any claim arising out of any agreement relating to the carriage of goods in a ship or to the use or hire of a ship;

(e) any claim arising out of bottomry;

(f) any claim by a master, shipper, charterer or agent in respect of disbursements made on account of a ship;

(g) any claim for damage done by a ship;

(h) any claim for damage received by a ship;

(i) any claim for loss of life or personal injury sustained in consequence of any defect in a ship or in her apparel or equipment, or in consequence of the wrongful act, neglect or fault of –

(i) the owners, charterers or persons in possession or control of a ship; or

(ii) the master or crew of a ship, or any other person for whose wrongful acts, neglects or defaults the owners, charterers or persons in possession or control of a ship are responsible;

being an act, neglect or default in the navigation or management of a ship or in the loading, carriage or disembarkation of persons on, in or from the ship;

(j) any claim for loss or damage to goods carried in a ship;

(k) any claim for the forfeiture or condemnation of a ship or of goods which are being or have been carried, or have been attempted to be carried, in a ship, or for the restoration of a ship or any such goods after seizure, or for droits of Admiralty;

(l) any claim in respect of a mortgage of or charge on a ship or any share therein;

(m) any claim in respect of goods or materials supplied to a ship for her operation or maintenance;

(n) any claim in respect of the construction, repair or equipment of a ship or dock charges or dues;

(o) any claim in the nature of pilotage in respect of a ship or an aircraft;

(p) any claim in the nature of towage in respect of a ship or an aircraft;

(q) any claim to the possession or ownership of a ship or to the ownership of any share therein, including power –

(i) to settle any account outstanding and unsettled between the parties in relation to the ship; and

(ii) to direct that the ship, or any share thereof, must be sold, and to make such other order as the court

thinks fit;

(r) any claim –

(i) under the International Convention on Salvage 1989; or

(ii) under any contract for or in relation to salvage services; or

(iii) in the nature of salvage not falling within (i) or (ii) above, or

any corresponding claim in connection with an aircraft,:

(s) any question arising between the co-owners of a ship as to possession, employment or earnings of that ship;

(t) every limitation claim, in relation to –

(i) all ships or aircraft whether of any Member State or Territory or not and whether registered or not and wherever the residence or domicile of their owners may be;

(ii) all claims, wherever arising (including, in the case of cargo or wreck salvage, claims in respect of cargo or wreck found on land); and

(iii) (so far as they relate to ships or aircraft) all mortgages or charges, whether registered or not and whether legal or equitable including mortgages and charges created under foreign law;

(u)  subject to any limitations imposed by the Act, any claim by a master or member of the crew of a ship for wages (including any sum allotted out of wages or adjudged by a superintendent to be due by way of wages);

are to be dealt with as Admiralty claims.


## Admiralty claims in rem

70.3 (1) In the case of any such claim or question as is mentioned in rule 70.2(b), (1), (q) or (s) a claim in rem may be brought against the ship or property in connection with which the claim or question arises.


(2) In any case in which there is a maritime lien or other charge on any ship, aircraft or other property for the amount claimed, a claim in rem may be brought against that ship, aircraft or property.

(3) In the case of any such claim as is mentioned in rule 70.2(c) to (g), (i) to (k), (m) to (p), (r) and (u), where –

(a) the claim arises in connection with a ship; and

(b) the person who would be liable in a claim in personam was, when the cause of action arose, the owner or charterer, or in possession or in control, of the ship;

a claim in rem may (whether or not the claim gives rise to a maritime lien on that ship) be brought against –

(i) that ship, if at the time when the claim is made the relevant person is either the beneficial owner of that ship as respects all the shares in it or the charterer of it under a charter by demise; or

(ii) any other ship of which, at the time when the claim is made, the relevant person is the beneficial owner as respects all the shares in it.

(4) In the case of a claim in the nature of towage or pilotage in respect of an aircraft, a claim in rem may be brought against that aircraft if, at the time when the claim is made, it is beneficially owned by the person who would be liable on the claim in a claim in personam.

(5) For the purpose of determining under paragraphs (3) and (4) whether a person would be liable on a claim in personam it shall be assumed that that person has an habitual residence or place of business within the jurisdiction.

(6) In this rule –

"**the time when the claim is made**" means the date on which the claim is issued in accordance with rule 8.1(2)

(7) If, as regards any claim mentioned in rule 70.3(3), a ship has been served with a claim form or arrested in a claim in rem brought to enforce that claim, no other ship may be –

(a) served with a claim form; or

(b) arrested;

in that or any other claim in rem brought to enforce that claim.

(8) Paragraph (7) does not prevent the issue, in respect of any one such claim, of a claim form naming more than one ship or two or more claim forms each naming a different ship.

(9) A claim in rem may not be brought against the Crown.

## How to make Admiralty claim

70.4 (1) An Admiralty claim in rem is begun by a claim form in Form 25.

 (2) An Admiralty claim in personam is begun by a claim form in Form 1.

(3)A limitation claim is begun by a claim form in Form 26.

(4) A claim in rem and a claim in personam may not be combined in the same claim form.

- Part 6 deals with the service of other documents.
- Part 8 deals with the issue of a claim form.

## Service of claim form in rem

70.5  (1) Subject to paragraph (2), a claim form by which a claim in rem is begun must be served on the property

against which the claim is brought, except where the property –

(a) has been sold by the marshal, in which case the claim form may not be served on that property but a sealed copy of it must be filed and the claim is deemed to have been duly served on the day on which the copy was filed; and

(b) is freight, in which case the claim form must be served on the cargo in respect of which the freight is payable or on the ship in which that cargo was carried.

(2) A claim form need not be served or filed as mentioned in paragraph (1) if it is deemed to have been duly served on the defendant by virtue of rule 5.19(2) or (3).

(3) If by virtue of this rule a claim form is required to be served on any property, the claimant may request service of the claim form to be effected by the marshal only if a warrant of arrest has been issued for

service against the property or the property is under arrest.

(4) Where paragraph (3) applies the claimant must file a request in the appropriate practice form and lodge –

(a) the claim form and a copy thereof; and

(b) an undertaking to pay on demand all expenses incurred by the marshal in respect of the service of the claim form;

and thereupon the marshal must serve the claim form on the property described in the request.

(5) If a claim form is served on any property by the marshal, the person effecting service must endorse on the claim form the following particulars –

(a) the day of the week and the date on which it was served;

(b) the manner in which it was served;

(c) the name and the address of the person effecting service;

(d) the property on which it was served; and

(e) where it was served;

and the endorsement is evidence of the facts stated.

(6) If the –

(a) claimant; or

(b) claimant's legal practitioner;

in a claim in rem becomes aware that there is in force a caveat against arrest with respect to the property against which the proceedings are brought, that person must serve the claim form forthwith on

the person at whose instance the caveat was entered.

(7) The general rule is that if a claim form by which a claim in rem is begun is amended after service under Part 20, the amended claim form must be served on any –

(a) defendant who has acknowledged issue or service of the claim form; and

(b) intervener.

(8) However, if no defendant has acknowledged issue or service of the claim form, it must be served or filed –

(a) in accordance with paragraph (1); or

(b) as the court otherwise directs.

(9) An application for a direction under paragraph (8) (b) may be made without notice but

must be supported by evidence on affidavit.


## Service on ships, etc. – how effected


70.6 (1) The general rule is that service of a warrant of arrest or claim form in proceedings in rem against a ship, freight or cargo is to be effected by –

    (a) affixing the warrant or claim form for a short time on any mast of the ship or on the outside of any suitable part of the ship's superstructure; and

    (b) on removing the warrant or claim form, leaving a copy of it affixed –

      (i) (in the case of the warrant) in its place; or

      (ii) (in the case of the claim form) on a sheltered, conspicuous part of the ship.


    (2) However, service of a warrant of arrest or claim form in proceedings in rem against freight or cargo or both, if the cargo has been landed or transhipped, is to be effected –

    (a) by placing the warrant or claim form for a short time on the cargo and, on removing the warrant or claim form, leaving a copy of it on the cargo; or

    (b) if the cargo is in the custody of a person who will not permit access to it, by leaving a copy of the warrant or claim form with that person.


## Service of claim form out of jurisdiction


70.7 (1) A claim form under rule 70.2(1) (g) or (v) other than a claim form in rem may be served out of the jurisdiction with the permission of the court if –

    (a) the defendant's habitual residence or place of business is within the jurisdiction;

    (b) the facts out of which the claim arises took place within the waters or within the limits of a port of a Member State or Territory; or

    (c) a claim arising out of the same incident or series of incidents is proceeding in the court or has been heard and determined in the court.


    (2) An application to serve a claim form out of the jurisdiction must be made in accordance with rule

7.5.

(3) In this rule –

"**port**" includes a place and a harbour.


## Acknowledgment of service

70.8 A defendant to a claim form in rem which has not been served, or a defendant to a limitation claim who has not been served with the claim form, who desires to take part in the proceedings, may acknowledge the issue of the claim form by filing an acknowledgment of service substituting for the references to service of the claim form references to issue of the claim.


## Warrant of arrest

70.9 (1) In a claim in rem the claimant or defendant who counterclaims may, after the issue of the claim form and subject to the provisions of this rule, issue a warrant in Form 27 for the arrest of the property against which the claim or counterclaim is brought.

(2) The party intending to issue the warrant must first cause a search to be made in the caveat book to see whether there is a caveat against arrest in force with respect to that property.

(3) The general rule is that a warrant of arrest may not be issued until the party intending to issue the same has filed an affidavit made by the party or its agent containing the following particulars –

(a) in every case –

(i) the nature of the claim or counterclaim and that it has not been satisfied;

(ii) if the claim arises in connection with a ship, the name of that ship;

(iii) the nature of the property to be arrested; and

(iv) if the property is a ship, the name of the ship and her port of registry;

(b) in the case of a claim against a ship under rule 70.2(c) to (g), (i) to (k), (m) to (p), (r) and (u) –

(i) the name of the person who would be liable on the claim in a claim in personam;

(ii) that the relevant person was when the cause of action arose the owner or charterer of, or in possession or in control of, the ship in connection with which the claim arose; and

(iii) that at the time of the issue of the claim form the relevant person was either the beneficial owner of all the shares in the  ship in respect of which the warrant is required or (where appropriate) the charterer of it under a charter by demise;

and

(c) in the case of a claim for possession of a ship or for wages –

(i) the nationality of the ship in respect of which the warrant is required; and

(ii) that the notice (if any) required by paragraph (7) has been sent.

(4) Where appropriate a copy of any notice sent to a consul under paragraph (7) must be exhibited to an affidavit required by paragraph (3).

(5) The court may, however, give permission to issue the warrant notwithstanding that the affidavit does not contain all those particulars.

(6) A warrant of arrest may not be issued without the permission of the court in the case of property whose beneficial ownership has, since the issue of the claim, changed as a result of a sale or disposal by the court.

(7) The general rule is that a warrant of arrest may not be issued in a claim in rem against a foreign ship registered at a port of a State having a consulate in the jurisdiction, being a claim for possession of the ship or for wages, until notice that the proceedings has been begun has been sent to the consul or the court gives permission.

(8) Issue of a warrant of arrest takes place upon its being sealed by the court office.

## Caveat against arrest

70.10(1) Except in a case to which paragraph (2) applies, a person who wishes to prevent the arrest of any property must file a request in the appropriate practice form signed by that person or that person's legal practitioner undertaking –

(a) to acknowledge issue or service (as may be appropriate) of the claim form in any claim that may be made against the property described in the request; and

(b) within 3 days after receiving notice that such a claim has been made, to give bail in that claim in a sum not exceeding an amount specified in the request or to pay the amount so specified into court.

(2) On the filing of the request under paragraph (1) the court office must enter a caveat against the issue of a warrant to arrest the property described in the request in the caveat book.

(3) If a claimant in limitation proceedings –

(a) has constituted a limitation fund in accordance with Article 11 of the Convention on Limitation of Liability for Maritime Claims 1976 and rule 70.35*; and*

(b) desires to prevent the arrest of any property for a claim which may be or has been made against the fund;

the claimant must file in the court office a request, in the appropriate practice form signed by the claimant or its legal practitioner –

(i) stating that a limitation fund in respect of damage arising from the relevant incident has been constituted; and

(ii) undertaking to acknowledge issue or service (as may be appropriate) of the claim form in any claim that may be begun against the property described in the request;

and on the filing of the request a caveat against the issue of a warrant to arrest the property described in the request must be entered in the caveat book.

(4) The fact that there is a caveat against arrest in force does not prevent the issue of a warrant to arrest the property to which the caveat relates.

(5) If any property with respect to which a caveat against arrest is in force is arrested in pursuance of a warrant of arrest, the party at whose instance the caveat was entered may apply to the court for an order discharging the warrant.

(6) On the hearing of an application under paragraph (5), the court, unless it is satisfied that the party procuring the arrest of the property had a good and sufficient reason for so doing, may –

(a) by order discharge the warrant; and

(b) order the last-mentioned party to pay to the applicant damages in respect of the loss suffered by the applicant as a result of the arrest.

## Committal of legal practitioner for failing to comply with undertaking

70.11 If the legal practitioner for a party to a claim in rem fails to comply with a written undertaking given by him or her to any other party or legal practitioner to –

(a) acknowledge issue or service of the claim form;

(b) give bail; or

(c) pay money into court in lieu of bail;

the legal practitioner is liable to committal.

• Part 53 deals with committal orders.

## Execution, etc., of warrant of arrest

70.12 (1) A warrant of arrest is valid for 12 months beginning with the date of its issue.

(2) A warrant of arrest may be executed only by the marshal.

(3) A warrant of arrest may not be executed until an undertaking to pay on demand —

(a) the fees of the marshal; and

(b) all expenses incurred by the marshal in respect of the arrest of the property and the care and custody of it while under arrest;

has been lodged in the marshal's office.

(4) A warrant of arrest may not be executed if the party at whose instance it was issued lodges a written request to that effect with the marshal.

(5) The general rule is that a warrant of arrest must be served on the property against which it is issued.

(6) However, a warrant of arrest issued against freight may be executed by serving the warrant on the cargo in respect of which the freight is payable or on the ship in which that cargo was carried or on both of them.

(7) Within 7 days after the service of a warrant of arrest, the warrant must be filed.

## Directions with respect to property under arrest

70.13 (1) The marshal may at any time apply to the court for directions with respect to property under arrest in any proceedings.

(2) The marshal may, and if the court so directs must, give notice of the application under paragraph (1) to any or all of the persons referred to in paragraph (3).

(3) The marshal must send by post a copy of any order made on an application under paragraph (1) to all those persons who, in relation to that property, have –

(a) acknowledged issue or service of the claim form in any claim in which the property is under arrest;

(b) caused a warrant for the arrest of the property to be executed by the marshal;

(c) entered a caveat which is still in force; or

(d) intervened in any claim in which the property is under arrest

(4) A person other than the marshal may make an application under this rule.

(5) The application together with copies of any affidavits in support must be served upon the marshal and all persons referred to in paragraph (3) unless the court otherwise orders.

(6) An application for an order dispensing with service may be made without notice.

## Release of property under arrest

70.14 (1) Except where property arrested in pursuance of a warrant of arrest is sold under an order of the court, such property may only be released under the authority of a release in the appropriate practice form.

(2) A release may not be issued with respect to property as to which a caveat against release is in force, unless –

(a) at the time of the issue of the release the property is under arrest in one or more other proceedings; or

(b) the court so orders.

(3) A release may be issued at the instance of any party to the claim in which the warrant of arrest was issued if –

(a) the court so orders; or

(b) subject to paragraph (2), if all the other parties, except a defendant who has not acknowledged issue or service of the claim form, consent.

(4) Before a release is issued, the party applying for its issue must, unless paragraph (2)(a) applies, give notice to any person at whose instance a subsisting caveat against release has been entered, or to that person's legal practitioner, requiring the caveat to be withdrawn.

(5) Before property under arrest is released in compliance with a release

issued under this rule, the party at whose instance it was issued must, in accordance with the directions of the marshal, either –

(a) pay the fees of the marshal already incurred and lodge in the marshal's office an undertaking to pay on demand the other fees and expenses in connection with the arrest of the property and the care and custody of it while under arrest and of its release; or

(b) lodge in the marshal's office an undertaking to pay on demand all such fees and expenses, whether incurred or to be incurred.

(6) The court, on the application of any party who objects to directions given to that party by the marshal under paragraph (5), may vary or revoke the directions.

## Caveat against release, etc.

70.15 (1) A person –

(a) claiming to have a right to claim in rem against any property which is under arrest or the proceeds of sale thereof; and

(b) who wishes to be served with notice of any application to the court in respect of that

property or those proceeds;

must file a request in the appropriate practice form.

(2) On the filing of a request under paragraph (1) the court office must enter a caveat in the caveat book.

(3) If the release of any property under arrest is delayed by the entry of a caveat under this rule, any person having an interest in that property may apply to the court for an order requiring the person who procured the entry of the caveat to pay to the applicant damages in respect of the loss suffered by the applicant by reason of the delay.

(4) On hearing an application under paragraph (3) the court, unless it is satisfied that the person procuring the entry of the caveat had a good and sufficient reason for so doing, may make an order accordingly.

(5) If the court makes an order under paragraph (4), it must decide who should pay the costs of the application and assess the costs in accordance with rule 65.11.

## Duration of caveats

70.16 (1) A caveat entered in the caveat book is valid for 12 months beginning with the date of its entry.

(2) The person at whose instance a caveat was entered may withdraw it by filing a request in the appropriate practice form.

(3) The period of validity of a caveat may not be extended, but this provision is not to be taken as preventing the entry of successive caveats.

**Bail**

70.17 (1) Unless a ship or aircraft has been arrested in respect of a claim under rule 70.2(q) or (s), the court must permit the release of a ship or aircraft which has been arrested upon sufficient bail being provided.

(2) If a ship or aircraft has been arrested in respect of a claim under rules 70.2(q) or (s), the court may –

(a) permit the person in possession of the ship or aircraft to continue trading upon such person providing sufficient bail; or

(b) deal otherwise with the operation of the ship or aircraft during the period of arrest.

(3) In default of agreement between the parties as to the amount of bail, the court must determine the nature and amount of such bail.

(4) Bail on behalf of a party to a claim in rem may be given by–

(a) bond in the appropriate practice form; or

(b) a bank guarantee or other security from a reputable financial institution acceptable to the marshal.

(5) Sureties to a bond must enter into the bond before a commissioner for oaths or justice of the peace, not being a commissioner who, or whose partner or associate, is acting as legal practitioner or agent for the party on whose behalf the bail is to be given.

(6) Subject to paragraph (7), a surety to a bail bond must make an affidavit stating that the surety is able to pay the sum for which the bond is given.

(7) If a corporation is a surety to a bail bond given on behalf of a party, no affidavit need be made under paragraph (6) on behalf of the corporation unless the opposite party requires it, but where such an affidavit is required it must be made by a director, manager, secretary or other similar officer of the corporation.

(8) The party on whose behalf bail is given must serve on the opposite party a notice of bail containing the names and addresses of the persons who have given bail on that party's behalf and of the commissioner for oaths or justice of the peace before whom the bail bond was entered into.

(9) After the expiration of 24 hours from the service of the notice (or sooner with the consent of the opposite party) the party on whose behalf bail is given may file the bond and must at the same time file –

(a) the affidavits (if any) made under paragraph (6); and

(b) an affidavit proving due service of the notice of bail to which a copy of that notice must be exhibited.

## Intervenors

70.18 (1) If property against which a claim in rem is brought is under arrest or money representing the proceeds of sale of that property is in court, a person who has an interest in that property or money but who is not a defendant to the proceedings may, with the permission of the court, intervene in the proceedings.

(2) An application for permission may be made without notice.

(3) It must be supported by an affidavit showing the interest of the applicant in the property against which the proceedings is brought or in the money in court.

(4) A person to whom leave is granted under this rule becomes a party to the proceedings.

(5) The court may order that a person to whom it grants leave to intervene in proceedings must, within the period or periods specified in the order, serve on any other party to the proceedings such notice of the intervention and such pleading as is specified.

## Preliminary acts

70.19 (1) This rule deals with proceedings relating to damage, loss of life or personal injury arising out of a collision between ships.

(2) The following provisions apply unless the court otherwise orders.

(3) The claimant must within 2 months after service of the claim form on any defendant and the defendant must within 2 months of acknowledging issue or service of the claim file in the court office a document in 2 parts (in these Rules referred to as a "**preliminary act")** containing a statement of the following —

**Part One**

(a) the names of the ships which came into collision and their ports of registry;

(b) the length, breadth, gross tonnage, horsepower and draught at the material time of the ship and the nature and tonnage of any cargo carried by the ship;

(c) the date and time (including the time zone) of the collision;

(d) the place of the collision;

(e) the direction and force of the wind;

(f) the state of the weather;

(g) the state, direction and force of the tidal or other current;

(h) the position, the course steered and speed through the water of the ship when the other ship was first  seen or immediately before any measures were taken with reference to her presence, whichever was the earlier;

(i) the lights or shapes (if any) carried by the ship;

(j) (i) the distance and bearing of the other ship if and when her echo was first observed by radar;
   (ii) the distance, bearing and approximate heading of the other ship when first seen;

(k) what lights or shapes or combinations of lights or shapes (if any) of the other ship were first seen;

(l) what other lights or shapes or combinations of lights or shapes(if any) of the other ship were subsequently seen before the collision,and when;

(m) what alterations (if any) were made to the course and speed of the ship after the earlier of the two times referred to in article (h) up to the time of the collision, and when, and what measures (if any) other than alterations of course or speed, were taken to avoid the collision, and when;

(n) the heading of the ship, the parts of each ship which first came into contact and the approximate angle between the two ships at the moment of contact, what light or shape or combination of lights or shapes (if any) of the other ship was first seen;

(o) what sound signals (if any) were given, and when; and

(p) what sound signals (if any) were heard from the other ship, and when.

**Part Two**

(a) a statement that the particulars in Part One are incorporated in Part Two;

(b) any other facts and matters upon which the party filing the preliminary act relies;

(c) all allegations of negligence or other fault which the party filing the preliminary act makes; and

(d) the remedy or relief which the party filing the preliminary act claims.

(4) Part Two of the preliminary act shall be deemed to be the statement of claim of the person filing the preliminary act including, in the case of the defendant, a counterclaim, and rules 8.4 to 8.8 and 10.5 to 10.8 apply to it save insofar as this rule and rule 70.21 provide otherwise.

(5) The court may order that Part Two of the preliminary act need not be filed by the claimant or defendant and give directions for the further conduct of the proceedings.

(6)Every preliminary act must be sealed before filing and be filed in a sealed envelope which must not be opened except as provided in paragraph (8) or by order of the court.

(7) A claimant must serve notice of filing the preliminary act on every defendant who acknowledges issue or service of the claim within 3 days of receiving notice of that acknowledgment or upon filing the preliminary act, whichever is the later. A defendant must, upon filing the preliminary act, serve notice that the defendant has done so on the claimant and on every other defendant who has acknowledged issue or service of the claim.

(8) Any party may inspect and bespeak a copy of the preliminary act of any other party upon filing a consent signed by that other party or its legal practitioner.

(9)Within 14 days after the last preliminary act in the proceedings is filed each party must serve on every other party a copy of its preliminary act.

(10) At any time after all preliminary acts have been filed any party may apply to the court for an order that –

(a) one or more parties file a schedule of the damages claimed by them and serve a copy thereof on every other party; and

(b) the damages be assessed prior to or at the trial on liability.


(11) Wherever practicable such an application must be dealt with at the case management conference.


## Failure to file preliminary act: proceedings against party in default


70.20 (1) If in a claim covered by rule 70.19 (1) the claimant fails to file a preliminary act within the prescribed period –

    (a) any defendant who has filed such an act may apply to the court for an order to dismiss the proceedings; and

    (b) the court may –

        (i) dismiss the proceedings; or

        (ii) make such other order on such terms as it thinks fit.


(2) If in a claim in personam covered by rule 70.19 (1) a defendant fails to file a preliminary act within the prescribed period, Part 12 applies as if the defendant's failure to file the preliminary act within that period were a failure to file a defence on the claimant within the period fixed for service of the defence, and the claimant, if it has filed a preliminary act may, subject to rule 12.3(1)(b), enter judgment against that defendant.

•Rule 12.3(1)(b) deals with default judgment in proceedings against a State.


(3) If in a claim in rem within rule 70.19(1) a defendant fails to file a preliminary act within the prescribed period, the claimant, if the claimant has filed such an act –

    (a) may apply to the court for judgment against that defendant; and

    (b) need not file or serve a statement of case or an affidavit before the hearing.


(4) On the hearing of an application under paragraph (3), if –

    (a) the defendant does not appear at the hearing; and

    (b) the court is of the opinion that judgment should be given for the claimant provided the claimant proves the claimant's case;

    it must order the claimant's preliminary act to be opened and require the claimant to satisfy the court that the claim is well founded.

(5) If paragraph (4) applies, the claimant's evidence may, unless the court otherwise orders, be given by affidavit without any order or direction in that behalf.

(6) If the claimant satisfies the court that the claim is well founded, the court may –

    (a) give judgment on the claim; and

    (b) at the same time order the property against which the claim is brought to be appraised and sold and the proceeds to be paid into court; or

    (c) make such order as it thinks fit.

(7) The court may, on such terms as it thinks fit, set aside any judgment entered in pursuance of this rule.

(8) In this rule references to the prescribed period are to be construed as references to the period within which by virtue of –

    (a) rule 70.19(3); or

    (b) any order of the court;

    a party is required to file a preliminary act.

## Special provisions as to statements of case in collision, etc. proceedings

70.21 (1) The claimant in any such claim as is referred to in rule 70.2(1) (a) may not serve a reply or a defence to counterclaim on the defendant without the permission of the court.

(2) Subject to paragraph (3), in any such proceedings there is an implied joinder of issue on the facts set out in the preliminary acts and those acts stand as the statements of case of the claimant and the defendants.

(3) Paragraph (2) does not apply to a counterclaim if the claimant has served a defence to counterclaim pursuant to leave given under paragraph (1).

70.22 (1) If a claim form is served under rule 70.5(5) on a party at whose instance a caveat against arrest was issued, then if —

    (a) the sum claimed in the proceedings begun by the claim does not exceed the amount

specified in the undertaking given by that party or that party's legal practitioner to procure the entry of that caveat; and

(b) that party or its legal practitioner does not within 14 days after service of the claim fulfil the undertaking given as aforesaid;

the claimant may, after filing an affidavit verifying the facts on which the proceedings is based, apply to the court for judgment by default.

(2) Judgment given under paragraph (1) may be enforced by the arrest and an order for sale of the property against which the proceedings was brought and by committal of the party at whose instance the caveat with respect to that property was entered.

(3) If a defendant to a claim in rem fails to acknowledge service of the claim within the time limited for doing so, then –

(a) on the expiration of 14 days after service of the claim form; and

(b) upon filing –

(i) an affidavit proving due service of the claim form;

(ii) an affidavit verifying the facts on which the proceedings is based; and

(iii) if a statement of claim was not filed and served with the claim form, a copy of the statement of claim;

the claimant may apply to the court for judgment by default and an order for sale.

(4) If the claim is deemed to have been duly served on the defendant by virtue of rule 5.19(2) (deemed service where defendant's legal practitioner accepts service), or was served by the marshal under rule 70.5(4), an affidavit proving due service of the claim need not be filed under this paragraph, but the certificate of service of the defendant's legal practitioner or the indorsement of the marshal under rule 70.5(5) must be lodged with the affidavit verifying the facts on which the claim is based.

(5) If a defendant to a claim in rem fails to serve a defence before the expiration of the period fixed by or under these Rules for service of the defence, the claimant, upon filing –

(i) an affidavit stating that no defence has been served by that defendant;

(ii) an affidavit verifying the facts on which the proceedings is based; and

(iii) if a statement of claim was not served with the claim, a copy of the statement of claim;

may apply to the court for judgment by default and an order for sale.

(6) If a defendant to a counterclaim in a claim in rem fails to serve a defence to counterclaim on the defendant making the counterclaim, then, subject to paragraph (7) –

(a) after the expiration of the period fixed by or under these Rules for service of the defence to counterclaim; and

(b) upon filing -

(i) an affidavit stating that no defence to counterclaim has been served on the defendant making the counterclaim by the first-mentioned defendant;

(ii) an affidavit verifying the facts on which the counterclaim is based; and

(iii) a copy of the counterclaim;

the defendant making the counterclaim may apply to the court for judgment by default.

(7) No application may be made under paragraph (6) against the claimant in any such proceedings as is referred to in rule 70.2(a).

(8) If the court is satisfied that the applicant's claim is well founded, it may –

(a) give judgment for the claim or counterclaim; and

(b) order the property against which the claim or counterclaim is brought to be appraised and sold and the proceeds to be paid into court; or

(c) make such other order as it thinks just.

(9) In default proceedings in rem evidence may, unless the court otherwise orders, be given by affidavit without any order or direction in that behalf.

(10) The court may, on such terms as it thinks just, set aside or vary any judgment entered in pursuance of this rule.

(11) Part 12 does not apply to a claim in rem.

## Order for sale of ship: determination of priority of claims

70.23 (1) If in a claim in rem against a ship the court has ordered the ship to be sold, any party who has obtained or obtains judgment against the ship or proceeds of sale of the ship may –

(a) in a case where the order for sale contains the further order referred to in paragraph (2), after the expiration of the period specified in the order under paragraph (2) (a); or

(b) in any other case, after obtaining judgment;

apply to the court for an order determining the order of priority of the claims against the proceeds of sale of the ship.

•Part 11 deals with applications to the court.

(2) If in a claim in rem against a ship the court orders the ship to be sold, it may further order that –

    (a) the order of priority of the claims against the proceeds of sale of the ship is not to be determined until after the expiration of 90 days, or such other period as the court specifies, beginning with the day on which the proceeds of sale are paid into court;

    (b) any party to the proceedings or to any other claim in rem against the ship or the proceeds of sale thereof may apply to the court in the proceedings to which it is a party to extend the period specified in the order; and

    (c) within 7 days after the date of payment into court of the proceeds of sale, the marshal must send for publication in the Official Gazette of the Member State or Territory concerned and such other newspaper, if any, as the court directs, a notice complying with paragraph (3).

(3) The notice referred to in paragraph (2) (c) must state that –

    (a) the ship (naming her) has been sold by order of the High Court in a claim in rem, identifying the claim;

    (b) the gross proceeds of the sale as specified have been paid into court;

    (c) the order of priority of the claims against the said proceeds will not be determined until after the expiration of the period specified in the order for sale; and

    (d) any person with a claim against the ship or the proceeds of sale thereof, on which that person intends to proceed to judgment should do so before the expiration of that period.

(4) The marshal must lodge in the court a copy of each newspaper in which the notice referred to in paragraph (2) (c) appeared.

(5) The expenses incurred by the marshal in complying with an order of the court under this rule are to be included in the marshal's expenses relating to the sale of the ship.

(6) A copy of any application to the court to extend the period referred to in paragraph (2) (a) must be served on each party who has begun a claim in rem against the ship or the proceeds of sale thereof at least 3 days before the day fixed for the hearing.

## Appraisement and sale of property

70.24(1) A commission for the appraisement and sale of any property under an order of the court may not be issued until the party applying for it has filed a request in the appropriate practice form.

(2) Such a commission must be –

(a) in the appropriate practice form; and

(b) executed by the marshal unless the court otherwise orders.

(3) A commission for appraisement and sale may not be executed until an undertaking in writing satisfactory to the marshal to pay the fees and expenses of the marshal on demand has been lodged in the marshal's office.

(4) The sale must be by public auction unless the court gives permission for a sale by private treaty.

(5) The court may allow the sale to be completed at a price lower than the value shown in the appraisement.

(6) The marshal must pay into court the gross proceeds of the sale of any property sold by the marshal under a commission for sale and bring into court the account relating to the sale (with vouchers in support) for assessment.

(7) On the assessment of the marshal's account relating to a sale any person interested in the proceeds of the sale is entitled to be heard.

• Rule 65.12 deals with the assessment of costs.

## Undertakings as to expenses, etc.

70.25(1) Every undertaking under rule 70.5(4), 70.12(3), 70.14(5) or 70.24(3) must be given in writing to the satisfaction of the marshal.

(2) If a party is required by any of the rules mentioned in paragraph (1) to give to the marshal an

undertaking to pay any fees or expenses, the marshal may accept instead of an undertaking the deposit with the marshal of such sum as the marshal considers reasonable to meet those fees and expenses.

(3) The court may on the application of any party who is dissatisfied with a direction or determination of the marshal under this rule, vary or revoke the direction or determination.

## Payment into and out of court

70.26(1) Parts 35 and 36 apply in relation to an Admiralty claim (other than limitation proceedings).

(2) However money paid into court may not be paid out except in pursuance of an order of a judge of the High Court.

## Case management conference

70.27(1) Parts 25 to 27 and 38 apply to an Admiralty claim except that –

  (a) the date time and place for the case management conference must be fixed by the court office on the happening of the following events –

    (i) in any proceedings other than one to which rule 70.19 or 70.36 applies – on the filing of a defence;

    (ii) where rule 70.19 applies – on the filing of the second preliminary act;

  (b) where rule 70.36 applies then, if the court does not make a decree limiting the claimant's liability, it must treat the hearing of the application under that rule as a case management conference;

    and

  (c) the case management conference must be conducted by a judge of the High Court.

(2) At the case management conference the court must determine whether the trial is to be without assessors or with one or more assessors and the qualifications for such assessors.

(3) Rules 38.5, 38.6 and 39.1 apply to Admiralty claims subject to the following and any other necessary modifications –

(a)  the bundles referred to in rules 38.6 and 39.1 must include any preliminary acts; and

(b)  if trial with one or more assessors has been ordered, an additional bundle of the documents listed in rule 39.1(5) as amended by paragraph (a) must be lodged for the use of each assessor.

## Trial

70.28  (1) Part 39 applies to the trial of Admiralty proceedings.

(2) If the claim has been ordered to be tried with an assessor or assessors, the legal practitioner to the party
with conduct of the claim must file in the court office an undertaking to pay the proper fees and expenses of such assessor or assessors.

(3) If all the parties to a claim consent, the proceedings may be withdrawn without the leave of the court at any time before trial by producing to the court a written consent to the proceedings being withdrawn signed by all the parties.

## Stay of proceedings in collision, etc. proceedings until security given

70.29  If a claim in rem, being proceedings to enforce any claim as referred to in rule 70.2(1) (a), is begun and a cross claim in rem arising out of the same collision or other occurrence as the first mentioned proceedings is subsequently begun, or a counterclaim arising out of that occurrence is made in the first mentioned proceedings –

(a) if the ship in respect of or against which the first mentioned proceedings is brought has been arrested or security given to prevent her arrest; but

(b) the ship in respect of or against which the cross proceedings is brought or the counterclaim made cannot be arrested and security has not been given to satisfy any judgment given in favour of the party bringing the cross proceedings or making the counterclaim;

the court may stay proceedings in the first mentioned claim until security is given to satisfy any judgment given in favour of that party.

## Inspection of ship, etc.

70.30    The court may, on the application of any party, make an order for the inspection by the assessors (if the proceedings are tried with assessors), by any party or witness, of any ship or other property, whether real or personal, the inspection of which may be desirable for the purpose of obtaining full information or evidence in connection with any issue in the claim.

## Examination of witnesses and other persons: evidence by affidavit

70.31(1) The powers under rules 33.7 to 33.16 extend to the making of an order authorising the examination of a witness or person on oath before a judge sifting in court as if for the trial of the claim.

(2) In proceedings in which preliminary acts fall to be filed under rule 70.19, an order must not be made authorising any examination of a witness before the preliminary acts have been filed unless for special reasons the court otherwise orders.

(3) Unless the court otherwise directs, affidavits made for the purpose of rules 70.20(5), 70.22(3) and 70.36(2) may contain statements of information and belief provided that the sources and grounds are given.

## Proceedings for apportionment of salvage

70.32(1) Proceedings for the apportionment of salvage the aggregate amount of which has already been ascertained must be commenced by a fixed date claim.

(2) The claimant need not file or serve a statement of claim but must file an affidavit in support of the claim.

(3) At the first hearing the judge may exercise any jurisdiction conferred by the Act or may give directions as on a case management conference.

## Applications in proceedings in rem

70.33(1)  The affidavits, if any, in support of an application in a claim in rem must be filed unless the court gives permission to the contrary.

(2)  Notice of an application, except an application for judgment in default, must be served on all caveators together with copies of the affidavits, if any, in support of the application 7 clear days at least before the

hearing, unless the court gives permission to the contrary.

## Limitation proceedings: parties

70.34 (1)  In a limitation claim the person seeking relief is to be the claimant and must be named in the claim by name and not described merely as the owner of, or as bearing some other relation to, a particular ship or

other property.

(2)  The claimant must make one of the persons with claims against it in respect of the casualty to which the proceedings relates a defendant to the proceedings and may also make any or all of the others defendants.

(3)  At least one of the defendants to the proceedings must be named in the claim by name but the other defendants may be described generally and not named by their names.

(4)  The claim form must be served on one or more of the defendants who are named by their names therein and need not be served on any other defendant.

(5)  In this rule and rules 70.36, 70.37 and 70.38, "name" includes a firm name or the name under which a person carries on business.

(6)  If any person with a claim against the claimant in respect of the casualty to which the proceedings relates is described for the purposes of the claim –
(a) merely as the owner of; or

(b) as bearing some other relation to;

a ship or other property, that person may be so described as defendant in the claim and, if so described, is deemed for the purposes of the rules mentioned in paragraph (5) to have been named in the claim by name.

## Limitation proceedings: payments into court

70.35(1) The claimant may constitute a limitation fund by paying into court the Eastern Caribbean (or in the case of the Virgin Islands, the United States) dollar equivalent of the number of special drawing rights to which the claimant claims to be entitled to limit its liability under the Act together with interest thereon from the date of the occurrence giving rise to its liability to the date of payment into court.

(2) If the claimant does not know the appropriate equivalent of the said number of special drawing rights on the date of payment into court, it may calculate the same on the basis of the latest available published Eastern Caribbean or United States (as the case may be) dollar equivalent of a special drawing right as fixed by the International Monetary Fund.

(3) In the event of the appropriate dollar equivalent of a special drawing right on the date of payment into court being different from that used under paragraph (2), the claimant may –

(a) make up any deficiency by making a further payment into court which, if made within 14 days after

the payment into court under paragraph (1), is to be treated, except for the purposes of the Rules relating to the accrual of interest on money paid into court, as if it had been made on the date of that payment into court; or

(b) apply to the court for payment out of any excess amount (together with any interest accrued thereon) paid into court under paragraph (1).

(4) An application under paragraph (3)(b) maybe made without notice.

(5) The application must be supported by evidence on affidavit proving the appropriate dollar equivalent of the appropriate number of special drawing rights on the date of payment into court.

(6) On making any payment into court under this rule, the claimant must give notice thereof in writing to every defendant, specifying the –

(a) date of payment in;

(b) amount paid in;

(c) amount of interest included therein;

(d) rate of such interest; and

(e) period to which such interest relates.

(7) The claimant must also give notice to every defendant of any excess amount (and any interest thereon) paid out to the claimant under paragraph (3)(b).

## Application for decree or directions in limitation proceedings

70.36(1) The claimant must within 7 days after the –

(a) acknowledgment of issue or service of the claim by one of the defendants identified by name; or

(b) time limited for entering an acknowledgment of service if none of the defendants acknowledges

issue or service;

apply to the court for a decree limiting liability or, in default of such a decree, for directions as to the future proceedings in the claim.

(2) The application must be supported by an affidavit –

(a) verifying the claimant's case in the proceedings;

(b) proving service of the claim on at least one of the defendants identified by name if no such defendant has acknowledged service;

and

(c) stating –

(i) the names of all the persons who, to the knowledge of the claimant, have claims against the claimant in respect of the casualty to which the proceedings relates, not being defendants to the claim who are identified in the claim form by their names; and

(ii) the address of each of those persons if known to the claimant.

(3) The application and every affidavit in support must be served on every defendant who has acknowledged issue or service of the claim at least 4 days before the hearing of the application.

(4)Any defendant who –

  (a) disputes the claimant's claim to limit his liability; or

  (b) alleges inability to decide whether to dispute that claim;

    must, within 14 days of the service of the summons and any affidavit in support upon that defendant, serve

upon the claimant an affidavit stating –

  (i) the grounds upon which the defendant relies to dispute the claimant's claim to limit his liability; or

  (ii) such facts and matters as could justify the court in giving a direction under paragraph (7) of this rule.

(5) The claimant may, within 7 days of service upon it of any affidavit under paragraph (4), serve such further affidavit evidence as it may wish upon any defendant who has served an affidavit under paragraph (4) of this rule.

(6) If on the hearing of the application it appears to the court that the claimant's claim to limit its liability is not disputed, the court must make an order limiting the claimant's liability to a specified amount.

(7) If on the hearing of the application the court is satisfied that any defendant has not sufficient information to enable the defendant to decide whether to dispute the claimant's claim to limit its liability, the court may, on such terms as seem just –

  (a) give such directions as appear to be appropriate to enable the defendant to obtain such information; and

  (b) adjourn the hearing to a specified date time and place.

(8) Any defendant who thereafter disputes the claimant's claim to limit its liability must –

  (a) file an affidavit stating the grounds upon which the defendant relies; and

  (b) serve the affidavit on the claimant at least 7 clear days before the adjourned hearing of the application.

(9) If on the hearing or the adjourned hearing of the application, the court does not make a decree limiting the claimant's liability, the court must proceed to deal with the application as a case management conference.

(10) Any defendant who, after the court has given directions under paragraph (7) or (9), ceases to dispute the claimant's right to limit its liability must –

(a) forthwith file a notice to that effect; and

(b) serve a copy on the claimant and on any other defendant who has acknowledged issue or service of the claim.

(11) If every defendant who disputes the claimant's right to limit its liability serves a notice on the claimant under paragraph (10), the claimant may apply to the court for an order limiting its liability; and paragraphs (3) and (6) apply to such an application.

## Limitation proceedings: proceedings under decree

70.37(1) If –

(a) the only defendants in a limitation proceedings are those named in the claim form by their names; and

(b) all the persons so named have either been served with the claim form or acknowledged the issue thereof; any order in the claim limiting the claimant's liability –

(i) need not be advertised; but

(ii) operates only to protect the claimant in respect of claims by the persons so named or persons claiming through or under them.

(2) In any case not falling within paragraph (1), any order in the claim limiting the claimant's liability must –

(a) be advertised by the claimant in such manner and within such time as may be provided by the order;

(b) fix a time within which persons with claims against the claimant in respect of the casualty to which the proceedings relates may file their claims, and, in cases to which rule 70.38 applies, apply to set the order aside.

(3) The advertisement required under paragraph (2) (a) must, unless for special reasons the court

otherwise directs, be a single advertisement in each of 3 newspapers specified in the order –

(a) identifying the claim, the casualty and the relation of the claimant thereto (whether as owner of a ship involved in the casualty or otherwise);

(b) stating that the order has been made; and

(c) specifying the –

    (i) amounts fixed thereby as the limits of the claimant's liability; and

    (ii) time allowed for the filing of claims and applying to set the order aside.

(4) The claimant must within the time fixed under paragraph (2) (b) file a copy of each newspaper in which the advertisement required under paragraph (2)(a) appears.

(5) The time to be allowed under paragraph (2) (b) must, unless for special reasons the court otherwise directs, be not less than 2 months from the latest date allowed for the acknowledgment of service of the advertisements.

(6) After the expiration of the time allowed under paragraph (5), no claim may be filed or application made to set aside the order except with the permission of the court.

(7) Save as aforesaid, on the making of any order limiting the claimant's liability arising out of a casualty to which the proceedings relate the court may –

(a) distribute the limitation fund; and

(b) stay any proceedings relating to any claim arising out of that occurrence which is pending against the claimant.

## Limitation proceedings: proceedings to set aside decree

70.38(1) If an order limiting the claimant's liability fixes a time in accordance with rule 70.37(2), any person with  a claim against the claimant in respect of the casualty to which the proceedings relates who –

(a) was not named by name in the claim as a defendant to the proceedings; or

(b) if so named –

    (i) was not served with; or

    (ii) has not acknowledged the issue of;

the claim form, may, within that time, after acknowledging issue of

the claim, apply for the order to be set aside.

(2) The application must be supported by an affidavit or affidavits showing that the defendant in question has –

    (a) a bona fide claim against the claimant in respect of the casualty in question; and

    (b) sufficient prima facie grounds for the contention that the claimant is not entitled to the relief given it by the decree.

(3) At least 7 clear days before the hearing of the application, the application and every affidavit in support thereof must be served on the claimant and any defendant who has acknowledged issue or service of the claim.

(4) On the hearing of the summons the court, if satisfied that the defendant in question has a bona fide claim against the claimant and sufficient prima facie grounds for the contention that the claimant is not entitled to the relief given to the claimant by the decree, must set the decree aside and give directions as if the hearing were a case management conference.

PART 71

# Obtaining Evidence for Foreign Courts

**Contents of this Part**

Scope of this Part                                             Rule 71.1

Application for order                                          Rule 71.2

Application by Attorney General in certain cases               Rule 71.3

Person to take and manner of taking examination               Rule 71.4

Dealing with depositions                                       Rule 71.5

Claim to privilege                                             Rule 71.6

## Scope of this Part

71.1 (1) This Part deals with the procedure by which evidence may be obtained from a witness in a State or Territory for the purpose of proceedings in a court or tribunal outside the jurisdiction.

(2) Except where the enactment provides otherwise, the power of the High Court to make an order under any relevant enactment may be exercised by a judge in chambers, a master or the registrar.

## Application for order

71.2 (1) Subject to paragraph (3) and rule 71.3, an application for an order may be made without notice but must be supported by affidavit evidence.

(2) There must be exhibited with the affidavit the request in pursuance of which the application is made, and if the request is not in the English language, a translation of the request into English.

(3) After an application has been made under paragraph (1) any application for a further order or directions must be on notice.

## Application by Attorney General In certain cases

71.3 If a request is to be received by the –

(a) court in pursuance of a Civil Procedure Convention providing for the taking of the evidence of any person in a State or Territory for the assistance of a court or tribunal in the foreign country, and no person is named in the document as the person who will make the necessary application on behalf of the party; or

(b) minister with responsibility for foreign affairs and sent by the minister to the court office with an intimation that effect should be given to the request without requiring an application for that purpose;

the court office must send the document to the Attorney General.

## Person to take and manner of taking examination

71.4 (1) Any order made in pursuance of this Part for the examination of a witness may direct the examination to be taken before any fit and proper person nominated by the person applying for the order or before an examiner of the court or before any other qualified person as to the court seems fit.

(2) Subject to rule 71.6 and to any special directions contained in any order made in pursuance of this Part for the examination of any witness, the examination must be taken in the manner provided by rules 33.8 to 33.12 and an order may be made under rule 33.13 for payment of the fees and expenses due to the examiner.

## Dealing with depositions

71.5 Unless any order made in pursuance of this Part for the examination of any witness otherwise directs, the examiner before whom the examination is taken must send the deposition of that witness to the court, and the court must –

(a) give a certificate sealed with the seal of the Supreme Court identifying the documents annexed thereto, that is to say, the request, the order of the court for examination and the deposition taken in pursuance of the order; and

(b) send the certificate with the documents annexed thereto to the minister with responsibility for foreign affairs, or, if sent to the court office by some other person in accordance with a Civil Procedure Convention, to that other person;

for transmission to the court or tribunal out of the jurisdiction requesting the examination.

## Claim

71.6 (1) This rule applies where –

    (a) a witness claims a right to withhold evidence; and

    (b) that claim is contested.


(2) The examiner may require the witness to give the evidence to which the claim relates.


(3) If the examiner does not do so the person who obtained the order under rule 71.2 may apply to
the court to do so.


(4) Such an application may be made without notice.


(5) If such evidence is taken

    (a) it must be recorded in a document separate from that witness' deposition;

    (b) the examiner must send to the court office with the deposition –

      (i) that document; and

      (ii) a statement signed by the examiner setting out the claim and the ground on which it was
made;

    (c) on receipt of the document the court office must, notwithstanding

    anything in rule 71.5 –

      (i) retain the document containing the evidence to which the claim related; and

      (ii) send the statement with a request to determine the claim to the foreign court or tribunal
with the documents mentioned in rule 71.5.


(6) If the claim is rejected by the foreign court or tribunal, the court office must send to that court
or tribunal the document containing the evidence to which the claim related.


(7) If the claim is upheld the court must send the document to the witness.


(8) In either case the court must notify the witness and the person who obtained the order under rule
71.2 of the court's or tribunal's determination.

PART 72

# Reciprocal Enforcement of Judgments

**Contents of this Part**

Scope of this Part                                                                          Rule 72.1

Application for registration                                                                Rule 72.2

Security for costs                                                                          Rule 72.3

Order for registration                                                                      Rule 72.4

Register of judgments                                                                       Rule 72.5

Notice of registration                                                                      Rule 72.6

Application to set aside registration                                                       Rule 72.7

Issue of execution                                                                          Rule 72.8

Certified copy of High Court judgment for enforcement in another country      Rule 72.9

## Scope of this Part

72.1 (a) This Part deals with the procedure whereby under the provisions of any enactment a judgment of a foreign court or tribunal may be registered in the High Court for enforcement within a Member State or Territory.

(b) In this Part –

"**relevant enactment**" means any enactment in force in a Member State or Territory in question which relates to the reciprocal enforcement of judgments.

(c) This Part is subject to the requirements of any relevant enactment.

## Application for registration

72.2 An application to have a judgment registered in the High Court may be made without notice to the court but must be supported by affidavit evidence –

(a) exhibiting the judgment or a verified, certified or otherwise duly authenticated copy of it and, if the judgment is not in the English language, an English translation of it certified by a notary public or authenticated by affidavit;

(b) specifying the amount of the interest, if any, which under the law of the country of the original court has become due under the judgment up to the time of the application;

(c) stating the name, trade or business and the usual or last known place of abode or business of the judgment creditor and the judgment debtor respectively, so far as is known to the deponent; and

(d) stating to the best of the information or belief of the deponent –

  (i) that the judgment creditor is entitled to enforce the judgment;

and either

    (A) that at the date of the application the judgment has not been satisfied; or

    (B) the amount in respect of which it remains unsatisfied;

  (ii) that the judgment may be ordered to be registered for enforcement under any relevant enactment; and

  (iii) that the registration would not be or be liable to be, set aside under any relevant enactment.

## Security for costs

72.3 The court may order the judgment creditor to give security for the costs of the application for registration and of any proceedings which may be brought to set aside the registration.

## Order for registration

72.4 (1) An order giving leave to register a judgment must be drawn up by, or on behalf of, the judgment creditor.

(2) Except where the order is made following an application on notice, it need not be served on the judgment debtor.

(3) The order must state the period within which an application may be made to set aside the registration and contain a notification that execution on the judgment will not issue until after the expiration of that period.

(4) The court may, on an application made at any time while it remains competent for any party to apply to have the registration set aside, extend the period (either as originally fixed or as subsequently extended) within which an application to have the registration set aside may be made.

(5) The court hearing the application may order that notice of the application be given to any person.

## Register of judgments

72.5 (1)A register of the judgments ordered to be registered must be kept in the court office.

(2) There must be included in each such register particulars of any execution issued on a judgment ordered to be so registered.

## Notice of registration

72.6 (1) Notice of the registration of a judgment must be served on the judgment debtor by delivering it to the judgment debtor personally or in such other manner as the court may direct.

(2) Service of such a notice out of the jurisdiction is permissible without leave, and rules 7.8, 7.9 and 7.10 apply to such a notice as they apply to a claim form.

(3) The notice of registration must state –
   (a) full particulars of the judgment registered and the order for registration;
   (b) the name and address of the judgment creditor or of the legal practitioner or agent on whom any summons issued by the judgment debtor may be served;
   (c) the period within which an application to set aside the registration may be made; and
   (d)  the right of the judgment debtor to apply to have the registration set aside.

## Application to set aside registration

72.7 (1) An application to set aside the registration of a judgment must be supported by affidavit evidence.

(2) If the court hearing an application to set aside the registration of a judgment is satisfied that –

(a) it is not just or convenient that the judgment should be enforced within the jurisdiction; or

(b) the judgment falls within any of the cases in which a judgment may not be registered under the provisions of any relevant enactment;

it may order the registration of the judgment to be set aside on such terms as it directs.

## Issue of execution

72.8 (1) Execution may not issue on a judgment registered under the Act until after the expiration of the period which, in accordance with rule 72.4(3), is specified in the order for registration as the period within which an application may be made to set aside the registration or, if that period has been extended by the court, until after the expiration of the extended period.

(2) If an application is made to set aside the registration of a judgment, execution on the judgment may not issue until after the application is finally determined.

(3) Any party wishing to issue execution on a registered judgment must produce to the court office an affidavit of service of the notice of registration of the judgment and any order made by the court in relation to the judgment.

## Certified copy of High Court judgment for enforcement in another country

72.9 (1) An application under any relevant enactment for a certified copy of a judgment entered in the High Court for the purpose of enforcement in some other country must be made without notice supported by affidavit evidence,

(2) The certified copy of the judgment must be an office copy sealed with the seal of the Supreme Court and indorsed with a certificate signed by a master or registrar that it is a true copy of a judgment obtained in the High Court and that it is issued in accordance with the relevant enactment.

PART 73

# Transitional Provisions

Contents of this Part
Scope of this Part                    Rule 73.1

New proceedings                       Rule 73.2

Old proceedings                       Rule 73.3

Exercise of discretion                Rule 73.4

## Scope of this Part

73.1 (1) This Part deals with the way in which actions, matters and other proceedings in existence at the commencement date become subject to these Rules.

(1) In this Part –

 "commencement date" means the date on which these Rules come

into force.

## New proceedings

73.2 (1) Subject to paragraph (2), these rules apply to all proceedings commenced on or after the commencement date.

(2) Proceedings commenced after the commencement date but before 1st July 2001 under the Rules of the Supreme Court 1970 may continue under those rules until that date but will then be deemed to have commenced under these Rules and must proceed accordingly.

## Old proceedings

73.3 (1) These Rules do not apply to proceedings commenced before the commencement date in which a trial date has been fixed unless that date is adjourned.

(2) In proceedings commenced before the commencement date, an application to adjourn a trial date is to be treated as a pre-trial review and these Rules apply from the date that such application is heard.

(3) If a trial date has not been fixed in proceedings commenced before the commencement date –

    (a) the court office must fix a date, time and place for a case management conference under Part 27 after a defence has been filed and give all parties at least 28 days notice of the conference; and

    (b) these Rules apply from the date of the case management conference.

## Exercise of discretion

73.4 If in proceedings commenced before the commencement date the court has to exercise its discretion, it may take into account the principles set out in these Rules and, in particular, Parts 1 and 25.

PART 74
# Schedules

**Contents of this Part**

| | |
|---|---|
| Scope of this Part | Rule 74.1 |
| Subject matter of schedules | Rule 74.2 |

## Scope of this Part

74.1 This part deals with the making of Schedules which will form part of the Rules.

## Subject matter of schedules

74.2 Schedules to the Rules may be made by authority in respect of the procedure to be followed when matters are to be dealt with under specific legislation of Member States or Territories.

**Appendix**
# PRESCRIBED FORMS

Prescribed Forms

| | |
|---|---|
| Form 1: | Claim Form |
| Form 1A: | Notes for Defendant |
| Form 2: | Fixed Date Claim Form |
| Form 3: | Application to Pay by Instalments |
| Form 4: | Acknowledgment of Service of Claim Form |
| Form 4A: | Acknowledgment of Service of Fixed Date Claim Form |
| Form 5: | Defence and Counterclaim |
| Form 6: | Application |
| Form 7: | Request for Default Judgment |
| Form 8: | Request for Entry of Judgment on Admissions |
| Form 9: | Ancillary Claim Form |
| Form 10: | Listing Questionnaire |
| Form 11: | List of Documents |
| Form 12: | Witness Summons |
| Form 13: | Notice to Non-Party Served With Order |
| Form 14: | Order for Oral Examination |
| Form 15: | Notice of Adjourned Examination |
| Form 16: | Financial Position Notice |
| Form 17: | Writ of Execution Against Goods (Fieri Facas) |
| Form 18: | Writ of Possession |
| Form 19: | Writ of Delivery or Value |
| Form 20 | Writ of Specific Delivery |
| Form 21: | Judgment Summons |
| Form 22: | Writ of Habeas Corpus |
| Form 23 | Notice of Appeal |
| Form 24: | Certificate of Result of Appeal |
| Form 25: | Admiralty Claim In Rem |
| Form 26 | Admiralty Limitation Claim |
| Form 27: | Warrant of Arrest (Admiralty) |

**Form 1: Claim Form**
*[Rule 8.1 (4)]*

The Eastern Caribbean Supreme Court
   In the High Court of Justice

[State/Territory]
Claim No.                    of 20…

Between              A.B.
                                        Claimant

                     and

                     C.D.
                                        Defendant

**Claim Form**

The claimant,        A.B. (full names), of          (full address)

claims against

the defendant,       C.D. (full names), of          (full address)

(Set out briefly the nature of the claim and state any specific amount or remedy that you are claiming)

(to be completed only where the claim is for a specified amount)

| | |
|---|---|
| Amount claimed | $ …………. |
| Court fees | $ …………. |
| Legal practitioner's fixed costs on issue | $ …………. |
| Together with interest from    to date | $ …………. |
| (Daily rate thereafter = $        per day) | |
| Total Claim | $ …………. |

NOTICE TO THE DEFENDANT — See the notes served with this claim form

This claim form must contain or have served with it either a statement of claim or a copy of a court order

entitling the claimant to serve the claim form without a statement of claim.

If you do not complete the form of acknowledgment of service served on you with this claim form and

deliver or send it to the court office (address below) so that they receive it within 14/21 days of service of

this claim form on you, the claimant will be entitled to apply to have judgment entered against you. The

form of acknowledgment of service may be completed by you or a legal practitioner acting for you.


You should consider obtaining legal advice with regard to this claim.


This claim form has no validity if it is not served within 6 months of the date below unless it is

accompanied by an order extending that time.


Dated

                                                                                    [SEAL]


The court office is at [xxx xxx xxx] telephone number xxx-xxxx, FAX xxx.xxxx. The office is open

between [ …….  a.m.] and [ …….. p.m.] ………… to ………..  except public holidays.


The claimant's address for service is:

**Form 1 A: Notes For Defendant**

*[Rule 8.14 (1)]*

**Notes for Defendant**

This form is important

When you get this document, you should consider getting legal advice.

**Action to be Taken on Receipt of this Form**

The claimant is making a claim against you in the court. If you do nothing judgment may be entered

against you. That means that the claimant will be entitled to take steps to enforce payment from you of

any money the claimant is claiming and you will have no right to be heard except as to the amount of any

costs claimed or as to the way in which you can pay the judgment, unless you apply to set judgment aside.

WHAT YOU CAN DO

You can

A. Defend the claim –

If you would like to do this you must:

— Complete the form of acknowledgment of service and return it to the court office so that they receive

it within 14/21 days of the date on which you received this form.

— AND, if a statement of claim was served on you with the claim form

— Complete the form of defence or submit some other form of defence showing why you dispute the claim giving full details of all the facts on which you intend to rely if there is a trial.

— Deliver or send the form of defence to the court office so that they receive it within 28/42 days of the date on which you received this form.

— Serve a copy of the form of defence on the claimant's legal practitioner (or the claimant if the claimant has no legal practitioner) at the address given on the claim form.

— If no statement of claim is served with the claim form you need not file and serve a defence until twenty eight/forty two days after the statement of claim is served on you.

— After you have filed your defence you will be given details of the date, time and place of a case management conference at which a judge will decide what issues have to be determined by the court and give directions about what needs to be done before the case is tried.

— You must attend the case management conference.

B. Admit the whole of the claim

If you would like to do this you must:

— Complete the form of acknowledgment of service stating that you admit the claim and return it to the court office so that they receive it within 14/21 days of the date on which you received this form.

— If you can pay the amount stated on the claim form including fees, costs and interest you should pay this to the claimant within 8/21 days and no further steps can be taken against you. You must add

interest at the daily rate shown from the date stated on the claim form.

— If you cannot pay this sum in full you may apply to the court to pay by instalments. If you wish to do so you must complete the Application to Pay by Instalments form and return it to the court with your acknowledgment of service.

C. Admit part of the claim and defend the rest

If you would like to do this you must:

— Complete the form of acknowledgment of service stating how much you admit and return it to the court office so that they receive it within 14/21 days of the date on which you received this form AND complete the form of defence as under section A above.

— You may also:-

— Pay the amount that you admit direct to the claimant OR apply to pay that sum by instalments. If so you should follow the procedure indicated under B.

D. Make a claim against the claimant

If you would like to do this you must:

— Complete the form of acknowledgment of service and return it to the court office so that they receive it within 14/21 days of the date on which you received this form.

— Complete the form of defence giving details of your defence (if any) to the claim as under A above and also the claim that you are making against the claimant and return it to the court office so that they receive it within 28/42 days of the date on which you received this form.

— If you admit the claim but wish to counterclaim you should say so. If your counterclaim is for a lower

sum than the claim you may pay the difference between the amount that the claimant claims from you

and the amount that you claim from him direct to the claimant OR apply (using the procedure

indicated under B) to pay that sum by instalments. You will be given details of the date, time and

place of a case management conference at which a judge will decide what issues have to be

determined by the court and give directions about what needs to be done before the case is tried.


REMEMBER THAT IF YOU DO NOTHING, JUDGMENT MAY BE ENTERED AGAINST

YOU WITHOUT ANY FURTHER WARNING.

**Form 2: Fixed Date Claim Form**

*[Rule 8.1(5)]*


The Eastern Caribbean Supreme Court

                              In the High Court of Justice

[State/Territory]

Claim No.              of 20...

Between                    A.B.

                                                            Claimant

                          and

                          C.D.

                                                    Defendant



**Claim Form**

The claimant,            A.B. (full names), of               (full address)

claims against

the defendant,           C.D. (full names), of        (full address)


(Set out briefly the nature of the claim and state any specific amount or remedy that you are claiming)



**Notice to the Defendant —**

The first hearing of this claim wilt take place at [xxx xxx xxx] on            day the          day of 20    , at

am/p.m.

If you do not attend at that hearing, judgment may be entered against you in accordance with the claim.

If you do attend, the judge may —

(a)  deal with the claim, or

(b)  give directions for the preparation of the case for a further hearing.

A statement of claim or an affidavit giving full details of the claimant's claim should be served on you with this claim form. If not and there is no order permitting the claimant not to serve the statement of claim or affidavit you should contact the court office immediately.

You should complete the form of acknowledgment of service served on you with this claim form and deliver or send it to the court office (address below) so that they receive it within 14/28 days of service of this claim form on you. The form of acknowledgment of service may be completed by you or a legal practitioner acting for you.

You should consider obtaining legal advice with regard to this claim. See the notes on the back of this form or on the next page.

This claim form has no validity if it is not served within 6 months of the date below unless it is accompanied by an order extending that time.

Dated                                                                                          [SEAL]

The court office is at [xxx xxx xxx] telephone number xx-xxxx, FAX xxx.xxxx. The office is open between [ ……… am.] and [ ……… p.m.] …………. to ………… except public holidays.

The claimant's address for service is:

NOTES FOR DEFENDANT (FIXED DATE CLAIM)

The claimant is seeking an order from the court as set out in the claim form on the basis of the facts or evidence set out in the statement of claim or affidavit served with it. The claimant will not be entitled to enter judgment against you without a hearing.

You may:

A.  Admit the claim

If so, you should complete and return the form of acknowledgment of service to the court office within 14/28 eight days stating this. You may attend the first hearing if you wish to do so.

B.  Dispute the claim

If so, you should complete and return the form of acknowledgment of service as under A. You should also file at the court office and serve on the claimant's legal practitioner (or the claimant if the claimant has no legal practitioner):

(a)  a defence if the claim form was accompanied by the claimant's statement of claim, OR

(b)  an affidavit in answer if the claim form is accompanied by an affidavit sworn by or on behalf of the claimant

within 28/42 days of the day on which the claim form was served on you. Your defence or affidavit must set out briefly ALL the facts on which you will rely to dispute the claim made against you.

You should also attend the first hearing. If you do not the judge may deal with the claim in your absence.

C. Make a claim against the claimant

If so, you should complete and return the form of acknowledgment of service as under A. You must file a statement of claim (a counterclaim) setting out full details of what you claim against the claimant and the facts on which you will rely. This must be done within 28/42 days of the date on which the claim form was served on you. The statement of claim should set out ALL the facts on which you rely in disputing any part of the claimant's claim against you.

You should also attend the first hearing. If you do not the judge may deal with the claim in your absence.

**Form 3: Application to Pay by Instalments**

*[Rule 8.14(1)]*

.    (Heading as in Form 6)

The Applicant,            AB. (full names),of               (full address)

owes the claimant the amount of $ ……………………… claimed on the claim form and cannot pay the

amount in one lump sum.

The Applicant applies to the court for an order to pay the amount due by instalments of $ ……… per

week/month and provides the following information:

1.    Marital status:  Married ☐   Single ☐   Other ☐   *(specify)*

2.    Age:

3.    Dependants: Children:                                *(state names and ages)*

4.    Other Dependants                          *(state names and give details)*

5.    If employed state nature of employment and name and address of employer

6.    If self-employed, give particulars of annual receipts of the business

7.    Give details of any job other than main job

8.    Give details of  -

     (a)   contracts and other work in hand and

     (b)   any sums due for work done

9.    If unemployed, say how long unemployed

10.   Pensioner:   Yes/No

11.   List cash assets

12.   I live in my own property ☐  jointly owned property ☐  rented property ☐  lodgings

other ☐ *(specify)*

    (a)   My usual take home pay is; or                            $ …………

    (b)   My pension is                        $ …………

    (c)   Other income                        $ …………

          Total Income                        $ …………

13.    My regular expenses are as follows:

    (a)   Mortgage                        $ …………

    (b)   Rent

    (c)   Electricity                        $ …………

    (d)   Water                        $ …………

    (e)   Cooking gas                        $ …………

    (f)   Telephone                        $ …………

    (g)   Hire Purchase repayments               $ …………

    (h)   Food                        $ …………

    (i)   School fees                        $ …………

    (j)   Travelling expenses                 $ …………

    (k)   Children's clothing

    (i)   Maintenance payments

    (m)  Others (do not include court orders and debts listed in 14, 15 and 16)     $ …………

        …………………………………………………          $ …………

        …………………………………………………          $ …………

        …………………………………………………          $ …………

        …………………………………………………          $ …………

Total expenses                        $ …………

14.    I am in arrears as follows:

    (a)    Rent arrears                                    $ …………

    (b)    Mortgage arrears                      $ …………

    (c)    Water arrears                         $ …………

    (d)    Electricity arrears                   $ …………

    (e)    Telephone arrears                 $ …………

    (f)    Maintenance arrears             $ …………

    (g)    Others                                     $ …………


    ……………………………………………    $ …………

    ……………………………………………    $ …………

    ……………………………………………    $ …………

    ……………………………………………    $ …………


    Total arrears                            $ …………


15.    I am making court ordered payments

    as follows: (specify particulars of case(s)

    and instalments or amounts ordered

    *to be paid)*

                                           $ …………


16. I have loans and credit card debts as follows:

    ……………………………………………    $ …………

    ……………………………………………    $ …………

……………………………………………                              $ …………

……………………………………………                              $ …………

Of the above payments, I am behind with payments to

(please list)

……………………………………………

……………………………………………

……………………………………………

……………………………………………

I declare that the details I have given above are true to the best of my knowledge.

Dated

Signed                                                    Applicant

NOTICE:

This application will be heard by [the Judge in Chambers] [Master xxxxx] on      day the      day of

,at          am/pm at [xxx xxx xxx]

If you do not attend this hearing an order may be made in your absence.

OR

The [Judge in Chambers] [Master] will deal with this application by — NB This notice of application

must be served as quickly as possible on the respondent to the application.

The court office is at [xxx xxx xxx] telephone number xxx-xxxx, FAX xxx.xxxx. The office is open

between [ ……… a.m.] and [ ……….. p.m.] …………. to ………… except public holidays.

**Form 4: Acknowledgment of Service of Claim Form**

*[Rule 9.2(1)]*

(Heading as in Form 1)

**Acknowledgment of Service**

WARNING:  If this form is not fully completed and returned to the court at the address below within

14/28 days of service of the claim form on you, the claimant will be entitled to apply to have judgment

entered against you. If the claimant does so, you will have no right to be heard by the court except as to

costs or the method of paying any judgment unless you apply to set judgment aside.

1.    Have you received the claim form with the above claim number?              YES/NO

2.    If so, when?                                                                                            __/__/__

3.    Did you also receive the claimants Statement of Claim?              YES/NO

4.    If so, when?                                                                                            __/__/__

5.    Are your names properly stated on the claim form?              YES/NO

        If not, what are your full names? ……………………………………………….

6.    Do you intend to defend the claim?              YES/NO

        If so you must file a defence within 28/42 days of the service of the claim

        form on you.

7.    Do you admit the whole of the claim?              YES/NO

        If you do you should either

    (a)   pay the claim direct to the claimant or the claimant's solicitor, or

    (b)   complete the application form to pay the claim by instalments. If you pay

         the whole debt together with the costs and interest as shown on the claim

         form within 14/28 days you will have no further liability for costs.

8.   Do you admit any part of the claim? YES/NO

    If you do you may—

    (a)   pay the money that you admit direct to the claimant or the claimant's

         legal practitioner, or

    (b)   complete the application form to pay the claim by instalments.

9.   If so, how much do you admit?

    ……………………………………………………………………..

    If you dispute the balance of the claim you must also file a defence within 28/42 days of service of

    the claim form on you or judgment may be entered against you for the whole amount claimed.

10.   What is your own address?

    …………………………………………………..

11.   What is your address for service? ………………………..

    If you are acting in person you must give an address within . . . miles of the court office to which

    documents may be sent either from other parties or from the court. You should also give your

    telephone number and FAX number, if any.

Dated ………………………..

Signed ………………………..

[Defendant in person] [Defendant's legal practitioner]

court office is at [xxx xxx xxx] telephone number xxx-xxxx, FAX xxx.xxxx. The office is open between [ …….. a.m.]

and [ ……. p.m.] …………… to ………….. except public holidays.

**FORM 4:A Acknowledgment of Service of**

**Fixed Date Claim Form**

*[Rule 9.2(1)]*

(Heading as in Form 1) -

**Acknowledgment of Service of Fixed Date claim Form**

WARNING:  This form should be completed and returned to the court at the address below within 14/28 days of service of the claim form on you. However, the claimant will not be entitled to have judgment entered against you except at the first or subsequent hearing of the claim.

| | | |
|---|---|---|
| 1. | Have you received the claim form with the above number? | YES/NO |
| 2. | If so, when did you receive it? | —/—/— |
| 3. | Did you also receive the claimants statement of claim or affidavit in support? | YES/NO |
| 4. | If so, on what date did you receive them? | __/__/__ |
| 5. | Are your names properly stated on the claim form? | YES/NO |
| | If not, what are your full names?   ………………………………………….. | |
| 6. | Do you intend to defend the claim? | YES/NO |
| | If so you must file a defence within 28/42 days of the service of the claim form on you. | |
| 7. | Do you admit the whole claim? | YES/NO |
| 8. | Do you admit any part of the claim? | YES/NO |
| 9. | If so, what do you admit?        ………………………………………….. | |
| 10. | What is your own address?        ………………………………………….. | |

………………………………………..

………………………………………..

11.   What is your address for service?   ………………………………………..


If you are acting in person you must give an address within …….. miles of the

court office to which documents may be sent either from other parties or from

the court. You should also give your telephone number and FAX number, if any.


Dated        ………………………………………..

Signed       ………………………………………..


[Defendant in person] [Defendant's legal practitioner]


The court office is at [xxx xxx xxx] telephone number xxx-xxxx, FAX xxx.xxxx. The office is open

between [ …………… a.m.] and [ …………… p.m.] ……….  to ………… except public holidays.

**Form 5: Defence and Counterclaim**

*[Rule 10.2 (1)]*


(Heading as in Form 1)


**Defence**

I dispute the claim on the following grounds —


I certify that all the facts set out in my defence are true to the best of my knowledge information and

belief.


My address for service is

Telephone no.


Dated  …………………

Signed …………………

[Defendant in person]

We are acting for the defendant; our address for service is:


Signed                                                        (Legal practitioner for the defendant)


The court office is at [xxx xxx xxx] telephone number xxx-xxxx, FAX xxx.xxxx. The office is open

between **[ ……… a.m.]** and **[ …………..** p.m.]** ……… to ………. except public holidays.

**Counterclaim**

I claim against the claimant

(set out details of the remedy or relief sought)

on the following grounds —

I certify that all the facts set out in my counterclaim are true to the best of my knowledge information and

belief and that I am entitled to the remedy claimed

Dated …………………………

Signed ………………………..

[Defendant in person]

We are acting for the defendant; our address for service is:

Signed                                                                      (Legal practitioner for the defendant)

Notes:

(a)   The defendant may set out the defendant's defence in another manner — it is not necessary to use

this form.

(b)   the defendant must:

        —   state which allegations in the claim are admitted

        —   which are denied

— which are neither admitted or denied because the defendant does not know whether they are true.

— identify any documents considered necessary to the defendant's case.

(c)    The defendant must give reasons for denying any allegations made by the claimant.

(d)    The defendant must set out clearly all the facts on which the defendant relies to dispute the claim and must set out any different version of events on which the defendant relies.

(e)    The defendant may not be allowed to give evidence about any fact which is not set out in the defence.

(f)    If the defendant wishes to counterclaim the defendant must

— specify any remedy that the defendant seeks against the claimant

— include a short statement of all facts on which the defendant relies

— identify any documents which the defendant considers necessary to the defendant's case.

(g)    If the defendant is represented by a legal practitioner, the defendant must also sign the form and give the defendant's address for service.

**Form 6: Application**

*[Part 11.6(1)]*


Eastern Caribbean Supreme Court

In the High Court of Justice


[State/Territory]

Claim No.                    of

Between

A.B.

Applicant

and

CD.

Respondent


**Notice of Application**

The Applicant,                    A.B. (full names), of                    (full address)

applies to the court for an order that —



A draft of the order that I seek is attached.

The grounds of the application are —

[An affidavit in support accompanies this application]


Dated …………………….

Signed ………………….

[Legal practitioner for the] Applicant

NOTICE:

This application will be heard by [the Judge in Chambers] [Master xxxxx] on        day the        day

of,            at        am/pm        at [xxx xxx xxx]

If you do not attend this hearing an order may be made in your absence.

OR

The [Judge in Chambers] [Master] will deal with this application by — NB This notice of application

must be served as quickly as possible on the respondent to the application.

The court office is at [xxx xxx xxx] telephone number xxx-xxxx, FAX xxx.xxxx. The office is open

between [ ……….. am.] and [ ………….. p.m.] ………………. to …………… except public holidays.

**Form 7: Request for Default Judgment**

*[Rule 12.7]*

(Heading as in Form 1)

**Request for Entry of Judgment In Default**

I/We                                the claimant/claimant's Legal practitioner request entry of judgment against the

defendant in default of —

|  |  |
|---|---|
| Acknowledgment of service | YES/NO |
| Defence | YES/NO |

(in case of failure to enter acknowledgment of service)

Evidence of service of the claim form and statement of claim is filed with this form.

(in case or failure to serve defence)                                    I/We certify that —

(a)    the time for the defendant to file and serve a defence has expired (including any extension of time

agreed between the parties);

(b)    no defence or counterclaim has been served on me/us; and

(c)    the defendant has not paid any monies in settlement of the claim except such sum as is stated

below;

(d)    (where appropriate) permission to enter judgment was given by the court on ……………….. (date),

*Judgment should be entered for claim for a specified sum*: -

Amount claimed                                    $ ………….

| | |
|---|---|
| Court fees on claim | $ ………….. |
| Legal practitioner's fixed costs on issue | $ …………. |
| Together with interest from date of issue to today | $ …………. |
| Court fees on entering judgment | $ …………. |
| Legal practitioner's fixed costs on entering judgment | $ …………. |
| Total | $ …………. |
| | |
| Less paid since issue of claim | $ ………….. |
| Amount for which judgment is to enter | $ ………….. |

to be paid [forthwith] [on                    (state date)] or by weekly/monthly instalments

of $ ……………………

**OR**

*Judgment should be entered for claim for an amount to be decided by the Court: [r.12.10(1)(b)]*

Is the claimant in a position to prove the amount of the damages

**Yes / No**

If *Yes*

State the estimate of the time the Claimant requires to deal with the assessment…………………………


If *No* State the period of time that will elapse before the Claimant will be in a position to prove the

amount of damages…………………………………………………………………………………………

**OR**

*Judgment should be entered for a claim for goods:*

*[Rule 12.10(1)(c)]*

Requiring the defendant either to deliver the goods or pay their value as assessed by the court    **Yes / No**

Requiring the defendant to pay the value of the goods as assessed by the court    **Yes / No**

**OR**

*Judgment should be entered for some other remedy: [Rule 12.10(4)]*

**Yes / No**

**NOTE: Application to determine the terms *of the judgment should be made to the court [Rule 12.10(5)]***


Dated ………………….

Signed ………………..

[Legal practitioner for the] Claimant

The court office is at [xxx xxx xxx] telephone number xxx-xxxx, FAX xxx.xxxx. The office is open between [ ………. a.m.] and [ ………. p.m.] ……… to ……….. except public holidays.

**Form 8: Request for Entry of Judgment on Admission**

*[Rule 14.6 (2)]*

(Heading as in Form 1)

**Request for Entry of Judgment on Admission**

I/We                    the claimant/ claimant's legal practitioner request entry of judgment against the

defendant on the defendants admission. — (Admission of whole debt)

A.    Judgment should be entered for:

|  |  |
|---|---|
| Amount claimed | $ ............. |
| Court fees on claim | $ ............. |
| Legal practitioner's fixed costs on issue | $ ............. |
| Together with interest from date of issue | |
| to today | $ ............. |
| Court fees on entering judgment | $ ............. |
| Legal practitioner's fixed costs on entering judgment | $ ............. |
| Total | $ ............. |
| | |
| Less paid since issue of claim | $ ............. |
| Amount for which judgment is to enter | $ ............. |

(Admission of part of debt)

B.  Judgment should be entered for:

|  |  |
|---|---|
| Amount admitted by defendant | $ .............. |
| Court fees on claim | $ .............. |
| Legal practitioner's fixed costs on issue | $ .............. |

*(Legal practitioner's fixed costs must be the fees and costs appropriate to the amount admitted)*

Together with interest from date of issue

to today                                    $ ………….

Court fees on entering judgment             $ ………….

Legal practitioner's fixed costs on entering judgment              $ ………….

*(Legal practitioner's fixed costs must be the fees and costs appropriate to the amount admitted)*

                           Total              $ ………….

      Less paid since issue of claim              $ ………….

      Amount for which judgment is to enter              $ ………….


C.  (i)     I/We accept the claimant's offer to pay the amount due —

on                                          (date);

or, by instalments of $                     per week/month


and ask for judgment to be entered accordingly [the first payment to on]

OR

(ii)     I/We do not accept the claimant's proposals for payment of the amount due but would accept

payment on                               (date);

or, by instalments of $                     per week/month

the first payment to be on                (date)

OR

(iii)    I/We do not accept the defendant's proposals as to payment and ask for judgment to be entered

for the balance due to be paid forthwith.


D.      (in cases (ii) and (iii) above) My/our reasons for objecting to the defendant's proposals are:

I/We do not accept that the defendant's financial statement is correct in the following ways:              - - 5

Dated ………………….

Signed …………………

[Legal practitioner for the Claimant]


The court office is at [xxx xxx xxx] telephone number xxx-xxxx, FAX xxx.xxxx. office is open between [

….. a.m.] and [ …….  p.m.] ……… to ………. except public holidays.

**Form 9: Ancillary Claim Form**

*[Rule 18.2 (2)]*

(Heading as in Form 1)

**Ancillary Claim Form**

To                                                           of

This claim has been brought by the claimant against the defendant in accordance with the claim form and statement of

claim served with this notice. Copies of the defendant's statement of claim (the defendant's defence) and

of all other statements of case that have been filed in the proceedings are also served with this notice.

The defendant claims against you on the grounds that [The defendant will also ask the court to determine the following

matters not only between the claimant and the defendant but also between defendant and you:]

If you wish to dispute the claimant's claim against the defendant or the defendant's claim against you,

you must —

(a)    send or deliver a completed form of acknowledgment of service to the court office (address below)

so that it is received by them within 14/28 days; and

(b)    send or deliver a defence to this claim to the court office so that it is received by them within 28/42

days of the day on which this claim was served on you. You must also serve a copy of your

defence on the defendant's legal practitioners whose address is given below.

If you do not file a defence you will —

(a)    be deemed to have admitted the defendant's claim against you; and

(b)    be bound by any judgment or decision in the main proceedings in so far as it  is relevant to any

claim made against you and judgment may be entered against you.

Dated

(SEAL)

This claim was issued by                                    of        [Legal practitioner for the Defendant]

The court office is at [xxx xxx xxx] telephone number xxx-xxxx, FAX xxx.xxxx. The office is open

between [ ………. am.] and [ ……… p.m.] ……… to ……… except public holidays.

**Form 10: Listing Questionnaire**

*[Rule 27.9(1)]*

(Heading as in Form 1)

**Listing Questionnaire -**

WARNING: This is an important document. The information is required by the Court to list your case

accurately. Inaccurate information may lead to a waste of court time and delays to other people's cases.

Failure to return the form to the court office within 21 days or to complete it fully will lead to a listing

hearing being fixed. You may have to pay the costs of this hearing.

1.      Have all the directions given by the court been carried out?                YES/NO

2.      If not, which directions have not been carried out?

Disclosure of documents                                                            YES/NO
Inspection of documents                                                            YES/NO
Service of witness statements                                                      YES/NO
Service of expert reports                                                          YES/NO
Other (state which)                                                                YES/NO

3**.**  Why have they not been carried out?

4.      When can the direction be complied with? -

5.      Will any application for relief be made by you?                              YES/NO

6.      Has ADR* been tried?                                                        YES/NO

7.  If not, why not?

8.  Is ADR likely to be tried?                                                      YES/NO

6.  Are you ready for trial?                                                        YES/NO

7.  If not, why not?

8.  How many witnesses do you intend to call?…………

9. What is your present estimate for trial length ?……… hours

10. What dates within the stated trial period will cause difficulty to

(a)        the claimant/defendant
(b)        the claimant's/defendant's Legal practitioner
(c)        the claimant's/defendant's advocate -
(d)        any non-expert witness
(e)        any expert witness

11. Please give names, addresses and telephone numbers of

(a)        any trial Legal practitioner you propose to instruct
(b)        any expert witness whom you are entitled to call to give oral evidence

12. Please state the name of the legal practitioner (if any) who has conduct of this matter and give the

legal practitioner's direct telephone number or Fax number.

Dated……………………………

Signed…………………………….

[Legal practitioner for the] Claimant/Defendant

**This form must be returned to the court office within 21 days.**

The court office is at [xxx xxx xxx] telephone number xxx-xxxx, FAX xxx.xxxx. The office is open between [……am.] and [……p.m.]…………….. to……………….  except public holidays.

*ADR means alternative dispute resolution.

**Form 11: List of Documents**

*[Rule 28.7(2)]*

 (Heading as in Form 1)

**List of Documents**

This list is completed in accordance with an order for:

(a)   Standard disclosure                                       YES/NO

(b)   Specific disclosure                                       YES/NO

dated

and is served on behalf of the claimant/defendant/                              [other].

I,                    [claimant] [defendant]                                    ]

certify that I have had explained to me –

(a) the duty of standard disclosure, and

(b)  the terms of the order dated                              for specific disclosure

and my duty to disclose documents in accordance with that order,

and that I have complied with that duty.

(In the case of a list served by a company, firm, association or other organisation, the certificate must

continue –)

I am the (capacity)          the                    of the [claimant] [defendant] [other].

I accept responsibility for identifying any individuals who might be aware of any document which should

be disclosed. I have asked the following individuals whether they are aware of any such documents -

                                    NAME                              POSITION




Part 1 of Schedule 1 contains a list of ALL the documents which –

 (a) are or were in the physical possession of the [claimant] [defendant];or

 (b)the [claimant] [defendant] has or has had a right to possession of; or

(c) the [claimant] [defendant] has or has had a right to inspect or take copies of, and on which the

[claimant] [defendant] relies or intends to rely in these proceedings, [together with such documents or

classes of documents which the [claimant] [defendant] was ordered to disclose by the order of the court

dated xx.xx.xxxx.


I/We claim a right to withhold disclosure and inspection of the documents listed in

Part 2 of Schedule 1 on the basis stated in the Schedule.


The [claimant] [defendant] is not in physical possession of the documents listed in

Schedule 2 and the Schedule states what has happened to those documents.


Neither the [claimant] [defendant] nor the [claimant's] [defendant's]

legal practitioner nor anyone else on behalf of the [claimant] [defendant] now has or has ever had
physical possession of, nor has the [claimant] [defendant] now or ever had the right to possession or the
right to take copies of any document which should be disclosed and inspected under the terms of the
court's order other than those listed in this List of Documents.


Dated………………………….

Signed…………………………

[Claimant] [Defendant]

[named representative for claimant/defendant]



The court office is at [xxx xxx xxx] telephone number xxx-xxxx, FAX xxx.xxxx. The office is open

between [….. a.m.] and [ …. p.m.]………… to ………………. except public holidays.

SCHEDULE 1

PART1

No.              Details of document or

                 class of documents

PART 2

No.                          Details of document or          Reason for claiming a right

                             class of documents              not to disclose

SCHEDULE 2

No.                          Details of document or          What has happened to the

                             class of documents              documents including (to the

                                                             best of my/our information

                                                             and belief) where they are.

NOTICE TO INSPECT

The Documents listed in Part 1 of Schedule 1 may be inspected at on any normal working day between

the hours of                    a.m and             p.m.

until                     (date).

Dated……………………………….

Signed…………………………..

[Legal practitioner for the] [Claimant] [Defendant]

The court office is at [xxx xxx xxx] telephone number xxx-xxxx, FAX xxx.xxxx. The office is open

between [……… am.] and [……… p.m.]…………..  to………………..  except public holidays.

**Form 12: Witness Summons**

[Rule *33.2(2)]*

(Heading as in Form 1)

**Witness Summons**

To                                                                (witness' name)

of                                                                (witness' address)

You are summoned to attend at the High Court of Justice at [xxx xxx xxx] at a.m.

on       day the         day of           20   , the day fixed for the hearing of this claim

and from day to day till the end of the trial to give evidence and to bring with you and produce the

following documents -

Sum to be paid to the witness $

DATED                                                     [SEAL]

This summons was issued on the application of the [claimant] [defendant] whose

legal practitioner is                    of

Tel.                         Fax.

The court office is at [xxx xxx xxx] telephone number xxx-xxxx, FAX xxx.xxxx. The office is open

between [……. am.] and […… p.m.]…………. to……… except public holidays.

**Form 13: Notice to Non-party served with Order**

[Rule *42.12(3)*]

(Heading as in Form 1)

**NOTICE**


To

of

A judgment or order of this court was given or made on the         day of         20...

and a copy of that judgment or order is attached to this notice.

You are bound by the terms of the judgment or order to the same extent as you would have been had you

been a party to the proceedings in which the judgment was given or order made.

However you may apply to the court within 28 days after service of this notice to

(a) set aside; or

(b) vary; or

(c) add to

the judgment or order.

You may do this by completing and issuing a form of application at the court office whose address is

given below saying what order you want the court to make and the grounds on which you make the

application.


Dated                                                                                               (SEAL)



This notice was issued by                                         [legal practitioners for] the

claimant/defendant

whose address for service is

The court office is at [xxx xxx xxx] telephone number xxx-xxxx, FAX xxx.xxxx. The office is open between […..a.m.] and [……  p.m.]……………. to………………  except public holidays.

**Form 14: Order for Oral Examination**

*[Rule 44.4(1)]*

[Heading as Form 1]

**Order for Oral Examination**

To: CD, the examinee

The claimant obtained a judgment/order against [you/the defendant company] in this court on [date] [and (in the case of a company) it appears you are an officer of the defendant company].

You are ordered to attend before an examiner of this court on [date] at……. a.m. to be examined under oath as to your financial circumstances [in the case of a company, the financial circumstances of the defendant company] including what property or other assets you/it may have, and to produce at the examination any books or documents in your possession or power containing information about your/the defendant company's financial circumstances.

And it is further ordered that the costs of this application and of the examination be in the discretion of the examiner.

Dated
                         [Seal]

This order was made on the application of
of ..[claimant/claimant's legal practitioner]

**AND TAKE NOTICE that if you fail to comply with the terms of this order, proceedings maybe commenced against you for contempt of court and you may be liable to be imprisoned.**

Amount due                                                         $…………………

Together with interest from     to date                           $…………………

(Daily rate thereafter =$      per day)                           $…………………
                  Total

Less payments made to date                                       $………………..

Amount now due                                                   $………………..

Important Notes:

1. It will not be necessary for you to attend the examination if you pay the amount now due to the claimant or the claimant's Legal practitioner.

2. DO NOT bring or send payments to the court office. They will not be accepted.

3. You should allow at least 4 days for your payment to reach the claimant or the claimant's Legal practitioner.

4. Keep records and ensure that you can account for all payments made. Proof may be required if there is disagreement.

5. If payment is made too late, you may be liable for further costs.

Date

[SEAL]

The court office is at [xxx xxx xxx] telephone number xxx-xxxx, FAX xxx.xxxx. The office is open between [….am.] and […. p.m.]……to………. except public holidays.

Form 15: Notice of Adjourned Examination
*[Rule 44.5(7)]*

**Notice of Adjourned Examination**
To: [CD, the examinee]
You were ordered to attend court on the [date] at…………. a.m. to be examined under oath before the examiner as to your financial circumstances (or as to the financial circumstances of the defendant company) and you failed to attend/refused to be sworn or affirmed/refused to answer a question(s).

TAKE NOTICE that your appointment for examination has been adjourned to [date] at …………. a. m. before a judge of the High Court when you are ordered to attend.

**Dated**

AND TAKE NOTICE that if you fail to comply with the terms of this order, proceedings may be commenced against you for contempt of court and you may be liable to be imprisoned.

Amount due                                                   $……………………..
  Together with interest from        to date
(Daily rate thereafter = $          per day)                 $……………………

                        Total

Less payments made to date                                   $……………………..
Amount now due                                               $  ……………………

Important Notes:
1. It will not be necessary for you to attend the examination if you pay the amount now due to the claimant or the claimant's legal practitioner.

2. DO NOT bring or send payments to the court office. They will not be accepted.

3. You should allow at least 4 days for your payment to reach the claimant or the claimant's legal practitioner.

4. Keep records and ensure that you can account for all payments made. Proof may be required if there is disagreement.

5. If payment is made too late, you may be liable for further costs.

Dated                                                        [SEAL]

The court office is at [xxx xxx xxx] telephone number xxx-xxxx, FAX xxx.xxxx. The office is open between [….  am.] and [ ….. p.m.]………… to………….except public holidays.

**Form 16: Financial Position Notice**

*[Rule 44.7(1)]*

[Heading as Form 1]

**Financial Position Notice**

To:

An application has been made to orally examine you as to your income, assets and liabilities [the income assets and liabilities of the [defendant] [claimant] company] and the means by which the judgment debt may be paid. There is served with this notice an order giving the date time and place of the oral examination.

You are required to complete and return the attached questionnaire as to your means [the means of the company]. A copy will be sent to the judgment creditor and the judgment creditor may withdraw its application for an oral examination if satisfied with the information that you provide.

Unless you are notified by the court that your attendance is not required you must attend court on the date time and place stated in the attached order. If you fail to do so further proceedings may be taken which may result in your being imprisoned.

Dated                                                                                                [SEAL]

The court office is at [xxx xxx xxx] telephone number xxx-xxxx, FAX xxx.xxxx. The office is open between [ ….. am.] and […..  p.m.]……………..to……………….except  public holidays.

**Form 17: Writ of Execution Against**

Goods (Fieri Facias)

*[Part 46]*

(Heading as in Form 1)    -

**Request for Issue of Writ of Execution**

To the Court

[We] [I]                                    of

(Tel                    Fax)            [Legal practitioners for the                    ] [          in person]

apply for the issue of a Writ of Execution against the judgment debtor to recover the sum stated below.

Amount of judgment                                    $
Costs                                                $
Interest to date                                     $
Total sum due                                        $
Less: Paid since judgment                            $
Balance of judgment now due                          $
Plus: fee on issue                                   $
Legal practitioner's costs on issue                  $
Amount for which writ to issue                       $

[We] [I] certify that

(a) the whole or part of any instalment due under the judgment has not been paid:

(b) the balance of judgment now due is as shown above.

Dated…………………………
Signed…………………………..
[Legal practitioners for the] [Claimant) [Defendant]

**Writ of Execution**

To: The Marshal

You are required to levy the sum stated above together with interest at the rate of        % per annum from the                    day of                    20-, until payment together with the marshal's poundage fees, cost of levying and all other legal incidental expenses and to pay the amount

levied in respect of the judgment debt, fees, costs and interest to the [claimant] [defendant].

You are also required to indorse on this Writ immediately after execution a statement of the manner in which you have executed it and send a copy to the [claimant] [defendant].

Dated                                                                                          [SEAL]


**Notice to Judgment Debtor**

Notice of levy

The marshal has levied on your goods. This means that you must not dispose of them as the marshal may have to take them and sell them, at a public auction.


Payment of the judgment debt

If you pay the total amount due under this Writ including the marshal's poundage fees, costs of levying and any other legal incidental expenses, your goods will not be taken and you will not have to pay any more costs. You must pay the money to the marshal and will be given a receipt.

If you do not want the marshal to remove your goods

You can ask the marshal not to do so but you must sign the walking possession agreement below.

–If your goods are removed
–you will be given a list of the goods removed
–the goods will not be sold for at least [ ] days unless they are perishable
–you will be given [ ] days notice of the date and place of sale
–further fees may be charged and added to the debt
–these fees could include the cost of removing the goods and the fees charged by the auctioneer.


When the goods are sold

You will be given a written statement as to the sale and the distribution of the proceeds of sale.

If the sale is stopped

You will normally have to pay a fee and any expenses incurred in removing the goods or advertising the sale.


Walking Possession Agreement
(request not to remove goods)

–Please do not take my goods listed here – I agree that until payment is made or the writ withdrawn, I will:
–not remove or damage the goods or allow anyone to do so

–show this form to anyone who calls and tries to take these goods
–tell you immediately if anyone tries to do so; and
–allow you to re-enter the premises at any time (and as often as you want)
–to see the goods or to complete the enforcement of this writ.


Dated……………

Signed……………..


The court office is at [xxx xxx xxx] telephone number xxx-xxxx, FAX xxx.xxxx. The office is open
between […..am.] and [……. p.m.]………    to ……….    except public holidays.

**Form 18: Writ of Possession**
*[Part 46]*
(Heading as in Form 1) -

**Request for Issue of Writ of Possession**

To the Court
[We] [I]                                                        of
 (Tel                 Fax)        [Legal practitioners for the            ][        in person]

apply for the issue of a Writ of Possession against the judgment debtor to recover possession of the land and property known as

        (description of property) and also to recover the sum stated below.

| | |
|---|---|
| Amount of judgment (if any) | $............................ |
| Costs | $.......................... |
| Interest | $.......................... |
| Rent/mesne profits to date | $........................ |
| | |
| Total sum due | $........................ |
| Less: Paid since judgment | $........................ |
| Balance of judgment now due | $........................ |
| Plus: Fee on issue | $........................ |
|      Legal practitioner's costs on issue | $........................ |
| Amont for which writ to issue | $........................ |

[We] [I] certify that
(a)   the claimant is entitled to possession and that the defendant has not complied with any conditions
    upon which the order for possession was suspended;

(b)  the balance of judgment and rent/mesne profits now due is as shown above.

Dated…………………..

Signed………………….
[Legal practitioners for the] Claimant/Defendant

**Writ of Possession**

To: The Marshal

   You   are required to take possession of the property known as

                                                    (description of
     property)

and  to deliver the same to the claimant/defendant or the claimant's/defendant's

representative and also to levy the sum stated above together with interest at the
rate of          % per annum from the          day of  20                    until payment together with
the marshal's poundage fees, cost of levying and all other legal incidental expenses and to pay
the amount levied in respect of the judgment debt, fees, costs and interest to the [claimant]
[defendant].

You are also required to indorse on this Writ immediately after execution a statement of the manner in
which you have executed it and send a copy to the [claimant] [defendant].

            Dated                                                                                    [SEAL]

**Notice to Judgment Debtor**

Notice of taking possession

You have failed to give up possession of the property described overleaf and the Marshal is authorised to
enter the land to take possession of the property and deliver possession to the claimant.

Notice of levy

The Marshal has levied on your goods in order to discharge the judgment for [arrears of rent] [damages]
[rent] [mesne profit] and [costs]. This means that you must not dispose of them as the Marshal may have
to take them and sell them, at a public auction.

Payment of the money judgment

If you are able to pay the money judgment in full, the Marshal will not need to remove your goods. You
will have to pay the full amount of the judgment plus interest and the costs of issuing this writ together
with the Marshal's fees. You will be given a receipt for any money that you pay.

**If your goods are removed**

    – you will be given a list of the goods removed
    – the goods will not be sold for at least [ ] days – unless they are perishable
    – you will be given [ ] days notice of the date and place of sale
    – further fees may be charged and added to the debt
    –these fees could include the cost of removing the goods and the fees charged by the auctioneer.

**When the goods are sold**

You will be given a written statement as to the sale and the distribution of the proceeds of sale.

If the sale is stopped

You will normally have to pay a fee and any expenses incurred in removing the goods or advertising the
sale.

The court office is at [xxx xxx xxx] telephone number xxx-xxxx, FAX xxx.xxxx. The office is open between [….a.m.] and […..p.m.]…………….. to………………..except public holidays.

**Form 19: Writ of Delivery or Value**
*[Part 46]*

Heading as in Form 1)

**Request for Writ of Delivery or Value**
To the Court

[We ] [I]                                              of
        (Tel            Fax                        ) [Legal practitioners for the in person          ][          in
person]


        apply for the issue of a Writ of Delivery against the judgment debtor to recover possession of
        (description of goods)

 to   recover the assessed value of the goods, namely                        $.................................

        And also to recover

                        Damages                        $.................................
                        Costs                          $.................................
                        Total sum due
                        Less:Paid since judgment        $.................................
                        Balance of judgment now due     $.................................
                        Plus:fee on issue               $.................................
                        Legal practitioner's costs on issue  $.................................
                        Amount for which writ to issue  $.................................

 [we] [II certify that
        (a) the claimant is entitled to recover the goods which are the subject of the court's order or the value of $
            , assessed by the court.

        (b) the balance of judgment now due is as shown above


        Dated……………………………..
        Signed…………………………….
        [Legal practitioners for the] Claimant/Defendant


**Writ of Delivery or Value**
To: The Marshal

        You are required to cause the goods                            (description of goods)

        to be delivered to the claimant/defendant, and if you are not able to do so to levy the sum of $      the
        assessed value

You are also required to levy the sum of $          as stated above together with interest at the rate of
% per annum from the day of                    20-, until payment together with the marshal's poundage fees,
cost of levying and all other legal incidental expenses and to pay the amount levied in respect of the judg-
ment debt, fees, costs and interest to the [claimant] [defendant].

You are also required to indorse on this Writ immediately after execution a statement of the manner in
which you have executed it and send a copy to the [claimant] [defendant].

Dated                                                                                          [SEAL]

**Notice to Judgment Debtor**

Notice of taking possession

You have failed to deliver up the goods described overleaf and the marshal is authorised to take
possession of the goods and deliver them to the claimant. If the marshal is not able to take possession of
the goods the marshal is authorised to levy the sum stated above being the value of the goods as assessed
by the court.

Notice of levy

The Marshal has levied on your goods in order to
(a) discharge the claim for the assessed value of the goods
(b) discharge the judgment for [damages] and [costs].
This means that you must not dispose of them as the marshal may have to take them and sell them at a
public auction.

Payment of the money judgment

If you are able to
(a) deliver the goods described overleaf; or
(b) pay the assessed value of the goods and
(c) pay the money judgment in full,

the Marshal will not need to remove your goods. You will have to pay the full amount plus interest and the costs of issuing this writ together with the marshal's fees. You will be given a receipt for any money that you pay.

If you do not want the marshal to remove your goods

You can ask the marshal not to do so but you must sign the walking possession agreement below.

If your goods are removed
  –you will be given a list of the goods removed
  –the goods will not be sold for at least [ ] days unless they are perishable
  –you will be given [ ] days notice of the date and place of sale
  –further fees may be charged and added to the debt
  –these fees could include the cost of removing the goods and the fees charged by the auctioneer.


When the goods are sold

  You will be given a written statement as to the sale and the distribution of the proceeds of sale.


  If the sale is stopped

you will normally have to pay a fee and any expenses incurred in removing the goods or advertising the sale.

Walking Possession Agreement
(request not to remove goods)
Please do not take my goods listed here —

I agree that until payment is made or the writ withdrawn, I will:
–not remove or damage the goods or allow anyone to do so
–show this form to anyone who calls and tries to take these goods
–tell you immediately if anyone tries to do so; and
–allow you to re-enter the premises at any time (and as often as you want) to see the goods or to complete the
  enforcement of this writ.


Dated……………………….

Signed………………………

The court office is at [xxx xxx xxx] telephone number xxx-xxxx, FAX xxx.xxxx. The  office is open between [……am.] and [……p.m.]…………….. to……………………………except  public holidays.

**Form 20: Writ of Specific Delivery**
-*[Part 46]*

(Heading as in Form 1)


Request for Writ of Specific Delivery


To the Court

[We] [I]                                    of
(Tel                      Fax           ) [Legal practitioners for the  ] [        in person]
apply for the issue of a Writ of Delivery against the judgment debtor to recover possession of

(description of goods)


And also to recover
    Damages                                    $...................................
    Costs                                        $...................................
    Total sum due                                $...................................
    Less:Paid since judgment                     $...................................
    Balance of judgment now due                  $...................................
    Plus:fee on issue                            $...................................
    Legal practitioner's costs on issue          $...................................
    Amount for which writ to issue               $...................................

[We] [I] certify that

(a) the claimant is entitled to recover the goods which are the subject of the
   court's order and that the court has given permission for the issue of a writ of
   specific delivery on                                                     (date);

(b) the balance of judgment now due is as shown above.

Dated…………………………….

Signed…………………………
[Legal practitioners for the] Claimant/Defendant


**Writ of Specific Delivery**


To: The Marshal

You are required to cause the goods                                 (description of
goods)

to be delivered to the claimant, A.B.

You are also required to levy the sum of $                as stated above together with interest at the rate of                % per annum from the                day of                19 , until payment together with Marshal's poundage fees, cost of levying and all other legal incidental expenses and to pay the amount levied in respect of the judgment debt, fees, costs and interest to the [claimant] [defendant] .

You are also required to indorse on this Writ immediately after execution a statement of the manner in which you have executed it and send a copy to the [claimant] [defendant].

Dated                                                                                [SEAL]

**Notice to Judgment Debtor**

Notice of taking possession

You  have failed to deliver up the goods described overleaf and the marshal is authorised to take possession of the goods and deliver them to the claimant.

Notice of levy

The marshal has levied on your goods in order to discharge the judgment for [damages] and [costs].

This means that you must not dispose of them as the marshal may have to take them and sell them at a public auction.

Payment of the money judgment

If you are able to pay the money judgment in full, the marshal will not need to remove your goods. You will have to pay the full amount plus interest and the costs of issuing this writ together with the marshal's fees. You will be given a receipt for any money that you pay.

If you do not want the marshal to remove your goods (other than the goods which the court order you to deliver up to the claimant)

You can ask the marshal not to do so but you must sign the walking possession agreement below.

If your goods are removed
        –you will be given a list of the goods removed
        –the goods will not be sold for at least [ ] days unless they are perishable
        –you will be given [ ] days notice of the date and place of sale
        –further fees may be charged and added to the debt
        –these fees could include the cost of removing the goods and the fees charged by the auctioneer.

When the goods are sold

You will be given a written statement as to the sale and the distribution of the proceeds of sale.

If the sale is stopped

You will normally have to pay a fee and any expenses incurred in removing the goods or advertising the sale.

**Walking Possession Agreement**
(request not to remove goods)

Please do not take my goods listed here −

I agree that until payment is made or the writ withdrawn, I will:
−not remove or damage the goods or allow anyone to do so
−show this form to anyone who calls and tries to take these goods
 −tell you immediately if anyone tries to do so; and
−allow you to re-enter the premises at any time (and as often as you want) to see the goods or to complete the
 enforcement of this writ.

Dated…………………………

Signed………………………

The court office is at [xxx xxx xxx] telephone number xxx-xxxx, FAX xxx.xxxx. The office is open between […a.m.] and [… p.m.]…………………to……………………..except public holidays.

**Form 21: Judgment Summons**

[*Rule 52.2(1)*]


[Heading as Form 1]


**Judgment Summons**

To the defendant [if the summons is issued against only one or some of several defendants, name that defendant or those defendants]

 On [date] the claimant obtained a judgment or order against you.

And as you have failed to pay as ordered, the claimant has requested this judgment summons be issued against you.

You are therefore summoned to appear [personally] in this court on [date] at…………….  am. to be examined on oath as to the means you have had since the date of the judgment or order to comply with the terms of the judgment or order and also to give good reasons why you should not be committed to prison for failing to comply.

                          Amount for which judgment summons is to issue
$................................
                          Court fees on summons
$................................
                          Legal practitioner's costs on summons
$................................
                          Together with interest from to date
$................................
                          (Daily rate thereafter =$            per day)

$................................
                                      Total
$................................
                          Less payments made to date
$................................
                          Amount now due
$................................


AND TAKE NOTICE that if you fail to comply with the terms of this order, proceedings may be commenced against you for contempt of court and you may be liable to be imprisoned.


Important Notes:

1. It will not be necessary for you to attend the examination if you pay the amount now due to the claimant or the claimant's legal practitioner.

2. DO NOT bring or send payments to the court office. They will not be accepted.

3. You should allow at least 4 days for your payment to reach the claimant or the claimant's legal practitioner.

4. Keep records and ensure that you can account for all payments made. Proof may be required if there is disagreement.

5. If payment is made too late, you may be liable for further costs.

Dated

[SEAL]

The court office is at [xxx xxx xxx] telephone number xxx-xxxx, FAX xxx.xxxx. The office is open between [ …..a.m.] and […..p.m.]…………….to…………       except public holidays.

**Form 22: Writ of Habeas Corpus**

*[Rule 57.3(1)]*

(Heading as in 10)

To: the Commissioner/Superintendent of Prisons:

You are required to produce to the High Court on the                                    day of
                         at                 a.m./p.m the body of                    by whatsoever name
that person is called, said to be detained in your custody, and be prepared to state the day and cause of
that person's being taken and detained so that the court may then and there examine whether such cause is
legal.

TAKE NOTICE that if you fail to produce the body of                                    before
the court on the date and at the time stated above the court may commit you to prison for your contempt
in not obeying the order.

Dated                                                                                (SEAL)

Issued by                                                        of

Legal practitioners for the claimant

The court office is at [xxx xxx xxx] telephone number xxx-xxxx, FAX xxx.xxxx. The office is
open between [……am.] and […… p.m.]………..to…….except public holidays.

**Form 23: Notice of Appeal**
*[Rule 62.4(1)]*

The Eastern Caribbean Supreme Court

[State/Territory]

                                                        In the Court of Appeal

High Court/Magisterial
Civil Appeal No.

Between

                                        **A.B.**

                        Appellant

                                                and

                                        **C.D.**

                        Respondent

**Notice of Appeal**

TAKE NOTICE that the appellant (being the [claimant] [defendant] in the court below) hereby appeals to the Court of Appeal against the decision of contained in the order dated [a copy of which is attached to this Notice].

1. Details of order appealed:

2. Details of –
(a) any finding of fact:
(b) any finding of law:
which are challenged.

3. Grounds of Appeal:
(a)
(b)
(c)

4. Order sought:

5. Any specific power which the court is asked to exercise:

6. Details of the other parties to the proceedings in the court below:

Name                                    Address for Service


Dated………………

Signed…………….                                    [Legal practitioners for the] Appellant(s)

Date                                                                [SEAL]


The court office is at [xxx xxx xxx] telephone number xxx-xxxx, FAX xxx.xxxx. The office is open
between [……..  am.] and […….p.m.]…………to…………………except public holidays.

 Address for service of the Appellant(s) is:

**Form 24:Certificate of Result of Appeal**

*[Rule 62.24]*

(Heading as in Form 19)

**Certificate of Result of Appeal**

This appeal was heard on [date(s)] before…………………………………………………………
in the presence of……………      for the Appellant(s) and…………     for the Respondent(s).

I HEREBY CERTIFY that an Order was made as follows:

Dated                                                            [SEAL]

………………………………
Chief Registrar

**Form 25**: Admiralty Claim In Rem
*[Rule 70.4(1)]*

**The Eastern Caribbean Supreme Court**

In the High Court of Justice

Claim No.            of  .

Admiralty

Between

**A.B.**

Claimant

and

**C.D.**

Defendant

**Claim Form In Rem**

Admiralty claim in rem against

[The ship "X" or other res]
The claimant,          A.B.          (full names), of                              (full address)
claims against
the defendant,          C.D.          (full names), of (full address)
Set out briefly the nature of the claim and state any specific sum that you are claiming

|  |  |  |  |
|---|---|---|---|
| | Amount claimed | | |
| | $..................................... | | |
| | Court fees | | |
| | $..................................... | | |
| | Legal practitioner's costs on issue | | $................................... |
| | Together with interest from | to date | $................................... |
| | (Daily rate thereafter = **$** | per day) | $................................... |
| | | Total Claim | $................................... |

NOTICE TO THE DEFENDANTS being the owners of and other persons interested in the ship
of the port of                              [or cargo or as may be]

If you do not complete the form of acknowledgment of service served on you with this claim form and
deliver or send it to xxx xxx xxx within 14/28 days of service of this claim form on you, the claimant will
be entitled to apply to have judgment entered against you for the amount claimed. If the res described in

this claim form is then under arrest of the court it may be sold by order of the court.

The form of acknowledgment of service may be completed by you or a solicitor acting for you.

You should consider obtaining legal advice with regard to this claim.

This claim form has no validity if it is not served within [12] months of the date below unless you are also served with an order that extends the time for service.

Dated
        [SEAL]


The court office is at [xxx xxx xxx] telephone number xxx-xxxx, FAX xxx.xxxx. The office is open between […….**a.m.**] and […….**p.m.**]…………..to……………..except public holidays.

Dated

The claimant's address for service is:

**Form 26: Admiralty Limitation Claim**
*[Rule 70.4(3)]*

(Heading as in Form 16)

**Limitation Claim Form**

The claimant,    A.B.      (full names),

of                          (full address) claims against

the defendant,    C.D      (full names),

of               (full address)

Set out briefly the nature of the claim

NOTICE TO THE DEFENDANT

Unless you admit the claim against you, you must complete the form of acknowledgment of service served
on you with this claim form and deliver or send it to xxx xxx xxx so that it is received within 14/28 days
of service of this claim form on you.

If you fail to do so the claimant may proceed with the claim without further notice to you. The form of
acknowledgment of service may be completed by you or a solicitor acting for you.

You should consider obtaining legal advice with regard to this claim.

This claim form has no validity if it is not served within [twelve] months of the date below unless you are
also served with an order that extends the time for service.
Dated                                                                                    [SEAL]

The court office is at [xxx xxx xxx] telephone number xxx-xxxx, FAX xxx.xxxx. The office is open
between [  a.m.] and [   p.m.]      to                    except public holidays.

The claimant's address for service is:

**Form 27: Warrant of Arrest (Admiralty)**

*[Rule 70.9(1)]*

(Heading as in Form 16)

**Request For Warrant Of Arrest**

We                              of

[Legal practitioners for ] the claimant request a warrant to arrest

(description of property, giving name and port if a ship)

Dated

(Signed)

**Warrant Of Arrest**

To: the Marshal

You are required to arrest the ship                              of the port of

[and the cargo now or lately laden in her together with the freight due for the transportation of it,] or [and the freight due for the transportation of the cargo now or lately laden in her] and to keep the same under safe arrest until you receive further orders from the Court.

The claimant claims:

Date                                                        [SEAL]

Taken out by                              of                    (Tel              )
                                          (Fax           )

[Legal practitioners for] the claimant

[Marshal's indorsement as to service]

Form 28

(Rule 14.2 (3) (4))

**Request for Claim to be recorded as satisfied**

(Heading as in Form 1)

Request for Claim to be recorded as satisfied

I/We                                    the defendant/defendant's legal practitioner hereby request that the claim in this matter be recorded as satisfied.

Dated:

Signed:

Legal practitioner for the Defendant

To: (Claimant/Legal practitioner for the Claimant

The Claimant is required to notify the court within 14 days of whether he/she disputes that the claim has been satisfied.  Failure to do so within the time stipulated, the court will record that the claim has been satisfied.

The court office is at [xxx xxx xxx] telephone number xxx xxxx, fax number xxx xxxx.  The office is open between[…a.m.] and […p.m.] … to … except public holidays.

Form 29

(Rule 44.2 (3))

**Request for Order for Oral Examination of an individual**

(Heading as in Form 1)

**Request for Order for Oral Examination of an individual**

The [claimant] [defendant] (the 'judgment creditor') applies for an order that the [defendant] [claimant] ('the judgment debtor') attend court to provide information about the judgment debtor's means and any other information needed to enforce the judgment or order dated the                    day of            , 20

1.**Judgment Debtor**

    The judgment debtor is _____

    whose address  is _____

2.**Judgment debt or order**

    [The judgment or order required the judgment debtor to pay $_____ (including interest and costs).  The amount now owing is $_____ [which includes further interest payable on the judgment debt].

[The        judgment      or      order      required      the      judgment      debtor to_____]

Notes:

Normally the examiner will ask the questions set out in the Appendix A of Practice Direction 44 and the judgment debtor will be told to produce all relevant documents including:
- ☐    Pay slips
- ☐    Bank statements
- ☐    Share certificates
- ☐    Credit Union Pass books
- ☐    Mortgage statement
- ☐    Hire purchase and similar agreements
- ☐    Court orders
- ☐    Any other outstanding bills
- ☐    Electricity, gas, water, cable, telephone bills for the last year

Statement of Truth

*(I believe) (The judgment creditor believes) that the facts stated in this application are true.

*I am duly authorized by the judgment creditor to sign this statement.

Signed_____

Date_____

*(Judgment creditor) (Judgment creditor's solicitor)*

*delete as appropriate*

Full name_____

Name of judgment creditor's solicitor's firm_____

The court office is at [xxx xxx xxx] telephone number xxx xxxx, fax number xxx xxxx.  The office is open between[…a.m.] and […p.m.] … to … except public holidays.

Form 30

(Rule 44.2 (3))

**Request for Order for Oral Examination of an officer of a debtor company**

(Heading as in Form 1)

**Request for Order for Oral Examination of an officer of a debtor company**

The [claimant] [defendant] (the 'judgment creditor') applies for an order that the [defendant] [claimant] company or corporation ('the judgment debtor') attend court to provide information about the judgment debtor's means and any other information needed to enforce the judgment or order dated the      day of , 20

1. **Judgment Debtor**

The judgment debtor is _____

whose address/registered office is situated at _____

2. **The officer**

The officer is the judgment debtor's _____

whose name and address is _____

3. **Judgment debt or order**

[The judgment or order required the judgment debtor to pay $_____ (including interest and costs). The amount now owing is $_____ [which includes further interest payable on the judgment debt].

[The      judgment      or      order      required      the      judgment      debtor to_____]

Notes:

   Normally the examiner will ask the questions set out in the Appendix B of Practice Direction 44 and the judgment debtor will be told to produce all relevant documents including:
   ☐ Bank statements
   ☐ Court orders on which money is still owed
   ☐ Bills owed to the company
   ☐ Hire purchase and similar agreements
   ☐ Any other outstanding bills
   ☐ 2 year's accounts

Statement of Truth

*(I believe) (The judgment creditor believes) that the facts stated in this application are true.

*I am duly authorized by the judgment creditor to sign this statement.


Signed

 Date_____

*(Judgment creditor) (Judgment Creditor's solicitor)

*delete as appropriate

Full name_____

Name of judgment creditor's solicitor's firm_____

The court office is at [xxx xxx xxx] telephone number xxx xxxx, fax number xxx xxxx.  The office is open between […a.m.] and […p.m.] … to … except public holidays."

**FORM 31    HEARING ON ASSESSMENT OF DAMAGES**

_____

**[Rule 12.13(a) and Rule 16.3(3)(c)]**


(Heading as in Form 1)


NOTICE OF INTENTION TO BE HEARD ON ASSESSMENT


I/We ................................................................................... the defendant/defendant's Attorneys-at-law wish to be heard on the issue of quantum at the assessment of damages and to be allowed to–

(a) cross-examine the following witness(es) to be called on behalf of the claimant(s):

…………………………….. …………………………………......................
…………………………….. …………………………………......................
…………………………….. …………………………………......................
…………………………….. …………………………………......................

(b) make submissions to the court:
Yes ☐ No ☐

(c) call evidence, to be set out in the witness statements of: [ *list the names of the witnesses whose witness statements you propose to file and serve]*

……………………………………………………………………..............
………………………………………………………………………........
……………………………………………………..........................................
……………………………………………………........................................
………………………………………………………………………........
……………………………………………..........................................


Dated ....................................................

Signed: ….................................................
Defendant/Attorney-at-law


The court office is at [   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx ] telephone number xxx xxxx, Fax xxx xxxxx. The court office is open between [… a.m.] and [… p.m.] … to … except public holidays and court holidays."

**Form 32: Form of Judgment for amount to be decided by the Court**

*[Rule 12.10(1)(b)]*

*(Heading as in Form 1)*

**Form of Judgment for amount to be decided by the Court**

NO ACKNOWLEDGEMENT OF SERVICE/DEFENCE having been filed by the Defendant herein, it is this day adjudged that Judgment be entered for the Claimant for an amount to be decided by the Court.

BY THE COURT REGISTRAR

**NOTICE:**

The matter is adjourned to Chambers for assessment of damages on the       day of       , 20     .

The parties are to have regard to Rule 16.2 of the Civil Procedure Rules 2000 as amended in relation to the assessment of damages.

# TAB 16

Forbes Hare
Barristers and Solicitors
P O Box 4649
Road Town, Tortola
British Virgin Islands

# EASTERN CARIBBEAN SUPREME COURT



FIAT JUSTITIA

# CIVIL PROCEDURE RULES 2000

**The Caribbean Law Publishing Company**
Kingston

## PART 7

# Service of Court Process out of Jurisdiction

**Contents of this Part**

| | |
|---|---|
| Scope of this Part | Rule 7.1 |
| General rule as to service of claim form out of jurisdiction | Rule 7.2 |
| Service of claim form out of jurisdiction in specified proceedings | Rule 7.3 |
| Proceedings which include other types of claim | Rule 7.4 |
| Permission to serve claim form out of jurisdiction | Rule 7.5 |
| Acknowledgment of service and defence where claim form served out of the jurisdiction | Rule 7.6 |
| Application to set aside service under rule 7.3 | Rule 7.7 |
| Mode of service of claim form – general provisions | Rule 7.8 |
| Service of claim form through foreign governments, or judicial or consular authorities | Rule 7.9 |
| Procedure where claim form is to be served through foreign governments, etc. | Rule 7.10 |
| Service of claim form on a State where court permits service out of jurisdiction | Rule 7.11 |
| Translation of claim form | Rule 7.12 |
| Undertaking to be responsible for expenses of Minister with responsibility for foreign affairs | Rule 7.13 |
| Service of court process other than claim form | Rule 7.14 |

## Scope of this Part

7.1    (1)    This Part contains provisions about the –

(a) circumstances in which court process may be served out of the jurisdiction; and

30

Service of Court Process out of Jurisdiction

     (b)  procedure for serving court process out of the jurisdiction.

(2)  In this Part references to service or filing copies of the claim form include –

     (a)  the statement of claim (unless contained in the claim form);

     (b)  an affidavit in support of the claim, if these Rules so require; and

     (c)  if permission has been given under rule 8.2 to serve the claim form without the statement of claim – a copy of the order giving permission.

## General rule as to service of claim form out of jurisdiction

7.2     A claim form may be served out of the jurisdiction only if –

     (a)  rule 7.3 allows; and

     (b)  the court gives permission.

## Service of claim form out of jurisdiction in specified proceedings

7.3  (1)  The court may permit a claim form to be served out of the jurisdiction if the proceedings are listed in this rule.

*Features which may arise in any type of claim*

(2)  A claim form may be served out of the jurisdiction if a claim is made –

     (a)  against someone on whom the claim form has been or will be served, and –

        (i)  there is between the claimant and that person a real issue which it is reasonable for the court to try; and

       (ii)  the claimant now wishes to serve the claim form on another person who is outside the jurisdiction and who is a necessary and proper party to that claim;

     (b)  for an injunction ordering the defendant to do or refrain from doing some act within the jurisdiction; or

     (c)  for a remedy against a person domiciled or ordinarily resident within the jurisdiction.

*Claims about contracts*

(3)  A claim form may be served out of the jurisdiction if –

     (a)  a claim is made in respect of a breach of contract committed within the jurisdiction;

31

CIVIL PROCEDURE RULES - 2000

(b) a claim is made to enforce, rescind, dissolve or otherwise affect a contract or to obtain any other remedy in respect of a breach of contract and (in either case) the contract –

    (i) contains a term to the effect that the court shall have jurisdiction to determine any claim in respect of the contract; or

    (ii) is by its terms or by implication governed by the law of any Member State or Territory;

    (iii) was made by or through an agent trading or residing within the jurisdiction; or

    (iv) was made within the jurisdiction;

(c) the claim is for a declaration that no contract exists.

### Claims in tort

(4) A claim form may be served out of the jurisdiction if a claim in tort is made and the act causing the damage was committed within the jurisdiction or the damage was sustained within the jurisdiction.

### Enforcement

(5) A claim form may be served out of the jurisdiction if a claim is made to enforce any judgment or arbitral award made within the jurisdiction.

### Claims about property within the jurisdiction

(6) A claim form may be served out of the jurisdiction if –

(a) a claim is made –

    (i) for a debt secured on land;

    (ii) to assert, declare or determine rights in or over land; or

    (iii) to obtain authority to dispose of land;

and (in any of these cases) the land is located within the jurisdiction;

(b) a claim is made in order to interpret, rectify, set aside or enforce a document, obligation or liability affecting land located within the jurisdiction; or

(c) the whole subject matter of the proceedings is –

    (i) land; or

    (ii) the perpetuation of testimony relating to land;

located within the jurisdiction.

### Claims about trusts, etc.

(7) A claim form may be served out of the jurisdiction if –

(a) a claim is made for a remedy against the defendant as constructive trustee and the defendant's alleged liability arises out of acts committed within the jurisdiction;

32

Service of Court Process out of Jurisdiction

    (b)  a claim is made for –
- (i) any remedy which might be obtained in proceedings for the administration of the estate of; or
- (ii) in probate proceedings as defined in Part 68 relating to;

a person who died domiciled within the jurisdiction; or

    (c)  a claim is made for any remedy which might be obtained in proceedings to execute the trusts of a written instrument and the –
- (i) trusts ought to be executed according to the law of any Member State or Territory; and
- (ii) person on whom the claim form is to be served is a trustee of the trusts.

*Admiralty proceedings*

(8)  This rule does not apply to an Admiralty claim in rem.

*Miscellaneous statutory proceedings*

(9)  A claim form may be served out of the jurisdiction if the claim is brought under the –
- (i) Carriage by Air Act, 1961 (U.K.);
- (ii) Schedule to the Carriage by Air (Supplementary Provisions) Act, 1962 (U.K);
- (iii) Schedule to the Carriage of Goods by Road Act, 1965 (U.K); or
- (iv) Nuclear Installations Act, 1965 (U.K.); or

any amendment or substitution for these Acts in so far as they form part of the law of any Member State or Territory.

## Proceedings which include other types of claim

7.4    If the claimant makes a claim which falls within –
- (a) rule 7.3(3) (claims about contracts);
- (b) rule 7.3(4) (claims in tort); or
- (c) rule 7.3(7)(a) (claims against the defendant as a constructive trustee);

the court may grant any claim for a remedy which –
- (i) does not fall within rule 7.3; but
- (ii) arises out of the same facts or substantially the same facts as the claim in respect of which the order is made.

**33**

CIVIL PROCEDURE RULES - 2000

## Permission to serve claim form out of jurisdiction

7.5  (1)  An application for permission to serve out of the jurisdiction may be
made without notice but must be supported by evidence on affidavit
stating –
(a)  the grounds on which the application is made;
(b)  that in the deponent's belief the claimant has a claim with a
realistic prospect of success;
(c)  in what place, within what country, the defendant may probably
be found; and
(d)  if the application is made under rule 7.3(2)(a), the grounds for
the deponent's belief that the conditions are satisfied.

(2)  An order granting permission to serve the claim form out of the
jurisdiction must state the periods within which the defendant must –
(a)  file an acknowledgement of service in accordance with Part 9; and
(b)  file a defence in accordance with Part 10.

(3)  The periods for filing a document under paragraph (2) are to be
determined by reference to a relevant practice direction.

## Acknowledgment of service and defence
## where claim form served out of the jurisdiction

7.6  A claim form to be served out of the jurisdiction must be amended to
state the period within which the –
(a)  acknowledgement of service; and
(b)  defence;
must be filed.

## Application to set aside service under rule 7.3

7.7  (1)  Any person on whom a claim form has been served out of the jurisdic-
tion under rule 7.3 may apply to set aside service of the claim form.

(2)  The court may set aside service under this rule if –
(a)  service out of the jurisdiction is not permitted by the rules;
(b)  the claimant does not have a good cause of action; or
(c)  the case is not a proper one for the court's jurisdiction.

(3)  This rule does not limit the court's power to make an order under rule
9.7 (procedure for disputing the court's jurisdiction, etc.).

34

Service of Court Process out of Jurisdiction

## Mode of service of claim form – general provisions

7.8   (1)   Subject to the following paragraphs of this rule, if a claim form is to be
served out of the jurisdiction, it may be served –

(a) by a method provided for by –
(i)   rule 7.9 (service through foreign governments, etc.); or
(ii)  rule 7.11 (service on a State);
(b) in accordance with the law of the country in which it is to be served;
or
(c) personally by the claimant or the claimant's agent.

(2)   Nothing in this Part or in any court order may authorise or require any
person to do anything in the country where the claim form is to be
served which is against the law of that country.

## Service of claim form through foreign governments, or judicial or consular authorities

7.9   (1)   This rule does not apply to service in –
(a) any independent Commonwealth country;
(b) the Republic of Ireland; or
(c) the United Kingdom, the Isle of Man or the Channel Islands;
unless the claim form is to be served in accordance with paragraph
(3).

(2)   The methods of service permitted by this rule are in addition to any
method of service permitted under rule 7.8(1)(b) or (c).

*Service under the Hague Convention*

(3)   A claim form to be served on a defendant in any country which is a
party to the Hague Convention may be served –
(a) through the authority designated under the Hague Convention in
respect of that country; or
(b) if the law of that country permits –
(i)   in the case of a claim form issued in a Member State – through
its consular authority in that country;
(ii)  in the case of a claim form issued in a Territory – through the
British consular authority in that country; or
(iii) through the judicial authorities of that country.

35

CIVIL PROCEDURE RULES - 2000

*Service under other Conventions*

(4)  A claim form to be served on a defendant in any country which is a
     party to a Civil Procedure Convention (to which the relevant Member
     State or Territory is also a party or which has been extended to the
     relevant Member State or Territory) other than the Hague Convention
     providing for service of court process in that country, may be served,
     if the law of that country permits –
     (i)   in the case of a claim form issued in a Member State – through its
           consular authority in that country (subject to any provision of the
           convention as to the nationality of persons who may be so served);
     (ii)  in the case of a claim form issued in a Territory – through the British
           consular authority in that country (subject to any provision of the
           convention as to the nationality of persons who may be so served);
           or
     (iii) through the judicial authorities of that country.

*Service where there is no applicable Convention*

(5)  A claim form to be served on a defendant in any country with respect
     to which there is no relevant Civil Procedure Convention providing for
     service of court process in that country may be served, if the law of that
     country so permits –
     (i)   in the case of a claim form issued in a Member State – through its
           consular authority in that country;
     (ii)  in the case of a claim form issued in a Territory – through the British
           consular authority in that country; or
     (iii) through the government of that country, if that government is
           willing to serve it.

## Procedure where claim form is to be served through foreign governments, etc.

7.10 (1)  This rule applies where the claimant wishes to serve the claim form
          through the –
          (a)  authority designated under the Hague Convention or any other
               relevant Civil Procedure Convention in respect of that country;
          (b)  consular authority of a Member State or, in the case of a Territory,
               the British consular authority in that country;
          (c)  government of that country; or

36

      (d) judicial authorities of the country where the claim form is to be served.

(2) If this rule applies, the claimant must file –

      (a) a copy of the claim form;

      (b) an additional copy of the claim form for each person to be served;

      (c) a request for service of the claim form by the claimant's chosen method; and

      (d) any translation required by rule 7.12.

(3) When the claimant files the documents specified in paragraph (2) the court office must –

      (a) seal the copy of the claim form; and

      (b) send the documents filed to the minister with responsibility for foreign affairs with a request that the minister arrange for the claim form to be served –

         (i) by the method indicated in the request for service filed under paragraph (2); or

         (ii) if the request indicates alternative methods – by the most convenient method.

(4) An official certificate which –

      (a) is made by –

         (i) a consular authority of a Member State or a British consular authority in the country where the claim form was served;

         (ii) the government or judicial authorities in that country; or

         (iii) any other authority designated in respect of that country under the Hague Convention or any other relevant Civil Procedure Convention;

      (b) states that the claim form has been served in accordance with this rule either personally or in accordance with the law of the country in which service was effected; and

      (c) specifies the date on which the claim form was served;

      is evidence of the facts stated in the certificate.

(5) A document purporting to be an official certificate under paragraph (4) is to be treated as such a certificate, unless it is proved not to be.

## Service of claim form on a State where court permits service out of jurisdiction

7.11 (1) This rule applies where a claimant wishes to serve a claim form on a State.

CIVIL PROCEDURE RULES - 2000

(2)  If the State has agreed to a method of service other than a method permitted by this Part, the claim form may be served either by the method agreed or in accordance with the other rules in this Part.

(3)  The claimant must file at the court office –
    (a)  a copy of the claim form;
    (b)  any translation required by virtue of rule; and
    (c)  a request for service to be arranged by the Minister with responsibility for foreign affairs.

(4)  The court office must send documents filed under this rule to the minister with responsibility for foreign affairs with a request that the minister arrange for the claim form to be served.

(5)  If a Member State or Territory has under any enactment relating to state immunity agreed to a method of service, the claim form may be served either by the method agreed or in accordance with this rule.

(6)  An official certificate by the minister with responsibility for foreign affairs stating that a claim form has been duly served on a specified date in accordance with a request made under this rule is evidence of that fact.

(7)  A document purporting to be such a certificate is to be treated as such a certificate, unless it is proved not to be.

## Translation of claim form

7.12  (1)  Except where paragraph (4) or (5) applies, every copy of the claim form filed under rule 7.10 or rule 7.11 must be accompanied by a translation of the claim form.

(2)  The translation must be –
    (a)  in the official language of the country in which it is to be served; or
    (b)  if there is more than one official language of that country – in any official language which is appropriate to the place in the country where the claim form is to be served.

(3)  Every translation filed under this rule must be certified by the person making it to be a correct translation, and the certificate must state –
    (a)  the name of the person making the translation; and
    (b)  his or her –
        (i)   address; and
        (ii)  qualifications for making the translation.

(4)  If the claim form is to be served –

**38**

    (a)  in a country of which English is an official language; or

    (b)  by a consular authority of a Member State or, in the case of a Territory, a British consular authority on a citizen of a Member State or Territory;

the claimant is not required to file a translation of a claim form filed under rule 7.9 (service through foreign governments, etc.) unless a relevant Civil Procedure Convention expressly requires a translation.

(5)    The claimant is not required to file a translation of a claim form filed under rule 7.11 (service on a State) if English is an official language of the State where the claim form is to be served.

## Undertaking to be responsible for expenses of minister with responsibility for foreign affairs

7.13 (1)  A person filing a request for service under rule 7.9 (service through foreign governments, etc.) or rule 7.11 (service on a State) must undertake in the request –

    (a)  to be responsible for all expenses incurred by the Minister with responsibility for foreign affairs; and

    (b)  on being informed of the amount of those expenses to –

        (i)  pay that amount to the Accountant General or other financial officer for the Member State or Territory concerned; and

        (ii)  produce a receipt for the payment to the court office.

(2)    The claimant may take no further step in the proceedings until the claimant produces the receipt required by paragraph (1)(b)(ii).

## Service of court process other than claim form

7.14 (1)  An application, order or notice issued, made or given in any proceedings may be served out of the jurisdiction without the court's permission if it is served in proceedings in which permission has been given to serve the claim form out of the jurisdiction.

(2)    The procedure by which a document specified in paragraph (1) is to be served is the same as that applicable to the service of a claim form and accordingly rules 7.8 to 7.13 apply.

**39**

# TAB 17

EASTERN CARIBBEAN SUPREME COURT
CIVIL PROCEDURE (AMENDMENT) RULES

The attached document specifies Saint Lucia; however the same provisions are applicable to all
Member States/Territories in the OECS.

223

No. 92 ]          *Eastern Caribbean Supreme Court*          [ 2011.
                  *Civil Procedure (Amendment) Rules*

## SAINT LUCIA

———

No.92 of 2011

ARRANGEMENT OF RULES

*Rules*

1.   Citation
2.   Commencement
3.   Interpretation
4.   Amendment of Rule 2.2
5.   Repeal and substitution of Rule 2.7
6.   Repeal and substitution of Rule 3.5
7.   Repeal and substitution of Rule 7.3
8.   Amendment of Rule 7.8
9.   Insertion of Rules 7.8A and 7.8B
10.  Amendment of Rule 8.7
11.  Insertion of Rule 8.7A
12.  Amendment of Rule 9.7
13.  Repeal and substitution of Rule 10.7
14.  Repeal and substitution of Rule 10.9
15.  Repeal and substitution of Rule 13.3
16.  Amendment of Rule 14.2
17.  Amendment of Rule 14.7
18.  Amendment of Rule 17.3
19.  Repeal and substitution of Rule 20.1
20.  Insertion of Rule 20.3
21.  Amendment of Rule 26.7
22.  Repeal and substitution of Rule 44.3
23.  Repeal and substitution of Table of Contents for Part 62
24.  Repeal and substitution of Rule 62.1
25.  Repeal and substitution of Rule 62.2
26.  Amendment of Rule 62.4
27.  Repeal and substitution of Rule 62.5
28.  Repeal and substitution of Rule 62.7
29.  Amendment of Rule 62.8
30.  Repeal and substitution of Rule 62.9
31.  Repeal and substitution of Rule 62.10
32.  Amendment of Rule 62.11

224

No. 92 ]            *Eastern Caribbean Supreme Court*            [ 2011.
                    *Civil Procedure (Amendment) Rules*

33.  Amendment of Rule 62.12

34.  Amendment of Rule 62.13

35.  Amendment of Rule 62.14

36.  Amendment of Rule 62.16

37.  Insertion of Rule 62.16A

38.  Amendment of Part 62

39.  Repeal and substitution of Rule 64.9

40.  Amendment of Rule 65.5

41.  Amendment of Rule 65.6

42.  Repeal and substitution of Rule 65.13

43.  Amendment of Part 65

44.  Amendment of Appendix to insert Forms

225

No. 92 ]            *Eastern Caribbean Supreme Court*            [ 2011.
                    *Civil Procedure (Amendment) Rules*

# SAINT LUCIA

STATUTORY INSTRUMENT, 2011, No. 92

[ 30th September, 2011 ]

In exercise of the powers conferred pursuant to section 17 of the Supreme Court Order Cap. 2.01, the Chief Justice and two other Judges of the Supreme Court make these Rules:

**Citation**

**1.** These Rules may be cited as the Eastern Caribbean Supreme Court Civil Procedure (Amendment) Rules 2011.

**Commencement**

**2.** These Rules shall come into effect on the 1st day of October 2011.

**Interpretation**

**3.** In these Rules "the principal Rules" means The Eastern Caribbean Supreme Court Civil Procedure Rules 2000, No. 95 of 2001.

**Amendment of Rule 2.2**

**4.** Rule 2.2 of the principal Rules is amended by repealing paragraph (3) and substituting the following Rule —

"(3) These Rules do not apply to proceedings of the following kinds —

(a)   family proceedings;

(b)   insolvency (including winding up of companies);

(c)   non-contentious probate proceedings;

(d)   proceedings when the High Court is acting as a prize court; or

(e)   any other proceedings in the Supreme Court instituted under any enactment, in so far as Rules made under that enactment regulate those proceedings,

except that Part 62 shall apply to paragraphs (a) and (b).".

226

No. 92 ]          *Eastern Caribbean Supreme Court*          [ 2011.
                  *Civil Procedure (Amendment) Rules*

**Repeal and substitution of Rule 2.7**

**5.** Rule 2.7 of the principal Rules is repealed and substituted by the following Rule—

> **"Court's discretion as to where, when and how it deals with cases**
>
> 2.7— (1) Claims, motions and petitions shall be heard in open court and applications shall be heard in chambers except that -
>
>> (a) any hearing except the trial of an action may be conducted in chambers if the court so directs; and the court shall in each case decide whether the application is a proper one to be made in open court or by application in chambers, and may at or before the hearing, if it shall think fit, remove the same into open court or into chambers, as the case may be; and
>>
>> (b) any proceedings may be heard in private, with the consent of the parties.
>
> (2) An order made in chambers shall have the same force and effect as an order made in open court, and the court sitting in chambers shall have the same power to enforce, vary, or deal with any such order, as if sitting in open court.
>
> (3) The court may order that any hearing be conducted in whole or in part by means of a telephone conference call, video-conference or any other form of electronic communication.
>
> (4) The court may give directions to facilitate the conduct of a hearing by the use of any electronic or digital means of communication or storage or retrieval of information, or any other technology it considers appropriate.
>
> *     "Action" has the meaning given to it by the Supreme Court Act.".*

**Repeal and substitution of Rule 3.5**

**6.** Rule 3.5 of the principal Rules is repealed and substituted by the following Rule —

227

No. 92 ]          *Eastern Caribbean Supreme Court*          [ 2011.
                  *Civil Procedure (Amendment) Rules*

**"Time - vacations**

3.5 — (1)  During the long vacation, the time prescribed by these Rules or by any practice direction for filing or serving any statement of case (other than a statement of claim) does not run unless the court orders or directs that time shall run.

(2)  In this Rule "long vacation" has the meaning given by Rule 3.3.".

**Repeal and substitution of Rule 7.3**

7.  Rule 7.3 of the principal Rules is repealed and substituted by the following Rule -

**"Service of claim form out of jurisdiction in specified proceedings**

7.3— (1)  The court may permit a claim form to be served out of the jurisdiction if the proceedings are listed in this Rule.

*Features which may arise in any type of claim*

(2)  A claim form may be served out of the jurisdiction if a claim is made —

(a)  against someone on whom the claim form has been or will be served, and -

(i)  there is between the claimant and that person a real issue which it is reasonable for the court to try; and

(ii)  the claimant now wishes to serve the claim form on another person who is outside the jurisdiction and who is a necessary or proper party to that claim;

(b)  for an injunction ordering the defendant to do or refrain from doing some act within the jurisdiction; or

(c)  for a remedy against a person domiciled or ordinarily resident within the jurisdiction.

*Claims about contracts*

(3) A claim form may be served out of the jurisdiction if -

228

No. 92 ]           *Eastern Caribbean Supreme Court*           [ 2011.
                   *Civil Procedure (Amendment) Rules*

(a) a claim is made in respect of a breach of contract committed within the jurisdiction;

(b) a claim is made in respect of a contract where the contract –

    (i) contains a term to the effect that the court shall have jurisdiction to determine any claim in respect of the contract; or

    (ii) is by its terms or by implication governed by the law of any Member State or Territory;

    (iii) was made by or through an agent trading or residing within the jurisdiction; or

    (iv) was made within the jurisdiction; or

(c) the claim is for a declaration that no contract exists, where, if the contract did exist, it would fulfill one or more of the conditions in sub-paragraph (b) of this Rule.

*Claims in tort*

(4)   A claim form may be served out of the jurisdiction if a claim in tort is made and the act causing the damage was committed within the jurisdiction or the damage was sustained within the jurisdiction.

*Enforcement*

(5)   A claim form may be served out of the jurisdiction if a claim is made to enforce any judgment or arbitral award which was made -

(a)   within the jurisdiction; or

(b)   by a foreign court or tribunal and registered in the High Court  pursuant to Part 72.

*Claims about property within the jurisdiction*

(6)   A claim form may be served out of the jurisdiction if the whole subject matter of the claim relates to property within the jurisdiction.

229

No. 92 ]            *Eastern Caribbean Supreme Court*            [ 2011.
                    *Civil Procedure (Amendment) Rules*

*Claims about companies*

(7)  A claim form may be served out of the jurisdiction if the subject matter of the claim relates to -

   (a)  the constitution, administration, management or conduct of the affairs; or

   (b)  the ownership or control of a company incorporated within the jurisdiction.

*Claims about trusts*

(8)  A claim form may be served out of the jurisdiction if –

   (a)  a claim is made for a remedy against the defendant as constructive trustee and the defendant's alleged liability arises out of acts committed within the jurisdiction;

   (b)  a claim is made for –

       (i)  any remedy which might be obtained in proceedings for the administration of the estate of; or

       (ii)  in probate proceedings as defined in Part 68 relating to; a person who died domiciled within the jurisdiction; or

   (c)  a claim is made for any remedy which might be obtained in proceedings to execute the trusts of a written instrument and the -

       (i)  trusts ought to be executed according to the law of any Member State or Territory; and

       (ii)  person on whom the claim form is to be served is a trustee of the trusts.

*Claims for restitution*

(9)  A claim is made for restitution where the defendant's alleged liability arises out of acts committed within the jurisdiction or out of acts which, wherever committed, were to the detriment of a person domiciled within the jurisdiction.

*Claims under an enactment conferring jurisdiction on the Court*

(10)  A claim is made under an enactment which confers jurisdiction on the Court and the proceedings are not covered by any of the other grounds referred to in this Rule.".

230

No. 92 ]　　　　　*Eastern Caribbean Supreme Court*　　　　[ 2011.
　　　　　　　　　*Civil Procedure (Amendment) Rules*

**Amendment of Rule 7.8**

　**8.** The principal Rules are amended in Rule 7.8(1) by inserting between the words "rule," and "if" the following words "and Rule 7.8A".

**Insertion of Rules 7.8A and 7.8B**

　**9.** Part 7 of the principal Rules is amended by inserting after Rule 7.8 the following Rules -

　　**"Mode of service - alternative procedure**

7.8A— (1) Where service under Rule 7.8 is impracticable, the claimant may apply for an order under this Rule that the claim form be served by a method specified by the court.

　　(2) An order made under this Rule shall specify the date on which service of the claim form shall be deemed to have been effected.

　　(3) Where an order is made under this Rule, service by the method specified in the court's order shall be deemed to be good service.

　　(4) An application for an order under this Rule may be made without notice but must be supported by evidence on affidavit –

　　　(a) specifying the method of service proposed;

　　　(b) providing full details as to why service under Rule 7.8 is impracticable;

　　　(c) showing that such method of service is likely to enable the person to be served to ascertain the contents of the claim form and statement of claim; and

　　　(d) certifying that the method of service proposed is not contrary to the law of the country in which the claim form is to be served.

　　(5) Where any method of service specified in an order made under this Rule is subsequently shown to be contrary to the law of the country in which the claim was purportedly served, such service shall be invalid.

231

No. 92 ]                *Eastern Caribbean Supreme Court*                [ 2011.
                         *Civil Procedure (Amendment) Rules*

### Power of court to dispense with service of the claim form

7.8 B—(1) The court may dispense with service of a claim form
            in exceptional circumstances.

(2)    An application for an order to dispense with service
       may be made at any time and –

(a)  must be supported by evidence on affidavit; and

(b)  may be made without notice.".

**Amendment of Rule 8.7**

**10.** Rule 8.7 of the principal Rules is amended by repealing
paragraph (3) and substituting the following paragraph -

"(3)  The claim form or the statement of claim must identify any
       document which the claimant considers to be necessary to
       his or her case.".

**Insertion of Rule 8.7A**

**11.** Part 8 of the principal Rules is amended by inserting after
Rule 8.7 the following Rule -

### "Permission to rely on allegation or factual argument

8.7A The claimant may not rely on any allegation or factual
argument which is not set out in the claim, but which could have
been set out there, unless the court gives permission or the parties
agree.

*     Rule 20.1 contains provisions about amendments to statements of
      case.".

**Amendment of Rule 9.7**

**12.** Rule 9.7 of the principal Rules is repealed and substituted by
the following Rules -

### "Procedure for disputing court's jurisdiction

9.7—(1)    A defendant who disputes the court's jurisdiction to try
           the claim may apply to the court for a declaration to
           that effect.

(2)    A defendant who wishes to make an application under
       paragraph (1) must first file an acknowledgment of
       service.

232

No. 92 ]          *Eastern Caribbean Supreme Court*          [ 2011.
                  *Civil Procedure (Amendment) Rules*

(3)   An application under paragraph (1) of this Rule must be made within the period for filing a defence; the period for making an application under this Rule includes any period by which the time for filing a defence has been extended where the court has made an order, or the parties have agreed, to extend the time for filing a defence.

   * *Rule 10.3 sets out the period for filing a defence.*

(4)   An application under this Rule must be supported by evidence on affidavit.

(5)   A defendant who -

   (a) files an acknowledgment of service; and

   (b) does not make an application under this Rule within the period for filing a defence,

   is treated as having accepted that the court has jurisdiction to try the claim.

(6)   An order under this Rule may also -

   (a) discharge an order made before the claim was commenced or the claim form served;

   (b) set aside service of the claim form; and

   (c) strike out a statement of claim.

(7)   If on application under this Rule the court does not make a declaration, it -

   (a) may-

      (i) fix a date for a case management conference; or

      (ii) treat the hearing of the application as a case management conference; and

   (b) must make an order as to the period for filing a defence.

   * *Part 26 sets out powers which the court may exercise on a case management conference.*

233

No. 92 ]             *Eastern Caribbean Supreme Court*             [ 2011.
                     *Civil Procedure (Amendment) Rules*

(8)     Where a defendant makes an application under this Rule, the period for filing a defence is extended until the time specified by the court under paragraph (7)(b) and such period may be extended only by an order of the court.

\*     *Rule 10.3(4) deals with an application to stay proceedings where there is a binding agreement to arbitrate.*

**Procedure for applying for a stay etc. where defendant served out of jurisdiction**

9.7A—(1)   A defendant who contends that the court should not exercise its jurisdiction in respect of any proceedings may apply to the court for a stay and a declaration to that effect.

(2)     A defendant who wishes to make an application under paragraph (1) must first file an acknowledgment of service if he has not previously done so.

(3)     An application under paragraph (1) of this Rule may be made at any time.

(4)     An application under this Rule must be supported by evidence on affidavit.

(5)     If on application under this Rule the court does not make a declaration, it –

(a) may-

(i)    fix a date for a case management conference; or

(ii)   treat the hearing of the application as a case management conference; and

(b) must make an order as to the period for filing a defence if none has yet been filed.

\*     *Part 26 sets out powers which the court may exercise  at a case management conference.*

(6)     Where a defendant makes an application under this Rule, the period for filing a defence (where none has yet been filed) is extended until the time specified by the court under paragraph (5)(b) and such period may be extended only by an order of the court.

\*     *Rule 10.3(4) deals with an application to stay proceedings where there is a binding agreement to arbitrate.".*

234

No. 92 ]                *Eastern Caribbean Supreme Court*                [ 2011.
                        *Civil Procedure (Amendment) Rules*

**Repeal and substitution of Rule 10.7**

**13.** Rule 10.7 of the principal Rules is repealed and substituted by the following Rule -

"**Consequences of not setting out defence**

10.7    The defendant may not rely on any allegation or factual argument which is not set out in the defence, but which could have been set out there, unless the court gives permission or the parties agree.

\*        *Rule 20.1 contains provisions about amendments to statements of case.*"

**Repeal and substitution of Rule 10.9**

**14.** Rule 10.9 of the principal Rules is repealed and substituted by the following Rule -

"**Reply to defence**

10.9—(1)    A claimant may file and serve a reply to a defence –

    (a)    14 days after the date of service of the defence; or

    (b)    at any time with the permission of the court.

(2)    Where the defence contains a counterclaim, Part 18 shall apply.

\*        *Part 18 deals with a defence to an ancillary claim including counterclaims.*".

**Repeal and substitution of Rule 13.3**

**15.** The principal Rules are amended by repealing Rule 13.3 and substituting the following Rule -

"**Cases where court may set aside or vary default judgment**

13.3—(1)    If Rule 13.2 does not apply, the court may set aside a judgment entered under Part 12 only if the defendant –

    (a)    applies to the court as soon as reasonably practicable after finding out that judgment had been entered;

    (b)    gives a good explanation for the failure to file an acknowledgment of service or a defence as the case may be; and

235

No. 92 ]          *Eastern Caribbean Supreme Court*          [ 2011.
                  *Civil Procedure (Amendment) Rules*

    (c)  has a real prospect of successfully defending the claim.

(2)  In any event the court may set aside a judgment entered under Part 12 if the defendant satisfies the court that there are exceptional circumstances.

(3)  Where this Rule gives the court power to set aside a judgment, the court may instead vary it.

\*   *Rule 26.1(3) enables the court to attach conditions to any order.".*

**Amendment of Rule 14.2**

**16.** Rule 14.2 of the principal Rules is amended by deleting paragraphs (3), (4), (5), and (6) and substituting the following paragraphs –

"(3) If the claimant does not file and serve a notice of discontinuance in accordance with paragraph (1) within 7 days of payment, the defendant may file and serve a notice in the form specified in Form 28 to request that the claim be recorded as satisfied.

(4) If there is no dispute the court office must record that the claim has been satisfied.

(5) If the claimant disputes satisfaction, the court office must fix a hearing to consider the application and give not less than 7 days notice of the hearing to the claimant and defendant.".

**Amendment of Rule 14.7**

**17.** Rule 14.7 of the principal Rules is repealed and substituted by the following Rule-

"**Admission of part of claim for money only**

14.7—(1)  This Rule applies where –

    (a)  the only remedy which the claimant is seeking is the payment of money;

    (b)  the defendant admits a specified -

        (i)  sum of money; or

        (ii) proportion of a claim for an unspecified sum of money;

           in the acknowledgement of service or defence; and

236

No. 92 ]                    *Eastern Caribbean Supreme Court*                    [ 2011.
*Civil Procedure (Amendment) Rules*

(c)    the defendant has filed a defence as to the amount not
admitted.

\*    *If the defendant does not file a defence the claimant will be entitled
to default judgment in accordance with Rule 12.5.*

(2)    The claimant must serve a notice on the defendant stating
that -

(a)    the amount or proportion admitted in satisfaction of the
claim is accepted; or

(b)    the claimant intends to continue the claim.

(3)    The claimant must -

(a)    file the notice under paragraph (2); and

(b)    serve a copy on the defendant;

within 14 days after service of the defendant's
acknowledgment of service or defence, as the case may be.

(4)    If the claimant does not file the notice within 14 days after
service of the defendant's acknowledgment of service or
defence -

(a)    the claim is stayed until the notice is filed; and

(b)    any party may apply for the stay to be lifted.

(5)    If the defendant has not requested time to pay under Rule
14.9, the claimant may file a request for judgment in Form
8 for the amount admitted, interest and fixed costs and may
specify -

(a)    the date on which the judgment debt is to be paid; or

(b)    the time and rate at which it is to be paid by installments.

(6)    The court office must enter judgment in accordance with
the request.

(7)    If the claimant gives notice that he accepts the defendant's
admission of a specified proportion of a claim for an
unspecified sum of money, the court must enter judgment
for that proportion of an amount to be decided by the court
and costs.

237

(8)   If the claimant files notice under paragraph (2)(b) the court
office must fix a date, time and place for a case management
conference.

\*    *Part 27 sets out the procedure relating to a case management
conference. Rule 65.4 deals with fixed costs.".*

**Amendment of Rule 17.3**

**18.** Rule 17.3 of the principal Rules is amended by inserting after
paragraph (1) the following paragraph –

"(1A) Where, in support of any application under this Rule, it is
not practicable to produce evidence on affidavit then the
application may be supported by evidence given by witness
statement and, in such event, the court may at any time
give such directions as it thinks fit in relation to the filing,
in due course, of evidence by affidavit.".

**Repeal and substitution of Rule 20.1**

**19.**   Rule 20.1 of the principal Rules is repealed and substituted
by the following Rule -

**"Changes to statement of case**

(1)   A statement of case may be amended once, without the
court's permission, at any time prior to the date fixed by the
court for the first case management conference.

(2)   The court may give permission to amend a statement of case
at a case management conference or at any time on an
application to the court.

(3)   A statement of case may not be amended without permission
under this Rule if the change is one to which any of the
following applies -

(a)   Rule 19.4 (special provisions about adding or
substituting parties after the end of a relevant limitation
period);or

(b)   Rule 20.2 (changes to statement of case after the end
of relevant period).

(4)   An amended statement of case must include a certificate of
truth under Rule 3.12.

238

No. 92 ]  *Eastern Caribbean Supreme Court*  [ 2011.
*Civil Procedure (Amendment) Rules*

(5)  The Chief Justice may, by practice direction, set out those factors to which the court must have regard when considering an application under this Rule.

\*  *Rule 27.3 (1) deals with the fixing of case management conference.".*

**Insertion of Rule 20.3**

**20.**  Part 20 of the principal Rules is amended by inserting after Rule 20.2 the following Rule -

**"Filing an amended statement of case**

20.3  A party who amends his statement of case must file in the court office the original amended statement of case and one copy of the amended statement of case and, after filing, serve a copy of it on every other party.".

**Amendment of Rule 26.7**

**21.** Rule 26.7 of the principal Rules is amended by inserting after paragraph (3) the following paragraphs -

**"Procedural default costs**

(4)  In circumstances where –

(a)  a pre-trial memorandum or a bundle is not filed in accordance with Rule 39.1(5);

(b)  a core bundle is not filed in accordance with Rule 62.12(4); or

(c)  a legal practitioner fails to comply with a provision of these Rules, a court order, a practice direction or a practice guide,

and, as a result of that default, a party has incurred costs or a hearing has to be vacated, then the court may on its own initiative order the practitioner responsible to pay to any party and or to the court an amount of money which does not exceed the sum or sums specified by the relevant practice direction.

(5)   Any sum paid under an order made under Rule 26.7(4) may be payable in addition to any sum which the court may order a practitioner to pay by way of wasted costs under Rule 64.8 or pay under Rule 64.10.".

239

No. 92 ]                    *Eastern Caribbean Supreme Court*                    [ 2011.
                            *Civil Procedure (Amendment) Rules*

**Repeal and substitution of Rule 44.3**

**22.** Rule 44.3 of the principal Rules is repealed and substituted by
the following Rule -

"**Procedure to obtain order for oral examination etc**.

44.3—(1)   Where permission is not required to enforce the
judgment, a request for an order that a person attend
an oral examination may be made by filing a request
as specified in Form 29 or 30 of the Appendix, as the
case requires, which contains the information required
by the relevant practice direction.

(2)   Where permission is required to enforce the judgment,
an application for an order that a person attend an oral
examination must be made and a copy of the permission
must be attached to the application.   An application
under this paragraph may be made without notice.

(3)   Where a request or an application for the order is
against an officer of a body corporate, the request or
the application must be supported by evidence on
affidavit showing that the person to be orally examined
is such an officer.".

**Repeal and substitution of Table of Contents for Part 62**

**23.** The Table of Contents for Part 62 of the principal Rules is
deleted and substituted by the following Table of Contents -

"**Part 62**

**Appeals to the Court of Appeal**

**Contents of this Part**

Scope of this Part                                Rule 62.1
How to obtain leave to appeal                     Rule 62.2
How to appeal                                     Rule 62.3
Contents of notice of appeal                      Rule 62.4
Time for filing notice of appeal                  Rule 62.5
Summary appeal                                    Rule 62.6
Service of notice of appeal                       Rule 62.7
Counter notice                                    Rule 62.8
Action by court on receiving notice of appeal     Rule 62.9
Interlocutory appeal                              Rule 62.10
Skeleton arguments                                Rule 62.11

240

No. 92 ]          *Eastern Caribbean Supreme Court*          [ 2011.
                  *Civil Procedure (Amendment) Rules*

| | |
|---|---|
| The record - appeals from High Court | Rule 62.12 |
| The record - appeals from magistrates courts | Rule 62.13 |
| Case management | Rule 62.14 |
| Procedural applications to court | Rule 62.15 |
| Powers of single judge of the court, master and Chief Registrar to make certain orders | Rule 62.16 |
| Security for costs of appeal | Rule 62.17 |
| Non-disclosure of payment into court, etc. | Rule 62.18 |
| Stay of execution | Rule 62.19 |
| General powers of the court | Rule 62.20 |
| Failure of party to attend appeal | Rule 62.21 |
| Application to set aside decision made in party's absence | Rule 62.22 |
| Adjournment of appeal | Rule 62.23 |
| Certificate of result of appeal | Rule 62.24 |
| Withdrawal or Discontinuance | Rule 62.25 |
| Liability for costs on withdrawal or discontinuance | Rule 62.26 |
| Quantification of costs on withdrawal or discontinuance | Rule 62.27 |
| Judicial review appeals | Rule 62.28 |

**Repeal and substitution of Rule 62.1**

**24.** Rule 62.1 of the principal Rules is repealed and substituted by the following Rule -

   **"Scope of this Part**

62.1—(1) This Part deals with appeals to the Court of Appeal from –

    (a) the High Court;

    (b) a magistrate's or district court; or

    (c) a tribunal, not being -

      (i) appeals or applications to the court for which other provision is made by these Rules or any other law; or

      (ii) appeals by way of case stated on a question of law for determination by the court.

\*    *Part 60 deals with appeals to the High Court and cases stated are dealt with in Part 61.*

241

No. 92 ]            *Eastern Caribbean Supreme Court*            [ 2011.
                    *Civil Procedure (Amendment) Rules*

(2)   In this Part -

**"appellant"** means the party who first files a notice of appeal;

**"core bundle"** means a bundle containing only such documents listed in Rule 62.12 which the court will need to pre-read or to which it will be necessary to refer repeatedly at the appeal;

**"court"** means the Court of Appeal;

**"court below"** means the court or tribunal from which the appeal is brought;

**"interlocutory appeal"** means an appeal from an interlocutory judgment or an interlocutory order;

**"respondent"** means  any party to the appeal other than the appellant whether or not the respondent files a counter-notice.

(3)   In this Part –

(a) a determination whether an order or judgment is final or interlocutory is made on the "application test";

(b) an order or judgment is final if it would be determinative of the issues that arise on a claim, whichever way the application could have been decided; and

(c) an order on an application for disclosure against a person who is not a party is a final order.".

**Repeal and substitution of Rule 62.2**

**25.** Rule 62.2 of the principal Rules is repealed and substituted by the following -

"**How to obtain leave to appeal**

62.2— (1) Where an appeal may be made only with the leave of the court below or the court, a party wishing to appeal must apply for leave within 14 days of the order against which leave to appeal is sought.

(1A) Where an application for leave has been refused by the court below, an application for leave may be made to the court within 7 days of such refusal.

(2)   The application for leave to appeal must be made in writing and set out concisely the grounds of the proposed appeal.

242

No. 92 ]            *Eastern Caribbean Supreme Court*            [ 2011.
                    *Civil Procedure (Amendment) Rules*

(3)   An application for leave to appeal made to the court may be considered by a single judge of the court.

(4)   The judge considering an application under Rule 62.2(3) may give leave without hearing the applicant.

(5)   However if the judge considering an application under Rule 62.2(3) is minded to refuse leave he or she must direct –

    (a)   that a hearing be fixed; and

    (b)   whether that hearing is to be by a single judge or the court.

\*   *Rule 2.7 deals with how, when and where the court may deal with cases.".*

### Amendment of Rule 62.4

**26.** Rule 62.4 of the principal Rules is amended by repealing paragraph (7) and substituting the following paragraph -

"(7)   The appellant may, except on an interlocutory appeal, amend the grounds of appeal once without permission at any time within 28 days from receiving notice under Rule 62.9 (1) (a), (b) or (c ) that a transcript of the evidence and the judgment have been prepared.".

### Repeal and substitution of Rule 62.5

**27.** Rule 62.5 of the principal Rules is repealed and substituted by the following Rule -

#### "Time for filing notice of appeal

62.5—(1)   The notice of appeal must be filed at the appropriate court office –

    (a)   in the case of an interlocutory appeal where leave is not required, within 21 days of the date the decision appealed against was made;

    (b)   in an interlocutory appeal where leave is required, within  21 days of the date when such leave was granted; or

    (c)   in the case of any other appeal, within 42 days of the date when judgment is delivered or the order is made, whichever is the earlier.

No. 92 ]                *Eastern Caribbean Supreme Court*                [ 2011.
                       *Civil Procedure (Amendment) Rules*

    (2)    The court below making the interlocutory decision in respect of which a party intends to appeal may extend any of the time limits in this Rule on application made orally at the time the decision is made.

    (3)    The court may extend any of the time limits in this Rule on an application made under Part 11 and any such application may be determined without a hearing.".

**Repeal and substitution of Rule 62.7**

**28.** Rule 62.7 of the principal Rules is repealed and substituted by the following Rule -

    "**Service of notice of appeal**

62.7— (1) The notice of appeal must be served on -

    (a)  all parties to the proceedings; and

    (b)  any other person if the court directs, or if required by law.

    (2)    The notice of appeal or amended notice of appeal must be served within 14 days, or within such period as prescribed by law, or order, after the notice has been filed.".

**Amendment of Rule 62.8**

**29.** Rule 62.8 of the principal Rules is amended by deleting paragraph (4) and substituting the following paragraph -

    "(4)  The party filing a counter-notice must serve a copy on all other parties to the proceedings within 7 days of filing.".

**Repeal and substitution of Rule 62.9**

**30.** Rule 62.9 of the principal Rules is deleted and substituted by the following Rule –

    "**Action to be taken on receipt of notice of appeal**

62.9—(1) Upon the notice of appeal being filed (unless Rule 62.6 applies) the court below must forthwith, if the appeal is -

    (a)  from the High Court –

    (i)    arrange for the transcript of the proceedings; and

244

No. 92 ]          *Eastern Caribbean Supreme Court*          [ 2011.
                 *Civil Procedure (Amendment) Rules*

(ii) when these are prepared give notice to all parties that copies of the transcript are available on payment of the prescribed fee;

(b) from the magistrate's or district court, comply with any provision for appeal in the Codes of Procedure, Criminal Code or any other enactment regulating appeals from the magistrate's or district court; or

(c) from a tribunal- apply to the clerk or other officer of the court or tribunal for a –

(i) certified copy of the record of the proceedings;

(ii) certified copy of the notes of evidence given; and

(iii) statement of the judgment, the reasons for the decision and any finding on any question of law under appeal;

and forthwith upon receipt of these documents give notice to all parties that copies of the record and other documents are available on payment of the prescribed fee.

(2) Where in any case, the transcript of the notes of evidence and of the judgment, or of the proceedings or the notes of evidence is unavailable, the court below shall inform all parties of this in writing.

(3) The parties may, by agreement in writing, dispense with the need for the transcript to be included in the record in whole or in part.".

**Repeal and substitution of Rule 62.10**

**31.** Rule 62.10 of the principal Rules is repealed and substituted by the following Rule -

**"Interlocutory appeal**

62.10—(1) On an interlocutory appeal the appellant shall be required to file and serve with the notice of appeal, written submissions in support of the appeal together with six bundles of documents comprising a copy of each of the following documents in the order set out below bound, indexed and paginated –

(a) the judgment (if any) or order appealed;

245

No. 92 ]          *Eastern Caribbean Supreme Court*          [ 2011.
               *Civil Procedure (Amendment) Rules*

    (b)    such affidavits, witness statements or exhibits relevant to the question at issue on the appeal which were put in evidence before the court below;

    (c)    any written admissions or requests for information and replies;

    (d)    the judge's notes of any submission made (if any); and

    (e)    any other relevant documents applicable to the appeal.

(2)    The appellant's notice of appeal must state in the heading that the appeal is an interlocutory appeal and is made under Rule 62.10 of the Civil Procedure Rules.

(3)    A respondent who intends to oppose the notice of appeal must within 7 days of receipt of the appeal file and serve a notice of opposition.

(4)    The respondent may within 14 days of receipt of the notice of appeal file and serve six copies of any written submissions in opposition to the appeal or in support of any cross appeal, together with any other documents, which have not been filed pursuant to paragraph (1) and the documents must be bound, indexed and paginated.

(5)    The general Rule is that an interlocutory appeal is to be considered on paper by a single judge of the court.

(6)    Consideration of the appeal must take place not less than 14 days after filing of the notice of appeal unless the court otherwise directs.

(7)    The judge may, however, direct that the parties be entitled to make oral submissions and may direct that the appeal be heard by the court.

(8)    The judge may exercise any power of the court whether or not any party has filed or served a counter-notice.".

**Amendment of Rule 62.11**

**32.** Rule 62.11 of the principal Rules is amended by -

    (a)    repealing paragraph (1) and substituting the following paragraph -
        "(1) Within 42 days of receipt of the notice under Rule 62.9 (1) (a), (b) or (c) the appellant must file with the court office and serve on all other parties a skeleton argument.".

246

No. 92 ]            *Eastern Caribbean Supreme Court*            [ 2011.
                   *Civil Procedure (Amendment) Rules*

(b)  repealing paragraph (4) and substituting the following
     paragraph -

"(4)      A skeleton argument must -

(a) set out concisely the nature of the appellant's
    arguments on each ground of appeal;

(b) in the case of a point of law, state the point and cite
    the principal authorities in support with references
    to the particular page where the principle
    concerned is set out; and

(c) in the case of questions of fact, state briefly the
    basis on which it is contended that the court can
    interfere with the finding of fact concerned, with
    cross references to the passages in the transcript
    or notes of evidence which bear on the point.".

(c)  inserting after paragraph (5) the following paragraph -

"(6) The Chief Justice may, by practice direction, set
     out those factors to which the court must have
     regard when considering the application of this
     Rule.".

**Amendment of Rule 62.12**

**33.** Rule 62.12 of the principal Rules is amended by repealing
paragraphs (1) and (2) and substituting the following paragraphs –

"(1) This Rule applies to all appeals from the High Court other
     than –

(a)    interlocutory appeals; or

(b)    summary appeals under Rule 62.6.

(2) Within 21 days of receipt of the notice under Rule 62.9(1)(a),
    (b) or (c) that the transcript is available, all parties must
    inform the appellant of the documents that they wish to have
    included in the record or the core bundle.".

**Amendment of Rule 62.13**

**34.** Rule 62.13 of the principal Rules is amended by deleting
paragraphs (2) and (3) and substituting the following paragraphs -

247

No. 92 ]            *Eastern Caribbean Supreme Court*            [ 2011.
*Civil Procedure (Amendment) Rules*

"(2) In the case of an appeal from a magistrate's or district court the record must consist of the documents referred to in Rule 62.9(1) (b) together with the notice of appeal and any counter-notices that have been served on the appellant.

(3) Within 28 days of receipt of the notice under Rule 62.9(1) (b) the appellant must file at the court office six copies of the record for the use of the court.".

**Amendment of Rule 62.14**

**35.** Rule 62.14 of the principal Rules is amended by inserting after paragraph (6) the following paragraph-

"(7) The Chief Justice may, by practice direction, set out those factors to which the court must have regard when considering the application of this Rule.".

**Amendment of Rule 62.16**

**36.** Rule 62.16 of the principal Rules is amended by -

(a) deleting the heading and substituting the following -

**"Powers of single judge of the court, master and Chief Registrar to make certain orders";** and

(b) deleting paragraph (4).

**Insertion of Rule 62.16A**

**37.** The principal Rules are amended in Part 62 by inserting after Rule 62.16 the following Rule -

"62.16 (A) Any order, direction or decision made or given by a single judge may be varied discharged or revoked by two judges where the order, direction or decision relates to an appeal of a class which may be heard and determined by two judges and by the full court in any other case.

*   *See The Windward Islands and Leeward Islands (Court's) Order in Council, 1959, section 10(3) and CPR 2.5 (4) and (5) which provides for actions that may be heard and determined by two judges of the court and actions that may be heard and determined by the full court.".*

248

No. 92 ]                *Eastern Caribbean Supreme Court*                [ 2011.
                        *Civil Procedure (Amendment) Rules*

**Amendment of Part 62**

**38.** Part 62 of the principal Rules is amended by inserting after Rule 62.24 the following Rules -

### "Withdrawal or Discontinuance

62.25—(1) If the appellant files a notice that he desires to withdraw or discontinue his appeal, the appeal shall stand dismissed on the date on which such notice is filed.

(2)   The appellant shall serve copies of the notice of withdrawal or discontinuance on all the parties with regard to whom the appellant wishes to withdraw his appeal within 2 days of filing, and shall file such notice and evidence of service within 2 days of service.

(3)   Any party served in accordance with this Rule shall be precluded from laying claim to any costs incurred by him after such service unless the Court shall otherwise order.

(4)   Notwithstanding the appeal stands dismissed, the appellant shall be liable for the costs incurred by the respondent.

### "Liability for costs on withdrawal or discontinuance

62.26—(1) Unless the -

(a)   parties agree; or

(b)   court orders otherwise;

an appellant who discontinues is liable for the costs incurred by the respondent against whom the claim is discontinued, on or before the date on which notice of discontinuance was served.

(2)   If an appeal is only partly discontinued -

(a)   the appellant is only liable for the costs relating to that part of the appeal which is discontinued; and

(b)   unless the court orders otherwise, the costs which the appellant is liable to pay are not to be quantified until the conclusion of the rest of the appeal.

### "Quantification of costs on withdrawal or discontinuance

62.27—(1) The general rule is that, unless an order has been made for budgeted costs under Rule 65.8, the costs are to be determined in accordance with the scale of prescribed costs contained in Part 65, Appendices B and C.

249

No. 92 ]          *Eastern Caribbean Supreme Court*          [ 2011.
                  *Civil Procedure (Amendment) Rules*

(2)  If the appellant discontinues part of the appeal only,
     the amount of costs must be assessed by the court when
     the remainder of the appeal is resolved.

(3)  In determining the appropriate amount of costs to be
     paid where an order has been made under Rule 65.8
     (budgeted costs), the court may take into account any
     written information provided by either party when the
     costs budget was made.

### "Judicial review appeals

62.28—(1)  Where leave to apply for judicial review has been
           refused at a hearing in the court below, the person
           seeking that leave, may apply to the court for leave to
           appeal.

(2)  An application in accordance with paragraph (1) must
     be made within 7 days of the decision of the court below
     to refuse to give leave to apply for judicial review.

(3)  On an application under paragraph (1), the court may
     instead of giving leave to appeal, give leave to apply
     for judicial review.

(4)  Where the court gives leave to apply for judicial review
     in accordance with paragraph (3) the claim will proceed
     in the court below, unless the court orders otherwise.".

### Repeal and substitution of Rule 64.9

**39.** Rule 64.9 of the principal Rules is repealed and substituted by
the following Rule -

### "Court's powers in relation to wasted costs orders

64.9—(1)  The court may make an order under this Rule where -

(a)  a party or his legal representative, fails to comply
     with a Rule, practice direction or court order; or

(b)  it appears to the court that the conduct of a party or
     his legal representative, before or during the
     proceedings, was unreasonable or improper.

(2)  Where paragraph (1) applies, the court may -

(a)  disallow all or part of the costs which are being
     assessed; or

250

    (b) order the party at fault or his legal representative to pay costs to the court or which he has caused any other party to incur; or both.

  (3)  Where -

    (a) the court makes an order under paragraph (2) against a legally represented party; and

    (b) the party is not present when the order is made, the party's legal practitioner must notify his client in writing of the order no later than 7 days after the legal practitioner receives notice of the order.".

**Amendment of Rule 65.5**

    **40.** Rule 65.5 of the principal Rules is amended by repealing paragraph (2) and substituting the following paragraph -

    "(2) The "value" of the claim, whether or not the claim is one for a specified or unspecified sum, coupled with a claim for other remedies is to be decided in the case of the claimant or defendant-

    (a) by the amount agreed or ordered to be paid; or if the claim is for damages and the claim form does not specify an amount that is claimed, such sum as may be agreed between the party entitled to, and the party liable to, such costs or, if not agreed, a sum stipulated by the court as the value of the claim; or

    (b) if the claim is not for a monetary sum it is to be treated as a claim for $50,000 unless the court makes an order under Rule 65.6(1)(a).".

**Amendment of Rule 65.6**

    **41.** Rule 65.6 of the principal Rules is amended by -
    (a) repealing paragraph (1) and substituting the following paragraph -

      "(1) A party may apply to the court at any time before trial -

    (a) to determine the value to be placed on a case which has no monetary value; or

251

    (b)   where the likely value is known, to direct that the prescribed costs be calculated on the basis of some higher or lower value."; and

(b)   deleting paragraph (2).

**Repeal and substitution of Rule 65.13**

**42.** Rule 65.13 of the principal Rules is repealed and substituted by the following Rule -

### "Costs of Proceedings in Court of Appeal

65.13—(1) The general rule is that the costs of any appeal must be determined in accordance with Rules 65.5, 65.6 and 65.7 and Appendix B but the costs must be limited to two thirds of the amount that would otherwise be allowed.

(2)   The Court of Appeal may, if the circumstances of the appeal or the justice of the case require, depart from the general rule and, in such a case, it may –

    (a)   make an order for budgeted costs whether on an application made in accordance with Rules 65.8 and 65.9 or otherwise; or

    (b)   make such other order as it sees fit.".

**Amendment of Part 65**

**43.** Part 65 of the principal Rules is amended—

(a) by inserting after Rule 65.13 the following Rules -

### "Costs capping orders – General

65.14—(1) A costs capping order is an order limiting the amount of future costs (including disbursements) which a party may recover pursuant to an order for costs subsequently made.

(2)   In this Rule, 'future costs' means costs incurred in respect of work done after the date of the costs capping order but excluding the amount of any additional liability.

(3)   A costs capping order may be in respect of –

    (a)   the whole litigation; or

    (b)   any issues which are ordered to be tried separately.

252

(4)    The court may at any stage of proceedings make a costs capping order against all or any of the parties, if –

   (a)  it is in the interests of justice to do so;

   (b)  there is a substantial risk that without such an order costs will be disproportionately incurred; and

   (c)  it is not satisfied that the risk in sub-paragraph (b) can be adequately controlled by -

      (i)   case management directions or orders made under Part 26; and

      (ii)  detailed assessment of costs.

(5)    In considering whether to exercise its discretion under this Rule, the court will consider all the circumstances of the case, including –

   (a)  whether there is a substantial imbalance between the financial position of the parties;

   (b)  whether the costs of determining the amount of the cap are likely to be proportionate to the overall costs of the litigation;

   (c)  the stage which the proceedings have reached; and

   (d)  the costs which have been incurred to date and the future costs.

(6)    A costs capping order, once made, will limit the costs recoverable by the party subject to the order unless a party successfully applies to vary the order. No such variation will be made unless –

   (a)  there has been a material and substantial change of circumstances since the date when the order was made; or

   (b)  there is some other compelling reason why a variation should be made.".

**"Application for a costs capping order**

65.15—(1)An application for a costs capping order must be made on notice in accordance with Part 11.

253

(2) The application must -

   (a)  set out –

      (i)  whether the costs capping order is in respect of the whole of the litigation or a particular issue which is ordered to be tried separately; and

      (ii)  why a costs capping order should be made; and

   (b)  be accompanied by an estimate of costs setting out –

      (i)  the costs (and disbursements) incurred by the applicant to date; and

      (ii)  the costs (and disbursements) which the applicant is likely to incur in the future conduct of the proceedings.

(3) The court may give directions for the determination of the application and such directions may –

   (a)  direct any party to the proceedings –

      (i)  to file a schedule of costs;

      (ii)  to file written submissions on all or any part of the issues arising;

   (b)  fix the date and time estimate of the hearing of the application;

   (c)  include any further directions as the court sees fit."

**"Application to vary a costs capping order**

65.16 An application to vary a costs capping order must be made by application notice pursuant to Part 11.";

        (b)  by deleting paragraph (3) in Table 2 of Appendix A and substituting the following -

254

No. 92 ]          *Eastern Caribbean Supreme Court*          [ 2011.
                   *Civil Procedure (Amendment) Rules*

---

| Column 1 | Column 2 | Column 3 |
| --- | --- | --- |

---

| "(3) | Where an order is made under Rule 5.14 (specified method of service) for each defendant served | ($500)"; |

(c) by deleting Appendix B and substituting the following -

### "APPENDIX B
### Scale of prescribed costs

| Column I | Column 2 | Column 3 |
| --- | --- | --- |
| | Value of Claim | Percentage |
| (1) | Not exceeding $100,000 | 15% |
| (2) | Exceeding 100,000 but not exceeding $250,000 | 12.5% |
| (3) | Exceeding 250,000 but not exceeding 500,000 | 10% |
| (4) | Exceeding 500,000 but not exceeding $1,000,000 | 7% |
| (5) | Exceeding 1,000,000 but not exceeding $2,500,000 | 3% |
| (6) | Exceeding 2,500,000 | 0.5% |

Note: The costs for each stage of the scale are cumulative

| (Example | Claim for | $750,000 |
| --- | --- | --- |
| First | $100,000 | $ 15,000 |
| Next | $150,000 | $ 18,750 |
| Next | $250,000 | $25,000 |
| Last | $250,000 | $17,500 |
| Total | $76,250)"; and | |

255

No. 92 ]                *Eastern Caribbean Supreme Court*                [ 2011.
                        *Civil Procedure (Amendment) Rules*

    (d)   by deleting the example in Appendix C and substituting the
          following -

## "APPENDIX C

(Example
Claim for $ 750,000 — full costs as in Appendix 3 — $76,250
Claim discontinued after case management conference —
defendant entitled to 70% of total costs — $53,375);".

**Amendment of Appendix to insert Forms**

    **44.** The Appendix to the principal Rules is amended by inserting
after Form 27 the following Forms -

"Form 28

                                  (Rule 14.2 (3) (4))

           Request for Claim to be recorded as satisfied

(Heading as in Form 1

Request for Claim to be recorded as satisfied

I/We                  the defendant/defendant's legal practitioner
hereby request that the claim in this matter be recorded as satisfied.

Dated:

Signed:

Legal practitioner for the Defendant

To: (Claimant/Legal practitioner for the Claimant

The Claimant is required to notify the court within 14 days of whether
he/she disputes that the claim has been satisfied.  Failure to do so
within the time stipulated, the court will record that the claim has been
satisfied.

The court office is at [xxx xxx xxx] telephone number xxx xxxx, fax
number xxx xxxx.  The office is open between[...a.m.] and [...p.m.] ...
to ... except public holidays.

256

No. 92 ]　　　　　*Eastern Caribbean Supreme Court*　　　　[ 2011.
　　　　　　　　　*Civil Procedure (Amendment) Rules*

Form 29

(Rule 44.2 (3))

Request for Order for Oral Examination of an individual

(Heading as in Form 1)

Request for Order for Oral Examination of an individual
The [claimant] [defendant] (the 'judgment creditor') applies for an order
that the [defendant] [claimant] ('the judgment debtor') attend court to
provide information about the judgment debtor's means and any other
information needed to enforce the judgment or order dated the
day of _____ , 20

1. **Judgment Debtor**
   The judgment debtor is _____
   whose address is _____

2. **Judgment debt or order**
   [The judgment or order required the judgment debtor to pay
   $_____ (including interest and costs).  The amount now owing
   is $_____ [which includes further interest payable on the
   judgment debt].

   [The judgment or order required the judgment debtor
   to_____]

**Notes:**

Normally the examiner will ask the questions set out in the Appendix A
of Practice Direction 44 and the judgment debtor will be told to produce
all relevant documents including:
   ·　Pay slips
   ·　Bank statements
   ·　Share certificates
   ·　Credit Union Pass books
   ·　Mortgage statement
   ·　Hire purchase and similar agreements
   ·　Court orders
   ·　Any other outstanding bills
   ·　Electricity, gas, water, cable, telephone bills for the last
      year

257

No. 92 ]                    *Eastern Caribbean Supreme Court*                    [ 2011.
                           *Civil Procedure (Amendment) Rules*

Statement of Truth

*(I believe) (The judgment creditor believes) that the facts stated in this application are true.

*I am duly authorized by the judgment creditor to sign this statement.

Signed_____

Date_____

*(Judgment creditor) (Judgment creditor's solicitor)*

*delete as appropriate*

Full name_____

Name of judgment creditor's solicitor's firm_____

The court office is at [xxx xxx xxx] telephone number xxx xxxx, fax number xxx xxxx.  The office is open between[...a.m.] and [...p.m.] ... to ... except public holidays.

258

No. 92 ]          *Eastern Caribbean Supreme Court*          [ 2011.
                  *Civil Procedure (Amendment) Rules*

Form 30

(Rule 44.2 (3))

Request for Order for Oral Examination of an officer of a debtor company (Heading as in Form 1)

Request for Order for Oral Examination of an officer of a debtor company

The [claimant] [defendant] (the 'judgment creditor') applies for an order that the [defendant] [claimant] company or corporation ('the judgment debtor') attend court to provide information about the judgment debtor's means and any other information needed to enforce the judgment or order dated the      day of      , 20

1. **Judgment Debtor**
The judgment debtor is _____

whose address/registered office is situated at _____

2. **The officer**
The officer is the judgment debtor's _____

whose name and address is _____

3. **Judgment debt or order**
[The judgment or order required the judgment debtor to pay $_____ (including interest and costs).  The amount now owing is $_____ [which includes further interest payable on the judgment debt].

[The judgment or order required the judgment debtor to_____]

**Notes:**

        Normally the examiner will ask the questions set out in the Appendix B of Practice Direction 44 and the judgment debtor will be told to produce all relevant documents including:

·   Bank statements
·   Court orders on which money is still owed
·   Bills owed to the company
·   Hire purchase and similar agreements
·   Any other outstanding bills
·   2 year's accounts

259

No. 92 ]            *Eastern Caribbean Supreme Court*            [ 2011.
                    *Civil Procedure (Amendment) Rules*

Statement of Truth

*(I believe) (The judgment creditor believes) that the facts stated in this application are true.

*I am duly authorized by the judgment creditor to sign this statement.

Signed_____ Date_____

*(Judgment creditor) (Judgment Creditor's solicitor)*

*delete as appropriate*

Full name_____

Name of judgment creditor's solicitor's firm_____

The court office is at [xxx xxx xxx] telephone number xxx xxxx, fax number xxx xxxx.  The office is open between [...a.m.] and [...p.m.] ... to ... except public holidays.".

      Made this 28th day of September 2011.


                                        **Hugh A. Rawlins**
                                        *Chief Justice*


                                        **Ola Mae Edwards**
                                        *Justice of Appeal*


                                        **Janice M. Pereira**
                                        *Justice of Appeal*

**SAINT LUCIA**
PRINTED BY THE NATIONAL PRINTING CORPORATION
CASTRIES
2011                              [Price: $18.50]

# TAB 18

CHAPTER 11

JURISDICTION IN CLAIMS IN PERSONAM

|  |  | PAGE |  |  |  | PAGE |
|---|---|---|---|---|---|---|
| 1. | General Principle ... .. .. .. | 371 |  | part thereof or in any other |  |  |
| 2. | Domicile .. .. .. .. .. .. | 402 |  | State which is a Member |  |  |
| 3. | Rules Relating to Jurisdiction .. | 411 |  | State or a Convention State . | 411 |  |
|  | A. Where the Brussels I Regulation and the Lugano Convention do not apply or where the defendant is not domiciled in the United Kingdom or any |  | B. | Where the defendant is domiciled in a Member State, in a Convention State, in Scotland or Northern Ireland .. .. .. | 464 |  |

## 1. GENERAL PRINCIPLE

**RULE 29[1]—(1) Subject to clause (2), the court has jurisdiction to entertain a claim *in personam* if, and only if, the defendant is served with process in England or abroad in the circumstances authorised by, and in the manner prescribed by, statute or statutory order.**          **11R–001**

**(2) Where a claim relates to a civil or commercial matter within the meaning of (a) Council Regulation (EC) 44/2001 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters ("the Brussels I Regulation"[2] or "the Regulation") or (b) the Lugano Convention on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (the "Lugano Convention," or "the Convention"[3]) the court has jurisdiction to entertain a claim *in personam* solely in accordance with the provisions of the Brussels I Regulation and the Lugano Convention.**

COMMENT

**Claim in personam.** A claim *in personam* may be defined positively as a claim brought against a person to compel him to do a particular thing, e.g. the payment of a debt or of damages for a breach of contract or for tort, or the specific performance of a contract; or to compel him not to do something, e.g. when an injunction is sought. A claim *in personam* may be negatively          **11–002**

---

[1] The Rules in this Chapter must be read subject to the Rules in Ch.10. As to the power of the court to stay proceedings, see below, Ch.12. On jurisdiction in the United States see Hay, Borchers and Symeonides, Chs 5 to 10; Restatement, ss.26–52.

[2] [2001] O.J. L12, as amended by Corrigendum [2001] O.J. L307; Commission Regulation (EC) 280/2009 [2009] O.J. L93/13; Commission Regulation (EU) 416/2010 [2010] O.J. L119/7, and the Act concerning the conditions of accession of the Czech Republic, etc.: [2003] O.J. L236.

[3] Text in [2007] O.J. L339.

described as any claim which is not an Admiralty claim *in rem*, a probate claim, or an administration claim. It may be well, though hardly necessary, to add that a claim *in personam* does not include a proceeding for divorce or judicial separation, or for a declaration of nullity of marriage or of legitimacy, or a proceeding in bankruptcy or regarding the custody of children, or an application to set aside an arbitral award.

**11–003**  **Service of process.** Clause (1) of this Rule expresses the general principle that in England service of process is the foundation of the court's jurisdiction to entertain a claim *in personam*. Every action commences with the issue of a claim form.[4] When process cannot legally be served upon a defendant, the court can exercise no jurisdiction over him. In proceedings *in personam* the converse of this statement holds good, and whenever a defendant can be legally served with process, then the court, on service being effected, has jurisdiction to entertain a claim against him. Hence in proceedings *in personam* (and subject to the effect of the Brussels I Regulation and the Lugano Convention) the rules as to service define the limits of the court's jurisdiction. The methods of service are laid down by the Civil Procedure Rules 1998 ("CPR"), and provision is made for substituted service (now called "service by an alternative method") on individual defendants where personal service cannot be effected.[5]

**11–004**  **The Brussels Convention and the Lugano Convention.**[6] Prior to the Civil Jurisdiction and Judgments Act 1982 ("the 1982 Act") coming into full force on January 1, 1987 the position in England, broadly, was that the court had jurisdiction over (a) persons who were present in England at the time of service of process, and (b) in certain specified cases over persons who were outside England. In the latter case it was generally (except for certain cases mainly arising under international conventions) necessary for the permission of the court to be obtained for issue of process and its service outside the jurisdiction. In each case the exercise of the court's jurisdiction was subject to a discretion: in the former case it was subject to the discretion to stay the proceedings under Rule 38; in the latter case the issue and service of process out of the jurisdiction was subject to the discretion of the court.

**11–005**  In 1968 the six original members of the European Economic Community entered into a Convention on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters ("the Brussels Convention"). The position following the incorporation of the Brussels Convention and the Lugano Convention by the 1982 Act (as amended by the Civil Jurisdiction and

[4] See CPR, Pt 7. The claim form replaces what in the High Court was known as a writ and an originating summons.
[5] CPR, Pt 6.
[6] On the Brussels I Regulation and the Brussels and Lugano Conventions see generally Layton and Mercer, *European Civil Practice* (2nd ed. 2004); Briggs and Rees, *Civil Jurisdiction and Judgments* (5th ed. 2009); Collins, *Civil Jurisdiction and Judgments Act 1982* (1983); Hartley, *Civil Jurisdiction and Judgments* (1984); Kaye, *Civil Jurisdiction and Enforcement of Foreign Judgments* (1987); Magnus, Mankowski (eds.), *Brussels I Regulation* (2007); Gaudemet-Tallon, *Compétence et exécution des jugements en Europe* (4th ed. 2010); Droz and Gaudemet-Tallon, 2001 *Rev. Crit.* 601; Weser, *Convention communautaire sur la compétence judiciaire et l'exécution des décisions* (1975).

Judgments Act 1991, "the 1991 Act") was substantially different. The mere presence of the defendant in England was no longer a sufficient basis of jurisdiction if he was domiciled in another part of the United Kingdom or in another Contracting State, and where the Conventions conferred jurisdiction on the English court its discretion not to exercise it was severely curtailed.[7] Similar, but not identical, rules were introduced by Sch.4 to the 1982 Act for intra-United Kingdom cases.[8]

The original purpose of the Brussels Convention was to facilitate the **11–006** enforcement of judgments between the Contracting States, but both the Brussels Convention and the original Lugano Convention also provided a detailed set of rules dealing with the circumstances in which courts in the Contracting States might exercise jurisdiction in matters within the scope of the Conventions. The approach of the Conventions was quite different from that of the United Kingdom bilateral conventions governing the recognition and enforcement of foreign judgments. Those conventions, which took effect in the United Kingdom through the Foreign Judgments (Reciprocal Enforcement) Act 1933,[9] did not regulate the circumstances in which the court which was originally seised might exercise jurisdiction: they merely told the enforcing court in which circumstances the jurisdiction of the original court had to be recognised, and they allowed the enforcing court to investigate whether the original court had international jurisdiction. This is frequently called a system of "indirect" rules of jurisdiction, which do not affect the courts of the State in which the action is originally brought, and only become relevant at the stage of enforcement.

By contrast, the Brussels Convention and the Lugano Convention laid down **11–007** a very elaborate system of jurisdictional rules, to which the court in which the action is originally brought had to adhere—this is a system of "direct" rules of jurisdiction. The primary basis of jurisdiction under the Conventions over those "domiciled" in a Contracting State was the "domicile" of the defendant. The Conventions did not define domicile, and left its determination to national law; corporations were to be treated as domiciled where they had their seat, but the determination of the seat was also left to national law.[10] In addition to the courts of the domicile of the defendant, there were other special bases of jurisdiction, such as the place of performance of a contractual obligation and the place of a tort, and there were certain areas of exclusive jurisdiction which displaced the domicile. Provision was also made for submission to jurisdiction by contract or by appearance, and for certain other procedural matters, including *lis alibi pendens* and jurisdiction to order provisional measures.

The origins of the Brussels Convention lay in the notion that the ideals of **11–008** the European Economic Community would be furthered by the greater facilitation of the enforcement of judgments between the Member States. Negotiations for the Convention began in 1959. It was signed in 1968 and entered into force for the original Contracting States (Belgium, Federal Republic of Germany, France, Italy, Luxembourg, Netherlands) in 1973. In 1971 they entered

---

[7] See below, paras 11–028; 12–019 *et seq.*
[8] See below, para.11–071.
[9] See below, Rule 54.
[10] See 1982 Act, ss.41 to 46, below, Rule 30.

Rule 29                    *Jurisdiction and Foreign Judgments*

into a Protocol conferring jurisdiction on the European Court to interpret the Brussels Convention, and the Protocol entered into force in 1975. In 1978 the United Kingdom, the Republic of Ireland and Denmark entered into an Accession Convention with the original Contracting States ("the 1978 Accession Convention"). The 1978 Accession Convention contained some important modifications of the Brussels Convention.

**11–009**   Conventions were signed in 1982 for the accession of Greece ("the 1982 Accession Convention"),[11] in 1989 for the accession of Spain and Portugal ("the 1989 Accession Convention"),[12] and in 1996 for the accession of Austria, Finland and Sweden.[13] The 1989 Accession Convention (also known as the San Sebastian Convention) made a number of substantive changes.[14] The Brussels Convention as amended by the Accession Conventions came into force between the United Kingdom and all the Contracting States.

**11–010**   The original Lugano Convention was opened for signature in 1988. It was adopted by the 12 Member States of the European Communities and by the six Member States of the European Free Trade Association (EFTA) (Austria, Finland, Iceland, Norway, Sweden and Switzerland). The accession of Poland took effect in 2000. Following the enlargement of the European Union and the adoption of the Brussels I Regulation, the original Lugano Convention applied only to Iceland, Norway and Switzerland.

**11–011**   The purpose of the original Lugano Convention was to strengthen the economic co-operation between the European Communities and EFTA. Negotiations proceeded from 1985 on the drafting of what was then called a parallel Convention to the Brussels Convention. The United Kingdom ratified the Lugano Convention in 1991, and it came into force for the United Kingdom in 1992. The original Lugano Convention was substantially[15] the same as the Brussels Convention as amended by the 1978 Accession Convention and the 1989 Accession Convention. An important distinction between the Brussels Convention and the Lugano Convention was that the European Court had no jurisdiction to give preliminary rulings on the interpretation of the Lugano Convention: the EFTA Member States would not have accepted that the European Court, an institution of the European Communities, should have jurisdiction to rule on the Lugano Convention. Instead, the Second Protocol to the Lugano Convention and two accompanying Declarations made by the signatory States contained special provisions designed to lead to uniformity of interpretation both as between national courts and between the two Convention systems.

**11–012**   Both the Brussels Convention and the 1978 Accession Convention were the subject of substantial reports which were sent to the governments concerned at the same time as the draft Conventions. The reports were, respectively, by M. Jenard (the rapporteur of the working party for the Brussels Convention)

---

[11] The text of the 1982 Accession Convention is in [1982] O.J. L388, with Report by Evrigenis and Kerameus at [1986] O.J. C298/1; and in Collins, p.251.

[12] [1989] O.J. L285, with report by de Almeida Cruz, Desantes Real and Jenard [1990] O.J. C189/35.

[13] [1997] O.J. C15.

[14] The Lugano Convention was negotiated before the 1989 Accession Convention and the variations from the original Brussels Convention were substantially derived from the Lugano Convention.

[15] But not quite identical (see especially Arts 5(1), 16(1), 17(5)).

and Professor Schlosser (the rapporteur of the working party for the 1978 Accession Convention). The original Lugano Convention was the subject of a report by M. Jenard and Mr Möller (a Finnish judge) which was submitted to the Member States of the European Communities and of EFTA before the diplomatic conference at Lugano in 1988. Each of these reports (and the reports on the 1982 and 1989 Accession Conventions) had a special status in relation to the interpretation of the Conventions.[16] They are also relevant to the interpretation of the Brussels I Regulation and the revised Lugano Convention, most of the provisions of which are derived from the Brussels and original Lugano Conventions.

**Brussels I Regulation.** The Brussels I Regulation came into force on March 1, 2002,[17] and applies to all the Member States of the European Union, with the exception of Denmark. Denmark opted out of the Brussels I Regulation, and the Brussels Convention continued to apply to it. But with effect from July 1, 2007 the Brussels I Regulation applies to Denmark by virtue of a parallel agreement.[18] The Brussels I Regulation supersedes the Brussels Convention,[19] and it also superseded (except as regards Iceland, Norway and Switzerland) the original Lugano Convention.    **11–013**

The background to the Brussels I Regulation was that in December 1997 the Council of the European Union instructed an ad hoc working party comprised of representatives of all Member States and of the EFTA States which were parties to the Lugano Convention to work on parallel revision of the Brussels and Lugano Conventions. The new Art.65 of the EC Treaty (now Art.81, TFEU) was introduced by the Treaty of Amsterdam, which came into effect in May 1999. Article 65 provided that measures in the field of judicial co-operation in civil matters having cross-border implications, to be taken in accordance with Art.69 and insofar as necessary for the proper functioning of the internal market, were to include (among other things) improving and simplifying the recognition and enforcement of judgments in civil and commercial cases, and promoting the compatibility of the rules applicable in the Member States concerning the conflict of laws and of jurisdiction. By Art.67, during the transitional period of five years following the entry into force of the Treaty of Amsterdam, the Council was to act unanimously on a proposal from    **11–014**

---

[16] The Jenard and the Schlosser reports are at [1979] O.J. C59 and are hereinafter cited as "Jenard" and "Schlosser." The Jenard-Möller report on the original Lugano Convention is at [1990] O.J. C189/57. These reports, and also the reports on the 1982 Accession Convention by Evrigenis and Kerameus and on the 1989 Accession Convention by de Almeida Cruz, Desantes Real and Jenard (above, n.11), are also in Butterworths, *International Litigation Handbook* (2nd ed. Dickinson *et al.*), ss.[3035], [3047], [3070], [3048], and [3052], respectively. The Scottish Committee on Jurisdiction and Enforcement under the Chairmanship of Lord Maxwell published a report ("the Maxwell Report") in 1980 on (inter alia) the practical aspects of the implementation of the Brussels Convention. On the history of the Brussels Convention see Jenard, p.3; Schlosser, paras 1–3; Maxwell Report, paras 1.9–1.15.

[17] On the transitional provisions of the Brussels I Regulation, see *Advent Capital Plc v GN Ellinas Imports-Exports Ltd* [2005] EWHC 1242 (Comm.), [2005] 2 Lloyd's Rep. 607.

[18] [2006] O.J. L120/22; SI 2001/3929, art.3A (providing that the Brussels I Regulation shall have effect as regards Denmark in accordance with the Agreement), added by SI 2007/1655.

[19] The Brussels Convention continues to apply to certain dependencies of France (French overseas territories, now called overseas collectivities) and the Netherlands (Aruba).

RULE 29          *Jurisdiction and Foreign Judgments*

the Commission or on the initiative of a Member State and after consulting the European Parliament.

**11–015**  By Art.3 of the Protocol on the position of the United Kingdom and Ireland, the United Kingdom and Ireland had the power to notify the President of the Council, within three months after a proposal or initiative had been presented to the Council pursuant to what became Title IV of the EC Treaty, that they wished to take part in the adoption and application of any such proposed measure. Denmark opted out of Title IV. In March 1999 the United Kingdom and Ireland indicated their intention to adopt Community instruments in relation to judicial co-operation in civil matters.

**11–016**  In July 1999 a proposal was made[20] in which the Commission converted its previous proposals for reform of the Brussels Convention into a proposal for a Council Regulation. The Brussels I Regulation was adopted on December 22, 2000.

**11–017**  Because the Brussels I Regulation is directly applicable in the United Kingdom by virtue of s.2(1) of the European Communities Act 1972, there is no implementing United Kingdom legislation, with the exception of those matters which are left by the Regulation to national law, such as the ascertainment of domicile,[21] and which are the subject of statutory order.[22] The Regulation uses the expression "Member State" (which is, however, defined to mean Member States of what is now the European Union with the exception of Denmark[23]) to refer to the States which are subject to it.

**11–018**  **Revised Lugano Convention.** In 1997 the Council of the European Union set up a working party of experts to work on amendments to the Brussels Convention and the original Lugano Convention in parallel. Although the proposal for a Council Regulation to replace the Brussels Convention proceeded from a proposal in July 1999 to its approval in December 2000, the revised Lugano Convention was held up because the European Commission took the view that, when the Amsterdam Treaty came into force in 1999, the conclusion of a revised Lugano Convention fell entirely within the sphere of the exclusive competence of the Community, and outside the competence of the Member States. The question of competence was referred by the Council to the European Court.

**11–019**  The European Court gave an opinion[24] that the conclusion of the new Lugano Convention fell entirely within the sphere of exclusive competence of the European Community. Where common rules had been adopted, the Member States no longer had the right, acting individually or collectively, to undertake obligations with non-Member States which affected those rules. In

---

[20] See European Commission, *Proposal for a Council Regulation (EC) on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters*, with explanatory memorandum: COM (1999) 348 final; [1999] O.J. C376.

[21] See below, Rule 30.

[22] SI 2001/3929, Sch.1. See Sch.2 for amendment of 1982 Act, Sch.4 on allocation of intra-UK legislation: see below, para.11–071.

[23] Art.1(3). For all practical purposes, however, Denmark may be regarded as a "Member State" for the purposes of the Brussels I Regulation: para.11–013, above.

[24] Opinion 1/03 *Competence of the Community to conclude the new Lugano Convention on jurisdiction and the recognition and enforcement of judgments (Opinion pursuant to Article 300 EC)* [2006] E.C.R. I–1145.

such a case, the Community had exclusive competence to conclude inter-national agreements. Given the unified and coherent system of rules on jurisdiction for which the Brussels I Regulation provided, any international agreement also establishing a unified system of rules on conflict of jurisdiction such as that established by the Regulation was capable of affecting those rules of jurisdiction. The new Lugano Convention affected the uniform and con-sistent application of the Community rules on jurisdiction and the proper functioning of the system established by those rules. Accordingly, the Com-munity had exclusive competence to conclude the new Lugano Convention.[25]

The revised Lugano Convention[26] entered into force between the Member States of the European Union (including Denmark) and Norway on January 1, 2010, and is now also in force for Iceland and Switzerland. Iceland, Norway and Switzerland will be referred to as "Convention States."[27] The original Lugano Convention was given effect by the 1982 Act[28] but the view has been taken that it is not necessary to incorporate the revised Lugano Convention into United Kingdom law because it is a treaty concluded by the European Union which takes direct effect in the United Kingdom, and requires legisla-tion only to the extent of consequential matters arising out of the Convention, and matters which are left by the Convention to national law. The 1982 Act, as amended, deals with such consequential matters[29] as allocation of jurisdic-tion within the United Kingdom[30] and with matters which are left by the Convention to national law.[31]     **11–020**

**Principal differences between the Brussels and original Lugano Con-ventions and the Brussels I Regulation.** The main changes introduced by the Brussels I Regulation were these: (1) The Regulation contains new autono-mous rules for the domicile of companies.[32] (2) In the Regulation, an autono-mous definition of the place of performance is provided for contracts for the sale of goods and the provision of services.[33] (3) The Regulation confirms that the place of the harmful event in jurisdiction in tort and delict extends to the place where the harmful event "may occur."[34] (4) There are changes to the provisions on insurance[35] and consumer contracts[36] and new provision is made for employment contracts.[37] (5) In relation to jurisdiction in disputes relating to immovable property, the exception to the court of the *situs* for short     **11–021**

---

[25] See Borrás (2006) 8 Yb. P.I.L. 37.

[26] [2007] O.J. L339/1. See the Pocar Report [2009] O.J. C319/1; Pocar (2008) 10 Yb. P.I.L. 1.

[27] It is also open to accession by other States: Art. 70, subject to the conditions in Art.72.

[28] It was set out in Sch.3C, inserted by the 1991 Act, and repealed by SI 2009/3131.

[29] See, e.g. ss.5A, 6A, 7–8, 11A, 14, 48.

[30] s.10.

[31] see ss.41A, 43A, 44A.

[32] Art.60.

[33] Art.5(1)(b), (c).

[34] Art.5(3).

[35] Arts 9(1)(b), 13(5), 14.

[36] Arts 15(1)(c), 15(3).

[37] Arts 18–21.

tenancies is an amalgam[38] of the differing provisions in the Brussels Convention and the original Lugano Convention. (6) The Regulation confirms the effectiveness of non-exclusive jurisdiction agreements.[39] (7) The Regulation contains a definition of seisin for the purposes of the *lis pendens* provisions.[40] An important effect of the rules being enacted in a Council Regulation is that references to the European Court are no longer to be under a separate Protocol, (as they were in the Brussels Convention regime), but will be under Art.267, TFEU.

**11–022**          **Proposals for amendment of the Brussels I Regulation.** Art.73 of the Brussels I Regulation provided that within five years of its entry into force the European Commission was to present to the European Parliament, the Council and the European Economic and Social Committee a report on the application of the Regulation, accompanied, if need be, by proposals for adaptations to it. The European Commission made the report in 2009.[41] The report was prepared on the basis of a general study ("the Heidelberg Report") commissioned by the European Commission. The Commission Report was accompanied by a Green Paper which was intended to launch a broad consultation on possible ways to improve the Regulation with respect to the points raised in the Report.[42] The more important points are noted at the appropriate places in this work, but they included these. First, the Commission proposed that the jurisdictional rules of the Regulation be extended to defendants domiciled in non-Member States.[43] The Report suggested that the absence of common rules determining jurisdiction against third State defendants might jeopardise the application of mandatory Community legislation, for example on consumer protection, commercial agents, data protection or product liability. Second, the Commission noted that problems were caused by there being no uniform rule for the validity of jurisdiction agreements, with the result that a choice of court agreement might be considered valid in one Member State and invalid in another.[44] Third, the Commission drew attention to the problems caused in the area of *lis pendens* by actions for negative declarations in intellectual property cases, and in cases involving corporate loans and in competition cases.[45] Fourth, the Commission considered that the diversity in the national procedural laws of the Member States relating to provisional measures made the free circulation of such measures difficult.[46] Fifthly, the Commission drew

---

[38] Art.22(1).

[39] Art.23(1).

[40] Art.30.

[41] COM(2009) 174, April 21, 2009. See Dickinson (2010) 12 Yb. P.I.L. 247; Briggs [2011] L.M.C.L.Q. 157. See also draft Report of the Committee on Legal Affairs of the European Parliament: 2010/0384 (COD), June 28, 2011; opinion of the European Economic and Social Committee [2011] O.J.C218/78; UK Ministry of Justice, Consultation Paper, *Revision of the Brussels I Regulation —How should the United Kingdom approach the negotiations*, CP18/10 (2010).

[42] COM(2009) 175, April 21, 2009.

[43] This proposal is rejected in the draft Report of the Committee on Legal Affairs of the European Parliament, above.

[44] See below, para.12–130.

[45] See below, para.12–063.

[46] See below, para.8–033, n.77.

attention to the difficulties caused by the exception of arbitration from the scope of the Regulation.[47] In December 2010 the Commission published a proposal for a new Regulation implementing these proposals.[48]

**European Order for Payment Procedure.** Regulation (EC) 1896/2006 of the European Parliament and of the Council creating a European order for payment procedure (which applies to the United Kingdom and Ireland, but not to Denmark) provides for the application to a court for an order for payment in the case of claims for a specific amount.[49] Jurisdiction is to be determined in accordance with the relevant rules of the Brussels I Regulation.[50] But in the case of claims against a consumer, for a purpose which could be regarded as being outside his trade or profession, only the courts of the Member State in which the defendant is domiciled will have jurisdiction.[51] The defendant is to be advised of his options to pay the amount indicated in the order or oppose the order by lodging with the court of origin a statement of opposition.[52] The procedure in England is regulated by section I of Part 78 of the Civil Procedure Rules.[53]

    **11–023**

**European Small Claims Procedure.** Regulation (EC) 861/2007 of the European Parliament and of the Council (in force January 1, 2009) establishes a European Small Claims Procedure, and applies in the United Kingdom and Ireland, but not in Denmark.[54] It applies in cross-border cases to civil and commercial matters, whatever the nature of the court or a tribunal, where the value of a claim does not exceed €2,000.[55] For the purposes of the Regulation a cross-border case is one in which at least one of the parties is domiciled or habitually resident in a Member State other than the Member State of the court or tribunal seised, and domicile is to be determined in accordance with Arts 59 and 60 of the Brussels I Regulation.[56] The body of the Regulation does not deal expressly with the grounds of jurisdiction, but it is apparent from Annex 1, which sets out the claim form, that the tribunal must have jurisdiction in accordance with the rules of the Brussels I Regulation.[57] The procedure in England is regulated by section II of Part 78 of the Civil Procedure Rules.[58]

    **11–024**

---

[47] See below, paras 11–046 *et seq*. See also the Green Paper of the House of Lords European Union Committee, Sub-committee E (Law and Institutions, under the chairmanship of Lord Mance), July 27, 2009, which is particularly supportive of proposals to increase the effectiveness of jurisdiction and arbitration agreements.
[48] COM (2010) 748/3.
[49] [2006] O.J. L399/1. See Lopez de Tejada 2007 *Rev. Crit.* 717.
[50] Art.6(1).
[51] Art.6(2).
[52] Art.12.
[53] CPR, rr.78.2–78.11.
[54] [2007] O.J. L199/1.
[55] Art.2.
[56] Art.3. On domicile see paras 11R–077 *et seq.*, below.
[57] Annex 1, Form A, para.4.
[58] CPR, rr.78.12–78.22.

Rule 29            *Jurisdiction and Foreign Judgments*

**11–025**  **Mediation in civil and commercial matters.** Directive 2008/52/EC of the European Parliament and of the Council of May 21, 2008[59] on certain aspects of mediation in civil and commercial matters is designed to facilitate access to alternative dispute resolution and to promote the amicable settlement of disputes by encouraging the use of mediation and by ensuring a balanced relationship between mediation and judicial proceedings. It applies to all civil and commercial matters (including family law), but not to revenue, customs or administrative matters or to the liability of the State for acts and omissions in the exercise of State authority (*acta iure imperii*).[60] It requires the content of an agreement resulting from mediation which has been made enforceable in a Member State to be recognised and declared enforceable in the other Member States in accordance with applicable Community or national law,[61] Section III of Part 78 of the Civil Procedure Rules was introduced to deal with this obligation.[62]

**11–026**  **Hague Conference developments.** In 1993 the Hague Conference on Private International Law decided to open negotiations for the conclusion of a worldwide convention on jurisdiction and the enforcement of judgments, but the negotiations did not meet with success.[63] Instead in 2005 a more limited Hague Convention on Choice of Court Agreements was adopted and opened for signature. It is not in force.[64]

**11–027**  ***Forum conveniens.*** In *Effer SpA v Kantner*[65] the European Court emphasised that the rules on jurisdiction in the Brussels Convention were designed in part to confer jurisdiction on the national court which was best qualified to determine a dispute. But it also recognised that the application of the jurisdictional rules might lead to a claim being subject to the jurisdiction of a court which does not have the closest connection with the dispute.[66]

**11–028**  The question therefore arose whether the English court had a discretion to decline jurisdiction or stay an action on the ground that the courts of another State were the more appropriate forum. It was accepted that the jurisdictional rules of the Brussels Convention were not subject to a discretion in the national court to stay an action on the basis that the courts of some other Convention State were the more appropriate forum.[67] But there was for some time uncertainty as to whether the court could stay proceedings brought in England under the Brussels Convention (and the Brussels I Regulation) rules on the ground that the courts of a non-Convention State (or non-Member

---

[59] [2008] O.J. L136/3. It does not apply to Denmark.

[60] Art.2.

[61] Art.6.

[62] Especially CPR, rr.78.23, 78.25. See also SI 2011/1133.

[63] See McClean, in *Reform and Development of Private International Law* (Fawcett ed., 2002), p.255; O'Brian (2003) 66 M.L.R. 491.

[64] See below, para.12–101.

[65] Case 38/81 [1982] E.C.R. 825, 834.

[66] Case C–282/92 *Custom Made Commercial Ltd v Stawa Metallbau GmbH* [1994] E.C.R. I–2913.

[67] See below, paras 11–249, 12–019 *et seq.*; *Aiglon Ltd v Gau Shan Co Ltd* [1993] 1 Lloyd's Rep. 164; and Schlosser, paras 76–81; Layton and Mercer, Vol.1, pp.373–374; Kaye, pp.269, 1244.

State) were more appropriate.[68] But in *Owusu v Jackson*[69] the European Court confirmed that a court having jurisdiction under the Brussels Convention could not apply the *forum non conveniens* doctrine to decline jurisdiction, even in favour of a non-Convention State. It held that application of the doctrine would undermine the predictability of the rules of jurisdiction laid down by the Convention. There is no doubt that the same conclusion applies in the case of the Brussels I Regulation. This question is dealt with more fully in connection with Rule 38.

**Sphere of application of the Brussels I Regulation and the Lugano Convention. Civil and commercial matters.** Article 1 of the Regulation (and of the Convention) provides that it is to apply in civil and commercial matters whatever the nature of the court or tribunal and that it is not to extend, in particular, to revenue, customs or administrative matters. In addition it is specifically provided that it is not to apply to the status or legal capacity of natural persons; rights in property arising out of a matrimonial relationship; wills and succession; bankruptcy, proceedings relating to the winding-up of insolvent companies or other legal persons, judicial arrangements, compositions and analogous proceedings, social security; or arbitration. In civil law countries "civil" law (which includes commercial law) is generally contrasted with "public" law. The term "civil and commercial" is not a term of art in the United Kingdom, although it appears as early as the Foreign Tribunals Evidence Act 1856, and the United Kingdom is party to several bilateral treaties with some of the Member States for the recognition and enforcement of judgments in "civil and commercial matters"[70] and to Hague Conventions which are similarly limited.[71] In the original Brussels Convention States there is a well-developed separate corpus of law dealing with the activities of public bodies acting in the exercise of public functions. It is claims by and against these authorities in relation to those functions which are effectively excluded by the general words of Art.1. But the precise boundaries of civil and public law differ even in the civil law countries and therefore the question arose at an early stage in the life of the Brussels Convention as to what system of law was to be applied to solve any difficulties of classification.

In a consistent series of decisions of the European Court, commencing in 1976 in the *Eurocontrol* case,[72] the Court held that the concept must be given

    11–029

    11–030

---

[68] See *Re Harrods* (*Buenos Aires*) *Ltd* [1992] Ch. 72 (CA), in which a reference by the House of Lords to the European Court was withdrawn when the case was settled.

[69] Case C–281/02 [2005] E.C.R. I–1383, [2005] Q.B. 801, on which see paras 12–019 *et seq.* See also, e.g. *Catalyst Investment Group Ltd v Lewinsohn* [2009] EWHC 1964 (Ch.), [2010] Ch. 218*; Skype Technologies SA v Joltid Ltd* [2009] EWHC 2783 (Ch.), [2011] I.L.Pr. 103; *UBS AG v HSH Nordbank* [2009] EWCA Civ 585, [2009] 1 Lloyd's Rep. 272, [103]. See generally Kruger, *Civil Jurisdiction Rules of the EU and their impact on third States* (2008).

[70] With Austria (SI 1962/1339); Belgium (S.R. O. 1936 No.1169); France (S.R. O. 1936 No.609); Germany (SI 1961/1199); Italy (SI 1973/1894); *cf.* Norway (SI 1962/636) ("civil matters"). The European Court held that the meaning of the expression may be different in a bilateral convention from its meaning in the Brussels Convention: Joined Cases 9 and 10/77 *Bavaria and Germanair v Eurocontrol* [1977] E.C.R. 1517.

[71] Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (1965); Taking of Evidence Abroad in Civil or Commercial Matters (1970), on which see *Re State of Norway's Application* (*Nos 1 & 2*) [1990] 1 A.C. 723, criticised by F.A. Mann (1989) 105 L.Q.R. 341.

[72] Case 29/76 *LTU GmbH v Eurocontrol* [1976] E.C.R. 1541.

an independent meaning in the light of "the objectives and scheme of the Convention" and "the general principles which stem from the corpus of the national legal systems."[73] This case concerned a claim for route charges levied on aircraft owners by Eurocontrol, an international organisation set up by treaty. The Court held that judgments in favour of such a body might be within the scope of the Brussels Convention, but not where the public authority was acting in the exercise of its powers. Thus in *Netherlands State v Rüffer*[74] the European Court held that an action for the recovery of the costs involved in the removal of a wreck in a public waterway, administered by the State pursuant to an international obligation and in its capacity as a public authority in the administration of that waterway, was not a civil or commercial matter. In *Sonntag v Waidmann*[75] the European Court held that, even if it were joined to criminal proceedings, a civil action for compensation for injury following a criminal act was civil in nature; and that the activity of a school teacher in a state school while supervising pupils during a school trip did not constitute an exercise of public authority. So also these claims have been held to be within the concept of civil or commercial matters: an action by a public authority against a man for recovery of sums paid as social assistance to his ex-wife and child;[76] a claim to statutory subrogation by the State against the parents of the recipients of education grants governed by civil law;[77] an action between private parties for the reimbursement of customs duties paid by the claimant;[78] a fine payable to the State for breach of an injunction in a civil and commercial matter.[79]

**11–031**     In *Lechouritou v Dimosio tis Omospondiakis Dimokratias tis Germanias*[80] a reference was made in proceedings by Greek nationals resident in Greece

---

[73] [1976] E.C.R. at p.1552. See also Joined Cases 9 and 10/77 *Bavaria and Germanair v Eurocontrol* [1977] E.C.R. 1517; Case 133/78 *Gourdain v Nadler* [1979] E.C.R. 733; Case 814/79 *Netherlands State v Rüffer* [1980] E.C.R. 3807; Case C–172/91 *Sonntag v Waidmann* [1993] E.C.R. I–1963; Case C-266/01 *Préservatrice Foncière TIARD Cie d'Assurances v Netherlands* [2003] E.C.R. I–4867.

[74] Case 814/79 [1980] E.C.R. 3807. In Case C–167/00 *Verein für Konsumenteninformation v Henkel* [2002] E.C.R. I–8111 an action by a consumer protection organisation to prevent traders from using unfair contract terms was held to be a civil matter: the consumer protection organisation was a private body, and the subject-matter of the proceedings was not an exercise of public powers, since the proceedings did not concern the exercise of powers derogating from the rules of law applicable to relations between private individuals, but concerned the prohibition on the use of unfair terms in contracts with consumers. *cf. R. v Harrow Crown Court, Ex p. UNIC Centre SARL* [2000] 1 W.L.R. 2112, where it was held that proceedings against a French company under the Trade Marks Act 1994 by the trading standards service for forfeiture of counterfeit jeans were in a civil matter: the local authority did not have a duty to bring such proceedings, nor any exclusive status to bring them, and the relief enured to the benefit of private individuals. Contrast *Criminal Assets Bureau v JWPL* [2007] IEHC 177, [2008] I.L.Pr. 298 (Irish High Ct.) See, on the impact of Art.1 on environmental claims, Betlem and Bernasconi (2006) 122 L.Q.R. 124.

[75] Case C–172/91 [1993] E.C.R. I–1963. See also *Grovit v Nederlandsche Bank* [2005] EWHC 2944, [2006] 1 W.L.R. 3323 (QB), affd. [2007] EWCA Civ 953, [2008] 1 W.L.R. 51.

[76] Case C–271/00 *Gemeent Steenbergen v Baten* [2002] E.C.R. I–10489.

[77] Case C–433/01 *Freistaat Bayern v Blijdenstein* [2004] E.C.R. I–981.

[78] Case C–265/02 *Frahuil SA v Assitalia SpA* [2004] E.C.R. I–1543.

[79] Case C–406/09 *Realchemie Nederland v Bayer CropScience AG* [2012] I.L.Pr. 17.

[80] Case C–292/05 [2007] E.C.R. I–1519. *cf.* Case C–435/06 *C* [2007] E.C.R. I–10141, [2008] Fam. 27 (Council Regulation (EC) 2201/2003, Art.1, is to be interpreted to the effect that a single decision ordering that a child be taken into care and placed outside his original home in a foster family is covered by the term "civil matters").

against Germany for compensation for damage which the plaintiffs had suffered on account of acts perpetrated by the German armed forces and of which their parents were victims at the time of the occupation of Greece during the Second World War, namely the massacre of civilians by soldiers in the German armed forces in 1943 in Kalavrita. The European Court ruled that "civil matters" did not cover a legal action brought by natural persons in a Convention State against another Convention State for compensation in respect of the loss or damage suffered by the successors of the victims of acts perpetrated by armed forces in the course of warfare in the territory of the first State. Operations conducted by armed forces were one of the characteristic emanations of State sovereignty, and were inextricably linked to foreign and defence policy. The action for damages therefore resulted from the exercise of public powers on the part of the State concerned on the date when those acts were perpetrated, irrespective of whether those acts were lawful.

Article 1(1) of each instrument provides expressly that it "shall not extend, **11–032** in particular, to revenue, customs or administrative matters." This provision was added by the 1978 Accession Convention following the request of the United Kingdom in the accession negotiations. The exclusion of revenue and customs matters reflects the general principle found in most countries that foreign tax laws will not be enforced.[81] In *Préservatrice Foncière TIARD Cie d'Assurances v Netherlands*[82] it was held that the exclusion for customs matters did not extend to a claim by which the State sought to enforce a guarantee for the payment of a customs liability, where the legal relationship between the State and the guarantor did not entail the exercise by the State of powers going beyond those existing under private law relationships, even if the guarantor raised in the proceedings an issue as to the existence and scope of the liability to customs duty.

In most of the Member States and in the EFTA countries claims relating to **11–033** the exercise of powers by public authorities are usually within the jurisdiction of special administrative courts. But the exclusion of "administrative matters" from the Brussels I Regulation and the Lugano Convention does not relate to the tribunal in which the claim is brought or by which the judgment is given. It relates to the nature of the legal relationship between the parties or the subject-matter of the action.[83]

It is settled that maintenance claims are covered by the Brussels I Regula- **11–034** tion and the Lugano Convention. They are within the concept of "civil matters," they are not excluded by Art.1(2), and Art.5(2) makes specific provision for such claims.[84] It is likely that claims for damages caused by restrictive practices or unfair competition, which often have public law elements, come within the scope of the Regulation and the Convention. Finally,

---

[81] See above, paras 5–029 *et seq.* See *QRS 1 ApS v Frandsen* [1999] 1 W.L.R. 2169 (CA): the rule that the English court will not directly or indirectly enforce the revenue laws of another country is not overridden by Art.1. But see above, para.5–029 for the Council Directives on mutual assistance for the recovery of claims relating to certain taxes and duties.

[82] Case C–266/01 [2003] E.C.R. I–4867.

[83] *LTU GmbH v Eurocontrol*, above; *Netherlands State v Rüffer*, above; *cf. Re Senator Hanseatische Verwaltungsgesellschaft mbH* [1997] 1 W.L.R. 515 (CA); *Bank of Scotland v IMRO*, 1989 S.L.T. 432; *Short v Ireland* [1996] IESC 8, [1996] 2 I.R. 188.

[84] See Case 120/79 *De Cavel v De Cavel (No.2)* [1980] E.C.R. 731; Case C–220/95 *Van den Boogaard v Laumen* [1997] E.C.R. I–1147, [1997] Q.B. 759.

Rule 29          *Jurisdiction and Foreign Judgments*

they apply to labour or employment law claims (which in some countries are not regarded as part of the civil law), at least to the extent that they are not claims by or against public authorities in some capacity other than as employer.[85]

**11–035**     **Matters expressly excluded from the scope of the Brussels I Regulation and the Lugano Convention.** Article 1(2) excludes, as has been seen, four general categories from the scope of the Regulation and the Convention: (1) status; (2) bankruptcy; (3) social security; and (4) arbitration. These categories were originally excluded from the scope of the Brussels Convention for two main reasons: first, to exclude one category which fell within the borderland of civil and public law, namely social security; secondly, to exclude those cases where there was a great disparity between the Contracting States in relation both to substantive law and private international law, particularly where there were other conventions in force or in draft; it was thought that to bring these areas within the scope of the Brussels Convention might interfere with the unification process being pursued in the European Communities.[86]

**11–036**     *Status or legal capacity of natural persons.*[87] The most important area excluded by this provision is divorce, but it also excludes judgments relating to voidability and nullity of marriage, judicial separation, death, status and legal capacity of minors, legal representation of mental patients, nationality or domicile of individuals, custody and adoption of children, guardianship. But they are only excluded if the proceedings deal directly with these questions. If they arise only in an incidental fashion the case will not be excluded from the scope of the Regulation and the Convention. The fact that a proceeding or judgment deals with matters which fall outside their scope will not prevent orders which do fall within it from being enforced.[88] Maintenance orders, in relation both to spouses and to children, are within the Regulation and the Convention.[89]

**11–037**     *Rights in property arising out of a matrimonial relationship ("régimes matrimoniaux").* This exception is considered in a later chapter.[90]

**11–038**     *Wills and succession.* Matters relating to wills and succession were excluded because it was thought that the divergence in laws, especially in the relevant rules of private international law, among the original Brussels Convention States was so great that it would be premature to include them before

---

[85] Case 25/79 *Sanicentral v Collin* [1979] E.C.R. 3423, 3429; Case 133/81 *Ivenel v Schwab* [1982] E.C.R. 1891. See now also the Brussels I Regulation and the Lugano Convention, Arts 18–21.

[86] See Jenard, p.10.

[87] In 1998 the members of the EU concluded a Convention on jurisdiction and the recognition and enforcement of judgments in matrimonial matters: [1998] O.J. C221/1. It did not come into force, but became the basis for Council Regulation (EC) 1347/2000 (now superseded by Council Regulation (EC) 2201/2003), below, paras 18–005 *et seq.*

[88] See Case 120/79 *De Cavel v De Cavel (No.2)* [1980] E.C.R. 731.

[89] See below, Rules 89, 102, 111.

[90] See below, paras 18–177 *et seq.*

the rules of private international law had been unified.[91] The expression "wills and succession" covers all claims to testate or intestate succession, including disputes as to validity or interpretation of wills setting up trusts; but disputes concerning the relations of the trustee with persons other than beneficiaries may come within the scope of the Regulation and the Convention.[92]

*Bankruptcy, etc.* This exclusion extends to bankruptcy, proceedings relating     **11–039** to the winding-up of insolvent companies or other legal persons, judicial arrangements, compositions and analogous proceedings. Bankruptcy was excluded because of the great disparities in national practice between the original Brussels Convention States, because of its proximity to public law, and because a draft Bankruptcy Convention was being considered by the Community.[93] In *Gourdain v Nadler*[94] the European Court held that for proceedings to be excluded on the basis that they concerned bankruptcy, etc., it was necessary that they must derive directly from the bankruptcy or winding-up and be closely connected with the bankruptcy proceedings. Thus a claim by an English liquidator against the directors of a company for fraudulent trading under s.213 of the Insolvency Act 1986 would be outside the scope of the Brussels I Regulation and the Lugano Convention. But an action by a liquidator to recover debts due to an insolvent company would not be excluded, since the claim in no sense relates to bankruptcy.[95] Nor would a claim against directors for breach of duty be excluded, even if the company is subject to insolvency proceedings in another Member State or Convention State.[96]

*Social security.* Social security was excluded because in some countries it     **11–040** was a matter of public law and in others it fell within the borderline area between private law and public law; in some countries it was within the jurisdiction of the ordinary courts, and in others within the jurisdiction of administrative tribunals, and sometimes both.[97] What is social security depends on Community law, and encompasses the matters covered by Regulation (EC) 883/2004 of the European Parliament and the Council.[98] The exclusion of social security concerns only disputes arising out of the relationship between the administration and employers and employees, and not cases

---

[91] See Jenard, p.11.

[92] Under Art.5(6), below, Rule 35, clause (6); see Schlosser, para.52. See also Case 25/81 *CHW v GJH* [1982] E.C.R. 1189, where a question was raised (but not decided) as to whether an application for the return of a "codicil" was excluded from the scope of the Brussels Convention as relating to wills and succession. See also *Re Hayward* [1997] Ch. 45.

[93] For the subsequent history see Fletcher, *Insolvency in Private International Law* (2nd ed. 2005), Ch.7.

[94] Case 133/78 [1979] E.C.R. 733, 744. See also *UBS AG v Omni Holding AG* [2000] 1 W.L.R. 916; *Oakley v Ultra Vehicle Design Ltd* [2005] EWHC 872 (Ch.), [2005] I.L.Pr. 747.

[95] This passage was approved in *Re Hayward* [1997] Ch. 45, 54.

[96] *Grupo Torras SA v Sheikh Fahad Mohammed Al-Sabah* [1995] 1 Lloyd's Rep. 374, 400, affirmed on other grounds [1996] 1 Lloyd's Rep. 7 (CA). Contrast *Firswood Ltd v Petra Bank* [1996] C.L.C. 608 (CA). *cf. Soc Rewah France v Walczak* (France, Cr. Cass, May 5, 2004) 2005 *Rev. Crit.* 104, note Bureau, also in [2005] I.L.Pr. 503.

[97] Jenard, p.12.

[98] On the application of social security rules to employed persons and their families moving within the EU.

Rule 29          *Jurisdiction and Foreign Judgments*

where the administration exercises a direct right of action against a third party liable for injury or is subrogated to the rights of a victim insured by it, because it is then acting under the rules of private law.[99]

**11–041**     *Arbitration.* Article 1(2)(d) of the Brussels I Regulation (and of the Lugano Convention) provides that it is not to apply to "arbitration."[100] Arbitration was excluded from the Brussels Convention because of the other international instruments in force or in contemplation dealing with the subject.[101] The Jenard Report indicated that the Brussels Convention did not apply to the recognition and enforcement of arbitral awards; nor did it determine the jurisdiction of courts in respect of litigation relating to arbitration, for example, proceedings to set aside an arbitral award, or deal with the recognition of judgments given in such proceedings.[102] But the Report gave no further elucidation. In the course of the negotiations which led to the 1978 Accession Convention, the United Kingdom took the view[103] that the exclusion covered all disputes which the parties had agreed should be settled by arbitration, including any secondary disputes connected with the arbitration. The original Brussels Convention States, on the other hand, thought that it had a narrower purpose, namely to exclude proceedings in national courts which related to arbitration proceedings which were contemplated, or were in progress, or had concluded. It was agreed that no amendment should be made to the original text, and that the new Contracting States could deal with the problem in their implementing legislation.[104] It is clear from the Schlosser Report that most of the discussion concerned the question whether the exclusion of arbitration from the scope of the Brussels Convention meant that Contracting States could refuse to enforce judgments given by foreign courts in proceedings brought in breach of arbitration agreements.[105]

**11–042**     *Schlosser and Evrigenis-Kerameus Reports.* The Schlosser Report also indicated that the Brussels Convention did not apply to court proceedings which were ancillary to arbitration proceedings, such as the appointment or dismissal of arbitrators, the fixing of the place of arbitration, or the extension

---

[99] Case C–271/00 *Gemeent Steenbergen v Baten* [2002] E.C.R. I–10527, adopting Jenard Report, pp.1, 12, 13 and the Schlosser Report, para.60.

[100] Regulation (EC) 1896/2006 of the European Parliament and of the Council creating a European order for payment procedure does not have an arbitration exception in Art.2, by contrast with Art.2 of Regulation (EC) 861/2007 of the European Parliament and of the Council establishing a European Small Claims Procedure.

[101] Jenard Report, p.13. The exclusion of "arbitration" is not an exclusion of arbitral proceedings as such, but of court proceedings relating to arbitration: *ETI Euro Telecom International NV v Republic of Bolivia* [2008] EWCA Civ 880, [2008] 1 W.L.R. 665, [82].

[102] *ibid.* p.13. See also Schlosser, para.65.

[103] A committee was appointed by the Lord Chancellor and the Secretary of State for Scotland in March 1972 under the chairmanship of Lord Kilbrandon to advise the United Kingdom Government on any adjustments which it might be necessary or desirable to negotiate with a view to enabling the United Kingdom to accede to the Brussels Convention. The committee reported that it was a matter of some importance to the United Kingdom that the exclusion of arbitration should be understood in the widest sense: *Report of the Committee on the European Judgments Convention* (October 1973), para.72 (unpublished): see *Youell v La Réunion Aérienne* [2009] EWCA Civ 175, [2009] 1 Lloyd's Rep. 586, at [26].

[104] Schlosser, para.61.

[105] See *ibid.* para.62, and below, paras 14–208 *et seq.*

of time limits; nor to a judgment determining whether an arbitration agreement was valid or not. The Evrigenis-Kerameus Report on the 1982 Accession Convention[106] drew a distinction between proceedings which were directly concerned with arbitration and proceedings which only incidentally raised the arbitration agreement. Proceedings which were directly concerned with arbitration as the principal issue, e.g. the establishment of the tribunal, annulment or the recognition of the validity or defectiveness of an award, were outside the Brussels Convention. But the verification, as an incidental question, of the validity of an arbitration agreement which was relied on by a litigant in order to contest the jurisdiction of the court before which he was being sued pursuant to the Brussels Convention, fell within the scope of the Convention.

*The Marc Rich case.* In *Marc Rich & Co AG v Società Italiana Impianti PA* **11–043**
*(The Atlantic Emperor)*[107] Italian sellers sold a cargo of crude oil to Swiss buyers. The contract was made by an exchange of telexes, one of which (from the buyers) contained a provision for English law and London arbitration. But the Italian sellers did not reply to the telex. Following delivery the buyers alleged that the oil had been contaminated with water. The Italian sellers sued the Swiss buyers in the Italian courts claiming a declaration that they were not liable to the buyers and denying that they were bound by the arbitration clause contained in the telex. The Swiss buyers commenced an arbitration, claiming damages, and sought in English proceedings the appointment of an arbitrator, and the Italian sellers argued that under Art.21 of the Brussels Convention (equivalent to Art.27 of the Brussels I Regulation) they were entitled to a stay because the Italian proceedings had priority. In the first reference from a United Kingdom court on the Brussels Convention, the European Court held[108] that, by excluding arbitration from the scope of the Brussels Convention on the ground that it was already covered by international conventions, the Contracting States intended to exclude arbitration "in its entirety", including proceedings brought before national courts. The appointment by a court of an arbitrator was covered by the exclusion because it was a measure adopted by the State as part of the process of setting arbitration proceedings in motion. The Court said that this conclusion was corroborated by the Schlosser Report,[109] according to which the Brussels Convention did not apply to court proceedings which were ancillary to arbitration proceedings, such as the appointment or dismissal of arbitrators. This was so even if the judicial proceedings necessarily involved the question of the existence or validity of an arbitration agreement. The test for determining whether the proceedings were outside the scope of the exclusion was the nature of the subject-matter

---

[106] [1986] O.J. C298/1, at p.10, para.35.
[107] [1989] 1 Lloyd's Rep. 548 (Hirst J. and CA).
[108] Case C–190/89 [1991] E.C.R. I–3855. The Swiss buyers contested the jurisdiction of the Italian courts, but after their objection was dismissed they defended the case on the merits, and were refused an injunction in England to restrain the Italian proceedings because they had submitted to the Italian jurisdiction: *The Atlantic Emperor (No.2)* [1992] 1 Lloyd's Rep. 624 (CA).
[109] para.64. Professor Schlosser changed his views and submitted (as did M. Jenard) an opinion on behalf of the Italian sellers: published at (1991) 7 Arb. Int. 227 and 243. The Court also relied on the Evrigenis-Kerameus Report on the 1982 Accession Convention, above.

of the proceedings. If the subject-matter of the proceedings was the appointment of an arbitrator, the fact that the court had to resolve a preliminary issue as to the existence or validity of the arbitration agreement did not justify the application of the Convention; and it would be contrary to the principle of legal certainty for the applicability of the Convention to vary according to whether there was a preliminary issue.

**11–044**     The actual ruling in that case was the narrow one that the exclusion of arbitration in what is now Art.1(2)(d) of the Brussels I Regulation extends to proceedings before a national court concerning the appointment of an arbitrator, even if the existence or validity of an arbitration agreement is a preliminary issue in that litigation.[110] In a second case before the European Court, *Van Uden Maritime BV v Deco-Line*,[111] one of the questions was whether the jurisdiction of a national court to order provisional measures in support of arbitration was within the scope of the Brussels Convention, or excluded by the arbitration exception. The Court held that proceedings to obtain provisional measures in aid of arbitration were not excluded. After referring to the views of the Schlosser Report, the Court said that the critical question was the nature of the rights which the proceedings sought to protect. Where the subject-matter of the application for provisional measures related to a question which fell within the scope *ratione materiae* of the Brussels Convention, the Convention was applicable even if arbitration proceedings had been, or were to be, commenced on the substance of the case. The Court also said that where the parties had validly excluded the jurisdiction of the courts in disputes arising under a contract and had referred the dispute to arbitration, there were no courts which had jurisdiction under the Convention as to the substance of the case.

**11–045**     Consequently both cases emphasise that the applicability of the arbitration exception depends on the subject-matter of the proceedings. In *West Tankers Inc v Allianz SpA (The Front Comor)*[112] a vessel was chartered to an Italian company under a charterparty containing a London arbitration clause. It collided with a jetty in Sicily owned by the charterer. The charterer's insurers, relying on their rights of subrogation under the Italian Civil Code, commenced proceedings in Syracuse against the owners for the money which they had paid to their insured. The owners commenced proceedings against the insurers in England for a declaration that the insurers were bound by the arbitration clause and for an injunction to restrain the Italian proceedings. For reasons which will be developed below,[113] the European Court ruled that it was incompatible with the Brussels I Regulation for a court of a Member State to

---

[110] See generally Hascher (1996) 12 Arb. Int. 233, (1997) 13 Arb. Int. 33; Van Houtte (1997) 13 Arb.Int. 85. *cf. Lexmar Corp v Nordisk Skibsrederforensig* [1997] 1 Lloyd's Rep. 289 (although matters relating to security for costs in an arbitration were within the exclusion, proceedings to enforce a letter of undertaking securing costs in arbitration were not within exclusion).

[111] Case C–391/95 [1998] E.C.R. I–7091, [1999] Q.B. 1225.

[112] Case C–185/07 [2009] E.C.R. I–663, [2009] 1 A.C. 1138; on a reference from the House of Lords *sub nom. West Tankers Inc v Ras Riunione Adriatica di Sicurta SpA (The Front Comor)* [2007] UKHL 4, [2007] 1 Lloyd's Rep. 391; below, para.16–096. See also *DHL GBS (UK) Ltd v Fallimento Finmatica SpA* [2009] EWHC 291 (Comm.), [2009] 1 Lloyd's Rep. 430.

[113] paras 16–092 *et seq.*

make an order to restrain a person from commencing or continuing proceedings before the courts of another Member State on the ground that such proceedings would be contrary to an arbitration agreement. But, as regards the scope of the arbitration exclusion, the European Court accepted that the English proceedings as a whole, which sought declaratory as well as injunctive relief, did not come within the scope of the Brussels I Regulation because their subject matter was arbitration. The proceedings before the Italian court, however, came within the scope of the Regulation, and consequently the effect of the arbitration agreement, including its validity, was an incidental question, which also came within the scope of the Regulation.[114] Consequently it was the Italian court which had the exclusive power under the Regulation to rule on the effect of the arbitration agreement on its jurisdiction.

Plainly, therefore, judicial proceedings to determine the existence or validity of an arbitration agreement are within the exclusion.[115] It is clear from the Jenard Report[116] and the Schlosser Report[117] that the recognition and enforcement of arbitral awards will be outside the scope of the Regulation and the Convention. It was held that a French judgment making a French award enforceable was not entitled to enforcement under the Brussels Convention for that reason.[118] Other examples of cases within the exclusion are proceedings claiming that an arbitration agreement is invalid,[119] or proceedings to enjoin an arbitration in a Member State on the basis of an English jurisdiction agreement.[120] The mere fact that there are arbitration proceedings pending abroad will not deprive the court of jurisdiction.[121]    **11–046**

Two further controversial questions have arisen in this context. The first question is whether a judgment deciding that an arbitration agreement is valid, or invalid or ineffective, is entitled to recognition under the Regulation or the Convention. The second question is whether a decision of a court in another Member State or Convention State that there is no valid arbitration agreement, or giving judgment in disregard of what English law would regard as a valid    **11–047**

---

[114] At [26], citing the Evrigenis and Kerameus report on the 1982 Accession Convention, above, text at n.106.

[115] The *West Tankers* case itself; *Through Transport Mutual Insurance Association (Eurasia) Ltd v New India Assurance Co Ltd* [2004] EWCA Civ 1598, [2005] 1 Lloyd's Rep. 67, approving *The Ivan Zagubanski* [2002] 1 Lloyd's Rep. 106. See also *The Lake Avery* [1997] 1 Lloyd's Rep. 540; *Sovarex SA v Alvarez SA* [2011] EWHC 1661 (Comm.), [2011] 2 Lloyd's Rep. 320. Contrast *Vale do Rio Doce Navegaçao SA v Shanghai Bao Steel Ocean Shipping Co Ltd* [2000] 2 Lloyd's Rep. 1 (claim for declaration against brokers that their principals bound by arbitration agreement not within exception).

[116] p.13, referred to with approval in Case C–190/89 *Marc Rich & Co AG v Soc Italiana Impianti PA* [1991] E.C.R. I–3855, 3900.

[117] para.65(c), referred to with approval in Case C–391/95 *Van Uden Maritime BV v Firma Deco-Line* [1998] E.C.R. I–7091, [1999] Q.B. 1225, para.32.

[118] *ABCI v Banque Franco-Tunisienne* [1996] 1 Lloyd's Rep. 495; affirmed on other aspects [1997] 1 Lloyd's Rep. 531 (CA). See Hascher (1996) 12 Arb. Int. 233, who suggests that the decision is supportable on the basis that the French order was not in fact a judgment on the award, but simply an execution order.

[119] *A v B* [2006] EWHC 2006 (Comm.), [2007] 1 Lloyd's Rep. 237.

[120] *Claxton Engineering v TXM (No.2)* [2011] EWHC 345 (Comm.), [2011] 1 Lloyd's Rep. 510.

[121] *Youell v La Réunion Aérienne* [2009] EWCA Civ 175, [2009] 1 Lloyd's Rep. 586 (fact that claims made in legal proceedings are the mirror image of claims made in an arbitration does not engage the arbitration exception).

arbitration agreement, is entitled to recognition or enforcement under the Regulation or the Convention. These questions are considered below in connection with the recognition and enforcement of foreign judgments.[122]

**11–048** *Proposals for change.* The European Commission has recognised that the current legal framework does not sufficiently protect the effectiveness of arbitration agreements in the EU. The Commission has accepted that the ruling in the *West Tankers* case creates a real risk of the abuse of litigation tactics and has put forward proposals for changes to the Brussels I Regulation as part of the general review of the Regulation.[123] It has put forward a solution designed to ensure that a national court should stay its proceedings in favour of the courts of the seat of the arbitration, or in favour of the arbitral tribunal.[124]

**11–049** **Ancillary claims and provisional measures.** It is clear that applications for provisional measures, such as preservation of property or interim injunctions, are within the scope of the Regulation and the Convention[125] and it is equally clear that provisional orders for interim payments, e.g. in respect of damages or of maintenance, are also within them.[126] The European Court has recognised that procedures authorising provisional and protective measures are found in the legal systems of the Brussels Convention States; but the grant of these measures requires special care on the part of the national court and detailed knowledge of the actual circumstances in which the measures are to take effect; the courts of the State where the assets subject to the measures sought are located are those best able to assess the need for the measures and the conditions on which they are to be granted; it was for this reason that Art.24 of the Brussels Convention (now Art.31 of the Regulation and the Lugano Convention) allowed applications for provisional and protective measures to be made to the courts of a Convention State even if, under the Convention, the courts of another Convention State had jurisdiction as to the substance of the matter.[127] Where a case involves some aspects which are within the Regulation and the Convention and others which are not, those aspects which are within them are severable. But if the ancillary claims are concerned essentially with a matter which is excluded from the scope of the Regulation and the Convention, the ancillary claims themselves are outside their scope.[128]

---

[122] Below, paras 14–206 *et seq.*
[123] Below, para.16–097.
[124] COM (2010) 748 Final, para.3.1.4. See also Report to the European Parliament, etc. on the application of the Brussels I Regulation, April 21, 2009 (COM (2009) 174, para.3.7; Green Paper, April 21, 2009 (COM (2009) 175, para.7; Hess, Pfeiffer, Schlosser, *The Brussels I Regulation (EC) No 44/2001* (2008), at paras 106–136. A draft report of the Committee on Legal Affairs of the European Parliament proposes that the exclusion of arbitration should be widened to include judicial procedures ruling on the validity or extent of arbitral competence as a principal issue or as an incidental or preliminary question. 2010/0383(COD), p.13, and also pp.6, 9.
[125] See Art.31, above, paras 8–026 *et seq.*; Case 143/78 *De Cavel v De Cavel (No.1)* [1979] E.C.R. 1055; *Babanaft International Co SA v Bassatne* [1990] Ch. 13, 29–32 (CA).
[126] Case 120/79 *De Cavel v De Cavel (No.2)* [1980] E.C.R. 731.
[127] Case 125/79 *Denilauler v SNC Couchet Frères* [1980] E.C.R. 1553, 1570.
[128] Case 143/78 *De Cavel v De Cavel (No.1)* [1979] E.C.R. 1055; Case 25/81 *CHW v GJH* [1982] E.C.R. 1189; Case 120/79 *De Cavel v De Cavel (No.2)* [1980] E.C.R. 731.

**Application of the Brussels I Regulation and the Lugano Convention and relationship with other international instruments.** Generally the Regulation and the Convention apply where the defendant is domiciled in a Member State or a Convention State, even if the claimant is not so domiciled, and as a general rule the place where the claimant is domiciled is not relevant for the purpose of applying the jurisdictional rules of the Regulation or the Convention.[129]

**11–050**

By Art.4(1) of the Regulation (and the Convention), if the defendant is not domiciled in a Member State (or Convention State), the jurisdiction of the courts of that Member State (or Convention State) is determined by the law of that State. Consequently, in England the jurisdictional rules in what was RSC Order 11, r.1(1) and which are now contained in CPR, r.36.6 and Practice Direction 6B, apply to defendants domiciled outside the Member States or Convention States.[130] But the Regulation and the Convention apply to defendants outside the Member and Convention States where Art.22 (exclusive jurisdiction) or Art.23 (jurisdiction agreements) apply.[131]

**11–051**

Chapter VII of the Regulation deals (as do the equivalent provisions of Title VII of the Convention[132]) with its relationship with other conventions. Art.69 provides that the existing treaties (mainly bilateral) on the recognition and enforcement of judgments are to be superseded, including those in force between the United Kingdom and other Member States, to the extent that the Regulation applies to the subject-matter of the specific conventions.[133]

**11–052**

Article 71[134] deals with other treaties governing jurisdiction or the recognition and enforcement of judgments, and provides in Art.71(1): "This Regulation shall not affect any conventions to which the Member States are parties and which in relation to particular matters, govern jurisdiction or the recognition or enforcement of judgments." By Art.71(2), with a view to its uniform interpretation, Art.71(1) is to be interpreted so that (as regards the assumption of jurisdiction) (a) the Regulation is not to prevent a court of a Member State which is a party to a convention on a particular matter from assuming jurisdiction in accordance with it, even if the defendant is domiciled in another Member State which is not a party; (b) where the defendant is domiciled in

**11–053**

---

[129] Case C–412/98 *Universal General Insurance Co (UGIC) v Group Josi Reinsurance Co SA* [2000] E.C.R. I–5925, [2001] 1 Q.B. 68.

[130] The Commission has proposed that this provision be removed, and that the Regulation should apply to defendants domiciled in any part of the world: see para.11–022, above.

[131] In addition, entities domiciled outside Member or Convention States, but with branches there, will be regarded as domiciled in there for the purposes of the rules on insurance contracts, consumer contracts and employment contracts: see para.11–097, below. There are also provisions to ensure that Art.4(1) does not apply in Member States to defendants domiciled in Convention States, and vice versa: Brussels I Regulation, Art.71; Lugano Convention, Art.64.

[132] For the inter-relationship of the Regulation and the Lugano Convention, see Lugano Convention, Art.64; Jenard-Möller, pp.67–69.

[133] See Joined Cases 9 and 10/77 *Bavaria and Germanair v Eurocontrol* [1977] E.C.R. 1517; and Art.70(1).

[134] See also Lugano Convention, Art.67, and Protocol No.3, para.1. Section 9(1) of the 1982 Act (as amended by the 1991 Act and by SI 2001/3929) provides that the relevant provisions of Title VII of the Convention shall have effect in relation to any statutory provision implementing any such other convention in the United Kingdom, and in relation to any rule of law so far as it has the effect of so implementing any such other convention.

Rule 29          *Jurisdiction and Foreign Judgments*

another Member State and does not enter an appearance, the court must examine whether it has jurisdiction and whether the defendant has had an opportunity to arrange for his defence.[135]

11–054     The United Kingdom is a party to several such conventions, which are discussed in Chapters 13 (jurisdiction *in rem*) and 15 (international conventions). Some of the conventions lay down direct rules of jurisdiction which are different from those of the Regulation and the Convention, including such bases as diverse as that of the court of the place of destination under the Warsaw Convention on international carriage by air or the arrest of a ship under the Brussels Convention (1952) on arrest of seagoing ships.

11–055     The effect of these provisions is that, notwithstanding the normal jurisdictional rules of the Regulation and the Convention, the English court may exercise jurisdiction in accordance with the provisions of international conventions to which the United Kingdom is a party, such as the Brussels Arrest Convention and the Brussels Collision Convention of 1952.[136] The effect of Art.71(2) of the Regulation (and Art.67 of the Convention) is that in these cases the court which is entitled to exercise jurisdiction under the treaty may do so and its judgment will be enforced in another Member State or Convention State even if the defendant is domiciled in that other State and that other State is not a party to the relevant international convention. Article 67(4) of the Lugano Convention allows the Convention State in which recognition or enforcement of a judgment is sought to refuse recognition or enforcement if that State is not a party to the convention in question and the person against whom recognition or enforcement is sought is domiciled in that State.[137]

11–056     It does not follow that, where a specialised convention is applicable, the Regulation and the Convention are entirely superseded. Thus the Brussels Arrest Convention contains rules on jurisdiction, but no rules on *lis alibi pendens*. Accordingly, the *lis pendens*[138] provisions of the Regulation and the Lugano Convention apply, because their rules are excluded "solely in relation to questions governed by a specialised convention."[139] But a provision in bills of lading for the exclusive jurisdiction of German courts has been held not to deprive the English court of jurisdiction under the Brussels Arrest Convention, even though the Arrest Convention had no provision equivalent to what

---

[135] Under Art.26, below, paras 11–075 *et seq*. This includes jurisdiction under an international convention: Case C–148/03 *Nürnberger Allgemeine Versicherungs AG v Portbridge Transport International BV* [2004] E.C.R. I–1023, [2005] 1 Lloyd's Rep. 592.

[136] *The Deichland* [1990] 1 Q.B. 361 (CA); *The Po* [1991] 2 Lloyd's Rep. 206 (CA); *The Nordglimt* [1988] Q.B. 183; *The Anna H* [1995] 1 Lloyd's Rep. 11 (CA) and see also *The Netty* [1981] 2 Lloyd's Rep. 57; *Clipper Shipping Co Ltd v San Vincente Partners*, 1989 S.L.T. 204.

[137] For other provisions in relation to recognition and enforcement of judgments see below, Rule 53.

[138] Rule 38(4).

[139] Case C–406/92 *The Tatry* [1994] E.C.R. I–5439, 5471, [1999] Q.B. 515, 533. The same conclusion had been reached in *The Nordglimt* [1988] Q.B. 183 and *The Linda* [1988] 1 Lloyd's Rep. 175. Contrast *Deaville v Aeroflot Russian International Airlines* [1997] 2 Lloyd's Rep. 67 (Warsaw Convention); *Pearce v Ove Arup Partnership Ltd* [2000] Ch. 403, 441–442 (CA) (Berne Convention). See also below, paras 13–034 *et seq*. and *Andrea Merzario Ltd v Internationale Spedition Leitner Gesellschaft GmbH* [2001] EWCA Civ 61, [2001] 1 Lloyd's Rep. 490, disapproving *Frans Maas Logistics (UK) Ltd v CDR Trucking BV* [1999] 2 Lloyd's Rep. 179.

is now Art.23 of the Brussels I Regulation giving effect to jurisdiction clauses.[140] That is because to deprive the English court of jurisdiction would involve a conflict between the jurisdictional provisions of the Arrest Convention and the Regulation; in such cases the specialised convention prevails.[141] But the European Court has held[142] that the application of specialised conventions under Art.71 cannot compromise the principles which underlie judicial co-operation in civil and commercial matters in the European Union, such as the principles in the Brussels I Regulation of (inter alia) predictability as to the courts having jurisdiction and therefore legal certainty for litigants and the minimisation of the risk of concurrent proceedings. Consequently, Art.71 cannot be interpreted to mean that, in a field covered by the Regulation, a specialised convention, such as the Convention on the Contract for the International Carriage of Goods by Road 1956 (CMR), may lead to results which are less favourable for achieving sound operation of the internal market than the results to which the Regulation's provisions lead. Accordingly the Court ruled that the effect of Art.71 was that the rules governing jurisdiction, recognition and enforcement which were laid down by a convention on a particular matter, such as the *lis pendens* rule set out in Art.31(2) of the CMR, and the rule relating to enforceability in Art.31(3) of the CMR, applied, provided that they were highly predictable, facilitated the sound administration of justice and enabled the risk of concurrent proceedings to be minimised and that they ensured, under conditions at least as favourable as those provided for by the Regulation, the free movement of judgments in civil and commercial matters and mutual trust in the administration of justice in the European Union.

**Direct applicability of the Brussels I Regulation and the Lugano Convention.** The 1982 Act brought into effect for the United Kingdom the rules of jurisdiction provided for by the Brussels Convention, as amended by the Accession Convention of 1978, and applied similar (but not identical) rules for allocating jurisdiction as between the constituent parts of the United Kingdom.[143] It also provided for the recognition and enforcement of judgments emanating from other Convention States, and introduced a revised system for the enforcement of judgments given by courts of one part of the United Kingdom in other parts. Amendments to the 1982 Act and its schedules came into force in 1989 to take account of the 1982 Accession Convention (Greece) and in 1991 to take account of the 1989 Accession Convention. The Civil Jurisdiction and Judgments Act 1991 was enacted to amend the 1982 Act in order to give effect to the original Lugano Convention.

**11–057**

---

[140] See below, Rule 39.

[141] *The Bergen* [1997] 1 Lloyd's Rep. 380. A stay of proceedings was subsequently granted: *The Bergen (No.2)* [1997] 2 Lloyd's Rep. 710.

[142] Case C–533/08 *TNT Express Nederland BV v AXA Versicherung AG* [2010] I.L.Pr. 663.

[143] The 1982 Act also introduced a new system of jurisdictional rules in Scotland: Sch.8, on which see *Tehrani v Secretary of State for the Home Department (Scotland)* [2006] UKHL 47, [2007] 1 A.C. 521, at [37]–[44]. For the special position of Gibraltar see SI 1997/2602, and below, Rule 56(3).

Rule 29      *Jurisdiction and Foreign Judgments*

**11–058**    The Brussels I Regulation is directly applicable in the United Kingdom by virtue of s.2(1) of the European Communities Act 1972. The Civil Jurisdiction and Judgments Order 2001[144] ("the 2001 Order") was made under the European Communities Act 1972, s.2(2), to deal with certain matters of implementation, including matters left by the Regulation to national law, such as the determination of the domicile of individuals. It has already been seen[145] that because the revised Lugano Convention was entered into by the European Union on behalf of the Member States, the United Kingdom Government has taken the view that incorporating legislation is unnecessary. The 1982 Act has been amended to deal with consequential matters and matters left to national law.

**11–059**    As a result of the introduction of the Brussels/Lugano regime in the United Kingdom there will be three sets of basic rules of jurisdiction in the United Kingdom: one set for cases within the Regulation and the Convention (mainly, but not only, where the defendant is domiciled in another Member State or Convention State); a second set, similar but not identical to the first, where the defendant is domiciled in another part of the United Kingdom; and a third set, substantially different from the first two, where the defendant is not domiciled in a Member State or a Convention State.

**11–060**    The Regulation and the Convention supersede any inconsistent prior legislation. This may have some unexpected results going beyond amendment of the existing general rules relating to jurisdiction and judgments. Thus the effect of the original Art.17 of the Brussels Convention was that where parties, one of whom was domiciled in a Convention State, agreed that a court in a Convention State was to have jurisdiction, that court would have exclusive jurisdiction. The effect of the unamended[146] version of Art.17 was that where it applied the jurisdiction of the courts of the defendant's domicile was wholly ousted, if another court had been chosen. The law of the United Kingdom contains provisions which prevent parties from contracting out of the jurisdiction of United Kingdom courts. Thus s.203 of the Employment Rights Act 1996 (as amended) is intended to prevent an English employee of a German company from effectively agreeing that any claims brought by the employee should be brought in a German court. There are similar laws in other countries.

**11–061**    But the effect of the decision of the European Court in *Sanicentral GmbH v Collin*[147] was that an agreement under the unamended Art.17 to oust the jurisdiction of the local court in favour of the courts of another Convention State had to be given effect notwithstanding the mandatory nature of the employment legislation of the local law. The European Court held that employment disputes came within the Brussels Convention, and that a jurisdiction clause in a contract between a French worker and a German employer

---

[144] SI 2001/3929. The Order (as amended) also applies the Brussels I Regulation to Denmark following the 2005 Agreement whereby the provisions of the Brussels I Regulation are applied to Denmark: Art.3A, and para.11–013, above.

[145] para.11–020.

[146] Special provision is now made for jurisdiction clauses in employment contracts: See Brussels I Regulation, Art.21; Lugano Convention, Art.21; below, para.12–132.

[147] Case 25/79 [1979] E.C.R. 3423.

conferring jurisdiction on a German court deprived the French courts of jurisdiction, notwithstanding that the jurisdiction clause was void by French law when it was entered into (before the Convention came into force in 1973). The effect of the decision is far-reaching. The Court disclaimed any intention on the part of the Convention to affect rules of substantive law, but held that "in matters of civil jurisdiction, the national procedural laws applicable to the cases concerned are set aside in the matters governed by the Convention in favour of the provisions thereof."[148]

**Interpretation of the Brussels I Regulation and the Lugano Convention.** All language versions of the Regulation, and of the Convention[149] are equally authentic. Consequently, the court will be able to consider the foreign language texts of the Regulation and the Convention and the official reports on the three Conventions may be resorted to for the purpose of interpretation. The United Kingdom court is entitled, and bound, to look at the texts in other languages where a problem of interpretation arises. There is therefore no room for a rule in this context that the other language versions may be resorted to only in the case of ambiguity in the English text. The English versions of the Regulation and the Convention are only one of the authentic versions, and resort may be had to the others for the purposes of interpretation. A striking example of this occurred when the European Court held, basing itself on the French text of Art.18[150] of the Brussels Convention, that an appearance to contest the jurisdiction was not to be regarded as a submission even if at the same time the defendant pleaded to the merits in the alternative. The other language texts required the protest to be solely to contest the jurisdiction if it was to escape being a voluntary submission, but the Court preferred the French text as being more in keeping with the objectives and spirit of the Brussels Convention.[151]          **11–062**

Because the Regulation and the Convention are not incorporated by legislation, there is no statutory provision equivalent to that in the 1982 Act in relation to the Brussels Convention[152] whereby the successive reports on the Brussels Convention (and the Accession Conventions) may be considered in ascertaining the meaning of the instruments. But there is no doubt that the provisions in the 1982 Act are declaratory of international law and European law, and that the reports remain a valuable aid to interpretation and have been so used by the European Court and by national courts since the inception of the Brussels/Lugano regime.          **11–063**

**References to the European Court.** There have been more than 200 rulings by the European Court on the Brussels Convention and the Brussels I          **11–064**

---

[148] At p.3429; *cf. Case 150/80 *Elefanten Schuh GmbH v Jacqmain* [1981] E.C.R. 1671.
[149] Art.79.
[150] Now Art.24 of the Brussels I Regulation and the Lugano Convention.
[151] Case 150/80 *Elefanten Schuh GmbH v Jacqmain* [1981] E.C.R. 1671, 1685. See also Case 38/81 *Effer SpA v Kantner* [1982] E.C.R. 825, 834; Case C–305/88 *Isabelle Lancray SA v Peters und Sickert KG* [1990] E.C.R. I–2725.
[152] s.3(3).

Regulation. References to the European Court under the Brussels Convention were governed by a protocol to the Convention. References on the interpretation of the Brussels I Regulation were governed by the EC Treaty but until the Lisbon Treaty came into force in 2009 the power of national courts to make references to the European Court on the interpretation of the Regulation was limited to courts or tribunals of a Member State against whose decisions there was no judicial remedy under national law. But since the Lisbon Treaty[153] references are governed by what is now Art.267 of the Treaty on the Functioning of the European Union (TFEU). Under Art.267, the European Court has jurisdiction to give preliminary rulings concerning the interpretation of acts of the European Union institutions, such as the Regulation. Where a question of interpretation is raised, a national court may, if it considers that a decision on the question is necessary to enable it to give judgment, request the Court to give a ruling, and where any such question is raised in a case pending before a court against whose decisions there is no judicial remedy under national law, that court must bring the matter before the European Court.[154]

**11–065**    The mere fact that one of the parties contends that the dispute gives rise to a question of interpretation does not mean that the English court is bound to consider that a true question of interpretation arises. If the English court considers that there is no room for reasonable doubt as to the interpretation and that the matter would be equally obvious in the courts of the other States it need not make a reference; but the court must bear in mind that the different language versions are equally authentic and that interpretation involves a comparison of the different language versions; in a clear case, however, the English court may refrain from making a reference.[155] The normal practice on references to the European Court, that the national court should not refer hypothetical questions and should find the relevant facts first, applies to references in relation to the Regulation.[156]

**11–066**    The European Court has held that, because the Brussels I Regulation sought to retain the structure and basic principles of the Brussels Convention, provisions in the Regulation are to be interpreted in accordance with its jurisprudence on the Convention.[157] Consequently, almost all of the extensive case law of the European Court on the Brussels Convention will apply to the interpretation of the Regulation. The European Court emphasised that the

---

[153] See C–278/09 *Martinez v MGN Ltd* [2009] E.C.R. I–11099 (jurisdiction declined because Art.267 not in force).

[154] For interpretation of the intra-UK provisions in 1982 Act, Sch.4, see below, para. 11–071.

[155] See, e.g. *Jordan Grand Prix Ltd v Baltic Insurance Group* [1999] 2 W.L.R. 134, 140 (HL) (*acte clair*) and *cf.* on the exercise of discretion, *The Nile Rhapsody* [1994] 1 Lloyd's Rep. 382 (CA); *Jarrett v Barclays Bank Plc* [1999] Q.B. 1 (CA).

[156] See C–111/01 *Gantner Electronic GmbH v Basch Exploitatie Maatschappij BV* [2003] E.C.R. I–4207.

[157] Case C–533/07 *Falco Privatstiftung v Weller-Lindhorst* [2009] E.C.R. I–3327, [2010] Bus. L.R. 210; C–167/08 *Draka NK Cables v Omnipol Ltd* [2009] E.C.R. I–3477; Case C–189/08 *Zuid-Chemie BV v Philippo's Mineralenfabriek NV/SA* [2009] E.C.R. I–6917; Case C–292/08 *German Graphics Graphische Maschinen GmbH v van der Schee* [2009] E.C.R. I–8421; Case C–406/09 *Realchemie Nederland v Bayer CropScience AG* [2012] I.L.Pr. 17; and Brussels I Regulation, recital (19).

*Jurisdiction In Claims In Personam*    Rule 29

Brussels Convention was to be interpreted by reference to its principles and objectives; thus the Court took into account the purposes of the simplification of formalities regarding the reciprocal recognition and enforcement of judgments and of strengthening the legal protection of persons within the European Communities.[158] The Court has encouraged uniformity in the Member States by interpreting most provisions of the instruments which have come before it according to an autonomous interpretation, rather than by a purely national interpretation.

This is because a common problem has been whether terms are to be interpreted according to national law (usually that of the *lex fori*) or according to an independent concept. In a few cases the instrument itself supplies the answer by referring to national law, or by supplying a definition itself. But more commonly the instruments are silent. The Court has almost invariably interpreted terms in accordance with an independent concept:[159] e.g. "civil and commercial matters" in Art.1;[160] "place of performance"[161] and "contract" in Art.5(1)(a);[162] "sale of goods" and "provision of services" in Art.5(1)(b);[163] place where goods "delivered" in Art.5(1)(b);[164] "maintenance" in Art.5(2)[165] "matters relating to tort, delict or quasi-delict" in Art.5(3);[166] "place where the

**11–067**

---

[158] Among many others see Case 33/78 *Somafer SA v Saar-Ferngas AG* [1978] E.C.R. 2183; Case 144/86 *Gubisch Maschinenfabrik AG v Palumbo* [1987] E.C.R. 4861; Case C–351/89 *Overseas Union Insurance Ltd v New Hampshire Insurance Co* [1991] E.C.R. I–3317, [1992] Q.B. 434. On the principle of "legal certainty" see, e.g. Case 38/81 *Effer SpA v Kantner* [1982] E.C.R. 825, 834; Case C–190/89 *Marc Rich & Co AG v Soc Italiana Impianti PA* [1991] E.C.R. I–3855.

[159] See Newton, *Uniform Interpretation of the Brussels and Lugano Conventions* (2002). For criticism see Audit, 2004 *Clunet* 789.

[160] Case 29/76 *LTU GmbH v Eurocontrol* [1976] E.C.R. 1541; Joined Cases 9 and 10/77 *Bavaria and Germanair v Eurocontrol* [1977] E.C.R. 1517; Case 133/78 *Gourdain v Nadler* [1979] E.C.R. 733; Case 814/79 *Netherlands State v Rüffer* [1980] E.C.R. 3807; Case C–172/91 *Sonntag v Waidmann* [1993] E.C.R. I–1963; Case C–167/00 *Verein für Konsumenteninformation v Henkel* [2002] E.C.R. I–8111; Case C–271/00 *Gemeent Steenbergen v Baten* [2002] E.C.R. I–10527; Case C–433/01 *Freistaat Bayern v Blijdenstein* [2004] E.C.R. I–981; Case C–343/04 *Land Oberösterreich v CEZ a.s.* [2006] E.C.R. I–4557; C–292/05 *Lechouritou v Dimosio tis Omospondiakis Dimokratias tis Germanias* [2007] E.C.R I–1519.

[161] Case C–204/08 *Rehder v Air Baltic Corp* [2009] E.C.R. I–6073.

[162] Case 34/82 *Peters v ZNAV* [1983] E.C.R. 787; Case 9/87 *Arcado v Haviland SA* [1988] E.C.R. 1539; Case C–26/91 *Soc Jakob Handte et cie GmbH v TMCS* [1993] E.C.R. I–3967; Case C–51/97 *Réunion européenne SA v Spliethoff's Bevrachtingskantoor BV* [1998] E.C.R. I–6511; Case C–334/00 *Fonderie Officine Meccaniche SpA v HWS GmbH* [2002] E.C.R. I–7357; Case C–167/00 *Verein für Konsumenteninformation v Henkel* [2002] E.C.R. I–8111; Case C–265/02 *Frahuil SA v Assitalia SpA* [2004] E.C.R. I–1543; Case C–27/02 *Engler v Janus Versand GmbH* [2005] E.C.R. I–481.

[163] C–381/08 *Car Trim GmbH v Key Safety Systems Srl* [2010] E.C.R. I–1255; Case C–533/07 *Falco Privatstiftung v Weller-Lindhorst* [2009] E.C.R. I–3327; Case C–19/09 *Wood Floor Solutions Andreas Domberger GmbH v Silva Trade SA* [2010] 1 W.L.R. 1900.

[164] Case C–386/05 *Color Drack GmbH v Lexx International Vertriebs GmbH* [2007] E.C.R. I–3699, [2010] 1 W.L.R. 1909.

[165] Case C–433/01 *Freistaat Bayern v Blijdenstein* [2004] E.C.R. I–981.

[166] Case 189/87 *Kalfelis v Schröder* [1988] E.C.R. 5565; Case C–261/90 *Reichert v Dresdner Bank (No.2)* [1992] E.C.R. I–2149; Case C–334/00 *Fonderie Officine Meccaniche SpA v HWS GmbH* [2002] E.C.R. I–7357; Case C–96/00 *Gabriel v Schlank & Schick GmbH* [2002] E.C.R. I–6367; Case C–167/00 *Verein für Konsumenteninformation v Henkel* [2002] E.C.R. I–8111; Case C–27/02 *Engler v Janus Versand GmbH* [2005] E.C.R. I–481.

harmful event occurred" in Art.5(3);[167] "contract," "consumer" and "instalment credit terms" in Art.15;[168] "rights *in rem* in immovable property"[169] and "tenancies of immovable property"[170] in Art.22(1); "proceedings concerned with registration or validity of patents" in Art.22(4);[171] "proceedings concerned with the enforcement of judgments" in Art.22(5);[172] whether there has been an agreement on jurisdiction under Art.23;[173] "provisional, including protective measures" in Art.31;[174] "ordinary appeal" in Arts 37 and 46;[175] and "party" in Art.43(1).[176] But where the reference is to procedural concepts the tendency towards an autonomous interpretation is less marked.[177]

**11–068**      The object of interpreting the terms autonomously is to ensure that the instruments are fully effective, and to ensure their uniform application, so as to avoid as far as possible multiplication of the bases of jurisdiction in relation to the same legal relationship and to reinforce legal protection by allowing the plaintiff easily to identify the court before which he may bring an action and the defendant reasonably to foresee the court before which he may be sued.[178] These objects have been used to justify an avoidance of an excessively liberal interpretation of the expression "harmful event" in Art.5(3)[179] and have justified an autonomous, rather than a national, interpretation of Art.5(5) on the meaning of "branch, agency or other establishment."[180] The Court has held that the exceptions to Art.2, which gives primacy to the court of the domicile, which is the basic jurisdictional rule, are to be construed strictly,[181]

---

[167] Case 21/76 *Bier v Mines de Potasse d'Alsace SA* [1976] E.C.R. 1735, [1978] Q.B. 708; and e.g. Case C–189/08 *Zuid-Chemie BV v Philippo's Mineralenfabriek NV/SA* [2009] E.C.R. I–6917.

[168] See Case C–89/91 *Shearson Lehman Hutton Inc v TVB* [1993] E.C.R. I–139; Case 150/77 *Société Bertrand v Paul Ott KG* [1978] E.C.R. 1431; Case C–99/96 *Mietz v Intership Yachting Sneek BV* [1999] E.C.R. I–2277; Case C–96/00 *Gabriel v Schlank & Schick GmbH* [2002] E.C.R. I–6367; Case C–167/00 *Verein für Konsumenteninformation v Henkel* [2002] E.C.R. I–8111; Case C–27/02 *Engler v Janus Versand GmbH* [2005] E.C.R. I–481.

[169] Case 115/88 *Reichert v Dresdner Bank* [1990] E.C.R. I–27; Case C–343/04 *Land Oberösterreich v CEZ a.s.* [2006] E.C.R. I–4557.

[170] Case 73/77 *Sanders v Van der Putte* [1977] E.C.R. 2383.

[171] Case 288/82 *Duijnstee v Goderbauer* [1983] E.C.R. 3663; Case C–4/03 *Gesellschaft für Antriebstechnik mBH & Co KG v Lamellen und Kupplungsbau Beteiligungs KG* [2007] E.C.R. I–6509.

[172] See Case C–261/90 *Reichert v Dresdner Bank (No.2)*, above.

[173] Many of the cases on Brussels Convention, Art.17 (Regulation, Art.23) from Case 24/76 *Salotti v RUWA* [1976] E.C.R. 1831 to (especially) Case 214/89 *Powell Duffryn Plc v Petereit* [1992] E.C.R. I–1745.

[174] See Case C–261/90 *Reichert v Dresdner Bank (No.2)*, above.

[175] Case C–43/77 *Industrial Diamond Supplies v Riva* [1977] E.C.R. 2175.

[176] Case C–167/08 *Draka NK Cables v Omnipol Ltd* [2009] E.C.R. I–3477.

[177] See Case 365/88 *Kongress Agentur Hagen GmbH v Zeehaghe BV* [1990] E.C.R. I–1845; Case 56/79 *Zelger v Salinitri* [1980] E.C.R. 89; Case 148/84 *Deutsche Genossenschaftsbank v Brasserie du Pêcheur SA* [1985] E.C.R. 1981; Case 145/86 *Hoffmann v Krieg* [1988] E.C.R. 645. But contrast Case 144/86 *Gubisch Maschinenfabrik AG v Palumbo* [1987] E.C.R. 4861.

[178] Case C–125/92 *Mulox IBC Ltd v Geels* [1993] E.C.R. I–4075; Case C–383/95 *Rutten v Cross Medical Ltd* [1997] E.C.R. I–1000, [1997] I.C.R. 715; Case C–295/95 *Farrell v Long* [1997] E.C.R. I–1683, [1997] Q.B. 842.

[179] Case 220/88 *Dumez France SA v Hessische Landesbank* [1990] E.C.R. I–49.

[180] Case 33/78 *Somafer SA v Saar-Ferngas AG* [1978] E.C.R. 2183.

[181] See, e.g. Case 189/87 *Kalfelis v Schröder* [1988] E.C.R. 5565; Case 32/88 *Six Constructions Ltd v Humbert* [1989] E.C.R. 341; Case 220/88 *Dumez France SA v Hessische Landesbank* [1990] E.C.R. I–49; Case C–89/91 *Shearson Lehman Hutton Inc v TVB* [1993] E.C.R. I–139;

particularly those rules (Art.22 on exclusive jurisdiction, and Art.23 on pro-rogation) which altogether exclude the jurisdiction of the court of the dom-icile.[182] Those provisions which safeguard the procedural rights of the defendant are to be interpreted liberally.[183]

**The Lugano Convention: special provisions.** It was necessary to make special provision for interpretation of the original Lugano Convention, because the European Court has no jurisdiction to interpret the Lugano Convention[184] and because the EFTA Member States would not have accepted a new régime under which an institution of the Communities on which they were not represented would rule, as a court of last resort, on the Lugano Convention. Nor was it desirable to create a new court for that purpose, since that would have created the possibility of conflicting rulings.[185]     **11–069**

Broadly following the equivalent Protocol to the original Lugano Convention, Protocol No.2 to the revised Lugano Convention provides that any court applying and interpreting the Convention shall pay due account to the princi-ples laid down by any relevant decision concerning the relevant of the original Lugano Convention, the Brussels I Regulation and the Brussels Convention rendered by the States bound by the Convention and by the European Court.[186] The non-EU parties to the Lugano Convention are entitled to submit observations to the European Court on references concerning the Lugano Convention or the Brussels I Regulation.[187] By Art.3, the European Commis-sion is to set up a system of exchange of information concerning relevant judgments delivered pursuant to the revised Lugano Convention as well as relevant judgments under the original Lugano Convention, the Brussels Con-vention and the Brussels I Regulation. No doubt the Jenard-Möller Report on the original Lugano Convention will remain an important aid to interpretation to the extent that it deals with matters which are still relevant to the new Brussels/Lugano regime. The Pocar Report on the revised Lugano Conven-tion[188] is very full, and indicates that its purpose is to provide courts with a point of reference to clarify the meaning of the revised Lugano Convention and facilitate its uniform application.[189]     **11–070**

---

Case C–269/95 *Benincasa v Dentalkit Srl* [1997] E.C.R. I–3767; Case C–51/97 *Réunion europé-enne SA v Spliethoff's Bevrachtingskantoor BV* [1998] E.C.R. I–6511; Case C–98/06 *Freeport Plc v Arnoldsson* [2007] E.C.R. I–839.

[182] Case 24/76 *Salotti v RÜWA* [1976] E.C.R. 1831; Case 25/76 *Galeries Segoura Sprl v Bonakdarian* [1976] E.C.R. 1851; Case 73/77 *Sanders v Van der Putte* [1977] E.C.R. 2383; Case 115/88 *Reichert v Dresdner Bank* [1990] E.C.R. I–27; Case C–292/93 *Lieber v Göbel* [1994] E.C.R. I–2535; Case 8/98 *Dansommer v Götz* [2000] E.C.R. I–393.

[183] Case 150/80 *Elefanten Schuh GmbH v Jacqmain* [1981] E.C.R. 1671; Case 166/80 *Klomps v Michel* [1981] E.C.R. 1593. *cf.* Case 125/79 *Denilauler v SNC Couchet Frères* [1980] E.C.R. 1553.

[184] It is not possible to obtain a ruling on the Lugano Convention by the use of what is now Art.267, TFEU: *Agnew v Lansförsakringsbolagens AB* [1997] 4 All E.R. 937 (CA), affirmed on other aspects [2001] 1 A.C. 223. On interpretation of the Lugano Convention, see Tebbens (2001) 3 Yb. Priv. Int. L. 1.

[185] Jenard-Möller, para.110.

[186] Art.1.

[187] Art.2.

[188] para.11–020, n.26, above.

[189] para.3.

RULE 29 *Jurisdiction and Foreign Judgments*

**11–071**  **Intra-United Kingdom cases.** Prior to the 1982 Act, service of process in English proceedings on individuals who were not in England, but were in Scotland or Northern Ireland, normally depended on whether the case was covered by a relevant head of jurisdiction under what was then RSC Order 11, r.1(1). Schedule 4 to the 1982 Act introduced rules for the assumption of jurisdiction in intra-United Kingdom cases, which were similar to, but not identical with, the provisions of the Brussels Convention. Since the coming into force of the Brussels I Regulation, a new Sch.4 has been introduced,[190] which is modelled upon, but is not identical with, the provisions of the Regulation. The differences will be mentioned at the appropriate points, but the main differences are these. First, Rule 3(a) (the equivalent of Art.5(1)) does not contain the partial definition of the place of performance.[191] Second, Sch.4 does not contain special provision for insurance contracts.[192] Third, Rule 4 (the equivalent of Art.22(2)) in relation to proceedings which have as their object a decision of a company organ is not exclusive.[193] Fourth, Rule 12 on jurisdiction agreements does not contain any formal requirements, and allows the chosen court to decline jurisdiction, by contrast with the Regulation.[194]

**11–072**  It should also be noted that in relation to intra-United Kingdom jurisdiction and Scottish rules of jurisdiction,[195] the 1982 Act provides[196] that, in determining any question as to the meaning or effect of any provision in Sch.4 and of any provision in Sch.8, regard is to be had to any relevant principles laid down by, and any relevant decision of, the European Court in connection with the Brussels Convention and the Brussels I Regulation, and to the reports on the Brussels Convention and the Accession Conventions. In *Kleinwort Benson Ltd v City of Glasgow DC*[197] the European Court held that it had no jurisdiction to interpret provisions in Sch.4 to the 1982 Act. Sch.4 took the Brussels Convention as a model only, and did not wholly reproduce its terms. The Court also referred to the fact that Sch.4 could be modified (pursuant to s.47 of the 1982 Act) to produce divergence from the corresponding provision of the Brussels Convention as interpreted by the European Court; in cases under the Brussels Convention, s.3 of the 1982 Act required the United Kingdom court to determine them in accordance with the principles laid down by, and any relevant decision of, the European Court; by contrast, in cases under Sch.4, s.16(3)(a) merely provided that "regard" should be had to such principles and decisions. Accordingly, any replies given by the European Court to the English court would be purely advisory, since the interpretation would not be binding on the English court.[198] To give such replies would have been to

---

[190] SI 2001/3929, Sch.2, para.4.
[191] Rule 35(2), below.
[192] Rule 35(13), below.
[193] Rule 35(17), below.
[194] Rule 39, below.
[195] See *Tehrani v Secretary of State for the Home Department (Scotland)* [2006] UKHL 47, [2007] 1 A.C. 521, at [37]–[44].
[196] ss.16(3), 20(5), as amended by the 2001 Order, Sch.2. See also SI 1997/2602 (Gibraltar).
[197] Case C–346/93 [1995] E.C.R. I–615, [1996] Q.B. 57.
[198] In *Kleinwort Benson Ltd v Glasgow City Council* [1999] 1 A.C. 153 Lord Goff of Chieveley and Lord Clyde adverted to, but did not decide, the question whether in a Sch.4 case it might not be possible to adopt a broader concept of contractual obligation under Art.5(1) (on which see paras 11–268 *et seq.*, below) than existed in European law.

alter the function of the Court under the 1971 Protocol, namely that of a court whose judgments were binding.

**Method of challenge to jurisdiction.** A defendant who has been served with process and wishes to challenge the jurisdiction of the English court should file an acknowledgment of service and apply, within 14 days (or 28 days in the Commercial Court) after filing an acknowledgment of service, for service to be set aside or other appropriate relief.[199] If the defendant files an acknowledgment of service, and does not make an application within the specified period, he is to be treated as having accepted that the court has jurisdiction to try the claim.[200] Where the defendant does not challenge the *existence* of jurisdiction but wishes to persuade the court not to exercise it, e.g. because, in a case not covered by the Regulation or the Lugano Convention, England is not the *forum conveniens* or there is an agreement between the parties conferring jurisdiction on the courts of another country,[201] he should apply under Pt 11 of the Civil Procedure Rules for a stay of the English proceedings and not for process to be set aside,[202] as an application to stay proceedings is not a challenge to the jurisdiction of the court.[203]    **11–073**

The Civil Procedure Rules provide that, upon the failure of an application for a declaration that the court has no jurisdiction or that its jurisdiction should not be exercised, the acknowledgment of service will cease to have effect and the defendant has a further period in which to file a further acknowledgment of service; and if the further acknowledgment of service is filed the defendant is treated as having accepted that the court has jurisdiction to try the claim.[204]    **11–074**

**Examination by the court of its jurisdiction.** Normally an English court is not required of its own motion to consider whether it has jurisdiction, although where a plaintiff seeks permission to serve a defendant out of the jurisdiction under Rule 34, i.e. CPR, r.6.36, and Practice Direction 6B, para.3.1, he has to satisfy the court that England is the proper place in which to bring the claim.[205] But there are some cases where the court itself must, as a result of express provisions of the Regulation or the Convention, declare of    **11–075**

---

[199] CPR, rr.11(4) and 58.7(2). It is not necessary that service of the application be made within the period: *Carmel Exporters (Sales) Ltd v Sealand Services Ltd* [1981] 1 W.L.R. 1068; *Broken Hill Pty Co Ltd v Xenakis* [1982] 2 Lloyd's Rep. 304 (decided under the RSC). The court has power to order disclosure of documents on the application, but the power will be exercised rarely: *Canada Trust Co v Stolzenberg* [1995] 1 W.L.R. 1582 (CA); *Rome v Punjab National Bank (No.1)* [1989] 2 Lloyd's Rep. 424; *Bank of Credit and Commerce International SA v Al-Kaylani* [1999] I.L.Pr. 278. See below, para.11–128, for the effect of this procedure.

[200] CPR, r.11(5). Permission may be given to make the application after the period has expired: *Sawyer v Atari Interactive Inc* [2005] EWHC 2351 (Ch.), [2006] I.L.Pr. 129 (applying authorities on earlier version of the rule).

[201] See Rules 38 and 39.

[202] See *The Fehmarn* [1958] 1 W.L.R. 159, 161 (CA); *The Eleftheria* [1970] P. 94, 98.

[203] *Bankers Trust Co v Galadari* [1986] 2 Lloyd's Rep. 446, 449 (CA). But see *The Sydney Express* [1988] 2 Lloyd's Rep. 257.

[204] CPR, r.11(7). But even if the defendant does not file the further acknowledgment of service and takes no further part, any resulting default judgment will be enforceable in other Member States or Convention States: see below, paras 14–222; 14–229.

[205] CPR, r.6.37(3).

Rule 29      *Jurisdiction and Foreign Judgments*

*its own motion* that it has no jurisdiction. The effect of Arts 25 and 26[206] is that the English court must do so in the following two cases: first, where the claim is principally concerned with a matter over which the courts of another Member (or Convention) State have exclusive jurisdiction by virtue of Art.22; secondly, where the defendant is domiciled in another Member State or Convention State and does not enter an appearance, and the English court does not have jurisdiction under the Regulation or the Convention.[207]

**11–076**      If the defendant fails to give notice of intention to defend, a default judgment may not be entered unless it is shown that the defendant was properly served.[208] The Civil Procedure Rules give effect to these requirements by: (a) requiring a claimant who intends to serve a claim form out of the jurisdiction to file with the claim form a notice containing a statement of the grounds on which the claimant is entitled to serve the claim form out of the jurisdiction, and to serve the notice with the claim form;[209] (b) requiring, before judgment in default of notice of filing of acknowledgment of service is entered on a claim form served out of the jurisdiction without permission or served within the jurisdiction on a defendant domiciled in another part of the United Kingdom or in a Member State or Convention State, an application supported by evidence that the claim is one which the court has power to hear and decide, that no other court has exclusive jurisdiction under the 1982 Act or the Lugano Convention or the Regulation, and that the claim has been properly served in accordance with Art.20 of Sch.1 to the 1982 Act, para.15 of Sch.4 to the 1982 Act, or Art.26 of the Regulation or the Convention.[210]

## 2. DOMICILE

**11R–077**      **Rule 30—(1) For the purposes of Rules 34 to 37 the domicile of an individual is determined as follows:**

     **(a)** **an individual is domiciled in the United Kingdom (or a particular part of the United Kingdom) if he is resident in, and the nature and circumstances of his residence indicate that he has a substantial connection with, the United Kingdom (or that part);[211]**

     **(b)** **an individual is domiciled in a particular place in the United Kingdom if he is domiciled in the part of the United Kingdom in which that place is situated and is resident in that place;[212]**

     **(c)** **an individual who is not domiciled in the United Kingdom in accordance with paragraph (a) of this clause is domiciled in**

---

[206] These provisions apply, in modified form, in intra-UK cases. See also Case 288/82 *Duijnstee v Goderbauer* [1983] E.C.R. 3663; *Coin Controls Ltd v Suzo International (UK) Ltd* [1999] Ch. 33.

[207] Art.26(1). This includes jurisdiction under an international convention: Case C–148/03 *Nürnberger Allgemeine Versicherungs AG v Portbridge Transport International BV* [2004] E.C.R. I–1023, [2005] 1 Lloyd's Rep. 592.

[208] *cf.* Art.26(2); *Noirhomme v Walklate* [1992] 1 Lloyd's Rep. 427.

[209] CPR, r.6.34(1); CPR 6PDB, para. 2.1; CPR PD7A, para.3.5; practice form N510.

[210] CPR, r.12.10(b)(i), (ii), PD12, para.4.3.

[211] SI 2001/3929, Sch.1, para.9(2), (3) (Brussels I Regulation); 1982 Act, s.41A(2), (3) (Lugano Convention).

[212] SI 2001/3929, Sch.1, para.9(4) (Regulation); 1982 Act, s.41A(4) (Lugano Convention).

As regards judgments of courts of other parts of the United Kingdom, the 1982 Act provides expressly that they shall not be enforced otherwise than in accordance with the registration procedures of the Act.[193] Where a judgment is registrable under the 1920 Act[194] the judgment creditor is not deprived of the possibility of suing to enforce it at common law, but the employment of this alternative is discouraged by a provision that it should ordinarily involve sacrifice of the costs of the action.[195]

**Exception 2—No proceedings may be entertained in any court in the United Kingdom for the recovery of any sum alleged to be payable under a judgment given in a court of a country to which section 9 of the Foreign Judgments (Reciprocal Enforcement) Act 1933 has been applied by Order in Council.[196]**   14E–052

## COMMENT

Section 9(1) of the 1933 Act provides that if it appears to Her Majesty that the treatment in respect of recognition and enforcement accorded by the courts of any foreign country to judgments given in the courts of the United Kingdom is substantially less favourable than that accorded by the courts of the United Kingdom to judgments of the courts of that country, Her Majesty may apply that section to that country, with the consequences stated in Exception 2 above. The object of this enactment was to strengthen the hand of HM Government in negotiating conventions with foreign counries for the reciprocal enforcement of foreign judgments.[197] No Order in Council has yet been made under the section. The section refers to "any foreign country." It is thus not limited to foreign countries to which Pt I of the 1933 Act applies, but is of general application. However, the term "foreign country" is limited to countries foreign in the political sense: it does not extend to countries forming part of the Commonwealth.[198]   14–053

### B. *Jurisdiction of foreign courts at common law*

#### (1) JURISDICTION IN PERSONAM

**RULE 43—Subject to Rules 44 to 46, a court of a foreign country outside the United Kingdom has jurisdiction to give a judgment *in personam* capable of enforcement or recognition as against the person against whom it was given in the following cases[199]:**   14R–054

---

[193] 1982 Act, s.18(8).
[194] Rule 53.
[195] 1920 Act, s.9(5). But a claim on the original cause of action may not be brought: para.14–179, below.
[196] 1933 Act, s.9, as amended by 1982 Act, Sch.10, para.2.
[197] See the Report of the Foreign Judgments (Reciprocal Enforcement) Committee, Cmd. 4213 (1932), Annex V, para.14.
[198] This is made clear in s.7.
[199] See generally *Adams v Cape Industries Plc* [1990] Ch. 433, 512–525 (CA). See also *Schibsby v Westenholz* (1870) L.R. 6 Q.B. 155, 161; *Rousillon v Rousillon* (1880) 14 Ch.D. 351, 371; *Emanuel v Symon* [1908] 1 K.B. 302, 309 (CA).

RULE 43       *Jurisdiction and Foreign Judgments*

**First Case**[200]**—If the person against whom the judgment was given was, at the time the proceedings were instituted, present in the foreign country.**

**Second Case**[201]**—If the person against whom the judgment was given was claimant, or counterclaimed, in the proceedings in the foreign court.**

**Third Case**[202]**—If the person against whom the judgment was given, submitted to the jurisdiction of that court by voluntarily appearing in the proceedings.**

**Fourth Case**[203]**—If the the person against whom the judgment was given, had before the commencement of the proceedings agreed, in respect of the subject matter of the proceedings, to submit to the jurisdiction of that court or of the courts of that country.**

COMMENT

14–055     A fundamental requirement for the recognition or enforcement of a foreign judgment in England at common law[204] is that the foreign court should have had jurisdiction according to the English rules of the conflict of laws. "All jurisdiction is properly territorial," declared Lord Selborne,[205] "and *extra territorium jus dicenti, impune non paretur. . . .* In a personal action, . . . a

---

[200] *Carrick v Hancock* (1895) 12 T.L.R. 59; *Littauer Glove Corporation v FW Millington (1920) Ltd* (1928) 44 T.L.R. 746; *Vogel v RA Kohnstamm Ltd* [1973] Q.B. 133; *Adams v Cape Industries Plc* [1990] Ch. 433 (CA); *cf. Sfeir & Co v National Insurance Co of New Zealand* [1964] 1 Lloyd's Rep. 330 (a case on the 1920 Act); Read, pp.148–151.

[201] Cases cited in n.199 above, and *Burpee v Burpee* [1929] 3 D.L.R. 18 (BC); Read, p.160.

[202] *De Cosse Brissac v Rathbone* (1861) 6 H. & N. 301, as explained in *Schibsby v Westenholz* (1870) L.R. 6 Q.B. 155, 162; *Voinet v Barrett* (1885) 55 L.J.Q.B. 39 (CA); *Guiard v de Clermont* [1914] 3 K.B. 145; *SA Consortium General Textiles v Sun & Sand Agencies Ltd* [1978] Q.B. 279 (CA) (a case under the 1933 Act); *Jet Holdings Inc v Patel* [1990] 1 Q.B. 335, 341 (CA); *Re Overseas Food Importers & Brandt* (1981) 126 D.L.R. (3d) 422; (BCCA); *Canada Trustco Mortgage Co v Rene Management & Holdings Ltd* (1988) 53 D.L.R. (4th) 222 (Man CA); *575225 Saskatchewan Ltd v Boulding* [1988] 6 W.W.R. 738 (BCCA); *First National Bank of Houston v Houston E&C Inc* [1990] 5 W.W.R. 719 (BC); *Gourmet Resources International Inc v Paramount Capital Corp* [1993] I.L.Pr. 583 (Ont); and *cf. The Atlantic Emperor (No.2)* [1992] 1 Lloyd's Rep. 624, 633 (CA); Read, pp.161–171; Clarence Smith (1953) 2 I.C.L.Q. 510; on the effect of an appearance to protest the jurisdiction of the foreign court see 1982 Act, s.33, and paras 14–070, *et seq.*, below.

[203] *Feyerick v Hubbard* (1902) 71 L.J.K.B. 509; *Copin v Adamson* (1875) 1 Ex. D. 17 (CA); *Jeannot v Fuerst* (1909) 25 T.L.R. 424; *Bank of Australasia v Harding* (1850) 9 C.B. 661; *Bank of Australasia v Nias* (1851) 16 Q.B. 717; *Kelsall v Marshall* (1856) 1 C.B.(N.S.) 241; *Vallée v Dumergue* (1849) 4 Exch. 290; *Blohn v Desser* [1962] 2 Q.B. 116; *Vogel v RA Kohnstamm Ltd* [1973] Q.B. 133; *SA Consortium General Textiles v Sun & Sand Agencies Ltd* [1978] Q.B. 279 (CA) (a case on the 1933 Act); *First City Capital Ltd v Winchester Computer Corp* (1987) 44 D.L.R. (4th) 301 (Sask CA); *Bank of Credit & Commerce International (Overseas) Ltd v Gokal* [1995] 2 W.W.R. 240 (BCCA); Read, pp.171–177; Restatement, ss.32, 43.

[204] And under the 1920 and 1933 Acts. The power of the English court to review the jurisdiction of the foreign court under the 1982 Act and the Brussels I Regulation is more limited. See Rule 55, below.

[205] *Sirdar Gurdyal Singh v Rajah of Faridkote* [1894] A.C. 670, 683–684 (PC).

690

decree pronounced *in absentem* by a foreign court, to the jurisdiction of which the defendant has not in any way submitted himself, is by international law an absolute nullity. He is under no obligation of any kind to obey it; and it must be regarded as a mere nullity by the courts of every nation, except (when authorised by special local legislation) in the country of the forum by which it was pronounced." Thus, in an early leading case[206] upon the subject, the plaintiff brought an action in England on a judgment of a court in the island of Tobago. The defendant had never been in the island, nor had he submitted to its jurisdiction. There had been a substituted service, valid by the law of Tobago, effected by nailing a copy of the writ to the court-house door. In refusing to recognise the judgment, Lord Ellenborough said "Can the Island of Tobago pass a law to bind the rights of the whole world? Would the world submit to such an assumed jurisdiction?"

In *Adams v Cape Industries Plc*,[207] the leading modern authority, it was said **14–056** that "in determining the jurisdiction of the foreign court. . . . , our court is directing its mind to the competence or otherwise of the foreign court to summon the defendant before it and to decide such matters as it has decided"[208] and "we would . . . regard the source of the territorial jurisdiction of the court of a foreign country to summon a defendant to appear before it as being his obligation for the time being to abide by its laws and accept the jurisdiction of its courts while present in its territory."[209]

It has already been seen[210] that the identification of the relevant "country" **14–057** can present a problem in the case of a federal system, whose constituent States (like those in the United States) retain some degree of legislative sovereignty. But while not deciding the issue, the Court of Appeal inclined to agree with Scott J. that the relevant country (or law district) for the purposes of the recognition and enforcement of the judgment of a federal court sitting in Texas (and applying Texan substantive law) was the United States and not Texas.

In that case the Court of Appeal indicated, first, that foreign judgments were **14–058** enforced in England only if the foreign court was one of "competent jurisdiction";[211] second, in deciding whether the foreign court was one of competent jurisdiction, the English court would apply, not the law of the foreign court, but English rules of the conflict of laws.[212] Those rules were developed in the 19th century, and were restated in the frequently cited judgment of Buckley L.J. in *Emanuel v Symon*[213]: "In actions *in personam* there are five cases in which the courts of this country will enforce a foreign judgment: (1) where the defendant is a subject of the foreign country in which the judgment has been obtained; (2) where he was resident in the foreign country when the action

---

[206] *Buchanan v Rucker* (1808) 9 East 192, 194.

[207] [1990] Ch. 433, 517–518 (CA).

[208] Citing *Pemberton v Hughes* [1899] 1 Ch. 781, 790 (CA).

[209] [1990] Ch. at pp.517–519.

[210] *Williams v Jones* (1845) 13 M. & W. 628, 633; *Godard v Gray* (1870) L.R. 6 Q.B. 139, 147; *Schibsby v Westenholz* (1870) L.R. 6 Q.B. 155, 159.

[211] *ibid.*

[212] See below, para.14–129.

[213] [1908] 1 K.B. 302, 309 (CA), which (as he acknowledged) was taken verbatim from the judgment of Fry J. in *Rouillon v Rousillon* (1880) 14 Ch.D. 351, 371. The Supreme Court of Canada has said that Buckley L.J.'s summary "bears a remarkable resemblance to a Code": *Morguard Investments Ltd v De Savoye* [1990] 3 S.C.R. 1077, 1087.

began; (3) where the defendant in the character of plaintiff has selected the forum in which he is afterwards sued;[214] (4) where he has voluntarily appeared; and (5) where he has contracted to submit himself to the forum in which the judgment was obtained." The actual issue in the case was whether the possession of property in the foreign country was sufficient to give jurisdiction to the foreign court,[215] and none of the heads of jurisdiction enumerated by Buckley L.J. was subjected to scrutiny in that case. As will be seen later,[216] the first case mentioned in Buckley L.J.'s statement can no longer be relied on. The second case was adopted in the 1933 Act, but was stated without reference to those cases which led to the conclusion that mere presence, without residence, would be sufficient to confer jurisdiction and which were approved by the Court of Appeal in *Adams v Cape Industries Plc*.[217] The other three cases are examples of the principle of submission and correspond respectively to the Second, Third and Fourth Cases of Rule 43. All four cases (including residence, rather than presence) were adopted (and slightly altered) in the 1933 Act, and in their altered and re-arranged form they are set out in Rule 54.

**14–059**    The provisions of the 1933 Act were deliberately framed so as to reproduce the rules of the common law as closely as possible,[218] though, as the Foreign Judgments (Reciprocal Enforcement) Committee conceded, it was found desirable to make one or two departures from the common law rules in order to secure international agreements which would be likely to operate satisfactorily in practice.[219] The question therefore arises whether the provisions of the 1933 Act as to the jurisdiction of foreign courts, and as to the scope of the defences, can legitimately be invoked by a court which is asked to enforce a foreign judgment at common law, even though the 1933 Act has not been extended by Order in Council to the foreign country in question. Although the Act has been used[220] to negative arguments that there are additional bases for recognition at common law,[221] the Court of Appeal has held that it is wrong to use the Act to ascertain the common law "by arguing backwards from the provisions of the statute."[222]

**14–060**    **The first case. Presence.** There is divergence of authority on the question whether presence, as distinct from residence, is a sufficient basis of jurisdiction. The older cases acknowledge that the residence of a defendant in the

---

[214] i.e. where a counterclaim is brought.
[215] See below, para.14–083.
[216] See below, para.14–085.
[217] [1990] Ch. 433 (CA).
[218] Report of the Foreign Judgments (Reciprocal Enforcement) Committee, Cmd. 4213 (1932), paras 2, 16, 18 and Annex V, para.7.
[219] *ibid.* para.18 and Annex V, para.7.
[220] See *Re Trepca Mines Ltd* [1960] 1 W.L.R. 1273, 1282 (CA); *Rossano v Manufacturers' Life Insurance Co Ltd* [1963] 2 Q.B. 352, 383.
[221] In *Owens Bank Ltd v Bracco* [1992] 2 A.C. 443, 489, it was held that, because the 1920 Act adopted the common law approach to fraud in relation to foreign judgments (below, para.14–145), it would be wrong for the courts now to alter the common law rule.
[222] *Henry v Geoprosco International* [1976] Q.B. 726, 751. *cf. Société Co-opérative Sidmetal v Titan International Ltd* [1966] 1 Q.B. 828, 845–846.

country at the time when proceedings are commenced gives that court jurisdiction over him at common law.[223] The position is the same under the 1920 Act[224] and the 1933 Act,[225] except that the former requires "ordinary residence", which in this context probably does not differ much from residence simpliciter[226] and the latter contains special rules for corporations. But some of the older cases also suggest that presence, rather than residence, is a sufficient basis,[227] and presence as a basis of jurisdiction is strengthened by those authorities which suggested that "temporary allegiance" to the local sovereign was one of the reasons why a defendant might be under an obligation to comply with the judgments of its courts.[228] For this reasoning is no less applicable where a defendant is merely present within the foreign country concerned. It is also supported by the authorities on the jurisdiction of the English court over persons present in England: the temporary presence of an individual defendant in England gives the English court jurisdiction at common law[229] and the test for the presence of corporations in that context[230] is the same as that for corporations in the context of the jurisdiction of foreign courts, although in the latter context it is described as residence rather than presence.[231] It may be questioned, however, whether casual presence, as distinct from residence, is a desirable basis of jurisdiction if the parties are strangers and the cause of action arose outside the country concerned. For the court is not likely to be the *forum conveniens*, in the sense of the appropriate court most adequately equipped to deal with the facts or the law.[232] The 1920 and 1933 Acts adopted residence rather than presence as the basis of jurisdiction over individuals, and presence (at least as regards domiciliaries of Member and Convention States) is regarded as an exorbitant basis of jurisdiction over individuals for the purposes of the Brussels I Regulation, and the Lugano Conventions.[233] Whilst it is true that the test for corporations in relation to foreign judgments is equivalent to that for the "presence" of corporations in the context of the jurisdiction of the English court, the test for "presence" of corporations involves some fixed place of business in the foreign country,[234] and is not comparable to what may be the fleeting presence

---

[223] *Schibsby v Westenholz* (1870) L.R. 6 Q.B. 155, 161; *Emanuel v Symon* [1908] 1 K.B. 302, 309 (CA). In *State Bank of India v Murjani Marketing Group Ltd*, unreported, March 27, 1991 (CA), Sir Christopher Slade inclined to the view that residence (in the sense of principal home) would be a sufficient basis of jurisdiction, even if the judgment debtor was not present in the foreign country at the date of commencement of proceedings.

[224] s.9(2)(b).

[225] s.4(2)(a)(iv).

[226] *cf.* above, para.6–160.

[227] *Carrick v Hancock* (1895) 12 T.L.R. 59; *Herman v Meallin* (1891) 8 W.N. (NSW) 38; *Forbes v Simmons* (1914) 20 D.L.R. 100 (Alta); *cf. General Steam Navigation Co v Guillou* (1843) 11 M. & W. 377. Contrast *Australian Assets Co Ltd v Higginson* (1897) 18 L.R. (NSW) Eq. 189, 193.

[228] *Schibsby v Westenholz* (1870) L.R. 6 Q.B. 155, 161; *cf. Sirdar Gurdyal Singh v Rajah of Faridkote* [1894] A.C. 670, 683–684 (PC).

[229] *Colt Industries Inc v Sarlie* [1966] 1 W.L.R. 440 (CA); *Maharanee of Baroda v Wildenstein* [1972] 2 Q.B. 283 (CA) above, para.11–108; *cf.* Restatement, s.28.

[230] See above, paras 11–113 *et seq.*

[231] See below, para.14–065.

[232] *cf.* Dodd (1929) 23 Ill.L.Rev. 427, 437–438.

[233] See above, para.11–257.

[234] See below, para.14–065.

of an individual, even in the extreme case where the place of business is established for a very short period.[235]

**14–061**     In *Adams v Cape Industries Plc*[236] the Court of Appeal reviewed the authorities on presence and residence in the context of the jurisdiction of foreign courts over corporations, but took the opportunity to express general views on the issue. The First Case of the Rule is framed in terms of presence rather than residence in the light of this decision but the issue remains open in the Supreme Court.

**14–062**     In *Carrick v Hancock*[237] the plaintiff was an Englishman domiciled in Sweden who had acted in Sweden as an agent on commission for the defendant, an Englishman. The defendant was served with Swedish proceedings during a short visit to Sweden, and he subsequently defended the Swedish proceedings. Accordingly, the case had a significant connection with Sweden, and in any event the defendant had clearly submitted to the jurisdiction of the Swedish courts. But in an unreserved judgment Lord Russell of Killowen C.J. decided that the Swedish judgment was enforceable because of the defendant's presence in Sweden, and "the question of the time the person was actually in the territory was wholly immaterial".[238]

**14–063**     This decision (among others[239]) was relied on by the Court of Appeal in *Adams v Cape Industries Plc* as supporting the principle that, in the absence of submission to the jurisdiction of the foreign court, the competence of a foreign court to summon the defendant before it depended on the physical presence of the defendant in the country concerned at the time of suit: "So long as he remains physically present in that country, he has the benefit of its laws, and must take the rough with the smooth, by accepting his amenability to the process of its courts. In the absence of authority compelling a contrary conclusion, we would conclude that the voluntary presence of an individual in a foreign country, whether permanent or temporary and whether or not accompanied by residence, is sufficient to give the courts of that country territorial jurisdiction over him under our rules of private international law."[240]

**14–064**     The Court of Appeal referred to the "voluntary" presence of the defendant as being one not induced by compulsion, fraud or duress, but it is clear from the context[241] that it was not finally decided that the presence of these factors would negative jurisdiction. There is no decision in England on what the position is when the defendant is forcibly brought, or fraudulently induced to

---

[235] As in *Dunlop Pneumatic Tyre Co Ltd v AG Cudwell & Co* [1902] 1 K.B. 342 (CA).

[236] [1990] Ch. 433 (CA).

[237] (1895) 12 T.L.R. 59.

[238] *ibid.* at p.60.

[239] *Sirdar Gurdyal Singh v Rajah of Faridkote* [1894] A.C. 670, 683–684; *Employers' Liability Assurance Corp v Sedgwick Collins & Co Ltd* [1927] A.C. 95, 114–115.

[240] [1990] Ch. 433 at p.519. The Court of Appeal indicated that dicta (in cases on the jurisdiction of the *English* court) indicated that the relevant time was *service* of proceedings, rather than *issue*, but expressed no final view. The Court of Appeal (at p.518) also left open the question whether residence without presence would be a sufficient basis of jurisdiction, but *cf. State Bank of India v Murjani Marketing Group Ltd*, above, which suggests that it does suffice, para.14–060.

[241] See *ibid.* pp.518–519.

come, into the jurisdiction of the foreign court and there served with proc-ess.[242] But in the United States the view is held that in such a case jurisdiction exists but may or should be disclaimed by the court for reasons of equity if the plaintiff is privy to the force or fraud.[243] In this case also, it is clear, the defendant has the benefit of the laws of the State concerned and owes temporary allegiance thereto. The question whether at common law a foreign court has jurisdiction over an individual who is neither resident or present within the foreign jurisdiction but who carries on business regularly there through an agent has been raised but not decided,[244] although it is a basis of jurisdiction under the 1920 Act.[245]

Where a corporation is concerned neither residence nor presence has, of course, any real meaning. But there is a long line of cases dealing with the question whether a foreign corporation does or does not carry on business in England so as to render itself amenable to the jurisdiction of the English courts at common law.[246] The principle of these cases applies also to the question whether a corporation is present in a foreign country so as to give its courts jurisdiction over it.[247] In *Adams v Cape Industries Plc*[248] the Court of Appeal held that in the case of corporations the test of jurisdiction is satisfied if the corporation is carrying on business at a definite and fixed place. The basic principle is that a trading corporation will be regarded as present within the jurisdiction of the courts of a foreign country if (a) it has established and maintained a fixed place of business and for more than a minimal time has carried on its own business there, *or* (b) its representative has for more than a minimal period of time been carrying on the corporation's business in that country at or from some fixed place of business. In the latter case it will be necessary to consider a number of factors (already mentioned in connection with the jurisdiction of the English court[249]) to determine whether the business being carried on is that of the corporation or its representative. In deciding whether a company is present in a foreign country as a result of the acts of a subsidiary present there, the court must consider whether the subsidiary was acting as agent, and if so, on what terms; it may also treat the subsidiary as the *alter ego* of the parent if special circumstances exist which indicate that there is a "mere façade concealing the true facts".[250] If the local agent has authority

**14–065**

---

[242] See *Stein v Valkenhuysen* (1858) E.B. & E. 65 and *Watkins v North American Lands, etc., Co* (1904) 20 T.L.R. 534 (HL), above, para.11–108, which suggest that in appropriate circum-stances English process might be set aside if the defendant was fraudulently lured into the jurisdiction.

[243] Restatement, s.82, comments b, d and f.

[244] *Blohn v Desser* [1962] 2 Q.B. 116, 123, on which see below, para.14–079. The mere fact that the defendant contracted through an agent in the foreign country is not of itself sufficient: *cf. Seegner v Marks* (1895) 21 V.L.R. 491.

[245] 1920 Act, s.9(2)(b). On the jurisdiction of the English court in such a case see above, para.11–109.

[246] See above, paras 11–114 *et seq.*

[247] *Littauer Glove Corporation v FW Millington (1920) Ltd* (1928) 44 T.L.R. 746; *Vogel v RA Kohnstamm Ltd* [1973] Q.B. 133; *Adams v Cape Industries Plc* [1990] Ch. 433 (CA); see also *Moore v Mercator Enterprises Ltd* (1978) 90 D.L.R. (3d) 590 (N.S.).

[248] [1990] Ch. 433, 530–544. *cf. Akande v Balfour Beatty Construction Ltd* [1998] I.L.Pr. 110 (a case on the 1920 Act).

[249] See above, para.11–120.

[250] [1990] Ch. at p.539, citing *Woolfson v Strathclyde Regional Council*, 1978 S.L.T. 159, 161 (HL) (a case not involving the conflict of laws).

to enter into contracts on behalf of the corporation without seeking the prior approval of the corporation, this is a powerful indicator that the corporation is present; if the agent does not have this authority, this fact points powerfully in the opposite direction.[251]

**14–066**     In the case of companies which carry on or promote their business by placing advertisements or other invitations or information on an internet website which is accessible from, or even targeted at customers in, the foreign country in which the judgment was given, there is no English support for the view that this should be regarded as, or as equivalent to, presence in that jurisdiction, or as conduct which connoted temporary allegiance to the foreign state.[252] There is a distinction to be drawn between "carrying on business in" and carrying on business from a fixed place of business in the foreign country.[253] Though the former expression may have some jurisdictional relevance in some systems, it is the latter which establishes presence for the purpose of the First Case of the Rule. And this latter has not yet been held to be demonstrated or satisfied by a "presence in cyberspace".

**14–067**     Under the 1920 Act the principle of the cases on the jurisdiction of the English court applies also to the question whether a corporation carries on business in the jurisdiction of the original court within the meaning of the Act. Thus it has been held that a New Zealand insurance company does not carry on business in Ghana merely because it maintains agents there with limited powers to settle claims.[254] The 1933 Act[255] requires that the corporation must have its principal place of business (and not merely carry on business) in the foreign country.

**14–068**     **The second case. Appearance as claimant or counter-claimant.**  It is obvious that a person who applies to a tribunal as claimant is bound to submit to its judgment, should that judgment go against him, if for no other reason than that fairness to the defendant demands this. It is no less obvious that a claimant exposes himself to acceptance of jurisdiction of a foreign court as regards any set-off, counterclaim or cross-action which may be brought against him by the defendant.[256] By the same token, a defendant who resorts

---

[251] *F&K Jabbour v Custodian of Israeli Absentee Property* [1954] 1 W.L.R. 139, 146; *Adams v Cape Industries Plc* [1990] Ch. 433, 531 (CA).

[252] *Lucasfilm Ltd v Ainsworth* [2009] EWCA Civ 1328, [2010] 3 W.L.R. 333. The point was not discussed on further appeal to the Supreme Court: [2011] UKSC 39, [2012] 1 A.C. 208.

[253] An Irish court has held that when a company is in liquidation and is no longer carrying on business, it is not to be regarded as present within the jurisdiction in question: *Re Flightlease (Ireland) Ltd* [2006] IEHC 193, [2008] 1 I.L.R.M. 53.

[254] *Sfeir & Co v National Insurance Co of New Zealand* [1964] 1 Lloyd's Rep. 330.

[255] s.4(2)(a)(iv).

[256] *Schibsby v Westenholz* (1870) L.R. 6 Q.B. 155, 161; *Burpee v Burpee* [1929] 3 D.L.R. 18 (BC); Westlake, ss.324, 325. It may, however, be otherwise where the action instituted after the claimant has submitted to the foreign jurisdiction is brought by someone other than the defendant against whom the original claim was made: see *Murthy v Sivajothi* [1999] 1 W.L.R. 467, discussed further below, para.14–075. Indeed, if a cross-action brought by the original defendant has nothing whatever to do with the subject matter of the original claim, but is permitted by the foreign court in accordance with its procedural law, it may still be arguable that the submission of the claimant should not be regarded as a matter of English law (whatever the foreign law may say, which is of no significance on this point) as automatically extending to proceedings and judgment in the cross-action.

to a counterclaim or like cross-proceeding in a foreign court clearly submits to the jurisdiction thereof.

**The third case. Appearance.** This case rests on the simple and universally admitted principle that a litigant who has voluntarily submitted himself to the jurisdiction of a court by appearing before it cannot afterwards dispute its jurisdiction. Where such a litigant, though a defendant rather than a claimant, appears and pleads to the merits without contesting the jurisdiction there is clearly a voluntary submission. The same is the case where he does indeed contest the jurisdiction[257] but nevertheless proceeds further to plead to the merits,[258] or agrees to a consent order dismissing the claims and cross-claims,[259] or where he fails to appear in proceedings at first instance but appeals on the merits.[260] If the defendant takes no part in the proceedings and allows judgment to go against him in default of appearance, and later moves to set the default judgment aside, the application to set aside may be a voluntary appearance if it is based on non-jurisdictional grounds, even if the application is unsuccessful.[261] There is no English authority directly in point; in *Guiard v De Clermont*[262] the defendant applied successfully to have a default judgment set aside and to have judgment entered in his favour at first instance, but the original judgment was restored by an appeal court; he was held to have voluntarily submitted.      **14–069**

Where the defendant contests the jurisdiction of a foreign court, the position is regulated by s.33 of the Civil Jurisdiction and Judgments Act 1982. If his challenge to the jurisdiction of the foreign court is successful, no question of submission arises. If it is unsuccessful and he goes on[263] to contest the case on the merits, he will have submitted to the jurisdiction of the foreign court. But if he takes no further part in the proceedings and judgment in default is entered against him, will he be regarded as having voluntarily submitted? Common sense would suggest that a defendant who has been vigorously protesting that a court has no jurisdiction should not be regarded as having voluntarily submitted.[264] Under the 1933 Act an appearance for the purpose of (inter alia) contesting the jurisdiction is not to be regarded as a voluntary      **14–070**

---

[257] But a defendant who wishes to enter an appearance but fails to succeed in doing so does not submit: *De Santis v Russo* [2002] 2 Qd.R 230 (Qd CA).

[258] *cf. Boissière v Brockner* (1889) 6 T.L.R. 85, criticised by Clarence Smith (1953) 2 I.C.L.Q. 510, 517–520; *McFadden v Colville Ranching Co* (1915) 8 W.W.R. 163 (Alta); *Richardson v Allen* (1916) 28 D.L.R. 134 (Alta CA).

[259] *Adams v Cape Industries Plc* [1990] Ch. 433, 461, *per* Scott J., affd. on other grounds *ibid.* p.503 (CA).

[260] *SA Consortium General Textiles v Sun & Sand Agencies Ltd* [1978] Q.B. 279 (CA) (a case on the 1933 Act).

[261] This may be an explanation for *Desert Sun Loan Corp v Hill* [1996] 2 All E.R. 847, where the application to set aside was based on the construction or validity of a power of attorney: a non-jurisdictional issue which had jurisdictional consequences.

[262] [1914] 3 K.B. 145.

[263] This expression was adopted and relied on at first instance in *AES Ust-Kamenogorsk Hydropower Plant LLP v AES Ust-Kamenogorsk Hydropower Plant JSC* [2010] EWHC 772 (Comm.), [2010] 2 Lloyd's Rep. 493, [47]–[51], affd. [2011] EWCA Civ 647, [2011] 2 C.L.C. 51.

[264] *Re Dulles' Settlement* (*No.2*) [1951] Ch. 842, 850 (CA), *per* Denning L.J. See also *Daarnhouwer & Co NV v Boulos* [1968] 2 Lloyd's Rep. 259.

appearance.[265] But in *Harris v Taylor*,[266] decided at common law, a defendant who had entered a conditional appearance in the Isle of Man court in order to set aside the proceedings on jurisdictional grounds was held to have submitted to the jurisdiction of the Manx Court, even though he took no further part in the proceedings after his application to set aside was unsuccessful. This decision was followed in *Henry v Geoprosco International*,[267] where the Court of Appeal held that there was a voluntary appearance where the defendant appeared before the foreign court to invite that court in its discretion not to exercise a jurisdiction which it had under its local law; and that there was also a voluntary appearance if the defendant merely protested against the jurisdiction of the foreign court if the protest took the form of a conditional appearance which was converted automatically by operation of law into an unconditional appearance if the decision on jurisdiction went against the defendant. The court left open the question whether an appearance the sole purpose and effect of which was to protest against the jurisdiction of the foreign court would be a voluntary appearance. The criticism to which this decision was subjected led to considerable pressure for its reversal by legislation, and this was effected by s.33 of the 1982 Act.

**14–071**        Section 33 provides that a judgment debtor shall not be regarded as having submitted by reason only of the fact that he appeared (conditionally or otherwise) in the foreign proceedings (a) to contest the jurisdiction of the court; (b) to ask the court to dismiss or stay the proceedings on the ground that the dispute in question should be submitted to arbitration[268] or to the determination of the courts of another country; or (c) to protect, or obtain the release of, property seized or threatened with seizure in the proceedings. If the defendant in the foreign court fails on any of these issues, but nevertheless goes on to defend the case on the merits, he will be regarded as having submitted. It follows that s.33 will be relevant if, but only if, the defendant has, apart from anything mentioned in the section, submitted to the jurisdiction of the foreign court, for if he has, the judgment against him will, in accordance with this Rule, be liable to be recognised and may be enforced: it is to this possibility that s.33 provides a defence.[269] If, by contrast, his participation before the foreign court would not constitute submission for the

---

[265] 1933 Act, s.4(2)(a)(i).

[266] [1914] 3 K.B. 580 (CA); followed in *Kennedy v Trites* (1916) 10 W.W.R. 412 (BC); not followed in *Dovenmuehle v Rocca Group Ltd* (1981) 34 N.B.R. (2d) 444, app. dismissed (1982) 43 N.B.R. (2d) 359 (Sup Ct Can); *WSG Nimbus Pte Ltd v Board of Control for Cricket in Sri Lanka* [2002] 3 Sing. L.R. 603 (HC). See also *Re McCain Foods and Agricultural Publishing Co Ltd* (1979) 103 D.L.R. (3d) 734 (Ont CA); *Mid-Ohio Imported Car Co v Tri-K Investments Ltd* (1995) 129 D.L.R. (4th) 181 (BCCA).

[267] [1976] Q.B. 726 (CA), criticised by Collins (1976) 92 L.Q.R. 268 (reprinted in Collins, *Essays*, p.313); Carter (1974–75) 47 B.Y.I.L. 379; Solomons (1976) 25 I.C.L.Q. 665.

[268] As in *Tracomin SA v Sudan Oil Seeds Co Ltd (No.1)* [1983] 1 W.L.R. 662, affirmed [1983] 1 W.L.R. 1026 (CA). If the applicant does not proceed to have his challenge heard and ruled on, it will be taken as waived and his appearance will be denied the protection of s.33: *Starlight International Inc v Bruce* [2002] EWHC 374 (Ch.), [2002] I.L.Pr. 617.

[269] The apparent suggestion in *AES Ust-Kamenogorsk Hydropower Plant LLP v AES Ust-Kamenogorsk Hydropower Plant JSC* [2011] EWCA Civ 647, [2011] 2 Lloyd's Rep. 233, [151], that even though the defendant has submitted to the jurisdiction of the foreign court, the English court is not bound to recognise or enforce the foreign judgment, because s.33 does not contain a specific instruction to that effect, is insupportable.

purpose of the English rules of the conflict of laws, s.33 has no role to play.[270]

If a defendant makes an appearance in order to argue that the court seised **14–072** has no international jurisdiction over him according to its law, the section plainly applies to protect him from the contention that he submitted by appearance. But if he appears to argue that the particular court has no local jurisdiction because the claim exceeds its internal competence, or because the court in a different judicial district alone has jurisdiction, it is less clear that an appearance to make this objection this would be protected by s.33(1)(a). Certainly it was not the problem which was presented by *Henry v Geoprosco International*, and which the section was immediately designed to remedy. It is submitted that if the whole of the relief sought by the defendant from the foreign court is a decision by the court that it has no international jurisdiction, the appearance will be protected from being regarded as a submission by s.33(1)(a);[271] but that a contention that a different court (but in the same country) has jurisdiction is not to be seen as contesting the jurisdiction within the meaning of s.33(1)(a), for it is implicit in the contention that the courts of the country do not lack jurisdiction.

Some systems of law require or allow a defendant to plead to the merits at **14–073** the same time as, and as an alternative to, an objection to the jurisdiction. In *Boissière & Co v Brockner*[272] a plea on the merits put forward in this way was regarded as a submission at common law. But it should not now be so regarded, provided at least that, having lost on the issue of jurisdiction, the defendant does not put forward his case on the merits. This conclusion is supported by two decisions on submission as a basis of jurisdiction in the original court, and by two decisions on foreign judgments. In *Elefanten Schuh GmbH v Jacqmain*[273] the European Court held, in the context of Art.18 of the Brussels Convention, that pleading to the merits as an alternative to an objection to the jurisdiction would not be a submission. The House of Lords has held, in the context of submission to the jurisdiction of the English court,[274] that a step in the proceedings only amounts to a submission when the defendant has taken some step which is only necessary or only useful if the objection to the jurisdiction has been waived.[275] In *Adams v Cape Industries Plc*[276] defendants to United States proceedings objected to the jurisdiction of

---

[270] *cf. AES Ust-Kamenogorsk Hydropower Plant LLP v AES Ust-Kamenogorsk Hydropower Plant JSC* [2010] EWHC 772 (Comm.), [2010] 2 Lloyd's Rep. 493 (no submission, as it could not be said that the defendant had lost his jurisdictional challenge but then gone on to defend: the defendant contested jurisdiction at all times, so there was neither room nor need for s.33 to be applied). This analysis is to be preferred to that of the Court of Appeal.

[271] In *Desert Sun Loan Corp v Hill* [1996] 2 All E.R. 847 (CA), the defendant appeared before the foreign court to contend that he had not authorised his attorney to accept service of the writ. The majority (Evans and Stuart-Smith L.JJ.) did not appear to consider s.33(1)(a) to be relevant to the case; by contrast, Roch L.J. interpreted such a contention as falling squarely within the section.

[272] (1889) 6 T.L.R. 85.

[273] Case 150/80 [1981] E.C.R. 1671.

[274] See above, para.11–128.

[275] *Williams & Glyn's Bank v Astro Dinamico* [1984] 1 W.L.R. 438 (HL), applied in *Akai Pty Ltd v People's Insurance Co Ltd* [1998] 1 Lloyd's Rep. 90.

[276] [1990] Ch. 433, 461 *per* Scott J., affirmed on other grounds *ibid.* p.503 (CA); *The Eastern Trader* [1996] 2 Lloyd's Rep. 585, 600; *Akai Pty Ltd v People's Insurance Co Ltd*, above *cf. Canada Trustco Mortgage Co v Rene Management & Holdings Ltd* (1986) 32 D.L.R. (4th) 747

the court, but also participated in pre-trial discovery on the merits of the case. These steps were accompanied, expressly or impliedly, by a re-assertion of the jurisdictional objection, and under Federal law the steps taken did not amount to a submission. It was held that steps not regarded by the foreign court as a submission should not be regarded as a submission for the purposes of enforcement in England. More importantly, perhaps, in *AES Ust-Kamenogorsk Hydropower Plant LLP v AES Ust-Kamenogorsk Hydropower Plant JSC*[277] it was held, correctly, that even if the foreign court might regard the defendant as having submitted to its jurisdiction, it was still open to an English court to find that there had been no submission as a matter of the English rules of the conflict of laws. In *Marc Rich & Co AG v Soc Italiana Impianti PA (No.2)*[278] it was held that s.33 should not be construed narrowly: an objection to the jurisdiction of the Italian court, accompanied by a defence on the merits, did not amount to a submission, even though it was not necessary under Italian law for an alternative defence on the merits to be put forward. But after the Italian court had ruled that the parties had not agreed to arbitrate in London, and that it therefore had jurisdiction over the merits of the dispute, the defendants in the Italian proceedings lodged a defence on the merits. The consequence was that they thereby submitted to the jurisdiction of the Italian court, and were bound by the decision that the contract did not contain an arbitration clause. The general thrust of the authorities, which were all examined in *AES Ust-Kamenogorsk Hydropower Plant LLP v AES Ust-Kamenogorsk Hydropower Plant JSC*[279] is that for so long as the defendant asserted, and is obviously[280] still asserting, as his primary defence that the court has no jurisdiction over him in relation to the merits of the claim, then even if he also takes steps which are purposeful in relation to the merits of the claim, his doing so should not be taken to mean that he has submitted to the jurisdiction for the purposes of the common law of submission, and has abandoned his challenge for the purpose of s.33. The real question for the English court should not be whether the defendant has taken a step in proceedings which prepare for the trial of the merits, but whether he has chosen to abandon his challenge to the jurisdiction. In answering this, the English court is not bound to follow the law of the foreign court on whether a defendant has succumbed to its jurisdiction; and if the defendant had "no real option but to act as it did", as it was put in *AES Ust-Kamenogorsk Hydropower Plant LLP v AES Ust-Kamenogorsk Hydropower Plant JSC,*[281] the court may be reluctant to find that it has submitted to the jurisdiction.

**14–074** Where the property of the defendant is attached in foreign proceedings and he intervenes to obtain its release, a similar question of submission arises. The

---

(Man); *Gourmet Resources International Inc v Paramount Capital Corp* [1993] I.L.Pr. 583 (Ont).

[277] [2010] EWHC 772 (Comm.), [2010] 2 Lloyd's Rep. 493, [42]–[52]. The decision of the Court of Appeal ([2011] EWCA Civ 647, [2011] 2 Lloyd's Rep. 233) at [186] did not disturb this conclusion.

[278] [1992] 1 Lloyd's Rep. 624 (CA); *The Eastern Trader*, above, at pp.598–602.

[279] [2011] EWCA Civ 647, [2011] 2 Lloyd's Rep. 233.

[280] And perhaps rationally: it will not be open to a defendant to give himself a lifeline by complaining about the jurisdiction in circumstances where there is no basis for making a challenge to it.

[281] [2011] EWCA Civ 647, [2011] 2 Lloyd's Rep. 233, [200].

1933 Act provided, for cases within its scope, that an appearance for the purpose of protecting, or obtaining the release of, property seized or threatened with seizure in the foreign proceedings was not to be regarded as a voluntary appearance.[282] There was some doubt as to the extent to which this represented the common law rule,[283] but the 1982 Act[284] makes this principle one of general application. The common law authorities may still be helpful in considering the extent to which the defendant may go in taking steps to preserve his property. Thus it is clear that an appearance was not involuntary at common law merely because it was motivated by the fact that the defendant had property within the jurisdiction of the foreign court on which execution might be levied in the event of judgment going against him by default;[285] still less was an appearance involuntary when it was made because, although the defendant had no property within the jurisdiction of the foreign court, his business often took him there, so that the judgment might be made effective against him.[286] Secondly, an appearance is not involuntary when it is made after execution has been levied under the judgment in order to rescue the property which is the subject-matter of the execution.[287] Thirdly, if property is seized and the defendant appears and defends the case on the merits, the appearance is not involuntary.[288] But there may be cases in which the defendant may appear to oppose the seizure on jurisdictional grounds, e.g. where he denies he has property within the jurisdiction or where he challenges the validity of the seizure.[289] In such cases the effect of s.33 of the 1982 Act is that the appearance will not be voluntary.

The defendant, by an appearance which is voluntary in the sense explained, renders himself subject to the jurisdiction of the foreign court with respect not only to the original claim but also to such further claims as the court allows to be added by the plaintiff. But this does not mean that he subjects himself also to claims by new claimants.[290] In principle, a submission will extend to claims concerning the same subject-matter, and to related claims which ought to be dealt with in the same proceedings, but (in either case) only if advanced

**14–075**

---

[282] 1933 Act, s.4(2)(a)(i).

[283] *Voinet v Barrett* (1885) 55 L.J.Q.B. 39, 41 (CA); *Schibsby v Westenholz* (1870) L.R. 6 Q.B. 155, 162 (CA); *Guiard v De Clermont* [1914] 3 K.B. 145, 155; *Henry v Geoprosco International* [1976] Q.B. 726, 746–747 (CA).

[284] 1982 Act, s.33(1)(c).

[285] *De Cosse Brissac v Rathbone* (1861) 6 H. & N. 301 (the third plea).

[286] *Voinet v Barrett* (1855) 55 L.J.Q.B. 39 (CA).

[287] *Guiard v De Clermont* [1914] 3 K.B. 145; *Poissant v Poissant* [1941] 3 W.W.R. 646, 650 (Sask).

[288] *Clinton v Ford* (1982) 137 D.L.R. (3d) 281 (Ont CA); *cf. Re Low* [1894] 1 Ch. 147, 160 (CA).

[289] As he may do in the United States on constitutional grounds: see *Shaffer v Heitner*, 433 U.S. 186 (1977). It is to be noted that although s.33(1)(c) is not expressly limited to appearances to protect property on jurisdictional grounds, such a limitation should be read it to avoid the absurdity of the sub-section providing a shield against recognition to every defendant who asserts, truthfully, that the only reason he defended on the merits was to protect property which had been seized or which had been threatened with seizure if judgment on the merits was given against him.

[290] See Restatement, s.26, comment e and Illustration 8, and *Re Indiana Transportation Co*, 244 U.S. 456 (1917) (submission to jurisdiction in respect of death of one passenger held not to involve submission in other claims). And see, by analogy, *Jordan Grand Prix Ltd v Baltic Insurance Group* [1999] 2 A.C. 127.

by parties who were such at the date of the defendant's submission to the jurisdiction of the court; the decision of the foreign court to allow the new claim is not decisive.[291]

**14–076**        **The fourth case. Agreement to submit.**  If a contract provides that all disputes between the parties shall be referred to the exclusive[292] jurisdiction of a foreign tribunal, not only will proceedings brought in England in breach of such agreement usually be stayed,[293] but also the foreign court is deemed to have jurisdiction over the parties.[294] A contractual submission to a particular court is not of itself a submission generally to the jurisdiction of all courts of that country;[295] the question is one of construction of the contract.[296]

**14–077**        An agreement to submit may also take the form of an agreement to accept service of process at a designated address. Thus, if a person takes shares in a foreign company, the articles of association or statutes of which provide that all disputes shall be submitted to the jurisdiction of a foreign court, and that every shareholder must "elect a domicile" at a particular place for service of process, and that in default the officers of the company may do so for him, then he is deemed to have agreed to submit to the jurisdiction of the foreign court, even if he never does elect a domicile.[297] And a member of a foreign company is bound by a statute enacted in the country of its incorporation providing that the particular company may sue and be sued in the name of its chairman and that execution on any judgment against the company may be issued against the property of any member in like manner as if the judgment had been obtained against him personally.[298] But English courts have stopped short of inferring an agreement to submit from a mere general provision in the foreign law (and not in the articles of association or in a statute specifically referring to the particular company) that the shareholder must "elect a domicile" for the service of process,[299] unless he does in fact elect such a domicile.[300]

**14–078**        It would seem that a judgment based on a "cognovit clause," which gives a claimant or his lawyer power to enter judgment against the defendant in a

---

[291] *Murthy v Sivajothi* [1999] 1 W.L.R. 467 (CA), in which the text to n.290 was approved. The principle in *Murthy* was applied in *Whyte v Whyte* [2005] EWCA Civ 858.

[292] The same will be true where the jurisdiction agreement is non-exclusive, though proceedings brought in England in breach of such an agreement be less likely to be stayed.

[293] Rule 40(2). A non-exclusive jurisdiction agreement (see above, para.12–105) will also be regarded as a submission: *First Capital Ltd v Winchester Computer Corp* (1987) 44 D.L.R. (4th) 301 (Sask CA).

[294] *Feyerick v Hubbard* (1902) 71 L.J.K.B. 509; *Jeannot v Fuerst* (1909) 25 T.L.R. 424.

[295] *SA Consortium General Textiles v Sun & Sand Agencies Ltd* [1978] Q.B. 279 (CA) (a case on the 1933 Act).

[296] See Briggs (2004) 8 Sing. Yb. Int. L. 1.

[297] *Copin v Adamson* (1874) L.R. 9 Ex. 345; (1875) 1 Ex. D. 17 (CA) (the first replication).

[298] *Bank of Australasia v Harding* (1850) 9 C.B. 661; *Bank of Australasia v Nias* (1851) 16 Q.B. 717; *Kelsall v Marshall* (1856) 1 C.B.(N.S.) 241.

[299] *Copin v Adamson* (1874) L.R. 9 Ex. 345 (the second replication). The point was reserved in the Court of Appeal: see 1 Ex D. 17, 19. See also *Risdon Iron & Locomotive Works v Furness* [1906] 1 K.B. 49, 57; *Allen v Standard Trusts Co* (1920) 57 D.L.R. 105 (Man CA); *Veco Drilling v Armstrong* [1982] 1 W.W.R. 177 (BC); *Jamieson v Robb* (1881) 7 V.L.R. 170, on which see Read, pp.176–177.

[300] *Vallée v Dumergue* (1849) 4 Exch. 290.

specified court in the event of a default in payment, would be enforceable on the basis that the defendant has agreed thereby to submit,[301] at any rate if the clause is valid by the law applicable to the contract. Such clauses are common in the United States, where they are subject to widespread criticism because of their potential abuse, and where their validity varies from state to state.[302]

It may be laid down as a general rule that an agreement to submit to the jurisdiction of a foreign court must be express: it cannot be implied.[303] If the parties agree, expressly or by implication, that their contract shall be governed by a particular foreign law, it by no means follows that they agree to submit to the jurisdiction of the courts which apply it.[304] Nor can any such agreement be implied from the fact that the cause of action arose within a foreign country or from the additional fact that the defendant was present there when the cause of action arose.[305] In *Emanuel v Symon*,[306] the Court of Appeal held that a defendant did not submit to the courts of a foreign country merely because he became a member of a partnership firm which carried on business there. But in *Blohn v Desser*,[307] Diplock J. held that where a person resident in England became a sleeping partner in an Austrian firm she did submit to the jurisdiction of the Austrian courts. These cases can perhaps be reconciled on the basis that *Emanuel v Symon* was concerned with the liability of the partners *inter se*, while *Blohn v Desser* was concerned with the liability of a partner to an outside creditor. In other words, there was an element of holding out in *Blohn v Desser* which was absent from *Emanuel v Symon*. It is submitted that on this point *Blohn v Desser* cannot be supported. It was not followed in *Vogel v RA Kohnstamm Ltd*,[308] and in *Adams v Cape Industries Plc*[309] Scott J. said that he did not think it was right that an agreement to submit could be implied: but he accepted that an alleged consent which was not contractually enforceable could be treated as a representation by the defendant of a willingness to submit to the jurisdiction if acted upon by the plaintiff, provided that the representation was intended to be acted upon, or at least be one which the

**14–079**

---

[301] See *Re Hughes & Sharp* (1968) 70 D.L.R. (2d) 298, reversed on other grounds (1969) 5 D.L.R. (3d) 760 (BCCA); *Batavia Times Publishing Co v Davis* (1977) 82 D.L.R. (3d) 247, app. dismissed (1979) 102 D.L.R. (3d) 192 (Ont CA); Read, p.172.

[302] See Hay, Borchers and Symeonides, p.1467; Restatement, s.32.

[303] *Sirdar Gurdyal Singh v Rajah of Faridkote* [1894] A.C. 670 (PC); *Emanuel v Symon* [1908] 1 K.B. 302 (CA); *Vogel v RA Kohnstamm Ltd* [1973] Q.B. 133 and *New Hampshire Insurance Co v Strabag Bau AG* [1992] 1 Lloyd's Rep. 361, 371–372 (CA), not following dicta in *Blohn v Desser* [1962] 2 Q.B. 116, 123 and in *Sfeir & Co v National Insurance Co of New Zealand* [1964] 1 Lloyd's Rep. 330, 339–340.

[304] *Sfeir & Co v National Insurance Co of New Zealand* [1964] 1 Lloyd's Rep. 330, 340 (a case on the 1920 Act); *Mattar and Saba v Public Trustee* [1952] 3 D.L.R. 399 (Alta CA); *Dunbee Ltd v Gilman & Co* (1968) 70 S.R.N.S.W. 219; also reported [1968] 2 Lloyd's Rep. 394.

[305] *Sirdar Gurdyal Singh v Rajah of Faridkote* [1894] A.C. 670 (PC); *Emanuel v Symon* [1908] 1 K.B. 302 (CA); *Mattar and Saba v Public Trustee* [1952] 3 D.L.R. 399 (Alta CA); *Gyonyor v Sanjenko* [1971] 5 W.W.R. 381 (Alta).

[306] [1908] 1 K.B. 302 (CA).

[307] [1962] 2 Q.B. 116, 123, criticised Lewis (1961) 10 I.C.L.Q. 910; Cohn (1962) 11 I.C.L.Q. 583; Carter (1962) 38 B.Y.I.L. 493.

[308] [1973] Q.B. 133.

[309] [1990] Ch. 433, 465–466, *per* Scott J., affirmed on other grounds *ibid.* p.503 (CA).

plaintiff reasonably believed was intended to be acted upon. But in that case no such representation could be inferred.[310]

**14–080**      If the defendant agrees to submit to the jurisdiction of a foreign court, and agrees (or is deemed to agree) to a particular method of service, it is immaterial at common law that he does not receive actual notice of the proceedings if service is effected in the agreed manner.[311] It was suggested in earlier editions of this work[312] that, even if there is no agreement as to method of service, it is immaterial that the defendant did not receive sufficient notice of the proceedings to enable him to defend them; but it is submitted that there is no rule to this effect: the ultimate question is whether there has been substantial injustice, and the court may take into account (inter alia) whether the foreign law provides an opportunity for the judgment to be set aside.[313]

**14–081**      The 1920 and 1933 Acts both contain provisions, separate and distinct from their provisions as to jurisdiction, which require respectively that the defendant must have been duly served[314] or must have received notice of the proceedings in sufficient time to enable him to defend.[315]

**14–082**      **What does not give jurisdiction.** The rules of common law (by contrast with those under the 1933 Act, which are exhaustive[316]) as to jurisdiction are not necessarily exclusive. Like any other common law rules, they are no doubt capable of judicious expansion to meet the changing needs of society. However, English courts have decided that certain jurisdictional bases are inadequate, though some of them are quite commonly relied upon by foreign courts. These are as follows:

**14–083**      (1) *Possession by the defendant of property in the foreign country.* This is relied upon in Scotland[317] but has been rejected in England.[318] As early as the Judgments Extension Act 1868 the registration in England or Northern Ireland of a Scottish judgment based on this ground was specifically excluded.

**14–084**      (2) *Presence of the defendant in the foreign country at the time when the cause of action arose.* Though a dictum of Lord Blackburn favours this

---

[310] In particular, it was held that a submission in one set of proceedings could not be regarded as a submission in another set of (related) proceedings.

[311] *Vallée v Dumergue* (1849) 4 Exch. 290; *Bank of Australasia v Harding* (1850) 9 C.B. 661; *Bank of Australasia v Nias* (1851) 16 Q.B. 509; *Copin v Adamson* (1875) 2 Ex. D. 17 (CA). *cf. Jamieson v Robb* (1881) 7 V.L.R. 170.

[312] 11th ed., p.446. *cf. Feyerick v Hubbard* (1902) 71 L.J. K.B. 509; and the Canadian cases on "cognovit clauses", above, n.301.

[313] *Adams v Cape Industries Plc* [1990] Ch. 433, 563–571; *cf. Jeannot v Fuerst* (1909) 25 T.L.R. 424. See below, Rule 52.

[314] 1920 Act, s.9(2)(c).

[315] 1933 Act, s.4(1)(a)(iii).

[316] *Société Co-opérative Sidmetal v Titan International Ltd* [1966] 1 Q.B. 828; *Sharps Commercials Ltd v Gas Turbines Ltd* [1956] N.Z.L.R. 819 (a decision on the identically worded New Zealand Act).

[317] See Anton, paras 9.32–9.33.

[318] *Schibsby v Westenholz* (1870) L.R. 6 Q.B. 155, 163; *Rousillon v Rousillon* (1880) 14 Ch.D. 351, 371; *Sirdar Gurdyal Singh v Rajah of Faridkote* [1894] A.C. 670 (PC); *Emanuel v Symon* [1908] 1 K.B. 302 (CA).

head,[319] the Privy Council and the Court of Appeal have since rejected it.[320]

(3) *Defendant a national of the foreign country.*  There is a long chain of dicta extending from 1828 to 1948 suggesting that the courts of a foreign country might have jurisdiction over a person if he was a subject or citizen of that country.[321] But there is no actual decision which supports this proposition. *Douglas v Forrest*[322] goes nearest to a decision to this effect. But that is a very old case, and the judgment dwells also on the fact that the defendant retained property in the foreign country—an alternative basis of jurisdiction which would not now be acknowledged as adequate. It is evident that nationality is quite inappropriate as a basis of jurisdiction when the defendant is, e.g. a British citizen[323] or an American citizen,[324] or an Australian citizen since in these cases the political unit (or State) does not coincide with the law district (or country). Citizenship does not serve to identify them with any particular law district, such as England or New York or Victoria, within a composite State such as the United Kingdom, the United States or Australia. Moreover, the question whether a person is a national of a given state is a matter for the law of that State.[325] As a connecting factor, therefore, nationality is not subject to the control or definition of the *lex fori*; and as the law of the given State may deem a person to be a national, or deny nationality, on grounds which are objectionable in English eyes, nationality would constitute too unpredictable a basis for jurisdiction. Nationality as a basis of jurisdiction has been doubted by three High Court judges,[326] and definitely rejected by the Irish High Court.[327] It cannot therefore safely be relied upon today.[328] It is not mentioned as a basis of jurisdiction in the 1933 Act.

**14–085**

(4) *Defendant domiciled (but not resident or present) in the foreign country.* There are dicta in English cases[329] which suggest (though rather faintly) the

**14–086**

---

[319] *Schibsby v Westenholz* (1870) L.R. 6 Q.B. 155, 161.

[320] *Sirdar Gurdyal Singh v Rajah of Faridkote* [1894] A.C. 670 (PC); *Emanuel v Symon* [1908] 1 K.B. 302 (CA); *cf. Mattar and Saba v Public Trustee* [1952] 3 D.L.R. 399 (Alta CA); *Gyonyor v Sanjenko* [1971] 5 W.W.R. 381 (Alta).

[321] *Douglas v Forrest* (1828) 4 Bing. 686; *Schibsby v Westenholz* (1870) L.R. 6 Q.B. 155, 161; *Rousillon v Rousillon* (1880) 14 Ch.D. 351, 371; *Emanuel v Symon* [1908] 1 K.B. 302, 309 (CA); *Gavin Gibson & Co v Gibson* [1913] 3 K.B. 379, 388; *Harris v Taylor* [1915] 2 K.B. 580, 591 (CA); *Forsyth v Forsyth* [1948] P. 125, 132 (CA). *cf.* Restatement, s.31, comment c. Contrast *Independent Trustee Services Ltd v Morris* [2010] NSWSC 1218.

[322] (1828) 4 Bing. 686.

[323] See *Gavin Gibson & Co v Gibson* [1913] 3 K.B. 379.

[324] See *Dakota Lumber Co v Rinderknecht* (1905) 6 Terr.L.R. 210, 221–224.

[325] See above, para.6–167.

[326] *Blohn v Desser* [1962] 2 Q.B. 116, 123; *Rossano v Manufacturers' Life Insurance Co Ltd* [1963] 2 Q.B. 352, 382–383; *Vogel v RA Kohnstamm Ltd* [1973] Q.B. 133; see also *Patterson v D'Agostino* (1975) 58 D.L.R. (3d) 63 (Ont).

[327] *Rainford v Newell-Roberts* [1962] I.R. 95.

[328] The observations in *British Nylon Spinners Ltd v Imperial Chemical Industries* [1953] Ch. 19, 25 (CA) relate, it is submitted, to nationality as a basis of legislative rather than curial jurisdiction.

[329] *Turnbull v Walker* (1892) 67 L.T. 767, 769; *Emanuel v Symon* [1908] 1 K.B. 302, 308, 314 (CA); *Jaffer v Williams* (1908) 25 T.L.R. 12, 13; *Gavin Gibson & Co v Gibson* [1913] 3 K.B. 379, 385.

recognition of domicile in the common law sense[330] as a basis of jurisdiction, but no English decision supports this, though one Canadian decision does.[331] It is not claimed as a ground of jurisdiction by the Scottish courts.[332] It is not mentioned in the 1933 Act. Despite the Canadian decision referred to above, Dean Read concluded that "domicile alone, unaccompanied by either residence or presence, will not yet suffice."[333]

**14–087**      (5) *Reciprocity.*  Reciprocity is used in two distinct senses in connection with the recognition and enforcement of foreign judgments. Firstly, it is used to describe the view, once espoused by the United States Supreme Court[334] but which has been largely abandoned in the United States,[335] that a judgment rendered by the court of a foreign country will not be enforced unless that country would enforce a comparable judgment of the requested court. That view of reciprocity forms part of the law of many civil law countries,[336] but has never been the law in England. Secondly, reciprocity is used to describe the view that the English court should recognise the jurisdiction of the foreign court if the situation is such that, *mutatis mutandis*, the English court might have exercised jurisdiction, e.g. under CPR, r.6.36 and Practice Direction 6B.[337] On the present state of the authorities, the jurisdiction of the foreign court will not be recognised on such a basis.

**14–088**      In *Schibsby v Westenholz*[338] the plaintiff brought an action in England on a French judgment. The defendant was not in France when the writ was issued, nor did he appear or submit to the jurisdiction. The writ was served on him in England. The Court of Queen's Bench was much pressed with the argument that, under what were then ss.18 and 19 of the Common Law Procedure Act 1852 and is now CPR, r.6.36[339] the English court would have had power to order service out of the jurisdiction on converse facts, and therefore it should enforce the French judgment. In rejecting this argument Lord Blackburn observed[340] that "if the principle on which foreign judgments were enforced was that which is loosely called 'comity,' we could hardly decline to enforce a foreign judgment given in France against a resident in Great Britain under circumstances hardly, if at all, distinguishable from those under which we, *mutatis mutandis*, might give judgment against a resident in France; but it is quite different if the principle be that which we have just laid down" (i.e. the doctrine of obligation quoted earlier in this chapter[341]). This was followed in *Turnbull v Walker*,[342] where Wright J. refused to enforce a New Zealand

---

[330] Domicile in the sense of the 1982 Act would for most purposes be within the First Case.
[331] *Marshall v Houghton* [1923] 2 W.W.R. 553 (Man CA). *cf.* Restatement, s.29.
[332] *Kerr v Ferguson*, 1931 S.C. 736, overruling *Glasgow Corporation v Johnston*, 1915 S.C. 555.
[333] Read, p.160.
[334] *Hilton v Guyot*, 159 U.S. 113 (1895).
[335] Restatement Third, *Foreign Relations Law*, s.481, Rep. Note 1.
[336] e.g. Germany: Code of Civil Procedure, para.328.
[337] See Rule 34, above.
[338] (1870) L.R. 6 Q.B. 155.
[339] i.e. Rule 34, above.
[340] At p.159.
[341] See above, para.14–006.
[342] (1892) 67 L.T. 767. *cf. Phillips v Batho* [1913] 3 K.B. 25, 29–30; *Wendel v Moran*, 1993 S.L.T. 44 (fact that delict occurred in the US insufficient to give jurisdiction).

judgment based on provisions for the service of writs out of the jurisdiction which were identical with the English provisions.

In spite of these decisions, it was suggested by Denning L.J.[343] that an **14–089** English court would recognise that a court in the Isle of Man had jurisdiction to give a judgment based on service of the writ out of the jurisdiction if the English court would have assumed jurisdiction in converse circumstances. And in *Travers v Holley*[344] the Court of Appeal recognised a New South Wales divorce granted in the absence of domicile on the ground that "it would be contrary to principle and inconsistent with comity if the courts of this country were to refuse to recognise a jurisdiction which *mutatis mutandis* they claimed for themselves." The width and generality of this statement led to suggestions being made extra-judicially[345] that the principle of reciprocity might be applicable to foreign judgments *in personam*. But it has since been held that this is not so and that English courts do not concede jurisdiction in the international sense *in personam* to foreign courts merely because English courts would, in converse circumstances, have power to order service out of the jurisdiction.[346] "The decision in *Travers v Holley* was a decision limited to a judgment *in rem* in a matter affecting matrimonial status, and it has not been followed in any case except a matrimonial case."[347] "Comity has never been the basis on which we recognise or give effect to foreign judgments."[348] "I am unwilling to accept . . . that the law of foreign divorce (still less other) jurisdiction must be a mirror image of our own law."[349] Indeed, in *Amin Rasheed Shipping Corp v Kuwait Insurance Co*[350] (which was not a case involving foreign judgments) Lord Diplock went so far as to say that the jurisdiction exercised under what is now CPR, r.6.36 and PD6B, para.3.1 is an exorbitant jurisdiction, in the sense that "it is one which, under general English conflict rules, an English court would not recognise as possessed by any foreign court in the absence of some treaty providing for such recognition." Although Lord Diplock was wrong to describe what is now CPR, r.6.36 and PD6B, para.3.1 as an exorbitant jurisdiction,[351] he was certainly expressing the orthodox view on recognition of foreign judgments in cases where the debtor was neither within the foreign jurisdiction nor had submitted to it. Thus, none of the following facts by itself gives international jurisdiction to the courts of a foreign country: that the cause of action arose out of a contract made or broken there or which was to be governed by the law thereof, or out of a tort committed there; or that the defendant is a necessary or proper party

---

[343] *Re Dulles' Settlement (No.2)* [1951] Ch. 842, 851 (CA).

[344] [1953] P. 246, 257, *per* Hodson L.J.

[345] Kennedy (1954) 32 Can.Bar Rev. 359, 373–383; (1957) 35 *ibid.* 123; Cheshire, 7th ed., pp.557–558.

[346] *Re Trepca Mines Ltd* [1960] 1 W.L.R. 1273, 1280–1282 (CA); *Société Co-opérative Sidmetal v Titan International Ltd* [1966] 1 Q.B. 828; *Sharps Commercials Ltd v Gas Turbines Ltd* [1956] N.Z.L.R. 819, 823; *Crick v Hennessy* [1973] W.A.R. 74.

[347] *Re Trepca Mines Ltd*, above, at pp.1281–1282, *per* Hodson L.J., approved in *Henry v Geoprosco International* [1976] Q.B. 726, 745 (CA). *cf. Schemmer v Property Resources Ltd* [1975] Ch. 273, 287.

[348] *Indyka v Indyka* [1969] 1 A.C. 33, 58, *per* Lord Reid, citing *Schibsby v Westenholz* (1870) L.R. 6 Q.B. 155 at p.159.

[349] *ibid.*, at p.106, *per* Lord Wilberforce.

[350] [1984] A.C. 50, 65.

[351] See above, para.11–142, n.404.

to an action properly brought against a person duly served. This has led some to say that in proceedings *in personam*, English courts claim a wider jurisdiction than they are prepared to concede to foreign courts. But it is submitted that such an observation involves playing with words and is apt to mislead. For there is no obvious reason for there to be symmetry between the jurisdiction which is exercised by an English court which is asked to adjudicate (but which does not do so with any concern for whether its judgment may be enforced outside the jurisdiction), and that "jurisdiction" of a foreign court which means that, as far as the common law is concerned, its judgment may be recognised as *res judicata* in England. The word "jurisdiction" is used in each case, but it is being used in two distinct different senses. Insofar as the point can be made at all, the similarity is linguistic rather than substantial.

**14–090**      (6) *Real and substantial connection.* In *Indyka v Indyka*[352] the House of Lords held that foreign divorce decrees should be recognised, not only on the basis of reciprocity under the doctrine in *Travers v Holley*, but also wherever a real and substantial connection was shown between the petitioner and the country whose court granted the decree. There is no authority in England which suggests that this is the appropriate test for the recognition and enforcement of foreign judgments *in personam*. But in 1990 the Supreme Court of Canada held in *Morguard Investments Ltd v De Savoye*[353] that, as regards the enforcement of judgments between the Canadian provinces, it was no longer appropriate to apply the 19th century rules developed in England for the recognition and enforcement of wholly foreign judgments. It was held that courts in one province should give full faith and credit (a phrase borrowed from the United States Constitution) to judgments given by a court in another province or territory "so long as that court has properly, or appropriately, exercised jurisdiction in the action". That condition was met when the defendant was present in the foreign jurisdiction at the time of the action, or submitted to its judgment by agreement or appearance: in other cases, the test to be applied was not that of reciprocity in the sense discussed above,[354] but whether the foreign jurisdiction had a real and substantial connection with the claim.

**14–091**      The decision of the Supreme Court of Canada involved the enforcement of an Alberta judgment in British Columbia, and rested in part on the federal structure of the Constitution, including the strong need for the enforcement throughout the country of judgments given in one province; the fact that there were no concerns about differential quality of justice in the various provinces; and the existence of the Supreme Court of Canada as a court of final review, which could determine when the courts of one province have appropriately

---

[352] [1969] 1 A.C. 33.

[353] [1990] 3 S.C.R. 1077, on which see Black and Swan (1991) 12 Advocates' Q. 489. *cf.* Briggs (1987) 36 I.C.L.Q. 240.

[354] Which was the basis on which the judgment had been recognised in the lower court: [1988] 5 W.W.R. 650 (BCCA), on which see Blom (1989) 68 Can.B.Rev. 359; Black (1989) 4 Oxford J. Leg. Stud. 547; Law Reform Commission, British Columbia, *The Enforcement of Judgments Between Canadian Provinces* (1989).

*Foreign Judgments*          RULE 43

exercised jurisdiction. Despite these doubts, in *Beals v Saldanha*[355] the Supreme Court extended the principle to permit the recognition of a judgment from the courts of Florida entered in default of defence. It thereby confirmed that this test will be applied to the recognition of foreign judgments generally, though this will be in addition to the traditional grounds of presence and submission, rather than as replacement of them.

(7) *Judgment in personam ancillary to divorce decree.*   In *Phillips v Batho*,[356] it was held that a judgment of an Indian divorce court awarding damages to a husband against a co-respondent could be enforced in England, although the co-respondent had left India before the commencement of the proceedings for divorce and did not submit to the jurisdiction. The decision is in terms confined to a foreign country which is part of the Commonwealth. It is submitted that this decision is wrong and that a foreign judgment for damages or costs against a co-respondent cannot be enforced in England unless the foreign court had jurisdiction over him under Rule 44. The decision has been severely criticised extra-judicially,[357] it has not been followed in New Zealand,[358] and there is a later English case which undermines its reasoning.[359]   **14–092**

### ILLUSTRATIONS[360]

THE FIRST CASE

1. 462 Individuals bring personal injury actions in the federal court in Texas against (inter alia) X & Co, an English company which is the holding company of two other defendants: Y & Co, an English company, which is engaged in the worldwide marketing of asbestos, and Z & Co, an Illinois corporation, which is engaged in the marketing of asbestos in the United States. X & Co and Y & Co object to the jurisdiction of the federal court, but the actions are settled under a consent order by a payment to the plaintiffs to which X & Co and its subsidiaries contribute. Subsequently a further 206 individuals commence similar proceedings in Texas. X & Co, Y & Co and Z & Co take no part in these proceedings. Z & Co ceases to carry on business, and the United States marketing is carried on by two new subsidiaries of X & Co, one incorporated in Illinois and the other in Liechtenstein, whose shares are held by nominees. Subsequently default judgments are entered in the Texas court. The default judgments are not recognised because, among other reasons,[361] the federal court in Texas has no jurisdiction: the consent order in the first set of actions is a submission to the jurisdiction of the court in that set of actions, but not in the second set of actions; whether or not presence in Illinois was sufficient for the purposes of the enforcement of the judgment of a Federal court sitting in Texas, X & Co and Y & Co were not present in Illinois through their Illinois subsidiaries.[362]   **14–093**

---

[355] [2003] 3 S.C.R. 416, (2003) 234 D.L.R. (4th) 1; *King v Drabinsky* (2008) 92 O.R. (3d) 616 (Ont.CA); *Disney Enterprises Inc v Click Enterprises Inc* (2006) 267 D.L.R. (4th) 291 (Ont.); *Canada Post Corp v Lépine* [2009] SCC 16, [2009] 1 S.C.R. 549. See also Briggs (2004) 8 Sing. Yb. Int. L. 1.

[356] [1913] 3 K.B. 25.

[357] Read, pp.262–267.

[358] *Redhead v Redhead* [1926] N.Z.L.R. 131 (costs).

[359] *Jacobs v Jacobs and Ceen* [1950] P. 146, where dicta in *Phillips v Batho* were dissented from. See below, para.18–088.

[360] See also the Illustration to Rule 49, below, para.14–136.

[361] See below, para.14R–128, on natural justice.

[362] *Adams v Cape Industries Plc* [1990] Ch. 433 (CA).

RULE 43          *Jurisdiction and Foreign Judgments*

2. X, an English traveller, is staying for a few days in an hotel in Massachusetts when there is issued and served upon him a summons commencing an action against him in the Massachusetts court. The Massachusetts court has jurisdiction.[363]

3. Y is the director of X & Co, an English company. Y visits New York and while he is there A, a New York firm, takes out a summons against X & Co and serves process upon Y. X & Co has no branch in New York and does not carry on business there. The New York court has no jurisdiction.[364]

4. X & Co, an English company, employs Y, a resident of Israel, as its representative there to elicit orders from customers for X & Co.'s goods. Y has no authority from X & Co to make contracts on its behalf. Y introduces an Israeli customer, A, who contracts with X & Co for the purchase of X & Co.'s goods. A sues X & Co in Israel for damages for breach of contract. X & Co takes no part in the proceedings and has no office or place of business in Israel. The Israeli court has no jurisdiction at common law.[365]

THE SECOND CASE

**14–094**  5. A, an Englishman residing in England, brings an action against X in Tel Aviv for breach of a contract made and broken in England. The court gives judgment for costs against A. The Israeli court has jurisdiction.

THE THIRD CASE

**14–095**  6. A brings an action in a New York court against X, an Englishman. X appears and defends the action because his business transactions frequently involve his presence in New York, so that judgment might be executed against him there. His appearance is voluntary and the New York court has jurisdiction over him.[366]

7. The circumstances are the same as in Illustration 6 save that X has valuable property in the United States upon which execution might be levied. X appears and defends the action in order to protect that property. The New York court has jurisdiction.[367]

8. The circumstances are the same as in Illustration 6 save that X does not appear until after judgment has been given against him in default and execution has been levied, when he appears and secures the reopening of the proceedings in order to recover property upon which execution has been levied. The New York court has jurisdiction.[368]

9. A brings an action in a foreign court against X and obtains a judgment against X in default of appearance. X's application to the foreign court for leave to appeal out of time is dismissed, but X also appeals to the Court of Appeal for the relevant district on the basis that he was not in fact out of time to appeal. The appeal is not expressed to be on jurisdictional grounds. The foreign court has jurisdiction.[369]

10. A brings an action in a foreign country against X, an Englishman, jurisdiction being founded solely upon the arrest of property of X in the country concerned. X appears in order to recover the property arrested. *Semble*, the foreign court has no jurisdiction.[370]

11. A brings an action against X in a foreign court. X enters a conditional appearance in order to contest the jurisdiction. The conditional appearance becomes unconditional automatically when X's application to contest the jurisdiction fails, but X takes no further part in the proceedings. The foreign court has no jurisdiction.[371]

---

[363] *Carrick v Hancock* (1895) 12 T.L.R. 59.

[364] *Littauer Glove Corporation v FW Millington* (1920) *Ltd* (1928) 44 T.L.R. 746.

[365] *Vogel v RA Kohnstamm Ltd* [1973] Q.B. 133 (decided before the 1933 Act was extended to Israel).

[366] *cf. Voinet v Barrett* (1885) 55 L.J.Q.B. 39 (CA).

[367] *cf. De Cosse Brissac v Rathbone* (1861) 6 H. & N. 301 (the third plea).

[368] *cf. Guiard v De Clermont* [1914] 3 K.B. 145. Although the language of Civil Jurisdiction and Judgments Act 1982, s.33(1)(c) might appear to cover the case, the view taken here is that it does not apply to cases in which the intervention in the foreign proceedings is not based on jurisdictional grounds. But no case has yet so held.

[369] *SA Consortium General Textiles v Sun & Sand Agencies Ltd* [1978] Q.B. 279 (CA) (a case on the 1933 Act).

[370] *Guiard v De Clermont*, above, at p.155. *cf. Re Low* [1894] 1 Ch. 147 (CA).

[371] 1982 Act, s.33(1)(a), reversing the effect of *Harris v Taylor* [1915] 2 K.B. 580 (CA).

## *Foreign Judgments* RULE 43

12. A brings an action against X in a foreign court. X applies to the foreign court to set aside the proceedings on the grounds that the foreign court is not the *forum conveniens*. The foreign court has no jurisdiction.[372]

13. A brings an action against X in a foreign court. X merely contests the jurisdiction. The foreign court has no jurisdiction.[373]

14. A brings an action against X in a foreign court. X applies to challenge the jurisdiction, but the court decides that rather than ruling on the jurisdictional challenge it will hear the merits of the claim and rule on jurisdiction at the end of that process, giving a ruling on the merits only if it concludes that there is jurisdiction. The court rules that it has jurisdiction, and gives judgments on the merits in favour of A. As the purpose of X in appearing before the foreign court was to contest the jurisdiction, the judgment against him will, in principle at least, not be recognised.[374]

THE FOURTH CASE

15. A is a New York firm carrying on business in New York. X is a British citizen resident in **14–096** England. By a contract made in New York X agrees to assign certain patent rights to A, the contract providing inter alia that "all disputes as to the present agreement and its fulfilment shall be submitted to the New York jurisdiction." In an action by A in the appropriate New York court for breach of the contract, judgment is given for A for $1 million. The New York court has jurisdiction.[375]

16. X, who was resident in England, held shares in a French company. The statutes or articles of association of the company provided that every dispute should be subject to the jurisdiction of the French courts and that every shareholder must "elect a domicile" in France for service of process and that in default the officers of the company might do so for him. X never elected a domicile. The company went into liquidation and A brought an action in France against X for moneys not paid up on X's shares. Notice was duly served on X at his statutory domicile. X, however, had no knowledge of the proceedings. Judgment was given against X. The French court had jurisdiction.[376]

17. The circumstances are the same as in Illustration 16, except that the provisions about disputes being referred to the jurisdiction of the French courts and about "electing a domicile" were general provisions of French law applicable to all French companies. The French court had no jurisdiction.[377]

18. X, who is resident in England, is a member of an Australian company. By an Australian statute referring to this particular company the chairman of the company is capable of suing or being sued in place of the company and may act and be treated as the agent of the members. A recovers judgment against the chairman, and therefore against, *inter alios*, X, in an action in an Australian court of which X has no notice. The Australian court has jurisdiction.[378]

19. X, a British citizen, when resident and carrying on business in Western Australia, there entered into partnership with A for the working of a gold mine there situate. The partnership was dissolved and an account was taken under decree of a Western Australian court. A deficiency appearing, A sued X therefor in the same court. X had ceased to be resident in Western Australia and the writ was served upon him in England. X did not appear. The Western Australian court had no jurisdiction.[379]

---

[372] 1982 Act, s.33(1)(b), reversing the effect of *Henry v Geoprosco International*, above.

[373] 1982 Act, s.33(1)(a).

[374] See *AES Ust-Kamenogorsk Hydropower Plant LLP v AES Ust-Kamenogorsk Hydropower Plant JSC* [2010] EWHC 772 (Comm.), [2010] 2 Lloyd's Rep. 493, affirmed [2011] EWCA Civ 647, [2011] 2 Lloyd's Rep. 233.

[375] *cf. Feyerick v Hubbard* (1902) 71 L.J.K.B. 509. See also *Jeannot v Fuerst* (1909) 25 T.L.R. 424.

[376] *Copin v Adamson* (1874) L.R. 9 Ex. 345; 1 Ex. D. 17 (CA) (the first replication).

[377] *Copin v Adamson*, above (the second replication). Contrast *Vallée v Dumergue* (1849) 4 Exch. 290, where X did "elect a domicile" though he had no notice of the proceedings. *cf.* Case C–214/89 *Powell Duffryn Plc v Petereit* [1992] E.C.R. I–1745.

[378] *Bank of Australasia v Harding* (1850) 9 C.B. 661. See also *Bank of Australasia v Nias* (1851) 16 Q.B. 717.

[379] *Emanuel v Symon* [1908] 1 K.B. 302 (CA). Contrast *Blohn v Desser* [1962] 2 Q.B. 116.

# TAB 19

age to render them

rds spoken and made
not recover more costs
certify that there was
ion.

# CHAPTER 43.

## LIMITATION.

(24*th August*, 1961.)                    20/1961
33/1961

### PART I.

#### PRELIMINARY.

**1.** This Ordinance may be cited as the Limitation Ordinance.    Short title.

**2.** In this Ordinance—    Interpretation.

"action" includes any proceeding in a court of law;

"duty" includes any debt due to Her Majesty;

"foreshore" means the shore and bed of the sea and of any tidal water, below the line of the medium high tide between the spring tides and the neap tides;

"land" includes corporeal hereditaments and rentcharges, and any legal or equitable estate or interest therein, including an interest in the proceeds of the sale of land held upon trust for sale, but save as aforesaid does not include any incorporeal hereditaments;

"parent" has the same meaning as in the Fatal Accidents Act;    Cap. 26.

"personal estate" and "personal property" do not include chattels real;

"rent" includes a rentcharge and a rentservice;

"rentcharge" means any annuity or periodical sum of money charged upon or payable out of land, or a rent service or interest on a mortgage on land;

"settled land" and "tenant for life" have the same meanings respectively as in the Settled Estates Act;    Cap. 230.

"ship" includes every description of vessel used in navigation not propelled by oars;

"trust" and "trustee" have the same meanings respectively as in the Trustee Ordinance;

"trust for sale" has the same meaning as in the Trustee Ordinance.

Cap. 303.

(2)  For the purposes of this Ordinance, a person shall be deemed to be under a disability while he is an infant, or of unsound mind, or a convict subject to the operation of the Forfeiture Act, in whose case no administrator or curator has been appointed under that Act.

Cap. 29.

(3)  For the purposes of the last foregoing subsection but without prejudice to the generality thereof, a person shall be conclusively presumed to be of unsound mind while he is detained in pursuance of any enactment authorising the detention of persons of unsound mind or criminal lunatics.

(4)  A person shall be deemed to claim through another person, if he became entitled by, through, under, or by the act of that other person to the right claimed, and any person whose estate or interest might have been barred by a person entitled to an entailed interest in possession shall be deemed to claim through the person so entitled:

Provided that a person becoming entitled to any estate or interest by virtue of a special power of appointment shall not be deemed to claim through the appointor.

(5)  References in this Ordinance to a right of action to recover land shall include references to a right to enter into possession of the land or, in the case of rentcharges, to distrain for arrears of rent, and references to the bringing of such an action shall include references to the making of such an entry or distress.

(6)  References in this Ordinance to the possession of land shall, in the case of rentcharges, be construed as references to the receipt of the rent, and references to the date of dispossession or discontinuance of possession of land shall, in the case of rentcharges, be construed as references to the date of the last receipt of rent.

(7)  In Part II references to a right of action shall include references to a cause of action and to a right to receive money secured by a mortgage or charge on any property or to recover

proceeds of the sale of land, and to a right to receive a share or interest in the personal estate of a deceased person; and references to the date of the accrual of a right of action shall—

> (*a*) in the case of an action for an account, be construed as references to the date on which the matter arose in respect of which an account is claimed;

> (*b*) in the case of an action upon a judgment, be construed as references to the date on which the judgment became enforceable;

> (*c*) in the case of an action to recover arrears of rent, dower or interest, or damages in respect thereof, be construed as references to the date on which the rent, dower or interest became due.

## PART II.

### PERIODS OF LIMITATION FOR DIFFERENT CLASSES OF ACTION.

**3.** The provisions of this Part shall have effect subject to the provisions of Part III which provide for the extension of the periods of limitation in the case of disability, acknowledgment, part payment, fraud and mistake.

*Part II to be subject to provisions of Part III relating to disability, acknowledgement, fraud, etc.*

*Actions of contract and tort and certain other actions.*

**4.** (1) The following actions shall not be brought after the expiration of six years from the date on which the cause of action accrued, that is to say—

*Limitations of actions of contract and tort, and certain other actions.*

> (*a*) actions founded on simple contract or on tort;

> (*b*) actions to enforce a recognisance;

> (*c*) actions to enforce an award, where the submission is not by an instrument under seal;

> (*d*) actions to recover any sum recoverable by virtue of any enactment, other than a penalty or forfeiture or sum by way of penalty or forfeiture.

(2) An action for an account shall not be brought in respect of any matter which arose more than six years before the commencement of the action.

(3) An action upon a specialty shall not be brought after the expiration of twelve years from the date on which the cause of action accrued:

Provided that this subsection shall not affect any action for which a shorter period of limitation is prescribed by any other provision of this Ordinance.

(4) An action shall not be brought upon any judgment after the expiration of twelve years from the date on which judgment became enforceable, and no arrears of interest in respect of any judgment debt shall be recovered after the expiration of six years from the date on which the interest became due.

(5) An action to recover any penalty or forfeiture, or sum by way of penalty or forfeiture, recoverable by virtue of any enactment shall not be brought after the expiration of two years from the date on which the cause of action accrued:

Provided that for the purposes of this subsection the expression "penalty" shall not include a fine to which any person is liable on conviction of a criminal offence.

(6) Subsection (1) shall apply to an action to recover seamen's wages, but save as aforesaid this section shall not apply to any cause of action within the Admiralty jursidiction of the High Court which is enforceable *in rem.*

(7) This section shall not apply to any claim for specific performance of a contract or for an injunction or for other equitable relief, except in so far as any provision thereof may be applied by the Court by analogy in like manner as the corresponding enactment repealed by this Ordinance has heretofore been applied.

Limitation in case of successive conversions and extinction of title of owner of converted goods.

**5.** (1) Where any cause of action in respect of the conversion or wrongful detention of a chattel has accrued to any person and, before he recovers possession of the chattel, a further conversion or wrongful detention takes places, no action shall be brought in respect of the further conversion or detention after the expiration of six years from the accrual of the cause of action in respect of the original conversion or detention.

(2) Where any such cause of action has accrued to any person and the period prescribed for bringing that action and for bringing any action in respect of such a further conversion or wrongful detention as aforesaid has expired and he has not during that period recovered possession of the chattel, the title of that person to the chattel shall be extinguished.

*Limitation.*     **(CAP. 43**     469

### Actions to recover land and rent.

**6.** (1) No action shall be brought by the Crown to recover any land after the expiration of thirty years from the date on which the right of action accrued to the Crown or, if it first accrued to some person through whom the Crown claims, to that person:

Limitation of actions to recover land.

Provided that an action to recover foreshore may be brought by the Crown at any time before the expiration of sixty years from the said date, and where any right of action to recover land, which has ceased to be foreshore but remains in the ownership of the Crown, accrued when the land was foreshore, the action may be brought at any time before the expiration of sixty years from the date of the accrual of the right of action, or of thirty years from the date when the land ceased to be foreshore, whichever period first expires.

(2) No action shall be brought by any spiritual or eleemosynary corporation sole to recover any land after the expiration of thirty years from the date on which the right of action accrued to the corporation sole or, if it first accrued to some person through whom the corporation sole claims, to that person.

(3) No action shall be brought by any other person to recover any land after the expiration of twelve years from the date on which the right of action accrued to him or, if it first accrued to some person through whom he claims, to that person:

Provided that, if the right of action first accrued to the Crown or a spiritual or eleemosynary corporation sole through whom the person bringing the action claims, the action may be brought at any time before the expiration of the period during which the action could have been brought by the Crown or the corporation sole, or of twelve years from the date on which the right of action accrued to some person other than the Crown or the corporation sole, whichever period first expires.

**7.** (1) Where the person bringing an action to recover land, or some person through whom he claims, has been in possession thereof, and has while entitled thereto been dispossessed or discontinued his possession, the right of action shall be deemed to have accrued on the date of the dispossession or discontinuance.

Accrual of right of action in case of present interests in land.