**BROWN RUDNICK LLP**
David J. Molton
May Orenstein
Daniel J. Saval
Marek P. Krzyzowski
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800

*Counsel for the Foreign Representatives*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) **Chapter 15 Case** |
| **FAIRFIELD SENTRY LIMITED, et al.,** | ) |
| | ) **Case No: 10-13164 (SMB)** |
| Debtors in Foreign Proceedings. | ) |
| | ) **Jointly Administered** |
| | ) |
| **FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al.,** | ) |
| | ) |
| Plaintiffs, | ) **Adv. Pro. No. 10-03496** |
| -against- | ) |
| | ) |
| **THEODOOR GGC AMSTERDAM, et al.,** | ) **Administratively** |
| | ) **Consolidated** |
| Defendants. | ) |
| | ) |

**DECLARATION OF DAVID J. MOLTON IN SUPPORT**
**OF OPPOSITION TO PI DEFENDANTS' SUPPLEMENTAL**
**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**
**BASED ON THE DOCTRINE OF *RES JUDICATA* AND IN FURTHER SUPPORT OF**
**FOREIGN REPRESENTATIVES' MOTION FOR LEAVE TO AMEND COMPLAINTS**

I, David J. Molton, do hereby declare, under penalty of perjury under the laws of the

United States of America, that the following is true and correct to the best of my knowledge

and belief:

1.  I am a member of the law firm of Brown Rudnick LLP, counsel for Kenneth Krys

and Charlotte Caulfield, (together, the "Liquidators" or "Foreign Representatives"), in their

capacities as the duly appointed Liquidators and Foreign Representatives of Fairfield Sentry Limited (In Liquidation), Fairfield Sigma Limited (In Liquidation), and Fairfield Lambda Limited (In Liquidation).    I submit this Declaration in support of the *Foreign Representatives' Opposition to PI Defendants' Supplemental Memorandum in Support of Defendants' Motion to Dismiss based on the Doctrine of Res Judicata and in Further Support of the Foreign Representatives' Motion for Leave to Amend Complaints*, filed in the above-captioned actions.

2.    Attached as Exhibit A is a true and correct copy of the Thirty Second Witness Statement of Kenneth Krys, submitted on January 19, 2012, in the Eastern Caribbean Supreme Court in the British Virgin Islands.

3.    Attached as Exhibit B is a true and correct copy of the Thirty Third Witness Statement of Kenneth Krys, submitted on January 27, 2012, in the Eastern Caribbean Supreme Court in the British Virgin Islands.

4.    Attached as Exhibit C is a true and correct copy of the Sixty Fifth Witness Statement of Kenneth Krys, submitted on March 6, 2015, in the Eastern Caribbean Supreme Court in the British Virgin Islands.

Executed on April 6, 2017.

_____/s/ David J. Molton_____
DAVID J. MOLTON

2

# EXHIBIT A





Kenneth Krys
Thirty Second Witness Statement
Filed 18.01.12

**EASTERN CARIBBEAN SUPREME COURT**
**BRITISH VIRGIN ISLANDS**
**IN THE HIGH COURT OF JUSTICE**
**COMMERCIAL DIVISION**
**Claim No. BVI HC (COM) 74, 136 and 139 of 2009**
**IN THE MATTER OF THE INSOLVENCY ACT 2003**
**AND IN THE MATTER OF FAIRFIELD SENTRY LIMITED (IN LIQUIDATION)**
**AND IN THE MATTER OF FAIRFIELD SIGMA LIMITED (IN LIQUIDATION)**
**AND IN THE MATTER OF FAIRFIELD LAMBDA LIMITED (IN LIQUIDATION)**

**BETWEEN:**

(6) **ABN AMRO FUND SERVICES (ISLE OF MAN) NOMINEES LIMITED**

(7) **BANK JULIUS BAER & CO LIMITED**

(8) **SNS GLOBAL CUSTODY BV**

(9) **DEUTSCHE BANK TRUST COMPANY AMERICAS**

(10)     **DEUTSCHE BANK (SUISSE) SA**

**Applicants**

-and-

(6) **KENNETH KRYS**

(7) **JOANNA LAU**

(8) **FAIRFIELD SENTRY LIMITED**

(9) **FAIRFIELD SIGMA LIMITED**

(10)     **FAIRFIELD LAMBDA LIMITED**

**Respondents**

---

**THIRTY SECOND WITNESS STATEMENT OF KENNETH KRYS**

---

1

I, **KENNETH KRYS,** of KRyS Global ("**KRyS Global**"), 2nd Floor, Commerce House, 181 Main Street, P.O. Box 930, Road Town, Tortola, BVI, **SAY AS FOLLOWS:**

1. I am the liquidator of Fairfield Sentry Limited (in liquidation) ("**Sentry**"), Fairfield Sigma Limited (in liquidation) ("**Sigma**") and Fairfield Lambda Limited (in liquidation) ("**Lambda**") (together the "**Funds**"). I was appointed jointly with Christopher Stride as liquidator of Sentry and Sigma by an Order of the British Virgin Islands High Court dated 21 July 2009. Christopher Stride was appointed as liquidator of Lambda on 23 April 2009. He resigned on 6 September 2010. Joanna Lau replaced Christopher Stride as liquidator of Sigma and Sentry, and by an Order dated 6 September 2010, she and I were appointed as co-liquidators of all three Funds. Joanna Lau resigned as a liquidator on 24 November 2011, and I am therefore now the sole liquidator of the Funds.

2. The contents of this witness statement are within my own personal knowledge and are true or, where not within my personal knowledge, are true to the best of my knowledge, information and belief.

3. I make this witness statement in response to the applications filed on 7 December 2012 by ABN Amro Fund Services (Isle of Man) Nominees Limited and various other applicants (the "**Applications**") by which relief is sought by various parties pursuant to s.273 of the Insolvency Act, 2003 in each of the liquidations of the Funds.

4. I have reviewed the Notices of Application filed in respect of the Applications. Based on my review, my understanding is that the thrust of the Applications is to seek the withdrawal or discontinuance of various proceedings brought in the United States of America Bankruptcy Court and/or for injunctive relief restraining the continued pursuit of those proceedings. I make this affidavit to explain the reasons why proceedings have been brought in the United States of America and why it is desirable, from the point of view of the Funds, for those claims to continue to be pursued. I also seek to correct some misconceptions that appear to arisen in respect of the claims in the United States of America (the "**United States:**").

2

**Summary of Redeemer Actions**

5.  In my role as Liquidator, I am pursuing 230 actions in the United States of America (collectively, the "**US Proceedings**") against former shareholders that took redemptions from the Funds in the years prior to the exposure of the Madoff fraud.  These actions seek the recovery of substantial sums, amounting to approximately US$6 billion (with the entire amount being claimed pursuant to common law claims and more than US$3 billion also being claimed pursuant to statutory avoidance claims brought in reliance on the Virgin Islands Insolvency Act, 2003.  Concluded settlements of some of the US Proceedings have already resulted in finalised settlements worth more than $24 million, and additional settlements in principle represent approximately $2.5 million in additional value potentially available to the Funds' estates.  The total amount at issue in ongoing settlement negotiations in the United States is more than $145 million.

**The BVI Proceedings**

6.  In my role as Liquidator I am pursuing a further 33 separate claims against 74 defendants in the BVI, seeking the recovery of sums amounting to approximately US$1.45 billion (collectively, the "**BVI Proceedings**").

7.  Each of the claim forms in the BVI Proceedings was filed shortly before the expiration of the primary six year limitation period which may be applicable to the specific redemption payments at issue in those proceedings.  The BVI Proceedings were accordingly brought primarily to preserve the position on claims that would otherwise be vulnerable to limitation defences.

8. It is important to emphasise that the BVI Proceedings have been brought only in respect of redemption payments that *do not form the subject matter of claims in the US Proceedings*. Although the background context is therefore similar there is no question of *the same claims* being advanced in both the BVI Proceedings and the US Proceedings. The BVI Proceedings are claims which it was impossible or impracticable to bring in the US Proceedings or some other jurisdiction (being the home jurisdiction of the redeeming party) whether because of limitation problems and/or because in particular cases the subscription agreements referred to at paragraph 11 below could not be found.

9. There are, however, no limitation difficulties in respect of the claims under sections 245 and 246 of the Virgin Islands Insolvency Act (the "**Statutory Claims**"). Those claims have accordingly, as mentioned below, been advanced in the US Proceedings, which is the main focus of my litigation as liquidator of the Funds. I have not found it necessary to bring similar claims in the BVI Proceedings, and I have not done so.

**The US Proceedings**

10. I have read the witness statement provided by David Molton of Brown Rudnick LLP and agree with its content in respect of the US Proceedings. I will seek to provide here the account of the reasons for bringing the US Proceedings that is mentioned at paragraph 2 of Mr Molton's witness statement.

11. The starting point in respect of the decision to bring the US Proceedings was the fact that the various subscribers to shares in the Funds had executed subscription agreements that were, at least for the most part, expressly governed by New York law and provided for the waiver of inconvenient forum arguments by the subscribing parties. Further, a number of parties had their principal place of business in the United States. It was on that basis that I determined that wherever possible claims would be brought in the United States. Moreover, the Liquidator has uncovered that many defendants in the US Proceedings designated New York bank accounts for the receipt of redemptions from the Funds pursuant to the subscription agreements and/or received the subject redemption payments through United States bank accounts, providing an additional basis for asserting those claims in the United States. In addition, certain of the defendants in the US Proceedings are domiciled in the United States.

4

12. In the first instance a number of claims were brought in the New York State Courts in order to prevent the expiry of limitation periods, which I understand are 6 years in that jurisdiction. Once the United States Bankruptcy Court (the "**Bankruptcy Court**") granted recognition of the Funds' liquidation proceedings as "foreign main" proceedings pursuant to Chapter 15 of the United States Bankruptcy Code, the New York State Court claims were removed to the Bankruptcy Court and claims have from that point on, where possible, been commenced in the Bankruptcy Court.

13. Chapter 15 recognition enables the pursuit of the Statutory Claims before the Bankruptcy Court and, accordingly, the Statutory Claims have been pursued in the United States consistent with the initial decision to bring claims in the United States as far as is possible.

14. It appears that the Applications proceed on the basis that I and the Funds are engaged in some form of illegitimate "forum shopping". I reject any such suggestion. The facts are quite simple: a consistent strategy has been followed from the beginning of the Funds' liquidation to the present, namely i) where possible the Liquidator is bringing in the United States pursuant to the terms of the subscription agreements that shareholders executed or where the shareholder had sufficient other contacts with the united States to support a finding of jurisdiction there (and the claims would not be time-barred), ii) otherwise the Liquidator is bringing claims in the home jurisdiction of the redeeming party (in practice this has only happened in the Cayman Islands) and iii) the Liquidator is bringing claims in the British Virgin Islands where no subscription agreement can be found to provide the basis of a claim in the United States, and where there are issues of limitation or other good reasons not to bring claims in the home jurisdiction of the redeeming party.

15. For the avoidance of doubt, I should again make clear that care has been taken to ensure that the same claims are not brought in multiple jurisdictions. Indeed where in one instance it was discovered that a claim in respect of a redemption payment had in error been advanced in more than one jurisdiction, immediate action was taken to address the matter. I am not aware of any other such instances, and believe there to be none.

16. Lastly, I would reiterate that the approach taken in respect of the United States and BVI Proceedings has the consistent and firm support of the non-conflicted members of Sentry's ad hoc liquidation committee and has been the subject of appropriate approval by the Courts in this jurisdiction.

I believe that the facts stated in this witness statement are true.

.........................................

Kenneth Krys

Dated: 19 January 2012

6

285

EASTERN CARIBBEAN SUPREME COURT
BRITISH VIRGIN ISLANDS
IN THE HIGH COURT OF JUSTICE
COMMERCIAL DIVISION
Claim No. BVI HC (COM) 74, 136 and 139 of 2009
IN THE MATTER OF THE INSOLVENCY ACT 2003
AND IN THE MATTER OF FAIRFIELD SENTRY LIMITED (IN LIQUIDATION)
AND IN THE MATTER OF FAIRFIELD SIGMA LIMITED (IN LIQUIDATION)
AND IN THE MATTER OF FAIRFIELD LAMBDA LIMITED (IN LIQUIDATION)

BETWEEN:

(1)  ABN AMRO FUND SERVICES (ISLE OF MAN) NOMINEES LIMITED

(2)  BANK JULIUS BAER & CO LIMITED

(3)  SNS GLOBAL CUSTODY BV

(4)  DEUTSCHE BANK TRUST COMPANY AMERICAS

(5)  DEUTSCHE BANK (SUISSE) SA

**Applicants**

-and-

(1)  KENNETH KRYS

(2)  JOANNA LAU

(3)  FAIRFIELD SENTRY LIMITED

(4)  FAIRFIELD SIGMA LIMITED

(5)  FAIRFIELD LAMBDA LIMITED

**Respondents**

---

**THIRTY SECOND WITNESS STATEMENT OF KENNETH KRYS**

---

**Forbes Hare**

P.O. Box 4649
Ground Floor
Palm Grove House
Road Town
Tortola VG 1110
British Virgin Islands
Tel: (284) 494 1890
Fax: (284) 494 1316

**Legal Practitioners for the Respondents**

(Ref: 1112-001)

# EXHIBIT B

Kenneth Krys
Thirty Third
Sworn [⊠].01.12
Filed [⊠].01.12

**EASTERN CARIBBEAN SUPREME COURT**
**BRITISH VIRGIN ISLANDS**
**IN THE HIGH COURT OF JUSTICE**
**COMMERCIAL DIVISION**
**Claim No. BVI HC (COM) 74, 136 and 139 of 2009**
**IN THE MATTER OF THE INSOLVENCY ACT 2003**
**AND IN THE MATTER OF FAIRFIELD SENTRY LIMITED (IN LIQUIDATION)**
**AND IN THE MATTER OF FAIRFIELD SIGMA LIMITED (IN LIQUIDATION)**
**AND IN THE MATTER OF FAIRFIELD LAMBDA LIMITED (IN LIQUIDATION)**

**BETWEEN:**

**BETWEEN:**

**(6) ABN AMRO FUND SERVICES (ISLE OF MAN) NOMINEES LIMITED**

**(7) BANK JULIUS BAER & CO LIMITED**

**(8) SNS GLOBAL CUSTODY BV**

**(9) DEUTSCHE BANK TRUST COMPANY AMERICAS**

**(10)      DEUTSCHE BANK (SUISSE) SA**

<u>**Applicants**</u>

**-and-**

**(6) KENNETH KRYS**

**(7) JOANNA LAU**

**(8) FAIRFIELD SENTRY LIMITED**

**(9) FAIRFIELD SIGMA LIMITED**

**(10)      FAIRFIELD LAMBDA LIMITED**

<u>**Respondents**</u>



FEE STAMPS ON ORIGINAL
$ 100 · 00

**THIRTY THIRD WITNESS STATEMENT OF KENNETH KRYS**

1

**I, KENNETH KRYS,** of KRyS Global (**"KRyS Global"**), 2nd Floor, Commerce House, 181 Main Street, P.O. Box 930, Road Town, Tortola, BVI, **SAY AS FOLLOWS:**

1.  I am the liquidator of Fairfield Sentry Limited (in liquidation), Fairfield Sigma Limited (in liquidation) and Fairfield Lambda Limited (in liquidation) (together the **"Funds"**).

2.  This witness statement is supplemental to my thirty second witness statement filed on 19 January 2012 (the **"Witness Statement"**) and contains additional information clarifying paragraphs 8 and 14 of the Witness Statement.

3.  In respect of paragraph 8 of the Witness Statement I should have added that claims were not issued against redeemers in the United States of America during the first seven months of the liquidations of the Funds because during that period the liquidators had not had sight of the relevant subscription agreements and, in particular, had not had sight of the express terms therein providing that those agreements were governed by New York law and waiving forum arguments.

4.  In respect of paragraph 14 of the Witness Statement I should have added that for the reasons set out at paragraph 3 above, during the first seven months or so of the liquidations of the Funds claims were only issued in the British Virgin Islands and were issued at that time primarily to avoid the risk of defendants raising a limitation defence.

5.  Subject only to the clarifications referred to above, the Witness Statement is true and accurate in relation to the approach taken in the liquidations subsequent to the first seven months or so from the commencement of the liquidations of the Funds.

I believe that the facts stated in this witness statement are true.

..............................

Kenneth Krys

Dated: 26 January 2012

EASTERN CARIBBEAN SUPREME COURT
BRITISH VIRGIN ISLANDS
IN THE HIGH COURT OF JUSTICE
COMMERCIAL DIVISION
Claim No. BVI HC (COM) 74, 136 and 139 of 2009
IN THE MATTER OF THE INSOLVENCY ACT 2003
AND IN THE MATTER OF FAIRFIELD SENTRY LIMITED (IN
LIQUIDATION)
AND IN THE MATTER OF FAIRFIELD SIGMA LIMITED (IN
LIQUIDATION)
AND IN THE MATTER OF FAIRFIELD LAMBDA LIMITED (IN
LIQUIDATION)

BETWEEN:

(1)  ABN AMRO FUND SERVICES (ISLE OF MAN) NOMINEES
LIMITED

(2)  BANK JULIUS BAER & CO LIMITED

(3)  SNS GLOBAL CUSTODY BV

(4)  DEUTSCHE BANK TRUST COMPANY AMERICAS

(5)  DEUTSCHE BANK (SUISSE) SA

**Applicants**

-and-

(1)  KENNETH KRYS

(2)  JOANNA LAU

(3)  FAIRFIELD SENTRY LIMITED

(4)  FAIRFIELD SIGMA LIMITED

(5)  FAIRFIELD LAMBDA LIMITED

**Respondents**

---

**THIRTY THIRD WITNESS STATEMENT OF KENNETH KRYS**

---

Forbes Hare

P.O. Box 4649
Ground Floor
Palm Grove House
Road Town
Tortola VG 1110
British Virgin Islands
Tel: (284) 494 1890
Fax: (284) 494 1316

**Legal Practitioners for the Applicant**

(Ref: 1112-001)

# EXHIBIT C



Respondents
K Krys
65th statement
Exhibit: KK-65
Made on: 6 March 2015

IN THE EASTERN CARIBBEAN SUPREME COURT
IN THE HIGH COURT OF JUSTICE
VIRGIN ISLANDS
COMMERCIAL DIVISION

CLAIM NOs BVIHC (COM) 136, 139 and 74 of 2009 [273 Proceedings]

IN THE MATTER OF THE INSOLVENCY ACT 2003
AND IN THE MATTER OF FAIRFIELD SENTRY LIMITED (IN LIQUIDATION)
AND IN THE MATTER OF FAIRFIELD SIGMA LIMITED (IN LIQUIDATION)
AND IN THE MATTER OF FAIRFIELD LAMBDA LIMITED (IN LIQUIDATION)

(1) ABN AMRO FUND SERVICES (ISLE OF MAN) NOMINEES LIMITED
(2) UBS AG NEW YORK
and others

Applicants

(1) KENNETH KRYS
(2) CHARLOTTE CAULFIELD
(3) FAIRFIELD SENTRY LIMITED
(4) FAIRFIELD SIGMA LIMITED
(5) FAIRFIELD LAMBDA LIMITED

Respondents

---

### SIXTY FIFTH WITNESS STATEMENT OF KENNETH KRYS

---

I, **KENNETH KRYS,** of Krys & Associates (BVI) Ltd trading as KRyS Global ("**KRyS Global**"), 2nd Floor, Commerce House, 181 Main Street, P.O. Box 930, Road Town, Tortola, BVI, **SAY AS FOLLOWS:**

1.    I am a joint liquidator of Fairfield Sentry Limited ("**Sentry**"), Fairfield Sigma Limited ("**Sigma**") and Fairfield Lambda Limited ("**Lambda**") (together, the "**Funds**").   I am authorised to give this witness statement on behalf of myself and Charlotte Ward-Caulfield, the other joint liquidator of the Funds.

2.    In this witness statement, references to the "Liquidator" are to me or Ms Caulfield in our capacities as Liquidators of the Funds.  References to the "Liquidators" include any actions or decisions made by both Ms Caulfield and me or to the previously appointed liquidators and me.

1

319

3.  Save where otherwise sufficiently appears the facts and matters hereinafter are within my own knowledge.  Where the facts and matters hereinafter are not within my own knowledge, I believe them to be true and the sources and grounds of my belief are set out.

4.  There is now produced and shown to me and exhibited hereto marked "**KK-65**" a paginated bundle of true copies of documents to which I refer in the course of this witness statement.  Numbers appearing in square brackets herein are references to page numbers in this exhibit bundle.

5.  I give this witness statement in opposition to the Applicants' applications by notices dated 7 December 2011 and 17 January 2012.  The Applicants in these proceedings are a number of entities who are defendants to claims brought by the Liquidators on behalf of the Funds in the United States.  For convenience, in this witness statement I shall refer to the Applicants in respect of the Application dated 7 December 2011 as the "**Harneys Applicants**" and those in respect of the application dated 17 January 2012 as the "**ONW Applicants**" (ie by reference to the law firm acting for each group in these proceedings).

6.  In essence, the Applicants contend that: (a) certain claims proceeding in the US courts (referred to as redeemer claims – see further below) are bound to fail and the Liquidators should not be pursuing them; (b) the said claims should not have been brought in the US, or should not be permitted to be continued there; and (c) the Applicants are aggrieved as a result of having to defend the US claims and thereby incur costs.  It is the Liquidators' position that (i) the claims are believed to have merit (based on legal advice, privilege in which is not waived), and (ii) the claims have properly been brought in the US courts (and were brought and pursued at all times with the sanction of this Court), and the Applicants should bring any challenge to the exercise of jurisdiction by the US courts in those courts.  I expand upon these matters below, but this witness statement does not attempt to deal with all points that may be made in response to the Applicants' position, firstly because many responses are matters for legal submissions, and secondly because many of the points have already been made in my previous statements filed in relation to the Applications or in the statements of David Molton, as set out in the next paragraph.

7.  It will be apparent from the date of the Applications that these proceedings have been in abeyance for some time.  However, following developments which will be described further below, the Applicants have sought to revive the Applications, and I understand that they have been listed for a trial to take place in March 2015.  The purpose of this witness statement is to summarise the existing evidence before the Court from the Liquidator, and where appropriate to update the Court in respect of various relevant developments since January 2012.  This witness statement therefore supplements and updates the following evidence which has previously been filed on the Liqudiators'

behalf in these proceedings in connection with the Applications and to which I shall refer in this witness statement:

a.   My thirty second witness statement dated 19 January 2012 ("**Krys-32**");

b.   The First witness statement of David Molton dated 18 January 2012 ("**Molton-1**");

c.   My thirty third witness statement dated 27 January 2012("**Krys-33**");

d.   My thirty sixth witness statement dated 31 January 2012 ("**Krys-36**"); and

e.   The second witness statement of David Molton dated 31 January 2012 ("**Molton-2**").

**Background**

8.    The Applications are brought in the liquidation proceedings of the Funds.  The Funds were originally placed into liquidation by orders of this Court in April 2009 (Lambda) and July 2009 (Sentry and Sigma).  Each of the Funds ultimately operated as "feeder funds" into Bernard L Madoff Investment Securities ("**BLMIS**") in New York, which was discovered in December 2008 to be a fraudulent Ponzi scheme.

9.    At the time of each investment into the Funds there would have been a suite of "Fund Documents" which comprised *inter alia* the Funds' respective Memorandum and Articles of Association, a subscription agreement entered into by each investor individually and the relevant Fund at the time of their investment, and the relevant Private Placement Memorandum ("PPM") (PPMs were issued by the Funds at various times).  Investments were made by way of subscription for shares, the price of which were determined by reference to the "Net Asset Value" or NAV of the relevant Fund, as determined by the Fund's directors (but in practice it appears the determination of NAV was largely delegated to the Funds' administrators, though the liquidators reserve their position regarding the precise roles that the Funds' functionaries and directors took in relation to calculation of the NAV, because the Liquidators do not yet have a complete set of documentation relating to the Funds' operations and have also not been in a position to review all the documentation that they do possess).  Upon request investors were entitled to redeem those shares on specified "Dealing Days", in return for a redemption payment which, again, was calculated according to the Funds' stated NAV.

10.   Lambda and Sigma invested 100% of the subscription moneys received from their investors into Sentry.  In turn Sentry invested approximately 95% of its investors' subscriptions with BLMIS.  Sentry did not buy shares or units in BLMIS: instead, money invested with BLMIS was (supposedly) used by

BLMIS to buy shares and other assets to be held for Sentry. BLMIS issued statements purporting to show the shares and other assets (including US Treasury bills) owned by Sentry.

11.  On 11 December 2008, Bernard Madoff was arrested and the BLMIS fraud became publically known. On 15 December 2008, the United States District court for the Southern District of New York, appointed Irving H. Picard (the "**SIPA Trustee**") as trustee for the liquidation of BLMIS pursuant to the Securities Investor Protection Act ("**SIPA**"). On 18 December 2008, the boards of directors of the Funds formally suspended calculation of NAV.

12.  From the date of their appointment, the Liquidators have pursued a litigation based strategy seeking, on several fronts, to recover moneys and other assets for the benefit of the Funds' shareholders. One element of that litigation has been claims to recover from the Funds' former investors redemption payments which were historically made by the Funds. Once the fraud of BLMIS became publicly known it was immediately apparent that the NAVs historically calculated by the Funds were entirely erroneous. That was because they were based, largely, on fraudulent reports of asset values generated by BLMIS (in reality, those assets simply did not exist). The redemption payments made to former members of the Funds were based on those vastly inflated asset values, and the Liquidators have therefore sought to recover those redemption payments, pursing claims under various causes of action in various jurisdictions. It is those claims, which I shall refer to broadly as the "redeemer claims" which are the subject of the Applications.

**The Redeemer Litigation**

13.  Immediately following our appointment the Liquidators began considering whether redemption moneys paid out based on erroneous NAV calculations could be recovered. The Liquidators were aware that there might be limitation defences accruing in the then near future. For that reason, and because the Liquidators were not initially aware that many investors were parties to "long form" subscription agreements that included New York jurisdiction clauses (and it appears that some investors were never parties to such agreements), from September 2009, the Liquidators (having first obtained permission from this Court to do so) issued claims in the British Virgin Islands in respect of those redemption payments which were made in late 2003 and early 2004. However, the Liquidators' position has always been that where possible, these types of redeemer claims should be issued in the United States. I have previously detailed the reasons why the Liquidators issued claims in the United States as a first preference and the nature of the claims brought in the United States in my Thirty Second Witness Statement (see paragraphs 10-14 of that statement, in particular), to which I respectfully refer the Court. Eventually, the vast majority of the redeemer

4

322

claims were in fact issued in the United States, as detailed in Krys-32. Again, those claims were issued with the permission of this Court.

14.  The US Bankruptcy Court for the Southern District of New York is the venue of the US Redeemer Claims. In fact, however, some (a minority) of the US redeemer claims were initially issued in the State Court in New York and were subsequently removed to the US Bankruptcy Court. A number of defendants to the redeemer claims subsequently challenged the jurisdiction of the US Bankruptcy Court. These matters are detailed in Molton-1 and Molton-2.

15.  In the British Virgin Islands and elsewhere (excepting the US) the redeemer claims were brought only under common law, seeking restitution of amounts paid under a mistake as to the true NAV of the Funds. Originally, the claims brought in the United States were also only for restitution at common law. However, as detailed in Molton-1, the US claims were subsequently amended (after first having obtained the permission of this Court) to include, as alternative causes of action, claims pursuant to statutory avoidance provisions contained in the BVI Insolvency Act, 2003. The avoidance claims are different from the common law restitution claims in a number of respects, but one key difference is this: I believe (based on legal advice, privilege in which is not waived) that they are not affected by the certification of NAV under the Articles, and so certain of the issues dealt with below (such as whether certificates of NAV were given in good faith) are not applicable.

16.  In the period since evidence was last given in these Applications, further amendments to the US claims were made to incorporate contractual causes of action (based on allegations that the overpayments under mistake gave rise to an implied obligation to repay the monies).

17.  Before significant progress could be made in the US redeemer claims, a number of defendants to redeemer claims brought in the BVI made an application to this Court seeking a determination of preliminary issues in the claims (the "Preliminary Issues"). The Preliminary Issues were ultimately determined by the Judicial Committee of the Privy Council ("JCPC") in favour of the defendants. The JCPC's decision and its effect are described more fully below.

18.  While the final determination of the Preliminary Issues remained pending, the US Bankruptcy Court stayed the US redeemer claims before it, with the effect that those proceedings have been largely dormant since around October 2011.

**The Preliminary Issues**

19.  A number of defendants to the BVI redeemer claims filed Statements of Defence in the BVI proceedings, raising a number of defences to the claims brought. Some of those defendants applied to the BVI Court to determine as Preliminary Issues whether either one or both of two of the

defences raised provided a complete defence to the common law restitutionary claims. The BVI Court was therefore asked to determine:

   a. The "Certification" issue - i.e. whether various documents issued to investors constituted certificates of NAV, within the meaning of the Funds' Articles. (This was based on Article 11(1), which provides: "…*Any certificate as to the Net Asset Value per Share or as to the Subscription Price or Redemption Price therefor given in good faith by or on behalf of the Directors shall be binding on all parties*");

   b. The "Good Consideration" issue - i.e. whether redeeming investors gave good consideration for the redemption payments by surrendering their shares, such that no claim could lie in restitution in respect of those payments.

20.   Both this Court (as the first instance tribunal) and the Court of Appeal found in favour of the defendants in respect of the Good Consideration issue, and against the defendants in respect of the Certification issue. Following its decision in respect of the Preliminary Issues, this Court granted summary judgment to the Applicant defendants, on the basis that the Funds were unable to identify any realistic prospect of success in respect of those claims in light of the court's findings in respect of the Preliminary Issues.

21.   The determinations in respect of Preliminary Issues were ultimately appealed, by both the Liquidators and the defendants, to the JCPC, which handed down its decision on 16 April 2014 and decided both appeals against the Liquidators.

22.   The detail of the reasoning of the JCPC is a matter which will be dealt with in submissions in due course, as necessary. However, broadly speaking, the JCPC determined that various documents which were regularly issued by the Funds constituted certificates of NAV (despite the apparent lack of formality on their face) and that, because certificates of NAV had been issued the redeeming investors were in principle contractually entitled to redemption payments on the basis of that certified NAV (notwithstanding the errors in its calculation). That the redemption payments were paid pursuant to a contractual obligation, and that the redeeming investors performed their corresponding contractual obligation, was sufficient to defeat a claim in restitution.

23.   What the Privy Council did not decide was whether the relevant "certificates" were, as a matter of fact, issued in good faith.

a. The question of whether certificates were issued in good faith (and indeed, any other issue of fact) was carved out from the scope of the preliminary issues which were before the JCPC and the lower courts, as can be seen from paragraphs 18 and 22(3) of the judgment of the Honourable Justice Edward Bannister QC dated 20 April 2011 (in which Bannister J directed a trial of preliminary issues [1-8], in which the judge ordered that a determination in respect of the Certification Issue against the Funds "*shall not debar the [Funds] from subsequently asserting on the basis of a fact or facts not actually known to the Liquidators of the Claimant at the time of the hearing of [the Certification Issue] that notwithstanding the determination of that question a particular defendant is liable to repay to [Funds] all or some part of any redemption monies paid to that defendant*". That carve out was reflected in paragraph 2 of the Directions Order dated 10 April 2011 [9-16].

b. Indeed, it is obvious that the judgment on preliminary issues was never intended to decide any issues of fact. Both parties were initially agreed that some disclosure would likely be necessary to dispose of the preliminary issues (as can be seen at paragraph 21 of the judgment of 20 April 2011 [6] and in the transcript of the hearing, which is exhibited at pages [17-198], for example at page [27]). Throughout his submissions, Mr Gadd appearing on behalf of the Funds, insisted that without a full disclosure exercise, it would be impossible to ascertain the relevant factual background (see pages [119]ff). However the Court declined to make a disclosure order, on the basis that it would remain open to the Funds to later assert facts that took the claims outside of the parameters of the ultimate decision on preliminary issues. The defendants ultimately agreed with the Court that this was an appropriate approach (see, for example, pages [160-164] and [170-173]).

c. The significance of this factual issue having not been decided yet is that, if the certificates were not issued in good faith (or if they were not received in good faith), arguably they did not bind the Funds and accordingly, it is arguable that redemption payments were not contractually obligated (see further below). In those circumstances, a restitutionary claim would not be defeated by reason of a contractual entitlement to the moneys.

24.    The majority of the defendants to the BVI claims now benefit from summary judgment in the BVI redeemer claims. Of the remaining defendants that are not also defendants to the US proceedings, some have not submitted to the BVI court's jurisdiction, many of the claims are of low individual value, and a number of the defendants are in a parlous or uncertain financial position. The Liquidators therefore believe that it is not cost-effective to continue the BVI redeemer litigation and intend to allow the remaining BVI claims to lapse.

**US redeemer claims**

25. As detailed in Molton-1 (particularly paragraphs 52-54), the US claims were stayed by order of the US Bankruptcy Court following the adverse decision at first instance in the Preliminary Issues, and pending the outcome of the appeal of that decision. Although the Liquidators sought and obtained permission from the Eastern Caribbean Court of Appeal to continue the US claims pending the ultimate decision by the JCPC, the US Bankruptcy Court maintained the stay (there have been occasions when the US Bankruptcy Court has permitted a limited lifting of the stay to deal with procedural matters but they are not relevant for the purposes of these proceedings).

26. To date, the Liquidators have not sought permission of this Court to continue the US redeemer claims since the decision of the Privy Council on the Preliminary Issues, having agreed with the Applicants herein that no such step would be taken pending the resolution of these Applications. (The US redeemer claims have therefore remained stayed. The Liquidators have at all times sought and obtained permission from this Court prior to taking steps in the US redeemer claims.) However, it is the position of the Liquidators that we should continue (and be permitted to continue) the claims in the United States, notwithstanding the adverse decision of the JCPC. That is because the Liquidators believe, based on advice from leading BVI counsel and also from US counsel (privilege in which is not waived), that:

   a. The JCPC's decision may not bar the common law restitutionary claims in the United States to the extent that it can be shown that certificates of NAV were not given in good faith; and

   b. The JCPC's decision does not affect the merits of the statutory avoidance claims advanced in the United States. The JCPC's decision proceeded on an analysis that the defendants were contractually entitled to certain payments, but the very essence of statutory avoidance claims is that they permit the unravelling of contractual transactions in circumstances where those transactions were valid under ordinary law but involved an undervalue, or gave preference to particular creditors, within the insolvency legislation. The merits of the statutory avoidance claims have, if anything, been improved since the Applications were issued by the decision in *Somers Dublin Ltd et al v Monarch Pointe Fund Ltd* (HCVAP 2011/040, 11 March 2013), which explains and distinguishes the *Westford* decision referred to in paragraph 19 of the witness statement of Kissock Laing. *Monarch Pointe* supports the contention that redeeming members were in fact creditors for the purposes of sections 245 and 246 of the BVI Insolvency Act (the Applicants have sought to argue the contrary, based on the *Westford* decision).

27. Further, the Liquidators have sought and obtained advice from US counsel and from Leading counsel for this jurisdiction (because there are matters of BVI law which must be dealt with in the US proceedings) as to the merits of the claims advanced in the United States in general and particularly in light of the decision by the JCPC. Privilege is not waived in that advice. However, broadly the advice is to the effect that the US redeemer claims are properly arguable and have good prospects of success. The Liquidators therefore intend to apply for sanction to continue the US redeemer claims once these section 273 applications have been dealt with.

**Evidence of lack of good faith**

28. It is clear that any prospect of success in the common law claims will hinge upon demonstrating that the certificates of NAV were not issued in good faith. (As stated above, this does not arise in relation to the statutory avoidance claims.) The decision of the JCPC in the Preliminary Issues found that certain documents issued by the Funds' administrators, Citco Fund Services (Europe) BV ("Citco") constituted certificates. The Liquidators believe there is strong evidence to suggest that Citco was at least recklessly indifferent to the accuracy of the NAV calculations they performed, such that the certificates of NAV issued by them were not issued in good faith.

29. The question of what constituted a lack of "good faith" is a matter for legal submissions, which will be made on the Liquidators' behalf in due course. Whether or not absence of good faith can be established as a matter of fact is a question to be decided by the US courts.

30. As to the facts which support an allegation that certificates of NAV were not issued in good faith, I do not consider that it is appropriate to provide a detailed recital, disclosing matters which will be the subject of pleadings in contentious proceedings, to the defendants to those proceedings. I am advised (though I do not waive privilege in that advice) that the evidence available (at least arguably) demonstrates the following:

   a. The administrator (Citco Fund Services (Europe) B.V.) was part of the Citco Bank Holding N.V. branch of the Citco Group, but worked with other Citco Fund Services ("CFS") entities.

   b. Both the head of internal audit for CFS and the head of internal audit for the Citco Group raised concerns as to the lack of segregation of duties at BLMIS and also as to the lack of independent evidence for the existence of the assets that BLMIS was purporting to hold on behalf of the Funds. The head of internal audit for CFS considered the risk that something was wrong to be at least 50%.

   c. Internal audit repeatedly pressed CFS and Citco Group management to address these concerns, for example by obtaining independent evidence for the existence of the assets. Neither CFS

9

327

nor Citco Group management ever apparently obtained any independent evidence for the existence of the assets.

d.  Internal audit placed Fairfield Sentry Limited on its "non-compliance" or "watch" list due to the concerns about BLMIS, and Fairfield Sentry Limited remained on that list from about 2000 until at least 2006.

e.  CFS management apparently considered that it was not the responsibility of the administrator to concern itself with whether the assets existed.

f.  CFS management claimed to be comfortable with BLMIS because, variously:

    i.  they relied on the fact that PwC (which audited the Funds) was issuing unqualified audit reports – but CFS management never obtained confirmation that PwC was doing anything to verify the existence of the assets purportedly being held by BLMIS for the Funds;

    ii.  they relied on the fact that BLMIS was regulated by the SEC and NASD, and on such regulators' general functions – but CFS management never gained an understanding of what, if anything, the SEC and NASD were doing by way of regulation of BLMIS;

    iii.  they relied on the fact that BLMIS was itself audited – but CFS management knew that the auditor of BLMIS was in fact a two-person firm, and internal audit (and at least some CFS management) considered that that "[did] not seem to match up with the size of [BLMIS]";

    iv.  representatives of CFS met with Madoff in 2000 and 2002 – however, CFS management never understood how BLMIS was making the returns it was purporting to make, and those who met with Madoff stated that they had not obtained any independent evidence of the existence of the assets (and indeed in relation to the second meeting it was expressly stated that "the mission has failed"); and

    v.  reliance was placed on the fact that Madoff had been trading for a number of years and that the Funds had always been able to pay redemptions – however, this is, of course, exactly what a Ponzi scheme does until it runs out of new investors, because it pays redemptions (including fictitious profits) out of new investments.

g.  The role of Citco Bank Nederland ("CBN", custodian to the Funds ) was regarded as being such that it was custodian "on paper only", as it was merely typing over the statements of assets received from BLMIS, and at certain points the management of CBN considered that CBN

should resign its role. However, the investment manager (Fairfield Greenwich) asked it to continue, and CBN's remuneration was increased.

h. Fairfield Sentry Limited was an important client, and Citco was deriving remuneration of about USD 4m per year from its roles in relation to the Funds by about 2008.

i. CFS management apparently were careful not to upset the relationship with the investment manager of the Funds, and did not wish to upset the relationship between the investment manager and BLMIS.

j. It is to be inferred from the evidence that CFS management were aware that, although not proved to be the case, there was a significant risk that the assets purportedly held by BLMIS for the Funds did not exist, and that there was therefore a significant risk that the NAV figures being calculated by the administrator were inaccurate. Further, it is to be inferred from the refusal of CFS management to heed the warnings of its internal audit department, and there was a view among CFS management that it was not the role of the administrator to concern itself with whether there was independent evidence for the existence of the assets (despite warnings from its internal audit department to obtain such evidence), that, in effect, CFS management did not care whether or not the assets existed.

k. It is, therefore, arguable that an inference should be drawn that the administrator acted with reckless indifference as to the existence of the assets purportedly held for the Funds, and as to the accuracy of the NAV statements the administrator produced. Such reckless indifference arguably constituted an absence of good faith.

31. The evidence in respect of Citco's possible lack of good faith has only become available to the Liquidators since about the time of the Privy Council decision. As such, it was not available to the Liquidators to argue points relating to the lack of good faith at the time of the summary judgment application brought by certain of the BVI redeemer claims defendants. It is, however, open to the Liquidators to make arguments on that basis in the US claims.

**Avoidance claims: insolvency of the Funds**

32. The Liquidators believe based on advice, privilege in which is not waived, that the statutory avoidance claims have good prospects of success. As indicated above, the effect of any NAV certificates is not material to the avoidance claims, and so whether or not such certificates were given in good faith is not a relevant issue. Most of the points to be made on the avoidance claims are matters for legal submission, so I do not propose to say more about them, save for the next paragraph.

33. I understand that the Applicants wish to introduce a new ground into the applications, namely a new paragraph 5A, which alleges that the Liquidators cannot possibly succeed in any avoidance claims because, having regard to the settlement between the Funds and the trustee of BLMIS (Irving Picard), the Funds cannot be shown to have been insolvent at the time of any of the redemption transactions. The settlement with Mr Picard is at Tab 3 of the Exhibit CF-3. I am advised (but do not waive privilege in that advice) that there are strong grounds for demonstrating insolvency at the time of the various redemption transactions. First, as is evident from the settlement agreement itself, Mr Picard has judgments against the Funds totalling about USD 3 billion, and only the manner and extent of enforcement of that liability is controlled by the settlement agreement. Secondly, I am advised (but again do not waive privilege therein) that under New York law, each time Fairfield Sentry Limited received a payment from BLMIS there immediately arose an obligation to repay the relevant sum, by reason of the Ponzi scheme nature of BLMIS, which obligation was enforceable by creditors of BLMIS. In view of the fact that the assets purportedly being held for the Funds did not exist, the cumulative liability to repay sums received from BLMIS meant that the Funds were insolvent at all material times.

**Jurisdiction and choice of law**

34. Much of the evidence in these proceedings to date has been focussed on questions relating to choice of law and the jurisdiction of the US claims. In summary, the Applicants have alleged in these proceedings that BVI law, rather than US or New York law, is applicable to the common law claims, that neither the US federal courts nor the New York state courts have jurisdiction over the Applicants and that New York is an inconvenient forum in which to litigate the claims. Our primary contention is that the courts in the United States are capable of deciding questions of jurisdiction and applicable law in proceedings before them. That there are questions of jurisdiction and choice of law, which are eminently capable of resolution by the US courts, does not give rise to any basis for enjoining the Liquidators from pursuing claims there. However, evidence has also been submitted on behalf of the Liquidators, rebutting the Applicants' contentions as to the jurisdictional and choice of law issues. I refer to the three statements made by David Molton in these proceedings.

35. I also note that I understand that there is nothing to prevent the Applicants from raising in the New York proceedings either of the following:

   a. Jurisdictional and forum challenges (though the fact that they signed subscription agreements agreeing to New York jurisdiction and waiving forum arguments means that any such challenges might well be weak);

   b. Summary dismissal motions.

**Significant issues of BVI law**

36. Finally, I note that the Applications herein count among their grounds that the US redeemer claims involve a number of issues which are said to be of "general importance to the jurisdiction", such that the Applicants allege that it is appropriate for the questions to be litigated within this jurisdiction. Having consulted with counsel (and no privilege in respect of those consultations or advice received is waived), I do not understand that the importance or otherwise of a particular point of law for this jurisdiction constitutes a proper basis for this Court to prevent me (or any other litigant) from exercising a right to invoke the jurisdiction of another Court to determine those issues.

37. What the Applicants seem to argue is that there is some degree of novelty to the points of BVI law which might be engaged in the US redeemer claims and that there is some overriding public interest in having those novel points determined by a BVI court first.   That proposition is not accepted: there is no authority or rule of law which would suggest that litigants ought, in principle, to litigate novel points of law in the BVI rather than in another appropriate forum; there is significant dispute between the parties as to the extent that BVI law even applies; and matters of US law (which also may be fairly described as "novel" or "important") may also apply to the relevant claims.

38. Nevertheless, and without prejudice to the above, it is worth noting that many of the "important issues" identified by the Applicants have been the subject of judicial comment both before and since the date their Applications were filed, or are not in fact matters of general importance.  Below, I have set out the "important issues" identified in paragraph 1 of the Applicants' Notice of Application, and some relevant considerations in respect of each:

   a. (i) The correct interpretation and application of section 8(1)(c)(ii) of the BVI Insolvency Act, 2003 (the "BVI Act"), which provides that a company is insolvent if it is "*unable to pay its debts as they fall due*". – I understand that this provision is mirrored by section 123(1)(e) the English Insolvency Act 1986 (the "English Act").  Both provisions establish the "cash flow insolvency" test as the basis a finding that a company is insolvent.  The cash flow insolvency test has been the subject of considerable consideration by the English Courts, including the Supreme Court, which while not technically binding on the BVI courts would customarily be followed.

   b. (ii) What, in the context of a redemption of shares pursuant to the Articles of Association of the Funds, constitutes a "transaction" for the purposes of the sections 245 and 246 of the BVI Act. Again, I understand that there is English case law on what the meaning of "transaction".

   c. (iii) Whether the entitlement of a shareholder or former shareholder in the Funds to redemption proceeds is a claim "*for a sum due to him in his character as a member*" under

section 197 of the BVI Act and, (iv) if so, whether it follows that the shareholder or former shareholder is not by reason of his entitlement to redemption proceeds a "*creditor*" of the relevant Fund within the meaning of sections 8 and 245 of the BVI Act. The law on this question was in a state of some confusion at the time the Applications were filed, however this area has now been clarified by the Court of Appeal's decision in *Somers Dublin Ltd et al v Monarch Pointe Fund Ltd*.

d.   (v) What in the context of the redemption of shares pursuant to the Articles of Association of the Funds, constitutes for the purposes of the sections 246(1)(b) of the BVI Act the consideration received by the Funds. This was considered in the Privy Council's decision in *Fairfield Sentry Limited v Migani & Ors*.

e.   (vi) The correct approach to valuation of that consideration for the purposes of section 246(1)(b) in circumstances where the Funds had been invested [directly or indirectly] in a Ponzi scheme. This does not appear to be a matter of general importance, but rather a highly fact specific question, unique to the particular circumstances of the Funds, as to how a proper valuation of its assets could take place. The question is appropriately answered by reference to factual evidence and accounting (rather than legal) principles.

f.   (vii) The correct basis for the Court's exercise of discretion as to whether to grant relief: once again the matters identified (in paragraph 1(vii) of the Notices of Application) are matters which clearly turn upon the individual circumstances of any particular avoidance claim.

**Value of settlements obtained to date**

39.   The pursuit of the redeemer claims has led to a number of valuable settlements (totalling about USD 28 million), which demonstrate that the redeemer claims are of real value to the estates. Further, under the settlement reached with the trustee in bankruptcy of BLMIS (Mr Picard), the Funds share in certain recoveries made by the trustee from redeemer defendants (and vice versa). To date the Funds have received a total of $58,006,728 in respect of their share of recoveries made by the trustee. Where there are redeemer claims by the Funds and the trustee against the same defendants, and where certain criteria are met, the sharing of recoveries is 85/15 in the Funds' favour.

**Support of the non-conflicted sub-committee of the ad hoc Liquidation Committee**

40.   An ad hoc Liquidation Committee was established early in the liquidations and it is used as a "sounding board" by the Liquidators. Some members of the Liquidation Committee are themselves redeemer defendants and so they are excluded from discussions of the redeemer claims, which are therefore only discussed with a sub-committee. The Liquidators have canvassed the views of the sub-committee as

14

332

regards continuing the US redeemer claims, and the sub-committee have had an opportunity to review, on a confidential basis and without any waiver of privilege, the advice obtained by the Liquidators. The Liquidators have been informed by one member the sub-committee that they support the continued pursuit of the US redeemer claims and the Liquidators' decision to oppose these applications. I refer to the email of Leif Raanes, the attorney of Nordea Life Group (one of the two non-conflicted sub-committee members) exhibited here to at [199-200].) The other member of the subcommittee has yet to respond (if any view is subsequently expressed, the court will be updated at the hearing) but has not objected to the Liquidators' proposal to continue the US redeemer claims. For the avoidance of doubt, privilege is not waived in respect of the legal advice referred to in the email exchanges.

**Conclusion**

41. In the circumstances, I respectfully request that the Court dismiss the Applications and order that the Applicants pay the Liquidators' costs of these proceedings.

I believe the facts stated in this witness statement are true.

Kenneth Krys
6 March 2015

15

333

EASTERN CARIBBEAN SUPREME COURT
BRITISH VIRGIN ISLANDS
IN THE HIGH COURT OF JUSTICE
COMMERCIAL DIVISION
Claim No. BVI HC (COM) 74, 136 and 139 of 2009
[273 Proceedings]

IN THE MATTER OF THE INSOLVENCY ACT 2003
AND IN THE MATTER OF FAIRFIELD SENTRY
LIMITED (IN LIQUIDATION)
AND IN THE MATTER OF FAIRFIELD SIGMA LIMITED
(IN LIQUIDATION)
AND IN THE MATTER OF FAIRFIELD LAMBDA
LIMITED (IN LIQUIDATION)

BETWEEN:
   (1)  ABN AMRO FUND SERVICES (ISLE OF MAN)
      NOMINEES LIMITED (FORMERLY FORTIS (ISLE
      OF MAN) NOMINEES LIMITED) AND OTHERS

   (2)  UBS AG NEW YORK AND OTHERS


**Applicants**

-and-

   (1) KENNETH KRYS
   (2) JOANNA LAU
  (3) FAIRFIELD SENTRY LIMITED
  (4) FAIRFIELD SIGMA LIMITED
  (5) FAIRFIELD LAMBDA LIMITED

**Respondents**

---

**SIXTY FIFTH WITNESS STATEMENT OF KENNETH
KRYS**

---



**FORBES HARE**

P.O. Box 4649

Road Town, Tortola

British Virgin Islands

Tel: (284) 494 1890

334