**BROWN RUDNICK LLP**
David J. Molton
May Orenstein
Daniel J. Saval
Marek P. Krzyzowski
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800

*Counsel for the Foreign Representatives*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 Case |
| FAIRFIELD SENTRY LIMITED, et al., | Case No: 10-13164 (SMB) |
| Debtors in Foreign Proceedings. | Jointly Administered |
| FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al., | Adv. Pro. No. 10-03496 |
| Plaintiffs, | |
| -against- | |
| THEODOOR GGC AMSTERDAM, et al., | Administratively Consolidated |
| Defendants. | |

**FURTHER SUPPLEMENTAL DECLARATION OF GABRIEL MOSS QC IN OPPOSITION TO PI DEFENDANTS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS BASED ON THE DOCTRINE OF *RES JUDICATA* AND IN FURTHER SUPPORT OF FOREIGN REPRESENTATIVES' MOTION FOR LEAVE TO AMEND COMPLAINTS**

I, GABRIEL MOSS QC, do hereby declare, under penalty of perjury under the laws of the United States of America, that the following is true and correct to the best of my knowledge and belief:

1. I am the same Gabriel Moss QC who executed Declarations herein on October 20, 2016 (the "Initial Moss Declaration"), and March 30, 2017 (the "Second Declaration"), and my qualifications for giving expert evidence of English and BVI law remain substantially the same. My means of knowledge remain the same.

2. As set forth in the Second Declaration, since submitting the Initial Moss Declaration, I have argued a number of points of BVI law on behalf of Kenneth M. Krys and Charlotte Caulfield, in their capacities as joint liquidators (the "Liquidators") of Fairfield Sentry Limited, in liquidation, Fairfield Sigma Limited, in liquidation, and Fairfield Lambda Limited, in liquidation (collectively, the Funds"), in a three day appeal before the East Caribbean Court of Appeal ("ECCA") from the dismissal by Leon J. of the applications, by Defendants in these proceedings, some of whom are PI Defendants, for relief under s.273 of the BVI Insolvency Act 2003 and for an anti-suit injunction. There may be some overlap between the arguments put to the ECCA on behalf of the liquidators and the matters dealt with in this further supplemental declaration. I believe that the arguments put on behalf of the liquidators to the ECCA are consistent with the views expressed in this Declaration.

3. Though it follows that I have acted and am continuing to act as counsel to the Liquidators in proceedings in the BVI, I should make clear that:

    a. My remuneration for giving expert evidence in this matter is not in any way dependent on the success or otherwise of any motion or proceeding.

    b. To the extent matters stated in this further supplemental declaration are statements of legal opinion, such statements represent my view of the law of the BVI as a practicing BVI attorney. In preparing this further supplemental declaration, I have adopted the approach of a person who gives expert evidence and owes a duty to the Court to be objective and which overrides any

2

            obligations to the person from whom the expert has received instructions or by whom he is paid.

    c.    Nothing in this further supplemental declaration is intended to waive privilege in relation to any advice that has been given to the Liquidators. I am not authorized to and do not waive privilege in any respect.

4.    I submit this further supplemental declaration in support of *Foreign Representatives' Opposition to PI Defendants' Supplemental Memorandum in Support of Defendants' Motion to Dismiss Based on the Doctrine of Res Judicata and in Further Support of Foreign Representatives' Motion for Leave to Amend Complaints*. Except as otherwise indicated, all facts set forth in this further supplemental declaration are based upon my personal knowledge or learned from my review of relevant documents, including, without limitation, the Sample Amended Complaints, the *PI Defendants' Supplemental Memorandum in support of Defendants' Motion to Dismiss based on the Doctrine of Res Judicata* and authorities cited therein, the witness statements of Kenneth Krys attached to the *Supplemental Declaration of David J. Molton in Opposition to PI Defendants' Supplemental Memorandum in Support of Defendants' Motion to Dismiss Based on the Doctrine of Res Judicata and in Further Support of Foreign Representatives' Motion for Leave to Amend Complaints* submitted herewith, and the *Defendants' Consolidated Memorandum of Law in Opposition to Plaintiffs' Motion for Leave to Amend and in Support of Defendants' Motion to Dismiss*, and accompanying declarations and authorities included and cited therein.

5.    I have been asked to express my view on the additional *res judicata* arguments raised by the PI Defendants in their Supplemental Memorandum dated March 27, 2017 from the point of view of BVI law. The essential argument being put forward by the PI Defendants is that the Liquidators should be precluded from advancing any claim in respect of redemption payments made to the PI Defendants in these proceedings, on the basis that

those claims could and should have been brought in the litigation in the BVI between Fairfield Sentry and the PI Defendants. That would certainly not be the position if the matter were held to be governed by BVI law.

6. As I set out at paragraph 10 *et seq.* of my Second Declaration, there are several different varieties of *res judicata* in English/BVI law which were enumerated by the UK Supreme Court in *Virgin Atlantic Airways v Zodiac Seats UK Ltd* [2014] AC 160. The varieties that might potentially be relevant to the question at hand are (i) cause of action estoppel; (ii) issue estoppel and (iii) *Henderson v Henderson* abuse of process. Unless one of those concepts applies, there can be no *res judicata* under BVI law.

7. As I explained at paragraphs 22 and 49(b) of my Second Declaration, <u>cause of action estoppel</u> cannot apply to redemption payments that were not the subject of the BVI litigation. For cause of action estoppel to apply, the claims would have to relate to the identical cause of action, *i.e.* a claim for the same alleged overpayment based on the same cause of action. That is not the case here.

8. As I explained at paragraph 50 of my Second Declaration, <u>issue estoppels</u> would arise as between the Funds and the PI Defendants in respect of issues that were actually decided by the Privy Council. That does not preclude the Funds from making claims in respect of redemption payments that were not the subject of the BVI proceedings: it merely prevents the Funds from advancing arguments in those claims that are inconsistent with the decisions of the Privy Council on the points that it decided (as set out at paragraph 50 of my Second Declaration).

9. As to <u>*Henderson* abuse of process</u>, as I explained at paragraph 39 and 57(c) of my Second Declaration, it is generally not an abuse of process for a party to seek to litigate a claim that he is not estopped from litigating. In particular, as I said there, where a claimant is owed a number of separate alleged debts by a defendant, English/BVI law has no difficulty

4

with the claimant claiming each alleged debt by way of a separate action if he wishes to do so, and if he loses the action in relation to the first alleged debt, there is nothing to stop him running different or better arguments in the second action for the second alleged debt, even if the underlying facts are the same.

10. A claimant who brings multiple claims in separate actions *might* be held to be acting abusively if it could be shown that *e.g.* he was trying unjustly to harass the defendant by confronting him with multiple sets of litigation for no good reason or that he was trying to keep claims hidden "up his sleeve" for some ulterior purpose (see *Stuart v Goldberg Linde* [2008] 1 WLR 823 (in which a second action, based mainly on the same facts as the first action, together with further facts discovered after the trial of the first action, but relying on a different cause of action, was held not to be an abuse) at paragraph 73 per Lloyd LJ, and see also *Ebert v Birch* [2000] Ch 484 for an example of the kind of (extreme) conduct that has been regarded as abusive in this sense).

11. There is nothing of that kind here. Even if the Liquidators had brought claims for some redemption payments in the BVI and for other redemption payments in the US without any particular reason for doing so, that would not be an abuse: they are claims for separate debts that the Liquidators can pursue in separate actions. But in fact, the Liquidators have explained in witness evidence filed in the BVI (and not, as I understand it, challenged or questioned by the PI Defendants) that there was a good reason why claims in respect of only a limited number of redemptions were commenced in the BVI (in short it was in order to protect limitation periods in relation to those redemption payments at a time when the ability to bring proceedings before the US Bankruptcy Court was uncertain: see the 32nd witness statement of Kenneth Krys at paragraphs 5 - 15 ). In light of that evidence, any argument that pursuing the separate redemption payments in proceedings in the US Bankruptcy Court itself

amounts to an abuse of process would in my view be dismissed as completely meritless by a

BVI or English court.

Executed on April 6, 2017
London, UK

                                                   /s/ Gabriel Moss
                                                   Gabriel Moss, QC

# *Ebert v Birch* [2000] Ch 484

**BAILII Citation Number: [1999] EWCA Civ 3043**

Case No. LTA 98/7471/6727/3

IN THE SUPREME COURT OF JUDICATURE
IN THE COURT OF APPEAL (CIVIL DIVISION)
ON APPEAL FROM THE CHANCERY DIVISION (IN BANKRUPTCY)
(MR JUSTICE NEUBERGER)

Royal Courts of Justice
Strand
London WC2A 2LL
Date: Tuesday 30 March 1999

B e f o r e:
THE MASTER OF THE ROLLS
(LORD WOOLF)
LORD JUSTICE OTTON
LORD JUSTICE ALDOUS

- - - - - -

| | | |
|---|---|---|
| **GEDALJAHU EBERT** | | **Plaintiff/Applicant** |
| | - v - | |
| **1. TREVOR NIGEL BIRCH (Liquidator of EUROPRIDE LIMITED) MIDLAND BANK PLC** | | |
| | **and** | |
| **2. JOAN YVONNE VENVIL RALPH WOLFF J RABONOWICZ** | | **Defendants/Respondents** |

- - - - -

(Transcript of the Handed Down Judgment of
Smith Bernal Reporting Limited, 180 Fleet Street,
London EC4A 2HD
Tel: 0171 421 4040
Official Shorthand Writers to the Court)

- - - - -

The Applicant appeared in person.
MR P EMERSON (Instructed by Messrs Carter Backer Winter, London, N19) appeared on behalf of
the Trustee in Bankruptcy
MR R HANTUSCH (Instructed by Messrs Teacher Stern & Selby, London, WC1) appeared on behalf
of Mr Ralph Wolff.
MR G COOPER (Instructed by Messrs Ince & Co, London, EC3) appeared on behalf of Mr
Rabinowicz)
MR A MITCHELL (Instructed by Messrs Eversheds, London, EC4V 4JL) appeared on behalf of the
Second Defendant/Respondent
MR I BURNETT QC appeared as an Amicus Curiae

- - - - - -

J U D G M E N T

LORD WOOLF, MR:   This is a judgment of the Court.  This case raises a point of considerable importance.  The point relates to the extent of the inherent jurisdiction of the Supreme Court to prevent the initiation of civil proceedings which are likely to constitute an abuse of the process of the court.  It is not in dispute that the court has an inherent jurisdiction to prevent further applications being made without the leave of the court in existing proceedings which are already before the court.  This was authoritatively decided in *Grepe v Loam* (1887) 37 Ch.D 168.  That case has given its name to the orders which have subsequently been made on numerous occasions to prevent applications without the leave of the court in existing proceedings.  What is in question is whether the court has jurisdiction in appropriate circumstances to make *Grepe v Loam* orders prohibiting new proceedings being commenced without the leave of the court and, if so, whether the orders can prohibit County Court proceedings as well as High Court proceedings.

That a court should have the jurisdiction which is in issue can hardly be doubted.  The facts of Mr Ebert's litigation make the need for the jurisdiction abundantly clear.  Mr Ebert by a series of vexatious proceedings has caused the parties to these proceedings to incur very considerable expense which they have little, or no, hope of recovering.  Those parties are the liquidator of Europride Limited, the Midland Bank PLC, Mr Ebert's Trustee in Bankruptcy and Mr Ralph Wolff.

We are prepared to accept that Mr Ebert may initially have had reason to consider that he had been hard done by, because his co-guarantor had avoided all liability; but it is clear that Mr Ebert has already brought vexatious proceedings, and that he will continue to bring such proceedings unless he is restrained from doing so.  For the purpose of determining this appeal, it is not necessary to set out the long history of Mr Ebert's various proceedings.  In a detailed judgment, with which Lord Justice Mummery agreed, dated the 25th March 1998, Lord Justice Potter sets out part of that history.   Further aspects of the history appear later in connection with Mr Ebert's application to appeal against the order of Neuberger J  of 23rd October 1998.

As a result of this history, on the 4th December 1998 HM Attorney General instituted proceedings against Mr Ebert under Section 42 of the Supreme Court Act 1981.  Those proceedings have not yet been heard.  Section 42 is in the following terms.

> "(1) If, on an application made by the Attorney General under this section, the High Court is satisfied that any person has habitually and persistently and without any reasonable ground –
>
> (a)   instituted vexatious civil proceedings, whether in the High Court or any inferior court, and whether against the same person or against different persons; or
>
> (b)   made vexatious applications in any civil proceedings, whether in the High Court or any inferior court, and whether instituted by him or another; or
>
> (c)   instituted vexatious prosecutions (whether against the same person or different persons),
>
> the court may, after hearing that person or giving him an opportunity of being heard, make a civil proceedings order, a criminal proceedings order or an all proceedings order.
>
> (1A) In this section –
>
> "civil proceedings order" means an order that –

      (a) no civil proceedings shall without the leave of the High Court be instituted in any court by the person against whom the order is made;

      (b) any civil proceedings instituted by him in any court before the making of the order shall not be continued by him without the leave of the High Court; and

      (c) no application (other than one for leave under this section) shall be made by him, in any civil proceedings instituted in any court by any person, without the leave of the High Court;

"criminal proceedings order" means an order that –

  (a) no information shall be laid before a justice of the peace by the person against whom the order is made without the leave of the High Court; and

  (b) no application for leave to prefer a bill of indictment shall be made by him without the leave of the High Court; and

  "all proceedings order" means an order which has the combined effect of the two other orders.

  (2) An order under subsection (1) may provide that it is to cease to have effect at the end of a specified period, but shall otherwise remain in force indefinitely.

  (3) Leave for the institution or continuance of, or for the making of an application in, any Civil proceedings by a person who is the subject of an order for the time being in force under subsection (1) shall not be given unless the High Court is satisfied that the proceedings or application are not an abuse of the process of the court in question and that there are reasonable grounds for the proceedings or application.

  (3A) Leave for the laying of an information or for an application for leave to prefer a bill or indictment by a person who is the subject of an order for the time being in force under subsection (1) shall not be given unless the High Court is satisfied that the institution of the prosecution is not an abuse of the criminal process and that there are reasonable grounds for the institution of the prosecution by the applicant.

  No appeal shall lie from a decision of the High Court refusing leave required by virtue of this section.

  A copy of any order made under subsection (1) shall be published in the London Gazette."

The procedure for making an application is set out in the rules of the Supreme Court Order 94 rule 15.

It will be observed from section 42 that, if an order is made, it may prevent either all civil proceedings or all criminal proceedings or all civil and criminal proceedings being initiated without the leave of the High Court. Such an order is considerably wider than the conventional *Grepe v Loam* order. It is also wider that the two orders made by Neuberger J against Mr Ebert which have given rise to the point now being considered. An order under s.42 is, however, subject to safeguards. The application has to be made by the Attorney General and the application has to be heard and determined by a Divisional Court (a court consisting of at least two High Court judges) in accordance with the requirement of Order 94 rule 15 (1). The Attorney General is not normally involved in the making of a *Grepe v Loam* order and not only can that order be made by a single High Court judge, it can be made in the county court [see *E Wayte v*

*Slocombe and Rose* C.A. (15th June 1994 unreported) and section 76 County Courts Act 1984].

Section 42 of the Supreme Court Act 1981 can be traced back to the Vexatious Litigants Act 1896. Its present form is derived from the Judicature Act 1925, s.51, as subsequently amended.

The issue raised by the appeal has to be considered in relation to two orders of Neuberger J. The first is dated 7 July 1998. The relevant parts of that order are as follows:

> "that the applicant be not allowed to make any further applications or take any steps in this court (a) in or arising out of these present bankruptcy proceedings. Or (b) concerning any matters involving or relating to or touching upon or leading to these present bankruptcy proceedings or the conduct thereof whether such application is brought in reliance upon any provision or provisions of the Insolvency Act 1986 or the Insolvency Rules 1986 or any amendments or modifications or re-enactments thereof or in reliance or purported reliance upon any other enactment or statutory provision or instrument or upon any principle of law or equity or upon any term of any contract on upon any other grounds whatsoever without leave of a judge being first obtained.
>
> that the applicant is not to apply to the Court for leave to issue any application against the Trustee in Bankruptcy without first giving notice in writing direct to the Trustee six working days before such application (save in the case of an emergency) of the nature of the application and the grounds thereof and if the Trustee replies to such notice in writing such response shall accompany any application made by the applicant for leave to issue such application."

The other order is the order of 23 October 1998. Under this order Neuberger J struck out an originating summons issued by Mr Ebert on 13 July 1998 in the Liverpool District Registry on the grounds that it was scandalous, frivolous, vexatious and an abuse of the process of the court. Mr Ebert applies for leave to appeal against that order. We set out later out the reasons why that leave should be refused. This order contains the following additional provisions:

> "The plaintiff be not allowed to make any further application or to take any steps (including for the avoidance of doubt the issuing of any new proceedings in whatever form) in this Court (which expression includes for the avoidance of doubt any division thereof, whether in the Royal Courts of Justice or in any District Registry) or in any County Court against the Second Defendant or its legal representatives in or arising out of or concerning any matters involving or relating to or touching upon or leading to the proceedings in the Queen's Bench Division 1995 M No. 156; and/or the Chancery Division proceedings 1997 E 4444; and/or any of the bankruptcy proceedings in the Chancery Division; or the conduct of any such proceedings whether such application is brought in reliance upon any provision or provisions of the Insolvency Act 1986 or of the Insolvency Rules or any amendments or modifications or other enactment or statutory provision or instrument or upon any principle of law or equity or upon any term of any contract or upon any other grounds whatsoever without leave of the judge being first obtained.
>
> If the plaintiff wishes to apply for such leave then such application must be made ex parte in writing to Mr Justice Rimer or Mr Justice Neuberger and will be dealt with on paper.
>
> If any Writ, Motion, Summons (whether Originating or otherwise), Notice of Application or any other form of document which is within the scope of this Order is served on or given to the Second Defendant or its legal representatives without the said leave having been first obtained that person shall not be required to appear and the application shall stand dismissed without being heard.

> The plaintiff is not to apply to the Court for leave to issue any application against the Second Defendant or its legal representatives without first giving notice in writing to the Second Defendant's solicitor six clear working days before such application (save in the case of an emergency) of the nature of the application and the grounds thereof and if the Second Defendant's solicitors reply to such notice in writing (there being no obligation to do so) such response shall accompany any application made by the Plaintiff for leave to issue such application.

The two orders were made in proceedings brought against two different sets of parties. The first set was Mr Ebert's Trustee in Bankruptcy and Mr Ralph Wolff. The other proceedings were brought by Mr Ebert against the liquidator of a company called Europride Limited and the Midland Bank Plc. It will be noted that the later order is in wider terms than the earlier order. The second order was drafted by Neuberger J in the wider terms in the hope that it would be less easy for it to be circumvented by Mr Ebert. Paragraph 3 of the order extends to the County Court and is extensive in its effect. But its effect still falls well short of an order which would be made under s.42 of the 1981 Act.

Mr Ebert's application for leave to appeal against the order of 7 July 1998 came before Nourse and Evans LJJ on 10 September 1998. On that occasion this Court dismissed his application for leave to appeal paragraphs 1 and 2 of that order (which are not set out) but adjourned the application for leave to appeal in relation to the remaining paragraphs of the order to an inter partes hearing with the substantive appeal to follow if leave is granted. On 8 December 1998 that adjourned application came before Nourse, Judge and Tuckey LJJ. On this occasion this Court further adjourned the application for leave to appeal in relation to paragraphs 3 – 6 of the earlier order and adjourned his applications in relation to the later order. The adjournment was so that the applications could both be heard at the same time. In addition the Court gave the Attorney General leave to intervene. In fact, the Attorney General chose not to do so. Instead he instructed Ian Burnett QC to appear as Amicus Curiae in relation to the points of principle which we have identified at the outset of this judgment. Mr Burnett was of great assistance to the court.

In his judgment explaining his reasons for taking this course, Nourse LJ drew attention to the fact that the orders dated 7 July and 23 October 1998 were in an extended form. He then added:

> "The respondents contend that it was one made within the court's inherent jurisdiction to protect its own process. English authority on the question whether relief in an extended form can be granted or not is virtually non-existent, the only case in which such relief was granted being *Landi Den Hartog v Sea Bird* [1976] FSR 489, a decision of Whitford J, when the point went by concession. There are authorities both in New Zealand and in Australia which have decided that relief in an extended form cannot be granted. They are *Stewart v Auckland Transport Board [*1951] NZLR 576, a decision of Fell J, sitting in the Supreme Court of New Zealand, and *Commonwealth Trading Bank v Inglis* [1974] 131 CLR 311, a decision of the High Court of Australia. We are grateful to counsel for the respondents for bringing those two cases to our attention."

Nourse LJ went on to indicate that because of the issues as to jurisdiction which the extended orders created, the court had been minded to invite the Attorney General to intervene. The court had then learnt of the Attorney General's statutory application. This confirmed the desirability of the court so doing.

At the outset of his submissions, Mr Burnett indicated that he saw it as his primary role to make sure that any arguments in favour of Mr Ebert should be before the court as he was not represented whereas all the other parties were. The court were fully in agreement with Mr Burnett adopting that course.

Mr Burnett did not suggest that the existence of the statutory power to make an order prevented the court

exercising its inherent jurisdiction under *Grepe v Loam*. Bearing in mind the period during which the *Grepe v Loam* jurisdiction has been exercised alongside the statutory jurisdiction, such a submission would have had no possible prospect of success. Nonetheless there was force in the submission which Mr Ebert, himself, advanced based on the existence of safeguards of an application under the statute having to be made by the Attorney General under s.42 and to a Divisional Court. Those safeguards do not, however, go to the jurisdiction to make a *Grepe v Loam* order. It is accepted that the existence of the statutory power has not supplanted the power of the court to make a limited *Grepe v Loam* order. They serve to emphasise the importance of the *Grepe v Loam* orders only being made when a clear case for making the orders has been established. This is one of the situations where it is accepted that notwithstanding the intervention of Parliament an inherent jurisdiction remains alongside the statutory jurisdiction. This does not mean that intervention of Parliament may not have cut down the inherent jurisdiction of the court. If there was an application for an order of the same width as the statutory jurisdiction, the court could only appropriately deal with such an application under the statutory jurisdiction. The inherent power to make an order is now more restricted. The question is how much more restricted?

Mr Burnett drew our attention to the fact that it would now be possible for the Attorney General to seek interim relief. (see re Blackstone [1995] COD 105) That is correct. If the Attorney General made such an application and it was successful, then the orders already made by Neuberger J would serve no purpose and should be discharged. However, until a statutory order is made, if there is jurisdiction to make the existing orders, they should not at the present time be set aside because the protection which they provide is necessary and enables any applications under the orders to be dealt with in a sensible manner.

On the question of jurisdiction, Mr Burnett disputed that the Court has an inherent jurisdiction to make orders in the wider form. His argument was founded upon the two Commonwealth decisions referred to by Nourse LJ. In the first of those cases, *Stewart v Auckland Transport Board* [1951] NZLR 576 Fell J in the Supreme Court of Auckland referred to Winfield's Present Law of Abuse of Legal Procedure (1921) 238,239 and *Grepe v Loam* and a further case of *Lord Kinnaird v Field* [1905] 2 Ch. 306. He then indicated that counsel had not been able to refer to any cases under the Court's inherent jurisdiction where the commencement of any further actions had been prevented. He then drew attention to the English statutory jurisdiction and added :

> "I think that this is conclusive to show that, without some special authority I cannot make an order preventing the plaintiff from issuing other proceedings, even though they may be vexatious."

The judgment of Fell J was referred to by the High Court of Australia in *Commonwealth Trading Bank v Inglis* [1974] 131 CLR 311. In Australia there is apparently a power similar to the statutory power in this jurisdiction to restrain a vexatious litigant from pursuing any action without leave. However the order is made pursuant to the procedural rule.

In that case counsel had apparently conceded that he could cite no authority "in direct support" of his proposition that a court could restrain fresh proceedings being brought without leave. He however still relied on the inherent powers of the court. Of these powers, the court (which included Barwick CJ) said:

> "7. In our opinion, it is not surprising that the courts do not appear (so far as we have been able to discover) to have taken the further step of intervening in a summary way to prevent the commencement, except by leave, of actions and other proceedings by a particular person or persons but have limited themselves to exercising their powers in relation to proceedings which have been taken in a court and have thus been placed under its control. It may be that the exercise of supervision, by means of a requirement that leave should be obtained for the bringing of proceedings, could have been justified logically as a proper safeguard against abuse of the court's process in cases where it was shown to be probable that a person would

continue bringing groundless proceedings. But, in our opinion, it is apparent that the courts, both in England and in this country, have declined to regard themselves as having power to do so, except where such power has been conferred upon them by an Act of Parliament or by rules promulgated under statutory authority. This is demonstrated, not merely by the absence of reported cases in which such orders have been made under the inherent power of the court, but by the fact that it has been thought necessary to deal with specific cases of the bringing of numerous unfounded proceedings by legislation rather than by invoking the inherent power of the court. There have been cases in which the vexatious character of the proceedings was so clear that it cannot be supposed that the court would have hesitated to exercise such a power if it had been regarded as existing.

18. But the making of unwarranted and vexatious applications in an action which is pending in the court is, in our opinion, a matter over which there is an inherent power in the court to exercise control. There is an essential different, in our opinion, between regulating the conduct of such an action so as to prevent the court's process from being abused, on the one hand, and impeding a particular person in the exercise of the right of access to the court, on the other hand. …

19. In our opinion, the cases to which we have referred provide authority for the proposition that there is an inherent power in the court to control the bringing of applications in the course of an action of which the court is seized for the purpose of preventing a party abusing the process of the court. When positive provisions directed to the same end have been made by statute or by rules of court, it may be necessary to consider whether the inherent power has been wholly or partly superseded. But, in our opinion, the power by virtue of which the applicant seeks to obtain an order that no applications in existing proceedings should be made without leave has not been abrogated by the rules of court. The words "other proceedings in the Court" at the end of r.6(1) should be construed, in our opinion, as referring to an original proceedings, rather than to an interlocutory proceeding in a matter which has already been initiated: see the definition of "suit" in O.1,5.5 of the Rules. On this view, there is no overlapping of the power conferred by r.6(1) and the inherent power now being considered.

20. In our opinion, we should hold that the Court has power to make an order in this application, in so far as the application relates to the bringing of applications in existing proceedings, but not otherwise.

As a result of the investigations of Mr Burnett and the counsel appearing for the other parties, in particular Mr Robert Hantusch, counsel for Mr Ralph Wolff, there is considerably more authority available to this court than was available either to Fell J or the High Court of Australia.

Thanks to the assistance of the Crown Office, there was made available to Mr Burnett a list of vexatious litigants orders maintained by the Court Service since the late 19th Century. The list is not complete because it contained no reference to the notorious Mr Chaffers who was responsible for the Vexatious Litigants Act 1896 being passed. However, prior to that Act there are at least six orders which have been made which are relevant since they restrain fresh proceedings. They are :

Giovanni Milissich v Lloyds 18.12.1880, an order made by Master Butler of the Queen's Bench Division; Butson v Davies, 5.6.1888, an order made by an unknown judge; Rawlins v Burton, Yeates & Company and others 5.2.1889, an order made by an unknown judge. Torkington v Torkington 22.5.1889, Master Francis of the QBD (the order was applied by Stirling J in the Chancery Division)Giovanni Milissich v Lloyds 20.5.1992 on reference to the Queen's Bench by Baron Pollock and Millie Marcusson v The Postmaster

General and The Governor and Company of the Bank of England 29.10.1894 by Day J.

There is nothing to suggest in these cases, that the question of the extent of the inherent jurisdiction of the court was the subject of argument. However they do provide support for the existence of a wider practice prior to the intervention by statute in 1896 of which both Fell J and the High Court of Australia were unaware. In addition, with respect to Fell J, he over-simplified the issue. The conclusion which he draws from the intervention of the legislature is by no means as obvious as he thought it was.

After the intervention by statute to provide a remedy, in this jurisdiction, counsel have been able to find a number of recent cases in which the court has granted a wider form of restraint. Again however it is far from clear that the issue was fully argued. These cases include Landi Den Hartog v Seabird [1976] FSR 489 to which Nourse LJ referred. An interesting case in this connection is the decision in *Attorney General v Landau* (22 January 1997) for which there is no a transcript available but to which reference is made by Brooke LJ in his judgement in *R v The Attorney General ex parte Price* (transcript CO/3390/96 19 March 1997, unreported). From the transcript in *Price* it appears that in *Landau* the Attorney General invoked the inherent jurisdiction of the court when the protection provided by s.42 was perceived to be insufficient. The court in London granted a permanent injunction on the application of the Attorney General to restrain a vexatious litigant from issuing statutory demands as a prelude to bankruptcy proceedings. In addition there is the recent decision of Blackburn J in *McLean Homes (North London) Limited v Deace* and another [1997] EGCS 120 where it was held "the court has jurisdiction to grant an injunction restraining fresh proceedings without leave of the court to prevent the plaintiff commencing litigation because it was likely to constitute an abuse of process.

Bearing in mind the absence of full argument in these cases, we would not regard them as conclusive. They do at least show that it cannot be assumed that Fell J and the decision of the High Court of Australia should be accepted uncritically. We prefer to approach the issues from a standpoint of principle. Doing so, the starting point must be the extensive nature of the inherent jurisdiction of any court to prevent its procedure being abused. We see no reason why, absent the intervention of a statute cutting down the jurisdiction, that jurisdiction should apply only in relation to existing proceedings and not to vexatious proceedings which are manifestly threatened but not yet initiated. In this connection we have gained considerable assistance from the article by Sir Jack Jacob "The Inherent Jurisdiction of the Court" 197 CLP 23. Reading that article as a whole, we find it strongly supportive of the approach that we have indicated. We recognise that Mr Burnett can obtain comfort from a passage at page 43 of the article on which he relied. However we regard a passage on the following page as indicating more clearly the views of this master of civil procedure. Sir Jack said :

> "I should conclude this aspect of inherent jurisdiction by emphasising that the inherent power of the court by summary process to stay or dismiss an action is not confined to closed categories of cases, of which vexatious suits is one illustration but is a power which is exercisable in any situation where the requirements of justice demand but not where there is no such requirement".

In relation to specific anticipated proceedings both in this jurisdiction or abroad, the court can and does grant an injunction to stay the proceedings. Where the injunction is in relation to foreign proceedings, the jurisdiction is not exercised by interfering with the foreign court. Instead, the injunction is granted against an individual and is enforceable personally against that individual. The ability of the court to operate in this way when the proceedings are only anticipated is no more than an example of the court being prepared to protect an applicant from anticipated damage when that damage is sufficiently imminent and serious. The court undoubtedly has the power to stay or strike out vexatious proceedings when they are commenced under its inherent power. We can see no reason in principle why it should not also, in accord with the general approach to the granting of quia timet injunctions, exercise that power to prevent the serious loss that anticipated but unidentified proceedings could cause the defendants to those proceedings.

If what was involved in this case constituted a major innovation, then there could be something said for the court declining to exercise the jurisdiction and waiting intervention either in the form of primary legislation or in the form of rules of court. (The decision of the High Court of Australia in *Frank William Dudley Jones v Alan George Sky Ring* (27 August 1992) upheld the use of the rules of court for creating this power).

The making of an extended *Grepe v Loam* order or a *Grepe v Loam* order in its usual form does involve a serious inhibition on a prospective litigant exercising his normal rights of access to the courts. However, the extent of this interference should not be exaggerated. First it is only an inhibition for bringing proceedings without the leave of the court. If the proceedings are arguably meritorious leave will be forthcoming. Secondly, the court will not make an order unless there is serious grounds for doing so and if there are no serious grounds, the order will be capable of being set aside on appeal.

The general approach of the courts in recent years has been not to restrict the inherent jurisdiction of the court but to adopt a broad approach where this is appropriate. In this regard we would draw attention to the decision of this court in *A B and others v John Wyeth* v *A B v Roche Products Limited* (unreported 13 December 1996).

In the course of argument reference was also made to article 6 of the European Convention of Human Rights. Article 6 does no more than reflect the approach of the common law indicated by Laws J in *R v The Lord Chancellor ex parte Witham* [1998] QB 575. As long as the inherent power is exercised only when it is appropriate for it to be exercised, no contravention of article 6 or common law principle is involved.

A separate argument was advanced by Mr Burnett in relation to the County Court. However, if the court has, as we think it has, jurisdiction to make an order in relation to proceedings which are anticipated but have not yet been initiated in the High Court, then I have no doubt that the High Court has power to make such an order in relation to the County Court as well.

The High Court has traditionally exercised a supervisory jurisdiction in relation to the County Court and although that jurisdiction is normally exercised over the County Court by means of Judicial Review this does not mean that it is the only way the jurisdiction can be exercised. It could for example properly be exercised by the granting of an injunction or by the sort of orders made by Neuberger J. If authority was needed for this it is provided by *Henry Connolly Brothers Limited* [1911] 1 Ch. 731. In that case the proceedings which were restrained were in the Lancaster Palatine Court and not a County Court. In addition the proceedings had already been commenced when they were restrained. Furthermore the injunction would be enforceable against the individual and not the court. Nonetheless these distinctions do not alter the principle involved. The County Court will give effect to the High Court order in the same way as it would give effect to an order made by a County Court judge. We still have a High Court and County Courts with separate but over-lapping jurisdictions. However both courts are part of the same civil justice system.

It would be absurd today when there is a process of merger between the High Court and County Court if it were necessary for a separate order to be made in the County Court when an order was in any event going to be made in the High Court. While it might not be appropriate for the County Court to make an order in relation to the High Court, we can see no difficulty in the High Court making an order in relation to the County Court if the facts justify such an order being made.

It will be clear that we are firmly of the opinion for the reasons indicated, that the orders which Neuberger J made were ones which he was entitled to make. It is important that any such orders should be sufficiently certain so as to enable the person who is the subject of the orders to know what he is entitled to do and what he is not entitled to do. These orders meet that requirement.

We would not grant Mr Ebert leave to appeal on the jurisdiction point. In our judgment any such appeal would be bound to fail. It remains to consider his application to appeal against that judge's order of 23rd

October 1998 (LTA 98/7471). That order struck out Mr Ebert's originating summons issued by him on 13th July 1998 in the Liverpool District Registry on the ground that it was scandalous, frivolous, vexatious and an abuse of process of the court.

The originating summons sought four orders. First an order and declaration that the assignment made between the Midland Bank PLC and a Ralph Wolff dated 22 January 1996 was ineffective and invalid, in so far as it related to Mr Ebert. Second an order that the liquidator should establish the alleged debt owed to the Midland Bank by Europride Ltd in liquidation. Third an order that the applicant should be allowed to inspect the proof of debt. Fourth a declaration that the release of Morris Wolff from his contribution under the guarantee was unlawful and in breach of the Insolvency Rules and was done without the consent of the liquidator of Europride and with the intention of defrauding creditors.

The originating summons procedure is only applicable to resolve issues where pleadings are not necessary. An example is the resolution of an issue of law when the facts are not in dispute. It follows that the only issue which might perhaps have been decided using the procedure adopted was the first issue, namely whether the assignment was effective and valid.

Mr Justice Neuberger in his judgment giving reasons for striking out the originating summons said this at page 3 of the transcript:

> "Mr Mitchell, who appears on behalf of the Bank says that: (a) it seems very unclear what relief Mr Ebert is actually claiming against the Bank, and (b) in so far as he relies on any points; and those points are set out as 10 grounds in his originating summons of 13th July 1998, they are really all points which have been raised before and disposed of adversely to Mr Ebert, at first instance on more than one occasion and/or in the Court of Appeal.
>
> Regretfully from Mr Ebert's point of view, I think that those submissions are right.
>
> I have no hesitation in saying that this originating summons should be struck out against the Midland Bank. Mr Ebert argues that because the points he seeks to take are against the Bank for the first time they should for that reason be open to him to pursue. However, the points are all ones which he has raised before. In any event, all the points he relies on are identical to those, and the arguments are identical to those, he has raised before and it would not be appropriate to let the action go ahead. I am not convinced that the application should be made against the Bank; it is Mr Ralph Wolff, not the Bank, which claim for Mr Ebert's creditors. Even assuming that the Bank was a proper party, in order for those matters to be determined, it seems to me quite plain Mr Ralph Wolff, who now claims the benefit of the debt would have to be a party, because he would be the person primarily affected by the various allegations and the relief sought. However all the points now sought to be raised have been unsuccessfully raised against Mr Ralph Wolff."

Before us Mr Ebert sought to explain why the judge was wrong in concluding that the originating summons raised issues that had already been raised by him in other proceedings. His main submission was the court had never pronounced upon the validity of the assignment nor whether in law and fact it had the effect of giving to Mr Ralph Wolff a right to the alleged debt claimed by him in the bankruptcy proceedings. It followed that it could not be an abuse for him to seek to have that issue litigated between himself and the Midland Bank, particularly as he was given that right under Order 14A of the Rules of the Supreme Court and sections 423-425 of the Insolvency Act 1986.

That submission is wrong. As has been made clear in a number of judgments in the bankruptcy

proceedings, Mr Ebert's bankruptcy was the result of the assignment. The Midland Bank obtained judgments against Mr Morris Wolff and Mr Ebert for £55,894.70 as joint guarantors. Mr Ralph Wolff supplied money to Mr Morris Wolff's solicitors to enable the judgment debt to be paid so to save his brother from threatened bankruptcy. The arrangement was that in consideration of payment of £67,780 the assignment referred to in the originating summons would be executed and Mr Morris Wolff would be released from all obligations under the guarantee. The money was paid and the assignment was executed. On 29th March 1996 Mr Ralph Wolff served on Mr Ebert a statutory demand for the amount that had been paid. On 22nd November 1996 Mr Ralph Wolff presented a petition which resulted in a bankruptcy order against Mr Ebert. Mr Ebert then launched a number of applications to annul that order. Ultimately those applications to annul came before Mr Justice Neuberger on 10th November 1997. The judge refused his applications. Mr Ebert sought leave to appeal to this Court. That application came before Potter and Mummery LJJ on 25th March 1998. They refused him leave to appeal. In his judgment Potter LJ set out the background and then he came to consider Mr Ebert's argument relating to the assignment. He said:

> "In relation to the applicant's argument that the assignment was not a true assignment but was in effect a means by which Morris Wolff reduced his liability under the guarantee by circumventing the rules on contribution, the judge considered the documentation disclosed and held that it was clear that the money paid in consideration for the assignment did indeed come from Morris Wolff rather than his brother, albeit via Ralph Wolff's bank account. The judge was enabled to say that he was no longer concerned that the plaintiff had paid more for the debt than he could expect to recover from the defendant, because he now saw that the excess represented the amount which the Bank had spent on obtaining the judgment, the Bank not being prepared to release Morris Wolff until it had recovered its costs in full.
> ...
>
> The judge held that, while the defendant was arguing that the transaction was not what it purported to be, it was quite clear that it was always intended that an assignment be taken by Ralph Wolff in return for the payment off of the Bank's debts and, while it may well have been the intended effect or side effect that Ralph Wolff would thereby acquire a right of action for the whole of the judgment sum against the applicant, that was not something which rendered the transaction a sham or objectionable in law. The judge held that it seemed clear that the debt had been assigned bona fide to Ralph Wolff and as a result he was entitled to enforce the judgment debt through the medium of the bankruptcy proceedings unless some ulterior and improper motive could be shown, as to which none had been demonstrated.
>
> The applicant had relied upon the affidavit of Ralph Wolff and the timing of the payment off of the Bank's debt to contend that the debt had in reality been paid off and the money was paid over to the Bank by Teacher Stern and, as a result, at the time of the assignment there was no debt to assign. The judge, however, held that, looking at the documents and the transaction as a whole, it was clear that it had in effect all been done pursuant to an overall agreement, and the fact that the assignment took place later did not mean that it was not linked to the repayment of the debt or that no consideration was thereby afforded."

Potter LJ went on to list the other grounds of proposed appeal. The first was that the debt was disputed. As to that Potter LJ pointed out that the judge had held that the debt and the assignment were properly proved. That put an end to the third ground of proposed appeal which was that the assignment was untrue and did not reflect the true facts surrounding it. Another ground of appeal was that even if the debt could be established it would only be for a 50% contribution. Potter LJ went on to recite the conclusion of the judge that that was not correct.

It is quite clear from the judgments of Neuberger J and of Potter LJ that the validity and effect of the assignment was at the very heart of the proceedings to annul the bankruptcy order. If as Mr Ebert contends in his originating summons, the assignment was ineffective and invalid, then it is clear that no bankruptcy order should have been made. That matter has been investigated at length by Neuberger J and this Court has refused leave to appeal against his decision. It follows that it would be an abuse of the process of this Court to allow the matter to be re-litigated by Mr Ebert, albeit in an action against the Midland Bank.

The second and third orders sought in the originating summons relate to the debt owed to the Midland Bank by Europride Ltd in liquidation. Again, that debt was the foundation of the bankruptcy proceedings. If there was no debt, then there was no basis for the judgments that were obtained by the Midland Bank against Mr Morris Wolff and Mr Ebert. Having regard to those judgments it would be an abuse to allow Mr Ebert to reopen the matter in the originating summons proceedings.

Lastly, Mr Ebert sought to raise against the Midland Bank questions as to whether the procedure adopted under the assignment was unlawful in that it was without the consent of Europride and carried out with the intention to defraud creditors. The bankruptcy proceedings were concerned with judgment debts owed by Mr Ebert and Mr Morris Wolff. If Europride owed the money to the Bank then it has been paid in full by Mr Morris Wolff and creditors of Europride have in no way been defrauded. There is no basis for the order sought in fact or law.

Mr Ebert has not shown that an appeal against the order of Neuberger J would stand a chance of success. It therefore would not be right to grant him leave to appeal. In any case, the issuance of the originating summons without leave of the court was contrary to the order of 7th July 1998 and therefore the originating summons should have been struck out on that ground also.

**Order: Application dismissed. No orders as to costs save that the Trustee's costs to be paid out of the estate.**