**BROWN RUDNICK LLP**
David J. Molton
Daniel J. Saval
Marek P. Krzyzowski
Seven Times Square
New York, New York 10036
(212) 209-4800

*Counsel for the Foreign Representatives*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | )   **Chapter 15 Case** |
| **FAIRFIELD SENTRY LIMITED, et al.,** | ) |
| | )   **Case No: 10-13164 (SMB)** |
|    Debtors in Foreign Proceedings. | ) |
| | )   **Jointly Administered** |
| | ) |
| **FAIRFIELD SENTRY LTD. (IN LIQUIDATION), et al.,** | ) |
| | ) |
|        Plaintiffs, | )   **Adv. Pro. No. 10-03496** |
| -against- | ) |
| | ) |
| **THEODOOR GGC AMSTERDAM, et al.,** | )   **Administratively** |
| | )   **Consolidated** |
|        Defendants. | ) |
| | ) |

**DECLARATION OF DAVID J. MOLTON**
**IN SUPPORT OF THE FOREIGN REPRESENTATIVES' OPPOSITION TO THE HSBC**
**DEFENDANTS' SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR LEAVE TO AMEND AND IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS AND IN FURTHER SUPPORT OF FOREIGN**
**REPRESENTATIVES' MOTION FOR LEAVE TO AMEND COMPLAINTS**

I, David J. Molton, do hereby declare, under penalty of perjury under the laws of the United States of America, that the following is true and correct to the best of my knowledge and belief:

1.     I am a member of the law firm of Brown Rudnick LLP, counsel for Kenneth Krys and Charlotte Caulfield, (together, the "Liquidators" or "Foreign Representatives"), in their capacities as the duly appointed Liquidators and Foreign Representatives of Fairfield Sentry Limited (In Liquidation), Fairfield Sigma Limited (In Liquidation), and Fairfield Lambda Limited (In Liquidation).  I submit this Declaration in support of the Foreign Representatives' Opposition to the HSBC Defendants' Supplemental Memorandum of Law in Opposition to Plaintiffs' Leave to Amend and in Support of Defendants' Motion to Dismiss and in Further Support of the Foreign Representatives' Motion for Leave to Amend in the above-captioned action.

2.     Additional information regarding the HSBC Knowledge Defendants' knowledge of the Madoff fraud has come to light in a recent proceeding before the Grand Court of the Cayman Islands, styled *Primeo Fund (in Official Liquidation) v. Bank of Bermuda (Cayman) Ltd. & HSBC Securities Services (Luxembourg) SA* (the "Primeo Case").  In the Primeo Case, the Liquidators of the Primeo Fund brought claims against HSBC Securities Services (Luxembourg) SA ("HSBC SSL"), one of the moving HSBC Defendants here, and Bank of Bermuda (Cayman) Limited n/k/a HSBC Bank Bermuda in connection with HSBC SSL's role as custodian of the Primeo Fund, a fund that invested all or substantially all of its assets in BLMIS.  The Liquidators have recently obtained and provided the Liquidators' U.S. counsel, Brown Rudnick, with a transcript of evidentiary testimony from the Primeo Case given in November and December of

2016. That testimony provides additional facts concerning the HSBC Knowledge Defendants' bad faith that were not previously available to the Liquidators.

3.      Attached as <u>Exhibit A</u> are certain excerpts of the transcript of testimony provided in the Primeo Case.

4.      Attached as <u>Exhibit B</u> is a true and correct copy of the revised proposed Third Amended Complaint in *Fairfield Sentry Limited et al. v. HSBC Securities Services (Luxembourg) SA*, Adv. Pro. No. 10-3630 (Bankr. S.D.N.Y.), which contains certain additional factual allegations (in red-line) based on the testimony and evidence provided in the Primeo Case and recently obtained by the Liquidators.

5.      Attached as <u>Exhibit C</u> is a true and correct copy of the revised proposed Third Amended Complaint in *Fairfield Sentry Limited et al. v. HSBC Private Bank Suisse SA et al.*, Adv. Pro. No. 10-3633 (Bankr. S.D.N.Y.), which contains certain additional factual allegations (in red-line) based on the testimony and evidence provided in the Primeo Case and recently obtained by the Liquidators.

6.      Attached as <u>Exhibit D</u> is a true and correct copy of the revised proposed Third Amended Complaint in *Fairfield Sentry Limited et al. v. Zurich Capital Markets Co. et al.*, Adv. Pro. No. 10-3634 (Bankr. S.D.N.Y.), which contains certain additional factual allegations (in red-line) based on the testimony and evidence provided in the Primeo Case and recently obtained by the Liquidators.

Executed on April 6, 2017

/s/ *David J. Molton*
DAVID J. MOLTON

# **EXHIBIT A**



Primeo Fund v (1) Bank of Bermuda (Cayman) Limited (2) HSBC
Securities Services (Luxembourg) SA

Day 2

November 8, 2016

Opus 2 International - Official Court Reporters

Phone:      +44 (0) 203 008 5900
Email:      transcripts@opus2.com
Website:    www.opus2.com

Tuesday, 8 November 2016

(10.00 am)

Housekeeping

MR JUSTICE ANDREW JONES:  Morning.

MR SMITH:  Good morning, my Lord.

Just a couple of pieces of housekeeping from yesterday.  The first was your Lordship asked me who was responsible for preparing the semi-annual financial statements and I said I thought we'd seen a document that said the responsibility for that rests with Bank of Bermuda.  The document I had in mind is {N/19/3}, which was the engagement letter between Bank of Bermuda and Primeo, of 21 December 1993.  This was the schedule to the engagement letter.

What I had was the third bullet point down underneath the heading, "The services covered by the above fees are ...".

And then it's:

"The preparation of semi-annual and annual financial statements including bookkeeping functions."

So the responsibility for preparing those statements was with Bank of Bermuda, and that's consistent with the duties imposed on them under the Administration Agreement to maintain the books and records.  That was the first point.

Page 1

The second point of housekeeping is that we have prepared a hard copy bundle of the Offering Memoranda, which it might be helpful to have.  I've got a copy of that which I can hand up to your Lordship.  It's bundle G.

(Handed).

It's just we may look at them from time to time and I think it's more convenient to have a hard copy rather than try to flick through the pages on the screen.  So we will refer from that from time to time.  It's obviously got the Offering Memoranda from 1993 and 1996 in, which we looked at yesterday.

MR JUSTICE ANDREW JONES:  So there are 20 separate editions?

MR SMITH:  That's right.  And obviously some of the changes are relatively minor, and what we will do is look at the Offering Memoranda from time to time where there's a significant change of some type, such as where Primeo Select was launched in 1996.

So, my Lord, I think that takes us to where we were yesterday --

MR JUSTICE ANDREW JONES:  The purpose of some of these is probably just to reflect changes in directorships.

MR SMITH:  Exactly, and some more minor changes like that.

MR JUSTICE ANDREW JONES:  We can look at some particular ones at key dates.

Page 2

MR SMITH:  Exactly, that's the intention.  So one's got the key versions.  For example, 1993 and 1996.  There's then a change in 2001, and then of course one sees the change when one gets to the Herald transfer.  In 2007 as well.  But we will come to those.

Opening submissions by MR SMITH (continued)

My Lord, I think that takes us to where we were at 5 o'clock yesterday and I was showing your Lordship a document at {N/606/2}, which is in tab 103 of the core bundle.

This was an email of Mr Young of Bank of Bermuda to Mr Fielding of 19 September and this followed the visit Mr Fielding had made to BLMIS in July 2002.  And Mr Young is then writing to Mr Fielding saying:

"On the basis that you are responsible for GFS due diligence in relation to Madoff as Sub-Custodian for ... assets, we would like to ask you if you could please look into the following ..."

Then he raises specifically the need for independent verification of asset segregation.  He says:

"Would it be possible to get independent verification that the assets of [the Fund] are segregated from other assets held by Madoff?  This could come ideally come from the ... auditor or be independently requested on behalf of Bank of Bermuda.

Page 3

While we have the Dec 01 report from Friehling & Horowitz ..."

Which I think is the internal control report which we looked at yesterday, but it's not specific on this point.  And then he goes on to raise some points on the audited financial statements:

"a) Is the audit certification in the accounts we received standard wording?

"b) Do we know of the standing of the audit firm, Friehling & Horowitz?

"c) Is it possible to get a more complete set of audited accounts ..."

So those are the questions he puts to --

MR JUSTICE ANDREW JONES:  I'm just looking here at my dramatis personae, he's described as "credit and risk manager".  Which office is he based in?

MR SMITH:  I think he's based in Dublin, because I think he's writing specifically in relation to Thema, and he's writing to Mr Fielding who is in Luxembourg, and as I understand it, it's written to him on the basis that Mr Fielding has assumed this role that performing "due diligence" for Bank of Bermuda in relation to BLMIS, and he's therefore addressing that to Mr Fielding, as you will see really from the first sentence of the email.

Then you get Mr Fielding's response back a page at

Page 4

{N/606/1}.  He says to Mr Young, also copied to various other people, including Mr Wilkinson and Mr David Smith:

"I have co-ordinated the due diligence of Madoff in relation to the managed accounts he runs for funds served by the bank.  These have been placed for a number of years."

So there you see Mr Fielding had assumed this role of being responsible for the due diligence in relation to BLMIS.  In relation to the first point, you will see he then says he agrees:

"... it makes sense for each fund with Madoff to have audit certification of those assets run by Madoff where they are material in the portfolio."

And his suggestion, it appears, is that that is something that ought to be done by the fund auditor.  Now, we'll come back to that, because others within Bank of Bermuda take a different view about that, but that's his suggestion at the moment.

Then, just skipping down the page, you will see he then deals with the second set of points made by Mr Young in relation to the financial statements.  He says:

"The wording and in fact the level of financial information provided in the annual and semi-annual financial statements was compared to other US

broker-dealers.  It is very similar and in some regards the Madoff audit reports go further ..."

Now that's something we may need to ask Mr Fielding about, because actually, the BLMIS financial statements are very brief indeed, they run only to a very small number of pages and really consist of little more than a balance sheet and a profit and loss account.  But that's something we will be able to ask him about no doubt.

Then secondly there's a rather odd comment, because he goes on to say:

"We enquired about Friehling & Horowitz and were told that they are a known, reputable firm though not large, and that they are known for audit work of US broker-dealers."

Now, that is a very strange comment, because the one thing Friehling & Horowitz weren't known for was their audit of US broker-dealers.  They didn't audit US broker-dealers.  As your Lordship knows, in fact this was a two-man firm on a strip mall in upstate New York that wasn't known for anything.  It certainly wasn't known and reputable and certainly wasn't known for its audit work of US broker dealers.

Now, Mr Fielding in his witness statement now says he was told this by Ernst & Young, but that's something

we're going to have to ask him about, frankly, because it seems very strange for Ernst & Young to have told Mr Fielding that Friehling & Horowitz were known for their audit work of US broker-dealers.  Clearly that wasn't the case.  So that's something we're going to need to explore.

MR JUSTICE ANDREW JONES:  And were BLMIS's financial statements publicly available?

MR SMITH:  I don't know the answer to that off the top of my head.  We'll check.  I don't know if they were.  I mean, BLMIS was registered with the SEC as a broker-dealer at this point, so presumably the financial statements would have been provided to the SEC.

MR JUSTICE ANDREW JONES:  That doesn't necessarily mean they were available to the public.

MR SMITH:  No, it doesn't.  We'll check that and then we will try to find out what the answer is and let your Lordship know.

Then you see, my Lord, in relation to the point (c), which was Mr Young's request to get a more complete set of audited accounts, for instance including an operating statement of P&L, he says:

"This was discussed ... with [Mr May] and [Mr Wilcockson] and we decided not to request this so far.

His closing shot is to say:

"The review is finished and signed off for this year and I do not intend to do more unless the GFS Board supports it, risk versus cost versus relationship, etc."

So he says he's got going to do more.

If your Lordship is interested, just so we can see it while we are here, there's a copy of BLMIS's audited financial statements at {N/574/23}.  I'm not suggesting we spend any time on it, but just so you can see.  Unfortunately one of the problems with BLMIS's financial statements is bizarrely it was printed in white type on black paper, which makes it very, very difficult to see.

Whether that was deliberate or not, I couldn't possibly comment on, but the reality is it's very difficult to see, and if we just flick the pages, just so your Lordship can see, one can I think just make out there there's a statement of assets.

Then over the page you see there's then, "Available Member's Equity", with an audit certification at the bottom of the page.

Perhaps if we can just keep flicking through, there's then effectively some text.

MR JUSTICE ANDREW JONES:  So this is standalone financial statements of BLMIS?

MR SMITH:  Yes, exactly.



Primeo Fund v (1) Bank of Bermuda (Cayman) Limited (2) HSBC
Securities Services (Luxembourg) SA

Day 2

November 8, 2016

Opus 2 International - Official Court Reporters

Phone:        +44 (0) 203 008 5900
Email:        transcripts@opus2.com
Website:      www.opus2.com

1  David mentioned there is still a concern over the level
2  of due diligence we have on Madoff."
3     Now this a very strange thing for Mr Fielding to be
4  writing because he knows that at 31 October the GFS
5  board has identified the problem and has said: what we
6  need to do is to get independent audit confirmation.
7     He goes on to say:
8     "I would mention that when Fergus and I visited
9  Madoff in July year we had him complete a due diligence
10  questionnaire based on the one used by
11  FIG/Thomas Murray. The completed questionnaire was
12  reviewed by Chris and Michael May. Not to say we should
13  not do more, but perhaps we could use the upcoming
14  NY visit to arrange for you to meet Madoff as a prelude
15  to sending any further questionnaires or requests for
16  information."
17     So they seem to have forgotten about, or at least
18  are not pursuing the decision of the GFS board to obtain
19  independent audit confirmation and what Mr Fielding is
20  suggesting here is: actually, we shouldn't do any more,
21  we'll just use the New York visit to arrange for
22  Mr Smith to meet Madoff and basically leave it at that.
23     So one sees, in our submission, pressure within
24  Bank of Bermuda not to follow through on what they
25  themselves decided they need to do.

Page 33

1     What Mr Smith's response to that, however,
2  your Lordship will see at the start of the page, is to
3  say well, actually:
4     "If Madoff is to be our sub-custodian, we need
5  FIG to do a full review. We do not have authority to
6  prove Madoff as a sub-custodian. Only FIG can do this.
7  We need to put this in the hands of FIG."
8     Which I think is the Financial Institutions Group.
9  And there's no evidence that that was ever done either.
10     So they're simply not following through in any way
11  the decision of the GFS board that they need to obtain
12  audit confirmation. And in fact, if you go over in
13  the next tab of the core bundle to 112, there's
14  a further email {N/648/1}, a further email from Mr Smith
15  to Mr Fielding, this time of 18 December. He's now
16  saying:
17     "I need you to take control of Madoff. I don't
18  think Bill Jones should visit them without you."
19     Now, Bill Jones was the Head of Legal and Compliance
20  at Bank of Bermuda, as we will see, but Mr Smith
21  certainly seems to be saying to Mr Fielding at this
22  point that he needs to be involved and certainly that he
23  needs to be participating in any visit which Bill Jones
24  is undertaking to Madoff.
25     If we follow that through on the next tab, 113,

Page 34

1  {N/651/1}.
2  MR GILLIS: Do you mind just going back to the bottom to
3  112, just explain the bottom:
4     "Dear All.
5     "I spoke with Ed Gomez ..."
6  MR SMITH: Well, I'm going to leave Mr Gillis to go to
7  the further documents. He can use his time for that.
8  MR GILLIS: All right.
9  MR SMITH: The bottom of the page is to do with, I think,
10  some issue about fees on leverage to funds. It doesn't
11  seem to be particularly relevant. But then what one
12  gets at the top of the page is Mr Smith coming in with
13  his comment:
14     "I need you to take control of Madoff. I don't
15  think Bill Jones should visit them without you."
16     And then the next page, {N/651/1}, Mr Fielding comes
17  back on that to Mr Smith, this time on 24 December:
18     "Paul seems hellbent on irritating Madoff with FIG,
19  I will take them but not until next year as I need to
20  preserve the relationship with Bank Austria."
21     So you see there is this tension within
22  Bank of Bermuda which appears to be really between
23  Mr Paul Smith on the one hand, Mr Wilkinson as well, and
24  on the other hand Mr David Smith and Mr Fielding, who
25  are much less keen for due diligence to be done.

Page 35

1     Going on, just to complete that sequence in tab 114
2  of the core bundle, {N/652/1}, Mr Smith comes back:
3     "Yes, I agree with your observation on Madoff.
4  Silly but there is nothing I can do about it."
5     So Mr David Smith's view is it's all a bit silly but
6  there's nothing we can do about it and, actually one
7  sees the divergence of approach between Paul Smith on
8  the one hand, the head of GFS, who has effectively said,
9  "There's a major issue here, you need to go and get
10  independent audit confirmation", and David Smith and
11  Nigel Fielding on the other hand who are effectively
12  soft pedalling on this, and actually it's never ever
13  carried out.
14     As I said, the decision to obtain independent audit
15  confirmation of the assets was something that was never
16  pursued. There's never been any explanation, so far as
17  I'm aware, as to why that was not done.
18  MR JUSTICE ANDREW JONES: Well, the conventional way of
19  doing it would be for the Fund's auditors to rely upon
20  the BLMIS auditor, and obviously the BLMIS auditor, in
21  the ordinary course, would have done substantial
22  completeness testing and had direct confirmation
23  from DTC.
24  MR SMITH: Yes.
25  MR JUSTICE ANDREW JONES: That's how that audit would have

Page 36



Primeo Fund v (1) Bank of Bermuda (Cayman) Limited (2) HSBC
Securities Services (Luxembourg) SA

Day 2

November 8, 2016

Opus 2 International - Official Court Reporters

Phone:        +44 (0) 203 008 5900
Email:        transcripts@opus2.com
Website:      www.opus2.com

1    So you see, my Lord, at the bottom of this page,
2    this is an email which goes out from Mr Fielding to
3    AFS country heads, copied to Ms Coe.  AFS is Alternative
4    Fund Services, which is the division within HSBC
5    Securities Services which was now responsible for funds
6    such as Primeo, and you'll see the heading of that.
7    It's headed, "Non standard sub-custodians".
8        And if we go over to page 2 you can see what
9    Mr Fielding asked:
10    "Please advise any sub-custodians your location has
11    appointed outside the standard network, ie like Madoff."
12    Now your Lordship may want to compare that with
13    the evidence he is proposing to give in these
14    proceedings that they never thought Madoff was their
15    sub-custodian.  Clearly at the time it was understood
16    that Madoff was the sub-custodian.
17    Now, you'll see {N/1144/1}, Mr Birgen's response:
18    "Nigel,.
19    "Apart from Madoff, we only have one additional
20    sub-custodian which was appointed more by error than
21    anything else ..."
22    So he understands as well that Madoff is
23    sub-custodian.  We're talking here about individuals in
24    the Luxembourg office, so Mr Birgen's head of GFS in
25    Luxembourg and he's looking at the position in relation

Page 161

1    to Luxembourg funds such as Primeo and Lagoon.  He
2    understands that Madoff is sub-custodian.
3    If we then go on {N/1177/1}, core 186 which is in
4    volume 3 of the core bundle.  It appears that part of
5    the reason for identifying who the sub-custodians were
6    was that HSBC, or at least Ms Coe, wanted to carry out
7    a review, no doubt for lending purposes, and you'll see
8    at the bottom of {N/1177/6}, if we can go on to that
9    page, within tab 186 of the core bundle, there's an
10    email from Mr Wilkinson to Mr Smith.  So 1177/6, please.
11    Your Lordship may have it in the core bundle.  He said:
12    "Paul, as you are aware [X] is one of our biggest
13    clients in Dublin.  The sponsor of the fund is [X].
14    "Following on from a recent board meeting in Dublin
15    [someone] has tabled several issues with Barry O'Rourke.
16    The two issues which are causing us the most concern are
17    as follows:-
18    "1. During the trustee review, it was suggested by
19    the trustee that GIS (HSBC) would be visiting Madoff to
20    undertake a full sub-custodial review, (as is normal
21    practice)."
22    And then over the page there's then a redacted
23    section:
24    "The consequence of the trustee review of the
25    sub-custodian Madoff will be both painful and, it would

Page 162

1    appear, fatal."
2    Interesting to see he says that:
3    "Clearly I am not suggesting that GIS/HSBC should
4    ignore their fiduciary responsibilities, however, we
5    should be aware of the potential fall-out."
6    Now, that was addressed to Mr Smith, and that
7    unsurprisingly appears to have prompted some enquiry on
8    the part of Mr Smith, because he then asked Mr Fielding
9    what on earth was going on.  And one sees that at
10    {N/1183/2}, tab 185 of the core bundle.  It's all part
11    of the same strand of emails, a few emails on now, and
12    you'll see there's an email in the middle of {N/1183/2}:
13    "Paul, partly I think this is a matter of getting
14    the correct spin.  All sub-custodians are subject to
15    periodic review and this is our call as we appoint
16    sub-custodian, it is not client specific."
17    And then this, again very important:
18    "As I recall, Madoff holds assets as our
19    sub-custodian for funds promoted by Genevalor,
20    Bank Austria, Bank Medici and Square One."
21    So again, he clearly and unequivocally thinks that
22    BLMIS is sub-custodian, including for the funds promoted
23    by Bank Austria, which of course is Primeo and, by this
24    stage, Alpha.
25    He goes on to say:

Page 163

1    "Also, we provide credit to nearly all these funds
2    relying on collateral rights over the assets.  These
3    clients asked us to be custodian and take that risk in
4    addition to providing credit and they wanted to
5    appoint Madoff as our sub-custodian; they can't expect
6    us to do no due diligence or review."
7    What I think he's referring to here is there was
8    some pressure from Genevalor Benbassat, where Mr Smith
9    had now become a director, not to carry out the review,
10    and the point he's making here is to say, well, they
11    can't resist the review because they wanted BLMIS
12    appointed as sub-custodian and therefore we've got to
13    review it.  But what is absolutely clear is that
14    Mr Fielding fully understands that BLMIS is
15    sub-custodian, and indeed that HSSL is the custodian in
16    relation to these assets.
17    And again, your Lordship may want to compare that to
18    the evidence which he's now proposing to give in these
19    proceedings.
20    Now, what then happened was Ms Coe then decided to
21    send Mr Pettitt, who was head of network management for
22    HSBC, to meet Mr Madoff to do the review.  And as
23    a precursor to that, Mr Pettitt met with Mr Fielding and
24    others in Luxembourg.  And your Lordship will see that
25    at tab 193 of the core bundle {N/1202/1}.  It's

Page 164

1    a relatively detailed meeting note, but your Lordship
2    will see first of all the purpose of the meeting:
3        "Discuss special 'sub-custodian' relationships and
4    credit collateral for specific former BoB
5    relationships."
6        They then identify on the first page the funds
7    they're looking at, so Primeo, Herald, Alpha Prime,
8    Hermes, Thema, Square One, Optima, which I think is
9    probably a reference to Optimal, but they are the funds
10   they've identified.
11       Then if we move on, please, straight away to page 3,
12   {N/1202/3}, there's a section:
13       "Due diligence issues arising:
14       "NF believes Madoff has only one account at the DTC
15   which, if true means that they may be mixing client and
16   proprietary trading assets. We need to identify the DTC
17   numbers ... Madoff will certainly be regulated as
18   a broker/dealer but we need to understand whether they
19   are audited and regulated as a custodian."
20       Which of course they weren't:
21       "There is clearly 'key-man' risk for the fund ..."
22       And he goes on to refer to the requirements for net
23   capital.
24       Over the page, {N/1202/4}, there's quite an
25   interesting section under "Operational", where they

Page 165

1    discuss how it is that information from BLMIS is
2    recorded and reported on HSBC's systems. Now,
3    unfortunately, the appendices haven't been discovered
4    to us by the defendants, so your Lordship doesn't have
5    the benefit of those, but what you do have is
6    the description, and you'll see he says:
7        "All information regarding the activity on the funds
8    is updated on HSSL systems retrospectively. Madoff
9    provide reports and trade tickets usually on the
10   Wednesday of the week following the activity. All info
11   is sent by post! Appendices 3 and 4 provide examples of
12   the Statements of Net Assets provided by the reporting
13   system known as 'Geneva' ..."
14       Then there's reference to examples of trade tickets:
15       "Appendix 6 shows an Investment Price Variance
16   Report ...
17       "Appendix 7 shows position checks ...
18       "All customers of Madoff see the trade tickets and
19   also the various reports shown in the attached
20   appendices on a monthly basis. Included at Appendix 8a
21   is a Madoff Trading statement and Appendix 8b shows
22   the end of month holdings. These arrive 2 or 3 days
23   into the next month.
24       "Appendix 9 shows the Madoff options trades ...
25       "Appendix 10 provides the HSSL transaction record

Page 166

1    which is checked against the Madoff supplied reports and
2    Appendices 11 and 12 ... show the end of December
3    positions ..."
4        Which presumably are similar if not the same as
5    the reports which were provided to Ernst & Young as part
6    of the custodian confirmation.
7        So, you see, that's what HSSL does and it
8    essentially records trade information from BLMIS as and
9    when it's received.
10       So this is, if you like, an information gathering
11   visit, I think undertaken by Mr Pettitt to Luxembourg,
12   and you can see what he's told about the position.
13       Moving on to tab 194, there's then an email from
14   Mr Wilcockson who writes to a Tanya Nystrom, and
15   Tanya Nystrom is someone from the US office of
16   Bank of Bermuda who is going to accompany Mr Pettitt on
17   the visit to BLMIS. But again, your Lordship will see
18   the second paragraph -- sorry, this is {N/1206/1} for
19   the screen. Again, your Lordship will see the second
20   paragraph, this is coming from Mr Wilcockson who was
21   the senior individual within Bank of Bermuda
22   (Luxembourg):
23       "In the case of two locations - Bermuda and
24   Luxembourg - there are sub-custody agreements where
25   the bank appoints Madoff as sub-custodian."

Page 167

1        So again, he clearly understands that
2    Bank of Bermuda has appointed BLMIS as sub-custodian:
3        "It is these appointments that Brian is looking at
4    most as Madoff is outside the bank's standard
5    sub-custody network. This is further complicated by the
6    fact that some of the funds have credit facilities,
7    mostly FX lines, and of course the assets are not
8    strictly in our control."
9        There's then a reference to Madoff's strategy and he
10   goes to say:
11       "We do get trade tickets for each deal he does for
12   our clients and monthly position statements."
13       And then:
14       "The conflict issue is that he effectively acts in
15   3 capacities for our client funds - investment manager,
16   broker/dealer and sub-custodian. He only takes income
17   as a broker/dealer; he does not charge for investment
18   management or custodian. So, as Investment Manager he
19   places deals with himself as broker/dealer and puts.
20   Them in custody with himself! The two key segments of
21   his business are segregated."
22       Well, I'm not sure that was in fact true:
23       "He runs the [investment management] business and
24   others run the broker/dealer bit."
25       But anyway, he's clearly identified the conflict

Page 168



Primeo Fund v (1) Bank of Bermuda (Cayman) Limited (2) HSBC
Securities Services (Luxembourg) SA

Day 15

November 29, 2016

Opus 2 International - Official Court Reporters

Phone:      +44 (0) 203 008 5900
Email:      transcripts@opus2.com
Website:    www.opus2.com

10-03635-jpm    Doc 296    Filed 04/12/17    Entered 04/12/17 18:15:42    Main Document
Pg 14 of 317

November 29, 2016    Primeo Fund v (1) Bank of Bermuda (Cayman) Limited (2) HSBC Securities Services (Luxembourg) SA    Day 15

1    Q.  Thank you.
2        Now, just looking on in this same document, if we go
3    to page 40, please.  {N/737/14}.  As I understand it,
4    this is then setting out the organisation of GFS within
5    Luxembourg; is that right?
6    A.  That's correct.
7    Q.  And Mr Birgen was Head of GFS in Luxembourg; is that
8    correct?
9    A.  That's correct.
10   Q.  As I understand it, at this stage there were, in effect,
11   two heads of HSSL; is that right?  Mr Birgen, who was on
12   the business development side, and Mr May, who was in
13   charge of operations, risk and compliance; is that
14   correct?
15   A.  Maybe it would help if I can explain to my Lord how
16   a regulated bank in Luxembourg is required to be
17   structured.  It's required to have two managing
18   directors.  We call them "four eyes".  Their exact
19   titles may vary from managing director but they are
20   authorised managers of the entity.  They are both there
21   to be responsible, and part of the idea is if one is
22   absent, the other can cover, but within that, they then
23   have to split and they have to tell the regulator on
24   a day-to-day how they split their activities.  So
25   Mr Birgen ran the business of Global Fund Services,

Page 109

1    Mr May, as I recall, at that time would have had all
2    the kind of support functions, so human resources,
3    finance, legal, and there were some other businesses in
4    Bank of Bermuda or HSSL, private banking, treasury, they
5    would have reported to Mr May.
6    Q.  So Mr Birgen and Mr May were the two managing directors;
7    is that correct?
8    A.  I think that's the best way to describe them, Authorised
9    Managers, Managing Directors is a good title.
10   Q.  If we bring up what Ms Andrich says in her witness
11   statement, {B/6/8}, you see there in paragraph 30 she
12   says:
13       "Administration and custody, the core fund services
14   we provided Primeo, were provided by staff in HSS in
15   Luxembourg and were supervised by managers within HSSL,
16   not at the HSBC group level.  In 2004 there were two
17   managing directors of HSSL: one in charge of operations,
18   risk and compliance (this was Michael May ... and
19   the second responsible for business development ([Mr]
20   ... Birgen)."
21       Do you see that?  I think from what you're saying
22   that's perhaps not quite right, in that Mr Birgen's role
23   is not limited to business development as such, but he's
24   responsible for the business of GFS; is that correct?
25   A.  That's correct.

Page 110

1    Q.  So probably, when we look at that, rather than reading
2    that as "business development", it would be more correct
3    to say the "business of GFS"; is that right?
4    A.  That's correct.  Business development would be within
5    that, but you're correct.
6    Q.  Okay, thank you.
7        If we go back to {N/737/14}, I assume it follows
8    from what we've just been discussing that this in effect
9    only shows Mr Birgen's side of the business structure;
10   is that correct?
11   A.  Actually, when I look at it, I'm wondering about
12   Fiona O'Brien, whether she was doing compliance for
13   the whole entity.  So she may also have had a line to
14   Mr May.
15   Q.  Right.  So it's possible we should also read in Mr May
16   in here as well as being responsible for some but
17   probably not all of these operations?
18   A.  I would say for all the others, he wasn't responsible.
19   Compliance and possibly legal.  Those would be the only
20   two.
21   Q.  I think we know he's responsible for risk, don't we?
22   A.  There wasn't a risk function -- a separate risk function
23   at that time.
24   Q.  So when we go --
25   A.  As I recall --

Page 111

1    MR JUSTICE ANDREW JONES:  This chart is as at December 2002;
2    is that correct?  I think that's what this document
3    says.
4    A.  This chart was prepared in --
5    MR SMITH:  So which chart is your Lordship -- this is
6    the one at N --
7    MR JUSTICE ANDREW JONES:  This is {N/737/14}.
8    MR SMITH:  Yes, this presentation was made in May 2003, so
9    my understanding was that this was looking at
10   the position in the first half of 2003, I think.
11   MR JUSTICE ANDREW JONES:  I thought I saw December 2002 on
12   this document.  Perhaps I got that wrong.
13   MR SMITH:  If you go back to {N/737/6}, your Lordship may
14   have seen the figure of -- the text at the bottom of
15   the page there.  Is that what your Lordship had in mind?
16   MR JUSTICE ANDREW JONES:  That wasn't the actual date I'd
17   looked at, but ...
18       So this presentation was made in May 2003?
19   MR SMITH:  That's right, yes.  So I'm assuming that we're
20   looking now at organograms which represent the position
21   as at May 2003.
22   A.  That's correct.
23   Q.  You said a moment ago that there wasn't a risk function
24   at this stage.  If we go back to Ms Andrich's statement,
25   paragraph 30 {B/6/8}, she says in the second sentence:

Page 112



Primeo Fund v (1) Bank of Bermuda (Cayman) Limited (2) HSBC
Securities Services (Luxembourg) SA

Day 18

December 2, 2016

Opus 2 International - Official Court Reporters

Phone:        +44 (0) 203 008 5900
Email:        transcripts@opus2.com
Website:      www.opus2.com

December 2, 2016    Primeo Fund v (1) Bank of Bermuda (Cayman) Limited (2) HSBC Securities Services (Luxembourg) SA    Day 18

1    A. No, I don't recall that.

2    Q. Is that something you recall no discussion of at all at

3       this time?

4    A. I don't recall that sort of discussion.

5    Q. Just to complete the story, we know, because it's

6       a matter of record, you resigned as a director of Primeo

7       on 3 October 2006, and then you then also resigned as

8       a director of Alpha on 29 December 2006. I just want to

9       ask you about a couple of matters from 2008 in which you

10      were involved.

11         If we can go first of all to {N/2572/1}, tab 310 of

12      core bundle 5. You see you're sent an email by

13      Mr Wilcockson on 12 August 2008 which is headed,

14      "Madoff", and it says:

15         "Hi.

16         "Are you aware of an increasing level of nervousness

17      here?"

18         And then you respond by saying:

19         "Not aware but I'm not surprised."

20         Can you explain why you weren't surprised that there

21      was an increasing level of nervousness about Madoff?

22    A. Because this had come up from time to time over at least

23      the period since 2002, possibly slightly earlier. Every

24      now and then somebody takes a look at this and says,

25      "Maybe there's some inherent risks", and people start to

Page 117

1       look at that and go, "Oh, yes, maybe -- maybe we need to

2       look at it again". And I think we've seen it come up

3       time and time again. 2002, 2005. So the fact that it

4       periodically comes back up does not surprise me.

5    Q. Really, Mr Fielding, it was because the issues had never

6       been resolved, had they? That's why they kept on coming

7       up time and time again?

8    A. Well, I think sometimes it's because new people are

9       coming in and looking at it. I mean, this is

10      August 2008. By this time, at least one KPMG review had

11      been done. I think the second one may have been done by

12      this time as well. And these reviews were way beyond

13      anything that was normal for a review, not necessarily

14      unrealistic given some people's look at the risk.

15    Q. Let's go on to the next document. It's tab 320 of core

16      bundle 5 {N/2633/1}. This is an email from someone

17      called Gordon Thomson which he's sending to Mr May.

18         And copied to Andrew Bastow, Brian Pettitt and

19      Christine Coe. Do you see, about halfway down the page,

20      he sets out:

21         "The items which make me concerned are:

22         "'Too good to be true'."

23         And then he sets out a couple of items, and then:

24         "'Unusual activity'."

25         Do you see that?

Page 118

1    A. I see that.

2    Q. Do you recall seeing this at the time?

3    A. I'm not sure that I saw it at the time.

4    Q. Do you recall similar views being expressed within HSSL

5       from time to time?

6    A. Actually, within HSSL, the direct employees of HSSL, I'm

7       not sure that I do.

8    Q. What --

9    A. Except Mr Thomson, obviously he's an employee of HSSL,

10      although he's from the traditional fund side.

11    Q. What about within HSS?

12    A. Clearly -- if I take HSS to be the umbrella that

13      includes the predecessor GFS? We've got Brian Wilkinson

14      saying there could be risk, Paul Smith, to an extent

15      David Smith.

16    Q. What about Mr May? Did you hear him express any sort of

17      concerns?

18    A. No, I don't recall Mr May expressing concerns.

19    Q. Let's go on to tab 331 of the same bundle {N/2710/1}.

20         Can we start, please, at page 2 {N/2710/2}. This is

21      an email which is sent from someone called Russell Ford

22      to Mr May on 12 December 2008, so this is now Madoff has

23      now collapsed and the balloon had gone up, as it were.

24      And Mr Ford says to Mr May:

25         "Just in case Chris has not contacted you yet or you

Page 119

1       have read the papers, Madoff has been arrested on

2       security fraud.

3         "Chris was due to be at home but is now coming into

4       the office and she is trying to get hold of Wilcockson,

5       do you have his mobile no?"

6         Then if we go back to the preceding page {N/2710/1},

7       Mr May then responds at the bottom of the page:

8         "Another case where all our suspicions were right."

9         Do you know what the other case might be he's

10      referring to there? He's obviously got something else

11      in mind which is similar to Madoff. Do you know what

12      that might be?

13    A. No, I don't.

14    Q. Does something called Sentinel ring a bell?

15    A. I've heard the word, but I can't remember what Sentinel

16      was about now.

17    Q. Let's continue. He then goes -- Mr Ford then responds

18      in the middle of the page:

19         "Indeed, the beauty of hindsight."

20         And then Mr May, at the top of the page:

21         "Worse - we suspected but never pinned it down. Not

22      even hindsight, just not enough courage to walk away

23      from what was not understood ..."

24         Now, I think we know that Mr May was Managing

25      Director, wasn't he, of HSSL for much of the relevant

Page 120



Primeo Fund v (1) Bank of Bermuda (Cayman) Limited (2) HSBC
Securities Services (Luxembourg) SA

Day 17

December 1, 2016

Opus 2 International - Official Court Reporters

Phone:        +44 (0) 203 008 5900
Email:        transcripts@opus2.com
Website:      www.opus2.com

1    he, independent to whatever processes the Fund's
2    auditors were doing?
3    A. Yes, that's correct.
4    Q. Then if you go up the page you see David Smith's
5    response to Mr Wilkinson, and all of this is copied into
6    the GFS Board as well, so he was also of the view,
7    wasn't he, GFS shouldn't be relying on the Fund's
8    auditors to confirm Madoff was holding assets in
9    segregated accounts?
10   A. That's what he says.
11   Q. And that became, didn't it, the general view within GFS
12   at this stage?
13   A. Wasn't my view, but the board took a different decision.
14   I wasn't on the board at the time.
15   Q. And he actually thinks this ought to be done as part of
16   the review of Madoff's custodial capability, which he
17   seemed to think you were doing when you conducted your
18   due diligence; do you see that?
19   A. I see that.
20   Q. Did you think you were doing a review of Madoff's
21   custodial capability at the time?
22   A. I was doing a sub-custodian review. I mean, I was
23   reviewing whether he looked like a fit and proper --
24   the organisation BLMIS looked fit and proper to hold
25   assets.

1    Q. Then if we go over the page to page 1, please {N/615/1},
2    there's an email from Mr Wilkinson at the bottom of
3    the page, and then just above that you see an email from
4    Mr Paul Smith, the Head of GFS:
5    "I am very worried about Madoff and I think we
6    should CEO seek independent confirmation. I would be
7    prepared for GFS to pay. Its too big for us to ignore
8    the warning signs."
9    Did you have any discussion about that with
10   Paul Smith at the time?
11   A. I don't recall a discussion about it with him.
12   Q. Was there any discussion you had with the members of
13   the GFS Board about the fact that they considered there
14   were warning signs in relation to Madoff?
15   A. I don't recall discussions. I recall there was a lot of
16   traffic by email.
17   Q. Do you recall seeing these emails at the time then?
18   A. Michael May forwarded it to me, so I -- I do recall
19   them.
20   Q. So when you saw this from -- Mr May sent it to you on
21   30 September, what did you think Mr Smith was
22   referring to when he was speaking of the warning signs.
23   A. I -- I don't know specifically at that time, and I don't
24   know whether he says it later, but some other people say
25   it later. You know, we've got these multiple roles,

1    the clients have got these multiple roles being carried
2    out by BLMIS which could -- could carry some risk.
3    Q. That was the warning sign, wasn't it, the concentration
4    of roles in one entity?
5    A. I think -- yes, that's one I seem to remember coming up
6    particularly.
7    Q. Did it concern you to know that the Head of GFS was very
8    worried about BLMIS at this time?
9    A. It concerned me no -- because -- in one sense I'd done
10   the due diligence, so I felt pretty confident and I'd
11   done additional due diligence, I had been close to E&Y
12   on this, but as he's a very senior experienced
13   individual I wouldn't ignore it, I would say, "Okay,
14   somebody wants something more to be done, let's see what
15   in the end they want to do".
16   Q. Then you would have seen Mr David Smith's response to
17   that:
18   "The external audit firm is not Madoff's
19   brother-in-law which is a rumour introduced by
20   [someone] after his failed attempt to secure
21   the business. But they are a small firm and it is an
22   excellent idea to engage KPMG."
23   So the proposal at this stage was to send KPMG in,
24   wasn't it?
25   A. It was an idea that David put out. It seems -- I wasn't

1    a party to this, but it seems they must have had some
2    discussions, or other email traffic.
3    Q. And he seems to be envisaging at this stage, doesn't he,
4    that you're the person who is going to arrange for that
5    review to be done?
6    A. He's suggesting that I could organise it.
7    Q. And he's saying if it's agreed he will brief you
8    about it; do you see?
9    A. I see that.
10   Q. Then Mr May forwards it to you, as you observed at
11   the top of the page, with four question marks. Do you
12   know what that denoted?
13   A. I think it's Mr May going: well, hold on a minute, I've
14   seen some traffic here. I guess -- he was probably on
15   the Dublin Risk Management Committee email address --
16   I see Nigel's name, we sat -- we work very closely
17   together, I see it looks like he's going to be asked to
18   do something, let's see if he knows about this.
19   Q. If we go on, {N/616/2}, tab 106 of core bundle 2, you
20   see at the top of the page Mr Wilkinson emails you on
21   30 September:
22   "Nigel,
23   "Please see below, can you please call me when you
24   get a. I think Paul is absolutely correct."
25   Do you see that?

1   A. I see that.
2   Q. He's referring to Mr Smith's email we've just been
3       talking about --
4   A. I think he could be referring to this whole chain of
5       conversation as well as that.
6   Q. Well, he's referring to what Mr Smith said, isn't he,
7       because he says, "I think Paul is absolutely correct"?
8   A. Yes, fair enough.
9   Q. Then if we go to {N/617/1}, I think you then in fact
10      have a call with Mr Wilkinson on 30 September, and this
11      is presumably a call further to the email we've just
12      been looking at.  And we see on the first page you
13      exchange greetings.
14          If we go over the page {N/617/2}, it you say:
15          "... I just had a chat with Chris about this too,
16      because he ... (?) it to me earlier in the day and he's
17      kind of a bit concerned in the sense that he doesn't
18      understand quite what the concern is ..."
19          Then at the bottom of the page, you say, do you see:
20          "In fact Primeo are trying to open another account
21      with him.  Let's see where they get to with that.
22          "So I ... I, you know, everybody has some concerns
23      about Madoff, or 'made off' as he likes to call himself,
24      which I think makes it even worse, 'made off with
25      the money'."

Page 77

1           What would be concerns which everybody had about
2       Madoff at this time?
3   A. I find that question very broad.  "Everybody" being?
4       I'm a bit -- it could be narrowed.
5   Q. Well, I think this is your statement in the telephone
6       conversation.
7   A. Okay, so --
8   Q. So what do you think you're likely to have been
9       referring to there?
10  A. "Everybody" I'm referring to -- thank you for
11      the clarification -- would be the -- those members of
12      the GFS Board that I have in the interaction, which
13      looks primarily like Paul, David and maybe Brian.
14  Q. What do you think the concerns were then?
15  A. I think the concern is about -- actually, the initial
16      concern, it starts off with this segregation.  I think
17      maybe some people are applying a little more to it and
18      saying, "Actually, it's -- it's maybe these multiple
19      roles, maybe there's more to this".
20  Q. And I know you're jocular about it in this telephone
21      conversation, but clearly, at the back of your mind,
22      there is a possibility of a risk to the assets at
23      Madoff, isn't there?
24  A. I didn't think that at the time.  I actually used to
25      pronounce him as "mad off", and then I was told, I think

Page 78

1       when I went to sort of learn -- when I went to see him,
2       that actually the pronunciation should be "made off".
3   Q. But there is, I would suggest, Mr Fielding, at least at
4       the back of people's minds, the possibility that there
5       is a risk to the assets here, isn't there?
6   A. Not at the back of my mind.
7   Q. Really?
8           Well, let's --
9   A. Other than the concern I had about him unduly enriching
10      himself, which I felt I had done an adequate check on.
11  MR JUSTICE ANDREW JONES:  How do you distinguish between
12      issues surrounding segregation and issues surrounding
13      existence of the assets?  Isn't segregation and
14      existence interrelated?  Don't you have to do
15      completeness testing to satisfy yourself about
16      segregation.
17  A. It depends how far you want to go.  You can just view it
18      from a process, which is really what I had done at that
19      point in my due diligence, of, are the answers to
20      the questions about segregation -- do they make sense
21      about how Madoff is doing the process, BLMIS is doing
22      the process?  You can go further and say, "Let's
23      actually go and do an audit of all the assets", and in
24      that we will also see that they're segregated.
25  MR JUSTICE ANDREW JONES:  Right, but it seemed to me that it

Page 79

1       would be difficult to do a systems-based audit when you
2       don't have three separate entities within the Madoff
3       group.  It's all done through one company and there's
4       only one account.
5   A. It is all done through one company.  I actually --
6       I don't know behind the scenes how they were structured.
7       The broker-dealer arm was physically separate, and they
8       may have had their own systems, which I -- I didn't look
9       at or see any -- I don't know whether the statements we
10      see come from that, or come from the investment
11      management operation, which was on another floor.  So
12      there was some physical separation.
13  MR SMITH:  Well, I do suggest, Mr Fielding, that an
14      independent audit of segregation of assets would
15      necessarily involve an audit of the existence of
16      the assets as well, wouldn't it?
17  A. It could do, as my Lord has said.  But you could do an
18      audit of the asset existence without necessarily looking
19      at segregation, but you would see segregation in
20      the process.
21  Q. But in this context, and in respect of what was in mind
22      here, it was clearly contemplated, wasn't it, that there
23      would be an independent audit which would include
24      confirming the assets held by BLMIS?
25  A. I think it might be relevant to go a bit further,

Page 80

1  because I think this phone call is really Brian
2  setting out his thoughts on what needs to be done.
3  Q. Absolutely.  And if we -- well, let's go on in the phone
4  call.  Turn the pages, please, page 3 {N/617/3}.
5  There's then reference to what you were doing in
6  Luxembourg, do you see, and you say:
7  "... we actually have an audit confirmation from
8  Ernst & Young."
9  Which I think you knew is what they'd based on what
10 they had internally received from Friehling & Horowitz,
11 hadn't they?
12 A. I believe they had largely based it on that.  I don't
13 know what other checks they might have done.
14 Q. And you say:
15 "So we're quite happy with that ..."
16 Then he refers to the position in Dublin where he
17 thinks it would only go to the custodian or the
18 sub-custodian.
19 Then there's some reference to difference in
20 standards, "Laughing":
21 "BW:  I could be wrong Nigel, and maybe I'll
22 investigate that, but I'm just covering all of our
23 backsides to make sure we've done everything possible if
24 this thing ever went up, you know.
25 "NF:  Yeah, and I guess my ... I'm not saying we

Page 81

1  shouldn't do it, I guess I wanted the board to say we
2  wanted to do it, having heard David rant and rave about
3  upsetting the guy before ..."
4  I suggest that David is David Smith, isn't it?
5  A. Logically, it would be David Smith.
6  Q. Then it continues, there's then some further discussion.
7  If we go over to the next page, page 4 {N/617/4},
8  you discuss at the top of the page some of the responses
9  you've got from Madoff, and Tom Young has raised
10 the question:
11 "... his financial statements are not very detailed,
12 you know, what really is his source of revenue, etc ...
13 which I think is important to us, cause we're really
14 relying on the financial strength of Madoff, as well as
15 much as anything ...
16 "NF: ... as a sub-custodian."
17 So you knew he was a sub-custodian, didn't you?
18 A. As I've said before, I knew the agreement was there,
19 I have a different view of the effect.
20 Q. You're very easily using in conversation with
21 Mr Wilkinson the fact -- the term that BLMIS is
22 a sub-custodian, aren't you?
23 A. I use the term there, yes.
24 Q. That's because that was your view, wasn't it, at this
25 time?

Page 82

1  A. It was my view that we had a sub-custodian agreement.
2  Q. Well, let's move on.
3  Then if we look towards the middle of the page,
4  Mr Wilkinson says:
5  "Would it be possible to get Ernst & Young since
6  they've already done it for your funds, rather than
7  KPMG, I suggest to E&Y to go in and they've already done
8  it and they just give us a clearance for all
9  the accounts that we have there?"
10 And then there's some discussion about that, but
11 then at the bottom of the page, you say:
12 "But if we want more independence and we want to
13 send our own auditor in regardless, I suppose what I'm
14 trying to think, and I don't know off of top of my head
15 what the answer is, do we ever send our external auditor
16 in to our other sub-custodian to verify positions?"
17 Do you see that?
18 A. I see that.
19 Q. I'm sorry to keep repeating the point, Mr Fielding, but
20 you did clearly understand BLMIS was a sub-custodian,
21 didn't you?
22 A. Here I'm talking about other sub-custodians.
23 Q. "... to our other sub-custodian ..."
24 So you regard BLMIS as a sub-custodian, don't you?
25 A. I think I've explained on what basis I felt we had

Page 83

1  entered into the agreement.
2  Q. Then, if we look down the page, you say:
3  "You know our agreements of normal sub-custody
4  agreements, they say that Madoff must maintain records,
5  he's liable if he loses anything, but they ... none of
6  them, as far as I can see, say that we have the right to
7  inspect his books and records with an external audit
8  firm."
9  Do you see that?  And you were making the point
10 there, weren't you, that the terms of the
11 Sub-Custody Agreements did not give Bank of Bermuda
12 the right to send in an external audit firm; correct?
13 A. That's correct.  And interestingly, I say BLMIS is
14 liable for everything.
15 Q. Yes, exactly.  So far as HSSL's concerned, that's
16 exactly right, and that's because that arises under the
17 terms of the Sub-Custody Agreement, doesn't it?
18 A. That's not what I say here.  I talk about "normal
19 sub-custody" arrangements.  He's liable to the client.
20 Q. Well, no, Mr Fielding, he's liable to HSSL under
21 the terms of the Sub-Custody Agreement, isn't he?
22 A. I don't read it that way.  It's -- it's the same point
23 again.  I don't agree with that.
24 Q. Well, I suggest that's exactly what you're referring to,
25 Mr Fielding.

Page 84



Primeo Fund v (1) Bank of Bermuda (Cayman) Limited (2) HSBC
Securities Services (Luxembourg) SA

Day 17

December 1, 2016

Opus 2 International - Official Court Reporters

Phone:          +44 (0) 203 008 5900
Email:          transcripts@opus2.com
Website:        www.opus2.com

1    bundle 2. I think we probably need to start with page 3
2    in the normal way because it's an email chain
3    {N/1082/3}. You see at the bottom of the page, someone:
4       "... called and asked if we could reconsider whether
5    we would be prepared to acting as administrator and
6    custodian (particular emphasis on custody) to
7    the [something] - this is the Madoff account.
8    Effectively it would be another ..."
9       And that's presumably the name of a fund that's been
10   redacted:
11      "He told me that [someone] would be willing to do
12   it - ie so why shouldn't we. He also sent me
13   the prospectus of an existing fund in Lux that [someone]
14   services and which he tells me is just a Madoff account.
15      "I told him that I didn't think that we would be
16   able to act as custodian, but I please can you confirm
17   before I go back with a definitive response."
18      This is from someone called Peter Heaps, I think
19   being sent to Brian Wilkinson.
20      If we go over the page, back to page 1, {N/1082/1},
21   you see Mr Wilkinson says:
22      "Please speak to Nigel Fielding on this. The whole
23   Madoff issue is coming under focus now that we are part
24   of HSBC.
25      "My gut reaction is that this will not fly."

1       First of all, why was Mr Heaps being sent in your
2    directing?
3    A.  I think Mr Heaps was being sent in my direction because
4    Brian knew I'd done the sub -- due diligence work on
5    BLMIS.
6    Q.  Then why do you think Mr Wilkinson was saying "My gut
7    recollection is that this will not fly"?
8    A.  I think I know who this fund is, and I think you'll
9    notice on the prior page, it says "emphasis on custody".
10   I think this particular client wanted the bank to take,
11   in Dublin, some level of responsibility for the assets
12   at Madoff, at BLMIS, that they had at BLMIS, so it was
13   going a step further. And therefore I think Brian --
14   Brian was of the view that might not -- might not be
15   acceptable.
16   Q.  What was the name of this fund?
17   A.  I believe this is Optimal again, and I think it links
18   back to another email we've seen where Paul Smith is
19   getting this FIG review going.
20   Q.  So when he says, "The whole Madoff issue is coming under
21   focus now that we are part of HSBC", what's that
22   a reference to?
23   A.  Well, I don't know what he knew at the time, but I,
24   I think, by this time had started to engage with
25   Christine Coe, because I was handing over the credit to

1    her, the whole credit process -- in fact I think we were
2    fairly advanced with it by this point -- and she had
3    picked up through credit review a similar -- similar
4    topic that I had: okay, if these clients have assets at
5    Madoff/BLMIS, how do we get certainty that we can get
6    them back in a case we need them for a credit? And then
7    there had started to be some discussion that she wanted
8    the due diligence taken over by Brian Pettitt.
9    Q.  Just moving on to February 2005, I just want to turn to
10   the issue of custody confirmations. You obviously
11   knew, in your capacity as a director it was
12   a requirement for Primeo to produce audited financial
13   statements, didn't you?
14   A.  Correct.
15   Q.  And we know from what we see and what you knew at the
16   time that Ernst & Young were the auditors; correct?
17   A.  Correct.
18   Q.  And I think, as we discussed previously, as part of its
19   audit, Ernst & Young sought something called a custody
20   confirmation, didn't it, from HSSL?
21   A.  They actually sought them from Friehling & Horowitz.
22   Q.  Well, were you not aware of Ernst & Young seeking
23   custody confirmations from HSSL?
24   A.  I've been shown an email chain where E&Y approached
25   Mr Fiorino and he, in passing, came to me.

1    Q.  I'm looking at the position now prior to 2005. I'm not
2    talking specifically about the BLMIS assets, but are you
3    aware that in the period prior to 2005, Ernst & Young
4    sought custody confirmations from HSSL in relation to
5    the assets in custody by HSSL for Primeo?
6    A.  I imagine, yes, they would have come to us -- sorry,
7    I did think it was discussion or a question about BLMIS.
8    They would have also come to the bank because we had
9    custody of the other assets.
10   Q.  Correct. And so far as the BLMIS assets were concerned,
11   were you aware -- I think you were -- that Ernst & Young
12   obtained a confirmation directly from BLMIS in
13   the period prior to 2005?
14   A.  I wasn't specifically aware at the time. I am from
15   material -- well, actually, now I say that, obviously
16   I was aware, because we've seen the transcript of
17   the phone call where Mr -- I don't know whether he uses
18   the word "audit confirmations" then, but I may have
19   understood it with that phone conversation with
20   Mr Lockwood.
21   Q.  I think that's right. You knew, didn't you, that
22   Ernst & Young were, in effect, dealing directly with
23   Friehling & Horowitz and obtaining some form of
24   confirmation, put it that way, from
25   Friehling & Horowitz?



Primeo Fund v (1) Bank of Bermuda (Cayman) Limited (2) HSBC
Securities Services (Luxembourg) SA

Day 17

December 1, 2016

Opus 2 International - Official Court Reporters

Phone:      +44 (0) 203 008 5900
Email:      transcripts@opus2.com
Website:    www.opus2.com

1   A. I've seen -- I think I've seen this email in
2   preparation, so this is Sav relaying to me something
3   that apparently E&Y had said. I don't recall E&Y
4   talking to me -- and not --
5   Q. No one's --
6   A. -- I wasn't sure I recall meeting Sav on it.
7   Q. No one's suggesting I think at this stage that E&Y were
8   meeting with you, but do you remember Mr Fiorino
9   reporting to you that he had met with E&Y and they'd got
10   this issue with Madoff?
11   A. I -- I don't recall it unless it's the other chain that
12   then follows, but I -- I'm getting lost with the dates
13   about where he -- he relays a meeting I think with E&Y
14   where they raised some concerns and they're thinking
15   they may have to go and visit Madoff.
16   Q. Let's look on, because there's a whole sequence of email
17   chains, and the next one is {N/1163/3}, and in fact,
18   actually, there's a better version of this which isn't
19   redacted at {N/1161/3}. It's in tab 82 of my Lord's
20   core bundle 3. This is the same email, but it's
21   a better version because you see this copy is not
22   redacted. And this is dated 24 February 2005, and you
23   see it's coming from Mr Fiorino to you, copied to
24   Mr Birgen:
25   "We met with E&Y. Yesterday Michael F and Kerry

1   N spent some time with Nespolo of Genevalor. Outcome.
2   "- Nespolo supports they intention to go and meet
3   Madoff.
4   "- Nespolo does not know if Madoff will accept an
5   audit review or similar process.
6   "- Nespolo understands the auditors concern and
7   asked if their worries were based on the rumours (1)
8   what is his real strategy, how an earth can he always
9   produce 12%pa (2) where are the assets and are there
10   really assets or is it all fictitious.
11   "- E&Y are other Banks in Lux that have funds with
12   Madoff in it to discuss.
13   "- from there the plan is to pay a visit to Madoff."
14   And if we go over the page:
15   "- if no satisfaction is received, E&Y may resign
16   and potentially qualify accounts Michael was not very
17   clear on this point).
18   "- as expected, Nespolo's comments were that HSBC
19   must feel quite comfortable with Madoff, since for
20   the Dublin fund we appointed them sub-custodian, hence
21   the group must have done and will do a regular due
22   diligence on Madoff ..."
23   Now, if we go back to the start of that email on
24   page 3 {N/1161/3}, do you recall Mr Fiorino raising
25   these issues with you?

1   A. When I saw the emails in preparation for the trial I had
2   some recollection that this had come up.
3   Q. Well, this is not -- a rather significant event, because
4   Ernst & Young were threatening potentially to resign as
5   auditors at this point, weren't they?
6   A. They were suggesting if they couldn't go through this
7   whole process and get comfort, they would, and I do
8   think we looked at this yesterday and the outcome of it.
9   Q. Was this not a rather significant event?
10   A. I think, as I explained it yesterday, that E&Y were
11   doing a review. This was after Mr Lockwood passed away,
12   I think Michael had taken over as partner -- Ferguson --
13   I don't know whether they were doing a review of their
14   entire book of clients, they were obviously reviewing
15   the ones that had invested in BLMIS anyway, amongst --
16   maybe amongst others, they were talking to relevant
17   parties, fund promoters, advisors, custodians, other
18   banks, and were obviously starting to say, you know,
19   maybe we've got some questions marks here, we need to do
20   a -- we need to just have a thorough look at it.
21   Q. Well, it goes absolutely beyond that, doesn't it,
22   really, Mr Fielding, because I suggest actually they
23   were raising some quite serious concerns and were saying
24   if they couldn't be satisfied in relation to these
25   matters, they might have no alternative but to resign

1   and possibly qualify the accounts; that's right, isn't
2   it?
3   MR JUSTICE ANDREW JONES: Which fund were they talking
4   about?
5   A. They would've -- for themselves, E&Y were auditors, as
6   I remember, of Primeo, Hermes, Alpha, I think --
7   MR JUSTICE ANDREW JONES: So this must have been Hermes?
8   A. But here, this is -- sorry, they're talking -- Nespolo
9   of Genevalor, that's the promoter of -- well, actually
10   it's the promoter of Hermes and also Thema. I think
11   he's talking about Thema here, because he refers to
12   Dublin.
13   MR SMITH: I'm not sure he has, because he knows PwC are
14   the auditors of Thema, so I suggest he's talking about
15   Hermes --
16   A. Yes.
17   MR SMITH: -- isn't he? They met with Nespolo in
18   the context of their audit of Hermes.
19   A. Sorry, that would be correct. I stand corrected.
20   Q. But we also know at the same time, as you say, they're
21   also the auditors of the Luxembourg funds, or the funds
22   administered from Luxembourg, Primeo and Alpha, aren't
23   they?
24   A. Primeo, Alpha, Hermes. I don't know about the other
25   Luxembourg ones that we've seen on that 2004 sub-custody

1    annex.

2    Q. But when they're talking about resigning and potentially

3       qualifying the accounts, that relates to Primeo, Hermes

4       and Alpha, doesn't it?

5    A. Certainly those -- well -- would be -- if they were

6       going to resign, one would expect they would resign from

7       all three, if their concerns were found to be the same

8       on all three.

9    Q. I'm slightly curious why you don't seem to have any

10      recollection of this matter, because it must have been

11      a very serious event, mustn't it, in the light of these

12      particular funds?

13   A. I don't know how much they -- I mean, obviously they'd

14      spoken to Nespolo, so he effectively represents one of

15      the funds. I don't know whether they'd spoken to other

16      clients, although they say they're going to talk to

17      others. I mean, they're doing a review, the concerns

18      are --

19   Q. Do you --

20   A. -- rumours and so on. You've got to remember, my role

21      at this point was relatively far away from

22      the day-to-day operations. I think -- when are we

23      talking about now? This is February 2005. I'd become

24      the Chief Administrative Officer for AFS.

25   Q. That's right. Mr Fiorino and Mr Birgen are specifically

1    reporting to you, aren't they? They've specifically

2       brought you directly into the loop on this issue and

3       they're reporting back to you, in effect as their

4       senior, aren't they?

5    A. No. No, I don't believe they're doing it for that

6       reason.

7    Q. So, why do you think they're reporting to you?

8    A. I believe they're bringing it to my attention because

9       they know that I have done due diligence on BLMIS in

10      the past. In fact, by this time it's -- we're about to

11      do the handover, actually, to Brian Pettitt at this

12      point.

13   Q. And because you're still a director of Primeo, aren't

14      you?

15   A. I don't think they're bringing it to my attention as

16      a director of Primeo.

17   Q. Sitting here now, do you have any recollection of

18      discussing these concerns with Mr Birgen and/or

19      Mr Fiorino?

20   A. No, I don't remember talking to them about it. I think

21      what I did if I remember this, is I went back to Sav

22      and -- I had some interest in it, clearly, "Let me know

23      where it goes", is I think what I said.

24   Q. Really? Were you yourself aware of rumours as to where

25      the assets -- "... where are the assets [held by BLMIS]

1    and are there really assets [at all] or is it all

2       fictitious"?

3    A. We've heard all sorts of rumours about BLMIS, and --

4       here's Nespolo, who is Genevalor, who's had a fund with

5       BLMIS for longer than Primeo, as I recall. You know, if

6       anybody would be concerned, genuinely concerned, it

7       would be him, and he's just saying there are these

8       rumours flying around.

9    Q. Were you yourself aware of rumours in relation to BLMIS

10      as to whether the assets existed or whether it was all

11      fictitious?

12   A. I don't remember whether I was for that one or not.

13   Q. You can't remember in relation to BLMIS whether there

14      were rumours that the assets were fictitious?

15   A. I obviously saw this, so this is almost third or fourth

16      hand. I don't remember reading press material.

17   Q. I'm not suggesting press material. Were you aware of

18      market rumours as to whether the assets with BLMIS were

19      fictitious?

20   A. No, not particularly market rumours other than people

21      like this who would relay that something -- "We've seen

22      something in the market".

23   Q. So were there any rumours at all as to whether

24      the activity of Madoff was fictitious?

25   A. Well, you have got to believe if Nespolo says there

1    were, he must have seen those rumours.

2    Q. Were you aware of them yourself?

3    A. I don't -- I don't recall, but it doesn't strike an

4       accord that I was.

5    Q. Well, this must have come as a big surprise to you then.

6       Do you recall that?

7    A. No when I see it's from Nespolo, no.

8    Q. Let's go to {L/2/84} to {L/2/85}. Again, this is an

9       extract of the Thema transcript referring to a document

10      which we looked at briefly yesterday, I just want to

11      show it to you again in its sequence. If you look down

12      again to line 18, you see there is reference to:

13      "... a note on HSBC files and it is in handwriting."

14      And counsel says:

15      "And it has been typed out on the following page,

16      Judge, and that is as much as I can say about it. But

17      it is important because it is on the HSBC files. 'Ernst

18      & Young have met Sav and Germain ... E&Y expressed

19      concern re transparency of Madoff activity'."

20      And then the counsel comments that that's:

21      "... not in connection with the Thema fund, it is in

22      connection with something else."

23      Then over the page {L/2/85}:

24      "'Especially as Madoff audit firm (F&H) appears to

25      be a two person shop and partners related to Madoff

1    family'. The first true and the second not true.
2    'Concern arose due to E&Y risk review. E&Y propose they
3    should go in and do specific scope review at Madoff'."
4      We looked at this earlier, but do you now remember
5    Mr Birgen or Mr Fiorino telling you that E&Y's proposal
6    was to go in and do a "specific scope review", as they
7    term it, at BLMIS?
8    A. I don't recall having a conversation with either
9    Mr Birgen or Mr Fiorino on this subject.
10   Q. Let's go on then to {N/1192/1}, and this is tab 190 of
11   core bundle 3. This is a slightly curious email. It
12   appears to be dated probably some time around
13   March 2005, looking at the lower email in the chain, and
14   it's from Mr Fiorino to you, do you see?
15   A. I see.
16   Q. And then do you want to just cast your eye over
17   the contents of the email.
18   A. (Pause). Okay, it's quite hard to read, but I've
19   read it.
20   Q. It is I'm afraid. I'll see if we can get a better copy.
21   The problem with some of these emails is the text is
22   rather small. If you can't read any of it, just tell me
23   and I'll read it out to you.
24   A. No, I can. Sorry, it's just taken me time because it's
25   quite small.

1    Q. No, I understand. It takes me some time as well;
2    the text is too small.
3   MR JUSTICE ANDREW JONES: Do you want to borrow my
4   magnifying glass?
5    (Handed).
6   A. Thank you, my Lord. We may have to share it.
7   MR SMITH: First of all, why do you think Mr Fiorino was
8   sending this to you then?
9   A. I don't know whether it would be helpful to go over
10   the page, but it looks like something he's drafting to
11   send to Paul, which I imagine is Paul Smith.
12   Q. Yes, there is a whole email chain, but none of it really
13   relates to E&Y. One has to go through, I'm afraid, to
14   page 7 {N/1192/7}. Again, the text is very small, and
15   it's not very helpful because there's been quite
16   substantial redactions that have been made, but to give
17   you the context, this is at the stage in March 2005
18   where it's proposed to do the first KPMG review, or at
19   least to send Mr Pettitt in originally, and I think it's
20   roughly at the same time as you're having the meeting
21   with Mr Pettitt in Luxembourg to brief him and I think
22   he then goes off to BLMIS in New York at the start of
23   April 2005.
24    What's happening here is there is a sort of
25   discussion taking place within Bank of Bermuda as

1    to: why we're doing these reviews, what we ought to be
2    telling the client, and I think Paul Smith has expressed
3    some announce that he's not being kept in the loop,
4    basically. Does any of this ring any bells with you?
5   A. Yes, I think I have seen this chain. I just couldn't
6    remember what the specific -- if there was a specific
7    request for Sav to send that first page summary to Paul,
8    or whether Sav was doing this off his own initiative.
9   Q. If you look, for example, at page 5 {N/1192/5}, you see
10   at the bottom of the page, Mr Smith says:
11    "We need a way forward here.
12    "Firstly, Nigel, this is the first I have heard of
13   these HSS reviews of sub-custodians. It would be nice
14   to know these things. Please let me know which of our
15   clients will be undergoing these reviews and exactly who
16   does them? Who do they report into?
17    "This is potentially a very serious issue and it
18   will get out of hand fast. We need to control this."
19    And then there's then some sort of further
20   exchanges, and if you go to page 3, for example,
21   {N/1192/3}, there's an email from Paul Smith in
22   the middle of the page to various people, including you:
23    "I am getting really really irritated with this.
24    "Who knows the full story here? I am thoroughly fed
25   up with getting drip fed information.

1    "This is the first I heard of Brian's involvement
2    ..."
3    Which I think is Brian Pettitt:
4    "Who is taking responsibility for this matter? Can
5   they please brief me fully on the history of it and what
6   happens next."
7    And then it's in this context that you then get
8   the email on page 1 {N/1192/1}, which goes from
9   Mr Fiorino to you, and I agree, it looks like it may be
10   a draft to be sent to Paul Smith, do you see that?
11   A. I see that, and I've seen that on the last page we
12   looked at that it's Germain who's asked Sav to brief
13   Paul.
14   Q. No, it doesn't look like this was in fact ever sent to
15   Paul Smith. Do you know whether or not that's the case?
16   A. I have no idea.
17   Q. Now, just looking at the content of this email, do you
18   see here it's put in terms of E&Y raising concerns about
19   Madoff, including, 2:
20    "Segregation of assets and real existence of these
21   assets with Madoff."
22    Now, do you remember it being of concern to you that
23   E&Y was raising concerns as to whether or not the assets
24   held with Madoff actually existed?
25   A. This is quite lengthy third and fourth-hand. I must

1  say, if the Nespolo email is in here, or I'd read it at
2  the same time, and that's where I thought this was
3  coming from, it would not have concerned me from
4  Nespolo.
5  Q. Really? Even though E&Y, as the auditors, were raising
6  this as a concern themselves?
7  A. But is it E&Y because they've met Nespolo, which they
8  obviously did? I -- it's really hard to tell from this.
9  Q. Well, we know E&Y have raised the concerns themselves,
10  haven't they, because they've done a review and they
11  then go to Nespolo and they go to Bank of Bermuda,
12  amongst other people. So E&Y are the ones that have
13  initiated the concerns, aren't they?
14  A. This is Sav relaying E&Y's concerns. I'm not saying
15  it's not an important point, but from my own position,
16  I would have gone: okay, I've actually done the due
17  diligence twice, I'm satisfied, E&Y have been satisfied,
18  they've gone through procedures with the audits, we're
19  about to transfer it -- you know, I'm doing a very
20  different job, we're about to transfer this to
21  Brian Pettitt, who is going to go, and if for some
22  reason -- you know, he does this day in day out,
23  sub-custody and sub-custody due diligence reviews,
24  I would be very interested to see what he makes of it,
25  because he does this day in day out.

Page 197

1  Q. But you never tell him though, do you, about these
2  concerns expressed by Ernst & Young?
3  A. I don't know. I don't know --
4  Q. Well, you don't, do you?
5  A. -- whether I tell him or not. And actually it's Sav,
6  and I think he meets with Sav. I would expect Sav, if
7  Sav was going to do that, to raise it with him.
8  Q. Well, we've got the note of the meeting that took place
9  with Mr Pettitt. There's no evidence, Mr Fielding,
10  whatsoever, that you tell Mr Pettitt either of
11  the concerns which E&Y have raised, or that they had
12  raised the possibility they might have to resign as
13  auditors. You didn't do that, did you?
14  A. I don't remember raising that with Brian, no.
15  Q. Well, didn't you think it was an important matter to
16  raise with him, given he was about to go off and do
17  the due diligence review at BLMIS the following month?
18  A. I obviously didn't connect those dots, and I'm quite
19  a long way away from this and this is third-hand from
20  someone else.
21  Q. You keep saying you're quite a long way away from
22  this, but it appears from these documents that
23  Mr Fiorino is treating you as the one he's reporting to
24  you on this, I'd suggest.
25  A. I don't know why he shared it with me, to be honest.

Page 198

1  Q. Well, you were a director of Primeo. Didn't it concern
2  you as a director that the auditors had raised
3  the possibility of resigning because they were that
4  concerned?
5  A. That's not the purpose he would have sent it to me for.
6  I think it's the same. He would have sent it to me, most
7  likely, because he knew that I'd dealt with Madoff
8  before and I was dealing with handover to Brian.
9  Q. Are you saying, Mr Fielding, really this was just of no
10  concern to you? Notwithstanding you were a director of
11  Primeo, it really didn't bother you that the auditors
12  had raised these concerns and that they were saying they
13  might resign?
14  A. It's okay for them to raise concerns, and to do their
15  own work to satisfy themselves. That's what I want to
16  know. I don't want rumour, I want to know what -- what
17  the conclusion is.
18  Q. So what steps, to your knowledge, were taken to deal
19  with these concerns, them having been raised?
20  A. I don't know what E&Y did.
21  Q. You don't know?
22  A. I know they got satisfied, because -- well, I assume
23  they got satisfied, because they continued as
24  the auditors for all these funds.
25  Q. Well, they got satisfied because HSBC provided them with

Page 199

1  a custody confirmation about the BLMIS assets, didn't
2  they?
3  A. But that wouldn't be enough to satisfy yourself; they're
4  talking about a detailed review. And I know we might
5  get on to it, but we know those custody confirms are
6  a bit of a -- an erroneous in some respects.
7  Q. I suggest they weren't erroneous, Mr Fielding, with
8  respect. Actually they were fundamental to
9  Ernst & Young staying on as the auditors, weren't they?
10  A. I have no idea what E&Y thought about all these strands
11  of information they were getting from lots of different
12  people.
13  Q. Do you recall having any discussions with E&Y about
14  the basis on which they would stay on as auditors?
15  A. No, none at all.
16  Q. So is this something we would have to speak to
17  Mr Fiorino about?
18  A. You would have to speak to E&Y about it, I think.
19  Q. Well, who would have dealt with it at HSSL's end?
20  A. Obviously Mr Fiorino was in contact. I guess Mr Birgen
21  was in contact as well.
22  Q. So we'd need to speak to them about this, is that what
23  you're saying?
24  A. There were possibly others too. It could have gone to
25  -- to others who ran Fund Administration, or Custody

Page 200



Primeo Fund v (1) Bank of Bermuda (Cayman) Limited (2) HSBC
Securities Services (Luxembourg) SA

Day 19

December 5, 2016

Opus 2 International - Official Court Reporters

Phone:        +44 (0) 203 008 5900
Email:         transcripts@opus2.com
Website:      www.opus2.com

1   A. What they gave was -- was the core information. Now, it
2   was quite probable that there were much more detailed
3   accounts sitting in Madoff but not available for,
4   you know, handing out to the general public, which,
5   again, was pretty consistent with Brown Brothers
6   Harriman. The only reason that we had more information
7   on that was because we were their banker.
8   Q. So, do you agree with my question or not, that
9   the Madoff financial statements were rather lacking in
10   detail as compared with the financial statements you
11   would normally expect to see from a financial
12   institution of Madoff's purported size?
13   A. No, what I'm saying is that the documentation we were
14   given was a summary document only. We didn't actually
15   have any full detailed financial statements which
16   clearly underpinned that, but we didn't have that
17   information. And that was something -- I mean, we're
18   talking March 2005 here -- something that we could have
19   looked for if we wanted to, but again, having said that,
20   the SEC get regular financial information, there would
21   have been little benefit to me in terms of assessing
22   the risk because I was quite confident we knew what the
23   key risks were, and the financial statements, over and
24   above knowing what the capital of that firm was and its
25   profitability were, would have been of limited use to

Page 161

1   me, never mind to anyone else.
2   Q. So you think the financial statements would have been of
3   limited use to you and what you saw was in the nature of
4   a summary document; is that right?
5   A. What I saw was a summary document and I don't believe
6   that if I had had 70 pages of financial assessment it
7   would have made any difference to my assessment of
8   the underlying risk.
9   Q. Let's go on to the next document, {N/1285/1}, which is
10   tab 207 of core bundle 3. This is a discussion paper --
11   A. Yes.
12   Q. -- which was produced by you --
13   A. Yes.
14   Q. -- in May 2005. Do you recall producing this discussion
15   paper?
16   A. Yes, I do.
17   Q. If we just look through it, firstly in paragraph 1, you
18   describe some background to BLMIS, and then, in
19   paragraph 2, to the London company, Madoff Securities
20   International Limited.
21   Then you see in paragraph 3 you say:
22   "HSS has a relationship with a number of funds ...
23   that use BLMIS. Essentially assets are placed with
24   BLMIS under a sub-custody agreement."
25   Now, the funds you're referring to there include

Page 162

1   Primeo, don't they?
2   A. That was the general statement, that's absolutely right,
3   and I'm using the term specifically to simplify what the
4   nature of the relationships were. Remember, at that
5   time, it was May 2005 -- yes, May 2005 I wrote this, we
6   had not yet established all of the documentation from
7   the underlying funds.
8   Q. Now, if we go indeed to {N/1286/1}, we see
9   the appendix 1 you refer to. It's been heavily
10   redacted. Well, this is the appendix to your discussion
11   paper?
12   A. Yeah.
13   Q. Ms Coe. And you see it says:
14   "Primeo Fund."
15   And then you set out I think some references to
16   facilities, and then there's "Total Revenue Before
17   Costs".
18   A. Yes, that's correct.
19   Q. Can you recall how you put this schedule together?
20   A. No, I can't. It will have certainly been from
21   the credit facilities that had passed over my desk.
22   May 2005 ... but there could be some omissions at the
23   time.
24   Q. Did you ask someone to identify the funds which were
25   invested with Madoff? Is that how you put this

Page 163

1   together?
2   A. I would have asked my -- my manager on the credit team
3   to try and identify what funds had got credit
4   facilities, but this was being predominantly the credit
5   facilities, so I would have seen probably about four or
6   five by then and he may have seen another one.
7   Q. Just going back to {N/1285/1}, and the paragraph we were
8   looking at, which is your paragraph, you say:
9   "Essentially assets are placed with BLMIS under
10   a sub-custody agreement."
11   So you understood, didn't you, that in the case of
12   Primeo and the other funds, the assets were placed with
13   BLMIS under the Sub-Custody Agreement?
14   A. I use the term "essentially", because, again, it was
15   getting very complicated to explain the various
16   differences between the various funds in the various
17   locations.
18   Again, it's probably quite useful if I very briefly
19   just explain. This document was originally designed to
20   go to the HSS Management Committee, and the people that
21   sit on that committee would -- would neither have
22   the time nor the understanding of the detail to -- to
23   appreciate a four or five-page document that went into
24   the various different structures. So that's why I used
25   the word "essentially". I was simplifying it and

Page 164

1    using "sub-custody" as a catch-all.
2    Q.  This is an important point, isn't it?  You were telling,
3        you say, the HSS Management Committee that HSS was
4        essentially in a sub-custodian relationship with BLMIS
5        in relation to all funds set out in the appendix,
6        weren't you?
7    A.  No, what I was doing was I was giving them background in
8        order to highlight a number of risks which I'd
9        identified to -- to pave the way to be able to get an --
10       an audit firm to go in to do a review, and that was
11       a background paper which set out the risks, but before
12       you can set out the risks, you have to have set out some
13       background.
14          Also, the important thing is for the people on that
15       committee is you have to speak in words that they --
16       they can understand and identify, and
17       the term "sub-custodian" would generally be understood
18       to mean someone else has got the assets.  It wouldn't
19       necessarily describe the legal basis on which those
20       assets were held by that other party, it would just be
21       a catch-all phrase to say someone else has got
22       the assets.  And that's the way we used it.  It wasn't
23       designed to be legally precise, it was designed to get
24       attention.
25    Q.  Well, you say it's "designed to get attention", but

Page 165

1        there's a fundamental difference, isn't there, so far as
2        HSSL is concerned, between BLMIS holding the assets not
3        as sub-custodian and BLMIS holding the assets as
4        sub-custodian?  That is a fundamental difference, isn't
5        it, so far as HSSL's liability is concerned?
6    A.  It's a fundamental difference to the liability, but this
7        document was not designed to discuss liability, this
8        document was designed to point out risks to senior
9        management to get backing to do a review.
10    Q.  I suggest, Ms Coe, you seem to be suggesting that
11       the label "sub-custodian" is used unthinkingly to cover
12       a wide variety of situations, but there is a fundamental
13       distinction, isn't there, between entities which hold
14       assets as sub-custodian for HSSL and entities which
15       don't?
16    A.  I'm not suggesting that the legal basis is not
17       different.  What I'm saying is this document was
18       designed for a completely different purpose to the one
19       that you're suggesting, and by no -- there's no
20       implication, I'm very clear in my own mind, the purpose
21       of this was to ensure that John Gubert was able to talk
22       to his management committee to get an understanding that
23       we needed to carry out a review because there were
24       a number of risks that we'd identified.  And whilst
25       those risks may have been known to a number of people

Page 166

1        round that committee for a very long time, it was my job
2        to make sure those risks were constantly looked at again
3        and reviewed, and that's what I was doing.
4    Q.  So if you're right, this is an important document, isn't
5        it?  You've prepared it for the HSS Management Committee
6        and you're identifying the risks for the benefit of that
7        committee, aren't you?
8    A.  That's correct.
9    Q.  And one of the risks which you identify is the risk to
10       HSS as custodian from assets being held by BLMIS, don't
11       you agree?
12    A.  No, what I'm -- what I was identifying was the fact that
13       we had a lot of credit out there, and we had to ensure
14       that we understood the nature of both the credit, we
15       needed to understand the nature of our whole
16       relationship, and we had to do that on the background of
17       a series of risks that I identified.
18    Q.  Well, let's go over to the second page, {N/1285/2},
19       because -- look at exactly what risks you identify.  You
20       say:
21          "However, there is substantial risk, in the event
22       there is question over the integrity of the process.
23       The financial cost of appointing a sub-custodian that we
24       cannot exercise a level of due care over, could be
25       significant; equally so would be the reputational risk."

Page 167

1        So you specifically identify the risk of HSS
2        appointing BLMIS as sub-custodian, don't you?
3    A.  Again, it was one of the risks, and -- and it is
4        a catch-all, because there was also a risk if -- if we
5        were classifying him as a prime broker, because that
6        will equally carry a number of risks for us.
7    Q.  You agree then, do you, that one of the risks you were
8        identifying for the HSS Management Committee was
9        the risk and the financial cost of having appointed
10       BLMIS as sub-custodian?
11    A.  Yes, but it wasn't the only risk.
12    Q.  I'm not saying it was the only risk.
13    A.  There was lots of risks.
14    Q.  I'm not saying it was the only risk, Ms Coe, but you
15       agree, don't you, that one of the risks you were
16       identifying for the HSS Management Committee was
17       the risk and potential financial cost of having
18       appointed BLMIS as sub-custodian for these funds?
19    A.  Yes, and I go on to say:
20          "... we cannot exercise a level of due care ..."
21          And that was very fundamental in Dublin with
22       the UCITS.
23    Q.  So you knew, didn't you, that BLMIS had been appointed
24       as sub-custodian, and that gave rise to risk for HSS,
25       didn't it?

Page 168

1  A. I knew that they had been appointed as sub-custodian in
2     Dublin. Of course I did.
3  Q. Well, it's not just Dublin we're talking about here,
4     is it, we're talking about all the funds. You don't
5     distinguish between Dublin and any of the other funds,
6     do you, in this note?
7  A. No, I don't distinguish because I didn't do a complete
8     schedule of the risks on every single fund, I did
9     a generic phrase.
10    And when you're trying to get the backing to do
11    stuff, you have to be concise; you've got a very limited
12    span of time to be able to get people's attention, so
13    you do it in -- in a language and a way that you think
14    is going to have the most impact. I mean, sometimes you
15    have to do that. It doesn't mean that that's a legally
16    contractual document as between me and John Gubert
17    and -- and there; it's an attention getter. It doesn't
18    mean that's an exclusive series of risks. It doesn't
19    mean that it was meant specifically in that way. It's
20    get attention, you know. If I'd have said to Paul Smith
21    about credit, he'd go, "Oh, I'm not interested in
22    credit". And so you have to use what you have to use to
23    get their attention. And you have to use language that
24    you think they can relate to, and that's what I was
25    doing.

Page 169

1  Q. Let's go through it in stages, Ms Coe. Paragraph 3 we
2     were looking at it on page 1 a minute ago {N/1285/1},
3     you start by saying:
4     "HSS has a relationship with a number of funds ...
5     that use BLMIS."
6     So you're not limiting this to Thema or indeed to
7     any other funds, are you?
8  A. No, I didn't say I was.
9  Q. And you then say:
10    "... assets are placed with BLMIS under
11    a sub-custody agreement."
12    So you understood in the case of these funds that
13    assets were being sent to BLMIS pursuant to
14    the Sub-Custody Agreement, didn't you?
15 A. No, I said "Essentially assets are placed ..."
16    Again, that's a catch-all to try and point out that
17    this -- this relationship is more than just credit.
18 Q. Well, exactly, the relationship is more than just
19    credit, but what you understood was that assets were
20    being sent to BLMIS under the Sub-Custody Agreement,
21    didn't you?
22 A. No, I said "essentially". That is just a catch-all
23    phrase. That doesn't mean that in every situation that
24    is an exact reflection of what the legal contract said.
25 Q. So, by "essentially", you meant that, in the case of

Page 170

1     some funds or perhaps one fund, assets were being sent
2     to BLMIS under a sub-custody agreement, but in the case
3     of the other funds they weren't? That's what you meant
4     by the word "essentially"?
5  A. "Essentially", it was not meant to be -- it was to
6     ensure that the people understood that wasn't in
7     every case. Explicitly what I was saying there.
8  Q. I suggest, Ms Coe, that's not what you say at all, you
9     don't distinguish any one fund from the other. But then
10    at the bottom of that page, you say:
11    "From a legal structure perspective, we can make
12    the arrangements work around the need for a legal charge
13    over assets in a custody, sub-custody arrangement.
14    "The real issue is are we satisfied with
15    the integrity of the Madoff operations such that we are
16    comfortable with a lack of real independent evidence of
17    the trading of clients assets. Further, given our duty
18    as custodian, are we potentially at risk from any
19    regulatory obligations we may have?"
20    And again, you're referring there generally, aren't
21    you, to HSSL's duty as custodian of each of these funds?
22 A. No, what I'm saying is, are we potentially at risk from
23    any regulatory obligations we may have. I was actually
24    saying I actually don't know what regulations we may
25    have at this stage, because we hadn't gone through

Page 171

1     the integration of all those accounts. So what I'm
2     doing is I'm throwing into the air that there were
3     a number of issues, a number of risks, and we had to
4     identify what those risks were and how we would mitigate
5     them. I'm actually saying there's a lot here we didn't
6     know at that time, and -- and trying to get as much into
7     that document as I possibly could.
8  Q. So what was the duty as custodian you had in mind in
9     the final sentence of that paragraph?
10 A. UCITS.
11 Q. Really? So you say here all you had in mind in terms of
12    the duty of sub-custodian was UCITS?
13 A. That was the one I was clear about at the time.
14 Q. Oh, really?
15 A. What I was not necessarily clear about was -- was some
16    of the other issues.
17 Q. So you say by this time you had realised had you that
18    there was a distinction between UCITS funds and other
19    funds so far as BLMIS was concerned?
20 A. Well, I knew that there was a difference between UCITS
21    funds and other funds from -- because that was part of
22    the stuff that I knew.
23 Q. I thought you said a moment ago you hadn't investigated
24    the matter by this stage and hadn't seen any of
25    the agreements?

Page 172

1  A. I said that -- that I had not investigated it in
2  relation to Madoff as a general point of principle.
3  I am clearly and was clearly aware at the time that
4  there were differences in different countries between
5  the custody obligations under a UCITS, custody
6  obligations under a non-UCITS, and -- and that was
7  a clear issue in our whole Bank of Bermuda acquisition.
8  We needed to understand the regulatory framework in
9  Hong Kong, in Bermuda, in the Isle of Man, all of those.
10 It was a huge exercise. So clearly I have not
11 investigated every single piece, but this had come over
12 my desk, I saw it as a high -- higher risk because of
13 the unusual nature of some of these relationships and
14 felt we should do something about it.
15 Q. When we go over the page to page 2, {N/1285/2}, you then
16 identify the substantial risk, and the substantial risk
17 you identify is the financial cost to HSBC of having
18 appointed a sub-custodian it can't exercise proper
19 control over; do you agree?
20 A. Yes, because that is absolutely true under a UCITS.
21 Q. It's true in relation to all the funds, isn't it,
22 Ms Coe? You don't distinguish here between UCITS funds
23 and other funds?
24 A. No, and I've said I wasn't distinguishing this document.
25 I was trying to get headline attention to do a job.

1  Q. Yes, by having identified the risk in relation to each
2  of these funds of having appointed BLMIS as
3  sub-custodian; correct?
4  A. I was highlighting a -- risks, not an exclusive number
5  of risks, but ones which were attention getters. I was
6  not suggesting that all of these risks applied in every
7  single case.
8  Q. Really? Well, I suggest that's exactly what you're
9  suggesting here in relation to the funds you identify in
10 the appendix.
11 A. Well, I wrote the paper and I know the purpose of
12 the paper so I'm very clear what I intended.
13 Q. I suggest that's not the purpose at all and
14 the Management Committee reading this paper would have
15 understood the risks you identified applied to each of
16 the funds identified in the appendix, wouldn't they?
17 A. I'm afraid not.
18 Q. You don't think they would have understood that?
19 A. No.
20 Q. Oh, really? So what in this paper do you think would
21 have meant that they didn't have that understanding?
22 What was telling them that the risk only applied to
23 a particular UCITS fund?
24 A. There would have been the opportunity to have presented
25 this paper and I would have just sat and told them that

1  we need to do this because the risks surrounding Madoff
2  were such that we could lose a lot of credit money,
3  we've got other risks, and the aggregation of those
4  risks is such that we need to do some form of review.
5  And from everything Bank of Bermuda personnel had told
6  me, we would not -- we, ie HSBC, would not have been
7  allowed to do that. As it happened, it never went to
8  Management Committee, it went to the network committee
9  only.
10 Q. It went to the sub-custodian review committee,
11 didn't it?
12 A. That's right. But it was intended to go to
13 the Management Committee at which I would have been able
14 to have presented the paper anyway, but they ran out of
15 time. All I needed was the mandate to be able to go
16 ahead and do this.
17 Q. If we go on, please, I want to ask you about a couple of
18 documents which relate to the instruction of KPMG, which
19 we have at {N/1390/7}, tab 219 of core bundle 3.
20 There's first of all an email from Mr Yim of
21 6 September 2005, and you can see this is in the run-up
22 to essentially agreeing the process which led to
23 the 2006 KPMG report. Do you see that?
24 A. Yes.
25 Q. Then if we go over to page 5, {N/1390/5}, there's an

1  email that you sent to Mr Fielding on 8 September 2005:
2  "Nigel, The engagement letter is agreed from my
3  perspective. Can you/Paul discuss with the clients
4  please?"
5  Do you see that?
6  A. Yes, I do.
7  Q. Then if we go over to page 3 {N/1390/3}, Mr Fielding
8  sends you an email the same day:
9  "Chris ..."
10 And then over the page {N/1390/4}:
11 "Are you aware of any precedents/Group standards we
12 might want to talk about where such a review has been
13 performed at HSBC agents."
14 Do you recall he was discussing here the process of
15 going out and really explaining to the clients why this
16 review was being undertaken; do you remember that?
17 A. I remember that he was going out to the clients to
18 explain the review was being undertaken, yes.
19 Q. Then we have your email on page 2 which you email him
20 back at 8.36 the following morning, 9 September
21 {N/1390/2}, and if we go over the page to page 3,
22 {N/1390/3}, it's at the top of the page:
23 "Nigel, This is a bit unusual as in our general due
24 diligence we can validate trades at the central
25 depository given the segregation of our accounts. It is



Primeo Fund v (1) Bank of Bermuda (Cayman) Limited (2) HSBC
Securities Services (Luxembourg) SA

Day 19

December 5, 2016

Opus 2 International - Official Court Reporters

Phone:      +44 (0) 203 008 5900
Email:      transcripts@opus2.com
Website:    www.opus2.com

Page 173

1    A. I said that -- that I had not investigated it in
2    relation to Madoff as a general point of principle.
3    I am clearly and was clearly aware at the time that
4    there were differences in different countries between
5    the custody obligations under a UCITS, custody
6    obligations under a non-UCITS, and -- and that was
7    a clear issue in our whole Bank of Bermuda acquisition.
8    We needed to understand the regulatory framework in
9    Hong Kong, in Bermuda, in the Isle of Man, all of those.
10   It was a huge exercise. So clearly I have not
11   investigated every single piece, but this had come over
12   my desk, I saw it as a high -- higher risk because of
13   the unusual nature of some of these relationships and
14   felt we should do something about it.
15   Q. When we go over the page to page 2, {N/1285/2}, you then
16   identify the substantial risk, and the substantial risk
17   you identify is the financial cost to HSBC of having
18   appointed a sub-custodian it can't exercise proper
19   control over; do you agree?
20   A. Yes, because that is absolutely true under a UCITS.
21   Q. It's true in relation to all the funds, isn't it,
22   Ms Coe? You don't distinguish here between UCITS funds
23   and other funds?
24   A. No, and I've said I wasn't distinguishing this document.
25   I was trying to get headline attention to do a job.

Page 174

1    Q. Yes, by having identified the risk in relation to each
2    of these funds of having appointed BLMIS as
3    sub-custodian; correct?
4    A. I was highlighting a -- risks, not an exclusive number
5    of risks, but ones which were attention getters. I was
6    not suggesting that all of these risks applied in every
7    single case.
8    Q. Really? Well, I suggest that's exactly what you're
9    suggesting here in relation to the funds you identify in
10   the appendix.
11   A. Well, I wrote the paper and I know the purpose of
12   the paper so I'm very clear what I intended.
13   Q. I suggest that's not the purpose at all and
14   the Management Committee reading this paper would have
15   understood the risks you identified applied to each of
16   the funds identified in the appendix, wouldn't they?
17   A. I'm afraid not.
18   Q. You don't think they would have understood that?
19   A. No.
20   Q. Oh, really? So what in this paper do you think would
21   have meant that they didn't have that understanding?
22   What was telling them that the risk only applied to
23   a particular UCITS fund?
24   A. There would have been the opportunity to have presented
25   this paper and I would have just sat and told them that

Page 175

1    we need to do this because the risks surrounding Madoff
2    were such that we could lose a lot of credit money,
3    we've got other risks, and the aggregation of those
4    risks is such that we need to do some form of review.
5    And from everything Bank of Bermuda personnel had told
6    me, we would not -- we, ie HSBC, would not have been
7    allowed to do that. As it happened, it never went to
8    Management Committee, it went to the network committee
9    only.
10   Q. It went to the sub-custodian review committee,
11   didn't it?
12   A. That's right. But it was intended to go to
13   the Management Committee at which I would have been able
14   to have presented the paper anyway, but they ran out of
15   time. All I needed was the mandate to be able to go
16   ahead and do this.
17   Q. If we go on, please, I want to ask you about a couple of
18   documents which relate to the instruction of KPMG, which
19   we have at {N/1390/7}, tab 219 of core bundle 3.
20   There's first of all an email from Mr Yim of
21   6 September 2005, and you can see this is in the run-up
22   to essentially agreeing the process which led to
23   the 2006 KPMG report. Do you see that?
24   A. Yes.
25   Q. Then if we go over to page 5, {N/1390/5}, there's an

Page 176

1    email that you sent to Mr Fielding on 8 September 2005:
2    "Nigel, The engagement letter is agreed from my
3    perspective. Can you/Paul discuss with the clients
4    please?"
5    Do you see that?
6    A. Yes, I do.
7    Q. Then if we go over to page 3 {N/1390/3}, Mr Fielding
8    sends you an email the same day:
9    "Chris ..."
10   And then over the page {N/1390/4}:
11   "Are you aware of any precedents/Group standards we
12   might want to talk about where such a review has been
13   performed at HSBC agents."
14   Do you recall he was discussing here the process of
15   going out and really explaining to the clients why this
16   review was being undertaken; do you remember that?
17   A. I remember that he was going out to the clients to
18   explain the review was being undertaken, yes.
19   Q. Then we have your email on page 2 which you email him
20   back at 8.36 the following morning, 9 September
21   {N/1390/2}, and if we go over the page to page 3,
22   {N/1390/3}, it's at the top of the page:
23   "Nigel, This is a bit unusual as in our general due
24   diligence we can validate trades at the central
25   depository given the segregation of our accounts. It is



Primeo Fund v (1) Bank of Bermuda (Cayman) Limited (2) HSBC
Securities Services (Luxembourg) SA

Day 21

December 7, 2016

Opus 2 International - Official Court Reporters

Phone:        +44 (0) 203 008 5900
Email:        transcripts@opus2.com
Website:      www.opus2.com

1  Q. If we go over the page to page 40 {K/5/40}, there's then
2      a comment at the top of the page:
3      "But that's the normal thing that custodians do in
4      fact ..."
5      And then it looks like you interject:
6      "Custodians take it that you can't validate that
7      it's not fabricated piece of information.  There is no
8      audit trail, and this is why we actually go to
9      the expense of having this external review, because ..."
10     And then there's some interruption:
11     "... and just do books and records internally to
12     show that this wonderful thing is happening and because
13     not everybody has taken their money out all at the same
14     time that's why it is open to the potential for fraud.
15     I mean it's a perfect structure for fraud."
16     And then Mr Yim tries to say something, but you then
17     say:
18     "But It is, I mean it is, I am sorry it is and
19     that's why we're all so like 'Woah'.
20     "Unidentified Speaker:  In a sense that's why we are
21     here.
22     "Christine Coe:  That's exactly why we're here."
23     Mr Yim says:
24     "Yeah, I know, but there is only so much we can
25     actually do."

21

1      So the point you're making there in the large
2      section, I suggest, is there is a concern that Madoff
3      may just be creating books and records internally to
4      give the impression that investment activity's
5      happening, whereas in fact nothing is taking place; is
6      that right?
7  A. The risk was exactly the same as it was in 1993 and it
8      was the risk that I identified in 2005.  So -- so, yes,
9      of course it's right.  The purpose of this tele -- this
10     meeting was to ensure that the structured finance people
11     understood that risk because they had not necessarily
12     considered real risks in their evaluation, because if
13     they did a performance review and a desktop look at
14     the way in which a return might be gained from however
15     they invested the money, they wouldn't necessarily go
16     through understanding what sits behind that, and that
17     was the purpose of dragging them in.
18     And it was -- it was two-thirds into the -- to
19     the meeting before I think the penny finally dropped,
20     that there's more to making investment than just looking
21     at returns, and so of course I had to be melodramatic,
22     but I wasn't telling myself or anybody anything that we
23     hadn't known for years.  This was always the risk.
24 Q. I agree you had known this for years, Ms Coe.  I don't
25     dispute that.  But the issue you've identified here is

22

1      that the concern and the risk with Madoff is it's all
2      dependent on books and records created internally by
3      Madoff, isn't it?
4  A. It's all dependent on the fact the whole thing was
5      a sham and he completely fabricated everything, which is
6      what I -- I explained yesterday --
7  Q. But that's exactly -- sorry, I don't want to interrupt
8      you until you've finished your answer.  But that's
9      exactly what you've identified here, isn't it, it's
10     the fact that he may just be doing the books and records
11     internally to show that this wonderful thing is
12     happening, and because not everybody's taking out all
13     their money at the same time, he's able to keep the show
14     on the road?
15 A. Yes, of course.  And as we discussed yesterday, what
16     I didn't say in this telephone call was the -- was the
17     flip side of that consideration, was: however, you will
18     need an army of people to do that, because it's not just
19     books and records which gives the impression that it's
20     a simple spreadsheet and it takes somebody about five
21     minutes to do, it's the sheer volume of the mechanics of
22     doing all of that over so many years, for so many funds,
23     for so many transactions, because it's not just
24     the custody side for his investment management
25     activities that would have to be fabricated, it would be

23

1      everything in his broker-dealer operations.  And he
2      would have to have some real trading, because otherwise
3      he wouldn't have the DTC terminal in the first place, he
4      wouldn't have the type of paperwork that was being
5      generated from those terminals, he wouldn't know what
6      the statements from Fidelity or JP Morgan looked like.
7      So there had to be some regular reality going on in
8      order for him to know what to replicate, because by law
9      of averages, if someone goes in there and gets a piece
10     of paper and thinks, "Hang on a minute, I know that's
11     not the current format", it would immediately raise
12     alarm bells.
13 Q. But, Ms Coe, you've identified here, haven't you,
14     the very fact that it may all be based on
15     cooked up books and records and that BLMIS may be
16     a Ponzi scheme?
17 A. I think we identified that back in -- in 2005, that one
18     of the possible options was that it was all a sham.
19     And, as I say, the protection that I tried to put in
20     place to evaluate that was to see, as far as possible,
21     whether those transactions were being -- could be traced
22     through and we could get evidence as far as we possibly
23     could from the information that was in BLMIS, and that's
24     what I believe KPMG did.
25 Q. But the point is, Ms Coe, it's a structural issue, isn't

24

1    it? As you say yourself, the issue is that it's
2    the perfect structure for fraud?
3    A. When all roads lead to one person, of course it is. He
4    has control over absolutely everything. And that would
5    be no different whether it was BLMIS or anybody. And
6    as -- again, as I said yesterday, if he'd been a man of
7    integrity, then this would have been the best thing
8    ever, because the flip side of -- of the risk, as far as
9    he's concerned, he's controlling something so no one
10   else can defraud within his organisation because he has
11   such strong control over it. So, had he been honourable
12   and had it been genuine, it would have been the best
13   investment vehicle in the whole of -- in the whole of
14   that 20 years.
15   Q. But the point, Ms Coe, is it's a structural issue and
16   you have to get to grips with the structure, don't you,
17   and do something to resolve the problem?
18   A. Well, we identified what the structural issue was all
19   the way through, and what we -- what we did was to have
20   those reviews done by KPMG for the checks and balances.
21   We were perfectly aware from the information that I'd
22   been given that you couldn't segregate accounts at
23   the DTC, which frankly was the only thing that I believe
24   would have helped. But if it's not possible to do that,
25   then I was left with no other option than to take that

25

1    reasonableness approach from the information that --
2    that we had available.
3    Q. But the problem here, Ms Coe, is we're now at July 2008,
4    you have sent KPMG in, they've come back, and you
5    yourself recognise you're left with a situation which is
6    a perfect structure for fraud, in your own words, and
7    that it remains the case that there's a risk that Madoff
8    is cooking up the books and records internally. Do you
9    agree?
10   A. I agree. That was always the risk.
11   Q. The KPMG report, as you recognised, has only gone so
12   far, hasn't it? The risk and the perfect structure for
13   fraud remains, doesn't it?
14   A. Yes, but it always did. And we knew there was
15   a limitation for how far KPMG would go, but as someone
16   who manages risk, you have to make those decisions. And
17   as I said, in 2005, the environment was such that there
18   didn't seem to be external pressures that could drive
19   Madoff to do something unusual, or illegal, if it had
20   been genuine. In 2008, that was quite different, and so
21   of course I was upping the ante in 2008 because of
22   everything else that was going on.
23   Q. When you were assessing this, you were just look looking
24   at it with your credit risk at hat on, weren't you?
25   A. I was looking at it from credit risk, yes, that was my

26

1    job.
2    Q. So you were looking at it with respect to HSBC's risk
3    exposure, weren't you?
4    A. In terms of the Fund clients, because I did not have
5    responsibility for the Structured Finance Group
6    directly.
7    Q. Well, you were looking at it in terms of HSBC's exposure
8    in terms of making lending to these client funds,
9    weren't you?
10   A. That was my principal review, yes, of course.
11   Q. I suggest what you weren't looking at or taking into
12   account was the interests of the funds and their
13   investors in placing assets into the hands of Madoff?
14   A. Well, if it had -- I think one works to the other,
15   because if -- clearly, if we were comfortable to lend
16   credit, then, from the fund's point of view, (a) they
17   had that credit available so they could still trade,
18   which they wouldn't have been able to do without
19   the credit, and secondly, because we'd been risk
20   evaluating it, then -- then there was that -- the -- we
21   had done our duty, I believe, in do -- going as far as
22   we could to make sure that that was an operation which
23   was genuine.
24   Q. But you knew these funds had pretty much all of their
25   assets held or purportedly held by Madoff, didn't you?

27

1    A. Well can I knew that some of them did, yes.
2    Q. So what consideration did you give as to whether it was
3    appropriate for those funds to continue with their
4    assets being held by Madoff in something which you
5    recognise was the perfect structure for fraud?
6    A. Well, the managers of those funds were not -- were very
7    experienced people themselves, and they -- they were all
8    people who, from the information I had available, had
9    actual wanted to deal with Madoff. And as we've seen
10   from correspondence from people like David Smith and
11   Sonja Kohn, they had no intention of wanting to upset
12   that relationship.
13      Now, the flip side is, if they were comfortable,
14   should I take comfort from that? Well, actually,
15   I didn't. I said no. It is not their view which is
16   important, it is our evaluation which is important.
17      But it was quite clear to me that they had
18   the necessary skills and they had the necessary
19   knowledge of Madoff to be able to make their own
20   decisions.
21   Q. What consideration did you yourself give to HSBC's
22   duties and responsibilities as a custodian at this time?
23   A. Well, I think that by doing the KPMG reports, we went
24   further than anyone else would have done. I mean,
25   ordinarily, one would have expected to -- to have done

28

1    the reviews by your own personnel, and I went to
2    considerable expense to get a forensic expert to go in
3    there and -- and look and to do what I believed was
4    a good job.
5    Q.  Did you think you ought to be telling the funds that
6    you'd formed the view that this was the perfect
7    structure for fraud?
8    A.  My personal point of view, the funds were well aware of
9    the structure of Madoff, none of that had changed, and
10   as sophisticated people, who were managing this, then --
11   they were well aware of the risks in 2008, they will
12   have been alive to the fact that Bear Stearns had -- had
13   had their problems in March 2008, they would surely not
14   have been in the position that they were in in
15   the financial services sector if they hadn't got
16   the capability of making those decisions for themselves.
17   We were not investment advisors, we were not investment
18   managers.
19   Q.  But you were the custodian, weren't you?
20   A.  Yes, and I believe we executed our duty as far as our
21   custody relationship was concerned by doing these
22   reviews.
23   Q.  So, looking at HSBC's duties and position as custodian,
24   I repeat, what consideration did you give as to whether
25   it was appropriate for the Fund's assets to continue to

29

1    be held with Madoff?
2    A.  Well, I think I've said that we did those reviews, and
3    I think we went further than anyone else would ever have
4    done.
5    Q.  So so you say you formed the view that it was appropriate
6    for these funds' assets to continue to be held with
7    Madoff notwithstanding the views you'd reached as
8    expressed in this telephone conference?
9    A.  As I say, the views that I expressed in this telephone
10   conference were no different to the views I expressed
11   when I first saw this, and I believe that we took
12   sufficient steps to ensure that the risks were
13   mitigated.  I don't know what else I could have done.
14   Q.  Did you not think it was incumbent on you to investigate
15   whether changes could be made to the structure so that
16   it was no longer the perfect structure for fraud?
17   A.  It was a little bit binary on the basis that if we
18   couldn't get a segregated account at the DTC, we -- we
19   would have to withdraw.  I didn't -- I didn't
20   consider -- and in fact this conversation goes on to --
21   to evaluate whether there may be other options and -- by
22   putting all the HSBC funds into one account, and I think
23   I then go on to say, "Well, it might put them all
24   together but it's still the same problem because it's
25   still Madoff which is controlling the whole process".

30

1    So, at the end of the day, the only thing that could be
2    done here, which is what we were having to do with other
3    investment banks, was literally trying to ring-fence
4    everything.  And if that wasn't possible, as I was led
5    to believe, then exit would have been the only other
6    option.
7       But of course I'd also got a duty that if we started
8    to do that -- and this had been the best thing in
9    20 years -- then -- then would those funds have -- have
10   then been saying that we had potentially prohibited them
11   from making their return?  You're a little bit damned if
12   you do and damned if you don't sometimes.
13   Q.  But wasn't the appropriate course for you to go to
14   the funds and say, "Look, we think there's this
15   structural issue, we've sent KPMG in, that only gives us
16   so much comfort, and what we need to do is have
17   a separate account or withdraw"?
18   A.  As I said, all of these funds wanted to deal with
19   Madoff.  All of these fund managers had made their own
20   investigation and evaluation about the Madoff structure.
21   It is for the Fund managers to advise their investors as
22   to whether they believe that that was the right
23   investment.
24   Q.  Did you think it was appropriate for HSBC, as
25   administrator, to be calculating the NAV on the sole

31

1    source of information from BLMIS in these circumstances?
2    A.  HSBC as administrator, as in other administrators, have
3    a lot of funds where information is provided to them
4    by -- by the directors of funds.  There were a lot of
5    assets which can't be priced from pricing sources.  In
6    this situation, at least we could check pricing.
7    Q.  Well, but you knew, didn't you, by this stage that
8    investors were buying in and out of the funds on
9    the basis of a NAV solely reliant on information from
10   BLMIS, where you yourself are concerned that the books
11   and records may have been cooked up?
12   A.  Well, they may have been buying in and out of the Fund since
13   1993 on exactly that basis.  The risks were the risk, as
14   I've said, since 1993.  So nothing could actually --
15   changed apart from the external market.
16   Q.  What's changed is you yourselves have clearly realised
17   here, explicitly, about the fraud risk, haven't you, and
18   you've also realised that the KPMG report only gives you
19   limited assurance.
20   A.  I don't believe this document says that suddenly
21   the light went on in 2008.  What I was doing here was
22   to share my concerns, my -- my risk evaluation, if you
23   like, in a pretty melodramatic way, because I felt that
24   was the only way I could get across to the structured
25   finance people the risks which they may be undertaking.

32



Primeo Fund v (1) Bank of Bermuda (Cayman) Limited (2) HSBC
Securities Services (Luxembourg) SA

Day 18

December 2, 2016

Opus 2 International - Official Court Reporters

Phone:        +44 (0) 203 008 5900
Email:        transcripts@opus2.com
Website:      www.opus2.com

1    agree?
2    A. She's coming at broadly a similar issue. I --
3    I disagree that I had taken no steps with BLMIS, because
4    I had done the due diligence. I had not done
5    independent evidence, that -- that is clear.
6    Q. Didn't it concern you when you read this that exactly
7    the same issue that had previously been identified
8    almost three years earlier was being raised yet again
9    and nothing had been done in the meantime to resolve it?
10   A. It was important -- when I read this again -- my role
11   was relatively removed at this point, but it was
12   important to me when I saw this that here's somebody
13   saying, "There could be a risk, we want to do more
14   work". I think I was particularly concerned on
15   the credit front of the delay it might take to do
16   the work, but I was perfectly happy for the work to be
17   carried out.
18   Q. But you knew by this stage -- the issue had been raised
19   in October 2002, it had been raised in the 2002 Board
20   meeting, it had been raised in the 2004 Board meeting,
21   and now, in 2005, senior people within HSS are raising
22   exactly the same issue, aren't they, and in the meantime
23   you had done nothing to resolve it, had you?
24   A. As I say, I had done the work I had done and I -- I felt
25   that the situation was okay. I had tried to assist

Page 65

1    in 2002 by giving all the information to -- to
2    Bill Jones, and I -- I think I -- it will be a question
3    perhaps for Ms Coe, but I think I was very co-operative
4    in this to the extent I needed to be, given my role was
5    somewhat removed.
6    Q. Well, I'm not sure you were all that co-operative, with
7    respect, Mr Fielding, because if we go over to
8    {N/1293/1}, we see what your response is. In fact,
9    let's start at page 3 of this document, {N/1293/3},
10   which will be the first email in the email chain, which
11   is an email sent from Mr Gubert. If we go please to
12   page 2 and just look at the bottom of that page
13   {N/1293/2}, you see it's sent from Mr Gubert to Ms Coe,
14   and it's copied to Mr Smith, Mr Pettitt, and to you. So
15   why are you being copied in on this if you're so far
16   removed at this moment?
17   A. I am -- my day-to-day job is quite removed, but I --
18   this is very shortly after I'd handed over it to
19   Brian Pettitt the sub due diligence process.
20   Q. Let's go over to page 3 --
21   A. Plus, if I may, I was heavily involved from the credit
22   transition.
23   Q. Is you think you were being copied in on this because
24   you were heavily involved in the credit transition; is
25   that right?

Page 66

1    A. And because -- in the bank at that point, I was the --
2    Brian had been -- Brian Pettitt had been once to see
3    Mr Madoff, I had -- I had had much more proximity.
4    Q. Let's have a look at what Mr Gubert was saying in
5    the email to you and the others {N/1293/3}:
6    "Thank you for the papers on the above. It strikes
7    me that the firm has reasonable capital ... has a solid
8    reputation but that we have a flawed process.
9    "Although there is no reason to doubt the integrity
10   or professionalism of the Group, the reality is that:
11   "we do not have full control of the assets or
12   real time sight of transaction flows.
13   "the transactions are all internal to the family
14   firms and there is no proof of best execution or even
15   actual execution."
16   And that reflected the fact, didn't it, that HSSL
17   actually had no proof, other than what was coming from
18   BLMIS, that the trades were actually being executed?
19   A. He's setting out a series of risks that -- that could be
20   there, looking at it with his eyes and his experience,
21   without being close to it, a very similar -- that --
22   that particular item he identifies is a very similar one
23   that the Primeo Board had -- had heard about from
24   the internal control report of Bank Austria.
25   Q. Yes, exactly. It had been raised at the Board meeting,

Page 67

1    hadn't it, and you had been entirely reassuring to
2    the Board on that occasion, hadn't you?
3    A. I don't know whether this was yesterday or the day
4    before, but I had given them some facts that I felt were
5    pertinent to that discussion we were having.
6    Q. Then Mr Gubert goes on:
7    "the audit is undertaken by a firm that is not on
8    our recognised list of auditors."
9    So this is someone else, isn't it, expressing doubt
10   about relying on Friehling & Horowitz; do you agree?
11   A. I don't know that he's expressing doubt. I mean,
12   I think on the -- above he says we have "no reason to
13   doubt the integrity or professionalism of the Group".
14   I know he's not specifically referring to the auditors
15   there, he's referring to BLMIS as a whole. He's just
16   recognising that they're not one of the big four, as it
17   were.
18   Q. Really? I think he's saying the audit's undertaken by
19   a firm that's not on the recognised list of auditors
20   at all, isn't he?
21   A. That -- that is what he is saying, and I know from my
22   experience that there are a few other audit firms, but
23   for funds, it's one of the big four that's normally --
24   normally there, which actually it was for the funds
25   anyway, it was E&Y, obviously.

Page 68

1  Q. What he's saying, I suggest, Mr Fielding, is that is
2     that: we don't know these auditors and there is an issue
3     about relying on them.  That's exactly what he's saying,
4     isn't it?
5  A. He's identifying as one of the possible things that he's
6     thinking about from a risk perspective: we don't know --
7     we don't know anything about this audit firm.
8  Q. He's not just identifying it as a possible thing he's
9     thinking about, he's saying: this is a problem, isn't
10    it, because we don't know who these auditors are and
11    there's an issue about relying on them?
12 A. It's one of the factors he's taking into account in
13    writing this email.
14 Q. If we go to the bottom of that page, the penultimate
15    paragraph, you see he concludes:
16       "I cannot countenance this process - and
17    I appreciate it is a major money earner - unless we can
18    adopt the process common in banking in the USA where
19    liens (rather than absolute title and possession) are
20    adopted.  Under that process, we - or our delegate -
21    could arrive unannounced at the client office to assess
22    that all security was in place as advised.  I appreciate
23    Madoff does not like external 'intrusion' and am willing
24    for this to be undertaken by our auditors (at our cost).
25       "If this cannot be done, then we should exit

1     the relationship."
2        A number of points on that.  First of all,
3     the relationship with BLMIS was a major money earner,
4     wasn't it, for HSS?
5  A. It's not the relationship with BLMIS, it's
6     the relationship with the clients.
7  Q. Well, the relationship with the clients that was
8     dependent on BLMIS was a major money earner for HSS,
9     wasn't it?
10 A. The clients who had appointed BLMIS, if you add them all
11    up, produced a reasonable income.  Actually, in
12    the scale of HSS, it wasn't a massive amount, but
13    I think I've seen somewhere it's around 4 million
14    a year.
15 Q. Well, Mr Gubert appears to regard it as a major money
16    earner, doesn't he, for HSS?
17 A. That's what he says.
18 Q. When you say 4 million, that's pretty much all profit,
19    isn't it?  The margin on this business is so high, that
20    of the 4 million income, a huge proportion of that is
21    straightforward profit, isn't it?
22 A. I -- I think we've seen Thema and we've seen maybe
23    Primeo have very good profit margins.
24 Q. It's an extremely profitable business this, isn't it?
25 A. It's a good profit margin -- very good profit margin.

1  Q. What I suggest Mr Gubert was suggesting ought to be done
2     here was a process whereby spot checks are carried out
3     of Madoff; do you agree?
4  A. We know where this goes, but he's saying: I want --
5     -- one option here is for our auditors to go in and
6     do a review.  And it's interesting that in this
7     penultimate paragraph, what he's clearly talking about
8     is credit risk again.
9  Q. Well, let's -- I'm sorry, Mr Fielding, you make that
10    point.  Let's look a couple of paragraphs up:
11       "We appoint BLMIS as our sub custodian and expect
12    them, according to the documentation, to exercise
13    the duty of care expected of a reasonable professional
14    sub custodian for hire.  We appoint them from Dublin and
15    appear to have a fiduciary duty to the underlying
16    investors."
17       He's not merely making a credit point, is he, he's
18    concerned about the fact that BLMIS has been appointed
19    sub-custodian and HSSL has duties to the investors?
20 A. I think he's making the credit point in the penultimate
21    paragraph, because I -- I imagine Ms Coe has briefed him
22    in -- in the paper -- I think we've seen the paper, that
23    there are actually credit facilities to a large number
24    of these funds.  He does, it's correct, make the point
25    in relation to Dublin, which I guess -- I think may be

1     just one fund -- that there may also be there, subject
2     to looking at it, some sort of fiduciary duty.
3  Q. What I suggest Mr Gubert is suggesting ought to be
4     carried out here is an ability to undertake spot checks
5     of BLMIS; do you agree?
6  A. No.  No, I don't agree.  What he's saying is: I think we
7     want to do a review.  He's saying that we would need to
8     be able to turn up, if we wanted to, to get -- well, he
9     says "turn up", maybe "issue instructions" might be
10    another way of putting it, to ensure we can get our
11    security for our credit facilities.
12 Q. So when he says:
13       "Under that process, we - or our delegate - could
14    arrive unannounced at the client office to assess that
15    all security was in place as advised."
16       You don't think that was a reference to unannounced
17    spot checks, do you?
18 A. It's not suggest -- I don't think he's suggesting that
19    they actually take place, but that that is something we
20    would want to have the right to do because the security
21    for the credit facilities is held there.  But I'm not
22    saying he's not suggesting that any form of review
23    shouldn't be taken.  We clearly know that a review got
24    commissioned.
25 Q. I suggest what he's very clearly suggesting here,

December 2, 2016    Primeo Fund v (1) Bank of Bermuda (Cayman) Limited (2) HSBC Securities Services (Luxembourg) SA    Day 18

1   Mr Fielding, is that a process ought to be put in
2   applies whereby BLMIS agrees to unannounced spot checks
3   taking place, and if that isn't done, there ought to be
4   an exit of the relationship.
5   A. He's saying that it would be right to have a process in
6   place, where we would arrive unannounced, if we wanted
7   to, to check that the security was there.
8   Q. And no such arrangement was ever put in place, was it,
9   with BLMIS?  There was no arrangement agreed with BLMIS
10   whereby HSBC or anyone on its behalf could make un
11   announced spot checks, was there?
12   A. I actually don't know.
13   Q. If we go to {N/1293/1}, and we have your response to
14   Mr Smith and Mr Wilcockson:
15   "Having spoken to Chris Coe, what she wants to do is
16   send in another audit firm, eg KPMG, to perform an
17   operations/security review at our cost. I think a key
18   question is whether to inform clients and/or plan how to
19   respond if Madoff calls them and they call our offices.
20   If I were Madoff I think I would have some difficulty
21   understanding why after Brian did a review that HSBC
22   want to send in another team to probe further and
23   I would probably call my clients [someone] is
24   a particularly sensitive client when it comes to Madoff
25   and I imagine him responding that he does not agree (not

Page 73

1   that it is his choice).  However, I suppose this is
2   a better risk than having John insist we exit all
3   accounts where Madoff is sub-custodian.  It would be
4   better if the clients acknowledged [support] of
5   the action.  If you agree, we have three main clients to
6   address."
7   So, first point, yet again, you're clearly of
8   the view that BLMIS is sub-custodian, aren't you?
9   A. No, I disagree.
10   Q. Well, that's what you very clearly say in this email,
11   isn't it, Mr Fielding?
12   A. I used those words.  We've started to use words like
13   that.  What I'm saying is there is a sub-custodian
14   agreement.
15   Q. Now, the other point is it's fair to say that you're
16   actually not particularly enthusiastic about Mr Gubert's
17   suggestion, are you?
18   A. That's not correct.  I -- I am putting a client reaction
19   hat on.  I think we know from very early on the clients
20   are very sensitive to their relationship and maintaining
21   the relationship with BLMIS, so all I'm saying is,
22   you know, we've got to think about this both from
23   the clients and therefore their interaction with
24   BLMIS --
25   Q. But that's your --

Page 74

1   A. -- and look at it, because we -- we know Brian has been
2   in in -- I think it's April.  We're now only in June.
3   you know, there could become a risk of overload review,
4   BLMIS getting upset talking to the clients.  So I simply
5   say, which I think is actually very helpful to
6   the review, let's talk to the clients.
7   Q. But what you're most concerned about, and I suggest this
8   is a pervading theme, is about not upsetting the clients
9   and not upsetting BLMIS; that's right, isn't it?
10   A. Not upsetting the relationship that the clients have
11   with BLMIS.
12   Q. And that's the reason why you hadn't done anything
13   previously to obtain independent confirmation, isn't it?
14   A. No, I think I've answered this before, that I was
15   satisfied with what I had done, I had helped Mr --
16   Mr Jones -- to position him to do that review.
17   Q. Now, you recall following this that the decision was
18   then made to instruct KPMG to carry out a type of review
19   in relation to BLMIS.  I assume you remember that?
20   A. I do remember that.
21   Q. And you commented, didn't you, on the draft letter of
22   engagement to KPMG?
23   A. The primary carriage of this was with Chris Coe.  She
24   sent it to me.  I did have a quick look through it.
25   I think I made one or two comments.

Page 75

1   Q. If we go to {N/1357/2} we see your email to Chris Coe.
2   I think this is in around, now, August 2005.  We'll just
3   look at your comments and then we'll look at the version
4   of the engagement letter in a moment.  You see,
5   under "Scope":
6   "... not sure what the references to Madoff's
7   related sub-custodian entity relate to, did Brian
8   determine that Madoff has a sister entity involved?
9   Also, I did not envisage we were getting all clients to
10   consent, rather Paul and I would infer all
11   the significant ones.  As Madoff is contracted as
12   sub-custodian to us I don't believe we specifically need
13   client consent, though clearly there support and
14   understanding is important in the situation."
15   So I suggest that your understanding at this time
16   was that because there were sub-custodian agreements in
17   place, and because BLMIS was the sub-custodian, you had
18   a right to carry out this work without the need to
19   obtain client consent; do you agree?
20   A. I think it's exactly as I state: because there was
21   a contract with BLMIS as sub-custodian, I think we could
22   go -- we could ask a firm to go in, but it would be
23   better to talk to the clients, given the overall
24   situation.
25   Q. And it was because, I suggest, Mr Fielding, BLMIS was

Page 76



Primeo Fund v (1) Bank of Bermuda (Cayman) Limited (2) HSBC
Securities Services (Luxembourg) SA

Day 2

November 8, 2016

Opus 2 International - Official Court Reporters

Phone:        +44 (0) 203 008 5900
Email:        transcripts@opus2.com
Website:      www.opus2.com

1    submission.
2    MR JUSTICE ANDREW JONES:  And Bank Austria also knows that
3    BLMIS is running an asset management business through
4    the same company that it's running a substantial
5    proprietary trading business -- or at least it appears
6    to be substantial, judging by its financial statements.
7    MR SMITH:  Yes, I think everyone knows that.  I mean, just
8    to answer your Lordship's question about BLMIS's
9    accounts, as a registered broker-dealer BLMIS was
10   required to file reports with the SEC, which would
11   include audited financial information.  So we think
12   those were publicly available.  At least that's
13   the answer we have been given.  And obviously those were
14   filed with the SEC, amongst other people.
15       But, my Lord, in our submission, it is rather
16   difficult.  The custodian's been asked the question and
17   he's come back, and how one can read that key
18   presentation in any way other than reassuring and
19   effectively providing the answer, "Don't worry, he's our
20   sub-custodian", is to our mind very difficult to
21   understand.
22       Now, if you go back then and let's just pick up
23   the story in 2003, {N/766/1}, tab 136 of the core
24   bundle, you'll see then there was an email from
25   Mr Birgen at the bottom of that page where he writes to

Page 93

1    Mr Schultz and Mr Wilkinson:
2        "Bank Austria is currently performing a major audit
3    on the Primeo Fund structure and the relation with
4    BOB and Madoff."
5        So again, that's what they're interested in,
6    the relation between the Bank of Bermuda and Madoff:
7        "Nigel Fielding and myself had to go to Vienna
8    2 weeks ago to make a presentation and answer questions.
9    With a German spirit, they want to know 1000 details.
10   We mentioned that BOB performed due diligence on Madoff.
11   Now they came back asking us the copies of
12   the QUARTERLY due diligence BOB is performing.  I am not
13   aware of any quarterly review.  Is any of your offices
14   performing quarterly reviews on Madoff?"
15       Mr Wilkinson's response:
16       "Quarterly due diligence, you have got to be
17   joking!!
18       "The only due diligence we have on Madoff is what
19   Nigel did some months ago.
20       Then at the top of the page:
21       "Thanks Brian.  That's what I thought.  It seems
22   they (BA internal audit) are desperately looking to find
23   a reason to kill this business."
24       You'll see then there's a response over the page,
25   core 137, {N/767/1}, and you'll see at the bottom of

Page 94

1    the page the email from Ms Fano, which has obviously
2    triggered Mr Birgen's enquiry:
3        "Internal controlling of [Bank Austria] told me that
4    BoB has quarterly due diligence documents on Madoff -
5    [is] this correct and could you send me copies of such
6    documentation?"
7        He says:
8        "Sorry for having taken a few days before responding
9    but I wanted to check as well with my Dublin and
10   New York offices.  BOB is NOT performing a Quarterly due
11   diligence on Madoff.  As Nigel explained in Vienna, the
12   due diligence procedure is regular but not on
13   a quarterly basis; The last one performed was done by
14   Nigel in fall 2002."
15       So they have been told it's not quarterly but it is
16   regular.
17       And then, top of that page, Ms Fano asks:
18       "... could I have a copy of the last due diligence?"
19       And over the tab again to {N/769/1}, you'll see
20   there there's a response from Mr Fielding to Ms Fano of
21   27 June.  He says in the first sentence:
22       "... I confirm that our normal cycle for a full due
23   diligence review of agents is every two years, unless
24   operational problems are encountered that lead to an
25   early review.  We increase the frequency to annual when

Page 95

1    the relationship becomes significant ..."
2        And then he goes on:
3        "The last full review of Madoff was performed in
4    the 3rd quarter of 2002 ... Salient points from
5    the review were included in the presentation we provided
6    in Vienna.
7        "Unfortunately, Bank policy does not allow us to
8    provide copies of our agent review files as these are
9    proprietary does not allow us to provide copies of our
10   agent review files ..."
11       Text appears to be repeated there.
12       So the due diligence isn't provided, and in truth we
13   know there wasn't much to provide, it was essentially
14   Mr Fielding's email recording the notes of the meeting,
15   the due diligence questionnaire and a copy of
16   the financial statements.
17   MR JUSTICE ANDREW JONES:  But Ursula Fano should have been
18   doing some due diligence of her own, of course.
19   MR SMITH:  Yes.
20       Now, what then happens is there's a board meeting
21   held on 23 June 2003 which your Lordship will see in
22   bundle H, tab 30.  It was held in Madrid. {H/30/1}.
23   Your Lordship will see present at this meeting was
24   Mr Kaniak, Mr Simon, Mr Fielding and Mr Spalek, also
25   Ms Fano and Ms Irwin in attendance.

Page 96



Primeo Fund v (1) Bank of Bermuda (Cayman) Limited (2) HSBC
Securities Services (Luxembourg) SA

Day 17

December 1, 2016

Opus 2 International - Official Court Reporters

Phone:        +44 (0) 203 008 5900
Email:        transcripts@opus2.com
Website:      www.opus2.com

1 his Lordship concludes that you did intend that. And my
2 question to you is that, in those circumstances,
3 wouldn't a very important thing to have considered be
4 whether it would be possible to get independent
5 confirmation of the information as to securities and
6 trades.
7 A. At the risk of repeating, I don't agree with
8 the assumption. But working on the assumption we were
9 trying to bring in the assets and be liable for them,
10 I think we probably would have done more work. Whether
11 it would have been independent confirmation, or sending
12 in -- getting a more detailed review done, exactly what
13 form I don't know. I do agree more work would -- would
14 probably have had to be done.
15 Q. What sort of detailed review do you think might have
16 been done?
17 A. I mean, we really are twisting away from the fact that
18 he's a broker-dealer. Maybe we would have asked for
19 a more thorough internal control review, or something
20 like that.
21 Q. Done by a major accountancy firm?
22 A. It could have gone towards what we later know as
23 the KPMG review. It's one option. There could have
24 been a range of things.
25 Q. But anyway, I think you say you would have looked at

1 addressing in some way the issue which arose from
2 the fact that BLMIS was the sole source of information
3 as to the securities and trades; do you agree?
4 A. It's actually very difficult to address, because this is
5 the situation. He's the managed account manager. He is
6 the sole source. That's the structure that was set up.
7 We know that structure exists in the market. Others do
8 it. So you -- you either have two choices: either you
9 go in and you do more detailed review work, or you
10 actually stand back and say, "Actually, we need to
11 change this structure".
12 Q. Do you remember, following your visit in July 2002, that
13 certain parts of Bank of Bermuda were not happy with
14 the due diligence which you had carried out in relation
15 to BLMIS?
16 A. I don't think I agree with that characterisation.
17 I suspect it refers to Dublin. But I think they were
18 actually very happy that I'd gone to do due diligence,
19 but they had some additional things they wanted.
20 Q. We've got copies last night of an email chain which took
21 place between you and other individuals in
22 September 2002. I'm afraid, because we only got it last
23 night, I'm going to have to hand up a paper copy; it has
24 not yet been included in the trial bundle.
25 MR JUSTICE ANDREW JONES: Is this moving on to a new

1 subject?
2 MR SMITH: Broadly. It would be convenient if you would
3 like to break now, my Lord.
4 MR JUSTICE ANDREW JONES: Shall we take a break. We'll
5 resume in 10 minutes.
6 (11.24 am)
7 (A short break)
8 (11.37 am)
9 MR JUSTICE ANDREW JONES: Yes.
10 MR SMITH: Thank you, my Lord.
11 Mr Fielding, I was about to ask you about the email
12 chain discovered to us yesterday, which I think you have
13 a copy of in front of you, and I hope there's a copy in
14 front of my Lord as well.
15 MR JUSTICE ANDREW JONES: Yes, thank you.
16 MR SMITH: Mr Fielding, just looking at that first of all,
17 on the second page, do you see that, on 22 August,
18 there's an email from Mr Young, who we know is in
19 Dublin, and you've obviously forwarded to him by this
20 stage a copy of the due diligence questionnaire you'd
21 obtained. Do you see that?
22 A. I see that.
23 Q. Then above that there's a further email from Mr Brady,
24 who I think was managing director of the Irish business,
25 wasn't he?

1 A. I think he was Managing Director of the Bank of Bermuda
2 entities in Dublin.
3 Q. What he was seeking, or what he thought ought to be
4 obtained, was independent confirmation that the Thema
5 assets in custody are not commingled with Madoff's prime
6 broker assets; do you see?
7 A. I see that.
8 Q. I then, if we just follow the page over, there's then
9 a further email from Mr Young at the bottom of the page.
10 Then, on 11th September, he emails you saying:
11 "When you get back, maybe you could look at this
12 again. What is required is independent auditor's
13 confirmation that the assets are not commingled.
14 Madoff's representation is not enough annual audited
15 accounts of Madoff."
16 Now, it looks like, by this stage, you have been
17 charged with responsibility for carrying out due
18 diligence on Madoff generally, haven't you?
19 A. I haven't been charged with it per se, nobody asked me.
20 I mean, it was part of my plan to continue doing due
21 diligence.
22 Q. But certainly the Dublin operation in relation to Thema
23 are looking to you, aren't they, as the person who's
24 carrying out the due diligence in respect of BLMIS?
25 A. Yes. They're aware I've done it, and they're asking me

1    for some further information.
2    Q. Well, they're asking you to do more, aren't they?
3    A. They're setting out what they require.
4    Q. What they're seeking, according to your email at the top
5       of the page, is some form of independent audit in
6       relation to the Thema assets; do you agree?
7    A. That's correct.
8    Q. You say, in response to that question:
9       "BTDL ..."
10      Which we know is Bermuda Trust (Dublin) Limited:
11      "... should request this via the client or the
12      external auditor. The external auditor of the Lux funds
13      with Madoff did this as a matter of course."
14      Now, what was that a reference to?
15   A. So that's a reference to me saying: if you've got
16      a fund, Thema, it's got an auditor -- I don't know which
17      firm it was for Thema, exactly -- they should go and --
18      and enquire about this, and I'm pointing out that in
19      Luxembourg for the clients that invest with BLMIS,
20      the external auditor of those funds, which is
21      Ernst & Young, is -- is doing that, is getting that
22      confirmation from Madoff or Madoff's auditors.
23   Q. But what this is referring to, isn't it, is an
24      independent audit of the assets held at Madoff; correct?
25   A. Correct.

Page 61

1    Q. Ernst & Young had not carried out, had they, an
2       independent audit of the assets held at Madoff?
3    A. I don't know what they had done, but I do know they had
4       followed a procedure to go to the auditor of BLMIS,
5       which they presumably considered to be independent.
6    Q. Well, I think --
7    MR JUSTICE ANDREW JONES: Mr Smith, we do know that at some
8       stage they instructed Friehling & Horowitz, didn't they?
9    MR SMITH: We do.
10      That's my very next question. We know what they'd
11      done, in fact, was essentially to rely on
12      Friehling & Horowitz, don't we?
13   A. I don't know if that was the only thing, but yes, they
14      did rely on that.
15   MR JUSTICE ANDREW JONES: I mean, in principle, that is an
16      independent audit, isn't it?
17   MR SMITH: What we're going to come to, my Lord, is just
18      show the view that was reached within GFS in response to
19      this email chain that that wasn't sufficient and what
20      they needed to do was send in the .bank's own auditors.
21      That's what this is leading up to.
22   MR JUSTICE ANDREW JONES: Right. But that's taking a view
23      about Friehling & Horowitz.
24   MR SMITH: It is, exactly.
25   MR JUSTICE ANDREW JONES: But in principle that's what they

Page 62

1    were doing, an independent audit.
2    MR SMITH: It is, exactly, taking a view about
3       Friehling & Horowitz, and one sees how it develops.
4       I don't want to jump ahead too far, but that's obviously
5       where we get to.
6       So what's being discussed at this stage, I think you
7       agree, is the possibility of some form of independent
8       audit in relation to the Thema assets; correct?
9    A. It is correct, to get some sort of independent audit of
10      segregation, and the question is specifically to ensure
11      that BLMIS is not commingling his own assets with client
12      assets.
13   Q. It's not really a question of commingling, is it? An
14      independent audit necessarily involves some sort of
15      confirmation that the asset exists, doesn't it?
16   A. That's not what it says in -- in this particular series
17      of emails. I think Mr Brady's quite clear he's looking
18      at -- and I think Mr Young also says, he uses
19      the word "commingling".
20   Q. If we look at your response, you certainly understand
21      this as an independent audit in relation to the Thema
22      assets, don't you, Mr Fielding?
23   A. I'm responding in what's in the emails below, which is
24      independent confirmation that the assets are segregated.
25   Q. Well, I suggest any form of independent audit is going

Page 63

1    to involve some form of check that the assets actually
2    exist, doesn't it?
3    A. Not necessarily at this stage, because that's not what
4       Dublin are asking.
5    Q. Are you seriously suggesting that what was being
6       contemplated here was simply instructing someone to go
7       along to BLMIS, look at BLMIS' books, see that
8       the assets were held in two separate ledgers and then
9       report back? Is that seriously what you're saying was
10      in your mind at this stage.
11   A. I don't know whether it would just have been looking at
12      BLMIS' records, or even going further than that, but
13      looking for the -- the segregation through the chain, to
14      the extent it was right to segregate through the chain
15      the asset pools.
16   Q. Exactly. So the auditor would be looking at the chain
17      of title, wouldn't he, to confirm the assets existed,
18      and that there was appropriate segregation at each part
19      of the chain?
20   A. I don't know that they would necessarily go and
21      double-check the assets themselves. They could do that,
22      but actually they may approach it from a control point
23      of view and say -- let's say they went to
24      Friehling & Horowitz or any independent party to
25      say: how is Madoff structured, does he keep things

Page 64

1  separate, what's his procedure?
2  Q. But the whole concept of an audit, Mr Fielding, involves
3      some sort of check, I would suggest, against a third
4      party or independent source of information, doesn't it?
5  A. It's getting an independent party to verify how BLMIS is
6      holding this.
7  Q. But if you instructed a firm of auditors to go into
8      BLMIS to carry out an audit of the assets, that auditor
9      is not merely going to look at BLMIS' ledgers, is he,
10     he's going to carry out some form of check against
11     a third party source of information?
12 A. But this isn't a request for an independent audit of
13     the assets, it's a request -- it's in the three or four
14     emails below, several times, that they are not
15     commingled.
16 Q. I suggest, Mr Fielding, that any request made to an
17     independent auditor to check that assets are not
18     commingled will necessarily involve that auditor
19     checking the existence of the assets against a third
20     party source. Do you agree?
21 A. No, I don't agree.
22 Q. We'll come and see how it's then developed and where you
23     actually end up.
24     Can we go to {N/606/2}, tab 103 of the core bundle,
25     we get an email of 20 September 2002, from Mr Fielding,

1  from you, to Mr Young; do you see that?
2  A. The one I see on the screen is from Mr Young to me.
3  Q. Sorry, you're quite right, I'm looking at the wrong
4      page. It begins with an email from Mr Young to you of
5      19 September.
6  MR JUSTICE ANDREW JONES: Before we go on to that, have we
7      got a number for this email?
8  MR SMITH: We haven't at the moment --
9  MR JUSTICE ANDREW JONES: But we will have in due course --
10 MR SMITH: We will have, and I will let your Lordship know.
11     I don't believe it's gone into --
12 MR JUSTICE ANDREW JONES: Don't worry about that now.
13 MR SMITH: So, on 19 September, Mr Young emails you. He
14     says:
15     "On the basis that you are responsible for GFS due
16     diligence in relation to Madoff as Sub-Custodian ..."
17     And one assumes that reads "Thema assets", do you
18     see that?
19 A. I see that.
20 Q. So, at this stage, he at least is of the view that
21     you're responsible for carrying out this due diligence
22     in relation to Thema assets, isn't he?
23 A. That's his understanding, yes.
24 Q. What he's referring to there in the first paragraph is:
25     "Independent Verification of Asset Segregation:

1  "Would it be possible to get independent
2      verification that the assets of ..."
3      That must be "Thema":
4      "... are segregated from our assets held by Madoff?
5  This [would] ideally [come] from the [something] auditor
6  or be independently requested on [the] behalf of
7  Bank of Bermuda. While we have the Dec 01 report from
8  Friehling & Horowitz, it is not specific on this point."
9      So he was of the view that the Friehling & Horowitz
10     report or certificate, whichever we call it, is not
11     sufficient for their purposes, is it?
12 A. That's what he's saying. He's saying it's not specific
13     on the point, he -- he doesn't actually say he doesn't
14     attach any value to -- to the report.
15 Q. No, my question was he doesn't regard it as sufficient,
16     does he?
17 A. Sufficient for this particular point he's asking,
18     that -- that there is segregation of the assets held --
19     that Madoff segregates the assets.
20 Q. Then you see he refers below that to the audited
21     financial statements, and one of the questions he raises
22     there is (b):
23     "Do we know of the standing of the audit firm,
24     Friehling & Horowitz?"
25     Do you see that?

1  A. I see that.
2  Q. Then over the page {N/606/1}, we get your response of
3      20 September back to Mr Young. In relation to the first
4      pointers you say:
5      "I think I responded to your first point before.
6  I fully agree it makes sense for each fund with Madoff
7  to have audit certification of those assets run by
8  Madoff where they are material in the portfolio."
9      What did you mean by "audit certification of those
10     assets run by Madoff"?
11 A. I could have been referring to segregation, or I could
12     have been, again, thinking about what Ernst & Young did
13     in Luxembourg, going directly to Madoff's -- BLMIS'
14     auditors to get effectively a confirmation of
15     the assets, or certification of the assets. It could
16     have been either.
17 Q. Well, is that right? Because if we just look on, you
18     say:
19     "This is a matter for the relationship office to
20     arrange. I believe a fund auditor worth his salt would
21     be doing this as a matter of course. The relationship
22     manager or delivery account manager should first enquire
23     with the fund auditor ... If it has not already been
24     done by the fund auditors then attempt to agree with
25     the client and auditors that it needs to be done and



Primeo Fund v (1) Bank of Bermuda (Cayman) Limited (2) HSBC Securities Services (Luxembourg) SA

Day 20

December 6, 2016

Opus 2 International - Official Court Reporters

Phone:      +44 (0) 203 008 5900
Email:      transcripts@opus2.com
Website:    www.opus2.com

1 and he's reading out extracts from those documents to
2 the judge. Do you follow --
3 A. Yes, I understand.
4 Q. -- what is going on?
5 A. Yes, I do.
6 Q. Do you see there's an email quoted beginning at line 4
7 dated 23 February 2005.
8     It appears it has been written by someone called
9 Ann Meehan, who I think was part of the Dublin
10 business --
11 MR JUSTICE ANDREW JONES:  And who is it addressed to?
12 I think -- don't we need to go back to the previous
13 page?
14 MR SMITH:  If we go back to the end of page 81, {L/2/81},
15 and at the bottom of the page, line 27, you see --
16 MR JUSTICE ANDREW JONES:  So it's Ann Meehan to
17 Brian Pettitt.
18 MR SMITH:  Exactly.  Ann Meehan, who is described as:
19     "... the new Dublin trustee, writing in this
20 instance to Brian Pettitt, an even more senior person."
21     And then over the page {L/2/82}:
22     "... and he I think is a HSBC person and is again
23 listed as a witness.  So he is a senior person in HSBC
24 in the custody business ..."
25     And then it's dated 23 February 2005.

Page 13

1     She says at line 7:
2     "'I was speaking to Matt Underwood and he tells me
3 that Nigel Fielding - Luxembourg has been in conduct
4 with you in respect of a Due Diligence Review to be
5 undertaken for Bernard L Madoff Investment
6 Securities LLC.  Nigel will be providing you with all
7 the background information on this relationship ...'"
8     Do you see that?
9 A. Yes, I do.
10 Q. Then she goes on, in line 20, to describe
11 the relationship of Thema under the UCITS regulations.
12     Then, at line 27, she begins to describe the due
13 diligence which is on file already at this time, and she
14 says:
15     "'A Due Diligence questionnaire was completed by
16 Madoff in Mar 04, but there is no information on our
17 file regarding the on-site visit, ie if checks were
18 undertaken to confirm if assets are held in segregated
19 accounts, completion of reconciliations etc'."
20     Was it consistent with your own understanding at the
21 time that there was no record of any of these sort of
22 checks having been undertaken?
23 A. Can I just clarify, "at the time", do you mean at the
24 time of the Thema proceedings or do you mean at the time
25 in -- in late 2004?

Page 14

1 Q. We're really looking at the position as at February
2 2005, so early 2005.  But late 2004/early 2005.
3 A. I was aware from correspondence that Nigel Fielding and
4 Chris Wilcockson had visited Madoff and that during
5 the course of that Nigel had completed a --
6 a questionnaire, and -- so, yes, I was aware of that.
7 Q. Were you aware that no checks appeared to have been
8 undertaken to confirm if assets were held in segregated
9 accounts, or whether any reconciliations had been
10 completed?
11 A. My understanding from the completion of
12 the questionnaire is that one of the -- one of the items
13 within that questionnaire was to -- was to establish
14 whether there was a segregated client account.  And
15 again, my recollection was that the answer was there was
16 a segregated account.  Which was a very standard
17 question that we would ask in any due diligence
18 questionnaire, that there was a segregation between
19 client and proprietary assets.
20 Q. But Ann Meehan clearly appears to expect that there
21 would be some check undertaken as well, didn't she?
22 A. Well, I'm not sure what Ann Meehan was thinking, but it
23 was quite standard to ask the question of -- of any
24 party where we were expecting them to have a client
25 asset account segregated from a proprietary account: do

Page 15

1 you have one?  And generally, you would get the number
2 of that account.  I'm talking specifically about the DTC
3 here, because there would be some jurisdictions where
4 the -- an omnibus account would not be the norm.  But
5 certainly in the US it was, and we would -- we would ask
6 for that number so that we had a record of that number
7 in order to -- to check any paperwork when we -- next
8 did our visit.
9 Q. I'm not sure I quite follow that answer, Ms Coe.
10 I think you said -- you referred to the DTC, but I think
11 you also said so far as the US is concerned the normal
12 position was to have an omnibus account at the DTC; is
13 that right?
14 A. That's correct.
15 Q. So, so far as checking segregation is concerned, it
16 doesn't really help to be told the account number of
17 the omnibus account at the DTC, does it?
18 A. Well, yes, it does, I mean, because what we would --
19 what we would do in normal due diligence, we'd -- we
20 would normally get a print to -- to show that there was
21 a number of the DTC terminal with that -- that account
22 on, and then they would show us.  It would all -- we
23 would all -- all of the confidential bit would be
24 excluded, but there would be a proprietary number as
25 well, would be typically what we would expect to get

Page 16



Primeo Fund v (1) Bank of Bermuda (Cayman) Limited (2) HSBC Securities Services (Luxembourg) SA

Day 17

December 1, 2016

Opus 2 International - Official Court Reporters

Phone:      +44 (0) 203 008 5900
Email:       transcripts@opus2.com
Website:    www.opus2.com

1    you would have done if you had been intending to appoint
2    BLMIS as a normal sub-custodian; is that right?
3    A. I'm not sure I can say that, because I wasn't doing that
4        particular work at that time.
5    Q. So you don't know, because you weren't doing
6        sub-custodian due diligence work; is that right?
7    A. Not at that time, but I believed it was appropriate.
8        I -- I took guidance before doing it.
9    Q. So if -- okay, but so far as you're concerned, based on
10        your own understanding and experience, you don't think
11        there's any difference, or any material difference
12        between the type of due diligence exercise you did do
13        and the type of exercise you would have done if you had
14        been intending to appoint BLMIS as a sub-custodian?
15    A. I don't think I can say that.
16    Q. So you think there is a difference; is that right?
17    A. I can't -- I can't clearly say whether there is. I took
18        guidance on what might be appropriate, I got the due
19        diligence questionnaire, I had previous experience, and
20        I -- I felt I was doing a good, proper due diligence.
21        Is it exactly the same as what somebody who was doing
22        that day in, day out on mainly banks would have been
23        doing? I really can't say.
24    Q. Okay.
25        Now, had you previously heard of

Page 25

1    Friehling & Horowitz prior to this meeting?
2    A. I'm not sure that I had prior to this meeting. I do
3        think this -- this subject came up at the Primeo Board
4        meetings, but I -- that might have been a little bit
5        later. The subject of who BLMIS' auditors were.
6    Q. It's right, isn't it, that the view subsequently formed
7        within HSSL was that little reliance could be placed on
8        Friehling & Horowitz?
9    A. There were people who expressed that view. I don't --
10        it's not a well known firm, but my view was that's why
11        I specifically, actually, checked this with
12        Ernst & Young, with Mr Lockwood, who assured me -- he
13        said he'd spoken to somebody in New York, or been in
14        contact with somebody in E&Y New York who said they were
15        known for doing broker-dealer work, and I didn't believe
16        the SEC would have registered him for 40 years if they
17        didn't think he had a qualified auditor.
18    Q. You say that in your witness statement about what
19        Mr Lockwood told you, but do you agree that
20        subsequently, the view was formed within HSSL that
21        little reliance could realistically be placed on
22        Friehling & Horowitz?
23    A. There were people who expressed that view.
24    Q. If we look, please, at {N/11/92}, which is tab 190 of
25        core bundle 3, this is an email in Mr Fiorino to you, of

Page 26

1    I think March 2005 or thereabouts. Do you see that?
2    It's referring to a conversation which Mr Fiorino's had
3    with Ernst & Young, do you see?
4    A. I see that.
5    Q. And one of the things he was saying is:
6        "over the last weeks, [Ernst & Young] raised some
7        concerns about Madoff, as follows ..."
8        Then do you see the third item:
9        "(iii) reliability and independence of
10        Friehling and Horowitz CPA (auditors of BMadoff).
11        Apparently F&H are related to BMadoff. Responses to
12        questions raised by E&Y to BM auditors were not clear."
13        Do you see that?
14    A. I see that.
15    Q. So at this stage Ernst & Young were expressing concern
16        about the reliability and independence of
17        Friehling & Horowitz.
18    A. I think this is coming to me indirectly. It's not E&Y
19        talking to me, this is Mr Fiorino relaying something
20        that he had understood from a meeting he had apparently
21        had, or a conversation he'd had with E&Y. And to put it
22        in context, I believe this is about the point, shortly
23        after Mr Lockwood had unfortunately passed away, E&Y had
24        obviously been auditors I think since the very
25        beginning, in 1994, and were -- you know, I'd never --

Page 27

1    never had those questions raised, or any concerns raised
2    by Mr Lockwood. Some new people were coming onto
3    the file who I think were reviewing the whole thing.
4    Probably they didn't recognise Friehling & Horowitz.
5    I don't know where they got the rumour that
6    Friehling & Horowitz might be related to BLMIS. I'm not
7    sure there's anything that says that. And they were
8    just starting to do some checking on it.
9    Q. Well, we know now, don't we, that Friehling & Horowitz
10        weren't independent of BLMIS, because Mr Friehling was
11        a large investor in BLMIS?
12    A. That's the first I have heard of that.
13    Q. Did it concern you at the time that Ernst & Young were
14        expressing doubts about the reliability of
15        Friehling & Horowitz?
16    A. It didn't particularly concern me for the -- for the
17        reason I'd been assured by Mr Lockwood and from the --
18        from the SEC being -- authorising Madoff -- BLMIS to
19        conduct business.
20    Q. If we go on, please, to {L/2/84}, to {L/2/85}, this is
21        an extract from the transcript of the Thema proceedings.
22        And this is around the same time, so it's March 2005.
23        If you look down at line 18, there's reference to a note
24        on the HSBC files which is in handwriting.
25        Unfortunately, this hasn't been discovered to us in

Page 28



Primeo Fund v (1) Bank of Bermuda (Cayman) Limited (2) HSBC
Securities Services (Luxembourg) SA

Day 2

November 8, 2016

Opus 2 International - Official Court Reporters

Phone:        +44 (0) 203 008 5900
Email:        transcripts@opus2.com
Website:      www.opus2.com

1    with a recommendation that either protects the group or
2    ceases the relationship.'"
3        So that was his view, and what that led to was
4    Ms Coe then producing a discussion paper, which you'll
5    see at tab 207, {N/1285/1}. This is produced by Ms Coe
6    for the purposes of the proposed review and discussion
7    with Mr Gubert.
8        Tab 207 of the core bundle. You see in the first
9    and second paragraphs a certain description of BLMIS,
10    and then in the third paragraph:
11        "HSS has a relationship with a number of funds
12    (appendix 1) that use BLMIS."
13        Well, sadly the appendix hasn't been discovered, but
14    one assumes it would include Primeo:
15        "Essentially assets are placed with BLMIS under
16    a sub-custody agreement. Records of transactions by
17    client are sent by BLMIS to the HSS custodian so that
18    our books and records can be updated. This is NOT
19    a real time process."
20        And she then refers in the next paragraph to some of
21    the FX lines that are in place and refers to the fact
22    that they rely on a right to make a free of payment
23    delivery request to BLMIS to return assets to
24    the charged custody account.
25        "BLMIS enters into a series of options ... Whilst we

1    have carried out due diligence ... we have not been able
2    to undertake (nor do we have the legal right to do
3    so) an audit of the end to end process flow to confirm
4    the integrity of the whole activity.
5        "It is questionable how much we can rely on the
6    auditor produced control statement. Not only is it
7    concise, the auditors are not one of the major
8    independent accountancy groups.
9        "From a legal structure perspective, we can make the
10    arrangements work around the need for a legal charge
11    over assets in a custody, sub-custody arrangement.
12        "The real issue is are we satisfied with the
13    integrity of the Madoff operations such that we are
14    comfortable with a lack of real independent evidence of
15    the trading of clients assets. Further, given our duty
16    as custodian, are we potentially at risk from any
17    regulatory obligations we may have?
18        "There are substantial relationships here, which
19    have operated with Bank of Bermuda for some time. Total
20    income in 2004 was ..."
21        That has been redacted for some reason:
22        "However, there is substantial risk, in the event
23    there is any question over the integrity of the process.
24    The financial cost of appointing a sub-custodian that we
25    cannot exercise a level of due care over, could be

1    significant; equally so would be the reputational risk.
2        "The key to this in my view, is the need for an
3    independent control review. If we had the equivalent of
4    a SAS70 carried out by a major firm, I think we could
5    get comfortable. How feasible this is, will of course
6    be the question."
7        Now, one of the things we say they should have in
8    fact have done is to carry out a SAS 70 review is to
9    send KPMG in to do that, exactly that, which would have
10    been the comprehensive review of the controls and
11    systems, and that's actually when she identifies here as
12    needs to be done. It wasn't in fact what was done.
13        One of the other interesting things about this, just
14    by way of aside, is that none of the individuals in
15    Luxembourg appear to have told either Ms Coe or
16    Mr Gubert, or indeed Mr Pettitt, about the concerns
17    which had been expressed by Ernst & Young. Now, that
18    was a relatively significant episode, in my submission,
19    which appears to have led to Ernst & Young expressing
20    some concerns and about a change in the approach for
21    giving the custody confirmation essentially to allay
22    those concerns and to allow Ernst & Young to continue
23    with its audit and sign off the financial statements.
24    MR JUSTICE ANDREW JONES: Why do you infer the Bank Austria
25        personnel were not aware of those concerns?

1    MR SMITH: Because there's no evidence that there is.
2    MR JUSTICE ANDREW JONES: You didn't get the documents from
3        Bank Austria. You have had limited documents from
4        Ernst & Young.
5    MR SMITH: We have, we got documents from Ernst & Young
6        Cayman.
7    MR JUSTICE ANDREW JONES: But all the action took place in
8        Luxembourg.
9    MR SMITH: My Lord, Mr Justice McMillan dismissed our
10        application in relation to that.
11    MR JUSTICE ANDREW JONES: Well, I understand that.
12    MR SMITH: Well, I'm not sure what your Lordship would like
13        us to do about it. We made the application to
14        Mr Justice McMillan, he dismissed it, he took
15        a different view from your Lordship as to the law in
16        that respect.
17        So far as the Bank Austria documents are concerned,
18        we will see what the Court of Appeal says about it, and
19        we made that application, as your Lordship directed, to
20        your Lordship, and it was Pioneer and Bank Austria who
21        have appealed it, and we will see what the Court of
22        Appeal say about it. But there's no grounds for making
23        that sort of inference at all.
24    MR JUSTICE ANDREW JONES: But it's difficult to draw
25        a positive inference when we simply don't have



Primeo Fund v (1) Bank of Bermuda (Cayman) Limited (2) HSBC
Securities Services (Luxembourg) SA

Day 2

November 8, 2016

Opus 2 International - Official Court Reporters

Phone:      +44 (0) 203 008 5900
Email:      transcripts@opus2.com
Website:    www.opus2.com

1  statements.
2  MR SMITH:  Yes.  It's much more useful to see the documents.
3      What he seems to be saying is: well, the way to deal
4  with this is to have a right to be able to make
5  unannounced spot check visits on BLMIS where you just
6  come in unannounced and spot check the systems, which he
7  seems to understand is this process common in banking in
8  the US where you can arrive to check your security, it
9  appears, and certainly that seems to be his
10  understanding, and what he seems to be proposing
11  is: well, actually what we ought to be doing here is
12  adopting that process and being able to arrive
13  unannounced at BLMIS's offices and do a check.
14      He then concludes:
15      "If this cannot be done, then we should exit
16  the relationship."
17      Now, that was his conclusion therefore.  He said: do
18  this or exit relationship.
19      There was then a telephone conversation that took
20  place on 6 June between Mr Fielding and Ms Coe, which is
21  in the next tab, tab 209, {N/1299/1}.  It's very heavily
22  redacted, but when we get to page 6 {N/1299/6}, it looks
23  like the discussion they're having then turns to
24  the question of BLMIS and Mr Madoff.  And what Ms Coe
25  says is:

Page 193

1      "The biggest single concern is the whole process,
2  once it gets into Madoff's hands, is fairly incestuous
3  within Madoff and their internal control system, which
4  is done by ... it's sort of a page and a half long,
5  isn't it, it's not really SAS 70 or even FAC 21 level.
6  And it's also done by his mate, the accountant, it's not
7  really independent enough to give us a level of
8  independent comfort that we would ordinarily look to.
9      "So the suggestion that I put to John was, look,
10  this earns up 4 million or thereabouts, according to
11  the figures which have been presented to us."
12      Then she goes on, we see in the next paragraph, to
13  refer to:
14      " ... Madoff may not want us crawling all over his
15  operation ... but would he be willing to allow an
16  independent firm to come in, not to divulge any
17  proprietary information to us, but to confirm that there
18  is integrity within the process, a sufficient degree of
19  independence to say this is kosher, for want of a better
20  word?  And we could pay for it, because otherwise we
21  could be looking at losing 4 million dollars of revenue
22  and therefore to pay maybe 100 grand to KPMG or
23  a PwC might be worthwhile."
24      So that's where they get to, and actually the way
25  it's said to take it forward is: let's instruct KPMG to

Page 194

1  do a review.  Now, the upshot is that KPMG were
2  instructed, but they weren't instructed either to carry
3  out an independent audit to confirm the assets managed
4  by BLMIS, which is what the GFS board had identified as
5  being required --
6  MR JUSTICE ANDREW JONES:  Only Madoff could instruct them to
7  do that.
8  MR SMITH:  Well, you would need Madoff's consent, certainly,
9  for that to be done, because you would need access to
10  information and documents to corroborate and confirm.
11  But they didn't even try to do that, and KPMG also
12  weren't instructed to carry out a SAS 70 review, which
13  is the other thing Ms Coe herself identified.
14      What they were instructed to carry out was a "review
15  of fraud risks".  That's what they were told to do.  And
16  that's a big difference.  And --
17  MR JUSTICE ANDREW JONES:  Well, a SAS 70 would have been
18  a much longer process.
19  MR SMITH:  Yes.
20  MR JUSTICE ANDREW JONES:  Which would have taken a lot of
21  time and cost a lot more than that.
22  MR SMITH:  Yes, it would have been a rigorous process.
23      One of the points we'll come to is, in our
24  submission, it is normal for a sub-custodian to be
25  the subject to a SAS 70 review.  That's something one

Page 195

1  ordinarily expects, in our submission, and I'll show
2  your Lordship some materials on that.  But
3  Bank of Bermuda obviously had their own SAS 70 reviews
4  carried out, and one sees the rigour, and it's
5  a substantial operation.  It is a substantial report,
6  but that's the sort of thing that's required.
7      Now, what happened instead, KPMG were instructed to
8  carry out a review of fraud risks, and that, in our
9  submission, is a very big difference, and I'll show
10  your Lordship in a moment the caveats on their report.
11  It's also interesting, we've now got some evidence from
12  Mr Yim, who's one of the partners at KPMG who carried
13  out the report.  He didn't co-operate with us initially,
14  we got an order from the English court that he provide
15  a witness statement.  He has done that and put it in
16  under a hearsay notice.  It's very interesting --
17  MR JUSTICE ANDREW JONES:  I haven't read that yet.
18  MR SMITH:  No, you won't have done.  I mean, your Lordship
19  might want a copy overnight, perhaps, to have a look at,
20  because it's a very interesting statement, because he
21  takes issue directly with a lot of what Ms Coe says in
22  his witness statement about what the KPMG report was
23  intending to do --
24  MR JUSTICE ANDREW JONES:  I have Christine Coe's recent
25  witness statement that comments on what Mr Yim said --

Page 196



Primeo Fund v (1) Bank of Bermuda (Cayman) Limited (2) HSBC Securities Services (Luxembourg) SA

Day 19

December 5, 2016

Opus 2 International - Official Court Reporters

Phone:      +44 (0) 203 008 5900
Email:       transcripts@opus2.com
Website:    www.opus2.com

1  What is then required, as part of due process, is to
2  address the recommendation.
3  Q. Do you remember dealing with internal staff at HSBC to
4     agree a budget for the 2008 KPMG work?
5  A. I would have to get authority. I don't recall it being
6     explicit in the sense of agreeing formally through my
7     process, because I wouldn't have paid for it, it would
8     have to have been paid through the business area. So
9     again, the normal process for this would be that -- once
10    agreed by the Head of HSS is there would be an
11    allocation to the various offices as to how much they
12    were going to contribute, and I would expect there to be
13    a number in their budgets for that.
14 Q. So is the answer to my question yes, or is it no?
15 A. I was involved insofar as I would have started a process
16    off, yes.
17 Q. So you do remember being involved with this, is that
18    right?
19 A. Yes.
20 Q. If we look at a document, core bundle 5, tab 296.
21    {N/2356/1}, you see, at the bottom of the page,
22    Craig Young emails you on 29 January 2008:
23    "Chris,
24    "Could you please confirm that you wish to appoint
25    KPMG to review fraud risk and internal controls at

*Page 213*

1  BLMIS.
2     "If this engagement is required I would be grateful
3  if you could:
4     "Review the scope of the services ...
5     "Confirm the fee payable to KPMG ..."
6     At the top of the page you say:
7     "Craig, I can confirm we wish to undertake this
8  appointment as set out in the attached letter.
9     "I further confirm our acceptance of the non audit
10 fees.
11    "We undertake this review to protect a multi-million
12 USD income stream which requires the appointment of
13 Madoff as a sub-custodian of HSS."
14    So again, you understood, didn't you, that BLMIS was
15 acting as sub-custodian of HSS?
16 A. Again, that's just terminology so that there is a focus
17    of what's going on. It's not meant to be a legal
18    representation of every single contract.
19 Q. But you're a risk person, aren't you, Ms Coe? I mean,
20    you're used to being precise?
21 A. I am a risk person, I'm not a lawyer.
22 Q. You wouldn't have used the term "sub-custodian" if you
23    didn't think that was the position, would you?
24 A. I would use the term "sub-custodian" to ensure that
25    the person on the other side would understand that this

*Page 214*

1  was part of the custody business and therefore there
2  were agreements in place that were -- were part of that,
3  because this is -- this is about allocation as well.
4     He wouldn't know the intricacies or been interested
5  in the intricacies. This gentleman was there to get the
6  finance sign-off, to use KPMG, who were at that time the
7  auditors of HSBC, to undertake a consultancy review, and
8  there were specific processes in place that we had to go
9  through, and he was the facilitator, so basically he
10 just wanted to know what's the justification for it,
11 the underlying justification.
12 Q. The point is it's a language you use, Ms Coe, and you
13    use perfectly naturally, in everyday correspondence,
14    the expression that Madoff is the sub-custodian of HSS,
15    because that's what you believed, wasn't it?
16 A. I used that language because people then can identify
17    a sub-custodian holds assets and we don't, and it
18    doesn't mean that those assets are part of a legal chain
19    or a legal contract, it just means he's got the assets,
20    we haven't, and therefore we have to do things. And --
21    and people can relate to that. It's a benchmark
22    identity. And that's a common phrase which they
23    understand. And that's what I was doing.
24 Q. People within HSBC and within the custody business
25    understand, don't they, what a sub-custodian means and

*Page 215*

1  what that denotes?
2  A. Well, they did, but the same principle applies, it's
3     used as a catch-all.
4  Q. Oh, really? Well let's look at the next one,
5     {N/2570/1}, 309 of core bundle 5.
6     This is from you to Mr Wilcockson in Luxembourg --
7  A. Mm hmm.
8  Q. -- Ms Leahy in Ireland and Mr Epstein, dated
9     12 August 2008?
10 A. Yes.
11 Q. "As you know we have appointed Bernard Madoff as
12    a sub-custodian for specific clients."
13    Do you see that?
14 A. Yes.
15 Q. "As part of our control routines we engage KPMG to
16    undertake a detailed control review on a regular basis.
17    "Whilst prima facie this is satisfactory,
18    the reality is that overall control is Madoff centric
19    and there are opportunities for misleading or
20    misappropriation to take place if he were so inclined.
21    "The fraud risk to us as custodian is huge."
22    Now, what did you think the fraud risk was to HSS as
23    custodian?
24 A. I -- I have to split that into two parts. This is
25    12 August 2008, a month before Lehmans went into

*Page 216*



Primeo Fund v (1) Bank of Bermuda (Cayman) Limited (2) HSBC
Securities Services (Luxembourg) SA

Day 17

December 1, 2016

Opus 2 International - Official Court Reporters

Phone:          +44 (0) 203 008 5900
Email:          transcripts@opus2.com
Website:        www.opus2.com

1    executing broker and has not been granted any investment
2    discretion."
3        And I haven't seen any such agreement, so I was
4    wondering whether actually it's a reference to
5    the side-letter?
6    A. I'm fairly sure this is not a reference to
7    the side-letter about free deliveries. There looks like
8    something may be slightly different about Thema in
9    the way that Thema had appointed BLMIS and it's
10   specifically in the area of how BLMIS was going to make
11   investments, and they're looking for some additional
12   agreement relating to that. I don't think it's anything
13   to do with free delivery.
14   Q. Right, so you think that may be a separate agreement
15   that was entered into in relation to Thema?
16   A. I think he's stating there is an agreement.
17   Q. It then says below that:
18       "Nigel Fielding expressed himself satisfied with
19   the due diligence meeting and questionnaire completed by
20   Madoff last July. In the meantime, we are awaiting
21   a report from Bill Jones on a promised meeting with
22   Madoff, to further confirm that assets of [Thema] are
23   segregated to our satisfaction."
24       Do you see that?
25   A. I see that.

Page 109

1    Q. And there's no reference here to the obtaining of
2    the independent audit confirmation by KPMG, is there?
3    A. No, but I -- I mean, it is -- it is a leap, but I would
4    say there would be a connection.
5    Q. Yes, and if we go -- I just want to show you an email
6    that was passing internally at the time, which is
7    {L/2/75}. Again, it's part of the Thema transcript, and
8    at the very top of this page, counsel in the Thema
9    proceedings is reading out the final part of
10   the document we were just looking at; do you see that?
11   A. I'll take your word for it. I'd need to go back to
12   the document --
13   Q. Well, take my word for it that what he's just been
14   reading out is the document we have just been looking
15   at, which is the Tom Young report on memoranda, and then
16   he says at line 10 that he's going to a new document
17   which is at page 303:
18       "... Tom writes to Gerry and Brian:
19       "'Thanks for coming back so quickly. In view of
20   your comments, I will now send this out and include it
21   for noting at the next CC meeting. I do have a copy of
22   correspondence between Paul Smith et al re
23   preference ... For an independent audit ... (eg by KPMG)
24   of the segregation of the assets. However, I think we
25   can follow this up separately with Bill Jones (if we

Page 110

1    ever hear from him)'."
2        Do you see that?
3    A. I see that.
4    Q. So I suggest what has been allowed to happen is this has
5    been effectively been allowed to rest in the long grass,
6    it has been left in the hands of Bill Jones, it's known
7    that it's not taking place, and everyone's quite happy
8    with that situation, aren't they?
9    A. I don't know that they're happy and I don't remember
10   exactly the date of the document you just showed me.
11   I think it's a few months after the
12   October/November 2002 period.
13   Q. Yes, we're now April 2003 basically.
14   A. Yeah, and there's been some follow-up with Bill, but he
15   hasn't got round to it by that time.
16   Q. I suggest this was just allowed to go into the long
17   grass, wasn't it, and everyone was very happy with that
18   and no one, including yourself, made any steps to follow
19   it up at all, did they?
20   A. As I say, it would be for Paul Smith to follow it up.
21   I do -- I do state -- and I know it's contrary to what
22   my boss said at the time -- that actually I was quite
23   comfortable, but ...
24   Q. But why would it be for Paul Smith to follow up?
25   Because you've told Mr May that it's in hand between

Page 111

1    yourself, David Smith and Bill Jones, haven't you?
2    A. That was in the process of formulating what was going to
3    be done and handing over what I had to Bill Jones, but
4    Bill Jones was clearly responsible for it. I think
5    that's shown in several places.
6    Q. I mean, didn't you think ever to follow up with
7    Bill Jones?
8    A. I think I did speak to Bill Jones at some point about
9    when he was going and at some point he said, "I can
10   probably get round to it when I visit my family in
11   the" -- he's an American -- "in the States".
12   Q. Mr Fielding, wasn't this a very important decision that
13   had been made by the GFS Board to obtain independent
14   audit confirmation by KPMG of the assets? It was quite
15   a key decision, wasn't it, really?
16   A. Absolutely, any decision of the GFS Board is important
17   and the GFS Board, I would expect them to follow up.
18   MR JUSTICE ANDREW JONES: What was Bill Jones expected to
19   do?
20   A. I think he would start with the instruction that comes
21   from Paul Smith as a basis, send in the bank's external
22   auditor to do an independent confirmation. Bill, being
23   the Head of Compliance and Legal, may have added or
24   subtracted or had his own views on how the scope of it
25   should be done, but that -- that would be the starting

Page 112



Primeo Fund v (1) Bank of Bermuda (Cayman) Limited (2) HSBC
Securities Services (Luxembourg) SA

Day 2

November 8, 2016

Opus 2 International - Official Court Reporters

Phone:        +44 (0) 203 008 5900
Email:        transcripts@opus2.com
Website:      www.opus2.com

MR SMITH:  Exactly, and if we bring up the Ernst & Young
summary review memorandum for these accounts, which is
at {N/656/1}, just bring that up on the screen, please.
This is explaining what they did as at 2002, but I don't
think anything changed.  And it if we go through to
{N/656/3}, you see they explain there what their
approach was at this point in time:
    "We obtained audit assurance that the securities
held in the Madoff Investment Corporation broker account
real and correctly valued throughout the period of
the audit and at the year end, we carried out
the following audit procedures:
    "Re-valuation of the securities ..."
    And then you'll see in the second bullet point
there's reference to relying on Friehling & Horowitz:
    "Friehling & Horowitz ... auditors of the Madoff
Investment Corporation carried out audit procedures on
the broker account."
    And there's a description of the procedures, and it
says at the end of that paragraph:
    "A clean audit opinion was issued by
Friehling & Horowitz CPA's."
    So that was the position at that point.
    Now, what happened was the position then changed
dramatically when it came to Ernst & Young's audit of

the 2004 accounts.  I'd like to just show your Lordship
how this developed.  If we can bring up
{N/1146.1/1} -- that seems to be the wrong reference.
What I wanted was the 11 February 2005 custody
confirmation.  If your Lordship would just bear with me
a second.
    Can we try {N/1146.4/1} instead.  Yes, that's what
I wanted.  So this is the custody confirmation that's
provided on 11 February 2005.  This is the first step,
and you'll see it's in a similar form.  It's in
the core bundle at 178.  Your Lordship will see at this
stage, in relation to question 4, which is asking about
"assets in your custody", it says, "Please see
attached".  And there's then an attachment which is at
{N/1146.4/3}, and --
MR JUSTICE ANDREW JONES:  What number was this in the core
    bundle?
MR SMITH:  This is tab 178 of the core bundle.
MR JUSTICE ANDREW JONES:  178?
MR SMITH:  Core 178.  Has your Lordship's bundles been split
    into six bundles now, because if they have, it's in core
    bundle 3, tab 178.
    So you see the response at this stage is effectively
was as it was before: there's a question in relation to
the assets in your custody and the attachment does not

include the BLMIS assets at all.
    So that's the position as at 11 February: they
provide a confirmation which is, in effect, in line with
the confirmations which were provided previously.
    Now, we'll subsequently see how that changes.  If we
go to {N/1146/1}, and perhaps if we go over on to
the next page {N/1146/2}, there's a request -- and
perhaps if we just go on to the next page please, so we
can see how the email chain begins, {N/1146/3}, you'll
see at the top of that page there's an email sent from
Ernst & Young to Mr Birgen and Mr Fiorino which says:
    "In relation to the funds that we audit,
administered by HSBC, which have Bernard L Madoff broker
accounts, we would like to have a meeting with you to
discuss various aspects of the accounts, including the
booking of the account transactions in the HSBC system
and the controls in place over the accounts.
    "We anticipate that the meeting would last [at
least] 1 hour."
    So this is the request that comes from in
Ernst & Young to have this meeting with HSBC to discuss
the accounts.
    Now, if we go to {N/1153/1}, tab 180 of the core
bundle, you'll see there in the middle of the page
Mr Birgen and Mr Fiorino report back to Mr Fielding.

This is now on 21 February 2005, presumably just having
had the meeting with Ernst & Young which had been
requested:
    "Germain and I just had a meeting with
[Ernst & Young], [Michael] Fergusson ..."
    That's Kerry Nichol, who I think is the senior
manager involved:
    "Can I speak to you when you have five minutes.
They have a transparency issue with Madoff."
    Then at the top of the page you'll see Mr Fielding:
    "[Tried] calling, imagine you have left, pls stop by
tomorrow, thanks."
    Now, that's then picked up in the documents in 182
of the core bundle {N/1161/3}, which is an email of
24 February, again to Mr Fielding from Mr Fiorino where
he reports back again to Mr Fielding, and it appears in
the meantime Ernst & Young have had a meeting with
a Mr Nespolo of Genevalor Benbassat.  He says:
    "We met with [Ernst & Young].  Yesterday,
Michael F and Kerry N spent sometimes with Nespolo of
Genevalor.  Outcome.
    "- Nespolo supports they intention to go and meet
with Madoff.
    "- Nespolo does not know if Madoff will accept an
audit review or similar process.

1  "- Nespolo understands the auditors concern and
2  asked if their worries were based on the rumours (1)
3  what is his real strategy, how on earth can he always
4  produce 12% pa (2) where are the assets and are there
5  really assets or is it all fictitious.
6  "- [Ernst & Young] are meeting other Banks in
7  Lux that have funds with Madoff in it to discuss.
8  "- from there the plan is to pay a visit to Madoff."
9  Then over the page on {N/1161/4}:
10  "- if no satisfaction is received, [Ernst & Young]
11  may resign and potentially qualify accounts Michael was
12  not very clear on this point).
13  "- as expected, Nespolo's comments were that HSBC
14  must feel quite comfortable with Madoff, since for the
15  Dublin fund we appointed them sub-custodian, hence the
16  group must have done and will do a regular due diligence
17  on Madoff ..."
18  Now, Mr Birgen adds to that at {N/1161/2}:
19  "Two other elements."
20  He says:
21  "Sonja Kohn does not want to be involved in this
22  although she seemed to know Madoff very well.  For
23  whatever reason, she asked E&Y not to refer to Madoff
24  anymore but to BMS.
25  "The other element of concern to E&Y is less

1  justified, but they do not understand why Madoffs
2  compensation by the funds is so low.  How can he make so
3  much money on transactions only.  Why doesn't he charge
4  a performance fee?  Why does he say that this is not his
5  core business as apparently he has with another bank in
6  [Luxembourg]."
7  So one sees there the issues that have been raised
8  by Ernst & Young.
9  If we bring up, please, {L/2/84}, we will see about
10  halfway down the page, again this is something from
11  the Thema transcript in Ireland.  It begins at line 18:
12  "Then I go forward to page 273.  Now, this is a note
13  on HSBC files and it is in handwriting.  And it has been
14  typed out on the following page, Judge ... but it is
15  important, because it is on the HSBC files.
16  'Ernst & Young have met Sav and Germain' ..."
17  So those are Mr Fiorino and Mr Birgen who we've just
18  seen feature in the emails:
19  "'Ernst & Young expressed concern re transparency of
20  Madoff activity.'"
21  That's counsel.  If we go over the page to page 85:
22  "Especially as Madoff audit firm (F&H) appears to be
23  a two person shop and partners related to Madoff family'
24  ... 'Concern arose due to E&Y risk review.  E&Y propose
25  they should go in and do specific scope review at

1  Madoff.  E&Y contacted Ursula Fano, Roberto Nespolo and
2  Sonja Kohn re this and they broadly agree but Sonja
3  wants it broached with Madoff by a large client
4  eg Genevalor.  E&Y to meet Roberto 23 Feb, then Sav &
5  Germain again on 24 Feb ..."
6  And we've seen that happen because we saw a moment
7  ago the email from Mr Fiorino to Mr Fielding(inaudible)
8  on 24 February referring to the meeting he's had with
9  Ernst & Young, and they are in turn reporting on the
10  meeting they had with Mr Nespolo, and obviously one of
11  the concerns which was being raised at that meeting was
12  whether the assets existed at all or whether it was all
13  fictitious.
14  Now, there's then a further email which is
15  at tab 190 of the core bundle, {N/1192/1}, which is
16  a curious email, because it's sent from Mr Fiorino to
17  Mr Fielding, but your Lordship will see it's addressed
18  to "Paul", and one surmises that this is a draft email
19  to be sent to Mr Paul Smith which Mr Fiorino has
20  approved, or which Mr Fiorino has drafted and which he's
21  sending to Mr Fielding for approval, but as far as we
22  can see it never in fact is sent to Mr Smith.  But it's
23  a very important email, just what Mr Fiorino is saying
24  and not -- obviously what Mr Fielding was appreciating.
25  And it says:

1  "Paul,
2  "In addition to Nigel's point, where Brian Pettitt
3  (working with Chris Coe) is in Luxembourg on Monday to
4  look into the non-network subcustodians due-diligence
5  but also credit implications when Madoff is invested
6  into by a subfund to which we give credit or leverage,
7  below are a few points on Madoff.
8  "Over the last weeks E&Y raised some concerns about
9  Madoff, as follows.
10  "i) Madoff strategy and queries on regular profits
11  even when markets are bad.
12  "ii) segregation of assets and real existence of
13  these assets with Madoff."
14  So they're questioning whether the assets are real:
15  "And the reliability and independence of
16  Friehling & Horowitz CPA (auditors of [B Madoff]).
17  Apparently F&H are related to BMadoff.  [Responses] to
18  questions raised by E&Y to BM auditors were not clear."
19  And then there's reference to having contacted key
20  people of the funds:
21  "E&Y met with Genevalor to share their worries and
22  way forward.  Genevalor explained Madoffs strategy to
23  E&Y."
24  And then this:
25  "E&Y have also been reassured by the fact that we

1  have appointed BMadoff sub custodian for nearly all
2  funds that have an interest in BM."
3      You will see it then continues:
4      "E&Y's objective is to get an appointment with and
5  if possible audit of Madoff - they are more reassured
6  and where initially they stated that they were
7  considering exiting the relationship if no further
8  [comfort] was met. When speaking to them yesterday,
9  they sounded less extreme in their exit plans."
10     And then there's reference to an attachment which
11  I don't think we have.
12     So you see there, my Lord, Ernst & Young have come
13  forward, they've raised some concerns, they've raised
14  serious concerns, including as to whether it's all
15  fictitious and whether the assets actually exist.
16     Now, what then transpires is nothing was actually
17  done about those concerns, but it seems the way it was
18  in fact dealt with was that the custody confirmation,
19  rather than being sought from BLMIS, was to be sought
20  from HSBC going forwards. That was the way the matter
21  was resolved in terms of the issues Ernst & Young were
22  having about relying on Friehling & Horowitz. So
23  the way it was resolved was not actually to tackle
24  the underlying problem at all, but rather to change
25  the identity of the person who was providing the custody

Page 133

1  confirmation, so that E&Y didn't have to be worried
2  about relying on Friehling & Horowitz, because they
3  could instead rely on a confirmation given by HSBC.
4      You see this in the documents if we go, please, to
5  {N/1178/1}, 184 of the core bundle. There's an email at
6  the bottom of the page of 8 March from Ernst & Young to
7  Mr Fiorino and the individual from Ernst & Young says
8  this:
9      "Further to our discussions in relation to
10  the Madoff accounts of several funds, I noted that HSBC
11  (or Bank of Bermuda) has entered into a sub-custodian
12  agreement dated ..."
13     And I don't know why that's been redacted but it
14  has:
15     "... with Bernard Madoff for a number of funds that
16  we audit.
17     "In relation to the funds covered by this agreement,
18  I assume that it will be possible to obtain a custodian
19  confirmation from HSBC for the positions held within
20  the Madoff account at 31 December 2004 - is this
21  correct?"
22     So Ernst & Young have spotted the existence of the
23  Sub-Custody Agreement and they've put the request in to
24  HSBC to say: well, given that, is it possible for us to
25  be able to get a custodian confirmation from you as to

Page 134

1  the assets as at 31 December 2004?
2      You'll see that's then chased up in an email, again
3  from Ernst & Young to Mr Fiorino, a few days later, on
4  14 March:
5      "Sav,
6      "Have you had a chance to consider my mail below?"
7      Now, the provision at that custody confirmation was
8  then discussed internally within HSBC. If we go to 189
9  of the core bundle, {N/1184/5}.
10     So it's the final page of this tab in the core
11  bundle, my Lord. The following day, on 15th March,
12  Mr Fiorino sends an email to Mr Fielding, and you'll see
13  what he says:
14     "Nigel,.
15     "Spoke to Chris and Nigel. I wanted your opinion on
16  this subject. - Production and custody confirmation for
17  Madoff."
18     And then quotes in the next paragraph the email
19  that's been received from Ernst & Young requesting
20  the confirmation which we saw a moment ago:
21     "You should know that historically E&Y went directly
22  to Madoff to get their confirmation. We did not
23  countersign the confirmation.
24     "I don't see any reasons why we would not sign
25  a custody confirmation - other than answering

Page 135

1  'historically we didn't work this way' - which is
2  a stupid answer that will raise concerns and in conflict
3  with the fact that.
4      "- a sub Custody Agreement dated 2004 is is in place
5  in which Madoff agrees to the sub-custodian's
6  responsibilities and segregation of assets ... etc.
7      "- due diligence seems to have taken place in
8  July 2002 and March 2004 (maybe more - I don't know)."
9      That's a reference to the two Mr Fielding visits to
10  BLMIS, which we've seen:
11     "By signing we don't comment on the advisory/trading
12  part of how they achieve profitability."
13     And then over the page, {N/1184/6}:
14     "Do you see an objection to us providing, for
15  the first time, custody confirmation for Madoff for
16  December 2004?"
17     Now, Mr Fielding's response to that is on
18  {N/1184/4}:
19     "I presume Chris and Germain support this approach.
20     "I would add that the sub-custodian agreement has
21  been in place much longer, I think Oct 2004 was simply
22  the last revision ..."
23     I assume that's a mistake and he actually means
24  September 2004:
25     "... when a new sub account was added for a new

Page 136



Primeo Fund v (1) Bank of Bermuda (Cayman) Limited (2) HSBC
Securities Services (Luxembourg) SA

Day 39

February 13, 2017

Opus 2 International - Official Court Reporters

Phone:        +44 (0) 203 008 5900
Email:        transcripts@opus2.com
Website:      www.opus2.com

1    that actually the person who was centrally involved was
2    Mr Fiorino, and probably together with Mr Birgen and
3    Mr Wilcockson.  So that we do suggest is an important
4    and somewhat remarkable feature of the evidence.  We'll
5    come to what its ramifications are.
6        My Lord, the decision not to call Mr May is equally
7    if not more remarkable.  He's someone else who's
8    currently an employee and a director at the second
9    defendant, so there's no reason at all why he couldn't
10   have been called to give evidence.  He was a managing
11   director of the second defendant from 2001 to 2007.  He
12   was a member of the Credit Committee.  Your Lordship
13   will have seen he received many of the relevant credit
14   application memoranda.  He was a member of the GFS Board
15   involved in the decision in October 2002 to obtain
16   the independent audit confirmation to be provided by
17   KPMG, and he was actually the very person whom
18   Mr Fielding told that he had in hand the carrying out of
19   that decision to obtain independent audit confirmation.
20   He was then Ms Coe's deputy in London.  And then,
21   my Lord, not only that, he was the author of the email
22   sent in December 2008, which your Lordship will see at
23   {N/2710/1}, first of all.
24       Your Lordship will be familiar with these emails,
25   which is an exchange that took place between Mr May and

1    Mr Ford once the balloon had gone up in December 2008.
2        "Worse - we suspected but never pinned it down.  Not
3    even hindsight, just not enough courage to walk away
4    from what was not understood ..."
5        And then at the bottom of the page:
6        "Another case where all our suspicions were right."
7        And equally {N/2716/1}, you have the same exchange,
8    this time with Mr Ford's response at the top:
9        "Always too afraid to lose the revenue, but the
10   business should pay more attention to the view of Risk."
11       We specifically pleaded those emails in
12   the statement of claim, we specifically identified
13   Mr May as a relevant individual whose knowledge we rely
14   on.  These, my Lord, are probably the most damaging
15   documents for the defendants in terms of their alleged
16   state of mind.
17       Mr May is a director, an employee of the second
18   defendant, and the idea that if he had any explanation
19   for these documents they wouldn't have called him
20   beggars belief.  So your Lordship is in a situation
21   again, with Mr May, of someone who is directly in
22   the firing line, who easily could have been called to
23   give relevant evidence and provide an explanation to
24   these documents, if there is one, who deliberately
25   hasn't been called.

1    Again, my Lord, this is a situation where we do
2    submit, in line with the authorities, your Lordship is
3    entitled to, and indeed required, to draw inferences
4    both as to Mr May's state of mind and as to the state of
5    mind of his colleagues within the second defendant as to
6    the understanding of Mr May and Mr Fiorino when they
7    signed the 2002 and 2004 Sub-Custody Agreements, that
8    they had both been signatories to those agreements, and
9    also as to the failure of Mr Fiorino to take any steps
10   to resolve Ernst & Young's concerns but instead to issue
11   a custody confirmation to be sent out to Ernst & Young
12   because, as he says, there was a sub-custody agreement
13   in place.  So, my Lord, that is a very important aspect
14   of the evidence, and, my Lord, we're going to come back
15   to that as we look at those particular matters.
16   MR JUSTICE ANDREW JONES:  Well, I've got the point,
17       Mr Smith.
18   MR SMITH:  So, my Lord, that's all I really wanted to say
19       about the evidence.  Let's turn on, then, to the next
20       topic, which is the analysis of the custodian and
21       the Sub-Custody Agreements.
22       My Lord, we deal with this really beginning at
23       paragraph 547, {P/23/180}, and onwards of our written
24       submission, because we submit the starting point is
25       the 1993 Custodian Agreement entered into in

1    December 1993 and, as your Lordship knows, governed by
2    Cayman Islands law.
3        My Lord, if we just turn that up, just to remind
4    ourselves of the relevant provisions, it's in bundle
5    F behind divider 3.  {F/3/1}.  So your Lordship has
6    the document.  It's dated 21 December 1993 between
7    Primeo and the second defendant.
8        My Lord, just looking at the clauses, the critical
9    clause, in our submission, is clause 2 of the agreement,
10   on the second page {F/3/2}, dealing with the appointment
11   of the custodian.  My Lord, there's two critical
12   features, we'd suggest, of that provision.  The first
13   is that it appointed the second defendant to act as
14   custodian of the company, and, in our submission, it was
15   envisaging there would be a single custodian of
16   the company.  That's the first point.
17       The second point, related to that and following on
18   from it, is that Primeo agreed to deliver to that
19   custodian all securities and cash owned by it and all
20   payments of income, payments of principal of capital,
21   distributions received by it with respect to security.
22   MR JUSTICE ANDREW JONES:  It seems to me perfectly clear
23       that Primeo did not in fact do that.
24   MR SMITH:  Well, it delivered all the cash.  It did.  It
25       certainly delivered all the cash, because the cash came

# **<u>EXHIBIT B</u>**

**BROWN RUDNICK LLP**

Seven Times Square
New York, New York 10036
David J. Molton
212-209-4800

*Attorneys for the Foreign Representatives*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 15 Case |
| | ) |
| **FAIRFIELD SENTRY LIMITED, et al.,** | ) Case No. 10-13164 |
| | ) (SMB) |
| **Debtors in Foreign Proceedings.** | ) |
| | ) Jointly Administered |
| | ) |
| **FAIRFIELD SENTRY LIMITED (IN LIQUIDATION) and FAIRFIELD SIGMA LIMITED (IN LIQUIDATION), acting by and through the Foreign Representatives thereof, and KENNETH KRYS and CHARLOTTE CAULFIELD, solely in their capacities as Foreign Representatives and Liquidators thereof,** | ) |
| | ) |
| | ) |
| | ) |
| | ) Adv. Pro. No. 10-03630 |
| | ) (SMB) |
| | ) |
| Plaintiffs, | ) **THIRD AMENDED** |
| | ) **COMPLAINT** |
| -against- | ) |
| | ) |
| **HSBC SECURITIES SERVICES (LUXEMBOURG) SA, BANCO ATLANTICO PANAMA SA, MOMENTUM CLIENT ACCOUNT, ORBIT CLIENT ACCOUNT, ORBIT PERF. STRATEGIES LTD., ORBIT US STRATEGY FUND, PRIVATE SPACE LTD., and BENEFICIAL OWNERS OF ACCOUNTS HELD IN THE NAME OF HSBC SECURITIES SERVICES (LUXEMBOURG) SA 1-1000, including without limitation BENEFICIAL OWNERS OF ACCOUNTS ASSOCIATED WITH REFERENCE IDENTIFIERS PS and BASF,** | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |

Fairfield Sentry Limited ("Sentry") and Fairfield Sigma Limited ("Sigma"), by and

through Kenneth Krys and Charlotte Caulfield (together with their predecessors, the "Foreign

Representatives"), and Kenneth Krys and Charlotte Caulfield (together with Sentry and Sigma, the "Plaintiffs"), solely in their capacities as the Liquidators of Sentry and Sigma and the Foreign Representatives of the liquidation proceedings involving Sentry, Sigma, and Fairfield Lambda Limited ("Lambda," together with Sentry and Sigma, the "Funds" or the "Debtors") pending before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands (the "BVI Court"), for their complaint against Defendants, allege the following based on personal knowledge or information derived from the Funds' books and records or from other sources, including, *inter alia*, court filings and statements of governmental agencies and other parties.

## PRELIMINARY STATEMENT

1.      This action and similar actions are brought by the Plaintiffs, with the approval of the foreign court having jurisdiction over the matter, to recover payments made to shareholders for the redemption of shares in the Funds prior to December 2008.

2.      The Funds were created as a means for private investment in managed accounts with Bernard L. Madoff Investment Securities LLC ("BLMIS"), the brokerage business that Bernard L. Madoff used to perpetrate his massive Ponzi scheme.  Sentry was the largest of all so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency investments (respectively, Euro and Swiss Franc investments) through purchases of shares of Sentry.  Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of assets supposedly held by BLMIS for Sentry.   As stated in their offering materials, the Funds' investment objective was to achieve capital appreciation of assets through investments in BLMIS (directly, in the case of Sentry; and indirectly, through Sentry, in the cases of Sigma and Lambda).

3.      It is now known that these types of feeder funds were essential to the perpetration of Madoff's Ponzi scheme.  In order for the Ponzi scheme to operate, Madoff required a continuous flow of new investors and investments to be able to satisfy redemption requests from early investors.  Feeder funds, such as Sentry (which was a direct feeder fund into BLMIS), and Sigma and Lambda (which were indirect feeder funds, through Sentry, into BLMIS), brought new investors into this scheme, allowing Madoff to make payments to early investors and thereby creating and perpetuating the illusion that BLMIS was engaged in a successful investment strategy and actively trading securities.

4.      From the Funds' inception until the disclosure of Madoff's fraud in December 2008, during most relevant times, substantially all cash, net of fees and expenses, raised by the Funds through the sale of their shares was transferred (either directly in the case of Sentry or indirectly, through Sentry, in the cases of Sigma and Lambda) to BLMIS for investment in accounts managed by Madoff.  Prior to December 2008, the voting participating shares of Sentry ($.01 par value per share), Sigma (€.01 par value per share), and Lambda (CHF.01 par value per share) (the "Shares"), were redeemable for a price equal to the applicable Fund's "Net Asset Value."  Net Asset Value was to be determined, in accordance with applicable accounting standards, as the value of the respective assets of Sentry, Sigma, and Lambda divided by the number of shares outstanding in each Fund, net of certain expenses ("Net Asset Value").

5.      From time to time, in order to make payments to investors for the redemption of Shares ("Redemption Payments"), Sentry generally made withdrawals from its BLMIS accounts.  On occasion, Sentry made Redemption Payments directly from amounts on hand invested by other subscribers in the Funds.  At all relevant times, the Funds believed payments

that Sentry received from BLMIS represented the proceeds of sales of securities and/or investments held by BLMIS for Sentry.  The amount, per share, paid by the Funds to shareholders for each Share redeemed was to be equal to the per share Net Asset Value, which was calculated based principally on the assets that the Funds believed were being held, and investments that were being made, by BLMIS for Sentry's account.

6.    As the world now knows, Madoff was operating a massive Ponzi scheme through BLMIS.  Thus, at all relevant times, the money that Sentry transferred to BLMIS was not invested, but, rather, was used by Madoff to pay other BLMIS investors or was otherwise misappropriated by Madoff for unauthorized uses.  Further, none of the securities shown on statements provided to Sentry by BLMIS were in fact purchased for Sentry.  Additionally, none of the amounts withdrawn by Sentry from its accounts with BLMIS were proceeds of sales of securities or other investments.  Instead, such amounts represented the monies of more recent investors into the Madoff scheme.

7.    In light of the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, at all relevant times the assets purportedly held at BLMIS for Sentry were non-existent, and the Funds were insolvent at the time Redemption Payments were made or they were rendered insolvent by those payments.  As a result, at all relevant times, the Net Asset Value of the Shares redeemed was miscalculated, and Redemption Payments were mistakenly made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at any relevant time.

8.    At all relevant times, all payments made from BLMIS to Sentry and other feeder funds and investors were made by Madoff to perpetuate his Ponzi scheme and avoid detection of his fraud.  Similarly, the Redemption Payments that the Funds made to redeeming

shareholders were not made in the ordinary course of any business or for any legitimate purposes. Those Redemption Payments did not conform to or follow the terms of the Funds' Subscription Agreements, Articles of Association and/or other offering documents, they were based upon Net Asset Values that were not calculated based upon the true facts existing at any relevant time, and because, more generally, the Redemption Payments represented the proceeds arising from investment in BLMIS (or a substitute therefor, in the form of subscription monies from other investors in the Funds, used as a shortcut to investing subscription monies with BLMIS and simultaneously withdrawing monies from BLMIS), which the world now knows was operated by Madoff as a Ponzi scheme. These payments were crucial in perpetuating the Ponzi scheme and maintaining the illusion that Madoff was making actual investments and employing a successful investment strategy.

9.     During the period from and after April 8, 2004 through November 16, 2008, following the receipt by Sentry and Sigma of notices of redemption, Sentry and Sigma made Redemption Payments to Defendant HSBC Securities Services (Luxembourg) SA ("HSBC SSL") aggregating USD $84,497,835.97.

10.     At the time such payments were made, Sentry and Sigma mistakenly believed that such payments were in the amount of the Net Asset Value of the Shares tendered at the time of redemption. In fact, however, as stated, the Redemption Payments made to HSBC SSL far exceeded the Net Asset Value of Shares redeemed that would have been calculated based on the true facts existing at that time or any relevant time. Moreover, these Redemption Payments did not, as Sentry and Sigma intended, represent the proceeds arising from the profitability of or to continue investment in BLMIS. Instead, any amounts obtained directly or indirectly by Sentry and Sigma from BLMIS to make Redemption Payments to HSBC SSL

4

REDACTED WITH REDACT-IT

generally were proceeds of Madoff's Ponzi scheme, obtained from other BLMIS investors or other Sentry investors invested in BLMIS.

11.     Accordingly, the Funds' actual assets are, and at relevant times were, far less than the amount needed to satisfy their liabilities and the claims that have been or may be asserted against them, and, at all relevant times, the Funds were unable to pay their debts as they fell or would fall due.   Indeed, at the time the Redemptions Payments were made, the Funds had insufficient assets from which to pay debts as they fell or would fall due.

12.     In particular, claims had been previously asserted against the Funds in actions commenced by Irving H. Picard, the Trustee appointed by the United States District Court for the Southern District of New York for the liquidation of BLMIS (the "BLMIS Trustee"), in an adversary proceeding pending before the United States Bankruptcy Court of the Southern District of New York, Picard v. Fairfield Sentry Limited, et al., No. 08-01789 (SMB) (the "BLMIS Adversary Proceeding").   As set forth in the complaint filed in the BLMIS Adversary Proceedings, the BLMIS Trustee sought to recover from the Funds, on preference and fraudulent transfer grounds, approximately $3.2 billion.   This amount was alleged to have been transferred to the Funds from BLMIS, directly (in the case of Sentry), or indirectly (in the cases of Sigma and Lambda), during the six years preceding the December 2008 disclosure of the Madoff fraud.   The BLMIS Trustee alleged that the monies transferred from BLMIS to the Funds were the misappropriated assets of other BLMIS investors.   At all relevant times, monies that the Funds received from BLMIS, net of fees and expenses, were transferred to shareholders as Redemption Payments.

13.     On July 13, 2011, pursuant to an agreement between the Foreign Representatives and the BLMIS Trustee dated May 9, 2011, the United States Bankruptcy

Court for the Southern District of New York entered judgments against each of the Funds on the claims against the Funds asserted in the BLMIS Adversary Proceeding (the "Judgments") in the amount of $3,054,000,000 with respect to Sentry, $752,300,000 with respect to Sigma, and $52,900,000 with respect to Lambda.  The Redemption Payments rendered the Funds unable to satisfy their liabilities to the BLMIS customers, the BLMIS Trustee, including on account of the Judgments, and other creditors of the Funds, and further increased the amount of those liabilities.  In this way, the Redemption Payments caused the Funds to become insolvent and/or deepened their existing insolvency, in that, among other things, at all relevant times the Funds were unable to pay their debts as they fell or would fall due.

14.    Upon information and belief, HSBC SSL has either retained the Redemption Payments made to it by Sentry and Sigma for its own account and benefit or, alternatively, paid all or some portion of such payments to or for the account of persons or entities, including but not limited to Banco Atlantico Panama SA, Momentum Client Account, Orbit Client Account, Orbit Perf. Strategies Ltd., Orbit US Strategy Fund, and Private Space, for whom HSBC SSL may have subscribed for shares of the Funds in the capacity of trustee, agent, representative, nominee or custodian (individually, a "Beneficial Shareholder" and collectively, "Beneficial Shareholders," together with HSBC SSL, the "Defendants").  Based on Sentry and Sigma's records, some or all of the Redemption Payments may have been paid to an account holder or holders associated with reference identifiers PS and BASF.

15.    Following the revelation of Madoff's fraud in December 2008, the Funds' boards of directors suspended any further redemptions of the Funds' shares and the calculation of each of the Funds' Net Asset Value.  As of December 2008 and presently, Sentry, Sigma,

and Lambda have, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

16.     Unless Redemption Payments paid to shareholders are recovered for the Funds' estates, the Funds will be unable to satisfy their liabilities and claims that have been made or may be made against them; further, recoveries of Redemption Payments will increase distributions to the Funds' investors who have been harmed.  Moreover, to the extent such liabilities and claims must be satisfied solely from the Funds' current assets, Defendants will have been unjustly enriched as they will not bear their proportionate share of such liabilities and claims, but rather will retain a windfall at the expense of other shareholders and creditors of the Funds.

## JURISDICTION AND VENUE

17.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 157(b) and 1334(b), as this adversary proceeding and the claims asserted by the Foreign Representatives herein arise under, arise in and/or relate to the Chapter 15 proceedings of the above-captioned Debtors, In re Fairfield Sentry Limited, et al., No. 10-13164 (SMB), pending in this Court. Additionally, pursuant to section 78eee(b)(2)(A)(iii) of the Securities Investor Protection Act ("SIPA"), which incorporates 28 U.S.C. § 1334(b) and applicable provisions of Title 11 of the United States Code, jurisdiction is also proper in this Court because this action also relates to the consolidated liquidation proceedings of BLMIS and Bernard L. Madoff, pending in this Court under the caption Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC, SIPA Liquidation No. 08-1789 (SMB).  Pursuant to the Amended Standing Order of Reference of the United States District Court for the Southern District of New York, dated January 31, 2012, all proceedings arising in, arising under and/or related to cases under

Title 11 of the United States Code (as amended, the "Bankruptcy Code") are referred to this Court for adjudication.

18.    This is a core proceeding under 28 U.S.C. § 157(b)(2).[1]    Should the Court determine that this is a non-core proceeding, Plaintiffs consent to entry of final judgment and order by this Court.

19.    This Court has jurisdiction over HSBC SSL and any Beneficial Shareholders pursuant to Rules 7004(d) and (f) of the Federal Rules of Bankruptcy Procedure and New York Civil Practice Law & Rules § 302 (McKinney 2008) because HSBC SSL and the Beneficial Shareholders purposely availed themselves of the laws of the United States and the State of New York by, among other things, investing money with the Funds, knowing and intending that the Funds would invest substantially all of that money in New York-based BLMIS, and, upon information and belief, maintaining bank accounts in the United States, and in fact receiving Redemption Payments in those United States-based accounts.    HSBC SSL and the Beneficial Shareholders selected U.S. dollars as the currency in which to invest and execute their transactions in Sentry, upon information and belief, designated United States-based bank accounts to receive their Redemption Payments from the Funds and actively directed Redemption Payments at issue in this action into those bank accounts.    HSBC SSL and the Beneficial Shareholders thus knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York, derived significant

---

[1]    Although the District Court, in In re Fairfield Sentry Ltd., No. 1:11-mc-00224-LAP, 458 B.R. 665 (S.D.N.Y. 2011), held that causes of action alleged by the Plaintiffs in other cases before this Court—causes of action that are similar or the same as those alleged in this complaint—are not core proceedings, this determination may be subject to appeal.    In any event, plaintiffs submit that the causes of action in this complaint, which include, *inter alia*, allegations regarding transfers of property that were directed into the territorial jurisdiction of the United States, render the claims asserted in this complaint core in accordance with the District Court's decision.

revenue from New York, and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein. HSBC SSL and the Beneficial Shareholders should therefore reasonably expect to be subject to United States jurisdiction.

20.    Moreover, this Court has jurisdiction over HSBC SSL and any Beneficial Shareholders by virtue of the legally binding and valid agreements and representations set forth in one or more agreements for the subscription of Shares that HSBC SSL entered into with Sentry and Sigma.

21.    HSBC SSL, upon information and belief, entered into a Subscription Agreement with Sentry on or about February 24, 2005 (the "Initial Subscription Agreement") pursuant to which HSBC SSL subscribed for Shares. Subsequent to entering into the Initial Subscription Agreement, HSBC SSL, upon information and belief, entered into additional agreements (the "Subsequent Subscription Agreements") with Sentry and Sigma on or about February 28, 2005, March 29, 2005, June 24, 2005, June 28, 2005, September 30, 2005, December 31, 2005, March 27, 2006, May 26, 2006, May 31, 2006, June 30, 2006, September 27, 2006, September 28, 2006, September 30, 2006, December 21, 2006, December 27, 2006, March 31, 2007, June 30, 2007, August 29, 2007, December 21, 2007, and January 28, 2008, pursuant to which it subscribed for additional Shares on the same terms and conditions as those Shares subscribed for pursuant to the Initial Subscription Agreement. The Initial Subscription Agreement and Subsequent Subscription Agreements are collectively referred to herein as the "Subscription Agreements."

22.    The Subscription Agreements provide for, *inter alia*, the irrevocable submission by HSBC SSL to the jurisdiction of the New York courts with respect to any proceeding with

respect to said agreement and Sentry and Sigma and HSBC SSL's consent to service of process by the mailing of such process, as provided therein. In particular, the Subscription Agreements provide as follows:

> New York Courts. Subscriber agrees that any suit, action or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York. Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum. Subscriber consents to the service of process out of any New York court in any such Proceeding by the mailing of copies thereof, by certified or registered mail, return receipt requested, addressed to Subscriber at the address of Subscriber then appearing on the Fund's records. Nothing herein shall affect the Fund's right to commence any Proceeding or otherwise to proceed against Subscriber in any other jurisdiction or to serve process upon Subscriber in any manner permitted by any applicable law in any relevant jurisdiction.

23.    Furthermore, by executing the Subscription Agreements, HSBC SSL agreed to all terms and conditions contained therein, including the express provision that any agreement made by HSBC SSL in the Subscription Agreements would also apply to any other person for whom HSBC SSL was subscribing as trustee, agent, representative, or nominee – i.e., all Beneficial Shareholders. Moreover, by executing the Subscription Agreements, HSBC SSL represented that it had all requisite authority from Beneficial Shareholders to execute and perform any and all obligations on their behalf, and also agreed to indemnify Sentry and Sigma for any damages resulting from an assertion by a Beneficial Shareholder that HSBC SSL lacked proper authorization to enter into the Subscription Agreements or perform the obligations thereof. Specifically, the Subscription Agreements provide as follows:

> If Subscriber is acting as a Representative. If Subscriber is subscribing as trustee, agent, representative, or nominee for another person (the "Beneficial Shareholder"), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder. Subscriber has all requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder. Subscriber also agrees to indemnify the

Fund . . . for any and all costs, fees and expenses (including legal fees and disbursements, fines and amounts paid in settlement) in connection with any damages resulting from Subscriber's misrepresentation or misstatement contained here, or the assertion of Subscriber's lack of proper authorization from the Beneficial Shareholder to enter into this Agreement or perform the obligations hereof.

24.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## PARTIES

**Plaintiffs**

25.     Sentry, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sentry's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI.   Sentry is currently in liquidation in proceedings commenced on April 21, 2009 in the BVI Court.

26.     Sigma, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sigma's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI.   Sigma is currently in liquidation in proceedings commenced on April 23, 2009, in the BVI Court.

27.     The Foreign Representatives were appointed by the BVI Court as Liquidators of the Funds to supervise the liquidation of the Funds' estates and, where necessary, commence proceedings in the name of and on behalf of the Funds or in their own official names.   On April 23, 2009, the BVI Court issued an order appointing Christopher Stride as liquidator of

Lambda (the "Lambda Appointment Order").  On July 21, 2009, the BVI Court issued an order appointing Kenneth Krys and Mr. Stride as joint liquidators of Sentry and Sigma (the "Sentry & Sigma Appointment Order").  On September 6, 2010, the BVI Court issued notices acknowledging Mr. Stride's resignation and the appointment of Joanna Lau as joint liquidator with Mr. Krys of all three Funds (the "Supplemental Appointment Order").  On November 23, 2011, Ms. Lau resigned as joint liquidator of the Funds.  On June 24, 2014, the BVI Court issued an order appointing Charlotte Caulfield as joint liquidator, with Mr. Krys, of all three Funds (the "Second Supplemental Appointment Order" and, together with the Lambda Appointment Order, the Sentry & Sigma Appointment Order, and the Supplemental Appointment Order, the "BVI Appointment Orders"). The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of the Funds, have been authorized by the foreign court having jurisdiction over the matter to bring this action and the claims herein, including the avoidance claims herein under the BVI Insolvency Act of 2003 (the "BVI Insolvency Act").

28.    Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' businesses, including, among other things, custody and control of the Funds' assets, the power to do all acts and execute, in the name and on behalf of the Funds, any deeds, receipts or other documents, and the power to compromise claims, commence litigation and to dispose of property.  After obtaining BVI Court approval, the Foreign Representatives filed petitions in this Court in June of 2010, under Chapter 15 of Title 11 of the United States Code, seeking recognition of the BVI Liquidation Proceedings as "foreign main proceedings" under Chapter 15.  On July 22, 2010, this Court issued an order (the "Recognition Order") granting that recognition.

12

29.    Pursuant to the Recognition Order, the Foreign Representatives were automatically afforded relief available under 11 U.S.C. § 1520, including application of the Bankruptcy Code's automatic stay to the Funds and their property located in the United States, as well as the ability to operate the Funds' business and exercise the rights and powers of a trustee under Sections 363 and 552 of the Bankruptcy Code.  Moreover, the Bankruptcy Court specifically granted additional relief in the Recognition Order to the Foreign Representatives pursuant to 11 U.S.C. § 1521(a).  Such relief includes, but is not limited to: (i) staying any actions, proceedings or execution against the Funds' assets to the extent not stayed under Section 1520; (ii) authorizing the Foreign Representatives to seek leave to conduct discovery concerning the Funds' assets, affairs, rights, obligations or liabilities; (iii) entrusting the Foreign Representatives with the administration and realization of the Funds' assets that are located within the United States, including all claims and causes of action belonging to the Funds; and (iv) otherwise giving full force and effect to the proceedings before the BVI Court.

**Defendants**

30.    HSBC SSL was, at all relevant times, a member of Sentry and Sigma and a registered holder of Shares.   Upon information and belief, HSBC SSL is a corporate entity organized under the laws of Luxembourg and having its registered address at 40 Avenue Monteray, L 2163 Luxembourg.  HSBC SSL subscribed for the purchase of Shares by entering into one or more Subscription Agreements with Sentry and Sigma.  All purchases of Shares by HSBC SSL were subject to the terms of the Subscription Agreements.

31.    Defendants "Beneficial Owners of the Accounts Held in the Name of HSBC Securities Services (Luxembourg) SA 1-1000" - i.e., the Beneficial Shareholders, are, as noted, any persons or entities having a beneficial ownership or interests in Shares of Sentry and/or

Sigma issued to HSBC SSL and on whose behalf HSBC SSL was acting as trustee, agent, representative, or nominee.   Based on Sentry and Sigma records, some or all of the Redemption Payments made to HSBC SSL may have been paid to an account holder or holders associated with PS and BASF.

32.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to HSBC SSL may have been paid to an account holder or holders associated with Banco Atlantico Panama SA.  Upon information and belief, Banco Atlantico Panama SA is a corporate entity organized under the laws of Panama and has its registered address at Calle 50 Y Calle 53, Edif. Banco De Atlantico-Apdo., Postal 6553, Zona 5, Panama.

33.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to HSBC SSL may have been paid to an account holder or holders associated with Momentum Client Account.

34.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to HSBC SSL may have been paid to an account holder or holders associated with Orbit Client Account.

35.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to HSBC SSL may have been paid to an account holder or holders associated with Orbit Perf. Strategies Ltd.

36.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to HSBC SSL may have been paid to an account holder or holders associated with Orbit US Strategy Fund.

37.    Based on Sentry and Sigma records, some or all of the Redemption Payments made to the Citco Subscribers may have been paid to an account holder or holders associated

with Private Space Ltd.  Upon information and belief, Private Space Ltd. is a corporate entity organized under the laws of Monaco and has as its registered address 7 Rue du Gabian, MC 98000, Monaco.

## NOTICE PURSUANT TO FED. R. CIV. P. 44.1

38.     Certain of the substantive issues to be resolved in this case will be governed by the laws of the British Virgin Islands.  Plaintiffs intend to rely upon the applicable laws of that territory.

## FACTUAL ALLEGATIONS

### A.     Role of Feeder Funds In Madoff Fraud

39.     Sentry was the largest of all the so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency (respectively, Euro and Swiss franc) investment through purchase of shares of Sentry. Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of invested assets supposedly held by BLMIS.  As stated in its offering materials, Sentry's investment objective was to achieve capital appreciation through investments in BLMIS.

40.     As discussed above, Sentry, Sigma and Lambda were established for the purpose of making investments in BLMIS.  It is now known that these types of feeder funds were a crucial part of Madoff's Ponzi scheme.  The feeder funds brought new investors and new investments into the scheme, allowing Madoff to make payments to early investors who sought to liquidate their investments, and in this way, the feeder funds were used by Madoff to continue and perpetuate his fraud by maintaining the illusion that BLMIS was making active investments and engaging in a successful investment strategy.

## B.    Calculation of Net Asset Value and Shareholder Redemption Payments

41.    Substantially all of the money (up to 95%) raised by the Funds from the sale of their Shares, net of fees and expenses, was turned over to and invested in BLMIS (by and/or through Sentry), and supposedly credited to accounts held in the name of Sentry with BLMIS, purportedly for use in the now infamous "split-strike conversion" investment strategy.    In accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other relevant documents, from time to time, the Funds paid to shareholders, for each Share tendered for redemption, an amount that was based on each of the respective Funds' purported Net Asset Value, as it was then calculated.

42.    In calculating each of the Funds' Net Asset Value, the Funds' administrators used and relied on account statements provided by BLMIS purportedly showing securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry.    Generally, all securities identified on BLMIS account statements were traded on public exchanges and had readily ascertainable market values, and those market values (in addition to, among other items, cash on hand that was identified in the Sentry account statement for the relevant time period) were used in accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other documents to calculate the Net Asset Value of the Shares.

43.    In fact, at all relevant times, no securities were ever purchased or sold by BLMIS for Sentry and any stated cash on hand in the BLMIS accounts was based on misinformation and fictitious account statements.    None of the transactions shown on the account statements provided by BLMIS to Sentry ever occurred.    Indeed, no investments of any kind were ever made by BLMIS for Sentry.    At all relevant times, all of the account

statements that BLMIS provided to Sentry were entirely and utterly fictitious. Further, all amounts deposited by Sentry (or by Sigma and Lambda through Sentry) with BLMIS for investment and the purchase of securities to be held by BLMIS for the account of Sentry were used by Madoff to pay other BLMIS investors or were misappropriated by Madoff for other unauthorized uses.

44.    From time to time, to make Redemption Payments, Sentry (and Sigma and Lambda through Sentry) made withdrawals from Sentry's BLMIS accounts (or utilized subscription monies of other investors on hand that were directed for investment in BLMIS). The Funds believed that the amounts provided in connection with such withdrawals represented the proceeds arising from the profitability of or to continue investment in BLMIS. In fact, however, payments made by BLMIS to Sentry purportedly representing the proceeds of sales of securities or other investment positions were nothing other than the deposits of other BLMIS investors or previous deposits made by Sentry, never invested but rather misused and misappropriated as part of Madoff's fraud. At all relevant times, payments made from BLMIS to Sentry were made by Madoff to continue and perpetuate his Ponzi scheme and avoid detection of his fraud. The payments from BLMIS to Sentry were not payments made in the ordinary course of or as part of any business, nor did they have a legitimate business purpose. Similarly, the Redemption Payments were not made for any legitimate purposes or in the ordinary course of any business.

45.    Given the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, the money paid by the Funds (directly in the case of Sentry and indirectly in the cases of Sigma and Lambda) to BLMIS on account of Sentry was, at all relevant times and unknown to the Funds, misused and misappropriated by Madoff as part of his Ponzi scheme. At all

relevant times, the Funds were insolvent when the Redemption Payments were made or were rendered insolvent, and/or their insolvency was deepened, as a result of the Redemption Payments.

**C.    Redemption Payments Made or Transferred to Defendants**

46.    During the period from and after April 8, 2004 through November 16, 2008, HSBC SSL received Redemption Payments totaling USD $84,497,835.97 from Sentry and Sigma in respect of Shares tendered for redemption.

47.    At HSBC SSL's directions and instructions, some or all of the Redemption Payments were received at, upon information and belief, designated United States-based bank accounts.

48.    The dates and amounts of each Redemption Payment received by HSBC SSL from Sentry, and the HSBC SSL bank accounts to which each Redemption Payment was made, are set forth on Exhibit A.  The dates and amounts of each Redemption Payment received by HSBC SSL from Sigma, and the HSBC SSL bank accounts to which each Redemption Payment was made, are set forth on Exhibit B.

49.    At the time those Redemption Payments were made, the Funds had insufficient assets and were unable to pay their debts as they would fall due.  In exchange for each Redemption Payment, each of which constitutes or forms part of a transaction between HSBC SSL and Sentry and Sigma, Sentry and Sigma received no consideration or consideration of a value that, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry and Sigma.

50.    Upon information and belief, HSBC SSL and/or the Beneficial Shareholders received Redemption Payments in excess of amounts paid by such person(s) for purchase of their Shares.

**D.    Citco Did Not Issue Any Certifications of Net Asset Value in "Good Faith"**

51.    Article 11 of the Funds' Articles provides that "[a]ny certificate as to the Net Asset Value per Share . . . given in good faith by or on behalf of the Directors shall be binding on all parties."  During the relevant period, statements of the Net Asset Value were issued by the Funds' administrators, Citco Fund Services (Europe) B.V. and its delegatee Citco (Canada) Inc. (the "Administrators").  On April 16, 2014, the Judicial Committee of the Privy Council (the "Privy Council") issued a decision in which it held that certain statements of Net Asset Value, in particular, certain monthly emails, contract notes, and monthly account statements issued by the Administrators, constituted "certificates" for the purposes of Article 11 (the "Certificates").   The Privy Council did not, however, address whether such Certificates were given "in good faith."  In carrying out this responsibility, the Administrators and affiliated Citco companies within Citco Group Limited (collectively, "Citco") acted with a lack of good faith in giving the Certificates.



REDACTED

REDACTED WITH REDACT-IT



REDACTED WITH REDACT-IT



*REDACTED*











REDACTED WITH REDACT-IT



REDACTED



*REDACTED*

REDACTED WITH REDACT-IT



80.      By virtue of the foregoing conduct, Citco issued the Certificates without good faith.  The Funds were the primary victims of Citco's conduct and its lack of good faith in issuing the Certificates.

**E.**    **HSBC SSL Knew or Should Have Known of, Was Willfully Blind to or Recklessly Disregarded the BLMIS Fraud[2]**

81.      Upon information and belief, all HSBC entities, including HSBC SSL, HSBC Bank USA, N.A., and HSBC Private Bank (Suisse) (collectively, the "HSBC Knowledge Defendants") worked collaboratively and freely shared information in connection with BLMIS-related matters.  Moreover, upon information and belief, the free flow of information and co-ordination of action between various HSBC entities extended to the HSBC Knowledge Defendants.

82.      81.  In their due diligence reviews, HSBC SSL and its affiliates repeatedly pointed to BLMIS's BLMIS's role as a sub-custodian as a fraud risk.  For example, HSBC SSL

_____

[2]  The allegations set forth in Paragraphs 82 83 through 89 of this Complaint are made by the Foreign Representative upon information and belief based on allegations set forth in the complaint filed by the Madoff Trustee in Picard v. HSBC Bank PLC, 09-01364 (Bankr. S.D.N.Y.).  Upon information and belief, the allegations of the BLMIS Trustee are based on an extensive investigation and the analysis of documentary evidence as well as other sources.

In August of 2008, Christine Coe, Global Head of Risk, HSBC (London), stated in an email to Chris Wilcockson ("Wilcockson"), Managing Director of Bank of Bermuda (Luxembourg) n/k/a HSBS Bank Bermuda and HSBC SSL, that she was concerned that Madoff was potentially using the fund's assets because "overall control [was] Madoff centric and there [were] opportunities for misleading or misappropriation to take place if he were so inclined," creating a "huge" fraud risk.  HSBC SSL specifically identified as a risk the lack of "independent custody and verification of trading activity away from the investment manager (unlike a standard hedge fund that has a prime broker)."  HSBC SSL identified this risk every year from at least 2003 2002 through 2008.  At the end of September 2002, Paul Smith ("P. Smith") (head of Global Fund Services ("GFS") n/k/a HSBC Securities Services ("HSS")) expressed these concerns in an email sent to Nigel Fielding ("Fielding"), who served as (a) General Manager of Corporate Trust for Bank of Bermuda n/k/a HSBC Bank Bermuda until 2001, (b) Deputy Global Head of Client Services for Bank of Bermuda until December 2003, (c) Global Head of Business Services of GFS from January 2004, and (d) a Director of HSBC SSL until November of 2015.  In that email, P. Smith stated:  "[W]e have a problem with him [Madoff].  He is the manager, broker and custodian to his accounts.  In today's world this is a *red flag.*"

### HSBC SSL Affiliates Engaged KPMG to Assess

**F.**      **Fraud and Operational Risk at BLMIS and then HSBC SSL Ignores its Findings**

83.   82. In September 2005, HSBC SSL affiliates engaged KPMG to review BLMIS for fraud and related operational risk. KPMG's KPMG's review focused on fraud risks in BLMIS's methods of recording and reporting client funds held by BLMIS, HSBC SSL's and its affiliates' ability to detect suspected fraud or misconduct in client funds for

which HSBC SSL and its affiliates served as primary custodian. ~~KPMG's~~KPMG's findings were encapsulated in a February 16, 2006 report, titled ""Review of fraud risk and related operational risks at Bernard L. Madoff Investment Securities LLC"" (the ""2006 Report""). In the 2006 Report, KPMG identified a laundry list of fraud and related operational risks related to BLMIS's operations including:

- o  falsification of client mandates;

- o  embezzlement of client funds;

- o  use of fabricated client instructions to disguise poor proprietary positions;

- o  failure to segregate client funds from BLMIS funds;

- o  diversion of client funds for ~~Madoff's~~Madoff's personal gain;

- o  inaccurate allocation of reinvested funds from Fidelity across individual accounts;

- o  manipulation of option prices to maximize commissions;

- o  use of BLMIS claim funds to settle options exercised against HSBC SSL;

- o  practice of exercising options without informing the client that the option was set to expire;

- o  use of client funds to make opportunistic trades that deviated from the SSC Strategy;

- o  diversion of cash resulting from the sale of equities and Treasury bills;

- o  systematic over-valuing of positions and the failure to report positions to HSBC SSL in order to manipulate control relationships;

- o  stocks were not held in client names;

- o  inflation of call values to disguise misappropriate or poor positions;

- o  unauthorized trading in client accounts;

- o  trades executions made by unauthorized BLMIS staff members;

- o  sham trades to divert client cash;

- o  front-running order flow in the market-making business;

- o  false reporting of trades without execution to collect commissions; and

- o  falsification of trade confirmations.

84.  83.  KPMG was particularly concerned that it could not identify the owners of individual HSBC SSL client assets, and that controls in place at BLMIS might not prevent fraud or errors in client accounts.

85.  84.  Despite the litany of fraud and operational risks identified by KPMG, HSBC SSL continued its relationship with Madoff, delegated custodial duties to BLMIS, and took no steps to implement KPMG's recommendations.

**KPMG Engaged Again and Uncovers**
**G.    HSBC SSL's Failure to Heed Earlier Warnings**

86.  85.  After ignoring ~~KPMG's~~ KPMG's dire warnings in 2006, HSBC SSL and its affiliates asked KPMG to conduct another review of BLMIS in March 2008. The terms and scope of the review were identical to the 2006 review, except that KPMG was also asked to assess the risk of placing HSBC SSL and its affiliates' investments with BLMIS.

87.  86.  KPMG's conclusions were contained in a September 8, 2008, report entitled "Review of fraud risk and related operational risks at Bernard L. Madoff Investment Securities LLC" (the "2008 Report"). KPMG wrote that, according to Madoff, HSBC ~~SSL's~~ SSL's and its affiliates' client investments represented an astonishing 33% of ~~BLMIS's~~ BLMIS's assets under management.

88.  87. In the 2008 Report, KPMG identified three additional fraud concerns at BLMIS, not previously identified in the 2006 Report:

> o  Client cash is diverted signatures falsified on client instruction in an attempt to legitimize an unauthorized transaction (i.e., redemption);
>
> o  Madoff LLC claim funds have been used to settle options exercised against HSBC SSL and/or its affiliates; and
>
> o  Stocks are intentionally not allocated a fair price from the bulk trade.

89.  88. HSBC SSL again ignored KPMG's KPMG's warnings and recommendations. HSBC SSL used the 2008 Report as a marketing tool to encourage additional investment in BLMIS. Upon information and belief, in mid-2008, HSBC SSL and/or its affiliates were asked to explain Madoff's investment strategy to Andreas Pirkner, an employee of Bank Medici. In response, HSBC SSL and/or its affiliates forwarded to Pirkner the 2008 Report with the comment that the Feeder Funds were in good shape.

## H.  Internal Discussions Reveal That HSBC SSL Was More Concerned With Upsetting The Madoff Relationship And Losing Customers And Fees Than Properly Investigating Potential Fraud[3]

90.  As early as 2000, Bank of Bermuda n/k/a HSBC Bank Bermuda was aware that Madoff's operational structure had the potential for fraud.  Paula Downey, Head of

---

[3] Paragraphs 90-111 and portions of paragraph 82 are derived from a transcript of testimony provided in a proceeding before the Grand Court of the Cayman Islands, styled *Primeo Fund (in Official Liquidation) v. Bank of Bermuda (Cayman) Ltd. & HSBC Securities Services (Luxembourg) SA.*

Compliance for Bank of Bermuda informed Gerry Brady, who upon information and belief served as Regional Managing Director and Country Head - Ireland for the Bank of Bermuda, of many concerns in this regard. Downey wrote to Brady in 2000, stating:

> "I've been thinking about the issue you asked me to take a look at ahead of the Board meeting. How do Bermuda Trust Dublin Limited discharge their duties as master custodian to Thema and what checks are in place to ensure
>
> there are adequate checks and controls in relation to the sub-custodian Madoff. It's a difficult one and many of the normal checks are not possible. The following is what I perceive to be the holes in the current procedure vis a vis other funds. We don't receive a trade ticket from the Client Investment Manager which matches the broker ticket. The Madoff ticket is effectively the composite of the two…
>
> In addition, we generally receive confirmation of trades from the Investment Manager and the broker on their behalf. This protects us against receiving fictitious or incorrect trade details from the Investment Manager and broker confirmation match. This is not possible as Madoff is both Investment Manager and broker. While I do not dispute the good character and reputation of Madoff, the concern is that we have no independent confirmation that the trades they say they are doing are being done, or that the holdings we say the Fund has are indeed registered in the name of the Fund. We don't receive bank statements. What information would I like to see us receiving. Independent confirmation that the assets of Thema exist and are registered under the name of Thema."

91.    In July 2002, Fielding made a visit to BLMIS as part of due diligence efforts for Bank of Bermuda. Following that visit, an employee with the credit desk of Bank of Bermuda Dublin, Tom Young ("Young"), raised questions about the Madoff structure with Fielding. Those questions arose out of concerns with respect to the Primeo Fund ("Primeo"), which invested all or substantially all of its assets in BLMIS, and HSBC SSL served as custodian for that fund. Fielding, however, resisted further inquiry. For example, in one email, Young asked Fielding: "Would it be possible to get independent verification that the assets of [the Primeo

Fund] are segregated from other assets held by Madoff?"  In response, Fielding stated: "[W]e decided not to request this so far.  The review is finished and signed off for this year and I do not intend to do more unless the GFS Board supports it, risk versus cost versus relationship, etc."

92.     On December 24, 2002, Fielding expressed to David Smith ("D. Smith"),  also a Director of HSBC SSL, resistance to the desire of P. Smith to obtain due diligence on Madoff, with Mr. Fielding stating: "Paul seems hellbent on irritating Madoff with FIG." Upon information and belief, "FIG" refers to "Financial Institutions Group", an internal group within HSBC.

93.     HSBC SSL also recognized that if HSBC's relationship with Madoff was damaged, the HSBC entities stood to lose customers and, in turn, fees from their custodian roles.  On October 10, 2002, D. Smith expressed these concerns in an email he sent to Fielding, in which he stated: "Madoff is really cheesed off with us (BOB) and he may cut the umbilical if we go once more to the well. We may think our [redacted] has power in the market but he can replace that within a month. He may put us on the black list so we have to agree a plan of action. Perhaps we should discuss?"

94.     Concerns regarding Madoff were also raised at a HSBC SSL Board meeting in Dublin, Ireland in the fall of 2004, following which further diligence of BLMIS was proposed. Commenting on the proposed diligence, Brian Wilkinson ("Wilkinson"), who at the time served as (a) Head of Bank of Bermuda Global Fund Services in Ireland (which later became Alternative Fund Services within HSBC Securities Services), (b) Europe Head of Alternative Fund Services within HSS, and (c) a Member of GFS' Board Management Committee, communicated to P. Smith by e-mail:  "The consequence of the trustee review of the sub-

custodian Madoff will be both painful and, it would appear, fatal. Clearly I am not suggesting that GIS/HSBC should ignore their fiduciary responsibilities, however, we should all be aware of the potential fall-out."

95.     In August 2008, Gordon Thomson, an employee of HSBC SSL, sent an email to Michael May ("May"), managing director of HSBC SSL in charge of operations, risk and compliance, copying Andrew Bastow (who, upon information and belief, was the Chief Technology and Services Officer of HSBC Ireland), Brian Pettitt (Deputy Head of Risk, HSBC (London)) and Coe. In that email, Mr. Thomson stated that Madoff investments were "too good to be true" and characterized them as involving "unusual activity."

**I.     HSBC SSL Repeatedly Raised Specific and Substantial Concerns Regarding Madoff's "Real Strategy"**

96.     During a telephone call that occurred between September and October 2002 between Fielding and Wilkinson, those individuals made a number of statements reflecting their serious concerns regarding Madoff, including the following:

> o    Fielding: "So . . . I, you know, everybody has some concerns about Madoff, or 'made off' as he likes to call himself, which I think makes it even worse. 'made off with the money.'"

> o    Wilkinson: "I could be wrong Nigel, and maybe I'll investigate that, but I'm just covering all of our backsides to make sure we've done everything possible if this thing ever went up, you know."

> o    Fielding: "Yeah, and I guess my ... I'm not saying we shouldn't do it, I guess I wanted the board to say we wanted to do it, having heard David rant and rave about upsetting the guy before ..."

> o    Wilkinson: "His financial statements are not very detailed, you know, what really is his source of revenue, etc. ... which I think is important to us, cause we're really relying on the financial strength of Madoff, as well as much as anything . . ."

36

97.    In December 2004, GFS, which by then had been acquired by or was a division within HSS, was approached about acting as custodian and administrator for a new Madoff related fund.  In an email to Peter Heaps, who it appears was handling this request on behalf of the Madoff related fund, Wilkinson stated: "Please speak to Nigel Fielding on this. The whole Madoff issue is coming under focus now that we are part of HSBC.  My gut reaction is that this will not fly."

98.    In February 2005, Fielding was asked about concerns expressed by Primeo's auditors, Ernst & Young ("E&Y"), about Madoff that were raised in a meeting with Saverio Fiorino ("Fiorino"), who was a Director of HSBC SSL Valuation & Client Administration and Head of Alternative Fund Services (AFS) at HSBC SSL from September 2003 to March 2008. Fielding responded as follows: "Nespolo [managed Madoff feeder funds Hermes, Thema International, and Thema Fund] understands the auditors concern and asked if their worries were based on the rumors (1) what is his real strategy, how on earth can he always produce 12%pa (2) where are the assets and are there really assets or is it all fictitious."

99.    In a Madoff discussion paper that Coe prepared for the HSS Board in 2005, Coe identified the risks associated with HSBC's diligence process as follows: "However, there is substantial risk, in the event there is any question over the integrity of the process. The financial cost of appointing a sub-custodian that we cannot exercise a level of due care over, could be significant; equally so would be the reputational risk."  In fact, as early as 2005, Coe considered "that one of the possible options was that it was all a sham."

100.    From 2005 to 2008, Fielding received emails from John Grubert ("Grubert"), Global Head of HSBC Securities Services, reflecting substantial concerns about BLMIS.  In

one email that Grubert sent to Coe, on which Smith, Pettitt and Fielding were copied, Grubert stated:

   o   "Thank you for the papers on the above. It strikes me that the firm has reasonable capital ... has a solid reputation but that we have a flawed process. Although there is no reason to doubt the integrity or professionalism of the Group, the reality is that: we do not have full control of the assets or real time sight of transaction flows; the transactions are all internal to the family firms and there is no proof of best execution or even actual execution."

   o   "[T]he audit is undertaken by a firm that is not on our recognised list of auditors…I cannot countenance this process – and I appreciate it is a major money earner."

   o   "I appreciate Madoff does not like external intrusion and am willing for this to be undertaken by our auditors (at our cost). If this cannot be done, then we should exit the relationship."

**J.    Audits and Purported Diligence of Madoff's Investments Were Incomplete**

101.    During a presentation Bank of Bermuda made to Bank Austria in May 2003, requests were made for copies of the quarterly due diligence questionnaires. When these questionnaires were requested of Bank of Bermuda, Wilkinson commented as follows regarding the lack of due diligence on Madoff: "Quarterly due diligence, you have got to be joking!! The only due diligence we have on Madoff is what Nigel [Fielding] did some months ago."

102.    In September of 2002, Tom Young sent an email to Fielding expressing concerns regarding the level and quality of the due diligence process. In that email, Young stated: "When you get back, maybe you could look at this again. What is required is independent auditor's confirmation that the assets are not comingled. Madoff's representation is not enough, annual audited accounts of Madoff."

103.    Although a diligence questionnaire was completed by Madoff in March of 2004, Ann Meehan, who upon information and belief was the Compliance Manager for HSBC

Institutional Trust Services (Ireland) Ltd., stated to Pettitt in an early 2005 email as follows: "[T]here is no information on our file regarding the on-site visit, ie if checks were undertaken to confirm if assets are held in segregated accounts, completion of reconciliations etc."

104.    In March of 2005, Fiorino emailed Fielding regarding concerns about BLMIS' auditors Friehling and Horowitz CPA, and stated in that email: "[O]ver the last weeks, [Ernst & Young] raised some concerns about Madoff, as follows . . . (iii) reliability and independence of Friehling and Horowitz CPA (auditors of BMadoff). Apparently F&H are related to BMadoff. Responses to questions raised by E&Y to BM auditors were not clear."

105.    Moreover, the discussion paper that Coe produced in 2005 for the HSS Board, described earlier, identified flaws and concerns with the Madoff structure and the diligence process relating to the investigation of that structure.    Specifically, Coe remarked in that paper:

> "Whilst we have carried out due diligence ... we have not been able to undertake (nor do we have the legal right to do so) an audit of the end to end process flow to confirm the integrity of the whole activity. It is questionable how much we can rely on the auditor produced control statement. Not only is it concise, the auditors are not one of the major independent accountancy groups. From a legal structure perspective, we can make the arrangements work around the need for a legal charge over assets in a custody, sub-custody arrangement.  The real issue is are we satisfied with the integrity of the Madoff operations such that we are comfortable with a lack of real independent evidence of the trading of clients assets."

106.    On June 6, 2005, Coe spoke on the phone with Fielding and voiced concerns regarding the review process.  During that phone conversation, Coe stated: "The biggest single concern is the whole process, once it gets into Madoff's hands, is fairly incestuous within Madoff and their internal control system, which is done by . . . his mate, the accountant, it's

not really independent enough to give us a level of independent comfort that we would ordinarily look to."

107.    In August of 2008, following a further KPMG review of BLMIS that had been requested earlier that year, Coe stated in an email to Wilcockson, that she was concerned that Madoff was potentially using the fund's assets because "overall control [was] Madoff centric and there [were] opportunities for misleading or misappropriation to take place if he were so inclined," creating a "huge" fraud risk.

**K.    Any Indicia of Fraud That Was Unearthed During Due Diligence Was Generally Downplayed, Ignored and/or Avoided**

108.    In May of 2003, Fielding and Germain Birgen, Managing Director of HSBC Securities Services (Luxembourg) SA ("Birgen") gave a presentation to Bank Austria that presented a positive impression of the relationship with BLMIS, even though Fielding and Birgen were aware that the GFS Board had identified a major issue in relation to BLMIS and had decided to require independent audit confirmation from KPMG.  Around the same time, Mr. Fielding, who was also on the Board of Primeo, played down any concerns regarding BLMIS that were raised by other members of the Primeo Board.

109.    In February of 2005, E&Y, Primeo's auditors, requested a meeting with Birgen and Fiorino to discuss concerns regarding whether assets with BLMIS in fact existed. Following that meeting, Fiorino told Fielding in an e-mail:  "Germain and I just had a meeting with [Ernst & Young], can I speak to you when you have five minutes. They have a transparency issue with Madoff."  Although these concerns were discussed by email, no action was taken by HSBC SSL or Bank of Bermuda to actually confirm either the existence of the assets or the validity of the BLMIS investments.

110.    In October 2008, May raised concerns whether the recommendations of KPMG, following its most recent review of BLMIS, were in fact implemented.  In an email May sent to Mr. Bastow during this time period, May stated:  "I share your concern regarding Madoff and have raised this with Chris Coe & Brian Pettitt.  I understand that KPMG made recommendations in their last visit and I am trying to obtain this reports so I can run an exercise to assess whether they were implemented."  In another email sent during this time period, May stated: "Chris [Coe] made some recommendations in their audit and so we should see if they were implemented. Who has a copy of those recommendations? Both Lux & Dub are expressing unease about Madoff (which we all feel already) . . ."

111.    In December 2008, shortly after Madoff's arrest, emails were exchanged between Russell Ford (upon information and belief, Global Head of Internal Control for HSBC) and May candidly acknowledging their lack of surprise by the arrest, due to their firmly grounded suspicions of the fraud.  Those e-mails included the following:

- o    Mr. Ford to Mr. May:  "Just in case Chris has not contacted you yet or you have read the papers, Madoff has been arrested on security fraud."

- o    Mr. May back to Mr. Ford: "*Another case where all our suspicions were right.*"

- o    Mr. Ford: "Indeed, the beauty of hindsight."

- o    Mr. May:  "*Worse - we suspected but never pinned it down. Not even hindsight, just not enough courage to walk away from what was not understood . . .*"

- o    Mr. Ford: "*Always too afraid to lose the revenue, but the business should pay more attention to the view of Risk.*"

**L.    HSBC SSL Acted On Behalf Of The Beneficial Owners**

112.    ~~89.~~ HSBC SSL served as trustee, agent, representative, nominee or custodian for the Beneficial Owners in connection with their investments in the Funds, including, by:

41

subscribing to Shares of Sentry and Sigma on behalf of the Beneficial Owners, maintaining custody of the Shares as record shareholders, paying redemption proceeds from the Shares of Sentry and Sigma to the Beneficial Owners, and otherwise exercising control over the Shares of Sentry and Sigma.

113. 90. Further, each of the Subscription Agreements, executed by HSBC SSL, manifested the Beneficial Owners' consent for HSBC SSL to act on behalf of and subject to the Beneficial Owners' control.

114. 91. In executing the Subscription Agreements, HSBC SSL accepted and agreed to act on behalf of the Beneficial Owners.

115. 92. Accordingly, the Beneficial Owners had the same knowledge as HSBC SL SSL regarding all relevant matters relating to BLMIS and the Funds' Net Asset Values at all relevant times.

## M. F. Exposure of Madoff's Fraud

116. 93. On December 11, 2008, federal agents arrested Madoff for violation of federal securities laws.  On that same day, the United States Attorney brought criminal charges against Madoff, alleging that Madoff ran a multi-billion dollar Ponzi scheme.  See United States v. Madoff, No. 08-mj-2735 (S.D.N.Y., filed Dec. 11, 2008).  Upon arrest, Madoff was reported to have told the agents that "there is no innocent explanation" for the fraudulent scheme he had orchestrated and confessed that he "paid investors with money that wasn't there."

117. 94. On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt ongoing fraudulent offerings of securities and investment advisory fraud by Madoff and

BLMIS.  See SEC v. Madoff, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC submitted to the Court a proposed partial judgment, to which Madoff consented, imposing a permanent injunction and continuing relief against him, including a permanent freezing of his assets.

118.  95.  In March 2009, Madoff pleaded guilty to the criminal charges brought against him.  In his plea allocution, Madoff confessed: "for many years up until my arrest on December 11, 2008, I operated a Ponzi scheme through the investment advisory side of my business, Bernard L. Madoff Securities LLC."  As Madoff himself described how the scheme worked:

> The essence of my scheme was that I represented to clients and prospective clients who wished to open investment advisory and individual trading accounts with me that I would invest their money in shares of common stock, options and other securities of large well-known corporations, and upon request, would return to them their profits and principal.  Those representations were false because for many years up and until I was arrested on December 11, 2008, I never invested those funds in the securities, as I had promised.  Instead, those funds were deposited in a bank account at Chase Manhattan Bank.  When clients wished to receive the profits they believed they had earned with me or to redeem their principal, I used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds.

119.  96.  Madoff further confessed to covering up his fraud by fabricating false trade confirmation and account statements:

> To further cover-up the fact that I had not executed trades on behalf of my investment advisory clients, I knowingly caused false trading confirmations and client account statements that reflected the bogus transactions and positions to be created and sent to clients purportedly involved in the split strike conversion strategy, as well as other individual clients I defrauded who believed they had invested in securities through me. The clients receiving trade confirmations and account statements had no way of knowing by reviewing these documents that I had never engaged in the transactions represented on the statements and confirmations.

120.  97.  Madoff is now serving a 150-year sentence in federal prison.

### N.    ~~G.~~ The Funds' Estates in Liquidation

121.  ~~98.~~ Following the revelation of Madoff's fraud, the Funds' boards of directors suspended any further redemptions of Shares and the calculation of the Funds' Net Asset Values.  As of December 2008 and presently, Sentry, Sigma, and Lambda had, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

122.  ~~99.~~ In 2009, the Funds were put into liquidation proceedings in the BVI.

123.  ~~100.~~ On February 27, 2009, a secured creditor of Lambda commenced proceedings in the BVI Court pursuant to the BVI Insolvency Act seeking the appointment of a liquidator over Lambda (the "Lambda Proceeding").  The Lambda Proceeding is pending in the BVI Court as claim number BVIHC(COM)2009/74.

124.  ~~101.~~ On April 21, 2009, ten shareholders applied to the BVI Court for the appointment of a liquidator over Sentry (the "Sentry Proceeding").  The Sentry Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/136.

125.  ~~102.~~ On April 23, 2009, a shareholder applied to the BVI Court for the appointment of a liquidator over Sigma (the "Sigma Proceeding" and collectively with the Lambda Proceeding and the Sentry Proceeding, the "BVI Liquidation Proceedings").  The Sigma Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/139.

126.  ~~103.~~ As alleged above, the BVI Court issued orders – the BVI Appointment Orders –appointing the Foreign Representatives as liquidators of the Funds.  Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates.

127. ~~104.~~ The Redemption Payments that were made to Defendants were mistaken payments and constituted or formed part of avoidable transactions, and generally represent assets of Sentry and Sigma's estates that Defendants are not entitled to keep.

## FIRST CLAIM
### (Unjust Enrichment - Against HSBC SSL)

128. ~~105.~~ Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 104 above as if set forth herein.

129. ~~106.~~ As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to HSBC SSL, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud.  The source of these Redemption Payments was not, as Sentry and Sigma mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

130. ~~107.~~ HSBC SSL did not provide valuable consideration to Sentry and Sigma in exchange for each of the Redemption Payments received by it, in that it received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

131. ~~108.~~ By reason of its receipt of monies represented as amounts deposited by other BLMIS investors or monies deposited by the Funds' subscribers, for amounts far in excess of the amounts that it would have received had the Net Asset Value of Shares been calculated based upon the true facts existing at that time or any relevant time, HSBC SSL has

been unjustly enriched to the detriment of Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

132. ~~109.~~ It would offend principles of equity and good conscience to permit HSBC SSL to retain the Redemption Payments it received from Sentry and Sigma.

133. ~~110.~~ The Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma, are entitled to recover from HSBC SSL an amount equal to the Redemption Payments received by it from Sentry and Sigma, or, in the alternative, an amount equal to the amount of all Redemption Payments received by HSBC SSL less the amount of redemption payments that HSBC SSL would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## SECOND CLAIM
### *(Unjust Enrichment - Against Beneficial Shareholders)*

134. ~~111.~~ Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 110 above as if set forth herein.

135. ~~112.~~ Upon information and belief, HSBC SSL may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

136. ~~113.~~ Upon information and belief, HSBC SSL may have paid to or credited some or all of the Redemption Payments received by it from Sentry and Sigma to accounts of the Beneficial Shareholders. These Redemption Payments did not, as Sentry and Sigma mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS. Instead, Redemption Payments were made for amounts far in excess of

the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

137. 114. The Beneficial Shareholders did not provide valuable consideration to Sentry and Sigma in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

138. 115. To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to HSBC SSL in its capacity as trustee, agent, representative, or nominee for a Beneficial Shareholder, such Beneficial Shareholder has been unjustly enriched to the detriment of Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

139. 116. It would offend principles of equity and good conscience to permit any Beneficial Shareholders to retain the Redemption Payments made by Sentry and Sigma.

140. 117. The Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma, are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by any Beneficial Shareholders less the amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

### THIRD CLAIM
*(Money Had and Received - Against HSBC SSL)*

141. ~~118.~~ Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 117 above as if set forth herein.

142. ~~119.~~ As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to HSBC SSL, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud. The source of these Redemption Payments was not, as Sentry and Sigma mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

143. ~~120.~~ HSBC SSL did not provide valuable consideration to Sentry and Sigma in exchange for each of the Redemption Payments received by it, in that it received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

144. ~~121.~~ By reason of its receipt of monies which generally represented the proceeds arising from or to continue investment in BLMIS, which the world now knows was operated by Madoff as a Ponzi scheme, HSBC SSL has been unjustly enriched to the detriment of Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

145. ~~122.~~ Furthermore, HSBC SSL was not entitled to receive the Redemption Payments because the amounts of each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by HSBC SSL

for its redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

146.   ~~123.~~ To the extent that Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma, the loss will be disproportionately and unjustly borne by Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

147.   ~~124.~~ It would offend principles of equity and good conscience to permit HSBC SSL to retain the Redemption Payments it received from Sentry and Sigma.

148.   ~~125.~~ The Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma, are entitled to recover from HSBC SSL an amount equal to the Redemption Payments received by it from Sentry and Sigma, or, in the alternative, an amount equal to the amount of all Redemption Payments received by HSBC SSL less the amount of redemption payments that HSBC SSL would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## FOURTH CLAIM
### *(Money Had and Received - Against Beneficial Shareholders)*

149.   ~~126.~~ Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 125 above as if set forth herein.

150.   ~~127.~~ Upon information and belief, HSBC SSL may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

151. ~~128.~~ Upon information and belief, HSBC SSL may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders. These Redemption Payments did not, as Sentry and Sigma mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS.

152. ~~129.~~ The Beneficial Shareholders did not provide valuable consideration to Sentry and Sigma in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

153. ~~130.~~ To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to HSBC SSL in its capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders, such Beneficial Shareholders have been unjustly enriched to the detriment of Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

154. ~~131.~~ Furthermore, the Beneficial Shareholders were not entitled to receive the Redemption Payments paid to HSBC SSL upon the redemption of Shares issued to it in its capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders because the amounts transferred by Sentry with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value which caused the payment received for redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

155. ~~132.~~ To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry

and Sigma, the loss will be disproportionately and unjustly borne by Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

156. ~~133.~~ It would offend principles of equity and good conscience to permit the Beneficial Shareholders to retain the Redemption Payments made by Sentry and Sigma.

157. ~~134.~~ The Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma, are entitled to recover from the Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by the Beneficial Shareholders less the amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## FIFTH CLAIM
### *(Mistaken Payment - Against HSBC SSL)*

158. ~~135.~~ Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 134 above as if set forth herein.

159. ~~136.~~ As described above, Sentry and Sigma made each of the Redemption Payments to HSBC SSL under the mistaken belief that the amounts paid to HSBC SSL represented the proceeds arising from the profitability of or to continue investment in BLMIS and were based upon the Net Asset Value of Shares redeemed based upon the true facts at that time.

160. ~~137.~~ Upon information and belief, however, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to

fund Redemption Payments to HSBC SSL represented, in fact, money deposited with BLMIS by other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

161. ~~138.~~ The Redemption Payments, while benefiting HSBC SSL, were made to the detriment of Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

162. ~~139.~~ Additionally, HSBC SSL was not entitled to receive the Redemption Payments because, as was unknown to Sentry and Sigma, the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by HSBC SSL for its redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.  In these circumstances, the Redemption Payments should be returned for the benefit of Sentry and Sigma, their creditors and the current holders of Shares in Sentry and Sigma.

163. ~~140.~~ HSBC SSL did not provide valuable consideration to Sentry and Sigma in exchange for each of the Redemption Payments received by it, in that it received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

164. ~~141.~~ To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma, the loss will be disproportionately and unjustly borne by Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

165. ~~142.~~ It would thus offend principles of equity and good conscience to permit HSBC SSL to retain the Redemption Payments.

166.    143. The Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma, are entitled to recover from HSBC SSL a sum in an amount equal to the Redemption Payments received by it from Sentry and Sigma, or, in the alternative, an amount equal to the amount of all Redemption Payments received by HSBC SSL less the amount of redemption payments that HSBC SSL would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## SIXTH CLAIM
### *(Mistaken Payment - Against Beneficial Shareholders)*

167.    144. Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 143 above as if set forth herein.

168.    145. As described above, Sentry and Sigma made each of the Redemption Payments to HSBC SSL under the mistaken belief that the amounts paid to HSBC SSL represented the proceeds arising from the profitability of or to continue investment in BLMIS.

169.    146. However, upon information and belief, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to HSBC SSL represented, in fact, money deposited with BLMIS by other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

170.    147. Upon information and belief, HSBC SSL may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders. These Redemption Payments did not, as Sentry and Sigma mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS.

171. 148. Additionally, the Beneficial Shareholders were not entitled to receive the Redemption Payments received by HSBC SSL upon the redemption of Shares issued to it in its capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders because, as was unknown to Sentry and Sigma, the amounts transferred with respect to these Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused the Redemption Payments received by HSBC SSL for its redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

172. 149. The Beneficial Shareholders did not provide valuable consideration to Sentry and Sigma in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

173. 150. The Redemption Payments, while benefiting any Beneficial Shareholder receiving any portion thereof, were made to the detriment of Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

174. 151. To the extent are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma, the loss will be disproportionately and unjustly borne and other shareholders and creditors of Sentry and Sigma.

175. 152. It would thus offend principles of equity and good conscience to permit any Beneficial Shareholder to retain the Redemption Payments.

176. ~~153.~~ The Foreign Representatives in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by any Beneficial Shareholders less the amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## SEVENTH CLAIM
### *(Constructive Trust - Against all Defendants)*

177. ~~154.~~ Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 153 above as if set forth herein.

178. ~~155.~~ As described above, upon receipt of a redemption request, Sentry and Sigma made each of the Redemption Payments to HSBC SSL based on a miscalculated and inflated Net Asset Value, which caused those Redemption Payments to be in excess of the Net Asset Value of redeemed Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

179. ~~156.~~ As alleged above, the Redemption Payments generally represented the proceeds arising from or to continue investment in what the world now knows was Madoff's Ponzi scheme.    Accordingly, these Redemption Payments did not, as Sentry and Sigma mistakenly believed, represent the proceeds arising from the profitability of (or to continue investment in) BLMIS.

180. ~~157.~~ Upon information and belief, HSBC SSL may have paid some or all of the Redemption Payments it received to the Beneficial Shareholders.

181. ~~158.~~ By reason of their receipt of some or all of the Redemption Payments, Defendants have been unjustly enriched to the detriment of Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

182. ~~159.~~ Furthermore, Defendants were not entitled to receive the Redemption Payments because the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by HSBC SSL for its redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

183. ~~160.~~ It would offend principles of equity and good conscience to permit Defendants to retain the Redemption Payments.

184. ~~161.~~ By reason of the foregoing, a constructive trust should be imposed on the Redemption Payments that were received by Defendants from Sentry and Sigma for the benefit of the Foreign Representatives and Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

### EIGHTH CLAIM
#### (Unfair Preference Pursuant to Section 245 of the BVI Insolvency Act - Against HSBC SSL)

185. ~~162.~~ The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry and Sigma, repeat and allege again the allegations contained in paragraphs 1 through 161 above as if set forth herein.

56

186.    ~~163.~~ Section 245 of the BVI Insolvency Act provides:

(1)  Subject to subsection (2), a transaction entered into by a company is an unfair preference given by the company to a creditor if the transaction (a) is an insolvency transaction; (b) is entered into within the vulnerability period; and (c) has the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if the transaction had not been entered into.

(2) A transaction is not an unfair preference if the transaction took place in the ordinary course of business;

(3) A transaction may be an unfair preference notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a transaction entered into the by the company within the vulnerability period has the effect specific in subsection 1(c) in respect of a creditor who is a connected person, unless the contrary is proved, it is presumed that the transaction was an insolvency transaction and that it did not take place in the ordinary course of business.

187.    ~~164.~~ A creditor is defined in Section 9 of the BVI Insolvency Act as follows:

(1) A person is a creditor of another person (the debtor) if he has a claim against the debtor, whether by assignment or otherwise, that is, or would be, an admissible claim in (a) the liquidation of the debtor, in the case of a debtor that is a company or a foreign company; or (b) the bankruptcy of the debtor, in the case of a debtor who is an individual.

188.    ~~165.~~ The BVI Insolvency Act further defines an "insolvency transaction" as a transaction that: "(a) is entered into at a time when the company is insolvent; or (b) . . . causes the company to become insolvent."  BVI Insolvency Act § 244(2).

189.    ~~166.~~ For the purposes of assessing unfair preferences under Section 245 of the BVI Insolvency Act and undervalue transactions under Section 246 of the BVI Insolvency Act, a company is "insolvent" if: "(c) . . . (ii) the company is unable to pay its debts as they fall due."  BVI Insolvency Act §§ 8, 244(3).

190.    ~~167.~~ For purposes of Section 245 and Section 246 of the BVI Insolvency Act, "vulnerability period" means "in the case of a transaction entered into with, or a preference

given to, a connected person, the period commencing two years prior to the onset of insolvency and ending on the appointment of the administrator or, if the company is in liquidation, the liquidator . . . ."  BVI Insolvency Act § 244(1).

191. 168. The "onset of insolvency" is defined as: "the date on which the application for the appointment of the liquidator was filed."  BVI Insolvency Act § 244(1).  Thus, the vulnerability period, for each of the Funds, is the period commencing two years prior to the application for the appointment of the Liquidators for each Fund and ending on the date of the appointment of the Liquidators of each Fund.

192. 169. A "connected person" is:

(1) . . . one or more of the following:

> (a) a promoter of the company;

> (b) a director or *member of the company* or of a related company;

> (c) a beneficiary under a trust of which the company is or has been a trustee;

> (d) a related company;

> (e) another company one of whose directors is also a director of the company;

> (f) a nominee, relative, spouse or relative of a spouse of a person referred to in paragraphs (a) to (c);

> (g) a person in partnership with a person referred to in paragraphs (a) to (c); and

> (h) a trustee of a trust having as a beneficiary a person who is, apart from this paragraph, a connected person.

BVI Insolvency Act § 5 (emphasis added).

193. 170. Redemption Payments aggregating USD $21,119,098.95 were made by Sentry to HSBC SSL during the two-year period prior to the application for appointment of

the Liquidators of Sentry in the BVI Liquidation Proceedings (the "Sentry Vulnerability Period").

194. ~~171.~~ During the Sentry Vulnerability Period, Sentry was insolvent or was rendered insolvent by the making of Redemption Payments.

195. ~~172.~~ Each of the Redemptions and/or Redemption Payments made during the Sentry Vulnerability Period ("Vulnerability Period Payments") was an "insolvency transaction" within the meaning of Section 245 of the BVI Insolvency Act.

196. ~~173.~~ HSBC SSL was a shareholder (i.e., a member) of Sentry during the Sentry Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

197. ~~174.~~ Each of the Vulnerability Period Payments put HSBC SSL in a better position than it would have been in had such Payment not been made.

198. ~~175.~~ Because HSBC SSL was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were "insolvency transactions." Further, even were this not presumed, the Redemptions and/or Vulnerability Period Payments were "insolvency transactions" because at all material times the Funds were insolvent. This is because the Funds' assets were up to 95% invested with BLMIS and were only able to pay debts falling due either (i) with payments (including fictitious profits) from the Ponzi scheme BLMIS, i.e. using the proceeds of fraud, or (ii) by using incoming subscription monies (as a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers). Each time the Funds withdrew monies from BLMIS an equivalent liability immediately arose to the creditors of and investors in

BLMIS.  On any commercial basis the Funds were insolvent on a cash flow basis at all material times.

199. ~~176.~~ In addition, there is a statutory presumption that the Vulnerability Period Payments were "not made in the ordinary course of any business" of Sentry.  Even were this not presumed, the same would follow in that, among other things, each Vulnerability Period Payment represented a distribution of monies (including fictitious profits) from Madoff's Ponzi scheme or incoming subscription monies (which merely represented a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers), and it was no part of the ordinary course of business of the Funds to invest in and distribute profits of a Ponzi scheme.

200. ~~177.~~ Each of the Vulnerability Period Payments was made following receipt by Sentry of a notice of redemption in respect of Shares, which triggered the redemption process under the Articles.  Following the receipt by Sentry of a notice of redemption by HSBC SSL, HSBC SSL became a contingent creditor. Upon the subsequent redemption of HSBC SSL's shares and until such time as HSBC SSL received the Vulnerability Period Payment, HSBC SSL was a "creditor" of Sentry with an admissible claim against Sentry in any subsequent liquidation of Sentry had payment of the Redemption Price not been made, albeit that post-liquidation HSBC SSL would have been deferred to outside creditors.

201. ~~178.~~ By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry, are entitled to an order avoiding and setting aside the Vulnerability Period Payments and entitling the Foreign Representatives to recover from HSBC SSL an amount equal to the Vulnerability Period Payments received by HSBC SSL from Sentry.

## NINTH CLAIM

### *(Unfair Preference Pursuant to Section 245 of the BVI*
### *Insolvency Act - Against Beneficial Shareholders)*

202. ~~179.~~ The Foreign Representatives, in their capacities as Foreign Liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 178 above as if set forth herein.

203. ~~180.~~ Upon information and belief, HSBC SSL may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

204. ~~181.~~ Upon information and belief, HSBC SSL may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders.

205. ~~182.~~ To the extent that any money that HSBC SSL received in connection with the Vulnerability Period Payments was transferred to the Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry, are entitled to avoid and set aside such further transfer by HSBC SSL to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability Period Payments received by them, and the Foreign Representatives, in their capacities as liquidators of Sentry, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act.

## TENTH CLAIM
### *(Undervalue Transaction Pursuant to Section 246 of the BVI Insolvency Act - Against HSBC SSL)*

206. ~~183.~~ The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 182 above as if set forth herein.

207. ~~184.~~ Section 246 of the BVI Insolvency Act provides that;

(1) Subject to subsection (2), a company enters into an undervalue transaction with a person if (a) the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration; or (b) the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company; and (c) in either case, the transaction concerned (i) is an insolvency transaction; and (ii) is entered into within the vulnerability period.

(2) A company does not enter into an undervalue transaction with a person if (a) the company enters into the transaction in good faith and for the purposes of its business; and (b) at the time when it enters into the transaction, there were reasonable grounds for believing that the transaction would benefit the company.

(3) A transaction may be an undervalue transaction notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a company enters into a transaction with a connected person within the vulnerability period and the transaction falls within subsection (1)(a) or subsection (1)(b), unless the contrary is proved, it is presumed that (a) the transaction was an insolvency transaction; and (b) subsection (2) did not apply to the transaction.

208. ~~185.~~ During the Sentry Vulnerability Period, all assets purportedly held by BLMIS for Sentry and other investors were non-existent, and Sentry was insolvent or rendered insolvent by the Vulnerability Period Payments, as alleged in paragraph 175 above. Thus, each of the Redemptions and/or Vulnerability Period Payments qualifies as an "insolvency

transaction" within the meaning of Section 244 of the BVI Insolvency Act and for purposes of Section 246 of the BVI Insolvency Act.

209. ~~186.~~ Sentry received no consideration for any of the Vulnerability Period Payments, or in the alternative, Sentry received, for each Vulnerability Period Payment, consideration, the value of which, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry to HSBC SSL for each of the Vulnerability Period Payments.

210. ~~187.~~ HSBC SSL was a shareholder (i.e., a member) of Sentry during the Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

211. ~~188.~~ Because HSBC SSL was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were "insolvency transactions." Further, there is a statutory presumption that the Vulnerability Period Payments were not made in good faith and for the purposes of the Funds' business with reasonable grounds to believe that they would benefit the Funds. Even were that not presumed, it is in any event clear that the purpose of the Funds was not to invest in and distribute fictitious profits from a Ponzi scheme such as BLMIS.

212. ~~189.~~ By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, are entitled to an order avoiding and setting aside the Vulnerability Period Payments and to recover from HSBC SSL an amount equal to the Vulnerability Period Payments received by HSBC SSL from Sentry.

REDACTED WITH REDACT-IT

**ELEVENTH CLAIM**

*(Undervalue Transaction Pursuant to Section 246 of the
BVI Insolvency Act - Against Beneficial Shareholders)*

213. ~~190.~~ The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, repeat and allege again the allegations contained in paragraphs 1 through 189 above as if set forth herein.

214. ~~191.~~ Upon information and belief, HSBC SSL may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

215. ~~192.~~ Upon information and belief, HSBC SSL may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders.

216. ~~193.~~ To the extent that any money that HSBC SSL received in connection with the Vulnerability Period Payments was transferred to the Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry, are entitled to avoid and set aside such further transfer by HSBC SSL to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability Period Payments received by them, and the Foreign Representatives, in their capacities as liquidators of Sentry, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act.

## TWELFTH CLAIM
### *(Breach of Contract - Against HSBC SSL)*

217. ~~194.~~ Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 193 above as if set forth herein.

218. ~~195.~~ HSBC SSL, upon information and belief, entered into a written agreement or agreements with Sentry and Sigma on or about May 20, 1998, August 17, 1998, September 1, 1998, February 12, 1999, June 10, 1999, August 13, 1999, September 9, 1999, October 14, 1999, November 10, 1999, March 10, 2000, April 12, 2000, July 24, 2000, August 22, 2000, September 14, 2000, September 28, 2000, November 30, 2000, December 29, 2000, January 31, 2001, February 28, 2001, February 22, 2002, March 1, 2002, May 31, 2002, and June 24, 2002, pursuant to which HSBC SSL subscribed for Shares.  Subsequent to entering into such agreements, HSBC SSL, upon information and belief, entered into the Initial Subscription Agreement with Sentry, on or about February 24, 2005 pursuant to which HSBC SSL subscribed for additional Shares.  HSBC SSL's subscription for Shares was made pursuant to the terms of the Initial Subscription Agreement itself as well as the terms of the other documents referred to therein, namely; (i) Sentry's Private Placement Memorandum (as amended from time to time); and (ii) Sentry's Memorandum of Association and Articles of Association (the "Articles"). Subsequent to entering into the Initial Subscription Agreement, HSBC SSL, upon information and belief, entered into the Subsequent Subscription Agreements with Sentry and Sigma on or about March 29, 2005, June 24, 2005, June 28, 2005, September 30, 2005, December 31, 2005, March 27, 2006, May 26, 2006, May 31, 2006, June 30, 2006, September 27, 2006, September 28, 2006, September 30, 2006, December 21, 2006, December

27, 2006, March 31, 2007, June 30, 2007, August 29, 2007, December 21, 2007, and January 28, 2008, pursuant to which it subscribed for additional Shares on the same terms and conditions as those Shares subscribed for pursuant to the Initial Subscription Agreement. The Initial Subscription Agreement, together with the Subsequent Subscription Agreements, including all of the terms and provisions incorporated therein by reference to the Private Placement Memorandum (as amended from time to time) and the Articles, are collectively referred to herein as the "Fund Documents." HSBC SSL, as a subscriber in Sentry and Sigma, is bound by the Articles, as amended from time to time.

219.    196.    The Fund Documents provide for the calculation of the redemption price for Shares (the "Redemption Price") based on the "Net Asset Value per Share." Net Asset Value per share is to be determined by the directors of Sentry and Sigma as of the relevant valuation day "by dividing the value of the net assets of [Sentry/Sigma] by the number of Shares then in issue [.]" Articles at 11(1).

220.    197.    The Fund Documents provide that in determining the Net Asset Value per share for each class of shares issued, the value of the net assets of the Funds is to be adjusted "to take into account any dividends, distributions, assets or liabilities" attributable to such class of shares. Articles at 11(1). Pursuant to the Fund Documents, each subscriber, including HSBC SSL acknowledges that "the value of its Shares and redemptions thereof, and the performance of the Fund, may be based on unaudited and in some cases, estimated, valuations of the Fund's investment and that any valuation provided in Subscriber's account statement may be an unaudited, estimated value." See Initial Subscription Agreement ¶ 10.

221.    198.    With respect to the valuation of different types of assets, the Fund Documents prescribe methods of valuation that are, however, subject to the exercise of the

judgment and discretion by the Directors of Sentry and Sigma. For example, with respect to the valuation of assets consisting of securities, the Fund Documents prescribe methods of valuation based on price and market data, provided however that "[i]f the Directors determine that [any of the prescribed methods of valuation] does not fairly represent its market value, the Directors shall value such securities as they determine and shall set forth the basis of such valuation in writing in the Company's records[.]" Articles at 11(3)(b).

222.    199. With respect to the value of any shares of stock held by Sentry and Sigma in an "investment company," the Fund Documents provide for valuation "in accordance with the manner in which such shares are valued by such investment company" provided however that "the Directors may make such adjustments in such valuations the Directors may from time to time consider appropriate." Articles at 11(3)(c).

223.    200. With respect to assets that have been "realised or contracted to be realised" the Fund Documents provide for the inclusion of the assets receivable in respect of such realization, provided however that "if the value of such assets is not then known exactly then its value shall be as estimated by the Directors." Articles at 11(3)(e).

224.    201. Additionally, the Fund Documents provide that "notwithstanding the foregoing, in the case of extraordinary circumstances which, in the Directors' sole discretion, warrant a different valuation of any securities, such securities will be valued at such prices as the Directors shall determine." Articles at 11(3)(f).

225.    202. The Fund Documents provide that any "certificate" as to the Net Asset Value per Share or as to the Redemption Price that is given in good faith by or on behalf of the Directors "shall be binding on all parties." Articles at 11(1).

226. 203. No Certificate was provided in good faith by or on behalf of the Directors to HSBC SSL in respect of any Net Asset Value determination made while HSBC SSL was a member of the Funds or in respect of any Redemption Payment made to HSBC SSL.

227. 204. Pursuant to the Fund Documents, at any time prior to the good faith issuance and receipt of a Certificate, the Redemption Price calculated in respect of the redemptions by HSBC SSL and paid to HSBC SSL remains subject to adjustment, recalculation and redetermination based on, *inter alia*, the foregoing identified provisions of the Fund Documents. Upon the true interpretation of the Fund Documents, the same contained an implied term for repayment of any over-payments, and/or such a term is to be implied on the basis of obviousness and/or as being necessary for the business efficacy of the Fund Documents and/or to give effect to the reasonable expectations of the parties.

228. 205. Upon information and belief, HSBC SSL received the Redemption Payments listed on Exhibit A and Exhibit B in respect of Shares submitted for redemption.

229. 206. Subsequent to December 8, 2008, Sentry and Sigma have determined that the Net Asset Value calculations upon which Redemption Payments were made to HSBC SSL included assets not held by or on behalf of Sentry and Sigma at the time of the making of such payments and, additionally, that such Net Asset Value calculations failed to account for and make appropriate deduction of liabilities of Sentry and Sigma existing at the time of such payments. For these and other reasons, such Net Asset Value calculation substantially overstated the net asset value of the assets of Sentry and Sigma.

230. 207. To the extent that HSBC SSL has received Redemption Payments in excess of the Net Asset Value of the Shares redeemed, HSBC SSL is contractually obligated to return

amounts in excess of the Net Asset Value that would have been calculated based upon the true facts existing at the relevant time.

231. ~~208.~~ Following determination by the Funds that Redemption Payments made to HSBC SSL had been calculated on the basis of an overstated Net Asset Value, demand has been made on HSBC SSL to return excess and overpaid Redemption Payments to the Funds.

232. ~~209.~~ HSBC SSL has failed and refused to repay to the Funds the amount that, under the Fund Documents, it is contractually required to repay to the Funds.

233. ~~210.~~ The failure of HSBC SSL to make the repayment requested constitutes a breach of the Fund Documents for which Sentry and Sigma are entitled to the award of damages.

## THIRTEENTH CLAIM
### *(Breach of Contract - Against Beneficial Shareholders)*

234. ~~211.~~ Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 210 above as if set forth herein.

235. ~~212.~~ Upon information and belief, HSBC SSL may have subscribed to all or some portion of the Shares issued to it under the Fund Documents in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

236. ~~213.~~ Each Beneficial Shareholder authorized HSBC SSL to enter into the Fund Documents on his, her or its behalf and to bind the Beneficial Shareholder to the agreements and representations contained therein to the same extent as had the Beneficial Shareholder executed the Fund Documents on his, her or its, own behalf.

237. 214. Upon information and belief, HSBC SSL may have paid to or credited some or all of the Redemption Payments received by it from Sentry and Sigma to accounts of the Beneficial Shareholders.

238. 215. To the extent that any Beneficial Shareholder has received Redemption Payments in excess of the Net Asset Value of the Shares redeemed, such Beneficial Shareholder is contractually obligated to return amounts in excess of the Net Asset Value that would have been calculated based upon the true facts existing at the relevant time.

239. 216. Following determination by the Funds that Redemption Payments made to HSBC SSL had been calculated on the basis of an overstated Net Asset Value, demand was made on the Beneficial Shareholders by demand on HSBC SSL for the return of excess and overpaid Redemption Payments.

240. 217. The Beneficial Shareholders have failed and refused to repay to the Funds the amounts that, under the Fund Documents, they are contractually required to repay to the Funds.

241. 218. The failure of the Beneficial Shareholders to make the repayment requested constitutes a breach of the Fund Documents for which Sentry and Sigma are entitled to the award of damages.

## FOURTEENTH CLAIM
### *(Breach of Implied Covenant of Good Faith and Fair Dealing - Against HSBC SSL)*

242. 219. Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 218 above as if set forth herein.

243. ~~220.~~ Following determination by the Funds that Redemption Payments to HSBC SSL had been made on the basis of an overstated Net Asset Value, demand was made to HSBC SSL to return excess and overpaid Redemption Payments to Sentry and Sigma.

244. ~~221.~~ HSBC SSL has failed and refused to make the requested repayment to Sentry and Sigma.

245. ~~222.~~ By retaining the Redemption Payments to which HSBC SSL is not entitled, HSBC SSL has deprived Sentry and Sigma of the benefit of their bargain and has subverted the Fund Documents.

246. ~~223.~~ The failure of HSBC SSL to make the repayment requested constitutes a breach of the covenant of good faith and fair dealing that inheres in the Fund Documents for which Sentry and Sigma are entitled to the award of damages.

### FIFTEENTH CLAIM
#### (Breach of Implied Covenant of Good Faith and Fair Dealing - Against Beneficial Shareholders)

247. ~~224.~~ Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 223 above as if set forth herein.

248. ~~225.~~ Upon information and belief, HSBC SSL may have subscribed to all or some portion of the Shares issued to it under the Fund Documents in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

249. ~~226.~~ Upon information and belief, HSBC SSL may have paid to or credited some or all of the Redemption Payments received by it from Sentry and Sigma to accounts of the Beneficial Shareholders.

250. ~~227.~~ Following determination by the Funds that Redemption Payments made to HSBC SSL had been calculated on the basis of an overstated Net Asset Value, demand was made on the Beneficial Shareholders by demand on HSBC SSL for the return of excess and overpaid Redemption Payments.

251. ~~228.~~ The Beneficial Shareholders have failed and refused to make repayment to Sentry and Sigma.

252. ~~229.~~ By retaining the Redemption Payments to which they are not entitled, the Beneficial Shareholders have deprived Sentry and Sigma of the benefit of their bargain and have subverted the Fund Documents.

253. ~~230.~~ The failure of the Beneficial Shareholders to make the repayment requested constitutes a breach of the implied covenant of good faith and fair dealing that inheres in the Fund Documents for which Sentry and Sigma are entitled to the award of damages.

## SIXTEENTH CLAIM
### *(Declaratory Judgment - Against All Defendants)*

254. ~~231.~~ Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 230 above as if set forth herein.

255. ~~232.~~ An actual and justiciable controversy exists between the Plaintiffs and the Defendants with respect to the obligation of the Defendants to repay to the Funds all or a portion of amounts received by them as excess or overpaid Redemption Payments under circumstances where:

(i)    the Net Asset Value per Share calculation upon which the Redemption Price was paid, directly or indirectly, to any Defendant has been subsequently adjusted, recalculated or redetermined in accordance with the Fund Documents;

(ii)    the resulting adjusted, recalculated and redetermined Redemption Price is less than the Redemption Price paid to the Defendant;

(iii)    prior to such adjustment, recalculation or redetermination, no binding Certificate has been issued by the Funds; and

(iv)    Citco issued no Certificates in good faith.

256.    233. The harm to Sentry and Sigma is real and immediate because, as a result of the failure and refusal of the Defendants to make repayment, Sentry and Sigma have become insolvent and are presently unable to pay its debts as they fall or will fall due.

257.    234. Plaintiffs have no adequate remedy at law.

258.    235. Pursuant to 28 U.S.C. § 2201 et. seq., Plaintiffs are entitled to a declaration by this Court declaring that, pursuant to the Fund Documents, each Defendant must repay Sentry and Sigma that portion of the Redemption Payments received by such Defendant representing the amount by which such Redemption Payments exceeded the Redemption Price as it has been subsequently adjusted, recalculated and redetermined by Sentry and Sigma.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.    On the First, Third and Fifth Claims, judgment in favor of Plaintiffs and against HSBC SSL allowing the Plaintiffs to recover an amount equal to the Redemption Payments received by HSBC SSL, plus interest, or, in the alternative, an amount equal to the amount of

the Redemption Payments received by HSBC SSL less the amount of redemption payments that HSBC SSL would have received had the Net Asset Value been calculated based upon the true facts existing at the time, plus interest;

B.    On the Second, Fourth and Sixth Claims, judgment in favor of Plaintiffs and against the Beneficial Shareholders allowing the Plaintiffs to recover an amount equal to any portion of any Redemption Payments received by the Beneficial Shareholders, plus interest, or, in the alternative, an amount equal to any portion of the Redemption Payments received by the Beneficial Shareholders less the amount of such portion that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time, plus interest;

C.    On the Seventh Claim, imposition of a constructive trust on Redemption Payments;

D.    On the Eighth and Ninth Claims:

    i.    a declaratory judgment in favor of the Foreign Representatives and against HSBC SSL and the Beneficial Holders that the Redemptions and/or Vulnerability Period Payments constitute Unfair Preferences under Section 245 of the BVI Insolvency Act;

    ii.    judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or Vulnerability Period Payments; and

    iii.    judgment pursuant to Section 249 of the BVI Insolvency Act against HSBC SSL and the Beneficial Holders in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest;

E.    On the Tenth and Eleventh Claims:

    i.    a declaratory judgment in favor of the Foreign Representatives and against HSBC SSL and the Beneficial Holders that the Redemptions and/or Vulnerability Period Payments constitute Undervalue Transactions under Section 246 of the BVI Insolvency Act;

ii.     judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or Vulnerability Period Payments; and

iii.    judgment pursuant to Section 249 of the BVI Insolvency Act against HSBC SSL and the Beneficial Holders in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest;

F.      On the Twelfth and Fourteenth Claims, judgment against HSBC SSL and in favor of the Plaintiffs in an amount to be determined at trial;

G.      On the Thirteenth and Fifteenth Claims, judgment against the Beneficial Shareholders and in favor of the Plaintiffs in an amount to be determined at trial;

H.      On the Sixteenth Claim, a declaratory judgment against the Defendants and in favor of the Plaintiffs that, under the Fund Documents, the Defendants must repay that portion of the Redemption Payments received by such Defendant representing the amount by which such Redemption Payments exceeded the Redemption Price as it has been subsequently adjusted, recalculated and redetermined by Sentry and Sigma;

I.      Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees and accountants' and experts' fees, costs and expenses; and

J.      Granting Plaintiffs such other and further relief as the Court deems just and proper.


Dated: New York, New York
          April 6, 2017


                              BROWN RUDNICK LLP


                              By:   /s/ David J. Molton
                                    David J. Molton
                                    May Orenstein

REDACTED WITH REDACT-IT

Daniel J. Saval
Kerry L. Quinn

Seven Times Square
New York, New York 10036
Telephone: 212.209.4800
Facsimile: 212.209.4801

*Attorneys for the Foreign Representatives*

REDACTED WITH REDACT-IT

# EXHIBIT A

***Redemption Payments Received by Defendants from Sentry***
***From April 8, 2004 Through September 16, 2008***

| Payment Date | Redemption Payment | Number of Shares | Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction[+] |
|---|---|---|---|
| April 8, 2004 | $3,685,986.86 | 3,793.19 | Bank of Bermuda (Luxembourg) Ltd., Bermuda |
| September 27, 2005 | $100,000.00 | 621.47 | HSBC Bank PLC, London |
| April 20, 2006 | $4,500,000.00 | 4,001.97 | HSBC Bank PLC, London |
| April 20, 2006 | $15,454,411.06 | 13,744.02 | HSBC Bank PLC, London |
| April 20, 2006 | $29,492,368.49 | 26,288.35 | HSBC Bank PLC, London |
| June 16, 2006 | $824,179.33 | 721.05 | HSBC Bank PLC, London |
| June 16, 2006 | $5,493,271.54 | 4,805.90 | HSBC Bank PLC, London |
| May 16, 2007 | $13,237,978.21* | 10,700.77 | HSBC Bank PLC, London |
| August 17, 2007 | $1,806,272.46* | 1,440.98 | HSBC Bank PLC, London |
| February 15, 2008 | $4,467,940.88* | 3,437.56 | HSBC Bank PLC, London |
| September 16, 2008 | $1,606,907.40* | 1,195.69 | HSBC Bank PLC, London |

* Denotes Redemptions in the Sentry Vulnerability Period

[+] Whether or not Redemption Payments were ultimately directed to bank accounts in the United States, all Redemption Payments from Sentry went through a correspondent bank account that Sentry's administrator maintained in the United States, and to the extent that any such Redemption Payments were directed outside the United States, they went through a correspondent bank account in the United States identified by shareholders for such payments.

REDACTED WITH REDACT-IT

# EXHIBIT B

*Redemption Payments Received by Defendants from Sigma*
*On or About April 17, 2007*

| Payment Date | Redemption Payment | Number of Shares | Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction |
|---|---|---|---|
| April 17, 2007 | $3,828,519.74 | 15,882.87 | HSBC Bank PLC, London |

All $USD amounts are based on the exchange rate as of the date of the Redemption Payment. However, upon application of a different exchange rate, as may be required by applicable law, the amount of damages may be different.

62571438 v1

62739746 v5

REDACTED WITH REDACT-IT

| | |
|---|---|
| **Summary report:** **Litéra® Change-Pro TDC 7.5.0.125 Document comparison done on 4/6/2017 7:28:44 PM** | |
| **Style name:** Standard | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://WORKSITE/WorkSiteUS/62571438/1 | |
| **Modified DMS:** iw://WORKSITE/WorkSiteUS/62739746/5 | |
| **Changes:** | |
| Add | 269 |
| Delete | 180 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 449 |

# **EXHIBIT C**

**BROWN RUDNICK LLP**

Seven Times Square
New York, New York 10036
David J. Molton
212-209-4800

*Attorneys for the Foreign Representatives*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 15 Case |
| | ) |
| **FAIRFIELD SENTRY LIMITED, et al.,** | ) Case No. 10-13164 |
| | ) (SMB) |
| | ) |
| **Debtors in Foreign Proceedings.** | ) Jointly Administered |
| | ) |
| **FAIRFIELD SENTRY LIMITED (IN LIQUIDATION), and FAIRFIELD SIGMA LIMITED (IN LIQUIDATION), acting by and through the Foreign Representatives thereof, and KENNETH KRYS and CHARLOTTE CAULFIELD, solely in their capacities as Foreign Representatives and Liquidators thereof,** | ) ) ) ) ) ) Adv. Pro. No. 10-03633 ) (SMB) ) |
| | ) |
| **Plaintiffs,** | ) THIRD AMENDED ) COMPLAINT |
| | ) |
| -against- | ) |
| | ) |
| **HSBC PRIVATE BANK SUISSE SA, CAPITALIA, PAN INTERNATIONAL LIMITED and BENEFICIAL OWNERS OF ACCOUNTS HELD IN THE NAME OF HSBC PRIVATE BANK SUISSE SA 1-1000,** | ) ) ) ) ) |
| | ) |
| **Defendants.** | ) |

Fairfield Sentry Limited ("Sentry") and Fairfield Sigma Limited ("Sigma"), by

and through Kenneth Krys and Charlotte Caulfield (together with their predecessors, the

"Foreign Representatives"), and Kenneth Krys and Charlotte Caulfield (together with Sentry

and Sigma, the "Plaintiffs"), solely in their capacities as the Liquidators of Sentry and Sigma

and the Foreign Representatives of the liquidation proceedings involving Sentry, Sigma, and

Fairfield Lambda Limited ("Lambda," together with Sentry and Sigma, the "Funds" or the "Debtors") pending before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands (the "BVI Court"), for their complaint against Defendants, allege the following based on personal knowledge or information derived from the Funds' books and records or from other sources, including, *inter alia*, court filings and statements of governmental agencies and other parties.

## PRELIMINARY STATEMENT

1.      This action and similar actions are brought by the Plaintiffs, with the approval of the foreign court having jurisdiction over the matter, to recover payments made to shareholders for the redemption of shares in the Funds prior to December 2008.

2.      The Funds were created as a means for private investment in managed accounts with Bernard L. Madoff Investment Securities LLC ("BLMIS"), the brokerage business that Bernard L. Madoff used to perpetrate his massive Ponzi scheme.  Sentry was the largest of all so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency investments (respectively, Euro and Swiss Franc investments) through purchases of shares of Sentry.  Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of assets supposedly held by BLMIS for Sentry.   As stated in their offering materials, the Funds' investment objective was to achieve capital appreciation of assets through investments in BLMIS (directly, in the case of Sentry; and indirectly, through Sentry, in the cases of Sigma and Lambda).

3.      It is now known that these types of feeder funds were essential to the perpetration of Madoff's Ponzi scheme.  In order for the Ponzi scheme to operate, Madoff required a continuous flow of new investors and investments to be able to satisfy redemption

REDACTED WITH REDACT-IT

requests from early investors. Feeder funds, such as Sentry (which was a direct feeder fund into BLMIS), and Sigma and Lambda (which were indirect feeder funds, through Sentry, into BLMIS), brought new investors into this scheme, allowing Madoff to make payments to early investors and thereby creating and perpetuating the illusion that BLMIS was engaged in a successful investment strategy and actively trading securities.

4.      From the Funds' inception until the disclosure of Madoff's fraud in December 2008, during most relevant times, substantially all cash, net of fees and expenses, raised by the Funds through the sale of their shares was transferred (either directly in the case of Sentry or indirectly, through Sentry, in the cases of Sigma and Lambda) to BLMIS for investment in accounts managed by Madoff. Prior to December 2008, the voting participating shares of Sentry ($.01 par value per share), Sigma (€.01 par value per share), and Lambda (CHF.01 par value per share) (the "Shares"), were redeemable for a price equal to the applicable Fund's "Net Asset Value." Net Asset Value was to be determined, in accordance with applicable accounting standards, as the value of the respective assets of Sentry, Sigma, and Lambda divided by the number of shares outstanding in each Fund, net of certain expenses ("Net Asset Value").

5.      From time to time, in order to make payments to investors for the redemption of Shares ("Redemption Payments"), Sentry generally made withdrawals from its BLMIS accounts. On occasion, Sentry made Redemption Payments directly from amounts on hand invested by other subscribers in the Funds. At all relevant times, the Funds believed payments that Sentry received from BLMIS represented the proceeds of sales of securities and/or investments held by BLMIS for Sentry. The amount, per share, paid by the Funds to shareholders for each Share redeemed was to be equal to the per share Net Asset Value, which

was calculated based principally on the assets that the Funds believed were being held, and investments that were being made, by BLMIS for Sentry's account.

6.      As the world now knows, Madoff was operating a massive Ponzi scheme through BLMIS.  Thus, at all relevant times, the money that Sentry transferred to BLMIS was not invested, but, rather, was used by Madoff to pay other BLMIS investors or was otherwise misappropriated by Madoff for unauthorized uses.  Further, none of the securities shown on statements provided to Sentry by BLMIS were in fact purchased for Sentry.  Additionally, none of the amounts withdrawn by Sentry from its accounts with BLMIS were proceeds of sales of securities or other investments.  Instead, such amounts represented the monies of more recent investors into the Madoff scheme.

7.      In light of the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, at all relevant times the assets purportedly held at BLMIS for Sentry were non-existent, and the Funds were insolvent at the time Redemption Payments were made or they were rendered insolvent by those payments.  As a result, at all relevant times, the Net Asset Value of the Shares redeemed was miscalculated, and Redemption Payments were mistakenly made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at any relevant time.

8.      At all relevant times, all payments made from BLMIS to Sentry and other feeder funds and investors were made by Madoff to perpetuate his Ponzi scheme and avoid detection of his fraud.  Similarly, the Redemption Payments that the Funds made to redeeming shareholders were not made in the ordinary course of any business or for any legitimate purposes.  Those Redemption Payments did not conform to or follow the terms of the Funds' Subscription Agreements, Articles of Association and/or other offering documents, as they

3

were based upon Net Asset Values that were not calculated based upon the true facts existing at any relevant time, and because, more generally, the Redemption Payments represented the proceeds arising from investment in BLMIS (or a substitute therefor, in the form of subscription monies from other investors in the Funds, used as a shortcut to investing subscription monies with BLMIS and simultaneously withdrawing monies from BLMIS), which the world now knows was operated by Madoff as a Ponzi scheme. These payments were crucial in perpetuating the Ponzi scheme and maintaining the illusion that Madoff was making actual investments and employing a successful investment strategy.

9. During the period from and after April 20, 2004, through November 21, 2008, following the receipt by Sentry and Sigma of notices of redemption, Sentry and Sigma made Redemption Payments to accounts held in the name of HSBC Private Bank Suisse SA ("HSBC Suisse") aggregating USD $124,301,366.68.

10. At the time such payments were made, Sentry and Sigma mistakenly believed that such payments were in the amount of the Net Asset Value of the Shares tendered at the time of redemption. In fact, however, as stated, the Redemption Payments made to HSBC Suisse far exceeded the Net Asset Value of Shares redeemed that would have been calculated based on the true facts existing at that time or any relevant time. Moreover, these Redemption Payments did not, as Sentry and Sigma intended, represent the proceeds arising from the profitability of or to continue investment in BLMIS. Instead, any amounts obtained directly or indirectly by Sentry and Sigma from BLMIS to make Redemption Payments to HSBC Suisse generally were proceeds of Madoff's Ponzi scheme, obtained from other BLMIS investors or other Sentry investors invested in BLMIS.

4

REDACTED WITH REDACT-IT

11.     Accordingly, the Funds' actual assets are, and at relevant times were, far less than the amount needed to satisfy their liabilities and the claims that have been or may be asserted against them, and, at all relevant times, the Funds were unable to pay their debts as they fell or would fall due.  Indeed, at the time the Redemptions Payments were made, the Funds had insufficient assets from which to pay debts as they fell or would fall due.

12.     In particular, claims had been previously asserted against the Funds in actions commenced by Irving H. Picard, the Trustee appointed by the United States District Court for the Southern District of New York for the liquidation of BLMIS (the "BLMIS Trustee"), in an adversary proceeding pending before the United States Bankruptcy Court of the Southern District of New York, Picard v. Fairfield Sentry Limited, et al., No. 08-01789 (SMB) (the "BLMIS Adversary Proceeding").  As set forth in the complaint filed in the BLMIS Adversary Proceedings, the BLMIS Trustee sought to recover from the Funds, on preference and fraudulent transfer grounds, approximately $3.2 billion.  This amount was alleged to have been transferred to the Funds from BLMIS, directly (in the case of Sentry), or indirectly (in the cases of Sigma and Lambda), during the six years preceding the December 2008 disclosure of the Madoff fraud.  The BLMIS Trustee alleged that the monies transferred from BLMIS to the Funds were the misappropriated assets of other BLMIS investors.  At all relevant times, monies that the Funds received from BLMIS, net of fees and expenses, were transferred to shareholders as Redemption Payments.

13.     On July 13, 2011, pursuant to an agreement between the Foreign Representatives and the BLMIS Trustee dated May 9, 2011, the United States Bankruptcy Court for the Southern District of New York entered judgments against each of the Funds on the claims against the Funds asserted in the BLMIS Adversary Proceeding (the "Judgments") in

REDACTED WITH REDACT-IT

the amount of $3,054,000,000 with respect to Sentry, $752,300,000 with respect to Sigma, and $52,900,000 with respect to Lambda. The Redemption Payments rendered the Funds unable to satisfy their liabilities to the BLMIS customers, the BLMIS Trustee, including on account of the Judgments, and other creditors of the Funds, and further increased the amount of those liabilities. In this way, the Redemption Payments caused the Funds to become insolvent and/or deepened their existing insolvency, in that, among other things, at all relevant times the Funds were unable to pay their debts as they fell or would fall due.

14.    Upon information and belief, HSBC Suisse has either retained the Redemption Payments made to it by Sentry and Sigma for its own account and benefit or, alternatively, paid all or some portion of such payments to or for the account of persons or entities, including, but not limited to, Capitalia and Pan International Limited, for whom HSBC Suisse may have subscribed for shares of the Funds in the capacity of trustee, agent, representative, nominee or custodian (individually, a "Beneficial Shareholder" and collectively, "Beneficial Shareholders," together with HSBC Suisse, the "Defendants").

15.    Following the revelation of Madoff's fraud in December 2008, the Funds' boards of directors suspended any further redemptions of the Funds' shares and the calculation of each of the Funds' Net Asset Value. As of December 2008 and presently, Sentry, Sigma, and Lambda have, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

16.    Unless Redemption Payments paid to shareholders are recovered for the Funds' estates, the Funds will be unable to satisfy their liabilities and claims that have been made or may be made against them; further, recoveries of Redemption Payments will increase distributions to the Funds' investors who have been harmed. Moreover, to the extent such

liabilities and claims must be satisfied solely from the Funds' current assets, Defendants will have been unjustly enriched as they will not bear their proportionate share of such liabilities and claims, but rather will retain a windfall at the expense of other shareholders and creditors of the Funds.

## JURISDICTION AND VENUE

17.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 157(b) and 1334(b), as this adversary proceeding and the claims asserted by the Foreign Representatives herein arise under, arise in and/or relate to the Chapter 15 proceedings of the above-captioned Debtors, In re Fairfield Sentry Limited, et al., No. 10-13164 (SMB), pending in this Court. Additionally, pursuant to section 78eee(b)(2)(A)(iii) of the Securities Investor Protection Act ("SIPA"), which incorporates 28 U.S.C. § 1334(b) and applicable provisions of Title 11 of the United States Code, jurisdiction is also proper in this Court because this action also relates to the consolidated liquidation proceedings of BLMIS and Bernard L. Madoff, pending in this Court under the caption Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC, SIPA Liquidation No. 08-1789 (SMB).   Pursuant to the Amended Standing Order of Reference of the United States District Court for the Southern District of New York, dated January 31, 2012, all proceedings arising in, arising under and/or related to cases under Title 11 of the United States Code (as amended, the "Bankruptcy Code") are referred to this Court for adjudication.

---

[1]     Although the District Court, in In re Fairfield Sentry Ltd., No. 1:11-mc-00224-LAP, 458 B.R. 665 (S.D.N.Y. 2011), held that causes of action alleged by the Plaintiffs in other cases before this Court—causes of action that are similar or the same as those alleged in this complaint—are not core proceedings, this determination may be subject to appeal.  In any event, plaintiffs submit that the causes of action in this complaint, which include, inter alia, allegations regarding transfers of property that were directed into the territorial jurisdiction of the United States, render the claims asserted in this complaint core in accordance with the District Court's decision.

18.     This is a core proceeding under 28 U.S.C. § 157(b)(2).[1]  Should the Court

determine that this is a non-core proceeding, Plaintiffs consent to entry of final judgment and

order by this Court.

19.     This Court has jurisdiction over HSBC Suisse and any Beneficial Shareholders

pursuant to Rules 7004(d) and (f) of the Federal Rules of Bankruptcy Procedure and New

York Civil Practice Law & Rules § 302 (McKinney 2008) because HSBC Suisse and the

Beneficial Shareholders purposely availed themselves of the laws of the United States and the

State of New York by, among other things, investing money with the Funds, knowing and

intending that the Funds would invest substantially all of that money in New York-based

BLMIS, and maintaining bank accounts in the United States at HSBC Bank USA, and in fact

receiving Redemption Payments in those United States-based and/or New York-based accounts.

HSBC Suisse and the Beneficial Shareholders selected U.S. dollars as the currency in which to

invest and execute their transactions in Sentry, designated United States-based and/or New

York-based bank accounts to receive their Redemption Payments from the Funds, and actively

directed Redemption Payments at issue in this action into those accounts.  HSBC Suisse and

the Beneficial Shareholders thus knowingly accepted the rights, benefits, and privileges of

conducting business and/or transactions in the United States and New York, derived significant

revenue from New York, and maintained minimum contacts and/or general business contacts

with the United States and New York in connection with the claims alleged herein.  HSBC

---

[1]     Although the District Court, in <u>In re Fairfield Sentry Ltd.</u>, No. 1:11-mc-00224-LAP, 458 B.R. 665
(S.D.N.Y. 2011), held that causes of action alleged by the Plaintiffs in other cases before this
Court—causes of action that are similar or the same as those alleged in this complaint—are not core
proceedings, this determination may be subject to appeal.  In any event, plaintiffs submit that the
causes of action in this complaint, which include, *inter alia*, allegations regarding transfers of property
that were directed into the territorial jurisdiction of the United States, render the claims asserted in this
complaint core in accordance with the District Court's decision.

Suisse and the Beneficial Shareholders should therefore reasonably expect to be subject to United States jurisdiction.

20.    Moreover, this Court has jurisdiction over HSBC Suisse and any Beneficial Shareholders by virtue of the legally binding and valid agreements and representations set forth in one or more agreements for the subscription of Shares that HSBC Suisse entered into with Sentry and Sigma.

21. HSBC Suisse, upon information and belief, entered into a Subscription Agreement with Sentry on or about April 15, 1998 (the "Initial Subscription Agreement") pursuant to which HSBC Suisse subscribed for a total of 93,529.5700 Shares.  Subsequent to entering into the Initial Subscription Agreement, HSBC Suisse, upon information and belief, entered into additional agreements (the "Subsequent Subscription Agreements") with Sentry and Sigma on or about April 24, 1998, June 10, 1998, June 16, 1998, June 22, 1998, August 17, 1998, September 1, 1998, October 1, 1998, October 2, 1998, October 5, 1998, November 12, 1998, December 8, 1998, December 11, 1998 December 31, 1998, January 13, 1999, February 10, 1999, April 13, 1999, April 23, 1999, May 12, 1999, May 14, 1999, May 17, 1999, June 10, 1999, July 9, 1999, August 10, 1999, August 23, 1999, September 9, 1999, October 14, 1999, November 10, 1999, December 8, 1999, December 9, 1999, January 11, 2000, January 31, 2000, February 8, 2000, March 10, 2000, April 12, 2000, May 12, 2000, May 24, 2000, May 29, 2000, April 30, 2001, June 9, 2000, July 12, 2000, August 15, 2000, August 22, 2000, September 19, 2000, September 20, 2000, September 28, 2000, October 31, 2000, November 30, 2000, December 29, 2000, January 31, 2001, March 30, 2001, April 4, 2001, April 30, 2001, May 1, 2001, May 31, 2001, June 29, 2001, July 31, 2001, September 4, 2001, October 31, 2001, November 30, 2001, December 3, 2001, January 3, 2003, April 8, 2002, June 27,

2002 June 28, 2002, August 26, 2002, August 30, 2002, September 23, 2002, December 23, 2002, July 31, 2003, October 2, 2003, October 28, 2003, November 28, 2003, December 30, 2003, March 24, 2004, March 25, 2004, April 26, 2004, May 25, 2004, November 24, 2004, January 27, 2005, March 28, 2005, April 25, 2005, April 26, 2005, April 29, 2005, January 26, 2006, March 28, 2006, May 12, 2006, July 27, 2006, August 22, 2006, August 28, 2006, August 29, 2006, October 27, 2006, October 30, 2006, November 27, 2006, December 22, 2006, January 26, 2007, February 23, 2007, February 26, 2007, March 27, 2007, March 28, 2007, April 24, 2007, April 26, 2007, May 29, 2007, July 26, 2007, June 27, 2007, August 29, 2007, September 26, 2007, October 26, 2007, October 29, 2007, November 28, 2007, December 24, 2007, January 28, 2008, February 26, 2008, February 27, 2008, March 26, 2008, March 28, 2006, April 25, 2008, May 29, 2008, June 24, 2008, July 31, 2008, and September 24, 2008 pursuant to which it subscribed for 330,009.1009 additional Shares on the same terms and conditions as those shares subscribed for pursuant to the Initial Subscription Agreement.  The Initial Subscription Agreement and Subsequent Subscription Agreements are collectively referred to herein as the "Subscription Agreements."

22.    The Subscription Agreements provide for, *inter alia*, the irrevocable submission by HSBC Suisse to the jurisdiction of the New York courts with respect to any proceeding with respect to said agreement and Sentry and Sigma and HSBC Suisse's consent to service of process by the mailing of such process, as provided therein.  In particular, the Subscription Agreements provide as follows:

> New York Courts.  Subscriber agrees that any suit, action or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York.  Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum.

Subscriber consents to the service of process out of any New York court in any such Proceeding by the mailing of copies thereof, by certified or registered mail, return receipt requested, addressed to Subscriber at the address of Subscriber then appearing on the Fund's records.  Nothing herein shall affect the Fund's right to commence any Proceeding or otherwise to proceed against Subscriber in any other jurisdiction or to serve process upon Subscriber in any manner permitted by any applicable law in any relevant jurisdiction.

23.    Furthermore, by executing the Subscription Agreements, HSBC Suisse agreed to all terms and conditions contained therein, including the express provision that any agreement made by HSBC Suisse in the Subscription Agreements would also apply to any other person for whom HSBC Suisse was subscribing as trustee, agent, representative, or nominee – i.e., all Beneficial Shareholders.  Moreover, by executing the Subscription Agreements, HSBC Suisse represented that it had all requisite authority from Beneficial Shareholders to execute and perform any and all obligations on their behalf, and also agreed to indemnify Sentry and Sigma for any damages resulting from an assertion by a Beneficial Shareholder that HSBC Suisse lacked proper authorization to enter into the Subscription Agreements or perform the obligations thereof.  Specifically, the Subscription Agreements provide as follows:

> If Subscriber is acting as a Representative.  If Subscriber is subscribing as trustee, agent, representative, or nominee for another person (the "Beneficial Shareholder"), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder. Subscriber has all requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder.  Subscriber also agrees to indemnify the Fund . . . for any and all costs, fees and expenses (including legal fees and disbursements, fines and amounts paid in settlement) in connection with any damages resulting from Subscriber's misrepresentation or misstatement contained here, or the assertion of Subscriber's lack of proper authorization from the Beneficial Shareholder to enter into this Agreement or perform the obligations hereof.

24.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## PARTIES

**Plaintiffs**

25.    Sentry, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sentry's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI.   Sentry is currently in liquidation in proceedings commenced on April 21, 2009 in the BVI Court.

26.    Sigma, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sigma's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI.   Sigma is currently in liquidation in proceedings commenced on April 23, 2009, in the BVI Court.

27.    The Foreign Representatives were appointed by the BVI Court as Liquidators of the Funds to supervise the liquidation of the Funds' estates and, where necessary, commence proceedings in the name of and on behalf of the Funds or in their own official names.   On April 23, 2009, the BVI Court issued an order appointing Christopher Stride as liquidator of Lambda (the "Lambda Appointment Order").   On July 21, 2009, the BVI Court issued an order appointing Kenneth Krys and Mr. Stride as joint liquidators of Sentry and Sigma (the "Sentry & Sigma Appointment Order").   On September 6, 2010, the BVI Court issued notices acknowledging Mr. Stride's resignation and the appointment of Joanna Lau as joint liquidator with Mr. Krys of all three Funds (the "Supplemental Appointment Order").   On November 23,

2011, Ms. Lau resigned as joint liquidator of the Funds.  On June 24, 2014, the BVI Court

issued an order appointing Charlotte Caulfield as joint liquidator, with Mr. Krys, of all three

Funds (the "Second Supplemental Appointment Order" and, together with the Lambda

Appointment Order, the Sentry & Sigma Appointment Order, and the Supplemental

Appointment Order, the "BVI Appointment Orders"). The Foreign Representatives, in their

capacities as Foreign Representatives and liquidators of the Funds, have been authorized by the

foreign court having jurisdiction over the matter to bring this action and the claims herein,

including the avoidance claims herein under the BVI Insolvency Act of 2003 (the "BVI

Insolvency Act").

28.     Pursuant to the BVI Appointment Orders, the Foreign Representatives are

responsible for all aspects of the Funds' businesses, including, among other things, custody and

control of the Funds' assets, the power to do all acts and execute, in the name and on behalf

of the Funds, any deeds, receipts or other documents, and the power to compromise claims,

commence litigation and to dispose of property.   After obtaining BVI Court approval, the

Foreign Representatives filed petitions in this Court in June of 2010, under Chapter 15 of Title

11 of the United States Code, seeking recognition of the BVI Liquidation Proceedings as

"foreign main proceedings" under Chapter 15.  On July 22, 2010, this Court issued an order

(the "Recognition Order") granting that recognition.

29.     Pursuant to the Recognition Order, the Foreign Representatives were

automatically afforded relief available under 11 U.S.C. § 1520, including application of the

Bankruptcy Code's automatic stay to the Funds and their property located in the United States,

as well as the ability to operate the Funds' business and exercise the rights and powers of a

trustee under Sections 363 and 552 of the Bankruptcy Code.  Moreover, the Bankruptcy Court

specifically granted additional relief in the Recognition Order to the Foreign Representatives pursuant to 11 U.S.C. § 1521(a). Such relief includes, but is not limited to: (i) staying any actions, proceedings or execution against the Funds' assets to the extent not stayed under Section 1520; (ii) authorizing the Foreign Representatives to seek leave to conduct discovery concerning the Funds' assets, affairs, rights, obligations or liabilities; (iii) entrusting the Foreign Representatives with the administration and realization of the Funds' assets that are located within the United States, including all claims and causes of action belonging to the Funds; and (iv) otherwise giving full force and effect to the proceedings before the BVI Court.

**Defendants**

30.     HSBC Suisse was, at all relevant times, a member of Sentry and Sigma and a registered holder of Shares. Upon information and belief, HSBC Suisse is a corporate entity organized under the laws of Switzerland and having its registered address at 2 Quai General Guisan, P.O. Box 3580, CH-1211 Geneva, Switzerland. HSBC Suisse subscribed for the purchase of Shares by entering into one or more Subscription Agreements with Sentry and Sigma. All purchases of Shares by HSBC Suisse were subject to the terms of the Subscription Agreements.

31.     Defendants "Beneficial Owners of the Accounts Held in the Name of HSBC Private Bank Suisse SA 1-1000" - i.e., the Beneficial Shareholders, are, as noted, any persons or entities having a beneficial ownership or interests in Shares of Sentry and/or Sigma issued to HSBC Suisse and on whose behalf HSBC Suisse was acting as trustee, agent, representative, or nominee.

32.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to HSBC Suisse may have been paid to an account holder or holders associated with

Capitalia.  Upon information and belief, Capitalia is a corporate entity organized under the laws of Italy and has its registered address at Piazza Cordusio, 20123, Milano, Italy.

33.     Based on Sentry and Sigma records, some or all of the Redemption Payments made to HSBC Suisse may have been paid to an account holder or holders associated with Pan International Limited.

## NOTICE PURSUANT TO FED. R. CIV. P. 44.1

34.     Certain of the substantive issues to be resolved in this case will be governed by the laws of the British Virgin Islands.  Plaintiffs intend to rely upon the applicable laws of that territory.

## FACTUAL ALLEGATIONS

### A.     Role of Feeder Funds In Madoff Fraud

35.     Sentry was the largest of all the so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency (respectively, Euro and Swiss franc) investment through purchase of shares of Sentry. Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of invested assets supposedly held by BLMIS.  As stated in its offering materials, Sentry's investment objective was to achieve capital appreciation through investments in BLMIS.

36.     As discussed above, Sentry, Sigma, and Lambda were established for the purpose of making investments in BLMIS.  It is now known that these types of feeder funds were a crucial part of Madoff's Ponzi scheme.  The feeder funds brought new investors and new investments into the scheme, allowing Madoff to make payments to early investors who sought to liquidate their investments, and in this way, the feeder funds were used by Madoff to

continue and perpetuate his fraud by maintaining the illusion that BLMIS was making active investments and engaging in a successful investment strategy.

**B.    Calculation of Net Asset Value and Shareholder Redemption Payments**

37.    Substantially all of the money (up to 95%) raised by the Funds from the sale of their Shares, net of fees and expenses, was turned over to and invested in BLMIS (by and/or through Sentry), and supposedly credited to accounts held in the name of Sentry with BLMIS, purportedly for use in the now infamous "split-strike conversion" investment strategy.   In accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other relevant documents, from time to time, the Funds paid to shareholders, for each Share tendered for redemption, an amount that was based on each of the respective Funds' purported Net Asset Value, as it was then calculated.

38. In calculating each of the Funds' Net Asset Value, the Funds' administrators used and relied on account statements provided by BLMIS purportedly showing securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry.   Generally, all securities identified on BLMIS account statements were traded on public exchanges and had readily ascertainable market values, and those market values (in addition to, among other items, cash on hand that was identified in the Sentry account statement for the relevant time period) were used in accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other documents to calculate the Net Asset Value of the Shares.

39.    In fact, at all relevant times, no securities were ever purchased or sold by BLMIS for Sentry and any stated cash on hand in the BLMIS accounts was based on misinformation and fictitious account statements.   None of the transactions shown on the

account statements provided by BLMIS to Sentry ever occurred. Indeed, no investments of any kind were ever made by BLMIS for Sentry. At all relevant times, all of the account statements that BLMIS provided to Sentry were entirely and utterly fictitious. Further, all amounts deposited by Sentry (or by Sigma and Lambda through Sentry) with BLMIS for investment and the purchase of securities to be held by BLMIS for the account of Sentry were used by Madoff to pay other BLMIS investors or were misappropriated by Madoff for other unauthorized uses.

40.    From time to time, to make Redemption Payments, Sentry (and Sigma and Lambda through Sentry) made withdrawals from Sentry's BLMIS accounts (or utilized subscription monies of other investors on hand that were directed for investment in BLMIS). The Funds believed that the amounts provided in connection with such withdrawals represented the proceeds arising from the profitability of or to continue investment in BLMIS. In fact, however, payments made by BLMIS to Sentry purportedly representing the proceeds of sales of securities or other investment positions were nothing other than the deposits of other BLMIS investors or previous deposits made by Sentry, never invested but rather misused and misappropriated as part of Madoff's fraud. At all relevant times, payments made from BLMIS to Sentry were made by Madoff to continue and perpetuate his Ponzi scheme and avoid detection of his fraud. The payments from BLMIS to Sentry were not payments made in the ordinary course of or as part of any business, nor did they have a legitimate business purpose. Similarly, the Redemption Payments were not made for any legitimate purposes or in the ordinary course of any business.

41.    Given the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, the money paid by the Funds (directly in the case of Sentry and indirectly in the cases

of Sigma and Lambda) to BLMIS on account of Sentry was, at all relevant times and unknown to the Funds, misused and misappropriated by Madoff as part of his Ponzi scheme. At all relevant times, the Funds were insolvent when the Redemption Payments were made or were rendered insolvent, and/or their insolvency was deepened, as a result of the Redemption Payments.

**C.    Redemption Payments Made or Transferred to Defendants**

42.    During the period from and after April 20, 2004, through November 21, 2008, HSBC Suisse received Redemption Payments totaling USD $124,301,366.68 from Sentry and Sigma in respect of Shares tendered for redemption.

43.    At HSBC Suisse's directions and instructions, Redemption Payments totaling USD $115,525,744.52 were received at HSBC Suisse's bank account with HSBC Bank USA in New York.

44.    The dates and amounts of each Redemption Payment received by HSBC Suisse from Sentry, and the bank accounts to which each Redemption Payment was made, are set forth on Exhibit A. The dates and amounts of each Redemption Payment received by HSBC Suisse from Sigma, and the bank accounts to which each Redemption Payment was made, are set forth on Exhibit B.

45.    At the time those Redemption Payments were made, the Funds had insufficient assets and were unable to pay their debts as they would fall due. In exchange for each Redemption Payment, each of which constitutes or forms part of a transaction between HSBC Suisse and Sentry and Sigma, Sentry and Sigma received no consideration or consideration of a value that, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry and Sigma.

18

46.     Upon information and belief, HSBC Suisse and/or the Beneficial Shareholders received Redemption Payments in excess of amounts paid by such person(s) for purchase of their Shares.

**D.     Citco Did Not Issue Any Certifications of Net Asset Value in "Good Faith"**

47. Article 11 of the Funds' Articles provides that "[a]ny certificate as to the Net Asset Value per Share . . . given in good faith by or on behalf of the Directors shall be binding on all parties."   During the relevant period, statements of the Net Asset Value were issued by the Funds' administrators, Citco Fund Services (Europe) B.V. and its delegatee Citco (Canada) Inc. (the "Administrators").   On April 16, 2014, the Judicial Committee of the Privy Council (the "Privy Council") issued a decision in which it held that certain statements of Net Asset Value, in particular, certain monthly emails, contract notes, and monthly account statements issued by the Administrators, constituted "certificates" for the purposes of Article 11 (the "Certificates").   The Privy Council did not, however, address whether such Certificates were given "in good faith."   In carrying out this responsibility, the Administrators and affiliated Citco companies within Citco Group Limited (collectively, "Citco") acted with a lack of good faith in giving the Certificates.



REDACTED





REDACTED



REDACTED









REDACTED WITH REDACT-IT



*REDACTED*





*REDACTED*

76. By virtue of the foregoing conduct, Citco issued the Certificates without good faith. The Funds were the primary victims of Citco's conduct and its lack of good faith in issuing the Certificates.

**E.**    **HSBC Suisse Knew** ~~or Should Have Known of,~~ **Was Willfully Blind to or Recklessly Disregarded** the BLMIS Fraud[2]

~~77.  HSBC Suisse served as trustee, agent, representative, nominee or custodian for the Beneficial Owners in connection with their investments in the Funds, including, by:  subscribing to Shares of Sentry and Sigma on behalf of the Beneficial Owners, maintaining custody of the Shares as record shareholders, paying redemption proceeds from the Shares of Sentry and Sigma to the Beneficial Owners, and otherwise exercising control over the Shares of Sentry and Sigma.~~

~~78.  Further, each of the Subscription Agreements, executed by HSBC Suisse, manifested the Beneficial Owners' consent for HSBC Suisse to act on behalf of and subject to the Beneficial Owners' control.~~

---

[2]    The allegations set forth in Paragraphs 47 through 57 of this Complaint are made by the Foreign Representative upon information and belief based on allegations set forth in the complaint filed by the Madoff Trustee in <u>Picard v. HSBC Bank PLC</u>, 09-01364 (Bankr. S.D.N.Y.).  Upon information and belief, the allegations of the BLMIS Trustee are based on an extensive investigation and the analysis of documentary evidence as well as other sources.

79. In executing the Subscription Agreements, HSBC Suisse accepted and agreed to act on behalf of the Beneficial Owners.

80. Accordingly, the Beneficial Owners had the same knowledge as HSBC Suisse regarding all relevant matters relating to BLMIS and the Funds' Net Asset Values at all relevant times.

77. 81. HSBC Suisse was well aware of the indicia of fraud surrounding BLMIS.

78. 82. In July 2001, HSBC Suisse's and its affiliates' due diligence team met with Fairfield Greenwich ("Fairfield") officers. At this meeting, Stephen Kinne, a high-ranking member of HSBC Suisse affiliate HSBC Bank USA's due diligence team, inquired about Madoff's choice to forego lucrative fees, the identities of the counterparties to Madoff's over-the-counter options transactions, and the percentage of securities that Madoff held at the Depository Trust Corporation.

79. 83. On August 7, 2001, HSBC Bank USA issued a due diligence report on Sentry ("2001 Report"). The 2001 Report stated that the due diligence team had been unable to meet with Madoff and that, therefore, the team formed its "opinions" solely on the basis of meetings with Fairfield representatives and a MAR/Hedge article on Madoff. The 2001 Report noted that, without meeting Madoff, there was no way for HSBC Bank USA to assess Madoff's trading system, risk controls, or compliance procedures. As a result, HSBC Bank USA stated that it was "very difficult" to understand how Madoff was able to make money in such a consistent fashion. The 2001 Report also noted multiple concerns associated with Madoff, including his taking custody of securities and refusal to accept fees at the fund level.

80. 84. In January of 2003, HSBC Bank USA issued another due diligence report on Sentry, which noted many of the same concerns addressed in the 2001 Report. In 2007 an

investor was informed by his HSBC Suisse adviser to "get out" because HSBC Suisse had conceded that it did not understand the investment strategy.

81.    Upon information and belief, all HSBC entities, including HSBC Securities Services (Luxembourg) SA ("HSBC SSL"), HSBC Bank USA, N.A., and HSBC Private Bank (Suisse) (collectively, the "HSBC Knowledge Defendants") worked collaboratively and freely shared information in connection with BLMIS-related matters.  Moreover, upon information and belief, the free flow of information and co-ordination of action between various HSBC entities extended to the HSBC Knowledge Defendants.

82.    In their due diligence reviews, HSBC SSL and its affiliates repeatedly pointed to BLMIS's role as a sub-custodian as a fraud risk.  In August of 2008, Christine Coe, Global Head of Risk, HSBC (London), stated in an email to Chris Wilcockson ("Wilcockson"), Managing Director of Bank of Bermuda (Luxembourg) n/k/a HSBC Bank Bermuda and HSBC SSL, that she was concerned that Madoff was potentially using the fund's assets because "overall control [was] Madoff centric and there [were] opportunities for misleading or misappropriation to take place if he were so inclined," creating a "huge" fraud risk.  HSBC SSL specifically identified as a risk the lack of "independent custody and verification of trading activity away from the investment manager (unlike a standard hedge fund that has a prime broker)."  HSBC SSL identified this risk every year from at least 2002 through 2008.  At the end of September 2002, Paul Smith ("P. Smith") (head of Global Fund Services ("GFS") n/k/a HSBC Securities Services ("HSS")) expressed these concerns in an email sent to Nigel Fielding ("Fielding"), who served as (a) General Manager of Corporate Trust for Bank of Bermuda n/k/a HSBC Bank Bermuda until 2001, (b) Deputy Global Head of Client Services for Bank of Bermuda until December 2003, (c) Global Head of Business Services of GFS from January

2004, and (d) a Director of HSBC SSL until November of 2015.  In that email, P. Smith stated: "[W]e have a problem with him [Madoff].  He is the manager, broker and custodian to his accounts.  In today's world this is a ***red flag.***"

**F.    HSBC Suisse Affiliates Engaged KPMG to Assess Fraud and Operational Risk at BLMIS and then HSBC Suisse Ignores its Findings**

83. ~~85.~~ In September 2005, HSBC Suisse affiliates engaged KPMG to review BLMIS for fraud and related operational risk. KPMG's review focused on fraud risks in BLMIS's methods of recording and reporting client funds held by BLMIS, HSBC Suisse's and its affiliates' ability to detect suspected fraud or misconduct in client funds for which HSBC SSL and its affiliates served as primary custodian. KPMG's findings were encapsulated in a February 16, 2006 report, titled "Review of fraud risk and related operational risks at Bernard L. Madoff Investment Securities LLC" (the "2006 Report"). In the 2006 Report, KPMG identified a laundry list of fraud and related operational risks related to BLMIS's operations including:

- o  falsification of client mandates;

- o  embezzlement of client funds;

- o  use of fabricated client instructions to disguise poor proprietary positions;

- o  failure to segregate client funds from BLMIS funds;

- o  diversion of client funds for Madoff's personal gain;

- o  inaccurate allocation of reinvested funds from Fidelity across individual accounts;

- o  manipulation of option prices to maximize commissions;

- o  use of BLMIS claim funds to settle options exercised against HSBC Suisse;

- o practice of exercising options without informing the client that the option was set to expire;

- o use of client funds to make opportunistic trades that deviated from the SSC Strategy;

- o diversion of cash resulting from the sale of equities and Treasury bills;

- o systematic over-valuing of positions and the failure to report positions to HSBC Suisse in order to manipulate control relationships;

- o stocks were not held in client names;

- o inflation of call values to disguise misappropriate or poor positions;

- o unauthorized trading in client accounts;

- o trades executions made by unauthorized BLMIS staff members;

- o sham trades to divert client cash;

- o front-running order flow in the market-making business;

- o false reporting of trades without execution to collect commissions; and

- o falsification of trade confirmations.

84. 86. KPMG was particularly concerned that it could not identify the owners of individual HSBC Suisse affiliates' client assets, and that controls in place at BLMIS might not prevent fraud or errors in client accounts.

85. 87. Despite the litany of fraud and operational risks identified by KPMG, HSBC Suisse continued its relationship with Madoff, delegated custodial duties to BLMIS, and took no steps to implement KPMG's recommendations.

**G. KPMG Engaged Again and Uncovers HSBC Suisse's Failure to Heed Earlier Warnings**

86. 88. After ignoring KPMG's dire warnings in 2006, HSBC Suisse and its affiliates asked KPMG to conduct another review of BLMIS in March 2008. The terms

and scope of the review were identical to the 2006 review, except that KPMG was also asked to assess the risk of placing HSBC Suisse's and its affiliates' investments with BLMIS.

87. 89. KPMG's conclusions were contained in a September 8, 2008, report entitled "Review of fraud risk and related operational risks at Bernard L. Madoff Investment Securities LLC" (the "2008 Report"). KPMG wrote that, according to Madoff, HSBC Suisse's and its affiliates' client investments represented an astonishing 33% of BLMIS's assets under management.

88. 90. In the 2008 Report, KPMG identified three additional fraud concerns at BLMIS, not previously identified in the 2006 Report:

  o Client cash is diverted signatures falsified on client instruction in an attempt to legitimize an unauthorized transaction (i.e., redemption);

  o Madoff LLC claim funds have been used to settle options exercised against HSBC Suisse and/or its affiliates; and

  o Stocks are intentionally not allocated a fair price from the bulk trade.

89. 91. Yet again, HSBC Suisse ignored KPMG's warnings and recommendations. HSBC Suisse, instead, used the 2008 Report as a marketing tool to encourage additional investment in BLMIS. Upon information and belief, in mid-2008, HSBC Suisse and/or its affiliates were asked to explain Madoff's investment strategy to Andreas Pirkner, an employee of Bank Medici. In response, HSBC Suisse and/or its affiliates forwarded to Pirkner the 2008 Report with the comment that the Feeder Funds were in good shape.

REDACTED WITH REDACT-IT

## H. Internal Discussions Reveal That HSBC SSL Was More Concerned With Upsetting The Madoff Relationship And Losing Customers And Fees Than Properly Investigating Potential Fraud[3]

90.    As early as 2000, Bank of Bermuda n/k/a HSBC Bank of Bermuda was aware that Madoff's operational structure had the potential for fraud.  Paula Downey, Head of Compliance for Bank of Bermuda informed Gerry Brady, who upon information and belief served as Regional Managing Director and Country Head - Ireland for the Bank of Bermuda, of many concerns in this regard.  Downey wrote to Brady in 2000, stating:

"I've been thinking about the issue you asked me to take a look at ahead of the Board meeting. How do Bermuda Trust Dublin Limited discharge their duties as master custodian to Thema and what checks are in place to ensure

there are adequate checks and controls in relation to the sub-custodian

Madoff. It's a difficult one and many of the normal checks are not possible. The following is what I perceive to be the holes in the current procedure vis a vis other funds. We don''t receive a trade ticket from the Client Investment Manager which matches the broker ticket. The Madoff ticket is effectively the composite of the two…

In addition, we generally receive confirmation of trades from the Investment Manager and the broker on their behalf. This protects us against receiving fictitious or incorrect trade details from the Investment Manager and broker confirmation match. This is not possible as Madoff is both Investment Manager and broker. While I do not dispute the good character and reputation of Madoff, the concern is that we have no independent confirmation that the trades they say they are doing are being done, or that the holdings we say the Fund has are indeed registered in the name of the Fund. We don't receive bank statements. What information would I like to see us receiving. Independent confirmation that the assets of Thema exist and are registered under the name of Thema."

---

[3]  Paragraphs 90-111 and portions of paragraph 82 are derived from a transcript of testimony provided in a proceeding before the Grand Court of the Cayman Islands, styled *Primeo Fund (in Official Liquidation) v. Bank of Bermuda (Cayman) Ltd. & HSBC Securities Services (Luxembourg) SA.*

91.    In July 2002, Fielding made a visit to BLMIS as part of due diligence efforts for Bank of Bermuda. Following that visit, an employee with the credit desk of Bank of Bermuda Dublin, Tom Young ("Young"), raised questions about the Madoff structure with Fielding. Those questions arose out of concerns with respect to the Primeo Fund ("Primeo"), which invested all or substantially all of its assets in BLMIS, and HSBC SSL served as custodian for that fund. Fielding, however, resisted further inquiry. For example, in one email, Young asked Fielding: "Would it be possible to get independent verification that the assets of [the Primeo Fund] are segregated from other assets held by Madoff?" In response, Fielding stated: "[W]e decided not to request this so far. The review is finished and signed off for this year and I do not intend to do more unless the GFS Board supports it, risk versus cost versus relationship, etc."

92.    On December 24, 2002, Fielding expressed to David Smith ("D. Smith"), also a Director of HSBC SSL, resistance to the desire of P. Smith to obtain due diligence on Madoff, with Mr. Fielding stating: "Paul seems hellbent on irritating Madoff with FIG." Upon information and belief, "FIG" refers to "Financial Institutions Group", an internal group within HSBC.

93.    HSBC SSL also recognized that if HSBC's relationship with Madoff was damaged, the HSBC entities stood to lose customers and, in turn, fees from their custodian roles. On October 10, 2002, D. Smith expressed these concerns in an email he sent to Fielding, in which he stated: "Madoff is really cheesed off with us (BOB) and he may cut the umbilical if we go once more to the well. We may think our [redacted] has power in the market but he can replace that within a month. He may put us on the black list so we have to agree a plan of action. Perhaps we should discuss?"

94.     Concerns regarding Madoff were also raised at a HSBC SSL Board meeting in Dublin, Ireland in the fall of 2004, following which further diligence of BLMIS was proposed. Commenting on the proposed diligence, Brian Wilkinson ("Wilkinson"), who at the time served as (a) Head of Bank of Bermuda Global Fund Services in Ireland (which later became Alternative Fund Services within HSBC Securities Services), (b) Europe Head of Alternative Fund Services within HSS, and (c) a Member of GFS' Board Management Committee, communicated to P. Smith by e-mail:  "The consequence of the trustee review of the sub-custodian Madoff will be both painful and, it would appear, fatal.  Clearly I am not suggesting that GIS/HSBC should ignore their fiduciary responsibilities, however, we should all be aware of the potential fall-out."

95.     In August 2008, Gordon Thomson, an employee of HSBC SSL, sent an email to Michael May ("May"), managing director of HSBC SSL in charge of operations, risk and compliance, copying Andrew Bastow (who, upon information and belief, was the Chief Technology and Services Officer of HSBC Ireland), Brian Pettitt (Deputy Head of Risk, HSBC (London)) and Coe.  In that email, Mr. Thomson stated that Madoff investments were "too good to be true" and characterized them as involving "unusual activity."

**I.      HSBC SSL Repeatedly Raised Specific and Substantial Concerns Regarding Madoff's "Real Strategy"**

96.      During a telephone call that occurred between September and October 2002 between Fielding and Wilkinson, those individuals made a number of statements reflecting their serious concerns regarding Madoff, including the following:

- o   Fielding: "So . . . I, you know, everybody has some concerns about Madoff, or 'made off' as he likes to call himself, which I think makes it even worse. 'made off with the money.'"

- o   Wilkinson: "I could be wrong Nigel, and maybe I'll investigate that, but I'm just covering all of our backsides to make sure we've done everything possible if this thing ever went up, you know."

- o   Fielding: "Yeah, and I guess my ... I'm not saying we shouldn't do it, I guess I wanted the board to say we wanted to do it, having heard David rant and rave about upsetting the guy before ..."

- o   Wilkinson: "His financial statements are not very detailed, you know, what really is his source of revenue, etc. ... which I think is important to us, cause we're really relying on the financial strength of Madoff, as well as much as anything . . ."

97.      In December 2004, GFS, which by then had been acquired by or was a division within HSS, was approached about acting as custodian and administrator for a new Madoff related fund.  In an email to Peter Heaps, who it appears was handling this request on behalf of the Madoff related fund, Wilkinson stated: "Please speak to Nigel Fielding on this. The whole Madoff issue is coming under focus now that we are part of HSBC.  My gut reaction is that this will not fly."

98.      In February 2005, Fielding was asked about concerns expressed by Primeo's auditors, Ernst & Young ("E&Y"), about Madoff that were raised in a meeting with Saverio Fiorino ("Fiorino"), who was a Director of HSBC SSL Valuation & Client Administration and

Head of Alternative Fund Services (AFS) at HSBC SSL from September 2003 to March 2008. Fielding responded as follows: "Nespolo [managed Madoff feeder funds Hermes, Thema International, and Thema Fund] understands the auditors concern and asked if their worries were based on the rumors (1) what is his real strategy, how on earth can he always produce 12%pa (2) where are the assets and are there really assets or is it all fictitious."

99.     In a Madoff discussion paper that Coe prepared for the HSS Board in 2005, Coe identified the risks associated with HSBC's diligence process as follows: "However, there is substantial risk, in the event there is any question over the integrity of the process. The financial cost of appointing a sub-custodian that we cannot exercise a level of due care over, could be significant; equally so would be the reputational risk."  In fact, as early as 2005, Coe considered "that one of the possible options was that it was all a sham."

100.    From 2005 to 2008, Fielding received emails from John Grubert ("Grubert"), Global Head of HSBC Securities Services, reflecting substantial concerns about BLMIS.  In one email that Grubert sent to Coe, on which Smith, Pettitt and Fielding were copied, Grubert stated:

   o   "Thank you for the papers on the above. It strikes me that the firm has reasonable capital ... has a solid reputation but that we have a flawed process. Although there is no reason to doubt the integrity or professionalism of the Group, the reality is that: we do not have full control of the assets or real time sight of transaction flows; the transactions are all internal to the family firms and there is no proof of best execution or even actual execution."

   o   "[T]he audit is undertaken by a firm that is not on our recognised list of auditors...I cannot countenance this process – and I appreciate it is a major money earner."

   o   "I appreciate Madoff does not like external intrusion and am willing for this to be undertaken by our auditors (at our cost). If this cannot be done, then we should exit the relationship."

**J.**    **Audits and Purported Diligence of Madoff's Investments Were Incomplete**

101.    During a presentation Bank of Bermuda made to Bank Austria in May 2003, requests were made for copies of the quarterly due diligence questionnaires. When these questionnaires were requested of Bank of Bermuda, Wilkinson commented as follows regarding the lack of due diligence on Madoff: "Quarterly due diligence, you have got to be joking!! The only due diligence we have on Madoff is what Nigel [Fielding] did some months ago."

102.    In September of 2002, Tom Young sent an email to Fielding expressing concerns regarding the level and quality of the due diligence process. In that email, Young stated: "When you get back, maybe you could look at this again. What is required is independent auditor's confirmation that the assets are not comingled. Madoff's representation is not enough, annual audited accounts of Madoff."

103.    Although a diligence questionnaire was completed by Madoff in March of 2004, Ann Meehan, who upon information and belief was the Compliance Manager for HSBC Institutional Trust Services (Ireland) Ltd., stated to Pettitt in an early 2005 email as follows: "[T]here is no information on our file regarding the on-site visit, ie if checks were undertaken to confirm if assets are held in segregated accounts, completion of reconciliations etc."

104.    In March of 2005, Fiorino emailed Fielding regarding concerns about BLMIS' auditors Friehling and Horowitz CPA, and stated in that email: "[O]ver the last weeks, [Ernst & Young] raised some concerns about Madoff, as follows . . . (iii) reliability and independence of Friehling and Horowitz CPA (auditors of BMadoff). Apparently F&H are related to BMadoff. Responses to questions raised by E&Y to BM auditors were not clear."

105.    Moreover, the discussion paper that Coe produced in 2005 for the HSS Board, described earlier, identified flaws and concerns with the Madoff structure and the diligence process relating to the investigation of that structure.    Specifically, Coe remarked in that paper:

> "Whilst we have carried out due diligence ... we have not been able to undertake (nor do we have the legal right to do so) an audit of the end to end process flow to confirm the integrity of the whole activity. It is questionable how much we can rely on the auditor produced control statement. Not only is it concise, the auditors are not one of the major independent accountancy groups. From a legal structure perspective, we can make the arrangements work around the need for a legal charge over assets in a custody, sub-custody arrangement. The real issue is are we satisfied with the integrity of the Madoff operations such that we are comfortable with a lack of real independent evidence of the trading of clients assets."

106.    On June 6, 2005, Coe spoke on the phone with Fielding and voiced concerns regarding the review process.  During that phone conversation, Coe stated: "The biggest single concern is the whole process, once it gets into Madoff's hands, is fairly incestuous within Madoff and their internal control system, which is done by . . . his mate, the accountant, it's not really independent enough to give us a level of independent comfort that we would ordinarily look to."

107.    In August of 2008, following a further KPMG review of BLMIS that had been requested earlier that year, Coe stated in an email to Wilcockson, that she was concerned that Madoff was potentially using the fund's assets because "overall control [was] Madoff centric and there [were] opportunities for misleading or misappropriation to take place if he were so inclined," creating a "huge" fraud risk.

41

**K.**    **Any Indicia of Fraud That Was Unearthed During Due Diligence Was Generally Downplayed, Ignored and/or Avoided**

108.    In May of 2003, Fielding and Germain Birgen, Managing Director of HSBC Securities Services (Luxembourg) SA ("HSBC SSL") ("Birgen") gave a presentation to Bank Austria that presented a positive impression of the relationship with BLMIS, even though Fielding and Birgen were aware that the GFS Board had identified a major issue in relation to BLMIS and had decided to require independent audit confirmation from KPMG.  Around the same time, Mr. Fielding, who was also on the Board of Primeo, played down any concerns regarding BLMIS that were raised by other members of the Primeo Board.

109.    In February of 2005, E&Y, Primeo's auditors, requested a meeting with Birgen and Fiorino to discuss concerns regarding whether assets with BLMIS in fact existed.  Following that meeting, Fiorino told Fielding in an e-mail:  "Germain and I just had a meeting with [Ernst & Young], can I speak to you when you have five minutes. They have a transparency issue with Madoff."  Although these concerns were discussed by email, no action was taken by HSBC SSL or Bank of Bermuda to actually confirm either the existence of the assets or the validity of the BLMIS investments.

110.    In October 2008, May raised concerns whether the recommendations of KPMG, following its most recent review of BLMIS, were in fact implemented.  In an email May sent to Mr. Bastow during this time period, May stated:  "I share your concern regarding Madoff and have raised this with Chris Coe & Brian Pettitt.  I understand that KPMG made recommendations in their last visit and I am trying to obtain this reports so I can run an exercise to assess whether they were implemented."  In another email sent during this time period, May stated: "Chris [Coe] made some recommendations in their audit and so we should

see if they were implemented. Who has a copy of those recommendations? Both Lux & Dub are expressing unease about Madoff (which we all feel already) . . ."

111.    In December 2008, shortly after Madoff's arrest, emails were exchanged between Russell Ford (upon information and belief, Global Head of Internal Control for HSBC) and May candidly acknowledging their lack of surprise by the arrest, due to their firmly grounded suspicions of the fraud. Those e-mails included the following:

> o    Mr. Ford to Mr. May: "Just in case Chris has not contacted you yet or you have read the papers, Madoff has been arrested on security fraud."
>
> o    Mr. May back to Mr. Ford: "*Another case where all our suspicions were right.*"
>
> o    Mr. Ford: "Indeed, the beauty of hindsight."
>
> o    Mr. May: "*Worse - we suspected but never pinned it down. Not even hindsight, just not enough courage to walk away from what was not understood . . .*"
>
> o    Mr. Ford: "*Always too afraid to lose the revenue, but the business should pay more attention to the view of Risk.*"

**L.    HSBC Suisse Acted on Behalf of the Beneficial Owners**

112.    HSBC Suisse served as trustee, agent, representative, nominee or custodian for the Beneficial Owners in connection with their investments in the Funds, including, by: subscribing to Shares of Sentry and Sigma on behalf of the Beneficial Owners, maintaining custody of the Shares as record shareholders, paying redemption proceeds from the Shares of Sentry and Sigma to the Beneficial Owners, and otherwise exercising control over the Shares of Sentry and Sigma.

113.    Further, each of the Subscription Agreements, executed by HSBC Suisse, manifested the Beneficial Owners' consent for HSBC Suisse to act on behalf of and subject to the Beneficial Owners' control.

114.    In executing the Subscription Agreements, HSBC Suisse accepted and agreed to act on behalf of the Beneficial Owners.

115.    Accordingly, the Beneficial Owners had the same knowledge as HSBC Suisse regarding all relevant matters relating to BLMIS and the Funds' Net Asset Values at all relevant times.

**M.    H. Exposure of Madoff's Fraud**

116.    92. On December 11, 2008, federal agents arrested Madoff for violation of federal securities laws.  On that same day, the United States Attorney brought criminal charges against Madoff, alleging that Madoff ran a multi-billion dollar Ponzi scheme.  See United States v. Madoff, No. 08-mj-2735 (S.D.N.Y., filed Dec. 11, 2008).  Upon arrest, Madoff was reported to have told the agents that "there is no innocent explanation" for the fraudulent scheme he had orchestrated and confessed that he "paid investors with money that wasn't there."

117.    93. On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt ongoing fraudulent offerings of securities and investment advisory fraud by Madoff and BLMIS.  See SEC v. Madoff, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC submitted to the Court a proposed partial judgment, to which Madoff consented, imposing a permanent injunction and continuing relief against him, including a permanent freezing of his assets.

118.    94. In March 2009, Madoff pleaded guilty to the criminal charges brought against him.  In his plea allocution, Madoff confessed: "for many years up until my arrest on December 11, 2008, I operated a Ponzi scheme through the investment advisory side of

my business, Bernard L. Madoff Securities LLC." As Madoff himself described how the

scheme worked:

> The essence of my scheme was that I represented to clients and prospective
> clients who wished to open investment advisory and individual trading accounts
> with me that I would invest their money in shares of common stock, options and
> other securities of large well-known corporations, and upon request, would
> return to them their profits and principal. Those representations were false
> because for many years up and until I was arrested on December 11, 2008, I
> never invested those funds in the securities, as I had promised. Instead, those
> funds were deposited in a bank account at Chase Manhattan Bank. When
> clients wished to receive the profits they believed they had earned with me or to
> redeem their principal, I used the money in the Chase Manhattan bank account
> that belonged to them or other clients to pay the requested funds.

119. 95. Madoff further confessed to covering up his fraud by fabricating false trade

confirmation and account statements:

> To further cover-up the fact that I had not executed trades on behalf of my
> investment advisory clients, I knowingly caused false trading confirmations and
> client account statements that reflected the bogus transactions and positions to
> be created and sent to clients purportedly involved in the split strike conversion
> strategy, as well as other individual clients I defrauded who believed they had
> invested in securities through me. The clients receiving trade confirmations and
> account statements had no way of knowing by reviewing these documents that I
> had never engaged in the transactions represented on the statements and
> confirmations.

120. 96. Madoff is now serving a 150-year sentence in federal prison.

**N.** ~~I.~~ **The Funds' Estates in Liquidation**

121. 97. Following the revelation of Madoff's fraud, the Funds' boards of directors

suspended any further redemptions of Shares and the calculation of the Funds' Net Asset

Values. As of December 2008 and presently, Sentry, Sigma, and Lambda had, respectively,

approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

122. 98. In 2009, the Funds were put into liquidation proceedings in the BVI.

123. 99. On February 27, 2009, a secured creditor of Lambda commenced proceedings in the BVI Court pursuant to the BVI Insolvency Act seeking the appointment of a liquidator over Lambda (the "Lambda Proceeding"). The Lambda Proceeding is pending in the BVI Court as claim number BVIHC(COM)2009/74.

124. 100. On April 21, 2009, ten shareholders applied to the BVI Court for the appointment of a liquidator over Sentry (the "Sentry Proceeding"). The Sentry Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/136.

125. 101. On April 23, 2009, a shareholder applied to the BVI Court for the appointment of a liquidator over Sigma (the "Sigma Proceeding" and collectively with the Lambda Proceeding and the Sentry Proceeding, the "BVI Liquidation Proceedings"). The Sigma Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/139.

126. 102. As alleged above, the BVI Court issued orders – the BVI Appointment Orders –appointing the Foreign Representatives as liquidators of the Funds. Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates.

127. 103. The Redemption Payments that were made to Defendants were mistaken payments and constituted or formed part of avoidable transactions, and generally represent assets of Sentry and Sigma's estates that Defendants are not entitled to keep.

## FIRST CLAIM
### *(Unjust Enrichment - Against HSBC Suisse)*

128. 104. Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 103 above as if set forth herein.

129. ~~105.~~ As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to HSBC Suisse, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud. The source of these Redemption Payments was not, as Sentry and Sigma mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

130. ~~106.~~ HSBC Suisse did not provide valuable consideration to Sentry and Sigma in exchange for each of the Redemption Payments received by it, in that it received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

131. ~~107.~~ By reason of its receipt of monies represented as amounts deposited by other BLMIS investors or monies deposited by the Funds' subscribers, for amounts far in excess of the amounts that it would have received had the Net Asset Value of Shares been calculated based upon the true facts existing at that time or any relevant time, HSBC Suisse has been unjustly enriched to the detriment of Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

132. ~~108.~~ It would offend principles of equity and good conscience to permit HSBC Suisse to retain the Redemption Payments it received from Sentry and Sigma.

133. ~~109.~~ The Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma, are entitled to recover from HSBC Suisse an amount equal to the Redemption Payments received by it from Sentry and Sigma, or, in the alternative, an amount equal to the amount of all Redemption Payments received by HSBC

Suisse less the amount of redemption payments that HSBC Suisse would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## SECOND CLAIM
### (Unjust Enrichment - Against Beneficial Shareholders)

134. ~~110.~~ Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 109 above as if set forth herein.

135. ~~111.~~ Upon information and belief, HSBC Suisse may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

136. ~~112.~~ Upon information and belief, HSBC Suisse may have paid to or credited some or all of the Redemption Payments received by it from Sentry and Sigma to accounts of the Beneficial Shareholders. These Redemption Payments did not, as Sentry and Sigma mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS. Instead, Redemption Payments were made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

137. ~~113.~~ The Beneficial Shareholders did not provide valuable consideration to Sentry and Sigma in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

138. ~~114.~~ To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to HSBC Suisse in its capacity as trustee, agent, representative, or nominee for a Beneficial Shareholder, such Beneficial Shareholder has been unjustly enriched to the detriment of Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

139. ~~115.~~ It would offend principles of equity and good conscience to permit any Beneficial Shareholders to retain the Redemption Payments made by Sentry and Sigma.

140. ~~116.~~ The Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma, are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by any Beneficial Shareholders less the amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## THIRD CLAIM
### (Money Had and Received - Against HSBC Suisse)

141. ~~117.~~ Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 116 above as if set forth herein.

142. ~~118.~~ As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to HSBC Suisse, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud.  The source of these Redemption Payments was not, as Sentry and Sigma

mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

143. ~~119.~~ HSBC Suisse did not provide valuable consideration to Sentry and Sigma in exchange for each of the Redemption Payments received by it, in that it received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

144. ~~120.~~ By reason of its receipt of monies which generally represented the proceeds arising from or to continue investment in BLMIS, which the world now knows was operated by Madoff as a Ponzi scheme, HSBC Suisse has been unjustly enriched to the detriment of Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

145. ~~121.~~ Furthermore, HSBC Suisse was not entitled to receive the Redemption Payments because the amounts of each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by HSBC Suisse for its redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

146. ~~122.~~ To the extent that Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma, the loss will be disproportionately and unjustly borne by Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

147. ~~123.~~ It would offend principles of equity and good conscience to permit HSBC Suisse to retain the Redemption Payments it received from Sentry and Sigma.

148. ~~124.~~ The Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma, are entitled to recover from HSBC Suisse an amount equal to the Redemption Payments received by it from Sentry and Sigma, or, in the alternative, an amount equal to the amount of all Redemption Payments received by HSBC Suisse less the amount of redemption payments that HSBC Suisse would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## FOURTH CLAIM
### *(Money Had and Received - Against Beneficial Shareholders)*

149. ~~125.~~ Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 124 above as if set forth herein.

150. ~~126.~~ Upon information and belief, HSBC Suisse may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

151. ~~127.~~ Upon information and belief, HSBC Suisse may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders. These Redemption Payments did not, as Sentry and Sigma mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS.

152. ~~128.~~ The Beneficial Shareholders did not provide valuable consideration to Sentry and Sigma in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

Pg 203 of 317

153.    ~~129.~~ To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to HSBC Suisse in its capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders, such Beneficial Shareholders have been unjustly enriched to the detriment of Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

154.    ~~130.~~ Furthermore, the Beneficial Shareholders were not entitled to receive the Redemption Payments paid to HSBC Suisse upon the redemption of Shares issued to it in its capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders because the amounts transferred by Sentry with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value which caused the payment received for redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

155.    ~~131.~~ To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma, the loss will be disproportionately and unjustly borne by Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

156.    ~~132.~~ It would offend principles of equity and good conscience to permit the Beneficial Shareholders to retain the Redemption Payments made by Sentry and Sigma.

157.    ~~133.~~ The Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma, are entitled to recover from the Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by the Beneficial Shareholders less the amount of redemption payments that such Beneficial

Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## FIFTH CLAIM
### *(Mistaken Payment - Against HSBC Suisse)*

158. ~~134.~~ Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 133 above as if set forth herein.

159. ~~135.~~ As described above, Sentry and Sigma made each of the Redemption Payments to HSBC Suisse under the mistaken belief that the amounts paid to HSBC Suisse represented the proceeds arising from the profitability of or to continue investment in BLMIS and were based upon the Net Asset Value of Shares redeemed based upon the true facts at that time.

160. ~~136.~~ Upon information and belief, however, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to HSBC Suisse represented, in fact, money deposited with BLMIS by other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

161. ~~137.~~ The Redemption Payments, while benefiting HSBC Suisse, were made to the detriment of Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

162. ~~138.~~ Additionally, HSBC Suisse was not entitled to receive the Redemption Payments because, as was unknown to Sentry and Sigma, the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by HSBC Suisse for its redemption of Shares to be

in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time. In these circumstances, the Redemption Payments should be returned for the benefit of Sentry and Sigma, their creditors and the current holders of Shares in Sentry and Sigma.

163. ~~139.~~ HSBC Suisse did not provide valuable consideration to Sentry and Sigma in exchange for each of the Redemption Payments received by it, in that it received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

164. ~~140.~~ To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma, the loss will be disproportionately and unjustly borne by Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

165. ~~141.~~ It would thus offend principles of equity and good conscience to permit HSBC Suisse to retain the Redemption Payments.

166. ~~142.~~ The Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma, are entitled to recover from HSBC Suisse a sum in an amount equal to the Redemption Payments received by it from Sentry and Sigma, or, in the alternative, an amount equal to the amount of all Redemption Payments received by HSBC Suisse less the amount of redemption payments that HSBC Suisse would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

### SIXTH CLAIM
#### *(Mistaken Payment - Against Beneficial Shareholders)*

167. ~~143.~~ Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 142 above as if set forth herein.

168. ~~144.~~ As described above, Sentry and Sigma made each of the Redemption Payments to HSBC Suisse under the mistaken belief that the amounts paid to HSBC Suisse represented the proceeds arising from the profitability of or to continue investment in BLMIS.

169. ~~145.~~ However, upon information and belief, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to HSBC Suisse represented, in fact, money deposited with BLMIS by other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

170. ~~146.~~ Upon information and belief, HSBC Suisse may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders. These Redemption Payments did not, as Sentry and Sigma mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS.

171. ~~147.~~ Additionally, the Beneficial Shareholders were not entitled to receive the Redemption Payments received by HSBC Suisse upon the redemption of Shares issued to it in its capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders because, as was unknown to Sentry and Sigma, the amounts transferred with respect to these Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused the Redemption Payments received by HSBC Suisse for its redemption of Shares to be

in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

172. 148. The Beneficial Shareholders did not provide valuable consideration to Sentry and Sigma in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

173. 149. The Redemption Payments, while benefiting any Beneficial Shareholder receiving any portion thereof, were made to the detriment of Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

174. 150. To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma, the loss will be disproportionately and unjustly borne by Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

175. 151. It would thus offend principles of equity and good conscience to permit any Beneficial Shareholder to retain the Redemption Payments.

176. 152. The Foreign Representatives in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by any Beneficial Shareholders less the amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

### SEVENTH CLAIM
#### (Constructive Trust - Against all Defendants)

177.    ~~153.~~ Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 152 above as if set forth herein.

178.    ~~154.~~ As described above, upon receipt of a redemption request, Sentry and Sigma made each of the Redemption Payments to HSBC Suisse based on a miscalculated and inflated Net Asset Value, which caused those Redemption Payments to be in excess of the Net Asset Value of redeemed Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

179.    ~~155.~~ As alleged above, the Redemption Payments generally represented the proceeds arising from or to continue investment in what the world now knows was Madoff's Ponzi scheme.  Accordingly, these Redemption Payments did not, as Sentry and Sigma mistakenly believed, represent the proceeds arising from the profitability of (or to continue investment in) BLMIS.

180.    ~~156.~~ Upon information and belief, HSBC Suisse may have paid some or all of the Redemption Payments it received to the Beneficial Shareholders.

181.    ~~157.~~ By reason of their receipt of some or all of the Redemption Payments, Defendants have been unjustly enriched to the detriment of Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

182.    ~~158.~~ Furthermore, Defendants were not entitled to receive the Redemption Payments because the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received

by HSBC Suisse for its redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

183. ~~159.~~ It would offend principles of equity and good conscience to permit Defendants to retain the Redemption Payments.

184. ~~160.~~ By reason of the foregoing, a constructive trust should be imposed on the Redemption Payments that were received by Defendants from Sentry and Sigma for the benefit of the Foreign Representatives and Sentry and Sigma and other shareholders and creditors of Sentry and Sigma.

## EIGHTH CLAIM
### (Unfair Preference Pursuant to Section 245 of the BVI Insolvency Act - Against HSBC Suisse)

185. ~~161.~~ The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry and Sigma, repeat and allege again the allegations contained in paragraphs 1 through 160 above as if set forth herein.

186. ~~162.~~ Section 245 of the BVI Insolvency Act provides:

(1) Subject to subsection (2), a transaction entered into by a company is an unfair preference given by the company to a creditor if the transaction (a) is an insolvency transaction; (b) is entered into within the vulnerability period; and (c) has the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if the transaction had not been entered into.

(2) A transaction is not an unfair preference if the transaction took place in the ordinary course of business;

(3) A transaction may be an unfair preference notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a transaction entered into the by the company within the vulnerability period has the effect specific in subsection 1(c) in respect of a creditor who is a connected person, unless the contrary is proved, it is presumed that the

transaction was an insolvency transaction and that it did not take place in the ordinary course of business.

187.  163. A creditor is defined in Section 9 of the BVI Insolvency Act as follows:

(1) A person is a creditor of another person (the debtor) if he has a claim against the debtor, whether by assignment or otherwise, that is, or would be, an admissible claim in (a) the liquidation of the debtor, in the case of a debtor that is a company or a foreign company; or (b) the bankruptcy of the debtor, in the case of a debtor who is an individual.

188.  164. The BVI Insolvency Act further defines an "insolvency transaction" as a transaction that: "(a) is entered into at a time when the company is insolvent; or (b) . . . causes the company to become insolvent."  BVI Insolvency Act § 244(2).

189.  165. For the purposes of assessing unfair preferences under Section 245 of the BVI Insolvency Act and undervalue transactions under Section 246 of the BVI Insolvency Act, a company is "insolvent" if: "(c) . . . (ii) the company is unable to pay its debts as they fall due."  BVI Insolvency Act §§ 8, 244(3).

190.  166. For purposes of Section 245 and Section 246 of the BVI Insolvency Act, "vulnerability period" means "in the case of a transaction entered into with, or a preference given to, a connected person, the period commencing two years prior to the onset of insolvency and ending on the appointment of the administrator or, if the company is in liquidation, the liquidator . . . ."  BVI Insolvency Act § 244(1).

191.  167. The "onset of insolvency" is defined as: "the date on which the application for the appointment of the liquidator was filed."  BVI Insolvency Act § 244(1).  Thus, the vulnerability period, for each of the Funds, is the period commencing two years prior to the application for the appointment of the Liquidators for each Fund and ending on the date of the appointment of the Liquidators of each Fund.

192. ~~168.~~ A "connected person" is:

(1) . . . one or more of the following:

> (a) a promoter of the company;

> (b) a director or *member of the company* or of a related company;

> (c) a beneficiary under a trust of which the company is or has been a trustee;

> (d) a related company;

> (e) another company one of whose directors is also a director of the company;

> (f) a nominee, relative, spouse or relative of a spouse of a person referred to in paragraphs (a) to (c);

> (g) a person in partnership with a person referred to in paragraphs (a) to (c); and

> (h) a trustee of a trust having as a beneficiary a person who is, apart from this paragraph, a connected person.

BVI Insolvency Act § 5 (emphasis added).

193. ~~169.~~ Redemption Payments aggregating USD $59,204,140.83 were made by Sentry to HSBC Suisse during the two-year period prior to the application for appointment of the Liquidators of Sentry in the BVI Liquidation Proceedings (the "Sentry Vulnerability Period").

194. ~~170.~~ Redemption Payments aggregating USD $8,264,422.14 were made by Sigma to HSBC Suisse during the two-year period prior to the application for appointment of the Liquidators of Sigma in the BVI Liquidation Proceedings (the "Sigma Vulnerability Period").

195. ~~171.~~ During the Sentry Vulnerability Period and the Sigma Vulnerability Period (the "Sentry and Sigma Vulnerability Periods") Sentry and Sigma were insolvent or were rendered insolvent by the making of Redemption Payments.

196. ~~172.~~ Each of the Redemptions and/or Redemption Payments made during the Sentry and Sigma Vulnerability Periods ("Vulnerability Period Payments") was an "insolvency transaction" within the meaning of Section 245 of the BVI Insolvency Act.

197. ~~173.~~ HSBC Suisse was a shareholder (i.e., a member) of Sentry and Sigma during the Sentry and Sigma Vulnerability Periods and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

198. ~~174.~~ Each of the Vulnerability Period Payments put HSBC Suisse in a better position than it would have been in had such Payment not been made.

199. ~~175.~~ Because HSBC Suisse was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were "insolvency transactions." Further, even were this not presumed, the Redemptions and/or Vulnerability Period Payments were "insolvency transactions" because at all material times the Funds were insolvent. This is because the Funds' assets were up to 95% invested with BLMIS and were only able to pay debts falling due either (i) with payments (including fictitious profits) from the Ponzi scheme BLMIS, i.e. using the proceeds of fraud, or (ii) by using incoming subscription monies (as a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers). Each time the Funds withdrew monies from BLMIS an equivalent liability immediately arose to the creditors of and investors in BLMIS. On any commercial basis the Funds were insolvent on a cash flow basis at all material times.

200.    176. In addition, there is a statutory presumption that the Vulnerability Period Payments were "not made in the ordinary course of any business" of Sentry and Sigma. Even were this not presumed, the same would follow in that, among other things, each Vulnerability Period Payment represented a distribution of monies (including fictitious profits) from Madoff's Ponzi scheme or incoming subscription monies (which merely represented a shortcut for investing those monies and also withdrawing monies from BLMIS to pay redeemers), and it was no part of the ordinary course of business of the Funds to invest in and distribute profits of a Ponzi scheme.

201.    177. Each of the Vulnerability Period Payments was made following receipt by Sentry and Sigma of a notice of redemption in respect of Shares, which triggered the redemption process under the Articles. Following the receipt by Sentry and Sigma of a notice of redemption by HSBC Suisse, HSBC Suisse became a contingent creditor. Upon the subsequent redemption of HSBC Suisse's shares and until such time as HSBC Suisse received the Vulnerability Period Payment, HSBC Suisse was a "creditor" of Sentry and Sigma with an admissible claim against Sentry and Sigma in any subsequent liquidation of Sentry and Sigma had payment of the Redemption Price not been made, albeit that post-liquidation HSBC Suisse would have been deferred to outside creditors.

202.    178. By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry and Sigma, are entitled to an order avoiding and setting aside the Vulnerability Period Payments and entitling the Foreign Representatives to recover from HSBC Suisse an amount equal to the Vulnerability Period Payments received by HSBC Suisse from Sentry and Sigma.

## NINTH CLAIM

### *(Unfair Preference Pursuant to Section 245 of the BVI Insolvency Act - Against Beneficial Shareholders)*

203. ~~179.~~ The Foreign Representatives, in their capacities as Foreign Liquidators of Sentry and Sigma, repeat and allege again the allegations contained in paragraphs 1 through 178 above as if set forth herein.

204. ~~180.~~ Upon information and belief, HSBC Suisse may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

205. ~~181.~~ Upon information and belief, HSBC Suisse may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders.

206. ~~182.~~ To the extent that any money that HSBC Suisse received in connection with the Vulnerability Period Payments was transferred to the Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and Liquidators of Sentry and Sigma, are entitled to avoid and set aside such further transfer by HSBC Suisse to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability Period Payments received by them, and the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act.

## TENTH CLAIM
### *(Undervalue Transaction Pursuant to Section 246 of the BVI Insolvency Act - Against* HSBC Suisse*)*

207. 183. The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry and Sigma, repeat and allege again the allegations contained in paragraphs 1 through 182 above as if set forth herein.

208. 184. Section 246 of the BVI Insolvency Act provides that:

(1) Subject to subsection (2), a company enters into an undervalue transaction with a person if (a) the company makes a gift to that person or otherwise enters into a transaction with that person on terms that provide for the company to receive no consideration; or (b) the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company; and (c) in either case, the transaction concerned (i) is an insolvency transaction; and (ii) is entered into within the vulnerability period.

(2) A company does not enter into an undervalue transaction with a person if (a) the company enters into the transaction in good faith and for the purposes of its business; and (b) at the time when it enters into the transaction, there were reasonable grounds for believing that the transaction would benefit the company.

(3) A transaction may be an undervalue transaction notwithstanding that it is entered into pursuant to the order of a court or tribunal in or outside the Virgin Islands.

(4) Where a company enters into a transaction with a connected person within the vulnerability period and the transaction falls within subsection (1)(a) or subsection (1)(b), unless the contrary is proved, it is presumed that (a) the transaction was an insolvency transaction; and (b) subsection (2) did not apply to the transaction.

209. 185. During the Sentry and Sigma Vulnerability Periods, all assets purportedly held by BLMIS for Sentry and other investors were non-existent, and Sentry and Sigma were insolvent or rendered insolvent by the Vulnerability Period Payments, as alleged in paragraph 175 above. Thus, each of the Redemptions and/or Vulnerability Period Payments qualifies as

an "insolvency transaction" within the meaning of Section 244 of the BVI Insolvency Act and for purposes of Section 246 of the BVI Insolvency Act.

210. ~~186.~~ Sentry and Sigma received no consideration for any of the Vulnerability Period Payments, or in the alternative, Sentry and Sigma received, for each Vulnerability Period Payment, consideration, the value of which, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry and Sigma to HSBC Suisse for each of the Vulnerability Period Payments.

211. ~~187.~~ HSBC Suisse was a shareholder (i.e., a member) of Sentry and Sigma during the Vulnerability Period and was, accordingly, a "connected person" as defined in the BVI Insolvency Act.

212. ~~188.~~ Because HSBC Suisse was a "connected person" as defined in the BVI Insolvency Act, there is a statutory presumption that the Redemptions and/or Vulnerability Period Payments were "insolvency transactions." Further, there is a statutory presumption that the Vulnerability Period Payments were not made in good faith and for the purposes of the Funds' business with reasonable grounds to believe that they would benefit the Funds. Even were that not presumed, it is in any event clear that the purpose of the Funds was not to invest in and distribute fictitious profits from a Ponzi scheme such as BLMIS.

213. ~~189.~~ By reason of the foregoing, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry and Sigma, are entitled to an order avoiding and setting aside the Vulnerability Period Payments and to recover from HSBC Suisse an amount equal to the Vulnerability Period Payments received by HSBC Suisse from Sentry and Sigma.

**ELEVENTH CLAIM**

*(Undervalue Transaction Pursuant to Section 246 of the*
*BVI Insolvency Act - Against Beneficial Shareholders)*

214. ~~190.~~ The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry and Sigma, repeat and allege again the allegations contained in paragraphs 1 through 189 above as if set forth herein.

215. ~~191.~~ Upon information and belief, HSBC Suisse may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

216. ~~192.~~ Upon information and belief, HSBC Suisse may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders.

217. ~~193.~~ To the extent that any money that HSBC Suisse received in connection with the Vulnerability Period Payments was transferred to the Beneficial Shareholders, the Foreign Representatives, in their capacities as Foreign Representatives and liquidators of Sentry and Sigma, are entitled to avoid and set aside such further transfer by HSBC Suisse to the Beneficial Shareholders and to recover from the Beneficial Shareholders an amount equal to any portion of any Vulnerability Period Payments received by them, and the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma, rely on, *inter alia*, section 249(2)(b) of the BVI Insolvency Act.

## TWELFTH CLAIM
### *(Breach of Contract - Against HSBC Suisse)*

218. ~~194.~~ Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 193 above as if set forth herein.

219. ~~195.~~ HSBC Suisse, upon information and belief, entered into the Initial Subscription Agreement with Sentry, on or about April 15, 1998, pursuant to which HSBC Suisse subscribed for a total of 93,529.5700 Shares. HSBC Suisse's subscription for shares was made pursuant to the terms of the Initial Subscription Agreement itself as well as the terms of the other documents referred to therein, namely; (i) Sentry's Private Placement Memorandum (as amended from time to time); and (ii) Sentry's Memorandum of Association and Articles of Association (the "Articles"). Subsequent to entering into the Initial Subscription Agreement, HSBC Suisse, upon information and belief, entered into the Subsequent Subscription Agreements with Sentry and Sigma on or about April 24, 1998, June 10, 1998, June 16, 1998, June 22, 1998, August 17, 1998, September 1, 1998, October 1, 1998, October 2, 1998, October 5, 1998, November 12, 1998, December 8, 1998, December 11, 1998 December 31, 1998, January 13, 1999, February 10, 1999, April 13, 1999, April 23, 1999, May 12, 1999, May 14, 1999, May 17, 1999, June 10, 1999, July 9, 1999, August 10, 1999, August 23, 1999, September 9, 1999, October 14, 1999, November 10, 1999, December 8, 1999, December 9, 1999, January 11, 2000, January 31, 2000, February 8, 2000, March 10, 2000, April 12, 2000, May 12, 2000, May 24, 2000, May 29, 2000, April 30, 2001, June 9, 2000, July 12, 2000, August 15, 2000, August 22, 2000, September 19, 2000, September 20, 2000, September 28, 2000, October 31, 2000, November 30, 2000, December 29, 2000,

January 31, 2001, March 30, 2001, April 4, 2001, April 30, 2001, May 1, 2001, May 31, 2001, June 29, 2001, July 31, 2001, September 4, 2001, October 31, 2001, November 30, 2001, December 3, 2001, January 3, 2003, April 8, 2002, June 27, 2002 June 28, 2002, August 26, 2002, August 30, 2002, September 23, 2002, December 23, 2002, July 31, 2003, October 2, 2003, October 28, 2003, November 28, 2003, December 30, 2003, March 24, 2004, March 25, 2004, April 26, 2004, May 25, 2004, November 24, 2004, January 27, 2005, March 28, 2005, April 25, 2005, April 26, 2005, April 29, 2005, January 26, 2006, March 28, 2006, May 12, 2006, July 27, 2006, August 22, 2006, August 28, 2006, August 29, 2006, October 27, 2006, October 30, 2006, November 27, 2006, December 22, 2006, January 26, 2007, February 23, 2007, February 26, 2007, March 27, 2007, March 28, 2007, April 24, 2007, April 26, 2007, May 29, 2007, July 26, 2007, June 27, 2007, August 29, 2007, September 26, 2007, October 26, 2007, October 29, 2007, November 28, 2007, December 24, 2007, January 28, 2008, February 26, 2008, February 27, 2008, March 26, 2008, March 28, 2006, April 25, 2008, May 29, 2008, June 24, 2008, July 31, 2008, and September 24, 2008, pursuant to which it subscribed for 330,009.1009 additional shares on the same terms and conditions as those shares subscribed for pursuant to the Initial Subscription Agreement. The Initial Subscription Agreement, together with the Subsequent Subscription Agreements, including all of the terms and provisions incorporated therein by reference to the Private Placement Memorandum (as amended from time to time) and the Articles, are collectively referred to herein as the "Fund Documents."

220. ~~196.~~ The Fund Documents provide for the calculation of the redemption price for Shares (the "Redemption Price") based on the "Net Asset Value per Share." Net Asset Value per share is to be determined by the directors of Sentry and Sigma as of the relevant

valuation day "by dividing the value of the net assets of [Sentry/Sigma] by the number of Shares then in issue [.]"  Articles at 11(1).

221.  ~~197.~~ The Fund Documents provide that in determining the Net Asset Value per share for each class of shares issued, the value of the net assets of the Funds is to be adjusted "to take into account any dividends, distributions, assets or liabilities" attributable to such class of shares.  Articles at 11(1).  Pursuant to the Fund Documents, each subscriber, including HSBC Suisse acknowledges that "the value of its Shares and redemptions thereof, and the performance of the Fund, may be based on unaudited and in some cases, estimated, valuations of the Fund's investment and that any valuation provided in Subscriber's account statement may be an unaudited, estimated value."  See Initial Subscription Agreement ¶ 10.

222.  ~~198.~~ With respect to the valuation of different types of assets, the Fund Documents prescribe methods of valuation that are, however, subject to the exercise of the judgment and discretion by the Directors of Sentry and Sigma.  For example, with respect to the valuation of assets consisting of securities, the Fund Documents prescribe methods of valuation based on price and market data, provided however that "[i]f the Directors determine that [any of the prescribed methods of valuation] does not fairly represent its market value, the Directors shall value such securities as they determine and shall set forth the basis of such valuation in writing in the Company's records[.]"  Articles at 11(3)(b).

223.  ~~199.~~ With respect to the value of any shares of stock held by Sentry and Sigma in an "investment company," the Fund Documents provide for valuation "in accordance with the manner in which such shares are valued by such investment company" provided however that "the Directors may make such adjustments in such valuations the Directors may from time to time consider appropriate."  Articles at 11(3)(c).

224.    200. With respect to assets that have been "realised or contracted to be realised" the Fund Documents provide for the inclusion of the assets receivable in respect of such realization, provided however that "if the value of such assets is not then known exactly then its value shall be as estimated by the Directors."   Articles at 11(3)(e).

225.    201. Additionally, the Fund Documents provide that "notwithstanding the foregoing, in the case of extraordinary circumstances which, in the Directors' sole discretion, warrant a different valuation of any securities, such securities will be valued at such prices as the Directors shall determine."  Articles at 11(3)(f).

226.    202. The Fund Documents provide that any "certificate" as to the Net Asset Value per Share or as to the Redemption Price that is given in good faith by or on behalf of the Directors "shall be binding on all parties."  Articles at 11(1).

227.    203. No Certificate was provided in good faith by or on behalf of the Directors to HSBC Suisse in respect of any Net Asset Value determination made while HSBC Suisse was a member of the Funds or in respect of any Redemption Payment made to HSBC Suisse.

228.    204. Pursuant to the Fund Documents, at any time prior to the good faith issuance and receipt of a Certificate, the Redemption Price calculated in respect of the redemptions by HSBC Suisse and paid to HSBC Suisse remains subject to adjustment, recalculation and redetermination based on, *inter alia*, the foregoing identified provisions of the Fund Documents.  Upon the true interpretation of the Fund Documents, the same contained an implied term for repayment of any over-payments, and/or such a term is to be implied on the basis of obviousness and/or as being necessary for the business efficacy of the Fund Documents and/or to give effect to the reasonable expectations of the parties.

229. 205. Upon information and belief, HSBC Suisse received the Redemption Payments listed on Exhibit A and Exhibit B in respect of Shares submitted for redemption.

230. 206. Subsequent to December 8, 2008, Sentry and Sigma have determined that the Net Asset Value calculations upon which Redemption Payments were made to HSBC Suisse included assets not held by or on behalf of Sentry and Sigma at the time of the making of such payments and, additionally, that such Net Asset Value calculations failed to account for and make appropriate deduction of liabilities of Sentry and Sigma existing at the time such payments. For these and other reasons, such Net Asset Value calculation substantially overstated the net asset value of the assets of Sentry and Sigma.

231. 207. To the extent that HSBC Suisse has received Redemption Payments in excess of the Net Asset Value of the Shares redeemed, HSBC Suisse is contractually obligated to return amounts in excess of the Net Asset Value that would have been calculated based upon the true facts existing at the relevant time.

232. 208. Following determination by the Funds that Redemption Payments made to HSBC Suisse had been calculated on the basis of an overstated Net Asset Value, demand has been made on HSBC Suisse to return excess and overpaid Redemption Payments to the Funds.

233. 209. HSBC Suisse has failed and refused to repay to the Funds the amount that, under the Fund Documents, it is contractually required to repay to the Funds.

234. 210. The failure of HSBC Suisse to make the repayment requested constitutes a breach of the Fund Documents for which Sentry and Sigma are entitled to the award of damages.

### THIRTEENTH CLAIM
#### *(Breach of Contract - Against Beneficial Shareholders)*

235. ~~211.~~ Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 210 above as if set forth herein.

236. ~~212.~~ Upon information and belief, HSBC Suisse may have subscribed to all or some portion of the Shares issued to it under the Fund Documents in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

237. ~~213.~~ Each Beneficial Shareholder authorized HSBC Suisse to enter into the Fund Documents on his, her or its behalf and to bind the Beneficial Shareholder to the agreements and representations contained therein to the same extent as had the Beneficial Shareholder executed the Fund Documents on his, her or its, own behalf.

238. ~~214.~~ Upon information and belief, HSBC Suisse may have paid to or credited some or all of the Redemption Payments received by it from Sentry and Sigma to accounts of the Beneficial Shareholders.

239. ~~215.~~ To the extent that any Beneficial Shareholder has received Redemption Payments in excess of the Net Asset Value of the Shares redeemed, such Beneficial Shareholder is contractually obligated to return amounts in excess of the Net Asset Value that would have been calculated based upon the true facts existing at the relevant time.

240. ~~216.~~ Following determination by the Funds that Redemption Payments made to HSBC Suisse had been calculated on the basis of an overstated Net Asset Value, demand was

made on the Beneficial Shareholders by demand on HSBC Suisse for the return of excess and overpaid Redemption Payments.

241. ~~217.~~ The Beneficial Shareholders have failed and refused to repay to the Funds the amounts that, under the Fund Documents, they are contractually required to repay to the Funds.

242. ~~218.~~ The failure of the Beneficial Shareholders to make the repayment requested constitutes a breach of the Fund Documents for which Sentry and Sigma are entitled to the award of damages.

### FOURTEENTH CLAIM
### *(Breach of Implied Covenant of Good Faith and*
### *Fair Dealing - Against HSBC Suisse)*

243. ~~219.~~ Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 218 above as if set forth herein.

244. ~~220.~~ Following determination by the Funds that Redemption Payments to HSBC Suisse had been made on the basis of an overstated Net Asset Value, demand was made to HSBC Suisse to return excess and overpaid Redemption Payments to Sentry and Sigma.

245. ~~221.~~ HSBC Suisse has failed and refused to make the requested repayment to Sentry and Sigma.

246. ~~222.~~ By retaining the Redemption Payments to which HSBC Suisse is not entitled, HSBC Suisse has deprived Sentry and Sigma of the benefit of their bargain and has subverted the Fund Documents.

247. ~~223.~~ The failure of HSBC Suisse to make the repayment requested constitutes a breach of the covenant of good faith and fair dealing that inheres in the Fund Documents for which Sentry and Sigma are entitled to the award of damages.

### FIFTEENTH CLAIM
### *(Breach of Implied Covenant of Good Faith and*
### *Fair Dealing - Against Beneficial Shareholders)*

248. ~~224.~~ Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 223 above as if set forth herein.

249. ~~225.~~ Upon information and belief, HSBC Suisse may have subscribed to all or some portion of the Shares issued to it under the Fund Documents in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

250. ~~226.~~ Upon information and belief, HSBC Suisse may have paid to or credited some or all of the Redemption Payments received by it from Sentry and Sigma to accounts of the Beneficial Shareholders.

251. ~~227.~~ Following determination by the Funds that Redemption Payments made to HSBC Suisse had been calculated on the basis of an overstated Net Asset Value, demand was made on the Beneficial Shareholders by demand on HSBC Suisse for the return of excess and overpaid Redemption Payments.

252. ~~228.~~ The Beneficial Shareholders have failed and refused to make repayment to Sentry and Sigma.

253. ~~229.~~ By retaining the Redemption Payments to which they are not entitled, the Beneficial Shareholders have deprived Sentry and Sigma of the benefit of their bargain and have subverted the Fund Documents.

254. ~~230.~~ The failure of the Beneficial Shareholders to make the repayment requested constitutes a breach of the implied covenant of good faith and fair dealing that inheres in the Fund Documents for which Sentry and Sigma are entitled to the award of damages.

### SIXTEENTH CLAIM
#### *(Declaratory Judgment - Against All Defendants)*

255. ~~231.~~ Sentry and Sigma (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and Sigma and on behalf of Sentry and Sigma) repeat and allege again the allegations contained in paragraphs 1 through 230 above as if set forth herein.

256. ~~232.~~ An actual and justiciable controversy exists between the Plaintiffs and the Defendants with respect to the obligation of the Defendants to repay to the Funds all or a portion of amounts received by them as excess or overpaid Redemption Payments under circumstances where:

(i)     the Net Asset Value per Share calculation upon which the Redemption Price was paid, directly or indirectly, to any Defendant has been subsequently adjusted, recalculated or redetermined in accordance with the Fund Documents;

(ii)    the resulting adjusted, recalculated and redetermined Redemption Price is less than the Redemption Price paid to the Defendant;

(iii)   prior to such adjustment, recalculation or redetermination, no binding Certificate has been issued by the Funds; and

(iv)    Citco issued no Certificates in good faith.

257. ~~233.~~ The harm to Sentry and Sigma is real and immediate because, a result of the failure and refusal of the Defendants to make repayment, Sentry and Sigma have become insolvent and are presently unable to pay its debts as they fall or will fall due.

258. ~~234.~~ Plaintiffs have no adequate remedy at law.

259. ~~235.~~ Pursuant to 28 U.S.C. § 2201 *et. seq.*, Plaintiffs are entitled to a declaration by this Court declaring that, pursuant to the Fund Documents, each Defendant must repay Sentry and Sigma that portion of the Redemption Payments received by such Defendant representing the amount by which such Redemption Payments exceeded the Redemption Price as it has been subsequently adjusted, recalculated and redetermined by Sentry and Sigma.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.     On the First, Third and Fifth Claims, judgment in favor of Plaintiffs and against HSBC Suisse allowing the Plaintiffs to recover an amount equal to the Redemption Payments received by HSBC Suisse, plus interest, or, in the alternative, an amount equal to the amount of the Redemption Payments received by HSBC Suisse less the amount of redemption payments that HSBC Suisse would have received had the Net Asset Value been calculated based upon the true facts existing at the time, plus interest;

B.     On the Second, Fourth and Sixth Claims, judgment in favor of Plaintiffs and against the Beneficial Shareholders allowing the Plaintiffs to recover an amount equal to any portion of any Redemption Payments received by the Beneficial Shareholders, plus interest, or, in the alternative, an amount equal to any portion of the Redemption Payments received by the Beneficial Shareholders less the amount of such portion that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time, plus interest;

C.      On the Seventh Claim, imposition of a constructive trust on Redemption

Payments;

D.      On the Eighth and Ninth Claims:

   i.     a declaratory judgment in favor of the Foreign Representatives and against HSBC Suisse and the Beneficial Holders that the Redemptions and/or Vulnerability Period Payments constitute Unfair Preferences under Section 245 of the BVI Insolvency Act;

   ii.    judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or Vulnerability Period Payments; and

   iii.   judgment pursuant to Section 249 of the BVI Insolvency Act against HSBC Suisse and the Beneficial Holders in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest;

E.      On the Tenth and Eleventh Claims:

   i.     a declaratory judgment in favor of the Foreign Representatives and against HSBC Suisse and the Beneficial Holders that the Redemptions and/or Vulnerability Period Payments constitute Undervalue Transactions under Section 246 of the BVI Insolvency Act;

   ii.    judgment pursuant to Section 249 of the BVI Insolvency Act, setting aside and avoiding the Redemptions and/or  Vulnerability Period Payments; and

   iii.   judgment pursuant to Section 249 of the BVI Insolvency Act against HSBC Suisse and the Beneficial Holders in the amount of the avoided Vulnerability Period Payments received by them or for their benefit, plus interest;

F.      On the Twelfth and Fourteenth Claims, judgment against HSBC Suisse and in

favor of the Plaintiffs in an amount to be determined at trial;

G.      On the Thirteenth and Fifteenth Claims, judgment against the Beneficial

Shareholders and in favor of the Plaintiffs in an amount to be determined at trial;

H.      On the Sixteenth Claim, a declaratory judgment against the Defendants and in

favor of the Plaintiffs that, under the Fund Documents, the Defendants must repay that portion of the Redemption Payments received by such Defendant representing the amount by which such Redemption Payments exceeded the Redemption Price as it has been subsequently adjusted, recalculated and redetermined by Sentry and Sigma;

I.    Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees and accountants' and experts' fees, costs and expenses; and

J.    Granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated: New York, New York
       April 6, 2017

BROWN RUDNICK LLP

By:    _/s/ David J. Molton_
       David J. Molton
       May Orenstein
       Daniel J. Saval

Seven Times Square
New York, New York 10036
Telephone: 212.209.4800
Facsimile: 212.209.4801

*Attorneys for the Foreign Representatives*

REDACTED WITH REDACT-IT

**EXHIBIT A**

*Redemption Payments to Certain Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| Payment Date | Redemption Payment | No. of Shares | Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction[+] |
|---|---|---|---|
| April 20, 2004 | $103.735.39 | 95.1200 | HSBC Bank USA, New York |
| April 21, 2004 | $116,039.15 | 119.3500 | HSBC Bank USA, New York |
| June 17, 2004 | $1,948,593.75 | 1,982.4700 | HSBC Bank USA, New York |
| June 17, 2004 | $60,569.50 | 55.0100 | HSBC Bank USA, New York |
| July 16, 2004 | $1,174,246.55 | 1,179.5600 | HSBC Bank USA, New York |
| August 13, 2004 | $29,889.77 | 30.0000 | HSBC Bank USA, New York |
| December 13, 2004 | $241,019.67 | 235.5600 | HSBC Bank USA, New York |
| January 14, 2005 | $311,729.80 | 303.9400 | HSBC Bank USA, New York |
| February 22, 2005 | $219,099.77 | 212.5400 | HSBC Bank USA, New York |
| March 15, 2005 | $644,443.10 | 622.8700 | HSBC Bank USA, New York |
| April 14, 2005 | $445,071.24 | 426.5400 | HSBC Bank USA, New York |
| May 13, 2005 | $160,000.00 | 153.1200 | HSBC Bank USA, New York |
| May 13, 2005 | $2,830,445.71 | 2,708.8000 | HSBC Bank USA, New York |
| June 15, 2005 | $156,669.61 | 149.0000 | HSBC Bank USA, New York |
| July 15, 2005 | $1,080,498.13 | 1,022.8500 | HSBC Bank USA, New York |
| September 15, 2005 | $638,114.02 | 602.3100 | HSBC Bank USA, New York |
| September 15, 2005 | $250,000.00 | 235.9700 | HSBC Bank USA, New York |
| September 15, 2005 | $6,673,440.91 | 6,299.0000 | HSBC Bank USA, New York |
| October 14, 2005 | $69,315.61 | 64.8500 | HSBC Bank USA, New York |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| Payment Date | Redemption Payment | No. of Shares | Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction[+] |
|---|---|---|---|
| October 14, 2005 | $150,000.00 | 140.3400 | HSBC Bank USA, New York |
| October 14, 2005 | $5,770,863.89 | 5,399.0800 | HSBC Bank USA, New York |
| November 17, 2005 | $210,000.00 | 193.3600 | HSBC Bank USA, New York |
| November 17, 2005 | $2,055,892.10 | 1,893.0300 | HSBC Bank USA, New York |
| December 19, 2005 | $124,945.05 | 114.1900 | HSBC Bank USA, New York |
| December 19, 2005 | $1,523,029.76 | 1,391.9300 | HSBC Bank USA, New York |
| December 19, 2005 | $2,034,867.90 | 1,859.7100 | HSBC Bank USA, New York |
| January 19, 2006 | $182,799.61 | 166.1700 | HSBC Bank USA, New York |
| January 19, 2006 | $2,231,041.93 | 2,028.0800 | HSBC Bank USA, New York |
| February 15, 2006 | $50,000.00 | 45.1400 | HSBC Bank USA, New York |
| February 15, 2006 | $491,370.43 | 443.5700 | HSBC Bank USA, New York |
| February 15, 2006 | $2,977,223.84 | 2,687.6000 | HSBC Bank USA, New York |
| February 15, 2006 | $938,452.50 | 847.1600 | HSBC Bank USA, New York |
| February 15, 2006 | $1,453,628.76 | 1,312.2200 | HSBC Bank USA, New York |
| March 17, 2006 | $111,393.34 | 100.3600 | HSBC Bank USA, New York |
| April 21, 2006 | $1,949,616.49 | 1,756.5100 | HSBC Bank USA, New York |
| April 20, 2006 | $867,195.40 | 771.2200 | HSBC Bank USA, New York |
| May 15, 2006 | $6,021,110.13 | 5,304.6900 | HSBC Bank USA, New York |
| June 16, 2006 | $1,553,338.86 | 1,358.9700 | HSBC Bank USA, New York |
| July 20, 2006 | $633,759.08 | 551.6500 | HSBC Bank USA, New York |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| Payment Date | Redemption Payment | No. of Shares | Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction[+] |
|---|---|---|---|
| August 14, 2006 | $304,177.04 | 261.9800 | HSBC Bank USA, New York |
| September 14, 2006 | $296,244.15 | 253.2000 | HSBC Bank USA, New York |
| September 14, 2006 | $380,402.30 | 325.1300 | HSBC Bank USA, New York |
| October 12, 2006 | $829,096.31 | 703.8500 | HSBC Bank USA, New York |
| December 15, 2006 | $879,586.72 | 737.2600 | HSBC Bank USA, New York |
| January 16, 2007 | $169,250.09 | 140.6600 | HSBC Bank USA, New York |
| February 15, 2007 | $356,631.61 | 295.5400 | HSBC Bank USA, New York |
| March 16, 2007 | $100,128.61 | 83.0700 | HSBC Bank USA, New York |
| March 16, 2007 | $154,948.03 | 128.5500 | HSBC Bank USA, New York |
| March 16, 2007 | $265,081.06 | 219.9200 | HSBC Bank USA, New York |
| March 16, 2007 | $2,469,622.02 | 2,048.8800 | HSBC Bank USA, New York |
| April 17, 2007 | $1,632,984.60 | 1,332.8800 | HSBC Bank USA, New York |
| May 16, 2007 | $551,143.97* | 445.5110 | HSBC Bank USA, New York |
| May 16, 2007 | $552,936.54* | 446.9600 | HSBC Bank USA, New York |
| June 15, 2007 | $30,000.00* | 24.0554 | HSBC Bank USA, New York |
| June 15, 2007 | $5,066,114.84* | 4,062.2500 | HSBC Bank USA, New York |
| July 19, 2007 | $20,244,083.07* | 16,176.9800 | HSBC Bank USA, New York |
| July 19, 2007 | $2,394,804.03* | 1,913.6800 | HSBC Bank USA, New York |
| July 19, 2007 | $422,789.88* | 337.8500 | HSBC Bank USA, New York |
| August 17, 2007 | $50,140.11* | 40.0000 | HSBC Bank USA, New York |

REDACTED WITH REDACT-IT

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| Payment Date | Redemption Payment | No. of Shares | Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction[+] |
|---|---|---|---|
| August 17, 2007 | $1,198,875.15* | 956.4200 | HSBC Bank USA, New York |
| September 19, 2007 | $30,000.00* | 23.8588 | HSBC Bank USA, New York |
| September 19, 2007 | $83,843.21* | 66.6800 | HSBC Bank USA, New York |
| October 16, 2007 | $267,833.99* | 210.9700 | HSBC Bank USA, New York |
| October 16, 2007 | $375,071.69* | 295.4400 | HSBC Bank USA, New York |
| November 19, 2007 | $9,482,634.23* | 7,435.0900 | HSBC Bank USA, New York |
| December 19, 2007 | $257,729.22* | 200.0000 | HSBC Bank USA, New York |
| December 19, 2007 | $2,010,126.45* | 1,559.8747 | HSBC Bank USA, New York |
| January 17, 2008 | $1,665,883.57* | 1,289.7702 | HSBC Bank USA, New York |
| February 15, 2008 | $156,329.05* | 120.2771 | HSBC Bank USA, New York |
| February 15, 2008 | $453,859.22* | 349.1921 | HSBC Bank USA, New York |
| March 18, 2008 | $124,647.698* | 95.8400 | HSBC Bank USA, New York |
| March 18, 2008 | $2,324,407.26* | 1,787.2067 | HSBC Bank USA, New York |
| April 14, 2008 | $170,690.16* | 131.0000 | HSBC Bank USA, New York |
| April 14, 2008 | $1,085,128.93* | 832.8066 | HSBC Bank USA, New York |
| May 15, 2008 | $113,265.20* | 86.1300 | HSBC Bank USA, New York |
| May 15, 2008 | $708,146.68* | 538.4944 | HSBC Bank USA, New York |
| June 17, 2008 | $86,171.98* | 65.0000 | HSBC Bank USA, New York |
| July 15, 2008 | $67,000.00* | 50.5687 | HSBC Bank USA, New York |
| July 15, 2008 | $113,089.38* | 85.3550 | HSBC Bank USA, New York |

*Redemption Payments Received by Defendants from Sentry*
*From April 20, 2004 Through November 19, 2008*

| **Payment Date** | **Redemption Payment** | **No. of Shares** | **Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction[+]** |
|---|---|---|---|
| July 31, 2008 | $296,237.49* | 222.0000 | HSBC Bank USA, New York |
| August 18, 2008 | $395,730.58* | 296.5600 | HSBC Bank USA, New York |
| July 31, 2008 | $593,809.38* | 445.0000 | HSBC Bank USA, New York |
| August 18, 2008 | $1,688,637.62* | 1,265.4629 | HSBC Bank USA, New York |
| September 16, 2008 | $40,000.00* | 29.7638 | HSBC Bank USA, New York |
| September 16, 2008 | $109,693.55* | 81.6223 | HSBC Bank USA, New York |
| September 16, 2008 | $294,358.01* | 219.0300 | HSBC Bank USA, New York |
| October 15, 2008 | $66,193.10* | 49.0100 | HSBC Bank USA, New York |
| October 15, 2008 | $166,103.63* | 122.9847 | HSBC Bank USA, New York |
| October 15, 2008 | $1,007,591.10* | 746.0300 | HSBC Bank USA, New York |
| November 19, 2008 | $103,591.70* | 76.7472 | HSBC Bank USA, New York |
| November 19, 2008 | $93,809.58* | 69.5000 | HSBC Bank USA, New York |
| November 19, 2008 | $222,713.40* | 165.0000 | HSBC Bank USA, New York |
| November 19, 2008 | $323,041.61* | 239.3294 | HSBC Bank USA, New York |
| November 19, 2008 | $3,715,884.58* | 2,752.9594 | HSBC Bank USA, New York |

\* Denotes Redemptions in the Sentry Vulnerability Period.

[+] Whether or not Redemption Payments were ultimately directed to bank accounts in the United States, all Redemption Payments from Sentry went through a correspondent bank account that Sentry's administrator maintained in the United States, and to the extent that any such Redemption Payments were directed outside the United States, they went through a correspondent bank account in the United States identified by shareholders for such payments.

REDACTED WITH REDACT-IT

**EXHIBIT B**

REDACTED WITH REDACT-IT

*Redemption Payments Received by Defendants from Sigma*
*From April 27, 2004 Through November 21, 2008*

| Payment Date | Redemption Payment | No. of Shares | Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction |
|---|---|---|---|
| April 27, 2004 | $22,965.69 | 131.0000 | Deutsche Bank AG, Frankfurt, Germany |
| August 20, 2004 | $78,506.19 | 419.0000 | Deutsche Bank AG, Frankfurt, Germany |
| November 23, 2005 | $144,573.77 | 749.9100 | Deutsche Bank AG, Frankfurt, Germany |
| February 15, 2006 | $124,477.34 | 631.9200 | Deutsche Bank AG, Frankfurt, Germany |
| April 21, 2006 | $65,253.74 | 315.9500 | Deutsche Bank AG, Frankfurt, Germany |
| May 24, 2006 | $75,423.29 | 348.3200 | Deutsche Bank AG, Frankfurt, Germany |
| December 18, 2007 | $153,478.92* | 575.6839 | Deutsche Bank AG, Frankfurt, Germany |
| January 22, 2008 | $235,710.74* | 875.5230 | Deutsche Bank AG, Frankfurt, Germany |
| January 22, 2008 | $491,618.38* | 1,826.0653 | Deutsche Bank AG, Frankfurt, Germany |
| February 15, 2008 | $63,256.35* | 232.5600 | Deutsche Bank AG, Frankfurt, Germany |
| February 15, 2008 | $105,520.01* | 387.9410 | Deutsche Bank AG, Frankfurt, Germany |
| February 15, 2008 | $226,114.32* | 831.3022 | Deutsche Bank AG, Frankfurt, Germany |
| February 15, 2008 | $451,220.13* | 1,658.8966 | Deutsche Bank AG, Frankfurt, Germany |
| March 18, 2008 | $3,129,698.79* | 10,634.2937 | Deutsche Bank AG, Frankfurt, Germany |
| April 18, 2008 | $163,036.38* | 547.2020 | Deutsche Bank AG, Frankfurt, Germany |
| April 22, 2008 | $164,029.52* | 552.9655 | Deutsche Bank AG, Frankfurt, Germany |
| August 15, 2008 | $499,526.63* | 1,744.1900 | Deutsche Bank AG, Frankfurt, Germany |
| August 15, 2008 | $767,537.26* | 2,679.9989 | Deutsche Bank AG, Frankfurt, Germany |
| November 21, 2008 | $1,813,674.71* | 7,439.4387 | Deutsche Bank AG, Frankfurt, Germany |

*Redemption Payments Received by Defendants from Sigma
From April 27, 2004 Through November 21, 2008*

\* Denotes Redemptions in the Sigma Vulnerability Period.  All $USD amounts are based on
the exchange rate as of the date of the Redemption Payment.  However, upon application of a
different exchange rate, as may be required by applicable law, the amount of damages may be
different.

62739843 v1 62739843 v3

REDACTED WITH REDACT-IT

| Summary report: Litéra® Change-Pro TDC 7.5.0.125 Document comparison done on 4/6/2017 7:31:25 PM | |
|---|---|
| **Style name:** Standard | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://WORKSITE/WorkSiteUS/62739843/1 | |
| **Modified DMS:** iw://WORKSITE/WorkSiteUS/62739843/3 | |
| **Changes:** | |
| Add | 253 |
| Delete | 163 |
| Move From | 7 |
| Move To | 7 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 430 |

# **EXHIBIT D**

**BROWN RUDNICK LLP**

Seven Times Square
New York, New York 10036
David J. Molton
212-209-4800

*Attorneys for the Foreign Representatives*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 15 Case |
| | ) |
| FAIRFIELD SENTRY LIMITED, et al., | ) Case No. 10-13164 |
| | ) (SMB) |
| Debtors in Foreign Proceedings. | ) |
| | ) Jointly Administered |
| FAIRFIELD SENTRY LIMITED (IN LIQUIDATION), acting by and through the Foreign Representatives thereof, and KENNETH KRYS and CHARLOTTE CAULFIELD, solely in their capacities as Foreign Representatives and Liquidators thereof, | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) Adv. Pro. No. 10-03634 |
| Plaintiffs, | ) (SMB) |
| | ) |
| -against- | ) THIRD AMENDED |
| | ) COMPLAINT |
| ZURICH CAPITAL MARKETS COMPANY, ANTONIO BACELAR CARREHAS, BANCO ITAU EUROPA LUXEMBOURG, BANK MORGAN STANLEY AG, BANK MORGAN STANLEY SA, BANQUE SUDAMERIS, CAPRICE INTERNATIONAL GROUP, CITIBANK (SWITZERLAND) ZURICH, CITIVIC NOMINEES LIMITED, COMPAGNIE BANCAIRE ESPIRITU SANTO SA n/k/a BANQUE PRIVEE ESPIRITO SANTO SA, DESERT ROSE LIMITED, EDSON TERRA CUNHA, DENISE BAR, EFG PRIVATE BANK SA, FABIO RODRIGUES MENDES, HSBC BANK USA, MERRILL LYNCH BANK, MORGAN STANLEY & CO. INTERNATIONAL PLC, PINE CLIFFS INVESTMENTS LIMITED, SAFRA NATIONAL BANK OF NEW YORK, ASBT CAYMAN SUB NO. 82, ZCM MATCHED FUNDING CORP., ZCM ASSET HOLDING CO. BERMUDA and BENEFICIAL OWNERS OF ACCOUNTS HELD IN THE NAME OF ZURICH CAPITAL MARKETS COMPANY 1-1000, | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

| Defendants. |
| --- |

Fairfield Sentry Limited ("Sentry"), by and through Kenneth Krys and Charlotte Caulfield (together with their predecessors, the "Foreign Representatives"), and Kenneth Krys and Charlotte Caulfield (together with Sentry, the "Plaintiffs"), solely in their capacities as the Liquidators of Sentry and the Foreign Representatives of the liquidation proceedings involving Sentry, Fairfield Sigma Limited ("Sigma"), and Fairfield Lambda Limited ("Lambda," together with Sentry and Sigma, the "Funds" or the "Debtors") pending before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands (the "BVI Court"), for their complaint against Defendants, allege the following based on personal knowledge or information derived from the Funds' books and records or from other sources, including, *inter alia*, court filings and statements of governmental agencies and other parties.

## PRELIMINARY STATEMENT

1.      This action and similar actions are brought by the Plaintiffs, with the approval of the foreign court having jurisdiction over the matter, to recover payments made to shareholders for the redemption of shares in the Funds prior to December 2008.

2.      The Funds were created as a means for private investment in managed accounts with Bernard L. Madoff Investment Securities LLC ("BLMIS"), the brokerage business that Bernard L. Madoff used to perpetrate his massive Ponzi scheme.  Sentry was the largest of all so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency investments (respectively, Euro and Swiss Franc investments) through purchases of shares of Sentry.  Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of assets supposedly held

by BLMIS for Sentry.   As stated in their offering materials, the Funds' investment objective was to achieve capital appreciation of assets through investments in BLMIS (directly, in the case of Sentry; and indirectly, through Sentry, in the cases of Sigma and Lambda).

3.    It is now known that these types of feeder funds were essential to the perpetration of Madoff's Ponzi scheme.   In order for the Ponzi scheme to operate, Madoff required a continuous flow of new investors and investments to be able to satisfy redemption requests from early investors.   Feeder funds, such as Sentry (which was a direct feeder fund into BLMIS), and Sigma and Lambda (which were indirect feeder funds, through Sentry, into BLMIS), brought new investors into this scheme, allowing Madoff to make payments to early investors and thereby creating and perpetuating the illusion that BLMIS was engaged in a successful investment strategy and actively trading securities.

4.    From the Funds' inception until the disclosure of Madoff's fraud in December 2008, during most relevant times, substantially all cash, net of fees and expenses, raised by the Funds through the sale of their shares was transferred (either directly in the case of Sentry or indirectly, through Sentry, in the cases of Sigma and Lambda) to BLMIS for investment in accounts managed by Madoff.   Prior to December 2008, the voting participating shares of Sentry ($.01 par value per share), Sigma (€.01 par value per share), and Lambda (CHF.01 par value per share) (the "Shares"), were redeemable for a price equal to the applicable Fund's "Net Asset Value."   Net Asset Value was to be determined, in accordance with applicable accounting standards, as the value of the respective assets of Sentry, Sigma, and Lambda divided by the number of shares outstanding in each Fund, net of certain expenses ("Net Asset Value").

5.      From time to time, in order to make payments to investors for the redemption

of Shares ("Redemption Payments"), Sentry generally made withdrawals from its BLMIS

accounts.   On occasion, Sentry made Redemption Payments directly from amounts on hand

invested by other subscribers in the Funds.  At all relevant times, the Funds believed payments

that Sentry received from BLMIS represented the proceeds of sales of securities and/or

investments held by BLMIS for Sentry.   The amount, per share, paid by the Funds to

shareholders for each Share redeemed was to be equal to the per share Net Asset Value, which

was calculated based principally on the assets that the Funds believed were being held, and

investments that were being made, by BLMIS for Sentry's account.

6.      As the world now knows, Madoff was operating a massive Ponzi scheme

through BLMIS.  Thus, at all relevant times, the money that Sentry transferred to BLMIS was

not invested, but, rather, was used by Madoff to pay other BLMIS investors or was otherwise

misappropriated by Madoff for unauthorized uses.   Further, none of the securities shown on

statements provided to Sentry by BLMIS were in fact purchased for Sentry.   Additionally,

none of the amounts withdrawn by Sentry from its accounts with BLMIS were proceeds of

sales of securities or other investments.  Instead, such amounts represented the monies of more

recent investors into the Madoff scheme.

7.      In light of the fraudulent nature of BLMIS and its operation as a massive Ponzi

scheme, at all relevant times the assets purportedly held at BLMIS for Sentry were non-

existent, and the Funds were insolvent at the time Redemption Payments were made or they

were rendered insolvent by those payments.  As a result, at all relevant times, the Net Asset

Value of the Shares redeemed was miscalculated, and Redemption Payments were mistakenly

made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at any relevant time.

8.    At all relevant times, all payments made from BLMIS to Sentry and other feeder funds and investors were made by Madoff to perpetuate his Ponzi scheme and avoid detection of his fraud.    Similarly, the Redemption Payments that the Funds made to redeeming shareholders were not made in the ordinary course of any business or for any legitimate purposes.  Those Redemption Payments did not conform to or follow the terms of the Funds' Subscription Agreements, Articles of Association and/or other offering documents, as they were based upon Net Asset Values that were not calculated based upon the true facts existing at any relevant time, and because, more generally, the Redemption Payments represented the proceeds arising from investment in BLMIS (or a substitute therefor, in the form of subscription monies from other investors in the Funds, used as a shortcut to investing subscription monies with BLMIS and simultaneously withdrawing monies from BLMIS), which the world now knows was operated by Madoff as a Ponzi scheme.  These payments were crucial in perpetuating the Ponzi scheme and maintaining the illusion that Madoff was making actual investments and employing a successful investment strategy.

9.    During the period from and after April 21, 2004, through August 14, 2006, following the receipt by Sentry of notices of redemption, Sentry made Redemption Payments to accounts held in the name of Zurich Capital Markets Company ("Zurich Capital") aggregating USD $15,142,755.05.

10.    At the time such payments were made, Sentry mistakenly believed that such payments were in the amount of the Net Asset Value of the Shares tendered at the time of redemption.  In fact, however, as stated, the Redemption Payments made to Zurich Capital far

exceeded the Net Asset Value of Shares redeemed that would have been calculated based on the true facts existing at that time or any relevant time. Moreover, these Redemption Payments did not, as Sentry intended, represent the proceeds arising from the profitability of or to continue investment in BLMIS. Instead, any amounts obtained directly or indirectly by Sentry from BLMIS to make Redemption Payments to Zurich Capital generally were proceeds of Madoff's Ponzi scheme, obtained from other BLMIS investors or other Sentry investors invested in BLMIS.

11.    Accordingly, the Funds' actual assets are, and at relevant times were, far less than the amount needed to satisfy their liabilities and the claims that have been or may be asserted against them, and, at all relevant times, the Funds were unable to pay their debts as they fell or would fall due. Indeed, at the time the Redemptions Payments were made, the Funds had insufficient assets from which to pay debts as they fell or would fall due.

12.    In particular, claims had been previously asserted against the Funds in actions commenced by Irving H. Picard, the Trustee appointed by the United States District Court for the Southern District of New York for the liquidation of BLMIS (the "BLMIS Trustee"), in an adversary proceeding pending before the United States Bankruptcy Court of the Southern District of New York, Picard v. Fairfield Sentry Limited, et al., No. 08-01789 (SMB) (the "BLMIS Adversary Proceeding"). As set forth in the complaint filed in the BLMIS Adversary Proceedings, the BLMIS Trustee sought to recover from the Funds, on preference and fraudulent transfer grounds, approximately $3.2 billion. This amount was alleged to have been transferred to the Funds from BLMIS, directly (in the case of Sentry), or indirectly (in the cases of Sigma and Lambda), during the six years preceding the December 2008 disclosure of the Madoff fraud. The BLMIS Trustee alleged that the monies transferred from BLMIS to the

4

Funds were the misappropriated assets of other BLMIS investors. At all relevant times, monies that the Funds received from BLMIS, net of fees and expenses, were transferred to shareholders as Redemption Payments.

13.    On July 13, 2011, pursuant to an agreement between the Foreign Representatives and the BLMIS Trustee dated May 9, 2011, the United States Bankruptcy Court for the Southern District of New York entered judgments against each of the Funds on the claims against the Funds asserted in the BLMIS Adversary Proceeding (the "Judgments") in the amount of $3,054,000,000 with respect to Sentry, $752,300,000 with respect to Sigma, and $52,900,000 with respect to Lambda. The Redemption Payments rendered the Funds unable to satisfy their liabilities to the BLMIS customers, the BLMIS Trustee, including on account of the Judgments, and other creditors of the Funds, and further increased the amount of those liabilities. In this way, the Redemption Payments caused the Funds to become insolvent and/or deepened their existing insolvency, in that, among other things, at all relevant times the Funds were unable to pay their debts as they fell or would fall due.

14.    Upon information and belief, Zurich Capital has either retained the Redemption Payments made to it by Sentry for its own account and benefit or, alternatively, paid all or some portion of such payments to or for the account of persons or entities, including, but not limited to, Antonio Bacelar Carrehas, Banco Itau Europa Luxembourg, Bank Morgan Stanley AG, Bank Morgan Stanley SA, Banque Sudameris, Caprice International Group, Citibank (Switzerland) Zurich, Citivic Nominees Limited, Compagnie Bancaire Espiritu Santo SA n/k/a Banque Privee Espirito Santo SA, Desert Rose Limited, Edson Terra Cunha, Denise Bar, EFG Private Bank SA, Fabio Rodrigues Mendes, HSBC Bank USA, Merrill Lynch Bank, Morgan Stanley & Co. International PLC, Pine Cliffs Investments Limited, Safra National Bank of New

York, ASBT Cayman Sub No. 82, ZCM Matched Funding Corp, and ZCM Asset Holding Co. Bermuda, for whom Zurich Capital may have subscribed for shares of the Funds in the capacity of trustee, agent, representative, nominee or custodian (individually, a "Beneficial Shareholder" and collectively, "Beneficial Shareholders," together with Zurich Capital, the "Defendants").

15.    Following the revelation of Madoff's fraud in December 2008, the Funds' boards of directors suspended any further redemptions of the Funds' shares and the calculation of each of the Funds' Net Asset Value.  As of December 2008 and presently, Sentry, Sigma, and Lambda have, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

16.    Unless Redemption Payments paid to shareholders are recovered for the Funds' estates, the Funds will be unable to satisfy their liabilities and claims that have been made or may be made against them; further, recoveries of Redemption Payments will increase distributions to the Funds' investors who have been harmed.  Moreover, to the extent such liabilities and claims must be satisfied solely from the Funds' current assets, Defendants will have been unjustly enriched as they will not bear their proportionate share of such liabilities and claims, but rather will retain a windfall at the expense of other shareholders and creditors of the Funds.

**JURISDICTION AND VENUE**

17.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 157(b) and 1334(b), as this adversary proceeding and the claims asserted by the Foreign Representatives herein arise under, arise in and/or relate to the Chapter 15 proceedings of the above-captioned Debtors, In re Fairfield Sentry Limited, et al., No. 10-13164 (SMB), pending in this Court. Additionally, pursuant to section 78eee(b)(2)(A)(iii) of the Securities Investor Protection Act

("SIPA"), which incorporates 28 U.S.C. § 1334(b) and applicable provisions of Title 11 of the

United States Code, jurisdiction is also proper in this Court because this action also relates to

the consolidated liquidation proceedings of BLMIS and Bernard L. Madoff, pending in this

Court under the caption Securities Investor Protection Corp. v. Bernard L. Madoff Investment

Securities LLC, SIPA Liquidation No. 08-1789 (SMB).    Pursuant to the Amended Standing

Order of Reference of the United States District Court for the Southern District of New York,

dated January 31, 2012, all proceedings arising in, arising under and/or related to cases under

Title 11 of the United States Code (as amended, the "Bankruptcy Code") are referred to this

Court for adjudication.

18.    This is a core proceeding under 28 U.S.C. § 157(b)(2).[1]    Should the Court

determine that this is a non-core proceeding, Plaintiffs consent to entry of final judgment and

order by this Court.

19.    This Court has jurisdiction over Zurich Capital and any Beneficial Shareholders

pursuant to Rules 7004(d) and (f) of the Federal Rules of Bankruptcy Procedure and New

York Civil Practice Law & Rules § 302 (McKinney 2008) because Zurich Capital and the

Beneficial Shareholders purposely availed themselves of the laws of the United States and the

State of New York by, among other things, investing money with the Funds, knowing and

intending that the Funds would invest substantially all of that money in New York-based

BLMIS, and maintaining bank accounts in the United States at Citibank NA, and in fact

---

[1]    Although the District Court, in In re Fairfield Sentry Ltd., No. 1:11-mc-00224-LAP, 458 B.R. 665 (S.D.N.Y. 2011), held that causes of action alleged by the Plaintiffs in other cases before this Court—causes of action that are similar or the same as those alleged in this complaint—are not core proceedings, this determination may be subject to appeal.  In any event, plaintiffs submit that the causes of action in this complaint, which include, *inter alia*, allegations regarding transfers of property that were directed into the territorial jurisdiction of the United States, render the claims asserted in this complaint core in accordance with the District Court's decision.

receiving Redemption Payments in those United States-based and/or New York-based accounts.
Zurich Capital and the Beneficial Shareholders selected U.S. dollars as the currency in which to invest and execute their transactions in Sentry, designated United States-based and/or New York-based bank accounts to receive their Redemption Payments from the Funds, and actively directed Redemption Payments at issue in this action into those bank accounts. Zurich Capital and the Beneficial Shareholders thus knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York, derived significant revenue from New York, and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein. Zurich Capital and the Beneficial Shareholders should therefore reasonably expect to be subject to United States jurisdiction.

20.     Moreover, this Court has jurisdiction over Zurich Capital and any Beneficial Shareholders by virtue of the legally binding and valid agreements and representations set forth in one or more agreements for the subscription of Shares that Zurich Capital entered into with Sentry.

21.     Zurich Capital, upon information and belief, entered into a Subscription Agreement with Sentry on or about January 31, 2003 (the "Initial Subscription Agreement") pursuant to which Zurich Capital subscribed for Shares. Subsequent to entering into the Initial Subscription Agreement, Zurich Capital, upon information and belief, entered into additional agreements (the "Subsequent Subscription Agreements") with Sentry on or about March 31, 2003, July 1, 2003, July 30, 2003, July 31, 2003, August 29, 2003, September 30, 2003, October 31, 2003, November 4, 2003, November 28, 2003, September 30, 2004, November 30, 2004, and April 29, 2005, pursuant to which it subscribed for additional Shares on the

REDACTED WITH REDACT-IT

same terms and conditions as those shares subscribed for pursuant to the Initial Subscription

Agreement.  The Initial Subscription Agreement and Subsequent Subscription Agreements are

collectively referred to herein as the "Subscription Agreements."

22.    The Subscription Agreements provide for, *inter alia*, the irrevocable submission

by Zurich Capital to the jurisdiction of the New York courts with respect to any proceeding

with respect to said agreement and Sentry and Zurich Capital's consent to service of process

by the mailing of such process, as provided therein.  In particular, the Subscription Agreements

provide as follows:

> New York Courts.  Subscriber agrees that any suit, action or proceeding
> ("Proceeding") with respect to this Agreement and the Fund may be brought in
> New York.  Subscriber irrevocably submits to the jurisdiction of the New York
> courts with respect to any Proceeding and consents that service of process as
> provided by New York law may be made upon Subscriber in such Proceeding,
> and may not claim that a Proceeding has been brought in an inconvenient forum.
> Subscriber consents to the service of process out of any New York court in any
> such Proceeding by the mailing of copies thereof, by certified or registered mail,
> return receipt requested, addressed to Subscriber at the address of Subscriber
> then appearing on the Fund's records.  Nothing herein shall affect the Fund's
> right to commence any Proceeding or otherwise to proceed against Subscriber in
> any other jurisdiction or to serve process upon Subscriber in any manner
> permitted by any applicable law in any relevant jurisdiction.

23.    Furthermore, by executing the Subscription Agreements, Zurich Capital agreed

to all terms and conditions contained therein, including the express provision that any

agreement made by Zurich Capital in the Subscription Agreements would also apply to any

other person for whom Zurich Capital was subscribing as trustee, agent, representative, or

nominee – i.e., all Beneficial Shareholders.  Moreover, by executing the Subscription

Agreements, Zurich Capital represented that it had all requisite authority from Beneficial

Shareholders to execute and perform any and all obligations on their behalf, and also agreed to

indemnify Sentry for any damages resulting from an assertion by a Beneficial Shareholder that

Zurich Capital lacked proper authorization to enter into the Subscription Agreements or perform the obligations thereof. Specifically, the Subscription Agreements provide as follows:

> If Subscriber is acting as a Representative. If Subscriber is subscribing as trustee, agent, representative, or nominee for another person (the "Beneficial Shareholder"), Subscriber agrees that the representations and agreements herein are made by Subscriber with respect to itself and the Beneficial Shareholder. Subscriber has all requisite authority from the Beneficial Shareholder to execute and perform the obligations hereunder. Subscriber also agrees to indemnify the Fund . . . for any and all costs, fees and expenses (including legal fees and disbursements, fines and amounts paid in settlement) in connection with any damages resulting from Subscriber's misrepresentation or misstatement contained here, or the assertion of Subscriber's lack of proper authorization from the Beneficial Shareholder to enter into this Agreement or perform the obligations hereof.

24.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## PARTIES

**Plaintiffs**

25.     Sentry, a British Virgin Islands company, was organized in 1990 under the International Business Company Act of the British Virgin Islands and was subsequently re-registered as a business company under the BVI Business Companies Act 2004. Sentry's registered agent is Codan Trust Company (B.V.I.) located at Romasco Place, Wickhams Cay 1, Road Town, Tortola, BVI. Sentry is currently in liquidation in proceedings commenced on April 21, 2009 in the BVI Court.

26.     The Foreign Representatives were appointed by the BVI Court as Liquidators of the Funds to supervise the liquidation of the Funds' estates and, where necessary, commence proceedings in the name of and on behalf of the Funds or in their own official names. On April 23, 2009, the BVI Court issued an order appointing Christopher Stride as liquidator of Lambda (the "Lambda Appointment Order"). On July 21, 2009, the BVI Court issued an

order appointing Kenneth Krys and Mr. Stride as joint liquidators of Sentry and Sigma (the "Sentry & Sigma Appointment Order").  On September 6, 2010, the BVI Court issued notices acknowledging Mr. Stride's resignation and the appointment of Joanna Lau as joint liquidator with Mr. Krys of all three Funds (the "Supplemental Appointment Order").  On November 23, 2011, Ms. Lau resigned as joint liquidator of the Funds.  On June 24, 2014, the BVI Court issued an order appointing Charlotte Caulfield as joint liquidator, with Mr. Krys, of all three Funds (the "Second Supplemental Appointment Order" and, together with the Lambda Appointment Order, the Sentry & Sigma Appointment Order, and the Supplemental Appointment Order, the "BVI Appointment Orders"). The Foreign Representatives, in their capacities as Foreign Representatives and liquidators of the Funds, have been authorized by the foreign court having jurisdiction over the matter to bring this action and the claims herein, including the avoidance claims herein.

27.    Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' businesses, including, among other things, custody and control of the Funds' assets, the power to do all acts and execute, in the name and on behalf of the Funds, any deeds, receipts or other documents, and the power to compromise claims, commence litigation and to dispose of property.   After obtaining BVI Court approval, the Foreign Representatives filed petitions in this Court in June of 2010, under Chapter 15 of Title 11 of the United States Code, seeking recognition of the BVI Liquidation Proceedings as "foreign main proceedings" under Chapter 15.  On July 22, 2010, this Court issued an order (the "Recognition Order") granting that recognition.

28.    Pursuant to the Recognition Order, the Foreign Representatives were automatically afforded relief available under 11 U.S.C. § 1520, including application of the

Bankruptcy Code's automatic stay to the Funds and their property located in the United States, as well as the ability to operate the Funds' business and exercise the rights and powers of a trustee under Sections 363 and 552 of the Bankruptcy Code. Moreover, the Bankruptcy Court specifically granted additional relief in the Recognition Order to the Foreign Representatives pursuant to 11 U.S.C. § 1521(a). Such relief includes, but is not limited to: (i) staying any actions, proceedings or execution against the Funds' assets to the extent not stayed under Section 1520; (ii) authorizing the Foreign Representatives to seek leave to conduct discovery concerning the Funds' assets, affairs, rights, obligations or liabilities; (iii) entrusting the Foreign Representatives with the administration and realization of the Funds' assets that are located within the United States, including all claims and causes of action belonging to the Funds; and (iv) otherwise giving full force and effect to the proceedings before the BVI Court.

**Defendants**

29.     Zurich Capital was, at all relevant times, a member of Sentry and a registered holder of Shares. Upon information and belief, Zurich Capital is a corporate entity organized under the laws of Ireland and having its registered address at La Touche House, 3rd Floor, IFSC, Dublin 1, Ireland. Zurich Capital subscribed for the purchase of Shares by entering into one or more Subscription Agreements with Sentry. All purchases of Shares by Zurich Capital were subject to the terms of the Subscription Agreements.

30.     Defendants "Beneficial Owners of the Accounts Held in the Name of Zurich Capital Markets Company" - i.e., the Beneficial Shareholders, are, as noted, any persons or entities having a beneficial ownership or interests in Shares of Sentry issued to Zurich Capital and on whose behalf Zurich Capital was acting as trustee, agent, representative, or nominee.

REDACTED WITH REDACT-IT

31.     Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with Antonio Bacelar Carrehas.

32.     Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with Banco Itau Europa Luxembourg.   Upon information and belief, Banco Itau Europa Luxembourg is a corporate entity organized under the laws of Luxembourg and has its registered address at 29 Avenue Porte-Neuve, P.O. Box 572, L-2227, Luxembourg.

33.     Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with Bank Morgan Stanley AG.   Upon information and belief, Bank Morgan Stanley Ag is a corporate entity organized under the laws of Switzerland and has its registered address at Bleicherweg 5, Postach CH-8022, Zurich, Switzerland.

34.     Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with Bank Morgan Stanley SA.   Upon information and belief, Bank Morgan Stanley SA is a corporate entity organized under the laws of Switzerland and has its registered address at 12 Place de la Fusterie, CH-1211 Geneva, Switzerland.

35.     Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with Banque Sudameris.   Upon information and belief, Banque Sudameris is a corporate entity organized under the laws of Florida and has its registered address at c/o Corporate Creations Network, Inc., 11380 Prosperity Farms Road, #221E, Palm Beach Gardens, FL 33410.

36.    Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with Caprice International Group.

37.    Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with Citibank (Switzerland) Zurich.    Upon information and belief, Citibank (Switzerland) Zurich is a corporate entity organized under the laws of Switzerland and has its registered address at Seestrasse 25, P.O. Box 3760, CH-8021 Zurich, Switzerland.

38.    Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with Citivic Nominees Limited.    Upon information and belief, Citivic Nominees Limited is a corporate entity organized under the laws of the United Kingdom and has its registered address at Citigroup Centre, Canada Square, Canary Wharf, London, E14 5LB, United Kingdom.

39.    Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with Compagnie Bancaire Espiritu Santo SA n/k/a Banque Privee Espirito Santo SA.    Upon information and belief, Compagnie Bancaire Espiritu Santo SA n/k/a Banque Privee Espirito Santo SA is a corporate entity organized under the laws of Switzerland and has its registered address at 15 Avenue de Montchoisi, Case Postale 390, 1001 Lousanne, Suisse, Switzerland.

40.    Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with Desert Rose Limited.    Upon information and belief, Desert Rose Limited is a corporate entity

organized under the laws of New York and has its registered address at 250 W. 39th Street, 8th Avenue, New York, NY 10018.

41.    Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with Edson Terra Cunha.

42.    Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with Denise Bar.

43.    Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with EFG Private Bank SA.  Upon information and belief, EFG Private Bank SA is a corporate entity organized under the laws of Switzerland and has its registered address at Quai du Seujet 24, P.O. Box 2391, 1211 Geneva 2, Switzerland.

44.    Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with Fabio Rodrigues Mendes.  Upon information and belief, Fabio Rodrigues Mendes is an individual maintaining an address at 89 Autumnwood Drive, Rockton, IL 61072.

45.    Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with HSBC Bank USA ("HSBC Bank").  Upon information and belief, HSBC Bank is a corporate entity organized under the laws of New York and has its registered address at 452 Fifth Avenue, New York, NY 10018.

46.    Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with Merrill

15

Lynch Bank ("Merrill Lynch").   Upon information and belief, Merrill Lynch is a corporate entity organized under the laws of Switzerland and has its registered address at 13 Route de Florissant, Geneva, CH-1211, Switzerland.

47.    Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with Morgan Stanley & Co. International PLC.   Upon information and belief, Morgan Stanley & Co. International PLC is a corporate entity organized under the laws of Switzerland and has its registered address at 13 Route de Florissant, Geneva, CH-1211, Switzerland.

48.    Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with Pine Cliffs Investments Limited.

49.    Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with Safra National Bank of New York.   Upon information and belief, Safra National Bank of New York is a corporate entity organized under the laws of New York and has its registered address at 546 Fifth Avenue, New York, NY 10036.

50.    Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with ASBT Cayman Sub No. 82.   Upon information and belief, ASBT Cayman Sub No. 82 is a corporate entity organized under the laws of the Cayman Islands and has its registered address at c/o John Cullinane and Derrie Boggess, c/o Walkers SPV Limited, P.O. Box 908, George Town, Grand Cayman, Cayman.

51.    Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with ZCM Matched Funding Corp.    Upon information and belief, ZCM Matched Funding Corp.  is a corporate entity organized under the laws of United States and has its registered address at c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

52.    Based on Sentry records, some or all of the Redemption Payments made to Zurich Capital may have been paid to an account holder or holders associated with ZCM Asset Holding Co. Bermuda.  Upon information and belief, ZCM Asset Holding Co. Bermuda is a corporate entity organized under the laws of Bermuda and has its registered address at c/o BNP Paribas Security Corp., 787 Seventh Avenue, 3rd Floor, New York, NY 10019.

## NOTICE PURSUANT TO FED. R. CIV. P. 44.1

53.    Certain of the substantive issues to be resolved in this case will be governed by the laws of the British Virgin Islands.  Plaintiffs intend to rely upon the applicable laws of that territory.

## FACTUAL ALLEGATIONS

**A.    Role of Feeder Funds In Madoff Fraud**

54.    Sentry was the largest of all the so-called "feeder funds" to maintain accounts with BLMIS.  Sigma and Lambda were indirect BLMIS feeder funds established for foreign currency (respectively, Euro and Swiss franc) investment through purchase of shares of Sentry. Sentry's account statements with BLMIS as of the end of October 2008 showed in excess of $6 billion of invested assets supposedly held by BLMIS.  As stated in its offering materials,

Sentry's investment objective was to achieve capital appreciation through investments in BLMIS.

55.    As discussed above, Sentry, Sigma, and Lambda were established for the purpose of making investments in BLMIS.  It is now known that these types of feeder funds were a crucial part of Madoff's Ponzi scheme.  The feeder funds brought new investors and new investments into the scheme, allowing Madoff to make payments to early investors who sought to liquidate their investments, and in this way, the feeder funds were used by Madoff to continue and perpetuate his fraud by maintaining the illusion that BLMIS was making active investments and engaging in a successful investment strategy.

**B.    Calculation of Net Asset Value and Shareholder Redemption Payments**

56.    Substantially all of the money (up to 95%) raised by the Funds from the sale of their Shares, net of fees and expenses, was turned over to and invested in BLMIS (by and/or through Sentry), and supposedly credited to accounts held in the name of Sentry with BLMIS, purportedly for use in the now infamous "split-strike conversion" investment strategy.   In accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other relevant documents, from time to time, the Funds paid to shareholders, for each Share tendered for redemption, an amount that was based on each of the respective Funds' purported Net Asset Value, as it was then calculated.

57.    In calculating each of the Funds' Net Asset Value, the Funds' administrators used and relied on account statements provided by BLMIS purportedly showing securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry.   Generally, all securities identified on BLMIS account statements were traded on public exchanges and had readily ascertainable market values, and those market values (in

addition to, among other items, cash on hand that was identified in the Sentry account statement for the relevant time period) were used in accordance with the Funds' Subscription Agreements, Articles of Association, offering materials and/or other documents to calculate the Net Asset Value of the Shares.

58.     In fact, at all relevant times, no securities were ever purchased or sold by BLMIS for Sentry and any stated cash on hand in the BLMIS accounts was based on misinformation and fictitious account statements.  None of the transactions shown on the account statements provided by BLMIS to Sentry ever occurred.  Indeed, no investments of any kind were ever made by BLMIS for Sentry.  At all relevant times, all of the account statements that BLMIS provided to Sentry were entirely and utterly fictitious.  Further, all amounts deposited by Sentry (or by Sigma and Lambda through Sentry) with BLMIS for investment and the purchase of securities to be held by BLMIS for the account of Sentry were used by Madoff to pay other BLMIS investors or were misappropriated by Madoff for other unauthorized uses.

59.     From time to time, to make Redemption Payments, Sentry (and Sigma and Lambda through Sentry) made withdrawals from Sentry's BLMIS accounts (or utilized subscription monies of other investors on hand that were directed for investment in BLMIS). The Funds believed that the amounts provided in connection with such withdrawals represented the proceeds arising from the profitability of or to continue investment in BLMIS.  In fact, however, payments made by BLMIS to Sentry purportedly representing the proceeds of sales of securities or other investment positions were nothing other than the deposits of other BLMIS investors or previous deposits made by Sentry, never invested but rather misused and misappropriated as part of Madoff's fraud.  At all relevant times, payments made from BLMIS

to Sentry were made by Madoff to continue and perpetuate his Ponzi scheme and avoid detection of his fraud. The payments from BLMIS to Sentry were not payments made in the ordinary course of or as part of any business, nor did they have a legitimate business purpose. Similarly, the Redemption Payments were not made for any legitimate purposes or in the ordinary course of any business.

60.    Given the fraudulent nature of BLMIS and its operation as a massive Ponzi scheme, the money paid by the Funds (directly in the case of Sentry and indirectly in the cases of Sigma and Lambda) to BLMIS on account of Sentry was, at all relevant times and unknown to the Funds, misused and misappropriated by Madoff as part of his Ponzi scheme. At all relevant times, the Funds were insolvent when the Redemption Payments were made or were rendered insolvent, and/or their insolvency was deepened, as a result of the Redemption Payments.

## C.    Redemption Payments Made or Transferred to Defendants

61.    During the period from and after April 21, 2004, through August 14, 2006, Zurich Capital received Redemption Payments totaling USD $15,142,755.05 from Sentry in respect of Shares tendered for redemption.

62.    At Zurich Capital's directions and instructions, Redemption Payments totaling USD $15,142,755.05 were received at Zurich Capital's bank account with Citibank NA in New York.

63.    The dates and amounts of each Redemption Payment received by Zurich Capital from Sentry, and the bank accounts to which each Redemption Payment was made, are set forth on Exhibit A.

64.    At the time those Redemption Payments were made, the Funds had insufficient assets and were unable to pay their debts as they would fall due.  In exchange for each Redemption Payment, each of which constitutes or forms part of a transaction between Zurich Capital and Sentry, Sentry received no consideration or consideration of a value that, in money or money's worth, was significantly less than the value, in money or money's worth, of the consideration provided by Sentry.

65.    Upon information and belief, Zurich Capital and/or the Beneficial Shareholders received Redemption Payments in excess of amounts paid by such person(s) for purchase of their Shares.

**D.    Citco Did Not Issue Any Certifications of Net Asset Value in "Good Faith"**

66.    Article 11 of the Funds' Articles provides that "[a]ny certificate as to the Net Asset Value per Share . . . given in good faith by or on behalf of the Directors shall be binding on all parties."  During the relevant period, statements of the Net Asset Value were issued by the Funds' administrators, Citco Fund Services (Europe) B.V. and its delegatee Citco (Canada) Inc. (the "Administrators").  On April 16, 2014, the Judicial Committee of the Privy Council (the "Privy Council") issued a decision in which it held that certain statements of Net Asset Value, in particular, certain monthly emails, contract notes, and monthly account statements issued by the Administrators, constituted "certificates" for the purposes of Article 11 (the "Certificates").  The Privy Council did not, however, address whether such Certificates were given "in good faith."  In carrying out this responsibility, the Administrators and affiliated Citco companies within Citco Group Limited (collectively, "Citco") acted with a lack of good faith in giving the Certificates.

21



REDACTED

REDACTED WITH REDACT-IT



*REDACTED*



REDACTED WITH REDACT-IT









*REDACTED*



*REDACTED*



REDACTED

REDACTED WITH REDACT-IT



*REDACTED*

95.    By virtue of the foregoing conduct, Citco issued the Certificates without good faith.  The Funds were the primary victims of Citco's conduct and its lack of good faith in issuing the Certificates.

**E.    Zurich Capital Knew ~~or Should Have Known of~~, Was Willfully Blind to or Recklessly Disregarded the BLMIS Fraud**

96.    Zurich Capital served as trustee, agent, representative, nominee or custodian for the Beneficial Owners in connection with their investments in the Funds, including, by: subscribing to Shares of Sentry on behalf of the Beneficial Owners, maintaining custody of the Shares as record shareholders, paying redemption proceeds from the Shares of Sentry to the Beneficial Owners, and otherwise exercising control over the Shares of Sentry.

97.    Further, each of the Subscription Agreements, executed by Zurich Capital, manifested the Beneficial Owners' consent for Zurich Capital to act on behalf of and subject to the Beneficial Owners' control.

98.    In executing the Subscription Agreements, Zurich Capital accepted and agreed to act on behalf of the Beneficial Owners.

99.    Accordingly, the Beneficial Owners had the same knowledge as Zurich Capital regarding all relevant matters relating to BLMIS and the Funds' Net Asset Values at all relevant times.

**F.    Merrill Lynch Knew ~~or Should Have Known of~~, Was Willfully Blind to or Recklessly Disregarded the BLMIS Fraud[2]**

100.    Merrill Lynch & Co, Inc. ("MLCI"), which is Merrill Lynch's parent corporation, and Merrill Lynch were each presented with multiple opportunities to invest with Madoff and his "success" – through Madoff Feeder Funds – over the course of many years. MLCI, as a global organization, performed due diligence on certain Madoff Feeder Funds, as well as on Madoff and his purported split-strike conversion strategy. MLCI concluded that Madoff's structure – serving simultaneously as the investment adviser, the prime broker and the custodian of assets – lent itself to fraud and manipulation without adequate independent checks, that Madoff's returns were not generated by the claimed trading strategy, and that Madoff's investment advisory business might very well be fraudulent.

---

[2]    The allegations set forth in Paragraphs 100 through 103 of this Complaint are made by the Foreign Representative upon information and belief based on allegations set forth in the complaint filed by the Madoff Trustee in Picard v. Merrill Lynch Int'l & Co. C.V., 10-05346 (Bankr. S.D.N.Y.). Upon information and belief, the allegations of the BLMIS Trustee are based on an extensive investigation and the analysis of documentary evidence as well as other sources.

101.    For some time, MLCI did not permit its own money or its clients' money to be used to invest directly or indirectly through BLMIS.  MLCI consistently refused to provide leverage to institutional investors seeking to make levered investments in Madoff Feeder Funds through structured products like notes or swaps, and also regularly refused to direct investments to Madoff or Madoff Feeder Funds through, for example, funds of funds or single hedge fund wrap vehicles.

102.    MLCI's prohibition on executing trades involving exposure to Madoff or any Madoff Feeder Fund started no later than the late 1990's, and was directed by the highest authorities within MLCI.  Fabio Savoldelli, a former senior executive at Merrill Lynch Investment Management, a subsidiary of MLCI, sounded the internal warning bell about Madoff within the global "Merrill Lynch" organization many years before BLMIS's collapse.

103.    In July 2007, a Vice President for Latin America Structured Products from a "Merrill Lynch" entity contacted the Merrill Lynch International ("MLI") London desk asking whether MLI would be willing to structure a leveraged trade on Sentry and possibly another Madoff Feeder Fund.  An MLI London desk employee answered promptly: "Both [funds] are related to Madoff. We can't provide leverage on these funds."

**G.    HSBC Bank Knew ~~or Should Have Known of~~, Was Willfully Blind to or Recklessly Disregarded the BLMIS Fraud[3]**

104.    HSBC Bank was well aware of the indicia of fraud surrounding BLMIS.

---

[3]    The allegations set forth in Paragraphs 104 through 108 of this Complaint are made by the Foreign Representative upon information and belief based on allegations set forth in the complaint filed by the Madoff Trustee in Picard v. HSBC Bank PLC, 09-01364 (Bankr. S.D.N.Y.).  Upon information and belief, the allegations of the BLMIS Trustee are based on an extensive investigation and the analysis of documentary evidence as well as other sources.

105.    On August 7, 2001, HSBC Bank issued a due diligence report on Sentry ("2001 Report"). The 2001 Report stated that the due diligence team had been unable to meet with Madoff and that, therefore, the team formed its "opinions" solely on the basis of meetings with Fairfield representatives and a MAR/Hedge article on Madoff. The 2001 Report noted that, without meeting Madoff, there was no way for HSBC Bank to assess Madoff's trading system, risk controls, or compliance procedures. As a result, HSBC Bank stated that it was "very difficult" to understand how Madoff was able to make money in such a consistent fashion. The 2001 Report also noted multiple red flags associated with Madoff, including his taking custody of securities and refusal to accept fees at the fund level.

106.    In January of 2003, HSBC Bank issued another due diligence report on Sentry, which noted many of the same concerns addressed in the 2001 Report. According to Research Committee Minutes, David Mullane, a member of the due diligence team, warned, "I would not invest in [Sentry] nor would I want investors to invest."

107.    Also in 2003, HSBC Bank issued a due diligence report for Ascot Fund, another Madoff Feeder Fund. The report noted similarities between the investment strategies employed by Ascot Fund and Sentry. HSBC Bank gave Ascot Fund a 1 rating, the worst possible score.

108.    In 2004, HSBC Bank issued yet another report regarding Sentry. In addition to the points noted above, HSBC Bank noted the concern that Madoff's track record was "[t]oo good to be true."

109.    Upon information and belief, all HSBC entities, including HSBC Bank, HSBC Securities Services (Luxembourg) SA ("HSBC SSL") and HSBC Private Bank (Suisse) SA (collectively, the "HSBC Knowledge Defendants") worked collaboratively and freely shared information in connection with BLMIS-related matters. Moreover, upon information and

34

belief, the free flow of information and co-ordination of action between various HSBC entities extended to the HSBC Knowledge Defendants.

110.    In their due diligence reviews, HSBC SSL and its affiliates repeatedly pointed to BLMIS's role as a sub-custodian as a fraud risk.   In August of 2008, Christine Coe, Global Head of Risk, HSBC (London), stated in an email to Chris Wilcockson ("Wilcockson"), Managing Director of Bank of Bermuda (Luxembourg) n/k/a HSBC Bank Bermuda and HSBC SSL, that she was concerned that Madoff was potentially using the fund's assets because "overall control [was] Madoff centric and there [were] opportunities for misleading or misappropriation to take place if he were so inclined," creating a "huge" fraud risk.  HSBC SSL specifically identified as a risk the lack of "independent custody and verification of trading activity away from the investment manager (unlike a standard hedge fund that has a prime broker)."  HSBC SSL identified this risk every year from at least 2002 through 2008.  At the end of September 2002, Paul Smith ("P. Smith") (head of Global Fund Services ("GFS") n/k/a HSBC Securities Services ("HSS")) expressed these concerns in an email sent to Nigel Fielding ("Fielding"), who served as (a) General Manager of Corporate Trust for Bank of Bermuda until 2001, (b) Deputy Global Head of Client Services for Bank of Bermuda until December 2003, (c) Global Head of Business Services of GFS from January 2004, and (d) a Director of HSBC SSL until November of 2015.  In that email, P. Smith stated:   "[W]e have a problem with him [Madoff].  He is the manager, broker and custodian to his accounts.  In today's world this is a *red flag*."

## H.   HSBC Bank Affiliates Engaged KPMG to Assess Fraud and Operational Risk at BLMIS and then HSBC Bank Ignores its Findings

111.   ~~109.~~ In September 2005, when HSBC Bank affiliates engaged KPMG to review BLMIS for fraud and related operational risk. KPMG's review focused on fraud risks in BLMIS's methods of recording and reporting client funds held by BLMIS, HSBC Bank's and its affiliates' ability to detect suspected fraud or misconduct in client funds for which HSBC SSL and its affiliates served as primary custodian. KPMG's findings were encapsulated in a February 16, 2006 report, titled "Review of fraud risk and related operational risks at Bernard L. Madoff Investment Securities LLC" (the "2006 Report"). In the 2006 Report, KPMG identified a laundry list of fraud and related operational risks related to BLMIS's operations including:

- o  falsification of client mandates;

- o  embezzlement of client funds;

- o  use of fabricated client instructions to disguise poor proprietary positions;

- o  failure to segregate client funds from BLMIS funds;

- o  diversion of client funds for Madoff's personal gain;

- o  inaccurate allocation of reinvested funds from Fidelity across individual accounts;

- o  manipulation of option prices to maximize commissions;

- o  use of BLMIS claim funds to settle options exercised against HSBC Bank;

- o  practice of exercising options without informing the client that the option was set to expire;

- o  use of client funds to make opportunistic trades that deviated from the SSC Strategy;

36

- o diversion of cash resulting from the sale of equities and Treasury bills;

- o systematic over-valuing of positions and the failure to report positions to HSBC Bank in order to manipulate control relationships;

- o stocks were not held in client names;

- o inflation of call values to disguise misappropriate or poor positions;

- o unauthorized trading in client accounts;

- o trades executions made by unauthorized BLMIS staff members;

- o sham trades to divert client cash;

- o front-running order flow in the market-making business;

- o false reporting of trades without execution to collect commissions; and

- o falsification of trade confirmations.

112. ~~110.~~ KPMG was particularly concerned that it could not identify the owners of individual HSBC Bank affiliates' client assets, and that controls in place at BLMIS might not prevent fraud or errors in client accounts.

113. ~~111.~~ Despite the litany of fraud and operational risks identified by KPMG, HSBC Bank continued its relationship with Madoff, delegated custodial duties to BLMIS, and took no steps to implement KPMG's recommendations.

I. **KPMG Engaged Again and Uncovers HSBC Bank's Failure to Heed Earlier Warnings**

114. ~~112.~~ After ignoring KPMG's dire warnings in 2006, HSBC Bank and its affiliates asked KPMG to conduct another review of BLMIS in March 2008. The terms and scope of the review were identical to the 2006 review, except that KPMG was also asked to assess the risk of placing HSBC Bank's and its affiliates' investments with BLMIS.

37

115. ~~113.~~ KPMG's conclusions were contained in a September 8, 2008, report entitled "Review of fraud risk and related operational risks at Bernard L. Madoff Investment Securities LLC" (the "2008 Report"). KPMG wrote that, according to Madoff, HSBC Bank's and its affiliates' client investments represented an astonishing 33% of BLMIS's assets under management.

116. ~~114.~~ In the 2008 Report, KPMG identified three additional fraud concerns at BLMIS, not previously identified in the 2006 Report:

    o  Client cash is diverted signatures falsified on client instruction in an attempt to legitimize an unauthorized transaction (i.e., redemption);

    o  Madoff LLC claim funds have been used to settle options exercised against HSBC Bank and/or its affiliates; and

    o  Stocks are intentionally not allocated a fair price from the bulk trade.

117. ~~115.~~ Yet again, HSBC Bank ignored KPMG's warnings and recommendations. HSBC Bank, instead, used the 2008 Report as a marketing tool to encourage additional investment in BLMIS. Upon information and belief, in mid-2008, HSBC Bank and/or its affiliates were asked to explain Madoff's investment strategy to Andreas Pirkner, an employee of Bank Medici. In response, HSBC Bank and/or its affiliates forwarded to Pirkner the 2008 Report with the comment that the Feeder Funds were in good shape. HSBC Bank continued to exploit their many relationships with Madoff and BLMIS, burying their heads in the sand, and effectively giving Madoff a "clean bill of health."

**J.    Internal Discussions Reveal That HSBC SSL Was More Concerned With Upsetting The Madoff Relationship And Losing Customers And Fees Than Properly Investigating Potential Fraud[4]**

118.    As early as 2000, Bank of Bermuda n/k/a HSBC Bank of Bermuda was aware that Madoff's operational structure had the potential for fraud.  Paula Downey, Head of Compliance for Bank of Bermuda informed Gerry Brady, who upon information and belief served as Regional Managing Director and Country Head - Ireland for the Bank of Bermuda, of many concerns in this regard.  Downey wrote to Brady in 2000, stating:

"I've been thinking about the issue you asked me to take a look at ahead of the Board meeting. How do Bermuda Trust Dublin Limited discharge their duties as master custodian to Thema and what checks are in place to ensure

there are adequate checks and controls in relation to the sub-custodian

Madoff. It's a difficult one and many of the normal checks are not possible. The following is what I perceive to be the holes in the current procedure vis a vis other funds. We don"t receive a trade ticket from the Client Investment Manager which matches the broker ticket. The Madoff ticket is effectively the composite of the two…

In addition, we generally receive confirmation of trades from the Investment Manager and the broker on their behalf. This protects us against receiving fictitious or incorrect trade details from the Investment Manager and broker confirmation match. This is not possible as Madoff is both Investment Manager and broker. While I do not dispute the good character and reputation of Madoff, the concern is that we have no independent confirmation that the trades they say they are doing are being done, or that the holdings we say the Fund has are indeed registered in the name of the Fund. We don't receive bank statements. What information would I like to see us receiving. Independent confirmation that the assets of Thema exist and are registered under the name of Thema."

---

[4] Paragraphs 118-139 and portions of paragraph 110 are derived from a transcript of testimony provided in a proceeding before the Grand Court of the Cayman Islands, styled *Primeo Fund (in Official Liquidation) v. Bank of Bermuda (Cayman) Ltd. & HSBC Securities Services (Luxembourg) SA*.

119. In July 2002, Fielding made a visit to BLMIS as part of due diligence efforts for Bank of Bermuda. Following that visit, an employee with the credit desk of Bank of Bermuda Dublin, Tom Young ("Young"), raised questions about the Madoff structure with Fielding. Those questions arose out of concerns with respect to the Primeo Fund ("Primeo"), which invested all or substantially all of its assets in BLMIS, and HSBC SSL served as custodian for that fund. Fielding, however, resisted further inquiry. For example, in one email, Young asked Fielding: "Would it be possible to get independent verification that the assets of [the Primeo Fund] are segregated from other assets held by Madoff?" In response, Fielding stated: "[W]e decided not to request this so far. The review is finished and signed off for this year and I do not intend to do more unless the GFS Board supports it, risk versus cost versus relationship, etc."

120. On December 24, 2002, Fielding expressed to David Smith ("D. Smith"), also a Director of HSBC SSL, resistance to the desire of P. Smith to obtain due diligence on Madoff, with Mr. Fielding stating: "Paul seems hellbent on irritating Madoff with FIG." Upon information and belief, "FIG" refers to "Financial Institutions Group", an internal group within HSBC.

121. HSBC SSL also recognized that if HSBC's relationship with Madoff was damaged, the HSBC entities stood to lose customers and, in turn, fees from their custodian roles. On October 10, 2002, D. Smith expressed these concerns in an email he sent to Fielding, in which he stated: "Madoff is really cheesed off with us (BOB) and he may cut the umbilical if we go once more to the well. We may think our [redacted] has power in the market but he can replace that within a month. He may put us on the black list so we have to agree a plan of action. Perhaps we should discuss?"

122.    Concerns regarding Madoff were also raised at a HSBC SSL Board meeting in Dublin, Ireland in the fall of 2004, following which further diligence of BLMIS was proposed. Commenting on the proposed diligence, Brian Wilkinson ("Wilkinson"), who at the time served as (a) Head of Bank of Bermuda Global Fund Services in Ireland (which later became Alternative Fund Services within HSBC Securities Services), (b) Europe Head of Alternative Fund Services within HSS, and (c) a Member of GFS' Board Management Committee, communicated to P. Smith by e-mail:  "The consequence of the trustee review of the sub-custodian Madoff will be both painful and, it would appear, fatal.  Clearly I am not suggesting that GIS/HSBC should ignore their fiduciary responsibilities, however, we should all be aware of the potential fall-out."

123.    In August 2008, Gordon Thomson, an employee of HSBC SSL, sent an email to Michael May ("May"), managing director of HSBC SSL in charge of operations, risk and compliance, copying Andrew Bastow (who, upon information and belief, was the Chief Technology and Services Officer of HSBC Ireland), Brian Pettitt (Deputy Head of Risk, HSBC (London)) and Coe. In that email, Mr. Thomson stated that Madoff investments were "too good to be true" and characterized them as involving "unusual activity."

### K.    HSBC SSL Repeatedly Raised Specific and Substantial Concerns Regarding Madoff's "Real Strategy"

124.    During a telephone call that occurred between September and October 2002 between Fielding and Wilkinson, those individuals made a number of statements reflecting their serious concerns regarding Madoff, including the following:

- o    Fielding: "So . . . I, you know, everybody has some concerns about Madoff, or 'made off' as he likes to call himself, which I think makes it even worse. 'made off with the money.'"

- o    Wilkinson: "I could be wrong Nigel, and maybe I'll investigate that, but I'm just covering all of our backsides to make sure we've done everything possible if this thing ever went up, you know."

- o    Fielding: "Yeah, and I guess my ... I'm not saying we shouldn't do it, I guess I wanted the board to say we wanted to do it, having heard David rant and rave about upsetting the guy before ..."

- o    Wilkinson: "His financial statements are not very detailed, you know, what really is his source of revenue, etc. ... which I think is important to us, cause we're really relying on the financial strength of Madoff, as well as much as anything . . ."

125.    In December 2004, GFS, which by then had been acquired by or was a division within HSS, was approached about acting as custodian and administrator for a new Madoff related fund. In an email to Peter Heaps, who it appears was handling this request on behalf of the Madoff related fund, Wilkinson stated: "Please speak to Nigel Fielding on this. The whole Madoff issue is coming under focus now that we are part of HSBC. My gut reaction is that this will not fly."

126.    In February 2005, Fielding was asked about concerns expressed by Primeo's auditors, Ernst & Young ("E&Y"), about Madoff that were raised in a meeting with Saverio Fiorino ("Fiorino"), who was a Director of HSBC SSL Valuation & Client Administration and Head of Alternative Fund Services (AFS) at HSBC SSL from September 2003 to March 2008.

Fielding responded as follows: "Nespolo [managed Madoff feeder funds Hermes, Thema International, and Thema Fund] understands the auditors concern and asked if their worries were based on the rumors (1) what is his real strategy, how on earth can he always produce 12%pa (2) where are the assets and are there really assets or is it all fictitious."

127.    In a Madoff discussion paper that Coe prepared for the HSS Board in 2005, Coe identified the risks associated with HSBC's diligence process as follows: "However, there is substantial risk, in the event there is any question over the integrity of the process. The financial cost of appointing a sub-custodian that we cannot exercise a level of due care over, could be significant; equally so would be the reputational risk."  In fact, as early as 2005, Coe considered "that one of the possible options was that it was all a sham."

128.    From 2005 to 2008, Fielding received emails from John Grubert ("Grubert"), Global Head of HSBC Securities Services, reflecting substantial concerns about BLMIS.  In one email that Grubert sent to Coe, on which Smith, Pettitt and Fielding were copied, Grubert stated:

> o  "Thank you for the papers on the above. It strikes me that the firm has reasonable capital ... has a solid reputation but that we have a flawed process. Although there is no reason to doubt the integrity or professionalism of the Group, the reality is that: we do not have full control of the assets or real time sight of transaction flows; the transactions are all internal to the family firms and there is no proof of best execution or even actual execution."

> o  "[T]he audit is undertaken by a firm that is not on our recognised list of auditors…I cannot countenance this process – and I appreciate it is a major money earner."

> o  "I appreciate Madoff does not like external intrusion and am willing for this to be undertaken by our auditors (at our cost). If this cannot be done, then we should exit the relationship."

**L.**        **Audits and Purported Diligence of Madoff's Investments Were Incomplete**

129.    During a presentation Bank of Bermuda made to Bank Austria in May 2003, requests were made for copies of the quarterly due diligence questionnaires. When these questionnaires were requested of Bank of Bermuda, Wilkinson commented as follows regarding the lack of due diligence on Madoff: "Quarterly due diligence, you have got to be joking!! The only due diligence we have on Madoff is what Nigel [Fielding] did some months ago."

130.    In September of 2002, Tom Young sent an email to Fielding expressing concerns regarding the level and quality of the due diligence process. In that email, Young stated: "When you get back, maybe you could look at this again. What is required is independent auditor's confirmation that the assets are not comingled. Madoff's representation is not enough, annual audited accounts of Madoff."

131.    Although a diligence questionnaire was completed by Madoff in March of 2004, Ann Meehan, who upon information and belief was the Compliance Manager for HSBC Institutional Trust Services (Ireland) Ltd., stated to Pettitt in an early 2005 email as follows: "[T]here is no information on our file regarding the on-site visit, ie if checks were undertaken to confirm if assets are held in segregated accounts, completion of reconciliations etc."

132.    In March of 2005, Fiorino emailed Fielding regarding concerns about BLMIS' auditors Friehling and Horowitz CPA, and stated in that email: "[O]ver the last weeks, [Ernst & Young] raised some concerns about Madoff, as follows . . . (iii) reliability and independence of Friehling and Horowitz CPA (auditors of BMadoff). Apparently F&H are related to BMadoff. Responses to questions raised by E&Y to BM auditors were not clear."

133.    Moreover, the discussion paper that Coe produced in 2005 for the HSS Board, described earlier, identified flaws and concerns with the Madoff structure and the diligence process relating to the investigation of that structure.    Specifically, Coe remarked in that paper:

> "Whilst we have carried out due diligence … we have not been able to undertake (nor do we have the legal right to do so) an audit of the end to end process flow to confirm the integrity of the whole activity. It is questionable how much we can rely on the auditor produced control statement. Not only is it concise, the auditors are not one of the major independent accountancy groups. From a legal structure perspective, we can make the arrangements work around the need for a legal charge over assets in a custody, sub-custody arrangement. The real issue is are we satisfied with the integrity of the Madoff operations such that we are comfortable with a lack of real independent evidence of the trading of clients assets."

134.    On June 6, 2005, Coe spoke on the phone with Fielding and voiced concerns regarding the review process.  During that phone conversation, Coe stated: "The biggest single concern is the whole process, once it gets into Madoff's hands, is fairly incestuous within Madoff and their internal control system, which is done by . . . his mate, the accountant, it's not really independent enough to give us a level of independent comfort that we would ordinarily look to."

135.    In August of 2008, following a further KPMG review of BLMIS that had been requested earlier that year, Coe stated in an email to Wilcockson, that she was concerned that Madoff was potentially using the fund's assets because "overall control [was] Madoff centric and there [were] opportunities for misleading or misappropriation to take place if he were so inclined," creating a "huge" fraud risk.

**M.    Any Indicia of Fraud That Was Unearthed During Due Diligence Was Generally Downplayed, Ignored and/or Avoided**

136.    In May of 2003, Fielding and Germain Birgen, Managing Director of HSBC Securities Services (Luxembourg) SA ("Birgen") gave a presentation to Bank Austria that presented a positive impression of the relationship with BLMIS, even though Fielding and Birgen were aware that the GFS Board had identified a major issue in relation to BLMIS and had decided to require independent audit confirmation from KPMG.  Around the same time, Mr. Fielding, who was also on the Board of Primeo, played down any concerns regarding BLMIS that were raised by other members of the Primeo Board.

137.    In February of 2005, E&Y, Primeo's auditors, requested a meeting with Birgen and Fiorino to discuss concerns regarding whether assets with BLMIS in fact existed. Following that meeting, Fiorino told Fielding in an e-mail:  "Germain and I just had a meeting with [Ernst & Young], can I speak to you when you have five minutes. They have a transparency issue with Madoff."  Although these concerns were discussed by email, no action was taken by HSBC SSL or Bank of Bermuda to actually confirm either the existence of the assets or the validity of the BLMIS investments.

138.    In October 2008, May raised concerns whether the recommendations of KPMG, following its most recent review of BLMIS, were in fact implemented.  In an email May sent to Mr. Bastow during this time period, May stated:  "I share your concern regarding Madoff and have raised this with Chris Coe & Brian Pettitt.  I understand that KPMG made recommendations in their last visit and I am trying to obtain this reports so I can run an exercise to assess whether they were implemented."  In another email sent during this time period, May stated: "Chris [Coe] made some recommendations in their audit and so we should

see if they were implemented. Who has a copy of those recommendations? Both Lux & Dub are expressing unease about Madoff (which we all feel already) . . ."

139.    In December 2008, shortly after Madoff's arrest, emails were exchanged between Russell Ford (upon information and belief, Global Head of Internal Control for HSBC) and May candidly acknowledging their lack of surprise by the arrest, due to their firmly grounded suspicions of the fraud.  Those e-mails included the following:

  o  Mr. Ford to Mr. May:  "Just in case Chris has not contacted you yet or you have read the papers, Madoff has been arrested on security fraud."

  o  Mr. May back to Mr. Ford: "*Another case where all our suspicions were right.*"

  o  Mr. Ford: "Indeed, the beauty of hindsight."

  o  Mr. May: "*Worse - we suspected but never pinned it down. Not even hindsight, just not enough courage to walk away from what was not understood* . . ."

  o  Mr. Ford: "*Always too afraid to lose the revenue, but the business should pay more attention to the view of Risk.*"

**N.    J. Exposure of Madoff's Fraud**

140.    116. On December 11, 2008, federal agents arrested Madoff for violation of federal securities laws.  On that same day, the United States Attorney brought criminal charges against Madoff, alleging that Madoff ran a multi-billion dollar Ponzi scheme.  See United States v. Madoff, No. 08-mj-2735 (S.D.N.Y., filed Dec. 11, 2008).  Upon arrest, Madoff was reported to have told the agents that "there is no innocent explanation" for the fraudulent scheme he had orchestrated and confessed that he "paid investors with money that wasn't there."

141.    117. On December 11, 2008, the United States Securities and Exchange Commission ("SEC") filed an emergency action in the Southern District of New York to halt

ongoing fraudulent offerings of securities and investment advisory fraud by Madoff and BLMIS. See SEC v. Madoff, No. 08-cv-10791 (S.D.N.Y. filed Dec. 11, 2008). On February 9, 2009, the SEC submitted to the Court a proposed partial judgment, to which Madoff consented, imposing a permanent injunction and continuing relief against him, including a permanent freezing of his assets.

142. 118. In March 2009, Madoff pleaded guilty to the criminal charges brought against him. In his plea allocution, Madoff confessed: "for many years up until my arrest on December 11, 2008, I operated a Ponzi scheme through the investment advisory side of my business, Bernard L. Madoff Securities LLC." As Madoff himself described how the scheme worked:

> The essence of my scheme was that I represented to clients and prospective clients who wished to open investment advisory and individual trading accounts with me that I would invest their money in shares of common stock, options and other securities of large well-known corporations, and upon request, would return to them their profits and principal. Those representations were false because for many years up and until I was arrested on December 11, 2008, I never invested those funds in the securities, as I had promised. Instead, those funds were deposited in a bank account at Chase Manhattan Bank. When clients wished to receive the profits they believed they had earned with me or to redeem their principal, I used the money in the Chase Manhattan bank account that belonged to them or other clients to pay the requested funds.

143. 119. Madoff further confessed to covering up his fraud by fabricating false trade confirmation and account statements:

> To further cover-up the fact that I had not executed trades on behalf of my investment advisory clients, I knowingly caused false trading confirmations and client account statements that reflected the bogus transactions and positions to be created and sent to clients purportedly involved in the split strike conversion strategy, as well as other individual clients I defrauded who believed they had invested in securities through me. The clients receiving trade confirmations and account statements had no way of knowing by reviewing these documents that I had never engaged in the transactions represented on the statements and confirmations.

144. ~~120.~~ Madoff is now serving a 150-year sentence in federal prison.

**O.    ~~K.~~ The Funds' Estates in Liquidation**

145. ~~121.~~ Following the revelation of Madoff's fraud, the Funds' boards of directors suspended any further redemptions of Shares and the calculation of the Funds' Net Asset Values. As of December 2008 and presently, Sentry, Sigma, and Lambda had, respectively, approximately 4.7 million, 3.9 million, and 0.2 million shares outstanding.

146. ~~122.~~ In 2009, the Funds were put into liquidation proceedings in the BVI.

147. ~~123.~~ On February 27, 2009, a secured creditor of Lambda commenced proceedings in the BVI Court pursuant to the BVI Insolvency Act seeking the appointment of a liquidator over Lambda (the "Lambda Proceeding"). The Lambda Proceeding is pending in the BVI Court as claim number BVIHC(COM)2009/74.

148. ~~124.~~ On April 21, 2009, ten shareholders applied to the BVI Court for the appointment of a liquidator over Sentry (the "Sentry Proceeding"). The Sentry Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/136.

149. ~~125.~~ On April 23, 2009, a shareholder applied to the BVI Court for the appointment of a liquidator over Sigma (the "Sigma Proceeding" and collectively with the Lambda Proceeding and the Sentry Proceeding, the "BVI Liquidation Proceedings"). The Sigma Proceeding is pending in the BVI Court under claim number BVIHC(COM)2009/139.

150. ~~126.~~ As alleged above, the BVI Court issued orders – the BVI Appointment Orders –appointing the Foreign Representatives as liquidators of the Funds. Pursuant to the BVI Appointment Orders, the Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates.

151. ~~127.~~ The Redemption Payments that were made to Defendants were mistaken payments and constituted or formed part of avoidable transactions, and generally represent assets of Sentry's estate that Defendants are not entitled to keep.

### FIRST CLAIM
### (Unjust Enrichment - Against Zurich Capital)

152. ~~128.~~ Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 127 above as if set forth herein.

153. ~~129.~~ As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to Zurich Capital, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud. The source of these Redemption Payments was not, as Sentry mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

154. ~~130.~~ Zurich Capital did not provide valuable consideration to Sentry in exchange for each of the Redemption Payments received by it, in that it received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

155. ~~131.~~ By reason of its receipt of monies represented as amounts deposited by other BLMIS investors or monies deposited by the Funds' subscribers, for amounts far in excess of the amounts that it would have received had the Net Asset Value of Shares been calculated based upon the true facts existing at that time or any relevant time, Zurich Capital

has been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

156. ~~132.~~ It would offend principles of equity and good conscience to permit Zurich Capital to retain the Redemption Payments it received from Sentry.

157. ~~133.~~ The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from Zurich Capital an amount equal to the Redemption Payments received by it from Sentry, or, in the alternative, an amount equal to the amount of all Redemption Payments received by Zurich Capital less the amount of redemption payments that Zurich Capital would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## SECOND CLAIM
### *(Unjust Enrichment - Against Beneficial Shareholders)*

158. ~~134.~~ Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 133 above as if set forth herein.

159. ~~135.~~ Upon information and belief, Zurich Capital may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

160. ~~136.~~ Upon information and belief, Zurich Capital may have paid to or credited some or all of the Redemption Payments received by it from Sentry to accounts of the Beneficial Shareholders. These Redemption Payments did not, as Sentry mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS. Instead, Redemption Payments were made for amounts far in excess of the Net Asset Value of

Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

161. ~~137.~~ The Beneficial Shareholders did not provide valuable consideration to Sentry in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

162. ~~138.~~ To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to Zurich Capital in its capacity as trustee, agent, representative, or nominee for a Beneficial Shareholder, such Beneficial Shareholder has been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

163. ~~139.~~ It would offend principles of equity and good conscience to permit any Beneficial Shareholders to retain the Redemption Payments made by Sentry.

164. ~~140.~~ The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by any Beneficial Shareholders less the amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

### THIRD CLAIM
#### *(Money Had and Received - Against Zurich Capital)*

165. ~~141.~~ Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 140 above as if set forth herein.

166. ~~142.~~ As alleged above, to the extent amounts were withdrawn from BLMIS to make Redemption Payments to Zurich Capital, each of such payments consisted of monies deposited with BLMIS for investment, but never invested and instead misappropriated as part of Madoff's fraud. The source of these Redemption Payments was not, as Sentry mistakenly believed, proceeds from the sale of securities or investments held by BLMIS for the account of Sentry.

167. ~~143.~~ Zurich Capital did not provide valuable consideration to Sentry in exchange for each of the Redemption Payments received by it, in that it received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

168. ~~144.~~ By reason of its receipt of monies which generally represented the proceeds arising from or to continue investment in BLMIS, which the world now knows was operated by Madoff as a Ponzi scheme, Zurich Capital has been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

169. ~~145.~~ Furthermore, Zurich Capital was not entitled to receive the Redemption Payments because the amounts of each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by Zurich

Capital for its redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

170. ~~146.~~ To the extent that Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

171. ~~147.~~ It would offend principles of equity and good conscience to permit Zurich Capital to retain the Redemption Payments it received from Sentry.

172. ~~148.~~ The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from Zurich Capital an amount equal to the Redemption Payments received by it from Sentry, or, in the alternative, an amount equal to the amount of all Redemption Payments received by Zurich Capital less the amount of redemption payments that Zurich Capital would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## FOURTH CLAIM
### *(Money Had and Received - Against Beneficial Shareholders)*

173. ~~149.~~ Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 148 above as if set forth herein.

174. ~~150.~~ Upon information and belief, Zurich Capital may have subscribed to all or some portion of the Shares issued to it under the Subscription Agreements in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

175. 151. Upon information and belief, Zurich Capital may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders. These Redemption Payments did not, as Sentry mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS.

176. 152. The Beneficial Shareholders did not provide valuable consideration to Sentry in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

177. 153. To the extent that a Beneficial Shareholder received any portion of the Redemption Payments paid to Zurich Capital in its capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders, such Beneficial Shareholders have been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

178. 154. Furthermore, the Beneficial Shareholders were not entitled to receive the Redemption Payments paid to Zurich Capital upon the redemption of Shares issued to it in its capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders because the amounts transferred by Sentry with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value which caused the payment received for redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

179. 155. To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss

will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

180. ~~156.~~ It would offend principles of equity and good conscience to permit the Beneficial Shareholders to retain the Redemption Payments made by Sentry.

181. ~~157.~~ The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from the Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by the Beneficial Shareholders less the amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## FIFTH CLAIM
### *(Mistaken Payment - Against Zurich Capital)*

182. ~~158.~~ Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 157 above as if set forth herein.

183. ~~159.~~ As described above, Sentry made each of the Redemption Payments to Zurich Capital under the mistaken belief that the amounts paid to Zurich Capital represented the proceeds arising from the profitability of or to continue investment in BLMIS and were based upon the Net Asset Value of Shares redeemed based upon the true facts at that time.

184. ~~160.~~ Upon information and belief, however, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to Zurich Capital represented, in fact, money deposited with

BLMIS by other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

185. ~~161.~~ The Redemption Payments, while benefiting Zurich Capital, were made to the detriment of Sentry and other shareholders and creditors of Sentry.

186. ~~162.~~ Additionally, Zurich Capital was not entitled to receive the Redemption Payments because, as was unknown to Sentry, the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by Zurich Capital for its redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time. In these circumstances, the Redemption Payments should be returned for the benefit of Sentry, their creditors and the current holders of Shares in Sentry.

187. ~~163.~~ Zurich Capital did not provide valuable consideration to Sentry in exchange for each of the Redemption Payments received by it, in that it received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

188. ~~164.~~ To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry.

189. ~~165.~~ It would thus offend principles of equity and good conscience to permit Zurich Capital to retain the Redemption Payments.

190. ~~166.~~ The Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, are entitled to recover from Zurich Capital a sum in an amount equal to the Redemption Payments received by it from Sentry, or, in the alternative, an amount equal to the amount of all Redemption Payments received by Zurich Capital less the amount of redemption payments that Zurich Capital would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## SIXTH CLAIM
### *(Mistaken Payment - Against Beneficial Shareholders)*

191. ~~167.~~ Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 166 above as if set forth herein.

192. ~~168.~~ As described above, Sentry made each of the Redemption Payments to Zurich Capital under the mistaken belief that the amounts paid to Zurich Capital represented the proceeds arising from the profitability of or to continue investment in BLMIS.

193. ~~169.~~ However, upon information and belief, BLMIS did not hold any securities or interests of securities on account for Sentry and the payments made by BLMIS to Sentry to fund Redemption Payments to Zurich Capital represented, in fact, money deposited with BLMIS by other BLMIS investors or previous deposits made by Sentry with BLMIS, never invested but rather misused and misappropriated as part of Madoff's fraud.

194. ~~170.~~ Upon information and belief, Zurich Capital may have paid to or credited some or all of the Redemption Payments received by it to accounts of the Beneficial Shareholders. These Redemption Payments did not, as Sentry mistakenly believed, represent the proceeds arising from the profitability of or to continue investment in BLMIS.

195. ~~171.~~ Additionally, the Beneficial Shareholders were not entitled to receive the Redemption Payments received by Zurich Capital upon the redemption of Shares issued to it in its capacity as trustee, agent, representative, or nominee for the Beneficial Shareholders because, as was unknown to Sentry, the amounts transferred with respect to these Redemption Payments were based on a miscalculated and inflated Net Asset Value, which caused the Redemption Payments received by Zurich Capital for its redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

196. ~~172.~~ The Beneficial Shareholders did not provide valuable consideration to Sentry in exchange for the Redemption Payments or any portion thereof received by them, in that they received Redemption Payments made for amounts far in excess of the Net Asset Value of Shares redeemed that would have been calculated based upon the true facts existing at that time or any relevant time.

197. ~~173.~~ The Redemption Payments, while benefiting any Beneficial Shareholder receiving any portion thereof, were made to the detriment of Sentry and other shareholders and creditors of Sentry.

198. ~~174.~~ To the extent the Redemption Payments are not recovered by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry, the loss will be disproportionately and unjustly borne by Sentry and other shareholders and creditors of Sentry

199. ~~175.~~ It would thus offend principles of equity and good conscience to permit any Beneficial Shareholder to retain the Redemption Payments.

59

200. 176. The Foreign Representatives in their capacities as liquidators of Sentry and on behalf of Sentry are entitled to recover from any Beneficial Shareholders an amount equal to any portion of any Redemption Payments received by them, or, in the alternative, an amount equal to the amount of all Redemption Payments received by any Beneficial Shareholders less the amount of redemption payments that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time.

## SEVENTH CLAIM
### *(Constructive Trust - Against all Defendants)*

201. 177. Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 176 above as if set forth herein.

202. 178. As described above, upon receipt of a redemption request, Sentry made each of the Redemption Payments to Zurich Capital based on a miscalculated and inflated Net Asset Value, which caused those Redemption Payments to be in excess of the Net Asset Value of redeemed Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

203. 179. As alleged above, the Redemption Payments generally represented the proceeds arising from or to continue investment in what the world now knows was Madoff's Ponzi scheme. Accordingly, these Redemption Payments did not, as Sentry mistakenly believed, represent the proceeds arising from the profitability of (or to continue investment in) BLMIS.

204. 180. Upon information and belief, Zurich Capital may have paid some or all of the Redemption Payments it received to the Beneficial Shareholders.

205. ~~181.~~ By reason of their receipt of some or all of the Redemption Payments, Defendants have been unjustly enriched to the detriment of Sentry and other shareholders and creditors of Sentry.

206. ~~182.~~ Furthermore, Defendants were not entitled to receive the Redemption Payments because the amounts transferred with respect to each of the Redemption Payments was based on a miscalculated and inflated Net Asset Value, which caused the payment received by Zurich Capital for its redemption of Shares to be in excess of the Net Asset Value of such Shares that would have been calculated based upon the true facts existing at that time or any relevant time.

207. ~~183.~~ It would offend principles of equity and good conscience to permit Defendants to retain the Redemption Payments.

208. ~~184.~~ By reason of the foregoing, a constructive trust should be imposed on the Redemption Payments that were received by Defendants from Sentry for the benefit of the Foreign Representatives and Sentry and other shareholders and creditors of Sentry.

## EIGHTH CLAIM
### *(Breach of Contract - Against Zurich Capital)*

209. ~~185.~~ Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 184 above as if set forth herein.

210. ~~186.~~ Zurich Capital, upon information and belief, entered into a written agreement or agreements with Sentry on or about August 17, 2000, April 3, 2001, June 4, 2001, July 31, 2001, October 31, 2001, December 3, 2001, January 31, 2002, March 1, 2002, March 28, 2002, April 30, 2002, May 31, 2002, August 30, 2002, and December 31, 2002,

pursuant to which Zurich Capital subscribed for shares. Subsequent to entering into such agreements, Zurich Capital, upon information and belief, entered into the Initial Subscription Agreement with Sentry, on or about January 31, 2003, pursuant to which Zurich Capital subscribed for additional Shares. Zurich Capital's subscription for shares was made pursuant to the terms of the Initial Subscription Agreement itself as well as the terms of the other documents referred to therein, namely; (i) Sentry's Private Placement Memorandum (as amended from time to time); and (ii) Sentry's Memorandum of Association and Articles of Association (the "Articles"). Subsequent to entering into the Initial Subscription Agreement, Zurich Capital, upon information and belief, entered into the Subsequent Subscription Agreements with Sentry on or about March 31, 2003, July 1, 2003, July 30, 2003, July 31, 2003, August 29, 2003, September 30, 2003, October 31, 2003, November 4, 2003, November 28, 2003, December 31, 2003, September 30, 2004, November 30, 2004, and April 29, 2005, pursuant to which it subscribed for additional shares on the same terms and conditions as those shares subscribed for pursuant to the Initial Subscription Agreement. The Initial Subscription Agreement, together with the Subsequent Subscription Agreements, including all of the terms and provisions incorporated therein by reference to the Private Placement Memorandum (as amended from time to time) and the Articles, are collectively referred to herein as the "Fund Documents." Zurich Capital, as a subscriber in Sentry, is bound by the Articles, as amended from time to time.

211. ~~187.~~ The Fund Documents provide for the calculation of the redemption price for Shares (the "Redemption Price") based on the "Net Asset Value per Share." Net Asset Value per share is to be determined by the directors of Sentry as of the relevant valuation day

"by dividing the value of the net assets of [Sentry] by the number of Shares then in issue [.]"
Articles at 11(1).

212. ~~188.~~ The Fund Documents provide that in determining the Net Asset Value per share for each class of shares issued, the value of the net assets of the Fund is to be adjusted "to take into account any dividends, distributions, assets or liabilities" attributable to such class of shares.  Articles at 11(1).  Pursuant to the Fund Documents, each subscriber, including Zurich Capital acknowledges that "the value of its Shares and redemptions thereof, and the performance of the Fund, may be based on unaudited and in some cases, estimated, valuations of the Fund's investment and that any valuation provided in Subscriber's account statement may be an unaudited, estimated value."  See Initial Subscription Agreement ¶ 10.

213. ~~189.~~ With respect to the valuation of different types of assets, the Fund Documents prescribe methods of valuation that are, however, subject to the exercise of the judgment and discretion by the Directors of Sentry.  For example, with respect to the valuation of assets consisting of securities, the Fund Documents prescribe methods of valuation based on price and market data, provided however that "[i]f the Directors determine that [any of the prescribed methods of valuation] does not fairly represent its market value, the Directors shall value such securities as they determine and shall set forth the basis of such valuation in writing in the Company's records[.]"  Articles at 11(3)(b).

214. ~~190.~~ With respect to the value of any shares of stock held by Sentry in an "investment company," the Fund Documents provide for valuation "in accordance with the manner in which such shares are valued by such investment company" provided however that "the Directors may make such adjustments in such valuations the Directors may from time to time consider appropriate."  Articles at 11(3)(c).

215. ~~191.~~ With respect to assets that have been "realised or contracted to be realised" the Fund Documents provide for the inclusion of the assets receivable in respect of such realization, provided however that "if the value of such assets is not then known exactly then its value shall be as estimated by the Directors."   Articles at 11(3)(e).

216. ~~192.~~ Additionally, the Fund Documents provide that "notwithstanding the foregoing, in the case of extraordinary circumstances which, in the Directors' sole discretion, warrant a different valuation of any securities, such securities will be valued at such prices as the Directors shall determine."  Articles at 11(3)(f).

217. ~~193.~~ The Fund Documents provide that any "certificate" as to the Net Asset Value per Share or as to the Redemption Price that is given in good faith by or on behalf of the Directors "shall be binding on all parties."  Articles at 11(1).

218. ~~194.~~ No Certificate was provided in good faith by or on behalf of the Directors to Zurich Capital in respect of any Net Asset Value determination made while Zurich Capital was a member of the Fund or in respect of any Redemption Payment made to Zurich Capital.

219. ~~195.~~ Pursuant to the Fund Documents, at any time prior to the good faith issuance and receipt of a Certificate, the Redemption Price calculated in respect of the redemptions by Zurich Capital and paid to Zurich Capital remains subject to adjustment, recalculation and redetermination based on, *inter alia*, the foregoing identified provisions of the Fund Documents.  Upon the true interpretation of the Fund Documents, the same contained an implied term for repayment of any over-payments, and/or such a term is to be implied on the basis of obviousness and/or as being necessary for the business efficacy of the Fund Documents and/or to give effect to the reasonable expectations of the parties.

220. 196. Upon information and belief, Zurich Capital received the Redemption Payments listed on Exhibit A in respect of Shares submitted for redemption.

221. 197. Subsequent to December 8, 2008, Sentry has determined that the Net Asset Value calculations upon which Redemption Payments were made to Zurich Capital included assets not held by or on behalf of Sentry at the time of the making of such payments and, additionally, that such Net Asset Value calculations failed to account for and make appropriate deduction of liabilities of Sentry existing at the time of such payments. For these and other reasons, such Net Asset Value calculation substantially overstated the net asset value of the assets of Sentry.

222. 198. To the extent that Zurich Capital has received Redemption Payments in excess of the Net Asset Value of the Shares redeemed, Zurich Capital is contractually obligated to return amounts in excess of the Net Asset Value that would have been calculated based upon the true facts existing at the relevant time.

223. 199. Following determination by the Fund that Redemption Payments made to Zurich Capital had been calculated on the basis of an overstated Net Asset Value, demand has been made on Zurich Capital to return excess and overpaid Redemption Payments to the Fund.

224. 200. Zurich Capital has failed and refused to repay to the Fund the amount that, under the Fund Documents, it is contractually required to repay to the Fund.

225. 201. The failure of Zurich Capital to make the repayment requested constitutes a breach of the Fund Documents for which Sentry is entitled to the award of damages.

### NINTH CLAIM
*(Breach of Contract - Against Beneficial Shareholders)*

65

226. ~~202.~~ Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 201 above as if set forth herein.

227. ~~203.~~ Upon information and belief, Zurich Capital may have subscribed to all or some portion of the Shares issued to it under the Fund Documents in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

228. ~~204.~~ Each Beneficial Shareholder authorized Zurich Capital to enter into the Fund Documents on his, her or its behalf and to bind the Beneficial Shareholder to the agreements and representations contained therein to the same extent as had the Beneficial Shareholder executed the Fund Documents on his, her or its, own behalf.

229. ~~205.~~ Upon information and belief, Zurich Capital may have paid to or credited some or all of the Redemption Payments received by it from Sentry to accounts of the Beneficial Shareholders.

230. ~~206.~~ To the extent that any Beneficial Shareholder has received Redemption Payments in excess of the Net Asset Value of the Shares redeemed, such Beneficial Shareholder is contractually obligated to return amounts in excess of the Net Asset Value that would have been calculated based upon the true facts existing at the relevant time.

231. ~~207.~~ Following determination by the Fund that Redemption Payments made to Zurich Capital had been calculated on the basis of an overstated Net Asset Value, demand was made on the Beneficial Shareholders by demand on Apollo Nominees for Zurich Capital for the return of excess and overpaid Redemption Payments.

232. ~~208.~~ The Beneficial Shareholders have failed and refused to repay to the Fund the amounts that, under the Fund Documents, they are contractually required to repay to the Fund.

233. ~~209.~~ The failure of the Beneficial Shareholders to make the repayment requested constitutes a breach of the Fund Documents for which Sentry is entitled to the award of damages.

## TENTH CLAIM
### *(Breach of Implied Covenant of Good Faith and Fair Dealing - Against Zurich Capital)*

234. ~~210.~~ Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 209 above as if set forth herein.

235. ~~211.~~ Following determination by the Fund that Redemption Payments to Zurich Capital had been made on the basis of an overstated Net Asset Value, demand was made to Zurich Capital to return excess and overpaid Redemption Payments to Sentry.

236. ~~212.~~ Zurich Capital has failed and refused to make the requested repayment to Sentry.

237. ~~213.~~ By retaining the Redemption Payments to which Zurich Capital is not entitled, Zurich Capital has deprived Sentry of the benefit of its bargain and has subverted the Fund Documents.

238. ~~214.~~ The failure of Zurich Capital to make the repayment requested constitutes a breach of the covenant of good faith and fair dealing that inheres in the Fund Documents for which Sentry is entitled to the award of damages.

## ELEVENTH CLAIM
### *(Breach of Implied Covenant of Good Faith and Fair Dealing - Against Beneficial Shareholders)*

239. ~~215.~~ Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 214 above as if set forth herein.

240. ~~216.~~ Upon information and belief, Zurich Capital may have subscribed to all or some portion of the Shares issued to it under the Fund Documents in the capacity of trustee, agent, representative, or nominee for the Beneficial Shareholders.

241. ~~217.~~ Upon information and belief, Zurich Capital may have paid to or credited some or all of the Redemption Payments received by it from Sentry to accounts of the Beneficial Shareholders.

242. ~~218.~~ Following determination by the Fund that Redemption Payments made to Zurich Capital had been calculated on the basis of an overstated Net Asset Value, demand was made on the Beneficial Shareholders by demand on Zurich Capital for the return of excess and overpaid Redemption Payments.

243. ~~219.~~ The Beneficial Shareholders have failed and refused to make repayment to Sentry.

244. ~~220.~~ By retaining the Redemption Payments to which they are not entitled, the Beneficial Shareholders have deprived Sentry of the benefit of its bargain and have subverted the Fund Documents.

245. ~~221.~~ The failure of the Beneficial Shareholders to make the repayment requested constitutes a breach of the implied covenant of good faith and fair dealing that inheres in the Fund Documents for which Sentry is entitled to the award of damages.

## TWELFTH CLAIM
### *(Declaratory Judgment - Against All Defendants)*

246. ~~222.~~ Sentry (acting by the Foreign Representatives, in their capacities as liquidators of Sentry and on behalf of Sentry) repeats and alleges again the allegations contained in paragraphs 1 through 221 above as if set forth herein.

247. ~~223.~~ An actual and justiciable controversy exists between the Plaintiffs and the Defendants with respect to the obligation of the Defendants to repay to the Funds all or a portion of amounts received by them as excess or overpaid Redemption Payments under circumstances where:

(i)     the Net Asset Value per Share calculation upon which the Redemption Price was paid, directly or indirectly, to any Defendant has been subsequently adjusted, recalculated or redetermined in accordance with the Fund Documents;

(ii)    the resulting adjusted, recalculated and redetermined Redemption Price is less than the Redemption Price paid to the Defendant;

(iii)   prior to such adjustment, recalculation or redetermination, no binding Certificate has been issued by the Fund; and

(iv)    Citco issued no Certificates in good faith.

248. ~~224.~~ The harm to Sentry is real and immediate because, as a result of the failure and refusal of the Defendants to make repayment, Sentry has become insolvent and is presently unable to pay its debts as they fall or will fall due.

249. ~~225.~~ Plaintiffs have no adequate remedy at law.

250. ~~226.~~ Pursuant to 28 U.S.C. § 2201 *et. seq.*, Plaintiffs are entitled to a declaration by this Court declaring that, pursuant to the Fund Documents, each Defendant must

repay Sentry that portion of the Redemption Payments received by such Defendant representing the amount by which such Redemption Payments exceeded the Redemption Price as it has been subsequently adjusted, recalculated and redetermined by Sentry.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the following relief:

A.       On the First, Third and Fifth Claims, judgment in favor of Plaintiffs and against Zurich Capital allowing the Plaintiffs to recover an amount equal to the Redemption Payments received by Zurich Capital, plus interest, or, in the alternative, an amount equal to the amount of the Redemption Payments received by Zurich Capital less the amount of redemption payments that Zurich Capital would have received had the Net Asset Value been calculated based upon the true facts existing at the time, plus interest;

B.       On the Second, Fourth and Sixth Claims, judgment in favor of Plaintiffs and against the Beneficial Shareholders allowing the Plaintiffs to recover an amount equal to any portion of any Redemption Payments received by the Beneficial Shareholders, plus interest, or, in the alternative, an amount equal to any portion of the Redemption Payments received by the Beneficial Shareholders less the amount of such portion that such Beneficial Shareholders would have received had the Net Asset Value been calculated based upon the true facts existing at the time, plus interest;

C.       On the Seventh Claim, imposition of a constructive trust on Redemption Payments;

D.       On the Eighth and Tenth Claims, judgment against Zurich Capital and in favor of the Plaintiffs in an amount to be determined at trial;

70

E.      On the Ninth and Eleventh Claims, judgment against the Beneficial Shareholders and in favor of the Plaintiffs in an amount to be determined at trial;

F.      On the Twelfth Claim, a declaratory judgment against the Defendants and in favor of the Plaintiffs that, under the Fund Documents, the Defendants must repay that portion of the Redemption Payments received by such Defendant representing the amount by which such Redemption Payments exceeded the Redemption Price as it has been subsequently adjusted, recalculated and redetermined by Sentry;

G.      Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees and accountants' and experts' fees, costs and expenses; and

H.      Granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated: New York, New York
          April 6, 2017

BROWN RUDNICK LLP


By:    _/s/ David J. Molton_
          David J. Molton
          May Orenstein
          Daniel J. Saval

Seven Times Square
New York, New York 10036
Telephone: 212.209.4800
Facsimile: 212.209.4801

*Attorneys for the Foreign Representatives*

REDACTED WITH REDACT-IT

**EXHIBIT A**

REDACTED WITH REDACT-IT

*Redemption Payments Received by Defendants from Sentry*
*From April 24, 2004 Through August 14, 2006*

| Payment Date | Redemption Payment | Number of Shares | Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction[+] |
|---|---|---|---|
| April 21, 2004 | $50,000.00 | 51.43 | Citibank NA, New York |
| June 17, 2004 | $110,000.00 | 111.91 | Citibank NA, New York |
| July 16, 2004 | $200,000.00 | 200.90 | Citibank NA, New York |
| August 13, 2004 | $120,000.00 | 120.44 | Citibank NA, New York |
| December 13, 2004 | $90,000.00 | 87.96 | Citibank NA, New York |
| January 14, 2005 | $50,000.00 | 48.75 | Citibank NA, New York |
| February 16, 2005 | $110,000.00 | 106.71 | Citibank NA, New York |
| March 15, 2005 | $70,000.00 | 67.66 | Citibank NA, New York |
| April 14, 2005 | $780,000.00 | 747.52 | Citibank NA, New York |
| May 13, 2005 | $50,000.00 | 47.85 | Citibank NA, New York |
| June 15, 2005 | $700,000.00 | 665.73 | Citibank NA, New York |
| July 15, 2005 | $660,000.00 | 624.79 | Citibank NA, New York |
| August 15, 2005 | $250,000.00 | 236.35 | Citibank NA, New York |
| September 15, 2005 | $250,000.00 | 235.97 | Citibank NA, New York |
| October 14, 2005 | $750,000.00 | 701.68 | Citibank NA, New York |
| November 17, 2005 | $800,000.00 | 736.63 | Citibank NA, New York |
| December 19, 2005 | $475,000.00 | 434.11 | Citibank NA, New York |
| January 19, 2006 | $325,000.00 | 295.43 | Citibank NA, New York |
| April 20, 2006 | $2,073,208.93 | 1,843.76 | Citibank NA, New York |

*Redemption Payments Received by Defendants from Sentry*
*From April 24, 2004 Through August 14, 2006*

| Payment Date | Redemption Payment | Number of Shares | Bank Account To Which Redemption Payment Was Made, Per Shareholder Direction[+] |
|---|---|---|---|
| June 16, 2006 | $2,110,587.19 | 1,846.49 | Citibank NA, New York |
| August 14, 2006 | $1,674,587.61 | 1,442.28 | Citibank NA, New York |
| August 14, 2006 | $3,444,371.32 | 2,966.55 | Citibank NA, New York |

[+] Whether or not Redemption Payments were ultimately directed to bank accounts in the United States, all Redemption Payments from Sentry went through a correspondent bank account that Sentry's administrator maintained in the United States, and to the extent that any such Redemption Payments were directed outside the United States, they went through a correspondent bank account in the United States identified by shareholders for such payments.

62739844 v162739844 v3

2

REDACTED WITH REDACT-IT

| Summary report: Litéra® Change-Pro TDC 7.5.0.125 Document comparison done on 4/6/2017 7:17:04 PM | |
|---|---|
| **Style name:** Standard | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://WORKSITE/WorkSiteUS/62739844/1 | |
| **Modified DMS:** iw://WORKSITE/WorkSiteUS/62739844/3 | |
| **Changes:** | |
| Add | 210 |
| Delete | 124 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 334 |