**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **In re:** | ) Chapter 15 Case |
| **Fairfield Sentry Limited, et al.,** | ) **Case No. 10-13164 (SMB)** |
| **Debtors in Foreign Proceedings.** | ) **Jointly Administered** |
| **Fairfield Sentry Limited, et al. (In Liquidation), acting by and through the Foreign Representatives thereof,** | ) **Adv. Pro. No. 10-03496 (SMB)** |
| **Plaintiffs,** | ) |
| **-against-** | ) **Administratively Consolidated** |
| **Theodoor GGC Amsterdam, et al., Defendants.** | ) |
| **This declaration applies to the adversary proceedings listed on Exhibit B hereto** | ) |

**SECOND DECLARATION OF SIMON MORTIMORE, QC**
**IN FURTHER SUPPORT OF THE DEFENDANTS' MOTION TO DISMISS**

Pursuant to 28 U.S.C. § 1746, I, SIMON MORTIMORE, declare as follows:

1.      I am the same Simon Mortimore QC who executed a declaration herein on 13 January 2017 (the "**First Mortimore Declaration**") in relation to the Plaintiffs' motion for leave to amend the complaints and the Defendant Institutions' opposition to such motion and their motion for an order dismissing with prejudice the pending complaints in the above-captioned adversary proceedings brought against them by the Plaintiffs.

2.      I make this declaration to set out my views, as an expert in BVI and English law, on the second declaration of Gabriel Moss QC executed on 30 March 2017 (the "**Second Moss Declaration**") in support of the Plaintiffs' motion for leave to amend the complaints and in opposition to the Defendant Institutions' motions to dismiss.

3.      Unless otherwise indicated, in this declaration I shall adopt the abbreviations used in the First Mortimore Declaration. What I said in ¶¶ 3 and 4 of the First Mortimore Declaration applies to this declaration, including that my compensation for providing this opinion is independent of the outcome of any proceedings in connection with the above-captioned Chapter 15 case or any associated adversary proceedings. I confirm that I agree with what Mr Moss says in ¶ 5 of the Second Moss Declaration about the fact that we both practice from the same chambers in Gray's Inn.

4.      On several occasions in the Second Moss Declaration,[1] Mr Moss says that I have misstated or misunderstood BVI or English law. While I find the tone of some of Mr Moss's criticisms disappointing, I shall not respond in kind. Instead, I will concentrate on the important points that may assist the Court and demonstrate that Mr Moss's criticisms are unjustified and that, where we disagree, he is wrong or misses the point. I will not answer all the points made by Mr Moss, and my failure to do so should not be interpreted as acceptance of what he says.

5.      Mr Moss also criticises me for expressing views on factual questions or on questions of mixed fact and law.[2] As I made clear in the First Mortimore Declaration,[3] I appreciate that the function of an expert on law is to state the law and explain how it applies to the facts stated in the Amended Complaints. Accordingly, I have referred to the facts stated in the Amended Complaints and other documents that I understand the Court will read on the motions before it, in order to explain why under BVI law the Amended Complaints do not state a case in the sense that, contrary to Mr Moss's opinion, the Amended Complaints do not set out properly arguable claims that are viable under BVI law.

---

[1] Second Moss Declaration at ¶¶ 9, 12, 18, 21, 26, 71, 78.

[2] Second Moss Declaration at ¶¶ 9, 44, 61, 103, 159, 160, 211, 274.

[3] First Mortimore Declaration at ¶¶ 3, 36, 115, 116, 134, 175, 200, 227.

6.     In forming my opinions, I have read (in addition to the documents described in the First Mortimore Declaration at ¶ 5) a copy of the declaration of David J. Molton, executed 31 March 2017, together with copies of (i) certain subscription agreements, governed by New York law (on which I do not express an opinion), (ii) two revised proposed amended complaints, one of which is the revised proposed fourth amended complaint in *Fairfield Sentry Ltd, et al. v. ABN Amro Schweiz AG et al.*, Adv. Pro. No. 10-03635 (SMB) (Bankr. S.D.N.Y. Apr. 3, 2017) (Dkt. No 270) (the "**Proposed Fourth Amended ABN Amro Complaint**"),[4] and (iii) certain brokerage and custody agreements (each a "**B&C Agreement**"), governed by the laws of the Netherlands or the Netherlands Antilles (on which I do not express an opinion, but shall assume they would be interpreted under those laws in the same way as they would be interpreted under BVI or English law).

7.     The Amended Complaints, the subject of the First Mortimore Declaration, allege that the Defendant Institutions were members of the Funds, in that their shares were or had been registered in their names. Unless otherwise expressly indicated, all references in this declaration to the Amended Complaints are to the proposed amended complaints in the form they were in when I made the First Mortimore Declaration. The Proposed Fourth Amended ABN Amro Complaint describes a different situation under which, pursuant to the B&C Agreements (i) a Citco company (defined as the "**Citco Record Subscriber**") held shares in the Funds as trustee for the Defendant Institutions, (ii) the Defendant Institutions maintained accounts with certain Citco banks (the "**Citco Banks**") into which all moneys received from or for the account of the Defendant Institutions were paid, and (iii) the Citco Record Subscriber

---

[4] So far as concerns Mr Molton's declaration, the proposed revised fourth amended complaint in Exhibit F is not materially different from the Proposed Fourth Amended ABN Amro Complaint. I am advised by counsel for the Defendant Institutions that the Proposed Fourth Amended ABN Amro Complaint is procedurally improper and that it and the other proposed revised fourth amended complaint in Exhibit F are not properly before the Court.

and the Citco Banks (collectively defined as the "**Citco Subscriber**") acted as agents for the Defendant Institutions in respect of investments in the Funds.[5]

8.    In general, the further amendments made in the Proposed Fourth Amended ABN Amro Amended Complaint would not make any difference to the issues under BVI law in relation to the Common Law Claims or the opinions I previously expressed in the First Mortimore Declaration, although they would give rise to a new issue as to whether knowledge of the Citco Subscriber should be attributed to the Defendant Institutions, on which Mr Moss expresses his opinion (Second Moss Declaration under the heading "**H. The Claims against bad faith recipients**" at ¶¶ 121-123). That is the only place where Mr Moss refers to the roles of the Citco Subscriber and the Citco Record Subscriber in relation to the Common Law Claims. I note that Mr Moss fails to address the fact that the roles of the Citco Record Subscriber or Citco Subscriber, as registered member of the Funds and party to the Redemption transactions and recipient of the Redemption Payments, would have a material adverse effect on the Liquidators' BVI Insolvency Act Claims in relation to the availability of remedies against the Defendant Institutions (see Section 10 below).

9.    It may assist if I briefly summarize my opinions on the main issues of BVI law that arise on the above-mentioned motions.

*The Common Law Claims (Sections 1-5 below)*

(a)    Disregarding the allegations of Citco bad faith, the Privy Council Judgment and, if there were no conclusive certificates, the judgment of the EC Court of Appeal on the Good Consideration Issue are binding decisions of BVI law, so that the Common Law Claims are futile and

---

[5] Proposed Fourth Amended ABN Amro Complaint at ¶¶ 9, 106-124, 168-177. Confusingly, the Proposed Fourth Amended ABN Amro Complaint at ¶¶ 235, 247 alleges that the Citco Subscriber, not the Citco Record Subscriber, was the shareholder.

would be dismissed by the BVI Court (Section 1, paragraphs 11-17 below).

(b)    Further, the Funds are precluded by issue estoppel from pursuing the Common Law Claims against the Defendant Institutions, since (i) the Defendant Institutions have privity of interest with the PI Defendants, and (ii) the Funds could and should have taken the point of law that, if the certificates were not issued in good faith, the Funds would not be precluded from recovering money paid to redeemed members to the extent it exceeded the true Redemption Price (Section 2, paragraphs 20-40 below); alternatively, it would be an abuse for the Funds to pursue such proceedings (Section 2, paragraphs 41-49 below).

(c)    The allegation of Citco's bad faith does not enable the Funds to disregard the outcome of the Preliminary Issues and pursue the Common Law Claims, because (i) purported certificates (even if issued by Citco in bad faith) still have conclusive effect under Article 11(1) (Section 3, paragraphs 51-57 below), (ii) the Funds are bound by certificates issued by Citco as their agent (Section 3, paragraphs 58-63 below), and (iii) the Funds are prevented from taking advantage of Citco's alleged wrong, which is attributed to the Funds (Section 3, paragraphs 64-83 below).

(d)    In any event, in the Amended Complaints, the Funds fail to meet the standard of BVI law for alleging Citco's bad faith, since they do not plead specific facts sufficient to make out a case that Citco was wilfully blind as to the existence of the BLMIS Ponzi fraud (Section 4, paragraphs 98-104 below).

(e)   Even if the Citco Subscriber and/or Citco Record Subscriber were in bad faith, their bad faith would not be attributed to the Knowledge Defendant Institutions (Section 5, paragraphs 105-121 below).

*The BVI Insolvency Act Claims (Sections 7-11 below)*

(f)   The Amended Complaints fail to state viable unfair preference or undervalue transaction claims, because a reasonable observer of all the circumstances of the Funds, including the nature of their businesses as described in the Amended Complaints as at the dates of the Redemptions, but disregarding as impermissible hindsight and/or speculation alleged claims against the Funds arising from the BLMIS Ponzi fraud, would have found that the Funds were able to pay their debts as they fell due as at those dates (Section 8, paragraphs 154-172 and Section 9, paragraph 182 below).

(g)   The Amended Complaints fail to state viable unfair preference claims, because (i) the relevant transactions were the Redemptions, not the Redemption Payments (Section 7, paragraphs 131-141 below), and, at the time the Redemptions were entered into, the Defendant Institutions were members, not creditors of the Funds (Section 8, paragraphs 145-153 below), and (ii) viewed by an objective observer at the times of the Redemptions, they took place in the ordinary course of the Funds' businesses as described in the Amended Complaints, disregarding impermissible hindsight and speculation (Section 8, paragraphs 173-181 below).

(h)   The Amended Complaints fail to state viable undervalue transaction claims, because (i) the Redemptions did not provide for the Funds to

receive no consideration, because they provided for shares to be surrendered to the Funds (Section 9, paragraphs 183-186 below), (ii) a reasonably well-informed purchaser at the times of the Redemptions would have regarded the Redemption Prices as reflecting proper arm's-length prices for the shares being surrendered (Section 9, paragraphs 187-203 below), and (iii) viewed by an objective observer at the times of the Redemptions, they were good faith business transactions benefitting the Funds' businesses, disregarding impermissible hindsight and speculation (Section 9, paragraph 204 below).

(i)     Section 249 of the BVI Insolvency Act is a substantive, not procedural, rule of BVI law under which, on an application by a liquidator, the BVI Court, if satisfied that there has been an unfair preference or undervalue transaction, may exercise its discretion to determine whether any, and if so what, order should be made (Section 11, paragraphs 217-231 below).

10.     Exhibit A to this declaration contains copies of legislation, cases and textbooks cited in this declaration, which have not been exhibited to the First Mortimore Declaration or the Second Moss Declaration.

## A.     THE COMMON LAW CLAIMS

**1.    BINDING PRECEDENT OF THE PRIVY COUNCIL JUDGMENT AND THE DECISION OF THE EC COURT OF APPEAL**

11.     In the First Mortimore Declaration (¶¶ 37-40), I expressed the opinion that (i) the Privy Council Judgment is a definitive statement of BVI law, binding on the BVI Supreme Court, and (ii) (apart from the bad faith issues discussed in Sections 4 to 6 of the First Mortimore Declaration) a Common Law Claim brought by the Funds against the Defendant Institutions, based on the same alleged mistake of fact and overstatement of NAV, would be bound to fail. The Second Moss Declaration does not appear to dispute this opinion.

7

12.    In the First Mortimore Declaration (¶ 36), I said that the Privy Council's decision left intact, and did not criticize, the judgments of the EC Court of Appeal or Bannister J on the Good Consideration Issue. Accordingly, I expressed the opinion that the judgment of the EC Court of Appeal also has the consequence that a Common Law Claim, as described in the preceding paragraph, would be bound to fail. In the Second Moss Declaration (¶¶ 12-18), Mr Moss disputes this opinion for two reasons: (i) where the reasoning of the appellate court differs from the reasoning of the lower court, it is the reasoning of the former court that is the source of any *res judicata*; and (ii) (in his opinion) the Privy Council Judgment rejects the reasoning of the EC Court of Appeal.

13.    As to Mr Moss's first ground, my opinion was directed to the question of whether the decision of the EC Court of Appeal regarding the Good Consideration Issue is binding on the BVI Supreme Court as a statement of law. I dealt with the question of *res judicata* later. On the issue of *res judicata*, I agree with Mr Moss that where an appellate court dismisses an appeal, it is the decision of the appellate court that is the source of any estoppel by *res judicata* regarding the point appealed.[6] The effect of the Privy Council Judgment and PC Order was to give affirmative answers to each of the three questions in the Certificate Issue and to confirm the affirmative answers given by the EC Court of Appeal and Bannister J to each of the two parts of the Good Consideration Issue.

14.    Turning to Mr Moss's second ground, the *ratio decidendi* of the EC Court of Appeal on the Good Consideration Issue is expressed in the statement that I quoted in the First Mortimore Declaration (¶ 24):

> "*I agree with the [PI Defendants] that Sentry's contractual obligations gave rise to a debt obligation whatever the value of the shares and the surrender of the rights to the shares by the [PI Defendants], in my view,*

---

[6] The lower court may remain the source of *res judicata* concerning any point not appealed. The cases noted in footnote 2 to ¶ 13 of the Second Moss Declaration are all cases where the court held that it was wrong to apply to the lower court to challenge the decision of the appellate court, which is not an issue that arises on the claims brought by the Funds in this Court.

> *having fully performed their part of the contract, gave good consideration which defeats Sentry's restitutionary claim*."

That decision must be followed by the BVI Supreme Court unless the Privy Council Judgment amounts to a contrary determination, or, although not expressly overruled, that decision cannot stand with the Privy Council Judgment.[7] The Privy Council Judgment does not criticise, still less expressly overrule, the EC Court of Appeal judgment. Nor is it the case that the EC Court of Appeal judgment cannot stand with the Privy Council Judgment.

15.    At ¶ 15 of the Second Moss Declaration, Mr Moss says that the reasoning of the EC Court of Appeal on the Good Consideration Issue was rejected by the Privy Council. I do not agree. If the Privy Council had taken such an adverse view of the judgment of the EC Court of Appeal, Lord Sumption, who gave the judgment on behalf of the Privy Council, would have made that clear; but he did not do so. The judgments of the EC Court of Appeal and Lord Sumption both hold that good consideration is given where shares are surrendered against payment of the amount that the Fund was obliged to pay, which was the amount determined by the directors (see Privy Council Judgment at § 19). Lord Sumption rejected the Funds' argument that "*determined in accordance with Article 11*" meant the NAV had to be correctly determined, so as to allow the Fund an indefinite time to reopen the subscription or Redemption Price (at §§ 22-23). That ruling is consistent with the judgment of the EC Court of Appeal. The difference between the two judgments lies in the different approach to what constitutes a certificate under Article 11. Lord Sumption explained that, since the subscription price and Redemption Price must be definitively ascertained at the time of redemption or subscription, certain ordinary transaction documents constituted certificates for the purposes of Article 11 and were therefore conclusive (at § 24). Lord Sumption went on to explain that the requirement of finality and the need to avoid capriciousness on the part of the directors meant there must

---

[7] *Halsbury's Laws of England* (5th ed, 2015) Volume 11 at §30.

always be a binding certificate, recording the directors' determinations of NAV (at § 26). Lord Sumption's conclusions regarding certificates confirm my opinion that Citco's alleged bad faith is irrelevant and that the Funds are bound by anything that purports to be a certificate (see Section 3 below). The consequence of Lord Sumption's conclusions is that the scenario considered by the EC Court of Appeal (*i.e.* absence of certificates) could never occur. But if it had occurred, the reasoning of the EC Court of Appeal, as quoted above, which is consistent with § 19 of Lord Sumption's judgment, remains valid and intact.

16.     I therefore disagree with the Second Moss Declaration (¶ 17), where Mr Moss says that if no certificate had been issued, the redeeming shareholder would have had "*no right to be paid anything other than the redemption amount calculated by reference to the true NAV.*" Mr Moss's opinion assumes a situation which, for the reasons explained by Lord Sumption, could not have occurred. If, however, the situation assumed by Mr Moss did occur, the Funds would have no right of recovery, because, as the EC Court of Appeal held, each redeeming shareholder would have given good consideration by surrendering its shares in return for the Redemption Price, which the Funds were obliged to pay, since it was based on the NAV determined by the directors, however that determination was manifest. Further, the strong policy argument against the subsequent reopening of the amount so determined, perhaps long after the transaction had been completed, applies, and the redeeming shareholder who gave good consideration by surrendering its shares cannot be restored to its original position. Mr Moss's argument amounts to saying that payment of the Redemption Price was merely a provisional payment, which could be revised by the Funds at any time thereafter, even perhaps years later. But there was no hint that the published certificates of NAV were provisional. On the contrary, the certificates were published to subscribers and redeemers on the basis that they could rely on the certificates in order to inform their investment decisions.

17.     It follows from what I have said above and in the First Mortimore Declaration (¶¶ 28-36) that I do not agree with ¶ 18 of the Second Moss Declaration. In this paragraph, Mr Moss also takes issue with the First Mortimore Declaration (¶¶ 68-69), where, after considering cause of action and issue estoppel and the *Henderson v Henderson* principle, I expressed the opinion that the Funds are bound by those affirmative answers on both parts of the Good Consideration Issue. For the reasons given below, I remain of that opinion.

## 2.     BARS TO RE-LITIGATION UNDER BVI LAW

18.     In the First Mortimore Declaration (¶¶ 42-53), I explained BVI law on cause of action and issue estoppel (the two aspects of the substantive rule of estoppel by *res judicata*), which share the same rule about privity of parties[8] and similar rules about taking new points, and went on to consider the procedural rule, known as the *Henderson v Henderson* principle (¶¶ 54-56). On reflection, it would have been clearer if I had addressed cause of action estoppel and issue estoppel separately, as I do below.

### (1)     Cause of action estoppel

19.     In the First Mortimore Declaration (¶ 42), I said that "*Cause of action estoppel is a rule of substantive law that precludes a party from challenging the same cause of action in subsequent proceedings*," and supported that opinion with quotations from the judgment of Lord Sumption in *Virgin Atlantic Airways Ltd v Zodiac Seats UK Ltd.*[9] Even if, as Mr Moss opines (Second Moss Declaration at ¶¶ 22-25), cause of action estoppel does not prevent the Funds from bringing the Common Law Claims in the US Proceedings, since the Redemption Payments targeted in the US Proceedings occurred at different time periods than the Redemption Payments in the BVI Redeemer Proceedings (including the claims in those proceedings against the PI Defendants) and are therefore not for the same causes of action, that

---

[8] Mr Moss agrees; see Second Moss Declaration at ¶ 36.

[9] [2014] AC 160, UK Supreme Court.

would not achieve anything for the Funds, because the separate principles of issue estoppel and *Henderson v Henderson* abuse of process prevent them from bringing the Common Law Claims.

### (2)    Issue Estoppel

20.    Mr Moss and I are agreed that the principle is stated by Lord Sumption in the *Virgin Atlantic* case:

> "*Fourth, there is the principle that even where the cause of action is not the same in the later action as it was in the earlier one, some issue which is necessarily common to both was decided on the earlier occasion and is binding on the parties.*"[10]

I understand Mr Moss to agree that issue estoppel is a rule of substantive law.[11] The Defendant Institutions rely on the decisions on the Preliminary Issues in the BVI Redeemer Proceedings, which determined issues that are necessarily common to the US Proceedings, as establishing an absolute bar to the US Proceedings, subject to the Court's determining in their favour the two points on which Mr Moss and I disagree; namely, (a) privity of interest,[12] and (b) relevant points not raised in the earlier proceedings (*i.e.* the new point about the effect of Citco's alleged bad faith).

### (a)    Privity of interest

21.    The issue here is whether the Defendant Institutions who were not PI Defendants, or any of them, have privity of interest with the PI Defendants in the subject matter of the BVI Redeemer Proceedings, in which the Preliminary Issues were determined, so as to

---

[10] At § 17, which is quoted in the First Mortimore Declaration at ¶ 43 and in the Second Moss Declaration at ¶ 35. At § 20, Lord Sumption quoted from the speech of Lord Keith in *Arnold v National Westminster Bank plc* [1991] 2 AC 93, 105, where Lord Keith described issue estoppel in these terms: "*Issue estoppel may arise where a particular issue forming a necessary ingredient in a cause of action has been litigated and decided and in subsequent proceedings between the same parties involving a different cause of action to which the same issue is relevant and one of the parties seeks to re-open that issue.*"

[11] Second Moss Declaration at ¶ 10 and ¶ 38, where Mr Moss makes the point that he agrees with me that *Henderson v Henderson* is a procedural rule.

[12] The Second Moss Declaration at ¶ 36 states that, in the context of issue estoppel, the meaning of privity is the same as its meaning in relation to cause of action estoppel, which Mr Moss discusses at ¶¶ 26-33. I agree that the meaning of privity is the same in both cases.

make it just for the decisions on the Preliminary Issues to be binding as between them and the Funds.[13] Mr Moss and I are agreed that helpful statements of what is required to establish privity of interest are to be found in the judgments of Sir Robert Megarry V-C in *Gleeson v J Wippell & Co Ltd*[14] and Floyd LJ in *Resolution Chemicals Ltd v H Lundbeck A/S*,[15] which we both quote.[16]

22.    Mr Moss refers to various ways in which privity of interest can be established (Second Moss Declaration at ¶ 29), some of which are not relevant, but he does refer to the *House of Spring Gardens* case, discussed below and on which the Defendant Institutions rely. In my opinion, the Defendant Institutions have privity of interest with the PI Defendants in the BVI Redeemer Proceedings in which the Preliminary Issues were determined if they come within the statement of Floyd LJ in the *Resolution Chemicals* case, which I quoted in the First Mortimore Declaration (¶ 47) and which for convenience I will quote again:

> "*One type of case where privity is recognised is where C knows of proceedings between A and B in which his rights are being tested but stands back and does nothing.*"[17]

23.    I should make three points about that passage. First, it derives from a strong line of authority discussed by Floyd LJ.[18] The most important of these cases is the decision of the English Court of Appeal in *House of Spring Gardens Ltd v Waite*.[19] In this case, a judgment had been obtained in Ireland against three joint tortfeasors (A, B and C), under which they were jointly and severally liable. A and B brought a separate action in Ireland, seeking to set aside the judgment against them on the ground of fraud. This action was dismissed. When the

---

[13] This formulation derives from the judgment of Sir Robert Megarry V-C in *Gleeson v J Wippell & Co Ltd* [1977] 1 WLR 510, 515, English High Court.

[14] [1977] 1 WLR 510, 515.

[15] [2013] EWCA Civ 924 at §32, English Court of Appeal.

[16] First Mortimore Declaration at ¶¶ 46, 49 and Second Moss Declaration at ¶¶ 27, 28.

[17] [2013] EWCA Civ 924 at § 26.

[18] At §§ 26-28.

[19] [1991] 1 QB 241.

plaintiffs enforced the Irish judgment in England against A, B and C, C challenged the validity

of the Irish judgment on the ground of fraud. His challenge was dismissed, because he was

estopped by the dismissal of the separate action brought in Ireland by A and B. In the words of

Stuart-Smith LJ:

> "*... he was content to sit back and leave others to fight his battle, at no
> expense to himself. In my judgment that is sufficient to make him privy
> to the estoppel ...*"[20]

In stating that proposition, Stuart-Smith LJ relied on earlier Privy Council and English

authority,[21] which showed that such a principle was not restricted to cases of wills and

representative actions, but was of general application where justice and common sense required

it. That was the case before the English Court of Appeal, because C could have joined in the

second action in Ireland, and, if that action had succeeded, either the original judgment would

have been set aside by the Irish court or the plaintiff would have been prevented from enforcing

it in England by a plea of estoppel or abuse of process.[22]

24.     Second, the estoppel described by Floyd LJ is consistent with cases on abuse of

process. Where, as a matter of case management, the court decides to take one or more test

cases to dispose of many cases before it which raise the same issue or issues, an attempt by a

party in one of the other cases to challenge the decision in the test cases will be dismissed as

an abuse of the process.[23]

25.     Third, a critical phrase in the passage quoted in paragraph 22 above is "*his rights

are being tested.*" Where that is the case, there is, in the words of Sir Robert Megarry V-C, "*a*

---

[20] At page 254A-B. The other members of the Court of Appeal agreed.

[21] See page 252G-253F.

[22] At page 253G, Stuart-Smith LJ said: "*The judgment against them was joint and several. If [A and B's] action
to set aside [the Irish] judgment had succeeded, that judgment would have been set aside in toto, not just
against [A and B]; it obviously could not stand. Even if (which I do not accept) the judgment against [C] did not
automatically fall in the event of [A and B] succeeding, it is plain that in the English proceedings the plea of
estoppel or abuse of process would have prevented the plaintiffs pursuing the claim on [the Irish] judgment
against [C].*"

[23] *Ashmore v British Coal Corporation* [1990] 2 QB 338, English Court of Appeal.

*sufficient degree of identification*" between the parties in the proceedings where the issue was determined and the non-party to make it just for the latter to be bound by the decision in those proceedings. It is not enough that the non-party merely has a business or commercial interest in the outcome of the proceedings, as was the case in both *Gleeson* and *Resolution Chemicals*. In *House of Spring Gardens*, C knew that his rights and liabilities under the Irish judgment were being tested by A and B's application in the second Irish action, but did nothing, leaving A and B and plaintiffs to fight out the issue among themselves. There was thus "*a sufficient degree of identification*"[24] between the defendants to make it just for C to be bound by the outcome of the second action in Ireland.

26.    Similarly, where the rights and liabilities of members who redeemed shares under a common procedure under a company's articles are tested in a proceeding between the company and one member (A), there is a sufficient degree of identification between A and the other redeemers (B and C) to make it just for B and C to be bound by the result if they are made aware of the proceedings between the company and A and have the opportunity to participate, but stand back and allow the proceedings against A to take their course. The position is the same, if not stronger, where the court stays the proceedings against B and C, pending the outcome of the proceeding against A, and thereby prevents B and C from testing their rights against the company. It should be noted that in this case, regardless of whether B and C have distinct business and commercial interests from A, they all have a common interest in the outcome of the case against A, since it will determine their rights and liabilities as against the company.

27.    Mr Moss and I agree that issue estoppel must be mutual in the sense that it must apply whatever the decision in the earlier proceedings.[25] Where that is the case, the decision in

---

[24] The *Gleeson* case at page 515.

[25] First Mortimore Declaration at ¶ 46 (last sentence) and Second Moss Declaration at ¶ 32.

the earlier proceedings "*ought fairly and truly to be said to be in substance a decision against him.*"[26]

28.    It seems clear that Mr Moss accepts that the decisions on the Preliminary Issues create an issue estoppel between the Funds and the PI Defendants, subject to the proposed amended allegations regarding Citco's alleged bad faith (Second Moss Declaration at ¶¶ 50-51). On the other hand, Mr Moss does not agree with me that issue estoppel arises from the decisions on the Preliminary Issues as between (a) the Funds and defendants to the BVI Redeemer Proceedings who were not PI Defendants, and (b) the Funds and defendants to the US Proceedings who were not PI Defendants.[27]

29.    It may be of assistance if I outline the factors that a BVI Court would regard as relevant when deciding whether there is sufficient privity of interest between the PI Defendants and the other defendants to the BVI Redeemer Proceedings and the US Proceedings to make it just for them and the Funds to be bound by the outcome of the Preliminary Issues in accordance with the principles described in paragraph 26 above.

(a)    At the time the PI Order was made, 33 claims against 74 BVI Defendants had been issued[28] and 229 actions had been commenced in the US Proceedings against various defendants, including the Defendant Institutions.[29]

---

[26] The *Gleeson* case at page 516; *House of Spring Gardens* at page 253F-H.

[27] First Mortimore Declaration at ¶¶ 51-53 and Second Moss Declaration at ¶¶ 46-48 and 49(C).

[28] Mr Hare's Declaration at ¶ 20.

[29] Liquidators' Opposition to Certain Defendants' Motion to Dismiss on Grounds of *Forum Non Conveniens*, *Fairfield Sentry Ltd. (In Liquidation) v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, Adv. Pro. No. 10-03496 (SMB) (Bankr. SDNY Apr. 6, 2017) (Dkt. No. 1406), at 11. Appendix A to the Defendants' memorandum of law dated 13 January 2017 (the "**Defendants' Memorandum**") shows that claims have been commenced against 419 Defendant Institutions.

(b)      The BVI Court had jurisdiction to try all the Common Law claims made in the US Proceedings as well as the claims made in the BVI Redeemer Proceedings (see paragraph 234 below).

(c)      It would have been exceptionally burdensome on the BVI Court to determine all the BVI Redeemer Proceedings as separate matters. The PI Order was made in furtherance of the overriding objective of the BVI Court to deal justly with cases, including saving expense, ensuring that cases are dealt with expeditiously and allocating to the BVI Redeemer Proceedings an appropriate share of the BVI Court's resources, while considering the need to allot resources to other cases.[30]

(d)      The BVI Court ordered the determination of the Preliminary Issues because they were common to all the BVI Redeemer Proceedings, being based on the Funds' Articles, which determined the common redemption procedure, and common form documentation relating to notification of the Funds' NAVs.

(e)      The Preliminary Issues were framed so that they applied generally as between the Funds and all redeeming or redeemed members, not just the PI Defendants.[31]

(f)      In exercise of its duty to actively manage the BVI Redeemer Proceedings, the BVI Court ordered that (i) the Preliminary Issues be determined first, (ii) notice of the PI Order be given to all BVI

---

[30] The Eastern Caribbean Supreme Court Rules 2000 ("**BVI CPR**"), Rule 1.1. These rules apply to proceedings in the BVI Court other than, among other things, insolvency proceedings (including the winding up of companies) (Rule 2.2), for which there are separate rules. The BVI CPR are modelled on the English Civil Procedure Rules ("**English CPR**"). By Rule 4 of the BVI Insolvency Rules 2005 ("**BVI IR**"), the BVI CPR applies to insolvency proceedings, except so far as inconsistent with the BVI Insolvency Act, BVI IR or practice direction made under Rule 8 of the BVI IR.

[31] Mr Hare's Declaration at Exhibit N.

Defendants so that they would have the opportunity to participate in the

Preliminary Issues, and (iii) the BVI Redeemer Proceedings listed in the

PI Order and all the other BVI Redeemer Proceedings be stayed until

after the determination of the Preliminary Issues.[32]

(g)    The order made in this Court staying the US Proceedings pending the

determination of the Preliminary Issues was made after and with

knowledge of the PI Order, as well as the outcome of the trial before

Bannister J and his summary judgment order.[33]

(h)    The requirement of mutuality was satisfied. If the Funds had succeeded

on the Preliminary Issues, a BVI Court would not have permitted any

Defendant Institution who had been notified of the PI Order to challenge

that result.

30.    Furthermore, it makes no difference to the privity issue that the Citco Subscriber

and/or the Citco Record Subscriber may have been agents and/or trustees for certain Defendant

Institutions. This is because, for the purposes of issue estoppel, the principal or beneficiary has

privity of interest with his agent or trustee.[34]

(b)    *The new point about the effect of bad faith on the conclusiveness of certificates*

31.    In the First Mortimore Declaration (¶ 43), I quoted a passage from the judgment

of Lord Sumption in the *Virgin Atlantic* case that explains the impact of issue estoppel on points

not raised in the earlier proceedings, which I will set out again, underlining the relevant phrases.

"*Except in special circumstances where this would cause injustice, issue
estoppel bars the raising in subsequent proceedings of points which (i)*

---

[32] BVI CPR 25.1, 26.1(2)(d), (e), (g), (q). See First Mortimore Declaration at ¶ 18. The BVI CPR include rules about representative parties (BVI CPR 21). I agree with footnote 16 to ¶ 43 of the Second Moss Declaration that none of the BVI Redeemer Proceedings was a representative action under those rules. The BVI CPR do not include formal rules for Group Litigation Orders and test cases, as are found in the English CPR 19.10-15. However, the case management PI Order achieves a similar result.

[33] First Mortimore Declaration at ¶ 23.

[34] In relation to trustees and beneficiaries: *Gleeson v J Wippell & Co Ltd* [1977] 1 WLR 510, 515.

18

_were not raised in the earlier proceedings_ or (ii) were raised but unsuccessfully. _If the relevant point was not raised, the bar will usually be absolute if it could with reasonable diligence and should in all the circumstances have been raised._"[35]

32.     In response, Mr Moss raises two arguments (¶ 37). First, he says that issue estoppel only arises if the issue was actually determined in the earlier proceedings. In support of this, Mr Moss cites _Sun Life Insurance v Lincoln National Life Assurance,_[36] where the Court of Appeal distinguished an issue actually decided in arbitration proceedings, to which issue estoppel would have applied, from a mere _obiter dictum_ or incidental point, to which issue estoppel did not apply.

33.     To see whether Mr Moss's first argument applies or whether the matter is covered by Lord Sumption's judgment, it is necessary to determine what was decided by the Privy Council on the Certificate Issue. The issues so decided were that (i) certain documents were certificates within Article 11 and therefore have conclusive effect, and (ii) publication or delivery of them to a member precludes the Funds from asserting that money paid to that member upon redemption exceeded the true Redemption Price and that such excess is recoverable from the redeemed member. Those decisions therefore resolved the status of the documents as conclusive certificates and stated the consequences in relation to the Funds' Restitution Claims. They were not _obiter dicta_ or merely incidental to some main decision. Therefore, the issue here was actually determined, such that issue estoppel applies.

34.     Second, Mr Moss says that "_If a party has, for any reason, not raised an issue in the original litigation, there can be no estoppel in relation to it._" This raises the distinction between (i) a point, which could with reasonable diligence and should have been raised in the earlier proceedings when the court determined the issue said to give rise to issue estoppel to

---

[35] At § 22. This principle derives from the speech of Lord Keith in _Arnold v National Westminster Bank plc_ [1991] 2 AC 93, 109.

[36] [2004] EWCA Civ 1660 at §§ 40-44.

which Lord Sumption's statement applies (paragraph 31 above), and (ii) a distinct issue, which is not such a point, which a person may be barred from pursuing under the *Henderson v Henderson* principle, if it could and should have been raised in the earlier proceedings. In the *Virgin Atlantic* case,[37] Lord Sumption indicated what is required of a "point" for the purposes of issue estoppel, when, in relation to cause of action estoppel, he referred to "*all points which had to be and were decided in order to establish the existence or non-existence of a cause of action.*" Applied to the determination of an "issue" in earlier proceedings, the "point" must be one which if it had been advanced and had succeeded would have led to a different outcome. Thus, the point of law as to the issue of interpreting a clause in a lease in *Arnold v National Westminster Bank plc*[38] was a point that the tenant would be barred by issue estoppel from raising in subsequent proceedings, unless, in accordance with the principles decided in that case and affirmed in *Virgin Atlantic*, the court allowed it do so (as it did). If successfully taking the point would have led to a different decision on the issue, the point cannot be treated as a merely incidental point (*Sun Life Insurance*).

35.    Mr Moss cites two cases about distinct issues, not points which were necessary to establish the existence or non-existence of the cause of action in the earlier proceedings or essential to the way an issue was determined in the earlier proceedings. In *Moss v Anglo-Egyptian Navigation Co*,[39] it was held that a plaintiff was not estopped by *res judicata* from bringing a claim for breach of contract in circumstances where an earlier claim for breach of contract had failed, but the new claim was for later breaches. The other case is *Lilly Icos LLC v 8pm Chemists Ltd*,[40] which concerned an inquiry as to the damages to which the defendants

---

[37] At § 22. The *Virgin Atlantic* case was one of "*true cause of action estoppel*"; see § 27.

[38] [1991] 2 AC 93, English House of Lords.

[39] (1865) LR 1 Ch App 108, 114-116, English High Court. See the explanation of the case in *Spencer Bower & Handley, Res Judicata* (4th ed, 2009) at §§ 7.12, 8.17, 17.30.

[40] [2009] EWHC 1905 (Ch), English High Court.

were entitled under cross-undertakings in damages given by the claimants when they obtained

an order from Mann J, at an interim hearing, continuing injunctions against the defendants to

restrain trademark infringement. At that hearing, Mann J also dismissed an application by the

defendants for summary judgment. On the defendants' appeal, the Court of Appeal found that

the claimants did not have a sustainable claim for trademark infringement, gave summary

judgment in favour of the defendants and set aside the injunctions. On the inquiry as to damages

before Arnold J, the claimants argued, among other things, that the defendants were not entitled

to damages since they conducted an unlawful business. Arnold J rejected this argument on the

merits and then went on to deal briefly with other grounds relied on by the defendants as to

why the claimants could not raise the illegality issue, one of which was that they were estopped

from doing so by Mann J's judgment. Arnold J disposed of that at § 303, in the passage quoted

by Mr Moss. The illegality issue was plainly distinct from, and would not have affected the

outcome of, the issues that Mann J had to decide; namely, whether the claimants had a properly

arguable claim for trademark infringement and, if so, whether the interim injunction should be

continued.

36.    The argument that if certificates were issued in bad faith they would not be

conclusive and that the Funds could recover payments to the extent they exceeded the true

Redemption Price was a point of law which, if it had been raised in the Funds' skeleton

arguments and oral submissions and accepted by the court, would have led to Preliminary

Issues 3 and 4 being decided differently,[41] in that the answers to those issues would have had

to include a proviso to this effect: *"provided the documents were given in good faith."* In this

connection, it is important to note that the wording of the PI Order was deliberately broad to

cover all documents that might be certificates and all redemptions, so that the effect of bad

---

[41] See the PI Order in Exhibit N to Mr Hare's Declaration (summarised at ¶¶ 18(a)(iii) and (b)(ii) of the First
Mortimore Declaration).

faith was not only within the scope of the PI Order, but plainly material to the outcome. I should add that, as a point of law, the effect of bad faith could have been raised, without any significant additional costs, not just before Bannister J, but also before the EC Court of Appeal and the Privy Council, if sufficient notice had been given.

37.    Under BVI law, there are therefore two questions for the Court to consider: (i) whether the Funds could with reasonable diligence have raised the point about the effect of bad faith in the Preliminary Issues, and (ii) if so, whether in all the circumstances the point should have been raised.

38.    As to reasonable diligence, the Defendant Institutions have referred to (i) the action brought in May 2009 by Sentry against one of its directors and certain agents, in which allegations of bad faith were made,[42] (ii) the August 2010 judgment of the U.S. District Court, denying the motion to dismiss proceedings by investors against Citco, in which allegations of bad faith were made against Citco that the court found sufficient to state claims under applicable U.S. law,[43] (iii) the fact that bad faith was raised by the PI Defendants at the hearing following which the PI Order was made,[44] (iv) the fact that at that hearing the Liquidators informed Bannister J that they wanted to examine more than 500,000 pages of documents that had been delivered to them by Citco,[45] and (v) the concession made on behalf of the Funds in submissions to the Privy Council.[46]

39.    Against that, at ¶ 57a of the Second Moss Declaration, Mr Moss says that, as a matter of professional conduct, an allegation of bad faith should not be pleaded in English or BVI proceedings without a proper basis for doing so. I agree with that, but it does not provide

---

[42] Defendants' Memorandum at page 7.

[43] Defendants' Memorandum at page 7.

[44] First Mortimore Declaration at ¶ 63, citing Exhibit G to Mr Hare's Declaration at § 21 and Exhibit A to Mr Kite's Declaration at ¶ 62.

[45] Bannister J's judgment at § 8 in Exhibit N to Mr Hare's Declaration.

[46] First Mortimore Declaration at ¶ 65, citing Exhibit N to Mr Kite's Declaration at § 6.

an answer to the reasonable diligence question. The Preliminary Issues arose from the BVI Defendants' defences, not from what had been pleaded in the Funds' statement of claim. Paragraph 2 of the PI Order enabled the Funds to make new claims based on facts coming to the knowledge of the Liquidators after the trial of the Preliminary Issues. Therefore, to preserve the ability of the Funds to make claims against redeemed members on the ground that Citco issued documents in bad faith, the Funds should have raised the point about the effect of bad faith on the certificates, so that the issue of whether bad faith made any difference could have been debated and resolved. Instead, not only did the Funds fail to raise the point, but before the Privy Council, they made an unqualified concession that if the documents were found to be certificates within Article 11(1), they would be binding on the Funds.

40.     If the Court finds that the Citco bad faith point could with reasonable diligence have been raised in the Preliminary Issues, as in my opinion it could have, the second question is whether in all the circumstances it should have been raised. Since the Funds now allege that the Citco bad faith point is critical to the conclusiveness of all certificates and applies to all redemptions that are the subject of the BVI Redeemer Proceedings and the US Proceedings, the effect of not raising it during the Preliminary Issues hearings is potentially to render nugatory the decisions made by the BVI Supreme Court and the Privy Council on the Preliminary Issues. That outcome involves a vast amount of wasted costs and time, not just for the parties, but also for the courts. These are factors that I would expect a BVI Court to take into account.

### (3)     *Henderson v Henderson*

41.     In the *Virgin Atlantic* case Lord Sumption said that while *res judicata* and *Henderson v Henderson* abuse of process are juridically different, they are "*overlapping legal*

*principles with the common underlying purpose of limiting abusive and duplicative litigation*."[47] So, it is not surprising to find that they share common legal features.

42.     Mr Moss and I agree on the following points in relation to *Henderson v Henderson* abuse of process:

> (a)     it is a procedural, not substantive, rule of BVI and English law;
>
> (b)     it may apply where the parties are different and do not satisfy the standard for privity required for issue estoppel to apply; and
>
> (c)     it may apply where the matter could and should have been raised in the earlier proceedings.[48]

43.     At ¶¶ 38 and 39 of the Second Moss Declaration, Mr Moss says that the decision to dismiss a claim as an abuse under the *Henderson v Henderson* principle is an exercise of discretion. This is not correct; it is now clearly established that the decision is one for the judgment of the court to which, after assessing all the facts, there can only be one correct answer.[49]

44.     At ¶¶ 40 and 41 of the Second Moss Declaration, Mr Moss refers to the recent decision of the English Court of Appeal in *Michael Wilson & Partners v Sinclair*.[50] In simple terms, the Court of Appeal had to consider "*whether it is an abuse of the Court's process for A to claim in legal proceedings against C, on a basis which has been decided against A in arbitration proceedings between A and B?*"[51] In the event, the Court of Appeal held it was not. The judgment of Simon LJ (with whom the Senior President of Tribunals and Patten LJ agreed)

---

[47] At § 25.

[48] First Mortimore Declaration at ¶ 54; Second Moss Declaration at ¶¶ 38, 39, 42.

[49] *Aldi Stores Ltd v WSP Group plc* [2008] 1 WLR 748 at § 16, English Court of Appeal; *Stuart v Goldberg Linde* [2008] 1 WLR 823 at § 24, English Court of Appeal; *Michael Wilson v Sinclair* [2017] EWCA Civ 3 at § 48 at (6), English Court of Appeal.

[50] [2017] EWCA Civ 3.

[51] At § 13.

contains a summary of what he described as "*themes*" that emerge from the cases about abuse of process that were relevant to the appeal before him. I should make two points about the themes quoted by Mr Moss. First, in relation to theme (2), which is that "*[a]n abuse may occur where it is sought to bring new proceedings in relation to issues that have been decided in prior proceedings*," there is a significant difference between (i) the case considered by Simon LJ, where the new proceedings are commenced after the issue had been determined in the earlier proceedings, and (ii) the other BVI Redeemer Proceedings and the US Proceedings, which had been commenced before the PI Order and were stayed by the BVI Court and this Court to await the eventual outcome in the Privy Council of the Preliminary Issues. This is because, in the latter case, the court has already decided that the outcome of the case that proceeds will be, or is likely to be, determinative so that the parties and the court should not be troubled with further duplicative litigation. Second, in relation to theme (5), which is that "*[i]t will be a rare case where the litigation of an issue which has not previously been decided between the parties or their privies will amount to an abuse of process*," the stay of proceedings for test cases to proceed in *Ashmore v British Coal Corporation*[52] is an example of proceedings being dismissed as abusive in just such circumstances.

45.    Mr Moss does not mention Simon LJ's first theme:

> "*In cases where there is no res judicata or issue estoppel, the power to strike out a claim for abuse of process is founded on two interests: the private interest of a party not to be vexed twice for the same reason and the public interest of the state in not having issues repeatedly litigated … These interests reflect unfairness to a party on the one hand, and the risk of the administration of public justice being brought into disrepute on the other …*"[53]

Simon LJ's statement about the interests of the parties is supported by his theme 4(b), referring to relitigation being "*manifestly unfair to a party*."[54] If the BVI Court concluded that the legal

---

[52] [1990] QB 338.

[53] *Michael Wilson & Partners v Sinclair* [2017] EWCA Civ 3 at § 48 at (1).

[54] At § 48 at (4)(b).

effect of bad faith on the certificates could and should have been raised in the Preliminary

Issues hearings, it would be manifestly unfair for the PI Defendants and the other Defendant

Institutions that waited for them to be resolved to relitigate the conclusiveness of the

certificates. Moreover, the failure by the BVI Court and the EC Court of Appeal to finally

resolve the Preliminary Issues and the conclusiveness of the certificates, induced by the Funds'

failure to take the bad faith point, would bring BVI public justice into disrepute.

46.     In ¶ 43 of the Second Moss Declaration, Mr Moss expresses the opinion that a

litigant does not have a duty to "*uncover facts which might support additional claims or

arguments.*"[55] The case relied on by Mr Moss shows that, while Mr Moss's opinion may be

correct in many cases, what a litigant or potential litigant should do depends on the

circumstances.[56] Here, as I have said, the BVI Court made the PI Order to resolve issues of

principle that affected many claims by the Funds in the BVI and the United States against

redeemed shareholders. As officers of the BVI Court,[57] with conduct of a large and complex

insolvent estate, the Liquidators would be expected to do everything they could to assist the

BVI Court in resolving issues as efficiently as possible for the benefit of all those interested in

the estate. That would involve bringing to the BVI Court's attention all points that could affect

the outcome of the Preliminary Issues, including any point of law that might benefit the Funds,

if the Liquidators became aware of sufficient facts to support it.

47.     Turning briefly to what Mr Moss says about the application of the *Henderson v

Henderson* principle to the circumstances of this case, at ¶ 56 he says that he is "*not aware of

any case in which there has been held to be such an abuse merely because a similar claim or

issue has been determined as against that litigant in proceedings against a different party.*"

---

[55] Citing *Stuart v Goldberg Linde* [2008] 1 WLR 823 at §§ 53, 59 and 70.

[56] *Stuart v Goldberg Linde* at § 59.

[57] Section 184 of the BVI Insolvency Act.

There is always more than that to a successful application. Simon LJ's first theme (paragraph 45 above) shows that the foundation of the *Henderson v Henderson* abuse principle is protecting the parties from unfairness and/or the reputation of public justice. Thus, in *Taylor Walton v Laing*,[58] a litigant had failed in proceedings against another party to a written agreement and then sued his solicitor who had drafted the agreement for negligence. The claim against the solicitor was struck out as an abuse, because, in the circumstances of the case, it necessarily involved arguing that the decision in the first case was wrong. The *House of Spring Gardens* case was also decided on abuse grounds, the Court of Appeal pointing out that if the plaintiff had lost the second action in Ireland, it would have been an abuse of process for the plaintiff to have brought proceedings against C in England to enforce the original Irish judgment. The BVI Court would derive assistance from the *Ashmore* case, noted in paragraph 24 above, where the defendant was subject to many industrial tribunal claims, some of which were allowed to proceed on the basis that the decisions in these sample cases would be persuasive, but not binding, on the other claimants. The sample claims failed and when one of the other claimants pursued her claim, it was dismissed as an abuse of the process, because it would be unfair to the other parties to re-open the issues and would bring the administration of justice into disrepute.

48.    At ¶ 57 of the Second Moss Declaration, Mr Moss gives three reasons why the Funds could not and should not have taken the bad faith point. Reason (a) is that the Liquidators lacked sufficient material to allege that Citco had acted in bad faith. That issue was within the scope of the PI Order and I refer to what I have said in paragraph 38 above about the matters relating to Citco's alleged bad faith of which the Liquidators were aware at the time. Reason (b) concerns paragraph 2 of the PI Order (quoted in the First Mortimore Declaration at ¶ 60), which as Mr Moss contends is concerned with factual matters, not points of law within the

---

[58] [2007] EWCA Civ 1146, English Court of Appeal, referred to in the *Michael Wilson* case at § 46.

scope of the PI Order. This reason is incorrect for the reasons discussed at paragraphs 31-40 above. Reason (c), under which Mr Moss argues that it would not be abusive to raise different arguments in relation to different redemptions, fails to take account of the wording of the PI Order, which was not limited to the redemptions of the PI Defendants, but applied to claims by the Funds against any redeeming or redeemed member. Even assuming that there is no issue estoppel here, the circumstances of these cases are at least as strong a case of *Henderson v Henderson* abuse as the *Ashmore* case, given that the PI Order was intended to provide answers to all claims to recover Redemption Payments, whereas the decisions in the cases that went forward in *Ashmore* were merely persuasive.

49.    There is one further point I should make about the relevance to *Henderson v Henderson* abuse of the PI Order and the stay of proceedings in that order and the later stay order made by this Court. Those orders were a means of overcoming oppression on defendants who were subject to multiple claims in different jurisdictions and of avoiding the administration of justice being brought into disrepute by inconsistent decisions being made in different cases in different jurisdictions. In *Barrow v Bankside Agency Ltd*, Sir Thomas Bingham MR said of the rule in *Henderson v Henderson*:

> "*It requires the parties, when a matter becomes the subject of litigation between them in a court of competent jurisdiction, to bring their whole case before the court so that all aspects of it may be finally decided (subject, of course, to any appeal) once and for all. In the absence of special circumstances, the parties cannot return to the court to advance arguments, claims or defences which they could have put forward for decision on the first occasion but failed to raise. The rule is not based on the doctrine of res judicata in a narrow sense, nor even on any strict doctrine of issue or cause of action estoppel. It is a rule of public policy based on the desirability, in the general interest as well as that of the parties themselves, that litigation should not drag on for ever and that a defendant should not be oppressed by successive suits when one would do. That is the abuse at which the rule is directed.*" [59]

---

[59] [1996] 1 WLR 257, 260A-C, English Court of Appeal.

The rationale of *Barrow* plainly applies here and would lead a BVI Court to bar the Funds' Common Law Claims against the Defendant Institutions as an abuse under the *Henderson v Henderson* principle, having regard in particular to the fact that the Liquidators chose to cause the Funds to bring the BVI Redeemer Proceedings against the PI Defendants and the other BVI Defendants in the BVI, where they established jurisdiction over them. The Funds could and should have brought in the same proceedings all their Common Law Claims against the PI Defendants and the other BVI Defendants and they could equally have brought their Common Law Claims against the other Defendant Institutions in the BVI (paragraph 234 below).

### 3.    IRRELEVANCE OF CITCO'S ALLEGED BAD FAITH

50.    I will consider Mr Moss's response in relation to the issues about Citco's alleged bad faith under three headings: (i) interpretation of Article 11(1), (ii) agency issues, and (iii) taking advantage of one's own wrong. In summary, even if Citco issued the certificates in bad faith, under BVI law the Funds are still bound by those certificates, because they purport to have been issued under Article 11 and therefore have conclusive effect, and the Funds are bound by the acts of its agent and are not permitted to avoid the conclusiveness of the certificates by relying on their own wrong.

### (1)    Interpretation of Article 11(1)

### (a)    *The Weavering and Kingate Cases*

51.    In the First Mortimore Declaration (¶¶ 70-74), I referred to the decision of the Cayman Islands Court of Appeal in the *Weavering Case* as authority for the proposition that, where a company's articles contain a provision for binding valuations, it is not permissible to reopen a NAV retrospectively on the ground of fraud, whether or not the company was complicit in it.[60]

---

[60] See the *Weavering* article quoted in the First Mortimore Declaration at ¶ 71 and the conclusion quoted in ¶ 73.

52.     Mr Moss discusses this case in the Second Moss Declaration (¶¶ 62-68) and draws different conclusions. I will not take up time commenting on all the differences between us, but I do need to address Mr Moss's major point about contractual interpretation. He says that Weavering's article 34 is distinguishable from the Funds' Article 11, because it does not expressly mention "*good faith*."[61] As regards contractual interpretation, Mr Martin QC, giving the judgment of the Cayman Islands Court of Appeal, made two points: (i) the Funds' articles were "*different in form from, but in substance the same as*" Weavering's articles;[62] and (ii) to achieve certainty and avoid the practical problems mentioned by Lord Sumption in § 23 of the Privy Council Judgment, Weavering's article 34 should be construed so that Weavering was bound by "*a valuation purportedly made in compliance with the articles*" (the "**Purported Compliance Interpretation**").[63]

53.     In ¶ 69, Mr Moss refers to the *Kingate Case* in the Supreme Court of Bermuda, which concerned a claim by another BLMIS feeder fund to recover management fees paid to its administrator and distributed to the other defendants, on the ground that the defendants were unjustly enriched by the mistaken payment of excessive fees, as revealed by the exposure of the BLMIS fraud. As summarised in Hellman J's judgment, Kingate's article 58 provided that valuations made pursuant to the articles were to be binding on all persons "*in the absence of bad faith or manifest error*."[64] In spite of the difference in language between this article and the Funds' Article 11, Hellman J held that the articles of Kingate and the Funds were

---

[61] Second Moss Declaration at ¶¶ 65, 66, 68. The Weavering article 34 is quoted in the First Mortimore Declaration at ¶ 71 and the relevant part of the Funds' Article 11 is quoted in the First Mortimore Declaration at ¶ 75. The quotation from Weavering's article 34 in the Second Moss Declaration at ¶ 65 is inaccurate, because it refers to "*parties*," when it should refer to "*persons*."

[62] The *Weavering Case* at § 27, as noted in the First Mortimore Declaration at ¶ 72(a).

[63] The *Weavering Case* at § 29, as noted in the First Mortimore Declaration at ¶ 72(c).

[64] The *Kingate* judgment at §§ 6, 42, 47, 57. In the Second Moss Declaration at ¶ 69, Mr Moss appears to quote from clause 4.2 of an administration agreement (see the *Kingate Case* at § 57), which may not be in precisely the same terms as Kingate's article 58.

indistinguishable.[65] As Mr Moss points out, Hellman J accepted the submission that the only circumstances in which the valuations would not be binding would be bad faith or manifest error.[66] In the *Kingate Case*, unlike *Weavering*, there was no issue about bad faith, so it was not necessary for the parties or the court to address what would have been the position if there had been bad faith (and in particular which party could rely on bad faith) and Hellman J's observations about bad faith were *obiter dicta*.

54.    In my opinion, the Cayman Islands Court of Appeal in *Weavering* was right to hold that the presence or absence of a reference to good faith made no substantial difference to the interpretation of Weavering's articles and the Funds' Articles. This is supported by the points I made in the First Mortimore Declaration at ¶¶ 78-82 and by two well-established principles of English and BVI law. One principle is that where a valuation, involving the exercise of discretion or judgment, is to be undertaken by one of the parties (whether acting by himself, his officers or agents), that party is subject to a duty to act in good faith (see paragraph 68 below). The other principle is that, where parties agree that a valuation made by an independent third party shall be conclusive and binding, the valuation is not binding if it is not made in good faith.[67] Therefore it would have been open to a subscriber to, or redeemer from, a Fund to say that he is not bound by a certificate if it was not given in good faith, even if good faith had not been expressly mentioned in Article 11(1).

55.    Reverting to the question of how the articles should be interpreted in relation to a claim that the company is not bound by a valuation given on its behalf in bad faith, Mr Martin QC gave a clear answer in the *Weavering Case*, when he held that the Purported Compliance Interpretation applied to Weavering's article 34. This meant that Weavering was obliged to pay

---

[65] The *Kingate Case* at § 76.

[66] The *Kingate Case* at § 108; also § 81.

[67] *Jones v Sherwood Computer Services Ltd* [1992] 1 WLR 277, English Court of Appeal.

redemptions based on the fraudulent valuations (based on fictitious values concealed by its own investment manager) and that, because it could not pay all the redemptions, it was unable to pay its debts and the official liquidators could recover redemption payments made to SEB as unfair preferences. Mr Martin QC's holding about the interpretation of Weavering's article 43 was part of the *ratio decidendi*, was correct, in my opinion, and would be followed by a BVI Court. In contrast, Hellman J's observations on this aspect of interpretation were *obiter dicta*, do not bind the BVI Court, and would not be followed.

<i>(b)    Interpretation of the Funds' Article 11(1)</i>

56.    Mr Moss appears to interpret the phrase "*any certificate … given in good faith by or on behalf of the Directors shall be binding*" in the Funds' Article 11(1) as if being given in good faith were a condition precedent to a certificate being binding, with the consequence that the Funds are not bound by a certificate given in bad faith.[68] He interprets the Article as if it said "*if, but only if, given in good faith by or on behalf of the Directors*." This interpretation conflicts with Mr Martin QC's Purported Compliance Interpretation, under which, as applied to Article 11(1), the Funds would be bound by certificates which <u>purport</u> to have been given in good faith in compliance with Article 11(1) and are published or delivered to members. Mr Moss's interpretation also conflicts with the Privy Council Judgment which found that, for the scheme under the Articles to work, there had to be conclusive certificates. The scheme would not work if some certificates were binding and others were not, depending on the good faith or otherwise of the Funds' directors or agents. In my opinion, the Purported Compliance Interpretation should therefore be adopted as the one that is consistent with the Privy Council Judgment and Mr Moss's interpretation should be rejected.

57.    Under English and BVI law, where there are two tenable interpretations of a provision in a contract, neither of which is excluded by the language used, the court takes an

---

[68] Second Moss Declaration at ¶¶ 65, 66, 68, 69, 75.

iterative approach to test the rival interpretations and is entitled to prefer the construction which is consistent with business common sense and to reject the other.[69] Applying those principles to the Purported Compliance Interpretation and Mr Moss's interpretation (assuming Mr Moss's interpretation to be a tenable one), it is my opinion that the former would be preferred as being the one consistent with business common sense. There are several reasons for this.

(a)    The Purported Compliance Interpretation avoids the practical problems mentioned by Lord Sumption in § 23 of the Privy Council Judgment, whereas Mr Moss's does not.[70] This is the point that led Mr Martin QC to adopt his interpretation.

(b)    The Purported Compliance Interpretation achieves the certainty and finality that was essential to the scheme under the Articles (as Lord Sumption stated at § 26). It gives members the commercial certainty that they can rely on certificates of NAV issued from time to time on behalf of the Funds, whereas Mr Moss's interpretation does not.

(c)    Mr Moss's interpretation amounts to a disclaimer, under which the Funds disclaim responsibility for the dishonesty of their own directors or agents. If potential investors appreciated that this was what Article 11(1) meant, they would be discouraged from investing in the Funds' shares, because potential subscribers could not rely on published information about NAV when considering a purchase and they and potential redeemers would have no certainty that they could retain Redemption Payments, without the risk of claw-back claims later being made by the Funds. This would have obvious adverse consequences for

---

[69] *Rainy Sky SA v Kookmin Bank* [2011] 1 WLR 2900 at §§ 20, 21, UK Supreme Court; *Wood v Capita Insurance Services Ltd* [2017] 2 WLR 1095 at §§ 11, 12, UK Supreme Court.

[70] This is the same as the reason stated in the First Mortimore Declaration at ¶ 82.

the Funds' businesses. Mr Moss's interpretation is therefore not consistent with business common sense.

(d)     The Purported Compliance Interpretation is consistent with business common sense because the phrase "*given in good faith*" does no more than give the Funds legitimate protection from disputes and claims on the grounds of negligence or innocent misrepresentation by them or their agents.[71]

(e)     The Purported Compliance Interpretation is consistent with the position at common law and under section 31 BCA 2004, under which the Funds are bound by certificates issued by Citco, acting as its agent (First Mortimore Declaration at ¶¶ 75-87 and paragraphs 58-63 below).

(f)     Mr Moss's interpretation does not benefit the Funds, because (i) sections 11 and 31 BCA 2004 prevent that (paragraphs 60-63 below), and (ii) they cannot take advantage of their own wrong (paragraphs 64-83 below).

**(2)     Agency issues**

*(a)     Common law*

58.     In the First Mortimore Declaration (¶¶ 76-77), I expressed the opinion that, at common law, in favour of a third party, such as a redeemer, dealing in good faith with a Fund, the Fund is bound by certificates given by Citco as its agent, acting within the scope of its actual or apparent authority, even though Citco may have been acting in bad faith. This is consistent with the Purported Compliance Interpretation of Article 11(1) and the Privy Council Judgment.

---

[71] First Mortimore Declaration at ¶ 80.

59.     As I read the Second Moss Declaration (¶¶ 70-77), Mr Moss takes issue with my opinion because, on his interpretation of Article 11(1), the Funds are not bound by a certificate issued by Citco if it was issued in bad faith. If the Court accepts the Purported Compliance Interpretation and rejects Mr Moss's interpretation, the legal position is as stated in the preceding paragraph. On the other hand, subject to sections 11 and 31 BCA 2004 (paragraphs 60-63 below) and to the good consideration defence (paragraphs 14-16 above), I would agree that, if (contrary to paragraphs 56 and 57 above) the Court were to adopt Mr Moss's interpretation and find that the certificates were issued in bad faith, the conditions for certificates having conclusive effect would not have been fulfilled and the Funds would not be bound.

*(b)     Section 31 BCA 2004*

60.     In the First Mortimore Declaration (¶¶ 83-85), I expressed the opinion that (i) pursuant to section 31 BCA 2004, the Funds cannot assert that Citco lacked authority to give certificates under Article 11(1) or that such certificates are not valid and genuine, (ii) this is so even if Citco acted in bad faith or fraudulently, and (iii) pursuant to section 11 BCA 2004, the Funds cannot avoid these consequences by relying on the reference to "*good faith*" in Article 11(1). Section 11 thus prevents the Funds from claiming that Redemption Payments were excessive, because that necessarily involves them asserting that they did not comply with the Articles, in that the Redemptions were effected pursuant to Article 10(1)(b)-(c) for the wrong Redemption Prices.

61.     Again, as I read the Second Moss Declaration (¶¶ 78-80), Mr Moss takes issue with my opinion, because he says the issue is not about the validity and genuineness of the certificates for the purposes of subsection 31(1)(e) BCA 2004, but whether, as a matter of interpretation, they give redeemers the contractual right to treat the certificates as conclusive. I disagree; in my opinion, subsection 31(1)(e) applies to the certificates and, read with

section 11, prevents the Funds from contending that the certificates are not valid, as they purported to be, because they were not issued by Citco in good faith.

(a)    The certificates were documents issued on behalf of the Funds by their directors or Citco, as agents, within subsection 31(1)(e).

(b)    The directors or Citco had actual or apparent authority to issue the certificates within subsection 31(1)(e).

(c)    In those circumstances, the Funds are precluded by subsection 31(1)(e) from asserting that the certificates are not valid or genuine. Plainly, the certificates were genuine, in that they were what they purported to be and the Privy Council has found that certain documents were indeed certificates.

(d)    The question then is what is meant by "*not valid*" in subsection 31(1)(e). Validity must mean something different from being genuine and must go beyond questions of authority to issue the document, since those matters are already dealt with in the section. Subsection 31(1)(e) therefore must prevent the company from claiming that a document was invalid because of formal defects. It must also prevent the company from contending that a document is invalid because of the impropriety or bad faith of the agent. That is the statutory context of subsection 31(1)(e), because subsections 31(1)(c) and (d) concern the acts of agents on behalf of the company and subsection 31(2) makes it clear that subsection 31(1) applies, even if the agent has acted fraudulently or forged a document on behalf of the company.

(e)    This interpretation of subsection 31(1)(e) is consistent with the Purported Compliance Interpretation and with the Privy Council

Judgment which held that, for the scheme under the Articles to work, the certificates had to be definitive. For the Funds to contend that a document that purports to be a certificate is not definitive, because it was issued by Citco in bad faith, amounts to saying that the certificate is not valid and did not achieve its purpose under the Articles. Such a contention is barred by subsection 31(1)(e).

(f)     Subsection 11(3) provides that a company's articles are of no effect to the extent that they contravene or are inconsistent with the BCA 2004. If Article 11(1) is interpreted, as Mr Moss does, so that certificates are not valid if issued by Citco in bad faith, it would contravene and be inconsistent with subsection 31(1)(e). That is not permitted and the Purported Compliance Interpretation of Article 11(1) must be adopted.

62.     At ¶ 80 of the Second Moss Declaration, Mr Moss gives the example of an architect's certificate. That example is unhelpful, because the architect is independent and is not the agent of the employer, and thus Section 31 could not apply to such a certificate.

63.     If the Court accepts the Purported Compliance Interpretation and rejects Mr Moss's interpretation, the legal position is as stated in paragraph 60 above. If (contrary to paragraphs 56 and 57 above) Article 11 were to be interpreted in accordance with Mr Moss's interpretation so as to exclude section 31 BCA 2004, it would still be an ineffective disclaimer pursuant to section 11 BCA 2004 and the legal position is as stated at paragraph 60.

**(3)     Taking advantage of one's own wrong**

64.     This issue is addressed in the First Mortimore Declaration (¶¶ 88-92) and the Second Moss Declaration (¶¶ 81-92). We are agreed that there is a principle of BVI and English law that a contract will be interpreted, so far as possible, in such a way as to prevent a party

from taking advantage of its own wrong.[72] For this purpose the contracts to be considered are the Funds' Articles and specifically Article 11(1). If the principle applies, as in my opinion it does, its effect is that the Funds are bound by the certificates issued by Citco, even if Citco gave them in bad faith.[73]

65.    The three areas of difference between Mr Moss and myself are whether under BVI law:

(a)    a term should be implied into the Articles that each Fund, acting through its agent, Citco, would carry out its functions under Article 11(1) rationally and in good faith;

(b)    if Citco acted in bad faith, its bad faith should be attributed to the Fund with the consequence that the Fund would be in breach of the implied term; and

(c)    Article 11(1) should be interpreted so as to prevent the Fund from avoiding the conclusive effect of certificates issued by Citco.

*(a)    Implied term*

66.    In the First Mortimore Declaration (¶¶ 80 and 89), I expressed the opinion that, under BVI and English law, a court would imply a term in each Fund's Articles to the effect set out in paragraph 65(a) above.

67.    Mr Moss and I are agreed that a term will be implied where it is necessary to give business efficacy to the Articles or where the Articles would otherwise "*lack commercial or practical coherence.*"[74]

---

[72] First Mortimore Declaration at ¶ 88 and Second Moss Declaration at ¶ 81.

[73] First Mortimore Declaration at ¶ 92.

[74] Second Moss Declaration at ¶ 82.

68.    In *Mid Essex Hospital Services NHS Trust v Compass Group UK and Ireland Ltd*,[75] Jackson LJ (with whom Lewison and Beatson LJJ agreed) reviewed the authorities and drew a distinction between:

(a)    a case where the contract confers on one of the parties a discretion which involves "*making an assessment or choosing from a range of options, taking into account the interests of both parties*," in which case there is an implied term, which it will be extremely difficult to exclude, to the effect that that party will not exercise its discretion in an arbitrary, capricious or irrational manner; and

(b)    a case where the only contractual discretion involves "*a simple decision whether or not to exercise an absolute contractual right*," where there is no such implied term.[76]

As Jackson LJ said, the implied term, referred to in (a) above, has been expressed in various ways and some cases have referred to an implied term to exercise the discretion "*honestly and in good faith*."[77] Lewison LJ said that such an implied term is a necessary control mechanism to prevent the exercise of the discretionary power from being at the decision maker's "*uninhibited whim*."[78] I believe that Mr Moss and I are agreed that these statements accurately state the laws of the BVI and England on this issue.[79]

69.    Where we disagree is on the application of those principles to Article 11. Rather than seeking to apply those principles, Mr Moss appears simply to rely on his interpretation of

---

[75] [2013] EWCA Civ 200, English Court of Appeal (cited by Mr Moss in footnote 27 to ¶ 83 of the Second Moss Declaration).

[76] At §§ 83, 91, 132, 136, 149.

[77] At § 78.

[78] At § 136.

[79] Second Moss Declaration at ¶ 83.

Article 11(1) (Second Moss Declaration at ¶ 84). If, however, those principles are applied to

Article 11, the following points require the implication of a duty of good faith:

(a)    Under Article 11(1) the determination of NAV by the directors of the Fund or an agent appointed by them affects subscribers and redeemers, as well as the Fund. Their interests must be considered and cannot be ignored.

(b)    The last sentence of Article 11(1) speaks of the directors or their agent giving the certificate of the NAV they have determined in good faith, which is consistent with the directors being under a duty to act in good faith.

(c)    The determination of NAV is not a mechanical calculation; it involves the exercise of discretion and judgment. Article 11(3) states how the value of the Fund's net assets is to be calculated to make the determination under Article 11(1). This process involves the exercise of discretion and judgment as described in each of Articles 11(3)(a)-(f). Mr Moss describes the process as "*highly complex assessments of asset value and judgments.*" (Second Moss Declaration at ¶ 254). Accordingly, the exercise of the discretion to determine the NAV cannot be described as a simple decision whether or not to exercise an absolute contractual right.

70.    It follows, in my opinion, that a term will be implied into the Articles to the effect at least that the directors or the agent appointed by them would exercise their power to determine NAV rationally and in good faith.

40

(b)    *Attribution*

71.    At ¶¶ 85-90 of the Second Moss Declaration, Mr Moss deals with the question of attribution. As he says, the leading case on the topic is the decision of the UK Supreme Court in *Bilta (UK) Ltd v Nazir*,[80] which clarified the law. I would respectfully suggest that in its application to the Funds' Common Law Claims, the law of attribution is not as complicated as Mr Moss makes out.

72.    All the Supreme Court justices agreed that whether the state of mind or knowledge of A should be attributed to another person, B, depends on the context in which the question of attribution arises; in one context it may be appropriate to make the attribution and in another it may not.[81]

73.    The context turns on which legal rule is to be applied. In the *Bilta* case, the legal rule was the duty of directors.[82] This was because the case concerned a claim by a company in liquidation, Bilta, alleging an unlawful means conspiracy to injure it, which involved two of the defendants, Mr Chopra and Mr Nazir, breaching their fiduciary duties as directors of Bilta and two other defendants, Jetivia and Mr Brunschweiler, dishonestly assisting them in so doing. Jetivia and Mr Brunschweiler were the appellants.[83]

74.    Having identified the applicable legal rule, the court should then decide whether the acts, knowledge and states of mind of the officer or agent are to be identified with the principal or company or whether they are to be separated. In the context of a claim by a

---

[80] [2016] AC 1.

[81] At § 41, per Lord Mance; §§ 181, 204-208, per Lords Toulson and Hodge. Also, Lord Sumption at §§ 82, 86-92. At §§ 7, 9 Lords Neuberger, Clarke and Carnwath agreed with these paragraphs.

[82] At §§ 42, 43 per Lord Mance; at §§ 87-89, 91, 92 per Lord Sumption. At §§ 7, 9 Lords Neuberger, Clarke and Carnwath agreed with these paragraphs.

[83] At § 3, per Lord Neuberger, with whom Lords Clarke and Carnwath agreed; §§ 32, 33, per Lord Mance; §§ 56-59, per Lord Sumption.

company founded on its directors' breach of duty, separation is required.[84] At ¶ 86 of the Second Moss Declaration, Mr Moss appears to agree with this.

75.     At ¶¶ 87, 88 of the Second Moss Declaration, Mr Moss discusses paragraphs in the judgments in *Bilta* which are directed to the issue at the heart of the appeal in that case; namely, whether the state of mind of the defaulting director or agent should be attributed to the company when it brings a claim against the directors and/or others arising out of the directors' breach of duty.[85] In my respectful opinion, this discussion does not assist the Court, because it addresses an issue which is not raised in the Amended Complaints.

76.     The present case is entirely different. The applicable legal rules are (i) the interpretation of contracts (Articles 11), (ii) agency (whether a principal (the Fund) is bound by a document issued by its agent (Citco) to a third party (a redeemer)), and (iii) breach of contract (whether the Fund, acting by its agent, is in breach of the contractual duty to act in good faith). The legal rules about fiduciary and other duties of directors to their company or agents to their principal are not engaged. As I read the Amended Complaints, they do not allege breach of duty against Citco, which is not a party, or claim remedies for Citco's alleged breach of duty against the Defendant Institutions. Instead, the Funds' Common Law Claims are primarily for restitution of payments made by mistake on the footing that the Funds are not bound by the certificates issued under Article 11(1).

77.     As the authorities set out in the First Mortimore Declaration (¶ 90) show, in the context of the Funds' Common Law Claims, the general rule is that knowledge gained by an agent in the course of his employment for his principal will ordinarily be attributed to the

---

[84] At §§ 42-43, per Lord Mance; §§ 71, 82, 86-97, per Lord Sumption. At §§ 7, 9 Lords Neuberger, Clarke and Carnwath agreed with these paragraphs.

[85] At §§ 71-78 Lord Sumption discussed the fraud exception, where there had been a breach of duty to the company, as it was before the controversial decision in *Stone & Rolls*. He returned to discuss the question of whether the illegality defence applies to claims by the company against a defaulting agent at §§ 82-97. Lord Toulson and Hodge discussed attribution, regarding the so-called fraud exception, at §§ 180-209. Lords Neuberger, Clarke and Carnwath agreed with all these paragraphs; see § 7. I do not agree with Mr Moss that these paragraphs, or any of them, are *obiter dicta*. They are all critical to the reasoning in *Bilta*.

principal. Those authorities show that, as against a third party, the state of mind or bad faith of an agent is attributed to the principal, so as to bind the latter. In footnote 95, I noted that passages in judgments of Lord Sumption and of Lords Toulson and Hodge in the *Bilta* case support the propositions stated in the First Mortimore Declaration at ¶ 90.

78.    As I said in the First Mortimore Declaration (¶ 91), the knowledge and state of mind of Citco, which is alleged to have been reckless, is attributed to the Funds, since Citco acted as their agent for the purpose of operating subscriptions and redemptions under Articles 9-11, including giving certificates and processing Redemption Payments. At ¶¶ 89 and 90, Mr Moss disagrees. I would respectfully suggest that Mr Moss is wrong to do so and that his error derives from his mischaracterisation of the claims made in the Amended Complaints as claims to recover "*money wrongly paid away as a result of the actions of a dishonest agent*." As I have said, the Common Law Claims are made in restitution and are founded on a mistake. In fact, Mr Moss's characterization of the claims is wrong for the further reason that the allegedly dishonest agent, Citco, did not induce the Funds to make the payments. Citco made the payments, so it is Citco's knowledge that is relevant. If Citco was acting in bad faith, it did not make the Redemption Payments by mistake.

79.    In ¶ 89(a) of the Second Moss Declaration, Mr Moss draws an analogy with knowing receipt claims. This is a false analogy, because in a knowing receipt claim, the defendant is liable because he is an accessory to the breach of trust or breach of fiduciary duty, whereas here the issue is whether the Funds can rely on the alleged bad faith of their agent Citco, to which the Defendant Institutions were not privy, in order to avoid the conclusive effect of the certificates.

80.    *Lipkin Gorman v Karpnale Ltd*,[86] to which Mr Moss refers (¶ 89(b) and again at ¶ 125 of the Second Moss Declaration) is a case where a partner of a firm of solicitors stole

---

[86] [1991] 2 AC 548, English House of Lords.

money from the firm's client account, which he used to buy gambling chips at the defendant's casino. The firm brought a claim against the casino for money had and received on the grounds that the firm was the legal owner of the money and the casino was a volunteer, since under English law gambling chips did not amount to good consideration. The claim succeeded, except to the extent that the casino had a change of position defence. The case did not concern mistaken payments, the actual or apparent authority of an agent, breach of duty by an agent, equitable tracing or indeed attribution. Important though this case has been in the development of English law, I would respectfully suggest that it does not assist in the present case, which is concerned with payments allegedly made by mistake.

81.    The plea for justice in ¶ 89(c) of the Second Moss Declaration ignores the importance of certainty and finality, which was recognised in the Privy Council Judgment, and the rule of agency law that a principal is bound by the acts of his agent, acting within the scope of his apparent authority, even if the agent was acting fraudulently and in furtherance of his own interests.[87] If Citco was in bad faith, the Funds who employed Citco must bear the consequences.

    *(c)*    *Interpretation of Article 11(1) to prevent the Funds from benefitting from their own wrong*

82.    I agree with Mr Moss (¶ 92 of the Second Moss Declaration) that the normal rules for the interpretation of contracts apply to the question of whether Article 11(1) can be interpreted in a way that prevents the Funds from benefitting from their breach of the duty of good faith. There is no difficulty about this, because that purpose can readily be achieved by adopting the Purported Compliance Interpretation discussed above. In the *Weavering Case*,

---

[87] See First Mortimore Declaration at ¶ 76, and *Bowstead and Reynolds on Agency* (20th ed, 2016) at § 8-062, quoted in footnote 81 to ¶ 76 of the First Mortimore Declaration.

Mr Martin QC had this point in mind when he said that "*it is in any event not on the face of it permissible for the company to rely on its own misconduct to terminate a contract.*"[88]

83.     The benefit that the Funds are prevented from obtaining is making recoveries from the Defendant Institutions, which had received the Redemption Payments to which they were entitled under the Articles. Mr Moss argues (¶ 91 of the Second Moss Declaration) that the Funds would not get a benefit, since they are seeking to undo the advantage that those who redeemed obtained to the detriment of those who did not. This complaint about unequal treatment is not relevant to the Common Law Claims, the merits of which are not affected by the solvency or otherwise of the plaintiff. If the complaint about unequal treatment is to be addressed at all, it should be addressed in the context of the BVI Insolvency Act Claims, which are discussed below. It was in the context of an unfair preference claim that, in the passage from the judgment in the *Weavering* Case that Mr Moss quotes (¶ 66 of the Second Moss Declaration), Mr Martin QC considered and rejected an argument on behalf of SEB for limiting the relief to be awarded to the joint official liquidators on their successful unfair preference claim.

**(4)     *Ex turpi causa non oritur actio***

84.     It is only necessary to consider this issue (addressed in the First Mortimore Declaration at ¶¶ 93-98 and the Second Moss Declaration at ¶¶ 93-101) if the Defendant Institutions do not succeed on any of the issues addressed in Section 3(1)-(3) above, but have succeeded in showing that Citco's bad faith is attributed to the Funds.

85.     At ¶ 95 of the Second Moss Declaration, Mr Moss maintains that the *ex turpi causa* principle does not apply, because the Funds' Common Law Claims are not founded on an illegal act, but on mistaken overpayment. Mr Moss's point would have been valid if made in respect of the complaints as originally issued, but they have been amended, by taking the

---

[88] At § 29.

new point about Citco's alleged bad faith, to try to circumvent the binding precedent of, and issue estoppel created by, the Privy Council Judgment (as well as the *Henderson v Henderson* principle).[89] The Funds can only maintain the Common Law Claims in the Amended Complaints by asserting that the certificates issued by Citco are invalid on the ground of the very bad faith which is attributed to the Funds. Accordingly, I would respectfully suggest that Mr Moss is wrong on this point.

86.    Mr Moss and I are agreed that the leading English authority on the *ex turpi causa* principle is the decision of the Supreme Court in *Patel v Mirza.*[90] Mr Moss and I have different views as to how that decision would be applied to the Funds' claims in the Amended Complaint (First Mortimore Declaration at ¶ 97 and Second Moss Declaration at ¶¶ 99-100) and there is nothing more that I need to say.

87.    At ¶ 101 of the Second Moss Declaration, Mr Moss compares the U.S. *in pari delicto* defence with the English *ex turpi causa* principle. I am not qualified to comment on U.S. law, but I confirm that in *Patel v Mirza* the majority adopted a flexible, "*range of factors*" approach when deciding whether a claim should be dismissed on *ex turpi causa* grounds.

**(5)    Attribution of Citco's bad faith to the Funds precludes them from claiming that Redemption Payments were made under a mistake of fact**

88.    This issue is addressed in the First Mortimore Declaration (at ¶¶ 99-100) and in the Second Moss Declaration (at ¶ 102). In my opinion, if Citco's alleged wilful blindness is attributed to the Funds, on the authorities that I cited, the Redemption Payments are irrecoverable by the Funds in a claim in restitution. If Citco paid the Redemption Payments, the position is the same and there can be no recovery.

89.    Mr Moss's answer appears to be that Citco's state of mind is not attributed to the Funds so as to prevent them from recovering money paid away as a result of their agent's

---

[89] CA Amended Complaint at ¶ 49.

[90] [2016] UKSC 42.

dishonesty. I do not accept Mr Moss's answer, because, for the reasons given in paragraph 78 above, he mischaracterises the nature of the Funds' claims in the Amended Complaints.

### (6)    The New Claims

90.    These issues are addressed in the First Mortimore Declaration (¶¶ 101-107) and the Second Moss Declaration under the heading "**The Contractual Claims**" (¶¶ 113-115).

91.    At ¶ 113 of the Second Moss Declaration, Mr Moss says that there is no need for the Funds to rely on Citco's alleged bad faith in order to maintain any of their claims, including the contractual claims. It is not clear to me how Mr Moss can maintain that answer. The present position is that, under the Privy Council Judgment, the Funds are bound by the conclusiveness of the certificates unless they are able to rely on Citco's alleged bad faith to avoid that conclusiveness. For the reasons given in Sections 2(2)-(3) and 3(1)-(4) above, they are unable to do so.

92.    Mr Moss disagrees with the four reasons I gave why a contractual obligation to repay any over-payments of Redemption Payments would not be implied.

93.    In ¶ 114(a) of the Second Moss Declaration, Mr Moss responds to my point about sections 56-59, 62 and 63 BCA 2004 by saying that section 58 is limited to dividends and that none of the other Sections seem to relate to the recovery of redemption payments. This is wrong. Section 56 defines "*distribution*" for the purposes of Division 4 of Part III of the BCA 2004, which includes all those sections, as including a distribution made by a company to a member, including by way of redemption or dividend. Section 59 gives a company the power to redeem shares in the circumstances there mentioned, provided the solvency test in section 57 is satisfied. If in respect of any distribution, including a redemption, the solvency test is not satisfied, subsection 58(1) gives the company a right of recovery from the member unless:

> "*(a)    the member received the distribution in good faith and without knowledge of the company's failure to satisfy the solvency test;*

> (b)    *the member has altered his position in reliance on the validity of the distribution; and*
>
> (c)    *it would be unfair to require repayment in full or at all.*"

Sections 62 and 63 deal with the case of companies like the Funds,[91] whose Articles give members a right of redemption. In such cases, the redemption is deemed not to be a distribution, so that the solvency test in section 57 and the remedy in section 58 do not apply. Sections 56-59 are relevant to the implied term that Mr Moss advocates, because, as I have said, his term appears to put redeeming shareholders in a more onerous position than they would have been in if section 58 had been applicable, in that the alleged implied term denies the redeeming shareholders the defences that are available under that section. That is one reason why a BVI Court would not imply such a term.

94.    In ¶ 114(b) of the Second Moss Declaration, Mr Moss correctly says that in certain contexts the court will imply a term into a contract which parallels a duty owed under the law of tort (*e.g.* a duty of care),[92] but he cites no case where a term has been implied that gives a party more extensive rights than he would have under the general law. If a term is to be implied, it must satisfy the requirements of necessity either for business efficacy or to prevent the contract from lacking commercial or practical coherence. Neither requirement is satisfied by the Funds' proposed implied term, which attempts to give them more extensive rights than they would have under the common law of restitution. The Articles (which take a familiar form) work perfectly well without the alleged implied term. Contracts seldom, if ever, legislate in

---

[91] These sections do not apply to the Funds, which were incorporated under the BVI International Business Companies Act (Cap 291). Paragraph 9 of the transitional provisions in Schedule 2 to the BCA 2004 provides that paragraphs 10-23 apply in place of sections 56-65. Paragraph 19 deals, among other things, with redemptions by preserving the old regime under section 33 of the International Business Companies Act, under which the provision for directors to determine solvency before a redemption did not apply where the member had a right to have his shares redeemed and there is no statutory cause of action equivalent to section 58 BCA 2004.

[92] The example he gives of an implied term that professional services will be supplied with reasonable skill and care is in fact implied by section 13 of the Supply of Goods and Services Act 1982. *Henderson v Merrett Syndicates Ltd* [1995] 2 AC 145, English House of Lords, on which Mr Moss also relies, is a case where the House of Lords affirmed the existence of a duty in tort that was not materially different from the acknowledged contractual duty: see pages 194F-G, 195A, per Lord Goff.

advance for mistaken payments. The modern law of restitution has developed to cater for such situations, without the need to resort to the fiction of implying a term.

95.    As to ¶ 114(c) of the Second Moss Declaration, § 18 of Lord Sumption's judgment in the Privy Council Judgment was concerned only with restitution. There is nothing to suggest that his summary of restitution principles extended to implied terms. In *Test Claimants in the FII Group Litigation v Revenue and Customs Commissioners*,[93] Lord Sumption had said that English law does not recognise:

> "*an action for the recovery of payments on the simple ground that they were not due…. It is necessary, as the law presently stands, to bring the facts within one of the categories of case in which the law recognises that the recipient's retention of the money would be unjust.*"

That is presumably why the Funds had previously tried, unsuccessfully, to bring their restitution claims on the ground of mistake.

96.    Mr Moss also refers to *Aspect Contracts (Asbestos) Ltd v Higgins Construction plc*,[94] in which Lord Mance said that the overpayment claimed by the claimant was repayable, either by contractual implication or under a restitutionary obligation. The facts of that case are far removed from the circumstances of the Funds' Common Law Claims in these proceedings and give no support for the term that the Funds seek to imply. In *Aspect Contracts*, the parties had referred a dispute under a building contract for determination under a statutory adjudication scheme. This scheme provided a speedy provisional means of adjudicating disputes under which the award was binding unless and until the dispute was finally determined. It was a necessary legal consequence of the scheme, implied by the legislation into the parties' contract, that if one party had paid the other party the amount of the provisional award, the payer had a right to recover any overpayment identified when the dispute was finally determined. That right was either under an implied term or in restitution. In contrast, the procedure for redemption

---

[93] [2012] 2 AC 337 at § 162.

[94] [2015] 1 WLR 2961, UK Supreme Court. The other Supreme Court Justices agreed with Lord Mance.

under the Articles was designed to be final and conclusive, for the reasons explained by Lord

Sumption in the Privy Council Judgment.

97.     As to ¶ 114(d) of the Second Moss Declaration, the fact that a proposed implied

term works in a one-sided way may demonstrate that it is neither obvious nor necessary.

## 4.    CITCO'S ALLEGED LACK OF GOOD FAITH

98.     In the First Mortimore Declaration (¶¶ 108-116), I addressed the Funds' case

made in the Amended Complaints dated September 2016.[95] Mr Moss answered these

paragraphs in the Second Moss Declaration (¶¶ 103-112). In these paragraphs, Mr Moss seems

to be arguing that reckless indifference, to which he refers in ¶ 104(c), is a lower bar for

establishing bad faith or dishonesty than Nelsonian blindness. I do not agree; the two phrases

amount to much the same thing. My opinion is supported by Lord Hobhouse (see paragraph

102 below). If Mr Moss is right, litigants would allege reckless indifference as a matter of

course to avoid the difficulties of establishing wilful blindness, but that is not what happens.

99.     Mr Moss and I agree that the leading authority on what is required for the

purposes of deceit is the speech of Lord Herschell in *Derry v Peek*,[96] which we both quote.

Lord Herschell identified three ways in which a person would act fraudulently: "*(1) knowingly,

or (2) without belief in its truth, or (3) recklessly, careless whether it be true or false.*" He went

on to say that, although he had treated (2) and (3) as distinct cases, (3) was merely an instance

of (2), in the sense that recklessness or not caring whether a statement is true or false means

that the person can have no real belief in the truth of what he states. A recent illustration of this

is *Mortgage Express v Countrywide Surveyors Ltd*,[97] where a valuer issued a production line

---

[95] Identified in the First Mortimore Declaration at ¶ 5(a)-(c).

[96] (1889) 14 App Cas 337, 374, English House of Lords.

[97] [2016] EWHC 224 (Ch), English High Court. For a review of the case law on this topic, see the leading textbook *Clerk & Lindsell on Torts* (21st ed) at §§ 18-19, 18-21.

property valuation without visiting the property and could have had no belief in the truth of the valuation.

100.    In ¶ 106 of the Second Moss Declaration, Mr Moss quotes from the speech of Lord Herschell in *London Joint Stock Bank v Simmons*,[98] in which Lord Herschell refers to the existence of an unchecked suspicion being inconsistent with good faith. That passage must be read subject to the much more recent authoritative statement of Lord Scott in *Manifest Shipping Co Ltd v Uni-Polaris Insurance Co Ltd* (quoted in the First Mortimore Declaration at ¶ 112),[99] which clarifies what sort of suspicion a person must have before he can be said to act with such recklessness or lack of care for the truth or falsity of what he says that he can have no belief in its truth. Lord Scott explained that the suspicion must be "*firmly grounded and targeted on specific facts*."

101.    In ¶ 107 of the Second Moss Declaration, Mr Moss quotes from Lord Nicholls's speech in *Royal Brunei Airlines v Tan*,[100] where he discusses the boundary between acting honestly and dishonestly in trust, commercial and property transactions. The illustrations Lord Nicholls gives can all be described as targeted at specific facts or matters: misapplication of trust assets and prejudice to other people's rights or possible rights.

102.    Finally, Mr Moss quotes passages from the speeches of Lords Steyn and Hobhouse in *Three Rivers District Council v Bank of England (No 3)*,[101] where the liquidators of Bank of Credit and Commerce International SA ("**BCCI**") brought a claim against the Bank of England, alleging the tort of misfeasance in public office, *i.e.* that the Bank was guilty of dishonest and unlawful conduct, in failing to carry out its statutory regulatory functions in relation to BCCI. In my opinion, this case should not be read as lowering the bar for making a

---

[98] [1892] AC 201, 223, English House of Lords.

[99] [2003] 1 AC 469, English House of Lords.

[100] [1995] 2 AC 378, 389-390, Privy Council on appeal from Singapore.

[101] [2003] 2 AC 1, 1919, 192, 230, English House of Lords.

case of bad faith or dishonesty in a commercial context. Lord Hobhouse's statement is consistent with the authorities cited in the preceding paragraphs:

> "*Another way of putting it is that he must be shown either to have known that he was acting unlawfully or to have wilfully disregarded the risk that his act was unlawful.*"

Lord Steyn concluded that what was required was "*a state of mind of reckless indifference to the illegality of his act.*" Here the recklessness was as to the legality, or otherwise, of what was done or not done as regulator under the applicable statutory scheme. A bank official would be expected to keep in mind the Bank's regulatory function, so that the statutory scheme identifies the targeted facts that he should check and verify. This is far removed from the context of a case such as that described in the Amended Complaints, where the issue is what, as a factual matter, people knew or closed their eyes to knowing, and not whether they knew or should have known that what they were doing (or not doing) was unlawful. Even so, it is interesting to note that in the second series of House of Lords speeches, considering the adequacy of the plaintiffs' pleading, Lord Hobhouse expressly referred to Lord Scott's speech in *Manifest Shipping* and equated "blind-eye" knowledge, as discussed by Lord Scott, with the statements about dishonesty and bad faith made by himself and Lords Steyn and Hutton in the first series of judgments (quoted in the Second Moss Declaration at ¶ 108).[102]

103.    Thus, whenever a claim alleges wilful blindness or recklessness, amounting to dishonesty, it is always necessary to meet the standard stated by Lord Scott. A mere sense of unease is not enough. As I have said, in the context of the present cases, there is no material difference between what is required to show recklessness or wilful blindness.

104.    In ¶ 112 Mr Moss takes me to task for using the phrase "*gross negligence.*" I am familiar with the cases cited by Mr Moss. I used the phrase to reflect the language of Lord Scott who said "*negligence, albeit gross,*" to emphasise that a person may be guilty of a high

---

[102] At §164 on p 285.

degree of negligence without it being appropriate to label him dishonest or to treat him as having blind-eye knowledge (First Mortimore Declaration at ¶¶ 112-114).

## 5.    THE KNOWLEDGE DEFENDANT INSTITUTIONS

105.    In the First Mortimore Declaration (¶¶ 117-134), I addressed the Funds' case made in the Amended Complaints dated September 2016.[103] Mr Moss answered these paragraphs in the Second Moss Declaration (¶¶ 116-120).

106.    The Proposed Fourth Amended ABN Amro Complaint, served on 30 March 2017, alleges for the first time that the Citco Record Subscriber, the Citco Banks and the Citco Subscriber had the roles summarised in paragraph 7 above and that (i) the Citco Record Subscriber and the Citco Banks were aware of "*the irregularities in BLMIS at all relevant times*,"[104] and (ii) the applicable Defendant Institutions had the same knowledge as the Citco Record Subscriber and the Citco Banks "*regarding all relevant matters relating to BLMIS and the Funds' [NAV] at all relevant times*."[105]

107.    In relation to the allegations of knowledge against the Defendant Institutions, there are two situations to consider: (i) where the Defendant Institution was the registered member of a Fund and itself subscribed for and redeemed shares in the Fund, as described in the Amended Complaints, and (ii) where the Citco Record Subscriber was the registered member of the Fund as trustee for the Defendant Institution and the Citco Banks and/or Citco Subscriber acted as agent for the Defendant Institution.[106] Mr Moss addresses the latter situation in the Second Moss Declaration (¶¶ 121-123).

---

[103] Identified in the First Mortimore Declaration at ¶ 5(a)-(c).

[104] The Proposed Fourth Amended ABN Amro Amended Complaint at ¶ 176.

[105] The Proposed Fourth Amended ABN Amro Amended Complaint at ¶ 177.

[106] But note the confusion in the Proposed Fourth Amended ABN Amro Complaint, mentioned in footnote 5 above.

### (1)    The Defendant Institution as member and redeemer

108.    At ¶ 117 of the Second Moss Declaration, Mr Moss responds to points I made in ¶¶ 120-123 about the implied term advocated by Mr Moss, which I set out in the First Mortimore Declaration at ¶ 118(a). Mr Moss has clarified that he was not intending to support the implied term pleaded in the HSBC Amended Complaint, but a different implied term that would only arise if a Knowledge Defendant Institution pleads a defence. My opinion remains that the implied term suggested by Mr Moss fails to meet the standard for implying a term into a contract; *i.e.* necessity for business efficacy or to provide commercial or practical coherence to the contract. Further, the suggested implied term is contrary to the need for certainty and finality and the express terms of Article 11(1).

109.    At ¶¶ 118 and 119 of the Second Moss Declaration, Mr Moss responds to what I had said in ¶¶ 124-129 of the First Mortimore Declaration, dealing with his opinion that absence of good faith may negate the good consideration defence. I note that Mr Moss has not addressed the rejection of his argument in the *Kingate Case* at § 167, to which I referred. For the reasons given in those paragraphs, I remain of the opinion that the good or bad faith of the recipient is irrelevant to the availability of the good consideration defence to a claim in restitution.

110.    In ¶ 120 of the Second Moss Declaration, Mr Moss takes issue with what I said about the allegations of bad faith made against the Knowledge Defendant Institutions (First Mortimore Declaration at ¶¶ 132-134), but I note that he does not comment on my opinion (which I maintain) that the Knowledge Defendant Institutions were entitled to rely on what they were told by Citco when it published the certificates unless they themselves were dishonest or irrational (First Mortimore Declaration at ¶ 131).

**(2)     The Citco Subscriber as agent and trustee**

111.     Solely for the purpose of considering this scenario, I shall treat the Citco Record Subscriber, Citco Bank and/or Citco Subscriber as if they were one entity, which I will call the Citco Subscriber, unless it is necessary to refer specifically to the Citco Record Subscriber or the Citco Bank. I shall assume that the Citco Subscriber had such knowledge as to make it in bad faith but that the Defendant Institutions themselves did not, even though the Court scrutinizing the relevant paragraphs of the Proposed Fourth Amended ABN Amro Complaint should find that they do not meet the standard (described in Section 4 above) for pleading the requisite actual or blind-eye knowledge of the BLMIS Ponzi fraud or for attributing the alleged knowledge of Citco to the Citco Subscriber.

112.     In ¶ 121 of the Second Moss Declaration, Mr Moss expresses the opinion that if the registered shareholder and subscriber is in bad faith, then its bad faith will prevent the beneficial owner from raising a defence of contractual entitlement to the Liquidators' (or more properly the Funds') contractual or restitution claim. The beneficial owners are said to be bound by the bad faith of the registered shareholder and subscriber.

113.     In my opinion, Mr Moss's proposition is wrong for several reasons. First, Mr Moss's argument presupposes that the bad faith of the recipient is relevant to the availability of defences to restitution claims. As I have explained in the First Mortimore Declaration (¶¶ 124-129) and in paragraph 109 above, that is not the case.

114.     Second, Mr Moss's reliance on Article 8 and section 42 BCA 2004 is misplaced. Section 42 is a familiar provision which has long been part of English companies legislation.[107] It prevents a company from entering notice of a trust in its register of members. Article 8 is a familiar regulation adopted by many companies,[108] which states that the Funds are entitled to

---

[107] See Section 126 of the English Companies Act 2006, which replaced without change Section 360 of the English Companies Act 1985.

[108] Compare regulation 5 of Table A to the English Companies Act 1985.

treat the registered member as absolute owner of the shares and are not obliged to recognise equitable interests in the shares. Accordingly, a Fund need only give notice of general meetings to the registered member and obtains a good discharge if it pays dividends or other distributions to the registered member. The provisions of section 42 and Article 8 do not in all circumstances allow the Fund to ignore equitable interests of which it has actual notice.[109] Nor do they prevent the Funds, directly or through Citco, as their agent, from entering into transactions with the Citco Subscriber as agent for the Defendant Institutions for the redemption of shares on the terms of the Articles. Furthermore, the provisions of section 42 and Article 8 cease to be relevant after the Dealing Day, when the redeemed member ceased to be a member, and have no relevance to any payment of a Redemption Payment made by Citco.

115.    Third, Mr Moss relies on clause 27 of the subscription agreements. The position of a member of a Fund who wishes that its shares be redeemed is regulated by Articles 10 and 11. I do not understand how clause 27 can be relevant to redemptions. This also was the opinion of Lord Sumption (see Privy Council Judgment at §§ 10, 17, 20).

116.    Fourth, the Funds' case in this respect amounts to an attempt to take advantage of the multiple agency functions of Citco and the Citco Subscriber to put the Funds in a better position in relation to the Common Law Claims than they would have been if the Defendant Institution had been the registered member. This contradicts the basic principle that a person should not be able, by interposing an agent or agents, to put himself in a better position than that in which he would have been if he had dealt personally.[110] As I have said,[111] each Fund delegated to Citco its functions in relation to the determination of NAV and redemptions, with the result that Citco's knowledge in relation to those matters is attributed to the Fund. As agent,

---

[109] *Bradford Banking Co v Henry Briggs & Co* (1886) 12 App Cas 29, English House of Lords.

[110] *Bowstead and Reynolds on Agency* (20th ed) at § 8-209;

[111] First Mortimore Declaration at ¶ 77.

Citco received the redemption notice in respect of the shares held for the Defendant Institution, accepted the surrender of the shares, and paid the Redemption Price into the account of the Defendant Institution with the Citco Bank (or to the Citco Subscriber as agent for the Defendant Institution).[112] If this is what happened, the arrangements amount to direct dealings between the Fund and the Defendant Institution with the same legal consequences as would have applied without the participation of the Citco Record Subscriber, Citco Bank or Citco Subscriber.

117.    Finally, I should add that, if the Defendant Institutions cannot rely on the Funds' Articles, as Mr Moss seems to be saying, then they cannot be bound by them and the Funds' various contractual claims against them fall away.

118.    It follows that, if the bad faith of the recipient is relevant, a Defendant Institution could only receive a Redemption Payment in bad faith if that bad faith is attributed to it from the bad faith of its agent, the Citco Subscriber. This is the issue that Mr Moss addresses at ¶¶ 122 and 123 of the Second Moss Declaration. *Bowstead* states the general rules that (i) notice given to an agent is effective as notice to the principal if the agent receives it within the scope of his actual or apparent authority,[113] and (ii) knowledge relating to the subject matter of the agency acquired by an agent acting within the scope of his authority may be imputed to his principal.[114] So, to take a simple example, where a creditor instructs a messenger to collect a cheque from a debtor and pay it into the creditor's bank account, it is not within the scope of the messenger's actual or apparent authority to receive information about the debtor's financial circumstances, and so the creditor does not have notice of any information about the debtor's financial circumstances that is given to the messenger.

---

[112] Proposed Fourth Amended ABN Amro Complaint at ¶¶ 107, 108. But see ¶¶ 232, 241, 250, 251, which allege that the payments were made to the Citco Subscriber.

[113] *Bowstead*: Article 94 at § 8-204.

[114] *Bowstead*: Article 94(1) at § 8-207.

119.    The Funds' argument is that the Defendant Institutions had the same knowledge

of irregularities within BLMIS that Citco had, so as to give them blind-eye knowledge of the

BLMIS Ponzi fraud, because this knowledge was passed on to their agent, the Citco Subscriber.

The Defendant Institutions would only potentially be treated as having knowledge of those

matters if it was within the scope of the agency of the Citco Subscriber with respect to them to

receive it. That would require the Court to consider the Citco Subscriber's functions as agents

of the Defendant Institutions as pleaded in the Proposed Fourth Amended ABN Amro

Complaint. Under the B&C Agreements, which are in substantially similar terms, the Citco

Subscriber, as broker, acted on the instructions of the Defendant Institution in a non-advisory

capacity,[115] and the Citco Record Subscriber, as custodian, acted on the instructions of the

Defendant Institutions without any monitoring role.[116] If BVI law were applicable, on those

facts, a Court would conclude that it was outside the scope of the essentially ministerial

functions of the Citco Subscriber and the Citco Record Subscriber for them to receive

information about irregularities in BLMIS, and that the Defendant Institutions are not fixed

with any such knowledge that the Citco Subscriber and/or the Citco Record Subscriber may

have had.

120.    In ¶ 122 of the Second Moss Declaration, Mr Moss states that "*the knowledge

of an agent connected with the subject matter of his agency and acquired in the course of his

employment is attributed to the principal*." This is similar to the principle I stated in paragraph

118 above at (ii), provided that "*in the course of his employment*" means within the scope of

his actual or apparent authority. Mr Moss goes on to consider the question of whether

information acquired by the registered shareholder before the commencement of his agency for

the Defendant Institution should be imputed to the latter. The answer to this question depends

---

[115] Exhibit G to Mr Molton's Declaration at clauses 2.1-2.3, 2.10.

[116] Exhibit G to Mr Molton's Declaration at clauses 6.3, 6.4, 7.1.4, 7.1.15 and 7.1.7.

on the scope of the agency, but even where the information is within the scope of the agency, knowledge will not usually be imputed to the principal if it was acquired by the agent before or outside the agent's engagement for the principal.[117] The well-known statement of Lord Halsbury LC in *Blackburn, Low & Co v Vigors* provides a useful guide:

> "*Some agents so far represent the principal that in all respects their acts and intentions and their knowledge may truly be said to be the acts, intentions, and knowledge of the principal. Other agents may have so limited and narrow an authority both in fact and in the common understanding of their form of employment that it would be quite inaccurate to say that such an agent's knowledge or intentions are the knowledge or intentions of his principal...*"[118]

I quoted the first sentence of that passage in relation to Citco's agency on behalf of the Funds in the First Mortimore Declaration at ¶ 90. The second sentence is apposite to the agency of the Citco Subscriber on behalf of the Defendant Institutions. One instance where information acquired before or outside the agent's engagement would be imputed to the principal is where the principal engaged the agent for his knowledge,[119] which is easily illustrated by reverting to the simple example of the creditor's messenger. It would make no difference if the messenger already knew of the debtor's financial difficulties before he was engaged to collect the cheque. This is because the agency was limited to providing a collection service; the messenger was not engaged for his knowledge. Under BVI law, applying those principles to the facts stated in the Proposed Fourth Amended ABN Amro Complaint, the Court would find, as the B&C Agreements indicate, that the Defendant Institutions engaged the Citco Subscriber and the Citco Record Subscriber to exercise ministerial functions, with no advisory role, and that there are no facts alleged to the effect that they were engaged for their knowledge of BLMIS.[120]

---

[117] See the discussion in *Bowstead* at § 8-210.

[118] (1887) 12 App Cas 531, 537, 538, English House of Lords.

[119] *Bowstead* Article 95(1) at § 8-207: "*Where an agent is authorised to enter into a transaction in which his own knowledge is material, knowledge which he acquired outside the scope of his authority may also be imputed to the principal.*" See comment at § 8-211.

[120] Proposed Fourth Amended ABN Amro Complaint at ¶ 176 includes the plea: "*As set forth above, and in accordance with the B&C Agreements, at all times this knowledge [of irregularities at BLMIS] was relevant if*

121.    In ¶ 123 of the Second Moss Declaration, Mr Moss expresses the opinion that where a claimant claims against a person for knowing receipt of misapplied money, and the person acted through an agent who knows of the misapplication, it will be no defence for the principal to say that his agent acted fraudulently. As I have said in paragraph 78 above, this mischaracterizes the Proposed Fourth Amended ABN Amro Complaint, which does not assert a claim of knowing receipt which is the distinct cause of action. Mr Moss relies on a passage from the *Bilta* case, where Lords Toulson and Hodge were considering whether knowledge should be attributed to a company when a third party pursues a claim against the company arising from the misconduct of the company's director, employee or agent. In such a case, they said that the rules of agency would normally suffice to attribute to the company not only the act of the director, employee or agent, but also his state of mind.[121] The situation considered by Lords Toulson and Hodge is far removed from the Funds' claims. The Funds are in the position of Lords Toulson and Hodge's third party, but they are not pursuing claims against the Defendant Institutions arising from the misconduct of the Defendant Institutions' agents. Nor were Lords Toulson and Hodge considering a case where the scope of the agency was limited to, for example, ministerial functions.

**6.    OTHER ISSUES**

122.    In ¶¶ 124-125 of the Second Moss Declaration, under the heading "Other issues: ministerial receipt," Mr Moss addresses the question of whether the Defendant Institutions would have a defence to the Common Law Claims on the ground that they received Redemption Payments as agents for their customers to whom they were paid over.

---

*not material to Defendants' investing in the Funds to participate in the Funds' investments in BLMIS*." There are no earlier paragraphs in the Proposed Fourth Amended ABN Amro Complaint that might support that plea. Further, the plea is contradicted by the terms of the B&C Agreements (paragraph 119 above).

[121] [2016] AC 1 at §§ 204, 205.

123.    A BVI court would recognise the "ministerial receipt" defence under BVI law.

In *Portman Building Society v Hamlyn Taylor Neck*,[122] Millett LJ explained that:

> "*At common law the agent recipient is regarded as a mere conduit for the money, which is treated as paid to the principal, not to the agent. … The true rule is that where the plaintiff has paid money under (for example) a mistake to the agent of a third party, he may sue the principal whether or not the agent has accounted to him, for in contemplation of law the payment is made to the principal and not to his agent. If the agent still retains the money, however, the plaintiff may elect to sue either the principal or the agent, and the agent remains liable if he pays the money over to his principal after notice of the claim. If he wishes to protect himself, he should interplead. But once the agent has paid the money to his principal or to his order without notice of the claim, the plaintiff must sue the principal.*"

Here, to the extent the Amended Complaints allege that the Defendant Institutions acted on behalf of their principals to whom they have paid the money, this defence is available and prevents the Funds from claiming the Redemption Payments from the Defendant Institutions.

124.    In ¶ 126 of the Second Moss Declaration, under the heading "Other issues: damages," Mr Moss considers an argument that has been raised to the effect that the Funds have suffered no loss, since they sold shares at inflated prices. He also states his opinion on the question of whether a person who remained a member of a Fund when it went into liquidation may rescind his agreement to acquire shares and/or claim damages for misrepresentation. These are not matters that are alleged in the Amended Complaints or the Proposed Fourth ABN Amro Complaint, and there is nothing about them in evidence that I have read. I therefore will not address them.

## B.    BVI INSOLVENCY ACT CLAIMS

## 7.    INTRODUCTION

125.    In the First Mortimore Declaration (¶¶ 135-174), I discussed the origins and provisions of sections 245 and 246 of the BVI Insolvency Act and explained the case law

---

[122] [1998] 4 All ER 202, 207f-j, English Court of Appeal.

relevant to claims brought under those sections. In Sections 8 and 9 below, I will address separately Mr Moss's responses with respect to the unfair preference claim under section 245 and the undervalue transaction claim under section 246 on the basis described in the Amended Complaints; *i.e.* that the shares in the Funds were registered in the names of the Defendant Institutions. In Section 10 below, I will address the different legal position where the shares were registered in the name of the Citco Record Subscriber or the Citco Subscriber. In Section 11 below, I will respond to Mr Moss's arguments about the court which has power to grant relief under section 249, where there has been a transaction within sections 245 or 246.

126.    First, however, I will respond to Mr Moss's arguments as to three issues that bear on claims brought under both sections 245 and 246: (i) the lack of overlap between those sections, such that a single transaction cannot fall under both sections, (ii) what is "a transaction entered into" for the purposes of both sections, and (iii) the restrictions on the use of hindsight in relation to claims under both sections.

**(1)    No overlap between sections 245 and 246**

127.    As I previously explained, a single transaction cannot be both an unfair preference and an undervalue transaction (First Mortimore Declaration at ¶¶ 151-154). That is supported by Professor Goode in his book *Principles of Corporate Insolvency Law* and the decision of Millett J in *Re MC Bacon Ltd* (First Mortimore Declaration at ¶¶ 152, 153). By way of example, Professor Goode refers to a case where a company paid a connected company an excessive amount for services. In such a case he said that, to the extent of the value of the services, the payment was a preference and to the extent of the excess, the payment was an undervalue transaction.[123] Mr Moss has not cited any case where a single transaction has been

---

[123] Goode, *Principles of Corporate Insolvency Law* (4th ed) at § 13-107. The example is taken from *Re HHO Licensing Ltd* [2008] 1 BCLC 223, referred to in footnote 146 to ¶ 160 of the First Mortimore Declaration and in paragraph 134 below as *Clements v Henry Hadaway Organisation Ltd*. In that case, there were distinct transactions; under one the company arranged to pay its receivables into the connected company's bank account and under another the company purported to agree to pay the connected company an excessive amount for services; see the judgment at § 20. That is the nearest I have come to finding a case where a transaction has been

held to be both an unfair preference and an undervalue transaction, and I am not aware of any

such case.

128.    Finding no authority to support his argument that a single transaction can fall

under both sections, Mr Moss nevertheless criticises the views of Professor Goode and Millett

J as being, according to him, overly dogmatic, and suggests that in English courts "*dogmatic*

*concepts*" are "*usually*" overturned (Second Moss Declaration at ¶ 134). I disagree with this

treatment of Professor Goode and Millett J, which does not fairly reflect their contributions to

the understanding and development of English insolvency law. As a judge of the Chancery

Division (1986-1994), as a Lord Justice in the Court of Appeal (1994-1998), as Lord Millett in

the House of Lords (1998-2004) and as a non-permanent judge of the Hong Kong Court of

Final Appeal since 2000, Lord Millett has given many significant and influential judgments in

the fields of insolvency and company law.[124] Similarly, Professor Goode has been one of the

most influential and distinguished academic commentators on English insolvency law.[125]

129.    Moreover, contrary to Mr Moss's dismissive treatment of it, *Re MC Bacon

Ltd*[126] was an early landmark case on the interpretation and application of the then-new

preference and undervalue provisions in the English Insolvency Act. Millett J's explanation of

the new law about preferences has been followed consistently. His decision that the grant of a

charge to secure a debt cannot be a transaction at undervalue has been followed on two

---

found to involve both an unfair preference and an undervalue transaction. In *Re Sonatacus Ltd* [2007] 2 BCLC
627, mentioned in footnote 196 to paragraph 210 below, both sections had been relied upon, but the claim was
decided on the basis of unfair preference, not undervalue transaction.

[124] As Peter Millett QC, he was a member of the committee, under the chairmanship of Sir Kenneth Cork, which in
June 1982 produced a report on *Insolvency Law and Practice* (Cmnd. 8558) that was "*the main inspiration for
the reforms*" introduced in 1985 and now embodied in the English Insolvency Act; see *Joint Administrators of
LB Holdings Intermediate 2 Ltd v Joint Administrators of Lehman Brothers Ltd* [2017] UKSC 38 at § 10, UK
Supreme Court.

[125] Sir Roy Goode was appointed a QC in 1990 and knighted for services to academic law in 2000. Among his
many academic posts and distinctions, he is Emeritus Professor of Law at the University of Oxford. His
publications include *Commercial Law* (5th ed, 2016), *Legal Problems of Credit and Security* (5th ed, 2013),
*Principles of Corporate Insolvency Law* (4th ed, 2011) and *Proprietary Rights and Insolvency in Sales
Transactions* (3rd ed, 2010).

[126] [1990] BCLC 324.

occasions by the English Court of Appeal[127] and is supported by Professor Goode (paragraph

130 below). It is correct that in *Hill v Spread Trustee Co Ltd*,[128] where the debtor had granted

security as part of a series of transactions to transfer property to defeat his creditors, Arden LJ

questioned the proper reach of Millett J's decision, because (i) she said that it did not follow

that the grant of security can never amount to a transaction for no consideration, and (ii) she

doubted whether Millett J's decision could apply to charges by way of legal mortgage.[129]

130.    Arden LJ's judgment in *Hill* is of little help to the Court because, as Professor

Goode noted in his book *Principles of Corporate Insolvency Law*, her judgment:

> "*confuses a transaction at an undervalue with a preference and cannot
> be accepted. The question is whether there is a transaction at an
> undervalue, meaning that the company parts with more than it receives.
> If the company grants a security interest, it still has the right to redeem
> and any payment it makes pro tanto reduces its indebtedness, so that it
> loses nothing.*"[130]

I agree with this.

**(2)    The transaction entered into**

131.    Mr Moss and I are agreed as to the meaning to be given to the word

"*transaction*" in sections 245 and 246 (First Mortimore Declaration at ¶¶ 159-161 and Second

Moss Declaration at ¶ 146).

132.    Moreover, in relation to the phrase "*a transaction entered into by a company*"

in subsection 245(1) and the comparable phrases used in sections 244(2) and 246, Mr Moss

---

[127] *National Bank of Kuwait v Menzies* [1994] 2 BCLC 306, 319, 320; *Feakins v DEFRA* [2007] BCC 54 at § 72
where Jonathan Parker LJ followed the reasoning of Millett J and said that the charge did not deplete the
company's assets.

[128] [2007] 1 BCLC 450, English Court of Appeal, at §§ 93 and 138, with which Nourse and Waller LJJ agreed.

[129] This was said in light of the speeches of Lord Hoffmann and Lord Millett in *Buchler v Talbot* [2004] 2 AC
298 at §§ 29, 51. I do not consider that those speeches cast any doubt on Millett J's decision. If a legal charge is
given to secure a debt, there is no diminution of the company's assets, any more than there would be if the
charge was equitable.

[130] At § 13-38, footnote 116. Professor Goode is not right when he says that the *Feakins* case was decided after
the *Hill* case. In fact, it was decided on 9 December 2005, a few weeks before the argument in *Hill*, on which
judgment was given on 12 May 2006. *Feakins* was not cited in *Hill*.

does not appear to disagree with my opinion that these phrases must have the same meaning in each of sections 245 and 246 (First Mortimore Declaration at ¶ 157).

133.    Mr Moss does not agree, however, that (i) the phrases require the court to focus on the inception of the transaction, and that (ii) it is necessary to distinguish between mere performance of an existing transaction and entry into a distinct, albeit linked transaction (First Mortimore Declaration at ¶¶162-166 and Second Moss Declaration at ¶¶ 147-151).

134.    Mr Moss argues incorrectly that the proposition that the Court should focus on the inception of the transaction is contradicted by the three cases I cited in the First Mortimore Declaration at ¶ 160 footnote 146. These cases all confirm that a transaction in this context connotes some form of dealing. In *Re Taylor Sinclair (Capital) Ltd*,[131] the Deputy Judge said that a transaction within section 238 of the English Insolvency Act "*will be something which involves at least some element of dealing between the parties to the transaction*"[132] and found that the mere payment of cheques by the company to the other party did not amount to a transaction within the section. *Clements v Henry Hadaway Organisation Ltd*[133] followed the approach in *Re Taylor Sinclair*. Beyond that, neither case discusses the identification of the transaction said to have been at an undervalue or its inception.

135.    The third case, *Feakins v DEFRA*,[134] concerned a transaction defrauding creditors. The debtor (F) owned farm land which was subject to (i) an agricultural tenancy in favour of a company he controlled, (ii) a first mortgage to secure his liabilities to a bank, and (iii) a second ranking charging order to secure a judgment debt owed to DEFRA. In order to defeat the interests of DEFRA, F entered in an arrangement, agreement or understanding with

---

[131] [2001] 2 BCLC 176, English High Court, at §§ 19-22.

[132] [2001] 2 BCLC 176, English High Court, at § 20.

[133] [2008] 1 BCLC 223, English High Court, at § 31 (see the quotation in the First Mortimore Declaration at ¶ 160 footnote 146).

[134] [2007] BCC 54, English Court of Appeal.

his fiancée, H, for three steps to be taken: (i) they would persuade the bank, as mortgagee, to sell the farm land to H subject to the agricultural tenancy, (ii) F would procure his company to release the agricultural tenancy, and (iii) H would sell the farm land to a third party free of encumbrances and the agricultural tenancy. The Court of Appeal agreed with the judge that the transaction that defrauded DEFRA was the initial arrangement, agreement or understanding between F and H, not the later sale by the bank.[135] This case supports my opinion that the statutory wording requires the Court to look at the inception of the transaction, not the steps taken to implement it, and is consistent with *Re MC Bacon Ltd* (First Mortimore Declaration at ¶ 162).

136.    In response to my point that entry into the transaction must be distinguished from performance of it, Mr Moss argues that section 245 of the BVI Act is "*very firmly based on*" and "*largely copied over from*" section 239 of the English Insolvency Act, under which it is clear (as I agree) that a payment is capable of giving a preference.[136] Mr Moss's argument is not correct. Except for subsection 245(1)(c) of the BVI Act, where the BVI legislature adopted almost exactly the language of subsection 239(4)(b) of the English Insolvency Act, the language used in the remainder of section 245 is different from that used in section 239 of the English Insolvency Act. The differences of language are the consequence of different statutory purposes. Whereas under the English section 239, a preference is unfair if, among other things, it is given with the requisite desire to prefer, under the BVI Act a preference is unfair if, among other things, the transaction was entered into outside the ordinary course of business. This is a change of substance which meant that much of the language used in the English section 239 was not appropriate for the BVI section 245. In consequence of the difference in language, there may have been an unfair preference under one section, but not under the other. In short,

---

[135] At §§ 74-78.

[136] Second Moss Declaration (¶¶ 147-48).

Mr Moss's arguments based on the different language of section 239 of the English Insolvency Act are not relevant to the analysis of section 245 of the BVI Insolvency Act.

137.    If the BVI Court finds that a transaction entered into by a company with one of its creditors is an unfair preference within section 245, it may make an order for the recovery of any payment made in performance of the transaction (subsections 249(1)(b) and (2)(d)). Therefore, it would not be necessary or appropriate to consider whether a mere payment made pursuant to the transaction should be regarded as a distinct transaction, albeit linked to the transaction under which the payment was made. In fact, if the transaction is valid as being in the ordinary course of business, it makes no sense to invalidate its performance. A demand for payment from the creditor, if the debt is not paid on time, or the company subsequently becoming unable to pay its debts, may justify the court in regarding the decision to make the payment as a distinct but linked transaction to which section 245 may be applied (see the cases in footnote 152 to ¶ 164 in the First Mortimore Declaration).

138.    The practical significance of the distinction between the transaction entered into and the performance of the transaction lies in the disagreement between myself and Mr Moss as to whether the transaction to which sections 245 and/or 246 may apply is the Redemption or, as Mr Moss argues, the Redemption Payment. I addressed this question in the First Mortimore Declaration (¶¶ 168-172) and Mr Moss has responded in the Second Moss Declaration (¶¶ 152-157).

139.    Mr Moss and I agree that a Redemption, entered into when the Fund receives a redemption notice, is a transaction to which sections 245 and 246 may apply. In ¶ 169 of the First Mortimore Declaration, I said that service of the redemption notice implemented a procedure laid down by the existing contract between the Fund and its members, constituted by the Articles. Mr Moss suggests that the redemption is a fresh contract of sale, albeit on the

terms of the Articles. It is not necessary for the Court to resolve this debate, since it does not change the analysis as to any of the points in issue.[137]

140.    Where Mr Moss and I disagree is over whether, as the Liquidators contend with the support of Mr Moss (Second Moss Declaration at ¶¶ 155, 157), a Redemption Payment is a separate transaction distinct from the Redemption. It is easy to demonstrate that the Liquidators are wrong. Suppose a company enters into a transaction with a supplier to buy goods with delivery and payment to take place immediately. Delivery and payment are part of the transaction. No one could sensibly argue that the company entered into a separate transaction when it made payment or that the supplier entered into a separate transaction when it delivered the goods. The position is the same if the transaction provides for delivery to be made on the following day and payment the day after that. It can therefore be seen that the Liquidators' argument is founded on the false premise that there are separate transactions as a result of the intervals of days or weeks between service of the redemption notice and delivery of the shares on the Dealing Day and between the Dealing Day and payment of the Redemption Price. Provided that events take their ordinary course, as they did, there is only one transaction, as was correctly pleaded in ¶ 164 of the CA Amended Complaint (First Mortimore Declaration at ¶ 171).

141.    Of course, it might be different if some event, such as the exposure of the BLMIS fraud, occurred during one or other of the intervals. If that event occurred before the Dealing Day, the determination of NAVs would be suspended under Article 11(4) and the Redemption could not proceed (Article 10(1)(e)). If that event occurred between the Dealing

---

[137] It is interesting to note that before the EC Court of Appeal, the Funds argued the opposite of what Mr Moss argues now. Then Sentry argued that the contract was contained in Article 10 and that the Redemption did not constitute a new contract; see the judgment of the EC Court of Appeal at §§ 53, 60, 75,79 (Exhibit G to Mr Hare's Declaration). The issue was not pursued before the Privy Council; see Sentry's case on the good consideration appeal at ¶¶ 19, 20 (Exhibit M to Mr Hare's Declaration).

Day and payment of the Redemption Price, the directors would have to decide whether the Fund could make the payment, having regard to its other debts and liabilities. Any decision to pay in those circumstances might well be regarded as a separate transaction, as I have explained (paragraph 137 above and First Mortimore Declaration at ¶ 164), but that issue does not arise in relation to any of the transactions referred to in the Amended Complaints.[138]

### (3)    The Liquidators' reliance on hindsight

142.    Mr Moss takes the position that, in applying sections 245 and 246 of the BVI Insolvency Act, hindsight knowledge may be used without restriction or limit. This is contrary to BVI law. I will deal with Mr Moss's specific arguments with respect to the use of hindsight as they arise in my discussion of unfair preference and undervalue transaction. In short, I will demonstrate that, when looking back at a past transaction, the court puts itself into the position of a reasonable observer of the circumstances of the company at the time of the transaction to determine whether (i) it was then able to pay its debts, (ii) the transaction was entered into in the ordinary course of business (or was a good faith business transaction), and (iii) the transaction was at an undervalue.

143.    I will also explain why my analysis is not "*directly contrary*" to the decision of the House of Lords in *Phillips v Brewin Dolphin Bell Lawrie Ltd*, as Mr Moss suggests (Second Moss Declaration at ¶ 158). As I will show, in *Brewin Dolphin*, Lord Scott used evidence of subsequent events only to confirm the value of consideration under a transaction, which, at the date of the transaction was known to be uncertain and precarious; *i.e.* to validate what would have been seen to be the value at the time of the transaction (see paragraph 167 below).[139]

---

[138] Mr Moss's suggestion in the Second Moss Declaration at ¶ 151, for dealing with the problem of a non-trading individual debtor under section 401 of the BVI Insolvency Act, is that the individual debtor should be treated as if he carried on business even if he did not. With respect, this does far more violence to the statutory language than my suggestion and I cannot agree with it.

[139] [2001] 1 WLR 143 at § 26.

**8.    THE UNFAIR PREFERENCE CLAIMS**

144.    As I explained in the First Mortimore Declaration (¶¶ 145, 175), a claim in relation to an unfair preference under section 245 can only be brought if the transaction entered into by the company (i) gives a preference to a creditor, (ii) is an insolvency transaction, in that the company was then, or became in consequence of the transaction, unable to pay its debts as they fell due, (iii) is entered into during the vulnerability period, which is two years if the preference is given to a connected person or 6 months if the preference is given to any other person, and (iv) did not take place in the ordinary course of business. Mr Moss does not dispute this, but argues incorrectly that the Defendant Institutions were creditors at the time the Redemptions were entered into, that at the relevant time the Funds were unable to pay their debts as they fell due, and that the transactions were not entered into in the ordinary course of the Funds' businesses. I shall address each point in turn below.

**(1)    The Defendant Institutions were members and not creditors when the Redemptions were entered into**

145.    This issue is discussed in the First Mortimore Declaration at ¶¶ 180-186 and in the Second Moss Declaration at ¶¶ 163-181. In considering this issue, it is helpful to identify the three relevant time periods: (i) the period up to and including receipt by the Fund of the redemption notice served by or on behalf of the Defendant Institution, which was when the Redemption transaction was entered into ("**Period 1**"), (ii) the period after receipt of the notice until the relevant Dealing Day, when the Funds actually redeemed the shares from the Defendant Institution, which then ceased to be a member ("**Period 2**"), and (iii) the period between the Dealing Day and payment of the Redemption Price ("**Period 3**").

146.    In the Second Moss Declaration at ¶ 163, Mr Moss states that in Period 1 each Defendant Institution was a member:

> "[T]he Defendant Financial Institutions were members/shareholders at the time they gave notice to redeem and started the redemption process."

70

Therefore, the Defendant Institution was a member, not a creditor, when the Redemption transaction was entered into with the Fund. However, Mr Moss seems to argue that at the moment the Defendant Institution submitted the redemption request—and thus entered into the Redemption transaction—the Defendant Institution was somehow already "*also a contingent creditor.*" (Second Moss Declaration at ¶ 163). This does not make any sense, as it cannot be that a Defendant Institution submitted the redemption request as a contingent creditor when it was indisputably a member. If the Fund went into liquidation before receipt of the redemption notice, the Defendant Institution would rank as a member in the liquidation, and it could not be argued that it was a contingent creditor at such time. Mr Moss's argument must be that the act of entering into the Redemption transaction, by submitting the redemption request, somehow transformed the Defendant Institution into *both* a member *and* a contingent creditor. This of course fails to alter the fact that the Defendant Institution was a member, not a creditor, when it entered into the Redemption transaction by serving notice on the Fund and could not acquire any rights under the Redemption procedure until after the notice had been received, at which point Period 2 begins (paragraph 148 below).

147.    Mr Moss and I agree that in Period 3, which under Article 10(1)(c) would normally last about 30 days, the Defendant Institution would be a creditor (Second Moss Declaration at ¶ 163, where he says that the Defendant Institutions "*became immediate creditors <u>once the redemption process took place</u>*" (emphasis added)). From the Dealing Day, the Defendant Institution ceased to be a member and was entitled to be paid the Redemption Price. Thus, during Periods 1 and 3 the Defendant Institution was either a member or creditor, but it was not simultaneously both. If the Fund went into liquidation during Period 3, and if *Somers Dublin Ltd A/C KBCS v Monarch Pointe Fund Ltd* is the governing BVI authority, the Defendant Institution would rank as a creditor for the unpaid Redemption Price, but its claim

would be subordinate to ordinary creditors under section 197 of the BVI Insolvency Act.[140] On

the basis that the transaction was entered into when the redemption notice was received, Period

3 starts too late for the Defendant Institution to be a creditor for the purposes of section 245(1).

On the other hand, if as Mr Moss contends and I disagree, the Redemption Payment was a

separate and distinct transaction entered into when payment was made, rather than performance

of the existing transaction entered into when the redemption notice was served, then the

Defendant Institution would have been a creditor immediately before payment.

148.    The period on which we disagree is Period 2. Under Article 10(1)(a), this period

may last between at least 15 days and about one month, depending on when the notice to

redeem was given.[141] Exploring the status during Period 2 of a member who has requested

redemption is not helpful, since the period begins after the Redemption transaction was entered

into, when the requesting party was a member, and it ends before the requesting party became

a creditor, entitled to receive the Redemption Payment. If a Fund went into liquidation during

Period 2, a Defendant Institution who had served a redemption notice would rank as a member,

because (i) it would still be a member when the Fund went into liquidation, its shares not having

been redeemed and its name not having been removed from the register of members, and (ii)

the Redemption could not be completed and the Defendant Institution could never acquire the

right to payment of the Redemption Price. Apart from anything else, the determination of NAV

would be suspended pursuant to Article 11 and the Defendant Institution would have no right

to have its shares redeemed (Article 10(1)(e)). The Defendant Institution could not claim that

it was a "contingent" creditor ranking behind ordinary creditors, but before members who had

not served a redemption notice, because the contingency of becoming entitled to payment of

the Redemption Price could never occur.

---

[140] HCVAP 2011/11, EC Court of Appeal. See my comments on this case in the First Mortimore Declaration at ¶ 185 footnote 165.

[141] See definitions in Article 1 of "*Dealing Day*," "*Dealing Time*" and "*Valuation Day*."

149.    In ¶ 164 of the Second Moss Declaration, Mr Moss says that I take too narrow a view of the time when the transaction was entered into. But the focus on entry into the transaction is dictated by the language of subsection 245(1), and that focus is supported by the need to determine (i) whether it was an insolvency transaction, in that it was entered into when the Fund was insolvent (subsections 244(2), (3) and 245(1)(a)) and, (ii) whether it was entered into within the vulnerability period (subsections 244(1) and 245 (1)(b)).

150.    In ¶¶ 165 and 166 of the Second Moss Declaration, Mr Moss addresses my example of a company, in the ordinary course of business, acquiring goods from a new supplier on 7 days' credit. I said that, when entered into, this would not be a transaction with a creditor for the purposes of subsection 245(1) and that payment would be performance of the sale and purchase contract (First Mortimore Declaration at ¶ 182). If the directors appreciated the company's perilous financial position before payment became due, but nevertheless made the payment, a court, applying BVI law, would have to consider the issues discussed in paragraphs 134 and 137 above. Mr Moss then considers how my example would stand if the preference provision in section 239 of the English Insolvency Act were applied. This is irrelevant, because the position under English law is entirely different, since the payment would give a preference to a creditor (subsections 239(2) and (4)(a)) and there is no need to identify the timing of the transaction entered into by the company that gives a preference.

151.    In ¶¶ 164 and 167-171 of the Second Moss Declaration, Mr Moss also says that the Fund became a contingent creditor upon the Redemption transaction being entered into. He refers to *Sibun v Pearce*,[142] which concerned the interpretation of the rules of a building society incorporated under applicable building societies legislation. Under those rules, a member who had given notice of withdrawal, but had not been paid, was held to be a member who was entitled to vote on a resolution for dissolution. The withdrawing member was also a creditor,

---

[142] (1890) 44 Ch D 354, English Court of Appeal.

but, as Lindley LJ said, he was not an ordinary creditor, since he would have a right to be paid before the surplus assets were distributed among members who had not given notice of withdrawal. Mr Moss says that *Sibun v Pearce* was adopted by the EC Court of Appeal in the *Monarch Pointe* case. This is correct, but *Monarch Pointe* was a Period 3 case (see paragraph 147 above). In a recent decision of the Privy Council,[143] Lord Mance had this to say about *Sibun v Pearce*:

> "*In Sibun v Pearce (1890) 44 Ch D 354 the question was whether a member who had given a notice of withdrawal which had expired remained a member for the purposes of a requirement that any resolution for winding up the society be with the assent of three-fourths of the members. The question turned upon the construction of a statute — which Lindley LJ said was "less obscure than usual" (page 369) — and of rules made under it. The court held that the member remained, in Lindley LJ's words, "a member who has given notice of withdrawal, and is entitled to payment", and should be taken into account when deciding whether the necessary three-fourths majority had been met (page 371). The case merely underlines the fact that all depends upon the particular provisions or rules.*"[144]

152.    Even if, immediately after the notice has been received and the Redemption transaction entered into, the Defendant Institution could be described as a contingent creditor (as was the case with my example of the new supplier before he delivered the goods), the description would achieve nothing to support the Liquidators' argument because (i) it is too late to make the Defendant Institution a creditor for the purposes of section 245, the transaction having already been entered into, (ii) if the Fund went into liquidation before the Dealing Day, the Defendant Institution would remain a member and the contingency would fall away (paragraph 148 above), and (iii) if the Fund did not go into liquidation until after the Dealing Day, so that Period 3 starts, the Defendant Institution would become a creditor and would cease to be a member (paragraph 147 above).

---

[143] *Culross Global SPC Ltd v Strategic Turnaround Master Partnership Ltd* [2010] UKPC 33, Privy Council on appeal from the Cayman Islands Court of Appeal.

[144] At § 38.

153.    At ¶¶ 173-180, Mr Moss engages in a lengthy discussion about the two EC Court of Appeal cases, *Westford* and *Monarch Pointe*, which I had mentioned in the First Mortimore Declaration at ¶ 185 footnote 165. It remains my opinion that these cases are unlikely to assist the Court, because neither concerned entry into a transaction for the purposes of section 245. *Westford* concerned the standing of an unpaid redeemed former member to apply for the appointment of liquidators and *Monarch Pointe* concerned whether the claims of redeemed former members for unpaid redemption proceeds took priority over the claims of continuing members in a distribution of surplus. Nor is it necessary for the Court to consider what effect the later *Monarch Pointe* decision has on *Westford*.

**(2)    No insolvency transaction: the Funds were able to pay their debts as they fell due**

154.    This issue is addressed in the First Mortimore Declaration at ¶¶ 187-212 and in the Second Moss Declaration at ¶¶ 182-221. Mr Moss and I agree on the following points:

(a)    for the purposes of preference and undervalue claims, the Fund must at the time when the transaction is entered into be unable to pay its debts as they fall due, which is a "cash-flow" or "commercial test";

(b)    the test is an objective one (so it does not matter what the directors subjectively may have thought the financial position to be);[145]

(c)    in interpreting subsection 8(i)(c)(ii) of the BVI Insolvency Act about cash-flow insolvency, a BVI Court would follow the three leading English authorities, which are *Re Cheyne Finance plc*,[146] *BNY*

---

[145] To be clear, I do not agree that an objective test incorporates hindsight knowledge. There is no support for that in English or BVI law.

[146] [2008] 2 All ER 987, English High Court.

*Corporate Trustee Services Ltd v Eurosail-UK 2007-3BL plc*,[147] and *Re Casa Estates (UK) Ltd*;[148]

(d)      under those authorities, the cash-flow test looks not just to the present, but also to the reasonably foreseeable future; but how far into the future the court will look depends on all the circumstances, especially the nature of the company's business;[149] and

(e)      even if, at the relevant time, a company is able to pay its debts as they fall due, in an appropriate case, the court should go on to inquire how it is managing to do so.[150]

155.    The principal areas of dispute between Mr Moss and myself concern:

(a)      the interpretation of subsection 8(1)(c)(ii) of the BVI Insolvency Act and, in particular, (i) whether "debts" in that subsection are restricted to liquidated monetary obligations, and (ii) whether the definition of "debt" in Rule 13.12(1) of the English Insolvency Rules 1986 ("**English IR 13.12**")[151] would be applied to subsection 8(1)(c)(ii) of the BVI Insolvency Act;

(b)      what assets and debts should be taken into account by a court considering the question of whether, at the relevant time, a company was unable to pay its debts as they fell due and, in particular, (i) how far into

---

[147] [2013] 1 WLR 1408, UK Supreme Court.

[148] [2014] 2 BCLC 49, English Court of Appeal.

[149] *Re Casa Estates (UK) Ltd* [2014] 2 BCLC 49 at § 27(ii), per Lewison LJ.

[150] *Re Casa Estates (UK) Ltd* [2014] 2 BCLC 49 at § 30, per Lewison LJ (the last sentence of the quotation in the Moss Second Declaration at ¶ 195).

[151] As from 6 April 2017, English IR 13.12 is replaced by Rule 14.1 of the Insolvency Rules (England and Wales) 2016.

the future the court may look, and (ii) the treatment of unknown assets

and debts;

(c)     what matters should be taken into account by a court considering the

question of how, at the relevant time, a company was managing to pay

its debts as they fell due; and

(d)     our respective explanations of how the law would be applied to the facts

stated in the Amended Complaints.

*(a)     Interpretation of subsection 8(1)(c)(ii)*

156.    The phrase "*the company is unable to pay its debts as they fall due*" in

subsection 8(1)(c)(ii) necessarily involves identifying some debt or debts which are due or

which will become due within the appropriate time frame and which the company cannot pay

or, on the balance of probabilities, will be unable to pay. Subject to what I say below about

unknown liabilities and hindsight, I agree that the court would take into account liabilities of

the debtor at the relevant time which would mature into debts within the appropriate time frame

and which the debtor will be unable to pay.[152]

157.    With respect, Mr Moss's contention that the English IR 13.12 is relevant to the

interpretation of subsection 8(1)(c)(ii) is clearly wrong. First, the BVI Insolvency Act does not

contain a definition of "*debt*" and has not adopted the definition of "*debt*" in the English IR

13.12(1), which Mr Moss quotes in ¶ 184. Instead, as I noted in the First Mortimore Declaration

at ¶ 190, under the BVI Insolvency Act, the word "*debt*" has its normal meaning, but section

10 of the BVI Insolvency Act gives "*liability*" a defined meaning. For this purpose, subsection

10(1) adopts, with modifications, the language of the English IR 13.12(4), which defines

"*liability*" in any provision in the English Insolvency Act or Rules, and subsection 10(2) adopts

---

[152] An example of this is *Bank of Australasia v Hall* (1907) 4 CLR 1514, High Court of Australia (see First
Mortimore Declaration at ¶ 194 footnote 173) and which was cited in the *Cheyne* case at § 43.

the language of the English IR 13.12(3) in relation to the range of liabilities covered by subsection 10(1). Since subsections 10(1) and (2) are concerned with the definition of liabilities, not debts, subsection 10(2) omits the reference to "*debt*" in English IR 13.12(3). Subsection 10(1) adds at the end "*and 'liability' includes a debt*" to make it clear that the wider word "*liability*" includes the lesser word "*debt*." I do not understand how Mr Moss can extract from that the proposition that "*a debt can also be for an unliquidated sum.*" (Second Moss Declaration at ¶ 188). Such a proposition departs from the normal meaning of the word "debt" and its application in insolvency legislation. An unliquidated sum is not payable within subsection 8(1)(c)(ii) unless and until it matures into a liquidated debt.

158.    Second, none of the three English cases mentioned in paragraph 154(c) above that considered the meaning of "*the company is unable to pay its debts as they fall due*" in subsection 123(1)(e) of the English Insolvency Act ever mentioned the English IR 13.12. Instead, they referred to the statutory antecedents of the subsection and cited and analysed English and Australian case law to interpret that subsection. I suggest that the reason for this is that the definitions in the English IR 13.12 support Rule 12.3 of the English Insolvency Rules,[153] which identifies provable debts in, among other things, the winding up of a company. These rules are included in the English Insolvency Rules, pursuant to section 411 and schedule 8, paragraph 12 of the English Insolvency Act, as "*provisions as to the debts that may be proved in a winding up.*" The definition of inability to pay debts in section 123 of the English Insolvency Act has a different function. It is used to define the circumstances in which a company may be wound up by the court (or enter administration) and prior transactions may be unwound as, for example, transactions at undervalue or preferences.[154] Section 8 performs a similar function in the BVI Insolvency Act.

---

[153] As from 6 April 2017, IR 12.3 is replaced by Rule 14.2 of the Insolvency Rules (England and Wales) 2016.

[154] My opinion that the English IR 13.12 supports IR 12.3 and is concerned with proofs of debt in a liquidation is confirmed by the judgment of David Richards J in *Re T&N Ltd* [2006] 1 WLR 1728 at §§ 70-75. These rules

159.    Third, if a debt can be for an unliquidated sum, it defeats the statutory purpose

of subsection 244(3), which is to restrict the circumstances in which a preference or undervalue

claim can be made to cases where the company is insolvent on a cash-flow basis only. This is

because it would enable liabilities for unliquidated amounts within section 10 to be taken into

account in subsection 8(1)(c)(ii), destroying the distinction between that subsection and

subsection 8(1)(c)(i).

(b)    *Assets and debts to be taken into account*

160.    There is a significant difference in the nature of the court's inquiry into a

company's inability to pay its debts on a cash-flow basis, depending on whether it is a

contemporary and forward looking inquiry for the purpose of deciding whether the company

should be wound up or certain contractual enforcement steps may be taken (*Cheyne* and

*Eurosail*), or whether it is a retrospective inquiry for the purpose of a preference or undervalue

claim (*Casa Estates* and the Australian cases *Bank of Australasia v Hall* and *Lewis v Doran*[155]).

In the contemporary and forward looking inquiry, the court considers all the evidence placed

before it by the parties concerning the company's circumstances and business. In the

retrospective inquiry, the court puts itself in the position of the "*reasonable observer*," looking

at all the circumstances of the company and its business at that past date; per Owen J in *The*

*Bell Group Ltd v Westpac Banking Corp*.[156]

---

can be traced back to sections 611 and 612 of the English Companies Act 1985 (which have a long history going back to 1862), read with section 30 of the English Bankruptcy Act 1914, which were about proof of claims ranking in the liquidation. On the other hand, section 123 of the English Insolvency Act derives from section 518 of the English Companies Act 1985 (which also has a long history going back to 1862). Both these sections provide the definition of inability to pay debts for the court's power to wind up a company, but the Insolvency Act 1986 extended the function of section 123 to supplying that definition for the new sections about adjusting prior transactions (undervalue transactions and preferences).

[155] *Lewis v Doran* concerned an alleged uncommercial transaction within section 588 of the Australian Corporations Law and whether at relevant times the company was insolvent in that it was unable to pay its debts as and when they became due and payable (section 95A).

[156] [2008] WASC 239 at § 1119, Western Australia Supreme Court (First Mortimore Declaration at ¶ 195).

161.    Where, at the relevant date, a known debt or liability is not yet payable, the court determines whether the time for payment will occur in the reasonably near future. To this extent, I agree with Mr Moss (at ¶ 193). When the court is conducting a contemporary and forward looking examination of a company that is in receivership and running off its affairs, as was the position in the *Cheyne* case, the court may look a year or so ahead with reasonable certainty to decide, on the balance of probabilities, whether the company is now unable to pay its debts as they fall due. On the other hand, where the company is carrying on its business, the reasonably near future will be shorter, because attempting to look further ahead would involve speculation which, as Lord Walker explained in *Eurosail*, is not permitted under the cash-flow test.[157]

162.    The position is different when the court is conducting a retrospective examination. Then, the court examines the circumstances of the company at the relevant time, taking into account debts that would become due for payment in what was then the reasonably near future, but the inquiry is not open-ended and does not permit the court to consider what were then unforeseen events, because that would involve impermissible speculation. Nor does the court take into account liabilities that were "*properly unknown or seen in lesser amount at the relevant time*"; see the Australian case *Lewis v Doran*.[158] In the *Cheyne* case, Briggs J

---

[157] In *Eurosail* at ¶ 37, Lord Walker compared the cash-flow test in subsection 123(1)(e) of the English Insolvency Act with the balance sheet test in subsection 123(2) (comparable to subsections 8(1)(c)(ii) and (i) of the BVI Insolvency Act respectively) and said that:

"*the 'cash-flow' test [in subsection 123(1)(e)] is concerned, not simply with the petitioner's own presently-due debt, nor only with other presently-due debt owed by the company, but also with debts falling due from time to time in the reasonably near future. What is the reasonably near future, for this purpose, will depend on all the circumstances, but especially on the nature of the company's business …. The express reference to assets and liabilities [in subsection 123(2)] is in my view a practical recognition that once the court has to move beyond the reasonably near future (the length of which depends, again, on all the circumstances) any attempt to apply a cash-flow test will become completely speculative, and a comparison of present assets with present and future liabilities (discounted for contingencies and deferment) becomes the only sensible test.*" (my insertions in square brackets)

[158] [2005] NSWCA 243 at § 103, New South Wales Court of Appeal (First Mortimore Declaration at ¶¶ 193-194.

endorsed *Lewis v Doran* and added, "*In short, it is a fact sensitive question depending on the nature of the company's business and, if known, of its future liabilities.*"[159]

163.    In the English Court of Appeal in *Casa Estates*, Lewison LJ conducted a retrospective examination of the company's affairs to determine whether, at the times relevant to the liquidator's undervalue claims, the company was able to pay its debts as they fell due and, if so, how it was able to do so. Casa Estates' principal business was that of introducing investors to properties being developed in Dubai. It received deposits from investors that it mixed with its own funds, misused and did not pass on to the developers in Dubai. In late 2008, the Dubai property market suffered a "*sudden and not generally anticipated*" collapse, which precipitated the liquidation of Casa Estates.[160] Lewison LJ agreed with the judges below that Casa Estates was under an immediate liability to account to investors for money received from them and remained under that liability unless and until it was discharged from it by paying the money to the developers in Dubai. The present liabilities to account to investors were debts of which account should be taken when determining whether, at the relevant dates, Casa Estates was insolvent under the cash-flow test.[161] Lewison LJ's analysis of the circumstances and business of Casa Estates at the relevant dates is entirely consistent with the examination conducted by a "*reasonable observer*." Critically, he did not take into account the later collapse of the Dubai property market that exposed the inability of Casa Estates to pay its debts at earlier times.[162]

164.    At ¶¶ 201-204 of the Second Moss Declaration, Mr Moss takes issue with the approach in the Australian cases and wrongly contends that the inquiry permits hindsight

---

[159] Emphasis added. [2008] 2 All ER 987 at § 50.

[160] Lewison LJ's judgment at § 8-10,17.

[161] For the facts see the judgment of Lewison LJ (with whom McFarlane and Sullivan LJJ agreed) at §§ 11, 18, 34-37.

[162] Lewison LJ's judgment at § 17.

without limit. I would respectfully suggest that Mr Moss fails to take into account the different natures of the inquiries; the inquiry in *Eurosail* was contemporary and forward looking, whereas the Liquidators' case in these proceedings involves a retrospective inquiry. In *Eurosail*, there was no need to imagine what the reasonable observer might consider, because the court could take into account all the facts about the company's circumstances revealed by the evidence. In a retrospective inquiry under BVI law, the court must bear in mind that, under the statutory restriction in sections 244(3) and 8(1)(c)(ii), the inquiry is into past cash-flow insolvency, not balance sheet insolvency. *Casa Estates* and the Australian cases show how that may be achieved.

165.    Further, the *Lewis v Doran* approach, excluding from the inquiry unknown debts, is supported by later English authority and, in my opinion, would be followed by a BVI Court. First, as noted in paragraph 162 above, it was approved by Briggs J in *Cheyne*. In *Eurosail*, Lord Walker commended Briggs J's judgment and noted his reference to Australian authority.[163] Second, it is consistent with Lord Walker's conclusion that speculation plays no part in the cash-flow insolvency test. Third, in *Evans v Jones*,[164] the English Court of Appeal excluded from a retrospective inquiry as to balance sheet insolvency a contingent asset that, at the relevant date, was an "*unknown unknown*," saying that the statutory test under section 123 should be applied with "*regard to commercial reality*" and the court should not make "*counter-factual assumptions*." Fourth, there is no case, of which I am aware, that supports Mr Moss by holding that the court, conducting a retrospective examination into cash-flow insolvency, is

---

[163] [2013] 1 WLR 1408 at § 33, 34.

[164] [2017] Ch 1, English Court of Appeal, at §§ 20-22, per Lewison LJ (with whom the other Lords Justices agreed). The contingent asset was a claim to recover an unlawful dividend. Section 123 does not allow contingent assets to be taken into account, but, in any event, as a matter of commercial reality the claim had no value at the relevant time (§§ 22-24). If it was left out of account, the company was unable to pay its debts on a balance sheet basis and it was not necessary for the Court of Appeal to form a concluded view about the value of a known contingent liability at the relevant dates; see discussion about hindsight at §§ 18, 23, 26.

entitled to treat itself as having knowledge of everything that has happened since the date of the relevant transaction.

166.    In ¶ 203 of the Second Moss Declaration, Mr Moss seems to suggest that the Australian test (*Lewis v Doran* and *Bell Group*) is partly subjective. I do not agree. In *Bell Group*, Owen J said that the court puts itself in the position of "*a reasonable observer at the relevant date, looking at all of the circumstances in which the company found itself.*" (First Mortimore Declaration at ¶ 195). Such an observer does not take into account assets that the company did not know it had (*Evans v Jones*). The observer takes into account the company's debts and "*if known, future liabilities*" (*Cheyne*), but not liabilities that were then "*properly unknown*" (*Lewis v Doran*), and he does not engage in speculation (*Eurosail*). *Casa Estates* illustrates what is meant by "*properly unknown,*" because, in that case, the company was subject to a present liability to account to its investors unless and until it paid their money to the developers. Whether or not the directors appreciated that the company was subject to that liability is irrelevant, because it would have been apparent to the reasonable observer. Accordingly, the test is objective and commercially realistic, consistent with the cases on ordinary course of business that I cited in the First Mortimore Declaration at ¶¶ 221 and 222.

167.    In ¶¶ 205-210 of the Second Moss Declaration, Mr Moss disputes my opinion that, when the court is looking back to an earlier date, it does not resort to hindsight. The phrase "*without intrusion of hindsight*" that I used comes from the judgment of Giles JA in *Lewis v Doran* (First Mortimore Declaration at ¶ 194). In his argument, Mr Moss relies heavily on *Phillips v Brewin Dolphin Bell Lawrie Ltd.*[165] This case concerned a claim by the liquidator that the company had sold the shares in its wholly-owned subsidiary (AJB), which carried on a stockbroking business, at an undervalue within section 238 of the English Insolvency Act. The consideration for the sale included an obligation by the purchaser's parent to pay the

---

[165] [2001] 1 WLR 143, English House of Lords.

company £312,500 per annum over four years under a sub-lease of computer equipment that had been leased on terms that the equipment could not be assigned or sub-let without the consent of the lessors. The lessors' consent to the sub-lease was not obtained, so that, at the time of the transaction, the prospects for the company receiving the £312,500 were uncertain and precarious. Lord Scott held that the court should take into account what had actually happened (repossession of the computer equipment shortly after the transaction), with the result that a nil value was attributed to the obligation to pay £312,500 under the sub-lease and there had been a transaction at undervalue.[166] In the passage quoted in the Second Moss Declaration at ¶ 206,[167] Lord Scott made it clear that he used hindsight for the particular purpose of confirming the value of consideration, which was known at the time to be uncertain and precarious, in a transaction at undervalue case and that in other contexts it might not be appropriate to do so. Lord Scott went on to say that his conclusion, that the covenant was worth nothing, was confirmed when he considered the position at the time of the transaction:

> "*After all, if following the signing of the sublease, AJB had taken the sublease to a bank or finance house and had tried to raise money on the security of the covenant, I do not believe that the bank or finance house, with knowledge about the circumstances surrounding the sublease, would have attributed any value at all to the sublease covenant.*"

In *Principles of Corporate Insolvency Law*, Professor Goode says that Lord Scott was not applying a hindsight test, but was relying on subsequent events to validate what would anyway have been the perception of the value of the sub-lease at the time of the transaction.[168] Accordingly, *Brewin Dolphin* (i) is not a case on cash-flow or even balance sheet insolvency, (ii) does not involve the valuation of an asset, liability or debt of a company that existed before the impugned transaction, (iii) restricts the use of hindsight to the valuation of the consideration

---

[166] The speech of Lord Scott at §§ 5, 21, 24, 26.

[167] At § 26.

[168] At § 13-32.

passing under the impugned transaction to the situation when that element of the consideration is known at the time to be uncertain and precarious, and (iv) recognises that in other contexts the resort to hindsight may be inappropriate.[169] Further, it sheds no light on the treatment of liabilities that were properly unknown at the relevant time.

168.    At ¶¶ 199 and 200 of the Second Moss Declaration, Mr Moss does not rely on the preference and fraudulent claims of the BLMIS Trustee on which the BLMIS Trustee obtained judgments against the Funds for over US$3.2 billion.[170] Instead, Mr Moss refers to the potential claims of investors and other creditors against the Funds.[171] This involves making "*counter-factual assumptions*" that Lewison LJ said were inappropriate to the application of the statutory insolvency tests, which he said should be applied with "*regard to commercial reality*."[172] The assumptions are that the claims were known to the Funds and the BLMIS investors and other creditors (which they were not), that the claims would have been pursued before the BLMIS Ponzi scheme was exposed (which they were not) and that they would be successful, in the sense of being admitted to proof in the liquidations of the Funds (which is not alleged in the Amended Complaints).[173] If a BVI Court concluded that these claims would have been properly unknown to a reasonable observer looking at the circumstances of the Funds at the relevant times, it would find that the Funds were able to pay their debts as they fell due.

---

[169] As to (iv), see *Joiner v George* [2003] BCC 298 at § 71, quoted in the Second Moss Declaration at ¶ 208).

[170] The CA Amended Complaint at ¶¶ 12, 13.

[171] The CA Amended Complaint at ¶¶ 162, 175.

[172] *Evans v Jones* [2017] Ch 1 at §§ 23, 24.

[173] The Amended Complaints do not quantify the claims of BLMIS investors or other creditors against the Funds or allege that they have been admitted in the Funds' liquidations. If, as seems probable, they overlap with the BLMIS Trustee's judgments against the Funds, the rule against double-proof would prevent the claims of investors and other creditors from being admitted in competition with the BLMIS Trustee's judgments, if the latter have been admitted.

    *(c)    How the company is managing to pay its debts as they fall due*

169.    At ¶ 194 of the Second Moss Declaration, Mr Moss quotes a passage from the judgment of Lewison LJ in *Casa Estates*, where he says "*a realistic examination may reveal that a company is on any commercial view insolvent, even though it may continue to pay its debts for the time being.*" At ¶ 195, Mr Moss quotes from the next paragraph of Lewison LJ's judgment, the last sentence of which explains that, in an appropriate case, the court should go on to inquire how the company is managing to pay its debts as they fall due. A retrospective examination of the affairs of *Casa Estates* at the relevant dates revealed that the way it conducted its business, including the misapplication of investors' money, meant that it was getting into ever deeper financial difficulties and could not pay its debts on a cash-flow basis.

170.    At ¶¶ 195-198 of the Second Moss Declaration, Mr Moss refers to Lewison LJ's example of a company that operated a Ponzi scheme. An examination into the circumstances of such a company at any date while it operated the scheme would reveal that it was cash-flow insolvent, since that is the inevitable consequence of such a scheme. Mr Moss recognises that the relevant inquiry into the Funds' circumstances is different, because the Funds did not operate a Ponzi scheme. A reasonable observer of the Funds' circumstances at the relevant times, considering how they were able to pay their debts at those times, would have found that they could do so without difficulty from their own cash resources and from normal redemption payments made by BLMIS. If such a reasonable observer would not have known of the BLMIS Ponzi fraud, he could not conclude that, as a matter of commercial reality, at the relevant dates, the Funds, which themselves were not Ponzi schemes, were insolvent on a cash-flow basis.

171.    It may be helpful to consider what would have been the position if, rather than being a Ponzi scheme, BLMIS had been a machinery manufacturer and the Fund its distributor. Business carried on normally for several years until it was discovered for the first time that a material used in the manufacture of the machines caused cancer. As a result, BLMIS and the

Fund became subject to massive personal injury claims and went into liquidation. If the Fund had entered into a transaction at undervalue within two years of the liquidation, but at a time when there was no hint of the cancer problem, the personal injury liabilities would not be taken into account in determining whether the Fund was unable to pay its debts as they fell due at the time of the transaction.

> (d)    *Application of BVI law to the facts stated in the Amended Complaints*

172.    At ¶¶ 211-221, Mr Moss takes issue with what I have said about the facts stated in the Amended Complaints in relation to the question of whether, at the times of the Redemptions and Redemption Payments, the Funds were unable to pay their debts as they fell due. The Amended Complaints describe their circumstances at those times, including reference to the claims of the BLMIS Trustee that later emerged, as well as claims by investors and other creditors which were not made at those times. If, on the application of BVI law to the facts stated in the Amended Complaints, those claims are excluded from the inquiry into the Funds' circumstances at those times, the facts stated in the Amended Complaints indicate that, at the relevant dates, the Funds were able to pay their debts as they fell due. I recognise that it is then a matter for the Court to decide whether, having regard to any statutory presumption, the Amended Complaints should be allowed to proceed or should be dismissed.

## (3)    Ordinary course of business

173.    This issue is addressed in the First Mortimore Declaration at ¶¶ 213-227 and in the Second Moss Declaration at ¶¶ 222-232, where Mr Moss again applies impermissible hindsight to support the argument that the relevant transactions did not occur in the ordinary course of business. Mr Moss and I agree that (i) whether a transaction took place in the ordinary course of business is to be judged objectively, and (ii) normal good faith commercial

transactions by an insolvent party will not be invalidated. The principal issues over which we disagree are:

> (a)    the approach taken by a BVI court to the assessment of whether a transaction took place in the ordinary course of business;
>
> (b)    whether hindsight may be used in the assessment;
>
> (c)    whether investing in and distributing returns from a company that was in fact operating a Ponzi scheme could ever be regarded as in the ordinary course of business; and
>
> (d)    the application of BVI law to the facts stated in the Amended Complaints.

> *(a)    The approach of the BVI Court*

174.    In my opinion, the BVI Court would take the same approach as would an English Court and would be guided by the authorities cited in the First Mortimore Declaration (¶¶ 219-223). When I referred to the court taking a broad approach (First Mortimore Declaration at ¶ 224), I meant that, in keeping with those authorities, the court would assess the transaction in the general flow of the company's business and in the factual setting at the time. The court would recognise that the ordinary course of business exception applies to prevent normal business transactions from being stultified.

175.    At ¶ 226 of the Second Moss Declaration, Mr Moss cites a further passage from the judgment of Gault J in *Countrywide Banking Corporation Ltd v Dean*,[174] a decision of the Privy Council. Gault J's words of caution, in the passage cited by Mr Moss, were followed by a paragraph in which Gault J rejected submissions of one of the parties and then by the two paragraphs from which I quoted at ¶ 221 of the First Mortimore Declaration. It seems clear that the statements made in those two paragraphs, about the approach to the assessment of whether

---

[174] [1998] AC 338, 349, Privy Council on appeal from the Court of Appeal of New Zealand.

a transaction was in the ordinary course of business, were ones that Gault J considered could be made, notwithstanding his earlier words of caution. As such, they provide valuable guidance for a court considering an issue under subsection 245(2) of the BVI Insolvency Act.

176.    That was how Foster J saw them in *Re Freerider Ltd*,[175] a Cayman Islands case, noted by Mr Moss in the Second Moss Declaration (at footnote 58 to ¶ 227). After quoting the passages from *Countrywide*, quoted by Mr Moss and me, Foster J said that "*certain key points were made clear*" by *Countrywide*:

> "*(a)    the transaction must be examined in the circumstances in which it occurred;*
>
> *(b)    the transaction must be such that an objective observer would view it as having taken place in the ordinary course of business;*
>
> *(c)    the focus of the enquiry must be on the ordinary operational activities of businesses, not responses to abnormal financial difficulties; and*
>
> *(d)    prior practices of the company will be a relevant consideration.*"[176]

In my opinion, those guidelines may properly be drawn from Gault J's judgment in *Countrywide*.

177.    In footnote 58 and ¶ 229b to the Second Moss Declaration, Mr Moss refers to another Cayman Islands case, *Re Wyser-Pratte Eurovalue Fund Ltd*.[177] The issue in that case was whether the company, which had operated as a feeder fund, should be wound up by the court on the ground that, by adopting a wind-down and compulsory redemption plan, the company had therefore ceased to carry on its investment business and that the substratum of its business had failed. I would respectfully agree that such a wind-down would not occur in the ordinary course of that company's business and that investors should not have anticipated that it would. But this case offers no guidance on whether a regular transaction, undertaken while a

---

[175] [2010] (2) CILR 154, Grand Court of the Cayman Islands.

[176] At § 15.

[177] [2010] (2) CILR 194, Grand Court of the Cayman Islands. The quotations from the judgment of Jones J are in fact from §§ 28 and 23, not §§ 25 and 20, as suggested in ¶ 227 footnote 58 of the Second Moss Declaration.

company was operating as a going concern, should be characterized as being in the ordinary course of business.

    *(b)*    *Hindsight*

178.    With respect, I do not agree with Mr Moss's contention that hindsight may be used to determine whether a transaction was in the ordinary course of business. In this connection, the court is looking back to consider past transactions. The passages that I have quoted demonstrate that the court should position itself in the circumstances of the company at the time, just as it does when considering whether, at some earlier date, the company was unable to pay its debts as they fell due (paragraphs 160-171 above).

179.    In support of that approach, I refer to these extracts from two passages in *Countrywide* (quoted in the First Mortimore Declaration at ¶ 221):

> *"Plainly the transaction must be examined in the actual setting in which it took place. ... [T]he transaction must be such that it would be viewed by an objective observer as having taken place in the ordinary course of business. ... The section therefore requires examination of the actual transaction in its factual setting..."*

I also refer to the judgment of Tipping J in the *Waikato* case (quoted in the First Mortimore Declaration at ¶ 222):

> *"The question is whether, at the time it was made, the relevant transaction was made in the ordinary course of business. ... The observer spoken of in the Privy Council [in Countrywide] is in reality the Court which must look at the circumstances, as objectively apparent at the time of the transaction."*

The court does not use hindsight to take into account matters that would not have been "*objectively apparent*" at the time.

    *(c)*    *The BLMIS Ponzi scheme*

180.    The passages to which I have just referred demonstrate that the court looks at the factual setting at the time of the relevant transaction in order to determine what was then the ordinary course of the company's business. If at that time, the Funds' businesses consisted

of receiving subscriptions, investing in BLMIS and making redemptions, that was the ordinary course. The later discovery of the BLMIS fraud does not affect that.

    *(e)*    *Application of BVI law to the facts stated in the Amended Complaints*

181.    What I have said in paragraph 172 above in relation to cash-flow insolvency applies to ordinary course of business, and there is nothing more that I need to add to what I said there and in the First Mortimore Declaration at ¶¶ 225-227.

## 9.    THE UNDERVALUE TRANSACTION CLAIM

182.    In the First Mortimore Declaration at ¶¶ 228-257, I explained that the Redemptions or Redemption Payments (i) were not entered into on terms that provided for the Funds to receive no consideration, (ii) were not made for significant undervalue, and (iii) were good faith business transactions. Since Mr Moss disagrees (Second Moss Declaration at ¶¶ 233-275), I shall address these points below. The issue about cash-flow insolvency, which is also relevant to the undervalue claim, is addressed in paragraphs 154-172 above.

### (1)    No consideration

183.    So far as relevant, subsection 246(1) of the BVI Insolvency Act provides that:

> "*a company enters into an undervalue transaction with a person if*
> *(a)    the company … enters into a transaction with that person on terms that provide for the company to receive no consideration.*"

As I have explained, a mere payment is not a transaction with a person, since it does not involve a dealing (First Mortimore Declaration at ¶¶ 160-161 and paragraph 134 above). It follows that a Redemption Payment is not a transaction with a person for the purposes of subsection 246(1). Rather, the relevant transaction is the Redemption, which provides for payment of the Redemption Price against surrender of the shares. Whatever the value of the shares, the transaction does not provide for the company to receive no consideration; on the contrary, it provides for the Funds to receive the surrender of the shares as consideration.

184.   Mr Moss argues (¶ 235 of the Second Moss Declaration) that, if there were no binding certificates, the Fund received no consideration for its payment and was not obliged to pay the Redemption Price. With respect, that does not address the statutory wording. What matters is the consideration to be received by the Fund as provided for in the Redemption transaction; *i.e.* the surrender of the shares, which had value.

185.   If, contrary to my opinion, the Redemption Payments were transactions within subsection 246(1), separate and apart from the Redemptions, I maintain my opinion that the Funds received consideration for the payments; namely, discharge of their obligations to pay the Redemption Price under the Redemptions. Mr Moss's answer is that, if there were no binding and conclusive certificates, the Funds were not obliged to pay the amount of the Redemption Price. This is an implausible scenario and is not correct, because, under Articles 10 and 11, the Funds were obliged to pay the Redemption Price based on the NAV determined by the directors, pursuant to which the members surrendered their shares to the Funds, which is what happened (paragraphs 14-16 above).

186.   Mr Moss's discussion about real value, as it emerged following the exposure of the BLMIS fraud, is not relevant to the "no consideration" issue. The case is not within subsection 246(1)(a) if the transactions provide for some value to be received by the Fund, as the transactions at issue here did.

**(2)   Significant undervalue**

187.   Mr Moss and I agree that the value of the consideration passing between the parties is to be assessed (i) as at the date of the transaction, and (ii) on an objective basis.

188.   The principal areas of disagreement between us concern:

(a) the relevance of open-market price and arm's-length negotiation;

(b) the matters to be taken into account in assessing value;

(c) whether the Liquidators rely on hindsight and, if so, whether they are entitled to do so; and

(d) the application of BVI law to the facts stated in the Amended Complaints.

*(a)*     *The relevance of an open-market price and arm's-length negotiation*

189.    So far as relevant, subsection 246(1)(b) provides that:

> "*a company enters into an undervalue transaction with a person if*
> ...
> *(b)     the company enters into a transaction with that person for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by the company.*"

190.    Under the Redemptions, the consideration provided by the Fund was cash, the Redemption Price. The issue, therefore, is whether the value of the shares that it received in return was significantly less than the Redemption Price.

191.    Mr Moss argues that there was no market for the shares in the Funds and that the Redemption Price was not based on arm's-length negotiation (Second Moss Declaration at ¶¶ 239-242, 249, 264). Those are not statutory tests, but matters to which the court may find it useful to refer in order to test whether the price fixed by the parties under the transaction represented proper value from the company's point of view. They are not the only tests that may be considered.

192.    In a case such as this, where the Liquidators ask the Court to go behind the price determined by the parties, or rather determined under a procedure agreed by them, the Court may find it helpful to consider that procedure and whether the price reflected the market value at the time.

193.    The present context is that when a Defendant Institution wished to request redemption of its shares in a Fund, it did not engage in arm's-length negotiations with the Fund to fix the Redemption Price in the traditional sense. Instead, the procedure in Articles 10 and 11 was put into motion. That procedure had been laid down by the Fund to attract investors,

who were independent of the Fund and free to accept or reject that procedure. It provided for the parties to be bound to a price fixed by reference to NAV, which would be determined by a valuer selected by the Fund (its directors or Citco) who would undertake "*highly complex assessments of asset value and judgments.*" (Second Moss Declaration ¶ 254). The court may well think that, on its face, this procedure was at least as robust as the normal arm's-length negotiation that would precede, for example, the sale of a house.

194.    Mr Moss may be correct that there was no market for shares in the Fund in the traditional sense.[178] This was because each Fund was an open-ended collective investment fund,[179] with value passing through subscriptions and redemptions. The presence of a traditional market for an item is not essential for the determination of market value, as is indicated by *Jowett's Dictionary of English Law*,[180] which defines "market price" or "market value" as "*the value that an asset would have in an arm's-length transaction between a willing buyer and a willing seller.*" This is much the same as the test stated by Lord Scott in *Phillips v Brewin Dolphin Lawrie Ltd*[181] and the tests adopted by Jonathan Parker J in *Re Brabon*[182] and by David Richards J in *Stanley v TMK Finance Ltd*,[183] which I quoted in the First Mortimore Declaration at ¶ 238.

195.    Here, the Defendant Institution was a willing seller, who could study information about NAV published on behalf of the Fund and choose the time of sale. The Fund was a willing buyer, in that it had willingly offered its shares to potential subscribers and had agreed to be bound by Articles 10 and 11, which set out the procedure for determining NAV.

---

[178] Footnote 87 to the Foreign Representatives' Memorandum of Law in Opposition to the Defendants' Consolidated Memorandum of Law says: "*Sentry's shares were listed on the Irish stock exchange,*" so that some market trading may have been possible.

[179] Mr Hare's Declaration at ¶ 8.

[180] (4th ed, 2015).

[181] [2001] 1 WLR 143 at § 30, English House of Lords.

[182] [2001] 1 BCLC 11, 38, English High Court.

[183] [2010] EWHC 3349 (Ch) at § 7, English High Court.

196.     Perhaps the strongest indication that the Redemption Price fixed under the Articles represented market value is that the same determination of NAV applied to the subscription price paid by subscribers under Articles 9 and 11. Subscribers were willing arm's-length purchasers able to choose whether to place investments with the Funds or with other institutions, and they chose the Funds.

   *(b)     Matters to be taken into account*

197.     At ¶¶ 243-259 of the Second Moss Declaration, Mr Moss takes issue with my summary of the relevant principles that the English courts have adopted to determine whether the consideration received by the company was a significant undervalue (First Mortimore Declaration at ¶¶ 234-243).

198.     In order to assess the propriety of the price fixed by the parties, the court has to look back, as it does when determining inability to pay debts for a preference or undervalue claim, or ordinary course of business for a preference claim. The test is an objective one under which, as David Richards J said in the *Stanley* case (First Mortimore Declaration at ¶ 238), the court puts itself in the position of "*a rational and reasonably well-informed purchaser, having knowledge of the actual characteristics of what it is he is buying.*" What would be known to such a reasonably well-informed purchaser sets the limits to what may be taken into account.

199.     The significance of the *Stanley* case is that it is a judgment of David Richards J, now Lord Justice David Richards in the English Court of Appeal, who has exceptional experience of insolvency and company law matters, and in which he considers the *Brewin Dolphin* decision. David Richards J had to consider submissions on behalf of the purchaser that "*in general, the court should confine itself to matters capable of being known to a hypothetical purchaser at the valuation date*" and on behalf of the liquidators of the vendor that "*the task of the court is to make a finding as to value based on all the evidence available to it, provided of course it is relevant and cogent,*" which could include evidence of a later event, provided it

"*genuinely sheds light on open market value at an earlier date*."[184] David Richards J considered the judgment of Lord Scott in *Brewin Dolphin*, quoting from the important paragraph 26, and said of it:

> "*The decision of the House of Lords establishes that, in appropriate circumstances, regard may be had to subsequent events, but it was in the context of attributing [a nil] value to a covenant which was, <u>on the facts known at the date of the transaction</u>, precarious.*"[185]

David Richards J held that he was entitled to have regard to the price obtained on a sale of the property about a year after the impugned transaction in order to establish by inference the value of the property at the date of the earlier transaction, provided that (i) there had been no significant change in market conditions between the two dates, and (ii) the circumstances of the later sale are such that they can reliably establish market value at the earlier date. The market value so inferred would be information that "*the rational and reasonably well-informed purchaser*" at the time of the impugned transaction could have ascertained.

200.    The *Stanley* case shows that, in relation to an undervalue claim, evidence of subsequent events can be used only for the purpose of putting a value on something that was known about, but had an uncertain value (the sub-lease covenant in *Brewin Dolphin* or the life policy or the example of the lottery ticket in *Re Thoars*[186]), or to enable inferences to be drawn as to market value at the date of the transaction (*Stanley*). I am not aware of any case where the court has admitted evidence of subsequent events for any other purpose or has taken into account information that would not have been known to "*the rational and reasonably well-informed purchaser*" at the time of the transaction. This state of English law is consistent with

---

[184] At §§ 9-18.

[185] Emphasis added; at § 14.

[186] [2003] 1 BCLC 499 at §§ 17, 20, 21. This case is noted in the First Mortimore Declaration at ¶ 237 footnote 213 and the Second Moss Declaration quotes from it at ¶ 246. In this case Sir Andrew Morritt V-C at § 20 said that a valuer of a lottery ticket, valuing it at the date of the transaction "*is entitled to consider the likelihood of a lottery ticket being sold for more than the value of the stake before the draw has been carried out, notwithstanding that he knows that thereafter it entitled the holder to £5m.*"

the law in relation to cash-flow insolvency and ordinary course of business, as described above. It represents a limited departure, for the purposes of undervalue claims, from the general rule about the valuation of shares in a company, which "*is to reject evidence of events which occurred after the valuation date*."[187]

> (c)    Use of hindsight

201.    Mr Moss suggests (Second Moss Declaration at ¶¶ 253, 256, 258) that it may not matter whether the claims of investors or other creditors of BLMIS or the claims of the BLMIS Trustee are regarded as a use of hindsight or reliance on evidence of subsequent events. In my opinion, reference to those claims would involve the inadmissible use of hindsight or speculation, because they were unknown and would not have been known to a person in the position of "*the rational and reasonably well-informed purchaser*" at the times of the transactions.

202.    Mr Moss also suggests that the true value of the Funds' shares was uncertain (Second Moss Declaration at ¶ 254), so that evidence of subsequent events can be adduced in accordance with *Brewin Dolphin*. I do not agree. In *Brewin Dolphin*, the obligation to make payments under the sub-leases was known about and its value was known to be uncertain and precarious. Similarly, the value of the policy on the life of the debtor in *Re Thoars* was known to be uncertain, given his known state of health.[188] In contrast, the value of the shares in the Funds was thought to be certain in that it was based on certificates which were, or which purported to be, conclusive.

---

[187] *Joiner v George* [2003] BCC 298, English Court of Appeal, at § 68, where authority for the rule was cited (referred in the First Mortimore Declaration at ¶ 239 and in the Second Moss Declaration at ¶ 244).

[188] [2003] 1 BCLC 499.

(d)    *Application of BVI law to the facts stated in the Amended Complaints*

203.    What I have said in paragraph 172 above in relation to cash-flow insolvency applies to the undervalue issue, and there is nothing more that I need to add to what I said there and in the First Mortimore Declaration at ¶¶ 244-248.

### (3)    Good faith business transactions benefitting the Funds

204.    On this issue, the only matter in the Second Moss Declaration that requires a response is at ¶ 270, where Mr Moss refers to a passage in *Palmer's Company Law*, which suggests that the purpose of the good faith business transaction exemption or defence (depending on whether the presumption applies) is that it enables those running a struggling company to enter into transactions on what would otherwise be regarded as unfavourable terms in order to keep the company going. I agree that is a purpose of the provision, but its application is not restricted to such a situation. It applies whenever the three statutory requirements are satisfied (First Mortimore Declaration at ¶¶ 251-253).

## 10.    THE PREFERENCE AND UNDERVALUE CLAIMS WHERE THE CITCO SUBSCRIBER IS THE MEMBER OF THE FUND

205.    The Proposed Fourth Amended ABN Amro Complaint alleges that the Citco Subscriber, not the Citco Record Subscriber,[189] was the member of the Fund who received the preference and with whom the Fund entered into an undervalue transaction, and that since it

---

[189] The Liquidators cannot rely on the presumptions under sections 245(4) and 246(4) where they allege that the preference was given to, or the Redemption transaction was entered into with, the Citco Subscriber, but the shares were registered in the name of the Citco Record Subscriber, which seems to have been the intended position under the B&C Agreements (see clause 7.1.1 of Exhibit G to Mr Molton's declaration). In this connection, there is an apparent conflict between ¶¶ 9 and 124 of the Proposed Fourth Amended ABN Amro Complaint, which allege that the Citco Record Subscriber was the registered member, and ¶¶ 235 and 247, which allege that the Citco Subscriber was the registered member. If the Citco Record Subscriber was the registered member, the vulnerability period is reduced from 2 years to 6 months: section 244(1) of the BVI Insolvency Act.

was the registered member, the presumptions in subsections 245(4) and 246(4) apply in relation to inability to pay debts, ordinary course of business and good faith business transaction.[190]

206.    Even if the Liquidators are right (and were the Court to allow them to further amend the Complaints) to plead that the alleged preferences were given to the Citco Subscriber and that the alleged undervalue transactions were entered into with the Citco Subscriber, then, by section 249(1) of the BVI Insolvency Act, the BVI Court may only go on to make an order under that subsection if it is satisfied that there has, in fact, been an unfair preference or undervalue transaction. It is hard to see how the BVI Court could be satisfied of those matters when the party (*i.e.* the Citco Subscriber) whose relationship with the Funds gives rise to the presumptions of inability to pay debts, transaction outside the ordinary course of business and non-good faith business transaction, which are essential components of the Liquidators' claims, has not been joined as a defendant to, or served with, the proceedings. The injustice to parties in the position of the Defendant Institutions is manifest.

207.    If nevertheless the BVI Court were to be satisfied that a preference had been given to the Citco Subscriber or that it had entered into an undervalue transaction with the Funds, the BVI Court may go on to consider what, if any, relief may be awarded under section 249 of the BVI Insolvency Act against the Defendant Institutions. The Proposed Fourth Amended ABN Amro Complaint alleges that the Redemption Payments were paid to the Citco Subscriber, who may have paid them on to the Defendant Institutions.[191] In respect of the preference and undervalue claims, the Prayer for Relief in the Proposed Fourth Amended ABN Amro Complaint claims payment of money from the Defendant Institutions;[192] *i.e.* the

---

[190] Proposed Fourth Amended ABN Amro Complaint at ¶¶ 235-237, 239-242 in relation to the preference claim and ¶¶ 247-251 in relation to the undervalue claim.

[191] Proposed Fourth Amended ABN Amro Complaint at ¶¶ 232, 241, 250.

[192] Proposed Fourth Amended ABN Amro Complaint at ¶¶ C(iii) and D(iii) of the Prayer for Relief.

Liquidators seek an order for payment of money against the Defendant Institutions under subsections 249(1)(b) and 249(2)(d).[193]

208.    Section 249 is subject to section 250, which limits the orders that may be made under section 249. By subsection 250(2) an order made under subsection 249(1) shall not:

> "*(a)    prejudice any interest in assets that was acquired in good faith and for value from a person other than the company, or prejudice any interest deriving from such an interest;*
>
> *(b)    require a person who received a benefit from the transaction in good faith and for value to pay a sum to the [liquidator], except where that person was a party to the transaction or, in respect of an unfair preference, the preference was given to that person when he was a creditor of the company.*"

The applicable protective provision for an order for payment of money under subsection 249(2)(d) would seem to be subsection 250(2)(b),[194] under which an order for payment of money cannot be made against a person who (i) received a benefit from the transaction in good faith and for value, and (ii) was not a party to the transaction and was not given a preference when he was a creditor of the company.

209.    Since the Defendant Institutions were not members of the Funds,[195] the presumption in subsection 250(3) applies. This states:

> "*For the purposes of subsection (2), where a person would, apart from the requirement of good faith, fall within the circumstances specified in paragraph (a) or (b), it is presumed, unless the contrary is proved, that he acquired the interest or received the benefit in good faith.*"

210.    Subsections 250(2) and (3) are closely modelled on subsections 241(2) and (2A) of the English Insolvency Act.[196] On the basis that the Defendant Institutions received any

---

[193] The comparable provisions of the English Insolvency Act are subsections 238(3), 239(3) and 241(1)(d).

[194] Subsection 250(2)(a) seems to be directed towards orders that might be made under subsections 249(2)(a)-(c), for the vesting of property in the company or the release of security given by the company or of liabilities of the company. The provisions of the English Insolvency Act comparable to subsections 249(2)(a)-(c) are subsections 241(1)(a)-(c).

[195] Subsection 250(4)(b) of the BVI Insolvency Act. Subsection 250(4)(a) does not apply to the facts stated in the Proposed Fourth Amended ABN Amro Complaint.

[196] There is one English Court of Appeal decision on these subsections that should be mentioned: *Re Sonatacus Ltd* [2007] 2 BCLC 627. In that case the appellant, CIL, had lent £65,000 to S, the sole director of the company, who lent it on to the company. When the company was insolvent and shortly before it went into liquidation, S

payment from the Citco Subscriber (not the Funds), were not parties to the undervalue transactions and were not creditors of the Funds when the alleged preferences were given and also gave value, they are entitled to the protection of the presumption given by subsection 250(2); *i.e.* that they received the payments from the Citco Subscriber in good faith. Subsection 250(2) does not require the value to have been received by the company; on the contrary, it would usually have been received by the person from whom the benefit was obtained. Nor does the subsection say anything about the amount of the value. Accordingly, while the value must be more than nominal, it need not be adequate or commensurate with the benefit received.[197]

211.    Since the presumption in subsection 250(3) applies to the Defendant Institutions, the Liquidators have the burden of pleading and (if the case is allowed to proceed) ultimately establishing their lack of good faith. In this respect, the law outlined in the First Mortimore Declaration at ¶¶ 110-114 and 131 and in paragraphs 98-104 above applies. For the reasons explained in paragraphs 111-121 above, the alleged bad faith of the Citco Subscriber would not be attributed to the Defendant Institutions, and the Liquidators have not otherwise independently pleaded that the Defendant Institutions acted in bad faith.

212.    As to value, that would be satisfied by the release of the Defendant Institutions' interest in the shares for which the Funds made the Redemption Payments to the Citco Subscriber.

---

caused it to transfer £50,000 to CIL. The case reached the Court of Appeal in an unsatisfactory state. That Court held that the effect of the transfer was to discharge *pro tanto* the company's debt to S and that it was an unfair preference (§ 17). The liquidators' claim against CIL was under subsection 241(1)(d), subject to a defence under subsection 241(2) (§ 23). As to that, counsel for CIL accepted that the onus was on CIL to satisfy the court as to good faith (§§ 27, 34); *i.e.* it did not rely, or try to rely, on the presumption in subsection 241(2A). The Court of Appeal dismissed the appeal and affirmed the order that CIL repay the £50,000 with interest.

[197] There are no cases on the meaning of value in subsection 250(2) or subsection 241(2), 342(2) or 425(2) of the English Insolvency Act, but authorities on fraudulent conveyance cases under section 172 of the Law of Property Act and the Statute of Elizabeth interpreted "*good consideration*" in the sense that I have stated; see e.g. *Bayspoole v Collins* (1871) LR 6 Ch App 228, 232, 233: "*small and inadequate consideration is sufficient to support such a settlement under the Statute of Elizabeth.*" The same approach applies to the question of whether a person is a bona fide purchaser for value.

## 11.    THE COURT WHICH MAY MAKE ORDERS UNDER SECTION 249

213.    The question of whether a U.S. court may order relief under section 249 of the BVI Insolvency Act is addressed in the First Mortimore Declaration at ¶¶ 258-266 and in the Second Moss Declaration at ¶¶ 276-301. The main counterargument put forward by Mr Moss is that the provision in section 249 about the court that may make orders under that section is not part of the substantive law of the BVI, but is merely procedural. I will address this argument under four headings: (i) the common law as to the distinction between substance and procedure, (ii) the scheme of the BVI Insolvency Act, of which the provisions about "*Voidable Transactions*" form a part, (iii) the distinctions between those provisions and provisions about transactions defrauding creditors, and (iv) the Liquidators' reasons for not pursuing claims against the Defendant Institutions in the BVI.

214.    Before doing so, I should deal with three preliminary points. First, I agree with Mr Moss (¶ 276) that the provisions of sections 245, 246 and 249 have extraterritorial effect, in the sense that they may apply to transactions undertaken within or outside the BVI.

215.    Second, at ¶ 278, Mr Moss suggests that in the First Mortimore Declaration (¶ 260), I misstated the definition of "court" in the BVI Insolvency Act. This is not correct. In that paragraph, I said "court" means "*the BVI Court, described in Section 1 above*." In ¶ 13 of that Section, I had defined "the BVI Court" as "*the High Court of Justice (Commercial Division) in the Eastern Caribbean Supreme Court*." The Commercial Division of the BVI Court is the division that deals with liquidations and commercial litigation.

216.    Third, at ¶¶ 295-299, Mr Moss refers to *Galbraith v Grimshaw*[198] and *Al Sabah v Grupo Torras SA*[199] and to passages in the judgment of Lord Walker in *Grupo Torras*, which

---

[198] [1910] AC 508, House of Lords.

[199] [2005] 2 AC 333, Privy Council, on appeal from the Court of Appeal of the Cayman Islands.

are critical of aspects of *Galbraith v Grimshaw*.[200] Regardless of the criticisms to which Mr Moss points, as I said in the First Mortimore Declaration at (¶ 261), Lord Walker cited *Galbraith v Grimshaw* for the proposition that a litigant may find himself "*falling between two stools*,"[201] if neither the court where the insolvency proceedings are taking place nor the foreign court have the powers to make the necessary asset recovery orders. It remains the case that a claim may fall "*between two stools*" unless, as I pointed out (¶ 263), the powers of the foreign court enable it to assist by applying its own law (as in *Grupo Torras*[202]) or the law of the place of the liquidation (which is what is sought by the Liquidators in the Amended Complaints).

### (1)    Common law as to substance and procedure

217.    The common law of the BVI and England recognises the distinction between questions of substance, which are governed by the *lex causae*, which includes questions as to parties' substantive rights or liabilities, and questions of procedure, including remedy, which are governed by the law of the forum.[203] Thus, the law of England includes substantive rules governing liability for personal injury caused by negligence or breach of statutory duty, so that a person injured by such torts has a substantive right or cause of action under English law. As a matter of English procedural law, claims for damages below a certain figure may be allocated to the County Court and claims over that figure to the High Court. In an appropriate case, a foreign court, applying its own conflict of laws rules, could apply the substantive tort law of England to a tort claim governed by that law, while disregarding English procedural rules about

---

[200] At §§ 41 and 45.

[201] At § 7.

[202] In *Grupo Torras*, the trustee in bankruptcy of the debtor in a Bahamian bankruptcy obtained a letter of request from the Bahamas court asking the Cayman court to set aside two Cayman trusts established by the debtor. The Privy Council affirmed that the Cayman court had power, under its own bankruptcy assistance legislation, to act in aid of the Bahamian bankruptcy by granting the trustee powers under Cayman bankruptcy law to enable him to set aside the trusts.

[203] *Harding v Wealands* [2007] 2 AC 1 at § 24, English House of Lords; *Cox v Ergo Versicherung AG* [2014] AC 1379 at § 14, UK Supreme Court; *Allen v Depuy International Ltd* [2015] EWHC 926 (QB) at § 34, English High Court. In *Cox* Lord Mance described the distinction between substantive and procedural issues as "*difficult*" (§ 43).

damages and venue. The foreign court can deal with the claim under English substantive law, because the claim exists independently of the venue to which it might be allocated under English procedural law. This provides the common law background for the enactment of the BVI Insolvency Act and the English Insolvency Act, which both have extraterritorial and cross-border assistance provisions.

### (2)    The scheme of the BVI Insolvency Act

218.    At ¶¶ 278-285 of the Second Moss Declaration, Mr Moss expresses the opinion that the reference to the "*Court*" in section 249 is procedural and that, read with the definition in Section 2, its purpose is to identify the BVI High Court, rather than the Magistrates Court or any other Virgin Islands Court, as the court able to exercise the specified powers under the BVI Insolvency Act. I agree that this is a purpose of those provisions, but it is only a minor purpose as compared with the major purpose, which is to place the BVI High Court at the heart of the statutory scheme for, among other things, the liquidation of companies. Integral elements of that scheme are the provisions for the BVI High Court to identify and grant relief in respect of what are called "voidable transactions" (sections 244-246 and 249, 250).

219.    The BVI Insolvency Act covers a range of matters relating to the insolvency of companies and individuals. The Parts of that Act which are in force and relevant to the liquidation of the Funds are: Part I (preliminary provisions, including definitions), Part V (provisions applicable to the liquidation of companies and to the bankruptcy of individuals), Part VI (liquidation), Part VIII (voidable transactions), Part IX (malpractice), Part XI (general provisions with regard to companies that are insolvent or in liquidation) and Part XVI (general provisions with regard to insolvency proceedings under that Act). Part XVIII (cross-border insolvency) might have been relevant, but it is not yet in force. Those Parts contain many sections that refer to applications to the BVI Court or to orders it may make, some of which have substantive effect and some of which are procedural.

220.    Examples of substantive orders that the statute gives the BVI Court power to make, which affect the rights and liabilities of the company or other persons, are orders:

(a)    vesting property that has been disclaimed by a liquidator in a person who claims an interest in it or who is under a liability in respect of the property that has not been discharged by the disclaimer (sections 221, 222);

(b)    rescinding a contract made by a person with the company (section 229);

(c)    in respect of voidable transactions (sections 244-250); and

(d)    making a person guilty of fraudulent trading or insolvent trading liable to make such contribution to the company's assets as the BVI Court considers proper (sections 253-258).

All those rights and liabilities are created by the BVI Insolvency Act and do not exist independently of it. In each case, the discretion of the BVI Court, signified by the word "*may*," is an integral element of the statutory power.[204]

221.    Examples of procedural orders that may be made by the BVI Court, which concern process or affect the enjoyment of rights, are orders:

(a)    staying actions and proceedings against the company (section 174),[205] permitting the continuance of an action or proceedings against the company or its assets or to permit the transfer of shares (section 175), affecting the benefit of executions (section 176);

---

[204] All those statutory powers derive from similar powers in the English Insolvency Act; see sections 181, 182, 186, 213, 214, 238-241. In the recent UK Supreme Court decision *Joint Administrators of LBH Holdings Intermediate 2 Ltd v Joint Administrators of Lehman Brothers Ltd* [2017] UKSC 38, there was a difference of provisional view between Lords Neuberger, Kerr and Reed on the one hand and Lords Sumption and Clarke on the other as to whether payment in full of a proof of debt affected the substantive right of the creditor to full payment under the currency of the debt; see §§ 97-111, per Lord Neuberger, and §§ 195-201, per Lord Sumption.

[205] This section is comparable in effect to section 52(2), referred to in the Second Moss Declaration at ¶ 279.

(b)     controlling or giving directions in respect of the powers of the liquidator (section 186);

(c)     against delinquent directors (section 254); and

(d)     for the examination of witnesses (section 285).[206]

222.     In English cross-border insolvency law, the distinction between substance and procedure has been noted. In the First Mortimore Declaration (footnote 234 to ¶ 265), I referred to *Rubin v Eurofinance AS*,[207] where Lord Collins said that the powers in Article 21(1) of the English Cross-Border Insolvency Regulation were procedural and did not give the English court the substantive power to recognise a judgment made in insolvency proceedings in New York, where the judgment debtor had not been present in New York or voluntarily appeared in the New York proceedings. In *Re Pan Ocean Co Ltd*,[208] another Article 21 case, where the English court had recognised a Korean rehabilitation proceeding as a foreign main proceeding, Morgan J refused to grant an injunction, on the application of the Korean administrator, restraining a party from terminating a contract with the company which was governed by English law, because such an order went "*well beyond matters of procedure and affects the substance of the parties' rights and obligations under the contract.*"

223.     In paragraph 220(c) above, I included an order in respect of voidable transactions among the substantive orders that the BVI Court may make. Sections 244-246, 249 and 250 should be read together. As I have pointed out (First Mortimore Declaration at ¶ 146), sections 245 and 246 state the elements of an unfair preference or undervalue transaction, but not the consequences. For those, one turns to section 249, which is subject to

---

[206] These sections also derive from the English Insolvency Act: see sections 126-128, 130, 168, 212, 236. It is well established that the power, on a summary hearing, to make orders against delinquent directors under section 254 of the BVI Insolvency Act or section 212 of the English Insolvency Act is a procedural power, since the company's cause of action against the director for breach of duty exists independently under the general law.

[207] [2013] 1 AC 237 at § 143.

[208] [2014] EWHC 2124 (Ch) at § 111.

section 250. The key provision is subsection 249(1), because that contains all the strands: (i)

the application to the BVI Court by the liquidator,[209] (ii) the determination by the BVI Court

whether the requirements of sections 245 or 246 have been satisfied, and (iii) the exercise by

the BVI Court of its discretion to make any, and if so what, order. It is, therefore, clear that a

liquidator's substantive legal right to bring a claim under section 249 is inexorably linked to

the power of the BVI Court to hear the application and make any appropriate orders. There is

no free-standing substantive legal right to relief for unfair preferences or undervalue

transactions.

224.    At ¶ 279 of the Second Moss Declaration, Mr Moss refers to the definition of

"*Virgin Islands court*" in section 2(1) of the BVI Insolvency Act and to the reference to those

courts in sections 8(1)(b), 8 (2)(b) and 52(2) of that Act (which may be compared with section

174, the corresponding liquidation provision). Those sections refer to proceedings outside the

liquidation proceedings, which may be stayed to enable the liquidation to proceed unimpeded,

or to orders made before the liquidation commenced and which may be relevant to questions

of whether liquidators should be appointed (sections 159, 162 and 163) or whether an

insolvency transaction occurred (section 244). These sections have no effect on the many

sections, including section 249, which provide that the BVI Court is the only court with power

to make substantive or procedural orders in the liquidation.

225.    In ¶¶ 281-284 of the Second Moss Declaration, Mr Moss refers to sections 238

and 239 of the English Insolvency Act concerning preferences and undervalue transactions,

which refer to the power of "*the court,*" identified in sections 251, read with section 117. Under

the English Insolvency Act, the High Court and a County Court may have jurisdiction to wind

---

[209] If a liquidator wishes to apply to the BVI Court for an order under section 249, he would normally do so in the liquidation proceedings by ordinary application in his own name (under the same case number that was allocated to the originating application to appoint the liquidator), supported by an affidavit containing the evidence on which he relies in support of his application (BVI Insolvency Rules, Rules 12-14). In an appropriate case the BVI Court may give permission to serve the proceedings outside the jurisdiction; see paragraph 234 below.

up a company and therefore they have power to make orders in its winding up under sections 238 and 239. There is no similar choice of courts in the BVI; the BVI Court is the only court with power to appoint liquidators and make orders in the liquidation, including orders under section 249 of the BVI Insolvency Act. In my opinion, the word "*court*" in sections 238 and 239 of the English Insolvency Act and in section 249 of the BVI Insolvency Act cannot be detached from their substantive provisions, as one would have to do to argue that the reference to it is procedural whereas the rest of the sections are substantive. Mr Moss has not identified any case where that has been done. On the contrary, the contemplation of the English legislation is that the court dealing with the liquidation would also deal with applications under sections 238 or 239 and the position is the same in the BVI, regarding section 249.

226.     I agree with Mr Moss (Second Moss Declaration at ¶ 285) that BVI and English insolvency legislation, even though they may have extraterritorial reach (paragraph 214 above), do not purport to give powers to foreign courts. The BVI and English Acts recognise that foreign courts will exercise their own powers, supplemented by any cross-border assistance provisions that apply to them (First Mortimore Declaration at ¶¶ 262-265).

227.     At ¶ 287 of the Second Moss Declaration, Mr Moss refers to *England v Smith*.[210] That was a case where the liquidation of an Australian company was being conducted in Australia. The Australian court issued a letter of request to the English court asking it to assist by conducting an examination of a witness under the principles and practice of the Australian courts. By subsection 426(5) of the English Insolvency Act, the letter of request gave the English court power to apply, in relation to the matters specified in the request, either English law or Australian law. The Court of Appeal held that the request should be acceded to and that, in exercise of its power under subsection 426(5), the examination should be conducted under Australian law. The decision turns on the powers given to the English court under subsection

---

[210] [2001] Ch 419, English Court of Appeal.

426(5), which are not found in Part XVIII of the BVI Insolvency Act or the English Cross-Border Insolvency Regulation. As I noted in the First Mortimore Declaration (footnote 233 to ¶ 264), the BVI will have a similar power to apply the law of the requesting state when section 467 comes into force.

### (3)    Statutory fraudulent transfer proceedings distinguished

228.    At ¶ 280 of the Second Moss Declaration, Mr Moss refers to *In re Hellas Telecommunications (Luxembourg) II SCA*, 535 B.R. 543 (Bankr. S.D.N.Y. 2015), where the Court accepted Mr Moss's opinion that section 423(4), which identifies the court for the purposes of section 423 of the English Insolvency Act (transactions defrauding creditors), is a procedural provision. I note that in the subsequent ruling, *In re Hellas Telecommunications (Luxembourg) II SCA*, 555 B.R. 323, 329, 342 (Bankr. S.D.N.Y. 2016), the Court noted, when granting the defendants' *forum non conveniens* motion, that "*the relief sections of the U.K.'s Insolvency Act 1986 appear to provide discretion to a U.K. court to tailor relief in a way that this Court could not do*" and that the defendants argued in support of their motion that, if the action remained pending before the Court, it would have to resolve a difficult issue of first impression under U.K. law, *i.e.* "*whether a U.S. court is authorised to grant relief under Section 423 of the U.K. Insolvency Act.*" Even if Mr Moss's opinion is correct, there are two points of distinction between the present case and the *Hellas* case.

229.    The first is that there is a distinction between sections 238 and 239 of the English Insolvency Act (transactions at undervalue and preferences) and section 423. The former sections only apply where the company is in administration or liquidation (subsections 238(1) and 239(1)). This means that the references to the court in those sections is to the court with jurisdiction to wind up the company (section 251). An application for relief under those sections can only be made by the administrator or liquidator[211] and he would do so by making

---

[211] As from 1 October 2015 the administrator or liquidator may assign the claim under Section 246ZD.

an application to the court under the English Insolvency Rules within the administration or liquidation proceedings. The substantive provisions of sections 238 and 239 are so closely connected with the statutory scheme for administration and liquidation, that it is not possible to say that the reference to "*court*" in those sections is procedural, when they give the court substantive powers to affect the rights and liabilities of other parties.

230.    On the other hand, section 423 may apply in a variety of situations: (i) if the debtor is a company, when it is in administration or liquidation, (ii) if the debtor is an individual, when he or she is bankrupt, (iii) when the debtor is subject to a voluntary arrangement under the English Insolvency Act, and (iv) when the debtor is not subject to any of those proceedings. Proceedings can be brought either within the insolvency proceedings or outside them by ordinary action. It is for this reason that subsection 423(4) gives jurisdiction not just to the High Court, but the County Courts with applicable bankruptcy or winding up jurisdiction. If the application is made in administration, liquidation or bankruptcy proceedings, it is made by application and will proceed under the English Insolvency Rules, but if it is made by a victim outside such proceedings, it will proceed by claim form with particulars of claim in accordance with the English CPR.[212]

231.    Secondly, there is no provision comparable to section 423 of the English Insolvency Act in the BVI Insolvency Act. The comparable BVI provision is section 81 of the BVI Conveyancing and Law of Property Act (Cap 220), which provides:

> "*(1)    Save as provided in this section, every conveyance of property, made whether before or after the commencement of this Ordinance, with intent to defraud creditors, shall be voidable at the instance of any person thereby prejudiced.*
> *(2)    This section does not affect the operation of a disentailing assurance, or the law of bankruptcy for the time being in force.*
> *(3)    This section does not extend to any estate or interest in property conveyed for valuable consideration and in good faith to any person not having at the time of the conveyance, notice of the intent to defraud creditors.*"

---

[212] *TSB Bank plc v Katz* [1997] BPIR 147, English High Court.

This section derives from the English section 172 of the Law of Property Act 1925, which has been repealed and was replaced by section 423 of the English Insolvency Act. The section gives a victim a substantive legal right that is independent of any procedural rules about venue and that is not tempered by any controlling discretion of any court. Normally, the victim would bring proceedings under section 81 by action under the BVI CPR, but the BVI Court might permit a liquidator to bring proceedings in the liquidation on behalf of all creditors.[213]

### (4)    The Liquidators' justification for not pursuing proceedings in the BVI

232.    At ¶ 301 of the Second Moss Declaration, Mr Moss says that if the claims, the subject of the US Proceedings, had been brought in the BVI, any judgments would be likely to be unenforceable outside the jurisdiction of the BVI. He also says that a common feature of the claims is that the Defendant Institutions submitted to the jurisdiction of this Court under the subscription agreements.

233.    The first point I should make about that is that it is important to keep in mind that the US Proceedings include two groups of claims, which under BVI law are distinct. First, there are the Common Law Claims, where the Funds are the proper plaintiffs. These claims exist independently of the liquidation proceedings. Second, there are the BVI Insolvency Act Claims, where the Liquidators (not the Funds) are the proper applicants or plaintiffs and the claims only arose in consequence of the appointment of liquidators (First Mortimore Declaration at ¶ 148).

234.    The Common Law Claims could have been brought by the Funds in the BVI Court by claim form and statement of claim under the BVI CPR. Indeed, the Common Law Claims against the BVI Defendants could have been added to the claims brought against them in the BVI Redeemer Proceedings. Permission to serve the Defendant Institutions with claim

---

[213] *Re Shilena Hosiery Co Ltd* [1980] Ch 219, English High Court.

forms asserting the Common Law Claims out of the jurisdiction of the BVI could have been obtained from the BVI Court in the same way as permission was obtained to serve the claim forms in the BVI Redeemer Proceedings out of the jurisdiction. The Funds could have relied on BVI CPR 7.3(3)(b)(ii) as the "gateway."[214] The currently applicable "gateway" under the BVI CPR is 7.3(b):

> "*a claim is made in respect of a contract where the contract - ... (ii) is by its terms or by implication governed by the law of any ... Territory.*"

The BVI is a territory and the Articles of the Funds are the contracts which, by necessary implication, are governed by BVI law.[215]

235.    The BVI Insolvency Act claims could have been brought by the Liquidators by applications in the liquidation proceedings in the BVI Court. By BVI Insolvency Rule 24, the BVI CPR Parts 6 and 7 apply as to service. The relevant "gateway" for a claim under section 249 of the BVI Insolvency Act is BVI CPR 7.3(10):

> "*A claim is made under an enactment which confers jurisdiction on the court and the proceedings are not covered by any other of the grounds referred to in this rule.*"

The claim would be made under an enactment, the BVI Insolvency Act, which plainly confers jurisdiction on the BVI Court in relation to the liquidation of a BVI incorporated company.[216]

236.    Mr Moss suggests that there would be difficulties about enforcement of any judgment obtained in either type of proceeding. Under English law, such a judgment would be enforced and recognised in the United Kingdom if the judgment debtor had submitted to the jurisdiction of the BVI Court by voluntarily appearing in the proceedings.[217] In respect of the

---

[214] See the Declaration of Philip Kite dated the 12th day of January 2017 at ¶ 23.

[215] *Dicey, Morris & Collins; The Conflict of Laws* (15th ed), Rule 175(2) at § 30R-020.

[216] *Erste Group Bank AG (London) v JSC (Red October)* [2015] EWCA Civ 379 at § 113; also see the case in the High Court [2013] EWHC 2926 (Comm) at § 150 (a case under section 423 of the English Insolvency Act); *Avonwick Holdings Ltd v Castle Investment Fund Ltd* [2015] EWHC 3832 (Ch) (sections 238, 239 and 423 of the English Insolvency Act).

[217] *Dicey* Rule 43 at § 14R-054; affirmed in *Rubin v Eurofinance SA* [2013] 1 AC 237, UK Supreme Court.

Common Law Claims, Defendant Institutions might voluntarily appear and submit to the jurisdiction by acknowledging service and giving notice of intention to defend. In respect of the BVI Insolvency Act Claims, the Defendant Institutions might voluntarily appear by responding to the application or by filing a claim in the liquidation proceedings.[218]

237.    The suggestion that the choice of law provisions in the subscription agreements apply to the Common Law Claims is contradicted by the Funds' applications to serve the BVI Redeemer Proceedings out of the jurisdiction, where the Funds asserted that the claims were governed by BVI law.[219] The BVI Court accepted that and gave permission to serve the claim forms on the BVI Defendants out of the jurisdiction. Moreover, in the Privy Council Judgment, Lord Sumption held that the claims were governed by BVI law and that the subscription agreements were irrelevant (at § 20). The subscription agreements have nothing to do with the BVI Insolvency Act Claims, which are founded on the BVI Insolvency Act. Moreover, the right to assert the BVI Insolvency Act Claims belongs not to the Funds, but the Liquidators, which were not party to the subscription agreements, confirming their irrelevance.[220]

[Remainder of page intentionally left blank]

---

[218] *Rubin v Eurofinance SA* [2013] 1 AC 237; *Stichting Shell Pensioenfonds v Krys* [2015] AC 616.

[219] Mr Kite's Declaration at ¶ 22 and Exhibit P.

[220] See cases cited in the First Mortimore Declaration at ¶¶ 197, 198. In *New Cap Reinsurance Co Ltd v Grant* [2009] 257 ALR 740 at § 87, New South Wales Supreme Court, Barrett J said of an unfair preference claim in respect of commutation payments under a reinsurance contract: "*This proceeding has nothing to do with the reinsurance contract. It is a proceeding upon a statutory cause of action maintainable by the liquidator of one of the former contracting parties. The cause of action is not available to the party itself. Its liquidator, when suing upon the statutory cause of action, does not attempt to enforce some right of the contracting party*."

## CONCLUSION

238.   For the reasons I have given, my opinions are as stated in this Declaration.

239.   I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Dated this 26th day of May 2017

Signed: _____

Simon Mortimore, QC

# EXHIBIT A

**Additional Sources Cited in Second Declaration of Simon Mortimore, QC**

| Cases | |
|---|---|
| | **Citation** |
| 1. | *Allen v Depuy International Ltd* [2015] EWHC 926 (QB) |
| 2. | *Ashmore v British Coal Corporation* [1990] 2 QB 338 |
| 3. | *Avonwick Holdings Ltd v Castle Investment Fund Ltd* [2015] EWHC 3832 (Ch) |
| 4. | *Barrow v Bankside Agency Ltd* [1996] 1 WLR 257 |
| 5. | *Bayspoole v Collins* (1871) LR 6 Ch App 228 |
| 6. | *Bradford Banking Co v Henry Briggs & Co* (1886) 12 App Cas 29 |
| 7. | *Cox v Ergo Versicherung AG* [2014] AC 1379 |
| 8. | *Culross Global SPC Ltd v Strategic Turnaround Master Partnership Ltd* [2010] UKPC 33 |
| 9. | *Erste Group Bank AG (London) v JSC (Red October)* [2013] EWHC 2926 (Comm) |
| 10. | *Erste Group Bank AG (London) v JSC (Red October)* [2015] EWCA Civ 379 |
| 11. | *Evans v Jones* [2017] Ch 1 |
| 12. | *Harding v Wealands* [2007] 2 AC 1 |
| 13. | *Joint Administrators of LB Holdings Intermediate 2 Ltd v Joint Administrators of Lehman Brothers Ltd* [2017] UKSC 38 |
| 14. | *Jones v Sherwood Computer Services Ltd* [1992] 1 WLR 277 |
| 15. | *Mortgage Express v Countrywide Surveyors Ltd* [2016] EWHC 224 (Ch) |
| 16. | *New Cap Reinsurance Co Ltd v Grant* [2009] 257 ALR 740 |
| 17. | *Portman Building Society v Hamlyn Taylor Neck* [1998] 4 All ER 202 |
| 18. | *Rainy Sky SA v Kookmin Bank* [2011] 1 WLR 2900 |
| 19. | *Re Shilena Hosiery Co Ltd* [1980] Ch 219 |
| 20. | *Re Sonatacus Ltd* [2007] 2 BCLC 627 |
| 21. | *Re T&N Ltd* [2006] 1 WLR 1728 |

| | |
|---|---|
| 22. | *Stichting Shell Pensioenfonds v Krys* [2015] AC 616 |
| 23. | *Taylor Walton v Laing* [2007] EWCA Civ 1146 |
| 24. | *Test Claimants in the FII Group Litigation v Revenue and Customs Commissioners* [2012] 2 AC 337 |
| 25. | *TSB Bank plc v Katz* [1997] BPIR 147 |
| 26. | *Wood v Capita Insurance Services Ltd* [2017] 2 WLR 1095 |
| **Rules & Statutes** | |
| | **Citation** |
| 27. | BVI Business Companies Act 2004 Schedule 2 ¶¶ 9-23 |
| 28. | BVI Insolvency Act 2003 §§ 159, 162-63, 175-76, 184, 186-87, 189, 221, 229, 233, 235, 253, 255-58, 285, Part XVIII |
| 29. | BVI Insolvency Rules 2005 §§ 4, 8, 12-14, 24 |
| 30. | BVI International Business Companies Act § 33 |
| 31. | English Bankruptcy Act 1914 § 30 |
| 32. | English Civil Procedures and Rules 19.10-15 |
| 33. | English Companies Act 1985 §§ 360, 518, 611, 612, Table A, regulation 5 |
| 34. | English Companies Act 2006 § 126 |
| 35. | English Cross-Border Insolvency Regulation |
| 36. | English Insolvency Act §§ 126-28, 130, 168, 181-82, 186, 212-14, 236, 411, Schedule 8 |
| 37. | English Insolvency Rules 1986 §§ 12.3, 12.4 |
| 38. | Insolvency Rules (England and Wales) 2016 Rule 14.1, 14.2 |
| 39. | Supply of Goods and Services Act 1982 § 13 |
| 40. | The Eastern Caribbean Supreme Court Rules 2000 Rule 1.1, 21, 25.1, 26.1, Parts 6 and 7 |

| **Other Authorities** | |
|---|---|
| | **Citation** |
| 41. | *Bowstead and Reynolds on Agency* (20th ed, 2016) at §§ 8-204, 8-209 |
| 42. | *Clerk & Lindsell on Torts* (21st ed) at §§ 18-21 |
| 43. | Dicey, Morris & Collins, *The Conflict of Laws* (15th ed) at §§ 14R-054, 30R-020 |
| 44. | Goode, *Principles of Corporate Insolvency Law* (4th ed, 2011), at §§ 13-32, 13-38 |
| 45. | *Jowett's Dictionary of English Law* (4th ed, 2015): "market price" & "market value" |
| 46. | Spencer Bower & Handley, *Res Judicata* (4th ed, 2009) at §§ 7.12, 8.17, 17.30 |

TAB 1

*Allen v Depuy International Ltd* [2015] EWHC 926 (QB)

Neutral Citation Number: [2015] EWHC 926 (QB)

Case No: TLQ/13/1229

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 1 April 2015

Before :

**MRS JUSTICE SIMLER DBE**
- - - - - - - - - - - - - - - - - - - - -
**Between :**

| | |
|---|---|
| **ALLEN AND OTHERS** | **Claimants** |
| - and - | |
| **DEPUY INTERNATIONAL LIMITED** | **Defendant** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Mr Hugh Preston QC, Professor Adrian Briggs & Mr Conor Dufficy** (instructed by **PLI Legal Services**) for the **Claimants**
**Mr Charles Dougherty QC & Mr Alexander Antelme QC** (instructed by **Kennedys Solicitors**) for the **Defendant**

Hearing dates: 17, 18, 19, & 20 March 2015
- - - - - - - - - - - - - - - - - - - - -
**Approved Judgment**
I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

.............................

MRS JUSTICE SIMLER DBE

**MRS JUSTICE SIMLER DBE :**

**Introduction**

1.     Mr Allen, Mr Monks and Mr Myson ("the Claimants") who are part of a much larger group of New Zealand and other overseas residents from a number of countries, claim damages for personal injury alleged to have resulted from being implanted with defective prosthetic hip implants manufactured by the Defendant and implanted in the course of operations that took place in New Zealand.  The Defendant is a company registered in England and manufactured the prosthetic hip implants in England.

2.     As the Defendant is domiciled in England, the Claimants are entitled as of right to bring their claims here, whether or not England is otherwise the appropriate forum. By a judgment in these proceedings reported at [2014] EWHC 753, Stewart J dealt with preliminary issues as to the applicable law in these proceedings and, if English law applies to any claim, whether the Consumer Protection Act 1987 applies. He concluded that pursuant to the Private International Law (Miscellaneous Provisions) Act 1995, the applicable law for the New Zealand Sample Claimants is that of New Zealand. Even if English law applied, he held that no Claimants would have the benefit of the provisions of the Consumer Protection Act 1987 as the supply and marketing of the product and the alleged injury, all occurred outside the EU and the Claimants had no connection with the EU.

3.     Since the judgment of Stewart J the New Zealand Claimants amended their claims to plead New Zealand law and in particular, reliance on the provisions of the Consumer Guarantees Act 1993 ("CGA"). Under the CGA a consumer has a claim against a manufacturer if goods supplied are not of acceptable quality or fit for purpose.  Where goods fail to comply with the acceptable quality guarantee there are rights of redress afforded by the CGA, including a remedy for loss and damage which was reasonably foreseeable (s.27 CGA).

4.      Although the Defendant denies that the goods supplied are defective, it submits in any event that claims for damages for personal injury, whether under the CGA or otherwise, are precluded by the statutory bar in s.317(1) of the New Zealand Accident Compensation Act 2001 ("ACA 2001"). Section 317(1) provides that "no person may bring proceedings independently of this Act, whether under any rule of law or any enactment, in any court in New Zealand, for damages arising directly or indirectly out of personal injury covered by this Act …".  The effect of the statutory bar, and its proper characterisation for these purposes is challenged by the Claimants.

5.     Consequently by order of Master Cook dated 2 July 2014, the trial of a further preliminary issue was directed in relation to four of the New Zealand Sample Claimants, as follows:

> "whether under the substantive law of New Zealand, as applicable pursuant to the Private International Law (Miscellaneous Provisions) Act 1995, their claims are precluded by section 317 of the ACA 2001".

6.    Following exchange of expert reports, the Defendant conceded the preliminary issue so far as Mr Fletcher, the Third Claimant is concerned, and the Defence was re-re-amended to reflect this. His claim is now stayed with the other New Zealand claims.

7.    The parties agree that the preliminary issue raises two essential questions:

    (i)   Is s.317 ACA 2001 a substantive or a procedural rule? If the rule is characterised as procedural only it will be disregarded by this court. By contrast, if it is a substantive rule, it must be applied by this court.

    (ii)  If the rule is substantive, does s.317 remove the right of these Claimants to compensatory damages for personal injury in this case as a matter of New Zealand law? In particular, does s.317 require relevant conduct in New Zealand as the Claimants contend before it has any application?

8.    If the preliminary issue is determined in the Defendant's favour it will bring the New Zealand Claimants' claims to an end. If it is determined in the Claimants' favour then they (and others) will be able to proceed with their claims in the English courts, under the CGA, applying New Zealand law.

9.    I have been greatly assisted in dealing with the preliminary issue by written and oral submissions on both sides: Charles Dougherty QC and Alexander Antelme QC for the Defendant; and Hugh Preston QC, Professor Adrian Briggs, and Conor Dufficy for the Claimants.  I am grateful to them all.

**The expert evidence**

10.   It is common ground that a New Zealand court called upon to decide the circumstances in which s.317(1) applies would approach this as an exercise in statutory interpretation. The meaning of the enactment in question would have to be ascertained from the text and in light of its purpose.

11.   Since foreign law is a matter of fact normally proved by expert evidence, expert evidence as to New Zealand law has been called on both sides directed at predicting the likely decision of a New Zealand court required to address the preliminary issue in this case.  In addition to assessing the weight of the expert evidence it is common

ground that I am both entitled and indeed bound to bring to bear my own judgement in reaching conclusions as to New Zealand law.

12.  I have received expert evidence in the form of expert reports, a statement as to what is agreed and what is disputed and oral evidence that was subject to cross-examination from two eminently qualified experts in New Zealand law.  I do not set out their qualifications or their evidence in any detail.  Campbell Alan McLachlan QC, Professor of Law at Victoria University of Wellington, whose specialist area of expertise is private international law, and who was called to the Inner Bar in New Zealand in 2007 and has practised extensively both as a barrister and as an arbitrator appeared on behalf of the Defendant.  In summary in his opinion where a person has cover under the ACA 2001 in accordance with its territorial scope, in respect of a personal injury, he or she has no actionable claim for or right to compensatory damages under New Zealand law.  In his opinion, the bar in s.317(1) ACA 2001 has substantive effect and removes the right to pursue an action for compensatory damages for personal injury, whether in negligence, under the CGA or under any other cause of action as the quid pro quo for the comprehensive cover provided under the statutory scheme of the ACA 2001.  Further in his view the ACA 2001 itself determines the scope of cover and therefore the scope of the operation of the statutory bar.

13.  By contrast, David Goddard QC, admitted in 1989, appointed as Queen's Counsel in 2003 and recognised as one of New Zealand's leading barristers with particular expertise in private international law and with long standing experience of acting in cases concerning tort claims and the author of a number of publications and responsible for a Ministerial Inquiry into Accident Compensation Funding and Accreditation of Physiotherapy Services in 2007, appeared on behalf of the Claimants.  In summary in his opinion as a matter of New Zealand law, s.317 does not extinguish any cause of action under New Zealand law or otherwise in respect of accidental personal injury, and does not prevent proceedings being brought in New Zealand or abroad claiming exemplary or punitive damages in respect of accidental personal injury covered by the ACA 2001.  Rather it prevents claims for compensatory damages in respect of conduct in New Zealand by a defendant who may have contributed levies to the scheme and who can "reasonably expect" not to have to insure against such claims or face such proceedings.  In his expert opinion, the answer to the question at issue is that however the provision is characterised (whether procedural or substantive) as a matter of statutory interpretation it does not apply to claims in an overseas court relating to conduct outside New Zealand.  In any event, since he concludes that the bar operates to prevent proceedings being brought for compensatory damages for personal injury and there is no need and no good reason to treat it as having a more far-reaching effect, he considers it to be a procedural rule and not a substantive one: it bars proceedings for the recovery of damages leaving causes of action intact.

**The New Zealand Accident Compensation Scheme**

14.   There is broad agreement between the experts about the origins, character and operation of the New Zealand Accident Compensation Scheme (referred to as "the Scheme") including the scope of cover and the claims process and administration of the Scheme.

15.   The Scheme derives from a Royal Commission of Inquiry Report in 1967, known as the Woodhouse Report which recommended the creation of a comprehensive, universal and compulsory no fault compensation scheme and

> "extinguishing present common law rights in respect personal injuries …" (paragraph 306(b)).

The Woodhouse Report identified common law actions for damages as hindering the rehabilitation of injured persons, and the fault principle as an illogical justification for the common law remedy in negligence, erratic and capricious in its operation (paragraph 485(1) and (2)). At paragraph 489 the Woodhouse Report dealt with the consequential changes that would result from the establishment of a no-fault scheme and at paragraph 490 the compulsory nature of the scheme, as follows:

> "489  (1) Given a suitably generous scheme on the foregoing basis it follows automatically that previous ways of seeking to achieve the same or a similar purpose become irrelevant.
>
> (2) Thus the common law rights in respect of personal injuries should be abolished and the Workers' Compensation Act repealed.
>
> (3) …
>
> (4) Such a scheme, involving the acceptance of community wide responsibility in respect of every injured citizen, must clearly be handled as a social service by an agency of the Government.
>
> (5)….."

> "490  (1) The scheme which has been outlined involves comprehensive entitlement. It must be given comprehensive support.
>
> (2) Protection is not to be restricted to work accidents or to road accidents, or to any period of the day, or to any group in the community. Individual liability, moreover, will disappear in favour of national responsibility.
>
> (3) If the scheme is to be universal in scope it must be compulsory in application. Accordingly there will be no place for special arrangements or for "contracting out". ..".

16.    As a result of those recommendations, the Scheme was originally introduced by the Accident Compensation Act 1972 and has been continued by a succession of statutes: the Accident Compensation Act 1982, the Accident Insurance Act 1998, and the Injury Prevention, Rehabilitation and Compensation Act 2001. In 2010, the 2001 Act was renamed the Accident Compensation Act 2001 (or ACA 2001) and remains in force. The Scheme is administered by the Accident Compensation Corporation ("the Corporation"), a Crown entity administered by a Board appointed by the responsible Minister. Its duties are to determine cover, provide entitlements under the legislation, collect levies, manage the relevant accounts and administer disputes.

17.    The purpose of the ACA 2001 as set out at s.3 is to:

> "enhance the public good and reinforce the social contract represented by the first accident compensation scheme by providing for a fair and sustainable scheme for managing personal injury that has, as it overriding goals, minimising both the overall incidence of injury in the community, and the impact of injury on the community (including economic, social, and personal costs) …"

18.    Coverage under the Scheme is dealt with by Part 2 of the ACA 2001. Cover is defined by s.8(1) as "cover for a personal injury" and generally depends on whether (i) the personal injury is suffered in New Zealand (s.20 ACA 2001); or (ii) if the injury is suffered outside New Zealand, the injured person is ordinarily resident in New Zealand at the time (s.22 ACA 2001).

19.    The ACA 2001 deals specifically with "treatment injuries". Treatment includes the failure of a prosthesis (s.33(1)(g)). Cover in respect of a "treatment injury" exists when the injury is suffered in New Zealand (s.20(2)(b) ACA 2001) or where the treatment injury was suffered outside New Zealand if the victim was ordinarily resident in New Zealand at the time (s.22(3) and (4) ACA 2001). Both experts agree that for these purposes, an injury is suffered where the treatment took place and for all three Claimants, that this was in New Zealand. Accordingly they are all covered by the Scheme.

20.    By s.67 ACA 2001 where a person is 'covered', he or she may be eligible for entitlements listed by s.69 and described in further detail by Part 4 ACA 2001. A covered person's eligibility for entitlements does not generally depend on the category of injury they have suffered (such as injury by accident or treatment injury), but on their assessed need in light of the actual injury. For example, s.70 provides that a person who has suffered personal injury for which he or she has cover—

"(a) is entitled to be provided by the Corporation with rehabilitation, to the extent provided by this Act, to assist in restoring the claimant's health, independence, and participation to the maximum extent practicable; but

(b) is responsible for his or her own rehabilitation to the extent practicable having regard to the consequences of his or her personal injury".

21.     Compensation or eligibility for entitlements does not depend on the establishment of any wrong or on the acts of a third party.  Accidental self-inflicted injuries are covered and the focus of the Scheme is on the injury rather than its cause.

22.     Individuals seeking compensation under the ACA 2001 must lodge a claim (s.48) within the time limits prescribed, but the scope of the Scheme depends on the existence of cover and not on whether the person has lodged a claim in respect of a covered injury.  In other words, a person may not avoid the operation of the ACA 2001 and chose instead to pursue a civil claim in respect of his or her injury by failing or declining to lodge a claim.  Conversely, however, a person who is covered may lose their entitlement to compensation by failing to lodge a claim within the time limits prescribed.

23.     The Scheme is funded by specific levies and general taxation.  Entitlement to compensation under the Scheme does not depend on having made a contribution to it. There are levies collected by the Corporation which is required to maintain and operate five separate accounts: a Work Account; a Motor Vehicle Account; an Earners' Account; a Non-Earners' Account; and a Treatment Injury Account.  As Professor McLachlan explains, the manner in which the Scheme is funded, consistent with its comprehensive no-fault character, is not correlated with any particular class of putative defendants. Rather it prescribes a set of levies which when added to general taxation are geared to ensuring adequate financial provision in the Accounts of the Corporation for all those personal injuries in respect of which there is cover under the ACA 2001.

24.     The structure of the Accounts that the Corporation is required to maintain reflects the categories of cover provided under the ACA 2001 and the sources of the levies (where appropriate) that primarily fund that cover.  So for example, the Work Account finances entitlements for employees or workers for work-related personal injuries, primarily funded by levies payable by employers.  The Treatment Injury Account finances entitlements in respect of 'treatment injury' and s.228(2) describes how the funds for the Treatment Injury Account are to be sourced:

"(2) The funds for the Treatment Injury Account are to be derived from—

(a) any levies payable by registered health professionals or any organisation that provides treatment under this Act, or a prescribed class of such persons or organisations; and

(b) if there is no such levy or the levy relates only to funding part of the Account, from the Earners' Account (in the case of an earner) or the Non-Earners' Account (in the case of a non-earner); and

(c) in the case of injuries suffered before the prescribed date from which levies become payable, from the Earners' Account (in the case of an earner) or the Non-Earners' Account (in the case of a non-earner)."

25.  The funds in the Treatment Injury Account must be applied to the treatment of 'entitlements in respect of persons who have cover for treatment injury' (s.228(4)). Although s.229 provides for the promulgation of regulations specifying the persons who are liable to pay levies (and in what amount) in respect of the Treatment Injury Account, no regulations have been promulgated, so that this Account is funded by levies from both the Earners' and Non-Earners' Accounts, the latter being funded by general taxation.

26.  The quid pro quo of the right to statutory compensation under the Scheme is the statutory bar to proceedings for damages for personal injury that might otherwise have been available.  The bar in s.317(1) on proceedings for damages for personal injury has the effect of precluding any claim for compensatory damages for personal injury in New Zealand where there is cover under the Scheme.  The basis of the claim for personal injury does not matter and claims for negligently inflicted personal injury and claims under the CGA are equally affected by the statutory bar.  The statutory bar does not preclude claims which fall outside the scope of cover under the ACA 2001 and furthermore, it is possible to bring a claim in trespass or negligence for exemplary damages in New Zealand, such damages not being compensatory in nature but punitive, and arising not out of the injury itself, but the outrageous manner in which the wrong was committed by the defendant.

**The substance/ procedure divide**

27.  The first question for determination is whether s.317(1) is a rule of substantive law or a rule of procedure it being common ground that English private international law distinguishes between questions of procedure, governed by the law of the forum, and questions of substance, governed by the applicable law (or *lex causae*).  If s.317(1) is properly characterised as a rule of substantive law, since the applicable law in this

case has been held to be New Zealand law, it will apply even in proceedings brought in this court, (subject only to any further consideration as to its scope). If, however, it is a rule of procedure, English law will apply as the law of the forum. An English court will apply foreign substantive law but will apply English procedural rules, for example as to mode and form of trial, evidence and the availability of remedies.

28.     The question of the characterisation of a statutory provision as substantive or procedural is a question for the law of the forum, and so is a matter of English law here. However in order to characterise the provision properly it is important to understand its effect under the applicable law. The distinction may not be clear cut. The proper approach is described by Dicey, Morris and Collins at paragraph 7–004 as follows:

> ".. regard should be had in each case to the purpose for which the distinction is being used and to the consequences of the decision in the instant context. The rule under examination must be considered as a whole, without giving undue weight to the verbal formula selected by previous judges, or by the draughtsman of a statute to introduce the rule. .....The mechanistic approach, sometimes found in English cases, of relying on the classification of the introductory verbal formula as used in a quite different statute, or of accepting a classification as procedural or substantive made for some purpose quite unrelated to the conflict of laws is now discredited. …"

29.     Words or phrases used in a private international law context (such as substance, procedure, rights and remedies) may have a different meaning when used in other contexts. English common law has drawn a long-standing and a well-established distinction between matters that affect a claimant's cause of action (his rights) and those that affect the way in which those rights are enforced (the remedies available); the former regarded as substantive and the latter as procedural.

30.     The leading case in England on the proper dividing line between substance and procedure is <u>Harding v Wealands</u> [2007] 2 AC 1 where the claimant was injured in a road traffic accident in New South Wales. The New South Wales Motor Accident Compensation Act 1999 ("MACA") placed floors and ceilings on compensation for injury and the question in proceedings commenced in England was whether those compensation provisions, contained in chapter 5 MACA, were substantive or procedural. The House of Lords affirmed the distinction between questions of actionability or liability (substantive) and questions of quantification and assessment which went to the availability and extent of the remedy (procedural). The House held that this distinction at common law was unaffected by the Act of 1995, rejecting the proposition that "questions of procedure" referred only to rules governing the manner in which proceedings were to be conducted. That meant that the floors and ceilings on compensation placed by chapter 5 MACA, did not apply because they were all procedural and therefore to be disregarded even though New South Wales law applied

to the claim.  At paragraph 24 Lord Hoffmann (with whom all other members of the House agreed) dealt with the substance/procedure distinction as follows:

> "In applying this distinction to actions in tort, the courts have distinguished between the kind of damage which constitutes an actionable injury and the assessment of compensation (i.e. damages) for the injury which has been held to be actionable. The identification of actionable damage is an integral part of the rules which determine liability.  As I have previously had occasion to say, it makes no sense simply to say that someone is liable in tort.  He must be liable <u>for</u> something and the rules which determine what he is liable for are inseparable from the rules which determine the conduct which gives rise to liability. Thus the rules which exclude damage from the scope of liability on the grounds that it does not fall within the ambit of the liability rule or does not have the prescribed causal connection with the wrongful act, or which require that the damage should have been reasonably foreseeable, are all rules which determine whether there is liability for the damage in question.  On the other hand, whether the claimant is awarded money damages (and if so, how much) or, for example, restitution in kind, is a question of remedy."

31.    In reaching those conclusions, the House of Lords followed the approach of the majority of the Australian Court of Appeal in *Stevens v Head* (1993) 176 CLR 433 which had adopted this traditional view of the substance/procedure divide.

32.    This distinction had earlier been considered and addressed in <u>Boys v Chaplin</u> [1971] AC 356, where the majority of the House of Lords held that the identification of heads of recoverable loss for the purposes of establishing civil liability for negligent infliction of a particular head of damage (pain and suffering) was a matter of substantive law going to the existence of liability. Once liability had been established however, the remedy available to a plaintiff who had established liability, was a matter of procedural law to be determined under the law of the forum.

33.    Although the result in <u>Harding</u> was questioned by the Supreme Court in <u>Cox v Ergo Versicherung</u> [2014] AC 1379 where at paragraph 43 Lord Mance  observed in relation to the relevant provisions contained within chapter 5 MACA that the "application of the difficult distinction between substantive and procedural issues may on the facts of that case appear in some respects questionable" it is common ground that it remains binding on me. (See also Lord Sumption at paragraph 15, where he expressed surprise "as regards some of them, such as the exclusion of economic loss, which would appear to be substantive according to Lord Hoffmann's test.  This may be why in their concurring judgments Lord Woolf and Lord Rodger of Earlsferry

justified this classification not only on the grounds given by Lord Hoffmann but on additional grounds.  Lord Woolf at paragraph 11 considered that because the greater part of the provisions of the MACA relating to damages were procedural, the rest which were "arguably" substantive should be regarded as procedural also.")

34.    It follows accordingly that:

   i)     the availability of heads of loss or kinds of damage is substantive; but

   ii)    once the substantive right or liability is established, the remedy or response is a matter of procedural law to be determined by the rules of the forum; and

   iii)   assessment or quantification of damages, (including limits, caps or floors) are all questions of remedy and procedural.

**Section 317 in more detail**

35.     It is common ground between the parties and the experts that in New Zealand the process of statutory interpretation is governed by s.5 of the Interpretation Act 1999.  This provides that the meaning of any enactment must be ascertained from its text and in the light of its purpose.  The importance of considering both purpose and context in the process of statutory interpretation in New Zealand was emphasised by the Supreme Court in *Commerce Commission v Fonterra Co-operative Group Limited* [2007] NZSC 36 at paragraph 22 where the court held that even:

   "if the meaning of the text may appear plain in isolation of purpose, that meaning should always be cross checked against purpose in order to observe the dual requirements of s.5.  In determining purpose the Court must obviously have regard to both the immediate and the general legislative context.  Of relevance to may be the social, commercial or other objective of the enactment."

36.    Accordingly, I turn to consider first the text of s.317 in light of the expert evidence.  It provides relevantly as follows:

   "Proceedings

   **317 Proceedings for personal injury**

(1) No person may bring proceedings independently of this Act, whether under any rule of law or any enactment, in any court in New Zealand, for damages arising directly or indirectly out of—

(a) personal injury covered by this Act; or

(b) personal injury covered by the former Acts.

(2) Subsection (1) does not prevent any person bringing proceedings relating to, or arising from,—

(a) any damage to property; or

(b) any express term of any contract or agreement (other than an accident insurance contract under the Accident Insurance Act 1998); or

(c) the unjustifiable dismissal of any person or any other personal grievance arising out of a contract of service.

(3) …..

(4) Subsection (1) does not prevent any person bringing proceedings under—

(a) Section 50 or s.51 of the Health and Disability Commissioner Act 1994; or

(b) any of sections 92B, 92E, 92R, 122, 122A, 122B, 123,

or 124 of the Human Rights Act 1993.

(5) Subsection (1) does not prevent any person bringing proceedings in any court in New Zealand for damages for personal injury of the kinds described in subsection (1), suffered in New Zealand or elsewhere, if the cause of action is the defendant's liability for damages under the law of New Zealand under any international convention relating to the carriage of passengers.

(6) ….

(7) Nothing in this section is affected by—

(a) the failure or refusal of any person to lodge a claim for personal injury of the kinds described in subsection (1); or

(b) any purported denial or surrender by any person of any rights relating to personal injury of the kinds described in subsection (1); or

(c) the fact that a person who has suffered personal injury of the kinds described in subsection (1) is not entitled to any entitlement under this Act."

37.     A number of points may be noted about the text of the provision at this stage. The statutory bar in s.317(1) operates on its strict wording by prohibiting a person from commencing proceedings for damages arising directly or indirectly out of personal injury in any court in New Zealand and does not expressly extinguish the underlying cause of action (albeit that this may be its effect).  By contrast, in the original 1972 Act, the New Zealand Parliament chose to abolish expressly certain causes of action (for loss of services and loss of consortium), and the distinction between that approach of abolishing permanently a cause of action as the original 1972 Act did, and the approach adopted by s. 317(1) is relied on by the Claimants here.   In agreement with Professor McLachlan however I do not consider that that distinction takes one very far in these particular circumstances. It is clear that the New Zealand legislature had no intention of abolishing  causes of action  entirely (for example in negligence) but rather intended to replace the availability of certain civil claims for personal injury with claims for compensation under the statutory Scheme where it applied.

38.     Subject to the qualifications within s.317, the statutory bar operates automatically by force of law and coterminously with cover under the Scheme.  In other words, a claimant either has cover for personal injury under the ACA 2001 in which case he or she will be prohibited from pursuing civil claims for damages for personal injury, or if there is no cover under the ACA 2001, the statutory bar will not apply and the claimant will be able to bring civil proceedings outside the scope of the ACA 2001. This is not a question of election as Professor McLachlan explains, since s.317(7) provides that the statutory bar applies irrespective of whether a covered person makes a claim under the Scheme, or has purported to deny his or her rights under the Scheme.

39.     The conclusion that the bar operates coterminously with cover is consistent with the decision in  *Queenstown Lakes DC v Palmer* [1999] 1 NZLR 549 where Henry J described the right to seek damages at common law as having been removed by the

legislation, the quid pro quo being the right to compensation under the Scheme.  At pg. 556 he said: "it follows from what has been said that the application of the Act and the corresponding scope for common law proceedings automatically adjust as and when the scope of cover provided by the act is extended or contracted.  To the extent that the statutory cover is extended, the right to sue at common law is removed; to the extent that the cover is withdrawn or contracted, the right to sue at common law is revived.  So it is in this case."

40.    The bar in s.317 (1) does not have to be raised as a defence.  It cannot be waived or contracted out of by parties subject to it: see s.299 and 317(7)(b).

41.    Section 317 identifies a number of qualifications to the scope of the bar in s.317(1).  Section 317(5) has been described as the only true exception to the application of statutory the bar since a person has both cover under the ACA 2001 and at the same time, a right to bring civil proceedings under this subparagraph. It can be explained as a specific exception by reference to New Zealand's international obligations relating to the carriage of passengers.

42.    There are also express qualifications on the scope of the statutory bar contained in subparagraphs (2) and (4).  By contrast, there is nothing in s.317 that addresses the question of where conduct takes place or that provides an express qualification to the application of the bar on that basis.  As Mr Goddard accepts, the language of s.317 on its face applies to all claims before a New Zealand court regardless of where a defendant's conduct occurred.

43.    Read literally s.317(1) appears only to apply to courts in New Zealand, and Mr Goddard has concluded that it should and would be read as not applying in an overseas court.  He suggests that if the New Zealand Parliament intended the provision to have effect overseas, the choice of language adopted was particularly inept.  On this basis, in his opinion it is unnecessary to decide whether the bar in s.317(1) should be characterised as procedural or substantive for private international law purposes.  Rather, in his view, however the bar is characterised, as a matter of statutory interpretation, s.317(1) simply does not apply to claims in an overseas court by virtue of the words limiting it to "proceedings in any court in New Zealand".  I shall return to this point below.

44.    Section 319 deals with exemplary damages and was introduced following *Donselaar v Donselaar* [1982] 1 NZLR 289 (CA) in terms as follows:

        "319 Exemplary damages

(1) Nothing in this Act, and no rule of law, prevents any person from bringing proceedings in any court in New Zealand for exemplary damages for conduct by the defendant that has resulted in—

(a) personal injury covered by this Act; or

(b) personal injury covered by the former Acts."

45.    Section 320 affords the Corporation a right to be heard in proceedings in which the existence or extent of cover is in issue. It provides:

"320 Corporation to be heard

(1) This section applies to proceedings in which a question arises as to whether or not a person—

(a) has suffered personal injury for which he or she has cover; or

(b) has suffered personal injury covered by the former Acts; or

(c) has died because of personal injury of a kind described in paragraph (a) or paragraph (b).

(2) The court, tribunal, or other body hearing the proceedings may not make a determination unless the Corporation is a party to the proceedings or is given an opportunity to be heard."

46.    Whilst s.320 is obviously a procedural provision, that cannot and does not affect the question whether s.317(1) is procedural or substantive.  The same is true of s.321 which reflects the policy of the Scheme to avoid double recovery, but does not reflect on the scope of s.317 (contrary to the arguments advanced by the Claimants).  It provides:

"321 Powers of Corporation when person has right to bring proceedings

(1) Subsection (2) applies when—

(a) any entitlement is required to be provided under this Act for personal injury to a person; and

(b) the person has the right to bring proceedings for damages in New Zealand or elsewhere for the personal injury.

(2) When this subsection applies, the Corporation may require a person to do one of the following things, at the person's option and at the Corporation's expense:

(a) to take all reasonable steps to enforce the right; or

(b) to assign the right to the Corporation, and to do all other things necessary to enable the right to be enforced by the Corporation, within a reasonable period.

(3) Subsection (4) applies when—

(a) any entitlement has been or is required to be provided under this Act for personal injury to a person; and

(b) the person has received a sum of money by way of damages, compensation, or settlement of any claim in New Zealand or elsewhere for the personal injury.

(4) When this subsection applies, the Corporation may, as the case requires,—

(a) deduct, from the cost of the entitlement required to be provided to a person, a sum equivalent to the net amount received by way of damages, compensation, or settlement; or

(b) recover from the person, as a debt due, the entitlement provided.

(5) …… "

47.    Section 321 entitles the Corporation to step into the shoes of a covered person, where either the covered person is entitled to bring proceedings in New Zealand or elsewhere in respect of the injury (subsection (2)) or has received a sum by way of damages, compensation or settlement in respect of the injury (subsection (4)).  In each case the Corporation is entitled to take the benefit of the injured person's rights or award.

48.    Mr Goddard relies on this provision as a clear indication that the statutory bar in s.317 (1) was not intended to prevent proceedings being brought outside New Zealand in all circumstances.  He points to the fact that this section expressly contemplates the possibility that there will be both cover in respect of personal injury under the Scheme and a right to bring proceedings in respect of that personal injury in New Zealand or abroad.

49.     I do not consider that s.321 affords any basis for inferring that Parliament intended the bar to be inapplicable abroad.  Section 321 is designed to ensure that the Corporation has the fullest ability possible to recoup a covered person's statutory entitlements and to avoid double recovery.  It says nothing about the scope of s.317.  Section 321(1) recognises that cover may be provided in circumstances where a foreign court does not regard New Zealand law as applicable to the claim so that the bar does not apply even if characterised as substantive by the foreign court – for example, in a case where a person ordinarily resident in New Zealand has cover for an accident suffered overseas where overseas law applies.  Furthermore, s.321 might also apply (whether in New Zealand or abroad) to claims brought under international conventions on the carriage of passengers preserved by s.317(5). There is nothing inconsistent in s.321 recognising that proceedings for personal injury might be brought overseas (or in New Zealand) in circumstances where the statutory bar is not in issue and might result in a recovery and therefore providing for a mechanism to avoid double recovery (s.321(3)).  The section as a whole simply ensures that if a covered person is entitled to recover damages wherever that may be and for whatever reason, the Corporation can take the benefit of that recovery: see by way of example of this happening, *Schlaadt v Accident Rehabilitation and Compensation Insurance Corp* [2000] 2 NZLR 318 (HC).


50.     Moreover,  the mere fact that s.317(1) is defined by reference to the New Zealand courts does not mean that the New Zealand legislature intended that foreign courts should not be able to apply it, as Mr Goddard accepted.  I cannot see what purpose would have been served in allowing someone with cover under the Scheme in New Zealand, and a technical right to sue abroad (as a result of happenstance) simply to bypass the statutory Scheme.   No evidence that this was the intention of the legislature has been produced, and no compelling basis for inferring such an intention on the part of the New Zealand legislature has been advanced.   In reaching that conclusion I am supported by the decision in *Rimini v Manning Management and Marketing Pty Ltd* [2003] 3 NZLR 22 where in analogous circumstances Randerson J held that the statutory purpose of a similar provision was not to restrict the application of the relevant Act to New Zealand courts, it remaining open to the Australian courts to apply it in a case where performance of the contract took place in Australia, and though New Zealand law was the applicable law, the claim otherwise had no connection with New Zealand.   Randerson J held that where a statute does not expressly or by clear implication exclude its application by foreign courts, it must be open to foreign courts to apply it.


51.     In my judgment the language of s.317(1) in this regard is best explained, as Mr Dougherty submitted, on the basis that the New Zealand legislature did not regard itself as competent to give directions to foreign courts.  However neither expressly nor by clear implication has the ACA 2001 excluded the application of the statutory bar by foreign courts, who may accordingly apply it.


**Interpretation of effect of s.317(1) by New Zealand courts**

52.     In addition to *Queenstown Lakes DC* (referred to above), and *Daniels v Thompson* [1998] 3 NZLR 22 (where the Court of Appeal referred to the accident compensation legislation as having *removed* liability to compensate for causing personal injury), both experts refer to two particular decisions of the New Zealand courts interpreting the effect of the statutory bar in s.317 and its predecessor provisions, and each side submits that the relevant decisions support their arguments.

53.     The two decisions are *Donselaar* (referred to above) and *Couch v Attorney General (No.2)* [2010] 3 NZLR 149 (SC).  I deal with each in turn having summarised briefly what Mr Goddard had to say about them, and Professor McLachan's response.  Mr Goddard states at paragraph 51 of his report that the New Zealand courts have held that the statutory bar does not extinguish the underlying cause of action in tort and that this interpretation was central to the reasoning of the Court of Appeal in *Donselaar*.  In this regard, Professor McLachlan fundamentally disagrees.  In the body of his report Mr Goddard refers only to the judgment of Richardson J in *Donselaar* who said that the statutory bar "is concerned with remedies and leaves rights of action intact".

54.     In *Donselaar,* there were two other judgments to different effect on this issue, albeit agreeing in the result, and I find it surprising that no reference is made  by Mr Goddard to these judgments.  In the view of Mr Goddard, the decision in *Donselaar* reflects a concern on the part of the New Zealand courts that the statutory bar be given effect so far as necessary to preserve the integrity of the ACA 2001 but no further; the bar should not be read as curtailing rights of personal injury victims to a greater extent than necessary to give effect to the policy of the Scheme.  Although Mr Goddard refers in his report to *Couch* in a footnote as approving an aspect of the reasoning in *Donselaar*, there is no further reference to it.  Again, I find this surprising since *Couch* is a decision of the Supreme Court and as I shall explain, it directly addressed the question whether the underlying cause of action was itself affected by the statutory bar.  Professor McLachlan regards *Couch* as conclusively supporting his approach to the character of the statutory bar in s.317(1) ACA 2001.

55.     It is common ground that the question of the availability of exemplary damages in light of the statutory bar in s.317(1) (or its predecessor sections) was a controversial one, with decisions going both ways in the New Zealand courts before the decision of the Court of Appeal in *Donselaar*, some 10 years after the Act was introduced.  The decision in *Donselaar* was itself controversial.  It arose out of a dispute between two brothers where a trespass involving assault and battery occurred.  Again, it is common ground that the cause of action relied on was complete without damage because the torts are actionable per se. There were two questions for the court on an application to strike out the claim in assault or battery as disclosing no cause of action.  First, whether actions for exemplary damages for assault or battery could still be brought in New Zealand notwithstanding the provisions of the 1972 Act and secondly, the scope of the predecessor section to s.317(1).  The Court of Appeal concluded that there was no basis for a claim for exemplary damages in *Donselaar* so that the remainder of the

judgments are strictly obiter.  However each member of the court concluded that the statutory bar did not apply to exemplary damages, arising as they did not out of any injury but out of the outrageous manner in which the defendant committed the tort, and in doing so made observations that have been referred to and relied on by the parties albeit to very different effect.

56.    The first judgment in *Donselaar* is given by Cooke J who said at pg 107:

> "All in all, in a situation where the right course for this court is far from self-evident I think that we should try to meet a problem occasioned by the Accident Compensation Act by consciously moulding the law of damages to meet social needs. The only feasible way of doing so, without intruding into the field of compensation which the Act has taken over, appears to be to allow actions for damages for purely punitive purposes; and to accept that as compensatory damages (aggravated or otherwise) can no longer be awarded, exemplary damages will have to take over part of the latter's former role....."

57.    Somers J adopted a similar approach to that of Cooke J stating at pg 116 that the

> "substratum of compensatory damages has disappeared and with it all practical possibility of taking account of their award in estimating whether and to what extent there should be any addition by way of exemplary damages.  A new approach is necessary. …. "

There is no suggestion in his judgment that compensatory damages remain available but in the background to be used in assessing an award of exemplary damages. Indeed if the bar was merely a bar to recovery as Mr Goddard suggests, then there should have been no difficulty in assessing the compensatory element (albeit that it could not have been recovered) and adding exemplary damages on top to reflect the punitive element that could be recovered.

58.    If anything, it seems to me that these two judgments are consistent with all heads of compensatory damages (in other words economic and non-economic heads of damage) having been removed or having disappeared as a result of the statutory bar.

59.    Richardson J took a significantly different approach. As Mr Goddard said in his report, Richardson J observed that the function of the bar was limited, its sole concern being to prohibit suits for damages in certain cases being "concerned with remedies

and leaves rights of action intact." (at pg 109). This is interpreted by Mr Goddard as the judge drawing a careful distinction between damage and damages in the context of the bar on proceedings. I disagree. *Donselaar* was not concerned with that question since the tort at issue was actionable per se without proof of any damage, and he was not therefore dealing with actionability. It seems to me that Richardson J's concern is about how to assess exemplary damages where there are no compensatory damages and in the context of an actionable tort of battery or assault. Richardson J addresses the question whether it is possible to award exemplary damages without a substratum of compensatory damages; in other words, on a notional basis. But he does not suggest that those damages had in fact been suffered or that they would be actionable but for the bar. In any event, his observations received no express support from either of the other two members of the Court. They do not form part of the ratio of the decision.

60.    In any event, the decision in *Donselaar* was overtaken by *Couch v AG* in the Supreme Court. This was also concerned with an application to strike out a claim as disclosing no reasonable cause of action. Ms Couch brought proceedings alleging negligence and claiming exemplary damages against the Attorney General on behalf of the Department of Corrections when she was severely injured by a prisoner released on parole. Her claim was based on tortious negligence and two questions arose. Firstly, whether the "damages" referred to in s.317(1) included exemplary damages. Secondly whether, since no claim could be brought for compensatory damages arising out of personal injury covered by the Act, exemplary damages could nevertheless be awarded on a stand-alone basis. The Attorney General argued that without actionable compensatory damages the tort of negligence was incomplete as damage is an essential ingredient and there was therefore no tort for which exemplary damages could be awarded. Accordingly the issue that lies at the heart of this dispute was raised squarely for decision by the New Zealand Supreme Court.

61.    The Supreme Court held unanimously that the statutory bar on actions arising out of personal injury applies only to compensatory damages and did not bar an action for exemplary damages, nor was an action for exemplary damages barred by the fact that the plaintiff could not obtain compensatory damages. Although doubt was expressed about the decision in *Donselaar* described by Tipping J as a "debatable conclusion at the time", he held that too much water had since gone under the bridge to contemplate taking a different view and that since the decision in that case the New Zealand Parliament had had several opportunities to include exemplary damages expressly within the statutory bar but had chosen not to do so.

Importantly, at [89] Tipping J (with whom Elias CJ at [7], Blanchard J at [71] and Wilson J at [248] agreed) having identified the critical question at [85] held:

"Section 319 also has relevance to the second aspect of this first issue. Parliament has expressly provided that exemplary damages may be awarded despite the Courts inability to award compensatory damages. It is therefore no bar to a claim for

> exemplary damages for personal injury that no compensatory damages may be awarded. The ordinary need for there to be damage to complete the tort of negligence must for this purpose be satisfied by there being a case for the award of exemplary damages. The consequence is that there is no actionable tort of negligence for causing personal injury in New Zealand unless the case justifies exemplary damages."

62.    In my judgment, the natural meaning of the last two sentences read together is that the tort of negligence for personal injury heads of damage in New Zealand is no longer available (or to put it another way, has been removed, replaced or extinguished where there is cover) except where the claim is for exemplary damages. In effect a stand-alone tort was created and thus like Cooke J in *Donselaar*, the Supreme Court fashioned the law of damages creating a special cause of action in personal injury cases where the only form of actionable damage is exemplary damage or damages.

63.    I do not accept that this interpretation leads to absurd results as Mr Preston submitted. In order to advance a claim for exemplary damages a claimant would need to establish a duty of care owed to the individual, together with breach of that duty. The absence of injury beyond exemplary damage is not surprising in circumstances where exemplary damages are available in New Zealand law for a touch or a push, both of which are actionable per se. Nor do I accept the Claimants' case that the last sentence of [89] is merely stating that there is no actionable claim for compensatory damages in a remedies inclusive sense, so that the better view of the ratio of *Couch* is that the tort of negligent infliction of personal injury remains unchanged and intact, but only the availability of remedies for that tort is affected, compensatory damages not being available but exemplary damages being so available. In my judgment the Supreme Court redefined the nature of the loss or head of damage that would have to be established as a constituent element of the tort, and was not merely dealing with enforcement or recoverability of certain remedies.

64.    Significant reliance was placed by Mr Goddard and Mr Preston on the judgment of McGrath J at in *Couch* [202] and [203]. I do not find these passages easy. In so far as McGrath J was suggesting that it was necessary to prove compensatory loss before claiming exemplary damages (thereby suggesting that the right to compensatory damages remained available even where the bar applied) he was clearly in the minority. However I have come to the conclusion that this is not what these paragraphs mean in any event. It seems to me most likely that he was merely saying that if what Tipping J said about the case for exemplary damages itself being sufficient damage is not correct, then the approach identified in *Donselaar* by Richardson J was available. In other words, he accepted the primary reasoning of Tipping J, but by way of alternative analysis, agreed that the notional exercise of assessing compensatory damages for the purposes of an assessment of exemplary damages, could be undertaken despite the fact that they could not be recovered.

**Other authority**

65.    Although not binding, the Defendant also relies (as highly persuasive authority) on
the characterisation of s.317(1) as a substantive provision by the Australian appellate
courts when applying the ACA 2001 and its predecessor Acts at a time when
Australian and English law on the distinction between substance and procedure (as set
out in *Stevens v Head* (1993) at 453, and followed in Harding) were materially
identical.  Of most significance in my view, is a decision of the Court of Appeal in
*James Hardie and Company Pty Ltd v Hall* (1998) 42 NSWLR 554 where a New
Zealand domiciled claimant diagnosed with mesothelioma, with cover under the
Scheme, sought to recover damages, not from his New Zealand employer, but in New
South Wales from two New South Wales companies responsible for supplying and
exporting the asbestos.  Shellar JA (with whom the other members of the Court
agreed) considered s.17 of the Accident Rehabilitation and Compensation Act 1992 (a
predecessor provision to s.317(1) ) to be a substantive provision although read
literally it merely barred an action to enforce a right to damages.  He held (applying
*Stevens v Head*) that the New Zealand accident compensation scheme is a
"comprehensive system of exclusive compensation, replacing tort recovery" with
statutory compensation. The relevant sections substituted cover under the Act for the
right to recover common law damages so that in effect the Scheme extinguished the
common law right to recover damages.   Accordingly he held that the relevant
provision (s.17):

> "must be read as extinguishing any cause of action for damages
> arising directly or indirectly out of personal injury caused and
> arising in the manner therein described.  While the language of
> the section in form bars an action to enforce the right to
> damages, its substantial effect, read in the context of the Act as
> a whole, is to substitute cover under the Act for the right to
> recover common law damages.  It is a substantive law. … The
> section extinguished the plaintiff's common law right to
> recover damages for his injury. "

66.    Although that judgment was followed by Spigelman CJ in *Amaca Pty Ltd v Frost*
(2006) 67 NSWLR 635 at [65] I accept Mr Preston's submission that this decision
was reached after the "no advantage principle" had been adopted by the Australian
courts and is therefore of limited assistance in this respect.

67.    Mr Goddard suggests that the Court of Appeal's decision in *James Hardie* was based
on an incomplete analysis of the New Zealand legislation, not having been referred to
the precursor to s.321 or to *Donselaar* (see paragraph 104 of his report).  So far as the
first point is concerned, I do not regard s.321 as shedding any light on the character of
the bar in s.317 as I have already indicated.  As to the latter, he is wrong: *Donselaar*
was cited in argument and submissions – see pg. 556 of the report.  More
fundamentally, the decision is challenged on behalf of the Claimants on the basis that
the legislation does not nullify or extinguish causes of action save where this is

expressly made clear (for example in s.5(2) Accident Compensation Act 1972) but is concerned with remedies (see reference to substitution of the "right to recover common law damages"), leaving rights of action intact. The distinction sought to be drawn between damages and damage in this context appears to me to be semantic: the rights referred to by Shellar JA as having been extinguished are in effect rights to recover all heads of loss encompassed within the term "damages". Accordingly I am not persuaded by Mr Goddard's conclusion that this reasoning is unlikely to be followed by the New Zealand courts.

68.    I was also referred to academic commentary in New Zealand on the effect of the statutory bar. Both sides referred to Tobin and Shoeman, "The New Zealand Accident Compensation Scheme: the Statutory Bar and the Conflict of Laws" (2005) Am J Comp L 493. At paragraph 105 of his report, Mr Goddard refers to an examination at pg.504 of the article of statements in a US case in 1982 *Bennett v Enstrom* (679 F 2d 630) to the effect that there is "simply no longer, under New Zealand substantive law, a common law tort action for persons covered". The authors describe this and like statements as "too wide" and he expresses agreement with those observations. However the criticism made by the authors is explained by reference to the continuing availability of a stand-alone tort action for personal injury for exemplary damages meaning it remains actionable but for that purpose alone. The ultimate conclusion reached by the authors supports the Defendant's contentions: namely that the statutory bar is properly to be regarded as having substantive effect and as having destroyed substantive rights. The authors state expressly that by denying recovery for a particular head of damage the bar is substantive so that although tort actions for personal injury have not been abolished because exemplary damages can be recovered, "compensatory damages, as a particular head of damage, cannot be recovered."

### First issue: The proper characterisation of the statutory bar in section 317(1)

69.    Against that background I turn to the proper characterisation of the statutory bar in the context of the purpose and objectives of the comprehensive no fault compensation scheme in New Zealand, on the premise that this court has already held that New Zealand is the applicable law.

70.    Whilst the dividing line between substance and procedure can be clearly drawn and a bright line identified in the case of certain rules or statutory provisions, I do not consider that it is always an easy line to draw. In particular where common law rules on the availability of certain heads of damage or damages are concerned, the line between substance and procedure can be blurred because such rules can be seen as affecting both rights (regarded as substantive) and remedies (regarded as procedural).

71.    Read literally the language of s.317(1) bars proceedings to enforce personal injury claims, but the language is not determinative and may be an uncertain guide. Subject to the exemplary damages exception, the language used to describe the effect of the statutory bar in the cases (and the academic material) to which I have referred above, is overwhelmingly consistent with the removal of civil liability for damages for personal injury within the scope of cover, and with that liability having disappeared

and been replaced by cover under the Scheme. This is consistent with the concerns and recommendations in the Woodhouse Report which identified problems caused by common law personal injury litigation (both in terms of their negative effect on rehabilitation and uneven and capricious results) and recommended the abolition of common law rights in respect of personal injuries and their substitution for cover under the Scheme.

72.     In my judgment, on its true construction, having regard to the purpose and objectives of the Scheme, the substantive effect of the statutory bar is to remove or render unavailable the right to recover common law (compensatory) damages for personal injuries, the phrase "compensatory damages" being shorthand for the heads of loss comprised by all non-economic and economic heads of loss (or damage) in a personal injury claim, but excluding exemplary damages. A claim for any such heads of loss no longer remains available because the basis for and scope of liability has been replaced by cover under the ACA 200. This is a matter of substantive law that determines for what there is liability. This conclusion that the statutory bar operates substantively is supported by the fact that it cannot be waived and operates automatically; that parties cannot contract out of its effect; and that courts and practitioners in New Zealand treat the statutory bar as a basis for striking out a claim in appropriate cases, as disclosing no reasonable cause of action.

73.     Mr Preston placed significant reliance on a number of passages in Professor McLachlan's evidence where he suggested that Professor McLachlan accepted that the cause of action continues to exist but is not enforceable by way of a claim for compensatory damages. I do not accept this characterisation of Professor McLachlan's evidence. Both in his report and his evidence he states that there is no longer any "actionable claim for compensatory damages" and that the effect of the statutory bar has been to remove rights to compensatory damages where there is cover. A fair reading of his evidence shows that he treats the phrase "compensatory damages" as necessarily including economic and non-economic heads of damage or loss. In his expert opinion, the ACA 2001 takes away the whole cause of action for damages for personal injury (save in the special case of exemplary damages) and replaces it with cover under the Scheme.

74.     In my judgment, whether viewed as extinguishing, abolishing, rendering not available or non-actionable, the effect of the statutory bar is that no heads of loss or kinds of damage for negligently inflicted or other personal injury remain where there is cover, subject to the exception for exemplary damages. This is not a rule that deals merely with remedy. The liability here (and therefore what is actionable) is for compensatory damages for personal injury. That is a substantive right, not merely a remedy. This is the *kind* of damage for which there is no longer any liability where there is cover, and rights of action are accordingly affected.

75.     The fact that a cause of action for exemplary damages remains is not inconsistent with this conclusion. This remaining cause of action is a stand-alone cause of action for

exemplary damages and does not entail the continued existence of an underlying cause of action for negligently inflicted (or other) personal injury compensatory damages. A defendant in such a case is only liable for exemplary damages, the effect of s.317(1) being to remove any liability such a defendant might otherwise have had for compensatory damages and the heads of damage encompassed within that phrase.

76.    A similar point may be made in relation to the existence of other potential remedies, such as a declaration or an injunction, relied on by the Claimants. One cannot identify the existence of a theoretical remedy and extrapolate from that the continuing existence of a right to sue for personal injury. The mere fact that a declaration or an injunction might in future be awarded tells one nothing about the underlying cause of action or liability that might give rise to such a remedy. There has been no case yet (in 40 years since the Scheme's inception) where such a remedy has been granted – in *Re Chase* [1989] 1 NZLR 325, declarations were sought but not on the basis of personal injury claims, and none was granted in any event. Even if an injunction or declaration were to be granted, the underlying basis or cause of action supporting such relief would have to be identified, and it cannot be assumed that such a cause of action would involve personal injury. In any event, if a court decides that injunctive or declaratory relief may be available in a case that would (absent the ACA 2001) be a cause of action for accidental personal injury that would not lead to the conclusion that such a cause of action or liability has been preserved. Just as in *Couch* where the law was moulded or re-fashioned to support a stand-alone claim for exemplary damages, the same may be possible in a claim for injunctive or declaratory relief. The theoretical availability of these remedies accordingly, provides no support in my judgment for the contention that substantive rights of action for personal injury remain intact.

77.    The Claimants point to the similarity of the language used in English limitation provisions (typically, "an action founded on… shall not be brought…") and other statutory provisions that bar rights of access to the courts (for example, s.34 Civil Jurisdiction and Judgments Act 1982, "no proceedings may be brought…") but leave substantive causes of action intact, and have been held to be procedural in nature, and contend that the statutory bar operates procedurally by analogy. I do not accept this analogy. There is a distinction between a statute of limitation which merely bars access to the courts for enforcement of the claim and a statute that removes or renders altogether unavailable a cause of action or head of loss. The former is obviously procedural, while the latter substantive. In the case of a limitation provision it is uncontroversial that the underlying cause of action remains and only the ability to bring a claim based on that underlying cause of action is removed by the expiry of the limitation period if it is relied on. The fact that the limitation period can be waived is itself confirmation that the underlying cause of action remains. I agree with Mr Dougherty that a limitation provision operates as an elected statutory defence that does not destroy the underlying right. Similar points can be made in relation to the other statutory provisions barring the bringing of proceedings relied on by the Claimants.

78.   The fact that substantive rights are available to be revived if and when the scope of the statutory bar is altered is also relied on by the Claimants as consistent with the statutory bar being procedural, leaving substantive rights intact.  Mr Preston contends that it is incompatible with the extinction of substantive rights as in those circumstances there would be nothing left to revive.  Again, I do not agree.  In the context of a unique scheme where the application of the statutory bar and the corresponding scope for common law proceedings automatically adjusts as and when the scope of cover extends or contracts, the language of revival is specific and says nothing about the nature of the statutory bar itself.  The question of characterisation is to be answered in light of the existence of the statutory bar and having regard to its nature and effect; and not by looking at the position when the bar is adjusted or removed.

### Second issue: Conduct outside New Zealand

79.   On the basis that s.317(1) is a substantive provision, the next question is whether there is an additional requirement under New Zealand law before the statutory bar applies to preclude a claim for compensatory damages.   On this question Professor McLachlan's position is that if there is cover under the ACA 2001, s. 317(1) applies without more and there is no basis for importing any additional requirements.

80.   Mr Goddard takes a different view.  He considers that in addition to cover under the Scheme, it is necessary to establish that the relevant "conduct" occurred in New Zealand before the statutory bar has application (see paragraphs 17 to 23 and 70 to 78 of his report) and this is how the New Zealand courts would interpret s.317(1).  In other words, s.317(1) does not apply to claims relating to conduct outside New Zealand as a matter of interpretation.

81.   In Mr Goddard's opinion any other interpretation would restrict claimants' rights of access to the courts to a greater extent than necessary to ensure the integrity of the Scheme.  He considers that where a potential defendant engages in conduct in New Zealand, that person can reasonably expect that they will not be exposed to personal injury claims in respect of that conduct and can reasonably proceed on the basis that they do not need to insure against liability for personal injury claims in respect of that conduct.  Where the person's conduct in New Zealand results in liability to pay levies to the scheme or general taxes, that person will have contributed to the costs of the scheme.  Accordingly, they can reasonably expect not to have to pay damages or insurance premiums in those circumstances.  In Mr Goddard's opinion the same cannot be said of a person engaging in conduct outside New Zealand.  Such a person does not have a reasonable expectation that they will be protected from liability by the Scheme and does not have a reasonable expectation that there is no need to insure in respect of such liability.  Such a person makes no contribution to the costs of the Scheme and if protected from liability in respect of conduct outside New Zealand despite not making any contribution whether directly or indirectly, would receive a windfall benefit.  Moreover it would deny the victim the ability to recover losses

caused by the overseas person's conduct, an ability expressly contemplated by s.321. Although Mr Goddard accepts that the language of s.317(1) on its face applies to all claims regardless of where a potential defendant's conduct occurred and accepts that some judges may be reluctant to read the provision down in the manner he has suggested, he concludes on balance that the likely approach of both first instance and appellate courts would be to read down s.317(1) in this way so that it does not apply to claims relating to conduct outside New Zealand.

82.   I do not accept this argument.  Quite apart from the fact that there is neither appellate or other authority for it, nor any academic support for it and it is rejected by Professor McLachlan, the ACA 2001 does not depend on the existence of a defendant or some third-party responsible for the injury, so that any focus on a defendant's conduct (or a defendant's reasonable expectation of being protected from liability) is irrelevant and inconsistent with the Scheme's purposes.  It is the injury rather than its cause or the conduct that is in issue and that gives rise to rights to compensation.

83.   The ACA 2001 carefully defines the scope of cover, addressing expressly its extraterritorial effect.  It provides cover for those suffering personal injuries in New Zealand irrespective of the location of the conduct said to have caused that injury, and cover for New Zealand residents abroad.  In both cases the focus is on the person injured and the location of the injury rather than on the conduct of a third party which is irrelevant to the scope of cover.  Further, on the face of its terms, s.317(5) proceeds on the basis that s.317(1) does apply in relation to conduct overseas because if it did not there would have been no reason to refer to claims where the injury was overseas.  Section 317 itself contains exceptions and qualifications but none relate to the conduct of a potential defendant.  This would be a major exception from its scope and given that the Scheme has been amended on a number of occasions since its inception, it is significant that there has never been any amendment in this regard.

84.   Moreover, there is no basis in the text or purpose of the statute for inferring that the New Zealand legislature intended the application of the statutory bar to depend on the "reasonable expectation" of a potential defendant in relation to protection from liability.  The purpose of the statutory bar is to protect the integrity of the comprehensive no-fault compensation scheme by ensuring that covered persons are restricted to their entitlements under the ACA 2001.  It is difficult to see any place for a concept of reasonable expectation in the context of this Scheme.  In any event, it seems to me that the only reasonable expectation a person manufacturing and exporting goods to New Zealand from abroad can have is to expect to take the law as he or she finds it.

**Conclusion**

85.   For the reasons given above, on a proper construction in light of its purpose and context, the statutory bar in s.317(1) has substantive effect.  Its application is not

limited to the courts of New Zealand.  There is no additional "conduct" or other requirement under New Zealand law, beyond cover under the ACA 2001 before the statutory bar in s.317(1) applies.

86.     The result is that the three Claimants who are covered under the ACA 2001 have no right to bring civil proceedings in England for compensatory damages for personal injury by reason of the statutory bar in s.317(1).

87.     My answer to the question set by the preliminary issue is accordingly as follows: the claims of the New Zealand Sample Claimants are precluded by s.317(1) ACA 2001.

TAB 2

*Ashmore v British Coal Corporation* [1990] 2 QB 338

Ashmore v. British Coal Corpn. (C.A.)                              [1990]

[COURT OF APPEAL]                                                          A

## ASHMORE v. BRITISH COAL CORPORATION

1990  Feb. 12, 13; 27                    Lord Donaldson of Lymington M.R.,
                                         Stuart-Smith and Farquharson L.JJ.

                                                                          B

*Industrial Relations—Industrial tribunals—Striking out proceedings—*
*Claim for equality of pay—Sample cases selected from numerous*
*similar claims against same employers—Sample claims dismissed*
*by industrial tribunal—Whether claimant able to relitigate issue—*
*Whether claim frivolous, vexatious or abuse of process—Industrial*
*Tribunals (Rules of Procedure) Regulations 1980 (S.I. 1980 No.*
*884), reg. 3, Sch. 1, r. 12(2)(e)*
*Practice—Pleadings—Striking out—Abuse of process—Sample cases*        C
*selected from similar claims for equal pay—Claims dismissed—*
*Unselected claimant seeking to relitigate—Whether contrary to*
*public policy and interests of justice*

    The applicant, together with some 1,500 other women
engaged as colliery canteen workers, complained to an industrial
tribunal that she was employed on less favourable terms than            D
certain male comparators contrary to section 1(2)(a) of the
Equal Pay Act 1970, as amended. The tribunal ordered that
sample cases be selected for trial representing the issues common
to all claims, but that the decision in such cases, although
persuasive in effect, would not be binding on the other claims.
The applicant was kept fully informed of the selection process
in which 14 sample cases were chosen. Despite ample opportunity          E
she did not seek to put forward her claim for selection so that
together with all other unselected claims her application was
stayed pending determination of the sample claims. After
investigation of extensive evidence the tribunal found that the
applicants in the sample proceedings had not been employed on
like work with their chosen comparator, who worked alone on
the night shift, and that in any event the employers were
entitled to rely on section 1(3) of the Act, because the variation       F
in the rates of pay was due to a material factor which was not
the difference of sex. The appeal tribunal upheld their decision.
The applicant, who like the male comparator had worked alone
on the night shift, sought to proceed with her claim and applied
for the stay to be lifted. She resisted the employers' application
to strike it out as frivolous or vexatious under rule 12(2)(e) in
Schedule 1 to the Industrial Tribunals (Rules of Procedure)
Regulations 1980[1] on the ground that in the absence of res            G
judicata or an agreement to be bound she was entitled to have
her claim determined with regard to the section 1(3) issue. The
chairman held that although the decision in the sample
proceedings was not technically binding on her it would amount
to an abuse of the process to relitigate the factual issue raised
under section 1(3) and, concluding that the claim was bound to
fail, he ordered that it be struck out as vexatious under rule
12(2)(e). The appeal tribunal upheld that decision.                     H
    On appeal by the applicant:—

[1] Industrial Tribunals (Rules of Procedure) Regulations 1980, Sch. 1, r. 12(2)(e): see
post, p. 347c–D.

03635-jpm    Doc 306    Filed 06/06/17    Entered 06/06/17 11:28:43    Main Docun
Pg 150 of 1164
339

2 Q.B.                    Ashmore v. British Coal Corpn. (C.A.)

A  *Held*, dismissing the appeal, that the categories of conduct rendering a claim frivolous, vexatious or an abuse of the process were not closed but depended on all the relevant circumstances of the particular case, public policy and the interests of justice being very material considerations; that, where sample cases had been selected to enable the tribunal fully to investigate and make findings on all the relevant evidence, relitigation of the same issues, being analogous to a collateral attack on the

B tribunal's decision, would defeat the purpose of sample selection and be contrary to the interests of justice and public policy unless there were fresh evidence which entirely changed the aspect of the case; that in the absence of any such evidence, since the applicant had not taken the opportunity of putting forward her claim for selection and since the issues had been fully investigated in the sample proceedings, it would be unfair

C to other claimants and contrary to the interests of justice to permit her to reopen the issue in respect of the applicability of section 1(3); and that, accordingly, the chairman had properly exercised his discretion in striking out her claim under rule 12(2)(e) (post, pp. 348B–C, H—349A, 352E–F, 354E–F, H—355A).

 Dictum of Lord Cairns L.C. in *Phosphate Sewage Co. Ltd. v. Molleson* (1879) 4 App. Cas. 801, 814, H.L.(Sc.) and *Hunter v. Chief Constable of the West Midlands Police* [1982] A.C. 529,

D H.L.(E.) applied.

 *National Coal Board v. Sherwin* [1978] I.C.R. 700, E.A.T. and *Thomas v. National Coal Board* [1987] I.C.R. 757, E.A.T. considered.

 *Ladd v. Marshall* [1954] 1 W.L.R. 1489, C.A. distinguished.

 *Per curiam.* A claim is not only to be struck out as being an abuse of the process if it is a sham, not honest or not bona fide.

E It is dangerous to try and define fully the circumstances which can be regarded as an abuse of the process (post, p. 352D–E).

 Dictum of Stephenson L.J. in *Bragg v. Oceanus Mutual Underwriting Association (Bermuda) Ltd.* [1982] 2 Lloyd's Rep. 132, 139, C.A. doubted.

 Decision of Employment Appeal Tribunal affirmed.

F  The following cases are referred to in the judgment of Stuart-Smith L.J.:

 *Bragg v. Oceanus Mutual Underwriting Association (Bermuda) Ltd.* [1982] 2 Lloyd's Rep. 132, C.A.
 *Davies (Joseph Owen) v. Eli Lilly & Co.* [1987] 1 W.L.R. 1136; [1987] 3 All E.R. 94, C.A.
 *Godfrey v. Department of Health and Social Security* (unreported), 25 July

G   1988, Stuart-Smith J.
 *Hunter v. Chief Constable of the West Midlands Police* [1982] A.C. 529; [1981] 3 W.L.R. 906; [1981] 3 All E.R. 727, H.L.(E.)
 *Ladd v. Marshall* [1954] 1 W.L.R. 1489; [1954] 3 All E.R. 745, C.A.
 *Loveday v. Renton*, The Times, 31 March 1988
 *McIlkenny v. Chief Constable of the West Midlands* [1980] Q.B. 283; [1980] 2 W.L.R. 689; [1980] 2 All E.R. 227, C.A.

H  *Marler (E. T.) Ltd. v. Robertson* [1974] I.C.R. 72, N.I.R.C.
 *Medallion Holidays Ltd. v. Birch* [1985] I.C.R. 578, E.A.T.
 *National Coal Board v. Sherwin* [1978] I.C.R. 700, E.A.T.
 *Phosphate Sewage Co. Ltd. v. Molleson* (1879) 4 App. Cas. 801, H.L.(Sc.)
 *Thomas v. National Coal Board* [1987] I.C.R. 757, E.A.T.

Ashmore v. British Coal Corpn. (C.A.)                    **[1990]**

A

The following additional cases were cited in argument:

*Associated Provincial Picture Houses Ltd. v. Wednesbury Corporation* [1948]
    1 K.B. 223; [1947] 1 All E.R. 498, C.A.
*Gleeson v. J. Wippell & Co. Ltd.* [1977] 1 W.L.R. 510; [1977] 3 All E.R. 54
*North West Water Authority v. Binnie and Partners* (unreported), 9
    November 1989, Drake J.

B

APPEAL from the Employment Appeal Tribunal.

By a notice of application dated 10 October 1982 the applicant, Ann
Ashmore, complained to the Birmingham Regional Office of Industrial
Tribunals that pursuant to section 1(2)(*a*) of the Equal Pay Act 1970, as
amended, she was entitled to receive the same pay and conditions as
male canteen workers employed on like work by the employers, the
National Coal Board now the British Coal Corporation. In August 1984      C
the applicant's application together with 1,558 other such applications
was transferred to an industrial tribunal sitting at London (Central). In
interlocutory proceedings on 10 October 1984 the chairman of the tribunal,
Mr. G. E. Heggs, directed that sample applications representative of
the issues involved be selected by the parties for determination not as
test cases but as of assistance in the remaining applications. The      D
employees selected six such cases and the employers eight, directions
being given as to trial at a number of subsequent interlocutory hearings
and all other applications being stayed pending determination of the
sample cases. The applicant, by her legal advisers, was aware of the
course taken.

By its decision promulgated on 8 September 1986 the industrial
tribunal dismissed the claims made in the 14 sample cases on the      E
grounds that the employees had not been employed on like work to the
chosen male comparator within the meaning of section 1(4) of the Act
and that the employers had made out a defence under section 1(3).

By a letter dated 23 September 1986 the applicant sought to transfer
her application to Nottingham and to pursue her claim on the ground
that she was engaged in like work to that of the chosen comparator. On      F
8 October 1986 the chairman of the industrial tribunal rejected her
application for transfer. The applicant sought further consideration of
her claim and at an interlocutory hearing on 12 December 1986 the
tribunal postponed such consideration pending the outcome of the
employees' appeals to the appeal tribunal in the sample cases. By a
notice of appeal dated 14 January 1987 the applicant appealed to the
appeal tribunal which on 15 April remitted the matter to the industrial      G
tribunal indicating that it was appropriate to lift the stay on her
application. On 15 May 1987 the appeals in the sample cases were
dismissed: see *Thomas v. National Coal Board* [1987] I.C.R. 757.

Thereafter the applicant made a further interlocutory application for
the stay to be lifted, such application being adjourned pending the outcome
of a proposed appeal to the Court of Appeal by one of the
employees in the sample cases. On 13 November 1987 the employers      H
applied to the industrial tribunal for her claim to be struck out pursuant
to rule 12(2)(*e*) of the Rules set out in Schedule 1 to the Industrial
Tribunals (Rules of Procedure) Regulations 1980 on the ground that it

03635-jpm    Doc 306    Filed 06/06/17    Entered 06/06/17 11:28:43    Main Docun
Pg 152 of 1164

341
2 Q.B.                          Ashmore v. British Coal Corpn. (C.A.)

A    was frivolous or vexatious. By his decision promulgated on 17 November
     1987 the chairman of a tribunal sitting at London South acceded to the
     employers' application and struck out the applicant's claim.

         By a notice of appeal dated 22 December 1987 the applicant appealed
     to the appeal tribunal on the grounds, inter alia, that (1) by treating the
     decision in *Thomas's* case as determinative of the applicant's claim the
     industrial tribunal effectively compelled the applicant to be represented
B    by the 14 employees in the sample proceedings notwithstanding that the
     tribunal had no power to order representative proceedings; (2) when the
     *Thomas* decision was promulgated it was clearly understood that it was
     only binding on the 14 employees in the sample proceedings so that the
     applicant might thereafter choose to proceed with her equal pay claim;
     (3) since the sample claims failed because they did not establish their
C    claims under section 1(2)(*a*) of the Act of 1970, as amended, they could
     not also fail on other grounds so that the decision in the sample cases on
     the section 1(3) issue was obiter, that accordingly in so far as the
     *Thomas* decision was binding on other employees it only related to the
     section 1(2)(*a*) issue, and the applicant's claim on that issue, that she
     was employed on like work with the comparator should therefore be
     determined; (4) the tribunal's conclusion in the sample cases on the
D    section 1(3) issue were conclusions of fact which could not bind the
     applicant; (5) there was no reason of public policy to deny the applicant
     access to the tribunals and courts; (6) it was a misuse of language for the
     tribunal to state that the applicant was attempting to secure for herself
     an advantage, since she had sought to obtain a hearing of her claim ever
     since the promulgation of the decision in the *Thomas* case and it had
E    been recognised throughout that the stay on her application was to be
     lifted after the appeal process in the sample cases was completed when
     she would be entitled to have her claim determined by the tribunal, and,
     accordingly, her attempts to pursue her claim could not amount to
     vexatious conduct.

         By their answer dated 3 February 1988 the employers sought to
     contend, inter alia, that (1) even if the applicant could succeed on the
F    section 1(2)(*a*) issue, her claim was indistinguishable from those in the
     sample cases on the section 1(3) issue so that in any event her claim was
     bound to fail unless she could persuade a fresh tribunal to reach a
     different conclusion on the identical factual issue to that already decided,
     and accordingly in view of the procedural history of the selection of
     sample cases it would be an abuse of the process to permit her to re-
G    litigate that issue, and would be wrong to enable her to have a rehearing
     de novo on what had been clearly understood to have been the definitive
     determination of all genuinely common issues; and (2) the tribunal's
     decision was a proper exercise of its discretion and gave rise to no issue
     of law.

         On 10 February 1989 the appeal tribunal dismissed the applicant's
     appeal and refused her leave to appeal to the Court of Appeal. Pursuant
H    to the leave granted by Balcombe L.J. on 6 June 1989 and a notice of
     appeal dated 15 June the applicant appealed on the grounds that
     (1) having found as a matter of law that the applicant was not bound by
     the decision in *Thomas v. National Coal Board* [1987] I.C.R. 757 the

A appeal tribunal erred in law in upholding the industrial tribunal's decision to strike out the claim; (2) the tribunal had struck out the claim pursuant to rule 12(2)(e) on the ground that the application was vexatious, and the appeal tribunal therefore erred in law in deciding as a matter of law that they were entitled to uphold the tribunal's decision on the ground that the claim was frivolous; (3) in so far as the appeal tribunal found that the claim was frivolous they erred in law; (4) the

B appeal tribunal failed to consider whether the claim was vexatious; and (5) the appeal tribunal erred in law in finding that there were considerations of public policy entitling the tribunal to strike out the claim under rule 12(2)(e) in the exercise of their discretion.

The facts are stated in the judgment of Stuart-Smith L.J.

C *Nigel Baker Q.C.* and *Kathryn Thirlwall* for the applicant. The applicant has a right to have her application determined on its merits by an industrial tribunal. She is not bound by the decision or the findings of fact in the sample case *Thomas v. National Coal Board* [1987] I.C.R. 757. There is no issue estoppel and no question arises of res judicata. At no stage did the applicant agree to be bound by the sample case or by any finding of fact by the industrial tribunal, so that in pursuing her

D claim she is not acting contrary to any agreement or understanding. She acts in her capacity as an independent applicant. There is no reason of public policy which can be invoked to justify denying the applicant's right to have her application heard and determined. Further the applicant's challenge is not a collateral attack on the decision in the *Thomas* case. The sample cases heard compendiously in *Thomas's* case

E were not test cases, the industrial tribunal having no power to order such cases, and sample litigation does not proceed as class litigation: see *Davies (Joseph Owen) v. Eli Lilly & Co.* [1987] 1 W.L.R. 1136.

In the alternative, even if the applicant's right is not absolute, she does not seek to relitigate her claim, she merely seeks to litigate it. Accordingly it cannot be characterised as frivolous, vexatious or an abuse of the process. Rule 12(2)(e) of the Industrial Tribunal (Rules of

F Procedure) Regulations 1980 refer to "scandalous, frivolous or vexatious." Such categorisation, as well as "abuse of process" cannot refer to the applicant's conduct, which has been to await the decision in the *Thomas* case, not having been selected as a lead case, and then to pursue her own claims which are distinct. Furthermore, the categorisation is properly applied to claims which are put forward as a sham or with dishonest intent: see *Bragg v. Oceanus Mutual Underwriting Association (Bermuda)*

G *Ltd.* [1982] 2 Lloyd's Rep. 132, 139, *per* Stephenson L.J. Accordingly the terms "frivolous," "vexatious" or "an abuse of process" are not appropriate in the present circumstances since there is no sham or dishonesty in respect of the applicant's claim or her wish to pursue it. To hold that in such circumstances the terms are applicable would be novel and inappropriate.

H The tribunal chairman considered the application "vexatious:" see *E. T. Marler Ltd. v. Robertson* [1974] I.C.R. 72 and cf. *Gleeson v. J. Wippell & Co. Ltd.* [1977] 1 W.L.R. 510. In doing so he wrongly allowed considerations of relitigation, finality and uniformity to influence

A    his decision, and he wrongly struck out the application. The appeal
tribunal upholding that exercise of his discretion, themselves wrongly
concluded that "vexatious" and "frivolous" were interchangeable terms,
and they therefore erroneously and without jurisdiction substituted a
finding that the application was frivolous for that of the chairman's.

The appeal tribunal further elevated the decision in *Thomas's* case
on the section 1(3) defence into an estoppel and made the assumption
B    that the applicant's case on that defence and the evidence which she
would adduce in support would be identical to that proffered in the
*Thomas* case. The appeal tribunal was, however, wrong to conclude that
the facts found in the *Thomas* case on the section 1(3) defence were not
in issue in the present applicant's claim, and they wrongly considered
that she was bound to fail. Her claim is different, although it is accepted
C    that she is not in a position to assert that she will obtain fresh evidence
in support of it. The tribunal could compensate the employers by way of
costs, if it considered that such an order would be appropriate.

*National Coal Board v. Sherwin* [1978] I.C.R. 700, where the
applicants succeeded on similar issues, is inconsistent with *Thomas v.
National Coal Board* [1987] I.C.R. 757 so that already similar claims
relating to the employers' canteen employees have received dissimilar
D    treatment by the tribunals. Not only is that unsatisfactory, but why
should the employers in the *Thomas* case have been permitted to raise
issues already determined against them in the *Sherwin* case, if, as it is
now said, it is an abuse of process for the applicant to do so?

*Peter Goldsmith Q.C.* and *Nicholas Underhill* for the employers. The
fundamental principle adopted for the orderly disposal of all the cases
E    was the selection of a number of sample or representative cases. That
principle was agreed between the parties' representatives at an early
stage. There was a series of interlocutory hearings at which the
applicants, including the present applicant, were represented, usually by
counsel. The eventual agreement was that 14 sample cases should be
heard and determined first. The industrial tribunal recorded that it was
mutually agreed that each side would put forward its best and most
F    representative cases. The intention was that the issues thus raised would
be the subject of the fullest and most careful scrutiny and determination,
if need be, by the highest appeal court. The cases were selected with the
greatest care and attention to that aim and their preparation was equally
extensive. The hearing was equally conducted with the intention of
raising all the issues between the employees and the employers.

G    Depending on the actual decision reached by the industrial tribunal it
might have been necessary to apply that decision to the facts of
individual cases. If that had been necessary, a short hearing on those
facts might have been required. But it was never intended that where
there was a common issue, in relation to which an individual applicant
could not show any difference between her own case and those of the
sample applications, that issue would be relitigated. That would mean
H    that the lengthy and expensive process of selection, pleading, discovery
and the hearing itself would have been a waste of time and money, and
it would moreover have been potentially unfair. Although the *Thomas*
decision is not therefore binding in any formal sense, the court in the

exercise of its discretion is entitled to conclude that it would be contrary    A
to public policy to permit a particular application to proceed.

The tribunal was in those circumstances right to strike out the
present claim. The chairman had power to do so under rule 12(2)(e): see
E. T. Marler Ltd. v. Robertson [1974] I.C.R. 72, 77 where the
interpretation of the rule includes "abuse of process." It is a discretionary
power and its exercise can only be challenged on what amount to
Wednesbury grounds: see Associated Provincial Picture Houses Ltd. v.    B
Wednesbury Corporation [1948] 1 K.B. 223, and see also Medallion
Holidays Ltd. v. Birch [1985] I.C.R. 578. The tribunal was entitled to
take into account that the section 1(3) defence was a distinct ground for
the decision in the Thomas case, and that that defence turned on the
circumstances of the particular male comparator selected and so could
not vary with the identity of the applicant. The applicant's case on that    C
aspect of her claim is indistinguishable from that of the sample applicants.
She does not challenge the findings made in relation to the regional
arrangements affecting the male comparator's rates of pay, nor suggest
that there were similar arrangements in her own area. The tribunal were
correct to take into account that it had already considered detailed
evidence of events now long ago, which it would be wasteful to rehearse,
and which might after so long, cause considerable risk of injustice to the    D
employers. The tribunal in striking out the application was also correct
to conclude that in seeking to relitigate the matter the applicant was in
clear breach of the understanding on which the sample cases were
chosen and litigated and that in any event, since her case was
indistinguishable on the section 1(3) defence, her claim was bound to
fail.    E

The applicant has no absolute right to have her case heard. If it were
frivolous, vexatious or an abuse of the process and if she were bound by
an agreement not to litigate it, the court might exercise its power to
prevent her from doing so. The jurisdiction is wide and the categories
are not closed: see Hunter v. Chief Constable of the West Midlands
Police [1982] A.C. 529, 536, per Lord Diplock. There are similarities
between that case and the present. The same parties there were before    F
the court, here the applicant had been in a very real sense involved in
the selection of the lead cases. In Hunter's case a court of competent
jurisdiction had determined the issue, the same had occurred here.
Similarly in both Hunter's case and the present no new evidence is
sought to be adduced, bearing in mind that a higher test applies than
that stated in Ladd v. Marshall [1954] 1 W.L.R. 1489, namely that it    G
must be such as would entirely change the aspect of the case: see
McIlkenny v. Chief Constable of the West Midlands [1980] Q.B. 283,
334, per Goff L.J.

While it is accepted that the present claim is not a collateral attack
on the decision in Thomas's case, it is analogous to it, because the
applicant now seeks to forsake the chosen route provided in the sample
litigation. It cannot be in the public interest in the administration of    H
justice to permit her to deviate from that chosen path, and public policy
requires the court to prevent the continuance of a claim in such
circumstances: see also North West Water Authority v. Binnie and

**2 Q.B.**              Ashmore v. British Coal Corpn. (C.A.)

A  *Partners* (unreported), 9 November 1989. In addition the court has power, and has correctly exercised its discretion, to strike out the present claim on the ground that it is bound to fail. That ground of itself is sufficient to justify such a course.

In cases of multiple applications raising identical issues, in the overall interest of the efficient administration of justice, there may be a need for flexibility in the use of the procedural powers available to the courts:

B  see *Davis (Joseph Owen) v. Eli Lilly & Co.* [1987] 1 W.L.R. 1136, 1139, *per* Sir John Donaldson M.R.

It is not an answer to suggest that the applicant's claim can proceed, the employers being compensated in costs. That is not adequate protection in particular since the tribunal's powers are restricted in that respect. Nor is *National Coal Board v. Sherwin* [1978] I.C.R. 700 a

C  contra-indication militating against striking out the present application. In *Sherwin's* case there were only two claimants, there was no sample or representative test and no full review of the evidence. That case can therefore be distinguished from *Thomas's* case where there was a full review of evidence based on a selection which included all the issues and from which the applicant had not been excluded.

*Baker Q.C.* in reply. In *Sherwin's* case the employers' evidence was

D  rejected, so it might be if the applicant is permitted to bring her claim. *Hunter's* case is distinguishable from the applicant's since the collateral attack which is impermissible must be brought by the same party as raised the original claim. Here the applicant raises a claim which has in fact never been litigated. If the court strikes out the present application, it will be permitting the frontiers of what constitutes "abuse of process"

E  to be extended too far, and further than any previous decision.

*Cur. adv. vult.*

27 February.   The following judgments were handed down.

F  STUART-SMITH L.J.   This appeal raises important questions as to how courts and tribunals deal with large numbers of cases that raise similar factual issues.

Between July and December 1982 about 2,000 applications were made by women canteen workers employed in various parts of the country by the National Coal Board under section 1(2)(*a*) of the Equal Pay Act 1970, as amended by section 8(1) of the Sex Discrimination Act

G  1975 and the Equal Pay (Amendment) Regulations 1983 (S.I. 1983 No. 1794) ("the Act"). Proceedings were issued in the industrial tribunal at Birmingham. The claimants alleged that they were doing like work with certain male comparators and that they were employed on terms that were less favourable than those under which the men were employed.

One such claimant is Ann Ashmore, the applicant, who was employed at the Gedley Colliery in Nottinghamshire. At that time all claimants

H  were members of the National Union of Mineworkers ("N.U.M.") and they were represented by the union's solicitors, Milners, Curry & Gaskell. It was necessary for the industrial tribunal and the parties to devise some means of dealing with all these cases, which eventually

Stuart-Smith L.J.        Ashmore v. British Coal Corpn. (C.A.)                [1990]

dwindled to about 1,500, which avoided the necessity of trying each one    A
separately.

In August 1984 the cases were transferred to London and assigned to
Mr. Heggs, Chairman of Industrial Tribunals. In October of that year
there occurred the first of a number of interlocutory hearings. The
tribunal ordered that representative sample cases should be chosen for
trial. In effect the union were to choose six of their best cases and the
employers six cases (subsequently increased to eight).                     B

In giving the tribunal's decision Mr. Heggs said:

"These would not be test cases, the decision on any of the cases
would not be binding upon the applicants or the respondents in any
other cases but the decision might well assist in the resolution of the
remaining cases by agreement."
                                                                           C
And a little later he said:

"The tribunal must determine each case upon its individual merits
but in doing so must not disregard the interests of justice to the
applicants as a whole and to the respondents. Care must be
exercised to ensure that the course of the proceedings is not
manipulated by any party for tactical advantage. Although a decision  D
on sample cases is not binding upon the respondents or applicants
in other cases it will undoubtedly have persuasive effect when the
cases of other applicants fall to be considered. . . . if a multiplicity
of appeals is to be avoided it is important that most of the triable
issues arising should be determined in the decision covering the
sample selected."
                                                                           E
During 1985 the claimants named seven comparators and the 14
sample cases were chosen; full particulars were given of the work by
each comparator and the sample claimants. There were further
interlocutory hearings involving directions as to pleadings, discovery and
selection of cases. All claims other than the 14 sample cases were stayed
pending determination of those cases.                                      F

By 1986, if not earlier, a number of claimants had left the N.U.M.
and become members of the Union of Democratic Mineworkers
("U.D.M."); these included the applicant and Mrs. Barker, who was the
only one among the 14 sample cases who had become a member of that
trade union. On 3 February 1986 Hopkin & Sons, the applicant's
solicitors, notified the employers that they had been instructed to act on
behalf of the U.D.M. claimants. On 7 May, the claimants abandoned all  G
other comparators save one, Mr. Tilstone.

The substantive hearing of the sample cases took place between 7
and 21 July 1986 under the name *Thomas v. National Coal Board* [1987]
I.C.R. 757; leading counsel appeared for those claimants who were
members of the N.U.M. and the employers; Mrs. Barker was separately
represented by junior counsel. All the applications were dismissed. The
basis of the decision was two-fold: first, that none of the sample          H
claimants were employed on like work with Mr. Tilstone, he being
employed on night work and alone, unlike the claimants, and so they
failed to satisfy section 1(2)(*a*) of the Act; and, secondly, that the

A  employers had established a defence under section 1(3), namely that the variation in rate of pay between the claimants' and Mr. Tilstone's contract was "genuinely due to a material factor which is not the difference of sex."

All 14 claimants appealed to the appeal tribunal. The appeals were dismissed on 15 May 1987. Mrs. Barker alone appealed to this court,
B  but she withdrew her appeal in early September 1987. Meanwhile, the present applicant had made several attempts to have the stay on her claim removed and the case listed for hearing. These applications had been adjourned pending the outcome of the appeal procedure. In September 1987, after the withdrawal of Mrs. Barker's appeal, she applied again. The employers thereupon applied under the provisions of the Industrial Tribunals (Rules of Procedure) Regulations 1980 to have
C  her claim struck out on the grounds that it was frivolous and vexatious. Rule 12(2), in Schedule 1, provides:

"A tribunal may, if it thinks fit . . . (e) at any stage of the proceedings order to be struck out . . . any originating application . . . on the grounds that it is scandalous, frivolous or vexatious."

D      The industrial tribunal acceded to the employers' application and struck out the claim on the grounds that it was vexatious. The argument advanced on behalf of the applicant to the tribunal was that, unlike the claimants in the 14 sample cases, the applicant was engaged in like work, because she had since 1984 been engaged in night work and she worked alone. It was argued that the tribunal's decision in the *Thomas*
E  case on the employers' defence under section 1(3) of the Act was obiter, and that, in the absence of res judicata or an agreement to be bound by the findings of fact, the applicant had an absolute right to relitigate that issue before a different tribunal. It does not appear that Mr. Todd, the applicant's solicitor, who argued the case before the tribunal, suggested that there was any further evidence to be adduced on this point. The tribunal were plainly correct to reject the submission that the decision
F  on the second ground was obiter; and Mr. Baker does not argue to the contrary. The chairman accepted that the decision in the *Thomas* case was not technically binding on the applicant but he held that it was an abuse of the process to relitigate a factual issue under section 1(3) of the Act, as amended, which had been fully litigated in fact if not in form on behalf of all applicants and that, if the applicant were allowed to
G  proceed, her claim would be bound to fail. The applicant's appeal to the appeal tribunal was dismissed on 10 February 1989. She now appeals to this court pursuant to leave granted by Balcombe L.J. on 6 June 1989.

The expression "frivolous or vexatious" in rule 12(2)(e) includes applications which are an abuse of process: see *E. T. Marler Ltd. v. Robertson* [1974] I.C.R. 72, 76, *per* Sir Hugh Griffiths. Whether or not an application should be struck out on this ground is a matter for the
H  discretion of the tribunal, which can only be challenged on the basis that the tribunal has misdirected itself in law or reached a decision to which no reasonable tribunal could come: see *Medallion Holidays Ltd. v. Birch* [1985] I.C.R. 578.

Mr. Baker submits that the tribunal did err in law. He submits that,     A
unless she is estopped by res judicata, issue estoppel or agreement to be
bound by the findings in the *Thomas* case, and it is common ground that
she is not, the applicant has an absolute right to have her claim litigated.
He argues that, because the applicant is not estopped for any of those
reasons, her claim cannot be frivolous, vexatious or an abuse of process.
I do not agree. A litigant has a right to have his claim litigated,
provided it is not frivolous, vexatious or an abuse of the process. What     B
may constitute such conduct must depend on all the circumstances of the
case; the categories are not closed and considerations of public policy
and the interests of justice may be very material. In *Hunter v. Chief
Constable of the West Midlands Police* [1982] A.C. 529, 536 Lord
Diplock, with whose speech the rest of the House agreed, said:

"My Lords, this is a case about abuse of the process of the High     C
Court. It concerns the inherent power which any court of justice
must possess to prevent misuse of its procedure in a way which,
although not inconsistent with the literal application of its procedural
rules, would nevertheless be manifestly unfair to a party to litigation
before it, or would otherwise bring the administration of justice into
disrepute among right-thinking people. The circumstances in which     D
abuse of process can arise are very varied; those which give rise to
the instant appeal must surely be unique. It would, in my view, be
most unwise if this House were to use this occasion to say anything
that might be taken as limiting to fixed categories the kinds of
circumstances in which the court has a duty (I disavow the word
discretion) to exercise this salutary power."

                                                                           E
In that case the House of Lords held that it was an abuse of the process
to bring a civil action which involved relitigating matters which had been
finally decided against the plaintiffs in a criminal court. Lord Diplock
said, at p. 541:

"The abuse of process which the instant case exemplifies is the
initiation of proceedings in a court of justice for the purpose of     F
mounting a collateral attack upon a final decision against the
intending plaintiff which has been made by another court of
competent jurisdiction in previous proceedings in which the intending
plaintiff had a full opportunity of contesting the decision in the
court by which it was made. The proper method of attacking the
decision by Bridge J. in the murder trial that Hunter was not
assaulted by the police before his oral confession was obtained     G
would have been to make the contention that the judge's ruling that
the confession was admissible had been erroneous a ground of his
appeal against his conviction to the Criminal Division of the Court
of Appeal. This Hunter did not do."

Mr. Goldsmith accepted that the applicant's claim is not a collateral
attack on the decision of the tribunal in *Thomas v. National Coal Board*     H
[1987] I.C.R. 757; but he submits that it is analogous to it. He submits
that, where sample cases have been chosen so that the tribunal can
investigate all the relevant evidence as fully as possible, and findings

**2 Q.B.**          **Ashmore v. British Coal Corpn. (C.A.)**          **Stuart-Smith L.J.**

A    have been made on that evidence, it is contrary to the interests of justice and public policy to allow those same issues to be litigated again, unless there is fresh evidence which justifies re-opening the issue. I agree; it is no answer to say that, if the applicant's claim fails, the employers can be compensated in costs. Even if an award of costs is made, and it is not necessarily so in the industrial tribunal (see Industrial Tribunals (Rules of Procedure) Regulations 1985 (S.I. 1985 No. 16),

B    Schedule 1, rule 11), it does not always amount to an indemnity, and is seldom compensation for inconvenience and disruption caused by litigation. Moreover, it is not in the interests of justice that the time of the courts or tribunals is taken litigating claims that have effectively been already decided. Furthermore, if the applicant is to be at liberty to pursue her claim, I can see no reason in principle why the 1,486 other

C    applicants, who were not among the sample claimants, should not also have a similar right. It is true that in their cases they have two hurdles to surmount, namely both grounds upon which the tribunal found in favour of the employers, while the applicant has only one; but, if the applicant is to be permitted to re-open one issue, I cannot see why the others cannot re-open two. This would plainly defeat the whole object of having the 14 sample cases. This was described by the chairman of

D    the tribunal in these words at paragraph 13(b):

> "Whatever the scope of the agreement between the representatives when the 14 sample cases were selected for first determination, the objective of those representing the parties at the hearing was that the tribunal should make and record all findings of fact relevant to any of the applications, irrespective of the conclusions which the tribunal might reach upon the facts found. The tribunal acted, in
E    effect, as a body which could conveniently be utilised for the finding and recording of facts material to any of the claims. The tribunal found the facts and it was open to the parties to challenge the conclusions. There was no objection to this course by Mr. P. Waterworth representing Mrs. Baker (who was a member of the Union of Democratic Mineworkers) on the instructions of Messrs.
F    Hopkin & Sons (who represent Mrs. Ashmore in the present proceedings). This was an example of the tribunal [being] 'as flexible . . . as possible in the application of existing procedures with a view to reaching decisions quickly and economically.'"

   The passage in inverted commas is a reference to an observation
G    made by Sir John Donaldson M.R. in *Davies v. Eli Lilly & Co.* [1987] 1 W.L.R. 1136, 1139, (the Opren claims) to the effect that courts should so act.

   Mr. Baker has submitted that, if we uphold this decision, we are going further than courts have previously done. This may be so, although in my opinion we should not hesitate to do so if the interests of justice and public policy demand it. In fact, I adopted a similar course dealing
H    at first instance in *Godfrey v. Department of Health and Social Security* (unreported), 25 July 1988. It was a decision in chambers and not reported. It arose out of the claims for damages in connection with whooping cough vaccine. In these cases it was alleged that various

doctors, nurses and health authorities had been negligent in giving those
injections to young children with the result that they had suffered
serious brain damage. There were a considerable number of such cases.
Those in which proceedings were started were assigned to me. I stayed
all but one action, *Loveday v. Renton*, The Times, 31 March 1988, in
which I directed that there should be trial of the issue of causation as a
preliminary issue, namely whether it was proved that the vaccine could
cause brain damage. That issue was tried at great length, and no
expense was spared on behalf of the plaintiff who was legally aided; very
many expert witnesses were called, both from this country and overseas.
I decided that the plaintiff had not proved the case on causation.
Subsequently the plaintiff Godfrey sought to bring a similar action, but
against a different defendant. It was said that the injection was given at
a time when the concentration of the pertussis vaccine was greater than
it was later and therefore a more potent source of damage. In my
judgment, this was not a material distinction. On the defendants'
application I struck out the action under R.S.C., Ord. 18, r. 19. I held
that it was an abuse of the process of the court to relitigate the same
issue in the absence of fresh evidence that bore materially on the issue
of causation.

Mr. Baker relied upon the decision of this court in *Bragg v. Oceanus
Mutual Underwriting Association (Bermuda) Ltd.* [1982] 2 Lloyd's Rep,
132. The facts of that case are complex. C.T.I. International Inc.
("C.T.I.") was engaged in the business of leasing out containers to
shipping lines on a large scale. By the terms of the leases C.T.I. were
responsible for making good part of the damage sustained by the
containers. They insured this liability with American insurers through
American brokers. The American insurers became dissatisfied with the
claims record and declined to remain on risk after 1 June 1975. The
American brokers, on the instruction of C.T.I. placed the insurance
through the second defendants C.E. Heath & Co. (Marine) Ltd.
("Heath") on the London market with the plaintiff as representative
underwriter and other Lloyds syndicates.

Lloyds became equally unhappy with the claims record and gave
notice of cancellation as from 1 June 1976. Heath, however, persuaded
them to continue till 30 November 1976. Lloyds became even more
concerned and told Heath that they would seek to avoid the cover for
non-disclosure and misrepresentation and would sue Heath unless they
were relieved from liability for the "run-off" of the C.T.I. policy by re-
insurance. Heath approached Oceanus who eventually agreed to take
over the C.T.I. cover from 1 December 1976 and re-insure the run-off
of the Lloyds policy. In due course Oceanus too became dissatisfied with
the claims record and sought to avoid both the C.T.I. cover and the re-
insurance on the grounds of misrepresentation and non-disclosure. This
led to two actions: the first by C.T.I. against Oceanus on the C.T.I.
policy, the second by Lloyds against Oceanus on the re-insurance policy
and alternatively against Heath for breach of duty.

Oceanus applied to consolidate the actions; this was opposed by all
other parties and was refused. The actions proceeded separately. The
C.T.I. action came on for trial before Lloyd J. At a late stage Oceanus

A  sought to amend their defence. Lloyd J. allowed the amendments but decided all issues against Oceanus. In the Lloyds action Oceanus sought to make similar amendments to their defence. Robert Goff J. gave leave and the plaintiff appealed. The main ground of objection to the proposed amendments was that the subject matter of the amendments had been litigated in the C.T.I. action and had been decided against Oceanus; it was therefore an abuse of the process of the court to allow the same
B  point to be raised again. The appeal was dismissed. But I do not understand any member of the court to say that in an appropriate case the claim may not be struck out as an abuse of the process if it has been litigated and decided in previous proceedings. Kerr L.J. said, at p. 137:

"To take the authorities first, it is clear that an attempt to relitigate in another action issues which have been fully investigated and
C  decided in a former action *may* constitute an abuse of process, quite apart from any question of res judicata or issue estoppel on the ground that the parties or their privies are the same. It would be wrong to attempt to categorize the situations in which such a conclusion would be appropriate."

He also regarded a defendant who wished to relitigate a matter as being
D  in a stronger position than a plaintiff (see p. 138), and attached significance to the fact that the defendants had themselves sought to avoid the risk of litigating the same issue twice and the risk of inconsistent verdicts by applying to consolidate.

Sir David Cairns said, at p. 138:

"I do not accept the proposition advanced by counsel for the
E  appellant Heath that when an issue has already been decided in proceedings between A. and B. it is prima facie an abuse of the process of the court for B. to seek to have the issue decided afresh in proceedings between himself and C. and that in such circumstances there is an onus on B. to show some special reason why he should be allowed to raise the issue against C. On the contrary, I consider
F  that it is for him who contends that the retrial of the issue is an abuse of process to show some special reason why it is so. Since the cases in which the retrial of an issue (in the absence of an estoppel) has been disallowed as an abuse of process are so few in number, it would be dangerous to attempt to define fully what are the circumstances which should lead to a finding of abuse of process. Features tending that way clearly include the fact that the first trial
G  was before the most appropriate tribunal or between the most appropriate parties for the determination of the issue, or that the purpose of the attempt to have it retried is not the genuine purpose of obtaining the relief sought in the second action, but some collateral purpose. It would be in my judgment be a most exceptional course to strike out the whole or part of a defence in a commercial action, or to refuse leave to amend a defence in such an action,
H  simply because the issue raised or sought to be raised had been decided in another commercial action brought against the same defendant by a different plaintiff. The facts that the first action had been fairly conducted and that the issue had been the subject of

lengthy evidence and argument could not, in my view, be sufficient    A
in themselves to deprive the defendant of his normal right to raise
any issue which he is not estopped from raising."

He then considered that procedural advantages to the defendants in the
second trial was a reason why the amendment should not be struck out.
    Stephenson L.J. said, at p. 139:

"Yet it is the duty of the judge and the Court of Appeal to shut out    B
the defence if it is an abuse of the court's procedure to repeat it, in
accordance with decisions of this court in *Remmington v. Scoles*
[1897] 2 Ch. 1, and of the House of Lords in *Reichel v. Magrath*
(1889) 14 App.Cas. 665, and *Hunter v. Chief Constable of the West
Midlands Police* [1982] A.C. 529. Every repetition of a defence (or
claim) may be said to mount a collateral attack on a previous    C
judicial decision, and to invite those derogatory references to 'a side
wind' or 'a back door' which are in favour with advocates whose
clients are not open to a frontal attack. But in my judgment it is
only those defences (or claims) that are sham and not honest and
not bona fide which abuse the process of the court and call for the
exercise of its inherent jurisdiction to prevent such abuse."

    With all respect to Stephenson L.J., I do not agree that the claim can    D
only be struck out as being an abuse of the process if it is a sham, not
honest or bona fide. On the contrary, I prefer the views of the other
members of the court that it is dangerous to try and define fully the
circumstances which can be regarded as an abuse of the process, though
these would undoubtedly include a sham or dishonest attempt to relitigate
a matter. Each case must depend upon all the relevant circumstances. In    E
the present case there was a large number of claims which raised similar
issues against the same employers. The tribunal went to great length to
devise arrangements which would enable the legal representatives of the
parties to put forward their best cases so that as many issues of fact as
possible could be raised and decided upon after the fullest inquiry and
investigation. If the applicant or her advisers wished her case to be one of    F
the sample cases, they could have applied at any time before the hearing
for that to be done; she did not do so.

    I must, however, deal with two further arguments advanced by Mr.
Baker. The first is based on *National Coal Board v. Sherwin* [1978]
I.C.R. 700. In that case two women, Mrs. Sherwin and Mrs. Spruce,
were, unlike the applicant, employed as canteen assistants by the
employers at the same canteen as Mr. Tilstone, the comparator in the    G
present claims; but they were not employed exclusively on night work or
alone. Similar issues arose as in the present claims and in particular
whether the women were employed on like work and whether the
employers established a defence under section 1(3) of the Act. The
claimants succeeded and the employers' appeal to the appeal tribunal
was dismissed. We are told there was an appeal to this court, but the
appeal was compromised. This is a case, therefore, where there is an    H
inconsistent verdict with that in *Thomas v. National Coal Board* [1987]
I.C.R. 757 by different tribunals on similar facts. Why, Mr. Baker asks
rhetorically, was it just for the employers to raise the same issues in the

2 Q.B.                    **Ashmore v. British Coal Corpn. (C.A.)**          Stuart-Smith L.J.

A  *Thomas* case on which they lost in the *Sherwin* case, but it is not just for the applicant to raise them in her claim? The first answer is that no one attempted on behalf of the 1,500 claimants to contend that the employers' defence should be struck out under rule 12(2)(*e*). But, even if such an application had been made, there are in my opinion material distinctions between the two cases and good reasons why an order under that rule should not have been made. In *Sherwin's* case they were two isolated
B  claims; in the present there were 1,500 and the industrial tribunal took great pains to devise a method which enabled all issues of fact to be investigated at length. Secondly, although the same argument was addressed to the court in *Sherwin's* case as to why the variation between Mr. Tilstone's contract and that of the two ladies was due to a material difference other than sex, namely the peculiar problems that pertained
C  in the North Staffordshire area in 1966, the evidence available to the tribunal in *Thomas's* case was much more extensive. In particular Phillips J. in giving reasons in supporting the industrial tribunal's decision in *National Coal Board v. Sherwin* [1978] I.C.R. 700, 710, said:

> "Secondly, there was no reason why the employers between 1966 and 1973 or between 1973 and the coming into force of the Equal
D  Pay Act 1970 should not have phased out the arrangements made in the case of Mr. Tilstone and Mr. Hampton and have adopted a common scale for canteen workers, irrespective of sex and with an appropriate but not exaggerated allowance for night work."

The reason was provided in the evidence in *Thomas's* case, namely, that pressure from the trade union prevented it.
E     In his decision in *Thomas's* case the chairman of the industrial tribunal said of *Sherwin's* case:

> "The full background to the re-grading of night work in 1966 was not presented to the Shrewsbury industrial tribunal. It would appear that they were influenced in their assessment by what they considered to be an excessive differential in 1977 and concluded that this was
F  partly due to the fact that the [employers] required a male night canteen worker and they knew that they had to pay more for a male than a female. The view that the differential was excessive was adopted in the judgment of the Employment Appeal Tribunal in the *Sherwin* case [1978] I.C.R. 700, 709 when they said: 'it seems to us that the finding of the industrial tribunal, that the differential between their pay and that of Mr. Tilstone was more than is
G  justified by the fact that he worked permanently on nights alone, is abundantly justified by the evidence.' In reality there was no evidence before the tribunal, except the rates of pay in 1977, and the tribunal reached their conclusion that the differential was excessive by applying their own general industrial experience. We have had the benefit of the expert evidence of Dr. P. Willman.
H  Notwithstanding the rigorous critical analysis to which Mr. McMullen subjected his evidence, it appears that shift premia or additions to basic rate vary from company to company and in accordance with the nature and demands of the work and that in addition to a night shift premium it is by no means unusual to find a further percentage

Stuart-Smith L.J.          Ashmore v. British Coal Corpn. (C.A.)                    [1990]

premium for permanent night work. Having read Dr. Willman's    A
report and heard his evidence we find as a fact that the terms and
conditions of employment as regards the rate and amount of
remuneration applied to Mr. Tilstone upon his appointment in July
1973 were no greater than reasonably reflected the fact that he
worked permanently at night and alone. It is important to remember
that night work in canteens was regarded as surface work in
November 1966 in accordance with the conditions prevailing at that    B
time. The solution then adopted was to move from the canteen
workers' rates to the surface workers' rates, which was the next
established grade. It is not for us to say what the correct differential
at that time ought to have been. We have the evidence of Dr.
Willman that it was not in fact excessive and he and Mr. Heathfield
both agree that it was reasonable to adopt the next established    C
grade. From 1966 onwards there was no occasion for the job to be
regraded and Mr. Tilstone, in common with all other surface
general workers, received only the normal increments of his grade."

If it were contended in the present appeal that there was evidence
available to the applicant which had not been presented to the tribunal
in *Thomas's* case which might affect the decision on section 1(3), then    D
we should have to consider that evidence and whether it satisfied the
test which would make it inappropriate to strike the claim out. But,
although Mr. Baker said that his instructions are that there might be
male comparators employed in the Nottinghamshire district at higher
rates than the applicant, no such evidence has been adduced before the
industrial tribunal, the appeal tribunal or this court. And, having regard    E
to the obvious care which was devoted to the crucial task of finding a
male comparator for the purpose of all the 1,500 cases, it is quite
impossible for this court to be influenced by such a vague suggestion.
Moreover, it appears to me that the correct test for determining whether
fresh evidence is of such a kind that the court should permit a claim
which would otherwise be an abuse of the process of the court is that it
"should entirely change the aspect of the case." This was the test    F
propounded by Lord Cairns L.C. in *Phosphate Sewage Co. Ltd. v.
Molleson* (1879) 4 App.Cas. 801, 814 and adopted by Goff L.J. in
*McIlkenny v. Chief Constable of the West Midlands* [1980] Q.B. 283,
334, in preference to the less rigorous test applied on the admission of
fresh evidence in appeals as laid down in *Ladd v. Marshall* [1954] 1
W.L.R. 1489, 1491, namely, that "it would probably have an important    G
influence on the result of the case, though it need not be decisive." The
judgment of Goff L.J. was approved in the House of Lords when the
case went there under the name of *Hunter v. Chief Constable of the
West Midlands Police* [1982] A.C. 529, 545, *per* Lord Diplock.

As it is, if the matter were relitigated on the applicant's claim, she
would merely invite the tribunal to reach different findings of fact on the
same evidence, as a result perhaps of different arguments being    H
addressed to it. That, in my judgment, is not in the interests of justice;
nothing could be calculated to cause a greater sense of injustice in those
who lost in *Thomas v. National Coal Board* [1987] I.C.R. 757, if some

**2 Q.B.**                **Ashmore v. British Coal Corpn. (C.A.)**        **Stuart-Smith L.J.**

A   other tribunal reached a different result on the same evidence. Alternatively, there is a risk, after so long a time, that the employers would be unable to call the same witnesses who had convinced the tribunal in *Thomas's* case; that would be a grave injustice to them.

Secondly, it is submitted by Mr. Baker that, because none of the 14 sample claimants was working alone and exclusively on night work, it was not in their interest at the trial to emphasize that Mr. Tilstone was
B   being paid the rate for the job, namely, night work alone. The battle, therefore, may have been concentrated on the issue of like work under section 1(2)(*a*) and 1(4) of the Act and not so much on section 1(3). I cannot accept this; it is clear from their decision that the tribunal in *Thomas's* case went into the question under section 1(3) in great detail. Furthermore, the 14 claimants had to succeed on both issues; it was no
C   good their succeeding on like work if they failed on section 1(3).

In my judgment, the industrial tribunal correctly exercised their discretion to strike out this claim under rule 12(2)(*e*) and I can find no ground for interfering with their decision.

FARQUHARSON L.J.   I agree.

D   LORD DONALDSON OF LYMINGTON M.R.   I also agree.

*Appeal dismissed with costs.*

*Solicitors: Hopkin & Sons, Mansfield; Solicitor, British Coal Corporation.*

E                                                                        D. E. C. P.

F

[COURT OF APPEAL]

REGINA v. Z

G   1990  Feb. 27                        Lord Lane C.J., Hirst and Kennedy JJ.

*Crime—Evidence—Child, of—Unsworn evidence—Whether corroboration necessary—Whether admission within judge's unfettered discretion—Greater care to be taken before admitting evidence of younger children—Children and Young Persons Act 1933 (23 Geo. 5, c. 12), s. 38(1) (as amended by Criminal Justice Act 1988 (c. 33), s. 34(1))*

H       The applicant was tried on a charge of incest with his five-year old daughter, who was to be a witness aged six years at the trial. The judge, who viewed a video film of the child talking to a woman police constable and a social worker, questioned the

TAB 3

*Avonwick Holdings Ltd v Castle Investment Fund Ltd*
[2015] EWHC 3832 (Ch)



IN THE HIGH COURT OF JUSTICE                                    No. HC-2014-001398

CHANCERY DIVISION

**[2015] EWHC 3832 (CH)**

Rolls Building

Tuesday, 15th December 2015

Before:

HIS HONOUR JUDGE DIGHT

B E T W E E N :

AVONWICK HOLDINGS LIMITED                              Claimant

- and -

CASTLE INVESTMENT FUND LIMITED                        Defendant

—————

*Transcribed by **BEVERLEY F. NUNNERY & CO.***
*(a trading name of Opus 2 International Limited)*
*Official Court Reporters and Audio Transcribers*
*5 Chancery Lane, London EC4A 1BL*
***Tel:  020 7831 5627    Fax:  020 7831 7737***
***info@beverleynunnery.com***

—————

MR. T. SMITH QC and MR. H. PHILLIPS (instructed by Dechert LLP) appeared on behalf of the Claimants.

MR. P. MARSHALL QC and MR. J. MATHER (instructed by Enyo LLP) appeared on behalf of the Defendants.

—————

# J U D G M E N T

(As approved by the Judge)

HIS HONOUR JUDGE DIGHT:

The applications

1    Avonwick has five applications before me falling into two groups.  The first
     group comprises three applications:  first, an application to lift the automatic
     stay arising on bankruptcy to allow Avonwick to bring a claim against Mr.
     Shlosberg outside the bankruptcy; secondly, for permission to join Mr.
     Shlosberg as an additional defendant to the substantive proceedings (which I
     will refer to as "the Proceedings"); and thirdly, to re-amend the particulars of
     claim in the Proceedings to include claims against Mr. Shlosberg and to make
     further claims against Castle.  I note in that respect that Castle consents to the
     application.  Mr. Shlosberg, the bankrupt, is represented in respect of these
     three applications, which he opposes.  The second group comprises, fourthly,
     an application for service out of the jurisdiction on Vi Holdings and Mr.
     Machitski, the second and fourth defendants who are overseas, for alternative
     service on Mr. Machitski and to extend time for service of the claim form.  Mr.
     Shlosberg takes no position on that application.  The fifth application is for
     release for use in the Proceedings of documents and information which have
     been disclosed and provided in earlier related proceedings (to which I will refer
     below) in respect of which Mr. Shlosberg offers no opposition.  A considerable
     quantity of documentation (in the form of 9 lever arch files) have been lodged
     in respect of these applications.  I have read the material I was taken to by
     counsel, including in particular the witness statements of Mr Silver for the
     claimant and that of Mr. Shlosberg.  I will only refer to a few of the many
     documents in the course of this short judgment.

The background

2    The general background is that Avonwick, a company incorporated in the
     British Virgin Islands, is the judgment creditor of Webinvest, a company
     incorporated in St. Vincent and the Grenadines and Mr. Shlosberg, a Russian
     national who is domiciled in London.  Mr. Shlosberg is the sole shareholder of
     Webinvest.  The liability of Webinvest and Mr. Shlosberg to Avonwick arise
     from the judgment given on 19th November 2014 by Mr. Justice Sales (as he
     then was) for the sum of approximately $200million being the sum due under
     an agreement whereby Avonwick had originally lent Webinvest $100million in
     2010 and which Mr. Shlosberg had guaranteed (I will refer to those as the
     "Original Proceedings).  Mr. Justice Sales was very critical of Mr. Shlosberg in
     his judgment, describing him as a "thoroughly dishonest witness".

3    Webinvest had, at around the same time as it borrowed $100million from
     Avonwick, also borrowed a further $100million from a company called Castle,
     which is also incorporated in the British Virgin Islands.  Avonwick says that

Castle is owned or controlled by Mr. Shlosberg but that is disputed, although Mr. Justice Sales found it to be reasonably arguable during the course of his judgment in the Original Proceedings, where he described it as a company in the control of the Shlosberg family, and in subsequently granting a freezing order against Castle. Webinvest in turn lent the total sum of $200million to Globoid, a company incorporated in Lichtenstein and connected with a Mr. Machitski who was described by Mr. Shlosberg in para.7 of his witness statement as a "man of honour". The principal sum was to be repaid by Globoid to Webinvest by 14th May 2012.

4      The purpose of the lending is said to have been to enable a Dutch mining company called Vimetco, then listed on the London Stock Exchange, to be listed on the Hong Kong Stock Exchange instead. Globoid did not repay the $200million to Webinvest, which, in 2013, went to arbitration against Globoid during which Mr. Shlosberg said, in his witness statement in the Original Proceedings, that Globoid was made aware that repayment of the loan was necessary so that Webinvest could satisfy its own creditors. That knowledge on the part of Globoid is also consistent with one reading of the live oral evidence given by Mr. Shlosberg and his witness, Mrs. Mutieva in the Original Proceedings.

5      That arbitration was subsequently settled in June 2014. Globoid has since been dissolved and has not paid back any part of the original loan directly to Webinvest. Webinvest itself has not paid the judgment debt and is now in liquidation in this jurisdiction. Joint liquidators were appointed on 24th March 2015. It is said by the claimants that Webinvest's major asset in the liquidation available to meet the judgment should be the debt of $200million plus interest owed to Webinvest by Globoid. However, the claimants say that it has become clear that Webinvest parted with that asset sometime prior to the liquidation as a result of the terms of the settlement of the arbitration with Globoid in the summer of 2014.

6      The effect of the arrangements entered into at about that time between Webinvest, Globoid, Castle and others was that, in essence, Castle (the company which had lent the other $100million to Webinvest) stood to receive the benefit of the $200million debt owed by Globoid to Webinvest whereas Avonwick stood to receive nothing with the result that its judgment debt would go unsatisfied. Avonwick says that the settlement arrangements were engineered and entered into with the express aim of defeating its money judgment by stripping Webinvest of its only real asset. Webinvest's joint liquidators say that they are entitled to attack the transfer of that asset to Castle under sections 238, 239 and 423 of the Insolvency Act 1986 as a transaction at an undervalue, a preference and a transaction defrauding creditors (which are referred to as the "Insolvency Claims").

7      Avonwick and the joint liquidators also allege that Mr. Shlosberg conspired
       with others by unlawful means, by putting in place the arrangement
       surrounding settlement of the arbitration, to deprive Webinvest of the right to
       the Globoid debt, thereby defeating Avonwick's claim to be paid the sum
       which was to become payable under the judgment in the Original Proceedings
       and thereby causing damage both to Webinvest and Avonwick.  They put Mr.
       Shlosberg at the centre of the conspiracy claims.  They wish to claim damages
       from those alleged to have been involved in the conspiracy, namely Mr.
       Shlosberg, Castle, Vi Holdings (a company incorporated in the Netherlands
       Antilles) and Mr. Machitski (who is the Russian owner and controller of
       Globoid and Vi Holdings).  The unlawful means are said to be: (1) causing
       Webinvest to enter into the transaction at an undervalue, the preference and the
       transaction defrauding creditors; and (2) procuring breaches of fiduciary duties
       owed to Webinvest by its directors as a result of which Webinvest entered into
       those transactions (I will refer to those two sets of allegations as the
       "Conspiracy Claims").  The Proceedings have already been commenced
       against Castle, Vi Holdings, Globoid and Mr. Machitski.  The current
       conspiracy claims for which permission exists are as set out in the amended
       particulars of claim.  The proposed re-amended particulars of claim include Mr
       Shlosberg as a defendant, although many of the details of the claims made
       against him had already been pleaded in the existing statement of case.

8      Mr. Shlosberg has not met his liability under Mr. Justice Sales' judgment and
       was made bankrupt on 14th January of this year.  Joint trustees were
       subsequently appointed (one of them also being one of the joint liquidators of
       Webinvest).  On the making of the bankruptcy order, an automatic stay arose
       under s.285 of the Insolvency Act 1986 preventing Avonwick and Webinvest
       from bringing substantive proceedings against Mr Shlosberg outside the
       bankruptcy without permission of the court.

9      Mr Shlosberg submits before me that there is no evidence supporting the claim
       against his alleged co-conspirators, and therefore there can be no claim against
       him.  However, in addition to the evidence which I refer to above concerning
       the alleged knowledge of Globoid, the transcript of the evidence before Mr.
       Justice Sales also suggests, on one reading, that while the negotiations were
       going on to settle the arbitration Mr. Machitski knew about the existence of the
       creditors of Webinvest including the existence of Avonwick (the reference in
       the evidence being to Mr. Gayduk, the beneficial owner and controller of
       Avonwick, rather than to Avonwick itself).  This is a matter which is hotly
       disputed.  I note that Mr. Hodge Malek QC, in his opinion dated 29th
       September 2015 in subsequent Dutch proceedings, having referred to the
       evidence of a Mr. Sventski in a witness statement of the same date, questioned
       whether there is evidence that Mr. Machitski and Vi Holdings knew of

Avonwick or its dealings with Webinvest. I have come to the conclusion on that particular factual dispute that it is a matter which can only be resolved at trial when all the evidence is explored in the usual way with the mechanisms that are open to parties and the court at trial.

10    The settlement arrangements which brought the arbitration between Webinvest and Globoid to an end and which are said to have diverted Webinvest's only real asset to Castle are to be found in five documents. They involve a number of different players, the names of which I have already mentioned. The first, dated 23rd June 2014, is an assignment agreement governed by English law by which Webinvest assigned to Castle all its rights to the Globoid debt. Second is a document dated 24th June 2014 and described as a "settlement deed" (again governed by English law) made between Webinvest, Castle and Globoid by which it was agreed that Globoid would procure the transfer of twenty-five per cent of the issued share capital of Vimetco to Castle in settlement of the arbitration. By Art.4.1 of the assignment agreement, Castle had agreed that it would credit $12million against the $100million loan which had been made by Castle to Webinvest as a result of the transfer of the shares referred to in the settlement deed. There is no explanation in the documents as to why this mechanism was chosen and why Castle became involved in this particular aspect of the transaction at all, nor why shares were to be used to settle the debt of Globoid to Webinvest instead of cash or some other asset passing directly from Globoid to Webinvest. Those are matters which, in my judgement, require an explanation. Thirdly, dated 27th June 2014, there was a side letter governed by English law from Mr. Shlosberg to Mr. Machitski, Vi Holdings and Globoid by which Mr. Shlosberg confirmed the settlement and waived various rights. Fourthly, also dated 24th June 2014, is the share purchase agreement, governed by Dutch law, by which Vi Holdings agreed to buy back from Castle the shares in Vimetco which had just been transferred to it as a result of Globoid's entry into the settlement deed. The following questions, among others, arise: although the market value of the shares was stated in the assignment agreement to be $12million, the purchase price being paid by Vi Holdings to Castle under the share purchase agreement was $172million payable in tranches between 2014 and 2018. Completion of the share purchase agreement and the transfer of title to the shares referred to in it was not to take place until final payment had been made. Related to this (in Art.4.2 of the assignment agreement) Castle had agreed to pay to or credit against Webinvest's loan debt to Castle fifty per cent of the payments received by Castle from Vi Holdings in respect of the share sale from time to time. Again, the question arises as to why the price was, on the face of it, inflated under this particular agreement from $12million to $172million, why this route was chosen for payment of the debt and why the simpler course of paying cash between those who owed each other debts was not chosen instead, given that it appeared that $172million was to become available somewhere in the chain.

Lastly, there was, dated 30th July 2014, a pledge granted over the shares (again, governed by Dutch law) by which Mrs. Mutieva and Castle gave Vi Holdings security over the Vimetco shares - which had been transferred to Castle by Globoid - entitling Vi Holdings to take various steps in respect of the shares on the occurrence of any one of many defined "Events of Default" which are described in clause 4.3 of the share purchase agreement including, among other events, if proceedings were to be taken in respect of the assets of Castle or if the control of Castle were to change. On one interpretation of the pledge, on the occurrence of either of those events, Castle would be under an obligation to repay to Vi Holdings a sum described in the document as a penalty equivalent to all the sums which had by then been paid by Vi Holdings to Castle under the share purchase agreement together with expenses and consequential damages. The nature of the parties' remaining rights and obligations under the share purchase agreement to perform and complete the transaction following the occurrence of an Event of Default are unclear. It is perhaps surprising that the Events of Default and the consequences triggered by them relate only to the party whose main obligation was to hand over the shares, whereas there are no other similar penalties relating to the obligation of the party who is obliged to pay the $172million for those shares over a period of four years.

11    The commercial explanation for the documents that I have just described is obscure to say the least. The claimants describe the provisions of the pledge as a poison pill because on their analysis the pledge potentially operates to deprive Castle of any part of the benefit of the price of the shares if it were to be attacked or if any of the Events of Default were to occur. The claimants submit that it appears that the payment obligation was designed to fail in circumstances where Avonwick sought to assert a claim against Castle; an assertion which is certainly arguable.

12    By 21st October 2014, Castle had received more than $8million under the share purchase agreement. Notwithstanding Art 4.2 of the assignment agreement there is no evidence to suggest that any part of that sum was paid or credited to Webinvest in reduction of Webinvest's liability to Castle for the $100million which Castle had advanced in 2010.

The Proceedings

13    On 6th November 2014 a freezing order was granted in the Original Proceedings against Castle. The Proceedings which asserted the Insolvency Claims were started as against Castle on 19th November 2014. Shortly afterwards, Vi Holdings notified Castle that an Event of Default had occurred and they gave the impression that, as a result, no further payments under the shared purchase agreement would be made. On 14th January 2015, Mr. Shlosberg was made bankrupt on the petition of Avonwick. By letter, dated

16th January 2015, Vi Holdings formally asserted that there had been default under the share purchase agreement because of the freezing order and that there was no further obligation on it to continue the payments due under the agreement. On 16th January 2015 (the same date), Globoid was placed in liquidation in Lichtenstein.

14    The Proceedings were subsequently amended and, by his order dated 8th May 2015, Master Price joined Webinvest, the liquidators, Vi Holdings, Globoid and Mr. Machitski to the proceedings and permitted amendments to be made to the particulars of claim to allow the Conspiracy Claims to be included. Later the same month proceedings were started by Vi Holdings against Castle in Amsterdam for a declaration that the share purchase agreement had been terminated. Proceedings were also started by Avonwick in the same jurisdiction against Vi Holdings, Vimetco and Castle seeking, among other things, a stay of the effect of the pledge over the shares pending the outcome of the current proceedings. The Dutch Court in a preliminary ruling rejected Avonwick's claims on the grounds that the case being advanced by it was not sufficiently plausible without further investigation.

15    There are subsequent judgments in the various Dutch proceedings in which it is said that the earlier ruling made by the Dutch Court does not mean that there are no merits in the Insolvency Claims and the Conspiracy Claims. Although I was taken to the detail of the claims being made in the Dutch proceedings and the decisions made by the Dutch Court I shall not set them out here for the reasons which follow. Mr Shlosberg submits that I am in the same position as the Dutch judges with the same materials and allegations before me and I should give effect to the Dutch judgments by refusing the relief which is sought. In respect of that argument I have been taken to two expert reports which contain opinion evidence as to the correct interpretation of those judgments. Mr Shlosberg relies on his expert evidence in support of an arguments that the existence of the Dutch judgments have determined the issues before me such that they are res judicata or that I should not grant the claimants the relief which they seek because of issue estoppel or because the Proceedings and the applications before me are an abuse of process. The effect of the judgments is a matter of considerable dispute between the parties before me. Having read the experts' reports, although it is right to say that there is a certain amount of common ground, there are significant differences between the experts, albeit of a nuanced nature. Because their evidence has been filed in respect of interim applications intended to be determined without live evidence and because there was no provision requiring the experts to meet and narrow their differences, their respective conclusions remain to be determined in this court as matters of fact: it would be wrong for me to attempt to choose between them on paper. Where there are differences between them material to the conclusions that I am being asked to reach, it is not appropriate, in my

judgement, to determine at an interim stage which of them is correct or what may be the consequences of them being correct based only on their reports at a time when they have not met and when their evidence has not been tested in court. That is in my judgement an exercise, which, if carried out, should be carried out as part of the trial process in due course.

### The (re)-amended particulars of claim

16    The basis of the Insolvency Claims and the Conspiracy Claims are set out in the draft re-amended particulars of claims. Permission was given for the bulk of the allegations by Master Price on 8 May 2015. As pleaded, pursuant to the permission granted by Master Price, the claimants assert in para.7 of the amended particulars of claim that they are entitled to relief in respect of the Insolvency Claims under s.239, 423 and 425 of the Insolvency Act 1986. By para.7A they assert that they are entitled to relief in respect of unlawful means conspiracy. They specifically say that the transactions contained in the five sets of documents that I have referred to above were entered into:

> "…pursuant to a combination, understanding or concert between Mr. Shlosberg on the one hand, Mr. Machitski and/or Globoid and/or Vi Holdings on the other to use unlawful means to cause harm to and to injure the first claimant in its capacity as creditor of Webinvest and/or to cause harm and to injure Webinvest by:
>
> (1)    wrongfully seeking to put assets of Webinvest beyond the reach of the first claimant, contrary to sections 238, 239 and/or 43 of the Act; and/or
> (2)    wrongfully inducing or procuring Webinvest directors to enter into transactions in breach of their fiduciary duties."

The underlying agreement between the alleged conspirators is pleaded from paragraph 27 onwards in the statement of case which then also asserts that effect was given to that underlying agreement through the entry into the five documents that I have already mentioned. The allegations concerning the unlawful means conspiracy are particularised in section I of the amended particulars of claim, in respect of which it is to be noted that permission had already been given by Master Price. The facts relied on by the claimants in support of the Conspiracy Claims are particularised in sub-paragraphs 49(i) and following. The principal facts on which the inferences of conspiracy are said to be drawn are set out in para.50 of the amended particulars of claim (again, a paragraph for which permission has already been granted). Loss and damage is then pleaded.

<u>Applications to lift the stay, join Mr Shlosberg and (re)amend the particulars of claim</u>

17    The application to lift the bankruptcy stay is not opposed by the joint trustees in bankruptcy. Insofar as material, section 285(3) of the Insolvency Act 1986 provides:

> "After the making of a bankruptcy order no person who is a creditor of the bankrupt in respect of a debt provable in the bankruptcy shall:
> …
> (b)    before the discharge of the bankrupt, commence any action or other legal proceedings against the bankrupt except with the leave of the court and on such terms as the court may impose."

Among the principles to be applied when considering whether the court should exercise its discretion on such an application are those set out in the decision of Mr. David Young QC (sitting as a Deputy Judge of this Division) in *Bristol and West Building Society v. The Trustee of the Estate of Back* [1998] 1 BCLC 485 at p.489 in the following passage:

> "(1)    An application for leave may be given if good cause is shown on the merits.  By that the court had in mind 'a serious question to be tried' similar to that required for an interlocutory relief rather than a prima facie case.
> (2)    There must be no prejudice to the creditors or to the orderly administration of the bankruptcy if the action is to proceed.
> (3)    The claim must be a of a type which is to proceed by action rather than through the proofing procedure in bankruptcy (see *Re Bank of Credit and Commerce International* SA No.4).
> (4)    Leave is more likely to be granted where there is an insurance company standing behind the respondent to pay any judgment debt the plaintiff might attain.  If successful, such an action is unlikely to prejudice the creditors of the respondent.  This section is not designed to protect an insurer.
> (5)    A condition is often imposed that the plaintiff will not enforce any judgment against the respondent without the leave of the court. This ensures that the bankruptcy court retains ultimate control.
> (6)    Mere delay in itself in applying for leave will not prevent leave being granted.  Leave is not to be withheld simply and solely as a punishment.
> (7)    Leave may be granted after the expiry of the relevant period of limitation to continue an action commenced within the limitation period without the leave of the court."

18    I have also to bear in mind the provisions relating to the second application
      before me, which pose a slightly different test when it comes to considering
      joinder of parties to proceedings.  CPR 19.2(2) provides:

> "The court may order a person to be added as a new party if:
> (a)    it is desirable to add the new party so that the court can resolve all
>        the matters in dispute in the proceedings; or
> (b)    there is an issue involving the new party and an existing party
>        which is connected to the matters in dispute in the proceedings,
>        and it is desirable to add the new party so that the court can
>        resolve that issue."

The threshold of "desirability" is relatively low.  There is no material
commentary in the White Book as to the application of this test.  Since the
power provided by CPR 19.2 is obviously one of the court's case management
powers it seems to me that it has to be exercised in such a way as to give effect
to the overriding objective.

19    So far as the third application is concerned, another different and arguably
      higher test is in play.  This is the key battleground in this series of applications.
      Re-amendment under CPR 17.1(2)(b) requires permission of the court.  The
      general principles for the grant of permission to amend are set out in the
      commentary to the rule in the White Book at 17.3.5 where the learned editors
      quote from Lord Justice Peter Gibson in *Cobbold v. Greenwich LBC*
      (unreported) 9th August 1999 and say that this citation is often relied upon and
      sometimes misapplied:

> "Amendments in general ought to be allowed so that the real dispute
> between the parties can be adjudicated upon provided that any prejudice
> to the other party or parties caused by the amendment can be
> compensated for in costs, and the public interest in the efficient
> administration of justice is not significantly harmed."

The above passage does not mean that the test for amendment is an easy hurdle
to overcome.  The prejudice referred to in that extract is one factor only.  It is
plain and indeed common ground, as identified in the note to 17.3.6 to the
White Book, that the applicant also needs to show some prospects of success
on the part of the proposed amendments, a test which is similar to that which is
applied under Part 24 on an application for summary judgment in respect of
which it has been said that the prospects of success must be real prospects as
opposed to fanciful prospects.

20    The claimants submit that the proposed amendments have a real, as opposed to
      fanciful, prospect of success as a matter of law and fact.  They say that both the

Insolvency Claims and the Conspiracy Claims satisfy the legal and factual requirements of the Part 17.3 test. They submit that in the circumstances it is just and fair to lift the stay in the bankruptcy; that it is appropriate to allow them to make use of the usual procedures available in mainstream proceedings to determine the Conspiracy Claims as opposed to the less satisfactory proofing procedure in the bankruptcy; that it is clearly desirable for Mr. Shlosberg, who is at the heart of the alleged conspiracy, to be joined to the proceedings and that I should accede to their applications.

21    Mr. Shlosberg's counsel submit that the claimants have no claims against the other alleged conspirators which stand a real chance of success and that, therefore, they have no real prospect of success as against him and that if there is no real prospect of success the application to lift the stay must fail. First, they say that the claimants have no real prospect of succeeding on their Conspiracy Claims as a matter of law because the acts which potentially lead to the relief sought under sections 238, 239 and 423 of the Insolvency Act are not "unlawful means" for the purposes of an unlawful means conspiracy. They say, additionally, that ss.238, 239 and 423 comprise a complete scheme which provides the appropriate remedy for transactions which fall within those sections and that therefore the sections ought not to be available as a springboard for claims of a wider nature such as the conspiracy alleged by the claimants in this case. As to the second set of acts relied on by the claimanst they say that there is no tort of procuring breaches of fiduciary duty, such that those alleged breaches of duty cannot be used as the foundation of an unlawful means conspiracy claim. In any event they say that, when properly analysed, there is no difference between the allegations of procuring breaches of fiduciary duty and the acts relied on as giving rise to the Insolvency Claims: they are one and the same thing. They argue that there are equitable remedies available for such alleged wrongs, such as accessory liability or dishonest assistance, and that there is no basis for grafting on a liability of the sort asserted by the claimants simply by alleging that the acts took place in performance of a conspiracy. They point out that there is authority for the proposition that there is no cause of action of conspiracy for breach of trust (*Metall und Rohstoff AG* [1990] 1 QB 391) and say that conspiracy for breach of a fiduciary duty is no different in principle.

22    Additionally, they refer to the view of Mr. Justice Norris on such a cause of action as expressed by him in *First Subsea Limited v. Balltec Limited & Ors.* [2014] EWHC 866 where, in a lengthy judgment, after a lengthy trial, the judge turned to consider whether there was such a tort as conspiring to injure by unlawful means, the unlawful means being inducing breach of fiduciary duty. At para.351, Mr. Justice Norris asked himself whether there was such a tort. He then went in para.353 to say as follows:

"The matter was not extensively argued before me and I shall therefore say only what is sufficient to dispose of this case. I accept that there are cases where there is a contractual obligation and an identical fiduciary obligation (e.g. to account) in which the inducement tort has been held to apply to both obligations: but in my judgment these do not provide a sufficient foundation for the proposition that there is a general tort of inducing breach of fiduciary duty. There are well-developed principles within equity itself covering accessory liability (based on knowing receipt and dishonest assistance): in my judgment these address secondary claims of the type advanced here. The existence of these principles led the Court of Appeal in *Metall und Rohstoff AG* [1990] 1 QB 391 to say (admittedly in the context of a plea of inducement to commit a breach of trust) that there was no reasonably arguable case for the introduction of the tort:-

> 'The principles of the law of trusts,… are quite sufficient to deal with those persons who incite a breach of trust or wrongfully… interfere with the relationship of trustee and beneficiary. We know of no authority supporting the existence of the alleged tort and can see no sufficient justification for the introduction of a new tort of this nature.'

I share this caution. I also note that the view is expressed in Clerk & Lindsell on Torts (20th edition) paragraph 24-31 that as yet there appears to be no general tort of procuring a breach of fiduciary duty."

I was also taken to annex A to the *Digicel* decision of Mr. Justice Morecambe in which he considers the elements of conspiracy in considerable detail.

23    Secondly, Mr. Shlosberg submits that the claimants have no real prospect of succeeding on the Conspiracy Claims as a matter of fact because not only is the case not sufficiently pleaded in that it does not identify the acts or the relevant intentions, but there is no basis for inferring the relevant intentions of Mr. Machitski, Globoid or Vi Holdings to harm the claimants. There is no causative loss because it was the directors of Webinvest and not the alleged conspirators which brought about the transactions. Thirdly, they submit that the damage claimed is in reality reflective loss which only Webinvest can recover. They rely on a decision of Lord Justice Neuberger (as he then was) in *Gardner v. Parker* [2004] EWCA Civ. 781. Fourth, they rely on illegality saying that because Webinvest is said to have been involved in this conspiracy, it cannot bring the claim benefit from the wrongs which it is said to have committed. Fifth is the argument that issue estoppel or abuse argument arises out of the earlier civil proceedings in the Dutch Courts. Sixth, that when it comes to the final analysis, it would not be right to allow this claim to be

brought where it is said that the sole reason for doing so is to create a jurisdictional anchor by allowing service on Mr. Shlosberg within the jurisdiction as a basis for serving various of the overseas defendants outside the jurisdiction.

24    Turning then to the first of those sets of submissions:  Whether the  Conspiracy Claims have a real, as opposed to fanciful, prospect of success as a matter of law.  The relevant principles relating to unlawful means conspiracy are, in my judgement, to be found most conveniently set out in the judgment of Lord Justice Nourse in *Kuwait Oil Tanker Company SAK v. Al Bader & Ors* [2002] All ER 271 (Comm) from para.107 onwards, where his Lordship said:

> "It is common ground that there are two types of actionable conspiracy, conspiracy to injure by lawful means and conspiracy to injure by unlawful means.  The first is sometimes described simply as a conspiracy to injure and the second as a conspiracy to use unlawful means: see eg **Clerk & Lindsell on Torts**, 17th edition, paragraph 23-76. In our view they are both conspiracies to injure and their ingredients are the same, with one crucial difference.  In both cases there must be conspiracy to injure the claimant, but in the first case (in which the means employed would otherwise be lawful) the predominant purpose of the conspiracy must be to injure the claimant whereas in the second case, although the defendant must intend to injure the claimant, injury to the claimant need not be his predominant purpose.
>
> We shall treat them as different torts, although, as it seems to us, they are better regarded as species of the same tort.  It matters not.  For present purposes we would define them as follows:
>
> - A conspiracy to injure by lawful means is actionable where the claimant proves that he has suffered loss or damage as a result of action taken pursuant to a combination or agreement between the defendant and another person or persons to injure him, where the predominant purpose of the defendant is to injure the claimant.
> - A conspiracy to injure by unlawful means is actionable where the claimant proves that he has suffered loss or damage as a result of unlawful action taken pursuant to a combination or agreement between the defendant and another person or persons to injure him by unlawful means, whether or not it is the predominant purpose of the defendant to do so.
>
> We shall call them a 'lawful means conspiracy' and an 'unlawful means conspiracy' respectively.

(110) It is important to note that the tort of conspiracy to injure by unlawful means is different in significant respects both from the crime of conspiracy and from the law of contract. A criminal conspiracy is in essence an agreement to commit a crime and, as such, is complete when the agreement is made, whether or not it is carried out. For this reason care must be taken in considering decisions in criminal cases where (as here) the question is whether the tort of conspiracy was committed. Lord Diplock put it in this way in *Lonrho v Shell* (at page 188):

> 'Regarded as a civil tort, however, conspiracy is a highly anomalous cause of action. The gist of the cause of action is damage to the plaintiff; so long as it remains unexecuted the agreement, which alone constitutes the crime of conspiracy, causes no damage; it is only acts done in execution of the agreement that are capable of doing that. So the tort, unlike the crime, consists not of agreement but of concerted action taken pursuant to agreement.' (see [1981] 2 All ER 456 at 461)

In that passage Lord Diplock appears to have been referring to both types of conspiracy. The essence of the unlawful means conspiracy is injury to the claimant as a result of an unlawful act or acts where two or more people have combined to cause the injury. It is not necessary that every overt act is done by every conspirator, but the act must be done pursuant to the conspiracy or combination.

(111) A further feature of the tort of conspiracy, which is also found in criminal conspiracies, is that, as the judge pointed out at page 124, it is not necessary to show that there is anything in the nature of an express agreement, whether formal or informal. It is sufficient if two or more persons combine with a common intention, or, in other words, that they deliberately combine, albeit tacitly, to achieve a common end. Although civil and criminal conspiracies have important differences, we agree with the judge that the following passage from the judgment of the Court of Appeal Criminal Division delivered by O'Connor LJ in *R v Siracusa* (1990) 90 Cr. App. R. 340 at 349 is of assistance in this context:

> 'Secondly, the origins of all conspiracies are concealed and it is usually quite impossible to establish when or where the initial agreement was made or when or where other conspirators were recruited. The very existence of the agreement can only be inferred from overt acts. Participation in a conspiracy is infinitely variable: it can be active or passive. If the majority shareholder

and director of a company consents to the company being used for drug smuggling carried out in the company's name by a fellow director and minority shareholder, he is guilty of conspiracy. Consent, that is agreement or adherence to the agreement, can be inferred if it is proved that he knew what was going on and the intention to participate in the furtherance of the criminal purpose is also established by his failure to stop the unlawful activity.'

Thus it is not necessary for the conspirators all to join the conspiracy at the same time, but we agree with the judge that the parties to it must be sufficiently aware of the surrounding circumstances and share the same object for it properly to be said that they were acting in concert at the time of the acts complained of. In a criminal case juries are often asked to decide whether the alleged conspirators were 'in it together'. That may be a helpful question to ask, but we agree with Mr Brodie that it should not be used as a method of avoiding detailed consideration of the acts which are said to have been done in pursuance of the conspiracy.

(112) In most cases it will be necessary to scrutinise the acts relied upon in order to see what inferences can be drawn as to the existence or otherwise of the alleged conspiracy or combination. It will be the rare case in which there will be evidence of the agreement itself."

In looking in the context of that guidance first at the Insolvency Claims, I was asked also to take account of the decision of the House of Lords in *Lonrho Limited v. Shell Petroleum Company Limited (No.2)* [1982] AC 173 and in particular the speech of Lord Diplock at p.185. In that case the House of Lords had to consider whether in an unlawful means conspiracy a crime could amount to the unlawful means. From sub-paragraph 185B onwards, Lord Diplock said:

"A sanctions order thus creates a statutory prohibition upon the doing of certain classes of acts and provides the means of enforcing the prohibition by prosecution for a criminal offence which is subject to heavy penalties including imprisonment. So one starts with the presumption laid down originally by Lord Tenterden C.J in *Murray v. Bridges* [1831] B & Ad 847, 859, where he spoke of the 'general rule' that 'where an Act creates an obligation, and enforces the performance in a specified manner…that performance cannot be enforced in any other manner' - a statement that has frequently been cited with approval ever since, including on several occasions in speeches in this House. Where the only manner of enforcing performance for which the Act provides is prosecution for the criminal offence of failure to perform the

statutory obligation or for contravening the statutory prohibition which the Act creates, there are two classes of exception to this general rule.

The first is where upon the true construction of the Act it is apparent that the obligation or prohibition was imposed for the benefit of protection of a particular class of individuals, as in the case of Factories Acts and similar legislation…"

25    It is submitted on behalf of the claimants that the Insolvency Claims fall within that first exception, submitting that the Insolvency Claims arise under statutory provisions which were imposed for the benefit or protection of a particular class of individuals who are creditors or, as they referred to in some parts of the relevant provisions of the Act, "victims". They say that, in reliance on Lord Diplock's reasoning, the acts which give rise to the relief under the Insolvency Act are therefore unlawful means such that the conspiracy that they plead, in the course of which those acts were carried out, is properly constituted and described as an unlawful means conspiracy. On the other hand, the defendants submit that properly understood Lord Diplock's speech and reasoning only relates to breaches of criminal statutes; that there is therefore no application of the principles considered by his Lordship in that case to the present case because no criminal statute is involved here. In my judgement, while that is one reading of what his Lordship said, I am not satisfied on the basis of the argument before me that there is good reason to confine the general rule, as described by Lord Tenterden, and the exception described by Lord Diplock, to breaches of criminal statutes only. The Insolvency Act provisions relied on by the claimants are clearly provisions which are intended to provide protection to creditors and others who, in that sense, as the claimants' submit, arguably form a particular class of individuals for whose benefit those provisions were enacted. It seems to me that it is reasonably arguable that it is therefore appropriate to describe the acts caught by those provisions as unlawful acts. There is no reason in principle, in my judgement, why it should not be arguable that a conspiracy to commit those unlawful acts is not actionable as an unlawful means conspiracy.

26    I was next taken by the claimants to the decision of Mr. Justice Flaux in *Concept Oil Services Limited v. En-Gin Group L & Ors* [2013] EWHC 1897 (Comm), which was a trial of a claim where none of the defendants attended and therefore his Lordship only heard argument on one side. That case concerned, among other things, a company which had been asset stripped. I was taken in particular to paras.49 and 50 in the judgment, where his Lordship considered an allegation of unlawful means conspiracy. Starting in the middle of para.49, he said:

"…This is said to be a conspiracy to cause loss to COS [the claimant] by unlawful means. That is a tort which is committed where two or more persons agree to perform unlawful acts, which need not be torts, with the intention, whether or not it is the sole or dominant intention, of causing loss to the claimant: see *Revenue and Customs Commissioners v Total Network SL* [2008] 1 AC 1174…"

At para.50, his Lordship continued:

"In the present case, Mr Stanley submits that all the defendants (with the exception of the tenth defendant who has not been served and the twelfth defendant Larson against whom no allegation of conspiracy is made) are liable for this unlawful means conspiracy. I accept that submission in relation to all the defendants and that, on analysis, all the defendants, including Skyagra, (to whose position I will return in more detail below) were involved in the conspiracy at all material times. In terms of the unlawful means, the deceit itself is sufficient unlawful means and it is not therefore strictly necessary to decide whether entering a transaction defrauding creditors within the meaning of section 423 of the Insolvency Act 1986 is sufficient unlawful means as well, although I see no reason in principle why it should not be."

The point was therefore, as I have already said, not determined in the sense that the learned Judge came to a reasoned conclusion based on argument which he then set out. However, at the very least, it seems to me, that what Mr. Justice Flaux said in that case is support for the conclusion that the argument that the insolvency claims give rise to a course of action, one with a real prospect of success, is a good argument.

27   I was also taken in support of that argument to the decision of the Court of Appeal in the *Air Canada* case [2015] EWCA Civ. 1024, where Lord Justice Elias giving the judgment of the court considered the elements of unlawful means conspiracy in considerable detail from para.131 of the judgment onwards. It seems to me that that judgment leaves open the precise categories of unlawful means conspiracy and it would, in my view, be wrong at a preliminary stage to come to the conclusion that the arguments raised by the claimants as pleaded in their particulars of claim relating to the Insolvency Act claims have no real prospect of success. There is no reason in principle why those claims are doomed to failure. Moreover, there is good reason to believe, having regard to the authorities I have already mentioned, that they have a real prospect of success. Whether they are ultimately good claims, it seems to me, are decisions which should await trial and arguments on the law at that stage in the context of the facts as the court then finds them. At that stage the court can

decide in the light of all the facts and full legal argument whether the view of Mr Justice Flaux is correct.

28      I move on then to consider the allegation of unlawful means conspiracy based on procuring breaches of fiduciary duty. It is said that the Webinvest directors acted in breach of their duties to the company in causing the various challenged transactions to be entered into. Mr. Shlosberg submits that there is no tort of procuring breach of fiduciary duty. Reliance is placed on the *Subsea* decision, as I have already mentioned; but, as Mr. Justice Norris acknowledged, that issue had not been fully argued before him, It therefore seems to me that it was not a decision which should lead me to conclude that the allegations are doomed to failure. Secondly, in my view there is a material difference between the arguments that there can be no conspiracy for breach of trust and the arguments that there can be no tort of conspiring to procure breaches of fiduciary duty. Without going into it in detail, I take support from the decision of the House of Lords in *Revenue & Customs Commissioners v. Total Network SL* [2008] UKHL 19 at paras.56, 96, 119, 120 and 211. In a sense, Mr. Shlosberg's submissions are correct in that the factual allegations relied on as giving rise to the alleged breaches of fiduciary duty are no different to the acts relied on in respect of the Insolvency Claims, but that is not a reason in my judgement why they should not form a good alternative ground for the cause of action relied on by the claimants: they focus on different stages of those chain of facts. The breaches of fiduciary duty, if proved, would in my judgement arguably amount to unlawful acts for the purposes of unlawful means conspiracy and I am not able to come to the conclusion at this point that there is no real prospect of succeeding in that argument as a matter of law. The questions of law arising in respect of both types of acts are, in my judgement, complicated questions not suitable for summary determination in the absence of a determination of the facts. They should be resolved at trial and, in respect of both, in my judgement, they pass the requisite threshold.

29      I turn then to the submission that the claimants' Conspiracy Claims have no real, as opposed to fanciful, prospect of success as a matter of fact. I bear in mind that, in respect of the majority of the facts set out in the claimants' pleading, permission has already been granted by Master Price. The principal assertion, which I have already cited it, is that there was a combination, understanding or concert between Mr. Shlosberg on the one hand and Mr. Machitski and/or Globoid and/or Vi Holdings on the other to use what I consider arguably to be unlawful means to cause harm and to injure Avonwick by removing Webinvest's assets so as to deprive Avonwick of the opportunity of recovering in respect of its judgment. All the elements of the conspiracy claim are, in my judgement, sufficiently pleaded. True it is that, if one looks at each of the individual acts pleaded in the proposed re-amended particulars of

claim, it may be said that that individual act does not provide the necessary evidence to support the claim. However, as in all pictures and particularly having regard to the guidance given by Lord Justice Nourse in the *Kuwait Oil Tanker* case, one has to recognise the fact that there will very rarely be direct evidence of the agreement itself and one has to look at the complete picture rather than all the pieces in isolation. In my judgement, on one reading of the evidence, it is possible to infer the necessary elements of the conspiracy claim from the five sets of documents that give rise to the transaction, the timing of them, the view the court will take of the credibility of the various witnesses and to that extent one has to bear in mind at this stage the view that Mr. Justice Sales took of the credibility of Mr. Shlosberg. Similarly, the claimants' contention as to Mr. Machitski, Globoid and Vi Holdings having the requisite knowledge of the harm and of the entity or class of entities likely to suffer such harm has a real prospect of being proved in the light of the evidence before Mr. Justice Sales and the documents which I have seen. It is, in my judgement, open to the court to draw the inferences which the claimants seek to be drawn. It is not appropriate at this stage to conduct a mini trial to decide where the truth lies. The test is whether there is a real, as opposed to fanciful, prospect of success. It may be said that there are many questions to be answered. Where there are questions, one might say that is not evidence. But where the questions are of the sort that I have mentioned earlier in respect of the documents comprising the transaction that took place at the time of settlement of the arbitration in 2014, one can see that there is a real prospect of the court drawing the inferences from the absence of answers to those questions in support of the claimants' case.

30      Mr. Shlosberg submitted that the claimants cannot show that there is a causative link between the allegations made and the loss which it is said to have suffered, given that the people who are alleged to have caused Webinvest to enter into the transactions were its directors. One has to stand back, in my judgement, and look at the picture as a whole. There had to be agents involved on the claimants' case and the fact that it was Webinvest's directors who were those specific agents does not mean that there was, on the claimants' case, no arguable causative link between the conspiracy and the loss which the claimants are said to have suffered. On the evidence therefore I have come to the conclusion that the claimants do have a real, as opposed to fanciful, prospect of success in proving the facts necessary to support their claims.

31      Next the argument advanced on behalf of Mr. Shlosberg was that because the transactions relied on involving Webinvest were said to be unlawful transactions, it should not be entitled to benefit from the causes of action advanced by it in the Proceedings. That is an argument which cannot apply to Avonwick, in my judgement, who was an outsider to the alleged transactions in any event. In any event, so far as Webinvest itself is concerned there must, in

my judgement, notwithstanding its alleged involvement in the conspiracy, be a means of protecting the innocent creditors and shareholders of Webinvest who ought not to be exposed by the illegality of the acts of the directors of the company with which they were dealing.

32    The next issue is whether the claimants are preventing from succeeding because what they seek is properly analysed as reflective loss: reliance is placed by Mr. Shlosberg on the decision of Lord Justice Neuberger (as he then was) in *Gardner v. Parker* [2004] EWCA Civ. 781 in support of that contention.  In a passage which was not central to his decision in that case Lord Justice Neuberger equated the position of creditors and shareholders in the context of what was said to be reflective loss.  In paragraphs 70 and 71 of that decision he said:

> "It is clear from those observations, and indeed from that aspect of the decision, in *Johnson* that the rule against reflective loss is not limited to claims brought by a shareholder in his capacity as such; it would also apply to him in his capacity as an employee of the company with a right (or even an expectation) of receiving contributions to his pension fund. On that basis, there is no logical reason why it should not apply to a shareholder in his capacity as a creditor of the company expecting repayment of his debt.  Indeed, it is hard to see why the rule should not apply to a claim brought by a creditor (or indeed, an employee) of the company concerned, even if he is not a shareholder.  While it is unnecessary to decide the point, as BDC was a shareholder in Scoutvale, it is hard to see any logical or commercial reason why the rule against reflective loss should apply to a claim brought by a creditor or employee, who happens to be a shareholder, of the company, if it does not equally apply to an otherwise identical claim by another creditor or employee, who is not a shareholder in the company.

> There are observations, which I have quoted, in the speech of Lord Millett in Johnson which appear to me strongly to reinforce the conclusion that the rule against reflective loss does indeed bar BDC's claim against Mr Parker insofar as it is based on the Loan. Thus, in the passage from his speech I have quoted at paragraph 30 above, Lord Millett does not merely refer to 'shareholders' but also to 'creditors'. Secondly, in the passage cited in paragraph 31 above, Lord Millett emphasised that reflective loss does not only extend to 'diminution of the value of the shares' and 'loss of dividends', but also to 'all other payments which the shareholder might have obtained from the company if it had not been deprived of its funds'.  Similarly, at 67B, he said in terms that the fact that Mr Johnson was claiming, as it were, qua employee, rather than qua shareholder, made no difference.  I can see no

basis whatever in logic or principle as to why, if a claim qua employee is barred by the rule, a claim made qua creditor is not similarly so barred. In most cases where an employee's claim is barred by the rule against reflective loss, the employee will be a creditor of the company. It is hard to see why a creditor who is an employee should be treated differently from any other creditor of the company when it comes to applying the rule against reflective loss."

In this case Avonwick is not claiming as a shareholder of Webinvest but as a creditor. Avonwick's losses would, however, *prima facie* fall within the reasoning of Lord Justice Neuberger, even though what it is claiming is its loss of the opportunity of looking to the assets of Webinvest to enforce its judgment.

33    In opposition to the defendants' submissions, the claimants rely on the comments of Mr. Justice Flaux in the case of *Fortress Value Recovery Fund* [2013] EWHC 14 (Comm) at paras.76 to 79. Mr. Justice Flaux, in connection with an application to amend a pleading, referred to the comments of Lord Justice Neuberger in *Gardner v. Parkers* before saying that he was not persuaded by them for the reasons given in para.79:

> "In any event, even if the defendants had not already consented to the amendment which they now seek to question, I would have given permission to amend for two reasons. First, whether or not the rule against reflective loss extends beyond shareholders of the company to creditors is not the subject of any binding judicial decision but only of the dictum I have quoted, albeit from as eminent a source as Lord Neuberger and it seems to me the contrary view must at least be arguable so that the point is not one on which it can be said the claimants are bound to fail."

His Lordship then considered the separate position of a secure creditor, which has no relevance to the matters which I have to consider in the present case.

34    In reliance on the view of Mr. Justice Flaux the claimants submitted that I should come to the same conclusion as the learned Judge to the effect that Lord Justice Neuberger's comments are obiter and raise a question of law which still remains to be resolved by the courts and, as a matter of principle, is equally arguable. It seems to me that the reasoning of Mr. Justice Flaux is compelling. The decision of Lord Justice Neuberger in *Gardner v. Parker* is not binding, however powerful the reasoning is and it would be wrong in principle to prevent the claimants from asserting their claim based on that line of reasoning at a time when the court has not pronounced definitively on whether such a

claim is barred by the principle of reflective loss as considered by Lord Justice Neuberger in that case.

35    Turning then to the arguments that the Dutch proceedings should be given effect to, such that I should view the current applications either as matters which have already been determined or as an abuse of the process. The claimants accept that issue estoppel can be based on foreign judgments and they refer me to the decision of the House of Lords in *Carl Zeiss Stiftung v. Rayner & Keeler Limited (No.2)* [1967] 1 AC 853 and remind me that three elements need to be established before issue estoppel could arise from the existence of a foreign judgment: first, that the foreign judgment must be final and conclusive on the merits; secondly, that there is an identity of parties; and, thirdly, that there is an identity of subject matter. Mr Shlosberg's argument is in fact put more broadly than that because the decisions of the Dutch Court, insofar as they are relied on, are on any basis interim decisions, which, if they had been made in this court, could not be decisions which would be re-opened in the absence of change of circumstances (in the absence of fraud and other specific factors). The bankrupt's argument therefore, in my judgment, is something more akin to an abuse of process argument.

36    The concerns that I have in forming the view that this line of reasoning prevents the claimants from raising their arguments in the current proceedings is that the true nature and effect of the Dutch judgments are still unresolved, for the reasons I gave earlier. There is expert evidence with nuanced differences. The consequences of the views of the experts have yet to be worked out. It is inappropriate to do so on an interim basis. Secondly, the parties are not identical in that some of the parties to the English proceedings were not parties to the Dutch proceedings and complicated questions of privies and identity of interests arise. I accept, so far as the third limb is concerned and for what it is worth, that the issues raised in the current proceedings appear to have been raised in the Dutch proceedings. But in the absence of a resolution in respect of the other two limbs, it seems to me that this is an argument which does not lead me to the conclusion that the claims being raised by the claimants are doomed to failure or have no real prospect of succeeding.

37    Therefore, I have come to the conclusion on the application to amend that there is a real prospect of success. So far as the joinder application is concerned, it is obviously desirable that Mr. Shlosberg is joined to the proceedings as a proper party. It is a claim which affects him on the face of it and in respect of which the claimants say he is at the heart. So the joinder test would be satisfied. The question arises whether permission should be granted to lift the stay. In that respect (and bearing in mind what I have already said) it seems to me that there is no prejudice to the creditors or to the orderly administration of the bankruptcy if the action were to proceed in the mainstream part of this

Division rather than the Bankruptcy Court. I bear in mind that the trustees have already consented. I also bear in mind that Avonwick is by far the largest creditor on the information that I have been provided with and that the estate in bankruptcy would not bear the cost of proving the claim which they seek to assert. As to the nature of the claim itself, it is a type which in my judgement is not suited to being dealt with through the proofing procedure which would, in any event, if challenged, result in mainstream proceedings being taken. It is more appropriate, in my judgement, for such a claim to be started in the ordinary way by statements of case without the diversion that would be involved in going via the proofing procedure. I also bear in mind the fact that any damages that might be awarded if the claims were to be successful in respect of any elements of fraud asserted by the claimants would survive the bankruptcy under s.281(3) of the Insolvency Act: that is another factor which weighs on the claimants' side in the balance.

38      The main countervailing factor in lifting the stay, in the defendant's submission, is the assertion that the claim against Mr Shlosberg in the Proceedings is merely being used as a jurisdictional anchor. Paragraph 3.1 of the Practice Direction to Part 6 provides:

> "The claimant may serve a claim form out of the jurisdiction with the permission of the court under Rule 6.36 where:
>
> (1)    A claim is made for remedy against a person domiciled within the jurisdiction.
>
> (3)    A claim is made against a person ('the defendant') on whom the claim form has been or will be served (otherwise than in reliance on this paragraph) and:-
>
>> (a)    there is between the claimant and the defendant a real issue which it is reasonable for the court to try; and
>> (b)    the claimant wishes to serve the claim form on another person who is a necessary or proper party to that claim."

39      The defendant submits that, if one strips away what appear to be the reasons for lifting the stay which are without substance, one is left with the jurisdictional anchor as the reason and motivation for the wish to join Mr. Shlosberg to the proceedings. I was taken in detail through the decision of the Court of Appeal in *Multinational Gas and Petrochemical Company v. Multinational Gas and Petrochemical Services Limited* [1983] 1 Ch. 258 and through the three judgments of the members of the Court of Appeal in that case. The parties before me took up different positions as to the true meaning of that decision was and those various judgments, particularly when applied to

the facts of this case.  Whatever the proper analysis of that judgment is, it seems to me that I am in fact bound by the decision of the Court of Appeal in the *Erste Group Bank AG v. JSE "VMZ Red October" & Ors.* [2015] EWCA Civ. 379 where Lady Justice Gloster, giving the judgment of the court, said in para.43 that the proper analysis of the *Multinational* Case is a task for the Supreme Court:

> "Accordingly, even if we have reservations on this point, we must accept for the purposes of this case the Board's conclusion, as expressed in paragraph 79 in *Altimo,* that the fact that the anchor defendant is sued only for the purpose of bringing in the foreign defendants is not an element in deciding the question whether the gateway requirements of paragraph 3.1(3)(a) or (b) have been satisfied.  That factor is only for consideration under the wider discretionary head of Issue 4."

40    In my judgement the fact that, on the defendants' case, the sole reason for Mr. Shlosberg as a jurisdictional anchor is not a good reason not to lift the stay in the bankruptcy.  I am, in any event, not persuaded for the reasons I have already given that it is the only reason for joining him to the proceedings.  For the reasons I have already given there are real prospects of success in the claim against Mr Shlosberg.  There are good reasons to join him to the Proceedings, of which being an anchor defendant is another.  In conclusion, I would therefore grant the claimants the relief they seek in the first group of applications.

41    So far as the second group of applications is concerned, I need deal with those only very briefly.  First, the application for permission to serve out of the jurisdiction.  It seems to me that the claimants have made out, both in respect of the Insolvency Claims and the Conspiracy Claims, the jurisdictional gateways that are required for me to make an order in their favour.  The prima facie view I form is that England is, on the face of the material before me, the most suitable jurisdiction in which to determine the claims, both in respect of both sets of claim.  The main parties are here, English law governs a number of the claims.  The Insolvency Act proceedings can only be dealt with under English law.

42    In respect of Mr. Machitski the claimants ask for permission to extend time for service, but they also ask for permission to use an alternative method of service.  The Foreign Process department of the Royal Courts of Justice have written to the claimants' solicitors suggesting that if the usual methods are used that it would take a minimum of two years to serve documents on Mr. Machitski in Russia.  Therefore, the claimants seek to serve him by alternative means, pursuant to CPR 6.15(1) and they referred me to the relevant principles that apply.  In my judgment, given the need to get on with these proceedings

and bearing in mind the fact that in the view of the Foreign Process department there would be considerable and inordinate delay in using conventional methods, service by alternative means is justifiable. Therefore, I would grant the orders sought by the claimants to serve by alternative means, namely by hand delivery of the relevant documents to Mr. Machitski in St. Petersburg and delivering them to the resident office of Vimetco in the Netherlands of which Mr. Machitski is the Chairman. The consequence of that may be that the proceedings can get under way much more speedily than would otherwise be the case which must, in my judgement, be in everyone's interests.

43    The last application is what is referred to as the "release application" under CPR 31.22 relating to certain of the documents which were disclosed or came to light in the course of the original proceedings, which are relevant to the present proceedings. I am told that a number of those documents were referred to during the course of the trial for Mr. Justice Sales and therefore technically no application is necessary. Secondly, that Webinvest and its liquidators are now claimants in these proceedings and therefore, in respect of documents held by them, no issue arises. But there is some confusion as to the origin of some of the documents bearing in mind the inadequacy of the lists which were prepared in the course of the original proceedings. Mr. Shlosberg does not oppose the application. Castle, I am told, positively consents and the application is made out an abundance of caution. In my judgement, none of the rights intended to be protected by the rule which would prevent disclosure apply in the instant case and, in exercising my discretion, I would grant the relief sought by the claimants.

_____

TAB 4

*Barrow v Bankside Agency Ltd* [1996] 1 WLR 257

1 W.L.R.                    Eves v. Hambros Bank (Jersey) Ltd. (P.C.)

A  every stage of the proceedings and at every level of the judicial hierarchy. The natural justice point, with which their Lordships have already dealt, was a pure point of law which was fully argued before the Court of Appeal and this Board. It could not have been improved by any further evidence which Mr. Eves might have put before the Royal Court. Accordingly, their Lordships consider that there is nothing in the second ground of appeal. They will humbly advise Her Majesty that the appeal

B  should be dismissed.

   *Solicitors: Public Law Project; Theodore Goddard.*

S. S.

C

———

D

[COURT OF APPEAL]

*BARROW v. BANKSIDE AGENCY LTD. AND OTHERS

E  1995  Nov. 6, 7                          Sir Thomas Bingham M.R.,
                                        Peter Gibson and Saville L.JJ.

   *Practice—Pleadings—Striking out—Abuse of process—Lloyd's litiga-
   tion—Plaintiff obtaining judgment in group action on single issue of
   liability in negligence—Commencement by plaintiff of fresh action
   against same defendant in respect of claim not raised in group
F  action—Whether fresh action abuse of process of court*

       As part of the procedural management of claims arising from losses in the Lloyd's insurance market ("the Lloyd's litigation") the Commercial Court divided the various claims into their generic classes and identified and selected for early trial those actions which raised issues common to numerous claims in the expectation that their resolution would be determinative of other actions. In certain cases claimants had formed action groups,
G  whereby members accepted certain rules and contributed to the cost of litigating single or common issues. In 1993 the plaintiff, a name at Lloyd's and a member of an action group, began an action together with over 3,000 co-plaintiffs against 71 defendants claiming damages for breach of contract and negligence in the conduct of underwriting business in relation to specified syndicates. The action was selected for early trial to determine
H  that issue on a global basis without reference to the individual circumstances of each claimant. The judge concluded the issue in favour of the plaintiffs save as to the extent of damages they might recover. The plaintiff immediately began a fresh action against two defendants, the first of whom had been a defendant to the group action, claiming damages in respect of a different generic class of claim, namely, for breach of duty in respect of his portfolio selection, which required consideration of the individual circumstances of the case. The defendants applied to strike out

the fresh action on the grounds of estoppel, alternatively that the    A
fresh proceeedings were an abuse of the court's process. The
judge dismissed the application.

On appeal by the first defendant:—

*Held,* dismissing the appeal, that the rule which required
parties to litigation to advance their whole case at one time and
prevented them from returning to the court to advance matters
which might have been raised in earlier proceedings did not
apply to a claim which could not have been dealt with on the first    B
occasion; that, given the procedural management of the Lloyd's
litigation and the terms on which the group action had been
litigated, the plaintiff's fresh claim could not have been dealt with
in the previous litigation; that commencement of the fresh action
did not subject the first defendant to an unnecessary series of
trials or prejudice him; and that, therefore, the procedure
adopted by the plaintiff was not an abuse of process; that,    C
alternatively, if the rule were applicable, the circumstances of the
case in the context of the Lloyd's litigation amounted to special
circumstances which excused the plaintiff's non-compliance with
the rule; and that, accordingly, the judge's refusal to strike out
the fresh action was correct (post, pp. 263C–F, G–H, 264G–H,
266F–G, 268B–C, E–G, H–269A, D–F).

*Henderson v. Henderson* (1843) 3 Hare 100 and *Brisbane City
Council v. Attorney-General for Queensland* [1979] A.C. 411, P.C.    D
considered.

Decision of Phillips J. affirmed.

The following cases are referred to in the judgments:

*Afromar Inc. v. Greek Atlantic Cod Fishing Co. (The Penelope II)* [1980]
    2 Lloyd's Rep. 17, C.A.
*Arnold v. National Westminster Bank Plc.* [1991] 2 A.C. 93; [1991] 2 W.L.R.    E
    1177; [1991] 3 All E.R. 41, H.L.(E.)
*Brisbane City Council v. Attorney-General for Queensland* [1979] A.C. 411;
    [1978] 3 W.L.R. 299; [1978] 3 All E.R. 30, P.C.
*Cargill v. Bower* (1878) 10 Ch.D. 502
*Deeny v. Gooda Walker Ltd.* (unreported), 4 October 1994, Phillips J.
*Greenhalgh v. Mallard* [1947] 2 All E.R. 255, C.A.
*Henderson v. Henderson* (1843) 3 Hare 100    F
*Lewis and Lewis v. Durnford* (1907) 24 T.L.R. 64
*Lockyer v. Ferryman* (1877) 2 App.Cas. 519, H.L.(Sc.)
*Talbot v. Berkshire County Council* [1994] Q.B. 290; [1993] 3 W.L.R. 708;
    [1993] 4 All E.R. 9, C.A.
*Yat Tung Investment Co. Ltd. v. Dao Heng Bank Ltd.* [1975] A.C. 581; [1975]
    2 W.L.R. 690, P.C.

                                                                        G

The following additional cases were cited in argument

*Chin v. Hackney London Borough Council* (unreported), 25 October 1995;
    Court of Appeal (Civil Division) Transcript No. 1409 of 1995, C.A.
*Chiron Corporation v. Organon Teknika Ltd.* (unreported), 10 October 1994;
    Court of Appeal (Civil Division) Transcript No. 1155 of 1994, C.A.

The following additional case, although not cited, was referred to in the    H
skeleton arguments:

*Mekhanik Evgrafov, The (No. 2)* [1988] 1 Lloyd's Rep. 330

APPEAL from Phillips J.

By an action begun in 1993 the plaintiff, Gerald Barrow, together with
3,062 other plaintiff names at Lloyd's, claimed damages for negligence
against 71 defendants, including Bankside Members Agency Ltd., for

1 W.L.R.                    **Barrow v. Bankside Ltd. (C.A.)**

A    alleged breach of their duty to conduct the underwriting business of certain syndicates with reasonable skill and care. By his judgment dated 4 October 1994 Phillips J. gave judgment in favour of the plaintiffs, save as to the extent of damages they might recover.

    By a writ dated 19 October 1994 the plaintiff began proceedings against the first defendants, Bankside Members Agency Ltd., and the second defendants, Bankside Underwriting Management Ltd. (formerly

B    Frizzell Members Agency Ltd.), claiming damages against the first defendant for breach of contract and against both defendants for negligent mis-statement and/or negligence in relation to the selection of his individual portfolio. By a summons dated 21 December 1994 the defendants applied to strike out the plaintiff's claim under R.S.C., Ord. 18, r. 19 and/or the court's inherent jurisdiction on the grounds that he was

C    estopped from bringing the proceedings and/or the points of claim and the action was an abuse of the court's process and/or frivolous and vexatious. By his order dated 21 March 1995 the judge dismissed the summons.

    By a notice of appeal, dated 4 May 1995, the first defendant appealed on the grounds, inter alia, that the judge misdirected himself and/or was wrong in law (1) in concluding that the plaintiff was not estopped from

D    raising the matters pleaded in the present action against the first defendant and in holding that the claim was not an abuse of the court's process and/or frivolous or vexatious; (2) in not considering first and concluding that the rule in *Henderson v. Henderson* (1843) 3 Hare 100 prima facie applied. He ought to have held that it did apply, subject to special circumstances, and that no such special circumstances existed; (3) in concentrating on the extent to which the defendant would be prejudiced

E    by the course adopted by the plaintiff, when he ought to have recognised that the rule in *Henderson v. Henderson* operated independently of the question of prejudice; (4) in failing to conclude that the rule applied he failed to give any or sufficient weight to the fact that (a) the same plaintiff sought to sue the same defendant in respect of the same agency agreement, participation in the same syndicates, the same underwriting year of

F    account, and the same loss; (b) the second action was commenced after judgment had been delivered in the first and was subject of appeal by the plaintiffs in respect of certain losses claimed; (c) the plaintiff had chosen to proceed against the first defendant and to limit his allegations of negligence thereby obtaining the advantages of early trial; (d) the plaintiff gave the first defendant no indication of the course he proposed adopting

G    with regard to the second action; (e) there were numerous overlapping issues in the actions; (f) there was a direct correlation between the judgment obtained in the group action and the pleaded issues in the fresh action; (g) the principle in *Henderson v. Henderson* ensured that all issues were before the court at the same time for its consideration so as to ensure finality in litigation and oppression to individual parties; and (h) it was a financial burden for the first defendant to defend two sets of proceedings

H    and there was a danger that issue estoppels might arise in circumstances where additional evidence would have been filed in the group action specifically to meet points raised in the second action.

    The facts are stated in the judgment of Sir Thomas Bingham M.R.

*Peregrine Simon Q.C.* and *Simon Bryan* for the first defendant.
*Anthony Mann Q.C.* and *David Lord* for the plaintiff.

Barrow v. Bankside Ltd. (C.A.)                                    **[1996]**

SIR THOMAS BINGHAM M.R. The rule in *Henderson v. Henderson*    A
(1843) 3 Hare 100 is very well known. It requires the parties, when a
matter becomes the subject of litigation between them in a court of
competent jurisdiction, to bring their whole case before the court so that
all aspects of it may be finally decided (subject, of course, to any appeal)
once and for all. In the absence of special circumstances, the parties
cannot return to the court to advance arguments, claims or defences which
they could have put forward for decision on the first occasion but failed    B
to raise. The rule is not based on the doctrine of res judicata in a narrow
sense, nor even on any strict doctrine of issue or cause of action estoppel.
It is a rule of public policy based on the desirability, in the general interest
as well as that of the parties themselves, that litigation should not drag on
for ever and that a defendant should not be oppressed by successive suits
when one would do. That is the abuse at which the rule is directed.    C

The question raised in the present appeal is, on its facts, novel: how
should the rule in *Henderson v. Henderson* be applied in the unusual
circumstances of the Lloyd's litigation? By "the Lloyd's litigation" I mean
to refer to the mass of claims (involving names, members' agents,
managing agents, underwriters, brokers and the Society of Lloyd's) which
has arisen from losses suffered in the Lloyd's insurance market in recent
years.    D

It would theoretically have been possible for each claimant individually
to have issued proceedings against each defendant whom he alleged to be
liable to him. The cost to individual plaintiffs would have been prohibitive,
the burden on the lawyers involved of preparing so many individual claims
and defences would have been enormous, and the courts would have
lacked the capacity to try such actions, running into thousands, within    E
any meaningful timescale. But the litigation could theoretically have been
handled in this way, which is what the rules of procedure have
conventionally envisaged and provided for.

The Lloyd's litigation has not, however, been handled in this way for
sound reasons of economy and convenience. There have been two
departures from conventional practice, neither of them unique in English    F
procedural history but together involving procedural steps for which there
is probably no exact precedent.

First, groups of claimants formed themselves into action groups, the
members of which accepted certain rules and contributed towards the very
high cost of litigating issues common to them all. Thus the action groups
were in practice single issue, or if not single issue, common issue, groups.
An example relevant to this appeal is the Gooda Walker action group.    G
This included over 3,000 names, all of whom claimed to have suffered
losses on the Gooda Walker syndicates. They issued proceedings against
their respective members' agents and against the two Gooda Walker
companies which had acted as managing agents for the loss-making
syndicates. The common complaint of the names, made in contract against
the members' agents and in tort against the managing agents, was one of    H
negligent underwriting, that is, failure to conduct the underwriting business
of the relevant syndicates with reasonable care and skill. When the action
brought by the Gooda Walker action group came to trial, that was the
issue which Phillips J. decided. He decided it in favour of the names,
although he did not hold that they were entitled to recover all the damages
they had claimed against the defendants in that composite action: see
*Deeny v. Gooda Walker Ltd.* (unreported), 4 October 1994.

The Weekly Law Reports, 1 March 1996

1 W.L.R.          Barrow v. Bankside Ltd. (C.A.)      Sir Thomas Bingham M.R.

A        Secondly, the Commercial Court (as the court of first instance responsible for trying the Lloyd's litigation) sought to manage the various actions on the basis of the generic class into which they respectively fell. Some were called "LMX cases." These were actions in which the plaintiffs complained of losses suffered as a result of writing London market excess of loss reinsurance. Some were called "long tail cases." These were actions in which the plaintiffs complained of action taken, or not taken, to close,
B   or provide for the discharge of liabilities arising under, underwriting years well in the past. Others were called "portfolio selection cases." In these the complaint was not of negligent underwriting but of inappropriate selection of syndicates for individual names. For some names of ample means and adventurous temperament there might be great attractions in syndicates offering the chance of large profits but an unquantifiable risk
C   of serious loss. For other names of more modest means, relatively speaking, and more cautious disposition, the prospect of smaller but more dependable profits and the avoidance of loss might be more appropriate, and instructions might be given by the name that this was the policy which he wished to be adopted. Names who fell into this last category, and who made large losses as a result of participating in high risk syndicates, complained that their participation in such syndicates
D   represented a breach of the duty which their members' agents owed to them to serve their best interests and comply with their instructions.

        In giving directions for the preparation and trial of cases (including cases brought by action groups) the object of the Commercial Court was to exploit the trial capacity of the court in the most productive possible way. Thus the court identified issues common to numerous claims and
E   ordered early trial in the expectation that the decision, whichever way it went, would prove determinative of many cases, whether by promoting settlement or leading to abandonment of claims. And the court selected certain cases for trial, not as test cases in the formal sense, but in the hope that the formulation of the relevant principles and the application of those principles to different sets of facts, would allow other claimants to assess their prospects of success and act accordingly.

F        Our attention was drawn to one issue pleaded in the *Gooda Walker* action which did not fall within the single issue I have defined, and which was thought to require consideration of the personal position of individual names. It was ordered that trial of this issue should be deferred. This order made complete procedural sense. The cohesion (and, probably, the economics) of action group suits depended on their being single issue, or
G   common issue, proceedings; and the court's procedural objectives would plainly have been frustrated had the trial of determinative issues become bogged down in detailed inquiry into the personal circumstances of thousands of names, their relationships with their agents, and so on.

        In devising its immediate programme the court inevitably confined its attention to cases actually begun and proceeding before it. But in 1993, when the process of effective management of the Lloyd's litigation took
H   shape, it was appreciated that the actions then in train did not represent the full extent of the litigation which might ensue. Some plaintiffs were known to be preparing claims, others to be considering proceedings. Knowledge of these embryonic and potential claims gave added relevance to the preliminary issues and sample cases selected for trial, since the need for further actions might thereby be obviated or reduced.

        It was also appreciated that the generic classes of claim into which, for convenience, the actions had been divided were not mutually exclusive.

Sir Thomas Bingham M.R.    Barrow v. Bankside Ltd. (C.A.)                    [1996]

A single plaintiff might belong to an LMX action group, and have a long    A
tail claim, and complain of the way in which his portfolio was selected.
Mr. Brown is an example. He was a Gooda Walker name and a member
of the Gooda Walker action group. He was also a portfolio selection
claimant. The two claims, one made as a member of an action group, the
other as an individual, proceeded side by side. His portfolio selection
claim was one of the sample claims selected for early trial, and he was one
of the first names to recover judgment in his favour. Later, his claim as    B
one of the 3,000 Gooda Walker claimants also succeeded.

That brings me to Mr. Barrow, the plaintiff in the present action. He
also was a Gooda Walker plaintiff and as such he also succeeded. But he
only obtained judgment for about 60 per cent. of the damages he had
claimed. Up to then he had issued no proceedings claiming damages for
negligence or breach of duty by his members' agent in selecting his    C
portfolio. But shortly after the *Gooda Walker* judgment he did so. It seems
probable that these new proceedings were issued in the hope of making
good the shortfall in the damages he had recovered in the *Gooda Walker*
action.

Mr. Peregrine Simon, who represents the defendant members' agent in
this court, challenges Mr. Barrow's right to bring these new proceedings
at this stage. He bases his challenge on *Henderson v. Henderson*.    D
Mr. Simon points out that the writ in the *Gooda Walker* action was
expressed in terms wide enough to cover any claim in negligence by
Mr. Barrow against his members' agent. In the first paragraph of the
points of claim the duty of the members' agent was similarly pleaded in
terms wide enough to support a portfolio selection claim. But no such
claim was made. Now, having failed to make full recovery in the *Gooda*    E
*Walker* action, Mr. Barrow is bringing another action against the same
defendant for breach of the same contract to recover the same damages.
That, says Mr. Simon, is a flagrant breach of the *Henderson v. Henderson*
requirement that a plaintiff bring forward his whole case at the outset,
instead of hoarding parts of it against a rainy day. Mr. Simon unreservedly
accepts that Mr. Barrow's portfolio selection claim, even if made in the
*Gooda Walker* action, would not have been determined in the course of    F
that trial, and he does not argue that it should have been. But he does
argue that the claim should have been made, and if it had been made
there would either have been an agreement to defer trial or an order to
that effect. For Mr. Barrow to remain inactive until after the *Gooda*
*Walker* trial and then bring this new claim, not even intimated before, is,
says Mr. Simon, precisely the mischief proscribed by *Henderson v.*    G
*Henderson*: an abuse of the court's procedure, working injustice to a
defendant called upon to resist multiple suits.

Mr. Anthony Mann, for Mr. Barrow, contends that the present
unusual situation is not covered by the rule in *Henderson v. Henderson* at
all. The basis of the rule is, he argues, that a plaintiff's whole claim should
be brought forward *and decided* at the same time. The rule has no
application where it is common ground that part of a plaintiff's claim,    H
whether it is brought forward or not, will not be ruled upon until later. In
this submission he gains some help from the cases. In *Henderson v.*
*Henderson,* 3 Hare 100, 115 Sir James Wigram V.-C. spoke of a matter
becoming "the subject of litigation in, and of adjudication by," a court. In
*Yat Tung Investment Co. Ltd. v. Dao Heng Bank Ltd.* [1975] A.C. 581, 590
the Judicial Committee of the Privy Council spoke of "matters which
could and therefore should have been litigated in earlier proceedings." In

A *Afromar Inc.* v. *Greek Atlantic Cod Fishing Co. (The Penelope II)* [1980] 2 Lloyd's Rep. 17, 19 Lord Denning M.R. held that the doctrine of res judicata only applied where a defence could and should have been raised in the previous proceedings, and not where it would not have been sensible to raise it before.

The rule in *Henderson* v. *Henderson* is, as Stuart-Smith L.J. observed

B in *Talbot* v. *Berkshire County Council* [1994] Q.B. 290, 297F, a salutary rule, and its application should not in my view be circumscribed by unnecessarily restrictive rules. It is important to focus on the purpose of the rule. As the Judicial Committee of the Privy Council said in *Brisbane City Council* v. *Attorney-General for Queensland* [1979] A.C. 411, 425:

C "This reference to 'abuse of process' had previously been made in *Greenhalgh* v. *Mallard* [1947] 2 All E.R. 255, *per* Somervell L.J. and their Lordships endorse it. This is the true basis of the doctrine and it ought only to be applied when the facts are such as to amount to an abuse: otherwise there is a danger of a party being shut out from bringing forward a genuine subject of litigation."

D So it seems right to begin by asking whether the procedure adopted by Mr. Barrow is an abuse of the process of the court. I do not think it is. Since his portfolio selection claim would not have been decided before now anyway, he is not causing there to be two trials where there would have been one. He is not exposing the defendant to an unnecessary series of trials. The defendant is not, in truth, any worse off as matters now stand than if Mr. Barrow had made and pleaded this new claim at the outset. One can, of course, understand the defendant's dismay at the

E emergence of this new claim, and Mr. Barrow's may not be the only claim of its kind; but the claim would not have been other than unwelcome whenever presented.

I do not therefore think that this unusual case falls within the mischief at which *Henderson* v. *Henderson* was directed. But if that conclusion is wrong, and the case does fall within that mischief, one must consider

F whether Mr. Barrow can plead special circumstances excusing him from compliance with the duty to bring forward his whole case at the outset. An exception based on special circumstances was recognised by Sir James Wigram V.-C. in *Henderson* v. *Henderson* and was recently recognised as necessary in the *Yat Tung* case [1975] A.C. 581, 590, "in case justice should be found to require the non-application of the rule." It is plain from both cases that negligence, inadvertence and even accident will not

G excuse non-compliance with the rule, but it is plainly unwise to attempt to define what may amount to a special circumstance. In this case, the same considerations which lead me to conclude that the rule does not apply also seem to me, if that first conclusion is wrong, to amount to special circumstances in the special setting of the Lloyd's litigation. If the

H defendant could point to any prejudice it had suffered as a result of Mr. Barrow's course of conduct which it would not have suffered anyway, my view would probably be different. But the defendant can point to none. If Mr. Barrow is in breach of the rule, the present facts in the context of the Lloyd's litigation do, in my judgment, provide a special circumstance.

When this issue was argued before Phillips J. he reached the first conclusion that I also have reached. In his judgment he said:

Sir Thomas Bingham M.R.      Barrow v. Bankside Ltd. (C.A.)                    [1996]

"*Multiplicity of proceedings*                                                  A

"The principal justification for the rule in *Henderson's* case is the
desirability of avoiding a multiplicity of proceedings and of bringing
a certain end to litigation. Had Mr. Barrow been the sole plaintiff in
the *Gooda Walker* action I would, without hesitation, have held that
he should have combined the allegation of negligent underwriting
made in that action with the allegations of negligent advice that he
makes against his members' agent in this action. That is not the        B
position, however. Mr. Barrow was one of over 3,000 potential
plaintiffs with claims against over 70 separate agents. Many of these
plaintiffs may have had individual grounds of complaint in respect of
the advice given by their agents. One issue was, however, common to
all names and all agents: was the business of underwriting conducted
with reasonable skill and care? It was in the interests of all parties,    C
and designed to achieve a massive reduction in multiplicity of
proceedings and saving of costs, that the common issue should be
litigated in a single action. This could only be achieved if the
individual claims that names might have against their members'
agents were not included in that action. Even if a number of the
individual names now bring portfolio selection claims, the result will    D
be far more manageable than if each had joined with his or her
portfolio selection claim a claim in respect of negligent underwriting.
Thus, in my judgment, Mr. Bryan cannot invoke the main principle
that underlies the rule in *Henderson's* case as rendering the course
adopted by Mr. Barrow vexatious and an abuse of process."

I agree. The judge acknowledged that there was some inconsistency    E
between the argument of the names in *Gooda Walker* and the argument to
be advanced by Mr. Barrow in his portfolio selection claim. But he did
not regard this inconsistency as an abuse. Again, I agree. Had Mr. Barrow
been a sole plaintiff from the outset, advancing all his claims together, it
would have been open to him to argue: "LMX syndicates involved no
unusual risk of loss and I suffered loss because your underwriting was
negligent. Alternatively, if these syndicates did involve an unusual risk of    F
loss, I suffered loss because your underwriting was negligent. Alternatively,
participation in these syndicates did involve an unusual risk of loss, and
I should not have been asked to participate and I suffered loss as a result,
even if your underwriting was not negligent." I do not think the defendant
is prejudiced by the development of these arguments in two actions rather
than one. There can, of course, be no question of Mr. Barrow recovering    G
the same damages twice over.

For these reasons I conclude that the judge was right, and I would
dismiss the appeal. Having had the opportunity to read in draft the
judgment which Saville L.J. will give, I would add that I am in complete
agreement with it.

                                                                               H
PETER GIBSON L.J. For the reasons given by Sir Thomas
Bingham M.R. and those to be given by Saville L.J., whose judgment in
draft I, too, have had the opportunity of reading, I also would dismiss
this appeal.

SAVILLE L.J. I agree with the judgment of Sir Thomas Bingham M.R.
and with the reasons he gives in that judgment.

265

1 W.L.R.                    Barrow v. Bankside Ltd. (C.A.)                    Saville L.J.

A    Mr. Barrow is a member of the Gooda Walker action group, which consists of some 3,000 Lloyd's names who joined together to bring proceedings against their respective members' and managing agents. In this group action, which started in March 1993, the plaintiffs claimed damages on the basis that these agents were in breach of a duty to exercise reasonable care and skill in the conduct of the business of underwriting on behalf of certain Gooda Walker syndicates, as a result of which the

B    plaintiffs, who were members of those syndicates, had sustained very heavy underwriting losses. So far as the members' agents were concerned, the case was put on the basis that these agents were responsible in law for the proper conduct of the underwriting, which was actually carried out by the managing agents. At an early stage in the proceedings it was decided that such responsibility did exist under the agency contracts

C    between the names and the members' agents which covered the underwriting years 1987–1989.

On 4 October 1994, after a trial, Phillips J. gave judgment for the plaintiffs, holding that the underwriting had not been carried out with reasonable care and skill. On 19 October 1994 Mr. Barrow (acting on his own behalf and not as part of the Gooda Walker action group) started

D    the present proceedings against his member's agent, who of course had been one of the defendants in the Gooda Walker action. In this new action Mr. Barrow does not rely on any allegation of negligent underwriting, but claims that his agents were in breach of duty in advising him to join two of the Gooda Walker syndicates the subject of the Gooda Walker action. The reason for bringing this new action is that Mr. Barrow hopes by this

E    means to recover losses which Phillips J. held were not recoverable as flowing from the different breach of duty relied on in the Gooda Walker action. It would also appear likely that Mr. Barrow deliberately waited until he knew the result of the Gooda Walker action before he started these new proceedings.

Mr. Barrow's members' agent applied to strike out this new action on

F    the grounds that it offended against what is known as the rule in Henderson v. Henderson, 3 Hare 100 and was an abuse of the process of the court. In March 1995 Phillips J. declined to strike out the action, from which ruling the members' agent now appeals.

The statement of the rule in Henderson v. Henderson has often been quoted in subsequent cases and at the risk of repetition I shall set it out here. In the course of his judgment Sir James Wigram V.-C. said, at

G    pp. 115–116:

"... I believe I state the rule of the court correctly, when I say, that where a given matter becomes the subject of litigation in, and of adjudication by, a court of competent jurisdiction, the court requires the parties to that litigation to bring forward their whole case, and

H    will not (except under special circumstances) permit the same parties to open the same subject of litigation in respect of matter[s] which might have been brought forward as part of the subject in contest, but which was not brought forward, only because they have, from negligence, inadvertence, or even accident, omitted part of their case. The plea of res judicata applies, except in special cases, not only to points upon which the court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which

Saville L.J.          **Barrow v. Bankside Ltd. (C.A.)**          **[1996]**

properly belonged to the subject of litigation, and which the parties,    A
exercising reasonable diligence, might have brought forward at the
time. . . . It is plain that litigation would be interminable if such a
rule did not prevail. . . ."

As Stuart-Smith L.J. pointed out in *Talbot v. Berkshire County Council*
[1994] Q.B. 290, 296, the rule is in two parts. The first relates to those
points which were actually decided by the court, the second to those which    B
might have been brought forward at the time but were not. The present
case is concerned with the second part, which has been variously described
as "res judicata in the wider sense," "non-issue estoppel" or (in certain
circumstances) as a form of cause of action estoppel.

The object of the rule of res judicata was said by Lord Blackburn in
*Lockyer v. Ferryman* (1877) 2 App.Cas. 519, 530 to be put on two
grounds—the one public policy, that it is in the interest of the state that    C
there should be an end to litigation, and the other, the hardship on the
individual, that he should be vexed twice for the same cause. Thus, as
Somervell L.J. stated in *Greenhalgh v. Mallard* [1947] 2 All E.R. 255, 257,
the principle covers issues or facts which are so clearly part of the subject
matter of the litigation and so clearly could have been raised that it would
be an abuse of the process of the court to allow a new proceeding to be    D
started in respect of them. In *Brisbane City Council v. Attorney-General
for Queensland* [1979] A.C. 411, 425, Lord Wilberforce described "abuse
of process" as the true basis of the doctrine, a description approved by
Lord Keith of Kinkel in the House of Lords in *Arnold v. National
Westminster Bank Plc.* [1991] 2 A.C. 93, 107. What this and other cases
have emphasised, of course, is that the rule does not apply to all
circumstances. As Lord Keith observed in the *Arnold* case, at p. 109, one    E
of the purposes of estoppel being to work justice between the parties, it is
open to the courts to recognise that in special circumstances inflexible
application of it may have the opposite result. The existence of special
circumstances excluding the application of the rule was of course
recognised by Sir James Wigram V.-C. himself in the passage I have
quoted.                                                                        F

In the present case, Mr. Simon submitted that there were no special
circumstances which excluded the operation of the rule. In his submission,
since it is clear that negligence or inadvertence in failing to raise a matter
does not provide a special circumstance, a deliberate decision to await the
result of the *Gooda Walker* action could hardly be treated differently.

Where I part company with Mr. Simon is not so much with this part
of his argument as with his basic premise that the rule is applicable to the    G
present case. In my judgment the circumstances are such that it could not
fairly be said, to use the words of Lord Kilbrandon in *Yat Tung Investment
Co. Ltd. v. Dao Heng Bank Ltd.* [1975] A.C. 581, 590, that the matters
now raised could and therefore should have been litigated in the earlier
proceedings.

The *Gooda Walker* group action formed part of the Lloyd's litigation,    H
which in the early months of 1993 threatened to overwhelm the
Commercial Court. In order to try to avoid this happening and to
continue to provide a proper service to both the Lloyd's litigants and
other users of the court, I (as the judge then in charge) held a meeting in
the summer of 1993 to which I invited the legal representatives of all those
who had started or who were considering starting proceedings arising out
of the catastrophic losses that had been sustained at Lloyd's, in order to

The Weekly Law Reports 1 March 1996

267

A    discuss, on a without prejudice basis, how the court could best handle the mass of actual and potential litigation. After that meeting I published a provisional management plan and invited concerned parties who disagreed or who had additional or different suggestions to make to come before me in the following days. At the end of July, after hearing some of the parties, I published a management plan covering the period up to the summer of 1995.

B        As will be seen from the management plan, and from revisions and additions to it made afterwards by Cresswell J., who took over the management of Lloyd's litigation from me at the end of 1993, the basic object was to select certain cases, and certain important issues in cases, in the hope that the resolution of the matters specified would assist other parties better to asses their respective positions. Implicit in this object was

C    that those who believed that they had claims might (subject to other considerations such as limitation) be well advised to wait and see the outcome of the chosen cases and issues before launching their own proceedings.

One of the problems with the Lloyd's litigation and its management was (and is) that there were no issues common to all actual or potential litigants. Instead there were various categories of cases in which quite

D    different issues were raised. Thus the long tail cases were concerned with the writing of run-off contracts at the end of the 1970s and the beginning of the 1980s, while the LMX cases were concerned with underwriting excess of loss in the late 1980s and in 1990. There were also those whose complaint was not of the underwriting itself, but of the advice given by their members' agents to join or remain members of particular syndicates,

E    these being known as the "portfolio selection" category of cases. In addition there were other issues, such as the liability of the auditors of certain syndicates, as well as proceedings by and against Lloyd's itself. In all or virtually all these various categories (and I have not listed them all) there were also numerous individuals or groups who were involved, some of whom were seeking priority for the hearing of their particular cases. It

F    was for these reasons, and because the Lloyd's litigation as a whole represented potentially if not actually the largest and most complicated civil litigation that had ever arisen, that the management plan had the object that I have described.

In July 1993 I selected the Gooda Walker action group as a suitable vehicle for trying first, the question whether members' and managing agents were under a duty to their names to conduct the underwriting with

G    reasonable care and skill, and second, if such responsibility existed, whether there was a breach of that duty and what damages flowed from that breach. It was possible to add both the Feltrim and the Merrett action groups to the hearing of the first of these matters, which took place in the autumn of 1993, after which these groups were given different hearing dates for the other issues that arose in their respective cases. So

H    far as Gooda Walker was concerned, certain issues were left over for later determination since they could not be properly accommodated within the timetable I had set out.

Also in July 1993 I selected the Sword-Daniels and Brown actions as the first of the portfolio selection cases to be heard, with the trial beginning in the early part of 1994. In addition I gave directions for the resolution of other cases and issues in the other categories forming the Lloyd's litigation.

Saville L.J.                    **Barrow v. Bankside Ltd. (C.A.)**                    **[1996]**

I have set out this background because it must be borne in mind when    **A**
considering the suggestion that Mr. Barrow could and therefore should
have litigated in the *Gooda Walker* action not only the claim that the
members' agents were responsible for negligent underwriting, but also the
claim that those agents were in breach of duty in giving the advice they
did about what syndicates the name in question should join.

In my view, such a suggestion cannot be sustained. It was possible to
select and deal with the *Gooda Walker* issues on a global basis, without    **B**
reference to individual circumstances of each claimant name. It would not
have been possible to deal with portfolio selection claims without going
into those individual circumstances.

It seems to me to be clear from the cases that I have cited that the rule
or principle is applicable to cases where the matter clearly could and
should have been dealt with in the earlier proceedings. To my mind there    **C**
is no doubt at all that had an attempt been made to bring into and deal
as part of the *Gooda Walker* action (a case in the LMX category) what
truly belonged to the portfolio selection category, that attempt would have
failed, for apart from anything else the court would have directed that any
such claims should stand over until after the claims relating to negligent
underwriting had been determined.

Mr. Simon conceded, as in my view he clearly had to, that this is what    **D**
would have happened. What he was content to describe as the central
plank of his argument was that Mr. Barrow should have raised his
portfolio selection claim before (at the latest) judgment in the *Gooda
Walker* action, either by incorporating it in those proceedings and seeking
appropriate directions for its determination, or by issuing separate
proceedings and seeking directions for consolidation or the like with the    **E**
*Gooda Walker* action, or, at the least, by seeking and obtaining from the
members' agent a "standstill agreement" so that by consent the matter
could be left over.

I am more than doubtful whether as a member of the Gooda Walker
action group, Mr. Barrow would have been allowed under the group
arrangements to have advanced a portfolio selection claim in the *Gooda
Walker* action or to have sought to consolidate such a claim in those    **F**
proceedings, since it is clear that the group was intent on preparing and
fighting at the earliest opportunity their claim of negligent underwriting.
For reasons already given, the incorporation of portfolio selection cases
would have vastly increased the time and money needed to be ready for
trial. In any event, however, the overwhelming difficulty with all the
courses Mr. Simon suggests that Mr. Barrow should have taken remains    **G**
that none of them would have resulted in the court dealing with the matter
before or at the same time as the question of negligent underwriting.

The principle of *Henderson v. Henderson* on which Mr. Simon relies, is
not, as I have already indicated, concerned with what should have been
raised in earlier proceedings, but what should have been dealt with in
those proceedings. I am prepared to accept that circumstances may arise
in which the prejudice caused to one party by the failure of another to    **H**
raise some matter in the first litigation could be said to be so serious that
it would amount to an abuse of process to start another proceeding raising
that matter, even where that matter could not have been litigated
(i.e. dealt with) at the first stage, but all Mr. Simon was able to point to
was the fact that the members' agent will now have to face another trial.
On his own concession, however, this would have been the result had
Mr. Barrow followed one of the courses which Mr. Simon said he should

1 W.L.R.                    Barrow v. Bankside Ltd. (C.A.)              Saville L.J.

A   have done, so that in truth it has not been demonstrated that the failure
to raise the matter earlier has caused any prejudice at all.

In the course of his submissions Mr. Simon suggested that since the
writ in the *Gooda Walker* action was framed in the broadest terms of
unparticularised breach of contract or duty, whereas the points of claim
confined themselves to allegations of responsibility for negligent
underwriting, Mr. Barrow is to be taken to have abandoned the claim he
B   now seeks to assert. I disagree. In the notes to R.S.C., Ord. 18, r. 15 in
*The Supreme Court Practice 1995,* vol. 1, p. 326, para. 18/15/10, it is stated
that if in his statement of claim, the plaintiff drops all mention of any
cause of action mentioned or any relief claimed on the writ, he will be
deemed to have elected to have abandoned it. *Cargill v. Bower* (1878)
10 Ch.D. 502 and *Lewis and Lewis v. Durnford* (1907) 24 T.L.R. 64 are
C   cited in support of this proposition, but an examination of these cases
shows that in both specific claims were made in the writ which were then
not repeated in the statement of claim, in circumstances in which it could
be said that the plaintiff had chosen to give up the claims not advanced in
the statement of claim. In the present case there were no specific claims in
the writ, and to my mind in the circumstances there is simply nothing to
indicate that Mr. Barrow had given up any right to claim on a portfolio
D   selection basis, let alone any suggestion that his members' agent was led
to believe that this was the case.

In his closing submissions, Mr. Simon suggested that if the new action
were allowed to proceed, then the court would be replacing the rule in
*Henderson v. Henderson* with a new rule, namely that parties are entitled
to wait and see the outcome of one claim before deciding whether or not
E   to pursue another. This is not the case. The rule remains that where a
matter could and should have been litigated first time round, then in the
absence of special circumstances a party will not be allowed to start
subsequent proceedings raising that matter, because that would be an
abuse of the process of the court. As I have tried to explain, in the
circumstances of the present case the matter now raised could not and
should not have been litigated first time round.
F       For these reasons I, too, would dismiss this appeal.

*Appeal dismissed with costs.*
*Leave to appeal refused.*

31 January 1996. The Appeal Committee of the House of Lords
G   (Lord Browne-Wilkinson, Lord Mustill and Lord Steyn) dismissed a
petition by the first defendant for leave to appeal.

*Solicitors: Elborne Mitchell; Travers Smith Braithwaite.*

D. E. C. P.

H

TAB 5

*Bayspoole v Collins* (1871) LR 6 Ch App 228

L. C.

1871

Jan. 17.

## BAYSPOOLE *v.* COLLINS.

*Voluntary Settlement—13 Eliz. c. 5—27 Eliz. c. 4—Consideration.*

The owner of a freehold estate which was worth, beyond a mortgage to which it was subject, about £1300, was persuaded by *K.*, a relative of his wife, to make a post-nuptial settlement of it on his wife and children. As an inducement to do this, *K.* agreed to advance him £150 on his promissory note to meet the interest on the mortgage, which was then in arrear. The settlement was accordingly prepared and executed, but no mention was made in it of the advance of £150 :—

*Held*, on a bill filed by a subsequent mortgagee to establish priority over the settlement, that the advance of the £150 was a sufficient valuable consideration to support the settlement under 27 Eliz. c. 4.

The decision of *James*, V.C., affirmed.

THIS was an appeal from a decree of Vice-Chancellor *James.*

The bill was filed by a puisne incumbrancer, praying a declaration that a settlement of the 21st of August, 1867, was a voluntary settlement of the premises therein comprised, and that the same was superseded by the Plaintiff's mortgage of the 30th of January, 1869, so far as was required to give ;the Plaintiff the full benefit of his security.

*Abraham Culy,* a market gardener, being seised in fee of land, part of which was charged with an annuity in favour of *Sarah Andrews,* in the year 1864 executed a mortgage of the property to the Defendants *James Collins* and *G. D. Collins,* to secure the repayment of £2200 and interest.

On the 21st of August, 1867, *Culy,* who had been for some time married, executed a post-nuptial settlement of the property comprised in the mortgage, by which, after reciting that in consequence of the natural love and affection which he bore to his wife and children, and for divers other good causes and considerations, he was desirous of settling the property, subject to the annuity and mortgage, it was witnessed that *A. Culy* granted the property to the Defendants, *Knowles* and *Bothway,* and their heirs, upon trust to sell at the request of *Sarah Jane Culy,* wife of the settlor, during her life, or until she should marry again; and after her death or future marriage, at the discretion of the trustees, who were to stand possessed of the proceeds, upon trusts for *Sarah Jane*

*Culy*, for her separate use, without power of anticipation; and after her death or future marriage, in trust for her children by the settlor.

L. C.
1871
BAYSPOOLE
*v.*
COLLINS.

On the 30th of January, 1869, *Culy* mortgaged the property to the Plaintiff as a security for the repayment of £250, and the Plaintiff directly afterwards gave notice to the mortgagees under the mortgage deed of 1864, who were the solicitors who had prepared the settlement of 1867, and now acted for the trustees thereof, of his intention to redeem their mortgage. Messrs. *Collins* declined to take the money, as the title to the equity of redemption was in dispute. In reply to a subsequent letter, they informed the Plaintiff that the settlement of 1867 was not voluntary, but made for value, and therefore that his mortgage could not prevail against it. It was suggested by the Defendants that the mortgage to the Plaintiff was made by *Culy* for the mere purpose of upsetting the settlement.

The Defendants, by their answer, denied that the settlement of August, 1867, was purely voluntary, and stated that previously to the making of the settlement, the interest on the mortgage being in arrear, Messrs. *Collins* gave notice to the tenants to pay rent to them and threatened to exercise their power of sale; that *Culy* consulted the Defendant *Knowles*, who was a cousin of *Culy's* wife's father, and *Knowles*, knowing *Culy* to be an intemperate and improvident person, advised him to make a settlement on his wife and children; and "by way of inducing him to make such settlement," offered to advance him £150 on his note of hand, to enable him to pay the interest on his mortgage and his other outstanding debts; and that *Culy* "was by such offer induced, and thereupon agreed, to make such settlement as was made by the indenture of the 21st of August, 1867."

The affidavit filed by *Knowles* supported this statement, and added, that "in consequence of his remonstrances and advice, and in consideration of the sum of £150, which he advanced him," the said *A. Culy* agreed to make a settlement of his estates on his wife and children; and on the 22nd of July, 1867, the said *A. Culy* went with him to the office of the Defendant *G. D. Collins,* and gave him instructions to prepare a settlement in accordance with the said agreement.

230                          CHANCERY APPEALS.                   [L. R.

L. C.
1871

BAYSPOOLE
*v.*
COLLINS.

The instructions thus given were signed by *Culy*, and were as follows :—

"I wish a settlement to be made of all my estates, subject to the existing mortgage for £2200 and the annuity of £28 per annum to Miss *Andrews*, to my wife for life, for her separate use, with remainder to my children equally. If my wife should marry after my death, her interest to cease and the trust to my children to come into effect. Trustees, Mr. *G. Knowles*, Mr. *Harry Bothway*. Mr. *Oldham* to concur. The estates to be sold after my wife's death or re-marriage, when youngest child attains twenty-one. Mr. *Collins*, solicitor, *Wisbeach*, to prepare the necessary document as soon as possible.

"July 22, 1867. ·                            *A. Culy*."

These instructions were laid before counsel, accompanied by the following observations :—

"The document, of which the above is a copy, is signed by Mr. *Culy* at the instance of his friend, with a view of saving his property to his wife and children, subject to the existing incumbrance. It is believed that at the present time he is not much, if at all, indebted beyond what he is able to pay ; but it is feared, from his intemperate habits and easy disposition, that unless an endeavour is made to provide some provision for his family, they will ultimately be left destitute."

On the 12th of August, 1867, *G. D. Collins* advanced *Culy* £20, which was to be repaid out of the £150 to be advanced by *Knowles* on the completion of the settlement. The settlement was executed on the 21st of August, 1867, and *Knowles* then gave *Culy* a cheque for £50 6s. 2d., and *G. D. Collins* a cheque for £99 13s. 10d., for interest and costs on his mortgage and the £20 advanced by him, and at the same time *Culy* gave *Knowles* a promissory note for £150.

In July, 1868, *Culy* was adjudicated bankrupt, and an attempt was made by him and his assignees, but without success, to get the settlement set aside by the Court of Bankruptcy.

*Culy* made an affidavit in the suit, in which he insisted that no valuable consideration whatever was paid or given to him for the execution of the settlement, and that it was purely voluntary on

his part, and made in consideration of natural love and affection only. He admitted that *Knowles* had offered to advance him £150, but denied that the £150 was advanced to him as a consideration for the settlement, or that it had anything whatever to do with the execution of it. He also stated that the offer was made before anything at all was stated or suggested with reference either to a will or settlement, and that he was not induced to make the settlement for the purpose of obtaining money to satisfy his creditors. With respect to the £150, he had always considered and treated it as a debt due by him to *Knowles*, of which payment could at any time be demanded, and accordingly it had been included in the schedule of debts filed in the bankruptcy proceedings.

The property included in the settlement had been valued at about £1300 beyond the charges affecting it, but the Plaintiff alleged it to be worth upwards of £1800.

The Vice-Chancellor dismissed the bill with costs, and from this decree the Plaintiff appealed.

Mr. *Kay*, Q.C., and Mr. *Alexander*, for the Appellant :—

There was no valuable consideration for this settlement. The advance of £150 on a promissory note, payable on demand, which might be called in next day, could form no consideration, and it was never treated as a consideration until after the suit was commenced. It is not alluded to in the settlement itself, nor in the instructions sent to counsel, although it was plainly the object of all parties to make a binding settlement. It was not so treated in the examination of *Knowles* in the bankruptcy, nor in the first letter of Messrs. *Collins*, in reply to the notice of the Plaintiff's mortgage. It was not even called a consideration in the answer of the Defendants ; they only say that *Knowles* offered the loan " as an inducement" for *Culy* to make a settlement. It was only by an afterthought, doubtless suggested by counsel, that this was called a consideration in the affidavits. We admit that a small consideration will support an otherwise voluntary settlement; but an inducement is not a consideration : there must be something in the nature of a bargain. In all the cases relied on by the other side, such as *Thompson* v. *Webster* (1), *Ford* v. *Stuart* (2),

(1) 4 De G. & J. 600; 9 W. R. 641.            (2) 15 Beav. 493.

L. C.

1871

BAYSPOOLE
*v.*
COLLINS.

L. C.
1871
BAYSPOOLE
*v.*
COLLINS.

*Holmes* v. *Penney* (1), *Roe* v. *Mitton* (2), and *Townend* v. *Toker* (3), there was a bargain between the parties. If such a transaction as this should be held to constitute a valuable consideration, it will be impossible for purchasers to know when a settlement is voluntary and when it is not.

Mr. *Fry*, Q.C., and Mr. *Fletcher*, for the Defendants, were not called on.

LORD HATHERLEY, L.C. :—

This case had been extremely ably argued, and every point has been raised which could possibly be suggested. The Vice-Chancellor's judgment pointed out the difficulties which existed in reference to the way in which the case was originally brought forward by the Defendants, as contrasted with the view that is now taken when the case comes to be sifted and the whole matter is fully discussed in Court.

With regard to the observation which was made by counsel, that purchasers would hardly know how they are to deal with property where there has been a voluntary settlement, I do not think anything could be more unsatisfactory than what we find to be the state of the law under which a person, with full and distinct knowledge of a voluntary settlement, is able at any time to overthrow it. It is quite established that, although a settlor cannot get rid of such a settlement directly, he can do so indirectly by making a mortgage of the property to somebody else for the purpose of being able to destroy the settlement.

Now it is not for me to say whether the mode by which the Court has attempted to remedy some of the evil of this state of the law, namely, by holding that a small and inadequate consideration is sufficient to support such a settlement under the Statute of *Elizabeth*, has diminished the extent of the mischief. But so it is, that a very small consideration is admitted to be sufficient. If this bargain which is alleged to have been entered into is established, then we have this fact, that in consideration of an advance of £150 to the settlor, he agreed to execute this settlement upon his wife and children. That being the case, the authorities are

(1) 3 K. & J. 90.        (2) 2 Wils. 356.        (3) Law Rep. 1 Ch. 446.

sufficient to shew that such a consideration, although merely by way of loan, secured by a promissory note, is adequate to support such a settlement. The whole thing, therefore, resolves itself into a question of evidence, whether there was or was not such a bargain as that which is asserted to have taken place.

Now there are some curious circumstances that have happened in the course of the inquiry; but I think they may be reconciled in this way: I have very little doubt that the solicitor who prepared this settlement, although he may be a very good lawyer, was not acquainted with the length to which the cases have gone in supporting settlements of this description. Doubtless he was not aware that a transaction of this description, that an advance of £150 to the settlor as a loan secured by a promissory note, would be sufficient to support a settlement of property worth £1300 more than it was mortgaged for, as against subsequent purchasers. And, therefore, although he was very desirous of making an effective settlement, yet in sending instructions to counsel to prepare this settlement, he only seems to have instructed him to recite that it was for providing for the settlor's wife and children, and divers good considerations, that the settlement was effected. In sending counsel instructions, he was careful to tell him that the settlor was not indebted to the extent of insolvency; but he did not tell him about this advance of £150, and consequently there is nothing to be found in the deed about the advance of £150 being the consideration.

This fact is deserving of great consideration in coming to a conclusion in this case. Nevertheless, I feel with the Vice-Chancellor that I cannot reject the evidence that has been given, and, I think, strongly supported by the surrounding circumstances of the case. Mr. *Knowles*, who lent the £150, and who was a distant relation of the settlor's wife, was anxious that a settlement should be made upon the wife and children, and uses this expression in the answer, "As an inducement for him to do so, I agreed to advance him the sum of £150, to enable him to pay the interest on his mortgage and his other outstanding debts." And, in his affidavit, he says that he offered to lend *Culy* £150 upon his promissory note, to get him out of his immediate difficulties, and he, "in consideration of" that advance, agreed to execute a settlement.

L. C.

1871

BAYSPOOLE
*v.*
COLLINS.

L. C.
1871
BAYSPOOLE
v.
COLLINS.

Mr. *Kay* contends that the advance was, at most, only an inducement, and that an inducement will not be sufficient. But I think that if a man is induced to do a thing upon the faith of £150 being paid to him, that amounts to a bargain between the parties, whether the word describing the transaction be "inducement" or "bargain." The question is twofold—whether the agreement at the date of the settlement to advance £150 led this man to do that which the person lending the money asked him to do, namely, to make a settlement; and whether the person who agreed to advance the £150 consented to do so upon that understanding, but not otherwise. If those questions are answered in the affirmative, I apprehend that is a "consideration" in every sense and meaning of the word.

It certainly is a somewhat suspicious part of the case, that the word "consideration" is constantly repeated in the evidence, although it never finds its way into any document. Still it is consonant with the view that the parties were not aware of the amount of consideration necessary in point of law to support the settlement, although the fact might be well known to them that the one had been induced to make the settlement by the £150 lent to him upon the promissory note, and the other had been induced to lend it to him by the promise that a settlement should be executed. [His Lordship then commented on the evidence of *Culy, G. D. Collins,* and *Knowles,* and continued:—]

A good deal has been said about the examinations in the Bankruptcy Court, in which nothing was elicited about the consideration for the settlement. The question there was under 13 Eliz. c. 5, and not 27 Eliz. c. 4. *Knowles* was examined, and was asked whether anything passed on the execution of the settlement, and he said he paid £150. He does not make mention of its being a condition precedent that a settlement should be executed. Nevertheless, it is clear that he paid it upon the settlement being executed, and not before. He was not even asked to pay it before. He was only asked to advance £20 before the settlement, and it was agreed that it was to be taken in part payment of the £150. It appears, therefore, to me that the doling out of the £20, instead of advancing the whole amount, and the suspense of the payment of the rest until the settlement was executed, are circumstances in

favour of the truth of the story of *Knowles* and *Collins*, more especially when I find that no attempt has been made to cross-examine them. The question might have been asked them, "When did you first take up the notion about this advance being a consideration for the settlement instead of a separate transaction?" But no such question has been asked. On the other hand, it is distinctly sworn that the settlement was for valuable consideration, and it is clear that the money was not advanced till the settlement was executed. Under these circumstances, I cannot disbelieve the evidence of these witnesses. The Vice-Chancellor made a decree dismissing the bill with costs, and I cannot interfere with that decree. The appeal must be dismissed with costs.

Solicitors for the Plaintiff: Messrs. *Blake & Snow.*

Solicitor for the Defendants: Mr. *G. F. Smith,* agent for Mr. *Collins, Wisbeach.*

<div style="text-align:right">

L. C.

1871

BAYSPOOLE
*v.*
COLLINS.

</div>

---

## BENT *v.* CULLEN.

*Will—Annuity—Gift of Principal.*

<div style="text-align:right">

L. C.

1871

*Jan. 25.*

</div>

A testator gave to his wife £50 a year, to be paid out of the interest, dividends, and produce arising from his personal property, and gave, after her decease, the said £50 to his two daughters and his granddaughter, or the survivors:—

*Held,* on the construction of the will, a gift to the survivors of the principal which would produce the annuity of £50.

Decision of *James,* V. C., reversed.

*T*HOMAS MINTER, by his will, gave to his executors all his personal estate, upon trust to pay the interest, dividends, and produce in manner following: "First, I give and bequeath unto my wife *Ann Minter* £50 a year, which I direct my said trustees and executors to pay the same to her; that is to say, £25 half-yearly out of the interest, dividends, and produce arising from all my personal property during her natural life, or so long as she continues my widow, and after her decease or next marriage then I give and bequeath the said £50, as received by my said wife, unto and amongst my two daughters, *Sarah,* the wife of *William*

TAB 6

*Bradford Banking Co v Henry Briggs & Co* (1886) 12 App Cas 29

[HOUSE OF LORDS.]

THE BRADFORD BANKING CO., LIMITED Appellants ;

AND

HENRY BRIGGS, SON & CO., LIMITED  . Respondents.

H. L. (E.)

1886

Dec. 7.

*Company— Shares— Equitable Mortgage—Priority—Deposit of Certificate of Shares—Articles of Association—Lien of Company on Shares for Money due from Shareholders—Notice of Trust—Companies Act 1862 (25 & 26 Vict. c. 89) s. 30.*

The articles of association of a company registered under the Companies Act 1862 provided that the company should have " a first and permanent lien and charge, available at law and in equity, upon every share for all debts due from the holder thereof." A shareholder deposited his share certificates with a bank as security for the balance due and to become due on his current account, and the bank gave the company notice of the deposit. The certificates stated that the shares were held subject to the articles of association :—

*Held*, reversing the decision of the Court of Appeal (31 Ch. D. 19) and restoring the judgment of Field J. (29 Ch. D. 149), that the company could not in respect of moneys which became due from the shareholder to the company after notice of the deposit with the bank claim priority over advances by the bank made after such notice, but that the principle of *Hopkinson* v. *Rolt* (9 H. L. C. 514) applied.

*Held* also, reversing the decision of the Court of Appeal, that the notice to the company of the deposit with the bank was not a notice of a trust within the meaning of the Companies Act 1862 (25 & 26 Vict. c. 89), s. 30, and that the bank by giving notice of the deposit did not seek to affect the company with notice of a trust, but only to affect the company in their capacity as traders with notice of the interest of the bank.

APPEAL from a decision of the Court of Appeal (Brett M.R. Baggallay and Fry L.JJ.) (1) reversing a judgment of Field J. (sitting in the Chancery Division). The facts are set out in the report of the judgment of Field J. (2)  For the present purpose the statement in the judgment of Lord Blackburn will suffice.

1886.  June 22, 24.  *Rigby* Q.C. and *G. Farwell* for the appellants :—

The question is whether as the appellants contend this case is

(1) 31 Ch. D. 19.                    (2) 29 Ch. D. 149.

HOUSE OF LORDS                    [VOL. XII.

H. L. (E.)
1886
BRADFORD
BANKING
COMPANY
v.
BRIGGS.
———

governed by *Hopkinson* v. *Rolt* (1). The deposit of share certificates was accompanied in each case by a deed of charge in favour of the appellants in the form common in such cases, and notice of the deposit was given by the appellants' solicitors to the respondents. For the debts due to the respondents before such notices it is admitted that they have priority over the appellants; but that they have not for advances subsequent to such notices is decided by *Hopkinson* v. *Rolt* (1). The Companies Act 1862 (25 & 26 Vict. c. 89) s. 30 no doubt says that the company shall take no notice of trusts, but that cannot operate to enable the company, if they take up the position of mortgagees, to get rid of all the obligations and conditions which attach to mortgagees. If such a clause as 103 can have the effect given to it by the Court of Appeal it will effectually prevent shareholders in such companies from borrowing moneys, because although they may not be indebted to the company at the moment of the proposed loan no one will lend money if it is to be postponed to subsequent advances by or debts to the company itself. A similar question was raised before North J. in *Miles* v. *New Zealand Alford Estate Co.* (2) The reasoning of Lord Esher in the Court below is identical with the unsuccessful argument in *Hopkinson* v. *Rolt* (1). It is said that clause 103 shews an intention to contract that the doctrine of *Hopkinson* v. *Rolt* (1) shall not apply; if so very inappropriate words have been used. The words are similar to—certainly not wider than —the provision in that case for securing a current account. The principle of that case is that the first mortgagee is secure as to past advances: if after notice of the second mortgage he chooses to make fresh advances he does so at his peril. See also *London and County Banking Co.* v. *Ratcliffe* (3).

*Cozens-Hardy* Q.C. and *L. T. Dibdin* for the respondents:—

*Hopkinson* v. *Rolt* (1) has no bearing upon the question. The shareholder cannot by any proceeding or device alter the nature of the property or derogate from the rights created therein at the time when the property itself was created. The appellants'

(1) 9 H. L. C. 514.                    (2) 32 Ch. D. 266.
(3) 6 App. Cas. 722.

claim does derogate from and is inconsistent with such rights. That such rights might exist so as to prevent such a claim as the appellants from arising is admitted in the judgments in *Hopkinson* v. *Rolt* (1): see also per Lord Romilly M.R. in *Menzies* v. *Lightfoot* (2). The language of the contract here is not the same as in *Hopkinson* v. *Rolt* (1). The bargain is that the company shall have a *first* lien. The appellants' contention strikes out the word " first." But the lien is not only first, it is " permanent ;" i.e. it extends to all advances at any time. No dealings with third parties can affect this contract: *In re Angelo* (3). Sect. 30 of the Companies Act 1862 makes the notices given by the appellants ineffectual for the purpose of giving priority to the appellants' advances. The judgment of Lord Selborne in *Société Générale* v. *Walker* (4) is in favour of the respondents and the judgment of the Court of Appeal in that case is conclusive in their favour.

[Lord Blackburn referred to *Ex parte Agra Bank* (5).]

Sect. 30 of the Companies Act 1862 is intended to prevent any notice of trust being given to a company at all, so as to affect the company in any way.

*Farwell* replied.

The House took time for consideration.

Dec. 7.  Lord Halsbury L.C. :—

My Lords I have had an opportunity of considering the reasons of the noble and learned Lord (Lord Blackburn) for the view he entertains, and in which I concur, that the judgment of the Court of Appeal should be reversed and the judgment of Field J. restored. Nor should I desire to add anything to what he is about to urge but that I see some reference to the words of a noble and learned Lord (Lord Selborne) with respect to the proposition that sect. 30 of the Companies Act renders it impossible for any company to be affected by notice of any trust, expressed, implied, or constructive.

H..L. (E.)

1886

BRADFORD
BANKING
COMPANY
*v.*
BRIGGS.

(1) 9 H. L. C. 514.
(2) Law Rep. 11 Eq. 459, 465.
(3) 5 De G. & Sm. 278.

(4) 14 Q. B. D. 424; 11 App. Cas. 20, 30.
(5) Law Rep. 3 Ch. 555.

H. L. (E.)

1886

BRADFORD
BANKING
COMPANY
*v.*
BRIGGS.

Lord Halsbury,
L.C.

I was a party to the judgment of your Lordships' House in the case to which reference is made (1), and I certainly never imagined myself to be agreeing to a decision which could establish any such proposition, and the noble and learned Lord in whose words I have expressed my concurrence gave no such reasons for his judgment. No such proposition was necessary for the decision of the case, and I wish to guard myself on the present occasion from being supposed to have so held.

The words occur not only in the Companies Act, sect. 30, but also in sect. 83 of the Land Transfer Act 1875, and if what is suggested as the true interpretation of those words were to be so determined by your Lordships' House it would come to this, that whenever the conduct of the parties to a dealing in land had been such that a Court of Equity would imply a trust, the operation of those words would be such as to shield the person registering from the jurisdiction of a Court of Equity in respect of the lands so registered, though but for that section he would have been held by a Court of Equity to be merely a trustee. So startling a result ought not to be arrived at without direct decision and, as I have already said, I do not understand your Lordships ever to have decided it.

I concur however in the conclusion to which the noble and learned Lord has arrived and in the reasons upon which it is founded.

LORD BLACKBURN :—

My Lords, this is an appeal against the following order of the Court of Appeal (England) dated the 14th of July 1885 :— " Upon motion this day made unto this Court by counsel for the defendants Henry Briggs, Son & Co. Limited, by way of appeal from the judgment dated the 13th of March 1885, and upon hearing counsel for the plaintiffs, and upon reading the said judgment, this Court doth order that the said judgment dated the 13th of March 1885 be reversed. And it is ordered and adjudged that this action do stand dismissed as against the defendants Henry Briggs, Son & Co. Limited. And it is ordered that the plaintiffs, the Bradford Banking Company Limited, do

(1) 11 App. Cas. 20.

pay to the defendants, Henry Briggs, Son & Co. Limited, their costs of this action and occasioned by the said appeal, such costs to be taxed by the taxing master."

In order to understand the points of law involved in this appeal and the judgment of the 13th of March 1885, a little statement is necessary.

The respondent company is a trading company limited by shares and incorporated under the Companies Act 1862, for the purpose of carrying on the business of a colliery. It has articles of association which exclude the regulations contained in the First Schedule Table A to the Companies Act 1862, and those articles of association were duly registered.

The Companies Act 1862 sect. 16 enacts that when registered the articles shall bind the company and the members thereof to the same extent as if each member had subscribed his name and affixed his seal thereto, and there were in such articles contained a covenant on the part of himself, his heirs, executors, and administrators to conform to all the regulations in such articles.

The only one of the articles of association which I think it material to notice is the 103rd article, which is as follows:—
"The company shall have a first and permanent lien and charge, available at law and in equity, upon every share of every person who is the holder or one of several joint holders thereof, for all debts due from him, either alone or jointly with any other person, whether a shareholder or not in the company."

John Faint Easby, a coal merchant, became a proprietor of a number of shares in the respondent company, and obtained certificates for them. This property in the shares was, by virtue of the 16th section of the Act already quoted, I think, bound to the company as much as if he had (at the time he became holder of these shares) executed a covenant to the company in the same terms as article 103, but I do not think it was bound any further.

John Faint Easby filed a petition for liquidation on the 31st of December 1883, being then indebted to the company. He had been a customer of the respondent company, and owed them a considerable sum at that date. He still continued the registered holder of the shares, and, if there had been no more in the

HOUSE OF LORDS                    [VOL. XII.

H. L. (E.)    case, it is not now at least disputed that the respondent company
1886       would have had a first lien on the shares.   But Easby was a cus-
BRADFORD    tomer of the Bradford Banking Company, the now appellants,
BANKING     and in November 1879 he deposited, amongst other things, the
COMPANY
   *v.*      certificates of 120 shares in the respondent company, and the
BRIGGS.     appellant company, by their solicitors, sent in duplicate the fol-
Lord Blackburn.  lowing notice :—" For and on behalf of the Bradford Banking
           Company, we do hereby give you notice that John Faint Easby,
           of Albert Place, Bradford, in the county of York, coal mer-
           chant, has deposited with the said company certificates for sixty
           £15 shares, Nos. 6629 to 6678, both inclusive, No. 7790 and
           Nos. 10,998 to 11,006, both inclusive, in Henry Briggs, Son & Co.,
           Limited, also for sixty B shares, Nos. 1908 to 1967, both in-
           clusive, in the same company, for securing the repayment of all
           moneys or balances due or to become due to the said company
           from the said John Faint Easby, either alone or together with
           any other person or persons.—Dated the 6th day of November
           1879.—Gardiner and Jeffery, solicitors or agents for the said
           banking company.—Mr. John Henry Phillips, secretary to Henry
           Briggs, Son & Co., Limited, Whitwood and Methley Collieries,
           near Leeds."—Endorsement.—" Notice of the above mentioned
           deposit lodged with Henry Briggs, Son & Co., Limited, this
           15th day of November 1879.—John H. Phillips, Secretary." One
           copy was returned with the indorsement on it; the other was
           retained by the secretary.

               On the 20th of June 1881, there was a further deposit of certi-
           ficates, and these letters were sent :—" Sir,—20th June 1881.—We
           hereby give you notice that Mr. John Faint Easby, of Oakroyd
           Terrace, Bradford, coal merchant, has deposited with this com-
           pany the following certificates, viz. (stating the numbers), in
           Henry Briggs, Son & Co., Limited, for securing the repayment of
           all moneys or balances due or to become due to us from him either
           alone or together with any other person or persons.—We are,
           Sir, your obedient servants, Joseph Crofts, sub-manager.—Please
           own receipt.—The Secretary, H. Briggs, Son & Co., Limited."
           " Whitwood Collieries, Normanton.—22nd June 1881.—Sir, We
           are in receipt of your favour of the 20th instant, informing us that
           Mr. J. F. Easby has deposited with your bank certain certificates
           of shares in our company.   We think it right to inform you that

Mr. Easby is indebted to us, and that, under a clause of our articles of association we have a first and permanent lien upon all shares held by him.—Yours faithfully, John H. Phillips, Secretary.—The Manager, the Bradford Banking Company, Limited."

I think it would only complicate the matter to make in detail a similar statement as to the shares of William Fletcher.

The action was brought by the Bradford Banking Company claiming to have: 1. An account taken of what is due to them for principal, interest, and costs on their said securities, and to have their said securities realized by foreclosure and sale. 2. A declaration that their said securities have priority over all lien (if any) of the defendant company (the respondents) on the said shares created by their articles of association or otherwise.

The points of law were argued on the admissions in the pleadings, and on admissions made by counsel at the bar and embodied in the judgment of Field J. The important admission, as far as regards Easby's shares, was that the account of John Faint Easby with the plaintiffs was closed in June 1881 (which involves an admission that all the advances in respect of which the plaintiffs sue were made before that date), and that all moneys owing by him to the defendants when the said account was so closed have since been paid. This at once raised the question whether the plaintiffs, as pledgees of Easby's interest in the shares, had priority for advances over debts which were contracted after notice of that pledge, though the lien was claimed by virtue of a contract made at the very time when the shares were first acquired by Easby, and consequently before the shares could be pledged by Easby to the appellants or any one else.

Field J. thought the point concluded by the decision of this House in *Hopkinson* v. *Rolt* (1). It was argued that the terms of the article 103 here prevented the application of that case. Field J. did not put such a construction on the article. He says, " The company had a first charge upon the shares for any debts which should become due to them by the shareholder, but after that charge had been created, and before any of the debts now sought to be recovered by the company were incurred, the shareholder exercised his right of borrowing money upon the shares

(1) 9 H. L. C. 514.

H. L. (E.)

1886

BRADFORD
BANKING
COMPANY
v.
BRIGGS.

Lord Blackburn.

H. L. (E.)

1886

BRADFORD
BANKING
COMPANY
*v.*
BRIGGS.

Lord Blackburn.

by means of an absolute charge upon them to the bank. The company had notice of that charge, and I think that from that time they had no power to make advances to the shareholders, so as to rank in priority to the debts due to the bank."

The Master of the Rolls (Lord Esher) and Baggallay L.J., both express an opinion that inasmuch as the article 103 stipulated for a " first and permanent " lien, the decision of this House in *Hopkinson* v. *Rolt* (1) did not apply. Fry L.J. did not go so far as to dissent from their opinion, but he certainly did not rest his judgment on that ground.

As I understand it, the principle of *Hopkinson* v. *Rolt* (2) is explained by Lord Campbell then Lord Chancellor, and it is this:—The owner of property does not, by making a pledge or mortgage of it, cease to be owner of it any further than is necessary to give effect to the security which he has thus created. And if the security is, as that in *Hopkinson* v. *Rolt* (1) was, a security for present and also for future advances, the pledgee or mortgagee, though not bound to make fresh advances, may, if he pleases, do so, and will, if the property at the time of the further advance remains that of the pledgor, have the security of that property.

But the mortgagor (unless there is something to make it against conscience in him to do so) may cease to take further advances from the first mortgagee, and borrow money from anyone else ready to lend it on the security of that property remaining in him not already pledged to the first, subject to the priority of the first pledgee for advances made or begun to be made. The first mortgagee is entitled to act on the supposition that the pledgor who was owner of the whole property when he executed the first mortgage continued so, and that there has been no such second mortgage or pledge until he has notice of something to shew him that there has been such a second mortgage, but as soon as he is aware that the property on which he is entitled to rely has ceased so far to belong to the debtor, he cannot make a new advance in priority to that of which he has notice. As Lord Campbell says, " the hardship upon the bankers from this view of the subject at once vanishes, when we consider that the security of the first mortgage is not impaired without notice of a

(1) 9 H. L. C. 514.                    (2) 9 H. L. C. 534–536.

second." It seems to me to depend entirely on what I cannot
but think a principle of justice, that a mortgagee who is entitled,
but not bound, to give credit on the security of property belong-
ing to the debtor, cannot give that credit after he has notice that
the property has so far been parted with by the debtor.

Lord Cranworth thought that it had been established for a
long time by the Courts of Equity that, under such circumstances,
the general rule of equity was to postpone the second mortgage
to advances made by the first mortgagee after notice of the
second, if the original mortgage was prior in time to the second.
He says, I think very truly, that if such was the established and
known rule in equity, there could be no injustice in enforcing it.
But the majority of this House held that such was not the estab-
lished and known rule of equity. And I think it was not ques-
tioned by any one that the decision of the majority in *Hopkinson*
v. *Rolt* (1) finally decided that point.

I cannot assent to what I understand to be the reasoning of
the Master of the Rolls and Baggallay L.J. in the construction
of the 103rd article. I do not see that the words "first and per-
manent lien" differ from "lien," or at least that they make it in
any way unconscientious or unjust in the owner of the property
pledged, to obtain a further advance from a second pledgee who
knows of the first pledge, though that second pledgee, for his
own sake, must take care to give notice of his security to the
first pledgee.

The Master of the Rolls says that the plaintiffs, when the
shares were deposited with them, knew, or at least ought to have
known, what the articles were, and I so far agree with him. But
he adds, "that is to say, the plaintiffs made their advances with
the knowledge of this, that those who deposited the shares with
them had contracted with the company that, notwithstanding
any deposit of the shares with the plaintiffs, the company should
have in equity the first lien and charge." I cannot agree that
such is the true construction of art. 103.

This brings me to the second point on which all three judges
in the Court of Appeal agreed. The Companies Act 1862 s. 30
is in the following terms:—" No notice of any trust, expressed,
implied, or constructive, shall be entered on the register or be

H. L. (E.)

1886

BRADFORD
BANKING
COMPANY
*v.*
BRIGGS.

Lord Blackburn.

(1) 9 H. L. C. 514.

H. L. (E.)
1886

BRADFORD
BANKING
COMPANY
*v.*
BRIGGS.

Lord Blackburn.

receivable by the registrar in the case of companies under this Act and registered in England or Ireland." The effect of that section was much discussed in a case of *Société Générale de Paris* v. *Tramways Union Company* (1) decided by the Court of Appeal on the 18th of December 1884. And of that decision the judges in the present case were aware. It was affirmed in this House under the name *Société Générale de Paris* v. *Walker* (2), not entirely for the same reasons, on the 17th of December 1885. The judges in the present case deciding, as they did, on the 14th of July 1885, could not know of that latter decision.

I think that in order to bring this case within the principle of *Hopkinson* v. *Rolt* (3), it is not necessary to establish any trust as against the company. It is, I think, enough to shew that the company, a trading one, had by its agents who managed its trading transactions such knowledge that their customer Easby had ceased to be the owner of the shares as would have made it unjust to allow him credit on the faith of that property, which had once been his, but which he had parted with before they were asked to allow him to incur the debt for which they now seek priority.

The legislature are competent to enact that a trading company of this sort should have the right to disregard the ordinary rules of justice, and charge what they knew was one man's property with another man's debt, if only that property consisted of shares in the company, but I do not think it possible to construe sect. 30 as an enactment to that effect. Lord Selborne in *Société Générale de Paris* v. *Walker* (2), said, " I think that according to the true and proper construction of the Companies Act 1862 and of the articles of this company, there was no obligation upon this company to accept, or to preserve any record of, notices of equitable interests or trusts if actually given or tendered to them ; and that any such notice, if given, would be absolutely inoperative to affect the company with any trust." I do not think it necessary to express any opinion as to this, for I do not think that the appellants in this case seek to affect the respondents with a trust ; they seek no more than to affect them, in their capacity of traders, with knowledge of their (the appellants') interest.

(1) 14 Q. B. D. 424.                    (2) 11 App. Cas. 20.
                    (3) 9 H. L. C. 514.

I think, therefore, that the order appealed against was wrong, and should be reversed; and that the judgment of the 13th of March 1885 should be restored; and that the respondents should pay to the appellants their costs, both in the Court of Appeal and in this House.

H. L. (E.)

1886

BRADFORD
BANKING
COMPANY
*v.*
BRIGGS.

LORD FITZGERALD :—

My Lords, I concur in the result at which my noble and learned friend has arrived. He has stated the facts so fully that it is unnecessary to recapitulate them.    I may however observe in reference to the certificates of the shares which Lord Selborne in *Société Générale* v. *Walker* (1) states to be "the proper (and indeed the only) documentary evidences of title in the possession of a shareholder," that though in the present instance they are expressed to be "subject to the articles of association," yet they do not contain any intimation that the holder is not at liberty to pledge, or mortgage, or otherwise to raise money or obtain credit on the deposit of the certificates, and seem to have been issued in this, as in other like cases, to the shareholder "as evidence of his title" to enable him to deal with them as he would with other property, but subject to the articles of association.    The House lately gave large effect to the possession of the certificates of shares in the *Colonial Bank* v. *Whinney* (2) in holding that where the shareholder pledged the certificates of his shares to the bank as a security for advances, though no notice of the pledge had been given to the company, yet that by the pledge of the certificates the shares ceased to be in his order and disposition and did not pass to his assignees in bankruptcy, although his name remained on the register as the registered shareholder.

I concur in opinion with my noble and learned friend that the principle of *Hopkinson* v. *Rolt* (3) governs the present case unless there is something in art. 103 which prevents its application. The articles of association provide for the transfer of shares and the registration of the instrument of transfer, and confer on the directors authority to disapprove of the transferee, but there is no limit to the right of the shareholder to pledge or raise money

(1) 11 App. Cas. 20.                    (2) 11 App. Cas. 426.
(3) 9 H. L. C. 514.

40                               HOUSE OF LORDS                  [VOL. XII.

H. L. (E.)
1886
BRADFORD
BANKING
COMPANY
v.
BRIGGS.

Lord FitzGerald.

on his shares, unless it is to be found in art. 103. I concur in the interpretation put on that article by Field J. and by my noble and learned friend. Full effect may be given to its terms, and yet the lien conferred by it be limited to liabilities of the shareholder contracted up to the time at which the company shall have had notice that he has ceased to be the beneficial holder of the share. The view taken by the majority of the Court of Appeal would necessarily render such shares practically unavailable as a security for advances other than those made by the company.

The judgment of Fry L.J. rests on the point arising on the 30th section of the Companies Act, in reference to which he seems to be of opinion that notice of the pledge to the company should not be deemed effectual for any purpose, and that the effect of the section is to exclude the application of *Hopkinson* v. *Rolt* (1). I cannot agree that the notice had no operation. It may not have affected the company with any trust in favour of the pledgees, but it was a valid and operative intimation to the company that the whole beneficial interest of the shareholder had been pledged to the bank.

Although my noble and learned friend has correctly quoted the opinion of Lord Selborne on the effect of sect. 30, yet it is observable that the other noble Lords who took part in the decision of the *Société Générale* v. *Walker* (2) expressly refrain from deciding the case on that ground, and I do not find that Lord Selborne expressed any opinion that the notice may not have been operative for other purposes.

> *Order appealed from reversed; order of Field J. restored; with costs in the Court of Appeal and in this House; cause remitted to the Chancery Division.*

> *Lords' Journals* 7th December 1886.

Solicitors for appellants; *Paterson, Snow, Bloxam & Kinder for Gardiner & Jeffery, Bradford.*

Solicitor for respondents: *R. Vincent for North & Sons, Leeds.*

(1) 9 H. L. C. 514.                    (2) 11 App. Cas. 20.

TAB 7

*Cox v Ergo Versicherung AG* [2014] AC 1379

1379

A

Supreme Court

## Cox *v* Ergo Versicherung AG

### [2014] UKSC 22

2014  Jan 20, 21;                    Lord Neuberger of Abbotsbury PSC, Lord Mance,
B        April 2                          Lord Sumption, Lord Toulson, Lord Hodge JJSC

*Conflict of laws — Tort — Assessment of damages — Englishman hit by car and
killed in Germany — Driver of car German national insured by German
insurance company — Widow claiming damages in England for bereavement and
loss of dependency — Whether English or German law applicable to assessment
of damages — Whether English fatal accidents legislation having any application
C    — Whether restrictions on damages in German statute procedural or substantive
— Fatal Accidents Act 1976 (c 30) (as amended by Administration of Justice Act
1982 (c 53), s 3), ss 1A, 3(1)(3), 4*

The claimant's husband, a British army officer serving in Germany, was killed
while cycling along the verge of a road near his army base when a car left the road
and hit him.  The driver of the car, a German national domiciled in Germany, was
D    insured by the defendant, a German insurance company, under an insurance contract
governed by German law.  At the time of the accident the claimant was living with her
husband in Germany and after the accident she returned to live in England, her place
of domicile.  She later entered into another relationship and had two children with
her new partner.  The claimant brought proceedings in England against the
defendant, alleging that her husband's death had been caused by the driver's
negligence and claiming damages for bereavement and loss of dependency.  She
E    accepted that German law governed the issue of liability but contended that the
quantification of damages recoverable from the defendant was governed entirely by
English law and the provisions of the Fatal Accidents Act 1976[1], which specifically
excluded remarriage or the prospect of remarriage in the assessment of damages, and
not German law, which conferred no right to a solatium for bereavement.  On the
trial of a preliminary issue the judge held that the claimant could not rely on the
1976 Act and that German law applied to the assessment of damages.  The Court of
F    Appeal, by a majority, dismissed an appeal by the claimant.
On appeal by the claimant—
*Held*, dismissing the appeal, (1) that English rules of private international law
distinguished between questions of procedure, governed by the law of the forum, and
questions of substance, governed by the lex causae; that the relevant German
damages rules were substantive, because they determined the scope of the liability,
and questions of causation included questions of mitigation and the recoverability of
particular heads of loss, since they determined the extent of the loss for which the
G    defendant was liable; and that it was unnecessary to classify sections 1A, 3 and 4 of
the Fatal Accidents Act 1976 as procedural or substantive because they applied only
to actions brought under section 1 of the Act itself and could not be applied to a cause
of action the substantive law of which was German (post, paras 12, 17, 20, 38, 41,
47, 48).
*Boys v Chaplin* [1971] AC 356, HL(E) and *Harding v Wealands* [2007] 2 AC 1,
HL(E) considered.
H        (2) That English law provided a remedy which harmonised with the German law
right, namely damages, the relevant principle of assessment being that the claimant

[1] Fatal Accidents Act 1976, s 1, as substituted: see post, para 7.
S 1A, as inserted: see post, para 9.
Ss 3, 4, as substituted: see post, para 8.

© 2014 The Incorporated Council of Law Reporting for England and Wales

1380
**Cox v Ergo Versicherung AG (SC(E))**                                    [2014] AC

had to be put in the financial position in which she would have been had her husband    A
not been fatally injured; that it followed that in principle credit had to be given for
maintenance from her subsequent partner during the period since the birth of their
child because damages at common law were assessed on the footing that credit had to
be given for receipts referable to the original loss; that under German substantive law
the claimant was entitled to an award of damages for the loss of her legal right of
maintenance from her late husband, while being required to give credit for
corresponding benefits by virtue of an alternative legal right of maintenance from    B
someone else; but that purely voluntary payments from someone who had no legal
obligation to make her, such as the claimant's receipt of maintenance from her
partner during the period before they had a child, could not be regarded as an
alternative to what the claimant had lost, and, accordingly, credit did not have to be
given for them (post, paras 21, 22, 39).

(3) That, as a matter of construction, there was nothing in the mischief or in the
language of the Fatal Accidents Act 1976 to suggest that its provisions were intended    C
to apply to foreign fatal accidents with no connection to England or English law, and
irrespective of the choice of law derived from the principles of private international
law; and that there was no policy reason for implying any extraterritorial application
of the Act on the ground that the Act, and in particular its damages rules, represented
mandatory rules overriding ordinary rules of private international law, since the
German rules relating to the claimant's case were based on an orthodox principle
which was not unjust and was accepted in principle by the English common law in    D
every context other than statutory liability for fatal accidents (post, paras 29, 33–35,
51).

Decision of the Court of Appeal [2012] EWCA Civ 854 affirmed.

The following cases are referred to in the judgments:

*Baker v Bolton* (1808) 1 Camp 493
*Banque Bruxelles Lambert SA v Eagle Star Insurance Co Ltd* [1997] AC 191; [1996]    E
    3 WLR 87; [1996] 3 All ER 365, HL(E)
*Boys v Chaplin* [1971] AC 356; [1969] 3 WLR 322; [1969] 2 All ER 1085, HL(E)
*Clark v Oceanic Contractors Inc* [1983] 2 AC 130; [1983] 2 WLR 94; [1983] 1 All
    ER 133, HL(E)
*Cookson v Knowles* [1979] AC 556; [1978] 2 WLR 978; [1978] 2 All ER 604, HL(E)
*Coupland v Arabian Gulf Oil Co* [1983] 1 WLR 1136; [1983] 2 All ER 434
*Davidsson v Hill* [1901] 2 KB 606, DC
*Duncombe v Secretary of State for Children, Schools and Families (No 2)* [2011]    F
    UKSC 36; [2011] ICR 1312; [2011] 4 All ER 1020, SC(E)
*Esso Malaysia, The* [1975] QB 198; [1974] 3 WLR 341; [1974] 2 All ER 705
*Harding v Wealands* [2006] UKHL 32; [2007] 2 AC 1; [2006] 3 WLR 83; [2006]
    4 All ER 1; [2006] RTR 422, HL(E)
*Harris v Quine* (1869) LR 4 QB 653
*Kuwait Airways Corpn v Iraqi Airways Co (Nos 4 and 5)* [2002] UKHL 19; [2002]
    2 AC 883; [2002] 2 WLR 1353; [2002] 3 All ER 209; [2002] 1 All ER (Comm)    G
    843, HL(E)
*Lawson v Serco Ltd* [2006] UKHL 3; [2006] ICR 250; [2006] 1 All ER 823, HL(E)
*M'Elroy v M'Allister* 1949 SC 110, Ct of Sess
*Macmillan Inc v Bishopsgate Investment Trust plc (No 3)* [1996] 1 WLR 387; [1996]
    1 All ER 585, CA
*Phillips v Eyre* (1870) LR 6 QB 1
*Phrantzes v Argenti* [1960] 2 QB 19; [1960] 2 WLR 521; [1960] 1 All ER 778    H
*Raiffeisen Zentralbank Österreich AG v Five Star Trading LLC* [2001] EWCA Civ
    68; [2001] QB 825; [2001] 2 WLR 1344; [2001] 3 All ER 257; [2001] 1 All
    ER (Comm) 961, CA
*Ravat v Halliburton Manufacturing and Services Ltd* [2012] UKSC 1; [2012] ICR
    389; [2012] 2 All ER 905, SC(Sc)

© 2014 The Incorporated Council of Law Reporting for England and Wales

1381

A   *Roerig v Valiant Trawlers Ltd* [2002] EWCA Civ 21; [2002] 1 WLR 2304; [2002]
         1 All ER 961, CA
     *Seward v Owner of the Vera Cruz (The Vera Cruz)* (1884) 10 App Cas 59, HL(E)
     *Stevens v Head* (1993) 176 CLR 433

     The following additional cases were cited in argument:

     *Adam v The British and Foreign Steamship Co Ltd* [1898] 2 QB 430
B   *Edmunds v Simmonds* [2001] 1 WLR 1003; [2001] RTR 367
     *Maher v Groupama Grand Est* [2009] EWCA Civ 1191; [2010] 1 WLR 1564; [2010]
         2 All ER 455; [2010] 2 All ER (Comm) 843; [2010] RTR 106, CA
     *Masri v Consolidated Contractors International (UK) Ltd (No 4)* [2009] UKHL 43;
         [2010] 1 AC 90; [2009] 3 WLR 385; [2009] Bus LR 1269; [2009] 4 All ER 847,
         HL(E)
     *Office of Fair Trading v Lloyds TSB Bank plc* [2007] UKHL 48; [2008] AC 316;
C        [2007] 3 WLR 733; [2008] Bus LR 450; [2008] 1 All ER 205; [2008] 1 All
         ER (Comm) 13, HL(E)
     *Paramount Airways Ltd, In re* [1993] Ch 223; [1992] 3 WLR 690; [1992] 3 All ER 1, CA

     **APPEAL** from the Court of Appeal
     The claimant, Katerina Cox, as the widow and sole dependant of Major
     Christopher Cedric Cox, claimed damages in England against the defendant,
D   Ergo Versicherung AG, in its capacity as the insurer of a motor car driven by
     a German national, Gunter Kretschmer, on 21 May 2004 in Gutersloh,
     Germany, when it had been involved in a road traffic accident which had
     resulted in her husband's death.  The claimant alleged that the accident had
     been caused by the negligence of the driver and that, while the issue of
     liability was governed by German law, the assessment of damages was
     governed by English law under the Fatal Accidents Act 1976.    On
E   28 October 2011 Sir Christopher Holland, sitting as a judge of the Queen's
     Bench Division [2012] RTR 137 held on the trial of a preliminary issue that
     the claimant could not rely on the 1976 Act and that German law applied to
     the assessment of damages.
     The claimant appealed.  On 25 June 2012, the Court of Appeal (Maurice
     Kay and Etherton LJJ, Dame Janet Smith dissenting) [2012] EWCA Civ 854
F   dismissed the appeal.
     On 12 February 2013 the Supreme Court (Lord Neuberger of
     Abbotsbury PSC, Lord Mance and Lord Sumption JJSC) granted the
     claimant permission to appeal, pursuant to which she appealed.
     The facts are stated in the judgment of Lord Sumption JSC.

     *Alexander Layton QC, Marie Louise Kinsler* and *Henry Morton Jack*
G   (instructed by *Leigh Day*) for the claimant.
     The damages which the claimant is entitled to receive from the defendant
     arising out of her husband's death are to be quantified in accordance with
     English law including the provisions of the Fatal Accidents Act 1976.
     The jurisdiction of the English court is not in issue.  The claimant is
     entitled to rely on the 1976 Act as a whole notwithstanding the fact that the
     accident giving rise to the claim took place in Germany.  It is irrelevant that
H   the claim is against an insurer rather than the tortfeasor.
     The 1976 Act applies in the claimant's action pursuant to section 14(4) of
     the Private International Law (Miscellaneous Provisions) Act 1995 as a
     mandatory rule of the forum.  The 1976 Act also applies as a matter of
     statutory construction.  The rationale for both those bases is the intention of

the legislature in enacting the 1976 Act. The purpose was to plug a gap in     *A*
the common law by giving dependants a claim when there was a fatal
accident.

Section 1(1) of the 1976 Act gives dependants a cause of action which is
separate from the cause of action which the deceased would have had, but
the dependants' cause of action is inextricably linked to and dependent upon
the cause of action which the deceased, had he not died, would have had       *B*
against the tortfeasor. If there had been no foreign element in the claimant's
action the conditions for the application of section 1(1) would inevitably
have been satisfied and she would be able to rely on section 1(1).

Certain foreign elements clearly have no impact on the applicability of
section 1(1). The fact that the tortfeasor or his insurer is foreign is itself
irrelevant. The fact that the claimant is a foreign national is equally
irrelevant.                                                                   *C*

The presumption against extraterritoriality does not apply in the
claimant's case as a matter of principle, precedent and practice and the
1976 Act does apply. Parliament has always been able to enact legislation
which applies to cases with foreign elements. That is a fundamental aspect
of its sovereignty. Ultimately the question is what Parliament intended to
fall within the scope of the 1976 Act. There is no express or implied         *D*
territorial restriction in that Act.

[Reference was made to *Maher v Groupama Grand Est* [2010] 1 WLR
1564; *Harding v Wealands* [2007] 2 AC 1; *Clark v Oceanic Contractors Inc*
[1983] 2 AC 130; *In re Paramount Airways Ltd* [1993] Ch 223 and
*Edmunds v Simmonds* [2001] 1 WLR 1003.]

Properly construed with regard to their purpose and legislative intent        *E*
the relevant provisions of the 1976 Act fall within section 14(4) of
the 1995 Act. Statutory provisions which come within the scope of
section 14(4) apply regardless of the other conflict of laws rules in the
1995 Act and are, in private international law language "mandatory rules"
which must apply in any action before a court of the forum even where the
issues are in principle governed by a foreign law selected by a choice of law
rule.                                                                         *F*

Whether a statute comes within the scope of section 14(4) of the 1995 Act
is a question of construction. The 1976 Act was intended to and did plug a
gap in the common law where a personal injury action would have been
maintainable had the deceased not died. The premise justifying the
introduction of a cause of action for wrongful death is a critical
consideration and applies with equal force whether the cause of action for    *G*
personal injury arises under English law or foreign law. Accordingly, there is
every reason to suppose that the legislature regarded it as implicit that the
1976 Act would and should plug the equivalent gap in circumstances where
a cause of action for personal injuries under foreign law could be brought in
the English courts but no cause of action existed under that foreign law if the
injured party died. The provisions of the 1976 Act are therefore mandatory,
and so must apply in all cases where the foreign law provides a cause of       *H*
action for personal injury irrespective of whether the foreign law also
provided a cause of action for dependants.

The issues between the parties are procedural and hence are governed by
English law as the law of the forum.

© 2014 The Incorporated Council of Law Reporting for England and Wales

A     [Reference was made to *Seward v Owner of the Vera Cruz (The Vera Cruz)* (1884) 10 App Cas 59; *Adam v The British and Foreign Steamship Co Ltd* [1898] 2 QB 430; *Davidsson v Hill* [1901] 2 KB 606; *The Esso Malaysia* [1975] QB 198 and *Roerig v Valiant Trawlers Ltd* [2002] 1 WLR 2304.]

      If the claimant is not entitled to rely on the 1976 Act and her claim arises only under German law, the damages due to her are none the less to be quantified in accordance with the measure of damages under English

B     law, including the 1976 Act. The claimant can found her claim on German law because financial loss as a result of wrongful death is actionable under German law. Heads of loss, as substantive matters, will be determined by German law but quantification, as a procedural matter, will be for English law as the law of the forum. The real issue in this appeal is how much compensation the defendant is liable to pay to the

C     claimant.

      There are three heads of loss under the 1976 Act: (1) loss of financial support of the deceased; (2) bereavement; and (3) loss of affection. Heads (2) and (3) are not available under German law.

      However if a proper approach is taken to characterisation it is clear that the heads of loss in English law and in German law are equivalent. The aim of characterisation is to identify the most appropriate law to govern a

D     particular issue. In the English court characterisation is to be carried out in accordance with English conflict of laws rules. Characterisation is to be carried out in a broad internationalist spirit. It should not be constrained by particular notions or distinctions of the domestic or foreign law which may have no counterpart in the other's system. The consequences and effect of adopting a particular characterisation is a relevant consideration and should

E     impact upon which consideration is adopted.

      [Reference was made to *Macmillan Inc v Bishopsgate Investment Trust plc (No 3)* [1996] 1 WLR 387 and *Raiffeisen Zentralbank Österreich AG v Five Star Trading LLC* [2001] QB 825.]

      In the claimant's case the aim in characterising the head of loss is to identify the most appropriate law to govern the issue of the quantification of her loss. It is common ground, and it was confirmed by the Court of Appeal,

F     that in respect of any heads of loss recoverable in German law, damages are to be quantified in accordance with English law as the lex fori.

      The appropriate characterisation of the heads of loss under English and German law is "loss of financial support" and "loss of service". That is a neutral "autonomous" characterisation of the relevant heads of loss. The approach adopted by the majority in the Court of Appeal was fundamentally

G     flawed. The minority approach of Dame Janet Smith is consistent with the authorities and is to be preferred.

      If the heads of loss under German law have no equivalent in English law, the court will have to fashion a new rule to deal with such cases. That will be particularly important as the narrow approach will lead to more cases arising in which no equivalent head of loss arises.

H     *Hugh Mercer QC* and *Sarah Crowther* (instructed by *DWF LLP*) for the defendant.

      The starting point is that a statute has no extraterritorial effect and excludes territory over which Parliament has no legislative power. Legislation was not intended to have worldwide effect as the claimant's argument would lead to. It is necessary to look at the purpose of the

© 2014 The Incorporated Council of Law Reporting for England and Wales

1384
Cox v Ergo Versicherung AG (SC(E))                                    [2014] AC
Argument

legislation. The authorities show that the courts still look for a connection   A
with the United Kingdom when deciding whether proceedings can be
brought in the United Kingdom.

[Reference was made to *Office of Fair Trading v Lloyds TSB Bank plc*
[2008] AC 316; *Masri v Consolidated Contractors International (UK) Ltd
(No 4)* [2010] 1 AC 90; *Ravat v Halliburton Manufacturing and Services Ltd*
[2012] ICR 389; *Roerig v Valiant Trawlers Ltd* [2002] 1 WLR 2304 and   B
*Davidsson v Hill* [1901] 2 KB 606.]

Any implicit overriding effect as a matter of construction is excluded
by section 11(2)(a) of the Private International Law (Miscellaneous
Provisions) Act 1995. If the Fatal Accidents Act 1976 were overriding so
that it applied to all wrongful death claims in England, regardless of
where in the world the death occurred, the draftsman would not have
provided that cross-border wrongful death claims applied the law of the   C
place where the injury was sustained. The general rule in section 11 of the
1995 Act is that the applicable law for the claim for damages for wrongful
death is the law of the place of the accident, which is, in the present case,
Germany.

The claimant claims to apply German law to identify the permissible
defendants and English law to identify the permissible claimants, i e, which   D
dependants can sue, and the scope of their cause of action. No policy
rationale is advanced for this change midway through the application of the
applicable law.

If the 1976 Act must be applied for claims for damages for wrongful
death occurring anywhere in the world, then English law would also
logically determine the permissible defendants to such claims. There is no
suggestion that the 1976 Act gives any right against an insurer. Under   E
English law there is no such direct right of action against insurers. English
law expressly limits a direct right of action against insurers to accidents
occurring in England and Wales and where the vehicle involved in the
accident is normally based in England and Wales. That evidences a
legislative decision to limit such a right to cases where the specified
connecting factors can be established.   F

The 1976 Act was not intended to plug a gap in the common law as the
claimant asserts. That was the function performed by the Law Reform
(Miscellaneous Provisions) Act 1934. The right to damages for wrongful
death is wholly distinct from any claims for personal injuries to which the
deceased might have been entitled. The 1976 Act and its predecessors were
designed to create a new cause of action to prevent dependants from being   G
left destitute where the deceased was killed by a wrongful act. The fact that
the 1976 Act creates a new cause of action excludes the suggestion that the
provisions of the 1976 Act are procedural.

Characterisation is not relevant to the method to be used to assess
damages. It is a technique designed to identify the most appropriate law to
govern a particular issue.

The issue is what the defendant is liable for and that is solely concerned   H
with mitigation. The claimant has two children with another partner and
has a right of support against him. In those circumstances the questions
relate to what the German insurer is liable for and how much. [Reference
was made to *Kuwait Airways Corpn v Iraqi Airways Co (Nos 4 and 5)*

© 2014 The Incorporated Council of Law Reporting for England and Wales

A   [2002] 2 AC 883; *Harding v Wealands* [2007] 2 AC 1 and *Cookson v Knowles* [1979] AC 556.]

English common law and German law are both firmly wedded to the issue of compensation. The risk against which spouses are protected is the diminution in their right to maintenance. Mitigation qualifies the substantive obligation. Mitigation is not procedural and *Harding v Wealands* is not authority for the proposition that it is.

B

Damages are to be assessed in accordance with the scope of the substantive right to damages for wrongful death under German law. The courts below were entitled to hold that the assessment should be carried out according to the method developed by the German court to satisfy the right under section 844 of the Burgerliches Gezetzbuch.

C   *Layton QC* replied.

The court took time for consideration.

2 April 2014. The following judgments were handed down.

**LORD SUMPTION JSC** (with whom **LORD NEUBERGER OF ABBOTSBURY PSC**, **LORD TOULSON** and **LORD HODGE JJSC** agreed)

D

*Introduction*

1   These proceedings arise out of a fatal accident in Germany. On 21 May 2004, Major Christopher Cox, an officer serving with HM Forces in Germany, was riding his bicycle on the verge of a road near his base when a

E   car left the road and hit him, causing injuries from which he died. The driver was Mr Gunther Kretschmer, a German national resident and domiciled in Germany. He was insured by the respondent, a German insurance company, under a contract governed by German law. The appellant, Major Cox's widow Katerina, was living with him in Germany at the time of the accident. After the accident, she returned to England where she has at all relevant

F   times been domiciled. Since then, she has entered into a new relationship and has had two children with her new partner.

2   It is common ground that the liabilities of Mr Kretschmer and his insurer are governed by German law. It is also common ground that under paragraph 3(1) of the Pflichtversicherungsgesetz, Mrs Cox had a direct right of action against Mr Kretschmer's insurer for such loss as she would have

G   been entitled to recover from him. That being so, the combined effect of articles 9 and 11 of Council Regulation No 44/2001/EC (OJ 2001 L12, p 1) is that she is entitled to sue the insurer in the courts of the member state where she is domiciled. She has availed herself of that right by suing the insurers in England for bereavement and loss of dependency.

3   Liability is not in dispute, but there is a number of issues relating to damages. Their resolution depends on whether they are governed by

H   German or English law, and, if by English law, whether by the provisions of the Fatal Accidents Act 1976 or on some other basis. Mrs Cox relies on both English and German law. The question which law applies was ordered to be tried as a preliminary issue, together with other issues which are no longer in dispute.

© 2014 The Incorporated Council of Law Reporting for England and Wales

*German and English law*                                                    A

4   In German law, the extent of Mrs Cox's recoverable loss is governed
by section 844 of the Burgerliches Gezetzbuch (or "BGB").  Section 844(2)
provides, so far as relevant:

"If the person killed, at the time of the injury, stood in a relationship to
a third party on the basis of which he was obliged or might become
obliged by operation of law to provide maintenance for that person and if    B
the third party has as a result of the death been deprived of his right to
maintenance, then the person liable in damages must give the third party
damages by payment of an annuity to the extent that the person killed
would have been obliged to provide maintenance for the presumed
duration of his life."

5   Sir Christopher Holland, who decided the preliminary issues in the    C
High Court, heard expert evidence about the effect of section 844(2) and
made a number of findings [2012] RTR 11.  These findings have not
themselves been appealed, and provide the point of departure for the
questions before us.  In summary, Sir Christopher held that the object of
section 844 of the BGB was to restore the claimant to the financial position
that she would have been in as a dependant of the deceased, but for his    D
death, taking account of any subsequent benefits received which impact on
the loss of dependency, apart from insurance recoveries.  These subsequent
benefits may include the income that the claimant has made or would be
likely to make by taking paid employment, together with any maintenance
accruing to the claimant through her remarriage or through some other
relationship following the birth of a child.  "Fundamental to the foregoing",
he found, at para 17, "is a substantive requirement of German law: the duty    E
to mitigate, such justifying ongoing reference to her earning capacity and to
benefits accruing from remarriage or from a similar relationship."

6   Broadly speaking, German law on the damages recoverable for a fatal
accident corresponds to the general principles applied at common law to the
recoverability of damages in tort, which require the claimant to be put into a
financial position equivalent to that which she would have been in but for    F
the wrong.  To that end, account must be taken of avoided or reasonably
avoidable loss.  In England, however, the law relating to liability for fatal
accidents is almost entirely statutory.  Before 1846, English law did not
permit actions in tort for the death of a human being.  This was the
combined result of two rules of common law.  The first was that the right of
action of a person who had been tortiously injured was a personal action,    G
which did not survive for the benefit of his estate on his death.  This rule
survived until 1934, when it was abolished by the Law Reform
(Miscellaneous Provisions) Act 1934.  The second rule was that "in a civil
court, the death of a human being could not be complained of as an injury"
by dependants claiming in their own right: *Baker v Bolton* (1808) 1 Camp
493 (Lord Ellenborough).  This is still the rule at common law, but it was    H
largely superseded by the Fatal Accidents Act 1846 (9 & 19 Vict c 93) ("Lord
Campbell's Act"), which created a new statutory cause of action in favour of
certain categories of dependant, including widows.  The 1846 Act was
repeatedly amended, elaborated and re-enacted, and the statutory cause of
action is now contained in section 1(1)(2) of the Fatal Accidents Act 1976.

© 2014 The Incorporated Council of Law Reporting for England and Wales

*A*  These statutory provisions remain the sole legal basis on which a claim can be made for bereavement or loss of dependency in English law.

7  The common law background explains the rather tortured form of section 1(1)(2) of the Fatal Accidents Act 1976. They provide (as substituted by section 3 of the Administration of Justice Act 1982):

*"Right of action for wrongful act causing death*

*B*  "(1) If death is caused by any wrongful act, neglect or default which is such as would (if death had not ensued) have entitled the person injured to maintain an action and recover damages in respect thereof, the person who would have been liable if death had not ensued shall be liable to an action for damages, notwithstanding the death of the person injured.

"(2) Subject to section 1A(2) below, every such action shall be for the benefit of the dependants of the person ('the deceased') whose death has been so caused."

*C*

For this purpose a "dependant" means someone falling within the categories defined in section 1(3), including the widow (or widower) of the deceased (section 1(3)(a)), a civil partner (section 1(3)(aa)), or a person who for at least two years before the death had been living with the deceased in the same household as the deceased's spouse or civil partner: section 1(3)(b).

*D*  8  Lord Campbell's Act contained no provisions relating to damages, but over the years such provisions have been added in the course of successive amendments and re-enactments. In particular, substantial changes were made in 1976 and 1982. For present purposes, the relevant provisions relating to pecuniary loss are sections 3 and 4 of the 1976 Act, as substituted by section 3 of the 1982 Act. They provide:

*E*  "3 *Assessment of damages*

"(1) In the action such damages, other than damages for bereavement, may be awarded as are proportioned to the injury resulting from the death to the dependants respectively."

"(3) In an action under this Act where there fall to be assessed damages payable to a widow in respect of the death of her husband there shall not be taken account the remarriage of the widow or her prospects of remarriage."

*F*

"4 *Assessment of damages: disregard of benefits*

"In assessing damages in respect of a person's death in an action under this Act, benefits which have accrued or will or may accrue to any person from his estate or otherwise as a result of his death shall be disregarded."

*G*  9  Turning to non-pecuniary loss, section 1A of the Fatal Accidents Act 1976 provides that an action under section 1(1) "may consist of or include a claim for damages for bereavement" by certain categories of dependant defined by section 1A(2), including a widow. Damages for bereavement are expressly excluded from the general rule of damages in section 3(1). This is because they are awarded as a lump sum, effectively a solatium, fixed by section 1A(3)(5).

*H*  10  These provisions are said to reflect a principle that the extent of any dependency is fixed at the moment of the death, and that anything which might otherwise be thought to affect it afterwards is legally irrelevant. For my part I would rather leave open the question whether that is a correct or helpful analysis of the Act. What is clear is that sections 3 and 4 mark a

© 2014 The Incorporated Council of Law Reporting for England and Wales

departure from the ordinary principles of assessment in English law, which    *A*
can fairly be described as anomalous. They provide for what Lord Diplock
in *Cookson v Knowles* [1979] AC 556, 568, called an "artificial and
conjectural exercise" whose "purpose is no longer to put dependants,
particularly widows, in the same economic position as they would have
been in had their late husband lived". Others have gone further. *Atiyah's
Accidents, Compensation and the Law*, 8th ed (2013), described damages
for bereavement as "highly objectionable" (p 89) and the exclusion of    *B*
maintenance from a subsequent remarriage as "one of the most irrational
pieces of law 'reform' ever passed by Parliament": p 133.

11 There are two relevant respects in which an award under the Fatal
Accidents Act 1976 may differ from an award under the BGB:

(1) Damages awarded to a widow under the BGB will take account of any
legal right to maintenance by virtue of a subsequent remarriage or a    *C*
subsequent non-marital relationship following the birth of a child.
Section 3(3) of the Fatal Accidents Act 1976 expressly excludes remarriage
or the prospect of remarriage as a relevant consideration in English law.

(2) Section 844 of the BGB confers no right to a solatium for
bereavement. Under section 823 of the BGB the widow may in principle be
entitled to compensation for her own pain and suffering, but this would
require proof of suffering going beyond normal grief and amounting to a    *D*
psychological disturbance comparable to physical injury.

*Choice of law: the legal framework*

12 English rules of private international law distinguish between
questions of procedure, governed by the law of the forum, and questions of
substance, governed by the lex causae. The issue in the present case is    *E*
whether Mrs Cox is entitled to rely on the provisions of sections 3 and 4 of
the Fatal Accidents Act 1976. They provide for a measure of damages
substantially more favourable to her than the corresponding provisions of
German law, mainly because of the more favourable rule concerning the
deduction of maintenance from her current partner. This issue depends on
whether the damages rules in sections 1A and 3 of the Fatal Accidents Act
1976 fall to be applied (i) on ordinary principles of private international law    *F*
as procedural rules of the forum, or (ii) as rules applicable irrespective of the
ordinary principles of private international law.

*Procedure or substance?*

13 The Private International Law (Miscellaneous Provisions) Act 1995
partially codifies the law relating to the choice of law in tort. Sections 9 to    *G*
15 of that Act apply to determine the law applicable to causes of action in
tort in all cases which are not governed by Council Regulation
No 864/2007/EC (OJ 2007 L199, p 40) ("Rome II"). Major Cox's death
having occurred before the Regulation came into force, any cause of action
arising out of it is governed by those provisions. The combined effect of
sections 9, 11(2)(a) and 12 of the 1995 Act is that issues arising on a cause of
action in respect of personal injury are to be determined according to the law    *H*
of the place where Major Cox was when he suffered the injury, i e Germany,
unless that law is displaced on the ground that the tort has substantially
more significant connections with England. These rules are, however,
subject to section 14(3)(b), which provides that nothing in Part III

A       "affects any rules of evidence, pleading or practice or authorises
        questions of procedure in any proceedings to be determined otherwise
        than in accordance with the law of the forum".

The effect of the proviso is to preserve the distinction between substance and
procedure.

    14   The leading case is the decision of the House of Lords in *Harding v*
B   *Wealands* [2007] 2 AC 1. The appeal arose out of an action in England for
personal injury caused by a road accident in New South Wales. Under New
South Wales law, damages were limited by Chapter V of the Motor
Accidents Compensation Act 1999 (known as "the MACA"). Section 123 of
the MACA provided: "A court cannot award damages to a person in a
respect of a motor accident contrary to this Chapter." The Chapter then
provided for a fixed limit to the damages and a number of detailed rules for
C   awarding them. These included an exclusion of the first five days of earning
capacity, an exclusion of economic loss, a specified discount rate to be used
to calculate lump sum awards, and a rule requiring credit to be given for
payments received from an insurer. The House rejected the view that in
section 14(3)(b) of the 1995 Act, "questions of procedure" referred only to
rules governing the manner in which proceedings were to be conducted.
D   They distinguished between questions of recoverability (substantive) and
questions of assessment (procedural). At common law the kinds of damage
recoverable was a question of substance, whereas their quantification or
assessment went to the availability and extent of the remedy and as such
were questions of procedure for the law of the forum. The House classified
all the relevant provisions of the MACA as rules of procedure. They were
accordingly inapplicable to litigation in England. The leading speech was
E   delivered by Lord Hoffmann, with whom the rest of the House agreed. Lord
Hoffmann stated the principle at para 24 as follows:

    "In applying this distinction to actions in tort, the courts have
    distinguished between the kind of damage which constitutes an
    actionable injury and the assessment of compensation (i e damages) for
    the injury which has been held to be actionable. The identification of
F   actionable damage is an integral part of the rules which determine
    liability. As I have previously had occasion to say, it makes no sense
    simply to say that someone is liable in tort. He must be liable for
    something and the rules which determine what he is liable for are
    inseparable from the rules which determine the conduct which gives rise
    to liability. Thus the rules which exclude damage from the scope of
G   liability on the grounds that it does not fall within the ambit of the
    liability rule or does not have the prescribed causal connection with the
    wrongful act, or which require that the damage should have been
    reasonably foreseeable, are all rules which determine whether there is
    liability for the damage in question. On the other hand, whether the
    claimant is awarded money damages (and, if so, how much) or, for
    example, restitution in kind, is a question of remedy."

H   This reflected the test previously stated by the majority of the House of Lords
in *Boys v Chaplin* [1971] AC 356.

    15   Lord Hoffmann, following the decision of the High Court of
Australia in *Stevens v Head* (1993) 176 CLR 433, characterised all the
relevant provisions of the MACA as procedural. This seems surprising as

© 2014 The Incorporated Council of Law Reporting for England and Wales

regards some of them, such as the exclusion of economic loss, which would *A*
appear to be substantive according to Lord Hoffmann's test. This may be
why in their concurring judgments Lord Woolf and Lord Rodger of
Earlsferry justified this classification not only on the grounds given by Lord
Hoffmann but on additional grounds. Lord Woolf, at para 11, considered
that because the greater part of the provisions of the MACA relating to
damages were procedural, the rest which were "arguably" substantive
should be regarded as procedural also. Lord Bingham of Cornhill and Lord *B*
Carswell agreed with Lord Rodger as well as Lord Hoffmann. Lord Rodger
found the answer in the opening words of section 123 of the MACA. He put
the point as follows [2007] 2 AC 1, para 73:

  "Section 122(1) of MACA explains that Chapter 5 applies to, and in
  respect of, 'an award of damages' relating to death or injury in motor *C*
  accidents. Section 123 provides that: 'A court cannot award damages to a
  person in respect of a motor accident contrary to this Chapter'. While, of
  course, it may be necessary to look beneath the surface of a statutory
  provision to ascertain its nature, the legislature is here signalling that the
  provisions in Chapter 5 are directed to what a New South Wales court can
  award by way of damages. In other words, prima facie at least, they are
  concerned, not with the scope of the defendant's liability for the victim's *D*
  injuries as such, but with the remedy which the courts of New South
  Wales can give to compensate for those injuries. For purposes of private
  international law, prima facie they are procedural in nature."

  16  In *Harding v Wealands* it was being contended that damages for a
New South Wales tort should be awarded in accordance with a New South
Wales statute. The present is the converse case, because what is being *E*
suggested is that damages for a German tort should be awarded in
accordance with an English statute. It is therefore necessary to consider the
damages rules of both laws.

  17  I consider that the relevant German damages rules are substantive.
This is because they determine the scope of the liability. Sir Christopher
Holland has found that the rule of German law requiring credit to be given
for maintenance received from a subsequent partner, reflects the principle *F*
requiring the victim of a tort to mitigate loss and to give credit for successful
mitigation. In German law this is classified as a substantive rule. Its
classification in an English court is a question of English law, but English law
would regard it in the same light. Questions of causation are substantive, as
Lord Hoffmann pointed out in the passage which I have quoted from
*Harding v Wealands*. Such questions include questions of mitigation, *G*
because they determine the extent of the loss for which the defendant ought
fairly, reasonably or justly to be held liable.

  "The inquiry is whether the plaintiff's harm or loss should be within
  the scope of the defendant's liability, given the reasons why the law has
  recognised the cause of action in question": *Kuwait Airways Corpn v
  Iraqi Airways Co (Nos 4 and 5)* [2002] 2 AC 883, para 70 (Lord Nicholls *H*
  of Birkenhead).

The rule of German law which makes damages available for psychological
distress in certain circumstances, and makes damages for bereavement as
such unavailable, is also substantive. These are paradigm examples of rules

© 2014 The Incorporated Council of Law Reporting for England and Wales

A    governing the recoverability of particular heads of loss, the avoidance of
which lies within the scope of the defendant's duty.

18    Turning to the categorisation of the relevant damages provisions of
the Fatal Accidents Act 1976, the Court of Appeal [2012] EWCA Civ 854
considered that they were procedural. Having arrived at this conclusion,
they were much exercised by the difficulty of applying the damages rules of
B    the Fatal Accidents Act 1976 to a cause of action under section 844 of the
BGB, given the considerable differences between them; and the absence of
any alternative basis for assessing damages for wrongfully causing death
under English law. The majority considered that the damages rules in the
Act could not be regarded as relevant to an assessment of damages for
the German cause of action, because the conceptual differences between the
English and German causes of action were too great. They therefore held
C    that English law should adopt the German damages rules as its own and
apply them not directly but by analogy. Dame Janet Smith dissented on the
ground that in her opinion the Fatal Accidents Act 1976 applied as part of
the lex fori, notwithstanding the differences between the English and
German causes of action.

19    There are certainly cases in which English law has no suitable
remedy for breach of a foreign law duty. As Lord Parker CJ observed in
D    *Phrantzes v Argenti* [1960] 2 QB 19, 35, to be available in support of a
foreign cause of action, the remedies afforded by English law "must
harmonise with the right according to its nature and extent as fixed by the
foreign law". But the ordinary consequence if it does not is that English law
cannot give effect to the foreign cause of action at all, which was why Lord
Parker CJ declined in that case to order a father to provide the dowry to
E    which his daughter would have been entitled under the law of Greece where
the father was assumed to be domiciled.

20    I agree with the majority of the Court of Appeal that the damages
rules of the Fatal Accidents Act cannot be applied to a cause of action under
section 844 of the BGB, but for an altogether simpler reason than the
conceptual differences between the two laws. In my view it is unnecessary to
F    engage in the difficult and technical task of classifying sections 1A, 3 and 4 of
the Fatal Accidents Act as procedural or substantive, because these sections
are irrelevant in either case. So far as they are substantive, they are irrelevant
because the substantive law in this case is German law. But whether they are
procedural or substantive, they do not apply under their own terms. These
provisions do not lay down general rules of English law relating to the
assessment of damages, even in personal injury actions, but only rules
G    applicable to actions under the Act itself. Sections 1A, 3(3), 3(4) and 4,
which include the provisions relevant to the present appeal, apply only to
"an action under this Act", i e to actions brought under section 1. The
context shows that the same is true of the other provisions of section 3 ("in
the action"). An action to enforce a liability whose applicable substantive
law is German law is not an action under section 1 of the Fatal Accidents Act
H    1976 to which the damages provisions of the Act can apply.

21    If the English court must apply its own rules of assessment, then
what rules are these, if not those of the Fatal Accidents Act 1976? I do not
think that it is necessary to resort to analogies, because English law does
provide a remedy that harmonises with the German law right, namely
damages. Mr Kretschmer committed a tort under German law, and thereby

© 2014 The Incorporated Council of Law Reporting for England and Wales

incurred a substantive liability to pay financial compensation. The principal    *A*
head of loss for which he was liable to compensate Major Cox's widow was
the deprivation of the net financial benefit to her of her legal right to
maintenance from him.  This is entirely cognate with the corresponding
remedy in English law.  It is true, as the Court of Appeal pointed out, that
because the cause of action in English law for a fatal accident is an action
under section 1 of the 1976 Act, there is no non-statutory measure of    *B*
damages for fatal accidents.  But this does not matter.  If, as I consider, the
particular rules of assessment in the Fatal Accidents Act do not apply as a
matter of construction of the Act, then the answer must be sought in the
rules of assessment which apply generally in English law in the absence of
any statute displacing them.    The relevant English law principle of
assessment, which applies in the absence of any statute to the contrary, is    *C*
that Mrs Cox must be put in the same financial position, neither better nor
worse, as she would have been in if her husband had not been fatally injured.
It follows that, even if one assumes, for the sake of argument, that the Court
of Appeal were right to regard the damages rules of the Act as procedural, in
principle credit must be given for maintenance from her subsequent partner
during the period since the birth of their child.  This is because damages at    *D*
common law are assessed on the footing that credit must be given for
receipts referable to the original loss, with very limited exceptions such as
insurance receipts which are not relevant in this case.

22 The only potential difficulty concerns Mrs Cox's receipt of
maintenance from her current partner during the period before they had a
child, when he was under no legal obligation to maintain her either in
German or in English law.  It appears from Sir Christopher Holland's    *E*
findings about the relevant German law that it is not just the maintenance
that she would have received from Major Cox that must have been received
by virtue of a legal obligation, but also the maintenance from her current
partner for which she can be required to give credit.  The classification of a
damages rule regulating the receipts for which credit must be given in an
award of damages is a difficult question which admits of no universal
answer.  In some cases, such a rule will be classed as part of the law of    *F*
mitigation and therefore substantive.  In some cases it will be regarded as a
rule excluding an otherwise relevant element from a purely factual issue
about quantum, which would normally be classified as procedural: see
*Roerig v Valiant Trawlers Ltd* [2002] 1 WLR 2304, para 23, and *Coupland v
Arabian Gulf Oil Co* [1983] 1 WLR 1136, 1149, concerning a foreign
statutory rule about the deductibility of social security receipts.  In the    *G*
present case, the rule in question seems to me to be substantive for a reason
peculiar to the nature of the German cause of action relied on in this case.
Mrs Cox is entitled as a matter of German substantive law to an award of
damages for the loss of her legal right of maintenance from her late husband.
German law requires credit to be given so far as she has received
corresponding benefits by virtue of an alternative legal right of maintenance
from someone else.  This follows from the nature of the duty in German law    *H*
and of the head of damages recoverable for breach of it.  It is a rule of
substantive law.  Purely voluntary payments from someone with no legal
obligation to make them cannot be regarded as an alternative to what she
has lost.  It follows that credit need not be given for it.

© 2014 The Incorporated Council of Law Reporting for England and Wales

*A*   23   It is not at all satisfactory that such significant consequences should turn on difficult and technical considerations of the kind considered in the previous paragraph. Under the law as it stood at the time of this accident, it was at least in theory possible that assessment rules of the forum could conflict with the substantive rules of the proper law. How that conflict should be resolved if it ever arose is a question on which I should prefer to express no opinion. The rational answer is that someone in Mrs Cox's

*B*   position should recover in respect of a German cause of action what she would have recovered in a German court. This has now been achieved by changing the law. Section 15A of the 1995 Act (added by regulation 2 of the Law Applicable to Non-Contractual Obligations (England and Wales and Northern Ireland) Regulations 2008 (SI 2008/2986)) applies the Rome II Regulation EC 864/2007 to causes of action arising after 11 January 2009.

*C*   Article 15(c) of the Regulation applies the applicable law to "the existence, the nature and the assessment of damage or the remedy claimed".

### Overriding effect of English law

24   Before us, this point has enjoyed greater prominence than it had in the courts below, but I reject it as the Court of Appeal did. If my reasons for doing so are more elaborate than theirs, this is only because it has been more

*D*   elaborately argued.

25   Section 14(3)(a)(i) of the Private International Law (Miscellaneous Provisions) Act 1995 provides:

  "Nothing in this Part . . . authorises the application of the law of a country outside the forum as the applicable law for determining issues arising in any claim in so far as to do so . . . would conflict with principles

*E*   of public policy . . ."

Section 14(4) provides:

  "This Part has effect without prejudice to the operation of any rule of law which either has effect notwithstanding the rules of private international law applicable in the particular circumstances or modifies

*F*   the rules of private international law that would otherwise be so applicable."

26   Mr Layton argued that the Fatal Accidents Act 1976 should be applied notwithstanding the ordinary rules of private international law, for two reasons. His first submission was that as a matter of construction that Act had extraterritorial effect.   His second submission was that the

*G*   principles enacted in the Act represented "mandatory rules" of English law, applicable irrespective of ordinary rules of private international law. For reasons that will become apparent, I regard both submissions as raising the same issue in the circumstances of this case, and as requiring the same negative answer.

### Extraterritorial application

*H*   27   Whether an English statute applies extraterritorially depends on its construction. There is, however, a presumption against extraterritorial application which is more or less strong depending on the subject matter. It arises from the fact that, except in relation to the acts of its own citizens abroad and certain crimes of universal jurisdiction such as torture and

© 2014 The Incorporated Council of Law Reporting for England and Wales

genocide, the exercise of extraterritorial jurisdiction is contrary to ordinary    A
principles of international law governing the jurisdiction of states.    It
follows, as Lord Scarman observed in *Clark v Oceanic Contractors Inc*
[1983] 2 AC 130, 145, that

"unless the contrary is expressly enacted or so plainly implied that the
courts must give effect to it, United Kingdom legislation is applicable only
to British subjects or to foreigners who by coming to the United Kingdom,    B
whether for a short or a long time, have made themselves subject to
British jurisdiction."

28    It is, however, important to understand what is meant when we talk
of the extraterritorial application of an English statute.   There are two
distinct questions, which are not always distinguished in the case law.  The
first question is what is the proper law of the relevant liability.  The answer    C
will usually depend on the extent of any connection between the facts giving
rise to liability and England or English law.  If the proper law of the liability is
English law, no question of extraterritorial application arises.  In principle
the exercise is no different from that which the court performs when it
identifies the proper law of a non-statutory tort, by reference to the
connection between the facts and the various alternative systems of law.  This    D
is what Lord Hodson (at p 380) and Lord Wilberforce (at pp 390–392) did in
*Boys v Chaplin* [1971] AC 356, when they held that liability in respect of a
road accident in Malta in which only English parties were involved was
governed by English law.  The same basic principle has applied under sections
11 and 12 of the Private International Law (Miscellaneous Provisions) Act
1995 since that Act came into force.  The second question is one of    E
extraterritorial application, properly so-called.  It is the question posed by
section 14(3)(a)(i)(4) of the Private International Law (Miscellaneous
Provisions) Act 1995, which had its counterpart in the common law, namely
whether the choice of law arrived at in accordance with sections 11 and 12 is
displaced by some mandatory rule of the forum.  This is not a choice of law
principle at all, but turns on the overriding rules of policy of the forum.

29    In the present case it is common ground that the lex causae arrived at    F
on ordinary principles of private international law is not English but
German law.  There is nothing in the language of the Fatal Accidents Act
1976 to suggest that its provisions were intended to apply irrespective of the
choice of law derived from ordinary principles of private international law.
Such an intention would therefore have to be implied.     Implied
extraterritorial effect is certainly possible, and there are a number of
examples of it.  But, in most if not all cases, it will arise only if (i) the terms of    G
the legislation cannot effectually be applied or its purpose cannot effectually
be achieved unless it has extraterritorial effect; or (ii) the legislation gives
effect to a policy so significant in the law of the forum that Parliament must
be assumed to have intended that policy to apply to any one resorting to an
English court regardless of the law that would otherwise apply.

30    There is a body of case law in which the Fatal Accidents Acts have    H
been applied to accidents outside England.  In *Davidsson v Hill* [1901] 2 KB
606, the Fatal Accidents Act 1846 was applied to the death of a foreign
seaman on a foreign ship, resulting from a collision with a British ship on the
high seas.  The reason was that the existence of a cause of action in favour of
dependants of a person negligently killed was regarded as a universal

© 2014 The Incorporated Council of Law Reporting for England and Wales

A  principle which should be treated as part of the international law maritime:
   see Kennedy J at pp 610, 614 and Phillimore J at pp 616, 618. In *The Esso
   Malaysia* [1975] QB 198, 24 Russian crewmen serving on a Latvian trawler
   were killed when it collided with a Panamanian tanker on the high seas.
   Jurisdiction was established in England by arresting a sister ship. Brandon J
   held, following *Davidsson v Hill*, that the rule which imposed liability for
B  negligently causing a fatal injury was a universal rule of the law maritime.
   On that footing, the Fatal Accidents Act 1846 applied, because its effect was
   not to create new rules of conduct, but only to regulate the consequences of
   existing rules of conduct: see p 206. These cases depend, in my opinion, on
   (i) the existence of an international principle of liability for negligent acts,
   which is to be regarded as part of the law maritime, coupled with (ii) the
   absence of any more appropriate system of law than English law to govern
C  the precise incidents, extent and conditions of that liability. The peculiarity
   of the cases about collisions in international waters lies in the absence of any
   relevant connection between the breach of duty and the territory of any
   state, or of any underlying relationship between the parties from which some
   more appropriate choice of law could be derived. In *Roerig v Valiant
   Trawlers Ltd* [2002] 1 WLR 2304 sections 3 and 4 of the Fatal Accidents Act
D  1976 were also applied, but on a different basis. There were relevant
   connections with English law because the accident occurred on a British
   vessel with no other vessel involved, and also with Dutch law because the
   vessel was operating out of the Netherlands and the deceased was a
   Dutchman working for a Dutch company. The Dutch factors were held to
   be insufficiently significant to displace the lex loci delicti, which was English.
   These cases all, in different ways, turn on the choice of law arising from the
E  circumstances of the case. None of them were about the extraterritorial
   effect of any statute. Indeed, in *The Esso Malaysia*, at p 207, Brandon J
   declined to consider that question.
       31 The relevant principle emerges perhaps more clearly from the case
   law on the application of the United Kingdom's scheme of statutory
   employment protection to employment with a foreign element. In *Lawson v
F  Serco Ltd* [2006] ICR 250, the House of Lords heard three cases in which
   claims were made for unfair dismissal under section 94 of the Employment
   Rights Act 1996. Two of them had been brought by British nationals
   employed by the Ministry of Defence at overseas military bases. The third
   was brought by a pilot employed on international routes. His employer was
   a Hong Kong airline, but he was based at Heathrow airport. It was held that
   as a general rule the application of section 94 should depend on whether the
G  employee was working in England when he was dismissed, but that
   exceptionally the Act might be applied where the employment relationship
   was substantially connected with the United Kingdom. This was held to be
   the case where a peripatetic employee was based in England, or an employee
   was hired in England to work in an extraterritorial enclave of the United
   Kingdom overseas. The employee therefore succeeded in all three cases.
H  Lord Hoffmann, with whom the rest of the House agreed, identified the
   relevant question at para 1:

       "Putting the question in the traditional terms of the conflict of laws,
       what connection between Great Britain and the employment relationship
       is required to make section 94(1) the appropriate choice of law in

© 2014 The Incorporated Council of Law Reporting for England and Wales

deciding whether and in what circumstances an employee can complain   *A*
that his dismissal was unfair?"

*Duncombe v Secretary of State for Children, Schools and Families (No 2)*
[2011] ICR 1312 did not concern an extraterritorial enclave of the United
Kingdom. The employees were teachers employed by the Secretary of State
to work in European schools abroad. But the Supreme Court treated the
result in *Lawson v Serco Ltd* as illustrative of a broader principle that   *B*
employment abroad might exceptionally have

"such an overwhelmingly closer connection with Britain and with
British employment law than with any other system of law that it is right
to conclude that Parliament must have intended that the employees
should enjoy protection from unfair dismissal": Baroness Hale of
Richmond JSC, at para 16.   *C*

In *Ravat v Halliburton Manufacturing and Services Ltd* [2012] ICR 389 the
employment tribunal was held to have jurisdiction to determine a claim
under section 94 by an employee based in Scotland but employed for periods
of 28 days at a time at oil installations in Libya. The Supreme Court treated
the result in *Lawson v Serco Ltd* as an example of the same broader principle.
Lord Hope of Craighead DPSC expressed it as follows, at para 27:   *D*

"the employment relationship must have a stronger connection with
Great Britain than with the foreign country where the employee works.
The general rule is that the place of employment is decisive. But it is not
an absolute rule."

Like the cases about maritime torts, these cases turn on the choice of law, not
on the extraterritorial effect of the Employment Rights Act 1996.   *E*

32   The Fatal Accidents Act 1976 is an unpromising candidate
for implied extraterritorial effect. In the first place, the question of
extraterritorial application could not have been an issue at the time when
the Act and its predecessors were passed. This is because actions brought in
England on a foreign tort were then subject to the double-actionability rule,
which was a procedural rule requiring the conduct alleged to be actionable   *F*
under English law as well as by its proper law. The practical effect of the
rule was not to displace the law governing the tort, but to make it pointless
ever to rely on that law because the elements of the tort in English law had to
be satisfied anyway. The double-actionability rule had its origin in *Phillips v
Eyre* (1870) LR 6 QB 1 and was no doubt based on the tacit instinct of
English judges that they should not be required to enforce values underlying
the law of tort in foreign countries, which might not be acceptable in   *G*
England. The Private International Law (Miscellaneous Provisions) Act
1995 abolished the double-actionability rule and introduced rules requiring
English courts to apply to claims in tort the law which had the most
significant connection with the wrong, subject to an altogether more limited
saving for the public policy of the forum applicable only in those cases
where a specific foreign law was found to be repugnant to the policy of the
forum.   *H*

33   Secondly, the whole purpose of section 1 of the Fatal Accidents Act
1976 was to correct an anomaly in the English law of tort. There is nothing
in the mischief of this legislation which requires it to be applied to fatal
accidents which, being governed by foreign laws, are unlikely to exhibit the

© 2014 The Incorporated Council of Law Reporting for England and Wales

A   same anomaly. If there is no reason of policy to apply section 1 to foreign
torts, there can be no better reason to apply sections 1A, 3 and 4, which
depend on section 1.

34   Thirdly, there is no reason whatsoever why Parliament should have
intended the Fatal Accidents Act 1976 to apply to foreign fatal accidents
with no connection to England or English law. Neither the terms nor the

B   purpose of the Act depend for their effect on its having extraterritorial effect.
The only other basis for imputing to Parliament an intention to apply the Act
internationally, irrespective of ordinary rules of private international law, is
that the Act, and in particular its damages rules, represents a "mandatory
rule". This is the expression commonly employed to describe what the Law
Commissions of England and Scotland have called:

C       "rules of . . . domestic law . . . regarded as so important that as a matter
of construction or policy that they must apply in any action before a court
of the forum, even where the issues are in principle governed by a foreign
law selected by a foreign choice of law rule": Law Commission and
Scottish Law Commission Working Paper No 87 (1984), paragraph 4.5.

Section 14(3)(a)(i)(4) of the Private International Law (Miscellaneous
D   Provisions) Act 1995 have the effect of saving such rules. Some foreign laws
governing the availability of damages for fatal accidents may no doubt be so
offensive to English legal policy that effect would not be given to them in an
English court. A rule of foreign law that women or ethnic minorities should
have half the damages awardable to white males similarly placed was cited
as an example. But the German rules with which this case is concerned are

E   based on a perfectly orthodox principle which is by no means unjust and is
accepted in principle by English common law in every other context than
statutory liability for fatal accidents.

*Mandatory rules*

35   It must follow from my reasons for rejecting the implied

F   extraterritorial application of the Fatal Accidents Act 1976 that Mr Layton's
second submission, based on the mandatory character of the rules contained
in the Act, also fails.

*Conclusion*

36   Since my reasons differ in some respects from those of both courts

G   below, the declarations may require some redrafting. I would leave the exact
wording to be agreed by counsel. Subject to that, I would dismiss Mrs Cox's
appeal.

**LORD MANCE JSC**

37   Mrs Cox claims in respect of the accident in Germany on 21 May
2004 which caused the death of her husband. The substantive law

H   governing the relevant tort is German. But, like the claimant in *Harding v
Wealands* [2007] 2 AC 1, Mrs Cox submits that English law—more
specifically the provisions of the Fatal Accidents Act 1976 ("the FAA")—
should apply in relation to the issues of damages which arise. In the
alternative, she relies on section 844 of the German Civil Code ("the BGB").

© 2014 The Incorporated Council of Law Reporting for England and Wales

1398
Cox v Ergo Versicherung AG (SC(E))                                    [2014] AC
Lord Mance JSC

*The relevant substantive law*                                                      A

38   I agree with Lord Sumption JSC that the principles by which
damages are recoverable by Mrs Cox are those established by section 844 of
the BGB. The decision of the Court of Appeal [2012] EWCA Civ 854 should
be upheld, albeit by different reasoning to that which it adopted and with
corresponding variation of the declarations made, as Lord Sumption JSC
indicates in para 36.                                                               B

39   I agree in particular with Lord Sumption JSC's conclusion in
paras 17 and 22 that the German rule under section 844 of the BGB
requiring credit to be given only for maintenance received as a matter of
legal right from a subsequent partner is a rule of substantive, rather than
procedural, law.

40   The distinction between substance and procedure originated in the
common law and was preserved by the Private International Law                       C
(Miscellaneous Provisions) Act 1995, which applies in this case. (The
distinction has, for torts committed since 11 January 2009, been, happily,
superseded by Regulation No 864/2007 ("Rome II"), article 15(c).) The
distinction was discussed, as Lord Sumption JSC notes, in *Boys v Chaplin*
[1971] AC 356 and *Harding v Wealands* [2007] 2 AC 1. It was, as Lord
Rodger of Earlsferry noted in *Harding v Wealands*, para 65, a distinction       D
drawn for private international law purposes, and it had in that context a
somewhat special meaning. The distinction applies in the present case when
examining both the nature of the German rules under section 844 of the BGB
and the nature of sections 3 and 4 of the FAA.

41   For the purposes of the distinction, substance includes the
identification of heads of recoverable loss, such as pain and suffering (see
*Boys v Chaplin* itself) and loss of consortium (solatium): see *M'Elroy v*         E
*M'Allister* 1949 SC 110, cited in *Boys v Chaplin*, at p 82B–E, per Lord Guest,
and see p 389E, per Lord Wilberforce. It further includes, as Lord Hoffmann
stated in *Harding v Wealands*, para 24, the rules governing causation and
remoteness and, as Lord Rodger of Earlsferry accepted at para 74,
traditionally also mitigation. The rules governing these matters are, as Lord
Hoffmann indicated in para 24, rules which determine the scope of a
defendant's liability, or "for what" he is liable. When Lord Hoffmann             F
referred in this connection to what he "previously had occasion to say", he
was clearly referring to *Banque Bruxelles Lambert SA v Eagle Star Insurance
Co Ltd* [1997] AC 191, where the House of Lords limited the scope of a
surveyor's liability for a negligent over-valuation to such loss as flowed from
the over-valuation—excluding, in effect, the further consequences of
subsequent market fall as well as any increased risk of default.                   G

42   A similar description of the substantive principles on which damages
fall to be awarded is found in *Kuwait Airways Corpn v Iraqi Airways Co
(Nos 4 and 5)* [2002] 2 AC 883. Lord Nicholls of Birkenhead there stated
that the value judgment, concerning "the extent of the loss for which the
defendant ought fairly or reasonably or justly to be held liable", involves the
law setting "a limit to the causally connected losses for which a defendant is
to be held responsible" under heads such as remoteness and mitigation             H
(para 70), and involves asking "In respect of what risks or damages does the
law seek to afford protection by means of the particular tort" (para 71).

43   I agree with Lord Sumption JSC's comments in para 15 on the
reasoning and decision in *Harding v Wealands* [2007] 2 AC 1. The House of

© 2014 The Incorporated Council of Law Reporting for England and Wales

A  Lords there refused in English proceedings to apply Chapter V of the Motor
Accidents Compensation Act ("the MACA"), which would have regulated
the damages recoverable had the matter been litigated in Australia. The
application of the difficult distinction between substantive and procedural
issues may on the facts of that case appear in some respects questionable.
What is presently interesting is the acceptance by members of the House of
B  Lords that the relevant chapter, Chapter V, contained provisions that
"traditionally fall on the substantive side of the line for purposes of private
international law": per Lord Rodger, at para 74, and see per Lord Woolf, at
para 11. Yet both held, at paras 12 and 77, with Lord Bingham of Cornhill
and Lord Carswell agreeing, at paras 1 and 79, that Chapter V was a code
the whole of which was to be characterised as procedural.

C  44   Lord Hoffmann, with whose speech Lord Bingham and Lord
Carswell also agreed, identified in para 17 the relevant parts of chapter 5.
These included a requirement that credit be given for payments made to the
claimant by an insurer—on its face a mitigating receipt. The most
convincing explanations of the House of Lords' decision that all aspects of
the MACA were procedural seem to me in these circumstances either the
package argument accepted by Lord Woolf (para 11) and perhaps also the
argument that the MACA was a remedy intended only for use in Australian
D  courts argument: see per Lord Rodger, para 75. Neither explanation affects
the relevance or applicability of article 844 BGB as part of the relevant
substantive law on the facts of this case.

*The Fatal Accidents Act 1976*

E  45   Lord Sumption JSC describes the development of English law in this
area in paras 6–10 and the differences between an award under the FAA and
under section 844 of the BGB in para 11. The FAA creates a new cause of
action in favour of dependants (and in favour of a spouse in respect of
bereavement): *Seward v Owner of the Vera Cruz* (1884) 10 App Cas 59, 67,
per Lord Selborne LC; *Davidsson v Hill* [1901] 2 KB 606, 614. Any claim
for pain, suffering or other loss suffered by the deceased before death is
F  distinct from these new claims for loss or dependency and bereavement.
This is so even though these new claims only arise where the deceased
would, if death had not ensued, have had a claim for damages for any loss he
or she incurred. That is a mere precondition to the new causes of action.

46   The Court of Appeal [2012] EWCA Civ 854, as Lord Sumption JSC
notes, at para 18, considered by a majority (Dame Janet Smith dissenting)
that a dependency claim under the FAA should be categorised as involving a
G  different sort of action from a dependency claim under section 844, and that
the FAA was irrelevant on this ground alone. That may be open to question.
Classification in private international law "should not be constrained by
particular notions or distinctions of the domestic law of the lex fori, or that
of the competing system of law, which may have no counterpart in the
other's system": *Macmillan Inc v Bishopsgate Investment Trust plc (No 3)*
[1996] 1 WLR 387, 407C, per Auld LJ, and it should, as I said in *Raiffeisen*
H  *Zentralbank Österreich AG v Five Star Trading LLC* [2001] QB 825,
paras 26–27, be "undertaken in a broad internationalist spirit". The Court
of Appeal was however also of the unanimous view that the provisions of
sections 3 and 4 of the FAA should under English private international law
be viewed as procedural rather than substantive.

© 2014 The Incorporated Council of Law Reporting for England and Wales

47   In my opinion, however, it can make no difference to the outcome of     *A*
this appeal whether or not the dependency claims under the FAA and
German law are categorised as broadly similar or whether the provisions of
sections 3 and 4 of the FAA are treated as substantive or procedural.

48   Assuming that the dependency claims are categorised as broadly
similar, the provisions of sections 3 and 4 of the FAA are, if substantive,
irrelevant to a tort subject to German substantive law. If on the other hand,
the provisions of sections 3 and 4 were to be treated as procedural, their     *B*
application could have no effect on the outcome. This is not because I think
that their impact must necessarily be confined to claims under the FAA, simply
because that is their domestic context—private international law may require
the application of procedures developed in a purely domestic context to
claims governed by foreign law. Rather it is because I do not, in this context,
see any basis on which an English procedural provision could expand on a     *C*
defendant's liability under the substantive principles of the relevant governing
law. So here an English procedural rule precluding account from being taken
of remarriage or the prospects of remarriage could not override the
substantive rule under section 844 BGB by which credit is required to be given
for maintenance received by way of legal right from a subsequent partner.

49   The problems arising from potential conflicts of this sort between a     *D*
foreign substantive lex causae and a domestic lex fori are discussed in the
context of limitation in *Dicey, Morris & Collins's The Conflict of Laws*, 15th
ed (2012), para 7-056. As proposition (ii) in that paragraph states, with
reference to dicta in, inter alia, *Harris v Quine* (1869) LR 4 QB 653, 658:

"once a substantive period of limitation of the lex causae had expired,
no action could be maintained even though a procedural period of
limitation imposed by the lex fori had not yet expired: in such a case there     *E*
was simply no right left to be enforced."

Such problems can of course be expected to, and do, arise only very
infrequently.

50   I add only that I leave open, for consideration if the need ever arises,
the correctness of the dicta regarding the nature of sections 3 and 4 of the
FAA to be found in *Coupland v Arabian Gulf Oil Co* [1983] 1 WLR 1136,     *F*
1149 and in *Roerig v Valiant Trawlers Ltd* [2002] 1 WLR 2304,
paras 13–27. In the *Coupland* case the point was not argued at all, though
Hodgson J asserted that it was correct to treat a Libyan law rule that social
security benefits were not deductible from an award of general damages
as a rule of quantification. The fuller reasoning in the *Roerig* case was
unnecessary for the decision, both because Dutch law did not apply
(para 12) and, as Waller LJ correctly recognised at paras 28–29, because the     *G*
claim was brought under the FAA and one cannot bring a claim under a
statute without accepting its terms.

*Overriding effect of English law and mandatory law*

51   I agree with Lord Sumption JSC's reasoning and conclusions on
these aspects in paras 24–35 of his judgment, and have nothing to add to     *H*
what he there says.

*Appeal dismissed with costs.*

SHIRANIKHA HERBERT, Barrister

© 2014 The Incorporated Council of Law Reporting for England and Wales

TAB 8

*Culross Global SPC Ltd v Strategic Turnaround Master Partnership Ltd*
[2010] UKPC 33



[2010] UKPC 33
Privy Council Appeal No 0045 of 2009

# JUDGMENT

# Culross Global SPC Limited *v* Strategic Turnaround Master Partnership Limited

## From the Court of Appeal of the Cayman Islands

**before**

**Lady Hale**
**Lord Brown**
**Lord Mance**
**Sir John Dyson SCJ**
**Sir David Keene**

## JUDGMENT DELIVERED BY
**Lord Mance**
**ON**

## 13 December 2010

**Heard on 3 November 2010**

*Appellant*
Michael Todd QC
Ross McDonough
(Instructed by Alan Taylor
and Co)

*Respondent*
Anthony Akiwumi

(Instructed by Janes
Solicitors)

**LORD MANCE**

*Introduction*

1.      This appeal arises from the Respondent's application to strike out as an abuse of the process a petition to wind up the Respondent, Strategic Turnaround Master Partnership Ltd., issued by the Appellant, Culross Global SPC Ltd., on 10 June 2008. Whether the petition was an abuse of the process depends upon whether, at the date of its issue, the Appellant was a current creditor, with standing to issue it, or at best only a prospective creditor, in which case it would have no such standing. The courts below did not accede to the Respondent's application but the Court of Appeal (in disagreement with the Grand Court) limited the basis upon which the petition could proceed in a way with which the Appellant takes issue. Hence, this appeal.

2.      The Respondent is incorporated under the Companies Law and regulated as a mutual fund under the Mutual Funds Law. As such, it was only permitted to offer its facilities to those investing at least US$50,000, and for this purpose, it issued a Confidential Explanatory Memorandum ("CEM") dated May 2006. The monies which it received from investments were in turn largely invested in Strategic Turnaround Equity Partners, L.P. (Cayman) ("the Master Fund"). A Delaware company, Strategic Turnaround Equity Partners, L.P. (Delaware) ("the Onshore feeder") also invested in the Master Fund. The Master Fund itself invested primarily in the US micro-cap turnaround sector.

3.      The Appellant subscribed for shares in the Respondent between November 2006 and May 2007 for a total price of US$1.84 million. On 31 October 2007, it gave notice to redeem all these shares. A redemption date of 31 March 2008 was subsequently agreed (with the Respondent waiving any early redemption fees). On 11 April 2008 the Respondent's administrator, Citi Hedge Fund Services (Cayman) Ltd. ("Citi") confirmed to the Appellant's custodian's nominee, Banco Nominees (Isle of Man) Ltd. ("Banco") that "full redemptions are approved for March 31 2008" and that "90% of the redemption proceeds will be paid within 30 days", with "balance to follow upon completion of the annual audit".

4.      On 17 April 2008 the Respondent's board resolved to suspend all redemptions, having regard to the "extremely volatile and illiquid" state of the US micro-cap turnaround sector; and on 22 April 2008 the board further and more formally resolved that:

"1. It is in the best interests of the Company and all shareholders in the Company that, in accordance with the Articles the calculation of the Net Asset Value of Shares be suspended ("the Suspension");

2. No Shares in the Company be redeemed nor new shares issued until such time as the Directors have lifted the Suspension;

3. All notices of redemption received by the Company be suspended until such time as the Directors have lifted the Suspension, although the Directors note that the relevant redeeming shareholders may revoke his [sic] notice of redemption during the period of Suspension."

5.      Recital 4 to this resolution noted that "the articles of association …. permit the Directors, from time to time and for any reason, to declare a suspension of the determination of the Net Asset Value of Shares and the issue and redemption of shares….". This was a reference to articles 55-56, to be read with article 32, to which the concluding part of resolution 3 above was referring.  Recitals 6 and 7 noted that the Directors believed that the Master Fund's portfolio values were temporarily depressed and at a level at which liquidating positions "will negatively impact all investor's interests in the Company", and that "this situation has evolved since several of the Company's shareholders representing approximately 27.5% of the Company's shareholders, as well as several of the limited partners in the Onshore Feeder, concerned by current U.S. market conditions, have given notice to redeem".

6.      On 30 April 2008 the Net Asset Value ("NAV") of the Respondent as at 31 March 2008 was determined, and on 14 May 2008 Citi, as the Respondent's administrator, notified the Appellant that the NAV applicable to its shares as at 31 March 2008 was US$980,508.97.  The Respondent's failure to pay any part of this sum led to the Appellant's issue on 10 June 2008 of its petition to wind up the Respondent.

7.      By its judgment delivered on 12 December 2008, the Court of Appeal held that, on the true construction of the Respondent's articles and the CEM dated May 2006, "the Company had power to suspend the payment of redemption proceeds after the Redemption Date but before payment of those proceeds". It followed that, if the power was properly and validly exercised, the Appellant was, at the date of issue of the petition, at best only a prospective creditor. The principal issue on this appeal relates to the correctness of these conclusions. However, the Court of Appeal refused to strike out the petition pending determination of an issue as to whether the power had been properly or validly exercised, permitting its

amendment to seek to wind the Respondent up on the ground that winding up was just and equitable.

*The legal and contractual framework*

8.     It is a basic principle of company law that capital subscribed to a company may not be returned to shareholders otherwise than as prescribed by statute. Section 37(1) of the Companies Law permits the issue by a company of shares liable to be redeemed at the option of the company or shareholder, and section 37(3)(c) goes on to provide that "Redemption of shares may be effected in such manner as may be authorised by or pursuant to the company's articles of association". It is uncontroversial that this means that the manner in which any redemption may be effected must be authorised by or pursuant to the articles of association. As Gower and Davies observe in *Principles of Modern Company Law* (7th ed) (2003) pages 248 and 250, in relation to similar, albeit not identical, provisions in the English Companies Act 1985, s.160(3), "In order to protect the shareholders whose shares are not to be redeemed, the terms and manner of the redemption must be set out in the company's articles".

9.     Article 1 contains definitions, including:

> "**Net Asset Value**" means the amount determined pursuant to these Articles as being the net asset value of the Company;" ….

> "**Period of Suspension**" means any period of suspension or limitation of, if any, the issue or redemption of Shares, the determination of Net Asset Value, the determination of Net Asset Value per Share, the determination of the value of a Class Account as determined in accordance with these Articles;" ….

> "**Redemption Date**" means generally the last Business Day of each calendar quarter or such other day as may be determined from time to time by the Board of directors in its discretion;" ….

> "**Redemption Price**" means the price at which Shares shall be redeemed as calculated in accordance with these Articles;" ….

> "**Valuation Date**" means the Business Day or Business Days determined from time to time by the Directors to be the day or

Page 3

days on which the Net Asset Value per Ordinary Share is calculated;"….

10.    Subsequent articles provided as follows:

## "ISSUE OF SHARES

17. Subject to these Articles, Shares shall be issued on the terms referred to in the [CEM], unless otherwise determined by the Directors.

18. Subject to these Articles, and upon receipt of an application …. the Directors may allot, issue, grant options over and otherwise dispose of any of the Shares on any Subscription Day

….

20. Any issue of Shares made after the initial offer period shall be generally as of the Subscription Day at a price equal to the Net Asset Value per Share of the Class referable to such Share as determined on the Valuation Date and in accordance with the [CEM] and these Articles.

….

## REDEMPTION OF SHARES

31. Subject to any provisions relating to the Shares set out in these Articles, or in any resolution constituting Shares, a Member may redeem all or any of such Member's Shares by serving a Redemption Notice on the Company, to be received by the Company at least 60 Business Days prior to the Redemption Date provided such capital has been invested in the Company for at least 2 years which shall be required to be received on a Redemption Day with respect to such Shares (or such number of Business Days prior to such Redemption Day as may be determined by the Directors), however, if a Member elects to redeem all or any of such Member's Shares within the 2 year period, specified herein, the Directors may in their absolute discretion charge an early redemption fee of 5% for any redemptions

made within the first year and 3% for any redemptions made within the second year. Any Member redeeming Shares shall submit to the Directors the share certificate (if any) issued in respect of those Shares. The Company shall redeem such Shares at the Redemption Price being an amount equal to:

1.   the Net Asset Value per Share calculated on that Redemption Day (or if the Redemption Day does not coincide with a Valuation Day then on the immediately preceding Valuation Day); less

2.   the Redemption Fee calculated on the Redemption Day (or if the Redemption Day does not coincide with a Valuation Day then on the immediately preceding Valuation Day).

32. A Member may not revoke a Redemption Notice once submitted to the Directors unless the Directors shall have declared a Suspension. If a Suspension has been declared by the Directors the right of the Member to have his Shares redeemed shall be suspended and during the period of Suspension he may withdraw his Redemption Notice. Any withdrawal of the Redemption Notice shall be made in writing and shall only be effective if actually received by the Directors before the termination of the period of Suspension. If the Redemption Notice is not withdrawn the redemption of the Shares shall be made at the Redemption Price calculated at the Valuation Point on the Valuation Day next following the end of the Suspension.

33. Notwithstanding any other provisions of these Articles, the Directors may temporarily suspend redemptions in order to effect orderly liquidation of the Company's assets in relation to Shares or if the Directors determine that the disposal of the Company's assets or the calculation of the Net Asset Value in relation to the Shares is not practicable or reasonable and that it would prejudice the interests of the Members.

34. If the Directors receive Redemption Notices in respect of Shares on any Redemption Date which in aggregate exceed such percentage of the Net Asset Value on such Redemption Date as the Directors may determine, the Directors may refuse to redeem all such Shares which are subject to the Redemption Notices, but in such circumstances the Directors may scale down the amounts to be redeemed pro rata in response to such extent as they consider may be necessary and may further determine that any Redemption Notices which have been postponed from any prior Redemption Day shall have priority on any subsequent Redemption Day.

....

37. Notwithstanding any other provisions of these Articles, the Company may, in the absolute discretion of the Directors, refuse to make a redemption payment to a Member if the Directors suspect or are advised that the payment of any redemption proceeds to such Member may result in a breach or violation of any anti-money laundering law by any person in any relevant jurisdiction, or such refusal is necessary to ensure the compliance by the Company, its Directors or the Administrator with any anti-money laundering law in any relevant jurisdiction.

38. Any amount payable to a Member for the redemption of Shares shall be paid in Dollars. The Company shall remit redemption proceeds (net of the costs of remittance) by cheque or wire transfer within such period as the Directors shall determine. In the absence of directions as to payment the Company shall remit redemption proceeds by cheque to the address for the Member appearing on the Register of Members. The Company shall not be liable for any loss resulting from this procedure.

39. On a redemption of a Share the Directors shall have power to divide in specie the whole or any part of the assets of the Company and appropriate such assets in satisfaction or part satisfaction of the Redemption Price and any other sums payable on redemption as provided in these Articles.

40. Once a Share is redeemed the Member shall cease to be entitled to any rights in respect of it (except the right to receive a Dividend which has been declared prior to such redemption). The Member's name shall be removed from the Register of Members in respect of that Share and that Share shall be available for re-issue, and until re-issue shall form part of the authorised and unissued capital of the Company.

....

## COMPULSORY REDEMPTION

42. The Board of Directors may compulsorily redeem all or any portion of the Shares of any Member at any time upon 48 hours prior written notice for any reason or no reason.

43. The Redemption Price for any compulsory redemption of Shares shall be the Net Asset Value per Share of the relevant Class (net of

any Management Fees or other charges and reserves for contingencies) as at the close of business on such Redemption Date.

44. The procedure and timing for payment of redemption proceeds upon a compulsory redemption shall follow the procedure and timing set out in the Articles in relation to a redemption at the option of the Member.

45. A Member will have no Member rights with respect to the Shares to be compulsorily redeemed after the close of business on the Redemption Day, except the right to receive the redemption proceeds therefore and all costs incurred in a compulsory redemption of Shares shall be for the account of the Member thereof and may be withheld from the proceeds of the redemption.

## DETERMINATION OF NET ASSET VALUE

47. The Net Asset Value and the Net Asset Value per Share shall be determined by the Directors as at the Valuation Date (or such other times as the directors may determine).

48. The Net Asset Value of Shares shall be determined by dividing the Net Asset Value by the number of Shares then in issue.

49. In calculating the Net Asset Value the Directors shall apply such generally accepted accounting principles as they may determine.

….

52. The price to be paid for Shares which have been applied for shall be deemed to be an asset of the Company and any costs in connection with that issue shall be deemed to be liabilities of the Company at the beginning of the Business Day following the Subscription Day upon which the application was made.

53. The price to be paid for Shares which are to be redeemed shall be deemed to be a liability of the Company from the close of business on the Redemption Day until the price is paid.

….

## SUSPENSION

55. The Directors may, from time to time, in their absolute discretion and for any reason declare a Suspension of the determination of the

Net Asset Value of Shares and the issue and redemption of the Shares.

56. A Suspension shall take effect at such times as the Directors shall specify but not later than the close of business on the Business Day next following the declaration and thereafter there shall be no determination of the Net Asset Value of Shares until the Directors shall declare the Suspension at an end.   The Suspension shall terminate in any event on the day following the first Business Day on which the condition giving rise to the Suspension shall have ceased to exist, provided that the Directors shall not have declared a Suspension on other grounds.   ….   The Directors shall promptly notify the Members of any such Suspension and shall promptly notify them upon termination of such Suspension."

11.    The Appellant subscribed through Banco for its initial shareholding of US$500,000 by Subscription Agreement dated either 31 October or 1 November 2006 (the apparent date is 31 October, but in later documents the date is referred to as 1 November). This read:

"The undersigned (the 'subscriber') hereby acknowledges receipt of the [CEM] dated May 2006 ('Memorandum') as amended from time to time …..

3. The Subscriber agrees that this subscription is being made and any Shares of the Company hereby subscribed will be held, subject to the terms and conditions of the Memorandum, the Memorandum and Articles of Association of the Company, as amended from time to time, and this Subscription Agreement …."

The appeal has proceeded on the footing that all subsequent subscriptions by the Appellant were made on the same basis or on the basis of additional subscription agreements in like same terms.

12.    The CEM includes various statements regarding its nature and intended status. At its front were three pages, which, after identifying the number of shares on offer, their par value, the minimum initial subscription and the price payable per share, included this warning, in capitals:

> "Prospective investors are not to construe the contents of this memorandum as legal, investment or tax advice. Each investor should consult his personal counsel, accountants and other advisers as to the legal, tax, economic and related aspects of the investment described herein and its suitability for such investor."

In the main body of the CEM, under the head "The Fund", investors were told:

> "This Memorandum sets forth the investment objective and method of operation of the Fund, the principal terms of its Investment Management Agreement, its Articles of Association and certain other pertinent information. However, the Memorandum does not set forth all the provisions and distinction of those documents that may be significant to a particular prospective shareholder. Each prospective Shareholder should examine this Memorandum and the Subscription Agreement and Revocable Proxy accompanying this Memorandum, and any other document available to the Fund or relating to the Fund in order to assure itself that the Fund's investment program is satisfactory to it."

Under the head "Description of The Fund's Ordinary Shares" appeared the statement:

> "All Shareholders are entitled to the benefit of, are bound by and are deemed to have notice of the provisions of the Memorandum and Articles of Association of the Fund."

Finally, under the head "General Comments", investors were told:

> "The foregoing summary does not purport to be and should not be construed as a complete description of the Memorandum and Articles of Association of the Fund, the Management Agreement or the Administration Agreement, copies of which will be made furnished on request made to the Fund at its principal office."

13.    The main body of the CEM opens with a summary of general information about the Fund, the investment manager, investment objective and approach and portfolio strategy and under the head "Redemptions" the following outline:

"Shareholders will have the right to require all or, subject to the minimum holding requirements, a portion of their Shares to be redeemed on the last Business Day of each calendar quarter at the Redemption Price than prevailing, pursuant to written notice which must actually be received by the Fund at least 60 Business Days prior to the redemption date; provided that such capital has been invested in the Fund for at least 25 months."

14.    After the summary, the main body of the CEM contained sections dealing with all aspects of the Fund, including its aims, management, shares, risks and taxation. Under the head "The Fund", it stated:

"OFFERING OF ORDINARY SHARES

**Offering of Shares**

The Fund is conducting an offering of its Ordinary Shares to a limited number of investors who meet the requirements set forth in the 'Subscription Agreement and Revocable Proxy' accompanying this Memorandum.  The minimum initial subscription for each investor is US$500,000.  The Board of Directors, in its sole discretion, may accept subscriptions of a lesser amount or establish different minimums in the future; <u>provided</u> that no initial subscription for less than US$50,000 will be accepted.  The Board of Directors, may reject a subscription for any reason or no reason. ….

**Offering Price**

Ordinary Shares of each new class or series will be offered at a price of US$1,000 per share. Thereafter, Ordinary Shares will be offered at the prevailing net asset value …. per share of the class or series ….

REDEMPTIONS

**General**

Any holder of Ordinary Shares has the right, in accordance with and subject to the applicable provisions of the Articles of Association of the Fund and the laws of the Cayman Islands, to have all or a portion of his Ordinary Shares redeemed as of the last Business Day of each calendar quarter <u>provided</u> that the redemption request is received by the Fund in proper written form actually received by the Fund at

least 60 Business Days prior to the Redemption Date; provided that the Shares to be redeemed have been held by the Shareholder for at least 25 months. Subject to the following sentence, any notice provided by a Shareholder to the Fund in connection with a redemption of Shares will be deemed irrevocable. The Board of Directors may, in its sole discretion, elect to waive any notice period or allow a notice to be revoked.

Notwithstanding anything to the contrary herein, if as of the end of any calendar quarter, redemption requests are received representing, in the aggregate, more than 25% of the Fund's Net Asset Value, the amount permitted to be redeemed by each Shareholder will be prorated on the basis of the number of Ordinary Shares held by each Shareholder requesting a redemption on such date that no more than 25% of the Fund's Net Asset Value will be paid out.

….

***Payments Upon Redemption.*** Payment of the Redemption Price will be made as soon as practicable but, except in cases otherwise described herein, a Shareholder who is making a redemption will receive at least 90% of the Redemption price no later than 30 days following the date of redemption. Promptly after the Fund has determined the Net Asset Value of the Ordinary Shares as of the date of redemption which will be  after the Fund's independent public accountants have completed their examination of the fund's annual financial statements, the Fund will pay to such Shareholder the balance, if any, of the amount to which such Shareholder is entitled, or such Shareholder will be obligated to repay the Fund the excess, if any, of the amount previously paid over the amount to which such Shareholder is entitled, in each case together with interest thereon at an annual rate equal to the broker's call rate charged by the Fund's prime broker for the period from the effective date of redemption through the date of payment. Redemption payments will be made in cash (in US dollars) or, in the discretion of the Fund, in securities or partly in cash and partly in securities, as further described below.

….

***Suspension of Redemptions.*** The Board of Directors may declare a suspension of the determination of the Net Asset Value or subscription or redemption of the shares or the payment of redemption proceeds for the whole or any part of any period when:

    (i)    any market or exchange on which a substantial part of securities owned by the Fund are traded is closed,

otherwise than for ordinary holidays, or dealings thereon are restricted or suspended; or

(ii)    there exists any state of affairs which constitutes a state of emergency or period of extreme volatility or illiquidity as a result of which (a) disposal of a substantial part of the investments of the Fund would not be reasonably practicable and might seriously prejudice the Shareholders or the Fund or (b) it is not reasonably practicable for the Fund to determine fairly the value of its net assets.

The Fund may compulsorily redeem a Shareholder's Shares for any reason or no reason upon prior written notice.  In the event of a compulsory redemption, the Redemption Price will be the NAV per Share of the respective class or series as of the close of business on the relevant Redemption Date.  The Shareholder will have no Shareholder rights with respect to the Shares to be redeemed after the close of business on the Redemption Date, except the right to receive the redemption proceeds therefor."

*Analysis*

15.    The Board turns in the light of these provisions to the issue whether "the Company had power to suspend the payment of redemption proceeds after the Redemption Date but before payment of those proceeds" (para 7 above). The Court of Appeal drew upon Victorian authority for a conclusion that "a redeeming shareholder remains a member of the company until he has received payment and his name has been removed from the register of members" (paras 49, 53-54 and 56). It held that the process of redemption continued until this point (para 52) and that "under the Articles as explained in the CEM" the Respondent had power "to suspend both (a) the effective redemption on 31 March 2008 and (b) the payment of the redemption proceeds due to the [Appellant]" (para 61).

16.    The issue depends, in the Board's view, upon the construction of the Appellant's articles, read with such other documents as may be incorporated or referred to therein. The existence and extent of any power to suspend the payment of redemption proceeds after the Redemption Date is a subject upon which the members were at liberty to make "any contract inter se which they pleased", as the Earl of Selborne LC said in *Walton v Edge* (1884) 10 App Cas 33, 35 with regard to an issue regarding the effect of a provision allowing a member of a building society "to withdraw (provided the funds permit) … by giving" either seven days' or one month's notice according to the amount. The discussion of the concept of redemption in the Australian case of *In re HIH Insurance Ltd. (in Liquidation)*

[2008] FAC 623, to which the Respondent referred the Board, took place in a very different context to the present, and cannot obviate the need for a detailed examination of the Appellant's articles and documentation to answer the present issue. The issue is not to be approached on the basis of any a priori view that, until payment of the redemption proceeds, a shareholder must or should necessarily remain a member of a company which is (as the Respondent was) due to make such payment upon or after a certain redemption date; and the fact that a person's name continues to remain on a company's register as member does not mean that it should have done so under the provisions of the Articles: see e.g. *Reese River Silver Mining Company Ltd v Smith* (1869) 4 HL 64, 80; *Michaels v Harley House (Maylebone) Ltd* [1997] 2 BCLC 166, 174.

17.    Any power to withhold payment of the redemption proceeds must be authorised by or pursuant to the articles of association. The Board understood this to have been ultimately common ground before it. In any event, it follows from the terms of section 37 of the Companies Law, and it remains so, therefore, despite the Subscription Agreement's general reference to the subscription being made and any Shares of the Company subscribed being held subject to the terms and conditions of the CEM. To the extent that articles 17 and 20 refer to the CEM, the terms of the CEM are expressly relevant under the articles, but it is in issue between the parties whether these references extend to redemption.

18.    The Board starts with the articles which deal expressly with redemption, determination of the NAV and suspension; that is articles 31 through to 56. Article 31 provides when a member may serve a Redemption Notice; and it defines the Redemption Date and Reference Price by reference to which a Redemption Notice will take effect and the NAV per share will be calculated. Article 38 provides for the Company to "remit redemption proceeds … within such period as the Directors shall determine". Article 37 enables a Company "in the absolute discretion of the Directors, [to] refuse to make a redemption payment to a Member" in limited situations, such as suspected breach or violation of any money-laundering law.

19.    The clarity and formality of the provisions regarding the giving of a Redemption Notice and the ascertainment of the Redemption Date and Price contrast with the open provision regarding payment of the redemption proceeds in article 38. However, article 38 cannot permit the Respondent's directors to delay payment beyond a reasonable time, and this is highlighted by article 37, which is the only provision in terms expressly authorising the withholding of payment of a redemption payment which has become due. Article 39 enables the Respondent to satisfy all or any part of "the Redemption Price and any other sums payable on redemption" in specie. Article 53 provides that "The price to be paid for shares which are to be redeemed shall be deemed to be a liability of the Company from the close of business on the Redemption Day until the price is paid".

20.     The focus of these provisions is on the Redemption Date by reference to which the Redemption Price payable is crystallised and from which the Price is deemed to be a liability of the Respondent; the remittance of the "redemption proceeds" is treated as a matter of supplementary procedure, although it may be refused on in particular money-laundering grounds. Both stages may be said to be part of a continuing process, but it does not follow that "redemption" within the meaning of articles 55 and 32 only occurs at the conclusion of that whole process. Nor, in the Board's view, can article 40 assist on the question what constitutes redemption under articles 55 and 32, as the Court of Appeal (in para 52 of its judgment) thought. Article 40 is largely neutral as to the date at which "a share is redeemed", at which the member ceases to be entitled to any rights, except a dividend "declared prior to such redemption", and at which the member's name falls to be removed from the register in respect of the share and the share is available for re-issue.

21.     So far as it is possible to gain any assistance from the provisions of article 40, the Board regards it as unlikely that it should have been intended that a redeeming member, the value of whose share fell to be ascertained at, say 31 March, could claim a subsequently declared dividend, merely because the Directors had not yet paid the redemption proceeds, or, presumably, any part of them. The Board is unimpressed by the linguistic contrast (relied upon by the Court of Appeal in its para 53) between article 40 and article 45, dealing with compulsory redemption. The Board does not consider that this demonstrates or suggests that article 40 must mean that, in cases of voluntary redemption, membership and the right to receive dividends declared survives until payment in full of the redemption proceeds, still less that redemption must be read in such a sense in other articles.

22.     Other articles may be relied upon as tending to favour one or the other party's interpretation. The language of article 39 seems marginally more consistent with the Appellant's case, phrased as it is to give power "on" redemption and in respect of sums payable "on" redemption, rather than "in" redemption. On the other hand, reliance is placed by the Respondent upon the provision in article 53 that the price to be paid for shares which "are to be" redeemed shall be "deemed" to be a liability from the Redemption Date until payment. The Board cannot however see real significance in this. Just as article 52 states the price "to be paid" for shares which have been applied for, so article 53 states the price for shares which are to be redeemed, which is quite capable of being understood as meaning under a Notice of Redemption or compulsory redemption notice. As to the use of the word "deemed", this reflects the position, which the Board understands to be common ground between the parties, that as from the Redemption Date (and subject to any right, if any, which there might be to alter the position by retrospective suspension), there was an existing right to receive a NAV yet to be calculated and therefore only payable in the future. In the present case, the NAV at

31 March 2008 was calculated on 30 April and communicated to the Appellant on 14 May 2008.

23.    This Board turns to articles 55-56 and 32, upon which the Respondent's directors were evidently relying in passing their resolutions of 17 and 22 April 2008. The "Suspension" contemplated by these articles is, in the Board's view, a single or composite declaration, preventing the (future) determination of any NAV and consequently precluding the (future) issue and redemption of any shares. This is also how the Suspension of 17 and 22 April 2008 was phrased.

24.    Article 32 contemplates the possibility that, at the date of declaration of a Suspension, there might be outstanding a Redemption Notice submitted by a member. In that event, the member is given the choice of withdrawing the outstanding notice or maintaining it, but in the latter case redemption will be made at a Redemption Price calculated at the next Valuation Date after the Suspension, rather than at the Valuation Date relevant under the Notice as given before the Suspension.

25.    These provisions, on their face, leave untouched the situation of a Suspension declared after a Redemption Notice has expired and the Redemption Date has passed. This too is consistent with what happened, since a NAV was fixed and was communicated to the Appellant for the Appellant's shares after the Suspension declared on 17 and 22 April 2008. The natural inference from article 32 is that it was not contemplated or intended that Suspension under articles 55-56 could or should affect the position once a Redemption Notice had expired and a Redemption Date had passed. Bearing in mind the evident importance attached in the articles, and likely to be attached by investors, to the Redemption Notice period and the Redemption Date, it would in the Board's view require clear words before the articles could or should be read as entitling the Respondent retrospectively to reverse or alter the effect of the passing of the Redemption Date pursuant to a valid Redemption Notice. There are no clear words to that effect in the present articles, which read naturally to the opposite effect.

26.    Likewise, although not relevant on the facts of this case, it would not, in the Board's view, be open to the Directors to declare "temporarily [to] suspend redemptions" under article 33, once the Redemption Date had expired. The power there temporarily to suspend arises only in order to effect orderly liquidation of assets or if the Directors determine that the disposal of assets or the calculation of NAV in relation to shares is not practicable or reasonable and that it would prejudice the interests of the Members, and its limitation to temporary suspension is underlined by the absence (in contrast with article 32) of any quid pro quo in the investor's favour in the form of a right to withdraw any notice of redemption already given. Again, this all makes sense in any situation where the Redemption

Date has not passed. The notice period gives the Respondent the opportunity to cover the forthcoming redemption or determine that circumstances are such that this or the calculation of NAV will not be practicable or reasonable and would prejudice other members' interests, and in that event to act under article 33.

27.    There is, in the Board's view, nothing surprising about such a conclusion; on the contrary. Article 31 gave the Respondent a measure of security against early redemption (though the Respondent in fact waived any 3% early redemption fees in respect of the Appellant's redemption on 31 March 2008), as well as a minimum of 60 days notice in respect of all redemptions. Investors on the other hand were entitled to the knowledge that, once they had given a Redemption Notice and the Redemption Date had passed, they would receive the NAV of their shares at the latter date.  The Respondent's submission that article 32 can apply to such a situation does not fit with the language used; and it would mean that a past Redemption Date could retrospectively be replaced by another, uncertain future date within whatever might happen to be the period which it took the Respondent to remit the redemption proceeds.

28.    In this regard, the Respondent's case has fluctuated. The CEM (under the heading Payments Upon Redemption), and the Respondent on 11 April 2008, held out a position according to which the Appellant would receive "at least 90% of the Redemption Price proceeds no later than 30 days following the date of redemption", while the balance would be paid promptly "after the Fund's independent public accountants had completed their examination of the Fund's annual financial statements". In an affidavit sworn 23 June 2008, Mr Herman, a director, argued that "The shares are redeemed after the 90% payment has been made". But there is no logic in this half-way house, or in the variant faintly suggested during oral submissions according to which redemption must take place not later than 30 days after the Redemption Date. Either redemption occurs for the purposes of articles 55-56 and 32 *on* the Redemption Date, or it must be postponed until payment *in full* of the redemption proceeds. On the latter analysis, a shareholder must remain correspondingly uncertain as to whether he will actually receive any proceeds and, if so by reference to what Redemption Date and NAV, so long as any sum remains outstanding under his original Redemption Notice; indeed, so long as that uncertainty lasted, he might (as the Respondent submitted orally) find himself having to repay part of the 90% advance or any other sum that he had up to that point received. Where the Redemption Date has been fixed, and a 90% sum has been paid on account of the NAV, there may always be a small risk that the final calculation of NAV may show a NAV less than the 90% payment made, and then no doubt there might have to be a repayment. But that risk is as nothing compared with the risk arising if the original Redemption Date could retrospectively be replaced by a new Redemption Date, months or years after the first.

29.     As far as commercial sense is concerned, the Respondent's analysis appears unattractive for investors in the Fund, and so for the Fund as an institution seeking investors. The Fund is on its face an investment vehicle to which investors can for a defined period commit funds, and which at the same time offers investors, for obvious commercial reasons, the relative security of a defined route by reference to which they may recover the value of their investments as at a defined date. Until the defined date, investors are subject to the risk of a full Suspension or a temporary suspension. The Respondent's analysis subjects them to different and much greater insecurity.

30.     The Court of Appeal, in reaching an opposite conclusion, relied largely, if not exclusively, upon the terms of the CEM, particularly those headed Payments Upon Redemption and Suspension of Redemptions set out in para 14 above. It treated these as expressly incorporated in the articles by article 17. In the Board's view, this is an incorrect analysis. The CEM served various distinct purposes. One was to identify the commercial terms upon which shares were available for issue. Another was to convey information about the Fund, the Investment Adviser, the investment objective, approach and strategy and reporting, risk factors, fees and expenses and tax.  A yet further aim was to describe the effect of the Respondent's memorandum and articles and certain other legal documents. But, as the CEM made repeatedly clear (see para 12 above), the last description was intended as no more that than. The CEM was not to constitute legal advice, and investors were to be both "entitled to the benefit of  [and] bound by and …. deemed to have notice of the provisions of the Memorandum and Articles of Association of the Fund".

31.     In these circumstances, there is every reason to read the reference in article 17 to shares being issued "Subject to these Articles" on "the terms referred to in the [CEM]" as referring only to those terms of the CEM which identify the terms of subscription - in particular as regards timing, numbers, par value and price - set out in the CEM, and not to the description in the CEM of the terms of the articles relating to matters such as redemption. This is consistent with the only references in the articles to the CEM appearing under the heading "Issue of Shares". There are no references to the CEM under the headings in the articles dealing with Redemptions, NAV and Suspension. It also follows from the statements in the CEM set out in para 12 above that, even if the articles were treated as referring more extensively to the CEM, the reference would be circular, since the CEM refers back to the articles, and makes clear that the legal relationship between the Respondent and its shareholders is defined by the articles, not the CEM. These points dispose of the Respondent's submission that the articles and CEM can in some way be read together, with the former supplementing the latter, where not flatly inconsistent.

32.     The Board adds that it is not concerned with a situation in which an investor is claiming the benefit of the effect of the description of the articles given in the

CEM. Despite the disclaimers in the CEM, it may be that an investor who had relied upon the description in the articles might have an arguable case for being entitled in one way or another to do so. In the present case, it is the Respondent itself that is seeking to draw advantage from what appears to the Board to be a discrepancy between its own description of the articles in the CEM and the reality; and in this situation the Board sees no basis for entitling the company to rely in its own favour upon its own mis-description of its own articles.

33.     Two of the provisions of the CEM call for further mention. The first, under the heading "Payments Upon Redemption", contains assurances regarding the timing of payment of any redemption proceeds which have no parallel in the articles. These may be regarded as the Directors' determination, for the time being, of the periods within which such proceeds are to be remitted, under article 38 (subject to the money-laundering provisions of article 37, which are not referred to in the CEM). The other, headed Suspension of Redemptions, covers an amalgam of articles 32-33, 42-43 and 45 and 55-56. It does so in terms which describe the power to suspend as in some respects more limited, but in one important respect as wider, than the power which the Board finds in the articles. The stated conditions (i) and (ii) are more limited. But the power to suspend in such conditions is stated baldly as extending to determination of the NAV *or* subscription *or* redemption *or* to the payment of the redemption proceeds for the whole or any part of any period when such conditions exist.

34.     The word "or" in each case represents an extension going beyond the articles. As the Board has already noted, the "Suspension" contemplated by articles 55-56 and 32 is a single or composite declaration, while that contemplated by article 33 relates to redemptions alone. More importantly, none of these articles extends, in the Board's view, to permit suspension of the payment of redemption proceeds after the Redemption Date has passed. Nor does article 38 permit any such suspension, and article 37, which does permit a refusal to pay redemption proceeds, does so in quite different circumstances to those indicated in conditions (i) and (ii).

35.     Quite how it came about that the CEM contained terms so very different to those in the articles, whose effect it purports to summarise, is a matter of conjecture. The description in the CEM may have been intended to describe the limited circumstances in which the Directors envisaged that it would ever be necessary to exercise the very general powers of suspension contained in the articles. But, in so far as the description embraced powers going beyond those in the articles, the description was and is, in the Board's view, of no legal effect as against investors such as the Appellant. The Board notes in parenthesis that the Respondent has never purported to exercise a power to suspend payment of the redemption proceeds, as distinct from a power to suspend redemptions under article 55. That might not have mattered, had the provision headed Suspension of

Payments in the CEM had contractual effect, bearing in mind that the Respondent has in fact withheld payment. But the Respondent's view that the only provisions which might be relevant to justify such withholding were those of articles 55-56 and 32 is nonetheless of interest.

36.    The Board returns to the Victorian cases upon which the Court of Appeal and the Respondent have relied (para 15 above). All of them related to building societies, where there is a strong mutual element, reflected in the power to change the rules from time to time featuring in some of such cases. The first case, chronologically, is *In re Planet Benefit Building and Investment Society* (1872) LR 14 Eq 441. During the period of one month's notice to withdraw given by a member, the society passed a new rule providing expressly that, upon the expiration of such a notice, the members should cease to be a member, but remain entitled to dividends and to be paid the balance of his investment when the funds of the society would admit it, in such instalments as the directors might determine. The case is of no relevance to the present, where the issue is whether the existing articles enable suspension of payment *after* the Redemption Date. The next case is *Walton v Edge* (1884) 10 App Cas 33. As the Board has already noted, the case indicates that the effect of the expiry of a period of notice to withdraw depends on the relevant contractual arrangements. The decision was that a provision for withdrawal "provided the funds permit" enabled the society to defer payment after expiry of the notice period, but meant that the member acquired a right "in praesenti, although it is solvendum in futuro", which gave the withdrawing member priority over other members, after payment of outside creditors.

37.    The third case, *Walker v General Mutual Building Society* (1887) 36 Ch D 777, is the case on which the Respondent most relies. Again, the member's right to withdraw on notice was expressly qualified, in that he was entitled "(provided there shall be sufficient funds available) within one month after such notice …. to receive all the subscription moneys paid on account of such shares". Within a month of such a notice, the society said that it had insufficient funds available, and a dispute arose. The issue was whether the member was bound to arbitrate the dispute under a clause applying to all disputes "arising between the society and any member or person claiming on account of any member". Unsurprisingly, the Court of Appeal held that the dispute must be referred to arbitration. Cotton LJ noted that, under the decision in *In re Planet*, the withdrawing member stood in a position of preference to other members who had not given notice, but observed that the "question is not whether … he is a creditor, but whether, if and so far as he is a creditor, he is bound qua member by the rules of the society, and therefore, by the rule under which disputes between the society and its members are to be referred to arbitration" (pages 782-783). Bowen LJ noted pertinently that "we should only get into difficulties by discussing the abstract question whether a person claiming as the present Plaintiff does is a creditor or not. The right way is to go to the rules and Acts of Parliament, and to consider whether the person is a

member within the meaning of the rule if it is rule that is in question ….." (page 785). Fry LJ said that the dispute was "between the society and the Plaintiff in his capacity as member", in that "His rights arise entirely from his membership, he is a withdrawing member, and till he has received payment it appears to me he remains a member" (page 786). The last statement cannot be pressed into service as a general proposition that any member withdrawing funds from any building society remains a member until payment for all purposes and whatever the rules - still less that the same applies in relation to a member redeeming shares under provisions not existing and in a manner not possible when any of these Victorian cases was being decided.

38.     In *Sibun v Pearce* (1890) 44 Ch D 354 the question was whether a member who had given a notice of withdrawal which had expired remained a member for the purposes of a requirement that any resolution for winding up the society be with the assent of three-fourths of the members. The question turned upon the construction of a statute - which Lindley LJ said was "less obscure than usual" (page 369) - and of rules made under it. The court held that the member remained, in Lindley LJ's words, "a member who has given notice of withdrawal, and is entitled to payment", and should be taken into account when deciding whether the necessary three-fourths majority had been met (page 371). The case merely underlines the fact that all depends upon the particular provisions or rules.

39.     The Respondent relies, lastly, upon *Pepe v City and Suburban Permanent Building Society* [1893] 2 Ch D 311. In that case a member gave one month's notice to withdraw under the rules on 5 January 1891, but payment was not received, and in May 1892 the society resolved by three-fourths majority to alter the relevant rule to authorise the directors to pay off in priority members not having more than £50 to their credit. Chitty J cited Lindley LJ's analysis of the legal position in *Sibun v Pearce*, and held that, despite his vested right, the member and so the right remained subject to the society's power to change its rules. It is unnecessary to express any view as to the correctness of this decision, since it turns upon a different scheme of legislation and rules.

40.     The Appellant, on the other hand, has referred to a series of recent first instance decisions, in which it has been held or contemplated that redemption of redeemable shares issued in various investment vehicles took place at the expiry of the relevant notice to withdraw, converting the member into a simple creditor as from that date, even though payment had not yet been received: *Basis Capital Funds Management Ltd v BT Portfolio Services Ltd* [2008] NSW SC 766, *Western Union International Ltd v Reserve International Liquidity Fund Ltd* (Claim No. BVIHCV 2009/322, unrep'd, judgment dated 26 January 2010), *SV Special Situations Fund Ltd v Headstart Class F Holdings Ltd* (Claim No. BVIHCV 2008/239, unrep'd, judgment dated 25 November 2008), *BNY AIS Nominess Ltd v Stewardship Credit Arbitrage Fund, Ltd* (Sup. Ct. Bermuda, judgment dated 27

November 2008), *In re Livingston International Fund Ltd (in liquidation)* (Claim No. BVIHCV 2002/0197) and *In re New Stream Capital Fund Ltd* (Sup. Ct. Bermuda, judgment dated 18 December 2009). These decisions all turn on the particular statutory and contractual provisions in question in them, and they are as stated first instance decisions. They do no more than lend some comfort that the view which the Board takes of the present contractual scheme is unlikely to be regarded as unusual or surprising.

41.    The Appellant relied upon a further point which the Board will address shortly. On the Respondent's analysis, the Appellant was both a creditor whose debt fell under article 53 to be regarded as a liability of the Respondent from the Redemption Date and would fall to be taken into account in any balance sheet, and at the same time a shareholder whose shareholding would continue to be included in the company's capital until payment of the debt. The result of this double-counting would be to dilute the company's NAV, to the potential detriment of present shareholders and benefit of prospective shareholders. No satisfactory response to this point was, to the Board's mind, forthcoming from the Respondent's side, but, since the point was not explored in detail in the light of relevant statutory and accounting principles, the Board need not rely upon it to decide the issue before the Board.

42.    The Respondents' written case also advances a point considered briefly by the Court of Appeal, to the effect that, even if the Appellant was a current creditor as at 10 June 2008, nonetheless it did not have standing to petition on the ground that the Respondent was insolvent, since in that event the only persons interested would be outside creditors, behind which it would rank: see *Walton v Edge* (para 36 above). The point was not developed orally before the Board. The Court of Appeal rejected it on the grounds that on the evidence the Respondent may prove solvent and that the Appellant could then still petition on the ground that winding up was just and equitable, and it permitted amendment of the petition to aver this. But the Board also notes that, insolvency, whether in the sense of inability to pay debts as they fell due or in the sense that liabilities exceeded assets, would not necessarily mean that the Respondent lacked sufficient assets to make any payment in a winding up to the Appellant as a current creditor ranking behind outside creditors, but ahead of continuing members of the Respondent.

43.    The Board is grateful for the helpful written cases and well-organised oral submissions received from counsel on each side. It has not proved necessary to follow every avenue which they opened up, but they have greatly facilitated the Board's task.

*Conclusion*

44.     The Board will humbly advise Her Majesty that:

    i)      the appeal be allowed;

    ii)     the first recital to the order dated 23 December 2008 made by the Court of Appeal should be replaced by a recital reading in terms:

          "Upon the Court holding that, on the proper construction of the Articles of Association, and of the Confidential Explanatory Memorandum so far as relevant thereunder, the Company had no relevant power after 31 March 2008 or at the date of the petition issued on 10 June 2008 to suspend the payment to the Appellant of the redemption proceeds relating to its shares the subject of its Redemption Notice given 31 October 2007."

    iii)   the last 33 words of the third recital ("but excluding the allegation …." onwards) should be deleted;

    iv)   subject to any representations which the parties may wish to make in writing within 21 days of the issue of this judgment and to any reconsideration by the Board of this proposed order in their light, the order for costs made by the Court of Appeal should be replaced by an order that the Respondent do pay the costs of the Respondent's application to strike out the Appellant's petition for the Respondent's winding up in both courts below as well as before the Board.

TAB 9

*Erste Group Bank AG (London) v JSC (Red October)*
[2013] EWHC 2926 (Comm)

Neutral Citation Number: [2013] EWHC 2926 (Comm)

Case No: 2012 Folio 1136

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Rolls Building
Fetter Lane, London, EC4A 1NL

Date: 03/10/2013

**Before**:

**THE HONOURABLE MR JUSTICE FLAUX**
- - - - - - - - - - - - - - - - - - - - -
**Between:**

| | |
|---|---|
| **ERSTE GROUP BANK A.G. London Branch** | **Claimant** |
| - and - | |
| **(1) JSC "VMZ RED OCTOBER"** | **Defendants** |
| **(2) RED OCTOBER STEEL WORKS** | |
| **(3) STATE CORPORATION FOR** | |
| **ASSISTANCE TO DEVELOPMENT,** | |
| **PRODUCTION AND EXPORT OF** | |
| **ADVANCED TECHNOLOGY** | |
| **INDUSTRIAL PRODUCT "RUSSIAN** | |
| **TECHNOLOGIES"** | |
| **(4) CJSC RUSSPETSSTAL** | |
| **(5) LLC RT-CAPITAL** | |
| **(6) CJSC NIOKRINVEST** | |
| **(7) OJSC RUSSPETSMASH** | |
| **(8) LLC SPETSSTALRESURS** | |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Simon Salzedo QC and David Scannell** (instructed by **Gide Loyrette Nouel LLP**) for the
**Claimant**
**Richard Morgan QC and James Sheehan** (instructed by **Macfarlanes LLP**) for the **Third
Defendant**
**David Mumford** (instructed by **Enyo Law LLP**) for the **Fifth Defendant**

Hearing dates: 17-20, 24 June, 3 July 2013
- - - - - - - - - - - - - - - - - - - - -
**Approved Judgment**
I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

.............................

THE HON MR JUSTICE FLAUX

**The Honourable Mr Justice Flaux:**

Introduction

1.   The Third and Fifth Defendants make applications both dated 31 January 2013 to set aside service of these proceedings upon them outside the jurisdiction in Russia pursuant to the Order of Cooke J dated 24 October 2012.

2.   The Claimant (referred to hereafter as "Erste") is the London branch of an Austrian bank. It was one of a syndicate of lenders ("the Lenders") who participated to the extent of 25% each in a US$80 million loan to the First Defendant (referred to hereafter as "the borrower") pursuant to a Facility Agreement ("the Loan Agreement") dated 26 November 2007. At the time, the borrower owned and operated one of Russia's largest steel works, the Red October facility in Volgograd, employing thousands of people and supplying the Russian defence industry. The original lender was VTB Capital plc, which acted as the Facility Agent under the Loan Agreement. The Loan Agreement is governed by English law. It contains a London arbitration clause but with a mechanism under clause 37.4 whereby, at the Lenders' option, a notice can be served on the borrower requiring the relevant dispute to be determined in court, in which case the English courts had exclusive jurisdiction to settle the dispute.

3.   The Second Defendant (referred to hereafter as "the guarantor") is the immediate parent of the borrower and itself a wholly owned subsidiary of the Fourth Defendant and (on Erste's case, in relation to which there is a serious issue to be tried) an indirect subsidiary of the Third Defendant. The guarantor guaranteed the performance of the borrower under the Loan Agreement pursuant to a Guarantee also dated 26 November 2007. The Guarantee is also governed by English law. It also contains a London arbitration clause but with the same mechanism under clause 13.5 whereby the Lenders can require a dispute to be subject to the exclusive jurisdiction of the English courts.

4.   The Third Defendant (hereafter referred to for convenience as "RT") is a State Corporation incorporated by statute on 23 November 2007 for the purposes of managing Russia's military and manufacturing assets and developing its military industry. Its supervisory council, its ultimate management body, comprises nine members, four who are representatives of the President of Russia, four who are representatives of the Government of Russia and one who is described as the "general director". One of the representatives of the President, who was the Chief Executive Officer at all material times was Mr Sergei Chemezov. It is not disputed that Mr Chemezov is one of President Putin's oldest and most trusted friends and colleagues, they having shared a house together in Dresden in the period 1983 to 1988 when they were both KGB agents in East Germany.

5.   On 31 July 2009, a repayment under the Loan Agreement of US$1,666,666.67 fell due which was not honoured by either the borrower or the guarantor. Prior to that repayments had been met on time. Notice of default was served on the borrower requiring repayment of the loan plus interest. Erste's case in these proceedings is that the default by the borrower and the guarantor was engineered deliberately by an unlawful means conspiracy between RT and the other Defendants (all of whom Erste contends are controlled by RT) designed to strip the borrower and the guarantor of

their assets and render them insolvent. In these proceedings Erste claims against the borrower and the guarantor in debt and under the contracts. It then claims against all the Defendants damages for unlawful means conspiracy, alternatively lawful means conspiracy, damages for unlawful interference with economic interests and/or with contractual relations. Erste also seeks an Order under section 423 of the Insolvency Act 1986. This case is strenuously resisted by RT and RT Capital on these applications. The inability of the borrower and the guarantor to honour their obligations is said by them to have been due to the failure of the business in 2009 due to the global economic downturn. Erste disputes that explanation, pointing out that the steel manufacturing business, although now run by different companies set up for the purpose, has been profitable in the last two years.

6.      In relation to the claims against the borrower and the guarantor, on 18 August 2011 Erste served notices under clause 37.4 and 13.5 of the Loan Agreement and Guarantee respectively to litigate the dispute with them before the English courts. The dispute was described in the notices as "The Dispute concerns the Borrower's [or Guarantor's] failure to repay the indebtedness under the Facility Agreement [as required by the Guarantee]." In his submissions before me, Mr Richard Morgan QC for RT contended that, although these notices were effective in respect of the claims against the borrower and the guarantor in debt and for breach of contract, they did not encompass the claims against them in conspiracy or the other wider claims, including under section 423. I should say at the outset that I disagree: all the claims against the borrower and guarantor "concern" their failure to repay the indebtedness so that the notices caught all the claims. However, in any event, this proved a non-point because during the course of the hearing Erste's solicitors served fresh notices which on any view were wide enough to encompass all the claims. It follows that (subject to the submission by Mr Morgan that Erste has by various actions in Russia submitted to the jurisdiction of the Russian insolvency courts any wider claim against the borrower and guarantor, to which I will return in detail below) all claims against the borrower and the guarantor are subject to the exclusive jurisdiction of the English courts.

7.      So far as the claims under the Loan Agreement and the Guarantee are concerned, they were the subject of a summary judgment application by Erste which was heard by HHJ Mackie QC on 14 December 2012. Both Defendants had been served with the proceedings and with notice of that application but chose not to participate save for issues raised by the liquidation manager of the guarantor that those two Defendants were subject to insolvency proceedings in Russia and that a Russian court had declared the Guarantee invalid under Russian law. Those issues (which are echoed by some of the points taken now before me) were rejected by the learned judge who decided neither issue had a reasonable prospect of success as a defence. He granted summary judgment against both defendants for US$16,843,003.13 plus interest, then standing at about €4 million. There was no appeal from that Order but equally no payment has been made to Erste.

Principles applicable on applications to set aside service out of the jurisdiction

8.      A useful summary of the applicable legal principles is to be found in the recent decision of the Court of Appeal in *VTB Capital v Nutritek International* [2012] EWCA Civ 808; [2012] 2 Lloyd's Rep 313 at [99]-[100] in the judgment of Lloyd LJ:

"99. There was no dispute between the parties on the general principles to be applied when deciding whether permission should be granted to serve proceedings on a defendant who is out of the jurisdiction, under the terms of paragraph 3.1 of Practice Direction 6B of the CPR. The three basic principles were recently restated by Lord Collins of Mapesbury in giving the advice of the Privy Council in *AK Investment CJSC v Kyrgyz Mobil Tel Ltd* [2011] UKPC 7; [2012] 1 WLR 1804 at paragraphs 71, 81 and 88. They can be summarised as follows: first, the claimant must satisfy the court that, in relation to the foreign defendant to be served with the proceedings, there is a serious issue to be tried on the merits of the claim, i.e. a substantial question of fact or law or both. This means that there has to be a real, as opposed to a fanciful, prospect of success on the claim. Secondly, the claimant must satisfy the court that there is a good arguable case that the claim against the foreign defendant falls within one or more of the classes of case for which leave to serve out of the jurisdiction may be given. These are now set out in paragraph 3.1 of Practice Direction 6B. "Good arguable case" in this context means that the claimant has a much better argument than the foreign defendant. Further, where a question of law arises in connection with a dispute about service out of the jurisdiction and that question of law goes to the existence of the jurisdiction (e.g. whether a claim falls within one of the classes set out in paragraph 3.1 of Practice Direction 6B), then the court will normally decide the question of law, as opposed to seeing whether there is a good arguable case on that issue of law.

100. Thirdly, the claimant must satisfy the court that in all the circumstances England is clearly or distinctly the appropriate forum for the trial of the dispute and that in all the circumstances the court ought to exercise its discretion to permit service of the proceedings out of the jurisdiction. This requirement is reflected in Rule 6.37(3) of the CPR, which provides that "The court will not give permission [to serve a claim form out of the jurisdiction on any of the grounds set out in paragraph 3.1 of Practice Direction 6B] unless satisfied that England and Wales is the proper place in which to bring the claim"."

9.    So far as the first requirement the claimant has to satisfy, that there is a serious issue to be tried on the merits is concerned, as that summary demonstrates, the test is the same as "a reasonable [or real] prospect of success" for the purposes of strike out under CPR Part 3 or summary judgment under CPR Part 24. Any number of cases have emphasised how this is a relatively low threshold and that, in considering whether the claimant satisfies it, the court must not engage in some form of mini-trial on the merits at this early interlocutory stage. The correct approach was succinctly put by Gross J (as he then was) in *Swiss Reinsurance Company Limited v United India Insurance Company* [2002] EWHC 741 (Comm) at [27] as follows:

> "To my mind, the wording in [6.37(1)(b)] is synonymous with "real prospect of success" — wording to be found in CPR parts 3 and 24. "Real" is to be contrasted with fanciful or imaginary. Once this stage is reached, the test is the same or substantially the same as the test in *Seaconsar*: an issue which is imaginary or fanciful is not a serious issue to be tried. … Any higher test would doom parties in such applications to unwarranted mini trials on the merits."

10.    The importance of the need to avoid a detailed exploration of the merits at the stage of a challenge to the jurisdiction is of particular significance in the present case where the Court is faced with 17 lever arch files of evidence, with RT and RT Capital seeking to challenge Erste on almost every point and seeking to rebut what Erste says in reply. In that context, what Lord Neuberger said recently in *VTB Capital plc v Nutritek International* [2013] UKSC 5; [2013] 2 WLR 398 at [82]-[83] has a particular resonance:

> "82.    The first point is that hearings concerning the issue of appropriate forum should not involve masses of documents, long witness statements, detailed analysis of the issues, and long argument. It is self-defeating if, in order to determine whether an action should proceed to trial in this jurisdiction, the parties prepare for and conduct a hearing which approaches the putative trial itself, in terms of effort, time and cost. There is also a real danger that, if the hearing is an expensive and time-consuming exercise, it will be used by a richer party to wear down a poorer party, or by a party with a weak case to prevent, or at least to discourage, a party with a strong case from enforcing its rights.

> 83.    Quite apart from this, it is simply disproportionate for parties to incur costs, often running to hundreds of thousands of pounds each, and to spend many days in court, on such a hearing. The essentially relevant factors should, in the main at any rate, be capable of being identified relatively simply and, in many respects, uncontroversially. There is little point in going into much detail: when determining such applications, the court can only form preliminary views on most of the relevant legal issues and cannot be anything like certain about which issues and what evidence will eventuate if the matter proceeds to trial."

11.    Although his Lordship was deprecating the proliferation of documentation in relation to determination of the third requirement, of appropriate forum, his observations are obviously equally applicable to the other aspects of jurisdictional challenges. He is reflecting an oft repeated warning by judges against over-analysis of the facts at the stage of a jurisdictional challenge. I agree with Mr Salzedo QC that the approach of RT and RT Capital to the presentation of their jurisdictional challenge in the present case ignores that warning and adopts a "scattergun" approach of adducing evidence which might support every conceivable argument available in principle on a jurisdictional challenge. The positive barrage of evidence from the Defendants

continued during the hearing, even after their oral submissions had been made in support of their applications.

12.    However, the reality is that, unless RT and RT Capital had some "killer point" which demonstrated that Erste's case on the facts was unsustainable (and, for reasons I will develop in detail below, they do not have any such "killer point"), the expending of so much time and energy on a full-scale evidential challenge is a fruitless exercise. All it succeeds in doing is demonstrating that Erste has raised serious issues to be tried.

13.    As the summary by Lloyd LJ demonstrates, so far as the second requirement the claimant must satisfy of bringing itself within one or more of the jurisdictional gateways in para 3.1 of Practice Direction 6B is concerned, the test is higher than a serious issue to be tried. The reference to "a much better argument" is to the so-called *Canada Trust* gloss, derived from the judgment of Waller LJ in *Canada Trust v Stolzenberg (No. 2)* [1998] 1 WLR 547 at 555:

> "It is I believe important to recognise, as the language of their Lordships in *Korner* [[1951] AC 869] demonstrated, that what the court is endeavouring to do is to find a concept not capable of very precise definition which reflects that the plaintiff must properly satisfy the court that it is right for the court to take jurisdiction. That may involve in some cases considering matters which go both to jurisdiction and to the very matter to be argued at the trial e.g. the existence of a contract, but in other cases a matter which goes purely to jurisdiction e.g. the domicile of a defendant. The concept also reflects that the question before the court is one which should be decided on affidavits from both sides and without full discovery and/or cross examination, and in relation to which therefore to apply the language of the civil burden of proof applicable to issues after full trial, is inapposite. Although there is power under Ord.12 r.8(5) to order a preliminary issue on jurisdiction, as Staughton L.J. pointed out in *Attock*, at p.1156D it is seldom that the power is used because trials on jurisdiction issues are to be strongly discouraged. It is also important to remember that the phrase which reflects the concept "good arguable case" as the other phrases in *Korner* "a strong argument" and "a case for strong argument" were originally employed in relation to points which related to jurisdiction but which might also be argued about at the trial. The court in such cases must be concerned not even to appear to express some concluded view as to the merits, e.g. as to whether the contract existed or not. It is also right to remember that the "good arguable case" test, although obviously applicable to the ex parte stage, becomes of most significance at the inter partes stage where two arguments are being weighed in the interlocutory context which, as I have stressed, must not become a "trial". "Good arguable case" reflects in that context that one side has a much better argument on the material available. It is the concept which the phrase reflects on which it is important to concentrate i.e. of the court

> being satisfied or as satisfied as it can be having regard to the
> limitations which an interlocutory process imposes that factors
> exist which allow the court to take jurisdiction."

14.    Two caveats have to be borne in mind in considering this second requirement. First,
that consideration of whether the claimant can satisfy one or other of the jurisdictional
gateways must not become the subject of a trial on the facts at this interlocutory stage.
That was a point which Waller LJ was himself making in the passage cited but Mr
Salzedo QC for Erste drew attention to the cautionary approach to the *Canada Trust*
gloss which was emphasised by Rix LJ in *Konkola Copper Mines v Coromin* [2006] 1
Lloyd's Rep 410 at [81]:

> "If a court, in applying the good arguable case test, as well as
> taking account of the opposing arguments as it has always
> done, in addition had to decide and rule as to which side had
> the "much better argument", I fear that, however much the
> judge couched his reasoning in terms of the provisional nature
> of his decision on the material available, he would inevitably be
> drawn into a trial of the merits. This is plainly undesirable. Is it
> necessary? I am doubtful that it is, especially in circumstances
> where, as was generally the case under the old RSC Order 11 or
> is now the position under CPR 6.20, the power to give leave to
> serve out of the jurisdiction is at the end of the day a
> discretionary one. However important the proper disposition of
> a jurisdictional challenge is, it is not something which should
> be allowed to subvert the merits of a potential trial."

15.    Second, although the claimant has to have the better of the argument, that is
emphatically not as stringent as establishing the jurisdictional gateway threshold on
the balance of probabilities: see e.g. *Carvill America Inc v Camperdown UK Ltd*
[2005] 2 Lloyd's Rep 457 at [45] per Clarke LJ. The correct approach to the
jurisdictional gateway threshold was summarised in this way by Christopher Clarke J
(as he then was) in *Cherney v Deripaska* [2008] EWHC 1530 (Comm); [2009] 1 All
ER (Comm) 333 at [44]:

> "I do not regard this [i.e. the *Canada Trust* gloss] as
> introducing by the back door a requirement that a claimant
> seeking permission should prove his case on the balance of
> probabilities. The Court is concerned, at this stage, with the
> *arguments* in favour of the respective parties in the light of the
> material then tendered. Whilst the Court is entitled to reject the
> wholly implausible, what it will be concerned with is the
> relative plausibility of the contentions. Proof on the balance of
> probabilities would require a finding of fact, not a decision
> about the strength of arguments, and would probably require
> the availability of oral evidence and discovery."

16.    The principles applicable to the third requirement the claimant must satisfy, that
England is clearly the appropriate forum, are summarised by Waller LJ in the Court of
Appeal in *Cherney v Deripaska* [2009] EWCA Civ 849; [2009] 2 CLC 408 at [19]-
[21]:

19. Furthermore Lord Goff [in *The Spiliada* [1987] AC 460] was not using the word "appropriate" in the sense simply of "natural". The use of the word "appropriate" as opposed to "natural" in that summary was, I think, deliberate. In the summary Lord Goff has not gone through a two-stage process; he has gone straight to what is the ultimate question – what is the forum where in the interest of the parties and the ends of justice the trial should take place?

20. I accept that there are instances in the authorities when the word "appropriate" and the word "natural" in relation to forum are used interchangeably. Indeed Lord Goff himself could be said to be doing so, even in the judgment in *The Spiliada,* in the passage at 478C, to which I have already referred but will quote in full below, where he spells out what is involved at the "second stage". Lord Goff himself in *Connelly v RTZ Corporation PLC* [1998] AC 854 at 874D, in a stay case where the "natural" forum was Namibia, was satisfied that "this is a case in which, having regard to the nature of the litigation, substantial justice cannot be done in the <u>appropriate</u> forum, but can be done in this jurisdiction" (my underlining). But in *The Spiliada* Lord Goff had made clear that it would be better to distinguish between "natural", i.e. the forum with which the case had the most natural connection, and "appropriate", which may be different, to meet the ends of justice [see 478A quoted above]. In my view the summary in the notes on page 22 of the White Book under CPR6.37(4) *Forum Conveniens* summarises the position correctly:-

"Subject to the differences set out below, the criteria that govern the application of the principle of forum conveniens where permission is sought to serve out of the jurisdiction are the same as those that govern the application of the principle of forum non conveniens where a stay is sought in respect of proceedings started within the jurisdiction. Those criteria are set out in *The Spiliada,* above:

(i) The burden is upon the claimant to persuade the court that England is clearly the appropriate forum for the trial of the action.

(ii) The appropriate forum is that forum where the case may most suitably be tried for the interests of all the parties and the ends of justice.

(iii) One must consider first what is the "natural forum"; namely that with which the action has the most real and substantial connection. Connecting factors will include not only factors concerning convenience and expense (such as the availability of witnesses), but also factors such as the law governing

the relevant transaction and the places where the parties reside and respectively carry on business.

(iv) In considering where the case can be tried most "suitably for the interests of all the parties and for the ends of justice" ordinary English procedural advantages such as a power to award interest, are normally irrelevant as are more generous English limitation periods where the claimant has failed to act prudently in respect of a shorter limitation period elsewhere.

(v) If the court concludes at that stage that there is another forum which is apparently as suitable or more suitable than England, it will normally refuse permission unless there are circumstances by reason of which justice requires that permission should nevertheless be granted. In this inquiry the court will consider all the circumstances of the case, including circumstances which go beyond those taken into account when considering connecting factors with other jurisdictions. One such factor can be the fact, if established objectively by cogent evidence, that the claimant will not obtain justice in the foreign jurisdiction. Other factors include the absence of legal aid or the ability to obtain contribution in the foreign jurisdiction.

(vi) Where a party seeks to establish the existence of a matter that will assist him in persuading the court to exercise its discretion in his favour, the evidential burden in respect of that matter will rest upon the party asserting it."

21.  That summary correctly emphasises, in relation to service out, the distinction between what may at stage one seem the "natural forum", as the place with which the case has the closest connection, and ultimately the "appropriate or proper forum" which a plaintiff can establish, even if England is not the "natural forum" if justice requires that permission to serve out be given."

17.  In *The Abidan Daver* [1984] AC 398 at 411, Lord Diplock spoke of "the risk that justice will not be obtained" in the foreign jurisdiction having to be established by positive and cogent evidence. In later cases in the House of Lords their Lordships treated Lord Diplock's dictum as requiring evidence that the claimant "will not" obtain justice in the foreign jurisdiction: see for example per Lord Goff in *The Spiliada* [1987] AC 460 at 478. In *Altimo Holdings v Kyrgyz Mobil Tel Ltd* [2011] UKPC 7; [2012] 1 WLR 1804, Lord Collins discusses this question of the standard of proof required. Having referred to *The Spiliada* and other decisions of the House of Lords, he says at [94]-[95]:

"94   In two decisions of the Court of Appeal it has been held that the relevant question to which the cogent evidence will go is to the *risk* that justice will not be done in the foreign jurisdiction, and that it is not necessary to establish that on the balance of probabilities that the risk will eventuate: *Cherney v Deripaska* [2009] EWCA Civ 849, [2009] 2 CLC 408, at [28]-[29], per Waller LJ; *Pacific International Sports Clubs Ltd. v Surkis* [2010] EWCA Civ 753, [34]-[35], per Mummery LJ. See also *OJSC Oil Company Yugraneft v Abramovich* [2008] EWHC 2613 (Comm), at [496], where Christopher Clarke J said that the risk of judicial impropriety could be inferred from such matters as departure from normal judicial practice, or irrational conclusions.

95 The better view is that, depending on the circumstances as a whole, the burden can be satisfied by showing that there is a real risk that justice will not be obtained in the foreign court by reason of incompetence or lack of independence or corruption. Of course, if it can be shown that justice "will not" be obtained that will weigh more heavily in the exercise of the discretion in the light of all other circumstances."

18.    Lord Collins goes on to discuss at [97] that comity requires the court to be extremely cautious before concluding that there is a real risk that justice will not be done in a foreign jurisdiction, hence the need for cogent evidence to that effect. He expands on that point at [101]-[102] in these terms:

"101 The true position is that there is no rule that the English court (or Manx court) [because that case was an appeal to the Privy Council from the Isle of Man] will not examine the question whether the foreign court or the foreign court system is corrupt or lacking in independence. The rule is that considerations of international comity will militate against any such finding in the absence of cogent evidence. That, and not the act of state doctrine or the principle of judicial restraint in *Buttes Gas & Oil Co v Hammer*, is the basis of Lord Diplock's dictum in *The Abidin Daver* and the decisions which follow it. Otherwise the paradoxical result would follow that, the worse the system of justice in the foreign country, the less it would be permissible to make adverse findings on it.

102   That conclusion is also supported by the many cases in the United States courts in which the standard of justice in the foreign court has been examined in the context of *forum non conveniens* questions. It was said in *Blanco v Banco Industrial de Venezuela*, 997 F 2d 974, at [50] (2d Cir 1993), quoting earlier decisions, that it "is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation." That is not the enunciation of the act of state doctrine (well known in the United States) or the doctrine of judicial restraint in foreign

relations cases (which has its origin in the United States), but simply a reflection of the fact that comity considerations require the court not to pass judgment on the foreign court system without adequate evidence. Evidence of corruption in the foreign court system is admissible (as, e.g., in *Cariajano v Occidental Petroleum Corp*, 626 F 3d 1137 (9th Cir 2010)), but it must go beyond generalised, anecdotal material: *Tuazon v RJ Reynolds Tobacco Co*, 433 F 3d 1163, 1179 (9th Cir 2006); *Stroitelstvo Bulgaria Ltd v Bulgarian-American Enterprise Fund*, 589 F 3d 417 (7th Cir 2009). Cases in which justice in the foreign legal system has been found wanting have been rare but they are by no means unknown: *Rasoulzadeh v Associated Press*, 574 F Supp 854 (SDNY 1983), affd 767 F 2d 908 (2d Cir 1985) and *Osorio v Dole Food Co*, 665 F Supp 2d 1307 (SD Fla 2009) are examples in the contexts of *forum non conveniens* and enforcement of foreign judgments respectively."

19. In its evidence and written submissions, Erste placed particular emphasis in contending that England was the appropriate and proper forum upon the risk that it could not obtain a fair trial of the present dispute in Russia. It is fair to say that by the time Mr Salzedo QC came to make his oral submissions, whilst that point was not in any sense abandoned (and I will deal with it below) the emphasis in Erste's submissions as to why England was clearly the appropriate and proper forum had shifted somewhat to other factors, in particular the fact that the case against the borrower and the guarantor in tort and under section 423 will proceed in England in any event on the basis that the English court has exclusive jurisdiction over that dispute, that on any view the other defendants are necessary or proper parties to the claim against the borrower and the guarantor and that, accordingly, the importance of trying the same dispute against all defendants in one forum and avoiding the risk of inconsistent judgments made England clearly the appropriate and proper forum.

Serious issue to be tried on the merits

20. It is necessary to consider Erste's case against the defendants and the various responses of RT and RT Capital in a certain amount of detail, whilst always bearing in mind the point I have already made that the Court is not engaged in any sort of mini-trial on the facts but only with whether Erste has shown a serious issue to be tried.

21. Before going through the factual history relied upon by Erste chronologically, I will deal with one aspect of Erste's overall case against all the defendants, that is the question of the control of the other defendants by RT. As already set out above, prior to the alienation of assets of which Erste complains, the borrower was a 100% subsidiary of the guarantor, which in turn was 100% owned by the Fourth Defendant, RusSpetsStal. Erste's case is that RT controls the Fourth Defendant and thus the borrower and the guarantor. In his submissions Mr Morgan QC sought to challenge that case, relying upon the fact that RT only held a minority shareholding in the Fourth Defendant of 25.3% through another entity called Promimpeks.

22. However, whatever the formal position as regards the shareholding, I agree with Mr Salzedo QC that there is evidence before the Court (both in [87] to [89] of the First

Witness Statement of Mr Rooney of Erste's solicitors and elsewhere) to demonstrate a sufficiently arguable case that RT controlled the Fourth Defendant, the guarantor and the borrower:

(1) In November 2007 an Information Memorandum was prepared for investors which stated that the majority of the board of the Fourth Defendant comprised Mr Chemezov, Mr Aleshin and Mr Zavyalov, all of whom were or became members of the board of RT. Although the evidence put forward by RT in support of its application from Mr Kudashkin, the head of its legal department, is that until RT acquired 100% of the shares in Promimpeks on 29 June 2009, Promimpeks was owned by another state enterprise, Rosoboronexport, it is striking that Mr Kudashkin only puts forward somewhat guarded evidence based on what he describes as "the publicly available information".

(2) Furthermore the suggestion that RT had no interest, direct or indirect in the Fourth Defendant, until 29 June 2009 lies uneasily with that Information Memorandum which refers to the strategic goal of the Fourth Defendant being "to create a state controlled specialised steel and alloys group in Russia". As I pointed out to Mr Morgan in argument, it is difficult to see how that state control would be achieved by RT through the Fourth Defendant merely through a minority shareholding, suggesting that it is arguable that the real extent of control was greater. The suggestion that RT had no interest in the Fourth Defendant until 29 June 2009 is also inconsistent with two other pieces of evidence: a Presidential Decree dated 10 July 2008 whereby RT acquired at least a 25.1% shareholding in the Fourth Defendant and a press release of 14 November 2008 in which RT described the Fourth Defendant as a "daughter venture".

(3) The general manager and single member executive of both the Fourth Defendant and another entity affiliated to RT, RT Metallurgica, is Sergey Nosov. He is also a member of the board of directors of the guarantor. This is all set out in a list of affiliates of the guarantor dated 30 September 2009. That list includes RT at number 22 being described in translation as "Persons belonging to the same group of persons as [the guarantor]: [RT] is entitled to control more than 50% of the charter capital of an affiliated person RT Metallurgica". Although Mr Morgan QC contended that RT was only on the list of affiliates because it controlled 50% of RT Metallurgica, I agree with Mr Salzedo QC that it is more than mere coincidence that Mr Nosov is the general manager and sole executive of not just RT Metallurgica but also the Fourth Defendant and also a member of the board of directors of the guarantor. According to the report of Mr Lyubimenko, subsequently appointed temporary manager of the borrower to the initial meeting of creditors of the company on 17 June 2010, from 4 April 2007 until 25 January 2010, the management of the borrower was carried out by the Fourth Defendant, of which of course Mr Nosov was sole executive. In other words it was Mr Nosov who was responsible for managing the borrower. Mr Salzedo QC points out that although RT has clearly had access to Mr Nosov in preparing its evidence in support of its application, it has produced no evidence from him on this important issue, let alone anything to deny what seems to me an arguable case that the borrower was under the control of RT through the Fourth Defendant and Mr Nosov.

(4) Although Mr Morgan QC placed great emphasis upon the fact that on the basis of what Mr Kudashkin described as "the publicly available information", RT only ever held a 25.3% shareholding in the Fourth Defendant through Promimpeks and submitted that this was inconsistent with RT controlling the Fourth Defendant and thus the borrower and the guarantor, not only does this ignore the overall involvement of Mr Nosov to which I have referred, but as Mr Salzedo QC pointed out 50% of the shares in the Fourth Defendant are held by two companies Briefway Trading Limited and Lacoveta Management Limited, said to be intermediary companies of Troika Dialogue which Mr Kudashkin says was a leading Russian private investment bank at the time. Mr Salzedo QC rightly pointed out that the identity of the investors is not vouchsafed by Mr Kudashkin.

(5) Furthermore, in his letter of 5 August 2009 to the lenders seeking restructuring of the debt, referred to in more detail below, Mr Zavyalov, deputy CEO of RT describes the borrower as "part of the group of companies JSC RusSpetsStal [the Fourth Defendant] and one of the largest and most important enterprises of [RT]" supporting at least the reasonable inference that whatever the formal position as regards the shareholding, these companies are all part of the same group over which RT exercises overall control. As Mr Salzedo QC submitted, that letter lies somewhat uneasily with RT's case that it was only involved in strategic decisions at a high level.

(6) The extent to which RT has controlled the borrower is further demonstrated by the extent to which it has continued to involve itself in the financial and operational affairs of the borrower. For example on 3 October 2011, the borrower issued a press release in which it described how with the aim of saving the borrower RT had undertaken "a programme of immediate financial rehabilitation measures, worked with the company's chief creditors and redeemed part of the debt". It is an obvious question why would RT do that unless it had an interest in and control over the borrower.

(7) Although Mr Morgan QC made a number of detailed submissions in reply seeking to dispute that RT controlled the other defendants, as I have already indicated, all that Erste has to show at this stage is a serious issue to be tried. Mr Morgan's submissions seemed to me to succeed, albeit unwittingly, in emphasising that there is a serious issue about control to be tried which cannot be resolved short of a trial.

23.    So far as the other defendants are concerned it is accepted by RT that RT Capital is a 100% subsidiary of RT incorporated on 3 December 2010 and, according to Mr Kudashkin established to engage in debt restructuring. It is striking that within days of its incorporation it acquired the debt owed by the borrower to two of the other banks, Gazprombank and Sberbank, a matter to which I return in the chronology below.

24.    The foundation agreement for the Seventh Defendant RusSpetsMash was executed by the borrower and the guarantor on 30 March 2009. On 26 May 2009, assets were transferred from the borrower and the guarantor to form the charter capital of the Seventh Defendant. As set out in more detail hereafter, the Seventh Defendant is thus the entity by which it is alleged by Erste that the Defendants diverted assets from the borrower rendering it unable to pay its indebtedness under the Loan Agreement.

25.    The Sixth Defendant, NIOKRinvest, is a subsidiary of OJSC RusSpetStal, which controls more than 50% of the share capital, according to the list of affiliates. That list also states that OJSC RusSpetStal is a separate company from the Fourth Defendant although more than 50% of the board of directors are the same persons as the board of the Fourth Defendant. Mr Morgan QC said that RT's case is that the Sixth Defendant has nothing to do with RT, although the only evidence from RT about that is the somewhat guarded statement by Mr Kudashkin, based on "the publicly available information" that RT has never been a shareholder of the Sixth Defendant. However, as Mr Salzedo QC pointed out, when one examines the list of affiliates carefully, there is a little sub-group of companies at numbers 14 to 19 which includes the Sixth Defendant and OJSC RusSpetStal, at the top of which is Russpecsteel Invest Limited, a Cypriot registered company which is entitled to control more than 50% of OJSC RusSpetStal. However, what is missing from the list of affiliates is any explanation as to how they are affiliated to the guarantor. Since that sub-group is, in effect entirely inward turning, there is no explanation as to why they are on the list of affiliates of the borrower at all. I agree with Mr Salzedo QC that it is a reasonable inference that they are affiliates because they are under the same ultimate control as the borrower and guarantor, namely under the control of RT.

26.    Although, as Mr Rooney explains at [89] of his First Witness Statement, there is no direct evidence (for example from the list of affiliates) that the Eighth Defendant, SpetsStalResurs is a member or affiliate of the RT group of companies, such a relationship can reasonably be inferred from the Eighth Defendant's involvement in the events which comprise the alleged conspiracy. In particular, the surety agreement referred to below was entered into between the guarantor and the Eighth Defendant. Erste's case is that that agreement had no commercial purpose but was a device to make the Eighth Defendant the largest creditor of the guarantor enabling it to influence the insolvency of the guarantor on behalf of the RT group. Furthermore, the Eighth Defendant and the borrower had managers in common, specifically Mr Dubovik. The close connection between the two entities is also indicated by the fact that in May 2010, after the borrower had been put in the supervision procedure, it took an assignment of a debt owed by the Eighth Defendant under a supply contract equivalent to some US$700,000 which the borrower did not have the resources to pay. The Russian Court subsequently ruled that that transaction was made without consideration and in breach of Russian insolvency law.

27.    In conclusion on the issue of control I agree with Mr Salzedo QC that Erste has shown that there is a serious issue to be tried that all the other Defendants are affiliated to RT and that RT is in control of the other Defendants.

28.    Turning to the chronology of the alleged conspiracy, according to the list of affiliates, RT became affiliated to the guarantor on 27 March 2009. In fact the evidence referred to above suggests it already had an indirect interest in the guarantor and hence the borrower, through the Fourth Defendant, before that date. However, taking that date at face value, within days the foundation agreement for the Seventh Defendant had been entered into on 30 March 2009. The Seventh Defendant had a charter capital of RUB 10,000, notwithstanding which, by a transfer dated 26 May 2009 the borrower transferred the entirety of its basic infrastructure assets (i.e. apparently plant and machinery) to the Seventh Defendant in return for a 92.64% shareholding in the Seventh Defendant which on the same date altered its charter to provide that its share

capital amounted to RUB 1,916,101,717. The remaining shares were transferred to the guarantor. Also on the same day, the borrower leased back the same assets from the Seventh Defendant at the equivalent of about US$900,000 per month. I refer to the transfer and lease back hereafter as "the borrower's asset transfer".

29.   Erste's case is that the purpose and effect of the borrower's asset transfer was to put the borrower and the guarantor in the position where they would not and could not make the repayments under the Loan Agreement and Guarantee and, indeed when the sum of US$1,666,666.67 fell due on 31 July 2009, it was unpaid, notwithstanding that previous sums had been paid and there was no dispute with the banks. Erste's case is that the borrower's asset transfer was procured or authorised by RT deliberately for the purpose of rendering the borrower insolvent.

30.   In fact there were other creditors of the borrower than the syndicate of banks under the Loan Agreement, including Gazprombank, Sberbank and a company called OOO Volgometallosnab ("VMS"). A month before the borrower's asset transfer, on 22 April 2009, VMS had petitioned for the bankruptcy of the borrower. Subsequently, Gazprombank brought proceedings in the Arbitrazh Court of the Volgograd Region (the "ACVR") against the borrower, the guarantor and the Seventh Defendant seeking a declaration that the borrower's asset transfer was void. Those proceedings were not resisted by the temporary manager of the borrower, Mr Lyubimenko, who had been appointed by the time of the hearing. By its judgment dated 2 June 2010, the ACVR decided that the borrower's asset transfer was designed to put the borrower's assets beyond the reach of its creditors and inflict harm on those creditors and that it was unlawful under the Russian Civil Code. The Court declared the borrower's asset transfer void and ordered the return of the assets to the borrower.

31.   On these applications, Mr Morgan QC put forward three principal arguments as to why Erste could not show a serious issue to be tried in relation to its case that the borrower's asset transfer was part of an overall conspiracy.  First, RT sought to contend that, contrary to Erste's case, the borrower's asset transfer had a genuine commercial purpose, in that it was necessary to set up the Seventh Defendant and transfer the assets to it in order to obtain state funding and external funding at a time when the borrower's business was suffering economically and required modernisation. However, quite apart from the fact that it remains unexplained why it was necessary to transfer the assets to a new company to obtain funding, it would be impossible for the Court to decide this issue on an interlocutory application. In any event, despite the purported explanation put forward, the fact that the ACVR considered that in effect the borrower's asset transfer was a step towards deliberate insolvency would be sufficient to support Erste's case that there is a serious issue to be tried in relation to its allegation of conspiracy, even if that Court decision were the only evidence of deliberate insolvency, which it is not.

32.   That conclusion by the ACVR that the borrower's asset transfer was a step towards deliberate insolvency is also the answer to Mr Morgan's submission that the transfer of assets away from the borrower was something permitted by the terms of the Loan Agreement. That may well be the case but the Loan Agreement did not contemplate or permit the deliberate alienation of the borrower's assets with a view to rendering it insolvent and ensuring that it could not honour its obligations under the Loan Agreement.

33.    Second, Mr Morgan QC placed great reliance on the fact that Erste's pleaded case at [63] of the Particulars of Claim is that the effect of the borrower's asset transfer was to render the borrower balance sheet insolvent. He relied upon a comparison of the published balance sheet of the borrower as at 30 March 2009 before the transfer and that as at 30 June 2009 after the transfer to submit that whereas in the latter the fixed assets had gone down by RUB 1,377,068, the long term investments had gone up by RUB 1,774,989, reflecting the acquisition by the borrower of the shareholding in the Seventh Defendant. Accordingly, he submitted the borrower was not rendered balance sheet insolvent.

34.    To the extent that Mr Morgan QC relied upon these accounts as a "killer blow" to there being a serious issue to be tried, it seems to me his approach was misconceived. To begin with, as Mr Salzedo QC pointed out, on a fair reading of the Particulars of Claim, Erste's case does not concentrate on balance sheet insolvency to the exclusion of everything else.  I agree with Mr Salzedo that the overall pleaded case makes a perfectly comprehensible and arguable case that the purpose and effect of the borrower's asset transfer was to put the borrower in a position where it could not and would not honour its obligations under the Loan Agreement. It is striking that there is no evidence produced by RT on its application that the borrower could afford to pay the monthly "rent" equivalent to US$900,000 for the lease back of its own assets or ever did pay such rent. If, as Mr Morgan insisted, the lease back arrangement was not a sham, an obvious question arises as to why rent was not paid and if it was not, that suggests the borrower was insolvent in the sense that it could not pay its debts as they fell due.

35.    Furthermore, as Mr Salzedo pointed out, the argument that the accounts disprove balance sheet insolvency depends upon the value of the shareholding in the Seventh Defendant being as set out in the balance sheet as at 30 June 2009 under long term investments. However, it is at the very least arguable that the shareholding was worth nothing of the sort and was either valueless or worth very little. On the basis that the borrower did not pay any rent to lease back its own assets, it seems at least arguable that the shares in the Seventh Defendant were worth nothing like the value placed upon them in the balance sheet.

36.    It is also striking that, somewhat inconsistently with its case that the borrower had not been rendered balance sheet insolvent, in a third witness statement of Mr Nurney of its solicitors put in very late, on the fifth day of the hearing, RT sought to put forward further evidence that, before the borrower's asset transfer, the borrower was in severe cash flow difficulties and not paying its creditors when they fell due, although it was accepted by Mr Morgan that it was paying its obligations under the Loan Agreement. He was unable to say on the evidence that the borrower was paying off the banks rather than its other creditors. It seems to me that this additional evidence merely serves to demonstrate that there is a serious issue to be tried. Also, if the borrower's financial position was already appallingly weak before the borrower's asset transfer, as RT now suggests, the obligation to pay the equivalent of US$900,000 a month which on that hypothesis it could never pay is all the more likely to have been a sham.

37.    Third, Mr Morgan QC made two related points about the judgment of the ACVR of 2 June 2010 setting aside the borrower's asset transfer, in the first instance that in circumstances where the Russian court had set aside the transfer, it was not necessary for Erste to seek an Order under section 423 of the Insolvency Act 1986 unravelling

the transfer. The short answer to that point is that, as appears later in the chronology, the assets of the borrower were not returned to it pursuant to the judgment but the so-called "amicable agreement" (described further below) was made instead for payment of money (which was never in fact paid) in lieu of the return of the assets. As set out below, Erste has a good argument that that agreement is a very odd one and that, in any event, there is no evidence of the Seventh Defendant having paid any sum to the borrower, so that in fact the borrower has received back neither the assets nor their money equivalent, making an Order under section 423 at least arguably necessary relief.

38.  As for the concern expressed by Mr Morgan that any order under sections 423 and 425 involving the restoration of assets would subvert the insolvency proceedings in Russia in some way, it seems to me there are two answers to that point. First none of the Russian liquidation managers or similar officials has applied for recognition of the Russian insolvency proceedings under the Cross-Border Insolvency Regulations 2006. Second, section 425 is in permissive not mandatory terms giving the court a wide discretion as to orders that can be made. In due course the court may need to take account of what has been happening in the Russian insolvency proceedings in determining what orders are appropriate, always bearing in mind that, if Erste makes out its case, it will have established that those insolvency proceedings in Russia have been manipulated by the Defendants.

39.  The second point was that, because Erste was relying upon the judgment of the ACVR, it was not open to Erste to go beyond it or to argue that notwithstanding that, on the face of the judgment the borrower's asset transfer had been set aside and the assets revested in the borrower, the true position was that that had not happened and that further relief was at least arguably necessary under section 423. The basis for this somewhat extreme submission was that by relying on the judgment, Erste was in some way a privy of Gazprombank which obtained the judgment and therefore privy to the judgment. I pressed Mr Morgan QC in argument as to whether he accepted that this submission went further than any earlier English authority and although he did not accept that, he did accept that he could not point to any specific case to support his submission.

40.  I agree with Mr Salzedo QC that this submission is fundamentally flawed and that the short answer to it is that Erste is not the privy of Gazprombank. For a party to be estopped by privity with a judgment obtained in other litigation, it is essential that the party had some kind of interest, legal or beneficial, in the previous litigation or its subject matter: see per Latham LJ in *Powell v Wiltshire* [2004] EWCA Civ 534; [2005] QB 117 at [15] citing with approval [231] in *Spencer Bower, Turner & Handley: Res Judicata* 3rd edition. Erste had no legal or beneficial interest in Gazprombank's litigation and subsequent reliance on the judgment does not somehow confer such an interest after the event. In any event, as Mr Salzedo QC rightly points out, the causes of action in the present proceedings are simply not the same as in the case of Gazprombank.

41.  Returning to the chronology, shortly before the borrower defaulted under the Loan Agreement, it appears that on 17 July 2009, the Fourth Defendant succeeded VMS as the creditor of the borrower under the supply contract with VMS in the amount of RUB 37 million plus interest. A fortnight later, on 30 July 2009, just before the borrower defaulted under the Loan Agreement, the Sixth Defendant succeeded to

RUB 30 million of this debt, leaving the Fourth Defendant as a creditor of the borrower in the amount of RUB 7.5 million. The ACVR recognised that the Fourth and Sixth Defendants had succeeded VMS as creditors of the borrower in a ruling on 7 August 2009. Although RT contends that this "VMS Swap" was effected in order to save the business, I agree with Mr Salzedo QC that that explanation has a somewhat hollow ring. It is at least arguable that the VMS Swap was effected in order to retain control of the borrower at any subsequent creditor's meeting within the RT group rather than losing control to third party creditors, a pattern of "buying up" the borrower's and guarantor's debt which arguably repeats itself thereafter.

42.    Within a week of those events and of the borrower defaulting under the Loan Agreement, on 5 August 2009, Mr Zavyalov, Deputy CEO of RT wrote the letter referred to at [22(5)] above to the lenders under the facility, including Erste, seeking restructuring of the borrower's debt. That letter made no mention of either the borrower's asset transfer or the VMS Swap.

43.    A meeting then took place in Moscow on 2 September 2009 between VTB Bank as Facility agent under the Loan Agreement and representatives of the Fourth Defendant on behalf of the borrower, including Mr Nosov, at which VTB Bank indicated a willingness to discuss restructuring of the debt provided that other creditors, specifically Gazprombank and Sberbank, agreed. Mr Nosov then wrote to VTB Bank as Facility Agent on 15 September 2009. He made what the recipient of the letter regarded (it seems to me with some justification) as an implied threat that if negotiations for restructuring reached a deadlock, filing for bankruptcy might be the only remaining option. However, he too made no mention in his letter of the borrower's asset transfer or the VMS Swap.

44.    Mr Nosov adopted an equally guarded approach when he wrote a further letter to VTB Bank as Facility Agent on 20 October 2009, stating "several commercial creditors have submitted insolvency claims against [the borrower] in the Volgograd regional court". He did not disclose that the creditors in question were companies in the same group as the borrower, the Fourth and Sixth Defendants, which in one sense could not be described as commercial creditors because they only became creditors by virtue of the VMS Swap. Since Mr Nosov was the general manager of the Fourth Defendant, it is arguable that the letter was positively misleading.

45.    When the petition of the Fourth and Sixth Defendants came on for hearing on 26 November 2009, the ACVR accepted that there was nothing to suggest the borrower could repay its debt and placed the borrower into the bankruptcy procedure, appointing Mr Lyubimenko as its temporary manager. On 9 February 2010, the guarantor followed suit, petitioning the ACVR itself to be placed within the supervision bankruptcy procedure on the basis that its debt far exceeded its assets. The guarantor's petition was granted by the ACVR on 14 May 2010 and Mr Vladimir Dobryshkin was appointed as its temporary manager.

46.    What does not emerge from the ruling of the ACVR is that a month earlier and two months after it had petitioned for its own bankruptcy, the guarantor entered into a so-called surety agreement whereby it agreed to guarantee the purchase by the Fourth Defendant of certain promissory notes from the Eighth Defendant for the equivalent of about £66 million. This sum was payable by the Fourth Defendant within ten days of the transfer of the notes or, if it defaulted, by the guarantor within five days of a

demand by the Eighth Defendant. The Fourth Defendant failed to fulfil its obligation and on 30 April 2010, the Eighth Defendant demanded payment under the surety agreement. However, the guarantor was in no position to pay under the surety agreement as its total assets were less than a third of the sum guaranteed.

47.  It is difficult to see what legitimate commercial purpose the surety agreement would have had if the guarantor had been able to honour that obligation, but given that the guarantor had petitioned for its own bankruptcy two months earlier, the transaction made no commercial sense whatsoever. It was concluded without consideration and given the size of the guarantee there was no hope that the guarantor could have honoured it.

48.  As Mr Salzedo QC points out, the effect of the surety agreement was to dilute the share of the creditors of the guarantor, including Erste, in the total claims against the guarantor, reducing the probability of a return, since by the agreement the Eighth Defendant became the largest creditor of the guarantor, representing 31.2% of the creditors' claims. Mr Salzedo QC submits that the surety agreement was a sham, designed to dilute the voting rights of legitimate creditors and ensure that RT through the Eighth Defendant could control creditors' meetings. Not only is that case fully arguable, but eventually, by a ruling dated 29 March 2012, the ACVR decided in terms that it was a sham concluded solely in the interest of the Fourth Defendant and that it defrauded the interests of the guarantor and its creditors. The Court declared the surety agreement void.

49.  However, before that ruling was eventually made, the Eighth Defendant had succeeded in obtaining a ruling from the ACVR that it be included on the creditors' register of the guarantor in an amount of some RUB 3 billion. An appeal by the Lenders, including Erste, to the Arbitrazh Appellate Court ("AAC") failed and in February 2011, principally on the basis of the vote of the Eighth Defendant, the guarantor was placed in external management, with Mr Dobryshkin as external manager. The Lenders failed to get a declaration from the ACVR at that stage that the surety agreement was void and an appeal to the AAC failed.

50.  The lawyer representing Mr Dobryshkin informed Erste's solicitors' Moscow office that if the Lenders insisted on challenging the surety agreement, he would endeavour to set aside the Guarantee. Undaunted, the Lenders applied to the ACVR for the removal of Mr Dobryshkin as external manager for failure to apply to set aside the surety agreement as being contrary to the Bankruptcy Law. The day before that application was due to be heard, Mr Dobryshkin did apply to set aside the surety agreement but, as his lawyer had threatened, he accompanied that with an application to set aside the Guarantee. Somewhat inconsistently, he did not apply to set aside guarantees granted by the guarantor in 2008-2009 to Gazprombank and Sberbank. Erste's case is that that omission was not an oversight but deliberate, since by the time of his application, those other guarantees had been assigned to RT Capital, as set out in more detail below. In due course in a ruling on 5 December 2011 the ACVR declared both the surety agreement and the Guarantee invalid. That judgment is the judgment about which Erste makes specific complaint in relation to the reasoning and ruling in relation to the Guarantee in that part of its case on appropriate forum which questions the availability of a fair trial in Russia, so that it will be necessary to consider it further in that context.

51.     Returning to the chronological analysis, on 14 May 2010, Mr Lyubimenko, the temporary manager of the borrower circulated a report to the creditors recommending that the borrower be put into compulsory liquidation as part of a three stage process. The first stage was to attempt to recover the assets alienated by the borrower's asset transfer and he reported that he had filed a claim with the ACVR on 22 April 2010 to recover those assets. The second stage was the sale of the borrower's land and other assets to increase the estate available to creditors. The third stage was to solicit potential investors, including the Russian Government. He anticipated that if the proposal were accepted, the creditors could expect to recover between 78.46% and 100%, whereas if nothing were done he predicted a recovery rate of 13.18%. Although this is disputed by RT, that figure of 13.18% suggests that he did not accept that the shareholding in the Seventh Defendant was worth anything like its face value.

52.     However, on the same day as Mr Lyubimenko presented his report to the creditors and at a time when the borrower had been in bankruptcy for some months, the borrower in fact entered an agreement with the Eighth Defendant under which it assumed the latter's obligations under an agreement between the Eighth Defendant and a company called SRP dated 27 October 2009, pursuant to which the Eighth Defendant owed about RUB 20 million. Erste's case, which is fully arguable, is that there was no proper commercial purpose for this SRP transaction between the borrower and the Eighth Defendant, given that the borrower was already in default under the Loan Agreement. The transaction appears to have simply created another debt the borrower could not satisfy, but one owed to another company in the RT group.

53.     The decision of the ACVR that the borrower's asset transfer was void already referred to in [30] above was then made on 2 June 2010, shortly after which Mr Lyubimenko reported to the first meeting of creditors on 17 June 2010 that, having reviewed the flow of funds out of the borrower, its alienation of core assets and its assumption of additional liabilities, there were features of deliberate bankruptcy. His proposal in his earlier report of 14 May 2010 for compulsory liquidation was approved by over 60% of the creditors by value. Although Mr Morgan QC sought to make much of a suggestion that Erste was inconsistent in its approach, sometimes (as at this stage) favouring liquidation of the borrower and at other times resisting it, the short answer is that Mr Lyubimenko's proposal involved recovering the alienated assets as part of the liquidation process with a substantial recovery rate as a consequence, a proposal which would make obvious sense to any commercial creditor such as Erste.

54.     The Fourth and Sixth Defendants (who had only become creditors by virtue of the VMS Swap) voted against liquidation at the creditors' meeting and in favour of external management. Erste's case is that, having failed to defeat that motion and given that, by virtue of the ACVR ruling of 2 June 2010, there was a risk that the alienated assets would be returned to the borrower, the Fourth and Sixth Defendants needed to take steps to ensure that the process of compulsory liquidation contemplated by Mr Lyubimenko did not happen. Accordingly, on 25 June 2010 the Sixth Defendant applied to the ACVR to remove Mr Lyubimenko as temporary manager on the basis of a series of technical and footling complaints. The ACVR acceded to that application on the basis that payments he had authorised totalling the equivalent of £3,300 to a company specialising in maintaining creditors' registers was unreasonable. Mr Salzedo submits, it seems to me with some force, that his dismissal

was on the basis of an irrelevant technicality and there was no valid commercial reason why the borrower, the guarantor or the Sixth Defendant should have objected to his incurring trifling expenses to ensure that an accurate picture of the borrower's financial position was maintained.

55. Following his dismissal, a further creditor's meeting was held on 5 July 2010 at which the Sixth Defendant achieved the election of Mr Akimov as temporary manager. That appointment was approved by the ACVR, rejecting submissions by another independent creditor LLC Partner that the approval of the Sixth Defendant's nominee was premature. Erste's case is that by these means of removing Mr Lyubimenko and achieving the appointment of their nominee Mr Akimov in his stead, the RT group averted the threat of the compulsory liquidation of the borrower and obtained control over the creditors' meeting. Although that challenge to the bona fides of the actions of the RT group is disputed by RT, in my judgment there is a serious issue to be tried as to whether this is not all part of the overall conspiracy alleged by Erste.

56. Thereafter, on 23 September 2010, the Lenders' claims (including that of Erste) were entered on the claims register of the guarantor by the ACVR which rejected a challenge by the guarantor on what Erste contends was the spurious basis that the Guarantee is governed by English law. The Seventh Defendant sought to appeal that decision of the ACVR, disputing the validity of the Guarantee even though the guarantor had expressly warranted its valid execution. That appeal was dismissed on 27 December 2010. As already recorded earlier, the external manager of the guarantor, Mr Dobryshkin, continued to threaten to dispute the validity of the Guarantee to the extent that the Lenders were persisting in challenging the validity of the surety agreement and ultimately he succeeded in having the Guarantee set aside by the ACVR in December 2011. That decision was upheld by the AAC. The Court of Cassation dismissed a further appeal and the Supreme Arbitrazh Court refused permission to appeal that decision on 25 May 2012, with the consequence that Erste cannot rely upon its rights under the Guarantee in Russia.

57. Following the decision of the ACVR of 2 June 2010 in favour of Gazprombank declaring the borrower's asset transfer invalid, Gazprombank applied for and was granted an enforcement order by the ACVR Execution Judge on 30 September 2010 entitling it to pursue the Seventh Defendant for the return of the borrower's alienated assets. At that point, on 6 December 2010 (three days after its incorporation) RT Capital (admitted to be a wholly owned subsidiary of RT) intervened and agreed to take an assignment of Gazprombank's claims against the borrower and the guarantor for 58% of their face value, then on 9 December 2010 agreed to acquire Sberbank's claims against the borrower and the guarantor for 46% of their face value. It is clearly arguable that RT Capital was set up for the purpose of taking over those debts.

58. Erste's case is that by those agreements with Gazprombank and Sberbank, which it refers to as the "Bank Debt Swaps", the Defendants secured the majority creditor votes by value in the borrower and the guarantor. In fact on 2 December 2010, four days before the Bank Debt Swaps, but at a time when it can reasonably be inferred they had been agreed, a creditors' meeting of the guarantor was held and the Eighth Defendant, Gazprombank and Sberbank voted in favour of removing the guarantor from the supervision procedure and placing it in external management, with Mr Dobryshkin as external manager. Similarly, on 28 December 2010, at a creditors' meeting of the borrower, the Eighth Defendant, Gazprombank and Sberbank voted in

favour of placing the borrower in external management rather than liquidation, with Mr Akimov as external manager. Those appointments were approved by the ACVR.

59.    On 21 December 2010, Gazprombank filed applications with the ACVR, supported by the borrower and the guarantor, to be replaced by RT Capital in the insolvency proceedings and on 25 January 2011, RT Capital applied to replace Sberbank as a creditor. Those applications were all granted by the ACVR.

60.    On Erste's case the position had then been reached by which through the Bank Debt Swaps, two of the major external creditors had been removed from the scene and the Defendants had ensured that the enforcement order of 30 September 2010 was not enforced and was able to influence the voting of Gazprombank and Sberbank at the creditors' meetings in December 2010 (just before and after the Bank Debt Swaps) referred to above. This all smoothed the way for the "amicable settlement". Although all these inferences are disputed by RT and RT Capital, I cannot possibly decide that point at this stage but would simply reiterate there is a serious issue to be tried.

61.    On 25 January 2011 the Lenders' Russian lawyer, Mr Marinichev, received an email from a Mr Traian Cabba claiming to act for the Roel Group, copied to an email address which on the face of it was connected with RT. The email proposed the purchase by the Roel Group of the debt under the Finance Documents for only 7% of face value "in order to resolve this imbroglio in which the syndicate of banks find themselves". He said that if the proposal commended itself, he and Mr Vladimir Bekish (whom he described as his partner) would draw up the necessary contracts. Mr Bekish is the General Manager of RT. A further email was sent by Mr Cabba two days later which sought to emphasise the connection between Roel and RT and invited Mr Marinichev to visit RT's website. Mr Cabba followed up the emails on the telephone, indicating he was acting on RT's instructions.

62.    Erste's case is that this was an attempt by RT through another related party to buy off external commercial creditors at a low recovery rate. In his submissions, Mr Morgan QC sought to pour scorn on this suggestion, pointing out that the email address was not one for RT at all and denying vehemently any involvement of RT in this offer. However, if that is right, as Mr Salzedo pointed out, it is odd that, when Erste subsequently wrote to RT on 18 March 2011 about this proposal, referring to Roel acting as an intermediary for RT, in response RT did not deny its involvement. In my judgment, there is enough material here for there to be a serious issue to be tried that RT was trying to buy off the Lenders at a low recovery rate.

63.    On 4 April 2011 a creditors' meeting of the borrower was held, of which RT Capital was in control, holding the majority of the votes. The purpose of the meeting was to approve the External Management Plan, drafted by Mr Akimov. The Plan proposed the incorporation of two new subsidiaries to hold the borrower's assets free of liabilities. No mention was made in the Plan of the recovery of the borrower's assets from the Seventh Defendant following the decision of the ACVR that the borrower's asset transfer should be set aside. RT Capital approved the Plan, the other creditors abstaining.

64.    A creditors' meeting of the guarantor was also convened on 22 April 2011 to approve the External Management Plan of the guarantor, drafted by Mr Dobryshkin. He proposed that the assets transferred to the Seventh Defendant be recovered and that an

option be exercised to acquire the freehold of land leased by the guarantor with a view to then selling the land at a substantial profit. The Plan envisaged an anticipated return of RUB 8 to 10 billion, enough to repay the guarantor's debts in full and that this could be achieved by August 2012.

65.     It would appear that around that time in April 2011, the amicable agreement was reached. This was subsequently approved by the ACVR on 13 July 2011 on the application of RT Capital. At the hearing approving the agreement, not only RT Capital, but the borrower, the guarantor and the Seventh Defendant were represented. The agreement was that, notwithstanding that, following the earlier decision setting aside the borrower's asset transfer, Article 167 of the Russian Civil Code and the enforcement order obtained by Gazprombank required restoration by the Seventh Defendant to the borrower of the alienated assets "in full and in their natural form", the parties agreed that taking account of natural wear and tear resulting from the use of the assets by the Seventh Defendant, the Seventh Defendant could not return the assets to the borrower in their full and natural form. Instead it was agreed that the Seventh Defendant would restore the value of the assets in monetary form, paying to the borrower RUB 183,281,167.61 (equivalent to about US$6 million) in two equal instalments before 1 August 2011 and 1 September 2011 respectively.

66.     Some further supposed explanation for the amicable agreement is provided in the evidence in support of RT's application from Mr Talanov, one of its Russian lawyers:

> "it was impossible to return the assets in full under the Execution Writ [i.e. the Order obtained by Gazprombank on 30 September 2010], as the assets had suffered deterioration through wear and tear. In addition, the full return of the assets was not possible as some of the old assets were completely worn out and unusable. Thus they would have been written-off on the balance sheet. A modest proportion of assets (10% as evaluated by Mr Fomenko [Head of Legal at the borrower]) which was not needed in the technological chain was sold at market value to cover the operational costs ..."

67.     As Mr Salzedo submits, this begs more questions than it answers: why was that explanation not given to the ACVR in July 2011 when it was invited to approve the amicable agreement? Why was no mention made of the sale of the assets, to whom were they sold and what account has been given of what was sold? Overall there remains something distinctly odd about the alleged need for this amicable agreement: since the borrower remained in physical possession of the assets throughout, given that it was paying the equivalent of US$900,000 to lease them back, why was it impossible to return them to the borrower? It would surely just have been a question of ensuring that ownership reverted to the borrower. In the circumstances, notwithstanding its approval by the ACVR, Erste is understandably critical of this amicable agreement.

68.     The amicable agreement was a means by which the Defendants avoided the enforcement of the order for enforcement obtained by Gazprombank which would have required the borrower's assets to be restored in full by the Seventh Defendant. In fact the Seventh Defendant did not pay any of the agreed compensation and it is difficult to see how it can ever have been intended to do so. As Erste points out, it was

never more than a holding company for the assets of the borrower and the guarantor. Furthermore, upon the application of the Sixth Defendant, the Seventh Defendant was placed into insolvency by order of the Arbitrazh Court of the City of Moscow dated 24 August 2011, only a few weeks after the first instalment of compensation fell due. The borrower submitted a claim in the Seventh Defendant's insolvency, but has otherwise taken no enforcement action against the Seventh Defendant.

69.     In my judgment Erste has a fully arguable case that the amicable agreement was a device by which RT and the other Defendants were able to continue to keep the assets of the borrower out of the reach of the external creditors, including the Lenders. Although RT now contends that Erste could have chosen to challenge the decision of the ACVR approving the amicable agreement, none of the external creditors was party to this deal between the Defendants and the contention presupposes such a challenge would have been successful.

70.     The External Management Plan of the borrower was carried out, in that the remaining assets of the borrower (said to be worth RUB 6 billion after the partial return by the Seventh Defendant) were transferred to two new companies, JSC "VMZ Red October" ("VMZ") and "Volgogradmetallobrabotka" ("VMO") on 12 September 2011 in return for shares in the new companies. There is no evidence that any valuable consideration was paid for the alienation of these remaining assets. It was only after these transfers that the external manager, Mr Akimov, determined that the borrower could not be restored to solvency, which begs the question why he did not reach the conclusion before the transfers to VMO and VMZ. In any event, RT's Russian law expert Professor Karelina, appears to accept that these transfers of assets were unlawful, as they were in breach of Russia's "mobilisation" laws which prohibit the alienation of strategic assets save in strictly regulated circumstances. Erste and VTB made an application to the ACVR to have the transfers declared invalid and on 17 December 2012 the ACVR held that the transfer to VMO was void.

71.     In relation to the guarantor, the Lenders were concerned about the validity of the surety agreement. In April 2011 they requested Mr Dobryshkin as external manager to apply to the Russian Court to invalidate the surety agreement on the basis that external managers are required under Article 20.3 of the Bankruptcy Law to take steps to protect the property of the debtor and act reasonably and in good faith in the interests of the debtor. Mr Dobryshkin refused to make such an application so the Lenders petitioned the Court for his dismissal. As already noted above, the day before that application was due to be heard, he eventually made an application to have the surety agreement declared invalid, although he coupled it with an application to have the Guarantee declared invalid.

72.     The ACVR refused the Lenders' application to remove Mr Dobryshkin, but the AAC allowed the appeal, finding that Mr Dobryshkin had violated Article 20.3 of the Bankruptcy Law by failing to take measures to protect the debtor's property, leading to the infringement of the rights and lawful interests of the creditors. Mr Dobryshkin applied to the court subsequently to resign rather than be dismissed and was later sanctioned by his professional body and fined by the ACVR.

73.     At the same time as a new external manager was required for the guarantor, RT Capital (which held the majority of the voting rights of the creditors of the borrower by virtue of the Bank Debt swaps) was seeking a new external manager for the

borrower. This was apparently because a new company, Uralvagonzavod had acquired an interest in the debt assets of RT Capital acquired by the Bank Debt Swaps. At his own request Mr Akimov was released from his role. At creditors' meetings of the borrower and the guarantor held on 24 November 2011, Mr Lysov and Mr Chikrizov were respectively appointed external managers. Those appointments were approved by the ACVR.

74.    The ACVR having declared the Guarantee invalid by its ruling on 5 December 2011, on 16 December 2011, the Lenders asked Mr Chikrizov to contest the guarantees in favour of Gazprombank and Sberbank, to which RT Capital had succeeded by the Bank Debt Swaps on the basis that by parity of reasoning with the judgment of the ACVR, those guarantees too, made in the same time period as the Guarantee, must have been transactions aimed at defrauding creditors. That request was ignored, so on 20 January 2012, the Lenders applied to the ACVR for an Order directing him to challenge those guarantees and also seeking his dismissal for failure to act earlier. Mr Chikrizov did then make the application to challenge the guarantees on 23 March 2012, by which time his challenge was time barred and, in due course, RT Capital successfully resisted the application on the basis of time bar on 6 August 2012. I agree with Erste that it must be a reasonable inference Mr Chikrizov would have realised any challenge was time barred.

75.    At the creditors' meeting of the borrower on 24 November 2011, the Lenders secured a place for their lawyer, Mr Marinichev, on the creditors' committee. However despite requests from Mr Marinichev to convene a creditors' meeting, Mr Lysov, the new external manager, did not do so. What then happened is that an important creditors' meeting of the borrower was held on 6 March 2012, but Erste was not given notice of the meeting and so did not attend, only learning about it afterwards from other creditors. The reason why Erste did not have notice is that Mr Lysov sent the notice of the meeting to an old address which was no longer being used. Erste submits with some force that he knew or ought to have known he was using the wrong address, as he had used the correct up to date address on several previous occasions.

76.    At the meeting on 6 March 2012 held in the absence of Erste, RT Capital, which was the majority creditor by value, voted in favour of the liquidation of the borrower. Also the creditors' committee was re-elected but did not include Mr Marinichev so that the Lenders were unrepresented on the committee. Erste's case is that this was all quite deliberate, another step in the conspiracy designed to give RT through RT Capital complete and unfettered control of the borrower to the exclusion of Erste and the other Lenders. Both Mr Morgan QC and Mr Mumford sought to pour scorn on this point, suggesting it was a non-point, because it would always have been open to Erste to reconvene another creditors' meeting to hold another vote and that, in fact, another meeting was convened on 10 April 2012.

77.    However, what those submissions fail to address is that whilst if the Lenders had been at the meeting on 6 March 2012, they would have had enough of the votes (23%) to keep Mr Marinichev on the committee, when it came to a request at the meeting on 10 April 2012 to re-elect the creditors' committee, which would have enabled the Lenders to elect Mr Marinichev, a majority of the votes (i.e. more than 50%) was required to force a re-election and the request for a re-election was defeated by a majority of the creditors led by RT Capital. The decisions taken at the meeting on 6 March 2012 were approved by the ACVR on 22 May 2012 and the Lenders' appeal to

the AAC was dismissed on 23 August 2012. Contrary to the submissions of Mr Morgan QC and Mr Mumford, I consider that Erste has shown a serious issue to be tried that its exclusion from the creditors' meeting of 6 March 2012 was deliberate and was part of the overall conspiracy between the Defendants.

78. As Mr Salzedo QC pointed out, the Lenders fared no better in relation to the guarantor. Following the ruling of the ACVR that the Guarantee was invalid as a matter of Russian law, Erste was excluded from the claims register of the guarantor by an order of the ACVR dated 20 February 2012. Notwithstanding the promising nature of the External Management Plan, which might if implemented have returned the guarantor to full solvency, nothing in the Plan was ever implemented and, on 26 March 2012, a creditors' meeting was held at which RT Capital voted in favour of liquidating the guarantor.

79. Subsequently RT Capital assigned its debt assets in respect of the borrower and the guarantor to another affiliate of RT, ZAO Trade House VMZ Red October. On 6 and 7 September 2012, the ACVR amended the creditors' registers of the borrower and the guarantor to replace RT Capital with Trade House.

80. To complete the chronology, the Claim Form was issued on 23 August 2012. An application for permission to serve the Third to Eighth Defendants outside the jurisdiction in Russia was made on 19 October 2012. A few days before the application for permission to serve out was made, Erste learnt that the liquidation of the Fourth and Eighth Defendants in Russia was imminent. So far as the Fourth Defendant is concerned, the Russian Court had made an order that the liquidation was complete and an appeal against that order by another creditor was dismissed on 12 October 2012. So far as the Eighth Defendant is concerned, the Russian Court had made an order on 27 September 2012 that the liquidation was complete.

81. In those circumstances, Erste asked for the application to be dealt with as a matter of urgency. On 24 October 2012, Cooke J granted Erste permission to serve the Claim Form on the Third to Eighth Defendants outside the jurisdiction in the Russian Federation. The proceedings were served on the Fourth and Eighth Defendants by registered post in Russia on 26 October 2012 and also delivered by Erste's lawyer in person on 31 October 2012 to the addresses for service specified in the order of Cooke J.

82. On 31 October 2012 Erste made an urgent application to the English court that in view of their imminent liquidation, the Fourth and Eighth Defendants should give early standard disclosure. In fact immediately before Erste's application was due to be heard by Hamblen J on 1 November 2012, Erste learnt that the Fourth Defendant had been dissolved and had ceased to exist. Accordingly, the application proceeded only against the Eighth Defendant. Having heard Leading Counsel for Erste, Hamblen J made an order for disclosure by the Eighth Defendant of specific categories of documents including documents relating to the surety agreement. The Eighth Defendant had until 4pm on 23 November 2012 to comply with that order. However, the dissolution of the Eighth Defendant took place and it ceased to exist shortly before the date for compliance with the order. As Mr Salzedo QC put it in submissions, the Fourth and Eighth Defendants have escaped justice in England by ceasing to exist after the Claim Form was issued.

83. In the meantime, on 11 October 2012, the ACVR recognised the borrower as insolvent and placed it into insolvency liquidation for six months. Mr Tarasov was appointed the Insolvency Liquidator. On 7 February 2013, Mr Tarasov made an application to the ACVR to reconsider its order of 18 February 2010 admitting Erste to the list of creditors of the borrower. The basis for his application appears to have been that Erste had filed its claim in England against the borrower before the borrower was placed into the insolvency procedure and that it had concealed the proceedings in England from the borrower. In a Statement of Defence dated 21 March 2013, Erste comprehensively refutes that suggestion, pointing out that the proceedings in England were commenced on 23 August 2012 and that the borrower and Mr Tarasov had been sent the Claim Form and other documents at the end of October 2012.

84. Subject to dealing with a series of specific points raised by RT and RT Capital which Mr Morgan QC and Mr Mumford submitted were in effect "killer blows" fatal to Erste's case, I consider that this chronology of events demonstrates a serious issue to be tried that RT and the other Defendants have conspired together to divert the borrower's and guarantor's assets and put them out of the reach of external creditors of those companies, including Erste. In effect, as Mr Rooney puts it, the claims of those legitimate external creditors were "washed out".

85. However, RT and RT Capital submit that they have two points which provide a complete answer to Erste's claim: governing law and reflective loss. Mr Morgan QC submitted that the governing law of the tort claims in conspiracy and for unlawful interference was Russian law, on the basis of Article 4.1 of Regulation EC 864/2007 ("Rome II"). He then submitted that since Erste has only pleaded its tort claim as a matter of English law, there was no case of Russian law made out or pleaded so that the case against RT was unsustainable.

86. In support of his submission that any alternative case that the facts alleged by Erste if proved would establish a civil wrong or tort as a matter of Russian law had to be specifically pleaded, he relied upon passages in the judgment of Sir Andrew Morritt C in *Global Multimedia International Ltd v Ara Media Services* [2006] EWHC 3107 (Ch); [2007] 1 All ER (Comm) 1160 at [38] and [39]. Although he accepted that these passages were obiter, he submitted that they stated the correct principle applicable in the present case:

> "The true proposition, I believe, is that as foreign law is in most cases a question of fact to be proved by evidence, in the absence of such evidence the court has no option but to apply English law. But if the facts alleged demonstrate that, for example, the proper law of a contract is not the law of England then as the law of England includes the principles of private international law those principles may demonstrate that some other system of law is applicable to the claim and if the relevant principles of that system of law are not sufficiently proved the claim may fail for that reason.
>
> 39 The Part 20 claim in this case is a good example. In paragraphs 10 to 15 AMS avers the existence of certain duties to be implied in the various contracts of employment entered

into by AMS and each of Mr. Aljadail, Mr. Abougabal and Mr. Al Serafi. Paragraph 14 avers that obligations of fidelity "were implied by law." Given the allegations in relation to the parties to and formation of the employment contracts the law there referred to must be the law of Saudi Arabia, yet there is no attempt to say what it is or, in the sense of legal source, where it is to be found. In my view such a pleading is deficient. It is not a mere pleading point but one of justice. If, as in this case, the true claim is based on propositions of foreign law then the party who advances it should make it good by reference to the system of law on which he relies. This is an *a fortiori* case because the defence of AMS in the proceedings brought by Global in Saudi Arabia does precisely that. It is true that that defence was advanced on 4th March 2006 as opposed to the Part 20 claim which was brought forward by AMS on 14th September 2005. But if AMS can provide the requisite details in the one it should be required to do so in the other. Quite apart from giving fair notice to the opposing party of the claim he has to meet, it merely increases costs if both parties have to carry out the same initial research into the relevant system of law."

87.  In reliance on those passages, Mr Morgan QC submitted that given that the applicable law of the tort claims is Russian law and no case of a civil wrong or delict is pleaded by Erste, the pleaded case is unsustainable and Erste cannot show any serious issue to be tried.

88.  Mr Salzedo QC submitted that, in circumstances where it was not being suggested by RT or RT Capital that the conspiracy case if proved on the facts would not give rise to a cause of action for a civil wrong in Russia, the question of applicable law is irrelevant to the question of whether there is a serious issue to be tried, although he accepts that it is relevant to the question of appropriate forum. I agree with Mr Salzedo about this and propose to leave over further consideration of the issue of applicable or governing law until later in the judgment when I consider the question of appropriate forum.

89.  The correct analysis is, as Mr Salzedo QC submitted, that Erste has pleaded in the Particulars of Claim a sufficiently arguable case of the tort of conspiracy and other torts having been committed as a matter of English law. If RT or any of the other defendants wish to allege that the applicable law is Russian law and that as a matter of Russian law the ingredients of the relevant delict or civil wrong are different from the position in English law, they will need to plead that in due course and, if Erste wishes at that stage to plead an alternative case in Russian law, it will be in a position to do so.

90.  As Mr Salzedo QC pointed out, that analysis is supported by the decision of the Court of Appeal in *Kuwait Oil Tanker Co SAK v Al Bader* [2000] 2 All ER (Comm) 271 at [178] and [180]. Although that was dealing with the issue of double actionability which no longer arises, the applicable principle is the same:

178. Mr Brodie's first argument is essentially a pleading point. He submitted that Kuwait being the lex loci delicti, the claimants should have begun by identifying the causes of action open to them under the law of Kuwait. He submitted that, had they done so they would have seen under the Articles previously quoted that the acts of wrongdoing on which they relied provided them prima facie with individual causes of action in respect of each of the misappropriations alleged against one or more of the defendants jointly and severally. Had those causes of action been pleaded it would have been seen that essentially similar claims for deceit, conversion and restitution lay against the defendants as several and joint tortfeasors under the laws of England, which claims could and (as Mr Brodie submitted) should have been pleaded without resort to the tort of conspiracy. He conceded that, had that been done, the double actionability rule would have been satisfied. However, he submitted that, the claimants having decided to pin their colours to the conspiracy mast in order to gain what they regarded as a more advantageous cause of action, it was appropriate that the question of double actionability should depend upon whether or not a cause of action for conspiracy to injure or defraud is known to the law of Kuwait.

180. Mr Brodie's first argument is neither founded upon authority nor hallowed by practice. The claimant's case, as originally pleaded, was a straightforward case in conspiracy in respect of which the claimants placed no reliance upon foreign law, it being their case that the lex loci delicti was English. Once the defendants had pleaded that the law governing any claim by the claimants arising out of any alleged breach of duty owed by the defendants was Kuwaiti law and it was expressly denied that the tort of conspiracy was actionable under the law of Kuwait, the claimants amended their claim to plead that each of the unlawful means by which the conspiracy was put into effect, and upon which the claimants would rely as a self-standing cause of action, was unlawful under the law of Kuwait as a breach of each of the defendants' duties of good faith and honesty owed as directors (in the case of Mr Al Bader and Mr Qabazard) and as an employee (in the case of Captain Stafford) and that the deliberate assistance by one defendant of any breaches committed by another defendant would be actionable under Article 227. That was a perfectly proper way to proceed and, save that the claimants later added to the Articles of the Kuwaiti Civil Code on which they relied, that was the way matters proceeded.

91.    That the correct analysis is that it is for the Defendants to allege and plead that the applicable law of the torts is Russian law is also borne out by [166] of the judgment of the Court of Appeal in *VTB Capital v Nutritek International* [2012] EWCA Civ 808; [2012] 2 Lloyd's Rep 313. Although the Supreme Court held that the Court of Appeal

had been wrong to conclude, albeit provisionally, that the applicable law was Russian law, the Supreme Court did not disapprove this part of the reasoning of the Court of Appeal. As Mr Salzedo pointed out, in that case, as in the present case, the claims in deceit and conspiracy were pleaded on the basis of English law and the claimants had not pleaded an alternative case as to the position under Russian law. Although Arnold J and the Court of Appeal concluded that the applicable law was Russian law, they evidently did not consider that the failure by the claimants to plead their case on Russian law was fatal in terms of there being a serious issue to be tried.

92.     Furthermore, I agree with Mr Salzedo that *Global Multimedia* is a very different case from the present. The Chancellor was considering a contract which was expressly governed by Saudi law and, in circumstances where the claimant was alleging that terms were to be implied into that contract as a matter of law, one can quite see why he considered that it was incumbent upon the claimant to set out its case in its Particulars of Claim as to the applicable principles of Saudi law. It is also to be noted that the Chancellor did not consider the absence of a pleading on Saudi law fatal to the claim. He would clearly have permitted an amended pleading to be served rather than striking out the claim.

93.     In any event, for reasons I will set out in more detail when I come to deal with appropriate forum, it seems to me that it is arguable that the applicable law of the torts alleged is English law, from which it follows that, even if applicable law were relevant to the question of whether there was a serious issue to be tried, one aspect of that serious issue to be tried is applicable law. Accordingly, this question of applicable law is in no sense a "killer blow" in favour of the defendants.

94.     Mr Morgan QC also submitted that on a proper analysis the claim under section 423 should be regarded as a cause of action in tort or delict and that as with the other tort claims the governing law of the tort or delict is Russian law. The basis for this rather surprising submission was said to be the historical derivation of the section which traces its roots back through section 172 of the Law of Property Act 1925 to the Act against Fraudulent Deeds, Gifts and Alienations of 1571 and the fact that whereas the Statute of Frauds had been promulgated across the common law world, civil law jurisdictions had a similar right of redress derived from the *actio Pauliana* in Roman law which is characterised as part of the general law at least in Holland and Germany. Therefore, submitted Mr Morgan, section 423 should be regarded for the purposes of Rome II as a cause of action in tort or delict and accordingly, although he accepted the section has worldwide ambit it could only be used where the Regulation identifies English law as the applicable law. Since, as he submits, the applicable law here under Article 4.1 is Russian law, section 423 has no application.

95.     These submissions seem to me to be founded on a fundamental misconception. Whatever its historical derivation, section 423 provides statutory relief and a statutory remedy if the requirements of the section are otherwise satisfied. It is not in any sense a cause of action in tort and the mere fact that the same facts as will give rise to an entitlement to an Order under section 423 may also give rise to a distinct cause of action for example in deceit or conspiracy do not make section 423 some form of "statutory" tort. The fact that civil law systems may not have an equivalent statutory regime is wholly irrelevant. It follows that even if the applicable law in relation to the tort claims is Russian law, that does not in itself affect the availability of relief under section 423. Given that, contrary to Mr Morgan's submissions, the assets of the

borrower have not been restored to it pursuant to the decisions of the Russian courts and Erste has shown a serious issue to be tried that there has been a deliberate alienation of the borrower's and guarantor's assets, Erste has shown a sufficiently arguable case that it is entitled to relief under section 423 of the Insolvency Act 1986.

96.    The other alleged "killer blow" on which RT and RT Capital rely is the assertion that Erste's claim is for reflective loss, in other words that its claim is for the diminution in the value of the borrower's assets, which is said on analysis to be the borrower's claim not Erste's. RT contends not only that this demonstrates clearly that the applicable law of the torts in Russia, because that loss was suffered by the borrower in Russia, but also that Erste does not have a sustainable claim since that is a claim for reflective loss which is not recoverable. Mr Mumford on behalf of RT Capital placed particular emphasis on that latter point, submitting that by the time his client is alleged to have become involved in the conspiracy, which cannot have been before its incorporation in December 2010, the borrower was in insolvency in Russia. Accordingly, he submitted, any claim that Erste has must necessarily be derivative because the only loss must be the diminution in the insolvent estate, prejudicing Erste's entitlement as a creditor to receive a distribution *pari passu*.

97.    Mr Salzedo QC submitted that the defendants were mischaracterising the nature of Erste's claim. In respect of each claim in tort, the pleaded loss was the sums due but unpaid under the Loan Agreement and/or the Guarantee on the basis that, but for the conspiracy and/or other torts committed, the borrower and the guarantor could and would have honoured their contractual obligations: see [120] to [127] of the Particulars of Claim. So far as Mr Mumford's point is concerned, Mr Salzedo contended that the short answer to it is that, at the point that RT Capital came on the scene, the borrower was in fact moving from supervision to external management which, not unlike Chapter 11 in the United States, involves a moratorium on claims by creditors and is designed to return the company to solvency not liquidation. Accordingly, he submits that Mr Mumford's point about reflective loss falls away.

98.    Although Mr Mumford sought to demonstrate in reply that this was wrong and that the termination of the process of external management would still lead to a distribution amongst creditors on a *pari passu* basis, on analysis that was a false point. As Mr Salzedo demonstrated, when there is a return to solvency and a termination of external management, the settlement with creditors is on the basis that they are paid in full or receive full satisfaction if they are prepared commercially to settle for less than 100% of their claim. It is not a *pari passu* distribution.

99.    In my judgment, on the basis of those submissions, Erste has a sufficiently arguable case for present purposes that its claims are not ones for reflective loss. In any event, even if the clams were for reflective loss, it is also arguable that the rule against reflective loss does not apply to creditors of a company: see [79] of my judgment in *Fortress Value Recovery Fund 1 LLC v Blue Skye Special Opportunities Fund LP* [2013] EWHC 14 (Comm); [2013] 1 All ER (Comm) 973. Like the applicable law point, this point about reflective loss is not a killer blow in favour of the defendants in relation to a serious issue to be tried.

100.    In the context of whether Erste had shown a serious issue to be tried against RT Capital, Mr Mumford made two related submissions, first that his clients could only have joined any conspiracy late in the day when RT Capital was incorporated in

December 2010 and second that everything his clients were then alleged to have done pursuant to the conspiracy had been done in the context of an insolvency process, administered by independent professional managers acting under the supervision of the Russian court or otherwise sanctioned by the court. Accordingly, he submitted Erste had not properly shown that the acts of RT Capital were unlawful as a matter of English law, and no alternative case of unlawfulness under Russian law is pleaded.

101.  The answer which Mr Salzedo QC gave to both these points was that, in English law, it is enough that RT Capital joined the conspiracy at a stage where a tortious plan was being executed using unlawful means, even if RT Capital did not carry out the unlawful acts itself, but they were carried out by other Defendants. Provided a sufficiently arguable case was shown that other Defendants had used unlawful means (and Mr Salzedo submitted correctly that the unlawful means, starting with the borrower's asset transfer are pleaded in detail in the Particulars of Claim), there was a sufficiently arguable case in conspiracy against RT Capital as well.

102.  In support of that submission, Mr Salzedo relied upon the decision of the Court of Appeal in *Kuwait Oil Tanker Company SAK v Al Bader* [2000] 2 All ER (Comm) 271 and in particular at [111] and [112] of the judgment of the Court (Nourse, Potter and Clarke LJJ) setting out what has to be proved to establish the tort of conspiracy:

> "111. A further feature of the tort of conspiracy, which is also found in criminal conspiracies, is that, as the judge pointed out at page 124, it is not necessary to show that there is anything in the nature of an express agreement, whether formal or informal. It is sufficient if two or more persons combine with a common intention, or, in other words, that they deliberately combine, albeit tacitly, to achieve a common end. Although civil and criminal conspiracies have important differences, we agree with the judge that the following passage from the judgment of the Court of Appeal Criminal Division delivered by O'Connor LJ in *R v Siracusa* (1990) 90 Cr. App. R. 340 at 349 is of assistance in this context:
>
> 'Secondly, the origins of all conspiracies are concealed and it is usually quite impossible to establish when or where the initial agreement was made or when or where other conspirators were recruited. The very existence of the agreement can only be inferred from overt acts. Participation in a conspiracy is infinitely variable: it can be active or passive. If the majority shareholder and director of a company consents to the company being used for drug smuggling carried out in the company's name by a fellow director and minority shareholder, he is guilty of conspiracy. Consent, that is agreement or adherence to the agreement, can be inferred if it is proved that he knew what was going on and the intention to participate in the furtherance of the criminal purpose is also established by his failure to stop the unlawful activity.'

Thus it is not necessary for the conspirators all to join the conspiracy at the same time, but we agree with the judge that the parties to it must be sufficiently aware of the surrounding circumstances and share the same object for it properly to be said that they were acting in concert at the time of the acts complained of. In a criminal case juries are often asked to decide whether the alleged conspirators were 'in it together'. That may be a helpful question to ask, but we agree with Mr Brodie that it should not be used as a method of avoiding detailed consideration of the acts which are said to have been done in pursuance of the conspiracy.

112. In most cases it will be necessary to scrutinise the acts relied upon in order to see what inferences can be drawn as to the existence or otherwise of the alleged conspiracy or combination. It will be the rare case in which there will be evidence of the agreement itself. Curiously this is such a case, although it appears to us that in crucial respects it is also necessary to draw inferences as to the extent of the agreement from what happened after it. Thus the essential nature of the agreement can be seen in part from the evidence of Mr Al Bader and Captain Stafford, although, especially in the case of Captain Stafford, the extent of the agreement will depend upon inferences to be drawn both from the surrounding circumstances and subsequent events."

103.    That case also demonstrates, from a consideration of the position of one of the conspirators, Captain Stafford, that a party can be party to a conspiracy to use unlawful means even if he does not himself commit some or all of the relevant unlawful acts: see [133] of the judgment of the Court of Appeal quoting with approval the judgment of Moore-Bick J at first instance. See also my judgment in *Concept Oil Services Limited v En-Gin Group LLP* [2013] EWHC 1897 (Comm) at [51]-[52]. Mr Mumford made the perfectly valid point that *Kuwait Oil Tanker* also establishes that a late joiner to a conspiracy cannot be liable for loss which has already been caused before he joins the conspiracy. However in the present case, it seems to me that the issue of which act or acts caused Erste's loss and when is quintessentially an issue for trial. In the circumstances, I consider that Erste has shown a serious issue to be tried that RT Capital is liable in conspiracy even though it joined the conspiracy late and even though it might establish it had not itself committed any unlawful acts.

Jurisdictional gateways: necessary and proper party

104.    The principal jurisdictional gateway relied upon by Erste to found jurisdiction against all the defendants other than the borrower and the guarantor is para 3.1(3) of CPR 6BPD: "A claim is made against a person ("the defendant") on whom the claim form has been or will be served (otherwise than in reliance on this paragraph) and - (a) there is between the claimant and the defendants a real issue which it is reasonable for the court to try; and (b) the claimant wishes to serve the claim form on another person who is a necessary and proper party to that claim". Erste's case is quite simple: it has

founded jurisdiction in England against the borrower and the guarantor under the exclusive jurisdiction clauses in the Loan Agreement and the Guarantee, appropriate litigation notices having been served before the proceedings commenced or during the hearing of the current applications. It has precisely the same wider claims in conspiracy and pursuant to other torts and for relief under section 423 against the borrower and the guarantor as it has against the other Defendants. It intends to pursue those claims against the borrower and the guarantor in England and the other Defendants (specifically RT and RT Capital) are both necessary and proper parties to the claims against the borrower and the guarantor. Furthermore, the issue of whether the other Defendants are necessary or proper parties to the claim against the borrower and the guarantor is to be considered at the date that Cooke J granted permission to serve out, 24 October 2012, so it is unaffected by whether the borrower and guarantor choose to defend the proceedings or summary judgment is entered against them (as it has been on the contractual claims) or even by their dissolution in Russia pursuant to the liquidations taking place: see *Mohammed v Bank of Kuwait* [1996] 1 WLR 1483 at 1492H-1493B per Evans LJ.

105.  Mr Morgan QC seeks to challenge the conclusion that the other Defendants are necessary or proper parties to the claims against the borrower and the guarantor, submitting that the English court in fact has no jurisdiction over the claims against the borrower and the guarantor (including the claims which have already been the subject of a successful application for summary judgment before HHJ Mackie QC) because Erste has submitted to the jurisdiction of the Russian bankruptcy court, the ACVR, in the case of the borrower by submitting claims in its liquidation in Russia and in the case of the guarantor by resisting Mr Dobryshkin's application to set aside the Guarantee as invalid under Russian law and by appealing the decision of the ACVR of 5 December 2011 declaring it invalid. Mr Morgan goes so far as to submit that Erste was at fault for failing to inform HHJ Mackie QC that it had submitted to the Russian bankruptcy jurisdiction and that, had he been so informed, HHJ Mackie QC should have declined jurisdiction.

106.  Reference was made by Mr Morgan QC to the Cross-Border Insolvency Regulations 2006, Chapter III of which relates to recognition of a foreign insolvency proceeding where a foreign liquidator or administrator or the like (described as a foreign representative) makes an application for recognition. Mr Morgan referred in particular to Article 20 which provides, in summary, that where the foreign insolvency proceeding is recognised by the English court, any proceedings in England in relation to the debtor's assets or liabilities or any insolvency proceedings in England will be stayed.

107.  Although Mr Morgan accepted that these Articles in Chapter III on recognition and its effect were not triggered unless and until a foreign representative made an application for recognition (which of course has not happened in the present case), he seemed to be submitting that the court should proceed as if such an application had been made. He drew attention to Article 29 (in Chapter V) which refers to concurrent proceedings in the foreign country and in England, but, contrary to his submissions, that Article is predicated upon there being an application for recognition by the foreign representative. There is no such application here. To the extent that what he appeared to be saying was that the English Court should take judicial recognition of the fact that there are insolvency proceedings in Russia, even though the Russian insolvency

representative is not making an application for recognition, and should either stay the claims against the borrower and the guarantor or decline jurisdiction in respect of those claims or under section 423 generally, there is nothing in the Regulations which supports or justifies that approach.

108.     Furthermore, in circumstances where there is no application for recognition and Erste's case is that the insolvency proceedings in Russia have come about as a consequence of the tortious conspiracy between the Defendants, it seems to me it would be quite wrong for this court to make some sort of assumption in favour of the Russian insolvencies and stay the present proceedings. In any event, as Mr Salzedo QC points out, even if there were an application for recognition, under Article 20.2(b) any stay of proceedings would be "subject to the same powers of the court… as would apply under the law of Great Britain in such a case", preserving the power of the English Court to permit the continuation of proceedings if it were just and convenient to do so. The factual background to the present dispute is such that even if there were recognition of the Russian insolvency proceedings by this Court, this might well be a case where the Court would permit the present proceedings, and specifically the claim for relief under section 423, to continue in this jurisdiction.

109.     Mr Morgan QC placed particular reliance on the judgment of Lord Collins in  the Supreme Court in the conjoined appeals of *Rubin v Eurofinance SA* and *New Cap Reinsurance Corporation (in liquidation) v Grant* [2012] UKSC 46; [2013] 1 AC 236. His decision (with which three other of their Lordships agreed, Lord Clarke dissenting) was that there is no special, more liberal rule as regards the recognition and enforcement of a foreign judgment in cases of insolvency or bankruptcy in the interests of the universality of bankruptcy or similar procedures. The rule in such proceedings is the same as in any other proceedings, as set out in what is now Rule 43 in *Dicey, Morris & Collins, The Conflict of Laws* 15th edition [14R-054]:

> "A court of a foreign country outside the United Kingdom has jurisdiction to give a judgment in personam capable of enforcement or recognition as against the person against whom it was given in the following cases:
>
> First Case- If the person against whom the judgment was given was, at the time the proceedings were instituted, present in the foreign country.
>
> Second Case- If the person against whom the judgment was given was claimant, or counterclaimed, in the proceedings in the foreign court.
>
> Third Case- If the person against whom the judgment was given submitted to the jurisdiction of that court by voluntarily appearing in the proceedings.
>
> Fourth Case- If the person against whom the judgment was given had before the commencement of the proceedings agreed, in respect of the subject matter of the proceedings, to submit to the jurisdiction of that court or of the courts of that country."

110.    Although Mr Morgan referred me extensively to a number of passages from the judgment, I agree with Mr Salzedo that much of Lord Collins' analysis is of no relevance to the issues in the present case. As he correctly submits Sections V, VI and VII of the judgment are all predicated upon there being an application for recognition and enforcement of the foreign insolvency proceedings or judgment, whereas there is no such application in the present case, as I have already found in the context of the Cross-Border Insolvency Regulations. Thus, although the section 423 claim would seem to fall within the definition of avoidance proceedings in [94], in my judgment in the absence of an application for recognition of judgments or orders made by the Russian courts in the insolvencies of the borrower and guarantor, there is nothing in Lord Collins' judgment to suggest that Erste should in some way be precluded from bringing the section 423 claim. Furthermore, as I have already said in the context of the Cross-Border Insolvency Regulations, even if there were such an application for recognition and a corresponding stay of the section 423 claim, the Court would always have a discretion to permit the claim to continue, which in the circumstances of this case, it might well exercise in Erste's favour.

111.    I agree with Mr Salzedo QC that the only section of the judgment which is of specific relevance in the present case is Section VIII, concerned with submission to the jurisdiction of the foreign bankruptcy court, the third case in Dicey Rule 43, which was a point which arose in the case of the Respondent Lloyd's syndicate in the *New Cap Re* appeal. In that case, the syndicate had not taken steps in the avoidance proceedings in Australia and had objected to the jurisdiction of the Australian court, but the syndicate had submitted its claim for proof in the liquidation in Australia. Lord Collins found that by doing so, the syndicate had submitted to the jurisdiction of the Australian court responsible for the supervision of the liquidation.

112.    The critical part of the judgment on this point is at [164]-[167]:

> "164. The Syndicate did not take any steps in the avoidance proceedings as such which would be regarded either by the Australian court or by the English court as a submission. Were the steps taken by the Syndicate in the liquidation a submission for the purposes of the rules relating to foreign judgments?
>
> 165. In English law there is no doubt that orders may be made against a foreign creditor who proves in an English liquidation or bankruptcy on the footing that by proving the foreign creditor submits to the jurisdiction of the English court. In *Ex p Robertson, In re Morton* (1875) LR 20 Eq 733 trustees were appointed over the property of bankrupt potato merchants in a liquidation by arrangement. A Scots merchant received payment of £120 after the liquidation petition was presented, and proved for a balance of £247 and received a dividend of what is now 20p in the pound. The trustees served a notice of motion, seeking repayment of the £120 paid out of the insolvent estate, out of the jurisdiction. The respondent objected to the jurisdiction of the English court on the ground that he was a domiciled Scotsman. On appeal from the county court, Sir James Bacon CJ held that the court had jurisdiction. He said, at pp 737-738:

"… what is the consequence of creditors coming in under a liquidation or bankruptcy? They come in under what is as much a compact as if each of them had signed and sealed and sworn to the terms of it - that the bankrupt's estate shall be duly administered among the creditors. That being so, the administration of the estate is cast upon the court, and the court has jurisdiction to decide all questions of whatever kind, whether of law, fact, or whatever else the court may think necessary in order to effect complete distribution of the bankrupt's estate. … [C]an there be any doubt that the Appellant in this case has agreed that, as far as he is concerned, the law of bankruptcy shall take effect as to him, and under this jurisdiction, to which he is not only subjected, but under which he has become an active party, and of which he has taken the benefit .. [The Appellant] is as much bound to perform the conditions of the compact, and to submit to the jurisdiction of the court, as if he had never been out of the limits of England."

166. The Syndicate objected to the jurisdiction of the Australian court. Barrett J in his judgment of 14 July 2009 accepted that it had made it clear that it was not submitting to its jurisdiction, and he also accepted that as a result the judgment of the Australian court would not be enforceable in England. His judgment is concerned exclusively with the preference claims, and he did not deal with the question of submission by reference to the Syndicate's participation in the liquidation by way of proof and receipt of dividends. He decided that the court had jurisdiction because the New South Wales rules justified service out of the jurisdiction on the basis that the cause of action arose in New South Wales.

167. I would therefore accept the liquidators' submission that, having chosen to submit to New Cap's Australian insolvency proceeding, the Syndicate should be taken to have submitted to the jurisdiction of the Australian court responsible for the supervision of that proceeding. It should not be allowed to benefit from the insolvency proceeding without the burden of complying with the orders made in that proceeding."

113. On the basis of that analysis, Mr Morgan QC submitted that by putting in a claim for proof in the insolvency of the borrower in Russia, Erste had submitted its claims against the borrower to the exclusive jurisdiction of the Russian courts and that it was not open to Erste to pursue its claims against the borrower in England.

114. In the context of that submission, it is important to note that Lord Collins was not purporting to lay down some rule of law that putting in a claim for proof in a foreign bankruptcy or liquidation constitutes a submission to the jurisdiction of the foreign court. On the contrary, as Lord Collins said in terms at [161]: "The question whether there has been a submission is to be inferred from all the facts". In my judgment on the material before the Court there are three critical aspects of the facts of this case

which distinguish it from *New Cap Re* and which mean that Erste has not submitted to the jurisdiction of the Russian court in relation to its claims against the borrower so as to preclude it from pursuing those claims in England.

115.    First, in stark contrast to *New Cap Re* where the application to enforce the Order of the Australian Court that the syndicate repay the sums paid to it by New Cap Re pursuant to the relevant commutation agreement, which the Australian Court found was a preference which should be set aside, was being made by the Australian liquidator, there is no such application by any of the court appointed managers or administrators in the present case. Rather the argument that there has been a submission to the Russian jurisdiction is being run by two of the Defendants to claims which I have held give rise to a serious issue to be tried that they are parties to a conspiracy to engineer the liquidation of the borrower and the guarantor by alienation of their assets and deliberate manipulation of the insolvency process in Russia.

116.    As I pointed out to Mr Morgan QC in argument, if he were right that RT can in effect subsume all the claims against it or its affiliates into the Russian liquidation procedure before any application for recognition has been made by the liquidator, that goes way beyond the principle of modified universalism of bankruptcy recognised in the authorities: see for example [19]-[20] of Lord Collins' judgment in *Rubin*, into some form super universalism. According that level of supremacy to a foreign bankruptcy proceeding (which is itself the subject of criticism in the claimant's case before the English court) goes beyond anything justified by the case law.

117.    Second, liquidation in Russia uses a completely different procedure from that in a common law jurisdiction. The evidence of the Defendants' own Russian law expert, Professor Karelina, is that when a claim is put forward to be placed upon the list of creditors' claims, the procedure is that the court will examine whether all formalities have been completed and the amount and priority of the claim. Whilst the court may assess the validity of the underlying transaction, no final decision is made at that stage because this procedure is not intended to replace ordinary civil proceedings. It will be in such ordinary civil proceedings that the validity or otherwise of the underlying transaction will be determined. Thus, as Mr Salzedo QC points out, unlike in common law jurisdictions such as Australia where an order of the Court dealing with bankruptcy or winding up will bind the parties, in Russia the procedure for admitting a claim to the list of creditors' claims is provisional. The validity or otherwise of the underlying transaction may be determined in separate proceedings and, depending upon the decision in those proceedings, the decision to admit the claim may need to be revisited.

118.    I agree with Mr Salzedo that what this demonstrates is that by putting forward its claim against the borrower to be placed on the list of creditors' claims, Erste has not submitted the determination of the merits of that claim (let alone the conspiracy claims) to the jurisdiction of the Russian courts in separate proceedings. It remains the case that those claims are to be determined in England pursuant to the exclusive jurisdiction clause.

119.    In his submissions in reply, Mr Morgan QC sought to rely upon Erste's Statement of Defence dated 21 March 2013 to the application by the Insolvency Liquidator of the borrower in effect to have Erste removed from the list of creditors as somehow a submission to the jurisdiction of the Russian courts. I consider that submission to be

hopeless. All Erste was doing was saying to the Russian court that the fact that it had obtained summary judgment in England was no reason for being removed from the list of creditors. Far from submitting the claims against the borrower to the jurisdiction of the Russian court, Erste was asserting that the dispute with the borrower had not been submitted to the Russian jurisdiction but to the jurisdiction of the English courts.

120.   The third matter which demonstrates that putting forward the claim to be placed on the list of creditors' claims did not amount to a submission of the determination of the merits of the claim to the Russian courts is closely related to the second and concerns the operation of the doctrine of *res judicata* in the Russian arbitrazh court system. The evidence of Dr Gladyshev, one of Erste's Russian law experts is that, in the arbitrazh court system, the doctrine of *res judicata* only applies within the Russian federation and then only to the facts found, not to the legal qualification of those facts or the application of the law to the facts. In other words court decisions are only binding as to the facts found and do not have extra-territorial effect. That point is not disputed by Professor Maggs, the defendants' Russian law expert.

121.   It follows in my judgment that *New Cap Re* does not necessitate the conclusion that by putting forward its claim against the borrower for proof in the liquidation, Erste submitted to the jurisdiction of the Russian courts for the determination of the merits of that claim or its conspiracy and other claims.

122.   That leaves the claims against the guarantor. Mr Morgan QC submits that Erste has submitted those claims to the jurisdiction of the arbitrazh courts in Russia by participating in the proceedings concerning the validity of the guarantee, resisting the application by Mr Dobryshkin to have the Guarantee declared invalid and appealing the decision of the ACVR declaring it invalid. Mr Morgan submits that this falls fairly and squarely within the third case of Dicey Rule 43.

123.   Mr Salzedo QC pointed out that it is clear from the judgment of the ACVR dated 5 December 2011 that the Lenders, including Erste, were submitting that the Russian court had no jurisdiction to determine the dispute as to the validity of the Guarantee as that dispute had to be determined by the LCIA pursuant to the London arbitration clause in the Guarantee. Although at that stage Erste had already elected to invoke the exclusive jurisdiction of the English courts so that in one sense the arbitration clause had fallen away and although no mention is made of the exclusive English jurisdiction clause in the judgment of the ACVR, what matters is that Erste was clearly challenging the jurisdiction of the Russian court, not submitting to that jurisdiction. As Mr Salzedo also pointed out, that challenge to the jurisdiction could not be taken as a separate point distinct from the merits as it would be in a common law jurisdiction. In civil law systems, even if you challenge the jurisdiction, you still have to set out your defence on the merits and those issues are dealt with by the court at the same time.

124.   Similarly, in the appeal process before the AAC, it is clear from its judgment dated 24 January 2012 that one of the points being taken by the Lenders was that the ACVR had erred in not applying the arbitration agreement. It is also apparent that the Lenders maintained before the Court of Cassation that the ACVR had violated the Arbitrazh Procedural Code by not recognising and applying the arbitration agreement. In any event, it seems to me that if the Lenders did not submit to the jurisdiction of

the ACVR, seeking to appeal the decision it had made in breach of the arbitration clause did not amount to a submission to the jurisdiction of the Russian courts.

125.  Mr Morgan QC sought to answer this point by submitting that Erste had submitted a claim against the guarantor to be included on the list of creditors in the liquidation, which was accepted by the ACVR on 22 September 2010 and in doing so it had not reserved its position that any dispute had to be arbitrated in London. Accordingly, Mr Morgan submitted that Erste had thereby submitted any dispute under the Guarantee to the jurisdiction of the arbitrazh courts. The answer to that point is the same one as I have given in relation to the borrower. The proof of claims in the liquidation and their approval by the Russian court is an entirely separate procedure from the determination of the merits of the dispute. But putting forward a claim in the liquidation, Erste did not submit any dispute as to the validity of the Guarantee to the jurisdiction of the Russian courts.

126.  On the basis that Erste did not submit to the jurisdiction of the Russian courts in relation to the determination of the validity of the Guarantee, the decision of the ACVR and the appellate courts that the Guarantee is invalid, which applied Russian law to the Guarantee, notwithstanding that it is expressly governed by English law, will not be recognised by the English Court. This is an application of the long-standing principle that discharge from liability under a foreign bankruptcy procedure will only be a discharge in England if it is a discharge under the law applicable to the contract. That principle was applied by the Court of Appeal in *Antony Gibbs & Sons v La Societe Industrielle et Commerciale des Metaux* (1890) 25 QBD 399 and has been applied many times since, most recently by Teare J in *Global Distressed Alpha Fund v PT Bakrie Investindo* [2011] EWHC 256 (Comm); [2011] 1 WLR 2038 at [11]-[13] (where the earlier authorities are summarised) and [25]-[27] (refusing an invitation not to follow the *Antony Gibbs* case).

127.  Once it is recognised that the argument based upon *New Cap Re*, that the claims against the borrower and the guarantor in England are unsustainable because they have been submitted to the jurisdiction of the Russian Courts dealing with the insolvency proceedings, is misconceived, the fact that the borrower and the guarantor may be in liquidation in Russia does not affect the entitlement of Erste to bring the wider tort claims or the claim under section 423 against them in England pursuant to the contractual jurisdiction provisions.

128.  I should add that, even if I had considered Mr Morgan was right that Erste had submitted its claims against the borrower and the guarantor to the jurisdiction of the Russian courts, I consider the only claims that would have been so submitted would be claims under the Loan Agreement and Guarantee themselves. I do not see any basis for the contention that it had submitted its wider claims in conspiracy and other torts to the jurisdiction of the Russian courts. To the extent that it were suggested that because the Guarantee had been declared void, Erste could not demonstrate that it had suffered any loss and damage, Erste still has an arguable case against the guarantor in conspiracy and the other torts in respect of the default of the borrower under the Loan Agreement.

129.  In conclusion on this jurisdictional gateway, for present purposes, I do not need to go beyond concluding that Erste has much the better of the argument that it has not submitted its claims against the borrower and guarantor to the jurisdiction of the

Russian courts and that it is free to and intends to pursue those claims in England. It is fair to say that, if he was wrong in his argument that Erste was precluded by the insolvencies in Russia and the judgment(s) of the Russian courts, Mr Morgan QC did not advance to any great extent an alternative argument that the other Defendants (and specifically RT and RT Capital) were not necessary or proper parties to the claims in tort and under section 423 against the borrower and the guarantor.

130.    Any such argument would be hopeless. The test as to whether the other defendants are proper parties to the claims against the borrower and the guarantor remains that formulated by Lord Esher MR in *Massey v Heynes* (1887) 21 QBD 330. As Lord Collins put it, giving the judgment of the Privy Council in *Altimo Holdings v Kyrgyz Mobil Tel Ltd* [2011] UKPC 7; [2012] 1 WLR 1804 at [87]:

> "Third, the question whether D2 is a proper party is answered by asking: "Supposing both parties had been within the jurisdiction would they both have been proper parties to the action?": *Massey v Heynes & Co* (1888) 21 QBD 330 at 338, per Lord Esher MR. D2 will be a proper party if the claims against D1 and D2 involve one investigation: *Massey v Heynes & Co* at 338, per Lindley LJ; applied in *Petroleo Brasiliero SA v Mellitus Shipping Inc (The Baltic Flame)* [2001] EWCA Civ 418, [2001] 1 Lloyd's Rep 203, at [33] and in *Carvill America Inc v Camperdown UK Ltd* [2005] EWCA Civ 645, [2005] 2 Lloyd's Rep 457, at [48], where Clarke LJ also used, or approved, in this connection the expressions "closely bound up" and "a common thread": at [46], [49]."

See also [36]-[38] in *United Film Distribution Ltd v Chhabria* [2001] EWCA Civ 416; [2001] 2 All ER (Comm) 865 per Blackburne J in the Court of Appeal.

131.    In my judgment the application of that test allows of only one answer: the claims in tort and under section 423 against the borrower and the guarantor are claims which are the same claims as are made against the other Defendants. Those claims involve one investigation and are, on any view, closely bound up with each other. It follows that Erste has much the better of the argument that RT and RT Capital (and the other Defendants) are necessary or proper parties to the claims against the borrower and the guarantor.

Jurisdictional gateways: claim in respect of a contract

132.    In one sense, once Erste has demonstrated, as it has, that the other Defendants are necessary or proper parties to the claims against the borrower and the guarantor, it is not necessary for Erste also to demonstrate that it could bring its claims against the other Defendants within one or other of the other jurisdictional gateways in the Practice Direction. However, since the matter was fully argued, I will deal with the other gateways.

133.    Erste relied also upon three sub-heads of para 3.1(6) of Practice Direction 6B: that the claims against the other Defendants were in respect of a contract or contracts made in England (sub-head (a)), governed by English law (sub-head (c)) or which contained an English jurisdiction clause (sub-head (d)).

134.    Mr Salzedo QC contended that the claims in tort against the other Defendants (and specifically, the claims for inducing breach of contract and interference with contractual relations) were claims "in respect of a contract" made in England, even though the other Defendants were not parties to the Loan Agreement or the Guarantee. He relied upon the decision of the Court of Appeal in *Greene Wood & McClean LLP v Templeton Insurance Ltd* [2009] EWCA Civ 65; [2009] 1 WLR 2013. The claimant was a firm of solicitors which had acted for a number of miners under a Group Litigation Order. The defendant was an Isle of Man insurance company which was an ATE insurer and it was the claimant's case that the defendant had agreed to indemnify the miners in respect of costs orders, which the defendant refused to do, leaving the claimant to satisfy those orders. The claimant claimed a contribution or indemnity from the defendant under the Civil Liability (Contribution) Act 1978 and sought permission to serve out on the basis that the claim was made "in respect of a contract", that is the contract between the defendant and the miners, even though the claimant was not party to that contract.

135.    Longmore LJ (with whom Sir Anthony Clarke MR and Hooper LJ agreed) held  at [17]-[20] that the claim was indeed one made in respect of the ATE contract and that the claimant did not need to be a party to the contract to bring itself within that jurisdictional gateway. He doubted whether it was even necessary for the defendant to be party to the contract:

> "17 The first question is whether the claim for a contribution or indemnity pursuant to the 1978 Act is "a claim in respect of a contract" for the purposes of sub-rule 5(c). The claim is only being made because, as it happens, the insurers do have a contract with the miners whereby they have agreed to indemnify the miners in respect of costs which may be ordered against them in the GLO application and in respect of own disbursements. But can it be said that GWM's claim is a claim in respect of a contract? It is not a contract to which GWM are a party and the paradigm case of a contract pursuant to which permission is given under part 6.20(5)(c) is a contract between the intended claimant and the intended defendant. Indeed the notes to the rule in the White Book (6.21.34) do actually say that the contract has to be a contract between those parties. That is adopted by Mr Sweeting for the insurers who says that is not enough for only one of the parties to the intended action to be a party to a contract. Suppose that there is a contract to which only the intended claimant is a party and the defendant merely has a tortious or fiduciary obligation to the third party, would that be sufficient for the sub-rule to apply? That would be odd because the defendant would be brought before the court under a contractual provision of CPR 6.20 when he was not a party to a contract at all.

> 18 To say that, for a claim to be "in respect of a contract", it must be "in respect of a contract between the intended claimant and the intended defendant" is to add words to the rule which are not there. The commentary in *Dicey, Morris and Collins,*

> *Conflict of Laws*, 14th ed (2006) 11-182 to 11-184 does not
> suggest any such requirement. Moreover since the Contracts
> (Rights of Third Parties) Act 1999, Parliament has
> contemplated cases in which a third party can sue on a contract
> made between two persons for his benefit. If such a contract is
> governed by English law (or, even, made or broken in England)
> why should the third party not be able to take advantage of sub-
> rule (5)(c) of CPR 6.20? It would be odd if he could not and
> every reason to suppose that he should be able to utilise the
> sub-rule, always subject to the court being satisfied that
> England is the "proper place" in which to bring the claim,
> pursuant to CPR 6.21(2A).

> 19 The claim in the present case clearly has a connection with a
> contract governed by English law. To my mind that makes it a
> claim in respect of that contract even if it is not a claim brought
> under the contract. No doubt some connections with contracts
> are more remote than others but the present claim has a very
> close connection with insurers' contract with the miners to pay
> their costs and own disbursements if they lose. As the judge
> said the remoteness from the contract (if any) is something that
> can be dealt with when the court considers whether England is
> the proper place for a claim under CPR 6.21(2A).

> 20 I doubt if it would be any different if it was the intended
> claimant rather than the intended defendant who was a party to
> the contract in respect of which the claim was brought but I am
> content to leave that question to be decided in a case in which it
> actually arises.

136.    Mr Salzedo QC submitted that that was a binding authority of the Court of Appeal
that it was not necessary for the purposes of this gateway that the defendant was party
to the contract in question. He also relied upon the application of the same principle
by Hamblen J in *Cecil v Bayat* [2010] EWHC 641 (Comm) at [135]. However, as
Tomlinson LJ pointed out in *Alliance Bank v Aquanta Corporation* [2012] EWCA
Civ 1588; [2013] 1 All ER (Comm) 819, what Longmore LJ said in *Templeton* in
relation to a defendant who was not a party to the contract was not binding, as the
point was left open and what Hamblen J said was strictly obiter: see [67] and [71].

137.    In *Alliance Bank* the Court of Appeal was faced with the argument that claims in
conspiracy were claims "in respect of a contract" even though the defendant was not a
party to the contract in question, but the claimant was, in other words the same
situation as in the present case. Mr Morgan QC, who appeared in that case, relied
upon passages in the judgment of Tomlinson LJ (with whom Elias and Lloyd LJJ
agreed) in support of his submission that the claims in tort against the other
Defendants are not "in respect of a contract", since those Defendants were not parties
to the Loan Agreement or the Guarantee.

138.    At [63], having cited Longmore LJ's observation at [19] in *Templeton* that the
remoteness of the connection with the contract can be dealt with in relation to
appropriate forum, Tomlinson LJ said:

> "Even so, I am intuitively resistant to the notion that gateway (6) can be used to justify service out of the jurisdiction by reference to a contract to which the intended defendant is not party. In such circumstances there is, as it seems to me, likely to be no sufficient link between the conduct of the intended defendant and this jurisdiction so as to justify the English court assuming an extra-territorial jurisdiction."

139.  He then goes on to consider a number of authorities relied on by the claimants in that case, including *Templeton* and *Cecil v Bayat* reaching his conclusion on this issue at [71]:

> "Notwithstanding the width of the language used by Longmore LJ in *Greene Wood,* plainly that case does not compel us to decide that connection of a claim with a contract to which an intended defendant is not party is a qualifying jurisdictional link under gateway 6. That point was left open. I am for my part attracted by the argument that a claim is not for that purpose properly described as "made in respect of a contract" where the contract in question is not one to which the defendant is party. For my part I see great force in the argument that it is implicit in the rule that the contract upon which reliance is placed must be one to which the intended defendant is party. I am also attracted by Mr Morgan's formulation which I would tentatively restate as follows:- unless the claimant is suing in order to assert a contractual right or a right which has arisen as a result of the non-performance of a contract, his claim is not in this context properly to be regarded as one made in respect of a contract. I think it likely that ordinarily such claims can only be made in respect of contracts to which the intended defendant is party. However the case of the intended defendant, Warner, considered by Hamblen J in *Cecil v Bayat* may show that that will not always be so. It is sufficient to dispose of the point in this case to indicate that the required connection between claim and contract must inevitably be the more difficult to establish in a case where the intended defendant is not party to the contract upon which reliance is placed than in a case where he is party to it. Longmore LJ was able to say in *Greene Wood* that the claim for contribution <u>clearly</u> had a connection with the Templeton contract which established the liability of Templeton to the miners, because that (contractual) liability was a prerequisite to *Greene Wood* claiming contribution from Templeton. Here there is in my judgment no clear connection, or no connection with any real content, between the claims in tort or delict against Ds 6-9 and the Reachcom loan agreements. Those agreements may be an incidental product of the conspiracy but it puts the cart before the horse to describe the claim in respect of the conspiracy as a claim in respect of the contracts to which it may, incidentally, have given rise. It would be more natural, but still in my judgment artificial, to

regard the claim as made in respect of the contracts of guarantee between Alliance and Reachcom rather than the loan agreements between Reachcom and Ds 3 and 4, since it was by the former that Alliance was deprived of its money. Similarly, I consider that the claims in unjust enrichment against the wrongdoers who allegedly participated in the scheme to divert Alliance's assets and the equitable claims for dishonest assistance and knowing receipt arising from the breach of fiduciary duty that arguably occurred when the contracts of guarantee were executed have a closer affinity to those contracts than to the contracts of loan. In these cases too however the necessary connection between the claim and the contracts is in my view lacking. In none of these formulations is Alliance suing Ds 6-9 in order to assert a contractual right or a right which has arisen as a result of the non-performance of a contract."

140. In my judgment, what emerges from that passage is that, despite the reluctance of Tomlinson LJ to accept that Para 3.1(6) could be applicable at all where the defendant is not a party to the contract in question, Mr Salzedo QC is right that Tomlinson LJ is recognising that a distinction can be drawn in principle between a case such as the Court of Appeal was considering there, of a contract made in effect pursuant to or incidental to the conspiracy where it is difficult to see the claim in conspiracy as being "in respect of" that contract and a case where there is a close connection between the claim being made and the contract. Mr Salzedo QC submitted that it was one thing to conclude that the conspiracy was not "in respect of the contract" where, as in *Alliance Bank*, the tort was "upstream" of the contract, preceding it, but it was another where the essence of the conspiracy was procuring the non-performance of the contract, in other words where the tort is "downstream" of the contract. He submitted that the present case fell into the latter category. Whilst it seems to me that, for reasons I will come to, this concept of the torts in the present case being "downstream" of the Loan Agreement and Guarantee (both governed by English law and containing an English jurisdiction clause) assists Erste in relation to the issue of appropriate forum, my own instincts are cautious like those of Tomlinson LJ and, in the light of the decision of the Court of Appeal in *Alliance Bank* I do not consider that Erste has much the better of the argument that the tort claims against the defendants other than the borrower and the guarantor are "in respect of a contract".

Jurisdictional gateways: claim in tort where damage sustained within the jurisdiction

141. Erste also relies upon para 3.1(9)(a) of Practice Direction 6B which provides: "A claim is made in tort where- (a) damage was sustained within the jurisdiction." As I have already indicated, Erste contends that the damage it has sustained as a consequence of the conspiracy and other torts is the non-fulfilment of the obligations of the borrower and the guarantor under the Loan Agreement and the Guarantee. Erste's case is very simple: its designated Facility Office for the purposes of the finance documents is at 68 Cornhill, London EC3V 3QE, where its London branch has its office and the Transfer Certificate (to which I refer in detail below) provided for payment to an account of Erste at a bank in London. Accordingly the damage claimed was sustained in England.

142.    Mr Morgan QC seeks to challenge Erste's entitlement to rely upon this gateway in three ways: (i) that the real loss is in fact the diminution in the value of the asset base of the borrower and the guarantor, a loss suffered in Russia; (ii) that even if the loss sustained is the non-fulfilment of the obligations under the finance documents, upon a close analysis of the Loan Agreement, the place of payment was New York so that the loss and damage was sustained in New York not London: (iii) that para 3.1(9) of the Practice Direction should be read as if it reflected Article 5(3) of the Brussels I Regulation. I have already concluded in the section of the judgment dealing with serious issue to be tried that the first head of challenge, the so-called reflective loss point, is misconceived, so it is not necessary to go back over that ground in the present context. However, I do need to deal with Mr Morgan's other two points in some detail.

143.    The starting point for Mr Morgan's submission that this gateway should be read as reflecting Article 5(3) was to refer to the Rules of the Supreme Court as they stood in 1982, immediately prior to the enactment of the Civil Jurisdiction and Judgments Act 1982 which brought the Brussels Convention into force in this jurisdiction. Order 11 rule 1(1)(h) as it then was, permitted service out when a tort was committed within the jurisdiction and, as was clear from the case law under that gateway summarised in the Supreme Court Practice 1982, it was not enough that the damage was sustained within the jurisdiction. With the coming into force of that part of the Civil Jurisdiction and Judgments Act 1982 which enacted into English law the Brussels Convention, RSC (Amendment No. 2) 1983 (S.I. 1983 No. 1181) made a number of amendments to adapt the Rules of the Supreme Court to the Convention.

144.    New Order 11 rule 1(1)(f) dealt with claims in tort and was essentially the same text as what is now para 3.1(9) of Practice Direction 6B. The alteration was made in order to ensure that English law was consistent with Article 5(3) of the Convention: see per Mance LJ in *ABCI v Banque Franco-Tunisienne* [2003] 2 Lloyd's Rep 146 at [43]. Mr Morgan QC argues that the gateway should be construed in accordance with Article 5(3) which permits claims in tort to be brought in "the courts of the place where the harmful event occurred" and the case law under that Article. However, as Mr Morgan QC recognises, that very argument has been raised and rejected in two first instance decisions.

145.    In *Cooley v Ramsey* [2008] EWHC 129 (QB); [2008] ILPr 27, Tugendhat J recorded and rejected this argument at [35] and [36] in these terms:

> "35 Mr Palmer starts his submissions on the Art 5(3) cases with the citation from *Metall & Rohstoff v Donaldson* [1990] 1 QB 391 at 437A, and *ABCI v Banque Franco-Tunisienne* [2003] EWCA Civ 205; [2003] 2 Lloyd's Rep 146 para 43, to the effect that the rule relating to service out of the jurisdiction in states not parties to the Brussels Convention (New York in that case) was changed to give effect to that Convention and the Civil Jurisdiction and Judgment Act 1982 and the decision of the European Court of Justice in *Handelskwekerij GJ Bier v Mines de Potases d'Alsace SA* (Case 21/76) [1978] QB 708. I accept that is so up to a point. But Parliament did not fully assimilate the rules relating to non-party states with those relating to states which are parties. The significant difference

that Parliament left in being was that under the Convention and the Judgments Regulation the court retains no discretion, whereas in relation to non-party states there is the discretion to be found in CPR Part 6.20 and 6.21(2A). "

36 It follows from this, in the words of Professor Briggs in "Civil Jurisdiction and Judgments" 4th ed para 4.43, that "there is no compelling reason to apply this line of Convention and, probably, Regulation authority outside the field of application of the Convention or Regulation itself".

146.    The same argument was rejected for the same reasons by Haddon-Cave J in *Wink v Croatia Osiguranje DD* [2013] EWHC 1118 (QB) at [41], following and approving *Cooley v Ramsey*:

"Miss Crowther's proposition (5), that Ground 9(a) 'falls to be read consistently with Article 5(3) of Brussels I', was comprehensively dismissed by Tugendhat J. in *Cooley (supra)* (at paragraphs [35]-[46]). In my judgment, Tugendhat J was right to do so. The case law of the Court of Justice ("CJEU") on Article 5(3) of the Brussels Convention/Brussels I Regulation is not relevant to the construction of Ground 9(a) because the two schemes are fundamentally different in structure and policy. The EU rules seek certainty at the price of inflexibility: thus *forum conveniens* arguments are not permitted (see *Owusu v Jackson* [2005] ECR I-01383). By contrast, in respect of non-Regulation countries, the common law rules adopt a more flexible legal framework which admits *forum conveniens* and makes the assumption of jurisdiction discretionary. "

147.    Mr Morgan QC rightly recognised that those authorities are completely against him. He seemed to be suggesting that in some way they could be distinguished because they failed to appreciate, that when the Rules Committee altered the wording of the gateway, it was intending to mirror the meaning and effect of "the place where the damage was sustained" in the Brussels Convention as interpreted by Professor Jenard in his report which constitutes the travaux preparatoires for the Convention. However in my judgment that point is hopeless, since, whilst neither judgment refers to Professor Jenard, the reason for rejecting the attempt to equate para 3.1(9) with Article 5(3), namely that the terms of the domestic rule are wider and the English Court retains a discretion as to jurisdiction absent from the Convention, would be unaffected by what Professor Jenard may have said, which only purports to deal with the position under the Convention, not with domestic jurisdictional rules of the Courts of the member states.

148.    It follows that, like Tugendhat J and Haddon-Cave J, I consider that the correct approach to the meaning of "damage was sustained within the jurisdiction" in para 3.1(9) is that adopted by Teare J  (when still a Deputy High Court Judge) in *Booth v Phillips* [2004] EWHC 1437 (Comm); [2004] 1 WLR 3292  at [35]:

> "I shall start (and perhaps ought to finish) with the words of the
> rule themselves. CPR r 6.20(8)(a) [what is now para 3.1(9) of
> Practice Direction 6B] refers to a claim in tort where "damage
> was sustained within the jurisdiction"… It should be given its
> ordinary and natural meaning, namely, harm which has been
> sustained by the claimant, whether physical or economic.
> Further, it is to be observed that CPR r 6.20(8)(b) refers to a
> claim in tort where "the damage sustained resulted from an act
> committed within the jurisdiction". The definite article is used
> here whereas it is not used in CPR r 6.20(8)(a). This suggests
> that it is sufficient for the purposes of sub-paragraph (a) that
> some damage (not all of the damage) is sustained within the
> jurisdiction. …"

149.    Applying that approach in the present case, in my judgment Erste has much the better
of the argument that it has sustained damage within the jurisdiction and therefore
brings itself within this additional jurisdictional gateway.

Jurisdictional gateways: claim under an enactment

150.    Finally in relation to jurisdictional gateways, Mr Salzedo QC submits that the claim
under section 423 of the Insolvency Act 1986 is a claim made under an enactment
within para 3.1(20)(a) of the Practice Direction. He is clearly correct about that. I
have already rejected Mr Morgan QC's argument that it is to be regarded as some
form of statutory tort and, shorn of that argument, RT and RT Capital are essentially
constrained to accept that the section 423 claim falls strictly within the ambit of this
gateway. However, what they contend is that the court retains a residual discretion to
refuse permission to serve out. That is no doubt correct but to the extent that, at this
stage of determining whether the Court has jurisdiction, they are seeking to argue that
the Court should decline jurisdiction on the basis that there is insufficient connection
with England to justify the application of section 423, I agree with Mr Salzedo QC
that this approach is misconceived for the reasons I gave in *Fortress Value v Blue
Skye* at [113]-[114]:

> "113 The other objection to the section 423 claim recently
> raised by the defendants is that there is insufficient connection
> with this jurisdiction, so that the court should effectively strike
> out the section 423 claim now. This approach is misconceived.
> It is well-established that section 423 can have extra-territorial
> effect. The principle was stated by Sir Donald Nicholls V-C in
> *Re Paramount Airways (No 2)* [1993] CH 223 at 239-240:
>
> > 'The court's discretion: a sufficient connection with England
> >
> > This conclusion is not so unsatisfactory as it might appear at
> > first sight. The matter does not rest there. Parliament is to be
> > taken to have intended that the difficulties such a wide ambit
> > may create will be sufficiently overcome by two safeguards
> > built into the statutory scheme. The first lies in the discretion
> > the court has under the sections as to the order it will make.
> > Section 423(2) provides that the court "may" make such

order as it thinks fit for restoring the position and protecting victims of transactions intended to defraud creditors. Sections 238, 239, 339 and 340 provide that the court "shall," on an application under those sections, make such order as it thinks fit for restoring the position. Despite the use of the verb "shall," the phrase "such order as it thinks fit" is apt to confer on the court an overall discretion. The discretion is wide enough to enable the court, if justice so requires, to make no order against the other party to the transaction or the person to whom the preference was given. In particular, if a foreign element is involved the court will need to be satisfied that, in respect of the relief sought against him, the defendant is sufficiently connected with England for it to be just and proper to make the order against him despite the foreign element. This connection might be sufficiently shown by the residence of the defendant. If he is resident in England, or the defendant is an English company, the fact that the transaction concerned movable or even immovable property abroad would *by itself* be unlikely to carry much weight. Likewise if the defendant carries on business here and the transaction related to that business. Or the connection might be shown by the situation of the property, such as land, in this country. In such a case, the foreign nationality or residence of the defendant would not *by itself* normally be a weighty factor against the court exercising its jurisdiction under the sections. Conversely, the presence of the defendant in this country, either at the time of the transaction or when proceedings were initiated, will not necessarily mean that he has a sufficient connection with this country in respect of the relief sought against him. His presence might be coincidental and unrelated to the transaction. Or the defendant may be a multinational bank, carrying on business here, but all the dealings in question may have taken place at an overseas branch.

Thus in considering whether there is a sufficient connection with this country the court will look at all the circumstances, including the residence and place of business of the defendant, his connection with the insolvent, the nature and purpose of the transaction being impugned, the nature and locality of the property involved, the circumstances in which the defendant became involved in the transaction or received a benefit from it or acquired the property in question, whether the defendant acted in good faith, and whether under any relevant foreign law the defendant acquired an unimpeachable title free from any claims even if the insolvent had been adjudged bankrupt or wound up locally. The importance to be attached to these factors will vary from case to case. By taking into account and weighing these and any other relevant circumstances, the court will ensure that it

> does not seek to exercise oppressively or unreasonably the very wide jurisdiction conferred by the sections.'
>
> 114 As that passage indicates, the question whether there is sufficient connection with England to justify relief under section 423 is a matter which depends upon all the circumstances of the case. This is not a threshold question of jurisdiction, but a question of discretion. Clearly a question of discretion which depends upon a fact-sensitive enquiry is not appropriate for determination on a summary basis at an interlocutory stage, such as when permission to amend is sought. That is borne out by what Evans-Lombe J said in *Jyske Bank (Gibraltar) Ltd v Spjeldnaes* [1999] 2 BCLC 101 at 122. In that case, at the stage when permission to amend to add a section 423 claim was being sought, he had been invited to decline to exercise the discretion to grant relief. He had not been prepared to decide the point at that stage but considered that he should wait until he had heard full evidence and argument."

Appropriate Forum: Factors other than the issue of a fair trial in Russia

151.  As I have already recorded earlier in the judgment, in its evidence and its written submissions, Erste focused heavily on what it contends is its inability to obtain a fair trial in Russia, because of the risk of improper influence on the part of the Defendants with the judicial process. This point was described by Mr Salzedo QC as a "torpedo" at the outset of his oral submissions on this part of the case, in the sense that it may dominate other factors concerning forum, but as he put it, there is a risk that the point comes to dominate more than it ought in the debate on forum. Accordingly, Mr Salzedo began his submissions on this part of the case by assuming that I was against him on the torpedo point, making submissions in relation to the other factors which he submitted point to England clearly being the appropriate forum, irrespective of whether Erste could obtain a fair trial in Russia. I propose to adopt the same approach and consider first the merits or otherwise of the other factors said by Erste to make England clearly the appropriate forum, before coming on to deal with the issue of fair trial.

152.  In relation to the factors which Erste contends point to England as clearly the appropriate forum even if the Court considers that Erste has not shown by cogent evidence  that there is a risk that it would not get a fair trial in Russia, Erste relies upon five points. First and foremost is that Erste is proceeding in England with the conspiracy claims against the borrower and the guarantor and RT and RT Capital are necessary or proper parties to those claims, since the same claims are made against them. Mr Salzedo pointed out that those conspiracy claims are being pursued here not only against the borrower and the guarantor who have been served as of right pursuant to the notice and service provisions of the contracts, but also against the Seventh Defendant which has been served in Russia and has not applied to set aside service.

153.  Mr Salzedo submits that the question of whether there is a conspiracy which is largely a question of fact will thus be litigated in this jurisdiction in any event and this is not a case where there are already proceedings on foot in Russia concerning the conspiracy.

In these circumstances, Mr Salzedo submits that the fact that Erste will pursue its claim against the borrower, guarantor and Seventh Defendant in this jurisdiction, seeking a determination of the issues at a trial on the merits even if those three Defendants choose not to participate in the proceedings, is an overwhelming factor in favour of England being the appropriate forum for the determination of this dispute.

154.    In his reply submissions in answer to this point Mr Morgan QC emphasised the anomalous nature of the necessary or proper party gateway and the need to exercise caution in relation to this head of jurisdiction, by reference to what Lord Collins said at [73] of *Altimo Holdings*:

> "The necessary or proper party head of jurisdiction is anomalous, in that, by contrast with the other heads, it is not founded upon any territorial connection between the claim, the subject matter of the relevant action and the jurisdiction of the English courts: *The Brabo* [1949] AC 326, 338, per Lord Porter. Piggott, *Foreign Judgments and Jurisdiction* (3rd ed, 1910), pt III, p 238, said: "This is perhaps the most important of the sub-rules, for it throws the net of jurisdiction over a wider area; and the principle of considering the nature of the cause of action which pervades the whole subject, appears here to be ignored." Consequently as Lloyd LJ said in *The Goldean Mariner* [1990] 2 Lloyd's Rep 215 at 222:
>
> > 'I agree … that caution must always be exercised in bringing foreign defendants within our jurisdiction under O.11 r.1(1)(c). It must never become the practice to bring foreign defendants here as a matter of course, on the ground that the only alternative requires more than one suit in more than one different jurisdiction.'"

155.    Mr Morgan submitted that, if the Court acceded to Mr Salzedo's submission on this point, then in every case where a defendant was a necessary or proper party to a claim against another defendant, the claimant could demonstrate that England was the appropriate forum because of the risk of inconsistent findings or judgments in this and another jurisdiction. This plea in terrorem seems to me to overstate the position, since whether England is or is not the appropriate forum will turn upon an assessment by the Court, albeit at an interlocutory stage, of the circumstances of the particular case.

156.    In the present case, for the reasons I have set out earlier in the judgment, Erste clearly has a fully arguable case against the borrower and the guarantor in conspiracy which it is entitled to pursue here, to which the other Defendants are necessary or proper parties on the basis that they are or were at the relevant times companies in the same group, of which RT was in overall control and that they were all parties to the same conspiracy as the borrower and the guarantor. In my judgment, it would be verging on the perverse for Erste to have to litigate the conspiracy and other tort claims against companies arguably in the same group as the borrower and the guarantor in Russia (a fortiori in the case of RT in relation to which there is a serious issue to be tried that it was in overall control of the conspiracy), involving as that would litigating the same complex issues of fact twice with all the attendant waste of costs and risk of inconsistent findings in the two jurisdictions. As I said during the course of argument,

whilst that is not quite unthinkable, it is certainly not something the Court would want to contemplate. In my judgment this is a very strong factor in favour of England being the appropriate forum for the determination of the dispute, even if that point stood alone, which it does not for reasons set out below.

157.  The second point was related to the first, that the Loan Agreement and the Guarantee both of which contained English law and jurisdiction clauses, were at the heart of the current dispute. Mr Salzedo QC points out that the tort claims in this case are all about breaching and undermining the obligations under those contracts. He submits that those claims are closely bound up with the contracts themselves so that the natural forum for the determination of the entire dispute is England. As a forensic point he relies upon the fact that the solicitors for RT, Macfarlanes, themselves asserted in correspondence: "These proceedings are clearly relating to the facility agreement."

158.  Mr Salzedo QC also relies in this context on a passage in the judgment of Lord Neuberger in *VTB Capital v Nutritek*. The context was an argument by VTB that the fact that the defendants had by fraudulent misrepresentations induced it to enter a contract with a third party RAP which contained a clause, clause 35, giving VTB the option to sue RAP in England, was a powerful pointer to England being the proper forum. There was in fact no claim by VTB against any party to that contract. At [105] Lord Neuberger considered that the judge at first instance, Arnold J, had been right to consider that clause 35 was a factor in favour of VTB but not a particularly strong factor. He went on at [108]-[109] in these terms:

> "108  However, clause 35 is not an exclusive jurisdiction provision: it merely gives VTB what is in effect an option to sue the other parties to the agreements in England in respect of any claim arising out of or in connection with those agreements. The present proceedings do not involve VTB suing any party to the agreements, although it may be that they could fairly be said to include any claim arising under the agreements. The fact that RAP was content to be sued under the agreements in England does not mean that Mr Malofeev would have been content to have been sued in tort here. The fact that VTB apparently wanted to have the right to sue RAP here does not mean that it would have wanted to have the same right against Mr Malofeev (e.g. RAP may have been believed to have assets here).
>
> 109  I accept that it would be different if VTB had a claim under the agreements against RAP to which its claim against Mr Malofeev was somehow connected. There is obvious force in Mr Hapgood QC's point that, if Mr Malofeev is to be treated as having had notice of clause 35 and its implications, it goes no further than helping VTB in suing him in this jurisdiction in proceedings which include a claim brought under the agreements against one or more of the parties to the agreements. However, I do not consider that the fact there are no such claims destroys VTB's reliance on clause 35 of any validity, but it severely weakens it."

159.    Reliance is also placed by Mr Salzedo on a passage in the dissenting speech of Lord Clarke at [221] where he concludes that the inclusion of the English law and jurisdiction clauses in the agreements which VTB was induced to enter into by fraudulent misrepresentation is a strong pointer to the conclusion that the natural forum is England. In my judgment, that passage needs to be approached with some circumspection, since Lord Clarke was in the minority in considering that the permission to serve out of the jurisdiction should stand.

160.    However, it seems to me Mr Salzedo is correct in his submission that the present case falls within the different case contemplated by Lord Neuberger in the first sentence of [109]. Whilst Lord Neuberger only deals with that different case briefly, the clear implication is that, if there is before the Court a claim against another party under a contract containing an English jurisdiction clause with which the particular claim in tort is connected, that is a potentially significant factor in favour of England as the appropriate forum. Since Erste's case is that the Defendants conspired to undermine the performance of two contracts governed by English law and containing English jurisdiction clauses, Mr Salzedo submits that that connection between the contracts and the torts is established here and also points to England as the appropriate forum.

161.    The answer which Mr Morgan puts forward to this point is that RT and RT Capital are not parties to the contracts and that all the factual dispute is concerned have taken place in Russia pursuant to relationships governed by Russian law, applying Russian accountancy reporting standards and that pretty well all the factual witnesses on each side will be Russian speaking and resident. I accept that this is a factor pointing away from England and towards Russia as the appropriate forum, as was the case in *VTB v Nutritek*. Accordingly, if Mr Salzedo's second point stood alone, I would not consider it a sufficiently significant factor to outweigh the obvious connection of the facts with Russia rather than England.

162.    The third point which Mr Salzedo QC makes is that if the claims had to be litigated in Russia, the starting point for the Russian court would be the invalidity of the Guarantee as a matter of Russian law, even though the Guarantee is subject to English law and jurisdiction. He submits that the invalidity of the Guarantee would have various potential impacts on the liability of each Defendant, as regards matters such as whether particular acts were wrongful and would on any view make Erste's claims more difficult to establish in Russia.

163.    I accept that this is not a question of a legitimate difference between two equally appropriate fora, but of the Russian court reaching the wrong result by applying the wrong governing law as a matter of English conflicts of laws rules. That this is a significant factor pointing to England as the appropriate forum is borne out by the judgment of Christopher Clarke J (as he then was) in *Stonebridge Underwriting v Ontario Municipal Insurance Exchange* [2010] EWHC 2279 (Comm); [2010] 2 CLC 349. That case concerned inter alia a dispute as to the effect of non-compliance with the Claims Cooperation Clause in a reinsurance contract whereby the claimant Lloyd's syndicate, of which XL was the managing agent, reinsured the defendant, a not-for-profit insurance exchange in Ontario. The defendant sought to set aside service out of the jurisdiction. The reinsurance did not contain an express choice of law provision, but it was in effect common ground that the putative proper law was English law. There was evidence in that case that notwithstanding that, as a matter of English conflicts rules and the Rome Convention, the proper law of the contract was

English law, if the dispute were litigated in Ontario, the Ontario court would be likely to determine it according to its own conflicts rules, under which the contract would be deemed to have been made in Ontario and held to be governed by Ontario law, which had a concept of relief from forfeiture under its Insurance Act. This would mean that the defendant could recover under the reinsurance contract even if it was in breach of the Claims Cooperation Clause, whereas as a matter of English law, compliance with that Clause was a condition precedent to XL's liability under the reinsurance contract.

164.    The learned judge considered that the English court should favour its own conflicts rules and that the fact that under those rules the contract was governed by English law was of considerable significance in pointing to England as the appropriate forum, since the alternative forum would deprive XL of the benefit of English law. Two passages in the judgment were relied upon in particular by Mr Salzedo at [33] and [36]:

> "33 Since different countries may have different private law rules the identification of the "*correct proper law*" will inevitably depend on which court is deciding the question. There is however authority that the English Court should favour its own conflict rules: see per Staughton LJ in *The Irish Rowan* [1991] 2 Q.B. 206, 229G (cited by Longmore J in Tiernan at [18], p525):
>
> > 'In an ideal world there would be no difference between the conflict rules applied by all nations. … But unfortunately uniformity is far from achieved. … [I]t seems to me fairly arguable that a plaintiff is entitled to claim the benefit of the conflict rules prevailing here. So far as concerns domestic law, it would be wrong for us to suppose that our system is better than any other. But in the case of conflict rules, which ought to be but are not the same internationally, there is a case for saying that we should regard our rules as the most appropriate.'
>
> 36 The fact that the parties have impliedly chosen English law is, as it seems to me, in this case, of considerable significance. Firstly this is so because, as I have said, the choice of the only alternative venue may deprive XL of the benefit of English law, to which the parties agreed and rights under the condition precedent in the claims co-operation clause to which, under that law it is entitled. I do not think this consideration is trumped by the fact that any relief against forfeiture would be granted only if the Ontario court thought that it was just to do so."

165.    In my judgment, the present is an a fortiori case, since the Guarantee is expressly governed by English law, pursuant to which it is a valid and binding contract and the Russian court has already applied its own law to declare the contract invalid, so there can be no doubt that if Erste were required to litigate in Russia it would be deprived not only of the benefit of English law but of a valid binding contract of guarantee. Mr Morgan QC really has no sustainable answer to this point. He reiterated that the judgment of the Russian court declaring the Guarantee invalid was binding on Erste,

but that contention depends upon Erste having submitted to the jurisdiction of the Russian courts, which I have already held it did not.

166. The only other argument he raised on this point was that the validity or otherwise of the Guarantee did not impact upon either Erste's cause of action or the quantum of its loss. Although that argument has a superficial attraction, it seems to me on closer analysis it is misconceived. The conspiracy alleged by Erste does not involve just the deliberate insolvency of the borrower, but of the guarantor as well and the loss claimed is in respect of the non-fulfilment of their obligations by both: see for example [120] and [121] of the Particulars of Claim. Accordingly, the fact that the Russian court would consider the Guarantee invalid would have a considerable impact upon Erste's ability to recover the loss it claims to have suffered. That is a significant factor pointing to England as the appropriate forum.

167. Mr Salzedo's fourth and fifth points in a sense go together. The fourth is that the Russian court would apply the wrong governing law, Russian law, to the conspiracy, a point the validity of which depends on the correctness of the fifth point which is that the governing law of the torts alleged is English law. Logically, therefore, that fifth point should be considered first.

168. It is common ground that the question of governing law falls to be decided pursuant to the Rome II Regulation. Article 4 of the Regulation sets out the general rule that the applicable law of the tort or delict should be the lex loci damni, that is the law of the place where the damage occurs, in these terms:

> "Article 4
>
> General rule
>
> 1. Unless otherwise provided for in this Regulation, the law applicable to a non-contractual obligation arising out of a tort/delict shall be the law of the country in which the damage occurs irrespective of the country in which the event giving rise to the damage occurred and irrespective of the country or countries in which the indirect consequences of that event occur.
>
> 2. However, where the person claimed to be liable and the person sustaining damage both have their habitual residence in the same country at the time when the damage occurs, the law of that country shall apply.
>
> 3. Where it is clear from all the circumstances of the case that the tort/delict is manifestly more closely connected with a country other than that indicated in paragraphs 1 or 2, the law of that other country shall apply. A manifestly closer connection with another country might be based in particular on a pre-existing relationship between the parties, such as a contract, that is closely connected with the tort/delict in question."

169.    To repeat what I said at [44] and [45] of my judgment in *Fortress Value*, Article 4(1) expressly provides that only the law of the place where the damage occurs is relevant, not the law of the place where the harmful event occurred, representing a deliberate departure from the case law of the European Court of Justice on Article 5(3) of the Judgments Regulation which provides that both systems of law are alternative gateways to jurisdiction. That deliberate departure in favour of a rule focused solely on the place where the direct damage arises is reflected in the Explanatory Memorandum i.e. the *travaux preparatoires* for the Regulation and in Recitals (15) to (17) to the Regulation itself.  As the wording of Article 4(1) itself and the previous case law on what has become Article 5(3) of the Judgments Regulation make clear, the court is concerned with the law of the place where the direct damage occurred, not of the place where indirect adverse consequences or financial loss were suffered: see the decision of the European Court of Justice in *Marinari v Lloyd's Bank* [1995] ECR I-2719; [1996] QB 217, a case under Article 5(3).

170.    Mr Morgan QC particularly relied on that case in support of his submission that the enquiry as to governing law under the Regulation is "cause of action blind" as he put it, involving looking at the facts independent of the cause of action to determine the place where the damage occurred and that the Regulation is looking at damage in the abstract, not at what the claimant suffers. I accept that *Marinari* supports Mr Morgan's submission about cause of action blindness, in the sense that both the Brussels Convention and the Rome II Regulation do not intend the determination of territorial jurisdiction to be dictated by national law on non-contractual civil liability: see [16] to [19] of the judgment.

171.    However I do not consider that that case supports the more extreme submission, that the Regulation is only focusing on abstract damage, not on the loss the claimant has suffered. What the European Court decided at [21] is, as I have already said, that the court is concerned with the law of the place where the direct damage occurred, not of the place where indirect adverse consequences or financial loss were suffered, but the direct damage in question is the damage suffered by the claimant, not some abstract damage as Mr Morgan contended. That is clear from the end of [21]: "[the Regulation] must be interpreted as not referring to the place where the victim claims to have suffered financial loss consequential upon <u>initial damage arising and suffered by him in another contracting state</u>" (my emphasis).

172.    Whilst the other cases relied upon by Mr Morgan, *Kronhofer v Maier* [2004] 2 All ER (Comm) 759 and  *Dumez France SA v Hessische Landesbank* [1990] IL Pr 299 reiterate that same principle at [21] and [20]-[22] of the respective judgments, they simply do not support Mr Morgan's more extreme submission. Rather, [20] of the judgment in *Dumez* would seem flatly contrary to that submission:

> "It follows from what has been said that although, according to the Court's case law, the phrase 'the place where the harmful event occurred' in Article 5(3) of the Convention may refer to the place where the damage occurred, the latter should be taken to mean only the place where the causal event, giving rise to delictual or quasi-delictual liability, directly produced the harmful effects in relation to the person who is the immediate victim".

173.   Mr Morgan's primary submission was that the only loss suffered by Erste was the diminution in the asset base of the borrower and the guarantor, i.e reflective loss and I can see the force of the submission that that loss must have occurred in Russia for the purposes of Article 4(1) of the Regulation. However, as I have already held above in dealing with the question of serious issue to be tried, Erste's pleaded case is not as Mr Morgan would like it to be, but is that its loss consists of the sums due but unpaid under the Loan Agreement and/or the Guarantee on the basis that, but for the conspiracy and/or other torts committed, the borrower and the guarantor could and would have honoured their contractual obligations. Erste has a sufficiently arguable case that that is the loss it has suffered and that that loss occurred in the country where Erste would have been paid had the borrower and the guarantor honoured their obligations.

174.   Mr Morgan submitted that, even if that was right, on a proper analysis of the Loan Agreement the loss was suffered in Russia. This was because under Clause 7 the borrower was bound to maintain Russian accounts into which at least two business days prior to the date any repayment instalment was due, the borrower had to ensure there were sufficient funds. His argument was that the moment the borrower failed to top up those accounts, Erste and the other Lenders suffered a loss and that loss was suffered in Russia.

175.   Even if that was wrong, Mr Morgan submitted that the place of payment under the Loan Agreement was New York. He relied upon Clause 28 .1 and 28.2 of the Loan Agreement which provided:

> "28.1    Payments to the Facility Agent
>
> (a)    On each date on which the Borrower…is required to make a payment under a Finance Document, the Borrower…shall make the same available to the Facility Agent…for value on the due date at the time and in such funds specified by the Facility Agent as being customary at the time for settlement of transactions in the relevant currency in the place of payment.
>
> (b)    Payment shall be made to such account in the principal financial centre of the country of that currency with such bank as the Facility Agent specifies.
>
> 28.2    Distributions by the Facility Agent
>
> Each payment received by the Facility agent under the Finance Documents for another Party shall…be made payable by the Facility agent as soon as practicable after receipt to the Party entitled to receive payment in accordance with this Agreement (in the case of a Lender, for the account of its Facility Office) to such account as that Party may notify to the Facility Agent by not less than five Business Days' notice with a bank in the principal financial centre of the country of that currency."

176. As Mr Morgan pointed out, payment under the Loan Agreement was to be made in US Dollars and the principal financial centre of the United States is New York. Accordingly, he submitted that, even if Erste's analysis as to the loss it had suffered was right, which he disputed, the governing law of the torts was New York law, not English law as Erste contended. To the extent that Erste sought to avoid that consequence by reliance on Article 4(3), as Recital (18) to the Regulation makes clear: "Article 4(3) should be understood as an 'escape clause' from Article 4(1) and (2), where it is clear from all the circumstances of the case that the tort/delict is manifestly more closely connected with another country." Mr Morgan submitted that, since the entire dispute on the facts concerned events in Russia, Russian entities and individuals, Russian insolvencies and decisions of the Russian courts, that provision was of no assistance to Erste; on the contrary, that demonstrated that the torts were manifestly more closely connected with Russia than with any other country.

177. Mr Salzedo's primary submission in response was that applying Article 4(1), the governing law was, at least sufficiently arguably, English law. The point about the Russian accounts was a false point because the Lenders had no proprietary interest in those accounts and, in any event, whilst it may have been a breach of contract not to top up those accounts, Erste did not suffer any immediate loss because, by definition, this breach occurred two business days before any payment was due to Erste. It seems to me that Mr Salzedo must be right about that.

178. Mr Salzedo submitted that the place where the loss was suffered was the place where the individual lender, in this case Erste, was to receive payment into the account it had notified to the Facility Agent, as contemplated by Clause 28.2. That notification was effected by means of the Transfer Certificate defined in the Loan Agreement as being "a certificate substantially in the form set out in Schedule 4 or any other form agreed between the Facility Agent and the Borrower". As Mr Salzedo pointed out, the actual Transfer Certificate which was signed by both VTB Bank Europe plc as Facility Agent and Erste as accepted by both, dated 31 January 2008, provided for payment to Erste Bank…AG London and gave the Swift Code for Erste in London. In other words, what was agreed with the Facility Agent is that Erste would be paid in London. Accordingly, Mr Salzedo submitted that the damage occurred in England and, pursuant to Article 4(1) "the law of the country where the damage occurs" was English law.

179. In support of that conclusion, Mr Salzedo also relied upon the decision of Christopher Clarke J (as he then was) in *Dolphin Maritime & Aviation Services Ltd v Sveriges Angfartygs Assurans Forening* [2009] EWHC 716 (Comm), a case in which Dolphin (a recovery agent and claims correspondent) claimed against the defendant P&I Club for conspiracy and procuring breach of contract. A ship entered with the Club was involved in a collision and became semi-submerged and grounded. Cargo was damaged and the cargo underwriters paid the cargo interests and became subrogated to their rights. The cargo underwriters instructed Dolphin to seek to recover compensation in respect of the cargo. Under its trading terms Dolphin would be entitled to deduct any commission from recoveries it made. Dolphin negotiated two important agreements on behalf of the cargo underwriters with the shipowners, an escrow agreement and a letter of undertaking from the Club by way of security for the cargo claim. Essentially what happened is that, without Dolphin's knowledge, a settlement agreement was made between the shipowners who were represented by the

Club and the cargo underwriters, whereby the underwriters' claims were settled for US$8.5 million to be paid direct by the Club to the underwriters. Dolphin's case was that the Club knew that the settlement agreement involved a breach by the cargo underwriters of their obligation to pay commission to Dolphin and that in entering that agreement the Club was procuring a breach of the contract between the underwriters and Dolphin and conspiring with the underwriters to damage Dolphin.

180.    The Club sought to strike out those claims on the ground that the English court had no jurisdiction to hear them, on the basis that any claim had to be brought against it in Sweden under Article 2 of the Judgments Regulation. Dolphin relied upon Article 5(3), which provides that in cases of tort or delict a defendant can be sued "in the courts for the place where the harmful event occurred". The learned judge recorded at [28] that in *Handelskwekerij GJ Bier BV v Mines de Potasse d'Alsace SA* [1978] 1 QB 708 the European Court had established that those words were to be construed so as to enable the claimant to commence proceedings "at the place where the damage occurred or the place of the event giving rise to it". Dolphin relied upon the former alternative, so the question before the court was where the damage occurred.

181.    The learned judge found that Dolphin had a sufficiently arguable case that the US$8.5 million should have been paid direct to its bank account in London. He went on to find, at [58] and [59] of his judgment, that the place where, in the words of *Dumez*, the damage to the direct victim occurred, was England, where Dolphin did not receive the money which, if the contract had been performed, it should have received and that if the tort had not been committed, payment would have been made to Dolphin in England and the essence of its complaint was that that did not occur.

182.    Mr Salzedo QC relied in particular on [60] of the judgment as setting out an analysis which deals with precisely the kind of damage which occurred in the present case, supporting the conclusion that the damage occurred where, but for the tort, Erste should have received payment, i.e. in England:

> "I do not ignore the danger of conflating the place where the damage occurred with the place where the loss was suffered. There is, however, a difference between a case in which the claimant complains that he has lost his money or goods (as in *Domicrest* or *The "Seaward Quest"*) and a case in which the claimant complains that he has not received a sum which he should have received. In the former case the harm may be regarded as occurring in the place where the goods were lost (*Domicrest*) or the place from or to which the monies were paid (*The "Seaward Quest"*), although the loss may be said to have been suffered in the claimant's domicile. In the latter case the harm lies in the non receipt of the money at the place where it ought to have been received, and the damage to him is likely to have occurred in the place where he should have received it. That place may well be the place of his domicile and, therefore, also the place where he has suffered loss. An analogy may be drawn with the non delivery of cargo at the destination port: see *Reunion Europeenne*."

183.    Mr Morgan did not have any convincing answer to Mr Salzedo's submission that the analysis in *Dolphin Maritime* supported Erste's case as to where the damage occurred, other than to reiterate that the real loss was the reflective loss of the borrower in Russia, a submission I have already rejected. Mr Morgan sought to challenge the conclusion that the damage occurred in England by submitting that, so far as the contractual position was concerned, payment was to be made in New York and that is what the borrower and the guarantor and thus the other Defendants would expect, but the answer to that is that this claim is in tort, not in contract and, whatever the Loan Agreement might have contemplated, the actual place of payment under the Transfer Certificate was London. Mr Morgan then submitted that the Transfer Certificate was non-contractual, but it seems to me that, since the Certificate was signed as accepted by both Erste and the Facility Agent, it is fairly clear that they had agreed payment would be made in London. In any event, even if the Certificate was non-contractual, the fact remains that Erste was to be paid in London so that it seems to me that, in accordance with Mr Salzedo's submissions, the loss Erste suffered occurred in England, in which case the governing law under Article 4(1) would be English law.

184.    Mr Salzedo submits that if he is wrong about English law being the governing law under Article 4(1), then the torts are nonetheless manifestly more closely connected with England. He relies on the second sentence of Article 4(3) pointing out that so far as the borrower and the guarantor are concerned they fall fair and square within that sentence: there are pre-existing contractual relationships governed by English law and the torts involve interference with and the undermining of those contracts, so that a close connection between the torts and the contracts are established. So far as the other Defendants, including RT and RT Capital are concerned, although they were not parties to those contracts, Erste has a sufficiently arguable case that they were parties to the same conspiracy and other torts involving interference with and undermining of the contracts, so that the close connection is established.

185.    As for Mr Morgan's point about all the events and acts alleged to comprise the conspiracy or other tortious acts having taken place in Russia, Mr Salzedo submits that this does not detract from the fact that the conspiracy and other torts involved interference with contracts governed by English law or damage to Erste's rights under those contracts, which remains a sufficiently manifest close connection with England. He relies in that context on [72] and [73] of my judgment in *Fortress Value*. Mr Salzedo submitted that, looking at the evidence as a whole, there was a clear case that the causes of action in tort were governed by English law, another factor which points to England as the appropriate forum.

186.    It seems to me that, on these applications concerned with jurisdiction, the Court is not engaged in making a final determination of the governing law but only with determining the question of governing law on a provisional basis as part of the assessment as to whether the claimant has satisfied the burden of showing that England is clearly the appropriate forum. Indeed, particularly in relation to the application of article 4(3) which depends in terms upon "all the circumstances of the case" it is undesirable for the court to reach a concluded view until it has the full factual picture at trial: see [59] to [62] of *Fortress Value* and the cases cited there.

187.    For the present, in my judgment all that it is necessary or desirable to find, whether under Article 4(1) or 4(3), is that Erste has a strongly arguable case that the governing law of the torts is English law. The question which then arises is how powerful a

factor that is in pointing to England as the appropriate forum, which really leads into Mr Salzedo's fourth point. There will be cases where, even if the governing law of the tort is English law, that is not a particularly compelling factor pointing to England as the appropriate forum, because the case will turn on a factual dispute where all the evidence and witnesses are in the alternative foreign forum and there is no evidence that the law of that foreign forum would lead to a different result if the claimant's case were established on the facts.

188.    *VTB Capital v Nutritek* was such a case, as is apparent from the judgment of Lord Mance at [45] to [47] :

> "45 The Court of Appeal was wrong to regard Russian law as governing the alleged torts, but it acknowledged that possibility and it dealt with the alternative, that English law governed them. However, in relation to this alternative, it was in my opinion also wrong to approach the matter on the basis that it made no difference which law governed, because each side would have in any event to prepare evidence on both legal systems in whichever country the case was tried.

> 46 The governing law, which is here English, is in general terms a positive factor in favour of trial in England, because it is generally preferable, other things being equal, that a case should be tried in the country whose law applies. However, that factor is of particular force if issues of law are likely to be important and if there is evidence of relevant differences in the legal principles or rules applicable to such issues in the two countries in contention as the appropriate forum. Neither of these considerations here applies.

> 47 VTB's claims are for deceit and for conspiracy. The conspiracy alleged is to obtain finance by the deceit. Accepting that the governing law of both alleged torts is, to English legal eyes, English, there is nothing to show that Russian law would reach any different conclusion. Parties are able to plead and rely on English law in Russian courts. But, even if there were reason to think that a Russian court would regard Russian law as governing the alleged torts, there is nothing to suggest that Russian law does not recognise and impose tortious liability for deceit, and for conspiracy to commit a deceit, on bases for material purposes equivalent to those which would be recognised under English law. It is unlikely that it does not, and no evidence has been adduced that it does not. It would have been for VTB to adduce evidence on all these points, if it could, in support of its case that England was the appropriate forum."

189.    Although the present case is also one involving allegations of conspiracy where the relevant alternative forum is Russia, in contrast with that case, there is evidence in this case (ironically from one of the Defendants' Russian law experts, Professor Maggs) that the Russian law equivalent of conspiracy, the liability for jointly caused harm under Article 1064 and 1080 of the Russian Civil Code, would involve a narrower

basis of liability than the English law of tort and that the damages recoverable might well be more circumscribed than under English law. It follows that, in my judgment, Erste's fourth and fifth points do support an arguable case that, since the Russian court would apply Russian law to the conspiracy case, it would not only be applying the wrong governing law, but a governing law that would potentially provide a more restrictive recovery than would be available under English law.

190. In my judgment, Erste's first point about RT and RT Capital being necessary or proper parties to the claims against their related companies, the borrower and the guarantor is, as I have said, a very strong factor in favour of England as clearly the appropriate forum, even if it stood alone. However, that point does not stand alone, it is supported by Erste's other points, particularly that the Russian courts have held and would continue to hold a binding and valid contract of guarantee invalid by the application of the wrong system of law and that the Russian courts would apply the wrong governing law also to the torts alleged, potentially limiting Erste's recovery. Taking all the points raised together, I am quite satisfied that they demonstrate that England is clearly the appropriate forum, irrespective of whether, as Erste contends, there is a risk that it could not get a fair trial in Russia.

Appropriate Forum: the issue of a fair trial in Russia

191. In those circumstances, in one sense it is not necessary to decide whether Erste could get a fair trial in Russia and it might be thought invidious to embark on that enquiry unless it is strictly necessary to do so. However, given the extent of the evidence and submissions expended on the point, it is appropriate to set out my findings on this issue, albeit in shorter form than I would have done if, contrary to the conclusion I have already expressed that England is clearly the appropriate forum, this issue of fair trial had been determinative on the issue of appropriate forum.

192. As I have already indicated, although the evidence adduced by Erste on this issue was extensive and its written submissions set out a detailed and wide-ranging critique both of the decisions of the Russian court to date in relation to the matters in issue and of the Russian court system generally, it is fair to say that in his oral submissions, Mr Salzedo QC presented a narrower and more focused case as to why, if the tort claims had to be pursued in Russia, improper influence of the courts would affect their outcome. In support of that proposition, he relied upon three points: (i) that RT is an entity of the first importance to the Russian state and very strongly connected to President Putin through Mr Chemezov; (ii) that an entity such as RT is capable of improperly influencing proceedings in Russia should it choose to do so; and (iii) that there is a real risk that it would choose to do so.

193. As Mr Salzedo says, the first of these points is not seriously in dispute and is borne out by the expert evidence of Professor William Bowring on behalf of Erste. He is Professor of Law at Birkbeck College, University of London. He is a fluent Russian speaker and has a particular interest in the independence of the Russian judiciary. In 2008, he produced a report on behalf of Mr Cherney in *Cherney v Deripaska* [2008] EWHC 1530 (Comm); [2009] 1 All ER (Comm) 333 setting out in detail his expert opinion that if Mr Cherney's claims were pursued in Russia, he was highly unlikely to get justice. That expert evidence was accepted by Christopher Clarke J who concluded on the evidence before him that there was a close link between Mr Deripaska and the Russian state, whose interests were aligned in that case and that

there was a significant risk of improper government interference if Mr Cherney were to bring his claims in Russia, so that justice would not be done (see the discussion of the question of a fair trial in Russia at [237] to [248] of the judgment).

194.    In the present case, Professor Bowring has put forward a wealth of evidence to show the close connection between RT and the Russian state and its strategic importance to the Russian state. Since this is not really in dispute, one citation from his first report will suffice:

> "[RT] could not be more intimately bound up with the Russian State and the Putin regime, in terms of its importance for Russia's manufacturing future, the prevention of the most serious social explosions, and the very close longstanding working relationship between its Director General and Mr Putin."

195.    So far as the second and third points are concerned, Mr Salzedo QC submitted that it seemed to be common ground that it was the case a few years ago that entities or individuals closely connected with the Russian state were capable of influencing court proceedings and did so. He pointed out that RT's own expert Professor William Simons, Professor of Law at the University of Leiden, who has extensive knowledge and experience of the Russian legal system, relies upon and refers to the work of Professor Kathryn Hendley which he describes as "grounded in her sound empirical research". He exhibits a paper of Professor Hendley's *"Are Russian Judges still Soviet?"* published in 2007. Mr Salzedo referred the court to a passage where Professor Hendley said this:

> "Where does that leave Russia in its quest for an independent judiciary? If we conceptualize independence as existing along a spectrum, with complete independence as an elusive (and perhaps undesirable) goal, then Russia would certainly seem to have made substantial forward progress in the post-Soviet era. But there are real limits on the extent of this progress. Russia can fairly be regarded as a dualistic legal state. Many cases are resolved by judges in accord with the law and without any outside interference. But the political and economic elite can and do interfere when their core interests are in play."

196.    Christopher Clarke J referred to and relied upon a not dissimilar passage in Professor Hendley's book *Putin's Russia* at [248] of his judgment in *Cherney v Deripaska*. Mr Salzedo also referred to an article by Professor Hendley in the second half of 2009 entitled Telephone Law and the Rule of Law which discusses an apparent paradox, that increasing numbers of Russians are willing to use their legal system, even though, as she described it, it is "deeply and patently flawed". Her explanation is that Russians are what she describes as "savvy consumers" who know when to bring a case and when to stay away. She maintains the opinion that outcomes are manipulated in cases with high political stakes.

197.    Although Mr Morgan sought to suggest by reference to the opinion of his expert, Professor Simons, that Professor Hendley had changed her views, in the sense that she detected a marked improvement, particularly in the arbitrazh court system, in a paper

published in August 2011 entitled *Explaining the Use of Russian Courts* she essentially reiterates her view expressed in her earlier papers that, whilst in the vast majority of mundane cases the courts will apply the written law, in high profile politicised cases, there remains manipulation of the courts.

198.    Mr Morgan sought to downplay much of this material by suggesting that what Professor Hendley was describing was the public perception of manipulation of the court system based upon some high profile cases in the past rather than the reality on the ground today. I consider that there is some force in that point. Mr Salzedo relied upon what was said by Professor Skvortsov, the Russian law expert on behalf of RT Capital to the effect that there are accusations of lack of impartiality on the part of arbitrazh courts in disputes involving the state or state companies. However, Professor Skvortsov goes on to say that there are relatively few instances where such criticisms are based on material factual evidence. Whilst Mr Salzedo was able to say that the Professor was not saying there were no cases at all where there was evidence of improper influence, in my judgment, the thrust of the point he was making was that the criticisms were as he said frequently unsuccessful parties expressing dissatisfaction at the outcome, part of ordinary litigation risk.

199.    This is not an instance of cogent evidence of a real risk of injustice, it is once again a perception that courts are the subject of improper influence without any concrete evidence to that effect. Mr Mumford rightly pointed out that the state of the expert evidence on concerns about the Russian judicial system in the present case is not dissimilar to the expert evidence as to concerns about the Ukrainian judicial system in *Ferrexpo AG v Gilson Investments Ltd* [2012] EWHC 721 (Comm); [2012] 1 CLC 645 and yet in that case Andrew Smith J concluded that despite those concerns, there was no cogent evidence of a real risk Ferrexpo would not get a fair trial in Ukraine.

200.    It is also noteworthy that many of the high profile cases which are considered by the experts to be ones where influence was brought to bear are criminal cases or cases which are before courts of general jurisdiction, not the arbitrazh courts. Furthermore, much of Professor Bowring's opinion that there is a significant risk of a biased decision wherever the interests of the state are engaged seems to be based on his experience in *Cherney v Deripaska* which is some five years ago. I agree with Mr Morgan that there is a fair amount of material amassed by Professor Simons to show that the arbitrazh court system is much more transparent and open than it was in 2008-2009. The judges for particular cases are selected at random by computer, judges have to give reasons for their judgments, judgments are published on the internet and there is a proper complaints system.

201.    It also has to be borne in mind that *Cherney v Deripaska* was an extreme case, in the sense that Mr Cherney was seen as something of an enemy of the Russian state and had good reasons for not returning to Russia because he might be a political target. Christopher Clarke J was at pains to point out at [247]-[248] of his judgment that he was not deciding that a fair trial could never be obtained in the arbitrazh system or that the state would always succeed in that system, just that, on the peculiar facts of that case, Mr Cherney could not obtain justice in Russia.

202.    The present case is in a completely different category, and although the amount of money involved (US$80 million if one takes account of all the Lenders) is not perhaps merely "chicken feed" as it was described by counsel then representing RT at an

earlier hearing before me, it is not so great or of such apparent financial significance to the Russian state to warrant improper interference with the courts dealing with the case. Furthermore, for reasons I will expand below, there is a complete absence of any evidence of some sustained "political" campaign already being successfully waged in the Russian courts against Erste and the other Lenders through improper influence on those courts by RT.

203. Professor Bowring remains of the opinion that there is a significant risk of a biased decision wherever the interests of the state are engaged and that a compliant judge will be selected by the Court Chairman without even the need for a telephone call, a point he reiterates in his second report.  Without echoing in any sense Mr Morgan's rather astringent criticism of Professor Bowring, it does seem to me that, on analysis, there are a number of difficulties with that opinion. To begin with, if the judge for the particular case is randomly selected by computer, it is difficult to see how the Court Chairman would be able to influence that selection. This point is borne out by the report of Gabriela Knaul, the Special Rapporteur of the European Commission on Human Rights, dated 25 April 2013. She compares the arbitrazh court system where there is a "sophisticated computer-based system" of assignment of cases favourably with the general jurisdiction courts where there is a lack of transparency and judges are indeed selected by the Court Chairman.

204. Furthermore, even if the Court Chairman of the aribtrazh court could influence the selection of the judge, the hypothesis would have to be, in decisions which went on appeal, as several decisions of the arbitrazh courts have in the present case, that similar unspoken manipulation was being exercised over the chairmen of the AAC, the Court of Cassation and the Supreme Arbitrazh Court, in order to get the right result. Furthermore, in order for the improper influence to be successful, the chairmen of each Court would have to make sure the case was "stitched up" sufficiently cleverly to ensure that no one spotted that manipulation had taken place. At this point it seems to me there is an air of unreality about Professor Bowring's opinion.

205. In his first report Professor Bowring also expresses the opinion that, whilst there appeared to have been a desire for openness and reform of the court system during the presidency of Mr Medvedev, matters have gone sharply into reverse with the re-election of Mr Putin as President. However, he produces no concrete evidence to support that opinion, at least so far as the arbitrazh courts are concerned.

206. Erste also relies upon the report of the Special Rapporteur of the European Commission on Human Rights dated 25 April 2013, which is therefore up to date so far as the issues before the court are concerned. In that report she refers in terms to reports she had received during her visit of improper influence on the judiciary and how some judges were still under the influence of the Soviet system. She also refers to how there was a lack of independent evidence of disciplinary action in cases of corruption. However, the overall tone of her report is optimistic: although much remains to be done, the independence of the judiciary is taken seriously in Russia.

207. Towards the end of his oral submissions, Mr Salzedo submitted that there were five reasons why the evidence as a whole establishes that there is a real risk that Erste would not get a fair trial in Russia. (1) that on the basis of Erste's case (which I have held is fully arguable) RT has deliberately and improperly rendered the borrower and the guarantor bankrupt and a state entity which is prepared to do that is unlikely to

stop there in furthering its own ends, in other words if it has the means of influencing the result of the case, it is likely to use them; (2) that if the tort claims were to proceed in Russia they would be more serious than anything which had happened so far in Russia, since the allegations would directly impugn RT, a major state entity; (3) that the amount of money at stake here, US$80 million, is sufficient for those in charge at RT to consider it worth seeking to influence the judges hearing the tort claim; (4) that the fact that certain court decisions to date have been favourable to the Lenders or other external creditors is a weak answer to Erste's case, because RT itself has not been directly involved in the proceedings to date and the only favourable decision of any real significance is that declaring the borrower's asset transfer invalid, which was an application made by another state entity, Gazprombank; (5) that the decision invalidating the Guarantee in particular is so doubtful that there is a real risk that it was the result of improper influence having already been exercised.

208.    In my judgment, the evaluation of these points needs to start with that last point, consideration of whether it can be said the decision invalidating the Guarantee is, in effect perverse, so that it provides cogent evidence of a real risk that Erste could not get a fair trial in Russia. Although the evidence of Mr Marinichev in support of Erste's application for permission to serve out contained a more wide-ranging criticism of the court decisions in Russia, with the exception of the decision invalidating the Guarantee that wider case is unsustainable, not least because there are a number of decisions which were favourable to the external creditors and in relation to which, if RT were going to seek to exercise influence, one might have expected it to intervene to obtain a favourable decision. Mr Salzedo QC has not sought to support the more extreme case advocated by Mr Marinichev, but has only sought to criticise the decisions invalidating the Guarantee.

209.    As appears from the judgment of the ACVR dated 5 December 2011, the court held that the Guarantee was invalid on two distinct legal grounds, although the factual basis for both seems to have been the same, that the Guarantee was guaranteeing the obligations of a wholly owned subsidiary and that the transaction was one which harmed the interests of the guarantor and its creditors. In other words, as Mr Morgan QC said, the Russian court was deciding that the Guarantee was a related party transaction.

210.    The first ground upon which the court then went on to hold that the Guarantee was invalid was that it contravened Article 61.2 of the Bankruptcy Law which provides that a transaction which harms the interests of creditors made within three years of the insolvency of the company can be declared invalid. That is a perfectly explicable concept of preference, but the problem is that, as is common ground between all the experts on Russian law, the Guarantee was dated 26 November 2007 whereas Article 61.2 only applies to transactions concluded on or after 5 June 2009. Accordingly that ground for the decision was simply wrong and cannot be sustained.

211.    However, the court also reached its decision on the distinct ground that the transaction contravened Article 10 of the Russian Civil Code which provides that actions taken exclusively with the intention of causing harm to another person are not allowed and abuse of rights in other forms is also restricted. The court effectively decided that on the facts it had found the Guarantee was a transaction which contravened that Article (which was in force and applicable, unlike Article 61.2). In the context of Erste's argument that the decision invalidating the Guarantee was in effect so doubtful it can

only have been reached on the basis that the judges were leant on by RT, it is striking that in his witness statement in support of the application for permission to serve out, Mr Marinichev does not seek to criticise this second ground for the decision. Indeed, he does not mention it at all. Professor Maggs, one of the experts on Russian law instructed by RT, considers that Article 10 was a proper basis for reaching the result declaring the Guarantee invalid.

212.    The decision of the ACVR was the subject of an appeal by Erste and the other Lenders to the AAC. In its decision of 24 January 2012, the AAC dismissed that appeal, on the same grounds as had the ACVR, that is that it should be declared invalid under Article 61.2 of the Bankruptcy Law and Article 10 of the Civil Code. Again Mr Marinichev is highly critical of the Court's reliance on Article 61.2 because it was not in force at the date of the Guarantee, but it is striking that, whilst the various lawyers who represented the banks at the appeal hearing argued that Article 61.2 should not apply because the entering of the Guarantee did not harm the interests of the creditors of the guarantor (an argument the AAC rejected), none of them appears to have argued that the Article did not apply at all because it was not in force when the guarantee was entered into and did not have retrospective effect. Mr Marininchev does not mention the alternative ground upon which the appeal was dismissed, Article 10 of the Civil Code, and so is not critical of that ground of the decision.

213.    That decision was the subject of a further appeal to the Federal Arbitrazh Court which delivered its judgment dismissing the Lenders' appeal on 19 April 2012. It essentially upheld the decision of the courts below on the basis that since the Guarantee had been concluded under conditions knowingly unfavourable to the guarantor solely in favour of related parties, it was not permitted under Article 10 of the Russian Civil Code.

214.    VTB Bank and Erste applied for permission to appeal to the Supreme Arbitrazh (Commercial) Court which, on 14 May 2012 ordered a stay of the decisions of the lower courts whilst the application for permission to Appeal was dealt with. On 25 May 2012, the Supreme Arbitrazh Court found no basis for a discretionary review on the basis of incorrect interpretation and application of the law by the courts. The Court stated that in declaring the Guarantee invalid the lower courts had proceeded on the basis that the Guarantee had been entered into in favour of related parties on terms unfavourable to the guarantor. The Court said that in those circumstances, the application of Article 61.2 of the Bankruptcy Law had not led to the lower courts making the wrong decision. Although the reasoning is rather opaque, I accept what Professor Maggs says, that the Supreme Arbitrazh Court was saying that the incorrect application of Article 61.2 did not lead to the wrong result because there was a proper basis for that result, namely Article 10 of the Civil Code.

215.    As I have said, in its original evidence in support of the application for permission to serve out, Erste did not criticise the application of Article 10 at all. Indeed Mr Marinichev did not mention it. In evidence for the purposes of resisting the Defendants' applications Erste relies upon the evidence of another Russian lawyer Dr Gladyshev that, for Article 10 to be applicable, proof of intention to cause harm is necessary, but in none of the judgments of the lower courts was any consideration given to the question whether the parties to the Guarantee intended to inflict harm.

216.    However, Professor Maggs disputes that analysis. He points out how a very expensive guarantee of a high-risk loan would reduce the value of the guarantor which would provide a plausible basis for the application of Article 10. He also disagrees with Dr Gladyshev, saying that Article 10 does not require an intent solely to cause harm. It also deals with abuse of rights in other forms which could include a mixed intent, to benefit oneself or some third party but with the knowledge that the transactions would cause harm to creditors. His view is that the language of Article 10: "nor is an abuse of a legal right allowed in other forms" is very broad and gives a wide discretion to the court.

217.    Mr Salzedo QC was highly critical of the reasoning that the Guarantee was not in the interest of the guarantor or its creditors, pointing out that if a guarantee from the parent is required to enable the loan to be made to a 100% owned subsidiary which it requires for its survival, it can hardly be said that the guarantee is not in the best interests of the guarantor and it might well be said it was in their joint interests. I can see the force in that argument but it seems to me that Professor Maggs is right that there is at least a plausible basis for the application of Article 10. At the conclusion of his second report he says this:

> "…there is a sound Russian law basis (Article 10) for the [ACVR] decision having been made in the way it was, without resorting to a conclusion that the decision was 'skewed' or 'biased'. For some reason the court applied not only Article 10, but also applied a provision of the bankruptcy law that was not yet in effect. For what it is worth, that is not something I would expect if someone was putting in place a well-crafted and/or sinister plot to invalidate the guarantee".

218.    I agree with that conclusion. It seems to me that merely because a Russian court applying Russian law has reached a decision which seems strange to an English court which would apply English law to the contract, but which a Russian law expert like Professor Maggs considers plausible and arguable as a matter of Russian law, that does not give rise to any inference that the decisions of the ACVR and the appellate courts were procured by improper influence from RT. I agree with Mr Morgan's submission that the decision of the ACVR and the appellate courts are intelligible and explicable and are within the margin of appreciation for judicial decisions. It is simply not possible to say they are so perverse no reasonable court could have reached them without being biased in favour of RT and its affiliates. Accordingly, in my judgment Erste has not made out an arguable case that the decisions invalidating the Guarantee were or even might have been procured by improper influence or interference.

219.    It seems to me that the absence of any improper influence or interference by RT to date is really borne out by the fact that, whilst certain court decisions (such as that invalidating the guarantee) have gone against the external creditors, a number of others have been in their favour, not least the other part of the ACVR judgment of 5 December 2011, declaring the surety agreement invalid, a further indication that that judgment as a whole was not procured by improper influence or interference. I do not accept Mr Salzedo's fourth submission that this is a weak point or that the only decision which matters is the one declaring the borrower's asset transfer invalid. On the basis that Erste has an arguable case that the surety agreement was part of the conspiracy, that decision is of equal importance in frustrating RT's objectives.

220.    So far as the decision invalidating the borrower's asset transfer is concerned, whilst it is of course true that it was obtained on the application of Gazprombank, I was unconvinced by Mr Salzedo's submission that somehow it was not inconsistent with RT being able to exercise improper influence over the judges of the arbitrazh courts because Gazprombank is also state owned. Rather, it seems to me that if RT really were seeking to exercise such influence, that application which sought to impugn the borrower's asset transfer, which on Erste's case is a critical aspect of the conspiracy, is one where RT could have been expected to seek to influence the court to ensure that a decision favourable to it upholding the transfer was reached, notwithstanding the involvement of another state owned entity.

221.    That one might have expected RT to intervene in relation to both the application to invalidate the borrower's asset transfer and the application to invalidate the surety agreement also seems to me to be one of the answers to Mr Salzedo's second point, that if the tort claims are brought in Russia, they will directly impugn RT and that it is only when that happened that RT would be likely to seek to influence the decisions of the courts. In my judgment, if RT had been going to seek to improperly influence the courts, they would have done so already, in relation to the attacks on the validity of the borrower's asset transfer and surety agreement.

222.    The other answer to Mr Salzedo's second point seems to me to be that, contrary to Professor Bowring's view that the reason why there is no evidence of improper influence to date is that none of the court decisions has involved RT itself, if, on Erste's case all the Defendants are in the control of RT, surely that will have been well known to the courts deciding the cases, which on Mr Salzedo's hypothesis, would then have been seeking to reach decisions favourable to RT and its subsidiaries and affiliates. Yet, with the exception of the decisions invalidating the Guarantee, there has been no suggestion by Erste that the courts have been influenced improperly in the decisions they have reached.

223.    Mr Salzedo's third point is, as he put it, the counterpoint to the second point, that the amount of money at stake (US$80 million in all) is sufficient for whoever would be conducting the defence of the proceedings in Russia to consider it worth RT's while to seek improperly to influence the outcome of the proceedings. I am unconvinced by that submission, which seems to me to be completely speculative. As I have already said, the amount at stake, although perhaps more than "chicken feed" in the context of commercial litigation, is not so great or of such apparent financial significance to the Russian state to warrant improper interference with the courts dealing with the case.

224.    That leaves Mr Salzedo's first point, which is essentially that an entity such as RT, if it has participated in a conspiracy to strip its affiliates of their assets, is unlikely to stop there if proceedings are on foot which would have the effect, if successful, of unravelling the conspiracy, but would seek improperly to influence the outcome of those proceedings if it could. Mr Salzedo submitted that what emerges, particularly from the work of Professor Hendley is that there is a completely different cultural background and history in Russia compared with the United Kingdom in terms of influence being brought to bear on the judiciary. This is a point of some force, but ultimately I have concluded that, even if RT wanted to try to improperly influence the judges and their decisions, there is simply no cogent evidence of a risk that they would be able successfully to do so.

225.   In that context, it seems to me there are three matters which point away from RT being able to influence the outcome of proceedings in Russia. The first I have already dealt with extensively above, which is that notwithstanding that proceedings in relation to the borrower and the guarantor and their assets have been ongoing in Russia for more than three years, there is no evidence that the court decisions have been improperly influenced and, if RT were going to try to influence the court decisions, it would surely have done so by now.

226.   The second matter is the fact that, in the arbitrazh court system, judges who hear cases are selected at random by computer. It follows that the point Professor Bowring makes about the court chairman being able to select compliant judges to hear cases, which is a cornerstone of his opinion that Erste could not get a fair trial in Russia, is simply factually incorrect. Whatever may happen in courts of general jurisdiction, it is not possible to select the "right" judge in the arbitrazh courts.

227.   The third matter is that, despite Mr Salzedo's submissions to the contrary, it does seem to me that the fact that the arbitrazh courts are required to give publicly available reasoned judgments for their decisions militates against there being any effective improper influence over those courts. Mr Salzedo relied upon the fact that Mr Morgan had told me, on instructions, that at the end of the hearing before the arbitrazh court, the judge has to announce his or her decision and then has a few days to produce written reasons. Mr Salzedo submitted that this would not prevent the judge from giving reasons which were not the true reasons but which hid the fact that the decision was in fact made on the basis of improper influence. It seems to me that would require a degree of deviousness on the part of the judges hearing the cases which they are unlikely to possess.

228.   Furthermore, the resort to the "wrong " reasons for a decision which was the one the judge thought RT or the state wanted would in all probability lead to reasoning which was manifestly odd, if not perverse. It is striking that, notwithstanding that the dispute between entities in the RT Group and external creditors concerning the assets of the borrower and the guarantor has been before the Russian courts since 2010 and there have been a substantial number of court judgments (some in favour of the creditors) the only one which Erste has tried to impugn is the one invalidating the Guarantee and, as I have already held, on analysis, that decision is not perverse and there is no evidence it was procured by improper influence.

229.   In conclusion on the question of whether Erste could get a fair trial in Russia, I find myself in a very similar position to the one in which Andrew Smith J found himself in *Ferrexpo AG v Gilson Investments Ltd* [2012] EWHC 721 (Comm); [2012] 1 CLC 645. Having examined all the evidence of Ukrainian law and about the Ukrainian judiciary and court system in that case, he concluded at [96]:

> "There are grounds for some general concern about the independence of the judicial system in Ukraine, but I am unable to accept that Ferrexpo have produced cogent evidence of a real risk that Ferrexpo will not receive justice in the courts of Ukraine in the 2011 Ukrainian proceedings or in other litigation. Looking at the material as a whole, it is too fragmentary, too vague and often too unreliable in its nature to justify such a conclusion."

230.   In my judgment, Erste has not produced cogent evidence of a real risk that it would not receive justice in the Russian courts if the tort claims proceeded in Russia. However, the other factors I have identified in the previous section of the judgment do point clearly to England as the appropriate and proper forum for the determination of the conspiracy and other tort claims.

Conclusion

231.    Erste has demonstrated that there are serious issues to be tried on the merits in relation to all the claims which it advances against the Defendants. It has also shown that it has much the better of the argument that it can bring itself within three jurisdictional gateways in para 3(1) of Practice Direction 6B: 3.1(3), that the other Defendants are necessary or proper parties to the claims against the borrower and the guarantor; 3.1(9)(a) that its conspiracy and other tort claims are claims made in tort where damage was sustained within the jurisdiction; and 3.1(20), the claim under section 423 of the Insolvency Act 1986 is a claim made under an enactment. Erste has also demonstrated that England is the appropriate and proper forum for the determination of the dispute between the parties.

232.   It follows that the applications of RT and RT Capital to challenge the jurisdiction and set aside service out are dismissed.

TAB 10

*Erste Group Bank AG (London) v JSC (Red October)*
[2015] EWCA Civ 379

Neutral Citation Number: [2015] EWCA Civ 379

Case No: A3/2013/3088
A3/2013/3437
A3/2013/3087
A3/2013/3438

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE,**
**QUEEN'S BENCH DIVISION, COMMERCIAL COURT**
**THE HON. MR JUSTICE FLAUX**
**2012 FOLIO 1136**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 17/04/2015

**Before :**

**LORD JUSTICE AIKENS**
**LADY JUSTICE GLOSTER**
and
**LORD JUSTICE BRIGGS**

- - - - - - - - - - - - - - - - - - - - -

**Between :**

**ERSTE GROUP BANK AG, LONDON BRANCH**          **Claimant/**
**Respondent**

**- and -**

**(1) JSC 'VMZ RED OCTOBER'**          **Defendants/**
**(2) RED OCTOBER "STEEL WORKS"**          **Appellants**
**(3) STATE CORPORATION FOR ASSISTANCE TO**
**DEVELOPMENT, PRODUCTION AND EXPORT OF**
**ADVANCED TECHNOLOGY INDUSTRIAL PRODUCT**
**"ROSTECKHNOLOGII"**
**(4) CJSC RUSSPETSSTAL**
**(5) LLC RT-CAPITAL**
**(6) CJSC NIOKRINVEST**
**(7) OJSC RUSSPETSMASH**
**(8) LLC SPETSSTALRESURS**

- - - - - - - - - - - - - - - - - - - - -

(Transcript of the Handed Down Judgment of
WordWave International Limited
A Merrill Communications Company
165 Fleet Street, London EC4A 2DY
Tel No:  020 7404 1400, Fax No: 020 7831 8838
Official Shorthand Writers to the Court)

- - - - - - - - - - - - - - - - - - - - -

**Mr Richard Snowden QC, Mr Richard Morgan QC and Mr James Sheehan** (instructed by **Macfarlanes LLP**) for the **Appellants/3rd Defendants**
**Mr David Mumford (instructed by Enyo Law LLP) for the Appellants/ 5**[th] **Defendants**

**Mr Simon Salzedo QC and Mr David Scannell** (instructed by **Greenberg Traurig Maher LLP**) for the **Respondent/Claimant**

Hearing dates : Tuesday 25th; Wednesday 26th; and Thursday 27th November 2014
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

**Lady Justice Gloster :**

1.       This is the judgment of the court, to which Lady Justice Gloster and Lord Justice Briggs have made the major contributions.

2.       This is an appeal by the third defendant, State Corporation for Assistance to Development, Production and Export of Advanced Technology Industrial Product "Rosteckhnologii", and by the fifth defendant, LLC RT-Capital, (collectively "D3 and D5", individually "D3" and "D5") against orders of Flaux J dated 3 and 8 October 2013 by which Flaux J dismissed applications made by D3 and D5 pursuant to CPR Part 11, challenging the jurisdiction of the English court and seeking to set aside service of the proceedings upon them outside the jurisdiction in Russia.

**Factual and procedural background**

3.       The factual background appears at paragraphs 2 to 7 and 20 to 84 of the judgment below ("the judgment").  In outline, the claimant, Erste Group Bank AG ("the Bank") is the London branch of an Austrian bank. It was one of a syndicate of lenders ("the Lenders") which participated in a US$80 million loan to the first defendant, JSC "VMZ Red October" ("D1") (described in the judgment as "the borrower"). At the time of the loan, D1 owned and operated one of Russia's largest steel works, the Red October facility in Volgograd, employing thousands of people in supplying the Russian defence industry. The loan was provided to D1 in Russia under the terms of a Facility Agreement dated 26 November 2007 ("the Loan Agreement") and D1's obligations as borrower under the Loan Agreement were guaranteed by the second defendant, Red October "Steel Works" ("D2"). The original lender was VTB Capital plc ("VTB"), which acted as the arranger and facility agent under the Loan Agreement. On 29 January 2008, the Bank was novated into the Lenders' rights and obligations under the Loan Agreement, as to 25%, so its share is some US$20 million. The Loan Agreement was governed by English law and all disputes arising out of or in connection with the agreement were made subject to a London arbitration clause, with a mechanism whereby, at the Lenders' option, a notice could be served on the borrower requiring the relevant dispute to be determined in court, in which case the English courts were to have exclusive jurisdiction to settle the dispute. Under the Loan Agreement the contractual place for repayment of the loan was New York, although, when the Bank was novated into the Loan Agreement, it identified to the Facility Agent an account in London as the place to which the agent should forward monies received on its behalf.

4.       D2 is the immediate parent of the borrower, D1, and is itself a wholly owned subsidiary of the fourth defendant, CJSC Russpetsstal ("D4"). There is no dispute that D3 was formerly an indirect parent of D1 and D2; in the action the Bank contends (in relation to which it is accepted that there is a serious issue to be tried) that D1 and D2 remain indirect subsidiaries of D3. The guarantee ("the Guarantee") was entered into on the same date as the Loan Agreement, namely 26 November 2007. It was likewise governed by English law and contained a London arbitration clause, but with the same mechanism whereby the Lenders could require a dispute to be made subject to the exclusive jurisdiction of the English courts.

5.       D3 was described by the judge as follows:

> "The Third Defendant (hereafter referred to for convenience as
> "RT") is a State Corporation incorporated by statute on 23
> November 2007 for the purposes of managing Russia's military
> and manufacturing assets and developing its military industry. Its
> supervisory council, its ultimate management body, comprises
> nine members, four who are representatives of the President of
> Russia, four who are representatives of the Government of Russia
> and one who is described as the "general director". One of the
> representatives of the President, who was the Chief Executive
> Officer at all material times was Mr Sergei Chemezov. It is not
> disputed that Mr Chemezov is one of President Putin's oldest and
> most trusted friends and colleagues, they having shared a house
> together in Dresden in the period 1983 to 1988 when they were
> both KGB agents in East Germany."

6.    It is common ground that, at all relevant times, D5 has been and remains a wholly
      owned subsidiary of D3, incorporated in late 2010. The judge held that there was an
      arguable case that at the relevant times D3 controlled D1, D2 and D4[1] and that all of
      the other defendants were affiliated to D3 and that D3 controls each of them[2]. We
      refer to the defendants collectively as "the Defendants".

7.    The seventh defendant, OJSC RusSpetsMash ("D7"), was an indirect subsidiary of D5
      (wholly-owned through D1 and D2) established on 30 March 2009. On 26 May 2009
      D1 transferred the entirety of its basic infrastructure assets to D7 in return for the
      issue of 92.64% of D7's share capital, the remaining shares being issued to D2,
      likewise in consideration for the transfer of assets from D2. The Bank contends that
      D7 was the instrument, or "holding company", by which, as part of an alleged
      conspiracy, D1 and D2 purported to divest themselves of their assets, to put them out
      of the reach of their creditors[3]. Although the asset transfers and the agreements
      pursuant to which they were made were  subsequently set aside by an order of the
      Russian court dated 2 June 2010, on the basis that they were transactions aimed at
      defrauding creditors, the Bank contends that, subsequently in April 2011, D5
      permitted and procured D7, D1 and D2 to enter into a fraudulent arrangement to avoid
      the full effect of those orders, which - had they been enforced - would have required
      D7 to return all assets to D1 and D2 and pay compensation ("the Amicable
      Agreement"). The Amicable Agreement, which was approved by the Russian court on
      13 July 2011, stated that the parties to the arrangement recognised and agreed that D7
      could not return the relevant assets to D1 in full, and in their natural form, and that it
      was therefore agreed that D7 should pay compensation. However, the payment was
      never made as, only 2 months later, D7 was put into insolvency proceedings on the
      application of D6.

8.    On 31 July 2009 D1 failed to pay an instalment due under the Loan Agreement.
      Previously all instalments had been met on time. On 3 August 2009 VTB, as Facility
      Agent, served written notice of default on D1. After various negotiations between D1
      and D2 on the one hand, and their creditors on the other, on 22 October 2009 D1

---

[1] See paragraph 22 of the judgment.
[2] See paragraph 27 of the judgment.
[3] See paragraph 28 of the judgment.

notified the Facility Agent of Events of Default under the Loan Agreement and associated facility documents ("the Finance Documents") including the fact that D1 was insolvent. On 26 November 2009 D1 was placed under supervision by the Russian Court. There then followed insolvency and numerous other proceedings in the Russian courts, as well as other relevant events and transactions, which are usefully summarised in an agreed chronology prepared by the parties to the appeal.

9.    We summarise the headline points as follows[4]:  on 17 December 2009 VTB gave written notice to D1 of acceleration of the loan and to D2, as guarantor, of a demand for payment. On 9 February 2010, D2 issued its own insolvency petition in the Russian court. On 18 February 2010 the Bank was admitted to the list of creditors of D1 pursuant to an order of the Arbitrazh Court of the Volgograd Region ("the ACVR") with the amount of the debt which it claimed was owed to it, namely RUB 490,338,795.34. On 14 May 2010 D2 was placed under supervision by the Russian court. On 22 September 2010 the Bank's claim against D2 pursuant to the terms of the Guarantee was entered pursuant to an order of the ACVR on the creditors' register of D2. On 20 May 2011 D4 was placed into insolvent liquidation. On 15 August 2011 an application was made to the Russian courts to avoid and invalidate the Guarantee given by D2 on the grounds that under Russian insolvency law, it was a related party transaction. On 18 August 2011 notices were sent by the Bank to D1 and D2 identifying a specific dispute which it required to be heard by the English Courts. On 5 December 2011 the application to invalidate the Guarantee was successful before the ACVR. On 24 January 2012 the Appellate court dismissed the appeal against that 5 December 2011 decision.  Following that dismissal the Bank was removed from the register of D2's creditors on 20 February 2012. On 19 April 2012 the Federal Cassational Court rejected the appeal against the decision to set aside the Guarantee. On 25 May 2012 the Highest Arbitrazh Court rejected the application for permission to appeal the decision to set aside the Guarantee. On 20 June 2012 D2's liquidation was approved by the Russian court.

10.    On 23 August 2012 the Bank issued its claim form in the Commercial Court proceedings against all the Defendants. Against D1 and D2 it claimed in debt, and as damages for breach of contract, the sum of US$16,843,003.13 of the US$20 million loan advanced to it under the Loan Agreement, together with interest, costs and various other amounts said to be variously due under the Loan Agreement, the Guarantee and the other Finance Documents. In addition, the Bank claimed against D1 and D2 and the remaining Defendants:

i)    damages for the tort of "unlawful means" conspiracy;

ii)    further or alternatively, damages arising out of acts carried out pursuant to a conspiracy entered into by the Defendants for the deliberate purpose of harming the Bank and furthered  by using lawful means;

iii)    further or alternatively, damages for the tort of unlawful interference with economic interests;

---

[4] This court has added certain relevant dates which are omitted from that chronology.

    iv)    further or alternatively, damages for interference with contractual relations, namely the Facility Agreement and/or the Guarantee, including a claim for exemplary damages from D3;

    v)    further or other relief, including relief pursuant to section 423 of the Insolvency Act 1986 ("the 1986 Act") to protect the interests of the Bank as victim of the divesting of assets by D1 and/or D2 on various dates pursuant to transactions at an undervalue to put assets out of reach of and/or prejudice creditors.

11.    The thrust of the Bank's claim is that the failure of D1 and D2 to comply with their contractual obligations under the Loan Agreement and the Guarantee was caused by the tortious conduct of the Defendants. In particular, it is alleged that the Defendants conspired, first to pressurise the Bank, the other Lenders and other creditors into restructuring the loans through the threat of bankruptcy and, when that failed to have the desired effect, to interfere with D1 and D2 so as to cause them to be unable to repay the Bank by procuring D1 and D2 to hive down some of their Russian assets to D1's subsidiary, D7, which thereby allegedly deprived D1 and D2 of assets and caused them to be put into, and be kept in, insolvency in Russia. The Bank further alleges that, having thus brought about the bankruptcies of D1 and D2 in Russia, the Defendants have latterly sought to manipulate the bankruptcy process (not least by procuring the Amicable Agreement) in order to ensure that creditors of the Red October steel mill remain unpaid and that, in effect, the bankruptcies have become a further vehicle for their conspiracy. The Bank further alleges that the Defendants have, in particular, succeeded to creditors of D1 and D2 and/or contrived uncommercial sham transactions to make themselves creditors in order to dilute the voting rights of legitimate creditors including the Bank. It is further alleged that, having done so, the Defendants avoided the liquidation of D1 and D2 at times when the companies had assets to distribute, but voted in favour of liquidation only once they had procured D1 and D2 to put those assets beyond the reach of legitimate creditors (by another series of unlawful transactions). The Bank also alleges that the Defendants procured the replacement of the temporary manager of D1, who had sought to restore D1's assets and proposed to liquidate the company, with managers who, it is alleged, appear to be determined to avoid a coincidence at any time between liquidation and the presence within D1 of assets which might be distributed to creditors. It is further alleged that, more recently, the Defendants, by exercise of their voting rights, have sought to exclude the Bank from the creditors' registers of those companies, as if the Bank had never been a creditor of D1 and D2 at all.

12.    D3 and D5 deny these allegations but, for the purposes of the appeal and of CPR Part 11, they accept that the Bank has a seriously arguable case in respect of its tort claims. However D3 and D5 emphasise the fact that the transactions about which complaint is made by the Bank in this jurisdiction have already been the subject of substantive judgments by the Russian Courts in the insolvencies of D1 and D2. They point out that the Bank has participated extensively in the Russian insolvencies of D1 and D2 by (amongst other things) lodging proofs of debt, attending and voting at meetings of creditors, having a representative appointed to the creditor's committee of D1, appealing against the inclusion of another creditor on the register of creditors for D2, applying for the removal of the Russian insolvency practitioner appointed in relation to D2, contesting the challenge (made on the basis that it was a related party

transaction) to the validity of the Guarantee, and contesting applications to remove it from the list of creditors of D1, as a result of which it continues to remain a creditor in the Russian insolvency of D1. D3 and D5 further point out that the Bank has also sought, before the Russian Court as the Court having the relevant insolvency jurisdiction, the setting aside of transactions in the course of the insolvencies, which transactions are now the subject of its claims in tort and under section 423 of the 1986 Act in this jurisdiction.

13.    The claim form was served on D1 and D2 on 23 August 2012 without leave and within the jurisdiction pursuant to the exclusive jurisdiction clauses in the Loan Agreement and the Guarantee. Despite having been served with the Claim Form in August, by the date of the application for permission to serve out of the jurisdiction (19 October 2012), no acknowledgement of service had been filed and no response has been received from either D1 or D2 to the Bank's claim. The Bank's evidence in support stated that it nevertheless believed that both companies were well aware of the proceedings. Accordingly by that date the Bank was entitled to apply for judgment in default against both companies.

14.    On 19 October 2012 the Bank issued its application for permission to serve the proceedings out of the jurisdiction on the other Defendants and on 24 October 2012 Cooke J granted permission to serve out on the papers. On 31 October 2012, the claim form and supporting documents were served, amongst others, on D3 and D5.  On 21 November 2012 D3 and D5 filed acknowledgements of service indicating their intention to contest the jurisdiction. Apart from D3 and D5, none of the other Defendants played any part in the application to set aside service or filed acknowledgements of service.

15.    By letter from the liquidation manager of D2, dated 13 December 2012, the day before the date of the hearing of the Bank's summary judgment application against D1 and D2 in relation to the Bank's debt and contractual claims, the manager indicated that D1 and D2 might have a defence on the grounds that they were each subject to insolvency proceedings in Russia; or that the Russian Court had set aside the Guarantee under Russian law.  On 14 December 2012, HHJ Mackie QC made an order for summary judgment pursuant to CPR Part 24 against D1 and D2 on the Bank's debt and contractual claims, in an amount of US$16,843,003.13 plus interest on that sum, then amounting to approximately US$4m. The Bank did not seek summary judgment in respect of its conspiracy and other tort claims. No appeal has been brought by either D1 or D2 against this Order. Nor has any payment been made to the Bank whether pursuant to the judgment, in the Russian insolvencies or otherwise.

16.    On 31 January 2013 D3 and D5 issued applications seeking appropriate relief challenging the jurisdiction of the English court.

17.    On 18 February 2013 the Liquidation Manager of D1 made an application to the court to remove the Bank from the creditors' register of D1. On 1 April 2013 the ACVR dismissed that application. On 18 April 2013 the Liquidation Manager of D1 made a second application to remove the Bank from the creditors' register of D1 which was likewise dismissed by the ACVR on 7 June 2013.

**Summary of the judgment under appeal**

18.    Although it will be necessary in due course to consider particular aspects of the judgment in some detail, it is convenient to provide a summary of it now.  After a brief introduction, the judge set out, at paragraphs 8-19, the principles generally applicable when determining applications to set aside service out of the jurisdiction. Those general principles are not challenged on this appeal.  Next, in a lengthy section headed 'Serious issue to be tried on the merits', in paragraphs 20-103, he concluded that, contrary to the Defendants' submissions, there was a serious issue to be tried on the merits of the conspiracy and other tort claims (which we refer to hereafter simply as "the conspiracy claims"), and also under section 423 of the 1986 Act.

19.    The judge then addressed, in succession, the questions whether a good arguable case had been shown by the Bank that its claim fell within one or more of the four "gateways", now found in paragraph 3.1 of Practice Direction 6B ("PD6B").

20.    In relation to gateway 3.1(3) (using the enumeration in PD6B), the judge rejected D3 and D5's argument that, by proving in the Russian insolvency proceedings relating to D1 and D2, and by participating in various other ways in those proceedings, the Bank had submitted to the jurisdiction of the Russian courts, either in relation to its conspiracy claims or, for that matter, any of its claims against D1 and D2.  He said that, on that issue of submission, the Bank had "much the better of the argument". Apart from that issue, he regarded it as plain beyond argument that the other Defendants were necessary and proper parties to the claims against D1 and D2.  He did not address the question, raised by paragraph 3.1(3)(a) of PD 6B, whether it was reasonable for the court to try the issues between the Bank and D1 and D2, either separately or at all. It must, we think, be assumed that he thought that it was reasonable for the court to try such issues, otherwise he could not have come to the conclusion which he did. He also held that the Bank's conspiracy claims against D1/D2 fell within the jurisdiction clauses in the Loan Agreement and the Guarantee – a finding that was not challenged by D3 and D5 on appeal.

21.    As for gateway 3.1(9), the judge accepted the Bank's argument that, since the Facility Agreement and the Guarantee provided for it to be paid by the Facility Agent at its (that is the Bank's) Facility Office in London, then the non-payment under the Facility Agreement and Guarantee as the alleged result of the conspiracy amounted to damage sustained within the jurisdiction.   In so doing he rejected the Defendants' submission that the phrase "damage sustained within the jurisdiction" should be interpreted more narrowly than it had been in a series of first instance decisions (*Booth v Phillips* [2004] EWHC 1437 (Comm); *Cooley v Ramsey* [2008] EWHC 129 (QB) and *Wink v Croatia Osiguranje DD* [2013] EWHC 1118 (QB)).

22.    Finally, in relation to gateway 3.1(20), the judge concluded that section 423 of the Insolvency Act 1986 was "an enactment" within the meaning of the gateway, and that the Defendants' attempt to demonstrate that there was an insufficient connection with this jurisdiction to satisfy the requirement to show a good arguable case under this gateway was misconceived, since that question depended upon a careful analysis of all the facts, which could only be carried out satisfactorily at the trial.  In so doing he followed his own decision to that effect in *Fortress Value v Blue Skye* [2013] EWHC 14 (Comm).

23.    The judge then addressed the question of appropriate forum.  He put on one side the question whether there could be a fair trial in Russia (which he later resolved against

the Bank's submissions that there could not be) and dealt first with all other relevant factors.  While recognising what he described as "the obvious connection of the facts with Russia rather than England" (see e.g. paragraph 161) he identified five connecting factors with England which, taken in the aggregate, demonstrated that in his view England was clearly the appropriate forum.  Those five factors were:

i)      The risk of inconsistent findings in two jurisdictions if the Bank's right to proceed in England against D1 and D2 was not accompanied by an ability to proceed against the other Defendants as well, when alleging a single conspiracy involving all of them.

ii)     The English law and jurisdiction clauses in the Loan Agreement and the Guarantee, which he described as "lying at the heart of the current dispute".

iii)    The fact that, if the claims had to be litigated in Russia, the starting point for the Russian court would be the invalidity of the Guarantee as a matter of Russian law, even though it was subject to English law and jurisdiction, which process he described as involving "the Russian court reaching the wrong result by applying the wrong governing law as a matter of English conflicts of laws rules."

iv)     The fact that the Russian court would apply the wrong governing law (Russian law) to the conspiracy.

v)      That what he called "the governing law of the torts" was, at least seriously arguably, English law.

24.    Finally in a detailed and carefully reasoned passage (from paragraphs 191-230) which is not challenged by the Bank on appeal, the judge concluded that the Bank had failed to produce cogent evidence of a real risk that it would not receive justice in the Russian courts if the tort claims proceeded in Russia.

**The correct approach**

25.    It was common ground that the correct approach to whether permission should be given to serve a foreign defendant out of the jurisdiction was as stated in the judgment of the Privy Council given by Lord Collins of Mapesbury in *Altimo Holdings and Investment Ltd–v- Kyrgyz Mobil Tel Ltd* [2011] UKPC 7, [2012] 1 WLR 1804 ("*Altimo*"), namely:

i)      the claimant must satisfy the court that in relation to the foreign defendant there is a serious issue to be tried on the merits;

ii)      the claimant must satisfy the court that there is a good arguable case that the claim falls within one or more classes of case in which permission to serve out may be given, which in this context connotes that one side has "much the better of the argument" than the other on that point;

iii)    the claimant must satisfy the court that in all the circumstances, England and Wales is clearly or distinctly the appropriate forum for the trial of the dispute, and that in all the circumstances the court ought to exercise its discretion to permit service of the proceedings out of the jurisdiction.

**The issues arising on the appeal**

26.    Subject to one discrete point, the first requirement was not in issue on this appeal in relation to the Bank's conspiracy claims as against D3 and D5. It was thus accepted by D3 and D5 for the purposes of the appeal that there was a serious issue to be tried on the merits of those claims as against them. The discrete point was that, since the applicable law for the conspiracy claims was Russian law, and no Russian law had been pleaded, a serious issue on the merits could not be demonstrated by the Bank.

27.    However in relation to the Bank's claim as against D3 and D5 under section 423 of the 1986 Act, the first requirement was in issue on the appeal.  D3 and D5 contended that the lack of a sufficient connection with England, and the practical impossibility of the grant of any relief at trial, meant that the claim under section 423 had no real prospect of success.

28.    Therefore, in summary the five issues arising on the appeal are:

i)    Has the Bank demonstrated that there is a good arguable case that (a) the Bank's contractual claims, and/or (b) the Bank's conspiracy claims, against D3 and D5 fell within paragraph 3.1(3) of PD6B?

ii)    Has the Bank demonstrated that there is a good arguable case that the Bank's conspiracy claims against D3 and D5 fell within paragraph 3.1(9) of PD6B?

iii)    Whilst D3 and D5 accepted that *prima facie* the Bank's claim under section 423 of the 1986 Act fell within paragraph 3.1(20) of PD6B, (because it was "a claim made under an enactment"), nonetheless the remaining issue is whether the Bank has demonstrated that there is a serious issue to be tried on the merits of the claim, in circumstances where, as alleged by D3/5, there is a lack of a sufficient connection with England.

iv)    Was the judge wrong to reach the evaluative conclusion that he could be satisfied for the purposes of CPR Part 6.37 (3) that England and Wales is "clearly or distinctly" the appropriate forum for the trial of the disputes as between the Bank and D3 and D5; and

v)    Did the judge go outside the reasonable ambit of his discretion in concluding that it is appropriate in all the circumstances to grant permission to serve out of the jurisdiction on D3 and D5?

29.    Necessarily the arguments in relation to the various issues overlapped to a certain extent.

**Issue 1: The ground relied upon under paragraph 3.1(3) of PD6B**

**Discussion and determination**

30.    The key issue which arises under this head is whether the Bank had established that there was between the Bank and D1/D2 "a *real issue* which it is *reasonable* for the

[English] court to try" (as required by paragraph 3.1(3)(a)). This issue in turn involves consideration of the following three sub-issues:

i)    had the Bank submitted to the jurisdiction of the Russian insolvencies of D1 and D2 and the Russian Courts;

ii)   irrespective of whether there had, or had not, been such submission, was it reasonable to try claims in England against entities in liquidation in another jurisdiction (D1/D2) in circumstances where:

   a)   the Bank had (admittedly) lodged claims in their insolvencies and participated in proceedings in Russia;

   b)   as alleged by D3/5, no additional sum would be recovered against D1 and D2 as a result of any judgment in English proceedings, beyond the amounts that had already been proved in the Russian insolvency proceedings;

   c)   as alleged by D3/5, as a matter of practical reality D1 and D2 were not going to take any part in any English Commercial Court proceedings as they were irrelevant to the process of insolvency in the jurisdiction of their centres of main interest ("COMI");  and

iii)  was it reasonable to try claims in England as against D1 and D2 which necessarily involved consideration of the propriety (or otherwise) of decisions of the Russian courts and actions taken by the Defendants, creditors or others in the context of Russian insolvency proceedings?

*The judge's specific findings in relation to Issue 1*

31.   For present purposes the critical paragraphs of the judge's judgment in relation to Issue 1 are paragraphs 109 - 128. At paragraphs 104 - 105 he summarised the issues and the arguments of the parties. Having quoted from paragraphs 164 - 167 of Lord Collins' judgment in *Rubin v Eurofinance SA and New Cap Reinsurance Corporation v Grant (in liquidation)* [2012] UKSC 46, [2013] 1 AC 236, ("*New Cap*"), and summarised Mr Morgan's submissions that, by putting in a claim for proof in the insolvency of D1 in Russia, http://www.bailii.org/cgi-bin/markup.cgi?doc=/ew/cases/EWHC/Comm/2013/2926.html&query=title+(+Erste+)+and+title+(+group+)+and+title+(+Bank+)&method=boolean    -    disp154 the Bank http://www.bailii.org/cgi-bin/markup.cgi?doc=/ew/cases/EWHC/Comm/2013/2926.html&query=title+(+Erste+)+and+title+(+group+)+and+title+(+Bank+)&method=boolean    -    disp156    had submitted its claims against D1 to the exclusive jurisdiction of the Russian courts and that    it    was    not    open    to    http://www.bailii.org/cgi-bin/markup.cgi?doc=/ew/cases/EWHC/Comm/2013/2926.html&query=title+(+Erste+)+and+title+(+group+)+and+title+(+Bank+)&method=boolean    -    disp155the Bankhttp://www.bailii.org/cgi-bin/markup.cgi?doc=/ew/cases/EWHC/Comm/2013/2926.html&query=title+(+Erste+)+and+title+(+group+)+and+title+(+Bank+)&method=boolean - disp157 to pursue its claims against D1 in England, the judge went on to conclude that on the evidence there were  three critical aspects of the facts of this case which distinguished it from

*New Cap* and which meant that http://www.bailii.org/cgi-bin/markup.cgi?doc=/ew/cases/EWHC/Comm/2013/2926.html&query=title+(+Erste+)+and+title+(+group+)+and+title+(+Bank+)&method=boolean    -    disp156 the Bank http://www.bailii.org/cgi-bin/markup.cgi?doc=/ew/cases/EWHC/Comm/2013/2926.html&query=title+(+Erste+)+and+title+(+group+)+and+title+(+Bank+)&method=boolean - disp158 had not submitted to the jurisdiction of the Russian courts in relation to its claims against D1 so as to preclude it from pursuing those claims in England. The three aspects are:

(i) In stark contrast to *New Cap* where the application to enforce the Order of the Australian Court was being made by the Australian liquidator, there was no such application by any of the court appointed managers or administrators in the present case. Rather the argument that there had been a submission to the Russian jurisdiction was being run by two of the Defendants to claims that they were parties to a conspiracy to engineer the liquidation of the borrower and the guarantor by alienation of their assets and deliberate manipulation of the insolvency process in Russia. According that level of supremacy to a foreign bankruptcy proceeding (which was itself the subject of criticism in the Bank's case before the English court) went way beyond the principle of "modified universalism of bankruptcy" recognised in the authorities.

(ii) Liquidation in Russia used a completely different procedure from that in a common law jurisdiction. The judge relied on the evidence of the Defendants' Russian law expert, Professor Karelina, to reach the conclusion that  in Russia the procedure for admitting a claim to the list of creditors' claims was only provisional and that the validity, or otherwise of the underlying transaction, might be determined in separate proceedings, leading to the original decision to admit the claim possibly having to be revisited. Accordingly, it remained the case that the merits of the Bank's claims were to be determined in England pursuant to the exclusive jurisdiction clause.

(iii) In the Arbitrazh court system, the doctrine of *res judicata* only applied within the Russian federation and then only to the facts found, not to the legal qualification of those facts or the application of the law to the facts.

Accordingly the judge held that the Bank had nothttp://www.bailii.org/cgi-bin/markup.cgi?doc=/ew/cases/EWHC/Comm/2013/2926.html&query=title+(+Erste+)+and+title+(+group+)+and+title+(+Bank+)&method=boolean - disp165 submitted to the jurisdiction of the Russian courts for the determination of the merits of its debt claim or its conspiracy and other claims against D1.

32.    As to the Bank's claims against D2, the judge relied upon the fact that, when defending the claim to set the Guarantee aside, the Bank had at all levels challenged the jurisdiction of the Russian court to determine the dispute as to the validity of the Guarantee, on the grounds that that dispute had to be determined by LCIA arbitrators pursuant to the London arbitration clause in the Guarantee. On the basis that http://www.bailii.org/cgi-bin/markup.cgi?doc=/ew/cases/EWHC/Comm/2013/2926.html&query=title+(+Erste+)+and+title+(+group+)+and+title+(+Bank+)&method=boolean    -    disp171the Bankhttp://www.bailii.org/cgi-bin/markup.cgi?doc=/ew/cases/EWHC/Comm/2013/2926.html&query=title+(+Erste+

)+and+title+(+group+)+and+title+(+Bank+)&method=boolean - disp173 had not submitted to the jurisdiction of the Russian courts in relation to the determination of the validity of the Guarantee, the decision of the ACVR and the Russian appellate courts that the Guarantee was invalid, which applied Russian law to the Guarantee, notwithstanding that it was expressly governed by English law, would not be recognised by the English Court. This, he held, was an application of the long-standing principle that discharge from liability under a foreign bankruptcy procedure would only be a discharge in England if it was a discharge under the law applicable to the contract. That principle was applied by the Court of Appeal in *Antony Gibbs & Sons v La Societe Industrielle et Commerciale des Metaux* (1890) 25 QBD 399 and had been applied many times since, most recently by Teare J in *Global Distressed Alpha Fund v PT Bakrie Investindo* [2011] EWHC 256 (Comm); [2011] 1 WLR 2038 (where he refused an invitation not to follow the *Gibbs* case).

33.    The judge concluded by holding that, even if he had considered Mr Morgan was right that http://www.bailii.org/cgi-bin/markup.cgi?doc=/ew/cases/EWHC/Comm/2013/2926.html&query=title+(+Erste+)+and+title+(+group+)+and+title+(+Bank+)&method=boolean - disp173the Bankhttp://www.bailii.org/cgi-bin/markup.cgi?doc=/ew/cases/EWHC/Comm/2013/2926.html&query=title+(+Erste+)+and+title+(+group+)+and+title+(+Bank+)&method=boolean - disp175 had submitted its claims against D1 and D2 to the jurisdiction of the Russian courts, in his view the only claims that would have been so submitted would have been claims under the Loan Agreement and Guarantee themselves and that there was no basis for the contention that it had submitted its wider claims in conspiracy and other torts to the jurisdiction of the Russian courts.

*Submissions of D3 and D5 in relation to Issue 1*

34.    The submissions of Mr Richard Snowden QC, who appeared for D3 on the appeal, were adopted by Mr David Mumford on behalf of D5.   The overall argument of both counsel was that the judge had failed to address the specific issue of whether, for the purposes of paragraph 3.1(3)(a) of PD6B, it is *reasonable* for the English court to try an issue between the Bank and D1/D2 on the facts of this case. In outline, Mr Snowden submitted that it was not *reasonable* for the English court to try issues between the Bank and D1/D2 because:

i)    By filing claims in the Russian insolvencies, the Bank had become a party to those proceedings and had taken part in them. To use the words of Lord Collins in *New Cap* at [164], the Bank had entered into a compact with other creditors with a view to taking the benefit of those collective insolvency proceedings; see also *Stichting Shell Pensioenfonds v Krys* [2014] UKPC 41 [2015] 2 WLR 289 ("*Shell*"). Having been admitted to the list of creditors in both insolvencies, the Bank had then also sought to use its status as a creditor to challenge various steps in the insolvency proceedings and, for example, to exclude other claimants from those proceedings. Accordingly, on the basis of the Russian evidence properly analysed, the Bank became a party to the Russian insolvency proceedings; that was more than enough to amount to a submission by the Bank to the jurisdiction of the Russian courts for the resolution of *all* its claims against D1 and D2 that would be necessary for the proper winding up of their affairs in Russia.

10-03635-jpm    Doc 306    Filed 06/06/17    Entered 06/06/17 11:28:43    Main Document
Pg 363 of 1164

Judgment Approved by the court for handing down.                                                    ERSTE GROUP v JSC

ii)    Moreover, the claims for damages in the English proceedings simply duplicated or "franked" the debt claim of the Bank that had been admitted in the Russian insolvency proceedings of D1.    Nothing further would be recovered in the English proceedings so they were pointless.

iii)    In relation to D2, the Bank had submitted its claim under the Guarantee in the Russian insolvency proceedings of D2, but the Guarantee had then been set aside, so that the Bank could not now rely on it in those proceedings. Yet the Bank was now trying to by-pass that conclusion by claiming the loss of the benefit of the Guarantee in the proposed English proceedings. The judge's conclusion, as set out in paragraph 126 of the judgment (that, on the basis that http://www.bailii.org/cgi-bin/markup.cgi?doc=/ew/cases/EWHC/Comm/2013/2926.html&query=title+(+Erste+)+and+title+(+group+)+and+title+(+Bank+)&method=boolean          -disp171 the                                    Bank http://www.bailii.org/cgi-bin/markup.cgi?doc=/ew/cases/EWHC/Comm/2013/2926.html&query=title+(+Erste+)+and+title+(+group+)+and+title+(+Bank+)&method=boolean          -disp173had not submitted to the jurisdiction of the Russian courts in relation to the determination of the validity of the Guarantee, the decision of the ACVR and the appellate courts that the Guarantee was invalid, which applied Russian law to the Guarantee, notwithstanding that it was expressly governed by English law, would not be recognised by the English Court), was also misconceived. The cases upon which the Bank relied, namely *Gibbs*, (supra), *Global Distressed Alpha Fund v PT Bakrie Investindo,* supra and (on appeal) *Joint Administrators of Heritable Bank plc v Winding up Board of Landesbanki Islands HF* [2013] UKSC 13; [2013] 1 WLR 725 were dealing with a different situation; those cases did not address the *New Cap* principle.

iv)    The English courts should not consider the propriety or otherwise of decisions of the Russian courts and the actions of the defendants and others taken in the context of the Russian insolvency proceedings under Russian legislation, which, it was common ground, were all governed by Russian law.

v)     The proposed English litigation was pointless because, even if it were to succeed, the only place any judgment could be enforced against D1 and D2 was Russia.  There was no evidence that the Russian courts would enforce such a judgment, so the whole proceedings would have been an expensive waste of time.

*Submissions of the Bank in relation to Issue 1.*

35.    Mr Simon Salzedo QC for the Bank began by offering an undertaking to the court (which had not been given below) to the effect that, at the trial of English proceedings, the Bank would limit its case on "unlawful means conspiracy" so that it did not include any assertion that any of the final decisions of the Russian courts in relation to the insolvencies of D1 and D2 was wrong as a matter of Russian law. Thus, it would not be argued that the Russian courts had been used as some kind of instrument in the conspiracy alleged.

36.    On the substance of the issue, Mr Salzedo's principal arguments were:

i)    Given the English law and London arbitration provisions in the Loan Agreement and Guarantee, D3 and D5 could not assert that it was not "reasonable" for the English court to try any "real issue" between the Bank and D1 and D2.  The English court was, effectively, obliged to accept jurisdiction, either under the EU Jurisdiction and Judgments Regulation (2001/44) ("the Judgments Regulation") or under common law principles; see *Lornamead Acquisitions Ltd v Kaupthing Bank HF* [2011] EWHC 2611.

ii)    There was a "real issue" because the Bank had obtained summary judgment on its claims against D1 and D2 in the English proceedings.

iii)    The *Gibbs* principle that the English court will not recognise a decision in foreign insolvency proceedings made under foreign law to discharge an obligation governed by English law remains good law and binds this court. Thus the Bank could still sue D2 under the Guarantee despite any decision of the Russian courts in the insolvency proceedings that the Guarantee is invalid.

iv)    The Bank had not submitted to the Russian insolvency proceedings. The crucial factor was that the Bank had received no *benefit*.  But, even if it was not, this court could not remake the judge's decision of fact that the Bank had not submitted to the Russian insolvency proceedings. At the most, the Bank had submitted only for the purposes of the distribution of the estates of D1 and D2.  It had not done so for the purposes of the validity of the Guarantee or, at the least, for the purposes of the conspiracy claims against D3 and D5.

v)    The English proceedings would not duplicate the debt claim proved in the Russian insolvency because (a) the interest recovery in England would be greater; and (b) the Rouble had depreciated so much against the US dollar that, in Rouble terms,  an English judgment in dollars would now be much more valuable a claim in the Russian insolvency than the existing (proved) claim.

*Issue 1: Analysis and conclusions*

*The approach to the determination of the question*

37.    Paragraph 3.1(3) of PD6B provides as follows:

> "(3) A claim is made against a person ('the defendant') on whom the claim form has been or will be served (otherwise than in reliance on this paragraph) and –
>
> (a) there is **between the claimant and the defendant a real issue which it is reasonable for the court to try**; and
>
> (b) the claimant wishes to serve the claim form on another person who is a necessary or proper party to that claim."
> [Emphasis supplied.]

38.    Thus a claimant has to demonstrate that both threshold requirements are met. At the first stage under paragraph 3.1(3)(a), the court has to examine the nature of the claim which arises against the anchor defendants in isolation; that is to say on the

assumption that there will be no additional joinder of the foreign defendants. The court has to be satisfied that not only is there "a real issue" between the claimant and the anchor defendants, but also that it is an issue "which it is reasonable for the court to try". These requirements are underlined by CPR 6.37(2) which provides that the application must also state the grounds on which the claimant believes that there is between the claimant and the defendant a real issue which it is reasonable for the court to try. Only at the second stage does the court go on to consider whether the foreign party is "a necessary or proper party to that claim".

39.    Mr Salzedo attempted to rely upon paragraphs 64 to 67 and 74 to 80 of the Board's judgment in *Altimo*, and the statements by Lord Collins as to the similarity between the Isle of Man provisions and paragraph 3.1(3) of PD6B, to support his submission that the *only* criterion which has to be satisfied at the first stage under paragraph 3.1(3)(a) is whether there is an arguable claim against the anchor defendants, D1 and D2.

40.    In the first group of paragraphs Lord Collins analysed the Isle of Man provisions on service out of the jurisdiction and compared them to the English provisions under the old RSC, but he concluded that the changes did not affect the point of law that arose on that appeal. In the second group of paragraphs Lord Collins considered the old English law on when a claim was "properly brought" against the defendant who had been served within the jurisdiction, D1 in Lord Collins' example. Lord Collins conducted a review of the cases on the old RSC Order 11 rule 1(1)(c) before it was amended in 1987. He concluded, in paragraph 79, that the better view of the case law was that the fact that D1 had been sued only for the purpose of bringing in the foreign defendants was a factor to be considered in the exercise of the court's overall discretion and was not an element in the question of whether the action was 'properly brought' against D1, provided that there was a viable claim against D1. However, if the claim against D1 was "bound to fail" then that action against D1 was not 'properly brought'.

41.    We do not accept Mr Salzedo's submissions that Lord Collins' statement in paragraph 79, together with his statement in paragraph 65 and 66 that, in effect, the changes in the wording of English rules made no difference to the old law relating to what was meant by "properly brought", lead to the conclusion that the only criterion which has to be satisfied at the first stage under paragraph 3.1(3)(a) of PD6B is whether there is an arguable claim against the anchor defendants. Such a construction would in our view unjustifiably restrict the wide ambit of the phrase "which it is reasonable for the court to try". Nor do we consider that Lord Collins was attempting any such exclusive or exhaustive definition of the phrase "which it is reasonable to try" as used in paragraph 3.1(3)(a) of PD6B of the English CPR, when he addressed the meaning of "Properly brought" and "proper party", or the issues of "The motive in suing the anchor defendants" and "Bound to fail" in the context of the Isle of Man provisions. If the Board had been attempting to do so, it clearly would have been *obiter* since the only issues that the Board were addressing in the context of the relevant Isle of Man "Properly brought" provision were (a) whether the relevant claims were bound to fail and (b) whether the motive for the defendants in bringing their counterclaim (viz. for the sole or predominant purpose of establishing jurisdiction against the other defendants to counterclaim, as opposed to suing the anchor defendants) was an issue that fell to be considered as part of the question whether the action had been "properly

brought"; see paragraphs 127 and 128. There was no consideration of the separate question whether there were real issues which it was reasonable to try.

42.     Accordingly in our view *Altimo* is not to be regarded as even persuasive authority for the proposition that the court is precluded from considering wider issues of reasonableness at stage one of the process under paragraph 3.1(3)(a) of PD6B.

43.     It was obvious from the evidence that the commercial (and indeed only) driver behind the Bank's issue of proceedings in England against D1 and D2 was to enable a claim to be brought against D3 and D5 and to attempt to execute against their assets, whether in Russia or elsewhere. However we do not consider that in the present case it is necessary or appropriate for this Court to revisit the question whether the fact that a claimant's motive in bringing proceedings against the anchor defendants was only for the purposes of enabling a claim to be brought against the foreign defendants is a factor which is relevant to the question whether the threshold criteria under paragraph 3.1(3) of PD6B have been satisfied. To do so would involve reconsideration of this Court's decision in *Multinational Gas and Petrochemical Co v. Multinational Gas and Petrochemical Services Ltd* [1983] Ch 258 and the various authorities there cited. That would be a task for the Supreme Court. Accordingly, even if we have reservations on this point, we must accept for the purposes of this case the Board's conclusion, as expressed in paragraph 79 in *Altimo,* that the fact that the anchor defendant is sued only for the purpose of bringing in the foreign defendants is not an element in deciding the question whether the gateway requirements of paragraph 3.1(3)(a) or (b) have been satisfied. That factor is only for consideration under the wider discretionary head of Issue 4.

44.     The parties did not dispute the proposition that an application to set aside permission to serve out of the jurisdiction falls to be determined by reference to the position at the time permission is granted, not by reference to circumstances at the time that the application to set aside is heard: see per Hoffmann J (as he then was) in *ICS Technologies Ltd and another v Guerin and others* [1992] 2 Lloyds Rep 430 at 434-435.

45.     That statement was approved by this Court in *Mohammed v Bank of Kuwait* [1996] 1 WLR 1483 (a stay application case) by Evans LJ at pages 1492−3 (with whom Saville LJ, as he then was, and Morritt LJ agreed); see also *Credit Agricole Indosuez v Unicof Ltd* [2003] EWHC 2676 (Comm), [2004] 1 Lloyd's Rep 196 per Cooke J at paragraph 22; and *Vitol Bahrain EC v NASDAQ General Trading LLC* [2014] EWHC 984 (Comm), per Popplewell J at paragraph 42. Thus permission which was rightly granted will not be discharged simply because circumstances have changed, although, as Hoffmann J observed in *ICS Technologies*, subsequent events may throw light upon considerations which were relevant at that time.

46.     Thus, in our judgment, it was clearly incumbent upon the judge at the first stage of the process under paragraph 3.1(3)(a), to address as a separate question, distinct from the issue of the necessary or proper party arising under paragraph 3.1(3)(b), whether the Bank's claims against D1 and D2, as at the date of the application before Cooke J, viewed in isolation, satisfied the requirements of paragraph 3.1(3)(a), namely whether there was between the Bank and D1 and D2, "a real issue which it is reasonable for the court to try". It was in that (paragraph 3.1(3)(a)) context that consideration of the

stage reached in the Russian insolvency proceedings, and the Bank's participation in those proceedings, was relevant.

47.    However, although the judge recited paragraph 3.1(3) in its entirety, he does not appear to have approached his consideration of D3 and D5's arguments that the Bank had submitted to the jurisdiction of the Russian courts and the effect of such submission, in the proper and separate context of the gateway requirements of paragraph 3.1(3)(a), viz. whether there is a "real issue" as between the Bank and D1 and D2 which it is reasonable for the English court to try. That error may well have been caused, or contributed to, by Mr Morgan (who at that stage was appearing as sole leading counsel for D3), as his arguments in relation to the effect or consequences of the participation by the Bank in the Russian insolvency proceedings appear to have been addressed to the second stage - the paragraph 3.1(3)(b) elements of the gateway - namely that the Defendants, other than D1 and D2, were not necessary or proper parties to the claims against D1 and D2; see e.g. paragraph 105 of the judgment. Thus in our view the judge adopted the wrong approach to his consideration of the effect or consequences of the participation by the Bank in the Russian insolvency process. Perhaps understandably, given the way in which Mr Morgan had formulated his submissions[5], the judge appears to have regarded the issue as being the hard-edged question as to whether, by putting in a proof in the insolvency of D1 in Russia, the Bank had submitted its claims against D1 to the exclusive jurisdiction of the Russian courts and therefore it was not open to the Bank to pursue its claims against D1 in England; and likewise, in relation to the Bank's claims against D2, whether by participating in the proceedings concerning the validity of the Guarantee, the Bank had submitted its claims against D2 to the exclusive jurisdiction of the Russian courts, so that the English court no longer had jurisdiction over the Bank's claims against D2.

48.    In our judgment the issue for determination under paragraph 3.1(3)(a) in the present case, as we have identified in the first sentence of the previous paragraph, is a much more finely nuanced, soft-edged, question than the stark questions which the judge seems to have posed and decided. We emphasise in this context the use of the word "try". The question is directed not at whether it is reasonable or proper from the perspective of the particular claimant to issue or bring proceedings, but rather whether it is reasonable for the English court to "try the issue", whether in summary judgment proceedings or otherwise. Indeed the wording of paragraph 3.1(3)(a) departs from the more subjective formulation of the principle articulated by Morton J in *Ellinger v Guinness, Mahon & Co* [1939] 4 All ER 16, 22 and referred to by Lord Collins in paragraph 65 of *Altimo* – namely "a real issue between the plaintiff and that party which *the plaintiff may reasonably ask* the court to try".

49.    In addition to not adopting the correct approach to consideration of the gateway requirements, in our view the judge went wrong in other aspects of his determination that the Bank had brought itself within the gateway of paragraph 3.1(3). We set out our reasons for this conclusion below.

50.    Logically the first question which the judge had to ask himself in the context of his enquiry as to whether the Bank had brought itself within paragraph 3.1(3) was

---

[5] See e.g. paragraphs 113 and 122 of the judgment.

whether the Bank had submitted all or some of its claims against D1 and/or D2 to the jurisdiction of the Russian courts and the Russian insolvency process. If the Bank had indeed submitted all of its claims to be determined in the Russian insolvency process, then it could not be the case that there was any "real issue" as between the Bank and D1 or D2 which it was "reasonable for the [English] court to try". If the Bank had submitted to the Russian courts or the Russian insolvency process in respect of some but not all of its claims (e.g. the debt, contractual and Guarantee claims, but not the conspiracy claims), then the further question arises whether, in the context of paragraph 3.1(3)(a), the conspiracy claim would, by itself, raise a "real issue" as between the Bank and D1 and/or D2 which it was "reasonable for the [English] court to try". The judge held that the Bank had not submitted to the jurisdiction of the Russian courts either in respect of its debt, contractual or Guarantee claims or its conspiracy claims against either D1, or D2. In the alternative he held that, even if there had been a submission in respect of the debt, contractual and Guarantee claims, there had been no submission in respect of the conspiracy claims. In our view the judge was wrong in both his primary and alternative conclusions.

*Shell*

51.    The English law principle articulated in *New Cap,* and recently affirmed in *Shell,* is that a foreign creditor submits to the jurisdiction of the court supervising a company's insolvency by proving in that insolvency. That, by itself, is sufficient without more (and irrespective of whether the proof has been accepted or a dividend has been received[6]) to require the creditor to have all questions, of whatever kind, as against the debtor resolved within the insolvency as administered by the court of the jurisdiction of that insolvency. The rationale for the rule was first set out in *Ex p. Robertson; In re Morton* (1875) LR 20 Eq 733, at 737 -738. The latest summary of the law is to be found in paragraphs 29 *et seq* of *Shell.*

52.    The facts of *Shell* were as follows. A Dutch pension fund ("Shell") had invested US$45 million in shares in a BVI mutual fund company ("the BVI company") set up by the now notorious fraudster, Mr Bernard Madoff. Immediately after Mr Madoff's arrest in December 2008, Shell applied to redeem its shares on the basis of a redemption price calculated by reference to the net asset value per share published by the BVI company as at 31 October 2008, but was not paid out. Shell subsequently applied to the Dutch courts to obtain a conservatory arrest of sums owned by the BVI company that were held in a Dublin bank account.   The BVI company was then wound up by the BVI court and Shell submitted a proof of debt in the liquidation for over US$63 million, which was said to represent the redemption price of Shell's shares due under its redemption notice submitted in December 2008. The Dutch court refused the application of the BVI company's liquidators to discharge the attachment to the Dublin funds. Shell brought substantive proceedings in the Netherlands, alleging that the BVI company had made actionable misrepresentations and was in breach of warranties, both made in a side letter to Shell at the time that it had bought the shares. Shell claimed US$ 45 million in damages (representing the subscription price of its shares, as opposed to the redemption price). The liquidators then applied to the BVI court for an anti-suit injunction to prevent Shell from prosecuting proceedings in the Netherlands.  The BVI High Court rejected the application but the

---

[6] See paragraph 31 of *Shell.*

Court of Appeal allowed the appeal.   Thereafter, the BVI High Court made an order in the liquidation on the basis that no outstanding redemption monies were due to any existing or former member of the BVI company.   The effect of this was that Shell's proof of debt based upon its redemption notice was rejected by the liquidators and it was left to participate in the liquidation *pari passu* as a member, not as a creditor. Shell accepted that the real purpose of the Dutch proceedings was to obtain priority by means of its attachment, which it could not otherwise obtain in the liquidation.

53.     Shell appealed to the Privy Council, arguing that it had not submitted to the jurisdiction of the BVI by submitting a proof of debt and, even if it had, it should not be subjected to an anti-suit injunction.  The Privy Council rejected Shell's arguments in a judgment given by Lords Sumption and Toulson. At paragraph 24 of their judgment,  they noted the particular circumstances which arose when a company is being wound up in one jurisdiction but a creditor attempts to obtain prior access to assets that are the subject of that winding up procedure by instigating foreign proceedings. They said:

> "Where a company is being wound up in the jurisdiction of its incorporation, other interests are engaged. The court acts not in interest of any particular creditor or member, but in that of the general body of creditors and members. Moreover, as the Board has recently observed in *Singularis Holdings Ltd v PriceWaterhouseCoopers* [2014] UKPC 36, 23, there is a broader public interest in the ability of a court exercising insolvency jurisdiction in the place of the company's incorporation to conduct an orderly winding up of its affairs on a world-wide basis, notwithstanding the territorial limits of its jurisdiction. In protecting its insolvency jurisdiction, to adopt Lord Goff's phrase, the court is not standing on its dignity. It intervenes because the proper distribution of the company's assets depends upon its ability to get in those assets so that comparable claims to them may be dealt with fairly in accordance with a common set of rules applying equally to all of them. There is no jurisdiction other than that of the insolvent's domicile in which that result can be achieved. The alternative is a free-for-all in which the distribution of assets depends on the adventitious location of assets and the race to grab them is to the swiftest, and the best informed, best resourced or best lawyered."

54.     Lords Sumption and Toulson then considered the question of whether Shell had submitted to the jurisdiction of the BVI courts by virtue of proving for the debt alleged to have arisen under the redemption notice and by participating unconditionally in the anti-suit injunction proceedings.    They concluded (in agreement with the Court of Appeal) that Shell had submitted by virtue of both actions.   They referred to *ex parte Morton (1875) LR 20 Eq 733* and noted that the Full Court of the Federal Court of Australia had held in *Saad Investments Company Limited (in official liquidation) v Deputy Commissioner of Taxation* [2014] FCAFC 57 that in *Morton* the submission to the jurisdiction consisted in the lodging of the proof,  not the receipt of a dividend in the liquidation.  They further noted that the

same view was taken by the Supreme Court in *New Cap,* where Lord Collins (with whom the rest of the court agreed on this point) stated that if a foreign creditor proves in an English liquidation, he submits to the jurisdiction of the English court so that the English court may then make orders against that foreign creditor.

55.    Lords Sumption and Toulson then identified the question as being whether Shell had submitted to the jurisdiction of the BVI court. They continued,  at paragraph 31:

> "31…... A submission may consist in any procedural step consistent only with acceptance of the rules under which the court operates. These rules may expose the party submitting to consequences which extend well beyond the matters with which the relevant procedural step was concerned, as when the commencement of proceedings is followed by a counterclaim. In the present case the Defendant lodged a proof. It cannot make any difference to the character of that act whether the proof is subsequently admitted or a dividend paid, any more than it makes a difference to the submission implicit in beginning an ordinary action whether it ultimately succeeds. This result is neither unjust nor contrary to principle, for by submitting a proof the creditor obtains an immediate benefit consisting in the right to have his claim considered by the liquidator and ultimately by the court according to its merits and satisfied according to the rules of distribution if it is admitted. The Board would accept that the submission of a proof for claim A does not in itself preclude the creditor from taking proceedings outside the liquidation on claim B. But what he may not do is take any step outside the liquidation which will get him direct access to the insolvent's assets in priority to other creditors. This is because by proving for claim A, he has submitted to a statutory scheme for the distribution of those assets pari passu in satisfaction of his claim and those of other claimants."

56.    The Privy Council rejected Shell's argument that it had not submitted to the jurisdiction of the BVI courts for all purposes, but only for the purposes of claims under the Insolvency Act and Rules, rather than claims governed by "the general law". Lords Sumption and Toulson stated,  at paragraph 32:

> "There is, in the present context, no relevant difference between the claim for which Shell proved (a debt arising from its redemption notice) and the claim for which it did not prove but which it has put forward in the Dutch proceedings (damages for misrepresentation and breach of warranty). They both arise under the general law. They are both capable of being proved in the liquidation."

57.    In relation to the issue of whether a creditor should be permitted to take part in proceedings in a foreign court,  the Privy Council concluded,  at paragraph 40  as follows:

"40. The Board would accept that as a general rule, there can be no objection in principle to a creditor invoking the purely adjudicatory jurisdiction of a foreign court, provided that it is an appropriate jurisdiction and that litigation there is not vexatious or oppressive to the liquidators or other interested parties. But it is in principle inimical to the proper winding up process for a creditor to seek or enforce an order from a foreign court which will result in his enjoying prior access to any part of the insolvent estate. ………"

58.    It follows from this analysis of *Shell* that we reject Mr Salzedo's argument (to the extent that it was ultimately advanced) based on the decision in *Banque des Marchands de Moscou v Kindersley* [1951] Ch 112 at 119[7] that the fact that the Bank had not received any dividend in the liquidation of D1 prevented any submission to the jurisdiction having taken place. Secondly, we reject his related submission that because, after the date upon which Cooke J granted permission to serve out of the jurisdiction, the Liquidation Manager unsuccessfully applied on two occasions to remove the Bank from the register of D1's creditors, that likewise prevents any submission to the jurisdiction on the part of the Bank.

59.    Thirdly, contrary to Mr Salzedo's submissions, it is not a valid argument that the claims being brought in the foreign jurisdiction (i.e. here the conspiracy claims, in *Shell* the claims for misrepresentation and breach of warranty) could be said to be different in character from the claim in respect of which the proof of debt was submitted in the liquidation, or brought under the general law rather than the relevant insolvency rules, or even that such claims are subject to the exclusive jurisdiction of the foreign court, whether by virtue of an exclusive jurisdiction clause or otherwise. As in *Shell,* in the present case there is no relevant difference between the claims for which the Bank proved or attempted to prove (the debt under the Loan Agreement in the case of D1, and under the Guarantee in the case of D2), and the claims for which it did not prove but which it has put forward in the English proceedings (damages for the conspiracy and the other tort claims) against D1 and D2. We accept Mr Snowden's submission, that, although they have different labels, they both arise under the general law and relate, and are limited, to the same amount. In other words, the claim for damages in the conspiracy claims duplicates the amount claimed under the debt and contractual claims against D1 and D2 in respect of the amounts advanced by, or owing to, the Bank under the Loan Agreement in respect of principal, interest and costs. Both claims are capable of being proved in the liquidations of D1 and D2, or, in the case of D2, would have been so capable, if the Guarantee had not been set aside by the Russian courts.

60.    Thus in our view, in the light of *Shell,* the conclusion reached by the judge in paragraphs 121 and 128 of his judgment that, on any basis, even if the Bank had submitted its claims under the Loan Agreement and the Guarantee against D1 and D2 to the jurisdiction of the Russian courts, it would not have submitted its wider claims in conspiracy and other torts, is erroneous.

---

[7] It appears that the case of *Kindersley* was cited in the written case and skeleton arguments in *Shell* and contained in the bundle of authorities before the Board.

61.    Fourthly, Mr Salzedo's further submission that, because on proper analysis, the basis on which the Guarantee was set aside was not strictly part of the insolvency jurisdiction and had been done under the ordinary rules of Russian law, such fact led to the conclusion that there had been no submission in respect of the Bank's Guarantee claims must also be rejected. *Shell* demonstrates that any such distinction is specious. Even on the assumption that the Guarantee was set aside under the general law, that was done in the context of the insolvency of D2 on the grounds that, as a related party transaction, it was inimical to the interests of creditors.

62.    Fifthly, Mr Salzedo's reliance  on the statement at paragraph 40 of the Board's judgment that, as a general rule, there could be no objection in principle to a creditor invoking the purely adjudicatory jurisdiction of a foreign court, provided that it was an appropriate jurisdiction and that litigation there was not vexatious or oppressive to the liquidators or other interested parties, is misplaced. Mr Salzedo submitted that, by the English proceedings, the Bank was merely invoking the "adjudicatory jurisdiction" of the foreign court, both in relation to the debt and guarantee claims, and the conspiracy claims, so that, as against D1 and D2, it might take any judgment back to enforce in the Russian insolvencies as best it could, and, as against D3 and D5 and the other defendants, it might seek to enforce its judgment wherever it could. That proposed course, submitted Mr Salzedo, was not in any way inimical to the proper winding up process of D1 or D2 in Russia and would not involve the Bank enjoying prior access to any part of their insolvent estates. In our judgment this argument does not assist Mr Salzedo on the question of whether the Bank had in fact submitted its claims to the jurisdiction of the Russian courts. It is only relevant to the issue of whether, irrespective of whether or not there had been a submission, there is an issue between the Bank and D1 and D2 that it is reasonable for the court to try.

*Critique of the judgment – submission to the jurisdiction of the Russian courts – the facts*

63.    Against that background we return to consider the conclusions of the judge. As Lord Collins stated in *New Cap* at paragraph 161:

> "The question whether there has been a submission is to be inferred from all the facts."

We are in equally as good a position as the judge to reach a conclusion on the facts since there was no oral evidence in this case and all the evidential material was available before us. In our judgment the judge's reliance upon what he referred to as the "three critical aspects of the facts of this case which distinguish it from *New Cap"* was misplaced.

64.    The first aspect said by the judge to take the case outside the principles identified in *New Cap* was that the submission to the jurisdiction point was being taken by the very defendants (D3 and D5), whom he had held were arguably parties to a conspiracy to engineer the liquidation of D1 and D2 by alienation of their assets and deliberate manipulation of the insolvency process in Russia; see paragraph 115 of the judgment. He regarded it as significant that there had been no application by any of the court-appointed managers or administrators in the Russian insolvencies. We cannot regard this point as in any way significant. What the judge had to decide was whether, in all the circumstances, for the purposes of paragraph 3.1(3)(a) of PD6B, there was between the Bank and D1 and D2 "a real issue which it is reasonable for the court to

try". The participation or non-participation of a Russian insolvency officer in the litigation was wholly irrelevant to the determination of that question. There was no reason whatsoever why any Russian insolvency court-appointed managers or administrators should consider it in the interests of the estates of D1 or D2  to be involved in applications by D3 and D5 in England to set aside orders for service out of the jurisdiction obtained by the Bank. There were no assets of the insolvent D1 and D2 in this jurisdiction; as at the date of the permission to serve out the Bank's proof of debt in D1's liquidation had been accepted pursuant to a court order. Further, any English judgment (in so far as it went beyond the quantum of the proof of debt, e.g. in respect of interest, or currency conversion uplift) would necessarily have to be proved and accepted in the Russian liquidations in accordance with Russian insolvency rules. The issue of alleged submission by the Bank to the jurisdiction by reason of its claims in Russia was an issue that the court had to consider in this context, irrespective of who was raising the point. We conclude that the application (if any) of the principle of "modified universalism" cannot depend on whether the issue has been raised by an office holder in the insolvency or another party. The question is simply: is it reasonable for the English court to allow a creditor who has (arguably) submitted in foreign insolvencies to pursue private proceedings against insolvent companies D1 and D2 in this jurisdiction. The judge was required to consider this question irrespective of the absence of any application by Russian officeholders to be involved. He did not do so.

65. The judge's second point was that the insolvency procedures in Russia used a completely different procedure from that used in a common law jurisdiction. He appears to have concluded in paragraph 117 of his judgment that the process of admitting a creditor to be placed upon the list of creditors' claims was a provisional process, which did not involve any final decision and was not intended to replace ordinary civil proceedings; it was in such ordinary civil proceedings that the validity or otherwise of the underlying transaction would be determined. Thus the validity or otherwise of the underlying transaction might be determined in separate proceedings and, depending upon the decision in those proceedings, the decision to admit the claim might need to be reconsidered. Accordingly, what this demonstrated was that, by putting forward its claim against D1 to be placed on the list of creditors' claims, the Bank had not submitted the determination of the merits of that claim (let alone the conspiracy claims) to the jurisdiction of the Russian courts in separate proceedings. It remained the case that those claims could be and were to be determined in England pursuant to the exclusive jurisdiction clause.

66. We cannot agree with the judge's analysis of the expert evidence on this issue. We accept Mr Snowden's submission that such differences as the judge purported to identify were irrelevant and did not bear upon whether the steps actually taken by the Bank amounted to a submission, as to which the Russian evidence was silent. Lord Collins stated in paragraph 161 of *New Cap:*

> "The characterisation of whether there has been a submission for the purpose of the enforcement of foreign judgments in England depends on English law. The court will not simply consider whether the steps taken abroad would have amounted to a submission in English proceedings. The international context requires a broader approach. Nor does it follow from the fact that

10-03635-jpm    Doc 306    Filed 06/06/17    Entered 06/06/17 11:28:43    Main Document
Pg 374 of 1164

Judgment Approved by the court for handing down.                                    ERSTE GROUP v JSC

the foreign court would have regarded steps taken in the foreign proceedings as a submission that the English court would so regard them. Conversely, it does not necessarily follow that because the foreign court would not regard the steps as a submission that they will not be so regarded by the English court as a submission for the purposes of the enforcement of the judgment of the foreign court. The question whether there has been a submission is to be inferred from all the facts."

The characterisation of whether there has been a submission for the purposes of deciding whether permission to serve out of the jurisdiction should be given must equally depend on English law and all the facts of the case.

67.     We agree with Mr Snowden's submission that the judge took a statement from the evidence of the Defendants' Russian law expert, Professor Karelina, out of context in coming to his conclusion that, notwithstanding that a creditor participated in the insolvency process, it was free to bring its own proceedings elsewhere and recover sums outside the liquidation process.  A proper analysis of Professor Karelina's evidence demonstrates: (i) that once the insolvency, supervision or external management process had begun, there was a moratorium on all claims; (ii) that in order to be able to prove in the liquidation it was necessary for a creditor to be admitted to the list of creditors; and (iii) that the adjudication of such claims might take place in other civil proceedings (as indeed is the position in England) or might be transferred to the insolvency court. In fact it is clear from Professor Karelina's evidence more generally that creditors' claims are subsumed within the insolvency process, within which their validity is examined – as indeed happened in respect of the Guarantee. There is nothing in her evidence to support what appears to be the judge's approach, namely that Russian law permits a creditor to submit a claim to get paid in the collective process, vote in the liquidation proceedings and benefit from the moratorium, and yet, at the same time pursue a separate claim to get paid outside the liquidation proceedings. Moreover, even if, at the initial stage, the inclusion of the Bank on D1's register of creditors was a provisional step, the subsequent active participation by the Bank in court proceedings and creditors' meetings relating to D1's insolvency process (as to which see below), can in our view only be characterised as a submission.

68.     The judge's third factor in reaching his conclusion that there had been no submission by the Bank to the jurisdiction of the Russian insolvency proceedings was that, in the Russian arbitrazh court system, the doctrine of *res judicata* only applied within the Russian Federation and then only to the facts found, not to the legal qualification of those facts or the application of the law to those facts; see paragraphs 120 and 121 of the judgment. With respect to the judge, the fact that a particular jurisdiction has, or has not, a fully formed concept of *res judicata* is not relevant to the issue of whether a creditor has sought to take an advantage from that system of law. We agree with Mr Snowden's submission that this point cannot be determinative of what is, ultimately, a question of English law, albeit viewed in the international context, namely whether a creditor has indeed submitted to the jurisdiction of the foreign court; see paragraph 161 of *New Cap*.

69.     In our judgment, on the evidence before him, the judge should properly have concluded that the Bank's participation in the Russian insolvencies of both D1 and D2

resulted in its submission to, and acceptance of, the jurisdiction of the Russian Courts in relation to all issues arising in the insolvencies. In a schedule attached to their skeleton argument on the appeal, counsel for D3 and D5 summarised 12 decisions of the Russian courts in relation to D1, and 28 decisions in relation to D2, which were all made on applications in which the Bank participated. That schedule clearly demonstrates the extent of the Bank's active involvement in the Russian Court proceedings process. In addition to lodging proofs, the Bank thereafter participated in the insolvencies through the assertion of its status as a creditor, its participation in appeals seeking positive relief and its objection to applications by other parties. In addition, the evidence demonstrated that the Bank's representative participated on the creditors' committee of D1 and also in lobbying D2's manager to start litigation to set aside transactions underlying the claims of other creditors. We agree with Mr Snowden's submission that those steps taken by the Bank in the insolvencies of D1 and D2 in Russia, and before the Russian courts, indicate, as a matter of fact, not only that the Bank had sought to take advantage of its claimed status as a creditor in the insolvencies of D1 and D2 but also that, by seeking positive determinations in its favour, the Bank had accepted the Russian courts' jurisdiction to determine all issues in the insolvencies of D1 and D2.

70.     We should also deal with the conclusions of the judge that, in opposing the exclusion of its proof from the register of creditors of D2, the Bank had not submitted its claim under the Guarantee against D2 to the Russian courts and was not bound by the subsequent Russian court decision setting aside the Guarantee; see paragraphs 122 to 126 of the judgment. In our judgment he was wrong to reach these conclusions. As a matter of fact, the detailed chronological evidence shows that, on a date in 2010, the Bank lodged its proof in the insolvency of D2 on the basis of its claim under the Guarantee without any reservation as to its entitlement to insist on London arbitration or as to the exclusive jurisdiction of the English courts, and without any objection to the jurisdiction of the Russian courts. On 23 September 2010 the ACVR, in court proceedings in which the Bank participated, entered the Bank as a creditor in respect of its claims under the Guarantee on D2's register of creditors, rejecting a challenge by D2 to the validity of the Guarantee on the grounds that it was governed by English law. On 27 December 2010 the 12th Arbitrazh (Commercial) Appellate Court ("the A(C)AC"), in court proceedings in which the Bank again participated, dismissed D7's appeal against the ACVR's decision to include the Bank on the register of D2's creditors. Thereafter throughout 2011 the Bank and others participated in various contested court applications in relation to the external management of D2, including seeking the dismissal of the court appointed external manager. In addition the Bank participated at creditors' meetings of D2, and, together with other creditors, sought to challenge decisions taken by such meetings in court proceedings.

71.     It was only after the external manager of D2 had issued an application dated 15 August 2011, challenging the validity of the Guarantee as being a related party transaction, that the Bank for the first time sought to assert, in its notices to D1 and D2 dated 18 August 2011, that it required a specific dispute to be heard by the English court. It was then, for the first time, in its defence to the external manager's application that the Bank submitted that the Russian court had no jurisdiction to determine the validity of the Guarantee because that dispute had to be determined by the LCIA pursuant to the London arbitration agreement; see paragraphs 123 and 124 of the judgment.

72.    Mr Salzedo placed great reliance on the fact that there was no finding by the Russian court that the Bank had submitted to the jurisdiction and that at every stage the Bank had reserved its position. In our view that is an unrealistic characterisation of what had actually happened. By August 2011 the Bank had on any basis waived its entitlement to arbitration by service of its notices dated 18 August 2011.  In a judgment dated 5 December 2011 the ACVR allowed the application to set aside the Guarantee. The Bank and others subsequently appealed against the order setting aside the Guarantee, but the A(C)AC dismissed that appeal in a judgment dated 24 January 2012. Subsequently the Bank and others appealed that decision first to the Federal Cassational Court, which dismissed the appeal on 19 April 2012, and subsequently applied for permission to appeal that decision, and for a stay, to the Supreme Arbitrazh Court of the Russian Federation ("SAC(RF)"). The application for permission to appeal was dismissed by the SAC(RF) on 25 May 2012.

73.    In our judgment, the Bank's full-blooded participation in the Russian insolvency proceedings of D2, in the first instance successfully seeking, without any reservation of jurisdiction, to uphold its rights, which in turn gave rise to the external manager's subsequent challenge to the Guarantee, and subsequently D2's defence to that challenge, can as a matter of English law only be characterised as a submission to the jurisdiction of the Russian courts. The Bank did  blow "hot and cold"; at one point seeking to take the benefit of having a registered claim, and at another seeking to assert that the Russian court had no jurisdiction to rule upon the validity of that claim. But it is difficult to see how the Bank could (as it apparently attempted to do) maintain a valid arbitration challenge to the jurisdiction of the Russian Court in circumstances where it had already waived its entitlement to arbitration by service of the 18 August 2011 notices. Again, as we have already said above, we do not consider that the fact that Russian law might permit the determination of the claim in separate proceedings impacts on the question whether, as a matter of English law, there had been a submission to the jurisdiction.

74.    It was common ground, and the judge so found that, after several appeals, including the application for permission and a stay to the Supreme Arbitrazh Court in Russia, the Bank could not now rely on the Guarantee in the Russian insolvency of D2. However the judge held in paragraph 126 of the judgment that this conclusion would not be recognised by the English courts. He relied on two points: first, http://www.bailii.org/cgi-bin/markup.cgi?doc=/ew/cases/EWHC/Comm/2013/2926.html&query=title+(+Erste+)+and+title+(+group+)+and+title+(+Bank+)&method=boolean        -        disp171 the Bank http://www.bailii.org/cgi-bin/markup.cgi?doc=/ew/cases/EWHC/Comm/2013/2926.html&query=title+(+Erste+)+and+title+(+group+)+and+title+(+Bank+)&method=boolean    -    disp173had not submitted to the jurisdiction of the Russian courts in relation to the determination of the validity of the Guarantee; and, secondly, the decisions of the ACVR and the appellate courts were invalid because they had applied Russian law to the Guarantee, notwithstanding that it was expressly governed by English law. The judge's conclusion was based on the application of what the judge referred to as "the long standing principle that discharge from liability under a foreign bankruptcy procedure will only be a discharge in England if it is a discharge under the law applicable to the contract" as articulated in the cases upon which the Bank relied, namely: *Gibbs (supra), Global Distressed Alpha Fund (supra),* and (on appeal) *Joint Administrators*

*of Heritable Bank plc v Winding up Board of Landesbanki Islands HF* [2013] *(supra)*. He concluded that the application of that principle meant that the fact that D1 and D2 were in liquidation in Russia did not affect "the entitlement" of the Bank to bring the wider tort claims or the claim under section 423 against them in England pursuant to the contractual jurisdiction provisions.

75.     In our judgment the judge was wrong to reach this conclusion for at least two reasons, neither of which require us to reconsider the correctness or otherwise of the *Gibbs* principle, which has been the subject of what many regard as justifiable criticism: see for example *Dicey, Morris & Collins, The Conflict of Laws,* 15th Edition, (2012), vol 2, at paragraph 31-097; Fletcher's *Insolvency in Private International Law* 2nd ed (2005), at paragraphs 2.127 and following[8].

76.     First, the judge's decision was clearly premised on the conclusion that there had been no submission to the jurisdiction of the Russian court. If, as we have held, the Bank had indeed submitted to the jurisdiction of the Russian courts in respect of its debt, Guarantee and contractual claims as against D1 and D2, then the so-called principle set out in the cases can, in the light of the decision in *New Cap*, have no application. The *Gibbs* line of cases did not address the *New Cap* principle, or the present situation, namely where a creditor has actively participated in the foreign insolvency and sought to uphold the validity of his contractual rights in that insolvency, and subsequently to resist avoidance proceedings brought by the foreign office holder in the foreign insolvency. As Lord Collins pointed out in *New Cap* at paragraphs 93-99, there is a substantial difference between avoidance proceedings in the context of an insolvency, and the issue whether a foreign insolvency discharged a debt subject to English law. As this court pointed out during the course of submissions, the fact that the court of the debtor's COMI, and/or country of incorporation, makes an order avoiding, or setting aside,  a transaction in the interests of creditors under its relevant insolvency laws, is a very different thing from contractual discharge – i.e. performance. In our judgment, *New Cap* demonstrates that, if there has indeed been a submission by the foreign creditor to the court of the debtor's insolvency for whatever purpose, (and, in particular, where the creditor has sought to obtain a benefit by such participation), then the creditor cannot in subsequent proceedings challenge the avoidance order made against it by the foreign insolvency court simply on the grounds that its contract was subject to English law and an English exclusive jurisdiction clause.

77.     Second, even if the judge had been correct to conclude that the Bank had not technically submitted to the Russian court, the question was not whether the Bank was "entitled" to bring its debt and contractual claims and/or its conspiracy claims in England, but rather whether, in all the circumstances, in the language of paragraph 3.1(3)(a) of PD6B, such claims gave rise, as between the Bank and D1 and D2, to "a real issue which is reasonable for the court to try". This was a question which the judge did not address. In our judgment, even if, contrary to our view, there had not technically been a submission to the Russian court, in all the circumstances it could not be said that the tests of "real issue" and "reasonable for the court to try" had been satisfied.

---

[8] For example at paragraph 2.129 Professor Fletcher states that "the *Gibbs* doctrine belongs to an age of Anglocentric reasoning which should be consigned to history."

78.    Our reasons for this conclusion are summarised as follows:

i)    As between the Bank and D1 there was, as at the date of the application before Cooke J (24 October 2012), no "real issue" at all as to the Bank's entitlement to its debt and contractual claims under the Loan Agreement. The claims had been admitted to the list of creditors of D1 as long ago as 18 February 2010 pursuant to an order of the ACVR. The Bank had been participating in creditors' meetings and court proceedings in Russia on the basis of its recognised status as a creditor - for example challenging the decision of the creditors meeting dated 6 March 2012 to place the company in liquidation. Although the Bank's evidence in support of the application for permission to serve out of the jurisdiction showed that D1 was well aware of the proceedings, there was no suggestion in such evidence that D1 was disputing its indebtedness under the Loan Agreement on any grounds, substantive or otherwise. Nor was there any suggestion in such evidence that there were "real issues" to be tried as between the Bank and D1 in relation to the debt and contractual claims which it was "reasonable for the court to try".

ii)    As at the date of the application to serve out, D1 and D2 had both failed to file any acknowledgement of service or otherwise indicated that they intended to defend the proceedings within 14 days of service of the Claim Form as required by CPR Part 58.6 (2). Consequently, as at that date the Bank was entitled to obtain or apply for judgment against both D1 and D2 in default of acknowledgement of service under CPR Part 12.

iii)    The fact that D1 was not substantially challenging its indebtedness under the Loan Agreement was subsequently confirmed by the attitude taken by D1 on the summary judgment proceedings in front of HH Judge Mackie QC on 14 December 2012, in so far as it is legitimate to consider such subsequent events as "casting light" upon what should have been relevant considerations as at the date of the application to serve out: see Hoffmann J in *ICS Technologies Ltd and another v Guerin and others* (*supra*). As stated above, the only consideration put forward in the letter from the liquidation manager of D2 was an indication that D1 might have a defence to the English claim on the grounds that it was subject to insolvency proceedings in Russia.

iv)    In such circumstances, as at the date of the application before Cooke J, there was no real issue as between the Bank and D1 in relation to the debt and contractual claims under the Loan Agreement and certainly none which it was "reasonable" for the court to try. Indeed the Bank's evidence in support of the application for permission to serve out did not seek to suggest as much. Even on the assumption that the Bank had not submitted to the jurisdiction of the Russian courts in relation to its claims against D1, in the absence of any assets outside Russia against which the Bank could execute judgment against D1, and in the light of D1's insolvency, there was no utility whatsoever in the English court trying the Bank's debt and contractual claims as against D1. It was common ground that any judgment against D1 would have to be taken back to Russia and proved in the insolvency proceedings there. On the evidence it did not appear that any additional interest or currency conversion uplift obtained under an English judgment would be provable under the Russian insolvency regime.

v)      So far as the Bank's claims against D2 under the Guarantee were concerned,
similar considerations applied. Even if, contrary to our conclusion, the Bank
had not submitted its claims under the Guarantee to the determination of the
Russian courts, it was common ground (on the basis that the *Gibbs* principle
applied and the Bank was not bound by the Russian judgment that the
Guarantee had been avoided), that the Bank would have to take any English
judgment it obtained against D2 back to Russia, in order to prove in respect of
the judgment in D2's insolvency. But again, as was common ground, since the
Guarantee would be regarded of no effect in the Russian insolvency process,
the Bank would not be able to rely on any English judgment to support any
proof of debt based on the Guarantee. Even if, arguably, it could be said that
there was a "real issue" between the Bank and D2 as to whether, as a matter of
English law, the Guarantee had been avoided, it is difficult to see how in those
circumstances that issue could properly be said to be an issue that it was
"reasonable for the court to try". No other defence had been raised by D2 to
the claim under the Guarantee and D2 had not served any acknowledgement
of service indicating it intended to defend the claim.

vi)     So far as the conspiracy claims against D1 and D2 were concerned, for similar
reasons it is difficult to see how, viewed in isolation as claims against those
defendants alone, there would be any utility in the court trying such claims,
irrespective of whether, as the judge held, the Bank had established a serious
issue to be tried in respect of them - in the sense that the evidence put forward
by the Bank was sufficient to support such claims as a matter of law. As Mr
Snowden submitted, and as we accept, in quantum terms the conspiracy
claims duplicated the debt, contractual and Guarantee claims. They did not
potentially give rise to any greater monetary recovery.

vii)    The fact that D1 and D2 were bound by the exclusive jurisdiction agreements
contained in the Loan Agreement and the Guarantee in favour of England in
relation to all the relevant claims did not predicate that it would be
"reasonable" for the purposes of the paragraph 3.1(3)(a) test  for the English
court to "try" such claims. The English court clearly had jurisdiction to try
such claims against D1 and D2, which, in the absence of any submission by the
Bank to the Russian courts, it would most probably accept. But the
question is not whether the English court should, or was obliged to, accept
jurisdiction; rather, in the context of an application for permission to serve
proceedings out of the jurisdiction against third parties, the question is
whether in all the circumstances it is reasonable for the English court to try
such claims against the anchor defendants, D1 and D2. Thus in this context
we do not consider that any assistance is to be derived from the statements of
Gloster J (as she then was) in *Lornamead Acquisitions Ltd v Kaupthing Bank
HF,* at paragraphs 116-121, or the statements of Lord Collins in *UBS AG v
HSH Nordbank AG* [2009] EWCA Civ 585, at paragraphs 100-104, upon
which Mr Salzedo sought to rely. These statements are to the effect that it is
very doubtful whether any residual discretion to stay on *forum conveniens*
grounds has survived where proceedings were brought in England pursuant to
an English jurisdiction clause in the light of the ECJ decision in *Owusu v
Jackson* [2005] ECR I-1383, although neither Lord Collins nor Gloster J
needed to decide the point. But the court is necessarily asking itself a different

question when it comes to consider whether the gateway requirements of paragraph 3.1(3)(a) are satisfied. Accordingly we reject Mr Salzedo's broad submission that "it was not open to D3 and D5 to contend in the context of reasonableness under paragraph 3.1(3)(a) of PD6B that the English courts should refuse jurisdiction over the D1 and D2 tort claims." The issue is not one of "refusing jurisdiction over the D1 and D2 tort claims" but rather one of considering whether it is reasonable for the English court to decide such claims, in the context of an application to serve foreign third parties out of the jurisdiction on the basis that they were proper or necessary parties to such claims.

viii)    However, in the light of the statements in *UBS* and *Lornamead,* we can see force in the more limited argument that, in the context of the court's consideration of reasonableness under paragraph 3.1(3)(a), it would not be legitimate to consider whether, on *forum conveniens* grounds alone, the English courts should refuse jurisdiction over the conspiracy claims against D1 and D2 on the basis that the claims should more properly be heard in Russia because they necessarily involved consideration of the propriety (or otherwise) of decisions of the Russian courts and actions taken by the Defendants, creditors or others in the context of Russian insolvency proceedings. But it is not necessary in this case to decide whether theoretically this is a matter which could fall for separate consideration under paragraph 3.1(3)(a), as part of the decision whether the threshold requirements of that paragraph had been satisfied, since it is clear, and indeed was common ground, that the court is entitled to consider the question of appropriate forum more generally under Issue 4, i.e. when deciding whether the court was satisfied for the purposes of CPR Part 6.37(3) that England and Wales is the proper place in which to bring the claims, or, in other words, is clearly or distinctly the appropriate forum for the trial of the dispute against all the Defendants. Had we considered the issue separately under paragraph 3.1(3)(a), we would have reached the conclusion that it is not reasonable to try such claims in England as against D1 and D2.

ix)    Nor do we accept Mr Salzedo's submission that this was essentially a case where, irrespective of any submission to the foreign insolvency court, the English court is being invited to exercise an adjudicatory function in relation to the determination of a claim as between the Bank and D1 and D2, which the decision in *Shell* clearly envisaged as permissible. We accept that in many cases, where there is an insolvent defendant, it may well nonetheless be appropriate, or indeed mandatory, notwithstanding that the insolvency process is taking place in another jurisdiction, for such an adjudicatory process to take place in the contractually agreed jurisdiction for the resolution of disputes. This may well be needed to establish whether the creditor has a debt which is capable of proof in the liquidation. But, for the reasons given above, this is not such a case. Nor is it relevant that, in this case, unlike *Shell,* there is no attempt by the creditor to obtain some illegitimate benefit against the assets of the insolvent company located in a foreign country in priority to other creditors.

79. Thus in our judgment for the above reasons it would not, as at the date of the application for permission to serve out of the jurisdiction, have been reasonable for the English court to try the debt, contractual and Guarantee claims and the conspiracy claims against D1 and D2. In the alternative it would not have been reasonable for the English court to try the conspiracy claims against D1 and D2. Not least it would not have been consistent with the overriding objective or the principle that the court will not engage with pointless and wasteful litigation; see CPR Part 1.1(2) and the commentary at paragraph 3.4.3.4.

80. Accordingly, for the above reasons we conclude that the gateway requirements of paragraph 3.1(3)(a) of PD6B are not satisfied in this case, because the Bank could not demonstrate, as at the date of the application to serve out, that, viewed in isolation, it would have been reasonable for the English court to try the debt, contractual and Guarantee claims and the conspiracy claims against D1 and D2. In the alternative we conclude that it would not in any event have been reasonable for the English court to try the conspiracy claims against D1 and D2.

81. Finally, even if this court's conclusion that the threshold requirements of paragraph 3.1(3)(a) are not satisfied were wrong, nonetheless all the factors which we have identified above support the conclusion that, when the court comes to consider the third stage of the test articulated in *Altimo* at paragraph 61 and has to decide whether:

   i)     in all the circumstances England is clearly or distinctly the appropriate forum for the trial of the dispute pursuant to  CPR rule 6.37(3), and

   ii)    in all the circumstances the court ought to exercise its discretion to permit service of the proceedings out of the jurisdiction,

   the only answer is that England is not the appropriate forum for the trial of the dispute and that the court ought not to exercise its discretion to permit service of the proceedings out of the jurisdiction. These are the issues which we address under Issue 4 below once we have considered the gateway requirements relating to paragraph 3.1(9) of PD6B and paragraph 3.1(20) of PD6B.

82. The result is that permission to serve out should not in our judgment have been granted under the paragraph 3.1(3) gateway.

   **Issue 2: The ground relied upon under paragraph 3.1(9) of PD6B**

83. The various issues which arise under this head can be summarised as follows:

   i)     What was the applicable law of the tort claims?

   ii)    Has the Bank demonstrated that there was a serious issue to be tried on the merits of the Bank's conspiracy claims against D3 and D5 in circumstances where, as alleged by D3 and D5, the applicable law for the claim in tort is Russian law, and no Russian law had been pleaded?

   iii)   Has the Bank demonstrated that there was a good arguable case that the Bank's tort claims against D3 and D5 fell within paragraph 3.1(9) of PD6B? In particular, was the judge right as a matter of fact and law to find that the alleged damage was sustained within the jurisdiction of the English court so

as to bring the Bank's claims within paragraph 3.1(9)(a) of PD6B?  In turn this issue involved consideration of the following two sub-issues:

a)    what, as a matter of law, is the meaning of the phrase "damage sustained within the jurisdiction" in paragraph 3.1(9)(a); and

b)    where, as a matter of fact, on an analysis of the Bank's claim and the contractual documentation, did the alleged torts prevent payment?

*Applicable Law*

84.    A number of issues, both before the judge and on this appeal, turned on the correct identification of the applicable law to the Bank's claims in tort, or a correct appreciation of the relative strength of the competing arguments in favour of English or Russian law.  The judge's view that it was "strongly arguable" that the applicable law of the tort claims was English law was an important factor in his rejection of D3 and D5's case that the Bank's failure to plead Russian law was not fatal to its assertion that it had a real prospect of success on the merits.  More importantly for the purposes of this appeal, his view that it was strongly arguable that English law was the applicable law was the foundation for the fourth and fifth of the five factors which, in his view, pointed to England as clearly the appropriate forum.

85.    It was common ground, both before the judge, and on this appeal, that the answer to the question whether English or Russian law was the law applicable to the Bank's tort claims depended on the application of the Rome II Regulation to the facts alleged in the Particulars of Claim.  Article 4, headed "General rule", provides as follows:

"Unless otherwise provided for in this Regulation, the law applicable to a non-contractual obligation arising out of a tort/delict shall be the law of the country in which the damage occurs irrespective of the country in which the event giving rise to the damage occurred and irrespective of the country or countries in which the indirect consequences of that event occur.

…

Where it is clear from all the circumstances of the case that the tort/delict is manifestly more closely connected with a country other than that indicated in paragraphs 1 or 2, the law of that other country shall apply. A manifestly closer connection to another country might be based in particular on a pre-existing relationship between the parties, such as a contract, that is closely connected to the tort/delict in question.

86.    The Bank's case, which the judge accepted was "strongly arguable", was as follows:

i)    Paragraph 1 of Article 4 pointed to English law because the place of payment under both the Loan Agreement and the Guarantee was London, so that England was the country in which the damage occurred, because the damage caused by the conspiracy was non-payment of those amounts.

    ii)    In any event, Paragraph 3 of Article 4 pointed toward England because the conspiracy was closely connected with the Loan Agreement and Guarantee, both of which were governed by English law, and contained English jurisdiction clauses.

87.    D3 and D5's case, both before the judge and on appeal, may be summarised as follows:

    i)    Paragraph 1 of Article 4 pointed toward Russian law, because the damage caused by the conspiracy was the stripping of assets from the first and second Defendants, thereby rendering them unable to pay their debts to the bank.

    ii)    In any event paragraph 1 did not point to English law, since the place of payment under both the Loan Agreement and the Guarantee was New York rather than London.

    iii)    Further, paragraph 3 plainly pointed to Russian law, since it was clear from all the circumstances that the conspiracy was manifestly more closely connected with Russia.

88.    The question for this court is whether the judge's conclusion that the Bank's case on applicable law was strongly arguable was right or wrong.  It is not a question of discretion, although it may fairly be said that the exercise called for by Article 4.3 is a multi-factorial evaluation in respect of which a trial judge's assessment ought to be given real respect by an appellate court.  This was however an interim application rather than a trial, in which this court has all the materials which were available to the judge, and where the judge had no particular advantage, such as observing cross-examination of witnesses.

89.    There is little authority which bears directly on the interpretation of Article 4 of Rome II.  Nonetheless the following principles may be taken as being reasonably clearly established, and were not indeed in dispute before the judge or on this appeal.  First, Article 4 is to be given an "autonomous" interpretation, independent of the law of any particular contracting state.  This much is common ground, and is essential if the Regulation is to achieve its recited objectives of legal certainty and consistent application across all member states: see recitals (4), (6), (8) and (14).

90.    Secondly, the Rome II Regulation ought to be interpreted in a manner which is broadly in harmony with the jurisprudence and interpretation of similar provisions in the Judgments Regulation.  This is clearly laid down in recital (7) of Rome II.  In that respect, the language of Article 4.1 clearly follows the jurisprudence, although not the language, of Article 5.3 of the Judgments Regulation.  Although Article 5.3 enables the claimant to sue;

        "in matters relating to tort, delict, or quasi-delict in the courts
        for the place where the harmful event occurred"

it is clear that this includes, as a further alternative, the courts of the place where the damage occurred: see *Dumez France v Hessische Landesbank* (Case C-220/88) [1990] IL Pr 299, at paragraph 10, following *Bier B v Mines de Potasse d'Alsace SA* [1976] ECR 1735.

91.    But there is, we think, this important difference between Article 4 of Rome II and Article 5.3 of the Judgments Regulation.  The latter contemplates that a claimant in tort may choose between the courts of the place where the harmful event occurred and the place where the damage was sustained.  But the purpose of Rome II is to identify a single applicable law rather than a choice: see Recitals (6) and (14).  It is for that reason that Article 4.1 excludes the place where "the event giving rise to the damage occurred", if different from the place where the damage itself occurred, and also excludes the place where any indirect consequences of the event giving rise to the damage occur.

92.    In fact, the jurisprudence on Article 5.3 of the Judgments Regulation also excludes the place where indirect consequences occur.  This was the main issue resolved in the *Dumez France* case.  The question referred to the Court of Justice by the French Cour de Cassation was as follows:

> "Is the rule on jurisdiction which allows the plaintiff, under Article 5(3) of the Convention, to choose between the court for the place of the event giving rise to damage and the court for the place where that damage occurs to be extended to cases in which the damage alleged is merely the consequence of the harm suffered by persons who were the immediate victims of the damage occurring at a different place, thereby enabling the indirect victim to bring proceedings before the court of the State in which he is domiciled?"

The Court of Justice firmly answered that question in the negative.  In that case, the immediate victims of the allegedly tortious conduct of the defendant banks were two subsidiaries of the French plaintiffs, incorporated in Germany, and the damage sustained by the plaintiffs was no more nor less than the destruction of the value of their shares in the subsidiaries, something which in this jurisdiction is called reflective loss.

93.    The judge rejected the Defendants' submission that there was a direct analogy between the *Dumez France* case and the present case, on the footing that the Bank's loss was merely an indirect consequence of the direct damage inflicted on the first and second Defendants by the alleged asset-stripping.  He said (at paragraph 173) that it was at least sufficiently arguable that the Bank's direct loss consisted of the destruction of its rights to payment under the Loan Agreement and Guarantee, as the result of an alleged tort in which D1 and D2 were, unlike the subsidiaries in *Dumez France*, co-perpetrators rather than mere victims.

94.    We do not think it necessary to resolve the question whether the jurisprudence based on *Dumez France*, cross-applied to Article 4.1 of Rome II, is such as to treat as "victims" the co-perpetrators of a conspiracy to strip themselves of their own assets.  In our judgment there is a much simpler reason why the judge was wrong to accept that there was a seriously arguable case that Article 4.1 points to England.  It is because, under the unambiguous provisions of the Loan Agreement (which, as is common ground, the Guarantee adopts) the place of re-payment of loan instalments to the Bank was New York rather than London. Under clause 28.1 of the Loan Agreement D1 was obliged to make loan repayments due to the syndicate to the Facility Agent in New York. Under clause 28.2 the Facility Agent was itself obliged

to pass on the Bank's share of the repayments to the Bank at its Facility Office (as defined) in London. In receiving payments from D1, the Facility Agent plainly acted as the agent for the syndicate banks, including the claimant Bank, such that a repayment to the Facility Agent was (vis à vis the Bank's share of it) a payment to the Bank: see clause 25.1(a). Put shortly, D1 and D2 were contractually entitled to obtain a good discharge by paying the Facility Agent. The Facility Agent's obligation to pay the Bank's share to its Facility Office in London was merely an aspect of the agency relationship between the Bank and the Facility Agent, albeit contained within the same contractual documents.

95.    Mr Salzedo QC submitted that receipt by the Facility Agent could not be regarded as receipt by the Bank, because of the declaration against the existence of any fiduciary duty owed by the Facility Agent to the bank, in clause 25.4(a) of the Loan Agreement. While we agree that the Facility Agent was thereby relieved of any duty to hold repayment instalments on trust for the Bank (or the other members of the lending syndicate) or to keep the Bank's share in a separate account, so that the Bank obtained no proprietary interest of its own in its share of repayments in New York, it by no means follows that, as against D1 and D2, they did not get a good receipt by payment to the Facility Agent, or that the location of the Bank's contractual right to repayment was not situated in New York. Where a trader stipulates for payment under a contract to be made to a stipulated bank account, then payment there is a good discharge of the payer's obligation. Yet there is not normally a fiduciary relationship between the trader and its bank in respect of that bank account, but simply one of debtor and creditor.

96.    It follows that, in our view, even if the judge was right to identify the loss suffered by the Bank as the result of the conspiracy as the damage to its right to repayment under the Loan Agreement and Guarantee, that loss was primarily, directly and immediately suffered in New York, as the place of payment under those two contracts. By contrast, the non-payment by the Facility Agent to the Bank in London was, in the words of Article 4.1, and the jurisprudence on Article 5.3 of the Judgments Regulation, merely an indirect consequence of the Defendants' non-payment in New York. The result is that the application of Article 4.1 points neither to English nor Russian law as the applicable law, but rather to New York law on the assumption, which we regard as at least arguable, that the co-perpetrator of a tort is not to be regarded for these purposes as a victim of it.

97.    Turning to Article 4.3, we have been wholly un-persuaded by the Bank's argument that the pre-existing contractual relationship between the Bank and D1 and D2 under the English law Loan Agreement and Guarantee establishes a closer connection, let alone a manifestly closer connection, between the alleged tort and England, rather than with either Russia or New York, those being, in our view, the only places which would be identified by the application of Article 4.1. On the contrary, we think that it is clear from all the circumstances of the case that this alleged conspiracy is manifestly more closely connected with Russia than with any other place.

98.    In our view, it is clear that all the participants in the alleged conspiracy were based in Russia, that the alleged conspiracy itself would have been hatched in Russia, and that all the acts done pursuant to it would have occurred in Russia. It was a conspiracy allegedly designed to take improper advantage of Russian insolvency procedures, by bringing about the insolvent liquidation of D1 and D2, and the benefit to the

conspirators consisted of the extraction of supposedly valuable assets (consisting of, or connected with, the Red October steel works) from D1 and D2, and their being vested in persons in Russia owing no obligations to the lending syndicate of which the Bank formed part.   Any impartial observer of the alleged facts, posed with the question: 'by reference to which system of law should it be adjudged whether the conduct complained of was unlawful?' would answer "Russian law of course".   No aspect of the question whether that conduct was or was not unlawful could possibly turn upon any issue of interpretation of the Loan Agreement or Guarantee, to which the main perpetrators of the conspiracy (i.e. the puppet masters rather than the puppets) were not parties in any event.

99.     Finally, although (as the judge said) in many cases it may be premature to reach a final decision on applicable law at the very early stage of an application for permission to serve proceedings out of the jurisdiction, we find it difficult to envisage what further developments during the litigation of a case based upon the existing Particulars of Claim could significantly detract from its manifestly close connection with Russia.  It is, in short, as Russian a conspiracy as it is possible to imagine.

100.    The result of this analysis is that, in our view, the judge was wrong to treat the Bank's case that the applicable law was English law as strongly arguable, or indeed better than fanciful.

*The paragraph 3.1(9) gateway – tort*

101.    Gateway (9) in paragraph 3.1 of PD6B, headed "Claims in tort", opens where:

> "a claim is made in tort where –
>
> 1.   damage was sustained within the jurisdiction; or
>
> 2.   the damage sustained resulted from an act committed within the jurisdiction."

Those innocent-sounding words have a long history which has given rise to sustained argument both before the judge and in this court about their true interpretation.

102.    Considerable effort was devoted on this appeal both in skeleton arguments and submissions to the question whether we should follow the line of first instance authorities (referred to above), which have interpreted the phrase "damage was sustained within the jurisdiction" as extending to any damage, rather than "the damage" in the sense in which that phrase has been interpreted in the European jurisprudence on Article 5(3) of the Judgments Regulation.  Originally, before 1987, permission under the predecessor of this gateway could only be obtained if the tort had been committed within the jurisdiction.  In 1987 the relevant paragraph of the Rules of the Supreme Court was changed so as to enable permission to be obtained where "the damage" from the tort was sustained within the jurisdiction, at the same time as the Brussels Convention became part of English law, including Article 5(3).  When the new CPR were introduced, the definite article "the" was omitted from Rule 6.20(8)(a), and that omission was carried through to the restatement of the tort gateway in what is now paragraph 3.1(9) of PD6B.

103.    We have already described the European jurisprudence on the equivalent gateway in what is now the Judgments Regulation, in the section dealing with applicable law. Were it not for the string of first instance authorities to the contrary, we would have regarded as very attractive the submission that the tort gateway was intended to reflect the same jurisprudence.

104.    By contrast, the effect of the first instance authorities is to make this gateway extraordinarily wide. For example, in *Booth v Phillips* [2004] 1 WLR 3292 it was sufficient that the executrix of the deceased, who had died in an accident in Egypt, had paid funeral expenses in England to enable her to serve out of the jurisdiction on behalf of his estate for the whole of the estate's loss: see paragraph 33. In *Cooley v Ramsey* [2008] EWHC 129 (QB) [2008] I.L.Pr 27, it was sufficient that the claimant, who had been left gravely handicapped by an accident in Australia, suffered loss of earnings after repatriation to England six months later. It follows that, subject to issues of *forum conveniens*, an English domiciled claimant injured anywhere in the world (outside the EU) may serve proceedings out of the jurisdiction for a claim in tort, provided that his injury caused him some loss after his return. The loss may apparently be continuing (e.g. loss of earnings) or it may be one-off (e.g. funeral expenses).

105.    While we have serious reservations as to whether those first instance cases were right, it is unnecessary to decide on this appeal whether they should be overruled, and we would therefore prefer not to do so.

106.    Rather, it seems to us that the tort gateway is not satisfied in any event on the claim pleaded because, largely for reasons already given in relation to applicable law, we have reached the clear view that the relevant damage for this purpose was sustained in New York rather than London. None of the first instance cases had treated as relevant damage a non-payment of money in England which is simply and precisely dependent upon an earlier non-payment outside England, in circumstances where there were prior arrangements, for example with an agent, that the offshore payment would be followed by an onward payment to an account within the jurisdiction. On the contrary, the damage successfully relied upon was, in each of those cases, "direct" damage, whether it consisted of payment of funeral expenses or a continuing loss of earnings, arising afresh month by month when salary would otherwise have been paid to the victim, but for his injury.

107.    In the present case, the relevant loss was the destruction of the value of the Bank's receivables under the Loan Agreement and Guarantee which, for reasons already given, is properly to be regarded as having occurred in New York, that being the place of payment. The knock-on consequence, namely non-payment by the Facility Agent to the Bank's Facility Office in London was merely reflective of that earlier loss. In relation to the Bank's share of repayments it was, dollar for dollar, the same. It was not in any rational sense a fresh, different or separate loss. Nor was it a continuing loss, like loss of earnings.

108.    For that simple reason, we consider that the judge was wrong to accept that the Bank had established a good arguable case that its tort claim qualified under gateway (9).

*Triable issue: Absence of any pleading of Russian law*

109.    D3 and D5 pursued on this appeal a submission rejected by the judge, namely that if (as they argued) Russian law was plainly the applicable law for the purposes of the tort claim, then the Bank had failed to demonstrate a serious issue to be tried on the merits, because no Russian law had been pleaded.

110.    The judge rejected that submission on two grounds.  First (although second in his judgment) because it was arguable that English law was the applicable law.  In that respect we have already concluded above that he was wrong about this.  But his second reason (based in particular on *Kuwait Oil Tanker Co. SAK v Al Bader* [2000] 2 All ER (Comm) 271 at paragraphs 178 and 180, and *VTB Capital v Nutritek International* [2012] EWCA Civ 808), was that where the facts alleged disclosed a serious issue to be tried as a matter of English law, it was for a party alleging that some foreign law both applied, and was fatal to the claim, to plead and prove it. Against that, the judge noted that there were dicta which appeared to be to the contrary in the decision of Sir Andrew Morritt C. in *Global Multimedia International v Ara Media Services* [2006] EWHC 1307, at paragraphs 38 and 39, but he regarded those as distinguishable because that case depended upon the implication of terms into a contract expressly governed by Saudi law.

111.    In our view the analysis which the judge derived from the *Kuwait* and *VTB* cases is clearly to be preferred, at least in the present case.  Despite the deployment of voluminous expert evidence about Russian law in the application before the judge, at no point had the Defendants suggested at any stage that the conspiracy alleged in the Particulars of Claim would not be actionable under Russian law.  All that has been suggested is that a narrower basis for the quantification of damages might be applied, so that the Bank would obtain an unwarranted juridical advantage if the case were to be tried in England under English law, rather than in Russia under Russian law.

112.    In this claim the primary case of the Bank is that the applicable law of the alleged tort is English law.   It is the defendants D3 and D5 who would wish to assert that the applicable law of the alleged tort is Russian law.   In those circumstances there is no obligation on the claimant to plead the foreign law as an alternative to its primary case at the stage of Particulars of Claim.   We accept that if there is a case that a foreign law might be applicable to the tort claim and that, if so, there would be a defence to the claim under that law,  the claimant seeking permission to serve out of the jurisdiction under paragraph 3.1(9) of PD6B would be wise to give full and frank disclosure of this fact in the evidence that leads to the without-notice application for permission for leave to serve out. If permission is given and the defence based on foreign law is then pleaded, the claimant will respond in a reply in the normal way. But the claimant is not obliged to cross that bridge before it is reached. So, like the judge, we reject this argument based on the pleadings.

### Issue 3: Paragraph 3.1(20) of PD6B

113.    The issue which arise under this head may be summarised as follows:

> Whilst D3 and D5 accepted that *prima facie* the Bank's claim under section 423 of the 1986 Act fell within paragraph 3.1(20) of PD6B, (because it was "a claim made under an enactment"), nonetheless had the Bank demonstrated that there was a serious issue to be tried on the merits of the claim, in circumstances where,

> as alleged by D3/5, there was a lack of a sufficient connection with England, and the practical impossibility of the grant of any relief at trial?

114.   In turn this raised the following sub-issue:

> should the Court have considered, at the stage of permission to serve out:

> a)    the consequences of permitting a claim under section 423 of the 1986 Act to proceed in England and Wales against D3/5; and

> b)    if the claim did proceed in England and Wales, whether there was any available relief, and if any relief was granted, how that relief would be administered.

115.   So far as is relevant, Section 423 of the Insolvency Act 1986 provides as follows, under the heading "Transactions defrauding creditors":

> "(1) This section relates to transactions entered into at an undervalue; and a person enters into such a transaction with another person if-

> He makes a gift to the other person or he otherwise enters into a transaction with the other on terms that provide for him to receive no consideration;

> …

> He enters into a transaction with the other for a consideration that the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by himself.

> Where a person has entered into such a transaction, the court may, if satisfied under the next sub-section, make such an order as it thinks fit for-

> Restoring the position to what it would have been if the transaction had not been entered into, and

> Protecting the interests of persons who are victims of the transaction.

> In the case of a person entering into such a transaction, an order shall only be made if the court is satisfied that it was entered into by him for the purpose-

> Of putting assets beyond the reach of a person who is making, or may at some time make, a claim against him, or

> Of otherwise prejudicing the interests of such a person in relation to the claim which he is making or may make.

…

> In relation to a transaction at an undervalue, references here and below to the victim of the transaction are to a person who is, or is capable of being, prejudiced by it; and in the following two sections the person entering into the transaction is referred to as "the debtor".

Section 424 provides, so far as is relevant, as follows under the heading

Those who may apply for an order under s. 423:

> "An application for an order under section 423 shall not be made in relation to a transaction except-
>
> In a case where the debtor has been adjudged bankrupt or is a body corporate which is being wound up or is in administration, by the official receiver, by the trustee of the bankrupt's estate or the liquidator or administrator of the body corporate or (with the leave of the court) by a victim of the transaction;
>
> …
>
> In any other case, by a victim of the transaction.
>
> (2)      An application made under any of the paragraphs of subsection (1) is to be treated as made on behalf of every victim of the transaction."

116.    It is clear that section 423 may be given extra-territorial effect: see *re Paramount Airways Limited (No.2)* [1993] Ch 223, where service out of the jurisdiction had been effected pursuant to the provisions for service in the Insolvency Rules 1986, and *re Banco Nacional de Cuba* [2001] 1 WLR 2039, where Lightman J recognised a discretion to permit service out under what was then CPR rule 6.20(10).  But both those cases recognised that for the court to exercise this jurisdiction extra-territorially, a sufficient connection with this jurisdiction must be shown.  As Sir Donald Nicholls VC (as he then was) put it in the *Paramount Airways* case (at page 239H), the court will need to be satisfied that, in respect of the relief sought against him, the defendant is sufficiently connected with England for it to be just and proper to make the order against him despite the foreign element.

117.    Recognising this, the judge concluded that it was misconceived for the question whether there existed a sufficient connection to be determined at the earlier stage of an application for permission to serve proceedings out of the jurisdiction, but rather at the discretion stage (i.e. at trial): see paragraph 150.  In taking this approach he gave as his reasons those which he had earlier set out in *Fortress Value v Blue Skye* [2013] EWHC 14 (Comm), in which he said, at paragraph 114, referring to the *Paramount Airways* case:

"As that passage indicates, the question whether there is sufficient connection with England to justify relief under section 423 is a matter which depends upon all the circumstances of the case. This is not a threshold question of jurisdiction, but a question of discretion. Clearly a question of discretion which depends upon a fact-sensitive enquiry is not appropriate for determination on a summary basis at an interlocutory stage, such as when permission to amend is sought."

118.   The judge therefore did not think it necessary to conduct any examination of the Particulars of Claim, to identify precisely what relief was being sought under section 423, or to consider the other circumstances of the case as revealed by the evidence before him.  In the *Banco Nacional de Cuba* case, Lightman J took the opposite view. Noting (correctly) that it was necessary for the applicant for permission to serve out to demonstrate a serious issue to be tried in relation to the relief sought, he concluded (on an application to set aside service out of the jurisdiction) that the particular facts of that case were, without the need for a trial, sufficient to show that there was no such serious issue to be tried, because no sufficient connection with this jurisdiction could be established at trial.

119.   On this issue of principle, we prefer the approach taken by Lightman J.  Of course there will be cases where the question whether a sufficient connection with this jurisdiction can be shown can only be resolved at trial and where, at the stage of considering service out of the jurisdiction, the claimant may demonstrate a serious issue to be tried in relation to the question of sufficient connection.  But that cannot, in our view, mean that the court will in no circumstances address that question (albeit only on a "serious issue to be tried" basis) at the stage of considering whether to grant, or to set aside, service out of the jurisdiction.  It is accordingly necessary to consider in the present case whether there is a more than fanciful prospect that the Bank would, if permitted to pursue a claim under section 423, obtain such relief at trial.  Since the judge did not consider this question, it falls upon this court to do so for the first time.

120.   The claim under section 423 is mainly to be found in the prayer to the Particulars of Claim.  At paragraph (8) the Bank seeks an order under section 423 "to protect the interests of the Claimant as victim of the divesting of assets by the First and/or Second Defendants *inter alia* on 26 May 2009 [the asset transfer to D7 referred to above], 8 April 2010, 14 May 2010 and/or 13 July 2011 [the Amicable Agreement referred to above] pursuant to transactions at an undervalue to put assets out of the reach of and/or prejudice creditors".

121.   Earlier, at paragraph 111, the Bank identifies a further transaction in about September 2011, also alleged to have been aimed at defrauding creditors of the First Defendant by putting its remaining assets out of their reach.

122.   With the help of a useful schedule provided during the hearing by Mr. Mumford, it can be seen that, on the evidence submitted to the judge, each of those transactions has been the subject of review by the Russian courts.  Some of them have already been set aside, and others have been specifically approved.  The decisions of the

relevant Russian court in relation to each of them were available to the judge, although not all were in the original appeal bundles.

123.   In those circumstances, and bearing in mind the close connection between the Bank's claim as a whole, and Russia, for the reasons given elsewhere in this judgment, it seems to us inconceivable that the Bank would be able to show at trial that a sufficient connection existed with this jurisdiction.  This is not one of those relatively unusual cases where the claimant is the only alleged victim of the impugned transactions. Plainly the other members of the lending syndicate were also victims, and it appears from the evidence that there were other unsecured creditors of D1 and D2 who were (if the Bank's claim is well-founded) equally prejudiced by the impugned transactions.

124.   Since therefore relief sought under section 423 would have to be treated as an application made on behalf of every one of those victims, it seems to us inconceivable that any courts other than the Russian courts which have jurisdiction over the insolvencies of D1 and D2 could be regarded as the appropriate courts for the grant of such relief.

125.   Yet further, relief directed to restoring the position to what it would have been had the transactions not been entered into and generally protecting the interests of persons who were their victims would again only be capable of being granted effectively by the Russian courts which have already adjudicated upon all those transactions.

126.   It follows in our judgment that, on the question whether there exists a sufficient connection with this jurisdiction, and on the question whether any practicable relief could be obtained at trial, the Bank has failed to disclose a serious issue to be tried. The result is that permission to serve out should not have been granted under Gateway (20).

## Issue 4: Appropriate forum and discretion

*Introduction*

127.   The issues which arise under this head are:

   i)      Was the judge wrong to reach the evaluative conclusion that he could be satisfied for the purposes of CPR Part 6.37 (3) that England and Wales was "clearly or distinctly" the appropriate forum for the trial of the disputes as between the Bank and D3 and D5 under paragraphs 3.1(3), (9) and/or (20) of PD6B; and

   ii)     Did the judge go outside the reasonable ambit of his discretion in concluding that it was appropriate in all the circumstances to grant permission to serve out of the jurisdiction on D3 and D5?

128.   In the light of our conclusions that permission to serve out should not have been granted under any of the relevant gateways, it could be said that Issue 4 does not strictly arise for consideration. But in our judgment it is nonetheless necessary to address this issue as a stand-alone ground of appeal for two reasons: first, our decision in relation to Issue 1 (namely whether the paragraph 3.1(3) gateway requirements

were satisfied) might be regarded as controversial; and second, in reality the issue as to whether England and Wales was, in all the circumstances, clearly or distinctly the appropriate forum for the trial of the dispute was the predominant issue in the case.

129.    If, for the reasons which we have already set out above, we are correct in concluding that the judge erred in relation to: the proper approach to the determination of the issue under paragraph 3.1(3); the applicable law; and whether each of the "gateway requirements" were satisfied, then those errors would fatally undermine the evaluative conclusion which he reached in relation to appropriate forum and likewise affected the exercise of his general discretion.

130.    However, even if this court were wrong in its conclusion that the requirements of the paragraph 3.1(3) gateway (or indeed the other gateways) were not satisfied, nonetheless we are of the view that on any basis the judge was "plainly wrong" in concluding that England and Wales was the appropriate place in which to try the Bank's conspiracy claims against the Defendants.  This is not a case of the sort disparaged by Lord Neuberger PSC and Lord Wilson JSC in *VTB v Nutritek* [2013] UKSC 5; [2013] 2 WLR 398, 441 at paragraphs 93 and 157, where an appeal court does little more than repeat the evaluative balancing exercise carried out by the first instance judge as to the relevant factors for and against the English forum.  On the contrary, this is a case where in our view the judge was plainly wrong, not just in relation to the factors which he took into account, but also in the conclusion which he reached that England was the appropriate forum.

131.    As we have already described in paragraphs 97 - 99 and 122 - 125 above, on any basis this was overwhelmingly a Russian case and (if there was one) a Russian conspiracy. It had no connection whatsoever with England other than the exclusive jurisdiction clauses in the Loan Agreement and the Guarantee. None of the arguments put forward by the Bank were sufficient in our judgment to discharge the burden it had of showing that England was clearly or distinctly the appropriate jurisdiction. Our reasons for reaching this conclusion are set out below.

*D3 and D5's submissions on Issue 4*

132.    Because we largely accept the reasons put forward by Mr Snowden and Mr Morgan in their submissions in relation to this issue, we do not rehearse them separately.

*The Bank's submissions on Issue 4*

133.    Mr Salzedo submitted that the judge (at paragraphs 151-190 of the judgment) had conducted a thorough, comprehensive and irreproachable assessment of the competing factors pressed upon him by each side as to why either England (as contended for by the Bank) or Russia (as contended for by D3 and D5) was the appropriate jurisdiction for the trial of the claims brought by the Bank. D3 and D5 had no basis for challenging the generous ambit of the judge's discretion by requesting this Court to conduct the evaluative exercise afresh. Mr Salzedo further submitted that the judge had fully appreciated that the Bank had the burden of proof of showing that England was the most appropriate jurisdiction despite the fact that most of the events and alleged events to which the claim related happened in Russia. Contrary to the suggestion from this court, the judge had not taken as his starting point the jurisdiction clause, namely that, as against D1 and D2, the Bank had tort claims which

the Bank was contractually entitled to bring in England. He had correctly stated that that factor was not sufficiently significant on its own to outweigh the obvious connection of the facts with Russia rather than with England; see paragraph 161 of the judgment.   However the jurisdiction clause was nonetheless a very weighty factor particularly in circumstances where the tort claims which the Bank sought to bring against the other Defendants -and in particular for procuring a breach of one of those contracts - were very closely connected to the claims against D1 and D2. Indeed they were the same conspiracy claims. Moreover D3, on the Bank's case, was firmly in control of the whole thing, including the wrongful acts of D1 and D2. It would be a very surprising thing if the Bank was prevented from pursuing its tort claims in conspiracy against D1 and D2 in England, as it was entitled to do contractually, simply because those acts were orchestrated by parties controlling them in Russia. Accordingly there was no material error of law or principle in the judgment below.

*Issue 4: Analysis and conclusions*

134.    We start our analysis with the reasons given by the judge for concluding that he was satisfied that England and Wales was the appropriate forum. The judge approached his consideration of the question on the assumption that the Bank would get a fair trial in Russia. The judge then proceeded to address 5 factors which the Bank contended pointed to England and Wales as clearly the appropriate forum.

135.    The first, and foremost, factor referred to by the judge was that the Bank was proceeding in England with the conspiracy claims not only against D1 and D2, as it was entitled to do under the exclusive jurisdiction clauses, but also as against D7, which had not applied to set aside service. He referred to Mr Salzedo's submission that "the question of whether there is a conspiracy, which is largely a question of fact, will thus be litigated in this jurisdiction in any event" and that the Bank was going to pursue its claims against D1, D2 and D7, "seeking a determination of the issues as a trial on the merits even if those three defendants chose not to participate". In those circumstances the judge held that

> "it would be verging on the perverse for [the Bank] to have to litigate the conspiracy and other tort claims against companies in arguably the same group as [D1 & D2] in Russia .... involving as that would litigating the same complex issues of fact twice with all the attendant waste of costs and risk of inconsistent findings in the two jurisdictions…. whilst that is not quite unthinkable, it is certainly not something the Court would want to contemplate. In my judgment this is a very strong factor in favour of England as the appropriate forum."[9]

136.    But for the reasons which we have already given above in the context of our consideration of the paragraph 3.1(3) gateway, it is unrealistic to suppose, even as at the date of the application before Cooke J (and as confirmed by subsequent events), and certainly by the time of the hearing before Flaux J, that there was ever going to be a trial in England on the merits and based on evidence, of the conspiracy claims as against D1, D2 and D7. First it was and is obvious that D1, D2 and D7, which were

---

[9] Judgment at paragraph 156.

all the subject of Russian insolvency procedures in October 2012[10], which had no assets outside Russia, which had not by that date (or in the case of D7, subsequently) filed acknowledgements of service, and which had not opposed the summary judgment proceedings, were not on any basis going to participate in a trial on the merits of the conspiracy claims in England.   Second, the Bank's assertion that it intended in any event to proceed with a full evidentiary hearing of its conspiracy claims on the merits as against D1, D2 and D7, was highly questionable. As we have already pointed out, there was no utility in the pursuit of such claims, in circumstances where the Bank had already obtained summary judgment on its debt and contractual claims, where no additional quantum could be obtained beyond the full amount of that judgment and where any English conspiracy judgment would have to be taken back to Russia to be the subject of proof in the liquidations of the relevant companies, and, on the evidence before the judge, subject to re-evaluation by the Russian Courts. There was no evidence that suggested that the Russian court would recognise or enforce an English judgment on the conspiracy claim. Third, it is inconceivable in such circumstances that the English Commercial Court would have regarded it as consistent with the overriding objective, to have made available court and judicial time for such a trial, when there was no obvious utility for a trial or for a judgment on the complex factual and legal issues arising on the conspiracy claims.

137.    Moreover, so far as the potential costs of proceedings were concerned, in the context of this first factor, the judge appears to have ignored obvious considerations such as the fact that all relevant documentation was in Russia and was written in Russian; that all relevant witnesses spoke Russian; that the basis for decisions by Russian insolvency practitioners and their ratification by the Russian Courts were being impeached, so that Russian law and insolvency procedure would need to be proved as a matter of fact by expert evidence in this jurisdiction, whereas these costs would not be incurred in proceedings in Russia.

138.    Thus, in relation to this first factor, in our judgment the judge wrongly placed far too much weight on what was, in reality, a negligible risk that the alleged complex issues of fact arising on the conspiracy claims would be litigated twice, with attendant waste of costs and risk of inconsistent findings in the two jurisdictions.  He ought to have concluded that, in reality, there was no prospect, or at most a very slight prospect, of there being a trial on the merits in this jurisdiction of the conspiracy claims against D1, D2 and D7.

139.    We also agree with Mr Morgan's submission that, in concluding as he did, the judge did not give due weight to the guidance identified in the passage from the speech of Lord Collins in *AK Investment CJSC –v- Kyrgyz Mobil Tel Ltd* [2011] UKPC 7, [2012] 1 WLR 1804 at paragraph 73, where Lord Collins cites from Lloyd LJ (as he then was) in *Golden Ocean Assurance Ltd v Martin (The Goldean Mariner)* [1990] 2 Lloyd's Rep 215, 222 that

> "I agree…. that caution must always be exercised in bringing foreign defendants within our jurisdiction under Ord 11, r1(1)(c). It must never become the practice to bring foreign defendants here as a matter of course, on the ground that the

---

[10] Indeed by the time of this appeal, it appears that D7 had been dissolved in Russia.

only alternative requires more than one suit in more than one different jurisdiction".

Although the judge recited this guidance at paragraph 154 of the judgment he does not appear to have given it any proper consideration. It was highly doubtful here whether in reality this was a situation where "the only alternative require[d] more than one suit in more than one different jurisdiction."

140.  The second factor put forward by the Bank, and to which the judge attributed some, but not decisive, weight, was the fact that the Loan Agreement and Guarantee contained English law and jurisdiction clauses. He appears to have accepted Mr Salzedo's submissions that

> "the tort claims in this case are all about breaching and undermining the obligations under those contracts. [Mr Salzedo] submits that those claims are closely bound up with the contracts themselves so that the natural forum for the determination of the entire dispute is England."[11]

Having cited passages from the judgment of Lord Neuberger in *VTB Capital Plc – v- Nutritek* (supra) at paragraphs [108]-[109] he continued in these terms:

> "160. However, it seems to me Mr Salzedo is correct in his submission that the present case falls within the different case contemplated by Lord Neuberger in the first sentence of [109]. Whilst Lord Neuberger only deals with that different case briefly, the clear implication is that, if there is before the Court a claim against another party under a contract containing an English jurisdiction clause with which the particular claim in tort is connected, that is a potentially significant factor in favour of England as the appropriate forum. Since Erste's case is that the Defendants conspired to undermine the performance of two contracts governed by English law and containing English jurisdiction clauses, Mr Salzedo submits that that connection between the contracts and the torts is established here and also points to England as the appropriate forum.

> 161. The answer which Mr Morgan puts forward to this point is that RT and RT Capital are not parties to the contracts and that all the events with which the factual dispute is concerned have taken place in Russia pursuant to relationships governed by Russian law, applying Russian accountancy reporting standards and that pretty well all the factual witnesses on each side will be Russian speaking and resident. I accept that this is a factor pointing away from England and towards Russia as the appropriate forum, as was the case in *VTB v Nutritek*. Accordingly, if Mr Salzedo's second point stood alone, I would not consider it a sufficiently significant factor to outweigh the

---

[11] See paragraph 157 of the judgment.

> obvious connection of the facts with Russia rather than
> England."

However it is clear from paragraph 190 of the judgment that the judge did indeed attach weight to the second factor when taken into account with the other considerations put forward by the Bank.

141.    In our judgment, given the nature of the factual disputes involved in the Bank's conspiracy claims, the judge was wrong to regard this second factor as weighing on the scales in favour of England as the appropriate forum. D3 and D5 were not parties to the Loan Agreement and Guarantee and had nothing to do with their formation; and there was no issue on those agreements that required to be determined under English law. The statements of Lord Mance in *VTB Capital Plc –v- Nutritek* at paragraphs 64 and 70, that the fact that the facility agreement in that case was governed by English law was irrelevant, given that no issue as to interpretation of the agreement arose, are particularly pertinent to the circumstances of this case.  Lord Mance said:

> "64.    I am inclined to agree with Arnold J (para 187) that the
> fact that the facility agreement was subject to English law is not
> relevant. He discounted it because of his view, erroneous on the
> basis on which I approach the case, that the tort claims were
> subject to Russian law. But, in my view, even though the tort
> claims are subject to English law, it bears scarcely - if at all -
> on the appropriateness of the forum for their resolution that
> they were designed to induce another English law contract. No
> issue arises about the interpretation of the facility agreement.
>
> …….
>
> 70……  The fact that any deceit was intended to induce an
> English law contract which provided for English jurisdiction is
> relevant, but cannot determine the appropriate forum in which
> to decide whether there was in fact any such deceit or
> conspiracy."

142.    Moreover, as we have already said in paragraph 98 above, no aspect of the question whether D3 and D5's conduct was or was not unlawful could possibly turn upon any issue of interpretation of the Loan Agreement or Guarantee, to which the main alleged perpetrators of the conspiracy (i.e. the puppet masters, D3 and D5, rather than the puppets) were not parties in any event. In all the circumstances this second factor should have been treated by the judge as irrelevant to the issue of the appropriate jurisdiction for the resolution of the claims against D3/5. What he should have addressed, and given appropriate weight to, were the factors which Mr Morgan had put forward[12] as overwhelmingly pointing to Russia as the appropriate forum. Apart from his brief reference in paragraph 161, he did not do so. We consider these factors further below.

---

[12] See paragraph 161 of the judgment.

143.    The third factor to which the judge attributed considerable weight in favour of
        England being the appropriate forum was the fact that a Russian court would proceed
        on the basis that the Guarantee was invalid as a matter of Russian law, even though
        the Guarantee was subject to English law and jurisdiction and that in those
        circumstances that would have a potential impact on the liability of each Defendant
        such as to make the Bank's claims more difficult to establish in Russia. At paragraphs
        163-166 he said:

        "163. I accept that this is not a question of a legitimate
        difference between two equally appropriate fora, but of the
        Russian court reaching the wrong result by applying the wrong
        governing law as a matter of English conflicts of laws rules.
        That this is a significant factor pointing to England as the
        appropriate forum is borne out by the judgment of Christopher
        Clarke J (as he then was) in *Stonebridge Underwriting v
        Ontario Municipal Insurance Exchange* [2010] EWHC 2279
        (Comm); [2010] 2 CLC 349. …………

        165. In my judgment, the present is an a fortiori case, since the
        Guarantee is expressly governed by English law, pursuant to
        which it is a valid and binding contract and the Russian court
        has already applied its own law to declare the contract invalid,
        so there can be no doubt that if Erste were required to litigate in
        Russia it would be deprived not only of the benefit of English
        law but of a valid binding contract of guarantee. Mr Morgan
        QC really has no sustainable answer to this point. He reiterated
        that the judgment of the Russian court declaring the Guarantee
        invalid was binding on Erste but that contention depends upon
        Erste having submitted to the jurisdiction of the Russian courts,
        which I have already held it did not.

        166. The only other argument he raised on this point was that
        the validity or otherwise of the Guarantee did not impact upon
        either Erste's cause of action or the quantum of its loss.
        Although that argument has a superficial attraction, it seems to
        me on closer analysis it is misconceived. The conspiracy
        alleged by Erste does not involve just the deliberate insolvency
        of the borrower, but of the guarantor as well and the loss
        claimed is in respect of the non-fulfilment of their obligations
        by both: see for example [120] and [121] of the Particulars of
        Claim. Accordingly, the fact that the Russian court would
        consider the Guarantee invalid would have a considerable
        impact upon Erste's ability to recover the loss it claims to have
        suffered. That is a significant factor pointing to England as the
        appropriate forum."

144.    We cannot agree that the fact that the Russian court would consider the Guarantee
        invalid, and so "have a considerable impact on the Bank's ability to recover its loss",
        is a significant factor pointing to England as the appropriate jurisdiction, whether for
        the reasons which the judge gave or at all. First, the judge's approach to the issue
        appears to be based on a misconception. In the context of the Bank's conspiracy

claims against D3 and D5, the premise is: that they and the other Defendants wrongfully contrived to render D1 and D2 insolvent, with the result that D1 and D2 were wrongfully subjected to insolvency proceedings; that D3 and D5 wrongfully procured that D1 and D2 were divested of their assets; and that they wrongfully procured the setting aside of the Guarantee (as to the last point see paragraph 100 (a) of the Particulars of Claim). If the Russian court were to find those allegations proved, it would have to decide, in order to establish the quantum of D3 and D5's liability in damages, what the position would have been on the hypothesis that these wrongful events had not happened - in other words what the amount of the Bank's recovery would have been in that event under the Loan Agreement and the Guarantee. In that scenario, the fact that the Guarantee had in fact been set aside would not adversely impact on the quantum of the Bank's conspiracy claim, unless, possibly, if it could be said that, even if the Defendants had behaved perfectly properly, the Guarantee would never have been enforceable as against D2 in Russia because it was a "related party transaction", under Article 10 of the Russian Civil Code. But precisely the same position would prevail if the conspiracy claims were to be tried in England against D3 and D5 and the other defendants. Even if, as a matter of English law, the Guarantee would be regarded as valid, in accordance with the *Gibbs* principle, in assessing the damages caused as a result of the alleged D3 and D5 conspiracy, an English court would have to take account of the same fact, namely that the Guarantee would (or might) never have been enforceable as against D2 in Russia in any event because it was a related party transaction, and, accordingly, in the absence of D2 having assets outside Russia, the Bank had suffered no loss as a result of the Guarantee having been set aside in wrongly brought about insolvency proceedings.

145.   Second, we cannot agree with the judge's statement that this was a case of "the Russian court reaching the wrong result by applying the wrong governing law as a matter of English conflicts of laws rules". The Russian court was not addressing the issue of governing law of the Guarantee or the relevant law of conflicts; nor was it addressing the issue in the context of a claim for damages for conspiracy against D3 and D5. What it was doing, in the context of its own insolvency jurisdiction, was applying the domestic insolvency law of D2's COMI (i.e. Russia) in the insolvency of D2 to decide whether the transaction should be invalidated on the grounds that, as a matter of Russian law, it fell to be characterised as a "related party transaction". Whether or not a transaction falls to be avoided under the insolvency jurisdiction of a debtor's COMI or state of incorporation cannot depend on the proper law of the transaction itself. Not surprisingly, no authority was cited by the Bank to support its proposition to the contrary.  It is inconceivable to think that, if the circumstances were reversed, an English insolvency court would refrain from declaring that a transaction concluded under a foreign law by an English registered company, or which had an English COMI, was a preference, or ought otherwise to be avoided, for example on the grounds that it was a transaction at an undervalue, merely because the applicable law of the contract was a foreign law, which expressly excluded such a contract being avoided or declared invalid on the grounds stated in the English insolvency legislation. Neither of the cases upon which the Bank sought to rely in this context (*Stonebridge Underwriting v Ontario Municipal Insurance Exchange* and *Dornoch v Mauritius* [2010] EWHC 2279 (comm), [2010] 2 CLC 349, [2006] 2 Lloyd's Rep 475) addressed the situation which would arise in an insolvency and accordingly they are of no assistance.

146.   For these reasons the Bank's third factor cannot in our view be regarded as "a significant factor pointing to England as the appropriate forum" or a reason for rejecting Russia as the appropriate jurisdiction.

147.   The fourth and fifth factors put forward by the Bank and relied upon by the judge were (i) that the Russian court would apply the wrong applicable law, Russian law, to the conspiracy claim and (ii) that the applicable law of the torts alleged was English law. As we have set out above, in the context of our consideration of the gateway contained in paragraph 3.1(9) of PD6B, the applicable law of the conspiracy and other tort claims was Russian law. In the light of that conclusion the judge's reliance on these factors as pointing to England as the appropriate forum cannot stand.

148.   Quite apart from the 5 factors which the judge did take into account in reaching his conclusion, in our view (apart from his passing reference to Mr Morgan's submissions in paragraph 161 of the judgment) he ignored, or attached far too little weight to, the fact that the fundamental factual and legal focus of this litigation concerned events which had occurred in Russia. Thus the judge failed, or failed adequately, to take into account the following critical factors in his evaluation of the issue of appropriate forum:

   i)   First, and most importantly, he failed to consider what was the actual scope of the factual inquiry that the conspiracy claims would involve. It was apparent from the Particulars of Claim and the Bank's supporting evidence that the conspiracy claim would involve a root and branch attack on the insolvency procedures governing D1 and D2, the conduct of meetings between creditors of D1 and D2, the propriety of applications made by creditors to the Russian court, and the propriety of the decisions made by the Russian Courts in relation to Russian law transactions. Mr Salzedo's proposed undertaking (as referred to above) that the Bank would limit its case at trial in relation to unlawful means so that it did not include any assertion that any final decision of the Russian court in relation to the insolvencies of D1 and D2 was wrong as a matter of Russian law, went no way to meeting this point. The undertaking was uncertain in ambit and, even if accepted, would necessitate a wholesale re-pleading of the Particulars of Claim which in their current form clearly challenged not only the entitlement, or propriety, of the Defendants in acting as they did to procure the relevant transactions, and seeking decisions of the Russian courts to uphold them, but also challenged the very decisions of the Russian courts themselves. The undertaking was neither before the judge, nor before Cooke J on the application to serve out. Moreover, even with the benefit of the undertaking, an English court hearing the conspiracy claims would still need a detailed understanding of Russian insolvency law and court procedure and it would be necessary to go through the entire course of the Russian insolvency process in relation to D1 and D2, and indeed the transactions which preceded it, to determine whether or not the conduct by D3 and D5 and the other Defendants was unlawful as a matter of Russian law.

   ii)   We take by way of example, the Bank's challenge to the Amicable Agreement, and the Russian court's approval of it, and the Bank's challenge to the subsequent transfer of assets by D1 to two newly created subsidiaries in September 2011, which was likewise upheld by the Russian court. In fact, as Mr Mumford's schedule shows, all the transactions about which the Bank

ERSTE GROUP v JSC

now makes complaint, were the subject of decisions by the Russian courts. In our judgment it is wholly inappropriate that the English court should be faced with the task of ascertaining whether, in the light of such judgments apparently approving the relevant transactions, the conduct of the Defendants was in any particular respect egregious. Any such assessment would necessarily require a detailed understanding of Russian insolvency law and court procedure.

iii)     Second, the judge failed to pay due regard to the fact that all relevant documentation is located in Russia and written in the Russian language; that all the relevant witnesses would be Russian speaking and many of them are resident in Russia; and that it would be necessary to review decisions taken by Russian insolvency practitioners, and the strategies which they advised, against the background of their relevant Russian professional obligations, in order to decide whether the conduct of the Defendants was unlawful.

iv)     Third, whatever the judge's view as to what was the applicable law of the conspiracy claims, the relationships between the various defendants and other parties are all governed by Russian law. Indeed, we were informed that it was common ground that, even if the Bank's tort claims are governed by English law, the lawfulness or not of the conduct on which those claims were based would be judged by reference to Russian law.

149.   For all the above reasons we consider that the judge was clearly wrong in his evaluation that England was the appropriate forum for the determination of the Bank's claims against D3 and D5. In our view he approached the issue relating to forum by examining the technical factors urged on him by the Bank, rather than by standing back and asking the practical question where the fundamental focus of the litigation was to be found. As Lord Mance said in *VTB Capital v Nutritek* at paragraphs 14-16 and 51, the appropriate starting point for deciding on appropriate forum is the place of commission of the tort. In the present case that was manifestly Russia. There was no reason to depart from that starting point. We have no doubt that the clearly appropriate forum for the determination of this dispute was Russia and that, on any basis, the Bank failed to discharge the burden on it to establish that England was the appropriate forum.

150.   Further, in the exercise of his general discretion the judge did not give any consideration to the fact that in reality the only commercial driver behind the Bank's issue of proceedings in England against D1 and D2 was to enable a claim to be brought against D3 and D5 and to attempt to execute against their assets, whether in Russia or elsewhere. Whilst taken on its own this particular factor did not predicate that permission to serve out should be refused, it was, in the circumstances of this case, clearly an important factor that should have been taken into account.

151.   For all the above reasons, the exercise of the judge's discretion in granting permission to serve out cannot be upheld. Accordingly we re-exercise the discretion under CPR Part 6.36 and 6.37 by setting aside the permission granted to the Bank by Cooke J to serve D3 and D5 out of the jurisdiction.

## Disposition

152.    The appeal is allowed.

TAB 11

*Evans v Jones* [2017] Ch 1

*A*

# The Law Reports

### Chancery Division

*B*

––––––––

Court of Appeal

*C*

### *In re* **Rococo Developments Ltd (in liquidation)**

### **Evans and another *v* Jones and another**

#### [2016] EWCA Civ 660

2016  June 23;                              Laws, Lewison, Christopher Clarke LJJ
*D*     July 7

*Insolvency — Liquidation — Company's debts — Company deemed unable to pay its debts where its assets exceeded by liabilities — Whether assets to include contingent assets — Whether amount of unlawful dividend contingent asset — Insolvency Act 1986 (c 45), s 123(2)*

*E*  In June 2010 the company paid a dividend to its directors, who owned all the shares, and subsequently gave them five preferences. In April 2011 the company went into creditors' voluntary liquidation. The liquidators applied under section 239 of the Insolvency Act 1986[1] for the repayment of the preferences. The effect of section 240(2) of the 1986 Act was that the court had no jurisdiction to make such an order unless at the time the preference was given the company had been unable to pay its debts within the meaning of section 123 of the Act or had become unable to pay its debts within the meaning of that section in consequence of the preference. Section 123(2) provided that

*F*  a company was deemed unable to pay its debts if the value of its assets was less than the amount of its liabilities. The judge refused the liquidators' application, finding that the dividend had been unlawful and therefore void; that the amount of the dividend had therefore been an asset of the company for the purposes of section 123(2) at the time of all five preferences; that, treating the amount of the dividend as an asset of the company, the value of the company's assets had exceeded the amount of its liabilities at those times; and that, accordingly, by virtue of section 240(2), the court had no power

*G*  under section 239 to order the repayment of the preferences.

On appeal by the liquidators—

[1] Insolvency Act 1986, s 123(2): see post, para 4.
 S 239: "(2) Where the company has at a relevant time (defined in the next section) given a preference to any person, the office-holder may apply to the court for an order under this section.   (3) Subject as follows, the court shall, on such an application, make such order as it thinks fit for restoring the position to what it would have been if the company had not given that
*H*  preference."
 S 240(1): "Subject to the next subsection, the time at which a company enters into a transaction at an undervalue or gives a preference is a relevant time if the transaction is entered into, or the preference given— (a) in the case of a transaction at an undervalue or of a preference which is given to a person who is connected with the company (otherwise than by reason only of being its employee), at a time in the period of two years ending with the onset of insolvency . . ."
 S 240(2): see post, para 3.

© 2017 The Incorporated Council of Law Reporting for England and Wales

*Held*, allowing the appeal, that contingent assets were not to be taken into account A
in determining whether the value of a company's assets was less than the amount of its
liabilities for the purposes of section 123(2) of the Insolvency Act 1986; that the
amount of the unlawful dividend was a contingent asset since it had been contingent
upon the unlawful nature of the dividend becoming known and someone on behalf of
the company pursuing the claim for repayment of the dividend before the company
went into liquidation; that, therefore, the amount of the unlawful dividend had not
been an asset of the company for the purposes of section 123(2); and that, accordingly, B
the company had been insolvent at the time when each preference had been given and
so the court had power to order their repayment (post, paras 19–25, 27, 28).

*BNY Corporate Trustee Services Ltd v Eurosail-UK 2007-3BL plc* [2013] 1 WLR
1408, SC(E) applied.

The following cases are referred to in the judgment of Lewison LJ:

*BNY Corporate Trustee Services Ltd v Eurosail-UK 2007-3BL plc* [2010] EWHC C
2005 (Ch); [2011] 1 WLR 1200; [2010] Bus LR 1731; [2011] 3 All ER 470;
[2011] EWCA Civ 227; [2011] 1 WLR 2524; [2011] Bus LR 1359; [2011] 3 All
ER 470, CA; [2013] UKSC 28; [2013] 1 WLR 1408; [2013] Bus LR 715; [2013]
3 All ER 271; [2013] 2 All ER (Comm) 531; [2013] 1 BCLC 613, SC(E)
*Bucci v Carman* [2014] EWCA Civ 383; [2014] 2 BCLC 49, CA
*Cheyne Finance plc, In re (No 2)* [2007] EWHC 2402 (Ch); [2008] Bus LR 1562;
[2008] 2 All ER 987; [2008] 1 BCLC 741 D
*Deiulemar Shipping SpA v Transfield ER Futures Ltd* [2012] EWHC 928 (Comm)
*Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] UKHL 2; [2001] 1 WLR 143;
[2001] 1 All ER 673; [2001] 1 BCLC 145, HL(E)
*Thoars, decd, In re; Reid v Ramlort Ltd* [2002] EWHC 2416 (Ch); [2002] 1 BCLC 499

The following additional cases were cited in argument:

*Allied Carpets Group plc v Nethercott* [2001] BCC 81 E
*Belmont Finance Corpn Ltd v Williams Furniture Ltd (No 2)* [1980] 1 All ER 393,
CA
*Bwllfa and Merthyr Dare Steam Collieries (1891) Ltd v Pontypridd Waterworks Co*
[1903] AC 426, HL(E)
*Harrison (JJ) (Properties) Ltd v Harrison* [2001] EWCA Civ 1467; [2002] 1 BCLC
162, CA
*Precision Dippings Ltd v Precision Dippings Marketing Ltd* [1986] Ch 447; [1985] F
3 WLR 812, CA
*Secretary of State for Trade and Industry v Glover* (unreported) 20 October 2005,
Judge Norris QC
*Thornton Baker v Duncan C Fraser & Co* (unreported) 21 December 1987, Vinelott J

**APPEAL** from Judge Milwyn Jarman QC sitting as a judge of the Chancery
Division G
By an application dated 13 November 2012 the liquidators of Rococo
Developments Ltd, Jason Mark Evans and Stephen John Burkinshaw, applied
under section 239 of the Insolvency Act 1986 seeking (1) a declaration that
the directors of the company, Peter Jones and Helen Jones, had received an
unlawful dividend and/or voidable preference of £75,000; (2) a declaration
that the directors had received four voidable preference payments during
2010 and 2011 totalling £448,672·73; (3) an order that the directors do repay H
the said sums to the liquidators; (4) interest; and (5) costs. By a judgment
dated 16 May 2014 Judge Milwyn Jarman QC, sitting as a judge of the
Chancery Division in the Cardiff District Registry, refused the application,
holding that the company had not been unable to pay its debts at the time of

© 2017 The Incorporated Council of Law Reporting for England and Wales

3

A   any of the five payments, within section 123(2) of the 1986 Act, with the
    consequence that by virtue of section 240(2) of the Act the court had no
    power to make an order under section 239.

    By an appellant's notice filed on 6 June 2014 the liquidators appealed on
    the grounds, inter alia, that the judge had erred in treating the unlawful
    dividend as an "asset" of the company when determining that the company
    had been unable to pay its debts at the relevant times.

B   The facts are stated in the judgment of Lewison LJ, post, paras 1–12.

    *George Bompas QC* and *Angharad Davies* (instructed by *William Parry
    & Co, Swansea*) for the liquidators.

    At the dates at which the solvency of the company was in question the
    potential liability of the directors to repay the unlawful dividend was
C   unknown and there was no realistic or worthwhile prospect of the dividend
    being available to the company to pay debts or claims against the company.
    Merely to characterise the directors as liable to account as constructive
    trustees did not mean that there was an asset which the company could have
    deployed in payment of the company's debts. [Reference was made to
    *Secretary of State for Trade and Industry v Glover* (unreported) 20 October
    2005.] In determining whether, when the payments were made, the value of
D   the company's assets was less than the amount of its liabilities the judge
    should have left out of account the dividend and any claim which the
    company might have had in respect of it.

    When the company made the payments it was influenced by a desire to
    put the directors into a better position than they would otherwise have been
    when the company went into insolvent liquidation. The directors should be
E   found to have received the payments as preferences which under section 239
    of the Insolvency Act 1986 they ought to be ordered to repay.

    From 1 June 2010 onwards the company had the benefit of claims against
    the directors in respect of the dividend, but the claims were contingent, in
    that (a) they needed to be discovered, (b) the company needed to be put in
    motion to pursue them, and (c) if (as happened) they were defended, the
    company would need to be financed to bring the claims before the court.
F   The claims, at the time of the payments, were of no value to the company
    and not in any conventional sense capable of being described as "assets".
    [Reference was made to *Bwllfa and Merthyr Dare Steam Collieries (1891)
    Ltd v Pontypridd Waterworks Co* [1903] AC 426.] In applying the
    section 123(2) test when determining whether the time at which a preference
    was made was a "relevant time", the court does not use hindsight: what
G   matters is the position as it fell to be judged at the time of the preference.
    [Reference was made to *BNY Corporate Trustee Services Ltd v Eurosail-UK
    2007-3BL plc* [2013] 1 WLR 1408, para 37 and *Thornton Baker v Duncan
    C Fraser & Co* (unreported) 21 December 1987.]

    *Hugh Sims QC* and *Simon Passfield* (instructed by *MLM Cartwright
    Solicitors, Cardiff*) for the directors.

H   The judge correctly considered the relevant legal principles and correctly
    applied them to the facts. He correctly found that the submission that the
    £75,000 dividend should not be taken into account when assessing solvency
    because the company had not asked for it or recovered it prior to liquidation
    had no legal foundation. If the sum, as was accepted and found, was held on
    trust (or seen as a loan), it was at the relevant times an asset of the company

© 2017 The Incorporated Council of Law Reporting for England and Wales

4

In re Rococo Developments Ltd (CA)                                    [2017] Ch
Argument

and would have to be recognised in the accounts. In any event the judge was    A
entitled to deploy hindsight where it was appropriate to do so: see *Phillips v
Brewin Dolphin Bell Lawrie Ltd* [2001] 1 WLR 143, para 26 and *In re
Thoars, decd; Reid v Ramlort Ltd* [2002] 1 BCLC 499, para 17. The court
was engaged in a retrospective exercise the starting point of which was that
the company was in fact insolvent and known to be insolvent. The
proposition that property held on constructive trust for a company should be    B
treated as a future asset is untenable. The £75,000 asset existed and was a
present property right and asset of the company. [Reference was made to
*Precision Dippings Ltd v Precision Dippings Marketing Ltd* [1986] Ch 447,
457–458.] The unlawful dividend was therefore an asset of the company
from the moment when the moneys were paid out into the hands of the
directors. The beneficial interest in the asset never left the company.
[Reference was made to *JJ Harrison (Properties) Ltd v Harrison* [2002]          C
1 BCLC 162, paras 25–29.]

As was said in *BNY Corporate Trustee Services Ltd v Eurosail-UK 2007-
3BL plc* [2013] 1 WLR 1408, para 37, the balance sheet test is not an exact
test. Whether the balance sheet test is satisfied depends on the available
evidence. It requires the first instance court to make an objective and fact-
sensitive judgment as to whether it has been established that the company     D
cannot reasonably be expected to meet its liabilities. If so, it will be deemed
insolvent even though it is currently able to pay its debts as they fall due.

To determine the question of whether a company is balance sheet
insolvent within the meaning of section 123(2) requires the court to apply an
objective test: whether the directors consider that there is an asset or not is
irrelevant. Moreover the knowledge of unlawfulness (as opposed to
knowledge of the relevant underlying facts) of the directors and members is    E
not relevant to the creation of a constructive trust. A constructive trust is
imposed by operation of law and may even arise contrary to the intentions of
the parties: see *Belmont Finance Corpn Ltd v Williams Furniture Ltd (No 2)*
[1980] 1 All ER 393, 405. As directors and shareholders of the company the
directors are deemed to have knowledge of the facts which made the
dividend unlawful: see *Precision Dippings Ltd v Precision Dippings*          F
*Marketing Ltd* [1986] Ch 447. Moreover, as the judge found, whether the
unlawful dividend is seen also as a debt does not alter the fact it was an asset
which should have been accounted for.

The valuation of liabilities and assets is an objective assessment of the
position at the time of the preference payment. [Reference was made to
*Allied Carpets Group plc v Nethercott* [2001] BCC 81, 89.]
                                                                              G
The court took time for consideration.

7 July 2016. The following judgments were handed down.

**LEWISON LJ**

1 Rococo Developments Ltd ("the company") was a property
development company until it went into creditors' voluntary liquidation on    H
21 April 2011. Mr and Mrs Jones were its two directors and own all the
company's issued share capital. In carrying out its development projects the
company was reliant on borrowings, both from the banks and also from
Mr and Mrs Jones.

© 2017 The Incorporated Council of Law Reporting for England and Wales

5

[2017] Ch
In re Rococo Developments Ltd (CA)
Lewison LJ

A    2   One of the sites that the company wished to develop was at Llanunwas, Solva. It entered into a building contract with a company called WJG Evans Ltd ("Evans"). In the latter stages of the project Mr Jones himself acted as the contract administrator. As completed units were sold, both at Solva and at another site in Sennybridge Brecon, the company repaid out of the sale proceeds the various loans made to it by Mr and Mrs Jones.

B    There were four such payments made in 2010 namely £97,272·73 made on 3 June, £10,000 and £90,000 both made on 4 October, £175,400 made on 27 October; and a fifth one (£76,000) made on 18 March 2011, just over a month before the company went into liquidation. These payments amount in total to £448,672·73. In addition on 1 June 2010 the company paid a dividend to its shareholders (Mr and Mrs Jones) of £75,000.

C    3   It is now accepted that each of the five payments counts as a "preference" for the purposes of sections 239 to 241 of the Insolvency Act 1986. It is also clear that each of the payments was made within the period of two years ending with the onset of the company's insolvency. The liquidators of the company thus claim repayment of the five payments under section 239. Prima facie the giving of a preference to a person connected with the company (such as Mr and Mrs Jones) within the period of two years ending with the onset of the company's insolvency is given at a "relevant

D    time" for the purposes of those sections. But section 240(2) provides:

"Where a company enters into a transaction at an undervalue or gives a preference at a time mentioned in subsection (1)(a) or (b), that time is not a relevant time for the purposes of section 238 or 239 unless the company— (a) is at that time unable to pay its debts within the meaning of section 123 in Chapter VI of Part IV, or (b) becomes unable to pay its

E    debts within the meaning of that section in consequence of the transaction or preference; but the requirements of this subsection are presumed to be satisfied, unless the contrary is shown, in relation to any transaction at an undervalue which is entered into by a company with a person who is connected with the company."

F    4   Section 123(1)(e) provides that a company is deemed to be insolvent "if it is proved to the satisfaction of the court that the company is unable to pay its debts as they fall due". Section 123(2) provides that

"A company is also deemed unable to pay its debts if it is proved to the satisfaction of the court that the value of the company's assets is less than the amount of its liabilities, taking into account its contingent and prospective liabilities."

G    5   The immediate cause of the company's entry into insolvent liquidation was an adjudication award made on 27 March 2011 by an adjudicator following a claim by Evans. However, that claim had something of a history. On 28 May 2010 Evans presented a final account stating that the total amount due for building works was £561,000-odd and that taking into account sums already paid there was a balance in their favour of

H    £191,487-odd. This was far in excess of the amounts which Mr Jones, as the self-appointed contract administrator, had certified. The parties did not narrow their differences, and by notice dated 18 February 2011 Evans referred the dispute to adjudication. The dispute referred to adjudication at this stage was limited to what were referred to as "headline items" for

© 2017 The Incorporated Council of Law Reporting for England and Wales

In re Rococo Developments Ltd (CA)                                    [2017] Ch
Lewison LJ

inclusion in the final account. The items included utility supplies, additional   A
roof works, external works and a claim by Evans in respect of an extended
contract period. A chartered surveyor was appointed as adjudicator. The
parties made written submissions to him (which included disputes about
his jurisdiction). Although Evans suggested widening the scope of the
adjudication to include the assessment of the whole of the final amount, the
company refused to do so. The company took legal advice from counsel,
which the judge described in the following terms, at para 22:                     B

"The company took legal advice from counsel, who gave what was
described as a very provisional view on 8 March 2011 that there was a
60–65% chance of success in arguing that Evans had lost the right to
dispute the appointment of the contract administrator and that the
certificates accordingly should be valid. He further thought that there was
a strong case for saying that the adjudicator was not being asked to direct   C
payment to be made, and he anticipated that what would be decided was
simply a calculation rather than a direction that those sums be paid. His
'best guess' on the anticipated outcome in respect of such a calculation was
that £55,241·66 would be found due to Evans on the items in the reference,
not including interest or adjudicator's fees. He ended on this note: 'I am
concerned that our case on the quantum of the valuations is difficult to       D
follow. What are we saying is wrong about the contractor's figures? Why
are our figures lower? Are these contractual arguments or what?'"

6   The outcome of the adjudication was the award of 27 March 2011.
The adjudicator rejected Evans's claim to an extended contract period, and
also decided that the certificates issued by Mr Jones were invalid, because he
was not entitled to appoint himself as contract adjudicator. He also decided   E
that the company had no claim for delay. The overall result, therefore, was
that he decided that a total principal sum of £66,881·80 for the headline
items should be in the final account. The company was also liable to pay, in
addition to that sum, legal and other fees amounting to £16,000. The
company had made no provision in its accounts for payment of anything to
Evans and therefore could not pay. It was that total liability that triggered
the decision to enter insolvent liquidation. The decision to that effect was   F
made on 1 April 2011. According to the statement of affairs the company
had no funds to proceed with the matter or to contest any further referral.
The deficiency as regards unsecured creditors was £52,479. Apart from a
relatively small sum of £3,939 all the directors' loans had been repaid.

7   Two weeks later Evans referred another dispute to adjudication. That
dispute related to the failure to agree the final account, and by a second      G
award dated 15 May 2011 the same adjudicator awarded Evans a total sum
of £122,670·15.

8   The current joint liquidators were appointed on 20 June 2011
replacing earlier liquidators. In the course of his investigations into the
company one of the joint liquidators became concerned that the dividend of
£75,000 that the company had paid to Mr and Mrs Jones on 1 June 2010 had
been unlawful. There were two reasons for his concern. First, the company's   H
statutory accounts showed an available distributable profit of £57,934 as at
31 May 2010. Second, the company's accounts made no provision for any
possible liability in the face of Evans's claim for £191,487-odd. When the
allegation that the dividend had been unlawful was put to Mr Jones he denied

© 2017 The Incorporated Council of Law Reporting for England and Wales

A    it, first in correspondence from his solicitors, and then in his witness statement
     of 22 August 2013. It was not until shortly before trial that on 6 March 2014
     Mr and Mrs Jones accepted that the dividend had indeed been unlawful.

         9    In preparation for the trial the parties instructed a single joint expert,
     Mr Roger Isaacs to prepare a report on the solvency of the company at the
     various dates in play. Mr Isaacs is an accountant and licensed insolvency
B    practitioner, and he made it clear that his report was confined to matters of
     accountancy and the preparation of accounts. In effect the exercise that he
     carried out was to reconstruct the company's accounts to determine what
     they would have shown if they had been prepared in accordance with UK
     Generally Accepted Accounting Practice ("UK GAAP"). As I have said the
     company's accounts made no provision for any liability to Evans. Mr Isaac
     considered that this aspect of the accounts failed to comply with Financial
C    Reporting Standard 12 ("FRS 12"). Although FRS 12 did not apply directly
     to the company, equivalent provisions did. Mr Isaac's view was that whether
     to make a provision for a debt to Evans would have been a matter of
     judgment, but that in order to comply with UK GAAP that judgment had to
     be made on a reasonable basis. Having considered the material before him he
     took the view that it was unreasonable to have made no provision at all. The
     level of provision that should have been made would have depended on the
D    advice that the company received about the claim. It could have been perhaps
     £50,000 or even £100,000; but it would have been difficult to have justified
     making a provision of less than £20,000. He went on to consider a number of
     other accounting issues which have played no part in the argument. Based on
     his overall conclusions he then reconstructed the company's balance sheets as
     he thought they ought to have been presented. In carrying out that
E    reconstruction he allowed a constant sum of £20,000 by way of provision for
     the Evans debt. Having done that he concluded: (i) as at 3 June 2010 the
     company's liabilities exceeded its assets by £41,855; (ii) as at 4 October 2010
     the company's liabilities exceeded its assets by £18,907; (iii) as at 27 October
     2010 the company's liabilities exceeded its assets by £6,736; and (iv) as at
     18 March 2011 the company's assets exceeded its liabilities by £11,083.

         10    On this basis, the company was insolvent on a balance sheet basis at
F    three of the four dates in play. However, Mr Isaacs then considered the
     question of the dividend. He first concluded that there were insufficient
     distributable reserves to justify the payment of the dividend. He then
     considered the consequences that followed from that. In relation to each of
     the three dates on which the company appeared to be insolvent on a balance
     sheet basis he said:

G       "If, however, one were to treat, for accounting purposes, the dividend
        that was paid on 3 June 2010 as being unlawful and therefore void, the
        result would be to increase the net assets of the company by £75k, thereby
        returning it to solvency."

         11    Mr Isaacs was asked to clarify this conclusion which he did by e-mail
     on 12 March 2014:

H       "My reference to the dividend being void is intended to refer to my
        understanding that if the dividend was unlawful then it could not be
        treated (for tax purposes at least) as a dividend. Were HMRC to consider
        the matter, it would require that the transaction be categorised as
        something other than a dividend and probably as a loan to the person to

© 2017 The Incorporated Council of Law Reporting for England and Wales

8

In re Rococo Developments Ltd (CA)                                    [2017] Ch
Lewison LJ

whom it was paid. In other words, if a dividend is unlawful, then for tax     *A*
purposes it is not capable of being treated as a dividend."

12   It was apparently in the light of this report that, as I have said,
Mr and Mrs Jones conceded on 6 March 2014 (some 3½ years after the
dividend had been paid) that it had been unlawfully paid. They offered to
repay it to the company and asked for time to do so.

13   The judge heard evidence before reaching his conclusions, although     *B*
Mr Isaacs was not required to give oral evidence. He was unimpressed by
the evidence of Mr Jones whom he regarded as "singularly unimpressive".
He found that when Mr Jones had given information to the company's
accountants in December 2010 for the purpose of preparing the accounts he
had included a figure of £68,000 as provision for the Evans claim. Based on
that, the judge considered that the provision that should have been made in     *C*
the accounts was not the minimum figure of £20,000 that Mr Isaacs had
used, but was £68,000. That would have increased the deficiency as at June
and October 2010; and would have turned the small surplus in March 2011
into a deficiency.

14   However, the judge noted that it was common ground that
Mr and Mrs Jones had at all times held the unlawful dividend on     *D*
constructive trust for the company and were under a duty to convey it as
directed by the company. He concluded in para 15 as follows:

   "The statutory scheme is clear in my judgment. It was unlawful to pay
   the dividend on 1 June 2010, and it has remained unlawful at all material
   times since. The Joneses held the dividend on trust for and liable to repay
   it to the company. In assessing whether at the time of any of the     *E*
   payments, made subsequently, the company was insolvent, regard must
   be had not only to the amount of its liabilities, but also to the value of its
   assets. The amount of the unlawful dividend was, in my judgment at the
   time of each of the payments, an asset of the company."

15   The judge also made adjustments to Mr Isaacs's figures to take
account of work in progress. In their revised skeleton argument of June     *F*
2015 Mr Bompas QC and Ms Davies, on behalf of the liquidators, set out a
table of the figures which I reproduce. The table shows the dates of the
various sales and payments and the amount of each. The table also shows in
italic font, in the last column, the company's net liabilities (or net assets
in one case) at the date of each of the payments as explained by Mr Isaacs. In
the last column the table shows in ordinary font those same figures, but
adjusted by substituting a provision of £68,000 for the WJG Evans debt in     *G*
the place of the £20,000 minimum included by Mr Isaacs and further
adjusting for work in progress (as the judge did) when the company still had
any. All the figures in the table ignore the dividend of £75,000. These
figures remained unchallenged until shortly before the hearing of the appeal;
and seem to me in any event to be soundly based on the evidence called
before the judge. Although Mr Sims QC, for Mr and Mrs Jones, submitted     *H*
that if we were to engage with detailed figures we should remit the case for
further argument at first instance, I do not think that it is necessary to do so.
If there were to have been any challenge to the table it should have been
made much earlier than it was.

© 2017 The Incorporated Council of Law Reporting for England and Wales

A

| Date | Sale | Payment | Net liabilities |
|---|---|---|---|
| 28 May 2010—Unit 8 sold | £189,894·75 | | |
| 3 June 2010—Payment 1 | | £97,272·73 | (£62,655) (£33,855) |
| 29 September 2010—Unit 1 sold | £279,950 | | |
| 4 October 2010—Payments 2 and 3 | | £100,000 | (£42,995) (£14,195) |
| 22 October 2010—Unit 3 sold | £245,000 | | |
| 27 October 2010—Payment 4 | | £175,400 | (£35,175) (£6,375) |
| 2 March 2011—Unit 4 sold | £149,950 | | |
| 3 June 2010—Payment 1 | | £97,272·73 | (£62,655) (£33,855) |

B

C

D

E    16    The table shows that at each of the dates in question, and leaving aside
the unlawful dividend, the company was insolvent on the balance sheet basis.
Thus the result of treating the company as having an asset worth £75,000 at the
date of each of the payments was to return it (notionally) to solvency. The
judge declined to take into account the amount that the adjudicator actually
awarded Evans because, he said, it was not permissible to use hindsight in
F    determining whether the company was unable to pay its debts at any particular
date. In so saying he relied on the decision of Mr Colin Edelman QC, sitting as a
deputy judge of the Queen's Bench Division, in *Deiulemar Shipping SpA v
Transfield ER Futures Ltd* [2012] EWHC 928 (Comm). The *Deiulemar
Shipping* case was a case which concerned the interpretation of the definition
of an "event of default" in six forward freight agreements. An event of default
would occur if a party or a party's credit support provider became insolvent or
G    unable to pay its debts or failed or admitted its inability generally to pay its
debts as they became due. Mr Edelman applied the test laid down by the Court
of Appeal in *BNY Corporate Trustee Services Ltd v Eurosail-UK 2007-3BL
plc* [2011] 1 WLR 2524: namely that a company was only to be regarded as
balance sheet insolvent when it had reached the point of no return because of
an incurable deficiency in its assets. One question that arose was how to deal
H    with contingent liabilities in making that assessment. Mr Edelman dealt with
that as follows [2012] EWHC 928 at [28]:

    "It is wholly unrealistic to suggest that the assessment of whether or not
a party is insolvent for the purposes of an 'event of default' is to be judged
by reference to events which occur after the date as at which the question of

© 2017 The Incorporated Council of Law Reporting for England and Wales

the existence of insolvency falls to be judged. If, of course, a reasonable *A* commercial person would regard the defence to a disputed liability as being fanciful as at the time of the alleged event of default, the liability would fall to be taken into account in full for the purposes of the assessment of insolvency. If, however, as at the time for the assessment of the existence of an event of default, a reasonable commercial person would consider that there were reasonable grounds for disputing the asserted liability, it would fall to be treated as a contingent liability in respect of *B* which some assessment would have to be made as part of the process of deciding whether the party had indeed reached 'the point of no return'."

17 Mr Bompas advanced two main arguments in support of the liquidators' appeal. First, he argued that at the various dates at which the solvency of the company was in question the potential liability of *C* Mr and Mrs Jones to repay the unlawful dividend was unknown. Since Mr and Mrs Jones both believed until the delivery of Mr Isaacs's report that the dividend was lawful, there would have been no occasion to investigate the question of the lawfulness of the dividend. That came about only because of subsequent events and in particular the company's entry into insolvent liquidation and the appointment of the current joint liquidators. Even then, Mr and Mrs Jones disputed liability until shortly before trial, and recovery of *D* the money had involved substantial expenditure on costs by the company. Merely to characterise them as being liable to account as constructive trustees did not mean that at the various dates in question there was an asset which the company could, at any of those dates, have deployed in payment of the company's debts. Second, he argued that there was a logical inconsistency in the judge's judgment because his assessment of the nature of the unlawful dividend as an asset of the company was itself an exercise in hindsight. Since he *E* had disavowed the use of hindsight in the assessment of the value of the Evans claim, he ought to have done the same in dealing with the unlawful dividend.

18 Mr Sims argued that the judge was right to have treated the dividend as he did. The liability of Mr and Mrs Jones was simply an application of the law to the facts as they were; and those facts were all in existence at each of the dates at which the solvency of the company was in question. In any event *F* the judge was entitled to deploy hindsight where it was appropriate to do so: *Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] 1 WLR 143, para 26; *In re Thoars, decd; Reid v Ramlort Ltd* [2003] 1 BCLC 499, para 17. Mr Edelman's view may not be the last word on the subject particularly where, as here, the court is engaged in a retrospective exercise whose starting point is that the company is in fact insolvent and known to be insolvent. The judge was entitled to conclude that it was appropriate to use hindsight to the *G* extent that he did both in analysing the nature of Mr and Mrs Jones's liability to account for the unlawful dividend and in assessing what provision ought to have been made on account of the disputed Evans claim.

19 The correct approach to section 123 of the Insolvency Act 1986 is now the subject of authoritative guidance in the *Eurosail* case. We were referred to that decision at all its stages: before Sir Andrew Morritt C [2011] *H* 1 WLR 1200; the Court of Appeal [2011] 1 WLR 2524 and the Supreme Court [2013] 1 WLR 1408. The case concerned the interpretation of a contractual provision which incorporated the definition in section 123(1)(e) and 123(2). The company had entered into a number of swap agreements with Lehman Bros which filed for bankruptcy protection in the USA. It had

© 2017 The Incorporated Council of Law Reporting for England and Wales

A made claims in the liquidation of Lehman Bros, and one of the questions was how those claims were to be taken into account. Sir Andrew Morritt C said [2011] 1 WLR 1200, para 30:

"First, the assets to be valued are the present assets of the company. There is no question of taking into account any contingent or prospective assets . . . The subsection provides no guidance as to the basis of that
B valuation. As the assets in question are those of the company presumably they are to be assessed at their value to the company but whether on a going concern or break-up basis is unclear. That problem does not arise in this case due to the nature of the issuer's business and its assets. What does arise is the question whether the claims of the issuer in the liquidation of Lehman Bros are present assets and if so their value. In my view they are clearly existing assets notwithstanding that they have not been admitted. Their present
C value may be more debatable but the evidence suggests that unadmitted claims are being traded on a secondary market at 35%–37% of their face value (subject to recourse requirements to the seller). I can see no reason why they should not be included in the assets of the issuer at that value."

20 The proposition of law was that contingent assets cannot be taken into account. If there is a present asset consisting of a chose in action (such as a
D claim in a liquidation) it can be given a value, and what it fetches in a market is good evidence of that value. In the Court of Appeal Lord Neuberger of Abbotsbury MR took the same approach [2011] 1 WLR 2524, paras 70–71. I note in passing that the claims in the Lehman Bros liquidation were not shown as assets in the company's accounts, but nevertheless the court took them into account at the value at which the claims were trading. Nothing was
E said to cast any doubt on the proposition of law that Sir Andrew Morritt C stated in para 30 of his judgment. In the Supreme Court [2013] 1 WLR 1408 Lord Walker of Gestingthorpe gave the leading judgment. At para 39 he referred with apparent approval to Sir Andrew Morritt C's exposition of the law (including para 30); and noted at para 40 that the Court of Appeal had not disagreed with anything in the Chancellor's judgment "so far as it related to statutory construction". He referred again to those paragraphs at para 43.
F I cannot see any criticism of the proposition of law stated by Sir Andrew Morritt C at para 30 of his own judgment. Bearing in mind that section 123(2) explicitly refers to contingent and prospective liabilities, but not to contingent or prospective assets, I consider that that proposition is correct.

21 How, then, should the judge have approached the question of the unlawful dividend? At the dates when he was considering the question of the
G company's solvency those in control of the company (Mr and Mrs Jones) believed that the dividend was lawful. They had no idea that there was any possible claim against them. No asset corresponding to the claim was shown in the company's accounts. There was, as Mr Bompas said, no reason for anyone to investigate whether or not such a claim existed, and there never would be unless and until the company became insolvent.

22 On these very peculiar facts I agree with Mr Bompas that the
H company's claim was a contingent claim. It was contingent in the first place on being discovered; and in the second place on being pursued which was itself unlikely so long as Mr and Mrs Jones remained in control of the company. In effect, therefore, the asset itself was contingent on the company's subsequent insolvency. It was a qualitatively different claim to

© 2017 The Incorporated Council of Law Reporting for England and Wales

12

In re Rococo Developments Ltd (CA)                                    [2017] Ch
Lewison LJ

the Evans claim which had been presented to the company. What was     *A*
uncertain about the Evans claim was whether it would succeed and to what
extent. To borrow Mr Donald Rumsfeld's well known distinction, the
eventual amount of the company's liability to Evans was a "known
unknown"; but the claim against Mr and Mrs Jones was an "unknown
unknown". The judge should not have taken it into account.

23    In addition, however liberal an approach to the use of hindsight is    *B*
permissible, what is not permissible in my judgment is to rewrite history.
The judge's approach, which was to treat the company as having a present
asset of £75,000, involved a number of counter-factual assumptions: first,
that the unlawfulness of the dividend was known (which it was not);
second that someone on behalf of the company would have pursued the
claim before it went into liquidation (which they did not); third that
Mr and Mrs Jones would not have disputed the claim (which they did);    *C*
fourth that the moneys would have been recovered from Mr and Mrs Jones
without cost (which they were not); and fifth that the company had the funds
to pursue the claim (which the statement of affairs clearly said that it did
not). If the sum of £75,000 is removed from the company's notional balance
sheet, then it was insolvent at each of the dates in question.

24    One of the lessons that emerges clearly from the *Eurosail* case is that    *D*
the statutory test in section 123 must not be mechanistically applied, but must
be applied in a way that has regard to commercial reality: Lord Neuberger MR
[2011] 1 WLR 2524, para 62, which I do not think was criticised in the
Supreme Court. In the course of his judgment Lord Walker referred [2013]
1 WLR 1408, para 33 to the "perceptive" judgment of Briggs J in *In re Cheyne
Finance plc (No 2)* [2008] Bus LR 1562. In the course of that judgment
Briggs J pointed out at para 51 that even though a company may continue to    *E*
pay its debts it may yet be "on any commercial view insolvent". See also *Bucci
v Carman* [2014] 2 BCLC 49, para 28. In my judgment the judge's treatment
of the unlawful dividend failed to accord with commercial reality.

25    For those reasons I would allow the appeal.

26    At the hearing of the appeal Mr Bompas sought to introduce an
amendment to his grounds of appeal, to the effect that if it were permissible to
use hindsight when evaluating a contingent asset or liability, the judge ought    *F*
to have included the debt to Evans at the full amount awarded by the
adjudicator. That amendment had not been foreshadowed before the
hearing. Mr Sims opposed the amendment on the ground that there were
materials before the judge (which were not before us) which he would have
wished to deploy in resisting that argument. Although the argument has
logical attractions, and some support in the authorities, we were not satisfied
that Mr and Mrs Jones's position could be adequately safeguarded in the light    *G*
of Mr Sims's submissions. Accordingly we refused permission to amend.

**CHRISTOPHER CLARKE LJ**

27    I agree.

**LAWS LJ**                                                            *H*

28    I also agree.

*Appeal allowed.*

BRENDAN WRIGHT, Barrister

© 2017 The Incorporated Council of Law Reporting for England and Wales

TAB 12

*Harding v Wealands* [2007] 2 AC 1

*A*

# The Law Reports

## Appeal Cases

## Volume 2

*B*

————

*C*

House of Lords

### Harding *v* Wealands

#### [2006] UKHL 32

2006    May 2, 3, 4;                     Lord Bingham of Cornhill, Lord Woolf,
      July 5               Lord Hoffmann, Lord Rodger of Earlsferry

*D*
                                      and Lord Carswell

*Conflict of laws — Tort — Assessment of damages — Englishman injured in road
accident in Australia — Vehicle driven by Australian national — Proceedings
served on driver in England — Whether English or New South Wales law
applicable in relation to assessment of damages — Whether restrictions on
damages in New South Wales statute procedural or substantive — Private*
*E*   *International Law (Miscellaneous Provisions) Act 1995 (c 42), ss 11, 14*[1]

The claimant, an Englishman, was rendered tetraplegic following an accident in a
vehicle driven by the defendant, an Australian national, which occurred in New
South Wales. The claimant issued and served proceedings seeking damages for
personal injuries on the defendant in England where she was working. The defendant
contended that the law of New South Wales applied to the assessment of damages
*F* and relied on certain provisions of the Motor Accidents Compensation Act 1999 of
New South Wales which imposed restrictions on the amount of damages which could
be recovered. The preliminary issue arose as to what was the law applicable to the
quantification of damages. The judge held, inter alia, that the provisions of the
Motor Accidents Compensation Act 1999 concerning the assessment of damages
were procedural rather than substantive and consequently, pursuant to
section 14(3)(b) of the Private International Law (Miscellaneous Provisions) Act
*G* 1995[1], English law would apply to them. The Court of Appeal reversed his decision.
    On the claimant's appeal—
    *Held*, allowing the appeal, that, under the common law rules of private
international law, questions of the quantification or assessment of damages had
long been regarded as procedural rather then substantive; that pursuant to
section 14(3)(b) of the 1995 Act questions of procedure were to be decided by the law
of the forum; that if section 14(3) were read in the context of, inter alia, the
*H* previously existing common law rules and, if necessary, a clear ministerial statement
to Parliament prior to the enactment of the statute, the question of the assessment of
damages was still to be regarded as a matter of procedure; that subsequent

    [1] Private International Law (Miscellaneous Provisions) Act 1995, ss 11, 14: see post,
para 31.

developments in the interpretation of the common law by Australian courts did not *A* justify a United Kingdom court altering what would otherwise be the appropriate interpretation of the 1995 Act; that for the purposes of the traditional distinction between substance and procedure which treated remedy as a matter of procedure all the provisions of the Motor Accidents Compensation Act 1999 should be characterised as procedural; and that, accordingly, the quantification of the claimant's damages was a matter of procedure to be determined in accordance with English law ( post, paras 1–2, 8, 11–12, 32–34, 36–39, 42, 48, 51, 53, 60, 64–65, 67, *B* 69–70, 73, 75–79, 83–84).

   *Caltex Singapore Pte Ltd v BP Shipping Ltd* [1996] 1 Lloyd's Rep 286 approved.
   *Pepper v Hart* [1993] AC 593, HL(E) applied.
   *Boys v Chaplin* [1971] AC 356, HL(E) considered.
   *Cope v Doherty* (1858) 4 K & J 367; 2 De G & J 614 explained.
   Decision of the Court of Appeal [2004] EWCA Civ 1735; [2005] 1 WLR 1539;
[2005] 1 All ER 415 reversed.

*C*

The following cases are referred to in the speeches of their Lordships:
*Adams v Cape Industries plc* [1990] Ch 433; [1990] 2 WLR 657; [1991] 1 All
   ER 929, Scott J and CA
*Allan J Panozza & Co Pty Ltd v Allied Interstate (Qld) Pty Ltd* [1976] 2 NSWLR 192
*Boys v Chaplin* [1971] AC 356; [1969] 3 WLR 322; [1969] 2 All ER 1085, HL(E)
*Caltex Singapore Pte Ltd v BP Shipping Ltd* [1996] 1 Lloyd's Rep 286
*Cope v Doherty* (1858) 4 K & J 367; 2 De G & J 614                                     *D*
*De la Vega v Vianna* (1830) 1 B & Ad 284
*Don v Lippmann* (1837) 5 Cl & Fin 1, HL(Sc)
*Huber v Steiner* (1835) 2 Bing NC 202
*John Pfeiffer Pty Ltd v Rogerson* [2000] HCA 36; 203 CLR 503
*Lowsley v Forbes (trading as L E Design Services)* [1999] 1 AC 329; [1998] 3 WLR
   501; [1998] 3 All ER 897, HL(E)
*Machado v Fontes* [1897] 2 QB 231, CA                                                 *E*
*Mitchell v M'Culloch* 1976 SC 1
*Pepper v Hart* [1993] AC 593; [1992] 3 WLR 1032; [1993] 1 All ER 42, HL(E)
*Phillips v Eyre* (1870) LR 6 QB 1
*Photo Production Ltd v Securicor Transport Ltd* [1980] AC 827; [1980] 2 WLR 283;
   [1980] 1 All ER 556, HL(E)
*R v Secretary of State for the Environment, Transport and the Regions, Ex p Spath
   Holme Ltd* [2001] 2 AC 349; [2001] 2 WLR 15; [2001] 1 All ER 195, HL(E)        *F*
*R (Jackson) v Attorney General* [2005] UKHL 56; [2006] 1 AC 262; [2005] 3 WLR
   733; [2005] 4 All ER 1253, HL(E)
*Red Sea Insurance Co Ltd v Bouygues SA* [1995] 1 AC 190; [1994] 3 WLR 926;
   [1994] 3 All ER 749, PC
*Regie Nationale des Usines Renault SA v Zhang* [2002] HCA 10; 210 CLR 491
*Robinson v Bland* (1760) 2 Burr 1077
*Roerig v Valiant Trawlers Ltd* [2002] EWCA Civ 21; [2002] 1 WLR 2304; [2002]   *G*
   1 All ER 961, CA
*Royal College of Nursing of the United Kingdom v Department of Health and Social
   Security* [1981] AC 800; [1981] 2 WLR 279; [1981] 1 All ER 545, CA and HL(E)
*Seismic Shipping Inc v Total E & P UK plc (The Western Regent)* [2005] EWCA Civ
   985; [2005] 2 Lloyd's Rep 359; [2005] 2 All ER (Comm) 515, CA
*Stevens v Head* (1993) 176 CLR 433
*Tolofson v Jensen* [1994] 3 SCR 1022; 120 DLR (4th) 289                              *H*
*Wilson v First County Trust Ltd (No 2)* [2003] UKHL 40; [2004] 1 AC 816; [2003]
   3 WLR 568; [2003] 4 All ER 97, HL(E)

The following additional cases were cited in argument:
*Amalia, The* (1863) 1 Moo PC NS 471, PC

A  *Aries Tanker Corpn v Total Transport Ltd* [1977] 1 WLR 185; [1977] 1 All ER 398, HL(E)

  *Assicurazioni Generali SpA v Arab Insurance Group (Practice Note)* [2002] EWCA Civ 1642; [2003] 1 WLR 577; [2003] 1 All ER (Comm) 140, CA

  *Baschet v London Illustrated Standard Co* [1900] 1 Ch 73

  *Chief Adjudication Officer v Foster* [1993] AC 754; [1993] 2 WLR 292; [1993] 1 All ER 705, HL(E)

B  *Coupland v Arabian Gulf Oil Co* [1983] 1 WLR 1136; [1983] 2 All ER 434; [1983] 3 All ER 226, Hodgson J and CA

  *D'Almeida (J) Araujo Lda v Sir Frederick Becker & Co Ltd* [1953] 2 QB 329; [1953] 3 WLR 57; [1953] 2 All ER 288

  *Davidsson v Hill* [1901] 2 KB 606, DC

  *Edmunds v Simmonds* [2001] 1 WLR 1003; [2001] RTR 367

  *Grayan Building Services Ltd, In re* [1995] Ch 241; [1995] 3 WLR 1, CA

C  *Halley, The* (1868) LR 2 PC 193, PC

  *Hamlyn & Co v Talisker Distillery* [1894] AC 202, HL(Sc)

  *Hansen v Dixon* (1906) 23 TLR 56

  *Happy Fellow, The* [1998] 1 Lloyd's Rep 13, CA

  *Hulse v Chambers* [2001] 1 WLR 2386; [2002] 1 All ER (Comm) 812

  *Kohnke v Karger* [1951] 2 KB 670; [1951] 2 All ER 179

  *M'Elroy v M'Allister* 1949 SC 110

D  *McKain v R W Miller & Co (South Australia) Pty Ltd* (1991) 174 CLR 1

  *Matthews v Ministry of Defence* [2003] UKHL 4; [2003] 1 AC 1163; [2003] 2 WLR 435; [2003] 1 All ER 689, HL(E)

  *OT Computers Ltd, In re* [2004] EWCA Civ 653; [2004] Ch 317; [2004] 3 WLR 886; [2004] 2 All ER (Comm) 331, CA

  *Pro Sieben Media AG v Carlton UK Television Ltd* [1999] 1 WLR 605, CA

  *R v Warwickshire County Council, Ex p Johnson* [1993] AC 583; [1993] 2 WLR 1; [1993] 1 All ER 299, HL(E)

E  *Reef Trade Mark, In re* [2002] EWCA Civ 763; [2003] RPC 101, CA

  *Somers v Fournier* (2002) 214 DLR (4th) 611

  *Stubbings v Webb* [1993] AC 498; [1993] 2 WLR 120; [1993] 1 All ER 322, HL(E)

  *T & N Ltd, In re (No 2)* [2005] EWHC 2990 (Ch); [2006] 1 WLR 1792; [2006] 3 All ER 755

  *Todorovic v Waller* (1981) 150 CLR 402

  *Wells v Wells* [1999] 1 AC 345; [1998] 3 WLR 329; [1998] 3 All ER 481, HL(E)

F
  **APPEAL** from the Court of Appeal

  This was an appeal by the claimant, Giles Christian Harding, brought with leave of the Court of Appeal, from a decision of the Court of Appeal (Arden LJ and Sir William Aldous; Waller LJ dissenting), dated 17 December 2004, allowing an appeal by the defendant, Tania Wealands, from a decision of Elias J given on 27 May 2004, in determining a preliminary issue in favour

G  of the claimant that the law applicable to the quantification of damages of the claimant's claim was the law of England rather than the law of New South Wales.

  The facts are stated in the opinion of Lord Hoffmann.

H  *Charles Haddon-Cave QC* and *Michael McParland* for the claimant. If the assessment of damages is made under English law the claimant will receive £5m but if the law of New South Wales applies he will get 30% less and will run out of money before he is likely to die.

  It is not in dispute that under section 11 of the Private International Law (Miscellaneous Provisions) Act 1995 the applicable law is the law of New

South Wales. However, following the traditional private international    *A*
law/common law rule, the assessment of the claimant's damages is a
questions of procedure under section 14(3)(b) and is to be determined only
by the law of the forum. Alternatively, the applicable law should be
displaced in regard to damages under section 12.

The Court of Appeal majority favoured a narrow definition of "questions
of procedure" in section 14(3)(b) based on the new Australian conflicts    *B*
model developed by Mason CJ and established by *John Pfeiffer Pty Ltd v
Rogerson* (2000) 203 CLR 503. This represents an abandonment of the
traditional English and Scottish private international law/common law
distinction between procedure and substance. It is revolutionary. All
aspects of assessment, quantification and measure of damages have always
been questions of procedure and governed by the law of the forum. The
clear intention of Parliament in passing the 1995 Act was that the assessment    *C*
of quantum of damages would continue to be governed by the law of the
forum. Any abrogation of that rule by the courts would thwart the will of
Parliament.

Hansard and the legislative history should be used as an aid to
interpretation in this case. Leave should be given under *Pepper v Hart*
[1993] AC 593. Looking at that history of the passage through Parliament of
the Private International Law (Miscellaneous Provisions) Bill it is clear that    *D*
if one proposed amendment had been enacted the problem in this case would
not have arisen: see Hansard (HL Debates) 27 March 1995, cols 1419–
1422. The statement of Lord Mackay of Clashfern LC, at col 1421, makes it
clear that the intention and purpose of Parliament in using the words
"questions of procedure" in section 14(3)(b) was to preserve and continue
the traditional private international law/common law rule that all issues    *E*
relating to quantum or measure of damages would be determined by the
laws of the forum and there was, consequently, no need for the proposed
amendment. English courts would continue to apply English rules on
quantum of damages even when a foreign law was the "applicable law"
governing the merits but the quantum allocated to any head of damage
permitted by some foreign system of law would continue to be regulated by
our own domestic law of damages. See also Hansard (HL Debates)    *F*
6 December 1994, cols 840–843, 845 and the Special Public Bill Committee
on the Private International Law (Miscellaneous Provisions) Bill, HL Paper
36, 1 March 1995, pp 4–5, 12, 22, 41. The import of Lord Mackay LC's
statement could not be clearer, when viewed in the context of the proposed
amendment, it is the paradigm case for the application of the rule in *Pepper v
Hart* [1993] AC 593. For examples of the application of the rule: see *Chief    *G*
Adjudication Officer v Foster* [1993] AC 754, *R v Warwickshire County
Council, Ex p Johnson* [1993] AC 583, *Stubbings v Webb* [1993] AC 498,
*R v Secretary of State for the Environment, Transport and the Regions,
Ex p Spath Holme Ltd* [2001] 2 AC 349, *Wilson v First County Trust Ltd
(No 2)* [2004] 1 AC 816, *In re OT Computers Ltd* [2004] Ch 317 and
*R (Jackson) v Attorney General* [2006] 1 AC 262.

Further, the reports of the English and Scottish Law Commissions make it    *H*
clear that there was an established Scottish and English private international
law/common law rule that damages were to be assessed by the law of forum
and that there was to be no change in this rule under section 14(3)(b) of the
1995 Act: see Private International Law: Choice of Law in Tort and Delict,

5

A   Law Commission (Working Paper No 87) and Scottish Law Commission
(Consultative Memorandum No 62) (1984) and Private International Law:
Choice of Law in Tort and Delict, Law Commission and Scottish Law
Commission Joint Report (Law Com No 193) (Scot Law Com No 129),
11 December 1990.
    The rule that remedies and damages are to be assessed by the laws of the
B   forum is a freestanding, fundamental principle of Scottish and English
private international law/common law which was well known and
established by the late 18th eighteenth or early 19th century. It was a long
established and clear principle which was well known prior to *Phillips v
Eyre* (1870) LR 6 QB 1: see *Robinson v Bland* (1760) 2 Burr 1077, *Huber v
Steiner* (1835) 2 Bing NC 202, *Don v Lippmann* (1837) 5 Cl & Fin 1, *Cope v
Doherty* (1858) 4 K & J 367; 2 De G & J 614, *The Amalia* (1863) 1 Moo
C   PC NS 471, *The Halley* (1868) LR 2 PC 193, *Phillips v Eyre* LR 6 QB 1,
*Hamlyn & Co v Talisker Distillery* [1894] AC 202, *Machado v Fontes*
[1897] 2 QB 231, *Baschet v London Illustrated Standard Co* [1900] 1 Ch 73,
*Hansen v Dixon* (1906) 23 TLR 56, *M'Elroy v M'Allister* 1949 SC 110,
*Kohnke v Karger* [1951] 2 KB 670, *J D'Almeida Araujo Lda v Sir Frederick
Becker & Co Ltd* [1953] 2 QB 329 and *Boys v Chaplin* [1971] AC 356.
D       It is clear from *Boys v Chaplin* [1971] AC 356 that all aspects of the
assessment of damages are "procedural" apart from whether a head of
damage is actionable. There is a "bright line" between liability and
quantum. Once the claim is found to be actionable in the foreign country,
the foreign law has no role to play: see *Coupland v Arabian Gulf Oil Co*
[1983] 1 WLR 1136, *Red Sea Insurance Co Ltd v Bouygues SA* [1995] 1 AC
190, *Edmunds v Simmonds* [2001] 1 WLR 1003, *Hulse v Chambers* [2001]
E   1 WLR 2386, *Roerig v Valiant Trawlers Ltd* [2002] 1 WLR 2304 and *In re
T & N Ltd (No 2)* [2006] 1 WLR 1792.
    The sea changes in Australian intra-national conflicts rules and, in
particular, the adoption of the new criterion developed by Mason CJ in
*McKain v R W Miller & Co (South Australia) Pty Ltd* (1991) 174
CLR 1 limiting "procedure" to rules "governing or regulating the mode or
F   conduct of court proceeds" was a conscious decision by the High Court of
Australia to depart from traditional English international law/common law
orthodoxy because of Australian Commonwealth and constitutional
imperatives. The radical move away from the rule was because of the
particular circumstances arising in Australia which have no relevance or
application in England: see *Stevens v Head* (1993) 176 CLR 433, *John
Pfeiffer Pty Ltd v Rogerson* 203 CLR 503, *Regie Nationale des Usines
G   Renault SA v Zhang* (2002) 210 CLR 491 and *McKain v R W Miller & Co
(South Australia) Pty Ltd* (1991) 174 CLR 1. There is much greater scope
for forum shopping in Australia
    The provisions of the New South Wales Motor Accidents Compensation
Act 1999, relied on by the defendant, clearly relate to the quantum and
assessment of damages and are not concerned with liability or the existence
H   of heads of damages: see the analysis in *Stevens v Head* 176 CLR 433, 458–
459 and *Somers v Fournier* (2002) 214 DLR (4th) 611, 631. They are all
part of the New South Wales machinery for the assessment of damages and
are, therefore, plainly procedural rather than substantive and are matters to
be covered by the law of the forum.

The dicta in *Cope v Doherty* 4 K & J 367, 384–385 and 2 De G & J 614,    A
623 are not authority for the broad proposition that caps on damages are
prima facie substantive. Properly understood the case is confined to the
particular statutory circumstances which existed between 1854 and 1862 in
the field of maritime limitation of liability and maritime torts. It had no
application after 1862 and no general application to the field of tort: see
*Davidsson v Hill* [1901] 2 KB 606. The passage in *Dicey & Morris, The*    B
*Conflict of Laws,* 13th ed (2000), vol 1, p 171 is unsound and is the result of
unfortunate editing, in particular in the 1993 edition when the contractual
context of the passage was removed: see *Dicey's Conflict of Laws,* 7th ed
(1958), pp 1091–1092, *Dicey & Morris, The Conflict of Laws,* 10th ed
(1980), vol 2, p 1179, *Dicey & Morris, The Conflict of Laws,* 12th ed
(1993), vol 1, p 184, *Dicey & Morris, The Conflict of Laws,* 13th ed, vol 1,
p 171. Subsequently, the passage in *Dicey & Morris,* denuded of its original    C
context, has been relied upon: see *Caltex Singapore Pte Ltd v BP Shipping*
*Ltd* [1996] 1 Lloyd's Rep 286, *The Happy Fellow* [1998] 1 Lloyd's Rep 13,
*Seismic Shipping Inc v Total E & P UK plc (The Western Regent)* [2005]
2 Lloyd's Rep 359 and *Aries Tanker Corpn v Total Transport Ltd* [1977]
1 WLR 185. However those authorities are not germane to caps and ceilings
on damages in tort generally.                                                D

The other provisions of the Motor Accidents Compensation Act 1999
concerning discount rates, interest, thresholds and credit provisions are all
procedural on any view of the procedural/substantive distinction: see
*Todorovic v Waller* (1981) 150 CLR 402 and *Wells v Wells* [1999] 1 AC 345.

The defendant's approach is a recipe for confusion, muddle, unfairness
and greatly increased litigation costs. Save for establishing the existence    E
of recoverable damages and damages which are not too remote, all matters
of quantum, measure, assessment or calculation of damages are questions of
procedure to be governed by the law of forum.

[Submissions were made on the application of section 12 of the 1995 Act
and on the facts. Reference was made to *Pro Sieben Media AG v Carlton*
*UK Television Ltd* [1999] 1 WLR 605 and *Assicurazioni Generali SpA v*
*Arab Insurance Group (Practice Note)* [2003] 1 WLR 577.]                     F

*McParland* following. [Submissions were made on the law in Northern
Ireland and Scotland. Reference was made to Rodger, "Ascertaining
the Statutory Lex Loci Delicti: Certain difficulties under the Private
International Law (Miscellaneous Provisions) Act 1995" (1998) 47 ICLQ
205.]

*Howard Palmer QC* and *Charles Dougherty* for the defendant.    G
[Submissions were made on section 12 of the Private International Law
(Miscellaneous Provisions) Act 1995, the facts and whether the Court of
Appeal had been entitled to reverse the judge's findings. Reference was made
to *Roerig v Valiant Trawlers Ltd* [2002] 1 WLR 2304, *In re Reef Trade Mark*
[2003] RPC 101 and *In re Grayan Building Services Ltd* [1995] Ch 241.]

Procedure is for the law of the forum. Rules of procedure are those which
are directed to the governing or regulating of the mode or conduct of court    H
proceedings. The reason for the rule is the practical one that it is impossible
or impracticable for the court of the forum to apply procedural rules other
than its own: see *Dicey & Morris, The Conflict of Laws,* 13th ed, vol 1,
pp 157, 172, *McKain v R W Miller & Co (South Australia) Pty Ltd* 174

A CLR 1 and *John Pfeiffer Pty Ltd v Rogerson* 203 CLR 503. "Procedure",
therefore, should be given its natural and ordinary meaning and a meaning
which accords with the reason why procedure is a matter for the law of the
forum.

Substance and procedure are not exhaustive categories. Rules which
affect how much a claimant is entitled to recover alter the substantive rights
B and obligations of the parties and are not merely procedural: see *Cope v
Doherty* 4 K & J 367; 2 De G & J 614. Obligations are substantive: see *The
Amalia* 1 Moo PC NS 471 and *Caltex Singapore Pte Ltd v BP Shipping Ltd*
[1996] 1 Lloyd's Rep 286. The right to receive and the obligation to pay
damages are equally matched and wholly substantive: see *Seismic Shipping
Inc v Total E & P UK plc (The Western Regent)* [2005] 2 Lloyd's Rep 359,
Private International Law: Choice of Law in Tort and Delict, Law
C Commission (Working Paper No 87) and Scottish Law Commission
(Consultative Memorandum No 62) (1984); Morse, "Torts in Private
International Law: A New Statutory Framework" (1996) 45 ICLQ 888,
895, *Dicey & Morris, The Conflict of Laws,* 13th ed, vol 2, pp 1532–1533,
paras 35-053–35-055, *Briggs, The Conflict of Laws* (2002), p 35 and
Opeskin "Statutory Caps on Damages in Australian Conflict of Laws"
D (1993) 109 LQR 533. In particular, legal restrictions on the amount of
damages recoverable are substantive and, consequently, so are the
provisions relied on in the Motor Accidents Compensation Act 1999.

The claimant's reliance on *Boys v Chaplin* [1971] AC 356 is misplaced.
Prior to *Phillips v Eyre* LR 6 QB 1, which introduced the double
actionability rule into English conflicts of law rules to deal with claims in
tort, no clear line was drawn between liability and quantum. The distinction
E between substance and procedure drawn in *Boys v Chaplin* [1971] AC 356
was predicated on the double actionability rule and the fact that once the
rule was satisfied only English law would be applied. *Boys v Chaplin* did not
seek to answer the crucial question whether the legal restriction on the
amounts of damages recoverable were "substantive" or "procedural". Nor
did the House in *Boys v Chaplin* consider whether a rule about caps on
F damages was more closely related to rules about "heads of damage" or rules
about "assessment of damages". It simply was not necessary in the context
of the double actionability rule to pursue such a detailed analysis of the
substance/procedure divide: see *Coupland v Arabian Gulf Oil Co* [1983]
1 WLR 1136, *Tolofson v Jensen* [1994] 3 SCR 1022 and *Red Sea Insurance
Co Ltd v Bouygues SA* [1995] 1 AC 190.
G The rule of double actionability has no relevance to the position under the
Private International Law (Miscellaneous Provisions) Act 1995 as it was
abolished by section 10 of the Act. Consequently, artificial devices about the
substance/procedure divide, devised to make double actionability workable
were abolished with the rule. Save that the Court of Appeal did not accept
that *Boys v Chaplin* [1971] AC 356 approach to the substance/procedure
divide was part and parcel of the double actionability rule and was thus
H abolished by section 10, the approach of the majority of the Court of Appeal
is wholly adopted.

The division between procedure and substance is for the common law.
The 1995 Act does not purport to lay down a rule, indeed section 14(3)(b)
specifically avoids doing so. Furthermore, the common law has developed in

line with the increasing sophistication of rules as to quantum and in line with    A
the purpose of the 1995 Act to give effect to the applicable law.

The High Court of Australia has given particular attention to the
distinction between substance and procedure in the private international law
arena.  The analysis of Mason CJ in *McKain v R W Miller & Co (South
Australia) Pty Ltd* 174 CLR 1 and *Stevens v Head* 176 CLR 433, which was
not based on any particularities of the Australian federal context but on first    B
principles derived from the common law cases, was accepted by the High
Court in *John Pfeiffer Pty Ltd v Rogerson* 203 CLR 503.  Whilst the federal
context was clearly a significant factor in the High Court's decision to adopt
a choice of law rule based on the lex loci delicti for intra-national torts, the
reasoning in relation to the distinction between substance and procedure
was not premised on any particularity of the Australian federal context. In    C
*Regie Nationale des Usines Renault SA v Zhang* 210 CLR 491 the High
Court abolished the double actionability rule for international torts and
replaced it with a choice of law based on the lex loci delicti.

The Australian position, that procedural law is confined to those rules
which are directed to the governing or regulating of the mode or conduct of
court proceedings, represents the common law of England.  The common
law distinction between substance and procedure in tort must develop with    D
(a) the abolition of the double actionability rule and (b) the implementation
of a rule (section 11 of the 1995 Act) giving effect to the foreign applicable
law.  A wide definition of what is procedural tends to defeat the purpose of
the law of the country whose law is to be applied and encourages forum
shopping, reduces comity and gives rise to anomalous and unjust results: see
*Edmunds v Simmonds* [2001] 1 WLR 1003.

It is for the common law to adapt, and in doing so English law should    E
strive to avoid anomalous differences arising between similar situations in
contract and tort and should heed the analogous situations arising in foreign
jurisdictions.    A narrow definition of what is procedural brings the
substance/procedure divide in relation to tort in line with: (a) contract cases
under the Rome Convention, as scheduled to the Contracts (Applicable Law)
Act 1990; (b) the position in Australia: see *John Pfeiffer Pty Ltd v Rogerson*    F
203 CLR 503; (c) the position in Canada: see *Tolofson v Jensen* [1994]
3 SCR 1022 and *Somers v Fournier* 214 DLR (4th) 611; (d) the position in
the United States: see the *American Law Institute, Restatement of the Law,
Conflict of Laws*, 2d (1969), vol 1, para 171; and (e) the proposed
EC Regulation on the Law Applicable to Non-contractual Obligations
("Rome II").
                                                                                    G
Reference to parliamentary materials should not be permitted because the
legislation is not ambiguous, unclear or leading to absurdity.  The relevant
parliamentary statement is insufficiently clear and does not deal with the
issues in this case, namely the limits on damages: see Hansard (HL Debates)
27 March 1995, cols 1419–1422.  *Pepper v Hart* [1993] AC 593 should be
confined to its facts as the parliamentary materials concerned were so
precise.  This case involves a wide-ranging bill and is not an appropriate case    H
to apply *Pepper v Hart* to: see *Bennion, Statutory Interpretation*, 4th ed
(2002), pp 762–782, *In re T & N Ltd (No 2)* [2006] 1 WLR 1792 and *R v
Secretary of State for the Environment, Transport and the Regions,
Ex p Spath Holme Ltd* [2001] 2 AC 349.

9

**[2007] 2 AC**                                    **Harding v Wealands (HL(E))**
                                                   **Lord Bingham of Cornhill**

A   *Haddon-Cave QC* in reply. There is no logic in the defendant's interpretation of the old cases. You cannot get from those cases to the defendant's propositions. The distinction between procedure and substance in *Boys v Chaplin* [1971] AC 356 was not dependent on the double actionability rule.

B   *Dicey & Morris, The Conflict of Laws,* 10th ed, vol 2, p 1179, when discussing *Cope v Doherty* 4 K & J 367; 2 De G & J 614, refers to *Allan J Panozza & Co Pty Ltd v Allied Interstate (Qld) Pty Ltd* [1976] 2 NSWLR 192 which is a law of contract case and has no relevance to tort. Contact and tort cases should not be confused: see *Matthews v Ministry of Defence* [2003] 1 AC 1163.

The Motor Accidents Compensation Act 1999 is not a complete code; it is simply a scheme for the payment of compensation. Caps which are

C   freestanding are different from those which are part of a liability regime.

England is not out of step with other countries: see *John Pfeiffer Pty Ltd v Rogerson* 203 CLR 503.

*Their Lordships took time for consideration.*

5 July. **LORD BINGHAM OF CORNHILL**

D   1   My Lords, I am in full agreement with the opinions of my noble and learned friends, Lord Hoffmann and Lord Rodger of Earlsferry, which I have had the advantage of reading in draft. For the reasons which they give, I also would allow the appeal and restore the order of Elias J.

**LORD WOOLF**

E   2   My Lords, I am able to confine my opinion to a single issue because I agree with the opinions of Lord Hoffmann and Lord Rodger of Earlsferry, which I have read in draft.

3   I have also had the advantage of reading the opinion of Lord Carswell in draft. While Lord Carswell agrees with Lord Hoffmann's and Lord Rodger's "reasons" and "conclusions", he does so subject to "one slight qualification": para 79.

F   4   Lord Carswell makes his qualification because of his understanding of what is the natural meaning of the word "procedure": para 83. As to this, Lord Carswell is in agreement with the judgments of Arden LJ and Sir William Aldous in the Court of Appeal. Arden LJ accepted that "damages are not naturally regarded as procedure" (para 58) and Sir William suggests that the natural meaning of "procedure" is "the mode or rules used to govern

G   and regulate the conduct of the court's proceedings": para 86. Lord Carswell adds, however, that in the field of private international law the word "procedure" has a "special meaning" which is wider than that which might be regarded as "natural".

5   Lord Carswell, having adopted this approach to the natural meaning of procedure, treats the "special meaning" as justifying reliance on *Pepper v Hart* [1993] AC 593 to resolve the significant issue of construction at the

H   heart of this appeal.

6   I am in agreement with Lord Carswell that, if it is necessary to rely on *Pepper v Hart* to decide the meaning of "procedure" in section 14(3)(b) of the Private International Law (Miscellaneous Provisions) Act 1995, the evidence of what was said in Parliament by the then Lord Chancellor

conclusively resolves this issue in the claimant's favour. Lord Carswell *A* rightly points out that this is an outstanding example of a case where the evidence as to what was said during the passage of the legislation through the parliamentary process makes it abundantly clear that it was the intention of Parliament by enacting section 14(3)(b) that the law of this country and not that of New South Wales is to be applied by the courts of this jurisdiction to the calculation of the claimant's damages. This is despite the fact that the claimant's accident occurred and his injuries were caused as the result of *B* negligence of the defendant in New South Wales.

7 However, I unfortunately differ from Lord Carswell as to his reasoning for relying on *Pepper v Hart*. The word "procedure" is frequently used in contrast to "substance" in order to distinguish between questions of procedural law and substantive law. Thus, unsurprisingly it is used together with the word "practice" in this context in section 1 of and Schedule 1 to the *C* Civil Procedure Act 1997 to identify the scope of the Civil Procedure Rules. The scope of the language is wide enough to encompass the contents of a civil procedure code which deals with evidence and remedies.

8 In determining the meaning of the word "procedure" the context in which the word is being used is of the greatest significance. In section 14(3)(b) "procedure" is used in conjunction with "rules of evidence, *D* pleading or practice". In that context it is natural to regard the assessment of damages as being a matter of procedure rather than substance.

9 The fact that the present context is one in the field of conflicts of law does not mean that "procedure" is being used in a special sense rather than in the sense in which you would expect it to be used having regard to the context in which it appears. It makes good practical sense to draw a *E* distinction between the treatment of questions of procedure and questions of substance; the former to be dealt, as you would expect in accordance with the procedure normally applied by the court in which the proceedings are brought.

10 This does not however mean that a cap on the amount of damages is obviously a question of procedure rather than a question of substance and if I had been left in doubt as to the correct answer I would certainly have been *F* prepared to apply *Pepper v Hart* [1993] AC 593.

11 The limits on the amount of damages on which the defendant seeks to rely are contained in the Motor Accidents Compensation Act 1999 of New South Wales. That Act contains in Chapters 3, 4, 5 and 6 a detailed statutory procedural code containing the machinery for recovering compensation for motor accident injuries, including the way damages are to be assessed. The code is clearly one that has provisions which it would be *G* very difficult, if not impossible, to apply in proceedings brought in this country, even though they may be capable of being applied in other parts of Australia. To have different parts of that code dealt with by different systems of law would not be an attractive result and in some cases this would produce an impractical result. (See for example section 132 which requires, in the case of a dispute over non economic loss, for the degree of impairment to be assessed by a medical assessor in New South Wales.) The greater part *H* of the code is clearly procedural and those parts which could be arguably regarded as substantive should be treated as being procedural as well.

12 For these reasons, as well as those given by Lord Hoffmann and Lord Rodger, I would allow this appeal and restore the judgment of Elias J.

*A*    **LORD HOFFMANN**

13    My Lords, the issue is whether damages for personal injury caused
by negligent driving in New South Wales should be calculated according to
the applicable law selected in accordance with Part III of the Private
International Law (Miscellaneous Provisions) Act 1995 ("Part III") or
whether it is a question of procedure which falls to be determined in
accordance with English law.    The Court of Appeal, by a majority
*B*    (Arden LJ and Sir William Aldous, Waller LJ dissenting) held that it should
be determined in accordance with the applicable law, which they decided
was the law of New South Wales.    In my opinion the dissenting opinion of
Waller LJ was correct and the question is one of procedure governed by the
law of the forum.    I also agree with the speech to be delivered by my noble
and learned friend, Lord Rodger of Earlsferry, which I have had the
*C*    advantage of reading in draft.

14    The accident happened on 3 February 2002 on a dirt track near
Huskisson in New South Wales, when the defendant Ms Wealands lost
control of the vehicle she was driving and it turned over.    Negligence is
admitted.    The claimant Mr Harding, who was a passenger, was severely
injured and is now tetraplegic.    Mr Harding is English and Ms Wealands
*D*    Australian.    They had formed a relationship when Mr Harding visited
Australia in March 2001 and in consequence Ms Wealands had come to
England in June 2001 to live with Mr Harding.    At the time of the
accident they had gone together to Australia for a holiday and a visit to
Ms Wealands's parents.    The vehicle belonged to Ms Wealands and she was
insured with an Australian insurance company.    After the accident,
Mr Harding and Ms Wealands returned to England.

*E*    15    The action was tried by Elias J, who applied English law to the
assessment of damages for two reasons.    First, because the assessment of
damages was a matter of procedure governed by the lex fori and secondly,
because even if it was a matter of substantive law, it was in this case
"substantially more appropriate" to apply English law: see section 12 of
Part III.    The Court of Appeal, as I have said, allowed the appeal on the first
*F*    point by a majority and allowed it unanimously on the second.    I shall first
address the question of substance and procedure.

16    Personal injury caused by negligence is an actionable wrong in
Australian common law.    In New South Wales, common law liability for
transport accidents was briefly abolished by the Transport Accidents
Compensation Act 1987 (NSW) and a statutory scheme of compensation
substituted but the Motor Accidents Act 1988 (NSW) repealed the 1987 Act
*G*    and section 6 reinstated the common law:

    "The law relating to a right to or a claim for damages or compensation
    or any other benefit (pecuniary or non-pecuniary) against any person for
    or in respect of the death of or bodily injury to a person caused by or
    arising out of a transport accident . . . shall be as if the [1987 Act] had not
    been passed and the common law and the enacted law (except that Act)
*H*    shall have effect accordingly."

17    The 1988 Act did however contain detailed provisions concerning
awards of damages for injuries suffered in motor accidents.    These have been
replaced by Chapter 5 of the Motor Accidents Compensation Act 1999
("MACA"), which was in force at the time of the accident.    Section 123

provides that "a court cannot award damages to a person in respect of a    A
motor accident contrary to this Chapter". The provisions of Chapter 5
which would have been relevant to an award of damages by a court in New
South Wales are: (a) the maximum recoverable for non-economic loss ( pain
and suffering, loss of amenities of life, loss of expectation of life,
disfigurement) is AUS$309,000 subject to indexation (section 134); (b) in
assessing loss of earnings, an excess of net weekly earnings over AUS$2,500
must be disregarded (section 125); (c) there is no award for the loss of the    B
first five days of earning capacity (section 124); (d) no award may be made
for gratuitous care which does not exceed six hours a week and is for less
than six months and the amount recoverable for care exceeding these
minima is limited to sums specified in section 128; (e) the discount rate for
calculating the present value of future economic loss is prescribed as 5%
(section 127); (f) credit must be given for payments made to the claimant    C
by "an insurer" (section 130); (g) no interest is payable on damages for
gratuitous care or non-economic loss and entitlement to interest on other
damages is subject to conditions, principally relating to the timely provision
of information by the claimant: section 137.

18  None of these provisions forms part of English law. Perhaps the
most striking difference is the 5% discount rate, compared with the 2·5% rate    D
set by the Lord Chancellor under the Damages (Personal Injury) Order 2001
(SI 2001/2301) pursuant to his power under section 1 of the Damages Act
1996 as the rate appropriate to ensure that the claimant is fully
compensated. The claimant says that under the provisions of MACA he
would recover about 30% less than he would under English law.

19  Until Part III was enacted, the English common law rule for    E
determining whether damage caused by acts committed abroad was
actionable in tort was that laid down by the Court of Exchequer Chamber in
*Phillips v Eyre* (1870) LR 6 QB 1, 28–29:

   "As a general rule, in order to found a suit in England for a wrong
   alleged to have been committed abroad, two conditions must be fulfilled.
   First, the wrong must be of such a character that it would have been
   actionable if committed in England . . . Secondly, the act must not have    F
   been justifiable by the law of the place where it was done."

20  I observe in passing that, since the common law of Australia is on
this point the same as the law of England, there is no doubt that the damage
suffered by Mr Harding would have satisfied this double actionability test.
But Willes J, giving the judgment of the court, went on to say: "the law is
clear that, if the foreign law touches only the remedy or procedure for    G
enforcing the obligation . . . such law is no bar to an action in this country."

21  What distinction was Willes J seeking to draw by saying that the
foreign law would not affect an action in this country if it touched "only the
remedy or procedure"? He referred to *Huber v Steiner* (1835) 2 Bing
NC 202, which concerned an action brought in 1835 on a French
promissory note made in 1813 and payable in 1817. The defendant pleaded
that by French law an action upon the note was prescribed but Tindal CJ    H
held that, upon its true construction, the French law did not extinguish the
debt but only barred the creditor from obtaining a remedy. It was therefore
a matter of French procedure which an English court would disregard.
Conversely, *Don v Lippmann* (1837) 5 Cl & Fin 1 was an action brought in

13

**[2007] 2 AC**                                 **Harding v Wealands (HL(E))**
                                                **Lord Hoffmann**

A  Scotland in 1829 on two French bills of exchange accepted in 1810. The
   House of Lords held the defendant entitled to rely on the Scottish six-year
   period of prescription because, as Lord Brougham said, at p 13: "whatever
   relates to the remedy to be enforced, must be determined by the lex fori, the
   law of the country to the tribunals of which appeal is made."

       22  Lord Brougham in turn referred to *De la Vega v Vianna* (1830)
B  1 B & Ad 284 in which the plaintiff, a Spaniard, had the defendant, a
   Portuguese, arrested in England for non-payment of a debt contracted
   in Portugal. The defendant claimed to be released on the ground that in
   Portugal imprisonment for debt had been abolished in 1774.   Lord
   Tenterden CJ, at p 288, was unmoved:

       "A person suing in this country must take the law as he finds it; he
C      cannot, by virtue of any regulation in his own country, enjoy greater
       advantages than other suitors here, and he ought not therefore to be
       deprived of any superior advantage which the law of this country may
       confer. He is to have the same rights which all the subjects of this
       kingdom are entitled to."

       23  An even earlier case touching upon the same distinction between the
D  cause of action and the remedy is *Robinson v Bland* (1760) 2 Burr 1077, an
   action upon a bill of exchange given in Paris in payment of gaming debts. By
   English law the debt was unenforceable but the plaintiff alleged that in
   France the debt could be enforced in a Court of Honour. Wilmot J said,
   at p 1084: ". . . I cannot help thinking, that where a person appeals to the
   law of England, he must take his remedy according to the law of England, to
E  which he has appealed."

       24  In applying this distinction to actions in tort, the courts have
   distinguished between the kind of *damage* which constitutes an actionable
   injury and the assessment of compensation (i e *damages*) for the injury which
   has been held to be actionable. The identification of actionable damage is an
   integral part of the rules which determine liability. As I have previously had
   occasion to say, it makes no sense simply to say that someone is liable in tort.
F  He must be liable *for* something and the rules which determine what he is
   liable for are inseparable from the rules which determine the conduct which
   gives rise to liability. Thus the rules which exclude damage from the scope of
   liability on the grounds that it does not fall within the ambit of the liability
   rule or does not have the prescribed causal connection with the wrongful act,
   or which require that the damage should have been reasonably foreseeable,
G  are all rules which determine whether there is liability for the damage in
   question.   On the other hand, whether the claimant is awarded money
   damages (and if so, how much) or, for example, restitution in kind, is a
   question of remedy.

       25  This was the distinction made by the House of Lords in *Boys v
   Chaplin* [1971] AC 356, in which the plaintiff had been injured in a traffic
   accident in Malta. By the law of Malta, non-economic damage (pain and
H  suffering, loss of amenity) was not actionable. Only financial loss was
   compensatable. The plaintiff brought proceedings in England and one of the
   questions raised by the appeal was whether the rule excluding liability for
   non-economic damage was part of the substantive law of Malta or
   concerned only the remedies which a Maltese court could provide.

14
**Harding v Wealands (HL(E))**                                                    [2007] 2 AC
**Lord Hoffmann**

26   Lord Hodson, Lord Wilberforce and Lord Pearson agreed that the    *A*
rule was part of the substantive law of tort liability. In Malta, causing non-
economic damage was not an injuria; not an actionable wrong.   Lord
Hodson said, at p 379:

"questions such as whether loss of earning capacity or pain and
suffering are admissible heads of damage must be questions of substantive
law.   The law relating to damages is partly procedural and partly    *B*
substantive, the actual quantification under the relevant heads being
procedural only."

27   Lord Wilberforce said, at p 389:

"The broad principle should surely be that a person should not be
permitted to claim in England in respect of a matter for which civil
liability does not exist, or is excluded, under the law of the place where    *C*
the wrong was committed.  This non-existence of exclusion may be for a
variety of reasons and it would be unwise to attempt a generalisation
relevant to the variety of possible wrongs. But in relation to claims for
personal injuries one may say that provisions of the lex delicti, denying,
or limiting, or qualifying recovery of damages because of some
relationship of the defendant to the plaintiff, or in respect of some interest    *D*
of the plaintiff (such as loss of consortium) or some head of damage (such
as pain and suffering) should be given effect to."

28   Lord Pearson said, at p 394:

"If the difference between the English law and the Maltese law could
be regarded only as a difference of procedural (or adjectival or non-
substantive) law, there would be an easy solution of the problem in this    *E*
appeal.  On that basis the nature and extent of the remedy would be
matters of procedural law regulated by the lex fori, which is English, and
the proper remedy for the plaintiff in this case according to English
law would be that he should recover damages for all the relevant
consequences of the accident, including pain and suffering as well as
pecuniary expense and loss . . . But I am not convinced that the difference    *F*
between the English law and the Maltese law can reasonably be regarded
as only a difference of procedural law.  There is a radical difference in the
cause of action, the right of action, the jus actionis. A claim to be
reimbursed or indemnified or compensated for actual economic loss is
substantially different in character from a claim for damages for all the
relevant consequences of the accident to the plaintiff, including pain and    *G*
suffering.  If an accident caused no economic loss, but only pain and
suffering, there would be a cause of action according to English law, but
not according to Maltese law. Surely that must be a matter of substantive
law."

29   On the other hand, Lord Guest said, at p 382, that

"It would not be correct, in my view, to talk of compensation for pain    *H*
and suffering as a head of damage apart from patrimonial loss.  It is
merely an element in the quantification of the total compensation"

and Lord Donovan said, at p 383, that once the claim was actionable in an
English court, "it was right that it should award its own remedies".

15
**[2007] 2 AC**                                        **Harding v Wealands (HL(E))**
                                                       **Lord Hoffmann**

A    30   Thus the majority held that the Maltese law denying liability for
     non-economic damage was substantive law to be governed by the lex causae
     while the minority thought that it was a matter of remedy to be governed by
     the lex fori. All of them agreed that the quantification of the damages to be
     awarded for actionable heads of damage was a question of remedy or
     procedure.

B    31   The next question is whether this distinction between questions of
     liability and questions of remedy or procedure was affected by Part III.
     Section 10 abolishes the *Phillips v Eyre* LR 6 QB 1 requirement of double
     actionability "for the purpose of determining whether a tort or delict is
     actionable" and the common law exceptions to that rule created by cases like
     *Boys v Chaplin* [1971] AC 356 and *Red Sea Insurance Co Ltd v Bouygues SA*
     [1995] 1 AC 190. Section 11 substitutes a "general rule" that the applicable
C    law is the "law of the country in which the events constituting the tort or
     delict in question occur". Section 12 provides for displacement of the
     general rule in certain cases in which it is "substantially more appropriate"
     for the applicable law to be different. This was the provision applied by
     Elias J on his alternative hypothesis that the MACA restrictions were
     substantive. But section 14 provides:

D         "(2) Nothing in this Part affects any rules of law (including rules of
     private international law) except those abolished by section 10 above.
          "(3) Without prejudice to the generality of subsection (2) above,
     nothing in this Part . . . (b) affects any rules of evidence, pleading or
     practice or authorises questions of procedure in any proceedings to be
     determined otherwise than in accordance with the law of the forum."

E    32   It will be noticed that whereas the older cases spoke of questions of
     "remedy" being governed by the lex fori and Willes J in *Phillips v Eyre*
     LR 6 QB 1, 29 spoke of "remedy or procedure", section 14(3)(b) refers only
     to "procedure". Does that mean that the old rule that *remedies* were a
     matter for the lex fori was to be abolished and the rule preserved only so far
     as it related to questions which could strictly speaking be regarded as
F    *procedure*? In my opinion this would be absurd. In this context, the terms
     "remedy" and "procedure" had been regularly used interchangeably. Thus
     in *Boys v Chaplin* [1971] AC 356, 378 Lord Hodson said: "the nature of a
     plaintiff's remedy is a matter of procedure to be determined by the lex fori.
     This includes the quantification of damages." Lord Guest, at p 381, posed
     the question as:

G         "Assuming that the conduct was actionable in Malta, what law is to be
     applied to the ascertainment of the damages? Is it to be the substantive
     law, the law of Malta, or is to be the procedural law which is the lex fori?"

     33   Furthermore, section 14(3) is expressed to be without prejudice to
     the generality of section 14(2), which says that nothing in Part III is to affect
     any rules of law except those abolished by section 10. Section 10 is
     concerned with the rules which determine "whether a tort . . . is actionable"
H    and not with the rules concerning the remedies available for actionable
     injury.

     34   The conclusion that the amount of damages for an injury actionable
     by the lex causae must be determined according to the lex fori was to be left
     untouched is confirmed by the Report of the Law Commission and the

16
**Harding v Wealands (HL(E))**                                                      **[2007] 2 AC**
**Lord Hoffmann**

Scottish Law Commission (Private International Law: Choice of Law in Tort    A
and Delict (Law Com No 193, Scot Law Com No 129)), published in 1990,
on which Part III was based. Paragraph 3.38 dealt with damages:

"The consultation paper [Law Commission Working Paper No 87 and
Scottish Law Commission Consultative Memorandum No 62, which had
been published in 1984] provisionally recommended that there should be
no change in the present law on the question of damages, which we    B
confirm. Accordingly, the applicable law in tort or delict determines the
question of the availability of particular heads of damages whereas the
measure or quantification of damages under those heads is governed by
the lex fori."

35  There are several statements in the consultation paper to the same
effect, which it is unnecessary to cite.    C

36  Mr Haddon-Cave, who appeared for the claimant, said that if the
House thought that the language of section 14(2)(3) was ambiguous or
obscure, it should resolve the ambiguity by reference to a statement made in
Parliament by the Lord Chancellor during the passage of the Bill. For my
part, I do not think that there is any ambiguity or obscurity. Of course,
taken out of context, the word "procedure" is ambiguous. In its narrow and    D
perhaps most usual sense it means, as La Forest J expressed it in *Tolofson v
Jensen* [1994] 3 SCR 1022, 1072 those rules which "make the machinery of
the forum court run smoothly as distinguished from those determinative of
the rights of *both* parties". Or it can have a wider meaning which embraces
what Mason CJ in *Stevens v Head* (1993) 176 CLR 433, 445 called "the
traditional equation drawn between matters relating to a remedy and
matters of procedure". This is the sense it which the term has always been    E
used in English private international law. If section 14 is read in its context,
against the background of the existing rules of common law and the report
of the Law Commission, there can be no doubt that the latter meaning was
intended. For my part, therefore, I see no need for Mr Haddon-Cave to
resort to Hansard.

37  If, however, there had been any ambiguity which needed to be    F
resolved, I am bound to say that this is as clear a case within the principle
stated in *Pepper v Hart* [1993] AC 593 as anyone could hope to find. At the
Report stage in the House of Lords, Lord Howie of Troon put down an
amendment to add a further paragraph to what is now section 14(3), so that
it would read: "[nothing in this Part] (d) authorises any court of the forum to
award damages other than in accordance with the law of the forum." Lord
Howie declared an interest on behalf of Cape Industries plc, which had a few    G
years earlier been sued in Texas for asbestos-related injuries (see *Adams v
Cape Industries plc* [1990] Ch 433) and was anxious that Part III should not
import American scales of compensation into English courts. In the debate
on 27 March 1995 Lord Mackay of Clashfern LC made what was obviously
a carefully prepared statement:

"With regard to damages, issues relating to the quantum or measure of    H
damages are at present and will continue under Part III to be governed by
the law of the forum; in other words, by the law of one of the three
jurisdictions in the United Kingdom. Issues of this kind are regarded as
procedural and, as such, are covered by clause 14(3)(b). It follows from

17

A   this that the kind of awards to which the noble Lord referred of damages
made in certain states, in particular in parts of the United States, will not
become a feature of our legal system by virtue of Part III. Our courts will
continue to apply our own rules on quantum of damages even in the
context of a tort case where the court decides that the 'applicable law'
should be some foreign system of law so far as concerns the merits of the
claim. Some aspects of the law of damages are not regarded as procedural
B   and, in accordance with the views of the Law Commissions in their report
on the subject, Part III does not alter this. These aspects concern so-called
'heads of damages'—the basic matter which is being compensated for—
such as special damage relating to direct financial loss.   Whether a
particular legal system permits such a head of damage is not regarded as
procedural but substantive and therefore not automatically subject to the
C   law of the forum. This seems right given the intimate connection between
such a concept and the particular nature of the case in issue. But again,
I foresee no significant increase in awards of damages because a particular
head of damage permitted by some foreign system of law would continue,
so far as the quantum allocated to it in any finding is concerned, to be
regulated by our own domestic law of damages. I hope the noble Lord
D   will feel reassured . . ."

38   Lord Howie declared himself reassured and did not move his
amendment.   The Lord Chancellor's statement clearly satisfied the
requirements of being (a) clear and (b) made by the minister promoting the
bill: see Hansard (HL Debates) 27 March 1995, cols 1421–1422.

39   My Lords, the next question is whether the provisions of MACA to
E   which I have referred should be characterised as relating to the actionability
of the economic and non-economic damage suffered by Mr Harding or to
the remedies which the courts of New South Wales provide for such damage.
On this point we could not have better authority than that of the High Court
of Australia in *Stevens v Head* 176 CLR 433.   The majority (Brennan,
Dawson, Toohey and McHugh JJ) analysed the equivalent damages-
limitation provisions of the Motor Accidents Act 1988, at pp 454–460, and
F   concluded that they were concerned with quantification rather than heads of
damage. Although MACA is more restrictive of the court's power to award
damages than the 1988 Act, the character of the relevant provisions is in my
opinion the same. Thus, at p 459, the majority said of section 79(3) of the
1988 Act, which provided that the maximum amount ("only in a most
extreme case") which might be awarded for non-economic loss was
G   AUS\$180,000:

"[It] is plainly a provision which affects the measure of damages but
does not touch the heads of liability in respect of which damages might be
awarded.   It is simply a law relating to the quantification of damages and
that, as we have seen, is a matter governed solely by the lex fori."

40   These extracts are from the opinion of the majority.   But there is
H   nothing in the dissenting judgments by Mason CJ and Deane and
Gaudron JJ to suggest that, if they had accepted that the court should apply
the traditional distinction between actionability and remedy, including
quantification of damages, they would have disagreed with the way the
majority characterised the provisions of the 1988 Act. It was the traditional

distinction itself which the minority rejected. Thus Mason CJ, at p 445,  *A*
proposed that the court should adopt:

"a new criterion for the substance-procedure distinction which . . . characterise[s] as procedural 'those rules which are directed to governing or regulating the mode or conduct of court proceedings'. All other provisions or rules are to be classified as substantive."

*B*

41  Deane J likewise said, at p 462, that the lex fori should be applied "only to the extent that it was procedural in the narrow sense of being directed to regulating court proceedings in that state" and Gaudron J adopted the same test: see pp 469–470.

42  In principle, therefore, I think that the relevant provisions of MACA should be characterised as procedural and therefore inapplicable by an English court. But Mr Palmer, who appeared for the defendant, submitted that in English private international law a limit or "cap" on the damages recoverable is regarded as substantive. There is, it is true, some authority for this proposition. *Dicey's Conflict of Laws*, 7th ed (1958), edited by Dr JHC Morris, contained the statement, at p 1092, "statutory provisions limiting a defendant's liability are prima facie substantive; but the true construction of the statute may negative this view" with a footnote: "This is suggested by two dicta in *Cope v Doherty* (1858) 4 K & J 367, 384–385 and (1858) 2 De G & J 614, 626."

*C*

*D*

43  *Cope v Doherty* concerned an application by the owners of an American ship which had collided with and sunk another American ship to limit its liability pursuant to section 504 of the Merchant Shipping Act 1854 (17 & 18 Vict c 104). Page Wood V-C held that the section did not apply to collisions between foreigners. The owners argued that the limitation rule was procedural and should therefore be applied as part of the lex fori. I should have thought that the short answer was that whether the rule was substantive or procedural, Parliament had said that it should not apply to foreigners and that was the end of the matter. But Page Wood V-C dealt with the argument on its own terms, 4 K & J 367, 384–385:

*E*

"clearly an Act, which limits the damage to which the ship owner is to be liable under circumstances like the present, deals with the substance and not the form of the procedure. It in effect forms a contract, that, whereas by the natural law, the owner of the ship or property that has been injured would be entitled to damages to the full extent of the loss he has sustained, all those persons upon whom the legislature can impose such a contract, that is to say, all its own subjects, shall forego that which the natural law—the common law, as we should call it in England— would give them, and shall be entitled only to the amount of the value of the ship by which the injury has been inflicted, and of the freight due or to grow due in respect of such ship during the voyage."

*F*

*G*

44  Thus his reasoning was that the statute operates as if it imposed a contractual term limiting the damages recoverable. In fact, one of the reasons why the Page Wood V-C held that the statute did not apply to foreigners was that he thought that, as a matter of international law, the United Kingdom could only impose such a deemed contract upon British ships. Such a term in a contract would clearly be a modification of the

*H*

A   substantive obligations of the parties. As Lord Diplock said in *Photo Production Ltd v Securicor Transport Ltd* [1980] AC 827, 849:

"The contract . . . is just as much the source of secondary obligations as it is of primary obligations; and like primary obligations that are implied by law, secondary obligations too can be modified by agreement between the parties."

B   **45** When *Cope v Doherty* went to the Court of Appeal, Turner LJ dealt with the point very briefly 2 De G & J 614, 626:

"An attempt was made on the part of the appellants to bring this case within *Don v Lippman* and cases of that class, but I think those cases have no bearing upon the point. This is a question of liability, and not of procedure."

C   **46** In my opinion the proposition in *Dicey* was too widely stated. *Cope v Doherty* is authority for the proposition that a contractual term which limits the obligation to pay damages for a breach of contract or a tort, or a statutory provision which is deemed to operate as such a term, qualifies the substantive obligation. It is not part of the rules of the lex fori for the assessment of damages. I therefore agree with the opinion of Street CJ in D  *Allan J Panozza & Co Pty Ltd v Allied Interstate (Qld) Pty Ltd* [1976] 2 NSWLR 192, 196–197 that a statutory limitation on damages deemed to be incorporated into a contract of carriage is "an express limitation upon the substantive liabilities". But, as the majority said in *Stevens v Head* 176 CLR 433, 458:

E   "Where the sources of the rights and obligations of contracting parties are in part the express terms of the contract and in part the provisions of its proper law, the courts of the forum are constrained to ascertain the parties' rights and obligations from those sources, not from the lex fori. In our respectful opinion, there is no valid analogy between the rules for determining the contractual rights and obligations arising in part from the proper law of the contract and the conflict of law rules governing the F   assessment of damages in respect of extraterritorial torts."

  **47** The Merchant Shipping Act Amendment Act 1862 (25 & 26 Vict c 63) extended the right to limit liability to all ships of whatever nation and thereafter it became impossible to regard such a provision as equivalent to a contractual term imposed upon British subjects. In my opinion, therefore, Clarke J was right in *Caltex Singapore Pte Ltd v BP Shipping Ltd* [1996] G  1 Lloyd's Rep 286 to treat a modern limitation statute (in that case, of Singapore) as a procedural provision, limiting the remedy rather than the substantive right: see also *Seismic Shipping Inc v Total E&P UK plc (The Western Regent)* [2005] 2 Lloyd's Rep 359, 370.

  **48** There is accordingly in my opinion no English authority to cast any doubt upon the conclusion of the Australian High Court in *Stevens v Head* 176 CLR 433 that, for the purposes of the traditional distinction between H   substance and procedure which treats remedy as a matter of procedure, all the provisions of MACA, including limitations on quantum, should be characterised as procedural. This was also the view of the Court of Appeal in *Roerig v Valiant Trawlers Ltd* [2002] 1 WLR 2304. In *John Pfeiffer Pty Ltd v Rogerson* (2000) 203 CLR 503, however, the High Court reversed

itself, abandoned the traditional rule (at least for torts committed in   *A*
Australia) and confined the role of the leges fori of the Australian states to
procedure in the narrow sense of rules "governing or regulating the mode or
conduct of court proceedings": see pp 543–544. This change was said to be
required by constitutional imperatives of Australian federalism. In a later
decision (*Regie Nationale des Usines Renault SA v Zhang* (2002) 210
CLR 491, 520, para 76) the court left open the question of whether it would   *B*
apply to foreign torts. But the decision in the *Pfeiffer* case 203 CLR 503
clearly influenced the judgments of the majority in the Court of Appeal in
this case, to which I must now turn.

49   Arden LJ said, at p 1559, para 52 that "the meaning of substance
and procedure for the purposes of section 14 of the 1995 Act must be
sought in the context of the 1995 Act". That, if I may respectfully say so,
seems to me plainly right. But then, instead of putting the 1995 Act into the   *C*
context of the previous common law and the proposals of the Law
Commission, she approached the matter in a more abstract way, saying that
a reference to the law of the forum must be "justified by some imperative
which, relative to the imperative of applying the proper law, has priority".
Such a reason, she suggested, might be the inability of the English court to
"put itself into the shoes of the foreign court" and adopt some procedure
which was not available in this country. But otherwise, she thought that the   *D*
principle adopted in the *Pfeiffer* case should be applied and restrictions on
the right to recover damages in the foreign law should not be regarded as
procedural.

50   Arden LJ may have been influenced in her approach to the
construction of section 14(3)(b) by her view, expressed earlier in her
judgment, at p 1559, para 51, that what she called "the damages principle",   *E*
i e the rule that the assessment of damages is governed by the lex fori, was
"one of uncertain meaning and application". So she felt that she was entitled
to start on the basis that section 14(3)(b) was, so to speak, written on a clean
sheet of paper. Of course there were peripheral uncertainties and differences
of opinion. We have seen that in *Boys v Chaplin* [1971] AC 356 Lord Guest
and Lord Donovan were willing to give the concept of procedure wider
application than the majority, although, if I may say so with respect, the   *F*
majority were in my opinion plainly right. There was also some uncertainty,
largely generated by *Dicey's* interpretation of *Cope v Doherty* 4 K & J 367;
2 De G & J 614, about whether a statutory limitation on damages could be
construed as substantive. I could add other possible uncertainties which
have not yet come before the courts. For example, there may be rules of
foreign or domestic law, under which a tort or other wrongful act gives rise   *G*
to a liability to pay a conventional sum of money, which make it impossible
to separate the concept of actionable damage from the concept of a remedy
for that damage. It might be more realistic to say that the rule simply lays
down the conditions under which the claimant is entitled to payment of a
prescribed sum of money. But I do not propose to explore this or other
hypothetical cases because they do not arise in this case and, so far as I know,
have not arisen in the past.   *H*

51   There can however be no doubt about the general rule, stated by
Lord Mackay in the House of Lords debate, that "issues relating to the
quantum or measure of damages" are governed by the lex fori. And this was
the rule which Parliament intended to preserve. Even if there appeared to be

A   more logic in the principle in *Pfeiffer's* case (and *Dicey & Morris*, 13th ed (2000), p 172, supports Arden LJ on this point) the question is not what the law should be but what Parliament thought it was in 1995. As Lord Lloyd of Berwick said of a provision in the Limitation Act 1980 in *Lowsley v Forbes (trading as L E Design Services)* [1999] 1 AC 329, 342:

B   "It is Parliament's understanding of the existing law when enacting the Limitation Amendment Act 1980 that matters, not what the law is subsequently shown to have been. As Lord Simon of Glaisdale said in *Black-Clawson International Ltd v Papierwerke Waldhof-Aschaffenburg AG* [1975] AC 591, 648: 'Once it is accepted that the purpose of ascertainment of the antecedent defect in the law is to interpret Parliament's intention, it must follow that it is Parliament's understanding of that law as evincing such a defect which is relevant, not what the law is subsequently declared to be.' If common error can make the law, so can parliamentary error."

C

52   Sir William Aldous likewise said [2005] 1 WLR 1539, 1566, para 86 that the term "procedure" in section 14(3)(b) "should be given its natural meaning". He placed considerable reliance upon *John Pfeiffer Pty Ltd v Rogerson* 203 CLR 503, despite the express statements in that case that it was, for Australian reasons, departing from traditional principles of English law. Such a construction was, he said, supported by *Dicey & Morris*, which is true, and by the Law Commission's Report, which in my opinion is not true. The only passage in the Commission's Report which may be said to support the conclusion reached by Sir William Aldous (although not his reasoning) is para 3.39, which reproduces *Dicey's* comment that "a statutory ceiling on damages" is a question of substance. But the Law Commission appears to have thought this proposition could be reconciled with its statement in the previous paragraph (3.38) which I have already quoted. In my opinion, that paragraph is consistent neither with the narrow construction of "procedure" adopted by Sir William Aldous nor with a characterisation of limits on damages as not being procedural in the broader sense.

D

E

F   53   In my opinion, therefore, Elias J was right to treat the MACA restrictions as entirely inapplicable. In the circumstances it is unnecessary to decide whether, if they had been properly characterised as substantive, it was open to the Court of Appeal to reverse his judgment that it was substantially more appropriate to apply English law. The hypothesis necessary to raise this question is in my view somewhat artificial, because most of the reasons why it may be more appropriate to apply English law are the reasons why the assessment of damages is traditionally characterised as a matter for the lex fori. I would therefore prefer not to express a view on this question. In my opinion the appeal should be allowed and the judgment of Elias J restored.

G

**LORD RODGER OF EARLSFERRY**

H   54   My Lords, in January 2002 the claimant and the defendant were living together in London. The defendant, who is Australian, travelled to New South Wales to attend a family wedding. A fortnight later the claimant flew out to join her. On 3 February near Huskisson, New South Wales, the claimant was a passenger in a car driven by the defendant when it was

involved in an accident. As a result of the accident the claimant was       A
rendered tetraplegic. He subsequently commenced the present action for
damages for his injuries against the defendant who was living in England at
the time. She admits liability. The claimant contends that the English court
should assess the damages according to English law, while the defendant
contends that the assessment of damages is regulated by the law of New
South Wales which limits the amounts which can be recovered.                 B

55   Until comparatively recently, any private international law questions
in a case like the present would have been decided according to the common
law. A person who had suffered damage abroad and who wished to bring
proceedings to recover compensation for that damage in the English courts
had to show that his claim, or any particular head of claim, relating to the
damage was actionable both under English law, the lex fori, and under the
law of the country where the injury had been sustained, the lex loci delicti:   C
*Phillips v Eyre* (1870) LR 6 QB 1. In *Machado v Fontes* [1897] 2 QB
231, the Court of Appeal had relaxed the rule to a certain extent by holding
that it was sufficient if the act was wrongful in the country where it was
committed, even though any damage would not have been actionable in civil
proceedings there. In *Boys v Chaplin* [1971] AC 356 this House overruled
*Machado v Fontes* [1897] 2 QB 231 and declared that, in general, the       D
damage or head of damage had indeed to be actionable under the lex loci
delicti as well as under English law. Provided that the claim passed this test,
the foreign law then fell out of the picture and the defendant's liability for
the damage or head of damage was determined in accordance with English
law: [1971] AC 356, 385B–386A, per Lord Wilberforce. The remedy to
make good the plaintiff's damage was, however, a matter for the law of the
forum. So, in assessing and awarding damages, an English court would       E
apply English law.

56   When this House restored the double actionability rule to its full
rigour in *Boys v Chaplin*, there was a somewhat increased risk that the test
would exclude certain claims which it would actually be just to admit.
Recognising this, the House held that, in appropriate cases, a claim or head
of claim could proceed even though it was not actionable under the lex loci
delicti.   The flexible test for recognising these situations which Lord       F
Wilberforce formulated came to win acceptance. In *Red Sea Insurance Co
Ltd v Bouygues SA* [1995] 1 AC 190, the Privy Council held, conversely,
that, where justice required in particular circumstances, an action could
proceed in the courts of the forum on the basis of the lex loci delicti, even
though the damage or head of damage would not be actionable under the lex
fori.                                                                         G

57   In the eyes of their supporters, in this version the common law rules
for determining whether damage or a head of damage was actionable in an
English court displayed a welcome pragmatic flexibility; to their critics, the
rules were too uncertain to provide sure guidance for practitioners. In 1990
in a joint report, Private International Law: Choice of Law in Tort and
Delict, the English and Scottish Law Commissions sided with the critics and
recommended that the common law rules for determining actionability       H
should be replaced by a statutory scheme. The commissions confirmed,
however, at para 3.38, that "the measure or quantification of damages . . .
[should be] governed by the lex fori". In due course Parliament enacted the
Private International Law (Miscellaneous Provisions) Act 1995, Part III of

A  which makes provision for new choice of law rules in tort and, for Scotland, in delict.

58  The first step which Parliament had to take was to abolish the pre-existing common law rules of double actionability which were perceived to be causing the problem. Except for defamation claims, where the common law is preserved by section 13, Parliament abolished these rules in section 10.

B  Indeed Part III affects these rules and no others. This is stated expressly in section 14(2): "Nothing in this Part affects any rules of law (including rules of private international law) except those abolished by section 10 above." This provision serves to delimit the scope of the enactment in Part III and means that there is no room for arguing that the abolition of the rules covered by section 10 must have impliedly effected a change in some other rule of law. More particularly, it immediately suggests that Part III does not

C  affect the assessment of damages since that matter was never governed by the double actionability rules which were abolished by section 10. If that is so, the assessment of damages must continue to be governed by the lex fori.

59  The abolition of the common law rules was just the first step in the reform. The next step was to replace them with new rules. That is what Part III is designed to do. As section 9(1) explains, the rules in Part III are to apply for choosing the law ("the applicable law") to be used for determining

D  "issues relating to tort or (for the purposes of the law of Scotland) delict". So Part III does three things. First, it provides that the English court is to use a particular law (the applicable law) to determine whether an actionable tort has occurred: section 9(4). In effect, this replaces the double actionability test. But, secondly, section 9(4), read along with subsection (1), goes on to provide that the applicable law is to be used to determine other "issues

E  relating to tort". Finally, sections 11 and 12 provide the rules by which the applicable law, which is to be used to determine these issues, is to be chosen. Under section 12 the English court can separate out various issues relating to the tort and, where appropriate, a different law is to be used to determine different issues (dépeçage).

60  Where matters are in dispute, the first step will be for the court to use the rules in sections 11 and 12 to decide what the applicable law is. Rather

F  as, under *Boys v Chaplin* [1971] AC 356, there was a general rule of double actionability which could be disapplied in certain circumstances, so too section 11 gives the general rule for choosing the applicable law, while section 12 provides for that general rule to be displaced where it would be substantially more appropriate for the law of another country to apply. Once the court has chosen the applicable law or laws in accordance with

G  these sections, the judge will use the chosen system or systems to determine whether an actionable tort has occurred and any other issue "relating to [the] tort" which arises. Parliament has not defined "issues relating to tort", but it has at least indicated certain matters which do not fall within that category. These are to be found in section 14(3) which provides, inter alia:

"Without prejudice to the generality of subsection (2) above, nothing
H  in this Part . . . (b) affects any rules of evidence, pleading or practice or authorises questions of procedure in any proceedings to be determined otherwise than in accordance with the law of the forum."

This provision reinforces section 14(2) by spelling out three types of rule which Part III is not to affect and one approach which it is not to authorise.

24
**Harding v Wealands (HL(E))**                                                    [2007] 2 AC
**Lord Rodger of Earlsferry**

It is not to affect any rules of evidence, pleading or practice and it is not to    A
authorise a court to determine "questions of procedure in any proceedings"
otherwise than in accordance with its own law. So, while Part III
authorises—indeed requires—an English court to use the applicable law to
determine "issues relating to tort", it does not authorise the court to use
anything other than English law to determine any "questions of procedure"
which arise in the proceedings.                                                    B

61    Here the defendant argues that under sections 11 and 12 the
applicable law relating to the issue of the assessment of damages is the law of
New South Wales. So the claimant is not entitled to recover any more by
way of damages for his personal injuries than he would be entitled to recover
under the Motor Accidents Compensation Act 1999 ("MACA") of New
South Wales. For his part, the claimant says that questions relating to the
assessment of damages are "questions of procedure" and so, in accordance    C
with section 14(3)(b), the English court must determine them by using
English law. By a majority (Arden LJ and Sir William Aldous, Waller LJ
dissenting), the Court of Appeal upheld the defendant's contention that the
MACA rules should be applied to the assessment of damages. The result is
that the maximum which the claimant could recover by way of damages for
his injuries is substantially less than he would be able to recover if the judge    D
had to apply English law.

62    The critical question concerns the interpretation of the expression
"questions of procedure" in section 14(3)(b). In the Court of Appeal [2005]
1 WLR 1539, 1559, para 52 Arden LJ explained how, in her view, the
English court should approach it:

"In the context of section 14, a principled approach requires the court    E
to start from the position that it has already decided that the proper law of
the tort is not the law of the forum, i e that some other law applies to the
tort, either because it is the lex loci delicti or because it is substantially
more appropriate than the lex loci delicti. On this basis, a reference to the
law of the forum must be the exception, and it must be justified by some
imperative which, relative to the imperative of applying the proper law,
has priority."                                                                     F

Later, Arden LJ [2005] 1 WLR 1539, 1563, para 66, held that there was "a
guiding principle" that "Once the court has decided that the law of New
South Wales is the proper law of the tort, it is logical, so far as possible, to
apply the law of New South Wales throughout". Adopting this approach,
she considered, at p 1562, para 61, that the context of section 14 suggested
that "the approach of Mason CJ in *McKain v R W Miller & Co (South*    G
*Australia) Pty Ltd* (1991) 174 CLR 1 that procedure covers matters as to the
mode and conduct of trial is the basic approach of section 14". On that basis
the assessment of damages was not a question of procedure and so was,
presumably, to be included among the "issues in the claim" which section
9(4) directs the court to determine by using the applicable law.

63    In my respectful view Arden LJ was wrong to see section 9(4) as    H
containing a guiding principle and section 14(3)(b) as containing an
exception which the court can invoke only where there is some overriding
imperative for doing so.

64    In Part III Parliament did not enact a comprehensive scheme and a
number of exceptions. It simply provided that the law chosen in accordance

A   with sections 11 and 12 is to be used to determine certain issues, while the
    law of the forum is to continue to be used to determine others. The matters
    where the United Kingdom courts are to continue to use the law of the forum
    are spelled out in section 14(3). In particular, Parliament has decided not to
    authorise an English court to use anything other than English law to
    determine "questions of procedure". This policy may be criticised as being
B   liable to encourage forum shopping or on some other ground, but it is the
    policy of the legislature and, as such, it is entitled to exactly the same weight
    and respect as the policy in section 9(4) that certain other issues are to be
    determined by the law chosen in accordance with sections 11 and 12. There
    is accordingly no reason to regard the rule requiring an English court to use
    English law to determine questions of procedure as "the exception", for
    which some overriding imperative must be found. On the contrary, the
C   words of section 14(3)(b) should be interpreted and applied in a
    straightforward fashion, giving them the meaning which is appropriate in
    the context in which they occur.

        65   So, does the expression "questions of procedure" in section 14(3)(b)
    include questions relating to the assessment of damages? Like Arden LJ, Sir
    William Aldous adopted a restrictive interpretation of those words: for him,
D   at p 1566, para 86, "the word 'procedure' in the 1995 Act should be given its
    natural meaning namely, the mode or rules used to govern and regulate the
    conduct of the court's proceedings". In many contexts something like that
    might well be regarded as the appropriate meaning and it might very well
    not include the assessment of damages. But here the expression "questions
    of procedure" is being used within Part III of a statute on private
    international law. So it is a fair assumption that Parliament meant the
E   expression to be understood in the way that it would be understood in the
    field of private international law. In fact, the scheme of Part III would not
    work on any other basis. In a case like the present, the English court has to
    decide whether to characterise the relevant aspects of the assessment of
    damages as issues relating to tort, to be governed by the applicable law, or to
    regard them as questions of procedure, to be governed by English law.
F   Given that the characterisation under section 9(2) is "for the purposes of
    private international law", in carrying it out, the court must have regard to
    the general principles of private international law. To be consistent, the
    court must apply the same general approach when considering the other side
    of the question, which involves interpreting and applying section 14(3)(b).

        66   By the time Parliament legislated in 1995, it was generally
    understood that, for the purposes of private international law, some
G   questions relating to damages were substantive while others were
    procedural. Questions relating to the actionability of heads of claim were
    substantive, while questions as to the quantification of damages for
    actionable heads of claim related to the remedy and so were classified as
    procedural. So, for instance, Lord Hodson said in *Boys v Chaplin* [1971]
    AC 356, 379:

H       "I am now, however, persuaded that questions such as whether loss of
        earning capacity or pain and suffering are admissible heads of damage
        must be questions of substantive law. The law relating to damages is
        partly procedural and partly substantive, the actual quantification under
        the relevant heads being procedural only."

Lord Wilberforce, at pp 392–393, was somewhat dismissive of an analysis    *A*
purely in terms of what he called "the accepted distinction between
substance and procedure", but none the less he too envisaged that certain
questions relating to damages were to be classified as "procedure" and so as
a matter for the application of the lex fori. Similarly, Lord Pearson spoke,
at p 394E–F, of "procedural (or adjectival or non-substantive) law" which
would regulate the recovery of damages. In *Mitchell v M'Culloch* 1976    *B*
SC 1, 7, Lord McDonald referred to counsel for the pursuer's argument that
"procedural matters, including the measure of damages are determined
solely by the lex fori". In *Stevens v Head* (1993) 176 CLR 433, 447,
Mason CJ summarised the current thinking:

    "The law relating to damages is partly procedural and partly
substantive. According to the traditional application of the substance-    *C*
procedure distinction, the question whether legislative provisions dealing
with awards of damages are substantive or procedural has been
approached by asking whether the provisions affect the character of the
wrong actionable or go only to the measure of compensation. This
approach is consistent with the equation traditionally drawn between
matters of procedure and matters relating to remedies."

    67 These references, which could be multiplied, demonstrate that    *D*
questions of the quantification or assessment of damages had long been
regarded as "procedural" as opposed to "substantive". I have accordingly no
doubt that when Parliament used the expression "questions of procedure" it
was intended to cover questions relating to the assessment of damages.
Indeed, if that were not so and the assessment of damages were to be
regarded as an issue relating to tort to be determined by reference to the    *E*
applicable law, Parliament would have made a major change in this aspect of
the law—despite the Law Commissions' recommendation that the existing
state of the law should be preserved.

    68 Counsel for the defendant contended, however, that, even if
Parliament had used the expression "questions of procedure" in that way
when it passed the 1995 Act, the common law was not set in stone and an
"updating construction" should be given to section 14(3)(b), to take account    *F*
of developments since 1995. In particular, the High Court of Australia,
which would, in 1995, have accepted that the assessment of damages was
procedural (*Stevens v Head* 176 CLR 433), had now changed direction and
held, in the words of the majority, that "*all* questions about the kinds of
damage, or amount of damages that may be recovered, would . . . be treated
as substantive issues governed by the lex loci delicti": *John Pfeiffer Pty Ltd v*    *G*
*Rogerson* (2000) 203 CLR 503, 544, para 100. In making this change,
members of the court had regard to the view of La Forest J, giving the
opinion of the Supreme Court of Canada in *Tolofson v Jensen* [1994] 3 SCR
1022, 1072, that

    "the purpose of substantive/procedural classification is to determine
which rules will make the machinery of the forum court run smoothly as    *H*
distinguished from those determinative of the rights of *both* parties."

Counsel for the defendant submitted that the expression "questions of
procedure" in section 14(3)(b) should now be interpreted in a way which
took account of this development. In effect, by adopting the High Court's

A  revised classification of questions relating to the assessment of damages as matters of substance, Arden LJ and Sir William Aldous accepted that argument.

69  In my view, however, the argument falls down for a variety of reasons. This is not a case of the kind envisaged by Lord Wilberforce in *Royal College of Nursing of the United Kingdom v Department of Health*
B  *and Social Security* [1981] AC 800, 822, where a new state of affairs, or a fresh set of facts bearing on policy, has come into existence since the 1995 Act was passed and the courts have to consider whether they fall within the parliamentary intention expressed in the words of the enactment. Indeed the decision of the Supreme Court of Canada in *Tolofson v Jensen* [1994] 3 SCR 1022 antedated the 1995 Act—but Parliament did not follow its lead. All that the defendant can point to, therefore, is a change in the way that the
C  High Court of Australia classifies questions about the quantum of damages for purposes of the common law rule in intra-Australian cases. As is plain from the judgments in *John Pfeiffer Pty Ltd v Rogerson* 203 CLR 503, however, their Honours were knowingly altering what had previously been well settled law. Moreover, they were doing so because they felt impelled by what they saw as a requirement of the federal nature of the constitution.
D  A similar consideration influenced the Canadian Supreme Court in *Tolofson v Jensen* [1994] 3 SCR 1022. It remains to be seen whether the High Court will hold that all questions about the kind or amount of damages are to be determined by the lex loci delicti in international cases: *Regie Nationale des Usines Renault SA v Zhang* (2002) 210 CLR 491, 520, para 76. These decisions of the Canadian and Australian courts, which show how the
E  common law can be reshaped, may give ammunition, or food for thought, for critics of the policy adopted by Parliament in the 1995 Act. But they contain nothing which can justify the House in altering what would otherwise be the appropriate interpretation of the statute.

70  The passage which Lord Hoffmann has quoted from the Hansard report of the speech of Lord Mackay of Clashfern LC in reply to the probing amendment in the name of Lord Howie of Troon, confirms the construction
F  which I would, in any event, have placed on the words in section 14(3)(b). But more importantly, perhaps, it shows that Parliament was assured that the provision would prevent damages being awarded by reference to the law and standards of other countries. The particular problem raised by Lord Howie related to the high level of damages in the United States which he was anxious should not be replicated here. But it would be equally unacceptable
G  if, say, United Kingdom courts had to award damages according to a statutory scale which, while adequate in another country because of the relatively low cost of services etc there, would be wholly inadequate in this country, having regard to the cost of the corresponding items here. As Parliament was assured by the Lord Chancellor, section 14(3)(b) guards against such eventualities. The interpretation advocated by the defendant would undermine the basis on which Parliament legislated.

H  71  The defendant relies on the provisions of MACA. So the ultimate question is whether the relevant provisions are to be regarded as procedural or substantive for the purposes of private international law. If they are procedural, they are to be disregarded since questions of procedure are to be regulated by the law of the forum in accordance with section 14(3)(b).

If they are substantive, then they would apply if the law of New South Wales were the applicable law, as the Court of Appeal held, reversing Elias J.

72   Lord Hoffmann has analysed the passage in *Dicey & Morris*, *The Conflict of Laws*, to the effect that "statutory provisions limiting a defendant's liability are prima facie substantive; but the true construction of the statute may negative this view". I respectfully agree with his analysis. In any event, as the passage recognises, in any given case the answer to the question must depend on the construction of the relevant provision in the context of the particular statute. In the present case the defendant relies on various provisions in Chapter 5 of MACA, headed "Award of damages". Many of them derive from equivalent provisions in the Motor Accidents Act 1988. The restrictions on the damages recoverable for non-economic loss under that Act were considered by the High Court of Australia in *Stevens v Head* 176 CLR 433. Applying the customary common law approach in private international law, the High Court classified them as procedural. That decision is not conclusive of any or all of the matters in dispute, but it does provide useful guidance from the highest court in the country.

73   Section 122(1) of MACA explains that Chapter 5 applies to, and in respect of, "an award of damages" relating to death or injury in motor accidents. Section 123 provides that: "A court cannot award damages to a person in respect of a motor accident contrary to this Chapter." While, of course, it may be necessary to look beneath the surface of a statutory provision to ascertain its nature, the legislature is here signalling that the provisions in Chapter 5 are directed to what a New South Wales court can award by way of damages. In other words, prima facie at least, they are concerned, not with the scope of the defendant's liability for the victim's injuries as such, but with the remedy which the courts of New South Wales can give to compensate for those injuries. For purposes of private international law, prima facie they are procedural in nature.

74   Of course, when it enacted MACA the Parliament of New South Wales was not concerned with the categories of private international law. So, not surprisingly, Chapter 5 contains provisions on matters which would traditionally fall on the substantive side of the line for purposes of private international law. This is the case, for example, with mitigation of damages in section 136. The same goes for section 138, on contributory negligence, and section 140, on volenti non fit iniuria.

75   Nevertheless, in Parts 5.2 and 5.3, dealing respectively with damages for economic and non-economic loss, the provisions are formulated in a way that emphasises their nature as directions to the courts of New South Wales. For instance, where the legislature refers to "an award of damages", it is referring to something that can only be made by a court. So, under section 125(2), in "an award of damages" for economic loss, "the court is to disregard" any amount by which the injured person's weekly earnings would have exceeded AUS$2,500, subject to indexation. Under section 127(1), "where an award of damages is to include compensation" for future economic loss, the present value of that future loss "is to be qualified by adopting the prescribed discount rate"—clearly a direction to a judge who is going to include this kind of compensation in an award of damages as to how to go about it. Similarly, under section 134, the maximum amount "that a court may award" for non-economic loss is now AUS$309,000, again subject to indexation.

A    76    Undoubtedly, in practice these and other provisions can be expected
to govern the amounts for which claims are settled outside the courts. But
that does not make them substantive. It merely means that litigants, who
know what the court can and cannot award, will settle their claims
accordingly. More particularly, it does not mean that the provisions are to
be regarded as substantive rather than procedural for purposes of private
B    international law. In that context, the brocard ubi remedium ibi ius would
be an unsafe guiding principle.

77    I would accordingly hold that the provisions of Chapter 5 of
MACA on which the defendant relies relate to the remedy which the courts
of New South Wales can award and are procedural for the purposes of
section 14(3)(b) of the 1995 Act. That being so, they fall to be ignored when
the English court awards damages for the claimant's injuries. I recognise
C    that this means that the defendant's insurers may have to meet a higher claim
for damages than would be the case if the provisions of MACA applied.
I recognise also that making a higher award would conflict with certain of
the overall objects set out in section 5 of MACA. But I do not regard that as
a compelling consideration since, as defendant's counsel was careful to
acknowledge, the impact on the scheme of applying a different scale of
damages in claims litigated in this country is unlikely to be anything other
D    than marginal.

78    For these reasons, as well as for those given by Lord Hoffmann, with
whose speech I am in full agreement, I would allow the appeal and hold that
the quantification of damages is to be determined in accordance with English
law. Since all the issues in dispute relate to the quantification of damages,
it is unnecessary to decide which law would be the applicable law for
E    determining issues relating to tort in accordance with section 9(1)(4) of the
1995 Act.

### LORD CARSWELL

79    My Lords, I have had the advantage of reading in draft the opinions
prepared by my noble and learned friends, Lord Hoffmann and Lord Rodger
of Earlsferry. I fully agree with their reasons and conclusions, with one slight
F    qualification on one aspect of the case, on which I shall add a few words.

80    Your Lordships have found it possible to decide the question of
construction of section 14(3)(b) of the Private International Law
(Miscellaneous Provisions) Act 1995 without recourse to external aids. The
claimant's counsel also relied strongly, however, on the statement made in
the House of Lords on 27 March 1995 by Lord Mackay of Clashfern LC set
G    out in para 37 of Lord Hoffmann's opinion. This was not just an expression
of the Government's intention from a most authoritative source, it was a
reassurance to Lord Howie of Troon that his amendment was not necessary,
since issues relating to the quantum or measure of damages would come
within the ambit of the words "questions of procedure" in section 14(3)(b).
As Lord Hoffmann has said ( para 37), it is as clear a case for the application
of the principle stated in Pepper v Hart [1993] AC 593 as anyone could hope
H    to find. If the officious bystander had volunteered his opinion on the point, it
could have been nothing short of conclusive.

81    Pepper v Hart has been out of judicial favour in recent years (no
doubt largely because there were some instances of its over-use, though there
have been some trenchant and irreconcilable critics), and courts have

constantly striven to avoid resorting to it. I do consider, however, that the      *A*
principle has a place in statutory interpretation. As Lord Nicholls of
Birkenhead remarked in *R (Jackson) v Attorney General* [2006] 1 AC 262,
291–292, para 65, it would be unfortunate if *Pepper v Hart* [1993] AC 593
were now to be sidelined, as there are occasions when ministerial statements
are useful in practice as an interpretative aid, perhaps especially as a
confirmatory aid. I would simply remark myself that it would be wilful
blindness for courts to deprive themselves of its assistance in proper cases.      *B*

82  The conditions for the application of the *Pepper v Hart* principle
have been authoritatively stated in a number of cases and do not require
repetition. It is sufficient to refer to the opinion of Lord Browne-Wilkinson
in *Pepper v Hart* [1993] AC 593, 634–635 and to the several expressions by
Lord Nicholls of Birkenhead in *R v Secretary of State for the Environment,
Transport and the Regions, Ex p Spath Holme Ltd* [2001] 2 AC 349, 396–          *C*
399, *Wilson v First County Trust Ltd (No 2)* [2004] 1 AC 816, 840–841,
paras 56–59 and *R (Jackson) v Attorney General* [2006] 1 AC 262, 291–292,
paras 65–66.

83  I would regard the essential precondition of ambiguity as satisfied in
the present case. I agree with the remarks of Arden LJ in the Court of Appeal
(para 58) that "Damages are not naturally regarded as procedure" and Sir      *D*
William Aldous (para 86) that the natural meaning of "procedure" is "the
mode or rules used to govern and regulate the conduct of the court's
proceedings"; cf La Forest J in *Tolofson v Jensen* [1994] 3 SCR 1022, 1072
on the purpose of the substantive/procedural classification. In the field of
private international law, however, the word bears a special meaning, as
your Lordships have indicated. It is the context which gives it the wider
meaning than that which might be regarded as natural: see para 36 above,      *E*
per Lord Hoffmann. So long as one could be quite satisfied that in using the
words "questions of procedure" in section 14(3)(b) Parliament intended that
special meaning to be adopted, then the interpretation is clear. There are
strong reasons, as your Lordships have set out, for concluding that it did
intend to adopt the special meaning, and it is quite possible to say that no
ambiguity exists. In my opinion there may, however, be said to be sufficient
possible ambiguity to justify resort to the Lord Chancellor's statement in      *F*
Hansard as a confirmatory aid. The other conditions in *Pepper v Hart*
[1993] AC 593 are obviously satisfied. When one does so, the intention of
Parliament is entirely clear and the correctness of the conclusions reached by
your Lordships on the construction of section 14(3)(b) is fully confirmed.

84  I would allow the appeal and restore the judgment of Elias J.

*Appeal allowed.*                                                                *G*
*Order of Elias J restored.*

Solicitors: Stewarts; Kennedys.

B L S

*H*

TAB 13

*Joint Administrators of LB Holdings Intermediate 2 Ltd v*
*Joint Administrators of Lehman Brothers Ltd*
[2017] UKSC 38



<div align="right">

**Easter Term**
**[2017] UKSC 38**
*On appeal from: [2015] EWCA Civ 485*

</div>

# JUDGMENT

**The Joint Administrators of LB Holdings Intermediate 2
Limited (Appellant) *v* The Joint Administrators of
Lehman Brothers International (Europe) and others
(Respondents)**
**The Joint Administrators of Lehman Brothers Limited
(Appellant) *v* Lehman Brothers International (Europe)
(In Administration) and others (Respondents)**
**Lehman Brothers Holdings Inc (Appellant) *v* The Joint
Administrators of Lehman Brothers International
(Europe) and others (Respondents)**

**before**

**Lord Neuberger, President**
**Lord Kerr**
**Lord Clarke**
**Lord Sumption**
**Lord Reed**

# JUDGMENT GIVEN ON

# 17 May 2017

**Heard on 17, 18, 19 and 20 October 2016**

*Appellant (LBHI2 Joint Administrators)*
Robert Miles QC
Louise Hutton
Rosanna Foskett
(Instructed by Dentons UKMEA LLP)

*Respondents (Anthony Victor Lomas and ors)*
William Trower QC
Daniel Bayfield QC
Stephen Robins
(Instructed by Linklaters LLP)

*Appellant (LBL Joint Administrators)*
David Wolfson QC
Nehali Shah
Ruth den Besten
(Instructed by DLA Piper UK LLP)

*Respondent (CVI GVI (LUX) Master Sarl)*
Robin Dicker QC
Richard Fisher
Charlotte Cooke
(Instructed by Freshfields Bruckhaus Deringer LLP)

*Appellant (LBHI)*
Barry Isaacs QC
(Instructed by Weil, Gotshal and Manges (London) LLP)

**LORD NEUBERGER: (with whom Lord Kerr and Lord Reed agree)**

1.      This appeal and cross-appeal raise a number of points of insolvency law, which arise out of the collapse of the Lehman Brothers group of companies ("the Group") in 2008.

**Introductory**

*The basic facts*

2.      The Group's main trading company in Europe was Lehman Brothers International (Europe) ("LBIE"), which is an unlimited company. Its share capital consists of a number of ordinary shares as well as a number of redeemable shares. All these shares, except for one ordinary share, are held by LB Holdings Intermediate 2 Ltd ("LBHI2"), whose sole function was to act as LBIE's immediate holding company. The remaining ordinary share is held by Lehman Brothers Ltd ("LBL"), which was the service company for the Group's operations in the UK, Europe and Middle East.

3.      LBIE and LBL have been in administration since September 2008, and LBHI2 has been in administration since January 2009. The purpose of the administrations of these companies has been the realisation of their respective assets to best advantage, rather than the preservation of the companies as going concerns. Contrary to many people's expectations when LBIE went into administration, it now appears that it is able to repay all its external creditors in full.

4.      Under the provisions of the Insolvency Act 1986 as amended ("the 1986 Act"), an administrator of a company is permitted to make distributions to creditors of the company. Once an administrator gives notice of an intention to make a distribution, the administration is commonly referred to as a distributing administration. Since 2 December 2009, LBIE has been in distributing administration, but LBHI2 and LBL have not been. In November 2012, the joint administrators of LBIE declared and paid a first interim dividend to LBIE's unsecured creditors of 25.2 pence in the pound, totalling some £1.611bn.

5.      Lehman Brothers Holdings, Inc ("LBHI") is the ultimate parent of the Group. In September 2008, it began Chapter 11 bankruptcy proceedings in the

United States Bankruptcy Court, and it emerged from those proceedings in March 2012. LBHI is an indirect creditor of many companies in the Group, and its primary interest relates to LBHI2's assets, including its right to recover subordinated loans made to LBIE and other issues relating to those subordinated loans.

6.    The LBIE administrators received proofs of debt from various unsecured creditors including LBL and LBHI2. LBL's initial proof was for £363m, and LBHI2 submitted a proof for an unsecured claim of around £1.254bn in respect of sums advanced to LBIE under three subordinated debt agreements made in November 2006 (together with a separate unsecured claim of around £38m). The LBL administrators received proofs from LBHI2 in the sum of £257m, and from LBIE for £10.4bn. The proof from LBIE included £10bn, which was the LBIE administrators' estimate of LBL's contingent liability to LBIE as a contributory under section 74 of the 1986 Act. This claim led to LBL seeking leave to amend its proof in LBIE's administration from £363m to £10.934bn. It is also relevant to mention that some of the proofs submitted to LBIE's administrators were in respect of debts denominated in foreign currencies.

7.    In February 2013, the administrators of LBIE, of LBL and of LBHI2 issued proceedings seeking the determination of the court on a number of questions arising out of the administrations. On 14 March 2014, David Richards J delivered a judgment (reported at [2015] Ch 1) dealing with those questions, and he subsequently made consequential declarations, which were set out in paras (i) to (x) of an order. The declarations in paras (i) to (ix) were challenged on appeal or cross-appeal, and the Court of Appeal (Moore-Bick, Lewison and Briggs LJJ) upheld most, but varied some, of them in a decision which is reported at [2016] Ch 50.

8.    The order made by David Richards J is set out in an appendix to the judgment of the Court of Appeal, and the contents of paras (i) to (ix) have now been the subject of argument in this Court. It is sensible to address them in the same order as they were discussed in the judgments in the Court of Appeal. Before turning to the issues, however, it is right to set out the principally relevant legislative provisions. It is also right to pay tribute to the well expressed and illuminating judgments below, which helped to ensure that the arguments were developed in this Court in a disciplined and clear way.

9.    Hereafter, unless the contrary is stated, all references to sections and Schedules are to sections of and Schedules to the 1986 Act, and all references to rules are to those in the Insolvency Rules 1986 (SI 1986/1925) as amended ("the 1986 Rules"). (It is right to add that the 1986 Act was preceded by the Insolvency Act 1985 and the Companies Act 1985 which between them contained the great

majority of the provisions now to be found in the 1986 Act. It was decided to repeal those 1985 statutes and consolidate all insolvency law in the 1986 legislation. For present purposes, the changes effected in 1985 can be elided with those in 1986, and accordingly I shall disregard the 1985 Act when describing the changes to insolvency law effected in the 1980s.)

*The 1986 Act and the 1986 Rules: introductory*

10.    The 1986 Act and the 1986 Rules ("the 1986 legislation") were introduced following the publication of the 1982 *Report of the Review Committee on Insolvency Law and Practice* (Cmnd 8558) (the Cork Report), and a 1984 Government White Paper, *A Revised Framework for Insolvency Law* (Cmnd 9175). Para 1 of the White Paper acknowledged the "thorough analysis" contained in "the Cork Report", which is accurately characterised by Sealy and Milman in their *Annotated Guide to the Insolvency Legislation*, 19th ed (2016), vol 1, p 1, as "[t]he main inspiration for the reforms" contained in the 1986 legislation. Para 2 of the White Paper described the objectives of the proposed new legislation, which included "establish[ing] effective and straightforward procedures for dealing with and settling the affairs of corporate and personal insolvents in the interests of their creditors". In para 3 of the White Paper it was stated that the law of corporate insolvency had "altered very little over the past century", and that there was "an urgent need to reform, update and strengthen the insolvency legislation so that the objectives … set out in para 2 can be met". Para 4 set out six objectives for the proposed changes which became the 1986 Act and the 1986 Rules. The third of those objectives was "To simplify wherever possible corporate and personal insolvency procedures". And the fifth included "the introduction of a new insolvency mechanism, known as the administrator procedure, designed to facilitate the rehabilitation and re-organisation of companies faced by insolvency but where there are reasonable prospects for a return to profitability".

11.    The 1986 legislation consolidated in a single statute and set of rules the legislative provisions regarding both personal insolvency and corporate insolvency. Until then, they had been dealt with in separate legislation - most recently the Bankruptcy Act 1914 ("the 1914 Act") and the Bankruptcy Rules 1952 (SI 1952/2113), which covered personal insolvency, and the Companies Act 1948 ("the 1948 Act") and the Companies (Winding-Up) Rules 1949 (SI 1949/330) ("the 1949 Rules"), which applied to corporate insolvency. Nonetheless, the 1986 legislation contains almost entirely separate regimes for personal insolvency and corporate insolvency. Thus, in the 1986 Act, sections 1 to 251 deal with "company insolvency", sections 251A to 385 with "insolvency of individuals", and the remaining sections, 386 to 444, while applicable to both types of insolvency, are concerned with matters such as insolvency practitioners and subordinate legislation. And this is reflected in the 1986 Rules: Parts 1 to 4 are concerned with "company insolvency", Parts 5 and 6 deal with "insolvency of

individuals", and Parts 7 to 13 are of general application, being concerned with court procedures, notices, meetings and a few common definitions. In many ways, there was greater overlap between personal and corporate insolvency in the preceding legislative regimes, because section 317 of the 1948 Act provided that the principles applicable in bankruptcy "with regard to the respective rights of secured and unsecured creditors and to debts provable and to the valuation of annuities and future and contingent liabilities" applied "[i]n the winding up of an insolvent company".

12.    As anticipated in the White Paper, the 1986 legislation represents a comprehensive overhaul of the insolvency legislation, adding new procedures and new rules and rewriting many of the established procedures and rules. Most, indeed probably all, fundamental principles apply just as they always have done - the *pari passu* principle is an obvious example. However, when it comes to less fundamental procedures and rules, it cannot be assumed that judicial decisions, even at the highest level, relating to previous insolvency legislation necessarily hold good in relation to the 1986 legislation. Where the wording of a provision in the 1986 legislation has not changed from that of a provision in previous legislation, then, at least prima facie, it may normally be assumed that the effect of the provision was intended to be unaltered, but where the language has been significantly changed, such an assumption may easily lead to error.

13.    Further, despite its lengthy and detailed provisions, the 1986 legislation does not constitute a complete insolvency code. Certain long-established Judge-made rules, albeit developed at a time when the insolvency legislation was far less detailed, indeed by modern standards sometimes positively exiguous, nonetheless survive. Recently invoked examples include the anti-deprivation principle (see *Perpetual Trustee Co Ltd v BNY Corporate Trustee Services Ltd* [2012] 1 AC 383), the rule against double-proof (discussed in *In re Kaupthing Singer & Friedlander Ltd (in administration) (No 2)* [2012] 1 AC 804, paras 8 to 12), the rule in *Cherry v Boultbee* (1839) 4 My & Cr 442 (also discussed in *Kaupthing (No 2)* [2012] 1 AC 804, paras 13 to 20), and certain rules of fairness (alluded to in *In re Nortel GmbH* [2014] AC 209, para 122). Provided that a Judge-made rule is well-established, consistent with the terms and underlying principles of current legislative provisions, and reasonably necessary to achieve justice, it continues to apply. And, as Judge-made rules are ultimately part of the common law, there is no reason in principle why they cannot be developed, or indeed why new rules cannot be formulated. However, particularly in the light of the full and detailed nature of the current insolvency legislation and the need for certainty, any judge should think long and hard before extending or adapting an existing rule, and, even more, before formulating a new rule.

14.    One of the reforms introduced by the 1986 legislation and foreshadowed by the White Paper is the administration procedure. It was introduced as part of the

so-called "rescue culture" which has been described as "a philosophy of reorganising companies so as to restore them to profitable trading and enable them to avoid liquidation" - Goode, *Principles of Corporate Insolvency Law,* 4th ed (2011), para 11-03. The procedure was less successful than had been hoped. Accordingly, the provisions of the 1986 legislation relating to administration were substantially amended as a result of the Enterprise Act 2002 ("the 2002 Act"). Among the changes introduced by the 2002 Act were the conferring of a power on an administrator to make distributions to unsecured creditors and a greater flexibility of exit routes from administration.

15.    Schedule B1 to the 1986 Act contains provisions dealing with administration. Para 53 of that Schedule provides for a creditors' meeting to approve the proposals of an administrator following his appointment. Paras 65 and 66 empower an administrator to make distributions to creditors, normally only with the prior consent of the court. Para 67 requires an administrator to take custody of the company's assets, and para 68 enables him to carry on the company's business in accordance with proposals approved under para 53. Para 69 states that "[i]n exercising his functions under this Schedule the administrator of a company acts as its agent." Paras 76 to 86 of Schedule B1 provide for various routes by which the company can exit from administration. Paras 76 to 81 set out a number of different ways in which the company can, in effect, be restored to its pre-administration status. Para 82 provides for a public interest winding-up. Para 83 entitles an administrator to move the company from administration to creditors' voluntary liquidation where, in summary terms, there are sufficient assets to pay the company's liabilities in full. And para 84 enables the company to pass straight from administration to dissolution, but only where it "has no property which might permit a distribution to its creditors" (a potentially narrower restriction, which should probably be construed widely).

16.    The provisions of the 1986 Rules governing distributing administrations were introduced by the Insolvency (Amendment) Rules 2003 (SI 2003/1730) ("the 2003 Amendment Rules"). In a distributing administration, as in a liquidation, the duty of the office-holder, whether administrator or liquidator, is to gather in and realise the assets of the company and to use them to pay off the company's liabilities (see sections 107 and 143 in relation to liquidators and paragraphs 65 to 67 of Schedule B1 in relation to administrators).

17.    I summarised the priorities in relation to such payments by a liquidator or a distributing administrator in the following terms in *In re Nortel GmbH* [2014] AC 209, para 39:

> "In a liquidation of a company and in an administration
> (where there is no question of trying to save the company or

its business), the effect of insolvency legislation …, as interpreted and extended by the courts, is that the order of priority for payment out of the company's assets is, in summary terms, as follows:

(1)     Fixed charge creditors;

(2)     Expenses of the insolvency proceedings;

(3)     Preferential creditors;

(4)     Floating charge creditors;

(5)     Unsecured provable debts;

(6)     Statutory interest;

(7)     Non-provable liabilities; and

(8)     Shareholders."

This description of what is known as the waterfall is a generalised summary of the distribution priorities in an insolvency. It was not intended to be treated as some sort of quasi-statutory statement of immutable legal principle, and it would have been better if I had said so at the time.

*The centrally relevant provisions of the 1986 Rules*

18.     I turn then to describe provisions of the 1986 Rules which apply to administrations, and which play a part in relation to the issues which have to be resolved on this appeal.

19.     Part 2 of the 1986 Rules is concerned with "Administration Procedure", and Chapter 10 of that Part ("Chapter 10 of Part 2"), which includes rules 2.68 to 2.105, deals with "Distributions to Creditors". The rules in Chapter 10 of Part 2 are very similar indeed to, and were no doubt based on, the rules concerned with

"proof of debts in a liquidation", which are to be found in Chapter 9 of Part 4 of the 1986 Rules.

20.    Rule 2.68(1) provides that Chapter 10 applies "where the administrator makes, or proposes to make, a distribution to any class of creditors ...". Rule 2.69 provides that provable debts rank equally between themselves and are paid in full unless the assets are insufficient to meet them, in which case they abate in equal proportions between themselves. This embodies the fundamental principle of equality, which applies similarly to liquidations - see rule 4.181. Rules 2.72 to 2.80 set out the machinery for proving debts, including the submission of a proof, its admission or rejection by the administrator and appeals against the administrator's decision.

21.    Rule 2.72 (which is in very similar terms to rule 4.73, which applies in a liquidation) is headed "Proving a debt", and it provides:

> "(1)    A person claiming to be a creditor of the company and wishing to recover his debt in whole or in part must (subject to any order of the court to the contrary) submit his claim in writing to the administrator.
>
> (2)    A creditor who claims is referred to as '*proving*' for his debt and a document by which he seeks to establish his claim is his '*proof*'."

The remaining paragraphs of this rule set out the machinery by which a debt should be proved. Rule 2.77 provides that a proof may be admitted for payment of a dividend in whole or in part, and rule 2.78 contains appeal procedures where a proof is refused or not admitted in its full amount. Rule 2.79 permits a proof to be withdrawn or varied by agreement with the administrator, and rule 2.80 enables the court to "expunge a proof or reduce the amount claimed" on the application of the administrator "where he thinks the proof has been improperly admitted, or ought to be reduced" or "on the application of the creditor, if the administrator declines to interfere in the matter". The equivalent provisions applicable in a liquidation are rules 4.82 to 4.85.

22.    Rules 2.81 to 2.94, 2.102, 2.103 and 2.105 are concerned with quantifying claims made in paying administrations. With one exception, namely rule 2.88 (whose equivalent is to be found in the 1986 Act rather than the 1986 Rules, as explained in para 28 below), these rules are very similar indeed in their language

Page 8

to (and were no doubt based on) rules 4.86 to 4.99, which relate to claims in liquidations.

23.    Rule 2.81 requires the administrator to "estimate the value of any debt which, by reason of its being subject to a contingency or for any other reason, does not bear a certain value", and the rule goes on to provide that "he may revise any estimate previously made … by reference to any change of circumstances or to any information becoming available to him". He is also required to "inform the creditor as to his estimate and any revision to it". (Rule 4.86 is the equivalent provision in liquidations.)

24.    Rule 2.83 entitles a secured creditor, who has realised his security, to prove for such part of his debt which remains unsatisfied. And rule 2.90 entitles a secured creditor who has proved for his debt on the basis of putting a value on his security to amend that value with the agreement of the administrator or the court. (Rules 4.88 and 4.95 have similar effect in liquidations.)

25.    Rule 2.85 provides for mutual credits and set-off of debts as at the date that the administrator gives notice that he proposes to make a distribution, and such a notice is provided for in rule 2.95. Rule 2.85(3) read together with rule 2.85(2) provides that, as at the date on which an administrator gives notice of his intention to make a distribution, there should be a set-off in respect of what is owing "between the company and any [proving] creditor of the company" in respect of "mutual dealings" between them. "Mutual dealings" are defined in rule 2.85(2) as "mutual credits, mutual debts or other mutual dealings", subject to exceptions all of which relate to events which arise after the administration date. Rule 2.85(4) states that rule 2.85 applies, inter alia, to future, contingent or other quantifiable liabilities, and rules 2.81, 2.86, 2.88 and rule 2.105 apply for the purposes of rule 2.85. (Rule 4.90, which applies in liquidations, is in very similar terms to rule 2.85, save that the date by reference to which set-off is to be effected is the liquidation date.)

26.    Rule 2.86 provides:

> "(1)    For the purpose of proving a debt incurred or payable in a currency other than sterling, the amount of the debt shall be converted into sterling at the official exchange rate prevailing on the date when the company entered administration or, if the administration was immediately preceded by a winding up, on the date that the company went into liquidation."

Rule 2.86 is virtually identical in its terms to rule 4.91, which applies to proving a debt incurred or payable in a foreign currency in a liquidation.

27.    Rule 2.88 deals with interest. Rule 2.88(1) provides that "Where a debt proved in the administration bears interest, that interest is provable as part of the debt except in so far as it is payable in respect of any period after the company entered administration". Para (1) was amended by the Insolvency (Amendment) Rules, 2005 (SI 2005/527) ("the 2005 Amendment Rules") by adding the words "or, if the administration was immediately preceded by a winding up, any period after the date that the company went into liquidation". Rule 2.88(7) states that:

> "Any surplus remaining after payment of the debts proved shall, before being applied for any purpose, be applied in paying interest on those debts in respect of the periods during which they have been outstanding since the company entered administration."

Para (8) states that all interest so payable "ranks equally", and para (9) provides that the rate of such interest is to be the higher of the judgment debt rate or the rate applicable to the debt apart from the administration.

28.    Virtually identical provisions to rule 2.88(7) to (9) are contained in section 189(2) to (4) which applies to post-liquidation interest on debts proved in a liquidation. Section 189(2) plays a significant part in some of the arguments on this appeal, and it should be set out in full:

> "Any surplus remaining after the payment of the debts proved in a winding up shall, before being applied for any other purpose, be applied in paying interest on those debts in respect of the periods during which they have been outstanding since the company went into liquidation."

29.    Rule 2.89 permits a creditor whose debt is not yet due for payment to prove "subject to rule 2.105". Rule 2.105 provides that, in the case of such a debt, "[f]or the purpose of dividend (and no other purpose) the amount of the creditor's admitted proof … shall be reduced by applying [a specified] formula", which basically represents a discount for early payment, calculated by reference to the date of administration (or, if relevant, the date of any preceding liquidation). In practice this means that the debt is reduced by 5% for each year between the administration and the contractual due date. Similar provisions for future debts in liquidations are to be found in rules 4.94 and 11.13.

30.    Rule 2.95 provides that an administrator who is proposing to make a distribution should give "28 days' notice of that fact". Rule 2.97 permits, indeed it enjoins, an administrator thereafter "to declare the dividend to one or more classes of creditor". Rule 2.98 deals with notification, and rule 2.99 with payment. Rule 2.101 applies where "the amount claimed by a creditor is increased" after a dividend has been paid, and rule 2.102 applies where "a creditor re-values his security" after a dividend has been declared. There are fairly similar rules for liquidations in Part 11 of the 1986 Rules.

31.    Reference should also be made to two rules which contain definitions applicable generally to the 1986 Rules. Rule 13.12(1) states that "in relation to the winding up of a company", the word "debt" means:

> "(a)    any debt or liability to which the company is subject at the date on which it goes into liquidation;

> (b)    any debt or liability to which the company may become subject after that date by reason of any obligation incurred before that date; and

> (c)    any interest provable as mentioned in rule 4.93(1)."

Rule 13.12(4) defines "liability" as meaning "[in] any provision of the [1986] Act or the Rules about winding up":

> "… a liability to pay money or money's worth, including any liability under an enactment, any liability for breach of trust, any liability in contract, tort or bailment, and any liability arising out of an obligation to make restitution."

Rule 13.12(3) explains that a debt or liability for this purpose can be "present or future, … certain or contingent, … fixed or liquidated, … capable of being ascertained by fixed rules or as a matter of opinion". Rule 13.12(5) applies these definitions to a case "where a company is in administration", so the references in these definitions to winding up and rule 4.93(1) must respectively be taken to be to administration and rule 2.88(1).

32.    Rule 12.3(1) provides:

> "Subject as follows, in administration, winding up and bankruptcy, all claims by creditors are provable as debts against the company or, as the case may be, the bankrupt, whether they are present or future, certain or contingent, ascertained or sounding only in damages."

33.     There are certain specified exceptions to this definition, but rule 12.3(3) makes it clear that they are not exhaustive. However, as is clear from the strikingly wide words of rules 13.12(1) and (3) and 12.3(1), the statutory policy, which Briggs J rightly identified at first instance in *In re Nortel GmbH* [2011] Bus LR 766, paras 102-103, and which is supported by the Supreme Court in the same case at [2014] AC 209, paras 92-93, is that claims should, if at all possible, be admitted to proof rather than being excluded from proof. Nonetheless, some non-provable liabilities, not specified in rule 12.3, still survive. The most obvious examples are claims which only arise after the date a company goes into administration or liquidation (see *In re Nortel GmbH* at [2014] AC 209, para 35), such as damages for personal injury in an accident which occurred after that date.

*The issues on this appeal*

34.     The first issue on this appeal concerns the ranking in the waterfall summarised in para 17 above which can be claimed by LBHI2 in its capacity as holder of the three subordinated loans made to LBIE. The second issue arises from the fact that LBIE's creditors who have debts denominated in foreign currency, will be paid out on their proofs at the rate of exchange prevailing at the date LBIE went into administration ("the administration date"), and, in some cases, sterling depreciated on the foreign exchange markets between that date and the date of payment. Those foreign currency creditors contend that they are entitled to claim the shortfall. The third issue raises the question whether, if interest which should have been paid during an administration under rule 2.88(7) was not in fact so paid, it can nonetheless be claimed in a subsequent liquidation.

35.     The remaining four issues arise because LBIE is an unlimited company and therefore its members can be called upon to make contributions pursuant to section 74 of the 1986 Act to meet liabilities if LBIE is in liquidation. The fourth issue is whether such contributions can be sought in respect of liability for interest under rule 2.88(7) and for liabilities of LBIE which are not provable. The other three issues arise because LBHI2 and LBL are not only creditors of LBIE, but are also members of LBIE and liable to contribute as such. The fifth issue is whether LBIE can prove in the administrations of LBHI2 and of LBL in respect of those respective companies' contingent liabilities to make contributions in LBIE's prospective liquidation. If they can, it is conceded that LBIE can set off its provable claims for contributions against the proofs lodged by LBHI2 and LBL in

LBIE's administration. If LBIE cannot so prove, the sixth issue is whether LBIE can nonetheless exercise such a right of set-off. The seventh issue, which only arises if LBIE loses on the fifth and sixth issues, is whether LBIE can nonetheless invoke the so-called contributory rule which applies in a liquidation, namely that a person cannot recover as a creditor of a company in liquidation until he has discharged his liability as a contributory.

36.    I turn now to address these issues.

**The ranking of the subordinated debt**

*Introductory*

37.    As mentioned above, there were three subordinated loan agreements ("the Loan Agreements") made by LBHI2 to LBIE, under which a substantial sum of money remains outstanding. As recorded in para (i) of the order which he made, David Richards J decided that the aggregate debt due under the Loan Agreements ("the subordinated debt") was provable, but that it was "subordinated to provable debts, statutory interest and non-provable liabilities, all of which … must be paid in full before … LBHI2 is entitled to prove and require the LBIE administrators to admit such proof in respect of its claims under [the Loan]". The Court of Appeal upheld this order in so far as it decided that the subordinated debt was provable and subordinated to provable debts, statutory interest and non-provable liabilities. However, they disagreed with the Judge's view that LBHI2 was not entitled to prove until all other proving creditors had been paid in full.

38.    On this appeal, while accepting that the subordinated debt ranks behind other provable debts, the LBHI2 administrators argue that the courts below were wrong to hold that the subordinated debt ranked behind statutory interest or non-provable liabilities. By contrast, the LBIE administrators contend that the Court of Appeal ought to have concluded that the Judge was right to hold that LBHI2 was not entitled to prove for the subordinated debt until all liabilities, including statutory interest and non-provable liabilities, had been paid in full.

39.    The Loan Agreements were revolving credit facilities made under agreements which contained certain "Variable Terms" and certain "Standard Terms". Clause 9 of the Variable Terms provided for repayment "subject always to [clause] ... 5 ... of the Standard Terms".

40.    Clause 1 of the Standard Terms ("clause 1") contained some definitions. "Insolvency Officer" meant "any person duly appointed to administer and

distribute [LBIE's] assets in the course of [its] Insolvency", and the term "Insolvency" extended to administration as well as liquidation. "Liabilities" were defined as "all present and future sums, liabilities and obligations payable or owing by [LBIE] (whether actual or contingent, jointly or severally or otherwise howsoever)", a wide definition. "Excluded Liabilities" were "Liabilities which are expressed to be, and in the opinion of the Insolvency Officer of [LBIE], do, rank junior to the Subordinated Liabilities [defined in turn as liabilities under the Loan] in any Insolvency of [LBIE]". "Senior Liabilities" were "all Liabilities except the Subordinated Liabilities and Excluded Liabilities".

41.    Clause 4 of the Standard Terms ("clause 4") dealt with repayment, and it was expressed to be "subject in all respects" to clause 5. Clause 4(4) provided that in the event of certain defaults in repayment LBHI2 could, subject to giving prior notice, "enforce payment by instituting proceedings for the Insolvency of [LBIE]". Clause 4(7) stated that:

> "No remedy against [LBIE] other than as specifically provided by this [clause] 4 shall be available to [LBHI2] whether for the recovery of amounts owing under this Agreement or in respect of any breach by [LBIE] of any of its obligations under this Agreement."

42.    Clause 5 of the Standard Terms ("clause 5") contained two sub-clauses of relevance which provided as follows:

> "(1)    Notwithstanding the provisions of [clause] 4, the rights of [LBHI2] in respect of the Subordinated Liabilities are subordinated to the Senior Liabilities and accordingly payment of any amount (whether principal, interest or otherwise) of the Subordinated Liabilities is conditional upon -
>
> > (a)    (if an order has not been made or an effective resolution passed for the Insolvency of [LBIE] …) [LBIE] being in compliance with not less than 120% of its Financial Resources Requirement immediately after payment by [LBIE] …; and
> >
> > (b)    [LBIE] being 'solvent' at the time of, and immediately after, the payment by [LBIE] and accordingly no such amount which would otherwise

fall due for payment shall be payable except to the extent that [LBIE] could make such payment and still be 'solvent'.

(2)    For the purposes of sub-[clause] (1)(b) above, [LBIE] shall be 'solvent' if it is able to pay its Liabilities (other than the Subordinated Liabilities) in full disregarding -

(a)    obligations which are not payable or capable of being established or determined in the Insolvency of [LBIE], and

(b)    the Excluded Liabilities."

43.    Clause 7 of the Standard Terms ("clause 7") included undertakings by LBHI2 not without the consent of the Financial Services Authority (now the Prudential Regulatory Authority) to:

"(d)    attempt to obtain repayment of any of the Subordinated Liabilities otherwise than in accordance with the terms of this Agreement;

(e)    take or omit to take any action whereby the subordination of the Subordinated Liabilities or any part of them to the Senior Liabilities might be terminated, impaired or adversely affected."

44.    As explained above, the LBHI2 administrators contend that the subordinated debt ranks ahead of statutory interest and non-provable liabilities (ie categories (6) and (7) in the waterfall set out in para 17 above). Their case in relation to non-provable liabilities is that, although they are "Liabilities" within clause 1, they are "not payable or capable of being established or determined in the Insolvency of [LBIE]" within the meaning of clause 5(2)(a), and therefore their existence does not prevent repayment of the subordinated debt. So far as statutory interest is concerned, the LBHI2 administrators' primary case is that it is not one of the "Liabilities" within clause 5(2)(a), because, although very widely defined, the term "Liabilities" in clause 1 is limited to obligations "payable or owing by [LBIE]", and statutory interest is payable and owing by LBIE pursuant to rule 2.88(7), which does not render its payment the responsibility of the company in administration. The LBHI2 administrators alternatively contend that, if statutory

interest is nonetheless within "Liabilities", it is excluded from clause 5(2)(a) for the same reason as non-provable liabilities.

45.    I turn first to deal with statutory interest, and will then deal with non-provable liabilities. Finally, I will discuss the question of proving for the subordinated debt.

*Subordination to statutory interest*

46.    It is convenient to discuss this issue in relation to liquidations, although the analysis that follows in paras 47 to 55 below is equally applicable to administrations - unsurprisingly, given that, as explained in para 28 above, rule 2.88(7), (8) and (9) are in effectively the same terms as section 189(2), (3) and (4) respectively.

47.    The effect of section 189 is that a company in liquidation ceases to be liable for contractual interest which falls due after it goes into liquidation, and instead, in the event of a surplus, there is a liability for statutory interest.

48.    LBHI2's first contention is that statutory interest is not payable "in the Insolvency" of LBIE within the meaning of clause 5(2)(a) - ie in an insolvency process of LBIE, as the LBHI2 administrators put it in argument. As a matter of ordinary language, it is hard to see any satisfactory basis for this contention. It is clear, indeed it is common ground, that statutory interest is payable by a liquidator pursuant to the provisions of section 189, and it is in respect of interest on debts which have been indubitably proved and paid "in the Insolvency". Briggs LJ rightly said in the Court of Appeal, at [2015] Ch 50, para 190, that "payment of statutory interest" is "plainly" a "part of the winding-up scheme", and that it is therefore not easy to see why statutory interest is not payable "in the Insolvency".

49.    The LBHI2 administrators, however, argue that the expression "obligations which are not payable … in the Insolvency" in clause 5(2)(a) effectively means obligations which are not capable of being the subject matter of a proof. That does not seem to me to accord with the natural meaning of the expression "in the Insolvency". Further, I can see no good commercial reason to exclude statutory interest from the "obligations" which fall within clause 5(2)(a). Contractual interest on provable claims falling due before the administration date or liquidation date (ie the date on which the company concerned goes into administration or liquidation as the case may be) would undoubtedly be such an obligation, and it is hard to see any business sense in excluding interest which falls due after that date from the expression, bearing in mind the overall commercial purpose of the Loan.

The fact that interest falling due after the liquidation date is treated somewhat differently in the insolvency legislation, and therefore in the waterfall, does not seem to me to be a good reason for treating it differently for the purposes of clause 5. Of course, clause 5 could have been expressed in a way which had such an effect, but my point is that given that, as drafted, it does not naturally read as having that effect, there is no commercial reason for rejecting its natural meaning.

50.    The LBHI2 administrators also argue that the need for consistency in the application of clause 5(2) supports its contended interpretation, because statutory interest would, as it were, be excluded from any solvency test if LBIE was not subject to insolvency proceedings. I accept that factual premise, but I do not accept that it assists the LBHI2 administrators' argument. The fact that an expression has a single meaning self-evidently does not prevent it from producing different outcomes in different circumstances. There are inevitable and often substantial differences between a company which is in insolvency proceedings and a company which is not. The conclusion reached by the courts below did not involve giving a different meaning to clause 5(2) when applied to a company in insolvency proceedings from that which it would have when applied to a company not in such proceedings. If LBIE, not being in such proceedings, had failed to pay interest on a debt due, its liability for interest would be an "obligation"; and it seems consistent with this that, if LBIE is in insolvency proceedings, any interest payable on a sum due until payment is also an "obligation". Nor do I consider that the LBHI2 administrators derive any assistance from the fact that "Insolvency" includes a foreign insolvency.

51.    The second contention raised by the LBHI2 administrators is that any statutory interest is not "payable or owing by [LBIE]" within the definition of "Liabilities" in clause 1. Statutory interest cannot give rise to a provable debt, as it is only payable out of a surplus after payment of proven claims in full, but that would not prevent it being within the expression "Liabilities". More powerfully, the LBHI2 administrators argue that section 189(2) (which is set out in para 28 above) is worded in such a way as to make it clear that the liability to pay statutory interest is not an obligation on the part of the company concerned, and that any such obligation is imposed on the liquidator. The LBHI2 administrators point to the fact that, when a company is in liquidation, its assets are under the custody, control and management of the liquidator, who has statutory duties, including the duty to comply with section 189(2).

52.    It is true that the company in liquidation cannot be sued for the purpose of enforcing section 189, and indeed that no claim can be made against the company if section 189 is infringed, because the relevant claim should be made against the liquidator: see the discussion in *In re HIH Casualty & General Insurance Ltd* [2006] 2 All ER 671, paras 115-121. However, in my judgment, that does not mean that statutory interest is not "payable or owing by" the company concerned,

at least so far as the meaning of the contractual definition of "Liabilities" in clause 1 is concerned.

53.    Section 189(2) effectively confirms that interest, which would, in the absence of the liquidation, normally be expected to be contractually payable by the company from the liquidation date until repayment of the principal, is payable in the liquidation, but only if there is a surplus. Possibly because the effect of a liquidation is thought to be like that of a judgment in that it stops contractual interest running, or possibly as compensation for such interest ranking below unsecured provable debts, section 189(4) gives a creditor the option of claiming such interest at the judgment debt rate rather than the contractual rate. Given that the creditor is owed the debt until the date of repayment, and given that the company would normally expect to pay interest on the debt to the creditor until that date, it would, as mentioned in paras 49 and 50 above, be surprising if the liability for this interest was not treated as that of the company.

54.    Further, the LBHI2 administrators' case proves too much. If payment of interest pursuant to section 189(2) is not treated as "payable and owing" by the company, because it is payable and owing by the liquidator, then it would appear to follow that even provable debts are not "payable and owing" by a company in a winding-up. As Millett LJ explained in *Mitchell v Carter, In re Buckingham International Ltd* [1997] 1 BCLC 673, 684, the making of a winding-up order "divests the company of the beneficial ownership of its assets", and those assets become "subject to a statutory scheme for distribution among the creditors and members", who have the right to have them administered by the liquidator "in accordance with the statutory scheme". When a company goes into liquidation and a creditor proves in respect of a debt, it seems to me that the logic of the case advanced by the LBHI2 administrators would be that the debt is no longer "payable and owing" by the company: there is a proof which is payable and owing out of the assets got in by the liquidator. If, as it must be, that argument is rejected, it would be on the basis that a payment out of the assets of the company by the liquidator of a proof which statutorily replaces a debt of the company should be treated as satisfying a liability "payable and owing" by the company. If that is so, it seems to me very hard to justify a different conclusion in relation to payment of statutory interest by a liquidator under section 189.

55.    If payment of interest under section 189(2) involves paying a "sum" or meeting a "liabilit[y]" which is "payable or owing by" the company concerned within the meaning of clause 1, payment of interest by an administrator under rule 2.88(7) seems to me to be *a fortiori*. As Lewison LJ pointed out at [2016] Ch 50, para 45, when paying the interest, the administrator acts as agent of the company pursuant to paragraph 69 of Schedule B1, and, as in the case of a company in liquidation, legal title to the assets from which the interest is paid remains vested in the company.

56.     Accordingly, I consider that under the terms of the Loan Agreements statutory interest enjoys priority over the repayment of the subordinated debt. In any event, in the light of my conclusion in para 63 below as to the priorities as between the non-provable liabilities and the subordinated debt, it seems to me that statutory interest must take priority over the subordinated debt as explained in paras 65 and 66 below.

*Subordination to non-provable liabilities*

57.     In the Court of Appeal at [2016] Ch 50, para 60, Lewison LJ accepted that a non-provable liability was "neither determined nor established in the Insolvency of [LBIE]". However, he said that, as a "liquidator's duties continue until the moment comes to make a distribution to members [and] non-provable liabilities rank higher than members", "the liquidator must pay those claims before making a distribution to members", and accordingly those claims are "payable in the Insolvency". Moore-Bick and Briggs LJJ not only agreed that non-provable liabilities were "payable", but also considered that they were "established or determined", "in the Insolvency" of LBIE.

58.     In my judgment, a liquidator who meets a non-provable liability of the company is making a payment "in the Insolvency", in the sense in which those words are used in clause 5(2)(a). It is true that there is no express reference to non-provable liabilities, and therefore inevitably no mention of any duty to meet such liabilities, in the 1986 legislation. However, section 107 states that, in a voluntary liquidation, the liquidator must apply the company's assets "in satisfaction of the company's liabilities" prior to distributing them to members; and section 143 requires a liquidator in a winding-up by the court to distribute "the assets of the company … to the company's creditors, and, if there is a surplus, to the persons entitled to it." As Briggs LJ pointed out at [2016] Ch 50, paras 185 to 189, these stipulations, properly interpreted, require a liquidator to meet the company's non-provable liabilities out of any assets remaining after paying proven debts and statutory interest in full, before paying over any outstanding sum to the members of the company.

59.     In *In re T & N Ltd* [2006] 1 WLR 1728, paras 106 and 107, David Richards J explained that, although there was no express reference in the 1986 legislation to non-provable liabilities, once all liabilities for which statutory provision has been made have been met by a liquidator, anyone with a non-provable claim would no longer be precluded from enforcing it by proceedings. Accordingly, a liquidator will in practice have to pay off non-statutory liabilities out of the company's remaining assets before distributing to shareholders any surplus remaining after payment of provable debts and statutory interest.

60.   Thus, while it is true that there is no provision in the 1986 legislation which specifically requires a liquidator to pay non-provable liabilities, he is in practice obliged to pay off any such claims. Otherwise, if there would still be a surplus after paying off non-provable liabilities in full, he could not distribute that remaining surplus to members, and, even if there would be no such remaining surplus, he would be in an impossible position, able neither to pay the money he held to satisfy the non-provable liabilities nor to pay it over to members. Support for that conclusion may be found in a number of first instance cases, including *Gooch v London Banking Association* (1886) 32 Ch D 41, 48, per Pearson J, *In re Fine Industrial Commodities Ltd* [1956] Ch 256, 262, per Vaisey J, and *In re Islington Metal & Plating Works Ltd* [1984] 1 WLR 14, 23-24, per Harman J, and also in the Court of Appeal in *In re Lines Bros Ltd (In Liquidation)* [1983] Ch 1, 21, per Brightman LJ.

61.   At [2016] Ch 50, para 185, Briggs LJ said that, although "the statutory scheme provides no detailed machinery for dealing with" non-provable liabilities, "they have always been dealt with in accordance with Judge-made principles". Given that the company concerned remains in liquidation, that the duties of the liquidator have not been completed (as payment to members of any final surplus is part of his express duty), and that, before they can be completed, he must in practice satisfy any non-provable liability by making a payment, it appears to me that such a payment would be effected "in the Insolvency" even if sections 107 and 143 did not have the effect described in para 58 above. The proposition that a liquidator is liable to pay off non-provable liabilities if there is a surplus after paying statutory interest is an example of a principle of Judge-made law which survives despite the increasingly full codification of insolvency law. Not merely is there nothing inconsistent with the principle in the 1986 legislation: the principle is effectively necessarily implied by the provisions of the legislation, and those responsible for drafting the legislation must have been well aware of the long-standing and consistent judicial approval of the principle.

62.   The same conclusion must apply to a distributing administration, although it is fair to say that an administrator would not necessarily face the quandary identified in para 60 above. Whether a person to whom a company in administration has a non-provable liability would be a "creditor" for the purposes of paragraph 65 of Schedule B1 was not argued, and I prefer to leave the point open. It is unnecessary to decide the point because it seems to have been accepted in argument that, if non-provable liabilities are "payable in a liquidation", they are "payable in the Insolvency of [LBIE]" within the meaning of clause 5(2)(a). In my view, that is plainly right. "Insolvency" in clause 5(2)(a) would appear to be a generic expression. In any event, if an administrator cannot pay off non-provable liabilities, then, where there is a surplus once he has paid off all proofs and all statutory interest, he would have to put the company into liquidation, whereupon the liquidator would have to pay off any non-provable liabilities.

63.    Accordingly, in agreement with the Court of Appeal and the Judge, I consider that the non-provable liabilities are payable "in the Insolvency". It is unnecessary to resolve the small difference between Moore-Bick and Briggs LJJ and Lewison LJ as to whether they are also "established or determined" in the insolvency.

*Conclusion as to priorities*

64.    Looking at the issue from a broader, purposive, perspective, the conclusion that both statutory interest and non-provable liabilities have priority over the subordinated debt seems to me to accord both with the eponymous nature of the subordinated debt, and with what a reasonable reader would expect from the general thrust of the terms of the Loan Agreements. The purpose of the parties to those agreements was to ensure that all those with claims on LBIE would have priority over the holders of the subordinated debt. In summary terms, the perception of the reasonable reader would be that the holders of the subordinated debt were to be at the end of the queue - and, in the event of an Insolvency, at the bottom of the waterfall. As to the two categories over which LBHI2 claims priority, the only difference between non-provable liabilities and statutory interest in the present connection is that statutory interest is specifically provided for in the 1986 legislation, whereas non-provable liabilities are not. However, they are both categories of liabilities which have to be met after paying out proofs in full and before any balance can properly be used for another purpose (ie paid over to the members, or rendered subject to a liquidation). It would therefore be surprising if they were treated differently for the purposes of a provision such as clause 5(2)(a).

65.    Even if (contrary to my conclusion in para 56 above) statutory interest were not "payable or owing by [LBIE]", then, because non-provable liabilities rank ahead of the subordinated debt, I would nonetheless have concluded that statutory interest should rank ahead of the subordinated debt. It would not, in my view, be legally possible for the subordinated debt to rank ahead of statutory interest but behind non-provable liabilities. The legislative provisions (as interpreted and, arguably, as extended, by judges) make it clear that statutory interest must be paid off before non-provable liabilities; and the terms of the Loan Agreements, as contractual documents, cannot vary the order in which statutory interest and non-provable liabilities are payable in accordance with the waterfall (unless all those who would thereby be prejudiced have agreed, and there is no public policy reason against giving effect to the variation).

66.    Although it may at first sight appear to be equally arguable in terms of narrower logic that the subordinated debt should, in these circumstances, rank ahead of statutory interest and non-provable liabilities, I do not consider that that could possibly be right. Once it is accepted that the terms of the Loan Agreements

mean that the subordinated debt ranks behind non-provable liabilities, it must necessarily follow that it ranks behind statutory interest. In agreement with all the parties on this appeal, I can see no objection to giving effect to a contractual agreement that, in the event of an insolvency, a contracting creditor's claim will rank lower than it would otherwise do in the "waterfall". James LJ's dictum in *Ex p McKay, Ex p Brown; In re Jeavons* (1873) LR 8 Ch App 643, 647 that a person "is not allowed, by stipulation with a creditor, to provide for a different distribution of his effects in the event of bankruptcy from that which the law provides" is correct, albeit that it should be treated as subject to two qualifications. First, that it does not apply where the "different distribution" involves the creditor in question ranking lower in the waterfall than the law otherwise provides. Secondly, even if the "different distribution" involves him ranking higher than he otherwise would, the dictum would not apply if all those who are detrimentally affected by his promotion have agreed to it (unless there was some public policy reason not to accede to the "different distribution").

67.    Finally, it is right to acknowledge that this conclusion involves giving little, if any, meaning to the expression "in the Insolvency" in clause 5(2)(a); the argument that it was intended to exclude claims which were unenforceable as a matter of general law (eg statute-barred claims or foreign tax demands) is not very attractive. However, the fact that an expression in a sentence, especially in a very full document, does not, on analysis, have much, if any, effect if it is given its natural meaning is not, at least on its own, a very attractive or a very convincing reason for giving it an unnatural meaning. As Lord Hoffmann put it in *Beaufort Developments (NI) Ltd v Gilbert Ash NI Ltd* [1999] AC 266, 274, "the argument from redundancy is seldom an entirely secure one. The fact is that even in legal documents (or, some might say, especially in legal documents) people often use superfluous words". And, if one has to choose between giving a phrase little meaning or an unnatural meaning, then, in the absence of a good reason to the contrary, the former option appears to me to be preferable.

*When can LBHI2 lodge a proof?*

68.    The LBIE administrators contend that it would not be open to LBHI2 to lodge a proof in LBIE's administration for the subordinated debt until all "Senior Liabilities" have been paid in full. David Richards J accepted that contention, on the ground that clause 7(d) and/or (e) had the effect of precluding the lodging of a proof. The Court of Appeal disagreed, and considered that LBHI2 could prove for the subordinated debt at any time. However, they said that, until the Senior Liabilities had been paid in full, the subordinated debt would be a contingent debt, and because of the terms of the Loan, the correct value to ascribe to such a proof before the Senior Liabilities have all been paid would be nil, as nothing could be paid on the proof. If and when the Senior Liabilities were met in full, the Court of

Appeal said that the proof in respect of the subordinated debt would be revalued pursuant to rule 2.79 - see at [2016] Ch 50, para 41.

69.    In my judgment, David Richards J's view on this point is to be preferred. The Court of Appeal's view appears to me to raise a logical problem. If, at the time such a proof was lodged, there was a chance that the Senior Liabilities would be paid in full, then, as with any other debt which rests on a contingency that may occur, a valuation of that proof would not be nil: it would have to be a figure which discounted the sum due, in order to allow for the contingency not occurring. However, if the proof is ascribed a valuation greater than nil, it would have to be paid out on any distribution made prior to the satisfaction in full of other proved claims (unless there was one payment of 100%). As David Richards J said, that would appear to fall foul of clause 7. Further, any dividend would be paid out before any statutory interest or any non-provable liabilities had been paid off, which would be inconsistent with the conclusions I have just expressed.

70.    It therefore follows that, in my view, it would not be open to LBHI2 to lodge a proof in respect of the subordinated debt until the non-provable liabilities have been paid in full, or at least until it is clear that, after meeting that proof in full and paying any statutory interest due on it, the non-provable liabilities could be met in full. As soon as that has happened, there would, subject to what I say in the next paragraph, be nothing to stop LBHI2 lodging a late proof.

71.    On the face of it at any rate, it seems a little strange that a proof can be, or has to be, lodged for a debt which ranks after statutory interest (which can only be paid out of a "surplus") and non-provable liabilities. It may be that the proper analysis is that the subordinated debt is a non-provable debt which ranks after all other non-provable liabilities. It is unnecessary to decide that point, and, as it was not argued, I say no more about it.

72.    Accordingly, I would restore para (i) of the order made by David Richards J, because, although I agree with the Court of Appeal that he was right as to the ranking of the subordinated debt, I disagree with the Court of Appeal, and agree with the Judge, as to when the subordinated creditors can prove for the subordinated debt (assuming that they can prove).

**The currency conversion claims**

*Introductory*

73.    Many of LBIE's creditors were owed unsecured debts payable in foreign currencies. Rule 2.86 applies to such debts and it is set out in para 26 above. In effect, it provides that such debts are to be converted into sterling at the official rate on the administration date. As also explained in para 26 above, rule 4.91 is in effectively identical terms in relation to proving foreign currency debts in liquidations.

74.    Given that LBIE is able to pay all external creditors in full, it is rightly common ground that its foreign currency creditors must be paid in full on proved claims, which have to be converted into sterling by reference to the exchange rates prevailing at the date LBIE went into administration. However, in a case where sterling has depreciated against the relevant foreign currency between the administration date and the date (or dates) on which the proved debt is paid, CVI GVF (Lux) Master SARL ("CVI"), effectively representing the foreign currency creditors of LBIE, contends that there would be a contractual shortfall, which they should be able to recover as a non-provable debt. The LBHI2 administrators, on the other hand, contend that there is no room for any such claim, on the ground that the foreign currency debts should be treated as satisfied when the proved claims based on those debts have been paid in full.

75.    CVI argues that there is a distinction between the rights of creditors *inter se* and the rights of creditors as against the company. The purpose of the regime contained in Chapter 10 of Part 2, runs the argument, is to ensure that the creditors of a company (or, to be more precise, those creditors falling in category (5) in the waterfall described in para 17 above) in a distributing administration are treated equally, and that distributions to them are effected in an orderly and equitable manner. In particular, it is said that, as between the creditors it is important to have a date by reference to which all debts and claims are valued, and that is the reason for rule 2.86. According to CVI's argument, at least in the absence of express words or necessary implication, the provisions of Chapter 10 of Part 2, and in particular of rule 2.86, do not impinge on the underlying contractual debt between the company and a creditor. If this is right, then so long as an administrator is unable to meet the creditors' proofs in full, no question of an effective claim for the currency shortfall could arise as there would be no money to meet it, but, if there is money left over after all the creditors and all statutory interest have been paid in full, the foreign currency creditors should be entitled to claim for any shortfall.

76.    By contrast, the LBHI2 administrators contend that payment in full of a proof based on a foreign currency debt in accordance with rule 2.86 (as with rule 4.91) satisfies the underlying debt. That contention may be advanced on two bases. The primary, narrower, basis simply relies on the effect of rule 2.86, or rule 4.91, read in its context in the 1986 Rules. Thus, the primary contention is that rule 2.86 mandatorily converts the foreign currency debt into sterling, and renders the sterling equivalent of the debt provable in the administration, so that payment in full of the proved, sterling, sum, together with statutory interest, satisfies the claim of the creditor, who has no further claim against any surplus.

77.    The alternative, wider, basis for the LBHI2 administrator's case is that payment in full of a proved debt, as assessed in accordance with any of the provisions of Part 10 of Chapter 2, or Chapter 9 of Part 4, of the 1986 Rules, satisfies the underlying contractual debt. The resolution of this alternative contention raises the rather fundamental question whether the payment in full of a proved debt, as assessed in accordance with the 1986 Rules, satisfies the underlying contractual debt or whether the underlying contractual debt survives the payment in full of the proved claim based upon it (except where the Rules expressly provide otherwise).

78.    David Richards J agreed with CVI on this point essentially on the wider of these two contentions, and that is reflected in paras (ii) and (iii) of the order which he made. The majority of the Court of Appeal (Moore-Bick and Briggs LJJ) agreed with this conclusion and held that the foreign currency creditors could claim any contractual shortfall as a non-provable liability. Lewison LJ dissented on this point and would have found for the LBHI2 administrators.

79.    I propose to address this issue by considering first the narrower basis for the LBHI2 administrators' case, and then the wider basis.

*The narrower issue: foreign currency claims and rules 2.86 and 4.91*

80.    Where sterling has depreciated relative to the relevant currency since the company went into administration or liquidation, a foreign currency creditor who is paid out on his proof will have received less at the time of payment than he would have been contractually entitled to receive. Accordingly, at any rate at first sight, it is hard to quarrel with the argument that, if it turns out that there is a surplus, it would be commercially unjust to distribute it to the members without first making good the shortfall suffered by the foreign currency creditor. CVI relies on *Miliangos v George Frank (Textiles) Ltd* [1976] AC 443, where it was decided that a court could award damages in foreign currency. In that case, Lord Wilberforce said at p 465 that "justice demands that the creditor should not suffer

from fluctuations in the value of sterling", as "[h]is contract has nothing to do with sterling: he has bargained for his own currency and only his own currency".

81.    Nonetheless, CVI's case seems to me to be at odds with the provisions of rule 2.86 read in the context of the 1986 Rules. Before turning to those Rules, it is appropriate to consider some judicial dicta and policy statements which preceded the 1986 legislation.

82.    As the courts below recognised, there are relevant judicial observations in two cases relating to foreign currency claims in liquidations under the insolvency code prevailing immediately before the 1986 legislation (namely the 1948 Act and the 1949 Rules). In *In re Dynamics Corporation of America* [1976] 1 WLR 757, Oliver J in passages at 764H-765A, 767E-G and 786D-F, quoted by Lewison LJ at [2016] Ch 50, para 66-68, said that he considered that the correct analysis was that the contractual debt was converted into the right to prove, and that "the obligation of the company … is to pay whatever is the sterling equivalent [of the foreign currency debt] at [the date of liquidation]". Although the issue in that case was not the same as that in this case, it appears to me that the observation just quoted was part of the ratio of the decision, and it accords with the LBHI2 administrators' case. On the other hand, in *In re Lines Bros Ltd (In Liquidation)* [1983] Ch 1, 21F-G, Brightman LJ said that he had "not heard any convincing objection" to the notion that, in a solvent liquidation, the liquidator should "make good the shortfall before he pays anything to the shareholders". That was a tentative obiter observation, but it indicates at least a leaning in favour of what is CVI's case. The other members of the Court, Lawton and Oliver LJJ, do not seem to have directly addressed the point, although Lewison LJ may well be right in suggesting that Lawton LJ tended towards the contrary view, ie that adopted by Oliver J in *Dynamics Corporation* [1976] 1 WLR 757.

83.    It is in my opinion dangerous to rely on judicial dicta as to the effect of an earlier insolvency code, given that the 1986 legislation amounts to what Sealy and Milman *op cit* describe as including "extensive and radical changes in the law and practice of bankruptcy and corporate insolvency, amounting virtually to the introduction of a completely new code". Accordingly, while the dicta in *Dynamics Corporation* [1976] 1 WLR 757 and *Lines Brothers* [1983] Ch 1 are in point, they are of limited value in themselves both because they are not mutually consistent and because they are based on different legislative provisions under a different code. However, they can be said to suggest that there are principled grounds for supporting either conclusion contended for in this case, and that there is no judicially established practice or understanding on the issue raised by the foreign currency claims.

84.    Turning to reports produced shortly before the 1986 legislation, in its 1981 Working Paper No 80 on *Private International Law Foreign Money Matters*, the Law Commission discussed in some detail the question of the date of conversion of foreign currency debts in insolvencies. The purpose of the Working Paper was to indicate the Law Commission's "provisional conclusions" on a number of legal issues involving foreign currencies (see para 1.4 of its *Final Report* mentioned in para 87 below). Paras 3.39 to 3.47 of the Working Paper discussed the specific issue of foreign currency claims in insolvencies. Paras 3.39 to 3.45, which included reference to *Miliangos* [1976] AC 443, *Dynamics Corporation* [1976] 1 WLR 757, and *Lines Brothers* [1983] Ch 1, contained a fairly full analysis of the arguments. In particular, para 3.43 expressed agreement with Oliver J's explanation in *Dynamics Corporation* [1976] 1 WLR 757 as to why the reasoning in *Miliangos* [1976] AC 443 should not apply to foreign currency creditors' claims in liquidations, namely (i) "the form of judgment approved in *Miliangos* did not relate to a creditor's substantive right", and (ii) the company's "obligation … in relation to a foreign money debt … was an obligation to pay the sterling equivalent of that sum in question at [the date of the winding-up order]". Para 3.43 also explained that adjustment of claims by foreign currency creditors as argued for by CVI in this case "would extend to the field of liquidation and bankruptcy the difficult problems connected with set-off" which had been discussed earlier in the Working Paper.

85.    In para 3.46 of the Working Paper, the Law Commission went on to consider and reject the suggestion that, where "the company is found to be solvent", "foreign currency creditors should be compensated from the assets of the company or the bankrupt for adverse exchange rate fluctuations between the date of the relevant order and the date of actual payment". In rejecting that suggestion, the Law Commission made the point that this would produce an "unacceptable … discrimination between foreign currency debts depending on whether the exchange rates have moved to the advantage or disadvantage of the creditors". The provisional conclusion expressed in para 3.47 was that "we support the view of Oliver J. in the *Dynamics Corporation* case that the date of the winding up order is the appropriate, once-for-all, date for the conversion of every foreign currency debt on the winding-up of both solvent and insolvent companies".

86.    In para 1308 of the 1982 Cork Report (referred to in para 10 above), the Committee explained that "a primary purpose of the winding up of an insolvent company [is] to ascertain the company's liabilities at a particular date", and accordingly the reasoning in *Miliangos* [1976] AC 443 had no part to play on the issue of the date as at which foreign currency debts should be converted into sterling in a liquidation. In para 1309, the Cork Report "strongly recommend[ed] that any future Insolvency Act should expressly provide that the conversion of debts in foreign currencies should be effected as at the date of the commencement of the relevant insolvency proceedings". Importantly for present purposes, the

Report then stated that "we take the same view as the Law Commission (Working Paper No 80) that conversion as at that date should continue to apply, even if the debtor is subsequently found to be solvent", and adding that "[t]o apply a later conversion date only in the case where the exchange rate has moved to the advantage of the creditor, but (necessarily) not where it had moved against him, would, in our view, be discriminatory and unacceptable".

87.     The Law Commission adhered to the provisional view expressed in the Working Paper when it published its *Final Report on Private International Law Foreign Money Liabilities*, Law Com No 124, in 1983 (Cmnd 9064). At para 3.34 of its 1983 Report, the Law Commission identified the conclusion reached in para 1309 of the Cork Report, and emphasised that that conclusion applied "whether [the company] is or is not solvent". At para 3.35, the Law Commission referred to the alternative suggestion that "conversion of a foreign currency obligation into sterling … be effected at the latest practicable date - which would seem to be each occasion on which it is decided to declare and pay a dividend". And at para 3.36, the Law Commission, while accepting that there were arguments both ways, rejected that alternative suggestion and stated that it "remain[ed] of the view which [was] expressed in the working paper".

88.     Accordingly, it is quite clear that the "Cork Committee" and the Law Commission each carefully addressed this very issue during the five years leading up to the 1986 insolvency legislation, and reached the clearly expressed and firmly held conclusion that foreign currency claims should be dealt with in solvent, as well as insolvent liquidations, in the manner contended for by the LBHI2 administrators in these proceedings. It is fair to say that the White Paper referred to in para 10 above did not specifically refer to this issue, and that it stated that it did not agree with a number of expressly identified recommendations in the Cork Report, but there is nothing in it to suggest disagreement with the carefully considered and very recently expressed views on the instant topic by the Law Commission and the Cork Committee. Indeed, the very fact that rule 4.91 (which was in the 1986 Rules from their inception, and applies to liquidations) is and was expressed as it is (ie effectively the same as rule 2.86) strongly suggests that the 1986 legislation was intended, on this aspect, to follow the views expressed in the Cork Committee and the Law Commission.

89.     In addition, the notion of foreign currency creditors having a possible second bite also appears to be inconsistent with one of the purposes of the 1986 legislation described in the White Paper, namely to "simplify" the insolvency process. Given the general understanding as expressed in the reports referred to in paras 84 to 87 above was that the view expressed by Oliver J in *Dynamics Corporation* [1976] 1 WLR 757 represented the law before the changes embodied in the 1986 legislation, it is scarcely consistent with the drive for simplicity that this simple one-stage approach to conversion should be replaced by a potential

two-stage process, particularly when there is no provision in the 1986 legislation which can possibly be said even to hint at such a process.

90.    The 1949 Rules were silent so far as the treatment of foreign currency creditors were concerned, and, at least until the decision in *Dynamics Corporation* [1976] 1 WLR 757, the authorities seemed to suggest that a foreign currency debt should be converted into sterling at the date it fell due. Given that the treatment of foreign currency creditors in corporate insolvencies was expressly dealt with for the first time in the 1986 Rules, it appears to me that there must be a presumption that the new rule 2.86 was intended to spell out the full extent of a foreign currency creditor's rights, particularly, when one bears in mind the fact just mentioned that the purpose of the 1986 legislation was to simplify and clarify the law.

91.    The LBHI2 administrators' argument is also supported by the fact that it is common ground that, if sterling appreciates against the foreign currency in which the debt is denominated after the date of administration, rule 2.86 would work to the benefit of the foreign currency creditor. I consider that it tells quite strongly against CVI's case that, if it is right, rule 2.86 would in effect operate as a one-way option on the currency markets in a foreign currency creditor's favour: a classic case of "heads I win, tails I don't lose". This is a point which weighed heavily with the Law Commission and the "Cork Committee" as explained in paras 84 to 87 above. Further, it demonstrates that CVI's argument would mean that foreign currency creditors are treated more favourably than partly secured creditors or contingent creditors, in respect of whom the 1986 Rules provide for post-proof adjustments either way. The point is, I think, another reason which substantially undermines CVI's reliance on Lord Wilberforce's observations in *Miliangos* [1976] AC 443, 465 cited in para 80 above, whose applicability to foreign currency claims in liquidations was in any event, as explained above, rejected by Oliver J, the Cork Report and the Law Commission.

92.    Turning to rules which apply to other types of debts, the revaluation provisions in rule 2.81 (and rule 4.86) appear to me to point against CVI's case. First, they are inconsistent with CVI's argument that the rules in Chapter 10 of Part 2 (like the distribution rules in liquidations under Chapter 9 of Part 4 of the 1986 Rules) proceed on the basis that, as between the creditors, there is a date by reference to which all debts and claims are valued (as explained in para 75 above). On the contrary: I consider that that the clear implication of the second part of rule 2.81 is that a contingent creditor should be able to be paid out on a distributing administration by reference to the contractual value of his claim as at the date of payment.

93.    Quite apart from that, and perhaps more centrally for present purposes, given that the 1986 Rules expressly provide that adjustments can be made to a proof for a contingent debt if the contingency varies, it can be said with force that the natural implication of there being no equivalent provision for a foreign currency debt is that it was not intended to be adjustable. CVI's argument thus appears to me to be questionable because it effectively infers a non-provable back-door for a foreign currency debt when there is no express provable front door to accommodate external changes, in circumstances where there is an express provable front door to accommodate external changes in relation to another type of debt.

94.    There are other provisions of the 1986 Rules which are inconsistent with CVI's contention that the scheme of the 1986 legislation is to have a single date by reference to which all debts and claims are valued, and which demonstrate that, where the legislature wishes to revalue a claim by reference to the date of payment, it so provides. Thus, rules 2.83 and 2.90 enable a creditor with security who proves for the unsecured balance of his debt to vary the amount for which he proves in the event of the creditor realising the security, or in the event of a change in the value of the security, on a date subsequent to that on which he proved for his debt. And the set-off provisions of rule 2.85(3) which mandate setting off as at the date of the declaration of a dividend are also inconsistent with CVI's argument.

95.    While the point has some limited force, I am not much impressed by CVI's argument that, on the LBHI2 administrators' case, a company with foreign currency debts could be put into voluntary liquidation for the sole purpose of benefitting from rule 4.91. In the first place, although I accept that it is not a fanciful notion, it would require very unusual facts before a voluntary liquidation, with its inconveniences and costs, would be a sensible course for a company to take simply to crystallise its foreign currency debts. Secondly, such a course would be very much of a gamble. Foreign currency movements, especially in the short and medium term are notoriously very unpredictable. Thirdly, any creditor could protect himself by covering his position, albeit at a cost and with a degree of uncertainty.

96.    For these reasons, as well as those expressed by Lord Sumption in para 194 below, I would allow the LBHI2 administrators' appeal in relation to the foreign currency claims issue on the basis of the primary, narrower, way in which they put their case, namely the effect of rule 2.86 in its context. I should perhaps add that I am not wholly convinced that there is a good reason for not having a provision (similar to that in the second part of rule 2.81) which enables a proof in respect of a foreign currency debt to be adjusted to take account of currency fluctuations either way between date of proof and date of payment. While my conclusion means that is not necessary to consider the wider, alternative way in which the LBHI2 administrators' case is put, it may be helpful to express a preliminary view

on the issue, not least because it was the basis on which the Court of Appeal and David Richards J reached a different conclusion from that which I have reached on the foreign currency claims issue.

*The wider basis: the effect of payment in full of a proof on a debt*

97.    The wider basis for the LBHI2 administrators' case involves challenging the correctness of a proposition which was well expressed by David Richards J at [2015] Ch 1, para 110, namely that creditors' contractual rights generally are "compromised by the insolvency regime only for the purpose of achieving justice among creditors through a *pari passu* distribution", and are not affected by payment in full of a proof in respect of the contract under which those rights arise (unless of course the 1986 Rules expressly so provide, as we are agreed that they do in relation to foreign currency debts).

98.    While I accept that there is much to be said for the view which the majority of the Court of Appeal and David Richards J reached on this issue (and with which Lord Sumption is inclined to agree), my current inclination is to the opposite effect.

99.    It is true that there are statements of high judicial authority which can be cited to support the notion that a contractual claim can survive the payment in full of a proof based on that claim. Thus, in *In re Humber Ironworks and Shipbuilding Co* (1869) LR 4 Ch App 643, 647, having said that "when the estate is insolvent [the Rule then in force] distributes the assets in the fairest way", Giffard LJ explained that "where the estate is solvent ..., as soon as it is ascertained that there is a surplus, the creditor ... is remitted to his rights under his contract". More recently, Lord Hoffmann discussed the effect of proving for a contractual debt on the underlying debt in the Privy Council case *Wight v Eckhardt Marine GmbH* [2004] 1 AC 47, paras 26 and 27, as quoted by Lord Sumption in para 198 below. In particular, Lord Hoffmann said that "[t]he winding up leaves the debts of the creditors untouched. It only affects the way in which they can be enforced" and that "[t]he winding up does not either create new substantive rights in the creditors or destroy the old ones". In the later Privy Council case *Parmalat Capital Finance Ltd v Food Holdings Ltd (in liquidation)* [2008] BCC 371, para 8, Lord Hoffmann said that "a winding up order does not affect the legal rights of the creditors or the company".

100.    Even ignoring the fact they were based on different insolvency codes, I do not consider that the observations of Giffard LJ in *Humber Ironworks* LR 4 Ch App 643, 647 or of Lord Hoffmann in *Wight* [2004] 1 AC 147, paras 23 to 29 and *Parmalat Holdings* [2008] BCC 371, para 8 can safely be treated as applying to

the wider issue raised on the LBHI2 administrators' case. *Humber Ironworks* LR 4 Ch App 643 was concerned with a creditor's claim for interest between the date of winding-up and payment of the principal, for which the Companies Act 1862 made no provision. Accordingly, the court had to decide what Judge-made rule to adopt in relation to such a claim, and it was decided that, in the case of a solvent company, after payment of all principal debts, the liquidator should pay interest at the contractual rate for the period in question. The court was concerned with the effect of the absence of any rule for payment, not with the effect of a rule which stipulated for payment.

101.    The dicta in *Wight* [2004] 1 AC 147 must, as Lewison LJ said at [2016] Ch 1, para 94, on any view be no more than a broad generalisation, as they are self-evidently subject to important exceptions, including statutory set-off, disclaimer of onerous property, and the treatment of future and contingent debts. Over and above that, the case was concerned with a very different issue from that in this case. Lord Hoffmann was making the point that the fact that a creditor proved for his debt did not mean that the legal incidences of his underlying debt were affected. Thus, as the proof was based on a contract whose benefit was subsequently lawfully transferred by legislation from the proving creditor to a third party, the liquidators were held entitled to reject the creditor's proof. The case was therefore concerned with the effect on the right to prove of a subsequent event which affected the creditor's rights under the underlying contract, not with the effect on the underlying contract of the payment of a dividend in respect of a proof. In *Parmalat Capital* [2008] BCC 371, Lord Hoffmann was describing the effect of a winding-up order, not the effect of proving for a debt, let alone the effect of payment of a dividend on a proof.

102.    It is right to mention *Financial Services Compensation Scheme Ltd v Larnell (Insurances) Ltd (in liquidation)* [2006] QB 808, where the Court of Appeal was concerned with the current legislation, and the reasoning in *Wight* [2004] 1 AC 147 was followed. However, no consideration appears to have been given as to the possibility of the law having changed, and in any event, the case was not concerned with the effect on the underlying debt of payment of a proof. (While it is strictly unnecessary to express a view on the point, it is right to add that, at any rate as at present advised, I consider that the actual outcome of those three cases was correct, and, through the medium of rules 2.79 and 2.80 and rules 4.84 and 4.85, the outcome would respectively have been the same in an administration and a liquidation under the 1986 legislation.)

103.    I accept that the dicta in *Humber Ironworks* LR 4 Ch App 643, *Wight* [2004] 1 AC 147 and, arguably, *Parmalat Capital* [2008] BCC 371, at least if read out of their context, suggest that paying a 100% dividend in respect of a proof does not necessarily discharge the underlying contractual debt. However, as explained above, in none of those cases was that question being addressed or even

considered, and I do not think it is safe to proceed on the basis that the dicta were intended to apply to it. It cannot be doubted that the dividend must at least in part satisfy the underlying contractual debt, and therefore it does affect the creditor's rights. In any event, it seems to me that the issue arising from the LBHI2 administrators' wider contention must be resolved by considering the relevant provisions of the applicable insolvency code, namely the 1986 legislation, in their context.

104.   It appears to me that there is a strong case for saying that it would be inconsistent with the general thrust of Chapter 10 of Part 2 (or indeed Chapter 9 of Part 4) of the 1986 Rules that a debt, which has been the subject of a proof that has been met in full, nonetheless includes a component which is somehow capable of resurrection. There are provable debts and non-provable debts, but I consider that it is inherently rather unlikely that the legislature intended that there could be a class of debts which, while wholly provable, may nonetheless transpire to have a non-provable element. In other words, the notion of a category of hybrid debt with a presently provable element and a contingently unprovable element seems improbable, particularly bearing in mind that the 1986 legislation was intended to simplify and that its policy was to render as many debts as possible provable (see paras 10 and 33 above).

105.   Many of the rules contained in Chapter 10 of Part 2 (and the equivalent rules relating to liquidations in Chapter 9 of Part 4 of the 1986 Rules) appear to me to support the notion that a proving creditor should be treated as having had his contractual rights fully satisfied once he is paid out in full on his proof. I have in mind the provisions for revaluation of underlying contingent claims up to the date of payment of the proof in rule 2.81, the allowance for adjusting partly secured claims up to the date of payment in rules 2.83 and 2.94, the rules regarding set-off in rule 2.85 the provisions relating to interest in rule 2.88(9), as well as the 5% discount rate on future debts in rule 2.105 - and of course rule 2.86 as discussed above (and the equivalent rules in Chapter 9 of Part 4).

106.   There is a powerful case for saying that the fundamental rule 2.72(1) appears to me to be expressed in terms which support the notion that, where a creditor proves for a debt, his contractual rights as a creditor are satisfied if his proof is paid in full. By submitting a proof, a creditor is seeking "to recover his debt in whole or in part". The words "or in part" plainly refer to a case where part of the debt is protected by security, a possibility which is specifically catered for in rules 2.83, 2.93 and 2.94.

107.   The suggestion that an unsecured foreign currency creditor who proves for the totality of the sum which he is owed at the time of his proof is seeking to recover only "part" of his debt appears to me to be self-evidently wrong.

Accordingly, I would have thought that the natural import of rule 2.72 (and the similarly worded rule 4.73 in the case of liquidations) is that, save where the debt is partially secured, a creditor is treated as seeking to recover his debt "in whole" when he proves. If that is right, it would seem to me to follow that, if and when a foreign currency debt, which has been converted into a sterling-denominated proof in accordance with rule 2.86, is paid in full, the debt has been recovered "in whole". On that basis, I consider that it may be said to follow that there is no basis upon which the foreign currency creditors can base their claims for a contractual shortfall.

108.    The notion that a creditor who proves in a liquidation is "wishing to recover his debt in whole or in part" was first introduced in the 1986 legislation. The equivalent provision to rule 4.73 of the 1986 Rules in the 1949 Rules was rule 91, which provided that, subject to certain exceptions, "every creditor shall … prove his debt". This change in wording makes it unsafe to cite judicial decisions or observations as to the effect of proving under the previous insolvency legislation, or indeed under insolvency legislation in other jurisdictions, as a reliable guide as to the effect of proving under the 1986 Rules. Indeed, the change in wording is consistent with the notion that a change in substantive law was contemplated. I doubt that this analysis can be answered by characterising rule 2.72(1) as a purely administrative provision: it is a provision which should be given its natural meaning, at least in the absence of good reason to the contrary.

109.    The way in which rule 2.72 is expressed is significant not just in itself, but also because weight is put by CVI on the opening words of rule 2.86, namely "[f]or the purpose of proving …" (see eg per Briggs LJ in the Court of Appeal at [2016] Ch 50, para 148). Yet, if, as appears to me to be the position, the effect of rule 2.72 is that proving for a debt involves the creditor seeking to recover the debt in whole, and this means that payment in full of the proof satisfies the debt, then the opening words of rule 2.86 take the instant debate no further. In any event, I do not agree with the suggestion that, on the view I incline to favour, the opening words of rule 2.86 are "otiose" (as Briggs LJ put it at [2016] Ch 50, para 150). The rule would have been oddly expressed if the opening words had been omitted.

110.    In support of the contrary view, some reliance has been placed on the contrasting legislative provisions relating to bankruptcy. Bankruptcy is different from liquidation not least because (i) the bankrupt normally survives the bankruptcy through discharge, whereas the liquidation of a company is usually followed by its dissolution, and (ii) the statutory history of the two codes is different, and many of the differences have survived into the 1986 legislation. It is true that rule 6.96, which applies in bankruptcy, is expressed in the same way as rules 2.72 and 4.73, but I do not consider that takes matters any further. If a creditor who proves in a bankruptcy is paid 100p in the pound, I know of no reason why his debt should not be treated as having been satisfied in the same way

as a creditor in a liquidation or administration. Sections 279 to 281 do not appear to me to be in point because, as I read them, they are concerned with releasing a bankrupt from liabilities which have not been satisfied.

111.   The absence of any provision dealing with joint obligors or sureties where a creditor of a company is paid 100p in the pound seems to me to take matters little further. On any view, the rights of such parties would have to be assessed by the court in a case where a creditor is paid less than 100p in the pound, as has been the position in relation to disclaimers by liquidators under section 181, where the courts have had to work out the consequences for sureties - see *Hindcastle Ltd v Barbara Attenborough Associates Ltd* [1997] AC 70. It is true that section 281(7) deals with joint obligors and sureties of a bankrupt, but that section, which re-enacts a statutory provision in the 1914 Act, appears to be intended to apply to cases where the creditor of a bankrupt has not been paid 100p in the pound. Quite apart from this, section 281(7) only applies where the bankrupt is discharged, a situation which has no equivalent in corporate insolvency. Just as in the case of joint obligors or sureties of an insolvent company, there is no provision dealing with joint obligors and sureties of a bankrupt where the bankrupt has not been discharged. The same points apply to section 251I, which in any event cannot be of any assistance as it was only added by the Tribunals, Courts and Enforcement Act in 2007.

*Conclusion*

112.   In these circumstances, based on what I have referred to as the narrower or primary contention raised by the LBHI2 administrators, I conclude that it is not open to the foreign currency creditors to seek to claim as a non-provable debt, the difference between the sterling value of the debt at the administration date and the sterling value of that debt when paid, where the latter exceeds the former. It therefore follows that I would discharge paras (ii) and (iii) of the order made by David Richards J.

**The claim for post-administration interest in a subsequent liquidation**

*Can rule 2.88(7) interest be claimed from a subsequent liquidator?*

113.   As explained in para 27 above, rule 2.88(1) provides that, when a company is in administration, creditors can only prove for contractual interest on their debts up to the date of administration, but para (7) provides for payment of interest at the rate specified in para (9) out of any surplus in the hands of the administrator, ie once all proving creditors have been paid in full. The question to be addressed is

this: if, after LBIE has been in administration, it is then put into liquidation before such statutory interest has been paid to a creditor (whose principal debt will have been paid in full), can the creditor claim such interest from the LBIE liquidator, or prove for it in the LBIE liquidation? David Richards J held that it could not and so directed in para (iv) of the order which he made. The Court of Appeal disagreed.

114.   There are, of course, legislative provisions which deal with interest on debts owed by a company in the winding-up context. As explained above, section 189 of the 1986 Act is concerned with "interest on debts" in a winding-up of a company, and section 189(2) (which is set out in para 28 above) is in very similar terms to Rule 2.88(7), which was no doubt based upon it.

115.   Rule 4.93 is concerned with the payment of interest on a debt proved for in a liquidation, and para (1), as originally drafted, provided that "[w]here a debt proved in a liquidation bears interest", such interest is "provable as part of the debt except in so far as it is payable in respect of any period after the company went into liquidation". Following the introduction of distributing administrations, rule 4.93(1) was amended by the 2005 Amendment Rules, by the addition of new final words "or, if the liquidation was immediately preceded by an administration, any period after the date that the company entered administration".

116.   The LBL administrators contend that, if interest payable under rule 2.88(7) was not paid by the LBIE administrators while LBIE was in administration and LBIE then goes into liquidation, such interest cannot be claimed from the LBIE liquidator or proved for in LBIE's liquidation. They rest this contention on two propositions. First, rule 2.88(7) is a direction to an administrator of a company, and applies so long as the company is in administration and not thereafter. Secondly, section 189(2), which gives a right to claim interest on debts from a company in liquidation, only applies to interest which has accrued since the date of liquidation, and therefore there is no room for a creditor to claim interest which accrued before that date, and in particular during a pre-liquidation administration. In addition, even disregarding the amendment made to it in 2005, rule 4.93 only applies to debts which are proved for in the liquidation - and a creditor who was entitled to interest under rule 2.88(7) cannot prove for his debt in a subsequent liquidation, because his debt will have been paid out in full by the administrator. With no enthusiasm, David Richards J accepted the LBL administrators' contention, but the Court of Appeal disagreed.

117.   I agree with David Richards J's conclusion that the interest provided for in rule 2.88(7) cannot be claimed from a subsequent liquidator, and I share his lack of enthusiasm in reaching that conclusion. As to the conclusion, rule 2.88(7) plainly only applies so long as there is an administration in existence. It is, in my view, an accurate characterisation to describe it as a direction to the administrator of a

company while he is in office: thus, it seems to me that he would be susceptible to a claim by the proving creditors if he distributed a surplus to members without first paying statutory interest (see the discussion in *HIH Casualty* [2006] 2 All ER 671 referred to in para 52 above). On no view, can it be read as a direction to a potential or actual subsequent liquidator, acting in a liquidation taking place after an administration has ended. Rule 2.88(7) is in Chapter 10, and, as mentioned above, rule 2.68(1) provides that that Chapter applies to a distributing administration. So, when the administration ends, rule 2.88(7) can no longer apply. And the effect of section 189(2), supported by rule 4.93, is clear: there is no room for rule 2.88(7) interest to be proved for, or to be paid, once a company, which was formerly in administration, is then put into liquidation.

118.    As to the lack of enthusiasm, there seems to be no reason why a creditor of a company in administration should lose what would otherwise be his right to statutory interest provided for by rule 2.88, simply because the company goes into liquidation before that interest has been paid. All the more so given that, as mentioned in para 27 above, rule 2.88 itself was amended in 2005 so that, in an administration following a liquidation, the interest which can be claimed under the rule dates back to the liquidation date, rather than the date of administration, but this underscores the force of the point that no similar amendment has been made to section 189(2). And the 2005 amendment to rule 4.93, which dealt with interest which would otherwise accrue after the administration date in the case of a company which subsequently goes into liquidation, further underscores the point.

119.    It seems likely that there was an oversight on the part of those responsible for revising the 1986 Act and the 1986 Rules when they were amended to provide for a distributing administration by the 2002 Act and the 2003 Amendment Rules. Two amendments were subsequently made to the 1986 Rules, explained respectively in paras 115 and 27 above: rule 4.93 was amended appropriately by the 2005 Amendment Rules and, even more in point, rule 2.88 was appropriately amended by the same 2005 Amendment Rules. However, section 189(2) was not amended, quite possibly because it is more difficult to amend primary, than secondary, legislation.

120.    Under the United Kingdom's constitutional arrangements, it is not normally appropriate for a judge to rewrite or amend a statutory provision in order to correct what may appear to have been an oversight on the part of Parliament. That would involve a court impermissibly usurping the legislative function of Parliament. As Lord Nicholls of Birkenhead said in *Inco Europe Ltd v First Choice Distribution* [2000] 1 WLR 586, 592 when discussing the judicial approach to statutes, "[t]he courts are ever mindful that their constitutional role in this field is interpretative" and "[t]hey must abstain from any course which might have the appearance of judicial legislation". For this reason, it would be impermissible to have recourse to an entirely new Judge-made rule to fill the gap in the present case. There has been

no such rule nor any similar rule in the past (unsurprisingly, as administration is a new concept and a distributing administration is even newer), and the invention of such a rule would be inappropriate for the reasons discussed in paras 117 to 120 above.

121.   The Court of Appeal appreciated this problem, but they considered that they could arrive at a commercially sensible conclusion on various grounds. While I sympathise with their wish to avoid the unattractive conclusion arrived at by the Judge, none of those grounds is supportable. The notion that a liquidator in a subsequent liquidation would be obliged to pay the interest which had accrued during the previous administration under rule 2.88(7) would be inconsistent with the fact that rule 2.88 only applies during the administration. Further, it would be inconsistent with the liquidator's duties as set out in the 1986 Act and the 1986 Rules if the liquidator was required to pay out money for which there was no warrant in the relevant legislative provisions. He does not stand in the shoes of the former administrator: he is the holder of a different statutory office with its own, different, statutorily imposed duties. And the notion that payment of statutory interest could be said to be a liability of the company concerned (as discussed in paras 49 and 53 above) takes matters no further. It would only be such a liability to the extent that the 1986 Act and the 1986 Rules provide, and that brings one back to the fact that rule 2.88 only applies while the company is in administration, and there is no "carry over" provision.

122.   Further, the principle laid down in *Quistclose Investments Ltd v Rolls Razor Ltd* [1970] AC 567, on which Briggs LJ relied, is not in point. It applies where money is transferred by one party to another party for a specific purpose. In this case, there would be no transfer, and there would be no purpose. No transfer because the administrator would simply relinquish office and the liquidator would assume a different office, albeit in relation to the same company and the same assets. No purpose, because, in relation to the company's assets, the administrator would have been responsible for them for his statutorily imposed purposes, and the liquidator for his.

123.   Quite apart from this, while the solution adopted by the Court of Appeal deals with the lacuna as it applies on the facts of the present case, it would not provide a complete answer. Thus, the solution would only apply to any surplus which had been in the hands of the administrator, and it could only be invoked by creditors who had lodged proofs in the administration. Accordingly, the Court of Appeal's solution would not help in a case where the administration preceding a liquidation had not been a distributing administration, a situation in which the unfairness of a lacuna would be even more marked. Lewison LJ thought, at paras 108 and 109 of his judgment, that "a limited solution is better than no solution at all". I would agree with that approach if the court had been simply seeking to arrive at as reasonable and commercial a result as possible: a partially

unreasonable and uncommercial outcome would be preferable to a generally unreasonable and uncommercial outcome. However, when it comes to deciding the meaning of a legislative provision, judges are primarily concerned with arriving at a coherent interpretation, which, while taking into account commerciality and reasonableness, pays proper regard to the language of the provision interpreted in its context. David Richards J's conclusion produced a coherent, if unattractive and quite possibly unintended, outcome, which paid proper, if reluctant, regard to the applicable provisions of the 1986 Act and the 1986 Rules.

*Does the right to contractual interest revive?*

124.   As just explained, David Richards J rightly concluded that a creditor of LBIE who had been entitled to, but had not been paid, interest under rule 2.88(7), could not claim such interest from a subsequent liquidator or prove for such interest in the subsequent liquidation. However, he went on to hold that such a creditor could nonetheless recover interest at the contractual rate for the period of the administration as a non-provable debt from any surplus, and so directed in para (v) of the order which he made. The Court of Appeal allowed the LBHI2 administrators' and LBHI's appeal on this point, on the very limited ground that the holding must be wrong in the light of their conclusion that such a creditor could claim the rule 2.88(7) interest from the liquidator. However, given my view that the Court of Appeal was wrong on that issue, it is necessary to consider whether the Judge was right in holding that a creditor's contractual right to interest revived.

125.   In my judgment, contrary to the conclusion reached by David Richards J, the contractual right to interest for the post-administration period does not revive or survive in favour of a creditor who has proved for his debt and been paid out on his proof in a distributing administration. As already mentioned in *In re Humber Ironworks* LR 4 Ch App 643, 647, Giffard LJ, having held that a creditor could only prove for contractual interest up to the liquidation date, explained that "[t]hat rule … works with … fairness", because "where the estate is solvent …, as soon as it is ascertained that there is a surplus, the creditor … is remitted to his rights under his contract". However, as I have also explained, that observation was made in the context of a decision which was wholly based on what Giffard LJ expressly described as "Judge-made law", because the contemporary statutory provisions gave no guidance as to how contractual interest was to be dealt with in a winding-up. The position is, of course, very different now, especially in relation to interest on proved debts in liquidations and administrations. In that connection, I consider that the legislative provisions discussed above, namely rules 2.88 and 4.93 and section 189 provide a complete statutory code for the recovery of interest on proved debts in administrations and liquidations, and there is now no room for the Judge-made law which was invoked by Giffard LJ. It seems to me that this view is consistent with what David Richards J said in *In re Lehman Brothers International*

*(Europe) (in administration)* [2016] Bus LR 17, para 164, although the point which was there being considered was more limited.

126.    This issue has some echoes of the currency conversion claim issue. In each case, I consider that the contractual right (in this case to recover interest and in the case of currency conversion claims, to be paid at a particular rate of exchange) has been replaced by legislative rules. On that basis, there is no room for the contractual right to revive just because those rules contain a *casus omissus* or because they result in a worse outcome for a creditor than he would have enjoyed under the contract.

127.    To put what may ultimately be the same point in somewhat different terms, it strikes me as rather bold to suggest that interest which accrues due between the date of administration and the date of liquidation can be claimed as a non-provable debt, when section 189(2) specifically gives the right to make such a claim for interest only when it accrues after the liquidation, and rule 4.93 as amended specifically deals with interest accruing during an administration in the case of a company which subsequently goes into liquidation.

*Conclusion*

128.    In these circumstances, without enthusiasm, I would reverse the Court of Appeal's decision and restore the direction given by the Judge in para (iv) of his Order, and, albeit for very different reasons, I would uphold the Court of Appeal's allowance of the appeal against para (v) of the order made by David Richards J.

**The issues concerning contributories: general**

129.    As explained in para 35 above, the remaining issues arise from the provisions of the 1986 Act and the 1986 Rules which are concerned with the liability of contributories. In recent years, these provisions and their legislative predecessors have been relatively rarely invoked. This is because the great majority of modern companies are limited by shares, and the provisions dealing with contributories can only come into play in relation to such companies where there are shares which are not paid up, and that is a relatively infrequent state of affairs. However, in the present case, LBIE is an unlimited company, and so the provisions have a potentially substantial part to play.

130.    Section 74(1) provides:

> "When a company is wound up, every present and past member is liable to contribute to its assets to any amount sufficient for payment of its debts and liabilities, and the expenses of the winding up, and for the adjustment of the rights of the contributories among themselves."

131.   As Briggs LJ explained in [2016] Ch 50, para 172, subsequent subsections of section 74 contain limitations, and they include a provision that no contribution is required from any member exceeding the amount unpaid on shares, where the company is limited by shares. In this case, because LBIE is an unlimited company, section 74 has, at least potentially, an unusually substantial effect.

132.   Section 148 provides that, "[a]s soon as may be after making a winding-up order, the court shall settle a list of contributories". By section 150(1):

> "The Court may, at any time after making a winding-up order … make calls on all or any of the contributories for the time being settled on the list of the contributories to the extent of their liability, for payment of any money which the court considers necessary to satisfy the company's debts and liabilities, and the expenses of winding up, and for the adjustment of the rights of the contributories among themselves, and make an order for payment of any calls so made."

Section 154 provides that the Court shall adjust the rights of the contributories among themselves and distribute any surplus among the persons entitled to it. Pursuant to section 160(1), rules 4.195 to 4.205 delegate the powers and duties of the Court in relation to contributories to the liquidator subject to the court's control. Hence it is the liquidator who settles the list of contributories and makes calls from contributories, but he does so on behalf of the court.

133.   Unlike the contents of the 1986 Rules, which, as explained above, are almost all either new provisions or rewritten versions of their legislative predecessors, the provisions of the 1986 Act relating to contributories are largely unchanged from their predecessors. Thus, section 74, section 148, and sections 150 and 154 are respectively expressed in virtually identical terms to section 38, section 98, section 102 and section 109 of the Companies Act 1862 (25 & 26 Vic c 89); and similar provisions are to be found in successive Companies Acts up to the Companies Act 1985.

134.   Four issues arise out of LBIE's administration in relation to contributories. The first is self-contained, and it is whether contributories can be liable to contribute towards liability for statutory interest and/or non-provable liabilities. The other three issues arise from the facts that (i) as explained in para 2 above, LBHI2 and LBL, as shareholders of LBIE, are both potentially liable as contributories, and (ii) as explained in para 6 above, LBHI2 and LBL are also both unsecured creditors of LBIE, and they have each lodged proofs in the administration of LBIE in respect of substantial sums.

## Liability of contributories for statutory interest and non-provable liabilities

*Introductory*

135.   The issue to be addressed is whether the phrase "debts and liabilities" in section 74(1) extends to statutory interest and non-provable liabilities, as the LBIE administrators contend. David Richards J held that the phrase does extend to statutory interest and non-provable liabilities, and this was recorded in para (vi) of the order which he made. The Court of Appeal agreed. In this connection, it was common ground below, and accepted by the Court of Appeal, that statutory interest and non-provable liabilities were not "debts" because that expression is limited to provable debts (in the light of the terms of rules 12.3 and 13.12). However, the LBIE administrators argued, and the courts below accepted, that statutory interest and non-provable liabilities constituted "liabilities" within section 74(1). That proposition is challenged by the LBHI2 administrators on this appeal.

*Non-provable liabilities*

136.   It is convenient to take non-provable liabilities first. I find it difficult to see why they are not within the expression "liabilities" in section 74(1). A non-provable liability of a company is *ex hypothesi*, as a matter of ordinary language, a liability of the company, albeit that it would appear to be a contingent liability, at least until it is clear that there is a surplus after all provable debts (and, at least normally, any statutory interest) have been paid in full. Despite the argument of the LBHI2 administrators to that effect, there do not appear to be any convincing grounds to support the argument that the expression "liabilities" in section 74(1) is limited to liabilities which can be the subject-matter of a proof. Neither section 74 nor rules 12.3 or 13.12 appear to contain anything in them to support such a reading. Indeed, in rule 13.12(4), "liability" is widely defined and in particular in such a way as not to limit it to provable liabilities.

137.   The LBHI2 administrators nonetheless argue that, because section 74 only applies after a winding-up and the liquidator has no liability to pay non-provable liabilities, such claims cannot be liabilities under section 74(1). I cannot accept that argument. In my view, section 74(1) refers to the "debts and liabilities" of the company, and therefore it can be invoked to ensure that non-provable liabilities are paid by the contributories. Further, the liability of contributories under section 74(1) and 150(1) is to the court, and, as explained in para 132 above, the liquidator is acting effectively on behalf of the Court when seeking payments under that section: it is an additional function to his more familiar role, which is concerned with provable debts and liabilities.

138.   More importantly in the present context, as discussed in paras 58 to 61 above, although there is no legislative provision requiring a liquidator to pay non-provable liabilities, he is, and has always been regarded by the courts as being obliged to pay off any such claims. I cannot in these circumstances see any basis for acceding to the contention that non-provable liabilities against a company are not within the scope of section 74 so far as its members are concerned.

*Statutory interest*

139.   The position with regard to statutory interest is in my view very different. Statutory interest is due under rule 2.88(7), and that provision states that the liability to pay such interest is only out of any "surplus remaining after payment of the debts proved". The contrary view was taken in the courts below, and I accept that their conclusion is more consonant with what one would expect. Nonetheless, it seems to me that there is no answer to the simple proposition advanced by the LBHI2 administrators that, as section 74 only requires payment from contributories of an "amount sufficient for payment of [a company's] … liabilities", the section cannot be invoked to create a "surplus" from which statutory interest can then be paid. If there is a deficit, there is no liability for statutory interest, and, if there is a surplus, there is only a liability for statutory interest to the extent of the surplus. Accordingly, in the absence of a sufficient surplus to pay all the statutory interest, there is no obligation to pay all the statutory interest, and therefore there can be no "liabilit[y]" which a contributory could be called on to meet under section 74(1). In effect, the LBIE administrators' argument to the contrary involves them pulling themselves up by their own bootstraps.

140.   Moore-Bick and Briggs LJJ concluded, in agreement with David Richards J, that they could defeat this analysis by relying on the proposition that the right under section 74 to make calls on contributories is itself an asset of the company. Accordingly, they reasoned, "where the aggregation of that right with the other assets of the company disclosed a surplus, then the making of the call, together

with payment by contributories in response to it, merely enabled statutory interest to be distributed, rather than created the surplus in the first place" (to quote Briggs LJ at [2016] Ch 50, para 197).

141.    In my view, that attractively expressed analysis does not answer the simple logic of the argument set out in para 139 above. Section 74(1) can only be invoked in order to pay off "liabilities", and, while I accept that that expression extends to contingent liabilities, it involves circuity of reasoning to say that the section can be invoked in relation to a liability which is contingent on the section being invoked. We were referred to observations of Lord Hatherley LC and Lord Chelmsford in *Webb v Whiffen* (1872) LR 5 HL 711, 718 and 724, which emphasised the broad scope of the power conferred by section 38 of the 1862 Act, but they cannot justify interpreting section 74(1) in a way which is inconsistent with the wording of the rule which is said to found the basis of the particular exercise of the power.

142.    The majority of the Court of Appeal also thought that LBHI2 and LBL administrator's argument relied too much on the way in which rule 2.88(7) is expressed. To quote Briggs LJ at [2016] Ch 50, para 198, "the use in section 189, rule 2.88 and elsewhere in the statutory code of the concept of payment out of a surplus is merely a convenient way of identifying liabilities which fall lower than other liabilities in the priorities encapsulated in the waterfall". It seems to me that this analysis involves re-writing the legislative provision to enable it to achieve a more instinctively likely result than if the actual words used in the provision are construed according to the normal principles of interpretation. Briggs LJ could well be right if one was concerned with identifying what the drafters of rule 2.88(7) thought that they were doing, although, because I believe that his re-writing of the rule would only make a difference in the rare case where section 74 applies, it may be more a matter of oversight than wrongly expressed intention. However, Briggs LJ's analysis does not, with respect, fairly reflect what the drafters of rule 2.88 actually wrote. The result of interpreting the words used in rule 2.88(7), unless one departs in a significant way from their natural meaning, may be counter-intuitive, even surprising, in a case where section 74 applies, but it is not absurd or unworkable, and therefore it should be adopted.

143.    Unlike Moore-Bick and Briggs LJJ, Lewison LJ was not persuaded by the arguments so far discussed. However, he agreed in the outcome, as he considered that, if (as I have concluded) non-provable liabilities can be the subject-matter of a section 74 claim from contributories, it must follow that statutory interest is in the same position because it ranks above non-provable liabilities in the waterfall summarised in para 17 above. Apart from the fact that one could equally well argue for the converse, it seems to me that that argument wrongly treats the statement quoted in para 17 above as some sort of fundamental principle of law. It is not. If money can be sought from contributories to pay non-provable liabilities, it does not follow that money can also be sought, or that the money obtained can

be used, to pay otherwise irrecoverable statutory interest. It merely means that any statutory interest is, as it were, by-passed in favour of non-provable liabilities. Statutory interest is payable out of "any surplus" which arises after payment of provable debts; if there is no surplus, but the liquidator can invoke section 74 to obtain money to pay other non-provable liabilities, it seems to me that, given that the money so obtained has been extracted for a specific purpose, it cannot be treated as a "surplus" which can be used for another purpose.

144.   It is true that the cases mentioned at the end of para 60 above underline the importance of a liquidator paying off the company's indebtedness before distributing any surplus to members. However, I do not think that they help the LBIE Administrators' case that statutory interest can found a section 74 claim (although they provide support for their case on non-provable liabilities). So long as there are assets to distribute to members, there is a surplus, and section 74 does not come into play, and once there is no surplus, there is nothing to distribute to shareholders. For the same reasons, I cannot see how the argument of the LBIE Administrators on this issue is assisted by the fact that section 74(1) can be invoked "for the adjustment of the rights of the contributories among themselves".

145.   It may be that the LBHI2 administrators are right for another reason, namely that statutory interest is not a liability of the company in question, but of its administrator or its liquidator. That was an argument which concerned Lewison LJ in the light of *In re Pyle Works* (1890) 44 Ch D 534, where it was held that the power to call on contributories is not part of the capital of the company - see at pp 575, 584 and 588, per Cotton, Lindley and Lopes LJJ respectively. The point has some echoes of the argument considered in relation to the subordinated debt in paras 51 and 52 above, but we do not need to decide it and I do not think we should do so.

146.   Having said that, I accept that my conclusion does produce the anomalous result that, where section 74 applies, there will be circumstances when one type of creditor who normally has priority over another type will receive nothing when the other type of creditor will be paid in full. It is therefore readily understandable why the courts below tried hard to find a way round this conclusion. However, the conclusion does not lead to any practical or even any conceptual difficulty (see paras 143 and 144 above). Further, if one rejects my conclusion, one is left with the unpalatable choice of holding that a payment for statutory interest is recoverable under section 74 despite the wording of the section and the provisions for statutory interest as discussed in paras 139 to 142 above, or of holding that a payment for other non-provable liabilities is irrecoverable under section 74 despite the argument discussed in paras 136 to 138 above.

147.   It is perhaps right to add that the conclusion that section 74 can be relied on to meet non-provable liabilities but not statutory interest may appear, at any rate at first sight, to conflict with what is said in paras 65 and 66 above in relation to the priority of the subordinated debt. In those paragraphs, I was concerned to explain that, while a party could validly contract to be in a worse position in the waterfall than he would normally be, he could not validly contract to improve his position in the waterfall (unless all those who are thereby disadvantaged have agreed). That is because, unless he agrees otherwise, a person is entitled to insist on his legal rights, which includes priorities in the waterfall. However, it is a different matter where the effect of a statutory provision purports to have the effect of changing or by-passing such priorities: the priorities are statutory (with some Judge-made additions), and therefore there is no reason why any statutory variation or modification cannot be effective.

*Conclusion*

148.   Accordingly, albeit without enthusiasm, I would allow the LBHI2 administrators' appeal on the issue whether section 74 can be invoked in order to pay statutory interest, but I would dismiss their appeal on the issue whether that section can be invoked in order to meet other non-provable liabilities. I would therefore allow the appeal in part against para (vi) of David Richards J's order.

**Contributories who are also creditors of LBIE**

*Introductory*

149.   As explained above, LBHI2 and LBL are each both creditors of, and potential contributories to, LBIE. Three questions arise from this. The first is whether the LBIE administrators are, as they argue, entitled to prove in the potential distributing administrations (or liquidations) of LBHI2 and LBL in respect of each company's respective potential liability to contribute in a future liquidation of LBIE. The second and third questions arise from the argument pursued by LBHI, effectively on behalf of LBHI2 and LBL, that those two companies are entitled to be paid in LBIE's distributing administration in their capacity as creditors of LBIE, even though in due course they may very well be liable as contributories under section 74. The LBIE administrators meet this argument with two contentions. Their first contention is that the potential liability of LBHI2 and LBL as contributories can be set off as a contingent debt in the administration of LBIE pursuant to rule 2.85, which gives rise to the second question. Alternatively, and this gives rise to the third question, the LBIE administrators contend that they are entitled to rely on the so-called contributory

rule, and so can resist paying LBHI2 and LBL on their proofs until they have met their liabilities as contributories (or it is clear that they will have no such liability).

150.    I shall take these three questions in turn.

*Can the LBIE administrators prove for contributories' potential liability?*

151.    Both the Judge and the Court of Appeal held that the LBIE administrators were entitled to prove in the administrations of LBHI2 and LBL in respect of the potential prospective liabilities of those companies as contributories of LBIE (which I will refer to as a "prospective section 150 liability"). This is recorded in para (viii) of the order made by the Judge.

152.    In order for a prospective section 150 liability to be provable in the administrations of LBHI2 and LBL, it is accepted by the LBIE administrators that it would have to be a contingent obligation under rule 2.85. At any rate on the face of it, such a liability would appear to be contingent, as it could arise in the event of LBIE going into liquidation, and its liquidator being unable to meet all claims and making one or more calls under section 150. The more difficult question would seem to be whether the prospective section 150 liability constitutes an "obligation" within rule 13.12. In that connection, it was accepted in the courts below and by the parties that the guidance given in *In re Nortel GmbH* [2014] AC 209, para 77 applies. That guidance is as follows:

> "… [T]he mere fact that a company could become under a liability pursuant to a provision in a statute which was in force before the insolvency event, cannot mean that, where the liability arises after the insolvency event, it falls within rule 13.12(1)(b). It would be dangerous to try and suggest a universally applicable formula, given the many different statutory and other liabilities and obligations which could exist. However, I would suggest that, at least normally, in order for a company to have incurred a relevant 'obligation' under rule 13.12(1)(b), it must have taken, or been subjected to, some step or combination of steps which (a) had some legal effect (such as putting it under some legal duty or into some legal relationship), and which (b) resulted in it being vulnerable to the specific liability in question, such that there would be a real prospect of that liability being incurred. If these two requirements are satisfied, it is also, I think, relevant to consider (c) whether it would be consistent with the regime under which the liability is imposed to conclude that the step

or combination of steps gave rise to an obligation under rule 13.12(1)(b)."

153.    In my view, that approach is apt in connection with a prospective section 150 liability. It is true that any claim against a contributory can be said to arise from contract, in that the basis of such a claim is contractual in origin. Thus, Lord Cranworth LC said in *Williams v Harding* (1866) LR 1 HL 9, 22 that a not dissimilar obligation under section 90 of the Bankruptcy Act 1861 (24 & 25 Vict c 134) "be referred back to the year … when he became a shareholder" - and see at pp 27-28 per Lord Kingsdown to the same effect. However, as each of them went on to say, the obligation in question was nonetheless "cast on [the contributory] by law" or "made under the statute". In relation to section 150, such an approach is supported by section 80, which describes the liability of a contributory as a debt "accruing due from him at the time when his liability commenced, but payable at the times when calls are made". Accordingly, it is ultimately a statutory obligation, albeit that exposure to such an obligation arises as a result of contract. I can therefore see no reason not to follow the approach suggested in *Nortel GmbH* [2014] AC 209, para 77.

154.    In my opinion, application of that approach to a prospective section 150 liability justifies a different conclusion from that reached by the courts below. This view is based on a combination of two propositions. First, the effect of section 150 and rule 4.195 is that the liquidator is the person entitled to make a call, and he possesses that entitlement for the purpose of performing his statutory duties. Secondly, the nature of the liability to contribute is such that it should not be capable of being the subject matter of a proof unless the company concerned is in liquidation, even bearing in mind the wide provisions of rules 2.85 and 13.12.

155.    It is clear from section 150 that the right to make calls on contributories only arises when a company is being wound up by the court. There are many judicial dicta which emphasise that a contributory has no liability until the company concerned is wound up (eg per Sir George Jessel MR in *In re Whitehouse & Co* (1878) 9 Ch D 595, 599 and per Cotton, Fry and Bowen LJJ in *Whittaker v Kershaw* (1890) 45 Ch D 320, 326 and 328-329), and it is consistent with section 80. However, those dicta, like section 80 itself, appear to me to take matters no further for present purposes, at least on their own, as they are consistent with the notion that a contributory has a liability for calls under section 150 which is contingent at least until the company concerned goes into liquidation, and probably until the liquidator makes a call.

156.    More to the point, however, it appears to me that any money paid pursuant to a call made under section 150 is not paid to or for the company, but to the liquidator, in order to enable him, as subsection (1) provides, to "satisfy the

company's debts and liabilities, and the expenses of winding up". The point is underscored by comparing this wording with that of section 149(1) which empowers the court, after it has made a winding-up order, to require "any contributory … to pay … any money due from him … to the company". As was explained in *In re Pyle Works* 44 Ch D 534, per Cotton LJ at pp 574-575 and Lindley LJ at pp 582-583 (quoted at [2016] Ch 50, paras 113-119), any money paid under section 74 cannot be treated as part of the property of the company concerned: it forms a statutory fund which can only come into existence once the company in question has gone into liquidation. A similar point was more recently made in *In re Oasis Merchandising Services Ltd* [1998] Ch 170, 182, where Peter Gibson LJ giving the judgment of the Court of Appeal, drew a "distinction … between the property of the company … (and property representing the same) and property which is subsequently acquired by the liquidator through the exercise of rights conferred on him alone by statute and which is to be held on the statutory trust for distribution by the liquidator". The importance of distinguishing some statutory rights of a liquidator from the rights of the company in liquidation is also apparent from the judgments of Millett J in *In re MC Bacon Ltd* [1991] Ch 127, 136-137, and of Knox J in *In re Ayala Holdings Ltd (No 2)* [1996] 1 BCLC 467, 470-484.

157.   As Lewison LJ said at [2016] Ch 50, para 126, the effect of the reasoning in *Pyle Works* is:

> "(i)    that capital capable of being raised only in a winding up is not part of the capital of the company in the ordinary sense;

> (ii)    that the liquidator is the only person empowered to make the call;

> (iii)    that the statutory fund created by the call comes into existence only when the company is in liquidation;

> (iv)    that when paid the call is payable to the liquidator as an officer of the court, and not to the company;

> (v)    that there can be no anticipation of future calls."

158.   Thus, where the company seeking to prove possible future calls is not in liquidation, there is not merely no extant debt: there would appear to be no existing person who could be identified as a potential creditor, merely a person who may

(or may not) in due course exist, namely a possible future liquidator. There are therefore obvious problems with the notion that the company or its administrator could prove. In this connection, I do not accept the argument that, because section 80 states that a contributory is a debtor from the time he acquires his shares, there must be a creditor at that time, and therefore the company is the creditor. Section 80 identifies the contractual source of a liability on a call (which is described as a debt, even though it is not actually payable until there is a call) and the person entitled to make the call, namely a liquidator - see in this connection the observations in *Williams v Harding* LR 1 HL 9 cited in para 153 above.

159.   If this were the only problem with the LBIE administrators' case, it may conceivably have been appropriate to conclude that LBIE or its administrators, as some sort of agent for a future liquidator of LBIE, could prove for the potential section 150 liability of LBHI2 and LBL in their respective administrations. It is unnecessary to consider whether that would have been possible because of the other problems faced by the LBIE administrators' case on this issue.

160.   Thus, quite apart from the fact that he is not a creditor in respect of the potential section 150 liability, it appears to me that there would be serious difficulties if an administrator of a company could prove for such a liability. If the LBIE administrators could prove for such a liability in the administrations of LBHI2 and LBL, it would seem to follow that LBIE could prove in respect of such a liability even if it was in good financial health. I find it difficult to accept that a company which is not insolvent and is trading should be able to prove for and recover sums representing payments in respect of calls, which are only capable of being made by a liquidator on behalf of the court in order to meet statutory liabilities which arise in the event of that company's winding-up.

161.   Perhaps on the assumption that a proof based on a contributory's potential liability would only be likely to lead to a substantial sum if the proving creditor was in poor financial health, Briggs LJ said at [2016] Ch 50, para 231, that the directors of the proving creditor "may reasonably be expected to use the fruits of that proof to keep the wolf from the door". In the first place, there is no reason, at least as a matter of law, which justifies that assumption. Secondly, even where it did apply, it would mean that the contributory's money was being used for a very different purpose from that for which it is statutorily intended. I am unconvinced by the argument that this point could be met by limiting the right to prove for a prospective section 150 liability to a case where the creditor company is in administration: some administrations result in the company being revived, and carrying on business. Further, the suggestion by Briggs LJ at para 233 that the sum paid by the insolvent contributory pursuant to such a proof could be used by the company "to put it back on its feet" is, again, inconsistent with the purpose of section 150.

162.   In addition, the notion that a company could prove for a prospective section 150 liability leads to this quandary. If a contributory pays out on a proof in respect of such a liability, it is unclear whether that would put an end to his liability as a contributory. If it would do so, then the whole point of section 150 would be thwarted: the contributory would be contributing towards putting the company on its feet (or keeping the wolf from the door) and could not then be called on again if the company became insolvent, which is the reason for being a contributory. Alternatively, if (as has been assumed in argument by all parties, and may be supported by the fact that there is no limit on the number of calls which a liquidator may make) paying on a proof in respect of a prospective section 150 liability would not put an end to the contributory's liability, he could sometimes find himself paying out twice - once for the costs of putting a company back on its feet (or keeping the wolf from the door), and if the company then falls over (or the wolf then gets in) for the more normal liabilities of a contributory.

163.   Other difficulties would arise if a company, which is solvent and viable, was entitled to prove in respect of a prospective section 150 liability in the insolvency of a contributory. Thus, sections 74(1) and 154 envisage that contributories should be entitled to "adjust" their rights "amongst themselves". It is difficult to see how that could be done, in the absence of any applicable statutory provision, in a case where a contributory is liable to pay out for a potential section 150 liability. Further, in most cases, it would also be very difficult to estimate the value of the right to invoke a call under section 150 if the company in question was a going concern. Apart from the inherently wholly speculative nature of the exercise of assessing the extent of the possible future insolvency, there would be the problem of allowing for settling the notional future list of contributories. Additionally, as Briggs LJ accepted at [2016] Ch 50, para 226, if a contributory could be held liable to a company in administration, he could find himself contributing towards the costs and expenses of the administration (as well as those of any subsequent liquidation), which is plainly not intended by section 74.

164.   Taking all these problems together, I conclude that it would not be open to LBIE to prove in the distributing administrations or liquidations of LBHI2 or LBL in respect of their potential respective liabilities to contribute under section 150 in the event of LBIE being wound up. I would accordingly allow the appeal of LBHI2 and LBL on this point and set aside para (viii) of the order made by David Richards J.

165.   As both Briggs and Lewison LJJ said, this is not an easy point, not least because of the wide words of rule 13.12, the general principle that all potential liabilities should if possible be provable, and the practical consequences of my conclusion. In relation to this last point, I acknowledge that, at least where the company to which it is liable to contribute is not itself in liquidation, this conclusion would enable a potential contributory to escape liability to contribute,

at least in some cases, by going into administration or liquidation. I also acknowledge that, in some cases, this conclusion would operate to induce a company to be wound up rather than to go into administration, or to induce an administrator to move a company into winding up. It may be that this raises a particularly acute problem for an administrator in the light of my conclusion in para 128 above in relation to statutory interest. However, I am unable to accept that these points can undermine the conclusion I have reached. They are ultimately attributable to the fact that distributing administrators have, either for good reason or through oversight, not been given all the powers of liquidators, and in particular have not been given the power to call on contributories.

*Can the LBIE administrators set off the contributories' potential liability?*

166.   The Judge and the Court of Appeal considered that the LBIE administrators were right to contend that they could set off against the proofs lodged by LBHI2 and LBL in respect of their claims as subordinated creditors, their respective prospective section 150 liabilities. This was declared to be the position in para (ix) of the order made by David Richards J. As Briggs LJ said, this followed from their conclusion that the prospective section 150 liabilities were provable. However, in the preceding section of this judgment, I have concluded that they are not provable, and it is therefore necessary to address the question of set-off.

167.   I do not accept the first line of argument advanced by LBHI, namely, that, simply because the prospective section 150 liabilities are not provable, that of itself means that they cannot be invoked by way of set-off by the LBIE administrators against the proofs lodged by LBHI2 and LBL. I can see no good reason why a debt owing by the creditor to the company which is or would be non-provable in the creditor's insolvency should thereby be disqualified from being set off under rule 2.85 against a proof lodged by the creditor in the company's administration.

168.   It is true that there is direct support for the notion that only a provable debt can be invoked to support a set-off, in the judgment of Rose LJ in *In re Bank of Credit and Commerce International SA (No 8)* [1996] Ch 245, 256, where he said "a claim is not capable of set-off unless it is admissible to proof … To qualify for set-off, therefore, the creditor's claim must be capable of proof … This is true of both sides of the account". In his speech in the appeal to the House of Lords, [1998] AC 214, 228, Lord Hoffmann said that he was "not sure that this is right", and mentioned the decision of the High Court of Australia, *Gye v McIntyre* (1991) 171 CLR 609 as reaching the opposite conclusion.

169.   In my view, Lord Hoffmann's doubts were justified, the decision on this point in *Gye* was correct, and Rose LJ's observation should be disapproved. There is nothing in rule 2.85 which, at least expressly, stipulates that the set-off liability has to be provable, and it is inappropriate to imply limitations into a legislative provision unless it is strictly necessary. In any event, the general purpose of insolvency set-off appears to me to point against implying any such restriction. As Parke B explained in *Forster v Wilson* (1843) 12 M & W 191, 204, the purpose of insolvency set-off is "to do substantial justice between the parties", which is reflected in the more recent analysis of Lord Hoffmann in *Stein v Blake* [1996] AC 243, 252-255. *Gye* was a clearly reasoned judgment of a powerful court, which included the observations at (1991) 178 CLR 609, 628-629 that there was "nothing at all" in the relevant legislation which required the set-off claim to be provable, that there was no "reason in fairness or common sense why such an additional test should be imposed", and "considerations of justice and fair dealing which underlie" the set-off provisions "require that a set-off be allowed in such circumstances". Further, the only case cited by Rose LJ to support his view, *Graham v Russell* (1816) 5 M & S 498 does not, with respect, appear to be in point.

170.   Accordingly, the mere fact that the prospective section 150 liabilities of LBHI2 and LBL are non-provable does not mean that, for that reason alone, they cannot be relied on by the LBIE administrators to set off against the respective proofs of LBHI2 and LBL in their capacities as creditors of LBIE. Nonetheless, I consider that LBHI is right to contend that such a set off would be impermissible.

171.   The various reasons set out in paras 152 to 165 above explaining why I consider that the prospective section 150 liabilities are not provable also serve to explain why they cannot be set off. Once one analyses who is entitled to make calls under section 150, what those calls are for, and the problems which would arise if the right to call could be raised as a contingent claim by the company concerned or its administrator, it seems to me that they are outwith the scope of rule 2.85 as well as rule 2.72. Thus, while it may appear somewhat casuistic, although the fact that the LBIE administrators cannot prove for the prospective section 150 liabilities does not of itself mean that they cannot invoke those liabilities by way of set-off, the reasons why the LBIE administrators cannot prove for those liabilities also justify the conclusion that they cannot invoke them by way of set-off.

*Does the contributory rule apply in distributing administrations?*

172.   In view of my conclusion that the LBIE administrators cannot set off the prospective section 150 liabilities of LBHI2 and LBL against their proofs, LBHI contends that those companies are entitled to be paid out on their proofs like any

other unsecured creditor. Given that LBHI2 and LBL are probably insolvent, the potential injustice of such an outcome is plain: although LBHI2 and LBL may each turn out to be liable under section 150 for a substantial sum (indeed, a sum which may be greater than their proved claims), they would have to be paid those claims in full, leaving a future liquidator of LBIE to receive nothing or a mere dividend in respect of any calls under section 150. Such an outcome would seem to me to be plainly inconsistent with one of the fundamental principles underlying the statutory corporate insolvency regime, namely the *pari passu* principle. It would also frustrate the statutory aim of enabling effective calls to be made in a liquidation.

173.   It is common ground that this problem would not arise if it was a liquidator, rather than administrators, of LBIE who was effecting a distribution because of the contributory rule, which is an aspect of a wider equitable principle known as the rule in *Cherry v Boultbee* (1839) 4 My & Cr 442. The contributory rule ("the Rule") was first applied in a corporate insolvency case 150 years ago in *In re Overend Gurney & Co; Grissel's Case* (1866) LR 1 Ch App 528, and it was more recently discussed by Lord Walker in *Kaupthing (No 2)* [2012] 1 AC 804. As he pithily expressed it at para 20, a "claimant could recover nothing as a creditor until all his liability as a contributory had been discharged". As he later explained, at para 53, when discussing the wider principle, the Rule "may be said to fill the gap left by disapplication of set-off, but it does not work in opposition to set-off. It produces a similar netting-off effect except where some cogent principle of law requires one claim to be given strict priority to another".

174.   The Rule applies in liquidations, although it is not provided for in the 1986 Act or the 1986 Rules, and is one of the surviving Judge-made rules of the insolvency code, as alluded to in para 17 above. The question is whether it can and should be applied in administrations, and, if so, how it should be so applied. In para (vii) of his Order, David Richards J held that the Rule did not have "any application in an administration (including the administration of LBIE)". The Court of Appeal agreed.

175.   A liquidator is statutorily authorised to make calls on a contributory, whereas an administrator is not, and the Rule has only ever been applied in liquidations. However, it does not necessarily follow from this that the Rule cannot be extended to administrations. Neither David Richards J nor the Court of Appeal thought it right so to extend it, but that was, in each case, after having concluded that the prospective section 150 liability of a contributory could be set off against its proved claim in the administration, a conclusion with which, as explained above, I disagree.

176.   As I have already indicated, given the detailed and coherent nature of the 1986 legislation, a judge must think long and hard before laying down a new Judge-made rule to liquidations. However, in this case, the course being contemplated does not involve inventing an entirely new rule. It involves extending an existing rule so that it can apply to what is an analogous, albeit not identical, situation to that to which it previously applied, and doing so in order to achieve precisely the same end for which it was conceived.

177.   A more difficult question is whether taking such a course would involve extending the contributory rule in a way which is inconsistent with the provisions or principles of the current legislation. There is, at least at first sight, a strong argument that such an extension would be inconsistent with rule 2.69 (which requires debts to be paid in full unless the assets are insufficient to meet them), and rule 2.88(7) (which requires any surplus remaining after payment of the debts proved to be applied in paying statutory interest "before being applied for any purpose") - see paras 20 and 27 above. The answer to this argument is to be found in the fact that the contributory rule undoubtedly applies in a liquidation - see per Lord Walker in *Kaupthing (No 2)* [2012] 1 AC 804, para 20 and per Briggs LJ in this case, [2016] Ch 50, para 243. Yet if the argument is correct, the contributory rule could not apply in a liquidation, as rule 4.181 and section 189(2) are expressed in effectively identical terms to rules 2.69 and 2.88(7) respectively. The true analysis is that the contributory rule is an aspect of a "general equitable principle" which operates as a qualification to the 1986 Rules regarding distributions in liquidations, and is needed to ensure compliance with the overall purpose of those rules (as discussed in *McPherson's Law of Company Liquidation*, 3rd ed (2013), paras 10.036, 13.097 and 13.099). Precisely those reasons justify the extension of a slightly modified version of the contributory rule to administrations.

178.   In these circumstances, I have come to the conclusion that it is permissible and appropriate for the LBIE administrators to apply the Rule to the proved claims of LBHI2 and LBL, provided it can be effected in a way which is practical, principled and in harmony with the applicable legislative provisions and principles.

179.   David Richards J rejected this conclusion, on the ground that:

> "The fundamental difficulty in applying the contributory rule in an administration is precisely because there is no statutory mechanism for making calls on contributories in an administration. While LBIE remains in administration, there can be no calls and therefore nothing that LBHI2 and LBL as members could do to put themselves in a position where they could prove as creditors in respect of their subordinated and

unsubordinated claims. Yet this would be the result of applying the contributory rule to a company in administration" - [2015] 1 Ch 1, para 188.

Briggs LJ expressed much the same view in the Court of Appeal:

"It would … be a serious injustice to a solvent contributory to be disabled from ever proving in a distributing administration because, in the absence of a call, there was nothing which he could pay to free himself from the shackles of the rule. The company might (and usually would) distribute all its assets to its creditors without ever going into liquidation, leaving the contributory high and dry, even though its liability as a contributory might be very small, and its claim as a creditor very large - [2016] Ch 50, para 239."

180.   I readily accept that, if the Rule was simply applied to a distributing administration in its existing terms, it could easily lead to injustice in the way described in those passages. However, in my view, a potential contributory can be protected if the Rule is applied with minor procedural modifications to distributing administrations. When making a distribution, the administrators should retain any sum which, if the Rule had not applied, would otherwise have been distributed to a contributory, in his capacity of a proving creditor. Thus, assuming a 100% dividend, if the administrator considers that a creditor's reasonable maximum potential liability as a contributory, A, is greater than his proved claim, B, then B must be retained. If A is less than B, then he can be paid (B-A), and A is retained. If the dividend is not 100% (as presumably almost by definition will be the case), then the position is a little more complex. The administrator would have to assess the likely level of dividend, C, and the same exercise would have to be carried out with (C x B) rather than B. Any such exercise would inevitably be speculative, and the administrator should be cautious but realistic. Any such retention should be kept safe and ready to be paid out appropriately when the final accounts were drawn up, and (save perhaps in these unusual days) the retained money would earn interest.

181.   What subsequently happens to that retained sum would depend on the outcome of the distributing administration. If it transpired that there were sufficient funds to meet all claims (other than statutory interest) payable under Chapter 10 of Part 2 (or if the contributories provided security for any potential liability they could have as contributories), then the retained sum could simply be paid to the contributories to meet their proved claims. If there were insufficient funds to meet all Chapter 10 claims (other than statutory interest), then, unless none of the potential contributories was good for any contributions, the administrators would, I

think, be bound to have the company wound up, for the very purpose of enabling a liquidator to make calls on the contributories, in which case the retained sum would be paid over to the liquidator. The liquidator would then proceed in accordance with the Rule, and would make calls on the contributories to enable any outstanding liabilities not met by the administrators to be met in so far as that was legally and practically possible, and the liquidator would apply the Rule in the normal way.

182.   If all sums payable (other than statutory interest) in the liquidation were duly paid without recourse to the retained sum, then the retained sum could be paid to the contributories. Otherwise, the retained sum would be dealt with in accordance with the duties of the liquidator. Referring back to paras 121 and 122 above, the liquidator would be obliged to deal with the retained sum in that way as it will have been held by, and been passed to him by, the administrator for that purpose.

183.   LBHI's objections to this course have force, but I do not consider that any of them represents a fatal objection either in law or in practice. It is perfectly fair to say that there is no legislative mechanism which provides for a reserved fund in an administration, let alone one which is liable to be handed over to a subsequent liquidator. However, it is scarcely surprising that there is no such mechanism, given that there is no legislative mechanism for the application of the Rule in the first place, even in liquidations. If, as I consider, justice requires extension of the Rule to administrations, I see no good reason why it should not be permissible to add a relatively simple procedural step which is needed to give effect to that extension, provided, as I say, that it is not inconsistent with any legislative provision.

184.   It is also true that, where it turns out that section 150 does not need to be invoked, a contributory may be kept out of the money which would have been distributed to him. However, in many such cases, the administrator will be able to be certain that section 150 need not be invoked when, or shortly after, the distribution is made; anyway, the reserved sum will attract interest. It is also true that it has been held that the Rule is not, at least normally, applicable to a contingent liability - see eg *In re Abrahams* [1908] 2 Ch 69. However, that was a decision on a will, and I do not consider that the same limitation is appropriate to a liquidation, not least in the light of the treatment of contingent liabilities in the 1986 Rules. Even assuming (which I doubt) that the same limitation would normally apply to section 150 claims, I do not see it as being so fundamental that it stands in the way of my conclusion.

185.   I was at one time attracted by Briggs LJ's point at [2016] Ch 50, para 243, that the courts did not need to devise an extension to the Rule as there would be

nothing to prevent an administrator from moving the company into liquidation simply in order to enable the Rule to be invoked against a contributory. However, if it would otherwise be right to continue the administration, it strikes me as involving a waste of time and money, as well as representing a potential inconvenience, to force an administrator to end the administration prematurely in such a way. Furthermore, given my (reluctant) conclusion in relation to statutory interest in para 128 above, effectively forcing an administrator to move the company into liquidation would potentially wreak real unfairness on all the other creditors of the company.

186.    Accordingly, I would allow the appeal of the LBIE administrators on this point, and set aside para (vii) of the Order made by the Judge. I draw support for this conclusion from Lord Walker's description of the Rule quoted in para 173 above. He said that it is intended to "fill the gap left by disapplication of set-off"; it seems to me that if the Rule is not extended to administrations, there would be a gap. Similarly, for the reasons just given, I do not consider that "some cogent principle of law requires" the Rule not to be extended to administrations.

**Conclusion**

187.    For these reasons, I would restore para (i), discharge paras (ii) and (iii), restore para (iv), uphold the discharge of para (v), vary para (vi), and discharge paras (vii), (viii) and (ix), of the order made by David Richards J. No doubt, counsel can agree a form of order which reflects the contents of this judgment.

**LORD SUMPTION:**

188.    I agree with the disposition of this appeal proposed by Lord Neuberger. I add a judgment of my own only in order to address some of the particular difficulties raised by the so-called currency conversion claims.

189.    The obligation of a foreign currency debtor is to pay the debt in the designated foreign currency. As a matter of contract, the only sterling sum which will satisfy that obligation is the sterling equivalent of the debt at the time of payment. This was the essential reason why, in *Miliangos v George Frank (Textiles) Ltd* [1976] AC 443, the House of Lords discarded the old rule of procedure that an English court could not give judgment in a foreign currency, but only in sterling at the rate of exchange prevailing when the debt fell due. Instead, it was held that unless previously paid in the contractual currency or its equivalent, the debt would be converted to sterling at the date of enforcement. Lord Wilberforce observed that circumstances had changed. In the world, then relatively

new, of fluctuating currency values, the old rule had given rise to problems whose resolution was "urgent in the interests of justice": see p 463G (Lord Wilberforce). This, he said at p 465G-H, was because

> "… justice demands that the creditor should not suffer from fluctuations in the value of sterling. His contract has nothing to do with sterling: he has bargained for his own currency and only his own currency. The substance of the debtor's obligations depends upon the proper law of the contract (here Swiss law): and though English law (*lex fori*) prevails as regards procedural matters, it must surely be wrong in principle to allow procedure to affect, detrimentally, the substance of the creditor's rights. Courts are bound by their own procedural law and must obey it, if imperative, though to do so may seem unjust. But if means exist for giving effect to the substance of a foreign obligation, conformably with the rules of private international law, procedure should not unnecessarily stand in the way."

190.   The application of the *Miliangos* principle to a liquidation was considered by Oliver J in *In re Dynamics Corporation of America* [1976] 1 WLR 757, a judgment subsequently approved by the Court of Appeal in *In re Lines Brothers Ltd* [1983] Ch 1. He held that foreign currency debts should be converted to sterling at the rate prevailing at the commencement of the winding up. The result was to shelter the creditor from the risk of a decline in sterling between the date when the debt fell due and the commencement of the liquidation. But the creditor remained exposed to the risk of a decline of sterling between the commencement of the liquidation and the payment of a dividend. This difference between the position of a judgment creditor and a creditor seeking to prove in a liquidation was, however, a necessary incident of any scheme for the distribution of an insolvent estate, because debts had to be expressed in a common unit of account valued as at a common date if creditors were to rank *pari passu* in their claims to the deficient pool of assets: see the judgment of Oliver J at pp 761-765.

191.   In both *In re Dynamics Corporation of America* and *In re Lines Brothers Ltd*, it was argued by analogy with the result in *Miliangos*, that the correct date of conversion should be the date of payment, the sterling value of the debt being restated at that date. The difficulty about this argument, as Brightman LJ pointed out in *In re Lines Brothers* (p 16) was that where there was a deficiency it was not consistent with *pari passu* distribution, because any upward restatement of the value of the foreign currency creditors' debts would have been at the expense of the sterling creditors:

> "The policy behind the decision, as … was recognised by counsel in argument before us, was that the foreign currency debtor should not be entitled to impose on the foreign currency creditor the risk of a fall in the value of sterling. Justice demands that the risk shall be borne by the debtor, who is the party in default. Hence the justice of the re-interpretation of the law, that the debtor in default is not to be excused from his contractual obligation by payment of anything less than the sterling equivalent of the money contractually due at the date of payment."

192.   At the time when in *In re Dynamics Corporation of America* and *In re Lines Brothers Ltd* were decided, there was no specific provision in the Companies Acts or the Winding-up Rules for the conversion of foreign currency debts. The mode of valuing them was determined by Judge-made law. Since 1986, it has been statutory. Rule 2.72 of the Insolvency Rules 1986 provides that a person claiming to be a creditor of a company must submit a proof to the administrator. Rule 4.73, which deals with liquidation, is in substantially the same terms. In both cases, a proof must state the value of the debt at the commencement of the administration or liquidation. I shall refer to this as the "cut-off" date. Rules 2.86 and 4.91 provide that "for the purpose of proving a debt incurred or payable in a currency other than sterling", the debt must be valued in sterling at the exchange rate prevailing on the cut-off date. The combined effect of these provisions is that a creditor with a foreign currency debt can prove only for its sterling equivalent at the cut-off date. The currency conversion claims made by the LBIE creditors arise from a fall in the value of sterling between the cut-off date and the date of payment of the dividend. The result is that at the date when the dividend comes to be paid, its amount will be based on a sterling valuation of the debt which is less than its actual sterling value on that date. The dividend will not therefore represent his pro rata share of the full amount which he was entitled by contract to be paid. Even if the company proves to be solvent and a dividend of 100 pence in the pound is paid on his proved debt, this will represent less than his contractual entitlement. Although described as currency conversion claims, the claims of the LBIE creditors are in reality simply claims for the unsatisfied balance of the original foreign currency liability. David Richards J and the majority of the Court of Appeal held that although a foreign currency creditor's proof was limited to the sterling equivalent of the debt at the cut-off date, the unsatisfied balance claimed by the LBIE creditors was recoverable as a non-provable debt in a case where there was a surplus available for that purpose after the satisfaction in full of provable debts.

193.   Non-provable debts are a necessary anomaly in the law of insolvency. Although successive statutory schemes have broadened the range of provable debts, some liabilities are still not provable. These are generally liabilities arising

after the commencement of the liquidation or administration, but which are not expenses of the office-holder because they arise from matters occurring while the company was a going concern. At the relevant time for the purposes of these proceedings (ie before the Rules were amended in 2006), they included liabilities in tort arising from breaches of duty before the cut-off date but giving rise to loss thereafter: *In re T & N Ltd* [2006] 1 WLR 1728, at paras 106-107. They still include statutory liabilities arising after the cut-off date by virtue of events occurring before: *In re Nortel GmbH* [2014] AC 209. As these examples demonstrate, non-provable debts are in principle payable out of any surplus remaining after the satisfaction of provable debts, notwithstanding the absence of express provision for them in the Act or the Rules. This is because the alternative would be to pay the surplus over to shareholders, something which is contrary to the fundamental principle that the assets of a company may not be returned to shareholders while there remains an outstanding unsatisfied liability. As Pearson J observed in *Gooch v London Banking Association* (1886) 32 Ch D 41, 48, the liquidators would be "guilty of a dereliction of duty if they were to distribute the assets without providing for this liability."

194.    I have no difficulty with the concept that non-provable debts may be recoverable from a surplus, but I do not accept the conclusion of David Richards J and the majority of the Court of Appeal that the unsatisfied balance of a foreign currency debt can be recovered on that basis. The reason can be shortly stated. It is axiomatic that where the Insolvency Rules deal expressly with some matter in one way, it is not open to the courts to deal with it in a different and inconsistent way. The recoverability of non-provable debts out of a surplus means that that the statutory rules for recovering a dividend on provable debts cannot be regarded as a complete code of the creditor's rights of recovery. But rules 2.86 and 4.91 must be regarded as a complete code for the specific case of foreign currency debts. Non-provable debts are normally debts for which no provision is made in the statutory mechanism of proof and distribution. But the Insolvency Rules do provide for foreign currency debts. Rules 2.86 and 4.91 provide that they are to be valued at the cut-off date and that distributions are to be made in accordance with that valuation. The limitations of these provisions are as much part of the statutory scheme as their positive enactments. It follows that if a debt is provable but the limited character of these provisions nonetheless leaves part of it unsatisfied, the creditor cannot recover more in respect of the same debt by reference to the Judge-made rules governing non-provable debts. A foreign currency debt is a provable debt. It is both inherently implausible and inconsistent with the language of the Rules to suppose that the legislator envisaged that the same debt could at one and the same time be recoverable as to part as a provable debt and as to the rest as a non-provable, conditionally on there being a surplus. That this limit on the recoverability of such debts was deliberate is strongly suggested by the fact that both the Law Commission and the Cork Committee, whose reports were the basis of the 1986 legislation, concluded that the unsatisfied balance of a foreign currency debt should not be recoverable, even if there was a surplus from which to

pay it. For my part, I have some misgivings about their reason for this conclusion, which was that since a creditor could not be required to account for a foreign currency gain arising from an appreciation of sterling, he should not be entitled to recover a loss arising from its fall. But that is beside the point. What matters is that, whether or not their reasons were good, their recommendation was on the face of it adopted by the legislator.

195.   This makes it unnecessary to determine the nature of insolvency proceedings as applied to debts in general. There are two possibilities. The first is that the statutory scheme for corporate insolvency works by discharging the creditor's legal right and replacing it by a right to receive a distribution from the insolvent estate in accordance with the Rules. In that case, there is no continuing contractual obligation which can be said to remain partially unsatisfied once the creditor has received all that the Insolvency Rules entitle him to. The second possibility is that insolvency proceedings merely operate as an administrative procedure for distributing the debtor's assets *pari passu* among its creditors when there is a deficiency, without abrogating or altering the creditor's pre-existing legal rights save in so far as the legislative scheme so provides. As David Richards J put it (para 110), the creditor's contractual rights are "compromised by the insolvency regime only for the purpose of achieving justice among creditors through a *pari passu* distribution." In that case, the creditor's claims survive and remain enforceable against any surplus assets, unless the legislation otherwise provides. On the view which I take, even if this latter analysis is correct, it will not avail the LBIE creditors, since in the case of foreign currency debts the legislation does otherwise provide.

196.   These fundamental questions about the nature of insolvency proceedings have arisen in the case law in a wide variety of legal contexts. It may well be necessary to answer them at some point in the future. In the meantime, I merely express the provisional view that there is much to be said for the way in which David Richards J and the majority of the Court of Appeal answered them.

197.   In the first place, the view that insolvency proceedings are in principle purely administrative, is consistent with the way that the law has developed historically. The origins of English insolvency law lie in statutory provisions governing personal insolvency which date back to the 16th century. The Companies Act 1862, which provided for the creation of the first modern limited liability companies, also provided for winding them up in accordance with a distinct regime for corporate insolvency. But the principles applied to personal and corporate insolvency were always closely related. Throughout their history, a cardinal feature of both has been that the effect of bankruptcy, winding up or administration on the company's existing liabilities is procedural, not substantive. Subject to any contrary order of the court, the commencement of insolvency proceedings suspends the creditor's right to proceed against the debtor or his

property for the recovery of his debt, and stays litigation already in progress. In other words, it suspends the creditor's remedies, but not his rights. The current statutory provisions are section 130 of the Insolvency Act 1986 (for a winding up by the court), section 285 (for personal bankruptcy), and Schedule B1, paras 43-44 (for administration). They are no different in their general approach from those which applied before 1986. The purpose of the procedural moratorium was to allow the insolvent's assets to be realised and distributed to his creditors in proportion to their justified claims. That process was also procedural. In the law of personal insolvency, a bankrupt remained personally liable for his pre-bankruptcy debts, for which he could be sued (and under the old law even imprisoned) for an indefinite period after his assets had been distributed to his creditors. The concept of discharge, which was first introduced into English insolvency law by the Bankruptcy Act 1705 (4 & 5 Anne c 17), was designed to mitigate that indefinite liability. By statute, the bankrupt might be discharged by an authority on whom powers were conferred for that purpose, originally the Lord Chancellor but ultimately the Chancery Division. This remains the position. Sections 279-281 of the Insolvency Act 1986 provide for automatic discharge a year after the bankruptcy order, but the time may be extended by the court. It will be apparent that the whole basis of the procedure for discharge was and is that the process of proof of debt and *pari passu* distribution of assets had not itself discharged the bankrupt. Discharge at the conclusion of the insolvency proceedings or at a specified time after their inception was never a feature of corporate insolvency, even on the limited basis on which it applied in personal insolvency. It was unnecessary, because a corporate insolvency ended with the dissolution of the company, as indeed with limited exceptions it still does.

198.   Secondly, English corporate insolvency law has from its inception adopted the principle which had always been fundamental to bankruptcy that liquidation was a mode of collective enforcement of debts, which operated procedurally and administratively rather than substantively and did not itself extinguish the creditors' liabilities. The point was first articulated by Lord Cranworth in *Oakes v Turquand* (1867) LR 2 HL 325, 364, in the context of the Companies Act 1862. For the same reason, Sir George Giffard stated, in *In re Humber Ironworks and Shipbuilding Co Ltd* (1869) LR 4 Ch App 643, 647, that upon a surplus being ascertained, so that *pari passu* distribution of a deficient estate is no longer relevant, "the creditor whose debt carries interest is remitted to his rights under his contract." A tentative statement to the same effect was made by Brightman LJ in *In re Lines Brothers Ltd*, at p 20. But the clearest modern statements of the principle are due to Lord Hoffmann. In *Wight v Eckhardt Marine GmbH* [2004] 1 AC 147, para 21, he rejected an argument that

> "the right to share in a liquidation is a new right which comes into existence in substitution for the previous debt and is governed by the law of the place where the liquidation is

taking place, rather in the way that obtaining a judgment
merges the cause of action in the judgment and creates a new
form of obligation, namely a judgment debt, governed by its
own rules of enforceability."

His reason was as follows:

"26.   … It is first necessary to remember that a winding up
order is not the equivalent of a judgment against the company
which converts the creditor's claim into something juridically
different, like a judgment debt. Winding up is, as Brightman
LJ said in *In re Lines Bros Ltd* [1983] Ch 1, 20, 'a process of
collective enforcement of debts'. The creditor who petitions
for a winding up is 'not engaged in proceedings to establish
the company's liability or the quantum of the liability
(although liability and quantum may be put in issue) but to
enforce the liability'.

27.   The winding up leaves the debts of the creditors
untouched. It only affects the way in which they can be
enforced. When the order is made, ordinary proceedings
against the company are stayed (although the stay can be
enforced only against creditors subject to the personal
jurisdiction of the court). The creditors are confined to a
collective enforcement procedure that results in pari passu
distribution of the company's assets. The winding up does not
either create new substantive rights in the creditors or destroy
the old ones. Their debts, if they are owing, remain debts
throughout. They are discharged by the winding up only to the
extent that they are paid out of dividends. But when the
process of distribution is complete, there are no further assets
against which they can be enforced. There is no equivalent of
the discharge of a personal bankrupt which extinguishes his
debts. When the company is dissolved, there is no longer an
entity which the creditor can sue. But even then, discovery of
an asset can result in the company being restored for the
process to continue."

Similar observations were made by Lord Hoffmann with the support of this court
or the Judicial Committee of the Privy Council in *Parmalat Capital Finance Ltd v
Food Holdings Ltd (in liquidation)* [2008] BCC 371, and *Cambridge Gas
Transportation Corpn v Official Committee of Unsecured Creditors of Navigator
Holdings Plc* [2007] 1 AC 508, at para 15; and by Lloyd LJ with the support of the

rest of the Court of Appeal in *Financial Services Compensation Scheme Ltd v Larnell (Insurances) Ltd (in liquidation)* [2006] QB 808.

199.   Third, there is no reason to believe that the position, well established before 1986, was altered by the insolvency legislation of that year. The 1986 legislation achieved some important changes in United Kingdom insolvency law. The provisions governing proof of debt and the distribution of assets became more elaborate and more comprehensive than the corresponding legislation in force before 1986. But these were incremental changes, many of which in effect codified earlier Judge-made law. The purpose and character of the process of proof of debt and distribution did not change. There are, as there always have been, specific circumstances in which the current scheme of corporate insolvency does provide for a discharge. The most significant of them is mutual set-off, which occurs automatically under rules 2.85 and 4.90, in circumstances when set-off would not necessarily be available at common law. Set-off by its very nature brings about a pro tanto discharge of the liability. The disclaimer of onerous obligations under section 178 of the Act is another example. But in neither case is the creditor's right affected, except by its pro rata abatement where there is a deficiency of assets. So far as the creditor's debt is discharged by set-off, he receives full value. So far as it is disclaimed, the debtor's obligation is transmuted into a claim for the full amount of the resultant loss, for which the creditor may prove just as he could have proved for the liability disclaimed. All of this was equally true of the pre 1986 legislation in force when most of the cases which I have cited were decided. The critical point, however, is that where the legislation effects a discharge of a liability, as it does in these special cases, it does so expressly. An implied discharge is of course conceptually possible. But there is a strong presumption against the implied legislative abrogation of existing rights, and nothing in the Act or the Rules from such an implication could be thought necessary.

200.   Fourth, in every respect relevant to the present question, the provisions of the Insolvency Act and Rules governing proof of debt and distribution are the same for liquidation or administration on the one hand and bankruptcy on the other. As I have pointed out, it is and always has been the position in personal insolvency that the underlying liabilities of the bankrupt are not discharged by the bankruptcy order or by the subsequent bankruptcy proceedings, save in so far as they are satisfied by the resultant distribution. There is no discharge of the unsatisfied balance until the bankrupt is discharged, either by the court or automatically subject to the discretion of the court. The statutory provisions for the discharge of the bankrupt in personal insolvency are qualified by express provisions preserving the liability of persons jointly or secondarily liable with the bankrupt, who might otherwise be released by the latter's discharge: see section 281(7) of the Insolvency Act, which substantially re-enacts section 28(4) of the Bankruptcy Act 1914. This is an important safeguard for the rights of and liabilities of third parties. By comparison, with limited exceptions (see above), the

law of corporate insolvency has never expressly provided and still does not expressly provide for the discharge of underlying liabilities at any stage, short of payment in full or dissolution. Moreover, there are no corresponding provisions relating to joint obligors and sureties in those parts of the Act which relate to corporate insolvency, as there surely would have been if the legislator had intended that a liquidation or distributing administration should discharge the liabilities of the insolvent company.

201.   I am not persuaded that such a radical transformation of the basis of our law of insolvency is achieved by Rule 2.72(1) of the Insolvency Rules, which was the only provision relied upon as expressly having that effect. Rule 2.72(1) provides that a person claiming to be a creditor of the company and "wishing to recover his debt in whole or in part" must submit a proof. The argument is that once the amount for which the creditor has proved has been satisfied by the payment of a dividend, the creditor is treated as having recovered the debt "in whole", or at any rate the whole of the part of the debt for which he proved. In my opinion, this reads too much into the words. Rule 2.72(1) is a purely administrative provision. It appears under the rubric "Machinery of Proving a Debt". The accuracy of this description is borne out by the remaining sub-rules. The reason why the rule refers to a person "wishing to recover his debt in whole or in part" is that he may not wish to prove for a debt so far as it is wholly or partly secured. If he did, he would have to surrender his security and allow the property to which it related to be added to the insolvent estate. As a matter of ordinary English, the natural meaning of rule 2.72(1) is simply that a creditor must prove for any claim or part of a claim in respect of which he wishes to receive a dividend. Moreover, rule 2.72(1) is in the same terms as rule 6.96, which is the corresponding provision governing proof of a bankruptcy debt in personal insolvency. Yet it is clear that in personal insolvency the underlying liability is not discharged by proof and survives the payment of a dividend.

**LORD CLARKE: (dissenting)**

202.   On every issue but one I agree with Lord Neuberger. The exception relates to the currency conversion claims.

203.   So far as claims made in foreign currencies are concerned, the position at common law was radically changed by the decision of the House of Lords in *Miliangos v George Frank (Textiles) Ltd* [1976] AC 443. Since then it has been recognised that a debt contractually payable in a foreign currency must be discharged in that currency or, if discharged in sterling, at the relevant rate of exchange at the date of payment in order to ensure that it is fully repaid in the contractual currency. It follows that, at any rate in the absence of an administration

or liquidation, where the debtor is solvent, the debtor must pay the whole amount so calculated. The obligation to pay is a common law obligation.

204.   Where a company goes into administration or liquidation, a creditor must submit a proof to the administrator or liquidator under rules 2.72 and 4.73 of the Insolvency Rules respectively. The combined effect of rules 2.86 and 4.91 is that the proof must state the value of the debt at the cut-off date and the debt must be converted into sterling at the exchange rate on that date. If the value of sterling falls between that date and the date on which the debt would be due at common law, and if the debtor is solvent at that time, the creditor will make a currency conversion loss unless he is entitled to recover the difference from the debtor.

205.   The question is whether he can recover that difference in order to ensure that he is repaid in aggregate the whole of the value of the debt inclusive of interest to the date of the repayment. In my opinion, he should in principle be entitled to recover that whole amount in order to ensure that he recovers the full amount to which he is entitled at common law under the contract. I am not persuaded that there is any relevant rule or statutory provision that leads to any contrary conclusion and, absent such an intervention, it is sufficient to resolve the issue by an application of the common law.

206.   As I see it, the point was clearly and accurately put by Briggs LJ in the Court of Appeal in this very case. In para 136 he expressed disagreement with Lewison LJ that currency conversion claims do not constitute, or therefore rank as, non-provable liabilities. In his view they do. He added that the conversion into sterling of foreign currency debts as at the cut-off date is, as both rule 2.86 and rule 4.91 make clear, for the purpose of proof and, under rule 4.90(6), for the purpose of set-off. Apart from that, he said, there is nothing in the Insolvency Act or in the Rules which prevents the foreign currency creditor from reverting to his contractual rights, once the process of proof (and payment of statutory interest) has run its course, if there is then a surplus. I agree. In my opinion, this is a critical point.

207.   I further agree with Briggs LJ when he accepted (at para 137) counsel's submission that a currency conversion claim is not a separate or new claim arising from the effect of the two conversion rules. He then in effect harked back to *Miliangos* in saying that it is simply the balance of the creditor's original contractual claim which has not been discharged by the process of early conversion, proof and dividend under the relevant part of the insolvency scheme. The creditor bargained for payment in the specified currency. What he received was payment in sterling, by reference to a conversion date years earlier than payment. Briggs LJ identified the injustice as arising entirely from his exposure to currency risk during the potentially long period between conversion and payment,

contrary to the contract, which placed that risk squarely on the company in liquidation or administration. He added that it was not a risk against which the creditor can easily hedge, since (even if while unpaid he has the financial resources) he does not know when, or how much, he will eventually be paid.

208.   I agree with Briggs LJ at para 138 that the starting point is to focus on insolvency law as it was immediately prior to 1986, some ten years after *Miliangos* and before the Insolvency Act 1986. He considered two particular circumstances: a liquidation might affect a company which was solvent; or, it might begin on the basis of insolvency but turn out to be solvent as the realisations of assets exceeded provable liabilities, as in the case of LBIE's administration. He noted in para 139 that in either case non-provable liabilities still had to be settled before distributions could be made to members. The basic principle upon which non-provable liabilities were dealt with was by reference to the creditor's full claim, whether under contract by reference to the concept of "reversion to contract" used in that case, or in tort, where the liability was not provable. He added, at para 140, that the rules were almost entirely judge made.

209.   In para 142 he explained that *In re Dynamics Corporation of America* [1976] 1 WLR 757 and *In re Lines Bros Ltd* [1983] Ch 1 need to be understood in that context. Both cases sought to fashion a judge-made rule to deal with the establishment in *Miliangos* of the principle that English law both could and should recognise the injustice of converting a foreign currency obligation into sterling at the date of the commencement of proceedings. They did so as an adjunct to the law of bankruptcy, which was applicable to the winding-up of insolvent companies, by requiring that, as an exception to the *Miliangos* principle, proof of the debt constituted by a foreign currency obligation required conversion into sterling at the cut-off date, so that all proving creditors could be treated equally, in a single unit of account. In particular, that adjunct was a Judge-made part of the legal process of proof of debts. It had no wider purpose. I agree with Briggs LJ that neither Brightman LJ nor Oliver LJ was deciding anything about how to deal with foreign currency liabilities in a solvent winding up. In so far as Lewison LJ expressed a different view, I respectfully disagree.

210.   As Briggs LJ explained in para 144, the 1986 insolvency legislation made significant changes to the insolvency structure, but it was not comprehensive and important judge made principles continued to be applicable. The new legislation did not purport to deal with non-provable claims. Having set out a number of classes of non-provable claims, Briggs LJ dealt with non-provable claims in this way at the end of para 145:

> "While it may be assumed that Parliament specifically intended them not to be provable liabilities in a liquidation,

> there can be no basis for inferring a legislative intent that they
> could not be pursued in a liquidation in the event of a surplus
> after payment of provable debts and statutory interest. In
> short, the 1986 legislation simply passed them by, leaving
> them to be pursued, in the rare event of a surplus, by reference
> to the pre-existing judge-made law."

I agree.

211.    In paras 146 and 147 Briggs LJ expressed these conclusions:

> "146. Thus, although the legislation provided for the first
> time that, in a solvent liquidation, a *pari passu* process of
> distribution against proved claims would be the first stage,
> distribution of any surplus (after statutory interest) would
> continue to require the liquidator to treat non-provable
> claimants as having an entitlement ranking prior to that of the
> members, applying legal principles not to be found set out in
> detail anywhere in the legislation.

> 147.   Against that background it is of course a question of
> construction whether or not the Insolvency Rules provide that
> claims in foreign currency can only be pursued by the process
> of conversion and proof set out in rules 2.86 and 4.91, so that
> proof followed by payment leaves them wholly exhausted, or
> whether, as the judge concluded, those rules merely provide a
> means of quantifying the amount of the proof, for the
> purposes of proof, but leave any residue of the original
> contractual entitlement intact, and capable of being pursued in
> the event of a surplus."

Again, I agree.

212.   Briggs LJ then considered the language of the rules, which he thought
pointed firmly in the direction identified by the judge. In particular rules 2.86 and
4.91 both used the same formula, namely "for the purpose of proving …". I agree
with him (in para 148) that the effect of each rule is simply to provide an exchange
rate for the necessary conversion of the face value of the foreign currency debt into
sterling so that the creditor can prove for a specific sterling amount. This was
exactly what the judge-made rule had done, also (and only) for the purpose of
proof.

213.   Briggs LJ expressed his conclusion on this part of the case thus in para 153:

> "The potential for injustice caused by the permanent conversion of a foreign currency debt into sterling is entirely the result of the inevitable gap in time between the conversion date and the payment of dividends, during which the risk of depreciation in sterling is thrown, contrary to the contract, on the creditor. But absent set-off there is no reason why the conversion for the purpose of proof should be anything more than a means of part-payment which is fair as between all proving creditors, leaving the foreign currency creditor with a remedy against a surplus if (but only if) sterling has depreciated in the meantime, and after all proving creditors have been paid in full with statutory interest."

I agree.

214.   Briggs LJ then noted in para 154 that Lewison LJ had given ten reasons for his preference for a permanent substantive effect as the true construction of the two conversion rules. He then gave his reasons for reaching a different conclusion. He did so in paras 154 to 161 which I find convincing but which it is not necessary to repeat here, save as follows.

215.   In para 161 Briggs LJ recognised that the currency conversion rules apply, like all the other rules about proof of debts, both to solvent and insolvent windings up. He added:

> "This was a major change wrought by the 1986 legislation, as I have described. The statutory part of the insolvency scheme is now applied to all companies in liquidation. It is by no means confined to the currency conversion rules, but applies also to the whole body of rules which focus on the cut-off date, to the exclusion from proof of post cut-off date liabilities, as well as to set-off."

I agree.

216.   Briggs LJ expressed his overall conclusions in paras 162, 163 and 166 in this way:

"162.  In the context of an undoubtedly solvent company it is not easy to see why any of those rules should be applied, where the undoubted consequence is that there has then to be a two stage process, first of proof and then of the satisfaction of non-provable liabilities. But there are equally unsatisfactory aspects of the old regime, in which bankruptcy law was applied only to insolvent companies. Parliament had a choice to make between two alternatives, neither of which can be said to have been ideal. Perhaps the main justification (apart from uniformity) of the choice actually made is that companies may move into and out of insolvency during a liquidation or distributing administration, so that it is better to deal by a single process first with the claims of all those entitled on insolvency, leaving until later the just distribution of any surplus, if there turns out to be one in fact. A second obvious reason is that insolvent liquidation or administration is overwhelmingly the main target of the legislation, as the name of both the Act and the Rules makes clear.

163.   However that may be, I do not regard that choice as saying much about the construction of the currency conversion rules, all the more so because they are prefaced by the phrase 'for the purpose of proving'. They are merely one provision which, (like the cut off-date itself) is not the end of the story if there is a relevant surplus to be distributed to those entitled to it.

...

166.   The result is that, in respectful disagreement with Lewison LJ, I consider that the judge was correct to regard currency conversion claims as non-provable liabilities falling to be dealt with as such in the event of a surplus after payment of provable debts and statutory interest. The language of both relevant rules contains a clear direction to treat conversion as being for the limited purpose of proof of debts, and a separate sub-rule applies the conversion rules for the additional purpose of set-off. Great injustice will be caused in ultimately solvent liquidations if those rules are given a wider effect than expressly prescribed, and there is in my view no convincing reason why that should be so. I would therefore dismiss the appeal against paragraphs (ii) and (iii) of the judge's order."

I found that reasoning wholly convincing.

217.    Moore-Bick LJ's reasoning was to much the same effect. I was struck in particular by his quotation of paras 26 and 27 of the judgment of Lord Hoffmann in the Privy Council in *Wight v Eckhardt Marine GmbH* [2003] UKPC 37; [2004] 1 AC 147, where he stressed that a winding up order is not the equivalent of a judgment against the company. He pointed to the statement of Brightman LJ in *In re Lines Bros Ltd* [1983] Ch 1, 20 that winding up is "a process of collective enforcement of debts". Lord Hoffmann stressed that a winding up does not either create new substantive rights in the creditors or destroy old ones. He added:

> "Their debts, if they are owing, remain debts throughout. They are discharged by the winding up only to the extent that they are paid out of dividends. But when the process of distribution is complete, there are no further assets against which they can be enforced."

218.    So, on the facts here the obligation upon the debtor to discharge its obligation to pay interest at the contract rate in dollars remained so long as the company was solvent. There is a good deal of support for this principle: see eg the (albeit *obiter*) statements of Brightman and Oliver LJJ in *In re Lines Bros Ltd* [1983] 1 Ch 1, 21 and 26 respectively quoted by Moore-Bick LJ in the Court of Appeal at paras 255 and 256. As I see it, any other view would have the effect of allowing shareholders to recover claims against the company ahead of creditors with valid claims at common law. In my opinion that would be wrong in principle.

219.    In short, there is no common law principle which supports the view that a creditor is not entitled to recover sums in a foreign currency owed to it by a solvent company. Such a conclusion would be to prefer the interests of a debtor company (and its shareholders) to those of the creditor.

220.    Such a conclusion could only be justified by statute or statutory instrument. To my mind clear words would be required to deprive the creditor of its common law rights. As I see it, there is no provision in the 1986 Act which has that effect. Reliance is placed upon rule 2.72(1) of the Insolvency rules quoted by Lord Sumption in para 201. I agree with him that the words relied upon in rule 2.72(1), "wishing to recover his debt in whole or in part" do not have that effect.

221.    I am bound to say that for my part I am not persuaded by the points made by Lord Neuberger in his discussion of the reports leading up to the 1986 legislation. In short, I prefer the reasoning of David Richards J at first instance and

of Moore-Bick and Briggs LJJ in the Court of Appeal to that of those who have taken a different view. I would dismiss the appeal on this point on the simple ground that there is no statute, statutory rule or common law principle to deprive creditors of a solvent company of a common law right to recover a debt in a foreign currency. As I see it, to conclude otherwise would be to permit shareholders to be preferred to creditors of a solvent company, which would be wrong in principle.

222.   I appreciate that the conclusion which I have reached above as to the true construction of rules 2.86 and 4.91 differs from that reached by the majority. I note that in para 194 Lord Sumption has expressed some misgivings about the reasons for the conclusion that the effect of those Rules is that the unsatisfied balance of a foreign currency debt should not be recoverable, even if there is a surplus from which to pay it. I share those misgivings, but I would go further. I do not think that the Rules are clear enough to give the shareholders a windfall at the expense of creditors where there is a surplus which could satisfy the whole or part of the company's liability to the creditors. However, I am pleased to note that the majority have left open the broader questions identified by Lord Sumption at paras 195 et seq. As matters stand at present I agree with his approach, which is essentially the same as I have tried to describe above. It is, as I understand it, agreed that these are questions for final determination on another day.

TAB 14

*Jones v Sherwood Computer Services Ltd* [1992] 1 WLR 277

1 W.L.R.

A

[COURT OF APPEAL]

*JONES AND OTHERS v. SHERWOOD COMPUTER SERVICES PLC.

[1988 J. No. 5594]

B 1989 Nov. 15;                                    Dillon and Balcombe L.JJ.
Dec. 7

*Company—Shares—Valuation—Agreement to purchase shares for
consideration related to amount of sales—Accountants to determine
amount of sales acting as experts—Accountants' determination to
be conclusive, final and binding for all purposes—No departure
from instructions by accountants—Whether determination
C challengeable on ground of mistake*

The defendant company agreed to purchase the plaintiffs'
shares in C. Plc. for a consideration which included the issue to
the plaintiffs of a number of new shares in the defendant to be
calculated by reference to the amount of sales, determined as
provided in the contract, of products sold by subsidiaries of C.
D Plc. in a stated period. It was further provided that a statement
of such amount of sales should be reviewed by firms of
accountants representing the parties, that if those firms were
unable jointly to approve the statement or agree on adjustments
thereto, the matter was to be referred to independent accountants
to determine and report the amount of the sales, and that the
accountants were to act as experts and not arbitrators and their
determination was to be "conclusive and final and binding for
E all purposes." The firms representing the parties having been
unable to agree whether two categories of transaction were to
be included as "sales," a third firm of accountants was asked to
investigate the area of difference and to provide a report
determining the amount of the sales. That firm, without giving
reasons, determined an amount which was the same as that
arrived at by the defendant's accountants. The plaintiffs brought
an action claiming, inter alia, a declaration that the report by
F the third firm of accountants was of no effect, on the ground,
inter alia, that that firm had not taken account of transactions
which it ought to have taken into account. The judge dismissed
an application by the defendant to strike out the parts of the
statement of claim relating to that claim.

On appeal by the defendant:—

*Held*, allowing the appeal, that, where parties had agreed to
G be bound by the report of an expert, the report, whether or not
it contained reasons for the conclusion in it, could not be
challenged in the courts on the ground that mistakes had been
made in its preparation unless it could be shown that the expert
had departed from the instructions given to him in a material
respect; and that, since the third firm of accountants had done
precisely what they had been asked to do and there was no
question of bad faith, their determination was not subject to
H challenge by the plaintiffs and the relevant paragraphs of the
statement of claim would therefore be struck out (post, pp. 284F–
G, 286H–287B, G, 288H, 289E—290A, D–E).

*Campbell v. Edwards* [1976] 1 W.L.R. 403, C.A. and *Baber
v. Kenwood Manufacturing Co. Ltd.* [1978] 1 Lloyd's Rep. 175,
C.A. applied.

*Dean v. Prince* [1954] Ch. 409, C.A. considered.

*Burgess v. Purchase & Sons (Farms) Ltd.* [1983] Ch. 216
disapproved.

The Weekly Law Reports 28 February 1992

Jones v. Sherwood Services Plc. (C.A.)                    [1992]

Decision of Judge Hague Q.C., sitting as a judge of the      A
Chancery Division, reversed.

The following cases are referred to in the judgments:

*Arenson v. Arenson* [1973] Ch. 346; [1973] 2 W.L.R. 553; [1973] 2 All E.R.
    235, C.A.; [1977] A.C. 405; [1975] 3 W.L.R. 815; [1975] 3 All E.R.
    901, H.L.(E.)
*Baber v. Kenwood Manufacturing Co. Ltd.* [1978] 1 Lloyd's Rep. 175, C.A.      B
*Belchier v. Reynolds* (1754) 3 Keny. 87
*Berry v. Tottenham Hotspur Football and Athletic Co. Ltd.* [1935] Ch. 718
*Burgess v. Purchase & Sons (Farms) Ltd.* [1983] Ch. 216; [1983] 2 W.L.R.
    361; [1983] 2 All E.R. 4
*Campbell v. Edwards* [1976] 1 W.L.R. 403; [1976] 1 All E.R. 785, C.A.
*Collier v. Mason* (1858) 25 Beav. 200
*Dean v. Prince* [1953] Ch. 590; [1953] 3 W.L.R. 271; [1953] 2 All E.R. 636;      C
    [1954] Ch. 409; [1954] 2 W.L.R. 538; [1954] 1 All E.R. 749, C.A.
*Finnegan v. Allen* [1943] K.B. 425; [1943] 1 All E.R. 493, C.A.
*Johnston v. Chestergate Hat Manufacturing Co. Ltd.* [1915] 2 Ch. 338
*Jones (M.) v. Jones (R.R.)* [1971] 1 W.L.R. 840; [1971] 2 All E.R. 676
*Pappa v. Rose* (1871) L.R. 7 C.P. 32
*Sudbrook Trading Estate Ltd. v. Eggleton* [1983] 1 A.C. 444; [1982] 3
    W.L.R. 315; [1982] 3 All E.R. 1, H.L.(E.)                                      D
*Sutcliffe v. Thackrah* [1974] A.C. 727; [1974] 2 W.L.R. 295; [1974] 1 All
    E.R. 319, H.L.(E.)
*Sutherland (Duke of) v. British Dominions Land Settlement Corporation
    Ltd.* [1926] Ch. 746
*Wright (Frank H.) (Constructions) Ltd. v. Frodoor Ltd.* [1967] 1 W.L.R.
    506; [1967] 1 All E.R. 433

The following additional case was cited in argument:                              E
*Smith v. Gale* [1974] 1 W.L.R. 9; [1974] 1 All E.R. 401

INTERLOCUTORY APPEAL from Judge Hague Q.C., sitting as a judge of
the Chancery Division.

By a contract dated 13 February 1987 between the plaintiffs, Miah
Gwynfor Jones, Geoffrey Paul Rees and John Miller, and the defendant,      F
Sherwood Computer Services Plc., for the acquisition of shares in
Corporate Technology Group Plc. ("the company"), the parties agreed
that, in the event of their accountants being unable to agree the amount
of sales of products sold by two subsidiaries of the company, the matter
would be referred to a third accountant or firm of accountants ("the
expert") who would determine the amount of sales and provide a report      G
stating that amount, and that the expert's determination would be
"conclusive and final and binding for all purposes." The accountants
representing the parties were unable to agree whether two categories of
transaction ("community charge contracts" and "contracts subject to
ratification") were to be included as "sales," and the matter was referred
to a third firm of accountants, Coopers & Lybrand ("Coopers"), who
determined the amount of sales in a letter dated 28 June 1988.              H

By a writ and statement of claim dated 5 July 1988, the plaintiffs
claimed, inter alia, in the prayer for relief, (1) a declaration that in the
calculation of sales it was necessary to bring into account community
charge contracts and a further specified category of sales, (2) a
declaration that the purported determination and report of 28 June 1988
was of no effect, (3) an order that the defendant forthwith prepare a
statement on the basis indicated in (1) and transfer to the plaintiffs the

A  appropriate number of shares in the defendant as calculated on that basis, (4), alternatively to (3), damages for the non-delivery of new shares in the defendant, and (5), if necessary, rectification in accordance with paragraph 10 of the statement of claim. By a summons dated 14 September 1988 the defendant applied for an order that certain paragraphs of the statement of claim and paragraphs (1) to (5) of the prayer for relief be struck out and/or the causes of action pleaded be

B  stayed on the grounds that they disclosed no reasonable cause of action against the defendant and/or were frivolous and vexatious and/or an abuse of the process and/or because the court had no jurisdiction in respect of those matters. On 26 May 1989 Judge Hague Q.C. dismissed the application.

By a notice dated 27 June 1989 the defendant appealed on the

C  grounds, inter alia, that (1) the judge ought to have held that it was not open to the plaintiffs to seek to challenge Coopers' determination, because they had agreed to accept the determination by Coopers acting as experts as conclusive and binding for all purposes; (2) the judge misdirected himself in his approach to the dispute by simply asking whether the determination was "speaking" or "non-speaking" and ought to have asked whether Coopers had acted in accordance with their

D  jurisdiction in determining the questions that had been referred to them and to have held that they had done so; (3) the judge ought to have held that it was within the jurisdiction of Coopers to determine whether sales, as defined, included the community charge contracts and the contracts subject to ratification; (4) the judge ought to have held that the plaintiffs' accountants had expressly agreed that Coopers should be

E  asked to determine whether sales as defined included those contracts, and that in those circumstances it was not open to the plaintiffs to assert that Coopers had acted in excess of their jurisdiction or to challenge their determination; (5) the judge erred in holding that it was arguable that the determination as expressed in the letter of 28 June 1988 did not amount to a "report;" (6) the judge ought to have held that the plaintiffs were estopped from alleging that Coopers had acted in excess

F  of their jurisdiction or without jurisdiction in relation to their determination as regards the community charge contracts and the contracts subject to ratification; and (7) the judge ought to have held that the plaintiffs were not entitled to seek rectification of the contract and/or were estopped from doing so.

The facts are stated in the judgment of Dillon L.J.

G
*Mark Howard* for the defendant.
*Nicholas Underhill* for the plaintiffs.

*Cur. adv. vult.*

7 December.  The following judgments were handed down.

H
DILLON L.J.  This is an appeal by the defendant in the action against a decision of Judge Hague Q.C., sitting as a judge of the High Court in the Chancery Division, whereby the judge dismissed a summons by the defendant to strike out certain parts of the statement of claim endorsed on the writ. The judge gave the defendant leave to appeal.

The defendant's summons had been issued on 14 September 1988. It seeks an order that paragraphs 4, 5 and 8 to 13, and paragraphs 1 to 5

Dillon L.J.                    Jones v. Sherwood Services Plc. (C.A.)                    [1992]

of the prayer for relief, in the statement of claim be struck out and/or    A
the causes of action pleaded therein be stayed

> "on the grounds that they disclose no reasonable cause of action
> against the defendant and/or are frivolous and vexatious and/or an
> abuse of the process . . . and/or because the court has no jurisdiction
> in respect of these matters."

What this rather comprehensive verbiage comes down to, when    B
applied to the circumstances of this case, is that the plaintiffs and the
defendant agreed by contract that certain matters arising in relation to
their contract should be determined by an expert whose determination
should be "conclusive and final and binding for all purposes;" the
plaintiffs now claim to set aside the expert's report and to now
have the matters in issue decided by the court, but the defendant says that
the plaintiffs cannot do that because the matters in issue are within the    C
reference to the expert and the plaintiffs are, under the contract, bound
by the expert's report. That in such circumstances a striking out
application can be the appropriate course is shown by the decision of
this court in *Campbell v. Edwards* [1976] 1 W.L.R. 403.

The contract in question between the plaintiffs and the defendant is
a sale agreement dated 13 February 1987 whereby the defendant    D
undertook to offer to acquire the entire share capital of a company
called Corporate Technology Group Plc. ("the company") on the terms
of an agreed offer document, and the plaintiffs, who were substantial
shareholders in the company, agreed with the defendant that they would
accept that offer in respect of their own shareholdings. The company
was the parent company of two operating subsidiaries, L.G. Software
Ltd. and C.T.G. Software Ltd. The consideration under the offer    E
document for the acquisition of the ordinary shares in the company was
the issue of a specified number of new shares in the defendant, referred
to as "Sherwood shares," for each ordinary share in the company but in
addition there was provision in the offer document for such further
consideration as might become payable in accordance with the provisions
of appendix I. Appendix I provided by paragraphs 1 to 4 and 7:    F

> "1. The further consideration under the ordinary offer shall be: for
> each C.T.G. ordinary share, one new Sherwood share for each
> whole amount of £35,000 (but not part thereof) by which the
> amount of the sales (as determined in accordance with this appendix)
> exceeds £2,720,000: provided always that in no circumstances shall
> the further consideration in respect of each C.T.G. ordinary share
> exceed 18 new Sherwood shares.    G
>
> "2. Sherwood shall as soon as practicable after 30 November
> 1987 and in any event not later than 1 February 1988 cause to be
> prepared a statement showing the combined software sales of L.G.
> Software Ltd. and C.T.G. Software Ltd. for the period of 12
> months ending 30 November 1987 ('sales'). For the purposes of the
> said statement: (a) sales shall mean sales to any person, firm or    H
> company other than a member of the C.T.G. group (a 'customer')
> of software products comprised in the current and planned product
> range (on display as set out in paragraph 5 of appendix VI) and of
> related services (including without prejudice to the generality of the
> foregoing sales of bespoke software and upgrades, manuals and all
> income derived from the customer services division) provided that
> the bespoke element of software sales shall be included only to the

**1 W.L.R.**          Jones v. Sherwood Services Plc. (C.A.)          Dillon L.J.

A    extent of 50 per cent. thereof; (b) a sale shall be counted only if a customer shall during the relevant period have entered into a binding contract in relation to a relevant product or service (which shall include but not be limited to contracts additional or supplemental to contracts existing at the date hereof); and (c) there shall be excluded from sales licence and maintenance fees and sales of hardware and there shall also be deducted from the amount of

B    sales any commissions, licence fees, royalties or similar amounts payable by any company in the C.T.G. group to third parties.

"3. The said statement, when prepared, shall be reviewed by Peat Marwick Mitchell & Co. (on behalf of Sherwood) and Deloitte Haskins & Sells (on behalf of accepting shareholders under the ordinary offer) (together 'the accountants') who shall: (a) jointly

C    approve such statement as prepared by Sherwood; or (b) make such adjustments thereto as they may jointly agree, and shall deliver a copy of such statement, as approved or adjusted, to Sherwood. Sherwood shall provide to the accountants such access to the working papers from which the said statement is derived as they shall require.

D    "4. If the accountants are unable either to approve the statement as prepared or to agree the adjustments to be made thereto, the matter shall be referred to an independent chartered accountant or firm of chartered accountants ('the expert') to be agreed between the accountants or, failing agreement, to be nominated by the president for the time being of the Institute of Chartered Accountants in England and Wales, who shall be instructed to determine the amount of the sales and to provide a report stating such amount to

E    Sherwood within the shortest practicable time. Sherwood shall procure to be provided to the expert all such information as may reasonably be required by him to enable him to determine the amount of the sales and provide his report as aforesaid. . . .

"7. The accountants and the expert (if any) shall act as experts and not as arbitrators and their or his determination shall be

F    conclusive and final and binding for all purposes."

What happened under that appendix was that a statement was prepared by the defendant purporting to show the sales for the purposes of paragraph 2, but the accountants, Messrs. Peat Marwick McLintock ("Peats") and Messrs. Deloitte Haskins & Sells ("Deloittes"), were unable to reach an agreement under paragraph 3, since there were two

G    categories of transaction which Deloittes thought should be included as "sales" and Peats thought should not be included. Everything else, including the amounts of the figures in respect of the disputed transactions, was agreed. Consequently, Peats and Deloittes jointly appointed Messrs. Coopers & Lybrand ("Coopers") to be "the expert" under paragraph 4. Coopers' terms of reference were set out in a letter

H    of 15 April 1988 from Coopers to the defendant, which provided as far as material:

"*Corporate Technology Group Plc.* 1. We have been asked by Peat Marwick McLintock and Deloitte Haskins & Sells to act as independent experts to determine the combined software sales of L.G. Software Ltd. and C.T.G. Software Ltd. for the 12 months ended 30 November 1987, in accordance with schedule 5 to an agreement dated 13 February 1987 relating to the acquisition of

The Weekly Law Reports 28 February 1992

Corporate Technology Group Plc. We are writing to set out the    A
work we understand is required.

"2. In the opinion of Peat Marwick McLintock (acting on behalf of Sherwood Computer Services Plc.) the turnover, as defined in the agreement for the relevant period, is £2,527,135. In the opinion of Deloitte Haskins & Sells (acting on behalf of former shareholders of Corporate Technology Group Plc.) the turnover, as defined in the agreement for the relevant period, is £3,065,810. The only    B
difference between the opinions of the two firms of accountants are as follows: (a) Peat Marwick McLintock believe sales should exclude and Deloitte Haskins & Sells believe that sales should include turnover relating to community charges net of royalties due to Lychgate amounting to £356,525; (b) Peat Marwick McLintock believe sales should exclude and Deloitte Haskins & Sells believe    C
that sales should include turnover relating to contracts containing cancellation clauses (including two contracts relating to community charges) amounting to £182,150.

"3. You require us to investigate the areas of difference described above but not to review the areas where there is agreement between the two accountants. This will involve reviewing the available    D
evidence at Corporate Technology Group Plc., discussing the matter with present (and if necessary former) employees of that company and its subsidiaries, and discussing the matter with and examining the working papers of Peat Marwick McLintock and Deloitte Haskins & Sells relating to this matter. If necessary we may seek independent legal advice but we would inform you of this beforehand. At the conclusion of our work we are required to    E
provide a report stating the amount of sales as defined in the agreement for the relevant period. We shall act as experts and not as arbitrators and all parties shall accept our determination as conclusive and final and binding."

Those instructions were, in my judgment, instructions which the    F
accountants could properly give Coopers under paragraph 4; they could refer matters not agreed between them to Coopers without requiring Coopers to work out afresh all the matters on which they were agreed. The judge rightly regarded Coopers, for the purposes of the striking out application, as not doing anything more than carrying through the procedure laid down by appendix 1 of the offer document.

There was indeed an assertion for the defendant that the plaintiffs    G
had themselves concurred in and authorised the instructions to Coopers, either because Deloittes were the plaintiffs' agents, or because the plaintiffs went along with the inquiries of Coopers, and one of them had a meeting with Coopers with some knowledge of what the disputed issues were. I put that assertion out of mind, however, for the purposes of this judgment, since the extent of the plaintiffs' knowledge is disputed,    H
and cannot be resolved on a striking out application. If the assertion is correct, the defendant's claim that the plaintiffs are bound by Coopers' determination would be that much the stronger. But even if the plaintiffs had not specifically authorised or endorsed Coopers' instructions, the position remains, as is common ground, that the plaintiffs did concur in the sale agreement, including the provisions of appendix 1 under which Coopers were appointed.

283

1 W.L.R.                    Jones v. Sherwood Services Plc. (C.A.)                    Dillon L.J.

A       The upshot was that Coopers sent to the defendant on 28 June 1988 a document signed by them in the following terms:

        "*Corporate Technology Group Plc.* We have acted as independent chartered accountants to determine the combined software sales of L.G. Software Ltd. and C.T.G. Software Ltd. for the period of 12 months ended 30 November 1987 calculated in accordance with appendix 1 to the offer document for the acquisition of Corporate
B       Technology Group Plc. and schedule 5 to the deed dated 13 February 1987 relating to the acquisition of Corporate Technology Group Plc. ("the sales.") We determine that the sales amount to £2,527,135. We have sent copies of this report to Deloitte Haskins & Sells and to Peat Marwick McLintock."

C       It is said for the plaintiffs on a subsidiary issue that the document is a nullity—of no effect for any purpose—since it is not a "report" as required by paragraph 4 of appendix I because it does not give Coopers' reasons for reaching their determination. All that paragraph 4 requires the expert's "report" to do, however, is to set out the expert's determination of the amount of the sales, and that the document of 28 June 1988 does. The use of the word "report" in paragraph 4 does
D       not, in my judgment, require the expert to set out the reasoning or calculations which led him to his conclusion. The document is therefore, in my judgment, a sufficient "report" for the purposes of paragraph 4, and I refer to it hereafter as "Coopers' report."

        Standing alone, Coopers' report is what is referred to in many of the cases as "a non-speaking certificate" since it gives no explanation at all of the conclusion Coopers had reached. A good deal of the judgment of
E       the judge is taken up with the distinction in the cases between "speaking" and "non-speaking" certificates or valuations, though in the end he lays the distinction aside. I shall myself have to refer to that distinction briefly but it is not the issue in this case. It is conceded for the defendant that Coopers' report does not stand by itself but must be looked at in the light of the terms of appendix I and their letter of
F       instructions. That concession is plainly right: see the judgment of Harman J. on the preliminary issue in *Dean v. Prince* [1953] Ch. 590, 592–594. Once, however, the earlier documents are looked at, it is apparent that the figure of £2,527,135 which Coopers in their report determined as the amount of the sales is the figure at which Peats had assessed the amount of the sales. Therefore Coopers must have decided
G       that the two classes of disputed transactions fell to be excluded from the total amount of sales. Coopers, therefore, in relation to both classes, agreed with the conclusions of Peats rather than with the conclusions of Deloittes, though it does not necessarily follow that Coopers got to those conclusions for the same reasons, or by the same reasoning, as Peats.

        In these circumstances the plaintiffs say that Deloittes have been
H       right all along, and Peats and Coopers are wrong. They say that Coopers have got it wrong because they made mistakes in relation to both classes of disputed transaction—as did Peats—and they say that they are entitled to call on the court to determine whether or not Coopers have made mistakes, and that if Coopers have made mistakes, they, the plaintiffs, are not bound by Coopers' determination, notwithstanding that by paragraph 7 of appendix I the determination is agreed to be "conclusive and final and binding for all purposes." They

**Dillon L.J.**          Jones v. Sherwood Services Plc. (C.A.)          **[1992]**

say that the mistakes, if they were mistakes, would have been mistakes    A
of law, or of mixed law and fact, as to the true construction and effect
of the provisions of appendix 1 and particularly of paragraph 2.

It is therefore necessary to see how the law stands on the question of
challenging an expert's certificate on the grounds of mistake. We are not
of course here concerned with any question of fraud or collusion on the
part of the expert.

The cases have been fully analysed by Sir David Cairns in *Baber v.*    B
*Kenwood Manufacturing Co. Ltd.* [1978] 1 Lloyd's Rep. 175, 181–183,
and by Nourse J. in *Burgess v. Purchase & Sons (Farms) Ltd.* [1983]
Ch. 216. The starting point for the modern statement of the law is, in
my judgment, the decision in *Campbell v. Edwards* [1976] 1 W.L.R. 403
and in particular the passage in the judgment of Lord Denning M.R., at
p. 407:                                                                   C

> "It is simply the law of contract. If two persons agree that the price
> of property should be fixed by a valuer on whom they agree, and he
> gives that valuation honestly and in good faith, they are bound by
> it. Even if he has made a mistake they are still bound by it. The
> reason is because they have agreed to be bound by it. If there were
> fraud or collusion, of course, it would be very different. Fraud or    D
> collusion unravels everything."

That statement was, as a matter of principle and disregarding the earlier
authorities, endorsed by Megaw L.J. in *Baber's* case [1978] 1 Lloyd's
Rep. 175, 179, and concurred in by the other members of this court in
*Baber's* case. It is in line with the passage, cited by Sir David Cairns in
*Baber's* case, at p. 181, from the judgment of Sir John Strange M.R. in    E
*Belchier v. Reynolds* (1754) 3 Keny. 87, 91:

> "Whatever be the real value is not now to be considered, for the
> parties made Harris their judge on that point; they thought proper
> to confide in his judgment and skill and must abide by it, unless
> they could have made it plainly appear that he had been guilty of
> some gross fraud or partiality."                                       F

Geoffrey Lane L.J. in *Campbell v. Edwards* [1976] 1 W.L.R. 403, 408
followed and applied an earlier statement by Lord Denning M.R. to the
same effect in *Arenson v. Arenson* [1973] Ch. 346, 363.

Both *Campbell v. Edwards* and *Baber v. Kenwood Manufacturing
Co. Ltd.* [1978] 1 Lloyd's Rep. 175 were cases of non-speaking valuations
and it is convenient to say a little at this juncture about the distinction    G
between speaking and non-speaking valuations or certificates, which to
my mind is not a relevant distinction. Even speaking valuations may say
much or little; they may be voluble or taciturn if not wholly dumb. The
real question is whether it is possible to say from all the evidence which
is properly before the court, and not only from the valuation or
certificate itself, what the valuer or certifier has done and why he has
done it. The less evidence there is available, the more difficult it will be    H
for a party to mount a challenge to the certificate. This may lead of
course to questions such as whether it is proper to join the certifier as a
defendant in proceedings for the purpose of getting discovery from him,
a matter considered by Geoffrey Lane L.J. in *Campbell v. Edwards*
[1976] 1 W.L.R. 403, 408–409, and whether it is proper to administer
interrogatories to the certifier to discover his reasons, a matter considered
in an analogous field in *Berry v. Tottenham Hotspur Football and*

A    *Athletic Co. Ltd.* [1935] Ch. 718 and *Duke of Sutherland v. British Dominions Land Settlement Corporation Ltd.* [1926] Ch. 746; but those questions do not arise on this appeal.

To revert to *Campbell v. Edwards,* however, what Lord Denning M.R. said is inconsistent, and was intended by him to be inconsistent, with the law as understood and declared in cases between *Belchier v. Reynolds,* 3 Keny. 87 and *Campbell v. Edwards.* One may note *Johnston v.*
B    *Chestergate Hat Manufacturing Co. Ltd.* [1915] 2 Ch. 338. There, a party was entitled under an agreement to a percentage of the net profits, if any, of a company for the whole year. The agreement provided that the words "net profits" should be taken to mean the net sum available for dividends as certified by the auditors after payment of certain items. Sargant J. commented, without citing authority, at p. 344:

C        "Even if the certificate, as an ad hoc certificate, is a proper certificate within the agreement, still, when it is obviously based, as I think it is, on a wrong principle, it does not oust my jurisdiction. It is not even as if this amounted to an arbitration. It is something entirely different, namely, an agreed machinery or method for arriving at a particular sum."

D    That approach, however, of treating the certificate as mere machinery for calculation which can automatically be overridden by the court if it appears to be wrong, cannot be enough where the expert or certifier is to certify the fair value of property for which there is no absolute objective criterion, or where, as in the present case, the parties have expressly declared that the determination of the accountants or expert is
E    to be conclusive, final and binding for all purposes, and where they have further shown that, as would be inherently likely where an issue of further shares is in question, they want a speedy determination without the delays and complexities of arbitration, let alone court proceedings: see in particular the requirement in paragraph 4 of appendix I that the expert is to provide his report "within the shortest practicable time." There is of course authority in *Sudbrook Trading Estate Ltd. v. Eggleton*
F    [1983] 1 A.C. 444 that where parties have agreed on a machinery, by way of a reference to accountants or valuers, for ascertaining a particular sum, or even the fair value of property, the court will intervene and provide its own machinery if the agreed machinery has broken down. It does not, however, automatically follow from that that the court will substitute its own machinery where the agreed machinery has operated.

G    More important, in the present context, than *Johnston v. Chestergate Hat Manufacturing Co. Ltd.* [1915] 2 Ch. 338 is *Dean v. Prince* [1954] Ch. 409. I have already referred to the decision of Harman J. [1953] Ch. 590 on the preliminary issue. The case was one in which the articles of a company provided that, if a member died, his shares should be purchased by the directors at such price as should be certified by the auditor to be in his opinion the fair value thereof at the date of the member's death.
H    In his substantive judgment at the end of the trial, Harman J. held that the auditor had based himself on an entirely wrong basis, in valuing the shares on break-up value without any increase for the fact that the shares carried control of the company. Harman J. brushed aside an argument for the defendant directors that those who committed themselves to the judgment of John Doe or Richard Roe could not complain if either proved to have very bad judgment. On appeal [1954] Ch. 409, the substantive judgment of Harman J. was reversed on the

286

Dillon L.J.          Jones v. Sherwood Services Plc. (C.A.)                [1992]

ground that in the unusual circumstances of the company in question the        A
basis of valuation adopted by the auditor was appropriate. However,
both parties and all members of this court took as settled law a dictum
of Sir John Romilly M.R. in *Collier v. Mason* (1858) 25 Beav. 200, 204,
that

> "this court, upon the principle laid down by Lord Eldon, must act
> on that valuation, unless there be proof of some mistake, or some        B
> improper motive, I do not say a fraudulent one: as if the valuer had
> valued something not included, or had valued it on a wholly
> erroneous principle . . . or even, in the absence of any proof of any
> of these things, if the price were so excessive or so small as only to
> be explainable by reference to some such cause; in any one of these
> cases the court would refuse to act on the valuation."
>
>                                                                          C

Denning L.J. in particular, in *Dean v. Prince* [1954] Ch. 409, 427,
stressed that if the courts were satisfied that the valuation was made
under a mistake they would not hold it to be binding on the parties. A
valuation could be impeached not only for fraud, but also for mistake or
miscarriage, for instance, if, inter alia, the expert had interpreted the
agreement wrongly.
                                                                          D
    Plainly Lord Denning came to change his views between 1954 and
1976. The reason for that was that in 1954 there was an established line
of authority, from *Pappa v. Rose* (1871) L.R. 7 C.P. 32 to *Finnegan v.
Allen* [1943] K.B. 425, to the effect that a valuer who had given a
certificate as an expert was not liable to an action unless he was
dishonest, but that line of authorities had been overruled by the House
of Lords in *Arenson v. Arenson* [1977] A.C. 405 and *Sutcliffe v.*        E
*Thackrah* [1974] A.C. 727 where the dissenting judgment of Lord
Denning M.R. in *Arenson v. Arenson* [1973] Ch. 346 was approved and
it was established that the expert could be liable for damages in
negligence if he had acted negligently in giving his certificate.
    In *Dean v. Prince* [1954] Ch. 409, 427, Denning L.J. had expressed
the view that the cases on the immunity of the valuer had no application    F
when the court was considering the validity of the valuation itself.
Looking at the problem from the other end, however, the members of
this court in *Campbell v. Edwards* [1976] 1 W.L.R. 403 and *Baber v.
Kenwood Manufacturing Co. Ltd.* [1978] 1 Lloyd's Rep. 175 were
concerned to see how a valuer could be liable for a negligent mistake in
giving a certificate as an expert if the effect of that mistake was that the
certificate was not binding on the parties: see especially the judgments    G
of Geoffrey Lane L.J. in *Campbell v. Edwards* [1976] 1 W.L.R. 403,
409, and of Megaw L.J. in *Baber's* case [1978] 1 Lloyd's Rep. 175, 180,
concurred in by Lawton L.J., at pp. 180–181.
    The result is, in my judgment, that in those two cases this court has
decided to look at the question of setting aside certificates of experts on
grounds of mistake afresh in the light of the principle that the expert or   H
valuer can be sued for negligence: see also *per* Sir David Cairns in
*Baber's* case, at p. 183. In so doing this court has rejected the latter part
of Sir John Romilly M.R.'s dictum in *Collier v. Mason*, 25 Beav. 200,
204, "or even, in the absence of any proof of any of these things . . ."
We also therefore are free to look at the matter afresh on principle, and
are not bound by the law as stated by common consensus in *Dean v.
Prince* [1954] Ch. 409.

A    On principle, the first step must be to see what the parties have agreed to remit to the expert, this being, as Lord Denning M.R. said in *Campbell v. Edwards* [1976] 1 W.L.R. 403, 407G, a matter of contract. The next step must be to see what the nature of the mistake was, if there is evidence to show that. If the mistake made was that the expert departed from his instructions in a material respect—e.g., if he valued the wrong number of shares, or valued shares in the wrong company, or

B    if, as in *Jones (M.) v. Jones (R.R.)* [1971] 1 W.L.R. 840, the expert had valued machinery himself whereas his instructions were to employ an expert valuer of his choice to do that—either party would be able to say that the certificate was not binding because the expert had not done what he was appointed to do.

The present case is quite different, however, as Coopers have done

C    precisely what they were asked to do. They were asked to consider only the points on which Peats and Deloittes were not in agreement, to decide whether the two classes of disputed transactions were or were not to be included in the total of "sales" as defined in appendix I, and to determine the amount of sales accordingly; that is what they have done. Under paragraph 7 of appendix I, a decision of the accountants under paragraph 3, if the accountants are in agreement, is to be as conclusive,

D    final and binding as the decision of the expert if the accountants disagree with each other. But the argument for the plaintiffs has, as it seems to me, to go the length of asserting that if Deloittes had agreed with Peats that the disputed transactions were to be excluded from the total amount of sales and had consequently agreed on Peats' figures as the total amount of the sales, the plaintiffs could still have applied to the court to determine the true (in the court's view) amount of the sales and

E    to hold the (ex hypothesi) joint view of the accountants not binding. I do not believe that that is the law.

Any number of issues could arise under the various sub-paragraphs of paragraph 2 of appendix 1 as to the application of the wording of those sub-paragraphs to particular facts. All these issues are capable of being described as issues of law or mixed fact and law, in that they all

F    involve issues as to the true meaning or application of wording in paragraph 2. I cannot read the categorical wording of paragraph 7 as meaning that the determination of the accountants or of the expert shall be conclusive, final and binding for all purposes "unless it involves a determination of an issue of law or mixed fact and law in which case it shall only be binding if the court agrees with it."

G    Accordingly, in my judgment, because Coopers did precisely what they were instructed to do, the plaintiffs cannot challenge their determination of the amount of the sales.

There is another line of reasoning which points in the same direction, though I do not found my judgment on it.

There were two classes of disputed transactions which are referred to in Coopers' letter of instructions as (a) and (b). For convenience, class

H    (a) transactions have been referred to as "community charge contracts" and class (b) transactions as "contracts subject to ratification." The contracts subject to ratification, of which there were four, were contracts entered into with local authorities which at 30 November 1987, which was the reference date for the purposes of paragraph 2 of appendix I, were subject to ratification or confirmation, before dates then still in the future, by the full councils of the authorities concerned. In the event all four were duly ratified or confirmed. The issue is then whether these

**Dillon L.J.**          **Jones v. Sherwood Services Plc. (C.A.)**          **[1992]**

four contracts were, either as unratified contracts or as a result of their    A
subsequent ratification or confirmation, to be classified as binding
contracts entered into during the relevant period within the meaning of
paragraph 2(b). For present purposes, however, the important point is
that the total amount of these four contracts is only £182,150. If they
are treated as sales and added to Peats' and Coopers' figure of
£2,527,135 as the amount of sales, the total is still below the sum of
£2,720,000 which is the threshold under paragraph 1 of Appendix I.    B
Therefore, if there was any "mistake" over the contracts subject to
ratification, it is a wholly immaterial mistake with no practical effect at
all: see the judgment of Roskill J. in *Frank H. Wright (Constructions)
Ltd. v. Frodoor Ltd.* [1967] 1 W.L.R. 506, 529, where he refers to an
error being "material" only if it materially affects the ultimate result.

     To achieve any practical result, therefore, the plaintiffs have to show    C
that Coopers made a mistake which the court will correct over the
community charge contracts. The question here is a combination of
whether the products to which the community charge contracts related
were "products comprised in the current and planned products range
(on display as set out in paragraph 5 of appendix VI)," as required by
paragraph 2(a) of appendix I, and also whether the contracts were to be
counted as sales under sub-paragraph (b). The factors involved in this,    D
in the view of Peats in a letter of 31 March 1988 to the defendant, seem
to have included (i) whether a community charge programme was to be
equated with a "Rateman" programme for the purposes of paragraph 5
of appendix VI, or at all, since the community charge was replacing the
rates, and (ii) the significance, if any, of the facts that at the date of the
sale agreement of 13 February 1987 the community charge legislation    E
had not even been introduced, and the community charge contracts
included arrangements whereby alternative products would be provided
if the community charge legislation did not proceed.

     In these circumstances, however Coopers may have reached their
conclusion, it would seem likely that if the court undertook a
consideration of the issue, it would be involved in questions of the
correct accountancy treatment of contracts such as the community charge    F
contracts, and, though of course the court can decide such an issue, or
any other issue, it would seem to be particularly a matter of the opinion
of the accountancy profession which the court would decide, if it had to,
by reference to the expert evidence of yet more accountants.

     If the parties to an agreement have referred a matter which is within
the expertise of the accountancy profession to accountants to determine,    G
and have agreed that the determination of the accountants is to be
conclusive, final and binding for all purposes, and the chosen accountants
have made their determination, it does not seem appropriate that the
court should rush in to substitute its own opinion, with the assistance of
further accountants' evidence, for the determination of the chosen
accountants. When the parties provided in appendix I to the sale
agreement for a third firm of accountants—in the event, Coopers—to    H
act as the expert in the event of disagreement between Peats and
Deloittes, they cannot have had in mind merely disagreements between
Peats and Deloittes on simple arithmetic—the adding up of the figures
of the sales.

     Accordingly, for the reasons given earlier in this judgment, I would
allow this appeal, and I would strike out paragraphs 1 to 4 of the prayer
in the statement of claim.

A    Paragraph 5 of the prayer, however, is in a different position. It asks for rectification, if necessary, in accordance with paragraph 10 of the statement of claim. The claim for rectification in paragraph 10 is put in the final sentence as follows:

"If, contrary to that contention, it is held that such software is not so included, the plaintiffs will seek rectification on the basis that the agreement does not in that respect reflect the prior express understanding of the parties that 'community charges' software was part of the planned product range."

This court has not been concerned on this striking out application with the strength or otherwise of the evidence of the existence of such a "prior express understanding." The argument for the defendant has been that, because the plaintiffs went along with what Coopers were doing, they are estopped from claiming rectification which would produce an agreement different from that which Coopers were considering. The legal analysis of that argument, however, is that the defendant would be claiming to set up an estoppel—estoppel by convention—as a defence to the plaintiffs' claim for rectification. But it is impossible to strike out the claim for rectification on the ground of a defence of estoppel which has not yet been pleaded and which would depend on facts not admitted and not yet proved.

Paragraph 5 of the prayer must therefore stand, and paragraph 10 of the statement of claim must remain to support it. Paragraphs 8 and 9 must also remain to explain paragraph 10, since without paragraph 9 it is not apparent what software is referred to in paragraph 10, and without paragraph 8 it is not apparent what statement is referred to in paragraph 9. Paragraphs 4 and 5 are merely narrative and should remain. Paragraphs 11 and 12 and the last three sentences of paragraph 13 should, however, be struck out. I would allow this appeal accordingly.

It follows from the foregoing that I respectfully differ from much that was said by Nourse J. in *Burgess v. Purchase & Sons (Farms) Ltd.* [1983] Ch. 216. This stems primarily from a difference in our respective assessments of the decisions in *Campbell v. Edwards* [1976] 1 W.L.R. 403 and *Baber v. Kenwood Manufacturing Co. Ltd.* [1978] 1 Lloyd's Rep. 175, which I regard as binding on us, as the starting point of the reassessment of the law in this field after the decisions of the House of Lords which I have mentioned, but which he, I apprehend, regarded as heretical and illogical departures from the established doctrine enunciated in *Dean v. Prince* [1954] Ch. 409—in effect, Lord Denning's first thoughts in *Dean v. Prince* ought to be preferred to his second thoughts in *Arenson v. Arenson* [1973] Ch. 346 and *Campbell v. Edwards* [1976] 1 W.L.R. 403. However it is unnecessary to encumber this over-long judgment with further analysis of *Burgess v. Purchase & Sons (Farms) Ltd.* [1983] Ch. 216 which on any view is not binding on this court.

H    BALCOMBE L.J. I have had the advantage of reading in draft the judgment of Dillon L.J. As we are differing from the judge I add a few words of my own.

The principle applicable to a case of this type is that stated by Lord Denning M.R. in *Campbell v. Edwards* [1976] 1 W.L.R. 403, 407. [His Lordship set out the passage cited by Dillon L.J., ante, p. 284C, and continued:] That principle was expressly approved by this court in *Baber v. Kenwood Manufacturing Co. Ltd.* [1978] 1 Lloyd's Rep. 175. In my

290

Balcombe L.J.        Jones v. Sherwood Services Plc. (C.A.)        [1992]

judgment that principle cannot be affected by the chance whether the    A
valuation is or is not a "speaking" valuation. I agree with Dillon L.J.
that that is not a relevant distinction and it follows that I also respectfully
disagree with the judgment of Nourse J. in *Burgess v. Purchase & Sons
(Farms) Ltd.* [1983] Ch. 216.

So I apply that principle to the facts of the present case. The
contract of 13 February 1987 between the parties provided that the
number of Sherwood shares to be issued as consideration for the shares    B
in the company that were being sold should be increased by an amount
proportionate to the amount by which the sales of the company's two
operating subsidiaries should exceed £2,720,000 during the period of 12
months ending on 30 November 1987. The contract contained a definition
of the sales which were to count for this purpose; it also provided for
the amount of the sales to be agreed by two named firms of accountants,    C
and for a reference to an independent firm of chartered accountants
acting as experts in the event of the failure of the two named firms to
agree on the amount of the sales. The parties clearly intended by this
clause to empower the named accountants—and in default of agreement
by them, the experts—to decide all matters necessary to determine the
amount of the sales, and not just to leave to them matters of
mathematical calculation. There was good reason for the parties to take    D
this course, since the number of new Sherwood shares, which were
marketable securities whose value might fluctuate over a short timescale,
depended on the determination of the amount of the sales, and therefore
a speedy method of determining this figure made sound business sense.
In my judgment, therefore, Coopers did exactly what the parties had
contracted they should do, no more and no less, and their report, for    E
such it clearly was, cannot be impugned in the manner which the
plaintiffs seek to do in these proceedings.

For these reasons, as well as for those given in greater detail by
Dillon L.J., I agree that this appeal should be allowed. I also agree with
the order proposed by Dillon L.J.

*Appeal allowed with costs.*    F
*Leave to appeal refused.*

*Solicitors: Norton Rose; Phillips & Buck, Cardiff.*

M. I. H.

G

H

TAB 15

*Mortgage Express v Countrywide Surveyors Ltd*
[2016] EWHC 224 (Ch)

Neutral Citation Number: [2016] EWHC 224 (Ch)

Case No: 3LS30416

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**LEEDS DISTRICT REGISTRY**

The Court House
Oxford Row
Leeds LS1 3BG

Date: Friday 12th February 2016

**Before** :

**His Honour Judge Behrens sitting as a Judge of the High Court in Leeds**
**Between :**

|  |  |
|---|---|
| **MORTGAGE EXPRESS** | **Claimant** |
| **and** |  |
| **COUNTRYWIDE SURVEYORS LIMITED** | **Defendant** |

**Crown copyright©**
(Transcript of the Handed Down Judgment of
WordWave International Limited
Trading as DTI
165 Fleet Street, London EC4A 2DY
Tel No:  020 7404 1400, Fax No: 020 7831 8838
Official Shorthand Writers to the Court)

**Paul Lowenstein QC and Charlotte Eborall** (instructed by **Walker Morris LLP**) for the
**Claimant**
**Michael Douglas QC** (instructed by **DAC Beachcroft LLP**) for the **Defendant**

Hearing dates:
18 – 22, 25 and 27 January 2016
**Judgment**
**As Approved by the Court**

**Crown copyright©**

**Judge Behrens :**

## 1   Abbreviations

**1.**   In this judgment I shall adopt the following abbreviations:

| Term | Abbreviation |
|------|--------------|
| Bradford and Bingley plc | B&B |
| Mortgage Express | MEX |
| Countrywide Surveyors Limited | CWS |
| Mr Peter Driver | Mr Driver |
| Per calendar month | pcm |
| The list of properties supplied by Mr Vaughan on 29/7/2005 | The Vaughan List |
| The desktop valuations sent by Mr Bolton on 25/8/2005 | The Revised Valuations |
| Report by Adrian Curtis for CWS dated 17/7/2005 | The Curtis Report |
| Report by Ray Simmonds for CWS dated 21/7/2005 | The Simmonds Report |
| Report by David Atter for CWS dated 5/9/2005 | The Atter Report |
| New Lending Officer | NLO |
| Securemove Property Services | SPS |
| Eastbourne Financial Services Limited | EFS |
| Jukes (UK) | Jukes (UK) |
| Members Mortgage Administration Ltd | MMA |
| Loan to Value Ratio | LTV |

## 2   Introduction

**2.**   This is a claim in deceit. Between December 2004 and 24 June 2005, Mr Driver, an employee of CWS, provided valuation reports for 64 properties which were mostly two-bedroom new-build flats located at a new marina development at Macquarie Quay, Sovereign Harbour, Eastbourne.

**3.**   In respect of all 64 properties, Mr Driver gave rental valuations of between £1,300 and £1,540 pcm. The opinion of both valuation experts separately instructed by MEX and CWS is that the overall range of retrospective rental valuations was in fact between £600 and £750 pcm. This valuation is now admitted by CWS.

**4.**   MEX claims that it advanced monies between May and December 2005 to borrowers in reliance on the valuations. It contends that the loans would not have been made if it had known the true rental valuations.

**5.**   MEX claims that it has lost more than £3.3 million as a result of lending against the security of 41 of these flats. It contends that it can recover this sum by way of damages for deceit. There is no allegation of negligence or other breach of duty.

**6.**   In July and August 2005, there was a series of emails between Mr Stones and Mr Bolton on behalf of CWS, and Mr Vaughan on behalf of MEX. Those emails are central to some of the issues in the case. It will be necessary to refer to the emails in detail later. For present purposes the position may be summarised.

**7.**   On 19 July 2005 Mr Stones sent an email to Mr Vaughan in which he stated that CWS was concerned that Mr Driver's rental valuations may have been overstated and asked to be given the opportunity to review its advice before any further lending decisions were made.

On 29 July 2005 Mr Vaughan sent Mr Stones a list of 19 or 21 properties which were valued by Mr Driver and which had been submitted to MEX using the two postcodes supplied by Mr Stones. He asked for all rental amounts to be reassessed on those cases. In an email dated 4 August 2005 Mr Stones described the process as "*an audit programme in progress – standard procedure with a change of Senior Staff*". On 25 August 2005 Mr Bolton sent Mr Vaughan an email which included revised desktop audits of each of the 21 properties which were contained in the Vaughan List. The revised rentals were on average only 50% of the valuations provided by Mr Driver.

**8.**    In relation to the 21 properties referred to in the Vaughan List, 9 mortgages were completed before 19 July 2005, 5 completed between 19 July 2005 and 25 August 2005 and 5 completed after 25 August 2005. The remaining 2 were duplicates.

**9.**    2 further mortgage transactions which were not on the Vaughan List, had completed before 19 July 2005. The remaining 43 transactions were mortgage applications made after the Vaughan List was compiled.

**10.**    On 11 July 2005, CWS commenced an internal investigation into Mr Driver's rental valuations. It will be necessary to set it out in some detail later in this judgment. On 17 July 2005, Mr Curtis prepared an internal report which concluded that the rental values for the flats "have been grossly overstated and should be no more than £700 pcm". On 21 July 2005 Mr Simmonds prepared a further report in which he concluded that "At best [Mr Driver] has been grossly negligent but it seems almost certain that he has been fraudulent". CWS never informed MEX of its suspicions of fraud.

**11.**    These matters give rise to a number of arguments on causation and loss. CWS claims that MEX did not and/or could not rely on upon any of Mr Driver's rental valuations after 19 July 2005. It accordingly denies that it caused MEX's loss. MEX asserts that if CWS had informed it of its suspicions of fraud it would not have relied on any of the Driver valuations. MEX contends that it did rely upon the Driver rental valuations and that CWS accordingly caused its losses.

**12.**    Losses have crystallised in respect of 41 of the 64 properties and the claim is now pursued only in respect of those 41 properties.

**13.**    At the Pre Trial Review on 16 December 2015 it was ordered that the claim should be tried by way of sample. 10 claims have been chosen as such samples. They relate to Nos: 188, 168, 178, 78, 96, 234, 68, 64, 144 and 92 Macquarie Quay. They were chosen primarily to ensure that the entire file was available in respect of at least two transactions falling within the following time periods, as follows:

| Category | Description of category | Sample Claim Transactions |
|---|---|---|
| A | Loan completion before 19 July 2005 (before any External Communications) | 234, 188, 168, 144 |
| B | Loan completion between 19 July 2005 and before 25 August 2005 (when CWS provided revised estimated valuations for properties on the "Vaughan List") | 92 and 78 |
| C | Loan completion after 25 August 2005 and on the "Vaughan List" | 64 and 68 |
| D | Loan completion after 25 August 2005, but not on the "Vaughan List" | 96 and 178 |

**14.** The parties helpfully agreed a list of issues. However the issues between the parties have narrowed and may now be summarised:

1. Whether MEX has established that Mr Driver had the mental element required in the tort of deceit in respect of the valuations which are the subject of the claim. If not, the claim fails. If so, it is conceded that MEX's claim succeeds in respect of the Category A Claims.

2. whether the communications between 19 July 2005 and 25 August 2005 mean that MEX's claims in respect of the Category B, C and D claims fail on the grounds that MEX did not or were not entitled to rely on the original valuations or because the communications broke the chain of causation between the valuations and any loss MEX may have suffered.

**15.** There was no detailed argument over quantum. MEX has put forward detailed figures in respect of quantum in respect of each of the 41 claims in accordance with the decision in Swingcastle v Alistair Gibson [1991] 2 AC 33. In his skeleton argument Mr Douglas QC did not appear seriously to dispute the methodology though he did raise a point about the appropriate rate of interest. Mr Lowenstein QC in turn raised the question whether MEX should be entitled to compound interest on any sum awarded. As there was no detailed argument it was agreed that this judgment would not deal with the issues of quantum and the parties would attempt to agree quantum if appropriate in the light of the judgment.

## 3   The Appendix

**16.** I have included, as an Appendix to this judgment a spreadsheet giving relevant details in respect of each of the 64 valuations which were originally the subject of this claim. The 41 remaining claims are shown coloured purple. As can be seen from the Appendix the claims remaining are divided as follows:

| Category | No of Claims | Total Loss |
|---|---|---|
|  |  |  |
| A | 3 | £234,843.54 |
| B | 4 | £265,867.14 |
| C | 2 | £159,801.52 |
| D | 32 | £2,649,763.92 |
| TOTAL | 41 | £3,310,276.52 |

**17.** It will accordingly be seen that the overwhelming majority of the claims fall into Category D. They are in respect of properties which were not on the Vaughan List. The applications were received between 28 July 2005 and 21 September 2005. The loans were finally made on dates between 16 September 2005 and 16 December 2005.

## 4   Evidence

**18.** Much of the evidence is documentary. MEX called two witnesses of fact.

**19.** Mr Vaughan was the MEX employee who received the emails sent between 19 July 2005 and 25 August 2005. In 2005 he was in Lending Support reporting into the Senior Manager, Mr Callaway. His main responsibility in this role was to monitor underwriting quality across the business. His team was also involved in the regular quality checking of underwriting as well as completions. He was also responsible for managing MEX's Valuation Panel. This involved monitoring the quality of the valuations provided by the panel valuers. It was not in dispute that Mr Vaughan was an appropriate person for Mr Stones to contact about the valuations.

**20.**   Ms Dennis was a Mortgage Underwriter who has been employed in various roles by MEX since 1997. In 2005 she had authority to approve loans up to £1,000,000. She had no direct involvement with any of the loans which are the subject of these proceedings.

**21.**   CWS called two witnesses of fact - Mr Driver, who is of course the subject of the allegations of deceit, and Mr Stones. In 2005 Mr Stones was the Operations Director of CWS. He was involved in the internal investigation which took place after Mr Driver left CWS on 30 June 2005. Mr Stones was the most senior of CWS's employees who was involved in the investigation. As he explained, Mr Atter and Mr Bolton reported to him. Mr Stones sent two of the emails between 19 July and 25 August 2005 which are central to the issues in the case.

**22.**   I shall consider Mr Driver's evidence in detail later in this judgment. Neither Mr Vaughan nor Mr Stones had any detailed recollection of events between July and September 2005. Thus, this is a case where close attention has to be paid to documents.

**23.**   In addition each side had the benefit of evidence from two experts – one valuation expert and one lending expert. There was substantial agreement between the valuation experts and they were not required to attend trial for the purpose of cross-examination. The lending experts' evidence was more controversial. They were called to give evidence on the exceptional nature of the contact which was made to MEX by CWS between July 19 and August 25 2005 and the extent to which the exceptional nature should have been apparent to MEX.

## 5   Acknowledgment

**24.**   It is right to acknowledge at the outset the considerable assistance I have had from those involved in preparing the case. The bundles were well thought out and easy to follow. I was provided with much of the material electronically which I find to be essential.

**25.**   The openings skeletons and closing submissions were detailed and of the highest order. Cross examination was detailed and relevant. I am grateful to all concerned.

## 6   The facts

### MEX

**26.**   MEX is a private unlimited company registered in England and Wales. It is a wholly owned subsidiary of B&B. It was B&B's specialist lender, and dealt with broker introduced residential lending and B&B's investment lending (including buy to let) until it ceased lending in September 2008.

**27.**   As noted above, each of the 64 loans was in respect of a newly built buy to let flat at Macquarie Quay. At that time the loan market for buy to let flats was highly competitive and MEX had installed systems to ensure a rapid turnover between the receipt of the application and the completion of the loan. MEX was in the business of making loans. Thus if the application fulfilled its criteria it would if possible make a mortgage offer.

### Mortgage Brokers and Packagers

**28.**   EFS was a broker company, the shareholders of which were Keith and Alan Rumary and Anthony Light (son in law of Alan Rumary). Jukes was also run by Keith Rumary together with his partners Leona Best and Roy Higgs.

**29.**   MMA is a mortgage applications packager. Brokers (including EFS and Jukes) could use the services of MMA by submitting the mortgage application form to MMA, who would

obtain the valuation report on their behalf and bundle the documents together to form the mortgage application pack to be submitted to MEX.

**30.** A feature of the case is that in all of the 64 cases the valuer was not instructed by MEX. He was instructed by the broker or the packager on behalf of the proposed borrower. The valuation would be submitted to MEX if and when the broker or packager submitted the mortgage application to MEX. Thus the valuer had no control of when or if the valuation would be submitted to MEX.

**31.** Another feature is that in all cases the applications were submitted to MEX by the broker, EFS/Jukes, or by MMA.

**32.** MEX's case is that the Rental Valuations were merely the start of a much wider dishonest scheme perpetrated by mortgage brokers, EFS and Jukes, which resulted in losses to MEX of over £40 million.

### MEX's new lending processes

**33.** There is a detailed summary of MEX's lending process in Ms Dennis's witness statement. Most of this was uncontroversial. However, as some understanding of the processes is necessary to resolve the issues in the case I shall summarise it further.

**34.** The New Lending Process that operated in 2004 and 2005 was divided into distinct parts, being the Underwriting Process and the Completion Process. This was to ensure a segregation of duties requiring differing mandate authorities.

**35.** First was the 'Decision in Principle' stage, for which MEX relied on its software to undertake an initial assessment of the application against its lending policy to ensure that the application fell within the policy criteria.

**36.** Second, the offer stage, which used the information provided in both the mortgage application form along with the valuation report and rental assessment to assess whether to make a mortgage offer and, if so, for how much. Each product had a maximum LTV which set a ceiling on how much could be loaned relative to the value of the property and a maximum loan amount based on the rental assessment. No underwriter had discretion or authority to exceed the maximum LTV or disregard the rental calculations.

**37.** Third, after the mortgage offer was despatched, and assuming no further information was submitted for review, then MEX would await a Certificate of Title from its appointed solicitor. MEX would treat receipt of an unqualified Certificate of Title as confirmation that all mortgage conditions had been met and that the Bank could release completion money to its solicitors.

**38.** There were a number of teams dealing with the underwriting of applications and each was headed up by a Senior Operations Manager. Each team had a Team Manager, a Senior New Lending Officer, an administrator and 8 to 17 NLO's.

**39.** Equally there were a number of completion teams. Each team had a Team Manager, a Senior Operations Manager, a Senior Completions Officer, and 10 to 12 Completions Officers.

### Decision in Principle

**40.** It is not necessary to refer to the Decision in Principle stage in any detail. Its purpose was to filter out at an early stage those applications that would ultimately be unsuccessful. MEX developed an electronic system called "ECROS" to create a smooth and efficient

mortgage application process for brokers. ECROS allowed the broker to input customer data electronically and enabled the broker to apply for an online DIP. The ECROS system would check to ensure that the 85% LTV ratio was satisfied. It would also take account of credit reference information and other variables, applying the outcome of the internal 'buy to let' score card before producing a DIP. It was not mandatory for a loan application to go through the DIP stage first. A broker could simply submit a fully completed loan application for underwriting.

### The Offer

**41.**   The process for considering the offer is set out in some detail in paragraphs 42 to 52 of Ms Dennis's statement. The NLO would check that MEX had received all the relevant documents. These would include the mortgage application form, the valuation form and documents proving the identity and address of the borrower. The NLO would enter the relevant details on MEX's OMIGA system. The OMIGA system would then either accept or reject the application. The NLO had power to override the decision or to refer any problems to a more senior or specialised member of the team.

**42.**   In order to be acceptable the application had to satisfy MEX's policy both in relation to LTV and affordability. As already noted the maximum LTV was 85%. The assessment of a borrower's ability to service a buy to let loan was based on the rental income of the property as assessed by the valuer rather than the borrower's income from employment. Consequently, in buy to let transactions where the security property was not yet let, the assessment of the property's rental potential had to be provided by the valuer in the rental assessment report.

**43.**   In order for the loan to be made the Lending Policy stated that

> "expected gross rental income from letting the property must be a minimum of 130% of the monthly mortgage interest payment. Where fixed/discount products are being taken with a fixed/discount period of less than 3 years then the normal variable rate must be used in this calculation."

**44.**   With effect from January 2005 the percentage was reduced to 125% where the rate selected was a fixed rate for 5 years or more.

### Completion

**45.**   The completions process is set out in detail in paragraphs 53 to 58 of Ms Dennis's statement. After the offer is sent out the next stage is the report on title. The majority of transactions proceed to completion on receipt of a clear report on title. If the solicitor reports an issue he must await further instructions from MEX. If an unqualified Certificate of Title is received the officer checks that all required information had been received and that there were no discrepancies between information contained in the Certificate of Title and information provided by the borrower/ valuer during the underwriting process. If any issue was identified, such as third party deposits, or discounts from the purchase price, then the Completions Officer would put it to the relevant solicitor and/or valuer so that they could explain it and confirm whether it affected the Bank's interests in the property and confirm that the valuation was not affected. If the solicitor and/or valuer provided such confirmation then the transaction could proceed.

**46.**   The Completions Officer required the final authority of a Senior Completions Officer who, if satisfied, would authorise the release of completion funds to the solicitor.

### The Valuers

**47.**    MEX did not directly instruct the valuers to carry out the individual mortgage valuations in any of the cases which are the subject of this dispute. Those instructions came from the broker/packager on behalf of the borrower.

**48.**    MEX operated a panel of valuer firms and a broker could only instruct a valuer from the valuation panel. Furthermore there were contracts between MEX and the valuer firms and detailed procedures that had to be followed in the valuations.

**49.**    Furthermore MEX employed Valuation Panel Managers to ensure that the panel was maintained and that the members complied with the qualification criteria. Any queries relating to the competence or otherwise of individual valuers were, at least initially, taken up with the Panel Managers.

**50.**    SPS, which became part of the Countrywide Plc group in October 2004 was the relevant Panel Manager in respect of the Eastbourne area.

### The Contracts

**51.**    The contractual relationship under which CWS provided services to MEX was governed by a written service level agreement dated 15 October 2004.

**52.**    Under clause 5(b) CWS had to "act reasonably in good faith and in accordance with generally accepted standards of good practice (if any)". Under clause 8 CWS warranted that valuations would be carried out by appropriately experienced persons, with reasonable care and skill in accordance with MEX's guidance notes to valuers, RICS guidance; and the 'Red Book' issued by RICS.

**53.**    The Red Book sets out practice statements, which apply to all valuers, as well as guidance notes for particular situations (including to the valuation of buy-to-let properties). It includes a definition of market rent which it is not necessary to set out.

**54.**    The Red Book deals with inspections, including the need to carry out an inspection to the extent necessary for the purposes of the valuation. The valuer must make it clear in his report if the valuation has been made without an opportunity to carry out an adequate inspection.

### The Procedures

**55.**    A valuer would normally be instructed from MEX's valuation panel by a broker/packager making an electronic request through one of two valuation portals (either Quest or Xit2). In evidence Mr Vaughan suggested[1] that there was a difference between the standard procedure in a packaged case and a broker case in that MEX instructed the valuer in a broker case.  It is not in dispute that in this case many of the instructions came directly from EFS or Jukes. Neither Mr Vaughan nor Ms Dennis regarded this as unusual.

**56.**    If the valuation portal was used it would identify the firm, but not the individual valuer, which was to carry out the valuation. The portal would produce a document (entitled "Record Details") giving basic details of the valuation required including the fee, the address, and the applicant and leaving other details such as the identity of the valuer and the time of the valuation to be filled in on line by an employee of the valuer firm. The software would then produce two documents. The first was a single page document entitled "Residential Mortgage

---

[1] Transcript – Day 2 p 107 – 108

Valuation Field Sheet" which contained the specific instructions for the valuation and a number of tick boxes for the valuer to complete. Amongst other instructions it gave a turnaround time of the order of 3 days. The instructions were taken from the information that had been fed into the system. The instruction made clear that Buy to Let schemes required an additional rental opinion form.

**57.**   The second document was a 4 page document entitled MVR Field Sheet which the valuer would take with him whilst inspecting and carrying out the valuations and would in effect provide a contemporaneous note of the valuation. It contained a number of boxes to be filled in by the valuer including boxes for the arrival and departure time, boxes for the nature of the accommodation, boxes to indicate the condition of various parts of the property, and boxes for the market value and rent.

**58.**   After completing the inspection and filling in the MVR Field Sheet the valuer would complete and sign the standard MEX valuation report and rental assessment addendum form and submit them to the broker/packager usually electronically. They each contain a valuation certificate which gives the date of the inspection, the valuer's signature and name. If completed electronically the valuer's signature would be in the form of a code.

**59.**   Although not obvious from the standard forms, Mr Driver confirmed in cross-examination that he knew from many of his instructions the proposed purchase price and the rental expected by the broker/packager.

### Procedures for Concerns

**60.**   In addition to providing a witness statement in these proceedings, Mr Vaughan had provided a detailed witness statement in relation to other proceedings between MEX and CWS and a firm of solicitors. In that statement he covers much of the procedural ground set out by Ms Dennis in these proceedings. In paragraphs 130 – 149 of that statement he dealt with the procedure where there were concerns.

**61.**   In paragraph 141 he made it clear that it was quite common for queries to be raised some of which resulted in the withdrawal of the loan offer. If the query related to a valuation issue it would be taken up with the panel manager. In cross examination he put the matter in this way:

> So that's obviously Countrywide, whoever the panel manager was at the time would be our point of contact. They would actually be the point of contact going back out to that firm with the information or requesting more information. WE wouldn't phone up the individual surveyor or firm, we would go to the panel – that was what we paid them to do, that's part of their panel management costs, was that they were our sort of go out and do the -----

**62.**   When asked whether he would go back to the panel manager if the valuer was part of that firm he said that he would:

> We didn't have relationships externally with anyone else. We had to rely on them to do that for us. It was – we did not – I viewed it that they were independent enough, the people I dealt with, that they wouldn't be trying to do anything, they would do what we asked them to do.

**63.**   However he confirmed that he would be looking for ways to resolve the query positively because MEX was in the business of lending and wanted to lend and keep relationships going if it could.

**64.**   In paragraph 143 of the statement Mr Vaughan said:

"If a query raised led to more serious concerns being revealed, particularly if it was suggestive of mortgage fraud, then we would not hesitate to take action to stop the immediate transaction and any other proposed business being undertaken with the parties concerned. It was normal practice when investigating a serious query concerning a potential fraud to run a search for any other existing loans or applications in the pipeline from the same borrower to see whether they showed the same problem."

**65.** In paragraphs 144 and 145 Mr Vaughan explained the procedure for the involvement of the fraud team and the issuing of warnings and blacklisting of brokers. In cross examination he repeated that if it was in relation to the valuation he would ask the panel managers for advice. He was asked[2]

But if there was a particular trend or there were concerns about a number of valuations, they are badly wrong, for the sake of example, and there is a trend, what would you do about that?

A. Again, we would go back to the panel manager to ask them to investigate.

Q. And they come back and say: "These valuations are all wrong, the ones we told you about." What do you do then? Do you carry on lending, or do you say: "We can't lend on those"?

A. Ultimately you could be looking for getting new valuations provided.

Q. Yes. And would proceed when the new valuations were provided and proceed on the basis of those.

A. Correct.

### The 64 Transactions.

**66.** A summary of each of the 64 transactions is contained in the spreadsheet which forms the Appendix[3] to this judgment. I shall refer to the transactions by the number which appears in the first column of the spreadsheet. Thus transaction 3 refers to the loan of £212,457 made to Curwen in respect of 188 Macquarie Quay.

### Sovereign Harbour and Macquarie Quay

**67.** Eastbourne is an established seaside resort with a large development known as Sovereign Harbour just over a mile from the centre of town. Sovereign Harbour is in two parts: North and South. Between them they contain 35,000 units of residential accommodation in the form of houses and flats. Flats predominate wherever there is a view of the sea or inland water feature.

**68.** In 2005 Sovereign Harbour South was complete but Sovereign Harbour North was in the process of development with many developers working on it.

**69.** Macquarie Quay was being built by Persimmon Homes. It comprised a series of four and five storey apartment blocks, with the ground floor being car parking. The development is attractive and apartments facing the sea not only have good views but also front onto a large beach.

---

[2] Transcript – Day 2 p 178 - 179
[3] In fact the Appendix contains 65 properties but for reasons that do not matter the first property can be ignored.

**70.** There is a marked contrast between Sovereign Harbour and Eastbourne. Sovereign Harbour is like any waterside development in trying to be upmarket whereas Eastbourne is more downmarket.

**71.** The layouts of the flats in Macquarie Quay are not identical. Many have two bedrooms but some have three bedrooms. Furthermore there are a number of different configurations. The list attached to the email of 23 June 2005 which is referred to below identified at least 6 different configurations.

### Brokers

**72.** Only two brokers were involved in the 64 transactions – Jukes and EFS. Where the broker was Jukes the individual broker was (with 2 exceptions) Keith Rumary. The two exceptions (transactions 63 and 65) involved Mr Higgs and Leona Best.

**73.** Where the broker was EFS the individual broker was usually Alan Rumary but there are 3 transactions where the individual broker was Mr Light.

### The valuations

**74.** If one ignores transactions 1 and 2 all of the valuations were carried out by Mr Driver between 7 April 2005 and 24 June 2005. 39 of the valuations were carried out between 23 and 24 June 2005.

**75.** Mr Driver gave the same valuations (Capital Value - £249,950, Rental Value - £1,540 pcm) for transaction 3 and transactions 7 to 65 inclusive. In respect of transactions 4, 5 and 6 his figures were slightly lower (£239,950 and £1,480 pcm).

### The instructions to Mr Driver

**76.** In many cases Mr Driver received his instructions directly from MMA, Jukes or EFS either by fax or email, but not through the portal.

**77.** Mr Driver acknowledged that in many cases he was made aware of the estimated or (in one case) required rental and capital value. Mr Driver readily acknowledged that he was aware that the proposed purchase price was £249,950 and the rental that was sought was £1,540.

**78.** The most striking of the instructions was contained in an email sent at 14.02 on 23 June 2005 from Karen Bailey to Mr Driver. The email referred to a discussion with "Roy" (it was suggested this might be Roy Higgs, a broker in Jukes, but this could not be confirmed) and sent a list of 61 properties showing the client, the retail price and the mortgage required. All but 8 of the properties showed MEX as the prospective lender. Mr Driver carried out these valuations between the time of receiving the email and 24 June 2005. 39 of the properties are within the 64 transactions that were the subject of the claim. In each and every case Mr Driver valued the properties at £249,950 with a rental valuation of £1,540.

### *The internal investigation into Mr Driver*

### The beginning of the Investigation

**79.** Mr Driver left CWS as Office Manager of CWS's Eastbourne Office on 30 June 2005. He was replaced by Mr Ramsden.

**80.**    On 8 July 2005 Mr Ramsden contacted Mr Atter (CWS's Regional Director for London and the South East), in respect of a property valued by Mr Driver where he had been asked to transcribe the valuation onto a form for another lender. Mr Ramsden felt that the valuation was overstated and that the rental income was given at £1,500 pcm as opposed to a more realistic value of £650 pcm.

**81.**    Mr Atter, who was about to go on leave, contacted both Ms Taylor (CWS's Head of Customer Relations) and Mr Curtis (a Senior Surveyor) about the situation.

**82.**    On 11 July 2005 Ms Taylor sent an email to Mr Stones (CWS's Operations Director) with a copy to Chris Shaw (CWS's Managing Director). The email referred to the developing situation in Eastbourne and included:

> It transpires that Peter Driver has carried out many valuations - in the region of 60 or so where a developer is the loan applicant. We understand PD is acquainted with the developer… The instructions were received and dealt with by PD who apparently made the appointments to inspect himself… Will [Ramsden]'s impression is that the valuation is overstated and also the rental income is given at £1500 pm and more realistically it would be £650. David [Atter] has instructed Adrian Curtis [...] to carry out a complete audit"

**83.**    On 15 July 2005 Mr Bolton (CWS's Assistant Regional Director for London and the South East) sent an email to Ms Taylor and Mr Stones with a copy to Mr Atter. He noted that Adrian Curtis had completed his investigations and was in the process of finalising his formal report. He continued:

> "On the basis of the information collected, it would seem that something like 65 properties were "inspected" by Peter Driver over two days and reports prepared just before he left the employment of [CWS]… The capital values appear strong but possibly defendable. The problem lies with the rental values which were put in at £1540 pcm whereas an analysis of comparable evidence indicates that £700 pcm is the top limit. Obviously these rentals were used to support the applications… We would however have to move quickly to establish if we can stall the lending process prior to funds being drawn down."

### The Curtis Report

**84.**    The Curtis Report was dated 17 July 2005 and was addressed to Mr Atter and to Mr Bolton. It bears a date stamp of 20 July 2005. It is not clear when or whether Mr Stones saw a copy. In his witness statement[4] Mr Stones states that he does not believe he saw the report at the time. However he accepted both in his statement and in cross-examination that he had little recollection of events beyond what is contained in the documents. In his email of 15 July 2005 Mr Bolton stated that he would send a copy of the report to Mr Stones when he received it. On balance it seems to me likely that he did.

**85.**    In any event the report included:

> "1(iii)    About a week before Peter Driver left [CWS] at the end of June, he carried out a "bulk valuation" of flats… and in particular mortgage valuations of **57** flats at Macquarie Quay and mortgage valuations of **8** flats at another development…

> "8(v)    I consider the rental values for the flats have been grossly overstated and should be no more than £700 pcm.

---

[4] Paragraph 14

"9(ii)        Sites notes are totally inadequate.

"9(iii)       Rental Values of £1540 pcm in all the mortgage valuation reports are grossly overstated and should not be more than £700 pcm.

"10(i)        Instructions from Jukes (UK) Financial Services commenced in 1999 and initially valuations were carried out by all surveyors in the office. Since April 2004, all valuations from Jukes have been carried out by Peter Driver with only one or two exceptions.

"10(ii)       The valuations carried out for Jukes by Peter Driver include jobs out of area, with for example 14 valuations carried out at [sic] on a new site at […].

"10(v)        In April 2005, rental values were being provided at the level of £1540 pcm.

"10(vii)      Rental values at "over market value" go back well beyond the recent tranche of valuations to October 2004."

### The Simmonds Report

**86.**    As a result of the discovery of the problem Mr Simmonds (a Quality Manager at CWS) was instructed to investigate further. Mr Simmonds prepared a further report on 21 July 2005.

**87.**    The report is 4 pages long and included:

"This report is the result of further investigations carried out as a result of the discovery of the following issues in respect of Buy-To-Let valuations compiled by Peter Driver (PD)…

The rents given by PD are at a much higher level than the market can bear.

A large number of valuations (over 60) came in and were processed by PD on 23 June 2005, one week prior to his retirement on 30 June 2005 and subsequent move to Spain.

 "[Reports] in Sovereign Heights [sic]

…

"In respect of [Mortgage Valuations] provided by PD, these are in the right ballpark; however, the rental values provided of £1540 are approximately double the more accurate figure of £700.

"There is clear evidence that PD has provided one set of rents for instructions in the name of Rumary provided by Jukes and another set for other applicants and other instruction sources…

"Regarding the tranches of instructions received for [lender's name redacted in the copy of this document provided as part of the Countrywide Disclosure] and Macquarie Quay PD has provided no comparables of substance to substantiate the rents provided. There are letters from Letting Agents but their contents are effectively worthless.

"Some reports ask for a countersignature and David Atter's name has been typed in but there is no copy report with such a signature. It is assumed that PD ignored this requirement.

 "Out of Area Working

…

"PD did nine [out of area] cases, all for Jukes and always meeting the rental figures requested.

"Conclusions

…

"Based on the evidence to date there is little doubt that PD has worked in conjunction with Jukes, MMA and Rumary. Areas of concern are:

Provision of rental values far in excess of current market levels.

Possibility of duplicate valuations for more than one lender.

What else will be discovered following more detailed observations carried out without the immediacy of the work that I have had to do over the past few days.

"At best PD has been grossly negligent but it seems almost certain that he has been fraudulent.

"The further investigations should be carried out urgently and if my findings are confirmed beyond reasonable doubt then the police should be informed."

**88.** On 22 July 2005 there was an internal meeting which included Mr Stones, Ms Taylor, Mr White and Mr Simmonds. Following the meeting, at 15.58 Mr Stones sent an email to Mr Atter, with copies to Ms Taylor, Mr White and Mr Bolton which included:

The severity of the situation is such that we need to pull all of the case files that Peter Driver has done since the start of 2003 and catalogue the details to understand the true extent of the problem; as yet we have been unable to see the bottom of the hole!!

"Given potentially catastrophic PII implications this could have (the last time something of this magnitude happened in the early 90's [sic] it nearly brought the company to its knees – yes it is potentially that serious!!) we need to assign some full time resource to do the exercise… The exercise needs to be carried out with the utmost speed."

**89.** At 16.41 on the same day he sent an email to Ms Taylor, Mr White and Mr Simmonds in which he outlined an action plan which included:

Arrange for Barbara Pickup and Paul Thompson to review all hard copy case files of Peter Driver's work since start of 2003 and summarise details in Excel per the following matrix:

…

Particular attention to be paid to cases from Jukes (UK) and Members Mortgage Administration.

### The audit

**90.** On 30 July 2005 Mr White sent an email to Mr Stones with copies to Mr Atter, Mr Bolton and Mr Simmonds giving an update of the situation. Ms Pickup and Mr Thompson were to attend on 1, 2 and 3 August to prepare the spreadsheet. Initially they would concentrate on what would be the most vulnerable cases, that is to say those from introducers such as Jukes. It would take longer to go through the files over the last 2 years.

**91.** Ms Pickup and Mr Thompson duly attended on 1 – 3 August 2005 and prepared the spreadsheet. The spreadsheet lists 105 Macquarie Quay entries of which 33 were part of the

64 which were included within the original claim. 19 of those 33 are included in the 41 where the loss has crystallised. It is not in fact clear when the spreadsheet was finalised. On 8 August 2005 Ms Pickup sent to Mr Cammidge and Mr White an email with a spreadsheet as an attachment. The spreadsheet was described as "the … cases identified so far".

### Revaluation by Mr Ramsden

**92.**    At 16.36 on 15 August 2005 Mr Ramsden sent an email to Mr Atter enclosing a spreadsheet of the revaluations of the properties in the Vaughan List in the following terms:

> Attached is the schedule for the above, which I hope is OK. I obtained the postal addresses from Persimmon Homes, but Mark and I have not made the usual enquiries of them, due to the sensitivity of the situation. We have visited the site, but not inspected any flats. Peter's fieldsheets provided no information, therefore we have relied almost entirely on the developers particulars. Values for flats on this development vary considerably from developer to developer, and with the differing locations and aspects of the flats. We feel the valuations are as accurate as we can get them, but you may have to allow a fairly wide margin of error.

**93.**    The spreadsheet was fairly detailed in that it had columns for the estimated (revised) and original valuations, and for the differences and percentage differences between the two valuations. Anyone reading it would have no difficulty in appreciating the significant differences both in real and percentage terms between the actual and estimated revised valuations.

**94.**    At 17.10 on 15 August 2005 Mr Bolton forwarded the email to Mr Stones asking for a "chat to discuss tactics". Between 15 and 16 August there was an exchange of emails between Mr Stones and Ms Taylor as to possible tactics. Mr Lowenstein QC has criticised Ms Taylor's email for looking at the position solely from CWS's point of view. I, however, agree with Mr Douglas QC that there was nothing improper in considering the position in that way.

### The Atter report

**95.**    On 5 September 2005 Mr Atter produced a further report which analysed the situation in detail. The report is 10 pages long. I shall not set it out in detail. After setting out the history he set an analysis of the audit reports:

> I have analysed some facts and figures which may be of assistance. There are basically six brokers involved as follows:
>
> [redacted]
>
> Eastbourne FS 9 cases
>
> Jukes FS 391 cases
>
> MMAL 114 cases
>
> Out of that, the lenders were as follows:
>
> [redacted]
>
> Mortgage Express 166 cases
>
> In addition it does appear that many of the applicants appear time after time …
>
> In addition, of the cases audited, 77 were completed in 2003, 233 in 2004, and 237 in 2005.

**96.**    He then highlighted what he described as a "clear pattern of issues that has emerged"

No approval sought for valuation amendments of more than 5% from the Regional Team.

Valuation amendments in letter form.

Little comparable analysis where comparables present.

Many files with no comparables at all.

No requests for Regional Director to countersign valuations over lender value levels.

Some duplicate reports for different lenders at different figures.

Working out of postcode area without prior approval from the Regional Team.

Valuations rubber stamped both in respect of capital and rental values on the basis of figures given by the introducers.

No full advance retentions imposed on partially completed properties.

No new build clause inserted in valuations for new build properties.

Incomplete and missing fieldsheets.

At least one commercial valuation carried out outside mandate levels.

No mention of incentives on new build properties.

Many files incomplete.

Some files missing.

Defects not picked up on second hand properties and generally no adverse comments made.

Photographs missing on many cases.

No mention of properties being ex-Local Authority properties.

**97.**    He then expressed his conclusions which included:

"It is quite clear that Peter Driver was providing whatever valuation figure was required by the introducers and, in most cases, figures were inflated, presumably to allow maximum borrowing by the applicants. It is also clear that Peter Driver was not following [Countrywide] procedures, or indeed RICS professional standards, and had he not retired he would certainly be subject to disciplinary procedures with [Countrywide] and no doubt with the RICS as well..."

… "Given all the evidence assembled thus far, I can see no reason why a competent Chartered Surveyor would value up properties on a consistent basis and ignore Company procedures unless there was some form of financial inducement and whilst a counter-argument could be that Peter was trying to generate more work for the business, or being merely careless, this, to be honest, doesn't wash and I have no doubt, albeit without any evidence, that some sort of financial inducement was given to Peter Driver."

**98.**    At no stage were these findings shared with MEX.

### Mr Driver's evidence.

**99.**   Mr Driver started his career in 1972 or 1973 as a building surveyor. He started work as a valuation surveyor in 1988 in Kent and has carried out valuations in the Eastbourne area since the late 1990s. In about 2000 he became the office manager of CWS's Eastbourne office. He had 5 surveyors working under him. He retired on 30 June 2005 at the age of 54.

**100.**   Mr Driver attended to give evidence voluntarily. He had provided a short witness statement of less than 3 pages in length. He dealt with the 64 valuations in 3 short paragraphs:

8.   I am aware that of those 64 valuations, I carried out about 42 of them on the days just prior to my retirement.  I think I probably carried out a few more than those 42 at Macquarie Quay on the couple of days before I retired although I cannot recall how many.  I am pretty sure it was a bulk instruction for a reduced fee.  I would not have inspected each and every flat.  I would have had regard to the plans and spoken to sales staff. It was entirely possible to carry out about 42 valuations of this nature over a period 2 days although it is a lot of dictation.

9.   I provided a rental valuation of £1,540 for each of the properties.  I believed at the time that this was sustainable especially in a rising market.  Sovereign Harbour was the hottest spot around and was simply not comparable to the rest of Eastbourne. Further, the Macquarie Quay block in which these properties were located was brand new, almost complete, and very much in demand due to its location within the Sovereign Harbour development.

10.  I acted honestly in providing all 64 valuations and deny that I acted fraudulently or intentionally misrepresented the rental value of these properties.

**101.**   Mr Driver was cross-examined by Mr Lowenstein QC for approximately 1½ days. Throughout his cross-examination he maintained his contention in paragraph 9 that he had acted honestly. He did, however, accept with hindsight that his rental valuations had been negligent.

**102.**   In his evidence in chief and at the end of his cross-examination he was asked a number of questions about documents relating to acquisitions of some 19 other mortgage transactions[5] which completed between May 2006 and September 2007. Each of those transactions involved EFS as broker. Each showed Mr Driver as the Borrower and there were a number of documents apparently signed by Mr Driver. The transactions had the hallmarks of a mortgage fraud in that many of them were described as remortgages rather than purchases. Furthermore the sums borrowed by the Borrower were (in many cases) significantly more than the purchase price with the result that substantial sums of cash (totalling more than £200,000) were paid into a bank account with Nationwide apparently in Mr Driver's name.

**103.**   In 2009 Mr Driver was arrested for conspiracy to commit mortgage fraud and interviewed at Eastbourne Police Station. He denied any involvement with the mortgage fraud and asserted his signature on the documents he was shown by the police had been forged. He asserted that he knew nothing about the 20 properties he was said to own. He has never been charged with any offence relating to the fraud. He was told in 2011 that the case against him had been dropped.

**104.**   In his evidence in chief he reasserted his innocence and asserted that the signatures that appeared to be his were forgeries. However at the end of his cross-examination after Mr

---

[5] At an early stage in the proceedings Mr Douglas QC objected to the use of these documents in cross-examination. However I ruled that they could be put to Mr Driver.

Lowenstein QC had asked a number of questions about a passport and a driving licence Mr Driver refused to answer further questions on the ground that he might incriminate himself. In particular he refused to answer any further questions about his passport and driving licence, any questions about the bank accounts in his name in 2006 and 2007, and about the property transactions.

**105.** I shall not lengthen this judgment by going through Mr Driver's cross-examination in detail. Instead I shall concentrate on the areas relied upon by Mr Lowenstein QC in paragraph 99C of his closing submissions. Mr Lowenstein QC drew my attention to 6 separate areas – (1) Comparables and lack of justification, (2) the bulk valuation, (3) the mistakes on the valuation files (4) the connection with Keith Rumary (5) motive and gain and (6) the bundle 10 documents

### Comparables

**106.** It is not in dispute that there was readily available comparable evidence of rental valuations for flats at Macquarie Quay. Paragraph 8(iv) of the Curtis Report refers to adverts in the local free newspaper, to Aspect lettings and to a letting list from Fox & Sons all of which give letting figures of less than £700 pcm. Mr Driver was shown advertisements in the local press dated 17 June 2005 to similar effect. Mr Driver accepted that his professional rules required him to value by reference to comparables.

**107.** Mr Driver's evidence on comparables is contained in this exchange[6]:

Q.  You did not look for comparables for any of them, did you?

A.  I don't know.

JUDGE BEHRENS:  "I don't know" or "no"?

A.  I don't know.

MR LOWENSTEIN:  You do know that you did not for Mortgage Express, because you accepted you did not.

A.  I didn't on these cases, clearly.

Q.  Because you were doing it too quickly.

A.  I was doing it quickly, yes, but I had an opinion that was based on my knowledge of the area.

Q.  You gave the opinion not knowing whether your opinions had any evidential foundation, you just gave them now knowing whether they were right -----

A.  No …..

Q.  ….. or wrong.

A.  ….. I knew that they were right because I knew what the area was like and how hot it was.  I just didn't make note of them.

Q.  You said you didn't look for any comparables.

A.  I'm sorry, I meant I didn't -----

Q.  We all (inaudible).

A.  I'm sorry, I meant I didn't put down any comparables.

---

[6] Transcript Day 4 p 111 - 113

Q.  You did not put down any comparables and I suggested to you twice that you did not look for any, and you accepted that you didn't.

A.  Not in the papers, not in the local papers, no.

Q.  You could have easily found them in the local papers.

A.  Possibly.

Q.  You did not look for or obtain any comparables from anywhere else, did you?

A.  I didn't note them down but I looked at other marina developments such as Brighton.

**108.**  Furthermore Mr Driver was shown 2 valuations in September 2003 and one in March 2004 where he had provided rental valuations for flats in Macquarie Quay at £800 and £900 pcm. In the 2003 valuations he had provided comparables.

### Lack of Justification

**109.**  As noted above in paragraph 8 of his witness statement Mr Driver sought to justify the rental valuation on 3 grounds. He was cross-examined on each of them. In relation to the rising market Mr Driver agreed that he was required to value at the valuation date so that the question of rising market is irrelevant. He also agreed that he had produced no evidence that the market was in fact rising and that the expert valuers were of opinion that rents for flats at Macquarie Quay had in fact risen very little.

**110.**  He asserted that Macquarie Quay had been a "hot spot" since 2002. He had, of course given 2 much lower valuations for flats in Macquarie Quay in 2003 and 2004.

**111.**  There was no evidence of comparable rents at Brighton Marina. In any event Mr Driver had earlier agreed that only comparables in Sovereign Harbour were relevant.

### The bulk valuations

**112.**  Mr Driver claimed that he talked to Keith Rumary who told him he was going to receive a bulk instruction for MEX and that he agreed to do the bulk instruction at a reduced fee: This was a discussion that took place face to face in Keith's office in Bexhill. He could not explain why the bulk instruction email of 23 June 2005 said "…as per Roy…" Mr Driver agreed that the bulk valuation was a "very unusual" and "abnormal" event and that he had not seen such a bulk valuation request in his career in respect of mortgage valuations.

**113.**  He attempted to justify his acceptance of the bulk valuation instruction by claiming that he had cleared the matter in a telephone call with Mr Atter.

**114.**  Mr Driver's evidence was "not all of the flats were finished. Indeed some of them had builders in them and were locked up so I looked at the plans in the sales office only." He said that he could give 42 valuations without doing the inspections, but that he would have regard to the plans. He claimed both in written evidence and in cross-examination that he would have inspected "some but not all" of those properties.

**115.**  A number of criticisms of this evidence are made in the closing submissions:

**116.**  There is no reference to the telephone conversation Mr Driver claims to have had with Mr Atter in any of CWS's documents including the Atter report. It is not referred to in Mr Driver's witness statement.

117. Mr Driver agreed that the field sheet "completed" in these cases is an obvious photocopy of one page. It does not evidence whether there was an inspection or not, and even if it did, it could only evidence an inspection of one.

118. Mr Driver claimed that he spent two days "on site". However email instruction was not until after 2pm on 23 June 2005. It would have taken time to put those 60+ instructions onto the system in order to create sufficient information for him to go out and value. In those circumstances it is difficult to see how he was on site on 23 June at all or managed to do proper valuations over the day and in the few hours available at all.

### Mistakes on the Valuation Files

119. A number of discrepancies were put to Mr Driver during the course of his cross-examination:

120. Several field sheets stated an inspection date of 7 May 2005 whereas the valuation report was dated 7 June 2005 (and the instruction had not been received until 3 June 2005)

121. There were a number of properties where the information recorded by Mr Driver in his field sheets shows apparent inconsistencies in the times when inspections took place. These are shown in a table taken from the closing submissions:

| File | Flat number | Inspection date | Inspection time |
|------|-------------|-----------------|-----------------|
| Information taken from Mr Driver's field sheets in relation to inspection times on 7 April 2005 | | | |
| 6(2)/2/259 | 162 (plot -) | 7 April 2005 | 9am-11am |
| 6(2)/8/304 | 130 (plot -) | 7 April 2005 | 9am-11am |
| 6(2)/9/316 | 146(plot -) | 7 April 2005 | 9am-11am |
| 4(2)/1/148 | 168 (plot -) | 7 April 2005 | 9am-11am |
| 4(3)/1/290 | 188 (plot -) | 7 April 2005 | 9am-11am |
| Information taken from Mr Driver's field sheets in relation to inspection times on 7 June 2005 | | | |
| 4(4)/1/410 | 144 (plot -) | 7 June 2005 | 10:00am-10:20am |
| 4(6)/1/606 | 92 (plot 139) | 7 June 2005 | 10:00am-10:20am |
| 6(2)/18/415 | 62 (plot -) | 7 June 2005 | 10:30am-10:50am |
| 4(8)/1/808 | 68 (plot 149) | 7 June 2005 | 10:50am-11:15am |
| 4(7)/1/700(d) | 64 (plot 147) | 7 June 2005 | 11:00am – 11:30am |
| Information taken from Mr Driver's field sheets in relation to inspection times on 13 June 2005 | | | |
| 6(2)/10/327 | 198 (plot 75) | 13 June 2005 | 9am-10am |
| 6(2)/11/336 | 218 (plot 70) | 13 June 2005 | 9am-10am |
| 6(2)/15/375 | 84 (plot -) | 13 June 2005 | 9am-10am |
| 6(2)/17/399 | 52 (plot 141) | 13 June 2005 | 9am-10am |
| 6(2)/19/427 | 50 (plot -) | 13 June 2005 | 9am-10am |

**122.** In one property, Mr Driver "missed" a third bedroom in a property, valuing it as a two-bedroom flat.

**123.** Mr Lowenstein QC suggests that these "mistakes" were too numerous and significant to be mere mistakes, as he claimed.

### Connection with Keith Rumary

**124.** There was evidence within the valuation files that Mr Driver (and only Mr Driver) was required to carry out the valuations emanating from Jukes and MMA. In his witness statement Mr Driver claimed that he carried out Jukes' work because the forms were more complicated. However he accepted in cross examination that the MEX forms were standard. He could provide no plausible explanation as to why he was the valuer at the Eastbourne office completing virtually all instructions from Jukes from May 2003; or why nearly 400 of his 1800 cases since January 2003 were from Jukes; or why all valuations for Macquarie Quay properties were for MMA/Jukes/EFS.

**125.** In evidence he accepted that in 2003 he had purchased 30 Arequipa Reef from Keith Rumary at a discounted price of £200,000. He sold the property in 2005 at a profit of £250,000.

**126.** In cross-examination he told the court that in January 2006, some 6 months after he emigrated to Spain, Keith Rumary invited him back to England to work for him on a casual basis for about three to four days a week every two or three months. This arrangement lasted about a year. Mr Driver claimed that Rumary paid him by funding a Spanish bank card.

### Motive

**127.** It was suggested to Mr Driver that his motive for providing the mortgage valuations at the figures estimated or required by Keith Rumary was either the profit he made out of the acquisition of 30 Arequipa Reef or the profits he made out of the mortgage frauds in 2006 or 2007 as evidenced by the Bundle 10 documents and the moneys passing into Mr Driver's bank account.

**128.** As already noted Mr Driver maintained that the mortgage valuations were honestly given.

### *The exchanges between MEX and CWS*

### The 19 July 2005 email

**129.** Mr Stones had a brief telephone conversation with Mr Vaughan on 18 July 2005. Neither had any independent recollection of the conversation and I agree with Mr Lowenstein QC that it would be wrong to attach any weight to it. In cross-examination Mr Stones did not seek to rely on his description of the conversation as set out in the second sentence of paragraph 15 of his witness statement.

**130.** At 15.27 on 19 July 2005 Mr Stones sent an email to Mr Vaughan in which he stated

> "I refer of course to our brief telephone conversation yesterday regarding a number of valuations undertaken on behalf of Mortgage Express by an ex-employee, P D Driver FRICS previously based at our Eastbourne office. As I explained, we are concerned that rental figures given in the report may have been overstated and we would ask to be given the opportunity to review our advice before any further lending decisions are

made on the properties concerned which are all located on a development known as Macquarie (sometimes incorrectly spelt as Mcquerie) Quay in Eastbourne (post code: BN23 5AW, 5AU etc.) Instructions were received from Members Mortgage Administration Ltd (of Derby), or Jukes (UK) Financial Services of Bexhill.

Should you require any further information or assistance, please do not hesitate to call…"

**131.** As this email is central to CWS's case on reliance it is worth making a number of points both on what it does and what it does not contain.

**132.** As set out above, it is not clear whether Mr Stones had seen the Curtis report by 19 July 2005. However he had seen Ms Taylor and Mr Bolton's emails of 11 and 15 July 2005 and thus he knew that 65 properties had been "inspected" by Mr Driver over 2 days just before he left CWS and that the rental values were more than double the figure supported by comparable evidence.

**133.** Yet the email he sent referred to none of these matters. It did not give the number of valuations, the fact that they had been carried out shortly before Mr Driver left or the extent of the overvaluations. It simply referred to possibility of overvaluation by the use of the word "may" and requested the opportunity to review the advice before lending decisions are made. On any view it understated the problem as perceived by CWS. It did not even expressly state that the valuations were unreliable and should not be relied on.

**134.** In his witness statement Mr Vaughan made a number of points about this and the subsequent emails. He accepted (paragraph 9) that he had no specific recollection of the emails. Thus he accepted that his evidence is a reconstruction with the benefit of hindsight. He expressed disappointment (paragraph 18) with the communications from Mr Stones and Mr Bolton. His usual contacts with CWS were with Mr Kettle and Mr Smith. He would have expected them to have told him in plain language if they thought there was a problem with any of CWS's valuations. He pointed out that MEX placed a great deal of reliance on valuers to be its "eyes and ears" in relation to properties. He referred to the tight timetables under which the bank operated and in paragraph 24 of his witness statement made the point:

Without strong and clear advice from its professional advisers, [MEX] would not simply put applications on hold on a whim, not knowing the scale of the problem or even if there was one. The alternative would have resulted in chaos with applicants, brokers and solicitors all chasing [MEX] for monies to complete, or at least for reasons why their respective applications were not being dealt with as expeditiously as they should.

**135.** Mr Vaughan was cross-examined about the email at some length The cross-examination included this exchange[7]:

MR DOUGLAS:  Before any further lending decisions are made – do you understand that?

THE WITNESS:  Yes.  What I can say, if I may, is that I mean ultimately Countrywide are our Panel Managers, they don't need to come to us to get advice to go and do audits and check cases.  Why – they've got the mandate to go and do auditing of cases and if they had concerns for those cases they could have come and said 'We can confirm to you here and now that these are – this is what's happened.'  I

---

[7] Transcript - Day 3 – p 19 -20

don't quite get in that – the context of that email as to why they are coming to get, you know, request – they can do what they like as a Panel Manager in terms of auditing.

Q. I am just asking you this, they are saying that they want to have the opportunity to review Mr Driver's valuations before you make any further lending decisions on the basis of them – true?

A. Yes, that's correct.

Q. So you get that information from a valuer; you have admitted – you have said – that it is a matter of significance, so I am asking you, even if you have to go and search and find out where they are on the system what is it – what do you do once you find out where they are?

A. At that – well, at that point I would be – because there's still no evidence at that point from what I've read into that that there – you know, there may have been issues, is before I'm going to start putting stops into the system and create potentially business issues I need confirmation from our Panel Manager that there is a significant problem here, and that's in my mind what I would have done at that moment in time. I wouldn't – I wouldn't have said 'Right, let's just put a halt to this.' There's still a – this still hasn't been proved to me that there's an issue.  I – we were talking thousands of jobs coming in and out every single week.  I can't stop cases running through the system on the basis of there may have been an issue; I need confirmation.

136.  Mr Vaughan was also asked his view of the significance of the email:

A.  It wasn't a daily occurrence but as I've said earlier there were – the regular flow of information about the Panel firms, about information about firms, about new build sites, about exposure and all sorts of questions were coming in and out, so it wasn't – I didn't sit there with nothing coming in and then this was suddenly out of the blue – 'Wow, this is –' that was my job, you know?  It was a regular thing of conversations with Countrywide Surveyors as our Panel Managers.  It should –

137.  It was pointed out that it was not a routine conversation and that Mr Vaughan had escalated the matter higher. This led to the following exchange[8]:

Q. And what would be the purpose of going up the scale?  The escalation?  To your senior managers?

A. For the facts of you know this information has come in and obviously to flag with them that our Panel Managers have made us aware of some concerns that they have got around these cases and I've gone back to them with information to go and investigate further.

Q. And would it be in part at any rate to make a decision about what to do with the information that you have escalated up?

A. I mean, at the level I was at, obviously in terms of stopping, you know, stopping cases, that there would be you know potentially a recommendation but ultimately I pass the information as Lending Support Team to them as looking after the valuations and the information that's come in and then obviously passed it across to them to kind of consider.

138.  That evidence has to be contrasted with the interpretation that CWS seek to place on the email. Mr Douglas QC submitted that it terminated any representation that any of Mr

---

[8] Transcript Day 3 – p 22 - 24

Driver's valuations which come into MEX on any property at Macquarie Quay are reliable or held out as being accurate.  Mr Douglas QC referred to the request to review Mr Driver's valuations. He submitted that it should be interpreted as if it read:

> You should not carry out any further lending on those properties without our confirmation or altered opinion about the valuations.  We need to see them and we will inform you"

### The 22 July email exchange

**139.**  On 22 July 2005 there was a short email exchange between Mr Vaughan and Mr Stones. At 15.59 in reply to Mr Stones' email of 19 July Mr Vaughan asked Mr Stones if he knew the customer detail of the cases.

**140.**  Mr Stones replied at 16.20 the same afternoon in the following terms:

> "There are a number of applicants names but the main ones appear to be [a list of 11 names followed]"

**141.**  By this time Mr Stones was aware of the contents of the Simmonds Report and of the seriousness of the situation and was about to initiate the audit of all Mr Driver's case work files since 2003. He knew that Mr Simmonds felt that it was almost certain that Mr Driver had been fraudulent. Yet he chose not to disclose any of these matters to Mr Vaughan.

**142.**  In cross-examination Mr Vaughan agreed that it was not unusual for buy to let customers to have a portfolio of properties.

### The Vaughan List

**143.**  On 29 July 2005 Mr Vaughan sent Mr Stones an email in the following terms:

> "Please find attached a copy of the report that shows all the cases which have been submitted to Mortgage Express using the two postcodes that you provided, and was valued by Mr P D Driver.
>
> As previously stated please can you arrange for the rentals amounts to be reassessed on all 21 cases. Please can you also confirm that as far as you are concerned there was no issues with the valuation amounts that were provided?"

**144.**  The Vaughan List comprised a list of 21[9] properties giving the name of the applicant, the application number and the house number.

**145.**  The email was copied to three of Mr Vaughan's colleagues at MEX and two of his usual contacts at CWS – Mr Callaway (Senior Manager at Lending Support and Mr Vaughan's line Manager), Mr Kettle (Usual Contact at CWS), Mr Smith (Usual Contact at CWS), Mr Scott (overall Head of New Business) and Mr Tucker (Head of Packaged New Business). It is plain therefore that Mr Vaughan had notified his superiors of the situation.

**146.**  Mr Vaughan was asked what MEX's intention was with any application pending re-evaluation. Mr Vaughan said he was sure that there must have been some discussions as to whether MEX awaited the outcome but he was not a party to the discussions.

---

[9] In fact there were 2 duplicate entries so that there were in fact only 19 different properties.

### The emails in early August 2005

**147.** At 20.59 on 1 August 2005 Mr Bolton sent Mr Vaughan an email. The email was copied to Mr Stones and Mr Atter. It included:

> Martyn Stones has referred your e-mail (below) to me in my capacity as a member of the Regional management team responsible for London & South East – which includes the Eastbourne office.

> In the circumstances I think it would be sensible to use the new Senior Office Manager at Eastbourne, Will Ramsden, to re-assess the rental values and to confirm the position as far as the capital values are concerned. Will has been based in the Eastbourne office for a number of years prior to his recent appointment as manager to replace Peter Driver and is familiar with the market and the area in general.

> Unfortunately however, Will is on holiday this week and whilst I appreciate there is a degree of urgency I wonder if matters could wait until his return. Perhaps you could give me a call at your convenience to discuss the time frames.

**148.** In cross-examination Mr Vaughan could not recollect whether he rang Mr Bolton or not. He agreed, however, that he did not tell Mr Bolton that he was not going to wait.

**149.** On 3 August 2005 Mr Vaughan sent an email to Mr Bolton. The email was copied to Mr Callaway and Mr Tucker. It included:

> "Please could you let me know if you are looking at all of PD Drivers [sic] rental assessments or just those at Macquarie Quay? The reason for my question is that we have identified other cases that have been submitted to MX by the same broker and for the same customer and have been valued by Mr Driver?"

**150.** On 4 August 2005 Mr Bolton replied, copying in Mr Stones and Mr Atter:

> "We have an audit programme in progress – standard procedure with a change of Senior Staff but if you would care to let me have a schedule of the cases you have identified I will arrange for them to be reviewed"

**151.** It was, of course, quite untrue to suggest that the audit program was standard procedure. The audit was wholly exceptional and was caused by the discoveries summarised in the Curtis and Simmonds reports. The only purpose that Mr Bolton can have had for using those words was to conceal from MEX CWS's concerns about Mr Driver's valuations.

**152.** Mr Vaughan could not remember whether he sent a further schedule of cases to Mr Bolton. There is no documentary evidence to suggest that he did but both sides agreed that it is possible that there were other emails which it has not been possible to find.

### The 25 August 2005 email

**153.** On 25 August 2005 Mr Bolton sent Mr Vaughan an email which included:

> "Further to our recent exchange of emails I attach a schedule showing the results of the desktop audits undertaken at Sovereign Harbour, Eastbourne.

> The local office has produced the schedule of estimated values on the basis of a desk-top review, backed up by a general site visits as, although the properties are not completed, the site sales office has closed.

**154.** The schedule was far simpler than the schedule which had been sent by Mr Ramsden to Mr Atter. It comprised 4 columns with headings for the house number, the applicant and the

new estimated capital and rental values for each property. The majority of the rental valuations were between £675 pcm and £725 pcm though there was one property (No 70) where the rental valuation was £850 pcm.

**155.** There was sufficient information to enable MEX to cross check the figures with the original valuations but it is not clear whether the exercise was carried out..

**156.** There was no other warning. The email did not say in terms that no reliance should be placed on the original valuations. Equally it made no mention of suspected fraud on the part of Mr Driver. It did not mention any of the other valuations which CWS knew were wrong and where it suspected fraud on the part of Mr Driver.

**157.** In cross-examination Mr Vaughan agreed that the revalued capital values were within a reasonable margin of Mr Driver's values but that the rental values were way out and that Mr Driver's figures were badly wrong.

**158.** He agreed that, so far as the rentals were concerned, this was very serious and that he would have escalated it to Mr Tucker, Mr Callaway or Mr Scott. However he had no recollection of what decision was made.

**159.** A number of hypothetical possibilities were put to Mr Vaughan as to possible decisions that MEX might have made in the light of the figures in the schedule. Mr Vaughan accepted them as possibilities but could not say what decision had been made. He thought it unlikely that MEX would have decided to carry on with the lending on the basis that it was protected on the capital values. He could not say whether consideration was actually given to the question of whether to place a stop on the lending.

## 7    The first issue - Mr Driver's mental element

### *The Law*

**160.** There was little (if any) dispute between Counsel as to the mental element required. Both Mr Lowenstein QC and Mr Douglas QC referred me to the decision of the House of Lords in <u>Derry v Peek</u> (1889) 14 App Cas 337. I was referred to a number of passages from the speech of Lord Herschell including (at 374):

> "…fraud is proved when it is shown that a false representation has been made (1) knowingly (2) without belief in its truth, or (3) recklessly, careless whether it be true or false. Although I have treated the second and third as distinct cases, I think the third is but an instance of the second, for one who makes a statement in such circumstances can have no real belief in the truth of what he states. To prevent a false statement being fraudulent, there must, I think, always be an honest belief in its truth."

> In my opinion making a false statement through want of care falls far short of, and is a very different thing from, fraud and the same may be said of a false representation honestly believed though on insufficient grounds.

**161.** By reference to the decision in the "<u>Kriti Palm</u>" [2006] EWCA Civ1601 Mr Douglas QC warned me against watering down the ingredient of dishonesty into something akin to negligence.

**162.** Both Counsel agreed that the test for dishonesty in dishonest assistance cases to be found in the speech of Lord Nicholls in <u>Royal Brunei Airlines v Tan</u> [1995] 2 AC 378 (PC) had no application in assessing honest belief in a deceit case. A statement honestly believed to be true, however implausible it may be, is not capable of amounting to fraud.

**163.** It is not enough for the representor to assert in evidence that he honestly believed the truth of his representation. The Court must assess the credibility of that evidence in the context in which it was given before accepting what the representor says at face value. If the evidence is incredible, then the necessary mental state will be established.

**164.** In this connection Mr Lowenstein QC referred me to a further passage from the speech of Lord Herschell (at 375):

> "At the same time I desire to say distinctly that when a false statement has been made the questions whether there were reasonable grounds for believing it, and what were the means of knowledge in the possession of the person making it, are most weighty matters for consideration. The ground upon which an alleged belief was founded is an important test of its reality. I can conceive of many cases where the fact that an alleged belief was destitute of all reasonable foundation would suffice of itself to convince the Court that it was not really entertained, and that the representation was a fraudulent one. So, too, although means of knowledge are, as was pointed out by Lord Blackburn, in *Brownlie v Campbell* 5 App Cas at p952, a very different thing from knowledge, if I thought that a person had shut his eyes to the facts, or purposely abstained from inquiring into them, I should hold that honest belief was absent, and that he was just as fraudulent as if he had knowingly stated that which was false."

**165.** It is not in dispute that the burden of proof on this issue is on MEX. MEX must establish that Mr Driver was fraudulent in the sense set out above. It is equally not in dispute that the standard of proof is the balance of probabilities.

**166.** In this connection I was referred to well-known passages from Re H (Minors) [1996] AC 563 at 586 – 7 and of Re B (Children) (Care Proceedings: Standard of Proof) [2009] 1 AC 11. In his closing submissions Mr Lowenstein QC referred me to Dadourian Group International v Simmons & Ors [2009] 1 Lloyd's Rep 601 where Arden LJ said

> 32 … There is one standard of proof and that is the simple balance of probabilities. The fact that the alleged conduct is particularly serious or unusual does not displace or change this fundamental principle. Baroness Hale stated that the inherent probabilities are simply one factor to be taken into account, where relevant, in deciding where the truth lies. However generally "there is no logical or necessary connection between seriousness and probability". Therefore arguments that Re H had introduced a principle that where a serious allegation is in issue the standard of proof required is higher were incorrect."

### Submissions

### Mr Douglas QC's submissions

**167.** In his closing written submissions Mr Douglas QC submitted that Mr Driver was a good witness. He submitted that his evidence was credible and, given the pressure upon him, the nature of the allegations and the persistence of the questioning, courageous.

**168.** He pointed out that Mr Driver was a surveyor of 33 years experience, that there is no allegation that the capital values provided by Mr Driver were fraudulent, that he was not charged by the police in respect of the 2006/2007 fraud. He invited the court to take a realistic view as to inspections carried out (or not carried out) by Mr Driver.

**169.** In paragraph 19 and 20 he submitted:

…the properties formed part of a single block in a harbour development with certain property types. All, according to Mr Driver had harbour views. All were new build, so issues such as damp ingress, obsolete or dangerous electrical wiring or subsidence could be disregarded. A flat visit would take about 5 minutes, according to Mr Driver, and his evidence should be accepted. Being practical, the valuer would be checking first that the flat was there, secondly if complete, that its layout was one of the "type layouts", that it was decorated and had the standard fittings supplied. All except two were two bed flats, which is typical of modern flat developments.

… He believed that these were flats in high demand whose value was rising in a hot market and believed that his own instinct and judgment should guide him. Having arrived at values for both capital and rental he essentially stuck by them in the absence of any factors suggesting to him that he should alter them.

170. In his oral submissions[10] Mr Douglas QC elaborated on some of these points and concluded[11]

in relation to the properties at Macquarie Quay, there is no reason to convict him or to come to the conclusion that he was acting deceitfully in the sense that he had no belief in the truth of the sums that he was putting forward.

171. He invited me to be cautious about the Bundle 10 documents. He acknowledged that they were difficult to deal with. He pointed out that Mr Driver had always denied the signatures were his. He pointed out that Mr Driver was unrepresented, that there was no evidence that he had actually had any money out of the transactions. He submitted accordingly that I should draw no adverse inference against Mr Driver on the main Macquarie Quay transactions as a result of his exercise of privilege.

### Mr Lowenstein QC's submissions

172. Mr Lowenstein QC's acknowledged that in the absence of an admission the case against CWS was based on inference. However he submitted that I should draw the inference that Mr Driver was fraudulent in the sense outlined above.

173. MEX's case is set out in paragraph 99 C of Mr Lowenstein QC's closing submissions[12]. Many of the points have been covered in the summary of Mr Driver's evidence. I shall not lengthen this judgment by repeating those points.

174. He submitted that the evidence on comparables was of prime importance. Mr Driver knew that he was supposed to provide comparables. Comparables were readily available. On balance I ought to find that he had not looked for them. Mr Driver had in fact himself valued comparable properties in 2003 and 2004 and concluded that the rental figure then was far lower than the £1,540 rental figure provided by Mr Driver in these valuations. £1,540 was, as Mr Driver knew, the figure requested or estimated by Keith Rumary.

175. Mr Lowenstein QC invited me to infer that, contrary to Mr Driver's evidence, Mr Driver did not in fact carry out any inspection or valuation of the bulk valuation flats. He simply put down the rental that Keith Rumary was seeking. This is evidenced by the numerous mistakes in the forms and the fact that only a photocopy of one page of the same internal mortgage valuation sheet was filed in respect of all of the bulk valuations. Yet Mr Driver was prepared to sign the valuation certificate that he had inspected the property.

---

[10] Transcript – Day 7 pp 143 - 171
[11] Transcript –Day 7 p 171
[12] Pp 53 - 70

176. He invited me to infer that Mr Driver's connections with Keith Rumary were much closer than Mr Driver was suggesting. He drew my attention to the purchase of 30 Arequipa Reef, the large number of instructions from Keith Rumary; the requirement that the valuations were to be carried out by Mr Driver, the employment by Keith Rumary after he retired and the 20 transactions in 2006/2007. He submitted (paragraph 99W2) that Mr Driver had found himself in an impossible situation over his passport and that there was no rational explanation of why Keith Rumary had a copy of his passport. He submitted that that there was ample material upon which I could infer a motive for Mr Driver in supplying Keith Rumary with the rental valuations he required.

177. He submitted that the justifications for the rental figures put forward by Mr Driver did not stand up to any sort of analysis and the final suggestion that Mr Driver had relied on figures from the Brighton Marina was mentioned for the first time when he was giving his evidence.

178. He noted that Mr Simmonds had concluded that "it was almost certain that the valuations were fraudulent" and that Mr Atter could see "no reason why a competent Chartered Surveyor would value up properties on a consistent basis and ignore Company procedures unless there was some form of financial inducement". Mr Lowenstein QC invited me to take the same view.

### Discussion and Conclusions

179. I regret that I did not find Mr Driver to be an honest witness. I accept, of course, that he gave evidence voluntarily. I also accept that until he refused to answer questions on the second day he answered Mr Lowenstein QC's questions. I also accept that the events were more than 10 years ago. Even so I formed the clear impression that he was not being honest about how he carried out the valuations, the extent to which he inspected at all and the reasons he now gave to justify the figure of £1,540 as a rental figure. I was also unimpressed with the answers he gave in respect of his passport.

180. I am very conscious that it is not enough for me simply to find that Mr Driver was grossly negligent. Nothing less than fraud will do. However, largely for the reasons given by Mr Lowenstein QC and summarised above I am satisfied on the balance of probabilities that Mr Driver had no honest belief in the £1,540 rental figure in the valuations. It was the figure required by Keith Rumary and that was the reason for the valuation. In my view Mr Driver was at the very least reckless in the sense that he did not care whether it was true or false.

181. I accept that that there is no allegation of deceit in relation to the capital values. That does not deter me from my conclusion in relation rental values. If necessary I would also consider that the capital values were supplied because they were the figure required by Keith Rumary. However they were sufficiently close to the market value for them not to be false. Furthermore, as Mr Lowenstein QC pointed out, Mr Driver did provide comparables for the capital values. Thus there is a distinction between the capital and the rental values.

182. Accordingly I conclude that MEX succeeds on the first issue.

## 8    The Second Issue – Reliance

### The law

183. Both Mr Lowenstein QC and Mr Douglas QC referred me to passages from Briess v Woolley [1954] AC 333 at 353 and 358:

"The tort of fraudulent misrepresentation is not complete when the representation is made. It becomes complete when the misrepresentation – not having been corrected in the meantime – is acted upon by the representee. Damage giving rise to a claim for damages may not follow or may not result until a later date, but once the misrepresentation is acted upon by the representee, the tortious act is complete provided that the representation is false at that date...... Where there is an appreciable interval between the two dates above mentioned [i.e., date when made and date when acted upon], and the representation relates to an existing state of things, the representor is deemed to be repeating his representation at every successive moment during the interval, unless he withdraws or modifies it by timely notice to the representee in the meantime.' I do not think the accuracy of these statements can be challenged."

" In any case where there is an interval between the representation and the alteration of position induced thereby, the representor is at liberty to withdraw or modify the representation at any time during such interval. Unless so withdrawn or modified, and if modified, subject only to the modification, the representation is deemed to be repeated at each successive moment during the whole of such interval and is hereinafter called "a continuing representation"".

**184.** Mr Douglas QC referred me to paragraph 20 of the judgment of Lord Reed in <u>Cramaso LLP v. Ogilvie-Grant</u> [2014] A.C. 1093 as to the effect in law where a misrepresentation has been withdrawn or lapsed.

"Where a misrepresentation does not have a continuing effect, for example because it is withdrawn or lapses, or because the other party discovers the true state of affairs before the contract is concluded, it cannot induce the other party to enter into the contract and therefore cannot affect its validity or give rise to a remedy in damages for any loss resulting from its conclusion. As Lord Brougham observed in Irvine v Kirkpatrick (1850) 7 Bell App 186, 237-238, in order that the misrepresentation may be of any avail whatever, it must inure to the date of the contract. If the other party discovers the truth before he signs the contract "the misrepresentation and the concealment go for just absolutely nothing"

**185.** It was common ground between the parties that <u>Redgrave v Hurd</u> (1881) 20 ChD 1 establishes that it is not a defence to an action for deceit that the person to whom the representation was made might with reasonable diligence have discovered that it was untrue.

**186.** It was also common ground that the relevant date when reliance/inducement had to be established was the date of completion of the loan. MEX may well have relied on the rental valuation when they made the mortgage offer. However it was common ground that the offer could be withdrawn at any time up to completion and that accordingly this was the relevant date.

**187.** The crucial question which arises is whether the correspondence between 19 July 2005 and 25 August 2005 had the effect of withdrawing or modifying the representations made by Mr Driver so that they did not inure to the date of completion.

**188.** Mr Lowenstein QC submitted that the withdrawal or modification of a misrepresentation must be clear and unambiguous. He referred me to the decision of the Court of Appeal in <u>Arnison v Smith</u> (1889) 41 ChD 348. In that case the Plaintiffs took debenture stock in a company in reliance upon statements in a prospectus issued by the directors that £200,000 of share capital had been subscribed, when it had in fact only been allotted in full paid-up shares to the contractor. After allotment, the directors sent to the

allottees along with their share certificate a circular, which amid statements about other matters, stated the truth as to the matter misrepresented, but did not admit the misrepresentation, nor inform the allottees that they could retire and have their money returned.

**189.** There are observations in the judgments of the Court of Appeal upon which Mr Lowenstein QC relied. Thus at p 370 Lord Halsbury said:

> I will observe that assuming a fraud to have been committed it obviously lies on those who rely on a subsequent explanation to shew that such explanation was quite clear. If the directors had repented of what they had done, and had been desirous of making reparation, they would have called the attention of the Plaintiffs to the fact that there was a serious error in the prospectus

**190.** At p 373 Lindley LJ said:

> "It [the circular] does not distinctly point out that there had been a misrepresentation in the prospectus, and it contains no offer to refund. I do not say that it does not make it clear to the mind of a lawyer what the misrepresentation was, but it was not calculated to make plain business people understand that there had been a misrepresentation entitling them to a return of their money, and it does not appear that any one of them understood that they could have their money back. "

**191.** Mr Lowenstein QC also referred me to the decision of Tomlinson J in <u>Abu Dhabi Investment Company and ors v H Clarkson and ors</u> [2007] EWHC 1267. In that case Tomlinson J asked himself whether the documents disclosed "revealed the falsity of the earlier representations". He held that a person with a more enquiring mind than Mr Agarwal might have asked questions which would have revealed the falsity of the representations but it could not be fairly expected that Mr Agarwal would have become so aware.

**192.** Mr Douglas QC submitted that both of these were decisions on the facts. They do not lay down any principle of law. The decision in <u>Abu Dhabi</u> was an example of the <u>Redgrave v Hurd</u> line of authority. The decision in <u>Arnison</u> is a decision on its facts. On its facts the wording of the circular in that case was not sufficient to displace the representations in the earlier circular.

**193.** I agree with Mr Douglas QC that each case depends on its own facts and that it is not possible to transfer observations of judges in relation to one set of facts to a case with a completely different set of facts. I also agree that <u>Abu Dhabi</u> was an example of the <u>Redgrave v Hurd</u> line of authority.

**194.** However I also agree with Mr Lowenstein QC that the burden of establishing a correction or withdrawal rests on the person making the correction and that the correction must be sufficiently clear in all the circumstances of the case.

**195.** Where, as here, the correction is made in written documents the court has to construe those documents in accordance with the well-known principles of construction:

**196.** The Court is required to consider the meaning which is reasonably (i.e. objectively) conveyed to the representee by the documents. This test must be applied in the context of the particular facts of the case. Thus, the Court applies an objective test, but takes into account all the factual matrix of the particular transaction, including the particular features of the person to whom the statement was made (i.e. Mr Vaughan). It is also relevant that MEX was a high volume commercial lender acting under tight timetables.

### Two Points

**197.**  Before analysing the actual communications it is convenient to deal with two points. Much was made during the course of the trial of the limited nature of what Mr Stones and Mr Bolton told Mr Vaughan and of the failure by CWS to inform MEX of the number of cases, the extent of the inaccuracy and of its strong suspicion of fraud.

**198.**  It is perfectly obvious that Mr Stones and Mr Bolton could have revealed far more than they did. Furthermore the email of 4 August 2005 was untrue. Although I do not have to decide the point it seems to me quite likely that CWS was in breach of its contractual duty in failing to make fuller disclosure.

**199.**  However I am not trying a case of breach of contract. The question of whether CWS corrected Mr Driver's valuations cannot in my view depend on matters which were not disclosed to Mr Vaughan. Furthermore this is not altered by the further question of whether the non disclosure was deliberate. It must follow as a matter of logic that the non-disclosure by CWS is irrelevant to the question I have to decide.

**200.**  As noted above the question for me is whether the communications which actually took place are to be interpreted (applying the rules of construction summarised above) as having corrected Mr Driver's valuations.

**201.**  The second point relates to the lending experts. I shall not lengthen this judgment by setting out and analysing their evidence in detail because in the end I derived very little assistance from either of them. The experts were asked specific questions on the exceptionality of the communications. The experts agreed that the communications were highly unusual but expressed differing views as to other matters. Mr Penman's view was that full and timely disclosure was required by CWS. For reasons that I have given this is irrelevant to the question I have to decide which relates to the communications actually made. Mr Wilson's view was based on what MEX ought to have realised and to have done. As is clear from <u>Redgrave v Hurd</u> this does not assist me.

### The communications

#### The 19 July email

**202.**  Earlier in this judgment I have set out the email in full and referred in some detail to Mr Vaughan's evidence in cross-examination. I shall not set them out again.

**203.**  As Mr Douglas QC pointed out it identifies the properties by way of address and postcode; the valuer - Mr Driver, and requests the "opportunity to review our advice before any further lending decisions are made".

**204.**  On the other hand, as pointed out by Mr Lowenstein QC it did not positively say that the properties were overvalued. It used the word "may"; it did not actually withdraw the valuations or say that they should not be relied on. It simply requested the opportunity to review. It did not specify the extent of the problem.

**205.**  As noted above Mr Douglas QC submitted that it terminated any representation that Mr Driver's valuations on Macquarie Quay were to be relied on or accurate and the request should be interpreted as an instruction not to carry out any further lending on any of the properties. In each case MEX should refer the matter back to CWS who will report back.

**206.**  I cannot accept Mr Douglas QC's submission. In my view the email falls far short of that construction. I take into account the commercial context, the fact that CWS were or were treated as the panel managers. I accept the evidence of Mr Vaughan that the email was not

sufficiently clear for him to recommend a stop on the system on the basis of the limited information set out in the email.

**207.** In my view the email is not a sufficiently clear correction or modification of Mr Driver's valuations to have the effect Mr Douglas QC contends.

### The Vaughan List

**208.** By sending the Vaughan List on 29 July 2005 Mr Vaughan expressly asked for a revaluation of the rentals of the 19/21 properties. In my view he was thereby consenting to CWS's request to be allowed to revalue the rental values in respect of those properties.

**209.** By his email dated 1 August 2005 (a Monday) Mr Bolton requested a delay of 1 week before Mr Ramsden could carry out the valuations. As Mr Vaughan did not reply to the email he impliedly consented to this request.

**210.** The email of 1 August referred to the degree of urgency and in my view impliedly thereby stated that Mr Ramsden would carry out the revaluations urgently after 8 August 2005. Alternatively it was implicit in the request that the revaluations would be carried out within a reasonable time.

**211.** In the context of the timescales in this case a reasonable time would not be more than 3 or 4 days. Thus MEX could have expected the valuations to have been given by 12 August 2005. I do not see why MEX should be expected to put on hold their lending procedures in respect of Macquarie Quay for a longer period than that in the absence of any further communication from CWS.

**212.** That conclusion is, in my view, reinforced by the email of 4 August 2005 describing the audit as "standard procedure with a change of Senior Staff".

### The email of 25 August 2005

**213.** I have commented earlier in this judgment on what was not contained in the email. I shall not repeat those comments.

**214.** In my view a fair reading of that email is that it provided corrected capital and rental valuations for the 19/21 properties. It did not and did not purport to correct the capital and rental values in respect of any of the other properties valued by Mr Driver at Macquarie Quay.

**215.** CWS were well aware from their audit (and from the Simmonds and Curtis reports) of the number of other properties that Mr Driver had valued and that most, if not all, of these valuations were likely to end up in support of mortgage applications to MEX. The email did not refer to any of these valuations nor did it warn MEX against any further reliance on Mr Driver's valuations at Macquarie Quay.

**216.** It may be that an astute lender ought to have appreciated from the email that all of Mr Driver's valuations were suspect and to have placed a stop on further lending in reliance on them. It may be that it was negligent of MEX to continue lending in reliance on them. However, in the light of Redgrave v Hurd, it is common ground that negligence on the part of MEX does not prevent MEX from being induced by the original deceitful representations.

*Conclusions*

### Category A Cases

**217.** It is common ground that MEX was entitled to rely on the deceitful valuations in the 3 category A cases. The Category A claims accordingly succeed.

### Category B Cases

**218.** As can be seen from the Appendix the completion date in respect of the 4 category B cases was between 17 and 22 August 2005[13].

**219.** For reasons given above I do not think the email of 19 July 2005 was effective to prevent MEX relying on Mr Driver's valuations. I think that the email exchange of early August 2005 was sufficient to prevent MEX from relying on the valuations for a reasonable time to give CWS the opportunity to carry out revaluations. However that reasonable time had expired well before 17 August 2005. It follows that MEX were entitled to rely on the valuations on 17 and 22 August 2005.

**220.** I am satisfied that MEX did rely on Mr Driver's valuations in making the loans. It follows that the Category B claims succeed.

### Category C claims

**221.** In my view the email of 25 August 2005 did have the effect of correcting Mr Driver's valuations in respect of the 2 category C claims. In those circumstances Mr Driver's valuations did not have a continuing effect and therefore cannot have induced MEX to make the loans or give rise to a remedy in damages.

**222.** It follows that the Category C claims fail.

### Category D claims

**223.** In my view none of the emails had the effect of correcting Mr Driver's valuations in respect of the 32 category D claims. The only possible emails that might have affected the position are those of the 19 July 2005 and 25 August 2005. For reasons I have given neither of them had that effect.

**224.** It would have been perfectly simple for CWS to have warned MEX in clearer terms in order to prevent reliance on the valuations. It could have mentioned their suspicions of fraud; it could have withdrawn the valuations in clear terms. It chose to inform MEX in the very limited way outlined above. I am not satisfied that that limited information was sufficient to correct the deceitful valuations of Mr Driver.

**225.** Mr Douglas QC suggested that MEX might have decided to continue with the lending in the knowledge that rental valuations were wrong but in reliance on the capital valuations. This would have been wholly contrary to MEX's lending policy and Mr Vaughan's evidence in relation to it. I reject the suggestion which I regard as fanciful.

**226.** I am satisfied that MEX did in fact rely on Mr Driver's valuations in making the loans. It is irrelevant whether or not they ought to have done.

**227.** It follows that the Category D claims succeed.

---

[13] In the two later cases the advance date is said to be 19 August but this difference is immaterial for present purposes.

TAB 16

*New Cap Reinsurance Co Ltd v Grant* [2009] 257 ALR 740

740

**NEW CAP REINSURANCE CORPORATION LTD and Another v A E GRANT and Others, LLOYD'S SYNDICATE No 991**

SUPREME COURT OF NEW SOUTH WALES

Barrett J

17 December 2008, 14 July 2009 — Sydney

[2009] NSWSC 662

**Corporations — Liquidators — Voidable transactions — Consequential order for payment of money — Appropriate plaintiffs — Proceeding in absence of overseas defendants — Requirements for making of order — Criterion of actual versus hypothetical winding up — Whether interest available — Enforceability of order overseas — Overseas legislation and common law — Letter of request to overseas courts — Circumstances in which appropriate — (CTH) Corporations Act 2001 ss 588FF, 581(4).**

The plaintiffs were a company in liquidation and its liquidator. Prior to the commencement of liquidation, the plaintiff company had made two payments of money to the defendants, who were located in the United Kingdom (the payments). The plaintiffs brought proceedings in the Supreme Court of New South Wales (the court), arguing that these payments were voidable transactions under s (1) of the Corporations Act 2001 (the Act), with the consequence that an order for repayment of the money should be made. A question arose as to the enforceability of the order in the United Kingdom.

**Held**, allowing the application:

(i)   In an application under s 588FF of the Act, while the liquidator was the only competent applicant, the appropriate course was for the company to be a co-plaintiff, so that it would be bound by the result of the action: at [17].

   *Spokes v Grosvenor Hotel Co* [1897] 2 QB 124, applied.

(ii)   The purpose of an order for repayment of the money under s 588FF(1)(a) of the Act was not to reverse invalid transactions but rather to adjust the rights of creditors among themselves in such a way as to eliminate the effects of favourable treatement afforded to one or more creditors immediately before liquidation commenced: at [21].

   *Tolcher v National Australia Bank Ltd* (2003) 44 ACSR 727; 174 FLR 251; [2003] NSWSC 207; *Hall v Ledge Finance Ltd* [2005] NSWSC 645, applied.

   *New Cap Reinsurance Corp Ltd v Faraday Underwriting Ltd* (2003) 47 ACSR 306; 177 FLR 52; [2003] NSWSC 842; *Re Harris Scarfe Ltd (in liq)* (2006) 203 FLR 46; [2006] SASC 277, considered.

(iii)   As the payments, if proved, would have originated in New South Wales, the cause of action under s 588FF of the Act had arisen there. As a result, service of the originating process outside of the jurisdiction had been authorised and performed. In these circumstances, there was no barrier to hearing the proceeding in the defendants' absence: at [23], [25].

   *New Cap Reinsurance Corp Ltd (in liq) v Renaissance Reinsurance Ltd* (2002) 192 ALR 601; 43 ACSR 65; [2002] NSWSC 856, applied.

(iv)   The payments were a transaction for the purposes of s 588FF of the Act, in light of the definition in s 9 of the Act: at [30].

(v)   The payments had been made within the requisite time, namely within the period of 6 months ending on the "relation-back day" under s 588FF(2)(b) of the Act: at [34].

(vi)   As decided at an earlier stage of the proceedings, the plaintiff company was insolvent for the purposes of s 588FC of the Act at the time the payments were made: at [35].

> *New Cap Reinsurance Ltd (in liq) v Grant* (2008) 68 ACSR 176; 221 FLR 164; [2008] NSWSC 1015, applied.

(vii)   The defendants had been a creditor of the plaintiff company and the payments had concerned unsecured debts, as required by s 588FA(1) of the Act: at [42].

(viii)   Whether assessed in light of the current winding up or a hypothetical or assumed winding up, the payments involved unfair preference to the defendants within the meaning of s 588FA(1)(b) of the Act: at [45], [48], [53].

(ix)   The application under s 588FF(1) of the Act was made within the relevant period of 3 years: at [55].

(x)   There was no reason why the discretion conferred by s 588FF(1) of the Act should not be exercised in favour of the plaintiffs by ordering repayment of the money: at [59].

(xi)   An appropriately calculated element on account of or in the nature of interest may, pursuant to s 588FF(1)(c) of the Act, be ordered: at [66].

(xii)   On this basis, interest should be awarded in the present case: at [67].

(xiii)   Interest should be quantified according to the benefit derived by the defendant from the payments, rather than deprivation suffered by the plaintiff company. That benefit comprised an interest liability for the period from the date of the payments to the date of judgment at a rate which a person could reasonably have borrowed the relevant currency in the United Kingdom at simple and not compound interest: at [72], [74].

> *Miliangos v George Frank (Textiles) Ltd (No 2)* [1977] QB 489; [1976] 3 All ER 599; *State Bank of New South Wales Ltd v Swiss Bank Corp* (1995) 39 NSWLR 350, applied.

(xiv)   Proceedings under s 588FF of the Act were not precluded by an arbitration clause in a contract between the plaintiff company and the defendants: at [87], [88].

(xv)   The order for repayment in the present case was not payment "in respect of compensation or damages to an injured party" within the meaning of s 11(1) of the Foreign Judgments (Reciprocal Enforcement) Act 1933 (UK) and could not, therefore, be enforced under that Act: at [94], [95].

(xvi)   Nor could there be enforcement at common law, as the defendant had not been within the terriorial jurisdiction of the court: at [97].

> *Buchanan v Rucker* (1808) 9 East 192; 103 ER 546; *Henry v Geopresco International Ltd* [1976] QB 726; [1975] 2 All ER 702, applied.

(xvii)   It was open to the court to provide a letter of request as to the English courts under s 581(4) of the Act. An English court, in exercising its power to act upon the request, could apply either English or Australian law to the matter, in light of the rules of private international law: at [103], [107], [108].

(xviii)   The court should provide the letter, as there was a good substantive reason for doing so and there was utility in doing so, in the sense that it was likely an English court would exercise it power to act upon the request: at [108], [109], [122].

(xix)   The plaintiffs' claim for an order extending time would be kept alive on the basis of liberty to restore to the list, if the need arises: at [125].

## Application

This was an application for an order for the payment of money under s 588FF(1) of the Corporations Act 2001 (Cth).

*R G Forster SC* and *S R Derham* instructed by *Henry Davis York* for the plaintiffs (New Cap Reinsurance Corporation Ltd and John Raymond Gibbons).

**Barrett J.**

### The principal claim

**[1]**   These proceedings were commenced by originating process filed on 19 April 2002. They arise out of the winding up of New Cap Reinsurance Corporation Ltd (NCRA).

**[2]**   The plaintiffs are NCRA and its liquidator, Mr Gibbons. The defendants are A E Grant and numerous other persons named in a schedule to the originating process. They are (or were at relevant times) the persons associated together as the members of Lloyd's Syndicate No 991.

**[3]**   Mr Gibbons became the administrator of NCRA under Pt 5.3A of the Corporations Law on 21 April 1999. By operation of s 446A of the Corporations Law, he became liquidator under a creditors voluntary winding up on 16 September 1999. By force of the transitional provisions in Div 6 of Pt 10.1 of the Corporations Act 2001 (Cth), the winding up and its consequences and incidents are now governed by that Act.

**[4]**   The principal relief sought in the originating process is an order that the defendants pay money. The order sought is, in terms, an order that the defendants pay money to the plaintiffs but since the originating process makes it plain that the proceedings are brought under s 588FF(1) of the Corporations Act, the situation is in truth one in which Mr Gibbons, as liquidator, seeks an order that the defendants pay money to NCRA.

**[5]**   If the claim for an order for the payment of money by the defendants to NCRA is successful, questions about enforcement of the order will need to be addressed. An amended interlocutory process filed by the plaintiffs on 17 December 2008 raises those questions.

**[6]**   The plaintiffs' application was heard on 17 December 2008. Written submissions were, by leave, subsequently filed. Judgment was reserved on 2 March 2009.

### Statutory provisions

**[7]**   Key provisions of the Corporations Act relevant to the plaintiffs' claim for an order under s 588FF(1) should be quoted. With the exception of the definition of "transaction", the provisions are within Pt 5.7B headed "Voidable Transactions".

**[8]**   Section 9 defines "transaction", for the purposes of Pt 5.7B, as follows:

*transaction*, in Part 5.7B, in relation to a body corporate or Part 5.7 body, means a transaction to which the body is a party, for example (but without limitation):
    (a)   a conveyance, transfer or other disposition by the body of property of the body; and
    (b)   a charge created by the body on property of the body; and
    (c)   a guarantee given by the body; and
    (d)   a payment made by the body; and
    (e)   an obligation incurred by the body; and
    (f)   a release or waiver by the body; and
    (g)   a loan to the body;

and includes such a transaction that has been completed or given effect to, or that has terminated.

**[9]**   Section 588FA, so far as is relevant, provides:

A transaction is an unfair preference given by a company to a creditor of the company if, and only if:

    (a)  the company and the creditor are parties to the transaction (even if someone else is also a party); and

    (b)  the transaction results in the creditor receiving from the company, in respect of an unsecured debt that the company owes to the creditor, more than the creditor would receive from the company in respect of the debt if the transaction were set aside and the creditor were to prove for the debt in a winding up of the company;

even if the transaction is entered into, is given effect to, or is required to be given effect to, because of an order of an Australian court or a direction by an agency.

**[10]**   Section 588FC relevantly provides:

A transaction of a company is an insolvent transaction of the company if, and only if, it is an unfair preference given by the company … and:

    (a)  any of the following happens at a time when the company is insolvent:

        (i)  the transaction is entered into;

**[11]**   Section 588FE(2), dealing with transactions of a company entered into on or after 23 June 1993, applies if the company is being wound up. It provides:

The transaction is voidable if:

    (a)  it is an insolvent transaction of the company; and

    (b)  it was entered into, or an act was done for the purpose of giving effect to it:

        (i)  during the 6 months ending on the relation-back day; or

        (ii)  after that day but on or before the day when the winding up began.

**[12]**   Section 588FF(1) is the central provision. It is in these terms:

Where, on the application of a company's liquidator, a court is satisfied that a transaction of the company is voidable because of section 588FE, the court may make one or more of the following orders:

    (a)  an order directing a person to pay to the company an amount equal to some or all of the money that the company has paid under the transaction;

    (b)  an order directing a person to transfer to the company property that the company has transferred under the transaction;

    (c)  an order requiring a person to pay to the company an amount that, in the court's opinion, fairly represents some or all of the benefits that the person has received because of the transaction;

    (d)  an order requiring a person to transfer to the company property that, in the court's opinion, fairly represents the application of either or both of the following:

        (i)  money that the company has paid under the transaction;

        (ii)  proceeds of property that the company has transferred under the transaction;

    (e)  an order releasing or discharging, wholly or partly, a debt incurred, or a security or guarantee given, by the company under or in connection with the transaction;

    (f)  if the transaction is an unfair loan and such a debt, security or guarantee has been assigned — an order directing a person to indemnify the company in respect of some or all of its liability to the assignee;

    (g)  an order providing for the extent to which, and the terms on which, a debt that arose under, or was released or discharged to any extent by or under, the transaction may be proved in a winding up of the company;

(h) an order declaring an agreement constituting, forming part of, or relating to, the transaction, or specified provisions of such an agreement, to have been void at and after the time when the agreement was made, or at and after a specified later time;

(i) an order varying such an agreement as specified in the order and, if the court thinks fit, declaring the agreement to have had effect, as so varied, at and after the time when the agreement was made, or at and after a specified later time;

(j) an order declaring such an agreement, or specified provisions of such an agreement, to be unenforceable.

**[13]**   Under s 588FF(3), an application under s 588FF(1) must be made within a particular limitation period. Section 588FF(3) is in these terms:

An application under subsection (1) may only be made:

(a) during the period beginning on the relation-back day and ending:

   (i) 3 years after the relation-back day; or

   (ii) 12 months after the first appointment of a liquidator in relation to the winding up of the company;

whichever is the later; or

(b) within such longer period as the court orders on an application under this paragraph made by the liquidator during the paragraph (a) period.

## The plaintiffs' case

**[14]**   The basic proposition advanced by the plaintiffs is that two payments made by NCRA to the defendants — a payment of US $2 million on 8 January 1999 and a payment of US $3,980,600 on 14 January 1999 — constituted "voidable transactions" within the meaning of s 588FE. The steps said to lead to such a conclusion are, first, that the making of each payment by NCRA was a "transaction" to which NCRA and the defendants were parties; second, that each such transaction was an "unfair preference" given by NCRA to the defendants (s 588FA); third, that NCRA was insolvent in January 1999 when each transaction was entered into so that the transaction is an "insolvent transaction" (s 588FC); and, fourth, that the transaction was made within the period of 6 months ending on the "relation-back day" in relation to the winding up of NCRA: s 588FE(2)(b).

**[15]**   The plaintiffs further say that, because of the matters just outlined, the court must be satisfied in the way mentioned in s 588FF(1), so that the power to make an order under that section is exercisable and should be exercised. The particular order sought is an order under s 588FF(1)(a) that the defendants pay to NCRA an amount equal to the aggregate paid to them under the transactions in question.

## The statutory cause of action

**[16]**   Section 588FF(1) appears in Div 2 of Pt 5.7B which was introduced into the corporations legislation with effect from 23 June 1993 and is headed "Voidable Transactions". It is important to note the structure of the section. The statutory jurisdiction it confers is only exercisable "on the application of a company's liquidator". The company itself is not a competent applicant although, in some cases, it may be an appropriate party to the proceedings in which its liquidator makes an application.

**[17]**   Among the orders that s 588FF(1) empowers the court to make on the liquidator's application are orders "directing" or "requiring" a person to pay money or transfer property to the company of which the applicant is liquidator:

see s 588FF(1)(a), (b), (c) and (d) (as I have said, the order sought in this case is an order under s 588FF(1)(a) directing payment by the defendants to NCRA). Other orders may require persons to confer less direct financial benefits on the company, for example, by freeing the company from a debt, security or guarantee (s 588FF(1)(e)), by indemnifying the company (s 588FF(1)(f)) or by suffering avoidance, variation or unenforceability of an agreement (s 588FF(1)(h), (i) and (j)). In all these other cases, the court's order will alter a legal relationship between the company and another person; and it will do so to the benefit of the company and to the detriment of the other person. It is for that reason that it will be appropriate for the company to be a party to the proceedings initiated by the liquidator. In a common law derivative action brought by a shareholder, the company is joined as a defendant so that it may be "bound by the result of the action": *Spokes v Grosvenor Hotel Co* [1897] 2 QB 124 at 128. In the present context, where the liquidator, who is the only competent applicant, is able to control actions of the company, the appropriate course is for the company to be a co-plaintiff so that, if and when the court makes, on the liquidator's application, an order within one of the classes mentioned, the company, as a party, will be "bound by the result of the action".

[18]   One type of order contemplated by s 588FF(1) does not entail payment of money to the company or variation of the legal relationship between the company and another person. Section 588FF(1)(g) allows the court to make an order varying or regulating a person's right to prove a debt in the winding up. When winding up commences, a creditor's right to prove in the winding up replaces pre-existing rights against the company: *Motor Terms Co Pty Ltd v Liberty Insurance Ltd (in liq)* (1967) 116 CLR 177; [1967] ALR 465; [1967] HCA 9. In a s 588FF(1)(g) case, therefore, the court's order merely redefines the basis on which the person's right is to be taken into account by the liquidator for the purposes of allocation of benefits in the administration of the estate. It is the right of proof arising upon and by virtue of winding up that a s 588FF(1)(g) order may modify.

[19]   The important point is that, although Div 2 of Pt 5.7B of the Corporations Act is, according to its heading, concerned with "voidable transactions", its provisions do not operate upon concluded transactions so as to deprive them of efficacy or effect. Neither the statutory provisions nor orders of the court made under them cause the relevant "transaction" to be "void" (although the particular type of order authorised by s 588FF(1)(h) may cause "an agreement constituting, forming part of, or relating to" the relevant transaction to be "void"). On the contrary, the provisions direct the court to take transactions as it finds them. If a particular transaction has particular characteristics, the court has statutory jurisdiction to make one or more of the orders specified in s 588FF(1). I would venture to repeat here what I said in *Hall v Ledge Finance Ltd* [2005] NSWSC 645 at [12]:

[12] Despite use of the word "voidable" as a label in Part 5.7B and references, in general parlance about Part 5.7B, to the "avoidance" of transactions and the "recovery" of moneys related to transactions, the statutory provisions are not concerned with undoing transactions or re-arranging the financial relationships of parties to transactions, vis-à-vis those transactions themselves. They do not involve reliance on contractual rights or the contractual consequences of events. The liquidator, in pursuing the statutory cause of action, does not sue upon a contract or for restitution consequent upon the invalidity of a transaction. Nor is the liquidator affected by any vitiating elements to which a transaction may be subject, except to the extent that those elements

may be shown by a defendant to make unavailable the "transaction" foundation for the liquidator's claim, in the sense that there never was in truth a transaction (even one liable to be rescinded or declared void). The liquidator's task is merely to prove facts justifying a conclusion that the company became party to a "transaction" described in s 588FA, s 588FB, s 588FC or was the borrower under a loan described in s 588FD. If any of those things is proved and if, in addition, elements are shown as referred to in a sub-section of s 588FE such as to cause the transaction to be given by s 588FE the statutory designation "voidable", the liquidator has access to the statutory jurisdiction conferred on the court by s 588FF(1).

[20]    As Palmer J observed in *Tolcher v National Australia Bank Ltd* (2003) 44 ACSR 727; 174 FLR 251; [2003] NSWSC 207 at [10], a s 588FF(1) order vindicates "not property rights which the company itself would have had prior to liquidation, but rather statutory rights which the liquidator alone has under" the statutory scheme in consequence of winding up.

[21]    The purpose of an order under s 588FF(1)(a) for the payment of money to a company in liquidation is not to compensate or make whole that company. The section does not create a proprietary right of any kind in the company: *New Cap Reinsurance Corp Ltd v Faraday Underwriting Ltd* (2003) 47 ACSR 306; 177 FLR 52; [2003] NSWSC 842 at [38]; *Re Harris Scarfe Ltd (in liq)* (2006) 203 FLR 46; [2006] SASC 277 at [26]. As with preference avoidance provisions in bankruptcy, the objective is to adjust the rights of creditors among themselves in such a way as to eliminate the effects of favourable treatment afforded to one or more creditors, to the exclusion of others, in the period immediately before an insolvent administration commences. As is said at para 11.400 of M G R Gronow "McPhersons Law of Company Liquidation", fifth edition (current looseleaf):

> … the focus on [sic] the relief that is available (under s 588FF(1)) where a payment or transaction is voidable under the Division is to enable the restoration to the company of money and other property that has been alienated, and to relieve it of the burden of liabilities of the kind mentioned.

**Non-appearance by the defendants**

[22]    Before the elements of the plaintiffs' claim are addressed, it is relevant to note that the defendants have filed no appearance. They are resident outside Australia and did not seek to take part in the proceedings. In correspondence with the liquidator's solicitors, the defendants have made it clear that they do not submit to the jurisdiction of this court.

[23]    On principles discussed in *New Cap Reinsurance Corp Ltd (in liq) v Renaissance Reinsurance Ltd* (2002) 192 ALR 601; 43 ACSR 65; [2002] NSWSC 856, however, the cause of action under s 588FF(1), if established, must be accepted as having arisen in New South Wales. If the case that NCRA and its liquidator advance is made out, it will be found that it was in New South Wales that NCRA depleted its resources by making the two payments to the defendants and took all the steps necessary on its part to transmit funds to the defendants in the United Kingdom accordingly. That will mean that the s 588FF(1) cause of action is one that arose in New South Wales, so that service of the originating process outside New South Wales was authorised by Pt 10 r 1A(a) of the Supreme Court Rules 1970 (NSW) or, after 15 August 2005, r 11.2 and item (a) of Sch 6 of the Uniform Civil Procedure Rules 2005 (NSW).

**[24]**   On 20 December 2003, orders for substituted service were made allowing the defendants to be served through their solicitors in London. Service in accordance with those orders has been proved. Leave to proceed was granted on 17 October 2003.

**[25]**   I am satisfied that there was no obstacle to the court's hearing the plaintiffs's s 588FF(1) claim on 17 December 2008 in the defendants' absence and that there is no obstacle to its now proceeding to determine that claim. Indeed, the court must do so. I shall, however, mention in due course matters raised in correspondence on the defendants' behalf in response to the claim.

### The payments

**[26]**   A key factual question must now be addressed. Did NCRA, as the plaintiffs allege, make payments of US $2 million and US $3,980,600 to the defendants on 8 January 1999 and 14 January 1999 respectively?

**[27]**   An affidavit sworn on 19 April 2002 by Mr Hutchison, a partner in Mr Gibbons' firm, includes copies of NCRA internal documents that led to payments of US $2 million and US $3,980,600 by NCRA to the defendants on 8 January 1999 and 14 January 1999 respectively. These show that those sums were transmitted by electronic funds transfer to A E Grant Underwriting Agencies Ltd on the relevant dates in respect of a "Contract Name" described as "A E Grant Syn 991".

**[28]**   Banking records annexed to Ms Merrick's affidavit of 25 September 2003 establish that the source of the two payments was NCRA's foreign currency account 100630436USD115601 with Commonwealth Bank of Australia, Sydney.

**[29]**   I am satisfied that the electronic transfers of funds on 8 and 14 January 1999 were payments by NCRA to the defendants; also that the payments were sourced from funds of NCRA held in New South Wales. This finding is relevant to the jurisdictional matter referred to at [23] above.

### The elements of the cause of action — "transaction"

**[30]**   Having established that the payments upon which the plaintiffs rely were made by NCRA to the defendants, it is necessary to examine separately the several elements that make up the s 588FF(1) cause of action. The first of these is that there is a "transaction". There can be no doubt that NCRA, by making each of the January 1999 payments to the defendants, entered into a "transaction" with the defendants. The s 9 definition of "transaction" is broad. It gives as one example of a transaction to which a body is party "a payment made by the body". The making by NCRA of each of the payments in question is thus within the "transaction" definition.

### The elements of the cause of action — timing

**[31]**   There next arises the question of timing posed by s 588FF(2)(b). In the particular context, the question is whether the relevant transaction was entered into within the period of 6 months ending on the "relation-back day". The question arises in that form in this case because each of the transactions was a simple payment, as distinct from something more complex which might have entailed a series of acts.

**[32]**   The "relation-back day" in relation to a winding up of this type is the day specified in para (b) of the s 9 definition of "relation-back day", that is, the day on which Div 1A of Pt 5.6 deems the winding up to have begun. The provisions

within Div 1A of Pt 5.6 applicable to this case are ss 513B(d) and 513C. They fix, as the commencement of the winding up, the day on which the antecedent voluntary administration began.

**[33]**   As I have said, Mr Gibbons became the administrator of NCRA under Pt 5.3A of the Corporations Law on 21 April 1999 and the liquidator under a creditors voluntary winding up on 16 September 1999. Because the voluntary administration began on 21 April 1999, it is that day that is the "relation-back day" in relation to the winding up.

**[34]**   Each transaction consisting of the making of a payment by NCRA to the defendants in January 1999 therefore occurred within the period of 6 months ending on the "relation-back day".

**The elements of the cause of action — insolvency**

**[35]**   The next question arises from s 588FC: was NCRA "insolvent" when each transaction was entered into in January 1999?

**[36]**   That question was decided at an earlier stage of the proceedings. The matter became the subject of an order for separate determination made in December 2006. In a comprehensive judgment delivered on 30 September 2008, White J determined that NCRA "was insolvent at all relevant times from 31 December 1998, including as at 8 January 1999 and 14 January 1999": see *New Cap Reinsurance Ltd (in liq) v Grant* (2008) 68 ACSR 176; 221 FLR 164; [2008] NSWSC 1015 (*Grant*).

**The elements of the cause of action — "creditors" and "unsecured debt"**

**[37]**   For each of the payments under consideration to be an "unfair preference" given by NCRA, as referred to in s 588FA(1) (so that it is capable of being, in terms of s 588FC, an "insolvent transaction" of NCRA), it must be established that, at the time the payment was made, the defendants were a "creditor" of NCRA and that the payment resulted in the defendants, as creditor, receiving from NCRA, in respect of "an unsecured debt" owed by NCRA to the defendants, more than the defendants would have received from NCRA in respect of the debt if the transaction were set aside and the defendants were to prove for the debt in the winding up of NCRA.

**[38]**   Before the hypothesis regarding proof in a winding up is addressed, attention must be given to two central and related matters, namely, the status of the defendants in January 1999 as a "creditor" of NCRA and the existence at that time of an "unsecured debt that [NCRA] owes to [the defendants]".

**[39]**   The evidence shows that NCRA had incurred contractual liabilities to the defendants under a whole account reinsurance contract entered into in January 1997. NCRA was the reinsurer and the defendants were the reinsured. Significant losses were incurred during the 1997 and 1998 policy years. In December 1998, the parties to the reinsurance contract entered into a commutation agreement. That agreement was evidenced by memoranda signed for the defendants and bearing the stamp of NCRA by way of its assent, together with slip endorsements for the 1997 and 1998 years.

**[40]**   The agreement was for commutation at a 92.5% discount, so that US $5,980,760 became owing by NCRA to the defendants, by way of sums of US $2,697,380 and US $3,283,380, both of which were expressed to be due and payable on 31 December 1998.

[41]   The effect of the commutation was that NCRA became obliged to pay to the defendants on 31 December 1998 the fixed and quantified sums of US $2,697,380 and US $3,283,380 expressly provided for in the commutation agreement and was thereby relieved of all liability under the reinsurance contract. The defendants thereupon ceased to have rights under the reinsurance contract. On the making of the commutation agreement, there thus arose, on the part of the defendants and as a matter of contract, two liquidated claims properly regarded as debts.

[42]   It follows that, on and after 31 December 1998, there existed two debts owing, due and payable by NCRA to the defendants, one of US $2,697,380 and the other of US $3,283,380. Each was an unsecured debt. The defendants were a creditor of NCRA because of the existence of those debts.

[43]   The two payments made by NCRA to the defendants in January 1999 totalled US $5,980,600. This was US $160 less than the indebtedness of US $5,980,760 created by the commutation agreement. It must nevertheless be accepted that the payments were made in discharge of that indebtedness. NCRA's internal records show an "amount outstanding" of US $3,380,760 after payment of the US $2,000,00 and an "amount outstanding" of "Nil" after payment of the US $3,980,600.

[44]   The conclusion must be that:

    (a)  before the payments of January 1999 were made, NCRA owed to the defendants the two sums of US$2,697,380 and US$3,283,380 by reason of the commutation agreement made in December 1998;

    (b)  those sums were due and payable by NCRA to the defendants on 31 December 1998;

    (b)  there were accordingly, in January 1999, unsecured debts totalling US$5,980,760 owed by NCRA to the defendants, who were accordingly creditors of NCRA;

    (c)  the payments made by NCRA to the defendants on 8 January 1999 and 14 January 1999 caused the defendants, as creditors, to receive, in respect of those unsecured debts, a total of US$5,980,600; and

    (d)  by making those payments to the defendants, NCRA entered into "transactions" with the defendants.

**The elements of the cause of action — the s 588FA(1)(b) hypothesis**

[45]   Once this point has been reached, it can be said that the January 1999 payments will be regarded as an "unfair preference" within s 588FA(1) if the amount of US $5,980,600 received by the defendants in respect of their unsecured debts is greater than the amount receivable by the defendants upon the hypothesis stated in s 588FA(1)(b), that is, if the payments were set aside and the defendants were to prove for the debts in a winding up of NCRA. On this hypothesis, an additional US $5,980,600 would be available to a liquidator of NCRA for deployment in the winding up and the debts and claims proved in the winding up would be increased by US $5,980,600.

[46]   Mr Gibbons states in his affidavit of 24 November 2008 that, as at 1 January 2008, the estimated net deficiency of NCRA was US $198,449,924. He does not believe that anything has occurred since 1 January 2008 to warrant any significant change to this estimate. It follows that, in the winding up of NCRA as it stands, unsecured creditors will receive very substantially less than

100 cents in the dollar even if available assets are increased by US $5,980,600 and the proved debts and claims of unsecured creditors are increased by the same amount.

[47]    It is, however, by no means clear that the question posed by s 588FA(1)(b) is to be approached by reference to the circumstances of the particular winding up presided over by the liquidator by whom the s 588FF(1) application is made. Section 588FA(1)(b) directs attention to the circumstances that would prevail "if the transaction were set aside and the creditor were to prove for the debt in a winding up of the company". The reference is to "a" winding up, not "the" winding up: see generally the discussion at [11.780] of B McPherson, M Gronow and R Mason, *McPhersons Law of Company Liquidation*, 5th ed, Lawbook, New South Wales, (current looseleaf).

[48]    There is no need, in the present case, to pursue this matter. For the reasons stated at [46] above, an approach to the s 588FA(1)(b) question based on the circumstances of the actual winding up now in progress produces a positive answer to that question — in other words, the answer that the US $5,980,600 actually received was more than the defendants would have received if the payments of that amount by NCRA were set aside and the defendants proved in the actual winding up. It is clear that the question will also receive a positive answer if regard is had to a hypothetical winding up commencing when the payments were made in January 1999.

[49]    In saying this, I do not mean that the financial consequences in an assumed winding up commencing in January 1999 would have been identical with those that have arisen in the actual winding up that commenced some 3 months later on 21 April 1999. Rather, I mean that, if in a hypothetical winding up that commenced in January 1999 an additional US $5,980,600 had been available to the liquidators and additional debts of US $5,980,600 had been provable, the situation would still have been one in which the defendants realised, in respect of their debts of US $5,980,600, less than the US $5,980,600 they in fact received by virtue of the January 1999 payments. I say this because of both White J's conclusion that NCRA was insolvent in January 1999 and his Honour's specific findings in *Grant* (above) as to NCRA's financial position at that very time. Those findings were stated thus at [31]:

> [31] In the following week to 15 January 1999, claims totalling $37,991,573 were paid. The principal source of funds for these payments was the receipt of US$30 million (approximately A$47.5 million) on 12 January 1999. However, additional claims which became due and payable in that seven-day period, together with net reinstatement premiums payable by NCRA, totalled A$59,424,918, leaving a total amount due and payable as at 15 January 1999 of A$75,665,625. The available cash (including investment funds and excess funds in the collateral account) totalled A$23,990,437, a deficit of A$51,675,188.

[50]    White J went on (at [32]) to refer to events in the weeks following the particular week mentioned:

> [32] In the following week, A$2,990,468 of claims were settled. Additional amounts totalling A$1,578,453 became payable. Available cash funds increased, presumably as the result of premium receipts. There remained a net deficit of A$44,210,168 between the amounts due and payable at the end of the period and the available funds. That pattern continued until administrators were appointed on 23 April 1999. Mr Smith summarised the net cash position, being the difference between available funds at the end of each week and the amounts due and payable at the end of each week, as follows:

| *Table 30 Net cash position —* *surplus/(deficit)* | A$ |
|---|---|
| 8 January 1999 | (41,928,374) |
| 15 January 1999 | (51,675,188) |
| 22 January 1999 | (44,210,168) |
| 29 January 1999 | (39,047,407) |
| 5 February 1999 | (30,261,874) |
| 12 February 1999 | (30,347,410) |
| 19 February 1999 | (46,016,059) |
| 26 February 1999 | (52,811,933) |
| 5 March 1999 | (48,867,209) |
| 12 March 1999 | (39,643,581) |
| 19 March 1999 | (53,756,039) |
| 26 March 1999 | (43,733,672) |
| 2 April 1999 | (51,813,326) |
| 9 April 1999 | (61,112,081) |
| 16 April 1999 | (73,400,209) |
| 23 April 1999 | (80,507,847) |

**[51]**   The overall position was summarised at [33]:

[33] NCRA did not obtain further additional capital or write substantial new profitable business after 31 December 1998. Mr Smith concluded on the basis of the later actuarial assessment of claims, liabilities and reinsurance recoveries that NCRA had a balance sheet deficiency of around A$400 million during the period from 1 January 1999 to 21 April 1999. I accept that opinion. Mr Gibbons, the administrator, and subsequently the liquidator of NCRA, estimated in his report to creditors of 22 July 1999 that as at 30 April 1999, NCRA had a deficiency in net assets of US$203,124,119. In his report to creditors of 30 September 2004, that estimate had increased to US$332,195,188.

**[52]**   The facts and analysis set out by White J amply support the conclusion I have stated at [49] above.

**[53]**   It follows that the s 588FA(1)(b) question must be answered favourably to the plaintiffs, whether regard is had to the actual winding up that commenced on 21 April 1999 and is now in progress or to a hypothetical or assumed winding up commencing in January 1999.

**The s 588FF(3) limitation period**

**[54]**   Section 588FF(3) says that an application under s 588FF(1) "may only be made" during the period of 3 years ending on the relation-back day (I leave to one side the possibility that the court may extend the period).

**[55]**   As noted above, the "relation-back day" in this case is 21 April 1999. The originating process was filed on 19 April 2002. The application under s 588FF(1) was therefore "made" within the relevant period of 3 years.

**Conclusions on the s 588FF(1) claim**

**[56]**   The plaintiffs have succeeded in establishing the several elements stated at [14] above. It follows that the court is, as contemplated by the opening words of s 588FF(1), satisfied that each payment transaction of January 1999 "is voidable because of s 588FE". It further follows that, by virtue of s 588FF(1), the court "may make" one or more of the orders referred to in s 588FF(1). That

power is, however, limited by s 588FG(1) and (2) each of which says that a court "is not to make under section 588FF an order materially prejudicing a right or interest of a person if" certain matters are "proved". Those matters are, in very broad terms, receipt in good faith, for value and without reasonable grounds for suspecting insolvency.

**[57]**   The s 588FG provisions may be dealt with briefly. Because the defendants have not participated in the proceedings, they have adduced no evidence. The evidence adduced by the plaintiffs does not touch upon any of the elements that must be "proved" in order to activate under s 588FG an obstacle to the making of a s 588FF(1) order. The court is therefore not confronted by any such obstacle.

**[58]**   The only other statutory constraint upon the making of a s 588FF(1) order, in a case of the present kind, arises from s 588FI(2) which says, in effect, that such an order cannot be made if the recipient of the preference has already disgorged it, whether pursuant to a s 588FF(1) order or otherwise. There is, on the evidence, no basis for s 588FI(2) to operate in this case.

**[59]**   Section 588FF(1), in terms, confers a discretion on the court. There is, in this case, no apparent reason why the discretion should not be exercised in the way the plaintiffs seek. The defendants received, in January 1999, 100 cents in the dollar in respect of their aggregate debts of US $5,980,600. They therefore came to occupy a more advantageous position than creditors whose claims then existing came to be proved in the winding up and whose returns will be much less than 100 cents in the dollar. There is no reason why the equalising means of redress put at the disposal of the court, upon the application of the liquidator, should not be employed so as to cause the defendants to participate on the same footing as those other creditors.

**[60]**   There will therefore be an order under s 588FF(1)(a) that the defendants pay US $5,980,600 to NCRA, this being an amount equal to the aggregate paid by NCRA under the two relevant transactions. Subject to compliance with that order, the defendants will then be in a position to prove in the winding up for an equivalent sum by virtue of s 588FI(3).

**The plaintiffs' claim for interest**

**[61]**   The plaintiffs say that there should also be an order that the defendants pay interest on the sum of US $5,980.600. Several matters arise:

> (a)  does the court have power to award interest in this case?
> (b)  if power exists, should it be exercised?
> (c)  if power exists and is exercised:
> > (i)  from which date should interest be computed; and
> > (ii)  at which rate should interest be calculated?

**The power to award interest**

**[62]**   The plaintiffs rely, in this respect, on s 100 of the Civil Procedure Act 2005 (NSW) which, so far as relevant, provides:

> In proceedings for the recovery of money (including any debt or damages or the value of any goods), the court may include interest in the amount for which judgment is given, the interest to be calculated at such rate as the court thinks fit:
> > (a)  on the whole or any part of the money, and
> > (b)  for the whole or any part of the period from the time the cause of action arose until the time the judgment takes effect.

**[63]**   There is a question whether proceedings in which an order for the payment of money is sought under s 588FF(1)(a) are properly characterised as "proceedings for the recovery of money". Those words most aptly apply to proceedings in which a person seeks to vindicate some separately existing right to payment vested in that person, rather than proceedings in which one person (liquidator) seeks to obtain a court order creating, by force of statute, a new and otherwise non-existent right of another person (the company in liquidation) to receive money: see generally the analysis at [16]–[21] above. I note, nevertheless, that in *Sheldrake v Paltoglou* [2006] QCA 400 (*Sheldrake*) the Queensland Court of Appeal proceeded on the basis that the Queensland equivalent of s 100(1) (being s 47(1) of the Supreme Court Act 1995 (Qld)) allowed interest to be awarded on a sum ordered to be paid under s 588FF(1)(a). The Queensland provision, like s 100(1), refers to proceedings "for the recovery of money". The Queensland court was content to adopt approaches taken to preference recovery proceedings under quite different earlier legislation with respect to recovery of preferences — for example, *Ferrier & Knight v Civil Aviation Authority* (1994) 55 FCR 28; 127 ALR 472 (*Ferrier*) and *Star v O'Brien* (1996) 40 NSWLR 695; 22 ACSR 434 (*Star*), decisions of the Full Federal Court and the New South Wales Court of Appeal respectively. I note also the broad construction of "proceedings for the recovery of money" recently adopted by the last-mentioned court in *Dome Resources NL v Silver* (2008) 68 ACSR 458; [2008] NSWCA 322.

**[64]**   The question of a supplement in the nature of pre-judgment interest on a sum ordered to be paid pursuant to s 588FF(1)(a) of the current legislation was considered by the Full Federal Court in *Capital Finance Australia Ltd v Tolcher* (2007) 164 FCR 83; 245 ALR 528; 64 ACSR 705; [2007] FCAFC 185 (*Capital Finance*) (an appeal to the High Court was compromised: see [2008] HCATrans 316). In that case, s 588FF(1)(c) was identified as the source of the court's power to award interest: see per Gordon J at [143] and [147], Heerey J concurring and Lindgren J, at [84], expressly approving her Honour's statements in [143]–[153]. Section 588FF(1)(c) identifies, as one of the orders a court may make when "satisfied" in terms of the opening words of s 588FF(1), an order "requiring a person to pay to the company an amount that, in the court's opinion, fairly represents some or all of the benefits that the person has received because of the transaction". I am satisfied that the question of "interest", in the broad sense, should be approached by reference to s 588FF(1)(c).

**[65]**   Since their receipt of the sums of US $2 million and US $3,980,600 in January 1999, the defendants have been in a position where they have been able to deploy the aggregate US $5,980,600 to their advantage without the need to raise it from some other source. The interest that the defendants have saved by not having to borrow US $5,980,600 should therefore be regarded as something that "fairly represents" benefit received by them "because of" the making of the payments to them, those payments being the relevant "transactions".

**[66]**   I am satisfied, therefore, that payment by the defendants of an appropriately calculated element on account of or in the nature of interest may, pursuant to s 588FF(1)(c), be ordered. Such a sum will not be, in concept, compensation to NCRA for having been kept out of its money. It will represent, rather, re-allocation of a benefit of the kind with which s 588FF(1)(c) is concerned.

### Should interest be awarded?

**[67]**   The answer to this question is "yes", provided that it can be seen that the defendants were made aware of the plaintiffs' claim for the payment of US $5,980,600 and, being so aware, declined to pay. I say this because the court has now ruled in favour of the plaintiffs' claim for the aggregate sum so that failure by the defendants to pay in response to any corresponding demand can be seen to have been unwarranted and to justify re-allocation of benefit.

### Timing considerations relevant to interest

**[68]**   The matter just mentioned, considered in conjunction with the question of the date from which interest should be computed, identifies a need to determine whether a demand for payment was made upon the defendants and, if so, when it was made. The relevance of that to identification of the date from which interest should be computed comes from the cases in which the date of claim is regarded as the relevant date. In cases arising under earlier legislation, three possibly relevant dates were identified: the date of the making of the payment which, under the present legislation, is the "transaction" for s 588FF(1)(a) purposes, the date of the appointment of the liquidator and the date on which the creditor who was the beneficiary of the transaction failed to comply with a demand by the liquidator. In both *Ferrier* (above) and *Star* (above), the last of these was regarded as the appropriate date, given that, until demand was made (and, in particular, before the advent of winding up), the recipient had no reason to think that he or she would be required to disgorge. The same approach, based on the date of failure to comply with the liquidator's demand, was taken in the cases under the present legislation to which I have referred, being *Sheldrake* (above) and *Capital Finance* (above).

**[69]**   The plaintiffs acknowledge that they made no demand upon the defendants before the filing of the originating process on 19 April 2002. They also acknowledge that service of the originating process was only ever effected in the manner provided for in the order for substituted service, that is, by delivery to the defendants' solicitors in London. Before that, however, the plaintiffs' London solicitors had written to the defendants' agent, A E Grant Underwriting Agencies Ltd, as follows (the letter is dated 6 August 2002):

> We act for the liquidators of NCRA which is an Australian company in liquidation.
> We are writing to request that you nominate a representative member to accept service of New South Wales Supreme Court proceedings on behalf of the Members of Syndicate 991 arising from preference payments totalling US$5,980,600 made by NCRA in January 1999. A copy of the originating process documents is attached.
> The next return date for the originating process is 27 August 2002, and we would appreciate receiving your response prior to that date.
> We look forward to hearing from you.

**[70]**   On 23 August 2002, after a follow up letter of 20 August 2002, Mr Michael Chan, a solicitor in the office of the plaintiffs' London solicitors, telephoned Mr Alan Grant of A E Grant Underwriting Agencies Ltd to ask whether the letters and documents previously sent had been received. It appears that they had been received since, according to Mr Chan's file note, Mr Grant said that advice was being sought from Australian counsel as to whether "such a claim could be made as AG [Mr Grant] thought that this contract was subject to English law". The file note also records Mr Grant as having said that "the claim was outrageous as the contracts and payments had been made in good faith"; and that "even if the claim had jurisdiction they would be resisting it".

**[71]**  I infer from this that, by 23 August 2002, the defendants' agent was fully on notice of the claims pursued by the plaintiffs in these proceedings. The defendants did not pay in response to the plaintiffs' claim or at all. They should be regarded as having derived benefits unjustifiably from the funds of US $5,980,600 after 23 August 2002.

### The rate of interest

**[72]**  Because the interest element will be awarded under s 588FF(1)(c), it is not appropriate to approach quantification on the basis of deprivation suffered by NCRA. Consistently with s 588FF(1)(c), the focus must be on the "benefits" that the defendants received because the sums of US $2 million and US $3,980,600 were paid to them.

**[73]**  As I have said, the defendants derived the "benefit" of not having to pay interest on borrowings to the extent of US $5,980,600. Quantification of that "benefit" and assessment of an amount that, in terms of s 588FF(1)(c) "fairly represents" it, will pay attention to interest rates applicable to US dollar loans in the relevant period.

**[74]**  The matter may be appropriately approached on the footing that the defendants were saved from having to borrow US $5,980,600 for the period 23 August 2002 to the date of the making of orders in this case; and that the benefit thus derived by the defendants is fairly represented by an interest liability avoided for that period "at a rate at which someone could reasonably have borrowed [United States dollars] in [the United Kingdom] at simple and not compound interest". This is an adaptation of words used in *Miliangos v George Frank (Textiles) Ltd (No 2)* [1977] QB 489 at 497; [1976] 3 All ER 599 at 603, allowing for the fact that the defendants are based in the United Kingdom and the relevant currency is United States dollars. The appropriateness of an interest rate relevant to the particular foreign currency was also recognised in *State Bank of New South Wales Ltd v Swiss Bank Corp* (1995) 39 NSWLR 350.

**[75]**  Having regard to the expert evidence of Mr Coughlin of Australia and New Zealand Banking Group Ltd concerning interest rates and banking practice, I am of the opinion that the calculation should be made by reference to the London Inter Bank Offer Rate (or LIBOR), as published daily throughout the period in question. Mr Coughlin gave evidence that middle market corporate customers are typically charged interest at a margin over LIBOR. The unadjusted LIBOR rate is inappropriate because it is used in transactions between banks. Loans to other borrowers involve greater credit risk. Mr Coughlin's evidence is that margins differ according to circumstances, but that, for each of the years 2002–07, the net interest rate margin of Australia and New Zealand Banking Group Ltd for all currencies was in the range 2.19%–2.77%, the average for the 6 years thus being 2.463%.

**[76]**  I consider that LIBOR plus a margin of 2.463% should be regarded as producing a fair representation of the kind that s 588FF(1)(c) contemplates.

### Orders to be made under s 588FF(1)

**[77]**  There should be an order under s 588FF(1)(a) that the defendants pay to NCRA a sum of US $5,980,600.

**[78]**  There should be an order under s 588FF(1)(c) that the defendants pay to NCRA the sum that would have been interest on a loan of US $5,980,600 for a term commencing on 23 August 2002 and ending on the date of the order,

computed at the London Inter Bank Offer Rate plus a margin of 2.463% per annum. The precise terms of this order will have to take account of practices in actually computing interest.

## The defendants' objection

[79]   Having said that there should be orders as just outlined, I should pause to consider whether that conclusion is in any way called into question by the articulated objection of the defendants.

[80]   Although the defendants played no part in the proceedings, they made it plain, through correspondence sent by their solicitors to the plaintiffs' solicitors, that they considered themselves to have a defence to the plaintiffs' claims.

[81]   The defendants' objection (or the basis for their defence) was articulated in their solicitors' letter of 7 October 2002:

> It is our view that the proceedings in Australia issued by New Cap Re and the liquidator of New Cap Re are in breach of the agreements for arbitration in the relevant reinsurance contracts. Any claims which New Cap Re and the liquidator have in connection with the reinsurance contracts must be submitted to arbitration in London in accordance with Article 16 of the reinsurance treaties. The proceedings that your clients have brought in Australia are in breach of these agreements.

[82]   The relevant reinsurance contract was that referred to at [39] above, that is, the contract of January 1997 between NCRA as reinsurer and the defendants as reinsured. That contract contained a provision as follows:

> All matters in difference between the parties arising under, out of or in connection with this Reinsurance, including its formation and validity, and whether arising during or after the period of this Reinsurance, shall be referred to an arbitration tribunal in the manner hereinafter set out.

[83]   Detailed procedures for arbitration were then set out.

[84]   The plaintiffs' London solicitors wrote to the defendants' solicitors on 14 October 2002 as follows:

> As you may be aware, the claim arises from payments made by NCRA to your client of US$2 million on 8 January 1999 and $3.98 million on 14 January 1999. Our client alleges that these payments were made in respect of an unsecured debt and at a time when NCRA was insolvent. Our client's claims are brought under Part 5.8B of the Corporations Act 2001 ("the Act"). The liquidator contends that the payments constituted an unfair preference or an uncommercial transaction as defined by the Act and seeks orders under s 588FF of the Act. These claims arise under a statute in circumstances where there is a liquidation in place. As a result it is clear that the arbitration provision does not apply.

[85]   The defendants' solicitors reiterated their clients' position on several occasions over several years up to and including 2008 in the course of a chain of correspondence through which the plaintiffs' solicitors kept them informed of developments in this litigation.

[86]   The objection taken by the defendants should not deter the court from making the orders outlined. The arbitration provision formed part of the agreement between NCRA and the defendants. It was concerned with all matters of difference "between" NCRA and the defendants "arising under, out of or in connection with" their reinsurance contract. A provision defining in those terms the relationship between a dispute or claim and the parties' contract must be broadly construed: see, for example, *Samick Lines Co Ltd v Owners of the*

*Antonis P Lemos"* [1985] AC 711; [1985] 1 All ER 695; *Francis Travel Marketing Pty Ltd v Virgin Atlantic Airways Ltd* (1996) 39 NSWLR 160; *Hi-Fert Pty Ltd v Kiukiang Maritime Carriers Inc (No 5)* (1998) 90 FCR 1; 159 ALR 142; *Comandate Marine Corp v Pan Australia Shipping Pty Ltd* (2006) 157 FCR 45; 238 ALR 457; [2006] FCAFC 192. Claims arising from things such as pre-contract representations by one party to the other will be caught.

**[87]**    But even on the most generous interpretation of the words "[a]ll matters in difference between the parties arising under, out of or in connection with this Reinsurance", they do not extend to the present proceeding under s 588FF(1) of the Corporations Act in which the liquidator of one party to the reinsurance contract seeks an order for the payment of money to that contracting party by the other contracting party. This proceeding has nothing to do with the reinsurance contract. It is a proceeding upon a statutory cause of action maintainable by the liquidator of one of the former contracting parties. The cause of action is not available to the contracting party itself. Its liquidator, when suing upon the statutory cause of action, does not attempt to enforce some right of the contracting party. Furthermore, the event giving rise to the proceeding is not anything done under, by reference to or in relation to the reinsurance contract. The relevant event is the making of a payment by one of the parties to the reinsurance contract to the other of them pursuant to a new and separate contact by which they agreed to compromise and release the rights and obligations created by the reinsurance contract.

**[88]**    In summary, the "matters in difference" in these present proceedings are matters between NCRA's liquidator and the defendants. They are matters arising from events that happened after the agreed termination of the reinsurance contract and, following the commencement of NCRA's winding up, caused a statutory cause of action to become vested in the liquidator. There was no cause of action and no claim upon the defendants until the winding up of NCRA intervened. The arbitration provision in the reinsurance contract — which ceased to be in force between NCRA and the defendants when, in December 1998, they became parties to the commutation agreement — has no bearing on the statutory right that the subsequently appointed liquidator of NCRA subsequently acquired to seek orders against the defendants under s 588FF(1).

**Enforcement of the s 588FF(1) orders**

**[89]**    The plaintiffs say that the court, having decided to make orders under s 588FF(1) that the defendants pay money to NCRA, should cause a letter of request to be transmitted to the High Court of Justice in England and Wales (which I shall call "the English court") with a view to securing enforcement of those orders.

**[90]**    The terms of the request, as proposed by the plaintiffs, are as follows:

> This court hereby requests the High Court of Justice in England to exercise its jurisdiction under Section 426 of the Insolvency Act 1986 to act in aid of and assist this court, if and in so far as the High Court of Justice in England considers it just and appropriate, by:
>
> (a)  Ordering that A E Grant & Others, Lloyd's Syndicate Number 991 pay to the Liquidator the sum of US$ (*amount of judgment*), plus interest as set out in the schedule attached to the letter and costs as agreed or assessed under the rules of this court.
>
> (b)  In the alternative:
>
>   (i)  Ordering that the Liquidator be at liberty to file and serve proceedings in the High Court of England in, or substantially to the effect of, the form attached to this letter of request; and further

(ii) Declaring that the proper law to be applied by the English Court for the determination of any such proceedings commenced pursuant to that liberty is the law of Australia.

(c) Granting such further and other relief as the High Court of Justice in England may consider just.

(d) Making such further or other orders as may, in the opinion of the High Court of Justice in England, be necessary or appropriate to give effect to the foregoing orders.

**[91]**  An immediate reaction is to think that a letter of request may not be necessary because the order can be enforced in England according to ordinary principles concerning the enforcement of foreign judgments. Upon examination, however, that possibility can be seen to be non-existent.

**Enforcement under reciprocal enforcement legislation?**

**[92]**  A statutory basis for the enforcement in England of a judgment of this court exists under the Foreign Judgments (Reciprocal Enforcement) Act 1933 (UK). Judgments of this and certain other Australian courts (designated "recognised courts") are relevant to the operation of that Act because of the Reciprocal Enforcement of Foreign Judgments (Australia) Order 1994 (UK). But the Act extends only to a "judgment" as defined by s 11(1):

"Judgment" means a judgment or order given or made by a court in any civil proceedings, or a judgment or order given or made by a court in any criminal proceedings for the payment of a sum of money in respect of compensation or damages to an injured party.

**[93]**  It seems to me clear that the payment of money required in obedience to a s 588FF(1) order is not payment "in respect of compensation or damages to an injured party". In the present case, the party to whom the payment will be due is NCRA. The occasion or pretext for the payment will be no more or less than the court's findings with respect to the several statutory elements discussed above.

**[94]**  Having regard to the nature of the statutory cause of action as outlined at [16]–[21] above, an order under s 588FF(1) for the payment of money to the company in liquidation cannot be regarded as an order for the payment of money "in respect of compensation or damages to an injured party". The company is not, in the particular context, an "injured party" and the money does not have the character of "compensation" or "damages".

**[95]**  The s 588FF(1) orders will therefore not be "judgments" as defined by the Foreign Judgments (Reciprocal Enforcements) Act and the liquidator, having obtained the orders, will not be in a position to make a successful application under s 2(1) of that Act in relation to them. There is the added difficulty for the plaintiffs that, under s 4 of the Act, registration of a judgment must be set aside if the judgment debtor, as defendant in the foreign court, did not submit to that court's jurisdiction.

**An action on the order?**

**[96]**  It is therefore necessary to consider whether it will be possible for the defendants to be sued in England on the obligation created by the s 588FF(1) order.

**[97]**  Apart altogether from difficulties that may arise from the form of the statutory claim already noted, an essential pre-condition to the exercise of the common law jurisdiction to enforce a foreign judgment by action at law is absent

from this case. As was made clear in *Buchanan v Rucker* (1808) 9 East 192; 103 ER 546 (*Buchanan*) and later cases discussed by the English Court of Appeal in *Henry v Geopresco International Ltd* [1976] QB 726; [1975] 2 All ER 702, an English court will not enforce a foreign judgment obtained against a defendant who was not within the territorial jurisdiction of the foreign court, was not otherwise subject to and did not submit to that court's jurisdiction and had no assets in the foreign jurisdiction; and this is so even though some mode of non-personal service sufficient under the foreign law has been adopted (in *Buchanan* service of process of the Court of Common Pleas of Tobago on a resident of England was effected by nailing it to the court house door at Scarborough in Tobago in accordance with a local practice).

**[98]**   The present defendants have not appeared. They occupy, in these proceedings, precisely the position of remoteness from this court just described. I accept, therefore, that the defendants could not be sued successfully in England on the s 588FF(1) order.

### The letter of request

**[99]**   Because NCRA (or its liquidator) thus seems to have no prospects of enforcing this court's s 588FF(1) orders in the United Kingdom either by separate action there upon the obligation the order will create or by resort to statutory processes for the enforcement of foreign judgments, I proceed to consider the application of NCRA and its liquidator concerning a letter of request.

**[100]**   Two comments need to be made at the outset about the form of the request this court is asked to make of the English court: see at [90] above. First, it seems inappropriate that the request contemplate, in para (a), payment "to the Liquidator". I say this because the orders of this court will be orders that the defendants pay NCRA. That is the form of order envisaged by both s 588FF(1)(a) (an order directing a person to pay to the company) and s 588FF(1)(c) (an order requiring a person to pay to the company). Second and in the same vein, para (a) will need adjustment to take account of the separate orders under s 588FF(1)(a) and (c).

**[101]**   I have not set out the form of application to the English court that is referred to in para (b) of the letter of request and defines the alternative relief the plaintiffs wish to have from that court. It is sufficient to say that the approach proposed by the plaintiffs is that, if the English court does not act as envisaged by para (a) of the letter of request by simply making orders for the payment of money so as to give new and independent force, by the exercise of its own jurisdiction, to the orders of this court, the English court will itself entertain an application under s 588FF(1) of the Corporations Act for new and separate orders in the same terms as this court's orders, with the plaintiffs re-agitating in their entirety before the English court the s 588FF(1) claims already determined in their favour by this court.

### Jurisdiction

**[102]**   The jurisdiction of this court now invoked by the plaintiffs is that created by s 581(4) of the Corporations Act:

> The court may request a court of an external Territory, or of a country other than Australia, that has jurisdiction in external administration matters to act in aid of, and be auxiliary to, it in an external administration matter.

**[103]**  Having regard to the definition of "external administration matter" in s 580 (which I do not pause to set out), the winding up of NCRA is clearly an "external administration matter". It is therefore open to this court to request that the English court act in aid of, and be auxiliary to, this court in the winding up of NCRA.

**[104]**  It is also relevant to refer to provisions of United Kingdom statute law. Section 426(4) of the Insolvency Act 1986 (UK) is as follows:

> The courts having jurisdiction in relation to insolvency law in any part of the United Kingdom shall assist the courts having the corresponding jurisdiction in any other part of the United Kingdom or any relevant country or territory.

**[105]**  By virtue of s 426(11) of the Insolvency Act and the Co-operation of Insolvency Courts (Designation of Relevant Countries and Territories) Order 1986 (UK), Australia is a "relevant country" for these purposes.

**[106]**  Section 426(5) of the Insolvency Act is in these terms:

> For the purposes of subsection (4) a request made to a court in any part of the United Kingdom by a court in any other part of the United Kingdom or in a relevant country or territory is authority for the court to which the request is made to apply, in relation to any matters specified in the request, the insolvency law which is applicable by either court in relation to comparable matters falling within its jurisdiction. In exercising its discretion under this subsection, a court shall have regard in particular to the rules of private international law.

**[107]**  It is thus made clear that the English court, in giving effect to a request of this court to render assistance in relation to an aspect of Australian winding up, may apply either English "insolvency law" or Australian "insolvency law" applicable to the matter. It is for the English court to decide which system of law it should apply, although it is required by s 426(5) to have regard to the rules of private international law. The ability of the English court, exercising its insolvency jurisdiction, to deploy "its own general jurisdiction and powers" (*Hughes v Hannover Ruckversicherungs-Aktiengesellschaft* [1997] 1 BCLC 497) will be relevant to a request that that court simply, as it were, re-impose this court's orders. The English court's ability, as a matter of English law, to apply Australian statute law with respect to insolvency (as it did in, for example, *England v Smith* [2001] Ch 419) will be relevant to the alternative request referred to at [101] above.

**Matters relevant to the discretion to order the making of the request**

**[108]**  Having regard to the statutory provisions just mentioned, I am satisfied that this court has power to make the relevant request of the English court and that the English court has power to act upon the request. Two points then arise for consideration: first, whether there is some good substantive reason for the request that this court is asked to make; and, second, whether there is utility in the request in the sense that the English court is likely to exercise its power to act upon the request if it is made: see *Re HIH Insurance Ltd (in liq)* [2004] NSWSC 454.

**[109]**  As to the first matter, it is clear that there is a good substantive reason for the making of the request. This court has determined that it will order, pursuant to s 588FF(1) and in order to effectuate the due administration of NCRA's winding up, that the defendants pay money to NCRA. Those defendants are in the United Kingdom. They are amenable, in a direct and practical sense, to the jurisdiction of the English court. It appears that the plaintiffs cannot obtain

satisfaction either by bringing a common law action in the English court upon this court's order or by resort to United Kingdom reciprocal enforcement legislation. In those circumstances, such assistance as the English court is minded to give pursuant to s 426 of the Insolvency Act in response to the letter of request will itself be a means of enhancing the due conduct of the winding up of NCRA in accordance with the Corporations Act.

**[110]**   The second matter requires closer attention.

### The utility question

**[111]**   The question whether the English court is likely to accept and act upon the request the plaintiffs ask this court to make was referred by the liquidator of NCRA to Mr Gabriel Moss QC of the English bar. Mr Moss's written opinion dated 16 December 2008 has been put into evidence by the plaintiffs.

**[112]**   I need not canvass Mr Moss's opinion in detail. His overall conclusion is that the English court will grant relief in the form of the primary relief sought (that is, by way of orders that the defendants pay to NCRA the money required by this court's s 588FF(1) orders to be paid) or, if for some reason that is not considered appropriate, in the form of the alternative relief sought (that is, by way of leave to re-institute in the English court the s 588FF(1) application already determined favourably to the plaintiffs by this court).

**[113]**   In reaching this conclusion, Mr Moss mentioned a number of cases. It is instructive to refer to two of them.

**[114]**   The first is the decision of the House of Lords in *Re HIH Casualty and General Insurance Ltd; McGrath v Riddell* [2008] 3 All ER 869; [2008] 1 WLR 852; [2008] UKHL 21 (*McGrath*). It is sufficient, for present purposes, to quote from the speech of Lord Hoffmann at [30]:

> [30] The primary rule of private international law which seems to me applicable to this case is the principle of (modified) universalism, which has been the golden thread running through English cross- border insolvency law since the 18th century. That principle requires that English courts should, so far as is consistent with justice and UK public policy, co-operate with the courts in the country of the principal liquidation to ensure that all the company's assets are distributed to its creditors under a single system of distribution.

**[115]**   There was some division of opinion in the House of Lords on the question whether an English court could or should give full effect to such a principle so as to subject United Kingdom assets to a foreign insolvency administration unless s 426 of the Insolvency Act compelled assistance to the relevant foreign court. Lord Hoffmann and Lord Walker of Gestingthorpe took the view that an order causing United Kingdom assets to be subjected to the foreign administration could be made in the exercise of the English court's discretion at common law. Lord Phillips of Worth Matravers preferred not to express an opinion on the matter, noting that s 426 provided a basis for such an order. Lord Scott of Foscote and Lord Neuberger considered that the order could not be made except under s 426.

**[116]**   The statement of Lord Hoffmann quoted above is consistent with the approach taken by the Privy Council (Lord Bingham of Cornhill, Lord Hoffmann, Lord Hutton, Lord Rodger of Earlsferry and Lord Carswell) in the earlier case of *Cambridge Gas Transport Corp v Official Committee of Unsecured Creditors of*

*Navigator Holdings plc* [2007] 1 AC 508; [2006] 3 All ER 829; [2006] UKPC 26 (*Cambridge Gas*). The relevant principle of universality was stated in this way (at [16]):

> [16] There should be a single bankruptcy in which all creditors are entitled and required to prove. No one should have an advantage because he happens to live in a jurisdiction where more of the assets or fewer of the creditors are situated.

**[117]**    After referring to principles of bankruptcy law to the effect that English moveables vest automatically in a foreign trustee or assignee but that English immoveable property does not, the Privy Council continued (at [20]–[21]):

> [20] Corporate insolvency is different in that, even in the case of moveables, there is no question of recognising a vesting of the company's assets in some other person. They remain the assets of the company. But the underlying principle of universality is of equal application and this is given effect by recognising the person who is empowered under the foreign bankruptcy law to act on behalf of the insolvent company as entitled to do so in England. In addition, as Innes CJ said in the Transvaal case of *Re African Farms* [1906] TS 373 at 377, in which an English company with assets in the Transvaal had been voluntarily wound up in England, "recognition carries with it the active assistance of the court". He went on to say that active assistance could include:
>
>> "A declaration, in effect, that the liquidator is entitled to deal with the Transvaal assets in the same way as if they were within the jurisdiction of the English courts, subject only to such conditions as the courts may impose for the protection of local creditors, or in recognition of the requirements of our local laws."
>
> [21] Their Lordships consider that these principles are sufficient to confer upon the Manx court jurisdiction to assist the committee of creditors, as appointed representatives under the Ch 11 order, to give effect to the plan. As there is no suggestion of prejudice to any creditor in the Isle of Man or local law which might be infringed, there can be no discretionary reason for withholding such assistance.

**[118]**    The actual decision in the *Cambridge Gas* case was that, as a matter of comity, an English court (or, as it actually was, the Isle of Man court) should act in aid of an insolvency administration instituted under Ch 11 of the United States Bankruptcy Code; and that this was so even where a statutory provision such as s 426 of the Insolvency Act did not require that the domestic court do so. Assistance might be given in any form within the domestic court's jurisdiction. As their Lordships said at [22]:

> [22] At common law … the domestic court must at least be able to provide assistance by doing what it could have done in the case of a domestic insolvency.

**[119]**    The assistance held appropriate in the circumstances was, in substance, an order that the local court could have made under statute in circumstances of creditor approval defined in the statute; and that order was appropriate even though those circumstances did not in fact exist. A foreign process of creditor determination analogous with the statutorily defined approval process was apparently considered a sufficient substitute for the making of the order.

**[120]**    This last matter should be explained in some greater detail. Navigator was a company incorporated in the Isle of Man. Its register of members was in the Isle of Man. The plan of reorganisation approved by creditors of Navigator under the United States Bankruptcy Code purported to divest from Cambridge Gas shares it held in Navigator and to vest those shares in other persons. The Privy Council took the view, on the basis of comity, that the Isle of Man court should make a form of vesting order in respect of the shares so as to allow

the effects of the Unites States reorganisation to be recognised on the Isle of Man
share register. The foundation for such an order was explained in this way:

1. If Navigator had been subject to winding up in the Isle of Man where it was
   incorporated and if an appropriate application had been made to the Manx
   court by Navigator or a member or creditor of Navigator, that court could
   have convened a meeting of Navigator's creditors under the Isle of Man
   equivalent of s 411(1) of the Corporations Act 2001 (Cth) to consider a
   creditors' scheme of arrangement.
2. If Navigator's creditors had, at such a meeting, favoured the scheme by the
   requisite majority and the Isle of Man court was satisfied that it was not unfair
   and made an approving order, the scheme would, under the counterpart of
   s 411(4), be binding on not only the creditors and the liquidator of Navigator
   but also — and crucially — on its contributories, including Cambridge Gas.
3. A creditors' scheme of arrangement approved by order of the court under the
   Isle of Man legislation could thus have deprived Cambridge Gas of its shares
   in Navigator.
4. Since Navigator's creditors had approved the plan of reorganisation under the
   United States legislation (in generally the same way as they might have
   approved a scheme of arrangement under Isle of Man law), comity allowed
   the making of an order in the nature of a vesting order having the same effect
   as a combination of the court's order approving such a scheme of arrangement
   and the statutory effects produced through the making of the order; and this
   was so even though none of the steps necessary to produce the statutory
   consequences had been taken.

**[121]**   *Cambridge Gas* was a case in which cross-border assistance provisions
such as s 426 of the Insolvency Act played no part. The Privy Council proceeded
on the basis of a comprehensive common law power of the domestic court to
assist in the effectuation of a foreign insolvency administration as a matter of
comity. As I have said, the existence of that power was questioned or rejected by
some members of the House of Lords in *McGrath* (above). But that case, like
this, was one in which s 426 of the Insolvency Act operated to require the
domestic court to assist the foreign court to implement the foreign scheme of
insolvency administration. Particularly since s 426 will be at work in the present
case, the decisions in *Cambridge Gas* and *McGrath* provide strong support for
the conclusion stated by Mr Moss QC.

**[122]**   This court should therefore proceed with confidence that the English
court will act upon the request that the plaintiffs ask this court to make.

**Application under s 588FF(3)**

**[123]**   The plaintiffs recognise that if the English court elects to embark afresh
upon the hearing of s 588FF(1) proceedings, a question will arise under
s 588FF(3): see [13] above. Any such new application under s 588FF(1) will
obviously be made to the English court more than 3 years after 21 April 1999,
being the "relation-back day" referred to in s 588FF(3).

**[124]**   To cater for the need that may arise for an order of this court extending
the limitation period pursuant to s 588FF(3) itself, the plaintiffs have included in
the application with which I am now dealing a claim for an extension to
31 December 2013. The plaintiffs do not ask that that order be made now. Indeed,
it is by no means clear to me that the court can make any extending order,
although counsel did outline in general terms submissions that might be
advanced if the need to pursue that aspect becomes real — which it will if the

English court does not, in response to the letter of request, adopt the course of re-imposing this court's orders for the payment of money.

**[125]**   The plaintiffs merely seek, at this point, to have their claim for an order extending time kept alive on the basis of liberty to restore to the list, if the need arises. I am content to adopt that course.

### Conclusion

**[126]**   The court will make orders under s 588FF(1)(a) and (c) as indicated at [77] and [78] above. It will be necessary for the amount relevant to the s 588FF(1)(c) order to be calculated and for brief submissions explaining the calculation to be furnished.

**[127]**   The court will also direct that the Registrar transmit to the English court a letter of request generally in the form sought by the plaintiffs, but taking account of the matters referred to at [100] above and some matters of drafting outlined in a separate note furnished to the plaintiffs' legal representative on the publication of these reasons.

**[128]**   In accordance with the plaintiffs' application, it will be ordered that the order concerning the letter of request be stayed for 28 days after it is made on the footing that, if the orders under s 588FF(1)(a) and (c) are satisfied by payment within that period, the stay will become permanent.

**[129]**   To deal with the possible need for the plaintiffs to seek an extension of time under s 588FF(3), it will be ordered that the claim in para 5 of the amended interlocutory process filed on 17 December 2008 stand over before the Corporations Judge on 20 July 2010 with liberty to restore to the list on 2 days notice.

**[130]**   Finally, there will be an order that the defendants pay the plaintiffs' costs.

**[131]**   I direct that short minutes of orders be filed by delivery to my Associate within 14 days.

### Orders

See [126]–[130].

OLIVER JONES
SOLICITOR AND BARRISTER

TAB 17

*Portman Building Society v Hamlyn Taylor Neck* [1998] 4 All ER 202

# Portman Building Society v Hamlyn
# Taylor Neck (a firm)

*a*

COURT OF APPEAL, CIVIL DIVISION

MILLETT, MORRITT AND BROOKE LJJ

*b*

22 APRIL 1998

*Restitution – Quasi contract – Money had and received – Mortgage application –*
*Express condition of mortgage offer that property to be used solely for residential*
*purposes – Purchaser using property for commercial purpose – Mortgagor defaulting –*
*Mortgagee obtaining possession of property and selling property at substantial loss –*
*Mortgagee seeking to recover loss from solicitors acting for mortgagor and mortgagee,*
*claiming by way of restitution account in quasi contract for money had and received –*
*Whether claim disclosing reasonable cause of action.*

*c*

*d*

In 1989 the defendant firm of solicitors acted for B in the purchase of a property
in Torquay for £98,000 and also for the plaintiff building society to which he had
applied for an advance towards the purchase price. In his mortgage application
B stated that it was his intention to use the property exclusively for residential
purposes, and he repeated that later in a letter to the society. The society offered
to advance £93,000 on condition that the property should be used solely for B's
own private occupation. In fact, the property was used as a guest house and the
solicitors prior to completion negotiated with the vendor an apportionment of
the purchase price between the property itself, the fixtures and fittings and the
goodwill of the guest house business; £87,250 of the purchase price was
apportioned to the property itself. However, the defendant failed to inform the
society of that fact in its report on title and confirmed that the society's conditions
of advance had been complied with and that there were no matters affecting the
property about which the society ought to be advised. Subsequently, having
applied £900 in effecting a mortgage guarantee policy, the society paid over to the
defendant the sum of £92,100, which was duly paid into the firm's client account,
and in March it paid that sum to the vendor's solicitor and obtained a conveyance
and mortgage of the property in favour of the society in exchange, thereby
completing the transaction. Thereafter, B defaulted in making payments due
under the mortgage, and the society became aware that B was using the property
as a guest house. In January 1996, after recovering possession of the property and
selling it at a substantial loss, the society issued proceedings against the
defendant, claiming, inter alia, by way of restitution an account in quasi contract
for money had and received. On the defendant's application, the master struck
out the claim on the grounds that it disclosed no reasonable cause of action, and
the judge dismissed the society's appeal. The society appealed, contending that
it had paid the advance in the mistaken belief induced by the defendant that the
condition contained in the mortgage offer that the property would be used solely
for private residential purposes had been complied with, and that the whole of
the purchase price was attributable to the property itself, and that therefore it was
entitled to maintain an action for recovery of the £92,100 as money paid to the
defendant under a mistake of fact.

*e*

*f*

*g*

*h*

*j*

*a*  **Held** – Although mistake might make it unjust for a defendant who had been enriched at the plaintiff's expense to retain the benefit of his enrichment, the mere fact that a payment might have been made by mistake was not by itself sufficient to justify a restitutionary remedy if the recipient had not been enriched at all. Moreover, the obligation to make restitution had to flow from the ineffectiveness of the transaction under which the money was paid and not from

*b*  a mistake or misrepresentation which induced it, since where money was paid under a legally effective transaction, neither misrepresentation nor mistake vitiated consent or gave rise by itself to an obligation to make restitution. In the instant case, the defendant was not enriched by the receipt of the £92,100, and it never made any claim to the money, which it applied in accordance with the society's instructions in exchange for a mortgage in favour of the society.

*c*  Furthermore, those instructions had never been revoked, so that the transaction under which the money was paid to the defendant remained valid. Accordingly the appeal would be dismissed (see p 206 *d f* to *h*, p 208 *d* to *f* and p 209 *a* to *d*, post).

**Notes**

*d*  For claims in respect of money had and received, see 9 *Halsbury's Laws* (4th edn) paras 675–684.

**Cases referred to in judgments**

*Barclays Bank Ltd v W J Simms Son & Cooke (Southern) Ltd* [1979] 3 All ER 522, [1980] QB 677, [1980] 2 WLR 218.

*e*  *Bristol and West Building Society v Mothew (t/a Stapley & Co)* [1996] 4 All ER 698, [1998] Ch 1, [1997] 2 WLR 436, CA.

*Edwards, Ex p, re Chapman* (1884) 13 QBD 747.

*Holland v Russell* (1863) 4 B & S 14, 122 ER 365, Exch Ch; *affg* (1861) 1 B & S 424, 121 ER 773.

*f*  **Cases also cited or referred to in skeleton arguments**

*Agip (Africa) Ltd v Jackson* [1992] 4 All ER 385, [1990] Ch 265; *affd* [1992] 4 All ER 451, [1991] Ch 547, CA.

*Consolidated Co v Curtis & Son* [1892] 1 QB 495

*Diplock's Estate, Re, Diplock v Wintle* [1948] 2 All ER 318, [1948] Ch 465, CA.

*g*  *Fibrosa Spolka Akcyjna v Fairbairn Lawson Combe Barbour Ltd* [1942] 2 All ER 122, [1943] AC 32, HL.

*Gowers v Lloyds and National Provincial Foreign Bank Ltd* [1938] 1 All ER 766, CA

*Henderson v Merrett Syndicates Ltd, Hallam-Eames v Merrett Syndicates Ltd, Hughes v Merrett Syndicates Ltd, Arbuthnott v Feltrim Underwriting Agencies Ltd, Deeny v Gooda Walker Ltd (in liq)* [1994] 3 All ER 506, [1995] 2 AC 145, HL.

*h*  *Lipkin Gorman (a firm) v Karpnale Ltd* [1992] 4 All ER 512, [1991] 2 AC 548, HL.

*Midland Bank Trust Co Ltd v Hett Stubbs & Kemp (a firm)* [1978] 3 All ER 571, [1979] Ch 384.

*Miller v Aris* (1800) 3 Esp 231, 170 ER 598.

*Oates v Hudson* (1851) 6 Exch 346, 155 ER 576.

*j*  *Phillips-Higgins v Harper* [1954] 1 All ER 116, [1954] 1 QB 411.

*Sharland v Mildon, Sharland v Loosemore* (1846) 5 Hare 469, 67 ER 997.

*Smith v Sleap* (1844) 12 M & W 585, 152 ER 1332.

*Snowdon v Davis* (1808) 1 Taunt 359, 127 ER 872.

*Steele v Williams* (1853) 8 Exch 625, 155 ER 1502.

*Townson v Wilson* (1808) 1 Camp 396, 170 ER 997.

*Westdeutsche Landesbank Girozentrale v Islington London BC* [1996] 2 All ER 961, [1996] AC 669, HL; *rvsg* [1994] 4 All ER 890, [1994] 1 WLR 938, CA.                *a*
*Whittaker v Campbell* [1984] 3 All ER 582, [1984] QB 318.

**Interlocutory appeal**

By notice dated 9 July 1997 the plaintiff, Portman Building Society, appealed from the decision of Sir Richard Scott V-C on 5 March 1997 dismissing the plaintiff's    *b* appeal from the decision of Master Barrett on 8 October 1996 whereby he struck out the plaintiff's action against the defendant, Hamlyn Taylor Neck, a firm of solicitors. The facts are set out in the judgment of Millett LJ.

*Simon Berry QC* and *Mark West* (instructed by *Clarke Willmott & Clarke*, Yeovil) for    *c* the society.
*Jonathan Sumption QC* and *David Halpern* (instructed by *Bond Pearce*, Exeter) for the firm.

**MILLETT LJ.** This is yet another case in which a mortgagee, having advanced money on mortgage at the height of the property boom in the late 1980s and    *d* having realised its security during a serious recession in the early 1990s, has sought to recover its loss from the solicitor who acted for it in the transaction. Unwilling to plead fraud and unable to recover damages for breach of contract or tort, or equitable compensation for breach of fiduciary duty, it has had resort to an even less promising claim in restitution.                     *e*

The appellant is the Portman Building Society (the society). The respondent is a firm of solicitors, Hamlyn Taylor Neck (the firm). The case concerns a property in Torquay, which was bought by a Mr Biggins with the assistance of a mortgage advance of £93,000 by the society. In his mortgage application Mr Biggins stated that it was his intention to use the property exclusively for residential purposes. He repeated this in a letter which he later wrote to the society. The society made    *f* it an express condition of its offer of a mortgage advance that the property should be used solely for Mr Biggins' own private occupation.

In accordance with the usual practice the firm acted for both Mr Biggins and the society in the transaction. In the proceedings the society alleges that in fact the property was an established guest house with some eight bedrooms and that    *g* to the firm's knowledge it was Mr Biggins' fixed intention throughout to continue to use it as a guest house and not solely as a private residence for himself and his family.       Before completion the firm negotiated with the vendor an apportionment of the purchase price of £98,000 between the property itself, the fixtures and fittings and the goodwill of the guest house business.                *h*

In due course the firm completed and returned the society's standard form of report on title. This stated that the society's conditions of advance had been complied with and that there were no other matters affecting the property about which the society ought to be advised. The firm did not tell the society that part of the purchase price had been apportioned to the goodwill of the business, or that only £87,250 of the purchase price had been apportioned to the property    *j* itself. In consequence, the society alleges, it believed that the special condition regarding the residential use of the property had been complied with and that the full amount of the purchase price of £98,000 was attributable to the property which was to be the subject of the proposed mortgage. Although the society pleads an actual representation of facts known to the representor to be untrue, it

*a* does not allege fraud or dishonesty and has disclaimed any intention of making such a claim.

Shortly before completion the society paid the sum of £92,100 to the firm, and this was duly paid into the firm's client account. The difference between the sum of £92,100 received by the firm and the amount of the agreed mortgage advance of £93,000 is accounted for by the fact that £900 was applied by the society in *b* effecting a mortgage guarantee policy.

The transaction was completed in March 1989, when in accordance with its instructions the firm paid the sum of £92,100 to the vendor's solicitor and obtained a conveyance and mortgage of the property in favour of the society in exchange.

*c* Mr Biggins afterwards defaulted in making payments due under the mortgage. The society became aware that Mr Biggins was using the property as a guest house. It brought proceedings against Mr Biggins for possession, recovered possession and sold the property, realising a substantial loss. It has not pursued Mr Biggins on his personal covenant for repayment, presumably on the ground that such an action would not be cost effective. Instead, in January 1996, it *d* brought the present action against the firm.

By its writ the society maintains a number of alternative causes of action. It claims damages for breach of contract, the tort of negligence or breach of trust; compensation for breach of fiduciary duty; or repayment of moneys had or received to the use of the society. It is to be observed that, with the exception of the last, all are claims to recover monetary compensation for loss in consequence *e* of a wrong alleged to have been committed by the firm. The last claim, however, is a straightforward claim in quasi contract for money had and received or, as we would now call it, restitution. As counsel for the society acknowledged, the remedy for such a claim is not damages but an account and payment.

On the firm's application the master struck out the entire action. He held that *f* the claims for breach of contract, tort and breach of trust were statute-barred, more than six years having elapsed between the completion of the transaction in March 1989 and the issue of the writ in January 1996. He struck out the remaining claims for breach of fiduciary duty and restitution on the ground that they disclosed no reasonable cause of action.

*g* The society appealed to Sir Richard Scott V-C. It did not pursue its appeal against the order striking out the claims for breach of contract, tort, breach of trust or fiduciary duty. It accepted that the claims for breach of contract, tort and breach of trust were statute-barred; and that the claim for breach of fiduciary duty was precluded by the decision of this court in *Bristol and West Building Society v Mothew (t/a Stapley & Co)* [1996] 4 All ER 698, [1998] Ch 1. This left only the *h* restitutionary claim for an account.

The society alleges that, in the events which happened, it paid the sum of £92,100 to the firm in the mistaken belief induced by the firm (i) that the special conditions contained in its offer of a mortgage advance that the property would be used solely as a private residence had been complied with and (ii) that the *j* whole of the purchase price of £98,000 was attributable to the property itself. The society alleges that, if it had not been for those mistakes, it would not have been prepared to make the mortgage advance to Mr Biggins and would, therefore, not have paid the £92,100 to the firm in the first place.

Accordingly, the society contends, it is entitled to maintain an action for the recovery of the £92,100 as money paid to the firm under a mistake of fact. It is

conceded on behalf of the firm that, if such an action is maintainable at all, it is arguably not statute-barred, on the ground that time will not have begun to run until the mistake which led to the payment being made was, or should with reasonable diligence have been, discovered. For its part the society concedes that the firm duly applied the money in accordance with its mandate. It is implicit in that concession, and was confirmed by counsel in argument before us, that the firm's authority to make the payment had not been determined; and it is not alleged in the statement of claim that it was. It is to be observed that the society has not sought to set the transaction aside whether for mistake, misrepresentation or otherwise; nor of course could it do so, at least against Mr Biggins, since with knowledge of the facts it has affirmed the transaction by enforcing the mortgage. In paying the £92,000 to the vendor's solicitor on completion and in exchange for an executed instrument of mortgage in favour of the society, therefore, the firm must be taken to have been acting in accordance with the society's unrevoked instructions.

Sir Richard Scott V-C struck out what remained of the action, and the society appeals to this court. In my judgment Sir Richard Scott V-C was plainly right. The society's claim for restitution is entirely misconceived. Whether the claim is for restitution for wrong or restitution for unjust enrichment by subtraction (as in the present case) such a claim is designed to reverse unjust enrichment. The first sentence of Goff and Jones *The Law of Restitution* (2nd edn, 1978) p 3 states: 'The law of restitution is the law relating to all claims … which are founded upon the principle of unjust enrichment.'

That passage echoes s 1 of the *Restatement of the Law of Restitution* (1937), published by the American Law Institute, in which the authors, Professors Warren Seavey and Austin Scott, made the epoch-making assertion: 'A person who has been unjustly enriched at the expense of another is required to make restitution to the other.'

This formulation explains why any claim to restitution raises the questions. (1) Has the defendant been enriched? (2) If so, is his enrichment unjust? (3) Is his enrichment at the expense of the plaintiff? There are several factors which make it unjust for a defendant to retain the benefit of his enrichment; mistake is one of them. But a person cannot be unjustly enriched if he has not been enriched at all. That is why it is necessary to ask all three questions and why the fact that a payment may have been made, e g by mistake, is not by itself sufficient to justify a restitutionary remedy.

In the present case the firm was not enriched by the receipt of the £92,100. The money was trust money, which belonged in equity to the society, and was properly paid by the firm into its client account. The firm never made any claim to the money. It acknowledged that it was the society's money, held to the order of the society and it was applied in accordance with the society's instructions in exchange for a mortgage in favour of the society. The firm did not receive the money for its own use and benefit, but to the society's use. Given that the money was held to the order of the society, the only question is whether the firm obtained a good discharge for the money. It is conceded that it did.

In its argument before us the society relies on three lines of authority. The first is the line of cases which establish that an action lies to recover payments made under a mistake of fact: see for example *Barclays Bank Ltd v W J Simms Son & Cooke (Southern) Ltd* [1979] 3 All ER 522 at 535, [1980] QB 677 at 695. So it does. In such cases the money is (mistakenly) paid to the defendant for his own use and benefit,

*a* or at least for the use and benefit of a third party and not for the use and benefit of the plaintiff himself. But for the mistake, there would be no injustice in the defendant or the third party retaining the benefit of the payment, for that is the common intention of the parties. The effect of the plaintiff's mistake, however, is to make it unjust for the defendant or the third party to retain the benefit of the payment. The action for restitution reverses the unjust enrichment.

*b* But in the present case the society paid the money to the firm to hold to the society's order, that is to say for the society's own use and benefit. The society was entitled to give the firm directions as to the application of the money, and to revoke those directions and demand the repayment of the money if not previously applied in accordance with its unrevoked directions. The society did not need to plead mistake or any other ground of restitution. The firm received

*c* the money on terms which made it an accounting party and has never denied its liability to account. The society's difficulty is not in establishing the firm's liability to account, but in showing that anything is due from the firm after it applied the money in accordance with the society's instructions.

Secondly, the society relies on those cases which show that the cause of action

*d* for money had and received is complete when the plaintiff's money is received by the defendant. It does not depend on the continued retention of the money by the defendant. Save in strictly limited circumstances it is no defence that the defendant has parted with the money. All that is true. But it is, of course, a defence that he has parted with it by paying it *to the plaintiff or to the plaintiff's order*: see *Holland v Russell* (1863) 4 B & S 14, 122 ER 365; *affg* (1861) 1 B & S 424,

*e* 121 ER 773. That is what the firm did in the present case.

Thirdly, the society relies on the doctrine described in art 113 of *Bowstead and Reynolds on Agency* (16th edn, 1996) and Goff and Jones *The Law of Restitution* (4th edn, 1993) pp 750–751. The general rule is that money paid (eg by mistake) to an agent who has accounted to his principal without notice of the claim cannot be

*f* recovered from the agent but only from the principal. The society submits that the agent's defence in such a case is a particular species of the change of position defence and does not avail the agent who has notice, actual or constructive, of the mistake which founds the plaintiff's claim.

I myself do not regard the agent's defence in such a case as a particular instance

*g* of the change of position defence, nor is it generally so regarded. At common law the agent recipient is regarded as a mere conduit for the money, which is treated as paid to the principal, not to the agent. The doctrine is therefore not so much a defence as a means of identifying the proper party to be sued. It does not, for example, avail the agent of an undisclosed principal; though today such an agent would be able to rely on a change of position defence.

*h* The true rule is that where the plaintiff has paid money under (for example) a mistake to the agent of a third party, he may sue the principal whether or not the agent has accounted to him, for in contemplation of law the payment is made to the principal and not to his agent. If the agent still retains the money, however, the plaintiff may elect to sue either the principal or the agent, and the agent

*j* remains liable if he pays the money over to his principal after notice of the claim. If he wishes to protect himself, he should interplead. But once the agent has paid the money to his principal or to his order without notice of the claim, the plaintiff must sue the principal.

But all this is by the way, because the doctrine is concerned with the receipt of money by an agent from a third party and his subsequent payment of the money

to his own principal without the authority of the third party. Where the agent
remains liable, it is not because a change of position defence is not available. It is
because neither he nor his own principal was entitled to retain the money as
against the third party who made the payment. The agent is liable to make
restitution to the third party because he knew that his principal was no more
entitled to the money than he was himself: see *Ex p Edwards, re Chapman* (1884)
13 QBD 747.

But in the present case, while the society's mandate remained unrevoked, the
firm was entitled and bound to deal with the money in accordance with the
mandate. In the present case there is no third party plaintiff. The firm was the
agent of the society. It received the payment from its principal, held it to the
order of its principal and applied it in accordance with its principal's instructions.
The firm's defence is not that it has paid the money away to a third party but that
it has dealt with it in accordance with the society's instructions, and thereby
obtained a good discharge.

In the course of argument counsel submitted that the society's mistake,
induced by the firm, rendered the money repayable and the mandate revocable.
In fact, of course, the mandate was revocable in any case. The problem is that it
was never revoked. The continuing validity of the transaction under which the
money was paid to the firm is, in my judgment, fatal to the society's claim. The
obligation to make restitution must flow from the ineffectiveness of the
transaction under which the money was paid and not from a mistake or
misrepresentation which induced it. It is fundamental that, where money is paid
under a legally effective transaction, neither misrepresentation nor mistake
vitiates consent or gives rise by itself to an obligation to make restitution. The
recipient obtains a defeasible right to the money, which is divested if the payer
rescinds or otherwise withdraws from the transaction. If the payer exercises his
right of rescission in time and before the recipient deals with the money in
accordance with his instructions, the obligation to make restitution may follow.

This court explained the effect of a defeasible payment in the recent case of
*Bristol and West Building Society v Mothew (t/a Stapley & Co)* [1996] 4 All ER 698 at
716, [1998] Ch 1 at 22, where I said:

'… it would appear that the judge was of opinion that the defendant's
authority to deal with the money was automatically vitiated by the fact that
it (and the cheque itself) was obtained by misrepresentation. But that is
contrary to principle. Misrepresentation makes a transaction voidable not
void. It gives the representee the right to elect whether to rescind or affirm
the transaction. The representor cannot anticipate his decision. Unless and
until the representee elects to rescind the representor remains fully bound.
The defendant's misrepresentations merely gave the society the right to elect
to withdraw from the transaction on discovering the truth. Since its
instructions to the defendant were revocable in any case, this did not
materially alter the position so far as he was concerned, though it may have
strengthened the society's position in relation to the purchasers.'

That, in my judgment, is the position in the present case.

The society brings a claim for money had and received. The firm does not
deny that it is an accounting party. It is an accounting party irrespective of the
existence of any mistake on the part of the society. But it has dealt with the whole
of the money which it received from the society in accordance with the society's

*a* instructions, which have never been revoked. Accordingly, although the firm is accountable for the money it received, it is plain that there is nothing due to the society on the taking of the account. The whole of the money has been expended on the society's behalf. The court does not order an account to be taken where it is plain that there is nothing due.

In my judgment the action is entirely misconceived and the appeal must be *b* dismissed.

**MORRITT LJ.** I agree.

**BROOKE LJ.** I agree. The writ in this action was issued on 25 January 1996, nearly seven years after the completion of the relevant transaction. The only *c* reason why this expensive litigation has taken up so much time in the courts through three different levels is that the law of limitation has grown up piecemeal over the last 450 years before the modern remedy of restitution was properly developed. As a result the plaintiff sought to take adventitious advantage of s 32(1)(c) of the Limitation Act 1980 by advancing its alternative claim in *d* restitution.

For the reasons given by Millett LJ, with which I agree, this claim is hopeless. The time and cost devoted to this appeal illustrates, in my judgment, the need for Parliament to bring appropriate limitation rules relating to restitutionary remedies within a coherent, principled limitation statute as suggested by the Law Commission in its recent consultation paper *Limitation of Actions* (No 151) (1998). *e* Everybody would then be able to understand clearly where they stand and what the relevant rules are, and this sort of litigation could be avoided.

*Appeal dismissed. Leave to appeal to the House of Lords refused.*

*f*                                                                                                      Dilys Tausz  Barrister.

*g*

*h*

*j*

TAB 18

*Rainy Sky SA v Kookmin Bank* [2011] 1 WLR 2900

2900

**Rainy Sky SA v Kookmin Bank (SC(E))**                    [2011] 1 WLR

Supreme Court                                             *A*

## *Rainy Sky SA v Kookmin Bank*

### [2011] UKSC 50

2011  July 27;          Lord Phillips of Worth Matravers PSC, Lord Mance,     *B*
      Nov 2              Lord Kerr of Tonaghmore, Lord Clarke of
                            Stone-cum-Ebony, Lord Wilson JJSC

*Contract — Construction — Performance bond — Advance payment bonds issued in*
*  respect of shipbuilding contracts — Shipbuilder experiencing financial difficulty*
*  and subjected to debt work-out procedure — Claimant buyers demanding*
*  repayment of instalments already paid to shipbuilder under terms of contracts —*
*  Shipbuilder refusing to repay instalments — Buyers claiming repayment under*       *C*
*  bonds — Whether bonds covering sums to which buyers claiming entitlement to*
*  repayment — Whether considerations of commercial common sense relevant in*
*  construing contractual terms*

A shipbuilder entered into six contracts to build and sell a vessel to each of the
first six claimants. The purchase price of each vessel was payable in five equal
instalments at specified times with the final instalment being paid on delivery. It was   *D*
a term of the contract that as a condition precedent to the payment of the first
instalment the shipbuilder would give the buyers refund guarantees relating to the
instalments. In accordance with that term the defendant bank issued each claimant
with advance payment bonds. After the six claimants had paid the first instalment
and the first claimant had paid the second instalment, the shipbuilder experienced
financial difficulties and became the subject of a debt work-out procedure. The
shipbuilder refused to refund the instalments paid. The first six claimants together   *E*
with the seventh claimant who was the assignee of the benefit of the bonds, brought
proceedings against the bank claiming repayment under paragraph 3 of the bonds of
the instalments paid to the shipbuilder, and issued an application for Part 24
summary judgment. The bank refused to pay on the grounds that paragraph 3 had to
be read with paragraph 2 and on its true construction paragraph 3 did not cover the
refunds which the six claimants sought, but covered pre-delivery instalments prior to
the termination of the contract or a total loss of the vessel. The defendant issued a
counter application for Part 24 summary judgment. The judge in the Commercial    *F*
Court held that the construction of paragraph 3 of the bonds contended for by the
bank would have an uncommercial result and gave summary judgment for the
claimants. The bank appealed but conceded that the two different interpretations
of paragraph 3 advanced by the bank and by the claimants were both arguable.
The Court of Appeal held, by a majority, that the construction contended for by the
bank would not produce an absurd or irrational result and that it was not sufficient to
say that no credible commercial reason had been advanced for the limited scope of   *G*
the bonds as that would put the court in danger of substituting its own judgment of
the commerciality of the transaction for that of the parties. Accordingly, the Court
of Appeal allowed the appeal and gave summary judgment for the bank.

On appeal by the claimants —

*Held*, allowing the appeal, that the ultimate aim of interpreting a provision in a
contract, especially a commercial contract, was to determine what the parties meant
by the language used, and that involved ascertaining what a reasonable person would   *H*
have understood the parties to have meant; that the relevant reasonable person for
that purpose was one who had all the background knowledge which would
reasonably have been available to the parties in the situation in which they were at
the time of the contract; that where the parties had used unambiguous language the
court had to apply it, but it was not necessary to conclude that unless the most

2901
[2011] 1 WLR    Rainy Sky SA v Kookmin Bank (SC(E))

A  natural meaning of the words produced a result so extreme as to suggest that it was unintended, the court had to give effect to that meaning; that the court had to have regard to all the relevant surrounding circumstances and if there were two possible constructions the court was entitled to prefer the construction which was consistent with business common sense and to reject the other; that it was not necessary to conclude that a particular construction would have an absurd or irrational result before having regard to the commercial purpose of the agreement; that since the two

B  possible interpretations of paragraph 3 contended for by the claimants and by the bank were both arguable, it was appropriate for the court to have regard to considerations of commercial common sense in resolving the question as to what a reasonable person would have understood the parties to have meant; that an appellate court was also entitled to take account of the fact that an experienced judge of the Commercial Court had concluded that the bank's construction would have an uncommercial result; that of the two arguable constructions of paragraph 3 the

C  claimants' construction was to be preferred because it was consistent with the commercial purpose of the bonds in a way that the bank's construction was not; and that, accordingly, the judge's order would be restored ( post, paras 14, 20, 21, 23, 29, 30, 40–47).

Co-operative Wholesale Society Ltd v National Westminster Bank plc [1995] EGLR 97, CA, Gan Insurance Co Ltd v Tai Ping Insurance Co Ltd (No 2) [2001] 2 All ER (Comm) 299, CA and Barclays Bank plc v HHY Luxembourg SARL [2011] 1 BCLC 336, CA considered.

D  Decision of the Court of Appeal [2010] EWCA Civ 582; [2011] 1 All ER (Comm) 18 reversed.

The following cases are referred to in the judgment of Lord Clarke of Stone-cum-Ebony JSC:

Antaios Cia Naviera SA v Salen Rederierna AB (The Antaios) [1985] AC 191; [1984] 3 WLR 592; [1984] 3 All ER 229, HL(E)

E  Barclays Bank plc v HHY Luxembourg SARL [2010] EWCA Civ 1248; [2011] 1 BCLC 336, CA
Chartbrook Ltd v Persimmon Homes Ltd (Chartbrook Ltd Part 20 defendants) [2009] UKHL 38; [2009] AC 1101; [2009] 3 WLR 267; [2009] Bus LR 1200, HL(E)
Co-operative Wholesale Society Ltd v National Westminster Bank plc [1995] 1 EGLR 97, CA

F  Gan Insurance Co Ltd v Tai Ping Insurance Co Ltd (No 2) [2001] EWCA Civ 1047; [2001] 2 All ER (Comm) 299; [2001] CLC 1103, CA
Golden Key Ltd, In re [2009] EWCA Civ 636, CA
Homburg Houtimport BV v Agrosin Private Ltd (The Starsin) [2003] UKHL 12; [2004] 1 AC 715; [2003] 2 WLR 711; [2003] 2 All ER 785, HL(E)
International Fina Services AG v Katrina Shipping Ltd (The Fina Samco) [1995] 2 Lloyd's Rep 344, CA

G  Investors Compensation Scheme Ltd v West Bromwich Building Society [1998] 1 WLR 896; [1998] 1 All ER 98, HL(E)
Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd [1997] AC 749; [1997] 2 WLR 945; [1997] 3 All ER 352, HL(E)
Pink Floyd Music Ltd v EMI Records Ltd (Practice Note) [2010] EWCA Civ 1429; [2011] 1 WLR 770, CA
Prenn v Simmonds [1971] 1 WLR 1381; [1971] 3 All ER 237, HL(E)

H  Sigma Finance Corpn, In re [2009] UKSC 2; [2010] 1 All ER 571, SC(E)
Society of Lloyd's v Robinson [1999] 1 WLR 756; [1999] 1 All ER (Comm) 545
Wickman Machine Tool Sales Ltd v L Schuler AG [1974] AC 235; [1973] 2 WLR 683; [1973] 2 All ER 39, HL(E)

No additional cases were cited in argument.

**APPEAL** from the Court of Appeal

On 8 August 2009 the claimants, Rainy Sky SA, Seiland Shipping and Trading Co, Islay Navigation Inc, Seapride Navigation Corpn, Seabrize Ltd, Recif Corpn and Metrobulk Holdings SA, issued a claim form commencing an action against the defendant, Kookmin Bank, for US$46,620,000 paid to Jinse Shipbuilding Co Ltd under a shipbuilding contract. On 2 September 2009 the claimants issued an application for CPR Pt 24 summary judgment. On 30 September 2009 the defendant issued a counter application for Part 24 summary judgment. On 29 October 2009, Simon J, sitting in the Commercial Court of the High Court [2009] EWHC 2624 (Comm); [2010] 1 All ER (Comm) 823, gave summary judgment for the claimants in the sum of US$46,620,000 plus interest. On 27 May 2010, the Court of Appeal (Thorpe and Patten LJJ, Sir Simon Tuckey dissenting) [2011] 1 All ER (Comm) 18 allowed the defendant's appeal and gave summary judgment for the defendant. By permission granted by the Supreme Court (Lord Phillips of Worth Matravers, Lord Mance and Lord Clarke of Stone-cum-Ebony) on 26 July 2010 the claimants appealed to the Supreme Court.

The facts are stated in the judgment of Lord Clarke of Stone-cum-Ebony.

*Mark Howard QC* and *Michael Ashcroft QC* (instructed by *Ince & Co LLP*) for the claimants.

*Guy Philipps QC* and *James Cutress* (instructed by *Linklaters*) for the bank.

The court took time for consideration.

2 November 2011. **LORD CLARKE OF STONE-CUM-EBONY JSC** (with whom **LORD PHILLIPS OF WORTH MATRAVERS PSC, LORD MANCE, LORD KERR OF TONAGHMORE** and **LORD WILSON JJSC** agreed) handed down the following judgment.

*Introduction and factual background*

1 This appeal raises a short question of construction of shipbuilder's refund guarantees given pursuant to six shipbuilding contracts ("the contracts"). The contracts, which were all dated 11 May 2007, were between each of the first to sixth claimants ("the buyers") and Jinse Shipbuilding Co Ltd ("the builder"). Under the contracts the builder agreed to build and sell one vessel to each of the buyers. The price of each vessel was US$33,300,000, payable in five equal instalments of US$6,660,000 due at specified points of time, with the final instalment payable on delivery. By article X.8 of the contracts it was a condition precedent to payment by the buyers of the first instalment that the builder would deliver to the buyers refund guarantees relating to the first and subsequent instalments in a form acceptable to the buyers' financiers. As envisaged by article X.8, by letter dated 22 August 2007 the respondent, Kookmin Bank ("the bank"), issued six materially identical "advance payment bonds" ("the bonds"), one to each of the buyers. The seventh claimant ("the assignee") is the assignee of the benefit of the bonds.

2 On 29 August 2007, the buyers each paid the first instalment of US$6,660,000 due under the contracts. On 29 September 2007, the first claimant paid the second instalment of US$6,660,000 under the contract to which it is a party.

A    3  In 2008 the builder experienced financial difficulties and in late
January 2009 it entered into and/or became subject to a debt work-out
procedure under the Korean Corporate Restructuring Promotion Law 2007.
On 25 February 2009 the buyers wrote to the builder notifying it that this
development triggered article XII.3 of the contracts and demanding an
immediate refund of all the instalments paid, together with interest at 7% per
annum.    The builder refused to make any refund on the ground that
B    article XII.3 of the contracts had not been triggered as alleged.  The dispute
between the buyers and the builder has been submitted to arbitration
pursuant to article XIV.3 of the contracts.

   4  On 23 April 2009, the buyers wrote to the bank demanding
repayment under the bonds of the instalments paid under the contracts. The
bank refused to pay. It did so initially on the ground that it was not obliged
C    to pay pending resolution of the dispute between the buyers and the builder.
That argument was subsequently rejected by Simon J ("the judge") [2009]
EWHC 2624 (Comm); [2010] 1 All ER (Comm) 823 and there was no
appeal to the Court of Appeal against that part of his order. The bank
subsequently raised a separate, and logically prior, argument that, on their
true construction, the bonds did not cover refunds to which the buyers were
D    entitled pursuant to article XII.3 of the contracts.

   5  That argument was also rejected by the judge, who gave summary
judgment for the assignee, but succeeded in the Court of Appeal, which gave
summary judgment for the bank against the buyers and the assignee. In the
Court of Appeal Sir Simon Tuckey agreed with the judge but the majority,
comprising Thorpe and Patten LJJ, held the bank's argument to be correct:
E    [2011] 1 All ER (Comm) 18. The orders of the judge and the Court of
Appeal were made on 29 October 2009 and 27 May 2010 respectively.
The Court of Appeal refused permission to appeal.

   6  The buyers appeal to this court pursuant to permission granted by the
court. The issue is whether, on the true construction of paragraph 3 of the
bonds, the buyers are entitled to payment under the bonds in respect of
refunds to which they are entitled under article XII.3 of the contracts.
F    No one suggested that the successful parties should not have summary
judgment in their favour.

*The bonds*

   7  I begin with the bonds because it was common ground that all
depends upon the true construction of the bonds and that the terms and
meaning of the contracts are only relevant to the extent that they inform the
G    true construction of the bonds. The paragraphs in the letter comprising the
bonds were not numbered but both the judge and the Court of Appeal
referred to them by number for convenience of reference and I will do the
same. As so numbered the relevant parts of each bond were these:

      "1. We refer to the . . . contract entered into between . . . the builder
      and yourselves for the construction and delivery of . . . the 'vessel' to be
H     delivered before [31 July 2009]. Other terms and expressions used in this
      bond shall have the same meaning as in the contract, a copy of which has
      been provided to us.

      "2. Pursuant to the terms of the contract, you are entitled, upon your
      rejection of the vessel in accordance with the terms of the contract,

your termination, cancellation or rescission of the contract or upon a *A*
total loss of the vessel, to repayment of the pre-delivery instalments of the
contract price paid by you prior to such termination or a total loss of the
vessel (as the case may be) and the value of the buyer's supplies delivered
to the shipyard (if any) together with interest thereon at the rate of . . .
(7%) per annum (or . . . (10%) per annum in the case of a total loss of the
vessel) from the respective dates of payment by you of such instalments to *B*
the date of remittance by telegraphic transfer of such refund.

"3. In consideration of your agreement to make the pre-delivery
instalments under the contract and for other good and valuable
consideration (the receipt and adequacy of which is hereby
acknowledged), we hereby, as primary obligor, irrevocably and
unconditionally undertake to pay to you, your successors and assigns, on
your first written demand, all such sums due to you under the contract (or *C*
such sums which would have been due to you but for any irregularity,
illegality, invalidity or unenforceability in whole or in part of the
contract) *provided that* the total amount recoverable by you under this
bond shall not exceed [US$26,640,000] . . . plus interest thereon at
the rate of . . . (7%) per annum (or . . . (10%) per annum in the case of a
total loss of the vessel) from the respective dates of payment by you of *D*
such instalments to the date of remittance by telegraphic transfer of such
refund.

"4. Payment by us under this bond shall be made without any
deduction or withholding, and promptly on receipt by us of a written
demand (substantially in the form attached) signed by two of your
directors stating that the builder has failed to fulfil the terms and
conditions of the contract and as a result of such failure, the amount *E*
claimed is due to you and specifying in what respects the builder has so
failed and the amount claimed. Such claim and statement shall be
accepted by us as evidence for the purposes of this bond alone that this
amount claimed is due to you under this bond.

"5. Our liability under this bond shall not be affected by . . . (v) any
insolvency, re-organisation or dissolution of the builder, or (vi) any other *F*
matter or thing which may operate to discharge or reduce our liability
hereunder . . ."

8   The bonds further provided that they were assignable, that they were
governed by English law and that all disputes arising out of them were to be
determined by the Commercial Court.

9   The resolution of the issue between the parties depends upon the true *G*
construction of paragraph 3. The bank promised to pay on demand "all
such sums due to you under the contract". The question is what was meant
by "such sums". Only two possibilities were suggested. The buyers said
(and the judge and Sir Simon Tuckey held) that the expression "such sums"
referred back to the "pre-delivery instalments" in the first line. They said
that the purpose of the bond was to guarantee the refund of pre-delivery
instalments and that the promise was therefore to refund pre-delivery *H*
instalments. By contrast the bank said (and Thorpe and Patten LJJ held) that
the expression "such sums" was a reference back to the sums referred to in
paragraph 2, namely the repayment of the pre-delivery instalments paid
prior to a termination of the contract or a total loss of the vessel and the

A   value of the buyer's supplies in the case of a total loss. On the buyers'
analysis the bond guaranteed pre-delivery instalments which were repayable
under article XII.3 in the case of any insolvency event, whereas on the bank's
analysis it did not.

*The contracts*

B   10   It is common ground that the terms of the contracts are relevant to
the true construction of the bonds. They are referred to in the bonds and
provide the immediate context in which the bonds were entered into. They
are thus plainly an important aid to the meaning of the bonds.

   11   Article X of the contracts provided, so far as material, as follows:

      "*Article X: Payment*

      "Refund by the builder

C     "5 . . . The payments made by the buyer to the builder prior to delivery
of the vessel shall constitute advances to the builder. If the vessel is
rejected by the buyer in accordance with the terms of this contract, or if
the buyer terminates, cancels or rescinds this contract pursuant to any of
the provisions of this contract specifically permitting the buyer to do
so, the builder shall forthwith refund to the buyer in US dollars, the full
D     amount of total sums paid by the buyer to the builder in advance of
delivery together with interest thereon as herein provided within thirty
(30) banking days of acceptance of rejection . . . The interest rate of the
refund . . . shall be seven per cent (7%) per annum . . . If the builder is
required to refund to the buyer the instalments paid by the buyer to the
builder as provided in this paragraph, the builder shall return to the buyer
E     all of the buyer's supplies as stipulated in article XIII which were not
incorporated into the vessel and pay to the buyer an amount equal to the
cost to the buyer of those buyer's supplies incorporated into the vessel.

      "Total loss

      6. If there is a total loss or a constructive total loss of the vessel prior to
delivery thereof, the builder shall proceed according to the mutual
F     agreement of the parties hereto either: (a) to build another vessel in place
of the vessel so lost . . . provided that the parties hereto shall have agreed
in writing to a reasonable cost and time for the construction . . . or (b) to
refund to the buyer the full amount of the total sums paid by the buyer to
the builder under the provisions of paragraph 2 of this article and the
value of buyer's supplies delivered to the shipyard, if any, together with
G     interest thereon at the rate of ten percent (10%) per annum . . . If the
parties hereto fail to reach such agreement within two (2) months after
the vessel is determined to be a total loss or constructive total loss, the
provisions of (b) herein above shall be applied . . ."

      "Refund guarantee

      "8. The builder shall as a condition precedent to payment by the buyer
of the first instalment deliver to the buyer an assignable letter of guarantee
H     issued by a first class Korean bank . . . to buyer's financiers for the refund
of the first instalment, and at the same time, together with the letter of
guarantee relating to the first instalment, builder shall also deliver to the
buyer an assignable letter of guarantee issued by a first class Korean
bank . . . for the refund of the respective instalments following the way of

the payment stipulated in this article. The refund guarantees by the *A* builder to the buyer shall be indicated pre-delivery instalments plus interest as aforesaid to the buyer under or pursuant to paragraph 5 above in the form annexed hereto as exhibit 'A' which is yet to be agreed . . . In the event that the refund guarantees, for all instalments, have not been provided to the buyer in a form acceptable to the buyer's financiers and have not been issued by an entity acceptable to buyer's financiers, by the 31st of August 2007 then the buyer may cancel this contract without *B* penalty on either side."

It is common ground that no form of guarantee was in fact annexed to the contracts.

12   Article XII provided, so far as relevant:

"*Article XII: Builders default*                                        *C*

"3. If the builder shall apply for or consent to the appointment of a receiver, trustee or liquidator, shall be adjudicated insolvent, shall apply to the courts for protection from its creditors, file a voluntary petition in bankruptcy or take advantage of any insolvency law, or any action shall be taken by the builder having an effect similar to any of the foregoing or the equivalent thereof in any jurisdiction, the buyer may by notice in *D* writing to the builder require the builder to refund immediately to the buyer the full amount of all sums paid by the buyer to the builder on account of the vessel and interest thereon at seven per cent (7%) per annum on the amount to be refunded to the buyer, computed from the respective date such sums were paid by the buyer to the date of remittance of the refundable amount to the buyer and immediately upon receipt of such notice the builder shall refund such amount to the buyer. Following *E* such refund the builder may, but shall not be obliged to, by notice in writing to the buyer given within ten (10) business days terminate this contract. If the builder does not so terminate the contract the buyer's obligation to pay further instalments prior to delivery of the vessel under article X 2(a), (b), (c) and (d) shall be suspended and the full contract price shall be paid to the builder upon delivery of the vessel in the manner *F* contemplated by article X paragraph 2(e)."

13   The contracts contained a number of provisions which entitled the buyer to cancel the contract, namely articles III.1 and XII.1 (delay) and article III.2(b), 3(c), 4(d) and 5(d) (insufficient speed, excessive fuel consumption, deficient deadweight or cargo capacity). Some of those provisions specifically entitled the buyer to a refund of all advance payments following cancellation. Others did not, although in such cases article X.5 *G* would apply and have the same effect. The contracts also contained in article XIII further detailed provisions relating to buyer's supplies.

*The correct approach to construction*

14   For the most part, the correct approach to construction of the bonds, as in the case of any contract, was not in dispute. The principles have *H* been discussed in many cases, notably of course, as Lord Neuberger of Abbotsbury MR said in *Pink Floyd Music Ltd v EMI Records Ltd* [2010] EWCA Civ 1429, para 17, by Lord Hoffmann in *Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] AC 749, passim, in *Investors*

A   *Compensation Scheme Ltd v West Bromwich Building Society* [1998]
1 WLR 896, 912F–913G and in *Chartbrook Ltd v Persimmon Homes Ltd
(Chartbrook Ltd Part 20 defendants)* [2009] AC 1101, paras 21–26. I agree
with Lord Neuberger (also at para 17) that those cases show that
the ultimate aim of interpreting a provision in a contract, especially a
commercial contract, is to determine what the parties meant by the language
used, which involves ascertaining what a reasonable person would have
B   understood the parties to have meant. As Lord Hoffmann made clear in the
first of the principles he summarised in the *Investors Compensation Scheme*
case [1998] 1 WLR 896, 912H, the relevant reasonable person is one who
has all the background knowledge which would reasonably have been
available to the parties in the situation in which they were at the time of the
contract.

C   15   The issue between the parties in this appeal is the role to be played by
considerations of business common sense in determining what the parties
meant. Sir Simon Tuckey said, at para 19 of his judgment, that there was no
dispute about the principles of construction and the bank so submitted in its
skeleton argument. However, I do not think that is quite correct.
16   At para 18 Sir Simon identified the question of construction,
substantially as set out in para 9 above, and said, at para 19:
D

"There is no dispute about the principles of construction to be applied
in order to answer this question. The court must first look at the words
which the parties have used in the bond itself. The shipbuilding contract
is of course the context and cause for the bond but is nevertheless a
separate contract between different parties. If the language of the bond
leads clearly to a conclusion that one or other of the constructions
E   contended for is the correct one, the court must give effect to it, however
surprising or unreasonable the result might be. But if there are two
possible constructions, the court is entitled to reject the one which is
unreasonable and, in a commercial context, the one which flouts business
common sense. This follows from the House of Lords decisions in
*Wickman Machine Tools Sales Ltd v L Schuler AG* [1974] AC 235, 251
F   where Lord Reid said: 'The fact that a particular construction leads to a
very unreasonable result must be a relevant consideration. The more
unreasonable the result, the more unlikely it is that the parties can have
intended it, and if they do intend it the more necessary it is that they shall
make that intention abundantly clear' and *The Antaios* [1985] AC 191,
201 where Lord Diplock said: 'If detailed and syntactical analysis of
words in a commercial contract is going to lead to a conclusion that flouts
G   business common sense it must yield to business common sense.' "

17   As I read his judgment, Patten LJ did not put the question in quite the
same way. This can be seen from paras 35–44 of his judgment. At para 35
he referred to Sir Simon Tuckey's approach at para 19 (as quoted above).
He also referred to para 18(iii) of the judge's judgment, where the judge
H   described the bank's construction of the bond as having the surprising and
uncommercial result of the guarantee not being available to meet the
builder's repayment obligations in the event of insolvency. Patten LJ noted
that the judge appeared to have taken that into account as a factor in favour
of the buyers' construction of paragraph 3 of the bonds. Patten LJ added
that the judge's approach was the same as that of Sir Simon Tuckey.

18 Patten LJ then referred to the cases mentioned above and expressed    *A*
his conclusion in principle thus, at para 42:

"In this case (as in most others) the court is not privy to the
negotiations between the parties or to the commercial and other pressures
which may have dictated the balance of interests which the contract
strikes. Unless the most natural meaning of the words produces a result
which is so extreme as to suggest that it was unintended, the court has no    *B*
alternative but to give effect it its terms. To do otherwise would be to risk
imposing obligations on one or other party which they were never willing
to assume and in circumstances which amount to no more than
guesswork on the part of the court."

19 Finally, at paras 43 and 44, Patten LJ quoted from the speeches of
Lord Wilberforce in *Prenn v Simmonds* [1971] 1 WLR 1381, 1384–1385    *C*
and of Lord Hoffmann in the *Chartbrook* case [2009] AC 1101, para 20,
where they discussed the reason for the rule excluding evidence of pre-
contractual negotiations. In particular they stressed the irrelevance of the
parties' subjective intentions and noted that the mere fact that a term in the
contract appears to be particularly unfavourable to one party or the other is
irrelevant. As Lord Hoffmann put it, the term may have been agreed in    *D*
exchange for some concession made elsewhere in the transaction or it may
simply have been a bad bargain.

20 I entirely accept those caveats. However, it seems to me to be clear
that the principle stated by Patten LJ in para 42 is different from that stated
by the judge in his para 18(iii) and by Sir Simon Tuckey in para 19. It is not
in my judgment necessary to conclude that, unless the most natural meaning
of the words produces a result so extreme as to suggest that it was    *E*
unintended, the court must give effect to that meaning.

21 The language used by the parties will often have more than one
potential meaning. I would accept the submission made on behalf of the
appellants that the exercise of construction is essentially one unitary exercise
in which the court must consider the language used and ascertain what a
reasonable person, that is a person who has all the background knowledge
which would reasonably have been available to the parties in the situation    *F*
in which they were at the time of the contract, would have understood the
parties to have meant. In doing so, the court must have regard to all the
relevant surrounding circumstances. If there are two possible constructions,
the court is entitled to prefer the construction which is consistent with
business common sense and to reject the other.

22 This conclusion appears to me to be supported by Lord Reid's    *G*
approach in *Wickman Machine Tool Sales Ltd v L Schuler AG* [1974]
AC 235 quoted by Sir Simon Tuckey and set out above. I am of course aware
that, in considering statements of general principle in a particular case, the
court must have regard to the fact that the precise formulation of the
proposition may be affected by the facts of the case. Nevertheless, there is a
consistent body of opinion, largely collated by the buyers in an appendix to
their case, which supports the approach of the judge and Sir Simon Tuckey.    *H*

23 Where the parties have used unambiguous language, the court must
apply it. This can be seen from the decision of the Court of Appeal in
*Co-operative Wholesale Society Ltd v National Westminster Bank plc*
[1995] 1 EGLR 97. The court was considering the true construction of rent

2909

A  review clauses in a number of different cases. The underlying result which the landlords sought in each case was the same. The court regarded it as a most improbable commercial result. Where the result, though improbable, flowed from the unambiguous language of the clause, the landlords succeeded, whereas where it did not, they failed. The court held that ordinary principles of construction applied to rent review clauses and applied the principles in *Antaios Cia Naviera SA v Salen Rederierna AB (The*
B  *Antaios)* [1985] AC 191. After quoting the passage from the speech of Lord Diplock cited above, Hoffmann LJ said, at p 99:

"This robust declaration does not, however, mean that one can rewrite the language which the parties have used in order to make the contract conform to business common sense. But language is a very flexible instrument and, if it is capable of more than one construction, one
C  chooses that which seems most likely to give effect to the commercial purpose of the agreement."

24  The court also comprised Leggatt and Simon Brown LJJ. Simon Brown LJ, at p 101, said that, having regard to the improbable result for which the landlords contended, only the most unambiguous of such clauses could properly be found to bear the landlords' construction and that in the
D  case of only one of the leases did the clause "unambiguously . . . achieve the improbable result for which the landlords contend". The case is of interest because Simon Brown LJ considered that, of the other three cases, one unambiguously failed to achieve the result sought by the landlords, whereas, of the other two, he said this, at p 102:

E  "For my part, I would accept that the more obvious reading of both favours the landlord's construction. I am persuaded, however, that they are capable of being, and therefore, for the reasons already given, should be, construed differently."

That case is therefore an example of the adoption and application of the principle endorsed by the judge and by Sir Simon Tuckey. See also
F  *International Fina Services AG v Katrina Shipping Ltd (The Fina Samco)* [1995] 2 Lloyd's Rep 344, 350, where Neill LJ said it was necessary when construing a commercial document to strive to attribute to it a meaning which accords with business common sense.

25  In 1997, writing extra-judicially in "Contract law: Fulfilling the reasonable expectations of honest men" 113 LQR 433, 441, Lord Steyn expressed the principle thus:

G  "Often there is no obvious or ordinary meaning of the language under consideration. There are competing interpretations to be considered. In choosing between alternatives a court should primarily be guided by the contextual scene in which the stipulation in question appears. And speaking generally commercially minded judges would regard the commercial purpose of the contract as more important than niceties of
H  language. And, in the event of doubt, the working assumption will be that a fair construction best matches the reasonable expectations of the parties."

I agree. He said much the same judicially in *Society of Lloyd's v Robinson* [1999] WLR 756, 763:

*A*

"Loyalty to the text of a commercial contract, instrument, or document read in its contextual setting is the paramount principle of interpretation. But in the process of interpreting the meaning of the language of a commercial document the court ought generally to favour a commercially sensible construction. The reason for this approach is that a commercial construction is likely to give effect to the intention of the parties. Words ought therefore to be interpreted in the way in which a reasonable commercial person would construe them. And the reasonable commercial person can safely be assumed to be unimpressed with technical interpretations and undue emphasis on niceties of language."

*B*

26 Similar assistance is at hand nearer at home. In *Gan Insurance Co Ltd v Tai Ping Insurance Co Ltd (No 2)* [2001] 2 All ER (Comm) 299, Mance LJ said:

*C*

"13. Construction, as Sir Thomas Bingham MR said in *Arbuthnott v Fagan* [1995] CLC 1396, 1400 is thus 'a composite exercise, neither uncompromisingly literal nor unswervingly purposive'. To para 5, one may add as a coda words of Lord Bridge of Harwich in *Mitsui Construction Co Ltd v Attorney General of Hong Kong* (1986) 10 Con LR 1, cited in my judgment in *Sinochem International Oil (London) Co Ltd v Mobil Sales and Supply Corpn (Sinochem International Oil Co Ltd, Third Party)* [2000] 1 All ER (Comm) 474, 482. Speaking of a poorly drafted and ambiguous contract, Lord Bridge said that poor drafting itself provides: 'no reason to depart from the fundamental rule of construction of contractual documents that the intention of the parties must be ascertained from the language that they have used interpreted in the light of the relevant factual situation in which the contract was made. But the poorer the quality of the drafting, the less willing the court should be to be driven by semantic niceties to attribute to the parties an improbable and unbusinesslike intention, if the language used, whatever it may lack in precision, is reasonably capable of an interpretation which attributes to the parties an intention to make provision for contingencies inherent in the work contracted for on a sensible and businesslike basis.' "

*D*

*E*

*F*

"16 . . . in my judgment the subclause has no very natural meaning and is, at the least, open to two possible meanings or interpretations—one the judge's, the other that it addresses two separate subject matters. In these circumstances, it is especially important to undertake the exercise on which the judge declined to embark, that is to consider the implications of each interpretation. In my opinion, a court when construing any document should always have an eye to the consequences of a particular construction, even if they often only serve as a check on an obvious meaning or a restraint upon adoption of a conceivable but unbusinesslike meaning. In intermediate situations, as Professor Guest wisely observes in *Chitty on Contracts* (28th ed) (1999), vol 1, para 12-049, a 'balance has to be struck' through the exercise of sound judicial discretion."

*G*

27 More generally, in *Homburg Houtimport BV v Agrosin Private Ltd (The Starsin)* [2004] 1 AC 715, para 10, Lord Bingham referred to

*H*

"the rule to which Lord Halsbury LC alluded in *Glynn v Margetson & Co* [1893] AC 351, 359, 'that a business sense will be given to business

A    documents'. The business sense is that which businessmen, in the course of their ordinary dealings, would give the document."

28   Three other cases merit brief reference. The same approach was adopted by Arden LJ in *In re Golden Key Ltd* [2009] EWCA Civ 636 at [29] and [42] and by this court in *In re Sigma Finance Corpn* [2010] 1 All ER 571, para 12, where Lord Mance said that the resolution of an issue of

B   interpretation in a case like the present was an iterative process, involving checking each of the rival meanings against other provisions of the document and investigating its commercial consequences.

29   Finally, it is worth setting out two extracts from the judgment of Longmore LJ in *Barclays Bank plc v HHY Luxembourg SARL* [2011] 1 BCLC 336, paras 25 and 26:

C     "25. The matter does not of course rest there because when alternative constructions are available one has to consider which is the more commercially sensible. On this aspect of the matter Mr Zacaroli has all the cards . . .

    "26. The judge said that it did not flout common sense to say that the clause provided for a very limited level of release, but that, with respect, is

D   not quite the way to look at the matter. If a clause is capable of two meanings, as on any view this clause is, it is quite possible that neither meaning will flout common sense. In such circumstances, it is much more appropriate to adopt the more, rather than the less, commercial construction."

30   In my opinion Longmore LJ has there neatly summarised the correct

E   approach to the problem. That approach is now supported by a significant body of authority. As stated in a little more detail in para 21 above, it is in essence that, where a term of a contract is open to more than one interpretation, it is generally appropriate to adopt the interpretation which is most consistent with business common sense. For these reasons I prefer the approach of the judge and Sir Simon Tuckey to that of Patten LJ, which is

F   to my mind significantly different on this point.

*Application to the facts*

31   As indicated above, two possible interpretations of paragraph 3 of the bonds were advanced. It was conceded on behalf of the bank in the Court of Appeal that both constructions were arguable. I did not understand Mr Guy Philipps QC to resile from that position on behalf of the bank in this

G   court. In any event, in my judgment there are indeed two possible interpretations.

32   The strength of the bank's interpretation is that it is not easy to see the point of paragraph 2 of the bonds if the buyers' interpretation of paragraph 3 is correct. On the other hand, the buyers' interpretation is straightforward. It is that, reduced to its essentials, the bank's promise in

H   paragraph 3 was that

    "in consideration of your [i e the buyers'] agreement to make the pre-delivery instalments . . . we hereby, as primary obligor, promise to pay to you, your successors and assigns, on your first written demand, all such sums due to you under the contract . . ."

In the absence of paragraph 2 there could be no doubt that the reference to    A
"such sums" was a reference to the "pre-delivery instalments" at the
beginning of paragraph 3. That makes perfect sense because one would
naturally expect the parties to agree (and the buyers' financiers to insist) that,
in the event, for example, of the insolvency of the builders, the buyers
should have security for the repayment of the pre-delivery instalments which
they had paid.                                                                  B

33  The question is whether the presence of paragraph 2 leads to a
different conclusion. It was submitted with force by Mr Philipps on behalf
of the bank that it did. He correctly submitted that paragraph 3 must be
construed in its context and that part of the context was paragraph 2, which
was of course the immediately preceding paragraph. He submitted that the
only purpose there can have been for including paragraph 2 in the bonds was
to identify the scope of paragraph 3. He further submitted that no other       C
sensible explanation for the inclusion of paragraph 2 had been advanced on
behalf of the buyers.

34  I accept the submission that no very good reason was advanced on
behalf of the buyers for the inclusion of paragraph 2 in the bonds. The best
they could do was to say that it was a preamble to the operative provision in
paragraph 3, that it simply set out some of the buyers' rights under the        D
contracts and that it was not intended to identify the scope of the bank's
liability under the bonds. Patten LJ accepted [2011] 1 All ER (Comm) 18,
para 50 that the buyers' construction was arguable but said that, in his view,
it was not the meaning that the document would convey to a reasonable
person reading it with knowledge of the terms of the contracts. This must
I think mean that he took the view that, although it was arguable that it had
that effect, it did not in fact do so. Otherwise the buyers' construction could    E
not in any relevant sense have been said to be arguable and Patten LJ would
surely not have described it as such. Patten LJ made this clear in para 51
(quoted below), where he described the alternative constructions as not
being in any way evenly balanced. The position is thus that, although he
regarded both constructions as arguable in the sense that the bonds might
convey either construction to a reasonable person reading the bonds with      F
knowledge of the terms of the contracts, in his view the bank's construction
was plainly to be preferred. If Patten LJ went further later in para 51, where
he said that the fact that cover for the insolvency of the builder was desirable
did not justify a departure from what would otherwise be "the natural and
obvious construction of the bond", I respectfully disagree because I do not
regard the bank's construction as being the natural and ordinary meaning of    G
the bonds.

35  I have considered the competing arguments for myself and have
concluded that they are much more finely balanced than suggested by
Patten LJ and the bank. In para 48 Patten LJ expressed the view that
paragraph 2 of the bonds reproduced the terms of article X.5 and article X.6
of the contracts and therefore complied with article X.8. In para 49 he
concluded that the obvious purpose of paragraph 2 was to give the addressee    H
of the bonds a clear statement of the builder's obligations under the
contracts "which are to be covered by the guarantee and one which is
consistent with the terms of the builder's obligations to provide the bond
under article X.8 of the contract".

A    36    For my part, I would not entirely accept that analysis. Paragraph 2 of the bonds did reproduce the terms of article X.5 and article X.6 of the contracts but it does not seem to me that it complied with the requirements of article X.8. As I see it, article X.8 did not provide for the terms in which the bonds were to be issued. It provided that two letters of guarantee were to be provided, the first by a first class Korean bank or Guarantee Insurance Company for the refund of the first instalment and the second issued by

B    "a first class Korean bank or Guarantee Insurance Company acceptable to the buyer's financiers for the refund of the respective instalments following the way of payment stipulated in this article". The first paragraph of article X.8 included this:

C        "The refund guarantees by the builder to the buyer shall be indicated pre-delivery instalments plus interest as aforesaid to the buyer under or pursuant to paragraph 5 above in the form annexed hereto as exhibit 'A' which is yet to be agreed."

     37    In fact there was no form annexed to the contracts, so it is far from clear what was meant by the sentence of the first paragraph of article X.8 just quoted. As I see it, it was left that the parties would agree the final form of the bonds referable to the second and subsequent instalments. Moreover

D    both the identity of the issuer of the bonds and the form of the bonds were to be acceptable to the buyers' financiers. That was made clear by the second paragraph of article X.8 which is quoted in para 11 above. I would accept the submission made on behalf of the buyers that it is clear that neither article X.5 nor article X.8 was intended to set out all the circumstances in which the refund guarantees should operate. For example, there was no

E    cross-reference in article X.8 to the builder's obligation under article X.6 of the contracts to refund the instalments paid in the event of actual or constructive total loss, although it is common ground that the bonds did cover that obligation. In short, article X.8 did not purport to dictate the final scope of the bonds. In particular, it did not require that the guarantees should cover refund obligations only under article X.5 and article X.6 of the contracts.

F    38    There is a further curiosity in paragraph 2 of the bonds. In describing the buyers' rights under the contracts, it did not limit their rights to a refund of the pre-delivery instalments of the price. It extended them to the case where the buyers were entitled to "the value of the buyer's supplies delivered to the shipyard (if any)," although in so doing it failed accurately to reflect the contractual position in relation to termination as opposed to total

G    loss, since under article X.5 of the contracts the obligation on termination was to return the supplies, and only to (re)pay their value insofar as already incorporated into the vessel. It would seem to follow from the bank's submission that paragraph 2 defined the scope of the bank's obligations under paragraph 3 that the expression "all such sums due to you under the contract" included both the obligations to refund identified in paragraph 2 and the obligation to pay the value of the buyer's supplies" (whatever that

H    might cover). That was indeed the submission advanced in the bank's skeleton argument in the Court of Appeal. It is however a submission that is no longer advanced by either party. That is no doubt because the difficulty with it is that the bonds were described as "advance payment bonds" and the amount of each bond was US$26,640,000, which was the total amount of

the second and subsequent instalments of the price, and because interest was    A
only payable under paragraph 3 of the bonds "from the respective dates of
payment by [the buyers] of such instalments", thus leaving no room for a
right to payment of the value of buyer's supplies under the bonds.

39   Sir Simon Tuckey took a different view of the construction of the
critical clauses of the bonds from that of Patten and Thorpe LJJ. He did so in
para 28, where he was considering whether in the particular circumstances    B
of the case the judge should have had regard to considerations of commercial
and business common sense. He said this:

   "But should the judge's approach in this case have been more restricted
   as Mr Philipps contends?  I do not think so.  The title to article X as a
   whole is 'payment' but it contains an assortment of different terms.
   Article X.8 is drafted on the basis that the form of guarantee which the    C
   parties contemplated would be annexed to the agreement.  That would be
   the document to look at if one was trying to discover from the contract
   what the buyer was looking for, not the reference back to article X.5.
   This reference back is poorly drafted and quite capable of referring simply
   to the opening sentence of paragraph 5.  It is difficult to construe it in a
   way which restricts the refund obligations which the bond was to cover,
   not least because there is no reference to the article X.6 obligation to a    D
   refund following total or constructive loss of the vessel which both parties
   agree was to be covered by the bond.  By the same token, no significance
   should be attached to the omission of the article XII.3 refund obligation.
   Nor do I think there is anything in Mr Philipps' further point.  On the
   happening of an article XII.3 event the buyer was entitled to a refund of
   its advance payments 'immediately'.  If that did not happen the contract
   was in a state of limbo: neither party could terminate at that stage.  If the    E
   builder did not proceed with the construction of the vessel, as would be
   extremely likely if it was insolvent, the buyer could terminate for delay
   under article XII.l but, under the terms of this article, only after 90 days
   plus 14 days notice.  Only then could it call on the bond.  I cannot see how
   any buyer (or its financiers) could possibly be satisfied with this as a
   remedy in the situation where the builder was insolvent or nearly so."    F

I agree with Sir Simon Tuckey and prefer his approach to that of the majority
in the Court of Appeal.

40   In all these circumstances, because of the difficulties in construing
paragraph 2 as setting out the sums due under the bond, if I were focusing
only on the language of the clause, I would be inclined to prefer the buyers'
construction to that of the bank.  I note in passing in this regard that the    G
construction advanced by the bank was something of an afterthought.
However, I recognize that, on the buyers' construction, it is not easy to see
why paragraph 2 was included in the bond at all, and that the bank's
construction is arguable.  This case is therefore a good example of the kind
of case referred to in the authorities to which I have referred.  Since the
language of paragraph 3 is capable of two meanings it is appropriate for the
court to have regard to considerations of commercial common sense in    H
resolving the question what a reasonable person would have understood the
parties to have meant.

41   As noted at para 17 above, at his para 18(iii) the judge described the
bank's construction of the bonds as having what he called the surprising and

A    uncommercial result that the buyers would not be able to call on the bonds
     on the happening of the event, namely insolvency of the builder, which
     would be most likely to require the first class security. I agree with Sir Simon
     Tuckey that an appellate court is entitled to take account of the fact that an
     experienced judge of the Commercial Court reached that conclusion. In any
     event, Sir Simon Tuckey expressed essentially the same view in strong terms,
B    at para 30:

         ". . . On the bank's construction the bonds covered each of the
     situations in which the buyers were entitled to a return or refund of the
     advance payments which they had made under the contracts apart from
     the insolvency of the builder. No credible commercial reason has been
     advanced as to why the parties (or the buyers' financiers) should have
C    agreed to this. On the contrary, it makes no commercial sense. As the
     judge said, insolvency of the builder was the situation for which the
     security of an advance payment bond was most likely to be needed.
     The importance attached in these contracts to the obligation to refund in
     the event of insolvency can be seen from the fact that they required the
     refund to be made immediately. It defies commercial common sense to
     think that this, among all other such obligations, was the only one which
D    the parties intended should not be secured. Had the parties intended this
     surprising result I would have expected the contracts and the bonds to
     have spelt this out clearly but they do not do so."

     I agree.
        42  Patten LJ's view to the contrary is summarised at para 51:

E        "For the reasons which I have given, I do not regard the alternative
     constructions of paragraph 3 advanced on this appeal as being in any way
     evenly balanced. I also agree with Mr Philipps that it is impermissible to
     speculate on the reasons for omitting repayments in the event of
     insolvency from the bond. Although the judge is right to say that cover
     for such event was, objectively speaking, desirable, that is not sufficient in
     itself to justify a departure from what would otherwise be the natural and
F    obvious construction of the bond. There may be any number of reasons
     why the builder was unable or unwilling to provide bank cover in the
     event of its insolvency and why the buyer was prepared to take the risk.
     This is not a case in which the construction contended for would produce
     an absurd or irrational result in the sense described in the cases I have
     referred to and merely to say that no credible commercial reason has been
     advanced for the limited scope of the bond does, in my view, put us in real
G    danger of substituting our own judgment of the commerciality of the
     transaction for that of those who were actually party to it."

        43  As Hoffmann LJ put it (in *Co-operative Wholesale Society Ltd v
     National Westminster Bank plc* [1995] 1 EGLR 97), after quoting from Lord
     Diplock's speech in *The Antaios* [1985] AC 191, if the language is capable of
     more than one construction, it is not necessary to conclude that a particular
H    construction would produce an absurd or irrational result before having
     regard to the commercial purpose of the agreement. See, for example, per
     Hoffmann LJ, quoted at para 23 above, where he said: "But language is a
     very flexible instrument and, if it is capable of more than one construction,
     one chooses that which seems most likely to give effect to the commercial

purpose of the agreement." See also the quotation from Longmore LJ at
para 29 above, where he said that, if a clause is capable of two meanings, it is
quite possible that neither meaning will flout common sense, but that, in
such a case, it is much more appropriate to adopt the more, rather than the
less, commercial construction: *Barclays Bank plc v HHY Luxembourg
SARL* [2011] 1 BCLC 336, para 26.

44   In para 51 Patten LJ appears to have accepted that no credible
commercial reasons were advanced for the limited scope of the bonds being
advanced by the bank. Mr Philipps submitted that it was not necessary for
the bank to address the question but I have no doubt that if he or the bank
had been able to think of a credible reason for excluding repayments in the
event of the builder's insolvency, such a reason would have been at the
forefront of the bank's case.

45   In these circumstances I would, if necessary, go so far as to say that
the omission of the obligation to make such re-payments from the bonds
would flout common sense but it is not necessary to go so far. I agree with
the judge and Sir Simon Tuckey that, of the two arguable constructions of
paragraph 3 of the bonds, the buyers' construction is to be preferred because
it is consistent with the commercial purpose of the bonds in a way in which
the bank's construction is not.

46   I note that Thorpe LJ was initially inclined to agree with the
conclusions of the judge but, in the event, agreed with Patten LJ without
giving any independent reasons of his own.

### Conclusion

47   For these reasons I would allow the appeal and restore the order of
the judge.

> *Appeal allowed.*
> *Order of Court of Appeal set aside and*
>   *order of Simon J restored.*
> *Defendant to pay claimants' costs in*
>   *Supreme Court and Court of Appeal,*
>   *to be assessed if not agreed.*

SHIRANIKHA HERBERT, Barrister

TAB 19

*Re Shilena Hosiery Co Ltd* [1980] Ch 219

A   Further it was said that the five-year period after adjudication would give the official receiver ample time to conclude the administration of the estate in any probable view of the facts. All those of course are matters to be considered. I do not myself think that they give a balanced or complete view of the bankrupt's conduct and the history of his misfortunes. But I do not think it necessary for me to make any appreciation of them. The point is that they were all matters for the registrar to take into account, they were all evident from the questions and answers in the examination, and some of them were expressly brought before the registrar by Mr. Saffman on the debtor's behalf. It was for the registrar to weigh them up and come to his decision. He did so without, so far as I can see, having committed any of the faults against a proper exercise of judicial discretion which, as I have indicated, would alone justify the interference of the Divisional Court.

Accordingly, for my part, I would dismiss the appeal.

Fox J.  I agree. I do not wish to add anything.

Goulding J.  For myself, I will add to my judgment that we have heard no argument as to the correctness of joining the official receiver as a respondent to this appeal, and so far as I am concerned my judgment is not to be taken as expressing any view either for or against that practice.

Fox J.  I would agree with that view.

*Appeal dismissed.*

Solicitors: *Saffman & Co., Leeds; Treasury Solicitor.*

K. N. B.

---

## *In re* SHILENA HOSIERY CO. LTD.

1978 Nov. 6, 8, 9;                               Brightman J.
    Dec. 1

*Company—Winding up—Fraud—Agreement between company and second company to pay sum for cancellation of agency agreement between them—Agreement between company and third company to sell company's factory premises at alleged undervalue—Liquidator's proceedings by summons to avoid both agreements—Whether summonses properly brought in Companies Court—Companies (Winding-up) Rules 1949 (S.I. 1949, No. 330), r. 68—R.S.C., Ord. 5, r. 2—Law of Property Act 1925 (15 & 16 Geo. 5, c. 20), s. 172 (1)*

The managing director of a company, Shilena, and his wife, who had at one time been the secretary of the company, held all the shares in it, as they did in another company, Lindsey.

220

### In re Shilena Hosiery Co. Ltd.                    **[1980]**

Lindsey had been appointed by Shilena to be its sole agent for
marketing certain merchandise but, a fortnight before a credi-   A
tor's notice was served on it under section 223 of the Companies
Act 1948, Shilena agreed to pay Lindsey £88,000 for cancellation
of the agency agreement.  Ten days later, Shilena contracted
to sell its factory premises at an alleged undervalue to a
company, Larboard, with which the managing director of
Shilena was alleged to be associated.  An order to wind up
Shilena was made in the following month.  The liquidator   B
started proceedings under section 172 (1) of the Law of
Property Act 1925,[1] against Lindsey to avoid the agreement
whereby that company received £88,000 from Shilena and
against Larboard to avoid the contract of sale of the factory
premises.  He also brought proceedings against the managing
director and his wife for misfeasance and breach of trust in
procuring Shilena to enter into the agreement to cancel the
agency and the contract for the sale of the factory premises.   C
On the liquidator's application for declarations that the
summonses were properly brought in the Companies Court and
that the Companies Court had jurisdiction to make the
declarations and grant the relief sought: —

*Held,* granting the declarations sought, (1) that the Com-
panies Court, not being a separate and distinct court from the
High Court, and every judge of the High Court having
jurisdiction to grant relief under section 172 of the Law of   D
Property Act 1925, the Companies Court had jurisdiction under
section 172 notwithstanding the provisions of rule 68 of the
Companies (Winding-up) Rules 1949 and R.S.C., Ord. 5, r. 2
(post, p. 224A–E).

*In re Rolls Razor Ltd. (No.* 2) [1970] Ch. 576 applied.

(2) That the disputes having arisen in, and in consequence
of, the winding up and being such as it was necessary for   E
them to be decided before the winding up was completed, they
were disputes which might properly be decided by summons
and, being very like dispositions to prefer creditors, which
were the proper subjects of a summons in the liquidation,
there was no need to exercise the discretion of the court so as
to require the disputes to be settled outside the Companies
Court (post, pp. 226C–D, H—227B, E–F).

*In re F. & E. Stanton Ltd.* [1928] 1 K.B. 464, D.C., and   F
*In re Union Bank of Kingston-upon-Hull* (1880) 13 Ch.D. 808
applied.

*In re Centrifugal Butter Co. Ltd.* [1913] 1 Ch. 188
distinguished.

*Per curiam.*  If there were a possibility of third party
proceedings, there might be grounds for claiming that proceed-
ings under section 172 of the Law of Property Act 1925 should
be begun by writ (post, p. 227c).   G

The following cases are referred to in the judgment:

*Butters, Ex parte; In re Harrison* (1880) 14 Ch.D. 265, C.A.
*Centrifugal Butter Co. Ltd., In re* [1913] 1 Ch. 188.
*Deadman, decd., In re* [1971] 1 W.L.R. 426; [1971] 2 All E.R. 101.
*Rolls Razor Ltd., In re (No.* 2) [1970] Ch. 576; [1970] 2 W.L.R. 100;   H
    [1969] 3 All E.R. 1386.

[1] Law of Property Act 1925, s. 172 (1): see post, p. 223F.

A
*Singer (A.) and Co. (Hat Manufacturers), Ltd., In re* [1943] Ch. 121;
    [1943] 1 All E.R. 225, C.A.

*Stanton (F. & E.) Ltd., In re* [1928] 1 K.B. 464, D.C.

*Union Bank of Kingston-upon-Hull, In re* (1880) 13 Ch.D. 808.

*Vimbos Ltd., In re* [1900] 1 Ch. 470.


The following additional cases were cited in argument:

B
*Anderson, In re* (1870) L.R. 5 Ch.App. 473.

*Belmont Finance Corporation Ltd.* v. *Williams Furniture Ltd.* [1979]
    Ch. 250; [1978] 3 W.L.R. 712; [1979] 1 All E.R. 118, C.A.

*Cadogan* v. *Cadogan* [1977] 1 W.L.R. 1041; [1977] 1 All E.R. 200;
    [1977] 3 All E.R. 831, Slade J. and C.A.

*Crawford* v. *M'Culloch*, 1909 S.C. 1063.

*Eichholz, decd., In re* [1959] Ch. 708; [1959] 2 W.L.R. 200; [1959]
C
    1 All E.R. 166.

*Hutton (A Bankrupt), In re* [1969] 2 Ch. 201; [1969] 2 W.L.R. 661;
    [1969] 1 All E.R. 936.

*Hyams, In re; Ex parte Lindsay* (1923) 130 L.T. 237, C.A.

*Ilkley Hotel Co., In re* [1893] 1 Q.B. 248, D.C.

*Independent Automatic Sales Ltd.* v. *Knowles & Foster* [1962] 1 W.L.R.
    974; [1962] 3 All E.R. 27.
D
*Leslie (J.) Engineers Co. Ltd., In re* [1976] 1 W.L.R. 292; [1976] 2 All
    E.R. 85.

*Lloyd's Furniture Palace Ltd., In re* [1925] Ch. 853.

*Lloyds Bank Ltd.* v. *Marcan* [1973] 1 W.L.R. 339; [1973] 2 All E.R.
    359; [1973] 1 W.L.R. 1387; [1973] 3 All E.R. 754, C.A.

*Oakwell Collieries Co., In re* [1879] W.N. 65.

E
*Pollard, In re; Ex parte Dickin* (1878) 8 Ch.D. 377, C.A.

*Selangor United Rubber Estates Ltd.* v. *Cradock (No. 3)* [1968] 1 W.L.R.
    1555; [1968] 2 All E.R. 1073.

*United English and Scottish Assurance Co., Ex parte Hawkins* (1868) L.R.
    3 Ch.App. 787.

*Wool Textile Employers Mutual Insurance Co. Ltd., In re* [1955] 1 W.L.R.
    862; [1955] 2 All E.R. 827.

F
MOTIONS

A winding up order was made against Shilena Hosiery Co. Ltd.
(" Shilena ") on May 30, 1977. The liquidator issued a summons, dated
February 22, 1978, against Larboard Investments Ltd. (" Larboard ")
seeking a declaration that a contract dated April 15, 1977, for the sale of
Shilena's factory premises to Larboard was void as against the liquidator
G under section 172 of the Law of Property Act 1925. The liquidator
issued a second summons, dated June 22, 1978, against Lindsey Knitting
Mills Ltd. (" Lindsey ") seeking a declaration that an agreement of
February 18, 1977, between Shilena and Lindsey whereby Shilena
agreed to pay a sum for the cancellation of an agency agreement
between them made on November 1, 1976, was similarly void. He issued
H a third summons, dated June 19, 1978, against, amongst others, John
Frederick Arnold and Patricia Mary Arnold, respectively managing director
and, until February 1977, secretary of Shilena, claiming that those two
persons were guilty of misfeasance and breach of trust in procuring Shilena

In re Shilena Hosiery Co. Ltd.                                    [1980]

to enter into the agreement of February 18, 1977, and the contract of
April 15, 1977.                                                            A

The liquidator issued notices of motion in respect of the summonses
against Larboard and Lindsey, seeking declarations that the summonses
were properly brought in the Companies Court and that the Companies
Court had jurisdiction to make the declarations and grant the relief sought,
and that the summonses ought to be proceeded with in the Companies
Court.                                                                     B

The facts are set out in the judgment.


*Edward Evans-Lombe Q.C.* and *Simon Mortimore* for the liquidator.
*Leslie Kosmin* for Lindsey.
*Dennis Levy* for Larboard.

The main submissions of counsel are indicated in the judgment; those
in opposition to the application at pp. 223G—224A, G—225C).                C

                                                    *Cur. adv. vult.*


BRIGHTMAN J.    These two motions raise the question whether the
Companies Court has jurisdiction to hear, and ought to hear, by way of
summonses in the liquidation of Shilena Hosiery Co. Ltd., claims against
two other companies which are based on allegations of fraud: not fraud     D
in the strictest sense but within the meaning of section 172 of the Law of
Property Act 1925.

Shilena Hosiery Co. Ltd. (which I shall call "Shilena") was ordered
to be wound up on the petition of a creditor on May 30, 1977. Shilena
had been incorporated in November 1967. The managing director was
Mr. J. F. Arnold, who held 95,500 shares. His wife, who held the        E
remaining 1,000 shares, was the secretary until February 1977. A company
in similar ownership was Lindsey Knitting Mills Ltd. (which I shall call
"Lindsey"). It was incorporated in January 1971. Mrs. Arnold acquired
99 shares in Lindsey in May 1975; the remaining share was held by Mr.
Arnold.

There is also a Jersey company, Larboard Investments Ltd. Three        F
shares are held by each of Mr. Labesse, Mr. Morcombe and Mr. Dimsey.
It is alleged that this company (which I shall call "Larboard") is associated
with Mr. Arnold.

Shilena traded profitably until 1974. In 1975 it made a loss of £3,528.
According to the statement of affairs sworn by Mr. Arnold in the liquida-
tion of the company, it made a net trading loss of £145,000 over the 17
months period January 1, 1976, to May 30, 1977, the date of the winding up  G
order, and had a deficiency on the latter date of £52,000. However,
according to management accounts which Mr. Arnold caused to be prepared
by the company's auditors in September 1976, Shilena made a profit of
£133,500 during the first half of this period. The latter accounts are
highly suspect, to say the least.

By an agreement dated November 1, 1976, Shilena appointed Lindsey    H
to be its sole agent for marketing certain merchandise for a period of five
years and undertook to pay Lindsey certain commissions for its services.
I have not been shown a copy of this agreement. No objection has been

03635-jpm    Doc 306    Filed 06/06/17    Entered 06/06/17 11:28:43    Main Docun

223
Pg 630 of 1164
1 Ch.                    In re Shilena Hosiery Co. Ltd.                    Brightman J.

A  taken to my accepting the short description which is contained in the liquidator's report. On February 18, 1977, Shilena, whose only shareholders were Mr. and Mrs. Arnold, agreed to pay Lindsey, whose only shareholders, again, were Mr. and Mrs. Arnold, the sum of £88,000 for the cancellation of this agency contract. Again, I have not seen a copy of this agreement. On April 5, a creditor served on Shilena a notice under section 223 of the Companies Act 1948. Ten days later, on

B  April 15, Shilena contracted to sell its factory premises to Larboard for £50,000. In the management accounts of September 10, 1976, the factory premises had been shown as having a value of £127,000, and they had been placed on the market at a figure of about £200,000 or £250,000. A valuation obtained by the liquidator puts them as worth £75,000 at the date of sale.

C  In these circumstances it will come as no surprise that the liquidator has started proceedings against Lindsey to avoid the agreement under which it became the recipient of £88,000 from Shilena, and against Larboard to avoid the contract for the sale of the factory premises at an alleged undervalue, and against Mr. and Mrs. Arnold for misfeasance. These proceedings take the following form:

(1) A summons issued on June 22, 1978, by the liquidator against

D  Lindsey, seeking, among other things, a declaration that the agreement of February 18, 1977, was entered into by Shilena with intent to defeat and delay the creditors of Shilena, and is void as against the liquidator pursuant to section 172 of the Law of Property Act 1925.

(2) A summons issued on February 22, 1978, by the liquidator against Larboard for a declaration that the contract of April 15, 1977, for the

E  sale of the factory premises at £50,000 is similarly void.

(3) A misfeasance summons against Mr. and Mrs. Arnold issued on June 19, 1978, claiming that they were guilty of misfeasance and breach of trust in procuring Shilena to enter into the agreement of February 18, 1977, and the contract of April 15, 1977.

Section 172 (1) of the Law of Property Act 1925 enacts as follows:

F  "Save as provided in this section, every conveyance of property, made whether before or after the commencement of this Act, with intent to defraud creditors, shall be voidable, at the instance of any person thereby prejudiced."

Lindsey and Larboard each takes the preliminary point that the Companies Court has no jurisdiction to hear *on a summons* a claim for

G  relief under section 172 and says that such relief should be sought only in proceedings commenced by writ. Alternatively, they submit that if jurisdiction does exist, nevertheless the court in its discretion should decline to entertain such summons but should require the matter complained of to be the subject of proceedings commenced by writ. All parties wish these points to be decided before they incur the expense of preparing for trial. The

H  liquidator has therefore served two notices of motion, one against Lindsey and one against Larboard, asking for a declaration that the summons in question was properly brought in the Companies Court and that the Companies Court has jurisdiction to make the declarations and grant the

Brightman J.              In re Shilena Hosiery Co. Ltd.              **[1980]**

relief therein sought.  No objection is taken by Lindsey or Larboard to the adoption of this procedure for deciding the preliminary point.

    There are two questions involved: first, whether the court has jurisdiction on a summons in the liquidation to grant relief under section 172 of the Law of Property Act 1925; secondly, if such jurisdiction exists, whether the court should decline to entertain such summons in the Companies Court on the basis that it is more appropriate that the desired relief be sought in an action begun by writ.  I will first consider the question of jurisdiction.

    The Companies Court is not a court separate and distinct from the High Court, with its own peculiar jurisdiction.  The jurisdiction to wind up a company is conferred on the High Court, not the Companies Court (see section 218 (1) of the Companies Act 1948), nor is the Companies judge invested with a special jurisdiction not possessed by a High Court judge sitting elsewhere.  The Companies Court is a way of describing the High Court when dealing with matters originating in the chambers of the Bankruptcy Registrar dealing with company matters, and the Companies judge is a way of describing a High Court judge when trying such matters.  If authority is needed for this proposition it will be found in *In re Rolls Razor Ltd. (No.* 2) [1970] Ch. 576, 588 et seq.  Once it is accepted that the Companies Court is merely a description of the High Court when operating through the chambers of the Bankruptcy Registrar dealing with company matters, the question of jurisdiction is greatly narrowed because every judge of the High Court has jurisdiction to grant relief under section 172 of the Law of Property Act, whether he is or is not sitting as the Companies judge.  All that remains is a procedural question, namely whether relief under section 172 is capable of being granted in proceedings begun by a summons issued in the Companies Court as distinct from some other form of procedure.

    Rule 68 of the Companies (Winding-up) Rules 1949 provides expressly that an application under sections 188, 332, 333 or 448 of the Companies Act 1948 to a judge exercising jurisdiction to wind up companies shall be made by summons in the High Court and by motion in any court other than the High Court.  These sections deal with restraints on fraudulent directors, fraudulent trading, misfeasance, and directors' indemnity.  However, this list of the matters which are to be dealt with by summons in the Companies Court is not exhaustive of the matters that are capable of being so dealt with.  A summons under section 320 of the Companies Act 1948, dealing with fraudulent preferences, is a familiar proceeding in the Companies Court and no-one has ever suggested that it is improper.  The power of the liquidator to apply by summons in such a case arises under section 246 (3) of the Act read with rules 5 (3) and 8 (2) of the Companies (Winding-up) Rules 1949.

    Mr. Levy, for Larboard, submitted that there was no jurisdiction for me to hear, on a summons in the liquidation, an application for relief under section 172 for the following reasons.  First, he submitted that R.S.C., Ord. 5, r. 2 (*b*), provides to the contrary.  Ord. 5, r. 2, says, so far as relevant:

    " Subject to any provision of an Act, or of these rules, by virtue of which any proceedings are expressly required to be begun otherwise

**A**    than by writ, the following proceedings must . . . be begun by writ, that is to say, proceedings . . . (*b*) in which a claim made by the plaintiff is based on an allegation of fraud; . . ."

There is no provision to the contrary, he submitted, in the Companies Act 1948 or in any rules made thereunder or in the Rules of the Supreme Court. The position is different, he said, in the case of applications based on fraud which are expressly dealt with by the Companies Act 1948 or by the rules **B** thereunder, for example an application alleging misfeasance on the part of a director which rule 68 of the Companies (Winding-up) Rules 1949 permits to be made by summons.

Secondly, he submitted that the court has no jurisdiction on a summons in a liquidation to decide on the merits of an issue between the company and a stranger, unless the claim falls within the four corners of the **C** Companies Act 1948. A claim of fraudulent preference, for example, being a wrong created by the Companies Act 1948, can be litigated by summons notwithstanding that a stranger is involved.

As regards the first point, in my judgment the provisions of R.S.C., Ord. 5, r. 2, do not go to jurisdiction but only to procedure: see *In re Deadman, decd.* [1971] 1 W.L.R. 426. Secondly, if there is a claim **D** against a stranger which needs to be decided in order to complete the collection and distribution of the assets of the company, I find no warrant for the suggestion that it can only be litigated by summons in the Companies Court if it is based upon a section of the Companies Act 1948. It would, I think, be particularly arbitrary if a claim arising out of an attempt to defraud creditors by preferring one of their number can properly be litigated in the Companies Court but an alternative claim to set aside **E** the same transaction under section 172 of the Law of Property Act 1925 cannot be.

I reach the conclusion that the opposition to the motions, so far as based on lack of jurisdiction, fails.

I turn, therefore, to the other question: whether, as a matter of discretion, I ought to decline to hear the summonses.

**F**    There is no doubt that the Bankruptcy Court can properly deal with a claim under section 172 of the Law of Property Act 1925, although the claim can equally well be tried by the High Court: see *Ex parte Butters. In re Harrison* (1880) 14 Ch.D. 265, decided under section 72 of the Bankruptcy Act 1869, now section 105 of the Bankruptcy Act 1914; and the statute 13 Eliz. c. 5 (1571), now section 172 of the Law of Property Act 1925. That does not provide a complete answer to the question before me, **G** because section 105 of the Bankruptcy Act 1914 confers on every court having jurisdiction in bankruptcy power to decide all questions whatsoever which arise in the bankruptcy. There is no comparable section in the Companies Act 1948 or in the Companies (Winding-up) Rules 1949.

In *In re F. & E. Stanton Ltd.* [1928] 1 K.B. 464, the question arose as to the extent of the jurisdiction of the county court which had made a **H** winding up order. Section 131 (6) of the Companies (Consolidation) Act 1908, now section 218 (6) of the Act of 1948, provided that: " Every court in England having jurisdiction under this Act to wind up a company shall for the purposes of that jurisdiction have all the powers of the High

Court . . ." A winding up order was made by the Greenwich County
Court. The liquidator applied by motion to the county court for a        A
declaration that certain debentures were void under what is now section
322 of the Companies Act 1948 because they were created shortly before
the liquidation or, alternatively, were void as a fraudulent preference under
what is now section 320 of that Act. There was an appeal alleging that
the county court had no jurisdiction, or, alternatively, that it ought not to
exercise jurisdiction. The appeal failed. Salter J. in the Divisional Court   B
said, at p. 471:

> ". . . the inferior court is clothed with all necessary powers of the
> High Court to wind up a particular company, which are necessary for
> the purpose of winding up that company. Those would be powers to
> decide matters of administration and disputes arising in and in
> consequence of the winding up, which have arisen because the company   C
> is being wound up and must be decided before the winding up is
> completed."

The disputes with Lindsey and Larboard in the present case, in my
judgment, satisfy that test. They would therefore be proper to be decided
in the county court by motion in the liquidation if the winding up order had
been made in the county court. By parity of reasoning, the winding up   D
order having been made in the High Court, such disputes are proper to be
decided in the High Court by summons in the liquidation. See also *In re
Union Bank of Kingston-upon-Hull* (1880) 13 Ch.D. 808, in relation to a
voluntary liquidation, where Jessel M.R. said, at pp. 809–810:

> "In a voluntary winding up a liquidator may apply to the court to
> decide any question fairly arising in the winding up, and it is much   E
> cheaper to bring it before me by way of motion than by an action."

In *In re Centrifugal Butter Co. Ltd.* [1913] 1 Ch. 188, a voluntary
liquidator took out a summons in the liquidation asking that a sale agree-
ment and an allotment of shares pursuant thereto might be set aside and
cancelled, in effect, for failure of consideration. In a brief judgment,
Neville J. expressed a doubt whether he had jurisdiction, and in any event   F
was clearly of the opinion that he ought not to exercise it because he
would be setting aside a contract between the company and third parties.
But that was a case in which the dispute did not arise in consequence of
the liquidation but existed quite independently of the liquidation. An
earlier case of *In re Vimbos Ltd.* [1900] 1 Ch. 470 is to the like effect,
although I would myself prefer to base the conclusion on discretion rather
than on jurisdiction.                                                        G

A claim that a conveyance of property by a company was made with
intent to defraud creditors is to my mind certainly a dispute which arises in
and in consequence of the winding up of that company. In the terms of
section 172 of the Law of Property Act 1925, relief is available at the
instance of any person thereby prejudiced, but it is difficult to imagine
circumstances in which such a claim could be made in the case of a   H
company which was, and remained, solvent. A disposition with intent to
defraud creditors bears a strong family likeness to a disposition with a view
to preferring a creditor. The latter is admitted to be the proper subject

A    matter of a summons in the liquidation of the company.  I see no valid
reason for exercising my discretion in such a way as to require an allegation
of fraudulent conveyance to be litigated outside the Companies Court if
an allegation of fraudulent preference is commonly litigated within it.  Nor
do I see that convenience would be served if in the instant case the
fraudulent conveyance claims were to be prosecuted outside the Companies
Court while the misfeasance claims arising from the same transactions were
B    to be prosecuted within it.  No procedural difficulties would arise in relation
to pleadings or discovery.

I have only one reservation.  Third party proceedings are not normally
available in the Companies Court: see *In re Singer and Co. (Hat
Manufacturers), Ltd.* [1943] Ch. 121.  Section 321 of the Companies Act
1948 has introduced an exception in the case of fraudulent preference.
C    There is no evidence before me of the likelihood or even of the possibility
of third party proceedings in the instant case.  If there were a possibility of
third party proceedings, there might be grounds for claiming that pro-
ceedings under section 172 of the Law of Property Act 1925 should be
begun by writ.  The point does not, however, arise in this case on the
evidence before me.

Some play has been made with section 258 of the Companies Act 1948.
D    In my view this section has no relevance to the points that I am considering.
Apart from the fact that the section is only available against the six
specified categories of person indicated in the section, into none of which
Lindsey or Larboard seems to fall, this is not a section which deals with
the determination of disputed claims.  It is concerned, as I read the section,
only with the delivery up to the liquidator of property to which the
company has a prima facie title.  An order under that section would not be
E    a final order determining title.  None of the reported cases under that
section is material.

In the result I shall make the declarations which are sought on each of
the motions.  So far as the exercise of my discretion is concerned, my
decision is based solely on the fact that the section 172 claims arise in
consequence of the winding up.  The decision will not, therefore, affect any
F    existing practice of the Companies Court in relation to a claim against a
stranger of which it cannot be said that it arises in consequence of the
winding up.  Other considerations apply to such a dispute and a different
conclusion may follow.

*Declarations accordingly.*

G    Solicitors: *Gregory, Rowcliffe & Co.* for Denham, Foxon & Watchorn,
Leicester; *Parker, Garrett & Co.; Raymond Tooth & Co.*

[Reported by IAN SLACK, ESQ., Barrister-at-Law]

H

TAB 20

*Re Sonatacus Ltd* [2007] 2 BCLC 627

*a*

# Re Sonatacus Ltd

# CI Ltd v Barber and another

*b*
[2007] EWCA Civ 31

COURT OF APPEAL, CIVIL DIVISION
SMITH AND HOOPER LJJ AND SIR MARTIN NOURSE
*c*
19 DECEMBER 2006, 25 JANUARY 2007

*Winding up – Preference – Liability of person receiving benefit from company – Company making payment of £50,000 to appellant to repay loan made to sole director – Company insolvent at time or becoming*
*d* *insolvent as result of payment – Whether company giving preference to director – Whether appellant receiving benefit from preference given by company to director – Whether appellant entitled to rely on defence of good faith – Insolvency Act 1986, ss 239, 241(1)(d), (2).*

By a loan agreement dated 18 September 2000 the appellant agreed to lend
*e* S the sum of £65,000 to be repaid by 18 February 2001. At S's request the loan was paid direct to a company of which he was the sole director. On 29 January 2001, some three weeks before the loan was repayable, the company, at the direction of S, paid £50,000 into the appellant's bank account. The company was insolvent at the time or became insolvent as
*f* result of the payment. It ceased trading on 2 March 2001 and was placed in creditors' voluntary liquidation on 29 March 2001 with an estimated deficiency of about £40,000. The joint liquidators applied to the county court for declarations that the payment of £50,000 by the company to the appellant on 29 January 2001 constituted either a preference or a transaction at an undervalue which was void or voidable under either
*g* ss 239 or 238 and s 240 of the Insolvency Act 1986. The district judge held that the payment was a transaction at an undervalue, but not a preference, and ordered the appellant to pay the joint liquidators £50,000 plus interest of £15,300. The appellant appealed to the High Court where the judge upheld the district judge's decision that the payment was a transaction at an undervalue and dismissed the appeal without deciding whether the payment
*h* also constituted a preference. The appellant appealed to the Court of Appeal.

**Held** – Since S became a debtor to the appellant for the amount of £65,000 when that amount was paid by the appellant to the company and the company in turn became a debtor to S for that amount, and since both
*i* debts were discharged when and to the extent that the company made the payment of £50,000 to the appellant, it followed that by making the payment the company gave a voidable preference to S within s 239 of the 1986 Act to the extent that the payment discharged its debt to S. Moreover, since the appellant was a person who received a benefit from the preference

given by the company to S it was liable to pay the amount of that benefit *a* (ie £50,000) to the liquidators under s 241(1)(d) of the 1986 Act unless it was able to rely on the defence provided by s 241(2) by showing that it received a benefit from the transaction or preference 'in good faith'. Both from the language and structure of s 241(1) and (2) and as a matter of common sense, the onus of showing good faith rested on the appellant and since it had failed to show that it acted in good faith, the court, without *b* deciding the issue of whether the transaction was at an undervalue, would make a declaration that the payment of £50,000 made by the company to the appellant on 29 January 2001 constituted a preference given by the company to the appellant within ss 239 to 241 of the 1986 Act. The appeal would accordingly be dismissed. (See [17], [23]–[24], [28]–[30], [32]–[33], *c* [35], below.)

**Case referred to in judgment**

*Phillips v Brewin Dolphin Bell Lawrie Ltd* [2001] UKHL 2, [2001] 1 All ER 673, [2001] 1 WLR 143, HL.

*d*

**Appeal**

CI Ltd appealed from the decision of Judge Hodge QC, sitting as a judge of the Chancery Division in Manchester on 8 June 2006, dismissing CI Ltd's appeal from the decision of District Judge Needham on 29 November 2005 ordering CI Ltd to pay the respondents, Nola Barber and Neil Henry, the joint liquidators of Sonatacus Ltd, the sum of £50,000 plus interest of *e* £15,300. The facts are set out in the judgment of Sir Martin Nourse.

*Mark Cooper* (instructed by *Jolliffe & Co,* Chester) for the appellant.
*Jeremy Cousins QC* and *Justin Kitson* (instructed by *Andrew Jay & Co,* Gainsborough) for the respondents.

*f*

*Cur adv vult*

25 January 2007. The following judgments were delivered.

**SIR MARTIN NOURSE** (giving the first judgment at the invitation of *g* Smith LJ).

[1] This appeal raises questions under Part VI of the Insolvency Act 1986 (miscellaneous provisions applying to companies which are insolvent or in liquidation), ss 238 (transactions at an undervalue) and 239 (preferences).

[2] The material facts can be taken from the judgment in the court below of Judge Hodge QC, sitting as a judge of the Chancery Division in *h* Manchester. They can be stated mainly in his own words, though it is now unnecessary to state them as fully as he did.

[3] Sonatacus Ltd (the company) was incorporated on 19 November 1997 under the Companies Act 1985 as a company limited by shares. It began trading shortly thereafter, its principal activity being the sale and distribution of mobile telephones and accessories. The sole director of the *i* company was Paul Santo Susca.

[4] Mr Susca was a friend, though not a close one, of Rahail Aslam, who was a director and the effective controller of the appellant, CI Ltd (CIL). By a deed described as a loan agreement dated 18 September 2000 and

*a* expressed to be made between Mr Susca (both as borrower and surety) and CIL (as lender), it was provided that, in consideration of the sum of £65,000 lent to Mr Susca by CIL, Mr Susca covenanted with CIL to repay the said sum to it on written demand, together with interest, Mr Susca and CIL agreeing that 'the loan to be the subject of a fixed term arrangement the full amount together with all costs interest and charges to be paid by

*b* 18 February 2001'. At that time, CIL had insufficient funds to advance the sum of £65,000 to Mr Susca directly. It therefore procured an associated company, Proweb Ltd, to advance the funds on its behalf. The judge said that he need say no more about the involvement of Proweb Ltd, since it was merely a source of funds to enable CIL to advance moneys to Mr Susca.

*c* [5] At Mr Susca's request the sum of £65,000 was paid direct to the company by Proweb. However, as the judge observed, the obligation to repay that sum remained, pursuant to the written loan agreement, an obligation of Mr Susca personally. He said that there was no evidence as to what happened to the £65,000 after it had been received by the company, but that the moneys had been advanced to the company in a commercial

*d* transaction which, in cross-examination, Mr Henry (see below) had agreed had led to an obligation upon the company to repay them to Mr Susca.

[6] On 29 January 2001 (some three weeks before the fixed term expired), a sum of £50,000 was paid into CIL's bank account by way of a CHAPS transfer made by the company at the direction of Mr Susca. It was accepted before Judge Hodge that the company was insolvent at that time, or that it

*e* became insolvent as a result of that transfer. It is unnecessary to deal with the fate of the remaining £15,000.

[7] On 2 March 2001 the company ceased trading, and a formal resolution was passed placing it into creditors' voluntary liquidation on 29 March 2001. On the same day joint liquidators of the company were appointed and Mr Susca swore an estimated statement of affairs indicating

*f* that the company had assets estimated to realise £20,140, preferential creditors totalling £7,474 and non-preferential creditors totalling £54,318.77.

[8] On 11 March 2005, after a delay of nearly four years, for reasons, which, as the judge observed, had not been explained in evidence, the joint liquidators issued an application against CIL in the Manchester County

*g* Court (the first application) pursuant to ss 239 and 240 of the 1986 Act claiming a declaration that the payment of £50,000 made by the company to CIL on 29 January 2001 constituted a preference and was void or voidable accordingly. The application was supported by a witness statement of Neil Henry, one of the joint liquidators, dated 9 March 2005, in which it

*h* was alleged that, on or about 20 September 2000, the company had received a loan from CIL in the sum of £65,000 thus making CIL a creditor of the company. Mr Henry went on to allege that, in receiving the repayment of £50,000 on 29 January 2001, CIL had been treated preferentially as compared to other non-secured creditors of the company. Evidence in answer to the first application was put in by Mr Aslam in the

*i* form of an undated witness statement, which it is agreed was made before 25 July 2005. It will be necessary to refer to Mr Aslam's statement in greater detail in due course. At present it is only necessary to say that his evidence was to the effect that the loan of £65,000 had been made to

Mr Susca personally, and that CIL was therefore a creditor of his and not of *a* the company.

[**9**] As the judge said, Mr Aslam's witness statement provoked the issue of a further (in substance an alternative) application by the joint liquidators in the county court on 25 July 2005 (the second application), claiming a declaration that the payment of £50,000 made by the company to CIL on 29 January 2001 constituted a transaction at an undervalue pursuant to the *b* provisions of ss 238 and 240 of the 1986 Act and was void or voidable accordingly. The second application was supported by a witness statement of Timothy James Foreman, an assistant solicitor in the employment of the solicitors acting for the joint liquidators, in which he claimed that CIL provided no consideration to the company for receiving the payment of *c* £50,000. In answer to the second application, Mr Aslam put in a further witness statement dated 13 November 2005, in which he contended that the allegation that the company had received no consideration for the payment of the £50,000 was fallacious.

[**10**] On 29 November 2005 the proceedings having been transferred to the Chancery Division, both applications came before District Judge *d* Needham, who dismissed the first and acceded to the second by making a declaration that the payment of £50,000 made by the company to CIL on or about 29 January 2001 constituted a transaction at an undervalue pursuant to the provisions of ss 238 and 240 of the 1986 Act. Since that declaration was made on a ground that the joint liquidators have not relied on, it is unnecessary to examine the district judge's reasoning. He made an *e* order for payment by CIL to the joint liquidators of £50,000 plus interest of £15,300.

[**11**] CIL appealed to the judge against the declaration and order made by the district judge. The appeal came before Judge Hodge on 8 June 2006. At the outset of the hearing, he gave the joint liquidators permission to put in a late respondents' notice relying on the preference claim that had been *f* dismissed by the district judge. However, he refused an application by the joint liquidators to adduce fresh evidence at that stage. After hearing argument on the substantive appeal, the judge dismissed it, affirming the district judge's decision on the transaction at an undervalue, though for different reasons. That made it unnecessary for him to consider the preference claim under the respondents' notice, and he did not do so. *g*

[**12**] On 25 July 2006 Jonathan Parker LJ gave CIL permission to bring a second appeal to this court. Again, the joint liquidators have put in a late respondents' notice (for which we have given permission) seeking, in the alternative, a declaration in relation to the preference claim.

[**13**] So far as material, s 238 of the 1986 Act provides: *h*

'(1) This section applies in the case of a company where—(a) the company enters administration, or (b) the company goes into liquidation; and "the office-holder" means the administrator or the liquidator, as the case may be.

(2) Where the company has at a relevant time (defined in section 240) *i* entered into a transaction with any person at an undervalue, the office-holder may apply to the court for an order under this section.

*a*      (3) Subject as follows, the court shall, on such an application, make
      such order as it thinks fit for restoring the position to what it would
      have been if the company had not entered into that transaction.
         (4) For the purposes of this section and section 241, a company enters
      into a transaction with a person at an undervalue if—(a) the company
      makes a gift to that person or otherwise enters into a transaction with
*b*      that person on terms that provide for the company to receive no
      consideration, or (b) the company enters into a transaction with that
      person for a consideration the value of which, in money or money's
      worth is significantly less than the value, in money or money's worth of
      the consideration provided by the company …'

*c*
      [**14**] So far as material, s 239 of the 1986 Act provides:

         '(1) This section applies as does section 238.
         (2) Where the company has at a relevant time (defined in the next
      section) given a preference to any person, the office-holder may apply to
      the court for an order under this section.
*d*      (3) Subject as follows, the court shall, on such an application make
      such order as it thinks fit for restoring the position to what it would
      have been if the company had not given that preference.
         (4) For the purposes of this section and section 241, a company gives
      a preference to a person if—(a) that person is one of the company's
      creditors or a surety or a guarantor for any of the company's debts or
*e*      other liabilities, and (b) the company does anything or suffers anything
      to be done which (in either case) has the effect of putting that person
      into a position which, in the event of the company going into insolvent
      liquidation, will be better than the position he would have been in if
      that thing had not been done …'

*f*
      [**15**] Section 240 of the 1986 Act makes provision for the 'relevant time'
under ss 238 and 239. Since it is agreed that the provisions of s 240 are
satisfied in the present case, it is unnecessary to rehearse them.
      [**16**] So far as material, s 241 of the 1986 Act, headed 'Orders under
ss 238, 239', provides:
*g*
         '(1) Without prejudice to the generality of sections 238(3) and 239(3),
      an order under either of those sections with respect to a transaction or
      preference entered into or given by a company may (subject to the next
      sub-section) … (d) require any person to pay, in respect of benefits
      received by him from the company, such sums to the office-holder as the
*h*      court may direct …
         (2) An order under section 238 or 239 may affect the property of, or
      impose any obligation on, any person whether or not he is the person
      with whom the company in question entered into the transaction or (as
      the case may be) the person to whom the preference was given; but such
      an order—(a) shall not prejudice any interest in property which was
*i*      acquired from a person other than the company and was acquired in
      good faith and for value, or prejudice any interest deriving from such an
      interest, and (b) shall not require a person who received a benefit from
      the transaction or preference in good faith and full value to pay a sum
      to the officer-holder, except where that person was a party to the

transaction or the payment is to be in respect of a preference given to *a*
that person at a time when he was a creditor of the company …'

[**17**] In order to understand how these provisions apply to the present
case, it is necessary to make a close analysis of the relationships between the
parties and the effect of the payments that were made. About the following *b*
propositions there can be no doubt:

(1) On the payment of the £65,000 by CIL to the company Mr Susca
became a debtor to CIL for that amount and the Company became a debtor
to Mr Susca for that amount. (2) On the payment of the £50,000 by the
company to CIL the debts of the company to Mr Susca and of Mr Susca to
CIL were, to that extent, respectively discharged. (3) Insofar as the payment *c*
of the £50,000 discharged the debt of the company to Mr Susca, the
company gave a preference to Mr Susca within s 239. It not having been
suggested on behalf of the joint liquidators that the payment was for some
reason void, it must be treated as being voidable by them.

[**18**] These propositions were the basis of Judge Hodge's decision on the
question of a transaction at an undervalue. Having stated (para [29]) that *d*
the only consideration on which CIL could rely to defeat the suggestion of
undervalue was the preferential payment to Mr Susca, he accepted the
submission of Mr Cousins QC, for the joint liquidators, relying on the
speech of Lord Scott of Foscote in *Phillips v Brewin Dolphin Bell
Lawrie Ltd* [2001] UKHL 2, [2001] 1 All ER 673 at paras [26]–[27],
[2001] 1 WLR 143 at 153, that, as a matter of law, a preferential payment *e*
which is inevitably susceptible to challenge cannot amount to consideration
for the making of that very payment. The judge stated his conclusion as
follows:

> '[33] … I am satisfied on the evidence that, as between Sonatacus and
> Mr Susca, this was a payment which fell within … s 239. In those *f*
> circumstances it does seem to me that that payment cannot properly be
> treated as constituting valuable consideration for the purpose of taking
> the payment made by Sonatacus to CI Ltd outside the scope of s 238 …
>
> [34] In my judgment, the principle underlying what Lord Scott said is
> equally applicable here. The consideration was always precarious in
> nature. It does seem to me that it would fly in the face of the legislative *g*
> purpose underlying ss 238 and 239 for a court to uphold a payment
> made in these circumstances.'

[**19**] On the basis of the arguments presented to the judge his reliance on *h*
the principle underlying what Lord Scott said in the *Brewin Dolphin* case
and his decision to affirm the district judge's decision on the transaction at
an undervalue on that ground appear to have been correct. However, a five
page case report published on 1 October 2006 in *Tolley's Insolvency Law
and Practice* (2006) 22 IL & P 183 was highly critical of the judge's
decision, concluding as follows: *i*

> 'For the reasons given above, it is submitted that the court in the
> present case committed a logical fallacy in holding that a payment
> susceptible to challenge as a preference can also therefore be challenged
> as a transaction at an undervalue. Moreover, the court misunderstood

*a*     the distinct functions performed by ss 238 and 239, thus undermining
the statutory defence of bona fide purchase in s 241(2).'

[20] In a supplementary skeleton argument dated 14 December 2006
Mr Cooper, who has appeared for CIL here and in both courts below,
*b*   invited us to read the case note in support of CIL's arguments on the appeal.
Apart from a quotation of the conclusion, no guidance was given as to the
nature and extent of the support which was said to be derived from the case
note. In opening CIL's appeal on 19 December, Mr Cooper made it clear
that he did not adopt the whole of the reasoning of the authors of the case
note, but it remained unclear to us what he did or did not adopt.
*c*   Accordingly, we directed him to put in a further supplementary skeleton
argument in order to clarify CIL's case.

[21] The oral argument was concluded on 19 December, when judgment
was reserved. On 20 December Mr Cooper put in his further supplementary
skeleton argument, from which the following summary of his submissions
may be taken:
*d*

     'The correct analysis in the present circumstances is, it is submitted,
as follows. Sonatacus gave consideration of £50,000 and received the
consideration of the pro tanto discharge or release of a debt due to
Mr Susca. There is no further analysis necessary to show that there was
no transaction at undervalue as at the date the payment was made. The
*e*     value of the consideration given by Sonatacus was identical to the value
of the consideration received by Sonatacus at the time the payment was
made. There was an equal exchange of values by Sonatacus receiving
the same value as it gave.'

*f*   [22] The position in regard to the transaction at an undervalue is not at
all satisfactory. The reasoning of the authors of the case note as adopted by
Mr Cooper, though it may possibly be specious, cannot simply be rejected.
Nor could their reasoning be accepted without Mr Cousins having been
accorded a proper opportunity for giving it a considered response. Had it
not been for the views hereafter expressed on the preference claim, it would
*g*   have been necessary for the matter to be adjourned for further written
submissions and perhaps for further oral argument.

[23] Although the preference claim has largely gone unnoticed, it is worth
remembering that it was that claim that was first made by the joint
liquidators. That is hardly surprising. The payment of £50,000 having been
made by an insolvent company, it would be natural to assume that it was
*h*   the actual payee which had been given the preference. However, once it is
established that it was not CIL that was the creditor of the company, the
joint liquidators must rely on s 241(1)(d), subject to the defence provided
by s 241(2), which, so far as it applies to the present case, provides:

*i*     'An order under section … 239 may affect the property of, or impose
any obligation on, any person whether or not he is … the person to
whom the preference was given; but such an order—(a) shall not
prejudice any interest in property which was acquired from a person
other than the company and was acquired in good faith and for value,
or prejudice any interest arising from such an interest, and (b) shall not

require a person who receives a benefit from the transaction or    *a*
preference in good faith and full value to pay a sum to the office-holder
…'

[**24**] There can be no doubt that CIL was a person which received a
benefit from the preference given by the company to Mr Susca. So, quite    *b*
apart from the question of value, if CIL is to retain the £50,000, it must be
shown that it received that sum 'in good faith'. Moreover, it is to my mind
obvious, both from the language and structure of s 241(1) and (2) and as a
matter of common sense, that the onus of showing good faith rests on CIL.

[**25**] The district judge dismissed the first application on the simple
ground that CIL was not a creditor of the company. He did not have to    *c*
decide any question of good faith. Nor did Judge Hodge, who, having held
that there had been a transaction at an undervalue, expressly stated
(para [37]) that he did not need to enter into questions of good faith.
Nevertheless, CIL's good faith is potentially an issue in each of the courts
below, and it is clear from Mr Aslam's first witness statement, which was
prepared under professional advice, that the point was well in mind.    *d*

[**26**] The material passages in Mr Aslam's first witness statement are the
following:

'2 … I have had a personal relationship with [Mr Susca] since 1995
though this ceased to be the case in or around mid 2001 … .

3. At some time prior to 18 September 2000 Mr Susca approached    *e*
me to ask for a loan. He wanted to borrow £65,000 to fund an
expansion of his business interests. In and around September 2000
Mr Susca's companies were in some financial difficulty. He had
consistently told me this was due to cash flow problems and the fact
that this was so is demonstrated by the often erratic and late payment
of rent to [CIL by an associated company of the company which was a    *f*
tenant of CIL] … Though Mr Susca did not ask me I would not have
lent money direct to the Company even if he had made such an enquiry.
I was only prepared for [CIL] to lend the money to Mr Susca
personally …

6. Mr Susca had asked me to pay the loan money into the company's
bank account. He said that this would be more convenient for him … .    *g*

7. Mr Susca repaid the money to [CIL] in part on 29 January 2001.
£50,000 was received in [CIL's] bank account by CHAPS on that date.
I did not know until my accountant examined my bank statement in
about March of 2001 that the money had been transferred out of the
company's bank account … I had no control over how Mr Susca chose    *h*
to repay [CIL], and it did not seem unusual to me that Mr Susca had
chosen to repay some of the loan in this way when he had initially
asked me to pay loan money due to him into the Company's bank
account. Any arrangement that there might have been between
Mr Susca and the company was a matter for him. …

11. [CIL] never became a creditor of the company. [CIL] was    *i*
Mr Susca's creditor and he has repaid the loan made to him to [CIL's]
satisfaction. When it came for Mr Susca to repay the money as agreed,
I was not concerned about the source of the money but I accepted it as
payment from Mr Susca and I had no reason to question it.

*a*      12. That the company became involved, as a third party receiving and
making payments for Mr Susca, was Mr Susca's choice …'

[27] The good faith issue having been decided in neither court below, it
would have been a possible course for us to remit it to the district judge to
*b*  be decided by him. However, Mr Cousins submitted that this court was in
just as good a position to make the decision on the basis of Mr Aslam's first
witness statement, which is the only evidence bearing on the point.
Mr Cooper accepted that the onus was on CIL to show good faith. On that
footing, I am of the opinion that we can and should decide the issue of good
faith ourselves.

*c*  [28] In my judgment Mr Aslam's first witness statement falls short of
establishing that CIL received the £50,000 in good faith. The evidence is
that, in and around September 2000, Mr Aslam knew that Mr Susca's
companies were in some financial difficulty; that he would not have lent
money direct to the company even if Mr Susca had asked him to do so; and
that Mr Susca asked him to pay the £65,000 into the company's bank
*d*  account because that would be more convenient for Mr Susca. That was the
position on 18 September 2000 when the loan agreement was entered into.

[29] On 29 January 2001, barely four and a half months later, £50,000
was received in CIL's bank account by a CHAPS payment made on that
date. Mr Aslam says that he did not know until his accountant examined
CIL's bank statement in about March 2001 that the money had been
*e*  transferred out of the company's bank account. But he does not say that he
did not know that the £50,000 had been repaid on 29 January. The clear
implication is that he did. With his previous knowledge that the £65,000
had been paid into the company's bank account and that Mr Susca's
companies had been in some financial difficulty, he must have known that it
*f*  was likely that the £50,000 had been repaid by the company and, moreover,
at a time when it was insolvent, or he must at the least have shut his eyes to
that possibility. On either footing Mr Aslam has failed to establish that CIL
acted in good faith.

[30] For these reasons I would substitute for the declaration made by the
district judge a declaration that the payment of £50,000 made by the
*g*  company to CIL on or about 29 January 2001 constituted a preference
given by the company to CIL within ss 239 to 241 of the 1986 Act. I would
affirm the district judge's order for payment or make such other order for
payment as may be appropriate. I would dismiss the appeal accordingly.

[31] Had the appeal been allowed, it would have been necessary for us to
rule on an application by the joint liquidators for an order that there be a
*h*  re-trial before Judge Hodge, on the ground that there was new and
compelling evidence that CIL had forged the loan agreement dated
18 September 2000, had given untruthful evidence and had committed a
fraud on the court. It was that evidence that was the subject of the
application made by the joint liquidators at the outset of the hearing before
*i*  Judge Hodge (see para [11] above), which he, correctly as it seems to me,
dismissed at that stage. In the event it is unnecessary for us to consider that
application and we have not done so.

**HOOPER LJ.**

[**32**] I have read both judgments in draft and agree with them.

**SMITH LJ.**

[**33**] I agree with the judgment of Sir Martin Nourse and add only a few words of my own to explain further why I was unwilling simply to uphold the judge's decision that the payment of £50,000 by the company to CIL must be set aside as a payment at undervalue.

[**34**] Much of the argument during the hearing related to the question of whether the authors of the article in *Tolley's Insolvency Law and Practice* were correct in their criticism of the judge's decision. Although Mr Cooper did not fully embrace the argument advanced in the article, I found it at least theoretically persuasive. I think that the judge might have been wrong to hold that the payment of £50,000 by the company to CIL was a transaction at undervalue because the consideration given by CIL (namely a partial discharge of Mr Susca's debt) was precarious in that it was liable to be set aside as a preferential payment. The argument advanced in the article was that the very fact that the consideration (discharge) was voidable meant that the payment itself was also voidable and therefore recoverable. The reduction in value to the company of the discharge (due to its precariousness) was precisely counterbalanced by the reduction in value of the payment made by the company (due its recoverability). Therefore the transaction was financially neutral. I see the theoretical logic of that argument. However, it seems to me that, in practice, the reduction in value of the discharge due to the chance that it would be set aside is not necessarily precisely counterbalanced by the chances of recovery of the money payment. The chances might be different. Although as a matter of law, the money would be recoverable if the preferential transaction were set aside, in practice it might not be; it might have disappeared. If CIL were of doubtful solvency, the transaction might not be financially neutral.

[**35**] Accordingly, it seems to me that the basis of the judge's finding was, if not actually wrong, somewhat uncertain. I do not imply any criticism of the judge. The argument discussed in *Tolley* was not raised before him. Indeed, it is possible that the judge was right. However, in my judgment, what happened in this case was obviously a preferential transaction and I agree with Sir Martin Nourse that it should be dealt with as such. If that is done the burden of showing that it received the £50,000 in good faith rests upon CIL. I also agree, for the reasons given by Sir Martin Nourse, that CIL failed to discharge that burden. I agree with the proposed disposal that he makes in para [30] of the judgment.

*Appeal dismissed.*

Dilys Tausz   Barrister.

TAB 21

*Re T&N Ltd* [2006] 1 WLR 1728

[2006] 1 WLR

A

B

C

Chancery Division

## *In re* T & N Ltd and others

### [2005] EWHC 2870 (Ch)

D

2005  Oct 11, 12, 13, 14, 25, 26;                                    David Richards J
       Dec 14

*Company — Scheme of arrangement — Creditor — Asbestos-related tort claims*  E
   *brought against companies — Companies in administration — Settlement*
   *agreement proposing schemes of arrangement and company voluntary*
   *arrangements — Whether potential future tort claimants "creditors" for purposes*
   *of schemes of arrangement or company voluntary arrangements — Companies*
   *Act 1985 (c 6), s 425 — Insolvency Act 1986 (c 45), Pt I*
*Insolvency — Winding up — Proof in liquidation — Potential future tort claims*
   *against companies — Whether claims provable as debts in liquidation —*
   *Whether potential claims "possessions" — Whether exclusion of claims from*  F
   *liquidation infringing right to enjoyment of possessions — Human Rights Act*
   *1998 (c 42), Sch 1, Pt I, art 14, Pt II, art 1 — Insolvency Rules 1986 (SI*
   *1986/1925), rr 12.3(1), 13.12*

The company and other English and American companies in the same group were
involved in the mining of asbestos and the manufacture and distribution of asbestos
products.  The number of claims for damages for personal injuries made against the  G
companies by employees and others who had been exposed to asbestos dust grew to
such a level that a decision was made that the affected companies should seek the
protection of insolvency proceedings.  Accordingly, administration orders were made
in England in respect of the English companies affected, while the American ones filed
for protection under Chapter 11 of the United States Bankruptcy Code.  It was agreed
that, if possible, a means should be found of avoiding liquidation.  A number of
parties entered into a settlement agreement, which proposed schemes of arrangement  H
or company voluntary arrangements ("CVAs").  A central feature of the proposals
was that not only persons who had already made or were entitled to make asbestos-
related claims but also all potential future claimants should be bound by the schemes
or CVAs.  The administrators applied for declarations as to: (i) whether a claimant in
respect of a future asbestos claim against a United Kingdom debtor could be a

1729
**[2006] 1 WLR**                                                       In re T & N Ltd (Ch D)

A  "creditor" of the UK debtor and therefore a party to and bound by either a scheme of
arrangement sanctioned by the court under section 425 of the Companies Act 1985[1]
or a CVA approved by the court under Part I of the Insolvency Act 1986[2]; (ii) whether,
if the companies were to be wound up, a future asbestos claimant (defined as
someone either without an accrued cause of action as at the liquidation date, or with
an accrued cause of action which accrued after the liquidation date) would have an
admissible claim for the purposes of proof in a winding up pursuant to rules 12.3(1)

B  and 13.12 of the Insolvency Rules 1986[3]; and (iii) whether a construction of the 1986
Rules which prevented such future claimants from proving in a liquidation was a
violation of article 1 of the First Protocol to the Convention for the Protection of
Human Rights and Fundamental Freedoms, as scheduled to the Human Rights Act
1998[4], either taken on its own or in conjunction with article 14 of the Convention.
    On the application—
    *Held*, (1) that "creditors" in section 425 of the 1985 Act was not limited to

C  persons who had a provable debt in the winding up of a company; that there was no
clear requirement that "creditors" for the purposes of a CVA under Part I of the 1986
Act was restricted to persons with provable debts either, and the term should
therefore be given as wide a meaning as in section 425 of the 1985 Act; that the
holder of a contingent claim was a "creditor" for the purposes of both schemes of
arrangement and CVAs; that, having regard to the nature of contingent liabilities, it
was right to say that the companies were subject to a contingent liability to pay

D  damages to those who had been carelessly exposed to asbestos and who would later
suffer compensatable loss; that although the source of the liability was the common
law of negligence, rather than a statute or contract claim, it would still be a liability
arising by operation of law; that the companies had already committed the relevant
act or omission by exposing potential claimants to asbestos and that would
automatically lead to a liability to pay damages, assuming all the other elements of a
negligence claim were present; that the companies were therefore subject to

E  contingent liabilities as regards future asbestos claims; and that, accordingly,
future asbestos claimants were "creditors" for the purposes of both schemes of
arrangements under section 425 of the 1985 Act and CVAs under Part I of the 1986
Act ( post, paras 40, 42, 46, 60, 63, 66, 193).
    *In re Sutherland, decd* [1963] AC 235, HL(E) and *Secretary of State for Trade
and Industry v Frid* [2004] 2 AC 506, HL(E) applied.
    (2) that although rule 12.3(1) of the 1986 Rules referred to a broad range of
claims as being provable "as debts", it had to be read in conjunction with the

F  definition of "debt" in rule 13.12; that rule 13.12(1) defined "debt" by reference to
time and thereby restricted the class of debts which could be proved in a winding up;
that the contrast between rule 13.12(1)(a), which referred to any debt or liability to
which the company was subject at the date on which it went into liquidation, and
rule 13.12(1)(b), which referred to any debts or liabilities to which the company
might become subject after that date by reason of any obligation incurred before that
date, made it clear that liabilities which were contingent at the liquidation date fell

G  within rule 13.12(1)(b); that contingent claims would be admissible to proof if they
arose by reason of any obligation incurred before the liquidation date; that in light of
rule 13.12(2) the obligation was incurred when the cause of action accrued, with the

---

[1] Companies Act 1985, s 425(1): "Where a compromise or arrangement is proposed between
a company and its creditors, or any class of them, or between the company and its members, or
any class of them, the court may on the application of the company or any creditor or member of
it or, in the case of a company being wound up, of the liquidator, order a meeting of the creditors

H  or class of creditors, or of the members of the company or class of members (as the case may be),
to be summoned in such a manner as the court directs."
    [2] Insolvency Act 1986, Pt I: see post, para 33.
    [3] Insolvency Rules 1986, r 12.3(1): see post, para 73.
    R 13.12: see post, para 74.
    [4] Human Rights Act 1998, Sch 1, Pt I, art 14: see post, para 157.
    Pt II, art 1: see post, para 145.

result that a contingent tort claim was not a provable debt unless the cause of action  A
had accrued before the date of liquidation; that it was a deliberate policy choice to
use the liquidation date as the cut-off point for causes of action in tort; and that,
accordingly, on the proper construction of rule 13.12, future asbestos claims were
not provable debts for the purposes of a winding up (post, paras 96, 98, 111–113,
115, 128, 129, 136, 141, 193).

*Per curiam.* The words "obligation occurred" in rule 13.12(1)(b) are not apt to
describe the duty of care or its breach. The obligation in negligence is to compensate  B
for loss caused by the defendant's careless act or omission. While the act or omission
will, if followed by material loss, lead to an obligation to compensate the victim, it is
not correct to say that by the careless act or omission alone the company incurs an
obligation (post, para 142).

Dicta of Sir Donald Nicholls V-C in *In re Kentish Homes Ltd* [1993] 1 BCLC
1375, 1382 applied.

(3) That material damage was an essential part of a cause of action in negligence  C
under English law and, by definition, future asbestos claimants had not yet suffered
any material damage; that a future asbestos claim was not a "possession" for the
purposes of article 1 of the First Protocol to the Convention and a construction of
the Insolvency Rules 1986 which did not permit future asbestos claims to be
admitted to proof involved no violation of article 1, nor did such a construction
infringe article 14 of the Convention taken in conjunction with article 1 of the First
Protocol, since article 14 was inapplicable unless the claim had a sufficient basis  D
in domestic law to constitute a possession within article 1; that, moreover, by
precluding a tort claim which accrued after the liquidation date from being treated
as a provable debt rule 13.12 of the 1986 Rules did not interfere with the enjoyment
of the claim as a possession in breach of article 1 of the First Protocol since it did not
deprive the claimant of an existing claim nor did it interfere with the exercise of any
existing rights; that an essential element of a complaint of discrimination contrary
to article 14 was that the ground of discrimination was a personal characteristic,  E
and, since the legal redress available to them under the general law was not to be
regarded as a personal characteristic within article 14, tort claimants did not possess
any relevant characteristic sufficient to distinguish them from other personal injury
claimants; and that, accordingly, rule 13.12 as it applied to tort claims which
accrued after the liquidation date did not breach article 14 taken in conjunction
with article 1 of the First Protocol (post, paras 153, 163, 165, 172, 176, 188, 189,
191, 193).                                                                           F

The following cases are referred to in the judgment:

*A v Secretary of State for the Home Department* [2002] EWCA Civ 1502; [2004]
    QB 335; [2003] 2 WLR 564; [2003] 1 All ER 816, CA
*Ambruosi v Italy* (2000) 35 EHRR 125
*Arnold v Central Electricity Generating Board* [1988] AC 228; [1987] 3 WLR 1009;
    [1987] 3 All ER 694, HL(E)                                                      G
*Berkeley Securities (Property) Ltd, In re* [1980] 1 WLR 1589; [1980] 3 All ER 513
*Bolton Metropolitan Borough Council v Municipal Mutual Insurance Ltd*
    (unreported) 28 May 2005, Michael Kershaw QC
*Bond Corpn Holdings Ltd v State of Western Australia (No 2)* (1992) 7 WAR 61
*Budak v Turkey* (Application No 57345/00) (unreported) 7 September 2004, ECtHR
*Cancol Ltd, In re* [1996] 1 All ER 37
*Cartledge v E Jopling & Sons Ltd* [1963] AC 758; [1963] 2 WLR 210; [1963] 1 All  H
    ER 341, HL(E)
*Child (RL) & Co Pty Ltd, In re* (1986) 4 ACLC 312
*Community Development Pty Ltd v Engwirda Construction Co* (1969) 120 CLR 455
*Constellation, The* [1966] 1 WLR 272; [1965] 3 All ER 873
*Corporate Affairs Commission v Karounos* (1984) 3 ACLC 410

A  *Coutts & Co v Inland Revenue Comrs* [1953] AC 267; [1953] 2 WLR 364; [1953]
   1 All ER 418, HL(E)
   *DEG-Deutsche Investitions und Entwicklungsgesellschaft mbH v Koshy* [2001]
   EWCA Civ 79; [2001] 3 All ER 878, CA
   *Debtor (No 66 of 1955), In re A, Ex p The Debtor v Waite's Trustee* [1956] 1 WLR
   480; [1956] 2 All ER 94, DC; [1956] 1 WLR 1226; [1956] 3 All ER 225, CA
   *Debtor (No 488 IO of 1996), In re; JP v A Debtor* [1999] 2 BCLC 571

B  *Draon v France* (Application No 1513/03) (unreported) 6 October 2005, ECtHR
   *Fairchild v Glenhaven Funeral Services Ltd* [2002] UKHL 22; [2003] 1 AC 32; [2002]
   3 WLR 89; [2002] 3 All ER 305, HL(E)
   *Flint v Barnard* (1888) 22 QBD 90, CA
   *Freakley v Centre Reinsurance International Co* [2004] EWHC 2740 (Ch); [2005]
   2 All ER (Comm) 65; [2005] 2 BCLC 530
   *Gasbourne Pty Ltd, In re* [1984] VR 801

C  *Glenister v Rowe* [2000] Ch 76; [1999] 3 WLR 716; [1999] 3 All ER 452, CA
   *Gratzinger and Gratzingerova v The Czech Republic* Reports of Judgments and
   Decisions 2002-VII, p 399
   *Great Orme Tramways Co, In re* (1934) 50 TLR 450
   *Grieves v FT Everard & Sons* [2005] EWHC 88 (QB); The Times, 22 March 2005
   *Gye v McIntyre* (1991) 171 CLR 609
   *Hardy v Fothergill* (1888) 13 App Cas 351, HL(E)
   *Hunter Douglas Australia Pty Ltd v Perma Blinds* (1970) 122 CLR 49

D  *Inland Revenue Comrs v Hinchy* [1960] AC 748; [1960] 2 WLR 448; [1960] 1 All
   ER 505, HL(E)
   *Islington Metal and Plating Works Ltd, In re* [1984] 1 WLR 14; [1983] 3 All ER 218
   *Keenan v Miller Insulation and Engineering Ltd* (unreported) 8 December 1987,
   Piers Ashworth QC
   *Kempe v Ambassador Insurance Co* [1998] 1 WLR 271, PC
   *Kentish Homes Ltd, In re* [1993] BCLC 1375

E  *Kjeldsen, Busk Madsen and Pedersen v Denmark* (1976) 1 EHRR 711
   *Kopecky v Slovakia* (Application No 44912/98) (unreported) 28 September 2004,
   ECtHR
   *Levy v Legal Services Commission* [2001] 1 All ER 895, CA
   *Llynvi Coal and Iron Co, Ex p; In re Hide* (1871) LR 7 Ch App 28
   *Mangin v Inland Revenue Comr* [1971] AC 739; [1971] 2 WLR 39; [1971] 1 All
   ER 179, PC

F  *Matthews v Ministry of Defence* [2003] UKHL 4; [2003] 1 AC 1163; [2003] 2 WLR
   435; [2003] 1 All ER 689, HL(E)
   *Midland Coal, Coke and Iron Co, In re* [1895] 1 Ch 267, Wright J and CA
   *National and Provincial Building Society v United Kingdom* (1997) 25 EHRR 127
   *Neal, Ex p; In re Batey* (1880) 14 Ch D 579, CA
   *Overseas Tankship (UK) Ltd v Morts Dock and Engineering Co Ltd (The Wagon
   Mound)* [1961] AC 388; [1961] 2 WLR 126; [1961] 1 All ER 404, PC

G  *Pennycook v Shaws (EAL) Ltd* [2004] EWCA Civ 100; [2004] Ch 296; [2004] 2 WLR
   1331; [2004] 2 All ER 665, CA
   *Poplar Housing and Regeneration Community Association Ltd v Donoghue* [2001]
   EWCA Civ 595; [2002] QB 48; [2001] 3 WLR 183; [2001] 4 All ER 604, CA
   *Pressos Cia Naviera SA v Belguim* (1995) 21 EHRR 301
   *Pye (JA) (Oxford) Ltd v United Kingdom* (Application No 44302/02) 15 November
   2005, ECtHR

H  *R (Carson) v Secretary of State for Work and Pensions* [2005] UKHL 37; [2006] 1 AC
   173; [2005] 2 WLR 1369; [2005] 4 All ER 545, HL(E)
   *R (Edison First Power Ltd) v Central Valuation Officer* [2003] UKHL 20; [2003] 4 All
   ER 209, HL(E)
   *R (Hooper) v Secretary of State for Work and Pensions* [2005] UKHL 29; [2005]
   1 WLR 1681; [2006] 1 All ER 487, HL(E)

*R (S) v Chief Constable of the South Yorkshire Police* [2004] UKHL 39; [2004]      A
  1 WLR 2196; [2004] 4 All ER 193, HL(E)
*R (Steele) v Birmingham City Council* [2005] EWHC 783 (Admin)
*R-R Realisations Ltd, In re* [1980] 1 WLR 805; [1980] 1 All ER 1019
*Roche v United Kingdom* The Times, 27 October 2005
*Rolls-Royce Co Ltd, In re* [1974] 1 WLR 1584; [1974] 3 All ER 646
*SBA Properties Ltd, In re* [1967] 1 WLR 799; [1967] 2 All ER 615
*St Aubyn v Attorney General* [1952] AC 15; [1951] 2 All ER 473, HL(E)               B
*Sea Assets Ltd v PT Garuda Indonesia* [2001] EWCA Civ 1696, CA
*Secretary of State for Trade and Industry v Frid* [2004] UKHL 24; [2004] 2 AC 506;
  [2004] 2 WLR 1279; [2004] 2 All ER 1042, HL(E)
*Smith v Canadian Broadcasting Corpn* [1953] 1 DLR 510
*Sneezum, In re; Ex p Davis* (1876) 3 Ch D 463, CA
*Stec v United Kingdom* (Application Nos 65731/01 and 65900/01) (unreported)
  6 July 2005, ECtHR                                                                 C
*Sutherland, decd, In re* [1963] AC 235; [1961] 3 WLR 1062; [1961] 3 All ER 855,
  HL(E)
*T & N Ltd, In re* [2004] EWHC 2361 (Ch); [2005] 2 BCLC 488
*Toshoku Finance UK plc, In re* [2002] UKHL 6; [2002] 1 WLR 671; [2002] 3 All
  ER 961, HL(E)
*Wight v Eckhardt Marine GmbH* [2003] UKPC 37; [2004] 1 AC 147; [2003] 3 WLR
  414, PC                                                                            D
*Willis v United Kingdom* (2002) 35 EHRR 547
*Wilson v First County Trust Ltd (No 2)* [2001] EWCA Civ 633; [2002] QB 74;
  [2001] 3 WLR 42; [2001] 3 All ER 229, CA; [2003] UKHL 40; [2004] 1 AC 816;
  [2003] 3 WLR 568; [2003] 4 All ER 97, HL(E)
*Wolmershausen v Gullick* [1893] 2 Ch 514


The following additional cases were cited in argument:                              E

*Abbott v Minister for Lands* [1895] AC 425, PC
*Abdulaziz, Cabales and Balkandali v United Kingdom* (1985) 7 EHRR 471
*Albert Life Assurance Co, In re (Craig's Executors' Case)* (1870) LR 9 Eq 706
*Allgemeine Gold- und Silberscheideanstalt v United Kingdom* (1986) 9 EHRR 1
*Amalgamated Investment and Property Co Ltd, In re* [1985] Ch 349; [1984] 3 WLR
  1101; [1984] 3 All ER 272
*Armstrong Whitworth Securities Co Ltd, In re* [1947] Ch 673; [1947] 2 All ER 479   F
*Art Reproduction Co Ltd, In re* [1952] Ch 89; [1951] 2 All ER 984
*Austin Securities Ltd v Northgate and English Stores Ltd* [1969] 1 WLR 529; [1969]
  2 All ER 753, CA
*Autolook Pty Ltd, In re* (1983) 2 ACLC 30
*Bagel v Miller* [1903] 2 KB 212, DC
*Belgian Linguistic Case (No 2)* (1968) 1 EHRR 252
*Birkbeck Permanent Benefit Building Society, In re* [1913] 1 Ch 400               G
*Blakemore, Ex p; In re Blakemore* (1877) 5 Ch D 372, CA
*Briggs v Thomas Dryden & Sons* [1925] 2 KB 667, CA
*British Aviation Insurance Co Ltd, In re* [2005] EWHC 1621 (Ch)
*Cases of Taffs Well Ltd, In re* [1992] Ch 179; [1991] 3 WLR 731
*Chief Adjudication Officer v Maguire* [1999] 1 WLR 1778; [1999] 2 All ER 859, CA
*Church v Ministry of Defence* (1984) 134 NLJ 623
*Collyer v Isaacs* (1881) 19 Ch D 342                                              H
*County Bookshops Ltd v Grove* [2002] EWHC 1160 (Ch); [2003] 1 BCLC 479
*Curwen v Milburn* (1889) 42 Ch D 424, CA
*Darby v Sweden* (1990) 13 EHRR 774
*Davis (S) & Co Ltd, In re* [1945] Ch 402
*Debtor, In re A; Ex p Debtor* [1936] Ch 237, CA

A   *Dhak v Insurance Co of North America UK (Ltd)* [1996] 1 WLR 936; [1996] 2 All
ER 609, CA

*Director of Public Works v Ho Po Sang* [1961] AC 901; [1961] 3 WLR 39; [1961]
2 All ER 721, PC

*Duke Group Ltd v Pilmer* (1993) 60 SASR 29

*Dynamics Corpn of America, In re* [1976] 1 WLR 757; [1976] 2 All ER 669

*Engel v The Netherlands (No 1)* (1976) 1 EHRR 647

B   *Equiticorp Tasman Ltd, In re* [2005] NSWSC 313

*Federal Comr of Taxation v Gosstray* [1986] VR 876

*Fielding v Vagrand Pty Ltd* (1992) 111 ALR 368; 9 ACSR 505

*Fine Industrial Commodities Ltd, In re* [1956] Ch 256; [1955] 3 WLR 940; [1955]
3 All ER 707

*Fleetwood and District Electric Light and Power Syndicate, In re* [1915] 1 Ch 486

*Free Lanka Insurance Co Ltd v Ranasinghe* [1964] AC 541; [1964] 2 WLR 66;
C   [1964] 1 All ER 457, PC

*Gaffney v Comr of Taxation* (1998) 81 FCR 574

*Ghaidan v Godin-Mendoza* [2002] EWCA Civ 1533; [2003] Ch 380; [2003] 2 WLR
478; [2002] 4 All ER 1162, CA; [2004] UKHL 30; [2004] 2 AC 557; [2004]
3 WLR 113; [2004] 3 All ER 411, HL(E)

*Great Eastern Electric Co Ltd, In re* [1941] Ch 241; [1941] 1 All ER 409

*Gudmundsson v Iceland* (1996) 21 EHRR CD 89

D   *Guidera v NEI Projects (India) Ltd* (unreported) 17 November 1988, McCullough J

*Harvest Lane Motor Bodies Ltd, In re* [1969] 1 Ch 457; [1968] 3 WLR 220; [1968]
2 All ER 1012

*Hawk Insurance Co Ltd, In re* [2001] EWCA Civ 241; [2001] 2 BCLC 480, CA

*Hentrich v France* (1994) 18 EHRR 440

*Hockley (William) Ltd, In re* [1962] 1 WLR 555; [1962] 2 All ER 111

*Holy Monasteries v Greece* (1994) 20 EHRR 1

E   *Jack v Kipping* (1882) 9 QBD 113, DC

*James Smith & Sons (Norwood) Ltd v Goodman* [1936] Ch 216, CA

*Jameson v Central Electricity Generating Board* (unreported) 10 March 1995, Sir
Hadyn Tudor Evans

*Krasner v McMath Duggins; Tipper Ellis v Harris* [2005] EWCA Civ 1072; [2006]
ICR 205; [2005] 4 All ER 886, CA

*Lampitt v Poole Borough Council (Taylor, Third Party)* [1991] 2 QB 545; [1990]
3 WLR 179; [1990] 2 All ER 887, CA

F   *Law Car and General Insurance Corpn, In re* [1913] 2 Ch 103, CA

*Law Society v Sephton & Co* [2004] EWCA Civ 1627; [2005] QB 1013; [2005]
3 WLR 212, CA

*Letang v Cooper* [1965] 1 QB 232; [1964] 3 WLR 573; [1964] 2 All ER 929, CA

*Lines Bros Ltd, In re* [1983] Ch 1; [1982] 2 WLR 1010; [1982] 2 All ER 183, CA

*Lines Bros Ltd (No 2), In re* [1984] Ch 438; [1984] 2 WLR 905

*Lithgow v United Kingdom* (1986) 8 EHRR 329

G   *Lofthouse v Commissioner of Taxation* [2001] VSC 326

*Lyford v Carey* (1985) 3 ACLC 515

*McCaul v Elias Wild & Sons Ltd* (unreported) 14 September 1989, McNeill J

*Marckx v Belgium* (1979) 2 EHRR 330

*Mid-Kent Fruit Factory, In re* [1896] 1 Ch 567

*Moakes v Blackwell Colliery Co* [1925] 2 KB 64, CA

*Morgan v Hardy* (1887) 18 QBD 646, CA

H   *Morrison v Central Electricity Board* (unreported) 15 March 1986, Rose J

*Neal, Ex p; In re Batey* (1880) 14 Ch D 579, CA

*Norglen Ltd v Reeds Rains Prudential Ltd* [1999] 2 AC 1; [1997] 3 WLR 1177;
[1998] 1 All ER 218, HL(E)

*Northern Counties of England Fire Insurance Co, In re* (1880) 17 Ch D 337

*Official Trustee in Bankruptcy v CS & GJ Handby Pty Ltd* (1989) 87 ALR 734

*Page v Commonwealth Life Assurance Society Ltd* (1935) 36 SR(NSW) 85        *A*
*Papamichalopolous v Greece* (1993) 16 EHRR 440
*Patterson v Ministry of Defence* (unreported) 29 July 1986, Simon Brown J
*Petrovic v Austria* (1998) 33 EHRR 14
*Pine Valley Developments v Ireland* (1991) 14 EHRR 319
*Plewa v Chief Adjudication Officer* [1995] 1 AC 249; [1994] 3 WLR 317; [1994]
   3 All ER 323, HL(E)
*Polley v Warner Goodman & Street* [2003] EWCA Civ 1013; [2003] PNLR 784, CA   *B*
*Pulsford v Devenish* [1903] 2 Ch 625
*R (Morris) v Westminster City Council* [2005] EWCA Civ 1184; [2006] 1 WLR 505,
   CA
*Royal Norwegian Government v Constant & Constant* [1960] 2 Lloyd's Rep 431
*Russell v Russell* [1998] BPIR 259
*S (Minors) (Care Order: Implementation of Care Plan), In re* [2002] UKHL 10;
   [2002] 2 AC 291; [2002] 2 WLR 720; [2002] 2 All ER 192, HL(E)            *C*
*Saggio v Italy* (Application No 41879/98) (unreported) 25 October 2001, ECtHR
*Simionato Holdings Pty Ltd, In re; Commissioner of Taxation of the Commonwealth
   of Australia v Simionato Holdings Pty Ltd* (1997) 15 ACLC 477
*Sporrong and Lönnroth v Sweden* (1982) 5 EHRR 35
*Stanley v Ministry of Defence* (unreported) 9 May 1988, Michael Davis J
*Stein v Blake* [1996] AC 243; [1995] 2 WLR 710; [1995] 2 All ER 961, HL(E)
*Stran Greek Refineries and Stratis Andreadis v Greece* (1994) 19 EHRR 293
*Stubbings v Webb* [1993] AC 498; [1993] 2 WLR 120; [1993] 1 All ER 322, HL(E)   *D*
*Sykes v Ministry of Defence* (unreported) 19 March 1984, Otton J
*Telewest Communications plc (No 1), In re* [2004] EWHC 924 (Ch); [2005] 1 BCLC
   752
*Tilley v Bowman Ltd* [1910] 1 KB 745
*Tre Traktörer AB v Sweden* (1989) 13 EHRR 309
*Vale v TMH Haulage Pty Ltd* (1993) 31 NSWLR 702
*Van der Mussele v Belgium* (1983) 6 EHRR 163                                 *E*
*Webb v Whiffin* (1872) LR 5 HL 711, HL(E)
*Whitaker, In re* [1901] 1 Ch 9, CA
*Woodley v Woodley (No 2)* [1994] 1 WLR 1167; [1993] 4 All ER 1010, CA
*Wyley v Exhall Coal Mining Co* (1864) 33 Beav 538

**APPLICATION**

    By an application dated 19 September 2005, the administrators of T & N   *F*
Ltd and its subsidiaries applied to the court for declaratory relief on the
following issues. (i) Whether a claimant in respect of a "future asbestos
claim" (defined below) against a UK debtor would be a "creditor" of the
UK debtor so as to be capable of being bound by any compromise or
arrangement sanctioned by the court pursuant to section 425 of the
Companies Act 1985 and/or by any company voluntary arrangement          *G*
approved pursuant to the provisions of Part I of the Insolvency Act 1986.
(ii) Whether a claimant in respect of such a future asbestos claim against
a UK debtor would be entitled to prove for a debt in the liquidation of that
UK debtor pursuant to Part IV of the Insolvency Act 1986 and/or Part 4 of
the Insolvency Rules 1986.

    For the purposes of the application, the administrators defined a "future   *H*
asbestos claim" as any personal injury claim against a UK debtor where the
claimant was exposed to asbestos which could cause an asbestos-related
disease, and the UK debtor would be liable in respect of that exposure, and
all of the exposure to asbestos occurred prior to the relevant date, namely,
the date on which the administrators proposed a scheme of arrangement or a

*A*  CVA, or the liquidation date, and where the claimant's cause of action, if any, would accrue after that relevant date or the liquidation date.

In addition to the administrators, six groups of interested parties were represented on the application, namely: (1) the official committee of asbestos creditors, appointed by the Office of the United States Trustee, and the legal representative of future claimants, appointed by the US court in the

*B*  Chapter 11 proceedings; (2) Federal Mogul Corpn Inc and its affiliates as debtors in Chapter 11 US bankruptcy proceedings; (3) the official committee of unsecured creditors and the official committee of equity security holders, and JP Morgan Chase Bank as administrative agent for the holders of pre-petition bank debts; (4) Syndicate 45/177 at Lloyd's; (5) the representative UK asbestos claimants; and (6) trustees of the T & N Retirement Benefit Scheme (1989).

*C*  Very shortly before the start of the hearing, the administrators raised a further issue for determination, namely, (iii) whether, if the statutory provisions were construed so as to prevent tort claimants without a cause of action accrued as at the liquidation date or those with an accrued cause of action, but where the cause of action accrued after the liquidation date, from proving in a winding up, such a construction was incompatible with

*D*  article 1 of the First Protocol to the European Convention for the Protection of Human Rights and Fundamental Freedoms, as scheduled to the Human Rights Act 1998, either on its own, or in conjunction with article 14 of the Convention.

The facts are stated in the judgment.

*E*  *Richard Snowden QC* and *Peter Arden* for the administrators.
*Richard Sheldon QC, Monica Carrs-Frisk QC, Jane Mulcahy* and *Daniel Bayfield* for the Official Committee of Asbestos Creditors and the Future Claimants' Representative.
*Robin Dicker QC* and *Richard Fisher* for Federal Mogul Corpn and its affiliates, the Official Committees of Unsecured Creditors and of Equity Security Holders, and JP Morgan Chase Bank.

*F*  *William Trower QC* and *Stephen Robins* for Lloyd's Syndicate 45/177.
*David Allan QC* and *Hugo Groves* of the representative UK asbestos claimants.
*Simon Mortimore QC, James Eadie* and *Blair Leahy* for the T & N pension trustees.

*Cur adv vult*

*G*

14 December.  **DAVID RICHARDS J** handed down the following judgment.

*Introduction*

*H*  1  This is an application by the administrators of T & N Ltd and other companies in the T & N group, by which they seek the determination of certain legal issues which are central to the future conduct of the administrations. The directions sought by the administrators and the issues raised by this application are set out in paras 12–18 below. It is convenient first to give the necessary background information.

2   In a judgment given in October 2004, *In re T & N Ltd* [2005] 2 BCLC    A
488, I set out in paras 6–44 the background to the administrations and the
problems confronting the companies. The brief summary which follows and
which brings the information up to date is sufficient for present purposes.

3   The T & N group was for many years engaged on a large scale in the
mining of asbestos and in the manufacture and distribution of asbestos
products.   More recently it diversified into other product areas not    B
necessarily involving asbestos, particularly the manufacture of parts for use
in the automotive industry. The UK holding company was listed on the
London Stock Exchange until 1998 when it was taken over by Federal
Mogul Corpn Inc ("FMC").

4   By then the hazardous nature of asbestos was well known and there
had for some years been a rising number of claims against asbestos
producers, such as T & N, by employees and former employees and    C
members of their families, by third parties who had worked with asbestos
products in, for example, the shipbuilding industry and by others who had
been exposed to asbestos dust. These were in the main personal injury
claims, but there have also been property damage claims and contribution
claims by other asbestos producers.

5   The volume and scale of asbestos-related claims, particularly in the    D
United States, continued to grow to the point in 2001 that the management
of the Federal Mogul group, including the management of the T & N sub-
group, concluded that the affected companies should seek the protection of
appropriate insolvency proceedings. On 1 October 2001, administration
orders were made in England in respect of T & N and 132 other English
companies in the Federal Mogul group. At the same time, those companies
and 23 US companies in the Federal Mogul group filed for protection under    E
Chapter 11 of the US Bankruptcy Code.

6   The relevant companies face liabilities on a massive scale. There are
great difficulties in attaching figures to the companies' asbestos-related
liabilities, particularly as some asbestos-related conditions do not manifest
symptoms, or even start, for many years after exposure to asbestos dust.
Evidence previously filed on applications in the administrations has    F
provided a range of figures for current values of present and future claims of
approximately £250m for the United Kingdom and a range of about $2·7
billion to $10·5 billion for the United States. Proceedings were held earlier
this year in the US District Court to estimate the value of all "pending" and
"future" asbestos claims against the T & N companies for the purposes of a
proposed plan of reorganisation of the companies. Written and oral expert
evidence was submitted to the court. In its judgment on 19 August 2005, the    G
US District Court estimated the current discounted value of total US claims,
both pending and future, at $9 billion. For these purposes, claims were
pending if they had been made by 1 October 2001, the date of the petitions
under Chapter 11, and all remaining claims were future. Although the figure
of $9 billion was not apportioned between the two categories, it is accepted
by all parties that the future claims represent a very significant majority of
the total figure. Future claims for these purposes include both claims made    H
since the petition date and an estimate of claims which may be made in the
future. Again there is no apportionment of the figure between these two
elements, but it is accepted that the estimate for claims not yet made
represents a significant majority of that category.

1737

[2006] I WLR

In re T & N Ltd (Ch D)
David Richards J

A    7   Evidence was also placed before the US District Court as to the value
to be attributed to UK asbestos claims.  This evidence was not challenged
and the relevant figures were adopted by the court in its judgment.  Pending
claims were valued at £14m and future claims at £229m.

8   As well as asbestos liabilities, T & N and 13 other companies in
administration have very substantial liabilities to the trustees of the T & N
Retirement Benefit Scheme (1989) ("the T & N pension scheme").  Actuaries
B  instructed by the trustees have valued the claim against the companies as at
March 2004 at £1·8 billion, making the trustees the largest single creditor by
a wide margin.  In addition, the trustees have claims under section 75 of the
Pensions Act 1995.  The Pension Protection Fund ("PPF") was established
under the Pensions Act 2004.  Its function is to assume responsibility for, and
to provide compensation to members of, eligible pension schemes, when
C  there is a qualifying insolvency event in relation to the employer and there
are insufficient assets in the pension scheme to provide for the level of
protected liabilities.  It became operational on 6 April 2005.  It is anticipated,
and it is critical to the success of proposals for the future conduct of the
administrations, that the T & N pension scheme will be taken into the PPF.
The "assessment period" during which the PPF must determine whether it
would be appropriate to take the scheme into the PPF will start when the
D  administrators send out notices to creditors convening meetings to consider
proposals for company voluntary arrangements ("CVAs") under Part I of the
Insolvency Act 1986.

9   Since the administration and Chapter 11 proceedings started in
October 2001, there has been agreement in principle among the
administrators, the debtor in possession management and the major creditor
E  groups and representatives that, if possible, a means should be found to
avoid a liquidation of the relevant US and UK companies.  Some of the
companies have businesses which are considered to be viable, and the
problems associated with the long-term profile of the asbestos claims make
highly desirable a solution other than liquidation.  The solution would, if
possible, involve a plan of reorganisation approved under the procedures
contained in Chapter 11 of the US Bankruptcy Code and schemes of
F  arrangement or CVAs in the UK.   There have, however, been great
difficulties in reaching agreement between the various groups as to the
appropriate terms of these proposals.  I outlined some of the issues in my
judgment given on 21 October 2004: see [2005] 2 BCLC 488, paras 45–57
and 83–120.

10   More recently, progress has been made and on 26 September 2005 a
G  number of parties entered into a settlement agreement.  The parties are the
administrators, FMC and T & N (acting by their debtor in possession
management), the US plan proponents, the PPF and High River Ltd
Partnership, the most substantial holder of bonds issued by FMC.  It
represents a settlement which is acceptable to the largest creditors or
creditor groups of the UK companies, that is, the trustees of the T & N
pension scheme, in so far as it leads to entry into the PPF, and the official
H  committee of US asbestos claimants.  It has been approved by a resolution of
the T & N creditors' committee, with two abstentions.  The unequivocal
view of the administrators is that it embodies a sensible solution which
treats all creditors fairly.  It will enable the companies to come out of
administration and Chapter 11 proceedings.

11  The settlement agreement involves the promotion of CVAs or      A
schemes of arrangement which will provide for the payment of specific
amounts to certain creditors and for the establishment of trusts and reserves
from which dividends will be paid to relevant groups of creditors.  The plan
proponents agreed to make an application to the US court for an order that
CVAs or schemes can be promoted before a plan of reorganisation is
approved by the US court. Since the hearing of this application, an order has      B
been made by the US court in terms which permit the promotion of CVAs or
schemes.   Certain creditor groups (notably US and Canadian asbestos
personal injury claimants and the overwhelming majority of inter-company
claims) are excluded from the UK asset distribution process, although
US asbestos claimants will receive a very substantial share of collections
under the Hercules insurance policy: as to which see *Freakley v Centre
Reinsurance International Co* [2005] 2 All ER(Comm) 65. Those creditors      C
will (except in relation to the Hercules insurance policy) rely entirely upon
the treatment they are to receive under the eventual plan of reorganisation to
be confirmed in the US.  Relevant participating creditors in the UK will (with
the exception of the claim of the T & N pension scheme against T & N) have
to establish their claims for dividend purposes in accordance with English
legal and procedural requirements.   The payments to creditors and the
establishment of the necessary trusts and reserves will be funded from the      D
cash already held by the administrators and the sale proceeds of certain
assets.

*Issues*

12  It is an essential feature of the proposals that not only those persons
who have already made or are entitled to make asbestos-related claims, but      E
also all future claimants, should be bound by the schemes or CVAs.  As will
appear, this involves no jurisdictional difficulty as regards future claimants
who were employees and therefore have contractual claims, or claimants
who have accrued causes of action in tort.  The issue requiring resolution is
whether future claimants who were not employees and who do not have
accrued causes of action in tort can be parties to a scheme of arrangement      F
or a CVA and bound by it.  I should mention that there have been no
submissions directed to statutory claims of former employees or their
dependants.   So far as US claims are concerned, they are or will be
principally product liability claims and are maintainable, if at all, in tort.

13  A further issue which has been raised for decision is whether, on the
hypothesis of a winding up, persons with potential tort claims but without
an accrued cause of action at the date on which the company goes into      G
liquidation ("the liquidation date") would have admissible claims for the
purposes of proof in a winding up.  This in turn requires consideration of,
first, claimants who do not have an accrued cause of action when they seek
to prove, and, secondly, claimants who have a cause of action which accrues
after the liquidation date.  A very large proportion of persons who have been
exposed to asbestos dust will never suffer any injury and will therefore never
have a cause of action in tort.  It is not however possible to predict whether      H
any particular individual will or will not develop an asbestos disease.

14  This second issue is not raised because liquidations are anticipated,
although they cannot be ruled out as a possible outcome.  It is raised
because, if these potential claimants are not entitled to prove and receive a

1739

**[2006] I WLR**

In re T & N Ltd (Ch D)
David Richards J

A   distribution in a winding up, issues may arise as to fairness and as to the proper constitution of classes for voting purposes in a scheme. I say that it may raise such issues, because it is not accepted by the administrators and other parties that it necessarily will do so. I have not heard submissions as to these consequential issues. Plainly, however, any problem is avoided if the proper conclusion is that such claimants are entitled to prove in a liquidation.

B   15   A third issue has arisen, if the answer to the second issue is that, applying the usual principles of statutory construction, the potential claimants cannot prove in a liquidation. It is then contended by the US Asbestos Creditors Committee and other parties that this would breach the claimants' rights under the European Convention for the Protection of Human Rights and Fundamental Freedoms and of the First Protocol to that Convention.

C   16   There are, as it appears to me, two principal reasons for the importance of these issues in this case, which also explain why they have not previously arisen. First, the particular nature of asbestos-related diseases is, as I have mentioned, such that there may be a very long period between the exposure to asbestos and the start, let alone the appearance of symptoms, of the resulting disease. The second reason is the scale of the potential liabilities, particularly in the United States, and the inadequacy of available insurance cover. Asbestos-related diseases are not unique in having so long a period of development (see *Cartledge v E Jopling & Sons Ltd* [1963] AC 758) but it may be that previously there has been adequate insurance to meet the problem.

E   *Administrators' application*

17   The administrators' application, as amended, contains definitions in para 2:

"For the purposes of this application (1) 'future asbestos claim' means any personal injury claim against a UK debtor where: (a) the claimant was exposed to asbestos which could cause an asbestos-related disease or diseases, and (b) the relevant UK debtor would be liable in respect of that exposure and any such disease or diseases, and (c) all of the exposure to asbestos occurred prior to the relevant date or the liquidation date (as the case may be), but (d) the claimant's cause of action, if any, against the relevant UK debtor will accrue after the relevant date (in the case of para (2) below) or the liquidation date (in the case of para 3 below). (2) 'Relevant date' means a date on which the administrators propose in respect of the relevant UK debtor a scheme of arrangement pursuant to section 425 of the Companies Act 1985 ('the 1985 Act'), and/or a company voluntary arrangement pursuant to the provisions of Part I of the Insolvency Act 1986 ('the 1986 Act'). (3) 'Liquidation date' means a date on which the relevant UK debtor goes into liquidation pursuant to the provisions of Part IV of the 1986 Act."

18   The substantive relief sought by the administrators is in paras 3 and 4:

"3. That it may be determined and declared whether a claimant in respect of a future asbestos claim against a UK debtor would be a 'creditor' of the UK debtor so as to be capable of being bound by any

compromise or arrangement sanctioned by the court pursuant to    A
section 425 of the 1985 Act and/or by any company voluntary
arrangement approved pursuant to the provisions of Part I of the 1986
Act.

"4. That it may be determined and declared whether a claimant in
respect of a future asbestos claim against a UK debtor would be entitled to
prove for a debt in the liquidation of that UK debtor pursuant to the
provisions of Part IV of the 1986 Act and/or Part 4 of the Insolvency Rules    B
1986."

*Representation and the parties' positions*

19  The application is for directions to enable the administrators to
pursue and fulfil the purposes of the administrations. They do not seek
declarations which would be binding or create issue estoppels as regards    C
individual claimants. One reason for this is that it is of vital importance not
to take any steps which might infringe the claims-handling rights of insurers
and reinsurers under the Hercules insurance arrangements. No
representation orders have therefore been sought or made.

20  The applications were provided to a number of interested parties. In
addition to the administrators, for whom Mr Snowden and Mr Arden    D
appeared, six groups of interested parties have been represented on
the applications. Mr Sheldon and Mr Bayfield appeared for the Official
Committee of Asbestos Creditors and for the Future Claimants'
Representative appointed in each case by the Office of the United States
Trustee for the purposes of the Chapter 11 proceedings. They are among the
proponents of, or they support, the plan of reorganisation being promoted in
the Chapter 11 proceedings. Mr Dicker and Mr Fisher appeared for certain    E
of the plan proponents, namely Federal Mogul Corpn and its affiliates as
debtors in possession in the Chapter 11 proceedings, the official committees
of unsecured creditors and of equity security holders and J P Morgan Chase
Bank as administrative agent for the holders of pre-petition bank claims.
Mr Trower and Mr Robins appeared for Syndicate 45/177 at Lloyd's, which
is one of T & N's employer's liability insurers, covering a period from 1977    F
to 1995. There has been litigation between T & N and the syndicate but
they have reached outline terms of settlement, one of the conditions of which
is that future asbestos claimants must be bound by the terms of any final
settlement, whether effected by scheme of arrangement or CVA. The
representatives of UK asbestos claimants appointed by Lindsay J on 27 May
2004 were represented by David Allan and Hugo Groves. While supporting
the administrators, they did not advance separate submissions on any of the    G
issues. All these parties supported the position of the administrators that
future asbestos creditors could be bound by a scheme of arrangement
or CVA and that their potential claims were admissible to proof in a
liquidation. There was a unanimity of approach to the first of those issues
but, as will be seen, on the second issue, their submissions differed and in
some respects conflicted. None the less they were agreed as to the outcome.

21  The T & N pension trustees were represented by Mr Mortimore and    H
Miss Leahy. The trustees do not have a position on the first issue and
therefore neither support nor oppose the declaration on that issue sought by
the administrators. Their primary concern is that the T & N pension scheme
should enter the PPF. The PPF, not the trustees, is a party to the settlement

**[2006] 1 WLR**

A  agreement and has indicated its support for CVAs embodying its terms. Under the terms of the settlement agreement the trustees would receive payments totalling about £250m and, if the pension scheme enters the PPF, these payments will be for the benefit of the PPF. At meetings to consider CVAs and schemes, the PPF, not the trustees, will be entitled to vote on behalf of the pension scheme. For these reasons, the trustees make no submissions on the first issue.

B
22    The trustees do, however, oppose the administrators' position on the second issue and submit that without an accrued cause of action as at the liquidation date, a potential tort claim is not admissible to proof, nor is an actual claim in tort where a cause of action has in fact accrued but only after the liquidation date. As a very substantial creditor, the trustees and the many thousands of present and former employees who are beneficiaries

C  under the scheme have a direct interest in this issue, if it proves impossible to give effect to the settlement agreement. Accordingly, Mr Mortimore assumed the burden of advancing submissions in opposition to the four separate sets of submissions made on this issue by Mr Snowden, Mr Sheldon, Mr Dicker and Mr Trower.

23    Very shortly before the start of the hearing, the administrators'
D  counsel lodged a supplemental skeleton argument, raising for the first time submissions that if the relevant statutory provisions were construed so as to prevent tort claimants without a cause of action accrued as at the liquidation date from proving in a liquidation, such a result would be incompatible with the Convention and of the First Protocol. If that were right, the court was bound by the Human Rights Act 1998 to construe the provisions in a way which was compatible with the Convention or, if that was impossible, the

E  court should at least indicate the incompatibility, whether or not formal declarations were sought. At my request, the administrators' solicitors notified the Department of Trade and Industry, which is the government department responsible for insolvency legislation, of these submissions. The Insolvency Service, which is the relevant agency of the department, replied in writing that it did not wish to participate in the application and it has not

F  made any submissions on this issue. Separate argument was addressed to me at a subsequent hearing by Miss Carss-Frisk on behalf of the Asbestos Creditors Committee and the Future Claimants' Representative and by Mr Eadie on behalf of the trustees of the T & N pension scheme. I am very grateful to them, as I am to all counsel, for the great assistance which they gave on this application. The submissions of Miss Carss-Frisk were adopted

G  without further argument by all parties, except of course, the pension scheme trustees.

*Development of asbestos-related diseases*

24    It is appropriate to give a very brief summary of the development of these diseases, to give some sense of their scale and nature. This is an area of developing scientific knowledge. There are helpful statements of current
H  medical opinion in a number of authorities, including *Fairchild v Glenhaven Funeral Services Ltd* [2003] 1 AC 32 and *Grieves v F T Everard & Sons* [2005] EWHC 88 (QB) (now on appeal). The following summary is taken from the administrators' skeleton argument. It is agreed by all counsel appearing on this application, including David Allan who has great

experience in this area. The stages of the development of asbestos-related    A
diseases, so far as known, are as follows:

"(1) The inhalation of asbestos fibres. Following inhalation, a
proportion of the fibres never reach the lungs. Some are caught in the
nasal passage; others are trapped in the mucus which lines the body's
airways and are eventually swallowed or expectorated. (2) Deposit of
fibres into lungs. When fibres are deposited in the lungs, the body's    B
natural defences (scavenger cells known as 'macrophages' and dissolution
in tissue fluids) succeed in clearing some of the fibres or (by a coating
process) operate so as to neutralise them. However, a substantial
proportion survives these processes. (3) The by-products of the body's
natural defences and the bio-persistence of asbestos fibres are the cause of
asbestosis. Failed macrophages die and they, and the surviving asbestos    C
fibres, produce a chemical reaction. This reaction in turn produces an
inflammation of the lung which, if sufficiently serious and prolonged, can
cause fibrosis—asbestosis—to develop. It does not usually become
apparent or detectable until after 20 years from first exposure. (4) The
presence of asbestos fibres in the lung increases the likelihood of the
development of lung cancer, with the fibres acting in relation to at least    D
some of the genetic mutations which result in the first malignant cell.
Asbestosis is a sufficient, but probably not a necessary, condition for
the development of cancer of the lung. With the other asbestos-related
diseases, it shares a long latency period. However, and as with
mesothelioma (as to which further below), the first malignant cell may
develop some considerable time before the cancer actually becomes
manifest. Once manifest, the disease is almost always fatal and death    E
occurs within a very short period of between 12 and 18 months.
(5) Asbestos fibres can pass from the lungs and penetrate the pleura. The
precise route is as yet unclear. (6) The presence of asbestos fibres
commonly causes pleural plaques to develop. These are localised areas of
pleural thickening, consisting of bland fibrous tissue. The cause is not
absolutely clear, although it appears to be similar to asbestosis; that is, an    F
inflammation caused by a chemical reaction produced by pleural
macrophages and the presence of asbestos fibres. As with asbestosis,
pleural plaque rarely becomes apparent or detectable until after 20 years
from first exposure. (7) Pleural thickening is pleural fibrosis, extending
continuously over a variable proportion of the thoracic cavity, usually
involving the visceral pleura. The cause, development and latency period    G
are similar to pleural plaques. However, unlike pleural plaques, the
disease may manifest itself in the form of physical symptoms.
(8) Mesothelioma is a malignant tumour arising from mesothelial cells
and is found most commonly in the pleura, and sometimes in the
peritoneum. Asbestos fibres in the pleura increase the likelihood of the
development of the requisite malignant cell, although it is not clear
precisely at which stages of mutation the fibre operates or what precise    H
form that development takes. The mean latency period is 40 years,
although (if the end of that period is taken to be the first manifestation of
symptoms) the appearance of the first malignant cell takes place within
that period—about ten years prior to the first manifestation of symptoms.

1743

**[2006] 1 WLR**

In re T & N Ltd (Ch D)
David Richards J

A    The disease is fatal, death usually occurring within about 12 months after
the onset of symptoms."

It is therefore not just the symptoms, but the condition itself, which may not
start to develop for many years after exposure.

*Accrual of causes of action*

B    25    Damage is a necessary element of a cause of action in the tort of
negligence. Unless and until the claimant suffers a loss which is recognised in
law as compensatable by an award of damages, the claimant has no claim in
negligence. This is not a technical requirement. It goes to the foundation of
the law of negligence and many other torts. The obligation which the law
imposes in appropriate circumstances (where the legal decision is that there
C    exists a duty of care to avoid loss of the type in question), and which a
claimant may enforce by legal proceedings, is an obligation to compensate
the claimant against loss which was a reasonably foreseeable consequence of
his carelessness. There is no free-standing obligation or duty of care. This
was clearly stated by Viscount Simonds in *Overseas Tankship (UK) Ltd v
Morts Dock and Engineering Co Ltd (The Wagon Mound)* [1961] AC 388,
D    425:

"It is, no doubt, proper when considering tortious liability for
negligence to analyse its elements and to say that the plaintiff must prove
a duty owed to him by the defendant, a breach of that duty by the
defendant, and consequent damage. But there can be no liability until the
damage has been done. It is not the act but the consequences on which
E    tortious liability is founded. Just as (as it has been said) there is no
such thing as negligence in the air, so there is no such thing as liability
in the air. Suppose an action brought by A for damage caused by the
carelessness (a neutral word) of B, for example, a fire caused by the
careless spillage of oil. It may, of course, become relevant to know what
duty B owed to A, but the only liability that is in question is the liability
for damage by fire. It is vain to isolate the liability from its context and to
F    say that B is or is not liable, and then to ask for what damage he is liable.
For his liability is in respect of that damage and no other. If, as admittedly
it is, B's liability (culpability) depends on the reasonable foreseeability of
the consequent damage, how is that to be determined except by the
foreseeability of the damage which in fact happened—the damage in suit?
And, if that damage is unforeseeable so as to displace liability at large,
how can the liability be restored so as to make compensation payable?"

G
26    A cause of action in negligence can therefore accrue only if and when
compensatable loss is suffered. The same is not true of a cause of action for
breach of contract. By making the contract, a party assumes a legally
recognised and enforceable obligation to perform it. A breach of contract is
therefore without more a breach of legal obligation and a cause of action has
accrued, even though substantial loss has not yet been suffered and may
H    never be suffered.
27    These differences between liability in contract and in tort play an
important part in the present application, for at least two reasons. First,
the way in which the relevant provisions in the Insolvency Act 1986 and the
Insolvency Rules are drafted focus attention on these issues. Secondly, the

differences may produce surprisingly different results depending on whether    A
a claim can be brought in contract or in negligence.

28   The accrual of causes of action in relation to asbestos-related claims
raises acute difficulties, because of the long period which may elapse
between exposure to asbestos and the onset of any medical consequences
which can be recognised as damage, and because of the difficulties, often
amounting to impossibility, of ascertaining the time at which those
consequences started.                                                           B

29   The issue of what constitutes compensatable loss is itself
controversial. There is, of course, no difficulty with conditions such as
mesothelioma, lung cancer or asbestosis. These are comparatively rare
developments on a statistical basis, although still representing a very serious
problem. The difficulty arises in relation to the much more common,
asymptomatic development of pleural plaques. In *Grieves v F T Everard &*    C
*Sons* [2005] EWHC 88 (QB), Holland J held that permanent penetration by
asbestos fibres, with only the potential for harmful physiological changes,
did not constitute compensatable loss. He further held that pleural plaques
were not of themselves sufficient for this purpose. However, pleural plaques
providing a catalyst for future symptomatic diseases and amounting to
physiological damage, when combined with resulting anxiety, was sufficient    D
to amount to a compensatable loss and was therefore sufficient to give rise to
a cause of action. On that basis, a claimant can elect for either a final award
of damages or a provisional award. A final award will compensate not only
for the damage presently suffered (e g anxiety) but also for all damage which
might be suffered in the future, such as the development of mesothelioma,
provided that it is not too speculative. A provisional award will compensate
the claimant for his present loss, but also enable the claimant to apply for    E
further damages in the event that a serious condition specified in the order
later develops.

30   The power to award provisional damages is conferred by section 32A
of the Supreme Court Act 1981, as inserted by section 6 of the
Administration of Justice Act 1982, which enables the award to be made:

"for damages for personal injuries in which there is proved or admitted    F
to be a chance that at some definite or indefinite time in the future the
injured person will, as a result of the act or omission which gave rise to
the cause of action, develop some serious disease or suffer some serious
deterioration in his physical or mental condition."

31   Its application to asbestos cases was described as follows by
Holland J in *Grieves v FT Everard & Sons*, at para 88(a):                    G

"This type of award has to be compensation for a penetration of the
body by asbestos fibres, which penetration is permanent and of sufficient
extent and maturity as to give rise to pleural plaques and to the fact of a
lifetime risk of the onset of a symptomatic condition, with concomitant
'suffering' or loss of amenity in terms of anxiety. It does not have to
compensate for the onset of any such conditions in terms of general    H
damages or prospective financial loss. I reject a defendants' submission
that the fact of an award presently predicated on the basis that no such
condition will in fact arise somehow adversely affects so much of the
claim as invokes anxiety. Whether or not there is an immediate award

A    that reflects the onset of such a condition and its consequences, the threat
of such remains and is a potential source of anxiety."

Holland J explained the approach to a final award and the submissions made
on it at para 90(b):

"Granted that the final award has from the onset been pitched at a level
B    higher than that for a provisional award, what is it that commands
greater compensation? The only apparent factor is the actual assessed
risk of the future onset of an asbestos-related symptomatic, possibly
terminal condition. I consider each of the three presently claimed full
awards separately in due course—it is convenient presently to take
Mr Grieves as an example. In his case (as a 64-year-old) that which
arguably justifies a general damages award higher than that appropriate
C    on a provisional basis are 2% risks of the future onset of diffuse pleural
thickening, further or alternatively asbestosis; and 5% risks of the future
development of a mesothelioma, further or alternatively lung cancer. It is
the potential for the onset of one or more of these conditions that is said to
merit an enhanced award. Essentially, proof on balance of probabilities
that there are these risks justifies, so it is submitted, substantially higher
D    compensation in terms of general damages."

Holland J held that Mr Grieves could not recover damages based on the
possibility of an asbestos-related condition developing because it was too
speculative.

*Are future asbestos claimants "creditors" for the purposes of schemes of
arrangement and CVAs?*
E
32    Section 425 of the Companies Act 1985 makes provision for "a
compromise or arrangement . . . proposed between a company and its
creditors, or any class of them" to become binding on the company and the
creditors, by a process involving a meeting or meetings of the creditors or
classes of creditors concerned and subsequent sanction by the court. There
is no definition of "creditors" for this or any other purpose in the Companies
F    Act 1985.
33    Part I of the Insolvency Act 1986 makes provision for the directors,
administrator or liquidator of a company to "make a proposal under this
Part to the company and to its creditors for a composition in satisfaction of
its debts or a scheme of arrangement of its affairs", called a voluntary
arrangement: section 1(1). Section 3 provides for a meeting of creditors and
G    a meeting of members of the company to consider the proposal. If approved
at both meetings, the CVA binds every creditor entitled to vote at the
meeting of creditors, whether or not he in fact voted or was present or had
notice of the meeting, as if he were a party to the arrangement: section 5(2).
The same is true if the proposal was approved only at the meeting of
creditors, subject to the court's powers under section 4A(6), as inserted by
section 2 of, and paras 1 and 5 of Schedule 2 to, the Insolvency Act 2000.
H    There is no definition of "creditor" for the purposes of Part I of the
Insolvency Act 1986, or indeed for the purposes of other provisions of the
Act relating to companies.
34    Provision for schemes of arrangement was first made by the Joint
Stock Companies Act 1870 (33 & 34 Vict c 104). It was more limited in

scope than the later provisions now re-enacted as section 425 of the    A
Companies Act 1985. It applied only to schemes of arrangement between a
company in liquidation and its creditors. The meaning of "creditors" was
considered in *In re Midland Coal, Coke and Iron Co* [1895] 1 Ch 267 which
concerned a scheme under that Act. The lessee of mines had assigned his
leases to the company which covenanted to indemnify him against liability
under the leases. The company went into liquidation and a scheme was
approved, under which a new company took over the assets and liabilities of    B
the company and agreed to pay or satisfy the unsecured creditors within
three months of approval of the scheme. The lessee applied in the
liquidation of the company to have a sum provided to meet his contingent
liability for rent, royalties and breaches of covenant. In considering whether
he was bound by the scheme and thereby precluded from lodging a proof in
the liquidation of the old company, there was consideration of the meaning    C
of "creditor" for the purposes of the 1870 Act. Wright J said, at p 271:

> "It is difficult to put a meaning on section 2 of the Joint Stock
> Companies Arrangement Act 1870, and the case is complicated by the
> scheme. But, on the whole, I may take it that section 2 is intended to
> apply to everybody who can be treated as a creditor of any sort, whether
> actual or contingent. Craig, being some sort of a creditor, within the    D
> meaning of the Act, so that he could be bound by meetings of creditors,
> either was bound by some order of the court, or he had it in his power to
> get himself protected, and must be treated as if he were a party
> represented by some particular class of creditors. As one of the creditors,
> or of a class of creditors, he was a party to and bound by the scheme."

35   On appeal it was argued by Mr Buckley QC for the lessee that the    E
word "creditor" in the 1870 Act did not include every person who has a
contingent claim against the company, whatever may be the nature of his
claim. Lindley LJ, giving the judgment of the Court of Appeal, agreed with
Wright J's approach to the meaning of "creditor" [1895] 1 Ch 267, 277:

> "Considering that that Act was passed in order to enlarge the powers
> conferred by section 159 of the Companies Act 1862, we agree with    F
> Wright J in thinking that the word 'creditor' is used in the 1870 Act in the
> widest sense, and that it includes all persons having any pecuniary claims
> against the company. Any other construction would render the Act
> practically useless."

36   Mr Snowden relied on this decision as support for an interpretation
of "creditors" which would include future asbestos claimants. The decision    G
dispels any notion that "creditors" are restricted to those with debts which
are presently payable or certain to be payable in the future. However, it
would not itself justify reading "creditors" in this context as having a wider
meaning than creditors with a provable claim in the winding up to meet their
claim: see Lindley LJ, at pp 275–277. Since schemes of arrangement under
the 1870 Act could only be proposed between a company in liquidation and
its creditors, it is to be expected that there should be an alignment between    H
the meaning of "creditors" under the 1870 Act and "creditors" in a
liquidation.

37   The power to promote schemes of arrangement was extended to all
companies, not just those in liquidation, by the Companies Act 1907. Since

A   then there has been no necessary link with the law relating to liquidations, and since 1986 the provisions governing liquidations have been contained in a different statute from those dealing with schemes of arrangements. While those treated as having provable debts in liquidation are "creditors" for the purposes of section 425 of the Companies Act 1985, it does not follow that "creditors" need be restricted to such persons.

B   38  This was the conclusion reached by the Supreme Court of New South Wales in *In re RL Child & Co Pty Ltd* (1986) 4 ACLC 312. It was an application to convene a meeting of creditors to consider a scheme of arrangement with creditors who were defined, at p 313, as

> "any person who is or claims to have any claim against the company arising out of or having its origin in any matter occurring on or prior to
C   > 14 February 1986 or arising out of any transaction, act or omission of the company or any person on or before 14 February 1986, whether the claim be present, future or contingent or whether liquidated sounding only in damages and whether in contract or in tort howsoever arising . . ."

The company was insolvent, but not in liquidation, and, under the applicable insolvency rules, a person with an unliquidated claim in tort was excluded from proof in the winding up of an insolvent company, whether his
D   cause of action accrued before or after the liquidation date. McLelland J saw no warrant for introducing this exclusion into the meaning of "creditors" in section 315 of the Companies Code, which governed schemes of arrangements in terms similar to section 425 of the Companies Act 1985. In reaching this conclusion, he referred to the fact that such claims were provable in the winding up of a solvent company and observed, at p 314:

E   > "It is highly unlikely that the legislature would have intended the ambit of that expression to vary depending upon whether the company was solvent or insolvent, and to exclude persons having unliquidated claims in tort from the scope of section 315 would make little commercial sense."

39  The class of creditors entitled to prove in a solvent liquidation was widely drawn to include all contingent liabilities and did not exclude
F   unliquidated claims in tort. McLelland J treated that provision as a "convenient guide" to the meaning of creditors in section 315. This decision was followed by Anderson J in *Bond Corpn Holdings Ltd v State of Western Australia (No 2)* (1992) 7 WAR 61 (although the decision was disapproved on other grounds by the Privy Council in *Kempe v Ambassador Insurance Co* [1998] 1 WLR 271). It is to be observed that the definition of creditors in the
G   scheme was wide enough to include not only tort claimants with an accrued cause of action, but also those with claims "arising out of or having [their] origin in any matter occurring on or prior to 14 February 1986 or arising out of any transaction, act or omission of the company" on or before the same date. That formulation was clearly wide enough to include persons who had as yet suffered no loss from the "matter occurring" or the act or omission of
H   the company, and who would therefore not have an accrued cause of action in tort.

40  In my judgment, "creditors" in section 425 of the Companies Act 1985 is not limited to those persons who would have a provable claim in the winding up of the company, although it clearly includes all those who would have such a claim. As was submitted by Mr Snowden and other counsel, one

of the recognised purposes of section 425 is to encourage arrangements with    A
creditors which avoid liquidation and facilitate the financial rehabilitation
of the company: see, for example, *Sea Assets Ltd v PT Garuda Indonesia*
[2001] EWCA Civ 1696 at [2]. This suggests that as wide a meaning as
possible should be given to "creditors" in the section. Having said that, it is
important to bear in mind that section 425 is designed as a mechanism
whereby an arrangement may be imposed on dissenting or non-participating    B
members of the class and such a power is not to be construed as extending so
as to bind persons who cannot properly be described as "creditors".

41    The provisions for CVAs are much more recent than those for
schemes of arrangements. They were first introduced by the Insolvency Act
1985 and came into effect as Part I of the Insolvency Act 1986, a
consolidating statute. They are based on recommendations contained in the
report of the Review Committee on Insolvency Law and Practice (1982)    C
(Cmnd 8558) ("the Cork Report").

42    Although contained in the Insolvency Act 1986 and although
envisaged as a mechanism for a company in financial difficulties, there is no
clear requirement that creditors for the purposes of CVAs should be
restricted to persons with provable debts. As a mechanism which is intended
as an alternative to schemes of arrangement, there is every reason for
concluding that "creditors" should have as wide a meaning in Part I of the    D
Insolvency Act 1986 as in section 425 of the Companies Act 1985.

43    The meaning of "creditors" in this context was considered by
Knox J in *In re Cancol Ltd* [1996] 1 All ER 37. A landlord contended that
future rent under a lease was not affected by a voluntary arrangement
approved in relation to the tenant company. Knox J rejected the argument
that "creditors" were restricted to those with presently enforceable claims,    E
and did not include those with future or contingent claims, a reading which
would of course have provided a much narrower class even than persons
with provable claims. Knox J relied in part on the analogy with schemes of
arrangement and on the meaning given to "creditors" by the Court of Appeal
in *In re Midland Coal, Coke and Iron Co* [1895] 1 Ch 267. He observed
[1996] 1 All ER 37, 44–45:                                                    F

"it would, in my view, be highly anomalous if company voluntary
arrangements under the 1986 Act, which are intended to be an alternative
to liquidation, and section 425 compromises or arrangements did not
have the same potential ambit."

Knox J therefore applied by analogy the decision of the Court of Appeal in
*In re Midland Coal, Coke and Iron Co* [1895] 1 Ch 267 that "creditors"    G
include all persons having any pecuniary claims against the company,
including those whose claims are future or contingent.

44    The claim for future rent in *In re Cancol Ltd* [1996] 1 All ER 37
would be a provable debt in a liquidation, and the decision is not therefore
authority for the proposition that the meaning of creditors in relation to
CVAs goes wider than those with provable debts. However, some persons
who do not have provable debts are clearly creditors: see rule 12.3(2) of the    H
Insolvency Rules 1986. Thus, a person with the benefit of a costs order
made in family proceedings was a creditor for the purposes of serving a
statutory demand and presenting a bankruptcy petition, even though the
debt was not provable: *Levy v Legal Services Commission* [2001] 1 All

A  ER 895; see also *In re Debtor (No 488 IO of 1996); JP v Debtor* [1999] 2 BCLC 571.

45  Every creditor who has notice of the meeting convened to consider a CVA is entitled to vote at it. Rules 1.17(2) and 1.17(3) of the 1986 Rules provide for the value to be attributed to the votes of creditors:

B  "1.17(2) [Calculation of votes] Votes are calculated according to the amount of the creditor's debt as at the date of the meeting or, where the company is being wound up or is in administration, the date of its going into liquidation or (as the case may be) when the company entered administration.

"1.17(3) [Limitation on voting] A creditor may vote in respect of a debt for an unliquidated amount or any debt whose value is not
C  ascertained and for the purposes of voting (but not otherwise) his debt shall be valued at £1 unless the chairman agrees to put a higher value on it."

The word "debt" is not defined for the purposes of this rule. While it might not obviously suggest a wholly contingent liability, it is clear from *In re Cancol Ltd* that it does so.

D  46  The present state of the authorities therefore shows that (i) the holder of a contingent claim is a creditor for the purposes of the provisions governing both schemes of arrangement and CVAs and (ii) the claim need not be a provable debt. The nature of contingent claims is such that a creditor for these purposes need not have an accrued cause of action. To take the simple example of an uncalled guarantee, the person with the benefit of the guarantee will be a "creditor" of the guarantor, even though
E  there has not been, and may never be, any default on the principal debt or any call on the guarantee.

47  None the less it is a significant step to go from saying that a person with a contingent claim on the basis of an existing contractual obligation is a "creditor" to saying that a person who has suffered no loss and who therefore has no claim in tort is a "creditor" because he may in the future
F  suffer loss, giving him then a cause of action in tort. There is no authority, except possibly the New South Wales case of *In re RL Child & Co Pty Ltd* 4 ACLC 312, which establishes this proposition. Nor, however, does any authority reject it.

48  It becomes necessary to look closely at the nature of a contingent liability. The most illuminating authority, on which Mr Snowden and other
G  counsel heavily relied, is the decision of the House of Lords by a majority of three to two in *In re Sutherland, decd* [1963] AC 235. It concerned the incidence of estate duty in circumstances where the deceased had "control" of a company, as defined in the Finance Act 1940, during the five years ending with his death. In such circumstances, his shares fell to be valued by reference to the net value of the company's assets, pursuant to sections 50 and 55 of the 1940 Act. At the date of death the assets included five ships for
H  which the company had received capital allowances under the Income Tax Act 1952, leaving a sum as "expenditure unallowed" as defined in the 1952 Act. If, as happened after his death, the ships were sold at a price greater than the expenditure unallowed, the company became subject to balancing charges resulting in a tax liability.

49    For the purposes of valuing the net assets of the company, allowance    A
had to be made under section 50 of the Finance Act 1940 for

> "all liabilities of the company (computed, as regards liabilities which
> have not matured at the date of the death, by reference to the value
> thereof at that date, and, as regards contingent liabilities, by reference to
> such estimation as appears to the commissioners to be reasonable) . . ."

B

The issue was whether the balancing charges payable on a sale of the ships
was for these purposes "contingent liabilities" of the company at the date of
the deceased's death.

50    It was submitted for the Inland Revenue that contingent liabilities
referred to an existing legal obligation under which any payment would
become due in consequence of the happening of a future uncertain event or
events. No legal obligation existed at the date of death, not only because it    C
was uncertain whether the ships would ever be sold, but also because any
sale, and therefore the liability to pay a balancing charge, depended on the
volition of the company. The contingency was under its control. While it
was conceded that as soon as a capital allowance was accepted there arose
an obligation to pay in certain circumstances, it was the element of volition
which meant that there was no contingent liability. Additionally, it was    D
submitted that section 50 was not aimed at obligations arising under a
statute, and was aimed primarily at contractual obligations.

51    Lord Reid, giving the leading majority speech, rejected the notion
that a contingent liability could arise under a contract, but not under statute:
*In re Sutherland, decd* [1963] AC 235, 247–248. As to the meaning of
contingent liability, he held that in Scots law and in section 50 of the Finance
Act 1940 it was, at p 249, "a liability which, by reason of something done by    E
the person bound, will necessarily arise or come into being if one or more of
certain events occur or do not occur". Although Lord Reid formally
expressed no final view as to the meaning of contingent liability as a matter
of English law, this was an English appeal on the construction of a United
Kingdom statute, and there is no good basis for suggesting that it generally
has a different meaning in English law.    F

52    While contingent liabilities in section 50 meant

> "sums, payment of which depends on a contingency, that is, sums
> which will only become payable if certain things happen, and which
> otherwise will never become payable,"

he agreed with the commissioners, at p 249,    G

> "to this extent, that this class can only include liabilities which in
> law must arise if one or more things happen, and cannot be extended to
> include everything that a prudent businessman would think it proper to
> provide against."

The difference here was that by accepting the capital allowances, the
company came under a statutory obligation to pay balancing charges if the    H
ships were later sold at more than a certain amount, and it did not matter
that it was a matter of choice for the company whether it sold the ships.

53    Lord Birkett and Lord Guest agreed with Lord Reid. Lord Birkett
said, of the obligation to pay the balancing charges, at pp 253–254:

A    "It was no less a contingent liability because the sale of the ships might
     not take place. The true legal position was that from the moment the
     appellants accepted capital allowances they were at once under a liability
     to pay tax in the circumstances provided for in the Income Tax Act
     1952."

Lord Guest said, in terms which are particularly in point to the present case,
B at p 264:

     "The claim for initial allowances for what has been described as
     depreciation is the voluntary choice of the taxpayer, but, once he has
     obtained such allowances, he is automatically involved by the operation
     of law in the payment of balancing charges, if the assets are parted with at
     a price greater than the written down value in the circumstances defined
C    in section 292 of the Income Tax Act 1952."

    54    It appears from Lord Hodson's minority speech, with which Lord
Tucker agreed, that the critical feature was that the contingency depended
on the volition of the company: see p 259. In those circumstances, it could
not properly be said that there was an underlying obligation. He did
however accept that a contingent liability could arise under a statute, as
D much as by contract.
    55    The analysis of contingent liability contained in the majority
speeches in *In re Sutherland, decd* [1963] AC 235 has been applied in the
context of insolvency: see *In re SBA Properties Ltd* [1967] 1 WLR 799 (no
contingent liability because the company had done nothing which could
result in it being subject to the alleged liability) and *Community
E Development Pty Ltd v Engwirda Construction Co* (1969) 120 CLR 455,
per Owen J (employer under a construction contract is contingently liable to
pay "extras" although their determination is subject to arbitration under the
contract: this would, I think, be a contingent liability under the minority, as
well as the majority, view in *In re Sutherland, decd* [1963] AC 235); see also
*In re Gasbourne Pty Ltd* [1984] VR 801.
    56    In *Secretary of State for Trade and Industry v Frid* [2004] 2 AC 506,
F the House of Lords held that there could be set-off under rule 4.90 of the
Insolvency Rules 1986 between an obligation which was contingent at the
liquidation date to reimburse the Secretary of State for payments made
under statute to former employees and a VAT credit in the company's favour
at the liquidation date. One issue was whether, for the purposes of rule 4.90
with its reference to "mutual credits, mutual debts or other mutual
G dealings", a contingent liability arising as a result of a statute, rather than
under a contract, was capable of set-off. The House of Lords held that it
was.
    57    The contingent liability arose in this way. The company was liable
for compensatory notice pay and redundancy payments to nine employees
under sections 88 and 135 of the Employment Rights Act 1996. As the
company did not make the payments, the Secretary of State was liable to
H do so under sections 166 and 167 of that Act. On making payment,
section 167(3) provided that all the rights and remedies of the employees
against the company vested in the Secretary of State.
    58    It was submitted for the liquidator that at the liquidation date there
was no debt arising under section 167(3), only a possibility that such a debt

would later come into existence. As to this, Lord Hoffmann, giving the    A
leading speech, said, at p 511, paras 9–10:

> "9. It is not however necessary for the purposes of rule 4.90(2) that
> the debt should have been due and payable before the insolvency date.
> It is sufficient that there should have been an obligation arising out of
> the terms of a contract or statute by which a debt sounding in money
> would become payable upon the occurrence of some future event or    B
> events. The principle has typically been applied to claims for breach
> of contract where the contract was made before the insolvency date
> but the breach occurred afterwards ( *In re Asphaltic Wood Pavement
> Co* (1885) 30 Ch D 216) or claims for indemnity by a guarantor where
> the guarantee was given before the insolvency date but the guarantor
> was called upon and paid afterwards: *Jones v Mossop* (1844) 3 Hare    C
> 568; *In re Moseley-Green Coal and Coke Co Ltd, Ex p Barrett* (1865)
> 12 LT (NS) 193.
> "10. The effect of these and similar cases was summed up by Millett J
> in *In re Charge Card Services Ltd* [1987] Ch 150, 182: 'By the turn of
> the [20th] century, therefore, the authorities showed that debts whose
> existence and amount were alike contingent at the date of the receiving
> order, and claims to damages for future breaches of contracts existing at    D
> that date, were capable of proof and, being capable of proof, could be
> set off under the section provided that they arose from mutual credits or
> mutual dealings. The only requirement was that they must in fact have
> resulted in quantified money claims by the time the claim to set off was
> made.'"

Lord Hoffmann held that the apparent reasoning of the Court of Appeal in    E
*In re A Debtor (No 66 of 1955), Ex p The Debtor v Waite's Trustee* [1956]
1 WLR 480, that a surety under a pre-insolvency guarantee is not entitled to
set off unless he has paid the debt before the insolvency date, was wrong and
continued [2004] 2 AC 506, 513, paras 17 and 19:

> "17. This means that if the Secretary of State had agreed by contract
> before the insolvency date to guarantee any future liability of the    F
> company to pay compensatory notice pay or make redundancy payments
> to employees under the 1996 Act, the contract of guarantee would have
> created a contingent liability on the part of the company to reimburse the
> Secretary of State which was a 'debt' at the insolvency date and became
> capable of set-off when the employees were afterwards paid. The next
> question is whether it makes a difference that the contingent liability    G
> existed by virtue of a statute rather than a contract and, not being
> consensual, that it involved no direct contract or other relationship with
> the employees or the company."
> "19. If a statutory origin does not prevent set-off in the case of debts
> due and payable at the insolvency date, I do not see why it should make
> any difference that the statute creates a contingent liability which exists
> before the insolvency date but falls due for payment and is paid    H
> afterwards. The term 'mutual debts' does not in itself require anything
> more than commensurable cross-obligations between the same people in
> the same capacity. How those debts arose—whether by contract, statute
> or tort, voluntarily or by compulsion—is not material."

A    59  It seems to me that even if section 167(3) had not expressly conferred
on the Secretary of State the rights and remedies of the employees of the
company, the result would have been the same. The primary liability to
make the payments rested with the company. The statute imposed an
obligation on the Secretary of State to make the payments, if the company
failed to do so. If the Secretary of State did so, she would have an
enforceable right of reimbursement against the company. The analogy with
B    a contractual guarantee was exact: see Lord Hoffmann, at p 513, para 20. If
a third party makes under legal compulsion a payment which is primarily
due from a debtor, the third party has a common law right of reimbursement
against the debtor. The liability of the company to the Secretary of State in
*Secretary of State for Trade and Industry v Frid* [2004] 2 AC 506 would not
then strictly be created by the statute but it would arise by operation of law.

C    60  If the principles established in *In re Sutherland, decd* [1963] AC 235
and *Secretary of State for Trade and Industry v Frid* [2004] 2 AC 506 are
applied to this case, it is right in my judgment to conclude that T & N is
subject to contingent liabilities to pay damages to those who have already
been carelessly exposed to asbestos by the actions of T & N and who later
suffer compensatable loss, resulting in claims for damages in negligence
against T & N. The creditors in respect of those contingent liabilities are the
D    persons who have been carelessly exposed to asbestos and who will have
claims in negligence if they suffer loss as a result. Reverting to Lord Reid's
speech, the contingent liability to pay damages is a liability which, by reason
of something done by the person (i e the use or distribution by T & N of
asbestos or asbestos products) will necessarily arise or come into being if one
or more certain events occur (i e the onset of asbestos-related conditions in
persons previously exposed to asbestos by T & N). Lord Guest referred
E    specifically to the contingent debtor being "automatically involved by the
operation of law in the payment" of the debt once the contingency occurred.
That precisely describes the situation here. The careless exposure of persons
to asbestos by T & N will automatically by the operation of the law of
negligence lead to the liability to pay damages, assuming the existence of the
other necessary elements of a claim in negligence.
F    61  This is in one important respect a stronger case than *In re
Sutherland, decd* [1963] AC 235. As already noted, the majority did not
regard as decisive that the liability to pay the balancing charges would arise
only as a result of the company's own choice to sell the ships. In this case
there is no question of volition. There is nothing which T & N can do to
incur or avoid the liability. There is no medical intervention which can
G    prevent the development of the asbestos-related conditions in those who
have been exposed to asbestos. Nature will take its course.
62  If a valuation to be performed under provisions identical to the
Finance Act 1940 was of a controlling shareholding in an asbestos producer,
rather than a shipping company, the existing exposure of the company to
asbestos-related personal injuries claims in the future would, in my view,
have constituted contingent liabilities. They go beyond something which "in
H    a business sense is morally certain and for which every businessman ought to
make provision".
63  In my judgment, it makes no difference that the source of the liability
is the common law of negligence, rather than a contract or a statute. There is
no logical reason why it should make a difference. Lord Guest in *In re*

*Sutherland, decd* [1963] AC 235 did not limit the source to contract or    A
statute but referred to the operation of law. Lord Hoffmann in *Secretary of
State for Trade and Industry v Frid* [2004] 2 AC 506, 513, para 19, did not
limit it, but said in terms: "How those debts arose—whether by contract,
statute or tort, voluntarily or by compulsion—is not material." The example
of a liability arising by application of the principle of reimbursement is
likewise "by operation of law". The liability in tort which Lord Hoffmann    B
may have had particularly in mind is illustrated by the Australian case of
*Gye v McIntyre* (1991) 171 CLR 609, to which he referred in the context of
"mutual dealings". The High Court held that a claim for damages for
fraudulently inducing the insolvent company to make a contract with a third
party could be set off against a liability on a loan. The loss caused by the
fraud had been suffered before the liquidation date, so that there was at that
date a complete cause of action in tort. This does not however mean that    C
Lord Hoffmann's reference to tort in the passage cited above should be
confined to completed causes of action.

64    I was referred, by way of comparison, to cases where the liability,
although arising from events prior to the liquidation date, is created by the
subsequent exercise of a judicial discretion. In *Glenister v Rowe* [2000]
Ch 76 the Court of Appeal held that a party to litigation against a bankrupt    D
could not prove for costs incurred in the litigation prior to the bankruptcy
but not covered by a costs order made before the bankruptcy, because the
bankrupt would be liable only if and when the court in its discretion made a
costs order. It was not therefore a contingent liability at the date of
bankruptcy. (I comment in passing that, while producing a just result on the
facts of the case, the decision is likely to produce an unjust result when
applied to the similar provisions governing proof in the winding up of a    E
company.) Likewise, there are a number of Australian decisions concerning
statutory provisions whereby personal liability for the debts of an insolvent
company can be imposed on a director, if he has been convicted of a relevant
offence. In such a case, the liability is imposed by the civil court in the
exercise of its discretion. These provisions have been held not to create a
contingent liability of the director at the time of his bankruptcy because any
liability is dependent on a subsequent exercise of judicial discretion: see, for    F
example, *Corporate Affairs Comr v Karounos* (1985) 3 ACLC 40.

65    I accept the submission that these cases are not in point to the issue as
regards future asbestos claims. There is no element of discretion as regards
such claims. If the ingredients of the tort of negligence, including
compensatable loss, are established, the claimants are entitled to damages.
They do not depend on an exercise of discretion by the court.    G

66    I conclude therefore that T & N is subject to contingent liabilities in
respect of future asbestos claims, as defined in the administrators'
application and that the future asbestos claimants, being those persons who
have been exposed to asbestos and who will have claims in negligence
against T & N if they develop asbestos-related diseases, are "creditors" of
T & N for the purposes of section 425 of the Companies Act 1985 and Part I
of the Insolvency Act 1986 dealing with CVAs.    H

67    In reaching this conclusion, I emphasise that I do so on the basis of
the facts relevant to asbestos claims, principally that the relevant acts or
omissions of T & N are complete, the potential claimants have been exposed
to asbestos and the existence of a claim in tort depends solely on whether a

1755

**[2006] 1 WLR**                                    In re T & N Ltd (Ch D)
                                                    David Richards J

A    relevant asbestos condition develops. I have not considered circumstances
     where all the relevant events excluding damage have not occurred, as, for
     example, where a company has negligently made a product but the putative
     claimant has not acquired it or used it. By way of extreme example, if aero-
     engines are negligently manufactured and are in use but have not (yet) caused
     an air crash, it could hardly be supposed that there exists a contingent
B    liability to the victims of a possible future crash: for facts of this sort, see
     *In re R-R Realisations Ltd* [1980] 1 WLR 805.
        68  As I have mentioned, no party represented on this hearing advanced
     submissions against the proposition that future asbestos claimants were
     creditors for these purposes. However, Mr Snowden and other counsel
     readily accepted that it was their duty to put before the court all counter-
     arguments which occurred to them. They conscientiously did so and after
C    the hearing Mr Arden supplied me with a summary of the counter-
     arguments. I believe therefore that my decision is reached after a full
     consideration of the relevant issues.

     *Are future asbestos claims provable debts in a winding up of T & N?*

        69  It does not necessarily follow from the characterisation of future
D    asbestos claimants as creditors for the purposes of a scheme of arrangement
     or a CVA that their claims are provable in a winding up of T & N if it goes
     into liquidation before they have suffered any compensatable loss. This issue
     turns on the relevant provisions of the Insolvency Rules 1986.
        70  The insolvency regime, dealing with the insolvency of both
     individuals and companies, is contained in the Insolvency Act 1986 and the
E    Insolvency Rules 1986 (in both cases, as amended from time to time). They
     contain a substantial degree of reform of the pre-existing law, which had
     been contained as regards individuals in the Bankruptcy Act 1914 and
     the Bankruptcy Rules 1915 (SR&O 1914/1824) and as regards companies in
     the Companies Act 1948 (and then, briefly the Companies Act 1985) and the
     Companies (Winding-up) Rules 1949 (SI 1949/330). Under the previous
     regime, significant portions of the Bankruptcy Act and Rules were made
F    applicable in the winding up of insolvent companies. The new regime
     implemented many of the recommendations for reform made by the Cork
     Report. However, not all its recommendations were accepted, including in
     particular those in relation to dealing with unliquidated tort claims. The
     reforms were introduced in the first instance by the Insolvency Act 1985,
     which was for the most part not brought into effect, but was consolidated
G    with other provisions in the Insolvency Act 1986.
        71  It is a striking feature of the present insolvency regime that while
     there is an almost complete correspondence between the provisions
     governing provable debts, the mechanics of proof and the distribution of
     assets in bankruptcy and in winding up, many of the bankruptcy provisions
     are contained in primary legislation, while the equivalent winding up
     provisions are contained in the Insolvency Rules 1986. It would appear that
H    the draftsman of the Rules used the bankruptcy provisions in the Insolvency
     Act as a template. Where the corresponding provisions are largely identical,
     it must be taken that the Rules are intended to achieve the same result for a
     winding up as applies under the Act (or equivalent rules) in a bankruptcy.
     It would be very odd to construe them in different ways. None the less,

provisions which made good sense in a bankruptcy context may be regarded    A
differently in the context of a winding up.

72    The principal provisions as regards provable debts are rule 12.3 of
the 1986 Rules, which applies to bankruptcy and winding up, rule 13.12,
which applies only to winding up, and section 382 of the 1986 Act,
which applies only to bankruptcy. The relevant rule-making powers are
contained in the Insolvency Act 1986: see section 411 and Schedule 8,    B
paragraph 12 (winding up); and section 412 and Schedule 9, paragraph 17
(bankruptcy).

73    Rule 12.3(1) of the 1986 Rules, as amended by rule 12 of and
paragraph 62(a) of Schedule 1 to the Insolvency (Amendment) Rules 2003
(SI 2003/1730), provides:

> "Subject as follows, in administration, winding up and bankruptcy, all    C
> claims by creditors, all claims by creditors are provable as debts against
> the company or, as the case may be, the bankrupt, whether they are
> present or future, certain or contingent, ascertained or sounding only in
> damages."

Rule 12.3(2) ("What is not provable") specifies very limited categories of
claims which are not provable; it does not include contingent claims in tort.    D

74    Rule 13.12 is one of the interpretation provisions contained in Part 13
of the Rules and provides:

> "(1) 'Debt', in relation to the winding up of a company, means (subject
> to the next paragraph) any of the following—(a) any debt or liability to
> which the company is subject at the date on which it goes into liquidation;
> (b) any debt or liability to which the company may become subject after    E
> that date by reason of any obligation incurred before that date; and (c) any
> interest provable as mentioned in rule 4.93(1).
>
> "(2) In determining for the purposes of any provision of the Act or the
> Rules about winding up, whether any liability in tort is a debt provable in
> the winding up, the company is deemed to become subject to that liability
> by reason of an obligation incurred at the time when the cause of action
> accrued.    F
>
> "(3) For the purposes of references in any provision of the Act or the
> Rules about winding up to a debt or liability, it is immaterial whether the
> debt or liability is present or future, whether it is certain or contingent,
> or whether its amount is fixed or liquidated, or is capable of being
> ascertained by fixed rules or as a matter of opinion; and references in any
> such provision to owing a debt are to be read accordingly.    G
>
> "(4) In any provision of the Act or the Rules about winding up, except
> in so far as the context otherwise requires, 'liability' means (subject to
> paragraph (3) above) a liability to pay money or money's worth,
> including any liability under an enactment, any liability for breach of
> trust, any liability in contract, tort or bailment, and any liability arising
> out of an obligation to make restitution."

H

75    The bankruptcy provision which is equivalent to rule 13.12 is
section 382 of the Insolvency Act 1986. It defines "bankruptcy debt":

> "(1) 'Bankruptcy debt', in relation to a bankrupt, means (subject to the
> next subsection) any of the following—(a) any debt or liability to which

A     he is subject at the commencement of the bankruptcy, (b) any debt or liability to which he may become subject after the commencement of the bankruptcy (including after his discharge from bankruptcy) by reason of any obligation incurred before the commencement of the bankruptcy . . . (d) any interest provable as mentioned in section 322(2) in Chapter IV of Part IX.

B     "(2) In determining for the purposes of any provision in this group of parts whether any liability in tort is a bankruptcy debt, the bankrupt is deemed to become subject to that liability by reason of an obligation incurred at the time when the cause of action accrued.

    "(3) For the purposes of references in this group of parts to a debt or liability, it is immaterial whether the debt or liability is present or future, whether it is certain or contingent or whether its amount is fixed or

C liquidated, or is capable of being ascertained by fixed rules or as a matter of opinion; and references in this group of parts to owing a debt are to be read accordingly.

    "(4) In this group of parts, except in so far as the context otherwise requires, 'liability' means (subject to subsection (3) above) a liability to pay money or money's worth, including any liability under an enactment, any liability for breach of trust, any liability in contract, tort or bailment

D and any liability arising out of an obligation to make restitution."

Just as rule 13.12 defines "debts" for the purposes of proof in a winding up, section 382 defines debts for the purposes of proof and distribution in bankruptcy: see sections 322 and 324 of the Insolvency Act 1986.

    76   Historically the development of rules for proving debts began with individual bankruptcy. As an individual will survive bankruptcy, it was not

E a necessity to include all or most debts and liabilities of the bankrupt as provable debts. If a particular debt was not provable, it would not be extinguished by the bankruptcy and could be enforced against the bankrupt and his after-acquired property. There was a balance between sharing in the distribution of the bankrupt's property which came at the price of not being able to pursue the bankrupt in any other way, and being free to pursue the

F bankrupt but at the price of not sharing in a distribution of his assets on bankruptcy. This was not a matter of choice for the creditor but turned on the definition of provable debts.

    77   Until the early 19th century, the prevailing legal policy was that debts should not be provable either if they were difficult to quantify or if they resulted from the personal wrongdoing of the bankrupt. Claims for unliquidated damages in tort showed both characteristics, but other claims

G such as unliquidated claims for breach of contract or contingent claims were excluded on the basis of the first ground.

    78   A succession of Bankruptcy Acts culminating in the Bankruptcy Act 1869 (32 & 33 Vict c 71) revolutionised the approach to provable claims. With a few exceptions, all claims were to be provable and it was no longer regarded as a sound basis for exclusion that the claim was difficult to

H quantify.

    79   In *Hardy v Fothergill* (1888) 13 App Cas 351, 355–356, Lord Halsbury LC gave some account of the developments before 1869:

    "My Lords, the question in this case seems to me to depend entirely upon the true construction of section 31 of the Bankruptcy Act 1869, but

before proceeding to discuss the particular words now under construction    *A*
it is not unimportant to notice the gradual steps taken by the legislature to
extend the application of the bankruptcy law to future and contingent
debts. Mr Eden in a treatise published in 1826 points out that one of the
most important and valuable alterations effected by the [Bankruptcy Act
1825] 6 Geo 4, c 16 was the provision which it contained with respect to
proof of contingent debts. Prior to that Act contingent demands could    *B*
not be proved under a commission taken out before the contingencies
upon which they were made payable had taken effect. Nearly 80 years
before that time Lord Hardwicke expressed a wish in which Lord Eldon
afterwards concurred 'that some gentleman might think of a clause which
might remedy and settle the matter for the future'. My Lords, from that
time till the year 1869 I think the legislature has been engaged in the effort
to exhaust every conceivable possibility of liability under which a    *C*
bankrupt might be, to make it provable in bankruptcy against his estate
and relieve the bankrupt for the future from any liability in respect
thereof."

80   In *Ex p Llynvi Coal and Iron Co; In re Hide* (1871) LR 7 Ch App 28,
31–32 James LJ described the changes made by the Bankruptcy Act 1869:

   *D*

"Upon the question of the right of proof I am satisfied that there can be
no real question as to the intention of the legislature. A great number of
cases occurred, before the passing of the late Act, in which the bankrupt
was left liable to several claims of various kinds, and the persons who had
those claims were entirely excluded from any participation in the general
division of the assets. Then came the Act of Parliament, which—dealing
in express terms with almost every one of the cases which had ever    *E*
previously occurred, and excluding nothing but demands for damages for
personal torts—provided that there should be nothing whatever for
which a right to proof should not be given. Every possible demand, every
possible claim, every possible liability, except for personal torts, is to be
the subject of proof in bankruptcy, and to be ascertained either by the
court itself or with the aid of a jury. The broad purview of this Act is, that
the bankrupt is to be a freed man—freed not only from debts, but from    *F*
contracts, liabilities, engagements, and contingencies of every kind. On
the other hand, all the persons from whose claims, and from liability to
whom he is so freed are to come in with the other creditors and share in
the distribution of the assets."

81   In *Flint v Barnard* (1888) 22 QBD 90, 92, concerning the
Bankruptcy Act 1883 (46 & 47 Vict c 52), Lord Esher MR derived from    *G*
*Hardy v Fothergill* 13 App Cas 351 the correct approach for the courts to the
construction of these provisions:

"It seems to me that the House of Lords, in *Hardy v Fothergill*, has laid
down a rule of interpretation, or rather a rule of conduct, for the court
where it has to construe the Bankruptcy Act. It is true that the remarks of
the Lord Chancellor relate to the Bankruptcy Act 1869 but they are    *H*
equally applicable to the later Act [Bankruptcy Act 1883], and may be
paraphrased by saying that since the statute 6 Geo 4, c 16, till the year
1883, the legislature has been engaged in the effort to exhaust every
conceivable possibility of liability under which a bankrupt might be, to

A   make it provable in bankruptcy against his estate and relieve the bankrupt
for the future from any liability in respect thereof."

82   Thus a wide range of contingent or unliquidated claims become
provable, with a just estimate being made of the value of the claim. Proofs of
debt were therefore admissible for unliquidated damages for breach of
contract (*In re Sneezum, Ex p Davis* (1876) 3 Ch D 463), for a contingent
B   claim in respect of a repairing covenant in a lease (*Hardy v Fothergill* 13 App
Cas 351), for a contingent claim under a guarantee (*Wolmershausen v
Gullick* [1893] 2 Ch 514), and for an annuity payable during joint lives and
for so long as the recipient should lead a chaste life: *Ex p Neal, In re Batey*
(1880) 14 Ch D 579. The provisions for valuing such claims for the
purposes of proof are now contained in section 322(3)(4) of the 1986 Act
C   (bankruptcy) and rule 4.86 of the 1986 Rules (winding up).

83   The same inclusive approach was adopted with regard to provable
debts in a winding up. Section 158 of the Companies Act 1862 (25 & 26 Vict
c 89) provided in language that has changed little in subsequent provisions:

"In the event of any company being wound up under this Act, all debts
payable on a contingency, and all claims against the company, present or
D   future, certain or contingent, ascertained or sounding only in damages,
shall be admissible to proof against the company, a just estimate being
made, so far as is possible, of the value of all such debts or claims as may
be subject to any contingency or sound only in damages, or for some
other reason do not bear a certain value."

84   The Cork Report noted, at para 1289:

E   "It is a basic principle of the law that every debt or liability capable of
being expressed in money terms should be eligible for proof in the
insolvency proceedings, so that the insolvency administration should deal
comprehensively with, and in one way or another, discharge, all such
debts and liabilities."

A similar statement of principle was contained in a report of the Australian
F   Law Reform Commission: General Insolvency Inquiry (1988) (ALRC 45
vol 1, para 774):

"*A comprehensive system.* A basic aim of insolvency law is to deal
comprehensively with all of the debts and liabilities of the insolvent. In
the case of an individual insolvent, the aim is to have all claims to which
the insolvent was subject at the time of the commencement of the formal
G   administration resolved so that the insolvent can make a fresh start. This
reflects the rehabilitative aim of insolvency law. In the case of a company,
the aim is to deal with all the claims against a company so that its affairs
can be fully wound up or so that it can resume trading."

85   Notwithstanding this inclusive policy, English insolvency law has
experienced particular difficulty in dealing with unliquidated claims in tort.
H   Until the reforms consolidated in the Insolvency Act 1986, such claims were
not provable at all in bankruptcy or in the winding up of an insolvent
company. It was widely understood that only claims for sums liquidated by
judgment or agreement before the bankruptcy or winding up could be the
subject of proof.

86    Provable debts in bankruptcy were governed by section 30 of the    A
Bankruptcy Act 1914:

"(1) Demands in nature of unliquidated damages arising otherwise
than by reason of a contract, promise, or breach of trust shall not be
provable in bankruptcy."

"(3) Save as aforesaid, all debts and liabilities, present or future,
certain or contingent, to which the debtor is subject at the date of the    B
receiving order, or to which he may become subject before his discharge
by reason of any obligation incurred before the date of the receiving
order, shall be deemed to be debts provable in bankruptcy.

"(4) An estimate shall be made by the trustee of the value of any debt or
liability provable as aforesaid, which by reason of its being subject to any
contingency or contingencies, or for any other reason, does not bear a
certain value."                                                             C

"(6) If, in the opinion of the court, the value of the debt or liability is
incapable of being fairly estimated, the court may make an order to that
effect, and thereupon the debt or liability shall, for the purposes of this
Act, be deemed to be a debt not provable in bankruptcy.

"(7) If, in the opinion of the court, the value of the debt or liability is
capable of being fairly estimated, the court may direct the value to be    D
assessed before the court . . . and the amount of the value when assessed
shall be deemed to be a debt provable in bankruptcy.

"(8) 'Liability' shall, for the purposes of this Act, include—(a) any
compensation for work or labour done; (b) any obligation or possibility
of an obligation to pay money or money's worth on the breach of any
express or implied covenant, contract, agreement, or undertaking,    E
whether the breach does or does not occur, or is or is not likely to occur or
capable of occurring, before the discharge of the debtor; (c) generally, any
express or implied engagement, agreement, or undertaking, to pay, or
capable of resulting in the payment of, money or money's worth; whether
the payment is, as respects amount, fixed or unliquidated; as respects
time, present or future, certain or dependent on one contingency or on
two or more contingencies; as to mode of valuation, capable of being    F
ascertained by fixed rules or as a matter of opinion."

The effect of section 30(1) was to exclude from proof unliquidated damages
in tort. Such claims therefore survived a bankruptcy and could be pursued
against a former bankrupt and his after-acquired property.

87    By section 317 of the Companies Act 1948, and its predecessor
sections, the provisions of bankruptcy law as to "debts provable and to the    G
valuation of annuities and future contingent liabilities" were made
applicable in the winding up of an insolvent company. If the company were
solvent, or became solvent in the course of the winding up (as for example, in
In re Rolls-Royce Co Ltd [1974] 1 WLR 1584), the bankruptcy provisions
did not apply or ceased to apply, and provable debts were governed
exclusively by section 316:                                              H

"In every winding up (subject, in the case of insolvent companies, to
the application in accordance with the provisions of this Act of the law of
bankruptcy) all debts payable on a contingency, and all claims against
the company, present or future, certain or contingent, ascertained or

A    sounding only in damages, shall be admissible to proof against the
     company, a just estimate being made, so far as possible, of the value of
     such debts or claims as may be subject to any contingency or sound only
     in damages, or for some other reason do not bear a certain value."

     Accordingly, unliquidated claims in tort could be proved in the winding up
     of a solvent company. If, however, the company were insolvent they could
B    not be the subject of proof and, in the absence of joint tortfeasors or
     insurance available to the claimant under the Third Parties (Rights against
     Insurers) Act 1930, the claim would remain entirely unpaid. This represents
     an important difference between insolvent companies and individuals. The
     winding up of an insolvent company leads almost inevitably to its
     dissolution and there is no equivalent to proceeding against the bankrupt
C    after his discharge.
         88   Shortly before the reforms were enacted in the Insolvency Act 1985,
     the problems posed by the exclusion of unliquidated claims in tort were
     considered in two decisions at first instance. In *In re Berkeley Securities
     (Property) Ltd* [1980] 1 WLR 1589 Vinelott J considered the position where
     tort damages became liquidated by judgment or agreement during the
     winding up. He held that in those circumstances the bankruptcy rules
D    imported by section 317 of the Companies Act 1948 required modification
     to fit into the scheme of the winding up of an insolvent company and did not
     preclude the admission of the claim for the liquidated sum. The claimant
     would not be entitled to disturb prior distributions to creditors but would be
     able, in effect, to catch up with prior distributions out of assets remaining
     with the liquidator and to participate pari passu in any future distributions.
E        89   Vinelott J did not regard it as sensible that an unliquidated claim for
     damages in tort should be excluded from proof in bankruptcy, although, as
     he acknowledged, that clearly was the legal position. He regarded it as
     anomalous, given that an unliquidated claim for damages for breach of
     contract was admissible to proof but may be just as difficult to ascertain and
     evaluate. He pointed to the facts of *In re Great Orme Tramways Co* (1934)
     50 TLR 450, which concerned a claim in respect of personal injuries
F    sustained by a passenger when a tram ran out of control. A claim for the
     same amount for the same injuries could be made in contract or in tort. The
     unliquidated claim in contract was provable, but not the unliquidated claim
     in tort. He drew the anomaly to the attention of the Cork Committee.
         90   In a subsequent case, *In re Islington Metal and Plating Works Ltd*
     [1984] 1 WLR 14, Harman J disagreed with the decision of Vinelott J. He
G    held that, on the relevant provisions, a tort claim could be proved in a
     bankruptcy or an insolvent liquidation only if liquidated by judgment or
     agreement before the bankruptcy or winding up. He founded this on the
     principle that the liquidation of an insolvent company and the distribution
     of its assets were to be treated as notionally simultaneous and all debts were
     to be computed at the liquidation date (subject to the application of the
     hindsight principle to contingent claims, which enables the court to take
H    account of later events in evaluating such claims). If, however, all provable
     debts and liquidation expenses were paid in full, Harman J held that the
     bankruptcy rules would cease to apply and, under section 316, unliquidated
     tort claims would be admitted to proof even if the claims might exceed the
     assets then available.

91   The Cork Report considered the admissibility of tort claims to proof      *A*
and recommended a change in the law. It stated, at para 1318:

"It has been put to us that, having regard to the elaborate rules which
exist for dealing with contingent liabilities, such as annuities, it is
unacceptable that tort claims should be left outside the category of
provable debts.  We agree.  We recommend that the present rule in
bankruptcy be reversed, and that all claims for damages, whether in      *B*
contract or in tort, be admissible to proof in liquidation of assets,
bankruptcy or winding up, *provided only that the claim is liquidated by
agreement or judgment before it becomes proved*." (Emphasis added.)

It can be seen that the Cork Report did not recommend that unliquidated
claims in tort should as such be provable, which would seem to have been
the solution favoured by Vinelott J in *In re Berkeley Securities Ltd
(Property) Ltd* [1980] 1 WLR 1589, 1611–1612 but was not open to him on      *C*
the statutory provisions as they then stood.  Instead, the Cork Report
adopted as its recommendations the route adopted by Vinelott J as his
decision, that tort claims should be admissible to proof but only after they
had been liquidated by judgment or agreement.

92   It is unclear from the Cork Report whether its recommendation was      *D*
premised on the assumption that the cause of action in tort would be
complete by the liquidation date, although not then quantified. This was not
a point which had arisen or been discussed in *In re Berkeley Securities
(Property) Ltd* [1980] 1 WLR 1589 or *In re Islington Metal and Plating
Works Ltd* [1984] 1 WLR 14 or, so far as I am aware, in any other English
decision or commentary.  It is, however, a point which has been addressed in
legislation elsewhere. The report refers to section 61(1) of the Civil Liability      *E*
Act 1961 of Ireland, which amended Irish bankruptcy law to provide:

"Notwithstanding any other enactment or any rule of law, a claim for
damages or contribution in respect of a wrong shall be provable in
bankruptcy where the wrong out of which the liability to damages or the
right to contribution arose was committed before the time of
bankruptcy."      *F*

The Cork Committee obviously considered that solution, but did not
recommend its adoption.  If it had been included in the Insolvency Act or
Rules, there would be no doubt that future asbestos claims would be
provable.  Under the Irish provision, the date of accrual of the cause of
action is irrelevant and all that is necessary is that a liability to damages
should arise out of a wrong committed before the time of bankruptcy.      *G*

93   The solution adopted in the Insolvency Act 1986 and Insolvency
Rules 1986 did not follow the recommendation of the Cork Report, as is
apparent from the terms of section 382 and rule 13.12. It is not necessary
that tort damages should be liquidated by judgment or agreement before
they can be the subject of proof, but section 382(2) and rule 13.12(2)
introduce special provision for tort claims and it is their proper construction
which is at the heart of this issue.  The Cork Report had also addressed the      *H*
discharge of the bankrupt from provable tort and other claims and
recommended that the bankrupt should be released from all claims
admissible to proof.  This recommendation was not adopted as regards
claims for personal injuries: section 281(5). The position in bankruptcy with

A  respect to a personal injury claim is therefore that, whether or not it is provable, the bankrupt does not obtain a release from it by his discharge from bankruptcy, except to such extent and on such conditions as the court may direct.

94   Although rule 13.12(2), as the provision expressly dealing with tort claims in the winding up of companies, is substantially the same as section 382(2) which applies in bankruptcy, there cannot, of course, be any
B  provisions equivalent to those which enable either personal injury claims, or claims incapable of proof, to survive the discharge of a bankrupt. In the vast majority of cases, the winding up of a company leads to its dissolution, whereby it ceases to exist.

95   It is against this background that the precise meaning and effect of rules 12.3 and 13.12, and section 382, as regards tort claims arises for
C  consideration. The fundamental issue for present purposes is whether the cause of action in tort must be complete by the liquidation date.

96   Sir Donald Nicholls V-C thought that this was the effect of the relevant provisions. In *In re Kentish Homes Ltd* [1993] BCLC 1375, 1382, the only authority in which this question has been considered, albeit obiter, he said:

D      "The cut-off provisions may, in general, work reasonably satisfactorily in respect of claims based on contract. Claims arising under contractual obligations incurred before the date on which the company went into liquidation are provable. As to payments under contracts made with a company after it has gone into liquidation, for example, if goods are supplied to a company pursuant to arrangements negotiated with the
E      liquidator, in general such payments will rank for preferential treatment as expenses incurred in the winding up. Unquantified claims for damages in tort are not so favourably treated. In the past, if a company went into liquidation before a claimant had been able to quantify his claim by judgment or agreement he was left out in the cold. In *In re Berkeley Securities (Property) Ltd* [1980] 1 WLR 1589 the court struggled hard to avoid this injustice. Vinelott J held that a claim for damages in tort is
F      excluded from proof only if it has not been liquidated at the time the claimant comes in to prove. He is not entitled to disturb prior distributions to other creditors but, as regards undistributed assets, he is entitled to a dividend enabling him to 'catch up' with distributions already made to other creditors. In *In re Islington Metal and Plating Works Ltd* [1984] 1 WLR 14, Harman J pointed out the difficulties with
G      this solution having regard to the then statutory provisions and an established line of authority. The particular problem raised in those two cases has now been addressed by winding up rule 13.12(2): 'In determining for the purposes of any provision of the Act or the Rules about winding up, whether any liability in tort is a debt provable in the winding up, the company is deemed to become subject to that liability by reason of an obligation incurred at the time when the cause of action
H      accrued.' So far as it enables some liabilities in tort to be proved, this provision ensures justice to tort claimants. However, it still leaves a tort claimant without any remedy if his cause of action arose after the date when the company went into liquidation. In some instances it will be a matter of chance whether a cause of action in tort accrues before or after

the date of the commencement of the liquidation. If a company sells and *A* supplies dangerous goods, it will be a matter of chance whether they cause injury and damage pre- or post-liquidation, and it is only when the damage is sustained that the cause of action in tort accrues."

97    The decision in *In re Kentish Homes Ltd* [1993] BCLC 1375, which concerned the company's liability to the community charge arising after the liquidation date and its status as a liquidation expense, was overruled by the *B* House of Lords in *In re Toshoku Finance UK plc* [2002] 1 WLR 671. However, the passage cited above, which is not part of the reasoning for the decision, was not commented upon and is not in my view affected by the overruling of the decision.

98    Sir Donald Nicholls V-C's reading of the relevant provision as regards tort claims is a natural reading and, as it seems to me, the most *C* obvious. It was not, however, an issue in the case before him and he did not have the benefit of the detailed submissions which were addressed to me.

99    The same approach is taken in *Muir Hunter on Personal Insolvency*, looseleaf ed, para 3-2699, in its commentary on section 382(2) of the Insolvency Act 1986:

"if, after the bankruptcy order, a person suffers damage caused by the *D* bankrupt's negligence before his bankruptcy, the injured person's claim, in so far as it is a claim in tort, will not be a bankruptcy debt."

100    Sir Donald Nicholls V-C was clearly conscious of the anomalies and even injustice which could arise if a claim in tort was provable only if the cause of action had accrued by the liquidation date. Before looking at the detailed arguments on construction, it is worth identifying the consequences *E* in relation to asbestos claims. These claims present particularly acute difficulties because of the very long periods which may pass between exposure to asbestos and the onset of any disease or compensatable condition, and because of the impossibility of identifying the time at which the disease or condition can be said to start.

101    The first consequence is that if the cause of action must accrue *F* before the liquidation date, it must be established that material injury had been suffered by that date. The start of an asbestos disease or condition does not coincide with the development of symptoms but occurs much earlier. It is impossible to identify even in the most approximate way the time when it started. In *Keenan v Miller Insulation and Engineering Ltd* (unreported) 8 December 1987, in which the claimant suffered from asbestosis, the evidence of one of the leading medical experts in this field was that the *G* material injury could have occurred anywhere between ten and 20 years after the first exposure. In cases of mesothelioma, material injury occurs with the development of the first malignant cell, but the first symptoms may not appear for many years. The evidence in *Bolton Metropolitan Borough Council v Municipal Mutual Insurance Ltd* (unreported) 28 May 2005 established that the symptoms in that particular case first appeared in January 1991, but the first malignant cell developed at some point in the *H* three years 1979 to 1981.

102    In general, the courts do not have to grapple with this issue. Since the Limitation Act 1963, the important question for limitation purposes has been the claimant's knowledge of his condition. Although the effect of the

A   decision in the House of Lords in *Arnold v Central Electricity Generating Board* [1988] AC 228 was that any action time-barred before 4 June 1954 remained time-barred, the date of first damage does not, on the medical evidence before the courts in the cases after the *Arnold* case to which I was referred, appear to have caused great difficulty; certainly not the difficulty which could arise in a liquidation of T & N in determining whether damage first occurred before or after the liquidation date. More difficult problems

B   could arise in deciding, for the purposes of insurance cover, the year in which damage first occurred, although on the medical evidence before the court in *Bolton Metropolitan Borough Council v Municipal Mutual Insurance Ltd*, the case in this category to which I was referred, it was not a major problem.

   103   Secondly, assuming that the start of the relevant condition can be

C   determined, the entitlement to prove a claim in tort and therefore the prospects of any recovery will depend on an accident of timing. Whenever a line is drawn it is inevitable that some people will be on the wrong side of it, but the consequences here are very serious. They will cause a well-grounded sense of injustice.

   104   Thirdly, precisely the same facts may give rise to a provable claim for breach of contract but not in tort. A former employee of T & N who was

D   exposed to asbestos during his employment and who develops a compensatable disease or condition after the liquidation date will unquestionably be entitled to prove for an unliquidated claim for his loss on the basis of a breach of contractual duty owed to him by T & N. He could not make the same claim in tort, only because his cause of action in tort had not accrued by the liquidation.

E   105   Where the claimant in contract and in tort is the same person, that consequence is an anomaly but not an injustice. The fourth consequence arises where the claimants are different. There are a number of cases involving family members of former employees. Typically an employee's wife would wash his work clothes which had asbestos dust on them. Both develop asbestos-related conditions after the liquidation date of the

F   employer. The employee has a claim for breach of contract. Assuming that the state of knowledge about the risks passed by asbestos was sufficient at the time of exposure to give rise to a duty of care, the wife has a claim in negligence. The employee's claim could be proved in the liquidation of the employer but not his wife's claim.

   106   I was pressed with a fifth consequence. It was submitted that if all provable debts and liquidation expenses were paid in full, the balance of

G   assets would be distributed among shareholders and no payment or provision would be made for non-provable claims, such as claims in tort accruing after the liquidation date. It was submitted that this resulted from, first, the liquidator's statutory duty to distribute the assets in accordance with section 107 of the Insolvency Act 1986 (voluntary winding up) and sections 148(1) and 154 and rule 4.181 of the Insolvency Rules 1986 (compulsory winding up), and secondly, the changes made by the Insolvency

H   Act 1986 and the Insolvency Rules 1986 which meant that there was no longer any mechanism for proving such tort claims even in a solvent liquidation.

   107   It would indeed be extraordinary if a company's assets could be, and were required to be, distributed to shareholders without paying tort

claims which had accrued since the liquidation date, or other claims not    A
provable in a liquidation, such as costs incurred in litigation against the
company before the liquidation date but not then the subject of an order.
In my judgment, this is not the position. The statutory duties of liquidators
are part of, and subject to, all the provisions of the Insolvency Act and the
Insolvency Rules. The voluntary liquidation of a company does not operate
as an automatic stay of proceedings or the enforcement of judgments. The    B
court may stay or restrain proceedings against the company by exercise of
its powers under section 112 of the Insolvency Act 1986. This power will
generally be exercised to prevent a creditor obtaining by execution an
advantage over other creditors. However, where all provable debts have
been paid in full and there is a surplus otherwise available for shareholders,
I can see no reason why the court would restrain a tort claimant from
obtaining or executing a judgment. In the case of a compulsory liquidation,   C
section 128(1) of the Insolvency Act 1986 provides that any execution put
in force after the commencement of the winding up is void. However, it is
well established that the court may exercise powers under section 130(2)
to permit execution to proceed: see *The Constellation* [1966] 1 WLR 272
and the authorities there cited. Again, if there is a surplus which would
otherwise be distributed to shareholders, I see no reason why the court
would not give leave to a tort claimant to obtain or execute a judgment.    D
This deals with the point put to me, but in a case where there was a surplus
but it was insufficient to pay all tort claims in full, the court would face a
major issue as to how best to deal with this situation in a fair and sensible
manner. It is not an issue for this case, where there is no realistic prospect
of a surplus.

108   In approaching the construction of the relevant provisions, I was    E
referred to a number of authorities which make clear that Parliament is
presumed not to have intended unreasonable, unjust or absurd results. So,
for example, in *Coutts & Co v Inland Revenue Comrs* [1953] AC 267, 281
Lord Reid said:

"In general, if it is alleged that a statutory provision brings about a
result which is so startling, one looks for some other possible meaning    F
of the statute which will avoid such a result, because there is some
presumption that Parliament does not intend its legislation to produce
highly inequitable results."

In *Inland Revenue Comrs v Hinchy* [1960] AC 748, 768, Lord Reid said:
"One is entitled and indeed bound to assume that Parliament intends to act
reasonably, and therefore to prefer a reasonable interpretation of a statutory    G
provision if there is any choice." In *Mangin v Inland Revenue Comr* [1971]
AC 739, 746, Lord Donovan said:

"the object of the construction of a statute being to ascertain the will of
the legislature it may be presumed that neither injustice nor absurdity was
intended. If therefore a literal interpretation would produce such a result,
and the language admits of an interpretation which would avoid it, then    H
such an interpretation may be adopted."

In *R (Edison First Power Ltd) v Central Valuation Officer* [2003] 4 All
ER 209, 238, paras 116–117, concerning, in effect, double taxation, Lord
Millett said:

1767

[2006] 1 WLR

In re T & N Ltd (Ch D)
David Richards J

A     "116 . . . The courts will presume that Parliament did not intend a statute to have consequences which are objectionable or undesirable; or absurd; or unworkable or impracticable; or merely inconvenient; or anomalous or illogical; or futile or pointless.

"117 But the strength of these presumptions depends on the degree to which a particular construction produces an unreasonable result."

B In the same case, Lord Hoffmann said, at p 218, para 25, that the strength of the presumption against unreasonable consequences "depends upon the degree to which the consequences are unreasonable, the general scheme of the legislation and the background against which it was enacted".

    109   I turn now to the detailed issues of construction.

    110   All counsel arguing that future asbestos claims are provable debts
C (the proponents) start their submissions with rule 12.3, stressing three features. First, it is the substantive provision which determines the claims which are provable by creditors in both corporate and personal insolvency proceedings. Secondly, rule 12.3(1) is cast in very wide terms which, read on their own, are apt to include claimants in the position of future asbestos claimants. Not only the proponents, but also Mr Mortimore, made this submission. Thirdly, if any categories of claims which would otherwise fall
D within the wide terms of rule 12.3(1) are to be excluded, it would be reasonable to expect the exclusion to be set out in this rule, and not for example in an interpretation provision. This is demonstrated by rules 12.3(2), 12.3(2A) and 12.3(3) which contain particular exclusions or qualifications to the generality of rule 12.3(1).

    111   I agree that rule 12.3(1) is cast in wide terms. I also agree that, read
E on its own, it includes contingent claims such as those of the future asbestos claimants. My reasons for this view are the same as those for concluding that they are creditors within the meaning of section 425: T & N is exposed to contingent liabilities to them, as analysed in *In re Sutherland, decd* [1963] AC 235.

    112   However, it is not possible to read rule 12.3(1) on its own. The broad range of claims to which it refers are provable "as debts". Necessarily
F this brings in the definition of "debt" in rule 13.12, for the purposes of a winding up: see *In re Toshoku Finance UK plc* [2002] 1 WLR 671, para 24, per Lord Hoffmann. It is only if claims fall within that definition that they are provable. It is by no means unusual for interpretation provisions to have a substantive effect. It does not follow from the presence of exclusions in rule 12.3 that the definition of "debt" will not also contain restrictions. The
G specific exclusions and qualifications contained in rule 12.3 all relate to debts which fall within the definition in rule 13.12 and it is, I think, for this reason that they are dealt by exclusion in rule 12.3.

    113   Although in terms an interpretative provision, rule 13.12 contains provisions with a major impact on the process of winding up, just as its equivalent, section 382 of the Insolvency Act 1986, does in bankruptcy.
H Rule 13.12(1) defines "debt" by reference to time and thereby restricts the class of debts which may be proved in a winding up. A "debt" is a debt or liability to which the company either (a) is subject at the date on which it goes into liquidation or (b) may become subject after that date by reason of any obligation incurred before that date. This gives effect to the principle of a pari passu distribution of assets, by identifying the relevant date for

determining provable debts as the date on which the company goes into       A
liquidation: see *Wight v Eckhardt Marine GmbH* [2004] 1 AC 147,
paras 28–33, per Lord Hoffmann. Either they exist at that date or, if they
are contingent at that date, they must arise by reason of an obligation
incurred before that date.

114    All counsel are agreed, as is obvious, that the claims of future
asbestos claimants are at best contingent at the liquidation date. By         B
definition, they have suffered no injury at that date and may never do so.
Most of the submissions made by the proponents adopted the approach that
future asbestos claims fell within rule 13.12(1)(b). The exception was a
submission by Mr Snowden, on behalf of the administrators, that these
claims fell within rule 13.12(1)(a). He relied on rule 13.12(3), providing
that, for the purposes of references in any provision of the Rules to a debt or
liability, it is immaterial whether the debt or liability is present or future, or     C
certain or contingent. Rule 13.12(3) therefore applies to rule 13.12(1)(a) as
much as to any other provision in the Rules, so that it encompasses
contingent as well as other debts to which the company is subject at the
liquidation date. As to rules 13.12(1)(b) and 13.12(2), Mr Snowden
submitted that they enabled a tort claimant to prove for liabilities which
accrued after the liquidation date. He gave two examples. The first is a
claim which is quantified by judgment or agreement after the liquidation      D
date. The second is a claim for damages in respect of loss after the
liquidation date, such as a claim in respect of a nuisance continuing after
that date (as discussed by Harman J in *In re Islington Metal and Plating
Works Ltd* [1984] 1 WLR 14).

115    This submission cannot stand with the terms of rule 13.12(1). The
contrast between paragraph (a), which refers to any debt or liability "to      E
which the company *is subject at the date* on which it goes into liquidation"
and, paragraph (b), which refers to any debts or liability "to which the
company *may become subject after that date* by reason of any obligation
incurred before that date" (emphasis added), makes clear in my view that
liabilities which are contingent at the liquidation date are addressed in
paragraph (b), not paragraph (a). Such liabilities clearly include those for
which the future asbestos claimants would seek to prove. I agree with       F
Mr Snowden that a post-liquidation judgment or agreement of a provable
contingent claim would fall within rule 13.12(1)(b), in accordance with the
hindsight principle explained by Lord Hoffmann in *Wight v Eckhardt
Marine GmbH* [2004] 1 AC 147. But it would make no sense for the
contingent claim to be within (a), but the liquidated amount to be within (b).
As to post-liquidation loss in respect of a cause of action which arose before   G
the liquidation, I again agree that it falls within paragraph (b). If such loss is
within paragraph (b) where there is already a cause of action, all the more
must a contingent loss fall within paragraph (b) where there is no cause of
action.

116    Another issue raised on rule 13.12(1)(a) was whether claims for
unliquidated damages existing at the liquidation date fell within it. So, for
example, if a breach of contract had occurred before the liquidation date or   H
if there were an accrued cause of action in tort, would any claim which could
be made for unliquidated damages at that date be within paragraph (a),
rather than paragraph (b). Most submissions, including those of
Mr Mortimore, were made on the basis that they were within paragraph (a).

A  However, Mr Trower submitted that paragraph (a) was limited in its scope to debts and liabilities which were ascertained at the liquidation date and payable then or at a certain date in the future. He contrasted the language of paragraph (a) ("is subject at the liquidation date") with paragraph (b) ("may become subject after that date"). This contrast suggested that paragraph (a) was restricted to those debts and liabilities which were unquestionably payable by the company. That would extend to debts which were definitely

B  payable at a future date, because the uncertain language of paragraph (b) ("may become subject") would not be applicable to them. However, he submitted, nothing was payable in respect of an existing claim for unliquidated damages until judgment or agreement and it might be that nothing would be found to be payable.

C  117  As a matter of impression from the terms of rule 13.12(1) there is force in this submission. It gains support from a consideration of the way express provision has been made for liabilities in tort in rule 13.12(2). Mr Snowden in his skeleton argument made the point that the draftsman appears to have assumed that unliquidated claims in tort, whether the cause in action had accrued or not, fell within rule 13.12(1)(b). However, I would conclude that an existing but unliquidated claim for damages comes within rule 13.12(1)(a). Referring to rule 13.12(3), it is immaterial whether the

D  amount of debt or liability is "fixed or liquidated, or is capable of being ascertained by fixed rules or as a matter of opinion". A debtor can properly be said to be "subject to" an existing but unliquidated liability even though it is not payable until liquidated by judgment or agreement. Unlike a contingent liability, it is not a liability to which the company only "may become subject".

E  118  All the proponents, including Mr Trower, submit that rule 13.12(1)(b) is wide enough to encompass future asbestos claims. They submit that it is immaterial that, because no compensatable loss has been suffered at the liquidation date, no cause of action has accrued at that date. The claims represent debts or liabilities to which the company will become subject if compensatable loss is suffered, and therefore they are debts or liabilities to which the company may become subject after the liquidation

F  date.

119  This leads to the central issues as to (a) what is meant in rule 13.12(1)(b) by the phrase "by reason of any obligation incurred before" the liquidation date in the context of tort claims and (b) the effect of rule 13.12(2). There is no difficulty in applying rule 13.12(1)(b) to a liability arising by reason of a contract made before the liquidation date. The

G  company thereby incurs an obligation to perform its terms and any claim under the contract which does not come within paragraph (a) will be within paragraph (b). The same is true of a statutory obligation which has been incurred before the liquidation date (for an example, see *R (Steele) v Birmingham City Council* [2005] EWHC 783 (Admin) or, picking up on other examples in rule 13.12(4), a bailment which has occurred before the liquidation date or an obligation to make restitution incurred before that

H  date.

120  The approach adopted by each of the proponents, including Mr Snowden in an alternative submission, was for the most part similar. First, rule 13.12(1)(a) is directed at present or accrued claims, including claims for unliquidated damages in tort where the cause of action has

accrued at the liquidation date; as noted above, only Mr Trower took a           A
different line on this point. Secondly, the words "any obligation incurred" in
rule 13.12(1)(b) are apt to include those torts which are based on a wrongful
act or omission which may occur before any damage is caused. In the
context of negligence, they cover the duty of care owed by the company to
claimant, or alternatively the duty and its breach. By being subject to a duty
of care, the company thereby incurs an obligation to compensate the           B
claimant for foreseeable loss caused by a breach of the duty. The effect was
to produce a similar approach to claims in contract and in tort. The duty of
care, or its breach, prior to the liquidation date is analogous to the contract
made before that date. Any damage resulting from breach of the duty of care
or breach of the contract will be provable, whenever it occurs, and a
contingent claim can be made in the meantime. Thirdly, the terms of
rule 13.12(2) show that it is intended to inform or qualify rule 13.12(1)(b).           C
Fourthly, it follows from the fact that a claim for unliquidated damages in
tort falls within rule 13.12(1)(a), that it cannot be the legislative intention of
rule 13.12(2) to confine claims in tort under rule 13.12(1)(b) to those which
have accrued at the liquidation date. There are no discernible policy reasons
for doing so and reliance is placed on the consequences outlined above
which flow from excluding tort claims which accrue after the liquidation
date.        Fifthly, rule 13.12(2) is intended to expand, not restrict,           D
rule 13.12(1)(b) in its application to tort claims. It is expressed as a deeming
provision, and the normal function of a deeming provision is to include
something which would otherwise be excluded.

121    Sixthly, the particular purpose of rule 13.12(2) is to clarify and
extend rule 13.12(1)(b) for those torts where it cannot otherwise be said that
the company has "incurred an obligation" before the cause of action accrues.           E
Mr Trower and Mr Dicker submitted that its effect is to create a statutory
fiction that a company is deemed to become subject to any liability in tort
*which does not arise by reason of an obligation already incurred* as if it had
become subject to that liability "by reason of an obligation incurred at the
time when the cause of action accrued". It is designed to fit certain tort
claims into a structure which presupposes that the liability is based on an
obligation incurred.        Those are the torts which do not involve any           F
"obligation incurred" prior to the accrual of the cause of action, such as
conversion, defamation and trespass to land. For claims of this sort,
rule 13.12(2) deems the obligation to have been incurred when the cause of
action accrues. Applied in that way, the cause of action would have to
accrue before the liquidation date. But Mr Trower and Mr Dicker submit
further that rule 13.12(2) should be read as if the words "by reason of an           G
obligation incurred" were in parenthesis, so that the operative part of the
paragraph reads "the company is deemed to become subject to that
liability . . . at the time when the cause of action accrued". In this way, any
cause of action in tort arising after the liquidation date, which was not
already within rule 13.12(1)(b), would be provable when the cause of action
accrued.

122    Mr Sheldon made substantially the same submission in a slightly           H
different way. He submitted that the effect of the deeming provision of
rule 13.12(2) is to substitute the following for 13.12(1)(b) in the case of
contingent tort claims: "(b) any debt or liability to which the company may
become subject after that date by reason of an obligation incurred at the time

**[2006] 1 WLR**                                      In re T & N Ltd (Ch D)
                                                     David Richards J

A the cause of action accrued." So read, rule 13.12(1)(b) would permit any possible future tort claim to be proved, even if all the elements of the tort occurred after the liquidation date. Mr Sheldon accepted that this construction was not free from difficulty and submitted that it should be read subject to an implied limitation that the company's tortious acts were committed prior to the liquidation date. There would have to be a solid basis for the possibility of a future claim before any value could be placed on a proof submitted in the liquidation.

B

 **123** By way of explanation, Mr Dicker submitted that the purpose of rule 13.12(2) was to dispel any residual doubt as to the issue which had arisen under the previous provisions. Both Vinelott J in *In re Berkeley Securities (Property) Ltd* [1980] 1 WLR 1589 and Harman J in *In re Islington Metal and Plating Works Ltd* [1984] 1 WLR 14 had treated a

C judgment or agreement as a necessary precondition to a proof for damages in tort, but had disagreed as to the time when it was required, before the date of proof (Vinelott J) or before the liquidation date (Harman J). The purpose of rule 13.12(2) is to reverse that requirement and make clear that the liability arises at the time of the cause of action. On that basis, rule 13.12(1) can apply in the same way as claims in contracts, with existing liabilities (i e an accrued cause of action) dealt with under paragraph (a) and

D contingent liabilities (where the cause of action has yet to accrue) under paragraph (b).

 **124** The proponents emphasised that if rule 13.12(2) was intended to exclude unliquidated damages in tort unless the cause of action had accrued at the liquidation date, it would have clearly so provided. There was no need for it if it was construed as providing for the purposes of rule 13.12(1) that a

E liability in tort arose when the cause of action accrued: this was the case without the need for a deeming provision. And if the cause of action had to have accrued before the liquidation date, rule 13.12(1)(b) would have no role in relation to tort claims, because such claims are within rule 13.12(1)(a).

 **125** As all counsel agreed, it is an important starting point in the construction of rule 13.12, and section 382, that they were for the first time

F permitting unliquidated claims in tort to be provable in winding up and bankruptcy. Further, because the drafting of those provisions was closely modelled on provisions in earlier legislation (section 30(1) and (8)(c) of the Bankruptcy Act 1914) it was necessary, as a matter of drafting, to fit any special provision as to tort claims within that framework.

 **126** The decision to make unliquidated tort claims provable was a

G policy choice, and the extent to which tort claims should be provable involved policy choices. There were a number of clear possibilities. First, there was the solution, adopted under the previous insolvency regime by Vinelott J in *In re Berkeley Securities (Property) Ltd* [1980] 1 WLR 1589 and recommended in the Cork Report, of providing that tort claims would be admissible once they were liquidated by judgment or agreement. This was not adopted. Secondly, there was the solution adopted in Ireland, under

H which tort claims were provable "where the wrong out of which the liability to damages . . . arose was committed before the time of bankruptcy". If it was intended to adopt that solution, the Irish section provided a ready precedent, but no language of that sort was used in the new provisions. A third solution was that unliquidated tort claims should be provable

provided that the cause of action had accrued by the liquidation date.   *A*
A fourth solution would be to provide that all unliquidated tort claims
should be provable whether the wrongful acts or omissions occurred before
or after the liquidation date.

127   A general principle that tort claims are to be provable is achieved
by the reference to them in rule 13.12(4) and section 382(4), but it is
rule 13.12(1) and section 382(1) which govern the timing requirements for
provable claims. As Mr Mortimore stressed, the entirety of rule 13.12(1) is   *B*
qualified by rule 13.12(2). This slight indication that rule 13.12(2) is
intended to be a complete code of the circumstances in which tort claims are
to be provable is given substantial support by its opening words: "In
determining for the purposes of any provision of the Act or the Rules about
winding up, whether any liability in tort is a debt provable in the winding
up . . ." This language is more obviously consistent with a provision which   *C*
will define the circumstances in which a liability in tort will be admissible to
proof, rather than with a provision which will do no more than extend the
meaning of another provision.

128   The language of rule 13.12(2) is, as all counsel agreed, most
obviously linked to rule 13.12(1)(b). As I have already held, unliquidated
claims in tort for loss already incurred at the liquidation date are probably
covered by paragraph (a). Once it is accepted that unliquidated tort claims   *D*
are to be provable at all, there is no difficulty in saying that claims for loss
already incurred at the liquidation date are admissible to proof. The
difficulty arises in relation to loss which has not then been incurred but
may be incurred at a later date. Contingent claims are the subject of
paragraph (b). All contingent claims are admissible to proof provided only
that they arise "by reason of any obligation incurred" before the liquidation   *E*
date.

129   The question requiring a clear answer is how those words are to be
applied, for the first time, to tort claims. The purpose of rule 13.12(2) is to
provide the answer. The obligation is incurred "when the cause of action
accrued". That provision can then be applied to answer the question posed
by rule 13.12(1)(b): was the obligation incurred before the liquidation date?   *F*
The result is that contingent tort claims are provable, provided that the cause
of action accrued before the liquidation date.

130   I do not consider sustainable the submissions that rule 13.12(2) is
to be read as if the words "by reason of an obligation" were in parenthesis or
even were omitted entirely. On the contrary, as a matter of both context and
grammar, it seems to me clear that the words "at the time when the cause of
action accrued" qualify "by reason of an obligation incurred" rather than   *G*
"became subject to that liability".

131   This approach does not deprive rule 13.12(2) of purpose. First, it
has the general purpose of making clear that tort claims are provable
provided that the cause of action has accrued by the liquidation date.
Secondly, it clarifies the position as regards claims for losses which have not
occurred at the liquidation date, and may never be incurred. An example
would be personal injury cases where provisional damages have been   *H*
awarded or are claimed, and where the claimant has a right to apply for a
further award if, but only if, he develops new diseases or conditions.
Another example would be the claim for further loss from a continuing
nuisance, to which Mr Snowden referred. Without a statement of the

A   applicable principle provided by rule 13.12(2), there could be real
uncertainty as to what was meant by "any obligation incurred" in this
context. As was said in a different context, in the Canadian case of *Smith v
Canadian Broadcasting Corpn* [1953] 1 DLR 510, 512, to which Mr
Mortimore referred, " 'Any obligation incurred' may not be very apt
language to describe a liability in tort".

B       **132** The question is fairly asked by the proponents as to why
rule 13.12(2) does not simply provide that a liability in tort is a "debt" only if
it arises out of a cause of action which had accrued at the liquidation date.
The answer, as it seems to me, is that, having decided to adopt the
phraseology of section 30(3) of the Bankruptcy Act 1914 for rule 13.12(1)
(and section 382(1)), rule 13.12(2) (and section 382(2)) were drafted so as to
fit in with it. It may also be fairly said against the proponents that, if the
C   intention had been to incorporate the Irish provision, why did it not use
language along the lines of that provision? In fact the proponents go further
and submit that the effect of rule 13.12(2) is to permit tort claims to be
proved, not only in cases in which the cause of action accrued after the
liquidation date, but also in cases where there has been no wrongful act or
omission until after the liquidation date. I find it impossible to find that
D   meaning in the paragraph.

    **133** The proponents rely heavily on the use of the word "deemed" in
rule 13.12(2). Deeming provisions are frequently, perhaps usually, used to
extend the natural meaning of a provision or even to create a statutory
fiction. A good example of the latter is a provision in the legal aid
regulations considered by the Court of Appeal in *DEG-Deutsche
Investitions und Entwicklungsgesellschaft mbH v Koshy* [2001] 3 All
E   ER 878, on which Mr Trower in particular relied. A person whose legal aid
certificate was revoked was deemed never to have been an assisted person.
Robert Walker LJ, with whom Aldous LJ agreed, endorsed, at p 882, the
approach which required the court to have regard to the legislative purpose
underlying a deeming provision which introduced a statutory fiction and not
to extend its effect further than was necessary to achieve that purpose.

F       **134** Deeming provisions do not necessarily extend the natural meaning
of a provision or create a fiction. Their purpose may be to define or clarify
the circumstances relevant to the main provision. In *St Aubyn v Attorney
General* [1952] AC 15, 53, Lord Radcliffe said:

        "The word 'deemed' is used a great deal in modern legislation.
    Sometimes it is used to impose for the purposes of a statute an artificial
G       construction of a word or phrase that would not otherwise prevail.
    Sometimes it is used to put beyond doubt a particular construction
    that might otherwise be uncertain. Sometimes it is used to give a
    comprehensive description that includes what is obvious, what is
    uncertain and what is, in the ordinary sense, impossible."

    In the High Court of Australia in *Hunter Douglas Australia Pty Ltd v Perma
H   Blinds* (1970) 122 CLR 49, 65 Windeyer J said:

        "the verb 'deem', or derivatives of it, can be used in statutory
    definitions to extend the denotation of the defined term to things it would
    not in ordinary parlance denote. This is often a convenient device for
    reducing the verbiage of an enactment. But that the word can be used in

that way and for that purpose does not mean that whenever it is used it    A
has that effect. After all, to deem means simply to judge or reach a
conclusion about something . . . The words 'deem' and 'deemed' when
used in a statute thus simply state the effect or meaning which some
matter or thing has—the way in which it is to be adjudged. This need not
import artificiality or fiction. It may be simply the statement of an
indisputable conclusion, as if for example one were to say that on         B
attaining the age of 21 years a man is deemed to be of full age and no
longer an infant. Hundreds of examples of this usage of the word appear
in the statute books."

He said, at p 67:

"There is no presumption, still less any rule, that wherever the word
'deemed' appears in a statute it demonstrates a 'fiction' or some         C
abnormality of terminology. Sometimes it does. Often it does not. Much
depends upon the context in which the word appears . . ."

135   In my view rule 13.12(2) falls into the second of Lord Radcliffe's
categories. It is designed to provide the certainty which, for the reasons
already given, was required.

136   The submission on which the proponents most strongly relied was   D
that this construction produced a result which was unjust and absurd and
which cannot have been intended. While I am sure that the framers of the
legislation did not intend to produce injustice, I consider that a deliberate
policy choice was made to use the liquidation date as the cut-off point for
causes of action in tort. There are reasons for this choice. It will generally
produce greater certainty, it may permit a liquidation to be brought to an   E
earlier conclusion and it may be regarded as consistent with the principle
that all claims are to be identified and valued as at the liquidation date.

137   Whether, in the light of circumstances disclosed by this case, it was
the right policy choice is another matter. Where the pre-liquidation
activities of the company lead to post-liquidation losses recoverable in tort,
particularly where, as here, it is a question only of waiting to see if the loss
occurs, very serious questions arise as to whether the claimants should be   F
excluded from all participation with other creditors in a distribution of the
company's assets. It is not, however, so obvious as to how participation
would best be achieved.

138   A system which allows all individuals who have been exposed to
asbestos to claim against the contingency that they will develop
compensatable injury will favour those who in fact never develop any injury   G
against those who do so. It would result in very small amounts being paid to
a very large number of people, rather than targeting the available resources
to those who develop serious conditions and need and deserve substantial
sums. That may not be thought to be an attractive policy choice. Some
might regard it as unreasonable or even absurd. An alternative approach
would be to calculate on a statistical and actuarial basis the sum needed to
meet future claims and allow a proof for that total sum, thereby creating a   H
reserve which can be applied in paying a dividend to those who in fact
develop compensatable conditions.

139   This does no more than illustrate that the right answer in policy
terms to the issues raised by this case requires careful consideration and is

A  not necessarily to be found in the Insolvency Act 1986 and the Insolvency Rules 1986 as they presently stand.

140  In this connection, the difference between the bankruptcy and winding up regimes is important. I have already made the point, as did counsel, that a claim which cannot be proved in a bankruptcy can be pursued against the bankrupt after his discharge. An exclusion from proof
B  for causes of action in tort accruing after the commencement of the bankruptcy will not necessarily produce an injustice and may be beneficial to the claimant, depending on the debtor's financial position after his discharge. This may strike a fair balance, provided that the debtor does emerge from bankruptcy, except to such extent and on such conditions as the court may direct. Further, in the case of personal injuries claims, Parliament provided that, even if provable, they were not released by the
C  debtor's discharge from bankruptcy, except to such extent and on such conditions as the court may direct. In choosing to apply the bankruptcy template of section 382 to the rules governing the winding up of companies, an approach has been adopted which leaves no room for these mitigating factors. This does not however enable the court to construe the substantially identical terms of section 382 and rule 13.12 in radically different ways.

141  In the result, therefore, I conclude that future asbestos claims (as
D  defined) are not provable debts for the purposes of winding up and I agree with the construction of the rules reached by Sir Donald Nicholls V-C in *In re Kentish Homes Ltd* [1993] 1 BCLC 1375, 1382.

142  The proponents' submissions also relied on a reading of "obligation incurred" in rule 13.12(1)(b) to include the situation where a duty of care in tort was engaged or broken before the liquidation date but no injury was
E  caused until after that date, if at all. In my judgment, the words "obligation incurred" are not apt to describe the duty of care or its breach. An analysis of the tort of negligence, such as that given by Viscount Simonds in *The Wagon Mound* [1961] AC 388, is important. It is not just the liability in damages, but also the underlying obligation, which is incurred when damage is suffered and a cause of action accrues. The obligation in negligence is to compensate for loss caused by the defendant's careless act or omission.
F  While the act or omission will, if followed by material loss, lead to an obligation to compensate the victim, it is not in my view correct to say that by the careless act or omission alone the company incurs an obligation. This is not, in my view, inconsistent with my conclusion that potential tort claimants are creditors for the purposes of section 425 of the Companies Act 1985. All that is required in that context is that there should exist
G  "contingent liabilities" in the sense described by the majority in *In re Sutherland, decd* [1963] AC 235. Unlike rule 13.12(1), it does not require that the company should already have "incurred an obligation". As shown by the authorities to which I have referred and on which all the proponents relied, a person may be a "creditor" for the purposes of section 425 without having a provable debt as defined in the insolvency legislation.

H  *Human rights*

143  My conclusion on the proper construction of rule 13.12 of the 1986 Rules makes it necessary to consider the submissions that this construction renders the legislation in breach of the Convention. Specifically, it is submitted that it would involve a violation of article 1 of the First Protocol

to the Convention either on its own or taken in conjunction with article 14 of   A
the Convention.

144   By section 3 of the Human Rights Act 1998: "So far as it is possible
to do so, primary legislation and subordinate legislation must be read and
given effect in a way which is compatible with Convention rights." The duty
imposed on the court by this section requires the court to reach, if possible, a
construction of legislation which is compatible with Convention rights,        B
although it may not be justified by the usual principles of statutory
construction.   But it is engaged only where the construction arrived at by the
application of those principles produces a result which is not compatible
with Convention rights.  The court must therefore first, as I have done, reach
its conclusion without recourse to section 3.  It must then decide whether
that construction is incompatible with Convention rights.  Only if it decides
that it is incompatible, does section 3 apply: see *Poplar Housing and*        C
*Regeneration Community Association Ltd v Donoghue* [2002] QB 48,
para 75, per Lord Woolf CJ.

145   Article 1 of the First Protocol ("article 1P1") provides:

"Every natural or legal person is entitled to the peaceful enjoyment of
his possessions.  No one shall be deprived of his possessions except in the
public interest and subject to the conditions provided for by the law and   D
by the general principles of international law.  The preceding provisions
shall not, however, in any way impair the right of a state to enforce such
laws as it deems necessary to control the use of property in accordance
with the general interest or to secure the payment of taxes or other
contributions of penalties."

The proponents submit that the potential tort claims of the future asbestos    E
claimants are "possessions" for the purposes of article 1P1 and that the effect
of rule 13.12, as I have construed it, violates article 1P1, not in the sense that
the claimants are deprived of their potential claims altogether but in the
sense that there is an interference with their enjoyment of them.
Alternatively, if potential tort claims are not "possessions" for these
purposes, it is submitted that asbestos claims arising from accrued causes of
action are possessions and that, in the case of those accruing after the       F
liquidation date, the inadmissibility of such claims to proof involves an
interference with the enjoyment of such claims.  It is in each case an
interference, not a deprivation of the claimants' rights: it is only a right to
prove in a winding up and to participate with other creditors in a
distribution which is denied to them.  Their claims are not extinguished and
in all other respects are enforceable.  However, the practical effect is likely to
be substantial because, except to the extent of any available insurance cover   G
(which in this case will be inadequate) or claims against other producers or
distributors of asbestos products, they will in practice recover nothing.

#### (i) Future asbestos claims: article 1P1

146   I consider first whether the potential tort claims (the future asbestos
claims as defined) are "possessions" within the meaning of article 1P1.  If   H
they are not possessions, then there can be no breach of the article in respect
of them.  The definition of future asbestos claims assumes that the claimant
was before the liquidation date exposed to asbestos which could cause an
asbestos-related condition for which T & N would be liable in damages.

1777

[2006] 1 WLR

In re T & N Ltd (Ch D)
David Richards J

A  Equally, however, it assumes that no such condition has started before the liquidation date and it may never start. In any individual case, the prospects of developing a compensatable condition are likely to be very low. Unless and until such condition does start, the future asbestos claimants have no cause of action in English law and any proceedings would be struck out as disclosing no cause of action.

B  147 In a number of decisions, the European Court of Human Rights has considered the status of claims as "possessions". In *Pressos Cia Naviera SA v Belgium* (1995) 21 EHRR 301, the court held that an accrued cause of action in tort was a possession. Damage was an essential element in the cause of action under Belgian law. Damage had occurred and under Belgian law the causes of action had accrued prior to the passing of retrospective legislation which deprived the claimants of their claims for compensation.

C  On the basis that the cause of action had accrued, the claimants had a "possession" and therefore had a legitimate expectation that their claims would be determined in accordance with the general law of tort: see para 31. It was common ground between Miss Carss-Frisk and Mr Eadie that the test of legitimate expectation is not material to the determination of whether a claim constitutes a possession. It is the status of a particular claim as a possession which creates the legitimate expectation that it will be dealt with in accordance with domestic law.

D  148 In *Kopecky v Slovakia* (Application No 44912/98) (unreported) 28 September 2004, the Grand Chamber considered the elements necessary for a claim to constitute a possession for the purposes of article 1P1. A number of relevant principles established by the practice of the Convention institutions under article 1P1 are set out in para 35, including:

E  "(c) An applicant can allege a violation of article 1 of Protocol No 1 only in so far as the impugned decisions related to his 'possessions' within the meaning of this provision. 'Possessions' can be either 'existing possessions' or assets, including claims, in respect of which the applicant can argue that he or she has at least a 'legitimate expectation' of obtaining effective enjoyment of a property right. By way of contrast, the hope of

F  recognition of a property right which it has been impossible to exercise effectively cannot be considered a 'possession' within the meaning of article 1 of Protocol No 1, nor can a conditional claim which lapses as a result of the non-fulfilment of the condition: see *Prince Hans-Adam II of Lichtenstein v Germany* Reports of Judgments and Decisions 2001-VIII, p 1, paras 82–83 and *Gratzinger and Gratizingerova v The Czech*

G  *Republic* Reports of Judgments and Decisions 2002-VII, p 399, para 69."

149 The Grand Chamber held that the alleged possession was not an "existing possession" and turned therefore to consider, at para 42, whether the "claim constituted an 'asset', that is whether it was sufficiently established to attract the guarantees of article 1 of Protocol No 1". The judgment considers the role of "legitimate expectation" in this context and states, in paras 48–49:

H  "48. . . . The 'legitimate expectation' identified in *Pressos Cia Naviera SA* was not in itself constitutive of a proprietary interest; it related to the way in which the claim qualifying as an 'asset' would be treated under domestic law and in particular to reliance on the fact that the established

case law of the national courts would continue to be applied in respect of    A
damage which had already occurred.

"49. In a line of cases the court has found that the applicants did not
have a 'legitimate expectation' where it could not be said that they had a
currently enforceable claim that was sufficiently established . . ."

The judgment concludes on this aspect, at para 52:

"In the light of the foregoing it can be concluded that the court's case    B
law does not contemplate the existence of a 'genuine dispute' or an
'arguable claim' as a criterion for determining whether there is a
'legitimate expectation' protected by article 1 of Protocol No 1. The
court is therefore unable to follow the reasoning of the chamber's
majority on this point. On the contrary, the court takes the view that
where the proprietary interest is in the nature of a claim it may be    C
regarded as an 'asset' only where it has a sufficient basis in national law,
for example where there is settled case law of the domestic courts
confirming it."

The principal question for the court was therefore "whether there was a
sufficient basis in domestic law, as interpreted by the domestic courts, for the
applicant's claim to qualify as an 'asset' for the purposes of article 1 of    D
Protocol No 1". As Mr Eadie submitted, it is difficult to see how a claim can
constitute a possession within the meaning of article 1P1 if under the
relevant domestic law the claim is not maintainable. There is a clear link in
this context with rights of access to the courts under article 6, but the
criterion for a possession under article 1P1 may be expected to be stricter
than for a right of access under article 6.

    150   The earlier judgment of the Grand Chamber in *Gratzinger and*    E
*Gratzingerova v The Czech Republic* 10 July 2002, referred to in the
judgment in *Kopecky v Slovakia* 28 September 2004, concerned a claim for
recovery of property confiscated under the former communist regime. The
applicants had no claim under Czech law because under the terms of the
Extrajudicial Rehabilitation Act 1991 they did not satisfy one of the
preconditions to an application, namely Czech nationality (although they    F
had been Czech nationals at the date of confiscation). The Grand Chamber
held that their claim was not a "possession" within the meaning of article 1P1
because under Czech law it was not sufficiently established to be
enforceable.

    151   The Grand Chamber has again considered the relevant principles
in two recent decisions. *Draon v France* (Application No 1513/03)
(unreported) 6 October 2005 concerned a claim for compensation in respect    G
of the birth of a child with a disability, which was negligently not detected
during pregnancy. During the course of proceedings the action was barred
by new legislation applicable to pending cases. Para 65 reads:

"The court reiterates that, according to its case law, an applicant can
allege a violation of article 1 of Protocol 1 to the Convention only in so far
as the impugned decisions relate to his 'possessions' within the meaning    H
of that provision. 'Possessions' can be 'existing possessions' or assets,
including, in certain well-defined situations, claims. For a claim to be
capable of being considered an 'asset' falling within the scope of
article 1 of Protocol 1, the claimant must establish that it has a sufficient

1779

[2006] I WLR

In re T & N Ltd (Ch D)
David Richards J

A  basis in national law, for example where there is settled case law of the domestic courts confirming it. Where that has been done, the concept of 'legitimate expectation' can come into play."

It was accepted that the claim was sufficiently established under French law to constitute a "possession" and that there had been an interference with the right to peaceful enjoyment of it. It was held that the interference was not
B  justified and that there had been a breach of article 1P1.

152  *Roche v United Kingdom* (Application No 32555/96) The Times, 27 October 2005 concerned a claim for damages for personal injury alleged to arise from the claimant's exposure to toxic chemicals during tests carried out on him while serving in the army. His claim under English law was barred by a certificate issued under section 10 of the Crown Proceedings Act
C  1947. He contended that this violated a number of Convention rights, including those under articles 6 and 14 and under article 1P1. The central issue as regards those provisions was whether the certificate represented a substantive or procedural bar. The Grand Chamber, reaching the same conclusion as the House of Lords in *Matthews v Ministry of Defence* [2003] I AC 1163, held that the certificate was part of a system which precluded a claim in tort as a matter of substantive law. There was accordingly no
D  violation of articles 6 or 14 or article 1P1. In dealing with the alleged violation of article 1P1 the Grand Chamber again reiterated the basic principle as regards the status of claims as possessions, at para 129:

"The court recalls that a proprietary interest in the nature of a claim can only be regarded as a possession where it has a sufficient basis in national law, including settled case law of the domestic courts confirming
E  it."

153  In the light of the principles established by these cases, the issue is whether future asbestos claims (as defined) have a sufficient basis in national law to constitute possessions for the purposes of article 1P1. It is clear, in my judgment, they do not. Material damage is an essential element of a cause of action in negligence under English law. By definition, future asbestos
F  claimants have not, as yet, suffered any material damage. Any claim form issued by them seeking damages in negligence would be struck out as disclosing no cause of action. Accordingly their "claims" are not possessions for the purposes of article 1P1. It follows that a construction of the Insolvency Rules 1986 which does not permit future asbestos claims to be admitted to proof involves no violation of article 1P1.

G  154  In his submissions, Mr Eadie suggested that the decisions of the European Court of Human Rights showed that to be recognised as a possession a claim must be both significantly established under domestic law and currently enforceable. In *Kopecky v Slovakia* 28 September 2004 and *Draon v France* 6 October 2005, for example, both expressions may be found. Whatever the relevance of the distinction between them in other cases, it is not, I consider, a distinction which arises in this case. To say that a
H  future asbestos claimant does not have a currently enforceable claim is literally true, but it suggests that he will have an enforceable claim in the future. That is not true, as regards many of the future asbestos claimants. They will have claims if, but only if, they develop compensatable conditions. Unless and until they do so, they have no sustainable claim in English law.

155   Miss Carss-Frisk relied on *Ambruosi v Italy* (2000) 35 EHRR 125,    A
a decision of the Second Section of the court, as showing that a claim may be
a "possession", even where an enforceable claim does not yet exist if, as she
submitted, in some sense payment has been earned or an obligation of some
kind has been incurred to the claimant. The applicant was a lawyer who had
acted for a number of pensioners with restitution claims in respect of
overpaid tax. The Italian Government decided that restitution should be     B
made. It did so and enacted a decree which extinguished the pending cases.
An effect of this was to deprive the applicant of her right, if the cases had
proceeded and been successful, to apply to the court for payment of her costs
directly by the defendant, in view of her clients' impecuniosity.  She had
already carried out work on the cases and incurred costs.  The court held
that the decree involved a breach of article 1P1 as regards the applicant's
right to claim her costs against the defendant.  The precise nature of the     C
applicant's rights under Italian law is not clear from the judgment and there
is no substantial discussion in the judgment as to the grounds for the
conclusion that the claim for fees was a possession, although it is noted, at
para 20, that future income constitutes a possession within article 1P1 "only
if it has been earned or where an enforceable claim exists".

156   I do not consider that it is possible to derive any principle from
*Ambruosi v Italy* which could assist in establishing that future asbestos    D
claims are possessions.  In any event, the applicable principles have been
established by the later decisions of the Grand Chamber to which I have
referred.

*(ii) Future asbestos claims: article 1P1 and article 14*

157   Alternatively, as regards future asbestos claims the proponents rely    E
on article 14 of the Convention in conjunction with article 1 of the First
Protocol. Article 14 provides:

"The enjoyment of the rights and freedoms set forth in this Convention
shall be secured without discrimination on any ground such as sex, race,
colour, language, religion, political or other opinion, national or social
origin, association with a national minority, property, birth or other     F
status."

Article 14 does not create autonomous rights, but rather a principle of non-
discrimination in the enjoyment of Convention rights and in the enjoyment
of additional rights, falling within the general scope of Convention rights,
which the state has voluntarily decided to provide.  This does not diminish
its importance, as it is fundamental to the values which the Convention is     G
intended to protect: *A v Secretary of State for the Home Department* [2004]
QB 335, para 8, per Lord Woolf CJ. The application of article 14 does not
necessarily require the violation of a Convention right. It is necessary, but
also sufficient, for the facts of the case to fall "within the ambit" of one or
more Convention articles: *Stec v United Kingdom* (Grand Chamber decision
as to the admissibility of Application Nos 65731/01 and 65900/01)
(unreported) 6 July 2005.                                                      H

158   Miss Carss-Frisk submitted that the facts of this case are sufficiently
linked to A1P1 to come within the ambit of article 14.  The complaint is that
rule 13.12 operates so as to prevent creditors from submitting claims in a
liquidation in respect of a "contingent tort claim", whereas other contingent

1781

[2006] I WLR

In re T & N Ltd (Ch D)
David Richards J

*A*   personal injury claims, such as those based on breach of contract, can be proved.

159   The state has chosen to allow contingent claims, in principle, to be proved in a liquidation. Having chosen to do so in relation to contractual claims, and thereby created for them legal rights sufficiently well-established in domestic law to be possessions within article 1P1, it is discriminatory not to extend the same right to contingent tort claims, such as future asbestos claims. For these purposes it is not necessary to establish that future asbestos claims are possessions within the meaning of article 1P1.

*B*

160   Miss Carss-Frisk submits that asbestos personal injury claimants with contingent claims in contract and those with such claims in tort are in an analogous or comparable situation for the purposes of article 14. First, both categories are concerned to obtain compensation for the same kind of loss, based on exposure to asbestos. Secondly, persons in neither category have at the liquidation date suffered loss, and may never do so. Thirdly, the only difference is the legal basis for the claim.

*C*

161   Miss Carss-Frisk relied in particular on two decisions of the European Court of Human Rights concerning rights to social security benefits. In *Willis v United Kingdom* (2002) 35 EHRR 547, the applicant successfully argued that the refusal to pay him a widowed mother's allowance and a widow's payment, to which he would have been entitled if he were a woman, constituted discrimination against him on grounds of sex. The court held that the right to these benefits was a pecuniary right which constituted a possession and that the applicant was denied the right on account of his sex, contrary to article 14. In *Stec v United Kingdom* 6 July 2005 an assertable right under domestic law to a welfare benefit was held to be a possession within article 1P1; the importance of the decision lay in its application to non-contributory benefits. Article 14 was held to be applicable, on the basis of the relevant test as stated in para 55:

*D*

*E*

"In cases, such as the present, concerning a complaint under article 14 in conjunction with article 1 of Protocol 1 that the applicant has been denied all or part of a particular benefit on a discriminatory ground covered by article 14, the relevant test is whether, but for the condition of entitlement about which the applicant complains, he or she would have had a right, enforceable under domestic law, to receive the benefit in question."

*F*

162   Even if it is right to apply the principles in these decisions to claims to be pursued in litigation, I do not think that they lead to the conclusion for which Miss Carss-Frisk contends. Her submissions proceed on the basis that through the insolvency legislation the state has chosen to protect contingent claims, but has denied that protection to contingent tort claims. But it is only by choosing a broad class of claims that a distinction can be argued to arise. If the particular class of claim is looked at, namely "contingent tort claims", it can be seen that there is no discrimination: no such "claims" may be proved by anyone. The test set out in *Stec v United Kingdom* 6 July 2005 involves examining "a particular benefit" and determining whether the applicant had been denied it on a discriminatory ground. I accept the force of what Miss Carss-Frisk submits as to the common features of those who may suffer personal injury in the future, but the legal differences are not matters of mere labels. As a matter of English law, claims in tort are

*G*

*H*

1782
**In re T & N Ltd (Ch D)**                                                    **[2006] 1 WLR**
David Richards J

essentially different in a number of fundamental respects from claims in          A
contract. In particular, in the case of employees and others with relevant
contractual rights, they already have at the liquidation date an accrued cause
of action for breach of contract. Claims in contract and claims in tort are no
more to be taken together for these purposes than different benefits under the
social security system.

163   In any event, and this was Mr Eadie's submission on this point, it          B
seems clear from the Strasbourg case law that article 14 is inapplicable in
relation to a claim, as opposed to other possessions, unless the claim has a
sufficient basis in domestic law to constitute a possession within article 1P1.

164   The application in *Gratzinger and Gratzingerova v The Czech
Republic* Reports of Judgments and Decisions 2002-VII, p 399 was made on
the basis of article 1P1 taken in conjunction with article 14. I have referred
above to the Grand Chamber's decision that the claim for recovery of         C
property was not a "possession" within the meaning of article 1P1. It was
submitted that the precondition of Czech nationality to the right to make the
claim was discriminatory within article 14. The Grand Chamber rejected
the application under article 14 on the grounds that the "claim" was not a
possession within article 1P1 and article 14 was not autonomous: see
paras 74 and 76. The case was not therefore within the ambit of article 1P1.
The case made under article 14 in conjunction with article 1P1 was rejected         D
by the Grand Chamber on the same ground in *Roche v United Kingdom*
The Times, 27 October 2005, para 133. The decisions in the *Gratzinger* and
*Roche* cases are all the stronger because in both cases all the facts required to
constitute the claims had occurred and it was only because of particular
features of the claimants (nationality and employment in the armed forces)
that their "claims" had an insufficient basis in domestic law to constitute         E
possessions. By contrast, in this case, future asbestos claims do not
constitute possessions because the essential element of loss is missing.

165   Accordingly I reject the submission that rule 13.12 of the 1986
Rules, as it applies to future asbestos claims, violates article 1P1 taken in
conjunction with article 14. I have not here dealt with the further issue as to
whether, if such claims were within the ambit of article 1P1, there would be
discrimination on a ground falling within article 14. I shall have to return to          F
article 14 when dealing with the position of causes of action in tort which
accrue after the liquidation date and deal there with the issue of
discrimination.

### (iii) Asbestos claims accrued after the liquidation date: article 1P1

166   If, as I hold, there is no violation of article 1P1, either on its own or          G
in conjunction with article 14, involved in a construction of the Insolvency
Rules 1986 which precludes future asbestos claims from being treated as
provable debts, the proponents submit that there is a violation of those
provisions in relation to the treatment of tort claims which in fact accrue
after the liquidation date. The effect of rule 13.12 is to prevent any proof in
respect of tort claims where the cause of action accrues after the liquidation
date. Once compensatable loss has occurred and the cause of action has          H
accrued, it is clear that a personal injuries claim in tort is a possession within
the meaning of article 1P1, assuming a relevant duty of care and breach. It is
submitted that, by precluding such claims from being provable debts,
rule 13.12 interferes with the enjoyment of the possession in breach of

A   article 1P1 or, alternatively, there is discrimination in breach of article 1P1 read in conjunction with article 14.

    167   Mr Eadie accepts that, once the cause of action has accrued, a personal injuries claim in tort with a substantial basis in fact and law is a possession within article 1P1. He accepts also that the effect of rule 13.12 prevents full enjoyment of the possession. However, he submits that there would be no violation of article 1P1. He submits that, as I have already

B   mentioned, the existence of a claim as a possession gives rise to a legitimate expectation that the claim will be determined and treated in accordance with the settled principles of domestic law and that the state will not then interfere with those settled principles. He further submits that rule 13.12 is part of the applicable domestic law and, unless changed, will be part of such law when a relevant cause of action accrues after the liquidation date. There

C   is therefore no interference, in breach of article 1P1, with the enjoyment of the claim as a possession. Article 1P1 protects claims against retrospective interference.

    168   *Pressos Cia Naviera SA v Belguim* 21 EHRR 301 and *Draon v France* 6 October 2005 provide clear examples of retrospective interference with settled principles of domestic law which deprived the applicants of their

D   legitimate expectation to have their claims, which were sufficiently established as a matter of domestic law to constitute possessions, determined in accordance with the existing domestic law. Neither Miss Carss-Frisk nor Mr Eadie are aware of any case in which it has been suggested or held that the principles of domestic law applying prior to the existence of a claim, or a change in those principles prior to the existence of a claim, constituted an interference with the claim as a possession for the purposes of article 1P1.

E   However, Miss Carss-Frisk submitted that it is not right that there can only be an interference with a possession if there is a change in the law after the applicant has acquired the possession. She relied on the speech of Lord Nicholls of Birkenhead in *Wilson v First County Trust Ltd (No 2)* [2004] 1 AC 816. The case concerned not a claim but contractual rights under a loan agreement which was subject to regulations made under the Consumer

F   Credit Act 1974. The rights could not be enforced because, in breach of the regulations, the contract failed correctly to state the amount of credit. The Court of Appeal [2002] QB 74 held that there was an interference with the contractual rights in breach of article 1P1, notwithstanding that the regulations predated both the loan agreement and the coming into force of the Human Rights Act 1998. The House of Lords reversed the decision, but on a number of different grounds.

G     169   It was submitted in the House of Lords that there was no interference, in breach of article 1P1, with the creditor's contractual rights because the regulations predated the agreement and the rights were, therefore, from inception subject to the limitations under the regulations. Miss Carss-Frisk relied on the rejection of this submission by Lord Nicholls [2004] 1 AC 816, paras 38–45. However, as she acknowledged, this was a

H   minority view. Lord Hope of Craighead, at paras 106–109, disagreed. He said, at paras 106–107:

    "106. Article 1 of the First Protocol has a similar character. It does not confer a right of property as such nor does it guarantee the content of any rights in property. What it does instead is to guarantee the peaceful

enjoyment of the possessions that a person already owns, of which a    A
person cannot be deprived except in the public interest and subject to the
conditions provided for by law: *Marckx v Belgium* (1979) 2 EHRR 330,
350, para 50. Here too it is a matter for domestic law to define the nature
and extent of any rights which a party acquires from time to time as a
result of the transactions which he or she enters into. One must, of
course, distinguish carefully between cases where the effect of the relevant    B
law is to deprive a person of something that he already owns and those
where its effect is to subject his right from the outset to the reservation or
qualification which is now being enforced against him. The making of a
compulsory order or of an order for the division of property on divorce
are examples of the former category. In those cases it is the making of the
order, not the existence of the law under which the order is made, that
interrupts the peaceful enjoyment by the owner of his property. The fact    C
that the relevant law was already in force when the right of property was
acquired is immaterial, if it did not have the effect of qualifying the right
from the moment when it was acquired.

"107. The rights of property which are in issue in this case are those set
in an agreement which is regulated by the 1974 Act. The Act subjects the
rights of the creditor to restrictions in some circumstances. Section 65    D
declares that a regulated agreement which is improperly executed cannot
be enforced by the creditor except by means of an order of the court, and
section 127(3) declares that it is not to be enforceable at all except upon
the condition which it lays down. The agreement which was entered into
in this case was from the outset an agreement which was improperly
executed. So it was always subject to the restrictions on its execution
which sections 65(1) and 127(3) of the 1974 Act set out. I would hold    E
that FCT's Convention rights under article 1 of the First Protocol are not
engaged in these circumstances."

Lord Scott of Foscote was of the same view, at para 168:

"First, article 1 of the First Protocol is directed to interference with
existing possessions or property rights. FCT never had, at any stage in the    F
history of the loan agreement, the right to enforce against Mrs Wilson
the repayment of the £5,000. Neither the 1974 Act as a whole nor
section 127(3) in particular constituted an interference with a pre-existing
right of FCT to enforce repayment by Mrs Wilson of the £5,000. The Act,
and section 127(3) prevented FCT from ever possessing that right. No
authority has been cited to your Lordships for the proposition that a
statutory provision which prevents a transaction from having the quality    G
of legal enforceability can be regarded as an interference for article 1
purposes with the possessions of the party who would have benefited if
the transaction had had that quality. In my opinion, the proposition
should be rejected."

170    Lord Hobhouse of Woodborough considered the matter in a rather    H
different way, his answer depending on whether on the facts the lender had
possession of the pledged car or was only seeking to enforce a contractual
right. Lord Rodger of Earlsferry, at para 178, agreed with Lord Nicholls as
to the disposal of all the grounds of appeal, without further comment on this
particular issue.

A     171 In the judgment of a chamber of the European Court of Human Rights in *JA Pye (Oxford) Ltd v United Kingdom* (Application No 44302/02) (unreported) 15 November 2005 it was held by a 4:3 majority that the application of the English law of adverse possession to deprive the applicant of its registered title to land violated article 1P1. It was argued by the UK Government that there was no breach because the relevant law existed at the time of the acquisition of the property. This was rejected, at para 51:

B

      "The court does not share the Government's view that the operation of the legislation is to be regarded as an incident of, or limitation on, the applicants' property right at the time of its acquisition, such that article 1 ceased to be engaged when the relevant provisions took effect and the property right was lost after 12 years of adverse possession. It is true that the relevant provisions of the legislation existed at the time the property was acquired by the applicants and that the consequences for the applicants' title to the land of 12 years adverse possession were known. However, article 1 does not cease to be engaged merely because a person acquires property subject to the provisions of the general law, the effect of which is in certain specified events to bring the property right to an end, and because those events have in fact occurred. Whether it does so will depend on whether the law in question is properly to be seen as qualifying or limiting the property right at the moment of acquisition or, whether it is rather to be seen as depriving the owner of an existing right at the point when the events occur and the law takes effect. It is only in the former case that article 1 may be held to have no application."

C

D

E    But the court went on to say, at para 52:

      "The provisions are also different from those examined by the House of Lords in *Wilson v First County Trust Ltd (No 2)* [2004] 1 AC 816— also invoked by the Government—in which the majority held that the relevant legislation regulating the enforceability of loan agreements 'bit' at the moment the transaction was concluded and that the lender accordingly had no right to enforce repayment of the loan of which he could be deprived under article 1. By contrast, the 1925 and 1980 Acts are in the view of the court to be seen as 'biting' on the applicants' property rights only at the point at which the Grahams had completed 12 years' adverse possession of the applicants' land and not as delimiting the right at the moment of its acquisition. Accordingly, the court rejects the Government's argument that, on this ground, article 1 was not engaged in the present case."

F

G

This passage involves no criticism of the majority view in *Wilson v First County Trust Ltd (No 2)* [2004] 1 AC 816, but appears to endorse it.

    172 In applying the principles to be deduced from these cases, it follows in my judgment that rule 13.12, in precluding a tort claim which accrues after the liquidation date from being treated as a provable debt, involves no relevant interference with the enjoyment of the claim as a possession in breach of article 1P1. Unlike the law of adverse possession, it does not have the effect of depriving the claimant of an existing claim nor does it interfere with the exercise of any existing rights. At no time will the claimant have had a right to prove in respect of his post-liquidation tort claim.

H

173   In *Pennycook v Shaws (EAL) Ltd* [2004] Ch 296, on which    A
Miss Carss-Frisk also relied, the Court of Appeal considered the application
of article 1P1 to the statutory rights of business tenants under Part II of the
Landlord and Tenant Act 1954. Arden LJ, with whom the other members of
the court agreed, observed that there were important differences between the
statutory provisions under consideration in *Wilson v First County Trust Ltd
(No 2)* [2004] 1 AC 816 and the statutory rights of a tenant to a continuation
of his tenancy or to a new tenancy, subject to the provisions of Part II of the    B
1954 Act. She cited the passages to which I have referred from the speeches
of Lord Nicholls and Lord Hope and, referring to Lord Nicholls's speech,
she said, at para 35:

> "On this analysis the court must look at the substance of the claimed
> right to see whether the bar in this case to the exercise of the tenant's right
> is a delimitation of the right or whether it represents a deprivation of    C
> right."

Applying that test to the business tenant's statutory rights, Arden LJ held
that the relevant provision in that case was more accurately analysed as a
deprivation of a right rather than a delimitation.

174   I do not consider that *Pennycook v Shaws (EAL) Ltd* [2004]    D
Ch 296 supports Miss Carss-Frisk's submission. Applying the distinction
between the deprivation of a right or its delimitation to post-liquidation tort
claims, the effect of rule 13.12 is in my judgment to delimit them, for the
reasons already given. The tort claimant has no right of which he is
deprived.

175   It is in any event important, as Mr Eadie stressed, to focus on the
nature of the possession in this case and the consequences under article 1P1.    E
The post-liquidation tort claims are possessions because they are sufficiently
established under the applicable principles of English law. The consequence
under article 1P1 is a legitimate expectation that English law will not be
altered after the claims come into existence in a way which deprives the
claimants of their claims or adversely interferes with them. This is the
principle applicable to claims which has been established by *Kopecky v
Slovakia* 28 September 2004 and other decisions of the European Court of    F
Human Rights. *Kopecky*'s case was decided after *Wilson v First County
Trust Ltd (No 2)* [2004] 1 AC 816 and *Pennycook v Shaws (EAL) Ltd*
[2004] Ch 296 but there is in any case nothing said in those cases, or in the
recent decision in *JA Pye (Oxford) Ltd v United Kingdom* 15 November
2005, which qualifies or casts doubt on the principle of legitimate
expectation as it applies to claims. On that basis, rule 13.12 involves no    G
breach of article 1P1 as it applies to tort claims which accrue after the
liquidation date, because it is part of domestic law before any such claims
exist.

176   My conclusion is therefore that rule 13.12 does not violate
article 1P1 as regards tort claims which accrue after the liquidation date.

*(iv) Asbestos claims accrued after the liquidation date: article 1P1 and*    H
*article 14*

177   Finally, in the alternative, the proponents submit that rule 13.12
violates article 1P1 taken in conjunction with article 14. First, they submit
that the exclusion from proof of post-liquidation tort claims is within the

A ambit of article 1P1, because these claims will exist as otherwise enforceable claims and will constitute possessions for the purposes of article 1P1. Secondly, the treatment of tort claimants is discriminatory when compared with the treatment of creditors with claims for breach of contract.

178  Mr Eadie submits that this submission fails, on grounds both of ambit and of the absence of any relevant discrimination.

B 179  As to ambit, Mr Eadie submits that, although the post-liquidation tort claims are capable of being possessions within article 1P1, there is still no breach of the legitimate expectation that such claims will be treated in accordance with the principles of domestic law. The decisions of the European Court of Human Rights in *Gratzinger and Gratzingerova v The Czech Republic* Reports of Judgments and Decisions 2002-VII, p 399 and *Roche v United Kingdom* The Times, 27 October 2005 support this

C submission in its application to claims. I admit to some misgivings in its rigid application to a case where there is clear discrimination. Suppose that domestic law provided that only men could bring personal injury claims in tort, notwithstanding that in all other aspects a woman's claim satisfied the criteria established by domestic law. It seems surprising that article 14 would not provide protection on the sole ground that this bar had existed at the time that her cause of action would otherwise have accrued.

D 180  As to discrimination, article 14 may apply only if there is "discrimination on any ground such as sex, race, colour, language, religion, political or other opinion, national or social origin, association with a national minority, property, birth or other status". Miss Carss-Frisk submits that the difference in treatment of personal injury claims in tort and similar claims in contract constitutes discrimination on grounds of "other status".

E She submits that this is a broad concept which should not be given a restricted meaning and that it is apt to describe the status of a person who has suffered injury as a result of a breach of a tortious duty of care. It defines their status as a victim of a particular type of legal wrong. Moreover, tort claimants are as between themselves subject to discrimination depending on whether their cause of action accrued before or after the liquidation date.

F 181  Miss Carss-Frisk further characterised the status in a different, but associated, way. Most of the personal injury claimants with contractual claims were employees of T & N. The distinction, and the discrimination, was between employees on the one hand and those who had not been employed by T & N on the other hand.

182  Miss Carss-Frisk relied on the judgment of the European Court of Human Rights in *National and Provincial Building Society v United*

G *Kingdom* (1997) 25 EHRR 127. Regulations imposing a tax charge on interest earned on building society accounts during a transitional period had been declared invalid in proceedings brought by Woolwich Building Society. Woolwich Building Society succeeded in a restitutionary claim for the repayment of the relevant tax. Retrospective legislation was enacted to validate the regulations, but it included an exemption in respect of proceedings for restitution commenced before 18 July 1986. This provision,

H on the facts, applied only to Woolwich Building Society. The applicant building societies complained that the legislation breached their Convention rights on grounds, amongst others, that it violated article 1P1 taken in conjunction with article 14. They contended that they were in a materially identical situation to that of Woolwich Building Society, enjoying the same

restitutionary rights, and that by not including them within the exemption   A
there was discrimination on grounds falling within article 14. The court
rejected the contention. Its judgment states, at para 88:

> "not every difference in treatment will amount to a violation of this
> article. Instead, it must be established that other persons in an analogous
> or relevantly similar situation enjoy preferential treatment, and that there
> is no reasonable or objective justification for this distinction."       B

The court accepted that the applicant building societies were in an
analogous if not identical situation as Woolwich Building Society with
respect to the tax regulations but, because only Woolwich Building Society
had taken proceedings, it rejected the contention that they were in fact in a
relatively similar situation to Woolwich Building Society.

183   Miss Carss-Frisk submitted that the approach of the court in the    C
*National and Provincial* case shows that the European Court of Human
Rights is prepared to proceed on the basis that it is not particularly
important to identify a relevant ground of discrimination. Rather, the court
asks whether the comparator groups are in an analogous situation and, if so,
can the discrimination be justified. Miss Carss-Frisk submitted that personal
injuries claimants are in an analogous position, whether their accrued causes   D
of action are in tort or in contract. Both have claims for damages, well-
established as a matter of the applicable principles of English law, and both
may obtain judgments quantifying their damages.

184   Miss Carss-Frisk accepted that some attention has to be paid to
whether the alleged discrimination is on a ground to which article 14 applies.
Mr Eadie submitted that recent decisions of the House of Lords, as well as
Strasbourg decisions, had underlined the importance of this part of the   E
analysis and had shown that, for article 14 to be engaged in any particular
case, the discrimination must be on a ground falling within article 14. In
*Kjeldsen, Busk Madsen and Pedersen v Denmark* (1976) 1 EHRR 711,
para 56, the European Court of Human Rights stated:

> "The court first points out that article 14 prohibits, within the ambit of
> the rights and freedoms guaranteed, discriminatory treatment having as   F
> its basis or reason a personal characteristic ('status') by which persons or
> groups of persons are distinguishable from each other."

185   The test of personal characteristic was adopted and applied by the
House of Lords in *R (S) v Chief Constable of the South Yorkshire Police*
[2004] 1 WLR 2196. Lord Steyn, with whom all other members of the
House agreed on this point, said, at paras 46–49:                         G

> "46. This question is important because if the different treatment is not
> on a relevant ground for the purposes of article 14, then this article is not
> applicable. In any event, identification of the ground for different
> treatment is material to the question of justification.
> "47. The different treatment afforded to the appellants and
> comparators was on the ground that the former had already provided   H
> samples and fingerprints to the police in a criminal investigation while
> the comparators had never been required to do so.
> "48. The list of grounds in article 14 is not exhaustive, and necessarily
> includes each of the specifically proscribed grounds as well as 'other

1789

**[2006] 1 WLR**

In re T & N Ltd (Ch D)
David Richards J

A  status'. The European Court of Human Rights has interpreted 'other status' as meaning a personal characteristic: *Kjeldsen, Busk Madsen and Pedersen v Denmark* 1 EHRR 711, 732–733, para 56. I do not understand Lord Woolf CJ [2002] 1 WLR 3223, 3238 to have expressed a different view in para 47 of his judgment. On the other hand, the proscribed grounds in article 14 cannot be unlimited, otherwise the wording of article 14 referring to 'other status' beyond the well-

B  established proscribed grounds, including things such as sex, race or colour, would be unnecessary. It would then preclude discrimination on any ground. That is plainly not the meaning of article 14.

"49. It is, therefore, necessary to examine whether the ground for different treatment in this case amounts to a status in the sense of a personal characteristic within the meaning of article 14."

C

186   Lord Steyn concluded, at para 51, that the difference in treatment was not analogous to any of the expressly proscribed grounds such as sex, race or religion and that the provision of fingerprints and DNA samples to the police did not constitute a "status" within article 14. In *R (Hooper) v Secretary of State for Work and Pensions* [2005] 1 WLR 1681, the House of Lords applied the same approach and held that discrimination by reference

D  to whether or not a person had started legal proceedings was not a "status" within article 14: per Lord Hoffmann, at para 65.

187   In *R (Carson) v Secretary of State for Work and Pensions* [2006] 1 AC 173, the House of Lords again looked at this question. The claimant was a British citizen who had spent most of her working life in Britain and had a full record of national insurance contributions. At the date of her

E  retirement, she was resident in South Africa. Because she was resident in South Africa, and because the United Kingdom had no relevant reciprocal agreement with South Africa, she was not entitled to annual cost of living increases in her state pension. She argued that this constituted discrimination under article 14 in the enjoyment of a possession under article 1P1, on the grounds of her status, namely residence in South Africa.

F  Lord Hoffmann referred to the need to show discrimination on the basis of a "personal characteristic", as set out in *Kjeldsen, Busk Madsen and Pedersen v Denmark* 1 EHRR 711 and *R (S) v Chief Constable of the South Yorkshire Police* [2004] 1 WLR 2196, and was content to assume that residence in South Africa was a personal characteristic: para 13. Likewise, in the conjoined appeal of *Reynolds*, age was treated as at least capable of falling within article 14. Lord Walker of Gestingthorpe said [2006] 1 AC 173,

G  paras 52–54:

"52. It will be apparent that the grounds of discrimination prohibited by article 14 extend a good way beyond sex and race. Its enumeration of grounds does not in terms include residence (the ground of complaint in Mrs Carson's case) or age (the ground of complaint in Ms Reynolds's case). The residual group, 'or other status' (in the French text, toute autre

H  situation), is far from precise. The respondent Secretary of State does not contend that the grounds of residence and age cannot be included within the scope of article 14. But it is clear from the jurisprudence of the Strasbourg court that the possible grounds of discrimination under article 14 are not wholly unlimited; nor are all possible grounds of equal

efficacy in establishing unlawful discrimination. These points call for   A
some explanation, since they are relevant to these appeals.

"53. In *Kjeldsen, Busk Madsen and Pedersen v Denmark* 1 EHRR 711,
an early Strasbourg decision concerned with compulsory sex education in
state primary schools, the court, at pp 732–733, para 56, interpreted
'status' in article 14 as 'a personal characteristic . . . by which persons or
groups of persons are distinguishable from each other'. The fact that a
number of parents objected to their children receiving sex education at   B
school was not accepted as equivalent to a religious belief so as to make
the complainants a group for the purposes of a claim under
article 14 taken together with article 2 of the First Protocol.

"54. It was suggested in argument that the *Kjeldsen* test of looking for
a personal characteristic is no longer part of the Strasbourg jurisprudence.
But it has recently been followed by the Fourth Section of the European   C
Court of Human Rights in two admissibility decisions, *Budak v Turkey*
(Application No 57345/00) (unreported) 7 September 2004 and *Beale v
United Kingdom* (Application No 16743/03) (unreported) 12 October
2004. In *Budak* the only relevant difference was in the criminal
procedure adopted for two different types of offence. In *Beale* it was the
different investigatory procedures appropriate for the police (on the one   D
hand) and trading standards officers (on the other hand). In neither case
was there any personal characteristic of the claimant which could be a
ground for discrimination contrary to article 14. Moreover this House
has recently applied *Kjeldsen* in *R (S) v Chief Constable of the South
Yorkshire Police* [2004] 1 WLR 2196, 2213, para 48, per Lord Steyn."

188   It is clear from these authorities that it is an essential element of a   E
complaint of discrimination contrary to article 14 that the ground of
discrimination should be a personal characteristic. The extensive list of
specific grounds of discrimination in article 14 both led to the interpretation
of "other status" as personal characteristics and has given some guidance as
to the underlying nature of those characteristics.

189   In my judgment, tort claimants do not as such possess any personal   F
characteristics which distinguish them from other personal injuries
claimants. Their distinctive features for present purposes are (i) they have
been negligently exposed to asbestos by T & N, (ii) they have as a result
suffered injury and (iii) the only legal basis on which they can make a claim is
in negligence. It is the third feature which distinguishes them. But the nature
of the legal redress available to them under the general law is not in my view
to be regarded as a personal characteristic within article 14, and it certainly   G
bears no relation to any of the characteristics specified in article 14. In my
view, it is no more a personal characteristic than commencing proceedings
before or after a particular date (*R (Hooper) v Secretary of State for Work
and Pensions* [2005] 1 WLR 1681) or committing or being charged with one
offence rather than another: *Budak v Turkey* (Application No 57345/00)
(unreported) 7 September 2004.

190   As I have mentioned, Miss Carss-Frisk also submitted that the   H
distinction was between employees, who have claims for breach of contract
and therefore have provable claims, and other claimants. However, I do not
consider that that demonstrates a personal characteristic shared by the other
claimants. They are an extremely disparate group, including, by way of

1791

**[2006] 1 WLR**
In re T & N Ltd (Ch D)
David Richards J

A example only, workers "loaned" to T & N by other T & N companies, wives of T & N workers, workers in other industries such as shipbuilding and construction, children living near T & N plants, people exposed to asbestos because of temporary building works at their workplace, and consumers using products incorporating asbestos. Their exposure has been in many different countries, notably the United States as well as the United Kingdom, and they are of many different nationalities. The absence of a contract of

B employment with T & N cannot in my view be regarded as a shared personal characteristic. It is a fact which defines a very broad category of persons, and affects their legal rights, but it is not a personal characteristic. Miss Carss-Frisk relied on Lord Hoffmann's inclusion of a person's occupation as a personal characteristic (*R (Carson) v Secretary of State for Work and Pensions* [2006] 1 AC 173, para 16) but a particular occupation is

C not analogous to the fact of not being employed by T & N.

**191** I conclude therefore that rule 13.12 of the 1986 Rules, as it applies to tort claims accruing after the liquidation date, does not breach article 14 taken in conjunction with article 1P1.

**192** My reasons for concluding that none of the challenges to rule 13.12 on the basis of Convention rights succeeds makes it unnecessary to consider whether the differences in treatment under the rule can be justified, whether

D under article 1P1 or under article 14.

*Conclusion*

**193** My overall conclusions are therefore, first, that future asbestos claimants (as defined) are creditors for the purposes of a scheme of arrangement under section 425 of the Companies Act 1985 and a CVA under

E Part I of the Insolvency Act 1986. Secondly, future asbestos claims are not provable debts in a liquidation. Thirdly, this second conclusion involves no breach of Convention rights under article 1 of the First Protocol whether taken on its own or in conjunction with article 14.

*Order accordingly.*

F *Solicitors: Denton Wilde Sapte; Lovells and Herbert Smith; Sidley Austin Brown & Wood; DLA Piper Rudnick Gray Cary (UK) LLP; John Pickering & Partners; Allen & Overy.*

Reported by Sarah Addenbrooke, *Barrister*

G

H

TAB 22

*Stichting Shell Pensioenfonds v Krys* [2015] AC 616

Privy Council                                          *A*

## Stichting Shell Pensioenfonds *v* Krys and another

[On appeal from the Eastern Caribbean Court of Appeal]

### [2014] UKPC 41

*B*

2014  Oct 8, 9;                            Baroness Hale of Richmond DPSC,
        Nov 26              Lord Clarke of Stone-cum-Ebony, Lord Wilson,
                                    Lord Sumption, Lord Toulson JJSC

Conflict of laws — Jurisdiction — Anti-suit injunction — Dutch creditor obtaining
    pre-judgment garnishing attachment in Dutch court in respect of assets in Dutch
    bank account of company incorporated in British Virgin Islands — Company
    subsequently wound up in British Virgin Islands and liquidators appointed by
    court — Liquidators obtaining injunction to restrain creditor from prosecuting     *C*
    Dutch proceedings — Whether court precluded from granting anti-suit
    injunction restraining foreign creditors from bringing proceedings in courts of
    their own country — Whether necessary to show that creditor had acted
    vexatiously or oppressively by invoking jurisdiction of foreign court — Whether
    injunction rightly made
                                                                                   *D*

The defendant, a regulated Dutch pension fund incorporated in The Netherlands,
invested large sums in F Ltd, a company incorporated in the British Virgin
Islands. F Ltd invested in a scheme controlled by M, who was subsequently convicted
of a major fraud.    Immediately after M's arrest the defendant obtained a
pre-judgment garnishing attachment from a Dutch court over approximately
US$71m in F Ltd's account in the Dublin branch of a Dutch bank.  About six months     *E*
later a court in the British Virgin Islands made an order for the winding up of F Ltd
and appointed the claimants as liquidators.  The claimants applied in the British
Virgin Islands for an injunction to restrain the defendant from pursuing the
proceedings against F Ltd in The Netherlands.  Bannister J refused the application but
the Eastern Caribbean Court of Appeal allowed the claimants' appeal and granted
the anti-suit injunction.

On the defendant's appeal—                                                  *F*
    *Held*, advising that the appeal be dismissed, that where an English company was
being wound up in England, or a British Virgin Islands company in the British Virgin
Islands, all of its assets, including those located within the jurisdiction of foreign
courts, were subject to the statutory trusts; that the rights and liabilities of claimants
against the assets were the same regardless of their nationality or place of residence;
that, where a creditor or member of a company in insolvent liquidation who was
amenable to the personal jurisdiction of the court began or continued foreign
proceedings which would interfere with the statutory trusts over the company's     *G*
assets, an injunction would in principle be available to restrain their prosecution,
irrespective of the nationality or residence of the creditor or member in question, and
there was no principle that such an injunction would not issue so as to prohibit a
foreign litigant from resorting to the courts of his own country or some foreign court;
that, although as a general rule there was no objection in principle to a creditor
invoking the purely adjudicatory jurisdiction of a foreign court provided that it was
an appropriate jurisdiction and that litigation there was not vexatious or oppressive     *H*
to other interested parties, it was in principle inimical to the proper winding up
process for a creditor to seek or to enforce an order from a foreign court which would
result in his enjoying prior access to any part of the insolvent estate; that, on an
application for an injunction to restrain foreign proceedings which were calculated to
give a creditor such prior access, it was not necessary to show that the creditor had

© 2015 The Incorporated Council of Law Reporting for England and Wales

617
**[2015] AC**                                    Stichting Shell Pensioenfonds v Krys (PC)

A   acted vexatiously or oppressively by invoking the jurisdiction of the foreign court;
    that, as with any injunction, the court had a discretion to refuse relief if in the
    particular circumstances it would not serve the ends of justice; and that, accordingly,
    although it had not acted vexatiously or oppressively by invoking the jurisdiction of
    the Dutch court, since (i) the defendant had invested in a company incorporated in
    the British Virgin Islands and had, as a reasonable investor, to have expected that if
    that company became insolvent it would be wound up under the law of that
B   jurisdiction, (ii) it had submitted to the jurisdiction of the courts of the British Virgin
    Islands and thereby to a statutory regime which precluded it from acting so as to
    prevent the assets subject to the statutory trust from being distributed in accordance
    with it, and (iii) there was nothing to suggest that allowing the defendant an
    advantage over other comparable claimants would be consistent with the ends of
    justice, the Court of Appeal had been entitled to exercise its discretion in the
    liquidators' favour and its order should stand (post, paras 24–28, 32–35, 38–40, 43,
C   45).
        *In re North Carolina Estate Co Ltd* (1889) 5 TLR 328, *Société Nationale
    Industrielle Aerospatiale v Lee Kui Jak* [1987] AC 871, PC and *Mitchell v Carter*
    [1997] 1 BCLC 673, CA applied.
        Dictum of Lord Cranworth LC in *Carron Iron Co Proprietors v Maclaren* (1855)
    5 HL Cas 416, 441, HL(E) explained.
        *In re Vocalion (Foreign) Ltd* [1932] 2 Ch 196 not applied.
D       *Per curiam.* (i) The true principle, which applies to all injunctions and not just
    anti-suit injunctions in the course of insolvency proceedings, is that the English and
    British Virgin Islands courts will not as a matter of discretion grant injunctions
    affecting matters outside their territorial jurisdiction if they are likely to be
    disregarded or would be "brutum fulmen". Various judicial statements suggesting a
    wider rule are in reality concerned either with personal jurisdiction over the person
    sought to be restrained or else with the practical efficacy of the remedy (post,
    para 34).
E       (ii) Where the foreign litigant undertakes to bring any assets realised in the
    foreign proceedings into the bankruptcy so that no advantage would be obtained
    over other creditors, the basis on which an anti-suit injunction might otherwise be
    justified will not apply (post, para 40).

        The following cases are referred to in the judgment of the Board:

F   *Akers as a joint foreign representative of Saad Investments Co Ltd v Deputy Comr of
        Taxation* [2014] FCAFC 57; 311 ALR 167
    *Ayerst v C & K (Construction) Ltd* [1976] AC 167; [1975] 3 WLR 16; [1975] 2 All
        ER 537, HL(E)
    *Bank of Credit and Commerce International SA, In re* [1992] BCLC 570
    *Barclays Bank plc v Homan* [1993] BCLC 680, Hoffmann J and CA
    *Bloom v Harms Offshore AHT "Taurus" GmbH & Co KG* [2009] EWCA Civ 632;
        [2010] Ch 187; [2010] 2 WLR 349; [2009] Bus LR 1663, CA
G   *Bushby v Munday* (1821) 5 Madd 297
    *Carron Iron Co Proprietors v Maclaren* (1855) 5 HL Cas 416, HL(E)
    *Castanho v Brown & Root (UK) Ltd* [1981] AC 557; [1980] 3 WLR 991; [1981]
        1 All ER 143; [1981] 1 Lloyd's Rep 113, HL(E)
    *Chapman, In re* (1872) LR 15 Eq 75
    *Cole v Cunningham* (1890) 133 US 107
    *HIH Casualty and General Insurance Ltd, In re* [2008] UKHL 21; [2008] 1 WLR
H       852; [2008] Bus LR 905; [2008] 3 All ER 869, HL(E)
    *International Pulp and Paper Co, In re* (1876) 3 Ch D 594
    *Kemsley v Barclays Bank plc* [2013] EWHC 1274 (Ch); [2013] BPIR 839
    *Liddell's Settlement Trusts, In re* [1936] Ch 365; [1936] 1 All ER 239, CA
    *Mitchell v Carter; In re Buckingham International plc* [1997] 1 BCLC 673, CA
    *North Carolina Estate Co Ltd, In re* (1889) 5 TLR 328

© 2015 The Incorporated Council of Law Reporting for England and Wales

*Oriental Inland Steam Co, In re; Ex p Scinde Railway Co* (1874) LR 9 Ch App 557    A
*Robertson, Ex p; In re Morton* (1875) LR 20 Eq 733
*Rubin v Eurofinance SA (Picard intervening)* [2012] UKSC 46; [2013] 1 AC 236;
    [2012] 3 WLR 1019; [2013] Bus LR 1; [2013] 1 All ER 521; [2013] 1 All
    ER (Comm) 513; [2012] 2 Lloyd's Rep 615, SC(E)
*Singularis Holdings Ltd v PriceWaterhouseCoopers* [2014] UKPC 36; [2015] 2 WLR
    971, PC
*Société Nationale Industrielle Aerospatiale v Lee Kui Jak* [1987] AC 871; [1987]    B
    3 WLR 59; [1987] 3 All ER 510, PC
*Vocalion (Foreign) Ltd, In re* [1932] 2 Ch 196

The following additional cases were cited in argument:

*Airbus Industrie GIE v Patel* [1999] 1 AC 119; [1998] 2 WLR 686; [1998] 2 All ER
    257; [1998] 1 Lloyd's Rep 631, HL(E)
*Deutsche Bank AG v Highland Crusader Offshore Partners LP* [2009] EWCA Civ    C
    725; [2010] 1 WLR 1023; [2010] Bus LR 515; [2009] 2 All ER (Comm) 987;
    [2009] 2 Lloyd's Rep 617, CA

**APPEAL** from the Eastern Caribbean Court of Appeal

The claimants, Kenneth Krys and Joanna Lau, in their capacity as joint
liquidators of the company, Fairfield Sentry Ltd, applied for an anti-suit
injunction to restrain the defendant, Stichting Shell Pensioenfonds, from    D
prosecuting ongoing proceedings in The Netherlands against the company.
On 9 August 2011 Bannister J sitting in the Commercial Division of the High
Court of the British Virgin Islands refused the application.

The claimants appealed. On 17 September 2012 the Eastern Caribbean
Court of Appeal (Pereira, Mitchell and Belle JJA) allowed the appeal and
made an order restraining the defendant from prosecuting its proceedings    E
against the company in The Netherlands.

The defendant appealed. The issue for the Judicial Committee of the
Privy Council was whether, when a company was being wound up in the
jurisdiction where it was incorporated, an anti-suit injunction should issue
to prohibit a creditor or member of the company from pursuing proceedings
in another jurisdiction which are calculated to give him an unjustifiable
priority over other creditors or members.    F

The facts are stated in the judgment.

*Catherine Newman QC* and *Arabella di Iorio* (instructed by *Herbert
Smith Freehills LLP*) for the defendant.

Dutch law allows the courts of The Netherlands to grant pre-judgment
attachment orders over assets in the jurisdiction or over assets of Dutch    G
debtors. Since the company's choice of banker, Citco, is a Dutch company,
the Amsterdam court had jurisdiction to grant attachments over debts owed
by Citco to the company. The jurisdiction to garnish or attach does not
depend on whether the Dutch court would have prior jurisdiction over the
dispute between the person with the prior claim to the asset in the hands of
the Dutch third party and the attacher.

The right of a creditor to invoke his right of payment from assets in The    H
Netherlands is not disturbed by a non-recognised foreign bankruptcy. The
right of the liquidator to speak for the company does not disturb any such
domestic principle. A foreign country such as the British Virgin Islands
("BVI") which has no treaty arrangement with The Netherlands cannot

© 2015 The Incorporated Council of Law Reporting for England and Wales

A  expect The Netherlands to abandon its own domestic law in favour of BVI law.

Statutory provisions preventing the continuation of litigation after the opening of an insolvency do not have extra-territorial effect. Before the court of the insolvency injuncts a foreigner from continuing proceedings in a foreign country (a fortiori his own) there must be a submission to the

B  jurisdiction of the insolvency for all purposes or vexatious or oppressive conduct. A submission to the BVI court for the purpose of defending the anti-suit injunction application is not a submission for the purpose of bringing a claim in tort governed by the general law and not arising out of the insolvency. Nor was there any vexatious or oppressive conduct on the part of the defendant: *Bloom v Harms Offshore AHT "Taurus" GmbH & Co KG* [2010] Ch 187. There must be a good reason why the foreign court's

C  decision to accept jurisdiction should not be respected: *In re Vocalion (Foreign) Ltd* [1932] 2 Ch 196. The natural forum for the litigation must be the domestic court. The company did not contend that the BVI court was the natural forum for the substantive litigation

It cannot be said that the company had no connection with The Netherlands. It had Dutch administrators and a Dutch bank account. The BVI must consider not only its own jurisdiction but also what the natural

D  forum is for the resolution of the issues. [Reference was made to *Rubin v Eurofinance SA (Picard intervening)* [2013] 1 AC 236.]

The defendant has not submitted to the jurisdiction of the BVI courts for all purposes although it respects the statutory scheme of the BVI liquidation. However, as in England, the statutory scheme of the BVI does not involve any provision which automatically provides for or requires the stay of

E  foreign proceedings. The defendant is not amenable to the BVI jurisdiction for the purpose of making claims which are governed by the general law and not specifically governed by insolvency law. The defendant accepts that if the liquidator were to reject its proof, any appeal which it might wish to bring would have to be brought in the court of the insolvency proceedings. But the defendant does not accept that claims under the general law should be brought in the BVI courts.

F  The justification for the grant of an anti-suit injunction in the present case cannot be found in contract, in statute or in an aspirational term like "modified universalism". Nor do the ordinary principles of private international law applicable to submission to the jurisdiction provide a route. The law relating to submission to the jurisdiction depends upon the foreigner submitting becoming involved in proceedings in the domestic

G  courts to decide the self same issues in a way which is inconsistent with resisting submission to the jurisdiction. That rule does not result in the defendant becoming amenable to BVI jurisdiction for all purposes as a result of attempting to prove. In *Ex p Robertson; In re Morton* (1875) LR 20 Eq 733, by contrast, the creditor had accepted a dividend and attended a meeting.

H  The BVI courts should not then use the anti-suit injunction simply to create a long-arm jurisdiction over foreigners or general law claims to establish rights where none exist.

There is no injustice to any creditor or redeeming member in permitting the defendant to litigate its claim in the Dutch court. In accepting jurisdiction to determine the defendant's damages claim the Dutch court was

© 2015 The Incorporated Council of Law Reporting for England and Wales

not exercising a jurisdiction which is exorbitant, oppressive, vexatious or
unjust to those interested in the company's estate, nor was it interfering with
the due process of the BVI court or the liquidation of the company.

The company has not suggested that it would not get a fair trial in The
Netherlands. It was legitimate for the defendant, which is a regulated pension
fund established to provide retirement income for Dutch former
employees of the Royal Dutch Shell group, to seek, by its substantive
proceedings, to advance its position from that of a member to that of a
creditor.

*Paul Girolami QC, Andrew Westwood* and *William Hare* (instructed by
*Wragge Lawrence Graham & Co LLP*) for the claimants.

The true issue is whether the Court of Appeal was correct to grant anti-
suit relief against the defendant when the object and effect of the Dutch
proceedings, if successful, would be to enable the defendant, by recourse to
an asset which it had attached, to make recovery on its claims in priority to
and at the expense of other creditors in the compulsory liquidation of the
company.

The position in the BVI in respect of the liquidation of a company is the
same as that under English law. In England, on the making of an order
winding up a company incorporated in England, all the company's assets,
wherever situated, are made subject to a statutory scheme for administration
and distribution among the creditors and members in accordance with the
Insolvency Act 1986. No creditor should be advantaged or disadvantaged
by where the assets happen to be. The core of the scheme is pari passu
distribution to all creditors, wherever situated and wherever their claims
arise.

For that purpose "creditor" is widely construed and extends to all manner
of claims, including contractual and tortious claims for damages. A foreign
creditor is treated no differently from a domestic creditor. Nor is a creditor
treated differently because he is in a jurisdiction where more or fewer of the
assets or of the creditors are located. The reason for the principal liquidation
being considered as having a worldwide reach is that it tends to achieve, so
far as possible, the fairest and most effective distribution of all the
company's assets to those entitled to share in them.

The scheme of the BVI legislation and of BVI policy are the same.
[Reference was made to the British Virgin Islands Insolvency Act 2003,
sections 2, 9, 12, 163, 175 and paragraph 5 of Schedule 3.]

The grounds for granting an anti-suit injunction are not confined to
evidence of oppression or vexatiousness. One of the categories of case which
the authorities recognise as potentially justifying the grant of anti-suit relief
is where there is a need to protect an insolvent or other estate which the
court is in the course of administering; and one of the particular instances
recognised as justifying relief in order to afford such protection is where a
creditor is taking proceedings to get hold of an asset and thereby gain
priority.

The object and effect of the Dutch proceedings was to obtain priority over
other creditors. The asset subject to conservatory attachment is money
standing to the credit of a bank account in Dublin. That is an asset located in
Ireland. There is no evidence of the company having any assets in The
Netherlands. The Dutch proceedings are distinctly not proceedings for the

© 2015 The Incorporated Council of Law Reporting for England and Wales

A administration of the company's assets located in The Netherlands for the benefit of the company's creditors as a whole, nor even for the body of its Dutch creditors; they are not proceedings relating to any asset located in The Netherlands at all. The sole basis upon which the Dutch court attached the asset was that Citco as garnishee is present in The Netherlands. Jurisdiction then to determine the substantive claim made by the defendant against the company was founded upon the attachments having been made. Under

B Dutch law any judgment obtained by the defendant will be enforced against the attached debt in priority to other creditors. The Court of Appeal rightly took the view that the defendant instituted the Dutch proceedings for the purpose of gaining priority. The question is not where there should be determined any underlying dispute as to the company's liability to the defendant, but rather whether the defendant should be able to take the

C benefit of that priority. [Reference was made to *Carron Iron Co Proprietors v Maclaren* (1855) 5 HL Cas 416; *In re Chapman* (1872) LR 15 Eq 75; *In re International Pulp and Paper Co* (1876) 3 Ch D 594; *In re Vocalion (Foreign) Ltd* [1932] 2 Ch 196 and *Bloom v Harms Offshore AHT "Taurus" GmbH & Co KG* [2010] Ch 187.]

The BVI court has jurisdiction to restrain a creditor from pursuing such

D proceedings. [Reference was made to *In re Oriental Inland Steam Co; Ex p Scinde Railway Co* (1874) LR 9 Ch App 557; *In re International Pulp and Paper Co* (1876) 3 Ch D 594; *In re North Carolina Estate Co* (1889) 5 TLR 328; *Société Nationale Industrielle Aerospatiale v Lee Kui Jak* [1987] AC 871 and *Kemsley v Barclays Bank plc* [2013] BPIR 839.]

By submitting a proof in the liquidation of the company the defendant claimed for itself the benefit of, and invoked its rights under, the BVI

E statutory scheme. Those were rights which would be protected under the BVI scheme. By doing so the defendant was making itself amenable to the jurisdiction of the BVI courts in matters relating to the liquidation of the company. It is the act of proof which is significant for the purposes of submission to the jurisdiction. A benefit need not have been received. [Reference was made to *Ex p Robertson; In re Morton* (1875) LR 20 Eq 733

F and *Rubin v Eurofinance SA (Picard intervening)* [2013] 1 AC 236.] There is no reason why the same principle should not apply to BVI law.

By supporting the decision of Bannister J which proceeded on the basis that the defendant was amenable to the jurisdiction of the BVI courts for present purposes, the defendant voluntarily recognised that the BVI courts had jurisdiction to hear and determine the application for an anti-suit injunction on the merits. In the circumstances the defendant is precluded

G from thereafter objecting to the court exercising its jurisdiction.

No considerations of comity apply to inhibit the grant of an anti-suit injunction and in all the circumstances the Court of Appeal was correct to restrain the defendant from pursuing the Dutch proceedings.

*Newman QC* replied.

H 26 November 2014. **LORD SUMPTION** and **LORD TOULSON JJSC** handed down the following judgment of the Board.

1 The question at issue on this appeal is whether, when a company is being wound up in the jurisdiction where it is incorporated, an anti-suit injunction should issue to prevent a creditor or member from pursuing

© 2015 The Incorporated Council of Law Reporting for England and Wales

proceedings in another jurisdiction which are calculated to give him an *A* unjustifiable priority. This question falls to be decided under the law of the British Virgin Islands, which is not identical to the law of the United Kingdom, because of differences in their respective insolvency legislation. But for the purpose of the present issue, the laws of the two jurisdictions can be treated as the same.

*Bernard L Madoff Investment Securities LLC and Fairfield Sentry Ltd* *B*

2  Bernard L Madoff Investment Securities LLC ("BLMIS"), was a New York-based fund manager controlled by the eponymous Bernard Madoff. Although not all of the facts are yet known, it appears that over a period of at least 17 years he operated what was probably the largest Ponzi scheme in history, accepting sums variously estimated between $17 billion and $50 billion for investment. From at least the early 1990s there appear to have *C* been no trades and no investments. Reports and returns to investors were fictitious and the corresponding documentation fabricated.         On 11 December 2008, Mr Madoff was arrested, and in March 2009 pleaded guilty to a number of counts of fraud.

3  Funds for investment were commonly entrusted to BLMIS by "feeder funds", of which the largest was Fairfield Sentry Ltd, the company whose *D* winding up has given rise to this appeal. Fairfield Sentry is incorporated as a mutual fund in the British Virgin Islands. Its liquidators have stated that as at 31 October 2008 about 95% of its assets, amounting to some US$7·2 billion, were placed with BLMIS. Investors participated indirectly in these placements by acquiring shares in Fairfield Sentry at a price dependent on the net asset value per share published from time to time by the directors. Investors were entitled to withdraw funds by redeeming their shares under *E* the provisions of the fund's articles of association, also at a price based on the published NAV per share. The information provided to investors was contained in a private placement memorandum, which made it clear that funds subscribed for shares would be placed for investment with BLMIS, and described in general terms the way that the scheme was supposed to work. *F*

4  Fairfield Sentry's business involved the use of a number of intermediaries. For present purposes three of them may be mentioned. Fairfield Greenwich Ltd was a Cayman-incorporated associate which acted as its investment manager. Dealings with investors were handled by Citco Fund Services (Europe) BV, a company incorporated in the Netherlands which served as Fairfield Sentry's administrative agent.    Citco Bank Nederland BV, an associated company of Citco Fund Services, is a Dutch *G* bank which acted as Fairfield Sentry's asset custodian under its agreements with subscribers. Citco Bank Nederland had a branch in Dublin.    It maintained an account in the name of Fairfield Sentry in which substantial cash balances were held.

5  The appellant, Stichting Shell Pensioenfonds, which we shall call "Shell", is a Dutch pension fund incorporated and with its seat in the Netherlands.      Between 2003 and 2006, it subscribed US$45m for *H* 46,708·1304 Fairfield Sentry shares, under five successive subscription agreements.    These agreements were governed by New York law and contained submissions to the exclusive jurisdiction of the New York courts. Before the first of its placements, Shell obtained a side-letter dated 26 March

© 2015 The Incorporated Council of Law Reporting for England and Wales

623

A   2003 from Fairfield Sentry and its parent company Fairfield Greenwich Ltd
containing various warranties, including a warranty that the contents of the
private placement memorandum were correct and complete.

*The Dutch proceedings*

6   On 12 December 2008, the day after Mr Madoff's arrest, Shell
B   applied to redeem its shares.  However, no redemption payment was
received and, six days later on 18 December, the directors of Fairfield Sentry
suspended determinations of its Net Asset Value per share, thereby in
practice bringing redemptions to an end.

7   On 22 December 2008 Shell applied in the Amsterdam District Court
for permission to obtain a pre-judgment garnishment or conservatory
attachment over all assets of Fairfield Sentry held by Citco Bank up to a value
C   of US$8om, including any credit balance on its account with Citco Bank's
Dublin branch.  An order in those terms was made on the following day,
23 December 2008.  In accordance with that order, attachments were made
on 23 December 2008, 21 January 2009 and 16 March 2010 of sums in the
Dublin account totalling about US$71m.  It is common ground that no other
assets of Fairfield Sentry are subject to the Dutch attachments.  The initial
D   application for authority to attach was made ex parte.  However, Fairfield
Sentry was entitled to apply inter partes to lift the attachment and did so.
The application was rejected by the District Court of Amsterdam on
16 February 2011.

8   The effect of the attachments as a matter of Dutch law was the subject
of argument in related proceedings in the Netherlands and of evidence in
other related proceedings in Ireland.  The parties are substantially agreed
E   about it.  Three points should be noted:

(1) Where the asset attached is a debt, the fact that the debtor (in this case
Citco Bank Nederland) is amenable to the jurisdiction of the Dutch courts is
a sufficient basis on which to establish the jurisdiction of the Dutch courts to
hear the substantive claim.  Fairfield Sentry being resident outside the
European Union, it is the only basis of jurisdiction available in the present
F   case.  It was a term of the court's permission to attach assets of Fairfield
Sentry that Shell should begin proceedings in support of its substantive claim
within four months.

(2) The attachments do not, as a matter of Dutch law, create any kind of
proprietary interest in the balances on the Dublin account.  But they purport
to conserve the funds in the account so that they will be available to satisfy
any judgment which may be obtained against Fairfield Sentry in due course.
G   Subject to any relevant period of limitation, it would be open to any other
person with claims against Fairfield Sentry to take the same course as Shell
has done, and apply in the Dutch courts to attach its assets in the hands of
Citco Bank.   Where there is more than one judgment creditor with
attachments over the same assets, the funds attached will then be shared
between them.

H   (3) In principle a claimant is entitled as of right to attach assets in support
of an arguable claim, subject only to the reservation that an attachment will
not be authorised if the substantive claim is unarguable or the attachment
would put the garnishee at risk of having to pay twice.  However, except in
cases governed by the insolvency legislation of the European Union, the fact
that the debtor is in liquidation elsewhere and that the attachment will

© 2015 The Incorporated Council of Law Reporting for England and Wales

prevent its assets from being distributed pari passu, is regarded as irrelevant    A
to the exercise of the power to authorise an attachment. In rejecting Fairfield
Sentry's challenge to the attachment order, the District Court of Amsterdam
explained that Dutch law does not treat a foreign insolvency, even where it is
proceeding in the jurisdiction of incorporation, as applying to assets located
in the Netherlands.

9   The four-month deadline for the commencement of proceedings on    B
Shell's substantive claim was extended several times, and the proceedings
were ultimately commenced within the extended time on 19 March 2010.
The principal claim made was for US$45m damages for the alleged breaches
of the representation and warranties contained in the side-letter of 26 March
2003. The present status of the Dutch proceedings is that they have been left
to lie on the file pending the final resolution of the injunction proceedings in
the BVI.                                                                C

*The winding up proceedings*

10   On 21 July 2009, Fairfield Sentry was ordered by the High Court of
the British Virgin Islands to be wound up and Mr Kenneth Krys and
Ms Joanna Lau were appointed as its joint liquidators. There are broadly
speaking three categories of claimant or potential claimant in the BVI    D
liquidation. First, there are what one can loosely call trade creditors, unpaid
suppliers of goods or services. The Board was told that the value of their
claims was small. Second, there are redemption claims, from shareholders in
Fairfield Sentry who submitted redemption notices before the determination
of its NAV per share was suspended on 18 December 2008. The Board
understands that there are persons claiming to fall within this category.
However, on 14 August 2014 Bannister J in the High Court directed that    E
subject to any contrary order of the court the assets should be distributed on
the footing that no outstanding redemption moneys were due to any member
or former member of Fairfield Sentry. Third, there are shareholders entitled
to share in any surplus. Somewhat unusually, therefore, it is likely that by
far the greater part of the recoveries made by the liquidators will be
distributed to shareholders in Fairfield Sentry. No one, however, suggests
that these distributions will represent more than a small part of the losses    F
that they will have suffered by investing in the company.

11   On 5 November 2009, Shell submitted a proof of debt in the
liquidation for US$63,045,616·18. This amount was said to represent the
redemption price of Shell's shares, calculated by reference to the NAV per
share published by the directors of Sentry at 31 October 2008. It was
claimed as a debt due under Shell's redemption notice of 12 December 2008.    G
The joint liquidators rejected Shell's proof on 21 August 2014, as a result of
Bannister J's direction of 14 August, subject to Shell's right if it objected to
the assets being distributed in accordance with that direction to put forward
its objection in writing by 17 October 2014. The Board was told that some
other members claiming to be entitled to redeem have objected, and their
objections will be heard by the BVI court later this year. But Shell has not
objected, and the position at the time of the hearing of this appeal was that it    H
was not intending to do so.

12   Manifestly, the effect of the attachments is that if Shell succeeds in its
claim in the Dutch courts, it is likely to be able to satisfy its judgment-debt in
full out of Fairfield Sentry's balance in the Dublin account, whereas others

© 2015 The Incorporated Council of Law Reporting for England and Wales

A who have claims in the liquidation ranking with or ahead of theirs may recover only a dividend. Shell says that it would have been open to other claimants to obtain attachments through the Dutch courts against the Dublin account in support of their own claims against Fairfield Sentry. If that had happened, there would have to be a kind of mini-liquidation in the Netherlands in which Shell might or might not fare better than comparable claimants in the liquidation. Shell also says that if it had proved for its

B damages claim (as it was and remains entitled to do), it would arguably be entitled to rank as a creditor ahead of other members and might have recovered in full anyway. These conjectural possibilities depend on questions that are not before the Board, and for present purposes can be ignored. Miss Newman QC, who appeared for Shell, candidly acknowledged, as she did below, that the real purpose of the Dutch attachments is to obtain priority

C which Shell would not, or not necessarily get in the liquidation. The issue on this appeal is whether Shell was in principle entitled to do that, and if not whether an injunction can issue to stop it.

13  On 8 March 2011, shortly after the District Court of Amsterdam rejected Fairfield Sentry's challenge to the attachments, the joint liquidators applied in the High Court of the British Virgin Islands for an anti-suit injunction restraining Shell from prosecuting its proceedings in the

D Netherlands and requiring it to take all necessary steps to procure the release of the attachments. The application was heard inter partes by Bannister J in July 2011, who rejected it in a judgment delivered on 9 August. His main reason, in summary, was that as a matter of principle the BVI court would not prevent a foreign creditor from resorting to his own courts, even if he was amenable to the BVI court's jurisdiction. The Court of Appeal allowed

E the appeal and made an order in substantially the terms which the joint liquidators had asked for in their notice of appeal. The order restrained Shell from taking any further steps in the existing Dutch proceedings against Fairfield Sentry or commencing new ones, but did not refer in terms to the attachments. The Court of Appeal's reasons, in summary, were (i) that Shell was subject to the personal jurisdiction of the BVI court by virtue of having lodged a proof in the liquidation, (ii) the assertion by the Dutch courts of a

F jurisdiction to attach assets on the sole ground that it consisted in a debt owed to the insolvent company by a Dutch entity was exorbitant; and (iii) Shell should not be allowed to avail itself of that jurisdiction so as to gain a priority to which it was not entitled under the statutory rules of distribution applying in the British Virgin Islands.

G *Anti-suit injunctions in insolvency cases*

14  In the British Virgin Islands, as in England, the making of an order to wind up a company divests it of the beneficial ownership of its assets, and subjects them to a statutory trust for their distribution in accordance with the rules of distribution provided for by statute: *Ayerst v C & K (Construction) Ltd* [1976] AC 167. In the case of a winding up of a BVI company in the BVI, this applies not just to assets located within the

H jurisdiction of the winding up court, but all assets world-wide. In England, this follows from the unqualified terms of section 144(1) of the Insolvency Act 1986. In the British Virgin Islands, it is provided for in terms by section 175(1) of the Insolvency Act 2003, combined with the inclusive definition of "asset" in section 2(1) ("every description of property, wherever

© 2015 The Incorporated Council of Law Reporting for England and Wales

situated"). It reflects the ordinary principle of private international law that *A* only the jurisdiction of a person's domicile can effect a universal succession to its assets. They will fall to be distributed in the BVI liquidation pari passu among unsecured creditors and, to the extent of any surplus, among its members.

15    This necessarily excludes a purely territorial approach in which each *B* country is regarded as determining according to its own law the distribution of the assets of an insolvent company located within its territorial jurisdiction. The lex situs is of course relevant to the question what assets are truly part of the insolvent estate. It will generally determine whether the company had at the relevant time a proprietary interest in an asset, and if so what kind of interest. Thus, if execution is levied on an asset of the company within the territorial jurisdiction of a foreign court before the company is *C* wound up, it will no longer be regarded by the winding up court as part of the insolvent estate. But short of a transfer of a proprietary interest in the asset prior to the winding up order, it is generally for the law of that jurisdiction to determine the distribution of the company's assets among its creditors and members, at any rate where the company is being wound up in the jurisdiction of its incorporation. In England and the BVI the court may, and commonly does, assert dominion over the local assets of an insolvent *D* foreign company by conducting an ancillary winding up. But it does so in support of the principal winding up, and so far as it can in such a way as to ensure that creditors and members are treated equally regardless of the location of the assets. It does not seek to ring-fence local assets or local creditors. As Sir Nicolas Browne-Wilkinson V-C put it in *In re Bank of Credit and Commerce International SA* [1992] BCLC 570, 577:

"The attempt to put a ring fence around either the assets or the *E* creditors to be found in any one jurisdiction is, at least under English law as I understand it, not correct, and destined to failure. I believe the position will prove to be the same in most other countries and jurisdictions."

16    In the present case the attachments were obtained some six months *F* before the company was ordered to be wound up in the British Virgin Islands. Therefore at the time that they were obtained there could have been no inconsistency with the law of the British Virgin Islands. If the effect of the attachments as a matter of Dutch law had been to charge the assets attached or otherwise transfer a proprietary interest in them to Shell, and if that were held to be effective in relation to an asset situated in Ireland, the interest thus *G* created would have ranked prior to the statutory trust created on the winding up order and there would be no basis for an anti-suit injunction. It is, however, common ground that no alteration in the proprietary interests in the Dublin balance was effected at the time of the attachments and that no right to execute against the balance had yet arisen. Any proprietary interest which might come into existence in future on execution being levied against it would in the eyes of BVI law be postponed to the administration of the *H* statutory trust. It must follow that since the date of the winding up order, 21 July 2009, the attachments, which exist only for the purpose of enabling property in the Dublin balance to be transferred to Shell if and when it recovers judgment in the Dutch proceedings, have been directly inconsistent

© 2015 The Incorporated Council of Law Reporting for England and Wales

627
Stichting Shell Pensioenfonds v Krys (PC)

A   with the mandatory statutory scheme resulting from the winding up order in
the British Virgin Islands.

17   The fundamental principle applicable to all anti-suit injunctions was
stated at the outset of the history of this branch of jurisprudence by
Leach V-C in *Bushby v Munday* (1821) 5 Madd 297, 307. The court does
not purport to interfere with any foreign court, but may act personally on a
B   defendant by restraining him from commencing or continuing proceedings
in a foreign court where the ends of justice require.

18   The "ends of justice" is a deliberately imprecise expression. It
encompasses a number of distinct legal policies whose application will vary
with the subject matter and the circumstances. In *Carron Iron Co
Proprietors v Maclaren* (1855) 5 HL Cas 416, Lord Cranworth LC (at
pp 437–439) identified three categories of case which, without necessarily
C   being comprehensive or mutually exclusive, have served generations of
judges as tools of analysis. The first comprised cases of simultaneous
proceedings in England and abroad on the same subject matter. If a party
to litigation in England, where complete justice could be done, began
proceedings abroad on the same subject matter, the court might restrain
him on the ground that his conduct was a "vexatious harassing of the
D   opposite party". The second category comprised cases in which foreign
proceedings were being brought in an inappropriate forum to resolve
questions which could more naturally and conveniently be resolved in
England. Proceedings of this kind were vexatious in a larger sense. The
court restrained them "on principles of convenience, to prevent litigation,
which it has considered to be either unnecessary, and therefore vexatious, or
else ill-adapted to secure complete justice". Third, there are cases which do
E   not turn on the vexatious character of the foreign litigant's conduct, nor on
the relative convenience of litigation in two alternative jurisdictions, in
which foreign proceedings are restrained because they are "contrary to
equity and good conscience". It is with this third category that the House of
Lords was concerned. The appeal arose out of the administration by the
English court of the insolvent estate of a deceased who appears to have been
F   domiciled in England. The estate comprised property in both England and
Scotland. The Carron Iron Co, which had claims against the estate, brought
proceedings against the executors in Scotland, in which they obtained
letters of arrestment. These attached the deceased's Scottish property and
would have resulted in the application of that property to the satisfaction of
their own claim in priority to claims in the liquidation. The House of Lords
by a majority (Lord Cranworth LC and Lord Brougham, Lord St Leonards
G   dissenting) refused an injunction to restrain the Scottish proceedings on the
ground that the company was not amenable to the personal jurisdiction of
the English court. The Board will return to that question below. But all
three members of the House agreed on the principle on which such an
injunction would issue if personal jurisdiction had existed. Lord
Cranworth LC said, at p 440:

H      "In general, after a decree under which the creditors of a testator may
come in and obtain payment of their demands, the court does not permit a
creditor to institute proceedings for himself. The decree is said to be a
judgment, or in the nature of a judgment, for all the creditors. The court
takes possession of the assets, and distributes them rateably, on principles

© 2015 The Incorporated Council of Law Reporting for England and Wales

of equality, giving, however, due effect to any legal rights of preference    *A*
which any one creditor may possess. To allow a creditor, after such a
decree, to institute proceedings for himself, would give rise to great
inconvenience and injustice: it would disturb the general principle of
equal distribution which the court is always anxious to enforce, and
would leave the executors exposed to actions after the assets have been
taken out of their hands. Of the general justice, therefore, of the rule on
which the court acts, no doubt can, I think, be entertained."    *B*

The basis of this conclusion, as the reasoning of all three members of the
House shows, is that the court has an equitable jurisdiction to restrain the
acts of persons amenable to the court's jurisdiction which was calculated to
violate the statutory scheme of distribution.

19   The principle thus stated has been applied on a number of occasions.    *C*
In *In re Oriental Inland Steam Co; Ex p Scinde Railway Co* (1874) LR 9 Ch
App 557, a creditor proved in the liquidation of the Oriental Inland Steam
Co in England but attempted to obtain priority to other creditors by
attaching property of the company in India. He was restrained by injunction
from proceeding in India, but obtained the value of his debt from the
liquidator in return for lifting the attachment, without prejudice to the
question whether he should be allowed to retain it. The Court of Appeal    *D*
affirmed an order of Malins V-C requiring him to repay it. James LJ said,
at p 559:

"All the assets there would be liable to be torn to pieces by creditors
there, notwithstanding the winding up, and there would be an utter
incapacity of the courts there to proceed to effect an equitable
distribution of them. The English Act of Parliament has enacted that in    *E*
the case of a winding up the assets of the company so wound up are to be
collected and applied in discharge of its liabilities. That makes the
property of the company clearly trust property. It is property affected by
the Act of Parliament with an obligation to be dealt with by the proper
officer in a particular way . . . One creditor has, by means of an
execution abroad, been able to obtain possession of part of those assets.
The Vice-Chancellor was of opinion that this was the same as that of one    *F*
cestui que trust getting possession of the trust property after the property
had been affected with notice of the trust. If so, that cestui que trust
must bring it in for distribution among the other cestuis que trust . So I,
too, am of opinion, that these creditors cannot get any priority over their
fellow-creditors by reason of their having got possession of the assets in
this way. The assets must be distributed in *England* upon the footing of    *G*
equality."

20   In *In re North Carolina Estate Co Ltd* (1889) 5 TLR 328, Chitty J
applied the same principle, observing that:

"Under the Companies Act of 1862 it was clear that after a winding up
order the assets of the company were to be collected and applied in
discharge of its liabilities, and that the assets were fixed by the Act of    *H*
Parliament with a trust for equal distribution among creditors (*In re
Oriental Inland Steam Co* LR 9 Ch App 557, 559; *In re Vron Colliery Co*
(1882) LR 20 Ch D 442). No creditor, therefore, could be allowed, by
taking proceedings at his own will and pleasure, to destroy, waste, or

© 2015 The Incorporated Council of Law Reporting for England and Wales

A    impair assets which were subjected to a trust for the general benefit of all creditors alike."

21    In *Mitchell v Carter* [1997] 1 BCLC 673, Millett LJ referred to the jurisdiction as well established. He said, at p 687:

B    "a creditor who successfully completes a foreign execution is able to gain priority over the unsecured creditors. To prevent this, the English court has jurisdiction to restrain creditors from bringing or continuing the foreign execution process . . ."

22    In the United States, the Supreme Court has independently arrived at the same position and recognised the right of the state of an insolvent's domicile to restrain proceedings in another state designed to obtain a more favourable distribution of the assets, notwithstanding the constitutional
C    duty of each state to give full faith and credit to judicial proceedings in every other state: *Cole v Cunningham* (1890) 133 US 107. As Fuller CJ observed, delivering the opinion of the court, at p 122:

"At the time of these proceedings, as for many years before, the Commonwealth of Massachusetts had an elaborate system of insolvent laws, designed to secure the equal distribution of the property of its
D    debtors among their creditors. Under these insolvent laws, all preferences were avoided and all attachments in favour of particular creditors dissolved. The transfer of the debtor's property to his assignees in insolvency extended to all his property and assets, wherever situated. This was expressly provided as to such as might be outside the state . . .
Nothing can be plainer than that the act of Butler, Hayden & Co in
E    causing the property of the insolvent debtors to be attached in a foreign jurisdiction tended directly to defeat the operation of the insolvent law in its most essential features, and it is not easy to understand why such acts could not be restrained within the practice to which we have referred."

The court regarded this, as the English courts do, as the enforcement of an equitable right: see p 116.

F    23    The leading modern case on the jurisdiction to restrain foreign proceedings is *Société Nationale Industrielle Aerospatiale v Lee Kui Jak* [1987] AC 871. This was an alternative forum case, in which the Judicial Committee, sitting on appeal from Brunei, granted an injunction restraining proceedings in Texas on the ground that Texas was not the appropriate forum and the proceedings there were oppressive. Lord Goff of Chieveley, delivering the advice of the Board, pointed out that the insolvency cases
G    proceeded on a different principle, which was based not on protecting litigants against vexation or oppression, but on the protection of the court's jurisdiction to do equity between claimants to an insolvent estate. At pp 892–893, he observed:

"The decided cases, stretching back over a hundred years and more, provide however a useful source of experience from which guidance may
H    be drawn. They show, moreover, judges seeking to apply the fundamental principles in certain categories of case, while at the same time never asserting that the jurisdiction is to be confined to those categories. Their Lordships were helpfully taken through many of the authorities by counsel in the present case. One such category of case

© 2015 The Incorporated Council of Law Reporting for England and Wales

arises where an estate is being administered in this country, or a petition    A
in bankruptcy has been presented in this country, or winding up
proceedings have been commenced here, and an injunction is granted to
restrain a person from seeking, by foreign proceedings, to obtain the sole
benefit of certain foreign assets.  In such cases, it may be said that the
purpose of the injunction is to protect the jurisdiction of the English
court . . . Another important category of case in which injunctions may    B
be granted is where the plaintiff has commenced proceedings against the
defendant in respect of the same subject matter both in this country and
overseas, and the defendant has asked the English court to compel the
plaintiff to elect in which country he shall alone proceed.  In such cases,
there is authority that the court will only restrain the plaintiff from
pursuing the foreign proceedings if the pursuit of such proceedings is
regarded as vexatious or oppressive: see *McHenry v Lewis* (1882)    C
22 Ch D 397 and *Peruvian Guano Co v Bockwoldt* (1883) 23 Ch D 225."

It is clear from Lord Goff's formulation that he was making the same
distinction as Lord Cranworth made in the *Carron Iron* case between cases
such as the insolvency cases, in which there is an equitable jurisdiction to
enforce the statutory scheme of distribution according to its terms, and cases
in which the court intervenes on the ground of vexation or oppression.    D

24  The conduct of a creditor or member in invoking the jurisdiction of a
foreign court so as to obtain prior access to the insolvent estate may well be
vexatious or oppressive, in which case an injunction may be justified on that
ground.  An example is provided by the decision of the English Court of
Appeal in *Bloom v Harms Offshore AHT "Taurus" GmbH & Co KG* [2010]
Ch 187, where a creditor used a foreign attachment order in a manner which    E
the court regarded as amounting to sharp practice.  However, vexation and
oppression are not a necessary part of the test for the exercise of the court's
jurisdiction to grant an anti-suit injunction in a case where foreign
proceedings are calculated to give the litigant prior access to assets subject
to the statutory trust.  In the Board's opinion there are powerful reasons of
principle why this should be so.   The whole concept of vexation or    F
oppression as a ground for intervention, is directed to the protection of a
litigant who is being vexed or oppressed by his opponent.  Where a company
is being wound up in the jurisdiction of its incorporation, other interests are
engaged.  The court acts not in interest of any particular creditor or member,
but in that of the general body of creditors and members.  Moreover, as the
Board   has   recently   observed   in   *Singularis   Holdings   Ltd   v*
*PriceWaterhouseCoopers* [2015] 2 WLR 971, para 23, there is a broader    G
public interest in the ability of a court exercising insolvency jurisdiction in
the place of the company's incorporation to conduct an orderly winding up
of its affairs on a worldwide basis, notwithstanding the territorial limits of
its jurisdiction.  In protecting its insolvency jurisdiction, to adopt Lord
Goff's phrase, the court is not standing on its dignity.  It intervenes because
the proper distribution of the company's assets depends on its ability to get
in those assets so that comparable claims to them may be dealt with fairly in    H
accordance with a common set of rules applying equally to all of them.
There is no jurisdiction other than that of the insolvent's domicile in which
that result can be achieved.  The alternative is a free-for-all in which the
distribution of assets depends on the adventitious location of assets and the

© 2015 The Incorporated Council of Law Reporting for England and Wales

A   race to grab them is to the swiftest, and the best informed, best resourced or
    best lawyered.

    25   The Board is not prepared to say that Shell acted vexatiously or
    oppressively by invoking the jurisdiction of the Dutch courts, but for the
    reasons that it has given, this does not prevent the issue of an anti-suit
    injunction.

B   26   It does not, however, follow that an injunction must issue. There are
    at least two matters to be considered before that step can be justified. The
    first is whether Shell, as a foreign entity, is amenable to the court's
    jurisdiction. The second is whether, even on the footing that an anti-suit
    injunction is available in principle, it is right to make one as a matter of
    discretion. To those questions the Board will now turn.

C   *Jurisdiction*

    27   As Chitty J pointed out in *In re North Carolina Estate Co Ltd* (1889)
    5 TLR 328, it necessarily follows from the fact that the court acts in
    personam against the foreign litigant, that the latter must be must be
    amenable to its personal jurisdiction. He must be present within the
    jurisdiction or amenable to being served with the proceedings out of the
D   jurisdiction, or else he must have submitted voluntarily.

    28   Subject to a reservation to which the Board will return, Miss Newman
    accepted that her clients had submitted to the jurisdiction of the BVI courts
    for the purpose of being amenable to an anti-suit injunction, by participating
    unconditionally in the injunction proceedings. Mr Girolami QC said that
    they had submitted not just by doing that but also by proving for the debt
    alleged to arise under their redemption notice of 12 December 2008. In
E   common with the Court of Appeal, the Board considers that Shell submitted
    in both ways. The Board will deal first with the consequences of the lodging
    of a proof of debt, about which the parties are fundamentally at odds, before
    turning to Miss Newman's reservation about the effect of participating in the
    injunction proceedings.

    29   In *Ex p Robertson; In re Morton* (1875) LR 20 Eq 733, a Scottish
F   merchant proved in the bankruptcy of his debtor for a debt of £367 and
    recovered a dividend without bringing into account £120 which he had
    obtained from the insolvent estate separately. He was held to be subject to
    the jurisdiction of the court in proceedings to recover the £120 for the benefit
    of the estate. Bacon CJ observed, at pp 737–738:

        "what is the consequence of creditors coming in under a liquidation or
G       bankruptcy? They come in under what is as much a compact as if each of
        them had signed and sealed and sworn to the terms of it—that the
        bankrupt's estate shall be duly administered among the creditors. That
        being so, the administration of the estate is cast on the court, and the
        court has jurisdiction to decide all questions of whatever kind, whether of
        law, fact, or whatever else the court may think necessary in order to effect
        complete distribution of the bankrupt's estate . . . can there be any doubt
H       that the appellant in this case has agreed, as far as he is concerned . . . the
        law of bankruptcy shall take effect as to him, and under this jurisdiction,
        to which he is not only subjected, but under which he has become an
        active party, and of which he has taken the benefit . . . [The appellant] is
        as much bound to perform the conditions of the compact, and to submit

© 2015 The Incorporated Council of Law Reporting for England and Wales

to the jurisdiction of the court, as if he had never been out of the limits of     A
England."

30   This was a case where the creditor had actually received a dividend.
However, in *Akers as a joint foreign representative of Saad Investments Co
Ltd v Deputy Comr of Taxation* (2014) 311 ALR 167, where no dividend
had been received, the Full Court of the Federal Court of Australia held that
in *Ex p Robertson* the submission consisted in the lodging of the proof and     B
not the receipt of the dividend. Accordingly, at para 165:

"formal submission of a proof of debt to the insolvency administration
will generally be adequate to support a conclusion that the court
supervising the administration thereafter has jurisdiction to make orders
in matters connected with the administration against the creditor who has
proved."                                                                          C

The same view was taken by the Supreme Court in *Rubin v Eurofinance SA
(Picard intervening)* [2013] 1 AC 236. Lord Collins of Mapesbury (with
whom on this point the rest of the court agreed) held at paras 165, 167,
citing *Ex p Robertson*, that there was:

"no doubt that orders may be made against a foreign creditor who proves     D
in an English liquidation or bankruptcy on the footing that by proving the
foreign creditor submits to the jurisdiction of the English court . . . having
chosen to submit to New Cap's Australian insolvency proceeding, the
syndicate should be taken to have submitted to the jurisdiction of the
Australian court responsible for the supervision of that proceeding. It
should not be allowed to benefit from the insolvency proceeding without
the burden of complying with the orders made in that proceeding."             E

31   It has been suggested by Professor Briggs in a recent lecture in
Singapore (*New Developments in Private International Law: A Busy
12 Months for the Supreme Court*, 21 November 2013) that this conclusion
was "astonishing" because no proof had been admitted and no dividend had
been paid. Miss Newman, adopting this criticism, submitted that Lord
Collins was wrong on this point. The Board is satisfied that his statement     F
was correct. The present case is not properly speaking a case of election, like
those in which a party must elect between two mutually inconsistent
remedies. In such cases he is usually not taken to elect until he has actually
obtained one of the remedies. The question here is not what remedy is Shell
entitled to have, but whether it has submitted to the jurisdiction of the court.
A submission may consist in any procedural step consistent only with         G
acceptance of the rules under which the court operates. These rules may
expose the party submitting to consequences which extend well beyond the
matters with which the relevant procedural step was concerned, as when the
commencement of proceedings is followed by a counterclaim. In the present
case the defendant lodged a proof. It cannot make any difference to the
character of that act whether the proof is subsequently admitted or a
dividend paid, any more than it makes a difference to the submission implicit     H
in beginning an ordinary action whether it ultimately succeeds. This result is
neither unjust nor contrary to principle, for by submitting a proof the creditor
obtains an immediate benefit consisting in the right to have his claim
considered by the liquidator and ultimately by the court according to its

© 2015 The Incorporated Council of Law Reporting for England and Wales

633

A    merits and satisfied according to the rules of distribution if it is admitted. The Board would accept that the submission of a proof for claim A does not in itself preclude the creditor from taking proceedings outside the liquidation on claim B. But what he may not do is take any step outside the liquidation which will get him direct access to the insolvent's assets in priority to other creditors. This is because by proving for claim A, he has submitted to a statutory scheme for the distribution of those assets pari

B    passu in satisfaction of his claim and those of other claimants.

32    Turning to Miss Newman's reservation, the argument was that Shell had not submitted to the jurisdiction of the BVI courts for all purposes. In particular, it was said to have submitted only for the purpose of claims under the Insolvency Act and Rules, and not for the purpose of claims governed by the general law, such as its claim in the Netherlands for misrepresentation

C    and breach of warranty. This, it was said, was because the BVI courts have no subject matter jurisdiction over the damages claim that is being asserted in the Netherlands. The Board has no hesitation in rejecting this contention. It has no bearing on the question whether Shell submitted by participating in the injunction proceedings, because that submission necessarily involved an acceptance on its part of the court's jurisdiction to grant the injunction sought in those proceedings. The point appears to the Board to be equally

D    irrelevant to the question whether Shell submitted by lodging a proof of debt for the redemption price. Liquidation is a mode of collective enforcement of claims arising under the general law. There is, in the present context, no relevant difference between the claim for which Shell proved (a debt arising from its redemption notice) and the claim for which it did not prove but which it has put forward in the Dutch proceedings (damages for

E    misrepresentation and breach of warranty). They both arise under the general law. They are both capable of being proved in the liquidation. If they are proved, the BVI courts will have subject matter jurisdiction to adjudicate on them. And so far as they submitted by proving for anything in the liquidation, Shell submitted to a statutory regime which precluded it from acting so as to prevent the assets subject to the statutory trust from being distributed in accordance with it.

F

*Application to foreign litigants*

33    Against that background, the Board turns to Miss Newman's main point, which was that even on the footing that Shell submitted to the jurisdiction of the BVI court, that was not enough to make it amenable to an anti-suit injunction. This, she contended, was because there was a distinct

G    principle that an anti-suit injunction will not issue so as to prevent a foreign litigant from resorting to the courts of his own country (or at any rate some foreign court).

34    In the Board's opinion, there is no such principle. Where an English company is being wound up in England or a BVI company in the BVI, all of its assets are subject to the statutory trusts including those which are located within the jurisdiction of foreign courts. The rights and liabilities of

H    claimants against the assets are the same regardless of their nationality or place of residence. A distinction between foreign and English claimants would respond to no principle known to the law. The true principle, which applies to all injunctions and not just anti-suit injunctions in the course of insolvency proceedings, is that the English and BVI courts will not as a

© 2015 The Incorporated Council of Law Reporting for England and Wales

matter of discretion grant injunctions affecting matters outside their *A* territorial jurisdiction if they are likely to be disregarded or would be, as the colourful phrase went, "brutum fulmen". With one exception, to which the Board will return, the various judicial statements suggesting a wider rule are in reality concerned either with personal jurisdiction over the person sought to be restrained or else with the practical efficacy of the remedy.

35 In the *Carron Iron* case 5 HL Cas 416 Lord Cranworth LC, having *B* set out the principles on which the court acts, continued, at p 441:

"the first question is, whether there is any rule or principle of the Court of Chancery which, after a decree for administering a testator's assets, would induce it to interfere with a foreign creditor resident abroad, suing for his debt in the courts of his own country? Certainly not. Over such a creditor the courts here can exercise no jurisdiction whatever. He is *C* altogether beyond their reach, and must be left to deal as he may with his own forum, and to obtain such relief as the courts of his own country may afford."

The observation that over such a person the English court can exercise "no jurisdiction whatever" shows that Lord Cranworth LC was in fact addressing the question of personal jurisdiction. The issue which divided the *D* House was whether the Carron Iron Co was domiciled in England as well as Scotland (as Lord St Leonards thought) or only in Scotland (as the majority thought). The injunction was refused for want of personal jurisdiction, not because the Carron Iron Co was a Scottish company proceeding in the courts of Scotland. That this was the issue is apparent from Lord Cranworth LC's observation at pp 442–443 that the position would have been different if the *E* Carron Iron Co had "come under the decree, so as to obtain payment partially from the English assets" or had "sought or obtained any relief in this country".

36 Cases in which the courts have been concerned with the practical efficacy of their injunctions include *In re Chapman* (1872) LR 15 Eq 75, 77. In that case, Bacon CJ refused an injunction to restrain proceedings brought by American creditors in New York on the ground that *F*

"neither this court not the Court of Chancery ever grants injunctions that will be wholly ineffectual."

In *In re International Pulp and Paper Co* (1876) 3 Ch D 594, Jessel MR granted an injunction restraining proceedings brought by an Irish creditor in Ireland. He distinguished between creditors resident in another jurisdiction of the United Kingdom and those resident in a "purely foreign country" such *G* as Turkey or Russia. They were both equally outside the territorial jurisdiction of an English court. The difference was that there were statutory procedures for enforcing English judgments in Ireland as if they were judgments of the Irish courts. Without such procedures, the English court's orders were likely to be disregarded by locally resident litigants. At p 599, Jessel MR said: *H*

"although it would be desirable in the interests of the person concerned in the litigation to make that creditor come in with the rest, yet the court cannot restrain the action for want of power—not from want of will or want of provisions in the Act of Parliament, but simply that the Act of

© 2015 The Incorporated Council of Law Reporting for England and Wales

A  Parliament cannot give this court jurisdiction over *Turkey* or over *Russia*. That is the only reason . . . Therefore, as to a purely foreign country, it is of no use asking for an order, because the order cannot be enforced."

In *In re North Carolina Estate Co Ltd* 5 TLR 328, Chitty J observed that it was:

B  "quite true . . . that Parliament did not legislate for a foreign country. The point, however, was would the court grant an injunction which was ineffectual, not as being against the foreign court but as being against a person who could not be reached?"

37  In some of the older cases, the foreign residence of a claimant combined with the foreign location of the relevant assets, was treated as a reason for expecting an order of the English courts to be disregarded. In an C  age when assets and persons were less mobile, the English courts were realistic enough to appreciate that the mere existence as a matter of English law of personal jurisdiction over a foreign resident offered no assurance that the injunction would in practice be observed. In modern conditions, with an increasingly unified global economy, the English courts have generally assumed that their injunctions will be obeyed by those who are subject to D  their personal jurisdiction, irrespective of their place of residence. The modern law takes the more robust position stated by the Court of Appeal in *In re Liddell's Settlement Trusts* [1936] Ch 365, 374 (Romer LJ), that it is "not the habit of this court in considering whether or not it will make an order to contemplate the possibility that it will not be obeyed". In *Castanho v Brown & Root (UK) Ltd* [1981] AC 557, 574 Lord Scarman, with the E  agreement of the rest of the House of Lords, regarded this retort as a sufficient answer to the submission that an anti-suit injunction should be refused because it was liable to be disregarded by a Portuguese party suing in Texas.

38  The case which on the face of it does most to advance Miss Newman's submission is the decision of Maugham J in *In re Vocalion (Foreign) Ltd* [1932] 2 Ch 196. Maugham J declined to issue an injunction F  restraining proceedings by a resident of Victoria in Melbourne. His reason, expressed at pp 209–210 was:

"I can find, however, no reason to doubt that a person domiciled abroad can sue in his own courts a company which, in carrying on business there, has incurred a debt or liability to him, whether or not that company is being wound up in this country, to which he owes no G  allegiance and with the laws of which he is not acquainted; though, as pointed out in Dicey, p 377, if he desires to benefit under the English winding up he must, generally speaking (see for an exception *Moor v Anglo-Italian Bank* (1879) 10 Ch D 681), give up for the benefit of other creditors any advantage which he may have obtained for himself by the proceedings abroad. If these views be well founded it is difficult to see why an English court should attempt to restrain such a creditor from H  enforcing his rights in his own country merely because it is possible to serve him with process here. To prevent a misconception I should point out that I am not here dealing with the case of a British subject or a corporation incorporated under our law, nor am I dealing with the case where the person sought to be restrained from proceedings abroad has

© 2015 The Incorporated Council of Law Reporting for England and Wales

made himself a party to the proceedings in the liquidation, for instance by   *A*
putting in a proof or in some other way."

Maugham J concluded, at p 210, that where a foreigner is proceeding in his
own courts:

   "in general it will be more conducive in such a case to substantial
   justice that the foreign proceedings should be allowed to proceed."     *B*

These observations were not a statement of law. As Millett LJ observed in
*Mitchell v Carter* [1997] 1 BCLC 673, they went to the court's discretion.
What is thought to be "conducive to the ends of justice" is liable to change
over time. The Court of Appeal in the present case considered that
Maugham J's remarks could no longer be regarded as consistent with the
policy of the law relating to international insolvencies. The Board is of the   *C*
same view. Maugham J's approach would be fair enough if the common law
regarded insolvency proceedings as purely territorial. But it has not taken
that view for many years, either in relation to its own winding up
proceedings which have always been universal, or in relation to the
corresponding proceedings of foreign courts dealing with the insolvency of
their own companies. The object of the winding up court in dealing with an
international insolvency is to ensure, so far as it properly can, that the   *D*
worldwide assets of the company and the worldwide claimants to those
assets are treated on a common basis: see *In re HIH Casualty and General
Insurance Ltd* [2008] 1 WLR 852, para 30 (Lord Hoffmann); *Singularis
Holdings Ltd v PriceWaterhouseCoopers* [2015] 2 WLR 971, para 19.

   39  The Board concludes that where a creditor or member who is
amenable to the personal jurisdiction of the court begins or continues   *E*
foreign proceedings which will interfere with the statutory trusts over the
assets of a company in insolvent liquidation, in principle an injunction will
be available to restrain their prosecution irrespective of the nationality or
residence of the creditor in question.

   40  The Board would accept that as a general rule, there can be no
objection in principle to a creditor invoking the purely adjudicatory
jurisdiction of a foreign court, provided that it is an appropriate jurisdiction   *F*
and that litigation there is not vexatious or oppressive to the liquidators or
other interested parties. But it is in principle inimical to the proper winding
up process for a creditor to seek or enforce an order from a foreign court
which will result in his enjoying prior access to any part of the insolvent
estate. In *Kemsley v Barclays Bank plc* [2013] BPIR 839, para 41 Roth J
observed that where the foreign litigant undertakes to bring any assets
realised in the foreign proceedings into the bankruptcy so that no advantage   *G*
would be obtained over other creditors, the basis on which an anti-suit
injunction might otherwise be justified will not apply. The Board wishes to
record its endorsement of that approach.

### Discretion

   41  As with any injunction, this is subject to the court's discretion to   *H*
refuse relief if in the particular circumstances it would not serve the ends of
justice. It is neither possible nor desirable to identify what circumstances
might have that effect. But it has often, and rightly, been said that the
jurisdiction to grant anti-suit injunctions is to be exercised with caution.

© 2015 The Incorporated Council of Law Reporting for England and Wales

A   There may in particular be factors at work other than the desire to obtain an advantage over comparably placed creditors or members which make it just to allow the foreign proceedings to continue, either without restriction or on terms which will sufficiently protect other interests. In the present case, the judge having concluded that the issue of an injunction would be contrary to principle, the Court of Appeal were entitled to overrule him and to exercise their own discretion. They exercised it in the liquidators' favour, and the

B   Board will not interfere unless it is shown that they were guilty of some error of principle or misconception of fact, or that they were plainly wrong.

   42   The only substantial criticism made of the way that they exercised their discretion was that as a matter of comity they ought to have left to the Dutch courts the decision whether the Dutch proceedings should be allowed to proceed. The District Court of Amsterdam having rejected Fairfield

C   Sentry's application to lift the attachments, it was said that the courts of the British Virgin Islands should have respected that decision. In the Board's opinion this submission misunderstands the role that comity plays in a decision of this kind. Where the issue is whether the BVI or the foreign court is the more appropriate or convenient forum, it can in principle be decided by either court. Comity will normally require that the foreign judge should decide whether an action in his own court should proceed: *Barclays Bank plc*

D   *v Homan* [1993] BCLC 680, *Mitchell v Carter* [1997] 1 BCLC 673 (Millett LJ). In the present case, however, there is no room for deference to the Dutch court's decision. In the first place, the question does not turn on the relative convenience or appropriateness of litigation in the courts of the Netherlands and the BVI. Both courts can adjudicate on the substantive dispute, the Dutch courts in Shell's current proceedings, and the BVI court in

E   ruling on a proof if Shell lodges one. But the BVI is the only forum in which priorities between claimants generally can be determined. The question before the Court of Appeal was whether Shell should be allowed to invoke the jurisdiction of the Dutch courts to obtain an unjustified priority in violation of a mandatory statutory scheme in the British Virgin Islands. Second, the relevant principles of Dutch law would prevent the Dutch courts from deciding in which court the issues would be better determined. It is

F   apparent from the evidence of Dutch law and the judgment of the Amsterdam District Court rejecting Fairfield Sentry's application, that the decision does not involve identifying the most appropriate forum. Save in the case of unarguable claims or those in which an attachment would expose the garnishee to a real risk of having to pay twice, the issue of an attachment is a matter of right in the Netherlands. The Dutch courts have no regard to

G   foreign insolvencies so far as they conflict with Dutch domestic law or limit the recovery of local creditors. Third, although when a company is being wound up under the law of the jurisdiction of its incorporation the distribution of its assets among creditors and members is in general a matter for that law, there may well be circumstances in which as a matter of discretion an English or BVI court might refuse an injunction on the ground that the foreign court had a special interest in asserting dominion over an

H   asset forming part of the insolvent estate within its own territory. However, that question could not arise in the present case, because the relevant asset was not located in the Netherlands but in Ireland. The jurisdiction of the Dutch court under its own law to authorise the attachment of an Irish debt owed to a BVI company in liquidation in the BVI may fairly be described, as

© 2015 The Incorporated Council of Law Reporting for England and Wales

the Court of Appeal did, as exorbitant. There are cases, as Hoffmann J    *A*
observed in *Barclays Bank plc v Homan* [1993] BCLC 680, 688, in which

> "the judicial or legislative policies of England and the foreign court are
> so at variance that comity is overridden by the need to protect British
> national interests or prevent what it regards as a violation of the
> principles of customary international law".

In the Board's opinion, this is such a case.    *B*

43    There appears to the Board to be nothing to suggest that allowing
Shell an advantage over other comparable claimants would be consistent
with the ends of justice. Nor, in the circumstances, should Shell find this
surprising. It invested in a company incorporated in the British Virgin
Islands and must, as a reasonable investor, have expected that if that
company became insolvent it would be wound up under the law of that    *C*
jurisdiction.

### The scope of the order

44    It is necessary, finally, to refer to an issue about the scope of the relief
sought which arose in the course of the hearing of the appeal. The reasoning
of the Court of Appeal was based on the inconsistency between the Dutch    *D*
attachments and the statutory trust of Fairfield Sentry's assets. But its order,
following the form proposed in the notice of appeal, restrained Shell from
pursuing the Dutch proceedings generally without any specific reference to
the attachments. As the Board has pointed out, merely by invoking the
adjudicatory jurisdiction of a foreign court, a creditor does not necessarily
act inconsistently with the statutory trusts.    The vice of the Dutch
proceedings lay in the attachments. In the generality of such cases, absent    *E*
vexation or oppression, an order restraining the entire proceedings would be
too wide. Miss Newman, however, objected to the order being modified so
as to limit it to the attachments because no application to limit it in that way
had been made in the Court of Appeal and an attempt to modify it after
judgment failed. The result is that both parties were contending for an all or
nothing solution.    *F*

45    In the particular circumstances of this case, the Board is persuaded
that it should leave the order of the Court of Appeal as it stands. The effect
of that order is that there can be no judgment on the merits in the
Netherlands to which the attachment could relate. The order as framed
therefore achieves the desired result of preventing the attachments from
leading to execution against the Dublin account. In theory, it achieves more
than that by also preventing the exercise of the Dutch court's adjudicatory    *G*
jurisdiction. But this is rather unreal. The sole substantial purpose of the
Dutch proceedings was to obtain the attachments and the resulting priority.
The attachments are also the sole basis in Dutch law for the Dutch court's
exercise of any adjudicatory jurisdiction. Therefore an injunction requiring
Shell to procure the lifting of the attachments would in reality have brought
an end to the Dutch proceedings as a whole by removing their jurisdictional
basis, just as the order of the Court of Appeal does. This will not deprive    *H*
Shell of any advantage to which it is legitimately entitled. It may prove in the
liquidation for its damages for misrepresentation and breach of warranty.
While the position as regards limitation has not been explored in detail on
this appeal, Miss Newman was not able to assert that a proof of debt for the

© 2015 The Incorporated Council of Law Reporting for England and Wales

639
[2015] AC                           Stichting Shell Pensioenfonds v Krys (PC)

*A*  claims brought in the Netherlands would be time-barred in the British Virgin
Islands, and nothing in the material before the Board suggests that it would
be. Since the operative date for limitation purposes in the liquidation will be
the date of the winding up order and the Dutch substantive proceedings were
begun after that date, if the claim which Shell have brought in the Dutch
courts is not time-barred there, there is no reason to think that a proof of
debt would be time-barred either.

*B*      46   The practical inconvenience of the present state of affairs is that the
Dutch proceedings and the attachments may remain for some time in
existence without going anywhere, and that in the meantime the liquidators
will be unable to access the balance on the Dublin account. As between
responsible parties such as these, the Board would expect this problem to be
resolved by agreement. If that does not happen, and the result is that the

*C*  money in Dublin remains in balk when the liquidators need it to fund
distributions, it may well be appropriate for the liquidators to make a
further application in the High Court for an order requiring the attachments
to be released.

*Conclusion*

*D*      47   The Board will humbly advise Her Majesty that the appeal should be
dismissed.

SHIRANIKHA HERBERT, Barrister

*E*

*F*

*G*

*H*

© 2015 The Incorporated Council of Law Reporting for England and Wales

TAB 23

*Taylor Walton v Laing* [2007] EWCA Civ 1146

Neutral Citation Number: [2007] EWCA Civ 1146

Case No: A2/2007/0528

**IN THE SUPREME COURT OF JUDICATURE**
**COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**MR JUSTICE LANGLEY**
**[2007] EWHC 196 (QB)**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 15/11/2007

Before :

**LORD JUSTICE BUXTON**
**LORD JUSTICE LAWS**
and
**LORD JUSTICE MOSES**
- - - - - - - - - - - - - - - - - - - -
**Between :**

**TAYLOR WALTON (A FIRM)**          **Appellant**
**- and -**
**DAVID ERIC LAING**          **Respondent**

- - - - - - - - - - - - - - - - - - - -

(Transcript of the Handed Down Judgment of
WordWave International Limited
A Merrill Communications Company
190 Fleet Street, London EC4A 2AG
Tel No:  020 7404 1400, Fax No: 020 7831 8838
Official Shorthand Writers to the Court)
- - - - - - - - - - - - - - - - - - - -

**Mr Michael Pooles QC** and **Mr William Flenley** (instructed by **Mills & Reeve**) for the
**Appellant**
**Mr Jonathan Marks QC** (instructed by **McBride Wilson & Co**) for the **Respondent**

Hearing dates : 30 October 2007
- - - - - - - - - - - - - - - - - - - -
**Judgement**

**Lord Justice Buxton :**

*Introduction*

1.      This is an appeal, brought with the leave of the judge, against the refusal of Langley J to strike out as an abuse of process a claim for negligence brought by Mr Laing against Taylor Walton [TW], a firm of solicitors.  For reasons that will become apparent, I will refer to those proceedings as *the second claim*.

2.      Mr Laing is an architect and property developer.  Over the years he has had a number of business dealings with, and a relationship of friendship with, a Mr Ian Watson.  Mr Watson has also for many years been active in property development.  He conducts that activity partly in his own name and partly through corporate entities, those with which we will be concerned being Burkle Holdings Ltd [Burkle], which is owned as to some 85 per cent by Mr Watson, and European Securities Ltd [ESL], an Isle of Man company beneficially owned by Mr Watson.

3.      In 1999 Mr Laing became aware of a business opportunity to develop a site at High Wycombe, which he intended to promote through a company formed for that purpose, New Federal Inc [NFI].  Mr Laing needed funding and, after having secured other investors, approached Mr Watson for the balance of the amount required of some £500,000.  In October 1999 it was informally agreed between Mr Laing and Mr Watson that Burkle would loan that sum to NFI.  However, in November 1999 that structure was changed, so that Burkle would make the loan to Mr Laing, who would then immediately make the same loan to NFI.  The dispute between Mr Laing and Mr Watson, which founded the litigation between them (which I will refer to as *the first case*), turned on the terms on which that loan was made.

4.      Mr Laing said that in November 1999 it had been agreed that Burkle would receive a 12 1/2% share of the profits of the venture, in place of the 12 1/2% shareholding originally to be allocated to Burkle or Mr Watson, security for that obligation on Mr Laing's part to be provided by a charge in favour of Burkle over a 12 1/2% shareholding in NFI that under the agreement was to be allocated to Mr Laing.  Mr Watson on the other hand said that there had been not one but two agreements.  The first agreement (which I will refer to as *Mr Watson's first agreement*), which was not affected by the changes in November 1999, was that Mr Watson or his nominee would receive a 12 1/2% shareholding in NFI.  That allocation to Mr Watson was said by him to have been in recognition of his procuring for the venture the £500,000 balance of the funding.  The second agreement (which I will refer to as *Mr Watson's second agreement*) was in the same terms as that alleged by Mr Laing, save that when the adjustment was made in November 1999 the security for Mr Laing's obligation to pay Burkle the agreed share of the profits of the venture was to be provided by a charge over shares in NFI allocated to an entity known as the Jedburgh Trust.  Those shares were different from the shares to be issued to Mr Watson under Mr Watson's first agreement.

5.      The stark difference between Mr Laing and Mr Watson was therefore that Mr Watson claimed to be entitled, either directly or through Burkle, both to a 12 1/2% share in the profits of the development and to a beneficial interest in a 12 1/2% shareholding in NFI.  Mr Laing contended that all that Mr Watson had been granted beneficially was

the 12 1/2% share in the profits.  His interest in the 12 1/2% shareholding was only as security for that share in the profits.

6.    Mr Laing caused a 12 1/2% shareholding in NFI to be issued to Burkle in November 1999.  That transfer on its face appeared to be to Burkle beneficially, something that Mr Laing later claimed to have been a mistake.  In 2000 the shares, still not expressed to be by way of charge or security, were at Mr Watson's request re-registered in the name of ESL.  Differences then arose between the protagonists, both in relation to the development itself and in relation to the status of the shares held by ESL.  The loan agreement was renegotiated in 2002.  Mr Laing and Mr Watson again strongly disagree as to the effect of that step.  Mr Laing says that the new agreement was the outcome of a previous oral agreement, and was intended entirely to abrogate the 1999 agreement by cancelling Mr Laing's obligation to pay the 12 1/2% profit share to Mr Watson in return for a recognition by Mr Laing that the shares held in the name of ESL were, as Mr Watson contended, held beneficially.  Mr Watson says that the 2002 agreement was only concerned with the loan provisions.  It did not refer to the 1999 agreements as to profit share because it was clear that Mr Watson and Mr Laing disagreed as to the implications of those agreements, and no variation of them was possible.  As a result, in Mr Watson's view the beneficial status of ESL's holding remained unchanged, as did Mr Laing's obligation to pay over to Mr Watson 12 1/2% of the profits of NFI.

7.    In the first case, heard in 2005, HHJ Thornton QC held, after a seven day trial in which he heard evidence from, inter alios, Mr Watson and Mr Laing, that Mr Watson's case as to the agreements and understandings between the two men had been true in its entirety.  Accordingly, Mr Watson obtained a declaration that ESL's 12 1/2% holding was beneficial, and Burkle's entitlement to a 12 1/2% share in the profits of the venture, as provided under the 1999 agreement, remained binding upon Mr Laing.   That decision was not appealed, Mr Laing having been advised of the difficulty of appealing decisions of fact made by a judge who had heard live evidence.

*The allegations of negligence against Taylor Walton*

8.    The agreements informally made both in 1999 and in 2002 were followed by written agreements.   I shall refer to those as, respectively, *the 1999 Written Agreement* and *the 2002 Written Agreement*.  The drafting of those agreements was undertaken by a Mr Mathew Kelly, a partner in TW.   Mr Kelly had in the past acted for both Mr Laing and Mr Watson in various matters.  Whether he was instructed in the drafting of these agreements by Mr Laing as well as by Mr Watson is a matter of controversy in the second claim.   On the assumption that Mr Kelly was instructed by Mr Laing, or alternatively owed a tortious duty of care to Mr Laing, Mr Laing complains in this, the second claim, that Mr Kelly was negligent in a number of respects, as set out in paragraph 18 of the Particulars of Claim.   Those allegations can for present purposes be grouped under two main headings.   First, that in or about preparing the 1999 Written Agreement Mr Kelly failed to advise Mr Laing that it must be clearly recorded in that agreement, as it was not, that Mr Laing held his 12 1/2% shareholding in NFI beneficially, and that the shares registered in Burkle's name were held by way of security only.   Second, that Mr Kelly failed to draft the 2002 Agreement in accordance with his instructions, which were that the 2002 Written Agreement was entirely to abrogate the 1999 Written Agreement. That abrogation of the 1999 Written Agreement, and its replacement by the 2002 Written Agreement,

would have meant that Burkle, through ESL, for the first time obtained a beneficial interest in the 12 1/2% shareholding in NFI, but Mr Laing ceased to have any obligation to pay over a 12 1/2% share in the profits of the venture to Mr Watson or Burkle.

9.     The pleading then proceeded, in its paragraph 19.1, to say that Judge Thornton's findings in the first case had been wrong, and that Mr Laing "was exposed to the risk of such adverse findings….because of the breach of retainer, breach of duty and negligence" of TW.   It is that claim that is said in the present application to be an abuse of process, in that it relitigates the findings reached by Judge Thornton in the first case between Mr Laing and Mr Watson.

10.    A further feature of the case, which it will be convenient to mention now, is that in front of Judge Thornton there was a witness statement from Mr Kelly that appeared in part to support Mr Laing's case; and in interlocutory proceedings before HH Judge Toulmin QC, to which we will come in due course, Mr Kelly gave live evidence that also appeared to support the case then being made by Mr Laing.   The full nature and implications of this evidence will have to be considered hereafter.

*Abuse of process and the approach of this court*

11.    The nature of a claim of abuse of process, and the categories of circumstance in which it can arise, are well settled, albeit that the law has inevitably to be stated in somewhat general terms.   It will be convenient to take that from the speech of Lord Diplock in *Hunter v Chief Constable of the West Midlands Police* [1982] AC 529 at p 536B:

> [abuse of process] concerns the inherent power which any court of justice must possess to prevent misuse of its procedure in a way which, although not inconsistent with the literal application of it procedural rules, would nevertheless be manifestly unfair to a party to litigation before it, or would otherwise bring the administration of justice into disrepute among right-thinking people.   The circumstances in which abuse of process can arise are very varied….It would, in my view, be most unwise if this House were to use this occasion to say anything that might be taken as limiting to fixed categories the kinds of circumstances in which the court has a duty (I disavow the word discretion) to exercise this salutary power.

12.    The court therefore has to consider, by an intense focus on the facts of the particular case, whether in broad terms the proceedings that it is sought to strike out can be characterised as falling under one or other, or both, of the broad rubrics of unfairness or the bringing of the administration of justice into disrepute.   Attempts to draw narrower rules applicable to particular categories of case (in the present instance, negligence claims against solicitors when an original action has been lost) are not likely to be helpful.

13.    As to the proper approach of this court, TW sought to draw from Lord Diplock's disavowal of the word discretion the conclusion that, since the issue was not one for the discretion of the judge, in any appeal this court should start again, and simply decide whether the trial judge had been right or wrong.   I do not think that the matter

is so straightforward.   In the passage relied on Lord Diplock was indicating that to strike out a case brought without infraction of the rules of procedure was a serious step, not to be taken unless the circumstances were sufficiently extreme as to demonstrate that the judge had a duty to act.  That is a much more stringent test than simply to say that the circumstances must fall within a category that entitles the judge to decide for himself whether or not to take action.  It is therefore correct that this court, in reviewing the judge's decision, is not limited to considering whether the facts fell within a wide ambit of discretion.   At the same time, however, the issue although not one of discretion is one of judgement in determining whether the duty referred to by Lord Diplock arises.   In reviewing such an exercise of judgement this court will always give considerable weight to the opinion of the judge, and particularly so when that opinion has been formed by a commercial judge of many years' experience.

*Mr Kelly's retainer and the decision of HH Judge Toulmin QC*

14.    In order to be able even to start the second case Mr Laing had to allege that TW, through Mr Kelly, owed a duty of care to him.  It will have been seen from the extract from the Points of Claim set out in §9 above that the allegation is not merely of a contractual duty, arising from a retainer, but also of a duty in tort whether or not Mr Kelly was in fact retained by Mr Laing.  I do not say that against the background of the facts of this case the latter claim is impossible, but it would need a good deal of explanation, such as is at present completely absent from the pleadings, before it could come under serious consideration.   The reality is that Mr Laing has to establish the retainer that is alleged at some length in the pleadings.

15.    That plea is affected by an interlocutory application by Mr Laing in the first case for disclosure of various documents relating to the transaction held by Mr Kelly, which application was resisted on the ground that they were subject to legal advice privilege enjoyed by Mr Watson.   That application could only succeed if, put shortly, such advice as might be contained in the documents was both to Mr Watson and to Mr Laing in the exercise of a joint retainer.   Mr Kelly gave evidence that, as quoted by Judge Toulmin in paragraph 73 of his judgment:

> in the context of [the 1999 Written Agreement] I regarded my role as to draw up a document to reflect what the parties had agreed between them.   I would have had some difficulty advising either of them as to anything in particular in relation to the document

16.    From that and other evidence Judge Toulmin concluded, at paragraphs 149-150 of his judgment, in relation to the 1999 Written Agreement that

> If I had concluded that Mr Laing was Mr Kelly's client…I should have concluded that Mr Laing and Mr Watson/Burkle had separate retainers and that Mr Laing's retainer was confined to the mechanical process of drawing up the 1999 agreement.  It certainly did not extend to seeing independent legal advice which was given by Mr Kelly to Burkle/Mr Watson.

Judge Toulmin went on to hold (paragraph 155) that if Mr Kelly was thereafter advising Mr Laing that was under a retainer separate from that given to Mr Kelly by Mr Watson, and therefore did not entitle Mr Laing to see any advice given to Mr Watson by Mr Kelly. He then said at the end of his judgment, paragraph 158, that he had not heard any focussed evidence about either the 2002 Written Agreement or the handling of the 12 1/2% holding in NFI, and was not going to pass on whether Mr Kelly was retained by Mr Laing in those matters.

17.    The suggestion that Mr Laing could not assert a retainer in making the new claim because that would be inconsistent with the decision of Judge Toulmin played only a subordinate role in the submissions before us, and rightly so. It will be seen from the account of Judge Toulmin's judgment set out above that, although he was plainly sceptical of all of Mr Laing's claims as to a retainer, he made no finding about the relationship between Mr Laing and Mr Kelly at the time of the event that bases a major part of Mr Laing's case, the drafting of the 2002 Written Agreement. And he did conclude that it was at least possible that Mr Kelly was retained by Mr Laing in relation to the drafting of the 1999 Written Agreement. In those circumstances I find it impossible to say that it will be an abuse of process for Mr Laing in the new claim to assert the retainer that he does. I note also that this argument does not seem to have been advanced before Langley J, or at least not advanced with sufficient force for him to consider it necessary to address it in his judgment.

18.    There are much more far-reaching difficulties for Mr Laing in relation to the substance of his claim, when considered in the context of the judgment of Judge Thornton; to which I now turn.

*The new claim and the judgment of Judge Thornton*

19.    In order to succeed in the new claim Mr Laing has to establish at least that (i) the underlying agreements between Mr Laing and Mr Watson were as alleged by Mr Laing; (ii) Mr Kelly knew that; (iii) in drafting the 1999 and 2002 Written Agreements Mr Kelly failed to reflect what the two protagonists had agreed; (iv) that failure caused Mr Laing loss, in the shape of the decision against him recorded by Judge Thornton. But Judge Thornton found in the first case that item (i) was not correct; so items (ii) and (iii) did not arise. Mr Laing's case in the new claim recognised that, and that it would be necessary to demonstrate that Judge Thornton's judgment on item (i) had been wrong.

20.    In pursuit of that recognition Mr Marks QC in able submissions took us, as he had taken Langley J, through a substantial amount of the documentation relating to the 1999 and 2002 Written Agreements, in an attempt to demonstrate that those agreements should have been in the form that Mr Laing alleges. Langley J concluded, after the same enquiry as was conducted before us, that there was a reasonably compelling case that the decision of Judge Thornton on the terms of the agreements is open to serious challenge. That conclusion enabled Langley J to find that it would not bring the administration of justice into disrepute to permit the issue of the terms of the agreements to be relitigated; and that in terms of fairness it would be unfair to Mr Laing if he were not permitted to pursue a case in which he alleges that it was the negligent drafting of the documentation which exposed him to the claim by Mr Watson/Burkle.

21.    There are two types of difficulty about this approach, which may have been stressed more clearly before us than they were before Langley J.   First, the attack on the judgment of Judge Thornton is in my view not as obviously cogent as Langley J concluded.   It depends at least in part on assuming what it has to prove, that the underlying agreements were not in the form alleged by Mr Watson.   That is because if, as Judge Thornton found, the parties did enter into Mr Watson's first agreement, then the drafting operation, directed only at the arrangements for the loan, was only intended to implement Mr Watson's second agreement; since, as Judge Thornton further found, at paragraph 159 of his judgment, Mr Kelly was never told about Mr Watson's first agreement.   And, further, in relation to the effect of Mr Kelly's negligence, I cannot find that Judge Thornton ever relied on the terms of the Written Agreements as guiding him to his conclusions as to the nature of the underlying agreements.   Rather, he found the Written Agreements to be accurate because they reflected what the protagonists had agreed: see for instance paragraph 171 of his judgment.   He reached his conclusion as to what had been agreed on the basis of the oral evidence of the protagonists, and analysis of their actions during and after the negotiations.

22.    The second, different, and more significant difficulty is however that everything said to us and to Langley J in criticism of Judge Thornton's judgment could have been said to Judge Thornton (and mainly was so said); and could have been deployed in the appeal from Judge Thornton that was never brought.   What is sought to be achieved in the second claim is, therefore, not the addition of matter that, negligently or for whatever reason, was omitted from the first case, but rather a relitigation of the first case on the basis of exactly the same material as was or could have been before Judge Thornton.

23.    I give as but one example of how the second claim involves relitigation of the first case an attendance note by Mr Kelly of a conversation that he had with Mr Laing on 24 February 2003 [item 591 in the documents before us].   Mr Marks argued that the note demonstrated that Mr Kelly thought that Mr Laing's case was correct, because it reported to Mr Laing a statement by Mr Watson that there was no longer any need to bother about his 12 1/2% share in the profits of the development because ESL now had a beneficial interest in 12 1/2% of NFI.   Knowledge on the part of Mr Kelly that Mr Watson had made that admission showed that it would not be unfair to TW to permit Mr Laing now to seek to depart from the findings of Judge Thornton.   But the document in question was heavily relied on by Mr Laing in the first case, and was subjected to detailed consideration by Judge Thornton in paragraphs 155-161 of his judgment.   He concluded that, read in context, Mr Watson had not made the admission asserted by Mr Laing.

24.    That the new claim involves relitigation is so even in respect of the ways in which Mr Kelly is now alleged to have been negligent. If it had been thought necessary at the trial to explain away the Written Agreements (and it is far from clear that that was seen as a difficulty for Mr Laing's case), Mr Kelly could have been called to explain what had gone wrong.   That was not done. Rather, in his written statement before Judge Thornton what Mr Kelly did say was that, when performing the role of amanuensis to which he referred in his evidence before Judge Toulmin quoted in §15 above, he was never instructed by Mr Laing that Burkle were to receive a 12 1/2% share in the profits as well as a 12 1/2% shareholding in NFI.   That says nothing as to

the implications of Mr Watson's first agreement: which Judge Thornton found Mr Kelly to have known nothing about.

*Bringing the administration of justice into disrepute*

25.  I therefore conclude that it would bring the administration of justice into disrepute if Mr Laing were to be permitted in the second claim to advance exactly the same case as was tried and rejected by Judge Thornton.  If Judge Thornton's judgment was to be disturbed, the proper course was to appeal, rather than seek to have it in effect reversed by a court not of superior but of concurrent jurisdiction hearing the second claim.  That the second claim is in substance an attempt to reverse Judge Thornton is important in the context of wider principles of finality of judgments.  In *Hunter*, at p 545D, Lord Diplock said that the proper course to upset the decision of a court of first instance was by way of appeal.  Where, wholly exceptionally, a collateral, first instance, action can be brought it has to be based on new evidence, that must be such as entirely changes the aspect of the case:  see per Earl Cairns LC in *Phosphate Sewage v Molleson* (1879) 4 App Cas 801 at p 814.  The second claim in our case not merely falls short of that standard, but relies on no new evidence at all.

26.  It is however argued that all of that is irrelevant, or at least not conclusive, where the second claim is, unlike the claim in *Phosphate Sewage*, not between the same parties.  The appellant relied on, and Langley J was impressed by, observations by Lord Hoffmann in *Hall v Simons* [2002] 1 AC 615 at p 705H, on the status of claims of abuse of process in negligence actions against solicitors involved in earlier proceedings:

> I see no objection on grounds of public interest to a claim that a civil case was lost because of the negligence of the advocate, merely because the case went to a full trial.  In such a case the plaintiff accepts that the decision is res judicata and binding upon him.  He claims, however, that if the right arguments had been used or evidence called, it would have been decided differently.

In the present case, Mr Laing perforce accepts that the decision of Judge Thornton is binding on him.  The obligation to Mr Watson placed on him by that judgment is the loss that he seeks to recover in the second claim against TW.  That judgment against him was only obtained by Mr Watson because of the negligence of Mr Kelly.  Accordingly, the second claim does not seek to reverse the decision of Judge Thornton, but rather seeks to recover from TW the cost to Mr Laing of that decision.

27.  I of course agree that it will not necessarily, or perhaps usually, be a valid objection to a claim for solicitors' negligence in or about litigation that the claim asserts matters different from those decided in that litigation.  That is so not only of cases where the solicitors' have made what might be called administrative errors that have prevented the earlier proceedings from being properly pursued or their outcome challenged by the proper means (eg *Walpole v Partridge & Wilson* [1994] AC 106); but also where errors in assembling the evidence or understanding the law are alleged to have led to an incorrect result, as was the case in *Hall v Simons* itself.  But the present case is significantly different from those just mentioned.  The difference is that, as shown in §19 above, in order to succeed in the new claim Mr Laing has to demonstrate not only

that the decision of Judge Thornton was wrong, but also that it was wrong because it wrongly assessed the very matters that are relied on in support of the new claim. That is an abusive relitigation of Judge Thornton's decision not by appeal but in collateral proceedings, and in substance if not strictly in form falls foul of the *Phosphate Sewage* rule.

28.   Mr Laing sought to escape from this dilemma by arguing that his complaint was not that Mr Kelly's drafting had produced the error on the part of Judge Thornton, but rather that, without that error, the case would never have reached Judge Thornton: because if the documentation had been correctly drawn Mr Watson would have recognised that it represented what had been agreed, and would have signed, in particular, the 2002 Written Agreement as a true record of the relationship between himself and Mr Laing. Mr Marks assured us that that claim could be extracted from the pleading quoted in §9 above; and Langley J at his §12 accepted that as the basis of the claim.

29.   The difficulty about this approach, which may not have been put clearly to Langley J, is that it requires there to be rejected another finding of Judge Thornton, that the parties had indeed entered into Mr Watson's first agreement. Unless that finding can be dislodged, it is plainly absurd to say that Mr Watson would have accepted a draft of the 2002 Written Agreement in the terms now contended for by Mr Laing as a complete statement of the relationship between the two men. The need to reverse that finding thus makes this way of putting the second claim equally as abusive as a direct attack on the whole of the decision of Judge Thornton.

*Unfairness*

30.   TW claimed that it would in any event be manifestly unfair to them to permit Mr Laing to reopen the issue between himself and Mr Watson. Mr Watson had claimed privilege for various documents that might assist the case; and Mr Watson himself had indicated that he would not attend a further trial. I doubt whether there are any other documents that could make a substantial addition to what is already before the court, but the absence of Mr Watson from the trial of the new claim is significant. Judge Thornton based his conclusions largely on his acceptance of the evidence of Mr Watson, which the trial court in the new claim will be deprived of. I am not entirely certain that this issue, taken on its own, would demonstrate manifest unfairness to TW; but what it does very firmly underline is that the new claim will indeed be a re-run of the first case, in both of which proceedings Mr Watson, for exactly the same reasons in each case, is a central witness.

31.   On the other side of the coin it was argued that it was unfair to Mr Laing, and possibly improper on the part of TW, that when Mr Kelly, a partner in TW, supported the case that Mr Laing seeks to put in the new claim TW should, as it was put, seek to shield themselves from that claim by relying on the judgment of Judge Thornton. There might be something in that complaint if Mr Kelly's evidence had not been available to Judge Thornton, who had a clear view of the role that Mr Kelly had played. The limited assistance that Mr Kelly gave to Mr Laing's case, and the fact, found by Judge Thornton, that he was unaware of a central issue between Mr Watson and Mr Laing, Mr Watson's first agreement, shows that it is not improper for unfair for TW to rely on the findings of Judge Thornton.

*Issue estoppel*

32.    It was argued before us, but not I think before Langley J, that TW were the privies in interest of their client Mr Watson.  Mr Laing was bound by estoppel not only as against Mr Watson but also against TW in respect of the issues decided in the first case.  The second claim should be dismissed on that ground, without therefore needing to evoke abuse of process.  This was a novel claim, and almost certainly misconceived.  It is difficult to see how a solicitor can have the *same* interest as his client either in fact or in law, not least because of his concurrent duty to the court.  In any event, this is not the case in which to seek to explore this suggestion further.

*Disposal*

33.    These proceedings are an abuse of process.  Langley J did not give sufficient weight to the central factor that creates that abuse, that the proceedings are in substance a complete relitigation of the decision of Judge Thornton.   I would allow the appeal and strike out Mr Laing's action.

**Lord Justice Laws:**

34.    I agree with both judgments.

**Lord Justice Moses :**

35.    I agree that the appeal should be allowed for the reasons given by Buxton LJ.  The attempt to bring proceedings in contract and in tort against TW involves an impermissible challenge to the facts found by Judge Thornton and is, for that reason, an abuse of process.

36.    I should explain why I conclude that the challenge is impermissible.  Allegations of negligence during the course of litigation, against solicitors or advocates, will normally involve an attempt by a claimant to demonstrate that the previous conclusion of the court would have been different, absent negligence on the part of the lawyer. In many cases it will, indeed, be necessary to do so in order to prove causation and loss.  The paradigm is the loss of a case due to negligent advocacy.  But to bring such proceedings for negligence does not bring the administration of justice in to disrepute; *Hall v Simons* teaches to the contrary.

37.    But such cases differ from the instant appeal in two important respects.  Firstly, in the normal run of case, the impugned conduct of the lawyer is independent of the previous conclusion of the court; those conclusions are only relevant to prove causation and loss.  His case does not, in reality, involve any challenge to the findings or conclusion of the court.  He merely contends that, in the light of the negligence of which he now complains, the court's conclusions would have been different. But this not so in the present case.  As Buxton LJ has demonstrated (at paragraphs 19 and 27), the claimant cannot establish that his adviser's drafting of the agreements was negligent without challenging the judge's findings as to credibility and fact.  To make good the allegations of negligence, Mr Laing must show that his account of the agreements is the truth.  He must demonstrate that Judge Thornton's judgment of his credibility was wrong.

38.   Secondly, generally in actions against legal advisers arising out of litigation, the losing party's allegations of negligence could not have been advanced in the case which he lost.  They arise only after the case is concluded.  But in the present case, the claimant had every opportunity during the course of the trial to raise, as he would have it, the inadequate drafting.  The more Mr. Marks QC emphasised the strength of Mr Laing's position on the basis of the written evidence, the harder it became to understand why the errors of Mr Kelly were not fully aired at trial.  On Mr. Laing's account the 1999 and 2002 written agreements were inadequate.  Mr Laing had every opportunity at trial to explain that the inadequacies were due to the incompetence or misunderstanding of Mr Kelly.

39.   Those two features demonstrate why the court should not permit this action to proceed.

TAB 24

*Test Claimants in the FII Group Litigation v*
*Revenue and Customs Commissioners* [2012] 2 AC 337

337
[2012] 2 AC        FII Group Test Claimants v Revenue and Customs Comrs (SC(E))

A                                    Supreme Court

## Test Claimants in the FII Group Litigation *v* Revenue and Customs Comrs (formerly Inland Revenue Comrs)

### [2012] UKSC 19

B   2012 Feb 21, 22, 23, 27, 28, 29;                    Lord Hope of Craighead DPSC,
         May 23                          Lord Walker of Gestingthorpe, Lord Clarke of
                                          Stone-cum-Ebony, Lord Dyson, Lord Sumption,
                                      Lord Reed JJSC, Lord Brown of Eaton-under-Heywood

*European Community — Breach of community law — Domestic remedy — Claims*
     *for recovery of taxes unduly levied — Requirement that domestic law of member*
C    *state provide effective remedy for recovery of taxes levied contrary to Community*
     *law — English law providing resitutionary remedy of recovery of unlawfully*
     *exacted taxes — Claimant relying on alternative remedy of recovery of sums paid*
     *under mistake of law — Whether Community law requirement extending to*
     *alternative remedy so as to preclude statutory curtailment of limitation period if*
     *contrary to Community law principles — Finance Act 2004 (c 12), s 320 —*
     *Finance Act 2007 (c 11), s 107*

D   *Restitution — Quasi-contract — Moneys had and received — Statute levying tax*
     *contrary to EU law — Payments of moneys to revenue in accordance with taxing*
     *statute — Payments made without prior formal demand by revenue —*
     *Taxpayers' right to recover unlawfully exacted taxes — Whether applicable in*
     *absence of demand by revenue — Whether within statutory provision extending*
     *limitation period for actions for relief from consequences of mistake — Whether*
     *applicable under statutory right for repayment of tax*
E    *paid by error or mistake — Taxes Management Act 1970 (c 9) (as amended by*
     *Finance Act 1994 (c 9), s 196, Sch 19, para 8(2)), s 33(1)(2A) — Limitation Act*
     *1980 (c 58), s 32(1)(c)*

     In March 2001 the Court of Justice of the European Union ruled that national
law had to provide an effective remedy where tax had been paid pursuant to
provisions which contravene EU law. In a group action in proceedings commenced in
June and September 2003, companies in two United Kingdom groups of companies
F   with overseas subsidiaries ("the test claimants") sought, inter alia, restitution of sums
paid by them under various provisions of the United Kingdom advance corporation
tax ("ACT") statutory regime in place between 1973 and 1999, or under section 18
(Schedule D, Case V) of the Income and Corporation Taxes Act 1988, on the ground
that such legislation, in treating dividends received by UK-resident companies from
non-resident subsidiaries differently from dividends paid and received within wholly
UK-resident groups of companies, gave rise to unjustified difference of treatment
G   between UK companies with resident subsidiaries and those with non-resident
subsidiaries, contrary to the freedom of establishment provisions of article 43EC and
the free movement of capital provisions of article 56EC of the EC Treaty, and so had
been levied contrary to EU law. Instead of relying on the principle of United
Kingdom law established in *Woolwich Equitable Building Society v Inland Revenue
Comrs* [1993] AC 70 ("the *Woolwich* principle") allowing recovery in restitution of
unlawfully exacted taxes, the test claimants claimed an entitlement to rely on
H   section 32(1)(c) of the Limitation Act 1980[1], which allowed an extended period for
bringing an action in case of mistake, with time running from the date of discovery of
the mistake, on the basis that it had not been until a decision of the Court of Justice
that they had had grounds for supposing that they had a good claim to recover

     [1] Limitation Act 1980, s 32(1): see post, para 42.

© 2012 The Incorporated Council of Law Reporting for England and Wales

ACT levied contrary to EU law. At trial they sought to rely on section 32(1)(c)   A
notwithstanding that on 8 September 2003, the same day as the test claimants
belonging to the second group of companies had commenced proceedings but
subsequent to the commencement of proceedings by the test claimants in the first
group, the revenue had announced the introduction of legislation, subsequently
enacted as section 320 of the Finance Act 2004, which disapplied section 32(1)(c) in
relation to any actions for relief from the consequences of a mistake of law relating to
a taxation matter brought on or after that day, and that in December 2006, following   B
a decision of the House of Lords in unrelated proceedings which confirmed the right
in English domestic law to claim tax wrongly paid under a mistake, Parliament had
enacted section 107 of the Finance Act 2007, which made a similar disapplication of
section 32(1)(c) in relation to proceedings brought brought before 8 September 2003.

On the question, subject to liability being proved, of the remedies available, in
particular whether the mistake of law claim was protected by EU law and, if so,
whether sections 320 of the 2004 Act and 107 of the 2007 Act could not be applied to
their claims, the judge held that EU law required there to be an effective remedy for   C
moneys paid in respect of the tax which had been unlawfully charged, that a claim for
restitution under the *Woolwich* principle did not provide an effective remedy, since it
required an unlawful "demand" for tax whereas ACT was a self-assessed tax, but that
EU law protected a mistake claim so that section 320 of the 2004 Act and section 107
of the 2007 Act could not lawfully curtail the extended limitation period. The judge
also held, with regard to those parts of the claims which fell within the statutory right
for repayment of tax paid by error or mistake in section 33 of the Taxes Management   D
Act 1970[2], that such right did not preclude a claimant from seeking recovery at
common law.

On, inter alia, the revenue's appeal against those findings, the Court of Appeal
held that the *Woolwich* restitution remedy was available to the test claimants, since it
did not require a "demand", and that it was a sufficient remedy for the purposes of
EU law, that EU law did not require that there must also be a remedy based on
mistake and so only protected a *Woolwich* claim, and since such claims were   E
unaffected by section 320 of the 2004 Act and section 107 of the 2007 Act, those
sections did lawfully curtail the extended limitation period for the actions brought on
the ground of mistake. The Court of Appeal also held that the section 32(1)(c)
extended limitation period did not extend to *Woolwich* claims, and that those claims
falling within the ambit of section 33 of the 1970 Act had to be brought before the
special commissioners under section 33, and not by way of action in the High Court.

On appeal by the test claimants—   F

*Held*, (1) dismissing the appeal in part, that in English law there was both an
entitlement to recover taxes paid in response to an unlawful demand under the
*Woolwich* principle and an entitlement to recover money paid under a mistake of law,
including taxes paid in ignorance of the fact that the legislation under which they
were levied was incompatible with EU law, and a taxpayer was entitled to take
advantage of the remedy which was most advantageous to him; that a claim for
repayment under the *Woolwich* principle arose whenever tax purportedly been   G
charged without lawful parliamentary authority, regardless of any official demand,
save where the payment had, on the facts, been made in order to close the
transaction; that that principle would be re-stated as covering all sums paid to a
public authority in response to, and sufficiently causally connected with, an apparent

² Taxes Management Act 1970, s 33, as amended: "(1) If any person who has paid tax
charged under an assessment alleges that the assessment was excessive by reason of some error
or mistake in a return, he may by notice in writing at any time not later than six years after the   H
end of the year of assessment (or, if the assessment is to corporation tax, the end of the
accounting period) in which the assessment was made, make a claim to the Board for relief . . .
(2A) No relief shall be given under this section in repsect of— (a) an error or mistake as to the
basis on which the liability of the claimant ought to have been computed where the return was in
fact made on the basis or in accordance with the practice generally prevailing at the time when it
was made . . ."

© 2012 The Incorporated Council of Law Reporting for England and Wales

A    statutory requirement to pay tax which both in fact and in law was not lawfully due; that the provision in section 32(1)(c) of the Limitation Act 1980 extending the limitation period for actions for relief from the consequences of a mistake required that the mistake which had led to the claim being made was an essential ingredient in the claimant's cause of action and so did not extend to claims for restitution of tax unlawfully demanded under the *Woolwich* principle; and that, accordingly, the test claimants had been entitled to claim restitution under the *Woolwich* principle, albeit

B    they had not been able to bring their claim in time, subject only, in relation to those claims which related to corporation tax under Case V of Schedule D of the Income and Corporation Taxes Act 1988, to such claims not being excluded at common law by reason of there being statutory relief under section 33 of the Taxes Management Act 1970 (paras 10, 13, 62–63, 79, 84, 120, 121, 126, 140, 171–174, 184–185, 207, 246).

*Woolwich Equitable Building Society v Inland Revenue Comrs* [1993] AC 70, HL(E) explained.

C    *Phillips-Higgins v Harper* [1954] 1 QB 411 approved.

(2) Allowing the appeal in part, that section 33 of the Taxes Management Act 1970 did not expressly exclude the availability of other causes of action at common law, nor could any such exclusion be implied into section 33 since it would be inconsistent with EU law; and that, accordingly, in so far as section 33 might apply to any of the claims, it would not preclude the claimants' right to recover in restitution (post, paras 10, 119–120, 121, 127, 140, 204–205, 207, 219, 246).

D    (3) That, therefore, any restitution for the test claimants was dependent on the additional domestic law right to recover tax paid under a mistake of law being protected by EU law and, if so, whether section 320 of the 2004 Act and section 107 of the 2007 Act offended the principles of effectiveness, legal certainty or legitimate expectations so as to preclude, under EU law, their application to such claims; that since it was not acte clair (i) whether the requirement under EU law was for a member state to make available an adequate remedy which met the principles of effectiveness

E    and equivalence, or whether those principles required every remedy recognised in domestic law to be available so that the taxpayer might obtain the benefit of any special advantage as to limitation, nor (ii) whether the enactment of section 320 so as to deprive taxpayers of a right previously available offended those principles, a reference would be made to the Court of Justice for a preliminary ruling thereon; that it was, however, clear that the enactment of section 107, by cancelling claims already brought more than three years after legislation had been announced precluding

F    recovery on the ground of mistake of law but excluding claims already then brought, so as retroactively to include such claims, was contrary to the principle of the protection of legitimate expectations; and that, accordingly, the determination of the question as to what remedies were open to the test claimants would be stayed pending the ruling on the questions referred (post, paras 15, 22, 23, 115, 120, 121, 125, 128–129, 140, 203, 207, 209, 212, 246).

Decision of the Court of Appeal [2010] EWCA Civ 103; [2010] STC 1251

G    affirmed in part.

The following cases are referred to in the judgments:

*ACF Chemiefarma NV v Commission of the European Communities* (Case 41/69) [1970] ECR 661, ECJ

*Air Canada v British Columbia* [1989] 1 SCR 1161; 59 DLR (4th) 161

*Amministrazione delle Finanze dello Stato v Ariete SpA* (Case 811/79) [1980] ECR

H    2545, ECJ

*Amministrazione delle Finanze dello Stato v Denkavit Italiana Srl* (Case 61/79) [1980] ECR 1205, ECJ

*Amministrazione delle Finanze dello Stato v Sas Mediterranea Importazione, Rappresentanze, Esportazione, Commercio (MIRECO)* (Case 826/79) [1980] ECR 2559, ECJ

© 2012 The Incorporated Council of Law Reporting for England and Wales

*Amministrazione delle Finanze dello Stato v SpA San Giorgio* (Case 199/82) [1983]   *A*
    ECR 3595, ECJ
*Aprile Srl v Amministrazione delle Finanze dello Stato (No 2)* (Case C-228/96)
    [2000] 1 WLR 126; [1998] ECR I-7141, ECJ
*Baker v Courage & Co* [1910] 1 KB 56
*Blake, In re* [1932] 1 Ch 54
*Braathens Sverige AB, formerly Transwede Airways AB v Riksskatteverket* (Case   *B*
    346/97) [1999] ECR I-3419, ECJ
*Brasserie du Pêcheur SA v Federal Republic of Germany* (Joined Cases C-46/93 and
    C-48/93) [1996] QB 404; [1996] 2 WLR 506; [1996] All ER (EC) 301; [1996]
    ECR I-1029, ECJ
*Brooksbank v Smith* (1836) 2 Y & C Ex 58
*Cartledge v E Jopling & Sons Ltd* [1963] AC 758; [1963] 2 WLR 210; [1963] 1 All
    ER 341; [1963] 1 Lloyd's Rep 1, HL(E)
*Clarke v Shee and Johnson* (1774) 1 Cowp 197   *C*
*Comateb, Société v Directeur Général des Douanes et Droits Indirects* (Joined Cases
    C-192 to C-218/95) [1997] STC 1006; [1997] ECR I-165, ECJ
*Comet BV v Produktschap voor Siergewassen* (Case 45/76) [1976] ECR 2043, ECJ
*Commission of the European Communities v French Republic* (Case 270/83) [1986]
    ECR 273, ECJ
*Danfoss A/S v Skatteministeriet* (Case C-94/10) 20 October 2011, ECJ
*David Securities Pty Ltd v Commonwealth Bank of Australia* (1992) 175 CLR 353
*Denys v Shuckburgh* (1840) 4 Y & C Ex 42   *D*
*Deutsche Morgan Grenfell Group plc v Inland Revenue Comrs* [2003] EWHC 1779
    (Ch); [2003] 4 All ER 645; [2003] STC 1017; [2005] EWCA Civ 78; [2006] Ch
    243; [2006] 2 WLR 103; [2005] 3 All ER 1025; [2005] STC 329, CA; [2006]
    UKHL 49; [2007] 1 AC 558; [2006] 3 WLR 781; [2007] 1 All ER 449; [2007]
    STC 1, HL(E)
*Deville v Administration des impôts* (Case 240/87) [1988] ECR 3513, ECJ
*Dilexport Srl v Amministrazione delle Finanze dello Stato* (Case C-343/96) [2000]   *E*
    All ER (EC) 600; [1999] ECR I-579, ECJ
*Diplock, In re; Diplock v Wintle* [1948] Ch 465; [1948] 2 All ER 318, CA
*Duff v Minister for Agriculture and Food, Ireland, and Attorney General* (Case
    C-63/93) [1996] ECR I-569, ECJ
*Edilizia Industriale Siderurgica Srl (Edis) v Ministero delle Finanze* (Case C-231/96)
    [1998] ECR I-4951, ECJ
*Emmott v Minister for Social Welfare* (Case C-208/90) [1993] ICR 8; [1991] ECR   *F*
    I-4269, ECJ
*Francovich v Italian Republic* (Joined Cases C-6/90 and C-9/90) [1995] ICR 722;
    [1991] ECR I-5357, ECJ
*Ghaidan v Godin-Mendoza* [2004] UKHL 30; [2004] 2 AC 557; [2004] 3 WLR 113;
    [2004] 3 All ER 411, HL(E)
*Grundig Italiana SpA v Ministero delle Finanze* (Case C-255/00) [2003] All ER (EC)
    176; [2002] ECR I-8003, ECJ   *G*
*Haahr Petroleum Ltd v Åbenrå Havn* (Case C-90/94) [1997] ECR I-4085, ECJ
*Hydro Electric Commission of Township of Nepean v Ontario Hydro* [1982] 1 SCR
    347; 132 DLR (3d) 193
*Kingstreet Investments Ltd v New Brunswick (Department of Finance)* 2007 SCC
    1; [2007] 1 SCR 3; 276 DLR (4th) 342
*Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 AC 349; [1998] 3 WLR 1095;
    [1998] 4 All ER 513; [1999] LGR 1, HL(E)   *H*
*Malkin v Birmingham City Council* (unreported) 12 January 2000, CA
*Marks & Spencer plc v Customs and Excise Comrs* (Case C-62/00) [2003] QB 866;
    [2003] 2 WLR 665; [2002] STC 1036; [2002] ECR I-6325, ECJ
*Marleasing SA v La Comercial Internacional de Alimentación SA* (Case C-106/89)
    [1990] ECR I-4135, ECJ

A    *Masdar (UK) Ltd v Commission of the European Communities* (Case C-47/07P)
    [2008] ECR I-9761, ECJ

  *Mason, In re* [1928] Ch 385; [1929] 1 Ch 1, CA

  *Metallgesellschaft Ltd v Inland Revenue Comrs* (Joined Cases C-397/98 and
    C-410/98) [2001] Ch 620; [2001] 2 WLR 1497; [2001] All ER (EC) 496; [2001]
    ECR I-1727; [2001] STC 452, ECJ

  *Ministero delle Finanze v Spac SpA* (Case C-260/96) [1998] ECR I-4997, ECJ

B    *Monro v Revenue and Customs Comrs* [2008] EWCA Civ 306; [2009] Ch 69; [2008]
    3 WLR 734; [2008] STC 1815, CA

  *Morgan Guaranty Trust Co of New York v Lothian Regional Council* 1995 SC 151,
    Ct of Sess

  *Moses v Macferlan* (1760) 2 Burr 1005

  *NEC Semi-Conductors Ltd v Inland Revenue Comrs* [2006] EWCA Civ 25; [2006]
    STC 606, CA

C    *Phillips-Higgins v Harper* [1954] 1 QB 411; [1954] 2 WLR 117; [1954] 1 All ER
    116

  *Reemtsma Cigarettenfabriken GmbH v Ministero delle Finanze* (Case C-35/05)
    [2007] ECR I-2425; [2008] STC 3448, ECJ

  *Rewe-Handelsgesellschaft Nord mbH v Haupzollamt Kiel* (Case 158/80) [1981]
    ECR I-1805, ECJ

  *Rewe-Zentralfinanz eG v Landwirtschaftskammer für das Saarland* (Case 33/76)
    [1976] ECR 1989, ECJ

D    *Robinson, In re* [1911] 1 Ch 502

  *Robinson v Giffard* [1903] 1 Ch 865

  *Roquette Frères SA v Direction des Services Fiscaux du Pas-de-Calais* (Case C-88/99)
    [2000] ECR I-10465, ECJ

  *Staatssecretaris van Financiën v Verkooijen* (Case C-35/98) [2000] ECR I-4071;
    [2002] STC 654, ECJ

E    *Test Claimants in the FII Group Litigation v Inland Revenue Comrs* (Case C-446/04)
    (Note) [2012] 2 AC 436; [2012] 2 WLR 1240; [2007] STC 326; [2006] ECR
    I-11753, ECJ

  *Unibet (London) Ltd v Justitiekanslern* (Case C-432/05) [2008] All ER (EC) 453;
    [2007] ECR I-2271, ECJ

  *Weber's Wine World Handels-GmbH v Abgabenberufungskommission Wien* (Case
    C-147/01) [2005] All ER (EC) 224; [2003] ECR I-11365, ECJ

  *Willis Faber Enthoven (Pty) Ltd v Receiver of Revenue* 1992 (4) SA 202

F    *Woolwich Equitable Building Society v Inland Revenue Comrs* [1989] 1 WLR 137;
    65 TC 265; [1993] AC 70; [1991] 3 WLR 790; [1991] 4 All ER 577; 65 TC 265,
    CA; [1993] AC 70; [1992] 3 WLR 366; [1992] 3 All ER 737; 65 TC 265; [1992]
    STC 657, HL(E)

The following additional cases were cited in argument:

G    *Autologic Holdings plc v Inland Revenue Comrs* [2005] UKHL 54; [2006] 1 AC 118;
    [2005] 3 WLR 339; [2005] 4 All ER 1141; [2005] STC 1357, HL(E)

  *British Steel plc v Customs and Excise Comrs* [1997] 2 All ER 366, CA

  *Eagerpath Ltd v Edwards* [2001] STC 26, CA

  *Europcar UK Ltd v Revenue and Customs Comrs* [2008] EWHC 1363 (Ch); [2008]
    STC 2751

  *Revenue and Customs Comrs v Total Network SL* [2008] UKHL 19; [2008] AC
    1174; [2008] 2 WLR 711; [2008] 2 All ER 413; [2008] STC 644, HL(E)

H    *Sempra Metals Ltd (formerly Metallgesellschaft Ltd) v Inland Revenue Comrs* [2007]
    UKHL 34; [2008] AC 561; [2007] 3 WLR 354; [2008] Bus LR 49; [2007] 4 All
    ER 657; [2007] STC 1559, HL(E)

  *Test Claimants in the Thin Cap Group Litigation v Revenue and Customs Comrs*
    [2009] EWHC 2908 (Ch); [2010] STC 301

© 2012 The Incorporated Council of Law Reporting for England and Wales

*Vodafone 2 v Revenue and Customs Comrs* [2009] EWCA Civ 446; [2010] Ch 77;    A
  [2010] 2 WLR 288; [2010] Bus LR 96; [2009] STC 1480, CA

**APPEAL** from the Court of Appeal

On 8 October 2003 Chief Master Winegarten made a group litigation
order ("the Franked Investment Income ('FII') Group Litigation") for the
determination of actions by (1) members of the British American Tobacco
group of companies (BAT Industries plc, British American Tobacco    B
(Investments) Ltd, British American Tobacco (Holdings) Ltd, BAT 1998 Ltd,
British American Tobacco plc, a number of indirect wholly owned
subsidiaries of BAT Industries plc, British American Tobacco International
(Holdings) BV and British-American Tobacco Co (Nederland) BV) and
(2) Aegis Group plc, Aegis International Ltd and Carat Ltd (all together,
"the test claimants in the Franked Investment Income ('FII') Group    C
Litigation") against the Inland Revenue Commissioners (now the Revenue
and Customs Commissioners) seeking (1) a declaration that, inter alia, (i) the
advance corporation tax provisions of sections 14, 231 and 238 to 242 of the
Income and Corporation Taxes Act 1988 (and the corresponding provisions
of the preceding legislation for accounting periods which ended before
5 April 1988), (ii) the foreign income dividend provisions of sections 246A    D
to 246Y of the 1988 Act (as inserted by section 138 of, and paragraph 1 of
Schedule 16 to, the Finance Act 1994), and (iii) section 18 (Schedule D, Case
V) of the 1988 Act, in so far as they applied to the claimants, were contrary
to article 43EC (freedom of establishment) and article 56EC (free movement
of capital) of the EC Treaty, and their predecessor articles, and were
therefore illegal; (2) restitution in respect of overpaid taxes; (3) damages;
and (4) interest pursuant to section 35A of the Supreme Court Act 1981    E
and/or compound or other interest at common law or pursuant to the rules
of equity.

By order dated 12 December 2008 Henderson J [2009] STC 254 held,
inter alia, that (1) the test claimants' claims for compensation based on the
principles set out in *Amministrazione delle Finanze dello Stato v SpA San
Giorgio* (Case C-199/82) [1983] ECR 3595 ("*San Giorgio*") extended to the    F
repayment of unlawfully levied tax and to all claims for losses which were a
direct consequence of the unlawful levying of tax; (2) the claims for
unlawfully levied ACT would as a matter of English law fall within the
proper scope of a mistake-based restitutionary claim, which mistake
continued to be operative at the time the payments were made; (3) the cause
of action for restitution of tax unlawfully demanded under the principle    G
established in *Woolwich Equitable Building Society v Inland Revenue
Comrs* [1993] AC 70 did not provide a sufficient remedy under English law
for Community law *San Giorgio* claims and, therefore, the cause of action in
mistake under English law was also necessary to give an effective remedy for
*San Giorgio* claims; (4) to the extent that claimants had paid unlawfully
levied ACT and/or corporation tax under Schedule D Case V, such
ACT and/or corporation tax had been paid under a mistake; (5) the    H
curtailment of the limitation period by section 320 of the Finance Act 2004,
and by section 107 of the Finance Act 2007, was incompatible with
Community law; consequently, those provisions fell to be disapplied in
relation to Community law claims; and (6) section 33 of the Taxes

© 2012 The Incorporated Council of Law Reporting for England and Wales

343

A    Management Act 1970 did not provide an effective remedy for a *San Giorgio* claim.

On 23 February 2010, the Court of Appeal (Arden, Stanley Burnton, Etherton LJJ), inter alia, allowed the test claimants' appeal against the judge's holdings (3), (5) and (6).

B    On 8 November 2010 the Supreme Court (Lord Hope of Craighead DPSC, Lord Collins of Mapesbury and Lord Clarke of Stone-cum-Ebony JJSC) gave the test claimants leave to appeal on the following matters (as subsequently amended). (1) Could Parliament lawfully curtail without notice the extended limitation period under section 32(1)(c) of the Limitation Act 1980 for the mistake cause of action by section 320 of the Finance Act 2004 and cancel claims made using that cause of action for the extended period by section 107 of the Finance Act 2007? In particular:

C    (a) Would a *Woolwich* restitution remedy be a sufficient remedy for the repayment claims brought on the basis of EU law? (b) Whether or not a *Woolwich* restitution remedy would be a sufficient remedy, did EU law protect the claims which were made in mistake; and, specifically, did the curtailment without notice of the extended limitation period for mistake claims (section 320) and the cancellation of such claims in respect of the extended period (section 107) infringe the EU law principles of effectiveness,

D    legal certainty, legitimate expectations and rule of law? (2) Were the restitution and damages remedies sought by the test claimants in respect of corporation tax paid under section 18 (Schedule D, Case V) of the 1988 Act excluded by virtue of the statutory provisions for recovery of overpaid tax in section 33 of the Taxes Management Act 1970? (3) Did section 32(1)(c) of the Limitation Act 1980 apply to a claim for a *Woolwich* restitution remedy?

E    The test claimants' appealed on the grounds, that, in summary, that (1) the application of section 320 of the Finance Act 2004 and section 107 of the Finance Act 2007 was precluded by the principles of effectiveness, legal certainty and legitimate expectations for all EU law claims; (2) the cause of action for restitution of tax unlawfully demanded under the principle established by the House of Lords in the *Woolwich* case did not provide a

F    sufficient remedy under English law for restitution based on the European Union law principles set out in the *San Giorgio* case and the mistake of law claim recognised by the House of Lords in *Deutsche Morgan Grenfell Group plc v Inland Revenue Comrs* [2007] 1 AC 558 was also necessary to give an effective remedy for *San Giorgio* claims; and (3) the test claimants' restitution and damages claims were not excluded by section 33 of the Taxes Management Act 1970.

G    The facts are stated in the judgment of Lord Walker of Gestingthorpe JSC.

*Graham Aaronson QC*, *Laurence Rabinowitz QC* and *David Cavender QC* (instructed by *Dorsey & Whitney (Europe) LLP*) for the taxpayers.

Section 320 of the Finance Act 2004 (if lawful) had retrospective effect, applying to all claims brought on or after 8 September 2003, without any

H    transitional provisions, and so shortened the limitation period which had until then been available to the Aegis claimants. Since the BAT claimants issued their proceedings (including claims in mistake) before section 320 took effect it did not affect their claims and they could continue to take advantage of the (unabridged) limitation periods contained in

© 2012 The Incorporated Council of Law Reporting for England and Wales

section 32(1)(c) of the Limitation Act 1980. Section 107 of the Finance Act    A
2007 (if lawful) produced the result in respect of the BAT claims that the
2004 Act had already produced in respect of the Aegis claim, that is to say,
retrospectively and without warning, reducing the limitation period which
had until then been available. *Marks & Spencer plc v Customs and Excise
Comrs* (Case C-62/00) [2003] QB 866 held that a member state was entitled
to curtail limitation periods for claims seeking repayment of taxes levied
contrary to EU law (providing the new limitation period was reasonable and    B
applied even-handedly to domestic and EU law claims) but that the
principles of effectiveness and the protection of legitimate expectations
prevent the curtailed limitation period from being introduced retrospectively
and without giving a transitional period within which claims could still be
brought under the old rules: see *Grundig Italiana SpA v Ministero delle
Finanze* (Case C-255/00) [2003] All ER (EC) 176. It follows that sections    C
320 and 107 both contravene EU law.    Section 302 contravenes the
principles of effectiveness and/or legal certainty and the protection of
legitimate expectations.   Section 107 breaches not only the principle of
effectiveness and the protection of legitimate expectations but the rule of law
itself.   The test claimants accordingly have valid claims for compensation
based on the principles set out in *Amministrazione delle Finanze dello Stato
v SpA San Giorgio* (Case C-199/82) [1983] ECR 3595 ("*San Giorgio*").    D

Whether or not the cause of action for restitution of tax unlawfully
demanded under the principle established by the House of Lords in
*Woolwich Equitable Building Society v Inland Revenue Comrs* [1993]
AC 70 provides a remedy under English law for *San Giorgio* claims, EU law
also requires a repayment remedy where tax was not unlawfully exacted but
paid under a mistake: see *Reemtsma Cigarettenfabriken GmbH v Ministero*    E
*delle Finanze* (Case C-35/05) [2007] ECR I-2425 and *Danfoss AS v
Skatteministeriet* (Case C-94/10) 20 October 2011.

The Court of Appeal wrongly sought to identify which domestic
remedy—a *Woolwich* claim or a mistake of law claim—gave effect to the
right to repayment under EU law but the Court of Justice of the European
Union recognises that domestic remedies giving effect to the right to
repayment of overpaid taxes may take a variety of forms: see    F
*Amministrazione delle Finanze dello Stato v Sas Mediterraneo
Importazione, Rappesentanze, Esportazione, Commercio (MIRECO)* (Case
826/79) [1980] ECR 2559. There is no obligation under EU law to find a
single domestic remedy corresponding to the *San Giorgio* right. Rather, all
the national remedies taken as a whole need to provide adequate legal
protection of EU rights: see *Unibet (London) Ltd v Justitiekanslern* (Case    G
C-432/05) [2008] All ER (EC) 453.   EU law does not single out particular
domestic causes of action for protection but allows litigants vindicating their
EU law rights to choose from the range of domestic remedies available: see
*Rewe-Handelsgesellschaft Nord mbH v Haupzollamt Kiel* (Case 158/80)
[1981] ECR 1805 and *Metallgesellschaft Ltd v Inland Revenue Comrs*
(Joined Cases C-397/98 and C-410/98) [2001] Ch 620. It follows that the
mistake of law claim recognised by the House of Lords in *Deutsche Morgan*    H
*Grenfell Group plc v Inland Revenue Comrs* [2007] 1 AC 558 is also
necessary to give an effective *San Giorgio* remedy. By making the mistake of
law claims, the claimants, like the taxpayer in *Deutsche Morgan Grenfell*,
were seeking to vindicate their rights in a situation falling within the scope of

© 2012 The Incorporated Council of Law Reporting for England and Wales

A  article 49 TFEU and were entitled to claim the protection of all of the relevant general principles of EU law.

A taxpayer who has paid too much tax because of a mistake of law has a cause of action at common law entitling him to recover the overpayment: see *Eagerpath Ltd v Edwards* [2001] STC 26. This right remains notwithstanding section 33 of the Taxes Management Act 1970. The

B  question is whether the statutory scheme supersedes and displaces the common law rights and remedies: see the *Deutsche Morgan Grenfell* case [2007] 1 AC 558, para 135 and *Revenue and Customs Comrs v Total Network SL* [2008] AC 1174, para 130. When Parliament enacts a special regime providing special rights and remedies, that regime may (but does not always) supersede and displace common law rights and remedies (or more general statutory rights and remedies). Whether it has that effect is a question

C  of statutory construction. The Court of Appeal misapplied *Marleasing SA v La Comercial Internacional de Alimentación SA* (Case C-106/89) [1990] ECR I-4135 so as effectively to excise the proviso in section 33(2) excluding relief where the erroneous or mistaken return had been "in accordance with practice generally prevailing at the time", with the result that the common law restitutionary claims (whether based upon a mistake of law claim or a

D  *Woolwich* claim) were not competent and the test claimants had to bring such claims under the ("Marleased") section 33. The principle laid down by the Court of Justice in the *Marleasing* case is that a member state must give effect to the requirements of EU law. In the present context the test claimants had sought to vindicate their EU rights as to freedom of establishment and freedom of movement of capital and payments by issuing proceedings in the High Court—proceedings which would, if successful, effectively vindicate

E  their EU rights. There is accordingly no need to try to re-work section 33, which on its face is incapable of vindicating those rights, in order to enable the test claimants to do so. It follows that "Marleasing" section 33 neither serves any relevant purpose nor ensures the fulfilment of the United Kingdom's obligation to protect the test claimants' EU law rights. Rather it deprives them of their ability to vindicate their EU law rights which, in the

F  absence of a "Marleased" section 33, could readily be vindicated by the proceedings brought in the High Court. The Court of Appeal erred in its belief that its conforming interpretation did not "go against the grain of the legislation" (see *Ghaidan v Godin-Mendoza* [2004] 2 AC 557, para 121) since it is a cardinal feature of section 33—and predecessor legislation dating back to 1923—that no redress is to be available for tax paid, albeit mistakenly, "in accordance with the practice generally prevailing at the time

G  of payment". There is nothing in *Autologic Holdings plc v Inland Revenue Comrs* [2006] 1 AC 118 which deprives that "practice generally prevailing" exclusion of its nature as a fundamental feature of section 33. Thus section 33 has no relevance to any of the claimants' claims.

*Rabinowitz QC* following.

Under domestic law the cause of action for restitution of tax unlawfully
H  demanded under the principle established by the House of Lords in *Woolwich Equitable Building Society v Inland Revenue Comrs* [1993] AC 70 does not provide the claimants with a sufficient remedy.

The *Woolwich* principle falls within the ambit of section 32(1)(c) of the Limitation Act 1980 and so is caught by sections 320 of the Finance Act

© 2012 The Incorporated Council of Law Reporting for England and Wales

2004 and 107 of the Finance Act 2007. The provision in section 32(1)(c) for    A
the extension of the limitation period where the action "is for relief from the
consequences of a mistake" contains no words limiting its application to
cases where the mistake was an essential element in the claimant's cause of
action, as opposed to it being a material factual cause leading to an outcome
from which the claimant, by his action, sought relief. Had Parliament
intended that section 32(1)(c) should require that the mistake be an essential    B
element in the claimant's cause of action it would have used the same, or
similar, words as those found in section 32(1)(a), where such a meaning was
intended. Section 32(1)(c) should be available whether or not the mistake is
an essential ingredient in the cause of action, provided only that the action is
indeed one for relief from the consequences of a mistake. *Phillips-Higgins v
Harper* [1954] 1 QB 411, a case where the relief sought was damages and
not restitution, is insufficient authority to the contrary. *Kleinwort Benson*    C
*Ltd v Lincoln City Council* [1999] 2 AC 349, 388 does not amount to an
endorsement of the *Phillips-Higgins* case. [Reference was also made to
*Franks, Limitation of Actions* (1959), p 206 and *Goff & Jones, The Law of
Restitution*, 7th ed (2007), para 43-005.]

In any event, the claimants cannot rely on the *Woolwich* principle since a
prerequisite of that remedy is a demand for the tax in question. The majority    D
judgments in *Woolwich* all proceeded on the basis that the claimant would
need to establish that the payment had been consequent upon an ultra vires
demand [1993] AC 70, 171–172, 174, 177, 196–198, 199–205. Where the
phrase "exaction of tax" is used, that is no more than a shorthand way of
describing tax which was paid pursuant to an unlawful demand. The
existence of the "demand" element in the *Woolwich* claim has been
consistently recognised in a number of House of Lords and Court of Appeal    E
decisions: *Deutsche Morgan Grenfell Group plc v Inland Revenue Comrs*
[2006] Ch 243, paras 194–200, 206–209, 261, 270–273; [2007] 1 AC 558,
paras 7, 17, 37, 47–48, 83, 121; *Sempra Metals Ltd (formerly
Metallgesellschaft Ltd) v Inland Revenue Comrs* [2008] AC 561, paras 19,
70; *British Steel plc v Customs and Excise Comrs* [1997] 2 All ER 366,
374–378, 382–383 and *NEC Semi-Conductors Ltd v Inland Revenue Comrs*    F
[2006] STC 606, paras 84, 89, 140–147, 162.

Even on the Court of Appeal's reformulation—leaving out the demand
element and requiring only an "unlawful" exaction of tax—the *Woolwich*
remedy may not provide a remedy for the claimants in so far as their claims
related to tax which was lawfully payable but in respect of which their
mistake was as to the existence of tax credits which could have been applied
to set off that lawful tax liability. Thus *Woolwich* does not provide the test    G
claimants with an effective basis by which they are able to vindicate their *San
Giorgio* rights. [Reference was made to *Vodafone 2 v Revenue and Customs
Comrs* [2010] Ch 77, para 56.]

*David Ewart QC*, *Rupert Baldry QC*, *Andrew Burrows QC*, *Kelyn
Bacon* and *Sarah Ford* (instructed by *Solicitor to the Revenue & Customs
Comrs*) for the Crown.    H

At all material times the test claimants have had an effective remedy to
recover both mainstream corporation tax ("MCT") and advance
corporation tax ("ACT") which have been unlawfully levied in breach of
EU law. In relation to MCT, that remedy was provided by section 33 of the

© 2012 The Incorporated Council of Law Reporting for England and Wales

A   Taxes Management Act 1970 and its successor and, as regards ACT, by the *Woolwich* cause of action: *Woolwich Equitable Building Society v Inland Revenue Comrs* [1993] AC 70. Those remedies have not been curtailed in any way, and they satisfy the requirements laid down by EU law. EU law does not require the UK to maintain any other remedies which happen to exist from time to time in domestic law. Such alternative domestic remedies, for example, restitution for mistake of law, are not rights conferred by, or

B   derived from, EU law.

The *Woolwich* principle does not fall within section 32(1)(c) of the Limitation Act 1980. The correct reading of section 32(1)(c) is that the mistake must be an essential element of, or ingredient in, the cause of action (or claim). This is supported by authority (see *In re Diplock, Diplock v Wintle* [1948] Ch 465 and *Europcar UK Ltd v Revenue and Customs Comrs*

C   [2008] STC 2751) and by the statutory history (including paragraphs 13–23 of the Law Review Committee's Fifth Interim Report (Statutes of Limitation) (1936) (Cmd 5334)) and is a natural construction of the words used. *Phillips-Higgins v Harper* [1954] 1 QB 411 was correctly decided.

There is no authority laying down that *Woolwich* requires a (formal) demand. The fact that the language of a demand has been used in a case does not represent a decision that a demand is necessary. On the facts of

D   *Woolwich* there was no (formal) demand in the sense of an assessment raised by the revenue [1993] AC 70, 104–105, 163. The method by which the tax was exacted in the *Woolwich* case was indistinguishable from the way in which ACT was exacted in the present cases. The Court of Appeal's reasoning [2010] STC 1251, paras 158, 173 is correct: *Woolwich* applies to any case where tax has been unlawfully exacted from a person by virtue of a

E   legislative requirement, including compulsory self-assessment. The underlying principle is that the revenue should repay tax which has been exacted without legal justification. There is no reason why the cause of action should be confined to those taxes which are payable on demand as against those, such as VAT, which are payable without a demand. The citizen who duly accounts for and pays, by way of example, VAT, without

F   waiting for a demand, on the assumption that the applicable legislation is valid, should not be disadvantaged as against the taxpayer who refuses to account or to pay until a peremptory demand is received. Because a demand is not required, restitution under the cause of action in the *Woolwich* case is sufficient for the *San Giorgio* requirement of repayment.

The application of sections 320 of the Finance Act 2004 and 107 of the Finance Act 2007 to the test claimants' causes of action for repayment of

G   moneys paid under a mistake of law is not precluded by EU law. *Reemtsma Cigarettenfabriken GmbH v Ministero delle Finanze* (Case C-35/05) [2007] ECR I-2425—a case dealing with the rights derived from the EU VAT system, not the rights which individuals might acquire pursuant to the national direct tax system—was not purporting to set out any general EU right of repayment of tax paid under a mistake. There is no such right. EU law merely requires that the test claimants be provided with an effective

H   remedy for their EU law rights. That requirement is satisfied by section 33 of the 1970 Act (in the case of MCT) and the *Woolwich* cause of action (in the case of ACT). Provided such an effective remedy is provided, EU law has nothing further to say as to whether, or the extent to which, other alternative domestic remedies are provided, curtailed or eliminated in their entirety.

© 2012 The Incorporated Council of Law Reporting for England and Wales

The Court of Appeal did not purport to identify which domestic    *A*
remedy—*Woolwich* or mistake of law—gives effect to the right to
repayment under EU law but merely ascertained that domestic law provides
an effective repayment remedy for tax levied in breach of EU law. This does
not entail the identification and protection of one remedy over another but
merely entails an inquiry as to whether there exists a remedy which satisfies
the principle of effectiveness.
                                                                  *B*
Claimants who allege a breach of EU law must rely upon the remedies and
procedures laid down by the domestic law of the member state in question.
A member state must provide a claimant with a remedy to recover tax which
has been unlawfully levied and any domestic procedural rules must not
render it excessively difficult to exercise the rights conferred by EU law.
However, in the interests of legal certainty, it is compatible with EU law to
lay down reasonable time limits for bringing proceedings and a national       *C*
limitation period of three years from the date of the contested payment is
reasonable: see *Marks & Spencer plc v Customs and Excise Comrs* (Case
C-62/00) [2003] QB 866, para 35. This is so even if the application of the
limitation period results in the dismissal of the action in whole or in part: see
*Haahr Petroleum Ltd v Åbenrå Havn* (Case C-90/94) [1997] ECR I-4085.

EU law will only create a new remedy if it is apparent from the overall      *D*
scheme of the national legal system in question that no effective remedy exists:
see *Unibet (London) Ltd v Justitiekanslern* (Case C-432/05) [2008] All
ER (EC) 453, paras 40–41. The *Unibet* case does not require that all the
national remedies, taken as a whole, provide adequate legal protection of
EU rights, but rather demonstrates that EU law requires only an effective
remedy, and that shortcomings in other available domestic remedies will
be immaterial so long as a single effective remedy is available: see the      *E*
Advocate General's opinion in *Weber's Wine World Handels-GmbH v
Abgabenberufungskommission Wien* (Case C-147/01) [2003] ECR I-11365,
paras 68–69. *Rewe-Handelsgellschaft Nord mbH v Haupzollamt Kiel* (Case
158/80) [1981] ECR 1805 is not authority for the proposition that litigants are
free to choose from the range of domestic remedies available. Read in context,
the court is merely pointing out that the Treaty did not intend to create new
national remedies for the purposes of vindicating EU law rights, since the full  *F*
range of domestic remedies will be available for that purpose, and on the same
conditions as apply for purely domestic claims. The court is not saying that a
member state must protect and preserve all available domestic remedies
because they might be utilised by claimants for the purposes of vindicating
their EU law rights. The general principles of EU law such as proportionality
and legal certainty protect the substantive rights conferred by EU law but not  *G*
cover purely domestic procedural rules such as alternative remedies.

The reasoning of Henderson J in *Test Claimants in the Thin Cap Group
Litigation v Revenue and Customs Comrs* [2010] STC 301 that EU law
requires the full range of domestic remedies to be made available and not to
be curtailed without due notice is without foundation. The sole EU law
obligation is to provide an effective remedy.
                                                                  *H*
The test claimants' mistake claim relates to a remedy in English law
which is not as a result of an union obligation: see *Wyatt & Dashwood's
European Union Law*, 6th ed (2011), pp 321–322, 330. Even if that is
wrong, the principles of effectiveness and protection of legitimate
expectations do not apply here. The reasons why those principles were

© 2012 The Incorporated Council of Law Reporting for England and Wales

A   infringed in the *Marks & Spencer* case were that the claimant had a single
statutory remedy for the recovery of overpaid VAT and changes had been
made to a long-standing statutory remedy for recovery of overpaid
VAT which had always been understood to have a limitation period of six
years and in respect of which the principles of legal certainty and legitimate
expectations clearly applied.  By contrast, sections 320 of the 2004 Act and

B   107 of the 2007 Act were a legislative response to the wide-ranging
consequences of an unpredictable judicial development of the law in
*Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 AC 349 and
*Deutsche Morgan Grenfell Group plc v Inland Revenue Comrs* [2007]
1 AC 558. Concepts of legal certainty and legitimate expectations have little
purchase in such circumstances.

Nor do sections 320 and 107 deprive the taxpayer of a right to repayment
C   which is effective.  At all material times the taxpayer had and retains an
effective right of repayment by virtue of section 33 of the 1970 Act or the
*Woolwich* remedy as appropriate.  Accordingly, there was no obstacle as a
matter of EU law to the imposition of a retrospective limitation period in
respect of the additional mistake remedy.  The absence of a transitional
period does not curtail in any way the effectiveness of the remedies provided
by section 33 or *Woolwich*, which wholly satisfy the United Kingdom's
D   obligations in respect of such a remedy.

Where section 33 of the Taxes Management Act 1970 is applicable, it
ousts or removes or abrogates any possible common law remedy which might
otherwise exist.  A claimant who has paid MCT levied contrary to the rules of
EU law is entitled in principle to be repaid that tax but such repayment
remedy is governed by the rules of domestic law, subject only to satisfying the
E   principles of equivalence and effectiveness.  Under domestic law the remedy
for obtaining repayment of excessive tax charged under an assessment due to
an error or mistake in a tax return is in section 33.  The consequence under
domestic law of section 33 applying to the test claimants' overpayments of
MCT is that their parallel common law claims for restitution of the tax are
excluded.  Where it applies section 33 is intended by Parliament to be the
exclusive remedy available under domestic law to obtain repayment of tax
F   overpaid under that regime: *Monro v Revenue and Customs Comrs* [2009]
Ch 69. Section 33 satisfies the principle of equivalence.  A taxpayer who has
overpaid tax because of an error based on EU law is in no less a favourable
position than a taxpayer whose error is based on domestic law.  It also
satisfies the principle of effectiveness by providing a straightforward
procedure under which a taxpayer who has overpaid assessed tax which was
G   not due under EU law can obtain repayment in full.

The Court of Appeal was correct to apply the well-established approach
to construction laid down in *Marleasing SA v La Comercial Internacional de
Alimentación SA* (Case C-106/89) [1990] ECR I-4135 to read the
section 33(2) proviso subject to the limitation that it applies only to the
extent that it is consistent with the United Kingdom's Treaty obligations.
Such construction lies well within scope of the domestic court's powers to
H   construe domestic legislation so that it is compatible with EU law provided it
does not go against "the grain of the legislation": see *Ghaidan v Godin-
Mendoza* [2004] 2 AC 557, para 121.  Section 33 is intended to be the sole
statutory relief which taxpayers should use for obtaining repayment of
assessed tax.  The courts should give effect to the provisions of that section as

© 2012 The Incorporated Council of Law Reporting for England and Wales

far as it is possible to do so, consistently with the taxpayer's directly effective    A
EU law rights. Reading down a limitation which might infringe those rights,
so ensuring that full effect is given to the relief, cannot conceivably be
described as going against the grain. The grain of this provision is to grant
people the right to recover tax which has been overpaid.

*Aaronson QC* in reply.

*Marks & Spencer plc v Customs and Excise Comrs* (Case C-62/00) [2003]    B
QB 866 squarely covers this case. It is not confined to VAT: see paras 34 and 36
and *Grundig Italiana SpA v Ministero delle Finanze* (Case C-255/00) [2003]
All ER (EC) 176. Nor is it confined to taxes which derive their authority for
collection from a Community instrument: it applies generally. The principles
set out in the *Marks & Spencer* case [2003] QB 866 apply to all remedies under
the domestic law. Every type of action provided for by national law should be    C
made available to individuals seeking to enforce their Community rights: see
Barav, "The Effectiveness of Judicial Protection and the Role of the National
Courts" in *Judicial Protection of Rights in the Community Legal Order* (ed
Bruylant) (1997), pp 259–260. The Community law principle of effectiveness
requires that although national remedies can be removed—provided what is
left is a sufficiently effective remedy—the method of removal has to be part of
due process. Whilst it might have been open to the United Kingdom,    D
consistently with the principle of effectiveness, to have made only one remedy
available to enable a claimant to claim repayment of overpaid taxes, that does
not justify treating any further remedy which is provided by English law and
available for the same purpose as wholly outside the scope of application of
EU law principles which would otherwise apply to it.

The right of claimants to choose which of the remedies available in    E
national law to proceed with in seeking to vindicate their EU law rights (see
*Deutsche Morgan Grenfell Group plc v Inland Revenue Comrs* [2007]
1 AC 558, paras 43, 51, 132, 136–137, 141) is a right which is endorsed by
European law: see *Metallgesellschaft Ltd v Inland Revenue Comrs* (Joined
Cases C-397/98 and C-410/98) [2001] Ch 620, para 81 and *Test Claimants
in the FII Group Litigation v Inland Revenue Comrs* (Case C-446/04) (Note)
[2012] 2 AC 436, para 201.    F

The revenue are wrong to seek to distinguish *Reemtsma
Cigarettenfabriken GmbH v Ministero delle Finanze* (Case C-35/05) [2007]
ECR I-2425 on the ground that it is a VAT case. VAT law cases in
Community law consistently refer to non-VAT cases and vice-versa.

Although the test claimants rely principally on the principle of
effectiveness, the subsidiary claim under the principle of legitimate    G
expectation cannot be dismissed as inapplicable as relating to a legislative
response to an unpredictable judicial development. The facts show the
existence of legitimate expectations—arising from case law from 2000
onwards—that these claims would be permitted to continue. European
Union law respects the declaratory theory of judgments. The case law all
pointed in one direction, apart from the Court of Appeal judgment in
*Deutsche Morgan Grenfell Group plc v Inland Revenue Comrs* [2006] Ch    H
243, subsequently reversed by the House of Lords [2007] 1 AC 558. That
one bump in the road should not deprive the test claimants of their
legitimate expectations: see *Wyatt & Dashwood's European Union Law*,
6th ed (2011), pp 328–329, 331.

© 2012 The Incorporated Council of Law Reporting for England and Wales

351

A   Section 33 of the Taxes Management Act 1970 contains no explicit ouster
of common law rules. *Monro v Revenue and Customs Comrs* [2009] Ch 69,
para 34 states in terms that different considerations may arise where
European Union law applies.

   *Rabinowitz QC* following.

B   The revenue, in seeking a narrow interpretation of section 32(1)(c) of the
Limitation Act 1980, does not dispute that the equitable rule on which it is
based is applied regardless of whether the mistake which gave rise to the
consequence from which the action sought relief was an essential part of the
cause of action: see *Brooksbank v Smith* (1836) 2 Y & C Ex 58 and *Denys v
Shuckburgh* (1840) 4 Y & C Ex 42. Consequently the better view is that the
Law Review Committee's Fifth Interim Report's reference to "cases where
relief is sought from the consequences of mistake" (paragraph 23) should be

C   followed by "(Where mistake is not an essential part of the claim because we
know that's what the equitable rule is)".

   The relevance of the section 32(1) argument is that if a *Woolwich* claim
could rely on section 32(1)(c) it would follow that sections 320 of the 2004
Act and 107 of the 2007 Act were as obnoxious in effect in relation to that
claim as they would have been in relation to a mistake claim and there would

D   be no remedy unaffected by sections 320 and 107. The revenue have no
answer to that.

   The court took time for consideration.

   23 May 2012. The following judgments were handed down.

E   **LORD HOPE OF CRAIGHEAD DPSC**
   1   Very substantial judgments have been prepared in this case by Lord
Walker of Gestingthorpe, Lord Reed and Lord Sumption JJSC, to each of
which I pay tribute. I wish in this short introduction to do two things. First,
I shall say a bit about the background, to assist the reader in understanding
at the outset what the issues are and to provide a guide to the passages in
those judgments where they are dealt with. Second, I shall indicate briefly

F   what my opinion is on each of them. I will however have to say a bit more
about the one issue on which the court is divided: the *DMG* (*Deutsche
Morgan Grenfell Group plc v Inland Revenue Comrs* [2007] 1 AC 558)
remedy/section 320 issue: see para 11, below. As it raises a question of
EU law and the division of opinion shows that the answer to it is not acte
clair, it is plain that it will need to be the subject of a reference to the Court of

G   Justice for a preliminary ruling under article 267FEU.

   *The proceedings*

   2   As Henderson J explained at the outset of his judgment [2009]
STC 254, para 1, the Franked Investment Income ("FII") Group Litigation
with which these proceedings are concerned was established by a group
litigation order on 8 October 2003. The test claimants are all companies

H   which belong to groups which have UK-resident parents and also have
foreign subsidiaries, both in the European Union and elsewhere. In the
broadest terms, the purpose of the litigation was to determine various
questions of law arising from the tax treatment of dividends received by UK-
resident companies from non-resident subsidiaries, as compared with the

© 2012 The Incorporated Council of Law Reporting for England and Wales

treatment of dividends paid and received within wholly UK-resident groups     *A*
of companies. The provisions giving rise to these questions related to the
system of advance corporation tax ("ACT") and to the taxation of dividend
income from non-resident sources under section 18 (Schedule D, Case V) of
the Income and Corporation Taxes Act 1988 ("the ICTA") ("the
DV provisions"). The relevant provisions of the ICTA have since been
amended, ACT was abolished for distributions made on or after 5 April     *B*
1999 and the DV provisions were repealed for dividend income received on
or after 1 April 2009. But the problems created by their existence in the past
have not gone away.

3 The test claimants' case is that the differences between their tax
treatment and that of wholly UK-resident groups of companies breached
article 43EC (freedom of establishment) and article 56EC (free movement of
capital) of the EC Treaty (now articles 49FEU and 63FEU of the Treaty on     *C*
the Functioning of the European Union) and their predecessor articles, and
that these breaches have caused them loss dating back, at least in some cases,
to the accession of the UK to the European Economic Community signed at
Brussels on 22 January 1972 and the introduction of ACT in April 1973.
Their arguments are directed in part to issues of domestic law. But they are
also directed to the extensive case law resulting from the application by the     *D*
Court of Justice of the European Communities and, since the coming into
force of the Lisbon Treaty, the Court of Justice of the European Union of
principles of Community law to domestic tax systems, including an earlier
reference in this case: *Test Claimants in the FII Group Litigation v Inland
Revenue Comrs* (Case C-446/04) (Note) [2012] 2 AC 436. They raise
difficult issues, and very large amounts of money are at stake. Henderson J     *E*
was told that the maximum amount of the claims advanced in the FII Group
Litigation was of the order of £5 billion.

4 The issues with which Henderson J had to deal were grouped by him
under four headings: see [2009] STC 254, para 7. These were (1) the
lawfulness of the UK rules imposing corporation tax on dividends received
by UK parent companies from subsidiaries resident in other EU member
states and, in some contexts, from subsidiaries in third countries, (2) the     *F*
lawfulness of UK rules charging ACT on the onward distribution by UK-
resident companies of dividend income received from such subsidiaries,
(3) the lawfulness of rules applicable to dividends payable out of
distributable foreign profits which permitted an election to be made to treat
such income as foreign income dividends ("FIDs") and (4) a number of
fundamental questions relating to remedies.     *G*

5 He held that it followed from the judgment of the Court of Justice
("ECJ") under the earlier reference that the UK rules on corporation tax on
overseas dividends were not compatible with Community law as regards
dividends from subsidiaries resident in other member states, and that the
UK legislative scheme as regards FIDs also breached Community law.
A further reference was however required in relation to two of the issues
relating to liability: paras 138, 197. As for the issues relating to remedies, it     *H*
was common ground that two types of restitutionary remedies are available
in domestic law: a claim for restitution of tax unlawfully demanded under
the principle established in *Woolwich Equitable Building Society v Inland
Revenue Comrs* [1993] AC 70 ("*Woolwich*"), and the claim for tax wrongly

© 2012 The Incorporated Council of Law Reporting for England and Wales

353
[2012] 2 AC     FII Group Test Claimants v Revenue and Customs Comrs (SC(E))
Lord Hope of Craighead DPSC

A  paid under a mistake which was recognised in *Deutsche Morgan Grenfell Group plc v Inland Revenue Comrs* [2007] 1 AC 558 ("*DMG*").

6 Henderson J held that, under the principle laid down in *Amministrazione delle Finanze dello Stato v SpA San Giorgio* (Case 199/82) [1983] ECR 3595 ("*San Giorgio*"), EU law required there to be an effective remedy for moneys paid in respect of the tax that was unlawfully charged.

B  The test claims were properly to be classified in English law as claims in restitution based on a mistake of law. The *Woolwich* cause of action (which is now time-barred), for which mistake was not a necessary ingredient, was likely to play a subsidiary role in such cases: para 260. It was not open to the revenue to rely on section 320 of the Finance Act 2004 ("section 320 FA 2004") or section 107 of the Finance Act 2007 ("section 107 FA 2007") to exclude *DMG* mistake claims, as these provisions purported to curtail

C  extended limitation period under section 32(1)(c) of the Limitation Act 1980 without notice and without providing any transitional arrangements to protect the right under Community law. But the test claimants had failed to establish any sufficiently serious breach to entitle them to damages.

7 The case then proceeded to the Court of Appeal (Arden, Stanley Burnton, Etherton LJJ) [2010] STC 1251. The various issues were made the subject of an agreed list which the court amended and to which it gave

D  numbers. They were identified in an index at the beginning of the judgment, to which reference may be made. Issues 1 to 10 related to liability. Issues 11 to 23 were concerned with remedy. The Court of Appeal was divided as to the meaning of para 54 of the judgment of the ECJ with respect to one of the test claimants' submissions on liability, so it held that a reference should be made on that issue. On all but one of the other issues relating to liability it

E  agreed with the judge. On four issues relating to remedy the appeal by the revenue was allowed. Differing from the judge, it held that the *Woolwich* restitution remedy was a sufficient remedy as EU law does not require that there must also be a remedy based on mistake (issue 12); that the *Woolwich* restitution remedy met the requirements of EU law and was not affected by sections 320 FA 2004 and 107 FA 2007 (issues 20 and 21); and that

F  section 33(2A) of the Taxes Management Act 1970 ("TMA") (issue 23), which excludes relief under that section where Case V corporation tax has been paid under a mistake, applied to an assessment based on a provision that infringed Community law as a conforming interpretation could be given to it. Issue 22, as to whether section 32(1)(c) of the Limitation Act 1980 applied to a *Woolwich* claim, was not argued before the judge. But it was argued before the Court of Appeal, which held that it could not be given that

G  wider meaning.

8 Applications for permission to appeal to the Supreme Court were lodged by both parties. On 8 November 2010 the panel refused permission on the issue as to which the Court of Appeal decided that there should be a reference, and it remitted another issue relating to liability to the management judge to frame a reference on that point also. The time limit for making an application for permission on a number of other issues,

H  including issue 22, was extended until the references had been determined by the ECJ and its rulings applied by the Court of Appeal. But permission to appeal was given on four issues relating to remedy: issues 12, 20, 21 and 23. Shortly before the hearing of the appeal permission was given to the claimants for issue 22 to be argued also.

© 2012 The Incorporated Council of Law Reporting for England and Wales

*The issues*                                                              A

9  The parties are agreed that the issues in the appeal are best expressed
as follows:

"(1) Could Parliament lawfully curtail without notice the extended
limitation period under section 32(1)(c) of the Limitation Act 1980 for
the mistake cause of action (section 320 FA 2004) and cancel claims made
using that cause of action for the extended period (section 107 FA 2007)?    B
In particular: (a) would a *Woolwich* restitution remedy be a sufficient
remedy for the repayment claims brought on the basis of EU law (Court of
Appeal issue 12)? and (b) whether or not a *Woolwich* restitution remedy
would be a sufficient remedy, does EU law protect the claims which were
made in mistake; and, specifically, did the curtailment without notice of
the extended limitation period for mistake claims (section 320 FA 2004)    C
and the cancellation of such claims in respect of the extended period
(section 107 FA 2007) infringe the EU law principles of effectiveness,
legal certainty, legitimate expectations and rule of law (Court of Appeal
issues 20 and 21)?

"(2) Are the restitution and damages remedies sought by the test
claimants in respect of corporation tax paid under section 18    D
(Schedule D, Case V) of the ICTA 1988 excluded by virtue of the statutory
provisions for recovery of overpaid tax in section 33 of the Taxes
Management Act 1970 (Court of Appeal issue 23)?"

To that there must be added the following: "(3) Does section 32(1)(c) of the
Limitation Act 1980 apply to a claim for a *Woolwich* restitution remedy
(Court of Appeal issue 22)?" As Lord Walker explains in para 35 below, a    E
further issue became apparent as the parties' submissions on issues 12, 20
and 21 have developed which can be expressed as follows: "(4) Does the
*Woolwich* restitution remedy apply only to tax that is demanded by the
revenue, and not to tax such as ACT which is payable on a return; and, if so,
what amounts to a demand?"

10  In the judgments that follow: (a) Issue (4), above, the question    F
whether a *Woolwich* claim arises only where a demand has been made by
the revenue, is dealt with by Lord Walker in paras 64–83 and by Lord
Sumption in paras 171–174. (b) Issue (3), above (Court of Appeal issue
22), as to whether section 32(1)(c) of the Limitation Act 1980 should be
widely construed so as to give a *Woolwich* restitution remedy the benefit
of the extended limitation period, is dealt with by Lord Walker in
paras 42–63 and by Lord Sumption in paras 177–185. (c) Issue (2),    G
above (Court of Appeal issue 23), as to whether section 33 of the
TMA is incompatible with EU law because it excludes the test claimants'
right of action at common law, is dealt with by Lord Walker in
paras 116–119 and by Lord Sumption in paras 204–205. I agree, for all
the reasons they give, that each of these three distinct issues should be
answered in the negative. I would uphold the judgment of the Court of    H
Appeal on issues (3) and (4) and, because it should not be read as
excluding rights of action for the recovery of tax charged contrary to
EU law, I would allow the appeal on issue (2) as to the meaning of
section 33 of the TMA.

© 2012 The Incorporated Council of Law Reporting for England and Wales

355
[2012] 2 AC         FII Group Test Claimants v Revenue and Customs Comrs (SC(E))
Lord Hope of Craighead DPSC

A  *The DMG remedy/section 320 issue*

11  The remaining issue (issue (1), above) is an issue of EU law. The background is provided by the ruling of the Grand Chamber that it is for the domestic legal systems of each member state to lay down the detailed procedural rules governing actions for safeguarding rights which individuals derive from Community law, and that the national courts and tribunals

B  before which claims are brought are obliged to ensure that individuals should have an effective legal remedy enabling them to obtain reimbursement of the tax unlawfully levied by a member state or withheld by it directly against that tax: *Test Claimants in the FII Group Litigation v Inland Revenue Comrs* (Case C-446/04) (Note) [2012] 2 AC 436, paras 202–203.

C  12  It follows from the answers given to issues (3) and (4) that this issue must be approached on the basis that a *Woolwich* claim would have been available had it been brought in time. But it has been excluded by the expiry of the limitation period. The test claimants are left therefore with their *DMG* mistake claim. It has the benefit of the extended limitation period, but the revenue say that it has been excluded by section 320 FA 2004 and section 107 FA 2007.

D  13  As Lord Walker explains in para 38, the question is whether EU law requires only that the member state must make available an adequate remedy which meets the principles of effectiveness and equivalence, or whether it requires every remedy recognised in domestic law to be available so that the taxpayer may obtain the benefit of any special advantages that this may offer on the question of limitation. The position in domestic law is not now in doubt. In *DMG* it was held that the taxpayer was entitled to take

E  advantage of the remedy which was most advantageous to him. The fact that a *Woolwich* claim was not available because it was subject to a shorter limitation period did not prevent him from pursuing his mistake claim if his interests were best suited by doing so.

14  This issue can be broken down into three questions. (1) Would *Woolwich* on its own provide a remedy for the test claimants' *San Giorgio*

F  claims which satisfies the requirements of the EU principles of effectiveness and equivalence? (2) Were those principles, and the principle which protects legitimate expectations, infringed by section 320 FA 2004, which curtailed without notice the extended limitation period for mistake claims? (3) Were these principles infringed by the retrospective cancellation of such claims by section 107 FA 2007 in respect of the extended period?

15  Lord Walker and Lord Sumption are agreed that section 107

G  FA 2007 was contrary to EU law, although they do not reach that conclusion by the same route. This is because they disagree on the primary issue as to whether *Woolwich* on its own was sufficient to meet the requirements of effectiveness and equivalence. Having reached the view that it was not, Lord Walker holds that section 320 FA 2004 was not compatible with EU law as it infringed those principles and maybe that it infringed the principle of legitimate expectations too: para 114–115. Lord Sumption disagrees. He

H  holds that the *Woolwich* remedy on its own with a normal limitation period was an effective way of asserting the test claimants' EU right, that there was no obligation on the UK to maintain a concurrent right and that, for this reason and because the test claimants could not have had a legitimate expectation that they would have the benefit of the extended limitation

© 2012 The Incorporated Council of Law Reporting for England and Wales

356
FII Group Test Claimants v Revenue and Customs Comrs (SC(E))      [2012] 2 AC
Lord Hope of Craighead DPSC

period, section 320 FA 2004 was lawful: paras 198–202. But, because the      A
circumstances had changed and they had acquired a legitimate expectation
by 2006, it was contrary to that principle for that expectation to be defeated
by section 107 FA 2007. Like Lord Walker (see para 115), I agree with Lord
Sumption's reasoning in para 203 as to section 107 FA 2007.

16    On the primary issue however, like Lord Reed, I agree with Lord
Walker. I would take as my starting point the fact that in domestic law two      B
types of restitutionary remedies are available and that the taxpayer is
entitled to take advantage of the remedy that is most advantageous to him: a
claim for restitution of tax unlawfully demanded under the principle
established in *Woolwich*, and the claim for tax paid under a mistake of law
which was recognised in *DMG*. It is, of course, true that *DMG* had not yet
reached the House of Lords when section 320 FA 2004 was enacted. But the      C
common law rule that money which had been paid under a mistake of law
was not recoverable had already been rejected. It was rejected in Scotland in
*Morgan Guaranty Trust Co of New York v Lothian Regional Council*
1995 SC 151, for reasons that were special to Scots law, and in South Africa
in *Willis Faber Enthoven (Pty) Ltd v Receiver of Revenue* 1992 (4) SA 202.
But it had also been rejected by the common law in Canada: see the
dissenting opinion of Dickson J, with which Laskin CJ agreed, in *Hydro*
*Electric Commission of Township of Nepean v Ontario Hydro* [1982]      D
1 SCR 347, 357–370. Dickson J's opinion was adopted by La Forest J, with
whom Lamer, Wilson and L'Heureux-Dubé JJ agreed on this point, in *Air*
*Canada v British Columbia* [1989] 1 SCR 1161. The same result was
reached in Australia in *David Securities Pty Ltd v Commonwealth Bank of*
*Australia* (1992) 175 CLR 353. Then in *Kleinwort Benson Ltd v Lincoln*
*City Council* [1999] 2 AC 349 the House of Lords held that the rule could no      E
longer be maintained, and that it should be recognised that there was a
general right to recover money paid under a mistake, whether of fact or law.

17    It was contended for the Inland Revenue Commissioners in *DMG*
that the general right of recovery did not apply in the case of payments made
under a mistake of law to the revenue. But this topic had already been the
subject of comment by one of the most distinguished and influential scholars
on the law of restitution, the late Professor Peter Birks. He declared that,      F
unless displaced by statute, causes of action good against private citizens are
no less good against public bodies: see his essay (in the volume *Essays on*
*Restitution* (1990), edited by Professor P D Finn) entitled "Restitution from
the Executive: a Tercentenary Footnote to the Bill of Rights", at p 174. He
also made the point that, if in *Woolwich* the building society had made a
mistake of fact, it would undoubtedly have entitled the society to restitution      G
of the money it paid to the revenue in consequence of its mistake, just as it
plainly would have been had the transaction been with a private citizen. The
decision of Park J at first instance in *DMG* [2003] 4 All ER 645, in which he
upheld the taxpayer's claim for repayment of tax wrongly paid under a
mistake of law with an extended limitation period, should be seen against
this background.

18    As Henderson J observed [2009] STC 254, para 406, it was not      H
possible to predict with any confidence what the outcome would be of the
appeals in *DMG* that were to follow. But I think that it would be going too
far to say that Park J's judgment was bound ultimately to be set aside. The
fact that on 8 September 2003, less than two months after Park J's judgment

© 2012 The Incorporated Council of Law Reporting for England and Wales

A was delivered on 18 July 2003, the Paymaster General announced the introduction of what was to become section 320 FA 2004, and said that it was to affect proceedings issued on or after that date, suggests that the revenue had at least some expectation that it would not be successful in achieving that result. Like Lord Walker (see para 108), I think that the suggestion that the Court of Appeal's decision was just a "bump in the road" understates the strength of the arguments in support of its appeal. But

B I cannot agree with Lord Sumption (see paras 200–201) that it was unrealistic for there to have been a reasonable expectation by that date that the right of recovery on the ground of mistake with an extended limitation period would be upheld. My own view lies between these two extremes.

19  I share Lord Walker's view that it would have been helpful to have had the view of the judge on this issue: para 112. But I also think that in

C para 243 Lord Reed has identified the right way to look at it, which does not require anything more than we already know. One must ask oneself what the test claimants were entitled to expect when they made their claims based on mistake. There was no certainty at that time when section 320 FA 2004 was enacted that their claims based on mistake would succeed. But those claims were undoubtedly arguable, as the subsequent ruling by the House of Lords in *DMG* [2007] 1 AC 558 made clear. They were entitled to expect

D that the question whether their claims based on mistake were well founded would be decided by the courts, as there was a real issue to be tried. They were also entitled to expect, according to the principle of legal certainty, that this entitlement would not be removed from them by the state by the introduction without notice of a limitation period that was not fixed in advance: see *ACF Chemiefarma v Commission of the European*

E *Communities* (Case 41/69) [1970] ECR 661, para 19; *Marks & Spencer plc v Customs and Excise Comrs* (Case C-62/00) [2003] QB 866, para 39.

20  The crucial question, however, is whether the retrospective application of that limitation period to claims based on mistake was in conformity with the principles of equivalence and effectiveness, as explained by the Grand Chamber in its judgment in these proceedings: *Test Claimants in the FII Group Litigation v Inland Revenue Comrs* (Case C-446/04) (Note)

F [2012] 2 AC 436, para 203. I accept, of course, that the *Woolwich* remedy on its own was an effective way of vindicating the *San Giorgio* right. But what about the principle of equivalence which, as Lord Reed points out in para 218, is a complementary requirement? The *Woolwich* remedy was not the only remedy in domestic law, as it was held in *DMG* that a taxpayer who wrongly paid tax under a mistake of law is entitled to a restitutionary

G remedy against the revenue. The theory is that judicial decisions must be taken to declare the law that applies to the case with retrospective effect, whenever the events that gave rise to the claim occurred. So, in the events that have happened, the *DMG* remedy must be taken to have been always available. It is not just a mirror image of the remedy that is afforded under *Woolwich*. Both remedies lead to the same result. But they are different remedies founded upon different principles and they are subject to different

H limitation periods. There may be other differences, depending on the facts and circumstances of each case.

21  There is no obvious way of deciding which of these two remedies must be adopted if only one can be allowed. Is it to be held the claimant is under an obligation, if both are available, to select the remedy which best

© 2012 The Incorporated Council of Law Reporting for England and Wales

suits his opponent?  This would be an odd result, as I said in *DMG* [2007]     A
1 AC 558, para 51.  For the reasons which I gave in that paragraph, I think
that domestic law must reject this idea because it has no basis in principle.  In
fairness, the claimant ought to be free to choose the remedy that best suits his
case.  The principle of equivalence requires that the rules regulating the right
to recover taxes levied in breach of EU law must be no less favourable than
those governing similar domestic actions.  So it seems to me that it must         B
follow, if the means of recovering of taxes levied contrary to EU law are to
match those in domestic law, that both remedies should be available.

*Conclusion*

22   For these reasons, and those given more fully by Lord Reed, I agree
with Lord Walker's analysis.  I would hold that Parliament could not            C
lawfully curtail without notice the extended limitation period under
section 32(1)(c) of the Limitation Act 1980 for the mistake cause of action
by section 320 FA 2004.  I agree with both Lord Walker and Lord Sumption
that it could not cancel claims made using that cause of action for the
extended period by section 107 FA 2007.  The question whether there was a
legitimate expectation of bringing an action of the kind that was excluded by
that section does not raise any issue of EU law.  So I do not think that there    D
are grounds for seeking a reference on that point.

23   I recognise however that, as there is a division of opinion among us
as to whether EU law requires that both remedies should be available to the
test claimants so that they can choose the remedy that best suits their case for
reimbursement, the answer to that question cannot be regarded as acte clair.
I would therefore invite the parties to prepare in draft the question or
questions on which they suggest a preliminary ruling should be sought from      E
the Court of Justice, and a brief note of the submissions that each party
would wish to be included in the reference.  I would also invite their views as
to whether this reference should be combined with the references that are to
be made on the other issues, or whether it should be submitted separately.

**LORD WALKER OF GESTINGTHORPE JSC**                                             F

*Introduction*

24   This appeal is a further stage, but by no means the last stage, in
complex and protracted group litigation, designated as Test Claimants in the
FII [franked investment income] Group Litigation.  In this group litigation,
and other parallel group litigation proceedings, numerous issues have been       G
raised as to whether features of the UK corporation tax regime infringe
EU law, and as to the remedies available to companies which claim to have
been financially disadvantaged in various ways by such infringements.
These proceedings have already resulted in two references to the Court of
Justice.

25   Since the Court of Justice's judgment on the first reference (*Test
Claimants in the FII Group Litigation v Inland Revenue Comrs* (Case             H
C-446/04) (Note) [2012] 2 AC 436), all the issues as to infringement have
been considered by Henderson J [2009] STC 254 and by the Court of Appeal
[2010] STC 1251.  Some have been decided and are no longer in dispute.  In
particular, it is now common ground that corporation tax measures relating

© 2012 The Incorporated Council of Law Reporting for England and Wales

A  to advance corporation tax ("ACT") and foreign income dividends ("FIDs") infringed former article 43EC (freedom of establishment) and former article 56EC (free movement of capital) of the EC Treaty, now articles 49FEU and 63FEU of the Treaty on the Functioning of the European Union. Other points have been the subject of a second reference to the Court of Justice. On yet further points this court has extended time for an application for permission to appeal. One of these is the concurrent finding

B  of the courts below that the infringements which have been established did not amount to grave and manifest breaches of EU law so as to give rise to a claim for damages on the principles in *Brasserie du Pêcheur SA v Federal Republic of Germany* (Joined Cases C-46/93 and C-48/93) [1996] QB 404.

26  It is now clear that, apart from any possible claim for damages, the claims to be met by HM Revenue and Customs ("HMRC", so as to include

C  its predecessors) are restitutionary in nature. Some are straightforward claims for recovery of tax which the claimants paid when it was not due. Other claims are for less direct losses which the claimants say they sustained in consequence of the non-compliance of the corporation tax system with EU law. In relation to restitutionary relief for both the direct and the indirect losses there are important differences between the parties as to the characterisation of the remedies available to the claimants as a matter of

D  English law. There are also important differences as to how far EU law requires the full range of domestic remedies to be made available for the recovery of unduly paid tax, despite parliamentary intervention (in the form of section 320 of the Finance Act 2004 and section 107 of the Finance Act 2007) to curtail those remedies drastically and with retroactive effect. Those two provisions ("the statutory cut-off provisions") are challenged as

E  infringing EU law.

27  That is a brief sketchy overview of the significance of this appeal in the context of the larger campaign of the FII group litigation. Except in relation to the statutory cut-off provisions the Supreme Court does not on this appeal have to revisit any issue as to infringement of EU law. But it is appropriate to give a brief explanation of the ACT system, now abolished, that gave rise to the substantive infringements. A much fuller explanation

F  can be found in the first instance judgment of Henderson J [2009] STC 254, paras 12–28. This draws on the first order for reference to the Court of Justice made by Park J on 13 October 1994. Since his retirement Sir Andrew Park has himself given an objective account of the progress of several of the associated sets of group litigation in "A judge's tale: corporation tax and community law" [2006] BTR 322.

G
*The ACT system*

28  Corporation tax was introduced in the UK in 1965. At first the system was a "classical" system, with full double taxation of company profits and non-corporate shareholders' dividends. In 1973 the system changed to one of "partial imputation". When a UK-resident company paid a dividend it was required (by way of self-assessment) to pay an amount of

H  ACT equal to the mainstream corporation tax ("MCT") payable on the part of its profits distributed as dividend. A non-corporate shareholder became entitled to a tax credit equal to the ACT paid in respect of his dividend. A UK-resident corporate shareholder receiving a dividend from another UK-resident company received it as "franked investment income" ("FII"), and if

© 2012 The Incorporated Council of Law Reporting for England and Wales

it both received and paid dividends, ACT was payable only on the excess of   A
its outgoing "franked payments" over its FII.

29   The position was different if a UK-resident company received a
dividend from a non-resident company in which it was a shareholder. That
was so whether or not the two companies were part of a group, but this
group litigation, and the parallel ACT group litigation, have both been
concerned with groups of companies. Most of the test claimants in this   B
litigation are members of the British American Tobacco ("BAT") group. In
para 2 of his judgment Henderson J gave a concise explanation of this group
litigation as compared with the ACT group litigation:

"Whereas the focus of the ACT Group Litigation was on the
UK domestic legislation which prevented UK-resident subsidiaries of
foreign parents from making group income elections, thereby obliging   C
them to pay ACT when paying dividends to their foreign parents, the
focus of the FII Group Litigation has been on UK-parented groups with
foreign subsidiaries, and on the tax treatment of dividends coming into
the UK from abroad. At the simplest level, therefore, the present
litigation is concerned with factual situations which are the opposite of
those which gave rise to the questions considered in *Hoechst*   D
[*Metallgesellschaft Ltd v Inland Revenue Comrs* (Joined Cases C-397/98
and C-410/98) [2001] Ch 620) and the ACT Group Litigation."

30   Since 1973 the BAT group has gone through various structural
changes (summarised in paras 1.8 to 1.21 of an agreed statement of facts set
out in para 29 of the judge's judgment) but it has always had as its ultimate
holding company a UK-resident company whose shares are listed and whose
thousands of shareholders expect to receive regular dividends. After 1973   E
the BAT group (in common with many large multinational groups) faced a
difficulty in that when it received dividends from overseas subsidiaries it did
not receive a tax credit that could be used to eliminate or reduce
ACT payable in respect of its dividends to its shareholders. The overseas
dividends were not FII. Although the UK-resident company was entitled to
double taxation relief against MCT (in the form of a credit against foreign
taxes paid by the subsidiary), it still had to pay ACT. If relatively little   F
MCT was payable (because of double taxation relief) the ACT became
surplus and of little or no utility to the holding company. A UK-resident
company with overseas subsidiaries (whether resident within or outside the
EU) was therefore at a disadvantage, and articles 43EC and 56EC of the
Treaty were infringed.

31   The other test claimants are members of the Aegis group, another   G
multinational group whose holding company is based in the UK. These
claimants have been included because they are (and claimants in the
BAT group are not) affected by section 320 of the Finance Act 2004.

32   The ACT regime was in force from 1973 to 1999. Its disadvantages
for multinational groups were to some extent mitigated by provisions as to
foreign income dividends (FIDs) which were in force from 1994 to 1999.
A UK-resident company receiving dividends from non-resident companies   H
could elect that dividends paid to its shareholders should be treated as FIDs.
The effect was that ACT was still payable, but would in some circumstances
be repaid after an interval, normally of a duration of between eight and a
half months and seventeen and a half months. There is a fuller explanation

© 2012 The Incorporated Council of Law Reporting for England and Wales

A  of the law in paras 23 to 25 of the judge's judgment, and of the facts as to
FID "enhancements" in paras 277 to 302.

33   The principal statutory provision giving a tax credit on qualifying
distributions between UK-resident companies was section 231 of the Income
and Corporation Taxes Act 1988 ("ICTA 1988"). Issue 6 before the Court of
Appeal was whether section 231 could be interpreted, under the *Marleasing*
principle (*Marleasing SA v La Comercial Internacional de Alimentación SA*
B  (Case C-106/89) [1990] ECR I-4135) so as to be compatible with EU law.
The Court of Appeal held that it could be interpreted in that way. That is
however an issue on which this court has deferred a decision on permitting a
further appeal. The uncertainty as to section 231 is a further complication in
clarifying the issues that are before the court on this appeal.

C  *The issues*

34   The Supreme Court gave permission to appeal on four of the 23
issues identified by the Court of Appeal (and set out in the index to its
judgment [2010] STC 1251). This permission was later extended to cover a
fifth issue, numbered 22 in the Court of Appeal's judgment, that is the
correct construction and scope of section 32(1)(c) of the Limitation Act
D  1980. The other four issues covered by the formal order granting permission
to appeal are wholly or largely questions of EU law, and the impact of
EU law on domestic rights and remedies: that is (issue 12) remedies in
English law; (issues 20 and 21) the compatibility with EU law of the
statutory cut-off provisions; and (issue 23) whether section 33 of the Taxes
Management Act 1970 (as amended) provides an exclusive code for
recovery of tax mistakenly paid under an assessment, and the impact on that
E  section of EU law.

35   However, as the parties' written and oral submissions have
developed it has become apparent that there is another wholly domestic
issue of central importance to the appeal. The Court of Appeal differed from
Henderson J as to whether the principle in *Woolwich Equitable Building
Society v Inland Revenue Comrs* [1993] AC 70 ("*Woolwich*") applies only to
F  tax that is demanded by revenue authorities (and if so, what amounts to a
demand).

36   For the appellants Mr Aaronson QC took the lead in making
submissions on issues of EU law, followed by Mr Rabinowitz QC on issues
of English law. This sequence of argument may have been unavoidable, but
it produced the result that the court heard submissions about the attitude of
EU law towards national procedures and remedies—which is an important
G  part of this appeal—before hearing submissions about the English remedies
themselves. It is more helpful to start with the issues of English law, and then
assess the impact that EU law has on them. So this judgment proceeds to
consider (i) the scope of section 32(1)(c) of the Limitation Act 1980 and
(ii) the scope of the decision in *Woolwich*, before addressing the effect of
EU law.

H  37   It may not be immediately apparent why these two domestic issues
have assumed such significance, so a brief explanation is called for. The
reason is certainly not the disinterested and scholarly interest of the parties,
or either of them, in the development and clarification of English private
law. That is apparent from another of the group litigation proceedings,
*NEC Semi-Conductors Ltd v Inland Revenue Comrs* [2006] STC 606

© 2012 The Incorporated Council of Law Reporting for England and Wales

("*NEC*"), in which (at paras 140 to 147) the claimant companies and    *A*
HMRC (through counsel, most of whom have appeared on this appeal)
made submissions on the *Woolwich* issue to the contrary effect, in each case,
to those they have made on this appeal.  These tactical shifts have occurred
because, naturally enough, each side wants to win, by any proper line of
argument, because of the very large sums of money at stake.

38  The main issue of EU law to be decided can be put, in a very    *B*
simplified (but not, it is to be hoped, tendentious) form, as follows.  When in
any member state tax has been paid which was not due because the national
taxing measure infringed the Treaty, must the member state make available
to its aggrieved taxpayer (i) an adequate remedy which meets the principles
of effectiveness and equivalence; or (ii) every available national remedy,
including any that offers the taxpayer special advantages as regards
limitation of actions?    *C*

39  At first glance the *Woolwich* principle provides an adequate remedy,
subject to a six-year limitation period unaffected by the statutory cut-off
provisions.  Similarly at first glance mistake of law, following the decision of
the House of Lords in *Deutsche Morgan Grenfell Group plc v Inland
Revenue Comrs* [2007] 1 AC 558 ("*DMG*"), provides a specially
advantageous basis of claim because of the possibility of an extended
limitation period under section 32(1)(c) of the Limitation Act 1980, but    *D*
subject to the statutory cut-off provisions (if and so far as valid under
EU law).  But if the test claimants have no *Woolwich* claim, because as a
matter of law such a claim requires an unlawful demand, and there was no
such demand, mistake of law would be promoted, as it were, to being the
only remedy available under national law, and so to being more surely
entitled to protection under EU law.  So it is expedient for the test claimants    *E*
in this appeal to reverse the stance taken by the test claimants in *NEC* and
argue that the *Woolwich* principle does not extend to self-assessed taxes, for
which there is no official demand.

40  The issue on section 32(1)(c) of the Limitation Act 1980 is part of an
alternative line of argument by which the test claimants seek to promote the
mistake of law claim and so ensure its protection under EU law.  They
submit that section 32(1)(c) should be widely construed, contrary to the    *F*
authority of *Phillips-Higgins v Harper* [1954] 1 QB 411, a first-instance
decision which has however stood and been followed for over half a century.
They submit that section 32(1)(c) is applicable, regardless of the cause of
action, wherever there is a causally relevant mistake.  In the words of
Mr Rabinowitz (day 2, page 80), "The mistake element does not have to be a
necessary part of the cause of action, so long as the mistake is materially    *G*
causal or causally material in producing the circumstances from which relief
is sought."  So this is an alternative method by which the test claimants seek
to saw off the apparent support of the *Woolwich* branch in order to rely on
mistake of law alone.

41  It seems very doubtful, even if their argument on section 32(1)(c) is
sound, whether the claimants' aim would be achieved.  In other, more
mainstream parts of their argument they rely heavily on the principle    *H*
(reasserted in this context by the House of Lords in *DMG* [2007] 1 AC 558)
that English law permits litigants to choose, as between concurrent causes of
action, the cause or causes of action most advantageous to their interests.
The test claimants have done so.  In the amended particulars of claim of the

© 2012 The Incorporated Council of Law Reporting for England and Wales

*A*  BAT group, paras 15 and 15A, they have clearly and distinctly relied on two separate causes of action in unjust enrichment, that is (para 15) payment of tax unduly levied and (para 15A) payment under a mistake. Section 32(1)(c) is relied on in relation to "mistake claims" only (paras 18, 18A and 18B). The position is the same on the Aegis group's pleadings. The statutory cut-off provisions (the essential text of which is set out at paras 107 and 109 below) do contain (in section 320(6) and section 107(2)) wide language

*B*  extending the scope of the sections to actions not expressed to be brought on the grounds of mistake. So the apparently self-inflicted injury which the test claimants invite would seem to require an amendment to the pleadings, and even then (if the section 32(1)(c) argument succeeds) the *Woolwich* claim would remain with a six-year limitation period, which is what it has always

*C*  been assumed to have. Nevertheless, the section 32(1)(c) point is an important point of law that has been fully argued, and so it should be addressed.

*Section 32(1)(c)*

    42   Section 32(1) of the Limitation Act 1980 provides:

*D*      "Subject to [provisions not now material], where in the case of any action for which a period of limitation is prescribed by this Act, either—(a) the action is based upon the fraud of the defendant; or (b) any fact relevant to the plaintiff's right of action has been deliberately concealed from him by the defendant; or (c) the action is for relief from the consequences of a mistake; the period of limitation shall not begin to run until the plaintiff has discovered the fraud, concealment or mistake (as the

*E*      case may be) or could with reasonable diligence have discovered it. References in this subsection to the defendant include references to the defendant's agent and to any person through whom the defendant claims and his agent."

    It replaces (with a minor amendment to section 32(1)(b)) provisions first enacted in section 26 of the Limitation Act 1939, in which section 26(c) was

*F*  in the same terms as section 32(1)(c). The change in the law made in 1939 was recommended by the Law Revision Committee (chaired by Lord Wright MR) in its Fifth Interim Report (Statutes of Limitation) (1936) (Cmd 5334). Indeed the expression "relief from the consequences of a mistake" appears three times in para 23 of the report, dealing with this topic. The recommendation was that in such cases the equitable rule (that time should

*G*  run only from when the mistake was, or could with reasonable diligence have been, discovered) should apply to claims which were formerly within the exclusive jurisdiction of common law courts (as opposed to being within equitable or concurrent jurisdiction).

    43   The previous state of the law was established by the decision of Hamilton J (later Lord Sumner) in *Baker v Courage & Co* [1910] 1 KB 56. The facts were that the plaintiff was the former owner of a public house who

*H*  had in 1896 been mistakenly overpaid by £1,000 on the sale of his leasehold public house to the defendants, who were brewers. The plaintiff then deposited £9,000 at interest with the defendants. In 1909 he wished to withdraw the last of the deposit (standing, as it happens, at £1,000) but the defendants, on reviewing the position, discovered their mistake and refused

© 2012 The Incorporated Council of Law Reporting for England and Wales

to return the money.    When sued they pleaded set-off and made a      *A*
counterclaim, both of which were opposed as statute-barred.

44    Hamilton J referred, at p 62, to the purely equitable claim made in
*Brooksbank v Smith* (1836) 2 Y & C Ex 58, a decision of Alderson B sitting
in the equity side of the Court of Exchequer.    Hamilton J said that
*Brooksbank v Smith*

"was a case to which the Statute of Limitations did not apply; and the      *B*
rule which was there laid down was one which in my opinion cannot be
transferred to cases like the present, to which the statute does directly
apply.    In dealing with the latter class of cases, courts of equity were just
as much bound by the statute as were courts of common law."

In any event, he went on, the brewers had had the means of knowing the
truth throughout, if they had chosen to look at the sale contract and examine      *C*
their books of account.    He also rejected a second contention that time did
not start to run until notice of the mistake (that is, the overpayment of
£1,000 in 1896) had been given to the plaintiff and a demand had been
made.

45    It is common ground that section 26(c) of the Limitation Act 1939
was intended to reverse the first point of principle (though not, on the facts,      *D*
the result) in *Baker v Courage & Co*.    The issue is how much further the
change in the law was meant to go.    The leading case on that point is the
decision of Pearson J in *Phillips-Higgins v Harper* [1954] 1 QB 411.    It was
fully argued, and the argument is fully reported.    Professor Andrew Burrows
has noted that there was an unsuccessful appeal on the facts by the
defendant, briefly reported at p 420, but no cross-appeal on the limitation
point.    The decision of Pearson J has been followed by the Court of Appeal,      *E*
apparently with little or no oral argument on the point, in *Malkin v
Birmingham City Council* (unreported) 12 January 2000, a claim for breach
of statutory duty.    The judgment of the Court of Appeal in this case recorded
[2010] STC 1251, para 242 that Mr Ewart (for HMRC) "very generously"
did not submit that the Court of Appeal was bound by *Malkin*.    In any event
the Court of Appeal, after full argument, accepted *Phillips-Higgins* and      *F*
*Malkin* as correct.    It did so after considering the history and language of
section 32(1)(c), and the reasoning in the judgment of Pearson J (a long
passage from which is set out at para 240).    But for the general importance of
the point, it might be sufficient to say that the Court of Appeal was right, and
for the right reasons.

46    *Phillips-Higgins v Harper* [1954] 1 QB 411 was an action by a      *G*
woman solicitor who had been employed as an assistant by a sole
practitioner, Mr Harper, between 1938 and 1950, when she became a
salaried partner.    Her employment was, on her case, at a basic salary
supplemented by an annual sum to bring her total remuneration up to one-
third of the net profits of Mr Harper's practice.    Mr Harper contended that
(until 1948) the bargain was to supplement her remuneration to one quarter
of the net profits as determined by his accountant, and he pleaded the      *H*
Limitation Act 1939.    The judgment is reported verbatim only on this point,
but it is recorded (at p 413) that Pearson J found:

"(1) that the original fraction of the relevant profit figure to which the
plaintiff was entitled was one-third, and that that fraction had been

© 2012 The Incorporated Council of Law Reporting for England and Wales

A  reduced to one quarter by the defendant by private instructions to his accountant and that the plaintiff did not know and did not consent to the reduction; (2) that the plaintiff's contention as to the relevant profit figure was correct; and (3) that there had been no intention on the part of the plaintiff to agree the accounts over the material period and that therefore they had not been agreed and settled."

B  47  Mr Harper's position was therefore deeply unattractive. But the plaintiff was not mistaken about the bargain; her mistake was in believing that Mr Harper and his accountant were giving proper effect to it. As the judge hinted, at p 418, the plaintiff might possibly have done better to rely on section 26(b), since although at that time it required fraudulent concealment, that expression was interpreted fairly broadly.

C  48  For present purposes the crucial passage is earlier on p 418. It is part of the passage quoted by the Court of Appeal, but it bears repetition:

"What, then, is the meaning of provision (c)? The right of action is for relief from the consequences of a mistake. It seems to me that this wording is carefully chosen to indicate a class of actions where a mistake has been made which has had certain consequences and the plaintiff seeks

D  to be relieved from those consequences. Familiar examples are, first, money paid in consequence of a mistake: in such a case the mistake is made, in consequence of the mistake the money is paid, and the action is to recover that money back. Secondly, there may be a contract entered into in consequence of a mistake, and the action is to obtain the rescission or, in some cases, the rectification of such a contract. Thirdly, there may be an account settled in consequence of mistakes; if the mistakes are

E  sufficiently serious there can be a reopening of the account."

All these are examples of relief which removes or mitigates the adverse consequences to the claimant of the mistake, while respecting the position of the defendant where justice so requires (for instance by the defence of change of position where money has been paid under a mistake, or the requirement for restitutio in integrum where rescission is granted). It is an important but

F  still relatively narrow category of causes of action, and much narrower than that for which Mr Rabinowitz has contended.

49  Mr Rabinowitz was critical of the decision of the Court of Appeal as having paid insufficient attention to the statutory language and the traditional equitable rules, and too much attention to the fifth interim report of the Law Revision Committee. In his reply (day 5, page 136) he invited the

G  court to read the first sentence of para 23 of the report as if it had contained a parenthesis, saying: "Where mistake is not an essential part of the claim because we know that's what the equitable rule is." In support of this he relied on *Brooksbank v Smith* 2 Y & C Ex 58 and *Denys v Shuckburgh* (1840) 4 Y & C Ex 42, another decision of Alderson B sitting in the equity side of the Court of Exchequer.

H  50  As to the statutory language, the criticism is in my view misplaced. The Court of Appeal cited and agreed with Pearson J's view that the wording is carefully chosen to indicate a category of actions with particular characteristics. As to the report of the Law Revision Committee, it showed (as would be expected of its distinguished membership) a full awareness of the historical background. The parenthesis suggested as a gloss by

© 2012 The Incorporated Council of Law Reporting for England and Wales

Mr Rabinowitz is not borne out by the example that comes at the end of the    *A*
first sentence of para 23, that is money or property transferred under a
mistake, where the mistake is an essential part of the claim, and would have
to be pleaded with some particularity.

51   The authorities cited by Mr Rabinowitz do not support the wide
equitable jurisdiction for which he contended. *Brooksbank v Smith* 2 Y &
C Ex 58 was about a will trust. The testatrix died in 1818 leaving a fund in    *B*
trust, subject to a life interest, for her children in equal shares, with
substitutional gifts if any child predeceased her leaving issue. Her daughter
Elizabeth did predecease her by two months, but on the death of the life
tenant in 1827 the trustees were given incorrect information about the date
of Elizabeth's death and her share (£1,000 nominal of stock) was transferred
to her widower instead of to her children. When the mistake was discovered
in 1833 the trustees claimed £100 stock (which was all that remained    *C*
unsold) from Elizabeth's widower. The bill was issued within six years of
discovery of the mistake. Alderson B held that the claim was not statute-
barred. He treated it as a proprietary claim based on a mistake of fact.

52   *Denys v Shuckburgh* 4 Y & C Ex 42 was similar, though the facts
were more complicated. Under a marriage settlement made in, 1793 the
Earl of Pomfret settled two quarter shares in some lead mines in Yorkshire    *D*
on trusts under which he had both an immediate life interest and an ultimate
reversion (with intermediate trusts that in due course failed). In 1813 the
Earl (whose marriage was childless and ended in judicial separation)
sub-settled (but only during his own lifetime) one quarter share on his sister,
Lady Charlotte, and another on her son William. Lady Charlotte owned
another quarter share of the mines in her own right. In 1826 the Earl
assigned the whole of his reversionary interest to William. On the Earl's    *E*
death in 1830 no one adverted to the fact that the 1813 sub-settlement then
came to an end, and the right to income from one-quarter share of the mines
passed from Lady Charlotte to her son William. He went abroad in 1832
and Lady Charlotte died in 1835. The mistake was not discovered until
1839, when William brought a bill against his mother's estate to recover
arrears of income.    *F*

53   Alderson B stated the principle, at p 53:

"The plaintiff contends, that he has established that this receipt has
been by mistake of fact, and that this is on the same footing as fraud, and
prevents the operation, if made out, of the Statute of Limitations; which
in equity is adopted as a guide, but is not at law binding on the court.
I agree in that conclusion, if the circumstances of the case warrant it. But
here, it seems to me, that the plaintiff had the means, with proper    *G*
diligence, of removing the misapprehension of fact under which I think he
did labour. He had in his power the deed on which the question turns;
and, although it is perhaps rather obscurely worded, still I think he has
allowed too much time to elapse not to be fairly considered as guilty of
some negligence; and a court of equity, unless the mistake be clear, and
the party be without blame or neglect in not having discovered it earlier,    *H*
ought, in the exercise of a sound discretion, to adopt the rule given by the
statute law as its guide."

He also referred, during counsel's argument, to the position at common law.
As it happened part of the misapplied income was represented by identifiable

© 2012 The Incorporated Council of Law Reporting for England and Wales

A   lead ore stored at Richmond.  When counsel for the plaintiff argued that
Lady Charlotte became liable to an action for money had and received only
when she sold the lead, Alderson B commented, at p 48:

"If she sold the lead and received the produce, you might have waived
the tort, and brought an action for money had and received.  But then the
Statute of Limitations runs from the conversion, and not from the time of
B   receiving the money."

54   These authorities were cited to Warrington J in *In re Robinson*
[1911] 1 Ch 502.  There the mistake was on a fairly arcane point of law, that
an entail created by royal grant as a reward for services cannot be barred:
*Robinson v Giffard* [1903] 1 Ch 865.  That decision showed that deeds
executed over 40 years before and intended to bar an annuity granted in tail
C   by King Charles II were ineffective.  The claim was to recover arrears of the
annuity.  Warrington J identified, at p 513, three types of case where there is
no time-bar for recovery of mistaken payments by trustees: (1) when an
estate is being administered by the court; (2) proprietary claims to recover
identifiable trust assets or their traceable proceeds; and (3) claims against
third parties in knowing receipt of trust property.  By contrast the claim
D   before him

"is in substance a mere money demand to which a court of equity,
acting by analogy to the statute, would apply the same period of
limitation.  I think, therefore, that the plaintiff's claim is barred by the
statute, and that the action fails."

55   The analysis in *In re Robinson* was followed by Romer J in *In re
E   Mason* [1928] Ch 385 and approved by the Court of Appeal on appeal in
that case [1929] 1 Ch 1.  That was a claim, brought after a very long lapse of
time, to recover an estate that had been taken by the Crown as bona
vacantia.  In the Court of Appeal Lord Hanworth MR distinguished, at p 9,
between the discovery of a mistake which was a cause of action and
discovery of the evidence needed to prove the cause of action.  He said:

F   "It is suggested by Miss Mason that it is only when she found proof of
the marriage of Maria L'Epine's parents that she was entitled to bring this
claim.  A confusion seems to have arisen between the power to prove a
claim and the right to bring it.  The cause of action on which this claim is
founded arose so far back as one of the three dates I have mentioned,
1798, 1801 or 1831, and the last of these dates is nearly 100 years ago.
G   The fact that the useful evidence did not turn up until 1921 does not affect
the date when the cause of action arose."

56   *In re Blake* [1932] 1 Ch 54 was another bona vacantia case, though
the interest had been assigned by the Crown to third parties.  Maugham J
stated, at p 60:

"An action in the Chancery Division brought by the next of kin against
H   a person to whom the administrator had wrongly paid part of the
personal estate of the intestate under a mistake of fact (not joining the
administrator and seeking administration) would be in the nature of a
common law action for money had and received, and the court acting on
the analogy of the Statute of James I (21 Jac 1, c 16) would hold the claim

© 2012 The Incorporated Council of Law Reporting for England and Wales

to be barred after the lapse of six years from the date of payment: see *In re*   *A*
*Robinson* [1911] 1 Ch 502, where the law is elaborately explained by
Warrington J, and *In re Mason* [1928] Ch 385; [1929] 1 Ch 1. A common
law action of the same character, assuming that such an action would lie,
would also be barred by the same statute after the expiration of six years
from the date of payment: *Baker v Courage & Co* [1910] 1 KB 56, 63. On
the other hand there is no doubt that in a proper case the next of kin might   *B*
bring an action in the Chancery Division to follow the trust property if the
defendant to whom the administrator had paid it were still in possession
of it."

57   The last relevant authority is an obiter passage in the monumental
judgment of the Court of Appeal in *In re Diplock; Diplock v Wintle* [1948]
Ch 465. It was concerned with both personal and proprietary claims against   *C*
numerous charities. The claims arose in consequence of the executors'
calamitous distribution of the testator's valuable residuary estate in the
mistaken belief that it was held on a valid charitable trust. The executors
had by then compromised claims against them personally. In relation to a
point which was not determinative Lord Greene MR, delivering the
judgment of the court, observed at pp 515–516:

*D*

"If [the respondent charities] seek to bring the case, for the purposes of
the defence of limitation, within section 2 of the [Limitation Act 1939]
and to rely upon the reasoning in *In re Blake* [1932] 1 Ch 54, they must
do so by averring that the cause of action is analogous to the common law
action for money had and received. And if they assert the analogy, they
must take it with its attributes and consequences. Beyond doubt, it would
appear that in the case of an action at common law to recover money paid   *E*
under a mistake of fact, section 26 would now operate to postpone the
running of time. It is true that no such action would lie where the mistake
is one of law: but for reasons which we have already given we do not
accept the respondents' contention that the 'analogous' claim in equity
will also lie only where the mistake was one of fact. In our judgment,
therefore, assuming the analogy (as it must be assumed if section 2 is to   *F*
apply at all) the action is one for the recovery of money paid away by
mistake—albeit by the mistake of other persons and by a mistake of
law—and in our judgment, on this assumption, is an action for relief from
the consequences of mistake no less than would be an action at common
law to recover money paid away under a mistake of fact."

58   The analogy with the common law action for money paid under a   *G*
mistake is a recurring feature of these authorities. Indeed, the analogy goes
right back to the great case of *Moses v Macferlan* (1760) 2 Burr 1005, the
fountain-head of the English law of unjust enrichment. This has been
explained in a recent article by the Hon Justice W M C Gummow of the
High Court of Australia, "Moses v Macferlan: 250 years on" (2010)
84 ALJ 756; (2011) 68 Washington and Lee Law Review 881, 882–888,
citing *Moses v Macferlan*, 1009–1011 and *Clarke v Shee and Johnson*   *H*
(1774) 1 Cowp 197, 199–200 for the proposition that the action for money
had and received was "a liberal action in the nature of a bill in equity".

59   In the old authorities the matter is sometimes treated simply as a case
of mistake, without further analysis. But in the cases where the period was

A or might have been extended the mistake seems to have been an essential ingredient in the cause of action. Dr James Edelman, in "Limitation Periods and the Theory of Unjust Enrichment" (2005) 68 MLR 848, reads *Denys v Shuckburgh* 4 Y & C Ex 42 differently. In this he follows Franks, whose monograph on *Limitation of Actions* (1959) suggests, at p 206, that the decision in *Phillips-Higgins v Harper* [1954] 1 QB 411 was too narrow:

B     "In particular it seems clear that a beneficiary under a will or trust who claims directly against a person to whom trust property has been wrongfully transferred can rely upon the mistake of the personal representative or trustee to postpone the running of time; although his cause of action rests upon his own title and the defendant's lack of title to the property—and the action would be just the same if the property had C     been transferred purposely, i e, with knowledge that the recipient was not entitled."

But Franks goes on to comment that if Pearson J's view is rejected the scope of section 26 might be dangerously expanded.

60 In a footnote to the passage about title to trust property Franks comments that mistake is not an essential allegation and adds:

D     "Indeed it may be doubted whether even in a common law action to recover money paid by mistake (i e money had and received to the use of the plaintiff) the mistake is an essential allegation though it would of course in practice be pleaded: see *Bullen & Leake*, 3rd ed, pp 45, 50; 10th ed, pp 227–228."

E This footnote may be thought to anticipate modern controversies about absence of basis in unjust enrichment. In a case like *Denys v Shuckburgh* 4 Y & C Ex 42 the claimant's cause of action rests both on his antecedent title and on his mistake. If Lady Charlotte's son had known the true position throughout, but had expressly or impliedly authorised the mine manager to continue paying income to his mother, he would have had difficulty recovering the payments even within the limitation period.

F 61 Doubts about *Phillips-Higgins v Harper* have been expressed not only by Franks and Edelman but also (in a rather more muted way) in *Chitty on Contracts*, 30th ed (2008) vol I, para 28-088; *Goff & Jones, The Law of Restitution*, 7th ed (2007), paras 43-004–43-006, and (renamed *The Law of Unjust Enrichment*) 8th ed (2011), paras 31-33–33-36; H M McLean, "Limitation of Actions in Restitution" [1989] CLJ 472, 493–495. Professor Burrows in a note on *DMG* in the Court of Appeal is generally supportive of G *Phillips-Higgins v Harper*: see "Restitution in Respect of Mistakenly Paid Tax" (2005) 121 LQR 540, 544. In *DMG* in the House of Lords Lord Hoffmann and I expressed some doubts, but Lord Scott of Foscote supported *Phillips-Higgins v Harper*: see [2007] 1 AC 558, paras 22, 91, 147. Lord Hoffmann observed, at para 22:

H     "The *Kleinwort Benson* case [1999] 2 AC 349 is recent authority for the proposition that an action for restitution of money paid under a void contract can fall within this description ['for relief from the consequences of a mistake']. That does not seem to me inconsistent with the existence of the mistake not being essential to the cause of action but merely one example of a case which falls within a more general principle, just as one

© 2012 The Incorporated Council of Law Reporting for England and Wales

could have (say, for the purposes of limitation) a category called 'clinical   *A*
negligence' without implying that it is a cause of action different in nature
from other kinds of negligence."

That is a reminder (and in view of current debates about "absence of basis" a
timely reminder) that "cause of action" can bear different meanings,
depending on the context.

62   Having considered the matter with the benefit of much fuller   *B*
argument than in *DMG* I have reached the clear conclusion that *Phillips-
Higgins v Harper* [1954] 1 QB 411 was rightly decided, and that we should
not seek to develop the law by broadening the interpretation of "an action
for relief from the consequences of a mistake." My reasons are essentially
the same as the Court of Appeal's. In summary, as to the statutory language,
I agree with Pearson J's view that the words have been carefully chosen, and   *C*
are more precise than some formula such as "based" or "founded" on a
mistake. That is an imprecise formula, and legal scholars seem to take
different views as to whether it would provide a wider or a narrower test
than the words of the statute. As to history, the authorities are rather short
on clear exposition of the relevant principles of equity, but on the whole they
provide little support for Mr Rabinowitz's thesis. Their clearest message is   *D*
the close analogy between the equitable jurisdiction and the common law
action to recover money paid under a mistake.

63   As to policy, departure from Pearson J's relatively narrow
interpretation would bring a real risk (as Franks put it, at pp 206–207) that
"the scope of [section 32(1)(c)] might be expanded dangerously close to the
basic rule of common law limitation that ignorance of the existence of a
cause of action does not prevent time from running". It would be difficult to   *E*
find any principled stopping-place for the expansion. The leading case of
*Cartledge v E Jopling & Sons Ltd* [1963] AC 758 (in which this point was
not even faintly argued) would be seen to have missed the point. The limits
(and indeed the rationale) of sections 11 and 14A of the Limitation Act 1980
would have to be revisited. Further complications would be introduced into
claims for pure economic loss for breaches of professional duties of care.   *F*
Any such developments are a matter for the Law Commission and for
Parliament, not for this court.

*Must there be a demand?*

64   At first instance, Henderson J referred to the *Woolwich* principle in
para 245 of his judgment and directed himself in these terms:   *G*

"Conversely, a *Woolwich* claim must involve, at least in some sense,
the making of a demand by the revenue, whereas there is no need for a
demand in cases of [payment under a mistake]."

Later in his discussion of the point he referred to the decision of the Court of
Appeal in *NEC Semi-Conductors Ltd v Inland Revenue Comrs* [2006]
STC 606, which was decided in the period between the decisions of the   *H*
Court of Appeal and the House of Lords in *DMG*. In *NEC* the Court of
Appeal held that since the companies in question had not made a group
income election, ACT was lawfully payable, and there had been no unlawful
demand: see especially the judgment of Mummery LJ, at paras 152–162.

© 2012 The Incorporated Council of Law Reporting for England and Wales

A    65    In the present case the Court of Appeal [2010] STC 1251 addressed
this issue at paras 152 to 174 of the judgment of the court delivered by
Arden LJ. The court differed from Henderson J. It accorded great respect to
the judgment of Mummery LJ in *NEC* but did not accept that it was a
binding precedent. It also pointed out, at para 169, that Mummery LJ's
conclusion (in para 162 of his judgment) tended to elide two distinct issues,
that is whether ACT was lawfully due and whether it was demanded.

B    66    The Court of Appeal went on to reach a different conclusion. The
heart of its reasoning is at paras 157 and 158:

"157. In our judgment, the judge was wrong to reject the revenue's
submission that *Woolwich* alone provides a sufficient United Kingdom
remedy for the *San Giorgio* claims of the claimants [*Amministrazione
delle Finanze dello Stato v SpA San Giorgio* (Case 199/82) [1983]
C    ECR 3595—'*San Giorgio*']. He did so because he considered that he was
bound by authority to hold that it is an essential ingredient of the
*Woolwich* cause of action that the tax was paid pursuant to a 'demand'.
We consider that authority does not require a demand, and that it is
sufficient that the state has exacted tax, which was not lawfully due, by
voluntary compliance by the taxpayer with the legislative imposition of
D    the tax.

"158. As a matter of principle, we do not see why a demand should be
a requirement of a *Woolwich* claim. The underlying principle is that the
revenue should repay tax that has been exacted without legal
justification. We can see no reason why the cause of action should be
confined to those taxes that are payable on demand as against those, such
as VAT, that are payable without a demand. Moreover, it is impossible to
E    see why the citizen who duly accounts for and pays, by way of example,
VAT, without waiting for a demand, on the assumption that the
applicable legislation is valid, should be disadvantaged as against the
taxpayer who refuses to account or to pay until a peremptory demand is
received."

F    67    Mr Rabinowitz criticised the Court of Appeal's reasoning and
conclusion on the following grounds (in very brief summary): first, that it
was contrary to binding authority, that is the decisions of the House of Lords
in *Woolwich* and *DMG*; second, that it was contrary to what he described as
the "conventional understanding" of *Woolwich*; third, that it would create
uncertainty, both as to the boundaries of any extended *Woolwich* principle
and in the general development of the law of unjust enrichment.
G    Mr Rabinowitz also had a further, separate argument based on the Court of
Appeal's conforming interpretation of section 231 of ICTA 1988 (mentioned
in para 33 above). This summary does not do justice to Mr Rabinowitz's
powerful written and oral submissions but it indicates their general scope.

68    As the matter is now before the Supreme Court, sitting in a
constitution of seven, it is unnecessary to embark on a lengthy consideration
of the question of precedent. It is clear from paras 108 to 112 of his
H    judgment in *NEC* [2006] STC 606 that Mummery LJ carefully considered
whether it was appropriate for him to express opinions on issues of law that
were not necessary to the decision. He reached the conclusion that, in the
exceptional circumstances of the group litigation, he should take a course
which he would not normally have taken, even though it resulted in

© 2012 The Incorporated Council of Law Reporting for England and Wales

judgment being reserved for a longer period. Mummery LJ's views (with    *A*
which Sedley and Lloyd LJJ agreed) do not bind this court, but they are
entitled to great respect.

69  Mr Rabinowitz's strongest point is the frequent and consistent use of
the expression "demand", not only in the speech of Lord Goff of Chieveley in
*Woolwich*, but in the speeches of the other members of the House of Lords
majority in that case, and in the speeches of the House of Lords in *DMG*.
Occasional variant uses of "exaction" carry no weight, since the two words    *B*
have much the same meaning (indeed, arguably "exaction" sounds rather
more coercive). Mr Rabinowitz is also right in submitting that most legal
scholars have understood *Woolwich* and *DMG* as laying down that an
official demand is an essential prerequisite for the principle to apply.
However legal scholars have also been unanimous, or almost unanimous, in
expressing the view that an official demand ought not to be a prerequisite for    *C*
the application of the principle.

70  The Law Commission in its report, *Restitution: Mistakes of Law and
Ultra Vires Public Authority Receipts and Payments* (1994) (Law Com
No 227) took the view that a demand was not necessary, at paras 6.41 to
6.42:

"6.41. Lord Goff's reasons for the new restitutionary right, described    *D*
above, also sustain these inferences, as they are based on the special
position of the state and other public bodies. They do not focus on the
particular requirements of a 'demand' or a 'tax'; but on the manifest
injustice of allowing moneys unlawfully extracted from the subject by a
public authority to be retained by it.

"6.42. Therefore, we believe that the principle may well be held to    *E*
apply to all taxes, levies, assessments, tolls or charges, whether for the
provision of services or not, collected by any person or body under a
statutory provision which is the sole source of the authority to charge. We
do not think that the *Woolwich* right is limited to payment of tax or to
governmental or quasi-governmental exactions, or to payments made in
accordance with a demand. We believe the crucial element is that the
payment is collected by any person or body which is operating outside its    *F*
statutory authority, that is, it is acting ultra vires."

71  The editors of *Goff & Jones, The Law of Unjust Enrichment*, 8th ed
(2011), para 22-15 comment, after referring to the Court of Appeal's
judgment in *NEC*:

"However, provided that a claimant's money has been paid *as    *G*
tax*—ie to discharge a supposed tax liability—it should make no
difference in principle whether HMRC demanded the payment. After all,
the *Woolwich* case itself was expressly fought and decided on the basis
that the building society's payment was not made in response to
illegitimate pressure exerted by the revenue, and as Bastarache J has
observed in the Supreme Court of Canada 'The right of [a claimant] to
obtain restitution for taxes paid under ultra vires legislation does not    *H*
depend on the behaviour of each party but on the objective consideration
of whether the tax was exacted without proper legal authority.'
[*Kingstreet Investments Ltd v New Brunswick (Department of Finance)*
[2007] 1 SCR 3, para 53.]"

© 2012 The Incorporated Council of Law Reporting for England and Wales

A    72    Professor Jack Beatson (as he then was) expressed similar views in an
article (written after the Law Commission's Consultation Paper No 120 on
*Restitution of payments Made Under a Mistake of Law* (1991), paras 3.90
to 3.91 but before its Report), "Restitution of Taxes, Levies and other
Imposts: Defining the Extent of the *Woolwich* Principle" (1993)
109 LQR 401, 405:

B        "So, the formulation of the principle indicates that only two of the four
features present in the *Woolwich* case—the demand and its ultra vires
nature—may be necessary prerequisites. In the case of the demand even
this is questionable in view of Lord Goff and Lord Slynn's view that a
payment of tax made under a mistake of law would be recoverable. The
Law Commission's Consultation Paper provisionally recommended that
nothing should turn on the existence or otherwise of an actual demand for
C        payment. Quite apart from the difficulties of distinguishing payments
made in response to an 'implied' demand or an 'expectation' of payment
generated by the authority (including its literature), which were
mentioned, this requirement is wholly inappropriate and may pose
difficulties in the context of a system based on self-assessment of tax (and
other levies) such as that under consideration by the revenue at present."

D    73    Similar views have been expressed by Professor Charles Mitchell (in
*English Private Law*, ed Burrows, 2nd ed (2007), para 18.157); Rebecca
Williams, in *Unjust Enrichment in Public Law* (2010), pp 40-41; and
Professor Burrows, in *The Law of Restitution*, 3rd ed (2011), pp 507–508.
    74    This is a formidable volume of distinguished academic opinion. One
of the main themes in the reasoning is the high constitutional importance of
E    the principle that there should be no taxation without Parliament. As
Professor Mitchell put it, *English Private Law*, 2nd ed, para 18.156):

        "One policy justification for the *Woolwich* entitlement mentioned by
Lord Goff is that a general right to recover payments of tax levied without
the authority of Parliament is needed to give full effect to the
constitutional principle enshrined in article 4 of the Bill of Rights 1689,
F        that the Crown and its ministers may not impose direct or indirect taxes
without Parliamentary sanction. Another, latent in their Lordships'
speeches, is the related but wider public law principle of legality, that
bodies invested with power by the state must respect the rule of law, and
adhere to the limits of the jurisdictions conferred upon them."

    An earlier footnote refers to two influential articles on the same theme:
G    Professor WR Cornish, " 'Colour of Office': Restitutionary Redress Against
Public Authority" (1987) 14 J Mal & Comp L 41, and Professor Peter Birks,
"Restitution from the Executive: a Tercentenary Footnote to the Bill of
Rights" in *Finn (ed), Essays on Restitution* (1990), p 164. These were
referred to by Lord Goff in *Woolwich* [1993] AC 70, 166.
    75    These high principles should not depend on the details of the
procedure adopted for the levying and payment of any particular tax,
H    especially in an age when (for reasons of economy and efficiency) the trend is
towards self-assessment of as many taxes as possible. ACT was self-assessed,
as already noted, and so was the tax which HMRC sought to charge under
the ultra vires Income Tax (Building Societies) Regulations 1986
(SI 1986/482) in *Woolwich*.

© 2012 The Incorporated Council of Law Reporting for England and Wales

76 It is helpful to see how the arguments developed as *Woolwich* $A$ proceeded through the courts. The building society was successful in judicial review proceedings decided by Nolan J on 31 July 1987. The building society had anticipated that decision by issuing a writ on 15 July 1987. Nolan J gave judgment in the action on 12 July 1988, [1989] 1 WLR 137. He felt bound by authority to dismiss the action so far as it claimed interest, holding that there was an implied agreement for repayment of any ultra vires exaction, but without interest. In his judgment Nolan J $B$ made detailed findings of fact, at pp 141–142, concluding that "the requirements of the Regulations as amplified in communications from the revenue amounted on their face to lawful demands from the Crown".

77 The Court of Appeal [1993] AC 70, 76–142 allowed the building society's appeal by a majority. The majority (Glidewell and Butler-Sloss LJJ) $C$ based their decision on an ultra vires demand and a payment which was not intended to close the transaction. Ralph Gibson LJ, dissenting, held that the payment should be classified as voluntary, with an implied agreement for repayment (without interest) if tax was not due. All three members of the Court of Appeal seem to have accepted, without much discussion, Nolan J's finding that there had been a demand. The differences between them turned on whether the building society's response to the demand should be regarded $D$ as a voluntary payment.

78 The matter came before the House of Lords, therefore, on the unchallenged factual basis that there had been a demand. The House was split three-two, with Lord Keith of Kinkel and Lord Jauncey of Tullichettle basing their dissents on the absence of any improper pressure or duress: [1993] AC 70, 160–161, 192–194. There was no difference between the majority and the minority as to the significance of a demand. $E$

79 In these circumstances it is in my view open to this court (whether or not it was strictly open to the Court of Appeal) to state clearly that where tax is purportedly charged without lawful parliamentary authority, a claim for repayment arises regardless of any official demand (unless the payment was, on the facts, made in order to close the transaction). The same effect would be produced by saying that the statutory text is itself a sufficient demand, but $F$ the simpler and more direct course is to put the matter in terms of a perceived obligation to pay, rather than an implicit demand. That is how it was put by Wilson J in her well known dissent in *Air Canada v British Columbia* [1989] 1 SCR 1161, 1214–1215:

"It is, however, my view that payments made under unconstitutional legislation are not 'voluntary' in a sense which should prejudice the $G$ taxpayer. The taxpayer, assuming the validity of the statute as I believe it is entitled to do, considers itself obligated to pay. Citizens are expected to be law-abiding. They are expected to pay their taxes. Pay first and object later is the general rule. The payments are made pursuant to a perceived obligation to pay which results from the combined presumption of constitutional validity of duly enacted legislation and the holding out of such validity by the legislature. In such circumstances I consider it quite $H$ unrealistic to expect the taxpayer to make its payments 'under protest'. Any taxpayer paying taxes exigible under a statute which it has no reason to believe or suspect is other than valid should be viewed as having paid pursuant to the statutory obligation to do so."

© 2012 The Incorporated Council of Law Reporting for England and Wales

A    Lord Goff stated in *Woolwich*[1993] AC 70, 176D, that he found this
reasoning "most attractive". The Supreme Court of Canada has in recent
years, in a judgment of the Court delivered by Bastarache J, unanimously
approved this passage from her dissenting speech: *Kingstreet Investments
Ltd v New Brunswick (Department of Finance)* [2007] 1 SCR 3, para 55. In
my view English law should follow the same course. We should restate the
*Woolwich* principle so as to cover all sums paid to a public authority in
B    response to (and sufficiently causally connected with) an apparent statutory
requirement to pay tax which (in fact and in law) is not lawfully due.

80    Mr Rabinowitz argued that to follow that course would introduce
uncertainty as to what amounts to a tax. The expression should in my view
be generously construed, but there are bound to be borderline cases (the
Foreign and Commonwealth Office is said to be engaged in a constant
C    dialogue with foreign embassies in London as to whether the congestion
charge is a tax). Borderline cases of that sort will arise whether or not a
demand is needed. They would be likely to cause very much less difficulty
than deciding, across the whole range of taxes of different sorts, what
amounts to an official demand.

81    Mr Rabinowitz suggested that there would also be uncertainty in the
general development of the English law of unjust enrichment. There is
D    vigorous debate among legal scholars on this topic at present, and
uncertainty as to the outcome. But to decide that an official demand is not a
prerequisite to a claim for the recovery of tax paid when not due ought not
to add appreciably to the uncertainty. It would not be a decisive step
towards a general "absence of basis" principle in place of the "unjust
factors" approach that has prevailed in the past. It would merely be
E    creating, in Mr Rabinowitz's metaphor, a rather larger island of recovery in
respect of undue tax.

82    Finally, under this head, there is the argument based on the Court of
Appeal's conforming interpretation of section 231 of ICTA 1988. This was
the Court of Appeal's issue 6, addressed at paras 97 to 109 of its judgment.
The test claimants' argument is that section 231, on the interpretation
F    adopted by the Court of Appeal, resulted in dividends from non-resident
subsidiaries of a UK-resident company being treated as FII, so that a credit
was available in the same way as for dividends received from UK-resident
subsidiaries. Therefore, the argument goes, ACT was not unlawfully levied.
The appropriate claim was a mistake claim, not a *Woolwich* claim. This is
an ingenious variation on the approach described at para 39 above. The
argument looks like another bit of self-inflicted harm for the test claimants,
G    but they seek to turn it to their advantage.

83    The tactical argument is ingenious but (even if the Court of Appeal
was right in its conforming interpretation, a point which may still be
revisited if permission is given for a further appeal to this court) it is in my
view unsound. It seeks to rewrite history. HMRC stoutly defended its
position before the Court of Justice until the judgment of the Grand
Chamber at the end of 2006. Until then it consistently contended that there
H    was nothing unlawful about the ACT/FII/FIDs regime, and it performed its
statutory functions on that basis. Any suggestion that section 231 of
ICTA 1988 did not mean what it plainly appeared to mean would have been
met with incomprehension and disbelief. In short, it did not administer the
taxation of UK-resident companies in accordance with any conforming

© 2012 The Incorporated Council of Law Reporting for England and Wales

interpretation. The unlawful levying of tax may depend either on the text of    *A*
the statute (which was on its face discriminatory and contrary to EU law) or
on how the tax is administered in practice. In this case HMRC were at fault
on at least one, and possibly both of these counts.

*The central issues revisited*

84   For the reasons given in paras 42 to 82 above I consider that the          *B*
Court of Appeal was correct in its conclusions (i) on section 32(1)(c) of the
Limitation Act 1980 and (ii) on an official demand for tax not being a
prerequisite of a *Woolwich* claim. The last 40 paragraphs can therefore be
seen as no more than a laborious detour which ultimately leads back to the
central issues in the appeal, outlined in paras 38 and 39 above: is a
*Woolwich* claim (on its own) an adequate remedy meeting the principles of
effectiveness and equivalence? Or are the test claimants also entitled to      *C*
regard a claim based on mistake as one which EU law will protect against
summary removal by national legislation (with the consequence that the
statutory cut-off provisions infringe EU law)?

85   The Court of Appeal answered the first of these questions in
the affirmative, and the second in the negative. The relevant part of the
judgment is paras 217 to 229. The court's reasoning is quite compressed, the   *D*
heart of it being in para 225:

"We have held, in respect of issues 11 and 12, that a demand is not an
essential ingredient of the *Woolwich* cause of action, and that that cause
of action provides an effective remedy for all the claimants' *San Giorgio*
claims. Thus the cause of action for repayment of moneys paid under a
mistake is not a cause of action required by Community law. The cause of       *E*
action for repayment of moneys paid under a mistake is a domestic
remedy of wide application, which Community law does not require the
member states to provide, attended by a limitation period
(ie section 32(1)(c) of the Limitation Act 1980) that goes beyond the
requirements of Community law: see *Marks & Spencer plc v Customs and
Excise Comrs* (Case C-62/00) [2003] QB 866, para 35, in which the court
considered a three-year limitation period to be reasonable. Community        *F*
law restricts the effectiveness of domestic legislation curtailing a
limitation period applicable to a domestic cause of action that protects
the Community right. That domestic cause of action is the *Woolwich*
claim, and it is unaffected by sections 320 and 107."

86   Mr Aaronson has criticised this reasoning as seriously flawed. The        *G*
test claimants' written case sets out an elaborate framework of five reasons,
the first and second of which have been the subject of the detour at paras 42
to 82 above. The third, fourth and fifth reasons are considered in the
following sections of this judgment.

*Reemtsma*

87   Mr Aaronson relied on the decision of the Court of Justice in            *H*
*Reemtsma Cigarettenfabriken Gmbh v Ministero delle Finanze* (Case
C-35/05) [2007] ECR I-2425 as authority for the general proposition that
EU law requires repayment of tax paid under a mistake (and not unlawfully
exacted). In that case an Italian advertising agency had supplied services to a

A German client and the services were to be treated as supplied in Germany. The Italian supplier erroneously invoiced the client and paid VAT to the Italian tax authorities. Having failed to obtain a refund from the supplier, the German company brought proceedings against the Italian tax authorities. The Court of Justice held that it was not reimbursable under the provisions of the Eighth Directive and should normally be claimed from the

B supplier. At para 42:

> "However, where reimbursement of the VAT would become impossible or excessively difficult, the member states must provide for the instruments necessary to enable that recipient [of the relevant services] to recover the unduly invoiced tax in order to respect the principle of effectiveness."

C 88 Mr Aaronson submitted that this principle was of general application, and not limited to VAT (as a specifically EU tax). He submitted that this was a mistaken payment which was within the wide *San Giorgio* principle but not within the *Woolwich* principle, however much it might be extended. In support of his submission that it was not limited to VAT Mr Aaronson referred to *Danfoss AS v Skatteministeriet* (Case

D C-94/10), 20 October 2011. Denmark imposed an indirect tax on lubricants and hydraulic oils which failed to give effect to exemptions required by article 8 of Council Directive 92/81/EEC. Danfoss purchased these products in large quantities and the suppliers passed on to Danfoss the amount of unlawfully exacted tax which they had paid. Following the judgment of the Court of Justice in *Braathens Sverige AB, formerly Transwede Airways AB v*

E *Riksskatteverket* (Case C-346/97) [1999] ECR I-3419 Danfoss claimed reimbursement direct from the Danish authorities. The Court of Justice referred to the general *San Giorgio* principle by which a member state is in principle required to pay charges levied in breach of EU law. This is subject to an exception if the wrongly levied charge has been passed on. Where the tax has been passed on the ultimate consumer should normally be able to

F recover from his supplier, but if that is impossible or unduly difficult there must be a remedy in the form of a direct claim against the tax authorities. *Reemtsma* was referred to as an authority for this proposition.

89 Lord Sumption regards this principle as limited to harmonised EU taxes, and I am inclined to agree with that. But in any event it applies to a different and relatively unusual situation, in which it is a third party, and not the original taxpayer, who is seeking to recover tax from the authorities.

G It does not assist the test claimants in this appeal.

*EU law's requirements as to national remedies (especially limitation periods)*

90 There is no doubt as to the general principles regulating what EU law requires of national remedies for infringements of EU law. The principles

H were stated by the Grand Chamber in its judgment on the first reference in these proceedings, *Test Claimants in the FII Group Litigation v Inland Revenue Comrs* (Case C-446/04) (Note) [2012] 2 AC 436, paras 201–203, in terms identical, or almost identical, to those which have been stated many times before by the Court of Justice:

© 2012 The Incorporated Council of Law Reporting for England and Wales

"201. It must be stated that it is not for the Court of Justice to assign a *A* legal classification to the actions brought before the national court by the claimants in the main proceedings. In the circumstances, it is for the latter to specify the nature and basis of their actions (whether they are actions for repayment or actions for compensation for damage), subject to the supervision of the national court: see *Metallgesellschaft Ltd v Inland Revenue Comrs* (Joined Cases C-397/98 and C-410/98) [2001] Ch 620, *B* para 81.

"202. However, the fact remains that, according to established case law, the right to a refund of charges levied in a member state in breach of rules of Community law is the consequence and complement of the rights conferred on individuals by Community provisions as interpreted by the court: see, inter alia *Amministrazione delle Finanze dello Stato v SpA San Giorgio* (Case 199/82) [1983] ECR 3595, para 12, *C* and *Metallgesellschaft* [2001] Ch 620, para 84. The member state is therefore required in principle to repay charges levied in breach of Community law *Société Comateb v Directeur Général des Douanes et Droits Indirects* (Joined Cases C-192 to C-218/95) [1997] ECR I-165, para 20, and the *Metallgesellschaft* case, para 84.

"203. In the absence of Community rules on the refund of national *D* charges levied though not due, it is for the domestic legal system of each member state to designate the courts and tribunals having jurisdiction and to lay down the detailed procedural rules governing actions for safeguarding rights which individuals derive from Community law, provided, first, that such rules are not less favourable than those governing similar domestic actions (principle of equivalence) and, secondly, that they do not render virtually impossible or excessively *E* difficult the exercise of rights conferred by Community law (principle of effectiveness): see, inter alia, *Rewe-Zentralfinanz eG v Landwirtschaftskammer für das Saarland* (Case 33/76) [1976] ECR 1989, para 5, and *Comet BV v Produktschap voor Siergewassen* (Case 45/76) [1976] ECR 2043, paras 13 and 16; and, more recently, *Edilizia Industriale Siderurgica Srl (Edis) v Ministero delle Finanze* (Case *F* C-231/96) [1998] ECR I-4951, paras 19 and 34; *Dilexport Srl v Amministrazione delle Finanze dello Stato* (Case C-343/96) [1999] ECR I-579, para 25; and *Metallgesellschaft* [2001] Ch 620, para 85."

91 This brings us to the fourth and fifth reasons in the test claimants' written case, which go to the heart of this appeal. They contend that in using the mistake cause of action to vindicate their EU rights they were *G* unquestionably entitled to the protection of EU law. They criticise the Court of Appeal for having asked the wrong question: that is for having asked which domestic remedies give effect to the *San Giorgio* principle, rather than considering, as they should have done, all national remedies as available for the purpose.

92 It is not necessary to multiply references to the general principles, *H* which are not in dispute. It is however necessary to look more closely at the attitude of EU law towards limitation of actions under the legal systems of different member states, and towards legislative measures taken by member states to curtail limitation periods, so far as they affect national remedies for breaches of EU law.

© 2012 The Incorporated Council of Law Reporting for England and Wales

A    93    It is well established that EU law has no general objection to limitation periods being provided for in the legal systems of member states. On the contrary, limitation periods are one manifestation of the principle of legal certainty.   As long ago as *Rewe I* (*Rewe-Zentralfinanz eG v Landwirtschaftskammer für das Saarland*) (Case 33/76) [1976] ECR 1989, para 5, the Court of Justice (after referring to the general principle of national courts acting in accordance with national rules) observed:

B

"The position would be different only if the conditions and time-limits made it impossible in practice to exercise the rights which the national courts are obliged to protect.  This is not the case where reasonable periods of limitation of actions are fixed.  The laying down of such time-limits with regard to actions of a fiscal nature is an application of the fundamental principle of legal certainty protecting both the taxpayer and the administration concerned."

C

There is a similar statement, again expressly linked to fiscal proceedings, in *Comet BV v Produktschap voor Siergewassen* (Case 45/76) [1976] ECR 2043, para 18.

94    Limitation periods must be reasonable, but the Court of Justice recognises that national systems vary a good deal, and accepts different approaches so long as there is no infringement of the principles of effectiveness and equivalence, and no disappointment of legitimate expectations.  This is made clear in *Amministrazione delle Finanze dello Stato v Sas Mediterranea Importazione, Rappresentanze, Esportazione, Commercio (MIRECO)* (Case 826/79) [1980] ECR 2559, paras 11–13, and other cases of the same vintage involving the Italian tax authorities,

E    including *Amministrazione delle Finanze dello Stato v Denkavit Italiana Srl* (Case 61/79) [1980] ECR 1205, paras 23 and 24, and *Amministrazione delle Finanze dello Stato v Ariete SpA* (Case 811/79) [1980] ECR 2545, paras 10 and 11.

95    In line with that approach, in *Haahr Petroleum v Åbenrå Havn* (Case C-90/94) [1997] ECR I-4085, a five-year period was accepted as reasonable for reimbursement of an unlawful goods duty.   *Emmott v Minister for Social Welfare* (Case C-208/90) [1993] ICR 8 was distinguished ([1997] ECR I-4085, para 52) because in that case the relevant directive had not been properly transposed, and until its proper transposition time was not to start to run.  In *Edilizia Industriale Siderurgica Srl (Edis) v Ministero delle Finanze* (Case C-231/96) [1998] ECR I-4951 a three-year period was accepted for recovery of company registration charges levied in breach of

G    article 10 of Council Directive 69/335/EEC despite the fact that the normal limitation period for restitution, under article 2946 of the Italian Civil Code, was ten years.

96    The principles of effectiveness, equivalence and legitimate expectation also apply if a national legislature enacts a measure to curtail an existing limitation period, especially if the measure appears to be directed at a particular ruling of the Court of Justice.  The leading authority is the first

H    judgment of the Court of Justice in *Marks & Spencer plc v Customs and Excise Comrs* (Case C-62/00) [2003] QB 866 ("*M&S*").  That litigation was complicated and protracted, involving as it did two distinct claims for repayment of VAT (one concerning gift vouchers, and the other concerning chocolate-covered marshmallow teacakes) which were linked together as a

© 2012 The Incorporated Council of Law Reporting for England and Wales

matter of case management. There were two references to the Court of     *A*
Justice, the first of which attracted criticism from the court because of its
restricted scope. The final chapter in the saga is reported at [2009] STC 452;
[2009] 1 All ER 939. For present purposes, however, it is sufficient to note
that section 47 of the Finance Act 1997 curtailed the period for a claim for
repayment of VAT from six to three years, with retrospective effect, and
without any period of grace. Some of the claimant's claims for VAT on        *B*
teacakes (which were properly treated as zero-rated) went back to 1973.

97   The Advocate General (Geelhoed) [2003] QB 866, para 54, referred
to a summary of the EU jurisprudence in *Roquette Frères SA v Direction des
Services Fiscaux du Pas-de-Calais* (Case C-88/99) [2000] ECR I-10465,
para 20. He also cited at para 57, *Dilexport Srl v Amministrazione delle
Finanze dello Stato* (Case C-343/96) [1999] ECR I-579, para 43:        *C*

"Community law does not preclude the adoption by a member state,
following judgments of the court declaring duties or charges to be
contrary to Community law, of provisions which render the conditions
for repayment applicable to those duties and charges less favourable than
those which would otherwise have been applied, provided that the duties
and charges in question are not specifically targeted by that amendment        *D*
and the new provisions do not make it impossible or excessively difficult
to exercise the right to repayment."

The Advocate General pointed out, at para 58, that the retrospective
alterations to the Value Added Tax Act 1994 affected

"not only taxable persons who expected under the existing rules to
have ample time to make their claims but even taxable persons who        *E*
before the date on which the announcement of a change in the law was
made (18 July 1996) or prior to the date on which it was enacted
(19 March 1997) had made claims for repayment of unduly levied tax."

98   The issue of specific targeting was raised at first instance, but in view
of the conclusions which he had already reached Henderson J preferred to
express no view on it: [2009] STC 254, paras 428–431. His reasons included        *F*
the difficulty of the constitutional issues which would arise in inquiring into
the legislative intention behind the amending legislation. The point was not
raised in the Court of Appeal or in this court.

99   The Court of Justice reached conclusions similar to those of the
Advocate General [2003] QB 866, paras 36–38:

"36. Moreover, it is clear from *Aprile* [2001] 1 WLR 126, para 28 and        *G*
*Dilexport* [1999] ECR I-579 paras 41 and 42 that national legislation
curtailing the period within which recovery may be sought of sums
charged in breach of Community law is, subject to certain conditions,
compatible with Community law. First, it must not be intended
specifically to limit the consequences of a judgment of the court to the
effect that national legislation concerning a specific tax is incompatible        *H*
with Community law. Secondly, the time set for its application must be
sufficient to ensure that the right to repayment is effective. In that
connection, the court has held that legislation which is not in fact
retrospective in scope complies with that condition.

© 2012 The Incorporated Council of Law Reporting for England and Wales

A
"37. It is plain, however, that that condition is not satisfied by national legislation such as that at issue in the main proceedings which reduces from six to three years the period within which repayment may be sought of VAT wrongly paid, by providing that the new time limit is to apply immediately to all claims made after the date of enactment of that legislation and to claims made between that date and an earlier date, being that of the entry into force of the legislation, as well as to claims for repayment made before the date of entry into force which are still pending on that date.

B

"38. Whilst national legislation reducing the period within which repayment of sums collected in breach of Community law may be sought is not incompatible with the principle of effectiveness, it is subject to the condition not only that the new limitation period is reasonable but also

C
that the new legislation includes transitional arrangements allowing an adequate period after the enactment of the legislation for lodging the claims for repayment which persons were entitled to submit under the original legislation. Such transitional arrangements are necessary where the immediate application to those claims of a limitation period shorter than that which was previously in force would have the effect of retroactively depriving some individuals of their right to repayment, or of

D
allowing them too short a period for asserting that right."

The Court of Justice held the amending legislation incompatible with the principle of effectiveness. It also held, at paras 45 and 46, that it was precluded by the principle of the protection of legitimate expectations.

E   *Legitimate expectations*

100 The principle of protection of legitimate expectations is closely linked to the principle of legality. But in the opinion of Advocate General Cosmas in *Duff v Minister for Agriculture and Food, Ireland and Attorney General* (Case C-63/93) [1996] ECR I-569, para 23, the two are not interchangeable.

F
101 The Advocate General's opinion contains, at paras 24–25, a passage about timing which is of particular interest (his emphasis):

"24. . . . Particularly for the individual the principle of legality would in many ways lose its significance as a guarantee of a sphere of freedom, if the temporal succession of legal provisions concerning him was not governed by an elementary consistency and coherence sufficient to enable

G
him to discern the consequences (legal and financial) of his activities.

"25. Thus the principle of legal certainty calls for clarity and accuracy in framing the rules of law, and the individual provisions giving effect to them, which *at a given moment in time* constitute the legal framework within which the competences of the institutions are exercised and the activities of individuals are carried on. The principle of the protection of legitimate expectations requires the Community legislature and the other

H
Community organs (or the national authorities operating under provisions of Community law) to exercise their powers *over a period of time* in such a way that situations and relationships lawfully created under Community law are not affected in a manner which could not have been foreseen by a diligent person."

© 2012 The Incorporated Council of Law Reporting for England and Wales

382
FII Group Test Claimants v Revenue and Customs Comrs (SC(E))    [2012] 2 AC
Lord Walker of Gestingthorpe JSC

This approach was not in terms adopted by the Court of Justice, but para 20    A
of its judgment appears to be in line with it.

102    I have quoted this passage at some length because it seems to me to
touch on what is, if I may respectfully say so, one of the crucial points in
Lord Sumption JSC's judgment. Lord Sumption JSC ultimately bases his
conclusions, on the central issue, on the principle of protection of legitimate
expectations: see post, paras 198 to 202. He observes, at para 196, that the    B
right of the test claimants to choose from a range of causes of action is a right
derived solely from English procedural law and (echoing the Court of Appeal
[2010] STC 1251, para 226) that it exists only to the extent that English law
so provides.  I have considerable difficulty in reconciling that with the
principles stated by the Advocate General and the Court of Justice in M&S
[2003] QB 866.  But before addressing that difficulty I should recapitulate    C
the sequence of events in which the statutory cut-off provisions were
announced and enacted.

*The enactment of the statutory cut-off provisions*

103    Mr Aaronson provided a useful summary of the key dates. The first
two are the decisions of the House of Lords in *Woolwich* [1993] AC 70
(20 July 1992) and *Kleinwort Benson Ltd v Lincoln City Council* [1999]    D
2 AC 349 (29 October 1998).  After 1998 English lawyers knew that the
recovery of money paid under a mistake of law (perhaps including a mistake
of tax law, subject to arguments on exclusive remedies) had become a real
possibility, although it was by no means a firmly established cause of action.
But until the decision of the Court of Justice in *Metallgesellschaft Ltd v
Inland Revenue Comrs* (Joined Cases C-397/98 and C-410/98) [2001] Ch    E
620 on 8 March 2001 there was no general appreciation that the
UK corporation tax regime was seriously open to challenge as infringing
the Treaty. Henderson J did not make any detailed findings about this, since
the principle of legitimate expectations does not seem to have been argued as
a separate issue before him. But he did [2009] STC 254, para 267, make a
general finding of fact about mistake:    F

"The unlawful payments of ACT made from 1973 to 1999, and the
unlawful payments of ACT made under the FID regime from 1994 to
1999, were in my view plainly made under a mistake about the lawfulness
of the tax regimes under which they were paid.  I am satisfied from the
evidence, both written and oral, that this was not obvious to anybody
within the BAT group at the time, since everybody proceeded on the
footing that the tax in question was lawfully due and payable."    G

104    After 8 March 2001 a well advised multinational group based in
the UK would have had good grounds for supposing that it had a valid claim
to recover ACT levied contrary to EU law, with at least a reasonable
prospect that the running of time could be postponed until then (but not
subsequently) by the operation of section 32(1)(c) of the Limitation Act
1980.  During 2002 the opinion of the Advocate General and the judgment    H
of the Court of Justice in *M&S*, while possibly not adding much to the earlier
jurisprudence, spelled out very clearly, for UK companies and lawyers, both
the capacity and the limits of national legislation in curtailing limitation
periods in proceedings for recovery of tax levied in breach of EU law.

© 2012 The Incorporated Council of Law Reporting for England and Wales

383
[2012] 2 AC    FII Group Test Claimants v Revenue and Customs Comrs (SC(E))
Lord Walker of Gestingthorpe JSC

A    105    The next important date was 18 July 2003, when Park J gave his
first instance judgment in *DMG* [2003] 4 All ER 645. This was the first
judicial decision which positively upheld a claim for repayment of unduly
levied tax with an extended limitation period under section 32(1)(c). But
appeals to the Court of Appeal and the House of Lords were to follow and
(as Henderson J observed, at para 406), "the outcome of those appeals was,
at the time, impossible to predict with any confidence."

B    106    The BAT group started its proceedings on 18 June 2003, a month
before Park J's judgment in *DMG*. On 8 September 2003 the Paymaster
General announced the introduction of retrospective legislation affecting
proceedings to recover tax on the ground of mistake if the proceedings were
issued on or after that day (the scope of the proposed legislation was later
extended to include amendment of existing proceedings). The Aegis group
C    issued its proceedings on that very day, 8 September 2003, and so was one of
the very first claimants to be affected by the legislation.

107    Section 320 of the Finance Act 2004 was enacted on 24 June 2004.
Its essential provisions were set out by Henderson J, at para 408:

"*Exclusion of extended limitation period in England, Wales and
Northern Ireland*

D    "(1) Section 32(1)(c) of the Limitation Act 1980 . . . (extended period
for bringing an action in case of mistake) does not apply in relation to a
mistake of law relating to a taxation matter under the care and
management of the Commissioners of Inland Revenue.    This
subsection has effect in relation to actions brought on or after
8 September 2003.

E    "(2) For the purposes of— (a) section 35(5)(a) of the Limitation Act
1980 . . . (circumstances in which time-barred claim may be brought in
course of existing action), and (b) rules of court . . . having effect for the
purposes of those provisions, as they apply to claims in respect of
mistakes of the kind mentioned in subsection (1), a new claim shall not be
regarded as arising out of the same facts, or substantially the same facts, if
it is brought in respect of a different payment, transaction, period or other
F    matter. This subsection has effect in relation to claims made on or after
20 November 2003 . . ."

"(6) The provisions of this section apply to any action or claim for
relief from the consequences of a mistake of law, whether expressed to be
brought on the ground of mistake or on some other ground (such as
unlawful demand or ultra vires act).

G    "(7) This section shall be construed as one with the Limitation Act
1980 . . ."

108    The Court of Appeal gave judgment in *DMG*, reversing Park J, on
4 February 2005: [2006] Ch 243. Mr Aaronson described the Court of
Appeal's decision as a "bump in the road", suggesting that it was unforeseen
and soon forgotten, but that seems an inappropriate description, even with
H    hindsight. Reference to the judgments (running to nearly 300 paragraphs in
all) shows that numerous issues were fiercely contested, including the date of
the mistakes discovery (which occurred, on HMRC's argument, in 1995).
The Court of Appeal's decision was reversed by the House of Lords on
25 October 2006: [2007] 1 AC 558. Shortly afterwards the UK Government
applied to the Court of Justice for the reopening of the hearing of the first

© 2012 The Incorporated Council of Law Reporting for England and Wales

384
FII Group Test Claimants v Revenue and Customs Comrs (SC(E))    [2012] 2 AC
Lord Walker of Gestingthorpe JSC

reference in these proceedings so that the United Kingdom could argue for a     A
temporal restriction to the judgment of the Court of Justice.    That
application was rejected on 6 December 2006, and on the same day
HMRC announced the introduction of further retrospective legislation.

109    This was enacted on 19 July 2007 as section 107 of the Finance Act
2007.  The essential terms of the section were set out by Henderson J, at
para 412:                                                                       B

"*Limitation period in old actions for mistake of law relating to direct
tax*

"(1) Section 32(1)(c) of the Limitation Act 1980 . . . (extended period
for bringing action in case of mistake) does not apply in relation to any
action brought before 8 September 2003 for relief from the consequences
of a mistake of law relating to a taxation matter under the care and         C
management of the Commissioners of Inland Revenue.

"(2) Subsection (1) has effect regardless of how the grounds on which
the action was brought were expressed and of whether it was also brought
otherwise than for such relief.

"(3) But subsection (1) does not have effect in relation to an action, or
so much of an action as relates to a cause of action, if— (a) the action, or
cause of action, has been the subject of a judgment of the House of Lords     D
given before 6 December 2006 as to the application of section 32(1)(c) in
relation to such relief, or (b) the parties to the action are, in accordance
with a group litigation order, bound in relation to the action, or cause of
action, by a judgment of the House of Lords in another action given
before that date as to the application of section 32(1)(c) in relation to such
relief.                                                                       E

"(4) If the judgment of any court was given on or after 6 December
2006 but before the day on which this Act is passed the judgment is to be
taken to have been what it would have been had subsections (1) to (3)
been in force at all times since the action was brought (and any defence of
limitation which would have been available had been raised) . . ."

"(6) In this section—'group litigation order' means an order of a court
providing for the case management of actions which give rise to common     F
or related issues of fact or law . . ."

110    On 30 September 2010 the European Commission announced that
it had made a formal request to the UK to change section 107 of the Finance
Act 2007.  On 26 January 2012 there was a further announcement that the
European Commission has referred the UK to the Court of Justice because of
the absence of proper transitional rules in section 107.                       G

*Discussion of the statutory cut-off provisions*

111    These provisions were challenged in the lower courts primarily on
the ground that they infringed the principle of effectiveness.  There was little
discussion of legitimate expectations.  Lord Sumption holds, at para 199,
that reasonable persons in the position of the test claimants would not, until     H
Park J's judgment in *DMG* on 18 July 2003, have counted on being able to
recover tax on the ground of mistake of law; and that even after that decision
the existence of such claim was being challenged on serious grounds.  He
concludes from that proposition that no one in the position of the test

© 2012 The Incorporated Council of Law Reporting for England and Wales

A  claimants could have had a reasonable and realistic expectation of
recovering tax on the ground of mistake.

112  I cannot disagree with that conclusion. The issue of legitimate
expectations was not raised before the judge, and he made no findings on it.
The issue of reasonable expectations must of course be decided objectively,
but it would have been helpful to have had the view of the judge who very
carefully considered the whole case. But in any case I do have great difficulty
B  in applying the same reasoning to upholding the validity of section 320
against attack under the principle of effectiveness, in the light of *M&S*. The
judgment of the Court of Justice in that case lays down a clear requirement
for transitional provisions, and that requirement is derived at least as much
from the principle of effectiveness and the principle of legality as from the
more limited principle of protection of legitimate expectations (as Advocate
C  General Cosmas said in *Duff* (Case C-63/93) [1996] ECR I-569, para 23,
they are not interchangeable).

113  If one asks what the test claimants were entitled to, and what they
could expect to continue to be entitled to, in the way of national remedies to
recover tax levied and paid contrary to EU law, the answer is plainly not that
they were entitled to the indefinite continuation of a range of alternative
D  remedies. The passage from *Rewe II* on which the test claimants rely (*Rewe-
Handelsgesellschaft Nord mbH v Haupzollamt Kiel* (Case 158/80) [1981]
ECR 1805, para 44) is, as Lord Sumption demonstrates, an example of the
operation of the principle of equivalence. It is not applicable in this case
because both of the statutory cut-off provisions applied to all claims for
repayment of direct tax, whether or not the repayment was claimed because
of an infringement of EU law.

E  114  Nor were the test claimants entitled to a remedy arrived at by some
precise formula furnished by EU law. That would be contrary to the basic
principles laid down in *Rewe I* (Case 33/76) [1976] ECR 1989, and repeated
in countless cases since then. What they were entitled to was that national
law should provide an effective remedy which met the requirements of
EU principles of effectiveness and equivalence; and that any curtailment of
any relevant limitation period should comply with those principles, as well
F  as with the principle of legitimate expectations. The fact that they could not
have complained, in another parallel universe in which section 32(1)(c) had
never existed, is not decisive on the principle of effectiveness.

115  I would therefore hold that section 320 was contrary to EU law as
infringing the principle of effectiveness as explained in *M&S*, and that
section 107 was contrary to EU law both on that ground and (in agreement
G  with Lord Sumption) under the principle of protecting legitimate
expectations. Examples can be tendentious, but the drastic way in which
section 320 could operate can be illustrated by the example of a UK-resident
holding company, part of a multinational group, which paid ACT from 1973
to 1996, building up an ever-increasing surplus of unused ACT, and then
(three years before the repeal of ACT) decided that enough was enough, and
disposed of its overseas subsidiaries. In 2001 it would have learned of the
H  possibility of a claim for repayment of tax, and taken advice as to the
wisdom of incurring costs by making a claim, which was still doubtful, at
some time during the next six years. In 2002, *M&S* (Case C-62/00) [2003]
QB 866 seemed to confirm that the law would not be changed
retrospectively and without reasonable notice. But if the company did not

act before 8 September 2003 it would have been deprived, retrospectively    *A*
and without any notice, of the entirety of its claims for over 20 years' tax.

*Section 33 of the Taxes Management Act 1970*

116   The last substantive point to be considered is section 33 of the
Taxes Management Act 1970, which provided a statutory right to
repayment of tax paid by mistake, subject to a number of restrictive    *B*
conditions. It replaced provisions originally introduced by the Finance Act
1923. It has since been replaced by two different sets of provisions, one
applicable to individuals and the other to companies. In the form in which it
was in force at the relevant time the conditions were (1) it applied only to
excessive tax charged by an assessment (which meant, Lord Goff stated in
*Woolwich* [1993] AC 70, 169, a valid assessment) as a result of an error or
mistake in a return; (2) there was a six-year time limit; (3) there was to be no    *C*
repayment if the erroneous or mistaken return was in accordance with
practice generally prevailing at the time; and (4) the repayment was to be
such as the Board of Inland Revenue (subject to a possible appeal to the
Special Commissioners) considered reasonable and just. The flexibility of
the last condition was explained by Mr Ewart by the example of a taxpayer
who had paid too much tax six years before, but who ought to have paid
more tax on the same income seven or more years before.    *D*

117   The issue on section 33 is whether it is an obstacle to the test
claimants and if so, whether it can be given a conforming interpretation
under the *Marleasing* principle (*Marleasing SA v La Comercial Internacional
de Alimentación SA* (Case C-106/89) [1990] ECR I-4135). In terms of the
amount of tax at stake, this issue is relatively minor in the context of the
litigation as a whole, as it extends only to tax charged under Schedule D,    *E*
Case V, pursuant to section 18 of ICTA 1988. But it is still a point of some
general importance. Before Henderson J HMRC argued, but only it seems
quite briefly, that the decision of the Court of Appeal in *Monro v Revenue
and Customs Comrs* [2009] Ch 69 established that section 33 was an
exclusive remedy which left no room for any common law claim in unjust
enrichment. The judge [2009] STC 254, paras 438–439 rejected that on two
grounds: first that section 33 did not extend to tax levied otherwise than by    *F*
an assessment; secondly that in any event the national legislation must, in a
*San Giorgio* claim, yield to the principle of effectiveness. It now seems to be
common ground that the first of these reasons does not hold good for tax
under Schedule D Case V.

118   The Court of Appeal took a different approach. It concluded
[2010] STC 1251, paras 261 and 264, that a conforming interpretation was    *G*
possible, and did sufficiently "go with the grain of the legislation" (a
reference to the expression "going against the grain" used in relation to
section 3(1) of the Human Rights Act 1998 by Lord Rodger of Earlsferry in
*Ghaidan v Godin-Mendoza* [2004] 2 AC 557, para 121, also adopted by
Lord Nicholls of Birkenhead, at para 33). The conforming interpretation
adopted, at para 261, was that the restrictive condition about prevailing
practice in section 33(2A) "is to be read as subject to the limitation that it    *H*
applies only if and to the extent that the United Kingdom can consistently
with its Treaty obligations impose such a restriction".

119   I have grave doubts as to whether that interpretation does not go
against the grain of the legislation, since the "practice generally prevailing"

A   condition is of long standing and has always been regarded as an important
safeguard for the public revenue. I am inclined to think that Mr Aaronson
was right (Day 2, pp 25–26) to call it a "cardinal feature" of the legislation.
In my view the *Marleasing* principle can be applied in a simpler and more
natural way by not construing section 33 as impliedly setting itself up as an
exclusive provision (which it did not do expressly, unlike section 80 of the
B   Value Added Tax Act 1994). The test claimants submit that the application
of *Marleasing* cannot rework section 33 in a way that serves any relevant
purpose. But to read it as non-exclusive does not go against its grain. It
would merely exclude an implication which is itself no more than a process
of statutory construction. In practical terms the effect is the same as that
which Henderson J reached by the second limb of his reasoning. I would
therefore allow the appeal on this point (although it may not, in the end,
C   make much practical difference).

120   In summary, therefore, my provisional view is that we
should—(1) uphold the Court of Appeal as to (i) the scope of section 32(1)(c)
of the Limitation Act 1980 and (ii) the scope of the *Woolwich* principle;
(2) allow the appeal on section 320 and section 107; and (3) allow the appeal
on section 33 of the Taxes Management Act 1970. But in view of the
difference of opinion in the court I consider (in common with Lord Hope,
D   Lord Dyson and Lord Reed) that it is necessary for the court to make a
further reference to the Court of Justice of the European Union in
accordance with directions in para 23 of Lord Hope's judgment.

### LORD BROWN OF EATON-UNDER-HEYWOOD

121   I have had the great advantage of reading in draft the judgments of
E   Lord Walker of Gestingthorpe and Lord Sumption JJSC and am in full
agreement with them both on the several issues upon which they each agree.
What, then, of the single issue upon which they disagree: was section 320 of
the Finance Act 2004 contrary to EU law as infringing the principle of
effectiveness as explained by the Court of Justice in *Marks & Spencer plc v
Customs and Excise Comrs* (Case C-62/00) [2003] QB 866?

F   122   During the hearing I confess to having found difficulty in
recognising any principled basis for distinguishing between on the one hand
section 47(1) of the Finance Act 1997 which (with effect from when
government had earlier announced its intention so to legislate:
section 47(2)), besides reducing the basic limitation period for tax
repayment claims from six to three years, in addition eliminated the special
advantage for claims in mistake previously introduced by section 24(5) of
G   the Finance Act 1989, delaying the commencement of the limitation period
for such claims until the claimants had actually or constructively discovered
the mistake—this being the provision held ineffective by the Court of Justice
in *Marks & Spencer*; and, on the other hand, section 320 with which this
court is now concerned which (similarly with effect from when government
first announced its intention so to legislate) similarly eliminates with regard
to tax repayment claims based on a mistake of law the similar special
H   provision enlarging the limitation period to be found in section 32(1)(c) of
the Limitation Act 1980.

123   Now, however, I am inclined to accept Lord Sumption's view that,
by the same token that, *on the facts of this case*, the appellants can establish
no legitimate expectation at any time prior to 8 September 2003 (when

© 2012 The Incorporated Council of Law Reporting for England and Wales

388
FII Group Test Claimants v Revenue and Customs Comrs (SC(E))     [2012] 2 AC
Lord Brown of Eaton-under-Heywood

government announced its intention to introduce section 320) that the     *A*
limitation period for mistake of law tax repayment claims would not be
attenuated by legislation, nor can they make good their argument that
section 320 infringes the EU principle of effectiveness.   The self-same
considerations—essentially of fairness and legal certainty—which underlie
the doctrine of legitimate expectation (both domestically and under EU law)
to my mind also inform the principle of effectiveness. If, as seems to me     *B*
plainly to be so, the situation even after Park J's first-instance decision in
*Deutsche Morgan-Grenfell Group plc v Inland Revenue Comrs* [2003] 4 All
ER 645 ("*DMG*") was one of complete uncertainty as to whether tax could
be re-claimed on the basis of a mistake of law—there being at least as much
room for a mistake of law as to this as for the mistake of law which the
majority of the House of Lords in *DMG* [2007] 1 AC 558 held the taxpayers
to remain under until the Court of Justice's final authoritative decision in the     *C*
*Hoechst* case (*Metallgesellschaft Ltd v Inland Revenue Comrs* (Joined Cases
C-397/98 and C-410/98) [2001] Ch 620)—there was to my mind neither
unfairness nor any denial of a legitimate expectation from Parliament
stepping in to legislate with immediate effect to clarify the situation (albeit to
the taxpayers' obvious disadvantage given that the common law was finally
to be developed in their favour).     *D*

124  In short, whereas the position as to limitation with regard to tax
recovery claims was crystal clear under section 24 of the 1989 Act—and
could not therefore fairly and legitimately be altered without due notice and
appropriate transitional provisions—it was entirely unclear under the
developing common law when Parliament chose to intervene by the
enactment of section 320. And it is that which provides the principled basis
for distinguishing this case from *Marks & Spencer*.     *E*

125  Section 107, by contrast, is not merely overtly retrospective
(eliminating pre-existing claims explicitly preserved by section 320), but was
introduced after the House of Lords decision in *DMG* finally resolved the
uncertainty in the law and proclaimed (albeit subject always to lawful
legislative change) that mistake of law claims with their extended limitation
periods were indeed available to those seeking recoupment of overpaid (or
prematurely paid) tax.   Small wonder that it is section 107 that the     *F*
Commission selected for attack.

**LORD CLARKE OF STONE-CUM-EBONY JSC**

126  In para 9 above Lord Hope of Craighead DPSC has conveniently
identified four issues for determination in this appeal. Issues 3 and 4, which
raise a question of construction of section 32(1)(c) of the Limitation Act     *G*
1980 and the ingredients of the common law *Woolwich* claim respectively,
raise no issue of EU law.  I agree with the other members of the court that,
for the reasons they give, the decisions of the Court of Appeal on both
questions should be upheld and that both questions should be answered no.
At the end of the argument I was inclined to the view that section 32(1)(c)
should be given the wider meaning contended for by the test claimants, but
I have been persuaded by the reasoning of Lord Walker of Gestingthorpe and     *H*
Lord Sumption JJSC that it should not.

127  I also agree with the other members of the court that the restitution
and damages remedies sought by the test claimants are not excluded by
section 33 of the Taxes Management Act 1970 and that it follows that

© 2012 The Incorporated Council of Law Reporting for England and Wales

-03635-jpm    Doc 306    Filed 06/06/17    Entered 06/06/17 11:28:43    Main Docume
Pg 801 of 1164

389
[2012] 2 AC        FII Group Test Claimants v Revenue and Customs Comrs (SC(E))
Lord Clarke of Stone-cum-Ebony JSC

A    question 2 must be answered no and that the test claimants' appeal on this
issue must succeed.    This seems to me to be essentially a matter of
construction of section 33.  In so far as it involves an issue of EU law, I would
hold that it is acte clair, and would not refer it to the Court of Justice.

128    By contrast, the questions posed by issue 1 raise difficult questions
of EU law.  This is evident from the differences of opinion between members
B    of the court.  A comparison between the judgments in this case shows that
the members of the court are divided, not only as to the question whether
EU law protects the mistake claims and, in particular, whether section 320
of the Finance Act 2004 infringes the EU law principles of effectiveness, legal
certainty and legitimate expectation, but also as to the correct reasoning for
the conclusions reached.  I too would refer the section 320 issues to the
Court of Justice.

C    129    If there is to be a reference, any further analysis of the position by
me will be largely, if not entirely, redundant, since all will depend upon the
conclusions ultimately reached by the Court of Justice.  I will therefore only
add this.  I agree that section 107 infringes EC law for the reasons given by
Lord Sumption JSC.  As to section 320, in agreement with Lord Hope of
Craighead DPSC, Lord Walker of Gestingthorpe, Lord Dyson, and Lord
Reed JJSC my provisional view is that the appeal should be allowed.

D    130    The problem (or potential problem) facing the test claimants is that
English law provides two remedies for their claim that tax has been exacted
from them contrary to EU law.  If the only available remedy were the
mistake claim, the position would be clear.  It would fall within the principle
in *Marks & Spencer plc v Customs and Excise Comrs* (Case C-62/00) [2003]
QB 866 ("*M&S*"), which is discussed in some detail by Lord Walker, at
E    paras 96 to 99.  The principle is summarised both by the Advocate General
and by the Court of Justice at paras 36 to 38 (quoted at para 99 above).  It
applies in respect of national legislation curtailing the period within which
recovery may be sought of sums charged in breach of EU law and may be
summarised as follows: (1) such legislation must not be intended specifically
to limit the consequences of a judgment of the Court of Justice to the effect
that national legislation concerning a specific tax is incompatible with
F    EU law; (2) the time set for its application must be sufficient to ensure that
the right to repayment is effective; and (3) where a new limitation period
limits the previously permitted period, the new period must be reasonable
and the new legislation must include transitional arrangements allowing an
adequate period for lodging claims which were available under the previous
legislation.

G    131    As Lord Walker explains at para 104, after 8 March 2001, when
the Court of Justice decided *Metallgesellschaft Ltd v Inland Revenue Comrs*
(Joined Cases C-397/98 and C-410/98) [2001] Ch 620, the test claimants
would have had good grounds for supposing that they had a good claim to
recover ACT levied contrary to EU law, with at least a reasonable prospect
that the running of time could be postponed until then by section 32(1)(c) of
the Limitation Act 1980.  In so far as proceedings had not been issued, their
H    claims were therefore in time as at 8 September 2003 when
HMRC announced the introduction of what became section 320 of the
Finance Act 2004.  The effect of section 320, which is set out at para 107
above and was enacted on 24 June 2004, was to deprive those Test
Claimants of rights which were available to them by reason of

© 2012 The Incorporated Council of Law Reporting for England and Wales

390
FII Group Test Claimants v Revenue and Customs Comrs (SC(E))        [2012] 2 AC
Lord Clarke of Stone-cum-Ebony JSC

section 32(1)(c) without any transitional provisions to allow them to issue proceedings within a reasonable time.

132    But for the availability of the *Woolwich* claim, section 320 would therefore be contrary to the principles clearly set out in *M&S*. It made it impossible for those Test Claimants to proceed with their mistake claim because of the absence of the introduction of a reasonable period of limitation as from then and because of the complete absence of transitional provisions. The facts are very similar to those relating to the chocolate covered marshmallow teacakes in *M&S*.

133    Does the existence of the *Woolwich* remedy make all the difference? I agree with Lord Hope, Lord Walker, Lord Reed and Lord Dyson that it does not. To my mind it would be remarkable if it did. In this regard, I agree in particular with the reasoning of Lord Hope at paras 16 to 19 above. As Lord Hope shows, the test claimants had every prospect of success. It is plain from the fact that section 320 was enacted that HMRC shared that view, since (at any rate as it seems to me) the whole point of the section was to ensure that such a claim would not succeed. In any event, in the period before section 320 came into force the test claimants were entitled to have their mistake claim adjudicated upon by the English courts. In my opinion they had a legitimate expectation that, as Lord Hope puts it at para 19 and Lord Reed puts it at para 243, that entitlement would not be removed from them by the introduction without notice of a limitation period that was not fixed in advance.

134    Before the decision in *Deutsche Morgan Grenfell Group plc v Inland Revenue Comrs* [2007] 1 AC 558 ("*DMG*") the test claimants knew that there was a reasonable prospect that they had a good mistake of law claim against the revenue. I agree with Lord Sumption (at para 201) that it must be relevant to ask on what basis the test claimants must be taken to have made their plans and that the issue is whether there is an assumption reasonably to be attributed to them about how long they had to bring their claims, which was then retrospectively falsified by Parliament. It seems to me that they can reasonably be taken to have made their plans on the basis of an expectation that the state would not remove their rights without warning or transitional provisions. That expectation was then retrospectively falsified by section 320.

135    In all these circumstances, I prefer the reasoning of Lord Hope and Lord Reed to that of Lord Sumption. It follows that in my opinion section 320 infringes their rights under EC law on the ground that it infringes the principle of legitimate expectation.

136    In addition I agree with Lord Hope, Lord Walker, Lord Dyson and Lord Reed that an application of the principle of effectiveness also leads to the conclusion that section 320 infringes their rights under EU law. This part of the case has been analysed in some detail by Lord Hope, Lord Walker and Lord Reed. In particular, Lord Reed's analysis is considerably more extensive than that of Lord Walker. As I read Lord Reed's judgment, a critical part of his reasoning is his reliance upon his view of the principles of equivalence, which he then deploys in reaching his conclusion that section 320 infringes the principle of effectiveness. His reasoning is to my mind convincing and, for the reasons he gives, I too would so hold.

© 2012 The Incorporated Council of Law Reporting for England and Wales

391
[2012] 2 AC        FII Group Test Claimants v Revenue and Customs Comrs (SC(E))
Lord Clarke of Stone-cum-Ebony JSC

A    137   I have a slight concern that so to hold is to determine the issue on a basis which was not advanced in argument on behalf of the test claimants, which (to put it no higher) is surprising given the many years they have been considering these issues. However, if the Court of Justice were to prefer the approach to equivalence adopted by Lord Sumption to that adopted by Lord Reed, I would nevertheless hold that section 320 infringes the principle of
B    effectiveness. Although there is, so far as I am aware, no decision of the Court of Justice which directly addresses the point, this conclusion seems to me to receive some support from the opinion of Advocate General Sharpston in *Unibet (London) Ltd v Justitiekanslern* (Case C-432/05) [2008] All ER (EC) 453, para 32, where she said:

C        "The starting point to my mind must be the principle, first laid down in *Rewe I* [(Case 33/76) [1976] ECR 1989, para 5], that it is for the domestic legal system of each member state to determine the procedural conditions governing actions at law intended to ensure the protection of Community law rights, provided that those conditions are not less favourable than those relating to similar actions of a domestic nature (principle of equivalence) and do not make it impossible in practice to
D        exercise those rights (principle of effectiveness). That approach was confirmed in *Rewe II* [(Case 158/80) [1981] ECR 1805, para 44], where the court stated that the Treaty was *not intended to create new remedies in the national courts* to ensure the observance of Community law other than those already laid down by national law and that the system of legal protection established by the Treaty implies that it must be possible
E        for *every type of action provided for by national law* to be available for the purpose of ensuring observance of Community provisions having direct effect."

138   I recognise that, as Lord Sumption observes at para 194, *Rewe-Handelsgesellschaft Nord mbH v Haupzollamt Kiel* (Case 158/80) [1981] ECR 1805 was an equivalence case and that the Court of Justice did not
F    expressly comment upon this passage, but it nevertheless seems to me that in her para 32 the Advocate General was putting the point more generally in the context of effectiveness and that, in that context it provides some support for the test claimants' case.

139   I appreciate that the views that I (and others) have expressed on the section 320 point can only be provisional and that it will ultimately be
G    resolved in the light of the answers to the questions referred to the Court of Justice. I nevertheless hope that these views will be of some assistance in the formulation of those questions.

**LORD DYSON JSC**

140   I too agree with the judgments of Lord Walker of Gestingthorpe and Lord Sumption JJSC on all the issues on which they agree. Like Lord
H    Hope of Craighead DPSC and Lord Reed JSC, I agree with Lord Walker on the *DMG*/section 320 issue. Nevertheless, I acknowledge the force of Lord Sumption's reasoning on this issue. For that reason I have concluded that the question cannot be regarded as acte clair and that a reference to the Court of Justice is necessary.

© 2012 The Incorporated Council of Law Reporting for England and Wales

392
FII Group Test Claimants v Revenue and Customs Comrs (SC(E))      [2012] 2 AC
Lord Sumption JSC

**LORD SUMPTION JSC**

*A*

*Introduction*

141  It is not in dispute that under EU Law, the United Kingdom is bound to provide an effective means under its national law of recovering tax charged contrary to the EU Treaty. It is common ground that it is open to member states to impose reasonable periods of limitation, even on actions to enforce directly effective EU law rights. It is also common ground that six years is a reasonable period of limitation for an action to recover tax charged contrary to EU law, and that if English law had always provided for the period to run from the date of payment in cases of mistake, then that too would have been reasonable. Broadly stated, the issue on this appeal is whether the United Kingdom was entitled to change the law relating to the running of the limitation period, without notice or transitional provisions for actions which were pending or in the pipeline. The commissioners say that the change related only to actions to recover tax paid under a mistake of law and that there are other causes of action unaffected by the change which satisfy the United Kingdom's obligation to provide an effective means of recovering the tax. The test claimants say, in bald summary, (i) that every cause of action available to them for common law restitution is, on analysis, an action for relief against the consequences of a mistake and therefore affected by the change, (ii) that so far as there are other causes of action available to them which are not affected by the change, they are subject to legal limitations which make it impossible to regard them as an effective means of recovery, and (iii) that irrespective of the fate of points (i) and (ii) the United Kingdom was not entitled to curtail, without notice or transitional provisions, the availability of any cause of action which might serve their purpose.

*B*

*C*

*D*

*E*

142  In my judgment, the test claimants and other companies in their position have an effective means of recovering the overpaid tax under the principle stated by the House of Lords in the landmark decision in *Woolwich Equitable Building Society v Inland Revenue Comrs* [1993] AC 70. The availability of that cause of action entirely satisfies the obligations of the United Kingdom under the EU Treaty, notwithstanding that it is subject to a limitation period which runs from the date of payment. Neither section 320 of the Finance Act 2004 nor section 107 of the Finance Act 2007 had any impact on a claim made on that basis, because both enactments were concerned only with actions for the recovery of tax paid under a mistake of law. Mistake of law is a more limited cause of action, which is neither necessary nor sufficient to satisfy the obligations of the United Kingdom under the EU Treaty. In those circumstances, I consider that the validity of those enactments depends entirely on whether they defeated the legitimate expectations of taxpayers as that concept is understood in EU law. I do not think that section 320 of the Finance Act 2004 can be criticised on that ground. Its effect was that the limitation period for an action to recover tax paid under a mistake of law was to run from the date of payment in the same way as the limitation period for an action to recover tax on any other ground. It was announced almost as soon as the existence of a right to recover tax paid under a mistake of law had been judicially recognised. It follows that taxpayers in the position of these claimants cannot at the

*F*

*G*

*H*

© 2012 The Incorporated Council of Law Reporting for England and Wales

A  relevant time have had any reasonable expectation that a cause of action to recover tax paid under a mistake of law would be available to them. For that reason, I think that they would suffer no injustice if section 320 of the 2004 Act were to be given effect according to its terms, whereas a significant injustice would be suffered by the general body of taxpayers if it were not. Different considerations apply to section 107 of the 2007 Act, which was retrospective in an altogether more radical and objectionable sense. It does

B  not surprise me that the European Commission has referred the enactment of 2007 to the Court of Justice, but has taken no comparable step in the case of the enactment of 2004.

143  I propose in this judgment to deal first with the general principles of EU law which are relevant, and on which I believe that there is substantial agreement among the members of the court. I shall then address the

C  argument that a claim to recover overpaid corporation tax on the principle in *Woolwich Equitable* is not enough to satisfy those principles. I shall then, finally, return to EU law to consider the main question which has divided this court, namely whether, even if English law did not need to make available a right to recover the tax on the footing of mistake, having done so it could lawfully curtail the limitation period for that right retrospectively and without warning or transitional provisions.

D

*EU law*

144  Unlike value added tax and certain other taxes and duties which are required and directly regulated by EU law, corporation tax is a creature of the domestic law of the United Kingdom.    Apart from the limited requirements of Directive 90/435/EEC relating to withholding tax and

E  double taxation relief, it is not subject to any EU scheme of harmonisation. Like other national tax systems, however, corporation tax is affected by EU law because it must be assessed and collected on a basis consistent with the Treaty. In particular, it must comply with the requirements of the single market, including the freedom of establishment and the free movement of capital guaranteed by what are now articles 49FEU and 63FEU of the

F  Treaty: *Commission of the European Communities v French Republic* (Case 270/83) [1986] ECR 273; *Staatssecretaris van Financiën v Verkooijen* (Case C-35/98) [2000] ECR I-4071.

145  The internal market is a domain in which competence is shared between the institutions of the EU and those of member states under article 4 of the Treaty. It follows that even in cases where EU law confers direct rights on private parties, it is for national courts applying national law to

G  determine what rights of action are available against member states to vindicate those rights, and subject to what procedural or other conditions. In *Rewe-Zentralfinanz eG v Landwirtschaftskammer für das Saarland* (Case 33/76) [1976] ECR 1989 ("*Rewe I*"), the principle was stated at para 5 in terms which have been repeated or paraphrased in many cases decided since:

H  "it is the national courts which are entrusted with ensuring the legal protection which citizens derive from the direct effect of the provisions of Community law. Accordingly, in the absence of Community rules on this subject, it is for the domestic legal system of each member state to designate the courts having jurisdiction and to determine the procedural conditions governing actions at law intended to ensure the protection of

© 2012 The Incorporated Council of Law Reporting for England and Wales

the rights which citizens have from the direct effect of Community law, it *A* being understood that such conditions cannot be less favourable than those relating to similar actions of a domestic nature. Where necessary, articles 100 to 102 and 235 of the Treaty enable appropriate measures to be taken to remedy differences between the provisions laid down by law, regulation or administrative action in member states if they are likely to distort or harm the functioning of the Common Market. In the absence of *B* such measures of harmonization the right conferred by Community law must be exercised before the national courts in accordance with the conditions laid down by national rules. The position would be different only if the conditions and time-limits made it impossible in practice to exercise the rights which the national courts are obliged to protect."

One consequence of this, as the court pointed out in *Metallgesellschaft Ltd v* *C* *Inland Revenue Comrs* (Joined Cases C-397/98 and C-410/98) [2001] Ch 620, para 81, is that the nature, basis and legal classification of rights of action available for this purpose in the national court is a matter for national courts:

"It must be stressed that it is not for the Court of Justice to assign a legal classification to the actions brought by the claimants before the *D* national court. In the circumstances, it is for the claimants [Metallgesellschaft Ltd and others and Hoechst AG] to specify the nature and basis of their actions (whether they are actions for restitution or actions for compensation for damage), subject to the supervision of the national court."

146 This is, however, subject to the overriding requirement derived *E* from the Treaty and referred to in the passage which I have quoted from *Rewe I*, that national legal systems should provide a minimum standard of protection for EU law rights. In the case law of the Court of Justice, the standard of protection required is embodied in two principles which are restated in almost every decision on the point. First, the substantive and procedural provisions of national law must be effective to protect EU law rights (the "principle of effectiveness"). Their enforcement in national law *F* must not be subject to onerous collateral conditions or disproportionate procedural requirements. They must not render "virtually impossible or excessively difficult" the exercise of rights conferred by EU law. Secondly, the relevant provisions of national law must not discriminate between the rules and procedures applying to the enforcement of EU law rights, and those applying to the enforcement of comparable national law rights (the *G* "principle of equivalence"). There is a third principle which features less prominently in the case law on this subject but is of considerable importance because it informs the approach of the Court of Justice to the first two. This is the principle of legal certainty, which lies at the heart of the EU legal order and entails (among other things) that those subject to EU law should be able clearly to ascertain their rights and obligations. One aspect of that principle is that within limits EU law will protect within its own domain legitimate *H* expectations adversely affected by a change in the law.

147 The leading case on the principle of effectiveness is *Amministrazione delle Finanze dello Stato v SpA San Giorgio* (Case 199/82) [1983] ECR 3595. This concerned charges levied for frontier health

© 2012 The Incorporated Council of Law Reporting for England and Wales

A inspections of imported animals or animal products under Italian legislation but contrary to EU law. Italian law provided for the recovery of the charges on conditions that were in themselves perfectly acceptable, but which were in practice almost impossible to satisfy because of the exacting rules of evidence applicable to such claims. The court held, at para 12:

B "In that connection it must be pointed out in the first place that entitlement to the repayment of charges levied by a member state contrary to the rules of Community law is a consequence of, and an adjunct to, the rights conferred on individuals by the Community provisions prohibiting charges having an effect equivalent to customs duties or, as the case may be, the discriminatory application of internal taxes. Whilst it is true that repayment may be sought only within the framework of the conditions as to both substance and form, laid down by the various national laws applicable thereto, the fact nevertheless remains, as the court has consistently held, that those conditions may not be less favourable than those relating to similar claims regarding national charges and they may not be so framed as to render virtually impossible the exercise of rights conferred by Community law."

C

D These principles were restated in the judgments of the Court of Justice in *Metallgesellschaft* [2001] Ch 620, paras 84–86 and in the first reference in this litigation: *Test Claimants in the FII Group Litigation v Inland Revenue Comrs* (Case C-446/04) (Note) [2012] 2 AC 436, paras 201–208. It follows that a member state is "in principle required to repay charges levied in breach of Community law": *Société Comateb v Directeur Général des Douanes et Droits Indirects* (Joined Cases C-192 to C-218/95) [1997] ECR I-165, para 20. Subsequent case law has emphasised the absolute character of this obligation. The only exception which has been recognised to date is the case where the charge has been passed on by the party who paid it, with the result that he would be unjustly enriched were he to recover it for his own benefit: see *Weber's Wine World Handels-GmbH v Abgabenberufungskommission Wien* (Case C-147/01) [2005] All ER (EC) 224, para 94. So, although national courts and legislatures are the masters of their own law and procedure, in so far as the legal system of a member state fails to give adequate effect to directly effective EU law rights, it is incumbent on national courts to give effect to those rights by filling the gap between existing causes of action or if necessary to create a new one: see *Unibet (London) Ltd v Justitiekanslern* (Case C-432/05) [2008] All ER (EC) 453, paras 40-41.

E

F

G 148 The combined effect of (i) the requirement of EU law that there must be an effective right of recovery of tax charged contrary to that law and (ii) the primacy of national law as the source of that right, is that EU law does not, indeed cannot, require that national law should recognise or create any *particular* cause of action or any *particular* remedy. It simply requires that whatever causes of action or remedies exist in national law must, taken as a whole, be effective and non-discriminatory.

H 149 The implications of these principles for the operation of rules of limitation in national systems of law is the subject of a considerable body of case law in the Court of Justice. Not only is limitation a feature of every national legal system of the EU, but the recognition of national rules of limitation as both necessary and desirable is treated as part of the principle

© 2012 The Incorporated Council of Law Reporting for England and Wales

of legal certainty in EU law. In *Rewe I* [1976] ECR 1989, one of the first    *A*
cases to come before the Court of Justice about the application of limitation
periods to claims to enforce directly effective rights in the area of tax, the
court observed, at para 5, that

> "the laying down of such time-limits with regard to actions of a fiscal
> nature is an application of the fundamental principle of legal certainty
> protecting both the taxpayer and the administration concerned".    *B*

This is so, notwithstanding that "the effect of that rule is to prevent, in whole
or in part, the repayment of those charges": *Haahr Petroleum Ltd v Åbenrå
Havn* (Case C-90/94) [1997] ECR I-4085, para 45. Subject to the overriding
principles of effectiveness and equivalence, EU law recognises the public
interest in orderly national budgeting and equity between generations of
taxpayers, which will generally require rules for establishing clear limits    *C*
beyond which tax accounts may not be reopened.

150    In the present appeals it has not been argued that section 320 of the
Finance Act 2004 or section 107 of the Finance Act 2007 are inconsistent
with the principle of equivalence. I do not find that surprising. The two
enactments with which we are concerned apply in precisely the same way to
claims to recover taxes charged contrary to domestic and EU law. So far as    *D*
they create practical limitations on a claimant's choice of legal route to
recovery, they have precisely the same effect whether the charging of the tax
was contrary to EU or domestic law. It is not suggested in these appeals that
either enactment offended against the principle in *Deville v Administration
des impôts* (Case 240/87) [1988] ECR 3513 on the ground that they were
specifically targeted at the assertion of rights under EU law. We are therefore
concerned on these appeals only with the principle of effectiveness and the    *E*
principle of the protection of legitimate expectations.

151    The fundamental requirement of the principle of effectiveness is
that limitation periods should be reasonable, i e not so short as to make
recovery by action "impossible" or excessively difficult: see *Rewe I* [1976]
ECR 1989, para 5 and *Comet BV v Produktschap voor Siergewassen* (Case
45/76) [1976] ECR 2043, paras 16–18. But the assessment of what is    *F*
reasonable allows for considerable variation between different national
systems. There is abundant case law concerning limitation periods much
shorter than six years, which have been held to be reasonable. Moreover, it
is not inconsistent with the principle of effectiveness that under national law
the limitation period for the recovery of unlawful charges should run from
the time of payment: see *Edilizia Industriale Siderurgica Srl (Edis) v
Ministero delle Finanze* (Case C-231/96) [1998] ECR I-4951, para 35 and    *G*
*Ministero delle Finanze v Spac SpA* (Case C-260/96) [1998] ECR I-4997,
para 32. Nor is there any rule of EU law requiring the running of a
limitation period to be deferred until the existence of a right to recover the
payment has been judicially established. It is not uncommon for a claim to
repayment to have become time-barred in national law while proceedings
are still in progress to determine whether the member state was in breach of
EU law. This was, for example, the position in *Rewe I*. It was also the    *H*
position in many of the decisions about the retrospective curtailment of
limitation periods, which I shall consider next.

152    The curtailment of an existing limitation period gives rise to special
considerations. There are two objections that might in principle be taken to

© 2012 The Incorporated Council of Law Reporting for England and Wales

A  it. First, even if the change applies only to future claims, it is likely to operate retrospectively to some extent. It will usually extinguish the possibility of enforcing existing rights to recover sums which have already been paid and could in due course have been reclaimed and recovered under the previous law, but are time-barred under the new one. This necessarily engages the principle of effectiveness.     Of course, the legislation may also be retrospective in the more radical sense of abrogating claims that have

B  already been properly made under the old law.     The second potential objection is that to the extent the change is retrospective, it may offend against the principle of legal certainty. People must be taken to appreciate that the law may be changed. But until it is, they are entitled to organise their affairs on the basis of the law as it stands and to assume a sufficient measure of predictability in its future development to enable them to

C  exercise their EU law rights.   This means that if they have already paid money which is in principle recoverable, they are entitled to be guided by the existing law when deciding how long they have left in which to claim. This objection is commonly analysed as depending on the principle of the protection of legitimate expectations.   But this is not really a distinct principle. It has been described as

D      "the corollary of the principle of legal certainty, which requires that legal rules be clear and precise, and aims to ensure that situations and legal relationships governed by Community law remain foreseeable": *Duff v Minister of Agriculture and Food, Ireland* (Case C-63/93) [1996] ECR I-569, para 20.

E  It is one manifestation of the broader principle that those subject to the law should be able to ascertain their rights and obligations at the time that they are called on to decide what to do about them.

153   EU law might have taken an absolute line on national legislation retrospectively extinguishing the possibility of enforcing existing rights to recover money charged contrary to EU law.   In fact, it has taken a more flexible and nuanced position. It follows from the liberty given to member states to devise their own domestic law means of giving effect to EU rights,

F  that national legislatures are in principle entitled to change their laws. Because they are not obliged to provide more than the minimum level of protection for EU rights necessary to make them effective, the changes may adversely affect claims to assert EU rights, provided that the new law still provides an effective means of doing so. The compromise which EU law has adopted between these conflicting considerations is to allow the

G  retrospective curtailment of limitation periods within limits set by the principle of the protection of legitimate expectations.   Legislation curtailing limitation periods is in principle consistent with the principle of effectiveness provided that a period of grace, which may be quite short, is allowed, either by giving sufficient advance notice of the change or by including transitional provisions in the legislation. These propositions are derived from the four leading decisions of the Court of Justice on this question, namely *Aprile Srl v*

H  *Amministrazione delle Finanze dello Stato (No 2)* (Case C-228/96) [2000] 1 WLR 126 ("*Aprile II*"), *Dilexport Srl v Amministrazione delle Finanze dello Stato* (Case C-343/96) [2000] All ER (EC) 600, *Grundig Italiana SpA v Ministero delle Finanze* (Case C-255/00) [2003] All ER (EC) 176 and *Marks & Spencer plc v Customs and Excise Comrs* (Case C-62/00) [2003] QB 866.

© 2012 The Incorporated Council of Law Reporting for England and Wales

154   The first two cases had a similar legal background. Italy had   *A*
unlawfully levied charges equivalent to customs duties, which the claimant
sought to recover under Italian law. Italian law conferred a general right to
recover payments made without legal basis ("pagamento non dovuto")
under article 2033 of the Civil Code, which was subject to the general
limitation period of ten years provided for by the article 2946 of the Code.
In addition, there was a specific right to a refund under the Consolidated   *B*
Customs Code in cases of "calculation errors in the assessment or the
application of a duty other than that laid down in the tariff", which was
subject to its own limitation period of five years. The latter right had no
application to a claim for a refund of tax charged contrary to Community
law. These provisions were amended by legislation so that the limitation
period in the Customs Code applied to actions under article 2033 whenever
the claim was for a "refund of sums paid in connection with customs   *C*
operations". In other words, the limitation period for the only relevant right
of recovery, under article 2033, was reduced from ten years to five. It is clear
that the decisive considerations which led the Court of Justice to conclude
that the amendment was consistent with the EU law were (i) that the reduced
limitation period was still long enough to satisfy the principle of
effectiveness and (ii) that the Italian courts had treated the amending   *D*
legislation as allowing claimants a period of grace of three years from the
time the amending legislation came into force, which meant that the
legislation "cannot be regarded as having retroactive effect"; see *Aprile II*,
para 28 and *Dilexport*, para 42. This was not enough to help the claimants,
for the period of grace had already expired by the time that they succeeded in
obtaining a judicial decision that the charges were unlawful. But it was held
to be enough to satisfy the principle of effectiveness.   *E*

155   In *Grundig Italiana* [2003] All ER (EC) 176, the Court of Justice
had to consider the minimum transitional period which would enable a
retrospective curtailment of the limitation period to satisfy EU law. The case
concerned the same amending legislation which had featured in *Aprile II*
and *Dilexport*, but a different aspect of it, namely the reduction of the
special limitation period from five years to three, which took effect 90 days   *F*
after the legislation came into force. This transitional period was held to be
too short. The court considered that a period of grace must be

"sufficient to allow taxpayers who initially thought that the old period
for bringing proceedings was available to them a reasonable period of
time to assert their right of recovery in the event that under the new rules
they would already be out of time": [2003] All ER (EC) 176, para 38.
   *G*

In the context of an original limitation period of five years, six months was
the least that should have been allowed: para 42. It is accordingly clear that
a reasonable period of grace may be considerably shorter than the amount
by which the limitation period has been abridged. It is a period long enough
to allow potential claimants to consider their position, not a period long
enough to save every existing right of recovery.

156   In none of the Italian cases was separate consideration given by the   *H*
Court of Justice to the principle of the protection of legitimate expectations.
But that principle must necessarily have informed the court's analysis of
what was required by the principle of effectiveness. The point was made in
terms by Advocate General Ruiz-Jarabo Colomer in his opinion in *Grundig*

© 2012 The Incorporated Council of Law Reporting for England and Wales

A  *Italiana*, at para 30, where he observed that a retrospective reduction in the
limitation period without a period of grace would be contrary to the
principle of effectiveness "on the grounds that the reduction is unexpected
and contrary to the principle of the protection of legitimate expectations and
to the principle of legal certainty". The court must have agreed with that. It
was critical to its view that legislation retrospectively curtailing an existing
limitation period so as to bar some existing rights, would nevertheless be
B  consistent with the principle of effectiveness if it allowed a sufficient period
of grace for taxpayers to adjust their plans to the new order of things.

157  In *Marks & Spencer plc v Customs and Excise Comrs* (Case
C-62/00) [2003] QB 866, the facts were more complex. It was a reference
from the Court of Appeal in England about a claim to recover
VAT unlawfully charged by the Commissioners of Customs and Excise. By
C  statute, the only right to obtain a refund from the Commissioners was by
way of a claim under section 24 of the Finance Act 1989 (subsequently
section 80 of the Value Added Tax Act 1994). Subsections (4) and (5) of
section 24 provided for a six-year limitation period, which was to run from
the date of payment save in cases of mistake, when it was to run from the
time when the mistake was or could with reasonable diligence have been
D  discovered. On 18 July 1996, the Government announced its intention of
introducing what later became section 47(1) of the Finance Act 1997. The
effect of this enactment was to reduce the limitation period for the statutory
claim from six years to three, and to provide that it was to run in all cases
from the time of payment. Section 47(2) provided that subsection (1) should
be deemed to have come into effect on 18 July 1996 and should apply to all
claims unsatisfied at that date whether made before or afterwards. There
E  were no relevant transitional provisions. The reference was concerned with
a claim to recover VAT overpaid on sales of gift vouchers. This claim was
affected by the reduction of the limitation period to three years. It was not
affected by the removal of the extended period of limitation in cases of
mistake, because the relevant payments had all occurred within six years
before the claim was made. But the facts are complicated by the existence of
another claim, to recover VAT paid in respect of sales of teacakes going back
F  to 1973, which was significantly affected by the removal of the extended
limitation period. The teacakes claim was not part of the reference: see the
Advocate General at para 27. But before us a submission was based on it by
Mr Aaronson QC (for the test claimants) because of the analogy with the
removal of the extended period of limitation in the present case. It is
therefore right to point out that it arose only in the context of a "preliminary
G  observation" of the Advocate General of the way in which the Court of
Appeal had framed the reference. The Court of Appeal had limited it to
(i) the gift vouchers claim, (ii) the reduction of the limitation period from six
years to three, and (iii) the period before August 1996 when the Sixth
VAT Directive 77/388/EEC had been in force but not properly transposed
into the law of the United Kingdom. The Advocate General, while
acknowledging that the court was bound by the terms of the reference,
H  pointed out that it had been framed on the assumption that the Directive had
no further relevance as a source of rights once it had been properly
transposed into English law in August 1996. This assumption was in his
opinion wrong: paras 32–34. He thought that the Court of Appeal's error
about the period in which the Directive was relevant had led it to treat the

© 2012 The Incorporated Council of Law Reporting for England and Wales

whole of the teacakes claim and the later part of the gift vouchers claim as *A* depending only on national law: see paras 30 and 44, and his citations from the judgments of the High Court and the Court of Appeal at para 32. None of this had anything to do with the compatibility of section 47 of the Finance Act 1997 with EU law. The Court of Justice, in its judgment, agreed that the Court of Appeal's assumption about the Directive was mistaken (paras 22–28), but dealt only with the application of the 1997 Act to the gift *B* vouchers claim: see para 13.

158  The Court of Justice had no difficulty in concluding that section 47 was contrary to the principle of effectiveness. There was only one means allowed by English law of recovering overpaid VAT, and the effect of the amendment was to extinguish without notice any possibility of using that method to recover overpayments between three and six years old. Indeed, it extinguished it even when there was already a pending claim at the date of *C* the announcement. The court took the opportunity to restate the effect of previous case law in the following terms, at paras 35–38:

"35. As regards the latter principle, the court has held that in the interests of legal certainty, which protects both the taxpayer and the administration, it is compatible with Community law to lay down reasonable time-limits for bringing proceedings: *Aprile,* para 19, and the *D* case law cited therein. Such time-limits are not liable to render virtually impossible or excessively difficult the exercise of the rights conferred by Community law. In that context, a national limitation period of three years which runs from the date of the contested payment appears to be reasonable: see, in particular, *Aprile,* para 19, and *Dilexport,* para 26.

"36. Moreover, it is clear from the judgments in *Aprile* [2000] *E* 1 WLR 126, para 28, and *Dilexport* [1999] ECR I-579, paras 41 and 42, that national legislation curtailing the period within which recovery may be sought of sums charged in breach of Community law is, subject to certain conditions, compatible with Community law. First, it must not be intended specifically to limit the consequences of a judgment of the court to the effect that national legislation concerning a specific tax is incompatible with Community law. Secondly, the time set for its *F* application must be sufficient to ensure that the right to repayment is effective. In that connection, the court has held that legislation which is not in fact retrospective in scope complies with that condition.

"37. It is plain, however, that that condition is not satisfied by national legislation such as that at issue in the main proceedings which reduces from six to three years the period within which repayment may be sought *G* of VAT wrongly paid, by providing that the new time-limit is to apply immediately to all claims made after the date of enactment of that legislation and to claims made between that date and an earlier date, being that of the entry into force of the legislation, as well as to claims for repayment made before the date of entry into force which are still pending on that date.

"38. Whilst national legislation reducing the period within which *H* repayment of sums collected in breach of Community law may be sought is not incompatible with the principle of effectiveness, it is subject to the condition not only that the new limitation period is reasonable but also that the new legislation includes transitional arrangements allowing an

© 2012 The Incorporated Council of Law Reporting for England and Wales

A   adequate period after the enactment of the legislation for lodging the claims for repayment which persons were entitled to submit under the original legislation. Such transitional arrangements are necessary where the immediate application to those claims of a limitation period shorter than that which was previously in force would have the effect of retroactively depriving some individuals of their right to repayment, or of allowing them too short a period for asserting that right."

B

159   The decision is also notable as being the one case in this area in which the court has given separate and explicit consideration to the principle of the protection of legitimate expectations. It did so because it was expressly invited to deal with both effectiveness and legitimate expectations by the terms of the Court of Appeal's reference. But it dealt with the point under both heads. In dealing with the principle of effectiveness, at para 38, it observed that the principle of effectiveness required that potential claimants should be given time to assert existing rights under the old law. This was because, at para 39, the right of member states to impose reasonable limitation periods was an exception to the rule that member states must repay taxes charged in breach of Community law, and that exception was founded on the principle of legal certainty. "However, in order to serve their purpose in ensuring legal certainty, limitation periods must be fixed in advance." In other words, the curtailment of limitation periods is consistent with the principle of effectiveness if it is subject to provisions protecting legitimate expectations. As the Advocate General had pointed out in his opinion, at para 68, the principle of protecting legitimate expectations is based on the need for legal certainty. Addressing the same point, the court held, at paras 44–46:

E

"44. In that connection, the court has consistently held that the principle of the protection of legitimate expectations forms part of the Community legal order and must be observed by the member states when they exercise the powers conferred on them by Community directives: see, to that effect, *Hauptzollamt Hamburg-Jonas v Krücken* (Case 316/86) [1988] ECR 2213, para 22, *Alois Lageder SpA v Amministrazione delle Finanze dello Stato* (Joined Cases C-31 to C-44/91) [1993] ECR I-1761, para 33, *Belgocodex v Belgian State* (Case C-381/97) [1998] ECR I-8153, para 26, and *Grundstückgemeinschaft Schlossstrasse GbR v Finanzamt Paderborn* (Case C-396/98) [2000] ECR I-4279, para 44).

"45. The court has held, in particular, that a legislative amendment retroactively depriving a taxable person of a right to deduction he has derived from the Sixth Directive is incompatible with the principle of the protection of legitimate expectations: *Schlossstrasse,* para 47.

"46. Likewise, in a situation such as that in the main proceedings, the principle of the protection of legitimate expectations applies so as to preclude a national legislative amendment which retroactively deprives a taxable person of the right enjoyed prior to that amendment to obtain repayment of taxes collected in breach of provisions of the Sixth Directive with direct effect."

160   Whether it is put on the basis of the principle of effectiveness or the protection of legitimate expectations or on a combination of the two, the rule of EU law which requires a reasonable period of grace before a

© 2012 The Incorporated Council of Law Reporting for England and Wales

retrospective curtailment of the limitation period can be lawful, assumes   *A*
that claimants generally can legitimately count on having the whole of the
old limitation period in which to bring whatever claims may be available to
them as a matter of domestic law, unless they have a reasonable warning that
the position is about to change. Thus far, I do not think that there is any
fundamental difference in principle between my views and those of other
members of the court.

161   The assumption that a claimant can legitimately count on having   *B*
the whole of the old limitation period in which to bring whatever claims are
available to him is one which would normally be made as a matter of course.
But this is not an ordinary case. The position is complicated by the highly
unusual way in which the right to recover unlawfully charged tax has
developed in England over the last two decades. It is a problem which could
only have arisen in a common law country such as England, where the law of   *C*
restitution has been the piecemeal creation of judges while limitation is
exclusively the creature of statute.      To these peculiarly English
developments, I now turn.

*Rights of recovery in English law*

162   Until surprisingly recently, English law afforded only very limited   *D*
possibilities of recovering overpaid tax. As Lord Goff of Chieveley observed
in *Woolwich Equitable Building Society v Inland Revenue Comrs* [1993]
AC 70, 172, English law had not recognised a conditctio indebiti allowing an
action for the recovery of payments on the simple ground that they were not
due. It has still not done so. It is necessary, as the law presently stands, to
bring the facts within one of the categories of case in which the law
recognises that the recipient's retention of the money would be unjust. The   *E*
relevant categories as they had stood for a considerable time up to 1992 were
described by Lord Goff in his speech in *Woolwich Equitable*, at pp 164–166.
Money was recoverable if it was paid under a mistake of fact, but not if it
was paid under a mistake of law (as it generally would be if taxes were paid
which were not duly authorised by law). It was recoverable if it was exacted
by actual or threatened duress to the person or to the person's goods, but not   *F*
on a mere threat to assert a claim by a method provided for by law (for
example, by legal proceedings). It was recoverable if it was demanded by a
public official or a person charged with a statutory duty as a condition of his
performing his duty. None of these situations was likely to cover the case
where a taxpayer paid money which was not in fact due under the relevant
legislation, because it had been misconstrued or was contrary to EU law, or
because (being secondary legislation) it was ultra vires the enabling Act.   *G*

163   A limited statutory right to claim repayment from the
Commissioners had been introduced in 1923 by section 24 of the Finance
Act of that year. Substantially the same provision has remained in force in
successive statutory iterations ever since. It is currently to be found in
section 33 of the Taxes Management Act 1970. In that form, its effect is that
overpaid tax may be reclaimed if (i) it was charged by an assessment, (ii) the
assessment was excessive because of a mistake in the taxpayer's return,   *H*
(iii) in the case of a mistake about the basis on which the taxpayer's liability
should be computed, the return was not in the relevant respect made in
accordance with the "practice generally prevailing at the time", and
(iv) having examined all the relevant circumstances of the case, the Board of

© 2012 The Incorporated Council of Law Reporting for England and Wales

A   Inland Revenue or the Special Commissioners on appeal from them considered that repayment would be "reasonable and just". It will be apparent that if tax was paid under invalid or unlawful legislation the claim will almost inevitably fail on the ground that the return having been made in accordance with the statute it accorded with the practice generally prevailing at the time. Even if the taxpayer can demonstrate that his return was not in accordance with that practice, the fate of his claim will depend on

B   the exercise of a discretion by the commissioners. His only right is to have his claim fairly considered in the light of all relevant circumstances. As Lord Goff pointed out in *Woolwich Equitable*, at p 170B, historically this provision presupposed that there was no right of recovery at common law.

164   The first major change in this state of affairs occurred with the judgment of the House of Lords in the *Woolwich Equitable* case, which was

C   delivered on 20 July 1992. The Woolwich Equitable Building Society paid the composite rate tax charged on building societies under statutory regulations which it considered to be ultra vires the enabling primary legislation, and which it then successfully challenged in proceedings for judicial review. It took this course because it was concerned about the reputational damage that it might suffer if it was seen to withhold tax which other building societies were paying, at a time when there had been no

D   definitive decision on the status of the regulations. The commissioners, having failed to justify the charge in the judicial review proceedings, repaid the tax, but declined to recognise that they were bound to do so and therefore felt entitled to reject a claim to interest. The question at issue was whether the commissioners had been bound to repay the principal and were therefore amenable to an order for the payment of interest as well.

E   Woolwich was unable to bring itself within any of the established categories of restitution. In particular, it could not claim repayment on the ground of mistake, because it had not been mistaken. It had always believed that the regulations were void. Nor could it claim under section 33 of the Taxes Management Act 1970, because there had been no assessment. It had pre-empted an assessment by paying. It followed that under the law as it had previously stood, the claim for interest was bound to fail. The question, as

F   Lord Goff put it at p 171, was whether the House in its judicial capacity should "reformulate the law so as to establish that the subject who makes a payment in response to an unlawful demand of tax acquires forthwith a prima facie right in restitution to the repayment of the money". The claim failed in the High Court, but it succeeded, by a majority, first in the Court of Appeal and then, on somewhat different grounds, in the House of Lords. In

G   summary, the House of Lords fashioned a cause of action which was (i) acknowledged to be new, (ii) specific to the case of money charged by a public authority in the absence of a valid statutory power to do so, and (iii) available irrespective of whether the payer was mistaken or whether, if he was mistaken, his mistake was one of fact or law.

165   It was not necessary in *Woolwich Equitable* to consider the rule that money paid under a mistake of law was irrecoverable. That question

H   came before the House of Lords in 1998 in *Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 AC 349, one of the last cases to be decided in the great tide of litigation arising out of ultra vires interest rate swap agreements with local authorities. Kleinwort Benson had made net payments to the local authorities under the terms of these agreements, which they claimed had

© 2012 The Incorporated Council of Law Reporting for England and Wales

been made under a mistake of law, namely that they were valid. In the High *A* Court, Langley J dismissed the claims on the ground that the law did not recognise a right to recover in these circumstances. The case was leapfrogged to the House of Lords on the ground that the Court of Appeal would be bound by authority to reach the same conclusion. In the House of Lords, the bank acknowledged that the existing law did not allow the recovery of money paid under a mistake of law. For their part, the local *B* authorities made no attempt to defend that state of the law in principle, in the face of sustained criticism by academic writers and the Law Commission, its total or partial abandonment in many common law jurisdictions, and the recognition of a wider basis of recovery, independent of mistake, in major civil law systems, notably those of Germany, France and Italy. The fundamental issue before the appellate committee was whether the law *C* should be changed by judicial decision, or the task left to Parliament. The House allowed the appeal and recognised a right in principle to recover money paid under a mistake of law, while acknowledging that this represented "a departure, even a major departure, from what has previously been considered to be established principle": see Lord Goff, at p 378.

166   For a number of years it remained uncertain whether the new cause of action to recover money paid under a mistake of law extended to *D* mistaken payments of tax. *Kleinwort Benson* was a case about private law transactions. In his speech Lord Goff (with whom on this point the rest of the appellate committee agreed) expressed the view, at pp 381–382, that there was a distinction between claims to recover payments made in private law transactions and claims to recover payments of taxes and other charges levied by public authorities. In the latter category, payments were *E* recoverable as of right under the principle laid down in *Woolwich Equitable* without the need to invoke a mistake of law, or under section 33 of the Taxes Management Act in cases of mistake to which that provision applied. Lord Goff continued, at p 382:

"Two observations may be made about the present situation . . . The first observation is that, in our law of restitution, we now find two *F* separate and distinct regimes in respect of the repayment of money paid under a mistake of law. These are (1) cases concerned with repayment of taxes and other similar charges which, when exacted ultra vires, are recoverable as of right at common law on the principle in *Woolwich*, and otherwise are the subject of statutory regimes regulating recovery; and (2) other cases, which may broadly be described as concerned with *G* repayment of money paid under private transactions, and which are governed by the common law. The second observation is that in cases concerned with overpaid taxes, a case can be made in favour of a principle that payments made in accordance with a prevailing practice, or indeed under a settled understanding of the law, should be irrecoverable. If such a situation should arise with regard to overpayment of tax, it is possible that a large number of taxpayers may be affected; there is an element of *H* public interest which may militate against repayment of tax paid in such circumstances; and, since ex hypothesi all citizens will have been treated alike, exclusion of recovery on public policy grounds may be more readily justifiable."

© 2012 The Incorporated Council of Law Reporting for England and Wales

A  The commissioners, relying mainly on this passage, subsequently contended that tax was subject to a special legal regime, and that the only cause of action at common law for the recovery of overpaid tax was a cause of action on the principle stated in *Woolwich Equitable*. The recognition of this basis of claim, it was said, impliedly excluded all other bases of claim apart from the statutory procedure under section 33 of the Taxes Management Act 1970.

B  **167** This proposition was tested in *Deutsche Morgan Grenfell Group plc v Inland Revenue Comrs* [2007] 1 AC 558. The case foreshadowed some of the issues on the present appeals, and was the genesis of section 320 of the Finance Act 2004. It concerned claims for the recovery of interest on corporation tax which the Court of Justice had held to have been prematurely charged in *Hoechst/Metallgesellschaft*. The taxpayer company wanted to claim interest for the period when it was out of pocket, on the

C  footing that the tax itself had been paid under a mistake of law. It took this course because a claim on that basis would benefit from the extended limitation period under section 32(1)(c) of the Limitation Act 1980, whereas claims based on *Woolwich Equitable* or section 33 of the Taxes Management Act ran from the time of payment and would have been time-barred. There were three main issues: (i) whether, in a case covered by the principle in *Woolwich Equitable*, a common law claim based on mistake

D  was also available to the taxpayer; (ii) if so, what was the mistake, bearing in mind that the tax had been paid in accordance with the correct construction of the taxing Acts, which was only later shown to be inconsistent with EU law by the decision of the Court of Justice in *Metallgesellschaft Ltd v Inland Revenue Comrs* (Joined Cases C-397/98 and C-410/98) [2001] Ch 620; and (iii) at what stage, for the purpose of section 32(1)(c) of the

E  Limitation Act 1980, could it be said that the taxpayer "discovered . . . or could with reasonable diligence have discovered" that mistake, so as to start the limitation period running. Park J [2003] 4 All ER 645 gave judgment on 18 July 2003. He decided all three questions in favour of the taxpayer, and held that accordingly a claim on the basis of mistake was available to it. In February 2005, the Court of Appeal unanimously overruled him and held that it was not. The House of Lords restored the judgment of Park J on

F  25 October 2006. On the first issue, the House held that the claimant could choose between concurrent causes of action on the principle in *Woolwich Equitable* and on the basis of mistake of law. On the second issue, there were some differences of reasoning within the majority of the appellate committee, but all of them agreed that by virtue of the theory that judicial decisions are deemed to declare the existing law, the taxpayer company had

G  made a "retrospective" or "deemed" mistake. The mistake consisted in its failing to appreciate that it was entitled to make a group income election and defer the payment of tax, notwithstanding that the statute said that it did not have this right. On the third issue, the House of Lords held that under section 32(1)(c) of the Limitation Act 1980 the limitation period for a claim in respect of that mistake did not start to run simply because the claimant was aware of a worthwhile claim or of doubts about the lawfulness of the

H  legislation. It started to run only when the Court of Justice definitively held that the relevant features of the United Kingdom corporation tax regime were contrary to EU law. The combined effect of the decisions on these three points was in one respect extremely remarkable. If tax was overpaid under a mistake of law, then provided that a claim to recover it was brought before

© 2012 The Incorporated Council of Law Reporting for England and Wales

six years had elapsed from the judgment establishing the correct legal *A* position, there was no limit upon how far back the claim could go. In the present cases, it goes back to the accession of the United Kingdom to the Common Market in 1973. If it had arisen from a mistake of purely domestic law, it might have gone back to the inception of corporation tax in 1965. In other cases where the unlawfulness of the charge depended wholly on English law, it could in principle go back indefinitely. *B*

168 It has been suggested in argument before us that once the House of Lords in *Kleinwort Benson* [1999] 2 AC 349 had accepted the right to recover money paid under a mistake of law, the commissioners' case in *Deutsche Morgan Grenfell* was never likely to be accepted. Its acceptance by the Court of Appeal was an aberration, a "bump in the road" to borrow Mr Aaronson's arresting phrase. Such arguments often sound plausible in hindsight, after the highest court has laid down the law, and ultimately of course the *C* commissioners' argument was not accepted. But it was nevertheless a formidable argument, to which the observations of Lord Goff appeared to lend substantial support. In *Kingstreet Investments Ltd v New Brunswick (Department of Finance)* [2007] 1 SCR 3, considerations rather similar to those raised by Lord Goff had led the Supreme Court of Canada to treat claims to recover unlawfully charged tax as governed by a distinct body of constitutional principle relating to tax charged without legislative authority, *D* and not by the general law of unjust enrichment. At least part of the Canadian court's reasoning was that the concurrent availability of both causes of action was liable to have unacceptable collateral consequences: see paras 32–42 (Bastarache J). Indeed, the decision of the House of Lords in *Deutsche Morgan Grenfell* [2007] 1 AC 558 is even now not beyond academic controversy. The decision on issue (ii) is criticised by the current editors of *E* *Goff & Jones, The Law of Unjust Enrichment*, 8th ed (2011), paras 22.29 to 22.31 on grounds closely related to the observations which I have quoted from Lord Goff in *Kleinwort Benson*. I do not intend by making these points to reopen a debate which has been settled for more than five years. My point is more straightforward: no reasonable and well-advised person could have counted on the decision in *Deutsche Morgan Grenfell* going the way it did on all three points, until the House of Lords delivered its judgment. *F*

169 Section 320 of the Finance Act 2004 was a direct response to the decision of Park J in *Deutsche Morgan Grenfell* [2003] 4 All ER 645. It altered not the limitation period itself but the statutory rule postponing its commencement in cases of mistake until the taxpayer had discovered or could with reasonable diligence have discovered the mistake. It had the effect of barring older claims for repayment of tax paid under a mistake *G* which might otherwise have succeeded. But the mischief to which section 320 was addressed was not the existence of a right to repayment, whether arising from EU or domestic law, but the problem created by Park J's decision that section 32(1)(c) of the Limitation Act 1980 might now enable past tax accounts to be reopened without limit of time.

*Is the right to bring a claim based on Woolwich Equitable an effective* *H* *remedy?*

170 Logically, the first question to be decided is whether a cause of action based on the *Woolwich Equitable* principle is an effective means of asserting the right to repayment required by EU law. The test claimants say that it is

A  not. Therefore, the argument runs, their only effective means of recovery was by way of an action to recover on the ground of mistake, and their right to bring such an action has been unlawfully curtailed by section 320 of the Finance Act 2004. They make three points. First, they say that a claim based on *Woolwich Equitable* requires an unlawful demand by a public authority and is not therefore available to recover taxes such as advance corporation tax which are paid with the return, not upon an assessment or other demand

B  by the Commissioners. Second, the Court of Appeal has held, applying the principle in *Marleasing SA v La Comercial Internacional de Alimentación SA* (Case C-106/89) [1990] ECR I-4135 that section 231 of the Income and Corporation Taxes Act 1988 (which provides for a tax credit in respect of distributions paid by UK resident companies) can be given a construction which, however strained, applies it to distributions by companies resident

C  anywhere in the EU. It follows, they say, that there is nothing unlawful about section 231 which can engage the principle in *Woolwich Equitable*. If either of these points is right, then a claim based on *Woolwich Equitable* is not an effective remedy in this case. Third, the test claimants submit that section 320 of the Finance Act 2004 and section 107 of the Finance Act 2007 curtail the limitation period for a claim based on *Woolwich Equitable*, because although such a claim does not legally depend on mistake, they were in fact mistaken.

D  Their action is therefore an action for "relief from the consequences of a mistake" for the purposes of section 32(1)(c) of the Limitation Act 1980. If this point is right, then Parliament has without warning curtailed the limitation period for all available methods of obtaining restitution, apart from a claim under section 33 of the Taxes Management Act for a small part of the overpayment and a somewhat problematical claim for damages

E  founded on the principle of state liability stated by the Court of Justice in *Francovich v Italian Republic* (Joined Cases C-6/90 and C-9/90) [1995] ICR 722. The test claimants need only be right on one of these three points, but in my view they are wrong on all of them.

*The demand point*

F  171  In spite of the importance attached to this point in argument, it can I think be dealt with quite shortly. The speeches of the majority in *Woolwich Equitable* [1993] AC 70 are full of expressions which, read literally and out of their analytical context, might support the suggestion that the cause of action recognised in that case was dependent on the making of an "unlawful demand": see Lord Goff at pp 171F–G, 172B–C, 174C–D, 177F, Lord Browne-Wilkinson at pp 196G–H, 197C–H, 198B–C, G–H, and Lord Slynn of Hadley at

G  pp 199B–D, 200B–C, 201D–E, 202G–203A, 204F–H, 205A–B. None of the majority in *Woolwich Equitable* discusses what they meant by a "demand". But both the facts of the case and the reasoning of the majority show that they cannot have had in mind a formal demand by the Inland Revenue triggering a payment or an apparent obligation to pay.

172  The facts, which are succinctly set out by Ralph Gibson LJ in the

H  Court of Appeal, at pp 104–105, show that Woolwich Equitable did not pay the composite rate tax in response to a formal demand. The inspector had simply invited it to agree figures and the collector had sent it a return form. The society sent in a return computed according to the Regulations, under cover of a letter informing them that they proposed to challenge their validity in legal proceedings. They then paid without prejudice to the

© 2012 The Incorporated Council of Law Reporting for England and Wales

outcome. As Lord Goff pointed out, at p 169, no assessment was ever made, because Woolwich pre-empted it by paying.    *A*

173   It is fair to look for the reasoning of the House of Lords mainly in the classic analysis of Lord Goff, although similar points were made by Lord Browne-Wilkinson, who agreed with Lord Goff in terms and by Lord Slynn, who agreed with him in substance. It is apparent that the mischief which justified in Lord Goff's eyes a special rule for unlawful charges by public authorities was (i) that no tax should be collected without parliamentary authority, and (ii) that citizens did not deal on equal terms with the state, and could not be expected to withhold payment when faced with the coercive powers of the revenue, whether those powers were actually exercised or merely held in reserve: see p 172. At pp 175–176, Lord Goff adopted the dissenting judgment of Wilson J in the Supreme Court of Canada in *Air Canada v British Columbia* [1989] 1 SCR 1161. In her judgment, Wilson J had expressed the view that there was a general right to recover money paid under unconstitutional legislation, and deprecated any suggestion that it must have been paid under protest. The reason, as she pointed out at pp 1214–1215, was that the legislature holds out its legislation as valid and that any loss resulting from payment under it "should not fall on the totally innocent taxpayer whose only fault is that it paid what the legislature improperly said was due". The emphasis in this reasoning was on the unlawful character of the legislation, with which in practice the citizen was bound to comply even if it might subsequently be shown to be void. This approach has subsequently been adopted by the Supreme Court of Canada in *Kingstreet Investments Ltd v New Brunswick (Department of Finance)* [2007] 1 SCR 3, to which I have already referred in another context. Lord Goff not only found the reasoning of Wilson J "most attractive", [1993] AC 70, 176D, but expressed his own conclusions in very similar terms. "In the end," he said, at p 173, "logic appears to demand that the right of recovery should require neither mistake nor compulsion, and that the simple fact that the tax was exacted unlawfully should prima facie be enough to require its repayment". The "exaction" of which he is speaking here is not confined to demands by any particular administrative agency of the state. It includes exaction by the state by enacting void legislation, which taxpayers are likely to pay because they know that the state will act on the footing that it is valid. It is not a condition of the taxpayer's right of recovery that it should have put the matter to the test by waiting until the Inland Revenue insisted. In a passage, at p 177, which strikingly foreshadows some of the issues in the present appeals, Lord Goff assimilated the rule of English law as he had formulated it to the absolute right of recovery recognised by the Court of Justice in *San Giorgio* (Case 199/82) [1983] ECR 3595 in cases where tax was charged contrary to EU law. Although the majority of the appellate committee stopped well short of adopting a concept of "absence of legal basis" as a general ground of recovery even in cases of taxation without lawful authority, Lord Browne-Wilkinson's analysis of the legal basis of recovery in such cases was also very similar to that of the case law of the Court of Justice. Money unlawfully "demanded" was recoverable because it was paid for no consideration: see p 198.    *B*    *C*    *D*    *E*    *F*    *G*    *H*

174   The word "demand" as it was used in the speeches in *Woolwich Equitable* referred in my view simply to a situation in which payment was being required of the taxpayer without lawful authority. Nothing in the principle underlying the decision turned on the mechanism by which that

© 2012 The Incorporated Council of Law Reporting for England and Wales

A  requirement was communicated to the taxpayer. It is therefore a matter of supreme indifference whether it was communicated by assessment, or by some other formal mode of demand, or by proceedings for enforcement, or by the terms of the legislation itself coupled with the knowledge that the Inland Revenue would be likely to enforce it in accordance with those terms.

B  *The Marleasing point*

175  The Court of Appeal [2010] STC 1251, para 107 held that on the principle of conforming construction stated in *Marleasing* (Case C-106/89) [1990] ECR I-4135, section 231 of the Income and Corporation Taxes Act 1988 should be construed so as to remove the discriminatory features of the United Kingdom's advance corporation tax regime. For present purposes we must assume that they were right about this. An appeal on that issue is not

C  before us. The right to apply for permission to appeal on it has been deferred pending the outcome of the second reference to the Court of Justice and its application by the courts below. The argument of the test claimants is that on the assumption that the Court of Appeal's construction is correct the legislation conformed to EU law. Therefore, it is said, the principle in *Woolwich Equitable* is not engaged.

D  176  *Marleasing*, at any rate as it has been applied in England, is authority for a highly muscular approach to the construction of national legislation so as to bring it into conformity with the directly effective Treaty obligations of the United Kingdom. It is no doubt correct that, however strained a conforming construction may be, and however unlikely it is to have occurred to a reasonable person reading the statute at the time, a later judicial decision to adopt a conforming construction will be deemed to declare the law

E  retrospectively in the same way as any other judicial decision. But it does not follow that there was not, at the time, an unlawful requirement to pay the tax. It simply means that the unlawfulness consists in the exaction of the tax by the Inland Revenue, in accordance with a non-conforming interpretation of what must (on this hypothesis) be deemed to be a conforming statute. This is so, notwithstanding that the tax may have been paid without anything in the

F  nature of a formal demand by the revenue. The rule as the House of Lords formulated it in *Woolwich Equitable* is in large measure a response to realities of the relationship between the state and the citizen in the area of tax. The fact that as a matter of strict legal doctrine a statute turns out always to have meant something different from what it appeared to say is irrelevant to the realities of power if it was plain at the relevant time that the tax authorities would enforce the law as it then appeared to be. Strictly speaking, in

G  *Woolwich Equitable* itself there were no unlawful regulations, because, being ultra vires the enabling Act, they were and always had been a nullity. But that did not stop the Woolwich from recovering.

*The section 32(1)(c) point*

177  Section 32(1) of the Limitation Act 1980 is (so far as relevant) in
H  the following terms:

> "*Postponement of limitation period in case of fraud, concealment or mistake*
>  "(1) . . . where in the case of any action for which a period of limitation is prescribed by this Act, either— (a) the action is based upon the fraud of

© 2012 The Incorporated Council of Law Reporting for England and Wales

the defendant; or (b) any fact relevant to the plaintiff's right of action has *A* been deliberately concealed from him by the defendant; or (c) the action is for relief from the consequences of a mistake; the period of limitation shall not begin to run until the plaintiff has discovered the fraud, concealment or mistake (as the case may be) or could with reasonable diligence have discovered it."

178   The argument for the test claimants on these appeals is that in *B* section 32(1)(c) actions "for relief from the consequences of a mistake" are not confined to actions where the mistake is part of the legal foundation of the claim. They extend to at least some actions where it was merely part of the history.   Mr Rabinowitz QC (who argued this point for the test claimants) accepted some limitations of the range of relevant mistakes. He said that there had to be a sufficient causal nexus between the mistake and the *C* claim, in the sense that the facts constituting the cause of action have come to pass because of the mistake.   It followed that although the *Woolwich Equitable* cause of action was available to claimants in the position of his clients regardless of whether they were mistaken or not, those who were in fact mistaken in some historically relevant respect would have benefitted from the extended limitation period until the law was changed by section 320 of the Finance Act 2004.   They have been deprived without notice of that *D* right.   Section 320(6) removes any doubt about this by providing that it applies "to any action or claim for relief from the consequences of a mistake of law, whether expressed to be brought on the ground of mistake or on some other ground (such as unlawful demand or ultra vires act)".

179   Section 32(1) of the 1980 Act substantially re-enacts section 26 of the Limitation Act 1939, with one minor change to paragraph (b) (from *E* concealment "by . . . fraud" to "deliberate" concealment).   The 1939 Act was a notable monument of law reform, replacing an incoherent series of statutes and equitable rules by a coherent statutory scheme. It was enacted on the recommendation of the Law Revision Committee in its Fifth Interim Report (Cmd 5334), which was prepared in 1936 under the auspices of Lord Wright, then Master of the Rolls.   Section 26 substantially followed the language of the report. It is clear from paragraphs 22 and 23 of the *F* committee's report that the intention was to replicate certain features of the rules applied by courts of equity in the absence of any statutory limitation period. The equitable rules on this subject had originally been developed in the context of cases involving fraud.   The doctrine of laches was applied by analogy with statutory limitation at law, save that in cases of fraud time ran from the point when the fraud was discovered or could with reasonable diligence have been discovered, and not from the accrual of the right as it did *G* at law. It is clear that fraud was relevant in equity in two circumstances, (i) that the right to equitable relief was itself based on fraud, in the sense that fraud was a legally essential element of it, and (ii) that whether or not the right to relief was based on fraud, its existence had been concealed from the plaintiff by the fraud of the defendant.   The Law Revision Committee summarised the position at para 22 of their report as follows: *H*

"Either the cause of action may spring from the fraud of the defendant or else the existence of a cause of action untainted in its origin by fraud may have been concealed from the plaintiff by the fraudulent conduct of the defendant."

© 2012 The Incorporated Council of Law Reporting for England and Wales

A    180   In 1936, when the committee was considering these matters, there
was inconsistent authority on the question whether since the fusion of law
and equity the equitable rule about the running of time in cases of fraud
applied to causes of action at law. They recommended that it should. The
result was section 26(a) and (b) of the 1939 Act, corresponding to
section 32(1)(a) and (b) of the 1980 Act. These two paragraphs dealt with
B    the two circumstances in which fraud was relevant to postpone the running
of time in equity, as summarised in the Committee's report. As applied to
fraud neither paragraph admits of the construction now proposed by the test
claimants. Paragraph (a) is concerned with cases where the action is "based
upon" fraud, ie where it is part of the legal foundation of the claim.
Paragraph (b) is concerned with cases where fraud by the defendant is not
necessarily part of the legal basis of the claim, but it has concealed the
C    relevant facts from the claimant and thereby delayed his taking action to
enforce his right. The fact that fraud, although no part of the legal basis of
the claim, may have brought about the factual situation which is the legal
basis of the claim, does not engage either paragraph.

181   The reason for enacting section 26(c) of the Limitation Act 1939
(now section 32(1)(c) of the 1980 Act) was that courts of equity had
D    previously applied the equitable rule relating to fraud by analogy to cases of
mistake. As Alderson B put it in *Brooksbank v Smith* (1836) 2 Y & C Ex 58,
60, "mistake is . . . within the same rule as fraud." The Law Revision
Committee considered that in this respect the rule for mistake should be the
same at law, and at para 23 of their report they recommended the statutory
reversal of the decision in *Baker v Courage* [1910] 1 KB 56, which had held
E    that it was not. Section 26(c) of the 1939 Act was the result. On the face of
it, therefore, the intention behind paragraph (c) was to replicate the rule of
equity by providing that mistake should give rise to an extended limitation
period in the same circumstances in which fraud had that effect under
paragraph (a), namely where it was the legal basis of the claim. The use of a
different phraseology in (a) and (c) (an "action for relief from . . ." instead of
F    "based upon") simply reflects the phraseology used in the committee's
discussion, which was lifted verbatim from the report by the parliamentary
draftsman. There is no indication in the report itself that the difference was
thought to be significant.

182   It is fair to say that there are cases decided in equity before the
Limitation Act 1939 where the court does not seem to have asked itself
whether the mistake was the foundation of the cause of action. *Brooksbank
G    v Smith* itself was one of them. *Denys v Shuckburgh* (1840) 4 Y& C Ex 42,
also decided by Alderson B, was another. In both cases, the reason for this
appears to have been that Alderson B was trying to apply the equitable rule
about fraudulent concealment (corresponding to section 31(1)(b)) by
analogy to cases of mistake, by holding that a mistake on the part of the
plaintiff which concealed from him his right was equivalent to the dishonest
H    or deliberate concealment of his right by the defendant. If so, the idea was
still-born. Lord Wright's committee may well have had these cases in mind
when it went out of its way in para 23 of its report to say that they

"desire[d] to make it clear, however, that the mere fact that a plaintiff
is ignorant of his rights is not to be a ground for the extension of time.

© 2012 The Incorporated Council of Law Reporting for England and Wales

Our recommendation only extends to cases when there is a right to relief *A*
from the consequences of a mistake."

This reservation was adopted by the draftsman of section 26 of the
Limitation Act 1939 and the corresponding provision of the 1980 Act, both
of which exclude from the ambit of paragraph (b) cases where the claimant
was mistaken about the existence of his right. There are clearly obscurities
about how the old rule in equity operated before statute intervened, *B*
attributable at least in part to the absence of analysis in the few reported
cases. But there is, as it seems to me, no difficulty in ascertaining what rule
the Law Revision Committee thought that it was proposing to Parliament.

183   Nor, in my view, is there any real difficulty in understanding what
Parliament must have intended by accepting that proposal when it enacted
section 26(c) of the 1939 Act. The point has been directly considered only *C*
once, by Pearson J in *Phillips-Higgins v Harper* [1954] 1 QB 411. That was
an action by an assistant solicitor to enforce a term of her contract of
employment which entitled her to a share of the profits of the firm for which
she worked.   She claimed to have been underpaid under the profits
agreement for the whole 13 years of her employment. In response to a plea
of limitation in respect of the early years, she contended that she had been
mistaken in failing to realise that she was being underpaid, and relied on *D*
section 26(c) of the Limitation Act 1939. Pearson J rejected her argument.
In his view the wording of the provision was "carefully chosen to indicate a
class of actions where a mistake has been made which has had certain
consequences, and the plaintiff seeks to be relieved from those
consequences": p 418. He gave as examples an action for the restitution of
money paid in consequence of a mistake; or for the rescission or rectification *E*
of a contract on the grounds of mistake; or an action to reopen accounts
settled in consequence of a mistake. Mrs Phillips-Higgins's alleged mistake
had no consequences relevant to her cause of action. Its only consequence
was that because she was unaware that she had a cause of action she missed
the limitation period. "But that is not sufficient", said Pearson J, at p 419:

    "Probably provision (c) applies only where the mistake is an essential *F*
    ingredient of the cause of action, so that the statement of claim sets out, or
    should set out the mistake and its consequences and pray for relief from
    those consequences."

It is fair to say about this reasoning that Mrs Phillips-Higgins would have
failed even on Mr Rabinowitz's construction of the Act, because the mistake
that she alleged was not the cause of the factual situation which she relied on *G*
for her claim.   It only explained why she had allowed so long to pass before
bringing her action.   But what matters for present purposes is that her
argument failed because her action was an action for relief from a breach of
contract, to which the fact that she was mistaken was legally irrelevant. As
Pearson J went on to point out, at p 419: "No doubt it was intended to be a
narrow provision, because any wider provision would have opened too wide
a door of escape from the general principle of limitation." *H*

184   I think that it is difficult to fault Pearson J's succinct and principled
analysis of the point. Section 32(1)(c) refers to a type of action and a type of
relief. They are assumed to be organically related to the relevant mistake.
But if the test claimants are right, there is no organic connection, but only an

© 2012 The Incorporated Council of Law Reporting for England and Wales

A   adventitious one. The result would be a state of the law that would operate quite arbitrarily. Some *Woolwich Equitable* claims would benefit from the extended limitation period while others would not, depending on whether the underlying facts arose from a mistake. I can see no principled ground for making such a distinction in a context where the mistake has no bearing on the nature of the action or the relief claimed.

B   185   It has been suggested by academic commentators that this result may be anomalous, in that the extended period of limitation applies to a claim to recover a mistaken overpayment of a debt but not to a claim to recover a mistaken underpayment. Pearson J himself drew attention to this in his judgment in *Phillips-Higgins* [1954] 1 QB 411, 419. But for my part, I do not see the anomaly. The difference simply arises from the fact that if the claimant is underpaid and sues for the balance, he is enforcing the

C   obligation that gave rise to the debt, whereas if he is overpaid then that obligation will have been discharged, so that he needs some other legal basis for getting it back. By comparison, there are far graver anomalies associated with the wider construction proposed by the test claimants. Once one departs from a construction of the subsection which requires the cause of action to be founded on the mistake, it is difficult to discern any principled limit to the reach of this provision. Mr Rabinovitz distinguishes between

D   cases where the mistake, albeit legally irrelevant, was an effective cause of the facts giving rise to the claim and cases where it was merely a background fact. I find this distinction conceptually difficult to grasp and almost impossible to apply. Questions of causation are notoriously difficult and highly sensitive to the legal context in which they fall to be answered. Where parties have fallen out, there is very likely to be mistake on the part of the

E   claimant somewhere in the chain of events that led to his losing money or property. If at some stage he could have done something to save himself from loss, in what circumstances is that to be a sufficient causal nexus between the legally irrelevant mistake and the legally relevant facts which give rise to the claim? The question will often be incapable of a clear answer. Moreover, if the test is not to depend on whether the claimant is asserting one of the established grounds of relief from the consequences of his

F   mistake, and depends on the mere fact that a mistake has brought about the situation in which he has a claim, then there is nothing in the language or purpose of the provision which would limit it to his own mistakes. It could be the defendant's mistake against whose consequences the plaintiff is seeking to be relieved, for example by an action for damages. This would mean that section 26(c) of the Limitation Act 1939 unwittingly covered at

G   least part of the ground which Parliament later covered by providing an extended limitation period for actions for damages for negligence or in respect of personal injuries and certain categories of property damage: see sections 11 to 14B of the Limitation Act 1980. Mr Rabinowitz disclaimed any suggestion that the extended limitation period would apply to a claim for damages, with the possible exception of damages for misrepresentation or negligent misstatement. This was no doubt tactically wise. But it is hard

H   to see how such a restriction can be justified if his basic submission is accepted. The difficulties associated with the claimants' construction of section 32(1)(c) persuade me that Lord Wright is unlikely to have proposed such an indefinite rule without any discussion of these problems, and that Parliament is unlikely to have intended to enact it. In an ideal world, all

© 2012 The Incorporated Council of Law Reporting for England and Wales

rules of law would be clear, but there are few areas where clarity is as *A*
important as it is in the law of limitation, whose whole object is to foreclose
argument on what ought to be well defined categories of ancient dispute.

*Mistake*

186 It follows that the principle in *Woolwich Equitable* applies
generally in all cases where tax has been charged unlawfully, whether by the *B*
legislature or by the tax authorities, whether by overt threats or demands or
simply by the taxpayer's appreciation of the consequences of not paying, and
whether the taxpayer was mistaken or not. By comparison, an action for
restitution on the ground of mistake is a more limited remedy, for the
obvious reason that it is necessary to prove the mistake. That will not
always be easy, as the facts of *Woolwich Equitable* itself demonstrate. On *C*
the face of it, the only case where the *Woolwich Equitable* cause of action is
probably not available and where a claimant may therefore need a right of
restitution for mistake, is the case where there is no unlawful exaction of tax
but the taxpayer has simply paid in error: e g he has miscalculated his
liability under a self-assessed tax or accidentally paid twice. But that has no
bearing on the position of the present claimants.

187 Does this mean that that the existence of the *Woolwich Equitable* *D*
cause of action in English law is enough to satisfy the obligations of the
United Kingdom in EU law? The test claimants submit that it does not.
Their case is that notwithstanding the sufficiency of a *Woolwich Equitable*
claim as a means of recovering unlawfully charged tax, at least in the
circumstances of the present case, EU law requires that English law should
also maintain a fully effective cause of action to recover tax paid by mistake. *E*
Two quite different arguments are advanced in support of this proposition.
The first is that EU law specifically requires that national legal systems
should provide for the recovery of overpaid taxes in all cases where they
were not due, including the one case where the principle in *Woolwich
Equitable* probably has no application, viz where there is no breach of
EU law by the state but the taxpayer has simply overpaid by mistake. I shall *F*
call this the "absence of basis point". The second argument is that even if
EU law does not specifically require national law to confer a right to recover
taxes overpaid on the ground of mistake, if national law allows a choice
between two causes of action to recover the tax, each of them must be
independently effective. I shall call this the "choice of remedies point".

*The choice of remedies point* *G*

188 The test claimants' argument is that the obligation of a member
state to provide an effective means of recovering overpaid taxes is not limited
to cases where the state was in breach of EU law. It also applies in cases
where the national law entirely conformed with EU law but the claimant
paid more than the law required of him. This, they submitted, reflected the
principle of restitution applied in EU law and in most civil law jurisdictions *H*
(but not England) that a payment is recoverable merely on account of the
absence of a legal basis for making it: see *Masdar (UK) Ltd v Commission of
the European Communities* (Case C-47/07P) [2008] ECR I-9761,
paras 44–46, 49.

© 2012 The Incorporated Council of Law Reporting for England and Wales

A    189  In *Reemtsma Cigarettenfabriken GmbH v Ministero delle Finanze* (Case C-35/05) [2007] ECR I-2425 a German company purchased services from an Italian advertising agency and paid VAT to them which was not due. There was nothing wrong with the relevant provisions of Italian law for charging and collecting the tax, which in the relevant respects entirely conformed with the Directives. The Italian tax authorities had charged no

B    tax unlawfully. All that happened was that the German purchaser received an invoice from the Italian supplier for the VAT and paid it, not appreciating that the relevant services were by law deemed to have been supplied in Germany. The supplier then accounted for the tax to the Italian tax administration. There was no provision of the two relevant VAT Directives requiring a refund to be made in these circumstances, but it was held that the principle of effectiveness required Italy to make available an effective means

C    of recovering sums paid but not due, either from the Italian supplier or from the state. Mr Aaronson QC argued that the juridical basis for the obligation to repay overpaid tax in these circumstances was the mere absence of a legal basis for the original payment. I think that he may well be right about that. But the reason for the decision was that VAT is an EU tax whose incidence and administration is governed by mandatory requirements of EU law. The

D    purpose of the VAT Directives is to produce a harmonised system operating according to uniform rules across the EU. The payment of VAT otherwise than in accordance with that scheme distorts its uniform operation. The point was made in *Danfoss AS v Skatteministeriet* (Case C-94/10), 20 October 2011, where a similar result was arrived at in the context of the common EU scheme for taxing mineral oils. In its judgment in that case, the court observed, at para 23, that the purpose of a right of recovery in a

E    harmonised tax scheme is not only compensatory but economic:

> "the right to the recovery of sums unduly paid helps to offset the consequences of the duty's incompatibility with EU law by neutralising the economic burden which that duty has unduly imposed on the operator who, in the final analysis, has actually borne it."

F    In those circumstances, a right of action to recover money paid but not due is required so "that the economic burden of the duty unduly paid can be neutralised": para 25.

190  If this issue were to arise in England in the context of an EU tax, the case would be classified in English law as one of mistake and recovery could probably be had on no other basis. But where the relevant tax is wholly a creature of national law, and no tax has been charged in breach of EU law,

G    EU law is not engaged at all.

*The choice of remedies point*

191  This point is at the heart of the division of opinion within this court. The Test Claimants argue, and the majority agrees, that the principle of effectiveness in EU law requires that all remedies which are available to

H    recover the tax should be independently effective for that purpose. Therefore, so the argument goes, it was not open to the United Kingdom to compromise the effectiveness of the right to recover on the ground of mistake by curtailing the limitation period for that right without a period of grace.

© 2012 The Incorporated Council of Law Reporting for England and Wales

192   In argument, this point was founded mainly on the decision of the
Court of Justice in *Rewe Handelsgesellschaft Nord mbH v Hauptzollamt
Kiel* (Case 158/80) [1981] ECR 1805 (*Rewe II*). This was another case
about VAT and excise duty chargeable under the terms of a Directive. It
concerned not an unlawful charging of tax, but an unlawful exemption from
tax. The claimants were companies operating supermarkets in German
coastal towns, who were adversely affected by tax-free sales made in
international waters during shopping cruises in the Baltic which began and
ended in Germany. Under the terms of the Directives, a limited exemption
was allowed for goods coming from member states in the personal luggage
of travellers, but German law allowed an exemption of its own which was in
some respects wider. The Court of Justice held that the exemption in the
Directive was not available for sales made on shopping cruises beginning
and ending in the same member state, that the tax ought to have been
charged, that the incidence of VAT and excise duty was an occupied field
governed exclusively by Community law, and that Germany had accordingly
had no power to grant further exemptions of its own. The relevant question
for present purposes concerned the remedies available to rival traders
against the cruise operators. German law allowed a right of action to those
adversely affected by breaches of national laws regulating economic activity.
At para 40 of its judgment, the Court of Justice referred to this German right
of action and then summarised the question at issue as follows:

"Placed in that context, the questions raised by the national court are
intended in substance to establish whether that right of action may be
exercised in similar conditions within the framework of the Community
legal system in particular in the sense that if the economic interests of a
person to whom Community law applies are adversely affected by the
non-application of a Community provision to a third party, either
through the action of a member state or of the Community authorities,
that person may institute proceedings before the courts of a member state
in order to compel the national authorities to apply the provisions in
question or to refrain from infringing them."

The court's answer to that question appears at para 44 of the judgment:

"it must be remarked first of all that, although the Treaty has made it
possible in a number of instances for private persons to bring a direct
action, where appropriate, before the Court of Justice, it was not intended
to create new remedies in the national courts to ensure the observance of
Community law other than those already laid down by national law. On
the other hand, the system of legal protection established by the Treaty, as
set out in article 177 in particular, implies that *it must be possible for
every type of action provided for by national law to be available for the
purpose of ensuring observance of Community provisions having direct
effect, on the same conditions concerning the admissibility and procedure
as would apply were it a question of ensuring observance of national
law.*" (Emphasis added.)

193   In their printed case (para 67) the test claimants rely on this
statement of principle, and in particular the passage which I have italicised,
as authority for the proposition that EU law requires a "right to choose from
the range of national remedies." Of course the test claimants do have a right

© 2012 The Incorporated Council of Law Reporting for England and Wales

A  to choose either or both of a *Woolwich Equitable* claim or a claim based on mistake. Neither of the Acts of 2004 and 2007 took it away from them. Their real complaint is not that the right to claim on the basis of mistake of law has been withdrawn, but that the law has been changed to make it subject to a period of limitation running from the date of payment in the same way as the limitation period for a *Woolwich Equitable* claim. The

B  argument, as it was developed at the hearing, was that even on the footing that a *Woolwich Equitable* cause of action was enough and that the United Kingdom was not obliged to confer an additional right to recover tax paid by mistake subject to an extended limitation period, since it has chosen to do so, the principle of effectiveness requires that that right with its extended limitation period should remain available for the purpose of recovering tax charged contrary to EU law. This submission is accepted by the majority on

C  the present appeal. I regret that I am unable to accept it for three reasons.

194  First, the argument is not supported by either the decision or the reasoning in *Rewe II* [1981] ECR 1805 nor by the many subsequent cases in which the relevant statement has been cited. *Rewe II* was concerned with the principle of equivalence, as the language and the legal context show. The issue was whether Germany was bound to make a right of action derived

D  from economic regulation under its national law available to litigants who wanted to enforce comparable rights derived from economic regulation under Community law. What the court was saying was that any cause of action available to enforce a national law right must be equally available to enforce a corresponding Community law right. Provided that there remains an effective remedy, it does not follow from this that national law is bound to maintain that cause of action subject to unchanged incidents or conditions.

E  Nothing was said in *Rewe II* about protecting the choice of litigants between concurrent national law rights or remedies. The question did not arise because the Court of Justice was considering the only German law remedy which appeared to exist.

195  Second, the test claimants' submission is inconsistent with the established case law of the Court of Justice. In *Edilizia Industriale*

F  *Siderurgica Srl (Edis) v Ministero delle Finanze* (Case C-231/96) [1998] ECR I-4951 and *Ministero delle Finanze v Spac SpA* (Case C-260/96) [1998] ECR I-4997, para 32, the facts were that in breach of a Directive which prohibited taxes on the raising of capital, Italy had charged fees for registering companies. The general limitation period under the Civil Code was ten years, but the decree-law authorising the registration fees provided (and

G  always had provided) for their repayment within three years if they had been wrongly charged. The Italian courts had held that as a matter of domestic law, the effect of the creation of a specific right to repayment within three years under the decree-law was to displace the general right conferred by the Civil Code to claim restitution on the ground of absence of basis within ten years. One of the questions referred was whether Italy was bound to make available the cause of action with the more generous limitation period for

H  the purpose of giving effect to EU law rights. The court held that it was not. Provided that the right of action carrying the more restrictive limitation period was effective and applied without discrimination whether the claim to repayment was based on EU or national law, there was no obligation to provide in addition a right of action under the Civil Code with a more

© 2012 The Incorporated Council of Law Reporting for England and Wales

generous limitation period. In *Edilizia Industriale Siderurgica Srl (Edis) v Ministero delle Finanze*[1998] ECR I-4951, paras 36–37, the court said: A

"36. Observance of the principle of equivalence implies, for its part, that the procedural rule at issue applies without distinction to actions alleging infringements of Community law and to those alleging infringements of national law, with respect to the same kind of charges or dues (see, to that effect, *Amministrazione delle Finanze dello Stato v Salumi* (Joined Cases 66/79, 127/79 and 128/79) [1980] ECR 1237, para 21). That principle cannot, however, be interpreted as obliging a member state to extend its most favourable rules governing recovery under national law to all actions for repayment of charges or dues levied in breach of Community law. B

"37. Thus, Community law does not preclude the legislation of a member state from laying down, alongside a limitation period applicable under the ordinary law to actions between private individuals for the recovery of sums paid but not due, special detailed rules, which are less favourable, governing claims and legal proceedings to challenge the imposition of charges and other levies. The position would be different only if those detailed rules applied solely to actions based on Community law for the repayment of such charges or levies." C

D

The same observations were made in *Ministero delle Finanze v Spac SpA* [1998] ECR I-4997, paras 20 and 21. They were later repeated and applied in *Aprile II* and *Dilexport*, where the facts were very similar (see paras 153–154 above) but the question arose from a change in the law.

196   Third, the test claimants' argument is contrary to principle. The starting point for any analysis of the law in this area is that, subject to the principles of effectiveness and equivalence, it is for national law to determine what remedies are available to enforce a directly effective EU right and on what procedural or other conditions. I have made this point already: see para 145 above. The right of the claimants to choose from the range of causes of action recognised by English law is a right derived solely from English procedural law and it exists only to the extent that English law so provides. So long as the principles of effectiveness and equivalence are respected, a choice between concurrent national law remedies need not exist, and in some member states does not exist, at any rate to the same extent. Thus English law allows a claimant to choose between concurrent rights of action in contract and tort, a principle which was applied by analogy in *Deutsche Morgan Grenfell* [2007] 1 AC 558 to allow a choice between concurrent rights to recover under the *Woolwich Equitable* principle and on the ground of mistake. French law, by comparison, is more prescriptive. The principle of non-cumul des responsabilités, which excludes delictual claims which fall naturally within the scope of a contract is generally thought to reflect a more general juristic preference for keeping legal categories distinct and allowing claims to be brought in the category to which their subject matter is appropriate. The same approach appears to lie behind the restriction of claims under the general doctrine of unjust enrichment (enrichissement sans cause légitime) to cases where no other action is available: *Flour, Aubert et Savaux, Droit civil, Les obligations*, 2 *Le fait juridique*, 11th ed (2011), pp 57–64. I can see no principled reason why EU law should wish to control these divergent features of national legal E F G H

© 2012 The Incorporated Council of Law Reporting for England and Wales

A   systems, provided that the choice which the relevant law mandates and the conditions on which it does so are non-discriminatory and effective to vindicate EU rights.

*The protection of legitimate expectations: section 320 of the Finance Act 2004*

B   197   I have already analysed the case law of the Court of Justice on the retrospective curtailment of limitation periods for the exercise of directly effective EU law rights. It establishes, first, that the retrospective curtailment of a limitation period is not necessarily inconsistent with the principle of effectiveness; and, secondly, that the combined effect of the principle of effectiveness and the principle of the protection of legitimate expectations is to preclude national legislatures from retrospectively curtailing the

C   limitation period applicable to the recovery of overcharged tax, unless there is a sufficient period of grace to enable actual and potential claimants to safeguard their existing rights. However, it is important to note that in every case in which these principles have been considered by the Court of Justice, the amending legislation curtailed the limitation period for the only right available in national law for recovering the tax. In none of them was there

D   an effective right of recovery on another legal basis, unaffected by the amendment. The observations of the Advocate General and the court, especially those made in *Marks & Spencer* [2003] QB 866, must be read in that light.

198   The primary case put forward on behalf of the commissioners is that because (i) English law would be compatible with EU law if the only means of recovering the overpaid tax was a claim on a *Woolwich Equitable*

E   basis, and (ii) the Finance Act 2004 did not affect a claim on that basis, it follows that the principles of effectiveness and the protection of legitimate expectations are not engaged at all. In common with every other member of the court, I reject that submission. The reason is that if, as I have sought to demonstrate, (i) a right to claim on the principle in *Woolwich Equitable* with a normal limitation period is an effective means of asserting the test

F   claimants' EU law right, and (ii) there is no obligation on the United Kingdom in EU law to maintain a concurrent right to claim on the basis of mistake with an extended limitation period, then logically there still remains one complaint that might arguably be made about section 320 of the Finance Act 2004. That complaint is that before the intention to legislate was announced potential claimants were entitled to make their plans on the assumption that they could recover the overpaid tax on the ground of

G   mistake with the benefit of an extended limitation period, but their right to do so was then curtailed without notice or transitional provisions. I think that this complaint depends on the principle of the protection of legitimate expectations, whereas Lord Walker of Gestingthorpe and Lord Reed JJSC consider that it can be justified on the basis of the principle of effectiveness alone. I doubt whether this difference matters. In either case, the force of the complaint depends entirely on the proposition that reasonable persons in

H   their position could have made their plans on that assumption.

199   Could they? I think not. If English law had never recognised a right to recover tax on the ground of mistake of law, but only on the basis of the principle in *Woolwich Equitable*, it is not disputed that that state of affairs would have satisfied the requirements of EU law. If Parliament had

© 2012 The Incorporated Council of Law Reporting for England and Wales

retrospectively created a concurrent right to recover tax on the ground of    *A*
mistake of law, but in the same enactment made it subject it to a limitation
period of six years to run from the time of payment, it is not disputed that
that state of affairs would also have satisfied the requirements of EU law.
The question whether the right to recover money paid under a mistake of
law extended to mistaken payments of tax was a difficult question. There
were powerful voices raised in favour, such as that of Professor Birks, but
also strong and principled arguments against. I have dealt with this matter    *B*
at paras 166–168 above. Before Park J gave judgment in *Deutsche Morgan
Grenfell* [2003] 4 All ER 645 on 18 July 2003, no one could reasonably have
counted on being able to recover tax on the ground of mistake of law. They
might have thought that there were strong arguments to that effect, but I do
not believe that they could reasonably have assumed when deciding how
long they had in which to bring their claims that those arguments would    *C*
prevail. Even after Park J's judgment, the right to recover tax on the ground
of mistake of law was being challenged on appeal on serious grounds. The
existence of such a right was rejected by the Court of Appeal [2006] Ch 243
and was not definitively established until the judgment of the House of Lords
[2007] 1 AC 558 on 25 October 2006.

200    In a common law system, it is open to the courts to create new    *D*
causes of action, but limitation is necessarily a matter for the legislature. On
8 September 2003, just seven weeks after the decision of Park J, the
government announced its intention to introduce what became section 320
of the Finance Act 2004, with its provision that the limitation period for the
newly recognised claim to recover tax on the ground of mistake of law
should run from the date of payment and not from the date of discovery.
I find it impossible to regard that sequence of events as any different in    *E*
substance from the situation that would have existed if Parliament had
simultaneously created a right to recover tax for mistake of law and
subjected it to a limitation period running from the date of payment. If
potential claimants in the position of the present appellants claim to have
been entitled to count on being able to recover on the ground of mistake of
law with an extended limitation period, then the highest that they can put
their case is that they were entitled to do so in the seven-week interval    *F*
between 18 July and 8 September 2003. Bearing in mind the brevity of the
interval, the virtual certainty of an appeal and the uncertainty about its
outcome, the argument that they had a legitimate expectation of the kind
suggested seems to me to be unrealistic. In my judgment, section 320 of the
Finance Act 2004 was not inconsistent with the protection of legitimate
expectations. All that Parliament did was to provide for the limitation    *G*
period applicable to a cause of action which English law had only just
recognised. This was a lawful exercise by Parliament of the discretion
allowed to member states as to the conditions regarding limitation on which
any national law right is available.

201    The contrary view of the majority depends on the declaratory
theory of judgments. It proceeds upon the basis that when Park J and then
the House of Lords held in *Deutsche Morgan Grenfell* that there was a right    *H*
to recover tax on the basis of mistake, they were declaring the law as it had
always been. At a purely formal level, this proposition is undoubtedly
correct. Judgments of the courts about the common law are deemed to be
declaratory and not legislative. But we are, I think, in danger of allowing the

© 2012 The Incorporated Council of Law Reporting for England and Wales

A   form to overlay the substance. In *Deutsche Morgan Grenfell*, at p 570, Lord
Hoffmann distinguished between two questions raised by the declaratory
theory of judgments:

"One is whether judges change the law or merely declare what it has
always been. The answer to this question is clear enough. To say that
they never change the law is a fiction and to base any practical decision
B   upon such a fiction would indeed be abstract juridical correctitude. But
the other question is whether a judicial decision changes the law
retrospectively and here the answer is equally clear. It does. It has the
immediate practical consequence that the unsuccessful party loses,
notwithstanding that, in the nature of things, the relevant events occurred
before the court had changed the law: see *In re Spectrum Plus Ltd* [2005]
2 AC 680. There is nothing abstract about this rule."
C

In my judgment, it is the first of Lord Hoffmann's propositions which is
relevant for present purposes. The question is not whether the law must be
treated as always having been as Park J and the House of Lords declared it to
be. It is whether before those judgments could reasonably count on being able to recover the overpaid tax on the ground of
mistake (with an extended period of limitation), as opposed to being limited
D   to the already established remedy under the *Woolwich Equitable* principle
(with a normal period of limitation). The question must in my judgment be
put in this way, because the issue is whether there is an assumption
reasonably to be imputed to litigants about how long they had in which to
bring their claim, which was then retrospectively falsified by Parliament.
The answer to the question cannot depend on any legal fiction. It must
E   depend on the position as it appeared to stand, before those judgments were
given. This must in particular be true when one is seeking to apply to the
relevant English law principles of EU law which have always depended on
substance rather than form. The reality is that the test claimants never were
in a position to make their plans on the footing that they had a right of action
for mistake until at the very earliest the judgment of Park J, but more
realistically until the matter was definitively settled by the House of Lords in
F   2006.

202   It is right to point out that this is substantially the same principle as
that on which the test claimants themselves rely when they say (with the
support of the House of Lords in *Deutsche Morgan Grenfell*) that they
cannot be taken to have discovered their mistake about the lawfulness of the
United Kingdom's corporation tax regime until the Court of Justice
G   definitively decided the point. By the same token, the test claimants cannot
be taken to have assumed that they had a right to recover the tax on the
ground of mistake at a stage when they had arguments and hopes but no
definitive decision.

*The protection of legitimate expectations: section 107 of the Finance Act
2007*
H
203   As I have already indicated, I regard this provision as more
problematic. It was announced on 6 December 2006, more than three years
after the announcement which preceded section 320 of the 2004 Act. It
went a great deal further than the earlier enactment, since it applied
retrospectively without limit of time to any action brought before the first

© 2012 The Incorporated Council of Law Reporting for England and Wales

announcement had been made on 8 September 2003. It might be said that *A* the announcement of 2006 was a response to the decision of the House of Lords in *Deutsche Morgan Grenfell* and that the interval between judgment and announcement was no greater than it had been in 2003. But the circumstances were different. Companies in the position of the British American Tobacco group who had already brought their actions before the announcement of 8 September 2003 had been expressly excluded from the operation of the legislation proposed on that date. That exclusion was duly *B* contained in section 320 of the Finance Act 2004. The British American Tobacco group and other companies in the same position had been pursuing their claims through the English courts and the Court of Justice on that basis since 2003, when their right to the fruits of those proceedings was removed in 2006. In my view, while they had had no legitimate expectation of being able to bring an action to recover on the ground of mistake of law in 2003, *C* they had acquired such an expectation by 2006, not least as a result of the terms of the announcement of September 2003 and the 2004 Act. It was therefore contrary to the principle of the protection of legitimate expectations, for that expectation to be defeated without notice of transitional provisions.

*D*
### Section 33 of the Taxes Management Act 1970

204  This provision applies only to assessed taxes, and therefore only to a very small part of the present claims. It confers a right subject to highly restrictive conditions to invoke what is essentially a discretionary power of the commissioners to grant a refund of overpaid tax. No one suggests on this appeal that such a limited remedy could possibly be enough in itself to satisfy *E* the virtually unqualified obligation of the United Kingdom to provide an effective means of recovering tax overcharged contrary to EU law. This does not of course matter if it is an additional remedy as opposed to an exclusive one. There is certainly nothing in the provision which expressly excludes the availability of other causes of action at common law. If that is its effect, it must be by implication. In the ordinary way, such an exclusion might be implied, on the ground that where Parliament confers a restricted right of recovery, that must impliedly displace a corresponding right at common law *F* which would be unrestricted. However, it is axiomatic that the courts cannot imply an exclusion of unrestricted rights of action at common law where that would be inconsistent with an overriding rule of EU law that an unrestricted right must be available. Section 33 cannot therefore be an exclusive right to recover tax overcharged contrary to EU law. Whether it is an exclusive right in other circumstances, is not a point which needs to be *G* considered on this appeal.

205  The Court of Appeal held that section 33 did impliedly exclude a right of action at common law, even in relation to claims for tax overcharged contrary to EU law. They then dealt with the resulting inconsistency with EU law by reinterpreting the section so as to remove the offending restrictions and the element of discretion. I think that this was wrong in principle. I very much doubt whether such radical surgery can be justified even under the *H* extended principles of construction authorised in *Marleasing*. Its effect would be fundamentally to alter the scheme of the provision. But, however that may be, it seems, with respect, eccentric to imply an ambit for section 33 which is inconsistent with EU law and then to torture the express provisions

A  so as to deal with anomalies that but for the implication would never have arisen.

*The damages claims*

206  In addition to their claims in restitution, the claimants have claims against the Commissioners in damages on the principle of state liability
B  adopted by the Court of Justice in *Francovich v Italian Republic* (Joined Cases C-6/90 and C-9/90) [1995] ICR 722. This cause of action is subject to a number of conditions, one of which is that the breach should be sufficiently serious, i e should involve a "grave and manifest" disregard of the limits of the member state's discretion: see *Brasserie du Pêcheur SA v Federal Republic of Germany* (Joined Cases C-46/93 and C-48/93) [1996] QB 404.
C  Both courts below have dismissed the claim for damages on the ground that that condition is not satisfied. That may explain why, although the issues before us were formulated so as to cover their implications for the damages claim also, the argument focused exclusively on the claim for restitution. In fact, the damages claims do not call for separate consideration because neither section 320 of the Finance Act 2004 nor section 107 of the Finance Act 2007 applied to those claims unless they fall within section 32(1)(c) of
D  the Limitation Act 1980. It follows from the construction that I would give to that provision that they do not fall within it. It is not suggested that section 33 of the Taxes Management Act 1970 has any bearing on a claim for damages on the principle of state liability.

*Conclusion*

E  207  In the result, I would (1) affirm the decision of the Court of Appeal on the requirements of the cause of action based on *Woolwich Equitable* and the absence of any requirement for an additional remedy in mistake (issue 12 in their numbering); (2) affirm their decision on the effect of section 32(1)(c) of the Limitation Act 1980) (issue 22); (3) allow the appeal on section 107 of the Finance Act 2007 (issues 20 and 21); and (4) allow the appeal on section 33 of the Taxes Management Act 1970: issue 23.
F  208  The question whether section 320 of the Finance Act 2004 is compatible with EU law cannot be decided without a reference to the Court of Justice. It is plain from the novelty of the circumstances in which it arises, and from the differences of opinion within the court that it is not acte clair. I would, however, limit the reference to section 320 of the 2004 Act.

G  **LORD REED JSC**

209  Lord Walker of Gestingthorpe and Lord Sumption JJSC have expressed different views about the way in which EU law applies to the grounds of action available to the test claimants for the recovery of taxes which were levied contrary to EU law, and in particular about the way in which EU law applies to legislation which shortened, retroactively and without transitional provisions, the limitation period applicable to one of
H  those grounds of action. In my opinion, Lord Walker's analysis of the compatibility of section 320 of the Finance Act 2004 and section 107 of the Finance Act 2007 with the principle of effectiveness, and of the compatibility of the latter provision with the principle of the protection of legitimate expectations, is consistent with the relevant case law of the Court of Justice

© 2012 The Incorporated Council of Law Reporting for England and Wales

of the European Union.  I agree with his reasoning and conclusions in *A* relation to those issues, as well as in relation to the issues of domestic law before the court.  For my part, in agreement with Lord Hope of Craighead DPSC and Lord Clarke of Stone-cum-Ebony JSC, I am inclined to the view that section 320 of the 2004 Act also infringes the principle of the protection of legitimate expectations.  I add some observations of my own in relation to the issues of EU law only because of the importance of those issues and the *B* division of opinion in the court.  It is perhaps unusual to discuss EU law in such detail when the matter is to be referred to the Court of Justice, but in the present case the issues of EU law and domestic law are closely inter-related.

210  The difficulties in this case arise partly from the fact that the relevant principles of English law have been in the course of development during much of the relevant period of time.  The principal milestones along the road are three decisions of the House of Lords.  First, in 1992 the House *C* of Lords held that a taxpayer was entitled to recover taxes paid in response to an unlawful demand: *Woolwich Equitable Building Society v Inland Revenue Comrs* [1993] AC 70.  Secondly, in 1998 the House of Lords held that money paid under a mistake of law was recoverable: *Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 AC 349.  Thirdly, in 2006 the House of Lords held that the latter principle applied to taxes paid under a mistake of *D* law, including taxes paid in ignorance of the fact that the legislation under which they were levied was incompatible with EU law: *Deutsche Morgan Grenfell Group plc v Inland Revenue Comrs* [2007] 1 AC 558 ("*DMG*").  Two other important matters were also decided in that case.  The first concerned the limitation period applicable to the claim.  In terms of section 32(1)(c) of the Limitation Act 1980, that period would not begin to *E* run until the mistake was discovered, or could with reasonable diligence have been discovered.  The House of Lords held that, in the circumstances of the case, the mistake could not be discovered until the incompatibility of the tax with EU law had been established by a judgment of the Court of Justice. The second matter was that the fact that the taxpayer might have a concurrent ground of action under the *Woolwich* principle, which was subject to a limitation period running from the date of the payment, did not *F* prevent it from pursuing its claim on the ground of mistake if the extended limitation period best suited its interests.  Finally, in its present decision this court has held that a taxpayer who pays taxes in compliance with legislation which is incompatible with EU law has a ground of action under the *Woolwich* principle, in addition to any ground of action which may be available on the basis of mistake. *G*

211  The legislative provisions with which we are now concerned alter the limitation period applicable to claims for the repayment of taxes on the ground of mistake, so that it runs from the date when the payment was made, rather than the date when the mistake was discovered or could reasonably have been discovered.  The first provision with which we are concerned, section 320 of the Finance Act 2004, applies to claims which were made on or after 8 September 2003.  The second provision, section 107 *H* of the Finance Act 2007, applies to claims made before that date.  The claims with which we are concerned were made on 18 June 2003, in the case of the BAT group claimants, and on 8 September 2003, in the case of the Aegis group claimants.  They were based on both grounds of action.  The principal

A  issue we have to determine is whether the application of the legislation to the claims is compatible with EU law.

212  In considering that issue, there appear to me to be three central questions, which can at this stage be broadly stated as follows. The first is whether the ground of action enabling taxes levied in breach of EU law to be recovered on the basis of mistake falls within the ambit of the EU principle of effectiveness. It is argued that it does not, since the ground of action based on an unlawful demand in itself fully satisfies the requirement of EU law that there should be an effective remedy. Since no additional remedy is required by the principle of effectiveness, it follows, so the argument runs, that the additional ground of action which English law provides, based on mistake, falls outside the scope of that principle. I disagree. As I shall explain, it appears to me that the EU principle of equivalence, which is the complement of the principle of effectiveness, applies to the grounds of action available for the recovery of taxes in domestic law. Where an action for the recovery of taxes under domestic law can be based either on the ground of mistake or on the ground of unlawful demand (or, as in the present case, on both grounds), it follows from the principle of equivalence that both grounds of action should also be available in similar circumstances to enforce an analogous right under EU law. So long as they must both be available, they must also both be effective. The principle of effectiveness therefore applies to both grounds of action.

213  The second question, which arises only if the first question is answered in the affirmative, is whether the application of section 320 of the 2004 Act to the Aegis claims, and of section 107 of the 2007 Act to the BAT claims, is compatible with the principle of effectiveness. As I shall explain, I consider that it is not compatible in either case, since the retroactive curtailment of the limitation period and the absence of any transitional provisions rendered impossible in practice the exercise of rights derived from EU law. If that is correct, it follows that the legislation cannot be relied upon against the claimants, whatever the answer to the third question may be.

214  The third question is whether the application of the legislation to these claims is compatible with the EU principle of the protection of legitimate expectations. That is a question which arises even if the first question is answered in the negative, since the procedural rules laid down by domestic law for the enforcement of rights derived from EU law must be in conformity with the general principles of EU law, including the general principle requiring the protection of legitimate expectations. The answer to the third question is however of no practical significance if the first two questions are answered as I would answer them. In the event, we are all agreed that the application of section 107 of the 2007 Act to the BAT claims is incompatible with the protection of the BAT claimants' legitimate expectations. In agreement with Lord Hope and Lord Clarke, I have also reached the same provisional conclusion in respect of the application of section 320 of the 2004 Act to the Aegis claims, for reasons which I shall explain.

215  It might be argued that a fourth question also arises on the facts of these cases: namely, whether the application of the legislation in issue to these claims would be compatible with the rights recognised in the Charter of Fundamental Rights of the European Union (OJ 2000 C 364, p 1)

© 2012 The Incorporated Council of Law Reporting for England and Wales

*A*

(notably in article 47), to which effect is given by article 6(1) of the Treaty on
European Union ("TEU"), or with the fundamental rights recognised by
article 6(3) TEU, including in particular the right of access to a court,
guaranteed by article 6(1) of the European Convention for the Protection of
Human Rights and Fundamental Freedoms, and the right to the peaceful
enjoyment of possessions, guaranteed by article 1 of the First Protocol to the
Convention. That question however goes beyond the ambit of the dispute as
defined by the parties, and it raises issues on which the court has not been
addressed. In those circumstances it would not be appropriate for the court
to consider that question of its own motion. My answers to the first three
questions in any event produce a result which is not incompatible with the
fundamental rights just mentioned.

*B*

**216**    I turn now to consider in greater detail the three questions which
I have identified.

*C*

### The mistake ground of action and the principles of equivalence and effectiveness

**217**    Under the principle of cooperation laid down in article 4(3)TEU, it
is for the member states to ensure the effective judicial protection of an
individual's rights under EU law: see, for example, *Unibet (London) Ltd v
Justitiekanslern* (Case C-432/05) [2008] All ER (EC) 453, paras 37–44. In
particular, in the absence of EU rules governing the matter, it is for the
domestic legal system of each member state to lay down the procedural rules
governing actions for safeguarding rights which individuals derive from
EU law. In a case such as the present, it may seem idiosyncratic to describe
the grounds of action available under domestic law as procedural rules, but
that description reflects the distinction drawn in the case law of the Court of
Justice between the right derived from EU law and the national law by
means of which effect is given to that right, which may govern such matters
as the procedure to be followed, the period within which claims must be
made, and the proof of such claims.

*D*

*E*

**218**    That general approach applies to the right to recover the taxes in
issue in the present case, to the extent that they were levied in breach of
EU law: see the judgment of the Grand Chamber on the first reference in
these proceedings, *Test Claimants in the FII Group Litigation v Inland
Revenue Comrs* (Case C-446/04) (Note) [2012] 2 AC 436, para 203. As the
Grand Chamber stated, the procedural rules laid down by domestic law
must comply with two conditions. First, they must not be less favourable
than those governing similar domestic actions. That is the principle of
equivalence. Secondly, they must not render virtually impossible or
excessively difficult the exercise of rights conferred by EU law. That is the
principle of effectiveness. Equivalence and effectiveness are complementary
requirements.

*F*

*G*

**219**    For the purpose of applying the principle of equivalence, a claim for
the recovery of taxes levied by a member state in breach of EU law is similar
to a claim for the restitution of taxes unlawfully levied under domestic law.
In England and Wales, the rules laid down by domestic law governing such
claims are in large part rules of common law. The procedure laid down by
section 33 of the Taxes Management Act 1970 is an exception. For the
reasons given by Lord Walker and Lord Sumption JJSC, however, that
statutory procedure is not applicable in the circumstances of this case. The

*H*

© 2012 The Incorporated Council of Law Reporting for England and Wales

A  relevant rules of common law include those laid down by the House of Lords in the three cases which I have mentioned—*Woolwich*, *Kleinwort Benson* and *DMG*—and by this court in the present case. In particular, as I have explained, it was held in the *DMG* case that a person who had mistakenly paid taxes which had been levied in breach of EU law had a ground of action based upon the fact that the payment had been made under a mistake: that is to say, the ground of action whose general nature was established in

B  *Kleinwort Benson*. The present decision holds that such a person also has a ground of action based upon the fact that the payment was made in compliance with legislation which was incompatible with EU law: that is to say, the ground of action whose general nature was established in *Woolwich*. The two grounds of action are in some respects subject to different rules, and in consequence one or the other may be more suitable to a claimant,

C  depending upon the circumstances. For example, apart from the legislation in issue in the present case, the two grounds of action are subject to different limitation periods. There may be other differences. In the present case, as I have explained, the claims are based upon both the mistake ground of action and the unlawful demand ground of action.

    220 Where both these grounds of action are available for the recovery of taxes which have been levied in breach of domestic law, and a person

D  seeking to recover such taxes can choose to base his claim upon whichever ground of action best suits his interests, it follows from the principle of equivalence that the same grounds of action, and the same freedom of choice, must equally be available in analogous circumstances to a person seeking to recover taxes which have been levied in breach of EU law: otherwise, claims based on EU law would be less favourably treated than

E  similar claims based on domestic law. As the Court of Justice stated in *Rewe-Handelsgesellschaft Nord mbH v Hauptzollamt Kiel* (Case 158/80) [1981] ECR 1805, para 44, the system of legal protection established by the Treaties implies that "it must be possible for *every type of action provided for by national law* to be available for the purpose of ensuring observance of Community provisions having direct effect" (emphasis added).

F     221 It might however be argued that a complication arises from the fact that it had not been definitively decided at the time when the claims were made, or at the time when the legislation was enacted, that those grounds of action were available for the bringing of claims such as those with which the present proceedings are concerned. Does that make a difference to the way in which the principle of equivalence applies? In my view it does not. The decision of the House of Lords in *DMG*, confirming the soundness of a claim

G  to the repayment of unlawfully levied tax on the basis of a mistake in law, was in no sense prospective only. The decision of this court in the present case, confirming that claims to the repayment of unlawfully levied tax can be made on the basis of the *Woolwich* principle even in the absence of a formal demand, has similarly determined what the law was at the time when the claims were made. Although each of those decisions determined a question of law which was previously contestable, and can therefore be said to have

H  involved a development of the law, they cannot be equiparated to legislation: such decisions actually, and not merely formally, declare the law that is applicable to the case before the court and all other comparable cases. As Lord Goff of Chieveley explained in *Kleinwort Benson Ltd v Lincoln City Council* [1999] 2 AC 349, 378–379, the declaratory theory of judicial

© 2012 The Incorporated Council of Law Reporting for England and Wales

decision is not an aberration of the common law, but reflects the nature of     *A*
judicial decision-making (an aspect which is also reflected in the temporal
effects of the judgment of the Grand Chamber on the first reference in these
proceedings). It follows that these claims, although made in proceedings
which commenced prior to the decisions of the House of Lords in *DMG* and
of this court in the present case, are based on grounds of action which were
available under English law at the time when the claims were made, as a       *B*
means of recovering taxes which had been unlawfully levied, even if that
could not have been known with certainty until the matter had been finally
determined by the highest courts.

222   It accordingly appears to me that the grounds of action based on
mistake and on an unlawful demand were both available at all material
times, in the circumstances laid down in the relevant case law, for the
recovery of taxes which had been levied contrary to domestic law. It follows   *C*
from the principle of equivalence that both grounds of action must also have
been available in analogous circumstances for the recovery of taxes levied
contrary to EU law. That is not, of course, to say that English law was
bound to maintain both grounds of action subject to unchanged incidents or
conditions; but any changes would have to comply with the requirements of
EU law, including the requirement of effective judicial protection.
                                                                                *D*
223   That conclusion is challenged on the basis that the mistake ground
of action is neither necessary nor sufficient to meet the requirements of
EU law, as laid down in such cases as *Amministrazione delle Finanze dello
Stato (Edis) v SpA San Giorgio* (Case 199/82) [1983] ECR 3595: it is not
necessary, since the unlawful demand ground of action is in itself adequate;
and it is not sufficient, since it requires the presence of an additional element
besides the levying of the taxes in breach of EU law, namely that they must    *E*
have been paid under a mistake as to the lawfulness of the domestic
legislation.

224   The first of these contentions appears to me to be off the point. The
fact that the ground of action based on an unlawful demand satisfies the *San
Giorgio* principle does not exclude the possibility that the ground of action
based on mistake also satisfies that principle. Indeed, the ground of action
based on mistake is of considerable practical importance as a means of        *F*
enforcing rights to repayment derived from EU law, as the present case
demonstrates, since it enables claims relating to taxes levied in breach of
EU law to be brought outside the six-year limitation period, reckoned from
the date of the payment, which applies to claims based upon the *Woolwich*
principle: a period which may have expired before the mistake as to the
validity of the tax legislation is discovered. Admittedly, if English law had   *G*
evolved differently, and the ground of action based on mistake had not been
available, then the ground of action based on an unlawful demand might
well have met the requirements of EU law. The fact of the matter, however,
is that English law provides two grounds of action which are capable of
satisfying the *San Giorgio* principle, and the principle of equivalence
therefore requires that both grounds of action should be available for the
enforcement of rights derived from EU law.                                     *H*

225   The second contention also appears to me to be mistaken. The two
grounds of action are not identical: in particular, subject to the legislation at
issue in the present case, they are subject to different limitation periods. The
mistake ground of action admittedly includes an additional element, namely

© 2012 The Incorporated Council of Law Reporting for England and Wales

A   that the taxes were paid under a mistake; but it is the presence of that additional element which enables the claimant to benefit from an extended limitation period which begins when the mistake is discovered or could with reasonable diligence have been discovered, rather than beginning when the payment was made. The mistake ground of action is therefore a valuable remedy for the recovery of taxes levied contrary to EU law. If it were not

B   available for that purpose, then the person who had paid taxes levied contrary to EU law would be in a less favourable position than the person who had a similar claim under domestic law.

    226 The principle of equivalence does not of course oblige a member state to extend its most favourable rules governing recovery under national law to all actions for repayment of charges or dues levied contrary to EU law: *Edilizia Industriale Siderurgica Srl v Ministero delle Finanze* (Case

C   C-231/96) [1998] ECR I-4951, para 36 ("*Edis*"). It was therefore open to the United Kingdom to curtail the limitation period applicable to the ground of action based on mistake without offending against the principle of equivalence, so long as it did so not only for claims based on a breach of EU law but also for similar claims based on a breach of domestic law. That had not however been done by the time the present actions were commenced. Whether the retroactive manner in which the limitation period

D   was subsequently curtailed was compatible with EU law raises issues not in relation to the principle of equivalence but in relation to the principle of effectiveness.

    227 If, then, the principle of equivalence required that the mistake ground of action should be available to the claimants at the time when they made their claims, then it follows under EU law that the principle of

E   effectiveness also applied to that ground of action, and continues to apply until the claims are determined. The question which arises, and to which I turn next, is whether the application of section 320 of the 2004 Act to the Aegis claims, and of section 107 of the 2007 Act to the BAT claims, would be compatible with that principle.

*The application of the principle of effectiveness*

F     228 The principle of effectiveness requires that the national procedural rules required by the principle of equivalence must provide effective judicial protection in conformity with EU law. Taken in conjunction with the principle of equivalence, it is a principle which has far-reaching implications for domestic law.

    229 The principle of effectiveness may in particular impinge upon

G   domestic laws relating to limitation periods. There is of course no objection in principle to limitation periods under EU law: on the contrary, it is recognised that reasonable periods of limitation are necessary in the interests of legal certainty: *Rewe-Zentralfinanz eG v Landwirtschaftskammer für das Saarland* (Case 33/76) [1976] ECR 1989, para 5 and *Comet BV v Produktschap voor Siergewassen* (Case 45/76) [1976] ECR 2043, paras 17–18. Equally, there is no requirement that rights derived from

H   EU law should be subject to the most favourable limitation period available under domestic law, provided the principle of equivalence is respected: *Edis* [1998] ECR I-4951.

    230 National legislation curtailing the period within which recovery may be sought of sums which have been levied in breach of EU law is not in

principle incompatible with EU law. The Court of Justice has however laid
down certain requirements with which such legislation must comply. It
must for example not be intended specifically to limit the consequences of a
judgment of the Court of Justice: see e g *Deville v Administration des impôts*
(Case 240/87) [1988] ECR 3513. In that regard, I note that the Government
announced its intention to introduce the provision which became
section 107 of the Finance Act 2007 on 6 December 2006, which was the
day on which the Court of Justice had rejected the Government's application
to re-open the hearing in the first reference in this case so as to allow it to
seek a temporal restriction to the effect of the judgment. The effect of
section 107 is not however confined to the taxes with which the court's
judgment was concerned, and it is not contended that the provision offended
against the *Deville* requirement. In the circumstances, I proceed on that
basis.

231 A further requirement of legislation curtailing a limitation period is
that the arrangements for its entry into force must be consistent with
effective judicial protection of the rights derived from EU law. In particular,
such legislation must ensure that it remains possible in practice to enforce
the right to repayment derived from EU law. In order to understand how
that principle applies in the present case, it is helpful to consider some of the
judgments of the Court of Justice.

232 First, *Aprile v Amministrazione delle Finanze dello Stato (No 2)*
(Case C-228/96) [2000] 1 WLR 126 concerned a claim for repayment of
charges wrongfully levied in 1990, when such claims were subject to the
general limitation period of ten years. On 27 January 1991 legislation was
enacted which brought such claims within the scope of a shorter limitation
period prescribed by customs legislation, which was then a period of five
years, and in addition reduced that limitation period to three years as from
27 April 1991. The action was begun on 30 March 1994. It was accepted by
the national authorities that the legislation could not be applied to claims
which had been lodged prior to 27 April 1991. In that regard, the Advocate
General observed at para 41 of his opinion that the legislation would be
clearly incompatible with Community law if it applied to claims which had
been lodged before that date: the Community principle of legal certainty did
not allow such claims to be affected by a later provision not existing at the
time of lodgement which detracted from the legal situation of the claimants.
The issue concerned claims lodged after 27 April 1991 in respect of
payments which had been made at a time when the longer limitation period
applied. As the Court of Justice noted, the national courts interpreted the
legislation as not having any retroactive effect: it was construed as meaning
that persons whose claims had arisen before the date when the legislation
came into force had three years from that date within which to commence
proceedings: a period which was sufficient to guarantee the effectiveness of
the right to reimbursement: para 28. On that basis, the legislation was
compatible with Community law. The same conclusion was also reached,
on similar facts, in *Dilexport Srl v Amministrazione delle Finanze dello Stato*
(Case C-343/96) [2000] All ER (EC) 600.

233 Secondly, *Marks & Spencer plc v Customs and Excise Comrs* (Case
C-62/00) [2003] QB 866 concerned a claim for repayment of VAT unduly
paid between May 1991 and August 1996, when the relevant limitation
period was six years. On 19 March 1997 legislation was enacted which

© 2012 The Incorporated Council of Law Reporting for England and Wales

*A* reduced the limitation period to three years. The legislation was deemed to have come into force on 18 July 1996. The action was begun on 15 April 1997. The Court of Justice considered the legislation both in relation to the principle of effectiveness and in relation to the principle of the protection of legitimate expectations. I shall consider the second of those aspects below. In relation to the principle of effectiveness, the court derived from its judgments in *Aprile* and *Dilexport* the proposition that, in order for national

*B* legislation curtailing the period within which recovery may be sought of sums charged in breach of Community law to be compatible with Community law, "the time set for its application must be sufficient to ensure that the right to repayment is effective": para 36. The cCourt continued, at paras 37–39:

*C* "37. It is plain, however, that that condition is not satisfied by national legislation such as that at issue in the main proceedings which reduces from six to three years the period within which repayment may be sought of VAT wrongly paid, by providing that the new time limit is to apply immediately to all claims made after the date of enactment of that legislation and to claims made between that date and an earlier date, being that of the entry into force of the legislation, as well as to claims for

*D* repayment made before the date of entry into force which are still pending on that date.

"38. Whilst national legislation reducing the period within which repayment of sums collected in breach of Community law may be sought is not incompatible with the principle of effectiveness, it is subject to the condition not only that the new limitation period is reasonable but also that the new legislation includes transitional arrangements allowing an

*E* adequate period after the enactment of the legislation for lodging the claims for repayment which persons were entitled to submit under the original legislation. Such transitional arrangements are necessary where the immediate application to those claims of a limitation period shorter than that which was previously in force would have the effect of retroactively depriving some individuals of their right to repayment, or of

*F* allowing them too short a period for asserting that right.

"39. In that connection it should be noted that member states are required as a matter of principle to repay taxes collected in breach of Community law (*Société Comateb v Directeur Général des Douanes et Droits Indirects* (Joined Cases C-192 to C-218/95) [1997] ECR I-165, 188, para 20, and *Dilexport* [1999] ECR I-579, 610–611, para 23), and whilst the court has acknowledged that, by way of exception to that

*G* principle, fixing a reasonable period for claiming repayment is compatible with Community law, that is in the interests of legal certainty, as was noted in paragraph 35 hereof. However, in order to serve their purpose of ensuring legal certainty limitation periods must be fixed in advance (*ACF Chemiefarma NV v Commission of the European Communities* (Case 41/69) [1970] ECR 661, 683, para 19)."

*H* 234  As the court made clear at para 38, the legislation in issue in *Marks & Spencer* was objectionable not only because it applied retroactively to persons who had already made claims for repayment which were within the limitation period then in force, but also because it precluded claims by persons who could otherwise have made claims within that period, without

© 2012 The Incorporated Council of Law Reporting for England and Wales

432
FII Group Test Claimants v Revenue and Customs Comrs (SC(E))        [2012] 2 AC
Lord Reed JSC

any transitional provisions to protect the rights of such persons. A similar    A
conclusion was also reached in *Grundig Italiana SpA v Ministero delle
Finanze* (Case C-255/00) [2003] All ER (EC) 176, where a limitation period
of five years was replaced by one of three years, and a transitional period of
90 days was held to be insufficient to ensure that the right of recovery was
not rendered excessively difficult.

235    It follows from cases such as *Aprile, Dilexport, Marks & Spencer*    B
and *Grundig* that a taxpayer who has paid taxes levied contrary to EU law is
not vested with a right to repayment in accordance with the domestic
provisions which were in force at the time when the payment was made. It is
permissible to alter the applicable rules of domestic law, including rules as to
limitation, provided the legislation effecting the alteration does not in
practice deprive the persons affected of their right to seek reimbursement. In
order for that proviso to be met, however, the legislation must not apply the    C
new limitation period retroactively so as to bar claims which were made
timeously according to the law then in force, and the arrangements for its
entry into force must also allow persons who have not yet made claims an
adequate period of time to ensure that their right to repayment remains
effective.

236    In the present case, the claims are for the repayment of taxes unduly    D
paid between 1973 and 1999, when the relevant limitation period was six
years. That period generally ran from the date of the payment, but in an
action for relief from the consequences of a mistake the period was
extended: it did not begin to run until the claimant discovered the mistake or
could with reasonable diligence have discovered it: section 32(1)(c) of the
Limitation Act 1980, re-enacting a provision previously contained in
section 12 of the Limitation Act 1939. As Lord Walker JSC has explained, at    E
paras 103–104, it has been established in this case that the payments were
made under a mistake about the lawfulness of the tax regimes under which
they were paid; and it was only after the Court of Justice issued its judgment
in *Metallgesellschaft Ltd v Inland Revenue Comrs* (Joined Cases C-397/98
and C-410/98) [2001] Ch 620 that it was generally appreciated that the
UK corporation tax regime was open to challenge as infringing Community
law. A well advised company in the position of the claimants would then    F
have had grounds for considering that it was entitled to the repayment of tax
which had been levied contrary to Community law, and that there was at
least a reasonable prospect that it could rely upon the extended limitation
period provided by section 32(1)(c) of the 1980 Act in order to recover any
taxes paid more than six years before the proceedings were begun. In order to
do so, it would of course have to base its claim upon the mistake ground    G
of action. The BAT action was begun in June 2003, and the Aegis action on
8 September 2003. In each action, the claim was based upon the mistake
ground of action (as well as the unlawful demand ground of action), and
reliance was placed on section 32(1)(c). Section 320 of the 2004 Act,
enacted in July 2004, excluded the application of section 32(1)(c) of the
1980 Act in relation to taxation matters where the action was brought on or
after 8 September 2003. Section 107 of the 2007 Act, enacted in July 2007,    H
excluded the application of section 32(1)(c) where the action was brought
prior to 8 September 2003.

237    It is apparent from that summary that the claims, so far as they
relate to payments made more than six years before the proceedings were

© 2012 The Incorporated Council of Law Reporting for England and Wales

A  commenced, have always been dependent on the application of section 32(1)(c) of the 1980 Act. The effect of the legislation of 2004 and 2007 is thus to deprive the claimants, retrospectively, of the ability to pursue their claims so far as they relate to those payments. Since the legislation was retroactive in its effect, there was nothing the claimants could do to avoid its operation: that, of course, was the point of making the legislation retroactive.

B  238  Since the legislation retroactively restricts the possibility of repayment to claimants who brought an action within six years of the date of the payment, rather than six years of the date when their mistake was discovered or could with reasonable diligence have been discovered, it deprives persons who do not satisfy that condition of any possibility of exercising the right to repayment derived from EU law, which they

C  previously enjoyed. In the circumstances of this case, it retroactively renders the taxes unduly paid by the BAT group prior to June 1997, and by the Aegis group prior to September 1997, irrecoverable: taxes whose reimbursement had been timeously sought under the law then in force. It therefore renders impossible in practice the exercise of rights derived from the EU treaties which national courts are bound to protect. That is the first reason why I have reached the provisional conclusion that it is contrary to EU law and

D  cannot be relied on in these proceedings.

239  That conclusion does not appear to me to be affected by the argument that the legislation serves the legitimate purpose of avoiding the disruption of public finances which the present claims, and other similar claims, would otherwise cause. As the Court of Justice observed in its *Marks & Spencer* judgment [2003] QB 866, para 39, member states are required as

E  a matter of principle to repay taxes collected in breach of EU law. Legal certainty, which protects both taxpayers and the administration, can justify fixing reasonable limitation periods for bringing claims for repayment, but it cannot in my view justify applying them in such a way that the rights conferred by EU law are no longer safeguarded.

240  Nor in my view can the present case be distinguished from such cases as *Marks & Spencer* on the ground that those cases concerned

F  situations where there was only one basis on which repayment could be sought, whereas the present case concerns a situation where two grounds of action exist, with differently calculated limitation periods, and the effect of the legislation in issue is merely to apply the same method of calculating the limitation period to both grounds of action. I accept that the present case differs in that respect from the cases which have come before the Court of

G  Justice, but the difference is in my view of no consequence. Since both grounds of action are available as means of enforcing EU rights in accordance with the principle of equivalence, it follows that the principle of effectiveness must also be respected in relation to both. The vice of the legislation in issue is not that it seeks to apply a common limitation period to the two grounds of action, but that it does so retroactively and without transitional provisions, and so fails to conform to the principle of effective

H  judicial protection.

*The principle of the protection of legitimate expectations*

241  A further reason for my provisional conclusion that the legislation is incompatible with EU law is that it is in my view incompatible with the

© 2012 The Incorporated Council of Law Reporting for England and Wales

principle of the protection of legitimate expectations. As a general principle    *A*
of EU law, this principle binds member states when implementing EU law at
national level. In particular, it applies to national rules governing the
protection of EU rights in national courts. The point is illustrated by *Marks
& Spencer* (Case C-62/00) [2003] QB 866, where the Court of Justice
rejected the Government's contention that the procedural rules governing
the recovery of overpayments of VAT were entirely a matter of domestic law,
subject only to the Community principles of equivalence and effectiveness.    *B*
As the court held, at para 44, the principle of the protection of legitimate
expectations forms part of the Community legal order; and, on the facts of
that case, legislation retroactively curtailing the period within which
repayment might be sought of taxes collected in breach of Community law
was incompatible with that principle.

242    It is in my opinion an even clearer breach of that principle for    *C*
legislation which has the effect of reducing the limitation period applicable
to actions for the enforcement of rights derived from EU law to be applied to
actions which were already pending before the courts when the legislation
was enacted. Although persons cannot legitimately expect that the legal
rules applicable to them will not be altered, they may legitimately expect
that rights which they possess will not be retroactively abridged. They are
therefore entitled to expect that a claim which was not time-barred when it    *D*
was made will not subsequently become time-barred as a result of
retroactive legislation.

243    My conclusion on this point does not depend on an assumption
that the claimants knew, at the time when they commenced proceedings,
that their claims could validly be based upon the mistake ground of action,
and could therefore benefit from the extended limitation period provided by    *E*
section 32(1)(c) of the 1980 Act. Although the validity of claims to the
repayment of unlawfully levied tax on the basis of mistake was strongly
arguable at that time, and was of course ultimately established, I accept that
it was only some years later that the point was definitively resolved by the
decision of the House of Lords in *DMG* [2007] 1 AC 558. Although there
was therefore an arguable question in 2003 as to whether the claims which
they had submitted to the court were time-barred, the claimants could    *F*
legitimately expect that that question would be decided by the court in
accordance with a proper understanding of the law in force at the time when
the claims were made. They could legitimately expect that the court's
decision of that question would not be pre-empted by retroactive legislation
subsequently enacted by Parliament.

244    Nor does it appear to me to be material that the legislation in issue    *G*
left untouched the limitation period which applied to the ground of action
based on an unlawful demand. The claimants had based their claims upon
both grounds of action, as they were entitled to do. The fact that their claims
in respect of payments made during the six years prior to the commencement
of the proceedings, so far as based on the unlawful demand ground of action,
were not affected by the legislation in issue does not diminish the significance
of the fact that their right to pursue claims in respect of earlier periods, on    *H*
the basis of mistake, was taken away from them after proceedings relying
upon that right had been commenced.

245    The protection of legitimate expectations is not of course an
absolute principle, and even retroactive measures interfering with the

© 2012 The Incorporated Council of Law Reporting for England and Wales

A  administration of justice may sometimes be justified by compelling considerations relating to the public interest; and, in any assessment of whether such a justification existed, a lack of certainty as to the law at the material time might be a relevant consideration. In the present case, however, for the reasons explained in para 239, there appear to me to be no other considerations capable of outweighing the breach of legitimate expectations which resulted from the legislation in issue.

B

*Conclusion*

246  In view of the division of opinion on the court in relation to the compatibility of section 320 of the 2004 Act with EU law, I agree that that issue will require to be the subject of a reference to the Court of Justice in accordance with the directions proposed by Lord Hope. The other issues should in my view be dealt with as proposed by Lord Walker.

C

> *Appeal allowed in part.*
> *Parties to prepare in draft questions to*
>    *be referred to Court of Justice for*
>    *preliminary ruling.*

D                                    COLIN BERESFORD, Barrister

E

F

G

H

© 2012 The Incorporated Council of Law Reporting for England and Wales

TAB 25

*TSB Bank plc v Katz* [1997] BPIR 147

Trim Size = 240mm x 150mm

# TSB BANK PLC v KATZ

## Chancery Division

### Arden J

### 7 March 1994

*Transactions at an undervalue – Appropriate venue for hearing applications made under s 423 of the Insolvency Act 1986*

After having obtained judgment in its favour in proceedings, a bank sought to amend its statement of claim by adding a claim for relief based upon s 423 of the Insolvency Act 1986. It was alleged that K had transferred his interest in family property in the USA to his wife in order to defeat a claim brought by the bank by putting that asset beyond its reach. Two issues were raised: first, whether such a late amendment of statement of claim was to be permitted, and, secondly, in which Division of the High Court should the application be heard? The application was heard in chambers and judgment was given in open court.

**Held** – granting the application – an amendment could be made to a statement of claim even though the plaintiff had already secured judgment in its favour. The court had discretion to permit such a late amendment. The wife did not object to it, and, by dealing with the application in the present proceedings, costs would be saved.

An application under s 423 could be dealt with by any Division in the High Court, as long as it did not form part of proceedings brought under Parts I–IX of the Insolvency Act 1986.

**Statutory provisions considered**
Insolvency Act 1986, ss 117, 411, 412, 423, 424
Insolvency Rules 1986 (SI 1986/1925), rr 6.9, 6.40, 7.1

**Cases referred to in judgment**
*Midland Bank Trust Co Ltd v Green (No 2)* [1979] 1 WLR 460, [1979] 1 All ER 726, CA
*Moon v Franklin* [1996] BPIR 196
*Singh (Santosh Kumari) v Atombrook Ltd (trading as Sterling Travel)* [1989] 1 WLR 810, [1989] 1 All ER 385, CA

*Michael Lerego* for the plaintiffs
*Eason Rajah* for the second defendant
The first defendant did not appear and was not represented.

## ARDEN J:

The plaintiff, having now obtained judgment for all the relief claimed in the statement of claim, seeks leave to amend the statement of claim by adding a new claim based on s 423 of the Insolvency Act 1986. The bank alleges that in March 1992 Mr Katz gave Mrs Katz his interest in their jointly owned flat in Beverly Hills in order to put that asset beyond the reach of the bank. I am not concerned with the merits of that claim or of the proposed defence. Section 423 provides:

> '(1) This section relates to transactions entered into at an undervalue; and a person enters into such a transaction with another person if—

Trim Size = 240mm x 150mm

148          Arden J          **TSB Bank plc v Katz**          (ChD)          [1997] BPIR

(a)    he makes a gift to the other person or he otherwise enters into a transaction with the other on terms that provide for him to receive no consideration;

(b)    he enters into a transaction with the other in consideration of marriage; or

(c)    he enters into a transaction with the other for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by himself.

(2) Where a person has entered into such a transaction, the court may, if satisfied under the next subsection, make such order as it thinks fit for—

(a)    restoring the position to what it would have been if the transaction had not been entered into, and

(b)    protecting the interests of persons who are victims of the transaction.

(3) In the case of a person entering into such a transaction, an order shall only be made if the court is satisfied that it was entered into by him for the purpose—

(a)    of putting assets beyond the reach of a person who is making, or may at some time make, a claim against him, or

(b)    of otherwise prejudicing the interests of such a person in relation to the claim which he is making or may make.

(4) In this section "the court" means the High Court or—

(a)    if the person entering into the transaction is an individual, any other court which would have jurisdiction in relation to a bankruptcy petition relating to him;

(b)    if that person is a body capable of being wound up under Part IV or V of this Act, any other court having jurisdiction to wind it up.

(5) In relation to a transaction at an undervalue, references here and below to a victim of the transaction are to a person who is, or is capable of being, prejudiced by it; and in the following two sections the person entering into the transaction is referred to as "the debtor".'

The bank is entitled to bring a claim under s 423 by virtue of s 424(1)(c). Section 424(1) provides:

'(1) An application for an order under section 423 shall not be made in relation to a transaction except—

(a)    in a case where the debtor has been adjudged bankrupt or is a body corporate which is being wound up or in relation to which an administration order is in force, by the official receiver, by the trustee of the bankrupt's estate or the liquidator or administrator of the body corporate or (with the leave of the court) by a victim of the transaction;

(b)    in a case where a victim of the transaction is bound by a voluntary arrangement approved under Part I or Part VIII of this

**[1997] BPIR**         **Arden J**         **TSB Bank plc v Katz**         **(ChD)**         **149**

> Act, by the supervisor of the voluntary arrangement or by any
> person who (whether or not so bound) is such a victim; or
>
> (c)    in any other case, by a victim of the transaction.'

Mr Rajah does not oppose the amendment provided that the claim is not
one which has to be brought in the Bankruptcy Court. There are no
proceedings in that court pending against Mrs Katz, against whom the relief is
sought. Mr Rajah has referred me to *Moon v Franklin* [1996] BPIR 196. That
case concerned an application under s 423 and the judge said [at p 198A]:

> 'The application was originally made in the Chancery Division but
> since, as I understand, all applications under the Insolvency Act 1986
> are to proceed under the Insolvency Rules, the application was
> transferred to Bankruptcy. It is in this way that the application before
> me is "in bankruptcy" although neither of the respondents is a bankrupt
> nor has there been any suggestion that bankruptcy proceedings are in
> contemplation by anyone.'

I have seen the Bankruptcy Court file in this action. The order to which
Mervyn Davies J refers was an order by consent dated 19 April 1989 for (inter
alia) the discontinuance of proceedings which had been begun in the
Chancery Division. Thus, in the passage I have quoted, the judge was not
explaining an order which he had made (indeed the earlier order had not been
made by a judge) but was setting out the background to the matter before him.
The result clearly appeared to the judge to be anomalous. However, it derives
some support from the Insolvency Rules 1986, r 7.1 which states that Chapter
1 in Part 7 (Court Procedure and Practice) of the Insolvency Rules applies to
all applications under the Insolvency Act 1986 with specified exceptions
(which are immaterial).

Notwithstanding this, I prefer the view that an application under s 423
which is not made in existing proceedings in the Companies Court or the
Bankruptcy Court, or which is brought otherwise than by virtue of a right to
apply to those courts conferred by some other provision of Parts I to XI of the
Insolvency Act 1986, may be commenced in any part of the High Court. I
base this view primarily on s 423(4). There would no point in the reference to
the High Court if it did not include the High Court generally since (taking the
case of a company) s 423(2)(b) includes the Companies Court in the Chancery
Division of the High Court in any event (s 117). The same is true (mutatis
mutandis) of s 423(4)(a) in the case of an individual in the circumstances
specified in Insolvency Rules 1986, rr 6.9 and 6.40. In those circumstances
the bankruptcy petition must be presented to the Bankruptcy Court in the
Chancery Division of the High Court.

The Insolvency Rules do not in my judgment apply to any application
under s 423, of the kind with which I am concerned, for the following reasons.
The rule-making powers in ss 411 and 412 are for the purpose of giving effect
to Parts I to XI of the Insolvency Act 1986 and they are not expressed to
extend to Part XVI of the Insolvency Act 1986 (which includes s 423). There
is power in ss 411 and 412 to include incidental and supplemental provisions
in the Rules, but a rule which makes the Rules apply to an application under
s 423 brought otherwise than in the course of

Trim Size = 240mm x 150mm

150        **Arden J**        **TSB Bank plc v Katz**        **(ChD)**        **[1997] BPIR**

proceedings already pending in the Companies Court or the Bankruptcy Court
or by virtue of some other provision in Parts I to XI of the Insolvency Act
would not in my view be within those words. Accordingly, the Insolvency
Rules 1986, r 7.1 has to be read as limited to proceedings under the
Insolvency Act 1986 to which the enabling powers themselves apply.
Proceedings under s 423 brought otherwise than in the course of proceedings
already pending in the Companies Court or the Bankruptcy Court or by virtue
of some other provision of Parts I to XI of the Act are not such proceedings.
There will be no proceedings pending in the Companies Court unless (for
example) a winding-up petition has been presented and there will be no
proceedings pending in the Bankruptcy Court unless (for example) a
bankruptcy petition has been presented; until some such proceedings have
been commenced, or some other right to apply to those courts under Parts I to
XI of the Act arises, the option of bringing an application under s 423 in the
Companies Court or the Bankruptcy Court (as the case may be) does not in
my judgment arise.

  I consider that I have jurisdiction to allow an amendment to the statement
of claim even after judgment (*Singh (Santosh Kumari) v Atombrook Ltd
(trading as Sterling Travel)* [1989] 1 WLR 810; *Midland Bank Trust Co Ltd v
Green (No 2)* [1979] 1 WLR 460 at p 468). I also consider that I should
exceptionally exercise my discretion in favour of the amendment, given the
fact that Mrs Katz consents and the fact that Mr Katz has not appeared
(despite service of a summons seeking relief under s 423) – no doubt because
he is not adversely affected by the new relief to be claimed. If the new claim
is made in the present proceedings costs will be saved and multiplicity of
proceedings avoided.

Solicitors:    *Pickering Kenyon* for the plaintiffs
                    *Cohen & Naicker* for the second defendant

TAB 26

*Wood v Capita Insurance Services Ltd* [2017] 2 WLR 1095

A                                Supreme Court

# Wood *v* Capita Insurance Services Ltd

## [2017] UKSC 24

2017  Feb 7;                              Lord Neuberger of Abbotsbury PSC,
B       March 29            Lord Mance, Lord Clarke of Stone-cum-Ebony,
                                        Lord Sumption, Lord Hodge JJSC

*Contract — Construction — Indemnity clause — Share capital of company sold
under sale and purchase agreement containing clause indemnifying buyer against
payments "arising out of claims or complaints registered with" Financial Services
Authority — Company making referral to Financial Services Authority regarding
mis-selling of insurance and agreeing to pay compensation to customers — Buyer*
C      *seeking to be indemnified under indemnity clause — Principles of construction to
be applied — Whether indemnity clause applying only in relation to claims or
complaints made by customers*

The buyer purchased the entire share capital in an insurance brokerage company
from the seller and two others. The agreement made between the parties contained an
indemnity clause whereby the sellers undertook to pay the buyer an amount equal
D    to the amount required to indemnify the buyer against, inter alia, "all fines,
compensation or remedial action or payments imposed on . . . the company . . .
arising out of claims or complaints registered with" inter alia, the Financial Services
Authority ("FSA") against the company. Shortly after the purchase the company's
employees raised concerns about some of the company's sales processes. The
company carried out a review which revealed that in many cases the company's
telephone operators had misled customers. The buyer was obliged to inform the FSA,
E    which informed the buyer that customers had been treated unfairly and had suffered
detriment. The company agreed with the FSA to establish a scheme for compensation
to be paid to customers affected by the mis-selling. The seller brought proceedings
against the company and the buyer, and the buyer counterclaimed against the seller
under the indemnity clause alleging that the company and its subsidiaries had suffered
loss resulting from mis-selling or suspected mis-selling of insurance products in the
period prior to the completion of the sale of the company and that the contractual
F    indemnity was not confined to loss arising out of customers' claims or complaints.
The seller defended the claim on the ground that the compensation scheme fell outside
the scope of the terms of the indemnity clause. The judge construed the indemnity
clause as requiring the seller to indemnify the buyer even though there had been no
claim or complaint by a customer and accordingly gave judgment for the buyer. The
Court of Appeal construed the indemnity clause as being confined to losses arising out
of customers' claims or complaints and accordingly allowed the seller's appeal.
G         On the buyer's appeal—
          *Held,* (1) that the court's task in interpreting a contractual term was to ascertain
the objective meaning of the language which the parties had chosen to express their
agreement; that that was not a literalist exercise focused solely on a parsing of the
wording of a particular clause but required consideration of the contract as a whole
and, depending on the nature, formality and quality of its drafting, more or less
weight to be given to elements of the wider context in reaching its view as to that
H    objective meaning; that the interpretation of a contract was a unitary exercise and,
where there were rival meanings, the court could give weight to the implications of
rival constructions by reaching a view as to which was more consistent with business
common sense; but that, in striking a balance between the indications given by the
language and the implications of the competing constructions, the court had to
consider the quality of drafting of the clause and also to be alive to the possibility that

© 2017 The Incorporated Council of Law Reporting for England and Wales

A

one side might have agreed to something which, with hindsight, did not serve his interest; that similarly the court should not lose sight of the possibility that the provision might be a negotiated compromise or that the negotiators had been unable to agree more precise terms; that that unitary exercise involved an iterative process whereby each suggested interpretation was checked against the provisions of the contract and its commercial consequences were investigated; that, when interpreting any contract, textualism and contextualism could be used as tools to ascertain the objective meaning of the language which the parties had chosen to express their agreement and the extent to which each tool would assist the court in its task would vary according to the circumstances of the particular agreements; that agreements which were sophisticated and complex because they had been negotiated and prepared with the assistance of skilled professionals might be successfully interpreted principally by textual analysis; and that the correct interpretation of other contracts, such those which lacked clarity because of their informality or brevity or the absence of skilled professional assistance, might be achieved by a greater emphasis on considering their factual matrix and the purpose of similar provisions in contracts of the same type (post, paras 10, 11–13).

B

C

*Rainy Sky SA v Kookmin Bank* [2011] 1 WLR 2900, SC(E) and *Arnold v Britton* [2015] AC 1619, SC(E) explained.

(2) Dismissing the appeal, that the disagreement between the judge and the Court of Appeal as to the interpretation of the disputed indemnity clause had not been caused by any failure to apply the correct principles but was the result of the clause not having been drafted with precision so that its meaning was avoidably opaque; but that, on analysis of the clause, the Court of Appeal's interpretation was correct (post, paras 24–29, 34, 35, 39–43).

D

*Per curiam.* The recent history of the common law of contractual interpretation is one of continuity rather than change. One of the attractions of English law as a legal system of choice in commercial matters is its stability and continuity, particularly in contractual interpretation (post, para 15).

Decision of the Court of Appeal [2015] EWCA Civ 839 affirmed.

E

The following cases are referred to in the judgment of Lord Hodge JSC:

*Arnold v Britton* [2015] UKSC 36; [2015] AC 1619; [2015] 2 WLR 1593; [2016] 1 All ER 1, SC(E)
*Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38; [2009] AC 1101; [2009] 3 WLR 267; [2009] Bus LR 1200; [2009] 4 All ER 677; [2010] 1 All ER (Comm) 365, HL(E)

F

*Gan Insurance Co Ltd v Tai Ping Insurance Co Ltd (No 2)* [2001] EWCA Civ 1047; [2001] 2 All ER (Comm) 299, CA
*Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896; [1998] 1 All ER 98, HL(E)
*Prenn v Simmonds* [1971] 1 WLR 1381; [1971] 3 All ER 237, HL(E)
*Rainy Sky SA v Kookmin Bank* [2011] UKSC 50; [2011] 1 WLR 2900; [2012] Bus LR 313; [2012] 1 All ER 1137; [2012] 1 All ER (Comm) 1, SC(E)

G

*Reardon Smith Line Ltd v Yngvar Hansen-Tangen* [1976] 1 WLR 989; [1976] 3 All ER 570, HL(E)
*Sigma Finance Corpn, In re* [2009] UKSC 2; [2010] 1 All ER 571, SC(E)

No additional cases were cited in argument.

**APPEAL** from the Court of Appeal

H

By a claim form issued on 8 February 2013 the claimant, Andrew Wood, sought damages for wrongful dismissal against the defendants, Sureterm Direct Ltd and Capita Insurance Services Ltd. The second defendant counterclaimed against the claimant seeking to enforce a right to indemnity for loss incurred pursuant to clause 7.11 of a share purchase agreement

© 2017 The Incorporated Council of Law Reporting for England and Wales

A    dated 13 April 2010 whereby the second defendant had agreed to buy, and
the claimant to sell, all the share capital in the first defendant.    On
14 October 2014 Popplewell J sitting in the Commercial Court of the
Queen's Bench Division [2014] EWHC 3240 (Comm) gave judgment for the
second defendant on a preliminary issue arising in the counterclaim as to
the construction of clause 7.11.

B    By an appellant's notice the claimant appealed.  On 30 July 2015 the
Court of Appeal (Patten, Gloster and Christopher Clarke LJJ) [2015] EWCA
Civ 839 allowed the appeal.

On 25 February 2016 the Supreme Court (Lord Mance, Lord Sumption
and Lord Toulson JJSC) granted the second defendant permission to appeal,
pursuant to which it appealed.

The facts are stated in the judgment of Lord Hodge JSC.

C
*Edward Cumming* (instructed by *Enyo Law LLP*) for the second
defendant buyer.
*Andrew Twigger QC* (instructed by *Birketts LLP, Norwich*) for the
claimant seller.

The court took time for consideration.

D
29 March 2017.  **LORD HODGE JSC** (with whom **LORD NEUBERGER
OF ABBOTSBURY PSC, LORD MANCE, LORD CLARKE OF STONE-
CUM-EBONY** and **LORD SUMPTION JJSC** agree) handed down the
following judgment.

E    1  This appeal raises a question of contractual interpretation.    It
concerns an indemnity clause in an agreement dated 13 April 2010 ("the
SPA") for the sale and purchase of the entire issued share capital of a
company, Sureterm Direct Ltd ("the Company"), which carries on business
as a specialist insurance broker, primarily offering motor insurance for
classic cars.

2  The sellers of the Company were the respondent, Mr Andrew Wood
F    ("Mr Wood"), who owned 94% of its share capital, and Mr Christopher
Kightley and Mr Howard Collinge, who owned 1% and 5% of its share
capital respectively.  Each was a director of the Company and Mr Wood was
its managing director.  The purchaser was Capita Insurance Services Ltd
("Capita").  Mr Wood remained as managing director of the Company until
the end of 2010.  He brought proceedings against Capita arising out of the
termination of his employment and Capita brought a counterclaim against
G    him under the indemnity provision in the SPA, which is the subject matter of
this appeal.  Mr Kightley and Mr Collinge were, but are no longer, parties to
the proceedings.

3  It is not necessary to set out in any detail the circumstances in which
Capita came to make its claim under the indemnity.  It suffices to summarise
Capita's claim as follows.

H    4  In about August 2008 the Company began to sell motor insurance
through online aggregator sites such as Confused.com.  The sales were not
completed online: potential customers obtained a quotation from the
Company on the aggregator site and the Company then contacted the
potential customer directly with a view to confirming their risk details before
selling them the appropriate insurance policy.

© 2017 The Incorporated Council of Law Reporting for England and Wales

5    Shortly after Capita's purchase of the Company's share capital,    A
employees of the Company raised concerns about the Company's sales
processes, which had resulted in some customers paying substantially more
than they had been quoted online. The employees alleged that the Company
had presented customers with higher quotations without informing them
why the quotations had increased. The Company had thus increased its own
arrangement fees when neither the underwriting premium nor the risk    B
profile had changed significantly.    The Company responded to the
allegations by carrying out a review of its sales between January 2009 and
January 2011. This review revealed that in many cases the Company's
telephone operators had misled customers into believing that an underwriter
had required a higher premium or that their risk profile was worse than it
was or had pressurised the customer to make sure that a sale was made.

6    Capita and the Company were obliged to inform the Financial    C
Services Authority ("FSA") of the findings and did so on 16 December 2011.
The FSA informed them that the customers had been treated unfairly and
had suffered detriment and that there would have to be redress. After the
FSA had conducted a risk assessment visit to the Company in November
2012, Capita and the Company agreed with the FSA to conduct a
remediation scheme to pay compensation to customers who were identified    D
as potentially affected by the Company's mis-selling. Capita alleges that it,
the Company and Capita's other subsidiaries have suffered loss as a result of
the mis-selling or suspected mis-selling of insurance products in the period
before the completion of the sale under the SPA. Capita's claim is for
£2,432.883·10, comprising an estimate of the compensation at £1·35m,
interest of about £400,000 and the costs of the remediation scheme.

7    It is appropriate to record that some of Capita's allegations are    E
disputed, including the extent of the mis-selling and any detriment to
customers. Other than, perhaps, the facts narrated in para 4 above (which
do not appear to be disputed), they are not facts by reference to which the
SPA is to be construed. But the circumstances in which Capita and the
Company were required to set up the remediation scheme are of some
importance because Mr Wood contends that they fall outside the scope of
the indemnity clause which is the subject matter of this action. In particular,    F
the requirement to compensate was not the result of a claim by one or more
of the Company's customers or a complaint by those customers to the FSA or
another public authority. It resulted, as I have said, from information about
the internal review which Capita and the Company gave the FSA and the
requirement by the FSA that compensation should be paid to the customers.

                                                                            G
*Contractual interpretation*

8    In his written case counsel for Capita argued that the Court of Appeal
had fallen into error because it had been influenced by a submission by
Mr Wood's counsel that the decision of this court in *Arnold v Britton* [2015]
AC 1619 had "rowed back" from the guidance on contractual interpretation
which this court gave in *Rainy Sky SA v Kookmin Bank* [2011] 1 WLR
2900. This, he submitted, had caused the Court of Appeal to place too much    H
emphasis on the words of the SPA and to give insufficient weight to the
factual matrix. He did not have the opportunity to develop this argument as
the court stated that it did not accept the proposition that *Arnold* had altered
the guidance given in *Rainy Sky*. The court invited him to present his case

© 2017 The Incorporated Council of Law Reporting for England and Wales

A    without having to refer to the well known authorities on contractual interpretation, with which it was and is familiar.

9    It is not appropriate in this case to reformulate the guidance given in the *Rainy Sky* and *Arnold* cases; the legal profession has sufficient judicial statements of this nature. But it may assist if I explain briefly why I do not accept the proposition that the *Arnold* case involved a recalibration of the approach summarised in the *Rainy Sky* case.

B    10    The court's task is to ascertain the objective meaning of the language which the parties have chosen to express their agreement. It has long been accepted that this is not a literalist exercise focused solely on a parsing of the wording of the particular clause but that the court must consider the contract as a whole and, depending on the nature, formality and quality of drafting of the contract, give more or less weight to elements of the wider

C    context in reaching its view as to that objective meaning. In *Prenn v Simmonds* [1971] 1 WLR 1381, 1383H–1385D and in *Reardon Smith Line Ltd v Yngvar Hansen-Tangen* [1976] 1 WLR 989, 997, Lord Wilberforce affirmed the potential relevance to the task of interpreting the parties' contract of the factual background known to the parties at or before the date of the contract, excluding evidence of the prior negotiations. When in his celebrated judgment in *Investors Compensation Scheme Ltd v West*

D    *Bromwich Building Society* [1998] 1 WLR 896, 912–913 Lord Hoffmann reformulated the principles of contractual interpretation, some saw his second principle, which allowed consideration of the whole relevant factual background available to the parties at the time of the contract, as signalling a break with the past. But Lord Bingham of Cornhill in an extra-judicial writing, "A New Thing Under the Sun? The Interpretation of Contracts and

E    the ICS decision" (2008) 12 Edin LR 374, persuasively demonstrated that the idea of the court putting itself in the shoes of the contracting parties had a long pedigree.

11    Lord Clarke of Stone-cum-Ebony JSC elegantly summarised the approach to construction in the *Rainy Sky* case [2011] 1 WLR 2900, para 21f. In the *Arnold* case [2015] AC 1619 all of the judgments confirmed the approach in the *Rainy Sky* case: Lord Neuberger of Abbotsbury PSC,

F    paras 13–14; Lord Hodge JSC, para 76 and Lord Carnwath JSC, para 108. Interpretation is, as Lord Clarke JSC stated in the *Rainy Sky* case (para 21), a unitary exercise; where there are rival meanings, the court can give weight to the implications of rival constructions by reaching a view as to which construction is more consistent with business common sense. But, in striking a balance between the indications given by the language and the

G    implications of the competing constructions the court must consider the quality of drafting of the clause (the *Rainy Sky* case, para 26, citing Mance LJ in *Gan Insurance Co Ltd v Tai Ping Insurance Co Ltd (No 2)* [2001] 2 All ER (Comm) 299, paras 13, 16); and it must also be alive to the possibility that one side may have agreed to something which with hindsight did not serve his interest: the *Arnold* case, paras 20, 77. Similarly, the court

H    must not lose sight of the possibility that a provision may be a negotiated compromise or that the negotiators were not able to agree more precise terms.

12    This unitary exercise involves an iterative process by which each suggested interpretation is checked against the provisions of the contract and its commercial consequences are investigated: the *Arnold* case, para 77

© 2017 The Incorporated Council of Law Reporting for England and Wales

citing *In re Sigma Finance Corpn* [2010] 1 All ER 571, para 12, per Lord   *A*
Mance JSC. To my mind once one has read the language in dispute and the
relevant parts of the contract that provide its context, it does not matter
whether the more detailed analysis commences with the factual background
and the implications of rival constructions or a close examination of the
relevant language in the contract, so long as the court balances the
indications given by each.

    13  Textualism and contextualism are not conflicting paradigms in a   *B*
battle for exclusive occupation of the field of contractual interpretation.
Rather, the lawyer and the judge, when interpreting any contract, can use
them as tools to ascertain the objective meaning of the language which the
parties have chosen to express their agreement. The extent to which each
tool will assist the court in its task will vary according to the circumstances
of the particular agreement or agreements. Some agreements may be   *C*
successfully interpreted principally by textual analysis, for example because
of their sophistication and complexity and because they have been
negotiated and prepared with the assistance of skilled professionals. The
correct interpretation of other contracts may be achieved by a greater
emphasis on the factual matrix, for example because of their informality,
brevity or the absence of skilled professional assistance. But negotiators of   *D*
complex formal contracts may often not achieve a logical and coherent text
because of, for example, the conflicting aims of the parties, failures of
communication, differing drafting practices, or deadlines which require the
parties to compromise in order to reach agreement. There may often
therefore be provisions in a detailed professionally drawn contract which
lack clarity and the lawyer or judge in interpreting such provisions may be
particularly helped by considering the factual matrix and the purpose of   *E*
similar provisions in contracts of the same type. The iterative process, of
which Lord Mance JSC spoke in *Sigma Finance Corpn* [2010] 1 All ER 571,
para 12, assists the lawyer or judge to ascertain the objective meaning of
disputed provisions.

    14  On the approach to contractual interpretation, the *Rainy Sky* and
*Arnold* case were saying the same thing.

    15  The recent history of the common law of contractual interpretation   *F*
is one of continuity rather than change. One of the attractions of English
law as a legal system of choice in commercial matters is its stability and
continuity, particularly in contractual interpretation.

*The sale and purchase agreement*

    16  The SPA is a detailed and professionally drafted contract. It   *G*
provided for the sale and purchase of the Company's share capital (clause 3)
for the consideration of £7,681,661 payable on completion (clause 4), and it
also provided for deferred consideration: Schedule 8. Clause 1 contained the
following definitions which are relevant to the construction of the disputed
indemnity:

    "*Authority* means any local, national, multinational, governmental or   *H*
non-governmental authority, statutory undertaking, agency or public or
regulatory body (whether present or future) which has jurisdiction over
the Business or any decision, consent or licence which is required to carry
out the Business and Authorities shall be construed accordingly.

© 2017 The Incorporated Council of Law Reporting for England and Wales

A        "*Company* means Sureterm Direct Ltd . . .
        "*Completion Date* means the date of this agreement.
        "*Employees* has the meaning given to it at paragraph 6 of Schedule 4
[which refers to a list of all of the employees employed by the Company].
        "*FSA* means the Financial Services Authority and any body which
supersedes it.
B        "*Regulatory Authority* means any body by which any part of the
Business is or was regulated pursuant to any Applicable Financial Services
Laws (including, but not limited to, the FSA, the Personal Investments
Authority Ltd, the General Insurance Standards Council, the Insurance
Brokers Registration Council and including the Financial Services
Ombudsman and any voluntary regulatory body with whose rules the
Company has agreed to comply).
C        "*Relevant Person* means an Employee or a former employee of the
Company and any dependant of an Employee or a former employee of
the Company.
        "*Shares* means all of the issued shares in the capital of the Company.
        "*Warranties* means the tax warranties and the warranties set out in
Schedule 4."

D    17    Clause 7 dealt with warranties and indemnities. Each of the sellers
severally warranted to the buyer on a proportionate basis in terms of the
Warranties (clause 7.1); the Warranties were qualified by matters which had
been fairly disclosed in the disclosure letter (clause 7.2); and where a
Warranty was qualified by an expression such as "so far as the Sellers are
aware" that referred to the actual knowledge of the sellers, who confirmed
E   that they had made due and careful enquiry of the Company's compliance
manager, IT Director and HR Director: clause 7.3.

    18    The indemnity clause whose interpretation is in dispute is
clause 7.11. It provided:

        "The Sellers undertake to pay to the Buyer an amount equal to the
        amount which would be required to indemnify the Buyer and each
F        member of the Buyer's Group against all actions, proceedings, losses,
        claims, damages, costs, charges, expenses and liabilities suffered or
        incurred, and all fines, compensation or remedial action or payments
        imposed on or required to be made by the Company following and arising
        out of claims or complaints registered with the FSA, the Financial Services
        Ombudsman or any other Authority against the Company, the Sellers or
        any Relevant Person and which relate to the period prior to the
G        Completion Date pertaining to any mis-selling or suspected mis-selling of
        any insurance or insurance related product or service."

    19    This clause must be seen in its contractual context. Schedule 4
contained 30 pages of detailed warranties. In Part 12 of that Schedule,
which concerned litigation, disputes and investigations, the sellers
warranted that they were not aware of circumstances which were likely to
H   give rise to any investigation or enquiry by any Authority (para 12.4) and
that no breach of contract, tort, statutory duty or law had been committed
for which the Company was or might be liabl:e para 12.5. Part 14 which
was concerned with compliance and regulatory matters included the
following paragraph:

© 2017 The Incorporated Council of Law Reporting for England and Wales

1102
**Wood v Capita Insurance Services Ltd (SC(E))**    [2017] 2 WLR
Lord Hodge JSC

"14.1    *A*

"(a) The Company conducts, and has conducted the Business in accordance with the requirements of all Competition laws and Applicable Financial Services Laws applicable to the business and has not been and is not being investigated for any alleged non-compliance or infringement of such Competition Laws and Applicable Financial Services Laws."

"(c) The Company has no reason to believe that any action will be taken against it in relation to any of its current or past activities based on any alleged non-compliance or infringement of any Competition Laws and Applicable Financial Services Laws."    *B*

20    Part 14 also contained detailed warranties that the Company had complied with its regulatory obligations and that correspondence between the Company and all Regulatory Authorities had been disclosed, that the Company, its officers and employees had not been subject to any regulatory sanction and that no such sanction was likely or pending; and that the Company had not been subject to a regulatory investigation and, so far as the Sellers were aware, there were no circumstances which could give rise to a visit by any Regulatory Authority.    *C*

21    Clause 8 of the SPA provided for limitations on the sellers' liability in Schedule 5, which in para 1 provided that the aggregate maximum liability of all claims under the SPA (with one exception) would not exceed the purchase price and that the liability of each seller would not exceed his proportionate liability (i e 94%, 5% and 1%). That limitation applied to claims under clause 7.11 as well as under the warranties. But paragraph 3 of Schedule 5 imposed time limits on the warranties by providing:    *D*

"3.1 Save in respect of a Warranty Claim or a claim under the Tax Covenant notified in writing to the Sellers prior to such a date, the Sellers will cease to be liable:    *E*

"(a) for any claim under the tax warranties or under the Tax Covenant on the seventh anniversary of Completion; and

"(b) for any other Warranty Claim on the second anniversary of Completion."    *F*

Thus in contrast to the indemnity under clause 7.11, the warranties relating to, among other things, regulatory compliance, had a lifespan of only two years.

22    In a judgment dated 14 October 2014 Popplewell J [2014] EWHC 3240 (Comm) decided the preliminary issue of the interpretation of the indemnity clause and held, in effect, that it required Mr Wood to indemnify Capita even if there had been no claim or complaint by a customer. The Court of Appeal (Patten, Gloster and Christopher Clarke LJJ) in a judgment written by Christopher Clarke LJ [2015] EWCA Civ 839 disagreed. In its order dated 30 July 2015 the Court of Appeal declared that Mr Wood's liability under the indemnity in clause 7.11 of the SPA:    *G*

"cannot arise unless the matter in respect of which indemnity is sought follows and arises out of either (i) a claim made against the Company, a Seller or a Relevant Person or (ii) a complaint registered with the FSA, the Financial Services Ombudsman or any other Authority against the Company, a Seller or a Relevant Person and, in either case, the claim or complaint (a) relates to the period prior to the Completion Date and    *H*

© 2017 The Incorporated Council of Law Reporting for England and Wales

A    (b) pertains to any mis-selling or suspected mis-selling of any insurance or
insurance related product."

23    Capita appeals against that order, arguing that the contractual
indemnity is not confined to loss arising out of a claim or complaint.

24    In this case both Popplewell J and the Court of Appeal have
considered and weighed both the language of the disputed clause 7.11 and
B    the commercial considerations.  They have both started by examining the
language but have reached opposing conclusions.  This disagreement is not
caused by any failure to apply the correct principles but is, in my view,
the result of an opaque provision which, as counsel for each party
acknowledged, could have been drafted more clearly.

25    I have concluded that the Court of Appeal has come to the correct
view as to the meaning of this difficult clause.  I set out below my reasons,
C    which are essentially the same as those which Christopher Clarke LJ
presented.

*Discussion*

26    Clause 7.11 has not been drafted with precision and its meaning is
avoidably opaque.  My preliminary view of the meaning of the clause on a
D    first reading was consistent with the view which the Court of Appeal
favoured, namely that the indemnity covered loss and damage which
(a) followed and arose out of claims or complaints against the Company, the
Sellers or any Relevant Person, (b) related to the period before completion
and (c) pertained to the mis-selling or suspected mis-selling of insurance
products or services.  But it is necessary to place the clause in the context of
the contract as a whole, to examine the clause in more detail and to consider
E    whether the wider relevant factual matrix gives guidance as to its meaning in
order to consider the implications of the rival interpretations.

27    The contractual context is significant in this case.  The indemnity in
clause 7.11 is an addition to the detailed warranties in Schedule 4.  The mis-
selling which clause 7.11 addresses is also covered by the warranty in
paragraph 14.1 of Schedule 4: paras 18 and 19 above.  But liability for the
F    Schedule 4 warranties is time-limited by Schedule 5.    In particular
paragraph 3.1(b) of that Schedule (para 20 above) required the Company to
claim within two years of the completion of the sale and purchase.  The
scope of the clause 7.11 indemnity, breach of which gives rise to a liability
which is unlimited in time, falls to be assessed in the context of those time
limited warranties.

28    All of the parties to the SPA were commercially sophisticated and
G    had experience of the insurance broking industry.  Capita was not involved
in the management of the Company before the share purchase.  The Sellers
were the directors and the only shareholders of the Company.  They were the
people who knew or ought to have known how the Company had operated
its business; Capita would in all probability not have that knowledge.  The
parties to the SPA would have known this.  That lack of knowledge explains
H    why Capita required the disclosures in the disclosure letter and the detailed
warranties in Schedule 4; but it does not assist the court to determine the
scope of the indemnity clause.  The court is not aware of the negotiations
which led to the SPA; they are not relevant to the task of interpreting that
agreement: *Chartbrook Ltd v Persimmon Homes Ltd* [2009] AC 1101.
Business common sense suggests that Capita had an interest in obtaining as

© 2017 The Incorporated Council of Law Reporting for England and Wales

broad an indemnity against the adverse consequences of mis-selling as it could obtain.  But the sellers had given warranties of compliance with regulatory requirements, which covered such mis-selling, subject to the agreed limits of quantum and time.  The sellers were exposed to a potential liability under those warranties for the two years after the Completion Date, during which Capita could learn of the Company's sales practices.  One may readily infer that they had an interest in minimising their further exposure to liability after that time had elapsed.  Business common sense is useful to ascertain the purpose of a provision and how it might operate in practice. But in the tug o' war of commercial negotiation, business common sense can rarely assist the court in ascertaining on which side of the line the centre line marking on the tug o' war rope lay, when the negotiations ended.  I therefore turn to examining the clause in more detail before returning to the commercial context.

29   In order to illustrate the competing contentions of the parties Popplewell J helpfully divided clause 7.11 into its constituent parts.  I set that presentation out below with the addition in (B) of the sub-headings (i) and (ii) to assist my exegesis.

30   Clause 7.11 thus divided provides:

"The Sellers undertake to pay to the Buyer an amount equal to the amount which would be required to indemnify the Buyer and each member of the Buyer's Group against

"(1) all actions, proceedings, losses, claims, damages, costs, charges, expenses and liabilities suffered or incurred, and

"(2) all fines, compensation or remedial action or payments imposed on or required to be made by the Company

"(A) following and arising out of claims or complaints registered with the FSA, the Financial Services Ombudsman or any other authority against the Company, the Sellers or any Relevant Person

"(B) (i) and which relate to the period prior to the Completion Date (ii) pertaining to any mis-selling or suspected mis-selling of any insurance or insurance related product or service."

31   Counsel for Capita submitted that the clause should be read by treating (2) and (A) as a composite phrase so that the Sellers were bound to indemnify against both (1) and (2+A), each of which was subject to the two conditions in (B).  This meant that it was only the fines etc in (2) which had to follow on or arise out of claims or complaints made to the FSA or other Authority against the Company etc as provided in (A).  Thus, it was submitted, the indemnity covered all liabilities in (1) provided only that (i) they related to the period prior to the completion date and (ii) pertained to any mis-selling or suspected mis-selling of insurance products etc

32   Counsel for Mr Wood submitted that the clause was properly construed by treating both (1) and (2) as being subject to three conditions, namely (A), B(i) and (B)(ii).  He submitted that (A) should be read as if there was a comma after "claims", so that it provided as a condition for the triggering of the indemnity under (1) or (2) that there must be either claims by customers, or complaints made to the regulatory authorities, in each case against the Company, the Sellers or any Relevant Person.  Thus, on his approach, either a claim by a customer against the Company, the Sellers or an employee or former employee of the Company, or a complaint to a

© 2017 The Incorporated Council of Law Reporting for England and Wales

A regulatory authority against the Company, the Sellers or an employee or former employee of the Company would trigger the indemnity if the two conditions in (B) were met.

33   Both counsel accepted that, because of the breadth of the terms used in (1), the types of loss and damage in (1) covered all of the types of loss and damage in (2). Thus it was suggested that (2) must have been included only for the avoidance of doubt. This means that on Mr Wood's approach

B (2) was otiose while on Capita's approach the composite (2+A) was otiose. I find the latter proposition remarkable and unlikely for two reasons.

34   First, and to my mind most significantly, (A) would serve no purpose by restricting the source of loss and damage if (A) governed only (2) and therefore (1) was unrestricted. (A) would not restrict the scope of the indemnity in any way. On Mr Wood's construction the words in (A) have a

C purpose as they limit the scope of both (1) and the otiose (2).

35   Secondly, if one airbrushes out (2+A) as otiose, the clause does not specify against whom the actions, proceedings and claims in (1) are directed. The clause would read:

> "The Sellers undertake to pay to the Buyer an amount equal to the amount which would be required to indemnify the Buyer and each
D > member of the Buyer's Group against all actions, proceedings, losses, claims, damages, costs, charges, expenses and liabilities suffered or incurred, and which relate to the period prior to the Completion Date pertaining to any mis-selling or suspected mis-selling of any insurance or insurance related product or service."

The identity of the persons against whom the relevant claims etc could be
E made so as to trigger the sellers' indemnity would, on Capita's approach, be left to implication. There must be a limit on who such persons could be as it would be absurd for Capita to have a claim against the Sellers for indemnity resulting from any mis-selling on its part before the Completion Date. But, even assuming that the target was mis-selling by or on behalf of the Company, it is far from obvious that the delimited class of persons would be
F "the Company, the Sellers or any Relevant Person".

36   Capita made three further points against Mr Wood's interpretation. First, there is an element of tautology as the "claims" in (1) are said in (A) to follow and arise out of "claims". But as Christopher Clarke LJ observed, tautology in commercial contracts is not unknown and the verbal exuberance (or torrential drafting) of (1) makes tautology difficult to avoid.

37   Secondly, Capita pointed out that there is a comma after "incurred"
G at the end of (1) and no comma after "Company" at the end of (2). This could support the separation of (1) from (2) and the conjunction of (2) and (A). Similarly, Mr Wood's interpretation would involve inserting in (A) a comma after "claims" and also after "any other Authority" so as to limit both the claims and the regulatory complaints to those against "the Company, the Sellers or any Relevant Person". Again in agreement with
H Christopher Clarke LJ I do not think that the use of commas in this clause is a strong pointer in favour of Capita's interpretation, both because there are no set rules for the use of commas and in any event the draftsman's use of commas in this clause is erratic.

38   Thirdly, the draftsman used an adjectival participle at the start of (A) ("following and arising out of") and "changed tone" by using a relative

© 2017 The Incorporated Council of Law Reporting for England and Wales

1106

**Wood v Capita Insurance Services Ltd (SC(E))**             **[2017] 2 WLR**
Lord Hodge JSC

pronoun ("and which") at the start of (B). But the use of the adjectival
participle does not tie (A) exclusively into (2) because in (B) the adjectival
participle ("pertaining to") unquestionably applies to both (1) and (2).
These detailed points of style and syntax are of little assistance in construing
an admittedly opaque clause.

39 I return to the commercial context and the practical consequences of
the rival interpretations. On Mr Wood's interpretation it requires a
customer or customers to make a claim, or complaint to the regulatory
authorities, against the Company, the sellers or a Relevant Person in order to
trigger the indemnity. Thus if a whistle-blower alerted the regulatory
authorities of suspected or actual mis-selling, or if (as in fact occurred)
management, complying with their regulatory obligations, reported such
mis-selling to the FSA, which ordered the payment of compensation, the
indemnity would not be triggered. Yet in each case, the mis-selling before
the date of completion causes the Company loss.

40 The general purpose of clause 7.11, to indemnify Capita and its
group against losses occasioned by mis-selling is clear. Had clause 7.11
stood on its own, the requirement of a claim or complaint by a customer and
the exclusion of loss caused by regulatory action which was otherwise
prompted might have appeared anomalous. But clause 7.11 is in addition to
the wide ranging warranties in Part 14 of Schedule 4 (paras 18 and 19 above)
which probably covered the circumstances which eventuated. Capita had
two years after completing the purchase to examine the sales practices of the
Company's employees and so uncover any regulatory breaches in order to
make a claim under the Schedule 4 indemnities. Prima facie that was not an
unreasonable time scale. Indeed, Capita was able to send its findings to the
FSA within 20 months of the Completion Date. It is not contrary to business
common sense for the parties to agree wide ranging warranties, which are
subject to a time limit, and in addition to agree a further indemnity, which is
not subject to any such limit but is triggered only in limited circumstances.

41 From Capita's standpoint the SPA may have become a poor bargain,
as it appears that it did not notify the sellers of a warranty claim within two
years of Completion. But it is not the function of the court to improve their
bargain.

42 In this case, the circumstances which trigger that indemnity are to be
found principally in a careful examination of the language which the parties
have used.

*Conclusion*

43 I would therefore dismiss the appeal.

*Appeal dismissed with costs.*

Shiranikha Herbert, Barrister

© 2017 The Incorporated Council of Law Reporting for England and Wales

TAB 27

BVI Business Companies Act 2004 Schedule 2 ¶¶ 9-23

# VIRGIN ISLANDS

## THE BVI BUSINESS COMPANIES ACT, 2004

### No. 16 of 2004

### Amended by
### 26/2005

### Subsidiary Legislation

### Segregated Portfolio Companies Regulations, 2005 (S.I. 2005 No. 96)

### Revised under the Statute Revision Act, 2005 (No. 25 of 2005)
### as of 1st January, 2006

Incorporation of a company.

**7.**    (1)  If he is satisfied that the requirements of this Act in respect of incorporation have been complied with, the Registrar shall, upon receipt of the documents filed under section **6**(1),

> (a)  register the documents;

> (b)  allot a unique number to the company; and

> (c)  issue a certificate of incorporation to the company in the approved form.

(2)  A certificate of incorporation issued under subsection (1) is conclusive evidence that

> (a)  all the requirements of this Act as to incorporation have been complied with; and

> (b)  the company is incorporated on the date specified in the certificate of incorporation.

Registration of company as restricted purposes company.

**8.**    (1)  If the memorandum of a company limited by shares, as filed under section **6**, contains the statements specified in section **10**(1) and (2),

> (a)  the company shall be registered on incorporation as having restricted purposes; and

> (b)  the certificate of incorporation shall state that the company is a restricted purposes company.

(2)  A company that is not registered as a restricted purposes company on its incorporation shall not subsequently be registered as a restricted purposes company.

### Division 2 – Memorandum and Articles

Memorandum.

**9.**    (1)  The memorandum of a company shall state

> (a)  the name of the company;

> (b)  whether the company is

>> (i)   a company limited by shares,

>> (ii)  a company limited by guarantee that is not authorised to issue shares,

20

      (iii)  a company limited by guarantee that is authorised to issue shares,

      (iv)  an unlimited company that is not authorised to issue shares, or

      (v)  an unlimited company that is authorised to issue shares;

(c)  the address of the first registered office of the company;

(d)  the name of the first registered agent of the company;

(e)  in the case of a company limited by shares or otherwise authorised to issue shares

      (i)  the maximum number of shares that the company is authorised to issue or that the company is authorised to issue an unlimited number of shares, and   26/2005

      (ii)  the classes of shares that the company is authorised to issue and, if the company is authorised to issue two or more classes of shares, the rights, privileges, restrictions and conditions attaching to each class of shares,

(f)  in the case of a company limited by guarantee, whether or not it is authorised to issue shares, the amount which each guarantee member of the company is liable to contribute to the company's assets in the event that a voluntary liquidator or an Insolvency Act liquidator is appointed whilst he is a member; and

(g)  in the case of a segregated portfolio company, that the company is a segregated portfolio company.

    (2)  In the case of a company limited by shares or otherwise authorised to issue shares, the memorandum shall also state,

(a)  if the company is prohibited by this or any other Act from issuing bearer shares, that the company is not authorised to

      (i)  issue bearer shares,

      (ii)  convert registered shares to bearer shares, or

      (iii)  exchange registered shares for bearer shares; or

(b)  in any other case, either that the company is, or is not, authorised to

(i)  issue bearer shares,

(ii)  convert registered shares to bearer shares, or

(iii)  exchange registered shares for bearer shares.

26/2005    (3)  *(Repealed)*

26/2005    (4)  The Regulations may require the memorandum of a company to contain a statement, in the form specified in the Regulations, as to any limitations on the business that the company may carry on.

Additional matters to be stated in memorandum of restricted purposes company.    **10.**    (1)  The memorandum of a company limited by shares may state that the company is a restricted purposes company.

(2)  The memorandum of a restricted purposes company shall state the purposes of the company.

26/2005    (3)  Nothing in this section prevents the memorandum or articles of a company that is not a restricted purposes company from limiting the purposes, capacity, rights, powers or privileges of the company.

Effect of memorandum and articles.    **11.**    (1)  The memorandum and articles of a company are binding as between

(a)  the company and each member of the company; and

(b)  each member of the company.

(2)  The company, the board, each director and each member of a company has the rights, powers, duties and obligations set out in this Act except to the extent that they are negated or modified, as permitted by this Act, by the memorandum or the articles.

(3)  The memorandum and articles of a company have no effect to the extent that they contravene or are inconsistent with this Act.

Amendment of memorandum and articles.    **12.**    (1)  Subject to subsection (2) and section **14**, the members of a company may, by resolution, amend the memorandum or articles of the company.

(2)  Subject to subsection (3), the memorandum of a company may include one or more of the following provisions:

(a)  that specified provisions of the memorandum or articles may not be amended;

(b)  that a resolution passed by a specified majority of members, greater

22

than fifty per cent, is required to amend the memorandum or articles or specified provisions of the memorandum or articles; and

(c) that the memorandum or articles, or specified provisions of the memorandum or articles, may be amended only if certain specified conditions are met.

(3)   Subsection (2) does not apply to any provision in the memorandum of a company that is not a restricted purposes company that restricts the purposes of that company.

(4)   Subject to subsection (5), the memorandum of a company may authorise the directors, by resolution, to amend the memorandum or articles of the company.

26/2005

(5)   Notwithstanding any provision in the memorandum or articles to the contrary, the directors of a company shall not have the power to amend the memorandum or articles

(a) to restrict the rights or powers of the members to amend the memorandum or articles;

(b) to change the percentage of members required to pass a resolution to amend the memorandum or articles; or

(c) in circumstances where the memorandum or articles cannot be amended by the members;

and any resolution of the directors of a company is void and of no effect to the extent that it contravenes this subsection.

**13.**    (1)   Where a resolution is passed to amend the memorandum or articles of a company, the company shall file for registration

Filing of notice of amendment of memorandum or articles.

(a) a notice of amendment in the approved form; or

(b) a restated memorandum or articles incorporating the amendment made.

(2)   An amendment to the memorandum or articles has effect from the date that the notice of amendment, or restated memorandum or articles incorporating the amendment, is registered by the Registrar or from such other date as may be ordered by the Court under subsection (5).

(3)   A company, a member or director of a company or any interested person may apply to the Court for an order that an amendment to the memorandum or

articles should have effect from a date no earlier than the date of the resolution to amend the memorandum or articles.

(4) An application under subsection (3) may be made

(a) on, or at any time after, the date of the resolution to amend the memorandum or articles; and

(b) before or after the notice of amendment, or the restated memorandum or articles, has been filed for registration.

(5) The Court may make an order on an application made under subsection (3) where it is satisfied that it would be just to do so but if, at the time of the order, the notice of amendment, or restated memorandum or articles, has not been filed, the Court shall order that the notice of amendment, or restated memorandum or articles, must be filed within a period not exceeding five days after the date of the order.

Amendment of memorandum with respect to restricted purposes.

**14.**　　(1)　A restricted purposes company shall not amend its memorandum to delete or modify the statement specified in section **10**(1) and any resolution of the members or directors of a company is void and of no effect to the extent that it contravenes this subsection.

(2)　Subject to section **12**(2), a restricted purposes company may amend its memorandum to modify its purposes.

(3)　A company that is not a restricted purposes company shall not amend its memorandum to state that it is a restricted purposes company and any resolution of the members or directors of a company is void and of no effect to the extent that it contravenes this subsection.

Restated memorandum or articles.

**15.**　　(1)　A company may, at any time, file a restated memorandum or articles.

(2)　A restated memorandum or articles filed under subsection (1) shall incorporate only such amendments that have been registered under section **13**.

(3)　Where a company files a restated memorandum or articles under subsection (1), the restated memorandum or articles has effect as the memorandum or articles of the company with effect from the date that it is registered by the Registrar.

(4)　The Registrar is not required to verify that a restated memorandum or articles filed under this section incorporates all the amendments, or only those amendments, that have been registered under section **13**.

24

**16.**    (1)  A copy of the memorandum and a copy of the articles shall be sent to any member who requests a copy on payment by the member of such amount as the directors may determine to be reasonably necessary to defray the costs of preparing and furnishing them.

Provision of copies of memorandum and articles to members.

(2)  A company that contravenes subsection (1) commits an offence and is liable on summary conviction to a fine of $1,000.

## Division 3 – Company Names

**17.**    (1)  Subject to subsections (3), (4), (5) and (6), the name of a limited company shall end with

Required part of company name.

(a)  the word "Limited", "Corporation" or "Incorporated";

(b)  the words "Societe Anonyme" or "Sociedad Anonima";

(c)  the abbreviation "Ltd", "Corp", "Inc" or "S.A."; or

(d)  such other word or words, or abbreviations thereof, as may be specified in the Regulations.

(2)  The name of an unlimited company shall end with the word "Unlimited" or the abbreviation "Unltd".

(3)  The name of a restricted purposes company shall end with the phrase "(SPV) Limited" or the phrase "(SPV) Ltd".

(4)  The name of a segregated portfolio company shall include the designation "Segregated Portfolio Company" or "SPC" placed immediately before one of the endings specified in subsection (1), or a permitted abbreviation thereof.

26/2005

(4A)The name of a segregated portfolio company that is a restricted purposes company shall include the designation "(SPV)" immediately before or immediately after the designation specified in subsection (4).

26/2005

(5)  Where the abbreviation "Ltd", "Corp", "Inc" or "Unltd" is used, a full stop may be inserted at the end of the abbreviation.

(6)  A company may use, and be legally designated by, either the full or the abbreviated form of any word or words required as part of its name under this section.

**18.**    (1)  No company shall be registered, whether on incorporation, continuation, merger or consolidation, under a name

Restrictions on company names.

(a)  the use of which would contravene another enactment or the Regulations;

(b)  that, subject to section **24**,

    (i)  is identical to the name under which a company is or has been registered under this Act or a former Act, or

26/2005

    (ii)  is so similar to the name under which a company is or has been registered under this Act or a former Act that the use of the name would, in the opinion of the Registrar, be likely to confuse or mislead;

(c)  that is identical to a name that has been reserved under section **25** or that is so similar to a name that has been reserved under section **25** that the use of both names by different companies would, in the opinion of the Registrar, be likely to confuse or mislead;

(d)  that contains a restricted word or phrase, unless the Commission has given its prior written consent to the use of the word or phrase; or

(e)  that, in the opinion of the Registrar, is offensive or, for any other reason, objectionable.

(2)  For the purposes of subsection (1)(d), the Commission may, by notice published in the Gazette, specify words or phrases as restricted words or phrases.

Company number as company name.

**19.**    The name of a company may comprise the expression "BVI Company Number " followed by its company number in figures and the ending required by section **17** that is appropriate for the company.

Foreign character name.

**20.**    (1)  A company may have an additional foreign character name approved by the Registrar.

26//2005

(2)  The Regulations may provide for the approval, use and change of foreign character names.

Company may change name.

**21.**    (1)  Subject to its memorandum and articles, a company may make application to the Registrar in the approved form to change its name or its foreign character name.

(2)  If he is satisfied that the proposed new name or foreign character name of the company complies with section **17** and, if appropriate, sections **19** and **20** and is a name under which the company could be registered under section **18**, the Registrar shall, on receipt of an application under subsection (1),

(a)  register the company's change of name; and

(b)  issue a certificate of change of name to the company.

**22.**    (1)  If the Registrar considers, on reasonable grounds, that the name of a company does not comply with sections **17**, **18**, **19** or **20**, he may by written notice direct the company to make application to change its name on or before a date specified in the notice, which shall be not less than twenty one days after the date of the notice.

Registrar may direct change of name.

(2)  If a company that has received a notice under subsection (1) fails to file an application to change its name to a name acceptable to the Registrar on or before the date specified in the notice, the Registrar may revoke the name of the company and assign it a new name acceptable to the Registrar.

(3)  Where the Registrar assigns a new name to a company under subsection (2), he shall

(a)  register the company's change of name;

(b)  issue a certificate of change of name to the company; and

(c)  advertise the change of name in the *Gazette*.

**23.**    (1)  A change of the name of a company under section **21** or **22**

Effect of change of name.

(a)  takes effect from the date of the certificate of change of name issued by the Registrar; and

(b)  does not affect any rights or obligations of the company, or any legal proceedings by or against the company, and any legal proceedings that have been commenced against the company under its former name may be continued against it under its new name.

26/2005

(2)  Where the name of a company is changed under section 21 or 22, the company's memorandum and articles are deemed to be amended to state the new name with effect from the date of the change of name certificate.

26/2005

**24.**    The Regulations may provide for the re-use of names previously used by companies that are or have been registered under this Act, or by former Act companies, that have

Re-use of company names.

26/2005

(a)  changed their name;

(b)  been struck off the Register, or off a register maintained under a

TAB 28

BVI Insolvency Act 2003
§§ 159, 162-63, 175-76, 184, 186-87, 189, 221, 229, 233, 235,
253, 255-58, 285, Part XVIII

**VIRGIN ISLANDS**


**INSOLVENCY ACT, 2003**
**No. 5 of 2003**


**VIRGIN  ISLANDS**


**INSOLVENCY  ACT, 2003**


**ARRANGEMENT  OF  SECTIONS**


Section

## PART I

### PRELIMINARY PROVISIONS

1.      Short title and commencement.
2.      Interpretation.
3.      Meaning of "company".
4.      Meaning of "subsidiary" and "holding company".
5.      Meaning of "connected person" and "related company".
6.      Meaning of "director".
7.      Meaning of "unlicensed financial services business".
8.      Meaning of "insolvent".
9.      Meaning of "creditor", "secured creditor" etc.
10.     Meaning of "liability".
11.     Admissible claims.
12.     Non-admissible claims.
13.     Meaning of "public document".

## PART II

### CREDITORS' ARRANGEMENTS

#### Division 1 - Interpretation

14.     Interpretation for and scope of this Part.
15.     Arrangements.
16.     Remuneration of supervisor and interim supervisor.

1

# PART VI

## LIQUIDATION

### PRELIMINARY

Application of
this Part to
Official
Receiver.

158.  Where the Official Receiver is appointed as the liquidator or provisional liquidator of a company, the provisions of this Act that apply to a liquidator apply to the Official Receiver, as liquidator, unless otherwise provided.

Appointment of
liquidator.

159.  (1)   The Court may appoint the Official Receiver or an eligible insolvency practitioner as liquidator

    (a)  of a company, on an application under section 162; or

    (b)  of a foreign company, on an application under section 163.

(2)   Subject to section 161, the members of a company may, by a qualifying resolution, appoint an eligible insolvency practitioner as liquidator of the company.

(3)   For the purposes of subsection (2), a resolution is a "qualifying resolution" if it is passed at a properly constituted meeting of the company by a majority of 75 per cent, or if a higher majority is required by the memorandum or articles, by that higher majority, of the votes of those members who are present at the meeting and entitled to vote on the resolution.

(4)   The members of a foreign company may not appoint a liquidator under this Part and any resolution of the members of a foreign company that purports to appoint a liquidator under this Part is void and of no effect.

Duration of
liquidation.

160.  The liquidation of a company commences at the time at which a liquidator is appointed as provided in section 159 and continues until it is terminated in accordance with section 232 and, throughout this period, the company is referred to in this Act as "in liquidation".

Appointment of
liquidator by
members.

161.  (1)   The members of a company may not appoint a liquidator of the company if

    (a)  an application to the Court to appoint a liquidator has been filed but not yet determined;

    (b)  a liquidator has been appointed by the Court; or

(c)   the person to be appointed liquidator has not consented in writing to his appointment;

and a resolution to appoint a liquidator in the circumstances referred to in paragraphs (a), (b) or (c) is void and of no effect.

(2)   Where the members resolve to appoint a liquidator under section 159(2), the company shall, as soon as practicable, give the liquidator notice of his appointment.

(3)   The members of a company may not appoint the Official Receiver as liquidator of the company, and any resolution of the members that purports to do so is void and of no effect.

(4)   A company that contravenes subsection (2) commits an offence.

## APPOINTMENT OF LIQUIDATOR BY COURT

162.  (1)   The Court may, on application by a person specified in subsection (2), appoint a liquidator of a company under section 159(1) if

*Appointment of liquidator by Court.*

(a)   the company is insolvent;

(b)   the Court is of the opinion that it is just and equitable that a liquidator should be appointed; or

(c)   the Court is of the opinion that it is in the public interest for a liquidator to be appointed.

(2)   Subject to subsections (3), (4) and (5), an application under subsection (1) may be made by one or more of the following:

(a)   the company;

(b)   a creditor;

(c)   a member;

(d)   the supervisor of a creditors' arrangement in respect of the company;

(e)   the Commission; and

(f)   the Attorney General.

121

(3)    An application under subsection (1)(a) by a member may only be made with the leave of the Court, which shall not be granted unless the Court is satisfied that there is a *prima facie* case that the company is insolvent.

(4)    An application to appoint a liquidator under subsection (1)(c) may only be made by the Commission or the Attorney General.

(5)    The Commission may only make an application to appoint a liquidator under subsection (1)(c) if the company concerned is, or at any time has been, a regulated person.

(6)    Where a creditor's arrangement has terminated, the person who, immediately before the termination of the arrangement, was the supervisor is treated as the supervisor for the purposes of this section.

(7)    An applicant may, in his application under this section, propose an eligible insolvency practitioner as liquidator of the company.

(8)    Where an order is made under section 159(1) at a time when an arrangement is in force in respect of the company, the Court may appoint the supervisor of the arrangement as liquidator of the company.

Appointment of liquidator of a foreign company.    163. (1) The Court may, on application by a person specified in section 162(2), appoint a liquidator of a foreign company under section 159(1) if the Court is satisfied that the company has a connection with the Virgin Islands and

(a)    the company is insolvent;

(b)    the Court is of the opinion that it is just and equitable that a liquidator should be appointed;

(c)    the Court is of the opinion that it is in the public interest for a liquidator to be appointed;

(d)    the company is dissolved or has otherwise ceased to exist under or by virtue of the laws of the country in which it was last registered;

(e)    the company has ceased to carry on business; or

(f)    the company is carrying on business only for the purpose of winding up its affairs.

(2)    For the purposes of subsection (1), a foreign company has a connection with the Virgin Islands only if

(a)    it has or appears to have assets in the Virgin Islands;

122

(b)  it is carrying on, or has carried on, business in the Virgin Islands; or

(c)  there is a reasonable prospect that the appointment of a liquidator of the company under this Part will benefit the creditors of the company.

(3)  An application for the appointment of a liquidator of a foreign company may be made

(a)  notwithstanding that the company has been dissolved or has otherwise ceased to exist under or by virtue of the laws of any other country; and

(b)  whether or not the company is or has been registered under Part IX
of the Companies Act.                                    Cap. 285

(4)  Subject to the modifications and exceptions set out in Schedule **3**, the provisions of this Part apply to an application to appoint a liquidator of a foreign company and to the liquidation of a foreign company.    Schedule 3

164. An application for the appointment of a liquidator may not be withdrawn except with the leave of the Court.    Withdrawal of application.

165. (1)  Unless the Court otherwise orders, an application for the appointment of a liquidator shall be advertised,    Advertisement of application.

(a)  if the company is the applicant, not less than seven days before the date set for the application to be heard; or

(b)  if the company is not the applicant, not less than seven days after service of the application on the company and not less than seven days before the date set for the application to be heard.

(2)  If the application is not advertised in accordance with this section and the Rules, the Court may dismiss it.

166. (1)  In the circumstances specified in subsection (2), the Court may, by order, substitute as applicant in an application for the appointment of a liquidator, a creditor or member who is entitled to make such an application.    Substitution of applicant.

(2)  The Court may make a substitution order under subsection (1) where the original applicant is a member or creditor of the company and the Court considers it appropriate to do so

123

## EFFECT OF LIQUIDATION

Effect of liquidation.

175. (1) Subject to subsection (2), with effect from the commencement of the liquidation of a company

    (a) the liquidator has custody and control of the assets of the company;

    (b) the directors and other officers of the company remain in office, but they cease to have any powers, functions or duties other than those required or permitted under this Part;

    (c) unless the Court otherwise orders, no person may

        (i) commence or proceed with any action or proceeding against the company or in relation to its assets, or

        (ii) exercise or enforce, or continue to exercise or enforce any right or remedy over or against assets of the company;

    (d) unless the Court otherwise orders, no share in the company may be transferred;

    (e) no alteration may be made in the status of or to the rights or liabilities of a member, whether by an amendment of the memorandum or articles or otherwise;

    (f) no member may exercise any power under the memorandum or articles, or otherwise, except for the purposes of this Act; and

    (g) no amendment may be made to the memorandum or articles of the company.

(2) Subsection (1) does not affect the right of a secured creditor to take possession of and realise or otherwise deal with assets of the company over which that creditor has a security interest.

(3) Any thing or matter done or purported to be done in contravention of subsection (1) is void and of no effect.

Restriction on execution or attachment.

176. (1) Subject to subsections (2) and (3), a creditor is not entitled to retain the benefit of any execution process, distress or attachment over or against the assets of a company in liquidation unless the execution, process or attachment is completed before the first occurring of the commencement of the liquidation and,

128

(a) where the liquidator was appointed by the members under section 159(2), the date upon which the creditor had notice of the calling of the meeting at which the resolution was proposed; or

(b) where the liquidator was appointed by Court, the date upon which the application to appoint the liquidator was filed.

(2)   A person who, in good faith and for value, purchases assets of a company from an officer charged with an execution process acquires a good title as against the liquidator of the company.

(3)   The Court may set aside the rights conferred on a liquidator under subsection (1) to the extent and subject to such terms as it considers fit.

(4)   For the purposes of this section,

(a) an execution or distraint against personal property is completed by seizure and sale;

(b) an attachment of a debt is completed by the receipt of the debt; and

(c) an execution against land is completed by sale, and in the case of an equitable interest, by the appointment of a receiver.

177. (1)   Subject to subsection (6), where

(a) assets of a company are taken in an execution process; and

(b) before completion of the execution process the officer charged with the execution process receives notice that a liquidator or a provisional liquidator of a company has been appointed;

Duties of officer in execution process.

he shall, on being required by the liquidator or provisional liquidator to do so, deliver or transfer the assets and any money received in satisfaction or partial satisfaction of the execution or paid to avoid a sale of the assets, to the liquidator.

(2)   The costs of the execution process are a first charge on any asset delivered or transferred to the liquidator under subsection (1) and the liquidator may sell all or some of the assets to satisfy that charge.

(3)   Subject to subsections (4) and (6), if in an execution process in respect of a judgement for a sum exceeding $500, assets of a company are sold or money

    (b)  he gives notice to the creditors stating

        (i)  that he does not consider it necessary for a meeting to be held,

        (ii)  the reasons for his view, and

        (iii)  that a meeting will not be called unless 10 per cent in value of the creditors give written notice to the liquidator within ten days of receiving the notice, that they require a meeting to be called; and

    (c)  no notice requiring a meeting to be held is received by him.

## LIQUIDATORS

184. (1)   In performing his functions and undertaking his duties under this Act, a liquidator, whether appointed by resolution of the members or by the Court, acts as an officer of the Court. *Status of liquidator.*

(2)   A liquidator is the agent of the company in liquidation.

185. (1)   The principal duties of a liquidator of a company are *General duties of liquidator.*

    (a)  to take possession of, protect and realise the assets of the company;

    (b)  to distribute the assets or the proceeds of realisation of the assets in accordance with this Act; and

    (c)  if there are surplus assets remaining, to distribute them, or the proceeds of realisation of the surplus assets, in accordance with this Act;

(2)   The liquidator shall, subject to this Act and the Rules, use his own discretion in undertaking his duties.

(3)   A liquidator also has the other duties imposed by this Act and the Rules and such duties as may be imposed by the Court.

186. (1)   A liquidator of a company has the powers necessary to carry out the functions and duties of a liquidator under this Act and the powers conferred on him by this Act. *General powers of liquidator.*

(2)   Without limiting subsection (1), a liquidator has the powers specified in

Schedule 2.

Schedule **2**.

(3)   The Court may provide that certain powers may only be exercised with the sanction of the Court

    (a)   where the liquidator is appointed by the Court, on his appointment or subsequently; or

    (b)   where the liquidator is appointed by the members, at any time.

(4)   Where a liquidator disposes of any assets of the company to a person connected with the company, he shall notify the creditors' committee, if any, of such disposition.

(5)   The liquidator of a company, whether or not appointed by the Court, may at any time apply to the Court for directions in relation to a particular matter arising in the liquidation.

**Removal of liquidator.**   187. (1)   The Court may, on application by a person specified in subsection (2) or on its own motion, remove the liquidator of a company from office if

    (a)   the liquidator

        (i)   is not eligible to act as an insolvency practitioner in relation to the company,

        (ii)   breaches any duty or obligation imposed on him by or owed by him under this Act, the Rules or any other enactment or law in the Virgin Islands, or

        (iii)   fails to comply with any direction or order of the Court made in relation to the liquidation of the company; or

    (b)   the Court is satisfied that

        (i)   the liquidator's conduct of the liquidation is below the standard that may be expected of a reasonably competent liquidator,

        (ii)   the liquidator has an interest that conflicts with his role as liquidator, or

        (iii)   that for some other reason he should be removed as liquidator.

(2)   An application to the Court to remove the liquidator of a company may be made by

    (a)   the creditors' committee;

    (b)   a creditor or member of the company; or

    (c)   the Official Receiver.

(3)   Where the Court removes a liquidator from office under this section

    (a)   if, following his removal, there is at least one liquidator remaining in office, the Court may appoint another liquidator in his place; or

    (b)   if the liquidator removed was the sole liquidator of the company, the Court shall appoint another liquidator in his place.

(4)   On the hearing of an application under this section, the Court may make any interim or other order it considers fit.

188.  (1)   A liquidator of a company

    (a)   shall resign if he is no longer eligible to act as an insolvency practitioner in relation to the company; but

    (b)   otherwise may only resign in accordance with this section.

> Resignation of liquidator.

(2)   Where a liquidator resigns under subsection (1)(a), he shall send a notice of his resignation to the creditors of the company and to the Official Receiver and, if he was appointed by the Court, to the Court.

(3)   A liquidator may resign in accordance with subsection (5)

    (a)   if he intends to cease to be in practice as an insolvency practitioner;

    (b)   if there is some conflict of interest or change of personal circumstances that precludes or makes impracticable the further discharge by him of his duties; or

    (c)   on the grounds of ill health.

(4)   Notwithstanding subsection (3), where joint liquidators are appointed in respect of a company, one or more of the joint liquidators may resign in accordance with subsection (5) if

    (a) all the joint liquidators are of the opinion that it is no longer necessary or expedient for the resigning liquidator or liquidators to continue in office; and

    (b) at least one of them will remain in office.

(5)    Where the liquidator of a company intends to resign on one of the grounds referred to in subsection (3) or under subsection (4), he shall call a meeting of creditors for the purpose of accepting his resignation as liquidator.

(6)    If, at the meeting called under subsection (5), the creditors resolve to accept the resignation of the liquidator, he ceases to hold office as liquidator with effect from the date of the meeting.

(7)    This section does not apply to the Official Receiver when acting as the liquidator of a company.

**Vacancy in office of liquidator.**

189. (1)    Where the liquidator of a company

    (a) dies;

    (b) is removed under section 187; or

    (c) resigns under section 188;

the Court may, on the application of a person specified in subsection (2) or on its own motion, fill the vacancy.

(2)    An application under subsection (1) may be made

    (a) by any continuing liquidator;

    (b) by the creditors' committee, if any; or

    (c) by the Official Receiver.

**Remuneration of liquidator.**

190. The remuneration payable to the liquidator of a company shall be fixed applying the principles set out in section 432.

**Notification of liquidation.**

191. (1)    Where a company is in liquidation, every document of a type specified in subsection (2) shall

    (a) state that the company is in liquidation; and

    (b) specify the name of the liquidator.

(2)    The disclaimer of property of a leasehold nature does not take effect unless a copy of the disclaimer notice has been given, so far as the liquidator is aware of their addresses, to every person claiming under the company as underlessee or mortgagee and either

(a)    no application for a vesting order is made under section 221 with respect to that property before the end of a period of 14 days beginning with the day on which the last notice under this subsection was given; or

(b)    where such an application is made, the Court directs that the disclaimer shall take effect.

(3)    Where the Court gives a direction under subsection (2)(b), it may also, instead of or in addition to any order it makes under section 221, make such orders with respect to fixtures, tenant's improvements and other matters arising out of the lease as it considers fit.

219. (1)    A person interested in property or whose rights would be effected by the disclaimer of property may, by serving a notice to elect on the liquidator, require him to elect whether or not to disclaim the property.

*Notice to liquidator to elect whether to disclaim.*

(2)    Where a notice to elect is served on a liquidator, he is not entitled to disclaim the property under section 217 unless he does so within 28 days of the date of service of the notice on him or within such extended period as the Court may allow.

220. (1)    A disclaimer of onerous property under section 217

*Effect of disclaimer.*

(a)    operates so as to determine, with effect from the date of the disclaimer, the rights, interests and liabilities of the company in or in respect of the property disclaimed; but

(b)    except so far as is necessary to release the company from liability, does not affect the rights or liabilities of any other person.

(2)    A person suffering loss or damage as a result of a disclaimer of onerous property under section 217 may claim in the liquidation of the company as a creditor for the amount of the loss or damage.

221. (1)    Subject to section 222, if a liquidator disclaims onerous property under section 217, the Court may make an order under subsection (2) on the application of

*Vesting orders and orders for delivery.*

(a)    a person who claims an interest in the disclaimed property; or

(b)   a person who is under a liability in respect of the disclaimed property, that has not been discharged by the disclaimer.

(2)   On an application under subsection (1), the Court may, on such terms as it considers fit, order that the disclaimed property be vested in or delivered to

(a)   a person entitled to the property;

(b)   a person under a liability in respect of the property that has not been discharged by the disclaimer; or

(c)   a trustee for a person referred to in paragraph (a) or (b).

(3)   The Court shall not make an order in respect of a person specified in subsection (2)(b), or in respect of a trustee of such a person, unless it appears to the Court that it would be fair to do so for the purpose of compensating the person subject to the liability in respect of the disclaimer.

(4)   The effect of any order under this section shall be taken into account in assessing the extent of the loss or damage suffered by a person for the purposes of section 220(2).

(5)   Subject to subsection (6), where a vesting order is made under this section vesting property in a person, the property vests immediately without any conveyance, transfer or assignment.

(6)   Where another Virgin Islands enactment

(a)   requires the transfer of property vested by an order under this section to be registered; and

(b)   that enactment enables the order to be registered;

on the making of a vesting order, the property vests in equity but does not vest at law until the registration requirements of the enactment have been complied with.

Vesting orders in respect of leases.

222.  (1)   Where the Court makes an order under section 221 vesting property of a leasehold nature in a person claiming under the company in liquidation as an underlessee or a mortgagee, the vesting order shall be made on terms that make that person subject

(a)   to the same liabilities and obligations as the company was subject to under the lease at the commencement of the liquidation; or

(b)   to the same liabilities and obligations as that person would have

148

## MISCELLANEOUS PROVISIONS

228. (1)    The liquidator shall call a meeting of the creditors of a company in liquidation if

      (a)  a meeting is requisitioned by the creditors of the company in accordance with subsection (2); or

      (b)  he is directed to do so by the Court.

    (2)    A creditors' meeting may be requisitioned in accordance with the Rules by 10 per cent in value of the creditors of the company.

*Liquidator to call meetings of creditors.*

229. (1)    On the application of a person who is, as against the liquidator of a company, entitled to the benefit or subject to the burden of a contract made with the company, the Court may make an order rescinding the contract on such terms as to payment by or to either party of damages for the non-performance of the contract, or otherwise as the Court considers just.

    (2)    Any damages payable to a person under an order made under subsection (1) may be claimed by him as a debt in the liquidation of the company.

*Recession of contracts by the Court.*

230. (1)    At any time after the appointment of a liquidator of a company, the Court may, on such terms as it considers appropriate, make an order for the inspection of specified books, records and documents of the company that are in its possession.

    (2)    Application for an order under subsection (1) may be made by a creditor or member of the company.

*Inspection of books by creditors.*

231. (1)    In this section "specified person" means

      (a)  the Official Receiver;

      (b)  a creditor of a company in liquidation; or

      (c)  a member of a company in liquidation.

    (2)    If a liquidator fails to file any notice, return, account or other document, a specified person may serve a notice on the liquidator requiring him to remedy the default.

    (3)    If a liquidator fails to remedy the default specified in a notice served under subsection (1) within 14 days of service of the notice on him, any specified person may apply to the Court for an order that the liquidator remedy the default within such time as the Court may specify.

*Enforcement of liquidator's duties.*

(4)    The Court may order that the costs of and incidental to an application under this section are payable by the liquidator personally.

(5)    A liquidator who fails to comply with an order made under subsection (3) commits an offence.

(6)    This section does not prejudice any other provision of this Act or any other enactment

## TERMINATION OF LIQUIDATION

Termination of liquidation.

232.   The liquidation of a company terminates on the first occurring of

(a)   the making by the Court of an order terminating the liquidation under section 233, or such later date as may be specified in the order;

(b)   the filing by the liquidator of a certificate of compliance with the provisions of section 234(2), as modified by the Court under section 234(4), if appropriate; or

(c)   the making by the Court of an order under section 234(4) exempting the liquidator from compliance with 234(2), or such later date as may be specified in the order.

Order terminating liquidation.

233.  (1)   The Court may, at any time after the appointment of the liquidator of a company, make an order terminating the liquidation if it is satisfied that it is just and equitable to do so.

(2)    An application under this section may be made by the liquidator, a creditor, a director or a member of the company or the Official Receiver.

(3)    Before making an order under subsection (1), the Court may require the liquidator to file a report with respect to any matters relevant to the application.

(4)    An order under subsection (1) may be made subject to such terms and conditions as the Court considers appropriate and, on making the order or at any time thereafter, the Court may give such supplemental directions or make such other order as it considers fit in connection with the termination of the liquidation.

(5)    Where the Court makes an order under subsection (1), the company ceases to be in liquidation and the liquidator ceases to hold office with effect from the date of the order or such later date as may be specified in the order.

(6)   Where the Court makes an order under subsection (1), the person who applied for the order shall, within ten days of the date of the order, file a sealed copy of the order with the Registrar.

(7)   A person who contravenes subsection (6) commits an offence.

234. (1)   In this section "Register" means, as appropriate

*Completion of liquidation.*

(a)   the register of international business companies maintained by the Registrar under the International Business Companies Act; or

*Cap. 291*

(b)   the register of companies maintained by the Registrar under the Companies Act.

*Cap. 285*

(2)   As soon as practicable after completing his duties in relation to the liquidation of a company, the liquidator shall

(a)   prepare and send to every creditor of the company whose claim has been admitted and to every member of the company

(i)   his final report, complying with subsection (3), and a statement of realisation and distribution in respect of the liquidation, and

(ii)   a summary of the grounds upon which a creditor or member may object to the striking of the company from the Register; and

(b)   file with the Registrar a copy the final report and the statement realisations and distributions sent to the creditors and members of the company.

(3)   The final report of a liquidator shall contain a statement

(a)   that all known assets of the company have been disclaimed, realised or distributed without realisation;

(b)   that all proceeds of realisation have been distributed; and

(c)   that there is no reason why, in his opinion, the company should not be struck from the Register, and dissolved.

(4)   On the application of the liquidator, the Court may on such terms and conditions as it considers just,

(a)  exempt the liquidator from compliance with subsection (2)(a); or

(b)  modify the application of the provisions of subsection (2) to the liquidator.

Release of liquidator.

235.  (1)   A person who ceases to be the liquidator, or provisional liquidator, of a company may apply to the Court for his release and the Court my grant the release unconditionally or upon such conditions as it considers fit, or it may withhold it.

(2)   If the Court withholds the release, it may make a compensation order against the former liquidator under section 254.

(3)   Subject to subsection (5), where a former liquidator is released under this section, he is discharged from all liability in respect of any act or default of his in relation to the administration of the company.

(4)   An order for the release of a former liquidator may be revoked by the Court if the release was obtained by fraud or the suppression or concealment of any material fact.

(5)   Subsection (3) does not prevent the Court from making an order under section 254 against a liquidator who has been released under this section.

(6)   Where the Official Receiver ceases to be liquidator and another liquidator is appointed in his place, the Official Receiver obtains his release

(a)  from the appointment of the new liquidator; or

(b)  such later date as the Court may determine.

(7)   A liquidator who obtains his release under this section shall file a notice in the prescribed form with the Registrar.

Dissolution.

236.  The Rules shall provide for the dissolution of a company on the termination and completion of the liquidation of the company.

(ii)  the relevant proceedings as defined in subsection (5); or

(b)  who was, at the time of the transaction, a connected person.

(5)   For the purposes of subsection (4), a person has notice of the relevant proceedings if,

(a)  in the case of a company in administration, he had notice of the filing of the application on which the administration order was made;

(b)  in the case of a company where a liquidator was appointed immediately following the discharge of an administration order, he had notice of the filing of the application on which the administration order was made or the filing of the application on which the order appointing a liquidator was made; or

(c)  in the case of a company where a liquidator was appointed in circumstances other than those set out in paragraph (b), he had notice of the filing of the application on which the order appointing a liquidator was made.

Recoveries.   251. Any money paid to, assets recovered or other benefit received by the liquidator as a result of an order made under section 249 are deemed to be assets of the company available to pay unsecured creditors of the company.

Remedies not exclusive.   252.    The provisions of this Part apply without prejudice to the availability of any other remedy, even in relation to a transaction that the company had no power to enter into.

# PART IX

## MALPRACTICE

Interpretation for this Part.   253.  In this Part,

(a)  a company or a foreign company goes into insolvent liquidation if a liquidator is appointed at a time when its assets are insufficient to pay its liabilities and the expenses of the liquidation; and

(b)  a relevant company is a company or a foreign company that has gone into insolvent liquidation.

254. (1)   On the application of the liquidator of a relevant company, the Court may make an order under subsection (3) where it is satisfied that a person specified in subsection (2)

> Summary remedy against delinquent officers and others.

    (a)  has misapplied or retained, or become accountable for any money or other assets of the company; or

    (b)  has been guilty of any misfeasance or breach of any fiduciary or other duty in relation to the company.

(2)   An order under subsection (3) may be made against a person

    (a)  who is or has been an officer of the company;

    (b)  who has acted as liquidator of the company;

    (c)  who, in the case of a relevant company that is not a foreign company, has acted as administrator, administrative receiver, supervisor or interim supervisor of the company; or

    (d)  who, not being a person falling within paragraphs (a) or (b), is or has been concerned in the promotion, formation, management, liquidation or dissolution of the company.

(3)   Where subsection (1) applies, the Court may make one or more of the following orders against the person:

    (a)  that he repays, restores or accounts for the money or other assets, or any part of it;

    (b)  that he pays to the company as compensation for the misfeasance or breach of duty such sum as the Court considers just; and

    (c)  that he pays interest to the company at such rate as the Court considers just.

(4)   The Court shall not make an order under subsection (3) unless it has given the person the opportunity

    (a)  to give evidence, call witnesses and bring other evidence in relation to the application; and

    (b)  to be represented, at his own expense, by a legal practitioner who may put to him, or to other witnesses, such questions as the Court may allow for the purpose of explaining or qualifying any answers or evidence given.

(5)    Application may not be made for an order under this section against a liquidator or an administrator who has been released, except with the leave of the Court.

(6)    Nothing in this section prevents any person from instituting any other proceedings in relation to matters in respect of which an application may be made under this section.

Fraudulent trading.

255.  (1)    On the application of the liquidator of a relevant company, the Court may make an order under subsection (2) where it is satisfied that, at any time before the commencement of the liquidation of the company, any of its business has been carried on

(a)    with intent to defraud creditors of the company or creditors of any other person; or

(b)    for any fraudulent purpose.

(2)    Where subsection (1) applies, the Court may declare that any person who was knowingly a party to the carrying on of the business in such manner are liable to make such contribution, if any, to the company's assets as the Court considers proper.

Insolvent trading.

256.  (1)    On the application of the liquidator of a relevant company, the Court may make an order under subsection (2) against a person who is or has been a director of the company if it is satisfied that

(a)    at any time before the commencement of the liquidation of the company, that person knew or ought to have concluded that there was no reasonable prospect that the company would avoid going into insolvent liquidation, and

(b)    he was a director of the company at that time.

(2)    Subject to subsection (3), where subsection (1) applies, the Court may order that that the person concerned makes such contribution, if any, to the company's assets as the Court considers proper.

(3)    The Court shall not make an order against a person under subsection (2) if it is satisfied that after he first knew, or ought to have concluded, that there was no reasonable prospect that the company would avoid going into insolvent liquidation, he took every step reasonably open to him to minimise the loss to the company's creditors.

(4)   For the purposes of subsections (1) and (3), the facts which a director of a company ought to know or ascertain, the conclusions which he ought to reach and the steps reasonably open to him which he ought to take are those which would be known or ascertained, or reached or taken, by a reasonably diligent person having both

(a)   the general knowledge, skill and experience that may reasonably be expected of a person carrying out the same functions as are carried out by that director in relation to the company; and

(b)   the general knowledge, skill and experience that that director has.

(5)   The reference in subsection (4) to the functions carried out in relation to a company by a director of the company includes any function which he does not carry out but which have been entrusted to him.

(6)   Nothing in this section affects section 255.

257.   Any money paid to, assets recovered or other benefit received by the liquidator as a result of an order made under section 255 or section 256 are deemed to be assets of the company available to pay unsecured creditors of the company.

<span style="float:right">Recoveries under sections 255 and 256.</span>

258.   (1)   Where the Court makes an order under section 255 or section 256, it may make give such directions or make such further order as it considers proper for giving effect to the order.

<span style="float:right">Ancillary orders.</span>

(2)   Without limiting subsection (1), the Court may

(a)   provide for the liability of any person under the order to be a charge on any debt or obligation due from the company to him, or on any mortgage or charge or any interest in a mortgage or charge on assets of the company held by or vested in him, or any person on his behalf, or any person claiming as assignee from or through the person liable or any person acting on his behalf; and

(b)   from time to time make such further order as may be necessary for enforcing any charge imposed under this subsection.

(3)   For the purposes of subsection (2), "assignee"

(a)   includes a person to whom or in whose favour, by the directions of the person made liable, the debt, obligation, mortgage or charge was created, issued or transferred or the interest created, but

(b) does not include an assignee for valuable consideration, not including consideration by way of marriage, given in good faith and without notice of any of the matters on the ground of which the declaration is made.

(4)    Where the court makes a declaration under either section 255 or 256 in relation to a person who is a creditor of the company, it may direct that the whole or any part of any debt owed by the company to that person and any interest on the debt shall rank in priority after all other debts owed by the company and after any interest on those debts.

(5)    Sections 255 and 256 have effect notwithstanding that the person concerned may be criminally liable in respect of matters on the ground of which the declaration under the section is to be made.

## PART X

## DISQUALIFICATION ORDERS AND UNDERTAKINGS

Interpretation for this Part.

Cap. 291

259. (1)    In this Part "voluntary liquidator" means a liquidator appointed by the directors or members of an international business company under Part IX of the International Business Companies Act.

(2)    For the purposes of this Part, a company becomes insolvent if

(a) an administration order is made in respect of the company;

(b) an administrative receiver of the company is appointed;

(c) a liquidator of the company is appointed at a time when its assets are insufficient to pay its liabilities and the expenses of the liquidation; or

(d) a liquidator is appointed by the Court on the ground specified in section 162(1)(c).

Disqualification orders and undertakings.

260. (1)    A disqualification order is an order that a person shall not, for the period specified in the order, engage in a prohibited activity without the leave of the Court.

(2)    A disqualification undertaking is an undertaking in writing given by a person to the Official Receiver that he will not, for the period specified in the undertaking, engage in a prohibited activity without the leave of the Court.

(3)    For the purpose of this Part, a person engages in a prohibited activity if

(a) he is a director of a company;

(b)  he acts as the voluntary liquidator of a company;

(c)  he acts as the receiver of the assets of a company;

(d)  he acts as an insolvency practitioner; or

(e)  in any way, whether directly or indirectly, he is concerned with or takes part in the promotion, formation or management of a company; or

(e)  he undertakes any activity prescribed as a prohibited activity.

(4)  A person is a "disqualified person" for the period in which

(a)  a disqualification order has effect against him; or

(b)  a disqualification undertaking is in place in respect of him.

(5)  The period specified in a disqualification order, or disqualification undertaking, made against or in respect of a person, runs concurrently with the period specified in any other disqualification order or disqualification undertaking made against or in respect of that person.

261. (1)  Subject to subsection (2), the Official Receiver may apply to the Court for a disqualification order against a person under section 262.

Application for disqualification order.

(2)  An application for a disqualification order may not be made more than six years after the date on which the company concerned became insolvent.

262. (1)  On an application under section 261, the Court may, make a disqualification order against a person

Hearing of application for disqualification order.

(a)  who has been convicted on indictment

(i)  of an offence in connection with the promotion, formation, management or dissolution of a company that is or becomes insolvent, or

(ii)  of an offence under this Act that relates to a company that at any time becomes insolvent,

whether the person was convicted before or after the company became insolvent;

(b)  who has had an order under section 255 or section 256 made

liquidator of the company.

(3)    A person who receives a notice under subsection (1) and who, without reasonable excuse, fails to comply with the notice, commits an offence.

283. (1)    This section applies to the examination of a person under section 282(1)(c) by an office holder.

Examination by office holder.

(2)    The office holder, or the legal practitioner conducting the examination on his behalf, may administer an oath to, or take the affirmation of, a person to be examined.

(3)    A person required to be examined is entitled to be represented by a legal practitioner.

(4)    The office holder shall ensure that the examination is recorded in writing or by means of a tape recorder or other similar device.

## EXAMINATION BEFORE COURT

284. (1)    Where a company is in liquidation, an application may be made to the Court, ex parte, by the liquidator or by the Official Receiver, for an order that a person specified in subsection (2) appear before the Court for examination concerning the company, or a connected company, including the promotion, formation, business, dealings, accounts, assets, liabilities or affairs of the company or connected company.

Application for examination before Court.

(2)    An application under subsection (1) may be made in respect of

(a)   a person specified in section 282(2); or

(b)   any other person who the applicant considers is capable of giving information concerning the company or a connected company.

(3)    An application under subsection (1) shall state whether the applicant seeks a public or a private examination.

285. (1)    In this section, "examinee" means the person to be examined before the Court.

Order for examination.

(2)    On hearing an application made under subsection 284, the Court may order the examinee to appear before the Court to be examined.

(3)    An order under subsection (1)

(a) shall direct the examinee to appear before the Court to be examined at a venue specified in the order;

(b) shall state whether the examination is to be a public or a private examination;

(c) may require the person concerned to produce at the examination any books, records or other documents in his possession or control that relate to the company, or a connected company, including the promotion, formation, business, dealings, accounts, assets, liabilities or affairs of the company or connected company;

(d) may provide for an alternative method of service of the order on the examinee;

(e) shall state the action that may be taken against a person if he does not appear before the Court as required by the order; and

(f) where the examination is to be a public examination, may require the examination to be advertised, specifying the method of such advertisement.

(4)   Where the Court makes an order under subsection (2), the applicant shall, forthwith serve a sealed copy of the order on the examinee and, where the liquidator is not the Official Receiver

(a) if the applicant is the liquidator of the company, send a sealed copy of the notice to the Official Receiver; or

(b) if the applicant is the Official Receiver, send a sealed copy of the notice to the liquidator of the company.

(5)   Where an order under subsection (2) is for the public examination of an examinee, the applicant shall       give not less than 14 days notice of the examination    to each creditor and member of the company.

(6)   The Court may as part of an order made under this section, or at any subsequent time, make one or more of the following directions:

(a) a direction specifying the matters upon which the examinee may be examined; and

(b) a direction specifying the procedures to be followed at the examination.

Conduct of
examination.

# PART XVIII

## CROSS-BORDER INSOLVENCY

### GENERAL PROVISIONS

436.  (1)   The purpose of this Part is to provide effective mechanisms for dealing with cases of cross-border insolvency so as to promote the objectives of

Purpose and scope of this Part.

   (a)   cooperation between

      (i)   the Court  and insolvency administrators of the Virgin Islands; and

      (ii)   the courts and other competent authorities of foreign countries involved in cases of cross-border insolvency;

   (b)   greater legal certainty for trade and investment;

   (c)   fair and efficient administration of cross-border insolvencies that protects the interests of all creditors and other interested persons, including the debtor;

   (d)   protection and maximisation of the value of the debtor's assets; and

   (e)   facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

(2)   This Part applies where

   (a)   assistance is sought in the Virgin Islands by a foreign court or a foreign representative in connection with a foreign proceeding;

   (b)   assistance is sought in a foreign country in connection with a Virgin Islands insolvency proceeding;

   (c)   a foreign proceeding and a Virgin Islands insolvency proceeding in respect of the same debtor are taking place concurrently; or

   (d)   creditors or other interested persons in a designated foreign country have an interest in requesting the commencement of, or participating in, a Virgin Islands insolvency proceeding .

(3)   This Part does not apply to a regulated person who holds, or at any time has held, a prescribed financial services licence of a type designated by the Governor for the purposes of this section by notice published in the *Gazette*.

Interpretation for this Part.

437.   (1)   In this Part,

"designated foreign country" means a country or territory designated by the Governor for the purposes of this Part by notice published in the *Gazette*;

"establishment" means any place of operations where the debtor carries out a non-transitory economic activity with human means and goods or services.

"foreign ancillary proceeding" means a foreign proceeding, other than a foreign main proceeding, taking place in a country where the debtor has an establishment within the meaning of subparagraph (f) of this article;

"foreign court" means a judicial or other authority competent to control or supervise a foreign proceeding;

"foreign main proceeding" means a foreign proceeding taking place in the country where the debtor has the centre of his main interests;

"foreign proceeding" means a collective judicial or administrative proceeding in a designated foreign country, including an interim proceeding, pursuant to a law relating to insolvency in which proceeding the property and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganisation, liquidation or bankruptcy;

"foreign representative" means a person or body, including one appointed on an interim basis, authorized in a foreign proceeding to administer the reorganisation or the liquidation of the debtor's property or affairs or to act as a representative of the foreign proceeding;

"insolvency officer" means the Official Receiver, a liquidator, provisional liquidator, bankruptcy trustee, administrator, receiver, supervisor or interim supervisor;

"Virgin Islands insolvency proceeding" means a collective judicial or administrative proceeding, including an interim proceeding, pursuant to this Act, or to any other enactment in the Virgin Islands, relating

(a)  to the bankruptcy, liquidation, administration or receivership of a debtor; or

(b)  to the reorganisation of a debtor's affairs;

where, in all cases, the property of the debtor is or will be realised for the benefit of secured or unsecured creditors.

(2)   In the interpretation of this Part, the Court shall have regard to its international origin and to the need to promote an application of this Part that is consistent with the application of similar laws adopted by foreign jurisdictions.

438.  To the extent that this Part conflicts with an obligation of the Virgin Islands arising out of any treaty or other form of agreement to which the Virgin Islands is a party with one or more other countries, the requirements of the treaty or agreement prevail.

International obligations of the Virgin Islands.

439.  Nothing in this Part prevents the Court from refusing to take an action governed by this Part if the action would be contrary to the public policy of the Virgin Islands.

Public policy exception.

440.  Subject to section 443, nothing in this Part limits the power of the Court or an insolvency officer to provide additional assistance to a foreign representative where permitted under any other Part of this Act or under any other enactment or rule of law of the Virgin Islands.

Additional assistance.

441.  An application under this Part shall be made to the Court in accordance with the Rules.

Application under this Part.

442.  The Court may, on the application of an insolvency officer, authorize him to act in a foreign country on behalf of a Virgin Islands insolvency proceeding as permitted by the applicable foreign law.

Authorization of insolvency officer  to act in a foreign country.

## ACCESS OF FOREIGN REPRESENTATIVES AND CREDITORS

## TO COURTS IN THE VIRGIN ISLANDS

443.  (1)   A foreign representative is entitled to  apply to the Court under section 448 for recognition of the foreign proceeding in respect of which he is appointed.

Right of direct access.

(2)   Subject to section 453, a foreign representative may not be granted comity or cooperation by the Court unless the foreign proceeding in respect of which he is appointed has been granted recognition by the Court.

(3)    Upon recognition being granted to the foreign proceeding in respect of which a foreign representative is appointed, he may apply directly to the Court for comity or cooperation or for any other relief under this Part.

Limited jurisdiction.

444.    The sole fact that a foreign representative makes an application under section 448 does not subject the foreign representative to the jurisdiction of the Court for any other purpose.

Commencement of and participation in a Virgin Islands insolvency proceeding by foreign representative.

445.    A foreign representative, upon the recognition of the foreign proceeding in respect of which he is appointed, may

    (a)    apply to commence a Virgin Islands insolvency proceeding if the conditions for commencing such a proceeding are otherwise met; and

    (b)    participate in a Virgin Islands insolvency proceeding regarding the debtor.

Access of foreign creditors to a Virgin Islands proceeding.

446.    (1)    Subject to subsection (2), foreign creditors have the same rights regarding the commencement of, and participation in, a Virgin Islands insolvency proceeding as creditors in the Virgin Islands.

    (2)    Subsection (1) does not affect the priority of claims in a Virgin Islands insolvency proceeding or the exclusion of foreign penal, revenue and social security claims from such a proceeding.

Notification to foreign creditors of a Virgin Islands insolvency proceeding.

447.    (1)    Whenever under a Virgin Islands insolvency proceeding notification is to be given to creditors in the Virgin Islands, such notification shall also be given to the known creditors that do not have addresses in the Virgin Islands.

    (2)    Where the address of any creditor is not known, the Court may order that appropriate steps be taken with a view to notifying that creditor.

    (3)    Notification to creditors under subsection (1) shall be made to the foreign creditors individually, unless the Court considers that, under the circumstances, some other form of notification would be more appropriate. No letters rogatory or other, similar formality is required.

    (4)    When    notification of the commencement of a Virgin Islands insolvency proceeding is to be given to foreign creditors, the notification shall

    (a)    indicate the time period for submitting claims and specify the place for their submission;

(b) indicate whether secured creditors need to submit their secured claims; and

(c) contain any other information required to be included in such a notification to creditors pursuant to the law of the Virgin Islands and any order of the Court.

(5)   The Rules and any order of the Court as to notice or the submission of a claim time shall provide such additional time to creditors with foreign addresses as is reasonable under the circumstances.

## RECOGNITION OF FOREIGN PROCEEDING AND RELIEF

448.  (1)   A foreign representative may apply to the Court for recognition of the foreign proceeding in which the foreign representative has been appointed.

*Application for recognition of foreign proceeding.*

(2)   An application for recognition shall be accompanied by

(a) a certified copy of the decision commencing the foreign proceeding and appointing the foreign representative; or

(b) a certificate from the foreign court affirming the existence of the foreign proceeding and of the appointment of the foreign representative; or

(c) in the absence of evidence referred to in paragraphs (a) and (b), any other evidence acceptable to the Court of the existence of the foreign proceeding and of the appointment of the foreign representative.

(3)   An application for recognition shall also be accompanied by a statement identifying all foreign proceedings in respect of the debtor that are known to the foreign representative.

(4)   If the documents referred to in subsection (2)(a) and (b) are not in English, a certified translation they shall be accompanied by a certified translation of the documents into English.

(5)   The Court may require a certified translation of any other documents supplied in support of the application for recognition into English.

449.  (1)   If the decision or certificate referred to in section 448(2) indicates that the proceeding is a foreign proceeding as defined in section 437(1)and that the person or body is a foreign representative as defined in section 437(1), the Court is entitled to so presume.

*Presumptions concerning recognition.*

267

(2)    The Court is entitled to presume that documents submitted in support of the application for recognition are authentic, whether or not they have been legalised.

(3)    In the absence of proof to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the centre of the debtor's main interests.

**Recognition of foreign proceedings.**

450.  (1)    Subject to section 439, a foreign proceeding shall be recognised if

(a)    the proceeding is a foreign proceeding within the meaning of section 437(1);

(b)    the person or body applying for recognition is a foreign representative within the meaning of section 437(1);

(c)    the application meets the requirements of section 448(2); and

(d)    the application has been made in accordance with this Part and the Rules.

(2)    The foreign proceeding shall be recognised

(a)    as a foreign main proceeding if it is taking place in the country where the debtor has the centre of his main interests; or

(b)    as a foreign ancillary proceeding if the debtor has an establishment in the foreign country.

(3)    An application for recognition of a foreign proceeding shall be decided upon at the earliest possible time.

(4)    The provisions of this Part do not prevent the modification or termination of recognition if it is shown that the grounds for granting it were fully or partially lacking or have ceased to exist.

**Subsequent information.**

451.  After the filing of an application for recognition of a foreign proceeding, the foreign representative shall inform the Court promptly of

(a)    any substantial change in the status of the recognised foreign proceeding or the status of the foreign representative's appointment; and

(b)    any other foreign proceeding regarding the same debtor that becomes known to the foreign representative.

268

452. (1)   Where an application for recognition of a foreign proceeding has been filed but not yet determined or withdrawn, the Court may, on the application of the foreign representative concerned, if it is satisfied that relief is urgently needed to protect the assets of the debtor or the interests of the creditors, grant such relief of a provisional nature as it considers appropriate, including

Interim relief.

    (a)   staying execution against the debtor's assets;

    (b)   entrusting the administration or realisation of all or part of the debtor's assets located in the Virgin Islands to the foreign representative or to another person designated by the Court, in order to protect and preserve the value of assets that, by their nature or because of other circumstances, are perishable, susceptible to devaluation or otherwise in jeopardy;

    (c)   any relief mentioned in section 454(1)(c), (d) and (f).

    (2)   The foreign representative in whose favour an order is made under subsection (1) shall notify the debtor of the order as soon as practicable or within such time as the Court may order.

    (3)   Unless extended under section 454(1)(f), the relief granted under this article terminates when the Court determines the application for recognition.

    (4)   The Court may refuse to grant relief under this section if such relief would interfere with the administration of a foreign main proceeding.

453. (1)   Upon recognition of a foreign proceeding that is a foreign main proceeding,

Effects of recognition of foreign main proceeding.

    (a)   commencement or continuation of individual actions or individual proceedings concerning the property of the debtor within the Virgin Islands, rights, obligations or liabilities is stayed;

    (b)   execution against the debtor's property within the Virgin Islands is stayed; and

    (c)   the right to transfer, encumber or otherwise dispose of any property of the debtor within the Virgin Islands is suspended.

    (2)   Notwithstanding subsection (1), the Court may, on the application of any creditor or interested person, order that the stay or suspension does not apply in respect of any particular action or proceeding or in respect of any particular property, rights, obligation or liability.

(3)    An order under subsection (2) may be made subject to such terms as it considers fit.

(4)    Subsection (1)(a) does not affect the right to commence individual actions or proceedings to the extent necessary to preserve a claim against the debtor.

(5)    Subsection (1) does not affect the right to request the commencement of a Virgin Islands insolvency proceeding or the right to file claims in such a proceeding.

Relief that may be granted upon recognition of foreign proceeding.

454.    (1)    Upon recognition of a foreign proceeding, whether main or ancillary, where necessary to protect the assets of the debtor or the interests of the creditors, the Court may, at the request of the foreign representative, grant any appropriate relief, including

(a)    staying the commencement or continuation of individual actions or individual proceedings concerning the debtor's property, rights, obligations or liabilities, to the extent they have not been stayed under section 453(1)(a);

(b)    staying execution against the debtor's property to the extent it has not been stayed under section 453(1)(b);

(c)    suspending the right to transfer, encumber or otherwise dispose of any property of the debtor to the extent this right has not been suspended under section 453(1)(c);

(d)    providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

(e)    entrusting the administration or realisation of all or part of the debtor's assets located in Virgin Islands to the foreign representative or another person designated by the Court;

(f)    extending relief granted under section 452(1);

(2)    Upon recognition of a foreign proceeding, whether main or ancillary, the Court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's property located in the Virgin Islands to the foreign representative or another person designated by the Court, provided that the Court is satisfied that the interests of creditors in the Virgin Islands are adequately protected.

270

(3)    In granting relief under this section to a representative of a foreign ancillary proceeding, the Court shall be satisfied that the relief relates to property that, under the law of the Virgin Islands, should be administered in the foreign ancillary proceeding or concerns information required in that proceeding.

455. (1)    In granting or denying relief under section 452 or 454, or in modifying or terminating relief under subsection (3), the Court shall be satisfied that the interests of the creditors and other interested persons, including the debtor, are adequately protected.

(2)    The Court may subject relief granted under section 452 or 454 to such conditions as it considers appropriate, including the giving of any security interest or the filing of any bond.

(3)    The Court may, at the request of the foreign representative or a person affected by relief granted under section 452 or 454, or at its own motion, modify or terminate the relief.

456. (1)    Subject to subsection (2), upon recognition of a foreign proceeding, the foreign representative shall have power to apply to the Court for an order under section 249 or 405, as the case may be.

(2)    The Court shall not make an order under section 249 or 405 on the application of the foreign representative of a recognised foreign proceeding unless it is satisfied that,

 (a)    in the case of an application under section 249, the foreign representative has roles and functions that are equivalent or broadly similar to the roles and functions of a liquidator appointed under this Act; and

 (b)    in the case of an application under section 405, the foreign representative has roles and functions that are equivalent or broadly similar to the roles and functions of a bankruptcy trustee appointed under this Act.

(3)    When the foreign proceeding is a foreign ancillary proceeding, the Court shall be satisfied that the action relates to property that, under the law of the Virgin Islands, should be administered in the foreign ancillary proceeding.

457.    Upon recognition of a foreign proceeding, the foreign representative may, if the requirements of the law of the Virgin Islands are met, intervene in any proceedings in which the debtor is a party.

*Protection of creditors and other interested persons.*

*Actions to avoid acts detrimental to creditors.*

*Intervention by foreign representative in proceedings in the Virgin Islands.*

## COOPERATION WITH FOREIGN COURTS AND
## FOREIGN REPRESENTATIVES

Cooperation and direct communication between court of the Virgin Islands and foreign courts or foreign representatives.

458. (1)   In matters referred to in section 436, the Court shall cooperate to the maximum extent possible with foreign courts or foreign representatives, either directly or through an insolvency administrator.

(2)   The Court is entitled to communicate directly with, or to request information or assistance directly from, foreign courts or foreign representatives, subject to the rights of parties to notice and participation at hearings.

Cooperation and direct communication between the insolvency administrator and foreign courts or foreign representatives.

459. (1)   In matters referred to in section 436, an insolvency administrator shall, in the exercise of his functions and subject to the supervision of the Court, cooperate to the maximum extent possible with foreign courts or foreign representatives.

(2)   Subject to section 442, the insolvency administrator is entitled, in the exercise of his functions and subject to the supervision of the Court, to communicate directly with foreign courts or foreign representatives.

Forms of cooperation.

460.  Cooperation referred to in sections 458 and 459 may be implemented by any appropriate means, including

(a)  appointment of a person or body to act at the direction of the Court;

(b)  communication of information by any means considered appropriate by the Court;

(c)  coordination of the administration and supervision of the debtor's property and affairs;

(d)  approval or implementation by courts of agreements concerning the coordination of proceedings;

(e)  coordination of concurrent proceedings regarding the same debtor.

## CONCURRENT PROCEEDINGS

461.  After recognition of a foreign main proceeding, a Virgin Islands insolvency proceeding  may be commenced only if the debtor has assets in the Virgin Islands and the effects of the Virgin Islands proceeding shall be restricted to the assets of the debtor that are located in the Virgin Islands and, to the extent necessary to implement cooperation and coordination under sections 458, 459 and 460, to other property of the debtor that, under the law of the Virgin Islands, should be administered in the recognised proceeding.

Commencement of a Virgin Islands insolvency proceeding after recognition of foreign main proceeding.

462.  Where a foreign proceeding and a Virgin Islands insolvency proceeding are taking place concurrently regarding the same debtor, the Court shall seek cooperation and coordination under sections 458, 459 and 460, and the following shall apply:

Coordination of a Virgin Islands insolvency proceeding and foreign proceeding.

(a) when the Virgin Islands insolvency proceeding is taking place at the time the application for recognition of the foreign proceeding is filed,

(i) any relief granted under section 452 or 454 shall be consistent with the Virgin Islands insolvency proceeding ; and

(ii) if the foreign proceeding is recognized in the Virgin Islands as a foreign main proceeding, section 453 does not apply;

(b) when the Virgin Islands insolvency proceeding commences after recognition, or after the filing of the application for recognition, of the foreign proceeding,

(i) any relief in effect under section 452 or 454 shall be reviewed by the Court and shall be modified or terminated if inconsistent with the Virgin Islands insolvency proceeding; and

(ii) if the foreign proceeding is a foreign main proceeding, the stay and suspension referred to in section 453(1) shall be modified or terminated pursuant to section 453(2) if inconsistent with the Virgin Islands insolvency proceeding;

(c) in granting, extending or modifying relief granted to a representative of a foreign ancillary proceeding, the Court shall be satisfied that the relief relates to property that, under the law of the Virgin Islands , should be administered in the foreign ancillary proceeding or concerns information required in that proceeding.

273

Coordination of more than one foreign proceeding.

463.  In matters referred to in section 436, in respect of more than one foreign proceeding regarding the same debtor, the Court shall seek cooperation and coordination under sections 458, 459 and 460 and the following shall apply:

(a)  any relief granted under section 452 or 454  to a representative of a foreign ancillary proceeding after recognition of a foreign main proceeding shall be consistent with the foreign main proceeding;

(b)  if a foreign main proceeding is recognised after recognition, or after the filing of an application for recognition, of a foreign ancillary proceeding, any relief in effect under section 452 or 454 shall be reviewed by the Court and shall be modified or terminated if inconsistent with the foreign main proceeding;

(c)  if, after recognition of a foreign ancillary proceeding, another foreign ancillary proceeding is recognised, the Court shall grant, modify or terminate relief for the purpose of facilitating coordination of the proceedings.

Presumption of insolvency based on recognition of foreign main proceeding.

464.  In the absence of evidence to the contrary, recognition of a foreign main proceeding is, for the purpose of commencing a Virgin Islands insolvency proceeding proof that the debtor is insolvent.

Rule of payment in concurrent proceedings.

465.  Without prejudice to secured claims or rights *in rem*, a creditor who has received part payment in respect of his claim in a proceeding pursuant to a law relating to insolvency in a foreign country may not receive a payment for the same claim in a Virgin Islands insolvency proceeding regarding the same debtor, so long as the payment to the other creditors of the same class is proportionately less than the payment the creditor has already received.

Section 155
amended.

**56.**     Section 155(2) of the principal Act is amended

    (a)     in paragraph (d), by inserting after the word "him", the words "or such longer period as may be prescribed"; and

    (b)     in paragraph (e), by inserting before the word "trustee", the word "bankruptcy".

Section 156
amended.

**57.**     Section 156(2) of the principal Act is amended by deleting the word "seven" and substituting the word "fourteen".

Section 157
amended.

**58.**     Section 157 of the principal Act is amended in subsections (3) and (5), by inserting after the words "liquidator or", the word "for".

Section 159
amended.

**59.**     Section 159 of the principal Act is amended

    (a)     in subsection (2), by inserting after the words "Subject to", the words "subsection (5) and"; and

    (b)     by inserting after subsection (4), the following subsections:

    "     (5)     The members of a company that is a regulated person may not appoint a liquidator under subsection (2) unless at least 5 business days written notice of the resolution, or such shorter period of notice as the Commission may agree to accept in writing, has been given to the Commission.

    (6)     A resolution passed in contravention of subsection (5) is void and of no effect.".

Section 161
amended.

**60.**     Section 161 of the principal Act is amended

    (a)     in subsection (1)(a), by inserting after the word "filed", the words "and served";

    (b)     by inserting after subsection (3), the following subsection:

    "     (3A)  The acts of a liquidator appointed in breach of section 161(1)(a) carried out in good faith are valid provided that he is not aware of the breach.".

Section 162
amended.

**61.**     Section 162(6) of the principal Act is amended by deleting the word "creditor's" and substituting the word "creditors'".

Section 163
amended.

**62.**    Section 163 of the principal Act is amended by inserting after subsection (3), the following subsections:

"    (3A)   An application to appoint a liquidator under subsection (1)(c) may only be made by the Commission or the Attorney General.

(3B)   The Commission may only make an application to appoint a liquidator under subsection (1)(c) if the foreign company concerned is, or at any time has been, a regulated person.".

Section 167
amended.

**63.**    Section 167 of the principal Act is amended by inserting after subsection (3), the following subsection:

"    (4)   An application for the appointment of a liquidator shall be dismissed if the company is in liquidation, a liquidator having been appointed by the members under section 159(2).".

Section 168
amended.

**64.**    Section 168 of the principal Act is amended by inserting after subsection (3), the following subsection:

"    (4)   Section 496(1)(a) shall not apply to the time periods specified in this section.".

Section 170
amended.

**65.**    Section 170(5) of the principal Act is amended by inserting after the words "deposit at Court", the words ", or otherwise secure to the satisfaction of the Court,".

Section 175
amended.

**66.**    Section 175(1)(b) of the principal Act is amended by inserting after the words "under this Part", the words "or authorised by the liquidator".

Section 178
amended.

**67.**    Section 178(1) of the principal Act is amended by deleting paragraph (a) and substituting the following paragraph:

"(a)   advertise his appointment in accordance with the Rules;".

Section 179
amended.

**68.**    Section 179(1) of the principal Act is amended by deleting the word "14" and substituting the word "21".

Section 185
amended.

**69.**    Section 185 of the principal Act is amended by inserting after subsection (2), the following subsections:

"    (2A)   If it appears to the liquidator that the company has carried on unlicensed financial services business, he shall as soon as reasonably practicable report the matter to the Commission.

22

(2B)    Where the liquidator makes a report to the Commission under subsection (2A) he shall

(a)    send to the Commission a copy of every notice or other document that he is required under this Part to send to a creditor or the Court; and

(b)    notify the Commission of any application made to the Court in or in connection with the liquidation.".

70.    Section 186 of the principal Act is amended by inserting after subsection (5), the following subsection:

Section 186 amended.

"(6) The acts of a liquidator of a company are valid notwithstanding any defect in his nomination, appointment or qualifications.".

71.    Section 187 of the principal Act is amended

Section 187 amended.

(a)    in subsection (1)(a)(ii), by inserting after the words "Rules or", the words "the Regulations made under section 486 or, in his capacity as liquidator, under";

(b)    in subsection (3)(a), by deleting the word "another" and substituting the words "an eligible insolvency practitioner as"; and

(c)    in subsection (3)(b), by deleting the word "another" and substituting "the Official Receiver or an eligible insolvency practitioner as".

72.    Section 188 of the principal Act is amended

Section 188 amended.

(a)    in subsection (2),

(i)    by inserting after the words "the company", the words "to the Registrar"; and

(ii)    by inserting at the end of the subsection before the full stop, the words "and his resignation takes effect from the date that the notice is received by the Official Receiver"; and

(b)    by deleting subsection (6) and substituting the following

subsections:

"    (6)  If the creditors resolve to accept the resignation of a liquidator, they may appoint an eligible insolvency practitioner as liquidator in his place.

(6A)  If the creditors refuse or fail to accept the resignation of the liquidator, he may apply to the Court for leave to resign in accordance with the Rules.".

Section 189 amended.

**73.**    Section 189 of the principal Act is amended

(a)    by deleting the marginal note and substituting the following marginal note:

"Appointment of replacement liquidator.";

(b)    by deleting subsection (1) and substituting the following subsection:

"    (1)    Where the liquidator of a company dies or resigns under section 188 and no liquidator is appointed in his place, the Court, on the application of a person specified in subsection (2) or on its own motion,

(a)    if there is at least one liquidator remaining in place, may appoint an eligible insolvency practitioner as liquidator in his place; or

(b)    if the liquidator who has died or resigned was the sole liquidator of the company, shall appoint the Official Receiver or an eligible insolvency practitioner in his place."; and

(c)    by inserting after subsection (2), the following subsections:

"    (3)  Where the Official Receiver is the liquidator of a company, an eligible insolvency practitioner may be appointed in his place

(a)    on the application of the Official Receiver, by the Court; or

24

(b)     with the consent of the Official Receiver, by resolution of the creditors at a meeting called by the Official Receiver for that purpose.

(4)  An application may be made under subsection (3) notwithstanding that the Court has refused to make an appointment on a previous application by the Official Receiver.".

74.     Section 193 of the principal Act is amended

*Section 193 amended.*

(a)     in subsection (1), by deleting the words "The liquidator" and substituting the words "Subject to subsection (7), the liquidator"; and

(b)     by inserting after subsection (6), the following subsection:

"       (7)  The liquidator is not required to settle a list of members under this section if it appears to him that it will not be necessary to require any member to contibute to the assets of the company or to adjust the rights of members.".

75.     Section 202 of the principal Act is amended by deleting the words "trustee in bankruptcy" and substituting the words "bankruptcy trustee".

*Section 202 amended.*

76.     Section 209 of the principal Act is amended

*Section 209 amended.*

(a)     in subsection (3), by deleting the words "As soon" and substituting the words "Subject to subsection (6A), as soon"; and

(b)     by inserting after subsection (6), the following subsection:

"       (6A)  The liquidator is not required to admit or reject claims under subsection (3) at any time when it appears to him that the company has insufficient assets to enable a distribution to be made to unsecured creditors.".

77.     Section 216 of the principal Act is amended

*Section 216 amended.*

(a)     in subsection (1), by deleting the words "The liquidator of a company may" and substituting the words "Where the liquidator of a company has sufficient funds to make a distribution, he shall, subject to the retention of such sums as may be necessary for his remuneration and the other

25

costs and expenses of the liquidation";

(b)   in subsection (2), by deleting the word "form" and substituting the word "from"; and

(c)   by inserting after subsection (2), the following subsection:

"    (3)   Where the liquidator makes more than one distribution, subsections (1) and (2) apply to each distribution.".

Section 225 amended.

**78.**   Section 225 of the principal Act is amended by inserting after subsection (3), the following subsection:

"    (4)   Subsection (3) does not apply to a liquidator appointed by the members of a company.".

Section 234 amended.

**79.**   Section 234(2) of the principal Act is amended

(a)   in paragraph (a)(i), by deleting the words "realisation and distribution" and substituting the words "realisations and distributions"; and

(b)   in paragraph (b), by inserting after the word "statement", the word "of".

Section 237 amended.

**80.**   Section 237 of the principal Act is amended

(a)   in subsection (1),

(i)   in the definition of "general insurance company", by inserting after the words "that is", the words "or was"; and

(ii)   in the definition of "long term insurance company", by inserting after the words "that is" and after the words "it is", the words "or was"; and

(b)   by inserting after subsection (1), the following subsections:

"    (2)   Subject to subsection (3), this Part applies, with such modifications as are necessary, to a company or a foreign company that has at no time held a licence as an insurer issued under the Insurance Act but which, immediately before the appointment of a liquidator, was

required to hold a licence as an insurer issued under that Act.

(3)   Section 239 does not apply to a company specified in subsection (2).".

**81.**   Section 238 of the principal Act is amended

<div style="text-align: right">Section 238 amended.</div>

(a)   in the marginal note, by deleting the words "Modification of Act in respect" and substituting the word "Liquidation";

(b)   by numbering the existing provision as subsection (1);

(c)   by inserting after the existing provision the following subsections:

"   (2)   The liquidator of an insurance company has a duty to obtain and consider such actuarial advice as is appropriate to enable him to properly conduct the liquidation of the company.

(3)   The Executive Council may, on the advice of the Commission, make Regulations with respect to the liquidation of insurance companies.

(4)   Subject to subsection (5), the Regulations made under subsection (3) may

(a)   modify or exclude the provisions of this Act and the Rules relating to the liquidation of companies in respect of insurance companies; and

(b)   make different provision for different persons, circumstances or cases.

(5)   Regulations made under subsection (3) shall not modify or exclude the provisions of this Part.".

<div style="text-align: right">Section 239 amended.</div>

**82.**   Section 239(4) of the principal Act is amended by inserting after the words "members of", the word "a".

<div style="text-align: right">Section 240 amended.</div>

**83.**   Section 240 of the principal Act is amended in subsections (3) and (4), by deleting the word "179" and substituting the word "163".

<div style="float:left; width:18%;">Section 242 amended.</div>

**84.**     Section 242(1) of the principal Act is amended by deleting the words "with a" in the first place where they occur.

<div style="float:left; width:18%;">Section 244 amended.</div>

**85.**     Section 244(1) of the principal Act is amended

(a)     by inserting after the definition of "insolvency transaction", the following definition:

""officer holder" means

(a)     in the case of a company in administration, its administrator; and

(b)     in the case of a company in liquidation, its liquidator;"; and

(b)     in paragraph (a) of the definition of "onset of insolvency", by inserting after the words "company is", the words "in administration or is".

<div style="float:left; width:18%;">Section 248 amended.</div>

**86.**     Section 248 of the principal Act is amended by deleting the words "the company" in the first place where it occurs and substituting the words "a company".

<div style="float:left; width:18%;">Section 249 amended.</div>

**87.**     Section 249 of the principal Act is amended

(a)     in subsection (1),

(i)     by deleting the words "liquidator of the company" and substituting the words "office holder"; and

(ii)     in paragraphs (c)(ii) and (c)(iii), by deleting the word "liquidator" and substituting the words "office holder"; and

(b)     in subsection (2),

(i)     in paragraph (d), by deleting the word "liquidator" and substituting the word "office holder"; and

(ii)     in paragraph (g), by deleting the word "prove" and substituting the word "submit a claim".

<div style="float:left; width:18%;">Section 250 amended.</div>

**88.**     Section 250 of the principal Act is amended in subsection (2)(b), by deleting the word "liquidator" and substituting the words "office holder".

89.      Section 255(2) of the principal Act is amended by deleting the word "are" and substituting the word "is". <span style="float:right">Section 255 amended.</span>

90.      Section 256(5) of the principal Act is amended by deleting the word "have" and substituting the words "has". <span style="float:right">Section 256 amended.</span>

91.      Section 258(1) of the principal Act is amended by deleting the word "make" in the first place where it occurs. <span style="float:right">Section 258 amended.</span>

92.      Section 260(3) of the principal Act is amended <span style="float:right">Section 260 amended.</span>

(a)      in paragraph (d), by deleting the word "or"; and

(b)      by redesignating the last paragraph as paragraph (f).

93.      Section 262(1) of the principal Act is amended <span style="float:right">Section 262 amended.</span>

(a)      in paragraph (b), by inserting after the semicolon the word "or";

(b)      in paragraph (c), by deleting the words "; or" at the end of the paragraph and substituting a full stop; and

(c)      by deleting paragraph (d).

94.      Section 271 of the principal Act is amended <span style="float:right">Section 271 amended.</span>

(a)      in subsection (1), by inserting before the words "prepare a written report", the words ", as soon as practicable,";

(b)      by inserting after subsection (4), the following subsections:

"(4A)  A liquidator, administrator or administrative receiver who prepares a report under subsection (1) shall not disclose the report to the creditors' committee, if any, or to any person other than the Official Receiver.

(4B)  Subsection (4A) does not prevent a liquidator, administrator or administrative receiver disclosing the report to any person properly employed or appointed by him, or acting for him, in the liquidation, administration or administrative receivership.

(4C)  A report provided to the Official Receiver under subsection (1) shall, in the absence of fraud or

malice, be absolutely privileged for the purposes of the law of defamation.

(4D)    Subsection (4C) shall not apply to the extent that the liquidator, administrator or administrative receiver, or a person to whom the report is disclosed under subsection (4B), discloses the report to another person in breach of subsection (4A).".

Section 272 amended.

95.    Section 272(2) of the principal Act is amended by deleting the words "Division 2" and substituting the words "Division 3" and by deleting the word "275" and substituting the word "281".

Section 274A inserted.

96.    The principal Act is amended by inserting after section 274, the following section:

"Order to deliver assets and documents.

274A.(1)    Where any person has in his possession or control any assets or documents to which the company appears to be entitled, the Court may, on the application of the office holder, require that person forthwith, or within such period as the Court may direct, to pay, deliver, convey, surrender or transfer the assets or documents to the office holder.

(2)    Subsection (3) has effect where the office holder

(a)    seizes or disposes of any asset which is not an asset of the company; and

(b)    at the time of seizure or disposal believes, and has reasonable grounds for believing, that he is entitled, whether in pursuance of an order of the Court or otherwise, to seize or dispose of that asset.

(3)    In the circumstances specified in subsection (2), the office holder

(a)    is not liable to any person in respect of any loss or damage resulting from the seizure or disposal except in so far as that loss or damage is caused by the office holder's own negligence; and

(b)    has a lien on the asset, or the proceeds of its sale, for such expenses as were incurred in connection with the seizure or disposal.".

Section 275
amended.

**97.**     Section 275 of the principal Act is amended by deleting the definition of "office holder".

Section 281
amended.

**98.**     Section 281 of the principal Act is amended in the definition of "office holder" by inserting after "provisional liquidator", the words "and, in respect of a company in administration or liquidation or in respect of which a provisional liquidator has been appointed, includes the Official Receiver".

Section 282
amended.

**99.**     Section 282 of the principal Act is amended

(a)     in subsection (1), by deleting the words "Subject to subsection (2), an" and substituting the word "An"; and

(b)     in subsection (2)(g), by inserting after the words "office holder is", the words "the Official Receiver or".

Section 284
amended.

**100.**     Section 284(2) of the principal Act is amended

(a)     in paragraph (a), by deleting the word "or" after the semi colon;

(b)     in paragraph (b), by deleting the full stop and substituting the words "; or"; and

(c)     by inserting after paragraph (b) the following paragraph:

"(c)     any other person who the applicant knows or suspects has in his possession or control any asset of the company or is indebted to the company.".

Section 285
amended.

**101.**     Section 285(4) of the principal Act is amended in paragraphs (a) and (b), by deleting the word "notice" and substituting the word "order".

Section 286
amended.

**102.**     Section 286(7) of the principal Act is amended by inserting after the words "this Act", the words "other than proceedings for a disqualification order under Part X".

Section 288
amended.

**103.**     Section 288(2) of the principal Act is amended by deleting the words "(AG's Chambers to complete)" and substituting the words "a police officer or a prescribed officer of the Court.".

Section 289
amended.

**104.**     Section 289(1) of the principal Act is amended by inserting after the word "time", the words "whilst an officer or".

31

No. 19 of 2006

# VIRGIN ISLANDS

## FINANCIAL SERVICES COMMISSION (AMENDMENT) ACT, 2006

### ARRANGEMENT OF SECTIONS

*Section*
1. Short title and commencement.
2. Section 2 amended.
3. Section 4 amended.
4. Section 5 amended.
5. Section 6 amended.
6. Section 9 amended.
7. Section 10 amended.
8. Heading to Part II amended.
9. Repeal and replacement of section 14.
10. Section 15 amended.
11. Section 16 amended.
12. Insertion of section 16A.
13. Section 17 amended.
14. Section 19 amended.
15. Section 20 amended.
16. Deletion and substitution of heading to Part IV.
17. Section 29 repealed.
18. Section 30 amended.
19. Section 32 amended.
20. Section 33 amended.
21. Insertion of sections 33A to 33D.
22. Amendment of heading to Part V.
23. Repeal and replacement of section 34.
24. Section 35 amended.
25. Section 36 amended.
26. Insertion of section 36A.
27. Section 37 amended.
28. Insertion of section 37A.
29. Section 38 amended.
30. Section 39 amended.
31. Repeal and replacement of section 40.
32. Insertion of Part VA.
33. Section 41 amended.
34. Section 41A inserted.
35. Insertion of sections 48A and 48B.
36. Section 49 repealed and replaced.
37. Section 50 amended.
38. Sections 50A and 50B amended.
39. Sections 50F and 50G amended.
40. Section 54 amended.

(ii) recklessly provides information which is false or misleading in a material respect;

(bb) for the purpose of obstructing or frustrating compliance with a request under section 30(1) or a notice issued by the Commission under section 32(1), he destroys, mutilates, defaces, hides or removes a document;"; and

(c) in paragraph (e), by deleting "section 49(1)" and substituting "section 49A(1)".

**41.** Section 62 of the principal Act is amended by inserting after subsection (1), the following subsections:

<div align="right">Section 62 amended.</div>

"(1A) Without limiting subsection (1), regulations made under subsection (1) may provide for the imposition by the Commission of administrative penalties on licensees that contravene a provision of this Act, any regulatory legislation, the Regulatory Code or any directive issued by the Commission.

(1B) An administrative penalty paid to the Commission under regulations made in accordance with subsection (1) shall be paid into the Commission's bank account for use by the Commission.".

**42.** The Insolvency Act, 2003 is amended

<div align="right">Amendment of the Insolvency Act, 2003.</div>

(a) in section 162(5), by inserting after the words "regulated person", the words "or the company is carrying on, or at any time has carried on, unlicensed financial services business"; and

(b) in section 163(3B), by inserting after the words "regulated person", the words "or the company is carrying on, or at any time has carried on, unlicensed financial services business".

**43.** The Financial Services (International Co-operation) Act, 2000 is repealed.

<div align="right">Repeal. No. 18 of 2000</div>

**44.** The principal Act is amended by repealing Schedule 2 and substituting the following Schedule:

<div align="right">Schedule 2 repealed and replaced.</div>

TAB 29

BVI Insolvency Rules 2005 §§ 4, 8, 12-14, 24

# VIRGIN ISLANDS

# INSOLVENCY RULES, 2005

# ARRANGEMENT OF RULES

*Rule*

## PART I

## PRELIMINARY PROVISIONS

**1**.   Short title and commencement.
**2**.   Interpretation.
**3**.   Prescribed financial services licence.

## PART II

## COURT PROCEDURE AND PRACTICE

### Division 1 – General

**4**.   Application of CPR.
**5**.   Exercise of Court's powers.
**6**.   Filing of documents with the Court.
**7**.   Filing of documents with the Registrar.

### Division 2 – Practice Directions and Guides

**8**.   Issue of practice directions.
**9**.   Practice directions to be published in Gazette.
**10**.   Compliance with practice directions.
**11**.   Practice guides.

### Division 3 – Applications

**12**.   Scope of rules.
**13**.   Types of application.
**14**.   Form and content of application.
**15**.   Application for appointment of insolvency practitioner.
**16**.   Filing of applications.
**17**.   Service of applications.
**18**.   Persons entitled to copy of certain applications.

# PART II

## COURT PROCEDURE AND PRACTICE

### Division 1 – General

Application of CPR.

**4.**    (1)    Subject to paragraph (2), except so far as inconsistent with the Act or the Rules or a practice direction issued under rule **8**, the CPR, practice directions issued under CPR Part 4 and practice guidance issued under CPR 4.6 apply to insolvency proceedings, with any necessary modifications.

(2)    The provisions of the CPR specified in Schedule 1 do not apply in insolvency proceedings.

Exercise of Court's powers.

**5.**    Subject to any provision in the Act or the Rules to the contrary or to any practice direction, the functions of the Court under the Act or the Rules may be exercised by a master.

Filing of documents with the Court.

**6.**    Every document filed with the Court shall have endorsed upon it the date and time at which it was filed and, if the Rules so provide, shall be sealed.

Filing of documents with the Registrar.

**7.**    (1)    Where a document is required or permitted under the Act or the Rules to be filed with the Registrar, the document is filed by delivering or posting it to the Registrar.

(2)    A document is filed with the Registrar on the day when it is received at the Companies Registry or, where it is received at a time when the Companies Registry is closed, on the next day on which the Companies Registry is open.

### Division 2 – Practice Directions and Guides

Issue of practice directions.

**8.**    (1)    The Chief Justice may issue a practice direction where required or permitted by the Act or the Rules.

(2)    Where there is no express provision in the Act or the Rules for such a direction, the Chief Justice may issue directions as to the practice and procedure to be followed with regard to insolvency proceedings before the Court.

(3)    In the case of any inconsistency between a practice direction issued under this rule and the CPR, or a practice direction or practice guide issued under the CPR, the practice direction issued under this Rule prevails.

18

**9.**    (1)    A practice direction issued under rule **8** shall be published in the Gazette.

(2)    A practice direction issued under rule **8** comes into effect on its publication in the Gazette or on such later date as may be specified in the direction.

Practice directions to be published in Gazette.

**10.**    (1)    In this rule, "relevant practice direction" means a practice direction made

(a)    under rule **8**; or

(b)    under CPR Part 4.

(2)    Unless there are good reasons for not doing so, a party shall comply with any relevant practice directions.

(3)    The Court may make an order under CPR Part 26 (Powers of Court) or CPR Part 64 (Costs – General) against a party who fails to comply with a relevant practice direction.

Compliance with practice directions.

**11.**    (1)    In this rule, "relevant practice guide" means a practice guide made

(a)    under this rule; or

(b)    under CPR 4.6.

(2)    The Court may issue practice guides to assist parties concerned with insolvency proceedings before the Court.

(3)    Parties shall have regard to any relevant practice guide.

(4)    The Court may take account of any failure of a party to comply with any relevant practice guide when deciding whether or not to make an order under CPR Part 26 (Powers of the Court) or CPR Part 64 (Costs – General).

Practice guides.

### Division 3 – Applications

**12.**    (1)    Except as otherwise provided in the Act or the Rules, this Division applies to every application made to the Court under the Act or the Rules.

(2)    Notwithstanding this Division, an application for an administration order, for the appointment of a liquidator and for a bankruptcy order shall also comply with the relevant provisions of the Act and the Rules.

Scope of rules.

Types of
application.

**13.**    (1)    An application to the Court which is not an application made in insolvency proceedings already before the Court shall be made as an "originating application".

(2)    An application to the Court made in insolvency proceedings already before the Court shall be made by way of an "ordinary application".

(3)    For the purposes of applying the CPR, an application made in insolvency proceedings, whether originating or ordinary, shall be regarded as a fixed date claim.

Form and content
of application.

**14.**    (1)    An application, whether originating or ordinary, shall be in writing and in the prescribed form, with such modifications as are appropriate.

(2)    In particular, an application shall state

(a)    the name of the applicant and the names of any respondents;

(b)    the nature of the relief or the order applied for or the directions sought from the Court;

(c)    the names and addresses of the persons, if any, on whom it is intended to serve the application or that no person is intended to be served;

(d)    where the Act or the Rules require that notice of the application is to be given to specified persons, the names and addresses of those persons so far as known to the applicant;

(e)    the applicant's name and his address for service within the Virgin Islands; and

(f)    the applicant's contact details.

(3)    Where an application is made on behalf of an applicant by a legal practitioner appointed by the applicant to act for him, the application shall state the full address of the legal practitioner, contact details for the legal practitioner and the name or reference of the individual dealing with the matter.

(4)    An originating application shall set out the grounds on which the applicant claims to be entitled to the relief or order sought.

(5)    The application shall be signed by the applicant if he is acting in person or, otherwise, by or on behalf of his legal practitioner.

20

(6)    An application may, and where the Rules so provide shall, be supported by an affidavit.

(7)    Where the address for service of an applicant changes, he shall immediately notify the Court and all other parties and any document sent to the original address before notice of the change is given is regarded as validly served.

**15.**    Any application that seeks the appointment of one or more insolvency practitioners in an insolvency proceeding shall have attached to it, a written statement signed by each of the proposed insolvency practitioners

Application for
appointment of
insolvency
practitioner.

(a)    stating that the insolvency practitioner consents to accept the appointment;

(b)    setting out details of any prior professional relationship that he has had with the company or individual concerned; and

(c)    stating that he is eligible to act as insolvency practitioner in respect of the company or individual concerned.

**16.**    (1)    An application, with any supporting documents, shall be filed with the Court together with one copy for exhibiting to the affidavit of service, if required, and sufficient additional copies for service.

Filing of
applications.

(2)    Unless the Rules otherwise provide, or the Court otherwise orders, the Court shall

(a)    fix a venue for the first hearing of the application;

(b)    seal each application and each copy of the application filed;

(c)    endorse on the application, and on each copy of the application filed, the date and time of filing and details of the venue fixed; and

(d)    return the copies of the application to the applicant.

**17.**    (1)    A copy of the application, endorsed in accordance with rule **16**(2), shall be served on

Service of
applications.

(a)    the respondent or respondents named in the application; and

(b)    any other person that the Court may direct.

Affidavits.    **22.**    (1)    Except as provided otherwise by the Act or the Rules, or as the Court otherwise orders, an affidavit in an insolvency proceeding may contain statements of information and belief.

(2)    The deponent of an affidavit in an insolvency proceeding,

(a)    shall state which of the statements in it are made from the deponent's own knowledge and which are matters of information and belief;

(b)    shall specify the means of his knowledge or belief as to the matters sworn to; and

(c)    if he is not an applicant, shall state the capacity in which and the authority by which he makes the affidavit.

(3)    Subject to paragraphs (1) and (2) and except as provided otherwise by the Act or the Rules or as the Court otherwise orders, CPR Part 30 applies to an affidavit sworn under the Act or the Rules with such modifications as the circumstances require.

## Division 4 – Service

Scope of rules concerning service.    **23.**    (1)    This Division applies where in an insolvency proceeding

(a)    a document is required or permitted to be served, sent or delivered to any person; or

(b)    notice of any matter is required or permitted to be given to any person.

(2)    In this Division, "registered office" has the meaning set out in the International Business Companies Act, the Companies Act or the BVI Business Companies Act, as the case may be.

Application of CPR.    **24.**    (1)    Except as otherwise provided in the Act or the Rules

(a)    CPR Parts 5 and 7 apply to the service of a document of a type specified in paragraph (2), as if the document was a claim form; and

(b)    CPR Parts 6 and 7 apply to the service of an ordinary application, a judgment or order and any other document

required or permitted to be served, sent or delivered in an
insolvency proceeding before the Court;

in each case with such modifications as are necessary.

(2)    Paragraph (1)(a) applies to the documents of the following types

(a)    an application for an administration order;

(b)    an application for the appointment of a liquidator;

(c)    an application for a bankruptcy order;

(d)    an originating application;

(e)    a statutory demand; and

(f)    an order for the examination of a person under section 284.

(3)    A document referred to in paragraph (2) shall be served in accordance
with paragraph (1)(a) on every person whom the Act or the Rules require to be
served with the document.

**25.**    (1)    Unless the Act or the Rules provide otherwise, the service of
documents in insolvency proceedings is the responsibility of the parties and will
not be undertaken by the Court.    Responsibility for service.

(2)    Paragraph (1) applies notwithstanding that a rule in the CPR
applicable in insolvency proceedings may state otherwise.

(3)    As soon as reasonably practicable after making an order in an
insolvency proceeding, the Court shall provide the applicant with, or send to the
applicant, sealed copies of the order for service.

**26.**    (1)    Subject to paragraphs (2) and (3), service on a company may be
effected by one of the methods of service specified in CPR 5.7 (Service on limited
company).    Service on company.

(2)    Service of a document of a type specified in Rule **24**(2)(a), (b), (d)
and (e)  shall be served on a company

(a)    at its registered office

(i)    by serving the application personally on a director,
officer or employee of the company,

TAB 30

BVI International Business Companies Act § 33

# BRITISH VIRGIN ISLANDS

# THE INTERNATIONAL BUSINESS COMPANIES ACT (CAP. 291)

Including amendments per
3 of 1988
10 of 1990
6 of 1991
19 of 1994

*The present document is an unofficial consolidation of the International Business Companies Act (CAP 291) and the amendments thereto. Though we made each and every effort to provide conformity to the original, no responsibility is assumed for any errors.*

*GLOBAL FINANCIAL ADVISERS LLC.*

(2) Without affecting subsection (1), where a person whose shares or other interests have been taken or seized as referred to in subsection (1) is other than a natural person, the person making the application under subsection (1), or the company itself, may apply to the court for an additional order for the company to treat the persons believed by the company to have held the direct or indirect beneficial interests in the share or other interests in the company as the holder of those shares or other interests.

(3) The court may, upon application made to it under subsection (1) or (2),
    (a) grant such relief as it considers equitable and proper; and
    (b) order that any shares of or other interests in the company vest in such trustees as the court may appoint upon such trusts and for such purposes as the court determines.

33.(1) Subject to any limitations or provisions to the contrary in its Memorandum or Articles, a company incorporated under this Act may purchase, redeem or otherwise acquire and hold its own shares but only out of surplus or in exchange for newly issued shares of equal value.

(1A) Subject to subsection (1), a company incorporated under this Act may not purchase, redeem or otherwise acquire its own shares without the consent of the member whose shares are to be purchased, redeemed or otherwise acquired, unless the company is permitted to purchase, redeem or otherwise acquire the shares without that consent by virtue of
    (a) the provisions of the Memorandum or Articles of the company;
    (b) the designations, powers, preferences, rights, qualifications, limitations and restrictions with which the shares were issued; or
    (c) the subscription agreement for the issue of the shares.

(2) No purchase, redemption or other acquisition permitted under subsection (1) shall be made unless the directors determine that immediately after the purchase, redemption or other acquisition
    (a) the company will be able to satisfy its liabilities as they become due in the ordinary course of its business; and
    (b) the realizable value of the assets of the company will not be less than the sum of its total liabilities, other than deferred taxes, as shown in the books of account, and its capital; and, in the absence of fraud, the decision of the directors as to the realizable value of the assets of the company is conclusive, unless a question of law is involved.

(3) A determination by the directors under subsection (2) is not required where shares are purchased, redeemed or otherwise acquired,
    (a) pursuant to a right of a member to have his shares redeemed or to have his shares exchanged for money or other property of the company;
    (b) by virtue of a transfer of capital pursuant to paragraph (b) (iii) of section 35(1);
    (c) by virtue of the provisions of section 83; and
    (d) pursuant to an order of the court.

(4) Subject to any limitations or provisions to the contrary in the Memorandum or Articles, shares that a company purchases, redeems or otherwise acquires may be cancelled or held as treasury shares unless the shares are purchased, redeemed or otherwise acquired by virtue of a reduction in capital in a manner that would be a contravention of the requirements of section 35(3), in which case they shall be cancelled but they shall be available for reissue; and upon the cancellation of a share, the amount included as capital of the company with respect to that share shall be deducted from the capital of the company.

(5) A company incorporated under this Act may purchase, redeem or otherwise acquire the shares of the company at a price lower than fair value if permitted by, and then only in accordance with, the terms of

    (a) its Memorandum or Articles; or

    (b) a written agreement for the subscription for the shares to be purchased, redeemed or otherwise acquired.

34. Where shares in a company incorporated under this Act

    (a) are held by the company as treasury shares; or

    (b) are held by another company of which the first company holds, directly or indirectly, shares having more than 50 per cent of the votes in the election of directors of the other company,

the shares of the first company are not entitled to vote or to have dividends paid thereon and shall not be treated as outstanding for any purpose under this Act except for purposes of determining the capital of the first Company.

35.(1) Subject to any limitations or provisions to the contrary in the Memorandum or Articles and subject to subsections (3) and (4), the capital of a company incorporated under this Act may, by a resolution of members or by a resolution of directors be

    (a) increased by transferring an amount out of the surplus of the company to capital; or

    (b) reduced by transferring an amount out of capital of the company to surplus.

(2) R E P E A L E D.

(3) No reduction of capital shall be effected that reduces the capital of the company to an amount that is less than the sum of

    (a) the aggregate par value of

        (i)   all outstanding shares with par value, and

        (ii) all shares with par value held by the company as treasury shares; and

    (b) the aggregate of the amounts designated as capital of

        (i)   all outstanding shares without par value, and

        (ii) all shares without par value held by the company as treasury shares that are entitled to a preference, if any, in the assets of the company upon liquidation of the company.

(4) No reduction of capital shall be effected under subsection (1) unless the directors determine that immediately after the reduction

    (a) the company will be able to satisfy its liabilities as they become due in the ordinary course of its business; and

    (b) the realizable value of the assets of the company will not be less than its total liabilities, other than deferred taxes, as shown in the books of account, and its remaining capital; and, in the absence of fraud, the decision of the directors as to the realizable value of the assets of the company is conclusive, unless a question of law is involved.

36.  (1) Subject to any limitations or provisions to the contrary in its Memorandum or Articles, a company incorporated under this Act may, by a resolution of directors, declare and pay dividends in money, shares or other property.

    (2) Dividends shall only be declared and paid out of surplus.

    (3) No dividend shall be declared and paid unless the directors determine that immediately after the payment of the dividend

TAB 31

English Bankruptcy Act 1914 § 30

# Bankruptcy Act, 1914.

### [4 & 5 Geo. 5.    Ch. **59**.]

## ARRANGEMENT OF SECTIONS.

A.D. 1914.

### Part I.

#### Proceedings from Act of Bankruptcy to Discharge.

*Acts of Bankruptcy.*

Section.
1. Acts of bankruptcy.
2. Bankruptcy notices.

*Receiving Order.*

3. Jurisdiction to make receiving order.
4. Conditions on which creditor may petition.
5. Proceedings and order on creditor's petition.
6. Debtor's petition and order thereon.
7. Effect of receiving order.
8. Power to appoint interim receiver.
9. Power to stay pending proceedings.
10. Power to appoint special manager.
11. Advertisement of receiving order.
12. Power to rescind receiving order in certain cases.

*Proceedings consequent on Order.*

13. First and other meetings of creditors.
14. Debtor's statement of affairs.

*Public Examination of Debtor.*

15. Public examination of debtor.

*Composition or Scheme of Arrangement.*

16. Compositions and schemes of arrangement.
17. Effect of composition or scheme.

A                                    1

A.D. 1914. contract with him, or any person who was surety or in the
nature of a surety for him.

Power for
court to annul
adjudication in
certain cases.

**29.**—(1) Where in the opinion of the court a debtor ought not to have been adjudged bankrupt, or where it is proved to the satisfaction of the court that the debts of the bankrupt are paid in full, the court may, on the application of any person interested, by order annul the adjudication.

(2) Where an adjudication is annulled under this section, all sales and dispositions of property and payments duly made, and all acts theretofore done, by the official receiver, trustee, or other person acting under their authority, or by the court, shall be valid, but the property of the debtor who was adjudged bankrupt shall vest in such person as the court may appoint, or, in default of any such appointment, revert to the debtor for all his estate or interest therein on such terms and subject to such conditions, if any, as the court may declare by order.

(3) Notice of the order annulling an adjudication shall be forthwith gazetted and published in a local paper.

(4) For the purposes of this section, any debt disputed by a debtor shall be considered as paid in full if the debtor enters into a bond, in such sum and with such sureties as the court approves, to pay the amount to be recovered in any proceeding for the recovery of or concerning the debt, with costs, and any debt due to a creditor who cannot be found or cannot be identified shall be considered as paid in full if paid into court.

## Part II.

### Administration of Property.

#### *Proof of Debts.*

Description of
debts provable
in bankruptcy.

**30.**—(1) Demands in the nature of unliquidated damages arising otherwise than by reason of a contract, promise, or breach of trust shall not be provable in bankruptcy.

(2) A person having notice of any act of bankruptcy available against the debtor shall not prove under the order for any debt or liability contracted by the debtor subsequently to the date of his so having notice.

(3) Save as aforesaid, all debts and liabilities, present or future, certain or contingent, to which the debtor is subject at the date of the receiving order, or to which he may become subject before his discharge by reason of any obligation incurred before the date of the receiving order, shall be deemed to be debts provable in bankruptcy.

(4) An estimate shall be made by the trustee of the value of any debt or liability provable as aforesaid, which by reason of its being subject to any contingency or contingencies, or for any other reason, does not bear a certain value.

(5) Any person aggrieved by any estimate made by the trustee as aforesaid may appeal to the court.

(6) If, in the opinion of the court, the value of the debt or liability is incapable of being fairly estimated, the court may

28

[4 & 5 Geo. 5.]          *Bankruptcy Act,* 1914.          [Ch. **59.**]

A.D. 1914.

make an order to that effect, and thereupon the debt or liability shall, for the purposes of this Act, be deemed to be a debt not provable in bankruptcy.

(7) If, in the opinion of the court, the value of the debt or liability is capable of being fairly estimated, the court may direct the value to be assessed before the court itself without the intervention of a jury, and may give all necessary directions for this purpose, and the amount of the value when assessed shall be deemed to be a debt provable in bankruptcy.

(8) "Liability" shall, for the purposes of this Act, include—

(*a*) any compensation for work or labour done ;

(*b*) any obligation or possibility of an obligation to pay money or money's worth on the breach of any express or implied covenant, contract, agreement, or undertaking, whether the breach does or does not occur, or is or is not likely to occur or capable of occurring, before the discharge of the debtor ;

(*c*) generally, any express or implied engagement, agreement, or undertaking, to pay, or capable of resulting in the payment of, money or money's worth ; whether the payment is, as respects amount, fixed or unliquidated ; as respects time, present or future, certain or dependent on any one contingency or on two or more contingencies ; as to mode of valuation, capable of being ascertained by fixed rules or as matter of opinion.

**31.** Where there have been mutual credits, mutual debts or other mutual dealings, between a debtor against whom a receiving order shall be made under this Act and any other person proving or claiming to prove a debt under the receiving order, an account shall be taken of what is due from the one party to the other in respect of such mutual dealings, and the sum due from the one party shall be set off against any sum due from the other party, and the balance of the account, and no more, shall be claimed or paid on either side respectively ; but a person shall not be entitled under this section to claim the benefit of any set-off against the property of a debtor in any case where he had, at the time of giving credit to the debtor, notice of an act of bankruptcy committed by the debtor and available against him.

Mutual credit and set-off.

**32.** With respect to the mode of proving debts, the right of proof by secured and other creditors, the admission and rejection of proofs, and the other matters referred to in the Second Schedule to this Act, the rules in that schedule shall be observed.

Rules as to proof of debts.

**33.**—(1) In the distribution of the property of a bankrupt there shall be paid in priority to all other debts—

Priority of debts.

(*a*) All parochial or other local rates due from the bankrupt at the date of the receiving order, and having become due and payable within twelve months next before that time, and all assessed taxes, land tax, property

29

TAB 32

English Civil Procedures and Rules 19.10-15

 Justice

# PART 19 - PARTIES AND GROUP LITIGATION

**Contents of this Part**

| Title | Number |
| --- | --- |
| Parties – general | **Rule 19.1** |
| I ADDITION AND SUBSTITUTION OF PARTIES | |
| Change of parties – general | **Rule 19.2** |
| Provisions applicable where two or more persons are jointly entitled to a remedy | **Rule 19.3** |
| Procedure for adding and substituting parties | **Rule 19.4** |
| Human Rights | **Rule 19.4A** |
| Special provisions about adding or substituting parties after the end of a relevant limitation period | **Rule 19.5** |
| Special rules about parties in claims for wrongful interference with goods | **Rule 19.5A** |
| II REPRESENTATIVE PARTIES | |
| Representative parties with same interest | **Rule 19.6** |
| Representation of interested persons who cannot be ascertained etc. | **Rule 19.7** |
| Representation of beneficiaries by trustees etc. | **Rule 19.7A** |
| Postal Services Act 2000 (c.26) | **Rule 19.7B** |
| Death | **Rule 19.8** |
| Power to make judgements binding on non-parties | **Rule 19.8A** |
| Derivative claims – how started | **Rule 19.9** |
| Derivative claims under Chapter 1 of Part 11 of the Companies Act 2006 – application for permission | **Rule 19.9A** |
| Derivative claims under Chapter 1 of Part 11 of the Companies Act 2006 – members of companies taking over claims by companies or other members | **Rule 19.9B** |
| Derivative claims – other bodies corporate and trade unions | **Rule 19.9C** |

| Derivative claims arising in the course of other proceedings | Rule 19.9D |
| Derivative claims – costs | Rule 19.9E |
| Derivative claims – discontinuance and settlement | Rule 19.9F |
| III GROUP LITIGATION | |
| Definition | Rule 19.10 |
| Group Litigation Order | Rule 19.11 |
| Effect of the GLO | Rule 19.12 |
| Case management | Rule 19.13 |
| Removal from the register | Rule 19.14 |
| Test claims | Rule 19.15 |

## Parties – general

**19.1** Any number of claimants or defendants may be joined as parties to a claim.

Back to top

# I ADDITION AND SUBSTITUTION OF PARTIES

## Change of parties – general

**19.2**

(1) This rule applies where a party is to be added or substituted except where the case falls within rule 19.5 (special provisions about changing parties after the end of a relevant limitation period[(GL)]).

(2) The court may order a person to be added as a new party if –

(a) it is desirable to add the new party so that the court can resolve all the matters in dispute in the proceedings; or

(b) there is an issue involving the new party and an existing party which is connected to the matters in dispute in the proceedings, and it is desirable to add the new party so that the court can resolve that issue.

(3) The court may order any person to cease to be a party if it is not desirable for that person to be a party to the proceedings.

(4) The court may order a new party to be substituted for an existing one if –

(a) the existing party's interest or liability has passed to the new party; and

(b) it is desirable to substitute the new party so that the court can resolve the matters in dispute in the proceedings.

Back to top

## Derivative claims – costs

**19.9E**

The court may order the company, body corporate or trade union for the benefit of which a derivative claim is brought to indemnify the claimant against liability for costs incurred in the permission application or in the derivative claim or both.

Back to top

## Derivative claims – discontinuance and settlement

**19.9F**  Where the court has given permission to continue a derivative claim, the court may order that the claim may not be discontinued, settled or compromised without the permission of the court.

Back to top

# III GROUP LITIGATION

## Definition

**19.10**  A Group Litigation Order ('GLO') means an order made under rule 19.11 to provide for the case management of claims which give rise to common or related issues of fact or law (the 'GLO issues').

Back to top

## Group Litigation Order

**19.11**

(1) The court may make a GLO where there are or are likely to be a number of claims giving rise to the GLO issues.

(Practice Direction 19B provides the procedure for applying for a GLO)

(2) A GLO must –

(a) contain directions about the establishment of a register (the 'group register') on which the claims managed under the GLO will be entered;

(b) specify the GLO issues which will identify the claims to be managed as a group under the GLO; and

(c) specify the court (the 'management court') which will manage the claims on the group register.

(3) A GLO may –

(a) in relation to claims which raise one or more of the GLO issues –

(i) direct their transfer to the management court;

(ii) order their stay(GL) until further order; and

(iii) direct their entry on the group register;

(b) direct that from a specified date claims which raise one or more of the GLO issues should be started in the management court and entered on the group register; and

(c) give directions for publicising the GLO.

Back to top

## Effect of the GLO

**19.12**

(1) Where a judgment or order is given or made in a claim on the group register in relation to one or more GLO issues –

(a) that judgment or order is binding on the parties to all other claims that are on the group register at the time the judgment is given or the order is made unless the court orders otherwise; and

(b) the court may give directions as to the extent to which that judgment or order is binding on the parties to any claim which is subsequently entered on the group register.

(2) Unless paragraph (3) applies, any party who is adversely affected by a judgment or order which is binding on him may seek permission to appeal the order.

(3) A party to a claim which was entered on the group register after a judgment or order which is binding on him was given or made may not –

(a) apply for the judgment or order to be set aside(GL), varied or stayed(GL); or

(b) appeal the judgment or order,

but may apply to the court for an order that the judgment or order is not binding on him.

(4) Unless the court orders otherwise, disclosure of any document relating to the GLO issues by a party to a claim on the group register is disclosure of that document to all parties to claims –

(a) on the group register; and

(b) which are subsequently entered on the group register.

Back to top

## Case management

**19.13**  Directions given by the management court may include directions –

(a) varying the GLO issues;

(b) providing for one or more claims on the group register to proceed as test claims;

(c) appointing the solicitor of one or more parties to be the lead solicitor for the claimants or defendants;

(d) specifying the details to be included in a statement of case in order to show that the criteria for entry of the claim on the group register have been met;

(e) specifying a date after which no claim may be added to the group register unless the court gives permission; and

(f) for the entry of any particular claim which meets one or more of the GLO issues on the group register.

(Part 3 contains general provisions about the case management powers of the court)

Back to top

## Removal from the register

**19.14**

(1) A party to a claim entered on the group register may apply to the management court for the claim to be removed from the register.

(2) If the management court orders the claim to be removed from the register it may give directions about the future management of the claim.

Back to top

## Test claims

**19.15**

(1) Where a direction has been given for a claim on the group register to proceed as a test claim and that claim is settled, the management court may order that another claim on the group register be substituted as the test claim.

(2) Where an order is made under paragraph (1), any order made in the test claim before the date of substitution is binding on the substituted claim unless the court orders otherwise.

Back to top

## Footnotes

1.   1980 c.58. Back to text
2.   1984 c.16. Back to text
3.   2006 c. 46. Back to text

TAB 33

English Companies Act 1985
§§ 360, 518, 611, 612, Table A, regulation 5

# Companies Act 1985

## CHAPTER 6

**A Table showing the derivation of the provisions of this consolidation Act will be found at the end of the Act. The Table has no official status.**

# ARRANGEMENT OF SECTIONS

## PART I

### FORMATION AND REGISTRATION OF COMPANIES; JURIDICAL STATUS AND MEMBERSHIP

### CHAPTER I

### COMPANY FORMATION

#### *Memorandum of association*

Section
1. Mode of forming incorporated company.
2. Requirements with respect to memorandum.
3. Forms of memorandum.
4. Resolution to alter objects.
5. Procedure for objecting to alteration.
6. Provisions supplementing ss. 4, 5.

#### *Articles of association*

7. Articles prescribing regulations for companies.
8. Tables A, C, D and E.
9. Alteration of articles by special resolution.

#### *Registration and its consequences*

10. Documents to be sent to registrar.
11. Minimum authorised capital (public companies).
12. Duty of registrar.
13. Effect of registration.
14. Effect of memorandum and articles.
15. Memorandum and articles of company limited by guarantee.
16. Effect of alteration on company's members.
17. Conditions in memorandum which could have been in articles.
18. Amendments of memorandum or articles to be registered.
19. Copies of memorandum and articles to be given to members.
20. Issued copy of memorandum to embody alterations.
21. Registered documentation of Welsh companies.

A

246     c. 6          *Companies Act 1985*

PART XI
CHAPTER II
Power to
close register.

**358.** A company may, on giving notice by advertisement in a newspaper circulating in the district in which the company's registered office is situated, close the register of members for any time or times not exceeding in the whole 30 days in each year.

Power of
court to
rectify
register.

**359.**—(1) If—

(a) the name of any person is, without sufficient cause, entered in or omitted from a company's register of members, or

(b) default is made or unnecessary delay takes place in entering on the register the fact of any person having ceased to be a member,

the person aggrieved, or any member of the company, or the company, may apply to the court for rectification of the register.

(2) The court may either refuse the application or may order rectification of the register and payment by the company of any damages sustained by any party aggrieved.

(3) On such an application the court may decide any question relating to the title of a person who is a party to the application to have his name entered in or omitted from the register, whether the question arises between members or alleged members, or between members or alleged members on the one hand and the company on the other hand, and generally may decide any question necessary or expedient to be decided for rectification of the register.

(4) In the case of a company required by this Act to send a list of its members to the registrar of companies, the court, when making an order for rectification of the register, shall by its order direct notice of the rectification to be given to the registrar.

Trusts not to
be entered
on register in
England and
Wales.

**360.** No notice of any trust, expressed, implied or constructive, shall be entered on the register, or be receivable by the registrar, in the case of companies registered in England and Wales.

Register to be
evidence.

**361.** The register of members is prima facie evidence of any matters which are by this Act directed or authorised to be inserted in it.

Overseas
branch
registers.

**362.**—(1) A company having a share capital whose objects comprise the transaction of business in any of the countries or territories specified in Part I of Schedule 14 to this Act may cause to be kept in any such country or territory in which it transacts business a branch register of members resident in that country or territory.

**346**      c. 6                      *Companies Act 1985*

PART XX            *Grounds and effect of winding-up petition*

CHAPTER II        **517.**—(1) A company may be wound up by the court if—
Circumstances
in which            (a) the company has by special resolution resolved that the
company may             company be wound up by the court,
be wound up
by the court.       (b) being a public company which was registered as such on
                        its original incorporation, the company has not been
                        issued with a certificate under section 117 (public
                        company share capital requirements) and more than a
                        year has expired since it was so registered,

                    (c) it is an old public company, within the meaning of
                        section 1 of the Consequential Provisions Act,

                    (d) the company does not commence its business within a
                        year from its incorporation or suspends its business for
                        a whole year,

                    (e) the number of members is reduced below 2,

                    (f) the company is unable to pay its debts,

                    (g) the court is of the opinion that it is just and equitable
                        that the company should be wound up.

(2) In Scotland, a company which the Court of Session has
jurisdiction to wind up may be wound up by the Court if there
is subsisting a floating charge over property comprised in the
company's property and undertaking, and the court is satisfied
that the security of the creditor entitled to the benefit of the
floating charge is in jeopardy.

For this purpose a creditor's security is deemed to be in
jeopardy if the Court is satisfied that events have occurred or
are about to occur which render it unreasonable in the creditor's
interests that the company should retain power to dispose of the
property which is subject to the floating charge.

Definition of      **518.**—(1) A company is deemed unable to pay its debts—
inability to pay
debts.              (a) if a creditor (by assignment or otherwise) to whom the
                        company is indebted in a sum exceeding £750 then
                        due has served on the company, by leaving it at the
                        company's registered office, a written demand requir-
                        ing the company to pay the sum so due and the com-
                        pany has for 3 weeks thereafter neglected to pay the
                        sum or to secure or compound for it to the reasonable
                        satisfaction of the creditor, or

                    (b) if, in England and Wales, execution or other process
                        issued on a judgment, decree or order of any court
                        in favour of a creditor of the company is returned
                        unsatisfied in whole or in part, or

                    (c) if, in Scotland, the induciae of a charge for payment
                        on an extract decree, or an extract registered bond, or
                        an extract registered protest, have expired without pay-
                        ment being made, or

*Companies Act 1985*        c. **6**        **347**

(d) if, in Northern Ireland, a certificate of unenforceability has been granted in respect of a judgment against the company, or    **PART XX**
**CHAPTER II**

(e) if it is proved to the satisfaction of the court that the company is unable to pay its debts (and, in determining that question, the court shall take into account the company's contingent and prospective liabilities).

(2) The money sum for the time being specified in subsection (1)(a) is subject to increase or reduction by regulations under section 664; but no increase of it affects any case in which the winding-up petition was presented before the coming into force of the increase.

**519.**—(1) Subject to the provisions of this section, an application to the court for the winding up of a company shall be by petition presented either by the company or by any creditor or creditors (including any contingent or prospective creditor or creditors), contributory or contributories, or by all or any of those parties, together or separately.    Application for winding up.

(2) Except as mentioned below, a contributory is not entitled to present a winding-up petition unless either—

(a) the number of members is reduced below 2, or

(b) the shares in respect of which he is a contributory, or some of them, either were originally allotted to him, or have been held by him, and registered in his name, for at least 6 months during the 18 months before the commencement of the winding up, or have devolved on him through the death of a former holder.

(3) A person who is liable under section 504 to contribute to a company's assets in the event of its being wound up may petition on either of the grounds set out in section 517(1)(f) and (g), and subsection (2) above does not then apply; but unless the person is a contributory otherwise than under section 504 he may not in his character as contributory petition on any other ground.

This subsection is deemed included in Chapter VII of Part V for the purposes of the Secretary of State's power to make regulations under section 179.

(4) If the ground of the petition is that in section 517(1)(b) or (c), a winding-up petition may be presented by the Secretary of State.

(5) The court shall not hear a petition presented by a contingent or prospective creditor until such security for costs has been given as the court thinks reasonable (or until caution is found, if so ordered by a Scottish court) and until a prima facie case for winding up has been established to the satisfaction of the court.

382        c. 6            *Companies Act 1985*

PART XX

## CHAPTER V

### PROVISIONS APPLICABLE TO EVERY MODE OF WINDING UP

#### *Proof and ranking of claims*

Debts of all descriptions may be proved.

**611.**—(1) In every winding up (subject, in the case of insolvent companies, to the application in accordance with this Act of the law of bankruptcy) all debts payable on a contingency, and all claims against the company, present or future, certain or contingent, ascertained or sounding only in damages, are admissible to proof against the company.

(2) A just estimate is to be made (so far as possible) of the value of such debts or claims as may be subject to any contingency or sound only in damages, or for some other reason do not bear a certain value.

Application of bankruptcy rules (England and Wales).

**612.**—(1) In the winding up of an insolvent company registered in England and Wales the same rules prevail and are to be observed with regard to the respective rights of secured and unsecured creditors, and to debts provable and to the valuation of annuities and future and contingent liabilities, as are in force for the time being under the law of bankruptcy in England and Wales with respect to the estates of persons adjudged bankrupt.

(2) All those who in any such case would be entitled to prove for and receive dividends out of the company's assets may come in under the winding up and make such claims against the company as they respectively are entitled to by virtue of this section.

Ranking of claims (Scotland).
1913 c. 20.

**613.**—(1) In the winding up of a company registered in Scotland, the following provisions of the Bankruptcy (Scotland) Act 1913—

> (a) sections 45 to 62 regarding voting and ranking for payment of dividends,
> (b) section 96 (reckoning of majorities), and
> (c) section 105 (interruption of prescription),

apply, so far as is consistent with this Act, in like manner as they apply in the sequestration of a bankrupt's estate, with the substitutions specified below, and with any other necessary modifications.

(2) The substitutions to be made in those sections of the Act of 1913 are as follows—

> (a) for references to sequestration, substitute references to winding up,
> (b) for references to the sheriff, substitute references to the court,

# Appendix 2:
# Companies Act 1985, Table A

[A2]

NOTES

The Companies Act 1985, Table A is set out in the Schedule to the Companies (Tables A to F) Regulations 1985, SI 1985/805. The Companies Act 1985, s 8(2), (3) (repealed by CA 2006, but see the note relating to SI 2008/2860 below) provide as follows—

"(2)   In the case of a company limited by shares, if articles are not registered or, if articles are registered, in so far as they do not exclude or modify Table A, that Table (so far as applicable, and as in force at the date of the company's registration) constitutes the company's articles, in the same manner and to the same extent as if articles in the form of that Table had been duly registered.
(3)   If in consequence of regulations under this section Table A is altered, the alteration does not affect a company registered before the alteration takes effect, or repeal as respects that company any portion of the Table.".

Following amendments by Regulations made under s 8 of the 1985 Act, this table is set out below both in its original form and in its form as amended at different dates.

Note also that this Table A was also amended by the Companies Act 1985 (Electronic Communications) Order 2000, SI 2000/3373. The 2000 Order was made under the powers conferred by the Electronic Communications Act 2000, ss 8, 9. It is assumed that these amendments (which do not fall within s 8(3) of the 1985 Act) are generally applicable.

Note that the Companies Act 2006 (Commencement No 8, Transitional Provisions and Savings) Order 2008, SI 2008/2860, Sch 2, para 1(1) (at [2.91]) provides that nothing in the Companies Act 2006 affects (a) the registration or re-registration of a company under the former Companies Acts, or the continued existence of a company by virtue of such registration or re-registration, or (b) the application in relation to an existing company of (i) Table B in the Joint Stock Companies Act 1856, (ii) Table A in any of the former Companies Acts, or (iii) the Companies (Tables A to F) Regulations 1985 or the Companies (Tables A to F) Regulations (Northern Ireland) 1986. See further the savings notes to the Companies (Tables A to F) Regulations 1985 at [6.3].

## TABLE A
## REGULATIONS FOR MANAGEMENT OF A COMPANY LIMITED BY SHARES

INTERPRETATION

1.   In these regulations—

["the Act" means the Companies Act 1985 including any statutory modification or re-enactment thereof for the time being in force and any provisions of the Companies Act 2006 for the time being in force;]

"the articles" means the articles of the company.

"clear days" in relation to the period of a notice means that period excluding the day when the notice is given or deemed to be given and the day for which it is given or on which it is to take effect.

["communication" means the same as in the Electronic Communications Act 2000.]

["electronic communication" means the same as in the Electronic Communications Act 2000.]

"executed" includes any mode of execution.

"office" means the registered office of the company.

"the holder" in relation to shares means the member whose name is entered in the register of members as the holder of the shares.

"the seal" means the common seal of the company.

"secretary" means the secretary of the company or any other person appointed to perform the duties of the secretary of the company, including a joint, assistant or deputy secretary.

"the United Kingdom" means Great Britain and Northern Ireland.

Unless the context otherwise requires, words or expressions contained in these regulations bear the same meaning as in the Act but excluding any statutory modification thereof not in force when these regulations become binding on the company.

NOTES

Definition "the Act" substituted by the Companies (Tables A to F) (Amendment) Regulations 2007, SI 2007/2541, reg 3, as from 1 October 2007; the original definition read as follows—

"the Act" means the Companies Act 1985 including any statutory modification or re-enactment thereof for the time being in force.".

Definitions "communication" and "electronic communication" inserted by the Companies Act 1985 (Electronic Communications) Order 2000, SI 2000/3373, art 32(1), Sch 1, para 1, as from 22 December 2000.

SHARE CAPITAL

2.   Subject to the provisions of the Act and without prejudice to any rights attached to any existing shares, any share may be issued with such rights or restrictions as the company may by ordinary resolution determine.

3.   Subject to the provisions of the Act, shares may be issued which are to be redeemed or are to be liable to be redeemed at the option of the company or the holder on such terms and in such manner as may be provided by the articles.

**4.** The company may exercise the powers of paying commissions conferred by the Act. Subject to the [provisions] of the Act, any such commission may be satisfied by the payment of cash or by the allotment of fully or partly paid shares or partly in one way and partly in the other.

### NOTES

Word in square brackets substituted for the original word "provision" by the Companies (Tables A to F) (Amendment) Regulations 1985, SI 1985/1052, reg 2, as from 1 August 1985.

**5.** Except as required by law, no person shall be recognised by the company as holding any share upon any trust and (except as otherwise provided by the articles or by law) the company shall not be bound by or recognise any interest in any share except an absolute right to the entirety thereof in the holder.

#### SHARE CERTIFICATES

**6.** Every member, upon becoming the holder of any shares, shall be entitled without payment to one certificate for all the shares of each class held by him (and, upon transferring a part of his holding of shares of any class, to a certificate for the balance of such holding) or several certificates each for one or more of his shares upon payment for every certificate after the first of such reasonable sum as the directors may determine. Every certificate shall be sealed with the seal and shall specify the number, class and distinguishing numbers (if any) of the shares to which it relates and the amount or respective amounts paid up thereon. The company shall not be bound to issue more than one certificate for shares held jointly by several persons and delivery of a certificate to one joint holder shall be a sufficient delivery to all of them.

**7.** If a share certificate is defaced, worn-out, lost or destroyed, it may be renewed on such terms (if any) as to evidence and indemnity and payment of the expenses reasonably incurred by the company in investigating evidence as the directors may determine but otherwise free of charge, and (in the case of defacement or wearing-out) on delivery up of the old certificate.

#### LIEN

**8.** The company shall have a first and paramount lien on every share (not being a fully paid share) for all moneys (whether presently payable or not) payable at a fixed time or called in respect of that share. The directors may at any time declare any share to be wholly or in part exempt from the provisions of this regulation. The company's lien on a share shall extend to any amount payable in respect of it.

**9.** The company may sell in such manner as the directors determine any shares on which the company has a lien if a sum in respect of which the lien exists is presently payable and is not paid within fourteen clear days after notice has been given to the holder of the share or to the person entitled to it in consequence of the death or bankruptcy of the holder, demanding payment and stating that if the notice is not complied with the shares may be sold.

**10.** To give effect to a sale the directors may authorise some person to execute an instrument of transfer of the shares sold to, or in accordance with the directions of, the purchaser. The title of the transferee to the shares shall not be affected by any irregularity in or invalidity of the proceedings in reference to the sale.

**11.** The net proceeds of the sale, after payment of the costs, shall be applied in payment of so much of the sum for which the lien exists as is presently payable, and any residue shall (upon surrender to the company for cancellation of the certificate for the shares sold and subject to a like lien for any moneys not presently payable as existed upon the shares before the sale) be paid to the person entitled to the shares at the date of the sale.

#### CALLS ON SHARES AND FORFEITURE

**12.** Subject to the terms of allotment, the directors may make calls upon the members in respect of any moneys unpaid on their shares (whether in respect of nominal value or premium) and each member shall (subject to receiving at least fourteen clear days' notice specifying when and where payment is to be made) pay to the company as required by the notice the amount called on his shares. A call may be required to be paid by instalments. A call may, before receipt by the company of any sum due thereunder, be revoked in whole or part and payment of a call may be postponed in whole or part. A person upon whom a call is made shall remain liable for calls made upon him notwithstanding the subsequent transfer of the shares in respect whereof the call was made.

**13.** A call shall be deemed to have been made at the time when the resolution of the directors authorising the call was passed.

**14.** The joint holders of a share shall be jointly and severally liable to pay all calls in respect thereof.

**15.** If a call remains unpaid after it has become due and payable the person from whom it is due and payable shall pay interest on the amount unpaid from the day it became due and payable until it is paid at the rate fixed by the terms of allotment of the share or in the notice of the call or, if no rate is fixed, at the appropriate rate (as defined by the Act) but the directors may waive payment of the interest wholly or in part.

**16.** An amount payable in respect of a share on allotment or at any fixed date, whether in respect of nominal value or premium or as an instalment of a call, shall be deemed to be a call and if it is not paid the provisions of the articles shall apply as if that amount had become due and payable by virtue of a call.

TAB 34

English Companies Act 2006 § 126



# Companies Act 2006

## CHAPTER 46

## CONTENTS

### PART 1

#### GENERAL INTRODUCTORY PROVISIONS

*Companies and Companies Acts*

1  Companies
2  The Companies Acts

*Types of company*

3  Limited and unlimited companies
4  Private and public companies
5  Companies limited by guarantee and having share capital
6  Community interest companies

### PART 2

#### COMPANY FORMATION

*General*

7  Method of forming company
8  Memorandum of association

*Requirements for registration*

9  Registration documents
10  Statement of capital and initial shareholdings
11  Statement of guarantee
12  Statement of proposed officers
13  Statement of compliance

58                                                      Companies Act 2006 (c. *46*)
                                                         *Part 8 — A company's members*
                                                         *Chapter 2 — Register of members*

and the company on the other hand, and generally may decide any question necessary or expedient to be decided for rectification of the register.

(4) In the case of a company required by this Act to send a list of its members to the registrar of companies, the court, when making an order for rectification of the register, shall by its order direct notice of the rectification to be given to the registrar.

### 126  Trusts not to be entered on register

No notice of any trust, expressed, implied or constructive, shall be entered on the register of members of a company registered in England and Wales or Northern Ireland, or be receivable by the registrar.

### 127  Register to be evidence

The register of members is prima facie evidence of any matters which are by this Act directed or authorised to be inserted in it.

### 128  Time limit for claims arising from entry in register

(1) Liability incurred by a company—
    (a) from the making or deletion of an entry in the register of members, or
    (b) from a failure to make or delete any such entry,
is not enforceable more than ten years after the date on which the entry was made or deleted or, as the case may be, the failure first occurred.

(2) This is without prejudice to any lesser period of limitation (and, in Scotland, to any rule that the obligation giving rise to the liability prescribes before the expiry of that period).

## CHAPTER 3

### OVERSEAS BRANCH REGISTERS

### 129  Overseas branch registers

(1) A company having a share capital may, if it transacts business in a country or territory to which this Chapter applies, cause to be kept there a branch register of members resident there (an "overseas branch register").

(2) This Chapter applies to—
    (a) any part of Her Majesty's dominions outside the United Kingdom, the Channel Islands and the Isle of Man, and
    (b) the countries or territories listed below.

| | |
|---|---|
| Bangladesh | Malaysia |
| Cyprus | Malta |
| Dominica | Nigeria |
| The Gambia | Pakistan |

TAB 35

English Cross-Border Insolvency Regulation

*Draft Legislation:* This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030

*Draft Regulations laid before Parliament under section 14 of the Insolvency Act 2000, for approval by resolution of each House of Parliament.*

## DRAFT STATUTORY INSTRUMENTS

# 2006 No. 0000

# INSOLVENCY

## COMPANIES

## INDIVIDUALS

# The Cross-Border Insolvency Regulations 2006

| | | |
|---|---|---|
| *Made* - - - - | | *2006* |
| *Coming into force* - - | | *2006* |

These Regulations are made in exercise of the powers conferred by section 14 of the Insolvency Act 2000(**1**).

In accordance with section 14(6) of that Act, the Lord Chancellor and the Scottish Ministers have agreed to the making of these Regulations.

A draft of these Regulations has been laid before Parliament in accordance with section 14(5) of that Act and approved by a resolution of each House of Parliament.

Accordingly, the Secretary of State makes the following Regulations:

**Citation, commencement and interpretation**

**1.**—(1)  These Regulations may be cited as the Cross-Border Insolvency Regulations 2006 and shall come into force on the day after the day on which they are made.

(2)  In these Regulations "the UNCITRAL Model Law" means the Model Law on cross-border insolvency as adopted by the United Nations Commission on International Trade Law on 30th May 1997.

**UNCITRAL Model Law to have force of law**

**2.**—(1)  The UNCITRAL Model Law shall have the force of law in Great Britain in the form set out in Schedule 1 to these Regulations (which contains the UNCITRAL Model Law with certain modifications to adapt it for application in Great Britain).

---

(**1**)  2000 c. 39.

*Document Generated: 2017-05-04*

*__Draft Legislation:__ This is a draft item of legislation. This draft has since been made as*
*a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

(2)  Without prejudice to any practice of the courts as to the matters which may be considered apart from this paragraph, the following documents may be considered in ascertaining the meaning or effect of any provision of the UNCITRAL Model Law as set out in Schedule 1 to these Regulations—

    (a)  the UNCITRAL Model Law;

    (b)  any documents of the United Nations Commission on International Trade Law and its working group relating to the preparation of the UNCITRAL Model Law; and

    (c)  the Guide to Enactment of the UNCITRAL Model Law (UNCITRAL document A/CN.9/442)(**2**) prepared at the request of the United Nations Commission on International Trade Law made in May 1997.

**Modification of British insolvency law**

**3.**—(1)  British insolvency law (as defined in article 2 of the UNCITRAL Model Law as set out in Schedule 1 to these Regulations) and Part 3 of the Insolvency Act 1986(**3**) shall apply with such modifications as the context requires for the purpose of giving effect to the provisions of these Regulations.

(2)  In the case of any conflict between any provision of British insolvency law or of Part 3 of the Insolvency Act 1986 and the provisions of these Regulations, the latter shall prevail.

**Procedural matters in England and Wales**

**4.**  Schedule 2 to these Regulations (which makes provision about procedural matters in England and Wales in connection with the application of the UNCITRAL Model Law as set out in Schedule 1 to these Regulations) shall have effect.

**Procedural matters in Scotland**

**5.**  Schedule 3 to these Regulations (which makes provision about procedural matters in Scotland in connection with the application of the UNCITRAL Model Law as set out in Schedule 1 to these Regulations) shall have effect.

**Notices delivered to the registrar of companies**

**6.**  Schedule 4 to these Regulations (which makes provision about notices delivered to the registrar of companies under these Regulations) shall have effect.

**Co-operation between courts exercising jurisdiction in relation to cross-border insolvency**

**7.**—(1)  An order made by a court in either part of Great Britain in the exercise of jurisdiction in relation to the subject matter of these Regulations shall be enforced in the other part of Great Britain as if it were made by a court exercising the corresponding jurisdiction in that other part.

(2)  However, nothing in paragraph (1) requires a court in either part of Great Britain to enforce, in relation to property situated in that part, any order made by a court in the other part of Great Britain.

(3)  The courts having jurisdiction in relation to the subject matter of these Regulations in either part of Great Britain shall assist the courts having the corresponding jurisdiction in the other part of Great Britain.

(**2**)  A United Nations Publication, ISBN 92-1-133608−2.
(**3**)  1986 c. 45.

*Document Generated: 2017-05-04*

**Draft Legislation:** This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030

**Disapplication of section 388 of the Insolvency Act 1986**

**8.** Nothing in section 388 of the Insolvency Act 1986(**4**) applies to anything done by a foreign representative—

    (a)  under or by virtue of these Regulations;

    (b)  in relation to relief granted or cooperation or coordination provided under these Regulations.

<div align="right">

Parliamentary Under Secretary of State for
Employment Relations and Consumer Affairs,
Department of Trade and Industry
</div>

Date

I agree to the making of these Regulations

Date                                                *C*

The Scottish Ministers agree to the making of these Regulations

Date                                A member of the Scottish Executive

---

(**4**)   Section 388 is amended by section 11 of the Bankruptcy (Scotland) Act 1993 (c. 6), section 4 of the Insolvency Act 2000 (c. 39), S.I.1994/2421. 2002/2708 and 2002/1240.

*Document Generated: 2017-05-04*

*Draft Legislation: This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

SCHEDULE 1                              Regulation 2(1)

UNCITRAL MODEL LAW ON CROSS-BORDER INSOLVENCY

# CHAPTER I

## General Provisions

*Article 1. Scope of Application*

**1.** This Law applies where—

   (a) assistance is sought in Great Britain by a foreign court or a foreign representative in connection with a foreign proceeding; or

   (b) assistance is sought in a foreign State in connection with a proceeding under British insolvency law; or

   (c) a foreign proceeding and a proceeding under British insolvency law in respect of the same debtor are taking place concurrently; or

   (d) creditors or other interested persons in a foreign State have an interest in requesting the commencement of, or participating in, a proceeding under British insolvency law.

**2.** This Law does not apply to a proceeding concerning—

   (a) a company holding an appointment under Chapter 1 of Part 2 of the Water Industry Act 1991(**5**) (water and sewage undertakers) or a qualifying licensed water supplier within the meaning of section 23(6) of that Act (meaning and effect of special administration order);

   (b) Scottish Water established under section 20 of the Water Industry (Scotland) Act 2002 (Scottish Water)(**6**);

   (c) a protected railway company within the meaning of section 59 of the Railways Act 1993(**7**) (railway administration order) (including that section as it has effect by virtue of section 19 of the Channel Tunnel Rail Link Act 1996(**8**) (administration));

   (d) a licence company within the meaning of section 26 of the Transport Act 2000(**9**) (air traffic services);

   (e) a public private partnership company within the meaning of section 210 of the Greater London Authority Act 1999(**10**) (public-private partnership agreement);

   (f) a protected energy company within the meaning of section 154(5) of the Energy Act 2004(**11**) (energy administration orders);

   (g) a building society within the meaning of section 119 of the Building Societies Act 1986(**12**) (interpretation);

---

(**5**)  1991 c. 56, section 23(6) was amended by the Water Act 2003 (c. 37), Schedule 8, paragraphs 2 and 8(1) and (6).
(**6**)  2002 asp 3.
(**7**)  1993 c. 43; relevant amendments to section 59 are made by the Railways Act 2005 (c. 14), Schedule 13, Part 1 and S.I. 2005/3050.
(**8**)  1996 c. 61.
(**9**)  2000 c. 38.
(**10**) 1999 c. 29.
(**11**) 2004 c. 20; there are amendments to section 119 which are not relevant to these Regulations.
(**12**) 1986 c. 53.

4

***Draft Legislation:*** *This is a draft item of legislation. This draft has since been made as*
*a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

    (h) a UK credit institution or an EEA credit institution or any branch of either such institution as those expressions are defined by regulation 2 of the Credit Institutions (Reorganisation and Winding Up) Regulations 2004(**13**) (interpretation);

    (i) a third country credit institution within the meaning of regulation 36 of the Credit Institutions (Reorganisation and Winding Up) Regulations 2004 (interpretation of this Part);

    (j) a person who has permission under or by virtue of Parts 4 or 19 of the Financial Services and Markets Act 2000(**14**) to effect or carry out contracts of insurance;

    (k) an EEA insurer within the meaning of regulation 2 of the Insurers (Reorganisation and Winding Up) Regulations 2004(**15**) (interpretation);

    (l) a person (other than one included in paragraph 2(j)) pursuing the activity of reinsurance who has received authorisation for that activity from a competent authority within an EEA State; or

    (m) any of the Concessionaires within the meaning of section 1 of the Channel Tunnel Act 1987(**16**).

**3.** In paragraph 2 of this article—

    (a) in sub-paragraph (j) the reference to "contracts of insurance" must be construed in accordance with—

        (i) section 22 of the Financial Services and Markets Act 2000 (classes of regulated activity and categories of investment);

        (ii) any relevant order under that section; and

        (iii) Schedule 2 to that Act (regulated activities);

    (b) in sub-paragraph (1) "EEA State" means a State, other than the United Kingdom, which is a contracting party to the agreement on the European Economic Area signed at Oporto on 2 May 1992.

**4.** The court shall not grant any relief, or modify any relief already granted, or provide any co-operation or coordination, under or by virtue of any of the provisions of this Law if and to the extent that such relief or modified relief or cooperation or coordination would—

    (a) be prohibited under or by virtue of—

        (i) Part 7 of the Companies Act 1989(**17**);

        (ii) Part 3 of the Financial Markets and Insolvency (Settlement Finality) Regulations 1999(**18**); or

        (iii) Part 3 of the Financial Collateral Arrangements (No. 2) Regulations 2003(**19**);

    in the case of a proceeding under British insolvency law; or

    (b) interfere with or be inconsistent with any rights of a collateral taker under Part 4 of the Financial Collateral Arrangements (No. 2) Regulations 2003 which could be exercised in the case of such a proceeding.

---

(**13**) S.I. 2004/1045.
(**14**) 2000 c. 8.
(**15**) S.I. 2004/353, to which there are amendments not relevant to these Regulations.
(**16**) 1987 c. 53.
(**17**) 1989 c. 40, amended by the Bank of England Act 1998 (c. 11), Schedule 5, paragraph 48, the Enterprise Act 2002 (c. 40), Schedule 17, paragraphs 44 to 47, S.I. 1991/880, 1992/1315, 1998/1748, 2001/3649 and 2001/3929.
(**18**) S.I. 1999/2979, relevant amendments are made by S.I. 2000/2952, 2001/3929, 2002/765 and 2003/2096.
(**19**) S.I. 2003/3226.

*Document Generated: 2017-05-04*

*Draft Legislation: This is a draft item of legislation. This draft has since been made as a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

**5.** Where a foreign proceeding regarding a debtor who is an insured in accordance with the provisions of the Third Parties (Rights against Insurers) Act 1930(**20**) is recognised under this Law, any stay and suspension referred to in article 20(1) and any relief granted by the court under article 19 or 21 shall not apply to or affect—

    (a) any transfer of rights of the debtor under that Act; or

    (b) any claim, action, cause or proceeding by a third party against an insurer under or in respect of rights of the debtor transferred under that Act.

**6.** Any suspension under this Law of the right to transfer, encumber or otherwise dispose of any of the debtor's assets—

    (a) is subject to section 26 of the Land Registration Act 2002(**21**) where owner's powers are exercised in relation to a registered estate or registered charge;

    (b) is subject to section 52 of the Land Registration Act 2002, where the powers referred to in that section are exercised by the proprietor of a registered charge; and

    (c) in any other case, shall not bind a purchaser of a legal estate in good faith for money or money's worth unless the purchaser has express notice of the suspension.

**7.** In paragraph 6—

    (a) "owner's powers" means the powers described in section 23 of the Land Registration Act 2002 and "registered charge" and "registered estate" have the same meaning as in section 132(1) of that Act; and

    (b) "legal estate" and "purchaser" have the same meaning as in section 17 of the Land Charges Act 1972(**22**).

*Article 2. Definitions*

For the purposes of this Law—

    (a) "British insolvency law" means—

        (i) in relation to England and Wales, provision extending to England and Wales and made by or under the Insolvency Act 1986(**23**) (with the exception of Part 3 of that Act) or by or under that Act as extended or applied by or under any other enactment (excluding these Regulations); and

        (ii) in relation to Scotland, provision extending to Scotland and made by or under the Insolvency Act 1986 (with the exception of Part 3 of that Act), the Bankruptcy (Scotland) Act 1985(**24**) or by or under those Acts as extended or applied by or under any other enactment (excluding these Regulations);

    (b) "British insolvency officeholder" means—

        (i) the official receiver within the meaning of section 399 of the Insolvency Act 1986(**25**) when acting as liquidator, provisional liquidator, trustee, interim receiver or nominee or supervisor of a voluntary arrangement;

        (ii) a person acting as an insolvency practitioner within the meaning of section 388(**26**) of that Act but shall not include a person acting as an administrative receiver; and

---

(**20**) 1930 c. 25.
(**21**) 2002 c. 9.
(**22**) 1972 c. 61; there are amendments to section 17 which are not relevant to these Regulations.
(**23**) 1986 c. 45.
(**24**) 1985 c. 66.
(**25**) Section 399 was amended by the Enterprise Act 2002 (c. 40), Schedule 23, paragraphs 1 and 14.
(**26**) Section 388 was amended by section 11 of the Bankruptcy (Scotland) Act 1993 (c. 6), section 4 of the Insolvency Act 2000 (c. 39), S.I. 1994/2421, 2002/2708 and 2002/1240.

Document Generated: 2017-05-04

*Draft Legislation:* This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030

    (iii) the Accountant in Bankruptcy within the meaning of section 1 of the Bankruptcy (Scotland) Act 1985(**27**) when acting as interim or permanent trustee;

(c) "the court" except as otherwise provided in articles 14(4) and 23(6)(b), means in relation to any matter the court which in accordance with the provisions of article 4 of this Law has jurisdiction in relation to that matter;

(d) "the EC Insolvency Regulation" means Council Regulation (EC) No. 1346/2000 of 29 May 2000 on Insolvency Proceedings(**28**);

(e) "establishment" means any place of operations where the debtor carries out a non-transitory economic activity with human means and assets or services;

(f) "foreign court" means a judicial or other authority competent to control or supervise a foreign proceeding;

(g) "foreign main proceeding" means a foreign proceeding taking place in the State where the debtor has the centre of its main interests;

(h) "foreign non-main proceeding" means a foreign proceeding, other than a foreign main proceeding, taking place in a State where the debtor has an establishment within the meaning of sub-paragraph (e) of this article;

(i) "foreign proceeding" means a collective judicial or administrative proceeding in a foreign State, including an interim proceeding, pursuant to a law relating to insolvency in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganisation or liquidation;

(j) "foreign representative" means a person or body, including one appointed on an interim basis, authorised in a foreign proceeding to administer the reorganisation or the liquidation of the debtor's assets or affairs or to act as a representative of the foreign proceeding;

(k) "hire-purchase agreement" includes a conditional sale agreement, a chattel leasing agreement and a retention of title agreement;

(l) "section 426 request" means a request for assistance in accordance with section 426 of the Insolvency Act 1986(**29**) made to a court in any part of the United Kingdom;

(m) "secured creditor" in relation to a debtor, means a creditor of the debtor who holds in respect of his debt a security over property of the debtor;

(n) "security" means—

    (i) in relation to England and Wales, any mortgage, charge, lien or other security; and

    (ii) in relation to Scotland, any security (whether heritable or moveable), any floating charge and any right of lien or preference and any right of retention (other than a right of compensation or set off);

(o) in the application of Articles 20 and 23 to Scotland, "an individual" means any debtor within the meaning of the Bankruptcy (Scotland) Act 1985;

(p) in the application of this Law to Scotland, references howsoever expressed to—

    (i) "filing" an application or claim are to be construed as references to lodging an application or submitting a claim respectively;

    (ii) "relief" and "standing" are to be construed as references to "remedy" and "title and interest" respectively; and

---

(**27**) Section 1 was amended by the Scotland Act 1998 (c. 46), Schedule 8, paragraph 22.
(**28**) Council Regulation (EC) 1346/2000, OJ No. L160, 30.06.00 p. 1.
(**29**) Relevant amendments are made to section 426 by the Insolvency Act 2000 (c. 39), Schedule 4, paragraph 16.

*Document Generated: 2017-05-04*

***Draft Legislation:*** *This is a draft item of legislation. This draft has since been made as*
*a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

(iii) a "stay" are to be construed as references to restraint, except in relation to continuation of actions or proceedings when they shall be construed as a reference to sist; and

(q) references to the law of Great Britain include a reference to the law of either part of Great Britain (including its rules of private international law).

### Article 3. International obligations of Great Britain under the EC Insolvency Regulation

To the extent that this Law conflicts with an obligation of the United Kingdom under the EC Insolvency Regulation, the requirements of the EC Insolvency Regulation prevail.

### Article 4. Competent court

**1.** The functions referred to in this Law relating to recognition of foreign proceedings and cooperation with foreign courts shall be performed by the High Court and assigned to the Chancery Division, as regards England and Wales and the Court of Session as regards Scotland.

**2.** Subject to paragraph 1 of this article, the court in either part of Great Britain shall have jurisdiction in relation to the functions referred to in that paragraph if—

(a) the debtor has—

(i) a place of business; or

(ii) in the case of an individual, a place of residence; or

(iii) assets,

situated in that part of Great Britain; or

(b) the court in that part of Great Britain considers for any other reason that it is the appropriate forum to consider the question or provide the assistance requested.

**3.** In considering whether it is the appropriate forum to hear an application for recognition of a foreign proceeding in relation to a debtor, the court shall take into account the location of any court in which a proceeding under British insolvency law is taking place in relation to the debtor and the likely location of any future proceedings under British insolvency law in relation to the debtor.

### Article 5. Authorisation of British insolvency officeholders to act in a foreign State

A British insolvency officeholder is authorised to act in a foreign State on behalf of a proceeding under British insolvency law, as permitted by the applicable foreign law.

### Article 6. Public policy exception

Nothing in this Law prevents the court from refusing to take an action governed by this Law if the action would be manifestly contrary to the public policy of Great Britain or any part of it.

### Article 7. Additional assistance under other laws

Nothing in this Law limits the power of a court or a British insolvency officeholder to provide additional assistance to a foreign representative under other laws of Great Britain.

### Article 8. Interpretation

In the interpretation of this Law, regard is to be had to its international origin and to the need to promote uniformity in its application and the observance of good faith.

Document Generated: 2017-05-04

*Draft Legislation:* This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030

# CHAPTER II

## ACCESS OF FOREIGN REPRESENTATIVES AND CREDITORS TO COURTS IN GREAT BRITAIN

### *Article 9. Right of direct access*

A foreign representative is entitled to apply directly to a court in Great Britain.

### *Article 10. Limited jurisdiction*

The sole fact that an application pursuant to this Law is made to a court in Great Britain by a foreign representative does not subject the foreign representative or the foreign assets and affairs of the debtor to the jurisdiction of the courts of Great Britain or any part of it for any purpose other than the application.

### *Article 11. Application by a foreign representative to commence a proceeding under British insolvency law*

A foreign representative appointed in a foreign main proceeding or foreign non-main proceeding is entitled to apply to commence a proceeding under British insolvency law if the conditions for commencing such a proceeding are otherwise met.

### *Article 12. Participation of a foreign representative in a proceeding under British insolvency law*

Upon recognition of a foreign proceeding, the foreign representative is entitled to participate in a proceeding regarding the debtor under British insolvency law.

### *Article 13. Access of foreign creditors to a proceeding under British insolvency law*

**1.** Subject to paragraph 2 of this article, foreign creditors have the same rights regarding the commencement of, and participation in, a proceeding under British insolvency law as creditors in Great Britain.

**2.** Paragraph 1 of this article does not affect the ranking of claims in a proceeding under British insolvency law, except that the claim of a foreign creditor shall not be given a lower priority than that of general unsecured claims solely because the holder of such a claim is a foreign creditor.

**3.** A claim may not be challenged solely on the grounds that it is a claim by a foreign tax or social security authority but such a claim may be challenged—

    (a) on the ground that it is in whole or in part a penalty, or

    (b) on any other ground that a claim might be rejected in a proceeding under British insolvency law.

### *Article 14. Notification to foreign creditors of a proceeding under British insolvency law*

**1.** Whenever under British insolvency law notification is to be given to creditors in Great Britain, such notification shall also be given to the known creditors that do not have addresses in Great Britain. The court may order that appropriate steps be taken with a view to notifying any creditor whose address is not yet known.

**2.** Such notification shall be made to the foreign creditors individually, unless—

    (a) the court considers that under the circumstances some other form of notification would be more appropriate; or

*Document Generated: 2017-05-04*

*__Draft Legislation:__ This is a draft item of legislation. This draft has since been made as*
*a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

(b) the notification to creditors in Great Britain is to be by advertisement only, in which case the notification to the known foreign creditors may be by advertisement in such foreign newspapers as the British insolvency officeholder considers most appropriate for ensuring that the content of the notification comes to the notice of the known foreign creditors.

**3.** When notification of a right to file a claim is to be given to foreign creditors, the notification shall—

(a) indicate a reasonable time period for filing claims and specify the place for their filing;

(b) indicate whether secured creditors need to file their secured claims; and

(c) contain any other information required to be included in such a notification to creditors pursuant to the law of Great Britain and the orders of the court.

**4.** In this article "the court" means the court which has jurisdiction in relation to the particular proceeding under British insolvency law under which notification is to be given to creditors.

# CHAPTER III

## RECOGNITION OF A FOREIGN PROCEEDING AND RELIEF

### *Article 15. Application for recognition of a foreign proceeding*

**1.** A foreign representative may apply to the court for recognition of the foreign proceeding in which the foreign representative has been appointed.

**2.** An application for recognition shall be accompanied by—

(a) a certified copy of the decision commencing the foreign proceeding and appointing the foreign representative; or

(b) a certificate from the foreign court affirming the existence of the foreign proceeding and of the appointment of the foreign representative; or

(c) in the absence of evidence referred to in sub-paragraphs (a) and (b), any other evidence acceptable to the court of the existence of the foreign proceeding and of the appointment of the foreign representative.

**3.** An application for recognition shall also be accompanied by a statement identifying all foreign proceedings, proceedings under British insolvency law and section 426 requests in respect of the debtor that are known to the foreign representative.

**4.** The foreign representative shall provide the court with a translation into English of documents supplied in support of the application for recognition.

### *Article 16. Presumptions concerning recognition*

**1.** If the decision or certificate referred to in paragraph 2 of article 15 indicates that the foreign proceeding is a proceeding within the meaning of sub-paragraph (i) of article 2 and that the foreign representative is a person or body within the meaning of sub-paragraph (j) of article 2, the court is entitled to so presume.

**2.** The court is entitled to presume that documents submitted in support of the application for recognition are authentic, whether or not they have been legalised.

**3.** In the absence of proof to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the centre of the debtor's main interests.

Document Generated: 2017-05-04

*Draft Legislation:* This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030

### *Article 17. Decision to recognise a foreign proceeding*

**1.** Subject to article 6, a foreign proceeding shall be recognised if—

    (a) it is a foreign proceeding within the meaning of sub-paragraph (i) of article 2;

    (b) the foreign representative applying for recognition is a person or body within the meaning of sub-paragraph (j) of article 2;

    (c) the application meets the requirements of paragraphs 2 and 3 of article 15; and

    (d) the application has been submitted to the court referred to in article 4.

**2.** The foreign proceeding shall be recognised—

    (a) as a foreign main proceeding if it is taking place in the State where the debtor has the centre of its main interests; or

    (b) as a foreign non-main proceeding if the debtor has an establishment within the meaning of sub-paragraph (e) of article 2 in the foreign State.

**3.** An application for recognition of a foreign proceeding shall be decided upon at the earliest possible time.

**4.** The provisions of articles 15 to 16, this article and article 18 do not prevent modification or termination of recognition if it is shown that the grounds for granting it were fully or partially lacking or have fully or partially ceased to exist and in such a case, the court may, on the application of the foreign representative or a person affected by recognition, or of its own motion, modify or terminate recognition, either altogether or for a limited time, on such terms and conditions as the court thinks fit.

### *Article 18. Subsequent information*

From the time of filing the application for recognition of the foreign proceeding, the foreign representative shall inform the court promptly of—

    (a) any substantial change in the status of the recognised foreign proceeding or the status of the foreign representative's appointment; and

    (b) any other foreign proceeding, proceeding under British insolvency law or section 426 request regarding the same debtor that becomes known to the foreign representative.

### *Article 19. Relief that may be granted upon application for recognition of a foreign proceeding*

**1.** From the time of filing an application for recognition until the application is decided upon, the court may, at the request of the foreign representative, where relief is urgently needed to protect the assets of the debtor or the interests of the creditors, grant relief of a provisional nature, including—

    (a) staying execution against the debtor's assets;

    (b) entrusting the administration or realisation of all or part of the debtor's assets located in Great Britain to the foreign representative or another person designated by the court, in order to protect and preserve the value of assets that, by their nature or because of other circumstances, are perishable, susceptible to devaluation or otherwise in jeopardy; and

    (c) any relief mentioned in paragraph 1 (c), (d) or (g) of article 21.

**2.** Unless extended under paragraph 1(f) of article 21, the relief granted under this article terminates when the application for recognition is decided upon.

**3.** The court may refuse to grant relief under this article if such relief would interfere with the administration of a foreign main proceeding.

*Draft Legislation: This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

*Article 20. Effects of recognition of a foreign main proceeding*

**1.** Upon recognition of a foreign proceeding that is a foreign main proceeding, subject to paragraph 2 of this article—

    (a) commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities is stayed;

    (b) execution against the debtor's assets is stayed; and

    (c) the right to transfer, encumber or otherwise dispose of any assets of the debtor is suspended.

**2.** The stay and suspension referred to in paragraph 1 of this article shall be—

    (a) the same in scope and effect as if the debtor, in the case of an individual, had been adjudged bankrupt under the Insolvency Act 1986(**30**) or had his estate sequestrated under the Bankruptcy (Scotland) Act 1985(**31**), or, in the case of a debtor other than an individual, had been made the subject of a winding-up order under the Insolvency Act 1986; and

    (b) subject to the same powers of the court and the same prohibitions, limitations, exceptions and conditions as would apply under the law of Great Britain in such a case,

and the provisions of paragraph 1 of this article shall be interpreted accordingly.

**3.** Without prejudice to paragraph 2 of this article, the stay and suspension referred to in paragraph 1 of this article, in particular, does not affect any right—

    (a) to take any steps to enforce security over the debtor's property;

    (b) to take any steps to repossess goods in the debtor's possession under a hire-purchase agreement;

    (c) exercisable under or by virtue of or in connection with the provisions referred to in article 1(4); or

    (d) of a creditor to set off its claim against a claim of the debtor,

being a right which would have been exercisable if the debtor, in the case of an individual, had been adjudged bankrupt under the Insolvency Act 1986 or had his estate sequestrated under the Bankruptcy (Scotland) Act 1985, or, in the case of a debtor other than an individual, had been made the subject of a winding-up order under the Insolvency Act 1986.

**4.** Paragraph 1(a) of this article does not affect the right to—

    (a) commence individual actions or proceedings to the extent necessary to preserve a claim against the debtor; or

    (b) commence or continue any criminal proceedings or any action or proceedings by a person or body having regulatory, supervisory or investigative functions of a public nature, being an action or proceedings brought in the exercise of those functions.

**5.** Paragraph 1 of this article does not affect the right to request or otherwise initiate the commencement of a proceeding under British insolvency law or the right to file claims in such a proceeding.

**6.** In addition to and without prejudice to any powers of the court under or by virtue of paragraph 2 of this article, the court may, on the application of the foreign representative or a person affected by the stay and suspension referred to in paragraph 1 of this article, or of its own motion, modify or terminate such stay and suspension or any part of it, either altogether or for a limited time, on such terms and conditions as the court thinks fit.

---

(**30**) 1986 c. 45.
(**31**) 1985 c. 66.

Document Generated: 2017-05-04

*Draft Legislation:* This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030

*Article 21. Relief that may be granted upon recognition of a foreign proceeding*

**1.** Upon recognition of a foreign proceeding, whether main or non-main, where necessary to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including—

(a) staying the commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities, to the extent they have not been stayed under paragraph 1(a) of article 20;

(b) staying execution against the debtor's assets to the extent it has not been stayed under paragraph 1(b) of article 20;

(c) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under paragraph 1(c) of article 20;

(d) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

(e) entrusting the administration or realisation of all or part of the debtor's assets located in Great Britain to the foreign representative or another person designated by the court;

(f) extending relief granted under paragraph 1 of article 19; and

(g) granting any additional relief that may be available to a British insolvency officeholder under the law of Great Britain, including any relief provided under paragraph 43 of Schedule B1 to the Insolvency Act 1986(**32**).

**2.** Upon recognition of a foreign proceeding, whether main or non-main, the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in Great Britain to the foreign representative or another person designated by the court, provided that the court is satisfied that the interests of creditors in Great Britain are adequately protected.

**3.** In granting relief under this article to a representative of a foreign non-main proceeding, the court must be satisfied that the relief relates to assets that, under the law of Great Britain, should be administered in the foreign non-main proceeding or concerns information required in that proceeding.

**4.** No stay under paragraph 1(a) of this article shall affect the right to commence or continue any criminal proceedings or any action or proceedings by a person or body having regulatory, supervisory or investigative functions of a public nature, being an action or proceedings brought in the exercise of those functions.

*Article 22. Protection of creditors and other interested persons*

**1.** In granting or denying relief under article 19 or 21, or in modifying or terminating relief under paragraph 3 of this article or paragraph 6 of article 20, the court must be satisfied that the interests of the creditors (including any secured creditors or parties to hire-purchase agreements) and other interested persons, including if appropriate the debtor, are adequately protected.

**2.** The court may subject relief granted under article 19 or 21 to conditions it considers appropriate, including the provision by the foreign representative of security or caution for the proper performance of his functions.

**3.** The court may, at the request of the foreign representative or a person affected by relief granted under article 19 or 21, or of its own motion, modify or terminate such relief.

---

(**32**)  Schedule B1 was inserted by the Enterprise Act 2002 (c. 40), section 248(2) and Schedule 16.

*Document Generated: 2017-05-04*

---

*Draft Legislation: This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

---

*Article 23. Actions to avoid acts detrimental to creditors*

**1.** Subject to paragraphs 6 and 9 of this article, upon recognition of a foreign proceeding, the foreign representative has standing to make an application to the court for an order under or in connection with sections 238, 239, 242, 243, 244, 245, 339, 340, 342A, 343, and 423 of the Insolvency Act 1986(**33**) and sections 34, 35, 36, 36A and 61 of the Bankruptcy (Scotland) Act 1985(**34**).

**2.** Where the foreign representative makes such an application ("an article 23 application"), the sections referred to in paragraph 1 of this article and sections 240, 241, 341, 342, 342B to 342F, 424 and 425 of the Insolvency Act 1986(**35**) and sections 36B and 36C of the Bankruptcy (Scotland) Act 1985(**36**) shall apply—

    (a) whether or not the debtor, in the case of an individual, has been adjudged bankrupt or had his estate sequestrated, or, in the case of a debtor other than an individual, is being wound up or is in administration, under British insolvency law; and

    (b) with the modifications set out in paragraph 3 of this article.

**3.** The modifications referred to in paragraph 2 of this article are as follows—

    (a) for the purposes of sections 241(2A)(a) and 342(2A)(a) of the Insolvency Act 1986, a person has notice of the relevant proceedings if he has notice of the opening of the relevant foreign proceeding;

    (b) for the purposes of sections 240(1) and 245(3) of that Act, the onset of insolvency shall be the date of the opening of the relevant foreign proceeding;

    (c) the periods referred to in sections 244(2), 341(1)(a) to (c) and 343(2) of that Act shall be periods ending with the date of the opening of the relevant foreign proceeding;

    (d) for the purposes of sections 242(3)(a), (3)(b) and 243(1) of that Act, the date on which the winding up of the company commences or it enters administration shall be the date of the opening of the relevant foreign proceeding; and

    (e) for the purposes of sections 34(3)(a), (3)(b), 35(1)(c), 36(1)(a) and (1)(b) and 61(2) of the Bankruptcy (Scotland) Act 1985, the date of sequestration or granting of the trust deed shall be the date of the opening of the relevant foreign proceeding.

**4.** For the purposes of paragraph 3 of this article, the date of the opening of the foreign proceeding shall be determined in accordance with the law of the State in which the foreign proceeding is taking place, including any rule of law by virtue of which the foreign proceeding is deemed to have opened at an earlier time.

**5.** When the foreign proceeding is a foreign non-main proceeding, the court must be satisfied that the article 23 application relates to assets that, under the law of Great Britain, should be administered in the foreign non-main proceeding.

**6.** At any time when a proceeding under British insolvency law is taking place regarding the debtor—

---

(**33**) 1986 c. 45; sections 238 and 242–245 are amended by the Enterprise Act 2002 (c. 40), Schedule 17, paragraphs 9, 25 and 28–31 and, in the case of section 245, Schedule 26; sections 339 and 423 are amended by the Civil Partnership Act 2004 (c. 33), Schedule 27, paragraphs 119 and 121; section 342A was inserted by the Welfare Reform and Pensions Act 1999 (c. 30), section 15.

(**34**) 1985 c. 66; section 34 is amended by the Civil Partnerships Act 2004 (c. 33), Schedule 28, paragraph 35, section 35 is amended by the Welfare Reform and Pensions Act 1999, Schedule 12, paragraphs 67 and 68 and section 36A is substituted by the Welfare Reform and Pensions Act 1999, section 16.

(**35**) Sections 240, 241 and 424 are amended by the Enterprise Act 2002, Schedule 17, paragraphs 9, 26, 27 and 36 and, in the case of section 240, Schedule 26; sections 241 and 342 are amended by the Insolvency (No. 2) Act 1994 (c. 12), sections 1 and 2; sections 342B–342F were inserted by the Welfare Reform and Pensions Act 1999, section 15 and Schedule 12, paragraphs 70 and 71.

(**36**) Sections 36B and 36C are substituted by the Welfare Reform and Pensions Act 1999, section 16.

Document Generated: 2017-05-04

***Draft Legislation:*** *This is a draft item of legislation. This draft has since been made as*
*a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

(a) the foreign representative shall not make an article 23 application except with the permission of—

   (i) in the case of a proceeding under British insolvency law taking place in England and Wales, the High Court; or

   (ii) in the case of a proceeding under British insolvency law taking place in Scotland, the Court of Session; and

(b) references to "the court" in paragraphs 1, 5 and 7 of this article are references to the court in which that proceeding is taking place.

**7.** On making an order on an article 23 application, the court may give such directions regarding the distribution of any proceeds of the claim by the foreign representative, as it thinks fit to ensure that the interests of creditors in Great Britain are adequately protected.

**8.** Nothing in this article affects the right of a British insolvency officeholder to make an application under or in connection with any of the provisions referred to in paragraph 1 of this article.

**9.** Nothing in paragraph 1 of this article shall apply in respect of any preference given, floating charge created, alienation, assignment or relevant contributions (within the meaning of section 342A(5) of the Insolvency Act 1986) made or other transaction entered into before the date on which this Law comes into force.

*Article 24. Intervention by a foreign representative in proceedings in Great Britain*

Upon recognition of a foreign proceeding, the foreign representative may, provided the requirements of the law of Great Britain are met, intervene in any proceedings in which the debtor is a party.

# CHAPTER IV

## COOPERATION WITH FOREIGN COURTS AND FOREIGN REPRESENTATIVES

*Article 25. Cooperation and direct communication between a court*
*of Great Britain and foreign courts or foreign representatives*

**1.** In matters referred to in paragraph 1 of article 1, the court may cooperate to the maximum extent possible with foreign courts or foreign representatives, either directly or through a British insolvency officeholder.

**2.** The court is entitled to communicate directly with, or to request information or assistance directly from, foreign courts or foreign representatives.

*Article 26. Cooperation and direct communication between the British*
*insolvency officeholder and foreign courts or foreign representatives*

**1.** In matters referred to in paragraph 1 of article 1, a British insolvency officeholder shall to the extent consistent with his other duties under the law of Great Britain, in the exercise of his functions and subject to the supervision of the court, cooperate to the maximum extent possible with foreign courts or foreign representatives.

**2.** The British insolvency officeholder is entitled, in the exercise of his functions and subject to the supervision of the court, to communicate directly with foreign courts or foreign representatives.

*Document Generated: 2017-05-04*

***Draft Legislation:*** *This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

### *Article 27. Forms of cooperation*

Cooperation referred to in articles 25 and 26 may be implemented by any appropriate means, including—

    (a)  appointment of a person to act at the direction of the court;

    (b)  communication of information by any means considered appropriate by the court;

    (c)  coordination of the administration and supervision of the debtor's assets and affairs;

    (d)  approval or implementation by courts of agreements concerning the coordination of proceedings;

    (e)  coordination of concurrent proceedings regarding the same debtor.

# CHAPTER V

## CONCURRENT PROCEEDINGS

### *Article 28. Commencement of a proceeding under British insolvency law after recognition of a foreign main proceeding*

After recognition of a foreign main proceeding, the effects of a proceeding under British insolvency law in relation to the same debtor shall, insofar as the assets of that debtor are concerned, be restricted to assets that are located in Great Britain and, to the extent necessary to implement cooperation and coordination under articles 25, 26 and 27, to other assets of the debtor that, under the law of Great Britain, should be administered in that proceeding.

### *Article 29. Coordination of a proceeding under British insolvency law and a foreign proceeding*

Where a foreign proceeding and a proceeding under British insolvency law are taking place concurrently regarding the same debtor, the court may seek cooperation and coordination under articles 25, 26 and 27, and the following shall apply—

    (a)  when the proceeding in Great Britain is taking place at the time the application for recognition of the foreign proceeding is filed—

        (i)  any relief granted under article 19 or 21 must be consistent with the proceeding in Great Britain; and

        (ii)  if the foreign proceeding is recognised in Great Britain as a foreign main proceeding, article 20 does not apply;

    (b)  when the proceeding in Great Britain commences after the filing of the application for recognition of the foreign proceeding—

        (i)  any relief in effect under article 19 or 21 shall be reviewed by the court and shall be modified or terminated if inconsistent with the proceeding in Great Britain;

        (ii)  if the foreign proceeding is a foreign main proceeding, the stay and suspension referred to in paragraph 1 of article 20 shall be modified or terminated pursuant to paragraph 6 of article 20, if inconsistent with the proceeding in Great Britain; and

        (iii)  any proceedings brought by the foreign representative by virtue of paragraph 1 of article 23 before the proceeding in Great Britain commenced shall be reviewed by the court and the court may give such directions as it thinks fit regarding the continuance of those proceedings; and

    (c)  in granting, extending or modifying relief granted to a representative of a foreign non-main proceeding, the court must be satisfied that the relief relates to assets that, under

Document Generated: 2017-05-04

*Draft Legislation:* This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030

the law of Great Britain, should be administered in the foreign non-main proceeding or concerns information required in that proceeding.

### *Article 30. Coordination of more than one foreign proceeding*

In matters referred to in paragraph 1 of article 1, in respect of more than one foreign proceeding regarding the same debtor, the court may seek cooperation and coordination under articles 25, 26 and 27, and the following shall apply—

(a) any relief granted under article 19 or 21 to a representative of a foreign non-main proceeding after recognition of a foreign main proceeding must be consistent with the foreign main proceeding;

(b) if a foreign main proceeding is recognised after the filing of an application for recognition of a foreign non-main proceeding, any relief in effect under article 19 or 21 shall be reviewed by the court and shall be modified or terminated if inconsistent with the foreign main proceeding; and

(c) if, after recognition of a foreign non-main proceeding, another foreign non-main proceeding is recognised, the court shall grant, modify or terminate relief for the purpose of facilitating coordination of the proceedings.

### *Article 31. Presumption of insolvency based on recognition of a foreign main proceeding*

In the absence of evidence to the contrary, recognition of a foreign main proceeding is, for the purpose of commencing a proceeding under British insolvency law, proof that the debtor is unable to pay its debts or, in relation to Scotland, is apparently insolvent within the meaning given to those expressions under British insolvency law.

### *Article 32. Rule of payment in concurrent proceedings*

Without prejudice to secured claims or rights in rem, a creditor who has received part payment in respect of its claim in a proceeding pursuant to a law relating to insolvency in a foreign State may not receive a payment for the same claim in a proceeding under British insolvency law regarding the same debtor, so long as the payment to the other creditors of the same class is proportionately less than the payment the creditor has already received.

### SCHEDULE 2                                            Regulation 4

## PROCEDURAL MATTERS IN ENGLAND AND WALES

# PART 1

## INTRODUCTORY PROVISIONS

**Interpretation**

**1.**—(1)  In this Schedule—

"the 1986 Act" means the Insolvency Act 1986(**37**);

---

(**37**)  1986 c. 45.

Document Generated: 2017-05-04

*Draft Legislation: This is a draft item of legislation. This draft has since been made as*
*a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

"article 21 relief application" means an application to the court by a foreign representative under article 21(1) or (2) of the Model Law for relief;

"business day" means any day other than a Saturday, a Sunday, Christmas Day, Good Friday or a day which is a bank holiday in England and Wales under or by virtue of the Banking and Financial Dealings Act 1971(**38**);

"CPR" means the Civil Procedure Rules 1998(**39**) and "CPR" followed by a Part or rule by number means the Part or rule with that number in those Rules;

"enforcement officer" means an individual who is authorised to act as an enforcement officer under the Courts Act 2003(**40**);

"file in court" and "file with the court" means deliver to the court for filing;

"the Gazette" means the London Gazette;

"interim relief application" means an application to the court by a foreign representative under article 19 of the Model Law for interim relief;

"main proceedings" means proceedings opened in accordance with Article 3(1) of the EC Insolvency Regulation and falling within the definition of insolvency proceedings in Article 2(a) of the EC Insolvency Regulation;

"member State liquidator" means a person falling within the definition of liquidator in Article 2(b) of the EC Insolvency Regulation appointed in proceedings to which it applies in a member State other than the United Kingdom;

"the Model Law" means the UNCITRAL Model Law as set out in Schedule 1 to these Regulations;

"modification or termination order" means an order by the court pursuant to its powers under the Model Law modifying or terminating recognition of a foreign proceeding, the stay and suspension referred to in article 20(1) or any part of it or any relief granted under article 19 or 21 of the Model Law;

"originating application" means an application to the court which is not an application in pending proceedings before the court;

"ordinary application" means any application to the court other than an originating application;

"practice direction" means a direction as to the practice and procedure of any court within the scope of the CPR;

"recognition application" means an application to the court by a foreign representative in accordance with article 15 of the Model Law for an order recognising the foreign proceeding in which he has been appointed;

"recognition order" means an order by the court recognising a proceeding the subject of a recognition application as a foreign main proceeding or foreign non-main proceeding, as appropriate;

"relevant company" means a company within the meaning of section 735(1) of the Companies Act 1985(**41**) or an unregistered company within the meaning of Part 5 of the 1986 Act which is subject to a requirement imposed by virtue of section 690A(**42**), 691(1)(**43**) or 718(**44**) of the Companies Act 1985;

---

(**38**)  1971 c. 80.
(**39**)  S.I. 1998/3132, relevant amendments are made by S.I. 1999/1008, 2000/221, 2000/2092, 2001/256, 2001/1769, 2001/2792, 2001/4015, 2002/2058, 2002/3219, 2003/1242, 2003/2113, 2003/3361, 2004/1306, 2004/2072, 2004/3419 and 2005/2292.
(**40**)  2003 c. 39.
(**41**)  1985 c. 6.
(**42**)  Section 690A was inserted by S.I. 1992/3179.
(**43**)  As amended by S.I. 2000/3373 and 2902/912.
(**44**)  As amended by the Statute Law (Repeals) Act 2004 (c. 14) and S.I. 2001/1228.

Document Generated: 2017-05-04

*Draft Legislation:* This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030

"review application" means an application to the court for a modification or termination order;

"the Rules" means the Insolvency Rules 1986(**45**) and "Rule" followed by a number means the rule with that number in those Rules;

"secondary proceedings" means proceedings opened in accordance with Articles 3(2) and 3(3) of the EC Insolvency Regulation and falling within the definition of winding up proceedings in Article 2(c) of the EC Insolvency Regulation;

"territorial proceedings" means proceedings opened in accordance with Articles 3(2) and 3(4) of the EC Insolvency Regulation and falling within the definition of insolvency proceedings in Article 2(a) of the EC Insolvency Regulation.

(2)  Expressions defined in the Model Law have the same meaning when used in this Schedule.

(3)  In proceedings under these Regulations, "Registrar" means—

(a)  a Registrar in Bankruptcy of the High Court; and

(b)  where the proceedings are in a district registry, the district judge.

(4)  References to the "venue" for any proceedings or attendance before the court, are to the time, date and place for the proceedings or attendance.

(5)  References in this Schedule to ex parte hearings shall be construed as references to hearings without notice being served on any other party, and references to applications made ex parte as references to applications made without notice being served on any other party; and other references which include the expression "ex parte" shall be similarly construed.

(6)  References in this Schedule to a debtor who is of interest to the Financial Services Authority are references to a debtor who—

(a)  is, or has been, an authorised person within the meaning of section 31 of the Financial Services and Markets Act 2000(**46**) (authorised persons);

(b)  is, or has been, an appointed representative within the meaning of section 39 (exemption of appointed representatives) of that Act; or

(c)  is carrying on, or has carried on, a regulated activity in contravention of the general prohibition.

(7)  In sub-paragraph (6) "the general prohibition" has the meaning given by section 19 of the Financial Services and Markets Act 2000 and the reference to a "regulated activity" must be construed in accordance with—

(a)  section 22 of that Act (classes of regulated activity and categories of investment);

(b)  any relevant order under that section; and

(c)  Schedule 2 to that Act (regulated activities).

(8)  References in this Schedule to a numbered form are to the form that bears that number in Schedule 5.

---

(**45**)  S.I. 1986/1925, as amended by S.I. 1987/1919, 1989/397, 1991/495, 1993/602, 1995/586, 1999/359, 1999/1022, 2001/763, 2002/1307, 2002/2712, 2003/1730, 2004/584, 2004/1070 and 2005/527.
(**46**)  2000 c. 8.

*Document Generated: 2017-05-04*

*Draft Legislation: This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

# PART 2

## APPLICATIONS TO COURT FOR RECOGNITION OF FOREIGN PROCEEDINGS

**Affidavit in support of recognition application**

**2.**  A recognition application shall be in Form ML 1 and shall be supported by an affidavit sworn by the foreign representative complying with paragraph 4.

**Form and content of application**

**3.**  The application shall state the following matters—

(a)  the name of the applicant and his address for service within England and Wales;

(b)  the name of the debtor in respect of which the foreign proceeding is taking place;

(c)  the name or names in which the debtor carries on business in the country where the foreign proceeding is taking place and in this country, if other than the name given under sub-paragraph (b);

(d)  the principal or last known place of business of the debtor in Great Britain (if any) and, in the case of an individual, his usual or last known place of residence in Great Britain (if any);

(e)  any registered number allocated to the debtor under the Companies Act 1985;

(f)  brief particulars of the foreign proceeding in respect of which recognition is applied for, including the country in which it is taking place and the nature of the proceeding;

(g)  that the foreign proceeding is a proceeding within the meaning of article 2(i) of the Model Law;

(h)  that the applicant is a foreign representative within the meaning of article 2(j) of the Model Law;

(i)  the address of the debtor's centre of main interests and, if different, the address of its registered office or habitual residence, as appropriate; and

(j)  if the debtor does not have its centre of main interests in the country where the foreign proceeding is taking place, whether the debtor has an establishment within the meaning of article 2(e) of the Model Law in that country, and if so, its address.

**Contents of affidavit in support**

**4.**—(1)  There shall be attached to the application an affidavit in support which shall contain or have exhibited to it—

(a)  the evidence and statement required under article 15(2) and (3) respectively of the Model Law;

(b)  any other evidence which in the opinion of the applicant will assist the court in deciding whether the proceeding the subject of the application is a foreign proceeding within the meaning of article 2(i) of the Model Law and whether the applicant is a foreign representative within the meaning of article 2(j) of the Model Law;

(c)  evidence that the debtor has its centre of main interests or an establishment, as the case may be, within the country where the foreign proceeding is taking place; and

(d)  any other matters which in the opinion of the applicant will assist the court in deciding whether to make a recognition order.

*Document Generated: 2017-05-04*

**Draft Legislation:** *This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

(2) The affidavit shall state whether, in the opinion of the applicant, the EC Insolvency Regulation applies to any of the proceedings identified in accordance with article 15(3) of the Model Law and, if so, whether those proceedings are main proceedings, secondary proceedings or territorial proceedings.

(3) The affidavit shall also have exhibited to it the translations required under article 15(4) of the Model Law and a translation in English of any other document exhibited to the affidavit which is in a language other than English.

(4) All translations referred to in sub-paragraph (3) must be certified by the translator as a correct translation.

### The hearing and powers of court

**5.**—(1) On hearing a recognition application the court may in addition to its powers under the Model Law to make a recognition order—

    (a) dismiss the application;

    (b) adjourn the hearing conditionally or unconditionally;

    (c) make any other order which the court thinks appropriate.

(2) If the court makes a recognition order, it shall be in Form ML 2.

### Notification of subsequent information

**6.**—(1) The foreign representative shall set out any subsequent information required to be given to the court under article 18 of the Model Law in a statement which he shall attach to Form ML 3 and file with the court.

(2) The statement shall include—

    (a) details of the information required to be given under article 18 of the Model Law; and

    (b) in the case of any proceedings required to be notified to the court under that article, a statement as to whether, in the opinion of the foreign representative, any of those proceedings are main proceedings, secondary proceedings or territorial proceedings under the EC Insolvency Regulation.

(3) The foreign representative shall send a copy of the Form ML 3 and attached statement filed with the court to the following—

    (a) the debtor; and

    (b) those persons referred to in paragraph 26(3).

# PART 3

## APPLICATIONS FOR RELIEF UNDER THE MODEL LAW

### Application for interim relief—affidavit in support

**7.**—(1) An interim relief application must be supported by an affidavit sworn by the foreign representative stating—

    (a) the grounds on which it is proposed that the interim relief applied for should be granted;

    (b) details of any proceeding under British insolvency law taking place in relation to the debtor;

*Document Generated: 2017-05-04*

*Draft Legislation: This is a draft item of legislation. This draft has since been made as*
*a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

(c) whether, to the foreign representative's knowledge, an administrative receiver or receiver or manager of the debtor's property is acting in relation to the debtor;

(d) an estimate of the value of the assets of the debtor in England and Wales in respect of which relief is applied for;

(e) whether, to the best of the knowledge and belief of the foreign representative, the interests of the debtor's creditors (including any secured creditors or parties to hire-purchase agreements) and any other interested parties, including if appropriate the debtor, will be adequately protected;

(f) whether, to the best of the foreign representative's knowledge and belief, the grant of any of the relief applied for would interfere with the administration of a foreign main proceeding; and

(g) all other matters that in the opinion of the foreign representative will assist the court in deciding whether or not it is appropriate to grant the relief applied for.

### Service of interim relief application not required

**8.** Unless the court otherwise directs, it shall not be necessary to serve the interim relief application on, or give notice of it to, any person.

### The hearing and powers of court

**9.** On hearing an interim relief application the court may in addition to its powers under the Model Law to make an order granting interim relief under article 19 of the Model Law—

(a) dismiss the application;

(b) adjourn the hearing conditionally or unconditionally;

(c) make any other order which the court thinks appropriate.

### Application for relief under article 21 of the Model Law—affidavit in support

**10.** An article 21 relief application must be supported by an affidavit sworn by the foreign representative stating—

(a) the grounds on which it is proposed that the relief applied for should be granted;

(b) an estimate of the value of the assets of the debtor in England and Wales in respect of which relief is applied for;

(c) in the case of an application by a foreign representative who is or believes that he is a representative of a foreign non-main proceeding, the reasons why the applicant believes that the relief relates to assets that, under the law of Great Britain, should be administered in the foreign non-main proceeding or concerns information required in that proceeding;

(d) whether, to the best of the knowledge and belief of the foreign representative, the interests of the debtor's creditors (including any secured creditors or parties to hire-purchase agreements) and any other interested parties, including if appropriate the debtor, will be adequately protected; and

(e) all other matters that in the opinion of the foreign representative will assist the court in deciding whether or not it is appropriate to grant the relief applied for.

### The hearing and powers of court

**11.** On hearing an article 21 relief application the court may in addition to its powers under the Model Law to make an order granting relief under article 21 of the Model Law—

*Document Generated: 2017-05-04*

*__Draft Legislation:__ This is a draft item of legislation. This draft has since been made as a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

(a) dismiss the application;

(b) adjourn the hearing conditionally or unconditionally;

(c) make any other order which the court thinks appropriate.

# PART 4

## REPLACEMENT OF FOREIGN REPRESENTATIVE

**Application for confirmation of status of replacement foreign representative**

**12.**—(1)  This paragraph applies where following the making of a recognition order the foreign representative dies or for any other reason ceases to be the foreign representative in the foreign proceeding in relation to the debtor.

(2)  In this paragraph "the former foreign representative" shall mean the foreign representative referred to in sub-paragraph (1).

(3)  If a person has succeeded the former foreign representative or is otherwise holding office as foreign representative in the foreign proceeding in relation to the debtor, that person may apply to the court for an order confirming his status as replacement foreign representative for the purpose of proceedings under these Regulations.

**Contents of application and affidavit in support**

**13.**—(1)  An application under paragraph 12(3) shall in addition to the matters required to be stated by paragraph 19(2) state the following matters—

(a) the name of the replacement foreign representative and his address for service within England and Wales;

(b) details of the circumstances in which the former foreign representative ceased to be foreign representative in the foreign proceeding in relation to the debtor (including the date on which he ceased to be the foreign representative);

(c) details of his own appointment as replacement foreign representative in the foreign proceeding (including the date of that appointment).

(2)  The application shall be accompanied by an affidavit in support sworn by the applicant which shall contain or have attached to it—

(a) a certificate from the foreign court affirming—

  (i) the cessation of the appointment of the former foreign representative as foreign representative; and

  (ii) the appointment of the applicant as the foreign representative in the foreign proceeding; or

(b) in the absence of such a certificate, any other evidence acceptable to the court of the matters referred to in paragraph (a); and

(c) a translation in English of any document exhibited to the affidavit which is in a language other than English.

(3)  All translations referred to in paragraph (c) must be certified by the translator as a correct translation.

**The hearing and powers of court**

**14.**—(1)  On hearing an application under paragraph 12(3) the court may—

*Document Generated: 2017-05-04*

*Draft Legislation: This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

(a)  make an order confirming the status of the replacement foreign representative as foreign representative for the purpose of proceedings under these Regulations;

(b)  dismiss the application;

(c)  adjourn the hearing conditionally or unconditionally;

(d)  make an interim order;

(e)  make any other order which the court thinks appropriate, including in particular an order making such provision as the court thinks fit with respect to matters arising in connection with the replacement of the foreign representative.

(2)  If the court dismisses the application, it may also if it thinks fit make an order terminating recognition of the foreign proceeding and—

(a)  such an order may include such provision as the court thinks fit with respect to matters arising in connection with the termination; and

(b)  paragraph 15 shall not apply to such an order.

# PART 5

## REVIEWS OF COURT ORDERS

### Reviews of court orders—where court makes order of its own motion

**15.**—(1)  The court shall not of its own motion make a modification or termination order unless the foreign representative and the debtor have either—

(a)  had an opportunity of being heard on the question; or

(b)  consented in writing to such an order.

(2)  Where the foreign representative or the debtor desires to be heard on the question of such an order, the court shall give all relevant parties notice of a venue at which the question will be considered and may give directions as to the issues on which it requires evidence.

(3)  For the purposes of sub-paragraph (2), all relevant parties means the foreign representative, the debtor and any other person who appears to the court to have an interest justifying his being given notice of the hearing.

(4)  If the court makes a modification or termination order, the order may include such provision as the court thinks fit with respect to matters arising in connection with the modification or termination.

### Review application—affidavit in support

**16.**  A review application must be supported by an affidavit sworn by the applicant stating—

(a)  the grounds on which it is proposed that the relief applied for should be granted;

(b)  whether, to the best of the knowledge and belief of the applicant, the interests of the debtor's creditors (including any secured creditors or parties to hire-purchase agreements) and any other interested parties, including if appropriate the debtor, will be adequately protected; and

(c)  all other matters that in the opinion of the applicant will assist the court in deciding whether or not it is appropriate to grant the relief applied for.

Document Generated: 2017-05-04

*Draft Legislation:* This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030

### Hearing of review application and powers of the court

**17.** On hearing a review application, the court may in addition to its powers under the Model Law to make a modification or termination order—

    (a) dismiss the application;

    (b) adjourn the hearing conditionally or unconditionally;

    (c) make an interim order;

    (d) make any other order which the court thinks appropriate, including an order making such provision as the court thinks fit with respect to matters arising in connection with the modification or termination.

# PART 6

## COURT PROCEDURE AND PRACTICE WITH REGARD TO PRINCIPAL APPLICATIONS AND ORDERS

### Preliminary and interpretation

**18.**—(1) This Part applies to—

    (a) any of the following applications made to the court under these Regulations—

        (i) a recognition application;

        (ii) an article 21 relief application;

        (iii) an application under paragraph 12(3) for an order confirming the status of a replacement foreign representative;

        (iv) a review application; and

    (b) any of the following orders made by the court under these Regulations—

        (i) a recognition order;

        (ii) an order granting interim relief under article 19 of the Model Law;

        (iii) an order granting relief under article 21 of the Model Law;

        (iv) an order confirming the status of a replacement foreign representative; and

        (v) a modification or termination order.

### Form and contents of application

**19.**—(1) Subject to sub-paragraph (4) every application to which this Part applies shall be an ordinary application and shall be in Form ML 5.

    (2) Each application shall be in writing and shall state—

    (a) the names of the parties;

    (b) the nature of the relief or order applied for or the directions sought from the court;

    (c) the names and addresses of the persons (if any) on whom it is intended to serve the application;

    (d) the names and addresses of all those persons on whom these Regulations require the application to be served (so far as known to the applicant); and

    (e) the applicant's address for service.

*Document Generated: 2017-05-04*

*Draft Legislation: This is a draft item of legislation. This draft has since been made as a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

(3)  The application must be signed by the applicant if he is acting in person, or, when he is not so acting, by or on behalf of his solicitor.

(4)  This paragraph does not apply to a recognition application.

### Filing of application

**20.**—(1)  The application (and all supporting documents) shall be filed with the court, with a sufficient number of copies for service and use as provided by paragraph 21(2).

(2)  Each of the copies filed shall have applied to it the seal of the court and be issued to the applicant; and on each copy there shall be endorsed the date and time of filing.

(3)  The court shall fix a venue for the hearing of the application and this also shall be endorsed on each copy of the application issued under sub-paragraph (2).

### Service of the application

**21.**—(1)  In sub-paragraph (2), references to the application are to a sealed copy of the application issued by the court together with any affidavit in support of it and any documents exhibited to the affidavit.

(2)  Unless the court otherwise directs, the application shall be served on the following persons, unless they are the applicant—

   (a)  on the foreign representative;

   (b)  on the debtor;

   (c)  if a British insolvency officeholder is acting in relation to the debtor, on him;

   (d)  if any person has been appointed an administrative receiver of the debtor or, to the knowledge of the foreign representative, as a receiver or manager of the property of the debtor in England and Wales, on him;

   (e)  if a member State liquidator has been appointed in main proceedings in relation to the debtor, on him;

   (f)  if to the knowledge of the foreign representative a foreign representative has been appointed in any other foreign proceeding regarding the debtor, on him;

   (g)  if there is pending in England and Wales a petition for the winding up or bankruptcy of the debtor, on the petitioner;

   (h)  on any person who to the knowledge of the foreign representative is or may be entitled to appoint an administrator of the debtor under paragraph 14 of Schedule B1 to the 1986 Act(**47**) (appointment of administrator by holder of qualifying floating charge); and

   (i)  if the debtor is a debtor who is of interest to the Financial Services Authority, on that Authority.

### Manner in which service to be effected

**22.**—(1)  Service of the application in accordance with paragraph 21(2) shall be effected by the applicant, or his solicitor, or by a person instructed by him or his solicitor, not less than 5 business days before the date fixed for the hearing.

(2)  Service shall be effected by delivering the documents to a person's proper address or in such other manner as the court may direct.

---

(**47**)  Schedule B1 was inserted by the Enterprise Act 2002 (c. 40), section 248(2) and Schedule 16.

Document Generated: 2017-05-04

*Draft Legislation:* This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030

(3) A person's proper address is any which he has previously notified as his address for service within England and Wales; but if he has not notified any such address or if for any reason service at such address is not practicable, service may be effected as follows—

  (a) (subject to sub-paragraph (4)) in the case of a company incorporated in England and Wales, by delivery to its registered office;

  (b) in the case of any other person, by delivery to his usual or last known address or principal place of business in Great Britain.

(4) If delivery to a company's registered office is not practicable, service may be effected by delivery to its last known principal place of business in Great Britain.

(5) Delivery of documents to any place or address may be made by leaving them there or sending them by first class post in accordance with the provisions of paragraphs 70 and 75(1).

### Proof of service

**23.**—(1) Service of the application shall be verified by an affidavit of service in Form ML 6, specifying the date on which, and the manner in which, service was effected.

(2) The affidavit of service, with a sealed copy of the application exhibited to it, shall be filed with the court as soon as reasonably practicable after service, and in any event not less than 1 business day before the hearing of the application.

### In case of urgency

**24.** Where the case is one of urgency, the court may (without prejudice to its general power to extend or abridge time limits)—

  (a) hear the application immediately, either with or without notice to, or the attendance of, other parties; or

  (b) authorise a shorter period of service than that provided for by paragraph 22(1),

and any such application may be heard on terms providing for the filing or service of documents, or the carrying out of other formalities, as the court thinks fit.

### The hearing

**25.**—(1) At the hearing of the application, the applicant and any of the following persons (not being the applicant) may appear or be represented—

  (a) the foreign representative;

  (b) the debtor and, in the case of any debtor other than an individual, any one or more directors or other officers of the debtor, including—

     (i) where applicable, any person registered under Part 23 of the Companies Act 1985(**48**) as authorised to represent the debtor in respect of its business in England and Wales;

     (ii) in the case of a debtor which is a partnership, any person who is an officer of the partnership within the meaning of article 2 of the Insolvent Partnerships Order 1994(**49**);

  (c) if a British insolvency officeholder is acting in relation to the debtor, that person;

  (d) if any person has been appointed an administrative receiver of the debtor or as a receiver or manager of the property of the debtor in England and Wales, that person;

---

(**48**) 1985 c. 6.
(**49**) S.I. 1994/2421, to which there are amendments not relevant to these Regulations.

*Document Generated: 2017-05-04*

***Draft Legislation:*** *This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

(e)  if a member State liquidator has been appointed in main proceedings in relation to the debtor, that person;

(f)  if a foreign representative has been appointed in any other foreign proceeding regarding the debtor, that person;

(g)  any person who has presented a petition for the winding up or bankruptcy of the debtor in England and Wales;

(h)  any person who is or may be entitled to appoint an administrator of the debtor under paragraph 14 of Schedule B1 to the 1986 Act (appointment of administrator by holder of qualifying floating charge);

(i)  if the debtor is a debtor who is of interest to the Financial Services Authority, that Authority; and

(j)  with the permission of the court, any other person who appears to have an interest justifying his appearance.

**Notification and advertisement of order**

**26.**—(1)  If the court makes any of the orders referred to in paragraph 18(1)(b), it shall as soon as reasonably practicable send two sealed copies of the order to the foreign representative.

(2)  The foreign representative shall send a sealed copy of the order as soon as reasonably practicable to the debtor.

(3)  The foreign representative shall, as soon as reasonably practicable after the date of the order give notice of the making of the order—

(a)  if a British insolvency officeholder is acting in relation to the debtor, to him;

(b)  if any person has been appointed an administrative receiver of the debtor or, to the knowledge of the foreign representative, as a receiver or manager of the property of the debtor, to him;

(c)  if a member State liquidator has been appointed in main proceedings in relation to the debtor, to him;

(d)  if to his knowledge a foreign representative has been appointed in any other foreign proceeding regarding the debtor, that person;

(e)  if there is pending in England and Wales a petition for the winding up or bankruptcy of the debtor, to the petitioner;

(f)  to any person who to his knowledge is or may be entitled to appoint an administrator of the debtor under paragraph 14 of Schedule B1 to the 1986 Act (appointment of administrator by holder of qualifying floating charge);

(g)  if the debtor is a debtor who is of interest to the Financial Services Authority, to that Authority;

(h)  to such other persons as the court may direct.

(4)  In the case of an order recognising a foreign proceeding in relation to the debtor as a foreign main proceeding, or an order under article 19 or 21 of the Model Law staying execution, distress or other legal process against the debtor's assets, the foreign representative shall also, as soon as reasonably practicable after the date of the order give notice of the making of the order—

(a)  to any enforcement officer or other officer who to his knowledge is charged with an execution or other legal process against the debtor or its property; and

(b)  to any person who to his knowledge is distraining against the debtor or its property.

(5)  In the application of sub-paragraphs (3) and (4) the references to property shall be taken as references to property situated within England and Wales.

*Document Generated: 2017-05-04*

***Draft Legislation:*** *This is a draft item of legislation. This draft has since been made as*
*a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

(6)  Where the debtor is a relevant company, the foreign representative shall send notice of the making of the order to the registrar of companies before the end of the period of 5 business days beginning with the date of the order. The notice to the registrar of companies shall be in Form ML 7.

(7)  The foreign representative shall advertise the making of the following orders once in the Gazette and once in such newspaper as he thinks most appropriate for ensuring that the making of the order comes to the notice of the debtor's creditors—

(a)  a recognition order;

(b)  an order confirming the status of a replacement foreign representative; and

(c)  a modification or termination order which modifies or terminates recognition of a foreign proceeding,

and the advertisement shall be in Form ML 8.

### Adjournment of hearing; directions

**27.**—(1)  This paragraph applies in any case where the court exercises its power to adjourn the hearing of the application.

(2)  The court may at any time give such directions as it thinks fit as to—

(a)  service or notice of the application on or to any person, whether in connection with the venue of a resumed hearing or for any other purpose;

(b)  the procedure on the application;

(c)  the manner in which any evidence is to be adduced at a resumed hearing and in particular as to—

(i) the taking of evidence wholly or in part by affidavit or orally;

(ii) the cross-examination on the hearing in court or in chambers, of any deponents to affidavits;

(d)  the matters to be dealt with in evidence.

# PART 7

## APPLICATIONS TO THE CHIEF LAND REGISTRAR

### Applications to Chief Land Registrar following court orders

**28.**—(1)  Where the court makes any order in proceedings under these Regulations which is capable of giving rise to an application or applications under the Land Registration Act 2002(**50**), the foreign representative shall, as soon as reasonably practicable after the making of the order or at the appropriate time, make the appropriate application or applications to the Chief Land Registrar.

(2)  In sub-paragraph (1) an appropriate application is—

(a)  in any case where—

(i) a recognition order in respect of a foreign main proceeding or an order suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor is made, and

(ii) the debtor is the registered proprietor of a registered estate or registered charge and holds it for his sole benefit,

_____

(**50**)  2002 c. 9.

*Document Generated: 2017-05-04*

**Draft Legislation:** *This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

an application under section 43 of the Land Registration Act 2002 for a restriction of the kind referred to in sub-paragraph (3) to be entered in the relevant registered title; and

(b)  in any other case, an application under the Land Registration Act 2002 for such an entry in the register as shall be necessary to reflect the effect of the court order under these Regulations.

(3)  The restriction referred to in sub-paragraph (2)(a) is a restriction to the effect that no disposition of the registered estate or registered charge (as appropriate) by the registered proprietor of that estate or charge is to be completed by registration within the meaning of section 27 of the Land Registration Act 2002 except under a further order of the court.

# PART 8

## Misfeasance

### Misfeasance by foreign representative

**29.**—(1)  The court may examine the conduct of a person who—

(a)  is or purports to be the foreign representative in relation to a debtor; or

(b)  has been or has purported to be the foreign representative in relation to a debtor.

(2)  An examination under this paragraph may be held only on the application of—

(a)  a British insolvency officeholder acting in relation to the debtor;

(b)  a creditor of the debtor; or

(c)  with the permission of the court, any other person who appears to have an interest justifying an application.

(3)  An application under sub-paragraph (2) must allege that the foreign representative—

(a)  has misapplied or retained money or other property of the debtor;

(b)  has become accountable for money or other property of the debtor;

(c)  has breached a fiduciary or other duty in relation to the debtor; or

(d)  has been guilty of misfeasance.

(4)  On an examination under this paragraph into a person's conduct the court may order him—

(a)  to repay, restore or account for money or property;

(b)  to pay interest;

(c)  to contribute a sum to the debtor's property by way of compensation for breach of duty or misfeasance.

(5)  In sub-paragraph (3) "foreign representative" includes a person who purports or has purported to be a foreign representative in relation to a debtor.

# PART 9

## General Provision as to Court Procedure and Practice

### Principal court rules and practice to apply with modifications

**30.**—(1)  The CPR and the practice and procedure of the High Court (including any practice direction) shall apply to proceedings under these Regulations in the High Court with such

Document Generated: 2017-05-04

*Draft Legislation:* This is a draft item of legislation. This draft has since been made as
*a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

modifications as may be necessary for the purpose of giving effect to the provisions of these Regulations and in the case of any conflict between any provision of the CPR and the provisions of these Regulations, the latter shall prevail.

(2) All proceedings under these Regulations shall be allocated to the multi-track for which CPR Part 29 (the multi-track) makes provision, and accordingly those provisions of the CPR which provide for allocation questionnaires and track allocation shall not apply.

### Applications other than the principal applications—preliminary

**31.** Paragraphs 32 to 37 of this Part apply to any application made to the court under these Regulations, except any of the applications referred to in paragraph 18(1)(a).

### Form and contents of application

**32.**—(1) Every application shall be in the form appropriate to the application concerned. Forms ML 4 and ML 5 shall be used for an originating application and an ordinary application respectively under these Regulations.

(2) Each application shall be in writing and shall state—

    (a) the names of the parties;

    (b) the nature of the relief or order applied for or the directions sought from the court;

    (c) the names and addresses of the persons (if any) on whom it is intended to serve the application or that no person is intended to be served;

    (d) where these Regulations require that notice of the application is to be given to specified persons, the names and addresses of all those persons (so far as known to the applicant); and

    (e) the applicant's address for service.

(3) An originating application shall set out the grounds on which the applicant claims to be entitled to the relief or order sought.

(4) The application must be signed by the applicant if he is acting in person or, when he is not so acting, by or on behalf of his solicitor.

### Filing and service of application

**33.**—(1) The application shall be filed in court, accompanied by one copy and a number of additional copies equal to the number of persons who are to be served with the application.

(2) Subject as follows in this paragraph and in paragraph 34, or unless the court otherwise orders, upon the presentation of the documents mentioned in sub-paragraph (1), the court shall fix a venue for the application to be heard.

(3) Unless the court otherwise directs, the applicant shall serve a sealed copy of the application, endorsed with the venue of the hearing, on the respondent named in the application (or on each respondent if more than one).

(4) The court may give any of the following directions—

    (a) that the application be served upon persons other than those specified by the relevant provision of these Regulations;

    (b) that the giving of notice to any person may be dispensed with;

    (c) that notice be given in some way other than that specified in sub-paragraph (3).

(5) Subject to sub-paragraph (6), the application must be served at least 10 business days before the date fixed for the hearing.

Document Generated: 2017-05-04

*Draft Legislation:* This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030

(6) Where the case is one of urgency, the court may (without prejudice to its general power to extend or abridge time limits)—

    (a) hear the application immediately, either with or without notice to, or the attendance of, other parties; or

    (b) authorise a shorter period of service than that provided for by sub-paragraph (5);

and any such application may be heard on terms providing for the filing or service of documents, or the carrying out of other formalities, as the court thinks fit.

### Other hearings *ex parte*

**34.**—(1) Where the relevant provisions of these Regulations do not require service of the application on, or notice of it to be given to, any person, the court may hear the application *ex parte*.

(2) Where the application is properly made *ex parte*, the court may hear it forthwith, without fixing a venue as required by paragraph 33(2).

(3) Alternatively, the court may fix a venue for the application to be heard, in which case paragraph 33 applies (so far as relevant).

### Use of affidavit evidence

**35.**—(1) In any proceedings evidence may be given by affidavit unless the court otherwise directs; but the court may, on the application of any party, order the attendance for cross-examination of the person making the affidavit.

(2) Where, after such an order has been made, the person in question does not attend, his affidavit shall not be used in evidence without the permission of the court.

### Filing and service of affidavits

**36.**—(1) Unless the court otherwise allows—

    (a) if the applicant intends to rely at the first hearing on affidavit evidence, he shall file the affidavit or affidavits (if more than one) in court and serve a copy or copies on the respondent, not less than 10 business days before the date fixed for the hearing; and

    (b) where a respondent to an application intends to oppose it and to rely for that purpose on affidavit evidence, he shall file the affidavit or affidavits (if more than one) in court and serve a copy or copies on the applicant, not less than 5 business days before the date fixed for the hearing.

(2) Any affidavit may be sworn by the applicant or by the respondent or by some other person possessing direct knowledge of the subject matter of the application.

### Adjournment of hearings; directions

**37.** The court may adjourn the hearing of an application on such terms (if any) as it thinks fit and in the case of such an adjournment paragraph 27(2) shall apply.

### Transfer of proceedings within the High Court

**38.**—(1) The High Court may, having regard to the criteria in CPR rule 30.3(2), order proceedings in the Royal Courts of Justice or a district registry, or any part of such proceedings (such as an application made in the proceedings), to be transferred—

    (a) from the Royal Courts of Justice to a district registry; or

    (b) from a district registry to the Royal Courts of Justice or to another district registry.

*Document Generated: 2017-05-04*

***Draft Legislation:*** *This is a draft item of legislation. This draft has since been made as*
*a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

(2)  The High Court may order proceedings before a district registry for the detailed assessment of costs to be transferred to another district registry if it is satisfied that the proceedings could be more conveniently or fairly taken in that other district registry.

(3)  An application for an order under sub-paragraph (1) or (2) must, if the claim is proceeding in a district registry, be made to that registry.

(4)  A transfer of proceedings under this paragraph may be ordered—

(a)  by the court of its own motion; or

(b)  on the application of a person appearing to the court to have an interest in the proceedings.

(5)  Where the court orders proceedings to be transferred, the court from which they are to be transferred must give notice of the transfer to all the parties.

(6)  An order made before the transfer of the proceedings shall not be affected by the order to transfer.

### Transfer of proceedings—actions to avoid acts detrimental to creditors

**39.**—(1)  If—

(a)  in accordance with article 23(6) of the Model Law, the court grants a foreign representative permission to make an application in accordance with paragraph 1 of that article; and

(b)  the relevant proceedings under British insolvency law taking place regarding the debtor are taking place in the county court,

the court may also order those proceedings to be transferred to the High Court.

(2)  Where the court makes an order transferring proceedings under sub-paragraph (1)—

(a)  it shall send sealed copies of the order to the county court from which the proceedings are to be transferred, and to the official receivers attached to that court and the High Court respectively; and

(b)  the county court shall send the file of the proceedings to the High Court.

(3)  Following compliance with this paragraph, if the official receiver attached to the court to which the proceedings are transferred is not already, by virtue of directions given by the Secretary of State under section 399(6)(a) of the 1986 Act, the official receiver in relation to those proceedings, he becomes, in relation to those proceedings, the official receiver in place of the official receiver attached to the other court concerned.

### Shorthand writers

**40.**—(1)  The judge may in writing nominate one or more persons to be official shorthand writers to the court.

(2)  The court may, at any time in the course of proceedings under these Regulations, appoint a shorthand writer to take down the evidence of a person examined in pursuance of a court order under article 19 or 21 of the Model Law.

(3)  The remuneration of a shorthand writer appointed in proceedings under these Regulations shall be paid by the party at whose instance the appointment was made or otherwise as the court may direct.

(4)  Any question arising as to the rates of remuneration payable under this paragraph shall be determined by the court in its discretion.

*Document Generated: 2017-05-04*

*Draft Legislation: This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

### Enforcement procedures

**41.** In any proceedings under these Regulations, orders of the court may be enforced in the same manner as a judgment to the same effect.

### Title of proceedings

**42.**—(1) Every proceeding under these Regulations shall, with any necessary additions, be intituled "IN THE MATTER OF . . . (naming the debtor to which the proceedings relate) AND IN THE MATTER OF THE CROSS-BORDER INSOLVENCY REGULATIONS 2006".

(2) Sub-paragraph (1) shall not apply in respect of any form prescribed under these Regulations.

### Court records

**43.** The court shall keep records of all proceedings under these Regulations, and shall cause to be entered in the records the taking of any step in the proceedings, and such decisions of the court in relation thereto, as the court thinks fit.

### Inspection of records

**44.**—(1) Subject as follows, the court's records of proceedings under these Regulations shall be open to inspection by any person.

(2) If in the case of a person applying to inspect the records the Registrar is not satisfied as to the propriety of the purpose for which inspection is required, he may refuse to allow it. That person may then apply forthwith and *ex parte* to the judge, who may refuse the inspection or allow it on such terms as he thinks fit.

(3) The decision of the judge under sub-paragraph (2) is final.

### File of court proceedings

**45.**—(1) In respect of all proceedings under these Regulations, the court shall open and maintain a file for each case; and (subject to directions of the Registrar) all documents relating to such proceedings shall be placed on the relevant file.

(2) No proceedings under these Regulations shall be filed in the Central Office of the High Court.

### Right to inspect the file

**46.**—(1) In the case of any proceedings under these Regulations, the following have the right, at all reasonable times, to inspect the court's file of the proceedings—

(a) the Secretary of State;

(b) the person who is the foreign representative in relation to the proceedings;

(c) if a foreign representative has been appointed in any other foreign proceeding regarding the debtor to which the proceedings under these Regulations relate, that person;

(d) if a British insolvency officeholder is acting in relation to the debtor to which the proceedings under these Regulations relate, that person;

(e) any person stating himself in writing to be a creditor of the debtor to which the proceedings under these Regulations relate;

(f) if a member State liquidator has been appointed in relation to the debtor to which the proceedings under these Regulations relate, that person; and

Document Generated: 2017-05-04

*Draft Legislation:* This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030

(g) the debtor to which the proceedings under these Regulations relate, or, if that debtor is a company, corporation or partnership, every person who is, or at any time has been—

  (i) a director or officer of the debtor;

  (ii) a member of the debtor; or

  (iii) where applicable, a person registered under Part 23 of the Companies Act 1985(**51**) as authorised to represent the debtor in respect of its business in England and Wales.

(2) The right of inspection conferred as above on any person may be exercised on his behalf by a person properly authorised by him.

(3) Any person may, by leave of the court, inspect the file.

(4) The right of inspection conferred by this paragraph is not exercisable in the case of documents, or parts of documents, as to which the court directs (either generally or specially) that they are not to be made open to inspection without the court's permission.

An application for a direction of the court under this sub-paragraph may be made by the foreign representative or by any party appearing to the court to have an interest.

(5) If, for the purpose of powers conferred by the 1986 Act or the Rules, the Secretary of State or the official receiver wishes to inspect the file of any proceedings under these Regulations, and requests the transmission of the file, the court shall comply with such request (unless the file is for the time being in use for the court's purposes).

(6) Paragraph 44(2) and (3) apply in respect of the court's file of any proceedings under these Regulations as they apply in respect of court records.

(7) Where these Regulations confer a right for any person to inspect documents on the court's file of proceedings, the right includes that of taking copies of those documents on payment of the fee chargeable under any order made under section 92 of the Courts Act 2003(**52**).

## Copies of court orders

**47.**—(1) In any proceedings under these Regulations, any person who under paragraph 46 has a right to inspect documents on the court file also has the right to require the foreign representative in relation to those proceedings to furnish him with a copy of any court order in the proceedings.

(2) Sub-paragraph (1) does not apply if a copy of the court order has been served on that person or notice of the making of the order has been given to that person under other provisions of these Regulations.

## Filing of Gazette notices and advertisements

**48.**—(1) In any court in which proceedings under these Regulations are pending, an officer of the court shall file a copy of every issue of the Gazette which contains an advertisement relating to those proceedings.

(2) Where there appears in a newspaper an advertisement relating to proceedings under these Regulations pending in any court, the person inserting the advertisement shall file a copy of it in that court.

The copy of the advertisement shall be accompanied by, or have endorsed on it, such particulars as are necessary to identify the proceedings and the date of the advertisement's appearance.

---

(**51**) 1985 c. 6.
(**52**) 2003 c. 39; section 92 is amended by the Constitutional Reform Act 2005 (c. 4), Schedule 11, paragraph 4 (from a day to be appointed) and Schedule 4, paragraphs 308 and 345.

Document Generated: 2017-05-04

*Draft Legislation: This is a draft item of legislation. This draft has since been made as*
*a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

(3)  An officer of any court in which proceedings under these Regulations are pending shall from time to time file a memorandum giving the dates of, and other particulars relating to, any notice published in the Gazette, and any newspaper advertisements, which relate to proceedings so pending.

The officer's memorandum is prima facie evidence that any notice or advertisement mentioned in it was duly inserted in the issue of the newspaper or the Gazette which is specified in the memorandum.

### Persons incapable of managing their affairs—introductory

**49.**—(1)  Paragraphs 50 to 52 apply where in proceedings under these Regulations it appears to the court that a person affected by the proceedings is one who is incapable of managing and administering his property and affairs either—

(a)  by reason of mental disorder within the meaning of the Mental Health Act 1983(**53**); or

(b)  due to physical affliction or disability.

(2)  The person concerned is referred to as "the incapacitated person".

### Appointment of another person to act

**50.**—(1)  The court may appoint such person as it thinks fit to appear for, represent or act for the incapacitated person.

(2)  The appointment may be made either generally or for the purpose of any particular application or proceeding, or for the exercise of particular rights or powers which the incapacitated person might have exercised but for his incapacity.

(3)  The court may make the appointment either of its own motion or on application by—

(a)  a person who has been appointed by a court in the United Kingdom or elsewhere to manage the affairs of, or to represent, the incapacitated person; or

(b)  any relative or friend of the incapacitated person who appears to the court to be a proper person to make the application; or

(c)  in any case where the incapacitated person is the debtor, the foreign representative.

(4)  Application under sub-paragraph (3) may be made *ex parte*; but the court may require such notice of the application as it thinks necessary to be given to the person alleged to be incapacitated, or any other person, and may adjourn the hearing of the application to enable the notice to be given.

### Affidavit in support of application

**51.**  An application under paragraph 50(3) shall be supported by an affidavit of a registered medical practitioner as to the mental or physical condition of the incapacitated person.

### Service of notices following appointment

**52.**  Any notice served on, or sent to, a person appointed under paragraph 50 has the same effect as if it had been served on, or given to, the incapacitated person.

### Rights of audience

**53.**  Rights of audience in proceedings under these Regulations are the same as obtain in proceedings under British insolvency law.

---

(**53**)  1983 c. 20.

Document Generated: 2017-05-04

*Draft Legislation:* This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030

**Right of attendance**

**54.**—(1)  Subject as follows, in proceedings under these Regulations, any person stating himself in writing, in records kept by the court for that purpose, to be a creditor of the debtor to which the proceedings relate, is entitled at his own cost, to attend in court or in chambers at any stage of the proceedings.

(2)  Attendance may be by the person himself, or his solicitor.

(3)  A person so entitled may request the court in writing to give him notice of any step in the proceedings; and, subject to his paying the costs involved and keeping the court informed as to his address, the court shall comply with the request.

(4)  If the court is satisfied that the exercise by a person of his rights under this paragraph has given rise to costs for the estate of the debtor which would not otherwise have been incurred and ought not, in the circumstances, to fall on that estate, it may direct that the costs be paid by the person concerned, to an amount specified.

The rights of that person under this paragraph shall be in abeyance so long as those costs are not paid.

(5)  The court may appoint one or more persons to represent the creditors of the debtor to have the rights conferred by this paragraph, instead of the rights being exercised by any or all of them individually.

If two or more persons are appointed under this paragraph to represent the same interest, they must (if at all) instruct the same solicitor.

**Right of attendance for member State liquidator**

**55.**  For the purposes of paragraph 54(1), a member State liquidator appointed in relation to a debtor subject to proceedings under these Regulations shall be deemed to be a creditor.

**British insolvency officeholder's solicitor**

**56.**  Where in any proceedings the attendance of the British insolvency officeholder's solicitor is required, whether in court or in chambers, the British insolvency officeholder himself need not attend, unless directed by the court.

**Formal defects**

**57.**  No proceedings under these Regulations shall be invalidated by any formal defect or by any irregularity, unless the court before which objection is made considers that substantial injustice has been caused by the defect or irregularity, and that the injustice cannot be remedied by any order of the court.

**Restriction on concurrent proceedings and remedies**

**58.**  Where in proceedings under these Regulations the court makes an order staying any action, execution or other legal process against the property of a debtor, service of the order may be effected by sending a sealed copy of the order to whatever is the address for service of the claimant or other party having the carriage of the proceedings to be stayed.

**Affidavits**

**59.**—(1)  Where in proceedings under these Regulations, an affidavit is made by any British insolvency officeholder acting in relation to the debtor, he shall state the capacity in which he makes it, the position which he holds and the address at which he works.

(2)  Any officer of the court duly authorised in that behalf, may take affidavits and declarations.

Document Generated: 2017-05-04

*Draft Legislation: This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

(3)  Subject to sub-paragraph (4), where these Regulations provide for the use of an affidavit, a witness statement verified by a statement of truth may be used as an alternative.

(4)  Sub-paragraph (3) does not apply to paragraphs 4 (affidavit in support of recognition application), 7 (affidavit in support of interim relief application), 10 (affidavit in support of article 21 relief application), 13 (affidavit in support of application regarding status of replacement foreign representative) and 16 (affidavit in support of review application).

### Security in court

**60.**—(1)  Where security has to be given to the court (otherwise than in relation to costs), it may be given by guarantee, bond or the payment of money into court.

(2)  A person proposing to give a bond as security shall give notice to the party in whose favour the security is required, and to the court, naming those who are to be sureties to the bond.

(3)  The court shall forthwith give notice to the parties concerned of a venue for the execution of the bond and the making of any objection to the sureties.

(4)  The sureties shall make an affidavit of their sufficiency (unless dispensed with by the party in whose favour the security is required) and shall, if required by the court, attend the court to be cross-examined.

### Further information and disclosure

**61.**—(1)  Any party to proceedings under these Regulations may apply to the court for an order—

  (a)  that any other party—

      (i)  clarify any matter which is in dispute in the proceedings; or

      (ii)  give additional information in relation to any such matter,

    in accordance with CPR Part 18 (further information); or

  (b)  to obtain disclosure from any other party in accordance with CPR Part 31 (disclosure and inspection of documents).

(2)  An application under this paragraph may be made without notice being served on any other party.

### Office copies of documents

**62.**—(1)  Any person who has under these Regulations the right to inspect the court file of proceedings may require the court to provide him with an office copy of any document from the file.

(2)  A person's right under this paragraph may be exercised on his behalf by his solicitor.

(3)  An office copy provided by the court under this paragraph shall be in such form as the Registrar thinks appropriate, and shall bear the court's seal.

### "The court"

**63.**—(1)  Anything to be done in proceedings under these Regulations by, to or before the court may be done by, to or before a judge of the High Court or a Registrar.

(2)  Where these Regulations require or permit the court to perform an act of a formal or administrative character, that act may be performed by a court officer.

Document Generated: 2017-05-04

*__Draft Legislation:__ This is a draft item of legislation. This draft has since been made as*
*a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

# PART 10

## COSTS AND DETAILED ASSESSMENT

**Requirement to assess costs by the detailed procedure**

**64.** In any proceedings before the court, the court may order costs to be decided by detailed assessment.

**Costs of officers charged with execution of writs or other process**

**65.**—(1)  Where by virtue of article 20 of the Model Law or a court order under article 19 or 21 of the Model Law an enforcement officer, or other officer, charged with execution of the writ or other process—

(a)  is required to deliver up goods or money; or

(b)  has deducted costs from the proceeds of an execution or money paid to him,

the foreign representative may require in writing that the amount of the enforcement officer's or other officer's bill of costs be decided by detailed assessment.

(2)  Where such a requirement is made, if the enforcement officer or other officer does not commence detailed assessment proceedings within 3 months of the requirement under sub-paragraph (1), or within such further time as the court, on application, may permit, any claim by the enforcement officer or other officer in respect of his costs is forfeited by such failure to commence proceedings.

(3)  Where, in the case of a deduction of costs by the enforcement officer or other officer, any amount deducted is disallowed at the conclusion of the detailed assessment proceedings, the enforcement officer or other officer shall forthwith pay a sum equal to that disallowed to the foreign representative for the benefit of the debtor.

**Final costs certificate**

**66.**—(1)  A final costs certificate of the costs officer is final and conclusive as to all matters which have not been objected to in the manner provided for under the rules of the court.

(2)  Where it is proved to the satisfaction of a costs officer that a final costs certificate has been lost or destroyed, he may issue a duplicate.

# PART 11

## APPEALS IN PROCEEDINGS UNDER THESE REGULATIONS

**Appeals from court orders**

**67.**—(1)  An appeal from a decision of a Registrar of the High Court in proceedings under these Regulations lies to a single judge of the High Court; and an appeal from a decision of that judge on such an appeal lies, with the permission of the Court of Appeal, to the Court of Appeal.

(2)  An appeal from a decision of a judge of the High Court in proceedings under these Regulations which is not a decision on an appeal made to him under sub-paragraph (1) lies, with the permission of that judge or the Court of Appeal, to the Court of Appeal.

*Document Generated: 2017-05-04*

*Draft Legislation: This is a draft item of legislation. This draft has since been made as*
*a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

**Procedure on appeals**

**68.**—(1)  Subject as follows, CPR Part 52 (appeals to the Court of Appeal) and its practice direction apply to appeals in proceedings under these Regulations.

(2)  The provisions of Part 4 of the practice direction on Insolvency Proceedings supporting CPR Part 49 relating to first appeals (as defined in that Part) apply in relation to any appeal to a single judge of the High Court under paragraph 67, with any necessary modifications.

(3)  In proceedings under these Regulations, the procedure under CPR Part 52 is by ordinary application and not by appeal notice.

# PART 12

## GENERAL

**Notices**

**69.**—(1)  All notices required or authorised by or under these Regulations to be given must be in writing, unless it is otherwise provided, or the court allows the notice to be given in some other way.

(2)  Where in proceedings under these Regulations a notice is required to be sent or given by any person, the sending or giving of it may be proved by means of a certificate by that person that he posted the notice, or instructed another person (naming him) to do so.

(3)  A certificate under this paragraph may be endorsed on a copy or specimen of the notice to which it relates.

**"Give notice" etc.**

**70.**—(1)  A reference in these Regulations to giving notice, or to delivering, sending or serving any document, means that the notice or document may be sent by post.

(2)  Subject to paragraph 75, any form of post may be used.

(3)  Personal service of a document is permissible in all cases.

(4)  Notice of the venue fixed for an application may be given by service of the sealed copy of the application under paragraph 33(3).

**Notice, etc. to solicitors**

**71.**  Where in proceedings under these Regulations a notice or other document is required or authorised to be given to a person, it may, if he has indicated that his solicitor is authorised to accept service on his behalf, be given instead to the solicitor.

**Notice to joint British insolvency officeholders**

**72.**  Where two or more persons are acting jointly as the British insolvency officeholder in proceedings under British insolvency law, delivery of a document to one of them is to be treated as delivery to them all.

**Forms for use in proceedings under these Regulations**

**73.**—(1)  The forms contained in Schedule 5 to these Regulations shall be used in, and in connection with, proceedings under these Regulations.

(2)  The forms shall be used with such variations, if any, as the circumstances may require.

Document Generated: 2017-05-04

*Draft Legislation:* This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030

**Time limits**

**74.**—(1)  The provisions of CPR Rule 2.8 (time) apply, as regards computation of time, to anything required or authorised to be done by these Regulations.

(2)  The provisions of CPR rule 3.1(2)(a) (the court's general powers of management) apply so as to enable the court to extend or shorten the time for compliance with anything required or authorised to be done by these Regulations.

**Service by post**

**75.**—(1)  For a document to be properly served by post, it must be contained in an envelope addressed to the person on whom service is to be effected, and pre-paid for first class post.

(2)  A document to be served by post may be sent to the last known address of the person to be served.

(3)  Where first class post is used, the document is treated as served on the second business day after the date of posting, unless the contrary is shown.

(4)  The date of posting is presumed, unless the contrary is shown, to be the date shown in the post-mark on the envelope in which the document is contained.

**General provisions as to service and notice**

**76.**  Subject to paragraphs 22, 75 and 77, CPR Part 6 (service of documents) applies as regards any matter relating to the service of documents and the giving of notice in proceedings under these Regulations.

**Service outside the jurisdiction**

**77.**—(1)  Sections III and IV of CPR Part 6 (service out of the jurisdiction and service of process of foreign court) do not apply in proceedings under these Regulations.

(2)  Where for the purposes of proceedings under these Regulations any process or order of the court, or other document, is required to be served on a person who is not in England and Wales, the court may order service to be effected within such time, on such person, at such place and in such manner as it thinks fit, and may also require such proof of service as it thinks fit.

(3)  An application under this paragraph shall be supported by an affidavit stating—

(a)  the grounds on which the application is made; and

(b)  in what place or country the person to be served is, or probably may be found.

**False claim of status as creditor**

**78.**—(1)  Rule 12.18 (false claim of status as creditor, etc) shall apply with any necessary modifications in any case where a person falsely claims the status of a creditor of a debtor, with the intention of obtaining a sight of documents whether on the court's file or in the hands of the foreign representative or other person, which he has not under these Regulations any right to inspect.

(2)  Rule 21.21 and Schedule 5 of the Rules shall apply to an offence under Rule 12.18 as applied by sub-paragraph (1) as they apply to an offence under Rule 12.18.

**The Gazette**

**79.**—(1)  A copy of the Gazette containing any notice required by these Regulations to be gazetted is evidence of any fact stated in the notice.

*Document Generated: 2017-05-04*

***Draft Legislation:*** *This is a draft item of legislation. This draft has since been made as*
*a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

(2)  In the case of an order of the court notice of which is required by these Regulations to be gazetted, a copy of the Gazette containing the notice may in any proceedings be produced as conclusive evidence that the order was made on the date specified in the notice.

<div align="center">

SCHEDULE 3                                       Regulation 5

PROCEDURAL MATTERS IN SCOTLAND

# PART 1

### INTERPRETATION

</div>

**Interpretation**

**1.**—(1)  In this Schedule—

"the 1986 Act" means the Insolvency Act 1986(**54**);

"article 21 remedy application" means an application to the court by a foreign representative under article 21(1) or (2) of the Model Law for remedy;

"business day" means any day other than a Saturday, a Sunday, Christmas Day, Good Friday or a day which is a bank holiday in Scotland under or by virtue of the Banking and Financial Dealings Act 1971(**55**);

"the Gazette" means the Edinburgh Gazette;

"main proceedings" means proceedings opened in accordance with Article 3(1) of the EC Insolvency Regulation and falling within the definition of insolvency proceedings in Article 2(a) of the EC Insolvency Regulation;

"member State liquidator" means a person falling within the definition of liquidator in Article 2(b) of the EC Insolvency Regulation appointed in proceedings to which it applies in a member State other than the United Kingdom;

"the Model Law" means the UNCITRAL Model Law as set out in Schedule 1 to these Regulations;

"modification or termination order" means an order by the court pursuant to its powers under the Model Law modifying or terminating recognition of a foreign proceeding, the sist, restraint or suspension referred to in article 20(1) or any part of it or any remedy granted under article 19 or 21 of the Model Law;

"recognition application" means an application to the court by a foreign representative in accordance with article 15 of the Model Law for an order recognising the foreign proceeding in which he has been appointed;

"recognition order" means an order by the court recognising a proceeding the subject of a recognition application as a foreign main proceeding or foreign non-main proceeding, as appropriate;

"relevant company" means a company within the meaning of section 735(1) of the Companies Act 1985(**56**) or an unregistered company within the meaning of Part 5 of the 1986 Act which

---

(**54**)  1986 c. 45.
(**55**)  1971 c. 80.
(**56**)  1985 c. 6.

Document Generated: 2017-05-04

*Draft Legislation:* This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030

is subject to a requirement imposed by virtue of section 690A(**57**), 691(1)(**58**) or 718(**59**) of the Companies Act 1985;

"review application" means an application to the court for a modification or termination order.

(2) Expressions defined in the Model Law have the same meaning when used in this Schedule.

(3) References in this Schedule to a debtor who is of interest to the Financial Services Authority are references to a debtor who—

(a) is, or has been, an authorised person within the meaning of section 31 of the Financial Services and Markets Act 2000(**60**) (authorised persons);

(b) is, or has been, an appointed representative within the meaning of section 39 (exemption of appointed representatives) of that Act; or

(c) is carrying, or has carried on, a regulated activity in contravention of the general prohibition.

(4) In sub-paragraph (3) "the general prohibition" has the meaning given by section 19 of the Financial Services and Markets Act 2000 and the reference to a "regulated activity" must be construed in accordance with—

(a) section 22 of that Act (classes of regulated activity and categories of investment);

(b) any relevant order under that section; and

(c) Schedule 2 to that Act (regulated activities).

(5) References in this Schedule to a numbered form are to the form that bears that number in Schedule 5.

# PART 2

## The Foreign Representative

### Application for confirmation of status of replacement foreign representative

**2.**—(1) This paragraph applies where following the making of a recognition order the foreign representative dies or for any other reason ceases to be the foreign representative in the foreign proceedings in relation to the debtor.

(2) In this paragraph "the former foreign representative" means the foreign representative referred to in sub-paragraph (1).

(3) If a person has succeeded the former foreign representative or is otherwise holding office as foreign representative in the foreign proceeding in relation to the debtor, that person may apply to the court for an order confirming his status as replacement foreign representative for the purpose of proceedings under these Regulations.

(4) If the court dismisses an application under sub-paragraph (3) then it may also, if it thinks fit, make an order terminating recognition of the foreign proceeding and—

(a) such an order may include such provision as the court thinks fit with respect to matters arising in connection with the termination; and

(b) paragraph 5 shall not apply to such an order.

---

(**57**) Section 690A was inserted by S.I. 1992/3179.
(**58**) As amended by S.I. 2000/3373 and 2002/912.
(**59**) As amended by the Statute Law (Repeals) Act 2004 (c. 14) and S.I. 2001/1228.
(**60**) 2000 c. 8.

*Document Generated: 2017-05-04*

***Draft Legislation:*** *This is a draft item of legislation. This draft has since been made as a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

**Misfeasance by a foreign representative**

**3.**—(1)  The court may examine the conduct of a person who—

(a)  is or purports to be the foreign representative in relation to a debtor, or

(b)  has been or has purported to be the foreign representative in relation to a debtor.

(2)  An examination under this paragraph may be held only on the application of—

(a)  a British insolvency officeholder acting in relation to the debtor,

(b)  a creditor of the debtor, or

(c)  with the permission of the court, any other person who appears to have an interest justifying an application.

(3)  An application under sub-paragraph (2) must allege that the foreign representative—

(a)  has misapplied or retained money or other property of the debtor,

(b)  has become accountable for money or other property of the debtor,

(c)  has breached a fiduciary duty or other duty in relation to the debtor, or

(d)  has been guilty of misfeasance.

(4)  On an examination under this paragraph into a person's conduct the court may order him—

(a)  to repay, restore or account for money or property;

(b)  to pay interest;

(c)  to contribute a sum to the debtor's property by way of compensation for breach of duty or misfeasance.

(5)  In sub-paragraph (3), "foreign representative" includes a person who purports or has purported to be a foreign representative in relation to a debtor.

# PART 3

## COURT PROCEDURE AND PRACTICE

**Preliminary and interpretation**

**4.**—(1)  This Part applies to—

(a)  any of the following applications made to the court under these Regulations—

(i)  a recognition application;

(ii)  an article 21 remedy application;

(iii)  an application under paragraph 2(3) for an order confirming the status of a replacement foreign representative;

(iv)  a review application; and

(b)  any of the following orders made by the court under these Regulations—

(i)  a recognition order;

(ii)  an order granting interim remedy under article 19 of the Model Law;

(iii)  an order granting remedy under article 21 of the Model Law;

(iv)  an order confirming the status of a replacement foreign representative; or

(v)  a modification or termination order.

Document Generated: 2017-05-04
*Draft Legislation:* This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030

**Reviews of court orders—where court makes order of its own motion**

**5.**—(1)  The court shall not of its own motion make a modification or termination order unless the foreign representative and the debtor have either—

   (a)  had an opportunity of being heard on the question, or

   (b)  consented in writing to such an order.

(2)  If the court makes a modification or termination order, the order may include such provision as the court thinks fit with respect to matters arising in connection with the modification or termination.

**The hearing**

**6.**—(1)  At the hearing of the application, the applicant and any of the following persons (not being the applicant) may appear or be represented—

   (a)  the foreign representative;

   (b)  the debtor and, in the case of any debtor other than an individual, any one or more directors or other officers of the debtor, including—

      (i)  where applicable, any person registered under Part 23 of the Companies Act 1985(**61**) as authorised to represent the debtor in respect of its business in Scotland;

      (ii)  in the case of a debtor which is a partnership, any person who is a member of the partnership;

   (c)  if a British insolvency officeholder is acting in relation to the debtor, that person;

   (d)  if any person has been appointed an administrative receiver of the debtor or as a receiver or manager of the property of the debtor, that person;

   (e)  if a member State liquidator has been appointed in main proceedings in relation to the debtor, that person;

   (f)  if a foreign representative has been appointed in any other foreign proceeding regarding the debtor, that person;

   (g)  any person who has presented a petition for the winding up or sequestration of the debtor in Scotland;

   (h)  any person who is or may be entitled to appoint an administrator of the debtor under paragraph 14 of Schedule B1 to the 1986 Act(**62**) (appointment of administrator by holder of qualifying floating charge);

   (i)  if the debtor is a debtor who is of interest to the Financial Services Authority, that Authority; and

   (j)  with the permission of the court, any other person who appears to have an interest justifying his appearance.

**Notification and advertisement of order**

**7.**—(1)  This paragraph applies where the court makes any of the orders referred to in paragraph 4(1)(b).

(2)  The foreign representative shall send a certified copy of the interlocutor as soon as reasonably practicable to the debtor.

(3)  The foreign representative shall, as soon as reasonably practicable after the date of the order, give notice of the making of the order—

---

(**61**)  1985 c. 6.
(**62**)  Schedule B1 was inserted by the Enterprise Act 2002 (c. 40), section 248(2) and Schedule 16.

*Document Generated: 2017-05-04*

***Draft Legislation:** This is a draft item of legislation. This draft has since been made as a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

(a) if a British insolvency officeholder is acting in relation to the debtor, to him;

(b) if any person has been appointed an administrative receiver of the debtor or, to the knowledge of the foreign representative, as a receiver or manager of the property of the debtor, to him;

(c) if a member State liquidator has been appointed in main proceedings in relation to the debtor, to him;

(d) if to his knowledge a foreign representative has been appointed in any other foreign proceeding regarding the debtor, that person;

(e) if there is pending in Scotland a petition for the winding up or sequestration of the debtor, to the petitioner;

(f) to any person who to his knowledge is or may be entitled to appoint an administrator of the debtor under paragraph 14 of Schedule B1 to the 1986 Act (appointment of administrator by holder of qualifying floating charge);

(g) if the debtor is a debtor who is of interest to the Financial Services Authority, to that Authority; and

(h) to such persons as the court may direct.

(4) Where the debtor is a relevant company, the foreign representative shall send notice of the making of the order to the registrar of companies before the end of the period of 5 business days beginning with the date of the order. The notice to the registrar of companies shall be in Form ML 7.

(5) The foreign representative shall advertise the making of the following orders once in the Gazette and once in such newspaper as he thinks most appropriate for ensuring that the making of the order comes to the notice of the debtor's creditors—

(a) a recognition order,

(b) an order confirming the status of a replacement foreign representative, and

(c) a modification or termination order which modifies or terminates recognition of a foreign proceeding,

and the advertisement shall be in Form ML 8.

### Registration of court order

**8.**—(1) Where the court makes a recognition order in respect of a foreign main proceeding or an order suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor being heritable property, the clerk of the court shall send forthwith a certified copy of the order to the keeper of the register of inhibitions and adjudications for recording in that register.

(2) Recording under sub-paragraph (1) or (3) shall have the effect as from the date of the order of an inhibition and of a citation in an adjudication of the debtor's heritable estate at the instance of the foreign representative.

(3) Where the court makes a modification or termination order, the clerk of the court shall send forthwith a certified copy of the order to the keeper of the register of inhibitions and adjudications for recording in that register.

(4) The effect mentioned in sub-paragraph (2) shall expire—

(a) on the recording of a modification or termination order under sub-paragraph (3); or

(b) subject to sub-paragraph (5), if the effect has not expired by virtue of paragraph (a), at the end of the period of 3 years beginning with the date of the order.

(5) The foreign representative may, if recognition of the foreign proceeding has not been modified or terminated by the court pursuant to its powers under the Model Law, before the end of the period of 3 years mentioned in sub-paragraph (4)(b), send a memorandum in a form prescribed by the

Document Generated: 2017-05-04

***Draft Legislation:*** *This is a draft item of legislation. This draft has since been made as*
*a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

Court of Session by act of sederunt to the keeper of the register of inhibitions and adjudications for recording in that register, and such recording shall renew the effect mentioned in sub-paragraph (2); and thereafter the said effect shall continue to be preserved only if such memorandum is so recorded before the expiry of every subsequent period of 3 years.

### Right to inspect court process

**9.**—(1)  In the case of any proceedings under these Regulations, the following have the right, at all reasonable times, to inspect the court process of the proceedings—

(a) the Secretary of State;

(b) the person who is the foreign representative in relation to the proceedings;

(c) if a foreign representative has been appointed in any other foreign proceeding regarding the debtor, that person;

(d) if a British insolvency officeholder is acting in relation to the debtor, that person;

(e) any person stating himself in writing to be a creditor of the debtor to which the proceedings under these Regulations relate;

(f) if a member State liquidator has been appointed in relation to a debtor which is subject to proceedings under these Regulations, that person; and

(g) the debtor to which the proceedings under these Regulations relate, or, if that debtor is a company, corporation or partnership, every person who is, or at any time has been—

(i) a director or officer of the debtor,

(ii) a member of the debtor, or

(iii) where applicable, a person registered under Part 23 of the Companies Act 1985 as authorised to represent the debtor in respect of its business in Scotland.

(2)  The right of inspection conferred as above on any person may be exercised on his behalf by a person properly authorised by him.

### Copies of court orders

**10.**—(1)  In any proceedings under these Regulations, any person who under paragraph 9 has a right to inspect documents in the court process also has the right to require the foreign representative in relation to those proceedings to furnish him with a copy of any court order in the proceedings.

(2)  Sub-paragraph (1) does not apply if a copy of the court order has been served on that person or notice of the making of the order has been given to that person under other provisions of these Regulations.

### Transfer of proceedings—actions to avoid acts detrimental to creditors

**11.**  If, in accordance with article 23(6) of the Model Law, the court grants a foreign representative permission to make an application in accordance with paragraph (1) of that article, it may also order the relevant proceedings under British insolvency law taking place regarding the debtor to be transferred to the Court of Session if those proceedings are taking place in Scotland and are not already in that court.

*Document Generated: 2017-05-04*

*Draft Legislation:* This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030

# PART 3

## GENERAL

### Giving of notices, etc

**12.**—(1)  All notices required or authorised by or under these Regulations to be given, sent or delivered must be in writing, unless it is otherwise provided, or the court allows the notice to be sent or given in some other way.

(2)  Any reference in these Regulations to giving, sending or delivering a notice or any such document means, without prejudice to any other way and unless it is otherwise provided, that the notice or document may be sent by post, and that, subject to paragraph 13, any form of post may be used. Personal service of the notice or document is permissible in all cases.

(3)  Where under these Regulations a notice or other document is required or authorised to be given, sent or delivered by a person ("the sender") to another ("the recipient"), it may be given, sent or delivered by any person duly authorised by the sender to do so to any person duly authorised by the recipient to receive or accept it.

(4)  Where two or more persons are acting jointly as the British insolvency officeholder in proceedings under British insolvency law, the giving, sending or delivering of a notice or document to one of them is to be treated as the giving, sending or delivering of a notice or document to each or all.

### Sending by post

**13.**—(1) For a document to be properly sent by post, it must be contained in an envelope addressed to the person to whom it is to be sent, and pre-paid for either first or second class post.

(2)  Any document to be sent by post may be sent to the last known address of the person to whom the document is to be sent.

(3)  Where first class post is used, the document is to be deemed to be received on the second business day after the date of posting, unless the contrary is shown.

(4)  Where second class post is used, the document is to be deemed to be received on the fourth business day after the date of posting, unless the contrary is shown.

### Certificate of giving notice, etc

**14.**—(1)  Where in any proceedings under these Regulations a notice or document is required to be given, sent or delivered by any person, the date of giving, sending or delivery of it may be proved by means of a certificate by that person that he gave, posted or otherwise sent or delivered the notice or document on the date stated in the certificate, or that he instructed another person (naming him) to do so.

(2)  A certificate under this paragraph may be endorsed on a copy of the notice to which it relates.

(3)  A certificate purporting to be signed by or on behalf of the person mentioned in sub-paragraph (1) shall be deemed, unless the contrary is shown, to be sufficient evidence of the matters stated therein.

### Forms for use in proceedings under these Regulations

**15.**—(1)  Forms ML 7 and ML 8 contained in Schedule 5 to these Regulations shall be used in, and in connection with, proceedings under these Regulations.

(2)  The forms shall be used with such variations, if any, as the circumstances may require.

Document Generated: 2017-05-04

*Draft Legislation:* This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030

SCHEDULE 4                                    Regulation 6

NOTICES DELIVERED TO THE REGISTRAR OF COMPANIES

**Interpretation**

**1.**—(1)  In this Schedule—

"the 1985 Act" means the Companies Act 1985(**63**);

"electronic communication" means the same as in the Electronic Communications Act
2000(**64**);

"Model Law notice" means a notice delivered to the registrar of companies under paragraph
26(6) of Schedule 2 or paragraph 7(4) of Schedule 3.

(2)  Expressions defined in the Model Law or Schedule 2 or 3, as appropriate, have the same
meaning when used in this Schedule.

(3)  References in this Schedule to delivering a notice include sending, forwarding, producing
or giving it.

**Functions of the registrar of companies**

**2.**—(1)  Where a Model Law notice is delivered to the registrar of companies in respect of a
relevant company, the registrar shall enter a note in the register relating to that company.

(2)  The note referred to in sub-paragraph (1) shall contain the following particulars, in each case
as stated in the notice delivered to the registrar—

(a)  brief details of the court order made;

(b)  the date of the court order; and

(c)  the name and address for service of the person who is the foreign representative in relation
to the company.

**Registrar of companies to whom notices to be delivered**

**3.**—(1)  References in Schedules 2 and 3 to the registrar of companies in relation to a relevant
company shall be construed in accordance with the following provisions.

(2)  The notices which a relevant company is required to deliver to the registrar of companies
shall be delivered—

(a)  to the registrar for England and Wales if the company has a relevant presence in England
and Wales, and

(b)  to the registrar for Scotland if the company has a relevant presence in Scotland,

and if the relevant company has a relevant presence in both parts of Great Britain, the notices shall
be delivered to both registrars.

(3)  For the purposes of this paragraph a "relevant presence" means—

(a)  in the case of a company within the meaning of section 735(1) of the 1985 Act, its
registered office,

(b)  in the case of an unregistered company within the meaning of Part 5 of the 1986 Act
which is subject to a requirement imposed by virtue of section 690A of the 1985 Act(**65**),
a branch,

---

(**63**)  1985 c. 6.
(**64**)  2000 c. 7.
(**65**)  1985 c. 6; section 690A was inserted by S.I. 1992/3179.

Document Generated: 2017-05-04

*Draft Legislation: This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

(c) in the case of an unregistered company within the meaning of Part 5 of the 1986 Act which is subject to a requirement imposed by virtue of section 691(1)(**66**) of the 1985 Act, an established place of business, and

(d) in the case of an unregistered company within the meaning of Part 5 of the 1986 Act which is subject to a requirement imposed by virtue of section 718(**67**) of the 1985 Act, a principal place of business.

### Delivery to registrar of notices

**4.**—(1)  Electronic communications may be used for the delivery of any Model Law notice, provided that such delivery is in such form and manner as is directed by the registrar.

(2)  Where the Model Law notice is required to be signed, it shall instead be authenticated in such manner as is directed by the registrar.

(3)  If a Model Law notice is delivered to the registrar which does not comply with the requirements of these Regulations, he may serve on the person by whom the notice was delivered (or, if there are two or more such persons, on any of them) a notice (a non-compliance notice) indicating the respect in which the Model Law notice does not comply.

(4)  Where the registrar serves a non-compliance notice, then, unless a replacement Model Law notice—

(a) is delivered to him within 14 days after the service of the non-compliance notice, and

(b) complies with the requirements of these Regulations or is not rejected by him for failure to comply with those requirements,

the original Model Law notice shall be deemed not to have been delivered to him.

### Enforcement of foreign representative's duty to give notice to registrar

**5.**—(1)  If a foreign representative, having made default in complying with paragraph 26(6) of Schedule 2 or paragraph 7(4) of Schedule 3 fails to make good the default within 14 days after the service of a notice on the foreign representative requiring him to do so, the court may, on an application made to it by any creditor, member, director or other officer of the debtor or by the registrar of companies, make an order directing the foreign representative to make good the default within such time as may be specified in the order.

(2)  The court's order may provide that all costs of and incidental to the application shall be borne by the foreign representative.

### Rectification of the register under court order

**6.**—(1)  The registrar shall remove from the register any note, or part of a note—

(a) that relates to or is derived from a court order that the court has declared to be invalid or ineffective, or

(b) that the court declares to be factually inaccurate or derived from something that is factually inaccurate or forged,

and that the court directs should be removed from the register.

(2)  The court order must specify what is to be removed from the register and indicate where on the register it is and the registrar shall carry out his duty under sub-paragraph (1) within a reasonable time of receipt by him of the relevant court order.

---

(**66**)  As amended by S.I. 2000/3373 and 2002/912.
(**67**)  As amended by the Statute Law (Repeals) Act 2004 (c. 14) and S. 1. 2001/1228.

Document Generated: 2017-05-04

*Draft Legislation:* This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030

SCHEDULE 5                    Schedule 2, paragraph 73 and Schedule 3,
                                                        paragraph 15

FORMS

Schedule 2,                                                    Form ML 1
Paragraph 2

## The Cross-Border Insolvency Regulations 2006

# Recognition application

| Name of Debtor | Company number *where applicable* |
|----------------|-----------------------------------|
| In the [full name of court] | *For court use only* Court case number |

(a) Insert full name(s) of applicant(s)

1. The application of(a)_____

being the foreign representative(s) appointed in relation to the above named debtor in a foreign

proceeding, in reliance on article 15 of the UNCITRAL Model Law on cross-border insolvency

as set out in Schedule 1 to the Cross-Border Insolvency Regulations 2006 ("the Model Law").

(b) Insert full name of the debtor

2. The application is in respect of a foreign proceeding in relation to(b)_____

(c) Insert name of country where the foreign proceeding the subject of the application is taking place

("the debtor") [[lately] carrying on business in(c) _____

(d) Insert any trading name of the debtor if different from the full name given above and any former trading names in respect of any business in respect of which the debtor may have incurred debts or other liabilities still unsatisfied

as(d) _____
_____ ]

(e) Insert any trading name of the debtor in Great Britain if different from the full name given above and any former trading names in respect of any business in Great Britain in respect of which the debtor may have incurred debts or other liabilities still unsatisfied

[and [lately] carrying on business in Great Britain as(e) _____
_____ ].

(f) Delete any statements in paragraph 3 which do not apply and insert full address details, where applicable
* Delete as applicable

3. (f)[The debtor's principal/last known* place of business in Great Britain is_____
_____ ]

*Document Generated: 2017-05-04*

*Draft Legislation: This is a draft item of legislation. This draft has since been made as*
*a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

Schedule 2,                                                                    Form ML 1
Paragraph 2

## The Cross-Border Insolvency Regulations 2006

# Recognition application

| Name of Debtor | Company number *where applicable* |
|---|---|

| In the | *For court use only* Court case number |
|---|---|
| [full name of court] | |

(a) Insert full name(s) of applicant(s)

1. The application of(a)_____

_____

being the foreign representative(s) appointed in relation to the above named debtor in a foreign

proceeding, in reliance on article 15 of the UNCITRAL Model Law on cross-border insolvency

as set out in Schedule 1 to the Cross-Border Insolvency Regulations 2006 ("the Model Law").

(b) Insert full name of the debtor

2. The application is in respect of a foreign proceeding in relation to(b)_____

_____

(c) Insert name of country where the foreign proceeding the subject of the application is taking place

("the debtor") [[lately] carrying on business in(c) _____

_____

(d) Insert any trading name of the debtor if different from the full name given above and any former trading names in respect of any business in respect of which the debtor may have incurred debts or other liabilities still unsatisfied

as(d) _____

_____]

(e) Insert any trading name of the debtor in Great Britain if different from the full name given above and any former trading names in respect of any business in Great Britain in respect of which the debtor may have incurred debts or other liabilities still unsatisfied

[and [lately] carrying on business in Great Britain as(e) _____

_____ ].

(f) Delete any statements in paragraph 3 which do not apply and insert full address details, where applicable
* Delete as applicable

3. (f)[The debtor's principal/last known* place of business in Great Britain is_____

_____]

52

*Document Generated: 2017-05-04*

*__Draft Legislation:__ This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

Form ML 1 continued

(g) If the debtor's principal/last known place of business is in Scotland insert details of any place of business in England and Wales

(g)[and the debtor's principal/last known* place of business in England and Wales is _____
_____ ]

* Delete as applicable

[The debtor's usual/last known* place of residence in Great Britain is_____
_____ ]

(h) If the debtor's usual/last known place of residence is in Scotland insert details of any place of residence in England and Wales

(h)[and the debtor's usual/last known* place of residence in England and Wales is _____
_____ ]

[The debtor has no place of business in Great Britain]

[The debtor has no place of residence in Great Britain.]

[The debtor has assets situated within England and Wales]

(i) Insert date of incorporation

4. The debtor was incorporated on(i) _____

(j) Insert registered number

under the Companies Act 19_____ , and the registered number of the debtor is(j) _____
_____

**OR**

(k) If the debtor has a registered branch or place of business include applicable statement(s) and insert required details

(k)[The debtor has one or more branches registered under Schedule 21A of the Companies
Act 1985. The registered numbers of the branch(es) are _____
_____ .]

[The debtor has delivered to the registrar of companies for the relevant part of Great Britain
documents in respect of one or more places of business established by it in Great Britain.]

**OR**

*Document Generated: 2017-05-04*

***Draft Legislation:** This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

Form ML 1 continued

The debtor is not registered under the Companies Act 19 _____ , nor does it have any branches

registered under that Act or places of business of which particulars have been delivered to the

registrar of companies.

(I) Give details of any business
carried on by the debtor in
respect of which the debtor
may have incurred debts or
other liabilities still unsatisfied

5. (I) The principal business [lately] carried on by the debtor in Great Britain is_____

_____

**OR**

The debtor does not carry on business in Great Britain.

(m) Insert name of country
where the foreign proceeding
is taking place

6. The foreign proceeding in respect of which recognition is applied for is taking place in(m)____

_____

(n) Insert brief details of the
foreign proceeding

The foreign proceeding is(n)_____

_____

_____

7. The foreign proceeding in respect of which recognition is applied for is a proceeding within

the meaning of article 2(i) of the Model Law,

and the applicant is the foreign representative of the debtor within the meaning of article 2(j) of

the Model Law in relation to that proceeding,

and the evidence referred to in article 15(2) of the Model Law is contained in or exhibited to the

affidavit in support attached to this application.

8. The address of the debtor's centre of main interests is _____

_____

_____

*Document Generated: 2017-05-04*

***Draft Legislation:*** *This is a draft item of legislation. This draft has since been made as*
*a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

Form ML 1 continued

and

(o) Delete whichever of the two statements does not apply and insert address details, where applicable

(o)**EITHER**

\* Delete as applicable

that is the address of the debtor's registered office/habitual residence\*

**OR**

the address of the debtor's registered office/habitual residence\* is _____

_____

(p) If the application is for recognition of a foreign non-main proceeding include this statement, giving the name of the country where the foreign proceeding the subject of this application is taking place and the address of the establishment in that country

(p)[and the debtor has an establishment within the meaning of article 2(e) of the Model Law in __

_____

and the address of that establishment is _____

_____

Note: The terms centre of main interests, habitual residence and establishment have the meaning given to them under the Model Law.

_____ ]

9. The debtor is not a person falling within any of the exceptions set out in article 1(2) of the

Model Law.

10. An affidavit in support of this application is attached.

11. The statement referred to in article 15(3) of the Model Law is exhibited to the affidavit in

support attached to this application.

(q) Insert address for service
\* Delete as applicable

12. The applicant's/applicant's solicitor's\* address for service is(q) _____

_____

_____

*Document Generated: 2017-05-04*

**Draft Legislation:** *This is a draft item of legislation. This draft has since been made as a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

Form ML 1 continued

13. The applicant(s) therefore request(s) as follows:

\* Delete as applicable

(a) that the court make an order recognising the foreign proceeding the subject of this application as a foreign main/non main\* proceeding

(r) Insert details of any ancillary orders sought

(b) (r) _____

_____

**OR**

(c) that such other order may be made as the court thinks appropriate.

Signed _____

\* Delete as applicable

Applicant/Applicant's solicitor\*
(If signing on behalf of firm or company state position or office held)

Dated _____

*Document Generated: 2017-05-04*

**Draft Legislation:** *This is a draft item of legislation. This draft has since been made as*
*a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

Schedule 2,
paragraph 5(2)

Form ML 2

## The Cross-Border Insolvency Regulations 2006
# Recognition order

| Name of Debtor | Company number *where applicable* |
|---|---|

| In the | *For court use only* Court case number |
|---|---|
| [full name of court] | |

(a) Insert full name(s) and address(es) for service of applicant(s)

UPON THE APPLICATION OF (a) _____

_____

(b) Insert date

presented to the court on (b) _____

(c) Insert full name and address for service of the debtor

in respect of (c) _____

_____

and upon hearing

(d) Insert details of any other parties (including the debtor) appearing and by whom represented

and for (d) _____

_____

and upon reading the evidence

(e) Insert details of foreign proceeding

IT IS ORDERED that (e) _____

_____

* Delete as applicable

be recognised as a foreign main proceeding/foreign non-main proceeding* in accordance with the UNCITRAL Model Law on cross-border insolvency as set out in Schedule 1 to the Cross-Border Insolvency Regulations 2006

(f) Insert particulars of any further order made by the court

AND it is ordered that (f) _____

_____

_____

(g) Insert terms of order for costs

AND it is ordered that the costs of the said application (g) _____

_____

*Document Generated: 2017-05-04*

**Draft Legislation:** *This is a draft item of legislation. This draft has since been made as*
*a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

Form ML 2 continued

(h) Insert date and time    This order shall take effect from (h) _____

*Document Generated: 2017-05-04*

*__Draft Legislation:__ This is a draft item of legislation. This draft has since been made as*
*a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

Schedule 2,
paragraph 6

Form ML 3

## The Cross-Border Insolvency Regulations 2006

# Statement of subsequent information

| Name of Debtor | Company number *where applicable* |
|---|---|

| In the | Court case number |
|---|---|
| [full name of court] | |

(a) Insert full name(s) and address(es) of foreign representative(s)

I/We(a) _____

_____

_____

_____

attach a statement providing information in accordance with article 18 of the UNCITRAL Model

Law on cross-border insolvency, as set out in Schedule 1 to the Cross-Border Insolvency

Regulations 2006, and paragraph 6(2)(b) of Schedule 2 to those Regulations.

Signed_____
        Joint/Foreign Representative(s)

Dated_____

*Document Generated: 2017-05-04*

***Draft Legislation:*** *This is a draft item of legislation. This draft has since been made as*
*a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

Schedule 2,
paragraph 32

Form ML 4

**The Cross-Border Insolvency Regulations 2006**

# Originating application

In the

_____ [full name of court]

For court use only
Court case number

**Between**

**Applicant** _____

**and**

**Respondent** _____

(a) Insert full name and address of respondent

Let(a) _____
_____

attend before the Judge on:

Date _____

Time _____ hours

Place _____

(b) Insert name of applicant

On the hearing of an application by(b) _____

(c) State the terms of the order to which the applicant claims to be entitled

the applicant for an order in the following terms:(c) _____
_____

(d) Set out grounds or refer to a witness statement or affidavit in support

The grounds on which the applicant claims to be entitled to the order are:(d) _____
_____

(e) State the name(s) and address(es) of the person(s) intended to be served

The names and addresses of the persons upon whom it is intended to serve this application are:(e) _____
_____
_____
_____

**OR**

*Document Generated: 2017-05-04*

**Draft Legislation:** *This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

Form ML 4 continued

It is not intended to serve any person with this application.

(f) State the applicant's
address for service

The applicant's address for service is:(f)_____

_____

Dated_____

Signed_____
(Solicitor for the) Applicant

**If you do not attend, the court may make such order as it thinks fit.**

*Document Generated: 2017-05-04*

**Draft Legislation:** *This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

Schedule 2,
paragraphs 19 and 32

Form ML 5

## The Cross-Border Insolvency Regulations 2006

# Ordinary application

| In the | Court case number |
|---|---|
| [full name of court] | |

**Between**

**Applicant** _____

**and**

**Respondent** _____

**Take notice** that I intend to apply to the Judge on:

Date _____

Time _____ hours

Place _____

(a) State nature and grounds of application

for(a) _____

_____

Signed _____
(SOLICITOR FOR THE) APPLICANT

My/Our address for service is: _____

_____

(b) Give the name(s) and address(es) of the person(s) (including the respondent) on whom it is intended to serve the application

To:(b) _____

_____

**OR**

It is not intended to serve any person with this application.

**If you do not attend, the court may make such order as it thinks fit.**

62

*Document Generated: 2017-05-04*

*__Draft Legislation:__ This is a draft item of legislation. This draft has since been made as*
*a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

Schedule 2,
Paragraph 23

Form ML 6

**The Cross-Border Insolvency Regulations 2006**

# Affidavit of service of application under the Cross-Border Insolvency Regulations 2006

| Name of Debtor | Company number *where applicable* |
|---|---|
| In the [full name of court] | Court case number |

(a) Insert full name and address of person making affidavit

I,(a) _____

_____

\* Delete as applicable   the applicant/acting on behalf of the applicant\* state on oath:

1. That I did on _____ day the _____ day of _____ 20 ___

(b) Insert details of application   serve the above-named debtor with a copy of an application for (b) _____

_____

("the application") duly sealed with the seal of the court and its supporting documents by leaving

(c) Insert address where served   the same at the debtor's proper address at(c) _____

_____

OR by posting the same on ____ day the _____ day of _____ 20 ___

by ordinary post first class mail in an envelope duly pre-paid and properly addressed to the said

debtor at(c) _____

2. That I did on _____ day the _____ day of _____ 20 ___

(d) Insert name   serve(d) _____

the foreign representative in relation to the said debtor with a copy of the application duly sealed

with the seal of the court and its supporting documents by leaving the same at his proper address

at(c) _____

_____

*Document Generated: 2017-05-04*

***Draft Legislation:*** *This is a draft item of legislation. This draft has since been made as*
*a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

Form ML 6 continued

OR by posting the same on _____ day the _____ day of _____ 20 ___

by ordinary post first class mail in an envelope duly pre-paid and properly addressed to the

said(d) _____

at(c) _____

_____

3. That I did on _____ day the _____ day of _____ 20 ___

serve(d) _____

a British insolvency officeholder acting in relation to the said debtor with a copy of the

application duly sealed with the seal of the court and its supporting documents by leaving the

same at his proper address at(c) _____

_____

OR by posting the same on _____ day the _____ day of _____ 20 ___

by ordinary post first class mail in an envelope duly pre-paid and properly addressed to the

said(d) _____

at(c) _____

_____

4. That I did on _____ day the _____ day of _____ 20 ___

serve(d) _____

* Delete as applicable   the administrative receiver/receiver or manager of the property of the debtor in England and

Wales* with a copy of the application duly sealed with the seal of the court and its supporting

documents by leaving the same at his proper address at(c) _____

_____

OR by posting the same on _____ day the _____ day of _____ 20 ___

by ordinary post first class mail in an envelope duly prepaid and properly addressed to the said(d)

_____

at(c) _____

_____

*Document Generated: 2017-05-04*

*__Draft Legislation:__ This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

Form ML 6 continued

5. That I did on _____ day the _____ day of _____ 20 ___

serve(d) _____

the member State liquidator of the said debtor with a copy of the application duly sealed with the

seal of the court and its supporting documents by leaving the same at his proper address at(c) ___

_____

OR by posting the same on ____ day the _____ day of _____ 20 ___

by ordinary post first class mail in an envelope duly pre-paid and properly addressed to the

said(d) _____

at(c) _____

_____

6. That I did on _____ day the _____ day of _____ 20 ___

serve(d) _____

a foreign representative of the said debtor appointed in another foreign proceeding regarding the

said debtor with a copy of the application duly sealed with the seal of the court and its supporting

documents by leaving the same at his proper address at(c) _____

_____

OR by posting the same on ____ day the _____ day of _____ 20 ___

by ordinary post first class mail in an envelope duly pre-paid and properly addressed to the

said(d) _____

at(c) _____

_____

7. That I did on _____ day the _____ day of _____ 20 ___

serve(d) _____

who has presented a petition to wind up the said debtor/for a bankruptcy order to be made against

\* Delete as applicable    the said debtor" with a copy of the application duly sealed with the seal of the court and its

supporting documents by leaving the same at his proper address at(c) _____

_____

OR by posting the same on ____ day the _____ day of _____ 20 ___

*Document Generated: 2017-05-04*

*Draft Legislation: This is a draft item of legislation. This draft has since been made as*
*a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

Form ML 6 continued

by ordinary post first class mail in an envelope duly pre-paid and properly addressed to the

said(d) _____

at(c) _____

_____

8. That I did on _____ day the _____ day of _____ 20 ___

serve(d) _____

a person who is or may be entitled to appoint an administrator of the said debtor under

paragraph 14 of Schedule B1 to the Insolvency Act 1986 with a copy of the application duly

sealed with the seal of the court and its supporting documents by leaving the same at his proper

address at(c) _____

_____

OR by posting the same on _____ day the _____ day of _____ 20 ___

by ordinary post first class mail in an envelope duly pre-paid and properly addressed to the

said(d) _____

at(c) _____

_____

9. That I did on _____ day the _____ day of _____ 20 ___

serve the Financial Services Authority with a copy of the application duly sealed with the seal of

the court and its supporting documents by leaving the same at its proper address at(c)_____

_____

OR by posting the same on _____ day the _____ day of _____ 20 ___

by ordinary post first class mail in an envelope duly pre-paid and properly addressed to the

Financial Services Authority at(c) _____

_____

Document Generated: 2017-05-04

*Draft Legislation: This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

Form ML 6 continued

A sealed copy of the application and its supporting documents are now produced to me marked

"A".

SWORN _____

*Document Generated: 2017-05-04*

*Draft Legislation: This is a draft item of legislation. This draft has since been made as*
*a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

Schedule 2,
paragraph 26(6)
and Schedule 3,
paragraph 7(4)

Form ML 7

**The Cross-Border Insolvency Regulations 2006**

## Notice to registrar of companies of order under the Cross-Border Insolvency Regulations 2006    **ML 7**

| Name of Debtor | Company number *where applicable* |
|---|---|

| In the  [full name of court] | Court case number |
|---|---|

(a) Insert name(s) and address(es) for service of foreign representative(s)

Notice is hereby given by(a) _____

_____

the foreign representative(s) in relation to the above named debtor that the following order has

(b) Insert brief details of court order

been made under the Cross-Border Insolvency Regulations 2006(b):

_____

_____

_____

(c) Insert date

The order was made on(c) _____

Signed _____
     Joint/Foreign Representative(s)

Dated _____

68

*Document Generated: 2017-05-04*

***Draft Legislation:*** *This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

Form ML 7 continued

(d) If the debtor is an oversea company with branches in Great Britain, please complete requested details of branches. If this form is delivered in respect of more than one branch in the same part of Great Britain, the branch number and name (where different) must be given for each branch

(d)This return is delivered in respect of all the branches listed below.

| Registration number | Branch name |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**Contact Details:**

You do not have to give any contact information in the box opposite but if you do, it will help Companies House to contact you if there is a query on the form.

| | |
|---|---|
| | |
| | Tel |
| DX Number | DX Exchange |

Companies House receipt date barcode

**When you have completed and signed this form please send it to the Registrar of Companies at:**

for companies or branches registered or places of business established in England and Wales:

**Companies House, Crown Way, Cardiff, CF14 3UZ**          **DX 33050 Cardiff**

for companies or branches registered or places of business established in Scotland:

**Companies House, 37 Castle Terrace, Edinburgh, EH1 2EB**          **DX 235 Edinburgh** or **LP-4 Edinburgh 2**

*Document Generated: 2017-05-04*

*__Draft Legislation:__ This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

Schedule 2,
paragraph 26(7)
and Schedule 3,
paragraph 7(5)

Form ML 8

**The Cross-Border Insolvency Regulations 2006**

## Notification of order under the Cross-Border Insolvency Regulations 2006 (for newspaper and London or Edinburgh Gazette)

| Name of Debtor | Company number *where applicable* |
|---|---|

| In the                           [full name of court] | Court case number |
|---|---|

Nature of business (where applicable) _____

(a) Insert any trading names used by the debtor in Great Britain within the last 12 months, if different from the full name given above

Trading name(s) (a) _____
_____

(b) Insert address of principal/last known place of business of debtor, or alternatively, in the case of a debtor who is an individual, the usual/last known place of residence of the debtor

Address of debtor (b) _____
_____
_____

The following order has been made in relation to the above debtor under the Cross-Border

(c) Insert brief details of order

Insolvency Regulations 2006 (c) _____
_____

(d) Insert date

Order made on (d)_____

(e) Insert address for service

Name(s) and address(es) of foreign representative(s) (e) _____
_____
_____

70

Document Generated: 2017-05-04

*Draft Legislation:* This is a draft item of legislation. This draft has since been made as
*a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030*

# EXPLANATORY NOTE

*(This note is not part of the Regulations)*

On 30th May 1997 the United Nations Commission on International Trade Law ("UNCITRAL") adopted the text of a model law on cross-border insolvency, which was approved by a resolution of the United Nations General Assembly on 15th December 1997. These Regulations give effect to the model law in Great Britain.

Regulation 2 of the Regulations provides that the UNCITRAL model law shall have the force of law in Great Britain in the form set out in Schedule 1 to the Regulations (the Model Law) and provides that in interpreting the Model Law the courts can have regard to other documents including the Guide to Enactment of the Model Law published by UNCITRAL (ISBN 92-1-133608-2). The model law and Guide may be accessed at http://www.uncitral.org/uncitral/en/uncitral–texts/ insolvency/1997Model.html.

Chapter I of the Model Law contains General Provisions (articles 1 to 8). Article 1 sets out the scope of application of the Model Law, which may apply in a number of cross-border situations, and also lists certain bodies to which the Model Law does not apply. Article 3 of the Model Law clarifies that Council Regulation (EC) No. 1346/2000 of 29th May 2000 on Insolvency Proceedings prevails over the Model Law.

Chapter II (articles 9 to 14) relates to the access of foreign representatives and creditors to courts in Great Britain and their rights to participate in an insolvency proceeding in Great Britain.

Chapter III of the Model Law deals with recognition of foreign proceedings and relief. Articles 15 to 17 set out criteria for determining whether a foreign proceeding is to be recognised and, if so whether as a foreign main proceeding or as a foreign non-main proceeding (see articles 16, 17 and definitions in article 2).

Articles 19 to 21 set out the effects of recognition and the relief available to a foreign representative. The relief accorded upon recognition of a foreign main proceeding is listed in article 20(1). Article 21 of the Model Law provides for the court to grant discretionary relief for the benefit of any recognised foreign proceeding, whether main or non-main. Urgently needed relief may be granted by the court on an interim basis pending a decision on recognition (article 19).

Chapter IV of the Model Law provides for the British courts and British insolvency officeholders to cooperate with foreign courts or foreign representatives in the areas covered by the Model Law (articles 25 to 27).

Chapter V of the Model Law (articles 28 to 32) provides for the coordination of a British insolvency proceeding and a foreign proceeding concerning the same debtor and facilitates coordination between two or more foreign proceedings concerning the same debtor.

Schedule 2 to the Regulations sets out procedural matters in relation to proceedings under the Model Law in England and Wales. Parts 2 to 5 of the Schedule contain details of the form and content of specified applications under the Model Law and Part 6 sets out more detailed procedural requirements in respect of those applications. Part 7 of Schedule 2 provides for applications to be made in appropriate cases to the Chief Land Registrar in connection with court orders under the Regulations. Part 8 provides for a summary remedy against foreign representatives guilty of misfeasance. Parts 9 to 12 contain general provision as to court procedure and practice and appeals in connection with proceedings under the Regulations, costs and other general matters.

Schedule 3 of the Regulations sets out miscellaneous procedural matters in relation to proceedings under the Model Law in Scotland.

Document Generated: 2017-05-04

*Draft Legislation:* This is a draft item of legislation. This draft has since been made as
a UK Statutory Instrument: The Cross-Border Insolvency Regulations 2006 No. 1030

Schedule 4 makes provision in relation to notices delivered to the registrar of companies under the Regulations.

Schedule 5 contains forms prescribed for use in connection with proceedings under the Regulations.

A full regulatory impact assessment has not been produced for this instrument as it has a negligible impact on the costs of business.

TAB 36

English Insolvency Act
§§ 126-28, 130, 168, 181-82, 186, 212-14, 236, 411, Schedule 8

# Insolvency Act 1986

## 1986 CHAPTER 45

Thomson Reuters (Legal) Limited.

UK Statutes Crown Copyright. Reproduced by permission of the Controller of Her Majesty's Stationery Office.

An Act to consolidate the enactments relating to company insolvency and winding up (including the winding up of companies that are not insolvent, and of unregistered companies); enactments relating to the insolvency and bankruptcy of individuals; and other enactments bearing on those two subject matters, including the functions and qualification of insolvency practitioners, the public administration of insolvency, the penalisation and redress of malpractice and wrongdoing, and the avoidance of certain transactions at an undervalue

[25th July 1986]

BE IT ENACTED by the Queen's most Excellent Majesty, by and with the advice and consent of the Lords Spiritual and Temporal, and Commons, in this present Parliament assembled, and by the authority of the same, as follows:—

[1]

**Notes**

[1]     Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

**Extent**

Preamble: England, Wales, Scotland



shall make a winding-up order; but this does not apply if the court is also of the opinion both that some other remedy is available to the petitioners and that they are acting unreasonably in seeking to have the company wound up instead of pursuing that other remedy.
1 2

**Notes**

1    Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

2    Modified by Company Directors Disqualification Act 1986 (c.46), ss. 21(2), 25, Criminal Justice Act 1988 (c.33), ss. 86(5), 123, Sch. 8 para. 16, Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 35(4), 47(4)(a) Extended with modifications by Building Societies Act 1986 (c.53), ss. 54(3)(a)(5)(a), 90, 126(3), Sch. 15

**Commencement**

Pt IV c. VI s. 125:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Pt IV c. VI s. 125(1)-(2)(b): England, Wales, Scotland

✅ Law In Force

### 126.—  Power to stay or restrain proceedings against company.

(1) At any time after the presentation of a winding-up petition, and before a winding-up order has been made, the company, or any creditor or contributory, may—

  (a)  Where any action or proceeding against the company is pending in the High Court or Court of Appeal in England and Wales or Northern Ireland, apply to the court in which the action or proceeding is pending for a stay of proceedings therein, and

  (b)  Where any other action or proceeding is pending against the company, apply to the court having jurisdiction to wind up the company to restrain further proceedings in the action or proceeding;

and the court to which application is so made may (as the case may be) stay, sist or restrain the proceedings accordingly on such terms as it thinks fit.

(2) In the case of [ a company registered but not formed under the Companies Act 2006 ] [1] , where the application to stay, sist or restrain is by a creditor, this section extends to actions and proceedings against any contributory of the company.



[(3) Subsection (1) applies in relation to any action being taken in respect of the company under Part 1 of Schedule 8 to the Finance (No. 2) Act 2015 (enforcement by deduction from accounts) as it applies in relation to any action or proceeding mentioned in paragraph (b) of that subsection.][2]

**Notes**

[1]   Words substituted by Companies Act 2006 (Consequential Amendments, Transitional Provisions and Savings) Order 2009/1941 Sch.1 para.75(14) (October 1, 2009: substitution has effect subject to transitional provisions specified in SI 2009/1941 art.8)

[2]   Added by Finance (No. 2) Act 2015 c. 33 Sch.8(2) para.27 (November 18, 2015)

**Commencement**

Pt IV c. VI s. 126:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Pt IV c. VI s. 126(1)-(3): England, Wales, Scotland

✅ Law In Force

**[ 127.  Avoidance of property dispositions, etc.**

(1) In a winding up by the court, any disposition of the company's property, and any transfer of shares, or alteration in the status of the company's members, made after the commencement of the winding up is, unless the court otherwise orders, void.

(2) This section has no effect in respect of anything done by an administrator of a company while a winding-up petition is suspended under paragraph 40 of Schedule B1.
][1]

**Notes**

[1]   Existing s.127 renumbered as s.127(1) and s.127(2) is added subject to transitional provisions specified in SI 2003/2093 art.3 by Enterprise Act 2002 c. 40 Sch.17 para.15 (September 15, 2003: substitution has effect subject to transitional provisions specified in SI 2003/2093 art.3)

**Commencement**

Pt IV c. VI s. 127:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Pt IV c. VI s. 127(1)-(2): England, Wales, Scotland

✅ Law In Force

**128.—  Avoidance of attachments, etc.**

(1) Where a company registered in England and Wales is being wound up by the court, any attachment, sequestration, distress or execution put in force against the estate or effects of the company after the commencement of the winding up is void.



(2) This section, so far as relates to any estate or effects of the company situated in England and Wales, applies in the case of a company registered in Scotland as it applies in the case of a company registered in England and Wales.

[ (3) In subsection (1) "attachment"includes a hold notice or a deduction notice under Part 1 of Schedule 8 to the Finance (No. 2) Act 2015 (enforcement by deduction from accounts) and, if subsection (1) has effect in relation to a deduction notice, it also has effect in relation to the hold notice to which the deduction notice relates (whenever the hold notice was given). ] [1]

**Notes**

[1]    Added by Finance (No. 2) Act 2015 c. 33 Sch.8(2) para.28 (November 18, 2015)

**Commencement**

Pt IV c. VI s. 128:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Pt IV c. VI s. 128(1)-(3): England, Wales, Scotland

*Commencement of winding up*

 Law In Force

### 129.—   Commencement of winding up by the court.

(1) If, before the presentation of a petition for the winding up of a company by the court, a resolution has been passed by the company for voluntary winding up, the winding up of the company is deemed to have commenced at the time of the passing of the resolution; and unless the court, on proof of fraud or mistake, directs otherwise, all proceedings taken in the voluntary winding up are deemed to have been validly taken.

[ (1A) Where the court makes a winding-up order by virtue of paragraph 13(1)(e) of Schedule B1, the winding up is deemed to commence on the making of the order. ] [1]

(2) In any other case, the winding up of a company by the court is deemed to commence at the time of the presentation of the petition for winding up.

**Notes**

[1]    Added subject to transitional provisions specified in SI 2003/2093 art.3 by Enterprise Act 2002 c. 40 Sch.17 para.16 (September 15, 2003: addition has effect subject to transitional provisions specified in SI 2003/2093 art.3)

**Commencement**

Pt IV c. VI s. 129:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Pt IV c. VI s. 129(1)-(2): England, Wales, Scotland



✅ Law In Force

### 130.— Consequences of winding-up order.

(1) On the making of a winding-up order, a copy of the order must forthwith be forwarded by the company (or otherwise as may be prescribed) to the registrar of companies, who shall enter it in his records relating to the company.

(2) When a winding-up order has been made or a provisional liquidator has been appointed, no action or proceeding shall be proceeded with or commenced against the company or its property, except by leave of the court and subject to such terms as the court may impose.

(3) When an order has been made for winding up a company [ registered but not formed under the Companies Act 2006 ] [1] , no action or proceeding shall be commenced or proceeded with against the company or its property or any contributory of the company, in respect of any debt of the company, except by leave of the court, and subject to such terms as the court may impose.

[ (3A) In subsections (2) and (3), the reference to an action or proceeding includes action in respect of the company under Part 1 of Schedule 8 to the Finance (No. 2) Act 2015 (enforcement by deduction from accounts). ] [2]

(4) An order for winding up a company operates in favour of all the creditors and of all contributories of the company as if made on the joint petition of a creditor and of a contributory.

**Notes**

[1]   Words substituted by Companies Act 2006 (Consequential Amendments, Transitional Provisions and Savings) Order 2009/1941 Sch.1 para.75(15) (October 1, 2009: substitution has effect subject to transitional provisions specified in SI 2009/1941 art.8)

[2]   Added by Finance (No. 2) Act 2015 c. 33 Sch.8(2) para.29 (November 18, 2015)

**Commencement**

Pt IV c. VI s. 130:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Pt IV c. VI s. 130(1)-(4): England, Wales, Scotland

*Investigation procedures*

✅ Law In Force

⚠️ Amendment(s) Pending

### 131.— Company's statement of affairs.

(1) Where the court has made a winding-up order or appointed a provisional liquidator, the official receiver may require some or all of the persons mentioned in subsection (3) below to make out and submit to him a statement in the prescribed form as to the affairs of the company.



**Extent**

Pt IV c. VII s. 166(1)-(7): England, Wales, Scotland

✅ Law In Force

### 167.— Winding up by the court

[(1) Where a company is being wound up by the court, the liquidator may exercise any of the powers specified in Parts 1 to 3 of Schedule 4. ]¹

(2) Where the liquidator (not being the official receiver), in exercise of the powers conferred on him by this Act—

      (a) disposes of any property of the company to a person who is connected with the company (within the meaning of section 249 in Part VII), or

      (b) employs a solicitor to assist him in the carrying out of his functions,

he shall, if there is for the time being a liquidation committee, give notice to the committee of that exercise of his powers.

(3) The exercise by the liquidator in a winding up by the court of the powers conferred by this section is subject to the control of the court, and any creditor or contributory may apply to the court with respect to any exercise or proposed exercise of any of those powers.

**Notes**

¹    Substituted by Small Business, Enterprise and Employment Act 2015 c. 26 Pt 10 s.120(3) (May 26, 2015)

**Commencement**

Pt IV c. VII s. 167:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Pt IV c. VII s. 167(1)-(3): England, Wales, Scotland

✅ Law In Force

### 168.— Supplementary powers (England and Wales).

(1) This section applies in the case of a company which is being wound up by the court in England and Wales.

[ (2) The liquidator may seek a decision on any matter from the company's creditors or contributories; and must seek a decision on a matter—

      (a) from the company's creditors, if requested to do so by one-tenth in value of the creditors;

      (b) from the company's contributories, if requested to do so by one-tenth in value of the contributories.

]¹

(3) The liquidator may apply to the court (in the prescribed manner) for directions in relation to any particular matter arising in the winding up.



*Insolvency Act 1986*                                                                 *Page 197*

(4) Subject to the provisions of this Act, the liquidator shall use his own discretion in the management of the assets and their distribution among the creditors.

(5) If any person is aggrieved by an act or decision of the liquidator, that person may apply to the court; and the court may confirm, reverse or modify the act or decision complained of, and make such order in the case as it thinks just.

[ (5A) Where at any time after a winding-up petition has been presented to the court against any person (including an insolvent partnership or other body which may be wound up under Part V of the Act as an unregistered company), whether by virtue of the provisions of the Insolvent Partnerships Order 1994 or not, the attention of the court is drawn to the fact that the person in question is a member of an insolvent partnership, the court may make an order as to the future conduct of the insolvency proceedings and any such order may apply any provisions of that Order with any necessary modifications.

(5B) Any order or directions under subsection (5A) may be made or given on the application of the official receiver, any responsible insolvency practitioner, the trustee of the partnership or any other interested person and may include provisions as to the administration of the joint estate of the partnership, and in particular how it and the separate estate of any member are to be administered.

[ (5C) Where the court makes an order for the winding up of an insolvent partnership under—
      (a)  section 72(1)(a) of the Financial Services Act 1986;
      (b)  section 92(1)(a) of the Banking Act 1987; or
      (c)  section 367(3)(a) of the Financial Services and Markets Act 2000,
the court may make an order as to the future conduct of the winding up proceedings, and any such order may apply any provisions of the Insolvent Partnerships Order 1994 with any necessary modifications.
] [3]
] [2]

---

**Notes**

[1]    Substituted by Small Business, Enterprise and Employment Act 2015 c. 26 Sch.9(1) para.41 (May 26, 2015 for the limited purposes of enabling the exercise of any power to make provision by regulations, rules or order made by statutory instrument or to prepare and issue guidance; April 6, 2017 in relation to England and Wales subject to transitional and saving provisions in SI 2016/1020 reg.5; not yet in force otherwise)

[2]    Added by Insolvent Partnerships Order 1994/2421 Pt VI art.14(1) (December 1, 1994)

[3]    S.168(5C) was repealed by SI 2001/3649 art.306 on December 1, 2001 but that repeal is treated as though it had not been made and s.168(5C) is instead substituted by Financial Services and Markets Act 2000 (Consequential Amendments) Order 2002/1555 Pt 2 art.15(2) (July 3, 2002)

**Commencement**

Pt IV c. VII s. 168:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Pt IV c. VII s. 168(1)-(5C)(c): England, Wales, Scotland



✅ Law In Force

### 181.— Powers of court (general).

(1) This section and the next apply where the liquidator has disclaimed property under section 178.

(2) An application under this section may be made to the court by—

> (a) any person who claims an interest in the disclaimed property, or
>
> (b) any person who is under any liability in respect of the disclaimed property, not being a liability discharged by the disclaimer.

(3) Subject as follows, the court may on the application make an order, on such terms as it thinks fit, for the vesting of the disclaimed property in, or for its delivery to—

> (a) a person entitled to it or a trustee for such a person, or
>
> (b) a person subject to such a liability as is mentioned in subsection (2)(b) or a trustee for such a person.

(4) The court shall not make an order under subsection (3)(b) except where it appears to the court that it would be just to do so for the purpose of compensating the person subject to the liability in respect of the disclaimer.

(5) The effect of any order under this section shall be taken into account in assessing for the purpose of section 178(6) the extent of any loss or damage sustained by any person in consequence of the disclaimer.

(6) An order under this section vesting property in any person need not be completed by conveyance, assignment or transfer.

1 2

---

**Notes**

1   Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

2   Modified by Company Directors Disqualification Act 1986 (c.46), ss. 21(2), 25, Criminal Justice Act 1988 (c.33), ss. 86(5), 123, Sch. 8 para. 16, Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 35(4), 47(4)(a) Extended with modifications by Building Societies Act 1986 (c.53), ss. 54(3)(a)(5)(a), 90, 126(3), Sch. 15

**Commencement**

Pt IV c. VIII s. 181: December 29, 1986 (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Pt IV c. VIII s. 181(1)-(6): England, Wales, Scotland

---



*Insolvency Act 1986*                                                                                      *Page 216*

☑ Law In Force

## 182.— Powers of court (leaseholds).

(1) The court shall not make an order under section 181 vesting property of a leasehold nature in any person claiming under the company as underlessee or mortgagee except on terms making that person—

(a) subject to the same liabilities and obligations as the company was subject to under the lease at the commencement of the winding up, or

(b) if the court thinks fit, subject to the same liabilities and obligations as that person would be subject to if the lease had been assigned to him at the commencement of the winding up.

(2) For the purposes of an order under section 181 relating to only part of any property comprised in a lease, the requirements of subsection (1) apply as if the lease comprised only the property to which the order relates.

(3) Where subsection (1) applies and no person claiming under the company as underlessee or mortgagee is willing to accept an order under section 181 on the terms required by virtue of that subsection, the court may, by order under that section, vest the company's estate or interest in the property in any person who is liable (whether personally or in a representative capacity, and whether alone or jointly with the company) to perform the lessee's covenants in the lease.

The court may vest that estate and interest in such a person freed and discharged from all estates, incumbrances and interests created by the company.

(4) Where subsection (1) applies and a person claiming under the company as underlessee or mortgagee declines to accept an order under section 181, that person is excluded from all interest in the property.

1 2

### Notes

1    Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

2    Modified by Company Directors Disqualification Act 1986 (c.46), ss. 21(2), 25, Criminal Justice Act 1988 (c.33), ss. 86(5), 123, Sch. 8 para. 16, Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 35(4), 47(4)(a) Extended with modifications by Building Societies Act 1986 (c.53), ss. 54(3)(a)(5)(a), 90, 126(3), Sch. 15

### Commencement

Pt IV c. VIII s. 182: December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

### Extent

Pt IV c. VIII s. 182(1)-(4): England, Wales, Scotland



*Execution, attachment and the Scottish equivalents*

☑ Law In Force

### 183.—   Effect of execution or attachment (England and Wales).

(1) Where a creditor has issued execution against the goods or land of a company or has attached any debt due to it, and the company is subsequently wound up, he is not entitled to retain the benefit of the execution or attachment against the liquidator unless he has completed the execution or attachment before the commencement of the winding up.

(2) However—
　　(a)  if a creditor has had notice of a meeting having been called at which a resolution for voluntary winding up is to be proposed, the date on which he had notice is substituted, for the purpose of subsection (1), for the date of commencement of the winding up;
　　(b)  a person who purchases in good faith under a sale by the [ enforcement officer or other officer charged with the execution of the writ ]¹ any goods of a company on which execution has been levied in all cases acquires a good title to them against the liquidator; and
　　(c)  the rights conferred by subsection (1) on the liquidator may be set aside by the court in favour of the creditor to such extent and subject to such terms as the court thinks fit.

(3) For purposes of this Act—
　　(a)  an execution against goods is completed by seizure and sale, or by the making of a charging order under section 1 of the Charging Orders Act 1979;
　　(b)  an attachment of a debt is completed by receipt of the debt; and
　　(c)  an execution against land is completed by seizure, by the appointment of a receiver, or by the making of a charging order under section 1 of the Act above-mentioned.

(4) In this section, "goods"includes all chattels personal; and [ "enforcement officer" means an individual who is authorised to act as an enforcement officer under the Courts Act 2003 ]² .

[ (4A) For the purposes of this section, Her Majesty's Revenue and Customs is to be regarded as having attached a debt due to a company if it has taken action under Part 1 of Schedule 8 to the Finance (No. 2) Act 2015 (enforcement by deduction for accounts) as a result of which an amount standing to the credit of an account held by the company is—
　　(a)  subject to arrangements made under paragraph 6(3) of that Schedule, or
　　(b)  the subject of a deduction notice under paragraph 13 of that Schedule.
]³

(5) This section does not apply in the case of a winding up in Scotland.

---

**Notes**

¹　　Word substituted by Courts Act 2003 c. 39 Sch.8 para.295(2) (March 15, 2004)

²　　Words substituted by Courts Act 2003 c. 39 Sch.8 para.295(3) (March 15, 2004)

³　　Added by Finance (No. 2) Act 2015 c. 33 Sch.8(2) para.31 (November 18, 2015)



**Commencement**

Pt IV c. VIII s. 185:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Pt IV c. VIII s. 185(1)-(4): England, Wales, Scotland

*Miscellaneous matters*

✅ Law In Force

### 186.—   Rescission of contracts by the court.

(1) The court may, on the application of a person who is, as against the liquidator, entitled to the benefit or subject to the burden of a contract made with the company, make an order rescinding the contract on such terms as to payment by or to either party of damages for the non-performance of the contract, or otherwise as the court thinks just.

(2) Any damages payable under the order to such a person may be proved by him as a debt in the winding up.
1 2 3

**Notes**

[1]   Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

[2]   Modified by Company Directors Disqualification Act 1986 (c.46), ss. 21(2), 25, Criminal Justice Act 1988 (c.33), ss. 86(5), 123, Sch. 8 para. 16, Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 35(4), 47(4)(a) Extended with modifications by Building Societies Act 1986 (c.53), ss. 54(3)(a)(5)(a), 90, 126(3), Sch. 15

[3]   S. 186 excluded by Companies Act 1989 (c.40), ss. 154, 155, 164(1), 182(4), 213(2), Sch. 22 para. 7(1)

**Commencement**

Pt IV c. VIII s. 186:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Pt IV c. VIII s. 186(1)-(2): England, Wales, Scotland


Westlaw. UK

**Notes**

[1]    Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

[2]    Modified by Company Directors Disqualification Act 1986 (c.46), ss. 21(2), 25, Criminal Justice Act 1988 (c.33), ss. 86(5), 123, Sch. 8 para. 16, Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 35(4), 47(4)(a) Extended with modifications by Building Societies Act 1986 (c.53), ss. 54(3)(a)(5)(a), 90, 126(3), Sch. 15

**Commencement**

Pt IV c. X s. 211:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Pt IV c. X s. 211(1)-(3): England, Wales, Scotland

*Penalisation of directors and officers*

Law In Force

### 212.—  Summary remedy against delinquent directors, liquidators, etc.

(1) This section applies if in the course of the winding up of a company it appears that a person who—

   (a)  is or has been an officer of the company,

   (b)  has acted as liquidator [...][1] or administrative receiver of the company, or

   (c)  not being a person falling within paragraph (a) or (b), is or has been concerned, or has taken part, in the promotion, formation or management of the company,

has misapplied or retained, or become accountable for, any money or other property of the company, or been guilty of any misfeasance or breach of any fiduciary or other duty in relation to the company.

(2) The reference in subsection (1) to any misfeasance or breach of any fiduciary or other duty in relation to the company includes, in the case of a person who has acted as liquidator [...][2] of the company, any misfeasance or breach of any fiduciary or other duty in connection with the carrying out of his functions as liquidator [...][2] of the company.

(3) The court may, on the application of the official receiver or the liquidator, or of any creditor or contributory, examine into the conduct of the person falling within subsection (1) and compel him—

   (a)  to repay, restore or account for the money or property or any part of it, with interest at such rate as the court thinks just, or



(b)  to contribute such sum to the company's assets by way of compensation in respect of the misfeasance or breach of fiduciary or other duty as the court thinks just.

(4)  The power to make an application under subsection (3) in relation to a person who has acted as liquidator [...]² of the company is not exercisable, except with the leave of the court, after [ he ]³ has had his release.

(5)  The power of a contributory to make an application under subsection (3) is not exercisable except with the leave of the court, but is exercisable notwithstanding that he will not benefit from any order the court may make on the application.

**Notes**

¹  Word repealed by Enterprise Act 2002 c. 40 Sch.26 para.1 (September 15, 2003: repeal has effect as SI 2003/2093 subject to transitional provisions specified in SI 2003/2093 art.3)

²  Words repealed by Enterprise Act 2002 c. 40 Sch.26 para.1 (September 15, 2003: repeal has effect as SI 2003/2093 subject to transitional provisions specified in SI 2003/2093 art.3)

³  Words substituted subject to transitional provisions specified in SI 2003/2093 art.3 by Enterprise Act 2002 c. 40 Sch.17 para.18(c)(ii) (September 15, 2003: substitution has effect subject to transitional provisions specified in SI 2003/2093 art.3)

**Commencement**

Pt IV c. X s. 212:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Pt IV c. X s. 212(1)-(5): England, Wales, Scotland

✅ Law In Force

### 213.—  Fraudulent trading.

(1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose, the following has effect.

(2) The court, on the application of the liquidator may declare that any persons who were knowingly parties to the carrying on of the business in the manner above-mentioned are to be liable to make such contributions (if any) to the company's assets as the court thinks proper.
¹ ²

**Notes**

¹  Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58)'Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878,



art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

2    Modified by Company Directors Disqualification Act 1986 (c.46), ss. 21(2), 25, Criminal Justice Act 1988 (c.33), ss. 86(5), 123, Sch. 8 para. 16, Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 35(4), 47(4)(a) Extended with modifications by Building Societies Act 1986 (c.53), ss. 54(3)(a)(5)(a), 90, 126(3), Sch. 15

**Commencement**

Pt IV c. X s. 213:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Pt IV c. X s. 213(1)-(2): England, Wales, Scotland

---

☑ Law In Force

### 214.— Wrongful trading.

(1) Subject to subsection (3) below, if in the course of the winding up of a company it appears that subsection (2) of this section applies in relation to a person who is or has been a director of the company, the court, on the application of the liquidator, may declare that that person is to be liable to make such contribution (if any) to the company's assets as the court thinks proper.

(2) This subsection applies in relation to a person if—
    (a) the company has gone into insolvent liquidation,
    (b) at some time before the commencement of the winding up of the company, that person knew or ought to have concluded that there was no reasonable prospect that the company would avoid going into insolvent liquidation [ or entering insolvent administration ] ¹ , and
    (c) that person was a director of the company at that time;
    but the court shall not make a declaration under this section in any case where the time mentioned in paragraph (b) above was before 28th April 1986.

(3) The court shall not make a declaration under this section with respect to any person if it is satisfied that after the condition specified in subsection (2)(b) was first satisfied in relation to him that person took every step with a view to minimising the potential loss to the company's creditors as ( [ on the assumption that he had knowledge of the matter mentioned in subsection (2)(b) ] ² ) he ought to have taken.

(4) For the purposes of subsections (2) and (3), the facts which a director of a company ought to know or ascertain, the conclusions which he ought to reach and the steps which he ought to take are those which would be known or ascertained, or reached or taken, by a reasonably diligent person having both—
    (a) the general knowledge, skill and experience that may reasonably be expected of a person carrying out the same functions as are carried out by that director in relation to the company, and
    (b) the general knowledge, skill and experience that that director has.

(5) The reference in subsection (4) to the functions carried out in relation to a company by a director of the company includes any functions which he does not carry out but which have been entrusted to him.



(6) For the purposes of this section a company goes into insolvent liquidation if it goes into liquidation at a time when its assets are insufficient for the payment of its debts and other liabilities and the expenses of the winding up.

[(6A) For the purposes of this section a company enters insolvent administration if it enters administration at a time when its assets are insufficient for the payment of its debts and other liabilities and the expenses of the administration.]³

(7) In this section "director" includes a shadow director.

(8) This section is without prejudice to section 213.

**Notes**

¹   Words inserted by Small Business, Enterprise and Employment Act 2015 c. 26 Pt 10 s.117(3)(a) (October 1, 2015: insertion has effect as SI 2015/1689 subject to transitional provisions specified in SI 2015/1689 Sch.1 para.15)

²   Words substituted by Small Business, Enterprise and Employment Act 2015 c. 26 Pt 10 s.117(3)(b) (October 1, 2015: substitution has effect as SI 2015/1689 subject to transitional provisions specified in SI 2015/1689 Sch.1 para.15)

³   Added by Small Business, Enterprise and Employment Act 2015 c. 26 Pt 10 s.117(3)(c) (October 1, 2015: insertion has effect as SI 2015/1689 subject to transitional provisions specified in SI 2015/1689 Sch.1 para.15)

**Commencement**

Pt IV c. X s. 214:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Pt IV c. X s. 214(1)-(8): England, Wales, Scotland

The text of this provision varies depending on jurisdiction or other application. See parallel texts relating to:
England and Wales | Scotland

✅ Law In Force

England and Wales

**[214A    Adjustment of withdrawals**

(1) This section has effect in relation to a person who is or has been a member of a limited liability partnership where, in the course of the winding up of that limited liability partnership, it appears that subsection (2) of this section applies in relation to that person.

(2) This subsection applies in relation to a person if—
      (a) within the period of two years ending with the commencement of the winding up, he was a member of the limited liability partnership who withdrew property of the limited liability partnership, whether in the form of a share of profits, salary, repayment of or payment of interest on a loan to the limited liability partnership or any other withdrawal of property, and



*Insolvency Act 1986*                                                                                          *Page 249*

(b)  it is proved by the liquidator to the satisfaction of the court that at the time of the withdrawal he knew or had reasonable ground for believing that the limited liability partnership—

    (i)  was at the time of the withdrawal unable to pay its debts within the meaning of section 123, or

    (ii)  would become so unable to pay its debts after the assets of the limited liability partnership had been depleted by that withdrawal taken together with all other withdrawals (if any) made by any members contemporaneously with that withdrawal or in contemplation when that withdrawal was made.

(3) Where this section has effect in relation to any person the court, on the application of the liquidator, may declare that that person is to be liable to make such contribution (if any) to the limited liability partnership's assets as the court thinks proper.

(4) The court shall not make a declaration in relation to any person the amount of which exceeds the aggregate of the amounts or values of all the withdrawals referred to in subsection (2) made by that person within the period of two years referred to in that subsection.

(5) The court shall not make a declaration under this section with respect to any person unless that person knew or ought to have concluded that after each withdrawal referred to in subsection (2) there was no reasonable prospect that the limited liability partnership would avoid going into insolvent liquidation.

(6) For the purposes of subsection (5) the facts which a member ought to know or ascertain and the conclusions which he ought to reach are those which would be known, ascertained, or reached by a reasonably diligent person having both:

    (a)  the general knowledge, skill and experience that may reasonably be expected of a person carrying out the same functions as are carried out by that member in relation to the limited liability partnership, and

    (b)  the general knowledge, skill and experience that that member has.

(7) For the purposes of this section a limited liability partnership goes into insolvent liquidation if it goes into liquidation at a time when its assets are insufficient for the payment of its debts and other liabilities and the expenses of the winding up.

(8) In this section "member" includes a shadow member.

(9) This section is without prejudice to section 214.
] [1]

---

**Notes**

[1]    Added by Limited Liability Partnerships Regulations 2001/1090 Sch.3 para.1 (April 6, 2001: the insertion of s.214A is one of the modifications to the Insolvency Act 1986 made by SI 2001/1090 Sch.3 in relation to Limited Liability Partnerships and is reproduced as full-text for the sake of clarity. The remaining modifications to this Act can be accessed via the Analysis Information of the relevant provisions)

> Scotland



**[ 214A   Adjustment of withdrawals**

(1) This section has effect in relation to a person who is or has been a member of a limited liability partnership where, in the course of the winding up of that limited liability partnership, it appears that subsection (2) of this section applies in relation to that person.

(2) This subsection applies in relation to a person if–

(a)  within the period of two years ending with the commencement of the winding up, he was a member of the limited liability partnership who withdrew property of the limited liability partnership, whether in the form of a share of profits, salary, repayment of or payment of interest on a loan to the limited liability partnership or any other withdrawal of property, and

(b)  it is proved by the liquidator to the satisfaction of the court that at the time of the withdrawal he knew or had reasonable grounds for believing that the limited liability partnership–

(i)  was at the time of the withdrawal unable to pay its debts within the meaning of section 123 of the Act, or

(ii)  would become so unable to pay its debts after the assets of the limited liability partnership had been depleted by that withdrawal taken together with all other withdrawals (if any) made by any members contemporaneously with that withdrawal or in contemplation when that withdrawal was made.

(3) Where this section has effect in relation to any person the court, on the application of the liquidator, may declare that that person is to be liable to make such contribution (if any) to the limited liability partnership's assets as the court thinks proper.

(4) The court shall not make a declaration in relation to any person the amount of which exceeds the aggregate of the amounts or values of all the withdrawals referred to in subsection (2) made by that person within the period of 2 years referred to in that subsection.

(5) The court shall not make a declaration under this section with respect to any person unless that person knew or ought to have concluded that after each withdrawal referred to in subsection (2) there was no reasonable prospect that the limited liability partnership would avoid going into insolvent liquidation.

(6) For the purposes of subsection (5) the facts which a member ought to know or ascertain, the conclusions which he ought to reach and the steps which he ought to have taken are those which would be known or ascertained, or reached or taken, by a reasonably diligent person having both:

(a) the general knowledge, skill and experience that may reasonably be expected of a person carrying out the same functions as are carried out by that member in relation to the limited liability partnership, and

(b)  the general knowledge, skill and experience that that member has.

(7) For the purposes of this section a limited liability partnership goes into insolvent liquidation if it goes into liquidation at a time when its assets are insufficient for the payment of its debts and other liabilities and the expenses of the winding up.

(8) In this section "member" includes a shadow member.

(9) This section is without prejudice to section 214.

] [1]



**Notes**

<sup>1</sup>     Added by Limited Liability Partnerships (Scotland) Regulations 2001/128 (Scottish SI) Sch.3 para.1 (April 6, 2001: the insertion of s.214A s one of the modifications to the Insolvency Act 1986 made by SSI 2001/128 Sch.3 in relation to Limited Liability Partnerships and is reproduced as full-text for the sake of clarity. The remaining modifications to this Act can be accessed via the Analysis Information of the relevant provisions.)

**Extent**

Pt IV c. X s. 214A(1)-(9): United Kingdom

---

✅ Law In Force

### 215.— Proceedings under ss. 213, 214.

(1) On the hearing of an application under section 213 or 214, the liquidator may himself give evidence or call witnesses.

(2) Where under either section the court makes a declaration, it may give such further directions as it thinks proper for giving effect to the declaration; and in particular, the court may—

      (a)  provide for the liability of any person under the declaration to be a charge on any debt or obligation due from the company to him, or on any mortgage or charge or any interest in a mortgage or charge on assets of the company held by or vested in him, or any person on his behalf, or any person claiming as assignee from or through the person liable or any person acting on his behalf, and

      (b)  from time to time make such further order as may be necessary for enforcing any charge imposed under this subsection.

(3) For the purposes of subsection (2), "assignee"—

      (a)  includes a person to whom or in whose favour, by the directions of the person made liable, the debt, obligation, mortgage or charge was created, issued or transferred or the interest created, but

      (b)   does not include an assignee for valuable consideration (not including consideration by way of marriage [ or the formation of a civil partnership ] <sup>1</sup> ) given in good faith and without notice of any of the matters on the ground of which the declaration is made.

(4) Where the court makes a declaration under either section in relation to a person who is a creditor of the company, it may direct that the whole or any part of any debt owed by the company to that person and any interest thereon shall rank in priority after all other debts owed by the company and after any interest on those debts.

(5) Sections 213 and 214 have effect notwithstanding that the person concerned may be criminally liable in respect of matters on the ground of which the declaration under the section is to be made.

**Notes**

<sup>1</sup>     Words inserted by Civil Partnership Act 2004 c. 33 Sch.27 para.112 (December 5, 2005)

**Commencement**

Pt IV c. X s. 215:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)



**Extent**

Pt VI s. 235(1)-(5): England, Wales, Scotland

---

✅ Law In Force

## 236.—  Inquiry into company's dealings, etc.

(1) This section applies as does section 234; and it also applies in the case of a company in respect of which a winding-up order has been made by the court in England and Wales as if references to the office-holder included the official receiver, whether or not he is the liquidator.

(2) The court may, on the application of the office-holder, summon to appear before it—
    (a) any officer of the company,
    (b) any person known or suspected to have in his possession any property of the company or supposed to be indebted to the company, or
    (c) any person whom the court thinks capable of giving information concerning the promotion, formation, business, dealings, affairs or property of the company.

(3) The court may require any such person as is mentioned in subsection (2)(a) to (c) to submit [ to the court ] [1] an account of his dealings with the company or to produce any books, papers or other records in his possession or under his control relating to the company or the matters mentioned in paragraph (c) of the subsection.

[ (3A) An account submitted to the court under subsection (3) must be contained in—
    (a) a witness statement verified by a statement of truth (in England and Wales), and
    (b) an affidavit (in Scotland).
] [2]

(4) The following applies in a case where—
    (a) a person without reasonable excuse fails to appear before the court when he is summoned to do so under this section, or
    (b) there are reasonable grounds for believing that a person has absconded, or is about to abscond, with a view to avoiding his appearance before the court under this section.

(5) The court may, for the purpose of bringing that person and anything in his possession before the court, cause a warrant to be issued to a constable or prescribed officer of the court—
    (a) for the arrest of that person, and
    (b) for the seizure of any books, papers, records, money or goods in that person's possession.

(6) The court may authorise a person arrested under such a warrant to be kept in custody, and anything seized under such a warrant to be held, in accordance with the rules, until that person is brought before the court under the warrant or until such other time as the court may order.

---

**Notes**

[1]  Words substituted by Legislative Reform (Insolvency) (Miscellaneous Provisions) Order 2010/18 art.5(6)(a) (April 6, 2010: substitution has effect subject to transitional provisions specified in SI 2010/18 art.12(4))

[2]  Added by Legislative Reform (Insolvency) (Miscellaneous Provisions) Order 2010/18 art.5(6)(b) (April 6, 2010: insertion has effect subject to transitional provisions specified in SI 2010/18 art.12(4))



**Commencement**

Pt VI s. 236:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Pt VI s. 236(1)-(6): England, Wales, Scotland

✅ Law In Force

### 237.— Court's enforcement powers under s. 236.

(1) If it appears to the court, on consideration of any evidence obtained under section 236 or this section, that any person has in his possession any property of the company, the court may, on the application of the office-holder, order that person to deliver the whole or any part of the property to the office-holder at such time, in such manner and on such terms as the court thinks fit.

(2) If it appears to the court, on consideration of any evidence so obtained, that any person is indebted to the company, the court may, on the application of the office-holder, order that person to pay to the office-holder, at such time and in such manner as the court may direct, the whole or any part of the amount due, whether in full discharge of the debt or otherwise, as the court thinks fit.

(3) The court may, if it thinks fit, order that any person who if within the jurisdiction of the court would be liable to be summoned to appear before it under section 236 or this section shall be examined in any part of the United Kingdom where he may for the time being be, or in a place outside the United Kingdom.

(4) Any person who appears or is brought before the court under section 236 or this section may be examined on oath, either orally or (except in Scotland) by interrogatories, concerning the company or the matters mentioned in section 236(2)(c).
[1] [2]

**Notes**

[1]   Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

[2]   Modified by Company Directors Disqualification Act 1986 (c.46), ss. 21(2), 25 Extended with modifications by Building Societies Act 1986 (c.53), ss. 54(3)(a) (5)(a), 90, 126(3), Sch. 15 Applied (with modifications) by S.I. 1989/1276, arts. 2, 3

**Commencement**

Pt VI s. 237:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)



*Insolvency Act 1986*                                                      *Page 524*

☑ Law In Force

### 410.  Extent of this Part.

This part of this Act extends to England and Wales only.
¹ ²

**Notes**

¹  Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

²  S. 410 applied with modifications by S.I. 1986/1999, art. 3, Sch. 1 Pt. II

**Commencement**

Pt XIV s. 410:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Pt XIV s. 410: England, Wales, Scotland

# PART XV

## SUBORDINATE LEGISLATION

*General insolvency rules*

☑ Law In Force

### 411.—  Company insolvency rules.

(1) Rules may be made—

      (a)  in relation to England and Wales, by the Lord Chancellor with the concurrence of the Secretary of State [ and, in the case of rules that affect court procedure, with the concurrence of the Lord Chief Justice ] ¹ , or

      (b)  in relation to Scotland, by the Secretary of State,

for the purpose of giving effect to Parts I to VII of this Act [ or the EC Regulation ] ² .



[ (1A) Rules may also be made for the purpose of giving effect to Part 2 of the Banking Act 2009 (bank insolvency orders); and rules for that purpose shall be made—

    (a) in relation to England and Wales, by the Lord Chancellor with the concurrence of—

        (i) the Treasury, and

        (ii) in the case of rules that affect court procedure, the Lord Chief Justice, or

    (b) in relation to Scotland, by the Treasury.

] [3]

[ (1B) Rules may also be made for the purpose of giving effect to Part 3 of the Banking Act 2009 (bank administration); and rules for that purpose shall be made—

    (a) in relation to England and Wales, by the Lord Chancellor with the concurrence of—

        (i) the Treasury, and

        (ii) in the case of rules that affect court procedure, the Lord Chief Justice, or

    (b) in relation to Scotland, by the Treasury.

] [4]

(2) Without prejudice to the generality of subsection (1), [ (1A) ] [5] [ or (1B) ] [6] or to any provision of those Parts by virtue of which rules under this section may be made with respect to any matter, rules under this section may contain—

    (a) any such provision as is specified in Schedule 8 to this Act or corresponds to provision contained immediately before the coming into force of section 106 of the Insolvency Act 1985 in rules made, or having effect as if made, under section 663(1) or (2) of [ the Companies Act 1985 ] [7] (old winding-up rules), and

    (b) such incidental, supplemental and transitional provisions as may appear to the Lord Chancellor or, as the case may be, the Secretary of State [ or the Treasury ] [8] necessary or expedient.

[ (2A) For the purposes of subsection (2), a reference in Schedule 8 to this Act to doing anything under or for the purposes of a provision of this Act includes a reference to doing anything under or for the purposes of the EC Regulation (in so far as the provision of this Act relates to a matter to which the EC Regulation applies).

(2B) Rules under this section for the purpose of giving effect to the EC Regulation may not create an offence of a kind referred to in paragraph 1(1)(d) of Schedule 2 to the European Communities Act 1972. ] [9]

[ (2C) For the purposes of subsection (2), a reference in Schedule 8 to this Act to doing anything under or for the purposes of a provision of this Act includes a reference to doing anything under or for the purposes of Part 2 of the Banking Act 2009. ] [10]

[ (2D) For the purposes of subsection (2), a reference in Schedule 8 to this Act to doing anything under or for the purposes of a provision of this Act includes a reference to doing anything under or for the purposes of Part 3 of the Banking Act 2009. ] [11]

(3) In Schedule 8 to this Act "liquidator" includes a provisional liquidator [ or bank liquidator ] [12] [ or administrator ] [13]; and references above in this section to Parts I to VII of this Act [ or [ Part 2 or 3 of the Banking Act 2009 ] [15] ] [14] are to be read as including [ the Companies Acts ] [16] so far as relating to, and to matters connected with or arising out of, the insolvency or winding up of companies.

[ (3A) In this section references to Part 2 or 3 of the Banking Act 2009 include references to those Parts as applied to building societies (see section 90C of the Building Societies Act 1986). ] [17]



(4) Rules under this section shall be made by statutory instrument subject to annulment in pursuance of a resolution of either House of Parliament.

(5) Regulations made by the Secretary of State [ or the Treasury ] [18] under a power conferred by rules under this section shall be made by statutory instrument and, after being made, shall be laid before each House of Parliament.

(6) Nothing in this section prejudices any power to make rules of court.

[ (7) The Lord Chief Justice may nominate a judicial office holder (as defined in section 109(4) of the Constitutional Reform Act 2005) to exercise his functions under this section. ] [19]

## Notes

[1]   Words inserted by Constitutional Reform Act 2005 c. 4 Sch.4(1) para.188(2) (April 3, 2006)

[2]   Words inserted by Insolvency Act 1986 (Amendment) Regulations 2002/1037 reg.3(1) (May 3, 2002)

[3]   Added by Banking Act 2009 c. 1 Pt 2 s.125(2) (February 17, 2009 for the purpose of enabling subordinate legislation or codes of practice to be made; February 21, 2009 otherwise)

[4]   Added by Banking Act 2009 c. 1 Pt 3 s.160(2) (February 17, 2009 for the purpose of enabling subordinate legislation or codes of practice to be made; February 21, 2009 otherwise)

[5]   Word inserted by Banking Act 2009 c. 1 Pt 2 s.125(3)(a) (February 17, 2009 for the purpose of enabling subordinate legislation or codes of practice to be made; February 21, 2009 otherwise)

[6]   Words inserted by Banking Act 2009 c. 1 Pt 3 s.160(3) (February 17, 2009 for the purpose of enabling subordinate legislation or codes of practice to be made; February 21, 2009 otherwise)

[7]   Words substituted by Companies Act 2006 (Consequential Amendments, Transitional Provisions and Savings) Order 2009/1941 Sch.1 para.79 (October 1, 2009)

[8]   Words inserted by Banking Act 2009 c. 1 Pt 2 s.125(3)(b) (February 17, 2009 for the purpose of enabling subordinate legislation or codes of practice to be made; February 21, 2009 otherwise)

[9]   Added by Insolvency Act 1986 (Amendment) Regulations 2002/1037 reg.3(2) (May 3, 2002)

[10]   Added by Banking Act 2009 c. 1 Pt 2 s.125(4) (February 17, 2009 for the purpose of enabling subordinate legislation or codes of practice to be made; February 21, 2009 otherwise)

[11]   Added by Banking Act 2009 c. 1 Pt 3 s.160(4) (February 17, 2009 for the purpose of enabling subordinate legislation or codes of practice to be made; February 21, 2009 otherwise)

[12]   Words inserted by Banking Act 2009 c. 1 Pt 2 s.125(5)(a) (February 17, 2009 for the purpose of enabling subordinate legislation or codes of practice to be made; February 21, 2009 otherwise)

[13]   Words inserted by Banking Act 2009 c. 1 Pt 3 s.160(5)(a) (February 17, 2009 for the purpose of enabling subordinate legislation or codes of practice to be made; February 21, 2009 otherwise)

[14]   Words inserted by Banking Act 2009 c. 1 Pt 2 s.125(5)(b) (February 17, 2009 for the purpose of enabling subordinate legislation or codes of practice to be made; February 21, 2009 otherwise)

[15]   Words inserted by Banking Act 2009 c. 1 Pt 3 s.160(5)(b) (February 17, 2009 for the purpose of enabling subordinate legislation or codes of practice to be made; February 21, 2009 otherwise)

[16]   Words substituted by Companies Act 2006 (Commencement No. 3, Consequential Amendments, Transitional Provisions and Savings) Order 2007/2194 Sch.4(3) para.44 (October 1, 2007)

[17]   Added by Building Societies (Insolvency and Special Administration) Order 2009/805 art.13 (March 29, 2009)

[18]   Words inserted by Banking Act 2009 c. 1 Pt 2 s.125(6) (February 17, 2009 for the purpose of enabling subordinate legislation or codes of practice to be made; February 21, 2009 otherwise)

[19]   Added by Constitutional Reform Act 2005 c. 4 Sch.4(1) para.188(3) (April 3, 2006)

## Commencement

Pt XV s. 411: December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)



*Insolvency Act 1986*                                                                                    *Page 527*

**Extent**

Pt XV s. 411(1)-(7): England, Wales, Scotland

☑ Law In Force

### 412.—  Individual insolvency rules (England and Wales).

(1)  The Lord Chancellor may, with the concurrence of the Secretary of State  [ and, in the case of rules that affect court procedure, with the concurrence of the Lord Chief Justice ] [1] , make rules for the purpose of giving effect to  [ Parts 7A to 11 ] [2]  of this Act  [ or the EC Regulation ] [3] .

(2) Without prejudice to the generality of subsection (1), or to any provision of those Parts by virtue of which rules under this section may be made with respect to any matter, rules under this section may contain—

> (a) any such provision as is specified in Schedule 9 to this Act or corresponds to provision contained immediately before the appointed day in rules made under section 132 of the Bankruptcy Act 1914; and

> (b)  such incidental, supplemental and transitional provisions as may appear to the Lord Chancellor necessary or expedient.

[ (2A) For the purposes of subsection (2), a reference in Schedule 9 to this Act to doing anything under or for the purposes of a provision of this Act includes a reference to doing anything under or for the purposes of the EC Regulation (in so far as the provision of this Act relates to a matter to which the EC Regulation applies).

(2B) Rules under this section for the purpose of giving effect to the EC Regulation may not create an offence of a kind referred to in paragraph 1(1)(d) of Schedule 2 to the European Communities Act 1972. ] [4]

(3) Rules under this section shall be made by statutory instrument subject to annulment in pursuance of a resolution of either House of Parliament.

(4) Regulations made by the Secretary of State under a power conferred by rules under this section shall be made by statutory instrument and, after being made, shall be laid before each House of Parliament.

(5) Nothing in this section prejudices any power to make rules of court.

[ (6) The Lord Chief Justice may nominate a judicial office holder (as defined in section 109(4) of the Constitutional Reform Act 2005) to exercise his functions under this section. ] [5]

**Notes**

[1]   Words inserted by Constitutional Reform Act 2005 c. 4 Sch.4(1) para.189(2) (April 3, 2006)

[2]   Words substituted by Tribunals, Courts and Enforcement Act 2007 c. 15 Sch.20(1) para.8 (February 24, 2009 for the purpose of making rules, regulations and orders; April 6, 2009 otherwise)

[3]   Words inserted by Insolvency Act 1986 (Amendment) Regulations 2002/1037 reg.3(3) (May 3, 2002)

[4]   Added by Insolvency Act 1986 (Amendment) Regulations 2002/1037 reg.3(4) (May 3, 2002)

[5]   Added by Constitutional Reform Act 2005 c. 4 Sch.4(1) para.189(3) (April 3, 2006)


Westlaw. UK

*Sittings of Tribunal*

🅡 Repealed

**3.— [...]**[1]

**Notes**

[1]    Repealed by Deregulation Act 2015 c. 20 Sch.6(6) para.21 (October 1, 2015: repeal has effect as SI 2015/1732
subject to savings specified in 2015 c.20 Sch.6 para.23)

*Procedure of Tribunal*

🅡 Repealed

**4.— [...]**[1]

**Notes**

[1]    Repealed by Deregulation Act 2015 c. 20 Sch.6(6) para.21 (October 1, 2015: repeal has effect as SI 2015/1732
subject to savings specified in 2015 c.20 Sch.6 para.23)

# SCHEDULE 8

## PROVISIONS CAPABLE OF INCLUSION IN COMPANY INSOLVENCY RULES

**Section 411**

*Courts*

☑ Law In Force

**1.**

Provision for supplementing, in relation to the insolvency or winding up of companies, any provision
made by or under section 117 of this Act (jurisdiction in relation to winding up).
[1]

**Notes**

[1]    Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch.
6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras.
3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2),
(England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal
Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33),
ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s.


Westlaw. UK

180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

**Commencement**

Sch. 8 para. 1: December 29, 1986 (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Sch. 8 para. 1: England, Wales, Scotland

---

☑ Law In Force

[ **2.**

(1) Provision for regulating the practice and procedure of any court exercising jurisdiction for the purposes of Parts I to VII of this Act or [ the Companies Acts ]² so far as relating to, and to matters connected with or arising out of, the insolvency or winding up of companies, being any provision that could be made by rules of court.

(2) Rules made by virtue of this paragraph about the consequence of failure to comply with practice or procedure may, in particular, include provision about the termination of administration.
]¹

**Notes**

¹  Existing Sch.8 para.2 renumbered as Sch.8 para.2(1) and Sch.8 para.2(2) is added subject to transitional provisions specified in SI 2003/2093 art.3 by Enterprise Act 2002 c. 40 Sch.17 para.38(2) (September 15, 2003: substitution has effect subject to transitional provisions specified in SI 2003/2093 art.3)

²  Words substituted by Companies Act 2006 (Commencement No. 3, Consequential Amendments, Transitional Provisions and Savings) Order 2007/2194 Sch.4(3) para.44 (October 1, 2007)

**Commencement**

Sch. 8 para. 2: December 29, 1986 (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Sch. 8 para. 2(1)-(2): England, Wales, Scotland

---

*Notices, etc.*



✅ Law In Force

### 3.

Provision requiring notice of any proceedings in connection with or arising out of the insolvency or winding up of a company to be given or published in the manner prescribed by the rules.
[1]

---

**Notes**

[1]    Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

**Commencement**

Sch. 8 para. 3:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Sch. 8 para. 3: England, Wales, Scotland

---

✅ Law In Force

### 4.

Provision with respect to the form, manner of serving, contents and proof of any petition, application, order, notice, statement or other document required to be presented, made, given, published or prepared under any enactment or subordinate legislation relating to, or to matters connected with or arising out of, the insolvency or winding up of companies.
[1]

---

**Notes**

[1]    Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)



**Commencement**

Sch. 8 para. 8:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Sch. 8 para. 8: England, Wales, Scotland

The text of this provision varies depending on jurisdiction or other application. See parallel texts relating to:
Scotland | England and Wales

🅿 Partially In Force

❗ Amendment(s) Pending

| Scotland |
| --- |

[NOTE: not yet in force otherwise.]

| England and Wales |
| --- |

**[ 8A**

(1) Provision about the making of decisions by creditors and contributories, including provision—

  (a)  prescribing particular procedures by which creditors and contributories may make decisions;

  (b) authorising the use of other procedures for creditors and contributories to make decisions, if those procedures comply with prescribed requirements.

(2) Provision under sub-paragraph (1) may in particular include provision about—

  (a)  how creditors and contributories may request that a creditors' meeting or a contributories' meeting be held,

  (b)  the rights of creditors, contributories and others to be given notice of, and participate in, procedures,

  (c)  creditors' and contributories' rights to vote in procedures,

  (d)  the period within which any right to participate or vote is to be exercised,

  (e)  the proportion of creditors or contributories that must vote for a proposal for it to be approved,

  (f)  how the value of any debt or contribution should be determined,

  (g)  the time at which decisions taken by a procedure are to be treated as having been made.

]¹

**Notes**

¹    Added by Small Business, Enterprise and Employment Act 2015 c. 26 Pt 10 s.122(3) (April 6, 2017: insertion has effect on April 6, 2017 as specified in SI 2016/1020 reg.4(a) subject to transitional and saving provisions specified in SI 2016/1020 reg.5)

**Amendments Pending**

Sch. 8 para. 8A:  added by Small Business, Enterprise and Employment Act 2015 c. 26 Pt 10 s. 122(3) (Not yet in force: Subject to savings specified in SI 2017/540 reg.4)

**Extent**

Sch. 8 para. 8A(1)-(2)(g): England, Wales, Scotland

✅ Law In Force

**9.**

The following provision with respect to meetings of a company's creditors, contributories or members—

    (a) provision as to the manner of summoning a meeting (including provision as to how any power to require a meeting is to be exercised, provision as to the manner of determining the value of any debt or contribution for the purposes of any such power and provision making the exercise of any such power subject to the deposit of a sum sufficient to cover the expenses likely to be incurred in summoning and holding a meeting);

    (b) provision specifying the time and place at which a meeting may be held and the period of notice required for a meeting;

    (c) provision as to the procedure to be followed at a meeting (including the manner in which decisions may be reached by a meeting and the manner in which the value of any vote at a meeting is to be determined);

    (d) provision for requiring a person who is or has been an officer of the company to attend a meeting;

    (e) provision creating, in the prescribed circumstances, a presumption that a meeting has been duly summoned and held;

    (f) provision as to the manner of proving the decisions of a meeting.

¹

**Notes**

¹    Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)



*Insolvency Act 1986*                                                                                                    *Page 832*

**Commencement**

Sch. 8 para. 9:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Sch. 8 para. 9(a)-(f): England, Wales, Scotland

Partially In Force

**[ 9A**

Provision about how a company's creditors may nominate a person to be liquidator, including in the case of a voluntary winding up provision conferring functions on the directors of the company. ] [1]

**Notes**

[1]    Added by Small Business, Enterprise and Employment Act 2015 c. 26 Sch.9(1) para.58 (May 26, 2015 for the limited purposes of enabling the exercise of any power to make provision by regulations, rules or order made by statutory instrument or to prepare and issue guidance; April 6, 2017 in relation to England and Wales subject to transitional and saving provisions in SI 2016/1020 reg.5; not yet in force otherwise)

**Extent**

Sch. 8 para. 9A: England, Wales, Scotland

Law In Force

Amendment(s) Pending

**10.—**

(1) Provision as to the [ establishment, ] [1] functions, membership and proceedings of a committee [ provided for by ] [2] [ section 49, 68, 101, 141 or 142 of, or paragraph 57 of Schedule B1 to, this Act ] [3] .

(2) The following provision with respect to the establishment of a committee under section 101, 141 or 142 of this Act, that is to say—

>       (a)    provision for resolving differences between [...] [4] the company's creditors and [...] [4] its contributories or members;

>       (b)    provision authorising the establishment of the committee without [ seeking a decision from ] [5] contributories in a case where a company is being wound up on grounds including its inability to pay its debts; and

>       (c)    provision modifying the requirements of this Act with respect to the establishment of the committee in a case where a winding-up order has been made immediately upon the discharge of an administration order.

**Notes**

[1]    Word inserted by Small Business, Enterprise and Employment Act 2015 c. 26 Sch.9(1) para.59(2)(a) (May 26, 2015 for the limited purposes of enabling the exercise of any power to make provision by regulations, rules or



**Commencement**

Sch. 8 para. 4: December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Sch. 8 para. 4: England, Wales, Scotland

☑ Law In Force

**5.**

Provision specifying the persons to whom any notice is to be given.

¹

**Notes**

¹  Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

**Commencement**

Sch. 8 para. 5: December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Sch. 8 para. 5: England, Wales, Scotland

☑ Law In Force

**[5A**

Provision for enabling a creditor of a company to elect to be, or to cease to be, an opted-out creditor in relation to an office-holder of the company (within the meaning of section 248A), including, in particular, provision—

　　(a)  for requiring an office-holder to provide information to creditors about how they may elect to be, or cease to be, opted-out creditors;

　　(b)  for deeming an election to be, or cease to be, an opted-out creditor in relation to a particular office-holder of a company to be such an election also in relation to any other officeholder of the company.

]¹

**Notes**

[1]    Added by Small Business, Enterprise and Employment Act 2015 c. 26 Pt 10 s.124(5) (May 26, 2015: Subject to savings specified in SI 2017/540 reg.4)

**Extent**

Sch. 8 para. 5A(a)-(b): England, Wales, Scotland

*Registration of voluntary arrangements*

☑ Law In Force

**6.**

Provision for the registration of voluntary arrangements approved under Part I of this Act, including provision for the keeping and inspection of a register.
[1]

**Notes**

[1]    Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

**Commencement**

Sch. 8 para. 6: December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Sch. 8 para. 6: England, Wales, Scotland

*Provisional liquidator*



✅ Law In Force

### 7.

Provision as to the manner in which a provisional liquidator appointed under section 135 is to carry out his functions.
[1]

---

**Notes**

[1]    Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

**Commencement**

Sch. 8 para. 7:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Sch. 8 para. 7: England, Wales, Scotland

---

*Conduct of insolvency*

✅ Law In Force

### 8.

Provision with respect to the certification of any person as, and as to the proof that a person is, the liquidator, administrator or administrative receiver of a company.
[1]

---

**Notes**

[1]    Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)



order made by statutory instrument or to prepare and issue guidance; April 6, 2017 in relation to England and Wales subject to transitional and saving provisions in SI 2016/1020 reg.5; not yet in force otherwise)

2    Words substituted by Small Business, Enterprise and Employment Act 2015 c. 26 Sch.9(1) para.59(2)(b) (May 26, 2015 for the limited purposes of enabling the exercise of any power to make provision by regulations, rules or order made by statutory instrument or to prepare and issue guidance; April 6, 2017 in relation to England and Wales subject to transitional and saving provisions in SI 2016/1020 reg.5; not yet in force otherwise)

3    Words substituted subject to transitional provisions specified in SI 2003/2093 art.3 by Enterprise Act 2002 c. 40 Sch.17 para.38(3) (September 15, 2003: substitution has effect subject to transitional provisions specified in SI 2003/2093 art.3)

4    Words repealed by Small Business, Enterprise and Employment Act 2015 c. 26 Sch.9(1) para.59(3)(a) (May 6, 2017: repeal has effect on April 6, 2017 as specified in SI 2016/1020 reg.4(e) subject to transitional and saving provisions specified in SI 2016/1020 reg.5)

5    Words substituted by Small Business, Enterprise and Employment Act 2015 c. 26 Sch.9(1) para.59(3)(b) (May 26, 2015 for the limited purposes of enabling the exercise of any power to make provision by regulations, rules or order made by statutory instrument or to prepare and issue guidance; April 6, 2017 in relation to England and Wales subject to transitional and saving provisions in SI 2016/1020 reg.5; not yet in force otherwise)

### Amendments Pending

Sch. 8 para. 10(2)(a): words repealed by Small Business, Enterprise and Employment Act 2015 c. 26 Sch. 9(1) para. 59(3)(a) (date to be appointed)

### Commencement

Sch. 8 para. 10: December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

### Extent

Sch. 8 para. 10(1)-(2)(c): England, Wales, Scotland

---

☑ Law In Force

## 11.

Provision as to the manner in which any requirement that may be imposed on a person under any of Parts I to VII of this Act by the official receiver, the liquidator, administrator or administrative receiver of a company or a special manager appointed under section 177 is to be so imposed.

1

### Notes

1    Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)



**Commencement**

Sch. 8 para. 11: December 29, 1986 (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Sch. 8 para. 11: England, Wales, Scotland

☑ Law In Force

## 12.

Provision as to the debts that may be proved in a winding up, as to the manner and conditions of proving a debt and as to the manner and expenses of establishing the value of any debt or security.[1]

**Notes**

[1]  Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

**Commencement**

Sch. 8 para. 12: December 29, 1986 (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Sch. 8 para. 12: England, Wales, Scotland

☑ Law In Force

## 13.

Provision with respect to the manner of the distribution of the property of a company that is being wound up, including provision with respect to unclaimed funds and dividends.[1]

**Notes**

[1]  Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s.



180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

**Commencement**

Sch. 8 para. 13:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Sch. 8 para. 13: England, Wales, Scotland

---

✅ Law In Force

## [ 13A

Provision for a creditor who has not proved a small debt to be treated as having done so for purposes relating to the distribution of a company's property (and for provisions of, or contained in legislation made under, this Act to apply accordingly).

"Small debt" means a debt not exceeding an amount prescribed by the rules.

] [1]

**Notes**

[1]    Added by Small Business, Enterprise and Employment Act 2015 c. 26 Pt 10 s.131 (May 26, 2015)

**Extent**

Sch. 8 para. 13A: England, Wales, Scotland

---

✅ Law In Force

## 14.

Provision which, with or without modifications, applies in relation to the winding up of companies any enactment contained in Parts VIII to XI of this Act or in the [ Bankruptcy (Scotland) Act 2016 ] [1].

**Notes**

[1]    Word substituted by Bankruptcy (Scotland) Act 2016 (Consequential Provisions and Modifications) Order 2016/1034 Sch.1(1) para.4(11) (November 30, 2016 subject to savings specified in SI 2016/1034 art.7(3))

**Commencement**

Sch. 8 para. 14:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Sch. 8 para. 14: England, Wales, Scotland



*Insolvency Act 1986*                                                                                    *Page 836*

✅ Law In Force

**[ 14A.**

Provision about the application of section 176A of this Act which may include, in particular—

    (a)  provision enabling a receiver to institute winding up proceedings;

    (b)  provision requiring a receiver to institute winding up proceedings.

**]** [1]

**Notes**

[1]    Added subject to transitional provisions specified in SI 2003/2093 art.3 by Enterprise Act 2002 c. 40 Sch.17 para.38(4) (September 15, 2003: addition has effect subject to transitional provisions specified in SI 2003/2093 art.3)

**Extent**

Sch. 8 para. 14A(a)-(b): United Kingdom


*[ Administration ]* [1]

**Notes**

[1]    Added subject to transitional provisions specified in SI 2003/2093 art.3 by Enterprise Act 2002 c. 40 Sch.17 para.38(5) (September 15, 2003: addition has effect subject to transitional provisions specified in SI 2003/2093 art.3)


✅ Law In Force

**[ 14B.**

Provision which—

    (a)  applies in relation to administration, with or without modifications, a provision of Parts IV to VII of this Act, or

    (b)  serves a purpose in relation to administration similar to a purpose that may be served by the rules in relation to winding up by virtue of a provision of this Schedule.

**]** [1]

**Notes**

[1]    Added subject to transitional provisions specified in SI 2003/2093 art.3 by Enterprise Act 2002 c. 40 Sch.17 para.38(5) (September 15, 2003: addition has effect subject to transitional provisions specified in SI 2003/2093 art.3)

**Extent**

Sch. 8 para. 14B(a)-(b): United Kingdom



*Financial provisions*

 Law In Force

### 15.

Provision as to the amount, or manner of determining the amount, payable to the liquidator, administrator or administrative receiver of a company or a special manager appointed under section 177, by way of remuneration for the carrying out of functions in connection with or arising out of the insolvency or winding up of a company.

¹

#### Notes

¹    Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

#### Commencement

Sch. 8 para. 15:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

#### Extent

Sch. 8 para. 15: England, Wales, Scotland

 Law In Force

### 16.

Provision with respect to the manner in which moneys received by the liquidator of a company in the course of carrying out his functions as such are to be invested or otherwise handled and with respect to the payment of interest on sums which, in pursuance of rules made by virtue of this paragraph, have been paid into the Insolvency Services Account.

¹

#### Notes

¹    Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para.



8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

**Commencement**

Sch. 8 para. 16:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Sch. 8 para. 16: England, Wales, Scotland

---

✅ Law In Force

**[ 16A.**
Provision enabling the Secretary of State to set the rate of interest paid on sums which have been paid into the Insolvency Services Account.
**] [1]**

**Notes**

[1]   Added by Enterprise Act 2002 c. 40 Pt 10 s.271(1) (December 18, 2003 as amended by SI 2003/3340; April 1, 2004 was the date originally appointed by SI 2003/2093)

**Extent**

Sch. 8 para. 16A: England, Wales, Scotland

---

✅ Law In Force

**17.**
Provision as to the fees, costs, charges and other expenses that may be treated as the expenses of a winding up.
[1]

**Notes**

[1]   Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)



*Insolvency Act 1986*                                                                                    *Page 839*

**Commencement**

Sch. 8 para. 17: December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Sch. 8 para. 17: England, Wales, Scotland

✅ Law In Force

## 18.

Provision as to the fees, costs, charges and other expenses that may be treated as properly incurred by the administrator or administrative receiver of a company.
[1]

**Notes**

[1]    Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

**Commencement**

Sch. 8 para. 18: December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Sch. 8 para. 18: England, Wales, Scotland

✅ Law In Force

## 19.

Provision as to the fees, costs, charges and other expenses that may be incurred for any of the purposes of Part I of this Act or in the administration of any voluntary arrangement approved under that Part.
[1]

**Notes**

[1]    Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal



Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

**Commencement**

Sch. 8 para. 19:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Sch. 8 para. 19: England, Wales, Scotland

---

*Information and records*

✅ Law In Force

**20.**

Provision requiring registrars and other officers of courts having jurisdiction in England and Wales in relation to, or to matters connected with or arising out of, the insolvency or winding up of companies—

        (a)  to keep books and other records with respect to the exercise of that jurisdiction, and

        (b)  to make returns to the Secretary of State of the business of those courts.

[1]

---

**Notes**

[1]  Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

**Commencement**

Sch. 8 para. 20:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Sch. 8 para. 20(a)-(b): England, Wales, Scotland



✅ Law In Force

### 21.

Provision requiring a creditor, member or contributory, or such a committee as is mentioned in paragraph 10 above, to be supplied (on payment in prescribed cases of the prescribed fee) with such information and with copies of such documents as may be prescribed.

[1]

#### Notes

[1] Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

#### Commencement

Sch. 8 para. 21:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

#### Extent

Sch. 8 para. 21: England, Wales, Scotland

✅ Law In Force

### 22.

Provision as to the manner in which public examinations under sections 133 and 134 of this Act and proceedings under sections 236 and 237 are to be conducted, as to the circumstances in which records of such examinations or proceedings are to be made available to prescribed persons and as to the costs of such examinations and proceedings.

[1]

#### Notes

[1] Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies



Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

**Commencement**

Sch. 8 para. 22: December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Sch. 8 para. 22: England, Wales, Scotland

✅ Law In Force

## 23.

Provision imposing requirements with respect to—

    (a) the preparation and keeping by the liquidator, administrator or administrative receiver of a company, or by the supervisor of a voluntary arrangement approved under Part I of this Act, of prescribed books, accounts and other records;

    (b) the production of those books, accounts and records for inspection by prescribed persons;

    (c) the auditing of accounts kept by the liquidator, administrator or administrative receiver of a company, or the supervisor of such a voluntary arrangement; and

    (d) the issue by the administrator or administrative receiver of a company of such a certificate as is mentioned in section 22(3)(b) of the Value Added Tax Act 1983 (refund of tax in cases of bad debts) and the supply of copies of the certificate to creditors of the company.

**Notes**

[1]   Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

**Commencement**

Sch. 8 para. 23: December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Sch. 8 para. 23(a)-(d): England, Wales, Scotland



☑ Law In Force

### 24.

Provision requiring the person who is the supervisor of a voluntary arrangement approved under Part I, when it appears to him that the voluntary arrangement has been fully implemented and that nothing remains to be done by him under the arrangement—

   (a) to give notice of that fact to persons bound by the voluntary arrangement, and
   (b) to report to those persons on the carrying out of the functions conferred on the supervisor of the arrangement.

¹

#### Notes

¹     Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

#### Commencement

Sch. 8 para. 24: December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

#### Extent

Sch. 8 para. 24(a)-(b): England, Wales, Scotland

☑ Law In Force

### 25.

Provision as to the manner in which the liquidator of a company is to act in relation to the books, papers and other records of the company, including provision authorising their disposal.

¹

#### Notes

¹     Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878,



*Insolvency Act 1986* <span style="float:right">*Page 844*</span>

art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

**Commencement**

Sch. 8 para. 25: December 29, 1986 (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Sch. 8 para. 25: England, Wales, Scotland

---

✅ Law In Force

**26.**

Provision imposing requirements in connection with the carrying out of functions under [ section 7A of the Company Directors Disqualification Act 1986 ][1] (including, in particular, requirements with respect to the making of periodic returns).

**Notes**

[1]   Word substituted by Enterprise and Regulatory Reform Act 2013 (Consequential Amendments) (Bankruptcy) and the Small Business, Enterprise and Employment Act 2015 (Consequential Amendments) Regulations 2016/481 reg.3 (April 6, 2016)

**Commencement**

Sch. 8 para. 26: December 29, 1986 (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Sch. 8 para. 26: England, Wales, Scotland

---

*General*

---

✅ Law In Force

**27.**

Provision conferring power on the Secretary of State [ or the Treasury ][1] to make regulations with respect to so much of any matter that may be provided for in the rules as relates to the carrying out of the functions of the liquidator, administrator or administrative receiver of a company.

**Notes**

[1]   Words inserted by Banking Act 2009 c. 1 Pt 2 s.125(7) (February 17, 2009 for the purpose of enabling subordinate legislation or codes of practice to be made; February 21, 2009 otherwise)

**Commencement**

Sch. 8 para. 27: December 29, 1986 (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)



**Extent**

Sch. 8 para. 27: England, Wales, Scotland

---

☑ Law In Force

**28.**

Provision conferring a discretion on the court.

[1]

---

**Notes**

[1]    Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

**Commencement**

Sch. 8 para. 28: December 29, 1986 (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Sch. 8 para. 28: England, Wales, Scotland

---

☑ Law In Force

**29.**

Provision conferring power on the court to make orders for the purpose of securing compliance with obligations imposed by or under [ section 47, 66, 131, 143(2) or 235 of, or paragraph 47 of Schedule B1 to, this Act ] [1] or section 7(4) of the Company Directors Disqualification Act 1986.

---

**Notes**

[1]    Words substituted subject to transitional provisions specified in SI 2003/2093 art.3 by Enterprise Act 2002 c. 40 Sch.17 para.38(6) (September 15, 2003: substitution has effect subject to transitional provisions specified in SI 2003/2093 art.3)

**Commencement**

Sch. 8 para. 29: December 29, 1986 (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)



**Extent**

Sch. 8 para. 29: England, Wales, Scotland

---

☑ Law In Force

**30.**

Provision making non-compliance with any of the rules a criminal offence.
¹

---

**Notes**

¹     Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878, art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

**Commencement**

Sch. 8 para. 30:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Sch. 8 para. 30: England, Wales, Scotland

---

☑ Law In Force

**31.**

Provision making different provision for different cases or descriptions of cases, including different provisions for different areas.
¹

---

**Notes**

¹     Act extended by Banking Act 1987 (c.22), s. 92(2) and (England and Wales) by Water Act 1989 (c.15), s.23, Sch. 6 Pt. II para. 11(1)(2)(3) (with ss. 58(7), 101(1), 141(6), 160(1)(2)(4), 163, 189(4)-(10), 190, 193(1), Sch. 26 paras. 3(1)(2), 17, 40(4), 57(6), 58) Act restricted by Companies Act 1989 (c.40), ss. 182(4), 213(2), Sch. 22 para. 4(2), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), s. 15(3)(7) Act excluded by Criminal Justice (Scotland) Act 1987 (c.41), ss. 30(6), 34(3)(4), 35(3), 36(3), 47(4)(a), Criminal Justice Act 1988 (c.33), ss. 84(3), 86(3), 123, Sch. 8 para. 16, Companies Act 1989 (c.40), ss. 154, 155, 159(2), 180(2), 213(2) (as to s. 180(2), subject to savings in S.I. 1991/878, art. 3(7)), Social Security Act 1989 (c.24), s. 22, Sch. 4 Pt. II para. 8(1), (England, Wales and Scotland) by Drug Trafficking Offences Act 1986 (c.32), ss. 15(5)(a)(7), 17(3) and (England and Wales) by Dartford-Thurrock Crossing Act 1988 (c.20), ss. 15(4), 19 Act amended by Companies Act 1989 (c.40), ss. 154, 155, 158(1), 174(1), 190(6), 213(2) (as to s. 174(1), subject to savings in S.I. 1991/878,



art. 3(4)), Social Security Pensions Act 1975 (c.60), s. 59D(3) (as inserted by Social Security Act 1990 (c.27), s. 12(1), Sch. 3) Financial Services Act 1986 (c.60), s. 72(4)

**Commencement**

Sch. 8 para. 31:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Sch. 8 para. 31: England, Wales, Scotland

# SCHEDULE 9

## PROVISIONS CAPABLE OF INCLUSION IN INDIVIDUAL INSOLVENCY RULES

**Section 412**

*Courts*

✅ Law In Force

**1.**

Provision with respect to the arrangement and disposition of the business under [ Parts 7A to 11 ]<sup>1</sup> of this Act of courts having jurisdiction for the purpose of those Parts, including provision for the allocation of proceedings under those Parts to particular courts and for the transfer of such proceedings from one court to another.

**Notes**

<sup>1</sup>    Words substituted by Tribunals, Courts and Enforcement Act 2007 c. 15 Sch.20(1) para.14(2) (February 24, 2009: 24 February, 2009 for the purpose of making rules, regulations and orders; 6 April, 2009 otherwise)

**Commencement**

Sch. 9 para. 1:  December 29, 1986  (1986 c. 45 Pt XIX s. 443; SI 1986/1924 art. 3)

**Extent**

Sch. 9 para. 1: England, Wales, Scotland

✅ Law In Force

**2.**

Provision for enabling a registrar in bankruptcy of the High Court [...]<sup>1</sup> to exercise such of the jurisdiction conferred for those purposes on the High Court [...]<sup>2</sup> as may be prescribed.



TAB 37

English Insolvency Rules 1986 §§ 12.3, 12.4

Status: 🔴 Superseded

**Insolvency Rules 1986/1925**

**THE THIRD GROUP OF PARTS**

**Part 12 MISCELLANEOUS AND GENERAL**

This version in force from: **April 22, 2014** to **April 5, 2017**

(version 9 of 10)

## 12.3.— Provable debts

(1) Subject as follows, [in administration, winding up and bankruptcy]
1

, all claims by creditors are provable as debts against the company or, as the case may be, the bankrupt, whether they are present or future, certain or contingent, ascertained or sounding only in damages.

(2) The following are not provable—

(a) in bankruptcy, any fine imposed for an offence, and any obligation [ (other than an obligation to pay a lump sum or to pay costs)]
2

arising under an order made in family [...]
3

proceedings [ or [ any obligation arising]
2

under a maintenance assessment made under the Child Support Act 1991]
4

;

(b) in [administration, ]
5

winding up or bankruptcy, any obligation arising under a confiscation order made under section 1 of the Drug Trafficking Offences Act 1986 [ or section 1 of the Criminal Justice (Scotland) Act 1987]
6

[ or section 71 of the Criminal Justice Act 1988]
7

[ or under Parts 2, 3 or 4 of the Proceeds of Crime Act 2002]
5

[ or any obligation arising from a payment out of the social fund under section 138(1)(b) of the Social Security Contributions and Benefits Act 1992 by way of crisis loan or budgeting loan.]
8

*"Fine"*[...]
9

and *"family proceedings"* have the meanings given by section 281(8) of the Act ( [which refers to proceedings in the family court and to the meaning of "family proceedings" in]

<u>10</u>

the <u>Matrimonial and Family Proceedings Act 1984</u>).

[

(2A) The following are not provable except at a time when all other claims of creditors in the insolvency proceedings (other than any of a kind mentioned in this paragraph) have been paid in full with interest under <u>section 189(2)</u> [, <u>Rule 2.88</u>]
<u>12</u>

or, as the case may be, <u>section 328(4)</u>-

[

(a) in [an administration, ]
<u>14</u>

a winding up or a bankruptcy, any claim arising by virtue of <u>section 382(1)(a)</u> of the <u>Financial Services and Markets Act 2000</u>, not being a claim also arising by virtue of <u>section 382(1)(b)</u> of that Act;

]
<u>13</u>

(c) in [an administration or ]
<u>15</u>

a winding up, any claim which by virtue of the Act or any other enactment is a claim the payment of which in a bankruptcy [, an administration]
<u>15</u>

or a winding up is to be postponed.

]
<u>11</u>

(3) Nothing in this Rule prejudices any enactment or rule of law under which a particular kind of debt is not provable, whether on grounds of public policy or otherwise.

---

## Notes

<u>1</u> .

Words substituted by Insolvency (Amendment) Rules 2003/1730 <u>Sch.1(9) para.62(a)</u> (September 15, 2003)

<u>2</u> .

Words inserted subject to transitional provisions specified in SI 2005/527 rule 3(1) by Insolvency (Amendment) Rules 2005/527 <u>rule 44</u>
(April 1, 2005: insertion has effect subject to transitional provisions specified in SI 2005/527 rule 3(1))

<u>3</u> .

Words revoked by Insolvency (Amendment) Rules 1993/602 <u>Sch.1 para.2</u> (April 5, 1993)

<u>4</u> .

Words added by Insolvency (Amendment) Rules 1993/602 <u>Sch.1 para.2</u> (April 5, 1993)

<u>5</u> .

Words inserted by Insolvency (Amendment) Rules 2003/1730 <u>Sch.1(9) para.62(b)</u> (September 15, 2003)

<u>6</u> .

Words added by Insolvency (Amendment) Rules 1987/1919 <u>Sch.1(1)(11) para.143(1)</u> (January 11, 1988)

<u>7</u> .

Words inserted by Insolvency (Amendment) Rules 1989/397 <u>Sch.1 para.2</u> (April 3, 1989)

8 .
Words inserted by Insolvency (Amendment) Rules 2012/469 rule 3(4) (March 19, 2012: insertion has effect only in relation to petitions for bankruptcy where the petition is presented on or after March 19, 2012)

9 .
Words revoked by Insolvency (Amendment) Rules 1993/602 Sch.1 para.3 (April 5, 1993)

10 .
Words substituted by Crime and Courts Act 2013 (Family Court: Consequential Provision) (No.2) Order 2014/879 Pt 2 art.22(b) (April 22, 2014)

11 .
Added by Insolvency (Amendment) Rules 1987/1919 Sch.1(1)(11) para.143(2) (January 11, 1988)

12 .
Words inserted by Insolvency (Amendment) Rules 2003/1730 Sch.1(9) para.62(c) (September 15, 2003)

13 .
Substituted by Financial Services and Markets Act 2000 (Consequential Amendments and Repeals) Order 2001/3649 Pt 9 art.380 (December 1, 2001)

14 .
Words inserted by Insolvency (Amendment) Rules 2003/1730 Sch.1(9) para.62(d) (September 15, 2003)

15 .
Words inserted by Insolvency (Amendment) Rules 2003/1730 Sch.1(9) para.62(e) (September 15, 2003)

## Modifications

| | |
|---|---|
| Pt 12 | Modified in relation to a bank undergoing the procedure in 2009 c.1 Pt 2 by Bank Insolvency (England and Wales) Rules 2009/356, Pt 1 rule 3(4) |
| | Modified in relation to the winding up of an unregistered company by Collective Investment in Transferable Securities (Contractual Scheme) Regulations 2013/1388, Sch. 3(1) para. 2 |
| Pt 12 rule 12.3 | Modified for the purposes of bank administration and applications for bank administration by Bank Administration (England and Wales) Rules 2009/357, Pt 5 rule 60, Pt 5 rule 58, Pt 5 rule 59, Pt 5 rule 61 |
| | Modified for the purposes of building society special administration and applications for special administration by Building Society Special Administration (England and Wales) Rules 2010/2580, Pt 5 rule 62, Pt 5 rule 60, Pt 5 rule 61, Pt 5 rule 63 |
| | Modified in relation to licensed bodies by Legal Services Act 2007 (Designation as a Licensing Authority) (No. 2) Order 2011/2866, art. 8, Sch. 2 para. 1 |
| | Modified in relation to licensed bodies by Legal Services Act 2007 (Designation as a Licensing Authority) (No. 2) Order 2011/2866, Sch. 2 para. 1, art. 8(2) |
| | Modified in relation to recognised bodies by Solicitors' Recognised Bodies Order 1991/2684, art. 4, art. 2(1), Sch. 1 para. 1 |

Crown Copyright material is reproduced with the permission of the Controller of HMSO and the Queen's Printer for Scotland

**Subject:** Insolvency

**Keywords:** Administration; Bankruptcy; Interpretation; Provable debts; Winding-up



Status: 🔲 Superseded

**Insolvency Rules 1986/1925**

**THE THIRD GROUP OF PARTS**

**Part 12 MISCELLANEOUS AND GENERAL**

This version in force from: **December 29, 1986** to **April 5, 2010**

(version 1 of 2)

### 12.4.— Notices

(1) All notices required or authorised by or under the Act or the Rules to be given must be in writing, unless it is otherwise provided, or the court allows the notice to be given in some other way.

(2) Where in any proceedings a notice is required to be sent or given by the official receiver or by the responsible insolvency practitioner, the sending or giving of it may be proved by means of a certificate—

(a) in the case of the official receiver, by him or a member of his staff, and

(b) in the case of the insolvency practitioner, by him, or his solicitor, or a partner or an employee of either of them,

that the notice was duly posted.

(3) In the case of a notice to be sent or given by a person other than the official receiver or insolvency practitioner, the sending or giving of it may be proved by means of a certificate by that person that he posted the notice, or instructed another person (naming him) to do so.

(4) A certificate under this Rule may be endorsed on a copy or specimen of the notice to which it relates.

### Modifications

| Pt 12 | Modified in relation to a bank undergoing the procedure in 2009 c.1 Pt 2 by Bank Insolvency (England and Wales) Rules 2009/356, Pt 1 rule 3(4) |
|---|---|
| | Modified in relation to the winding up of an unregistered company by Collective Investment in Transferable Securities (Contractual Scheme) Regulations 2013/1388, Sch. 3(1) para. 2 |
| Pt 12 rule 12.4 | Modified for the purposes of bank administration and applications for bank administration by Bank Administration (England and Wales) Rules 2009/357, Pt 5 rule 60, Pt 5 rule 58, Pt 5 rule 59, Pt 5 rule 61 |
| | Modified in relation to a bank undergoing the procedure in 2009 c.1 Pt 2 known as bank insolvency by Bank Insolvency (England and Wales) Rules 2009/356, Pt 1 rule 3, Pt 22 rule 263 |
| | Modified in relation to a bank undergoing the procedure in 2009 c.1 Pt 2 known as bank insolvency by Bank Insolvency (England and Wales) Rules 2009/356, Pt 22 rule 263 |

| | |
|---|---|
| | Modified in relation to a building society undergoing the procedure in 2009 c.1 Pt 2, as applied and modified by 1986 c.53 s.90C and by any order made under 2009 c.1 s.130, known as building society insolvency by Building Society Insolvency (England and Wales) Rules 2010/2581, Pt 1 rule 3, Pt 22 rule 255(1) |
| | Modified in relation to a building society undergoing the procedure in 2009 c.1 Pt 2, as applied and modified by 1986 c.53 s.90C and by any order made under 2009 c.1 s.130, known as building society insolvency by Building Society Insolvency (England and Wales) Rules 2010/2581, Pt 22 rule 255(2), Pt 1 rule 3 |
| | Modified for the purposes of building society special administration and applications for special administration by Building Society Special Administration (England and Wales) Rules 2010/2580, Pt 5 rule 62, Pt 5 rule 60, Pt 5 rule 61, Pt 5 rule 63 |
| | Modified in relation to licensed bodies by Legal Services Act 2007 (Designation as a Licensing Authority) (No. 2) Order 2011/2866, art. 8, Sch. 2 para. 1 |
| | Modified in relation to licensed bodies by Legal Services Act 2007 (Designation as a Licensing Authority) (No. 2) Order 2011/2866, Sch. 2 para. 1, art. 8(2) |
| | Modified in relation to recognised bodies by Solicitors' Recognised Bodies Order 1991/2684, art. 4, art. 2(1), Sch. 1 para. 1 |

Crown Copyright material is reproduced with the permission of the Controller of HMSO and the Queen's Printer for Scotland

**Subject:** Insolvency



TAB 38

Insolvency Rules (England and Wales) 2016 Rule 14.1, 14.2

# S T A T U T O R Y   I N S T R U M E N T S

## 2016 No. 1024

## INSOLVENCY, ENGLAND AND WALES

### COMPANIES

### INDIVIDUALS

## The Insolvency (England and Wales) Rules 2016

| | |
|---|---|
| *Made* - - - - | *18th October 2016* |
| *Laid before Parliament* | *25th October 2016* |
| *Coming into force* - - | *6th April 2017* |

## CONTENTS

### *INTRODUCTORY RULES*

| | | |
|---|---|---|
| 1. | Citation and commencement | 32 |
| 2. | Revocations | 32 |
| 3. | Extent and application | 32 |
| 4. | Transitional and savings provisions | 32 |
| 5. | Power of the Secretary of State to regulate certain matters | 32 |
| 6. | Punishment of offences | 33 |
| 7. | Review | 33 |

### PART 1
### SCOPE, INTERPRETATION, TIME AND RULES ABOUT DOCUMENTS
#### CHAPTER 1
##### Scope of these Rules

| | | |
|---|---|---|
| 1.1. | Scope | 34 |

#### CHAPTER 2
##### Interpretation

| | | |
|---|---|---|
| 1.2. | Defined terms | 34 |
| 1.3. | Calculation of time periods | 40 |

#### CHAPTER 3
##### Form and content of documents

| | | |
|---|---|---|
| 1.4. | Requirement for writing and form of documents | 40 |
| 1.5. | Authentication | 40 |
| 1.6. | Information required to identify persons and proceedings etc. | 40 |

## CHAPTER 1

### Application and interpretation

**Application of Part 14 and interpretation**

[Note: "bankruptcy debt" and related expressions are defined in relation to bankruptcy in section 382.]

**14.1.**—(1) This Part applies to administration, winding up and bankruptcy proceedings.

(2) The definitions in this rule apply to administration, winding up and bankruptcy proceedings except as otherwise stated.

(3) "Debt", in relation to winding up and administration, means (subject to the next paragraph) any of the following—

    (a) any debt or liability to which the company is subject at the relevant date;

    (b) any debt or liability to which the company may become subject after the relevant date by reason of any obligation incurred before that date;

    (c) any interest provable as mentioned in rule 14.23;

"small debt" means a debt (being the total amount owed to a creditor) which does not exceed £1,000 (which amount is prescribed for the purposes of paragraph 13A of Schedule 8 to the Act and paragraph 18A of Schedule 9 to the Act(**a**));

"dividend", in relation to a members' voluntary winding up, includes a distribution;

"provable debt" has the meaning given in rule 14.2; and

"relevant date" means—

    (a) in the case of an administration which was not immediately preceded by a winding up, the date on which the company entered administration,

    (b) in the case of an administration which was immediately preceded by a winding up, the date on which the company went into liquidation,

    (c) in the case of a winding up which was not immediately preceded by an administration, the date on which the company went into liquidation,

    (d) in the case of a winding up which was immediately preceded by an administration, the date on which the company entered administration, and

    (e) in the case of a bankruptcy, the date of the bankruptcy order.

(4) For the purposes of any provision of the Act or these Rules about winding up or administration, any liability in tort is a debt provable in the winding up or administration, if either—

    (a) the cause of action has accrued at the relevant date; or

    (b) all the elements necessary to establish the cause of action exist at that date except for actionable damage.

(5) For the purposes of references in any provision of the Act or these Rules about winding up or administration to a debt or liability, it is immaterial whether the debt or liability is present or future, whether it is certain or contingent, or whether its amount is fixed or liquidated, or is capable of being ascertained by fixed rules or as a matter of opinion; and references in any such provision to owing a debt are to be read accordingly.

(6) In any provision of the Act or these Rules about winding up or administration, except in so far as the context otherwise requires, "liability" means (subject to paragraph (4)) a liability to pay money or money's worth, including any liability under an enactment, a liability for breach of trust,

---

(**a**) Paragraph 13A was inserted into Schedule 8 by section 131 of the Small Business, Enterprise and Employment Act 2015 (c.26) and paragraph 18A was inserted into Schedule 9 by section 132 of that Act.

any liability in contract, tort or bailment, and any liability arising out of an obligation to make restitution.

## CHAPTER 2

### Creditors' claims in administration, winding up and bankruptcy

[Note: a document required by the Act or these Rules must also contain the standard contents set out in Part 1.]

**Provable debts**

**14.2.**—(1) All claims by creditors except as provided in this rule, are provable as debts against the company or bankrupt, whether they are present or future, certain or contingent, ascertained or sounding only in damages.

(2) The following are not provable—

    (a)   an obligation arising under a confiscation order made under—

        (i)  section 1 of the Drug Trafficking Offences Act 1986(**a**),

        (ii)  section 1 of the Criminal Justice (Scotland) Act 1987(**b**),

        (iii)  section 71 of the Criminal Justice Act 1988(**c**), or

        (iv)  Parts 2, 3 or 4 of the Proceeds of Crime Act 2002(**d**);

    (b)   an obligation arising from a payment out of the social fund under section 138(1)(b) of the Social Security Contributions and Benefits Act 1992(**e**) by way of crisis loan or budgeting loan.

    (c)   in bankruptcy—

        (i)  a fine imposed for an offence,

        (ii)  an obligation (other than an obligation to pay a lump sum or to pay costs) arising under an order made in family proceedings, or

        (iii)  an obligation arising under a maintenance assessment made under the Child Support Act 1991(**f**).

(3) In paragraph (2)(c), "fine" and "family proceedings" have the meanings given by section 281(8) (which applies the Magistrates Courts Act 1980(**g**) and the Matrimonial and Family Proceedings Act 1984(**h**)).

(4) The following claims are not provable until after all other claims of creditors have been paid in full with interest under sections 189(2) (winding up), section 328(4) (bankruptcy) and rule 14.23 (payment of interest)—

    (a)   a claim arising by virtue of section 382(1)(a) of the Financial Services and Markets Act 2000 (restitution orders)(**i**), unless it is also a claim arising by virtue of sub-paragraph (b) of that section (a person who has suffered loss etc.); or

---

(**a**)  1986 c.32; repealed by Schedule 3 to the Drug Trafficking Act 1994 (c.37).
(**b**)  1987 c.41; repealed by Schedule 5 to the Criminal Procedure (Consequential Provisions) (Scotland) Act 1995 (c.40).
(**c**)  1988 c.33; repealed by Schedule 12 to the Proceeds of Crime Act 2002 (c.29) with savings in articles 10 and 13 of S.I. 2003/333.
(**d**)  2002 c.29; relevant amendments are made by paragraph 75(1) and (2) of Part 2 of Schedule 3 to the Criminal Justice Act 2003 (c.44); Part 1 of Schedule 8 and paragraphs 1 and 2 of Schedule 14 to the Serious Crime Act 2007 (c.27); and paragraphs 11 and 12 of the Schedule to the Prevention of Social Housing Fraud Act 2013 (c.3).
(**e**)  1992 c.4; section 138(1)(b) is repealed by section 71 of the Welfare Reform Act 2012 c.5.
(**f**)  1991 c.48.
(**g**)  1980 c.43.
(**h**)  1984 c.42.
(**i**)  2000 c.8; section 382 has been amended by paragraph 21 of Schedule 9 to the Financial Services Act 2012 (c.21).

   (b)  in administration and winding up, a claim which by virtue of the Act or any other enactment is a claim the payment of which in a bankruptcy, an administration or a winding up is to be postponed.

  (5) Nothing in this rule prejudices any enactment or rule of law under which a particular kind of debt is not provable, whether on grounds of public policy or otherwise.

### Proving a debt

**14.3.**—(1) A creditor wishing to recover a debt must submit a proof to the office-holder unless—

   (a)  this rule or an order of the court provides otherwise; or

   (b)  it is a members' voluntary winding up in which case the creditor is not required to submit a proof unless the liquidator requires one to be submitted.

  (2) A creditor is deemed to have proved—

   (a)  in a winding up immediately preceded by an administration, where the creditor has already proved in the administration; or

   (b)  in an administration immediately preceded by a winding up, where the creditor has already proved in the winding up.

  (3) A creditor is deemed to have proved for the purposes of determination and payment of a dividend but not otherwise where—

   (a)  the debt is a small debt;

   (b)  a notice has been delivered to the creditor of intention to declare a dividend or make a distribution under rule 14.29 which complies with rule 14.31 (further contents of notice to creditors owed small debts); and

   (c)  the creditor has not advised the office-holder that the debt is incorrect or not owed in response to the notice.

### Requirements for proof

**14.4.**—(1) A proof must—

   (a)  be made out by, or under the direction of, the creditor and authenticated by the creditor or a person authorised on the creditor's behalf;

   (b)  state the creditor's name and address;

   (c)  if the creditor is a company, identify the company;

   (d)  state the total amount of the creditor's claim (including any value added tax) as at the relevant date, less any payments made after that date in relation to the claim, any deduction under rule 14.20 and any adjustment by way of set-off in accordance with rules 14.24 and 14.25;

   (e)  state whether or not the claim includes any outstanding uncapitalised interest;

   (f)  contain particulars of how and when the debt was incurred by the company or the bankrupt;

   (g)  contain particulars of any security held, the date on which it was given and the value which the creditor puts on it;

   (h)  provide details of any reservation of title in relation to goods to which the debt relates;

   (i)  provide details of any document by reference to which the debt can be substantiated;

   (j)  be dated and authenticated; and

   (k)  state the name, postal address and authority of the person authenticating the proof (if someone other than the creditor).

  (2) Where sub-paragraph (i) applies the document need not be delivered with the proof unless the office-holder has requested it.

TAB 39

Supply of Goods and Services Act 1982 § 13

To be returned to
HMSO PC12C1
for Controller's Library
Run No. B.S.H.
Bin No. O3.52.05.
Box No.
YRR. 1982.



# Supply of Goods and Services Act 1982

## CHAPTER 29

## ARRANGEMENT OF SECTIONS

### PART I

### SUPPLY OF GOODS

#### *Contracts for the transfer of property in goods*

Section
1.  The contracts concerned.
2.  Implied terms about title, etc.
3.  Implied terms where transfer is by description.
4.  Implied terms about quality or fitness.
5.  Implied terms where transfer is by sample.

#### *Contracts for the hire of goods*

6.  The contracts concerned.
7.  Implied terms about right to transfer possession, etc.
8.  Implied terms where hire is by description.
9.  Implied terms about quality or fitness.
10. Implied terms where hire is by sample.

#### *Exclusion of implied terms, etc.*

11. Exclusion of implied terms, etc.

### PART II

### SUPPLY OF SERVICES

12. The contracts concerned.
13. Implied term about care and skill.
14. Implied term about time for performance.
15. Implied term about consideration.
16. Exclusion of implied terms, etc.

A

## PART II

### SUPPLY OF SERVICES

The contracts concerned.

**12.**—(1) In this Act a " contract for the supply of a service " means, subject to subsection (2) below, a contract under which a person (" the supplier ") agrees to carry out a service.

(2) For the purposes of this Act, a contract of service or apprenticeship is not a contract for the supply of a service.

(3) Subject to subsection (2) above, a contract is a contract for the supply of a service for the purposes of this Act whether or not goods are also—

    (*a*) transferred or to be transferred, or

    (*b*) bailed or to be bailed by way of hire,

under the contract, and whatever is the nature of the consideration for which the service is to be carried out.

(4) The Secretary of State may by order provide that one or more of sections 13 to 15 below shall not apply to services of a description specified in the order, and such an order may make different provision for different circumstances.

(5) The power to make an order under subsection (4) above shall be exercisable by statutory instrument subject to annulment in pursuance of a resolution of either House of Parliament.

Implied term about care and skill.

**13.** In a contract for the supply of a service where the supplier is acting in the course of a business, there is an implied term that the supplier will carry out the service with reasonable care and skill.

Implied term about time for performance.

**14.**—(1) Where, under a contract for the supply of a service by a supplier acting in the course of a business, the time for the service to be carried out is not fixed by the contract, left to be fixed in a manner agreed by the contract or determined by the course of dealing between the parties, there is an implied term that the supplier will carry out the service within a reasonable time.

(2) What is a reasonable time is a question of fact.

Implied term about consideration.

**15.**—(1) Where, under a contract for the supply of a service, the consideration for the service is not determined by the contract, left to be determined in a manner agreed by the contract or determined by the course of dealing between the parties, there is an implied term that the party contracting with the supplier will pay a reasonable charge.

(2) What is a reasonable charge is a question of fact.

TAB 40

The Eastern Caribbean Supreme Court Rules 2000
Rule 1.1, 21, 25.1, 26.1, Parts 6 and 7

# EASTERN CARIBBEAN
# SUPREME COURT



# CIVIL PROCEDURE RULES
# 2000

**The Caribbean Law Publishing Company**
Kingston

PART 1

# The Overriding Objective

**Contents of this Part**

| | |
|---|---|
| The overriding objective | Rule 1.1 |
| Application of overriding objective by the court | Rule 1.2 |
| Duty of parties | Rule 1.3 |

## The overriding objective

1.1 (1) The overriding objective of these Rules is to enable the court to deal with cases justly.

(2)Dealing justly with the case includes –

(a) ensuring, so far as is practicable, that the parties are on an equal footing;

(b) saving expense;

(c) dealing with cases in ways which are proportionate to the –

(i) amount of money involved;

(ii) importance of the case;

(iii) complexity of the issues; and

(iv) financial position of each party;

(d) ensuring that it is dealt with expeditiously; and

(e) allotting to it an appropriate share of the court's resources, while

taking into account the need to allot resources to other cases.

## Application of overriding objective by the court

1.2 The court must seek to give effect to the overriding objective when it –

(a) exercises any discretion given to it by the Rules; or

(b) interprets any rule.

## Duty of parties

1.3  It is the duty of the parties to help the court to further the overriding

objective.

- Part 25 deals with the court's duty to forward the overriding objective by active

PART 6
# Service of other Documents

**Contents of this Part**

Who is to serve documents other than claim form          Rule 6.1

Method of service                                        Rule 6.2

Address for service                                      Rule 6.3

Serving documents where no address for service is given  Rule 6.4

Service of documents on person who is not a party        Rule 6.5

Deemed date of service                                   Rule 6.6

Proof of service                                         Rule 6.7

Power of court to dispense with service                  Rule 6.8

Service of notices, etc. on Attorney General             Rule 6.9

# Who is to serve documents other than claim form

6.1 (1) Subject to paragraph (2) any judgment or order which requires service must be served by the court, unless –

  (a) a rule provides that a party must serve the document in question; or

  (b) the court orders otherwise.

  (2) The following orders must be served by the party obtaining the order –

   (a) a freezing order under rule 17.1(f);

   (b) an injunction;

   (c) any order listed in rule 17.1 (c),(d),(k) or (l);

   (d) an order under rule 17.1(g); and

   (e) a search order under rule 17.1(h).

  (3) Any other document must be served by a party, unless –

   (a) a rule otherwise provides; or

   (b) the court orders otherwise.

## Method of service

6.2 If these Rules require a document other than a claim form to be served

on any person it may be served by any of the following methods –

(a)any means of service in accordance with Part 5;

(b) leaving it at or sending it by prepaid post to any address for service in accordance with rule 6.3(1);

(c) if rule 6.3(2) applies by FAX; or

(d) other means of electronic communication if this is permitted by a relevant practice direction;

unless a rule otherwise provides or the court orders otherwise.

## Address for service

6.3 (1)Documents must be delivered or posted to a party at any address for service within the jurisdiction given by that party.

(2)If a party's address for service includes a FAX number, documents may be sent by FAX to that number.

(3)If a party to be served has not given an address within the jurisdiction at which documents for that party may be served, documents must be served at the address indicated in rule 6.4.

## Serving documents where no address for service is given

6.4 (1) If no address is given for service the document may be served by leaving it or posting it at or to –

(a) in the case of a firm or partnership – either –

(i) the principal or last known address of the firm or partnership or any place where the firm or partnership carries on business and which has a real connection with the claim; or

(ii) the usual or last known place of residence of one of the partners;

(b) in the case of an individual – that person's usual or last known place of residence;

(c) in the case of a proprietor of a business – that person's –

(i) usual or last known place of residence; or

(ii) place of business or last known place of business; or

(d) the business address of any legal practitioner who purports to act for the party in the proceedings.

(2) The provisions of Part 5 may be applied to such a document as if it were a claim form.

## Service of documents on person who is not a party

6.5   If the court or a party is to serve documents on a person who is not a party, such documents must be served by one of the methods specified in Part 5.

## Deemed date of service

6.6 (1) A document which is served within the jurisdiction in accordance with these Rules is deemed to be served on the day shown in the following

table –

| Method of Service | Deemed date of service |
|---|---|
| Post | 14 days after posting |
| Registered Post | 10 days after the date indicated on the Post Office or courier receipt |
| Leaving document at a permitted address | The day after leaving the document |
| FAX | (a) If it is transmitted on a business day before 4 p.m. – the day of transmission; (b) In any other case – the business day after the day of transmission. |
| Other electronic method of service | The business day after the day of transmission. |

(2) Any document served after 4 p.m. on a business day or at any time on a day other than a business day is treated as having been served on the next business day.

(3)In this rule "business day" means any –

   (a) day other than a Saturday, Sunday or Bank Holiday; or

   (b) other day on which the court office is closed;

  and is to be determined by reference to the relevant enactment of the Member State or Territory in which the document is to be served.

## Proof of service

6.7  If proof of service of any document is required, it may be proved by any method of proving service set out in Part 5.

## Power of court to dispense with service

6.8(1) The court may dispense with service of a document if it is appropriate to do so.

  (2) An application for an order to dispense with service may be made without notice.

## Service of notices, etc. on Attorney General

6.9 (1) This rule applies where any document has to be served on the Attorney General of any Member State or Territory in connection with any proceedings of which notice has to be given to the Attorney General and where express provision as to service is not made by any enactment or rule.

  (2) Any such document must be served in accordance with rule 59.2.

PART 7

# Service of Court Process out of Jurisdiction

**Contents of this Part**

| | |
|---|---|
| Scope of this Part | Rule 7.1 |
| General rule as to service of claim form out of jurisdiction | Rule 7.2 |
| Service of claim form out of jurisdiction in specified proceedings | Rule 7.3 |
| Proceedings which include other types of claim | Rule 7.4 |
| Permission to serve claim form out of jurisdiction | Rule 7.5 |
| Acknowledgment of service and defence where claim form served out of the jurisdiction | Rule 7.6 |
| Application to set aside service under rule 7.3 | Rule 7.7 |
| Mode of service of claim form – general provisions | Rule 7.8 |
| Mode of Service - alternative procedure | Rule 7.8A |
| Power of Court to dispense with service of the claim form | Rule 7.8B |
| Service of claim form through foreign governments, or judicial or consular authorities | Rule 7.9 |
| Procedure where claim form is to be served through foreign Governments, etc. | Rule 7.10 |
| Service of claim form on a State where court permits service out of jurisdiction | Rule 7.11 |
| Translation of claim form | Rule 7.12 |
| Undertaking to be responsible for expenses of Minister with responsibility for foreign affairs | Rule 7.13 |
| Service of court process other than claim form | Rule 7.14 |

## Scope of this Part

7.1(1) This Part contains provisions about the –

    (a)circumstances in which court process may be served out of the jurisdiction; and

    (b)    procedure for serving court process out of the jurisdiction.

(2) In this Part references to service or filing copies of the claim form include –

    (a) the statement of claim (unless contained in the claim form);

    (b)an affidavit in support of the claim, if these Rules so require; and

    (c) if permission has been given under rule 8.2 to serve the claim form without the statement of claim – a copy of the order giving permission.

## General rule as to service of claim form out of jurisdiction

7.2 A claim form may be served out of the jurisdiction only if –

    (a) rule 7.3 allows; and

    (b) the court gives permission.

## Service of claim form out of jurisdiction in specified proceedings

7.3    (1) The court may permit a form to be served out of the jurisdiction if the proceedings are listed in this Rule.

*Features which may arise in any type of claim*

    (2) A claim form may be served out of the jurisdiction if a claim is made –

        (a)    Against someone on whom the claim form has been or will be served, and –

            (i)    there is between the claimant and that person a real issue which it is reasonable for the court to try; and

            (ii)    the claimant now wishes to serve the claim form on another person who is outside the jurisdiction and who is necessary or proper party to claim;

        (b)    for an injunction ordering the defendant to do or refrain from doing some act within the jurisdiction; or

        (c)    for a remedy against a person domiciled or ordinarily resident within the jurisdiction.

*Claims about contracts*

    (3) A claim form be served out of the jurisdiction if –

        (a)    a claim is made in respect of a breach of contract committed within the jurisdiction;

        (b)    a claim is made in respect of a contract where the contract –

            (i)    contains a term to the effect that the court shall have jurisdiction to determine any claim in respect of the contract; or

            (ii)    is by its terms or by implication governed by the law of any Member State Territory;

(iii)    was made by or through an agent trading or residing within the jurisdiction; or

(iv)    was made within the jurisdiction; or

(c)    the claim is for a declaration that no contracts exists, where, if the contract did exist, it would fulfill one or more of the conditions in sub-paragraph (b) of this Rule.

*Claims in tort*

(4) A claim form may be served out of the jurisdiction if a claim in tort is made and the act causing the damage was committed within the jurisdiction or the damage was sustained within the jurisdiction.

*Enforcement*

(5)    A claim form may be served out of the jurisdiction if a claim is made to enforce any judgment or arbitral award which was made by a foreign court or tribunal and is amenable to be enforced at common law.

*Claims about property within the jurisdiction*

(6) A claim form may be served out of the jurisdiction if the whole subject matter of the claim relates to property within the jurisdiction.

*Claims about companies*

(7) A claim form may be served out of the jurisdiction if the subject matter of the claim relates to –

(a) the constitution, administration, management or conduct of the affairs; or

(b) the ownership or control of a company incorporated within the jurisdiction.

*Claims about trusts*

(8) A claim form may be served out of the jurisdiction if –

(a) a claim is made for a remedy against the defendant as constructive trustee and the defendant's alleged ability arises out of acts committed within the jurisdiction;

(b) a claim is made for –

(i)    any remedy which might be obtained in proceedings for the administration of the estate of; or

          (ii)     in probate proceedings as defined in Part 68 relating to; a person who died domiciled within the jurisdiction; or

(c) a claim is made for any remedy which might be obtained in proceedings to execute the trust of a written instrument and the –

          (i)     trusts ought to be executed according to the law of any Member State or Territory; and

          (ii)     person on whom the claim is to be served is a trustee of the trusts.

*Claims of restitution*

(9) A claim is made for restitution where the defendant's alleged ability arises out of acts committed within the jurisdiction or out of acts which, wherever committed, where to the detriment of a
person domiciled within the jurisdiction

*Claims under an enactment conferring jurisdiction on the Court*

(10) A claim is made under an enactment which confers jurisdiction on the court and the proceedings are not covered by any of the other grounds referred to in this Rule.

## Proceedings which include other types of claim

7.4 If the claimant makes a claim which falls within –

    (a) rule 7.3(3) (claims about contracts);

    (b) rule 7.3(4) (claims in tort); or

    (c) rule 7.3(7) (a) (claims against the defendant as a constructive

     trustee);

the court may grant any claim for a remedy which –

       (i) does not fall within rule 7.3; but

       (ii) arises out of the same facts or substantially the same facts as

       the claim in respect of which the order is made.

## Permission to serve claim form out of jurisdiction

7.5(1) An application for permission to serve out of the jurisdiction may be made without notice but must

be supported by evidence on affidavit stating –

(a) the grounds on which the application is made;

(b) that in the deponent's belief the claimant has a claim with a realistic prospect of success;

(c) in what place, within what country, the defendant may probably be found; and

(d) if the application is made under rule 7.3 (2) (a), the grounds for the deponent's belief that the

conditions are satisfied.

(2) An order granting permission to serve the claim form out of the jurisdiction must state the periods

within which the defendant must –

(a) file an acknowledgement of service in accordance with Part 9; and

(b) file a defence in accordance with Part 10.

(3) The periods for filing a document under paragraph (2) are to be determined by reference to a

relevant practice direction.

## Acknowledgment of service and defence where claim form served out of the jurisdiction

7.6 A claim form to be served out of the jurisdiction must be amended to state the period within which the

–

(a) acknowledgement of service; and

(b) defence;

must be filed.

## Application to set aside service under rule 7.3

7.7 (1) Any person on whom a claim form has been served out of the jurisdiction under rule 7.3 may

apply to set aside service of the claim form.

(2) The court may set aside service under this rule if –

(a) service out of the jurisdiction is not permitted by the rules;

(b) the claimant does not have a good cause of action; or

(c) the case is not a proper one for the court's jurisdiction.

(3) This rule does not limit the court's power to make an order under rule

9.7 (procedure for disputing the court's jurisdiction, etc.).

## Mode of service of claim form – general provisions

7.8 (1) Subject to the following paragraphs of this rule, and Rule 7.8A if a claim form is to be served out of the jurisdiction, it may be served –

(a) by a method provided for by –

(i) rule 7.9 (service through foreign governments, etc.); or

(ii) rule 7.11 (service on a State);

(b) in accordance with the law of the country in which it is to be served; or

(c) personally by the claimant or the claimant's agent.

(2) Nothing in this Part or in any court order may authorise or require any person to do anything in the country where the claim form is to be served which is against the law of that country.

## Mode of service – alternative procedure

7.8A       (1)  Where service under Rule 7.8 is impracticable, the claimant may apply for an order under this Rule that the claim form be served by a method specified by the court.

(2) An order made under this Rule shall specify the date on which service of the claim form shall be deemed to have been affected.

(3) Where an order is made under this Rule, service by the method specified in the court's order shall be deemed to be good service.

(4) An application for an order under this Rule may be made without notice but must be supported by evidence on affidavit –

(a) specifying the method of service proposed;

(b) providing full details as to why service under Rule 7.8 is impracticable;

(c) showing that such method of service is likely to enable the person to be served to ascertain the contents of the claim form and statement of claim; and

(d) certifying that the method of service proposed is not contrary to the law of the country in which the claim form is to be served.

(5) Where any method of service specified in an order made under this Rule is subsequently shown to be contrary to the law of the country in which the claim was purportedly served, such service shall be invalid.

## Power of the court to dispense with service of the claim form

7.8B  (1) The court may dispense with service of a claim form in exceptional circumstances.

(2) An application for an order to dispense with service may be made at any time and –

(a)  must be supported by evidence on affidavit; and

(b)  may be made without notice.

## Service of claim form through foreign governments, or judicial or consular authorities

7.9 (1) This rule does not apply to service in –

(a) any independent Commonwealth country;

(b) the Republic of Ireland; or

(c) the United Kingdom, the Isle of Man or the Channel Islands;

unless the claim form is to be served in accordance with paragraph

(3)

(2) The methods of service permitted by this rule are in addition to any method of service permitted under rule 7.8(1) (b) or (c).

*Service under the Hague Convention*

(3) A claim form to be served on a defendant in any country which is a party to the Hague Convention may be served –

(a) through the authority designated under the Hague Convention in respect of that country; or

(b) if the law of that country permits –

(i) in the case of a claim form issued in a Member State – through its consular authority in that country;

(ii) in the case of a claim form issued in a Territory – through the British consular authority in that country; or

(iii) through the judicial authorities of that country.

*Service under other Conventions*

(4) A claim form to be served on a defendant in any country which is a party to a Civil Procedure Convention (to which the relevant Member State or Territory is also a party or which has been extended to the relevant Member State or Territory) other than the Hague Convention providing for service of court process in that country, may be served, if the law of that country permits –

(i) in the case of a claim form issued in a Member State – through its consular authority in that country (subject to any provision of the convention as to the nationality of persons who may be so served);

(ii) in the case of a claim form issued in a Territory – through the British consular authority in that country (subject to any provision of the convention as to the nationality of persons who may be so served); or

(iii) through the judicial authorities of that country.

*Service where there is no applicable Convention*

(5) A claim form to be served on a defendant in any country with respect to which there is no relevant Civil Procedure Convention providing for service of court process in that country may be served, if the law of that country so permits –

(i) in the case of a claim form issued in a Member State – through its consular authority in that

country;

(ii) in the case of a claim form issued in a Territory – through the British consular authority in that country; or

(iii) through the government of that country, if that government is willing to serve it.


## Procedure where claim form is to be served through foreign governments, etc.


7.10 (1) This rule applies where the claimant wishes to serve the claim form through the –

(a) authority designated under the Hague Convention or any other relevant Civil Procedure Convention in respect of that country;

(b)consular authority of a Member State or, in the case of a Territory, the British consular authority in that country;

(c) government of that country; or

(d) judicial authorities of the country where the claim form is to be served.

(2) If this rule applies, the claimant must file –

(a) a copy of the claim form;

(b) an additional copy of the claim form for each person to be served;

(c) a request for service of the claim form by the claimant's chosen method; and

(d) any translation required by rule 7.12.

(3) When the claimant files the documents specified in paragraph (2) the court office must –

(a)seal the copy of the claim form; and

(b)send the documents filed to the minister with responsibility for foreign affairs with a request that the minister arrange for the claim form to be served –

(i) by the method indicated in the request for service filed under paragraph (2); or

(ii) if the request indicates alternative methods – by the most convenient method.

(4)An official certificate which –

(a) is made by –

(i) a consular authority of a Member State or a British consular authority in the country where the claim form was served;

(ii) the government or judicial authorities in that country; or

(iii) any other authority designated in respect of that country under the Hague Convention or any other relevant Civil Procedure Convention;

(b) states that the claim form has been served in accordance with this rule either personally or in accordance with the law of the country in which service was effected; and

(c) specifies the date on which the claim form was served;

is evidence of the facts stated in the certificate.

(5) A document purporting to be an official certificate under paragraph (4) is to be treated as such a certificate, unless it is proved not to be.

## Service of claim form on a State where court permits service out of jurisdiction

7.11 (1) This rule applies where a claimant wishes to serve a claim form on a State.

(2) If the State has agreed to a method of service other than a method permitted by this Part, the claim form may be served either by the method agreed or in accordance with the other rules in this Part.

(3) The claimant must file at the court office –
   (a) a copy of the claim form;
   (b) any translation required by virtue of rule; and
   (c) a request for service to be arranged by the Minister with responsibility for foreign affairs.

(4) The court office must send documents filed under this rule to the minister with responsibility for foreign affairs with a request that the minister arrange for the claim form to be served.

(5) If a Member State or Territory has under any enactment relating to state immunity agreed to a

method of service, the claim form may be served either by the method agreed or in accordance with this rule.

(6) An official certificate by the minister with responsibility for foreign affairs stating that a claim form has been duly served on a specified date in accordance with a request made under this rule is evidence of that fact.

(7) A document purporting to be such a certificate is to be treated as such a certificate, unless it is proved not to be.


## Translation of claim form

7.12 (1) Except where paragraph (4) or (5) applies, every copy of the claim form filed under rule 7.10 or rule 7.11 must be accompanied by a translation of the claim form.

(2) The translation must be –
(a) in the official language of the country in which it is to be served; or
(b) if there is more than one official language of that country – in any official language which is appropriate to the place in the country where the claim form is to be served.

(3) Every translation filed under this rule must be certified by the person making it to be a correct translation, and the certificate must state –
(a) the name of the person making the translation; and
(b) his or her –
(i)address; and
(ii)qualifications for making the translation.

(4) If the claim form is to be served –

(a) in a country of which English is an official language; or
(b) by a consular authority of a Member State or, in the case of a Territory, a British consular authority on a citizen of a Member

State or Territory;

the claimant is not required to file a translation of a claim form filed under rule 7.9
(service through foreign governments, etc.) unless a relevant Civil Procedure Convention
expressly requires a translation.

(5) The claimant is not required to file a translation of a claim form filed  under rule 7.11 (service on
a State) if English is an official language of the State where the claim form is to be served.

## Undertaking to be responsible for expenses of minister with responsibility for foreign affairs

7.13 (1) A person filing a request for service under rule 7.9 (service through foreign governments, etc.) or
rule 7.11 (service on a State) must undertake in the request –
(a) to be responsible for all expenses incurred by the Minister with responsibility for foreign
affairs; and
(b) on being informed of the amount of those expenses to –
(i) pay that amount to the Accountant General or other financial officer for the Member State
or (Territory concerned; and
(ii) produce a receipt for the payment to the court office.

(2) The claimant may take no further step in the proceedings until the claimant produces the receipt
required by paragraph (1) (b) (ii).

## Service of court process other than claim form

7.14 (1) An application, order or notice issued, made or given in any proceedings may be served out of
the jurisdiction without the court's permission if it is served in proceedings in which permission
has been given to serve the claim form out of the jurisdiction.

(2) The procedure by which a document specified in paragraph (1) is to be served is the same as that
applicable to the service of a claim form and accordingly rules 7.8 to 7.13 apply.

PART 21

# Representative Parties

**Contents of this Part**

Representative claimants and defendants – general                                    Rule 21.1

Appointment of representative claimant or defendant – procedure                      Rule 21.2

Consequence of order appointing representative party                                 Rule 21.3

Representation of persons who cannot be ascertained, etc. in proceedings about

      estates, trusts and construction of written instruments                    Rule 21.4

Compromise in proceedings to which rule 21.4 applies                                 Rule 21.5

Representation of beneficiaries by trustees                                          Rule 21.6

Proceedings against estate of deceased person                                        Rule 21.7

Power of court to give directions to enable proceedings to be carried on after party's death    Rule 21.8

Power of court to strike out action after death of claimant                          Rule 21.9

# Representative claimants and defendants – general

21.1 (1) This rule applies to any proceedings, other than proceedings falling within rule 21.4, in which 5 or more persons have the same or a similar interest.

(2) The court may appoint —

  (a) a body having a sufficient interest in the proceedings; or

  (b) one or more of those persons;

  to represent all or some of the persons with the same or similar interest.

(3) A representative under this rule may be either a claimant or a defendant.

# Appointment of representative claimant or defendant – procedure

21.2 (1) An application for an order appointing a representative party may be made at any time, including a time before proceedings have been started.

(2) An application for such an order may be made by any –

(a) party;

(b) person or body who wishes to be appointed as a representative party; or

(c) person who is likely to be a party to proceedings.

(3) An application for such an order must –

(a) be supported by affidavit evidence; and

(b) identify every person to be represented, either

(i) individually; or

(ii) by description, if it is not practicable to identify a person individually.

(4) An application to appoint a representative defendant must be on notice to the claimant.

(5) An application to appoint a representative claimant may be made without notice.

(6) The court may direct that notice of an application be given to such other persons as it thinks fit.

(7) If the court directs that a person not already a party is to be a representative defendant, it must make an order adding that person as a defendant.

## Consequence of order appointing representative party

21.3 (1) If there is a representative claimant or defendant, an order of the court binds everyone whom that party represents.

(2) It may not however be enforced against a person not a party to the proceedings unless the person wishing to enforce it obtains permission from the court.

(3) An application for permission must be supported by evidence on affidavit and must be served on the person against whom it is wished to enforce the judgment.

## Representation of persons who cannot be ascertained, etc. in proceedings about estates, trusts and construction of written instruments

21.4 (1) This rule applies only to proceedings about –

    (a) the construction of a written instrument;

    (b) the estate of someone who is deceased; or

    (c) property subject to a trust.

(2) The court may appoint one or more persons to represent any person or class of persons (including an unborn person or persons) who is or may be interested in or affected by the proceedings (whether presently or for any future, contingent or unascertained interest) where –

    (a) the person, or the class or some member of it, cannot be ascertained or cannot readily be ascertained;

    (b) the person, or the class or some member of it, though ascertained cannot be found; or

    (c) it is expedient to do so for any other reason.

(3) An application for an order to appoint a representative party under this rule may be made by any –

    (a) party; or

    (b) person who wishes to be appointed as a representative party.

(4) A representative appointed under this rule may be either a claimant or a defendant.

(5) A decision of the court binds everyone whom a representative claimant or representative defendant represents.

## Compromise in proceedings to which rule 21.4 applies

21.5 (1) If –

    (a) a compromise is proposed in proceedings to which rule 21.4 applies;

    (b) some of the persons who are interested in, or who may be affected by the compromise are not parties to the proceedings;

    (c) those persons are represented by a representative appointed under rule 21.4 when the court considers the proposed compromise; and

    (d) the court is satisfied that the compromise will be for the benefit of the absent persons;

    the court may approve the compromise.

(2)The persons for whose benefit the court may approve a compromise may be unborn or unascertained.

(3) The court's order approving the compromise binds the absent persons
unless it has been obtained by fraud or non-disclosure of material facts.

## Representation of beneficiaries by trustees

21.6 (1) A claim may be made by or against a person in that person's capacity as a trustee, executor or administrator.

(2)If a claim is so made, there is no need for a beneficiary also to be a party.

(3)The court may direct that notice of the proceedings be given to any beneficiary.

(4)A decision of the court in such proceedings binds a beneficiary unless the court otherwise orders.

(5)The only grounds for an order that a decision is not binding on a beneficiary is that the trustee, executor or administrator –
(a) could not or did not in fact, represent the interest of the beneficiary; or
(b) has acted fraudulently.

## Proceedings against estate of deceased person

21.7 (1) If in any proceedings it appears that a deceased person was interested in the proceedings but the deceased person has no personal representatives, the court may make an order appointing someone to represent the deceased person's estate for the purpose of the proceedings

(2)A person may be appointed as a representative if that person –
(a) can fairly and competently conduct proceedings on behalf of the estate; and
(b) has no interest adverse to that of the estate;
of the deceased person.

(3)The court may make such an order on or without an application.

(4) Until the court has appointed someone to represent the deceased person's estate, the claimant may take no step in the proceedings apart from applying for an order to have a representative appointed under this rule.

(5) A decision in proceedings in which the court has appointed a representative under this rule binds the estate to the same extent as if the person appointed were an executor or administrator of the deceased person's estate.

## Power of court to give directions to enable proceedings to be carried on after party's death

21.8 (1) If a party to proceedings dies, the court may give directions to enable the proceedings to be carried on.

(2) An order under this rule may be made on or without an application.

## Power of court to strike out claim after death of claimant

21.9 (1) If a claimant dies and the claimant's personal representatives do not apply for an order under rule 19.3 to be substituted as claimants, the defendant may apply for the claim to be struck out.

(2) Notice of the application must be given to the personal representatives of the claimant (if any) and such other persons as the court directs.

(3) The general rule is that if the court makes an order on an application under this rule it will be that unless the personal representatives or some other persons on behalf of the estate apply to be substituted under rule 19.3 or for directions under rule 21.8 by a specified date, the claim is to be struck out.

(4) The court may give directions under rule 21.8 at the hearing of an application under this rule.

PART 25

# Case Management –The Objective

**Contents of this Part**

Court's duty to actively manage cases        Rule 25.1

# Court's duty to actively manage cases

25.1 The court must further the overriding objective by actively managing cases. This may include –

(a) actively encouraging and assisting parties to settle the whole or part of their case on terms that are fair to each party;

(b) considering whether the likely benefits of taking a particular step will justify the cost of taking it;

(c) dealing with as many aspects of the case as is practicable on the same occasion;

(d) dealing with as many aspects of the case, as it appears appropriate to do, without requiring the parties to attend court;

(e) deciding promptly which issues need full investigation and trial and accordingly disposing summarily of the others;

(f) deciding the order in which issues are to be resolved;

(g) encouraging the parties to co-operate with each other in the conduct of proceedings;

(h) encouraging the parties to use any appropriate form of dispute resolution including, in particular, mediation, if the court considers it appropriate and facilitating the use of such procedures;

(i) ensuring that no party gains an unfair advantage by reason of that party's failure to give full disclosure of all relevant facts prior to the trial or the hearing of any application;

(j) fixing timetables or otherwise controlling the progress of the case;

(k) giving directions to ensure that the trial of the case proceeds quickly and efficiently;

(1) identifying the issues at an early stage; and

(m) making appropriate use of technology.

• Part 1 sets out the overriding objective.

PART 26

# Case Management –The Court's Powers

Court's general powers of management                                              Rule 26.1

Courts power to make orders of its own initiative                                 Rule 26.2

Sanctions - striking out statement of case                                       Rule 26.3

Court's general power to strike out statement of case                            Rule 26.4

Judgment without trial after striking out                                        Rule 26.5

Setting aside judgment after striking out                                        Rule 26.6

Court's powers in cases of failure to comply with rules, etc.                     Rule 26.7

Relief from sanctions                                                            Rule 26.8

General power of court to rectify matters where there has been a procedural error  Rule 26.9

# Court's general powers of management

26.1 (1)The list of powers in this rule is in addition to any powers given to the court by any other rule, practice directions or any enactment.

(2)Except where these rules provide otherwise, the court may –

(a) adjourn or bring forward a hearing to a specific date;

(b) consolidate proceedings;

(c) deal with a matter without the attendance of any of the parties;

(d) decide the order in which issues are to be tried;

(e) direct a separate trial of any issue;

(f) direct that any evidence be given in written form;

(g) direct that notice of any proceedings or application be given to any person;

(h) direct that part of any proceedings (such as a counterclaim or  other ancillary claim) be dealt with as separate proceedings;

(i) dismiss or give judgment on a claim after a decision on a preliminary issue;

(j) exclude an issue from determination if the court can do substantive justice between the parties on the other issues and determines it would therefore serve no worthwhile purpose;

(k) extend or shorten the time for compliance with any rule, practice direction, order or direction of the court even if the application for an extension is made after the time for compliance has passed;

(1) give the conduct of any matter to any person it thinks fit and make any appropriate consequential order about costs;

(m) hold a hearing and receive evidence by telephone or use any other method of direct oral communication;

(n) instead of holding an oral hearing deal with a matter on written representations submitted by the parties;

(o) require any party or a party's legal practitioner to attend the court;

(p) require the maker of an affidavit or witness statement to attend for cross-examination;

(q) stay the whole or part of any proceedings generally or until a specified date or event;

(r) transfer proceedings to the Family Court or the District or Magistrate's Court;

(s) transfer the whole or any part of any proceedings to another court office from the court office of one Member State, Territory or circuit;

(t) try two or more claims on the same occasion;

(u) where there is a substantial inequality in the proven financial position of each party, order any party having the greater financial resources who applies for an order to pay the other party's costs of complying with the order in any event;

(v) where two or more parties are represented by the same legal practitioner –

(i) direct that they be separately represented;

(ii) if necessary, adjourn any hearing to a fixed date to enable separate representation to be arranged; and

(iii) make any consequential order as to costs thrown away; and

(w) take any other step, give any other direction, or make any other order for the purpose of managing the case and furthering the overriding objective.

(3) When the court makes an order or gives a direction, it may make the order or direction subject to conditions.

(4) The conditions which the court may impose include a condition –

(a) requiring a party to give an undertaking;

(b) requiring a party to give security;

(c) requiring a party to pay all or part of the costs of the proceedings;

(d) requiring the payment of money into court or as the court may direct; and

(e) that a party permit entry to property owned or occupied by that party to another party or someone acting on behalf of another party.

(5) In considering whether to make an order, the court may take into account whether a party is prepared to give an undertaking.

(6) In special circumstances on the application of a party the court may dispense with compliance with any of these rules.

## Court's power to make orders of its own initiative

26.2 (1) Except where a rule or other enactment provides otherwise, the court may exercise its powers on an application or of its own initiative.

(2) If the court proposes to make an order of its own initiative, it must give any party likely to be affected a reasonable opportunity to make representations.

(3) The opportunity may be to make representations orally, in writing, telephonically or by any other means as the court considers reasonable.

(4) If the court proposes to –

(a) make an order of its own initiative; and

(b) hold a hearing to decide whether to do so;

the court office must give each party likely to be affected by the order at least 7 days' notice of the date, time and place of the hearing.

## Sanctions – striking out statement of case

26.3(1) In addition to any other power under these Rules, the court may strike out a statement of case or part of a statement of case if it appears to the court that –

TAB 41

*Bowstead and Reynolds on Agency* (20th ed, 2016) at §§ 8-204, 8-209

THE COMMON LAW LIBRARY

# BOWSTEAD AND REYNOLDS

## ON

# AGENCY

*TWENTIETH EDITION*

BY

**Peter Watts,** QC, LLB (Hons) (Cantuar),
LLM (Cantab)

*Professor of Law, University of Auckland*
GENERAL EDITOR

AND

**F. M. B. Reynolds,** QC(Hon.), DCL, FBA

*Honorary Bencher of the Inner Temple;*
*Professor of Law Emeritus in the University of Oxford*
*and Emeritus Fellow of Worcester College Oxford*

SWEET & MAXWELL     THOMSON REUTERS

CHAPTER 8—RELATIONS BETWEEN PRINCIPALS AND THIRD PARTIES    [ART.93

It should be noted that a similar result may sometimes be obtained without the aid of equity, by invoking the doctrine of tracing at common law. If the money has been paid into the principal's bank account, he may be liable to an action in restitution.[1237]

### Illustrations

8–203
(1) The managing director of a company borrows money on the company's behalf without authority. The lender knows that he has no authority, but expects that the company will adopt the loan. The company does not do so, but the money is spent by the managing director in discharging existing legal debts of the company. The company must repay the money.[1238]

(2) The secretary of a company forges and discounts certain bills of exchange, and pays the proceeds to his own account, upon which he draws cheques in favour of the company. The company is liable to the discounter to the extent that the proceeds of the bills have been applied for its benefit.[1239]

(3) A manager who had no authority to borrow money or overdraw his principal's account, having overdrawn the account and misapplied the money, borrowed £20 for the alleged purpose of paying the principal's workmen (but really to make up the defalcations), paid it into the principal's account, and drew on the account to pay the workmen. Held, that the £20 having been applied for the benefit of the principal, he was liable to repay the amount to the lender.[1240]

### 4.—NOTIFICATION TO AND KNOWLEDGE ACQUIRED THROUGH AGENT[1241]

### Article 94

#### NOTIFICATION TO AGENT

8–204    A notification given to an agent is effective as such if the agent receives it within the scope of his actual or apparent authority,[1242] whether or not it is subsequently

---

[1237] Illustration 3; see Article 88.

[1238] *Reversion Fund & Insurance Co v Maison Cosway Ltd* [1913] 1 K.B. 364. See also *Bannatyne v D. & C. McIver* [1906] 1 K.B. 103; and *Campden Hill Ltd v Chakrani* [2005] EWHC 911; [2005] N.P.C. 65 at [90].

[1239] *Ex p. Shoolbred* (1880) 28 W.R. 339. See also *Hazlewood v West Coast Securities Ltd* (1974) 49 D.L.R. (3d) 46; affd (1976) 68 D.L.R. (3d) 172.

[1240] *Reid v Rigby & Co* [1894] 2 Q.B. 40.

[1241] Previous editions contained an Article on the question when admissions by agents were evidence against the principal. The case law on this constituted, as did the rules as to admissions by the principal himself, an exception to the Hearsay Rule. Since the abolition of that rule by the Civil Evidence Act 1995 this body of authority is of little relevance in civil law in England, the matter being now one of reliability and weight of evidence. They may sometimes be relevant in criminal cases, and similar reasoning may apply in some other common law jurisdictions (e.g. Australian Evidence Act 1995 (Cth.) s.87; Singapore Evidence Act s.18). A full account was given in the 16th edition of this work, and an abbreviated account is given in *Cross and Tapper on Evidence* (12th edn), p.582 onwards. Problems may arise in connection with admissions by solicitor and counsel in litigation: an account is given in Phipson, *Evidence* (18th edn), para.4–23 onwards.

[1242] *Tanham v Nicholson* (1872) L.R. 5 H.L. 561, Illustration 3; and see Comment.

transmitted to the principal, unless the person seeking to charge the principal with notice knew that the agent intended to conceal the notification from the principal.[1243]

## Comment

The notion that the knowledge of an agent is that of the principal is frequently invoked in cases of varying types and its full applications are not clearly determined: "When a question of notice, or knowledge, arises, we find ourselves overwhelmed in a sea of authorities, not altogether reconcilable with each other".[1244] *Restatement, Second* sought to lay down exhaustive rules,[1245] but *Restatement, Third* adopts a more general approach.[1246] This Article is the first part of an initial division between cases of notification and mere notice or knowledge. This distinction has been forcefully argued by academic writers,[1247] is adopted in both *Restatements*,[1248] and has received judicial support in England[1249] and New Zealand.[1250] It is based on the fact that in some cases of the formal giving of information, use of the notion of authority to receive it, not only actual but also apparent, seems natural and appropriate.

**8–205**

*Restatement, Third*[1251] defines notification as:

"a manifestation that is made in the form required by agreement among parties or applicable law, or in a reasonable manner in the absence of any agreement or applicable law, with the intention of affecting the legal rights and duties of the notifier in relation to rights and duties of persons to whom the notification is given."

An obvious example is the notice to quit, and this and other examples appear in the Illustrations. In England Hoffmann LJ referred to a category of cases:

"in which the agent has actual or ostensible authority to receive communications, whether informative (such as the state of health of an insured) or performative (such as a notice to quit)."[1252]

---

[1243] *Restatement, Third*, § 5.02; *Blackley v National Mutual Life Assn of Australasia Ltd* [1972] N.Z.L.R. 1038, Illustration 7. See also *Norwegian American Cruises A/S v Paul Mundy Ltd (The Vistafjord)* [1988] 2 Lloyd's Rep. 343 at 354.

[1244] *Taylor v Yorkshire Insurance Co Ltd* [1913] 2 Ir.R. 1 at 21, per Palles C.B.

[1245] See §§ 9–11 and 268–282.

[1246] §§ 5.01–5.04.

[1247] Powell, pp.236–244; Wright (1935) 1 U. Toronto L.J. 17 at 52, fn.5; Falconbridge (1939) 17 Can.B.R. 248 at 259; Seavey (1916) 65 U.Pa.L.Rev. 1 (a valuable article); but cf. Fridman, para.10.6, who rejects the distinction.

[1248] *Restatement, Second*, §§ 9 and 268–271; *Restatement, Third*, § 5.01(1)(3).

[1249] *El Ajou v Dollar Land Holdings Ltd* [1994] 2 All E.R. 685; see below.

[1250] *Blackley v National Mutual Life Assn of Australasia Ltd* [1972] N.Z.L.R. 1038, per Turner P. (Illustration 7).

[1251] § 5.01(1).

[1252] *El Ajou v Dollar Land Holdings Ltd* [1994] 2 All E.R. 685, at 703. See too *Ng Hock Kon v Sembawang Capital Pte Ltd* [2010] 1 S.L.R. 307.

CHAPTER 8—RELATIONS BETWEEN PRINCIPALS AND THIRD PARTIES    [ART.95

practitioner's work not to state these categories, which are stated in other books also[1294]; but some reservations are expressed about them below. Rule (1), which did not figure in Hoffmann LJ's account, preserves a general rule of imputation for the reasons stated below; and Rule (4) seeks to state the fraud exception.

**8–209**    **Rule (1). Rationales for imputation.** This gives a general indication of an often stated approach to this part of the law. Apart from general pragmatic justifications,[1295] two main reasons are given for imputing knowledge to the principal for the purposes of a common law rule. The first is that of the identity of principal and agent. This rather conceptual approach can be explained on the basis that a principal should not be able by using an agent to put himself in a better position than that in which he would have been if he had dealt personally. This is a very old idea in the case law, well illustrated by a dictum of Lord Northington LC's in *Sheldon v Cox*: "[It] is a fixed and settled principle that notice to an agent is notice to the principal. If it were otherwise it would cause great inconvenience, and notice would be avoided in every case by employing agents".[1296] Consistently, knowledge acquired by an agent after the relevant contract has been completed will no more bind the principal than if the principal had itself acquired the knowledge at that stage.[1297] *Aliter*, where the knowledge is acquired before the contract becomes unconditional.[1298] The position is less clear where knowledge is acquired before the principal has provided its consideration and the principal can withdraw from the contract.[1299]

The second explanation is that where an agent receives information which it would be his duty to pass on to his principal, it may be assumed or presumed in favour of the third party, at least in the absence of explicit indications to the contrary, that he has done so.[1300] This explanation may permit the imputation of knowledge acquired outside the agency, which is a key problem of this part of the law. It has been said that such reasoning is "rather a justification of the rule than a reason for it".[1301] It links with the so-called fraud exception discussed below.[1302] With varying indications as to the strength of the supposed presumption, it has a long history in the cases, but there are as many cases that do not support it, and it was rejected in *El Ajou*.[1303] Hoffmann LJ admitted that there

---

[1294] e.g. *Lewin on Trusts* (18th edn), para.42–51.

[1295] e.g. "Policy and the safety of the public": per Lord Brougham LC in *Kennedy v Green* (1834) 3 Myl. & K. 699 at 719.

[1296] (1764) 2 Eden 224 at 228. See too *Boursot v Savage* (1866) L.R. 2 Eq. 134 at 142, per Kindersley VC: "I confess my own impression is, that the principle on which the doctrine rests is this: that my solicitor is alter ego; he is myself; I stand in precisely the same position as he does in the transaction, and therefore his knowledge is my knowledge; and it would be a monstrous injustice that I should have the advantage of what he knows without the disadvantage."; *Vane v Vane* (1873) L.R. 8 Ch.App. 383 at 400. See further Watts (2001) 117 L.Q.R. 300 at 301.

[1297] *Kettlewell v Watson* (1882) 21 Ch.D. 685 at 712.

[1298] *MBF Australia Ltd v Malouf* [2008] NSWCA 214. See also *Forsyth v Blundell* (1973) 129 C.L.R. 477.

[1299] See *Atterbury v Wallis* (1856) 8 De G.M. & G. 454 at 466.

[1300] See, e.g. *Boursot v Savage* (1866) L.R. 2 Eq. 134 at 142; *Rolland v Hart* (1871) L.R. 6 Ch.App. 678.

[1301] Mechem, *Law of Agency* (2nd edn), § 1806.

[1302] See below, para.8–213.

[1303] See *Espin v Pemberton* (1859) 3 De G. & J. 547 at 555; *Rolland v Hart* (1871) L.R. 6 Ch.App. 678 at 681–682; *Boursot v Savage* (1866) L.R. 2 Eq. 134 at 142. For other cases not supporting the presumption as the basis of imputation, see (2001) 117 L.Q.R. 300 at 304–308.

ART.95]          KNOWLEDGE ACQUIRED THROUGH AGENT

were situations in which a weak presumption that information had been passed on might be applied, but no more, and treated the reasoning as primarily applicable to notification cases .[1304] On analysis, it is an unsatisfactory explanation for imputation. In the first place, it is apparent from the case law that imputation can occur even though it is clear beyond doubt that the principal was personally unaware of the relevant fact, and that therefore there has not been any communication by the agent. In such circumstances, the rationale would have to work as an irrebuttable presumption,[1305] which is an artifice. Secondly, it is not obvious how obligations as between principal and agent can confer rights on third parties, who are strangers to that relationship. Thirdly, it is unrealistic to assume that there is in fact a duty as between principal and agent that the agent will inform the principal of all matters of relevance to the principal's business that the agent learns; one of the reasons for using agents is to free the principal's time for other things.

**Only knowledge acquired while performing mandate prima facie imputed.** It is implicit in Rule (1) that only knowledge acquired by an agent whilst performing the tasks delegated by the principal will be imputed. Knowledge acquired before appointment, or even in the period of appointment but whilst not engaged for the principal, would not be imputed. Such an approach has been taken in decisions over many years[1306]; though it is rejected by both *Restatement, Second* and *Restatement, Third*.[1307] If it is correct, it creates an important limitation on the whole doctrine.[1308] The rule would be consistent with either general rationale discussed in the previous paragraph, but arguably not dictated by them. Another explanation that has been given from time to time is that it is unreasonable to expect a busy agent, such as a solicitor, to recall all information that might be relevant to a client's affairs when it was learned while acting for other clients. This rationale emerged early in judgments of Lord Harwicke LC, in particular *Warrick v Warrick*[1309]:    8–210

"[N]otice should be in the same transaction: this rule ought to be adhered to, otherwise it would make purchasers and mortgagees' titles depend altogether on the memory of their counsellors and agents, and oblige them to apply to persons of less eminence as counsel, as not being so likely to have notice of former transactions."

---

[1304] [1994] 2 All E.R. 685 at 703–704.

[1305] See *Kettlewell v Watson* (1882) 21 Ch.D. 685 at 705 (presumption irrebuttable).

[1306] See, e.g. *Taylor v Yorkshire Insurance Co Ltd* [1913] 2 Ir.R. 1 at 21 and other cases there cited; *Mountford v Scott* (1818) 3 Madd. 34 at 40; *Farah Constructions Pty Ltd v Say-Dee Pty Ltd* (2007) 236 C.L.R. 89 at [125] (assumption by court that only knowledge acquired within mandate is imputable); *Hickman v Turn and Wave Ltd* [2011] 3 N.Z.L.R. 318 at [192], reversed on other grounds [2013] 1 N.Z.L.R. 741.

[1307] See *Restatement, Third*, § 5.03.

[1308] See further Watts [2005] N.Z.L. Rev. 307, discussing *Waller v Davies* [2005] 3 N.Z.L.R. 814; upheld on different grounds [2007] 2 N.Z.L.R. 508. See also Watts, *Unjust Enrichment in Commercial Law* (Degeling and Edelman eds, 2008), Ch.21.

[1309] (1745) 3 Atk. 291 at 293. See also *Preston v Tubbin* (1684) 1 Vern. 286; *Worsley v The Earl of Scarborough* (1746) 3 Atk. 392: "It is settled, that notice to an agent or counsel who was employed in the thing by another person, or in another business, and at another time, is no notice to his client, who employs him afterwards; and it would be very mischievous if was so, for the man of most practice and greatest eminence would then be the most dangerous to employ."

TAB 42

*Clerk & Lindsell on Torts* (21st ed) at §§ 18-21

THE COMMON LAW LIBRARY

# CLERK & LINDSELL

## ON

# TORTS

*TWENTY-FIRST EDITION*

**SWEET & MAXWELL**           **THOMSON REUTERS**

2. Requirements                                                                18–21

in what they had said.[95] Nevertheless, although the unreasonableness of the grounds of the belief will not of itself support an action for deceit, it will of course be evidence from which fraud may be inferred. As Lord Herschell has pointed out, there must be many cases:

> "where the fact that an alleged belief was destitute of all reasonable foundation would suffice of itself to convince the court that it was not really entertained, and that the representation was a fraudulent one."[96]

**Motive irrelevant** It should be noted that if the requisite degree of knowledge or recklessness is shown, the defendant's motive in making the representation is irrelevant: "If fraud be established it is immaterial that there was no intention to cheat or injure the person to whom the false statement was made."[97] The fact that the representor was not actually dishonest,[98] or acted with the aim of facilitating a bona fide business transaction,[99] is beside the point (though of course lack of dishonest intent may be powerful evidence of a bona fide belief in the truth of the facts asserted by the defendant[100]).                                          18–20

**Absence of belief in truth; recklessness** If the defendant knows his statement to be untrue he will be responsible for any loss suffered as a result.[101] Little more need be said on this point. However, liability goes further than this. Even if the party making the representation may have had no knowledge of its falsehood, he will still be responsible if he had no belief in its truth and made it, "not caring whether it was true or false".[102] As Lord Herschell put it:                     18–21

---

[95] (1889) 14 App. Cas. 337, 376 (Lord Herschell). See too *Angus v Clifford* [1891] 2 Ch. 449 to the same effect. Note, however, that directors in the position of the defendants in *Derry v Peek* are under a statutory liability which does include negligence: see Financial Services and Markets Act 2000 s.90, re-enacting the Directors' Liability Act 1891, and para.18–54.

[96] See *Derry v Peek* (1889) 14 App. Cas. 337 at 376; also *Gross v Lewis Hillman* [1970] Ch. 445 at 465, per Harman L.J.

[97] *Bradford Third Benefit Building Society v Borders* [1941] 2 All E.R. 205, 211 (Viscount Maugham); also *Polhill v Walter* (1832) 3 B. & Ad. 114; *Derry v Peek* (1889) 14 App. Cas. 337, 365 (Lord Herschell); *Watts v Spence* [1976] Ch. 165, 176 (Graham J.); and *Ludsin Overseas Ltd v Eco3 Capital Ltd* [2013] EWCA Civ 413 at [77]–[78] (Jackson L.J.).

[98] "It is not necessary that the maker of the statement was 'dishonest' as that word is used in the criminal law. The relevant intention is that the false statement shall be acted upon by a person to whom it is addressed."—*Standard Chartered Bank v Pakistan National Shipping Corp (No.2)* [2000] 1 Lloyd's Rep. 218 at 224, per Evans L.J.

[99] See *Standard Chartered Bank v Pakistan National Shipping Corp (No.2)* [2000] 1 Lloyd's Rep. 218, esp. at 224 (date of presentation of letter of credit falsified to speed up business deal: presenter still guilty of deceit. The case was reversed on other grounds at [2002] UKHL 43; [2003] 1 A.C. 959). A similar type of case is *Shinhan Bank Ltd v Sea Containers Ltd* [2000] 2 Lloyd's Rep. 406 (buyer signing receipts for undelivered goods to accommodate seller, knowing seller would then use them to obtain bank finance: buyer liable to bank for deceit); and see too *Brown Jenkinson and Co Ltd v Percy Dalton (London) Ltd* [1957] 2 Q.B. 631 (agreement to issue clean bills of lading for damaged goods deceitful and hence promise to indemnify shipowner for liability ineffective), and also *Ansbacher (Henry) & Co Ltd v Brinks Stern (A Firm)* [1998] P.N.L.R. 221.

[100] *Barings Plc v Coopers & Lybrand (No.5)* [2002] EWHC 461 (Ch); [2002] P.N.L.R. 39.

[101] *Pasley v Freeman* (1789) 3 T.R. 51. This was the first case in which fraud was held to give a cause of action between persons not parties to a contract.

[102] See *Joliffe v Baker* (1883) 11 Q.B.D. 255 at 275, per Smith J.

**18–21**                          CHAPTER 18—DECEIT

"Any person making such a statement must always be aware that the person to whom it is made will understand, if not that he who makes it knows, yet at least that he believes it to be true. And if he has no such belief he is as much guilty of fraud as if he had made any other representation which he knew to be false, or did not believe to be true."[103]

However, there may be one qualification to this. A defendant who is a mere mouthpiece or ministerial employee may well make a statement on behalf of his employer without any personal belief whatever as to its truth or otherwise. Although theoretically this might be said to amount to recklessness, it might be thought unjust to hold him liable in the absence of personal dishonesty, and there is some authority that in such a case he may have a defence.[104]

**18–22**    **Timing: defendant forgetting facts once known** Since the tort of deceit is committed at the time the claimant relies on the defendant's false statement, it is not enough to show that the defendant once knew facts contrary to the representation made by him, if at the time of making it he had honestly forgotten them. In an action of deceit it is essential that the defendant should be without honest belief in the truth of his statement at the time of making it[105] (though no doubt when it can be shown that the defendant has at one time known facts inconsistent with the truth of his statement, this will be strong evidence that he knew such facts at the time of making the statement).

**18–23**    **Timing: defendant's later knowledge** In the converse case, where the defendant does not acquire knowledge of the untruth of his statement until after it has been made, but becomes aware of it before the claimant has acted upon it, it follows from general principle that he is bound to communicate the truth and will be answerable in damages if he does not.[106]

**18–24**    **Timing: statement becoming untrue ex post facto** It may be that a statement was in fact true at the time when made, but before being acted upon by the party to whom it was made had been rendered untrue by reason of later events. In such

---

[103] per Lord Herschell in *Derry v Peek* (1889) 14 App. Cas. 337 at 368; see also ibid. at 361. See too *AIC Ltd v ITS Testing Services (UK) Ltd* [2005] EWHC 2122 (Comm); [2006] 1 Lloyd's Rep. 1 (defendants test cargo of petrol for quality and send results to buyers: when told of doubts as to correctness of results, repeat "we stand by that test" despite having no idea whether correct or not: held, liable to buyers in deceit). The decision was reversed by the CA on the facts (see *AIC Ltd v ITS Testing Services (UK) Ltd* [2006] EWCA Civ 1601; [2007] 1 All E.R. (Comm) 667), but it is submitted that the principle remains.

[104] See *GE Commercial Finance Ltd v Gee* [2005] EWHC 2056 (QB); [2006] 1 Lloyd's Rep. 337 (junior employee relayed fraudulent employer's falsehoods to factoring company: despite lack of direct knowledge of, or positive belief in, the truth of what he was saying, Tugendhat J. thought, obiter, that "open to question" whether liable: see [2005] EWHC 2056 (QB); [2006] 1 Lloyd's Rep. 337 at [105]).

[105] See *Derry v Peek* (1889) 14 App. Cas. 337, 343 (Lord Halsbury); *Angus v Clifford* [1891] 2 Ch. 449, 471; *Bradford Third Benefit Building Society v Borders* [1941] 2 All E.R. 205, 220 (Lord Wright); *Armstrong v Strain* [1951] 1 T.L.R. 856, 870–871 (per Devlin J.; affirmed [1952] 1 K.B. 232).

[106] See (obiter) per Lord Blackburn in *Brownlie v Campbell* (1880) 5 App. Cas. 925, 950; cf. *Briess v Woolley* [1954] A.C. 333. In *Ansbacher (Henry) & Co Ltd v Brinks Stern (A Firm)* [1998] P.N.L.R. 221, the point was raised but it became unnecessary to decide it, though the court would have found it difficult to accept that the defendant continued to hold the honest belief he claimed to have had.

TAB 43

Dicey, Morris & Collins, *The Conflict of Laws* (15th ed)
at §§ 14R-054, 30R-020

# DICEY, MORRIS AND COLLINS

## ON

# THE CONFLICT OF LAWS

### FIFTEENTH EDITION

UNDER THE GENERAL EDITORSHIP OF

## LORD COLLINS OF MAPESBURY

P.C., LL.D., LL.M., F.B.A.

WITH

SPECIALIST EDITORS

VOLUME 1

SWEET & MAXWELL

 THOMSON REUTERS

*Foreign Judgments*                    RULE 43

As regards judgments of courts of other parts of the United Kingdom, the 1982 Act provides expressly that they shall not be enforced otherwise than in accordance with the registration procedures of the Act.[193] Where a judgment is registrable under the 1920 Act[194] the judgment creditor is not deprived of the possibility of suing to enforce it at common law, but the employment of this alternative is discouraged by a provision that it should ordinarily involve sacrifice of the costs of the action.[195]

***Exception 2*—No proceedings may be entertained in any court in the United Kingdom for the recovery of any sum alleged to be payable under a judgment given in a court of a country to which section 9 of the Foreign Judgments (Reciprocal Enforcement) Act 1933 has been applied by Order in Council.**[196]     14E–052

### COMMENT

Section 9(1) of the 1933 Act provides that if it appears to Her Majesty that the treatment in respect of recognition and enforcement accorded by the courts of any foreign country to judgments given in the courts of the United Kingdom is substantially less favourable than that accorded by the courts of the United Kingdom to judgments of the courts of that country, Her Majesty may apply that section to that country, with the consequences stated in Exception 2 above. The object of this enactment was to strengthen the hand of HM Government in negotiating conventions with foreign counries for the reciprocal enforcement of foreign judgments.[197] No Order in Council has yet been made under the section. The section refers to "any foreign country." It is thus not limited to foreign countries to which Pt I of the 1933 Act applies, but is of general application. However, the term "foreign country" is limited to countries foreign in the political sense: it does not extend to countries forming part of the Commonwealth.[198]     14–053

### B. *Jurisdiction of foreign courts at common law*

#### (1) JURISDICTION IN PERSONAM

**RULE 43—Subject to Rules 44 to 46, a court of a foreign country outside the United Kingdom has jurisdiction to give a judgment *in personam* capable of enforcement or recognition as against the person against whom it was given in the following cases**[199]**:**     14R–054

---

[193] 1982 Act, s.18(8).

[194] Rule 53.

[195] 1920 Act, s.9(5). But a claim on the original cause of action may not be brought: para.14–179, below.

[196] 1933 Act, s.9, as amended by 1982 Act, Sch.10, para.2.

[197] See the Report of the Foreign Judgments (Reciprocal Enforcement) Committee, Cmd. 4213 (1932), Annex V, para.14.

[198] This is made clear in s.7.

[199] See generally *Adams v Cape Industries Plc* [1990] Ch. 433, 512–525 (CA). See also *Schibsby v Westenholz* (1870) L.R. 6 Q.B. 155, 161; *Rousillon v Rousillon* (1880) 14 Ch.D. 351, 371; *Emanuel v Symon* [1908] 1 K.B. 302, 309 (CA).

RULE 43      *Jurisdiction and Foreign Judgments*

***First Case***[200]**—If the person against whom the judgment was given was, at the time the proceedings were instituted, present in the foreign country.**

***Second Case***[201]**—If the person against whom the judgment was given was claimant, or counterclaimed, in the proceedings in the foreign court.**

***Third Case***[202]**—If the person against whom the judgment was given, submitted to the jurisdiction of that court by voluntarily appearing in the proceedings.**

***Fourth Case***[203]**—If the the person against whom the judgment was given, had before the commencement of the proceedings agreed, in respect of the subject matter of the proceedings, to submit to the jurisdiction of that court or of the courts of that country.**

<div align="center">COMMENT</div>

**14–055**   A fundamental requirement for the recognition or enforcement of a foreign judgment in England at common law[204] is that the foreign court should have had jurisdiction according to the English rules of the conflict of laws. "All jurisdiction is properly territorial," declared Lord Selborne,[205] "and *extra territorium jus dicenti, impune non paretur.* . . . In a personal action, . . . a

---

[200] *Carrick v Hancock* (1895) 12 T.L.R. 59; *Littauer Glove Corporation v FW Millington (1920) Ltd* (1928) 44 T.L.R. 746; *Vogel v RA Kohnstamm Ltd* [1973] Q.B. 133; *Adams v Cape Industries Plc* [1990] Ch. 433 (CA); *cf. Sfeir & Co v National Insurance Co of New Zealand* [1964] 1 Lloyd's Rep. 330 (a case on the 1920 Act); Read, pp.148–151.

[201] Cases cited in n.199 above, and *Burpee v Burpee* [1929] 3 D.L.R. 18 (BC); Read, p.160.

[202] *De Cosse Brissac v Rathbone* (1861) 6 H. & N. 301, as explained in *Schibsby v Westenholz* (1870) L.R. 6 Q.B. 155, 162; *Voinet v Barrett* (1885) 55 L.J.Q.B. 39 (CA); *Guiard v de Clermont* [1914] 3 K.B. 145; *SA Consortium General Textiles v Sun & Sand Agencies Ltd* [1978] Q.B. 279 (CA) (a case under the 1933 Act); *Jet Holdings Inc v Patel* [1990] 1 Q.B. 335, 341 (CA); *Re Overseas Food Importers & Brandt* (1981) 126 D.L.R. (3d) 422; (BCCA); *Canada Trustco Mortgage Co v Rene Management & Holdings Ltd* (1988) 53 D.L.R. (4th) 222 (Man CA); *575225 Saskatchewan Ltd v Boulding* [1988] 6 W.W.R. 738 (BCCA); *First National Bank of Houston v Houston E&C Inc* [1990] 5 W.W.R. 719 (BC); *Gourmet Resources International Inc v Paramount Capital Corp* [1993] I.L.Pr. 583 (Ont); and *cf. The Atlantic Emperor (No.2)* [1992] 1 Lloyd's Rep. 624, 633 (CA); Read, pp.161–171; Clarence Smith (1953) 2 I.C.L.Q. 510; on the effect of an appearance to protest the jurisdiction of the foreign court see 1982 Act, s.33, and paras 14–070, *et seq.*, below.

[203] *Feyerick v Hubbard* (1902) 71 L.J.K.B. 509; *Copin v Adamson* (1875) 1 Ex. D. 17 (CA); *Jeannot v Fuerst* (1909) 25 T.L.R. 424; *Bank of Australasia v Harding* (1850) 9 C.B. 661; *Bank of Australasia v Nias* (1851) 16 Q.B. 717; *Kelsall v Marshall* (1856) 1 C.B.(N.S.) 241; *Vallée v Dumergue* (1849) 4 Exch. 290; *Blohn v Desser* [1962] 2 Q.B. 116; *Vogel v RA Kohnstamm Ltd* [1973] Q.B. 133; *SA Consortium General Textiles v Sun & Sand Agencies Ltd* [1978] Q.B. 279 (CA) (a case on the 1933 Act); *First City Capital Ltd v Winchester Computer Corp* (1987) 44 D.L.R. (4th) 301 (Sask CA); *Bank of Credit & Commerce International (Overseas) Ltd v Gokal* [1995] 2 W.W.R. 240 (BCCA); Read, pp.171–177; Restatement, ss.32, 43.

[204] And under the 1920 and 1933 Acts. The power of the English court to review the jurisdiction of the foreign court under the 1982 Act and the Brussels I Regulation is more limited. See Rule 55, below.

[205] *Sirdar Gurdyal Singh v Rajah of Faridkote* [1894] A.C. 670, 683–684 (PC).

<div align="center">690</div>

RULE 175                    *Corporations and Insolvency*

## 3. CAPACITY AND INTERNAL MANAGEMENT

30R–020    **RULE 175—(1) The capacity of a corporation to enter into any legal
transaction is governed both by the constitution of the corporation and by
the law of the country which governs the transaction in question.[77]**

**(2) All matters concerning the constitution of a corporation are governed by the law of the place of incorporation.[78]**

---

[77] *Risdon Iron and Locomotive Works v Furness* [1906] 1 K.B. 49, 56–57 (CA); *Banque Internationale de Commerce de Petrograd v Goukassow* [1923] 2 K.B. 682, 690–691 (CA); *Janred Properties Ltd v ENIT* [1989] 2 All E.R. 444 (CA); *JH Rayner (Mincing Lane) Ltd v Department of Trade and Industry* [1990] 2 A.C. 418; *Arab Bank Plc v Merchantile Holdings Ltd* [1994] Ch. 71; *Presentaciones Musicales SA v Secunda* [1994] Ch. 271 (CA); *Grupo Torras SA v Al-Sabah* [1996] 1 Lloyd's Rep. 7 (CA); *Merrill Lynch Capital Services Ltd v Municipality of Piraeus* [1997] C.L.C. 1214; *Sierra Leone Telecommunications Co Ltd v Barclays Bank Plc* [1998] 2 All E.R. 821; *Azov Shipping Co v Baltic Shipping Co* [1999] 2 Lloyd's Rep. 159; *Grupo Torras SA v Al-Sabah* [1999] C.L.C. 1469; reversed in part on other grounds [2001] C.L.C. 221 (CA); *Continental Enterprises Ltd v Shandong Zhucheng Foreign Trade Group Co* [2005] EWHC 92 (Comm.); *Laemthong International Lines Co Ltd v Artis (No.3)* [2005] EWHC 1595 (Comm.); *Haugesund Kommune v Depfa ACS Bank* [2010] EWCA Civ 579, [2011] 1 All E.R. 190; *Standard Chartered Bank v Ceylon Petroleum Corp* [2011] EWHC 1785 (Comm.) at [391] *et seq.*; Foreign Corporations Act 1991, s.1; Overseas Companies (Execution of Documents and Registration of Charges) Regulations 2009 (SI 2009/1917) Pt.2, in force from October 1, 2009, applying Companies Act 2006, ss.43–46, in modified form, to overseas companies, as amended by SI 2011/2194, which amendments do not relate to this aspect of the Regulations; Foreign Corporations Ordinance 1993, s.1 (Hong Kong); Foreign Corporations (Application of Laws) Act 1989, s.7(3) (Australia). *cf. Pickering v Stephenson* (1872) L.R. 14 Eq. 322, 340. As to international organisations, see *Westland Helicopters Ltd v Arab Organisation for Industrialisation* [1995] Q.B. 282, above, para.30–013. See also Rome I Regulation, below paras 30–029 *et seq.*; *Marubeni Hong Kong and South China Ltd v Mongolian Government* [2002] 2 All E.R. (Comm.) 873. Rule 175(1) does not apply to delictual capacity, which is governed by different considerations: see Rome II Regulation, Art.1(2)(f), Rule 247.

[78] *General Steam Navigation Co v Guillou* (1843) 11 M. & W. 877; *Pickering v Stephenson* (1872) L.R. 14 Eq. 322; *Bateman v Service* (1881) 6 App. Cas. 386, 389 (PC); *Risdon Iron and Locomotive Works v Furness* [1906] 1 K.B. 49 (CA); *Banco de Bilbao v Sancha and Rey* [1938] 2 K.B. 176 (CA); *National Bank of Greece and Athens SA v Metliss* [1958] A.C. 509; *Carl Zeiss Stiftung v Rayner & Keeler Ltd (No.2)* [1967] 1 A.C. 853, 972; *Janred Properties Ltd v ENIT*, above; *JH Rayner (Mincing Lane) Ltd v Department of Trade and Industry*, above; *Arab Bank Plc v Merchantile Holdings Ltd*, above; *Presentaciones Musicales SA v Secunda*, above; *Grupo Torras SA v Al-Sabah* [1996] 1 Lloyd's Rep. 7 (CA); *Merrill Lynch Capital Services Ltd v Municipality of Piraeus*, above; *Sierra Leone Telecommunications Co Ltd v Barclays Bank Plc*, above; *Azov Shipping Co v Baltic Shipping Co*, above; *Grupo Torras SA v Al-Sabah* [1999] C.L.C. 1469; reversed, in part, on other grounds [2001] C.L.C. 221 (CA); *Konamaneni v Rolls-Royce Industrial Power (India) Ltd* [2002] 1 W.L.R. 1269; *Shaker v Al-Bedrawi* [2002] EWCA Civ 1452, [2003] Ch. 350; *SMAY Investments Ltd v Sachdev* [2003] EWHC 474 (Ch.), [2003] 1 W.L.R. 1973; *Base Metal Trading Ltd v Shamurin* [2004] EWCA Civ 1316, [2005] 1 W.L.R. 1157; *Speed Investments Ltd v Formula One Holdings Ltd* [2004] EWCA Civ 1512, [2005] 1 W.L.R. 1936; *Reeves v Sprecher* [2007] EWHC 117 (Ch.), [2008] B.C.C. 49; *889457 Alberta Inc v Katanga Mining Ltd* [2008] EWHC 2679 (Comm.), [2009] I.L.Pr. 175; *Debt Collect London Ltd v SK Slavia Praha-Fotbal AS* [2010] EWHC 57 (QB); *Haugesund Kommune v Depfa ACS Bank* [2010] EWCA Civ 579, [2011] 1 All E.R. 190; *Standard Chartered Bank v Ceylon Petroleum Corp* [2011] EWHC 1785 (Comm.); *Fiona Trust & Holding Corp v Privalov* [2010] EWHC 3199 (Comm.) at [140] *et seq.*; *National Trust Co v Ebro Irrigation & Power Ltd* [1954] 3 D.L.R. 326, 341 (Ont); *cf. Virgtel Ltd v Zabusky* [2006] QSC 66; *Oates v Consolidated Capital Services Ltd* [2008] NSWSC 464; Rome I Regulation, Art. 1(2)(e) and (f), below, para.30–029; and see Rome II Regulation, Art.1(2)(f); below, Rule 247; Foreign Corporations Act 1991, s.1; Overseas Companies (Execution of Documents and Registration of Charges) Regulations 2008 (SI 2009/1017) applying ss. 43–46 of Companies Act 2006, in modified form, to overseas companies, as amended by SI 2011/2194. Foreign Corporations Ordinance 1993, s.1 (Hong Kong); Foreign

TAB 44

Goode, *Principles of Corporate Insolvency Law* (4th ed, 2011),
at §§ 13-32, 13-38

# PRINCIPLES OF CORPORATE
# INSOLVENCY LAW

**by**

**Roy/Goode**

**SWEET & MAXWELL**

 THOMSON REUTERS

In delivering the Opinion of the House, Lord Scott made the following points:

(1) The linked agreements together constituted the transaction. Accordingly, the issue before the court was not the transaction but the consideration. It was irrelevant who provided this. Accordingly the covenant by PCG to pay rent under the sub-lease formed part of the consideration received by AJB and had to be valued.

(2) The sub-lease was in breach of the sub-lessor's covenant under the head lease, and the court was entitled to look at subsequent events—in particular, the termination of the head lease for default by AJB and the consequent termination of the sub-lease by PCG for repudiatory breach—in order to value PCG's covenant at the time it entered into the sub-lease, and those events made it clear that the value was nil.

(3) However, Brewin Dolphin was entitled to be given credit for the amount of its loan and interest.

Lord Scott's speech has generated much debate on the use of hindsight to determine a value at the time of the transaction. But it seems clear that Lord Scott was not in truth applying a hindsight test; rather he was relying on evidence of subsequent events to show that from the outset the covenant under the sub-lease was so precarious and its value so speculative that even at the time it was entered into a bank or finance house with knowledge of the surrounding circumstances would not have attributed any value to the sub-lease covenant.[101] In this connection, it is helpful to recall the distinction drawn by the accountancy profession between adjusting and non-adjusting events in determining whether a balance sheet value should be corrected by reference to subsequent facts.[102] In the present context, an adjusting event is one which helps to establish the value of consideration at the transaction date, while a non-adjusting event is one which simply reduces or increases such value at the time the event occurs. It is obvious that a mere decline in the value of consideration by reason of an event after the transaction date is of no relevance whatsoever in determining whether the transaction was at an undervalue. But *Brewin Dolphin* did not concern a non-adjusting event; Lord Scott relied on the post-transaction termination of the sub-lease as validating what would anyway have been the perception at the time of the sub-lease of the nil value of the sub-lessee's covenant. In accountancy terms, the termination was an adjusting event.[103]

**13–32**

---

[101] See para.[26].

[102] See above, para.4–35.

[103] For non-insolvency cases in which the hindsight principle has been applied, see *Gorne v Scales* [2006] EWCA Civ 311; and *Bwllfa and & Merthyr Dare Steam Collieries (1891) Ltd v Pontypridd Waterworks Co* [1903] A.C. 426.

*The Avoidance of Transactions on Winding up or Administration*

To be contrasted with this is the case of *Ramlort Ltd v Reid*.[104]

T, a heavy drinker, took out a unit-linked life policy providing for a sum assured of £180,000. T owned two companies which together owed £185,000 to Ramlort Ltd. T, though not legally liable for the debts, regarded himself as morally bound to see that they were paid. To that end he arranged for the sum assured to be increased to £185,000 and, while seriously ill and awaiting a liver transplant, executed a declaration of trust of the policy in favour of Ramlort in consideration of two cheques issued by Ramlort totalling £3,000. At that time the policy had a surrender value of £71. Two months later T had a liver transplant and the following day he died. The judicial factor challenged the declaration of trust as a transaction at an undervalue. The medical evidence showed that at the time the declaration of trust was executed T was gravely ill and without a transplant his illness would be terminal, while if the transplant were to be carried out he might survive, though the mortality risk was not measurable. The greater the risk of T's death, the higher the value of the policy. There was a conflict of evidence as to the value of the policy. On one view it was no more than the surrender value, on another it was a value substantially higher than £33,000. The trial judge rejected the former view as unrealistic but concluded that it was not possible to assign a precise value to the policy, which would appear to be within the range £25,000-£35,000 but with an absolute minimum of £10,000, the figure he determined to be the outgoing value. He pointed out that the fact that there might not be a market for an asset did not mean it had no value, an example being shares in a private company. Neither valuer relied on the fact of T's death as a factor in his valuation and the judge did not apply the hindsight principle. The Court of Appeal, upholding the decision apart from allowing a credit for the two cheques, also found it unnecessary to apply hindsight to the valuation.[105]

Other examples where hindsight would be inappropriate are the valuation of a lottery ticket by reference to its proving to be the winning ticket; the valuation of a policy covering a young and healthy life assured by reference to his accidental and premature death; and the valuation of residential property by reference to a subsequent increase in its market value.[106] In all of these cases the subsequent event is not one which helps to establish the value at the

---

[104] [2004] B.P.I.R. 985, affirming the decision of Judge Norris Q.C. sub. nom. *Re Thoars (dec'd)* [2003] B.P.I.R. 1444.

[105] The court also held, in agreement with the trial judge, that there was nothing to preclude the court from taking a range of possible values rather than a precise figure.

[106] These were among the examples given on the trial of a preliminary issue by Sir Andrew Morritt V.C. in *Re Thoars (dec'd)* [2003] 1 B.C.L.C. 499.

transaction date, for it has no relation to what a willing purchaser might be prepared to pay for the asset in question; it is simply an event which changes the situation.

## (5) *Value of property sold subject to a security interest*

Where property of the company is sold subject to a security interest previ-  **13–33**
ously given by the company, its value is the value of the equity of redemption, for to the extent of the security interest the property is not that of the company at all.[107]

## Guarantees[108]

Particular difficulties are raised by guarantees.[109] Company A in a group of  **13–34**
companies gives a guarantee to secure advances already made or intended to be made by X Bank to Company B, another member of the group—usually Company A's parent, subsidiary or co-subsidiary. If Company A goes into winding up or administration, in what circumstances, if any, will the issue of the guarantee be considered a transaction at an undervalue?

The first question is whether a guarantee is within s.238 at all. Undoubtedly, it is a transaction within the meaning of s.436. The difficulty in applying s.238 lies in the fact that whereas most transactions involve the transfer of property, the provision of services or the payment of money by the company and the receipt of money or property in exchange, the issue of a guarantee by the company merely involves it in a contingent liability which may never crystallise and the quid pro quo is the making of an advance to a third party, the principal debtor. So in contrast to the usual case, a guarantee does not at the time of its issue involve any form of transfer either from or to the company and, indeed, it may never pay anything or receive anything as a result of the transaction. But these are matters which go merely to the valuation of benefit and burden, they do not affect the applicability of s.238 to contracts of guarantee.

As stated earlier, a guarantee is not a gift or no-consideration transaction, even though the advance to which it relates is made to the principal debtor,

---

[107] *Re Brabon, Treharne v Brabon* [2001] 1 B.C.L.C. 11, a decision on s.339(3)(c) of the Insolvency Act.
[108] See also *Goode on Legal Problems of Credit and Security*, edited by Louise Gullifer, 4th edn (London: Sweet & Maxwell, 2008), p.375. The analysis in the paragraphs that follow was adopted by Treacy J. in *Levy McCallum Ltd v Allen* [2007] N.I. Ch. 3.
[109] The same considerations apply to indemnities, and for brevity the term "guarantee" will be used to cover both forms of transaction.

into another member of the group (Company B) will benefit the group as a whole, including Company A. Valuing the benefit, however, is likely to be a matter of considerable difficulty. In some cases, there will be no value at all, as where Company B is already on the rocks and the giving of the guarantee for a temporary advance is merely staving off disaster. In such cases, Company A's guarantee is given solely for the benefit of Company B and will almost certainly constitute a transaction at an undervalue; indeed, the directors of Company B may well be in breach of duty to the company in authorising the issue of the guarantee in the first place, for their loyalties are owed in law solely to their company, not to the group as a whole. But where Company B's business is basically sound and the infusion of funds will enable it to expand its activities and increase its profitability for the benefit of the group as a whole, at least some value may be ascribable to the consideration given by Company A for its guarantee. This may (indeed usually will) be less than the amount of the advance to Company B but as long as it is not significantly below the ultimate burden likely to fall on Company A as the result of furnishing the guarantee, this will not be a transaction at an undervalue.

In practice, it is unlikely that a guarantee will be impeached as a transaction at an undervalue except where it is clearly of no benefit to the surety company. There are serious problems of valuation on both sides of the equation and the onus is on the office-holder who is impeaching the transaction to prove that the guarantee is a transaction at an undervalue. Hence, the difficulties of valuation lie primarily on him rather than on the creditor.

## Giving of security for a past debt not a transaction at an undervalue

Suppose that a company gives its bank security for a previously unsecured **13–38** loan and then goes into liquidation. Is the furnishing of security for past consideration a transaction at an undervalue? No, because it does not reduce the net assets of the company but merely attaches an existing liability to an existing asset, leaving the net balance sheet figures unchanged. This was so held by Millett J. in *Re M.C. Bacon Ltd*.[116] Likewise, the realisation of the

---

[116] [1990] B.C.C. 78. In *Hill v Spread Co Trustee Ltd* [2007] 1 W.L.R. 2404, which concerned an attack on a transaction as being at an undervalue, Arden L.J., in an obiter dictum at [138], expressed disagreement with this view, saying there was nothing in s.423 that referred to a diminution in assets and that had it been necessary he would provisionally not have accepted that the grant of security did not involve the disposition of any property right. With all respect, this confuses a transaction at an undervalue with a preference and cannot be accepted. The question is whether there is a transaction at an undervalue, meaning that the company parts with more than it receives. If the company grants a security interest, it still has the right to redeem and any repayment it makes *pro tanto* reduces its indebtedness, so that it loses nothing. Subsequently, a differently constituted Court of Appeal correctly applied Millett J.'s reasoning in *M.C. Bacon*, making no reference to Arden L.J.'s dictum. See *Secretary of State for the Environment, Food and Rural Affairs v Feakins* [2007] B.C.C. 54, per Jonathan Parker L.J. at [72].

security has no impact on the net asset position, for while the asset given in security disappears from the balance sheet, so also does the liability which it secured. A simple example will demonstrate the point. Suppose that A Ltd borrows £100,000 unsecured, uses it to buy stock and later gives a charge over its factory to secure the loan. Prior to the giving of the security, A Ltd's balance sheet, assuming that no part of the stock has yet been sold, the factory has a value (at cost) of £500,000 and that there are no other assets or liabilities, would look like this:

| *Assets* | | |
|---|---|---|
| Factory (at cost) | | £500,000 |
| Stock (at cost) | | £100,000 |
| | | £600,000 |
| *Less liabilities* | | |
| Bank loan | £100,000 | |
| Trade creditors | £ 50,000 | £150,000 |
| *Net assets* | | £450,000 |

When the charge is given, it will be recorded by way of a note to the accounts (or alternatively the loan will be shown in the balance sheet as a secured loan) but the figures remain unchanged. Now suppose that on default by the company the factory is sold for £500,000 and the debt of £100,000 repaid from the proceeds, the balance of £400,000 being paid into the company's bank account. The balance sheet will now look like this:

| *Assets* | |
|---|---|
| Cash at bank | £400,000 |
| Stock (at cost) | £100,000 |
| | £500,000 |
| *Less liabilities* | |
| Trade creditors | £50,000 |
| *Net assets* | £450,000 |

We can see that there has been no depletion of the value of the company's assets through realisation of the security, for the payment of £100,000 from the proceeds is exactly matched by the disappearance of the bank loan from the liabilities. So the effect of giving security for a previously unsecured loan is not to reduce the company's assets but simply to allocate the asset given in security to a particular creditor instead of leaving it available for creditors generally. The proper ground of attack, then, is not that the transaction is at

for while the asset given in
o does the liability which it
point. Suppose that A Ltd
k and later gives a charge
ing of the security, A Ltd's
ick has yet been sold, the
here are no other assets or

£500,000

£100,000

£600,000

£150,000

£450,000

l by way of a note to the
in the balance sheet as a
ed. Now suppose that on
£500,000 and the debt of
if £400,000 being paid into
ill now look like this:

£400,000

£100,000

£500,000

£50,000

£450,000

he value of the company's
payment of £100,000 from
ince of the bank loan from
previously unsecured loan
to allocate the asset given
ig it available for creditors
ot that the transaction is at

an undervalue but that it is a preference.[117] As Millett J. pointed out,[118] all that the company loses in giving the security is the ability to apply the proceeds of the charged assets otherwise than in satisfaction of the charged debt, and "that is not something capable of valuation in monetary terms and is not customarily disposed of for value".[119] This comment should not be misunderstood. The point that Millett J. was making was not the difficulty of valuing a detriment but the fact that detriment by itself is irrelevant, for the crucial question is whether it was incurred as part of the bargained-for consideration so as to confer on the other party a benefit capable of being valued. In *Agricultural Mortgage Corp Plc v Woodward*,[120] the fact that one party suffered a detriment by reason of a reduction in value of his property through the grant of a tenancy was not in itself material; what mattered was that the grant of the tenancy gave the tenant a protected status which placed her in a position to hold the landlord and the mortgagee to ransom in negotiating a surrender value, and the conferment of that benefit formed part of the bargained-for consideration. By contrast, the loss of a mortgagor's ability to apply the proceeds of a mortgaged asset otherwise than in satisfaction of the debt confers no additional benefit on the mortgagee for which he would expect to pay; on the contrary, it is the very remedy which the mortgage is designed to provide. One might add that, by the same token, the fact that the grant of a mortgage over an asset inhibits the company's ability to obtain credit from other sources is equally irrelevant, not simply because it is incapable of valuation but because it is not something which confers a bargained-for benefit on the mortgagee.

The position is otherwise, of course, where the company gives security for the indebtedness of a third party, for in that situation realisation of the security does not result in the discharge of any debt owed by the company, which accordingly suffers a loss of the charged asset.

### The "relevant time"

Under s.238(2) of the Insolvency Act 1986, the office-holder is not entitled **13-39** to apply for an order to reverse the effect of a transaction at an undervalue unless the transaction was entered into at "a relevant time". This is defined by s.240(1) as at a time:

(1) in the period of two years ending with the onset of insolvency but only if at that time the company was unable to pay its debts within the

---

[117] See above, n.116.
[118] *Re M C Bacon Ltd*, cited above n.116, at 92.
[119] *Re M C Bacon Ltd*, cited above n.116, at 92.
[120] [1994] B.C.C. 688. See above, para.13–28.

TAB 45

*Jowett's Dictionary of English Law* (4th ed, 2015):
"market price" & "market value"

# Jowitt's Dictionary of English Law

## Volume 2: J–Z

### Fourth Edition

**Daniel Greenberg**
*Editor*
Barrister; Parliamentary Counsel, Berwin Leighton Paisner LLP; Legal
Adviser, Office of Speaker's Counsel, House of Commons

**Klara Banaszak**
*Deputy Editor*

**Yisroel Greenberg**
*Assistant Editor*

SWEET & MAXWELL



THOMSON REUTERS

**MARKETS**

**Market purchase.** In the context of a purchase by a company of its own shares, this is a purchase made on a UK investment exchange, such as the London Stock Exchange, which is recognised by the Financial Services Authority (*q.v.*) using its powers under Pt 18 of the Financial Services and Markets Act 2000. The share purchase must take place in accordance with a facility that the company has with the exchange without any requirement for advance permission from the exchange authorities for individual transactions or any limit on the time during which those facilities are to be available (Companies Act 2006 s.693(3)(b), (4)). In such cases the procedure to be followed by the company to authorise its purchase of its own shares is less demanding than in the case of an off-market purchase (*q.v.*). A market purchase can be authorised by an ordinary resolution of the company general meeting for a period of up to 18 months ahead, at a price within a band set by the resolution, and the authorisation can be general or can apply to shares of a particular class and can be conditional or unconditional (Companies Act 2006 s.701). See Off-market purchase.

**Market value.** In general, the value that an asset would have in an arm's length transaction between a willing buyer and a willing seller. The calculation depends on the type of asset and in some cases also the accounting convention used. In certain tax contexts (e.g. transfers of assets between connected persons (*q.v.*) to which s.18 of the Taxation of Chargeable Gains Act 1992 applies) market value is substituted for the actual consideration given (if any). For judicial and statutory constructions and definitions in different contexts see *Stroud's Judicial Dictionary*.

**Marketable security.** For the purposes of the Stamp Act 1891, the expression "marketable security" is defined by s.82 of that Act as a security of such description as to be capable of being sold in any stock market in the United Kingdom (*Brown v IRC* [1895] 2 Q.B. 598). Stamp duty under this heading was abolished by the Finance Act 1973 s.49, Sch.22 Pt V. For judicial and statutory constructions and definitions in different contexts see *Stroud's Judicial Dictionary*.

**Markets and fairs.** At common law a market or a fair is a franchise or privilege to establish meetings of persons to buy and sell. The privilege is in each case derived either from royal grant or from prescription implying such grant. It may be possessed by a lord of a manor or by a municipal corporation or other body corporate. Per Harman L.J. in *Wyld v Silver* [1963] Ch. 243 at [261] "A fair is only a market held at rarer intervals. The essential is a concourse of buyers and sellers". The franchise carries with it the right to restrain by injunction any person from setting up another market or fair so near as to interfere with the exercise of the franchise. A disturbance of a market occurs where a person (a) sets up a rival market or (b) does some act whereby the market owner is deprived of the benefit of his franchise (*Scottish Co-operative Wholesale Society v Ulster Farmers' Mart Co.* [1960] A.C. 63). The holding of a same-day market within 6 2/3 miles of the prior market place constitutes a nuisance actionable without proof of special damage (*Sevenoaks DC v Patullo & Vinson Ltd* [1984] 1 Ch. 211). The franchise also implied the right to hold a court of pie powder (*q.v.*); but the right to levy tolls (*q.v.*) is not implied and exists only where given by the grant, though it may be established by prescription (*Att Gen v Colchester Corporation* [1952] Ch. 586). In course of time many fairs had ceased to fulfil any useful purpose, and had become mere gatherings of undesirable persons. The Fairs Act 1871 empowered the Home Secretary to abolish any fair upon the representation of the justices of the petty sessional district in which it was held, and with the consent of the owner of the franchise; the power to make representations is now vested in the district

TAB 46

Spencer Bower & Handley, *Res Judicata* (4th ed, 2009)
at §§ 7.12, 8.17, 17.30

BUTTERWORTHS COMMON LAW SERIES

**Spencer Bower and Handley**

# Res Judicata

Fourth Edition

**The Honourable Mr Justice KR Handley**
*Officer of the Order of Australia,*
*BA, LLB, LLD (Honoris Causa) (Sydney),*
*Honorary Bencher of Lincoln's Inn,*
*Visiting Fellow, Wolfson College, Cambridge*
*A Judge of the Court of Appeal of New South Wales*

Series editor
**Andrew Grubb MA (Cantab), LLD (Lond), FMedSci**
*Senior Immigration Judge, Asylum and Immigration Tribunal; Visiting*
*Professor of Law, Cardiff Law School, Cardiff University*


LexisNexis

for a cash account in the same transactions[2]. In *Re Hilton*[3] an action by a trustee in bankruptcy alleging that a deed of assignment was invalid failed, and this barred a second action alleging invalidity on another ground. A claimant's cause of action in ejectment to recover a property covered other property that could be claimed from the same defendant under the same title[4]. The principle applies to personal property.

[1] *Asher v Secretary of State for the Environment* [1974] Ch 208 CA (*Asher*). The Secretary of State directed the district auditor to audit a local authority. The auditor surcharged the councillors who appealed unsuccessfully to the Divisional Court. They then challenged the direction in judicial review proceedings against the Secretary of State which were dismissed for abuse of process. Lord Denning MR held that the direction could have been attacked on the appeal but the matter was not strictly *res judicata* but Lawton LJ applied *Henderson* and held that it was. Since the Minister was not a party to the appeal he was neither bound by, nor entitled to the benefit of any cause of action estoppel. However, as Lord Denning MR held, abuse of process is available in such a case; paras 8.36 n 4, 26.04 nn 8–10.

[2] *Re (No 472 of 1950) Debtor* [1958] 1 All ER 581 CA.

[3] *Re Hilton, ex p March* (1892) 67 LT 594.

[4] *Mohammed Khan v Mahbub Ali Mian* [1948] AIR (PC) 78, 84–86.

## IDENTIFY OF CAUSES OF ACTION (CONTRACT)

**7.12** Where an action for breach of contract failed because the plaintiff did not prove a breach, an action for a later breach was not barred. Lord Cranworth LC said that it was necessary[1]:

'... to show that the question raised in the second suit had been adjudicated upon in the first ... this is not ... a technical rule ... but is one of substance, and unless it is strictly adhered to plaintiffs who have a clear title to relief on account of the breach of an agreement may, by failing to prove a breach, lose all right to complain of future breaches.'

When the same facts give rise to more than one breach of a single contract there is a composite breach and only one cause of action. In *The Indian Grace*[2] lack of care for cargo resulted in short delivery and delivery of damaged cargo, but there was only one cause of action. When the plaintiff obtained damages for failure to build a house in a good and workmanlike manner he could not bring a further action for failure to build with proper materials. The damage was different but there was a single obligation to complete the building, and only one cause of action[3]. This principle bars a second action for latent defects discovered since the first judgment[4].

[1] *Moss v Anglo–Egyptian Navigation Co* (1865) 1 Ch App 108, 115.

[2] [1993] AC 410.

[3] *Conquer v Boot* [1928] 2 KB 336.

[4] *Honeywood v Munnings* (2006) 67 NSWLR 466 CA.

**7.13** A financier's claims against solicitors for failing to register assignments of life policies, and for failing to arrange valid guarantees and third party mortgages, were different causes of action[1]. The breaches were different, they occurred at different times, and the losses were different.

[1] *Macquarie Bank Ltd v National Mutual Life Association of Australia Ltd* (1996) 40 NSWLR 543 CA, 559, 561.

ful
lid
an

led

:a);

ass

an
ıut
en
on
a
us
In
ıer

cts

ter
ıke
of
ɔer

ird
t v
ʼoe
he
on
ʼ4)
20;

ıis
ɔn
ɔle
ɔm
in
ʒh
or

### 8.15  *Issue estoppel*

cause of action; ... and pleas in discharge, stating facts which show a subsequent discharge of a cause of action once subsisting; ... The distinction depends upon whether the defence existed before the alleged breach or arose after it.'

A judgment in favour of the plaintiff, by default or otherwise, establishes that he had a cause of action and each essential element of it, but will not negative any matter extraneous to that cause of action which had to be raised by a plea in confession and avoidance, requiring proof by the defendant of additional facts.

1    *New Brunswick* [1939] AC 1, 28, 38; *Kok Hoong* [1964] AC 993, 1012. The judgments in *Henderson* (1843) 3 Hare 100 were *ex parte* and the new points in *Hoystead* [1926] AC 155; *Humphries* [1910] 2 KB 531 CA; and *Cooke v Rickman* [1911] 2 KB 1125 had gone by default earlier.
2    Ibid at 21 (the first action was on a single bond); para 2.24.
3    *Kok Hoong* [1964] AC 993, 1011–1012, para 2.25; *Anshun* (1981) 147 CLR 589, 601.
4    Such as the statutory defences in *Kok Hoong*.
5    *Benning v Wright* [1972] 1 WLR 972 HL, 979.
6    Bullen & Leake, Precedents of Pleadings, 3rd edn 1868, p 437.

### NO ISSUE ESTOPPEL WHERE DEFENDANT NOT BOUND TO RAISE ISSUE

**8.16**  Where there was no duty to raise an issue, or raising it attracted some disadvantage, an adverse decision does not cover it. Judgment in an action for the price of goods or work, to which the defendant was not bound to plead a breach of warranty in reduction of the price, does not negative such a breach[1]. An employer sued in the county court for wages did not set up a claim for damaging materials, preferring his statutory remedy in a court of summary jurisdiction, and was not estopped[2]. An issue estoppel was rejected in a will construction case where related issues had been raised on an earlier summons[3]. The court will be reluctant to find an issue estoppel in such a case[4] unless the point was actually decided[5] or there was a duty to raise it[6].

1    *Davis v Hedges* (1871) LR 6 QB 687, 691, where the court distinguished 'the general rule that, where a party has the opportunity to raise some question and does not avail himself of it, he is in no better position than if he had raised it,' now Sale of Goods Act 1979, s 53. Where the defendant sued for fees alleged lack of diligence and a failure to exercise due care on the part by the plaintiff, and paid a lesser amount into court, acceptance of the payment in did not bar an action by the defendant for professional negligence: *Hoppe v Titman* [1996] 1 WLR 841 CA.
2    *Hindley v Haslan* (1878) 3 QBD 481.
3    *Kennedy* [1914] AC 215, 220 (decision that clause not void for uncertainty did not bar contention that it was void for perpetuity); *Re Koenigsberg* [1949] Ch 348 CA, 362.
4    *Re Koenigsberg* [1949] Ch 348 CA, 365.
5    *Re Waring* [1948] Ch 221.
6    *Re Koenigsberg* [1949] Ch 348 CA, 363; *Re Westlake* [1940] NZLR 887 (declaration as to vesting did not bar question as to different contingency).

### PROCEEDINGS BASED ON CHANGED CIRCUMSTANCES

**8.17**  If an action is brought prematurely, for example, before a period of credit has expired or a contract has been rescinded, an action after those events have occurred will not be barred[1]. If an action fails because a

112

composition with creditors remains in force, an action after the composition has become void is not barred[2]. An application which failed because it was not made to the trial judge could be renewed before him[3]. A prosecution which failed because notice was not given did not bar a prosecution after it was[4]. These cases illustrate the principle that a decision in favour of a defendant does not bar proceedings 'founded on any new or altered state of circumstances'[5], and the statement by Dixon J[6] that an issue estoppel created by a dismissal is limited to 'the actual ground upon which the existence of the right was negatived.'

1   *Palmer v Temple* (1839) Ad & El 508, 521; *Lordsvale Finance Plc v Bank of Zambia* [1996] QB 752, 759 (claim for penalty interest not barred because cause of action had not accrued at date of earlier proceedings).
2   *Hall v Levy* (1875) LR 10 CP 154.
3   *Tek Ming Co v Yee Sang Metal Supplies Co* [1973] 1 WLR 300 PC.
4   *Jenkins v Merthyr Tydvil UDC* (1899) 80 LT 600.
5   *Liverpool Corpn v Chorley Waterworks Co* (1852) 2 De GM & G 852, 866; *Moss v Anglo-Egyptian Navigation Co* (1865) 1 Ch App 108, 115 quoted para 2.28 n 3; *Re Anglo-French Co-Operative Society* (1880) 14 Ch D 533, 536; *Richards* [1953] P 36.
6   *Blair v Curran* (1939) 62 CLR 464, 532 quoted paras 8.02, 2.28, 8.26.


## NO ISSUE ESTOPPEL IN CHANGING SITUATION

**8.18**  This topic is considered in para 17.30.


## THE ISSUE MUST BE THE SAME

**8.19**  An issue estoppel only applies if an issue in the second proceedings is the same as one decided in or covered by the first. The difficulty in determining this in some cases is demonstrated by the conflicting judgments in *Blair v Curran*[1]. The court construed a clause in a will which governed the destination of particular property. The later proceedings concerned the destination of other property under the same clause. Rich J upheld a *res judicata* estoppel in spite of 'the difference in subject matter'[2]. Dixon J[3] did so because the issues were the same. Starke J, on the other hand, could not 'assent to the applicability of these principles [of estoppel] in cases in which the subject matter of the litigation was not the same'[4]. The proper inquiry, as Dixon J held, was whether the same issue arose. This is supported by a Privy Council decision that a finding that the plaintiff had not been adopted was binding in a later suit over different property[5]. A decision of Walton J[6] that the construction of a clause dealing with the destination of the share of one deceased daughter did not create an issue estoppel for the share of another is contrary to principle[7].

1   (1939) 62 CLR 464.
2   Ibid at 502.
3   Ibid at 531–533.
4   Ibid at 510.
5   *Rajah of Pittapur v Sri Rajah Garu* (1884) LR 12 Ind App 16, 18–19; *Re Westlake* [1940] NZLR 887; para 8.16 n 6.
6   *Re Manly's Will Trusts (No 2)* [1976] 1 All ER 673. It is also contrary to *Bader Bee* [1909] AC 615; *Re Lart* [1896] 2 Ch 788.

2   *Scarf v Jardine* (1882) 7 App Cas 345, 350 per Lord Selborne LC: 'You cannot at once rely
upon estoppel and set up the facts'; *Heskell v Continental Express Ltd* [1950] 1 All ER
1033, 1044. A party held liable on the basis of an estoppel in one proceeding may rely on
the truth against a different party in another: Cleary v Jeans (2006) 65 NSWLR 355 CA,
359.
3   *Taylor v Ansett Transport Industries Ltd* (1987) 18 FCR 342.
4   Under the Administrative Decisions (Judicial Review) Act 1977 (C'wlth) s 13(4A).
5   (1987) 18 FCR 342, 358.
6   Ibid at 356–357, 358, 365.
7   Cf *Mulkerrins* [2003] 1 WLR 1937 HL, 1941, 1942; paras 9.32–9.34.

## CHANGING SITUATION

**17.30** There can be no effective *res judicata* in a changing situation. A
decision on greater hardship under the Rent Acts is not *res judicata* because
the facts may alter[1]. A decision that a person was not a gipsy did not bar that
allegation at a later date[2] because 'being a gipsy is not an unalterable status
but depends on the way of life which a person is leading at any particular
time'. A decision that a liquidator had not carried on a trade in one year was
not *res judicata* in the next because 'The facts in the latter year may have
been ... different'[3]. Breach of planning control on one date does not establish
a breach at any other[4]. In *Thrasyvoulou*[5] Lord Bridge said:

'... a decision to withhold planning permission resolves no issue of legal
right ... It is no more than a decision that in existing circumstances and in the
light of existing planning policies the development ... is not one which it would
be appropriate to permit ... such a decision cannot give rise to an estoppel *per
rem judicatam*.'

A refusal to find desertion[6] or cruelty[7] will not bar such a finding at a later
date. Evidence relied on unsuccessfully before can be called again because the
question[8] "can only be judged in the light of the whole course of conduct" and
the earlier decision 'does not shut out that evidence forever'. The principle was
applied in the High Court of Australia where Evatt J referred to the fallacy[9]:

' ... that, where an issue between A and B relates to a state of things which is
capable of subsequent alteration, the conclusive determination in A's favour of
that state of things as at one date plus conclusive proof that up to a later date
there had been no alteration of such state of things establishes in A's favour as
against B an estoppel as to the state of things existing at the later day'.

Lord Maugham LC made the same point in *New Brunswick*[10]:

' ... the doctrine cannot be made to extend to presumptions or probabilities as
to issues in a second action which may be, and yet cannot be asserted beyond
all possible doubt to be, identical with those raised in the previous action'.

The Employment Appeals Tribunal has held that potential for change is not
enough, and dismissal of a claim to equal pay created an issue estoppel against
a later claim where the facts had not changed[11]. Such cases are better dealt
with for abuse of process. A decision in favour of a defendant does not
prevent the claimant commencing fresh proceedings 'founded on any new or
altered state of circumstances'[12].

**17.30**  *Affirmative answers*

1    *Burman v Woods* [1948] 1 KB 111 CA; *Macdonald v Fyson* [1948] NZLR 669; *DCT v Swain* (1988) 20 FCR 507.

2    *Mills v Cooper* [1967] 2 QB 459, 470 per Diplock LJ; *Carl-Zeiss (No 2)* [1967] 1 AC 853, 913 (authority of Council of Gera at one date different question from authority at another).

3    *Edwards v Old Bushmills Distillery Co Ltd* (1926) 10 TC 285 HL, 299.

4    Para 16.06.

5    [1990] 2 AC 273, 290.

6    *Froud* (1920) 123 LT 176.

7    *Richards* [1953] P 36.

8    Ibid at 40: 'The conduct ... alleged to amount to persistent cruelty can only be judged in the light of the whole course of conduct and the mere fact that at an earlier stage, when the conduct was only partly completed, a court has adjudged that at that point it does not amount to persistent cruelty does not shut that evidence out forever.'

9    *O'Donel* (1938) 59 CLR 744, 763; para 16.06.

10   [1939] AC 1, 20.

11   *McLoughlin v Gordon (Stockport) Ltd* [1978] ICR 561. The decision is contrary to principle because the facts had to be found at both dates to determine whether there was an issue estoppel; para 17.30 n 3.

12   *Liverpool Corpn v Chorley Waterworks Co* (1852) 2 De GM & G 852, 866; para 8.17; *Moss v Anglo Egyptian Navigation Co* (1865) LR 1 Ch App 108, 114–116 (finding that breach of contract not established no bar to allegation of later breach).

## CONSTITUTIONAL QUESTIONS

**17.31**  A special public policy exception exists for decisions on the construction of a written constitution. The Supreme Court of Canada[1] and the High Court of Australia[2] treat them as precedents only. A Federal Constitution must operate consistently at any one time. Any other result would be unworkable for reasons similar to those given by Lord Selborne LC for deciding that issue estoppels should not be recognised in the construction of statutes authorising local taxation[3]:

> 'There would therefore be, within the same district, two laws operating simultaneously in opposite directions as against different persons in exactly the same circumstances, under the same words of taxation in the same public Act of Parliament; and either imposing on some ... a liability which the statute had not in fact imposed ... or exonerating others ... from the share of a common burden which the statute had imposed equally on all.'

1    *Emms v R* (1979) 102 DLR (3d) 193, 201.

2    *Victoria v Commonwealth* (1957) 99 CLR 575, 654; *Queensland v Commonwealth* (1977) 139 CLR 585, 597, 614–615; *Re Wakim* (1999) 198 CLR 511, 564–565, 633; and the exception for special circumstances paras 8.31–8.35.

3    *R v Hutchings* (1881) 6 QBD 300 CA, 305–306.

## SPURIOUS ANSWERS: ERROR IN AN ENGLISH COURT

**17.32**  It is no answer that the prior judgment was wrong; a competent tribunal has jurisdiction to give a wrong decision and if a mistake is made the judgment is conclusive unless and until corrected on appeal[1].

1    Para 1.14. The point was made in *Meyers v Casey* (1913) 17 CLR 90, 115 by Isaacs J who referred to 'the well known rule that a competent court or other tribunal has jurisdiction to give a wrong judgment, and if there is no appeal in the strict sense then its decision, right or wrong, must stand, and cannot be questioned in any subsequent proceedings elsewhere',

# EXHIBIT B

# Applicable Adversary Proceedings

| Adv. Pro. No. | Case Name |
|---|---|
| 10-03496 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Theodoor GGC Amsterdam, et al.* |
| 10-03502 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. RBC Dominion Securities Sub A/C, et al.* |
| 10-03503 | *Fairfield Sigma Ltd. (In Liquidation), et al. v. Tercas-Cassa di Risparmio della Provincia di Teramo S.P.A.* |
| 10-03504 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. FS ABN AMRO Global Custody, et al.* |
| 10-03505 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque Privee Edmond De Rothschild (Europe), et al.* |
| 10-03507 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Meritz Fire & Marine Insurance Company Ltd., et al.* |
| 10-03508 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Schroder & Co. (Asia) Ltd., et al.* |
| 10-03508 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Schroder & Co. (Asia) Ltd., et al.* |
| 10-03509 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Santander (Suisse) S.A., et al.* |
| 10-03510 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Bank Hapoalim (Suisse) Ltd., et al.* |
| 10-03512 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. FS Mizrahi Tefahot Bank Ltd., et al.* |
| 10-03513 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque Syz & Co. S.A., et al.* |
| 10-03514 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque Piguet & Cie S.A., et al.* |
| 10-03515 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Bilbao Vizcaya Argentaria S.A., et al.* |
| 10-03516 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., et al.* |
| 10-03519 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Neue Bank AG, et al.* |
| 10-03521 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Lombardy Properties Limited, et al.* |
| 10-03525 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Fund Nominees Limited, et al.* |
| 10-03540 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Vontobel Asset Management, et al.* |
| 10-03595 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. SG Private Banking (Suisse) SA, et al.* |
| 10-03615 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Bank of America National Trust and Savings Association, et al.* |
| 10-03616 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque de Luxembourg, et al.* |
| 10-03618 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/BBVA Miami, et al.* |
| 10-03619 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. HSBC Institutional Trust Services (Asia) Limited, et al.* |
| 10-03620 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit Suisse International, et al.* |
| 10-03621 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. FS Oddo & Cie, et al.* |
| 10-03622 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Citibank NA London, et al.* |
| 10-03623 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. AXA Isle of Man A/C L&C, et al.* |
| 10-03624 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Caceis Bank Luxembourg, et al.* |
| 10-03625 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. EFG Bank, et al.* |
| 10-03628 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Robinson & Co., et al.* |
| 10-03629 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/HSBC Private Banking Nom, et al.* |
| 10-03630 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. HSBC Securities Services (Luxembourg) SA, et al.* |
| 10-03631 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. HSBC Private Bank (Guernsey) Ltd., et al.* |
| 10-03632 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/Andbanc Andorra, et al.* |

| Adv. Pro. No. | Case Name |
|---|---|
| 10-03633 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. HSBC Private Bank (Suisse) SA, et al.* |
| 10-03634 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Zurich Capital Markets Company, et al.* |
| 10-03635 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* |
| 10-03636 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ABN AMRO Schweiz AG, et al.* |
| 10-03640 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Citibank (Switzerland) AG, et al.* |
| 10-03744 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Deutsche Bank Trust Company America, et al.* |
| 10-03745 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Deutsche Bank (Suisse) SA Geneve, et al.* |
| 10-03746 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Deutsche Bank (Cayman), et al.* |
| 10-03747 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Deutsche Bank AG Singapore, et al.* |
| 10-03750 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Blubank Ltd., et al.* |
| 10-03752 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Brown Brothers Harriman & Co., et al.* |
| 10-03753 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Dresdner Bank LateinAmerika AG, et al.* |
| 10-03754 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. CDC IXIS, et al.* |
| 10-03755 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Itau Europa Luxembourg SA, et al.* |
| 10-03756 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/CBESSA, et al.* |
| 10-03757 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. SNS Global Custody B.V. a/k/a SNS Bank N.V., et al.* |
| 10-03758 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. UBS Fund Services (Cayman) Ltd. Ref Greenlake Arbitrage Fund Ltd., et al.* |
| 10-03764 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Pictet & Cie, et al.* |
| 10-03776 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Fortis (Isle of Man) Nominees Ltd. a/k/a ABN AMRO Fund Services (Isle of Man) Nominees Ltd., et al.* |
| 10-03778 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Wall Street Securities SA, et al.* |
| 10-03780 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. UBS AG New York, et al.* |
| 10-03782 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit Suisse (Bahamas), et al.* |
| 10-03783 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Atlantico (Bahamas), et al.* |
| 10-03786 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. SG Private Banking (Suisse) SA, et al.* |
| 10-03787 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Altantico (Gibraltar), et al.* |
| 10-03788 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Merrill Lynch Bank (Suisse) SA, et al.* |
| 10-03790 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Zayed, et al.* |
| 10-03791 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Monte Paschi Ireland Ltd., et al.* |
| 10-03792 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ZCM Asset Holding Company (Bermuda) Limited, et al.* |
| 10-03793 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Nomura International PLC, et al.* |
| 10-03795 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Lombard Odier Darier Hentsch & Cie, et al.* |
| 10-03798 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Strina, et al.* |
| 10-03799 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Hambros Guernsey Nominees, et al.* |
| 10-03801 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. ING Bank (Suisse) SA, et al.* |
| 10-03863 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Sumitomo Trust & Banking Co., LTD.* |
| 10-03864 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Natixis Private Banking International SA, et al.* |
| 10-03865 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Celfin Int'l Ltd., et al.* |

Exhibit B [2]

| Adv. Pro. No. | Case Name |
|---|---|
| 10-03867 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. FS Stichting Stroeve Global Custody, et al.* |
| 10-03868 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Kredietbank SA Luxembourgeoise, et al.* |
| 10-03869 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Six Sis AG/CH104026, et al.* |
| 10-03871 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Caceis Bank EX-IXIS IS, et al.* |
| 10-03873 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Bordier & Cie, et al.* |
| 10-04087 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Royal Bank of Canada (Suisse), et al.* |
| 10-04088 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit Suisse (Luxembourg) SA, et al.* |
| 10-04089 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Inversis SA, et al.* |
| 10-04090 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Dexia BIL for Customer Account, et al.* |
| 10-04091 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Dexia Private Bank (Switzerland), et al.* |
| 10-04093 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Commercial Bank of Kuwait, et al.* |
| 10-04094 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Natexis Banques Populaires, et al.* |
| 10-04095 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. UBS Fund Services (Cayman) Limited, et al.* |
| 10-04096 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Di Desio E Della Brianza/Zenit Altern. Inv./Zenit Master, et al.* |
| 10-04097 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Nominees (IOM) Limited, et al.* |
| 10-04098 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. BNP Paribas Arbitrage SNC, et al.* |
| 10-04099 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. BNP Paribas Private Bank and Trust Cayman Ltd., et al.* |
| 10-04100 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Citivic Nominees Limited, et al.* |
| 10-04212 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Bank Morgan Stanley AG, et al.* |
| 10-04236 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit Suisse Nominees, et al.* |
| 10-04238 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Hansard Europe Ltd., et al.* |
| 11-01467 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. BK Hapoalim/B M Tel Aviv, et al.* |
| 11-01242 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/Fortis Banque Luxembourg, et al.* |
| 11-01243 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Bank Julius Baer and Co. Ltd., Zurich, et al.* |
| 11-01244 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit Agricole (Suisse) SA a/k/a Banque du Credit Agricole (Suisse) SA, et al.* |
| 11-01249 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Schroder & Co. Bank AG, et al.* |
| 11-01250 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. UBS Luxembourg SA, et al.* |
| 11-01253 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/SWEDCLIENT/IAM, et al.* |
| 11-01254 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/AEB Lux a/k/a American Express Bank (London), et al.* |
| 11-01256 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque SCS Alliance SA, et al.* |
| 11-01257 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Mirabaud & Cie a/k/a Mirabaud & Cie Banquiers Prives, et al.* |
| 11-01258 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. UBS Fund Services (Ireland) Ltd., et al.* |
| 11-01259 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Barclays Bank (Suisse) SA, et al.* |
| 11-01260 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/NBK Kuwait a/k/a National Bank of Kuwait, et al.* |
| 11-01263 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Clearstream Banking SA, et al.* |

Exhibit B [3]

| Adv. Pro. No. | Case Name |
|---|---|
| 11-01460 | *Fairfield Sigma Ltd. (In Liquidation), et al. v. FS/LAB/AXA PM, et al.* |
| 11-01461 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Melrose Investments Ltd., et al.* |
| 11-01462 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Grand Cathay Securities (Hong Kong) Limited, et al.* |
| 11-01463 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Merrill Lynch International, et al.* |
| 11-01464 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Natixis f/k/a IXIS Corporate and Investment Bank, et al.* |
| 11-01467 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/BK Hapoalim/B M Tel Aviv, et al.* |
| 11-01470 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Barfield Nominees Limited, et al.* |
| 11-01486 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Korea Exchange Bank, et al.* |
| 11-01564 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Deutsche Bank Nominees (Jersey) Limited, et al.* |
| 11-01565 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/ING Lux, et al.* |
| 11-01566 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/SG Private Banking (Lugano-Svizzera) SA, et al.* |
| 11-01567 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Global Fund Porvenir, et al.* |
| 11-01569 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/Banque Degroof Bruxelles, et al.* |
| 11-01571 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Banc of America Securities LLC, et al.* |
| 11-01575 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit Industriel et Commercial Singapore Branch, et al.* |
| 11-01576 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Multi-Strategy Fund Limited, et al.* |
| 11-01577 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Cathay Life Insurance Co. Ltd., et al.* |
| 11-01578 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. NYROY, et al.* |
| 11-01579 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. BNP Paribas Securities Nominees Ltd., et al.* |
| 11-01581 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Rahn & Bodmer Banquiers, et al.* |
| 11-01582 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Royal Bank of Canada (Asia) Limited, et al.* |
| 11-01584 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Societe Generale Bank & Trust (Luxembourg), et al.* |
| 11-01585 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque de Reescompte et de Placement, et al.* |
| 11-01586 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Swedbank, et al.* |
| 11-01587 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Bie Bank & Trust Bahamas Ltd., et al.* |
| 11-01589 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. BNY AIS Nominees Ltd., et al.* |
| 11-01591 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. All Funds Bank, et al.* |
| 11-01592 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Cherwinka, et al.* |
| 11-01594 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/HSBC Guyerzeller Zurich, et al.* |
| 11-01595 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. KWI, et al.* |
| 11-01596 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Kefong Lee, et al.* |
| 11-01598 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Banque et Caisse D'epargne de L'Etat Lux, et al.* |
| 11-01599 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Eduardo Fernandez de Valderrama Murillo, et al.* |
| 11-01600 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/BBVA Zurich/Shares, et al.* |
| 11-01601 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit Suisse AG Nassau Branch Wealth Management, et al.* |
| 11-01604 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. PFPC Bank Limited, et al.* |
| 11-01607 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Melguizo, et al.* |
| 11-01610 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/Israel Discount Bank, Limited, Tel Aviv, et al.* |

Exhibit B [4]

| Adv. Pro. No. | Case Name |
|---|---|
| 11-01612 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Bank Sarasin & Cie AG, et al.* |
| 11-01614 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. IDF Global Fund, et al.* |
| 11-01615 | *Fairfield Sigma Ltd. (In Liquidation), et al. v. Societe Europeenne de Banque S.A.* |
| 11-01616 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Woori Bank, et al.* |
| 11-01617 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Fortis Bank SA/NV, et al.* |
| 11-01619 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/NBP Titres, et al.* |
| 11-01719 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Abu Dhabi Investment Authority et al.* |
| 11-01760 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Bank Vontobel AG, et al.* |
| 11-02253 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Royal Bank of Canada a/k/a RBC Capital Markets Corporation, et al.* |
| 11-02336 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Naidot & Co., et al.* |
| 11-02392 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Lion Global Investors f/k/a Lion Fairfield Capital Management, et al.* |
| 11-02422 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Fortis Global Custody Services N.V. n/k/a ABN AMRO, et al.* |
| 11-02440 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Bank Sal. Oppenheim Jr. & Cie (Schweiz) AG a/k/a Bank Sal. Oppenheim Jr. & Cie, et al.* |
| 11-02530 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Avalon Absolute Return Funds PLC, et al.* |
| 11-02532 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Deltec Bank & Trust Limited, et al.* |
| 11-02534 | *Fairfield Sigma Ltd. (In Liquidation) et al. v. Simgest SpA et al.* |
| 11-02594 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Rothschild Trust (Schweiz) AG, et al.* |
| 11-02611 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Andorra Banc Agricol Reig SA, et al.* |
| 11-02612 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit Suisse Nominees (Guernsey) Limited, et al.* |
| 11-02613 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Societe Generale Bank & Trust S.A. (Luxembourg), et al.* |
| 11-02770 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Citigroup Global Markets Limited, et al.* |
| 11-02771 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Fullerton Capital PTE, Ltd., f/k/a Goldtree Invest, et al.* |
| 11-02772 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. BankMed (Suisse) S.A. f/k/a Banque de la Mediterra, et al.* |
| 11-02787 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit Agricole Titres, et al.* |
| 12-01119 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Fortis Bank (Nederland) N.V., et al.* |
| 12-01122 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Maple Key Market Neutral Cayman Islands LP, et al.* |
| 12-01123 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. BANCA CARIGE SPA, et al.* |
| 12-01124 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Itau Europa International, et al.* |
| 12-01125 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Investec Bank (Switzerland) AG, et al.* |
| 12-01127 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Credit Suisse Nassau Branch Wealth Management a/k/a Credit Suisse Wealth Management Limited, et al.* |
| 12-01128 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. HSBC Seoul Branch, Ltd., et al.* |
| 12-01131 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Rothschild & Cie Banque Paris, et al.* |
| 12-01132 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. RBC Dexia Investor Services Espana S.A.* |

| Adv. Pro. No. | Case Name |
|---|---|
| 12-01134 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. SEI Investments Trustee and Custodial Services (Ireland) Ltd. Nominee A/C 1, et al.* |
| 12-01135 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Bank of Ireland Nominees Limited, et al.* |
| 12-01136 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Bred Banque Populaire, et al.* |
| 12-01140 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Banca Cesare Ponti SPA, et al.* |
| 12-01142 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Citibank Korea Inc., et al.* |
| 12-01143 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Centre College, et al.* |
| 12-01144 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Bank Hapoalim BM, London, et al.* |
| 12-01146 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Portobelo Advisors Inc., et al.* |
| 12-01147 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Fair and Banque Degroof Luxembourg, S.A., et al.* |
| 12-01148 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Banca Popolare Dell'Alto Adige Soc. Coop. Resp. Lim., et al.* |
| 12-01155 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Kiangsu Chekiang and Shanghai Residents (H.K.) Association, et al.* |
| 12-01158 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/Bank Leumi Israel, et al.* |
| 12-01162 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Delta S.P.A., et al.* |
| 12-01164 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Public Bank (Hong Kong) Limited, et al.* |
| 12-01187 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Popolare Di Verona E Novara Luxembourg S.A. n/k/a Banco Popolare Luxembourg S.A., et al.* |
| 12-01264 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Jared Trading Limited/BVI et al.* |
| 12-01265 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Barclays Bank SA Madrid, et al.* |
| 12-01267 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. TAIB Bank E.C., et al.* |
| 12-01270 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. HSBC Securities (Panama) SA, et al.* |
| 12-01271 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Hontai Life Insurance Company Limited, et al.* |
| 12-01272 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Schroders Italy SIM SPA, et al.* |
| 12-01285 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Banca Profilo SPA, et al.* |
| 12-01286 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco General SA Banca Privada, et al.* |
| 12-01287 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Banco Patagonia (Uruguay) S.A.I.F.E., et al.* |
| 12-01288 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Cais Bank, et al.* |
| 12-01289 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Dreadnought Finance OY, et al.* |
| 12-01290 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. HSBC International Trustee Limited, et al.* |
| 12-01294 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Alok Sama, et al.* |
| 12-01295 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Bank Sarasin & Cie a/k/a Bank Sarasin & Co., et al.* |
| 12-01298 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Don Chimango SA, et al.* |
| 12-01301 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Unicorp Bank & Trust Limited, et al.* |
| 12-01550 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Atlantic Security Bank, et al.* |
| 12-01551 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. BNP Paribas Espana f/k/a Fortis Bank (Espana), et al.* |
| 12-01555 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. HSH Nordbank Securities S.A., et al.* |
| 12-01556 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Somers Nominees (Far East) Limited List Parties, et al.* |

Exhibit B [6]

| Adv. Pro. No. | Case Name |
|---|---|
| 12-01567 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. First Gulf Bank, et al.* |
| 12-01568 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Fortis Global Custody Services NV, et al.* |
| 12-01569 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. FS/GSCO London, et al.* |
| 12-01571 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Fortis Bank Cayman Limited n/k/a ABN AMRO Fund Services Bank (Cayman) Limited, et al.* |
| 12-01599 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Barclays Private Bank & Trust (Channel Islands) Limited, et al.* |
| 12-01600 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Hyposwiss Private Bank Geneve F/K/A Anglo Irish Bank (Suisse), S.A. et al.* |
| 12-01601 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Select Absolute Strategies SICAV, et al.* |
| 12-01716 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. Essex 21 Limited, et al.* |
| 16-01214 | *Fairfield Sentry Ltd. (In Liquidation), et al. v. RBC Investor Services Bank SA, et al.* |

Exhibit B [7]